EXHIBIT

1

1

1                   STATE OF NEW HAMPSHIRE

2         9TH CIRCUIT COURT - FAMILY DIVISION - NASHUA

3

    IN THE MATTER OF            )

4                         )

    THOMAS SOBELL,             ) Family Division Case No.

5                       ) 659-2013-DM-00348

               Petitioner,    )

6                       ) Nashua, New Hampshire

           and             ) May 1, 2014

7                       ) 1:20 p.m.

    PATRICIA SOBELL,          )

8                       )

              Respondent.    )

9    _____ )

10                  HEARING ON PRE-TRIAL CONFERENCE

            BEFORE THE HONORABLE JULIE INTROCASO

11         JUDGE OF THE CIRCUIT COURT - FAMILY DIVISION

12   APPEARANCES:

13   For the Petitioner:        Sandra F. Bloomenthal, Esq.

                             BLOOMENTHAL LAW OFFICE

14                          P.O. Box 6761

                             Laconia, NH 03247

15

    For the Respondent:        Allen Lucas, Esq.

16                        LUCAS LAW, PLLC

                             PO Box 445

17                         Wolfeboro, NH 03894

    ALSO PRESENT:

18   Kathleen Sternenberg,

    Guardian ad Litem

19

    Audio Operator:            Electronically Recorded

20                          **Not Monitored**

21   TRANSCRIPTION COMPANY:     eScribers, LLC

                             7227 N. 16th Street, Suite 207

22                         Phoenix, AZ 85020

                             (800) 257-0885

23                         www.escribers.net

24   Proceedings recorded by electronic sound recording; transcript

    produced by court-approved transcription service.

25



1          (Proceedings commence at 1:20 p.m.)

2          THE COURT:   Okay.   We are here on 659-2013-DM-348,

3  the matter of Thomas Sobell and Patricia Sobell.

4          Both parties are here.   The Petitioner is

5  represented by Attorney Bloomenthal; Respondent's represented

6  by Attorney Lucas.   We are also joined by the guardian ad

7  litem, Kathleen Sternenberg.

8          Before we start the pre-trial conference, Attorney

9  Sternenberg gives reason for me to talk with counsel.   I heard

10  some preliminary motions in this case, I know, sometime ago.

11  And at that time, I recall that Mr. Sobell had asked for the

12  appointment of a guardian ad litem by the Court.   And I

13  indicated, I believe, at that time that there was no fund.

14  And the only way that we would have a guardian is if one of

15  the parties were to take financial responsibility for that.

16          And I invited the parties to seek out the assistance

17  of a guardian if Mr. Sobell felt the need for a guardian and

18  had the ability to pay.   Sometime thereafter, I received an

19  order on appointment of guardian ad litem form that was

20  prepared by someone, I assume Petitioner's counsel.   And I

21  approved that on January 30th.

22          And I recognize Attorney Sternenberg's writing, I

23  believe -- maybe, maybe not -- but her name.   Counsel should

24  know that Attorney Sternenberg and I are very good friends.

25  Very good friends.   I don't know if she shared that with you,

3

1    or she did not.  And I'm going to look at K. -- who I refer to
2    as K.  I don't call her Kathleen or -- K., are we very good
3    friends?
4                 MS. STERNENBERG:  Yeah, I think so.
5                 THE COURT:  Yeah, we are very good friends.  Very
6    good friends like godparent of my child.  We are very close.
7                 That being said, I have no problem at all in telling
8    Attorney Sternenberg she's completely wrong about something,
9    which is probably why she's one of my good friends.  We're
10   both pretty strong women and argue with one another about a
11   lot of things.  We met in the context of being marital
12   attorneys in a number of cases.  So we have a very healthy, I
13   think, professional respect for one another, but we also have
14   a pretty strong personal relationship.
15                She is on my conflict list.  I would never hear a
16   case of hers where she was acting as counsel for a party, but
17   I know she's a guardian ad litem.  I also think, by the way,
18   she's probably one of the best guardian ad litems out there.
19   I don't appoint her to cases because I don't want anyone to
20   think that I'm choosing a friend.
21                But you independently found her.  And under those
22   circumstances, I was certainly willing to accept what I
23   thought was a fine choice for a guardian.  So I have a lot of
24   respect for her, but I also would not necessarily and feel
25   absolutely feel no obligation -- sorry, K. -- to follow any



EXHIBIT

2

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### NH CIRCUIT COURT

9th Circuit - Family Division - Nashua
30 Spring Street, Suite 102
Nashua NH 03060

Telephone: 1-855-212-1234
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

## DOMESTIC VIOLENCE TEMPORARY ORDER AND NOTICE OF HEARING
PURSUANT TO RSA 173-B

Case Number: **659-2016-DV-00120**                    PNO: **6591610120**

**Katherine Albrecht**                    v. **Dana Albrecht**                    ▮**/1971**

Plaintiff                                        Defendant                    Def Date of Birth

### NOTICE OF HEARING

The plaintiff and defendant are summoned to appear at 9th Circuit - Family Division - Nashua on April 28, 2016 at 2:30 PM . The court will hear testimony from both parties. **One half hour will be allotted for this hearing.** FINAL ORDERS may be issued at that time.

April 08, 2016                                        _Sherry L. Besson_ )
Date                                                  Clerk of Court

### NOTICE TO DEFENDANT

PURSUANT TO RSA 173-B:4, you have a right to a hearing on these temporary orders within five business days, but not earlier than three business days, after you file a written request with the court. Unless you request this hearing in writing, the case will be heard on the date shown above.

*****************************************************************************************

### NOTICE OF INTERSTATE ENFORCEMENT AND
### COMPLIANCE WITH THE VIOLENCE AGAINST WOMEN ACT (VAWA)

1.  This temporary protective order meets all full faith and credit requirements of the Violence Against Women Act, 18 U.S.C. sec. 2265 (1994). This Court has jurisdiction of the parties and the subject matter; the defendant is afforded notice and a timely opportunity to be heard as provided by the laws of this jurisdiction. This order is valid and enforceable throughout New Hampshire and all other states, the District of Columbia, all tribal lands and all U.S. Territories, and shall be enforced as if it were an order of that jurisdiction.

2.  Pursuant to Section 2265 of Title 18, United States Code, violation of any provision(s) of this Order, including support, child custody or visitation provisions issued under the authority of RSA 173-B of this State, is enforceable by court and/or law enforcement personnel of any other State, Indian tribal government, or Territory, as if it were their own order.

3.  Violations of this order are subject to state and federal criminal penalties. If the restrained party (the defendant) travels across state or tribal boundaries, or causes the protected party (the plaintiff) to travel across state or tribal boundaries, with the intent to violate the protective orders and then violates a protective provision of this order, the defendant may be prosecuted for a federal felony offense under the Violence Against Women Act, 18 U.S.C. sec. 2262(a)(1) or (2) (1994).

4.  The National Domestic Violence Hotline provides information on a 24-hour basis on interstate enforcement of protection orders, how to reach an advocate, and the location of shelters. The Hotline number is: 1-800-799-7233.

*****************************************************************************************

**REPORTING A VIOLATION OF THIS ORDER:** If the defendant violates any portion of this order, the plaintiff may report the violation to the local law enforcement agency and file a written notice in the form of a petition for contempt requesting a further hearing on the matter. Forms are available at the court or on the court website www.courts.state.nh.us.

$626 - ?$

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
NH CIRCUIT COURT

## DOMESTIC VIOLENCE TEMPORARY ORDER OF PROTECTION

Case Number: 659-2016-DV-00120          PNO Number: 6591610120

| | |
|---|---|
| Court: | 9th Circuit - Family Division - Nashua |
| Court ORI: | NH006151J |
| County: | Hillsborough |
| Address: | 30 Spring Street, Suite 102  Nashua NH  03060 |

| PLAINTIFF | PLAINTIFF IDENTIFIERS | | |
|---|---|---|---|
| First     Middle     Last | Date of Birth | Sex | Race |
| Katherine Albrecht | ▮/1966 | Female | White |

### V.

| DEFENDANT'S NAME | DEFENDANT IDENTIFIERS | | | |
|---|---|---|---|---|
| First     Middle     Last | DOB | ▮/1971 | HEIGHT | 5 Ft. 10 In. |
| Dana Albrecht | SEX | Male | WEIGHT | 125 Lbs. |
| **DEFENDANT'S ADDRESS:** | RACE | White | EYES | Brown |
| 214 Worchester Road | State/Birth | California | HAIR | Brown |
| Hollis NH  03049 | | | | |
| **RELATIONSHIP to PLAINTIFF** | ETHNICITY  Non Hispanic | | | |

| RELATIONSHIP to PLAINTIFF | DISTINGUISHING FEATURES: |
|---|---|
| ☒ Married              ☐ Household member | |
| ☐ Divorced            ☐ Other _____ | SKIN TONE     Light |
| ☐ Separated | SCARS, MARKS, TATTOOS: _____ |
| ☐ Cohabit / cohabited | Location and description |
| ☐ Child in common | |

| CAUTION | LICENSE INFO: | DRIVER'S LICENSE# | |
|---|---|---|---|
| ☐ Weapon involved | | STATE   N H | EXP DATE |
| ☐ Weapon is ordered to be relinquished pursuant to New Hampshire state law RSA 173-B | **VEHICLE INFO:** YEAR | | STYLE |
| | MAKE   Honda | COLOR   Black | |
| | MODEL | VIN # | |

**WARNING:** The attached order shall be enforced, even without registration, by the courts of any state, the District of Columbia, and any U.S. Territory, and may be enforced on Tribal Lands (18 U.S.C. section 2265). Crossing state, territorial, or tribal boundaries to violate this order may result in federal imprisonment (18 U.S.C. section 2262).

**The court has found as evidenced by this order:**
That it has jurisdiction over the parties and subject matter, and the defendant, upon service, will be given reasonable notice and opportunity to be heard.

☒ The above named defendant is restrained from committing further acts of abuse or threats of abuse.

