

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### NH CIRCUIT COURT

**COPY**

9th Circuit - Family Division - Nashua
30 Spring Street, Suite 102
Nashua NH 03060

Telephone: 1-855-212-1234
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

## NOTICE OF DECISION

**FILE COPY**

**EXHIBIT** 9
Judge I.
2/8/2021

**EXHIBIT**
6

Case Name:     **In the Matter of David Campbell and Robin Partello**
Case Number:   **659-2018-DM-00702**

Enclosed please find a copy of the Court's Order dated March 15, 2019 relative to:

**Petitioner's Expedited Motion to Continue March 19, 2019 Status
Conference and Motion to Clarify Subject of Hearing - Granted**

Introcaso, J.

March 15, 2019

Sherry L. Bisson
Clerk of Court

(659304)
C:  David Campbell; Robin Partello; Kathleen A. Sternenberg; Tracey G. Crvle, ESQ

NHJB-2207-DF (07/01/2011)

JAI000157




DAVID CAMPBELL

AND

ROBIN PARTELLO

659-2018-DM-702

On 3-15-19, the Petitioner filed a motion to continue a Status Conf. scheduled by this judge. The motion (#38) is GRANTED.

In filing the motion, the Petitioner inquired as to the purpose of the hearing. The undersigned judge scheduled the hearing to disclose her conflict with the Court-appointed GAL in the case.

Although this judge has made no substantive rulings in this matter, it has approved substantative orders issued by the marital master that had previously handled this litigation.

The marital master has been reassigned to another court location, so numerous substantive motions were presented to this judge for review.

In doing so, this judge

JAI000158

pg 2.

has determined that she is unable to address these motions, particularly as some relate directly to the payment and performance of the GAL.

The GAL has been a long-standing friend of this judge; she has vacationed with her, discussed personal matters in depth (including financial issues) and the GAL is the godparent to one of this judges children.

The Court does not believe this conflict, under the circumstances as stated above, is one which can be waived.

The Court hoped to put this matter on the record and set this matter for trial before another judge; however, even that may be seen as inappropriate given the conflict over the GAL specifically.

The wisest course for this judge, and in an attempt to

JAI000159



pg 3.   provide the parties with the most unbiased and fair hearing, is to simply withdraw as the presiding justice in this matter with regret as to the delay this may cause to the parties.

ORDER:

1.   Judge Julie Introcaso shall have no further involvement in this matter.

2.   The Clerk shall expeditiously work with the parties to reassign this matter, resolve the pending motions, and schedule this matter for any further hearing.

3.   No status conference will occur on March 19, 2019.

So Ordered.

3/15/19

Julie A. Introcaso




EXHIBIT 10
Judge I.
2/8/2021

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### NH CIRCUIT COURT

9th Circuit - Family Division - Nashua
30 Spring Street, Suite 102
Nashua NH  03060

Telephone: 1-855-212-1234
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

## NOTICE OF DECISION

**FILE COPY**

EXHIBIT

7

Case Name:   **In the Matter of David Campbell and Robin Partello**
Case Number:   **659-2018-DM-00702**

Enclosed please find a copy of the Court's Order dated April 26, 2019 relative to:

**Order on Motion to remove GAL**

**Derby, M.**

April 29, 2019

Sherry L. Bisson
Clerk of Court

(659304)

C:  Jeffrey Leo Manganaro, ESQ; Robin Partello; Kathleen A. Sternenberg

NHJB-2207-DF (07/01/2011)

JAI000113

# The State of New Hampshire

Hillsborough County                    Ninth Circuit Court ~ Family Division ~ ⊗ Nashua ~ ~~El Merrimack~~

In the matter of: __David Campbell__          and  __Robin Partello__

Docket No. 65 __9__ - 20__18__ -__DM__ - __702__

## ORDER on #41, Motion to Remove GAL

Prior to ruling on the motion to remove GAL, the undersigned officer reviewed the October 24, 2018 Order Appointing GAL, the February 15, 2019 Order approving the Master's recommendation on the GAL's motion for instruction, the February 15, 2019 Order approving the Master's recommendation on the Motion to Strike, and the two March 12, 2019 orders re the GAL's fee cap and GAL payment method, as well as the relevant motions and objections. Reviewing all of those matters de novo, the undersigned officer would have issued the same orders, though the respondent may pay the GAL by personal check (in addition to the other methods), though the respondent does not use personal checks.

Substantively, the motion to dismiss/remove GAL is denied. The respondent's allegations do not form a sufficient basis to terminate the GAL and start over, which would cost significant funds and waste judicial resources. The GAL's sole mission is to investigate and advocate for ▮▮▮▮ and this may cause friction with the parents. That is a normal part of the process. Motion denied.

Date: __4-26__ , 2019

_Mark S. Derby_, Judge
Ninth Circuit Court

EXHIBIT

8

1          STATE OF NEW HAMPSHIRE

2       9TH CIRCUIT COURT – FAMILY DIVISION – NASHUA

3

IN THE MATTER OF:        )
4                )
DANA ALBRECHT,        ) Family Division Case No.
5                ) 659-2016-DM-00288
       Petitioner,    )
6                ) Nashua, New Hampshire
       and        ) May 9, 2019
7                ) 10:33 a.m.
KATHERINE ALBRECHT,      )
8                )
       Respondent.   )
9 _____ )

10           MOTIONS HEARING
     BEFORE THE HONORABLE BRUCE F. DALPRA
11   MARITAL MASTER OF THE CIRCUIT COURT – FAMILY DIVISION

12 APPEARANCES:

13 For the Petitioner:     Joseph Caulfield, Esq.
              CAULFIELD LAW & MEDIATION
14               OFFICE
              126 Perham Corner Road
15               Lyndeborough, NH 03082-6522

16 For the Respondent:     Michael J. Fontaine, Esq.
              WELTS WHITE & FONTAINE, PC
17               29 Factory Street
              PO Box 507
18               Nashua, NH 03061-0507

19 Audio Operator:       Electronically Recorded
              Aline Chasseur
20
TRANSCRIPTION COMPANY:    eScribers, LLC
21               7227 N. 16th Street, Suite 207
              Phoenix, AZ 85020
22               (800) 257-0885
              www.escribers.net
23
Proceedings recorded by electronic sound recording; transcript
24 produced by court-approved transcription service.

25



1                              I N D E X

2    WITNESS(ES)        DIRECT      CROSS     REDIRECT     RECROSS

3    FOR THE PETITIONER:

4    Dana Albrecht        5          10       15,38       20,77

5

6    FOR THE RESPONDENT:

7    Katherine Albrecht  95         155

8    MISCELLANEOUS                                          PAGE

9    NONE

10

11   EXHIBITS                                        ID      EVD

12   Petitioner's 1        Emails from 9/18/17               41

13   Petitioner's 2        Sierra Madre Police Report        48

14   Petitioner's 3        High school application           55

15   Petitioner's 4        Transcript and photos             60

16   Petitioner's 5        S████'s two letters               61

17   Respondent's A        Dentist's Letter                 137

18

19

20

21

22

23

24

25

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### NH CIRCUIT COURT

| EXHIBIT |
| --- |
| 9 |

9th Circuit - Family Division - Nashua
30 Spring Street, Suite 102
Nashua NH  03060

Telephone: 1-855-212-1234
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

## NOTICE OF DECISION

**JOSEPH CAULFIELD, ESQ**
**CAULFIELD LAW & MEDIATION OFFICE**
**126 PERHAM CORNER ROAD**
**LYNDEBOROUGH NH  03082-6522**

Case Name:   **In the Matter of Dana Albrecht and Katherine Albrecht**
Case Number:   **659-2016-DM-00288**

Enclosed please find a copy of the Court's Order dated May 30, 2019 relative to:

      **Order**

      **DalPra, MM / Introcaso, J.**

June 11, 2019

Sherry L. Bisson
Clerk of Court

(579)
C:  Michael J. Fontaine, ESQ

NHJB-2207-DF (07/01/2011)

# THE STATE OF NEW HAMPSHIRE

## JUDICIAL BRANCH

### Ninth Circuit-Family Division-Nashua

### Docket No. 659-2017-DM-00288

### In the Matter of: Dana Albrecht and Katherine Albrecht

## ORDER

The parties are parents of four children, two of whom are minors: ages 15 and 12. The parties appeared before the court with counsel regarding more than a dozen motions-most filed by the Petitioner. These parties have litigated virtually all issues than exist in a divorce proceeding. They have filed dozens of post Parenting Plan and divorce motions in addition to the current pleadings. The conflict between the parties appears to be never-ending. The level of animosity between them is immeasurable. They are absolutely unable to effectively communicate with one another. Respondent maintains that Petitioner is hacking in to her devices and has "bugged" her home. The court notes that Petitioner continues to live in NH while Respondent resides with the children in CA. In short, there is no order the court can issue that will ease the tension and utter disdain these parties have for one another. If that is ever to happen, it is squarely on the parties to do so. These circumstances serve as the backdrop for the hearing the court conducted on May 9, 2019.

In August 2017 the court heard the first installment of a bifurcated divorce hearing. This hearing dealt with parenting issues. The court issued a Parenting Plan in September 2017. The reader is invited to review the Plan and accompanying narrative (document 176). The reader is also invited to review the narrative and terms of the Divorce Decree (document 248). The order accompanying this narrative may reference either of the 2 documents without quoting from either.

The provisions below will cite document numbers and will refer to allegations in the documents briefly, if at all. The reader is invited to review the documents in conjunction with the provisions of this Order.

RECOMMENDED:

1. Petitioner's Petition for Contempt (doc. 241) is denied. He has failed to prove his allegations that Respondent has refused to allow the children to telephone, text or write. The allegations are simply speculation or suspicion.

2. Petitioner's Petition for Contempt (doc. 273-alleged refusal to allow a second period of summer parenting time) is denied. The child, G▇▇▇, refused to board the plane in CA for the flight to NH. The parties' inability to effectively communicate with one another also led to Respondent's not exercising all his 2018 summer parenting time.

3. Petitioner's Petition for Contempt (doc. 283-winter 2018 parenting time) is denied. Petitioner alleged that Respondent refused parenting time for the December school holiday period. At the time the court formulated the Parenting Plan (September 2017) the court was unaware that the sole winter school vacation was in December. Unlike in

*345*

NH, there is no February (winter) school vacation. There is the December vacation period and a spring vacation period. Further there was reliable evidence that the parties had reached a verbal agreement-also through counsel-regarding the December vacation period. Evidence existed supporting the Respondent's assertion that Petitioner did not comply with the verbal agreement.

