EXHIBIT 17

Friday, October 23, 2020 • NEW HAMPSHIRE UNION LEADER • Page A5

# Nashua judge under ethics, criminal investigation

**Investigation includes possible charges of falsifying physical evidence and tampering with public records.**

### By Mark Hayward
New Hampshire Union Leader

CONCORD — A Circuit Court judge in Nashua is under criminal investigation, apparently to cover up what had started as a minor mistake but grew to her whiting out court records to hide the mistake, according to documents accusing her of wrongdoing.

New Hampshire Attorney General Gordon MacDonald announced on Thursday that he has opened an investigation into criminal activity on the part of Judge Julie A. Introcaso.

The investigation includes possible charges of falsifying physical evidence and tampering with public records, MacDonald said in a statement.

The announcement follows a decision last week by the state Judicial Conduct Committee to accuse Introcaso of eight violations of the code of judicial conduct. The case against Introcaso is spelled out in a 13-page Formal Statement of charges issued against her.

According to the statement, the JCC started investigating Introcaso in September 2019, when it received a complaint from Robin Partello, who was involved in a parenting case.

As a judge, Introcaso was merely signing off on recommendations made by family court masters. Her initial mistake was to sign off on a recommendation that a friend of hers, lawyer Kathleen Sternenberg, be appointed as a guardian ad litum in Partello's case. Introcaso said she signed the recommendation without reading it.

"There simply isn't enough time (to) read every order coming out of Nashua Family Division in detail," she wrote in her explanation to the JCC.

But as the case progressed, Introcaso began issuing decisions that went against Partello and favored Sternenberg. She authorized payments beyond the $350 cap, and she ordered Partello to pay in cash or check, rather than Apple pay.

Eventually Introcaso stepped off the case, citing the conflict and her longstanding, close friendship with Sternenberg.

After the JCC asked Introcaso to respond to Partello's complaint, she had the file delivered into her office and — according to allegations from the JCC — whited out her hand-written orders in the court file.

Court clerks and staff told the JCC that Introcaso queried staff to ask if they had whited out the document, even asking if they did so to protect her. She even checked the register to see who had access to the file. But she never reported the white outs to her superiors.

"The facts set forth establish compelling circumstantial evidence that Judge Introcaso whited out the Apple Pay Order and Fee Cap Order some time between January 6 and January 9, 2020," the JCC wrote. "At the time, she knew there was an ongoing investigation by the Committee with respect to her rulings in this order."

# Salvation Army accepting applications for Christmas assistance

### Staff Report

The Salvation Army is considering applications for its Christmas assistance program in Manchester through Dec. 3.

The 121 Cedar St. office will be open 9 a.m. to 2 p.m. Monday through Thursday to take applications. It will also be open 6:30 to 8:30 p.m. Thursday evenings on Oct. 22 and 29, Nov. 5 and 12 and Dec. 3. Applicants must be from Manchester, Bedford or Litchfield.

No children will be allowed in the building on these dates.

Applicants need to bring a valid photo ID, proof of address (such as a bill or current mail), identification of each child (such as birth certificate, or health commanding officer/pastor, in a statement. "This year we have added all of the COVID guidelines supplied by the CDC and The Salvation Army into our Christmas Assistance Application Process. Please recognize that with these added protocols it will take a little time to bring you through the process."

The Salvation Army's Christmas Toy Shop, when parents come to pick up toys for their children, will take place at the DoubleTree by Hilton Hotel, 700 Elm St., on Dec. 20 and 21.

A limited number of clients will be allowed in the building. Children will not be allowed. Masks are required to enter the building, and social distancing will be required.

EXHIBIT

18

# The State of New Hampshire
## ADMINISTRATIVE OFFICE OF THE COURTS

Christopher Keating
Director

1 Granite Place, Suite N400
Concord, NH 03301
(603) 271-2521
Fax: (603) 513-5454
eMail: aoc@courts.state.nh.us
TTY/TDD Relay: (800) 735-2964

October 26, 2020

Philip Waystack, Esquire
Waystack & Frizzell
251 Main Street
P.O. Box 137
Colebrook, NH 03576
**Sent via email: phil@waystackfrizzell.com**

Re:  In Re: Honorable Julie A. Introcaso, JC-19-050-C and JC-20-010-C

Dear Attorney Waystack:

I am writing to advise you of a telephone conversation I had with Judge Mark Derby relative to this matter.  Today, on October 26, 2020, Judge Derby contacted me after reviewing the Statement of Formal Charges Pursuant to New Hampshire Supreme Court Rule 40(9) in this matter.

By way of background, when I interviewed Judge Julie Introcaso on January 21, 2020, she stated that she contacted Judge Derby on January 9, 2020 while drafting her answer to the JCC complaint regarding the two March 12, 2019 Orders.  Judge Derby informed her that he held a status conference subsequent to those orders being issued and reviewed all motions de novo.  The date of Judge Derby's Order is April 26, 2019.

Following the interview with Judge Introcaso on January 21, 2020, I spoke by phone with Judge Derby.  Judge Derby remembered speaking with Judge Introcaso about the file and issuing the de novo order.  We discussed whether he would have whited out the March 12, 2019 Orders as part his April 26, 2019 Order and he informed me that he was almost positive he did not.  He called me on October 26, 2020 to reiterate that he could not say with 100% certainty that he did not white out the March 12, 2019 Orders as part of his April 26, 2019 Order.  He does not believe he did it but, in reviewing the Statement of Formal Charges Par. 30(a), he saw that Clerk Bisson stated that she saw an exhibit and he was concerned that it may not have been the original Order but rather an exhibit to Ms. Partello's JCC complaint.  I told him that I believed the exhibit referenced in Par. 30(a) was an exhibit to Ms. Bisson's examination under oath and that exhibit is the original Apple Pay Order.  I also told him that I would let you know that he had contacted me in case you had any questions in connection with the JCC matter.

Although Judge Derby informed me that he was not completely positive he did not white out the March 2019 Orders, my factual investigation concluded he did not. On January 21, 2020, I met with Sherry Bisson for a second time. I asked if it was possible that, on January 6, 2020 when she was in Judge Introcaso's office, she was shown a copy of the March 12, 2019 Orders and not the originals. As reflected in my Factual Investigation, dated January 26, 2020, Sherry Bisson confirmed that, on January 6, 2020, she saw only the Apple Pay Order, dated March 12, 2019, and it was the original hand-written order in the court file and it was not whited out. This confirmed that the white out of the orders occurred between January 6, 2020 and January 9, 2020.

Sincerely,

Mary Ann Dempsey

/mad

Cc: Geoffrey Ward, Senior Assistant Attorney General

EXHIBIT

19

1

1   STATE OF NEW HAMPSHIRE

2   9TH CIRCUIT COURT - FAMILY DIVISION - NASHUA

3   IN THE MATTER OF:              ) Family Division Case No.
                                   ) 659-2016-DM-00288
4   DANA ALBRECHT,                 )
                                   )
5              Petitioner,         )
                                   ) Nashua, New Hampshire
6          and                     ) November 6, 2020
                                   ) 11:37 a.m.
7   KATHERINE ALBRECHT,            )
                                   )
8              Respondent.         )
                                   )
9   ─────────────────────────────  )

10                  HEARING ON MOTIONS
             BEFORE THE HONORABLE BRUCE DALPRA
11   MARITAL MASTER OF THE CIRCUIT COURT - FAMILY DIVISION

12         **REVISED — UNABRIDGED FINAL WITH TIMESTAMPS**

13   APPEARANCES (All present by video or telephone):

14   For the Petitioner:        Joseph Caulfield, Esq.
                                CAULFIELD LAW AND MEDIATION
15                              OFFICE
                                126 Perham Corner Rd
16                              Lyndeborough, NH 03082

17   For the Respondent:        Michael J. Fontaine, Esq.
                                WELTS, WHITE & FONTAINE, P.C.
18                              P.O. Box 507
                                Nashua, NH 03061

19   Also Present:              Kathleen Sternenberg
                                GAL
20

21   Audio Operator:            Electronically Recorded
                                **Not Monitored**

22   TRANSCRIPTION COMPANY:     eScribers, LLC
                                7227 N. 16th Street, Suite 207
23                              Phoenix, AZ 85020
                                (800) 257-0885
24                              www.escribers.net

25   Proceedings recorded by electronic sound recording; transcript
     produced by court-approved transcription service.

2

1                      I N D E X

2  WITNESS(ES)      DIRECT    CROSS    REDIRECT    RECROSS

3  FOR THE PETITIONER:

4  Dana Albrecht       4        40         66

5  Dana Albrecht      126
   (rebuttal)
6

7
   WITNESS(ES)      DIRECT    CROSS    REDIRECT    RECROSS
8
   FOR THE RESPONDENT:
9
   Katherine Albrecht 78       126
10

11
   MISCELLANEOUS                              PAGE
12
   Petitioner Rests                            74
13
   Respondent's Opening Statement              74
14
   Respondent Rests                           137
15
   Matter Taken Under Advisement              130
16

17
   EXHIBITS                              ID      EVD
18
   NONE
19

20

21

22

23

24

25

3

1    (Proceedings commence at 11:37 a.m.)

2        THE COURT: Good morning, Atty. Caulfield?

3        MR. CAULFIELD: Yes.

4        THE COURT: Atty. Fontaine?

5        MR. FONTAINE: Good morning, Judge.

6        THE COURT: My name is DalPra. You folks are

7    connected to the courtroom, and we're here on four pleadings.

8    And they both are pretty much -- the first two pleadings filed

9    by Mr. Albrecht regarding a modification of the parenting

10   plan, and the second two pleadings filed by Mrs. Albrecht with

11   pretty much the same requests, modification of the parenting

12   plan.

13       I'll tell you at the outset that the several hundred

14   pages of exhibits have not been reviewed to date. And for the

15   record, all the exhibits will be marked for identification,

16   and I will make a determination following the hearing as to

17   which documents should be submitted as full exhibits and which

18   aren't. So we won't have any argument on those at this point.

19       Mr. Caulfield, these are your motions; you may

20   proceed.

21       MR. CAULFIELD: Yes, Your Honor. I -- I just want

22   to point out that that doesn't clear up the docket as they set

23   forth in Petitioner's --

24       THE COURT: I don't care whether it clears the

25   docket up or not, counsel. The order that went out said that

33

1   for Christmas 2018.  If we --

2        Q  Do you have any photographs of that?

3        A  Yes.  One moment, please.  I would direct the Judge to

4   -- Exhibit would be -- there's two sets of photographs.

5   Exhibit 47 is the first batch taken from 12/23 through 12/27.

6   And Exhibit 48 is just an email from Dr. Albrecht's is in the

7   middle chronologically, just to be chronological.  And then

8   the next set of photographs is Exhibit 49, which were taken on

9   the 31st, where I'm opening the last presents they gave me,

10  and we're altogether at the airport.  And G███ is hanging out

11  watching TV at my dad's house.  And that's the last I've ever

12  been able to see them.

13        And again, that's when P███ also came back with me

14  and moved to New Hampshire after that.  So he's been okay for

15  those two years, but it's the other kids.  And there's

16  pictures of the dinner there, if anybody cares, but the point

17  is, is I'm always the one that made it.

18        I heard from C███ that last year, they did get to go

19  out and eat at a super nice place, so I think that's what --

20  I'm glad they got to go out to eat at a super nice place.  At

21  the same time, that's not the traditional homecooked meal that

22  I always make --

23        THE COURT:  *[Whispered] Who gives a fuck?*

24        A  -- that they were used to.  So it's just sad for

25  me.  Again, just a basic, they probably miss the traditional



65

1    A  Dated July 2nd.  Excuse me while I look through these

2  17 pages for this letter.

3          THE COURT:  *[Laughter]*

4    A  You said -- what was the date again?

5  BY MR. FONTAINE:

6    Q  July 2nd, 2019.

7          THE COURT:  *[Whispered] And while you're looking*

8  *through that, I'm gonna go pee.*

9          *Can you imagine if this was in person?*

10         UNIDENTIFIED SPEAKER:  *Oh, my God.  I don't know if*

11  *I (indiscernible).*                               **Commented [DF15]: 1:12:33**

12    A  So I don't know.  Yes, it does say the vaccinations on

13  schedule agreed to.  I don't know how we could do that if we

14  don't have a copy of the schedule, but I would be amenable, if

15  we have a copy of the schedule, to anyone administering the

16  vaccines.

17  BY MR. FONTAINE:

18    Q  Okay.  So let me ask you this.  After this, there was

19  an appointment scheduled for Dr. -- but you --

20    A  Yeah, with --

21    Q  You canceled it, didn't you?

22    A  There was a prior appointment scheduled with

23  Dr. Greenberg that was canceled.

24          THE COURT:  *[Laughs].*

25    A  So yes, if she's canceling the appointment that we

66

```
 1   agreed to, I will cancel the appointment that we did not agree
 2   to.
 3           THE COURT:  [Laughs].
 4   BY MR. FONTAINE:
 5       Q  So you canceled the appointment with Dr. Hanif,
 6   correct?
 7       A  Yes.  It's the only appointment in the entire history
 8   of this case I have ever canceled.
 9       Q  And --
10       A  I can't say the same for Katherine.
11           UNIDENTIFIED SPEAKER:  [Whispered] Stupid.
12           MR. FONTAINE:  I have no further questions, Your
13   Honor, for this witness.
14           THE COURT:  Any redirect, Mr. Caulfield?
15           MR. CAULFIELD:  Yes, Your Honor.  One moment,
16   please.
17                   REDIRECT EXAMINATION
18   BY MR. CAULFIELD:
19       Q  Atty. Fontaine asked you about your relationship with
20   C███ deteriorating since Christmas 2018, and you said that
21   that's not correct, and you were trying to refer to some
22   exhibit?
23       A  The --
24           THE COURT:  [Whispered] No, (indiscernible).
25       A  -- apology for C███?  Or the relationship since then?
```

Commented [DF16]: 1:14:13

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

67

1     Q  Well, my notes say that Atty. Fontaine asked you about

2 the relationship with C██████ deteriorating since Christmas

3 2018, and I see that I have an asterisk --

             Commented [DF17]: 1:14:23

4     A  Yes.  Yes.  That was the weekend -- so I have shown

5 these texts to get some advice from my therapist because I'm

6 concerned he's mentally ill.

7        THE COURT:  *[Laughs]*

8     A  So October 5th, from a different number I'm not

9 familiar, he asked me, how long does it take to hack into a

10 black phone, do you know?  I need to know how often I need to

11 replace it.  I have no idea why he thinks he needs to replace

12 his phones.  He says he's got to throw his phone out soon.

13        THE COURT:  *Hopeless.  Heartless.*

14        UNIDENTIFIED SPEAKER:  *No, he did.*

15        THE COURT:  *He was concerned; he said he was*

16 *hopeless.  (Indiscernible).*

             Commented [DF18]: 1:15:17

17     A  I can read this in-depth, his own words, but they're

18 quite incoherent.  So long, rambling emails.

19 BY MR. CAULFIELD:

20     Q  That was after this incident?  Mr. Albrecht, that was

21 after the incident that Atty. Fontaine asked you about?

22     A  This is most recently, if we go to the incident at

23 church, that's more relevant because he's much saner at that

24 point where he just apologizes for not getting in touch with

25 me.

68

1        THE COURT:  *(Indiscernible).*                    Commented [DF19]: 1:15:48

2   BY MR. CAULFIELD:

3       Q  So after the incident in which you have these -- which

4   the DV is outstanding, he apologized to you?

5            THE COURT:  *[Laughs]*

6       A  Correct.  No.

7            THE COURT:  *[Laughs]*

8   BY MR. CAULFIELD:

9       Q  But -- but -- but during your cross-examination, you

10  were challenged with, did you do this this way, did you do

11  that way; what did you say in your apology letter; why didn't

12  you say this in your apology letter.

13           THE COURT:  *(Indiscernible) so what?*          Commented [DF20]: 1:16:17

14           UNIDENTIFIED SPEAKER:  *(Indiscernible).*

15  BY MR. CAULFIELD:

16      Q  If for some reason you found out that over your

17  lifetime as a parent, you didn't make the right choice every

18  single blessed time, would you accept that?

19           THE COURT:  *[Laughs]*

20      A  Yes.

21  BY MR. CAULFIELD:

22      Q  Right.  And -- and if somebody -- and if you did the

23  best you could in writing a letter and consulted with your own

24  therapist as how you should write the letter --

25           THE COURT:  *[Whispered] The apology (indiscernible)*   Commented [DF21]: 1:16:45

e*scribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

69

1  *to have a (indiscernible) relationship.  He doesn't think his*

2  *son's (indiscernible).*

3  BY MR. CAULFIELD:

4      Q  -- if someone else thinks that it should be written

5  differently, is that really neither here nor there,

6  Mr. Albrecht?

7      A  Only in the sense that a professional therapist,

8  professional opinion, I would think, would be better than

9  somebody who's not similarly trained.

10     Q  Okay.  Now, if Master DalPra orders this fractured

11  family to go to -- for some sort of reunification therapy --

12         THE COURT:  *He lives on the East Coast.  They live*

13  *on the West Coast.  They're going to go there (indiscernible).*  — Commented [DF22]: 1:17:18

14         UNIDENTIFIED SPEAKER:  *[Laughs].*

15  BY MR. CAULFIELD:

16     Q  -- would you do what the therapist tells you to do?

17     A  Absolutely, in a heartbeat.  I would love that.

18     Q  Would -- would you send the letter the way the

19  therapist says you should do it?

20     A  Absolutely, in a heartbeat, sir.

21     Q  Okay.  Now, there was some discussion about some

22  examination about Judge -- Judge DalPra -- Master DalPra's

23  order regarding insurance, and you were saying that you -- you

24  didn't understand it --

25         THE COURT:  *[Laughs]*



70

1   BY MR. CAULFIELD:

2       Q   -- and you -- you started to try to reference it and

3   then we moved on.  Is there something about that order you

4   wanted to discuss?

5       A   Yes, if you could just briefly give me one moment to

6   bring it up.

7       Q   And while you're getting it up, assuming you can

8   multi-process, sir, if it turns out that somewhere along the

9   line in your lifetime as a parent you had made some mistake,

10  you didn't say the right thing in a letter, you held the kids

11  two more days during parenting, would it make any sense that

12  you should be punished and the children should be punished by

13  never seeing their dad again?

14      A   Yeah.

15      Q   Okay.  That would -- that would really be mentally ill

16  to think that way, wouldn't it?

17      A   Yes.

18      Q   Yes.  Okay.

19      A   Okay.  So I found the order.

20          THE COURT:  [Laughs].

21      A   So I think the issue here is the uniform support order

22  that Judge Introcaso signed in paragraph 16 says, see decree

23  providing coverage under Blue Shield of California.  So the

24  order from the judge is to look at the decree for providing

25  Blue Shield coverage.  But when I look at the divorce decree



(973) 406-2250 | operations@escribers.net | www.escribers.net

71

1  for providing coverage under Blue Shield, I can't find it

2  anywhere in there.

3      So it's unclear how I -- I -- I accept that by the

4  time we get to the order where judge -- I accepted Judge

5  Introcaso found me in contempt of that.  But again, to this

6  point, I'm not sure why, because he told me to look at the

7  decree and I can't find it in the decree.

8      MR. CAULFIELD:  Okay.  I have -- I have no further

9  questions.

10     THE COURT:  Any recross, Mr. Fontaine?

11     MR. FONTAINE:  No, I'm all set, Your Honor.  Thank

12  you.

13     THE COURT:  Very well.  At this point we're going to

14  take about a 15-minute recess.  I am going to keep my line

15  open here; you can stay on the line, or you can call back in

16  15 minutes.  Okay?

17     MR. CAULFIELD:  Thank you, Your Honor.

18     MR. FONTAINE:  Thank you.

19     THE COURT:  Very well.

20     We're going to take, like, about a three-minute

21  break because I have to --

22     UNIDENTIFIED SPEAKER:  You're absolutely right; it

23  sounds like Gilbert Godfrey.

24     (Recess at 1:20 p.m., recommencing at 1:33 p.m.)

25     MR. CAULFIELD:  (Audio begins mid-sentence) yes, Your



72

1    Honor.

2              THE COURT:  Are your clients back?  Ms. Albrecht?

3              Katherine Albrecht, are you back on the line?

4              Dana Albrecht, are you back on the line?

5              THE PETITIONER: I'm here, Your Honor.

6              THE COURT:  Very well; we'll wait a few more

7    minutes.

8              MR. CAULFIELD:  [Indiscernible] now, Judge.          | Commented [DF23]: 1:33:59 |

9              THE COURT:  *[Whispered] She's probably having a hot*

10   *dog.  [Laughter]*

11             So Alex Corey is back.

12             UNIDENTIFIED SPEAKER:  Yup.

13             THE COURT:  I wonder if they're going to do anything

14   with the other guy with a thing like the guy from New

15   Hampshire.  Fold (phonetic)?

16             UNIDENTIFIED SPEAKER:  Oh, it's not -- what's his

17   name?  The guy that was the manager this year who was the

18   bench coach, he's not coming back.

19             THE COURT:  No.

20             UNIDENTIFIED SPEAKER:  Did they -- the first base

21   coach and third base coach, was those new coaches?

22             THE COURT:  They're back.

23             UNIDENTIFIED SPEAKER:  Were they the ones that

24   worked on this (indiscernible) previously?

25             THE COURT:  Yeah, they were.  I think they're both

73

1  back.  Febles and the other guy, I think they're both back.

2          UNIDENTIFIED SPEAKER:  I'll be curious to see what

3  they do to improve the team, if they even try.

4          THE COURT:  I don't know.  I don't -- I don't mind

5  John Henry as an owner, but I don't like Werner at all.

6          UNIDENTIFIED SPEAKER:  Oh, yeah.

7          THE COURT:  He's too --

8          UNIDENTIFIED SPEAKER:  What do you think of this new

9  GM they have?

10          THE COURT:  It's hard -- it's hard to say over the

11  first --

12          UNIDENTIFIED SPEAKER:  Yeah, because of the --

13          THE COURT:  -- first year with what went on.

14          UNIDENTIFIED SPEAKER:  -- the way the end of the

15  season was.

16          THE COURT:  I mean, they -- they basically told him

17  to trade Betts (phonetic), and I don't think Betts was going

18  to stay anyway.  Didn't sound like he wanted to be in the --

19  the Boston.

20          UNIDENTIFIED SPEAKER:  Ken Nuke (phonetic) can

21  pitch.

22          [Laughter]

23          THE COURT:  All right.

24          I must have these exhibits somewhere.  Forgot to

25  check them.



79

1      Q  For the record, state your full name.

2      A  My name is Katherine Michelle Mingus, and was

3  previously Albrecht.

4      Q  Okay.  And where do you reside?

5      A  I reside at 730 West Alegria Avenue in Sierra Madre,

6  California.

7      Q  And who lives with you at that location?

8      A  My son C████, my daughters S████ and G████, and most

9  recently, my sister Laura.

10     Q  Okay.  And your sister Laura, does -- is -- does she

11  need assistance?

12     A  She is -- she has cerebral palsy.  She's in a

13  wheelchair.  She has attendant care 24 hours, and my mother

14  was her primary caregiver until she passed away last year.

15  And now I'm --

16     Q  Okay.

17     A  I'm not the primary caregiver.  She has an attendant,

18  but I'm supporting her and helping her out.

19     Q  Have you had an opportunity to discuss with the girls

20  whether they want to see their father?

21     A  Yes.

22     Q  And has that been recent?

23     A  Yes.

24     Q  And have they changed their prior position that you

25  testified to at the motion hearing a little over a year ago?

80

1       A   No.

2       Q   Have they indicated any desire to have any contact

3   with him?

4       A   No.

5       Q   Have you continued, on occasion, to encourage them to

6   reach out to him?

7       A   Yes.

8       Q   And what has their response been?

9       A   Their response has consistently been no.

10       Q   Do you believe that they're mature minors?

11       A   Yes.

12       Q   How do they do in school?

13       A   They have very good grades.

14       Q   Have they had any problems with their conduct in

15   school or outside of school?

16       A   Never, never.

17       Q   Do they make wise, mature decisions in their daily

18   lives relative to, for example, schoolwork?

19           THE COURT:   *[Whispered] Of course not; they're a*

20   *bunch of morons.*

21       A   Yes.

22   BY MR. CAULFIELD:

23       Q   Helping around the house?

24       A   Yes.

25       Q   Do they have chores?

144

## CERTIFICATE

I, Dena Farbman, a court-approved proofreader, do hereby

certify that the foregoing is a correct transcript from the

official electronic sound recording of the proceedings in the

above-entitled matter, to the best of my professional skills

and abilities.

Karen Raile, CDLT-105, Transcriptionist
Erin Perkins, CET-601, Proofreader

**Dena Farbman**   Digitally signed
by Dena Farbman
Date: 2022.04.07
15:07:43 -04'00'

DENA FARBMAN, CET-629                    April 6, 2022
Proofreader/Quality Control Manager


**Original transcript signed on November 12, 2020**



**phil@waystackfrizzell.com**

EXHIBIT

20

**From:**        Hon. David D. King <DKing@courts.state.nh.us>
**Sent:**        Tuesday, July 26, 2022 5:19 PM
**To:**          Richard W. Head
**Subject:**     FW: Albrecht hearing November 6, 2020
**Attachments:** Nashua CC CR5_20201106-1227_01d6b43829be0cfc.trm; Nashua CC CR5_
                 20201106-1344_01d6b443031dc438.trm

EXHIBIT

 3

**From:** Hon. David D. King
**Sent:** Friday, November 13, 2020 4:22 PM
**To:** Master Bruce F. Dalpra <BDalPra@courts.state.nh.us>
**Subject:** Albrecht hearing November 6, 2020

Bruce:

I am sorry to have to be writing this email but I'm sure you will understand that I have an obligation under the Code to deal with these situations. On November 6, 2020 you had what I believe was a telephonic hearing in what is obviously a very difficult matter, Albrecht and Albrecht. One of the parties requested a copy of the audio recordings from the hearing, which was provided, and subsequently ordered a transcript.

When the transcriptionist from escribers was preparing the transcript, she brought to her supervisor's attention comments that "the judge" made during the proceedings. The supervisor in turn reached out to court administration. I am attaching two examples that were sent to my attention, both email excerpts from escribers staff as well as snippets of the actual audio. The audio is difficult, but not impossible, to hear on our equipment but apparently very clear on the more sophisticated equipment used by escribers. Obviously I do not know anything about this case, other than the fact that it has a very large number of docket entries, which in and of itself is an indication that it involves difficult issues, and probably difficult parties. For that reason it isn't clear whether your comments indicate a bias against one of the parties or are just comments made in frustration. I think we can both agree that they do not demonstrate the patience or dignity expected of judicial officers under Rule 2.8.

I am hoping that we can speak about this next week after you have a chance to review what I have attached. (The 2 notes pasted below are from the emails received from escribers.)

David

David D. King
Administrative Judge
New Hampshire Circuit Court
1 Granite Place, Suite N400
Concord, N.H. 03301
Telephone (603) 271-6418

I thought you should be aware, per our transcriber regarding the above order:

1

So everyone is on Zoom/telephonic for this hearing, other than the judge. The mic is right next to the judge and I can hear everything. He talks to his clerk and himself a lot and makes some pretty bad remarks about the parties and the commentary the parties make.

For instance, he whispers to himself, right in the mic, "who gives a fuck" when the witness is answering a question, or calls them all a bunch or morons, and so much. It actually creates it to where I can't hear what the witness is saying because he's talking into the mic, I think, completely unaware of what he's doing.

```
Here are a few examples of time stamps where you can clearly hear the
Court:

"Who gives a fuck?" - **12:28:16

"Of course not, they're a bunch of morons." - **1:45:59
```

**EXHIBIT**

**21**

*In the Matter Of:*

## RE HONORABLE JULIE A. INTROCASO

---

# HON. MARK S. DERBY

## January 18, 2021

---



**Certified**
**Videographers & Court Reporters**
**VIDEOCONFERENCING**

**603-666-4100**
**Toll Free: 1-888-212-2072**

814 Elm Street * Suite 400 * Manchester, NH 03101
Fax: 603-666-4145 * Email: info@avicorereporting.com
Website: www.avicorereporting.com

**3**

THE STATE OF NEW HAMPSHIRE

JUDICIAL CONDUCT COMMITTEE

. . . . . . . . . . .

                * Case Nos.:

IN RE:             * JC-19-050-C

HONORABLE JULIE A. INTROCASO * JC-20-010-C

                *

. . . . . . . . . . .

DEPOSITION OF HON. MARK S. DERBY

Zoom deposition taken by agreement of counsel on

Monday, January 18, 2021, commencing at 9:05 a.m.

Court Reporter:  (Via Zoom)

Michele M. Allison, LCR, RPR, CRR

LCR #93 (RSA 310-A:161-181)

---

1  STIPULATIONS
2      It is agreed that the deposition shall be taken in the
  first instance in stenotype and when transcribed may be used
3  for all purposes for which depositions are competent under
  New Hampshire practice.
4
    Notice, filing, caption and all other formalities are
5  waived.  All objections, except as to form, are reserved and
  may be taken in court at time of trial.
6
    It is further agreed that if the deposition is not
7  signed within thirty (30) days after submission to counsel,
  the signature of the deponent is waived.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

---

**2**

1  APPEARANCES:
2
  For the Judicial Conduct Committee:
3
  WAYSTACK FRIZZELL
4  By:  Philip R. Waystack, Esq.
  251 Main Street
5  Colebrook, NH  03576
  603-237-8322
6  phil@waystackfrizzell.com
7
8  For the Honorable Julie A. Introcaso:
9  McLANE MIDDLETON, P.A.
  By:  Michael A. Delaney, Esq.
10  900 Elm Street
  Manchester, NH  03101
11  603-628-1248
  michael.delaney@mclane.com
12
13
  For NHJB:
14
  DEPARTMENT OF JUSTICE
15  OFFICE OF THE ATTORNEY GENERAL
  By:  James T. Boffetti, Esq.
16  33 Capitol Street
  Concord, NH  03301
17  603-271-0302
  james.boffetti@doj.nh.gov
18
19
  Also Present:  Dawn Poulson
20
21
22
23

---

**4**

1             I N D E X
2
3  WITNESS:  Hon. Mark S. Derby
4
5
6  EXAMINATION:                 PAGE
7        By Mr. Delaney      7, 143
8        By Mr. Waystack      94
9
  EXHIBITS FOR IDENTIFICATION:
10
  INTROCASO    DESCRIPTION            PAGE
11
  Exhibit 2    Case Summary            12
12
  Exhibit 4    3/12/19 Motion to Exceed Fee Cap    42
13             w/margin order
14  Exhibit 8    3/12/19 Notice of Decision to Motion to    41
           Exceed Fee Cap w/markings
15
  Exhibit 14    3/15/19 handwritten recusal order    30
16
  Exhibit 17    4/26/19 Order on #41 Motion to Remove GAL    32
17
  Exhibit 20    9/12/19 JCC complaint    44
18
  Exhibit 22    1/9/20 Introcaso/Dabilis, et al. E-mail    66
19
  Exhibit 23    1/9/20 e-mail string    66
20
  Exhibit 24    12/19/18 Assented to Motion to Remove    14
21             Ex Parte Hearing From Docket and to Approve
           Agreed Upon Christmas and New Year's
22             Parenting Time
23  Exhibit 25    12/9/18 Motion for Instruction    15

5

| 1 | EXHIBITS FOR IDENTIFICATION CONTINUED: | |
| 2 | INTROCASO | DESCRIPTION | PAGE |
| 3 | Exhibit 26 | 1/7/19 Notice of Decision | 16 |
| 4 | | | |
| 5 | Exhibit 27 | 1/11/19 Temporary Hearing/Scheduling Conference Order | 20 |
| 6 | Exhibit 28 | 1/11/19 Parenting Plan | 24 |
| 7 | Exhibit 29 | 1/16/19 Notice of Decision | 28 |
| 8 | Exhibit 30 | 4/5/19 handwritten motion | 54 |
| 9 | Exhibit 31 | 4/16/19 Petitioner's Objection to Respondent's Motion to Remove Guardian Ad Litem | 55 |
| 10 | | | |
| 11 | Exhibit 32 | 5/10/19 Order On Pending Motions Nos. 30, 31, 43, 44, 45, 46, 50 | 55 |
| 12 | | | |
| 13 | Exhibit 33 | 5/17/19 Notice of Decision | 57 |
| 14 | Exhibit 34 | 5/20/19 Further Order on Continuance No. 50 | 58 |
| 15 | Exhibit 35 | 5/21/19 Notice of Decision | 59 |
| 16 | Exhibit 36 | 5/24/19 handwritten order | 59 |
| 17 | Exhibit 37 | 5/24/19 Notice of Decision | 60 |
| 18 | Exhibit 38 | 5/31/19 Order on Pending Motions Nos. 43, 46, Prayer B, 57, 63 | 62 |
| 19 | | | |
| 20 | Exhibit 39 | 6/3/19 Notice of Decision | 62 |
| 21 | Exhibit 40 | 6/17/19 Order on Pending Motions Nos. 31, 31, 66 | 62 |
| 22 | Exhibit 41 | 6/19/19 Notice of Decision | 62 |
| 23 | | | |

6

| 1 | EXHIBITS FOR IDENTIFICATION CONTINUED: | |
| 2 | Derby | DESCRIPTION | PAGE |
| 3 | 3 | 3/15/19 handwritten recusal order | 107 |
| 4 | 4 | RSA 641:6 · felony · falsifying physical evidence | 132 |
| 5 | | | |
| | 5 | RSA 641:7 · misdemeanor · tampering with public records | 132 |
| 6 | | | |
| 7 | 6 | 3/12/19 Notice of Decision and Apple Pay Motion w/margin order | 134 |
| 8 | | | |
| | 8 | 4/26/19 Notice of Decision and Derby's order, Motion to Remove GAL | 104 |
| 9 | | | |
| 10 | | | |
| 11 | (Electronically marked exhibits were provided to counsel via Dropbox link.) | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |

7

1                HON. MARK S. DERBY

2      having been duly sworn by the reporter, under

3       RSA 310-A:181, Limited Notarial Function,

4        was deposed and testified as follows:

5             EXAMINATION

6 BY MR. DELANEY:

7     Q.  Please state your name.

8     A.  Mark Derby.

9     Q.  Your Honor, what is your profession?

10     A.  I am presently a circuit court judge.

11     Q.  Can you describe your judicial background as a

12 circuit court judge?

13     A.  I became a judge in late 2018 and I've been a judge

14 for about two, a little over two years now.

15     Q.  Is it correct that you received your commission as

16 a judicial officer in September of 2018?

17     A.  I believe the council confirmed my nomination on

18 September 20th and I took my oath in early October, and I

19 started working like October 29th or 30th.

20     Q.  Could you generally describe your judicial

21 assignments after you began working as a judge in late

22 October of 2018?

23     A.  The month of November was spent doing training at

8

1 One Granite Place and some shadowing.  The month of December

2 was spent doing shadowing and training in Nashua and about

3 two weeks give or take of district time in Derry.

4       The year 2019 I split my time between Nashua and

5 Merrimack, roughly 57, 58 percent of it was Nashua, 40, low

6 40s was Merrimack.  I presently have been splitting my time

7 roughly 50/50 2020 and this year between Milford and

8 Merrimack.

9     Q.  So you gave us some fairly specific percentages on

10 the time split.  How did you calculate those percentages?

11     A.  When I first got appointed they send out a sheet

12 that says like so many days in Nashua, so many days in

13 Merrimack, and everybody asks me all the time, where are you

14 sitting?  Where are you sitting?  Where are you sitting?  So

15 I basically had those percentages memorized as people said,

16 where are you sitting?  Where are you sitting?  Like 90

17 something days in Merrimack and like 130 something in Nashua.

18       I had those memorized because I repeated them over

19 and over again to people asking me where I was.

20     Q.  When you split time between Nashua and Merrimack in

21 2019, was there any regularity to the days you sat in each

22 respective courthouse or did it vary considerably?

23     A.  Every Monday and Wednesday were always Nashua.

1  Every Thursday was always Merrimack. And then Tuesdays and
2  Fridays could be either.
3      Q. When you shadowed in Nashua in December, were you
4  assigned to particular judges?
5      A. No. Pretty much one day I'd just sort of see what
6  was going on and I might shadow Judge Leary one day and I
7  might shadow Judge Introcaso the next.
8      Q. My understanding -- I'm sorry, your Honor.
9      A. There was no -- Nashua in December of 2018 was
10 pretty much just shadowed whoever I wanted, go where I want,
11 and I would -- mostly it was Judge Leary, but I think I sat
12 in on a first appearance with Judge Introcaso.
13     Q. In terms of the types of cases you worked on at the
14 beginning of your judicial career, what types of cases were
15 you sitting on?
16     A. In 2019, I was scheduled to do family a hundred
17 percent. Every day in Merrimack except one was family.
18 Nashua, it worked out to family just about every day except
19 maybe once a month I'd do district. And there was a little
20 bit of probate here and there. Mostly guardianships of
21 incapacitated.
22     Q. Do I understand correctly that your arrival in the
23 9th Circuit handling marital cases resulted in a transition

1  of Marital Master DalPra to take more assignments in
2  different courthouses?
3      A. I don't -- I don't know. I know Master DalPra did
4  some writing in Nashua in 2019. I think he was sitting -- he
5  sat some days in 2019, but I don't really know what he did
6  before or what he's done since 2019.
7      Q. How does your current caseload between areas of
8  judicial review compare to how it was in 2019?
9      A. I would say I'm doing more district. It's sort of
10 a -- maybe 70/30 split of family and district between Milford
11 and Merrimack. I don't do any -- I've done no probate.
12     Q. Can you briefly describe your private practice and
13 legal education prior to becoming a judge?
14     A. Sure. I graduated from Boston University School of
15 Law in 2018 (sic). I was a law clerk for the Massachusetts
16 Superior Court for one year. Then I practiced at general
17 civil practice at Walker & Varney in Wolfeboro from '99
18 through 2004, then I was at Cleveland, Waters & Bass in
19 Concord from 2004 until becoming a judge in 2018.
20     Q. And, your Honor, I believe you may have
21 inadvertently misstated the date of your graduation from BU
22 Law School, so I'll ask you to repeat that for the record.
23     A. 1998.

