## JUDICIAL IMMUNITY AT THE (SECOND) FOUNDING: A NEW PERSPECTIVE ON § 1983

Immunity doctrines have received increased scrutiny in recent years, both in academic scholarship[1] and in the popular press.[2]  While the overwhelming majority of the focus on immunity doctrines has been on qualified immunity and its application to police officers (and perhaps justifiably so, in light of increased visibility of police abuses[3]), absolute immunity has attracted much less attention.  Even in the context of discussions around absolute immunity, conversation and scholarship have focused mostly on prosecutorial immunity.[4]

This Note considers the doctrine of an even less discussed kind of immunity: judicial absolute immunity.  In Part I, this Note explores recent issues of judicial misconduct and the lack of repercussions or effective deterrence for judges, who hold the highest positions of public trust.  Part II then gives an overview of judicial absolute immunity, delving into the contours of what it applies to, whom it applies to, and gaps in accountability.  Part III explores the historical justifications offered in support of judicial absolute immunity.  Other scholarship has focused broadly on the policy and instrumental values of judicial immunity from civil suit, has generally explored judicial immunity from both civil and

---

[1] *See, e.g.*, William Baude, *Is Qualified Immunity Unlawful?*, 106 CALIF. L. REV. 45 (2018); Joanna C. Schwartz, *Qualified Immunity's Boldest Lie*, 88 U. CHI. L. REV. 605 (2021); Scott A. Keller, *Qualified and Absolute Immunity at Common Law*, 73 STAN. L. REV. 1337 (2021); *see also* Erwin Chemerinsky, *Absolute Immunity: General Principles and Recent Developments*, 24 TOURO L. REV. 473 (2008) (discussing the uniquely large scope of absolute immunity and its applicability to different groups and individuals).

[2] *See, e.g.*, Shaila Dewan, *If the Police Lie, Should They Be Held Liable? Often the Answer Is No.*, N.Y. TIMES (Oct. 18, 2021), https://www.nytimes.com/2021/09/12/us/federal-police-immunity.html [https://perma.cc/MX53-C4XL]; Hailey Fuchs, *Qualified Immunity Protection for Police Emerges as Flash Point Amid Protests*, N.Y. TIMES (Oct. 18, 2021), https://www.nytimes.com/2020/06/23/us/politics/qualified-immunity.html [https://perma.cc/W2TC-MTJQ]; Kimberly Kindy, *Dozens of States Have Tried to End Qualified Immunity. Police Officers and Unions Helped Beat Nearly Every Bill.*, WASH. POST (Oct. 7, 2021, 6:00 AM), https://www.washingtonpost.com/politics/qualified-immunity-police-lobbying-state-legislatures/2021/10/06/60e546bc-0cdf-11ec-aea1-42a8138f132a_story.html [https://perma.cc/ZKP5-NHTR].

[3] *See, e.g.*, Nicol Turner Lee, *Where Would Racial Progress in Policing Be Without Camera Phones?*, BROOKINGS INST. (June 5, 2020), https://www.brookings.edu/blog/fixgov/2020/06/05/where-would-racial-progress-in-policing-be-without-camera-phones [https://perma.cc/YQ73-FCZK] ("[T]he ubiquity of video recordings has recast the narrative surrounding police violence and heightened public concerns about law enforcement. . . . The combination of smart phones, video recording apps, and social media platforms have generated a revolution in public empowerment.  Rather than having to take the word of African Americans over the police, people can see the violence for themselves and demand justice.").

[4] *See, e.g.*, Samantha M. Caspar & Artem M. Joukov, *The Case for Abolishing Absolute Prosecutorial Immunity on Equal Protection Grounds*, 49 HOFSTRA L. REV. 315 (2021); Ariba Ahmad, Comment, *The Next Step in Civil Rights: Abolish Absolute Prosecutorial Immunity so Prosecutors Cannot Use Their Power to Violate Others' Constitutional Rights*, 72 CASE W. RSRV. L. REV. 839 (2022); Brian M. Murray et al., *Qualifying Prosecutorial Immunity Through Brady Claims*, 107 IOWA L. REV. 1107 (2022).

criminal liability,[5] or has focused on the legislative history of only the Ku Klux Klan Act of 1871,[6] from which emerged 42 U.S.C. § 1983. This Note is the first piece to discuss judicial immunity in the context of the Civil Rights Act of 1866.[7] Part IV delves into the legislative history of the Civil Rights Act of 1866 and 18 U.S.C. § 242 in particular, a provision courts have consistently interpreted to eliminate judicial immunity from criminal prosecution. It then examines the legislative history of the Ku Klux Klan Act of 1871. In Part V, this Note then compares the two statutes, highlighting the virtually identical text and the similarities in historical context, and argues that in the same way judicial immunity is abrogated in criminal suits, so too should it be eliminated in the context of civil suits.

## I. MISCONDUCT

*Quis custodiet ipsos custodes?*

— Juvenal[8]

How significant of a problem is judicial misconduct? Is it a one-off issue, or widespread? What consequences are there for those who engage in misconduct? If there are few or no instances of judicial misconduct, what normative justifications are there for opening judges up to lawsuits? This Part seeks to answer these questions.

Judges hold an important position in society. Both federal and state judges hear cases and render decisions that affect millions of people's lives each year.[9] Federal judges must be nominated by the President and confirmed by the Senate.[10] State judges are selected in a variety of ways, including by election, appointment for a certain number of years or for life, or a combination of these methods.[11] Judges often are

---

[5] *See, e.g.*, Jay M. Feinman & Roy S. Cohen, *Suing Judges: History and Theory*, 31 S.C. L. REV. 201 (1980); Jeffrey M. Shaman, *Judicial Immunity from Civil and Criminal Liability*, 27 SAN DIEGO L. REV. 1 (1990); Chemerinsky, *supra* note 1.

[6] Ch. 22, 17 Stat. 13 (codified as amended at 42 U.S.C. §§ 1983, 1985–1986); *see also* Michael H. LeRoy, *Targeting White Supremacy in the Workplace*, 29 STAN. L. & POL'Y REV. 107, 138–41 (2018).

[7] Ch. 31, 14 Stat. 27 (codified as amended in scattered sections of 42 U.S.C.).

[8] SATIRE VI 347–48 (Lindsay Watson & Patricia Watson eds., Cambridge Univ. Press 2014) ("Who will guard the guards themselves?").

[9] *See* INST. FOR THE ADVANCEMENT OF THE AM. LEGAL SYS., UNIV. OF DENVER, FAQS: JUDGES IN THE UNITED STATES 3 (2014) ("More than 100 million cases are filed each year in state trial courts, while roughly 400,000 cases are filed in federal trial courts.").

[10] U.S. CONST. art. II, § 2, cl. 2; *see also id.* art. III, § 1. There are also non–Article III federal judges who do not go through this process, such as administrative law judges and immigration judges. *See generally* William Baude, *Adjudication Outside Article III*, 133 HARV. L. REV. 1511 (2020) (exploring governmental power and its role in adjudication).

[11] *Comparing Federal & State Courts*, U.S. COURTS, https://www.uscourts.gov/about-federal-courts/court-role-and-structure/comparing-federal-state-courts [https://perma.cc/G4AS-8CKK].

