No. 80-945
U.S.

# Harlow v. Fitzgerald

457 U.S. 800 (1982)
Decided Jun 24, 1982

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT.

No. 80-945.

Argued November 30, 1981. Decided June 24, 1982.

In respondent's civil damages action in Federal District Court based on his alleged unlawful discharge from employment in the Department of the Air Force, petitioners, White House aides to former President Nixon, were codefendants with him and were claimed to have participated in the same alleged conspiracy to violate respondent's constitutional and statutory rights as was involved in *Nixon v. Fitzgerald, ante*, p. 731. After extensive pretrial discovery, the District Court denied the motions of petitioners and the former President for summary judgment, holding, *inter alia*, that petitioners were not entitled to absolute immunity from suit. Independently of the former President, petitioners appealed the denial of their immunity defense, but the Court of Appeals dismissed the appeal.

## Held:

*Butz v. Economou*438 U. S. 478*Nixon v. Fitzgerald, ante Scheuer v. Rhodes*416 U. S. 232

2. Public policy does not require a blanket recognition of absolute immunity for Presidential aides. Cf. *Butz, supra*. Pp. 808-813.

(a) The rationale of *Gravel v. United States*, 408 U. S. 606 — which held the Speech and Debate Clause derivately applicable to the "legislative acts" of a Senator's aide that would have been privileged if performed by the Senator himself — does not mandate "derivative" absolute *801 immunity for the President's chief aides. Under the "functional" approach to immunity law, immunity protection extends no further than its justification warrants. Pp. 809-811.

(b) While absolute immunity might be justified for aides entrusted with discretionary authority in such sensitive areas as national security or foreign policy, a "special functions" rationale does not warrant a blanket recognition of absolute immunity for all Presidential aides in the performance of all their duties. To establish entitlement to absolute immunity, a Presidential aide first must show that the responsibilities of his office embraced a function so sensitive as to require a total shield from liability. He then must demonstrate that he was discharging the protected function when performing the act for which liability is asserted. Under the record in this case, neither petitioner has made the requisite showing for absolute immunity. However, the possibility that petitioners, on remand, can satisfy the proper standards is not foreclosed. Pp. 811-813.

3. Petitioners are entitled to application of the qualified immunity standard that permits the defeat of insubstantial claims without resort to trial. Pp. 813-820.

(a) The previously recognized "subjective" aspect of qualified or "good faith" immunity — whereby such immunity is not available if the official asserting the defense "took the action with the malicious intention to cause a deprivation of constitutional rights or other injury," *Wood v. Strickland*, 420 U. S. 308, 322 — frequently has proved incompatible with the principle that insubstantial claims should not proceed to trial. Henceforth, government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate "clearly established" statutory or constitutional rights of which a reasonable person would have known. Pp. 815-819.

(b) The case is remanded for the District Court's reconsideration of the question whether respondent's pretrial showings were insufficient to withstand petitioners' motion for summary judgment. Pp. 819-820.

## Vacated and remanded.

802 post post post *802

*Elliot L. Richardson* argued the cause for petitioners. With him on the briefs was *Glenn S. Gerstell*.

*John E. Nolan, Jr.*, argued the cause for respondent. With him on the brief were *Samuel T. Perkins* and *Arthur B. Spitzer*.

- *Louis Alan Clark* filed a brief for the Government Accountability Project of the Institute for Policy Studies as *amicus curiae* urging affirmance.

    Briefs of *amici curiae* were filed by *Solicitor General Lee* for the United States; by *Roger J. Marzulla* and *William H. Mellor III* for the Mountain States Legal Foundation; by *John C. Armor* and *H. Richard Mayberry* for the National Taxpayers Legal Fund, Inc.; and by *Thomas J. Madden* for Senator Orrin G. Hatch et al.

JUSTICE POWELL delivered the opinion of the Court.

The issue in this case is the scope of the immunity available to the senior aides and advisers of the President of the United States in a suit for damages based upon their official acts.

## I

In this suit for civil damages petitioners Bryce Harlow and Alexander Butterfield are alleged to have participated in a conspiracy to violate the constitutional and statutory rights of the respondent A. Ernest Fitzgerald. Respondent avers that petitioners entered the conspiracy in their capacities as senior White House aides to former President Richard M. Nixon. As the alleged conspiracy is the same as that involved in *Nixon v. Fitzgerald, ante*, p. 731, the facts need not be repeated in detail.

803 Respondent claims that Harlow joined the conspiracy in his role as the Presidential aide principally responsible for congressional relations.[1] At the conclusion of discovery the *803 supporting evidence remained inferential. As evidence of Harlow's conspiratorial activity respondent relies heavily on a series of conversations in which Harlow discussed Fitzgerald's dismissal with Air Force Secretary Robert Seamans.[2] The other evidence most supportive of Fitzgerald's claims consists of a recorded conversation in which the President later voiced a tentative recollection that Harlow was "all for canning" Fitzgerald.[3]

> [1] Harlow held this position from the beginning of the Nixon administration on January 20, 1969, through November 4, 1969. On the latter date he was designated as Counselor to the President, a position accorded Cabinet status. He served in that capacity until December 9, 1970, when he returned to private life. Harlow later resumed the duties of Counselor for 1974. Respondent appears to allege that Harlow

continued in a conspiracy against him throughout the various changes of official assignment.

2  The record reveals that Secretary Seamans called Harlow in May 1969 to inquire about likely congressional reaction to a draft reorganization plan that would cause Fitzgerald's dismissal. According to Seamans' testimony, "[w]e [the Air Force] didn't ask [Harlow] to pass judgment on the action itself. We just asked him what the impact would be in the relationship with the Congress." App. 153a, 164a-165a (deposition of Robert Seamans). Through an aide Harlow responded that "this was a very sensitive item on the Hill and that it would be [his] recommendation that [the Air Force] not proceed to make such a change at that time." *Id.*, at 152a. But the Air Force persisted. Seamans spoke to Harlow on at least one subsequent occasion during the spring of 1969. The record also establishes that Secretary Seamans called Harlow on November 4, 1969, shortly after the public announcement of Fitzgerald's impending dismissal, and again in December 1969. See *id.*, at 186a.

