1                        STATE OF NEW HAMPSHIRE

2              HILLSBOROUGH COUNTY SUPERIOR COURT SOUTH

3

    STATE OF NEW HAMPSHIRE,          )
4                                    ) Superior Court Case No.
                    Plaintiff,       ) 226-2021-CR-00126
5                                    )
            vs.                      ) Nashua, New Hampshire
6                                    ) November 15, 2021
    JULIE A. INTROCASO,              ) 10:04 a.m.
7                                    )
                    Defendant.       )
8    _____ )

9

10                 HEARING ON PLEA AND SENTENCING
            BEFORE THE HONORABLE CHARLES S. TEMPLE
                 JUDGE OF THE SUPERIOR COURT
11

    APPEARANCES:
12

    For the Plaintiff:          Geoffrey W.R. Ward, Esq.
13                               OFFICE OF THE ATTORNEY GENERAL
                                 33 Capitol Street
14                               Concord, NH 03301

15   For the Defendant:         Michael A. Delaney, Esq.
                                 MCLANE MIDDLETON
16                               900 Elm Street
                                 10th Floor
17                               Manchester, NH 03101

18   Audio Operator:            Electronically Recorded
                                 by Elizabeth K. Lynch
19

    TRANSCRIPTION COMPANY:       eScribers, LLC
20                               7227 N. 16th Street, Suite 207
                                 Phoenix, AZ 85020
21                               (800) 257-0885
                                 www.escribers.net
22

    Proceedings recorded by electronic sound recording; transcript
23   produced by court-approved transcription service.

24

25



1                                    I N D E X

2   WITNESS(ES)          DIRECT      CROSS      REDIRECT      RECROSS

3   FOR THE PLAINTIFF:

4   NONE

5

6   WITNESS(ES)          DIRECT      CROSS      REDIRECT      RECROSS

7   FOR THE DEFENDANT:

8   NONE

9

10  MISCELLANEOUS                                                PAGE

11  Court's Ruling                                                  5

12  Plea                                                           36

13  Sentencing                                                     46

14

15  EXHIBITS                                                  ID      EVD

16  NONE

17

18

19

20

21

22

23

24

25

1          (Proceedings commence at 10:04 a.m.)

2          THE CLERK:  So, Judge, we are on the record in State

3    vs. Julie Introcaso.

4          THE COURT:  Thank you.  Good morning, everybody.

5    I've reviewed the various motions that were recently filed by

6    citizens that intervened in this matter.  And I'd like to

7    review that with parties in this case, as well as with the

8    people who have filed the motion.

9          There's a motion for a leave to appear that's been

10   filed by Andy Martin (phonetic); that was filed on November

11   12th of this year.

12         There's a joint motion to intervene filed by Dana

13   Albright (phonetic), Robin Partello, Vivian Gerard (phonetic),

14   and any other similarly situated people, that's dated November

15   12th of this year, along with a memorandum in support of the

16   motion to intervene and exhibits that were filed.  That group

17   also filed a motion for the clerk to docket hearing

18   transcripts in this matter.

19         I've reviewed a number of New Hampshire cases on

20   this particular issue:  the Petition of Steven J. Rubenzer,

21   which is an unpublished New Hampshire Supreme Court case at

22   2015 WL 11082 (indiscernible - audio cuts out) -- 16.  And

23   Rullo, R-U-L-L-O, v. Rullo, at 121 N.H. 299.  That's a 1981

24   case.

25         I've reviewed carefully the rules of criminal



1  procedure.  Those rules do not provide a nonparty with any

2  right to intervene in a criminal case.  And New Hampshire

3  cases as well as other cases provide generally that a nonparty

4  has no right to intervene in a criminal case.  This includes

5  even crime victims who enjoy various statutory rights for

6  participation in criminal proceedings but have no right to

7  intervene in a criminal case.

8          I've also reviewed RSA 21-M:8-k in this particular

9  case that defines victim.  I've looked at that definition very

10  carefully in this case, particularly in the light of the facts

11  that I know that I gleaned from the probable cause affidavit

12  in this case, which is a quite extensive affidavit.

13          The Supreme Court, in my view, has spoken clearly,

14  and I'll cite their quotes from the Petition of Lath because

15  that's the most recent case.  "As a general proposition, a

16  private citizen lacks a judicially cognizable interest in the

17  prosecution or nonprosecution of another.  It is for this

18  reason that generally, a victim has no right to intervene in

19  the criminal case of the accused."

20          The cases that the court cites to, they go on to

21  say, "Reflect the underlying principle that a crime is a

22  public wrong, raising an issue between the State and the

23  accused, rather than between the accused and the accuser."

24          As I said before, I've really carefully reviewed the

25  facts and circumstances.  I'm going to hear a offer of proof.



1    So I'll reserve any ruling as to who I will allow to speak as

2    it relates to the sentencing because in my view, what the

3    joint motion to intervene request is the right to speak here

4    under, specifically, 21-M:8-k.  I know there's other arguments

5    made, but I think those arguments have been answered by the

6    Supreme Court, other courts, and certainly by the lack of any

7    provision for intervention in the New Hampshire Rules of

8    Criminal Procedure.

9                        COURT'S RULING

10            THE COURT:  So I'm going to deny the motion for

11   leave to appear for the reasons I've stated in terms of how

12   the New Hampshire Supreme Court views intervention in a

13   criminal case; deny the joint motion to intervene.

14            As it relates to the motion for -- to docket hearing

15   transcripts, I would just note that the hearings are all

16   recorded, and anyone at any time can request a transcript of

17   those proceedings.  So I'm not quite sure what that motion is

18   asking for, but will just say the recordings are here,

19   transcripts can be requested, and they will be produced

20   according to the court rules.

21            With all of that being said, I obviously am going to

22   address who I'll hear from at the appropriate time in this

23   case, as I said before.

24            In terms of the request for intervention, I do

25   appreciate the request.  I can empathize and appreciate the



1   concerns that have been addressed by those parties.  I hope

2   they know that this ruling doesn't diminish that at all.  In

3   my view, I'm just following the law as has been handed down by

4   the New Hampshire Supreme Court.

5          So those motions have been ruled upon.  When we get

6   to the stage of any victim input, I'll allow the State to

7   address that, and then I'll make a decision as to who I would

8   allow, if anybody, to speak as it relates to the proposed

9   sentence.

10         The other thing I want to make clear is that

11   everything that has been done in this case from the beginning

12   to now has been done in the public sector.  I think there was

13   one motion filed by Mr. Martin that we rejected based on its

14   letter form; that was put in a sealed file just so it was

15   there for the record.  But all the status hearings, all the

16   hearings that have occurred have been done publicly.

17         I noted in reviewing the joint motion to intervene,

18   there was concern that at one status hearing, I called counsel

19   up here.  I will represent to you in status hearings,

20   generally, counsel always approach the bench and we discuss

21   the status of the case up at the bench.  That was done on the

22   record.  I know there was another status hearing where various

23   people voiced concerns at a status hearing.  I allowed those

24   people to speak that day; that's not my usual course of

25   action.  I was unsure who they were or what they had to say,

1  so I listened carefully.  And I think I told them, at that

2  point, there would come a time where they may or may not be

3  able to have input in this case.  That time has come today.

4          So we'll proceed forward with the plea and

5  sentencing at this time.

6          THE CLERK:  So, Ma'am, if you can stand with your

7  attorney.  And if you could state your name for the record.

8          THE DEFENDANT:  Sure.  It's Julie Ann Introcaso,

9  I-N-T-R-O-C-A-S-O.

10         THE CLERK:  Thank you.  If you could raise your

11 right hand.

12               JULIE INTROCASO, DEFENDANT, SWORN

13         THE CLERK:  Thank you.  You can put your hand down.

14 I just have some paperwork to go over with you.  Your attorney

15 has submitted an acknowledgement and waiver of rights for a

16 misdemeanor.  Did you go through that paperwork with him?

17         THE DEFENDANT:  I did.

18         THE CLERK:  Great.  On the last page of this form --

19 or second to last page, there's a signature line above where

20 it says defendant.  Is that your signature?