☒ The above named defendant shall not have any contact with the plaintiff, whether in person or through third persons, including but not limited to contact by telephone, letters, fax, e-mail, the sending or delivery of gifts or any other method unless specifically authorized by the court. The defendant is prohibited from coming within _300_ feet of the plaintiff.

Case Name: <u>In the Matter of Katherine Albrecht v. Dana Albrecht</u>

Case Number: <u>659-2016-DV-00120</u>           PNO: <u>6591610120</u>

<u>DOMESTIC VIOLENCE TEMPORARY ORDER OF PROTECTION</u>

The court, having jurisdiction over the parties and subject matter under New Hampshire RSA 173-B (Protection of Persons from Domestic Violence), and having considered the plaintiff's Domestic Violence Petition dated <u>April 08, 2016</u> hereby finds that the plaintiff is in immediate and present danger of abuse as defined in RSA 173-B and makes the following **TEMPORARY ORDERS OF PROTECTION:**

1. ☒ The defendant shall not abuse the plaintiff.

2. ☒ The defendant shall not have any contact with the plaintiff, whether in person or through third persons, including but not limited to contact by telephone, letters, fax, texting, social media, e-mail, the sending or delivery of gifts or any other method unless specifically authorized by the court. The defendant is prohibited from coming within __30O__ feet of the plaintiff. ☒ This includes any household animals, *if only* .

3. ☒ The defendant shall not enter the premises or curtilage where the plaintiff resides, ~~except when the defendant is accompanied by a peace officer and, upon reasonable notice to the plaintiff, is allowed entry by the plaintiff for the sole purpose of retrieving toiletries, medication, clothing, business equipment, and any other items as determined by the court.~~

_____

4. ☒ The defendant shall not contact the plaintiff at or enter upon plaintiff's place of employment, school, or __Anywhere__

5. ☒ The defendant shall not abuse plaintiff's relatives (including children) regardless of their place of residence, or members of the plaintiff's household.

6. ☒ The defendant shall not take, convert or damage any property in which the plaintiff has a legal or an equitable interest.

7. ☒ The plaintiff is awarded exclusive care, custody, or control of any animal owned, possessed, leased, kept, or held by the petitioner, defendant, or a minor child in either household, and the defendant is prohibited from taking, transferring, encumbering, concealing, committing an act of cruelty or neglect, or disposing of the animal(s).

8. ☒ The plaintiff is awarded custody of the minor child(ren). ~~The defendant may exercise the following visitation:~~ _____ or

    ☒ Visitation is denied pending a hearing.

9. ☒ The defendant shall relinquish to a peace officer all firearms and ammunition in his/her control, ownership or possession, or in the possession of any other person on behalf of the defendant, and the defendant is prohibited from purchasing or possessing any firearms or ammunition during the pendency of this order.

10. ☒ The defendant shall also relinquish all deadly weapons as defined in RSA 625:11,V which may have been used, intended to be used, threatened to be used or could be used in an incident of abuse. These weapons may include the following: _____

_____

11. ☐ Other protective orders: _____

_____

Case Name: **In the Matter of Katherine Albrecht v. Dana Albrecht**

Case Number: **659-2016-DV-00120** PNO: _____

**DOMESTIC VIOLENCE TEMPORARY ORDER OF PROTECTION**

## ADDITIONAL ORDERS:

12. ☐ The Plaintiff is awarded the temporary and exclusive use of the motor vehicle identified as follows:

_____

13. ☐ The Plaintiff is awarded the temporary and exclusive use of the shared residence located at:

_____

14. ☒ The defendant shall relinquish all concealed weapons permits and hunting licenses.

15. ☒ Other: _Sections 8, 9, 10, 11, 12, 15, 15 Granted_

_4-8-16_
Date

Signature of Judge / Marital Master Recommendation

_Paul S Moon_
Print / Type Name of Judge / Marital Master

_Sections 13 & 14 will be addressed at the parties hearing_

**So Ordered:** _Section 12 regarding Y015 will be addressed at the_

I hereby certify that I have read the recommendation(s) and agree that, to the extent the marital _above_
master/judicial referee/hearing officer has made factual findings, she/he has applied the correct legal
standard to the facts determined by the marital master/judicial referee/hearing officer.

_referenced hearing_

_____
Date

Signature of Judge Approving Marital Master's Recommendation

**1-855-212-1234**
Telephone Number of Court

_____
Print / Type Name of Judge

**THESE ORDERS ARE EFFECTIVE IMMEDIATELY AND REMAIN IN EFFECT UNTIL FINAL ORDERS ARE MADE BY THE COURT. ANY WILLFUL VIOLATION OF THE PROTECTIVE PROVISIONS OF THESE ORDERS IS A CRIME. VIOLATIONS SHALL RESULT IN ARREST AND MAY RESULT IN IMPRISONMENT. ALL FUTURE NOTICES AND ORDERS SHALL BE MAILED. BOTH PARTIES MUST KEEP THE COURT INFORMED OF THEIR CURRENT ADDRESS.**

From:                                                                04/08/2016  16:28   #536  P.007/012

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### NH CIRCUIT COURT

9th Circuit–District Division-Nashua
30 Spring Street, Suite 101
Nashua, NH 03060

Telephone: 1-855-212-1234
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

## DOMESTIC VIOLENCE PETITION
Pursuant to RSA 173-B

Case Number: _____                 PNO _____

Plaintiff: KATHERINE ALBRECHT            -66 v. Defendant: DANA ALBRECHT            -71
Plf Date of Birth                               Def Date of Birth

Sex: ☐ M   ☒ F
Race: ☐ Asian   ☐ Other   ☐ Black
☐ Unavailable   ☐ Indian   ☒ White
☐ Multiracial   ☐ Native Hawaiian or Other
Pacific Islander.
Ethnicity: ☐ Hispanic   ☒ Non-Hispanic   ☐ Refused

Sex: ☒ M   ☐ F

214 WORCESTER ROAD
Street Address
HOLLIS, NH 03049
City / State / Zip

### RELATIONSHIP to DEFENDANT
☒ Married          ☐ Household member
☐ Divorced         ☐ Other _____
☐ Separated
☐ Cohabit / cohabited
☐ Child in common

TO THE JUSTICE OF THE COURT: I am in immediate danger of abuse by the defendant. I base my request for protection from abuse on the following facts that occurred on the following dates, and ask the court to issue orders as noted below:

Earlier today (FRI 4/8) I discovered that Dana had been stalking me by using secret files installed on my laptop and copying all of my email, diary, personal files, and had installed audio recording software to listen to me, had also been monitoring all of my phone calls in real time. He did not have my permission, this was my own personal laptop w/a password to protect it from him. ~~He~~ My personal files were copied to his personal laptop →

☒ SEE ATTACHED ADDITIONAL PAGE(S)

The defendant and I are currently involved in or have received orders in the following court actions:
☐ divorce   ☐ custody   ☐ protective order   ☒ none   ☐ other _____
Please list the court(s) handling the case(s): _N/A_

Are you represented by a lawyer in any of these matters?   ☐ Yes   ☒ No   (JOINTLY OWNED)
**Residence:**   ☒ own   ☐ rent   ☐ in whose name? YSM TRUST   (JOINTLY OWNED)

Children living in household:

| NAME | DOB | BIRTH PARENTS | WHO HAS CUSTODY |
|---|---|---|---|
| C____ A____ | __-00 | KATHERINE & DANA (ABOVE) | JOINT |
| S____ A____ | __-04 | ,, | ,, |
| G____ A____ | __-06 | ,, | ,, |

**Note: If you have minor children born to or adopted by you and the defendant, you must submit a UCCJEA Affidavit (Form NHJB-2660-FP).**

I have suffered the following financial losses as a result of the abuse:   ☒ medical/dental/optical expenses
☐ loss of wages   ☐ loss of personal property   ☐ other (explain) _____

NHJB-2050-DF (07/21/2014)                        Page 1 of 3

Case Name: ____v_____

Case Number: _____ PNO: _____

**DOMESTIC VIOLENCE PETITION**

**REQUEST FOR PROTECTIVE ORDERS:**

1. ☒ Restrain the defendant from abusing me, having any contact with me, whether in person or through third persons, including but not limited to contact by telephone, letters, fax, texting, social media, e-mail, the sending or delivery of gifts or any other method, unless specifically authorized by the court.

2. ☒ Restrain the defendant from entering in or on the premises (including curtilage) where I reside except with a peace officer for the purpose of removing defendant's personal possessions; my place of employment; my school.

3. ☒ Restrain the defendant from abusing my relatives or members of my household.

4. ☒ Restrain the defendant from taking, converting or damaging property in which I have a legal or equitable interest.

5. ☒ Direct the defendant to temporarily relinquish to a peace officer any firearms or other deadly weapons, including _____

6. ☒ Award temporary custody of our minor child(ren) to me.

7. ☒ Restrain the defendant from contact and from taking, transferring, encumbering, concealing, committing an act of cruelty or neglect or disposing of any animal owned, possessed, leased, kept or held by me or the defendant or a minor child in either household.

**REQUEST FOR ADDITIONAL ORDERS:**

8. ☒ Direct the defendant to make child support payments to me for the care of our minor children.

9. ☒ Direct the defendant to follow a court approved visitation plan if defendant wishes to exercise child visitation rights.

10. ☒ Award me the exclusive right to use and possession of our residence and household furnishings.

11. ☒ Award me the exclusive right of use and possession of the following vehicle: HONDA ODYSSEY MINIVAN

12. ☒ Award me the exclusive care, custody or control of any animal owned, possessed, leased, kept or held by me, the defendant or a minor child in either household. YOKI · DOG ; 2 Cats

13. ☒ Order the defendant to pay me for financial losses suffered as a direct result of the abuse.

14. ☒ Recommend that the defendant attend a batterers treatment program or personal counseling.

15. ☒ Other relief: Keep Dana's Computer

**Additional Space for Statement of Facts**

which he surrendered to the Hollis Police. Dana has copped all of my bank account and online passwords and passwords for all other medical & financial accounts store now on his laptop. ~~I request that~~ The officer suggested the the the court withhold the computer for my safety since it has been the instrument of those acts against me, and with those files, he could do me further harm.