4. Respondent's Motion for Contempt (doc. 286-Christmas 2018) is denied. See Paragraph 3.

5. Respondent's Motion to Change the Parenting Plan (doc. 290-decision-manking responsibility) is denied. The Parenting Plan allows Respondent to have final decision-making regarding school choice if there is no agreement between the parties. In the narrative regarding the Parenting Plan (doc. 176) the court was reluctant to issue and order for sole decision-making due to the potential that the party with such authority would abuse it. The conduct of the parties and these proceedings since the issuance of that order has reinforced that finding. Respondent shall ensure that Petitioner is listed as an emergency contact on all the children's school and health records.

6. Respondent's Motion for Contempt (doc. 291-USO, medical insurance) is granted. Petitioner was ordered to provide a certain type of medical insurance for the children in CA. The communications between the parties and counsel are classic examples of each party placing their own interests above those of the children. Petitioner refused to comply with the USO requiring him to provide medical insurance. When he finally did provide some form of medical insurance, Respondent objected and alleged that the type provided was inadequate and alleged some sort of stigma attached to families who participate in the program. She eventually purchased health insurance for the children. Petitioner's obligation to provide health insurance is vacated, effective May 31, 2019. He has been found in contempt. He shall reimburse Respondent for the cost of health insurance for the children from when Respondent purchased same through May 31, 2019. He shall reimburse Respondent the sum of $700.00 as reasonable attorneys' fees and the aforementioned reimbursement in 30 days.

7. Petitioner's Motion for Contempt (doc. 294-failure to allow phone calls) is denied. He has not proven that Respondent does not allow the children to turn on their phones or willfully interferes with any calls.

8. Petitioner's Motion to Compel (doc. 295-C███b's Social Security number) is denied. ██████ is 18 years old; presumably an adult and can apply for his own.

9. Petitioner's Motion to Amend Parenting Plan (doc. 296-school choice) is denied. He has presented no reliable evidence that would warrant a modification this provision of the Parenting Plan. See Paragraph 5, above.

10. Petitioner's Motion to Amend the Parenting Plan (doc. 297-return the children to NH) is denied. There is reliable evidence to show that the parties' two youngest children have a problematic relationship with Petitioner at times and that Petitioner's actions and conduct is the major contributor to these circumstances. Petitioner has not demonstrated the necessary proof that a change in residence of the children would obviate their stress and emotional health. To emphasize yet again: it is the parties' conduct toward one another that adversely affects the children's emotional and psychological health.

11. Petitioner's Motion to Confirm Escrow Order (doc. 315) will be rendered moot by the terms described elsewhere in this order.

12. Petitioner's Motion to Change Court Order (doc. 318) is denied. The NH Supreme Court upheld the provisions of this court's Divorce Decree.

13. Petitioner's Motion for Contempt (doc 320-parental alienation) is denied. The court heard many of the same allegations at the August 2018 parenting portion of this matter. The court does find that Respondent is very hyper-sensitive regarding alleged spying and hacking. The court finds no credible evidence that Petitioner has engaged in any of these activities since the Respondent and children left for CA. The Petitioner has failed to prove allegations of other types of supposed harassment and interference with his parental rights. The evidence gleaned from the August 2017 hearing, as well as in recent hearings, disclosed that any estrangement that exists between Petitioner and his two youngest daughters is largely the result of his actions and obsession with this case.

14. Petitioner's Motions for Contempt (doc. 321 and 322-G██████'s and S█████'s spring vacations) are denied. The evidence disclosed that the girls do not wish to fly to NH for parenting time with the Petitioner. There is insufficient reliable evidence to show that Respondent has willfully disregarded the Parenting Plan or has acted in any way as to discourage parenting time.

15. Respondent's Motion for Attorneys' Fees (doc. 324) is denied without prejudice. The court finds that Petitioner's pleadings border on vexatious and frivolous. The court may revisit this provision should Petitioner file any further pleadings deemed to be so.

16. Petitioner's Motion for Attorneys' fees (doc 325) is denied.

17. Petitioner's Motion for Contempt (doc. 334-S█████'s spring parenting time) is denied. The reliable evidence disclosed that Respondent has encouraged S█████ (15 years old) to travel to NH for parenting time.

18. Respondent's Ex Parte Motion (doc. 335-disbursement of escrow funds is granted. Counsel is authorized to disburse the funds held in escrow pursuant to the terms of the Divorce Decree.

_____   5/30/19 _____
Date

_____ Bruce F. DalPra _____
Bruce F. DalPra, Master

I hereby certify that I have read the recommendation and agree that, to the extent that the marital master has made factual findings, he has applied the correct legal standard to the facts determined by the marital master.

**So ordered:**

_____ 5/30/19 _____
Date

_____ Judge _____

**Julie A. Introcaso**

EXHIBIT

10

# STATE OF NEW HAMPSHIRE

### 9th Circuit-Family Division-Nashua

### Dana Albrecht and Katherine Albrecht

### 659-2016-DM-00288

2019 JUN 21  P 3: 52

## Petitioner's Motion for Reconsideration

Now comes Dana Albrecht, Petitioner, by and through his attorney, requests that this honorable court reconsider its order dated May 30, 2019, and states:

1.  This *Motion for Reconsideration* is being filed because Petitioner believes that this honorable court has misapprehended some of the evidence submitted during trial on May 9, 2019, as well as certain points of law and fact.

2.  The trier of fact considers not only the facts, but the reasonable inferences from those facts. Consequently, Petitioner believes this honorable court has not correctly applied the law, and has held Petitioner to a higher standard of proof than "more likely than not."

3.  It is not frivolous to question whether the court has made a mistake, or misapprehended the facts or reasonable inferences from these facts.

4.  It is also required by our rules that a motion for reconsideration be filed in order to preserve issues for appellate review.

### Telephone Contact

5.  In its order, this court states that "Petitioner ... has failed to prove his allegations that Respondent has refused to allow the children to telephone, text, or write."

6.  However, RSA 461-A:6, I(f) requires that the court shall consider "The support of each parent for the child's contact with the other parent as shown by allowing and promoting such contact." RSA 461-A:6, I(f) requires that the court shall consider "the ability and disposition of each parent to foster a positive relationship and frequent and continuing physical, written, and telephonic contact with the other parent."

7.  Pursuant to the transcript of the hearing of May 9, 2019 (henceforth *transcript*), Petitioner reminded this court of "Katherine's own sworn pleading in which she told them the privacy implications, quote, unquote, of them using phones [owned] by their father." (*see transcript at 11*).

343

8. In Respondent's own sworn pleading (document #244), Respondent admitted (see paragraphs 11 & 12) that:

> *When S▮▮ and G▮▮ returned from Christmas [December 2017] with new phones from their father, Ms. Albrecht said they were welcome to use them. However, since they had previously told her they did not want their father monitoring their communications, she felt it important to tell them the privacy implications of using phones that are owned by him. She explained that all phones (except pre-paid phones) allow the account holder to view usage logs, which include the time, date, phone number, and duration of all phone calls and SMS messages sent or received, although they cannot listen to the calls or read the texts themselves.*
>
> *The girls were unhappy to learn that their father, as the account holder, could determine who they called and texted on their new phones. Neither girl had realized that when they accepted the phones. They felt tricked that their father had not discussed it with them, and were concerned that he would use the phones to monitor them and then abuse the information. Both girls emphatically stated they no longer wanted the phones. Ms. Albrecht reminded them that their father had given them phones to regularly speak to him, not call their friends, and said they had to keep them and use them to speak to him. The girls grudgingly agreed.*

9. The undisputed evidence is that Respondent caused "both girls to emphatically state they no longer wanted the phones" provided by Petitioner. The court's claim in paragraph 1 of its order that "the allegations are simply speculation or suspicion" is inaccurate.

10. The reasonable inference from the fact that Dr. Albrecht told their children about the "privacy implications of using phones that are owned by [their father]" was that Dr. Albrecht caused the children to be convinced of Dr. Albrecht's own paranoid delusions, and also caused the children to be frightened and distrustful of their father.

11. To act accordingly is alienation. The most common cause of parental alienation is <u>one parent wishing to exclude the other parent from the life of their child</u>, though family members or friends, as well as professionals involved with the family (including psychologists, lawyers and judges)[1].

12. Parental alienation is the process, and the result, of psychological manipulation of a child into showing unwarranted fear, disrespect or hostility towards a parent and/or other family members. It is a distinctive form of psychological abuse and family violence, towards both the child and the rejected family member, that occurs almost exclusively in association with family separation or divorce, particularly where legal action is involved.[2]

13. Parental alienation often leads to the long-term, or even lifelong, estrangement of a child from one parent and other family members, and, as a significant adverse childhood experience and

---

1    See https://en.wikipedia.org/wiki/Parental_alienation (internal citations omitted.)
2    *Id.*

form of childhood trauma, results in significantly increased lifetime risks of both mental and physical illness.[3]

14. The court also states in paragraph 7 of its order that Petitioner "has not proven that Respondent does not allow the children to turn on their phones or willfully interferes with any calls."

15. Petitioner observes that it is not necessary for Respondent to have done so, as she long ago caused caused "both girls to emphatically state they no longer wanted the phones" provided by Petitioner.

## The Sierra Madre Police Incident on August 28, 2018

16. On September 1, 2017, this court permitted Respondent to relocate with their minor children to Pasadena, CA. Respondent represented that she and their children would reside with Respondent's mother, Ms. Elaine Hodgkinson, at Ms. Hodgkinson's residence at 2610 Deodar Circle, Pasadena, CA.

17. In March 2018, Respondent and their children began spending time in a second home at 730 W Alegria Ave, Sierra Madre, CA. *See Transcript at 95-96.*

18. On August 28, 2019, at approximately 0500 hours, Sgt. Amos (#130) and Officer Deem (#10831) of the Sierra Madre Police Department were dispatched to Respondent's home at 730 W Alegria Ave, Sierra Madre, CA as a consequence of Respondent reporting a burglary in progress. Officer Kenneth Berry (#117) was then dispatched at 6:11 am to assist Sgt. Bailey (#10906), Sgt. Amos, and Ofc. Deem. The relevant police report (#180537) was admitted into evidence as Petitioner's "Exhibit 2."

19. On August 28, 2019 Petitioner was unaware that Respondent and their children had moved. Respondent did not disclose to Petitioner that she and their children had moved to Sierra Madre, CA until January 2, 2019, nine months later. *See Transcript at 46.*

20. Respondent reported to the Sierra Madre Police that on Tuesday, August 29, 2019, at approximately 5:30 a.m. she heard the sounds of something aggressively impacting the east facing door of the residence. Respondent reported that she went to check on the disturbance and also reported that somebody was outside attempting to force their way in.