1      Q. Your Honor, you're generally aware that this matter
2  involves a JCC proceeding related to Judge Introcaso and a
3  marital case in the 9th Circuit entitled Campbell versus
4  Partello?
5      A. Yes.
6      Q. I'll refer to that as the Partello case in this
7  instance given that she was the party who filed the JCC
8  complaint at issue.
9      Are you familiar with two orders issued by Judge
10 Introcaso in March -- on March 12th of 2019 that we have
11 generally referred to in this matter as the Apple Pay order
12 and the motion to exceed fee cap?
13     A. Yes.
14     Q. So if I use those terms in this deposition, you
15 understand what those relate to?
16     A. Yes.
17     Q. I understand you had an opportunity to consider
18 those orders de novo on April 26th of 2019; is that correct?
19     A. Correct.
20     Q. Your Honor, what's the current status of the
21 Partello case to your knowledge?
22     A. I don't know. I'll say it this way, I know it's
23 still pending, but I have not had any involvement with it

1  since 2019.
2      Q. And I just lack access to the later pleadings,
3  which prompts the question, your Honor, did you proceed over
4  a trial or a hearing of the merits?
5      A. No hearing on the merits. Several status
6  conferences and motion hearings, but I did not preside over a
7  final or temporary hearing in that case.
8      Q. Do you know if a final hearing has occurred?
9      A. I don't know. I don't think it has. And the only
10 reason I know is I -- in preparing, I looked at the docket
11 report and it was still pending.
12     Q. Okay.
13     A. But I had no involvement with the case after 2019.
14     Q. And based on the review of the case summary, is it
15 fair to say that you handled this case regularly after Judge
16 Introcaso recused herself in March 2019 during the calendar
17 year 2019?
18     A. Yes.
19     Q. And just to orient you to that, your Honor, I will
20 ask Attorney Boffetti to show you what was previously marked
21 as Exhibit Introcaso 2.
22     (Introcaso Exhibit 2 was marked.)
23     A. (Witness peruses document.) Okay.

13

1    Q.   You'll see it's a case summary for the Partello
2  case printed on October 29 of 2019?
3    A.   Correct.
4    Q.   Drawing your attention to page 3 of 10, index 24,
5  it appears you considered a motion for instruction in
6  December of 2018?
7    A.   Yes.
8    Q.   And then looking at indexes 27 and 28, it indicates
9  that you had reviewed a recommendation of Marital Master
10  DalPra related to the parenting plan?
11   A.   I see a scheduling -- yes.  Yeah, January 11th,
12  yeah.
13   Q.   And then on indexes 30 and 31 on page 4 of 10, it
14  appears you considered two motions for contempt in May 2019
15  that had been filed in January of 2019?
16   A.   Correct.
17   Q.   And then just to orient you to the Apple Pay order
18  and the fee cap order, you see those listed at indexes 34 and
19  35?
20   A.   Yes.
21   Q.   And then consistent with your prior statement, it
22  looks like as of index 39 on page 5 of 10, you're primarily
23  handling this case in 2019 after that date?

14

1    A.   Correct.
2    Q.   If you could review Introcaso 24, your Honor.
3        (Introcaso Exhibit 24 was marked.)
4    A.   Introcaso --
5        MR. DELANEY:  That would be the first new exhibit
6  in the sealed envelope.
7        MR. BOFFETTI:  Okay.  All right.  There you go.
8    Q.   While Attorney Boffetti opens that, I'm going to
9  simply review with you the orders in the case.
10   A.   Okay.  I've got 24.  (Witness peruses document.)
11   Q.   Your Honor, Introcaso 24 is an assented-to motion
12  regarding parenting time with an order you issued approving
13  the motion on the second page.  Do you see that?
14   A.   I do.
15   Q.   Recognizing that sometimes judges issue orders
16  separately from a motion and sometimes they use handwriting
17  to approve a motion on the motion itself, is there a term
18  that you use to describe your court orders when you apply
19  handwriting to a motion as opposed to issuing a separate
20  court order?  Do you call that something?
21   A.   I'm pretty sure we call those margin orders.
22   Q.   Okay.  So we'll call -- so you'd indicate that on
23  Introcaso 24, you issued a margin order on December 21st of

15

1  2018?
2    A.   Correct.
3    Q.   Your Honor, if you could review Introcaso 25.
4        (Introcaso Exhibit 25 was marked.)
5    A.   I see it.
6    Q.   That was a motion for instruction filed by the
7  guardian ad litem; is that correct?
8    A.   Correct.
9    Q.   You also issued a margin order in that case on the
10  second page of the motion dated December 31, 2018?
11   A.   Correct.
12   Q.   That's your handwriting; is that correct?
13   A.   Correct.  Yes.
14   Q.   And is it your practice to use your name stamp and
15  a time stamp when you make margin orders?
16   A.   It is my practice to use a date stamp and a stamp
17  with my name on it.  Although I'll tell you, December 31,
18  2018, I was pretty new and I, you know, didn't really have
19  any specific practice, but I found that using a date stamp
20  was faster and clearer than writing the date by hand, so yes.
21   Q.   Appreciating that your practices were developing as
22  you began to sit as a judge, can you give me a general sense
23  of when you use a marginal order and when you write an order

16

1  on a separate page?
2    A.   Well, if it's -- if it can be done in a few
3  sentences, I will do a margin order.  If it needs more space,
4  I will handwrite it -- I will use a longer order.  It just
5  depends.  I mean, sometimes I'll start writing -- like
6  Introcaso 25 is a pretty long one, but I would just sort of
7  experiment -- not experimenting, but, you know, that was a
8  long one.
9        But if it's faster to write maybe four sentences
10  than it is to, you know, start up the computer or take a
11  separate sheet of paper and write so... I don't know if I
12  answered your question.
13   Q.   You did, thank you.  Can you review Introcaso 26.
14       (Introcaso Exhibit 26 was marked.)
15   A.   (Witness peruses document.)  Yep.
16   Q.   Is this a file copy of the Notice of Decision issue
17  with respect to your two orders that we just reviewed on
18  Introcaso 24 and Introcaso 25?
19   A.   Yes.  It's a Notice of Decision on the two
20  handwritten orders, yeah.
21   Q.   And on this Notice of Decision, your marginal order
22  has been included on the Notice of Decision by the clerk who
23  processed this Notice of Decision?

17

1   A. It appears so, yes.

2   Q. There are three initials at the bottom of the

3 Notice of Decision, which indicate the clerk who processed

4 the Notice of Decision. In parentheses it says 906. Do you

5 see that?

6   A. Yes.

7   Q. Do you know any of the -- the numbering sequence

8 for clerks to identify --

9   A. No.

10   Q. -- who processed the orders?

11   A. I have no idea.

12   Q. This Notice of Decision was issued on January 7 of

13 2019?

14   A. Yes.

15   Q. And is it your understanding that at the same time

16 this Notice of Decision was issued and a file copy was made

17 for the case file, that's the period of time when the actual

18 marginal orders would be sent to the parties with this Notice

19 of Decision?

20   A. I don't know what gets sent to the parties. I

21 didn't know at that time and I'm not sure what the process

22 is.

23   Q. So specifically you don't know if they just send

18

1 this Notice of Decision or if they send it with a copy of the

2 original motion containing your marginal order?

3   A. In preparing for this case and looking back at it,

4 it's my understanding that in Nashua they do attach a

5 photocopy of the written margin order to the Notice of

6 Decision. I'm not sure that all clerks do that in all

7 courthouses.

8   Q. And so relative to the assented-to motion for the

9 holiday parenting plan, your order dated December 21st was

10 processed 17 days after you issued the order?

11   A. That appears to be the case, yes.

12   Q. And the Notice of Decision related to your motion

13 for instruction marginal order that you issued on

14 December 31st was processed a week later?

15   A. Yes.

16   Q. So I take it there are occasions when the clerk's

17 office requires a bit of time to process and issue marginal

18 orders that you issue as a judge?

19   MR. WAYSTACK: I'll object to the form. You can

20 answer.

21   A. It's been my experience that if I do signing at the

22 signing table and put signing in the pile, there can be a

23 long gap between me signing an order and the Notice of

19

1 Decision going out. There can be. I don't know an average

2 length or anything, but there can be a gap.

3   Q. Based on your experiences, why do you believe there

4 can be a long gap?

5   A. I don't know. The clerks are very busy down there

6 and Nashua is a very busy courthouse. They have to go to the

7 windows and stuff. I'd only be speculating, but I know that

8 there have been times when I've issued a margin order and

9 then I've had a hearing two weeks later and the parties might

10 still not have the order because it was still being processed

11 or I guess they -- so it can take a while. I don't know why.

12 I never really inquired.

13   MR. WAYSTACK: Move to strike that as to his -- the

14 judge's words about speculation.

15   Q. And is there any way you as a judge can find out

16 when the file copy of the Notice of Decision is actually

17 placed into the case file?

18   A. I don't know how to do that. I mean, if it's in

19 there, it's in there. If it isn't, it isn't.

20   Q. Do you as a judge receive any notice from the

21 clerk's office when the Notice of Decision related to your

22 orders is processed?

23   A. No.

20

1   Q. So the only way you would know if a Notice of

2 Decision is processed is if it is, one, located in the case

3 file, and two, you look at it in the case file; is that

4 correct?

5   A. I suppose if I wanted to see if it had been issued,

6 I could look on Odyssey and see, but ordinarily I wouldn't do

7 that unless I was interested in something specific and looked

8 it up.

9   Q. So you would have to affirmatively either look at

10 it in the case file or use your case management system to

11 track the processing of the order?

12   A. Yes. I can't think of any other way.

13   Q. Your Honor, can you review Introcaso 27, which is a

14 scheduling conference order?

15   (Introcaso Exhibit 27 was marked.)

16   A. (Witness peruses document.) Yes.

17   Q. You cosigned this recommendation for Marital Master

18 DalPra on January 11th, 2019?

19   A. Yes.

20   Q. How do you receive marital master recommendations

21 to cosign?

22   A. Are you asking how I do it now or how I did it in

23 Nashua or in 2018?

21

1    Q.   Let's focus on Nashua in late 2018 and early 2019.
2    A.   Well, in terms of signing, in December of 2018 I --
3  we did not have a signing cubicle, so signing would come into
4  my office on a cart and I would do some signing, and I didn't
5  have an office. I was working out of a conference room in
6  December of 2018.
7        So signing would come into my conference room, I
8  would put it on the table, I would do the signing, and then I
9  would put it back on the cart or put a note on it that says
10  the signing is done.
11       2019, we put up -- we used a cubicle that had -- a
12  cubicle next to the district signing cubicle where there were
13  piles, and I think there was a pile for Master DalPra
14  cosigning, a pile for Lauren Thorn cosigning, and then a pile
15  with my name and a pile with Judge Introcaso's name.
16       So I tend to think that in January of 2019, I don't
17  know when we got the signing cubicle opened, but if it would
18  have come to me as signing, I would have looked at it and
19  signed it and sent it along.
20   Q.   Is there any way you could identify when you began
21  using the cubby you described in 2019, appreciating your
22  testimony you don't have a specific recollection of when that
23  occurred?

22

1    A.   I think it was pretty early, but I can't tell you
2  when it happened. I know we discussed how to do the signing
3  and where to put it, and ultimately we had a district signing
4  cubicle for the district division stuff, and next door to it
5  we had a cubicle that wasn't being used and we made that into
6  the family signing cubicle. And there was, you know, those
7  labels then a place where everything was done. Once you
8  signed it, it would be put in that pile.
9    Q.   When you stated pretty early, were you referring to
10  pretty early in calendar year 2019 when you established the
11  cubby?
12   A.   I didn't establish it, I think the clerks did, but
13  it was pretty early, because I was doing the signing, and I
14  think it made sense to have a centralized place for signing
15  rather than have it on a cart.
16   Q.   Once you got out of your conference room and
17  received a chambers or office, how did you handle the
18  cosigning of master recommendations?
19   A.   They would be in the signing cubicle and I would go
20  to the signing -- if signing needed to be done, I would go to
21  the signing cubicle and do signing.
22   Q.   You would sit at the cubicle and sign there as
23  opposed to bringing the case files back to your office?

23

1    A.   Yes. If a -- unless it were like a complicated
2  discovery motion or something, I might bring that back to my
3  office and work on it, but for the most part the signing
4  would happen sitting at the cubicle on the third floor.
5    Q.   Was it your experience that it was common for
6  judicial officers to sit at that cubby and consider master
7  recommendations?
8    A.   Yes. In 2019, yes.
9    Q.   And looking at page 2 of 2 on the temporary hearing
10  scheduling conference order, can you just describe for me in
11  the preprinted cosignature line what it is you do as a judge
12  when you cosign a master recommendation?
13   A.   I look at the master recommendation and see if I
14  agree with it, and then I sign it if I do, and if I don't, I
15  have questions, I talk to the master.
16   Q.   And the certification says: I hereby certify that
17  I have read the recommendations and agree that, to the extent
18  the marital master/judicial referee/hearing officer has made
19  factual findings, she/he has applied the correct legal
20  standard to the facts determined by the marital
21  master/judicial referee/hearing officer. Do you see that?
22   A.   Yes.
23   Q.   What does that language mean to you?

24

1    A.   It means that I've read it and I -- it means what
2  it says. It's boilerplate that appears on pretty much all of
3  our forms. I don't know why it's there, but I think it's
4  there just because legally we are taking ownership of the
5  order, and if -- I guess it's because they're not a judge. A
6  judge has to approve the factual findings and the legal --
7  the legal conclusion -- the legal ruling the master is
8  making.
9    Q.   And does that certification identify the scope of
10  judicial review of a judicial officer considering a master
11  recommendation?
12       MR. WAYSTACK: Objection to form.
13   A.   Can you rephrase that? I'm not really sure what
14  you mean.
15   Q.   Sure. The certification we just read, does that
16  identify the scope of the judicial review that you as a
17  judicial officer are supposed to do when you consider a
18  marital recommendation?
19   A.   Yes.
20   Q.   Your Honor, could you review Introcaso 28?
21       (Introcaso Exhibit 28 was marked.)
22   A.   (Witness peruses document.) Yes.
23   Q.   This is a parenting plan, and in the first

25

1  paragraph it identifies the plan with a checkmark proposed by
2  petitioner with some handwriting and amended by the court.
3  Do you see that?
4      A.  Yes.
5      Q.  Do you recognize the handwriting?
6      A.  I flipped ahead and saw that Bruce DalPra cosigned
7  it, so that must be -- it's not mine, so it must be his.
8      Q.  Turning your attention to page 6 of 9 of the
9  parenting plan.
10     A.  Yes.
11     Q.  Under paragraph D1, do you see some handwriting
12 under the heading, Transportation and Exchange of Children?
13     A.  Yes.
14     Q.  Do you recognize that as Master DalPra's
15 handwriting?
16     A.  All I know is it's not mine.
17     Q.  And --
18     A.  I look at the word "amended" and amended appears to
19 be in cursive and then I look at D1 and it appears to be
20 written in more of a printing style.  I don't -- none of
21 that's mine but -- so I can't -- I don't know whose
22 handwriting that is.
23     Q.  Fair enough.

26

1      A.  I'm assuming -- I very much assume it's Master
2  DalPra, but I haven't looked at his work in over a year, so I
3  can't -- I can't tell you who -- for sure who that is.
4      Q.  Understood.  Thank you.  You'll see some sort of
5  little black ink marks in the box under D1.  Do you see
6  those, beyond the handwriting?
7      A.  Yes.
8      Q.  And, your Honor, it's hard for you to see this on a
9  photocopy, and we don't have access to the originals as
10 parties to this case.  So let me just represent to you that
11 there's some White-Out correction tape that has been applied
12 to that paragraph with the handwriting that you see written
13 on top of the White-Out correction tape.
14        Is it unusual for the court to be using White-Out
15 tape on parenting plans?
16        MR. WAYSTACK:  Objection to the form.  You may
17 answer.
18     A.  No.  In my experience marital masters will take a
19 temporary plan proposed by a party and then if they disagree
20 with something, they will use White-Out and write their own
21 stuff on it and then give it to me for signing.  And that's
22 just based on my experience.
23     Q.  And looking at paragraph D1, there aren't any

27

1  marital master initials there next to the handwriting; is
2  that right?
3      A.  I don't see any.
4      Q.  And there's no time that the White-Out correction
5  tape was applied in the margins, is there?
6        MR. WAYSTACK:  Objection to the form.
7      A.  No.  I'm sorry, I don't see anything other than the
8  handwriting and the black dashes that suggest that there was
9  use of White-Out tape.
10     Q.  And in your experience as a judge, is it fairly
11 common for you to see that White-Out applied to a parenting
12 plan, you know, without seeing marginal initials or time
13 stamps associated with the use of correction White-Out tape?
14        MR. WAYSTACK:  Objection to the form.  You may
15 answer.
16     A.  If I get -- if I get a -- if a master holds a
17 temporary hearing and I get a stack of temporary documents
18 signed by the master or a judicial referee, it's not uncommon
19 for those to be based on a proposal but for the master or the
20 referee to change them with White-Out and make handwritten
21 changes, and my assumption is that if the master or the
22 referee delivered those documents to the clerk and then the
23 signing pile, that those handwritten changes are what the

28

1  master wanted or the referee.
2      Q.  Your cosignature on the parenting plan is on page 9
3  of 9; is that correct?
4      A.  Yes.
5      Q.  Your Honor, please review Introcaso 29.
6        (Introcaso Exhibit 29 was marked.)
7      A.  (Witness peruses document.)  It's a Notice of
8  Decision.
9      Q.  That's the Notice of Decision related to the
10 temporary parenting plan and scheduling conference orders we
11 just reviewed?
12     A.  That's what it appears to be, yes.
13     Q.  And you'll see the three initials for the clerk who
14 processed it in the bottom left.  You don't recognize those
15 initials either, do you?
16     A.  I never learned what those meant or who they
17 applied to.
18        MR. WAYSTACK:  Mike, just for the purpose of
19 keeping records today, you used the words "initials," you
20 mean the three digits, right?
21        MR. DELANEY:  Thank you, Phil.  Yes, that's a
22 helpful clarification.
23     Q.  And it looks like there was a five-day time lag

29

1  between your order and the issuance of the Notice of
2  Decision.
3      A.  Yes.
4      Q.  Your Honor, at some point did you learn that Judge
5  Introcaso had recused herself from the Partello case?
6      A.  Yes.
7      Q.  How did you learn that?
8      A.  I don't remember exactly how I learned it.  The one
9  way I -- I know I learned it, I know that it was -- she
10  issued an order of recusal, and that -- I definitely learned
11  it from there, but I don't know whether a clerk told me or
12  she told me or anything else.  I don't remember exactly how I
13  learned.
14      Q.  You mentioned the order of recusal and that you
15  learned it from there.  I take it that means you had an
16  opportunity to read that recusal order at some point in time?
17      A.  I did.
18      Q.  And you don't have a recollection one way or the
19  other at present regarding when -- whether any other clerks
20  spoke to you about the recusal?
21      A.  I just don't remember if -- I don't remember
22  whether it showed up in my signing pile and that's where I
23  read about it or if someone said, Judge Introcaso is recused,

30

1  this is your case now.  I just don't remember.
2      Q.  And I'm going to show you that recusal order in a
3  moment, your Honor.  It's dated March 15, 2019.  Do you have
4  any recollection of whether you spoke to Judge Introcaso
5  about the Partello case on or about March 2019?
6      A.  No.
7      Q.  You don't have a recollection one way or the other
8  or you did not speak to her?
9      A.  I don't have a recollection one way or the other,
10  no.
11      Q.  Can you please review Introcaso 14?
12          (Introcaso Exhibit 14 was marked.)
13      A.  (Witness peruses document.)  Okay.
14      Q.  Your Honor, is this the order of recusal by Judge
15  Introcaso to which you referred?
16      A.  Yes.
17      Q.  Did you have the opportunity to review this recusal
18  order in connection with the orders that you issued in this
19  case in April of 2019?
20      A.  Yes, I know I read it before I issued the April
21  orders.
22      Q.  Directing your attention to the last full paragraph
23  on page 1, which is JAI 158 Bates number, the last full

31

1  paragraph reads:  The marital master has been reassigned to
2  another court location, so numerous substantive motions were
3  presented to this judge for review.
4          Did you have any sense as to what particular
5  substantive motions Judge Introcaso was referring to in her
6  order when you considered the case file?
7      A.  No, I just knew she'd ruled on motions.  I didn't
8  know whether she meant they were all substantive or just
9  some.  I didn't know which specific motion she was referring
10  to.
11      Q.  And did you have any understanding of what a
12  substantive motion would mean?
13      A.  I really don't think I spent any -- I don't think I
14  focused on the word "substantive."  I don't know what she
15  meant by that.
16      Q.  Referring, your Honor, to the last page of Judge
17  Introcaso's March 15th order, the paragraph numbered two
18  under the order reads:  The clerk shall expeditiously work
19  with the parties to reassign this matter, resolve the pending
20  motions, and schedule this matter for any further hearing.
21  Do you see that?
22      A.  Yes.
23      Q.  Do you know how you went about the process of

32

1  understanding what motions were pending when this case was
2  referred to you?
3      A.  Yeah, I mean, I know that there were motions
4  pending, so it would be all motions that didn't have a ruling
5  on them at that time.  Those would be pending motions.
6      Q.  Your Honor, please review Introcaso 17.
7          (Introcaso Exhibit 17 was marked.)
8      A.  (Witness peruses document.)  Yes.
9          MR. DELANEY:  Jim, for the purposes of going
10  forward, I have no objection if it's easier for his Honor to
11  sort of have a pile of the exhibits next to him.
12      A.  Oh, no, is that a problem if the pile --
13      Q.  No, for the purposes of the record, your Honor, if
14  that will move things along, I'm happy to have it closer by
15  if that's convenient.
16      A.  It might save a few seconds.
17      Q.  Can you identify Introcaso 17?
18      A.  This is what I've referred to as the recusal -- no,
19  I'm sorry, it's the de novo order.
20      Q.  And, your Honor, this order is somewhat long.  Can
21  you help me get a sense of why you think this one was
22  handwritten as opposed to typed?
23      A.  I don't know.  It's just long enough that it

33

1  probably could have been typed, but not so long that it would
2  have been worthwhile to turn on the computer and create a
3  form and type it.
4       Q.  Do you have a present memory of where you were
5  located when you wrote this order?
6       A.  I was probably in my chambers.
7       Q.  Why do you --
8       A.  I know it would have -- I think it started in the
9  signing cubicle and then when I saw how much there was to do,
10 I probably took it with me to my chambers and worked on it
11 there.
12      Q.  So this is one of those cases you decided where
13 there was sufficient complexity that you may have started at
14 the cubicle but brought the case file back to your office?
15      A.  I can't be a hundred percent sure, but it sure
16 seems like it, yes, because it involved looking at lots of
17 different orders and then writing something.
18      Q.  When you draft an order of this nature, would it be
19 typical for you to have the whole case file with you?
20      A.  Yes.  Well, no, the whole case -- well, yes.  I
21 don't know whether there were two volumes at that point or
22 not, but I would have needed to at least go back to October
23 24 of 2018, and that's pretty close, I think, when the case

34

1  started, so I -- I would have -- I would have at least had
2  something going back that far.
3       Q.  And the order is entitled:  Order on No. 48 Motion
4  to Remove GAL.
5       A.  Correct.
6       Q.  In the first paragraph, you identify motions you
7  reviewed prior to ruling on the motion to remove the GAL?
8       A.  That's what I said.  I think -- yeah, I reviewed
9  the October 24th order, and then I reviewed -- I basically --
10 I think what I did is I went off Judge Introcaso's recusal
11 order listing all the stuff that she said she ruled on, and
12 then I think I also checked the docket report or something to
13 make sure that I caught all of the Introcaso orders and then
14 I listed them all.
15      Q.  What was your purpose in doing so?
16      A.  Well, what happened is Ms. Partello -- after Judge
17 Introcaso recused herself, Ms. Partello filed a motion to
18 discharge the guardian ad litem, and I had to rule on that
19 motion, and I think that's the motion that ended up in my
20 signing pile that I had to deal with.
21      And because Judge Introcaso recused herself because
22 of the guardian ad litem, and now a party wanted to get rid
23 of the guardian ad litem, I had to make sort of a de novo

35

1  review of all the orders that Judge Introcaso made.
2       And so in my view the remedy for the -- the remedy
3  for the recusal was an independent review by a neutral judge,
4  and so that's what I did.  In other words, she moved to --
5  she moved to get rid of the guardian ad litem, and I looked
6  at it saying, well, if this had come through my signing pile,
7  me being independent, would I have approved Master DalPra's
8  recommendation, and I would have and that's what I said.
9       Q.  That's helpful.  And you listed the two March 12,
10 2019, orders regarding the motion to exceed fee cap and the
11 Apple Pay order in the first paragraph of your order?
12      A.  I did.  Yeah, I -- they were the most recent, so I
13 started with the oldest one, October 24.  There were some in
14 February and then there were some in March.  And what I did
15 is I made an independent review of Master DalPra's
16 recommendation, and I concluded that I would have approved --
17 in other words, if those things had showed up in my signing
18 pile, I would have approved all of those.
19      Again, what I did is I looked at the -- and in that
20 case I looked at the motion, I looked at the objection, and I
21 came to the same conclusion on everything except the Apple
22 Pay order.
23      Q.  And why do you say on everything except the Apple

36

1  Pay order?  Because of the clarification you made?
2       A.  Yeah.  I wanted to allow the respondent to pay with
3  a personal check.
4       Q.  So let me just back you up one minute.  You did
5  review the Apple Pay order and the fee cap order issued by
6  Judge Introcaso on March 12th?
7       A.  On April 26th I reviewed the motion and the
8  objection and the -- and her ultimate order, yes.
9       Q.  And you understand that those orders did not
10 include a marital master recommendation?
11      MR. WAYSTACK:  Objection to the form.
12      A.  I do -- I do now.  I don't remember -- I don't
13 remember if the distinction mattered to me as much when I did
14 this in April.  But either way I was just, you know, doing a
15 de novo review of everything that Judge Introcaso did.
16      Q.  Your Honor, when you reviewed the motion to exceed
17 fee cap and the motion related to the Apple Pay order, do you
18 know if White-Out correction tape had been applied over Judge
19 Introcaso's March 12 handwritten marginal orders when you
20 made your ruling on April 26th?
21      A.  I just can't remember.  I remember seeing the
22 capital "only," and do I remember whether I pulled that off a
23 Notice of Decision or whether I looked at it on the sheet, I

37

1  can't be a hundred percent sure. It was a long time ago.
2     Q. Your Honor, with apologies, I think the
3  difficulties of the mask just restricted my hearing on that.
4  You indicated that you remembered reviewing something on one
5  of the orders. Can you repeat that?
6     A. I remembered, because I was doing a de novo review,
7  I read the motion, I read the objection, and I'm quite sure
8  that I saw the word "only," O-N-L-Y, capitalized.
9     Q. That's what I --
10    A. I'm not a hundred percent sure whether I saw them
11 in Judge Introcaso's handwriting on the margin at the end of
12 the motion, or did I see it on a Notice of Decision. I
13 cannot be morally certain one way or the other at this point.
14    Q. That's helpful. Thank you.
15       MR. DELANEY: Let's go off the record for a second.
16       (Discussion held off the record.)
17    Q. BY MR. DELANEY: Back on the record. So you can't
18 rule out that White-Out correction tape had been applied to
19 the motion to exceed fee cap and the Apple Pay order on top
20 of Judge Introcaso's marginal handwritten orders when you
21 reviewed it on April 26th?
22       MR. WAYSTACK: Objection to the form.
23    A. I just don't remember. I know that there was an

38

1  emphasis on the word "only" and I remember thinking, I ought
2  to allow personal checks as well, so I wrote that in my
3  order. I remember the "only," but I cannot guarantee you
4  that I saw it in Judge Introcaso's handwriting or typed on a
5  Notice of Decision in the file.
6     Q. You just don't know one way or the other if the
7  White-Out correction tape had been applied before or after
8  April 26th; is that right?
9        MR. WAYSTACK: Objection to form.
10    A. I can't -- I can't be sure one way -- I can't be
11 sure one way or the other, no, I'm sorry.
12    Q. And I also understand, your Honor, that you can't
13 rule out the possibility that you might have applied the
14 White-Out correction tape to the March 12th orders when you
15 reconsidered them on April 26th?
16       MR. WAYSTACK: Objection to the form.
17    A. I cannot be a hundred percent morally certain that
18 I didn't do it as part of the April 26th de novo order. I'm
19 quite certain I did not, but can I tell you with absolute
20 moral certainty that I didn't, no, I can't.
21    Q. Your Honor, other than your present memory, is
22 there any other source of information like notes or entries
23 by way of example that you could look to to refresh your

39

1  memory of what happened when you considered those orders de
2  novo on April 26th?
3     A. I don't recall taking any notes or preparing any
4  drafts. And when I do signings -- and again, this was a
5  signing project, I generally don't make notes or prepare a
6  chart or anything like that.
7     Q. But generally speaking, it's not your common
8  practice to sort of take side notes as you consider these
9  types of motions?
10       MR. WAYSTACK: Objection to the form.
11    A. Well, in April of 2019, I'd only been a judge for
12 about four months, so I had no common practice -- you know,
13 you just develop the practices as you go along. But as I sit
14 here today, I said, okay, the February 15 order, write the
15 February 15 order. Look and find, you know, if March 12th --
16 you know, I would have just worked through and written the
17 stuff I looked at. I don't think I -- I don't recall notes
18 or drafts or anything when I did this.
19    Q. Regarding your current practices, do you take notes
20 as you consider motions and make rulings separate from the
21 case file?
22    A. You know, I'll tell you, if I get an ex parte with
23 lots of names and people and girlfriends and sons and fathers

40

1  and stuff, I do sit down and I'll make a little chart, you
2  know, just to sort of figure out who's who and who's related
3  to who when I get a pro se thing where they use pronouns and
4  first names and last names. That's a common time I will make
5  a little chart of who's who just to help me sort through the
6  facts, but that's one example in my current practice where I
7  do -- I make a little chart if I'm having trouble figuring
8  out who's who and I have to do a quick ex parte or something.
9     Q. Using your chart as an example, after you make the
10 ruling, what are your practices with respect to maintaining
11 the chart?
12    A. Throw it away. It's just scribbling. Sometimes if
13 it's a search warrant and I'm having trouble reading the
14 search warrant, I will write my chart in the note section of
15 the search warrant if -- again, if the police -- if I have to
16 follow, you know, what happened, I'm having trouble following
17 the time frame.
18       But if it's -- the most common example of me making
19 notes is a quick ex parte with lots of pronouns and first
20 names and figure out how everybody's related.
21    Q. And you don't believe there's any obligation for
22 you to retain those types of notes or charts that you may
23 draft as you consider a motion?

41

1     MR. WAYSTACK: Objection to the form.
2     A. If it's just me trying to figure out who's who, no,
3  I don't think I have an obligation to save those. I crumble
4  them up and throw them away.
5     Q. Your Honor, going back to your review of the
6  Partello case file on April 26th, I think you agree that
7  sometimes you can find prior judges' decisions quoted in two
8  locations in the case file, the order itself and the Notice
9  of Decision; is that right?
10    A. Correct.
11    Q. Your Honor, could you review Introcaso 8?
12       MR. WAYSTACK: What number, Mike?
13       MR. DELANEY: Eight.
14       MR. WAYSTACK: Eight.
15       (Introcaso Exhibit 8 was marked.)
16    A. (Witness peruses document.) Yeah.
17    Q. Your Honor, this is a copy, a file copy of the
18  Notice of Decision related to the motion to exceed fee cap;
19  is that correct?
20    A. Yes.
21    Q. And for the record, there's some stamps and
22  notations in the footer that I'm not going to ask you about,
23  but I take it you have no knowledge of how those got there?

42

1     A. No. No, sorry.
2     Q. Do you have any present memory as to whether the
3  file copy of the Notice of Decision for the motion to exceed
4  fee cap was located in the case file on April 26th?
5     A. No. What I will say in -- is that there are
6  actually three places. If the case summary is included on
7  the left-hand side of the file, sometimes the case summary
8  has the text of the margin order there. So it could be in
9  the case summary, it could be on the document itself, and it
10  could be in the Notice of Decision here.
11    Q. And in your answer to the negative were you simply
12  saying you don't -- you don't remember whether this Notice of
13  Decision was in the case file?
14    A. I don't remember.
15    Q. Any reason to believe it would not have been in the
16  case file as of April 26th?
17       MR. WAYSTACK: Objection to the form.
18    A. I don't know. I can't think of any reason why it
19  wouldn't.
20    Q. Your Honor, could you please review Introcaso 4?
21       (Introcaso Exhibit 4 was marked.)
22    A. (Witness peruses document.) Yeah.
23    Q. This is a motion to exceed fee cap. Directing your

43

1  attention to page 2, JAI 196 Bates number. Do you see Judge
2  Introcaso's handwritten marginal order on the motion to
3  exceed fee cap?
4     MR. WAYSTACK: Objection. Objection to form.
5     A. Sorry. Sorry, I'm violating my own rules. I'm
6  stepping on your question. I'm sorry about that. I see it
7  here, yes.
8     Q. You recognize that handwriting as Judge Introcaso's
9  handwriting?
10    A. I assume it is. It's been over a year since I've
11  looked at -- I don't have her handwriting memorized, but I
12  assume it's hers.
13       MR. WAYSTACK: Move to strike.
14    A. Oh, sorry.
15       MR. WAYSTACK: That's all right.
16    Q. Do you know if that handwritten marginal order was
17  visible in the case file when you reviewed it on April 26th?
18    A. As I sit here today, I don't remember. I know that
19  somewhere I saw what her order was, but I can't tell you
20  whether I got it off the Notice of Decision or whether I saw
21  it after I finished reading the motion.
22    Q. And you identified the case summary as a third
23  possibility?

44

1     A. Yes. And if I were looking -- if I were looking to
2  identify all of the Introcaso motions quickly, that's a place
3  I could have gone to just look at everything that has her
4  name on it on the case summary without looking at every
5  single order that -- in the file.
6     Q. Your Honor, could you please review Introcaso 20.
7       (Introcaso Exhibit 20 was marked.)
8     A. Wait a minute. Jim, can you give me a hand, here?
9  I have 19 and 21.
10       MR. BOFFETTI: Mike, I think there was one
11  exhibit -- let me see -- that we didn't use in Dabilis. I
12  think it was 20. Let me see if I can find it.
13       MR. DELANEY: I can share the screen if that's
14  easier, Jim.
15       MR. BOFFETTI: Yeah. I don't remember. I thought
16  we pulled that one out. I don't know if I have it.
17       MR. DELANEY: So let's go off the record for a
18  second.
19       (Discussion held off the record.)
20       MR. DELANEY: So let's go back on the record. Jim,
21  are you ready?
22       MR. BOFFETTI: Yeah.
23    Q. BY MR. DELANEY: Your Honor, we have shared our

1  screen over the Zoom deposition to display Introcaso 20 on
2  the screen, which is the cover sheet of Robin Partello's
3  judicial conduct complaint. Is that visible over the shared
4  screen?
5      A. Yes.
6          MR. DELANEY: And Dawn, if I could have you go ten
7  pages in. Thank you.
8      Q. Your Honor, do you see the Notice of Decision
9  related to the Apple Pay order?
10     A. I do.
11     Q. You can see Robin Partello's address at the top of
12  this Notice of Decision; is that correct?
13     A. Yes.
14     Q. And on this exhibit to the judicial conduct
15  complaint, we're seeing the copy of the Notice of Decision
16  that would have been mailed to the parties; is that right?
17     A. I think so. I assume so, yes.
18     Q. And the text of Judge Introcaso's marginal order on
19  the Apple Pay order was included on the Notice of Decision;
20  is that right?
21     A. Yes.
22     Q. Do you have a present memory as to whether the file
23  copy of this Notice of Decision was located in the file when

1  you reviewed it on April 26th?
2      A. I do not.
3          MR. DELANEY: And Dawn, if you can scroll forward
4  three more pages to the motion itself.
5      Q. Your Honor, we are now displaying a Further Motion
6  for Instruction Regarding GAL Supplemental Retainer Payment
7  by Robin Partello with index 35 in the bottom right margin.
8  Do you see that?
9      A. Yes.
10     Q. It's got a date stamp of March 1, 2019, at the top
11  as the date of filing?
12     A. Yeah.
13     Q. You understand this to be the Apple Pay motion; is
14  that right?
15     A. Yes.
16     Q. Looking to the second page of the motion, do you
17  see the handwritten marginal order with Judge Introcaso's
18  signature and name stamp applied --
19     A. Right.
20     Q. -- to the motion?
21     A. Sorry. I see that.
22     Q. Do you know whether this Apple Pay motion with the
23  handwriting marginal order was located in the case file when

1  you reviewed it on April 26th?
2      A. On April 26th I know that I read the motion, so the
3  motion itself was in the case file. And if that's the
4  motion, it was in the case file.
5      Q. But you don't know whether Judge Introcaso's
6  handwritten marginal order at the bottom of the second page
7  of the motion was visible or not when you read the motion; is
8  that right?
9          MR. WAYSTACK: Objection to form.
10     A. I can't remember with absolute certainty. What
11  I've said before is that I remember seeing the word "only"
12  capitalized, and I adjusted that order a little bit, but I
13  can't be sure as I sit here today.
14     Q. And, your Honor, I regret the repetition in the
15  questions, but there was some value in asking you the
16  questions related to the two motions separately.
17          Directing your attention back to your April 26th
18  order on Introcaso 17, your Honor.
19     A. Yes.
20     Q. I understand, then, in your order when you said you
21  had reviewed the two March 12, 2019, orders regarding the GAL
22  fee cap and GAL payment method, you can't be certain where
23  you reviewed those orders; is that right?