*HARVARD LAW REVIEW* [Vol. 136:1456

required to take an oath before assuming their office,[12] and they face heightened ethics requirements compared to attorneys.[13]

The importance of judges' roles makes judicial breaches of the public trust all the more egregious. In recent years, lawsuits and reporting have uncovered significant instances of judicial misconduct. For example, a 2021 *Wall Street Journal* investigation revealed that 131 federal judges heard cases in which they had a financial interest,[14] in violation of law.[15] Similarly, various organizations have documented concerns about misconduct by immigration judges,[16] including one immigration judge "becoming so irate about an attorney speaking on the record at a credible fear review that he stormed out of the courtroom," and another immigration judge throwing "an applicant's asylum application (I-589) on the ground for a perceived lack of detail, announcing that 'let the record show I threw the I-589 on the ground.'"[17] And, for state judges, a twelve-year-long investigation by *Reuters* uncovered thousands of instances of abuses.[18]

To be sure, the vast majority of judges behave properly.[19] And not all of these violations are created equal: many of the financial violations referenced before were the result of inadvertence or oversight,[20] in contrast to other violations. For example, one judge allegedly made death threats to informants against him and exploited his position to reduce bond in exchange for sex,[21] both of which constitute more substantial transgressions. Nonetheless, given the status of their office and the duty

---

[12] *See, e.g.*, 28 U.S.C. § 453 (oath for federal judges).

[13] *See generally* MODEL CODE OF JUD. CONDUCT (AM. BAR ASS'N 2020); U.S. COURTS, CODE OF CONDUCT FOR UNITED STATES JUDGES (2019), https://www.uscourts.gov/sites/default/files/code_of_conduct_for_united_states_judges_effective_march_12_2019.pdf [https://perma.cc/RE8K-XVHJ].

[14] James V. Grimaldi et al., *131 Federal Judges Broke the Law by Hearing Cases Where They Had a Financial Interest*, WALL ST. J. (Sept. 28, 2021, 9:07 AM), https://www.wsj.com/articles/131-federal-judges-broke-the-law-by-hearing-cases-where-they-had-a-financial-interest-11632834421 [https://perma.cc/L8JG-GF7Z].

[15] *See* 28 U.S.C. § 455(b)(4).

[16] *See, e.g.*, INNOVATION L. LAB & S. POVERTY L. CTR., THE ATTORNEY GENERAL'S JUDGES: HOW THE U.S. IMMIGRATION COURTS BECAME A DEPORTATION TOOL 16 (2019), https://www.splcenter.org/sites/default/files/com_policyreport_the_attorney_generals_judges_final.pdf [https://perma.cc/8U3M-NR6Q] (describing issues with immigration judges' lack of judicial temperament); *Complaints Against Immigration Judges*, AM. IMMIGR. COUNCIL, https://www.americanimmigrationcouncil.org/litigation/complaints-against-immigration-judges [https://perma.cc/8HZY-MXQH].

[17] INNOVATION L. LAB & S. POVERTY L. CTR., *supra* note 16, at 16.

[18] Michael Berens & John Shiffman, *The Teflon Robe: Thousands of U.S. Judges Who Broke Laws or Oaths Remained on the Bench*, REUTERS (June 30, 2020, 12:00 PM), https://www.reuters.com/investigates/special-report/usa-judges-misconduct [https://perma.cc/A4LM-M9J5].

[19] *Id.; see also* INST. FOR THE ADVANCEMENT OF THE AM. LEGAL SYS., *supra* note 9, at 3 ("There are approximately 30,000 state judges, compared to only 1,700 federal judges.").

[20] Grimaldi et al., *supra* note 14.

[21] John Shiffman & Michael Berens, *The Teflon Robe: The Long Quest to Stop a "Sugar Daddy" Judge Accused of Preying on Women*, REUTERS (July 14, 2020, 12:00 PM), https://www.reuters.com/investigates/special-report/usa-judges-commissions [https://perma.cc/U52M-HAV7].

they owe to the public they serve, judges are expected to — and should — maintain high standards of conduct, beyond those expected of ordinary citizens.[22]  This expectation is necessary, as other judges have observed, "to maintain the high level of public confidence crucial for the judiciary's continued vitality."[23]  Misconduct "has the potential to erode trust in America's courts."[24]

To preserve the public trust, adequate safeguards must exist to discipline judges who engage in misconduct.[25]  In general, judges may face private discipline, public remand, suspension, or removal from office, whether or not the misconduct is covered by judicial immunity.[26]  But in practice, consequences seem exceedingly rare or nonexistent for judges who misbehave.  For state judges, oversight commissions are usually a mix of laypeople, lawyers, and judges.[27]  Some require complaints to be made in writing, deterring many complainants out of fear of retaliation.[28]  Many oversight commissions deliberate in secret, with at least thirty-eight of them issuing private sanctions when judges misbehave, keeping the name of the judge secret, and keeping from the public "details of the transgression."[29]  For state judges, nine out of every ten judges were allowed to return to the bench after being sanctioned for misconduct in an "'excessively' forgiving judicial disciplinary system."[30]  This includes a Utah judge who texted sexually explicit material to clerks, three Indiana judges who got into a physical fight outside of a restaurant, and an Alabama judge who sentenced a single mother to 496 days behind bars for failing to pay traffic tickets, a sentence exceeding the jail time Alabama allows for negligent homicide.[31]  All of these judges were reprimanded, but they were ultimately allowed to retain their positions.[32]

---

[22] See U.S. COURTS, supra note 13, at 2 (Canon 1 states: "An independent and honorable judiciary is indispensable to justice in our society.  A judge should maintain and enforce high standards of conduct and should personally observe those standards, so that the integrity and independence of the judiciary may be preserved.").

[23] Harry T. Edwards, Regulating Judicial Misconduct and Divining "Good Behavior" for Federal Judges, 87 MICH. L. REV. 765, 771 (1989); see also Steven Lubet, Judicial Ethics and Private Lives, 79 NW. U. L. REV. 983, 985–88 (1985).

[24] Berens & Shiffman, supra note 18.

[25] Id. ("Judicial misconduct specialists say such behavior has the potential to erode trust in America's courts and, absent tough consequences, could give judges license to behave with impunity.").

[26] Michael Berens & John Shiffman, The Teflon Robe: Holding Judges Accountable, REUTERS (June 30, 2020, 12:00 PM), https://www.reuters.com/investigates/special-report/usa-judges-methodology-qanda [https://perma.cc/P66N-DB8R].

[27] Berens & Shiffman, supra note 18.

[28] Id.

[29] Michael Berens & John Shiffman, The Teflon Robe: With "Judges Judging Judges," Rogues on the Bench Have Little to Fear, REUTERS (July 9, 2020, 10:00 AM), https://www.reuters.com/investigates/special-report/usa-judges-deals [https://perma.cc/CV8R-ZZ9B].

[30] Berens & Shiffman, supra note 18 (quoting Professor Stephen Gillers).

[31] Id.

[32] Id.

In short, while misconduct by judges is rare, it is especially insidious because of its negative effects on the judicial system.[33] And despite the existence of various structures meant to investigate or discipline judges for misconduct, the reality is that those investigations are usually secretive, penalties are usually light, and, ultimately, most judges are allowed to remain on or return to the bench. The result is a severe lack of deterrence for bad behavior by judges.[34]

## II. OVERVIEW OF JUDICIAL IMMUNITY

This Part gives an overview of judicial immunity. It explores what actions are covered by judicial immunity, as well as its limits; who is covered by judicial immunity; and finally, gaps in accountability and relief available to litigants as a result of judicial immunity.