3  See *id.*, at 284a (transcript of a recorded conversation between Richard Nixon and Ronald Ziegler, February 26, 1973). In a conversation with the President on January 31, 1973, John Ehrlichman also recalled that Harlow had discussed the Fitzgerald case with the President. See *id.*, at 218a-221a (transcript of recorded conversation between Richard Nixon and John Ehrlichman, January 31, 1973). In the same conversation the President himself asserted that he had spoken to Harlow about the Fitzgerald matter, see *id.*, at 218a, but the parties continue to dispute whether Mr. Nixon — at the most relevant moments in the discussion — was confusing Fitzgerald's case with that of another dismissed employee. The President explicitly stated at one point that he previously had been confused. See *id.*, at 220a.

Disputing Fitzgerald's contentions, Harlow argues that exhaustive discovery has adduced no direct evidence of his in the period from July 1, 1973, through April 14, *804 volvement in any wrongful activity.[4] He avers that Secretary Seamans advised him that considerations of efficiency required Fitzgerald's removal by a reduction in force, despite anticipated adverse congressional reaction. Harlow asserts he had no reason to believe that a conspiracy existed. He contends that he took all his actions in good faith.[5]

4  See Defendants Memorandum of Points and Authorities in Support of Their Motion for Summary Judgment in Civ. No. 74-178 (DC), p. 7 (Feb. 12, 1980).

5  In support of his version of events Harlow relies particularly on the deposition testimony of Air Force Secretary Seamans, who stated that he regarded abolition of Fitzgerald's position as necessary "to improve the efficiency" of the Financial Management Office of the Air Force and that he never received any White House instruction regarding the Fitzgerald case. App. 159a-160a. Harlow also disputes the probative value of Richard Nixon's recorded remark that Harlow had supported Fitzgerald's firing. Harlow emphasizes the tentativeness of the President's statement. To the President's query whether Harlow was "all for canning [Fitzgerald], wasn't he?", White House Press Secretary Ronald Ziegler in fact gave a negative reply: "No, I think Bryce may have been the other way." *Id.*, at 284a. The President did not respond to Ziegler's comment.

Petitioner Butterfield also is alleged to have entered the conspiracy not later than May 1969. Employed as Deputy Assistant to the President and Deputy Chief of Staff to H. R. Haldeman,[6] Butterfield circulated a White House

memorandum in that month in which he claimed to have learned that Fitzgerald planned to "blow the whistle" on some "shoddy purchasing practices" by exposing these practices to public view.[7] Fitzgerald characterizes this memorandum as evidence *805 that Butterfield had commenced efforts to secure Fitzgerald's retaliatory dismissal. As evidence that Butterfield participated in the conspiracy to conceal his unlawful discharge and prevent his reemployment, Fitzgerald cites communications between Butterfield and Haldeman in December 1969 and January 1970. After the President had promised at a press conference to inquire into Fitzgerald's dismissal, Haldeman solicited Butterfield's recommendations. In a subsequent memorandum emphasizing the importance of "loyalty," Butterfield counseled against offering Fitzgerald another job in the administration at that time.[8]

> [6] The record establishes that Butterfield worked from an office immediately adjacent to the oval office. He had almost daily contact with the President until March 1973, when he left the White House to become Administrator of the Federal Aviation Administration.

> [7] *Id.*, at 274a. Butterfield reported that this information had been referred to the Federal Bureau of Investigation. In the memorandum Butterfield reported that he had received the information "by word of several mouths, but allegedly from a senior AFL-CIO official originally. . . . Evidently, Fitzgerald attended a recent meeting of the National Democratic Coalition and, while there, revealed his intentions to a labor representative who, fortunately for us, was unsympathetic." *Ibid.*

> [8] *Id.*, at 99a-100a, 180a-181a. This memorandum, quoted in *Nixon v. Fitzgerald, ante*, at 735-736, was not sent to the Defense Department.

For his part, Butterfield denies that he was involved in any decision concerning Fitzgerald's employment status until Haldeman sought his advice in December 1969 — more than a month after Fitzgerald's termination had been scheduled and announced publicly by the Air Force. Butterfield states that he never communicated his views about Fitzgerald to any official of the Defense Department. He argues generally that nearly eight years of discovery have failed to turn up any evidence that he caused injury to Fitzgerald.[9]

> [9] See Memorandum in Support of Summary Judgment, *supra*, at 26. The history of Fitzgerald's litigation is recounted in *Nixon v. Fitzgerald, ante*, p. 731. Butterfield was named as a defendant in the initial civil action filed by Fitzgerald in 1974. Harlow was named for the first time in respondent's second amended complaint of July 5, 1978.

Together with their codefendant Richard Nixon, petitioners Harlow and Butterfield moved for summary judgment on February 12, 1980. In denying the motion the District Court upheld the legal sufficiency of Fitzgerald's *Bivens* ( *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971)) claim under the First Amendment and his "inferred" statutory causes of action under 5 U. S. C. § 7211 (1976 ed., Supp. IV) and 18 U. S. C. § 1505.[10] The court *806 found that genuine issues of disputed fact remained for resolution at trial. It also ruled that petitioners were not entitled to absolute immunity. App. to Pet. for Cert. 1a-3a.

> [10] The first of these statutes, 5 U. S. C. § 7211 (1976 ed., Supp. IV), provides generally that "[t]he right of employees . . . to . . . furnish information to either House of Congress, or to a committee or Member thereof, may not be interfered with or denied." The second, 18 U. S. C. § 1505, is a criminal statute making it a crime to obstruct congressional testimony. Neither expressly creates a private right to sue for damages. Petitioners argue that the District Court erred in finding that a private cause

of action could be inferred under either statute, and that "special factors" present in the context of the federal employer-employee relationship preclude the recognition of respondent's *Bivens* action under the First Amendment. The legal sufficiency of respondent's asserted causes of action is not, however, a question that we view as properly presented for our decision in the present posture of this case. See n. 36, *infra*.

Independently of former President Nixon, petitioners invoked the collateral order doctrine and appealed the denial of their immunity defense to the Court of Appeals for the District of Columbia Circuit. The Court of Appeals dismissed the appeal without opinion. *Id.*, at 11a-12a. Never having determined the immunity available to the senior aides and advisers of the President of the United States, we granted certiorari. 452 U. S. 959 (1981).[11]

> [11] As in *Nixon v. Fitzgerald, ante*, p. 731, our jurisdiction has been challenged on the basis that the District Court's order denying petitioners' claim of absolute immunity was not an appealable final order and that the Court of Appeals' dismissal of petitioners' appeal establishes that this case was never "in" the Court of Appeals within the meaning of 28 U. S. C. § 1254. As the discussion in *Nixon* establishes our jurisdiction in this case as well, we need not consider those challenges in this opinion.