21         THE DEFENDANT:  Yes.  It is.

22         THE CLERK:  And did you sign that form voluntarily?

23         THE DEFENDANT:  Yes.  I did.

24         THE CLERK:  Thank you.

25         THE COURT:  Before we start with you, Ms. Introcaso,

 1    I also want to put on the record that I received a notice of

 2    intent to enter a plea of guilty today.  This plea and

 3    sentencing hearing was arranged between the clerks and

 4    counsel.  This was also my first opportunity to review the

 5    acknowledgement and waiver of rights form that I believe was

 6    uploaded and filed today, as well as all the proposed House of

 7    Correction sentences in this matter that look like they were

 8    filed on Friday.  My first chance to take a look at everything

 9    was this morning as I returned from vacation this morning.

10            So Ms. Introcaso, I want to make sure that you've

11    carefully reviewed the acknowledgement and waiver of rights

12    form with Attorney Delaney.

13            THE DEFENDANT:  I have over time, yes, Your Honor.

14            THE COURT:  And do you understand that form?

15            THE DEFENDANT:  I do.

16            THE COURT:  And has Attorney Delaney advised you

17    that if you're not a citizen of the United States, these

18    conditions can have certain immigration consequences, all the

19    way up to and including deportation?

20            THE DEFENDANT:  He did.

21            THE COURT:  And do you understand all of those

22    consequences?

23            THE DEFENDANT:  I do.

24            THE COURT:  Do you have any questions of me

25    regarding those consequences?



1          THE DEFENDANT:  No, sir.

2          THE COURT:  And how old are you?

3          THE DEFENDANT:  57.

4          THE COURT:  And how far did you go in school?

5          THE DEFENDANT:  I have a juris doctor degree.

6          THE COURT:  And I assume you can read, write, and

7    understand the English language, obviously?

8          THE DEFENDANT:  I can.

9          THE COURT:  Have you carefully reviewed all of the

10   Constitutional rights on the front side of the acknowledgement

11   form with your attorney?

12         THE DEFENDANT:  Yes.  I have.

13         THE COURT:  Do you understand all of those rights?

14         THE DEFENDANT:  I do.

15         THE COURT:  Thank you.  You may be seated along with

16   Attorney Delaney.

17         I'll turn to Attorney Ward for an offer of proof and

18   a review of the proposed sentencing recommendations, please.

19         MR. WARD:  Thank you, Your Honor.  Your Honor, would

20   this matter proceed to trial, the State would present the

21   following evidence to prove the charges to which the Defendant

22   is pleaing -- and the Defendant who is before you today,

23   beyond a reasonable doubt.

24         On October 22nd of 2020, Attorney General Gordon

25   MacDonald received a letter from Senior Associate Justice Gary

1  Hicks of the New Hampshire Supreme Court concerning a Judicial

2  Conduct Committee statement of formal charges against the

3  Defendant.  At the time, the Defendant was a sitting justice

4  of the Ninth Circuit Court and a member of the New Hampshire

5  Bar.  The letter from Justice Hicks relayed that the JCC

6  investigation into the Defendant had, quote, "Established

7  compelling circumstantial evidence that the Defendant whited

8  out two court orders, and such conduct could constitute either

9  a felony or a misdemeanor offense."

10        Specifically quoting the JCC statement of formal

11  charges, Justice Hicks wrote, quote, "The evidence supports

12  that the Defendant may have committed a crime by whiting out

13  court orders with the purpose of deceiving the Judicial

14  Conduct Committee into thinking that someone else had altered

15  those orders."  Justice Hicks requested that the Attorney

16  General's Office investigate the matter.

17        The formal charges that were brought against the

18  Defendant by the JCC in the matter In Re Julie A. Introcaso

19  were based are two separate complaints, the first of which

20  arose out of a report brought by a Robin Partello.  Ms.

21  Partello was a Respondent in a parenting petition filed by

22  David Campbell in the Ninth Circuit Court Family Division.

23  And during the course of the matter Robin Partello v. David

24  Campbell, the issues that I'll discuss came about.

25        I'm going to provide this background information to



1    Your Honor about the Partello matter because it's important to

2    understand the context in which the Defendant acted to tamper

3    with records.  But at the same time, it's also important for

4    this Court to understand the Defendant is not charged with

5    crimes based upon her actions as the presiding judge in the

6    Partello case, actions she took as a judge sitting on that

7    case or any other case, for that matter.  But instead is

8    charged based on the tampering and altering of a court file,

9    as I will discuss in detail, during a time when she was under

10   investigation by the JCC.

11          That is the conduct at issue here, not any actions

12   or decision the Defendant made in a particular case before

13   her.  Her judicial decisions, right or wrong, are not involved

14   in the charges here.

15          During the course of the Partello matter, Marital

16   Master Bruce DalPra recommended the appointment of Attorney

17   Kathleen Sternenberg as a guardian ad litem.   Attorney

18   Sternenberg was on the Defendant's recusal list.

19          On February 28th of 2019, GAL Sternenberg had filed

20   a motion asking the court for instructions regarding the

21   method of payment from one of the parties to the family court

22   matter.  In the motion, the GAL asked the court to order Ms.

23   Portello to pay the GAL retainer in the amount of 350 dollars

24   by cash, check, or money order.  Ms. Partello objected.

25          And on March 12th of 2019, the Defendant issued an



1    order on what we'll call the Apply Pay motion, and issued the
2    Apple Pay order.  And the Defendant handwrote on the GAL's
3    motion, "Legal fees, GAL fees to be paid in cash by money
4    order or bank check only."

5            The same day, the court sent a photocopy of the
6    Defendant's handwritten order in a notice of decision to the
7    parties.  The notice of decision included a typewritten quote
8    that included the full text of the Defendant's handwritten
9    order.  The clerk that processed that order for the court was
10   Julianne Lodes.

11           Also, on February 28th, the same day, there was a
12   motion filed by the GAL to exceed the fee cap.  And again on
13   March 12th, the Defendant issued an order on the fee-cap
14   motion, the fee-cap order, and handwrote on the GAL's motion,
15   "Motion granted over the Respondent's objection at number 36."

16           Again, that same day, the court sent a photocopy of
17   the Defendant's handwritten order in a notice of decision to
18   the parties.  The notice of decision included a typewritten
19   quote that included the full text of the handwritten order,
20   and the clerk was again Clerk Lodes.

21           Shortly after the Defendant issued the orders, she
22   asked the court to schedule a status conference with the
23   parties.  The status conference was scheduled for March 19th
24   of 2019.  Thereafter, a motion was filed to continue the
25   status conference.

1           And at that point, on March 15th, the Defendant

2  issued an order granting the motion to continue and also

3  issued a three-page handwritten order in which she recused

4  herself from that Partello matter.

5           In the order, the Defendant outlined in great detail

6  the nature of her friendship and therefore her conflict with

7  GAL Sternenberg.  And also wrote that the court does not

8  believe that this is a conflict that can be waived.

9           Thereafter, now in September of 2019, Ms. Partello

10  filed a report with the JCC against the Defendant, alleging

11  misconduct.  The report concerned the Defendant's conflict

12  with GAL Sternenberg.  And then in spite of the conflict, the

13  Defendant ruled on the motions that I've referenced.

14           According to the JCC's statement of formal charges,

15  on or about October 7th of 2019, the Defendant took leave from

16  her judicial duties.

17           On November 8th of 2019, the JCC elevated the

18  complaint -- the report, excuse me, to the level of a

19  complaint and docketed it.  And the Defendant's answer -- per

20  the JCC executive secretary's letter, the Defendant's answer

21  to the complaint was due on December 12th of 2019.

22           On or about that day, while still on leave from her

23  judicial duties, the Defendant emailed a partial answer to the

24  complaint to the JCC and requested an extension of time to

25  complete the answer.  The JCC granted the extension to January

1    16th of 2020.

2            When my office began its investigation into this

3    matter, we issued a grand jury subpoena duces tecum to the JCC

4    to include the Defendant's answers to these complaints and her

5    partial answer issued December 12th of 2019.  The Defendant

6    conceded, in substance, that she had signed and approved the

7    marital master's orders that I have referenced, that she had

8    done so as a matter of routine course and did not have any

9    specific knowledge about the case and had never conducted any

10   hearings in that matter.

11           The Defendant also stated, in substance, that she

12   would have to investigate the matter further upon her return

13   from her leave, as she did not have access to the court's

14   file.  According to the JCC's statement of formal charges, the

15   Defendant returned to work on December 16th of 2019.

16           Thereafter, on January 2nd of 2020, at the

17   Defendant's request, Clerk Lodes brought volume 1 of the case

18   file in the Partello matter to the Defendant's chambers.   The

19   file contained the original versions of both the Apple Pay

20   order and the fee-cap order that I've referenced, as well as

21   the original motions.