Last week I was at my mom's house next door and our 11 year old came over. Dana was very angry, angry & demanded she come out forbidding her to be with me. She hid upstairs afraid. I asked him to stay away. He came onto the property against my wishes, angrily tried the door, and refused to leave, terrifying us both. I called the Police, who asked him to leave

Case Name: ___v_____

Case Number: _____ PNO: _____

__DOMESTIC VIOLENCE PETITION__

On two different occasions in the last 2 weeks
"family meeting" where he intimidate me and
kids. Called me terrible names in front of them.
I asked him to please stop, because the kids
were shaking & crying. He escalated and scared
us badly for quite a long time.
Today when I discovered what he had been doing
on my computer, he responded in a menacing way
and to am afraid for my safety.
He is angry and irrational and I am afraid my children
are afraid of him. My husband has dominated and controlled the finances
and not allowed me access to my own accounts, has
withheld my banking mail for weeks, has shut
me out of my own accounts and exercised complete
intimidating control over any virtually every
aspect of my life.

THIS PETITION MUST BE SIGNED BY THE PETITIONER WHILE AT COURT.

THIS PETITION WILL NOT BE ACCEPTED BY FAX, E-MAIL, OR U.S. MAIL.

I swear that the foregoing information is true and correct to the best of my knowledge. I understand that making a false statement on this petition will subject me to criminal penalties.

4/8/16
Date

Signature of Plaintiff

State of __NH__, County of __Hillsborough__

This instrument was acknowledged before me on 4-8-16 by _____

SARAH LYNN COYLE, Notary Public
State of New Hampshire
My Commission Expires October 16, 2018

My Commission Expires _____
Affix Seal, if any

Clerk of Court/Deputy Clerk/Justice of Peace/Notarial Officer

EXHIBIT 17
Judge I.
2/8/2021

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
http://www.courts.state.nh.us

Court Name: 9th Circuit-Family Division Nashua

Case Name: Dana Albrecht and Katherine Albrecht

Case Number: 659-2016-DM-00258
(if known)

EXHIBIT
3

## ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM*
### (Divorce/Parenting)

Dana Albrecht                    71        Katherine Albrecht           66
Petitioner's Name          D.O.B.         Respondent's Name          D.O.B.

38 E NASHUA ROAD                          214 Worcester Rd.
Street Address                            Street Address

WINDHAM, NH 03087-1139                    Hollis, NH 03069
City, State, Zip                          City, State, Zip

(603) 809-1097                            (626) 484-4042
Telephone          E-Mail Address        Telephone          E-Mail Address

The following order shall be entered:
1. The attached Standing Order Relative to Guardian *ad Litem* Appointment (hereinafter referred to as the "Standing Order") is made a part of this order.
2. Name: Kathleen Sternenberg Telephone: 64-1088
   Address: 27 Webster St Manchester, NH
   is appointed Guardian *ad Litem* of the child(ren):

   █ A█ ████            D.O.B. 2000
   S█ A█ ████            D.O.B. 2006
   S█ A█ ████            D.O.B. 2004

\* If you are not currently a board certified GAL you must notify the Court immediately and this order will be vacated. If at any time during appointment your certification lapses, you must notify the Court immediately and file a motion to withdraw.

3. The Guardian *ad Litem* shall investigate the following issues and make recommendations to the court thereon:
   ☑ Decision-making responsibilities
   ☑ Residential responsibilities
   ☐ Parenting time
   ☐ Special needs of the child(ren) (specify):
   _____
   _____

   ☑ Counseling for family/individual counseling for ☐ Petitioner ☐ Respondent ☑ child(ren)
   ☐ Psychological evaluations of ☐ Petitioner ☐ Respondent ☐ child(ren)

NHJB-2070-F (09/30/2014)                Page 1 of 4

Case Name: _____   _____   _____
Case Number: _____   _____   _____
ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM* (Divorce/Parenting)

☑ Parenting skills of ☐ Petitioner ☐ Respondent ☑ both parties

☑ Appropriateness of the home environment of ☐ Petitioner ☐ Respondent ☑ both parties

☐ Substance abuse: ☐ alcohol ☐ drugs ☐ both ☐ other _____

☑ Violence, physical abuse, emotional abuse

☐ Sexual abuse of

☐ Supervision of parenting time

☐ Rights of grandparents to visit

☐ Influence of companions of either party on child(ren)

☑ Maturity of child(ren) stating a preference

☐ Travel arrangements

☐ Time, place and manner of exchange for parenting time

☑ Assessment of bond between child and each parent and/or between siblings

☑ Other issues which the GAL deems relevant based upon the investigation

☐ Other (specify):
_____
_____

4. The Court sets the maximum fee in this case at $4,000⁻. The fee may only be exceeded with prior approval of the Court and notice to all parties. Payment of the costs and fees of the Guardian *ad Litem* shall be made as follows:

   A. **Percentage of payment:**
      ☑ The Petitioner shall pay _50_ % of the Guardian *ad Litem* fees.

      ☑ The Respondent shall pay _50_ % of the Guardian *ad Litem* fees.

   B. **Payment Orders:**
      ☐ Unless otherwise agreed with the Guardian *ad Litem*, the Guardian *ad Litem's* hourly rate shall be no more than $ _____. All parties must cooperate with the Guardian *ad Litem's* reasonable requests for payment.

      ☑ Unless otherwise agreed with the Guardian *ad Litem*, a retainer of $2,000⁻ shall be paid to the Guardian *ad Litem* by no later than 11/8/16 in the proportion set forth in the paragraph above. In the event any party's payment is not made in accordance with this Order, the other party or the GAL may request a hearing. The party not in compliance with this Order may be required to appear at the hearing, prepared to show cause why s/he should not be held in contempt of court. Unless otherwise ordered, the Guardian *ad Litem* is not required to commence an investigation until the retainer is paid in full.

      ☐ Other Payment Orders:
      _____
      _____

5. Other provisions:
   _____
   _____

6. Guardian *ad Litem* Stipulations to be filed by: _11/9/16_ _____

Case Name: _____      _____
Case Number: _____      _____
ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM* (Divorce/Parenting)

7. Preliminary Report to be filed by: _1/20/17_

8. Final Report to be filed by: _TBD_

**Recommended:**

_10/13/16_

Date

*Bruce F. Dalpra*

Signature of Marital Master

**BRUCE F. DALPRA**

Printed Name of Marital Master

**So Ordered:**

I hereby certify that I have read the recommendation(s) and agree that, to the extent the marital master/judicial referee/hearing officer has made factual findings, she/he has applied the correct legal standard to the facts determined by the marital master/judicial referee/hearing officer.

_10/13/16_

Date

Signature of Judge

**JULIE A. INTROCASO**

Printed Name of Judge

---

| STANDING ORDER RELATIVE TO GUARDIAN *AD LITEM* APPOINTMENT |
|---|

This order applies to all Guardian *ad Litem* appointments unless its terms are altered by an order entered in a specific case. Any changes in the order or the stipulations must be in writing and filed with the court.

1. **GUARDIAN *AD LITEM* STIPULATION:**

   In every case in which a Guardian *ad Litem* is appointed, the parties and the Guardian shall file a stipulation as to the following issues:

   a. Expenses for which the Guardian *ad Litem* will be reimbursed;

   b. Guardian *ad Litem* hourly billing rate and the maximum fee established by the court in this case;

   c. Frequency of billing, terms of payment, and payment of retainer;

   d. The names of the individuals requested to be interviewed by the Guardian *ad Litem*, including names, addresses, telephone numbers and relationship to party or child, listed in order of importance. The Guardian *ad Litem* shall have the discretion to decide which individuals to interview;

   e. Manner in which the Guardian *ad Litem* will communicate with each party's references (e.g., office conference, telephone call, letter);

   f. Action(s) the Guardian *ad Litem* will take if unable to contact a reference;

   g. Whether the Guardian *ad Litem* will visit each party's home;

   h. Whether conversations between the Guardian *ad Litem* and the children will be confidential;

   i. Other orders necessary to protect confidentiality; and

   j. Dates by which parties will execute authorizations for reports. Specify records to be requested.

   If this stipulation is not filed by the date set forth in the Order on Appointment of Guardian *ad Litem*, the court shall schedule an immediate enforcement hearing at the request of the Guardian *ad Litem* or either party.

Case Name: _____   _____   _____
Case Number: _____   _____   _____
ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM* (Divorce/Parenting)

2. GUARDIAN *AD LITEM* FEES:

a. The Guardian ad Litem shall be compensated at the rate of $_____ per hour. The maximum fee set by the court (including costs) shall not exceed $_____ for this case, and shall include attendance at hearings.

b. Parties, counsel and the GAL shall be aware of the GAL fees and costs and shall take reasonable action to contain those fees and costs. Maximum limits will be strictly enforced.

c. The maximum fee shall not be exceeded without prior approval of the court after hearing with the parties and the Guardian *ad Litem* present. Any request to exceed the maximum shall be filed with the court in writing and shall set forth in detail the reasons for the request and the amount by which the maximum is to be exceeded.

d. When the parties are paying the cost of the GAL, the $_____ per hour rate and the maximum fee set by the court may be waived upon written agreement of the parties and counsel which shall be filed with the court and subject to court approval. The agreement shall set forth the hourly rate and the maximum fee agreed to by the parties.

e. If counseling, therapy or evaluations are recommended by the GAL, no expenses for those may be incurred without the prior approval of the court after hearing. Notwithstanding the above, the court may enter orders upon motion of either party, or *sua sponte*, to authorize specific additional services with appropriate limits on payment.