21. Respondent said <u>she also heard the sound of a drill</u> being operated and <u>feared somebody was going to use the drill on the door locks in an attempt to gain entry.</u>

22. As a result, Respondent ran into C███'s bedroom and woke him up. Respondent said that C███ screamed in fear when he realized somebody was attempting to gain access inside. C███ also turned on a light in the kitchen. According to Respondent, these actions caused the suspect(s) to stop their activities and flee the location.

3    *Id.*

23. Respondent said she believed the suspect(s) were somehow affiliated with Petitioner. She said this was the reason she had so many monitoring devices placed in and around the house. She also stated there have been several other crime reports made with the Sierra Madre Police Department.

24. Respondent, however, was unable to show the police anything around the property that was either freshly disturbed or was missing.

25. Officer Kenneth Berry (#117) reported[4] that:

> *I arrived and I met with Sgt. Baily who requested that I get statements from the three children. I spoke to C███ A███ who told me that at about 5:30 a.m., he was awakened by his mother Katherine Albrecht because she told him she head someone at the front door. C███ said he and his mother went outside and walked around the house, but they did not notice anything unusual. C███ stayed home while his mother and two sisters, S███ A███ and G███ A███, drove to the police department. C███ said he did not see any cars parked behind his mother's car in the driveway, any cars parked in the street, or any persons on the property.*
>
> *I spoke to S███ A███, who told me at about 5:30 a.m., she was asleep in the same room as her sister, G███. S███ heard her mother "freaking out" and someone scream. Respondent told S███ to lock the front door while Respondent and C███ went to check outside. S███ said after she locked the front door, she <u>saw on the camera monitor,</u> which was on the counter next to the front door, lights come on from a car parked behind mom's car in the driveway, reverse out of the driveway, and drive westbound. She said she saw a second car that was parked in front of the house drive eastbound. S███ said she could not describe either car and she could not describe anyone who was inside either car.*

26. The police further noted that Respondent's extensive surveillance system was non-operational and could not record. Respondent told the police that the reason she had so many monitoring devices placed in and around the house was because Petitioner, who lives in New Hampshire, had "essentially been stalking her." Respondent told the police that none her video monitoring devices record because Petitioner had the expertise to disable them and had "bugged" her house.

27. Consequently, S███ reported to the Sierra Madre police that S███ "saw" events occur on a non-operation camera monitor.

28. The reasonable inference from these facts is that Dr. Albrecht has caused their daughter S███ to be convinced of Dr. Albrecht's own paranoid delusions.

29. Officer Kenneth Berry (#117) also reported[5] that:

4       See the police report in evidence.
5       *Id.*

*I then spoke to G███ A█████, who told me at about 5:30 a.m., she was asleep in her
bedroom and she was awakened by her mother "freaking out" and her brother's scream.
She stood at the front door with her sister, S████, while her mother and brother went
outside. She thought she saw a car back out of the driveway while she was looking at
looking at the camera monitor. She could not describe the car and she did not describe
anyone inside the car.*

30. Consequently, G███ reported to the Sierra Madre police that G███ "thought she saw" events
occur on a non-operation camera monitor.

31. The reasonable inference from these facts is that Dr. Albrecht has caused their daughter G███
to be convinced of Dr. Albrecht's own paranoid delusions.

32. The Sierra Madre Police further documented that Officer Baily discovered "inconsistencies" in
the children's statements.

33. Dr. Albrecht "heard" the "sound of a drill, … fearing that somebody was going to use the drill
on the door locks in an attempt to gain entry," woke up screaming, and caused their children to
report that she was "freaking out." Dr. Albrecht then <u>drove to the police station with S███ and
G███, all while blaming Petitioner for this incident.</u>

34. Respondent testified that the Sierra Madre Police Report accurately characterized these events.
*See transcript at 161-164.*

35. The reasonable inference from these facts is that Respondent has caused the children to be
frightened and distrustful of their father. To act accordingly is alienation.

## Paragraphs 10 and 13 of the court's order.

36. Petitioner acknowledges that "the parties' two youngest children have a problematic
relationship with Petitioner at times."

37. However, the court claims (paragraph 10) that "Petitioner's actions and conduct is the major
contributor to these circumstances," and (paragraph 13) "any estrangement that exists between
Petitioner and his two youngest daughters is largely the result of his actions." Petitioner
continues to deny this.

38. The court did not explain how Petitioner's actions contributed to the Sierra Madre Police
Incident, or how Petitioner's actions caused their children to "to emphatically state they no
longer wanted the phones" provided by Petitioner.

39. Petitioner also testified at trial on May 9, 2019 that more recently he had not been able to
contact his daughters S███ or G███ at all since Christmas in 2018. *See Transcript at 8.* This
is not disputed. By a reasonable inference, consequently Petitioner's actions since Christmas
2018 could not in any way have contributed to his problematic relationship with their daughters.

40. The court should have explained how Respondent's actions have contributed to these circumstances.

## **Education Decisions**

41. The court granted Dr. Albrecht the final authority to make educational decisions for the parties' children in the event the parties do not agree. This has amounted to de-facto sole-decision making authority exercised by Dr. Albrecht, without any participation by Petitioner.

42. Petitioner has previously advised this court that it should refer to <u>In the Matter of Kurowski & Kurowski, 161 NH 578 (2011)</u> for guidance, most recently testifying that "I'd like the Judge to read sort of about the Cowapowski (phonetic) case in the pleadings." *See transcript at 55.*

43. Paragraph 5 of the court's order notes that:

> *In the narrative regarding the Parenting Plan (doc. 176) the court was reluctant to issue and order for sole decision-making due to the potential that the party with such authority would abuse it. The conduct of the parties and these proceedings since the issuance of that order has reinforced that finding.*

44. The party to whom the court gave more decision making authority is Dr. Albrecht. The court has found this decision making authority has been abused. By a logical necessity, the court has found that Dr. Albrecht has abused her decision making authority.

45. Respondent also testified that decisions concerning counseling for the children do not need to be made jointly in California. *See transcript at 166.* She has refused to cooperate with Petitioner concerning joint decision making for counseling for their children.

46. The only remedy the court has ordered is to require that "Respondent shall ensure Petitioner is listed as an emergency contact on all the children's school and health records."

47. This ineffective remedy in no way curtails Dr. Albrecht's abuse of her de-facto sole-decision making authority.

## **Counseling**

48. On September 1, 2017, Petitioner requested that this court "order the parties and their children to attend Family Systems Therapy; or as the parties otherwise agree." *See Petitioner's Verified Motion for Reconsideration (document #180), Prayer (H).*

49. In its order dated October 2, 2017, this court denied Petitioner's request.

50. On May 9, 2019, Respondent testified that their daughter S█████ now refuses to see a counselor. *See transcript at 154.*

51. In its most recent order, this court has re-iterated that it will not "order the parties and their children to attend Family Systems Therapy; or as the parties otherwise agree," by stating that "there is no order the court can issue that will ease the tension and utter disdain these parties have for one another."

52. Petitioner has previously raised the issue that high-conflict divorce is highly correlated with one or both parents having a "cluster B" personality disorder, such as borderline or narcissistic personality disorder. He wishes to do so again here.

53. Mr. Albrecht's treating therapist, Dr. Hildreth Grossman, has not diagnosed Mr. Albrecht with any personality disorder.

54. The court did not order any form of court-ordered counseling or mental health evaluation for either of the parties or their children. Based upon the facts about and the reasonable inferences thereof, the court should have done so.

## Frequent and continuing contact between each child and both parents

55. RSA 461-A:6, I(l) requires that this court consider whether its parenting plan and subsequent orders have supported "frequent and continuing contact between each child and both parents" pursuant to the policy of the state regarding the determination of parental rights and responsibilities described in RSA 461-A:2.

56. Since the court issued its *Final Parenting Plan,* Petitioner has had a total of 38 days of parenting time with S███ and G███ from September 1, 2017, to the present time, a period of over one and a half years. *See document #322, paragraphs 39-42.*

57. Petitioner testified at trial on May 9, 2019 that more recently he had not been able to contact his daughters S███ or G███ at all since Christmas in 2018. *See Transcript at 8.*

58. Respondent has caused their daughters S███ and G███ to have separate school vacations by enrolling them, against Petitioner's wishes, in two different private schools. Neither private school's vacation schedule comports with the public school vacation schedule where their children reside. *See Transcript at 55.*

59. The court's present Parenting Plan does not "frequent and continuing contact between each child and both parents." The court has not amended its Parenting Plan. Based upon the facts above and the reasonable inferences thereof, the court should amend its Parenting Plan to support "frequent and continuing contact between each child and both parents."

## Heinrich and Curotto, 160 NH 650 (2010)

60. Petitioner has been unemployed for the duration of these proceedings, and remains so.

61. Respondent is currently on SSDI.

62. This court has found the parties cannot effectively communicate.

63. In <u>Heinrich and Curotto, 160 NH 650 (2010)</u>, our Supreme Court noted that the Derry Family Division trial court:

> *worried that the Florida parenting plan "would require <u>significant air travel</u>, which involves a cost factor that the parties may or may not be able to realistically afford, as well as requiring the parties to <u>effectively communicate</u>, which they have been unable to do so to date."*

when it upheld the trial court's decision to <u>deny</u> a mother's request to relocate their family's minor children to Florida.

64. Consequently, the court's current *Parenting Plan* is not consistent with <u>Heinrich</u> in light of how well the parties can "effectively communicate" and whether they can "realistically afford significant air travel."

## <u>Tomasko v. Dubuc, 145 NH 169, 172 (2000)</u>

65. In paragraph 10 of its order denying P*etitioner's Motion to Amend the Parenting Plan (document #297)*, this court did not properly examine the factors set forth in <u>Tomasko v. Dubuc, 145 NH 169, 172 (2000)</u>, which include:

(1) each parent's reasons for seeking or opposing the move; (2) the quality of the relationships between the child and the custodial and noncustodial parents; (3) the impact of the move on the quantity and quality of the child's future contact with the noncustodial parent; (4) the degree to which the custodial parent's and child's life may be enhanced economically, emotionally, and educationally by the move; (5) the feasibility of preserving the relationship between the noncustodial parent and child through suitable visitation arrangements; (6) any negative impact from continued or exacerbated hostility between the custodial and noncustodial parents; and (7) the effect that the move may have on any extended family relations.

## <u>The Family's Medical Needs and RSA 461-A:6, I(b)</u>

66. In determining the best interests of the child, RSA 461-A:6, I(b) requires that the court consider "the ability of each parent to assure that the child receives adequate food, clothing, shelter, medical care, and a safe environment."

67. Respondent did not allow any dental treatment <u>at all</u> for their daughter G███ for over fifteen months, causing G███ to have eleven dental caries ("cavities") and require costly sedation dentistry.