1          MR. WAYSTACK: Objection to form.
2      A. As I sit here today, that much later I cannot be a
3  hundred percent certain whether I read them off the case
4  summary, whether I read them off the Notice of Decision, or
5  whether I read them in Judge Introcaso's handwriting at the
6  bottom of the motion.
7      Q. You indicated in the first paragraph that you had
8  reviewed all of the matters identified de novo.
9      A. Correct.
10     Q. What does de novo mean?
11     A. I take it to mean that I review it as I would for
12  the first time without any deference or consideration to what
13  the prior judge did.
14     Q. You decide an issue anew without deference to a
15  prior court decision; is that right?
16     A. Yes, basically.
17     Q. Would another way to say it be that you
18  reconsidered all of those motions on April 26th?
19          MR. WAYSTACK: Objection to the form.
20     A. Well, I basically viewed the motion to get rid of
21  the GAL as kind of a motion to reconsider. That's in
22  substance what it was. Partello wanted to get rid of the GAL
23  on the basis that the judge who approved the appointment had

49

1  recused herself.
2      So the main issue that -- the thing that brought
3  this before me was, in essence, a motion to reconsider,
4  although it was phrased differently following the recusal.
5      So I viewed in my mind that I was doing a de novo
6  review, not really reconsideration, because the only new --
7  the only new facts or evidence presented was what Judge
8  Introcaso said in her recusal motion.  So I'm not really sure
9  I would agree that it was a reconsideration --
10     Q.  Fair enough.
11     A.  -- to the extent that the -- in the initial
12  appointment of the guardian ad litem was being challenged on
13  the newly revealed information about the relationship with
14  Judge Introcaso.
15     Q.  You seem to be indicating that while you
16  reconsidered the issues anew, you believe the better term for
17  your judicial review was a de novo consideration of the
18  listed orders?
19     MR. WAYSTACK:  Objection to form.
20     A.  I understood that the -- I believed that the
21  appropriate remedy after a judge recuses herself is an
22  independent review of the orders by an independent judge, not
23  wholesale vacating everything.  And so I -- I believed I was

50

1  doing the de novo review, and the motion to remove the
2  guardian ad litem, it begged a reconsideration of the initial
3  appointment, but the relief was in my view a de novo review
4  as to whether I would have approved Judge -- whether I would
5  have approved if -- if Master DalPra's recommendation of that
6  GAL had landed in my signing pile, would I have approved it
7  independent of and not knowing anything about Judge
8  Introcaso, and the answer was yes.  So I denied her motion to
9  remove the GAL.
10     Q.  In the first paragraph of your order you also made
11  one clarification to the Apple Pay order.
12     A.  Yes.
13     Q.  What did you do?
14     A.  I added the option of paying with a personal check.
15     Q.  You also noted that you knew the respondent did not
16  use personal checks at that time; is that correct?
17     A.  Yes.
18     Q.  Where did you obtain that information?
19     A.  I believe it was from Ms. Partello's objection that
20  she filed -- there was some back and forth and I think I got
21  it from the objection.  I don't want to get too deep into the
22  weeds of why I did what I did, but the bottom line is I
23  almost -- generally guardians will accept personal checks,

51

1  and I thought that in this case I would make that generally
2  accepted form of payment available if she wanted -- you know,
3  if Apple Pay had a personal check option or her bank had a
4  bill pay option, most guardians ad litem will take a personal
5  check, so I wanted to open that additional avenue for
6  payment.
7      Q.  You also believed that Ms. Partello had indicated
8  in her objection related to the Apple Pay motion that she
9  personally did not use personal checks?
10     A.  I think that -- I don't have her objection in front
11  of me, but I got it somewhere and I wanted to at least
12  acknowledge that I had thought about that and that I
13  understood she didn't, but that's how everybody does business
14  with guardians ad litem, so I'm giving her that option if she
15  wants to find a way to get a personal check from somebody
16  else or use her bank or something.
17     Q.  Her notification to the court of not using personal
18  checks could be a reason why personal checks was not included
19  in the original order that you reviewed de novo; is that
20  right?
21     MR. WAYSTACK:  Objection to the form.
22     A.  I don't know.  All I know is somewhere along the
23  way I thought that I would open -- I would open for her an

52

1  opportunity that every other GAL opens.  I wanted to treat
2  her like any other parent who was using a GAL.
3      Q.  In the second paragraph of your order you denied
4  the motion to dismiss/remove GAL for the reasons you stated;
5  is that right?
6      A.  Yes.
7      Q.  Your Honor, in the fourth line of your order on
8  Introcaso 17, there appears to be White-Out correction tape
9  applied at the end of the fourth line.
10     A.  Yes.
11     Q.  Who applied that White-Out correction tape to your
12  April 26th order?
13     A.  I'm sure it was me.  I mean, I -- I assume it was
14  me.
15     Q.  Can you describe your use of White-Out correction
16  tape as a judge?
17     A.  I have it -- I have one of those little tape
18  dispensers with me everywhere I write and I use it -- usually
19  if I'm writing something, and then while I'm writing it, if I
20  make a word wrong or I scribble something or mess it up, I
21  white it out and write over it, or if I'm in court and the
22  parties are saying -- you know, are sort of agreeing to
23  something and I write it down and then they change something,

53

1  I'll make that change. But it's really -- I use it all the
2  time.
3      Q.  Is it fair to say in your experience that judges
4  and clerks use White-Out correction tape in the 9th Circuit?
5          MR. WAYSTACK: Objection to the form.
6      A.  I can't speak for the clerks. I can only speak for
7  myself and what little I've observed of what other judges do.
8  But I know myself, I use it while I'm writing stuff, usually
9  to correct things, if I say something wrong or if I -- if I
10 write, you know, you've got seven days and then I get another
11 couple lines in and I say, no, it's going to be 14 days, you
12 know, I'll White-Out the seven and write 14 right in
13 there. Something like that.
14     Q.  Are you aware of any rules or policies that apply
15 in the 9th Circuit when a judge uses White-Out correction
16 tape to make corrections?
17     A.  No.
18     Q.  You did not feel the need to initial your use of
19 White-Out correction tape on this order?
20     A.  No.
21         MR. WAYSTACK: Objection to form.
22     A.  My answer is no.
23     Q.  You did not see the need to date or specify a time

54

1  when the White-Out correction tape was applied to the surface
2  of the document?
3      A.  No --
4          MR. WAYSTACK: Objection to form.
5      A.  Sorry, no.
6      Q.  Could you please review Introcaso 30, your Honor?
7          (Introcaso Exhibit 30 was marked.)
8      A.  (Witness peruses document.) Yeah.
9      Q.  Is this the motion to remove Kathleen Sternenberg
10 as guardian ad litem to which you were speaking?
11     A.  I believe it is, but -- yeah, I believe it is, yes.
12     Q.  And she references Judge Introcaso's recusal in
13 paragraph two of the motion?
14     A.  Yes.
15     Q.  And then she again references the judge ruling on
16 the motions related to a guardian ad litem who was her best
17 friend in paragraph 12?
18     A.  Yes.
19     Q.  Paragraph 13 discusses disclosure of conflict of
20 interest?
21     A.  Yes.
22     Q.  And in paragraph 15, Ms. Partello indicated that
23 Judge Introcaso had ruled on several motions related to the

55

1  guardian ad litem prior to the disclosure.
2      A.  That's what she alleges in her petition -- in her
3  motion.
4      Q.  Please review Introcaso 31.
5          (Introcaso Exhibit 31 was marked.)
6      A.  (Witness peruses document.) Okay.
7      Q.  This is an objection by the petitioner, David
8  Campbell, to the motion to remove the guardian ad litem?
9      A.  Yes.
10     Q.  Time stamped as received on April 16th of 2019?
11     A.  Yes.
12     Q.  Did you have an opportunity to review that
13 objection before issuing your order on April 26th?
14     A.  I did.
15     Q.  Did you take Ms. Partello's assertions in her
16 motion into consideration when deciding to conduct your de
17 novo review of the orders involving Judge Introcaso?
18     A.  Yes.
19     Q.  Please review Introcaso 32.
20         (Introcaso Exhibit 32 was marked.)
21     A.  (Witness peruses document.) Okay.
22     Q.  This is an order dated May 10, 2019, that you
23 issued on several pending motions?

56

1      A.  Yes.
2      Q.  Just curious, your Honor, on the use of sort of
3  yellow paper versus white paper, how do judges approach that?
4      A.  My understanding is that we generally have our
5  orders printed on yellow paper. I just think -- I think
6  because it makes it easier when you're looking through a file
7  to find the last order that a judge wrote. So orders
8  generally go on yellow paper in the family division.
9      Q.  Do you know who printed this order for you?
10     A.  I believe I printed it myself.
11     Q.  And do you have like a separate bin in the
12 photocopier that always has yellow paper in it or do you have
13 to sort of shove it in there before you print?
14     A.  Well, it depends where I did this. If I did it in
15 Nashua, I am -- yeah, in Nashua there's a big copier/scanner
16 machine and then there was an HP printer next to it, and I
17 think the printer had yellow paper in it all the time.
18     Q.  Is that a rule or policy of the court or would you
19 simply describe it as a best practice?
20     A.  I've never seen anything in writing that says
21 orders go on yellow paper, and nobody ever told me to always
22 put orders on yellow paper. It's just that's how I saw it
23 done, and so I stayed consistent with that as best I could.

57

1  Q.  Please review Introcaso 33.

2      (Introcaso Exhibit 33 as marked.)

3  A.  (Witness peruses document.)

4  Q.  Is this the file copy of the Notice of Decision

5  related to your May 10th order that we just reviewed?

6  A.  It appears to be, yes.

7  Q.  And there's a seven-day time lag in processing this

8  order after you issued it; is that right?

9  A.  Yes.

10  Q.  Is it the general practice to refer the order from

11  processing on the day that you issue your order?

12  A.  Well, when I issue the order I put it -- if I issue

13  an order, I put it in the signing pile.  If it's something

14  that I want to go out quickly, I put the word -- I put a

15  Post-It note that says "expedite" on it.

16  Q.  In your experience, how do the clerks receive

17  orders that you place in the signing pile?

18  A.  My understanding is they bring a cart up from the

19  first floor with the elevator and then all the stuff that's

20  in the completed, ready-to-be-processed pile, they put them

21  on the cart and they take them away.

22  Q.  So they take those away for processing.  Is it your

23  experience that that happens on a daily basis?

58

1  A.  I don't know.  It happens regularly, but I -- I

2  would say -- I mean, again, based on my -- you know, it's a

3  year ago.  They were pretty regular.  If the pile got big, it

4  would disappear.  I don't remember seeing a big pile sitting

5  there for a long time, but yeah, I think probably -- I don't

6  know.  I can't be sure.

7  Q.  But it does seem fairly common, at least in this

8  case, that it can take up to a week for a Notice of Decision

9  to get out of the courthouse; is that right?

10      MR. WAYSTACK:  Objection to the form.

11  A.  Yes.  In what you've shown me so far, it can take a

12  week, yeah.

13  Q.  Please review Introcaso 34, your Honor.

14      (Introcaso Exhibit 34 was marked.)

15  A.  (Witness peruses document.)  Yeah.

16  Q.  This appears to be an order dated May 20, 2019,

17  regarding a continuance at index No. 50?

18  A.  Yes.

19  Q.  You issued that order?

20  A.  I did.

21  Q.  Looking to Introcaso 35, this is an instance where

22  the Notice of Decision was processed on the next day; is that

23  right?

59

1      (Introcaso Exhibit 35 was marked.)

2  A.  (Witness peruses document.)  That appears to be the

3  case, yes.

4  Q.  Do you know when court administrators or clerks do

5  filing in relation to when they process orders?

6  A.  No.

7  Q.  Please review Introcaso 36, your Honor.

8      (Introcaso Exhibit 36 was marked.)

9  A.  (Witness peruses document.)  Okay.

10  Q.  This is an order related to a forensic

11  psychological evaluation of Ms. Partello; is that correct?

12  A.  Yes.

13  Q.  There's another use of White-Out correction tape

14  applied to this order?

15  A.  I see it, yes.

16  Q.  Do you know who applied that White-Out correction

17  tape to this order?

18  A.  I'm quite sure I did.

19  Q.  There's White-Out correction tape applied to the

20  eighth line on page 1; is that correct?

21  A.  I see, yes, "process."

22  Q.  And there's White-Out correction tape applied to

23  line two on page 2?

60

1  A.  Correct.

2  Q.  Why were you recommending a full psychological

3  evaluation of Ms. Partello?

4  A.  The guardian ad litem had recommended it.

5  Q.  Do you recall what the basis for that was?

6  A.  I'm not really -- at this point I -- I will say I

7  think this order I wrote on the bench.  I really don't want

8  to -- I think the case is still pending.  I -- this was a

9  matter of some controversy.  I really -- I really don't feel

10  comfortable getting into my thought process talking about

11  these two counts.

12  Q.  I'm going to defer to your judgment on that, your

13  Honor.  We have no desire to complicate the outcome of this

14  matter.

15  A.  I just -- but I will say this order was written on

16  the bench.  It looks like something I did during a hearing

17  after hearing from people, and I believe I wrote it on the

18  bench as opposed to a piece of signing, but I really don't

19  want to get any deeper into the facts of the case or why I

20  did what I did.

21  Q.  Introcaso 37 is the Notice of Decision related to

22  your May 24th, 2019 order on pending motions?

23      (Introcaso Exhibit 37 was marked.)

61

1    A.  (Witness peruses document.)  Yes, and it says the
2  court -- or my order refreshes my recollection now.  There
3  was a status conference motion review hearing on May 24th.
4      So I wrote this in court, and I guess they sent it
5  out, then they processed it.
6    Q.  In your experience is it more likely that an order
7  will be processed on the same day when a hearing is held as
8  opposed to when a motion is reviewed in your chambers without
9  the court having held a hearing on the motion?
10     MR. WAYSTACK:  Objection to form.
11   A.  In Nashua in 2019, if I had a hearing and wrote an
12 order from the bench, I would hand it to the clerk who was
13 with me and sometimes, if I recall, they would process it
14 right there from their -- from their chair in the courtroom,
15 but -- and that -- and I don't know if that happened in this
16 case, but sometimes when I write an order from the bench at
17 or after a hearing, I hand it straight to the clerk with the
18 file and they take care of it.
19   Q.  Do you refer to that clerk in the courtroom as a
20 courtroom clerk?
21   A.  Courtroom clerk, court assistant, monitor.  I don't
22 know what their --
23   Q.  And on the three digits on this Notice of Decision,

62

1  your Honor, 567, same answer, that you can't -- you can't
2  identify those --
3    A.  I don't know what -- I don't know who those codes
4  apply to.
5    Q.  Your Honor, could you please review Introcaso 38?
6      (Introcaso Exhibit 38 was marked.)
7    A.  (Witness peruses document.)  Yes.
8    Q.  This is an order that you issued in the case dated
9  May 31st of 2019; is that correct?
10   A.  Yes.
11   Q.  Please review Introcaso 39.
12     (Introcaso Exhibit 39 was marked.)
13   A.  (Witness peruses document.)  Yes.
14   Q.  It appears that this Notice of Decision was issued
15 four days after you made your ruling; is that correct?
16   A.  That is -- that's what it says.
17   Q.  Last exhibit, and then I'm going to recommend we
18 take a short break, your Honor.
19   A.  Okay.
20   Q.  Please review 40 and 41.
21     (Introcaso Exhibits 40 and 41 were marked.)
22   A.  (Witness peruses document.)  Yes.
23   Q.  That's an order dated June 17th, 2019, by you on

63

1  pending motions?
2    A.  Yes.
3    Q.  And that order was processed two days later on June
4  19th?
5    A.  That's what it says, yes.
6      MR. DELANEY:  For the benefit of our stenographer,
7  your Honor, I recommend that we take a quick break.
8    A.  Okay.  Thank you.
9      (Recess taken.)
10     MR. DELANEY:  Back on the record.  Dawn, could you
11 display for his Honor a visual of calendar month January
12 2020?
13     (Calendar displayed on screen.)
14   Q.  BY MR. DELANEY:  Your Honor, you had indicated that
15 you primarily handled this case from the time of Judge
16 Introcaso's recusal through calendar year 2019.  Was there a
17 reason why you no longer handled the case in 2020?
18   A.  My assignment changed from Nashua and Merrimack to
19 Milford and Merrimack, so I was no longer sitting in Nashua.
20   Q.  And is it fair to say you had no involvement in
21 this case after that transition of judicial assignments?
22   A.  Correct, unless there was a leftover piece of
23 writing or something, which I don't think there was.  Like if

64

1  there had been a hearing in December and I didn't finish the
2  order until January, that's the only explanation, but I was
3  sitting in Milford and Merrimack in January of 2020 so I had
4  nothing more to do with that case.
5    Q.  Your Honor, appreciating that this is a pending
6  case, I'm going to proceed cautiously with the following
7  questions and defer to your judgment on whether you can
8  answer them.
9      Did you have an opportunity to interact regularly
10 with Ms. Partello while you were handling the case?
11   A.  Only in court hearings.
12   Q.  Was it a large case compared to other parenting
13 cases?
14   A.  In 2019 I didn't have much to compare it to, so if
15 you define large, I can try to answer it better.
16   Q.  How many hearings do you think you presided over?
17   A.  I would say probably three.
18   Q.  And -- I'm just going to leave it at that.  I'm
19 going to leave it at that.
20     My recollection of your testimony, your Honor, is
21 that in January 2020, you were working Monday and Wednesday
22 in Nashua; is that right?
23   A.  No.  In January of 2020, I no longer worked in

65

1  Nashua.

2    Q.  Oh, got it.  I'm mixing that up with what you did

3  in 2019.  Excuse me.

4    A.  Okay.

5    Q.  When were you assigned to Nashua in January 2020,

6  if at all, based on your statements?

7    A.  I was cleaning out my office and finishing up

8  writing.  I never sat in Nashua for a court case in 2020.

9    Q.  If I wanted to identify your physical location from

10  your calendar during the week of January 6th, 2020, could you

11  do that by memory or reference to online calendars?

12    A.  I could look at Odyssey or my Outlook to see

13  whether I was in Milford or Merrimack in January of 2020.

14    Q.  Were you cleaning out your office in Nashua during

15  working hours or were you doing that after hours?

16    A.  It would have been on weekends.  It was a

17  combination of cleaning out my office and finishing up

18  writing assignments from Nashua from stuff that had gone

19  under advisement in December.

20    Q.  And unless --

21    A.  I'm sorry.

22    Q.  Go ahead.

23    A.  So basically it was weekends and before work or

66

1  after work I might drive some files to Nashua, drop them off

2  in the clerk's office, and then go to Milford or Merrimack

3  where I was sitting.

4    Q.  That's helpful.  Looking at Introcaso 22 and 23,

5  your Honor.  Take a minute to review those.

6        (Introcaso Exhibits 22 and 23 were marked.)

7        MR. DELANEY:  Off the record.

8        (Discussion held off the record.)

9    Q.  BY MR. DELANEY:  Back on the record.

10    A.  Yes, I have 22 and 23.

11    Q.  Have you had an opportunity to review them, your

12  Honor?

13    A.  (Witness peruses document.)  Yes.

14    Q.  Introcaso 22 is an e-mail that Judge Introcaso sent

15  to a group of judges and clerks on January 9th with a time

16  entry of 10:12 a.m. on this exhibit.  Do you see that?

17    A.  Yes.

18    Q.  And then Introcaso 23 is a follow-up e-mail with

19  her correcting the subject line of the e-mail.  Do you see

20  that?

21    A.  Yes.

22    Q.  Do you recall receiving those e-mails on January

23  9th?

67

1    A.  Yes.

2    Q.  What did you do when you received them?

3    A.  I believe I called Judge Introcaso.

4    Q.  Do you have a present memory of what courthouse you

5  were sitting at when you received them?

6    A.  No.  I could find out, but I don't know whether it

7  was Milford or Merrimack.

8    Q.  Do you recall what time of day you read the e-mails

9  in relation to the 10:12 a.m. time stamp on the first e-mail?

10    A.  I don't remember when I read them, no.

11    Q.  But you do believe it was on the same day, January

12  9th?

13        MR. WAYSTACK:  Objection to form.

14    A.  I'm quite sure I read them on January 9th, and I

15  called Judge Introcaso on the same day.  I don't remember

16  what time of day it was.

17    Q.  Please describe the conversation that occurred.

18    A.  I think she asked if I knew or -- if I knew about

19  orders being whited out in the file, and I said, no, I don't.

20  I didn't know anything about it.  I said no.  I think Judge

21  Introcaso thought that perhaps Robin Partello had done it,

22  and I think she shared that thought with me.  And it was a

23  pretty quick conversation, I think, because I had to be

68

1  somewhere and she wanted to hear from me today.

2        So I think that's it.  I don't remember how long

3  the conversation was, but that was -- I know I called her

4  back that day, I know I said I didn't know anything about it,

5  and she mentioned she thought Robin Partello might have done

6  it.

7    Q.  Do you remember anything specifically about your

8  conversation regarding Judge Introcaso thinking Robin

9  Partello might have done it?

10    A.  No, not really.  Just she thought she might have

11  done it and, you know, I don't remember what I said at that

12  point.

13    Q.  Did you -- do you recall discussing Robin Partello

14  with her at that time?

15    A.  I don't know.  I've seen Robin Partello, you know,

16  in court a few times, and I don't remember exactly what I

17  said, but, you know, I might have said -- I probably said it

18  was possible that she could have done it.  I don't know.

19        MR. WAYSTACK:  I move to strike that portion of the

20  answer as being nonresponsive, probably.

21    A.  Okay.  All right.

22    Q.  Do you have any memory of discussing that with

23  Judge Introcaso, the possibility that she could have done it?

69

1    A. I have a vague recollection of talking about that,
2  yes. I don't remember what words I used or what I said.
3    Q. And was the discussion surrounding the possibility
4  that she could have done it or the possibility that she could
5  not have done it?
6       MR. WAYSTACK: Objection to form.
7    A. I don't remember. I think it was more about the
8  possibility that she could have done it.
9    Q. Did you have any discussion with Judge Introcaso at
10  that time regarding your consideration of her orders, orders
11  de novo in the Partello case?
12    A. Not on January 9th, no.
13    Q. Is there anything else that Judge Introcaso said to
14  you during that first call that we haven't discussed?
15    A. I don't remember.
16    Q. Is your memory exhausted at present, your Honor,
17  regarding what conversations took place during that phone
18  call?
19    A. I would say it is, yes.
20    Q. Is there any other source of information you could
21  look to by way of phone logs or notes that might refresh your
22  recollection of what conversations took place at that time?
23    A. I know I didn't take notes during that phone call,

70

1  and I do not believe I sent a follow-up e-mail or anything
2  afterwards.
3    Q. Did you have an opportunity to discuss this matter
4  with Judge Introcaso on another occasion?
5    A. I believe that after I issued my de novo order,
6  sometime in 2019, I did poke my head in the room and say, you
7  know, just so you know, you know, this is what I did
8  afterwards, but it would have been shortly after I issued the
9  de novo order in 2019. I don't recall discussing the de novo
10  order with Judge Introcaso on January 9th, 2020.
11    Q. Was your purpose in doing that simply to advise
12  Judge Introcaso that the issues upon which she had recused
13  herself had been considered de novo by the Court?
14       MR. WAYSTACK: Objection to form.
15    A. Yes.
16    Q. Did you have any conversations with Judge Introcaso
17  regarding the Partello case after January 9, 2020?
18    A. No.
19    Q. Other than the conversation that you just described
20  in 2019 and the conversation that you described on January 9,
21  2020, do you have any recollection of speaking to Judge
22  Introcaso at any other time regarding the Partello case?
23    A. Not regarding the Partello case, no.

71

1    Q. Did you speak to Judge Introcaso regarding the
2  judicial conduct complaint that Robin Partello had filed?
3    A. I don't recall.
4    Q. And so I take it you're not sure if you spoke to
5  her on any occasion one way or the other regarding the JCC
6  complaint filed by Ms. Partello?
7    A. The only possibility that I can think of is there
8  was a brief period in December when she came back when I
9  said, hello, welcome back, and she asked me to get a present
10  to Judge Gorman in Milford. So I saw her late -- I don't
11  remember us talking about the Partello/JCC case, it was more
12  just welcome back and can you get this Christmas present to
13  Judge Gorman in Milford.
14       So I delivered a present, I talked with her in
15  December when she came back, and I've had no conversations
16  with her after January 9th, 2020.
17    Q. Have you had any conversations with Clerk Julianne
18  Lodes regarding the JCC complaint or the Partello case?
19    A. No, not after -- never about the JCC case. I think
20  Clerk Lodes sat with me during a couple hearings in 2019, but
21  not about Judge Introcaso or the JCC complaint.
22    Q. Have you had any conversations with Clerk Nancy
23  Dabilis regarding the Partello/JCC complaint or the Partello

72

1  case?
2    A. Certainly not the JCC complaint. I can't be
3  certain that Nancy wasn't a courtroom clerk during one of the
4  hearings. There's day-to-day handling of the case, and I
5  can't be sure which clerks I talked to about the day-to-day
6  handling of the case in 2019, but I've not spoken with any of
7  them about the JCC complaint.
8    Q. Thank you, your Honor, and I understand your
9  answer. Have you had any conversations with Clerk Sherry
10  Bisson regarding the Partello/JCC complaint or the Partello
11  case?
12    A. No, other than -- other than -- actually, I don't
13  even think I talked to her during -- in 2019 handling the
14  case, so I'm going to say no.
15    Q. Did you speak with General Counsel Mary Ann Dempsey
16  in January 2020 concerning the Partello case?
17    A. I think it might have been February, but yes.
18    Q. What makes you think it might have been February?
19    A. I checked my e-mails and there was an e-mail from
20  her on like February 7th asking for a call. But it could
21  have been January. I don't know. It was early in the year.
22    Q. Do you have a copy of that e-mail at present?
23    A. I could get -- I could get one, yes. I could

73

1  probably call it up on my computer.  (Brief pause.)  Are you
2  waiting for me to call it up?
3      Q.  I am, your Honor, I'm sorry.
4      A.  Oh, okay.  I'm going to do that.
5      Q.  Please do so, and my apologies.
6      A.  Okay.  I'm reading an e-mail February 7th, it's
7  addressed to me, Judge King, and Judge Ashley.  I'm helping
8  Judge King and Judge Ashley relative to understanding some
9  alterations to a marital file that -- I'm talking too fast.
10  I'm sorry.
11      If you could give me a call -- so she's asking for
12  a call at her number and it's February 7th.  So that's the
13  only basis I have to think it was February 7th and not
14  January.
15      Q.  You don't have any recollection of speaking to her
16  before you received that e-mail on February 7th?
17      A.  No.
18      Q.  What did you do when you received the e-mail?
19      A.  I called her.
20      Q.  Please describe the conversation that you had with
21  her.
22      A.  She talked about the same topic that Judge
23  Introcaso brought up, which was that they were looking into

74

1  who or how some orders got whited out, and, you know, I just
2  sort of said -- you know, we kind of talked about it and
3  tried to figure out why someone would white out orders.  And,
4  you know, I said, I don't remember whiting out any orders,
5  but I was the person in charge of that file for most of 2019.
6      You know, I started thinking and I said, you know,
7  the only possibility, the only possibility, and I think it's
8  remote, and I don't think I did it because I don't remember,
9  and I'm quite confident, is that if I did it, it would have
10  been part of the de novo order in April.  I don't think I
11  did, but that's the one possibility that involves me that I
12  can think of.
13      Q.  When you were talking to her, your Honor, you
14  didn't have the case file with you, did you?
15      A.  I did not, and actually, I think what I said is --
16  you're right, when I talked to her I said, I did a de novo
17  order, I looked at all the other stuff, and I think she might
18  have pulled it up and said over the phone, does April 20 -- I
19  think she gave me a date and I said, yeah, that date sounds
20  right for the de novo order.
21      Q.  Did she ask you to review any documents at the time
22  you were speaking with her?
23      A.  I think she offered to let me see the de novo

75

1  order, but she also said -- you know, after I talked through
2  that possibility, she said, you know, there's a -- there's a
3  witness who saw the orders after that point, after that time,
4  so it couldn't have been you who did it.
5      So at that point I didn't -- yeah, I just moved on.
6      Q.  And she specifically stated to you that it couldn't
7  have been you that did it?
8      MR. WAYSTACK:  Objection to form.
9      A.  Something to that effect, yes.  It was that --
10  there was a witness who saw those orders not whited out after
11  April of 2019, so it could not have been you.  And I said,
12  okay, I don't -- I didn't feel the need to press the issue
13  any further, so that was it.
14      Q.  Your Honor, did she ever show you the White-Out
15  correction tape that had been applied to the orders in
16  question?
17      A.  No.
18      Q.  Did you ask to see them?
19      A.  No.
20      Q.  Did she volunteer to give them to you?
21      A.  I don't remember.  I think the only thing that she
22  offered -- if I'd asked, I'm sure she would have given them
23  to me, but the only thing I thought about was my de novo

76

1  order, and then once -- once it was clear there was a witness
2  who saw this stuff unchanged after April of 2019, I didn't
3  see the need to push the issue any further.
4      Q.  So your decision not to request access to the
5  orders was tied to General Counsel Dempsey's statement that
6  couldn't have been you that did this?
7      MR. WAYSTACK:  Objection to form.
8      A.  Yes, I accepted the idea that there was a witness
9  who saw the stuff not whited out after the one possible
10  instance where I thought -- I thought really hard about it,
11  and the one possible instance that came up that involved me
12  would have been that de novo order and nothing else.
13      I mean, I never would have -- I know I didn't go in
14  and -- as a single transaction white out an order.  I know I
15  didn't do that, but the one possibility was the de novo
16  order.  And knowing there was a -- she didn't say who the
17  witness was or when they saw it, but knowing that the orders
18  were intact after the one possibility I thought of, I didn't
19  see a reason to go any further with it.
20      Q.  Did she share with you the identify of the witness?
21      A.  No.
22      Q.  Did she share with you any of the circumstances in
23  which the witness had alleged to have seen the orders in

77

1  original fashion?
2      A. She did not.
3      Q. How long did you speak to her at that time?
4      A. Maybe five minutes, ten minutes maybe. I don't
5  remember.
6      Q. Did you take any notes at the time, your Honor?
7      A. No.
8      Q. Were you ever asked to review any written
9  statements or notes from General Counsel Dempsey concerning
10  your conversation with her?
11      A. No.
12      Q. I appreciate, your Honor, that you had some --
13      A. Wait a minute. Wait a minute. I mean, I called
14  her in October, but between -- if we're still talking about
15  the February conversation, the answer is no.
16      Q. And we were. That was the intent of the call. And
17  I understand that you spoke to her in October, your Honor.
18          Between the time you spoke to her on February 7th
19  and the time you referenced speaking to her in October 2020,
20  did you discuss this matter with General Counsel Dempsey at
21  any time in between?
22      A. The only time would have been e-mails related to a
23  litigation hold request, and I think that happened in March.

78

1  She asked for some stuff, I did a search of my e-mails, and I
2  sent her a screenshot of the e-mails that I had preserved.
3      Q. But other than -- go ahead.
4      A. Other than that e-mail communication, nothing.
5      Q. Were you aware that the JCC was conducting a
6  preliminary investigation at some point in time after your
7  February 7th call with General Counsel Dempsey and the time
8  you spoke to her again in October 2020?
9      A. I believe that the e-mail from Attorney Dempsey
10  that talked about the litigation hold also mentioned the JCC
11  complaint. I don't remember whether she talked about the JCC
12  complaint in the first phone call, and I'm going to call it
13  February 7th. I could be wrong, but I don't recall her
14  mentioning the JCC in the February 7th phone call, but I
15  was -- I think I was aware of the JCC by the time of the
16  litigation hold request, because it was mentioned in I think
17  that letter -- in the e-mail.
18      Q. Did you speak to Attorney Philip Waystack at any
19  point in time in connection with the JCC confidential
20  proceeding?
21      A. No.
22      Q. Did you speak to anybody else who may have been a
23  representative of the JCC regarding a JCC confidential

79

1  proceeding involving Judge Introcaso?
2      A. No.
3      Q. Is the next time you had a conversation about this
4  matter, excepting the communications regarding the litigation
5  hold, excepting those conversations, is the next time you
6  spoke to anyone about this matter when you spoke to General
7  Counsel Dempsey in October 2020?
8      A. That is correct.
9      Q. Tell me what happened.
10          MR. BOFFETTI: So at this point, Mike, I would like
11  to go off the record and have a chance to talk to Judge Derby
12  about that conversation, because I think there's some
13  attorney/client issues that I just want to sort through.
14          MR. DELANEY: Sure.
15          (Discussion held off the record.)
16          MR. BOFFETTI: Thank you for giving me a moment to
17  sort through a couple of issues here. We're all set to go.
18  You can continue your questions.
19      Q. BY MR. DELANEY: Your Honor, let me restart it this
20  way. Did you have an opportunity to read the statement of
21  formal charges that was issued against Judge Introcaso in the
22  JCC proceeding?
23      A. I read them in a link provided by the Union when I

80

1  saw it online.
2      Q. So you read an article about it in the Manchester
3  Union Leader that had a link to the online statement of
4  formal charges?
5      A. Yes.
6      Q. Did you ever print a hard copy of the statement of
7  formal charges?
8      A. I did.
9      Q. When did you do that?
10      A. The day -- I'm going to say it was October 22nd or
11  23rd. I clicked the link and it had a PDF so I printed it.
12      Q. Where is the copy of the document that you printed
13  from the PDF?
14      A. It's in my car.
15      Q. Did you make any notations or other markings on
16  that document, your Honor?
17      A. I did.
18      Q. So I'm just going to state for the purposes of the
19  record that I'd like that document to be preserved and
20  produced.
21          MR. BOFFETTI: Sure. It will certainly be
22  preserved and we can take a look at it to see if there's any
23  issues that we see with it, but he will -- he has it with him

81

1  today, so we can get it before he leaves and then we'll take
2  a look at it and see if there's any issues we have with it.
3      Q.  What was your reaction having read the statement of
4  formal charges, your Honor?
5      A.  I was -- I was surprised to see that they thought
6  that Judge Introcaso did the whiting out.
7      Q.  Why were you surprised to see that?
8      A.  It didn't make sense to me that she would have done
9  it at that time.
10     Q.  Why didn't it make sense to you?
11     A.  Because it would have served no purpose.
12     Q.  Can you describe your relationship with Judge
13  Introcaso as a fellow judge?
14     A.  Yeah.  I mean, we're cordial.  I'd say we're
15  friendly, but I did not know her before I became a judge and,
16  you know, our offices were next door, so she would -- I would
17  go to her for advice on things.  She did some of the, you
18  know, sort of the informal training in December of 2018.  So
19  I think it's a good relationship.  I view her kind of as a
20  mentor and a colleague.
21     Q.  After you read the statement of formal charges, I
22  understand at some point in time you called General Counsel
23  Dempsey?

82

1      A.  That's correct.  I sort of read it over the weekend
2  and kind of digested it, and I called Attorney Dempsey, I
3  believe the Monday -- on a Monday.
4      MR. DELANEY:  Dawn, I haven't prepped you for this,
5  but can you quickly pull up an October 2020 calendar and
6  share your screen?
7      MR. WAYSTACK:  Of course she can.
8      MR. DELANEY:  The delay on this is my fault, your
9  Honor.
10     MR. WAYSTACK:  You've been pretty efficient,
11  Michael.  You don't have to apologize.
12     Q.  BY MR. DELANEY:  Your Honor, do you have an iPhone
13  or a mobile device handy?
14     A.  Yes.
15     Q.  Could I ask you just to see if you can reference a
16  calendar for October 2020?
17     A.  Yeah.  I have to go monthly.  Okay.  I've got it.
18     (Calendar displayed on screen.)
19     Q.  And Dawn is helping us on the screen as well.  Do
20  you recall which Monday it was that you spoke to General
21  Counsel Dempsey in October of 2020?
22     A.  It would have been the 26th.
23     Q.  What time of day did you call her?

83

1      A.  I'm going to say 8:30, 8:45, something like that.
2      Q.  In the morning?
3      A.  Yes.
4      Q.  So that was shortly after your workday would have
5  begun?
6      A.  Yes.
7      Q.  Please describe the conversation that you had with
8  her.
9      A.  So I called her up and I said, you know, I was
10  surprised to see that Judge Introcaso is -- has been accused
11  of this, accused of doing this.  I was very surprised.  And I
12  had a question about one of the paragraphs of the statement
13  of the charges.
14     Q.  Do you have a personal memory of what paragraph it
15  is you wanted to question General Counsel Dempsey about?
16     A.  I believe it was the paragraph where they talked
17  about -- it was, it was the paragraph where they quoted
18  something that Sherry Bisson said.
19     MR. DELANEY:  Dawn, could you please unshare your
20  screen and reshare it with a copy of the statement of formal
21  charges?
22     (Statement of formal charges shared on screen.)
23     MR. DELANEY:  If you could go to paragraph 30,

84

1  Dawn.
2      Q.  Your Honor, I'd ask you to read paragraph 30 for a
3  moment.
4      A.  Yes, and that's the -- that's the paragraph I had a
5  question about.  Clerk Bisson testified that she has a clear
6  recollection of seeing Judge Introcaso -- I'll slow down.
7  I'm sorry.
8      Q.  Go right ahead.
9      A.  Clear recollection of seeing Judge Introcaso's
10  original handwriting on this Apple Pay order on January 6,
11  2020.  Subparagraph A:  Specifically, Clerk Bisson states
12  that the judge, quote, opened the file to the Apple Pay order
13  and explained to me why she didn't agree that it was an
14  issue, that it wasn't considered a substantive order -- can
15  you enlarge that a little bit, please?  Yeah, thanks. --
16  substantive order, and opened it to, on the exhibit, to the
17  writing part of the order, she took her finger and read
18  across the lines in front of me and said that she could write
19  that order, bracket, because it is not substantive.
20     Subparagraph B:  Clerk Bisson further states,
21  quote, she pointed to that in my presence.  Not only pointed
22  to it, but she took her finger and read the order as her
23  finger was moving across the text.