### A. What Judicial Immunity Covers

Judicial immunity shields judges from civil liability for judicial acts.[35] This immunity does not extend to criminal prosecutions, as the Supreme Court explained in *O'Shea v. Littleton*[36] (and then reaffirmed in *Imbler v. Pachtman*[37] and *Dennis v. Sparks*[38]).

The immunity itself is broad. Under current doctrine, it covers (1) "judicial acts" that are (2) not undertaken in "clear absence of all jurisdiction."[39] In other words, so long as a judge does not run afoul of these

---

[33] *See* U.S. COURTS, *supra* note 13, at 2; Albert W. Alschuler, *Courtroom Misconduct by Prosecutors and Trial Judges*, 50 TEX. L. REV. 629, 685 (1972) ("[J]udicial misconduct surely has an even more harmful effect on the attitudes of various constituencies toward our system of justice.").

[34] Berens & Shiffman, *supra* note 29 ("Privacy also robs the system of a deterrent effect: Concealing the punishment fails to discourage bad conduct by other judges, who may never learn of the consequences . . . .").

[35] Mireles v. Waco, 502 U.S. 9, 12–13 (1991) (per curiam) ("[T]his Court's precedents [have] acknowledge[d] that, generally, a judge is immune from a suit for money damages." *Id.* at 9.). "[G]enerally, with a few exceptions, absolute immunity claims are for money damages, not for injunctive relief." Chemerinsky, *supra* note 1, at 476. However, Congress extended judicial immunity to both injunctive and declaratory relief in its 1996 amendments to 42 U.S.C. § 1983. *See* Federal Courts Improvement Act of 1996, Pub. L. No. 104-317, § 309(c), 110 Stat. 3847, 3853 (codified at 42 U.S.C. § 1983) ("[I]n any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.").

[36] 414 U.S. 488 (1974); *id.* at 503.

[37] 424 U.S. 409 (1976); *id.* at 429 ("This Court has never suggested that the policy considerations which compel civil immunity for certain governmental officials also place them beyond the reach of the criminal law. Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful deprivations of constitutional rights on the strength of 18 U.S.C. § 242, the criminal analog of § 1983." (footnote omitted) (citing *O'Shea*, 414 U.S. at 503)).

[38] 449 U.S. 24 (1980); *id.* at 31 ("[J]udicial immunity was not designed to insulate the judiciary from all aspects of public accountability. Judges are immune from § 1983 damages actions, but they are subject to criminal prosecutions as are other citizens." (citing *O'Shea*, 414 U.S. at 503)).

[39] Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 351 (1872).

two conditions, a judge cannot be civilly liable — even if the judge acts maliciously or corruptly.[40]

"[C]lear absence of all jurisdiction" is a very high bar to meet. In *Bradley v. Fisher*,[41] the Supreme Court distinguished between a judge acting "in excess of their jurisdiction" and a judge acting in "the clear absence of all jurisdiction over the subject-matter."[42] Whereas the latter could be held liable for damages, even if they did not act maliciously or corruptly, the former, by merely exceeding their jurisdiction, could not be held liable for damages.[43] The challenge of finding that a judge acted in clear absence of their jurisdiction was on full display in *Stump v. Sparkman*.[44] In *Stump*, Ora Spitler McFarlin asked Judge Stump, a county judge in Indiana, to approve the surgical sterilization of her fifteen-year-old daughter, Linda Sparkman, because she claimed Sparkman had been staying overnight with men and was not very bright.[45] Judge Stump signed the order to sterilize Sparkman, despite having no authority under Indiana law to do so,[46] and Sparkman was told she was having an appendectomy.[47] When Sparkman discovered the truth two years later, she sued Judge Stump for damages.[48] The Supreme Court held that Sparkman's claims were barred by judicial immunity because although Judge Stump had no authority to order her sterilization, he did have authority to sterilize other people, who were incarcerated.[49] Thus, Judge Stump did not act in "clear absence of all jurisdiction."[50]

What constitutes a "judicial act" is similarly, perhaps surprisingly, expansive. In *Stump*, the Supreme Court concluded that Judge Stump's approval of the sterilization petition was a judicial act, because, even though he could not have validly approved the petition, "[s]tate judges with general jurisdiction not infrequently are called upon in their official capacity to approve petitions relating to the affairs of minors,"[51] and at the time he approved the petition, Judge Stump was "acting as a county circuit court judge."[52] Even a somewhat tenuous relationship to the kinds of acts judges perform seems to suffice for purposes of finding a judicial act. For example, in *Mireles v. Waco*,[53] public defender Howard

---

[40] *Id.* at 354.
[41] 80 U.S. (13 Wall.) 335.
[42] *Id.* at 351.
[43] *Id.* at 351–53.
[44] 435 U.S. 349 (1978).
[45] *Id.* at 351.
[46] *Id.* at 357.
[47] *Id.* at 353.
[48] *Id.*
[49] *See id.* at 358.
[50] *Id.* at 357 (quoting Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 351 (1872)).
[51] *Id.* at 362.
[52] *Id.* at 360.
[53] 502 U.S. 9 (1991) (per curiam).

*HARVARD LAW REVIEW*           [Vol. 136:1456

Waco sued Judge Mireles, a state court judge in California, for instructing police officers to bring Waco into court "forcibly and with excessive force."[54]  The Court found that this was a judicial act, triggering judicial immunity, because "[a] judge's direction to court officers to bring a person who is in the courthouse before him is a function normally performed by a judge."[55]  This is despite the fact that, as the Court acknowledged, "a judge's direction to police officers to carry out a judicial order with *excessive force* is not a 'function normally performed by a judge.'"[56]

There are some limits on what judicial immunity covers.  An example of a judge acting in "clear absence of all jurisdiction" would be something like a probate court judge trying and sentencing a party for a criminal offense.[57]  Meanwhile, some examples of nonjudicial acts include administrative tasks, such as hiring and firing of employees, which are not subject to the protections of absolute immunity.[58]  Similarly, at least one federal court of appeals has held that when a judge sexually assaulted, stalked, and harassed two women working in his chambers, the judge did not enjoy the protections of absolute immunity because those are not "judicial acts."[59]  Nonetheless, despite these limits on the reach of judicial acts, the definition of "judicial act" for purposes of applying judicial immunity remains quite broad.[60]

## B. *Whom Judicial Immunity Covers*

Of course, state and Article III federal judges are covered by judicial immunity.[61]  Other actors are covered by judicial immunity as well,[62] such as immigration judges[63] and administrative law judges.[64]  But

---

[54]  *Id.* at 10 (quoting Petition for Writ of Certiorari app. at B-3, ¶ 7(a), *Mireles* (No. 91-311)).

[55]  *Id.* at 12.

[56]  *Id.* (emphasis added) (quoting *Stump*, 435 U.S. at 362).

[57]  Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 351–52 (1872).

[58]  *See, e.g.*, Forrester v. White, 484 U.S. 219, 229 (1988).

[59]  Archie v. Lanier, 95 F.3d 438, 441 (6th Cir. 1996) ("We hold that stalking and sexually assaulting a person, no matter the circumstances, do not constitute 'judicial acts.'  The fact that, regrettably, Lanier happened to be a judge when he committed these reprehensible acts is not relevant to the question of whether he is entitled to immunity.  Clearly he is not.").

[60]  *See* Ann Bowe, Note, Stump v. Sparkman, *98 S. Ct. 1099 (1978)*, 62 MARQ. L. REV. 112, 119–20 (1978) ("[T]o determine whether the act of a judge is a 'judicial' one, . . . it is clear that broad and generous analysis will be used to determine if a judge's act is 'judicial' to the point where it merits absolute immunity.").