## II

As we reiterated today in *Nixon v. Fitzgerald, ante*, p. 731, our decisions consistently have held that government officials are entitled to some form of immunity from suits for damages. As recognized at common law, public officers require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability. *807

Our decisions have recognized immunity defenses of two kinds. For officials whose special functions or constitutional status requires complete protection from suit, we have recognized the defense of "absolute immunity." The absolute immunity of legislators, in their legislative functions, see, *e. g., Eastland v. United States Servicemen's Fund*, 421 U. S. 491 (1975), and of judges, in their judicial functions, see, *e. g., Stump v. Sparkman*, 435 U. S. 349 (1978), now is well settled. Our decisions also have extended absolute immunity to certain officials of the Executive Branch. These include prosecutors and similar officials, see *Butz v. Economou*, 438 U. S. 478, 508-512 (1978), executive officers engaged in adjudicative functions, *id.*, at 513-517, and the President of the United States, see *Nixon v. Fitzgerald, ante*, p. 731.

For executive officials in general, however, our cases make plain that qualified immunity represents the norm. In *Scheuer v. Rhodes*, 416 U. S. 232 (1974), we acknowledged that high officials require greater protection than those with less complex discretionary responsibilities. Nonetheless, we held that a governor and his aides could receive the requisite protection from qualified or good-faith immunity. *Id.*, at 247-248. In *Butz v. Economou, supra*, we extended the approach of *Scheuer* to high federal officials of the Executive Branch. Discussing in detail the considerations that also had underlain our decision in *Scheuer*, we explained that the recognition of a qualified immunity defense for high executives reflected an attempt to balance competing values: not only the importance of a damages remedy to protect the rights of citizens, 438 U. S., at 504-505, but also "the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Id.*, at 506. Without discounting the adverse consequences of denying high officials an absolute immunity from private lawsuits alleging constitutional violations — consequences found sufficient in *Spalding* v.

808 *Vilas,* 161 U. S. 483 (1896), and *Barr v. Matteo,* 360 U. S. 564 *808 (1959), to warrant extension to such officials of absolute immunity from suits at common law — we emphasized our expectation that insubstantial suits need not proceed to trial:

> "Insubstantial lawsuits can be quickly terminated by federal courts alert to the possibilities of artful pleading. Unless the complaint states a compensable claim for relief . . ., it should not survive a motion to dismiss. Moreover, the Court recognized in *Scheuer* that damages suits concerning constitutional violations need not proceed to trial, but can be terminated on a properly supported motion for summary judgment based on the defense of immunity. . . . In responding to such a motion, plaintiffs may not play dog in the manger; and firm application of the Federal Rules of Civil Procedure will ensure that federal officials are not harassed by frivolous lawsuits." 438 U. S., at 507-508 (citations omitted).

*Butz* continued to acknowledge that the special functions of some officials might require absolute immunity. But the Court held that "federal officials who seek absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope." *Id.,* at 506. This we reaffirmed today in *Nixon v. Fitzgerald, ante,* at 747.

## III A

Petitioners argue that they are entitled to a blanket protection of absolute immunity as an incident of their offices as Presidential aides. In deciding this claim we do not write on an empty page. In *Butz v. Economou, supra,* the Secretary of Agriculture — a Cabinet official directly accountable to the President — asserted a defense of absolute official immunity from suit for civil damages. We rejected his claim. In so doing we did not question the power or the importance of the Secretary's office.

809 Nor did we doubt the importance to the *809 President of loyal and efficient subordinates in executing his duties of office. Yet we found these factors, alone, to be insufficient to justify absolute immunity. "[T]he greater power of [high] officials," we reasoned, "affords a greater potential for a regime of lawless conduct." 438 U. S., at 506. Damages actions against high officials were therefore "an important means of vindicating constitutional guarantees." *Ibid.* Moreover, we concluded that it would be "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under [42 U. S. C.] § 1983 and suits brought directly under the Constitution against federal officials." *Id.,* at 504.

Having decided in *Butz* that Members of the Cabinet ordinarily enjoy only qualified immunity from suit, we conclude today that it would be equally untenable to hold absolute immunity an incident of the office of every Presidential subordinate based in the White House. Members of the Cabinet are direct subordinates of the President, frequently with greater responsibilities, both to the President and to the Nation, than White House staff. The considerations that supported our decision in *Butz* apply with equal force to this case. It is no disparagement of the offices held by petitioners to hold that Presidential aides, like Members of the Cabinet, generally are entitled only to a qualified immunity.

## B

In disputing the controlling authority of *Butz,* petitioners rely on the principles developed in *Gravel v. United States,* 408 U. S. 606 (1972).[12] In *Gravel* we endorsed the view that "it is literally 810 impossible . . . for Members of Congress to *810 perform their legislative tasks without the help of aides and assistants" and that "the day-to-day work of such aides is so critical to the Members' performance that they must be treated as the latter's alter egos. . . ." *Id.,* at 616-617. Having done so, we held the Speech and Debate Clause

derivatively applicable to the "legislative acts" of a Senator's aide that would have been privileged if performed by the Senator himself. *Id.*, at 621-622.

> [12] Petitioners also claim support from other cases that have followed *Gravel* in holding that congressional employees are derivatively entitled to the legislative immunity provided to United States Senators and Representatives under the Speech and Debate Clause. See *Eastland v. United States Servicemen's Fund*, 421 U. S. 491 (1975); *Doe v. McMillan*, 412 U. S. 306 (1973).

Petitioners contend that the rationale of *Gravel* mandates a similar "derivative" immunity for the chief aides of the President of the United States. Emphasizing that the President must delegate a large measure of authority to execute the duties of his office, they argue that recognition of derivative absolute immunity is made essential by all the considerations that support absolute immunity for the President himself.