22           Again, in our investigation, included in the

23   responsive documents were also examinations under oath with

24   two witnesses initially in the context of the JCC

25   investigation.  Sherry Bisson was one of those witnesses, was

1   the clerk of the Ninth Circuit Court, and was interviewed --

2   examined under oath on July 22nd of 2020.  She has worked for

3   the New Hampshire Court System in various capacities for 35

4   years.

5           She testified, in substance, that she had a clear

6   recollection of seeing the Defendant's original handwriting on

7   the Apple Pay order on January 6th of 2020 in the court's case

8   file.  Specifically, she testified that that day, she had met

9   with the Defendant in her chambers to discuss the Defendant's

10  writing days.  Clerk Bisson testified that during that

11  meeting, the Defendant stated that she had the judicial

12  conduct complaint response that she needed to write.  Clerk

13  Bisson then testified that the Defendant proceeded to open the

14  Partello file and go to the Apple Pay order and pointed to her

15  handwriting on that order and talked about that order.

16          In opening the file, Clerk Bisson testified she saw

17  the Defendant's original handwritten Apple Pay order.  Clerk

18  Bisson then testified that on January 14th of 2020, Julianne

19  Lodes and another court staff employee, Nancy Dabilis, came

20  into her office to speak with her about the Partello matter.

21  They had come to see Clerk Bisson to let her know they had

22  spoken to Judge Leary because they were upset that they had

23  been accused by the Defendant of altering a court file.

24          Clerk Bisson testified that she was told that the

25  Defendant called Julianne Lodes into her chambers and asked

1  her questions about the file, and thereafter, Ms. Lodes was

2  upset that she was questioned about altering the file because

3  that is not something she would do.  Nancy Dabilis also told

4  Clerk Bisson she was called into chambers by the Defendant and

5  asked essentially the same thing:  whether she had altered the

6  file, and also whether any of her staff had altered the file.

7  Both Nancy Dabilis and Julianne Lodes told Clerk Bisson that

8  the alteration that they were being accused of making to the

9  file involved the whiting out of a court order.

10         During that initial conversation, Clerk Bisson was

11  not aware that they were talking about the file in the

12  Partello matter.  However, later that same day, again January

13  14th of 2020, Clerk Bisson again spoke with Ms. Lodes and Ms.

14  Dabilis about that matter.  And during that conversation, Ms.

15  Lodes mentioned something about Apple Pay and that being the

16  order that had been altered.

17         Clerk Bisson testified, in substance, that at that

18  point, she realized that the orders that they were being

19  accused of by the Defendant of altering was the order she had

20  just seen in its original, unaltered format when she had seen

21  it on January 6th of 2020.

22         As described by Clerk Bisson during this examination

23  under oath, in the original court document that is the Apple

24  Pay order, the handwriting that was the Defendant's order was

25  now obscured by whiteout tape.  Given what she had seen on

1  January 6th of 2020, Clerk Bisson testified that the

2  alteration, in her opinion, would have to have occurred

3  between or after the date that her and I spoke, which was

4  January 6th, 2020 and January 9th of 2020.

5           As part of this investigation, my office again

6  obtained the original court file in this matter from the

7  judicial branch, pursuant to the grand jury subpoena.  Upon

8  review of the court's file, the Apple Pay order is not present

9  in the file anywhere else in an unaltered format.  That is,

10 there is not a copy of the Defendant's unaltered handwritten

11 order anywhere in the case file.  Therefore, Clerk Bisson,

12 when she testified that she had seen the original handwritten

13 Apple Pay order on January 6th, 2020, could not have been

14 viewing a copy of that order but instead would have been

15 looking at the original order, as she testified, prior to it

16 being whited out.

17          The second examination under oath conducted by the

18 JCC initially in that investigation was that -- was of the

19 Defendant's courtroom clerk, Julianne Lodes.  Clerk Lodes has

20 worked for the New Hampshire court system for 32 years in

21 various capacities.  She testified that on January 2nd, the

22 Defendant had requested the Partello file and told the clerk

23 that she had needed it to respond to the JCC complaint.  And

24 Clerk Lodes testified she provided the Partello file to the

25 Defendant in her chambers.  And to her knowledge, the file

1  remained in the Defendant's chambers between January 2nd and

2  January 9th, 2020.

3       On January 9th, 2020, Clerk Lodes met with the

4  Defendant in the Defendant's chambers.  And at that time, the

5  Defendant showed her an order where everything was whited out

6  with whiteout.  And the Defendant said to Clerk Lodes, did you

7  do this to protect me?  Clerk Lodes responded, no, I didn't do

8  that to protect you; I would not do that.

9       Also on January 9th, 2020, the Defendant asked Clerk

10 Lodes to make copies of the March 12th, 2019 orders, both the

11 Apple Pay order and the fee-cap order that had been whited

12 out, and then to stamp the original order and the copies.  The

13 Defendant, while in the process of answering the JCC

14 complaints, was typing with her back to Clerk Lodes and stated

15 that she was also typing an affidavit for Clerk Lodes to sign,

16 including the information about when Clerk Lodes brought the

17 file to her.  Clerk Lodes testified that she thought to

18 herself that this was -- she was not going to sign any

19 affidavit, and stated she was thinking to herself, something

20 is not right here, and just got up and left the judge's

21 chambers.

22       On January 14th, Clerk Lodes and Nancy Dabilis then

23 met with Judge Leary to report again that on January 9th, the

24 Defendant had questioned them about whiting out the Apple Pay

25 order and the fee-cap order; testified again about meeting

1   with Clerk Bisson to report the same thing; and testified that

2   when they had told Clerk Bisson about the Apple Pay order,

3   Clerk Bisson recalled seeing, in that conversation with them,

4   the unaltered Apple Pay order, just eight days before when the

5   Defendant had showed it to her in chambers on January 6th of

6   2020.

7             And as I've discussed, Clerk Bisson testified she

8   believes the order was obscured between January 6th and

9   January 9th, 2020, during the time when the file was in the

10  Defendant's chambers.

11            The substance of the second JCC complaint against

12  Judge Introcaso was a JCC-generated complaint and is based on

13  the alteration of the court file that we've discussed with

14  respect to the Apple Pay order and the fee-cap order.  And in

15  response to questions posed to the Defendant by the JCC, dated

16  April 3rd of 2020, so the Defendant's response to now the

17  second JCC complaint, in a letter of April 3rd, 2020, the

18  Defendant repeatedly and adamantly denied having whited out

19  the original fee-cap order and the original Apple Pay order.

20  She stated repeatedly throughout that letter that she did not

21  do that and stated it as well, quote, "I do not know how or

22  when the March 12th orders became obscured by whiteout

23  correction tape", end quote.

24            As the JCC process continued following the filing of

25  the JCC statement of formal charges, depositions of witnesses

1    were conducted in that matter.  Clerk Bisson was deposed on

2    January 21st of this year.  Her testimony was substantively

3    consistent with that given during her examination under oath,

4    which I have discussed.  She again testified in detail that

5    she observed the Defendant on January 6th, 2020 turn the court

6    file to the Apple Pay order, take her finger, the Defendant,

7    went across the writing, her original handwritten writing on

8    that order, and read it out loud to Clerk Bisson.

9              Clerk Lodes was deposed on January 21st, as well,

10   2021 in the JCC matter.  Her testimony remained consistent to

11   that given during her examination under oath and reporting the

12   issue to both Judge Leary and Clerk Bisson.

13             Judge Leary was also deposed.  He recalled the

14   meeting with Clerk Lodes and Clerk Dabilis, recalled the

15   meeting -- in the meeting, excuse me, that they had been upset

16   and stated the Defendant had accused them of whiting out the

17   file or whiting out the orders.  Judge Leary also recalled a

18   further meeting and described both of clerks as very upset

19   that they had been accused of having done this.

20             As the JCC matter progressed, the Defendant was

21   deposed on February 8th of 2021.  During the deposition, the

22   Defendant was asked by counsel for the JCC, Attorney Philip

23   Waystack, whether or not she had obstructed the margin orders

24   by using whiteout tape.  The Defendant responded no.  Later

25   during that deposition, the Defendant was questioned by her

1    own counsel, Attorney Delaney, concerning the question that

2    Attorney Waystack had previously asked.  The following

3    exchange occurred:

4         "Attorney Waystack asked you a pointed question

5    about whether you had used whiteout tape.  Do you recall that

6    question? "

7         The Defendant answered, "Yes".

8         Attorney Delaney, "As I take it, you took issue with

9    his use of the word obscured because as a judge, you know that

10   may have criminal significance; is that right?"