3. COMMENCEMENT, SUSPENSION AND RESUMPTION OF WORK:

The Guardian *ad Litem* shall commence an investigation on receipt of the Order of Appointment and, unless otherwise ordered, on receipt of payment of the retainer in full, and shall diligently investigate the case, and prepare a report. If the parties agree to suspend the investigation and preparation of a report for any reason, they shall immediately seek the assent of the Guardian *ad Litem* to such suspension and file with the Court a written agreement to suspend the Guardian *ad Litem* 's work. This agreement shall be signed by all parties, including the Guardian *ad Litem* who shall suspend work on the case on receipt of notice that the Court has approved the agreement.

A party desiring that the Guardian *ad Litem* resume work on the case shall immediately file an appropriate motion and shall send a copy of the motion to the Guardian *ad Litem* who shall resume work in that case only on receipt of the court's notice that the motion has been granted.

4. PLEADINGS AND STIPULATIONS:

Each party shall certify on every pleading that s/he has mailed or delivered a copy of the pleading to the Guardian *ad Litem*.

The parties may agree on any issue concerning the child(ren) or incapacitated adult, and shall certify that s/he has mailed or delivered a copy of the written agreement to the Guardian *ad Litem*. The Guardian *ad Litem* may sign the agreement or file an objection, if appropriate, within ten days from the date of mailing or delivery.

EXHIBIT

4
_____

STATE OF NEW HAMPSHIRE

9TH CIRCUIT COURT - FAMILY DIVISION - NASHUA

IN THE MATTER OF:            )   Family Division Case No.
DANA ALBRECHT,               )   659-2016-DM-00288
                             )
                Petitioner,  )   Nashua, New Hampshire
                             )   August 9, 2017
        and                  )   9:04 a.m.
                             )
KATHERINE ALBRECHT,          )   Volume II of II
                             )   Pages 193 - 397
                Respondent.  )
_____)

FINAL HEARING - DAY 2
BEFORE THE HONORABLE BRUCE F. DALPRA
MARITAL MASTER OF THE CIRCUIT COURT - FAMILY DIVISION

APPEARANCES:

For the Petitioner:        Joseph Caulfield, Esq.
                           CAULFIELD LAW & MEDIATION OFFICE
                           126 Perham Corner Road
                           Lyndeborough, NH 03082-6522

For the Respondent:        Michael J. Fontaine, Esq.
                           WELTS, WHITE & FONTAINE, P.C.
                           29 Factory Street
                           Nashua, NH 03060

Also Present:              Kathleen A. Sternenberg
                           Guardian ad litem (GAL)

Audio Operator:            Electronically Recorded
                           by Aline Chasseur

TRANSCRIPTION COMPANY:     AVTranz, an eScribers Company
                           7227 N. 16th Street, Suite 207
                           Phoenix, AZ 85020
                           (800) 257-0885
                           www.avtranz.com

Proceedings recorded by electronic sound recording; transcript
produced by court-approved transcription service.

```
 1                          I N D E X

 2    WITNESS(ES)      DIRECT    CROSS    REDIRECT    RECROSS

 3    FOR THE PETITIONER:

 4    NONE

 5

 6    FOR THE RESPONDENT:

 7    Tina Michael        195       210      217         218

 8    Katherine Albrecht 220       305      329

 9    Jack Bopp          333       342

10    Kathleen Sternenberg 348     373

11    Elaine Hodgkinson 387        393

12

13    MISCELLANEOUS                                    PAGE

14    NONE

15

16    EXHIBITS                                    ID    EVD

17    NONE

18

19

20

21

22

23

24

25
```



AVTRANZ   eScribers
AVTranz, an eScribers Company
www.avtranz.com - www.escribers.net - (800) 257-0885

```
 1   life.

 2              MR. CAULFIELD:  No further questions.

 3              THE COURT:  Attorney Sternenberg, do you have

 4   anything?

 5              MS. STERNENBERG:  No.

 6              THE COURT:  Thank you, sir.  You can step down.

 7              THE WITNESS:  Thank you, Your Honor.

 8              MR. FONTAINE:  Your Honor, we'd call the guardian ad

 9   litem next.  Raise your right hand.

10        KATHLEEN STERNENBERG, WITNESS FOR THE RESPONDENT, SWORN

11                         DIRECT EXAMINATION

12   BY MR. FONTAINE:

13        Q   With the Court's permission, be seated.

14              THE COURT:  Okay.  Before you start your examination,

15   I've read the report.  I don't want to hear it in conversation

16   form at this point.

17              MR. FONTAINE:  Sure.

18              THE COURT:  Okay.

19              MR. FONTAINE:  I'll keep it brief.

20              THE WITNESS:  Could I just get a pen?  I'm sorry.

21              THE COURT:  Certainly.

22              THE WITNESS:  I didn't mean to come up here without

23   one.

24              THE COURT:  You're going to carve your initials into

25   the witness stand?
```



AVTRANZ   escribers
AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

```
 1              THE WITNESS:  Yes.

 2              THE COURT:  One never knows.

 3   BY MR. FONTAINE:

 4        Q  Good morning or afternoon, I should say.  Are you a

 5   certified GAL?

 6        A  I am.

 7        Q  And how long have you been a certified GAL?

 8        A  I've been certified since my training in 1993.

 9        Q  And estimate how many cases you've served on as a GAL?

10        A  People ask me that all the time, at least hundreds.

11        Q  Okay.  And this Court's original order of appointment

12   requested that you investigate certain specific matters.

13   Correct?

14        A  Yes.

15        Q  And did you in fact do that?

16        A  I did.

17        Q  You were also asked at a later point in time to

18   investigate Ms. Albrecht's motion to relocate and provide an

19   opinion on that as well?

20        A  Yes.

21        Q  And you added that to your list as well?

22        A  I did.

23        Q  And the parties were paying 50/50?

24        A  Yes.

25        Q  And has Ms. Albrecht paid you to date?
```



AVTRANZ ◇ eScribers
AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

```
 1        A  Yes.

 2        Q  Has Mr. Albrecht paid you to date?

 3        A  I'm waiting for a payment that I've requested.

 4        Q  Okay.  In the process of conducting this investigation,

 5   did you send out questionnaires to the parties?

 6        A  I did.

 7        Q  And did both of them return them?

 8        A  They did.

 9        Q  And did you ask for their opinions as to people that

10   they should -- that you should contact or send questionnaires

11   to get further information on this issue?

12        A  I did.

13        Q  And did you in fact do that?

14        A  Yes.

15        Q  Have you in this particular case met with both parents?

16        A  I have.

17        Q  Have you had an opportunity to meet with the children?

18        A  I have.

19        Q  And have those meetings been more than one?

20        A  Multiple meetings with parents, parents together, one

21   parents-together session, and many meetings with the children.

22        Q  Okay.  And did each of the parents fill out a guardian

23   ad litem questionnaire?

24        A  They did.

25        Q  Did you put many hours into this investigation?
```



AVTRANZ  escribers
AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1      A   Yes.

2      Q   Is this one of the most time intensive cases you've had

3   as a guardian?

4      A   It's a very heavy, intensive case.

5      Q   Okay.  And you filed numerous motions to exceed your

6   fees?

7      A   I have.

8      Q   Do you feel, after completing this investigation, that

9   you were able to obtain sufficient information to be able to

10   provide this Court with your findings and your recommendations?

11      A   Yes.

12      Q   And in fact, does your report do that?

13      A   Yes.

14      Q   Does that report contain everything that came out of

15   your investigation?

16      A   No, because I had to stop somewhere and 25 pages is a

17   long report.

18      Q   Okay.  And is --

19          MR. FONTAINE:  Your Honor, I'm not sure.  Do I need

20   to ask that, that be introduced into an exhibit?  Okay.

21          THE COURT:  It's part of the record.

22   BY MR. FONTAINE:

23      Q   So in this report, you provide an opinion on the

24   relocation issue, correct?

25      A   I do.


AVTranz, an eScribers Company
www.avtranz.com - www.escribers.net - (800) 257-0885

1      A   And in summary, would you indicate what that opinion
2    is?

3      A   I believe, for the reasons that I have in my report and
4    I think I've done a pretty good job of explaining that
5    Katherine Albrecht is in need of relocating to southern
6    California, where she has the support of her family, she's
7    closer to the facility where she would get treatment for her
8    cancer, and she has financial stability where she doesn't have
9    it now.

10     Q   Okay.   And --

11     A   And I believe those meet the standard that she needs to
12   prove.

13     Q   And in doing that, you looked at the statute on
14   relocation, correct?

15     A   I have.

16     Q   And you looked at whether you thought her reason for
17   moving was legitimate --

18     A   I have.

19     Q   -- for a legitimate purpose.   And you feel that it is?

20     A   I feel that it is.

21     Q   And just again, I notice in your report, you reference
22   that both parties are from California?

23     A   Yes.

24     Q   Both parties have family in California?

25     A   Yes.



AVTRANZ  escribers
AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1      Q   Both parties do not have family that they regularly

2   have contact with in New Hampshire?

3      A   Yes.

4      Q   Right?   And Dana currently is unemployed, correct?

5      A   Yes.

6      Q   And your recommendation is not only that Katherine be

7   allowed to relocate, but that Dana -- it's his choice, but that

8   Dana also consider relocating to the Pasadena area.

9      A   I think that would be the best thing that could happen,

10  yes.

11     Q   And do you believe, based on all of the factors,

12  including these interviews, et cetera, that it is in fact in

13  the best interests of the children to relocate?

14     A   I do.   And I couldn't be any stronger in my

15  recommendation that this happen right away so that the children

16  can get established so they can be in school so they can get

17  out of the fray.

18     Q   And did you have discussions with Katherine about her

19  opinions on relocation?

20     A   Yes.

21     Q   And did you talk with her about investigating school

22  options, for example?

23     A   I did.

24     Q   And did she provide you with information on what she

25  had done?



AVTRANZ   escribers
AVTranz, an eScribers Company
www.avtranz.com - www.escribers.net - (800) 257-0885

1           A   She and her mother both were former educators and they

2    know the area.

3           Q   Okay.  And do you feel that they did a thorough job on

4    finding the best schools?