68. Respondent Dr. Albrecht has been diagnosed with stage IV breast cancer with brain metastases.

69. Respondent testified that her mother, Ms. Elaine Hodgkinson, has stage IV ampullary cancer, which is related to pancreatic cancer, and that Respondent spends "a considerable amount [of time] taking care of my mom." *See transcript at 95-96*. Respondent did not disclose this information to Petitioner prior to trial. Respondent also did not elaborate on her mother's prognosis, but as this is a terminal condition, it does not appear to be positive.

70. Respondent also testified that her sister, Ms. Laura Minges, "is disabled," and "had a series of health problems." *See transcript at 95-96*.

71. Respondent has been locking their children, alone, inside her residence at 730 W Alegria Ave in Sierra Madre, CA with zip ties while traveling to 2610 Deodar Circle in Pasadena, CA to care for her mother. *See transcript at 144-146*.

72. It is unclear, under these circumstances, who is caring for the parties' children.

### Petitioner is unemployed

73. Petitioner has not worked outside the parties' home or family business since 2004 and is presently unemployed. Petitioner submitted to this court, as evidence, a report by his treating therapist, Dr. Hildreth Grossman. In her report dated May 6, 2019 , Dr. Grossman stated:

> *I have seen Mr. Albrecht in psychotherapy since April 11, 2016. He came to therapy under severe stress caused by marital conflicts. At the time, his wife had taken out a restraining order after having the police come and remove him from their home. That began a series of court battles and police filings by Mrs. Albrecht in which Mr. Albrecht had to continually defend himself. The outcome of these accusations has been to exonerate Mr. Albrecht. Clearly the effect of having to continually defend himself against unwarranted accusations has exacerbated the stress, anxiety and depression Mr. Albrecht has struggled with through this process.*

74. Dr. Grossman also stated:

> *Mr. Albrecht's stress and strain emotionally and financially have made it difficult if not impossible to seek adequate employment. He has relied on the generosity of his father to support him through his tribulations. The oldest Albrecht son, P___ has chosen to spend time with his father working on university courses toward his bachelor's degree. Mr. Albrecht is enjoying spending time with P___ and working to restore their relationship. He has made it a point to avoid putting his son in the middle of the enduring difficulties between himself and Mrs. Albrecht. P___ was witness to some of the falsehoods Mrs. Albrecht rendered during a visit between the children and their father in California. Mr. Albrecht has avoided asking P___ to testify in court to eliminate the potential wrath by his mother for being disloyal.*
>
> *Mr. Albrecht is a forthright person who works very hard in therapy and is always willing to look at himself as well as his situation in order to understand what has been happening to him. He has a deep and sincere need to know and tell the truth.*

75. As to Petitioner's prognosis, Dr. Grossman remarked:

> *Mr. Albrecht has a strong motivation to get his life in order. I experience him as very hard working in therapy. I believe that <u>when access to his children is stable</u> and follows the judgment in his divorce decree, and when he finds employment in a field of his expertise and interest, an enormous amount of anxiety and depression will lift. He is also willing to do more work looking at his acceptance of a harmful spousal relationship and work on how to look for and feel entitled to healthier and more rewarding connections.*

### The children's health insurance and the USO

76. Petitioner, who has been unemployed for the duration of these proceedings, nevertheless faithfully paid $350/month in child support to Respondent from September 9, 2016 through February 14, 2018 under the courts temporary USO (document #42).

77. Petitioner also faithfully paid $50/month in child support to Respondent from February 14, 2018 to the present time under the court's final USO (document #247).

78. Petitioner has also faithfully paid for Medi-share to cover <u>all four</u> of the parties children from the commencement of this action on April 15, 2016 to the present time. The current cost is $434 per month. *See transcript at 90.*

79. On December 22, 2018, Petitioner obtained Medi-Cal coverage under the Affordable Care Act (ACA) for S███ and G███ through "Covered California," the "Official Site of California's Health Insurance Marketplace." Petitioner also continued to maintain the Medi-Share coverage for all four of the parties children (P██, C██, S███, and G███) that Petitioner has paid for for the duration of these proceedings and that has been the primary coverage for all four children since 2011.

80. With no finding concerning Petitioner's ability to pay, the court in paragraph 6 of its order has now found Petitioner in contempt, and required him to pay $700 in attorneys' fees, as well as to reimburse Respondent "for the cost of health insurance for the children from when Respondent purchased same through May 31, 2019," an <u>undetermined amount</u>, even though the parties' minor daughters S███ and G███ were <u>already covered</u> through <u>both</u> Medi-Cal and Medi-Share.

81. Paragraph 16A of the USO (document #247) stated that "Obligor is ordered to provide private health insurance for the child(ren) effective <u>Continuing – See Decree re providing coverage under Blue Shield of California</u>"

82. However, Petitioner could not find any place in the Decree (document #248) the court described "providing coverage under Blue Shield of California."

83. Consequently, it appears that Petitioner did not understand this court's order, believing in good faith that this court had made a scrivener's error on the USO (document #247) in paragraph 16A.

84. Consequently, this court should now explain why it failed to describe "providing coverage under Blue Shield of California" in its Decree (document #248) when its USO (document #247) referenced this.

85. If the court did not make a scrivener's error, then Petitioner now asserts the court's USO order was "vague and indefinite" and was incomprehensible to Petitioner.

86. Blue Shield of California is a private California not-for-profit mutual benefit corporation.

87. Medi-Cal and Blue Shield of California are both controlled by California and Federal Law, not New Hampshire law.

88. Based upon the facts above, the reasonable inference is that requiring Petitioner, who is unemployed, to have purchased a <u>new</u>, and higher-cost health plan for their children directly from a private California not-for-profit mutual benefit corporation, rather than under the Affordable Care Act (ACA) from "Covered California," the "Official Site of California's Health Insurance Marketplace," was an unsustainable exercise of discretion.

## RSA 461-A:6, I(m)

89. RSA 461-A:6, I(m) requires, when determining the "best interests of the child," that the court shall consider "any other additional factors the court deems relevant."

90. Concerning a "Judicial Enforcement of Parenting Plan," RSA 461-A:4-a requires that "Any motion for contempt or enforcement of an order regarding an approved parenting plan under this chapter, if filed by a parent, shall be reviewed by the court within 30 days."

91. On March 30, 2018, Petitioner filed *Petitioner's Motion for Contempt re Telephone Contact and Written/Electronic Communication with Children* (document #241).

92. On August 21, 2018, Petitioner filed *Petitioner's Motion to Schedule Outstanding Parenting Motions* (document #274).

93. On May 9, 2019, this court heard *Petitioner's Motion for Contempt re Telephone Contact and Written/Electronic Communication with Children* (document #241).

94. Petitioner believes the court should state whether it considered any "additional factor" that is "relevant" to the best interests of the child pursuant to RSA 461-A:6, I(m).

**Paragraphs 15 and 16 of the court's order**

95. Petitioner also wishes to remind the court that he filed a no-fault petition for Legal Separation on April 15, 2016 (document #1) in response to Respondent's DV action filed against him a week earlier on April 8, 2016. Respondent then filed her cross-petition alleging fault grounds on April 27, 2017 (document #7).

96. Respondent has also filed numerous "potty pleadings" with this court, and has continued to do so as recently as January 25, 2019. The court may refer to paragraph 7 of document #290, filed by Respondent.

97. The court has made no finding why Respondent's motion for attorney's fees was denied without prejudice, but Petitioner's motion was apparently denied "with prejudice."

98. Petitioner notes that many of his motions have been made simply to defend himself against Respondent's numerous "potty pleadings."

99. Petitioner notes that his other motions, which the court now describes as "border[ing] on vexatious and frivolous," have been limited in scope to parenting and financial issues.

100.     The court should advise whether it finds paragraph 7 of document #290 filed by Respondent either "vexatious" or "frivolous."


WHEREFORE, the Petitioner prays this Honorable Court for relief as follows:

A) Reconsider its order dated May 30, 2019; and,

B) Find that Respondent caused both S████ and G████ "to emphatically state they no longer wanted the phones" provided by Petitioner; and,

C) Grant Petitioner's Motions for Contempt (documents #241 and #294) regarding phone calls; and,

D) Adopt Petitioner's proposed Parenting Plan (document #298); or,

E) Develop a new parenting plan that "supports frequent and continuing contact between each child and both parents," comports with RSA 461-A:4, VI, and is in the best interests of the children; and,

F) Order the parties and their children to attend Family Systems Therapy; or as the parties otherwise agree,

G) Deny Respondent's Motion for Contempt (document #291) concerning the USO; and,

H) Vacate paragraphs 15 and 16 of its order; and,

I) Deny Respondent's Motion for Attorneys' Fees (document #324) with prejudice; and,

J) Set forth the reasons for its decision in a written order; and,

K) For such other relief as this Court deems just and reasonable.

Respectfully submitted,

June 21, 2019

Dana Albrecht
by his attorney

Joseph Caulfield, Esq.
NH Bar #262
Caulfield Law & Mediation Office
126 Perham Corner Rd.
Lyndeborough, NH  03082
603-505-8749

MASTER RECOMMENDS: Denied

6/26/19
Date          Bruce F. DalPra, Master

Approved & so ordered.

JUN 30 2019

MARK S. DERBY

State of New Hampshire
Hillsborough, SS

Now comes Dana Albrecht and swears that the foregoing is true to the best of his knowledge and belief.

June 21, 2019

Joseph Caulfield
NH Justice of the Peace
Comm. expires Dec. 3, 2019

Certification

I sent this date a copy of this Motion to Atty. Fontaine.

Joseph Caulfield, Esq.

```
┌─────────────────┐
│    EXHIBIT      │
│                 │
│      11         │
│   ─────────     │
└─────────────────┘
```

# THE STATE OF NEW HAMPSHIRE

## SUPREME COURT

### In Case No. 2019-0436, <u>In the Matter of Dana Albrecht and Katherine Albrecht</u>, the court on September 16, 2019, issued the following order:

Notice of appeal is declined.  <u>See</u> Rule 7(1)(B).

Under Supreme Court Rule 7(1)(B), the supreme court may decline to accept a notice of discretionary appeal from the superior or circuit court.  No appeal, however, is declined except by unanimous vote of the court with at least three justices participating.

This matter was considered by each justice whose name appears below.  If any justice who considered this matter believed the appeal should have been accepted, this case would have been accepted and scheduled for briefing.

Katherine Albrecht's motion for summary affirmance is therefore moot.  Her request for attorney's fees is denied.

<u>Declined.</u>

Hicks, Bassett, Hantz Marconi, and Donovan, JJ., concurred.