85

1   Q.  Having reviewed that paragraph, your Honor, what
2   was your question for General Counsel Dempsey?
3   A.  Well, as I read the statement of charges, there
4   was -- it was clear that Judge Introcaso had in her
5   possession an exhibit to Robin Partello's JCC complaint, and
6   that the exhibit to Robin Partello's JCC complaint would have
7   had the original writing.  And I saw the word "exhibit" and
8   pointing to an exhibit, and what my concern was was that are
9   you guys sure that Clerk Bisson was pointing to the case file
10  with the unobscured writing or was she pointing to Robin
11  Partello's exhibit to the JCC complaint, because I wanted to
12  be absolutely sure now that I knew who the witness was that
13  they were absolutely -- that that testimony was clear,
14  because that's important testimony.
15  Q.  What response did General Counsel Dempsey provide?
16  A.  I believe she said they met with Clerk Bisson twice
17  and they were -- they were sure that she was talking about an
18  exhibit that was prepared for the purposes of the examination
19  under oath, not the Robin Partello exhibit to the JCC
20  complaint.
21  And then I said, okay, fine, and hung up, and then
22  she called me back and had a letter written.  So she read me
23  the letter and I said, sounds good.  Sorry, I think I said, I

86

1   just want to be sure we, you know -- you know, summarize what
2   we talked about, and I approved it.
3   Q.  The letter you're referencing, was that a letter
4   that was addressed to Attorney Philip Waystack in his
5   capacity as committee counsel for the JCC?
6   A.  Actually, let me back up.  She read me the text of
7   a letter that she was writing and I said, be sure that if any
8   of the people -- if anyone wants to talk to me, I'm available
9   to talk to, and she gave me the name of somebody from the
10  criminal bureau and I think she gave me Attorney Waystack's
11  name as well, and said, these are the two people who might be
12  in touch.
13  And then -- again, I think she said that and then
14  she called back in a few hours and read me the text of a
15  letter that she had written.  I didn't see the letter until
16  after they indicated I would be deposed.
17  Q.  So she read you the text over the phone and you had
18  an opportunity to review the letter in preparation for your
19  deposition?
20  A.  She read me the text over the phone on October
21  26th.  I didn't think about the case again until sometime in
22  December when they said they wanted to depose me, and at that
23  point I got a copy of it from, I believe Attorney Boffetti

87

1   got it for me.
2   Q.  When she read the proposed text of the letter to
3   you over the phone, do you recall making or suggesting any
4   changes to the letter?
5   A.  I think I just wanted to be clear that, you know, I
6   had brought up the -- brought up the de novo order, you know,
7   before, you know, that I'd sort of gone on record and brought
8   up the de novo order possibility, and she brought it up
9   again, and, you know, just wanted to be clear that our prior
10  conversation and our current conversation were consistent.
11  Q.  And, your Honor, I'm not -- I'm not going to
12  attempt to quote the letter you're referencing, but do you
13  recall that the letter had language in it indicating that you
14  could not say with 100 percent certainty that you did not
15  apply the White-Out correction tape to the March 12th orders?
16  A.  Yes, that is what I said and that is language that
17  I approved.
18  Q.  Did you have the opportunity to speak to anybody in
19  the criminal bureau at the Attorney General's Office?
20  A.  No.
21  Q.  Did you have the opportunity to speak to Attorney
22  Waystack thereafter?
23  A.  I've never spoken with Attorney Waystack.

88

1   Q.  And, your Honor, you've seen the judicial conduct
2   complaint this morning, because I showed it to you as an
3   exhibit -- as an exhibit to this deposition, and I also
4   referenced one of the exhibits to that JCC complaint
5   consisting of the Apple Pay order.  Do you recall that?
6   A.  Yes, you showed me it appended to Robin Partello's
7   complaint to the JCC.
8   Q.  When you had this conversation with General Counsel
9   Dempsey on October 26th raising your question about the
10  exhibit, did she in any way tell you that Judge Introcaso in
11  this matter has told her that Judge Introcaso thinks Clerk
12  Bisson reviewed the Apple Pay order as an exhibit to the
13  judicial conduct complaint as opposed to within the original
14  case file?
15  MR. WAYSTACK:  Objection to the form.
16  A.  I came up with that on my own after reading the
17  statement of formal charges, and Attorney Dempsey didn't say
18  anything about what Judge Introcaso said or didn't say about
19  what her position was, about what Judge Introcaso's position
20  was.
21  Q.  Appreciating your statements, your Honor, that you
22  came up with it in reviewing the statement of formal charges,
23  had you ever heard that idea at all before you read the

89

1  statement of formal charges?
2     A.  No.  I was just concerned -- not concerned.  It's
3  just the testimony of Clerk Bisson is very important, and
4  when I saw the word "exhibit" in paragraph 30, I had read in
5  other parts of the statement of formal charges that there --
6  somewhere else in the statement of formal charges that there
7  was in Judge Introcaso's possession a copy of the JCC
8  complaint with the exhibits and that the unobscured order was
9  an exhibit, and because Clerk Bisson's testimony was
10  critical, I wanted to be sure that she saw what -- that she
11  was looking at the original case file and not the exhibit to
12  the JCC complaint.
13     Q.  I understand.  Thank you, your Honor.  How long did
14  you speak to General Counsel Dempsey on October 26th?
15     A.  I'm going to say it was less than five minutes,
16  maybe ten.  I don't know.
17     Q.  Did you take any notes of your conversation with
18  her at that time?
19     A.  No.
20     Q.  Have you spoken to her regarding the Partello case
21  or the JCC complaint after you spoke to her on October 26th?
22     A.  Not speaking.  I think she was involved in e-mails
23  to set up the depositions.

90

1     Q.  And I have --
2     A.  I've never spoke --
3     Q.  I don't want to know about those conversations,
4  your Honor.
5     A.  Okay.
6     Q.  Your Honor, do you maintain a recusal list?
7     A.  The clerk does.
8     Q.  Can you describe your recusal list for me?
9     A.  It's a list of attorneys, pretty much everybody
10  from my former law firm and then maybe another six to ten
11  friends, family, friends who are also attorneys.
12     Q.  When you referenced the clerk, who did you mean to
13  reference?
14     A.  When I first became a judge, I prepared the recusal
15  list, and because I was sitting in Nashua and Merrimack, I
16  believe I e-mailed it to Clerk Bisson and Clerk Killkelley.
17     Q.  Do you know what Clerk Bisson has done with your
18  recusal list?
19     A.  No.
20     Q.  Do you know which clerks have access to it?
21     A.  You mean which sub clerks within the office?
22     Q.  I do.
23     A.  I don't know.

91

1     Q.  Do you know if it has been entered into the Odyssey
2  Case Management System?
3     A.  I don't know.
4     Q.  Last line of questioning, your Honor, and I'm just
5  about done.
6        Reflecting on the time you were sitting in Nashua,
7  in terms of the volume of cases, can you compare it to
8  Milford and Merrimack?
9     A.  I would say it's heavy everywhere for family law
10  cases.  It's a very high volume.  It got even higher when
11  Judge Introcaso took her sabbatical, because then I had to do
12  it almost all myself, but it was a big -- it was a very busy
13  family court.  Very busy.
14     Q.  And if you were sitting in Nashua on any given day,
15  can you give me a ballpark sense of how many hearings you
16  would sit on?
17     A.  It depends.  If it was a trial day or a motion or a
18  list -- they call them list days, there might be seven or
19  eight hearings on a list day.  If it's a trial day it might
20  be a full day trial, or one day of a multi-day trial.
21        And then if I did probate, there might be some
22  guardianships.  Or if I did a district day, I could sit on 40
23  or 50 cases if they're pleas and continuances and stuff.

92

1     Q.  So a list day in Nashua on marital cases might
2  include seven to eight hearings?
3     A.  Yeah.  I mean, either half-hour hearings, you know,
4  let's say three hours -- three one-hour hearings in the
5  morning, two in the afternoon, a DV in the morning, maybe
6  multiple DVs at 8:30 and then a list starting at 9.  So yeah,
7  seven -- six, seven, eight, maybe four, depending on how long
8  they are.
9     Q.  You would be responsible for issuing orders on all
10  of those cases, some of which you may have ruled on in the
11  courtroom and some of which you may not have?
12     A.  Correct, if it's a list day and I hear the case and
13  there's enough time and it's a simple enough issue, I will
14  write an order, sort of like the one I did in the Partello
15  case.  It was like a page and a half long, but I'll write an
16  order on the bench and send them off with it.  But if I don't
17  have time or it's too complicated, I take it under
18  advisement.
19     Q.  And recognizing that there may be times when a
20  marital master is in the courthouse and at times when a
21  marital master is not in the courthouse, how many marital
22  master recommendations would you need to cosign in a
23  courthouse staffed by a marital master?

93

1   A. Well, I don't have much to compare it to, but I
2  would say -- and where I sit now -- I mean, it changes every
3  year, because in Merrimack I signed for Judge Kinghorn and
4  Master Love, but she's retiring. In Nashua we have a child
5  support referee and Master DalPra. I could go and there
6  would be maybe ten -- there would be ten cases stacked up.
7  The child support stuff there might be 15 or 20 stacked up.
8       I think Master DalPra's volume was higher than
9  Master Love or Judge Kinghorn. Referee former Judge
10 Kinghorn. I can't give you a real number, but, you know,
11 probably -- again, I'm thinking Merrimack numbers in my head.
12      Q. And when you were sitting in Nashua between January
13 of 2019 and April of 2019, who were the clerks you worked
14 with most frequently?
15      A. Aline Chasseur, Julie Lodes for family law. I'm
16 going to say Julie and Aline were the most -- the others
17 were -- Julie Lodes. The others kind of came and went out of
18 family.
19      MR. DELANEY: Thank you very much, your Honor. If
20 I could just have one minute, Phil, before I conclude.
21      MR. WAYSTACK: Take your time.
22      MR. DELANEY: With the understanding that Judge
23 Derby will be available to testify at the time of the

94

1  hearing, I have no further questions at this time. Your
2  Honor, thank you very much.
3       THE WITNESS: Thank you.
4            EXAMINATION
5  BY MR. WAYSTACK:
6       Q. Good morning, your Honor. First of all, I'm going
7  to go for a bit. I don't think I'll be quite as long as
8  Attorney Delaney. Are you okay to keep going forging through
9  here without a break?
10      A. Yes. Maybe in another 15 or 20 I'd like a break,
11 but I'm good to get started.
12      Q. Whenever you would like. Okay. Just generally --
13 general questions for the beginning, Judge Derby. Can you
14 tell me what you've read to prepare for today's deposition?
15      A. I reviewed the letter from -- and again, this is
16 back in December. I reviewed the letter from Attorney
17 Dempsey. I reviewed the motion --
18      Q. That's the October -- excuse me. That's the
19 October 26, 2020, letter?
20      A. Yes, the October 26th letter from Attorney Dempsey.
21 I reviewed the recusal order from Judge Introcaso.
22      Q. Yeah.
23      A. I reviewed the motion to terminate the guardian. I

95

1  reviewed the objection to that. And I reviewed my de novo
2  order. In order to obtain those pleadings, I looked at the
3  docket report for the Partello case so that I could identify
4  them and get the copy sent to me, because I didn't have
5  access to the file. And I also looked at copies of the
6  actual whited-out orders, like high contrast copies of the
7  actual whited-out orders.
8       Q. Does that include everything you've read before
9  upon preparing for today's deposition?
10      A. For deposition preparation that is -- once I knew
11 the deposition was going to be happening, that is to the best
12 of my knowledge right now all of the documents that I looked
13 at to get ready for today.
14      Q. Did you review the judicial conduct complaint of
15 Robin Partello?
16      A. I've never read that.
17      Q. Did you review the formal statement of charges
18 again before today's deposition?
19      A. No.
20      Q. Is there any other document other than what you've
21 discussed that you can recall reviewing prior to the
22 deposition today?
23      A. For the time period between the notice that I would

96

1  be deposed and today, I cannot presently remember any other
2  documents that I looked at.
3       Q. Okay. With the exception of discussions with
4  Attorney Boffetti, can you tell me what, if any,
5  conversations you have had with other individuals in order to
6  prepare yourself for the deposition today?
7       A. Nobody I can think of.
8       Q. Okay.
9       A. Nobody at all, no.
10      Q. Okay. You mentioned the case summary. I just want
11 to -- and Attorney Delaney had asked you earlier to take a
12 look at Introcaso 2. I think he used a little different
13 words, and I think we're on the same page but I want to be
14 sure. Introcaso 2 is the case summary of the Partello and
15 Campbell case.
16      A. I sometimes call them docket reports, but case
17 summary is what we call them in the courts, yes.
18      Q. So when I asked you the documents you have
19 reviewed, you were talking -- when you said the case report,
20 you were talking about the case summary, which is Introcaso
21 2?
22      A. Not necessarily. I used Odyssey to go online and
23 download a current case summary.

| | 97 |
|---|---|
| 1 | Q. But it is this same document in an electronic |
| 2 | version -- |
| 3 | A. Yes. |
| 4 | Q. -- perhaps updated? |
| 5 | A. Yes. Yes. |
| 6 | Q. If you look -- turn to Introcaso Exhibit 2 for a |
| 7 | moment, it's a ten-page document. If you turn to the tenth |
| 8 | page, it shows -- seems to show that the last date is |
| 9 | November 1st, 2019, and that's in a category called target |
| 10 | date. Do you see that? |
| 11 | A. Yes. |
| 12 | Q. If you flip to the previous page, page 9 of 10, the |
| 13 | last formal thing on the case summary appears to be 10/29/19, |
| 14 | other. Do you see that? |
| 15 | A. Yes. |
| 16 | Q. So by you going to Odyssey, you would have seen a |
| 17 | more complete version of case summary, which is Introcaso 2, |
| 18 | because it would be more updated than October of 2019; would |
| 19 | you agree with that? |
| 20 | A. Yes. Sorry. |
| 21 | Q. Okay. And do you have a recollection of seeing |
| 22 | entries from October 29th to closer in time when you reviewed |
| 23 | Odyssey for the case summary? |

| | 99 |
|---|---|
| 1 | until December 9th, 2019, there was a block of period there |
| 2 | from January 11th, 2019, until the date of your so-called de |
| 3 | novo order on April 26th, '19, where you had no involvement |
| 4 | in the case or no orders written by you. Do you disagree |
| 5 | with that statement, Judge Derby? |
| 6 | A. I do not specifically -- yeah. I don't disagree. |
| 7 | Q. Okay. And to the best of your recollection, and |
| 8 | you're free to use your recent research of the Odyssey |
| 9 | system, what was the last formal date that you did something |
| 10 | on this case and what was that? |
| 11 | A. I don't remember. I don't have the -- I don't have |
| 12 | the printed-out Odyssey with me and -- I don't know. I mean, |
| 13 | I don't remember -- |
| 14 | Q. Okay. |
| 15 | A. -- what it was. |
| 16 | Q. From some of the testimony developed earlier with |
| 17 | Attorney Delaney, is it so -- it seems as though you were |
| 18 | clear on this. You issued no orders on the Partello case or |
| 19 | the Partello/Campbell case in the year 2020; is that |
| 20 | accurate? |
| 21 | A. To the best of my recollection, that is correct. |
| 22 | Q. And part of that reason is you're no longer in |
| 23 | Nashua; is that right? |

| | 98 |
|---|---|
| 1 | A. I didn't really pay attention to the newer stuff. |
| 2 | I mean, I skimmed over and noticed that it was still ongoing |
| 3 | and that Judge Curran was sitting on it, but I was focused |
| 4 | more on printing out the page that had the orders I wanted to |
| 5 | look at so that I could circle them and make it easy to find. |
| 6 | Q. Sure. |
| 7 | A. That's all I had available. I didn't have -- all I |
| 8 | had was Odyssey to do it, so I downloaded the whole thing, |
| 9 | yes. |
| 10 | Q. Okay. In one of the discovery disclosures from the |
| 11 | New Hampshire Judicial Branch, there is a newer version of |
| 12 | the case summary that we're talking about. It doesn't have |
| 13 | many more entries, just a few, but I just -- in terms of the |
| 14 | next question, in looking at Introcaso 2 and a more recent |
| 15 | version of the case summary in discovery, it appears to me, |
| 16 | this is about your own involvement with this case, that |
| 17 | between December 21st, 2018, and December 9th, 2019, you |
| 18 | issued or your name is on about 17 orders or forms in this |
| 19 | case. Does that sound familiar to you? |
| 20 | A. It sounds about right. |
| 21 | Q. But it also appears to me, again, when I look at |
| 22 | the case summary and the orders, that although your time |
| 23 | frame was almost a year, that is, from December 21st, 2018, |

| | 100 |
|---|---|
| 1 | A. Correct. |
| 2 | Q. Was your involvement in the family court in Nashua, |
| 3 | was that part of your training program, Judge Derby, or was |
| 4 | it just the assignment that you had for that period in time? |
| 5 | A. 2019 was my formal assignment. I was sitting on |
| 6 | cases by myself and I had my own docket. And as far as |
| 7 | everyone was concerned, I was a full-time judge, but I |
| 8 | reached out for help. I sought out help when I needed it, |
| 9 | but to the extent I had a training program, it was November |
| 10 | and kind of December 2018. |
| 11 | Q. Okay. And that -- the term I've heard over the |
| 12 | years is when newer judges would take to the bench they would |
| 13 | do shadowing of experienced judges. Did you mention |
| 14 | shadowing at some point during your direct examination? |
| 15 | A. Shadowing occurred in November and in December of |
| 16 | 2018. I did no more shadowing in 2019, because I was sitting |
| 17 | full time. |
| 18 | Q. So in November and December of '18, did you shadow |
| 19 | Judge Introcaso? |
| 20 | A. I believe I did once, yes. |
| 21 | Q. And what does that actually mean? You went into |
| 22 | the courtroom and sort of sat and watched as she proceeded |
| 23 | through the day's docket? |

101

1    A.  Yes, but I think -- I think the only thing I did
2  was a first appearance, so I sat either in the audience or in
3  the security chair or something and just watched her do a
4  first appearance.
5    Q.  Is that the only recollection you have of a shadow
6  experience with Judge Introcaso?
7    A.  It is.  It's possible there were more, but I think
8  that was the only one I did with her.
9    Q.  Did you also shadow other judges in November and
10  December of 2018?
11    A.  Yes.
12    Q.  And who were those other judges?
13    A.  In November it would have been Judge Spath in
14  Concord, Judge Yazinski in Claremont.  What else?  Oh, Judge
15  Emery in Manchester.
16      In December I was sitting in Derry doing district
17  without any shadowing and then in December of 2018, I know I
18  shadowed Judge Leary a fair amount.  I may have shadowed -- I
19  sat in on a first appearance -- I don't -- (Zoom connection
20  interrupted.)
21    Q.  I'm having a little difficulty hearing you, Judge
22  Derby.
23    A.  Sorry.  Yes, so November, Yazinski, Spath --

102

1    Q.  Leary?
2    A.  Emery, and then Leary in Nashua.  Introcaso.  I
3  don't know whether I sat in on cases, but I know I did a
4  first appearance with her.
5    Q.  Sure.
6    A.  Maybe Judge Quigley.  I don't really remember what
7  else.
8    Q.  In terms of what you're doing now, as I understand
9  your testimony, you're now working primarily in Milford and
10  Merrimack; is that right?
11    A.  Correct.
12    Q.  And are you doing all three disciplines in the
13  circuit court: probate, district, and marital?
14    A.  I'm doing two, marital and district.
15    Q.  Okay.  Do you do district court?  Do you act as a
16  justice in the district court portion with the circuit court
17  on a regular basis?
18    A.  In Milford, yes.  In Merrimack, when Judge Ryan is
19  away I do district in Merrimack, too.
20    Q.  Is there some designation, do you consider yourself
21  primarily a family court, a marital judge or a district judge
22  or neither?
23    A.  I -- in 2020 I asked for a mix of whatever the

103

1  court has, in other words, I wanted -- if the court is 70/30
2  marital/district, I asked to have that be my mix.  So right
3  now the two courts that I sit in, we don't have a probate
4  division because that's in Nashua, but it's about 30 percent
5  district days, 70 percent marital days.
6    Q.  Okay.  And is that to your liking?
7    A.  Yeah.  I mean, I would -- you know, marital days
8  generate a lot of writing, so I mean, I like the marital
9  work, but it does generate a lot of writing and it's hard to
10  keep up with that.  So, you know, the more district days you
11  have, you get fewer writing projects out of a district day,
12  so those are almost kind of like a break.
13      But our caseload is heavily weighted towards
14  marital, because that's where the needs and the cases are.
15    Q.  Right.  When you're doing district, particularly
16  criminal, ruling from the bench guilty or not guilty saves a
17  lot of writing time, doesn't it?
18    A.  Yes.
19    Q.  Let me --
20    A.  We do get motions to suppress --
21    Q.  Oh, sure.
22    A.  -- and civil -- you know, I do get writing
23  assignments that way.

104

1    Q.  I understand.  Attorney Delaney has covered a lot
2  of the areas that I'm focused on so I'll try not to be overly
3  redundant.  I'd like to go -- you have a set of exhibits from
4  me, I believe, or Attorney Boffetti does.
5      MR. WAYSTACK:  Mike, were you able to get all
6  those?
7      MR. BOFFETTI:  I have them, Phil, thank you.
8    Q.  BY MR. WAYSTACK:  Okay.  And although Attorney
9  Delaney used some of these same exhibits, Judge, I just want
10  to go over the ones I've marked because that's the way I've
11  set it up.
12      I'd like to go to Derby Exhibit 8, if you would
13  take that, please.
14      (Derby Exhibit 8 was marked.)
15    Q.  If you could just take a second and take a look at
16  that.
17    A.  (Witness peruses document.)  Yeah, got it.
18    Q.  So let me explain, and tell me if I don't explain
19  this correctly.  Derby Exhibit 8 is two documents:  The first
20  document is a Notice of Decision dated April 29, 2019, and
21  the notice, the text is Order on Motion to Remove GAL.
22      The second page of Derby Exhibit 8 is the
23  handwritten April 26, 2019, order that was previously

105

1  discussed by Attorney Delaney, correct?

2     A.  Yes.

3     Q.  Okay.  So this order that we're talking about in

4  Exhibit 8, this was really an order on Ms. Partello's motion

5  to remove the guardian ad litem, am I correct?  That was the

6  substance, the main substance of this order, am I correct?

7     A.  Yes.  That is what I -- that is the thing that

8  started the writing project, yes.

9     Q.  Good.  And if you look at the second page of

10  Exhibit 8 in the second paragraph, we know that because you

11  actually use the word "substantively."  Substantively the

12  motion to dismiss, and it goes on.  Am I correct?

13     A.  Yes.

14     Q.  Okay.  And so let me turn now to the first

15  paragraph on the second page of Exhibit 8.  In order -- as I

16  understand your testimony, Judge Derby, in order for you to

17  be able to make a decision on the motion to remove the

18  guardian, you had to sort of back pedal and review all of the

19  preceding motions that you specifically listed in paragraph

20  one of the -- your order in Exhibit 8, am I correct?

21     MR. DELANEY:  Objection to form.  You can answer

22  the question.

23     A.  I don't know.  I guess -- I guess when I first

106

1  looked at the motion to remove, I said if I don't remove -- I

2  don't know.  I mean, I think the other stuff had to be

3  addressed as part of it, so I mean, I think I looked at it

4  afresh and said, I would have granted this, but I'm not -- I

5  would have -- I would have appointed the same guardian, but

6  now that I have, and now that I'm not going to change my

7  mind, I need to go back and look at everything else.

8     Q.  Sure.

9     A.  So before I -- I don't know --

10     Q.  I'm sorry.  Go ahead.

11     A.  So I don't quite know what I was thinking about by

12  prior to other than just saying that I had to look at it all

13  at some point.

14     Q.  And in fairness, when you look at the motion to

15  remove file by Ms. Partello, it raised many of those very

16  issues you considered in the first paragraph of Exhibit 8,

17  didn't it?

18     A.  Yeah.  I mean, it raised -- it raised the -- it --

19  the only new thing there I think was the conflict, the

20  conflict of interest -- the alleged conflict of interest.

21     Q.  Sure.

22     A.  And then I think the substantively, I think what I

23  meant there was all the other stuff about, you know, lying to

107

1  me and, you know, all of the stuff that didn't have to do

2  with the recusal, you know, it was just friction between the

3  guardian and the mom, and I said I'm rejecting that too.  I

4  think that's the purpose of the second paragraph.

5     Q.  I want to go back to the words you just used in

6  your response.  You said the "alleged conflict"; that is, the

7  conflict of interest with Judge Introcaso sitting on a case

8  on someone who is on her recusal list.  Why did you use the

9  word "alleged" conflict?  Don't you think that's a conflict,

10  Judge Derby?

11     A.  Actually, I do.  I'm sorry, I'm used to hedging my

12  words, and I think -- yes, it was a conflict.  She admitted

13  it was a conflict.  I agree.

14     Q.  Okay.  Let's go to Derby Exhibit 3, but keep Derby

15  Exhibit 8 nearby, if you would.

16     (Derby Exhibit 3 was marked.)

17     A.  (Witness peruses document.)  Okay.

18     Q.  So Derby Exhibit 3 is the -- and correct me if

19  yours does not reflect that.  It's the three-page handwritten

20  recusal order of Judge Introcaso dated March 15th, 2019; is

21  that correct?

22     A.  Yes.

23     Q.  Okay.  If you would turn to the third page of Derby

108

1  Exhibit 3, which is the recusal order.  Under the part -- it

2  says "order" in caps and then there's a colon.  Do you see

3  that?  And there are three provisions in the order.  Am I

4  right?

5     A.  Yes.  Yes.

6     Q.  So in the first specific provision of the order, it

7  says that Judge Julianne Introcaso should have no further

8  involvement in this matter.  Clear as a bell there, correct?

9     A.  Yes.

10     Q.  And in the process of making that order, she

11  essentially sua sponte, she, Judge Introcaso, sua sponte

12  recuses himself -- herself from any further involvement as a

13  judge in this case.  Is that what you understood?

14     MR. DELANEY:  Objection to form.  You may answer

15  the question.

16     A.  That is how I understood the order, yes.

17     Q.  Okay.  The second part of the order is that the

18  clerk, presumably Clerk Bisson, shall expeditiously work with

19  the parties to reassign this matter, resolve the pending

20  motions, and schedule this matter for any further hearing.

21  Did I read that correctly?

22     A.  That's what it says, yes.

23     Q.  Okay.  In terms of a portion of paragraph two, the

|     | 109 |     | 111 |
| --- | --- | --- | --- |
| 1 | pending motions, the only pending motion at that time was the | 1 | 2019, that we've just discussed? |
| 2 | motion to remove the GAL. | 2 | A. They changed one of the orders, yes. |
| 3 | MR. DELANEY: Objection to form. | 3 | Q. Let me take that back. As to payment by check; is |
| 4 | A. No, that's not -- okay. That's not correct. | 4 | that right? |
| 5 | Q. Okay. Go ahead. | 5 | A. That's the only change, yes. |
| 6 | A. There was a slew of contempt and back and forth | 6 | Q. You had said that early on when you were at the |
| 7 | stuff that went back to January or February that had not been | 7 | Nashua court that your chambers or your office was next to |
| 8 | ruled on. | 8 | that of Judge Introcaso's; is that correct? |
| 9 | Q. Fair enough. | 9 | A. Yes. |
| 10 | A. Judge Introcaso recused herself, the date is I | 10 | Q. And Judge Introcaso from my brief knowledge seems |
| 11 | guess March 19th. The motion to remove the GAL happened | 11 | to be -- she's kind of talkative. Did you chitchat on a |
| 12 | after Judge Introcaso recused herself, and the recusal was in | 12 | regular basis about things? |
| 13 | the reasons to remove. So that wasn't pending when she wrote | 13 | A. Not every day, because I was only there about, you |
| 14 | this order. | 14 | know, 60 percent of the time and we both had busy schedules |
| 15 | Q. Fair enough. I stand corrected. Let me go to the | 15 | when we were there. So we didn't regularly talk every day, |
| 16 | third provision of the order, which is that no status | 16 | but if I needed help with something and she was available, we |
| 17 | conference will occur on March 19th, 2019. Did I read that | 17 | might talk for 15, 20 minutes or even 30 minutes to talk |
| 18 | correctly? | 18 | through an issue or to get help. |
| 19 | A. Yes. | 19 | Q. Do you as you sit here -- sit there today, do you |
| 20 | Q. And are you aware -- you may not be. Shortly after | 20 | have any recollection of ever having a specific discussion |
| 21 | issuing the two March 12th, 2019, orders, that is, the Apple | 21 | with Judge Introcaso about her March 12th, 2019, orders? |
| 22 | Pay order and the exceed the cap order, that Judge Introcaso | 22 | A. The only conversation that could be considered to |
| 23 | scheduled a kind of quick status conference. Are you aware | 23 | talk about those orders was sometime after I did the de novo |

|     | 110 |     | 112 |
| --- | --- | --- | --- |
| 1 | of that? | 1 | order, I told her, hey, this is what I did. I did the de |
| 2 | A. Only by reading the file. | 2 | novo order and basically ruled on the same, you know -- |
| 3 | Q. Right. And so the third provision in this order | 3 | didn't change much. |
| 4 | just -- it ends the status conference. | 4 | I don't think -- I think it was just an FYI, |
| 5 | A. That's what it says, yes. | 5 | letting you know, but we did not -- I do not recall ever |
| 6 | Q. Nowhere in this order of March 15th, 2019, Judge, | 6 | talking with her about those two orders specifically other |
| 7 | does Judge Introcaso vacate the two March 12th, 2019, orders, | 7 | than telling her what I did after I did it. |
| 8 | that is, the Apple Pay pay order and the exceed the cap order | 8 | Q. And when you said, hey, this is a heads-up, I just |
| 9 | that she had previously ruled on, does she? | 9 | did the de novo review, what, if anything, do you recall |
| 10 | A. Paragraphs one through three do not have a | 10 | Judge Introcaso saying to you, Judge Derby? |
| 11 | substantive vacation or reconsideration of those two orders. | 11 | A. I don't remember anything other than, okay, or |
| 12 | They do not appear there. | 12 | thanks or something. |
| 13 | Q. And you saw nothing else in the file which would | 13 | Q. So Judge Introcaso never asked you to review her |
| 14 | suggest that Judge Introcaso did vacate the two orders she | 14 | March 12th, 2019, orders? |
| 15 | issued on March 12th, 2019, the Apple Pay and the exceed the | 15 | A. She did not. Again, I'm going to say no, she did |
| 16 | cap orders, am I correct? | 16 | not, no. |
| 17 | MR. DELANEY: Objection to form. You may answer | 17 | Q. Okay. To the best of your recollection, when did |
| 18 | the question. | 18 | you first learn or hear that there was a judicial conduct |
| 19 | A. No. I mean, you are correct, I didn't see anything | 19 | complaint that had been -- a report that had been made |
| 20 | in her writing or her order that vacated those two orders. | 20 | against Judge Introcaso in connection with the Partello and |
| 21 | Q. And so your use of the words "de novo" in your | 21 | Campbell case? |
| 22 | April 26th, 2019, order, they did not in any way change the | 22 | A. I know I became aware in about March of 2020 with |
| 23 | two orders that Judge Introcaso had entered on March 12th, | 23 | the preservation -- the preservation request. I'm -- I can't |

113

1  remember if Judge Introcaso mentioned it on January 9th when
2  I talked -- when she sent out the e-mail requesting a call.
3  I don't remember.  And I don't think we talked about it when
4  I saw her in December after she came back from her sabbatical
5  break.
6      Q.  To be precise, you're talking about December of
7  2019 now, correct?
8      A.  Right, December of 2019.
9      Q.  So if I understand correctly -- go ahead.
10     A.  We did talk when she got back and I had to get a
11  gift over to Judge Gorman, so...
12     Q.  I remember that discussion from earlier.  So to the
13  best of your recollection the first that you, Judge Derby,
14  learned about the fact that there was a JCC proceeding
15  concerning Judge Introcaso and the Partello and Campbell case
16  was in the calendar year 2020?
17     A.  Yes.
18     Q.  Back to the -- your April 26th, 2019, order for a
19  minute, Exhibit 8.  Other than reviewing the prior orders in
20  connection with your decision on the motion to remove the
21  guardian, you had no formal basis to be doing a de novo
22  review of Judge Introcaso's two March 12th orders, did you?
23     A.  Well, I think I -- I mean, I -- I think that when I

114

1  chose -- when -- there was a recusal.  The judge recused
2  herself.  And I chose not to get rid of the guardian ad
3  litem, and I felt on my own that if I'm going to keep the
4  guardian ad litem, I needed to do a de novo review of all the
5  orders related to the guardian ad litem for the benefit of
6  the parties so that it was independently reviewed by an
7  independent judge.
8      Q.  You weren't sitting as an appellate court, were
9  you, Judge Derby?
10     A.  No.
11     Q.  You were reviewing the prior orders only inasmuch
12  as they affected the motion to remove the guardian, correct?
13         MR. DELANEY:  Objection to form.  You may answer
14  the question.
15     A.  The -- yes, there was a recusal of a judge who had
16  issued some orders.  I felt that now that I was being asked
17  to basically reconsider the big order, which is whether or
18  not to appoint this guardian, I felt that I had -- once I had
19  adopted, you know, and agreed that we were keeping the
20  guardian ad litem, I felt that I had to independently look at
21  the other orders and rule on them independently on their own
22  merit.
23         MR. WAYSTACK:  I've gone for more than 15 minutes.

115

1      Did you want a break now?  I still have a ways to go.
2      A.  Yeah, take like five minutes maybe.
3         MR. WAYSTACK:  Fine.  No problem.
4         (Recess taken.)
5      Q.  BY MR. WAYSTACK:  Judge Derby, I'm going to ask you
6  some questions about your own use of White-Out.  And again,
7  I'm trying not to be redundant.
8      Attorney Delaney asked you about your use of
9  White-Out specifically on your April 26th, 2019, order which
10  was marked as Introcaso 17, and I also separately marked it
11  as Derby 8.  Do you remember that discussion?
12     A.  Yes.
13     Q.  And summarizing and trying to move us through, it
14  looks like there's probably a quarter-inch piece of White-Out
15  on line four of the first page of the 4/26/19 order, and is
16  that it?  Is that the only White-Out on that order?
17     A.  That appears to be the case, yes.
18     Q.  It looks like you don't -- I mean, we're going --
19  I'm going to go through some of the other orders, but it
20  looks like you don't use it extensively.  It's only a small
21  thing to change a date or a name or something.  Is that
22  fairly accurate about your normal use of White-Out?
23         MR. DELANEY:  Objection to form.  You may answer

116

1  the question.
2      A.  My normal use of White-Out is while I am writing.
3  I will tell you, though, you know, if I -- if I rule on
4  something with like a one-sentence margin order and then
5  before it goes out an objection comes in --
6      Q.  Yep.
7      A.  -- I will white out a sentence.
8      Q.  Okay.
9      A.  And write in, you know, objection noted, denied or
10  something like that.
11     Q.  So let me go through at least in the orders you
12  made in this case that I see in terms of your use of
13  White-Out.  So let me go on.  I'm referring now to Attorney
14  Delaney's exhibits.  If you look at Exhibit 27.  You still
15  have his exhibits in front of you?
16     A.  I'm getting them.  27, yep.
17     Q.  Exhibit 27 is a two-page temporary hearings
18  conference -- it's a form that the court uses, correct?
19     A.  Yes.
20     Q.  And I see no White-Out on that order, Judge Derby;
21  would you agree with that?
22     A.  Correct.
23     Q.  On the second page of Exhibit 27 in paragraph 10,

117

1  it looks like there is something that's been stricken out,
2  but I'm going to assume it was Master DalPra that did that
3  and not you.  Do you have any recollection of that as you sit
4  here today?
5      A.  I have no recollection.  But I do note that the box
6  is checked so they must have changed their mind or something.
7      Q.  Okay.  And then in paragraph 11, whatever was first
8  written down, looks like it was scribbled out and then the
9  words "two days" added.  Again, I'm going to assume that
10  that's Master DalPra and not Judge Derby.
11      A.  Yeah, because it says 15-minute pretrial and then
12  they changed it to final hearing, two days.  So that makes
13  total sense.
14      Q.  Okay.  Just below that where it's so ordered with
15  the preprinted full on -- Attorney Delaney went over that
16  with you a bit.  And this is that anytime you're cosigning or
17  a judge is signing an order that a referee or a master did,
18  that language appears or supposed to appear; is that right?
19      A.  Yes.
20      Q.  And that at least on this form, Exhibit 27, that's
21  what's expected of the judge who signs an order to do in
22  order to sign you out, correct?
23      A.  Yeah.