[61]  *See generally Stump*, 435 U.S. 349.

[62]  *See* Margaret Z. Johns, *A Black Robe Is Not a Big Tent: The Improper Expansion of Absolute Judicial Immunity to Non-judges in Civil-Rights Cases*, 59 SMU L. REV. 265, 274 (2006).

[63]  *See generally* Jacqueline Stevens et al., *The Case Against Absolute Judicial Immunity for Immigration Judges*, 37 LAW & INEQ. 309 (2019); Stevens v. Osuna, 877 F.3d 1293, 1304 (11th Cir. 2017) ("[W]e are persuaded that Immigration Judges are judges entitled to absolute immunity for their judicial acts . . . .").

[64]  Butz v. Economou, 438 U.S. 478, 512–13 (1978) ("We think that adjudication within a federal administrative agency shares enough of the characteristics of the judicial process that those who participate in such adjudication should also be immune from suits for damages.").

ultimately, judicial immunity covers functions, not specific individuals (although judges are probably most likely to engage in adjudicatory functions). This means that a medical licensing board may have judicial immunity when making particular decisions about people's medical licenses;[65] a mayor may have judicial immunity when suspending a restaurant's liquor license;[66] or a local board may have judicial immunity when issuing permits since the action is adjudicatory in nature.[67] The expansiveness of judicial immunity's application has been subject to considerable scholarly critique.[68]

### C. Gaps in Accountability and Relief

The exceptions to judicial immunity leave a great deal of misconduct beyond civil redress. What if a judge ordered the excessive imprisonment of a mother, leading to her children ending up in foster care and being abused?[69] Or abusively charged a party with contempt while there was no transcript of the proceedings?[70] Or ordered the permanent sterilization of a party?[71] Or operated, in effect, a debtors' prison?[72] For some of these examples, perhaps an argument could be made that appeal would solve the litigants' issues and correct the harm inflicted by the judges. But sometimes, if the consequences of the judge's actions cannot be taken back, appeal is simply insufficient and, as Justice Harlan put it in another context, "it is damages or nothing."[73] In other circumstances, appeal is not a viable course of action at all: nonparties, after all, have no right of appeal.[74] And, given the trust placed in judicial tribunals to dispense justice, one might consider harms that accrue from the abuse of judicial authority to be even more significant than those from private violence.[75]

---

[65] See, e.g., Olsen v. Idaho State Bd. of Med., 363 F.3d 916, 919 (9th Cir. 2004).

[66] See, e.g., Killinger v. Johnson, 389 F.3d 765, 767 (7th Cir. 2004).

[67] See, e.g., Dotzel v. Ashbridge, 438 F.3d 320, 322 (3d Cir. 2006).

[68] See generally Johns, supra note 62; Stevens et al., supra note 63; David M. Coriell, Note, The Transferred Immunity Trap: Misapplication of Section 1983 Immunities, 100 CORNELL L. REV. 985 (2015); W. Monroe Bonnheim, Note, Immunity and Justice for All: Has the Second Circuit Overextended the Doctrine of Absolute Immunity by Applying It to Arbitration Witnesses?, 2009 J. DISP. RESOL. 213.

[69] See Berens & Shiffman, supra note 18.

[70] See Berens & Shiffman, supra note 29.

[71] See generally Stump v. Sparkman, 435 U.S. 349 (1978).

[72] See Mahoney v. Derrick, No. CV-21-185, 2022 WL 404182, at *2 (Ark. 2022).

[73] Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 410 (1971) (Harlan, J., concurring in the judgment) ("For people in Bivens' shoes, it is damages or nothing.").

[74] See How Courts Work: Appeals, AM. BAR ASS'N (Nov. 28, 2021), https://www.americanbar.org/groups/public_education/resources/law_related_education_network/how_courts_work/appeals [https://perma.cc/7CGE-6ZVV] ("In a civil case, either party may appeal to a higher court. In a criminal case, only the defendant has a right to an appeal in most states.").

[75] See supra pp. 1457–58.

*HARVARD LAW REVIEW* [Vol. 136:1456

## III. Historical Justifications for Judicial Immunity

The historical justification for judicial immunity can be traced to the case of *Floyd v. Barker*,[76] a 1607 English case written by Lord Coke. In *Floyd*, Lord Coke held that a judge handling a murder trial could not be prosecuted in another court for criminal conspiracy; rather, any disciplinary measures had to be taken without resort to criminal prosecution.[77] This, in turn, had the effect of "establish[ing] the immunity of judges of courts of record, thus ensuring the independence of those courts from review by their newer rivals, especially the Star Chamber, which were under the control of the king."[78] Judicial immunity was thus, as the Supreme Court declared in *Bradley*, "the settled doctrine of the English courts for many centuries."[79] Apparently consistent with this proclamation, judicial immunity had "never been denied . . . in the courts of [the United States]."[80]

Upon closer examination, however, the historical record provides an ill-fitting justification for judicial immunity on both of these points. First, whereas *Floyd v. Barker* established judicial immunity to ensure judicial independence from the power of the crown, modern judicial immunity usually shields judges from the suits of ordinary people, rendering the comparison inapposite.[81] And, although "English decisions have consistently held judges absolutely immune from liability for their judicial acts," "even this broad immunity applied only to judges of superior courts";[82] in contrast, "justices of the peace, acting within their authority, were liable to civil suit if they acted maliciously."[83] This discrepancy is explained by the availability of alternative remedies and in particular the availability of appellate review: whereas the decisions of justices of the peace were almost never appealable, because "few justice [of the peace] courts [were] courts of record,"[84] superior courts, on the other hand, could be — and would often be — subjected to appellate review.[85] In other words, whereas decisions of judges of superior courts

---

[76] (1607) 77 Eng. Rep. 1305; 12 Co. Rep. 23 (Star Chamber); *see* Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 347–48 (1872).

[77] *Floyd*, 77 Eng. Rep. at 1307; 12 Co. Rep. at 25.

[78] J. Randolph Block, Stump v. Sparkman *and the History of Judicial Immunity*, 1980 DUKE L.J. 879, 885–86.

[79] *Bradley*, 80 U.S. (13 Wall.) at 347.

[80] *Id.*

[81] *See* David R. Cohen, Note, *Judicial Malpractice Insurance? The Judiciary Responds to the Loss of Absolute Judicial Immunity*, 41 CASE W. RSRV. L. REV. 267, 269 (1990) (stating that without judicial immunity, "fear of reprisal would undermine judicial independence from the interests of litigants").

[82] Peter J. Gregora, Note, *Liability of Judicial Officers Under Section 1983*, 79 YALE L.J. 322, 325 (1969).

[83] *Id.*

[84] Chester H. Smith, *The Justice of the Peace System in the United States*, 15 CALIF. L. REV. 118, 125 (1927).

[85] Block, *supra* note 78, at 885–86.

could be more easily appealed and relief could be obtained through appeal, the same was not true for decisions of justices of the peace, necessitating some exposure to civil liability.  Moreover, judicial immunity in *Floyd* shielded judges from *criminal* actions, not civil actions;[86] thus, the immunity's importation into the civil context at the time of *Bradley* went unexplained.