Petitioners' argument is not without force. Ultimately, however, it sweeps too far. If the President's aides are derivatively immune because they are essential to the functioning of the Presidency, so should the Members of the Cabinet — Presidential subordinates some of whose essential roles are acknowledged by the Constitution itself[13] — be absolutely immune. Yet we implicitly rejected such derivative immunity in *Butz*.[14] Moreover, in general our cases have followed a "functional" approach to immunity law. We have recognized *811 that the judicial, prosecutorial, and legislative functions require absolute immunity. But this protection has extended no further than its justification would warrant. In *Gravel*, for example, we emphasized that Senators and their aides were absolutely immune only when performing "acts legislative in nature," and not when taking other acts even "in their official capacity." 408 U. S., at 625. See *Hutchinson v. Proxmire*, 443 U. S. 111, 125-133 (1979). Our cases involving judges[15] and prosecutors[16] have followed a similar line. The undifferentiated extension of absolute "derivative" immunity to the President's aides therefore could not be reconciled with the "functional" approach that has characterized the immunity decisions of this Court, indeed including *Gravel* itself.[17]

> [13] See U. S. Const., Art. II, § 2 ("The President . . . may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices . . .").
>
> [14] THE CHIEF JUSTICE, *post*, at 828, argues that senior Presidential aides work "more intimately with the President on a daily basis than does a Cabinet officer," and that *Butz* therefore is not controlling. In recent years, however, such men as Henry Kissinger and James Schlesinger have served in both Presidential advisory and Cabinet positions. Kissinger held both posts simultaneously. In our view it is impossible to generalize about the role of "offices" in an individual President's administration without reference to the functions that particular officeholders are assigned by the President. *Butz v. Economou* cannot be distinguished on this basis.
>
> [15] "See, *e. g., Supreme Court of Virginia v. Consumers Union of United States*, 446 U. S. 719, 731-737 (1980); *Stump v. Sparkman*, 435 U. S. 349, 362 (1978).
>
> [16] In *Imbler v. Pachtman*, 424 U. S. 409, 430-431 (1976), this Court reserved the question whether absolute immunity would extend to "those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer." Since that time the Courts of Appeals generally have ruled that prosecutors do not enjoy absolute immunity for acts taken in those capacities. See, *e. g., Mancini v. Lester*, 630 F. 2d 990, 992 (CA3 1980); *Forsyth v. Kleindienst*, 599 F. 2d 1203,

1213-1214 (CA3 1979). This Court at least implicitly has drawn the same distinction in extending absolute immunity to executive officials when they are engaged in quasi-prosecutorial functions. See *Butz v. Economou*, 438 U. S., at 515-517.

[17] Our decision today in *Nixon v. Fitzgerald, ante*, p. 731, in no way abrogates this general rule. As we explained in that opinion, the recognition of absolute immunity for all of a President's acts in office derives in principal part from factors unique to his constitutional responsibilities and station. Suits against other officials — including Presidential aides — generally do not invoke separation-of-powers considerations to the same extent as suits against the President himself.

## C

Petitioners also assert an entitlement to immunity based on the "special functions" of White House 812 aides. This form *812 of argument accords with the analytical approach of our cases. For aides entrusted with discretionary authority in such sensitive areas as national security or foreign policy, absolute immunity might well be justified to protect the unhesitating performance of functions vital to the national interest.[18] But a "special functions" rationale does not warrant a blanket recognition of absolute immunity for all Presidential aides in the performance of all their duties. This conclusion too follows from our decision in *Butz*, which establishes that an executive official's claim to absolute immunity must be justified by reference to the public interest in the special functions of his office, not the mere fact of high station.[19] *Butz* also identifies the location of the burden of proof. The burden of justifying absolute immunity rests on the official asserting the claim. 438 U. S., at 506. We have not of course had occasion to identify how a Presidential aide might carry this burden. But the general requisites are familiar in our cases. In 813 order to establish entitlement to absolute *813 immunity a Presidential aide first must show that the responsibilities of his office embraced a function so sensitive as to require a total shield from liability.[20] He then must demonstrate that he was discharging the protected function when performing the act for which liability is asserted.[21]

[18] Cf. *United States v. Nixon*, 418 U. S. 683, 710-711 (1974) ("[C]ourts have traditionally shown the utmost deference to Presidential responsibilities" for foreign policy and military affairs, and claims of privilege in this area would receive a higher degree of deference than invocations of "a President's generalized interest in confidentiality"); *Katz v. United States*, 389 U. S. 347, 364 (1967) (WHITE, J., concurring) ("We should not require the warrant procedure and the magistrate's judgment if the President of the United States *or his chief legal officer, the Attorney General*, has considered the requirements of national security and authorized electronic surveillance as reasonable") (emphasis added).

[19] *Gravel v. United States*, 408 U. S. 606 (1972), points to a similar conclusion. We fairly may assume that some aides are assigned to act as Presidential "alter egos," *id.*, at 616-617, in the exercise of functions for which absolute immunity is "essential for the conduct of the public business," *Butz, supra*, at 507. Cf. *Gravel, supra*, at 620 (derivative immunity extends only to acts within the "central role" of the Speech and Debate Clause in permitting free legislative speech and debate). By analogy to *Gravel*, a derivative claim to Presidential immunity would be strongest in such "central" Presidential domains as foreign policy and national security, in which the President could not discharge his singularly vital mandate without delegating functions nearly as sensitive as his own.

[20] Here as elsewhere the relevant judicial inquiries would encompass considerations of public policy, the importance of which should be confirmed either by reference to

the common law or, more likely, our constitutional heritage and structure. See *Nixon v. Fitzgerald, ante*, at 747-748.

21 The need for such an inquiry is implicit in *Butz v. Economou, supra*, at 508-517; see *Imbler v. Pachtman, supra*, at 430-431. Cases involving immunity under the Speech and Debate Clause have inquired explicitly into whether particular acts and activities qualified for the protection of the Clause. See, *e. g., Hutchinson v. Proxmire*, 443 U. S. 111 (1979); *Doe v. McMillan*, 412 U. S. 306 (1973); *Gravel v. United States, supra*.

Applying these standards to the claims advanced by petitioners Harlow and Butterfield, we cannot conclude on the record before us that either has shown that "public policy requires [for any of the functions of his office] an exemption of [absolute] scope." *Butz*, 438 U. S., at 506. Nor, assuming that petitioners did have functions for which absolute immunity would be warranted, could we now conclude that the acts charged in this lawsuit — if taken at all — would lie within the protected area. We do not, however, foreclose the possibility that petitioners, on remand, could satisfy the standards properly applicable to their claims.

## IV

Even if they cannot establish that their official functions require absolute immunity, petitioners assert that public policy at least mandates an application of the qualified immunity standard that would permit the defeat of insubstantial claims without resort to trial. We agree.