11        The Defendant said, "That would be fair to say."

12        Attorney Delaney asked, "Do you have any other

13   memory presently about how whiteout tape became applied to the

14   March 12th orders?"

15        And the Defendant responded, "I do."

16        The Defendant then went on to explain, in substance,

17   that after she had written the Apple Pay order and fee-cap

18   order back on March 12th, now, of 2019, while on the third

19   floor of this courthouse, she took them -- she then took the

20   file she had worked on downstairs to the clerk's office.  She

21   provided the file to Clerk Lodes and told her that she had

22   issues two orders in matter and wanted them to go out to the

23   parties that same day.  After directing Clerk Lodes to process

24   the orders, the Defendant then spoke with Clerk Dabilis.

25   According to the Defendant, she went to talk to Clerk Dabilis

1  because she realized she needed to disclose her conflict, deal

2  with the issues with respect to those issues and the two

3  orders that she just made, and determine whether or not the

4  parties wanted to go forward.

5        The Defendant testified that she spoke with Clerk

6  Dabilis about finding time as soon as possible on her schedule

7  to hold a status conference in that Partello matter.  She

8  further explained that she had told Clerk Dabilis to send out

9  the orders, referring to the Apple Pay order and the fee-cap

10 order.  And then testified that as she was standing there, in

11 view of Clerk Dabilis and Clerk Lodes, quote, "So as I was

12 standing there waiting for things to be processed, I put

13 whiteout on those orders."

14       The Defendant testified that on January 9th of 2020,

15 the day she had the interaction with Clerk Lodes and had

16 questioned her about whether or not she had been the one who

17 had whited out those orders, she had had no recollection of

18 what had happened back on March 12th of 2019, as she now

19 described it.  She further stated that while responding to the

20 JCC in December, March, and April of 2020, when she had denied

21 any alteration of these orders, she again had no recollection

22 of what she was now saying had occurred on March 12th of 2019.

23       When asked by her counsel how it was, then, that she

24 had come to remember, having done so back in March as she was

25 claiming, the Defendant explained, "The more I thought about



1    it, the clearer it became."  When questioned further by

2    Attorney Waystack, the Defendant stated that she had

3    remembered, as far as she was concerned, within the past three

4    months that she had actually been the one to whiteout the

5    orders.

6           When questioned further by Attorney Waystack

7    concerning her admission that she had whited out the original

8    Apple Pay and fee-cap orders, the Defendant confirmed that she

9    was now admitting to having done so but on March 12th of 2019.

10   The Defendant also stated she believed Clerk Dabilis had

11   witnessed her doing so.  And that while Clerk Lodes may not

12   have witnessed her whiting out the orders, the Defendant

13   stated that Clerk Lodes knew that she had whited out the

14   orders back on that day because Clerk Lodes had asked the

15   Defendant the question, why am I sending out these decisions

16   if you were just going to have a hearing?

17          Based on this new version of events provided by the

18   Defendant during her deposition on February 8th, investigators

19   from my office then made arrangements to conduct further

20   interviews of Clerk Lodes and Clerk Dabilis.  And those

21   occurred on February 10th of 2021, given that the Defendant

22   was now alleging that they either witnessed or were aware of

23   her whiting out the orders back on March 12th of 2019.

24          On February 10th, 2021, Investigator Scott Gilbert

25   of the Attorney General's Office spoke with Julianne Lodes



1    about her memory of her March 12th, 2019 interaction with

2    Judge Introcaso and the two orders in question, as had been

3    described by the Defendant in her deposition.  Clerk Lodes

4    said she had no specific recollection of the described

5    interaction, but she described Nancy Dabilis' cubicle of being

6    approximately six feet from her own, and she was absolutely

7    certain that she never saw the Defendant whiting out any court

8    orders at that time.

9              That same day, Investigator Gilbert also spoke with

10   Nancy Dabilis about her memory of her March 12th, 2019

11   interaction with the Defendant and the two orders in question.

12   Nancy Dabilis also said she didn't have a specific memory of

13   the interaction but was certain she did not see the Defendant

14   whiteout the orders.  She said she does not use whiteout tape

15   and none would have been available at her desk.

16             Thereafter, on February 11th of 2021, the Defendant

17   was arrested and charged with the matters that are before you

18   today.  And that is, Your Honor, a summary of the evidence the

19   State would introduce to support findings of guilt on the

20   pending charges.

21             THE COURT:  And will you review the proposed House

22   of Corrections sentences, please?

23             MR. WARD:  I will, Your Honor.  There are three

24   charges that we're dealing with here today:  two counts of

25   tampering with public records or information and one newly

1    filed charge of unsworn falsification.  And I think we

2    mentioned this perhaps before, Your Honor, with respect to

3    that charge, but if we didn't, I'll say it again.  That's a

4    charge where it's alleged to have occurred in Bedford, but as

5    I understand it, the Defense has no objection to proceeding

6    with that before you here today and waiving venue to the

7    extent necessary.

8              But with respect to those three charges, they are

9    concurrent sentences, so the sentences are the same.  I did

10   notice one error as well that was pointed out to me on the

11   unsworn falsification charge.  It lists on the sentencing

12   sheet, date of crime as Friday.  That's obviously not the

13   case.  It was April 3rd of 2020 as I've discussed and as

14   outlined in the complaint.  The complaint is correct.  So my

15   apologies for that error.

16             But these convictions are all for misdemeanor

17   offenses.  The Defendant is to be sentenced to the House of

18   Correction for a period of 12 months.  All of that sentence is

19   suspended during good behavior and compliance with all terms

20   and conditions of the order.  Any suspended sentence may be

21   imposed after hearing at the request of the State.  The

22   suspended sentence begins and ends two years from today's

23   date.

24             As I mentioned, these three charges are concurrent

25   with one another.



1           And then finally, the Defendant, to the extent

2    necessary, is to meaningfully participate in completing a

3    counseling treatment educational program as directed, shall

4    perform 100 hours of community service and provide proof to

5    the State within 12 months of today's date.  Any evidence may

6    be returned to its rightful owner, and the Defendant is

7    ordered to be of good behavior and comply with all the terms

8    of this sentence.

9           And as I stated, those three sentences are identical

10   and concurrent as to each.

11           THE COURT:  Thank you, Attorney Ward.

12           Attorney Delaney, do both you and your client agree

13   to the fully negotiated terms of those three House of

14   Corrections sentences?

15           MR. DELANEY:  Yes, Your Honor.

16           THE COURT:  And do either you or she have any

17   objection at all to the State's offer of proof?

18           MR. DELANEY:  No, Your Honor.  At the appropriate

19   time, Ms. Introcaso would like me to briefly address the basis

20   for us requesting your consideration of an Alford plea.  And

21   I'm happy to do that whenever it's most convenient for the

22   Court.

23           THE COURT:  I think this is the appropriate time.

24   I'm about to review that with her, so you can do that right

25   now.



1              MR. DELANEY:  Great.  Thank --

2              THE CLERK:  Judge, I apologize.  Can I just

3    interrupt for a minute?  Liz emailed me.  She just wants to

4    check the record because it sounds like it's skipping in her

5    ears, and she wants to make sure everything is getting

6    recorded properly.

7              THE MONITOR:  Sorry, Judge.

8              THE COURT:  Sure.

9              THE MONITOR:  I've been trying to fix it, but --

10             THE COURT:  All right.  Let's just let you fix that

11   and then we'll go --

12        (Recess at 10:37 a.m., recommencing at 10:37 a.m.)

13             THE COURT:  -- for your justification for an Alford

14   plea in this case.  Go right ahead, sir.

15             MR. DELANEY:  Thank you, Your Honor.  It was

16   important that we just point out, for your consideration, a

17   couple of things that Attorney Ward mentioned.

18             First, that in March of 2019, Ms. Introcaso issued

19   an order, a detailed order, recusing herself from the Partello

20   matter, and identifying, in detail, why that was the case.

21   After a complaint was filed with the Judicial Conduct

22   Committee, Attorney Ward referenced an initial partial answer

23   that Ms. Introcaso sent to the Judicial Conduct Committee in

24   response to the complaint.  That was when she was not located

25   in the courthouse.  And that was on December 12th of 2019.