5           A   It was a lot of information and they looked at a lot of

6    different schools --

7           Q   Okay.

8           A   -- and provided a lot of information.

9           Q   Okay.  Now, you've also recommended in your report that

10   Katherine be awarded primary residential parenting rights and

11   responsibilities?

12          A   I did.

13          Q   Could you give the Court a summary of your reasons that

14   you feel that, that is in the best interests of the children?

15          A   Well, at this point, the children really need

16   stability.  They need to feel secure.  They need to have a

17   nurturing environment.  They need to have an environment where

18   their developmental needs are taken into consideration and

19   their needs are placed before others.  And it's my

20   recommendation and my determination that, that would be with

21   Ms. Albrecht at this time.

22          Q   And what specific personality traits does Katherine

23   Albrecht have that Dana does not that you factored into that

24   assessment?

25          A   The biggest concern that I have is that there is a 16-



AVTRANZ  e cribers
AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

```
 1   year-old boy -- and Your Honor, if you would make a correction,
 2   the Court sent me an appointment that had C    's date of birth
 3   wrong and I just want to make sure that it's corrected for the
 4   record.  I put           because that was on the appointment,
 5   but it's    /2000, so there is a mistake on my first page of
 6   my report.
 7              C    is 16, S    is 13, and G    is 10.  10-year-
 8   olds are developmentally sort of at a black-and-white thinking
 9   stage and oftentimes are more aligned with their mother at that
10   time in their life.  In this case, S    and G    are very
11   connected with their mother.  They have a secure attachment
12   with their mother from what I've observed.  And they are really
13   having difficulty with their dad.
14              And while Dana has tried, and loves them, and has
15   spent time with them, they tend to come to odds about most
16   simple decision making.  And it's been my observation that, no
17   matter what kinds of recommendations I make to try to settle
18   that down, for him to understand that 13-year-old girls are
19   really difficult -- and I've raised one, so I know they are --
20   that you have to be the parent.
21              And you have to, you know, make sure that you show
22   them that you're listening to their feelings because, at some
23   point, a 13-year-old grows up and wants to be listened to.  And
24   a 10-year-old is not like G   .  G    is more like an 18-
25   year-old unfortunately.  G    has the presence of an 18-year-
```



AVTRANZ  eScribers
AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1  old.  She really does.

2        So this is definitely a hardship for Dana because he

3  is used to dealing with his boys, who are very similar to him

4  and his girls just are not.  They're emotive.  They're

5  emotional.  They cry.  They don't feel that he's communicating

6  with them or feel that he is listening to their needs.  And

7  this has not been something that just happened in March or

8  April.

9        This is something that I've heard about since

10 December.  I started my investigation.  Pretty much in

11 December, it was underway.  It's gotten worse over time.  And I

12 can't sit here as a guardian ad litem and recommend that these

13 girls be placed with their father with the situation getting

14 worse, not better.

15   Q   And do you have -- I notice you've commented that you

16 did not believe that alienation by the mother was the cause of

17 this.  But you can further elaborate on what you've done to try

18 and figure out whether there was alienation and figure out the

19 reasons these things are happening?

20   A   These kids have heard their parents' disputes for a

21 long time.  And they've had family meetings where they've aired

22 their parents' disputes.  And each of the children has met with

23 me individually on multiple occasions and they all say

24 different things.  But one of the things that they are very

25 clear about is Dad blaming Mom, Dad yelling, Dad being rageful



AVTRANZ  escribers
AVTranz, an eScribers Company
www.avtranz.com - www.escribers.net - (800) 257-0885

1    (sic) at Mom, and continuing to talk about Mom in terms of

2    being crazy and being not available to parent, you know, really

3    denigrating Mom.  And that has had an effect on these kids.

4          In conjunction with not having a relationship, a

5    nurturing relationship in which they feel listened to and they

6    feel Dad wants to be in their presence, the girls are really

7    getting to a point where they don't want to be around him.  And

8    I tried to explain that to these parents.  I sat with them.  I

9    talked to them about, I go to trainings every year and one of

10   the trainings I did within the last three years was in

11   Baltimore at the University of Baltimore School of Law.

12         And they brought in a specialist on alienation.  And

13   adolescents between the age of 12 to 15 start being estranged

14   when they don't feel like they're being listened to.  They

15   start being resistant and then they start refusing.  And in

16   April, I wrote to counsel and the parties and said, "I'm really

17   concerned that these kids are going to start refusing," and

18   it's happened.  And I haven't been listened to unfortunately.

19     Q  Have you spoken specifically to Dana about things that

20   he could do differently?

21     A  Yes.

22     Q  And has Dana implemented those things?

23     A  He says he will, but then it doesn't work that way.

24     Q  The evidence that you see in subsequent meetings with

25   the children, et cetera -- does it show differently?


AVTRANZ e scribers
AVTranz, an eScribers Company
www.avtranz.com - www.escribers.net - (800) 257-0885

1    A   The big issue was if -- my preliminary report, I also

2    intended to be a part of my final report, Your Honor.   In my

3    preliminary report that I filed, I was very clear about the

4    fact that the children's pediatrician and the family's

5    pediatrician, the family doctor, was very concerned that this

6    issue of, you have to go to my church and you have to attend my

7    church, was causing the children to be really upset at their

8    father.

9          So in January, I recommended that, that not be the

10   case.   And yet, at Easter time, we're still talking about, from

11   Dana's perspective, they should come to Paskha at my church and

12   they should be overnight from 10:00 at night until 4:00 the

13   next morning, and they'd done that at the Hampshire Hills for a

14   lock-in, so I don't understand why they couldn't do it in this

15   case, not understanding that one of the children was really

16   objecting to the smell of the incense.

17         One of the children just didn't like standing for the

18   period of time that they stand.   One of the children just

19   didn't really feel comfortable with the whole congregation and

20   tells me that she was hit by one of the boys at the church.

21   Those are things that need to be listened to.   You don't have

22   to agree with your child, but you have to at least listen to

23   and take into consideration their feelings.   That was happening

24   in January and, yet, we're still talking about it into April.

25   It's still a big issue.



1     Q   Based upon your conversations with the children -- and

2 you can be specific in your answer as to which child -- at this

3 time, do they feel that the father is listening any more to

4 them?

5     A   No.

6     Q   Do they actually feel that the father has actually not

7 listened to them more, but actually -- strike that.  Do the

8 children actually feel that his listening has decreased?

9     A   They feel that he's punishing them.

10     Q   And could you tell us a couple?

11     A   They feel that, if they say something, he gets angry

12 and he pouts or he punishes them by not taking them to church

13 the next day.  Or he goes, and rolls up in a ball, and doesn't

14 do anything with them for the rest of the day.

15     Q   And is there any specific examples you have of that,

16 that they have described to you?

17     A   Over and over, they've described examples of that.

18     Q   Okay.  Why don't you tell us a couple?

19     A   While the children were at camp, the two older children

20 were at camp for a second week of camp.  Dana took the youngest

21 child, G    , to Cozy Tea Cart and Dana told G     -- and this

22 is G    talking to me about this -- you don't need to listen

23 to Mom.  You don't need to listen to the guardian ad litem.

24 You don't need to listen to the court.  And Dana now at each

25 Wednesday visit wants to go back to the Cozy Cart.  And G

AVTRANZ ⬥ eScribers
AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1    doesn't ever want to go there again.  And G███ has told him by

2    her words to me that she doesn't like it there, she doesn't

3    want to go back, but every Wednesday, he starts with, "We're

4    going to the Cozy Tea Cart."

5         Q   Okay.

6         A   That's a complete inability to understand or listen to

7    your child.

8         Q   Okay.  Any other examples?

9         A   They went to Launch and Chipotle.  And the girls were

10   very upset because Dana follows them around very closely

11   because, at some point, I recommended to Dana that he be one on

12   one with the girls, sit and do a game, a board game on the

13   floor, do something interactive, go out and kick a ball, do

14   something directly with them because they didn't feel that he

15   was doing that.

16            So now, they feel that he gets right up to them and

17   he's kind of creepy because they feel like he's in their space.

18   At Launch, he went and jumped with them.  And one of the girls

19   said it'd be great if Dad was just jumping and throwing the

20   ball, but instead, he's blaming the way we feel on problems

21   from the girls hearing from their mother.  And the girls are

22   telling me, "No.  The problems that are existing are with our

23   dad and with our inability to get through how we're feeling."

24        Q   If there's alienation here, do you feel that it's

25   coming from Dana?



AVTRANZ ◇ escribers
AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1      A   No.   I just think it's estrangement because of his
2   inability to do these things that we've talked about over
3   several months.

4      Q   Okay.  And there was also an art exhibit or a play that
5   they went to if I recall?

6      A   I heard about from one of the girls that Dana wanted to
7   take them to an art exhibition, Botticelli exhibition.  These
8   are 10-year-old and 13-year-old girls from a conservative
9   Christian upbringing and Botticelli is naked paintings.  And
10  they're large paintings.  And the girls were turned off by
11  that.

12          They didn't want to do that.  But he said, "If you
13  don't go to the art exhibit, then you can't go to church the
14  next day."  So these are girls who are just being turned off in
15  lots of ways.  And then I was told by Katherine that G     had
16  some real problems sleeping the next day because of what she
17  had seen, you know.  It's just an inability to understand where
18  your kids are developmentally.

19     Q   Do you feel that Katherine does listen to them?

20     A   I know I've seen her listen to them and I have
21  experience with her listening to them.

22     Q   Is she a nurturer?

23     A   She is.

24     Q   And does she put the kids' interests before hers?

25     A   She tries to.  Sometimes, she doesn't.



AVTRANZ  escribers
AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1      Q  But does she do it more than Dana?

2      A  She does.

3      Q  And have you had any recent discussions with the
4 children that would further provide this Court with an
5 understanding of what's happening?

6      A  Well, there are two things that I've learned recently.
7 One is about Dana's recent visit with the kids, wherein they
8 went to the Casual Cat and A&E to eat.