<b>Eileen Fox,<br>Clerk</b>

Distribution:
9th N.H. Circuit Court - Nashua Family Division, 659-2016-DM-00288
Honorable Mark S. Derby
Honorable Julie A. Introcaso
Marital Master Bruce F. DalPra
Mr. Dana Albrecht
Michael J. Fontaine, Esquire
Israel F. Piedra, Esquire
Kathleen A. Sternenberg, Esquire
File

```
┌─────────────────────┐
│      EXHIBIT        │
│                     │
│        12           │
│      _____         │
└─────────────────────┘
```

## THE STATE OF NEW HAMPSHIRE

## SUPREME COURT

### In Case No. 2019-0436, <u>In the Matter of Dana Albrecht and Katherine Albrecht</u>, the court on October 25, 2019, issued the following order:

Supreme Court Rule 22(2) provides that a party filing a motion for rehearing or reconsideration shall state with particularity the points of law or fact that he claims the court has overlooked or misapprehended.

We have reviewed the claims made in the petitioner's motion for reconsideration and conclude that no points of law or fact were overlooked or misapprehended in the decision to decline the petitioner's appeal. Accordingly, upon reconsideration, we affirm the September 16, 2019 decision and deny the relief requested in the motion.

Respondent's request for attorney's fees is denied.

<u>Relief requested in motion for reconsideration denied.</u>

Hicks, Bassett, Hantz Marconi, and Donovan, JJ., concurred.

**Eileen Fox,
Clerk**

Distribution:
9th N.H. Circuit Court - Nashua Family Division, 659-2016-DM-00288
**Honorable Mark S. Derby**
Honorable Julie A. Introcaso
Marital Master Bruce F. DalPra
Mr. Dana Albrecht
Michael J. Fontaine, Esquire
Israel F. Piedra, Esquire
Kathleen A. Sternenberg, Esquire
Allison R. Cook, Supreme Court
File

**EXHIBIT**

**13**

1

STATE OF NEW HAMPSHIRE

2

9TH CIRCUIT COURT - FAMILY DIVISION - NASHUA

3

4        KATHERINE ALBRECHT,                    )
                                                ) Family Division Case No.
                              Petitioner,       ) 659-2019-DV-00341
5                                               )
                    vs.                         ) Nashua, New Hampshire
6                                               ) December 20, 2019
         DANA ALBRECHT,                         ) 8:34 a.m.
7                                               )
                              Respondent.       )
8        _____        )

9

DOMESTIC VIOLENCE HEARING

10

BEFORE THE HONORABLE MARK S. DERBY
JUDGE OF THE CIRCUIT COURT - FAMILY DIVISION

11

APPEARANCES:

12

13        For the Petitioner:          Michael Fontaine, Esq.
                                        WELTS, WHITE & FONTAINE, P.C.
                                        29 Factory Street
14                                      PO Box 507
                                        Nashua, NH 03061-0507

15

16        For the Respondent:          Joseph Caulfield, Esq.
                                        CAULFIELD LAW & MEDIATION
                                        OFFICE
17                                      126 Perham Corner Road
                                        Lyndeborough, NH 03082-6522

18

19        Audio Operator:              Electronically Recorded
                                        **Not Monitored**

20

21        TRANSCRIPTION COMPANY:       eScribers, LLC
                                        7227 N. 16th Street, Suite 207
22                                      Phoenix, AZ 85020
                                        (800) 257-0885
                                        www.escribers.net

23

24        Proceedings recorded by electronic sound recording; transcript
          produced by court-approved transcription service.

25



1   window.

2       Q   You also recall the courts order in May, referencing

3   that the court found evidence existed supporting Katherine's

4   assertion that you did not comply with the verbal agreement

5   reached between counsel for the December incident?

6       A   I don't.  May I see the order, please?

7       Q   Does it say that?

8       A   Yes.

9       Q   Okay.  So you're a very detailed person, wouldn't you

10  say?

11      A   Sometimes.

12      Q   Did you read the order?

13      A   Some time ago.

14      Q   Did you find -- did you see what the judge said

15  regarding his findings against you on that regard?

16      A   May I see that one more time?

17          MR. FONTAINE:  It's on the second page, Your Honor,

18  that order.

19      A   Yes.

20          MR. FONTAINE:  Top of -- very top, first paragraph.

21      A   Yes.

22  BY MR. FONTAINE:

23      Q   Okay.  So despite the fact that your children are

24  telling you they don't want to have contact, despite the fact

25  that the court is saying that you violated an agreement

1    reached between counsel -- your counsel and me -- regarding

2    your December visit, despite the fact that you were asked

3    politely to leave the church, despite the fact that you were

4    found to have -- strike that.  Despite all those things, you

5    still thought it was appropriate to one, show up at the

6    church, two, not leave the church when you were asked to

7    leave?  You thought all that was appropriate, given the

8    backdrop here?

9        A   Haven't seen my kids in 10 months, and this parenting

10   plan isn't being followed, so I have to see my kids.

11       Q   So you're just going to keep insisting --

12       A   And I have no way to contact them, so yes.  No way to

13   contact them.

14       Q   Okay.  So do you understand why Katherine, who

15   testified to this, who's concerned for her safety regarding

16   the fact that you showed up like this?

17       A   Yeah.  We've got her emergency room psych admission.

18   She's --

19           MR. FONTAINE:  Your Honor, again, here we go.

20       A   That's why.

21           THE COURT:  So one of the --

22           MR. FONTAINE:  I didn't ask anything about the psych

23   admission.

24       A   Well, you asked if I understood.  I'm answering his

25   question.

1        THE COURT:  No, you're -- you need to ask the little

2   bits -- answer the question that is asked.  And if there's

3   something like that that you didn't think of, that's

4   important, your attorney will have an opportunity called

5   redirect, to bring up those things and explore those areas, if

6   he thinks it's necessary.

7        THE WITNESS:  Well --

8        THE COURT:  Attorney Fontaine -- so I am striking

9   that last bit.  Ask your question again, give an answer, and

10  let's try it again.

11      A   I am sitting peacefully in a pew, if she wants to

12  leave, she can.  If she wants to sit peacefully in another

13  pew, she can.

14  BY MR. FONTAINE:

15      Q   But you understand why she was concerned for her

16  safety, why she was upset, why she was distraught; do you

17  understand that?

18      MR. CAULFIELD:  Objection to the form of the

19  question.  Why she was concerned, why she was upset, why she

20  was distraught -- can we have separate questions?

21      THE COURT:  I think the question can be phrased in a

22  way that would not call for speculation as to what Dr.

23  Albrecht was thinking.

24      MR. FONTAINE:  Yep.  Sure.

25      THE COURT:  So I'll ask you to rephrase.



1   BY MR. FONTAINE:

2       Q  You understand why she would testify that she felt

3   that she was in fear for her safety?

4           MR. CAULFIELD:  Objection to the form of the

5   question.

6           THE COURT:  Overruled.

7   BY MR. FONTAINE:

8       Q  Do you understand?

9       A  She's trying to hit me with a DV, because it's all

10  about parenting.

11      Q  Sir, do you understand why that would cause her to

12  feel that way, to testify that way?  To testify that?

13      A  I'm a peaceful person.

14          MR. CAULFIELD:  Your Honor, I want to renew my

15  objection, because he's asking two different things.  He's

16  asking this witness to explain why his witness would testify

17  in a certain way, and then, in the same question, he's asking

18  this witness to testify as to why his witness would feel a

19  certain way.  Assuming that either of those are marginally

20  appropriate, it's a double question, and we won't know what

21  his answer is.

22          MR. FONTAINE:  Your Honor, if I just may point out,

23  you gave this --

24          THE COURT:  I'm overruling the objection.

25          MR. FONTAINE:  Thank you.



1   BY MR. FONTAINE:

2       Q   Now can you answer the question, please?

3       A   I'm a peaceful person.   There's no restraining order.

4   If she wants to approach me, she can.   If she wants to ignore

5   me, she can.   If she wants to leave the church, she can.

6       Q   And you're just going to show up wherever you feel

7   like it?   Is that your feeling?   That you can just show up

8   wherever you feel like it, interject yourself in her life and

9   in the children's life whenever you feel like it?   Isn't that

10  your feeling, that you can do that?

11          MR. CAULFIELD:   Objection to the form of the

12  question.

13          THE COURT:   Overruled.   You can answer the question.

14      A   I think if my children are eight miles from my house,

15  when they normally live three thousand miles away, that's

16  appropriate.

17      Q   Even when it's not your parenting time?

18      A   Especially if it's my adult son.

19      Q   Did your adult --

20      A   Oh, and I have no way to contact my children.

21      Q   So let me ask you, when was the last time that you

22  visited with your adult son, C       ?

23      A   At Christmas.

24      Q   Of 2018, correct?

25      A   Yes.



1      Q   Your son has also refused, based upon the incident in

2   December, to visit with you, hasn't he?

3      A   I'm not aware of that.

4      Q   Why else wouldn't he have had contact with you since

5   that incident?

6      A   He's had plenty of contact.

7          MR. CAULFIELD:   Objection to the form of the

8   question.

9          THE COURT:   Overruled.   Answer the question.

10     A   You asked about visit, he's had plenty of contact.   In

11  fact, I talked to him a couple of days ago.

12     Q   I said visits, sir.

13     A   I haven't asked him to.

14         MR. FONTAINE:   Again, Your Honor, he interjects

15  constantly what he wants to say.   His attorney -- he's leading

16  his attorney to tell him what to --

17         THE COURT:   No.   No.   No.

18         MR. FONTAINE:   -- cross-examine him on.

19     A   No.   Are we talking about visit or talk?

20         THE COURT:   Everybody stop talking.

21         You're going to answer the question that is asked.

22  Now, I'm sure your brain is moving ahead and thinking the next

23  step ahead and providing an explanation and trying to draw

24  conclusions.   But it's my job to draw the conclusions from the

25  facts.   Okay?

1          THE WITNESS:  Okay.

2          THE COURT:  So just answer the questions.  And if

3   there's something that your attorney feels important enough --

4   if your attorney thinks I'm not getting it, he can ask you

5   questions on redirect.

6          Go ahead.

7          THE WITNESS:  Okay.

8   BY MR. FONTAINE:

9      Q  Answer the question.

10     A  Repeat the question, please.

11         THE COURT:  I think it was about physical visitation

12  with C███ since --

13         MR. FONTAINE:  Yes.  Thank you.

14         THE COURT:  -- December.

15  BY MR. FONTAINE:

16     Q  Have you had any physical visitation with C███ since

17  the December 2018 parenting time?

18     A  No.

19     Q  Have you had any contact with your girls, at all, the

20  two minor children, since the December incident?