118

1      Q.  And do you ascribe to that yourself, Judge Derby?
2  In other words, do you read the orders to see if you agree
3  with the facts and do you look at the ruling to determine if
4  the correct law was applied?
5      A.  Yes, I do.
6      Q.  Do you -- is your experience, and I recognize
7  you're a relatively new judge.  Is it your experience that
8  you cosign orders written by a master or a referee without
9  reading the order?
10      A.  No.  I read the orders.  Some orders are all
11  boilerplate, so I'll skim over the boilerplate and zero in --
12  like a parenting plan I'll zero in on just maybe four or five
13  things I look at.
14      Q.  Sure.
15      A.  And then the rest is boilerplate and I just skim
16  over it really quickly.
17      Q.  I understand.
18      A.  But if it's a narrative order, I read those.
19      Q.  Okay.  And so you would not sign an order without
20  reading at least what you consider the relevant portions on a
21  parenting plan or the narrative in a written note; fair
22  statement?
23      A.  Yeah, the narrative, you know, if it's many, many

119

1  pages long I might skim stuff.  If it's a child support
2  order, there's certain things I look for.  And if they're
3  unusual, I dig deeper.  If it's all kind of pretty standard,
4  I go through it quickly, but I do look at everything.
5      Q.  Let's turn to the next exhibit, which is Introcaso
6  28.  That's the parenting plan, and that's a multiple-page
7  document.
8      A.  Yes.
9      Q.  It does not appear to me, Judge Derby, that there's
10  any White-Out that you applied to this order; am I correct
11  about that or am I wrong?  Attorney Delaney raised something
12  on D, transportation, on page 8 or 9 that I can't see.
13      A.  I have it in front of me.  I would not have applied
14  White-Out, because there's writing on top of it that isn't
15  mine, so whoever did that writing would have probably done
16  the White-Out.
17      Q.  So in the second-to-last page or third-to-last
18  page, you signed this order that was made by Master DalPra,
19  correct?
20      A.  Yes.
21      Q.  And it looks like you signed it on January 11th,
22  and again, that same phrase there that you reviewed it, you
23  read it, you reviewed the factual findings and the correct

120

1  legal standard was applied, and then you signed it and used
2  your Mark Derby stamp; is that right?
3      A.  Yes.
4      Q.  Fair to say that in Exhibit 28 there is no
5  White-Out that Judge Mark Derby applied to this order?
6      A.  No, and what I will tell you is if I'm ever going
7  to change a master's order, I usually talk to the master
8  before I would do it.  I wouldn't -- I wouldn't make a
9  change -- a master's recommendation.  I would -- so if
10  there's anything on here, I would -- I don't -- I don't think
11  I've ever changed a master's recommendation without talking
12  to the master before doing it.  So I would not have whited
13  something out without talking to the master.
14      Q.  So if I understand your response, if you're
15  reviewing an order of a master or a referee, you would not
16  apply White-Out to their order without discussing it with
17  them first?
18      A.  That is correct.
19      Q.  With regard to the orders you make yourself
20  independently, you don't need to speak to anyone, correct?
21      A.  No, because those are changing my mind as I go
22  along.
23      Q.  Sure.  And routinely, I have an understanding

121

1  having practiced law for quite a number of years how many
2  individual decisions as a family judge or a family law judge
3  you make on a day to day, and there's got to be hundreds in
4  some days, maybe thousands per week, and if you have a date
5  wrong or something, the use of White-Out for a draft of an
6  order, that is, before an order is sent out to the parties,
7  there's nothing wrong with that, is there?
8     A.  I don't think so.
9     Q.  How about once an order has been sent out to the
10  parties, what about your -- what's your position on whether
11  you have the right to white out an order after it's been sent
12  out to the parties?
13       MR. DELANEY:  Objection to form.  You may answer
14  the question.
15     A.  I don't know.  It depends.  I would expect that --
16  I don't know.  I mean, I would expect that if -- if something
17  had already gone out and you were changing it, I think as a
18  judge, if I'm re-ruling on something or if I have to rule on
19  something, I think I'd have the right to change it, but there
20  would have to be something that explains what I did.  Like if
21  you modify another judge's order, you cross it out with a pen
22  and then write something next to it, so I --
23     Q.  You'd agree with me that even in that

122

1  circumstance --
2       MR. DELANEY:  I just don't think -- I don't think
3  he completed his answer to that.
4     Q.  I'm sorry.  I'm sorry, Judge Derby.  I interrupted
5  you.
6     A.  I pretty much did.  I don't know -- as I sit here
7  today, I don't know who would have the right to change an
8  order that had already gone out to the parties, but my practice is when I do
9  something with another judge's order, and I think it's pretty
10  standard, you cross it out with a pen so you can still see
11  it, then you write your stuff next to it so everybody knows
12  you did it.
13     Q.  And regarding an order that you had made yourself
14  that had already gone out to the parties, if you were going
15  to alter the order after it had gone out to the parties with
16  White-Out based on your response, my understanding is you
17  would not do that without notification to the parties; did I
18  say that correctly?
19     A.  Right.  Yes.  If I had already issued an order and
20  I needed to change it, I would probably grab one of those
21  one-page things that I -- I'd grab one of these things and
22  then say, you know, my October 15th order was incorrect
23  because I didn't -- I misheard the parties when they said the

123

1  pickup is at seven and they really wanted to do the pickup at
2  three, so the order is amended accordingly.  And then they
3  issue a new order.
4     Q.  Sure.  Let's turn to Exhibit Introcaso 32, and
5  that's your order on a bunch of pending motions dated May
6  10th, 2019.  Do you have that?
7     A.  Yeah.
8     Q.  Okay.  And that's another one of those yellow-page
9  orders?
10     A.  Yes.
11     Q.  I don't see that you used any White-Out on that
12  order, Judge Derby; am I correct?
13     A.  I typed it on a computer, so I would have used
14  backspace or delete.
15     Q.  You didn't use White-Out.
16     A.  No, I didn't, because I typed it on a computer.
17  There would be no -- like if I started typing and I got
18  something wrong, I would just backspace and delete it and
19  type it over.
20     Q.  How about order -- Exhibit 34, Introcaso 34.  This
21  is another yellow-page order that you typed out, correct?
22     A.  Yes.
23     Q.  This is the order on further continuance dated May

124

1  20th, 2019.  No White-Out on that order --
2     A.  Yeah.
3     Q.  -- and I understand it was typed?
4     A.  Correct.
5     Q.  Let's go to Exhibit 38, Introcaso 38.
6     A.  Got it.
7     Q.  That's an order on yellow paper dated May 31st,
8  2019.  Do you have it?
9     A.  Yes.
10     Q.  Am I correct that there is no White-Out used in
11  Introcaso 38?
12     A.  Correct.
13     Q.  Let's turn to Introcaso Exhibit 40.  That's
14  another -- we'll call it a narrative order that you did.  The
15  date of this order is June 17th, 2019.  Fair statement to say
16  that there's no White-Out applied to Introcaso 40, Judge
17  Derby?
18     A.  Correct.  Correct.
19     Q.  How frequently do you think, in percentage-wise if
20  we could do it that way, that you would use White-Out when
21  you were drafting an order?
22     A.  If I am drafting an order on computer, I would
23  never use White-Out because I have the backspace key.  If I'm

125

1  writing on the bench after a hearing trying to come up with
2  something that I can give the parties and there's back and
3  forth and arguments and stuff, there might be a fair amount
4  of White-Out on that order like the one that I wrote in court
5  in this case.
6        If I'm doing margin orders, yeah, I use White-Out
7  every now and then. Like if I start writing and my hand just
8  makes the character wrong so it looks bad, I white that out
9  and write the word again.
10    Q. And I'm going to use your words --
11    A. And then I -- go ahead.
12    Q. Sorry, go ahead.
13    A. If, for example, as I said before, if I write, you
14  know, you have 14 days to pay and then I write another line
15  and I think I'd better make it 30, I'll white out the 14 and
16  write 30 and send it off.
17    Q. Sure. To use your own words in responding to the
18  question, you use White-Out every now and then, fair
19  statement?
20    A. I would say every day.
21    Q. You said earlier every now and then. Are you
22  changing your --
23    A. Yeah.

126

1    Q. Are you changing that answer?
2    A. Yeah, now and then. I mean, now and then sounds
3  like occasionally. I would say I use it frequently. I would
4  say I probably use it three to four times a day on
5  handwritten things that I do where I need to. Now and then,
6  that probably suggests a little too infrequently.
7    Q. Do you -- as you sit there today, do you ever have
8  a recollection of using White-Out tape on a court order after
9  it was issued and sent to the parties?
10    A. No.
11        MR. DELANEY: Objection to the form. You may
12  answer the question.
13    A. No.
14    Q. You talked to Attorney Mary Ann Dempsey, who
15  represents the New Hampshire Judicial Branch, on several
16  occasions; is that right?
17    A. Two occasions, three phone calls.
18    Q. Okay. The first occasion was in January of 2020?
19    A. I think it might be early February, but --
20    Q. Okay.
21    A. -- there was one phone call in that area.
22    Q. Okay. And I am looking at Attorney Dempsey's
23  October 26th, 2020 letter to me, and she said in that first

127

1  occasion when she spoke with you, and we'll say it's February
2  2020, you told her that you are almost positive that you did
3  not use White-Out to Judge Introcaso's two March 12th, '19
4  orders. Do you agree with that statement?
5    A. Yes.
6    Q. And then more recently in October of 2020, after
7  you read the statement of formal charges, you called her back
8  and said, looks like her words, that you would reiterate that
9  you could not say with 100 percent certainty that you did not
10  white it out. That's a little change in your testimony,
11  isn't it, a little change in what you told her?
12    A. I think those two statements are consistent.
13    Q. So without a hundred percent certainty, almost
14  positive, those are consistent with you. You're almost
15  positive you did not white out the two March 12th, '19 orders
16  made by Judge Introcaso?
17    A. I am almost positive, but I just -- I doubt myself.
18  When I think about all the other explanations for how that
19  could have happened, I doubt myself, and, you know, I just --
20  I can't completely exclude that possibility. Whether I said
21  almost positive or 98 percent, I think that's saying the same
22  thing. If I chose different words in October that I chose in
23  February, so be it.

128

1    Q. Okay. Your level of belief that you might not have
2  done it, it's not more probable than not that you whited it
3  out, is it?
4        MR. DELANEY: Objection to form. You may answer
5  the question.
6    A. In my view it's beyond a reasonable doubt, but, you
7  know, as I said, I just -- I just doubt -- I doubted myself,
8  because, you know, I just doubted myself and I didn't -- I
9  can't say with a hundred percent certainty that I didn't do
10  it as part of that order.
11    Q. I want to understand what you just said. It's not
12  beyond a reasonable doubt that you did not -- that you did
13  white out the order; am I correct?
14        MR. DELANEY: Objection to form. You may answer
15  the question.
16    A. This answer started with the preponderance of the
17  evidence standard.
18    Q. Sure. Yes.
19    A. And I am well, well, well beyond preponderance of
20  the evidence that I did not white out --
21    Q. Okay.
22    A. -- the --
23    Q. Fair enough. Go ahead.

| 129 | 131 |
|---|---|
| 1  A. No, we are beyond a reasonable doubt that I did | 1  and went over to the piece of paper. That seemed likely. |
| 2  not, and beyond a reasonable doubt is usually like 98, 99 | 2  And I wanted to eliminate that possibility to make sure that |
| 3  percent moral certainty, but I cannot -- I just have this | 3  my writing wasn't sandwiched in between two passes of |
| 4  little lingering bit of self-doubt given that it makes no | 4  White-Out. That's when I looked at a high-contrast photo of |
| 5  sense, it made no sense to me that anybody else would have | 5  the original. |
| 6  done that. So that's my answer. | 6  Q. And you have resolved after looking at that copy |
| 7  Q. Did you ever see the original whited-out orders of | 7  that you didn't -- there was not a second pass of White-Out |
| 8  March 12th, 2019, on the Apple Pay motion and the exceed the | 8  and you did not white out the documents? |
| 9  cap motion? | 9  A. That's what the -- that's what the pass shows. |
| 10  A. No. | 10  That's what the photos show, because my theory was that there |
| 11  Q. In responding to Attorney Delaney's questions | 11  would be my writing somewhere in between and that I whited |
| 12  earlier, you mentioned that you saw, it sounds like a copy | 12  her out, then I whited myself out, but that does not appear |
| 13  from the rear of one of those motions that shows the whiting | 13  to have happened based on the photos I looked at. |
| 14  out; is that what you said? | 14  Q. When you reviewed the formal statement of charges, |
| 15  A. Yes, and I'll tell you how I came to look at those. | 15  I think you said you printed it out. You've read the entire |
| 16  Q. Sure. | 16  document, haven't you? |
| 17  A. One of my concerns is that, again, this is that one | 17  A. Yes. |
| 18  or two percent, what if my plan was to write my own order on | 18  Q. And there was a reference, actually several |
| 19  top of Judge Introcaso's? What if I whited out Judge | 19  references to criminal charges involving alteration or |
| 20  Introcaso's order, I wrote my order on top, and then I whited | 20  falsifying of records. Did you look those sections of law up |
| 21  that out in favor of the written narrative order. | 21  after reading the formal statement of charges? |
| 22  If that was the case, there would be two swipes of | 22  A. Yes. |
| 23  White-Out on that original order. I had never seen the | 23  MR. WAYSTACK: Okay. Jim, would you hand Judge |

| 130 | 132 |
|---|---|
| 1  whited-out order, so what I -- I asked is, you know, getting | 1  Derby Derby Exhibit 4, please. |
| 2  ready for today if there was any way they could like x-ray it | 2  (Exhibit 4 was marked.) |
| 3  or put it up to a light so that I could see if there was one | 3  A. I've got it right here. |
| 4  swipe of White-Out or if there were multiple swipes of | 4  Q. Okay. |
| 5  White-Out, which is the one kind of scenario that in my head | 5  A. (Witness peruses document.) |
| 6  maybe like I goofed up and I should have crossed it out with | 6  Q. So that's a printout of section -- of RSA 541-6, |
| 7  a pen, but I whited it out and I wrote my own thing on top, | 7  falsifying physical evidence, and as you can see in the text, |
| 8  and then I changed my mind and whited out my thing. | 8  that's in a case where an investigation is pending; do you |
| 9  But I looked -- but they have gotten for me like a | 9  see that? |
| 10  high-contrast picture showing there's only one swipe of | 10  A. Yes. |
| 11  White-Out over those words. | 11  Q. And even with the very slim possibility you may |
| 12  So that is the time I looked at the whited-out | 12  have whited out a part of the March 12th orders of Judge |
| 13  thing. And I've never seen the original. I've just seen a | 13  Introcaso, based on your testimony so far, you weren't aware |
| 14  high-contrast lighted copy showing what I think is only one | 14  in April of 2019 that there was a pending judicial conduct |
| 15  swipe of White-Out. | 15  complaint, were you? |
| 16  Q. And as a result of seeing that high-contrast copy | 16  A. No. |
| 17  that disclosed only one swipe of White-Out, what, if | 17  Q. Okay. |
| 18  anything, did that mean to you in terms of the possibility, | 18  MR. WAYSTACK: Would you hand him Exhibit 5, |
| 19  although remote, that you whited out the 3/12/19 orders? | 19  please. |
| 20  A. Reduced it, because the most likely of those | 20  (Exhibit 5 was marked.) |
| 21  difficult unusual self-doubt possibilities was that, you | 21  A. I got it right here. (Witness peruses document.) |
| 22  know, I whited her thing out because I was going to write on | 22  Q. So Exhibit 5 is the misdemeanor RSA 641-7 in |
| 23  top of it. I wrote on top of it. Then I whited myself out | 23  connection with altering a record of government information. |

133

1  The distinction of course is that there's no investigation
2  pending at the time. Your testimony this morning is --
3        MR. DELANEY: Objection -- finish your question.
4  Finish your question.
5        Q.  Your testimony this morning is you did not alter
6  that record without letting anyone know?
7        MR. DELANEY: Objection to form. Misstates the
8  law. You may answer the question.
9        A.  Can you break that into smaller pieces?
10       Q.  Sure. Let me withdraw the question. That was a
11 poor question.
12       If a person under this statute that's shown in
13 Exhibit 5 knowingly makes a false alteration or a false entry
14 in a government record, that subjects them potentially to the
15 misdemeanor of tampering with public records. Would you
16 agree with that general statement?
17       MR. DELANEY: Objection to form and to any
18 conclusions by this particular judge on the interpretation of
19 the law. You may answer the question.
20       A.  I -- the law says what it says. I think the
21 statute speaks for itself.
22       Q.  Okay. Earlier, Judge Derby, when Attorney Delaney
23 was asking you questions specifically about the Apple Pay

134

1  order, you repeated something several times and that was that
2  the word "only" was in capitals. Do you remember that?
3        A.  Yes.
4        Q.  And if you'd turn to Derby Exhibit 6 for a moment.
5        (Derby Exhibit 6 was marked.)
6        A.  Got it. (Witness peruses document.)
7        Q.  So Derby Exhibit 6 is a multi-page document and it
8  begins with a Notice of Decision on page 1. Do you see that?
9        A.  Yes.
10       Q.  And as we have learned in this case, certain clerks
11 use text right from the order in the Notice of Decision and
12 in here it's, quotes, legal fees/GAL fees to be paid in cash,
13 by money order or bank check, only, end of quotes, and the
14 word "only" is capitalized; am I right?
15       A.  Yes.
16       Q.  So if you had reviewed this file prior to issuing
17 your April 26th, '19 order that we discussed earlier, the
18 likelihood is you would have come across this Notice of
19 Decision; is that a fair statement?
20       A.  Yes.
21       Q.  And in this Notice of Decision we're talking about
22 now, Derby 6, the word "only" in caps appears?
23       A.  It does, yes.

135

1        Q.  My recollection is when Attorney Delaney was asking
2  you about this, if you turn now to the third page of Exhibit
3  6, you were not certain whether or not you read the margin
4  note; am I wrong about that?
5        A.  I'm not certain. I can't tell you today which
6  place I found the text of what Judge Introcaso said.
7        Q.  To follow up on that, but you have no independent
8  recollection today that you ever saw the margin order on page
9  3 of Exhibit 6 that I just asked you about?
10       A.  No.
11       Q.  I assume in preparation for this case you have seen
12 that and we've talked about it today?
13       A.  Yes, I mean, in preparation for the case I have now
14 seen it, but I just can't remember what -- as I said, I know
15 I looked at the motion. I read the whole motion over again,
16 and the motion had that thing on it, but I don't remember
17 where I saw the order.
18       Q.  You're not saying that the margin orders were not
19 in Exhibit 6, which is the Apple Pay, you're just saying you
20 didn't see it, you don't remember seeing it?
21       A.  I don't remember what I saw. I could have seen it.
22 I could have not seen it. I could have -- I could have read
23 Introcaso's written order, I could have read from the Notice

136

1  of Decision, and I could have also, I believe, read that off
2  the case summary/docket sheet that was in the file.
3        Q.  In one of the conversations that you've discussed
4  in response to Attorney Delaney's question about your
5  conversations with Judge Introcaso, did I understand
6  correctly that Judge Introcaso asked you if you knew about
7  the orders having been whited out and your testimony was no,
8  you do not? Do you recall that testimony?
9        A.  I believe I -- yes. On January 9th we had a phone
10 call and I answered her questions in the negative.
11       Q.  Okay. So that was in response to that e-mail that
12 Judge Introcaso sent to some fellow judges and some of the
13 clerk staff, correct?
14       A.  Yes.
15       Q.  When she -- when Judge Introcaso asked you if you
16 knew about the White-Out orders, did that -- did that raise
17 your curiosity about that question, Judge Derby?
18       A.  Not really. I mean, I was busy. I wanted to get
19 back to her and give her an answer. I don't know. I don't
20 know how long we talked or what we exactly talked about.
21       Q.  So if -- well, let me ask you, did you specifically
22 yourself do anything to investigate further after your
23 telephone discussion with Judge Introcaso on January 9th,

1  2020, about the so-called whited-out orders?

2     A.  I did nothing to investigate until Attorney

3  Dempsey -- I didn't investigate anything.  I didn't think

4  about it.  I don't know that I thought about it, but I took

5  no steps between January 9th and Attorney Dempsey's phone

6  call.

7     Q.  Judge Introcaso was on leave in 2019 from, I'm

8  going to say early October to late December.  You have a

9  general recollection of that, do you?

10     A.  I do.

11     Q.  Okay.  And I think what you said earlier was that

12  in December of 2018 [sic] when she got back, you had a brief

13  discussion with her at that point?

14     A.  I think when she came back, and I knew she was

15  back, I went in and said hello and welcomed her back.

16     Q.  Okay.  And to your recollection nothing was said

17  about the judicial conduct investigation at that point in

18  that conversation?

19     A.  I do not remember talking about Robin Partello's

20  judicial conduct complaint, and I don't know whether I knew

21  about it.

22     Q.  So it appears -- well, you may or may not know

23  this.  So in the week of January 6th to January 10th, 2020,

1  there's been some discussion about that, and part of what

2  Judge Introcaso was doing was responding, filing an answer to

3  the judicial conduct complaint of Robin Partello.  When did

4  you first learn that?

5     A.  When did I first learn that in that period of

6  January Judge Introcaso was responding to a JCC complaint?

7     Q.  Sure.

8     A.  I'm going to say when I read it in the -- when I

9  read it in the statement of charges that I got off the Union

10  Leader website in October of 2020.  And again, that is

11  distinct from -- let me clarify that.

12     I don't know whether Judge Introcaso mentioned the

13  JCC complaint on January 9th, but that she was working on her

14  response in that week.  I don't remember learning about that

15  particular task until I read it spelled out in the statement

16  of formal charges.

17     Q.  Okay.  So let me ask you a more general question.

18  To the best of your recollection, when is the first time you

19  learned anything about a judicial conduct complaint against

20  Judge Introcaso?

21     A.  I'm going to say March of 2020 when I was asked to

22  preserve e-mails.

23     Q.  That's the litigation hold letter that you probably

1  got or e-mail from Attorney Dempsey?

2     A.  I believe it was a litigation hold e-mail and it

3  mentioned Attorney Delaney and it mentioned the Judicial

4  Conduct Committee.  I could call it up and see whether it

5  mentions Partello or not, but that's clearly -- I clearly

6  knew about the JCC -- I clearly knew there was a JCC

7  complaint at that time.

8     Q.  Okay.  And you've discussed a little bit earlier

9  that prior to taking the bench you worked in private

10  practice, you worked with the Cleveland Waters law firm.  You

11  understand what litigation hold means in terms of preserving

12  information?

13     A.  Yes.

14     Q.  And can I assume that once you got that

15  communication from Attorney Dempsey that you did preserve

16  whatever information Attorney Dempsey asked you to preserve?

17     A.  Yes, I preserved -- I did some searches of my

18  e-mails using search terms that I created, and then I put

19  them all in a folder, and then I just took screenshots of the

20  lines, you know, where it says date and subject matter.  I

21  took screenshots of the e-mails I had preserved and I sent

22  those screenshots to Attorney Dempsey.

23     Q.  I just have a few more areas and hopefully I'll

1  wrap this up quick.  So I want to talk a little about you and

2  your recusal list.

3     So how many people are on your recusal list, Judge

4  Derby?

5     A.  I'm going to say if you count my former firm and --

6  I'm going to say 35, 30-ish, maybe in the 20s.

7     Q.  Sounds like you're a popular person.

8     A.  Depending on the size of my firm, but...

9     Q.  Sure.  Some judges from larger firms, I remember

10  this from Shane Devine many years ago, have what they call a

11  timed recusal, meaning I will not appear -- I will not allow

12  any members of my former firm to appear in front of me for a

13  period of five years from when I was appointed.  Do you have

14  a time recusal policy with former members of your firm?

15     A.  At present it is blanket.  I am considering seeing

16  what things -- I was thinking maybe I'd do it in two, maybe

17  I'd do it in five, but in reality firms in Concord I'm in --

18  they very rarely come to my two courts so -- the two courts I

19  sit at, so it -- I haven't really -- it's not really slowing

20  anything down having a broad recusal.

21     Q.  Sure.

22     A.  But I was going to just kind of keep it in place

23  and then revisit maybe in two years, five years, I don't

141

1  know.

2  Q.  Fair enough.  Parenthetically, I haven't known the

3  Cleveland, Waters & Bass firm to do a lot of family law over

4  the years, but we're in a changing world.

5  A.  We did do some, yeah.

6  Q.  Did you?

7  A.  Yeah, I did some.

8  Q.  I didn't know that.  So I think you testified

9  earlier that you gave -- there's actually a printed list and

10  you gave it to Clerk Bisson; is that right?

11  A.  To my knowledge it was an e-mail that I sent with

12  the -- with -- I sent an e-mail to Clerk Bisson and Clerk

13  Killkelley.

14  Q.  Okay.  Having sent those lists to the clerks, is it

15  your sense that it's up to the clerk to tell you when

16  somebody is to appear in front of you who is on your recusal

17  list?  Is that the clerk's responsibility, is that your

18  responsibility, or is it a shared responsibility?

19  A.  I think it's ultimately my responsibility.  I would

20  rely on the clerks, but, you know, if I look at a docket

21  sheet of my upcoming cases and I see somebody who's

22  problematic who is on the list, I make sure I tell the clerk

23  to reschedule or that I can't hear it.

142

1  Q.  Sure.

2  A.  And that's the recusal list.  I mean, there are

3  other -- there are other times when somebody's not really on

4  the recusal list but there's a connection that you disclose

5  to the parties before the hearing and then that might open a

6  discussion about recusal.

7  Q.  Sure.  You find out that one of the parties in

8  front of you is your next-door neighbor and it's a, let's say

9  a litigious divorce, you're going to do something about that

10  one.  Is that the type of situation you're talking about?

11  A.  Absolutely, because I might not know the last name

12  of -- my recusal list is really only about attorneys.

13  Q.  Right.

14  A.  If a former client or someone I'm socially friendly

15  with or whatever shows up in court, I spot it and I either

16  flat out recuse or if it's kind of a -- you know, if it's

17  kind of a question -- not a question but if it's a close

18  call, I will disclose it at the beginning of the hearing,

19  tell everybody what the issue is, and then if they all say

20  that's fine, that's fine.  If they have an issue, we work it

21  out.

22  Q.  Give me just a moment.  So I just want to be clear

23  on this, I think we're clear on.  To this day you have not

143

1  seen the original version of the March 12th, '19 Apple Pay

2  and exceed the cap orders with the original White-Out

3  applied?

4  A.  I have not been in the physical presence of those

5  documents, no.

6  Q.  And the reference to the order that I showed you in

7  the Partello complaint, the legal fees, whatnot, that's in

8  handwriting, your reference to that, and I've heard this from

9  other judges, that is called a margin order, that is,

10  handwriting on the margin or empty space in one of the

11  motions of a file?

12  A.  That's what I call it and most judges do.

13  MR. WAYSTACK:  I have no further questions for you,

14  Judge Derby.

15  THE WITNESS:  Okay.

16  FURTHER EXAMINATION

17  BY MR. DELANEY:

18  Q.  Judge, I just have a few follow-ups to Attorney

19  Waystack's questions.

20  A.  Sure.

21  Q.  First, just your last answer of not being in the

22  physical presence of those documents and appreciating we're

23  all not in the physical presence of one another a lot during

144

1  a pandemic.  Other than the high-resolution camera shot that

2  I understand has been prepared for you, have those original

3  documents been shown to you in any other electronic form or

4  audio/visual medium?

5  A.  No.  I saw them for the first time today printed

6  out on colored paper.

7  Q.  So no shots over the Zoom, you've just had a camera

8  shot taken for you?

9  A.  I was shown colored pictures that Attorney Boffetti

10  brought in with me today.  I have had them described to me,

11  but I did not see them for the first time until this morning.

12  Q.  And I don't want to get into any conversations with

13  your counsel of record for this deposition.  Who described

14  the original whited-out orders to you?

15  A.  I'm going to assert attorney/client privilege.

16  Q.  Fair enough.

17  A.  I mean, I can --

18  Q.  That's all I -- it wasn't --

19  A.  The only time those orders have been described to

20  me would be in the confines of an attorney/client privilege

21  relationship and those would be attorney/client

22  communication.

23  Q.  And I'm going to add this broadly, hoping I don't

145

1  need to tread any further.  Can we eliminate from that
2  conversations you may have had with General Counsel Dempsey
3  when she was investigating this matter?
4      A.  Yes, I did not -- I did not have communications
5  with Attorney Dempsey about the one or two pass of White-Out
6  distinction and wanting to check that.
7      Q.  Thank you.  I just want to reference the first date
8  of your first conversation with Mary Ann Dempsey because
9  Attorney Waystack asked a question at the beginning
10  referencing January and February of 2020.  I had understood
11  you to testify earlier that you received an e-mail from
12  General Counsel Dempsey on February 7th and spoke to her
13  thereafter for the first time.  Is that accurate?
14      A.  I base that answer on a -- I don't know whether it
15  was late January -- I have no independent recollection of
16  whether it was late January or early February, but I looked
17  at my e-mail inbox and the first communication I had from her
18  is a request for a telephone call in an e-mail that was sent
19  on February 7th.
20      Q.  Do you believe that your conversation with her took
21  place after you received that e-mail?
22      A.  Yes.
23      Q.  Your Honor, when you were answering questions about

146

1  your personal use of White-Out, you used one example of using
2  White-Out while writing and then before it goes out receiving
3  an objection and whiting out the sentence.  Do you recall
4  that?
5      A.  Yes.
6      Q.  Were you referencing some scenario where you may
7  have been considering ruling in one way based on your review
8  of the motion and then reconsidered your decision to rule in
9  a particular way based on additional information you received
10  such as from an objection?
11      A.  Well, that is the nuance, because sometimes the
12  ten-day thing will come, there will be nothing, there will be
13  no objection, they will put it in signing, I will read it,
14  and I will say, okay, I'll put a note, no objection.  And
15  then I'll read the motion.  I'll write, no timely written
16  response having being filed and it appearing appropriate,
17  motion granted.  And then I'll put it in the pile and then a
18  clerk will say, oh, this came in the mail today.  I forgot to
19  put it in with signing and it's the objection.  And it was a
20  timely objection.
21      So I grab that back, I read the objection, and then
22  I might say -- I might white out the thing I wrote and say,
23  schedule a hearing, or I heard the other side and we need to

147

1  have a hearing, or I might still grant the motion or I might
2  deny it.
3      But I'm just giving that as an example of an
4  instance where I will wipe out a whole sentence or two,
5  because I've written it, it hasn't gone out, but the only
6  reason I wrote it is because the clerk didn't give me the
7  objection or it didn't make it over into -- it got into my
8  signing before they got the objection in or they missed it or
9  something, and so yeah, I will white out a sentence or two.
10      Q.  And in that instance, you believe it is appropriate
11  to use White-Out to cover your first issuance of a marginal
12  order to then reconsider that order before it goes out?
13      MR. WAYSTACK:  Objection to the form.
14      A.  Yes.  Yes, because it would be really confusing if
15  I issued an order saying no objection and the attorney says,
16  yes, I filed a timely objection, and it was just a paper
17  handling issue in the clerk's office that caused the
18  objection not to get in with the -- that caused the -- an
19  apparently unopposed motion to get into my signing pile when
20  there was still an objection floating around somewhere.
21      So I think it would cause unnecessary work and
22  confusion to issue an order and then issue another order.  So
23  that -- that's the use of a lot of white -- not a lot, but

148

1  it's a sentence or two that you would white out and write
2  over.
3      Q.  This is my last area of inquiry, your Honor, and I
4  don't want to take you through, you know, lots of
5  possibilities of what may have happened here, but I
6  understand you requested a photograph of the whited-out
7  orders to help inform your review of a possibility that there
8  could have been two layers of White-Out on the order; is that
9  correct?
10      MR. WAYSTACK:  Objection to form.
11      A.  Yes.
12      Q.  It certainly doesn't eliminate other possibilities,
13  for example, that you whited out the two orders intending to
14  reconsider them, continued to review the case file, and then
15  decided to print an order on another piece of paper, right?
16  That possibility isn't entirely eliminated?
17      MR. WAYSTACK:  Objection to form.
18      A.  It's not entirely eliminated, but the possibility
19  would have been just forgetting to -- forgetting to write
20  something on there.
21      Q.  Right.  Is it fair to say that looking back at what
22  you may have done in April of 2009 (sic) is hard to do after
23  such a long period of time?

149

1    MR. WAYSTACK: Objection to form.

2    A. Yeah. Yeah, 2019. 2009 is even harder.

3    Q. Thank you for the correction. And, you know, doing

4  the same thing, you were talking to Judge Introcaso on

5  January 9th of 2020 about things that you had both ruled on

6  in March of 2019 and April of 2019; is that correct?

7    A. Well, I forget whether she talked about -- whether

8  she identified the orders or not. All I really remember is

9  whiting out orders and the question was phrased in such a way

10  that the answer was an absolute no, and that's pretty much

11  all there was to it. There was some discussion of whether,

12  you know, Robin Partello had done it and that's all I

13  remember.

14    Q. Did you have a sense that as you were talking to

15  Judge Introcaso, it was hard for both of you to recreate in

16  your mind exactly what had happened in March 2019 and April

17  of 2019 when you were discussing this nine months later?

18    MR. WAYSTACK: Objection to form.

19    A. I will tell you the April 29 thing, it didn't even

20  enter my mind when I talked with her in February -- on

21  January 9th of 2020. It was like, did you go in and white

22  out orders? No, of course I didn't go in and white out

23  orders. It wasn't -- it wasn't like the more drawn-out and

150

1  deliberative discussion that I had with Attorney Dempsey

2  after that.

3    Q. And when you had that drawn-out discussion with

4  Attorney Dempsey after that, was it hard to look back nine or

5  ten months beforehand?

6    A. It was even harder. And drawn out, I think -- I

7  meant drawn out in relation to the Introcaso phone call. It

8  was still a relatively short phone call with Attorney

9  Dempsey. But it was hard to go back and remember, you know,

10  what I did, and that's -- it's just hard to remember that far

11  back.

12    Q. Thank you very much, your Honor. With the

13  understanding that you'll be available to testify at the time

14  of the hearing, I have no further questions at this time.

15    MR. WAYSTACK: I likewise have no further

16  questions. Thank you for making yourself available on a

17  holiday, Judge.

18    A. Okay. Thank you.

19    (At 1:31 p.m. the deposition concluded.)

20      * * *

21

22

23

151

1                    CERTIFICATE OF WITNESS

2        I, HON. MARK S. DERBY, do hereby swear/affirm that I

3   have read the foregoing transcript of my testimony, and

4   further certify that it is a true and accurate record of my

5   testimony (with the exception of corrections listed below):

6   Page     Line          Correction

7   ____    ____          _____

8   ____    ____          _____

9   ____    ____          _____

10   ____    ____          _____

11   ____    ____          _____

12   ____    ____          _____

13   ____    ____          _____

14   ____    ____          _____

15   ____    ____          _____

16                        _____

17                            HON. MARK S. DERBY

18   Subscribed and sworn to before me this _____ day

19   of_____, 2021.

20        _____

21           Notary Public/Justice of the Peace

22           My commission expires_____

23

152

1                        CERTIFICATE

2

3        I, Michele M. Allison, a Licensed Court Reporter,

4   Registered Professional Reporter and Certified Realtime

5   Reporter, do hereby certify that the foregoing is a true and

6   accurate transcript of my stenotype notes of the deposition

7   of HON. MARK S. DERBY, who was duly sworn, taken place on the

8   date hereinbefore set forth.

9        I further certify that I am neither attorney nor

10   counsel for, nor related to or employed by any of the parties

11   in the action to which this deposition was taken, and further

12   that I am not a relative or employee of any attorney or

13   counsel employed in this case, nor am I financially

14   interested in this action.