Next, it is unclear that judicial immunity was as well established in the United States as posited in *Bradley*.  Three years before *Bradley*, the Supreme Court in *Randall v. Brigham*[87] even seemed to contemplate suits against judges, ruling that judges of general jurisdiction were not civilly liable for judicial acts, even when they exceeded their jurisdiction, "unless perhaps when the acts, in excess of jurisdiction, are done maliciously or corruptly."[88]  As one scholar has put it, given "the historical development of the rules of judicial immunity as applied to justices of the peace and other inferior officers of justice, . . . these words of qualification are not surprising."[89]  In the same vein, another scholar has suggested that in 1871, at the time *Bradley* was heard, there was "substantial variation about judicial immunity from state to state."[90]  Indeed, while "thirteen states followed the rule of absolute immunity," "six states had ruled that judges [were] not immune if they act[ed] maliciously," consistent with the rule the Court articulated in *Randall*.[91]  Meanwhile, "nine states had considered the issue of immunity but had not ruled definitively on it," and "nine other states had not considered the issue."[92]  So in reality, far from being settled, judicial immunity in some states was not absolute at all.

In modern times, 42 U.S.C. § 1983 is "the major enforcer of individual federal constitutional rights," with one scholar dubbing it "the most important civil statute in American law."[93]  And yet, as previously discussed,[94] suits against judges under 42 U.S.C. § 1983 are barred by absolute immunity.[95]  In *Pierson v. Ray*,[96] fifteen white and Black clergymen attempted to use segregated facilities at a bus terminal in Mississippi in 1961.[97]  They were arrested and charged with a

---

[86] Floyd v. Barker (1607) 77 Eng. Rep. 1305, 1307; 12 Co. Rep. 23, 25 (Star Chamber).

[87] 74 U.S. (7 Wall.) 523 (1869).

[88] *Id.* at 536.

[89] Block, *supra* note 78, at 900.

[90] Shaman, *supra* note 5, at 2–3.

[91] *Id.* at 3.

[92] *Id.*

[93] Martin A. Schwartz, *Constitutional Litigation Under Section 1983 and the* Bivens *Doctrine in the October 2008 Term*, 26 TOURO L. REV. 531, 531 (2010).

[94] *See supra* Part II, pp. 1460–63.

[95] *See* Pierson v. Ray, 386 U.S. 547, 554–55 (1967) ("The immunity of judges for acts within the judicial role is . . . well established, and we presume that Congress would have specifically so provided had it wished to abolish the doctrine.").

[96] 386 U.S. 547.

[97] *Id.* at 549.

*HARVARD LAW REVIEW* [Vol. 136:1456

misdemeanor and, after waiving their right to a jury trial, convicted by Judge Spencer, a municipal police justice.[98]  As relevant here, they then brought a civil action against Judge Spencer under 42 U.S.C. § 1983.[99] After the clergymen lost their jury trial, they appealed to the United States Court of Appeals for the Fifth Circuit, which held that Judge Spencer had judicial immunity from suit under 42 U.S.C. § 1983.[100]  The clergymen appealed, arguing in part that judicial immunity did not apply because "[j]udges are the essential cog in a system of sham justice, in the enforcement of segregation.  [Judge] Spencer and others like him are the very persons the 1871 Congress sought to make liable."[101]

The Supreme Court affirmed.[102]  The Court relied on the history of judicial immunity and congressional intent in reaching this decision.  It stated that "[f]ew doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction, as this Court recognized when it adopted the doctrine, in *Bradley v. Fisher*."[103]  It also rejected the argument that 42 U.S.C. § 1983 abolished judicial immunity, stating:

> We do not believe that this settled principle of law was abolished by § 1983 . . . .  The legislative record gives no clear indication that Congress meant to abolish wholesale all common-law immunities.  Accordingly, this Court held in *Tenney v. Brandhove*, 341 U.S. 367 (1951), that the immunity of legislators for acts within the legislative role was not abolished.  The immunity of judges for acts within the judicial role is equally well estab- lished, and we presume that Congress would have specifically so provided had it wished to abolish the doctrine.[104]

The Court thus rejected the idea that 42 U.S.C. § 1983 abrogated judicial immunity.  In dissent, Justice Douglas critiqued this "atomistic conception of intention"[105] and cited to statements by members of Congress contemplating civil liability of judges under the statute.[106]  In sum, *Pierson* takes for granted what was said in *Bradley* about judicial immunity generally, without considering that *Bradley* glossed over many competing views and without considering the history of and Congress's goals for 42 U.S.C. § 1983.[107]

---

[98] *Id.*

[99] *Id.* at 550.  The clergymen also brought suit against the police officers who arrested them, *id.*, and the Court engaged in a qualified immunity analysis, *id.* at 555–58.  However, this discussion is outside the scope of this Note, so it has been omitted.

[100] *Id.* at 550.

[101] Brief for the Petitioners, *Pierson* (Nos. 79 & 94), 1966 WL 100720, at *25.

[102] *Pierson*, 386 U.S. at 553 ("We find no difficulty in agreeing with the Court of Appeals that Judge Spencer is immune from liability for damages for his role in these convictions.").

[103] *Id.* at 553–54 (citing Bradley v. Fisher, 80 U.S. (13 Wall.) 335 (1872)).

[104] *Id.* at 554–55.

[105] *Id.* at 560 (Douglas, J., dissenting) (quoting LON L. FULLER, THE MORALITY OF LAW 84 (1964)).

[106] *Id.* at 559–62.

[107] *See id.* at 548–58 (majority opinion).

The Supreme Court explicitly stated that the history of 42 U.S.C. § 1983 and congressional intent in enacting it were the bases for ruling that judges are immune from suit under 42 U.S.C. § 1983.[108]  But, given that cases in the years following the Civil War did not clearly endorse the concept of judicial immunity, and that *Pierson* rests on shaky historical ground, this Note considers materials that courts have not: the history of 18 U.S.C. § 242 and 42 U.S.C. § 1983 together.  The following Parts explore legislative history surrounding early civil rights laws passed in the immediate wake of the Civil War.[109]

## IV. (LACK OF) IMMUNITY FROM PROSECUTION UNDER 18 U.S.C. § 242

To understand § 1983, it is necessary to first look to an earlier criminal statute — 18 U.S.C. § 242, which was enacted as section 2 of the Civil Rights Act of 1866.  In the immediate aftermath of the Civil War, the Civil Rights Act of 1866 affirmed to all citizens the equal protection of the laws.[110]  As relevant here, section 2 reads as follows:

> And be it further enacted, That any person who, under color of any law, statute, ordinance, regulation, or custom, shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act, or to different punishment, pains, or penalties on account of such person having at any time been held in a condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, or by reason of his color or race, than is prescribed for the punishment of white persons, shall be

---

[108] *See supra* p. 1466.

[109] The use of legislative history is not without its critiques.  *See, e.g.*, Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 568 (2005) ("Judicial investigation of legislative history has a tendency to become, to borrow Judge Leventhal's memorable phrase, an exercise in 'looking over a crowd and picking out your friends.'" (quoting Patricia M. Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme Court Term*, 68 IOWA L. REV. 195, 214 (1983))).  Nonetheless, as even some textualists recognize, legislative history can elucidate the ordinary public meaning of a statute.  *See, e.g.*, Bostock v. Clayton County, 140 S. Ct. 1731, 1750 (2020) ("[W]hile legislative history can never defeat unambiguous statutory text, historical sources can be useful for a different purpose: Because the law's ordinary meaning at the time of enactment usually governs, we must be sensitive to the possibility a statutory term that means one thing today or in one context might have meant something else at the time of its adoption or might mean something different in another context. . . . To ferret out such shifts in linguistic usage or subtle distinctions between literal and ordinary meaning, this Court has sometimes consulted the understandings of the law's drafters as some (not always conclusive) evidence.").  Moreover, the critique that consulting legislative history amounts to "looking over a crowd and picking out your friends" applies with equal force to the common law in some circumstances, including in this situation where there was a notable divide in state courts over judicial immunity in the mid-nineteenth century.  *See supra* p. 1465.