### A

The resolution of immunity questions inherently requires a balance between the evils inevitable in any available alternative. *814

In situations of abuse of office, an action for damages may offer the only realistic avenue for vindication of constitutional guarantees. *Butz v. Economou, supra*, at 506; see *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U. S., at 410 ("For people in Bivens' shoes, it is damages or nothing"). It is this recognition that has required the denial of absolute immunity to most public officers. At the same time, however, it cannot be disputed seriously that claims frequently run against the innocent as well as the guilty — at a cost not only to the defendant officials, but to society as a whole.[22] These social costs include the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office. Finally, there is the danger that fear of being sued will "dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties." *Gregoire v. Biddle*, 177 F. 2d 579, 581 (CA2 1949), cert. denied, 339 U. S. 949 (1950).

22 See generally Schuck, Suing Our Servants: The Court, Congress, and the Liability of Public Officials for Damages, 1980 S. Ct. Rev. 281, 324-327.

In identifying qualified immunity as the best attainable accommodation of competing values, in *Butz, supra*, at 507-508, as in *Scheuer*, 416 U. S., at 245-248, we relied on the assumption that this standard would permit "[i]nsubstantial lawsuits [to] be quickly terminated." 438 U. S., at 507-508; see *Hanrahan v. Hampton*, 446 U. S. 754, 765 (1980) (POWELL, J., concurring in part and dissenting in part).[23] Yet petitioners advance persuasive arguments that the dismissal of insubstantial lawsuits without trial — a factor presupposed in the balance of competing interests struck by *815 our prior cases — requires an adjustment of the "good faith" standard established by our decisions.

23 The importance of this consideration hardly needs emphasis. This Court has noted the risk imposed upon political officials who must defend their actions and motives before a jury. See *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U. S. 391, 405 (1979); *Tenney*

*v. Brandhove*, 341 U. S. 367, 377-378 (1951). As the Court observed in *Tenney*: "In times of political passion, dishonest or vindictive motives are readily attributed . . . and as readily believed." *Id.*, at 378.

## B

Qualified or "good faith" immunity is an affirmative defense that must be pleaded by a defendant official. *Gomez v. Toledo*, 446 U. S. 635 (1980).[24] Decisions of this Court have established that the "good faith" defense has both an "objective" and a "subjective" aspect. The objective element involves a presumptive knowledge of and respect for "basic, unquestioned constitutional rights." *Wood v. Strickland*, 420 U. S. 308, 322 (1975). The subjective component refers to "permissible intentions." *Ibid.* Characteristically the Court has defined these elements by identifying the circumstances in which qualified immunity would *not* be available. Referring both to the objective and subjective elements, we have held that qualified immunity would be defeated if an official "*knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], *or* if he took the action *with the malicious intention* to cause a deprivation of constitutional rights or other injury. . . ." *Ibid.* (emphasis added).[25]

> 24  Although *Gomez* presented the question in the context of an action under 42 U. S. C. § 1983, the Court's analysis indicates that "immunity" must also be pleaded as a defense in actions under the Constitution and laws of the United States. See 446 U. S., at 640. *Gomez* did not decide which party bore the burden of proof on the issue of good faith. *Id.*, at 642 (REHNQUIST, J., concurring).
>
> 25  In *Wood* the Court explicitly limited its holding to the circumstances in which a school board member, "in the specific context of school discipline," 420 U. S., at

322, would be stripped of claimed immunity in an action under § 1983. Subsequent cases, however, have quoted the *Wood* formulation as a general statement of the qualified immunity standard. See, *e. g., Procunier v. Navarette*, 434 U. S. 555, 562-563, 566 (1978), quoted in *Baker v. McCollan*, 443 U. S. 137, 139 (1979).

The subjective element of the good-faith defense frequently has proved incompatible with our admonition in *Butz* *816 that insubstantial claims should not proceed to trial. Rule 56 of the Federal Rules of Civil Procedure provides that disputed questions of fact ordinarily may not be decided on motions for summary judgment.[26] And an official's subjective good faith has been considered to be a question of fact that some courts have regarded as inherently requiring resolution by a jury.[27]

> 26  Rule 56(c) states that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In determining whether summary judgment is proper, a court ordinarily must look at the record in the light most favorable to the party opposing the motion, drawing all inferences most favorable to that party. *E. g., Poller v. Columbia Broadcasting System, Inc.*, 368 U. S. 464, 473 (1962).
>
> 27  *E. g., Landrum v. Moats*, 576 F. 2d 1320, 1329 (CA8 1978); *Duchesne v. Sugarman*, 566 F. 2d 817, 832-833 (CA2 1977); cf. *Hutchinson v. Proxmire*, 443 U. S., at 120, n. 9 (questioning whether the existence of "actual malice," as an issue of fact, may properly be decided on summary judgment in a suit alleging libel of a public figure).

In the context of *Butz*' attempted balancing of competing values, it now is clear that substantial costs attend the litigation of the subjective good faith of government officials. Not only are there the general costs of subjecting officials to the risks of trial — distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service. There are special costs to "subjective" inquiries of this kind. Immunity generally is available only to officials performing discretionary functions. In contrast with the thought processes accompanying "ministerial" tasks, the judgments surrounding discretionary action almost inevitably are influenced by the decisionmaker's experiences, values, and emotions. These variables explain in part why questions of subjective intent so rarely can be decided by summary judgment. Yet they also frame a background *817 in which there often is no clear end to the relevant evidence. Judicial inquiry into subjective motivation therefore may entail broad-ranging discovery and the deposing of numerous persons, including an official's professional colleagues.[28] Inquiries of this kind can be peculiarly disruptive of effective government.[29]

[28] In suits against a President's closest aides, discovery of this kind frequently could implicate separation-of-powers concerns. As the Court recognized in *United States v. Nixon*, 418 U. S., at 708: "A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately. These are the considerations justifying a presumptive privilege for Presidential communications. The privilege is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution."

[29] As Judge Gesell observed in his concurring opinion in *Halperin v. Kissinger*, 196 U. S. App. D. C. 285, 307, 606 F. 2d 1192, 1214 (1979), aff'd in pertinent part by an equally divided Court, 452 U. S. 713 (1981):

"We should not close our eyes to the fact that with increasing frequency in this jurisdiction and throughout the country plaintiffs are filing suits seeking damage awards against high government officials in their personal capacities based on alleged constitutional torts. Each such suit almost invariably results in these officials and their colleagues being subjected to extensive discovery into traditionally protected areas, such as their deliberations preparatory to the formulation of government policy and their intimate thought processes and communications at the presidential and cabinet levels. Such discover *[sic]* is wide-ranging, time-consuming, and not without considerable cost to the officials involved. It is not difficult for ingenious plaintiff's counsel to create a material issue of fact on some element of the immunity defense where subtle questions of constitutional law and a decisionmaker's mental processes are involved. A sentence from a casual document or a difference in recollection with regard to a particular policy conversation held long ago would usually, under the normal summary judgment standards, be sufficient [to force a trial]. . . . The effect of this development upon the willingness of individuals to serve their country is obvious."