1           The tampering charges are alleged by the State to

2    have occurred between June (sic) 6th and June (sic) 9th of

3    2020.  So approximately one month before that time period.

4    Ms. Introcaso submitted a preliminary answer to the Judicial

5    Conduct Committee, and she acknowledged again that she had

6    issued these two orders, the fee-cap order and the Apple Pay

7    order.

8           So there is information in the record of this case,

9    making it clear that she acknowledged to the Judicial Conduct

10   Committee that she had written and published these orders

11   approximately one month before the State charges that, in

12   fact, whiteout was applied to those orders.  Those are facts

13   we simply wanted to bring to your consideration because they

14   do inform the recommendation for an Alford plea to be entered.

15          I would also note that the record includes Judge

16   Introcaso's evaluations as a former judge.  She had a

17   distinguished public service career, and she received

18   outstanding evaluations from members of the Bar, members of

19   the staff of this very courthouse, and from citizens who

20   access the justice system.  And we would ask Your Honor to

21   take those into consideration as the basis for the

22   recommendation we're providing.

23          THE COURT:  All right.  Very good.

24          Ms. Introcaso, if you will stand, please.  I want to

25   review, first of all, the Alford plea context with you because



1 I want to make sure that you understand when I allow you to do

2 this, there's still going to be entry of guilty convictions on

3 each one of these complaints.  Do you understand that?

4          THE DEFENDANT:  I do.

5          THE COURT:  And I think under the circumstances of

6 this case, including the representations made by Attorney

7 Delaney, this is the type of case that I would allow an Alford

8 plea in.  I indicated that prior to counsel at a status

9 hearing.  And what I've heard and I've read has not changed my

10 mind.  I've done this in other cases, including felony level

11 cases.  I know it's been done in this courtroom, for instance,

12 in a homicide case.  So I think this is the type of case and

13 these are the type of circumstances where I will allow an

14 Alford plea.

15          So I want to go over that with you with some

16 additional questions other than the standard questions that I

17 ask.  If you have any concerns as we do this, we can turn to

18 Attorney Delaney, and I'm sure he'll answer them.

19          THE DEFENDANT:  I appreciate that.

20          THE COURT:  You understand correctly that although

21 you are not admitting to the truth of the charges against you,

22 you intend to enter an Alford plea consistent with the United

23 States Supreme Court case of North Carolina v. Alford?

24          THE DEFENDANT:  I do.

25          THE COURT:  Specifically, do I understand correctly,



1    although you are willing to enter three pleas to the charges

2    of tampering with public records and unsworn falsification,

3    you do not admit that you committed the alleged acts and/or

4    that you possess the mental state that the State has alleged

5    in each complaint?

6              THE DEFENDANT:   That's correct.

7              THE COURT:   Are you entering these pleas because you

8    recognize that the State can prove each one of these

9    complaints and each element of these complaints beyond a

10   reasonable doubt?

11             THE DEFENDANT:   I do.

12             THE COURT:   Have your lawyers advised you that they

13   believe the evidence in this case against you is sufficiently

14   strong to establish your guilt beyond a reasonable doubt as to

15   each element of each complaint?

16             THE DEFENDANT:   Yes.

17             THE COURT:   In making the decision to enter these

18   Alford pleas, have you considered that if you went to trial

19   and were convicted, the Court may impose more severe sentences

20   than you have negotiated in this case?

21             THE DEFENDANT:   I have.

22             THE COURT:   Do you understand that if I accept your

23   Alford pleas on just one of these complaints, convictions of

24   guilt will be entered and will be reflected in your criminal

25   history?

1                    THE DEFENDANT:  Yes.

2                    THE COURT:  You understand that I'm not bound by the

3     agreement of the lawyers in terms of the recommended sentence

4     in this case and if I accept your pleas in this matter but

5     choose to impose a sentence greater than what has been agreed

6     to, you will be allowed to withdraw your plea at that point?

7                    THE DEFENDANT:  Yes.

8                    THE COURT:  On the other hand, you understand that

9     if I accept your pleas and impose the sentences that have been

10    fully negotiated by your counsel and yourself on your behalf,

11    you will not later be able to change your mind and withdraw

12    these pleas?

13                   THE DEFENDANT:  Yes.

14                   THE COURT:  Very good.  If you need a break, let me

15    know.  If you need to talk to Attorney Delaney, let me know.

16                   I want to review with you all of the constitutional

17    rights that you'll be waiving in this proceeding.  And if you

18    need to sit down, go ahead and sit down.

19                   THE DEFENDANT:  I apologize, Your Honor.  We were

20    just talking mechanics.

21                   MR. DELANEY:  My apologies, Your Honor.

22                   THE COURT:  Sure.  If you need to sit down, you're

23    welcome to sit down.

24                   THE DEFENDANT:  If you could simply repeat what you

25    were saying, I'd appreciate it.



 1              THE COURT:  Sure.  Sure will.  I'm about to review

 2   the various constitutional rights you have in this proceeding

 3   with you to ensure that you understand them.  I know you

 4   carefully reviewed them with Attorney Delaney, but I just need

 5   to make sure that you understand each one of these rights.

 6              Do you understand that you have a right to a speedy

 7   and public trial on each of these complaints?

 8              THE DEFENDANT:  I do.

 9              THE COURT:  Do you also understand you have a

10   constitutional right to counsel so that if we went to trial,

11   Attorney Delaney would continue to represent you?

12              THE DEFENDANT:  I do.

13              THE COURT:  Do you understand that you have the

14   right to produce evidence and call all witnesses in your favor

15   at the trial?

16              THE DEFENDANT:  Yes.

17              THE COURT:  Do you understand as part of that right,

18   you have a right to see, hear, and question each witness at

19   trial?

20              THE DEFENDANT:  Yes.

21              THE COURT:  You understand you have a constitutional

22   right to remain silent, and if you exercised it at trial, I

23   would inform the jurors not to infer any guilt at all from

24   your silence?

25              THE DEFENDANT:  Yes.  I do.



1              THE COURT:  Importantly, do you understand you have

2      a right not to be convicted of these complaints, unless and

3      until the State proves each element of each complaint beyond a

4      reasonable doubt?

5              THE DEFENDANT:  I do.

6              THE COURT:  Do you understand that means you do not

7      have to prove your innocence at trial?

8              THE DEFENDANT:  Yes.

9              THE COURT:  Prior to trial, do you understand you

10     have the right to move to suppress or keep out any evidence

11     that you believe the police unlawfully obtained from you?

12             THE DEFENDANT:  Yes.

13             THE COURT:  And finally, do you understand that if

14     you were to go to trial, Ms. Introcaso, and receive

15     convictions, you could appeal those convictions as a matter of

16     right to the New Hampshire Supreme Court?

17             THE DEFENDANT:  I do.

18             THE COURT:  Have you carefully reviewed the existing

19     complaints for tampering with public records, along with the

20     complaint filed for unsworn falsification with Attorney

21     Delaney?

22             THE DEFENDANT:  Yes.

23             THE COURT:  Do you understand the elements of each

24     one of those complaints?

25             THE DEFENDANT:  I do.

1            THE COURT:  Have you reviewed the discovery in your

2    case?

3            THE DEFENDANT:  Yes.

4            THE COURT:  Have you discussed with Attorney Delaney

5    any and all possible defenses you have to each of these

6    complaints?

7            THE DEFENDANT:  Yes.  I have.

8            THE COURT:  Have you reviewed the maximum penalty

9    for each one of these Class A misdemeanors with Attorney

10   Delaney?

11           THE DEFENDANT:  Yes.

12           THE COURT:  And you understand that maximum penalty

13   to be one year in jail and up to a 2,000 dollar fine?

14           THE DEFENDANT:  Yes.

15           THE COURT:  Attorney Delaney, have you had

16   sufficient opportunity and ample time to review each of the

17   complaints with Ms. Introcaso?

18           MR. DELANEY:  I have, Your Honor.

19           THE COURT:  Do you believe she understands the

20   elements of each one of these complaints?

21           MR. DELANEY:  I do believe that.

22           THE COURT:  Have you reviewed the discovery with her

23   in this case?

24           MR. DELANEY:  In detail, Your Honor.

25           THE COURT:  Have you discussed any and all possible

1    defenses she may have to each of these charges?

2          MR. DELANEY:  We have discussed those possible

3    defenses.

4          THE COURT:  Have you carefully reviewed the maximum

5    penalty for each one of these Class A misdemeanor complaints

6    with your client?