9      And the kids told me that they got in the car, that
10 G    determined that there was a microphone with a red light
11 and a counter on in the car, and that they each, all three of
12 them, asked their father not to be recording them, and that he
13 continued to record them, and that, when they got to a point
14 where they were really insisting about that, that he then took
15 out his phone and started videotaping them, and that he
16 videotaped them all the way through at the Casual Cat, which is
17 apparently a store.  I don't -- I've never been there and at
18 the place where they eat, and that it was very upsetting, and
19 that they cried, and that Dana didn't understand how upsetting
20 it was to them, didn't do anything to comfort them.

21      Q  Did that include C   ?

22      A  It included C   .  He was very angry and eventually
23 convinced his dad to turn off his phone.  But all three of them
24 told me that, that was just over the top, and that their father
25 was crying at times, and just it was a very scary thing.  And

AVTRANZ ⬥ e cribers
AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1      then C     told me that he really wants -- he doesn't feel

2      listened to.  He doesn't feel like he's able to talk because he

3      doesn't want to anger his dad or anger his mother, and he's

4      really feeling very much in the middle, and he's 16, and he's

5      very concerned that he wants to go on to college, and he wants

6      his parents to support that.

7           Q   Okay.

8           A   He told me that, with regard to hacking, it isn't what

9      his mother has told him about hacking.  It's what he's actually

10     observed on his own devices that worries him, that he's seen a

11     log where a Linux machine from Nashua was on the log.  He's

12     seen things happen on his computer.  He's seen the root

13     administrator change.

14          He's seen, you know, what Katherine was talking about

15     on his phone with regard to things changing right in front of

16     him.  He's seen a phone call come in and not be able to

17     disconnect it.  So whatever that is, he feels that his father

18     is hacking his devices.  And he told me, "This is not my

19     mother.  This is me.  I feel this way.  And Dad completely

20     denies it, but I still feel this way."

21          So those are the reasons that I think these kids are

22     really in the middle of battle, but they really need a place

23     where they can be in one place with one parent.  And I want

24     them to have a relationship.  I talked to each one of them

25     about the fact that it's really important in their life to have



AVTRANZ ◇ escribers
AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1   a relationship with both parents, they only have two parents,

2   and that they need to work on that, and that counseling will

3   help that, and I hope that they get into counseling.

4       Q   You've recommended family systems counseling?

5       A   I did that in May.

6       Q   Right.  And did Dana take any steps that you're aware

7   of to actually commence with that?

8       A   He came back to see -- he wanted to think about it.  I

9   gave him a bunch of different people that I had researched who

10  might be able to do it.  And then he came back to me on June

11  7th and I made calls to the two people that I thought could do

12  it locally.  And neither of them was available.  And I didn't

13  hear back from one until, like, the 22nd of June.  The problem

14  with family systems work is, you can't just start it and think

15  it's going to happen overnight.  It takes quite a while to get

16  that underway.

17      Q   If this Court were to follow your recommendation and

18  allow Katherine to relocate with the children to California, is

19  there any reason that you're aware of that family systems

20  counseling can't continue to go on and the individual

21  counseling that you've also recommended for the children to go

22  on and for them to be able to speak to each other by phone, or

23  online, or --

24      A   I think the family systems work would be better if

25  everybody was in one place.


AVTRANZ   escribers
AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1     Q   Sure.

2     A   I think that the kids have to have their own therapy.

3  And I think that has to happen right away.  Family systems work

4  can be done telephonically.  These days, there are a lot of

5  people who do Skype sessions.  But I think that it'd be better

6  off if everybody was in one place.

7     Q   And that's why you're recommending that Dana move to --

8     A   I am.  And even if he doesn't, if he were to come in

9  for once-a-month-long weekends, where he could be in town for

10  Thursday, have a session with the kids on Friday, that would

11  be, you know, something that could happen in this case.

12     Q   And do you agree with the language that we put into our

13  proposed parenting plan that the individual counselors be able

14  to consult with the family systems counselors to try to

15  maximize the possibility of the relationship being improved?

16     A   I think it's really important for therapists who are

17  involved with the family members to all be able to collaborate.

18  That's what they call that.  And I have recommended both

19  parents also continuing therapy.

20     Q   Is there anything else that you think that you've heard

21  from the children on these issues.  I don't want to have you

22  address legal parenting -- I'm sorry.

23     A   Decision making.

24          MR. CAULFIELD:  Your Honor, I object.

25  BY MR. FONTAINE:



366

```
 1        Q   Decision making in a second, but on the residential
 2   portion --
 3            MR. CAULFIELD:   Could I just have the question
 4   repeated?
 5            MR. FONTAINE:   Sure, sure.
 6            MR. CAULFIELD:   Thanks.
 7            MR. FONTAINE:   Yeah.   I asked if there was any
 8   additional information that she wanted to include --
 9            MR. CAULFIELD:   Okay.
10            MR. FONTAINE:   -- on the residential portion.
11            MR. CAULFIELD:   Thank you.
12            THE WITNESS:   No.
13   BY MR. FONTAINE:
14        Q   With regards to the legal decision making, you've
15   indicated in your proposal that you believe the parties should
16   work together, try to make mutual decisions, important
17   decisions.
18        A   It's a really close one, but you know, both parents
19   need to be involved in decision making for their kids,
20   especially major decisions.   These people have such a hard time
21   making a decision, so somebody has to make the -- somebody has
22   to have a way to break the tie.   And this is about everything.
23   I've noticed this about very small things.
24        Q   I understand the importance of you trying to remain
25   neutral in this investigation.   It's your obligation ethically.
```



AVTRANZ ◆ escribers
AVTranz, an eScribers Company
www.avtranz.com - www.escribers.net - (800) 257-0885

1  But do you feel that, when some disagreements have occurred in

2  the midst of this legal separation matter relative to

3  residential parenting that Katherine has been willing to make

4  compromises more so than Dana?

5      A  I think Katherine usually suggests something.  Then it

6  goes to Dana and he suggests something much bigger or

7  different.  And then it goes back to Katherine and she tries to

8  make some sort of halfway compromise.  And then it breaks down.

9          So I think, what happens is -- a good example of this

10  is with David Albrecht in town and he hasn't seen the kids in

11  several years.  And the kids are with Dana tonight from 4:00 to

12  6:00 for a Wednesday visit.  Dana said, "My dad's in town.  Can

13  we have time with Dad?"  Katherine said, "Well, we're not going

14  to get out of court today, but we could expand your time today

15  from 5:10 to 9:10.  That gives you four hours to go to dinner."

16          Dana came back and said, "Well, I want the kids for

17  from 5:10 until Sunday."  Then there was a breakdown.  That's

18  basically what happens here.  And then this morning, Mr.

19  Caulfield came to me and I think, after two years of not seeing

20  your grandfather, in the middle of trial, a four-hour visit may

21  be a good start.  And I don't know what after that, but at

22  least there should be something.  That's what I've done

23  continually with this case because it just breaks down.  They

24  can't make a decision.

25      Q  Was the weekend of the rehearsal of the play that you



AVTRANZ   eScribers
AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1    heard testimony about another example of that?

2        A   I don't work on Sundays and I try not to work on

3    Saturdays.  But the kids had the opportunity to be in a play

4    and, apparently, the play has been something they've been to at

5    least for some years.  And while Dana doesn't particularly like

6    Collinsville anymore, these are the kids and they've been

7    involved with this congregation, so I thought it was a good

8    idea.

9        So Katherine said, "Hey, we've got this play, and

10   it's a lot of rehearsals and a lot of getting ready for.

11   What's a good idea about how to try to deal with parenting time

12   for Dana but also allow the kids to participate?"  My thought

13   was, she take the weekend that he should have the kids, and you

14   give him the next weekend, and you swap weekends.

15       And then there's no getting all over each other.  And

16   if he wanted to go over to the play and watch the play, I have

17   no problem with that.  It just can't happen because that's the

18   suggestion that's made.  And then the next thing is, "I'll take

19   them to the play."  And then they're all over each other, which

20   happened, and it --

21       Q   All right.

22       A   -- broke down badly.

23       Q   And it was also that there was the discussion, I think,

24   that was confirmed with the children, that the father was

25   indicating he was going to come every night that the play was



AVTRANZ   eScribers
AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1  playing.

2       A   Well, this is what happens when they start having

3  disagreements, the 10- and 13-year-old and Dana, that things

4  just spiral.  And having raised a child myself, I know that, at

5  13, sometimes they're not very rational.  So it just gets

6  spiraled into, you know, okay, then you can't go at all.  Well,

7  that's not what should be going on.  It really should be, this

8  is something I'm going to do for my kids because I've always

9  done it.

10      Q   Yeah.

11      A   And I'm going to put their needs first.  And I'm going

12  to put my needs second.

13      Q   So your recommendation, then, is for them to work

14  together at making joint decisions.

15      A   Identify that there's a joint decision that has to be

16  made -- give the opportunity for both of them to be involved,

17  and discuss the issue, and then if there is absolutely not

18  agreement, I've said Katherine, but I don't have -- if this

19  Court decides that it should be a third party, that's fine with

20  me.  I just think there has to be a deal breaker.  Something

21  has to happen because, in my experience with this case, it's

22  been me.

23      Q   And if it's not addressed in some fashion like you just

24  said, will it increase the anxiety level of these children?

25      A   It's horrible for them.  Yes.


AVTRANZ  eScribers
AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1    Q   So this is a way to try to avoid that.   Is there -- you

2   did not specifically address in your report what residential

3   parenting, non-residential parenting arrangement Dana would

4   have if he were to move to California.   Currently, under the

5   plan of this Court, he sees the children on Wednesday evenings

6   from 4:00 to 6:00 and every other weekend from Saturday at

7   10:00 to Sunday at 6:00.   Is it your recommendation that, if

8   they move to California and if Dana moves to the Pasadena area,

9   that, that same schedule be followed together with the

10   counseling, et cetera that you would recommend?

11    A   I think that has to be in place if he's local and that

12   he has to be in family systems therapy with the kids.   And

13   maybe they can expand that over time, which even in January, I

14   had hoped to eventually get to a point where they could do an

15   every-other-weekend-type arrangement.