21     A  No.

22     Q  Have you ever called your children, written to them,

23  sent them a letter, done anything to apologize for the

24  incident on November 3rd?

25     A  I have no way to contact them.

1    Q  You can't send them a letter in the mail?  You know

2  their address, right?

3    A  Is it 730 West Alegria or 2610 Deodar Circle?

4    Q  Sir, could you have sent a letter to both, if you

5  cared?

6    A  I sent birthday cards and gifts.

7    Q  Okay.  But you've never apologized for the incident

8  that you created on November 3rd, did you?

9       MR. CAULFIELD:  Objection.  "Incident you created".

10      THE COURT:  Yeah.  I think that that's inserting --

11      MR. FONTAINE:  Okay.

12      THE COURT:  -- enough little commentary there.  Just

13  rephrase.

14      MR. FONTAINE:  All right.  I'll rephrase it.  I'll

15  rephrase it.

16  BY MR. FONTAINE:

17    Q  You never apologized or contacted your children

18  regarding what happened on November 3rd, did you?

19    A  No.

20    Q  Cause you --

21    A  I don't think I need to.

22    Q  Okay.  Did you ever contact Katherine to discuss what

23  had happened on November 3rd?

24    A  Katherine refuses to communicate with me, except

25  through counsel.

1    Q   Did you ever try to contact her through my office,

2   then?

3    A   I've tried to contact her through your office many

4   times.

5    Q   Okay.   Have you ever contacted her regarding the

6   November 3rd incident and what happened?

7    A   The November 3rd incident at Collinsville?

8    Q   Yes.   You -- are you --

9    A   I -- we just switched gears from Christmas to

10   November, I'm just making sure I understand the question.

11          THE COURT:   He has shifted gears, and he's asking

12   you if, using the mechanism that Katherine set out, which is

13   you communicate through counsel -- have you reached out to his

14   office to talk about, confront, or apologize for what happened

15   on the 3rd of November?

16    A   Not to discuss the 3rd.

17    Q   You don't think you did anything wrong on the 3rd, do

18   you?

19    A   No, I don't, sir.

20    Q   All right.   Let's talk about the Christmas incident in

21   more detail.   Do you -- you don't dispute, do you, that there

22   was an agreement reached between your attorney, on your

23   behalf, and Katherine's attorney, on her behalf, that you

24   would have parenting time in Christmas break of 2018, from

25   December 23rd to December 28th, do you?

# The State of New Hampshire
# Circuit Court



**EXHIBIT**

**14**

David D. King
*Administrative Judge*

Susan W. Ashley
*Deputy Administrative Judge*

*Senior Administrator*
Gina Belmont, Esq.

*Administrators*
Kate E. Geraci, Esq.
Paula Hurley, Esq.
Patrick W. Ryan, Esq.
Brigette Siff Holmes, Esq

February 3, 2020

Robert T. Mittelholzer, Esq.
Executive Secretary
State of New Hampshire
Judicial Conduct Committee
132 Chapel Street
Portsmouth, NH  03801

**Sent via email:  rmittelholzer@nhjcc.com**

<u>Re:  Judge Julie Introcaso – Pending JCC Matter</u>

Dear Attorney Mittelholzer:

I am aware of the pending JCC matter involving a complaint filed by Robin Partello, on or about September 19, 2019, having been provided a copy.  The complaint arose out of litigation in a custody matter, currently pending in the 9th Circuit Family Division in Nashua captioned <u>In the Matter of David Campbell and Robin Partello</u>, Case Number 659-2018-DM-00702.

Upon return from leave, Judge Introcaso requested that staff bring her this file for purposes of allowing her to review it in preparation of her answer.  In the course of providing the original file to the judge, and handling it during this time, court staff discovered two handwritten orders which had been obscured by white out tape.  As soon as these alterations were brought to my attention, I contacted Mary Ann Dempsey, General Counsel to the Judicial Branch and Supreme Court and requested that she conduct an investigation to try and determine what happened with this file, and who was responsible for the alterations.  We had the file delivered to our offices and reviewed it.  In addition to the orders which had been covered with white out tape, a number of other unusual alterations to the file were found.  These included missing original documents, insertion of photocopies of pleadings and handwritten notations on the face of original documents in the file. Between January 15 and 21, Attorney Dempsey interviewed three members of the court staff from the Nashua Circuit Court, as well as Judge Introcaso.  Judge Susan Ashley and I were present for the interview with Judge Introcaso, as well as a second interview with Clerk Sherry Bisson.

The relevant portions of the summaries from these interviews are attached to this letter. Based on a review of the file, and the interviews that were conducted, Attorney Dempsey concluded that the two orders that were whited out in the Campbell file were altered between January 6-9, 2020, during the time that the file was in Judge Introcaso's chambers.  She further concluded that Judge Introcaso was the only individual with any motivation to alter the file, specifically the two orders that she issued on March 12, 2019 which form, in part, the basis of Ms. Partello's JCC complaint. While Judge Introcaso admits to removing original documents from the file, inserting photocopies of certain pleadings, and making notations on the face of certain documents, she denies having whited out orders, the evidence of which is entirely circumstantial.  Given the ongoing JCC complaint regarding this matter, I deemed it my obligation to notify the JCC of the fact that these irregularities exist in the file, as well as the sequence of events as they have been determined.

Finally, I would request that you return any original documents that you have in your possession from this file.

Of course, if you have any questions, or need further clarification on any non-personnel related issues, please don't hesitate to contact me.

Very truly yours,

David D. King
Circuit Court Administrative Judge

Cc: Judge Susan Ashley
    Mary Ann Dempsey, General Counsel

**CONFIDENTIAL**

### Factual Investigation

**Investigator:**       Mary Ann Dempsey

**Date of Report:**    January 26, 2020

#### Scope of Investigation:

The purpose of this investigation is to review the alleged alteration of a court file (*In The Matter of David Campbell and Robin Partello*, 659-2018-DM-00702) and interactions between Judge Julie Introcaso and court staff relative to the file.

#### Summary of Complaint:

On January 14, 2020, Judge James Leary, serving in the 9th Circuit Court – Nashua, reported to Administrative Circuit Court Judge David King that court staff had informed him that Judge Introcaso had questioned them about whiting out orders in the *Campbell* file. The Judicial Conduct Committee ("JCC") has a complaint pending against Judge Introcaso related to her conduct in this matter. I was asked by Judge King and Judge Ashley to meet with court staff to obtain the factual information in order to assess whether any action needed to be taken from an employment context and/or whether additional factual information needed to be provided to the JCC in connection with their investigation.

On January 14, 2020, Judge King asked Clerk Sherry Bisson to please transport the hard copy *Campbell* file (2 volumes) from Nashua to the Administrative Office of the Courts ("AOC") as part of the investigation. Both files are presently in my office.

#### Interview of Sherry Bisson:

On January 15, 2020, I met with Sherry at the AOC. Sherry Bisson is Clerk of Court and has worked with the Judicial Branch for over 23 years. Sherry reported that there was an interaction between Julie Lodes and Judge Julie Introcaso last Thursday (1/9/2020) relative to the *Campbell* file. Sherry was not in the Nashua court that day as she was attending an all-day clerk's meeting at the AOC. Julie Lodes does not work on Fridays and, on Monday (1/13/2020), Sherry and Julie Lodes did not have a chance to discuss the matter. On Tuesday, January 14th, Sherry saw Julie Lodes waiting in Judge Chabot's office. Julie was waiting to meet with Judge Leary whose door was shut. Sherry saw that Julie looked very upset. Julie told her that she had not slept all weekend and Sherry was concerned enough to almost send Julie home. Sherry asked if she could help Julie and Julie did not want to discuss it with her so Sherry respected her wishes.

Sherry learned later in the day from Judge Leary that, on January 9, 2020, Judge Introcaso had discussions with both Julie Lodes, a 30 year court employee, and Nancy Dabalis, a 29 year court employee, as to whether either of these employees whited out two orders in the *Campbell* file. Sherry met with Julie and Nancy on January 14, 2020 and learned that Julie Lodes informed Judge Introcaso that she had not whited out the orders and Julie Lodes asked the judge whether she had done it herself. Sherry also learned that Nancy told Judge Introcaso that she had not done it and that none of the staff in the clerk's office would white out a judge's order. Sherry then learned that the orders were related to the *Campbell* file and, the orders in question, were related to a discussion Sherry had with Judge Introcaso earlier in the week.

On Monday, January 6, 2020, Judge Ashley contacted Sherry Bisson to request that Judge Introcaso be provided writing time during the week. Sherry Bisson met with Judge Introcaso that day to let her know that, unintentionally, her docket was clear for Thursday and Friday of the week so those could be writing days. Judge Introcaso thanked her and told her that it allowed her time to prepare an answer to the JCC complaint filed against her by Robin Partello in the *Campbell* matter. Judge Introcaso told Sherry that she signed off on some of Master DalPra's Orders in the case and issued some orders on non-substantive matters. She told

Sherry one matter involved whether Ms. Partello could pay the GAL by Apple Pay and Judge Introcaso then showed Sherry her handwritten order ("Apple Pay Order") in the *Campbell* file denying the request. Sherry has a clear memory of seeing the handwritten order, on Pleading #35, that states:

> 3/12/19 –
>
>> Legal fees / GAL fees to be paid in cash, by money order or bank check, ONLY.
>> So Ordered.
>>
>>> [signature]
>>> Julie A. Introcaso

When Sherry met with Julie Lodes and Nancy Dabalis on January 14, 2020, she realized that one of the orders that Judge Introcaso asked about being whited out was the "Apple Pay Order." Sherry realized that this meant that between January 6th (Monday) and January 9th (Thursday) someone altered the *Campbell* file and whited out that order. She also learned that a second order was whited out. The second order was with respect to the GAL's Motion to Exceed Fee Cap and was a handwritten order on Pleading #34, that states:

> Motion　　　Granted/~~Denied~~
>
> 3-12-19
> Date
>
> [Signature]
> Judge Julie A. Introcaso
>
>> over the
>> Respondent's objection at
>> #36

Sherry informed me that the file[1] would have been in Judge Introcaso's chambers from January 6-January 9, 2020. The Court does not have a sheet that keeps track of where the files are physically located but, the Case Summary Sheet indicates that the last action in the file took place on December 9, 2010.

Following her meeting with Julie and Nancy, Sherry met with Judge Leary the same day (January 14th). Judge Leary was aware of the matter because he met with Julie but he did not understand the full implications of the whited out documents. Sherry explained to Judge Leary that she actually saw the text of one of the whited out orders on Monday (January 6th) so this meant the action was taken recently (January 6-9) and not in March 2019 when the orders were issued. Judge Leary contacted Judge King and Sherry was present for the phone conversation where all of this information was relayed.