15        THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES

16   NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS

17   UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING

18   REPORTER.        *Michele Allison*

19

20           Michele M. Allison, LCR, RPR, CRR

21           N.H. Licensed Court Reporter

21           No. 93 (RSA 310-A:161-181)

22

23

**1**

**1** 30:23 46:10 59:20
134:8

**10** 13:4,13,22 55:22
97:12 116:23

**10/29/19** 97:13

**100** 87:14 127:9

**10:12** 66:16 67:9

**10th** 57:5 123:6 137:23

**11** 117:7

**11th** 13:11 20:18 99:2
119:21

**12** 35:9 36:19 47:21
54:17

**12th** 11:10 36:6 38:14
39:15 87:15 109:21
110:7,15,23 111:21
112:14 113:22 127:3,15
129:8 132:12 143:1

**13** 54:19

**130** 8:17

**14** 30:11,12 53:11,12
125:14,15

**15** 30:3 39:14,15 54:22
93:7 94:10 111:17
114:23

**15-minute** 117:11

**158** 30:23

**15th** 31:17 107:20 110:6
122:22

**16th** 55:10

**17** 18:10 32:6,7,17 47:18
52:8 98:18 115:10

**17th** 62:23 124:15

**18** 100:18

**19** 44:9 99:3 127:3,15
134:17 143:1

**196** 43:1

**1998** 10:23

**19th** 63:4 109:11,17

**1:31** 150:19

**1st** 97:9

**2**

**2** 12:21,22 23:9 43:1
59:23 96:12,14,21 97:6,
17 98:14

**20** 44:6,7,12 45:1 58:16
74:18 93:7 94:10 111:17

**2004** 10:18,19

**2009** 148:22 149:2

**2018** 7:13,16,22 9:9
10:15,19 13:6 15:1,10,18
20:23 21:1,2,6 33:23
81:18 98:17,23 100:10,
16 101:10,17 137:12

**2019** 8:4,21 9:16 10:4,5,
6,8 11:10,18 12:1,13,16,
17 13:2,14,15,23 17:13
20:18 21:1,11,16,21
22:10 23:8 30:3,5,19
35:10 39:11 46:10 47:21

**55:10,22 58:16 60:22
61:11 62:9,23 63:16
64:14 65:3 70:6,9,20
71:20 72:6,13 74:5 75:11
76:2 93:13 97:9,18 98:17
99:1,2 100:5,16 104:20,
23 107:20 109:17,21
110:6,7,15,22 111:1,21
112:14 113:7,8,18 115:9
123:6 124:1,8,15 129:8
132:14 137:7 149:2,6,16,
17**

**2020** 8:7 63:12,17 64:3,
21,23 65:5,8,10,13
70:10,17,21 71:16 72:16
77:19 78:8 79:7 82:5,16,
21 84:11 94:19 99:19
102:23 112:22 113:16
126:18,23 127:2,6 137:1,
23 138:10,21 145:10
149:5,21

**20s** 140:6

**20th** 7:18 124:1

**21** 44:9

**21st** 14:23 18:9 98:17,23

**22** 66:4,6,10,14

**22nd** 80:10

**23** 66:4,6,10,18

**23rd** 80:11

**24** 13:4 14:2,3,10,11,23
16:18 33:23 35:13

**24th** 34:9 60:22 61:3

**25** 15:3,4 16:6,18

**26** 16:13,14 94:19 104:23

**26th** 11:18 36:7,20 37:21
38:8,15,18 39:2 41:6
42:4,16 43:17 46:1 47:1,
2,17 48:18 52:12 55:13
82:22 86:21 88:9 89:14,
21 94:20 99:3 110:22
113:18 115:9 126:23
134:17

**27** 13:8 20:13,15 116:14,
16,17,23 117:20

**28** 13:8 24:20,21 119:6
120:4

**29** 13:2 28:5,6 104:20
149:19

**29th** 7:19 97:22

**3**

**3** 13:4 107:14,16,18
108:1 135:9

**3/12/19** 130:19

**30** 13:13 54:6,7 83:23
84:2 89:4 103:4 111:17
125:15,16

**30-ish** 140:6

**30th** 7:19

**31** 13:13 15:10,17 55:4,5

**310-A:181** 7:3

**31st** 18:14 62:9 124:7

**32** 55:19,20 123:4

**33** 57:1,2

**34** 13:18 58:13,14 123:20

**35** 13:19 46:7 58:21 59:1
140:6

**36** 59:7,8

**37** 60:21,23

**38** 62:5,6 124:5,11

**39** 13:22 62:11,12

**4**

**4** 13:13 42:20,21 132:1,2

**4/26/19** 115:15

**40** 8:5 62:20,21 91:22
124:13,16

**40s** 8:6

**41** 62:20,21

**48** 34:3

**5**

**5** 13:22 132:18,20,22
133:13

**50** 58:17 91:23

**50/50** 8:7

**541-6** 132:6

**567** 62:1

**57** 8:5

**58** 8:5

**6**

**6** 25:8 84:10 134:4,5,7,22
135:3,9,19

**60** 111:14

**641-7** 132:22

**6th** 65:10 137:23

**7**

**7** 17:12

**70** 103:5

**70/30** 10:10 103:1

**7th** 72:20 73:6,12,13,16
77:18 78:7,13,14 145:12,
19

**8**

**8** 41:11,15 104:12,14,19,
22 105:4,10,15,20
106:16 107:15 113:19
115:11 119:12

**8:30** 83:1 92:6

**8:45** 83:1

**9**

**9** 25:8 28:2,3 70:17,20
92:6 97:12 119:12

**90** 8:16

**906** 17:4

**98** 127:21 129:2

**99** 10:17 129:2

**9th** 9:23 11:3 53:4,15
66:15,23 67:12,14 69:12
70:10 71:16 98:17 99:1
113:1 136:9,23 137:5
138:13 149:5,21

**A**

**a.m.** 66:16 67:9

**absolute** 38:19 47:10
149:10

**absolutely** 85:12,13
142:11

**accept** 50:23

**accepted** 51:2 76:8

**access** 12:2 26:9 76:4
90:20 95:5

**accurate** 99:20 115:22
145:13

**accused** 83:10,11

**acknowledge** 51:12

**act** 102:15

**actual** 17:17 95:6,7

**ad** 15:7 34:18,22,23 35:5
49:12 50:2 51:4,14
54:10,16 55:1,8 60:4
105:5 114:2,4,5,20

**add** 144:23

**added** 50:14 117:9

**additional** 51:5 146:9

**address** 45:11

**addressed** 73:7 86:4
106:3

**adjusted** 47:12

**administrators** 59:4

**admitted** 107:12

**adopted** 114:19

**advice** 81:17

**advise** 70:11

**advisement** 65:19 92:18

**affected** 114:12

**affirmatively** 20:9

**afresh** 106:4

**afternoon** 92:5

**agree** 23:14,17 41:6 49:9
84:13 97:19 107:13
116:21 118:2 121:23
127:4 133:16

**agreed** 114:19

**agreeing** 52:22

**ahead** 25:6 65:22 78:3
84:8 106:10 109:5 113:9
125:11,12 128:23

**Aline** 93:15,16

**alleged** 76:23 106:20
107:6,9

**alleges** 55:2

**alter** 122:15 133:5

**alteration** 131:19 133:13

**alterations** 73:9

**altering** 132:23

**amended** 25:2,18 123:2

**amount** 101:18 125:3

**anew** 48:14 49:16

**Ann** 72:15 126:14 145:8

**answering** 145:23

**anytime** 117:16

**apologies** 37:2 73:5

**apologize** 82:11

**apparently** 147:19

**appearance** 9:12 101:2,
4,19 102:4

**appearing** 146:16

**appears** 13:5,14 17:1
18:11 24:2 25:18,19
28:12 52:8 57:6 58:16
59:2 62:14 97:13 98:15,
21 115:17 117:18 134:22
137:22

**appellate** 114:8

**appended** 88:6

**Apple** 11:11 13:17 35:11,
21,23 36:5,17 37:19
45:9,19 46:13,22 50:11
51:3,8 84:10,12 88:5,12
109:21 110:8,15 129:8
133:23 135:19 143:1

**applied** 23:19 26:11 27:5,
11 28:17 36:18 37:18
38:7,13 46:18 52:9,11
54:1 59:14,16,19,22
75:15 118:4 119:10,13
120:1,5 124:16 143:3

**apply** 14:18 53:14 62:4
87:15 120:16

**appoint** 114:18

**appointed** 82:11 106:5
140:13

**appointment** 48:23 49:12
50:3

**appreciating** 15:21 21:21
64:5 88:21 143:22

**approach** 56:3

**approve** 14:17 24:6

**approved** 35:7,16,18
48:23 50:4,5,6 86:2
87:17

**approving** 14:12

**April** 11:18 30:19,20
36:7,14,20 37:21 38:8,
15,18 39:2,11 41:6 42:4,
16 43:17 46:1 47:1,2,17
48:18 52:12 55:10,13
74:10,18 75:11 76:2
93:13 99:3 104:20,23
110:22 113:18 115:9
132:14 134:17 148:22
149:6,16,19

**area** 126:21 148:3

**areas** 10:7 104:2 139:23

**arguments** 125:3

**arrival** 9:22

**article** 80:2

**ascribe** 118:1

**Ashley** 73:7,8

**asks** 8:13

**assented-to** 14:11 18:8

assert 144:15

assertions 55:15

assigned 9:4 65:5

assignment 63:18 100:4, 5

assignments 7:21 10:1 63:21 65:18 103:23

assistant 61:21

assume 26:1 43:10,12 45:17 52:13 117:2,9 135:11 139:14

assuming 26:1

assumption 27:21

attach 18:4

attempt 87:12

attention 13:4 25:8 30:22 43:1 47:17 98:1

attorney 12:20 14:8 78:9, 18 82:2 86:4,10,23 87:19,21,23 88:17 94:8, 16,20 96:4,11 99:17 104:1,4,8 105:1 115:8 116:13 117:15 119:11 126:14,22 129:11 133:22 135:1 136:4 137:2,5 139:1,3,15,16,22 143:18 144:9 145:5,9 147:15 150:1,4,8

attorney/client 79:13 144:15,20,21

attorneys 90:9,11 142:12

audience 101:2

audio/visual 144:4

avenue 51:5

average 19:1

aware 11:1 53:14 78:5,15 109:20,23 112:22 132:13

B

back 18:3 21:9 22:23 23:2 33:14,22 34:2 36:4 37:17 41:5 44:20 47:17 50:20 63:10 66:9 68:4 71:8,9,12,15 85:22 86:6, 14 94:16 105:18 106:7 107:5 109:6,7 111:3 113:4,10,18 125:2 127:7 136:19 137:12,14,15 146:21 148:21 150:4,9, 11

background 7:11

backspace 123:14,18 124:23

bad 125:8

ballpark 91:15

bank 51:3,16 134:13

base 145:14

based 12:14 19:3 26:22 27:19 58:2 65:6 122:16 131:13 132:13 146:7,9

basically 8:15 34:9 48:16,20 65:23 112:2 114:17

basis 48:23 57:23 60:5 73:13 102:17 111:12 113:21

Bass 10:18 141:3

Bates 30:23 43:1

began 7:21 15:22 21:20

begged 50:2

beginning 9:14 94:13 142:18 145:9

begins 134:8

begun 83:5

belief 128:1

believed 49:20,23 51:7

bell 108:8

bench 60:7,16,18 61:12, 16 92:16 100:12 103:16 125:1 139:9

benefit 63:6 114:5

big 56:15 58:3,4 91:12 114:17

bill 51:4

bin 56:11

Bisson 72:10 83:18 84:5, 11,20 85:9,16 88:12 89:3 90:16,17 108:18 141:10, 12

Bisson's 89:9

bit 9:20 18:17 47:12 84:15 94:7 117:16 129:4 139:8

black 26:5 27:8

blanket 140:15

block 99:1

Boffetti 12:20 14:7,8 44:10,15,22 79:10,16 80:21 86:23 96:4 104:4,7 144:9

boilerplate 24:2 118:11, 15

Boston 10:14

bottom 17:2 28:14 46:7 47:6 48:6 50:22

box 26:5 117:5

bracket 84:19

Branch 98:11 126:15

break 62:18 63:7 94:9,10 103:12 113:5 115:1 133:9

briefly 10:12

bring 23:2 57:18

bringing 22:23

broad 140:20

broadly 144:23

brought 33:14 49:2 73:23 87:6,7,8 144:10

Bruce 25:6

BU 10:21

bunch 123:5

bureau 86:10 87:19

business 51:13

busy 19:5,6 91:12,13 111:14 136:18

C

calculate 8:10

calendar 12:16 22:10 63:11,13,16 65:10 82:5, 16,18 113:16

calendars 65:11

call 14:20,21,22 69:14, 18,23 72:20 73:1,2,11,12 77:16 78:7,12,14 82:23 91:18 96:16,17 113:2 124:14 126:21 136:10 137:6 139:4 140:10 142:18 143:12 145:18 150:7,8

called 67:3,15 68:3 73:19 77:13 81:22 82:2 83:9 85:22 86:14 97:9 127:7 143:9

calls 126:17

camera 144:1,7

Campbell 11:3 55:8 96:15 112:21 113:15

cap 11:12 13:18 35:10 36:5,17 37:19 41:18 42:4,23 43:3 47:22 109:22 110:8,16 129:9 143:2

capacity 86:5

capital 36:22

capitalized 37:8 47:12 134:14

capitals 134:2

caps 108:2 134:22

car 80:14

care 61:18

career 9:14

cart 21:4,9 22:15 57:18, 21

case 11:3,6,21 12:7,13, 14,15 13:1,2,23 14:9 15:9 17:17 18:3,11 19:17 20:2,3,10 22:23 26:10 29:5 30:1,5,19 31:6 32:1 33:14,19,20,23 35:20 39:21 41:6,8 42:4,6,7,9, 13,16 43:17,22 44:4 46:23 47:3,4 48:3 51:1 58:8 59:3 60:8,19 61:16 62:8 63:15,17,21 64:4,6, 10,12 65:8 69:11 70:17, 22,23 71:11,18,19 72:1, 4,6,11,14,16 74:14 85:9 86:21 88:14 89:11,20 91:2 92:12,15 95:3 96:10,14,15,16,19,20,23 97:13,17,23 98:12,15,16, 19,22 99:4,10,18,19 107:7 108:13 112:21 113:15 115:17 116:12 125:5 129:22 132:8 134:10 135:11,13 136:2 148:14

caseload 10:7 103:13

cases 9:13,14,23 33:12 64:13 91:7,10,23 92:1,10 93:6 100:6 102:3 103:14 141:21

cash 134:12

category 97:9

caught 34:13

caused 147:17,18

cautiously 64:6

centralized 22:14

certainty 38:20 47:10 87:14 127:9,13 128:9 129:3

certification 23:16 24:9, 15

certify 23:16

chair 61:14 101:3

challenged 49:12

chambers 22:17 33:6,10 61:8 111:7

chance 79:11

change 27:20 52:23 53:1 106:6 110:22 111:5 112:3 115:21 120:7,9 121:19 122:7,20 127:10, 11

changed 63:18 111:2 117:6,12 120:11 130:8

changing 120:21 121:17 125:22 126:1 141:4

character 125:8

charge 74:5

charges 79:21 80:4,7 81:4,21 83:13,21,22 85:3 88:17,22 89:1,5,6 95:17 127:7 131:14,19,21 138:9,16

chart 39:6 40:1,5,7,9,11, 14

charts 40:22

Chasseur 93:15

check 36:3 50:14 51:3,5, 15 111:3 134:13 145:6

checked 34:12 72:19 117:6

checkmark 25:1

checks 38:2 50:16,23 51:9,18

child 93:4,7 119:1

Children 25:12

chitchat 111:11

chose 114:1,2 127:22

Christmas 71:12

circle 98:5

circuit 7:10,12 9:23 11:3 53:4,15 102:13,16

circumstance 122:1

circumstances 76:22

civil 10:17 103:22

Claremont 101:14

clarification 28:22 36:1 50:11

clarify 138:11

cleaning 65:7,14,17

clear 76:1 84:5,9 85:4,13 87:5,9 99:18 108:8 142:22,23

clearer 15:20

clerk 10:15 16:22 17:3 27:22 28:13 29:11 31:18 61:12,17,19,20,21 71:17, 20,22 72:3,9 84:5,11,20 85:9,16 88:11 89:3,9 90:7,12,16,17 108:18 136:13 141:10,12,15,22 146:18 147:6

clerk's 18:16 19:21 66:2 141:17 147:17

clerks 17:8 18:6 19:5 22:12 29:19 53:4,6 57:16 59:4 66:15 72:5 90:20,21 93:13 134:10 141:14,20

Cleveland 10:18 139:10 141:3

clicked 80:11

client 142:14

close 33:23 142:17

closer 32:14 97:22

codes 62:3

colleague 81:20

colon 108:2

colored 144:6,9

combination 65:17

comfortable 60:10

commission 7:15

committee 86:5 139:4

common 23:5 27:11 39:7,12 40:4,18 58:7

communication 78:4 139:15 144:22 145:17

communications 79:4 145:4

compare 10:8 64:14 91:7 93:1

compared 64:12

complaint 11:8 45:3,15 71:2,6,18,21,23 72:2,7, 10 78:11,12 85:5,6,11,20 88:2,4,7,13 89:8,12,21 95:14 112:19 132:15 137:20 138:3,6,13,19 139:7 143:7

complete 97:17

completed 57:20 122:3

completely 127:20

complexity 33:13

complicate 60:13

complicated 23:1 92:17

computer 16:10 33:2 73:1 123:13,16 124:22

concern 85:8

concerned 89:2 100:7

concerns 12:17

conclude 93:20

concluded 35:16 150:19

conclusion 24:7 35:21

conclusions 133:18

Concord 10:19 101:14 140:17

conduct 45:3,14 55:16

71:2 88:1,13 95:14
112:18 132:14 137:17,20
138:3,19 139:4

**conducting** 78:5

**conference** 20:14 21:5,7
22:16 23:10 28:10 61:3
109:17,23 110:4 116:18

**conferences** 12:6

**confident** 74:9

**confidential** 78:19,23

**confines** 144:20

**confirmed** 7:17

**conflict** 54:19 106:19,20
107:6,7,9,12,13

**confusing** 147:14

**confusion** 147:22

**connection** 30:18 78:19
101:19 112:20 113:20
132:23 142:4

**considerably** 8:22

**consideration** 48:12
49:17 55:16 69:10

**considered** 13:5,14 31:6
39:1 70:13 84:14 106:16
111:22

**consistent** 13:21 56:23
87:10 127:12,14

**consisting** 88:5

**contempt** 13:14 109:6

**continuance** 58:17
123:23

**continuances** 91:23

**continue** 79:18

**continued** 148:14

**contrast** 95:6

**controversy** 60:9

**convenient** 32:15

**conversation** 67:17,23
68:3,8 70:19,20 73:20
77:10,15 79:3,12 83:7
87:10 88:8 89:17 111:22
137:18 145:8,20

**conversations** 69:17,22
70:16 71:15,17,22 72:9
79:5 90:3 96:5 136:3,5
144:12 145:2

**copier/scanner** 56:15

**copies** 95:5,6

**copy** 16:16 17:16 18:1
19:16 41:17 42:3 45:15,
23 57:4 72:22 80:6,12
83:20 86:23 89:7 95:4
129:12 130:14,16 131:6

**cordial** 81:14

**correct** 7:15 11:18,19
13:3,16 14:1 15:2,7,8,11,
12,13 20:4 23:19 28:3
34:5 41:10,19 45:12 48:9
50:16 53:9 59:11,20 60:1
62:9,15 63:22 79:8 82:1
92:12 99:21 100:1
102:11 105:1,5,6,12,20
107:18,21 108:8 109:4
110:16,19 111:8 113:7
114:12 116:18,22 117:22
118:4 119:10,19,23

**corrected** 109:15

**correcting** 66:19

**correction** 26:11,13 27:4,
13 36:18 37:18 38:7,14
52:8,11,15 53:4,15,19
54:1 59:13,16,19,22
75:15 87:15 149:3

**corrections** 53:16

**correctly** 9:22 104:19
108:21 109:18 113:9
122:18 136:6

**cosign** 20:21 23:12 92:22
118:8

**cosignature** 23:11 28:2

**cosigned** 20:17 25:6

**cosigning** 21:14 22:18
117:16

**council** 7:17

**counsel** 72:15 76:5 77:9,
20 78:7 79:7 81:22 82:21
83:15 85:2,15 86:5 88:8
89:14 144:13 145:2,12

**count** 140:5

**counts** 60:11

**couple** 53:11 71:20 79:17

**court** 7:10,12 10:16
14:18,20 25:2 26:14 31:2
48:15 51:17 52:21 56:18
59:4 61:2,4,9,21 64:11
65:8 68:16 70:13 91:13
100:2 102:13,15,16,21
103:1 111:7 114:8
116:18 125:4 126:8
142:15

**courthouse** 8:22 19:6
58:9 67:4 92:20,21,23

**courthouses** 10:2 18:7

**courtroom** 61:14,19,20,
21 72:3 92:11 100:22

**courts** 96:17 103:3
140:18

**cover** 45:2 147:11

**covered** 104:1

**create** 33:2

**created** 139:18

**criminal** 86:10 87:19
103:16 131:19

**critical** 89:10

**cross** 121:21 122:10

**crossed** 130:6

**crumble** 41:3

**cubby** 21:21 22:11 23:6

**cubicle** 21:3,11,12,17
22:4,5,6,19,21,22 23:4
33:9,14

**curiosity** 136:17

**curious** 56:2

**Curran** 98:3

**current** 10:7 11:20 39:19
40:6 87:10 96:23

**cursive** 25:19

---

**D**

**D1** 25:11,19 26:5,23

**Dablis** 44:11 71:23

**daily** 57:23

**Dalpra** 10:1,3 13:10
20:18 21:13 25:6 26:2
93:5 117:2,10 119:18

**Dalpra's** 25:14 35:7,15
50:5 93:8

**dashes** 27:8

**date** 10:21 13:23 15:16,
19,20 46:10,11 53:23
74:19 97:8,10 99:2,9
109:10 115:21 121:4
124:15 139:20 145:7

**dated** 15:10 18:9 30:3
55:22 58:16 62:8,23
104:20 107:20 123:5,20
124:7

**David** 55:7

**Dawn** 45:6 46:3 63:10
82:4,19 83:19 84:1

**day** 9:5,6,17,18 57:11
58:22 61:7 67:8,11,15,16
68:4 80:10 82:23 91:14,
17,19,20,22 92:1,12
103:11 111:13,15 121:3
125:20 126:4 142:23

**day's** 100:23

**day-to-day** 72:4,5

**days** 8:12,17,21 10:5
18:10 53:10,11 62:15
63:3 91:18 103:5,7,10
117:9,12 121:4 125:14

**de** 11:18 32:19 34:23
36:15 37:6 38:18 39:1
48:8,10 49:5,17 50:1,3
51:19 55:16 69:11 70:5,
9,13 74:10,16,20,23
75:23 76:12,15 87:6,8
95:1 99:2 110:21 111:23
112:1,9 113:21 114:4

**deal** 34:20

**December** 8:1 9:3,9 13:6
14:23 15:10,17 18:9,14
21:2,6 64:1 65:19 71:8,
15 81:18 86:22 94:16
98:17,23 99:1 100:10,15,
18 101:10,16,17 113:4,6,
8 137:8,12

**decide** 48:14

**decided** 33:12 148:15

**deciding** 55:16

**decision** 16:16,19,21,22,
23 17:3,4,12,16,19 18:1,
6,12 19:1,16,21 20:2
28:8,9 29:2 36:23 37:12
38:5 41:9,18 42:3,10,13
43:20 45:8,12,15,19,23
48:4,15 57:4 58:8,22
60:21 61:23 62:14 76:4
104:20 105:17 113:20
134:8,11,19,21 136:1
146:8

**decisions** 41:7 121:2

**deep** 50:21

**deeper** 60:19 119:3

---

**defer** 60:12 64:7

**deference** 48:12,14

**define** 64:15

**Delaney** 7:6 14:5 28:21
32:9 37:15,17 41:13
44:13,17,20,23 45:6 46:3
63:6,10,14 66:7,9 79:14,
19 82:4,8,12 83:19,23
93:19,22 94:8 96:11
99:17 104:1,9 105:1,21
108:14 109:3 110:17
114:13 115:8,23 117:15
119:11 121:13 122:2
126:1,1 128:4,14 133:3,7,
17,22 135:1 139:3
143:17

**Delaney's** 116:14 129:11
136:4

**delay** 82:8

**delete** 130:17

**deliberative** 150:1

**delivered** 27:22 71:14

**Dempsey** 72:15 77:9,20
78:7,9 79:7 81:23 82:2,
21 83:15 85:2,15 88:9,17
89:14 94:17,20 126:14
137:3 139:1,15,16,22
145:2,5,8,12 150:1,4,9

**Dempsey's** 76:5 126:22
137:5

**denied** 50:8 52:3 116:9

**deny** 147:2

**depending** 92:7 140:8

**depends** 16:5 56:14
91:17 121:15

**depose** 86:22

**deposed** 7:4 86:16 96:1

**deposition** 11:14 45:1
86:19 88:3 94:14 95:9,
10,11,18,22 96:6 144:13
150:19

**depositions** 89:23

**derby** 7:1,8 79:11 93:23
94:13 99:5 100:3 101:22
104:12,14,19,22 105:16
107:10,14,16,18,23
112:10 113:13 114:9
115:5,11 116:20 117:10
118:1 119:9 120:2,5
122:4 123:12 124:17
132:1 133:22 134:4,5,7,
22 136:17 140:4 143:14

**Derry** 8:3 101:16

**describe** 7:11,20 10:12
14:18 23:10 52:15 56:19
67:17 73:20 81:12 83:7
90:8

**designation** 102:20

**desire** 60:13

**determine** 118:3

**determined** 23:20

**develop** 39:13

**developed** 99:16

**developing** 15:21

**device** 82:13

**Devine** 140:10

---

**differently** 49:4

**difficult** 130:21

**difficulties** 37:3

**difficulty** 101:21

**dig** 119:3

**digested** 82:2

**digits** 28:20 61:23

**direct** 100:14

**Directing** 30:22 42:23
47:17

**disagree** 26:19 99:4,6

**disappear** 58:4

**discharge** 34:18

**disciplines** 102:12

**disclose** 142:4,18

**disclosed** 130:17

**disclosure** 54:19 55:1

**disclosures** 98:10

**discovery** 23:2 98:10,15

**discuss** 70:3 77:20

**discussed** 22:2 69:14
95:21 105:1 111:1
134:17 136:3 139:8

**discusses** 54:19

**discussing** 68:13,22
70:9 120:16 149:17

**discussion** 37:16 44:19
66:8 69:3,9 79:15 111:20
113:12 115:11 136:23
137:13 138:1 142:6
149:11 150:1,3

**discussions** 96:3

**dismiss** 105:12

**dismiss/remove** 52:4

**dispensers** 52:18

**display** 45:1 63:11

**displayed** 63:13 82:18

**displaying** 46:5

**distinct** 138:11

**distinction** 36:13 133:1
145:6

**district** 8:3 9:19 10:9,10
21:12 22:3,4 91:22
101:16 102:13,14,15,16,
19,21 103:5,10,11,15

**division** 24:6 56:8 103:4

**divorce** 142:9

**docket** 12:10 34:12 95:3
96:16 100:6,23 141:20

**document** 12:23 14:10
16:15 20:16 24:22 28:7
30:13 32:8 41:16 42:9,22
54:2,8 55:6,21 57:3
58:15 59:2,9 61:1 62:7,
13,22 66:13 80:12,16,19
95:20 97:1,7 104:17,20
107:17 119:7 131:16
132:5,21 134:6,7

**documents** 27:17,22
74:21 95:12 96:2,18
104:19 131:8 143:5,22
144:3

**door** 22:4 81:16

**doubt** 127:17,19 128:6,7, 12 129:1,2

**doubted** 128:7,8

**download** 96:23

**downloaded** 98:8

**draft** 33:18 40:23 121:5

**drafting** 124:21,22

**drafts** 39:4,18

**Drawing** 13:4

**drawn** 150:6,7

**drawn-out** 149:23 150:3

**drive** 66:1

**drop** 66:1

**duly** 7:2

**DV** 92:5

**DVS** 92:6

**E**

**e-mail** 66:14,18,19 67:9 70:1 72:19,22 73:6,16,18 78:4,9,17 113:2 136:11 139:1,2 141:11,12 145:11,17,18,21

**e-mailed** 90:16

**e-mails** 66:22 67:8 72:19 77:22 78:1,2 89:22 138:22 139:18,21

**earlier** 96:11 99:16 113:12 125:21 129:12 133:22 134:17 137:11 139:8 141:9 145:11

**early** 7:18 21:1 22:1,9,10, 13 72:21 111:6 126:19 137:8 145:16

**easier** 32:10 44:14 56:6

**easy** 98:5

**education** 10:13

**effect** 75:9

**efficient** 82:10

**eighth** 59:20

**electronic** 97:1 144:3

**elevator** 57:19

**eliminate** 131:2 145:1 148:12

**eliminated** 148:16,18

**Emery** 101:15 102:2

**emphasis** 38:1

**empty** 143:10

**end** 37:11 52:9 134:13

**ended** 34:19

**ends** 110:4

**enlarge** 84:15

**enter** 149:20

**entered** 91:1 110:23

**entire** 131:15

**entitled** 11:3 34:3

**entries** 38:22 97:22 98:13

**entry** 66:16 133:13

**envelope** 14:6

**essence** 49:3

**essentially** 108:11

**establish** 22:12

**established** 22:10

**evaluation** 59:11 60:3

**everybody's** 40:20

**evidence** 49:7 128:17,20 132:7

**examination** 7:5 85:18 94:4 100:14 143:16

**exceed** 11:12 35:10 36:16 37:19 41:18 42:3, 23 43:3 109:22 110:8,15 129:8 143:2

**excepting** 79:4,5

**exception** 96:3

**Exchange** 25:12

**exclude** 127:20

**excuse** 65:3 94:18

**exhausted** 69:16

**exhibit** 12:21,22 14:3,5 15:4 16:14 20:15 24:21 28:6 30:12 32:7 41:15 42:21 44:7,11 45:14 54:7 55:5,20 57:2 58:14 59:1, 8 60:23 62:6,12,17 66:16 84:16 85:5,6,7,8,11,18, 19 88:3,10,12 89:4,9,11 97:6 104:12,14,19,22 105:4,10,15,20 106:16 107:14,15,16,18 108:1 113:19 116:14,17,23 117:20 119:5 120:4 123:4,20 124:5,13 132:1, 2,18,20,22 133:13 134:4, 5,7 135:2,9,19

**exhibits** 32:11 62:21 66:6 88:4 89:8 104:3,9 116:14,15

**expect** 121:15,16

**expected** 117:21

**expedite** 57:15

**expeditiously** 31:18 108:18

**experience** 18:21 23:5 26:18,22 27:10 53:3 57:16,23 61:6 101:6 118:6,7

**experienced** 100:13

**experiences** 19:3

**experiment** 16:7

**experimenting** 16:7

**explain** 104:18

**explained** 84:13

**explains** 121:20

**explanation** 64:2

**explanations** 127:18

**extensively** 115:20

**extent** 23:17 49:11 100:9

**F**

**fact** 113:14

**facts** 23:20 40:6 49:7 60:19 118:3

**factual** 23:19 24:6 119:23

**fair** 12:15 25:23 49:10 53:3 63:20 101:18 109:9, 15 118:21 120:4 124:15 125:3,18 128:23 134:19 141:2 144:16 148:21

**fairly** 8:9 27:10 58:7 115:22

**fairness** 106:14

**false** 133:13

**falsifying** 131:20 132:7

**familiar** 11:9 98:19

**family** 9:16,17,18 10:10 22:6 56:8 90:11 91:9,13 93:15,18 100:2 102:21 121:2 141:3

**fashion** 77:1

**fast** 73:9

**faster** 15:20 16:9

**fathers** 39:23

**fault** 82:8

**favor** 129:21

**February** 35:14 39:14,15 72:17,18,20 73:6,12,13, 16 77:15,18 78:7,13,14 109:7 126:19 127:1,23 145:10,12,16,19 149:20

**fee** 11:12 13:18 35:10 36:5,17 37:19 41:18 42:4,23 43:3 47:22

**feel** 53:18 60:9 75:12

**fees** 134:12 143:7

**fees/gal** 134:12

**fellow** 81:13 136:12

**felt** 13:6,16,18,20

**fewer** 103:11

**figure** 40:2,20 41:2 74:3

**figuring** 40:7

**file** 16:16 17:16,17 19:16, 17 20:3,10 31:6 33:14,19 38:5 39:21 41:6,8,17 42:3,4,7,13,16 43:17 44:5 45:22,23 46:23 47:3,4 56:6 57:4 61:18 67:19 73:9 74:5,14 84:12 85:9 88:14 89:11 95:5 106:15 110:2,13 134:16 136:2 143:11 148:14

**filed** 11:7 13:15 15:6 34:17 50:20 71:2,6 146:16 147:16

**files** 22:23 66:1

**filing** 46:11 59:5 138:2

**final** 12:7,8 117:12

**find** 19:15 39:15 41:7 44:12 51:15 56:7 67:6 98:5 142:7

**findings** 23:19 24:6 119:23

**fine** 85:21 115:3 142:20

**finger** 84:17,22,23

**finish** 64:1 133:3,4

**finished** 43:21

**finishing** 65:7,17

**firm** 90:10 139:10 140:5, 8,12,14 141:3

**firms** 140:9,17

**five-day** 28:23

**flat** 142:16

**flip** 97:12

**flipped** 25:6

**floating** 147:20

**floor** 23:4 57:19

**focus** 21:1

**focused** 31:14 98:3 104:2

**folder** 139:19

**follow** 40:16 135:7

**follow-up** 66:18 70:1

**follow-ups** 143:18

**footer** 41:22

**forensic** 59:10

**forget** 149:7

**forgetting** 148:19

**forging** 94:8

**forgot** 146:18

**form** 18:19 24:12 26:16 27:6,14 33:3 36:11 37:22 38:9,16 39:10 41:1 42:17 43:4 47:9 48:1,19 49:19 51:2,21 53:5,21 54:4 58:10 61:10 67:13 69:6 70:14 75:8 76:7 88:15 105:21 108:14 109:3 110:17 114:13 115:23 116:18 117:20 121:13 126:11 128:4,14 133:7, 17 144:3 147:13 148:10, 17 149:1,18

**formal** 79:21 80:4,7 81:4, 21 83:20,22 88:17,22 89:1,5,6 95:17 97:13 99:9 100:5 113:21 127:7 131:14,21 138:16

**forms** 24:3 98:18

**forward** 32:10 46:3

**found** 15:19 135:6

**fourth** 52:7,9

**frame** 40:17 98:23

**free** 99:8

**frequently** 93:14 124:19 126:3

**friction** 107:2

**Fridays** 9:2

**friend** 54:17

**friendly** 81:15 142:14

**friends** 90:11

**front** 51:10 84:18 116:15 119:13 140:12 141:16 142:8

**full** 30:22,23 60:2 91:20 100:17 117:15

**full-time** 100:7

**Function** 7:3

**FYI** 112:4

**G**

**GAL** 34:4,7 46:6 47:21,22 48:21,22 50:6,9 52:1,2,4 104:21 109:2,11

**gap** 18:23 19:2,4

**gave** 8:9 74:19 86:9,10 141:9,10

**general** 10:16 15:22 57:10 72:15 76:5 77:9,20 78:7 79:6 81:22 82:20 83:15 85:2,15 88:8 89:14 94:13 133:16 137:9 138:17 145:2,12

**General's** 87:19

**generally** 7:20 11:1,11 39:5,7 50:23 51:1 56:4,8 94:12

**generate** 103:8,9

**get all** 104:5

**gift** 113:11

**girlfriends** 39:23

**give** 8:3 15:22 26:21 44:8 73:11 75:20 91:15 93:10 125:2 136:19 142:22 147:6

**giving** 51:14 79:16 147:3

**good** 81:19 85:23 94:6, 11 105:9

**goofed** 130:6

**Gorman** 71:10,13 113:11

**government** 132:23 133:14

**grab** 122:20,21 146:21

**graduated** 10:14

**graduation** 10:21

**Granite** 8:1

**grant** 147:1

**granted** 106:4 146:17

**group** 66:15

**guarantee** 38:3

**guardian** 15:7 34:18,22, 23 35:5 49:12 50:2 54:10,16 55:1,8 60:4 94:23 100:5,18 106:5 107:3 113:21 114:2,4,5, 12,18,20

**guardians** 50:23 51:4,14

**guardianships** 9:20 91:22

**guess** 19:11 24:5 61:4 105:23 109:11

**guilty** 103:16

**guys** 85:9

**H**

**half** 92:15

**half-hour** 92:3

**Hampshire** 98:11 126:15

**hand** 15:20 44:8 61:12,17 125:7 131:23 132:18

**handle** 22:17

**handled** 12:15 63:15,17

**handling** 9:23 13:23 64:10 72:4,6,13 147:17

**handwrite** 16:4

**handwriting** 14:16,19 15:12 25:2,5,11,15,22 26:6,12 27:1,8 37:11 38:4 43:8,9,11 46:23 48:5 84:10 143:8,10

**handwritten** 16:20 27:20, 23 32:22 36:19 37:20 43:2,16 46:17 47:6 104:23 107:19 126:5

**handy** 82:13

**happen** 23:4

**happened** 22:2 34:16 39:1 40:16 61:15 77:23 79:9 109:11 127:19 131:13 148:5 149:16

**happening** 95:11

**happy** 32:14

**hard** 26:8 76:10 80:6 103:9 148:22 149:15 150:4,9,10

**harder** 149:2 150:6

**head** 70:6 93:11 130:5

**heading** 25:12

**heads-up** 112:8

**hear** 68:1 92:12 112:18 141:23

**heard** 88:23 100:11 143:8 146:23

**hearing** 12:4,5,7,8 19:9 23:9 27:17 31:20 37:3 60:16,17 61:3,7,9,11,17 64:1 94:1 101:21 108:20 117:12 125:1 142:5,18 146:23 147:1 150:14

**hearings** 12:6 64:11,16 71:20 72:4 91:15,19 92:2,3,4 116:17

**heavily** 103:13

**heavy** 91:9

**hedging** 107:11

**held** 37:16 44:19 61:7,9 66:8 79:15

**helpful** 28:22 35:9 37:14 66:4

**helping** 73:7 82:19

**hey** 112:1,8

**high** 91:10 95:6

**high-contrast** 130:10,14, 16 131:4

**high-resolution** 144:1

**higher** 91:10 93:8

**hold** 77:23 78:10,16 79:5 138:23 139:2,11

**holds** 27:16

**holiday** 18:9 150:17

**HON** 7:1

**Honor** 7:9 9:8 10:20 11:1, 20 12:3,19 14:2,11 15:3 20:13 24:20 26:8 28:5 29:4 30:3,14 31:16 32:6,

10,13,20 36:16 37:2 38:12,21 41:5,11,17 42:20 44:6,23 45:8 46:5 47:14,18 52:7 54:6 56:2 58:13 59:7 60:13 62:1,5, 18 63:7,11,14 64:5,20 66:5,12 69:16 72:8 73:3 74:13 75:14 77:6,12,17 79:19 80:16 81:4 82:9,12 84:2 85:1 87:11 88:1,21 89:13 90:4,6 91:4 93:19 94:2,6 145:23 148:3 150:12

**hoping** 144:23

**hours** 65:15 86:14 92:4

**HP** 56:16

**hundred** 9:16 33:15 37:1, 10 38:17 48:3 127:13 128:9

**hundreds** 121:3

**hung** 85:21

**I**

**idea** 17:11 76:8 88:23

**identified** 43:22 48:8 149:8

**identifies** 25:1

**identify** 17:8 21:20 24:9, 16 32:17 34:6 44:2 62:2 65:9 76:20 95:3

**important** 85:14 89:3

**inadvertently** 10:21

**inbox** 145:17

**incapacitated** 9:21

**include** 36:10 92:2 95:8

**included** 16:22 42:6 45:19 51:18

**incorrect** 122:22

**independent** 35:3,7,15 49:22 50:7 114:7 135:7 145:15

**independently** 114:6,20, 21 120:20

**index** 13:4,22 46:7 58:17

**indexes** 13:8,13,18

**indicating** 49:15 87:13

**individual** 121:2

**individuals** 96:5

**inform** 148:7

**informal** 81:18

**information** 38:22 49:13 50:18 69:20 132:23 139:12,16 146:9

**infrequently** 126:6

**initial** 49:11 50:2 53:18

**initials** 17:2 27:1,12 28:13,15,19

**ink** 26:5

**inquired** 19:12

**inquiry** 148:3

**instance** 11:7 58:21 76:10,11 147:4,10

**instruction** 13:5 15:6

18:13 46:6

**intact** 76:18

**intending** 148:13

**intent** 77:16

**interact** 64:9

**interest** 54:20 106:20 107:7

**interested** 20:7

**interpretation** 133:18

**interrupted** 101:20 122:4

**introcaso** 9:7,12 11:2,10 12:16,21,22 14:2,3,4,11, 23 15:3,4 16:6,13,14,18 20:13,15 24:20,21 28:5,6 29:5,23 30:4,11,12,15 31:5 32:6,7,17 34:13,17, 21 35:1 36:6,15 41:11,15 42:20,21 44:2,6,7 45:1 47:18 49:8,14 50:8 52:8 54:6,7,23 55:4,5,17,19, 20 57:1,2 58:13,14,21 59:1,7,8 60:21,23 62:5,6, 11,12,21 66:4,6,14,18 67:3,15,21 68:8,23 69:9, 13 70:4,10,12,16,22 71:1,21 73:23 79:1,21 81:6,13 83:10 84:6 85:4 88:10,11,18 91:11 94:21 96:12,14,20 97:6,17 98:14 100:19 101:6 102:2 107:7,20 108:7,17 109:10,12,22 110:7,14, 23 111:10,21 112:10,13, 20 113:1,15 115:10 119:5 123:4,20 124:5,11, 13,16 127:16 132:13 135:6 136:5,6,12,15,23 137:7 138:2,6,12,20 149:4,15 150:7

**Introcaso's** 21:15 31:17 34:10 36:19 37:11,20 38:4 43:2,8 45:18 46:17 47:5 48:5 54:12 63:16 84:9 88:19 89:7 111:8 113:22 127:3 129:19,20 135:23