[110] Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27, 27 ("[C]itizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, . . . shall have the same right, in every State and Territory in the United States, . . . to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding.").

deemed guilty of a misdemeanor, and, on conviction, shall be punished by
fine not exceeding one thousand dollars, or imprisonment not exceeding one
year, or both, in the discretion of the court.[111]

Initially, President Andrew Johnson vetoed the Civil Rights Act of
1866.[112]  In his veto message, President Johnson expressed concern that
section 2 would cause "judges of the State courts who should render
judgments in antagonism with [section 2's] terms" to "be brought before
other tribunals and there subjected to fine and imprisonment for the
performance of the duties which such State laws might impose."[113]
President Johnson critiqued section 2 for "invad[ing] the judicial power
of the State" and argued that "adequate judicial remedies could be
adopted to secure the desired end . . . without assailing the independ-
ence of the judiciary, always essential to the preservation of individual
rights."[114]

When the Senate reconsidered the bill after it was vetoed, Senator
Lyman Trumbull, the sponsor of the bill, did not shy away from the
application of the bill to judges, stating instead: "I admit that a minis-
terial officer or a judge, if he acts corruptly or viciously in the execution
or under color of an illegal act, may be and *ought to be* punished; but
if he acted innocently the judge would not be punished."[115]  Senator
Trumbull went on to cite historical examples of judges facing criminal
consequences for their actions.[116]  He also stated:

> The assumption that State judges and other officials are not to be held re-
> sponsible for violations of United States laws, when done under color of
> State statutes or customs, is akin to the maxim of the English law that the
> King can do no wrong.  It places officials above the law.  It is the very
> doctrine out of which the [Civil War] was hatched.  Everything that was
> done by that wicked effort to overturn our Government was done under
> color of law. . . . Every judge who has held a court in the southern States
> for the last four years [from 1862 to 1866], and has tried and convicted of
> treason men guilty of no other offense than loyalty to the Union, acted under
> color of law.[117]

Members of the House of Representatives similarly embraced the
potential criminalization of judges' actions.  In minimizing President
Johnson's argument that section 2 "invade[d] the judicial power of the
State,"[118] Representative William Lawrence from Ohio argued that the
Supremacy Clause of the Constitution inherently "'invades the judicial

111 *Id.* § 2, 14 Stat. at 27.
112 *Historical Highlights: The Civil Rights Bill of 1866*, U.S. HOUSE OF REPRESENTATIVES:
HIST., ART & ARCHIVES, https://history.house.gov/Historical-Highlights/1851-1900/The-Civil-
Rights-Bill-of-1866/ [https://perma.cc/42SX-U45Q].
113 CONG. GLOBE, 39th Cong., 1st Sess. 1680 (1866).
114 *Id.*
115 *Id.* at 1758 (emphasis added).
116 *Id.* at 1759.
117 *Id.* at 1758.
118 *Id.* at 1680.

power of a State' whenever it undertakes to disregard the national Constitution."[119]  Moreover, Representative Lawrence went on to say:

> I answer it is better to invade the judicial power of the State than permit it to invade, strike down, and destroy the civil rights of citizens.  A judicial power perverted to such uses should be speedily invaded. . . . I concede that in ordinary times it might be well to await the slower forms of the civil law to reach the final decision of fundamental constitutional questions.  But we now employ military power to reach the same results, to secure civil rights.  If penal enactments enforced by civil tribunals, can reach the same result, this is better than the exercise of military power.[120]

Like Senator Trumbull, Representative Lawrence read a requirement of willfulness for a judge to be prosecuted under section 2; responding to the critique that errors of judgment would lead to judges being fined or imprisoned, he said: "[T]his is by no means [section 2's] purpose or its legal effect.  The universal rule of law is that there can be no crime unless there be willful wrong. . . . [I]f an officer shall intentionally deprive a citizen of a right, knowing him to be entitled to it, then he is guilty of a willful wrong which deserves punishment."[121]  After numerous conversations and remarks about judges being open to prosecution due to section 2, in April of 1866, the Senate and the House of Representatives overrode President Johnson's veto, passing the Civil Rights Act of 1866 into law.[122]  In the years since its passage, section 2 has been revised and amended and now appears in the U.S. Code as 18 U.S.C. § 242, though it largely retains the original text of section 2 of the Civil Rights Act of 1866.[123]

Under 18 U.S.C. § 242, it is a crime for a person acting under color of law to willfully deprive a person of a right or privilege protected by the Constitution or the laws of the United States.[124]  Consistent with the legislative history of the Civil Rights Act of 1866,[125] the Supreme Court has held that judges are not immune from 18 U.S.C. § 242, stating:

---

[119] *Id.* at 1836.

[120] *Id.* at 1837.

[121] *Id.*

[122] *See Senate Vote #94 in 1866 (39th Congress)*, GOVTRACK, https://www.govtrack.us/congress/votes/39-1/s94 [https://perma.cc/TC63-57UY]; *House Vote #154 in 1866 (39th Congress)*, GOVTRACK, https://www.govtrack.us/congress/votes/39-1/h154 [https://perma.cc/Z5QM-2KEN].

[123] *See* 18 U.S.C. § 242 ("Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both . . . .").  Notably, 18 U.S.C. § 242 also requires willfulness, which was discussed by both Senator Trumbull and Representative Lawrence, *see supra* pp. 1468–69, but was not in the original text of section 2 of the Civil Rights Act of 1866, *see supra* pp. 1467–68.

[124] 18 U.S.C. § 242.

[125] *See supra* pp. 1467–69.

*HARVARD LAW REVIEW* [Vol. 136:1456

> [W]e have never held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates the immunization of otherwise criminal deprivations of constitutional rights. On the contrary, the judicially fashioned doctrine of official immunity does not reach "so far as to immunize criminal conduct proscribed by an Act of Congress . . . ."[126]

To highlight the point: despite criminal prosecutions inevitably having an effect on judicial behavior, and despite the fact that judicial immunity from criminal and civil suit was well established since the days of *Floyd v. Barker*, the Supreme Court has held that judges lack immunity from prosecution for violating constitutional rights under 18 U.S.C. § 242 because Congress acted to proscribe criminal conduct by judges in the Civil Rights Act of 1866. This conclusion makes sense: after all, absolute judicial immunity was not universal in 1866,[127] so the framers of what became 18 U.S.C. § 242 would not have needed to insert a clear statement in the text of the statute; it was obvious that the statute would open judges up to prosecution.[128] Indeed, in the immediate aftermath of the Civil War, the prosecution of state judges for violating people's civil rights under a congressional statute was affirmed by the Supreme Court as a valid exercise of Congress's power.[129] And in any event, if there were any doubt remaining, the Supreme Court enshrined the lack of judicial immunity from criminal prosecution under 18 U.S.C. § 242 in *O'Shea v. Littleton*,[130] *Imbler v. Pachtman*,[131] and *Dennis v. Sparks*.[132]

This holding in the criminal context clashes with assumptions the Court made in *Pierson v. Ray* about the state of the common law and about Congress's intent to incorporate it in the context of civil liability for damages. The history of 18 U.S.C. § 242 reveals that in the criminal context, congressional legislation did enough to invert the assumption that judicial immunity applied; in contrast, the Court asserted in *Pierson* that "[f]ew doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction."[133] The Court also stated:

> We do not believe that this settled principle of law was abolished by § 1983 . . . . The legislative record gives no clear indication that Congress meant to abolish wholesale all common-law immunities. . . . The immunity of judges for acts within the judicial role is equally well established, and we

---

[126] O'Shea v. Littleton, 414 U.S. 488, 503 (1974) (omission in original) (citation omitted) (quoting Gravel v. United States, 408 U.S. 606, 627 (1972)).