Consistently with the balance at which we aimed in *Butz*, we conclude today that bare allegations of malice should not suffice to subject government officials either to the costs of *818 trial or to the burdens of broad-reaching discovery. We therefore hold that government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known. See *Procunier v. Navarette*, 434 U. S. 555, 565 (1978); *Wood v. Strickland*, 420 U. S., at 322.[30]

> [30] This case involves no issue concerning the elements of the immunity available to state officials sued for constitutional violations under 42 U. S. C. § 1983. We have found previously, however, that it would be "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." *Butz v. Economou*, 438 U. S., at 504.
>
> Our decision in no way diminishes the absolute immunity currently available to officials whose functions have been held to require a protection of this scope.

Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law,[31] should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred.[32] If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed. If the law was clearly established, the immunity defense ordinarily *819 should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors.

> [31] This case involves no claim that Congress has expressed its intent to impose "no fault" tort liability on high federal officials for violations of particular statutes or the Constitution.
>
> [32] As in Procunier v. *Navarette*, 434 U. S., at 565, we need not define here the circumstances under which "the state of the law" should be "evaluated by reference to the opinions of this Court, of the Courts of Appeals, or of the local District Court."

By defining the limits of qualified immunity essentially in objective terms, we provide no license to lawless conduct. The public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the objective legal reasonableness of an official's acts. Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action.[33] But where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken "with independence and without fear of consequences." *Pierson v. Ray*, 386 U. S. 547, 554 (1967).[34]

> [33] Cf. *Procunier v. Navarette, supra*, at 565, quoting *Wood v. Strickland*, 420 U. S., at 322 ("Because they could not reasonably have been expected to be aware of a constitutional right that had not yet been declared, petitioners did not act with such disregard for the established law that their conduct `cannot reasonably be characterized as being in good faith'").
>
> [34] We emphasize that our decision applies only to suits for civil *damages* arising from actions within the scope of an official's duties and in "objective" good faith. We

express no view as to the conditions in which injunctive or declaratory relief might be available.

## C

In this case petitioners have asked us to hold that the respondent's pretrial showings were insufficient to survive their motion for summary judgment.[35] We think it appropriate, *820 however, to remand the case to the District Court for its reconsideration of this issue in light of this opinion.[36] The trial court is more familiar with the record so far developed and also is better situated to make any such further findings as may be necessary.

---

[35] In *Butz*, we admonished that "insubstantial" suits against high public officials should not be allowed to proceed to trial. 438 U. S., at 507. See Schuck, *supra* n. 22, at 324-327. We reiterate this admonition. Insubstantial lawsuits undermine the effectiveness of government as contemplated by our constitutional structure, and "firm application of the Federal Rules of Civil Procedure" is fully warranted in such cases. 438 U. S., at 508.

[36] Petitioners also have urged us, prior to the remand, to rule on the legal sufficiency of respondent's "implied" causes of action under 5 U. S. C. § 7211 (1976 ed., Supp. IV) and 18 U. S. C. § 1505 and his *Bivens* claim under the First Amendment. We do not view petitioners' argument on the statutory question as insubstantial. Cf. *Merrill Lynch, Pierce, Fenner Smith, Inc. v. Curran*, 456 U. S. 353, 377-378 (1982) (controlling question in implication of statutory causes of action is whether Congress affirmatively intended to create a damages remedy); *Middlesex County Sewerage Auth. v. National Sea Clammers Assn.*, 453 U. S. 1 (1981) (same); *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U. S. 630, 638-639 (1981) (same). Nor is the *Bivens* question. Cf. *Bush v. Lucas*, 647 F. 2d 573, 576 (CA5 1981) (holding that the "unique relationship between the Federal Government and its civil service employees is a special consideration which counsels hesitation in inferring a *Bivens* remedy"). As in *Nixon v. Fitzgerald, ante*, p. 731, however, we took jurisdiction of the case only to resolve the immunity question under the collateral order doctrine. We therefore think it appropriate to leave these questions for fuller consideration by the District Court and, if necessary, by the Court of Appeals.

## V

The judgment of the Court of Appeals is vacated, and the case is remanded for further action consistent with this opinion.

*So ordered.*

---

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, concurring.

I agree with the substantive standard announced by the Court today, imposing liability when a public-official defendant *821 "knew or should have known" of the constitutionally violative effect of his actions. *Ante*, at 815, 819. This standard would not allow the official who *actually knows* that he was violating the law to escape liability for his actions, even if he could not "reasonably have been expected" to know what he actually did know. *Ante*, at 819, n. 33. Thus the clever and unusually well-informed violator of constitutional rights will not evade just punishment for his crimes. I also agree that this standard applies "across the board," to all "government officials performing discretionary functions." *Ante*, at 818. I write separately only to note that given this standard, it seems inescapable to me that some measure of discovery may sometimes be required to determine exactly what a public-official defendant did "know" at the time of his actions. In this respect the issue before us is very similar to that addressed in *Herbert v. Lando*, 441 U. S. 153 (1979), in which the Court observed

that "[t]o erect an impenetrable barrier to the plaintiff's use of such evidence on his side of the case is a matter of some substance, particularly when defendants themselves are prone to assert their goo[d f]aith. . . ." *Id.*, at 170. Of course, as the Court has already noted, *ante*, at 818-819, summary judgment will be readily available to public-official defendants whenever the state of the law was so ambiguous at the time of the alleged violation that it could not have been "known" then, and thus liability could not ensue. In my view, summary judgment will also be readily available whenever the plaintiff cannot prove, as a threshold matter, that a violation of his constitutional rights actually occurred. I see no reason why discovery of defendants' "knowledge" should not be deferred by the trial judge pending decision of any motion of defendants for summary judgment on grounds such as these. Cf. *Herbert v. Lando, supra*, at 180, n. 4 (POWELL, J., concurring).