7          MR. DELANEY:  I have.

8          THE COURT:  Based on all of your contact with her,

9    do you believe that Ms. Introcaso is waiving her

10   constitutional rights and entering these Alford pleas in a

11   knowing, intelligent, and voluntary manner?

12         MR. DELANEY:  I believe that.

13         THE COURT:  Ms. Introcaso, are you presently under

14   the care of a doctor, a psychiatrist, or a therapist of any

15   type?

16         THE DEFENDANT:  I am.

17         THE COURT:  Are you taking any prescription

18   medications?

19         THE DEFENDANT:  Yes, Your Honor.

20         THE COURT:  Did you take those medications this

21   morning?

22         THE DEFENDANT:  I did.

23         THE COURT:  Do those medications in any way prevent

24   you from understanding your rights, waiving them, and entering

25   these Alford pleas this morning?



1           THE DEFENDANT:  I don't believe so.

2           THE COURT:  Have you consumed any other drugs or

3  alcohol within the last 24 hours?

4           THE DEFENDANT:  No.

5           THE COURT:  Is anyone forcing you to enter these

6  Alford pleas?

7           THE DEFENDANT:  No.

8           THE COURT:  Are you entering these pleas in a

9  voluntary manner after having plenty of time to discuss both

10  your case in general, as well as your pleas with Attorney

11  Delaney?

12           THE DEFENDANT:  Yes.

13           THE COURT:  Are you satisfied with the legal

14  services provided to you by Attorney Delaney?

15           THE DEFENDANT:  I am indeed.

16           THE COURT:  Other than the terms of the plea

17  agreement, has anyone promised you anything beyond that

18  agreement to get you to enter these pleas today?

19           THE DEFENDANT:  No, Your Honor.

20           THE COURT:  And are you entering these Alford pleas

21  after having the Alford process fully explained to you by

22  Attorney Delaney?

23           THE DEFENDANT:  Yes.

24           THE COURT:  I will now take your pleas.

25                              PLEA

1           THE COURT:  Attorney Delaney, do you waive formal

2   reading of each complaint on behalf of Ms. Introcaso?

3           MR. DELANEY:  I do, Your Honor.

4           THE COURT:  We'll start with the tampering of public

5   records.  Each of these pleas is entered in 226-2021-CR-126.

6   The charge ID number 1837214C, charging you with the crime of

7   tampering with public records, how do you plea?

8           THE DEFENDANT:  I am not admitting to the facts of

9   this case; however, I would like to enter a plea pursuant to

10  Alford with the Court.

11          THE COURT:  And moving on to charge ID number

12  1837215C, in the same docket number, charging you again with

13  the crime of tampering with public records, how do you plea?

14          THE DEFENDANT:  Your Honor, again, I'm not admitting

15  to the facts of this case as presented by the State, but I

16  wish to enter a plea pursuant to Alford.

17          THE COURT:  And then as it relates to charge ID

18  number 1923979C, charging you with the crime of unsworn

19  falsification, how do you plea?

20          THE DEFENDANT:  Once again, Your Honor, I'm not

21  admitting to the truth of the charges; however, I would like

22  the Court to accept my plea pursuant to Alford.

23          THE COURT:  Based on the State's extensive offer of

24  proof, I find that there is a factual basis to each one of

25  these complaints.

1             I also find Ms. Introcaso, based on your

2    presentation to me today, specifically your demeanor, your

3    attitude, your intelligence, and your answers to all of my

4    questions, that you're waiving your constitutional rights and

5    entering these Alford pleas in a knowing, intelligent, and

6    voluntary manner.

7             I also find that while you have consumed your

8    prescription medications this morning, those medications are

9    not in any way preventing you from understanding your rights,

10   waiving them, and entering these Alford pleas.

11            I also find that you have not consumed any other

12   drugs or alcohol within the last 24 hours.

13            Based on all those findings, I accept your Alford

14   pleas.  You may be seated, once again --

15            THE DEFENDANT:  Thank you, Your Honor.

16            THE COURT:   -- along with Attorney Delaney.

17            I'll turn to Attorney Ward for a review of Ms.

18   Introcaso's criminal history and any victim input you have in

19   this case.

20            MR. WARD:  Thank you, Your Honor.  There is no

21   criminal history.

22            With respect to any victim input, as I hope the

23   offer of proof made clear, there are no victims with respect

24   to these offenses.  These offenses, again, did not occur in

25   the context of judicial cases in the sense that they were not

1  crimes committed from the bench for which a party to those

2  judicial proceedings were harmed in the course of those

3  judicial proceedings.

4          Those orders that are at issue here, the Apple Pay

5  and fee-cap order, were issued.  As you heard, the Defendant

6  later recused herself from that case.  That case began anew

7  with a new judge who reviewed all of those orders and

8  affirmed, in essence, all of those orders.  The issue is not

9  the context of the orders or the decision made in those orders

10 to say you can't pay by Apple Pay or to raise the fee cap.

11         At issue in this case was that the Defendant, as is

12 charged by the State, while the JCC proceedings were pending,

13 in an attempt to avoid responsibility, whited out those orders

14 and then did not disclose that those orders had been whited

15 out to the JCC in the first instance, later denied having done

16 so to the JCC during the course of that investigation and then

17 accused others in the clerk staff of perhaps having done so.

18         So the substance of these charges is that.  And

19 therefore, there are no victims to address the Court.

20         While we certainly understand that there are folks

21 that have petitioned the Court who feel aggrieved by decisions

22 made in the judicial process by the Defendant during the time

23 that she was a judge, those issues are not challengeable

24 through the criminal process.  Criminal process cannot do

25 anything to change or alter those orders.  Those are

1    challengeable through the court process in their own cases and

2    the cases out of which they arose with the new judges to the

3    degree they are still pending and have been assigned or to

4    appellate courts.  And so there is no victim impact, Your

5    Honor.

6            THE COURT:  All right.  Thank you.

7            I've carefully listened to your offer of proof, and

8    have reviewed multiple times during the course of this

9    proceeding the Gerstein affidavit that I believe is 22 pages

10    long.  And as I look through the complaints, and obviously

11    there's the reference to the matter of Robin Partello vs.

12    David Campbell in the Ninth Circuit Court Family Division, I

13    don't disagree with the State's assessment that under the

14    victim rights statute because this conduct relates to

15    alterations that occurred through the JCC, that there are

16    victims under that statute.

17            However, as I look through the affidavit and see the

18    sworn testimony of, for instance, Clerk Lodes and Clerk

19    Dabilis along with the Clerk of Court, Ms. Bisson, I'm

20    concerned when I read the victim rights statute about the

21    emotional, psychological impact that this would have had, even

22    as it proceeded in the JCC on Ms. Partello.  She was the

23    complainant in the JCC.  She was obviously the Respondent in

24    the underlying family division matter where these orders were

25    issued and was the subject of orders that were ultimately

1   altered.

2          I don't disagree with you that this is not conduct

3   that arose from her specific rulings and conduct in that case

4   but as the complainant before the JCC.  Reading through the

5   affidavit, where there are circumstances, for instance, where

6   they're searching the file because of the accusations that

7   have been made by Ms. Introcaso against particularly Ms. Lodes

8   for how this whiteout would have occurred.  And one of the

9   things they do is they search the sign-in sheets for the file

10  for Ms. Partello.

11         I think under those circumstances with her

12  involvement in this case, while I don't disagree with the

13  State's assessment, I think it's fair, I think it's just for

14  me to hear from Ms. Partello.  As it relates to Dana Albright

15  and Vivian Gerard and the other similarly situated people,

16  those complaints relate to their specific cases and the

17  conduct of then Judge Introcaso on the bench.  There are other

18  remedies.  I don't think they have a right to intervene.  I've

19  already stated my ruling on that.  I don't think they qualify

20  as victims under RSA 21-M:8-k.

21         But for purposes of this proceeding and for me

22  evaluating this plea based on everything I've read and heard,

23  I think it is appropriate for me to hear from Ms. Partello.

24  So I'm going to allow her to speak as to the proposed

25  sentences.

1          Ms. Partello, if you would state your full name,

2    please, for the record and spell your last name, please.