16    Q   All right.   If he chooses not to go to California and

17   to stay here in New Hampshire and the Court allows Katherine to

18   relocate, you've also suggested an alternative residential

19   parenting arrangement.

20    A   I would want the kids to see Dana on their school

21   vacations.   And here, I know what they are, but in California,

22   I really don't know what they are.   But here, it would be,

23   December, they have a break, February and April.   So I would

24   think that, that would be time for them to be able to see their

25   father.



1        I would want him to have the regular summer trip to
2   the Cow Creek hiking adventure that they've done in their
3   lives.  And I would like him to commit to coming to them and
4   being present with them so that he can have some relationship
5   with their schools and their activities on the ground in
6   California.

7        Q   Okay.  And you had said something about, on long
8   weekends, et cetera, you could try to coordinate them around
9   that long weekend?

10       A   Right.  I think that was the reason that my thought
11  was, in months that there isn't a holiday week, that he come
12  for a long weekend so that at least he could get there by
13  Thursday and have the ability to meet with a therapist on
14  Friday, go to the school or do whatever he could do for that
15  day once a month.

16           MR. FONTAINE:  Give me one minute.

17  BY MR. FONTAINE:

18       Q   Have you had an opportunity -- I think you said this in
19  your report, but did you speak with the counselor at the school
20  that the children attend?

21       A   I did.

22       Q   And her name is Laura Burback (phonetic)?

23       A   Audra --

24       Q   Audra, sorry.

25       A   -- Burback.



AVTRANZ  escribers
AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

```
1        Q   And what did she say about the children?

2        A   I didn't speak with her once.  I spoke with her

3    multiple times.  G     and S       started at the school and

4    they were quite socially awkward and not used to following a

5    routine.  And she had worked with them for two years, so I

6    thought she was a good person to tell me about them.  But then,

7    when I met with her, I found that they really go down to her

8    office often.  They kind of hang out down in the office.  And

9    so she had the opportunity to meet with them and talk to them

10   most days in their school year.

11       Q   And how did she think over the course of those two

12   years they were doing?

13       A   She was concerned about the children and their real

14   emotional distress of their trying to work out a relationship

15   with their dad.

16       Q   Yeah.  Did she have an opportunity to speak to you

17   about their academic performance?

18       A   Yes.

19       Q   And what did she say about that?

20       A   All of the Albrecht children are very gifted

21   academically.  They're all gifted academically.  The two girls

22   are less interested in being nerds than the two boys and the

23   two girls were not used to doing homework, and having a

24   routine, and sitting, and having demands placed upon them

25   academically.  And so that was a real adjustment, but they have
```



AVTRANZ  eScribers
AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

```
 1    really adjusted well.

 2        Q   Now, I know that you've recommended in your decision

 3    making that the parties discuss important decisions.  And that

 4    would, I guess, include education, but if this Court allows

 5    them to relocate to California and Katherine were to discuss

 6    with Dana her proposal relative to their schooling there, that

 7    is, the girls go to the Gooden School and that C      be allowed

 8    to take classes at the community college, with the idea of

 9    going into a four-year college, do you think that's a good

10    plan?

11        A   From what I can see it is, but I think that the parents

12    need to really look at that.  These parents are very able to do

13    that.  They are.  I don't know if they're able to agree with

14    each other, but they're very able to do what's best for their

15    kids.

16            MR. FONTAINE:  Thank you.  No further questions.

17            THE COURT:  Cross-examine?

18                           CROSS-EXAMINATION

19    BY MR. CAULFIELD:

20        Q   Attorney Sternenberg, did you suggest to Dana that he

21    take the children last Christmas to the Orthodox Christian

22    celebration?

23        A   Not to the actual -- he told me that they have a big

24    meal in celebration around Christmas, so I did suggest that.

25        Q   You did or didn't?
```



AVTRANZ ⟨⟩ escribers
AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1      A   I did.

2      Q   Okay.  You suggested that they go to the Orthodox --

3      A   That's what I said.  Yes.  I did.

4      Q   -- Christian -- okay.  And in your guardian ad litem

5  report, you first recommended that joint decision making, but

6  if they can't agree, Ms. Albrecht makes the call.  And you put

7  it in your report.

8      A   That's what I -- yes.

9      Q   But on the stand, you started thinking that might not

10  be the best idea?

11     A   On the stand, I said that the man with the black robe

12  could make a decision that a third party would be a better

13  tiebreaker.

14     Q   Right, because they haven't -- unfortunately, your own

15  experience you testified to, these parents haven't been able to

16  make a decision on their own.  Right?

17     A   Unfortunately, they do make decisions, and they make

18  good decisions around medical care and other things when they

19  don't realize that they're fighting.  But when they're in the

20  middle of battle, they have to take positions.

21     Q   Not having birth certificates and Social Security

22  numbers for their children, you consider a good decision among

23  other things?

24     A   It's not my life, but --

25     Q   No.  But you think that was a good decision.


AVTRANZ  escribers
AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1        A    I don't know how to say -- I don't --

2        Q    Okay.

3        A    I think they do now have birth certificates and Social

4    Security numbers are on the way.  That's what I heard, so --

5        Q    Well, I think one of them still doesn't have a birth

6    certificate.

7        A    All right.  My thought is this.

8        Q    Yeah.

9        A    I don't parent for these kids.  I just try to do an

10   overview investigation as to what's in their best interest.

11       Q    So if this history of the case -- and would it be fair

12   -- and we're both guardian ad litems.  Would it be fair to say

13   this is a highly conflicted family law case?

14       A    That would be fair.

15       Q    Okay.  And is it fair to say that there's been a

16   dialectic, a struggle between Ms. Albrecht and Mr. Albrecht

17   regarding just about every single parenting exchange?

18       A    Yeah.

19       Q    And they all take place at the Hollis Police

20   Department?

21       A    Not all of them.

22       Q    Do the majority of them take place at the Hollis --

23       A    Majority, not all of them.

24       Q    Okay.  And is it fair to say that the majority of the

25   ones that take place result in mutual complaints to the police,


AVTRANZ  eScribers
AVTranz, an eScribers Company
www.avtranz.com - www.escribers.net - (800) 257-0885

1   police reports being generated -- let me finish the question --

2   you being provided the police reports, strong lawyer letters

3   from Attorney Fontaine, strong loyal letters from me, all

4   copied to you?  Is that a fair statement?

5        A   I don't think it's every week --

6        Q   All right.

7        A   -- because if it were I'd probably pull out my hair.

8        Q   But once a month, every six weeks, yes.

9        Q   Okay.  All right.  So what do you think it would look

10  like if Ms. Albrecht moves to California and Mr. Albrecht

11  remains here?  If you could just let me answer the question --

12       A   Well, I don't want you to answer the question.

13       Q   I'm sorry, ask it.

14       A   I want to answer the question.

15       Q   Yeah, but let me ask it.

16       A   I thought it was a question.

17       Q   No.  I haven't finished.

18       A   Okay.

19       Q   Okay.  What do you think it's going to look like?

20       A   Okay.  Now, can I --

21       Q   Now, I'm finished.  Now, you can answer.

22       A   All right.  I think that these children desperately

23  need space.

24       Q   Space?

25       A   Space.



1       Q  Different from stability, space now?

2       A  It's not different than stability.

3       Q  Okay.  It was stability in your report.  Right?

4       A  I think these children need peace, and space, and

5  stability --

6       Q  Yeah.

7       A  -- and consistency, and predictability.  And that means

8  I think they need this Court to make an order that's very

9  specific about what happens and not have the parents do

10  whatever they want to do.

11      Q  Space from whom, Attorney Sternenberg?

12      A  Space.

13      Q  Space from whom, from Dad?

14      A  Space from the conflict that they're involved with --

15      Q  Okay.

16      A  -- all of the time.

17      Q  Okay.  Now, explain to me, explain to His Honor, not

18  me -- I'm insignificant here -- how moving Ms. Albrecht and the

19  children to California will stop these two contentious people

20  from contending.

21      A  Okay.

22      Q  Yeah.

23      A  I don't know that it will.

24      Q  Uh-huh.

25      A  I do know, in other cases that I've had in 24 years of



AVTRANZ  escribers
AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1   doing guardian ad litem work --

2       Q   Yeah.

3       A   -- that, when there is a move, when these people cannot

4   do day-to-day communication, that sometimes it calms down.

5       Q   Yeah.  And thank you.  And based upon your 24 years of

6   experience, does it sometimes go the other way?

7       A   Sometimes.

8       Q   Yeah, yeah, yeah.  What do you think is going to happen

9   in this case?

10      A   I think that the kids really desperately want to go to

11  live with their mother no matter what happens.

12      Q   Yeah.

13      A   And so they're always going to have to deal with their

14  father not feeling that he got the fair end of the shake and

15  that their mother got the --

16      Q   Okay.

17      A   -- you know, one.  And this isn't a win or lose for

18  them.

19      Q   All right.

20      A   I also feel that it would be wonderful if the

21  children's parents were able to look at this, not at each other

22  as a winner and a loser, but at the need for one parent to have

23  support so that she can deal with her medical issues and other

24  issues and be available to these little girls for as long as

25  possible.  But that's not possible in this case.



1      Q   But you do admit in your report you talked about

2   stability?

3      A   I did, I do.

4      Q   Okay.  Now, do you agree with me that there's a

5   substantial chance that, if Ms. Albrecht moves with the

6   children to California, that Dad's going to have less and less

7   contact with the children?

8      A   Not if this Court makes a very strong order about what

9   his contact is and that it's not going to be changed every

10  week.

11     Q   And was there something weak with the Court's order

12  that's been going on for the last year, which hasn't been

13  working?

14     A   The problem with the Court's order in the last year has

15  been that Dana has not been interested in just doing it.  And a

16  lot of times, as a guardian ad litem, I tell people at a

17  temporary stage, "Do have good visits, and use the time, and

18  make them good because then they will get bigger.  Then it will

19  increase."  And in this case, unfortunately, it hasn't worked

20  that way --

21     Q   Okay.

22     A   -- because, every time there's a visit, something

23  occurs that just causes the kids to be unhappy.