---

[1] In speaking with all witnesses, it appears that Judge Introcaso had Volume 1 of the *Campbell* file, which had the relevant pleadings to the JCC Complaint, and not Volume 2 with the most recent pleadings.

**Interview of Julie Lodes and Nancy Dabalis:**

I met with Julie and Nancy together on January 15, 2020 for approximately 2 hours. Julie was very nervous and wanted Nancy with her for support. I explained to both individuals that I simply wanted to know the facts they each had relative to recent communications about the *Campbell* file. It was my job to then discuss those facts with Judge King and Judge Ashley. They were both very upset and informed me multiple times that they did not want to get Judge Introcaso in trouble.

On January 2, 2020 (Thursday), Judge Introcaso asked Julie Lodes to bring the *Campbell* file to her chambers. Judge Introcaso had told both Julie and Nancy at some point that there was a pending JCC complaint so Julie knew this was the purpose of Judge Introcaso needing the file. When Julie brought Judge Introcaso the file Julie told Judge Introcaso that she was present for a hearing on October 30th before Judge Derby in the case and Robin Partello made a number of accusations against Judge Introcaso.[2]  Judge Introcaso asked Julie Lodes to get her a copy of the tape from that hearing and Julie Lodes did so.

On January 9, 2020, Julie Lodes went to Judge Introcaso's chambers where Judge Introcaso was working on her answer to the JCC complaint. She asked Julie Lodes to make copies of certain pleadings in the *Campbell* file and to stamp "ORIGINAL" on some pleadings that Judge Introcaso took out of the file to presumably send to the JCC and replace with a copy that was to be "COPY" with the handwritten notation "1-9-2020 originals have been submitted @ JCC, JDL." Judge Introcaso also had her stamp "ORIGINAL" on some pleadings that stayed in the file. Julie stated that she felt very uncomfortable being asked to do this project related to the JCC complaint but did as the Judge asked.

Before Julie Lodes did the actual stamping of the documents, Judge Introcaso showed her the 3 page, white-lined order dated March 15, 2019 and said to Julie, "now I know what this Order is all about." Judge Introcaso then said to Julie "Oh my God, did you do this to protect me" and pointed to an order that was whited out in the file. Julie Lodes immediately told her that did not and asked whether Robin Partello could have looked at the file and done it. Julie Lodes went to the Clerk's office and retrieved the sign-out sheets for files going back to approximately 2014. She showed Judge Introcaso that Robin Partello had not asked to see the file and Judge Introcaso told Julie Lodes that the sign-out sheets were not all there. Julie Lodes told me that they were all there. Julie Lodes then asked Judge Introcaso: "Judge, do you think you could have done this?" Judge Introcaso did not provide any response. Julie Lodes stated that Judge Introcaso was not angry during the exchange but rather seemed shocked that someone altered the file. Julie Lodes pointed out to Judge Introcaso that the text of handwritten orders were also part of the clerk's notices that were sent out to the parties. Judge Introcaso then told Julie Lodes she would need Julie to complete an affidavit about the file and Julie Lodes did not respond as she did not think this was proper. Julie Lodes then stamped the pleadings as Judge Introcaso instructed her.

Julie Lodes explained that Judge Introcaso would white out orders regularly as those two orders had been and none of the court staff would ever white out an order. Julie Lodes told me she knew based on working with Judge Introcaso that Judge Introcaso had whited out the orders and thought she had forgot that she had done so.

When Julie Lodes learned on January 14th that the white out did not exist in the file earlier in the week, she believed that Judge Introcaso was not being honest when she asked Julie if she had done it and that Judge Introcaso was "trying to cover her rear-end." Julie states that she cares very much about Judge Introcaso but she has questioned for months whether she is capable of doing her job any longer.

Nancy Dabalis told me that, on January 9th, she received a voicemail from Judge Introcaso for Nancy to please go to her chambers. Nancy said she went up between 12 and 12:30 because she brought her lunch with her. Judge Introcaso showed Nancy one of the whited out orders in the *Campbell* filed and said "did you do this?"

---

[2] Julie Lodes was so concerned about the accusations related to Judge Introcaso's conflicts with the GAL and others in the case that she spoke with Judge Leary immediately following the October 30th hearing to report it.

Nancy told her of course not. Nancy told me in 29 years she has never whited out an order. Judge Introcaso then asked whether another staff member could have done so and Nancy told her "none of the girls would have done it."

**Email Provided by Sherry Bisson:**

On January 9, 2020, Judge Introcaso emailed six court employees in Nashua about the *Campbell* file, and copying the Clerk, Deputy Clerk, and 2 judges and a marital master, stating as follows:

> Good Morning folks,
>
> I know some of you may recognize this case, it is unresolved and consists of two jackets of pleadings. I also learned that Ms. Partello has come to the counter at times for various reasons. If you have had any contact with this file, could you please contact me TODAY at ext. 0930. I have a few questions about this file.
>
> Thanks.

The email was marked as high importance. The email was sent at 10:12 am which I believe to be after the meeting that Julie Lodes had with Judge Introcaso that day but before the meeting with Nancy Dabalis.

**Interview of Judge Julie Introcaso:**

On January 21, 2020, I interviewed Judge Introcaso as the AOC for approximately 2 hours. Judge David King and Judge Susan Ashley were present for the interview. On January 15, 2020, Judge King emailed Judge Introcaso requesting that she attend a meeting at the AOC on Monday, July 21st. Judge Introcaso was on a scheduled trip from Thursday to Sunday so, on Monday July 20, 2020, Judge King texted Judge Introcaso to confirm that she would attend. Judge Introcaso confirmed that she would. Judge King started the meeting by explaining that we had received a report of irregularities in the *Campbell* file and wanted to discuss it with her. I then told her that I had been asked to investigate the matter and conduct witness interviews. Since the file was in her office and was the subject of a JCC complaint, I had questions to ask her. I explained, however, that before I did so I needed to advise her that it had come to my attention that the potential alteration of a public file could implicate criminal statutes, including statutes related to public officials. Therefore, I wanted to advise Judge Introcaso that she had a right not to incriminate herself so her participation in the meeting was voluntary. If she chose not to do participate, no discipline would be imposed by the New Hampshire Judicial Branch based on that decision. Judge Introcaso quickly told me that she had no problem answering questions. She also mentioned that she did not think this was the purpose of the meeting and referenced a new JCC matter that we discussed later in the meeting.

I began by confirming that Judge Introcaso returned from medical leave on December 16, 2019. She informed me that, while on leave, she received the JCC complaint filed by Robin Partello. She contacted Bob Mittelholzer at the JCC and requested an extension because of her leave. Judge Introcaso said she had until January 16th or January 19th to file an answer. Judge Introcaso stated that she began working on an answer while on medical leave to "practice" writing orders in anticipation of her return to work. At that time, Judge Introcaso questioned how Robin Partello knew the factual information about Judge Introcaso set forth in the JCC complaint. Judge Introcaso had forgotten that she had issued a 3 page written order in March 2019 setting forth the facts of Judge Introcaso's personal relationship with the GAL. Judge Introcaso indicated that she thought to herself that she would not have given such detail to Judge Derby when transferring the file.

Judge Introcaso would often divert the discussion from the status of the *Campbell* file to the nature of the JCC complaint against her. She stated that the *Campbell* file was put in her signing pile and when she cosigned on Master DalPra's orders. She is not sure that she even fully reviewed the documents to know that GAL Sternenberg was involved. She stated that she signed the two March orders she issued on her own at the

signing box. After Master DalPra was assigned to another court, Judge Introcaso said she had to do all the signing and the staff kept putting this file in her pile. She said after she issued those orders she scheduled a status conference with the intent to put her conflict on the record and see if the parties would waive the conflict on the orders she had already issued. She acknowledged that in her 3 page written order she considered the conflict un-waivable. She stated that she wrote her initials on the file cover to indicate her conflict and that the file should not come to her in the future. She stated that the orders in question at the JCC are "routine, not substantive." I asked why she called them substantive in her 3 page order and she said she should not have written that.

Judge Introaso stated that she requested that Julie Lodes bring her the *Campbell* file shortly upon her return in December but Julie Lodes did not bring it to her until January 2, 2020. Julie Lodes told her on that day that she was present for the court hearing where Ms. Partello made a number of complaints against Judge Introcaso including discussions of the GAL discussing finances with Judge Introcaso and an alleged family connection between Judge Introcaso (maiden name Johnson) and a Dr. Johnson who was part of case. Julie Lodes got Judge Introcaso a copy of the hearing but Judge Introcaso said she never listened to it.

On January 6, 2020, Judge Introcaso recalled a discussion with Sherry Bisson about having writing days that week but she did not recall any conversation with Sherry about the *Campbell* file and said it is "absolutely not true" that she showed Sherry any documents in the *Campbell* file.[3]

Judge Introcaso informed me that she thinks the file would have stayed in her office from January 2, 2020 until January 10, 2020 when she completed her answer. She began working on the answer on January 9, 2020. She said she started looking through the file and saw the whited out orders. She says she asked Julie Lodes who whited them out and told her that it makes Judge Introcaso "look pretty bad" because they are two of the orders at issue in the JCC. Judge Introcaso said that from approximately 8:30 – 11:00 am that day she tried to figure out who whited out the orders which included asking Julie Lodes, Nancy Dabalis, and sending an email to the marital staff. She stated that, by 11 am, she decided she did not have time to deal with the file issue any longer. She states that she did talk with Judge Derby[4] that morning. Judge Derby told her that he had a status conference and tried to help Judge Introcaso out by reviewing all of her motions de novo and determining that he would have reached the same result. Judge Introcaso stated that when she looked for Judge Derby's Order in the file is when she found her 3 page written order[5] and understood how Robin Partello had all the factual information about Judge Introcaso. Judge Introcaso stated that the March 15th order was not intended to vacate any of her prior orders (including the 2 orders on March 12th). She said the March 15th order was to make clear to staff not to give her the file in the future and to schedule a status conference for the parties to waive the conflict.

When Judge Introcaso spoke with Julie Lodes on January 9th, Julie Lodes asked whether Robin Partello could have done it. Julie Lodes got the sign out sheets for marital files to know Judge Introcaso. Judge Introcaso said that the sign out sheets were "very incomplete" and had gaps of time that equated to months missing. She also said she had to send Julie Lodes down 2-3 times to get all the sheets. Judge Introcaso said she asked Nancy Dabalis, who sent out the notices of decision, why someone would have whited out the orders and Nancy said she did not know. Judge Introcaso claimed that she asked Nancy to bring the file issues to Sherry's attention.