**investigate** 136:22 137:2,3

**investigating** 145:3

**investigation** 78:6 132:8 133:1 137:17

**involved** 33:16 76:11 89:22

**involvement** 11:23 12:13 63:20 98:16 99:3 100:2 108:8,12

**involves** 11:2 74:11

**involving** 55:17 79:1 131:19

**iphone** 82:12

**issuance** 29:1 147:11

**issue** 11:8 14:15 16:16 18:17,18 48:14 49:2 57:11,12 75:12 76:3 84:14 92:13 111:18 123:3 142:19,20 147:17, 22

**issued** 11:9 14:12,23 15:9 17:12,16 18:10,13 19:8 20:5 29:10 30:18,20 36:5 55:23 57:8 58:19

62:8,14 70:5,8 79:21 98:18 99:18 110:15 114:16 122:19 126:9 147:15

**issues** 49:16 70:12 79:13,17 80:23 81:2 106:16

**issuing** 14:19 55:13 92:9 109:21 134:16

**J**

**JAI** 30:23 43:1

**January** 13:11,15 17:12 20:18 21:16 63:11 64:2, 3,21,23 65:5,10,13 66:15,22 67:11,14 69:12 70:10,17,20 71:16 72:16, 21 73:14 84:10 93:12 99:2 109:7 113:1 119:21 126:18 136:9,23 137:5, 23 138:6,13 145:10,15, 16 149:5,21

**JCC** 11:2,7 71:5,18,19,21 72:2,7 78:5,10,11,14,15, 19,23 79:22 85:5,6,11,19 86:5 88:4,7 89:7,12,21 113:14 138:6,13 139:6

**Jim** 32:9 44:8,14,20 131:23

**judge** 7:10,12,13,21 9:6, 7,11,12 10:13,19 11:2,9 12:15 15:22 18:18 19:15, 20 21:15 23:11 24:5,6 27:10 29:4,23 30:4,14 31:3,5,16 34:10,16,21 35:1,3 36:6,15,18 37:11, 20 38:4 39:11 43:1,8 45:18 46:17 47:5 48:5, 13,23 49:7,14,21,22 50:4,7 52:16 53:15 54:12,15,23 55:17 56:7 63:15 66:14 67:3,15,20 68:8,23 69:9,13 70:4,10, 12,16,21 71:1,10,13,21 73:7,8,22 79:1,11,21 81:6,12,13,15 83:10 84:6,9,12 85:4 88:10,11, 18,19 89:7 90:14 91:11 93:3,9,22 94:13,21 98:3 99:5 100:3,7,19 101:6, 13,14,18,21 102:6,18,21 104:9 105:16 107:7,10, 20 108:7,11,13 109:10, 12,22 110:6,7,14,23 111:8,10,21 112:10,13, 20 113:1,11,13,15,22 114:1,7,9,15 115:5 116:20 117:10,17,21 118:1,7 119:9 120:5 121:2,18 122:4 123:12 124:16 127:3,16 129:19 131:23 132:12 133:18,22 135:6 136:5,6,12,15,17, 23 137:7 138:2,6,12,20 140:3 143:14,18 149:4, 15 150:17

**judge's** 19:14 121:21 122:9

**judges** 9:4 14:15 53:3,7 56:3 66:15 100:12,13 101:9,12 136:12 140:9 143:9,12

**judges'** 41:7

**judgment** 60:12 64:7

**judicial** 7:11,16,20 9:14 10:8 23:6 24:10,16,17 27:18 45:3,14 49:17 63:21 71:2 88:1,13 95:14 98:11 112:18 126:15 132:14 137:17,20 138:3, 19 139:3

**Julianne** 71:17 108:7

**Julie** 93:15,16,17

**June** 62:23 63:3 124:15

**justice** 102:16

**K**

**Kathleen** 54:9

**keeping** 28:19 114:19

**key** 124:23

**Killkelley** 90:16 141:13

**kind** 48:21 74:2 81:19 82:2 93:17 100:10 103:12 109:23 111:11 119:3 130:5 140:22 142:16,17

**King** 73:7,8

**Kinghorn** 93:3,9,10

**knew** 31:7 50:15 67:18 85:12 95:10 136:6,16 137:14,20 139:6

**knowing** 50:7 76:16,17

**knowingly** 133:13

**knowledge** 11:21 41:23 95:12 111:10 141:11

**L**

**labels** 22:7

**lack** 12:2

**lag** 28:23 57:7

**landed** 50:6

**language** 23:23 87:13,16 117:18

**large** 64:12,15

**larger** 140:9

**late** 7:13,21 21:1 71:10 137:8 145:15,16

**Lauren** 21:14

**law** 10:15,22 90:10 91:9 93:15 118:4 121:1,2 131:20 133:8,19,20 139:10 141:3

**layers** 148:8

**Leader** 80:3 138:10

**learn** 29:4,7 112:18 138:4,5

**learned** 28:16 29:8,9,10, 13,15 113:14 134:10 138:19

**learning** 138:14

**Leary** 9:6,11 101:18 102:1,2

**leave** 64:18,19 137:7

**leaves** 81:1

**left** 28:14

**left-hand** 42:7

**leftover** 63:22

**legal** 10:13 23:19 24:6,7
120:1 134:12 143:7

**legally** 24:4

**length** 19:2

**letter** 78:17 85:22,23
86:3,7,15,18 87:2,4,12,
13 94:15,16,19,20
126:23 138:23

**letting** 112:5 133:6

**level** 128:1

**light** 130:3

**lighted** 130:14

**likelihood** 134:18

**likewise** 150:15

**liking** 103:6

**Limited** 7:3

**lines** 53:11 84:18 139:20

**lingering** 129:4

**link** 79:23 80:3,11

**list** 90:6,8,9,15,18 91:18,
19 92:1,6,12 107:8
140:2,3 141:9,17,22
142:2,4,12

**listed** 13:18 34:14 35:9
49:18 105:19

**listing** 34:11

**lists** 141:14

**litem** 15:7 34:18,22,23
35:5 49:12 50:2 51:4,14
54:10,16 55:1,8 60:4
105:5 114:3,4,5,20

**litigation** 77:23 78:10,16
79:4 138:23 139:2,11

**litigious** 142:9

**located** 20:2 33:5 42:4
45:23 46:23

**location** 31:2 65:9

**locations** 41:8

**Lodes** 71:18,20 93:15,17

**logs** 69:21

**long** 16:6,8 18:23 19:4
32:20,23 33:1 37:1 58:5
68:2 77:3 89:13 92:7,15
94:7 119:1 136:20
148:23

**longer** 16:4 63:17,19
64:23 99:22

**looked** 12:10 20:7 21:18
26:2 35:5,19,20 36:23
39:17 43:11 74:17 95:2,
5,12 96:2 106:1,3 130:9,
12 131:4,13 135:15
145:16

**lot** 103:8,9,17 104:1
141:3 143:23 147:23

**lots** 33:16 39:23 40:19
148:4

**Love** 93:4,9

**low** 8:5

**lying** 106:23

---

**M**

**machine** 56:16

**made** 17:16 22:5,14
23:18 35:1,15 36:1,20
50:10 62:15 112:19
116:12 119:18 122:13
127:16 129:5

**mail** 146:18

**mailed** 45:16

**main** 49:2 105:6

**maintain** 90:6

**maintaining** 40:10

**make** 15:15 27:20 34:13,
23 39:5,20 40:1,4,7,9
51:1 52:20 53:1,16 80:15
81:8,10 98:5 105:17
120:8,19 121:3 125:15
131:2 141:22 147:7

**makes** 56:6 72:18 117:12
125:8 129:4 133:13

**making** 24:8 40:18 87:3
108:10 150:16

**management** 20:10 91:2

**Manchester** 80:2 101:15

**March** 11:10 12:16 30:3,5
31:17 35:9,14 36:6,19
38:14 39:15 46:10 47:21
77:23 87:15 107:20
109:11,17,21 110:6,7,15,
23 111:21 112:14,22
113:22 127:3,15 129:8
132:12 138:21 143:1
149:6,16

**margin** 14:21,23 15:9,15
16:3 18:5 19:8 37:11
42:8 46:7 116:4 125:6
135:3,8,18 143:9,10

**marginal** 15:23 16:21
17:18 18:2,13,17 27:12
36:19 37:20 43:2,16
45:18 46:17,23 47:6
147:11

**margins** 27:5

**marital** 9:23 10:1 11:3
13:9 20:17,20 23:18,20
24:18 26:18 27:1 31:1
36:10 73:9 92:1,20,21,23
102:13,14,21 103:5,7,8,
14

**marital/district** 103:2

**Mark** 7:1,8 120:2,5

**marked** 12:20,22 14:3
15:4 16:14 20:15 24:21
28:6 30:12 32:7 41:15
42:21 44:7 54:7 55:5,20
57:2 58:14 59:1,8 60:23
62:6,12,21 66:6 104:10,
14 107:16 115:10 132:2,
20 134:5

**markings** 80:15

**marks** 26:5

**Mary** 72:15 126:14 145:8

**mask** 37:3

**Massachusetts** 10:15

**master** 10:1,3 13:9
20:17,20 21:13 22:18
23:6,12,13,15 24:7,10
25:14 26:1 27:1,16,18,
19,21 28:1 31:1 35:7,15
36:10 50:5 92:20,21,22,
23 93:4,5,8,9 117:2,10,
17 118:8 119:18 120:7,
12,13,15

**master's** 120:7,9,11

**master/judicial** 23:18,21

**masters** 26:18

**matter** 11:1,11 31:19,20
60:9,14 70:3 77:20 79:4,
6 88:11 108:8,19,20
139:20 145:3

**mattered** 36:13

**matters** 48:8

**meaning** 140:11

**means** 24:1 29:15 139:11

**meant** 28:16 31:8,15
106:23 150:7

**medium** 144:4

**members** 140:12,14

**memorized** 8:15,18
43:11

**memory** 33:4 38:21 39:1
42:2 45:22 65:11 67:4
68:22 69:16 83:14

**mention** 100:13

**mentioned** 29:14 68:5
78:10,16 96:10 113:1
129:12 138:12 139:3

**mentioning** 78:14

**mentions** 139:5

**mentor** 81:20

**merit** 114:22

**merits** 12:4,5

**Merrimack** 8:5,6,8,13,17,
20 9:1,17 10:11 63:18,19
64:3 65:13 66:2 67:7
90:15 91:8 93:3,11
102:10,18,19

**mess** 52:20

**met** 85:16

**method** 47:22

**Michael** 82:11

**Mike** 28:18 41:12 44:10
79:10 104:5

**Milford** 8:7 10:10 63:19
64:3 65:13 66:2 67:7
71:10,13 91:8 102:9,18

**mind** 49:5 106:7 117:6
120:21 130:8 149:16,20

**mine** 25:7,16,21 119:15

**minute** 36:4 44:8 66:5
77:13 93:20 113:19

**minutes** 77:4 89:15
111:17 114:23 115:2

**misdemeanor** 132:22
133:15

**misheard** 122:23

**missed** 147:8

**misstated** 10:21

**Misstates** 133:7

**mix** 102:23 103:2

**mixing** 65:2

**mobile** 82:13

**modify** 121:21

**mom** 107:3

**moment** 30:3 79:16 84:3
97:7 134:4 142:22

**Monday** 8:23 64:21 82:3,
20

**money** 134:13

**monitor** 61:21

**month** 7:23 8:1 9:19
63:11

**monthly** 82:17

**months** 39:12 149:17
150:5

**moral** 38:20 129:3

**morally** 37:13 38:17

**morning** 83:2 88:2 92:5
94:6 133:2,5 144:11

**motion** 11:12 12:6 13:5
14:11,13,16,17,19 15:6,
10 18:2,8,12 23:2 31:9,
12 34:3,7,17,19 35:10,20
36:7,16,17 37:7,12,19
40:23 41:18 42:3,23
43:2,21 46:4,5,13,16,20,
22 47:2,3,4,7 48:6,20,21
49:3,8 50:1,8 51:8 52:4
54:9,13 55:3,8,16 61:3,8,
9 91:17 94:17,23 104:21
105:4,12,17 106:1,14
109:1,2,11 113:20
114:12 129:8,9 135:15,
16 146:8,15,17 147:1,19

**motions** 13:14 31:2,5,7,
20 32:1,3,4,5 34:6 39:9,
20 44:2 47:16 48:18
54:16,23 55:23 60:22
63:1 103:20 105:19
108:20 109:1 123:5
129:13 143:11

**move** 19:13 32:14 43:13
68:19 115:13

**moved** 35:4,5 75:5

**moving** 84:23

**multi-day** 91:20

**multi-page** 134:7

**multiple** 92:6 130:4

**multiple-page** 119:6

---

**N**

**names** 39:23 40:4,20

**Nancy** 71:22 72:3

**narrative** 118:18,21,23
124:14 129:21

**Nashua** 8:2,4,5,12,17,20,
23 9:3,9,18 10:4 18:4
19:6 20:23 21:1 56:15
61:11 63:18,19 64:22
65:1,5,8,14,18 66:1
90:15 91:6,14 92:1 93:4,
12 99:23 100:2 102:2
103:4 111:7

**nature** 33:18

**nearby** 107:15

**necessarily** 96:22

**needed** 22:20 33:22
100:8 111:16 114:4
122:20

**negative** 42:11 136:10

**neighbor** 142:8

**neutral** 35:3

**newer** 98:1,11 100:12

**newly** 49:13

**next-door** 142:8

**nomination** 7:17

**nonresponsive** 68:20

**normal** 115:22 116:2

**Notarial** 7:3

**notations** 41:22 80:15

**note** 21:9 40:14 57:15
117:5 118:21 135:4
146:14

**noted** 50:15 116:9

**notes** 38:22 39:3,5,8,17,
19 40:19,22 69:21,23
77:6,9 89:17

**notice** 16:16,19,21,22,23
17:3,4,12,16,18 18:1,5,
12,23 19:16,20,21 20:1
28:7,9 29:1 36:23 37:12
38:5 41:8,18 42:3,10,12
43:20 45:8,12,15,19,23
48:4 57:4 58:8,22 60:21
61:23 62:14 95:23
104:20,21 134:8,11,18,
21 135:23

**noticed** 98:2

**notification** 51:17 122:17

**November** 7:23 97:9
100:9,15,18 101:9,13,23

**novo** 11:18 32:19 34:23
36:15 37:6 38:18 39:2
48:8,10 49:5,17 50:1,3
51:19 55:17 69:11 70:5,
9,13 74:10,16,20,23
75:23 76:12,15 87:6,8
95:1 99:3 110:21 111:23
112:2,9 113:21 114:4

**nuance** 146:11

**number** 30:23 41:12 43:1
73:12 93:10 121:1

**numbered** 31:17

**numbering** 17:7

**numbers** 93:11

**numerous** 31:2

---

**O**

**O-N-L-Y** 37:8

**oath** 7:18 85:19

**object** 18:19

**objection** 24:12 26:16
27:6,14 32:10 35:20
36:8,11 37:7,22 38:9,16
39:10 41:11 42:17 43:4
47:9 48:1,19 49:19
50:19,21 51:8,10,21
53:5,21 54:4 55:7,13
58:10 61:10 67:13 69:6
70:14 75:8 76:7 88:15

95:1 105:21 108:14 109:3 110:17 114:13 115:23 116:5,9 121:13 126:11 128:4,14 133:3,7, 17 146:3,10,13,14,19,20, 21 147:7,8,13,15,16,18, 20 148:10,17 149:1,18

**obligation** 40:21 41:3

**observed** 53:7

**obtain** 50:18 95:2

**occasion** 70:4 71:5 126:18 127:1

**occasionally** 126:3

**occasions** 18:16 126:16, 17

**occur** 109:17

**occurred** 12:8 21:23 67:17 100:15

**October** 7:18,19,22 13:2 33:22 34:9 35:13 77:14, 17,19 78:8 79:7 80:10 82:5,16,21 86:20 88:9 89:14,21 94:18,19,20 97:18,22 122:22 126:23 127:6,22 137:8 138:19

**Odyssey** 20:6 65:12 91:1 96:22 97:16,23 98:8 99:8,12

**offered** 74:23 75:22

**office** 18:17 19:21 21:4,5 22:17,23 23:3 33:14 65:7,14,17 66:2 87:19 90:21 111:7 147:17

**officer** 7:16 23:18,21 24:10,17

**officers** 23:6

**offices** 81:16

**oldest** 35:13

**one-hour** 92:4

**one-page** 122:21

**one-sentence** 116:4

**ongoing** 98:2

**online** 65:11 80:1,3 96:22

**open** 51:5,23 142:5

**opened** 21:17 84:12,16

**opens** 14:8 52:1

**opportunity** 11:17 29:16 30:17 52:1 55:12 64:9 66:11 70:3 79:20 86:18 87:18,21

**opposed** 14:19 22:23 32:22 60:18 61:8 88:13

**option** 50:14 51:3,4,14

**order** 11:11 13:17,18 14:12,20,23 15:9,23 16:3,4,21 18:2,5,9,10,13, 23 19:8,10 20:11,14 23:10 24:5 29:1,10,14,16 30:2,14,18 31:6,17,18 32:19,20 33:5,18 34:3,9, 11 35:11,22 36:1,5,8,17 37:19 38:3,18 39:14,15 41:8 42:8 43:2,16,19 44:5 45:9,18,19 46:17,23 47:6,12,18,20 50:10,11 51:19 52:3,7,12 53:19 55:13,22 56:7,9 57:5,8, 10,11,12,13 58:16,19

59:10,14,17 60:7,15,22 61:2,6,12,16 62:8,23 63:3 64:2 70:5,9,10 74:10,17,20 75:1 76:1, 12,14,16 84:10,12,14,16, 17,19,22 87:6,8 88:5,12 89:8 92:14,16 94:21 95:2 96:5 99:3 104:21,23 105:3,4,6,15,16,20 107:20 108:1,2,3,6,10, 16,17 109:14,16,22 110:3,6,8,20,22 112:1,2 113:18 114:17 115:9,15, 16 116:4,20 117:17,21, 22 118:9,18,19 119:2,10, 18 120:5,7,15,16 121:6, 9,11,21 122:8,9,13,15, 19,22 123:2,3,5,12,20, 21,23 124:1,7,14,15,21, 22 125:4 126:8 128:10, 13 129:18,20,21,23 130:1 134:1,11,13,17 135:8,17,23 143:6,9 147:12,15,22 148:8,15

**ordered** 117:14

**orders** 11:9,18 14:9,15, 18,21 15:15 16:17,20 17:10,18 18:18 19:22 28:10 30:18,21 33:17 34:13 35:1,10 36:9,19 37:5,20 38:14 39:1 47:21,23 49:18,22 55:17 56:5,7,21,22 57:17 59:5 67:19 69:10 74:1,3,4 75:3,10,15 76:5,17,23 87:15 92:9 95:6,7 98:4, 18,22 99:4,18 109:21 110:7,11,14,16,20,23 111:2,21,23 112:6,14 113:19,22 114:5,11,16, 21 115:19 116:11 118:2, 8,10 120:19 123:9 125:6 127:4,15 129:7 130:19 132:12 135:18 136:7,16 137:1 143:2 144:14,19 148:7,13 149:8,9,22,23

**ordinarily** 20:6

**orient** 12:19 13:17

**original** 18:2 51:19 77:1 84:10 85:7 88:13 89:11 129:7,23 130:13 131:5 143:1,2 144:2,14

**originals** 26:9

**outcome** 60:13

**Outlook** 65:12

**overly** 104:2

**ownership** 24:4

―――――

**P**

**p.m.** 150:19

**pages** 45:7 46:4 119:1

**paid** 134:12

**pandemic** 144:1

**paper** 16:11 56:3,5,8,12, 17,21,22 124:7 131:1 144:6 147:16 148:15

**paragraph** 25:1,11 26:12, 23 30:22 31:1,17 34:6 35:11 48:7 50:10 52:3 54:13,17,19,22 83:14,16, 17,23 84:2,4 85:1 89:4

105:10,15,19 106:16 107:4 108:23 116:23 117:7

**paragraphs** 83:12 110:10

**parent** 52:2

**parentheses** 17:4

**Parenthetically** 141:2

**parenting** 13:10 14:12 18:9 24:23 25:9 26:15 27:11 28:2,10 64:12 118:12,21 119:6

**part** 23:3 38:18 74:10 84:17 99:22 100:3 106:3 108:1,17 128:10 132:12 138:1

**parte** 39:22 40:8,19

**Partello** 11:4,6,21 13:1 29:5 30:5 34:16,17 41:6 46:7 48:22 51:7 54:22 59:11 60:3 64:10 67:21 68:5,9,13,15 69:11 70:17,22,23 71:2,6,18,23 72:10,16 85:19 89:20 92:14 95:3,15 96:14 99:18 106:15 112:20 113:15 138:3 139:5 143:7 149:12

**Partello's** 45:2,11 50:19 55:15 85:5,6,11 88:6 105:4 137:19

**Partello/campbell** 99:19

**Partello/jcc** 71:11,23 72:10

**parties** 17:18,20 19:9 26:10 31:19 45:16 52:22 108:19 114:6 121:6,10, 12 122:14,15,17,23 125:2 126:9 142:5,7

**parts** 89:5

**party** 11:7 26:19 34:22

**pass** 131:7,9 145:5

**passes** 131:3

**pause** 73:1

**pay** 11:11 13:17 35:11,22 36:1,2,5,17 37:19 45:9, 19 46:13,22 50:11 51:3, 4,8 84:10,12 88:5,12 98:1 109:22 110:8,15 125:14 129:8 133:23 135:19 143:1

**paying** 50:14

**payment** 46:6 47:22 51:2,6 111:3

**PDF** 80:11,13

**pedal** 105:18

**pen** 121:21 122:10 130:7

**pending** 11:23 12:11 31:19 32:1,4,5 55:23 60:8,22 63:1 64:5 108:19 109:1,13 123:5 132:8,14 133:2

**people** 8:15,19 39:23 60:17 86:8,11 140:3

**percent** 8:5 9:17 33:15 37:1,10 38:17 48:3 87:14 103:4,5 111:14 127:9,13, 21 128:9 129:3,18

percentage-wise 124:19

**percentages** 8:9,10,15

**period** 17:17 71:8 95:23 99:1 100:4 138:5 140:13 148:23

**person** 74:5 133:12 140:7

**personal** 36:3 38:2 50:14,16,23 51:3,4,9,15, 17,18 83:14 146:1

**personally** 51:9

**peruses** 12:23 14:10 16:15 20:16 24:22 28:7 30:13 32:8 41:16 42:22 54:8 55:6,21 57:3 58:15 59:2,9 61:1 62:7,13,22 66:13 104:17 107:17 132:5,21 134:6

**petition** 55:2

**petitioner** 25:2 55:7

**Phil** 28:21 93:20 104:7

**Philip** 78:18 86:4

**phone** 69:17,21,23 74:18 78:12,14 86:17,20 87:3 126:17,21 136:9 137:5 150:7,8

**photo** 131:4

**photocopier** 56:12

**photocopy** 18:5 26:9

**photograph** 148:6

**photos** 131:10,13

**phrase** 119:22

**phrased** 49:4 149:9

**physical** 65:9 132:7 143:4,22,23

**pickup** 123:1

**picture** 130:10

**pictures** 144:9

**piece** 60:18 63:22 115:14 131:1 148:15

**pieces** 133:9

**pile** 18:22 21:13,14,15 22:8 27:23 29:22 32:11, 12 34:20 35:6,18 50:6 57:13,17,20 58:3,4 146:17 147:19

**piles** 21:13

**place** 8:1 22:7,14 44:2 57:17 69:17,22 135:6 140:22 145:21

**places** 42:6

**plan** 13:10 18:9 24:23 25:1,9 26:19 27:12 28:2, 10 118:12,21 119:6 129:18

**plans** 26:15

**pleadings** 12:2 95:2

**pleas** 91:23

**point** 29:4,16 33:21 37:13 60:6 68:12 75:3,5 78:6,19 79:10 81:22 86:23 100:14 106:13 137:13,17

**pointed** 84:21

**pointing** 85:8,9,10

**poke** 70:6

**police** 40:15

**policies** 53:14

**policy** 56:18 140:14

**poor** 133:11

**popular** 140:7

**portion** 68:19 102:16 108:23

**portions** 118:20

**position** 88:19 121:10

**positive** 127:2,14,15,17, 21

**possession** 85:5 89:7

**possibilities** 130:21 148:5,12

**possibility** 38:13 43:23 68:23 69:3,4,8 71:7 74:7, 11 75:2 76:15,18 87:8 127:20 130:18 131:2 132:11 148:7,16,18

**Post-it** 57:15

**potentially** 133:14

**practice** 10:12,17 15:14, 16,19 39:8,12 40:6 56:19 57:10 122:8 139:10

**practiced** 10:16 121:1

**practices** 15:21 39:13,19 40:10

**preceding** 105:19

**precise** 113:6

**preliminary** 78:6

**preparation** 86:18 95:10 135:11,13

**prepare** 39:5 94:14 96:6

**prepared** 85:18 90:14 144:2

**preparing** 12:10 18:3 39:3 95:9

**preponderance** 128:16, 19

**prepped** 82:4

**preprinted** 23:11 117:15

**presence** 84:21 143:4, 22,23

**present** 29:19 33:4 38:21 42:2 45:22 67:4 69:16 71:9,12,14 72:22 140:15

**presented** 31:3 49:7

**presently** 7:10 8:6 96:1

**preservation** 112:23

**preserve** 138:22 139:15, 16

**preserved** 78:2 80:19,22 139:17,21

**preserving** 139:11

**preside** 12:6

**presided** 64:16

**press** 75:12

**pretrial** 117:11

**pretty** 9:5,10 14:21 15:18 16:6 22:1,9,10,13 24:2

33:23 58:3 67:23 82:10 90:9 119:3 122:6,9 149:10

**previous** 97:12

**previously** 12:20 104:23 110:9

**primarily** 13:22 63:15 102:9,21

**print** 56:13 80:6 148:15

**printed** 13:2 56:5,9,10 80:11,12 131:15 141:9 144:5

**printed-out** 99:12

**printer** 56:16,17

**printing** 25:20 98:4

**printout** 132:6

**prior** 10:13 13:21 34:7 41:7 48:13,15 55:1 87:9 95:21 106:12 113:19 114:11 134:16 139:9

**private** 10:12 139:9

**privilege** 144:15,20

**pro** 40:3

**probable** 128:2

**probate** 9:20 10:11 91:21 102:13 103:3

**problem** 32:12 115:3

**problematic** 141:22

**proceed** 12:3 64:6

**proceeded** 100:22

**proceeding** 11:2 78:20 79:1,22 113:14

**process** 17:21 18:17 31:23 59:5,21 60:10 61:13 108:10

**processed** 16:23 17:3,10 18:10,14 19:10,22 20:2 28:14 58:22 61:5,7 63:3

**processing** 20:11 57:7, 11,22

**produced** 80:20

**profession** 7:9

**program** 100:3,9

**project** 39:5 105:8

**projects** 103:11

**prompts** 12:3

**pronouns** 40:3,19

**proposal** 27:19

**proposed** 25:1 26:19 87:2

**provide** 85:15

**provided** 79:23

**provision** 108:6 109:16 110:3

**provisions** 108:3

**psychological** 59:11 60:2

**public** 133:15

**pull** 82:5

**pulled** 36:22 44:16 74:18

**purpose** 28:18 34:15 70:11 81:11 107:4

**purposes** 32:9,13 80:18 85:18

**push** 76:3

**put** 18:22 21:8,9,11 22:3, 8 56:22 57:12,13,14,20 130:3 139:18 146:13,14, 17,19

**Q**

**quarter-inch** 115:14

**question** 12:3 16:12 43:6 75:16 83:12,15 84:5 85:2 88:9 98:14 105:22 108:15 110:18 114:14 116:1 121:14 125:18 126:12 128:5,15 133:3,4, 8,10,11,19 136:4,17 138:17 142:17 145:9 149:9

**questioning** 91:4

**questions** 23:15 47:15, 16 64:7 79:18 94:1,13 115:6 129:11 133:23 136:10 143:13,19 145:23 150:14,16

**quick** 40:8,19 63:7 67:23 109:23 140:1

**quickly** 44:2 57:14 82:5 118:16 119:4

**Quigley** 102:1

**quote** 84:12,21 87:12

**quoted** 41:7 83:17

**quotes** 134:12,13

**R**

**raise** 136:16

**raised** 106:15,18 119:11

**raising** 88:9

**rarely** 140:18

**re-ruling** 121:18

**reached** 100:8

**reaction** 81:3

**read** 23:17 24:1,15 29:16, 23 30:20 37:7 47:2,7 48:3,4,5 67:8,10,14 79:20,23 80:2 81:3,21 82:1 84:2,17,22 85:3,22 86:6,14,17,20 87:2 88:23 89:4 94:14 95:8,16 108:21 109:17 118:2,10, 18 119:23 127:7 131:15 135:3,15,22,23 136:1 138:8,9,15 146:13,15,21

**reading** 40:13 43:21 73:6 88:16 110:2 118:9,20 131:21

**reads** 31:1,18

**ready** 44:21 95:13 130:2

**ready-to-be-processed** 57:20

**real** 93:10

**reality** 140:17

**rear** 129:13

**reason** 12:10 42:15,18 51:18 63:17 76:19 99:22

147:6

**reasonable** 128:6,12 129:1,2

**reasons** 52:4 109:13

**reassign** 31:19 108:19

**reassigned** 31:1

**recall** 39:3,17 60:5 61:13 66:22 67:8 68:13 70:9 71:3 78:13 82:20 87:3,13 88:5 95:21 112:5,9 136:8 146:3

**receive** 19:20 20:20 57:16

**received** 7:15 22:17 55:10 67:2,5 73:16,18 145:11,21 146:9

**receiving** 66:22 146:2

**recent** 35:12 98:14 99:8

**recently** 127:6

**recess** 63:9 115:4

**recognize** 25:5,14 28:14 43:8 118:6

**recognizing** 14:15 92:19

**recollection** 21:22 29:18 30:4,7,9 61:2 64:20 69:1, 22 70:21 73:15 84:6,9 97:21 99:7,21 101:5 111:20 112:17 113:13 117:3,5 126:8 135:1,8 137:9,16 138:18 145:15

**recommend** 62:17 63:7

**recommendation** 13:9 20:17 23:12,13 24:11,18 35:8,16 36:10 50:5 120:9,11

**recommendations** 20:20 22:18 23:7,17 92:22

**recommended** 60:4

**recommending** 60:2

**reconsider** 48:21 49:3 114:17 147:12 148:14

**reconsideration** 49:6,9 50:2 110:11

**reconsidered** 38:15 48:18 49:16 146:8

**record** 10:22 32:13 37:15,16,17 41:21 44:17, 19,20 63:10 66:7,8,9 79:11,15 80:19 87:7 132:23 133:6,14 144:13

**records** 28:19 131:20 133:15

**recreate** 149:15

**recusal** 29:10,14,16,20 30:2,14,17 32:18 34:10 35:3 49:4,8 54:12 63:16 90:6,8,14,18 94:21 107:2,8,20 108:1 109:12 114:1,15 140:2,3,11,14, 20 141:16 142:2,4,6,12

**recuse** 142:16

**recused** 12:16 29:5,23 34:17,21 49:1 70:12 109:10,12 114:1

**recuses** 49:21 108:12

**Reduced** 130:20

**redundant** 104:3 115:7

**refer** 11:6 57:10 61:19

**referee** 27:18,20,22 28:1 93:5,9 117:17 118:8 120:15

**referee/hearing** 23:18,21

**reference** 65:11 82:15 90:13 131:18 143:6,8 145:7

**referenced** 77:19 88:4 90:12

**references** 54:12,15 131:19

**referencing** 86:3 87:12 145:10 146:6

**referred** 11:11 30:15 32:2,18

**referring** 22:9 31:5,9,16 116:13

**reflect** 107:19

**Reflecting** 91:6

**refresh** 38:23 69:21

**refreshes** 61:2

**regard** 120:19

**regret** 47:14

**regular** 58:3 102:17 111:12

**regularity** 8:21

**regularly** 12:15 58:1 64:9 111:15

**reiterate** 127:8

**rejecting** 107:3

**relate** 11:15

**related** 11:2 13:10 18:12 19:21 28:9 36:17 40:2,20 41:18 45:9 47:16 51:8 54:16,23 57:5 59:10 60:21 77:22 114:5

**relation** 59:5 67:9 150:7

**relationship** 49:13 81:12, 19 144:21

**relative** 18:8 73:8

**relevant** 118:20

**relief** 50:3

**rely** 141:20

**remedy** 35:2 49:21

**remember** 29:8,12,21 30:1 36:12,13,21,22 37:23 38:1,3 42:12,14 43:18 44:15 47:10,11 58:4 67:10,15 68:2,7,11, 16 69:2,7,15 71:11 74:4, 8 75:21 77:5 78:11 96:1 99:11,13 102:6 112:11 113:1,3,12 115:11 134:2 135:14,16,20,21 137:19 138:14 140:9 149:8,13 150:9,10

**remembered** 37:4,6

**remote** 74:8 130:19

**remove** 34:4,7 50:1,9 54:9 55:8 104:21 105:5, 17 106:1,15 109:2,11,13 113:20 114:12

**repeat** 10:22 37:5

**repeated** 8:18 134:1

**repetition** 47:14

**rephrase** 24:13

**report** 12:11 34:12 95:3 96:19 112:19

**reporter** 7:2

**reports** 96:16

**represent** 26:10

**representative** 78:23

**represents** 126:15

**request** 76:4 77:23 78:16 112:23 145:18

**requested** 148:6

**requesting** 113:2

**requires** 18:17

**reschedule** 141:23

**research** 99:8

**reshare** 83:20

**resolve** 31:19 108:19

**resolved** 131:6

**respect** 16:17 40:10

**respective** 8:22

**respondent** 36:2 50:15

**responding** 125:17 129:11 138:2,6

**response** 85:15 107:6 120:14 122:16 136:4,11 138:14 146:16

**responsibility** 141:17,18, 19

**responsible** 92:9

**rest** 118:15

**restart** 79:19

**restricted** 37:3

**result** 130:16

**resulted** 9:23

**retain** 40:22

**Retainer** 46:6

**retiring** 93:4

**revealed** 49:13

**review** 10:8 12:14 14:2,9 15:3 16:13 20:13 24:10, 16,20 28:5 30:11,17 31:3 32:6 35:1,3,15 36:5,15 37:6 41:5,11 42:20 44:6 48:11 49:6,17,22 50:1,3 54:6 55:4,12,17,19 57:1 58:13 59:7 61:3 62:5,11, 20 65:5,11 74:21 77:8 86:18 95:14,17 105:18 112:9,13 113:22 114:4 146:7 148:7,14

**reviewed** 13:9 16:17 28:11 34:7,8,9 36:7,16 37:21 43:17 46:1 47:1, 21,23 48:8 51:19 57:5 61:8 85:1 88:12 94:15, 16,17,21,23 95:1 96:19 97:22 114:6 119:22,23 131:14 134:16