[127] *See supra* p. 1465.

[128] *See supra* pp. 1467–69.

[129] *See, e.g., Ex parte* Virginia, 100 U.S. 339, 348 (1880) (permitting criminal prosecution of state judge where state judge excluded Black jurors from jury selection in violation of the Constitution).

[130] 414 U.S. 488, 503 (1974).

[131] 424 U.S. 409, 429 (1976).

[132] 449 U.S. 24, 31 (1980); *see also* United States v. Lanier, 520 U.S. 259, 269 (1997).

[133] Pierson v. Ray, 386 U.S. 547, 553–54 (1967).

presume that Congress would have specifically so provided had it wished to abolish the doctrine.[134]

Rather than reading 42 U.S.C. § 1983 to abrogate judicial immunity in the civil liability context the way that 18 U.S.C. § 242 did for criminal liability, the Court instead drew the opposite conclusion.

## V. PARALLELS WITH 42 U.S.C. § 1983

After the ratification of the Fourteenth Amendment in 1868, violence against Black people and their allies in the South remained rampant.[135] Although Amos Akerman, the Attorney General under President Ulysses S. Grant, "instructed federal legal officers to prosecute every reported violation of federal civil rights laws,"[136] "[a] gross insufficiency in personnel and funding impeded enforcement" of civil rights laws.[137] To "eliminate extralegal violence and protect the civil and political rights of four million freed slaves," Congress passed and President Grant signed into law the Ku Klux Klan Act of 1871.[138] The Ku Klux Klan Act of 1871 granted the President increased powers to act, authorizing the President to do whatever "he may deem necessary" to suppress violence,[139] including suspending the writ of habeas corpus.[140] It also permitted civil suits against individuals who deprived others of their civil rights. Section 1 of the Act, which is the origin of 42 U.S.C. § 1983, reads in relevant part:

> Be it enacted . . . [t]hat any person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress; such proceeding to be prosecuted in the several district or circuit courts of the United States, with and subject to the same rights of appeal, review upon error, and other remedies provided in like cases in such courts, under the provisions of the act of the ninth of April, eighteen hundred sixty-six, entitled "An act to protect all persons in the United States in their civil rights, and to furnish the means of their

---

[134] *Id.* at 554–55.

[135] *See Historical Highlights: The Ku Klux Klan Act of 1871*, U.S. HOUSE OF REPRESENTATIVES: HIST., ART & ARCHIVES, https://history.house.gov/Historical-Highlights/1851-1900/hh_1871_04_20_KKK_Act/ [https://perma.cc/JN56-NZ6C].

[136] Robert J. Kaczorowski, Essay, *Federal Enforcement of Civil Rights During the First Reconstruction*, 23 FORDHAM URB. L.J. 155, 159 (1995).

[137] *Id.* at 160.

[138] *Historical Highlights: The Ku Klux Klan Act of 1871*, *supra* note 135; *see also* Kaczorowski, *supra* note 136, at 159–60.

[139] Ku Klux Klan Act of 1871, ch. 22, § 3, 17 Stat. 13, 14.

[140] *Id.* § 4, 17 Stat. at 14–15.

*HARVARD LAW REVIEW* [Vol. 136:1456

vindication"; and the other remedial laws of the United States which are in their nature applicable in such cases.[141]

If the language of section 1 seems familiar, that is because Representative Samuel Shellabarger, the Congressman who sponsored the Ku Klux Klan Act of 1871, explicitly based it on the language used in the Civil Rights Act of 1866:

> The model for [section 1 of the Ku Klux Klan Act of 1871] will be found in the second section of the act of April 9, 1866, known as the "civil rights act." That section provides a criminal proceeding in identically the same case as this one provides a civil remedy for, except that the deprivation under color of State law must, under the civil rights act, have been on account of race, color, or former slavery. This section of this bill, on the same state of facts, not only provides a civil remedy for persons whose former condition may have been that of slaves, but also to all people where, under color of State law, they or any of them may be deprived of rights to which they are entitled under the Constitution by reason and virtue of their national citizenship.[142]

In other words, section 1 of the Ku Klux Klan Act of 1871 was meant to provide a civil remedy for constitutional violations where section 2 of the Civil Rights Act of 1866 focused on criminal penalties, and section 1 of the Ku Klux Klan Act of 1871 was meant to be *more expansive* in coverage of constitutional deprivations than section 2 of the Civil Rights Act of 1866, since it did not include a willfulness element.[143]

Perhaps it is unsurprising, then, that just like congressional debates about section 2 of the Civil Rights Act of 1866, congressional debates about section 1 of the Ku Klux Klan Act of 1871 contemplated the loss of judicial immunity, though they focused on liability in civil suits rather than exposure to criminal prosecution.[144]  Representative William Evans Arthur of Kentucky critiqued section 1 for "overrid[ing] the reserved powers of the States" and argued that "[h]itherto, in all the history of this country and of England, no judge or court has been held liable, civilly or criminally, for judicial acts . . . ."[145]  Though Representative Arthur acknowledged that "[w]illfulness and corruption" could "create[] a liability" for judges,[146] he criticized section 1 for going too far, stating:

> Under the provisions of this section every judge in the State court . . . will enter upon and pursue the call of official duty with the sword of Damocles suspended over him by a silken thread, and bent upon him the scowl of

---

[141] *Id.* § 1, 17 Stat. at 13 (citing Civil Rights Act of 1866, ch. 31, 14 Stat. 27).
[142] CONG. GLOBE, 42d Cong., 1st Sess. app. at 68 (1871).
[143] *See* Monroe v. Pape, 365 U.S. 167, 187 (1961) ("In the *Screws* case we dealt with a statute that imposed criminal penalties for acts 'wilfully' done. We construed that word in its setting to mean the doing of an act with 'a specific intent to deprive a person of a federal right.' We do not think that gloss should be placed on § [1983] which we have here. The word 'wilfully' does not appear in § [1983]." (citation omitted) (quoting Screws v. United States, 325 U.S. 91, 103 (1945)).
[144] *See supra* pp. 1468–69.
[145] CONG. GLOBE, 42d Cong., 1st Sess. 365 (1871).
[146] *Id.*

unbridled power, the forerunner of the impending wrath, which is gathering itself to burst upon its victim.[147]

Similarly, Representative Joseph Horace Lewis of Kentucky critiqued the Ku Klux Klan Act of 1871 for "put[ting] in jeopardy the officers of the States, though in the conscientious discharge of their duties," and singled out section 1 because "in certain cases, the judge of a State court, though acting under oath of office, is made liable to a suit in the Federal court and subject to damages for his decision against a suitor, however honest and conscientious that decision may be."[148]

Proponents of the Ku Klux Klan Act of 1871 similarly contemplated the role of judges in addressing — or failing to address — the violence perpetrated throughout the South by the Ku Klux Klan.  Representative Joseph Hayne Rainey submitted into the Congressional Record an article describing the murder of "one of the most inoffensive" people he knew, and even though "[t]he judge of [that] circuit [was] sitting on his bench" and the "machinery of justice [was] in working order," "[t]he courts of justice seem[ed] paralyzed" to address the murder because the victim was a Republican.[149]  Similarly, other representatives decried "the failure and complicity of the state courts in the terror of the post–Civil War South,"[150] with Representative David Perley Lowe of Kansas stating that the "records of the [state] tribunals are searched in vain for any evidence of effective redress [of federally secured rights]"[151] and Representative Aaron Fyfe Perry of Ohio declaring that "judges, having ears to hear, hear not."[152]

In April 1871, President Grant signed the Ku Klux Klan Act of 1871 into law.[153]  Since then, section 1 of the Act has been revised and amended and now appears in the U.S. Code as 42 U.S.C. § 1983, though it largely retains the original text.[154]

---

[147] *Id.* at 366.