JUSTICE BRENNAN, JUSTICE WHITE, JUSTICE MARSHALL, and JUSTICE BLACKMUN, concurring.

We join the Court's opinion but, having dissented 822 in *Nixon v. Fitzgerald, ante,* *822 p. 731, we disassociate ourselves from any implication in the Court's opinion in the present case that *Nixon v. Fitzgerald* was correctly decided.

JUSTICE REHNQUIST, concurring.

At such time as a majority of the Court is willing to reexamine our holding in *Butz v. Economou*, 438 U. S. 478 (1978), I shall join in that undertaking with alacrity. But until that time comes, I agree that the Court's opinion in this case properly disposes of the issues presented, and I therefore join it.

CHIEF JUSTICE BURGER, dissenting.

The Court today decides in *Nixon v. Fitzgerald, ante*, p. 731, what has been taken for granted for 190 years, that it is implicit in the Constitution that a President of the United States has absolute immunity from civil suits arising out of official acts as Chief Executive. I agree fully that absolute immunity for official acts of the President is, like executive privilege, "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *United States v. Nixon*, 418 U. S. 683, 708 (1974).[1]

[1] As I noted in *Nixon v. Fitzgerald*, Presidential immunity for official acts while in office has never been seriously questioned until very recently. See *ante*, at 758, n. 1 (BURGER, C. J., concurring).

In this case the Court decides that senior aides of the President do not have derivative immunity from the President. I am at a loss, however, to reconcile this conclusion with our holding in *Gravel v. United States*, 408 U. S. 606 (1972). The Court reads *Butz v. Economou*, 438 U. S. 478 (1978), as resolving that question; I do not. *Butz* is 823 clearly distinguishable.[2] *823

[2] If indeed there is an irreconcilable conflict between *Gravel* and Butz, the Court has an obligation to try to harmonize its holdings — or at least tender a reasonable explanation. The Court has done neither.

In *Gravel* we held that it is implicit in the Constitution that aides of Members of Congress have absolute immunity for acts performed for Members in relation to their legislative function. We viewed the aides' immunity as deriving from the Speech or Debate Clause, which provides that "for any Speech or Debate *in either House*, [Senators and Representatives] shall not be questioned in any other Place." Art. I, § 6, cl. 1 (emphasis added). Read literally, the Clause would, of course, limit absolute immunity only to the Member and only to speech and debate within the Chamber. But we have read much more into

this plain language. The Clause says nothing about "legislative acts" outside the Chambers, but we concluded that the Constitution grants absolute immunity for legislative acts not only "in either House" but in committees and conferences and in reports on legislative activities.

Nor does the Clause mention immunity for congressional aides. Yet, going far beyond any words found in the Constitution itself, we held that a Member's aides who implement policies and decisions of the Member are entitled to the same absolute immunity as a Member. It is hardly an overstatement to say that we thus avoided a "literalistic approach," *Gravel, supra,* at 617, and instead looked to the structure of the Constitution and the evolution of the function of the Legislative Branch. In short, we drew this immunity for legislative aides from a functional analysis of the legislative process in the context of the Constitution taken as a whole and in light of 20th-century realities. Neither Presidents nor Members of Congress can, as they once did, perform all their constitutional duties personally.[3] *824

[3] A Senator's allotment for staff varies significantly, but can range from as few as 17 to over 70 persons, in addition to committee staff aides who perform important legislative functions for Members. S. Doc. No. 97-19, pp. 27-106 (1981). House Members have roughly 18 to 26 assistants at any one time, in addition to committee staff aides. H. R. Doc. No. 97-113, pp. 28-174 (1981).

We very properly recognized in *Gravel* that the central purpose of a Member's absolute immunity would be "diminished and frustrated" if the legislative aides were not also protected by the same broad immunity. Speaking for the Court in *Gravel*, JUSTICE WHITE agreed with the Court of Appeals that

"It is literally impossible, in view of the complexities of the modern legislative process, with Congress almost constantly in session and matters of legislative concern constantly proliferating, for Members of Congress to perform their legislative tasks *without the help of aides* and assistants; that the day-to-day work of such aides *is so critical to the Members' performance* that they must be treated as the latter's *alter egos;* and that if they are not so recognized, the central role of the Speech or Debate Clause — to prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary . . . — will inevitably be diminished and frustrated." 408 U. S., at 616-617 (emphasis added).

I joined in that analysis and continue to agree with it, for without absolute immunity for these "elbow aides," who are indeed "alter egos," a Member could not effectively discharge all of the assigned constitutional functions of a modern legislator.

The Court has made this reality a matter of our constitutional jurisprudence. How can we conceivably hold that a President of the United States, who represents a vastly larger constituency than does any Member of Congress, should not have "alter egos" with comparable immunity? To perform the constitutional duties assigned to the Executive would be "literally impossible, in view of the complexities of the modern [Executive] process, . . . without the help of *825 aides and assistants."[4] *Id.*, at 616. These words reflect the precise analysis of *Gravel*, and this analysis applies with at least as much force to a President. The primary layer of senior aides of a President — like a Senator's "alter egos" — are literally at a President's elbow, with offices a few feet or at most a few hundred feet from his own desk. The President, like a Member of Congress, may see those personal aides many times in one day. They are indeed the President's "arms" and "fingers" to aid in performing his constitutional duty to see

"that the laws [are] faithfully executed." Like a Member of Congress, but on a vastly greater scale, the President cannot personally implement a fraction of his own policies and day-to-day decisions.[5]

[4] In the early years of the Republic, Members of Congress and Presidents performed their duties without staffs of aides and assistants. Washington and Jefferson spent much of their time on their plantations. Congress did not even appropriate funds for a Presidential clerk until 1857. Lincoln opened his own mail, Cleveland answered the phone at the White House, and Wilson regularly typed his own speeches. S. Wayne, The Legislative Presidency 30 (1978). Whatever may have been the situation beginning under Washington, Adams, and Jefferson, we know today that the Presidency functions with a staff that exercises a wide spectrum of authority and discretion and directly assists the President in carrying out constitutional duties.

[5] JUSTICE WHITE'S dissent in *Nixon v. Fitzgerald* today expresses great concern that a President may "cause serious injury to any number of citizens even though he knows his conduct violates a statute. . . ." *Ante*, at 764. What the dissent wholly overlooks, however, is the plain fact that the absolute immunity does not protect a President for acts *outside* the constitutional function of a President.