3          MS. PARTELLO:   Thank you, Your Honor.   Robin

4    Partello, P-A-R-T as in Thomas, E-L-LO.   I am resident of

5    Nashua, New Hampshire.

6          And I'd first like to point out that the true victim

7    in this case is my child.   What Judge Introcaso did has had

8    such a negative effect on my life for three years.   And it not

9    only affected me, it affected my child.   It -- and the last

10   time I checked, I walked into this courthouse and I thought it

11   was a court of equity.   I went before a judge thinking that

12   the judges in this courthouse are ethical and trustworthy.

13         And to the contrary, the former Judge Introcaso

14   appointed her best friend to be the guardian ad litem in my

15   case and collectively, they described the process of dealing

16   with children as a business transaction.   This isn't a

17   business transaction.   This is our lives that they're dealing

18   with, and my son is seven years old.   He's been through this

19   process for three years.   He's been dragged through mud.   It's

20   not fair for any of us.

21         And for Judge Introcaso to alter my court record and

22   to, you know, blame it on the clerks to suggest that it was

23   me, to say go check the sign-in sheet and make sure Robin

24   didn't do this, this is simply unfair.   And my confidence in

25   the judiciary is pretty low at this point.   And I have a hard

1    time trusting any court official at this moment.  And that's

2    unfortunate.  But that's the work of Julie Introcaso.

3              And it's sad representation of being a judge in this

4    court.  And while I believe that you are an ethical man, Julie

5    Introcaso put a bad look on this court system.  And if she

6    then goes before you and you simply say, we'll plead down the

7    felonies to misdemeanors and she can just stay at home and

8    life goes on, how is that fair?

9              You know, I often think it wasn't like I was a

10   criminal in her criminal court and she issued me a fine.

11   There's no justification for what she did because this

12   affected my child, and that is a death sentence.  When you

13   hurt somebody's child, that is the worst thing you can do to a

14   mother.

15             And while I guess I have no say or standing to

16   challenge the plea down to misdemeanors, I would say that it's

17   fair and just and it would send a strong message to every

18   judicial officer in the state that Julie Introcaso serve at

19   least 12 months in the House of Corrections.  I mean, she's --

20   she's already, you know, issued an Alford plea to three

21   misdemeanors.  It's -- it's just not fair to allow her to walk

22   away from this, you know, unharmed when she has destroyed the

23   lives of so many families in the state of New Hampshire.

24             THE COURT:  Thank you.  I appreciate those comments.

25             MS. PARTELLO:  Thank you.



1              THE COURT:  Anything further, Attorney Ward?

2              MR. WARD:  Nothing further at this time, Your Honor.

3              THE COURT:  All right.  Attorney Delaney?

4              MR. DELANEY:  Nothing further, Your Honor.

5              THE COURT:  All right.  And does your client wish to

6     speak at all?

7              THE DEFENDANT:  No, Your Honor.

8              THE COURT:  All right.  I want to just take a few

9     minutes to consider the proposed sentences, obviously.  I've

10    reviewed them carefully.  I want to consider the comments that

11    have been made by Ms. Partello in terms of the impact of this,

12    consider the goals of sentencing, specifically punishment,

13    deterrence, and rehabilitation.  And give thought to my

14    acceptance or rejection of this particular negotiation.  So

15    that'll take me a few minutes.

16              And Attorney Ward?

17             MR. WARD:  I'm sorry, Your Honor.  To the extent you

18    wanted the State to speak on the rationale or address that any

19    further than we've already discussed, I'm happy to address

20    that --

21             THE COURT:  Yeah.  I would be happy for you to do

22    that.

23             MR. WARD:  -- on the record as well.  We certainly

24    have taken into consideration punishment, deterrence, and

25    rehabilitation, as well as comparable cases.  And in this

1 realm, as I'm sure the Court is aware, there are a few

2 comparable cases.

3          But certainly, I was involved in a prosecution

4 against a former -- or a judge at the time, but former Judge

5 Paul Moore for offenses against a judicial retirement system.

6 And so while not completely analogous, that was another case

7 were there no-time pleas entered.  There was a more

8 significant course of conduct there over several years that

9 the defendant had engaged in in terms of lack of candor, lack

10 of truthfulness, and again, a whole scheme there that

11 warranted felony convictions.

12          Here, given the incidents at issue, which while

13 egregious and while rightly have caused issues with the

14 confidence in the judicial system and the damage has been

15 caused to the judicial system that I think you see through the

16 folks that are represented here, that on par with felony

17 convictions did not make sense to the State.  As well as

18 considering not only the facts and circumstances of this case,

19 but as well as mitigating factors to include -- and I won't

20 get into detail -- but to include the mental health history

21 that's been provided to the State during the course of this

22 matter.

23          And as well as, and we can take this into

24 consideration at any matter as Your Honor is aware, but

25 punishment that exists outside of this courtroom but



1  punishment that has nevertheless been exacted on the Defendant

2  in this case and the impact on any individual or particular

3  defendant in here.  As I'm sure the Court is aware, there have

4  been sanctions with respect to the Judicial Conduct Committee,

5  the loss of her job, her suspension from the practice of law

6  and the significant financial penalties that need to be paid

7  to the JCC for the cost of the investigation that occurred in

8  that matter.

9          So taking all of those things together, with respect

10  to the goals in sentencing, the State believes that this is a

11  fair and just resolution in this particular case.

12          THE COURT:  All right.  Anything you need to add,

13  Attorney Delaney?

14          MR. DELANEY:  Nothing to add, Your Honor.

15          THE COURT:  All right.  Thank you.  I'll take a few

16  minutes for a recess.

17          THE BAILIFF:  All rise.

18      (Recess at 11:03 a.m., recommencing at 11:19 a.m.)

19                        SENTENCING

20          THE COURT:  It's very unusual for me to take a break

21  during a fully negotiated plea.  I've done hundreds and

22  hundreds of these.  I don't know if I've ever taken a break

23  before.  But I think the importance of this case to everyone

24  involved -- the State, Ms. Introcaso, the court system, Ms.

25  Partello, and other members of the public -- needs careful

1 thought in terms of whether to accept this proposed sentencing
2 scheme in this case.

3           I do want to point out that the charging decisions
4 in this case under our system are made by the State.  And the
5 charging decisions cannot be interfered with in any way by the
6 Court.  The Court does not decide ultimately what charges are
7 before it or pleas to be entered into by a defendant.  And as
8 a judge, I respect that at the highest level.  The State and,
9 in this case, Attorney Ward has all the investigative
10 information in his possession.  He obviously, as he referred
11 to, has mental health materials that were submitted in
12 mitigation that I don't see.  He has very difficult yet
13 crucial decisions to make in this case.  And he made them and
14 charged three Class A misdemeanors:  two tampering with public
15 records and one unsworn falsification complaint.

16           All of these are directly tied to the JCC process,
17 originally initiated by Ms. Partello and related to the
18 alteration of court orders in the underlying family division
19 case that she was a party to.

20           I made a decision to hear from Ms. Partello based on
21 everything I had reviewed and importantly the offer of proof I
22 have heard.  And I think there were a few words that she said
23 that addressed this particular tragic circumstance for
24 everyone involved in this courtroom head on.  The violation of
25 trust that she spoke about is clear in this case.  More

1    importantly, the loss of trust that she referred to for

2    herself related to a family division case involving her son is

3    evident.  These types of crimes eviscerate the trust that

4    people put in the judicial system.  And unfortunately, this

5    tragedy came to fruition for the litigants in that case for

6    then Judge Introcaso.

7            The family court probably deals with our most scared

8    and sensitive dynamics and issues, especially when it involves

9    children.  There's been a flagrant violation of trust before

10   the JCC with the associated ethics violations that were

11   stipulated to.

12           However, as I look at this case, I can't just focus

13   on the crimes.  If I just focused on the crimes, quite

14   frankly, this would be a 12-month stand-committed sentence.

15   But that's not all I focus on in a case.  I have to turn my

16   attention to the constitutional objectives of punishment,

17   deterrence, and rehabilitation.  And the Supreme Court in a

18   long line of cases has indicated that I must sentence the

19   individual before me.

20           So as I consider the goals of punishment,

21   deterrence, and rehabilitation, I have to take into account

22   the individual I have before me.  Ms. Introcaso is a 57-year-

23   old woman who obviously has gone through a high level of

24   education, graduated from law school, became a lawyer,

25   ultimately became a judge.  The only representation I have in

49

1   front of me in this proceeding is that she led a distinguished

2   legal career, as represented by Attorney Delaney.  I'm aware

3   that there are people in this courtroom that strongly disagree

4   with that, but that's the record I have in front of me.