24     Q   Let's look at another stability piece.  So Ms. Albrecht

25  has told us all that she's basically terminal.  Correct?



1        A   Yes.

2        Q   Okay.

3        A   That's what she said and that's what her doctor has

4   said.

5        Q   So now -- and we don't have a prognosis of when that

6   sad event will happen.   Right?

7        A   I don't think any of us do, no.

8        Q   All right.   Okay.   So tell me how Ms. Albrecht moving

9   the children, the children I guess have -- three of them --

10  well, there's three children.   Two of them have never lived in

11  California and one lived in California for a year.   Right?

12              THE PETITIONER:   Six months.

13  BY MR. CAULFIELD:

14       Q   Six months -- they're New Hampshire children.   Right?

15       A   The children have lived in New Hampshire.   The two

16  girls have lived in New Hampshire their lives, but they have

17  connections with California because they've been there every

18  year for vacation, on extended vacation.

19       Q   Right.   And the younger boy?

20       A   C▆▆   has lived out here most of his life.

21       Q   Right.   Okay.   So they're really New Hampshire

22  residents.   You don't want to acknowledge they're New Hampshire

23  residents?

24       A   They're New Hampshire residents.   I don't know why

25  that's relevant to --



AVTRANZ ◇ ecribers
AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1    Q   Okay.  So if Ms. Albrecht may be terminal, and she

2    moves with the children to California, and Dad stays here, how

3    does that give the children stability?

4    A   It's my understanding that Ms. Albrecht has a close and

5    loving relationship with her mother and her sister --

6    Q   Okay.

7    A   -- that her mother is going to support her in her

8    housing --

9    Q   Yeah.

10   A   -- support her in her care for the children --

11   Q   Yeah.

12   A   -- and for herself --

13   Q   Uh-huh.

14   A   -- and that Pasadena is her environment.  That's where

15   she grew up.

16   Q   Right.

17   A   It's my understanding that, that would be, from my

18   position, a very good stabilizing thing for these kids, whereas

19   right now, Ms. Albrecht doesn't have income, cannot afford the

20   house that they live in, cannot afford the travel that she's

21   doing right now to try to get treatment, and doesn't have any

22   support.  So the support and the stability that you're talking

23   about, I think, is in California.  And if for some reason these

24   children go from 13 to 16 with their mother and then their

25   mother passes away --



AVTRANZ  eSCRIBERS
AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1    Q  Right.

2    A  -- I will still feel that that's better for the

3  children, to have had that time of stability --

4    Q  So --

5    A  -- at 10 to 13 and 16 to 19.

6    Q  Right.  Okay.  So let me parse this into two pieces,

7  Attorney Sternenberg.  First, you feel that the children will

8  be stable if either they're 3,000 miles away from Dad or -- let

9  me finish -- Dad moves to California.  Correct?

10   A  I think the children will be more stable with their

11  mother in California than they are now.

12   Q  Okay.

13   A  And I think that I would hope that Dana, not having a

14  lot of significant connections right now to New Hampshire,

15  would move and be in California near his children.  That would

16  be the best thing in my mind to happen in this case.

17   Q  Okay.  Now, if Mother is unable to take care of the

18  children, wouldn't you anticipate that Dad is going to say,

19  "Give me back my children"?

20   A  He needs to do some work so that he can say that.

21   Q  Isn't it really - isn't really what you're foreseeing

22  is that Ms. Albrecht's mother seek a guardianship over these

23  children in California?

24   A  I have --

25   Q  Isn't that really what you're seeking?



```
 1        A   No.  And I have not any --

 2        Q   No?

 3        A   I haven't gone near that.  I don't even know where that

 4   comes from.  That hasn't been asked of me.

 5        Q   Okay.  So let me ask you now, let's assume that, sad as

 6   it is, Ms. Albrecht dies in California.

 7        A   Okay.

 8        Q   And maybe she doesn't die in the two years you think.

 9   Maybe she's actually iller (sic) than you think and she does

10   sooner.  Okay?

11        A   Okay.

12        Q   Okay.  Now, the children are in California.  Dad is

13   here.  What do you think Ms. Albrecht's mother is going to do

14   next?

15             MR. FONTAINE:  Your Honor, I object.  That's --

16             THE COURT:  Sustained.

17             MR. FONTAINE:  -- irrelevant.

18             MR. CAULFIELD:  Your Honor, I think on the issue

19   of --

20             THE COURT:  The objection is sustained.

21   BY MR. CAULFIELD:

22        Q   Would it be --

23             THE COURT:  We all could get hit by a bus when we

24   leave the courtroom today also.  The objection is sustained.

25   BY MR. CAULFIELD:
```


AVTRANZ  eScribers
AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1        Q   Are you troubled by these children being in the middle

2   of a parenting dispute?

3              THE COURT:  Are you talking to me?

4              MR. CAULFIELD:  No.

5              THE COURT:  Well, you're looking at me.

6              MR. CAULFIELD:  Well, because you're the most

7   important person here, Judge.

8              THE COURT:  No.  I'm not.  The most important people

9   are here at the -- the most important people in this case

10  aren't in here today.  Ask your question of the guardian ad

11  litem.

12             MR. CAULFIELD:  Yeah.  I really -- what it was --

13  okay.

14  BY MR. CAULFIELD:

15       Q   Do you think the effect that these children are in the

16  middle of a parenting dispute is a problem?

17       A   I think the fact that the children have been exposed to

18  their parents' rages, and fighting, and blaming, and

19  manipulating is a problem.

20       Q   Don't you foresee that, if Ms. Albrecht dies and she's

21  in California, you're going to have another parenting dispute

22  with the children?  You don't foresee that as a guardian ad

23  litem?

24             MR. FONTAINE:  Your Honor, I'm going to object.

25             THE COURT:  Sustained.



1          MR. CAULFIELD:  Okay.

2    BY MR. CAULFIELD:

3      Q  Is spying a big issue in this case, Attorney

4    Sternenberg?

5      A  It's an issue.  It's not a big issue, but it's

6    something that I addressed, yes.

7      Q  Right.  How has it affected the children in that the

8    mother thinks that the dad is spying on her?  And one of the, I

9    guess, boys thinks that their dad is spying on them.  How has

10   that affected this case?

11     A  It's not one of the boys.  It's both of the boys.

12     Q  So you're saying that the older boy --

13     A  I met with P    .

14     Q  -- in college says that Dad is spying on the family?

15     A  Yes.  He did not want to bring his computer home and,

16   when he did and he had to use it at Dad's house, he was going

17   wipe it before he took it home.

18     Q  Is that in your report?

19     A  No.

20     Q  I see.

21     A  You just asked me a question about how it's affected

22   the children.

23     Q  I see.  So you believe that Dana is spying on

24   everybody?

25     A  I believe from what my investigation has led me to that


AVTRANZ  eScribers
AVTranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1  he's definitely able to spy on the children.

2      Q   But able -- we're all able to do things, Attorney

3  Sternenberg.  That doesn't mean we're doing them.  Right?

4      A   Sure, no.

5      Q   No.  Okay.  No.

6      A   If you were mistaken, and it turned out that Dana

7  wasn't spying on anyone, and that this was either a fantasy of

8  Ms. Albrecht's or maliciousness of Ms. Albrecht, would that

9  change your opinion in this case in any way?

10     A   It won't change my recommendations to this Court.

11     Q   I see.

12     A   No.  It won't.

13         MR. CAULFIELD:  Okay.  One moment, please.  I think

14  I'm done.

15         (Counsel confer)

16         MR. CAULFIELD:  I'm done.  Thank you.

17         THE COURT:  You may step down.

18         MR. CAULFIELD:  Thank you, Attorney Sternenberg.

19         THE WITNESS:  Thank you, Your Honor.

20         MR. FONTAINE:  Your Honor, could we take a five-

21  minute break?

22         THE COURT:  We can.

23         (Recess taken from 2:32 p.m. to 2:40 p.m.)

24         THE COURT:  Next witness?

25         MR. FONTAINE:  Yes.  In fact, I'm going to call



EXHIBIT

5

# THE STATE OF NEW HAMPSHIRE

## SUPREME COURT

## O R D E R

## LD-2018-0005, In the Matter of Paul S. Moore, Esquire

On May 4, 2018, the Attorney Discipline Office (ADO) filed a certified copy of documents in State of New Hampshire v. Paul S. Moore, showing that the respondent, Attorney Paul S. Moore, had pleaded guilty and was convicted of violating RSA 100-C:16, Protection Against Fraud, a class B felony. On May 9, 2018, the court suspended the respondent from the practice of law on an interim basis.

The respondent's conviction for violating RSA 100-C:16 constitutes a "serious crime," as that term is defined in Supreme Court Rule 37(9)(b). Subparagraph 9(d) of Rule 37 provides that "[u]pon the receipt of a certificate of conviction of an attorney for a 'serious crime,' the court may, and shall if suspension has been ordered pursuant to subsection (a) above, institute a formal disciplinary proceeding by issuing an order to the attorney to show cause why the attorney should not be disbarred as result of the conviction."

In accordance with this rule, the May 9, 2018 suspension order also required the respondent to show cause why he should not be disbarred as a result of the conviction. The respondent, through counsel, advised the court that he did not contest disbarment.

In light of the seriousness of the respondent's misconduct, the court concludes that the respondent should be disbarred. THEREFORE, the court orders that Paul S. Moore be disbarred from the practice of law in New Hampshire. He is hereby assessed all expenses incurred by the Professional Conduct Committee in the investigation and prosecution of this matter.

Lynn, C.J., and Hicks, Bassett, Hantz Marconi, and Donovan, JJ., concurred.

DATE: July 5, 2018

ATTEST:

Eileen Fox, Clerk

Distribution:
Janet F. DeVito, Esquire
Michael A. Delaney, Esquire
File