---

[3] Judge Introcaso made some definitive statements that she never talked with Sherry about the file and questioned how Sherry would know about the JCC complaint. She then backed off and in a phone call on January 21st she told me she probably showed Sherry the Orders from the JCC complaint but never the orders in the file itself.

[4] Judge Introcaso thought they communicated by email but after searching for emails unsuccessfully, she remembered they spoke by phone.

[5] Judge Introcaso called it a written letter multiple times during the interview but I confirmed that she is referring to her March 15th handwritten order.

Judge Introcaso said that her reference to Robin Partello coming into the court often in her email is because of reports from court staff that Ms. Partello comes in and complains.[6]  She discussed her request to have Julie Lodes stamp some pleadings "original" and others "copy" and to make notes on the pleadings.  Judge Introcaso said she was trying to make clear that this was the condition of the file and how it came to her on January 2, 2020.  She said the alterations to the file concerned her greatly and made her look bad.  She stated that she did not view the statement "original sent to JCC . . . ." as a notation for the public.  She stated that with her background with the Professional Conduct Committee she knew the importance of a file in connection with a complaint so she wanted to document where the originals were.  The notations she made on the clerk's notices were because Judge Introcaso was going to attach them as exhibits to her JCC answer.  She decided not to include them and marked "STRICKEN" on the documents.  She acknowledged that she may have put a copy of the whited out order in the file regarding exceeding the fee cap since the original had been whited out.  She also said she probably screwed up the order of the file when putting it back together.  Judge Introcaso said she understands that she "muckied up the file" but she did not make misrepresentations and she did not white out the orders.  She said she was not stupid enough to do so.

Judge Introcaso completed her answer on January 9, 2020.  She proofread it and, on January 10, 2020 she had a court staff member (Sue) from Probate attest her signature on the answer.  On January 10th she spoke with Judge Leary about finishing her answer but did not recall discussing the alterations to the file.

When I explained to Judge Introcaso that Sherry Bisson recalled a conversation about the file on January 6th and seeing the documents, Judge Introcaso stated that "the clerk makes me look evil" and she feel like she is working for the enemy.

**Follow-up Meeting with Sherry Bisson on January 21, 2020:**

Following the meeting with Judge Introcaso, where she denied adamantly showing Sherry the pleadings in the file that were later whited out, I met a second time with Sherry Bisson.  Judge King and Judge Ashley attended that meeting.  I showed Sherry the copy of those pleadings from the JCC packet and asked if it was possible that she saw those copies and not the originals in the file on January 6th.  Sherry reiterated that she only saw the Apple Pay Order and she was clear that Judge Introcaso took her over to her table where the file was located and opened the file and showed her the Apple Pay Order.  She remembered that it was the original hand-written order in the file.  She told us again about her 10-15 minute conversation with Judge Introcaso and Sherry's subsequent conversations with court staff and Judge Leary about the matter.

**Judge Introcaso's Draft Response and Final Response to JCC:**

Following our meeting, Judge Introcaso sent me a copy of communications she had with Bob Mittelholzer on December 12, 2019.  The email explained that she was on leave and needed an extension to file her answer but it also included a draft answer.  The draft answer references the two March orders with an explanation of why she ruled on them.

In her Final Answer she also references the two orders as well has her 3 page written order setting forth the conflict.  Judge Introcaso told us that, when she continued to work on her answer on January 9th, she spent a whole page setting forth the issue of the whited out orders in the file but deleted it entirely and made no reference in her answer because she said it was not what the JCC was interested in.

**Investigator's Impressions:**

Based on my interviews with the above individuals, I do not find Judge Introcaso credible with respect to the alterations to the file.  Judge Introcaso has a different perspective on interactions with Sherry, Julie and Nancy to some degree.  When provided some facts that contradict her account, she quickly changed her account to

---

[6]  Sherry Bisson agreed that this file is well known by the staff because Ms. Partello and her interactions with court staff.

provide a justification. For example, she was defensive about why Sherry Bisson would even know about the JCC matter and denied a conversation about the case but when I expressed that Sherry had a 10-15 minute conversation with her where Judge Introcaso showed her the Apple Pay Order, the judge altered her memory to be that they may have discussed it and she may have shown her the JCC packet but not the file and not the original order in the file.

I do not have a rational reason for why anyone, including Judge Introcaso, would white out two orders that are set forth in the text of the clerk's notices. I also acknowledge that Judge Introcaso's draft answer in December acknowledges the existence of those orders. I believe that Sherri Bisson was shown the handwritten Apple Pay Orders in the file on January 6th by Judge Introcaso. Sherry's description of the file being opened and pages flipped to get to the order is credible. Judge Introcaso does not recall what Sherry has described as a 10-15 minutes conversation about Judge Introcaso's defense to the JCC. It is identical to the defense Judge Introcaso provided us at the meeting. I know that Judge Introcaso believes that Sherry is out to get her but I do not form the same impression. I believe they have probably had issues working together because Judge Introcaso was a clerk and I suspect has difficulty not sharing her opinions about the scheduling of the court but I have had the opportunity to work closely with Sherry on a few matters in Nashua and I believe she is a consummate professional. In meeting with her on this matter, she expressed no ill will, or even frustration with Judge Introcaso, and offered no opinion on whether Judge Introcaso altered the file. She told me the facts in a straightforward manner. She stated that it has been a "honeymoon" period since Judge Introcaso has been back and interactions with Sherry and the judge have been cordial.

It is my opinion that the two orders in the *Campbell* file were whited out between the period of January 6-9, 2020. This was when the file was in Judge Introcaso's chambers. It is also my opinion that Judge Introcaso is the only person with any motivation to alter the file. I believe that Judge Introcaso is dealing with difficult medical issues and may not have altered the file with a clear state of mind. She did not remember writing a very detailed 3 page handwritten order in a contentious case where everyone knows the parties. I believe it is possible that she intended that order to vacate the decisions she made in March and, upon reviewing the file in January 2020, realized the orders were not vacated and tried to white them out. She would only have done so if she did not realize that Ms. Partello included a copy of the orders with her JCC complaint and/or remember the text of those orders would be on the Clerk's Notices (as Julie Lodes told her). I cannot state for certain that this what happened but I do question Judge Introcaso's memory and credibility based on the stress of responding to a JCC complaint right back from leave and due to her ongoing medical issues.

### Recommendations:

I believe the next step is for Judge King to provide this additional information to the JCC for its consideration.

---

Respectfully Submitted,

Mary Ann Dempsey
General Counsel




**EXHIBIT**

15

STATE OF MICHIGAN
St Clair County
October 30 2020
Receipt # 90976

REAL ESTATE
TRANSFER TAX

$173 80 - CO
$1 185 00 - ST
Stamp # 53423

Jay De Boyer Register Of Deeds
St Clair County Michigan

Rec    $26 00
Reason $4 00
Tax Crt $0 00



Seal

Recorded

October 30 2020  02 56 02 PM
Liber 5264 Page 710-711
Receipt # 90976    AC  92020-10 11

**Liber 5264 Page 710**

## WARRANTY DEED
File No.: 20-24195-19

THE GRANTOR, Jennifer L. DuWoll

whose address is: 5374 Orchard Drive, East China, MI 48054

conveys and Warrants to Katherine Midges

whose address is: 730 West Alegria Avenue, Sierra Madre, CA 91024

Property is situated in the Township of East China, County of St. Clair and State of Michigan described as:

Lots 16 and 17, Supervisor's Robert Baker Canal Plat, according to the plat thereof as recorded in Liber 55 of Plats, page 2, St. Clair County Register of Deeds Office.

Tax Parcel No.:
74-18-749-0009-000
Commonly known as:  5374 Orchard Drive, East China, MI 48054

for the sum of ONE HUNDRED FIFTY EIGHT THOUSAND AND 00/100 Dollars ($158,000.00)

Subject to easements, reservations, use, building and other restrictions of record, if any.

Date _____ 20____

This is to certify that there are no tax liens or titles on
This property and that the taxes are paid for FIVE YEARS
previous to the date of this instrument. This certification
does not include taxes, if any now in the process of
collection by the City, Village or Township Treasurer.
ST. CLAIR COUNTY TREASURER

_Nanna Bennett_

Warranty Deed (April 10  2018)

Page 1 of 2

CISLO TITLE CO.
20 24195-19

Dated: October 15, 2020

Jennifer L. DeWolf

STATE OF MICHIGAN
COUNTY OF MACOMB

DEANNA NOWAK
Notary Public · State of Michigan
County of Macomb
My Commission Expires Mar 15, 2022
Acting in the County of Macomb

Acknowledged by Jennifer L. DeWolf before me on 15th day of October, 2020.

Notary Public Signature

Notary name

Notary public, State of Michigan, COUNTY OF MACOMB

My Commission Expires:

Recording Fee $30.00        Transfer Tax $1,185.00        County Revenue Stamps $173.80

Drafted by:

Jennifer L. DeWolf
5374 Orchard Drive
East China, MI 48054

When recorded return to:

Katherine Minges
730 West Alegria Avenue
Sierra Madre, CA 91024

PLATINUMFIRST
T I T L E

Warranty Deed (April 10, 2018)

File No  20-24195-19

Page 2 of 2

EXHIBIT

16

# THE STATE OF NEW HAMPSHIRE
## SUPREME COURT

**GARY ELLIS HICKS**
SENIOR ASSOCIATE JUSTICE



SUPREME COURT BUILDING
ONE CHARLES DOE DRIVE
CONCORD, N.H. 03301
(603) 271-2646
FAX: (603) 513-5442
ghicks@courts.state.nh.us

October 22, 2020

Attorney General Gordon J. MacDonald
New Hampshire Department of Justice
Office of the Attorney General
33 Capitol Street
Concord, NH 03301

Re:    Judicial Conduct Committee Statement of Formal Charges
       against Judge Julie A. Introcaso

Dear Attorney General MacDonald:

      On behalf of the New Hampshire Supreme Court, I respectfully submit
the attached materials related to the Judicial Conduct Committee's Statement
of Formal Charges against Judge Julie A. Introcaso.  The Statement concludes
at Paragraph 44 that, the facts determined from the Judicial Conduct
Committee investigation establish compelling circumstantial evidence that
Judge Introcaso whited out two court orders and such conduct could
constitute either a felony or misdemeanor under RSA 641:6.  Paragraph 45
states that the evidence supports that Judge Introcaso "may have committed a
crime by whiting out [Court Orders]...with the purpose of deceiving the
[Judicial Conduct] Committee into thinking someone else altered the orders."
As such, I am respectfully requesting that the Public Integrity Unit of the
Attorney General's Office review the matter.

      I offer the Judicial Branch's full cooperation in that regard.

                                   Sincerely,

                                   Gary E. Hicks
                                   Senior Associate Justice

Enclosure