**reviewing** 37:4 88:22 95:21 113:19 114:11 120:15

revisit 140:23

rid 34:22 35:5 48:20,22 114:2

Robin 45:2,11 46:7 67:21 68:5,8,13,15 71:2 85:5,6, 10,19 88:6 95:15 137:19 138:3 149:12

room 21:5,7 22:16 70:6

roughly 8:5,7

routinely 120:23

RSA 7:3 132:6,22

rule 34:18 37:18 38:13 56:18 114:21 116:3 121:18 146:8

ruled 31:7 34:11 54:23 92:10 109:8 110:9 112:2 149:5

rules 43:5 53:14

ruling 24:7 32:4 34:7 36:20 40:10 54:15 62:15 103:16 118:3 146:7

rulings 39:20

Ryan 102:18


**S**

sabbatical 91:11 113:4

sandwiched 131:3

sat 8:21 9:11 10:5 65:8 71:20 100:22 101:2,19 102:3

save 32:16 41:3

saves 103:16

scenario 130:5 146:6

schedule 31:20 108:20 146:23

scheduled 9:16 109:23

schedules 111:14

scheduling 13:11 20:14 23:10 28:10

School 10:14,22

scope 24:9,16

screen 44:13 45:1,2,4 63:13 82:6,18,19 83:20, 22

screenshot 78:2

screenshots 139:19,21, 22

scribble 52:20

scribbled 117:8

scribbling 40:12

scroll 46:3

sealed 14:6

search 40:13,14,15 78:1 139:18

searches 139:17

second-to-last 119:17

seconds 32:16

section 40:14 132:6

sections 131:20

security 101:3

self-doubt 129:4 130:21

send 8:11 17:23 18:1 92:16 125:16

sense 15:22 22:14 31:4 32:21 81:8,10 91:15 117:13 129:5 141:15 149:14

sentence 116:7 146:3 147:4,9 148:1

sentences 16:3,9

separate 14:19 16:1,11 39:20 56:11

separately 14:16 47:16 115:10

September 7:16,18

sequence 17:7

served 81:11

set 79:17 89:23 104:3,11

seven-day 57:7

shadow 9:6,7 100:18 101:5,9

shadowed 9:3,10 101:18

shadowing 8:1,2 100:13, 14,15,16 101:17

Shane 140:10

share 44:13 76:20,22 82:6

shared 44:23 45:3 67:22 83:22 141:18

she'd 31:7

she/he 23:19

sheet 8:11 16:11 36:23 45:2 136:2 141:21

Sherry 72:9 83:18

short 62:18 150:8

shortly 70:8 83:4 109:20

shot 144:1,8

shots 144:7

shove 56:13

show 12:20 30:2 75:14 97:8 131:10

showed 39:22 35:17 88:2,6 143:6

showing 130:10,14

shown 58:11 133:12 144:3,9

shows 97:8 129:13 131:9 142:15

sic 10:15 137:12 148:22

side 39:8 42:7 146:23

sign 22:22 23:14 117:22 118:19

signature 46:18

signed 21:19 22:8 27:18 93:3 119:18,21 120:1

signing 18:21,22,23 21:2,3,4,7,8,10,12,17,18 22:2,3,6,13,14,19,20,21 23:3 26:21 27:23 29:22 33:9 34:20 35:6,17 39:5 50:6 57:13,17 60:18 117:17 146:13,19 147:8, 19

signings 39:4

signs 117:21

simple 92:13

simply 14:9 42:11 56:19 70:11

single 44:5 76:14

sit 15:22 22:22 23:6 39:13 40:1 43:18 47:13 48:2 91:16,22 93:2 103:3 111:19 117:3 122:6 126:7 140:19

sitting 8:14,16 9:15 10:4 23:4 58:4 63:19 64:3 66:3 67:5 90:15 91:6,14 93:12 98:3 100:5,16 101:16 107:7 114:8

situation 142:10

size 140:8

skim 118:11,15 119:1

skimmed 98:2

slew 109:6

slim 132:11

slow 84:6

slowing 140:19

small 115:20

smaller 133:9

so-called 99:2 137:1

socially 142:14

somebody's 142:3

sons 39:23

sort 9:5 10:9 16:6 26:4 32:11 34:23 39:8 40:2,5 52:22 56:2,13 74:2 79:13,17 81:18 82:1 87:7 92:14 100:22 105:18

sought 100:8

sound 98:19

sounds 74:19 85:23 98:20 126:2 129:12 140:7

source 38:22 69:20

space 16:3 143:10

Spath 101:13,23

speak 30:8 53:6 71:1 72:15 77:3 78:18,22 87:18,21 89:14 120:20

speaking 39:7 54:10 70:21 73:15 74:22 77:19 89:22

speaks 133:21

specific 8:9 15:19 20:7 21:22 31:9 108:6 111:20

specifically 17:23 68:7 75:6 84:11 99:6 105:19 112:6 115:9 133:23 136:21

speculating 19:7

speculation 19:14

spelled 138:15

spent 7:23 8:2 31:13

split 8:4,10,20 10:10

splitting 8:6

spoke 29:20 30:4 71:4 77:17,18 78:8 79:6 82:20

89:21 90:2 127:1 145:12

spoken 72:6 87:23 89:20

sponte 108:11

spot 142:15

stack 27:17

stacked 93:6,7

staff 136:13

staffed 92:23

stamp 15:14,15,16,19 46:10,18 67:9 120:2

stamped 55:10

stamps 27:13 41:21

stand 109:15

standard 23:20 119:3 120:1 122:10 128:17

start 16:5,10 125:7

started 7:19 33:8,13 34:1 35:13 74:6 94:11 105:8 123:17 128:16

starting 92:6

state 7:7 80:18

stated 22:9 52:4 75:6

statement 13:21 76:5 79:20 80:3,6 81:3,21 83:12,20,22 85:3 88:17, 22 89:1,5,6 95:17 99:5 118:22 124:15 125:19 127:4,7 131:14,21 133:16 134:19 138:9,15

statements 65:6 77:9 88:21 127:12

states 84:11,20

status 11:20 12:5 61:3 109:16,23 110:4

statute 133:12,21

stayed 56:23

stenographer 63:6

stepping 43:6

steps 137:5

Sternenberg 54:9

straight 61:17

stricken 117:1

strike 19:13 43:13 68:19

stuff 19:7 22:4 26:21 34:11 39:17 40:1 53:8 57:19 65:18 74:17 76:2,9 78:1 91:23 93:7 98:1 106:2,23 107:1 109:7 119:1 122:11 125:3

style 25:20

sua 108:11

subject 66:19 139:20

subjects 133:14

Subparagraph 84:11,20

substance 48:22 105:6

substantive 31:2,5,8,12, 14 84:14,16,19 110:11

substantively 105:11 106:22

sufficient 33:13

suggest 27:8 110:14

suggesting 87:3

suggests 126:6

summarize 86:1

summarizing 115:13

summary 12:14 13:1 42:6,7,9 43:22 44:4 48:4 96:10,14,17,20,23 97:13, 17,23 98:12,15,22

summary/docket 136:2

Superior 10:16

Supplemental 46:6

support 93:5,7 119:1

suppose 20:5

supposed 24:17 117:18

suppress 103:20

surface 54:1

surprised 81:5,7 83:10, 11

surrounding 69:3

swipe 130:4,10,15,17

swipes 129:22 130:4

sworn 7:2

system 20:10 91:2 99:9


**T**

table 18:22 21:8

taking 24:4 39:3 139:9

talk 23:15 79:11 86:8,9 111:15,17,23 113:10 120:7 140:1

talkative 111:11

talked 71:14 72:5,13 73:22 74:2,16 75:1 78:10,11 83:16 86:2 113:2,3 126:14 135:12 136:20 149:7,20

talking 60:10 69:1 71:11 73:9 74:13 77:14 85:17 96:19,20 98:12 105:3 112:6 113:6 120:11,13 134:21 137:19 142:10 149:4,14

tampering 133:15

tape 26:11,13,15 27:5,9, 13 36:18 37:18 38:7,14 52:8,11,16,17 53:4,16,19 54:1 59:13,17,19,22 75:15 87:15 126:8

target 97:9

task 138:15

telephone 136:23 145:18

telling 112:7

temporary 12:7 23:9 26:19 27:17 28:10 116:17

ten 45:6 77:4 89:16 90:10 93:6 150:5

ten-day 146:12

ten-page 97:7

tend 21:16

tenth 97:7

term 14:17 49:16 100:11

terminate 94:23

terms 9:13 11:14 21:2
91:7 98:13 102:8 108:23
116:12 130:18 139:11,18

testified 7:4 84:5 141:8

testify 93:23 145:11
150:13

testimony 21:22 64:20
85:13,14 89:3,9 99:16
102:9 105:16 127:10
132:13 133:2,5 136:7,8

text 42:8 45:18 84:23
86:6,14,17,20 87:2
104:21 132:7 134:11
135:6

theory 131:10

thing 40:3 49:2 75:21,23
97:13 98:8 101:1 105:7
106:19 115:21 127:22
130:7,8,13,22 135:16
146:12,22 149:4,19

things 32:14 35:17 53:9
81:17 111:12 118:13
119:2 122:21 126:5
140:16 149:5

thinking 38:1 68:8 74:6
93:11 106:11 140:16

thinks 88:11

third-to-last 119:17

Thorn 21:14

thought 44:15 51:1,12,23
60:10 67:21,22 68:5,10
75:23 76:10,18 81:5
137:4

thousands 121:4

three-page 107:19

throw 40:12 41:4

Thursday 9:1

tied 76:5

time 8:3,4,6,10,13,20
14:12 15:15 17:15,17,21
18:17 27:4,12 28:23
29:16 32:5 37:1 40:4,17
48:12 50:16 53:2,23
55:10 56:17 57:7 58:5
63:15 66:15 67:8,9,16
68:14 69:10,22 70:22
74:21 75:3 77:3,6,18,19,
21,22 78:6,7,15,19 79:3,
5 81:9,22 82:23 89:18
91:6 92:13,17 93:21,23
94:1 95:23 97:22 98:22
100:4,17 103:17 109:1
111:14 130:12 133:2
138:18 139:7 140:14
144:5,11,19 145:13
148:23 150:13,14

timed 140:11

timely 146:15,20 147:16

times 19:8 68:16 92:19,
20 126:4 134:1 142:3

today 28:19 39:14 43:18
47:13 48:2 68:1 81:1
95:13,22 96:1,6 111:19
117:4 122:7 126:7 130:2
135:5,8,12 144:5,10
146:18

today's 94:14 95:9,18

told 29:11,12 56:21 88:11
112:1 127:2,11

top 26:13 37:19 45:11
46:10 119:14 129:19,20
130:7,23

topic 73:22

total 117:13

touch 86:12

track 20:11

training 7:23 8:2 81:18
100:3,9

transaction 76:14

transition 9:23 63:21

transportation 25:12
119:12

tread 145:1

treat 52:1

trial 12:4 91:17,19,20

trouble 40:7,13,16

Tuesdays 9:1

turn 33:2 97:6,7 105:14
107:23 119:5 123:4
124:13 134:4 135:2

Turning 25:8

two-page 116:17

type 33:3 123:19 142:10

typed 32:22 33:1 38:4
123:13,16,21 124:3

types 9:13,14 39:9 40:22

typical 33:9

typing 123:17

U

ultimate 36:8

ultimately 22:3 141:19

unchanged 76:2

uncommon 27:18

understand 9:22 11:15,
17 36:9 38:12 46:13
47:20 72:8 77:17 81:22
89:13 102:8 104:1
105:16 113:9 118:17
120:14 124:3 128:11
136:5 139:11 144:2
148:6

understanding 9:8 17:15
18:4 31:11 32:1 56:4
57:18 73:8 93:22 120:23
122:16 150:13

understood 26:4 49:20
51:13 108:13,16 145:10

Union 79:23 80:3 138:9

University 10:14

unnecessary 147:21

unobscured 85:10 89:8

unopposed 147:19

unshare 83:19

unusual 26:14 119:3
130:21

upcoming 141:21

updated 97:4,18

V

vacate 110:7,14

vacated 110:20

vacating 49:23

vacation 110:11

vague 69:1

Varney 10:17

vary 8:22

version 97:2,17 98:11,15
143:1

versus 11:3 56:3

view 35:2 50:3 81:19
128:6

viewed 48:20 49:5

violating 43:5

visible 43:17 45:3 47:7

visual 63:11

volume 91:7,10 93:8

volumes 33:21

volunteer 75:20

W

Wait 44:8 77:13

waiting 73:2

Walker 10:17

wanted 9:10 20:5 28:1
34:22 36:2 48:22 51:2,5,
11 52:1 65:9 68:1 83:15
85:11 86:22 87:5,9 89:10
98:4 103:1 123:1 131:2
136:18

wanting 145:6

warrant 40:13,14,15

watched 100:22 101:3

Waters 10:18 139:10
141:3

ways 115:1

Waystack 18:19 19:13
24:12 26:16 27:6,14
28:18 36:11 37:22 38:9,
16 39:10 41:1,12,14
42:17 43:4,13,15 47:9
48:1,19 49:19 51:21
53:5,21 54:4 58:10 61:10
67:13 68:19 69:6 70:14
75:8 76:7 78:18 82:7,10
86:4 87:22,23 88:15
93:21 94:5 104:5,8
114:23 115:3,5 131:23
132:18 143:13 145:9
147:13 148:10,17 149:1,
18 150:15

Waystack's 86:10 143:19

website 138:10

Wednesday 8:23 64:21

weeds 50:22

week 18:14 58:8,12
65:10 121:4 137:23
138:14

weekend 82:1

weekends 65:16,23

weeks 8:3 19:9

weighted 103:13

welcomed 137:15

whatnot 143:7

white 52:21 56:3 74:3
76:14 116:7 121:11
125:8,15 127:10,15
128:13,20 131:8 146:22
147:9,23 148:1 149:21,
22

White-out 26:11,13,14,20
27:4,9,11,13,20 36:18
37:18 38:7,14 52:8,11,15
53:4,12,15,19 54:1
59:13,16,19,22 75:14
87:15 115:6,9,14,16,22
116:2,13,20 119:10,14,
16 120:5,16 121:5
122:16 123:11,15 124:1,
10,16,20,23 125:4,6,18
126:8 127:3 129:23
130:4,5,11,15,17 131:4,7
136:16 143:2 145:5
146:1,2 147:11 148:8

whited 67:19 74:1 75:10
76:9 120:12 128:2
129:19,20 130:7,8,19,22,
23 131:11,12 132:12
136:7 148:13

whited-out 95:6,7 129:7
130:1,12 137:1 144:14
148:6

whiting 74:4 81:6 129:13
146:3 149:9

wholesale 49:23

windows 19:7

wipe 147:4

withdraw 133:10

Wolfeboro 10:17

word 25:18 31:14 37:8
38:1 47:11 52:20 57:14
85:7 89:4 105:11 107:9
125:9 134:2,14,22

words 19:14 28:19 35:4,
17 69:2 96:13 103:1
107:5,12 110:21 117:9
118:2 125:10,17 127:8,
22 130:11

work 23:3 26:2 31:18
65:23 66:1 103:9 108:18
142:20 147:21

workday 83:4

worked 9:13,18 33:10
39:16 64:23 93:13 139:9,
10

working 7:19,21 21:5
64:21 65:15 102:9
138:13

world 141:4

worthwhile 33:2

wrap 140:1

write 15:23 16:9,11 26:20
39:14 40:14 52:18,21,23
53:10,12 61:16 84:18
92:14,15 116:9 121:22
122:11 125:9,13,14,16
129:18 130:22 146:15
148:1,19

writing 10:4 15:20 16:5

33:17 52:19 53:8 56:20
63:23 65:8,18 84:17
85:7,10 86:7 103:8,9,11,
17,22 105:8 110:20
116:2 119:14,15 125:1,7
131:3,11 146:2

written 18:5 25:20 26:12
39:16 60:15 77:8 85:22
86:15 99:4 117:8 118:8,
21 129:21 135:23 146:15
147:5

wrong 52:20 53:9 78:13
119:11 121:5,7 123:18
125:8 135:4

wrote 33:5 38:2 56:7
60:7,17 61:4,11 109:13
125:4 129:20 130:7,23
146:22 147:6

X

x-ray 130:2

Y

Yazinski 101:14,23

year 8:4,7 10:16 12:17
22:10 26:2 43:10 58:3
63:16 72:21 93:3 98:23
99:19 113:16

years 7:14 100:12 121:1
140:10,13,23 141:4

yellow 56:3,5,8,12,17,21,
22 124:7

yellow-page 123:8,21

Z

zoom 45:1 101:19 144:7

 

DEPOSITION EXHIBIT

INTRO CASO
4

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
## CIRCUIT COURT

### 9th CIRCUIT - FAMILY DIVISION - NASHUA

CASE NO: 659-2018-DM-00702

2019 MAR -1 A 11: 12

EXHIBIT 1
DERBY
1/18/2021

## IN THE MATTER OF DAVID B. CAMPBELL AND ROBIN A. PARTELLO

## MOTION TO EXCEED FEE CAP

**NOW COMES** Kathleen A. Sternenberg, Guardian ad Litem, in the above-referenced case, and she respectfully requests that this Court issue allow the Guardian ad Litem to exceed the fee cap by an additional $1,000 and in support thereof states as follows:

1. On October 25, 2018, Kathleen A. Sternenberg, was appointed to act as Guardian ad Litem for ███████████████, DOB ███/2014.

2. This matter has involved allegations of inappropriate contact with the child and a police investigation and DCYF investigation.

3. The GAL has filed multiple pleadings, prepared for and attended hearings, and has received and replied to ongoing daily email exchanges, phone calls, arranged and attended in person meetings, home visits at both homes, had multiple contacts with the child's school, pediatricians, therapist; and has received police, DCYF and medical records and met with police and had contacts with DCYF.

4. The GAL has used the initial retainer and supplemental retainer[1] as of her billing this week.

5. The GAL anticipates that within a month, she will need to write and file a comprehensive report and to testify at the upcoming contested hearing.

6. The GAL has informed both parties of her intent to file this motion.

7. David Campbell has assented to this motion.

8. Robin Partello objects to this motion.

**WHEREFORE**, the Guardian ad Litem respectfully requests that this Court:

    A.    Allow the GAL's motion to exceed the fee cap in the amount of $1,000 and order

---

[1] The GAL has not received Robin Partello's portion of the supplemental retainer as of this writing.

-1-

34

JAI000195



the parties to ~~CAL~~ ~~ad~~diti~~onal~~ ~~per~~centage of the retainer within fourteen days o~~f~~ ~~the or~~der; and

B.      Grant such other relief as may be fair and just.

                                        Respectfully submitted,

Dated: February 28, 2019



                        *Kathleen A. Sternenberg*
                        Kathleen A. Sternenberg, Esq., NHB#8840
                        Law Office of Kathleen A. Sternenberg
                        P.O. Box 2288
                        Concord, NH 03302-2288
                        (603)641-1048 phone
                        (603)215-7570 fax
                        kas@sternenberglaw.com

                        Certificate of Service

        I, Kathleen A. Sternenberg, hereby certify that I have, this day, mailed a copy of this motion to Jeffrey Manganaro, Esq./Tracey Goyette Cote, Esq., counsel for David B. Campbell and to Robin A. Partello, pro se.

                        *Kathleen A. Sternenberg*
                        Kathleen A. Sternenberg

Motion                   Granted / ~~Denied~~
        3-12-19
Date
JU~~DG~~ JULIE A. INGBRETSON

                                        over the
                                        Respondent's
                                        objection at
                                        # 36

                        -2-

JAI000196

EXHIBIT 2

DERBY
1/18/2021

DEPOSITION EXHIBIT

INTROCASO
5

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### CIRCUIT COURT

CIRCUIT COURT
NASHUA

2019 MAR -1 A 11: 12

### 9th CIRCUIT - FAMILY DIVISION - NASHUA

### CASE NO: 659-2018-DM-00702

## IN THE MATTER OF DAVID B. CAMPBELL AND ROBIN A. PARTELLO

## MOTION TO EXCEED FEE CAP

**NOW COMES** Kathleen A. Sternenberg, Guardian ad Litem, in the above-referenced case, and she respectfully requests that this Court issue allow the Guardian ad Litem to exceed the fee cap by an additional $1,000 and in support thereof states as follows:

1.  On October 25, 2018, Kathleen A. Sternenberg, was appointed to act as Guardian ad Litem for B███████ ████████, DOB ████2014.

2.  This matter has involved allegations of inappropriate contact with the child and a police investigation and DCYF investigation.

3.  The GAL has filed multiple pleadings, prepared for and attended hearings, and has received and replied to ongoing daily email exchanges, phone calls, arranged and attended in person meetings, home visits at both homes, had multiple contacts with the child's school, pediatricians, therapist; and has received police, DCYF and medical records and met with police and had contacts with DCYF.

4.  The GAL has used the initial retainer and supplemental retainer[1] as of her billing this week.

5.  The GAL anticipates that within a month, she will need to write and file a comprehensive report and to testify at the upcoming contested hearing.

6.  The GAL has informed both parties of her intent to file this motion.

7.  David Campbell has assented to this motion.

8.  Robin Partello objects to this motion.

**WHEREFORE,** the Guardian ad Litem respectfully requests that this Court:

A.  Allow the GAL's motion to exceed the fee cap in the amount of $1,000 and order

---

[1]The GAL has not received Robin Partello's portion of the supplemental retainer as of this writing.

-1-

ORIGINAL

JAI000189

34



the parties to pay the GAL the additional percentage of the retainer within fourteen days of this order; and

B.    Grant such other relief as may be fair and just.

Respectfully submitted,

Dated: February 28, 2019

*Kathleen A. Sternenberg*

Kathleen A. Sternenberg, Esq., NHB#8840
Law Office of Kathleen A. Sternenberg
P.O. Box 2288
Concord, NH 03302-2288
(603)641-1048 phone
(603)215-7570 fax
kas@sternenberglaw.com

## Certificate of Service

I, Kathleen A. Sternenberg, hereby certify that I have, this day, mailed a copy of this motion to Jeffrey Manganaro, Esq./Tracey Goyette Cote, Esq., counsel for David B. Campbell and to Robin A. Partello, pro se.

*Kathleen A. Sternenberg*

Kathleen A. Sternenberg



-2-

DEPOSITION EXHIBIT

INTROCASO
14

EXHIBIT 3
DERBY
1/18/2021

DAVID CAMPBELL
AND
ROBIN PARTELLO

659-2018-DM-702

On 3-15-19, the Petitioner filed a motion to continue a Status Conf. scheduled by this judge. The motion (#38) is GRANTED.

In filing the motion, the Petitioner inquired as to the purpose of the hearing. The undersigned judge scheduled the hearing to disclose her conflict with the Court-appointed GAL in the case.

Although this judge has made no substantive rulings in this matter, it has approved substantiative orders issued by the marital master that had previously handled this litigation.

The marital master has been reassigned to another court location, so numerous substantive motions were presented to this judge for review.

In doing so, this judge

JAI000158

 

pg 2.

has determined that she is unable to address these motions, particularly as some relate directly to the payment and performance of the GAL.

The GAL has been a long-standing friend of this judge; she has vacationed with her, discussed personal matters in depth (including financial issues) and the GAL is the godparent to one of this judge's children.

The Court does not believe this conflict, under the circumstances as stated above, is one which can be waived.

The Court hoped to put this matter on the record and set this matter for trial before another judge; however, even that may be seen as inappropriate given the conflict over the GAL specifically.

The wisest course for this judge, and in an attempt to

JAI000159

pg 3.  provide the parties with the most unbiased and fair hearing, is to simply withdraw as the presiding justice in this matter with regret as to the delay this may cause to the parties.

ORDER:

1. Judge Julie Introcaso shall have no further involvement in this matter.

2. The Clerk shall expeditiously work with the parties to reassign this matter, resolve the pending motions, and schedule this matter for any further hearing.

3. No status conference will occur on March 19, 2019.

So Ordered.

3/15/19

Julie A. Introcaso

JAI000160



EXHIBIT 4
DERBY
1/18/2021

# 2019 New Hampshire Revised Statutes
# Title LXII - Criminal Code
# Chapter 641 - Falsification in Official Matters
# Section 641:6 - Falsifying Physical Evidence.

**Universal Citation:** NH Rev Stat § 641:6 (2019)

**641:6 Falsifying Physical Evidence. —**

A person commits a class B felony if, believing that an official proceeding, as defined in RSA 641:1, II, or investigation is pending or about to be instituted, he:

I. Alters, destroys, conceals or removes any thing with a purpose to impair its verity or availability in such proceeding or investigation; or

II. Makes, presents or uses any thing which he knows to be false with a purpose to deceive a public servant who is or may be engaged in such proceeding or investigation.

**Source.** 1971, 518:1, eff. Nov. 1, 1973.



EXHIBIT 5
DERBY
1/18/2021

# 2019 New Hampshire Revised Statutes
# Title LXII - Criminal Code
# Chapter 641 - Falsification in Official Matters
# Section 641:7 - Tampering With Public Records or Information.

**Universal Citation:** NH Rev Stat § 641:7 (2019)

**641:7 Tampering With Public Records or Information.** –
A person is guilty of a misdemeanor if he:

I. Knowingly makes a false entry in or false alteration of any thing belonging to, received, or kept by the government for information or record, or required by law to be kept for information of the government; or

II. Presents or uses any thing knowing it to be false, and with a purpose that it be taken as a genuine part of information or records referred to in paragraph I; or

III. Purposely and unlawfully destroys, conceals, removes or otherwise impairs the verity or availability of any such thing.

**Source.** 1971, 518:1, eff. Nov. 1, 1973.

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### NH CIRCUIT COURT

9th Circuit - Family Division - Nashua
30 Spring Street, Suite 102
Nashua NH 03060

Telephone: 1-855-212-1234
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

## NOTICE OF DECISION

ROBIN PARTELLO
97 EAST BROADWAY
APT 7
DERRY NH 03038



**EXHIBIT 6**
DERBY
1/18/2021

Case Name:   **In the Matter of David Campbell and Robin Partello**
Case Number:   **659-2018-DM-00702**

Enclosed please find a copy of the Court's Order dated March 12, 2019 relative to:

**Further Motion for Instruction Regarding GAL Supplemental
Retainer Payment by Robin Partello
"Legal fees/GAL fees to be paid in Cash, by Money Order or
Bank Check, ONLY".**

**So Ordered**

**Introcaso, J.**

March 12, 2019

Sherry L. Bisson
Clerk of Court

(579)
C: Kathleen A. Sternenberg; Tracey G. Cote, ESQ

**EXHIBIT 1**

LODES
8/26/2020

Michelle Perrier Cole, LCR

**EXHIBIT 9(Copy)**

BISSON
7/22/2020

Michelle Perrier Cole, LCR

NHJB-2207-DF (07/01/2011)

THE STATE OF NEW HAMPSHIRE
JUDICIAL BRANCH
CIRCUIT COURT

9th CIRCUIT - FAMILY DIVISION - NASHUA

CASE NO: 659-2018-DM-00702

**IN THE MATTER OF DAVID B. CAMPBELL AND ROBIN A. PARTELLO**

**FURTHER MOTION FOR INSTRUCTION REGARDING
GAL SUPPLEMENTAL RETAINER PAYMENT BY ROBIN PARTELLO**

     **NOW COMES** Kathleen A. Sternenberg, Guardian ad Litem, in the above-referenced case, and she respectfully requests that this Court issue a further order to instruct Robin Partello to pay the GAL via check, money order or cash payment immediately and in support thereof states as follows:

1. On October 25, 2018, Kathleen A. Sternenberg, was appointed to act as Guardian ad Litem for ███████████████, DOB ████2014.

2. Although this court ordered that Robin Partello pay the Guardian ad Litem within seven days of its recent order, the Guardian ad Litem has not received the $350 second retainer amount in a form acceptable to the GAL.

3. Robin Partello has apparently sent electronic funds to Apple Pay and insists that the GAL accept these funds.

4. The GAL does not accept Apple Pay and does not have Apple Pay connected to her client trust account.

5. The GAL has repeatedly informed Robin Partello that she does not accept electronic payments for retainers.

6. The GAL has informed Robin Partello that she needs to either send a check or money order or arrange a time to meet the GAL to give her cash.

7. Robin Partello has refused to do so.

    **WHEREFORE**, the Guardian ad Litem respectfully requests that this Court:

    A.    Order Robin Partello to pay the GAL retainer in the amount of $350 by cash, by check or by money order and to either mail the check or money order to the GAL's business address or to arrange to meet the GAL at the NH Bar Association offices with a cash payment; and

    B.    Grant such other relief as may be fair and just.

-1-

Respectfully submitted,

Dated: February 28, 2019

*Kathleen A. Sternenberg*

Kathleen A. Sternenberg, Esq., NHB#8840
Law Office of Kathleen A. Sternenberg
P.O. Box 2288
Concord, NH 03302-2288
(603)641-1048 phone
(603)215-7570 fax
kas@sternenberglaw.com

## Certificate of Service

I, Kathleen A. Sternenberg, hereby certify that I have, this day, mailed a copy of this motion to Jeffrey Manganaro, Esq./Tracey Goyette Cote, Esq., counsel for David B. Campbell and to Robin A. Partello, pro se.

*Kathleen A. Sternenberg*

Kathleen A. Sternenberg

3/12/19 —
Legal fees / GAL fees
to be paid in Cash,
by money order or
bank check, ONLY.
So Ordered.

Julie A. Introcaso

-2-

**Kathleen Sternenberg**

| | |
|---|---|
| **From:** | Robin Partello <robinpartello@yahoo.com> |
| **Sent:** | Tuesday, February 26, 2019 5:16 PM |
| **To:** | Kathleen Sternenberg |
| **Subject:** | Re: I do not accept Apple Pay |

RECEIVED
NH CIRCUIT COURT
9TH CIRCUIT NASHUA

2019 MAR -1  A 11: 12

Yes, I fully understand. Everyone is set up for Apple Pay is you have an Apple phone.

You take the funds that I sent you and deposit it into your IOLTA.

Quite honestly, you are the first attorney that I've ever met that doesn't take electronic payments and does not have an office.

I did my part. I sent the money. You have it available. It's not my obligation to drive to Concord NH to drop off cash when you may not be there. The office staff at the N.H. Bar Association already refused to sign a statement as a witness. They said they don't work for you. You're putting me in a tough spot.

I'll just file with the Court for instruction.

Sent from my iPhone

> On Feb 26, 2019, at 4:52 PM, Kathleen Sternenberg <kas@sternenberglaw.com> wrote:
>
> Ms. Partello,
>
> Please arrange to bring me $350 cash at the NH Bar Association. I can not accept Apple Pay. I do not have it set up. This money is deposited in to my Client Trust account. It is not my money, as you know. I would appreciate your understanding.
>
> Kathleen A. Sternenberg, Esq., #8840
> Law Office of Kathleen A. Sternenberg
> P. O. Box 2288
> Concord, NH 03302-2288
> (603)641-1048
> kas@sternenberglaw.com
>
>> On Feb 26, 2019, at 4:45 PM, Robin Partello <robinpartello@yahoo.com> wrote:
>>
>> Apple Pay is the most secure source of electronic payment. I sent the exact amount of money that you requested and it was available to you instantaneously.
>>
>> Kathleen, honestly, you asked for a $350, I sent it and it was immediately available. Instead, you email me and tell me to go to a bank, get a money order, go to a Post Office and mail it with "tracking".
>>
>> As I told you before, you don't have a business office, I can't drop off cash like I did the last time when we met at the N.H. Bar Association conference room. Mailing a money order is like mailing cash, it's never a good idea.
>>



1

>> I sent you the exact amount that you requested. You have the $350. I will file a motion with the Court for instruction as it seems ludicrous that you won't accept such a secure form of payment. You are essentially tying my hands behind my back. I don't use checks. You don't have an office & you don't accept electronic payments.

>>

>> I'll file a Motion to Inform the Court.

>>

>> Sent from my iPhone

>>

>>> On Feb 26, 2019, at 2:24 PM, Kathleen Sternenberg <kas@sternenberglaw.com> wrote:

>>>

>>> Please go to the post office, purchase a money order and mail it to me. If you would like, you can send it with tracking. I do not, and will not, accept Apple Pay for retainer deposits.

>>>

>>> Kathleen A. Sternenberg, Esq., #8840 Law Office of Kathleen A.

>>> Sternenberg P. O. Box 2288 Concord, NH 03302-2288

>>> (603)641-1048

>>> kas@sternenberglaw.com

ORIGINAL

2

**Kathleen Sternenberg**

| | |
|---|---|
| **From:** | Robin Partello <robinpartello@yahoo.com> |
| **Sent:** | Tuesday, February 26, 2019 9:12 AM |
| **To:** | Kathleen Sternenberg |
| **Subject:** | Re: Following up with you. |

I sent it electronically. Honestly, you only accept checks, which I don't use and haven't for years. I can get a money order but I don't want to mail it as it's the same as cash. You don't have an office so I couldn't even drop off the money order or cash.

Additionally, I'd prefer to have a record of my payment. Further, have you sent a recent invoice? I have not received it.

Sent from my iPhone

On Feb 26, 2019, at 8:08 AM, Kathleen Sternenberg <kas@sternenberglaw.com> wrote:

> Robin,
>
> You told me that you would send me the $350 retainer. I have not received your payment. Is this something you have sent?
>
> Kathleen A. Sternenberg, Esq., NH Bar #8840
> Law Office of Kathleen A. Sternenberg
> P.O. Box 2288
> Concord, NH 03302
> (603)641-1048 phone
> kas@sternenberglaw.com
>
> ---
> **From:** Robin Partello [mailto:robinpartello@yahoo.com]
> **Sent:** Tuesday, February 26, 2019 7:24 AM
> **To:** Kathleen Sternenberg
> **Subject:** Re: Following up with you.
>
> Kathleen:
>
> I am in the process of obtaining an attorney. Although I would love to answer your questions, I await for my counsel to advise.
>
> Due to the voluminous case file, it will take three to five business days for the attorney(s) to review.
>
> I DO NOT assent to your motion to exceed the cap.
>
> Sent from my iPhone
>
> On Feb 25, 2019, at 1:04 PM, Kathleen Sternenberg <kas@sternenberglaw.com> wrote:
>
>> 2/25/2019
>>
>> Hi, Robin,
>>
>> I have not received your retainer check.



1

I have a couple of things that I would like to hear directly from you about. I would ask that you respond to these questions in writing, please.

1.  When we originally sat down, I believe you told me that you had never been married. I would like to have you confirm this as when I asked your parents, they said you had been married to a man named Jeff. Please provide Jeff's full name and the dates of your marriage and how the marriage ended and date of separation and divorce. I would like to understand from you what the circumstances of the divorce were.

2.  Also, when we met, I believe you told me that you moved from your parents' home to your Derry condo. You told me that you did not live anywhere in between. It is my understanding that there were several months between when you left your parents' home and when you were able to move in to your Derry condo after the tenant's vacated. Could you please tell me where you lived between June and September? It is important to me to know and understand where ▮▮▮ has lived.

3.  Would you also clarify for me if you have had any boyfriends, companions or significant others during ▮▮▮ lifetime? I had asked you about the nature of the relationship with Russ, your neighbor, and I believe that you said that Russ was just someone who allowed you and ▮▮▮ to use his bathroom while he was at work. However, I have information that ▮▮▮ may have been around Russ and Russ may have disciplined him and that Russ may have provided you transportation. I would like to better understand the nature of this relationship and any other relationship where the man has been in contact with your son for any length of time and has gotten to know him. I understand from David that there was someone who used to go to the sports activities with you to watch ▮▮▮?

4.  Could you also provide me with your work schedule for the past several months? I would like to confirm exactly what your hours are and what days and times during each 7 day period.

5.  I would like to better understand where ▮▮▮ stays during your work hours. I know that your parents have mentioned that he is sometimes with them. I know that ▮▮▮ spends some time with David. Before this current court order, where was ▮▮▮ when you were working? Please tell me any and all places where he would have been watched. I would like to better understand where ▮▮▮ has stayed throughout this case.

Thank you for your answers to these specific questions.

Finally, it is clear to me that it will be necessary for me to exceed the fee cap in order to prepare my report and to testify at the final hearing. I will be filing a motion to exceed and would very much appreciate your assent. Please let me know if you assent to this filing. Thank you.

Kathleen A. Sternenberg, Esq., NH Bar #8840
Law Office of Kathleen A. Sternenberg
P.O. Box 2288
Concord, NH 03302



Case 1:20-cv-01053-JM Document 1-3 Filed 08/04/23 Page 87 of 91



# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### NH CIRCUIT COURT

9th Circuit - Family Division - Nashua
30 Spring Street, Suite 102
Nashua NH 03060

STRICKEN

Telephone: 1-855-212-1234
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

1/10/20

## NOTICE OF DECISION

**FILE COPY**

EXHIBIT 7
DERBY
1/18/2021

Case Name: **In the Matter of David Campbell and Robin Partello**
Case Number: **659-2018-DM-00702**

Enclosed please find a copy of the Court's Order dated March 12, 2019 relative to:

**Further Motion for Instruction Regarding GAL Supplemental
Retainer Payment by Robin Partello
"Legal fees/GAL fees to be paid in Cash, by Money Order or
Bank Check, ONLY".**

**So Ordered**

**Introcaso, J.**

March 12, 2019

Sherry L. Bisson
Clerk of Court

(579)
C: Robin Partello; Kathleen A. Sternenberg; Tracey G. Cote, ESQ

ORIGINAL

NHJB-2207-DF (07/01/2011)

JAI000181

 

### THE STATE OF NEW HAMPSHIRE
### JUDICIAL BRANCH
### CIRCUIT COURT

#### 9ᵗʰ CIRCUIT - FAMILY DIVISION - NASHUA

CASE NO: 659-2018-DM-00702

**IN THE MATTER OF DAVID B. CAMPBELL AND ROBIN A. PARTELLO**

**FURTHER MOTION FOR INSTRUCTION REGARDING**
**GAL SUPPLEMENTAL RETAINER PAYMENT BY ROBIN PARTELLO**

**NOW COMES** Kathleen A. Sternenberg, Guardian ad Litem, in the above-referenced case, and she respectfully requests that this Court issue a further order to instruct Robin Partello to pay the GAL via check, money order or cash payment immediately and in support thereof states as follows:

1. On October 25, 2018, Kathleen A. Sternenberg, was appointed to act as Guardian ad Litem for B██████ ███████ ███████, DOB ████2014.

2. Although this court ordered that Robin Partello pay the Guardian ad Litem within seven days of its recent order, the Guardian ad Litem has not received the $350 second retainer amount in a form acceptable to the GAL.

3. Robin Partello has apparently sent electronic funds to Apple Pay and insists that the GAL accept these funds.

4. The GAL does not accept Apple Pay and does not have Apple Pay connected to her client trust account.

5. The GAL has repeatedly informed Robin Partello that she does not accept electronic payments for retainers.

6. The GAL has informed Robin Partello that she needs to either send a check or money order or arrange a time to meet the GAL to give her cash.

7. Robin Partello has refused to do so.

**WHEREFORE,** the Guardian ad Litem respectfully requests that this Court:

A. Order Robin Partello to pay the GAL retainer in the amount of $350 by cash, by check or by money order and to either mail the check or money order to the GAL's business address or to arrange to meet the GAL at the NH Bar Association offices with a cash payment; and

B. Grant such other relief as may be fair and just.

-1-



Respectfully submitted,

Dated: February 28, 2019

*Kathleen A. Sternenberg*

Kathleen A. Sternenberg, Esq., NHB#8840
Law Office of Kathleen A. Sternenberg
P.O. Box 2288
Concord, NH 03302-2288
(603)641-1048 phone
(603)215-7570 fax
kas@sternenberglaw.com

### Certificate of Service

I, Kathleen A. Sternenberg, hereby certify that I have, this day, mailed a copy of this motion to Jeffrey Manganaro, Esq./Tracey Goyette Cote, Esq., counsel for David B. Campbell and to Robin A. Partello, pro se.

*Kathleen A. Sternenberg*

Kathleen A. Sternenberg



-2-

 

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### NH CIRCUIT COURT

9th Circuit - Family Division - Nashua
30 Spring Street, Suite 102
Nashua NH 03060

Telephone: 1-855-212-1234
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

## NOTICE OF DECISION

**FILE COPY**



EXHIBIT 8
DERBY
1/18/2021

Case Name: **In the Matter of David Campbell and Robin Partello**
Case Number: **659-2018-DM-00702**

Enclosed please find a copy of the Court's Order dated April 26, 2019 relative to:

### Order on Motion to remove GAL

Derby, M.

April 29, 2019

Sherry L. Bisson
Clerk of Court

(659304)

C: Jeffrey Leo Manganaro, ESQ; Robin Partello; Kathleen A. Sternenberg

# The State of New Hampshire

Hillsborough County                    Ninth Circuit Court ~ Family Division ~ Nashua ~ Merrimack

In the matter of: _David Campbell_          and _Robin Partello_

Docket No. 65 _9_ - 20_18_ - _DM_ - _702_

## ORDER on #41, Motion to Remove GAL

Prior to ruling on the motion to remove GAL, the undersigned officer reviewed the October 24, 2018 Order Appointing GAL, the February 15, 2019 Order approving the Master's recommendation on the GAL's motion for instruction, the February 15, 2019 Order approving the Master's recommendation on the Motion to Strike, and the two March 12, 2019 orders re the GAL's fee cap and GAL payment method, as well as the relevant motions and objections. Reviewing all of those matters de novo, the undersigned officer would have issued the same order, though the respondent may pay the GAL by personal check (in addition to the other methods), though the respondent does not use personal checks.

Substantively, the motion to dismiss/remove GAL is denied. The respondent's allegations do not form a sufficient basis to terminate the GAL and start over, which would cost significant funds and waste judicial resources. The GAL's sole mission is to investigate and advocate for ▮▮▮ and this may cause friction with the parents. That is a normal part of the process. Motion denied.

Date: _4-26_____, 2019

Mark S. Derby, Judge
Ninth Circuit Court