[148] *Id.* at 385.

[149] *Id.* at 394.

[150] Recent Case, Freedom from Religion Found., Inc. v. Mack, *4 F.4th 306 (5th Cir. 2021)*, 135 HARV. L. REV. 1472, 1477 (2021).

[151] CONG. GLOBE, 42d Cong., 1st Sess. 374 (1871).

[152] *Id.* app. at 78.

[153] Ku Klux Klan Act of 1871, ch. 22, 17 Stat. 13.

[154] 42 U.S.C. § 1983 reads:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983.  The language about precluding injunctive relief against judicial officers was added when Congress extended judicial immunity to both injunctive and declaratory relief in its

Since the enactment of section 2 of the Civil Rights Act of 1866, the Supreme Court has consistently held that judges lack judicial immunity from prosecution and are exposed to criminal liability under the statute.[155]  In contrast, since the enactment of section 1 of the Ku Klux Klan Act of 1871, the Court has been, with minor exceptions,[156] quite consistent in its assertion that judges are not exposed to civil liability because of the shield of judicial immunity.[157]

But, as the history of both statutes reveals, the foundation is faulty for judicial immunity from suit under 42 U.S.C. § 1983.  In *Pierson*, the principal justification for judicial immunity was a historical one.[158]  That reasoning was erroneous in that it (1) failed to read the history correctly, (2) assumed that Congress wanted to incorporate that supposed history into 42 U.S.C. § 1983, and (3) ignored the legislative history of 42 U.S.C. § 1983, including its basis in 18 U.S.C. § 242.

The Court in *Pierson* misread the history of judicial immunity because the landscape of judicial immunity at the time of *Bradley v. Fisher*, the principal case *Pierson* relies upon for this assertion, was neither as uniform, nor as absolute, as the Supreme Court represented it to be.[159]

Next, the Court in *Pierson* erroneously assumed that Congress wanted to incorporate that supposed history.  Congress passed the Ku Klux Klan Act of 1871 in the aftermath of the Civil War, when violence against Black people and their allies was widespread.[160]  In congressional debates, the role of judges in maintaining lawlessness and preventing accountability was discussed explicitly.[161]  And, at the same time that federal criminal prosecutions for civil rights violations were plagued by resource constraints, Congress passed the Ku Klux Klan Act of 1871, which dramatically expanded the President's powers to address the crisis and also permitted civil suits for damages.[162]  Viewed as a whole, the history of the Ku Klux Klan Act of 1871's passage demonstrates that whatever the state of judicial immunity was prior to the Civil War, it did not survive after the enactment of the Act.

---

1996 amendments to 42 U.S.C. § 1983.  *See* Federal Courts Improvement Act of 1996, Pub. L. No. 104-317, § 309(c), 110 Stat. 3847, 3853 (codified at 42 U.S.C. § 1983).  Notably, the 1996 amendments did not modify § 1983 to similarly preclude recovery for damages.  *See id.*

[155] *See, e.g.*, O'Shea v. Littleton, 414 U.S. 488, 503 (1974).

[156] *See supra* p. 1462.

[157] *See supra* section II.A, pp. 1460–62.

[158] *See supra* p. 1466.

[159] *See supra* p. 1465 (discussing the Court's qualification in Randall v. Brigham, 74 U.S. (7 Wall.) 523 (1869), and variations in judicial immunity among different states).

[160] *See supra* p. 1471; *see also Southern Violence During Reconstruction*, PBS, https://www.pbs.org/wgbh/americanexperience/features/reconstruction-southern-violence-during-reconstruction [https://perma.cc/4W7L-TKMR].

[161] *See supra* p. 1473.

[162] *See supra* pp. 1471–72.

Finally, the Court failed to consider the legislative history of 42 U.S.C. § 1983, including its basis in 18 U.S.C. § 242. As the sponsor of the Ku Klux Klan Act of 1871 made clear, the text of 42 U.S.C. § 1983 was explicitly modeled on the text of 18 U.S.C. § 242.[163] Moreover, this provision for civil liability was intended to be even more expansive than 18 U.S.C. § 242, even omitting in 42 U.S.C. § 1983 the requirement in 18 U.S.C. § 242 that violations be willful.[164] And, just as members of Congress assumed that 18 U.S.C. § 242 would expose judges to criminal liability, a hypothesis that was later affirmed by the Supreme Court,[165] members of Congress debating the Ku Klux Klan Act of 1871 also assumed that 42 U.S.C. § 1983 would expose judges to civil liability.[166]

Ultimately, a rereading of the history of 42 U.S.C. § 1983, including its legislative history, and a comparison of 42 U.S.C. § 1983 to 18 U.S.C. § 242 reveal that the Court's decision in *Pierson* rests on erroneous foundations. There is consensus that after the Civil War, judicial immunity was eliminated in the criminal context under the Civil Rights Act of 1866. Given that the Ku Klux Klan Act of 1871 considered the Civil Rights Act of 1866 to the utmost degree when imposing civil liability for violations of people's constitutional rights, and given that the Ku Klux Klan Act of 1871 was meant to be even broader than the Civil Rights Act of 1866, 42 U.S.C. § 1983 should therefore be understood to also eliminate judicial immunity.

## Conclusion

Judicial immunity has landed in a place far from where it began. It provides an incredibly broad shield for judges who perform judicial acts that are not clearly beyond their jurisdiction. But, as a close examination of history shows, judicial immunity in its current form prevents judges from being held accountable, as measures for accountability outside of civil liability are often ineffectual at best or nonexistent at worst.

If the Supreme Court were to revisit the existence of judicial immunity, it should consider this history. Doing so would be a good first step in allowing for greater accountability for judges who misbehave. It would also help to provide relief to litigants who may not otherwise be able to receive it. And eliminating judicial immunity in this way would also provide much-needed deterrence for bad behavior, which is not adequately covered by current judicial oversight organizations. As Congress reevaluates other kinds of immunity doctrines such as qualified immunity,[167] and as American society discusses and evaluates other kinds of immunity doctrines for officials ranging from the President to

---

[163] *See supra* p. 1472.
[164] *See supra* p. 1472.
[165] *See supra* p. 1470.
[166] *See supra* pp. 1472–73.
[167] *See* George Floyd Justice in Policing Act of 2021, H.R. 1280, 117th Cong. § 102 (2021).

*HARVARD LAW REVIEW*

prosecutors to police officers,[168] those conversations should also include a doctrine that was created by judges for the benefit of judges, which has veered from its historical and policy-objective roots, and which, in combination with ineffectual oversight mechanisms, provides little to no meaningful deterrence for officials entrusted with dispute resolution.

---

[168] *See* sources cited *supra* notes 1–2.