For some inexplicable reason the Court declines to recognize the realities in the workings of the Office of a President, despite the Court's cogent recognition in *Gravel* concerning the realities of the workings of 20th-century Members of Congress. Absent equal protection for a President's aides, how will Presidents be free from the risks of "intimidation . . . by [Congress] and accountability before a possibly hostile *826 judiciary?" *Gravel*, 408 U. S., at 617. Under

826

today's holding in this case the functioning of the Presidency will inevitably be "diminished and frustrated." *Ibid.*

Precisely the same public policy considerations on which the Court now relies in *Nixon v. Fitzgerald*, and that we relied on only recently in *Gravel*, are fully applicable to senior Presidential aides. The Court's opinion in *Nixon v. Fitzgerald* correctly points out that if a President were subject to suit, awareness of personal vulnerability to suit "frequently could distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve." *Ante*, at 753. This same negative incentive will permeate the inner workings of the Office of the President if the Chief Executive's "alter egos" are not protected derivatively from the immunity of the President. In addition, exposure to civil liability for official acts will result in constant judicial questioning, through judicial proceedings and pretrial discovery, into the inner workings of the Presidential Office beyond that necessary to maintain the traditional checks and balances of our constitutional structure.[6]

[6] The same remedies for checks on Presidential abuse also will check abuses by the comparatively small group of senior aides who act as "alter egos" of the President. The aides serve at the pleasure of the President and thus may be removed by the President. Congressional and public scrutiny maintain a constant and pervasive check on abuses, and such aides may be prosecuted criminally. See *Nixon, ante*, at 757. However, a criminal prosecution cannot be commenced absent careful consideration by a grand jury at the request of a prosecutor; the same check is not present with respect to the commencement of civil suits in which advocates are subject to no realistic accountability.

I challenge the Court and the dissenters in *Nixon v. Fitzgerald* who join in the instant holding to say that the effectiveness of Presidential aides will not "inevitably be diminished and frustrated," *Gravel, supra*, at 617, if they must weigh every act and decision in relation to the risks of future *827 lawsuits. The *Gravel* Court took note of the burdens on congressional aides: the stress of long hours, heavy responsibilities, constant exposure to harassment of the political arena. Is the Court suggesting the stresses are less for Presidential aides? By construing the Constitution to give only qualified immunity to senior Presidential aides we give those key "alter egos" only lawsuits, winnable lawsuits perhaps, but lawsuits nonetheless, with stress and effort that will disperse and drain their energies and their purses.[7]

> [7] The Executive Branch may as a matter of grace supply some legal assistance. The Department of Justice has a longstanding policy of representing federal officers in civil suits involving conduct performed within the scope of their employment. In addition, the Department provides for retention of private legal counsel when necessary. See Senate Subcommittee on Administrative Practice and Procedure of the Committee on the Judiciary, Justice Department Retention of Private Legal Counsel to Represent Federal Employees in Civil Lawsuits, 95th Cong., 2d Sess. (Comm. Print 1978). The Congress frequently pays the expenses of defending its Members even as to acts wholly outside the legislative function.

In this Court we witness the new filing of as many as 100 cases a week, many utterly frivolous and even bizarre. Yet the defending party in many of these cases may have spent or become liable for thousands of dollars in litigation expense. Hundreds of thousands of other cases are disposed of without reaching this Court. When we see the myriad irresponsible and frivolous cases regularly filed in American courts, the magnitude of the potential risks attending acceptance of public office emerges. Those potential risks inevitably will be a factor in discouraging able men and women from entering public service.

We — judges collectively — have held that the common law provides us with absolute immunity for ourselves with respect to judicial acts, however erroneous or ill-advised. See, *e. g.*, *Stump v. Sparkman*, 435 U. S. 349 (1978). Are the lowest ranking of 27,000 or more judges, thousands of prosecutors, and thousands of congressional aides — an aggregate *828 of not less than 75,000 in all — entitled to greater protection than two senior aides of a President?

*Butz v. Economou*, 438 U. S. 478 (1978), does not dictate that senior Presidential aides be given only qualified immunity. *Butz* held only that a Cabinet officer exercising discretion was not entitled to absolute immunity; we need not abandon that holding. A senior Presidential aide works more intimately with the President on a daily basis than does a Cabinet officer, directly implementing Presidential decisions literally from hour to hour.

In his dissent today in *Nixon v. Fitzgerald*, JUSTICE WHITE states that the "Court now applies the dissenting view in *Butz* to the Office of the President." *Ante*, at 764. However, this suggests that a President and his Cabinet officers, who serve only "during the pleasure of the President," are on the same plane constitutionally. It wholly fails to distinguish the role of a President or his "elbow aides" from the role of Cabinet officers, who are department heads rather than "alter egos." It would be in no sense inconsistent to hold that a President's personal aides have greater immunity than Cabinet officers.

The Court's analysis in *Gravel* demonstrates that the question of derivative immunity does not and should not depend on a person's rank or position in the hierarchy, but on the *function* performed by the person and the relationship of that person to the superior. Cabinet officers clearly outrank United States Attorneys, yet qualified immunity is accorded the former and absolute immunity the

latter; rank is important only to the extent that the rank determines the function to be performed. The function of senior Presidential aides, as the "alter egos" of the President, is an integral, inseparable part of the function of the President.[8] JUSTICE WHITE *829 was clearly correct in *Gravel*, stating that Members of Congress could not "perform their legislative tasks without the help of aides and assistants; [and] that the day-to-day work of such aides is so critical to the Members' performance that they must be treated as the latter's alter egos. . . ." 408 U. S., at 616-617.

829

> [8] This Court had no trouble reconciling Gravel with *Kilbourn v. Thompson*, 103 U. S. 168 (1881). In *Kilbourn* the Sergeant-at-Arms of the House of Representatives was held not to share the absolute immunity enjoyed by the Members of Congress who ordered that officer to act.

By ignoring *Gravel* and engaging in a wooden application of *Butz*, the Court significantly undermines the functioning of the Office of the President. Under the Court's opinion in *Nixon* today it is clear that Presidential immunity derives from the Constitution as much as congressional immunity comes from that source. Can there rationally be one rule for congressional aides and another for Presidential aides simply because the initial absolute immunity of each derives from different aspects of the Constitution? I find it inexplicable why the Court makes no effort to demonstrate why the Chief Executive of the Nation should not be assured that senior staff aides will have the same protection as the aides of Members of the House and Senate.

*830

830

 casetext