5          The constitution also is very clear in terms of when

6   it considers these objectives.  There's very strong language

7   in that constitution that says the purpose of punishment is

8   not to exterminate mankind but to reform man and woman.  The

9   ultimate goal of any sentencing is rehabilitation, is

10  reformation.

11         So as I consider these crimes, I have to consider

12  that I have a 57-year-old woman before me, a former judge who

13  has now pled guilty to three misdemeanor crimes involving the

14  alteration and falsification of specific court records before

15  the JCC.  She has no criminal history before these crimes.

16  This is her first conviction of any kind in a courtroom.

17         I'm also cognizant of the fact, as referred to by

18  the State, that there's been other consequences that have

19  served as significant punishment for Ms. Introcaso, including

20  the loss of a career, the loss of employment and the financial

21  stability that comes with that, the significant loss of

22  reputation.  And as I consider punishment, specifically as I

23  consider whether 12 months should be suspended or a portion

24  should be suspended, I have to think under the constitution of

25  what does that punishment accomplish.  The main goal of

1    punishment is to prevent the recommission of crimes.  It's to

2    prevent recidivism.  The constitution is very clear on that.

3          The likelihood of recidivism in this case,

4    especially based on the nature of these particular crimes, is

5    either extremely low or nonexistent.  She's lost her position

6    as a judge.  She won't be altering or falsifying anything in a

7    courtroom.  The punishment and deterrence has been directly

8    addressed by the JCC and the ethical violations and the, in

9    essence, removal from the bench.

10          And while I fully appreciate and understand Ms.

11   Partello's proposal for 12 months in jail and her reasoning

12   behind that, I have to carefully look at the individual before

13   me and consider that.  I have to consider whether jail is

14   going to accomplish anything or if it's just meant to really

15   destroy or, to use the constitution's word, exterminate this

16   particular individual and her life.

17          In many cases, punishment is especially needed.

18   Cases involving violence are particular punished at a high

19   level.  Cases involving violations of people's homes or their

20   bodies, whether it be burglaries or whether it be aggravated

21   felonious sexual assault, the punishment has to be

22   significant.

23          Punishment has been rendered in this case.  For all

24   intents and purposes, former Judge Introcaso's life, her

25   career track, her retirement track, her financial track have

1   been destroyed by these three crimes.  And I want to stress

2   that it hasn't been destroyed by anyone else other than Ms.

3   Introcaso.  And that truly is tragic.

4          With the representation that you made, Attorney

5   Delaney, regarding her reputation, obviously that reputation

6   boded for a very different career track than we have now.

7          So she's accepted responsibility for her actions.

8   She has no criminal history.  She's had an exemplary career.

9   Although I know there's strong disagreement with that, that's

10  the representation in front of me.

11         I also have to comment on other members of the

12  judiciary because I hope in some ways, that will rebuild the

13  trust that you, Ms. Partello, justifiably lost and others have

14  lost.  You saw Judge Hicks report this to Attorney General

15  MacDonald.  You saw the JCC handle this.  Importantly, as I

16  read through the affidavit, you saw the highly ethical conduct

17  of Ms. Lodes and Ms. Dabilis, long-time employees of the court

18  system.  You saw Clerk Bisson step in and give her testimony.

19  All people within the judiciary working to see that these

20  ethical violations were not hidden, were brought into

21  transparency, and dealt with.

22         After considering those objectives of punishment,

23  deterrence, and rehabilitation, I have decided that I am going

24  to accept the proposed House of Correction sentences and

25  impose them upon you, Ms. Introcaso.



52

1            And, Ms. Partello, I'll just say this to you before

2    I impose those sentences.  I allowed you to speak because I

3    wanted to hear from you.  I allowed you to speak because of

4    what I read and heard today, especially by way of offer of

5    proof.  And because I have accepted these sentences, I don't

6    want you to take that as I haven't heard your voice.  I have,

7    loud and clear.  And I'm glad I allowed you to speak today.  I

8    know others feel differently, potentially, about my rulings on

9    the motion to intervene.  I respect those views also.  I just

10   have to consider things under the law and make a call on what

11   I receive as I walked in the door this morning.  And I made

12   that call, and I don't regret it in any way.  But you need to

13   know that not only was your voice heard, but the voice of Ms.

14   Lodes, the voice of Ms. Dabilis, the voice of Clerk Bisson,

15   and the voice of Judge Hicks were heard.  So I appreciate your

16   comments today.

17            The loss of trust remains, however, and it's up to

18   judges like myself and many others, but especially judges in

19   the family division to rebuild that.  There's been a lot of

20   destruction with trust.

21            With that all being said, Ms. Introcaso, if you

22   would stand, please.  I am going to now impose these

23   sentences.  These are three -- yes?

24            THE DEFENDANT:  Excuse me, if I may, Your Honor?

25            THE COURT:  Yeah.  Sure.

1              MR. DELANEY:  Thank you, Your Honor.

2              THE COURT:  Okay.  Thank you.

3              Ms. Introcaso, these are three separate sentences,

4     but they're all identical and concurrent.  So I'm not going to

5     read them three separate times.

6              THE DEFENDANT:  That's fine, Your Honor.

7              THE COURT:  I'll read them one time, but please

8     understand that -- three different -- similar sentences, two

9     similar identical crimes and one other crime.

10              So in 2021-CR-126 on charge ID 1837214 and -15C,

11     upon your pleas under the Alford case, findings of guilty are

12     entered for these two Class A misdemeanors.

13              And on charge ID number 1923979C, a plea of guilty

14     is entered on the crime of unsworn falsification.

15              All these convictions are for Class A misdemeanors.

16              I'm just going to make a few corrections.  I think

17     there's one correction you wanted me to make, and I'll make

18     that when I've entered these.  The date of crime for the

19     unsworn falsification will be April 3rd of 2020.

20              Again, these convictions are for Class A

21     misdemeanors, and you are sentenced as follows.  You are

22     sentenced to the House of Corrections for a period of 12

23     months.  All of each sentence is suspended during good

24     behavior and compliance with all terms and conditions of this

25     order.  Any suspended sentence may be imposed after a hearing

1  at the request of the State. The suspended sentence begins

2  today and ends two years from today. The sentence are all

3  concurrent with each other if they are ever imposed.

4          You are ordered to participate meaningfully and

5  complete any counseling, treatment, and educational programs

6  as directed by the correctional authority or the

7  probation/parole officer. That only applies if these

8  sentences are ever imposed.

9          You shall perform 100 hours of community service and

10  provide proof to the state within 12 months of today's date.

11  Law enforcement agencies may return evidence to its rightful

12  owner.

13          And you're ordered to be of good behavior and comply

14  with all terms of each of these sentences. Good behavior

15  means that you not commit any federal, state, or local crimes.

16          Do you understand each one of those sentences, Ms.

17  Introcaso?

18          THE DEFENDANT: I do, Your Honor.

19          THE COURT: I know this is a very dark day for you.

20  But I think through your provision of community service and

21  with your intelligence and your engaging personality, which we

22  have witnessed in the legal system over time, that you can

23  repay this debt and really impact other lives. So I leave you

24  with that hope. I really hope you can rebuild your life, and

25  that you can have a real positive impact in others. And I

1   know how profoundly tragic this day is for you, but you've got

2   the rest of your life to create some real meaningful and

3   constructive impact on this society.  And that will start with

4   your community service.

5           So as you go, I wish you well with that.  I hope

6   that you can transform your life and really have an effect on

7   the people within it.  All right.

8           THE DEFENDANT:  Thank you, Your Honor.  I appreciate

9   you doing this hearing today.

10          THE COURT:  All right.  Thank you very much.  That

11  will conclude the hearing.

12          Thank you, Attorney Ward.

13          Thank you, Attorney Delaney.

14          Thank you, Ms. Partello.

15          MR. WARD:  Thank you, Your Honor.

16          THE BAILIFF:  All rise.

17      (Proceedings concluded at 11:36 a.m.)

18

19

20

21

22

23

24

25

<u>CERTIFICATE</u>

I, Bonnie Torrez, a court-approved proofreader, do hereby

certify that the foregoing is a correct transcript from the

official electronic sound recording of the proceedings in the

above-entitled matter, to the best of my professional skills

and abilities.

TRANSCRIPTIONIST(S):   Bonnie Torrez, CET-1213

BONNIE TORREZ, CET-1213                 November 28, 2021
Proofreader

