**EXHIBIT**
**12**

 **Minuteman Press**®

**Packing Slip**

*2022-0517*

WE DESIGN, PRINT & PROMOTE...**YOU!**

44 Nashua Rd., Unit 18 Londonderry, NH 03053
(603) 818-4390 www.londonderry-nh.minutemanpress.com

 POSTED

| Date | Client PO No. | Invoice # | Ship Via |
|------|---------------|-----------|----------|
| 12/20/2022 | | | DELIVERED |

**Ship to:**   **Supreme Court of NH**        **Bill to:**
**1 Charles Doe Drive**
**Concord, NH 03301**

| QTY. Ordered | Description | No. of boxes | Qty. per box | Qty. Delivered |
|---|---|---|---|---|
| | 659-2106-DM-00288, 2022-0517 | | | |
| | 659-2106-DM-00288-20201106 | | | |
| 1 | In the Matter of Dana Albrecht and Katherine Albrecht | | | 1 |
| | Pages 144 | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| REC'D NH SUPREME COURT DEC 20 '22 PM 4:21 | | | | |

Signature: _J. Sanders_           Date: _12-20-22_

1

1        STATE OF NEW HAMPSHIRE

2      9TH CIRCUIT COURT - FAMILY DIVISION - NASHUA

3   IN THE MATTER OF:            ) Family Division Case No.
                                 ) 659-2016-DM-00288
4   DANA ALBRECHT,               )
                                 )
5           Petitioner,          )
                                 ) Nashua, New Hampshire
6         and                    ) November 6, 2020
                                 ) 11:37 a.m.
7   KATHERINE ALBRECHT,          )
                                 )
8           Respondent.          )
    _____ )

9                    HEARING ON MOTIONS
10        BEFORE THE HONORABLE BRUCE DALPRA
     MARITAL MASTER OF THE CIRCUIT COURT - FAMILY DIVISION

11              **REVISED – UNABRIDGED FINAL WITH TIMESTAMPS**

12   APPEARANCES (All present by video or telephone):

13
    For the Petitioner:          Joseph Caulfield, Esq.
14                               CAULFIELD LAW AND MEDIATION
                                 OFFICE
15                               126 Perham Corner Rd
                                 Lyndeborough, NH 03082
16
    For the Respondent:          Michael J. Fontaine, Esq.
17                               WELTS, WHITE & FONTAINE, P.C.
                                 P.O. Box 507
18                               Nashua, NH 03061

19   Also Present:               Kathleen Sternenberg
                                 GAL
20
    Audio Operator:              Electronically Recorded
21                               **Not Monitored**

22   TRANSCRIPTION COMPANY:      eScribers, LLC
                                 7227 N. 16th Street, Suite 207
23                               Phoenix, AZ 85020
                                 (800) 257-0885
24                               www.escribers.net
    Proceedings recorded by electronic sound recording; transcript
25   produced by court-approved transcription service.

2

I N D E X

| WITNESS(ES) | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

FOR THE PETITIONER:

| Dana Albrecht | 4 | 40 | 66 | |
| Dana Albrecht (rebuttal) | 126 | | | |

| WITNESS(ES) | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

FOR THE RESPONDENT:

| Katherine Albrecht | 78 | 126 | | |

| MISCELLANEOUS | PAGE |
|---|---|
| Petitioner Rests | 74 |
| Respondent's Opening Statement | 74 |
| Respondent Rests | 137 |
| Matter Taken Under Advisement | 130 |

| EXHIBITS | ID | EVD |
|---|---|---|
| NONE | | |

3

1        (Proceedings commence at 11:37 a.m.)

2              THE COURT:  Good morning, Atty. Caulfield?

3              MR. CAULFIELD:  Yes.

4              THE COURT:  Atty. Fontaine?

5              MR. FONTAINE:  Good morning, Judge.

6              THE COURT:  My name is DalPra.  You folks are

7   connected to the courtroom, and we're here on four pleadings.

8   And they both are pretty much -- the first two pleadings filed

9   by Mr. Albrecht regarding a modification of the parenting

10  plan, and the second two pleadings filed by Mrs. Albrecht with

11  pretty much the same requests, modification of the parenting

12  plan.

13             I'll tell you at the outset that the several hundred

14  pages of exhibits have not been reviewed to date.  And for the

15  record, all the exhibits will be marked for identification,

16  and I will make a determination following the hearing as to

17  which documents should be submitted as full exhibits and which

18  aren't.  So we won't have any argument on those at this point.

19             Mr. Caulfield, these are your motions; you may

20  proceed.

21             MR. CAULFIELD:  Yes, Your Honor.  I -- I just want

22  to point out that that doesn't clear up the docket as they set

23  forth in Petitioner's --

24             THE COURT:  I don't care whether it clears the

25  docket up or not, counsel.  The order that went out said that



4

1 | these four motions are what we're hearing today, and that's

2 | what I'm hearing today.

3 |       MR. CAULFIELD:  Yes, Your Honor.  And -- and -- and

4 | also, there's a couple of motions that both parties have

5 | signed that are sort of in the nature of in limine motions.

6 |       THE COURT:  Proceed.

7 |       MR. CAULFIELD:  Yes, Your Honor.  Call Dana Albrecht

8 | to the stand, please.

9 |       THE PETITIONER:  I'm here.

10 |       MR. CAULFIELD:  Okay.  Dana, could you raise your

11 | right hand, and swear that what you testify to today will be

12 | the truth, the whole truth, and nothing but the truth?

13 |       THE PETITIONER:  Yes.

14 |       DANA ALBRECHT, PETITIONER, SWORN

15 |          DIRECT EXAMINATION

16 | BY MR. CAULFIELD:

17 |   Q  Okay.  Would you please state your name for the

18 | record, sir?

19 |   A  Dana Albrecht.

20 |   Q  Where do you reside, sir?

21 |   A  Nashua, New Hampshire.

22 |   Q  And are you the defendant (sic) in this divorce and

23 | petition to modify?

24 |       THE COURT:  He's the --

25 |   A  I am the Petitioner in the --



5

1          THE COURT:  -- Petitioner.

2      A  -- divorce.

3  BY MR. CAULFIELD:

4      Q  Yes.  And you are also the moving party, the

5  Petitioner, to modify, correct?

6      A  Yes.

7      Q  Now, you have -- you have a filed a sworn offer of

8  proof in this case, have you not?

9      A  Yes.

10      Q  And if you were to testify, would that be your

11  testimony, sir?

12      A  Yes.

13      Q  Okay.  And that -- and that described, basically, why

14  you feel the Court should order this family into counseling?

15      A  Absolutely.

16      Q  Okay.  Now, in addition to your sworn offer of

17  proof --

18          MR. CAULFIELD:  And Your Honor, I -- I guess I need

19  to know if you accept that sworn offer of proof.  If not, I

20  would have my client testify to it.

21          THE COURT:  I'll need testimony, counsel.

22          MR. CAULFIELD:  Okay.

23  BY MR. CAULFIELD:

24      Q  Dana, direct -- directing -- I'm going to question you

25  on the substance of your sworn offer of proof.



6

1     A  All right.

2     Q  So -- so let's start with, how old are you, sir?

3     A  I'm 49.

4     Q  Okay.  And what do you do for a living?

5     A  I'm unemployed.

6     Q  Okay.  What's your education, sir?

7     A  I have a master's from Harvard in applied mathematics.

8     Q  Okay.  And were you married to Dr. Katherine Albrecht?

9     A  I was.

10     Q  Okay.  And you're divorced?

11     A  Correct.

12     Q  Okay.  And do you have any children?

13     A  Yes.

14     Q  Okay.  Could you tell us, please, about your children

15 together?

16     A  My oldest child is ██████.  He is 23.  He lives with me

17 here in Nashua, New Hampshire, and has for the past couple --

18 almost couple years, since Christmas of 2018.  My next son is

19 ██████.  He is currently 20.  I understand that he is with his

20 mother in Southern California due to dorms being closed at

21 college because of COVID.  My next daughter is ██████.  She is

22 currently age 16, residing with her mom in Sierra Madre,

23 California.  And my youngest daughter is ██████.  She is

24 currently 13, residing with her mother in Sierra Madre,

25 California.  ██████ attends Maranatha High School.  ██████

7

1   attends Flintrith -- Flintridge Sacred Heart Academy.

2       Q   Now, let me -- I'm sorry, were you saying something

3   else?

4       A   No, go ahead.

5       Q   Oh, okay.  Now, do you have any substance abuse

6   history?

7       A   No.

8       Q   Okay.  Have you ever been convicted of a crime?

9       A   No.

10      Q   Okay.  Have you ever had a complaint that DCYF

11  determined to be founded?

12      A   No.

13      Q   Okay.  There is -- there is a DV restraining order

14  against you, correct?

15      A   Correct.

16      Q   Okay.  Very briefly, would you tell us how that

17  occurred?

18      A   Yes.  I was at the -- putting a pleading to the court.

19  It's still outstanding from over a year ago now.  When that

20  wasn't ruled on, I went to Collinsville Bible Church on

21  Sunday, November 3rd, 2019 in an attempt to see or have some

22  contact with my children, ████, ████, and ████, who were

23  attending at that time.  There was no prior prohibition in

24  place for me to go there.  And quite frankly, I am confused

25  why I have a DV because I'm not aware of two events that would

8

1  cause one to have me (sic).  So I was there for just one day,

2  and I was just trying to see my kids.

3       Rob Cooper told me I could come back on a different

4  day --

5           MR. FONTAINE:  Your Honor, Your Honor.  Your Honor,

6  I'm going to object.  This -- there -- there was a extensive

7  trial on this matter.  There was findings and rulings by the

8  Court, which are actually at our -- are part of our exhibits.

9  This -- this shouldn't be an opportunity for him to retestify

10 and recharacterize his testimony at the previous hearing.  The

11 judge already made findings on that.  I object to this.

12          MR. CAULFIELD:  Your Honor, one -- once -- the

13 statute talks about someone being a fit parent.  I want to

14 show that Mr. Albrecht is a fit parent.  The only blemish on

15 his record is the second DV that Ms. -- that Dr. Albrecht has

16 brought.  I think he's entitled to explain what happened.

17          THE COURT:  It sounds like he's trying to relitigate

18 the -- the hearing.  I'm going to be bound solely by the

19 findings of the court in the -- the prior court in that -- in

20 that matter, at this point.  I'll note that the only

21 quote/unquote blemish on his record, as you put it, counsel,

22 is that there was a domestic violence entered against him.

23 Other --

24          MR. CAULFIELD:  Thank you, Your Honor.

25          THE COURT:  Other than that, you may proceed.



9

1          MR. CAULFIELD:  Thank you, Your Honor.

2     BY MR. CAULFIELD:

3          Q   Now, I want to -- I want to go over, Mr. Albrecht,

4     what your contacts with these children have been over the last

5     several years, to the end of how little your contact has been

6     with these children.  Would you briefly explain that to Master

7     DalPra?

8          A   So the date of separation was April 8th, 2016.  During

9     the first portion, while they were still in California, I

10    believe it was 38 days total I saw them.  They moved out --

11    they moved to Pasadena September 1st, 2017, I believe.  And

12    since Christmas 2018, which is one year and ten months, I have

13    not been able to see them at all.  And I don't even know what

14    phone number or email address I should even use to reach out

15    to them.

16         Q   Have you made any attempts to see these children?

17         A   Absolutely.

18         Q   Could you -- could -- could you -- could you go over

19    the attempts that you've made to see these children?  And if

20    you -- and if there are any exhibits that you filed in this

21    case that -- that refer to your testimony and supports your

22    testimony, could you please reference them?

23         A   Yes.  So first, I'd like to reference what I refer to

24    as exhibit group B, which are Exhibits Number 7 through 28.

25         Q   Okay.  One moment, please.  I need to slide over to my



10

1  PC to bring that up.  So this is -- this is your -- this was

2  your first exhibit list?

3       A  Yes.

4       Q  And what group is it -- would you tell me what group

5  it is again, please?

6       A  Group B, starting with Exhibit 7.

7            MR. CAULFIELD:  Your Honor, do you -- are you -- are

8  you going to be looking at these now or just making notes, or

9  should I wait for you?  Or what should we do?

10           THE COURT:  I have them with me.

11           MR. CAULFIELD:  Okay.

12  BY MR. CAULFIELD:

13       Q  So what -- so continue, Mr. Albrecht.

14       A  Okay.  So January 15th, Exhibit 7, you requested, I

15  believe twice, for the kids to come out here for their spring

16  vacation.  We provided even forms for unaccompanied minors for

17  ██████'s travel.  We never received those back, and the kids

18  did not make it on the plane.  That's starting with their

19  spring vacations.

20           When we get to summer -- hang on.  One moment here.

21  So that's starting with Exhibit 8.  I'm very frustrated

22  because the kids were here at camp, at The Wilds of New

23  England --

24           MR. FONTAINE:  Your Honor -- Your Honor, this is

25  Mike Fontaine.  I object to this.  This -- this was litigated



11

1   at length before you at a motion hearing regarding the

2   December -- Christmas -- the December 2018 Christmas fiasco.

3   And the -- the -- this information is going back in time.

4   This is -- you -- you made orders and you made findings in

5   your orders at -- after that motion hearing pertaining to the

6   December incident that took into account all these same

7   arguments.  He's rearguing this case and attempting to reargue

8   these points all over again, and they've been litigated before

9   you.  It's wasting your time and our time having to listen to

10  this all over again.

11          THE COURT:  I'll allow it as --

12          THE WITNESS:  We never discussed the summer of 2019.

13          THE COURT:  I'll allow it as background, counsel.

14          Please continue.

15          MR. CAULFIELD:  Thank you, Your Honor.  Thank you,

16  Your Honor.

17      A   In the summer of 2019, my children were in New England

18  at The Wilds of New England associated with Collinsville Bible

19  Church.  I didn't know that.  So Exhibit 8, Atty. Fontaine

20  wrote a letter that didn't include that information.  And

21  because I was unaware and we notified them I wanted parenting

22  time, we, meaning  my older son and I, flew out to

23  Southern California in an attempt to exercise our summer

24  parenting time from July 31st, 2019 through August 14th, 2019.

25  That's two out of the four weeks that the Court awarded me.

12

1        After we got there, we were very shocked to learn that

2   Katherine had put them on a plane before I even left and sent

3   them to the east coast.

4        She told the Sierra Madre police -- one moment -- that

5   their father does not know.  That would be Exhibit 40.  So

6   even before I got there, she told the Sierra Madre Police that

7   I didn't know they were in camp.  And that's why I went, in an

8   attempt to see my children per the Court's parenting plan.

9        Should we move onto --

10  BY MR. CAULFIELD:

11       Q  I would -- I would -- I -- I -- I would move on, yes,

12  rapidly; as rapidly as you can, but still prove the case.

13  Yes.

14       A  Okay.  So -- so when we got back -- so again, this

15  exhibit group B, it's the chain of correspondence between

16  attorneys.  I missed the email that's Exhibit 9 or 10 at the

17  time.  They were alleged to be sent by my daughters.  Those

18  were sent while they were here at Collinsville Bible Church,

19  so I actually didn't see those before I left.

20       Q  If may -- if may -- if I can maybe, Mr. Albrecht, you

21  reference --

22       A  Yes.

23       Q  -- the -- the attempts that you sought to exercise the

24  parenting rights that Master DalPra gave you, the -- the

25  attempts --



13

1       A   Okay.

2       Q   -- in other words, that -- that may well be an

3   exhibit.  And then what your result was, and then I think you

4   could just reference the exhibit and Judge -- and Master

5   DalPra can -- if he wants to, can look at the letter and learn

6   more.  I -- I think that's --

7       A   Okay.

8       Q   -- probably sufficient and it would help you move --

9       A   I --

10      Q   -- and it would move the business, Mr. Albrecht.

11      A   Okay.  I tried and failed.  We flew all the way across

12  the country.

13          Moving on, November -- so moving on.  When I learned

14  that they were out here, we -- or when Katherine brought

15  ███ , ███ , and ███ out here, we requested that the Court

16  provide parenting time.  That motion was never ruled on, so

17  that's still pending.  So I wasn't -- and that's when I tried

18  to go to the church Sunday to see them.  So as we know, that

19  didn't work out.

20          So next up, Exhibit 14, November 7th, we had a request

21  for me to go out to California for a weekend that the Court

22  has awarded I can see them in a reasonable amount of time, ten

23  days' notice, so we did that.  I -- that was 11/7.  The

24  following day, Katherine responded by filing her DV, so that

25  didn't work out.  Or -- I believe that also references me

14

1  wanting to see them during Christmas, December 27th through

2  31st, which the Court awarded me.  That didn't work out.

3      Q  You say "that didn't work out".  What -- what do you

4  mean?

5      A  Quite frankly, it's my understanding that Katherine

6  was not amenable to that happening, and I actually didn't just

7  get off a plane that time.  I wasted my time the last time I

8  did that.

9      Q  Okay.

10     A  And there was also a lot of court pleadings going on

11 at that time.  We -- on December 13th, 2019, we proposed --

12     Q  Is there -- is there -- is there an exhibit regarding

13 that, Mr. Albrecht?

14     A  Yes, Exhibit 17.

15     Q  Thank you.  And it'd be helpful if you reference the

16 exhibits for Master DalPra.

17     A  Okay.  So Exhibit 17, December 13th, 2019, we tried to

18 get Craig Childress onboard as a reunification counselor.  If

19 there's a relationship problem with my children, I'd like to

20 see a counselor about that.  I'd like to be able to have them

21 see a counselor about that and figure out what the issue is.

22 So Exhibit 17, trying to get Craig Childress, whom Katherine

23 rejected, so that didn't work out.  Moving on to --

24     Q  So by -- excuse -- excuse -- excuse me, Mr. Albrecht.

25 "That didn't work out" --



15

1     A   Yeah.

2     Q   -- "that didn't work out", "that didn't work out".

3   You mean that you didn't have parenting?

4     A   I didn't have parenting and Katherine didn't

5   cooperate.

6     Q   Thank you.

7     A   Exhibit 18, we sent a letter quoting that the Court

8   order asking for me to be able to place calls to both ███

9   and ███ on phone numbers.  The Court wanted us to work out

10  phones, Skype, and FaceTime with them December 20th, 2019, so

11  close to a year ago.  And Katherine was uncooperative with

12  that and was unwilling to set up any phones, Skype, or

13  FaceTime with ███.  So I wasn't even -- was unable to

14  discuss the Christmas holiday period with them.

15        Exhibit 18, we also offered to travel to Southern

16  California for the weekend of January 11th and 12th, 2020, for

17  parenting time.  And Katherine basically refused to have that

18  happen.

19        And also notes we gave them, I do believe

20  (indiscernible) any reunified -- reunification counselor, but          ███ **[DF1]:** 11:58:08

21  Katherine was not amenable to that.

22        Moving on to Exhibit 19, we requested parenting time

23  for the children's spring and school vacations 2020 as awarded

24  by the Court.  I was hoping that my entire extended family --

25  my Aunt Karen, my cousin Liz, Linda, Karen's granddaughter,

16

1 Valerie -- all the people on my side of the family that ████

2 and ████ have historically been able to see would be

3 delighted to see them.  I was also hopeful that they would

4 want to spend time with their brother ████ who lives with me.

5 And Katherine again refused reunification counseling and did

6 not want to follow the Court's parenting plan for those spring

7 vacations.

8      And the only response we got from Atty. Fontaine was

9 if I wish to communicate with them, it would have to be postal

10 mail only.  And he asked that I send letters and cards, which

11 I did.

12      Q  Excuse me, Mr. Albrecht; is -- is there some exhibit

13 that supports that testimony?

14      A  Yes.

15      Q  Would you tell us --

16      A  Yes, Exhibit 23 is the card I sent to ████ and

17 Exhibit 24 -- excuse me, the card and letter I sent to ████,

18 and Exhibit 24 is the card and letter I sent to ████ (sic).

19      Q  What happened next, Mr. Albrecht?

20      A  July -- we also asked for the four weeks of court-

21 awarded parent -- parenting time July 8th, 2020 through August

22 1st, and also August 8th through August 22nd.  We proposed

23 those dates specifically, noting that we were, of course,

24 amicable to alternate dates if those would work better for

25 Katherine.  And we asked Katherine to bring ████ and ████

17

1  to Sierra Madre Police Department, Sierra Madre, California,

2  for a parenting stage, and Katherine did not agree.

3       Q  Is that memoral -- memorialized in --

4       A  So I didn't fly out.

5       Q  Is that memoral -- memorialized in an exhibit?

6       A  The request is Exhibit 21, and the response from Atty.

7  Fontaine is Exhibit 22.

8       Q  That's (indiscernible).

9       A  So there was some concern whether they actually got

10 that because Exhibit 25 --

11      Q  Got -- got -- excuse -- excuse me, Mr. Albrecht.  Got

12 what?

13      A  That the children even got the cards because Exhibit

14 25, they're signed for her agent, and it's not until almost

15 three weeks later that we get a response from Nadine

16 (phonetic) -- that's Exhibit 26 -- that Katherine said that

17 the girls' weren't received.  So I'm not sure it took them

18 three weeks after they arrived to the girls to get those, but

19 that's neither here nor there.

20      We next asked on Dec -- on September 18th, 2020,

21 because Katherine rejected our first proposed counselor, Dr.

22 Craig Childress.  We proposed four more; that's Exhibit 27.

23      Q  So what -- excuse me for one moment.

24      A  And --

25      Q  Excuse me one moment.  So you -- you proposed a Dr.

**Commented [DF2]:** 12:00:55

18

1   Craig Childress.  Now, is -- is -- how did you find him?

2       A  I simply went on the internet looking for who I

3   thought was the best qualified person in the immediate

4   geographic area.  So -- which is in --

5       Q  Okay.

6       A  -- Claremont --

7       Q  And so --

8       A  -- you know, (indiscernible) California.

9       Q  Okay.  And Dr. Albrecht rejected him?

10      A  Correct.

11      Q  Now, did -- now, you propose some other people?

12      A  Yes.  So again, we're on Exhibit 27 where we proposed

13   Carey Edwards, attorney (phonetic), Renee A. Cohen, Ph.D.,

14   Lynn Steinberg, Ph.D., and Alan Yellin, Ph.D.

15      Q  And -- and --

16      A  I --

17      Q  And excuse me for a moment.  And are their curricular

18   vitaes and their fees set forth in the exhibit?

19      A  Yes, I was just --

20      Q  Not the exhibit --

21      A  -- about to get there, that their CVs are set forth in

22   Exhibits 1 through 5, one CV for each reunification counselor.

23   And Exhibit 6 is their fees.

24      Q  And what was Dr. Albrecht's response to these

25   additional five reunification therapists you proposed?

**Commented [DF3]:** 12:02:25

19

1    A  She did ask for fees, which she provided.  After that,
2 we attempt --

3    Q  You mean -- you mean, their -- you mean -- excuse me;
4 you mean their fees, correct?

5    A  Their fees, yeah.

6    Q  Okay.  Gotcha.

7    A  But after that, repeated requests, I believe, through
8 counsel, did not get any response back from her on those.

9    Q  I see.

10   A  So that would be -- I would refer the judge to my
11 Exhibit 28, which is the email chain of us attempting to get a
12 response.

13   Q  Regarding these five additional reunification
14 therapists?

15   A  Four additional after the first one --

16   Q  Oh, I'm sorry.

17   A  -- was rejected.

18   Q  I'm sorry, yes.

19   A  Yeah, so five total with the (indiscernible).  So

**Commented [DF4]:** 12:04:14

20 we've got no cooperation on getting reunification therapy for
21 the kids.  Does that answer your question?

22   Q  I -- I think so.  So now -- so -- so now we'll pose
23 another one.  One of the issues brought -- brought up in this
24 case is the children's teeth.  And from --

25   A  Yes.

20

1    Q  -- the pleadings -- from the pleadings, I'm sure the

2  Court will notice that Dr. Albrecht is -- is blaming you for

3  the children's teeth and, I believe, wants to take away joint

4  medical deciding ability from you, if I remember correctly.

5  And you're blaming her for the teeth and saying she's not

6  cooperating; is that a fair statement?

7    A  That's a fair statement.

8    Q  Okay.  Could you please tell Doc -- could you please

9  tell Master DalPra your position as to the children's dental

10  needs and what has been happening with them?

11    A  One moment, let me find the relative (sic) exhibits.

12  So I would characterize my position is I've agreed to all

13  medical and dental care that Katherine has proposed with a

14  single exception.  So we had an -- I'm going to cover teeth

15  and vaccinations at once, if you don't mind?

16    Q  I don't mind.

17    A  Okay.  So Exhibit 89 represents an agreement that we

18  had to obtain a vaccination schedule in writing from Dr.

19  Greenberg.  Exhibit 87 is Katherine's proposing Dr. Greenberg.

20  So she proposed Dr. Greenberg; I accepted; we had an

21  agreement.  And after that agreement was violated by

22  Katherine, I did not consent to start over with Dr. Hanif.

23  Quite frankly, given the amount of trouble that caused, at

24  this stage, I -- I would reconsider.  But anyway, the

25  different tracks that Katherine --



21

```
 1        Q   Excuse -- excuse -- excuse me, Mr. Albrecht.  What do
 2    you mean the --
 3        A   Yes.
 4        Q   -- agreement was violated by Dr. Albrecht?
 5        A   So we agreed that Dr. Greenberg was going to provide
 6    us with a schedule for vaccinations.  Now, I don't care where
 7    the kids actually get them, but after spending two or three
 8    hours on the phone with Dr. Greenberg together going over
 9    that, I'd at least like to get the vaccination schedules in
10    writing.  At that point, we can go to Walgreens and get it for
11    free; I don't care where we go.  But there were real medical
12    issues that she had to address, and the schedule was not the
13    usual one.  And she never even got either kids for a single
14    appointment.  You know, what's an appointment cost, a couple
15    hundred bucks?  For a single appointment so we could get that
16    schedule so we could receive the total visit.
17        Q   Mr. Albrecht, you mentioned -- so -- so you said there
18    were real medical issues regarding getting the kids
19    vaccinated.  Would you explain that to Master DalPra this
20    morning?
21        A   Yes, there is a family history of allergic reactions.
22    That is the only time I have ever been admitted to a hospital
23    was ICU 20 years ago when I had a reaction to vaccines.  What
24    that means is I'm not opposed to them.  I just want the doctor
25    who's doing this to be well aware of that and to give them
```



22

1    separately, not all at once, on a schedule that takes that

2    into account.

3        Q  So you -- so you feel that this is -- I --

4        A  I feel that we worked that all out, and then it got

5    canned.

6        Q  Okay, all right.  All right.

7        A  And it got canned over failure to want to spend a

8    couple hundred bucks on one more appointment.

9        Q  All right.  Please continue.

10       A  So my greater concern for the children is their

11   dental.  She's resisted, canceled, and changed appointments

12   since the beginning of this case.  So if I may refer to

13   Exhibit 92.  This is way back in the first DV where I set up

14   an appointment with Dr. Cheifetz for ███, needing an exam

15   and X-ray.  I paid for that in full in advance on my credit

16   card.  And when she took ███ there, she refused to have a

17   cleaning done.  If I wasn't under a DV, I would have taken

18   ███ myself because I normally, throughout the marriage, was

19   the one who took these kids to the dentist.

20       Q  This -- by this -- when you mean "under a DV", you're

21   talking about the temporary orders of the first DV which was

22   with the -- the DV was eventually dismissed, correct?

23       A  Right.  So the first one --

24       Q  Okay.

25       A  -- had me required to go to the church; the second one

23

```
 1  prohibited me from going to church.
 2       Q  Okay.  So that -- so those are the -- so when you say
 3  "under the DV", you mean the temporary orders on the first DV?
 4       A  Temporary, yes.
 5       Q  Okay.
 6       A  Yeah, so back in 2016, we -- we had this going on
 7  already when Katherine -- when we start to schedule dental
 8  appointments, and basically Katherine's not getting them
 9  there.  The response --
10       Q  You --
11       A  -- we got from --
12       Q  Excuse me.
13       A  -- Atty. Font --
14       Q  Excuse me.
15       A  Yes.
16       Q  Excuse me just one second.  I'm sorry to interrupt
17  you, but I want to -- just want to ask you a question.
18       A  Sure.
19       Q  So before -- before you were removed from the
20  household ex parte way back when, who used to --
21       A  Yeah.
22       Q  -- handle the -- who used to handle the kids' dental
23  needs?
24       A  Me.
25       Q  Okay.  Continue, please.
```



24

1      A  So after that, Exhibit 93, Katherine believed that

2  these -- says these are not essential appointments.  They also

3  got cancelled for ██████ and ██████, so that's why they didn't

4  get there.  So starting out with cancellations of appointments

5  I make.  So yeah, she cancelled the appointments for ██████

6  and ██████ with their dentist, Dr. Machell, on July 26th.

7         Exhibit 94, we put Katherine essentially on notice;

8  that's your letter to her that you were expecting regular

9  dental care for the kids every six months.  Again, I never

10  hindered any dental or orthodontics appointment she set up.

11  That Katherine (sic) has gone over a year in braces, about 15

12  months without any cleanings and exams.

13      Q  Who -- who is -- who is not -- start over again.

14      A  ██████.  ██████ --

15      Q  Okay.

16      A  -- went over a year in braces without any cleaning or

17  exam at all, and she wound up needing two crowns.  ██████ has

18  gone 15 months without any appointments whatsoever, and that

19  resulted in ██████ having 11 cavities.  It required full

20  general anesthesia.  It cost $2,550.  That's my Exhibit 32.

21  And Katherine didn't even -- hasn't even submitted that bill

22  to insurance.

23         So there's one other exhibit here.

24      Q  Now, in --

25      A  Oh, and she -- yes.



25

```
 1       Q   I -- I was -- don't mean to interrupt you, but some of
 2    the pleadings in this case allege that you've been spiting the
 3    dental appointments by sending threatening letters to -- to
 4    the providers or something.  Could you address that, Mr.
 5    Albrecht?
 6       A   Yes, one moment.  Let me find the appropriate exhibit
 7    here.  So if we can go to Exhibit 84.  This is a letter I sent
 8    to Hastings Ranch Dental Group in Pasadena.  And to summarize
 9    it, it's just to let them know that I'm dad and to provide
10    them with the parenting plan, and all I ask they do is to
11    update their records with my name and contact information.
12    And I thanked them for the care they've provided my daughters.
13    I think they were surprised to learn that the kids had a dad,
14    but the letter's polite.  It's Exhibit 84.
15           The one other letter I sent Hastings Ranch is Exhibit
16    85 in which I'm making an effort to get them all of ████'s
17    dental records from her prior providers.  I just thought that
18    her current dentist should have all of the old records, that
19    it's in her best interest.
20           And I'm very disappointed -- I will direct your
21    attention to 87 -- that this is characterized as harassing
22    them and that these letters were legal threats.  I don't
23    think --
24       Q   So did you -- did you --
25       A   -- they're legal threats.
```



26

1      Q   -- did you mean them to be threats?

2      A   Not at all.  I meant them to let the kid -- the

3  dentist know that the kids had a dad, what the parenting plan

4  is, that I have no objection to their treatment, and oh, by

5  the way, here's their prior providers so you can even get all

6  the old records so you can treat them better.

7      Q   And exact -- and exactly which is said to the -- to

8  the dentist is memorialized in those exhibits?

9      A   Yes.

10     Q   Okay.  Now, is there anything else concerning --

11  before I move onto something else, Mr. Albrecht, is there

12  anything else concerning the children's dental and medical

13  issues that you think are important for Master DalPra to know?

14     A   Yes, I would refer the judge to Exhibit 96, which is

15  an --

16     Q   What is that?

17     A   -- email chain.  It's an email chain.  It -- it starts

18  where I email Katherine.  She's always unwilling to respond

19  directly.  I always continue to try.  It goes to you; it goes

20  to her counsel.  But the bottom line is we're just trying to

21  make sure we've got a list of all the dentists.  And it went

22  for over a year, and my (indiscernible) you never responded,

23  even February this year, we asked again, and we've (sic) never

24  responded.  So the point is, is when we just ask some

25  reasonable questions about who the children have even seen, we

**Commented [DF5]:** 12:15:44



27

1   get silence.

2          The last -- I think if I can just say one more thing

3   on this issue, I think the issue -- and I refer the judge to

4   Exhibit 62, which is her admissions, is we've got a pattern

5   where we're (sic) misrepresenting to schools and the kids'

6   providers that I don't have custody, and -- or any kind of

7   legal decision at all, that I'm just not in the picture.  And

8   when the providers find out, they kind of scratch their heads,

9   but I -- I don't have any issue with them treating the kids.

10         Anything else surface?

11      Q  Well, since you brought up the school, why don't we

12  segue into the school because that -- that's another issue

13  that's been raised by both parties' pleadings.  You mention --

14  you -- you were saying, regarding the dentist, that Dr.

15  Albrecht doesn't let these -- the provider know that you even

16  exist.  Have you experienced that same issue concerning the

17  schools?

18      A  Yes.  So it's --

19      Q  And tell us -- can you tell us about that, please?

20      A  Yes.  So -- so Katherine, without any input from me,

21  submitted an application to (sic)  to Flintridge Sacred

22  Heart Academy.  If I may refer to that henceforth as just FHHA

23  (sic) or Flintridge, we'd all be happier.  So that school

24  application here is Exhibit 29.  And if I may direct your

25  attention to page 4 of that exhibit, that's the information

28

1  she provided for me.  She said I'm not the custodial parent,

2  that I don't have legal custody, that I'm not responsible for

3  any school-related decisions, I'm not responsible for any

4  communications, and she doesn't even provide any contact

5  information for the -- the school to be able to contact me.

6  The issue's, you know, again, so that leaves the school in a

7  state of confusion.

8       I would also direct the Court to Exhibit 62 with

9  respect for admissions in which she basically acknowledges

10  that she did this.  So again, that's Exhibit 62, admissions 42

11  through 53.

12       Going specifically to 53, again, admission 53 on

13  Exhibit 62, the issue here:  we're in the age of COVID and

14  everything is being done remotely.  We're also in an age where

15  it's customary for parents just to be able to log on to see

16  there is assignments, to get their grades.  This is standard.

17  I'm able to do it for ███████.  I've been able to do it for

18  ██████ and ██████ since day one.  Flintridge Sacred Heart

19  customarily provides online access for this.  They've never

20  not done it.  I mean, aside from a termination of parental

21  rights, they've never not done it.  I think they are confused,

22  and they're in a very hard place now because I have to email

23  them manually.  They have to go into the system, they have to

24  print it out, and then they have to send back the request

25  because they've got to -- they need to provide me with what --



29

1  the school records, and we're putting them in the middle.

2       So I guess --

3    Q  Excuse me.

4    A  -- it's Katherine's position that I'm not -- that she

5  wants me to be different from all the other parents and not

6  have access to this and to have to email the school, have the

7  school go into it, print it out, send it to me, and it's just

8  causing everybody a lot of headaches.

9    Q  All right.  And -- and concerning that issue with

10  Flint (sic), did Master DalPra grant Respondent's verified

11  expedited motion concerning that issue, prevent -- preventing

12  you from access to Flint (sic)?

13    A  It was granted as a temporary order, which is why I

14  had to email them and have them print it all out for me.

15    Q  And so it was -- it was -- it was --

16    A  But it's per the order.

17    Q  It was granted by Master DalPra; it says granted on a

18  temporary basis?

19    A  Yes.  So I'm hoping we can vacate that so the school

20  doesn't have to do it for me.

21    Q  Okay, okay.  Now, is there anything else concerning

22  the school issue that you wish to testify about?

23    A  No.

24    Q  Okay.  Now, you did file a written offer of proof, and

25  Master DalPra said that he -- he wishes oral testimony.  So in



30

1  that written oral -- offer of proof, I think you told the

2  Court what you feel you're missing in the children's lives and

3  what the children are missing not having a dad; is that

4  correct?

5       A  Yeah.  So if I can just --

6       Q  Could you -- could -- could -- could --

7       A  Yeah, sorry.

8       Q  Yeah.  So -- so -- so could you please tell us that,

9  what you -- why you feel the children should have a dad, why

10  you feel you should be in the children's lives and what you've

11  missed by the fact that you haven't seen your children, what

12  is it, about two years now?

13      A  Yes, two years --

14      Q  Okay.

15      A  -- close to two years in fall; it's close to four

16  years for any kind of normal relationship.

17      Q  Okay.  So how --

18      A  Before the divorce, and I'm going to talk about █████,

19  █████, and █████ because █████ lives with me.  He's not the

20  issue.  █████, █████, and █████ had me, I'm a dad.  I drove

21  them every week to their piano lessons.  I was a former

22  pianist myself.  I helped them practice.  I played music with

23  them.  I played the duet parts with them.  They played music

24  for me.  The last time we got to do that together was at my

25  dad's house in San Jose and that's the ghetto I grew up in.

31

1  And that's close to two years ago.  And I respect Katherine,

2  she's got lots of talent, but that's not something she can do.

3  She doesn't play an instrument.

4      I mean, I was the dad.  I drove up to New Hampshire

5  Hills.  Got the house club in Milford, New Hampshire here, as

6  the Court is unfamiliar, and I went swimming with them.  All

7  four of the kids were on the swim team during our marriage,

8  and I'm the one who took them and did all the swimming with

9  them.  And I understand that ███ is on the swim team now at

10 Maranatha High School where she's going, and I've never been

11 able to be there for that.  I used to be there for all her

12 competitions, but I've never been -- before the divorce, I

13 went to all her swim meets.  But -- and saw her compete and

14 I've never been able to see ███ compete since the divorce.

15     All remarks either -- them or myself.  ███, again,

16 he lives with me.  We do distance open water swimming at

17 Walden Pond practically every week regularly.  ███ has even

18 been here for that.  It's been a while since he doesn't live

19 with us.  And I've never been able to take ███ and ███.

20 They were -- I used to do that with them and before the

21 divorce.

22     I regularly took them camping, and I took them on

23 outdoor hikes.  And in particular, we used to go together as a

24 family with my dad, that's their paternal grandfather.  We

25 went to our family property in Northern California every



32

1    summer with the kids on vacation.  And there is an exhibit

2    relative to that.  I'd like to direct the judge to Exhibit 76.

3    And --

4        Q  What is that, sir?

5        A  That's her -- Katherine's first request for

6    admissions, and it's very long.  It's relative to the

7    vacation.  I'm directing to just answers 35 through 41.  And

8    that's just to establish that we're all on the same page, that

9    summer of 2015, I took the kids on their normal vacation for

10   two, two-and-a-half weeks, whatever the dates are, while

11   Katherine stayed home in New Hampshire.  So again, that's

12   something I was always able to do.  And we've only been able

13   to do that once since the divorce.  That was two weeks in the

14   summer of 2018.  And those two weeks were the longest period

15   of time I've had with my daughters for over four years now.

16   Other than those two weeks, I've never seen them more than

17   five days, and even that's just a couple times.

18        But, you know, moving on.  Before the divorce, I read

19   out loud to them in bed every night.  I'm guessing four years

20   now, they've outgrown that.  I haven't.  If they're still

21   inclined, I still would, but you know, that was the life we

22   had.  I read to them in bed every night.

23        Before the divorce, I made all the family meals for

24   holidays, and Thanksgiving, Christmas.  And the last time we

25   had that together was our Christmas dinner at my dad's house



33

1  for Christmas 2018.  If we --

2      Q  Do you have any photographs of that?

3      A  Yes.  One moment, please.  I would direct the Judge to

4  -- Exhibit would be -- there's two sets of photographs.

5  Exhibit 47 is the first batch taken from 12/23 through 12/27.

6  And Exhibit 48 is just an email from Dr. Albrecht's is in the

7  middle chronologically, just to be chronological.  And then

8  the next set of photographs is Exhibit 49, which were taken on

9  the 31st, where I'm opening the last presents they gave me,

10  and we're altogether at the airport.  And ████ is hanging out

11  watching TV at my dad's house.  And that's the last I've ever

12  been able to see them.

13      And again, that's when ████ also came back with me

14  and moved to New Hampshire after that.  So he's been okay for

15  those two years, but it's the other kids.  And there's

16  pictures of the dinner there, if anybody cares, but the point

17  is, is I'm always the one that made it.

18      I heard from ████ that last year, they did get to go

19  out and eat at a super nice place, so I think that's what --

20  I'm glad they got to go out to eat at a super nice place.  At

21  the same time, that's not the traditional homecooked meal that

22  I always make --

23          THE COURT:  *[Whispered] Who gives a fuck?*

24      A  -- that they were used to.  So it's just sad for

25  me.  Again, just a basic, they probably miss the traditional



34

1  one too.

2        Other stuff I think of, I helped them with their

3  schoolwork.  And what I mean by that is the actual concrete

4  details.  Caring in the individual math problems, actually

5  looking at what they've written, you know, for English, help

6  them edit to the degree that's ethical and it's still their

7  own work.  And I haven't been able to do that since the

8  divorce.  And even finding out what ████'s daily schoolwork

9  is now -- is problematic because why -- it's within my rights,

10  I guess, to email whatever teachers every day and ask, that's

11  obnoxious to them, they don't want to deal with that.  They're

12  used to having the parents just log onto the system and look.

13  But when I have emailed their teachers, they've responded.  I

14  mean, I just don't want to do it regularly and put an undue

15  burden on them.  So it's hard losing the kids.  Or I guess,

16  losing all but one.  So again, I have ████ here close to two

17  years now.

18        I'm just thinking of other stuff I've missed.  The

19  only pictures I have of ████, ████, and ████ are from when

20  they've been with me.  I don't get any pictures from when

21  they're with Katherine.  ████ was 10 when she lost -- when

22  she lost her dad.  She's 13, almost 14 now.  So just a few

23  pictures I have during the very minimal parenting time, almost

24  nothing the last two years.

25  BY MR. CAULFIELD:



35

1      Q   Excuse me.

2      A   I guess, ▆▆▆▆ --

3      Q   Excuse me.

4      A   Yes.

5      Q   Excuse me, Mr. Albrecht.  You're telling us that Dr.

6    Albrecht has never sent you a single picture of the kids in

7    two years?

8      A   Correct.

9      Q   Okay, thank you.

10     A   So, you know, one minor spot in that, so when ▆▆▆▆

11   had her eighth-grade graduation from Gooden, I just clarified

12   to the Court that ▆▆▆▆ was -- last year, was in Gooden

13   School, which only goes through eighth grade.  This year she's

14   at Flintridge, which is ninth through twelfth.  So this

15   spring, ▆▆▆▆ and I, her brother, are in our living room.

16   We're sitting on the TV, we did get to see her graduation

17   because it was broadcast live on Zoom.  So ▆▆▆▆ and I are

18   sitting on the couch together watching it.  Again, a little

19   rough because while we can see it, there was no mechanism to

20   communicate anything back to ▆▆▆▆.  And that's nobody's --

21   that's not the school's fault, a million parents, you know,

22   going back in to that.

23         Forgive me, I probably misspoke about a million

24   parents because it's actually a very, very small school.  But

25   still.  So just, you know, that once I got to see how much

36

1   ███ has grown, you know, how she's matured, how she's

2   becoming a young lady, but I haven't been there for that.  She

3   doesn't have a dad for that.

4        The one thing I did notice at her graduation is she

5   seems very quiet and withdrawn.  So what I point out is,

6   again, this is a very small school and during that ceremony,

7   the teachers were able to devote, you know, maybe five, ten

8   minutes per student, just talked about the students.  And what

9   they were like, and what they appreciated about each student,

10  and just a really nice human.  And the thing that struck me is

11  that ███'s teachers really couldn't find much to say about

12  her, other than she worked very hard and was a very thoughtful

13  young lady.  So again, she struck me as very withdrawn.  The

14  teachers didn't talk about her outside interests, dreams,

15  hobbies, much even about her friends, and they were talking

16  about these sorts of things for all the other students.  And

17  this was sort of a very bland about ███; a good student,

18  thoughtful, pleasure to have in class, so these very nice

19  things, but so generic.

20       Q  Are there any other -- you of course, Mr. Albrecht,

21  set this out in the -- your offer of proof.  Is there a --

22  since we're limited -- we're limited, is there anything else

23  very relevant that you want to talk about on this issue?

24       A  I just thought -- I understand that they participate

25  in band and orchestra, that they do plays.  I never got to see



37

1     █████ play Gertrude in Hamlet.  I never got to see her perform

2  in Romeo and Juliet the year before that.  When you see a

3  brief mention of her report card, you know, it's hard to

4  remember stuff.  When you see it live, you remember the rest

5  of your life.  I've never been there for that.

6          Even miss going with the kids to church.  I know

7  there's issues with the church now, but that's something we

8  always did as a family.  And the last time I got to go to

9  church with them was Christmas 2018 in California.  I get to

10 go every Sunday, even every Monday I would be there to our new

11 church, but --

12     Q  Let me –

13     A  -- even to pray.

14     Q  -- let me -- these things, of course, are very

15 important, but again, we only --

16     A  Yeah.

17     Q  -- have a limited amount of time.

18     A  Okay.

19     Q  So let me -- so let me bring you to some other issues.

20 So you --

21     A  Sure.

22     Q  -- you're asking the -- I want to discuss specifically

23 what you're asking the Court to do.  And of course, in your

24 answer -- because you've read the pleadings, you understand

25 that Dr. Albrecht's position appears to be "I can't get the

38

1    kids to do it"?

2        A   Right.

3        Q   So you're going to address specifically what you want

4    the Court to do, and how you think it's going to play out.

5        A   Well, so specifically, this is a fractured family.  I

6    think we even have issues between ███ and the younger

7    siblings in which -- but the bottom line is these kids need

8    counseling.  These kids need reunification counseling with

9    their dad.  To the degree there's an issue with the

10   relationship between me and them and ███ and ███, we need

11   a professional who has dealt with these kind of things before.

12   It's all over the CVs in the exhibits we've already

13   referenced.  And so we're really just looking for the Court to

14   get some cooperation or even compel Katherine that -- to

15   cooperate with therapy for myself and the kids together with a

16   qualified reunification therapist.

17       Does that answer your question?

18       Q   Well, sort of.  What are you -- so how do you -- what

19   do you do when you're going to, as I'm sure shortly hear, "I

20   can't get the kids to do it"?  What's your position?

21       Hello?  Oh, okay.

22       A   Yes.  Yeah.

23       Q   I thought I lost you, okay.

24       A   Well, so we've gotten -- Katherine has been able to

25   get the kids to her own therapist.  So her therapist was

39

1    Cherylynne Berger that she treated with.  And Katherine

2    also -- oh, I forget her name, the other one she treated with.

3    Katherine also got the kids to go there.  So if Katherine gets

4    the kids to go to her treating therapist, I can't imagine why

5    she couldn't get the kids to go to a therapist that we -- the

6    Court selects or that is involved in reunification.

7        Q   Do you anticipate that these children are compliant,

8    that if Katherine were to say, "I'd like you to do it," that

9    they would do it?

10       A   Yes.

11       Q   Okay.

12       A   If she wants -- I think if Katherine wants the kids to

13   go to this therapy and I think if Katherine wants this

14   relationship to be repaired, I would anticipate that these

15   therapists would be doing a bang-up job of that, so we'd be

16   miles ahead of where we are now.

17       Q   All right.  Mr. Albrecht, I don't really think that I

18   have anything more, unless you feel like I've forgotten

19   something.  So I'm inclined to let Atty. Fontaine inquire.

20   Would that be a fair thing for me to do, Mr. Albrecht?

21       A   Yes.

22           MR. CAULFIELD:  Turn it over to Atty. Fontaine.

23           THE COURT:  Cross-examine.

24           MR. CAULFIELD:  Your witness.

25           MR. FONTAINE:  Thank you.  Okay, Judge.  Am I okay



40

1   to go forward?

2         THE COURT:  Yes.

3         MR. FONTAINE:  Okay, thank you.

4                CROSS-EXAMINATION

5   BY MR. FONTAINE:

6     Q  Mr. Albrecht, you testified -- you made a statement,

7   "To the degree there is an issue between me and the children."

8     A  Yes.

9     Q  Do you recognize there's an issue?

10     A  Yes.

11     Q  You admit there's an issue?

12     A  I think -- what?

13     Q  Do you admit that there is an issue in your

14   relationship with your two girls?

15     A  Yes.

16     Q  As you recall, at a 2019 extensive hearing, hearing

17   testimony at length about how your pair of girls felt about

18   the Christmas break 2018 visit with you?

19     A  I recall hearing testimony.  I can't characterize it

20   as to the length.

21     Q  Do you recall that it was testified that the girls, as

22   well as , your now over 18-year-old son, were very, very

23   troubled with your behavior at the December visit?

24     A  Excuse me, whose testimony are we referring to?

25     Q  The testimony of Katherine in describing the

41

 1   children's reaction to the visit of 2018.

 2        A   Yes.

 3        Q   And you understood from that testimony, did you not,

 4   that the children were very bothered by the fact that you had

 5   not allowed them to return on the day that was specifically

 6   agreed to?

 7        A   I understand that Katherine said that's what they

 8   said.

 9        Q   Okay.  So you have not acknowledged that your children

10   were troubled by that, are you?

11        A   I acknowledge they were troubled, but under any normal

12   circumstances, spending a weekend where they wouldn't want to

13   be, they may be annoyed, but they would quickly get over it.

14   That's what normal kids do if they spend a weekend where they

15   don't want to be, they're annoyed and then they quickly get

16   over it.

17        Q   How has your relationship -- because you've talked

18   about Katherine and her alleged control over the girls.  How

19   has your relationship been with ██████ since that December

20   visit in 2018?

21        A   My -- excuse me, my relationship with ██████ in 2018 or

22   now?

23        Q   How has your relationship been with ██████ since the

24   visit of 2018?

25        A   I believe it's deteriorated.  If I may refer to some

42

1  texts?

2      Q   No, you may not, sir.  You can answer the question I

3  ask of you, which --

4      A   Okay.

5      Q   -- you've already done.  You -- you, in fact, were

6  told by ███████ that he was very upset with your behavior during

7  that December 2018 visit, didn't he?  Did he --

8      A   No.

9      Q   He's never told you that?

10     A   If he has, I don't recall.  The last thing I recall

11 him referring to on visits was at the church on November 3rd.

12 I don't recall ██████ and I discussing Christmas after

13 Christmas happened.

14     Q   Do you recall -- let's move on.  Do you recall the

15 incident with regards to The Wilds of New England summer camp?

16     A   So one moment here, because there's been a lot of

17 stuff at The Wilds.  So we've got --

18         MR. CAULFIELD:  So excuse --

19     A   -- tickets -- 77 proof -- on the --

20         MR. CAULFIELD:  Excuse me.

21         THE WITNESS:  Yes.

22         MR. CAULFIELD:  Excuse me.  This is Atty. Caulfield.

23 Perhaps Atty. Fontaine could tell which visit he's talking

24 about?

25         THE WITNESS:  Yes, because there's been so many.

43

1  BY MR. FONTAINE:

2      Q  In the -- in the -- in the late July going into August

3  of 2019, the children attended the Wilds of New England summer

4  camp; isn't that correct?

5      A  That's my understanding.  I'm not sure why Katherine

6  denied that on her admission, so.

7      Q  Your understanding was that you, in fact, attempted to

8  contact your children during that visit when they were at the

9  Wilds of New England summer camp during that late July through

10  August?

11     A   Indirectly, yeah.  I attempted to contact the camp.

12     Q  You also filed a DCYF complaint, or a department -- I

13  don't have it in front of me right now, but Department of

14  Children and Family Services complaint in late July of 2018,

15  didn't you?  2019.

16     A  If you're referring to L.A. DCSF, then yes.  And for

17  everybody's clarification, it's DCSF in California and DCYF in

18  New Hampshire.

19     Q  And you filed the complaint in California while you

20  were in California, correct?

21     A  Yes.

22     Q  And was that the same time that you claim that you

23  went out to visit with your children?

24     A  Yes.

25     Q  And isn't that the same time that Katherine's mother



44

1  passed away?

2      A   Yes.  I was not aware of that at the time though.

3      Q  So while you were out there for the purpose of

4  visiting with your children, instead you sidetracked and went

5  to the Department of Children and Family Services in L.A. and

6  filed a complaint with them?

7      A   Well, the first thing I did when they weren't there is

8  I went to ask them simply what they thought I should do.  I

9  did not file a complaint at all, I just said I'm here to see

10  my kids, they're not here, what do you recommend.  They said,

11  we recommend that you go talk to Sierra Madre police.  So

12  Sierra Madre -- and then come back and talk to us.

13          Sierra Madre police went out there and, again, that

14  was the first I learned that Katherine took them to the other

15  side of the country.  After I learned that, I forget what

16  night it was, L.A. DCSF did call me.  They wanted -- and I

17  went and met with them and they wanted more information on

18  what was going on.  One other thing --

19      Q   And this -- what --

20      A   Let me just finish.  In terms of contacting them, I

21  also in --

22      Q   I didn't ask anything about the police.  I didn't ask

23  anything about the police, sir.  I'll ask that --

24      A   Okay.

25      Q   -- in a separate question.



45

1      A   Okay.

2      Q   And also briefly.

3      A   Okay.  So I did let them know I'd had concerns about

4   their dental, and when they asked what I wanted them to do I

5   said I just wanted them to make sure that they were -- were

6   okay.

7      Q   And you're -- and you're fully aware that they were,

8   in fact, contacted by the Division when they were at a summer

9   camp, are you not?

10     A   I believe I -- that sounds right.  But I -- I only had

11  gotten the records last week so it was unclear to me, you

12  know, what they did in terms of trying to contact the kids.  I

13  didn't have the records.

14     Q   Now, so let's be clear.  So you were aware that they,

15  in fact, contacted the children.  And in fact, you filed this

16  complaint while you were out there supposedly for purposes of

17  visiting with them.  I --

18          MR. CAULFIELD:  Objection to the "supposedly".

19          THE COURT:  He may answer.

20  BY MR. FONTAINE:

21     Q   Sir, you have to cooperate with --

22     A   I went out there to visit.  When they went missing, I

23  don't know what they did.  It sounds very reasonable that they

24  would attempt to contact the children, but I don't know that.

25  I don't have access to the records until you produced them



46

1    last week.

2        Q   Now, you acknowledge, sir, that prior to your visiting

3    them, in California you presented a request to exercise

4    visitation and you were informed that the children did not

5    want to visit with you, correct?

6        A   I was informed that Katherine said they didn't.  My

7    position is that if they didn't, then when I went out there if

8    they told me at that time they didn't, then we'd take that

9    bridge if we come with it and maybe there we would want to be.

10    and I went out to see the kids.  If we're there and they

11   don't want to visit, that's one thing.  But my position is

12   we're going to go out there and make sure that they realize

13   that we're there and we want to see them.  And if at that

14   point --

15       Q   You didn't --

16       A   -- they don't, they don't, but we could do that

17   exchange at Sierra Madre PD.

18       Q   And sir, you're --

19       A   Yes.

20       Q   -- you're aware that from the May hearing, the May

21   motion hearing where there was extensive testimony as to what

22   the girls' feelings were about visiting or having contact with

23   you, and that they didn't want it, you insisted on going out

24   and visiting them anyway, didn't you?

25       A   I believe the testimony at that hearing was they

47

1   didn't want to get on the plane to come to Sierra.  And if

2   they don't want to get on the plane to come to Sierra then

3   I'll get on the plane to go there.

4       Q   So you're testifying under oath that you were not

5   aware that your children, based upon what occurred at the

6   December 2018 Christmas break visit with you, that your

7   children, your girls specifically did not want to have any

8   contact or any visit with you?  Are you saying you weren't

9   aware of that?

10      A   I'm aware there's issues, but if they don't want to

11  have contact then we can discuss that when they're aware, and

12  they're fully aware that I'm available, near them physically,

13  and they can make their choice at that time.  Kids change

14  their minds.  If they know I was there they might have changed

15  their mind.

16      Q   And so you thought it was wise --

17      A   Particularly with  with me, yes.

18      Q   I'm asking a question, sir.  You figure as why after

19  your children -- after you understood from the May hearing

20  that they wanted no contact with you, they wanted no visit

21  with you, and after being informed in a letter by my office

22  after you requested a visit in July, you stuck -- you thought

23  it was wise to go out and visit with them anyway?

24      A   Absolutely, because at that time I had ███ with me,

25  who they might want to see.  Even if they don't want to see

1   me, maybe they want to see their older brother.  And my dad

2   was coming down, and even if they don't want to see me, maybe

3   they want to see their grandfather.  And we have extended

4   family in California, and even if they don't want to see me

5   maybe they want to see their extended family.

6       Q   So instead of that happening, you go and file a DCYF

7   complaint that results in them receiving a call while they're

8   away at summer camp.  Did you --

9       A   Again, if I had known they were at summer camp, none

10  of this would ever have happened.  Yeah.  Because I -- my kids

11  are missing, I was very surprised.  Very surprised that they

12  were at summer camp when I showed up.

13      Q   Can you cite me to the section of any order that

14  requires Katherine to inform you of where her children are at

15  all times when they're in her care?

16      A   I would anticipate that she would inform me where they

17  are when it's my parenting time that we requested.

18      Q   Do you understand why Katherine might have concerns

19  about you informing -- to telling you of where she is at with

20  the children?

21      A   I see the paranoia, medical reports.  I see all the

22  police reports in evidence where she falsely accuses me of --

23      Q   I didn't ask you that, sir -- I -- sir --

24      A   -- breaking in.

25      Q   I didn't ask you that.  Sir, you --



49

1        A   So yes.  So those would be concerns, yes.

2        Q   You --

3        A   Yeah.

4        Q   Sir, do you understand from your actions, from what

5   you are doing in going and insisting on seeing them when they

6   have expressed to you that they don't want to see you, that

7   they don't want to spend time with you, do you see why to have

8   a concern about informing you of where they are at?

9        A   ███████ and ███████ have never expressed that to me

10  directly.  We're going just from what their mother said.

11       Q   Did you ever --

12       A   To the degree they have -- go on.

13       Q   Have you ever issued an apology to them for the

14  December Christmas visit incident?

15       A   Yes.  There were the letters and cards I sent

16  referenced in prior testimony to --

17       Q   Show me --

18       A   -- the exhibit numbers again?

19       Q   Show me in those -- show me in those cards -- it's

20  Exhibit Number 22, it looks like.  Show me in those cards

21  where it says you apologize for your behavior in not allowing

22  the girls and your son to return?  Where does it say it?

23       A   First of all, my son was 18 and he was entitled to do

24  what he wants, so I object to the form of the question.

25       Q   Then answer it as to the girls.  Where does it say in

50

1   that -- that card you -- that you submitted as an exhibit,

2   where does it say anything about you apologizing for your

3   behavior, which you understood from Katherine's testimony was

4   the cause of them not wanting to see you?

5       A  I don't believe Katherine, that that's the primary

6   cause because it says -- sir --

7       Q  No.  Sir, I'm asking you --

8       A  Okay, let me find the exhibit.  Hang on.  Hang on.  If

9   you give me one moment.  Okay.  "I'm so sorry things are so

10  strange between us."

11      Q  That's your way of apologizing for failing to return

12  them on an agreed-upon time?

13      A  Absolutely, when that's the advice of my professional

14  therapist on how best to patch things up.

15      Q  Okay.  Where in the second card that's attached from

16  July 7th of 2020, is there any apology to them in the prior --

17      A  "I'm so sorry things are so strange between us."

18      Q  That's the extent of your apology?

19      A  Absolutely.  I mean, my prior behavior, there they

20  were.  I have not done anything -- I have treated these kids

21  well.  So as my -- again, on the advice of my therapist,

22  what's in their best interest, my therapist was quite clear

23  that any -- normal kids under any normal circumstance who were

24  upset at being a single weekend where they wanted to be

25  someplace else would normally quickly get over that, and it



51

1   would not be an issue.  And --

2        Q   So it's --

3        A   -- she's shocked that they haven't.

4        Q   So in --

5        A   That's what we get from Katherine.  I haven't heard --

6   I've heard very little -- I've heard nothing directly from my

7   children.

8        Q   So in the --

9        A   Only from Katherine.  So you're kind of asking me to

10  testify to what I heard from Katherine --

11       Q   Sir, I'm not asking you -- I'm not asking a question

12  at this point.  Can you let me --

13       A   Okay.

14       Q   -- ask the questions, please?

15       A   Sure.

16       Q   So in no document that you've ever given to your

17  children:  ███, your adult son, or the girls, have you ever

18  admitted that your failure --

19           THE COURT:  *[Whisper] (Indiscernible) want something*

20  *(indiscernible).*

21  BY MR. FONTAINE:

22       Q   -- to return them on an agreed-upon time in December

23  of 2018 was a mistake on your part --

24       A   I think that --

25       Q   -- and then that you apologized.  There's no --

**Commented [DF6]:** *12:55:23*

52

```
1        A  I think that --
2        Q  -- way (indiscernible) back to Katherine.
3        A  -- that that was handled verbally, and I've had no way
4   to verbally --
5            THE COURT:  [Whispered] (Indiscernible).
6        A  -- contact ████ and ████.
7   BY MR. FONTAINE:
8        Q  Okay.  Now let's move up to the incident where you
9   filed the complaint with the DCYF.
10       A  Sure.
11       Q  You're aware that the -- the girls were involved in
12  that investigation?
13       A  Yes.  I'm surprised ████ wasn't, though.
14       Q  You're aware that the girls were involved you said,
15  right?
16       A  Yes.  Yes.
17       Q  And did you ever -- and you've read the report that's
18  now been filed, correct?
19       A  I have gone over it briefly.
20       Q  And you see that --
21       A  I -- I --
22       Q  -- there's no findings -- there was no finding of
23  neglect by them, right?
24       A  Actually, it's indeterminate.
25       Q  Sir, did they conclude that the file was being
```

**Commented [DF7]:** 12:55:33

**Commented [DF8]:** 12:55:38

53

1   closed -- that their file was being closed?

2       A   They concluded that it was insufficient evidence and

3   that the complaint was not unfounded.

4       Q   And did you ever apologize to your children, your

5   girls specifically, relative to involving them in that DCYF

6   investigation, including when they were at summer camp?

7       A   So first of all, until I had the records, I don't know

8   to what degree they were involved.  The -- to the degree I

9   know they've been involved in an investigation it's been here

10  in New Hampshire, Exhibit 63.  I've -- not for a while.  You

11  gave me this last week, even though it's dated November 1,

12  2019.  You know, if I had it earlier, you know, maybe we could

13  have done something.

14      Q   Well, you've had it for -- now for a week.  Did you do

15  anything after that?  Did you send them anything --

16      A   I have no --

17      Q   -- like a card -- hold on, let me finish, sir.  I'm

18  asking a question.  Did you ever write them a note or a letter

19  or send them a card saying, I'm so sorry that you got involved

20  in this investigation?  Were you --

21      A   I'd love to call them up and even send them -- I --

22  I'd love an email.  Give me an email, I'll write them an

23  email.  Postal mail is slow, and the last time I sent a postal

24  mail it took them three weeks to get it.

25      Q   Have you ever apologized for the incident that



54

1  occurred at the Collinsville Bible Church that resulted in you

2  having a one-year final domestic violence restraining order

3  issued against you?

4      A  I had no way to contact ████ and ████.  With regard

5  to ████, he apologized to me for not contacting me while I

6  was there.

7      Q  So -- so your answer is you didn't -- you didn't send

8  any apologies.  You never wrote a card, you never wrote -- I

9  mean, you never attempted it even.  You never did anything,

10  did you, with regard to apologizing for your behavior?

11      A  I was sitting in a church pew quietly by myself.  I

12  don't feel a need to chur -- to say -- to apologize for

13  sitting in a church pew quietly by myself hoping to see my

14  daughters.

15      Q  Okay.  In fact, do you recall -- and this is at our

16  Exhibit Number 10 -- do you see the transcript --

17      A  On yours?

18      Q  Yes.

19      A  Yours?

20      Q  Yes.  Do you see this -- the domestic violence

21  transcript?

22      A  I don't see an exhibit.  One moment, please, I don't

23  see an Exhibit 10 from you.  I only see Exhibits 1 through 9.

24      Q  Well, let me ask you the question then.  Do you

25  remember testifying, and I asked you at that hearing, did you



55

1  ever --

2      A  Where we were -- which?

3      Q  Domestic violence hearing, sir.

4      A  Yes.

5      Q  Do you remember me asking you, had you ever apologized

6  to or contacted the children regarding the incident on

7  November 3, 2019, and your response was, "No.  I don't think I

8  need to."  Do you remember saying that?

9      A  Yes.

10      Q  And you still think you don't need to, don't you?

11      A  When they spent ten years being there with their

12  father, sitting with their father in a pew, one would

13  anticipate that their father sitting quietly in a pew like

14  they have been used to for ten years of their life would not

15  upset them.

16      Q  That's your -- that's your belief, correct?

17      A  That's my belief, unless Katherine or the church

18  pastor has done something to cause them to be upset by my

19  presence.  Just seeing Dad sitting in a church pew.

20      Q  Do you --

21      A  People sit in church pews quietly.

22      Q  You mentioned something --

23      A  Yeah.

24      Q  You mentioned something about contacting -- pictures.

25  You said you wanted -- you haven't been sent any pictures.



56

1  Have you ever requested of Katherine directly or my office

2  directly for pictures of the children, harmless, are sent --

3       A  Yes.  I don't -- it's not in an exhibit but I

4  requested recordings of their performances in the VBS.  I'd

5  have to check my email for other requests.  And quite frankly,

6  I don't think I should have to request it through your office,

7  I think I should be able to request it from Katherine

8  directly.

9       Q  Okay.  But beyond your requesting video recordings of

10 them, you've never asked for, as you testified, that you never

11 received photographs or pictures.  You've never asked --

12      A  Well, it's -- most of my requests go ignored, so after

13 I request them a couple of times, if I don't get anything you

14 kind of give up.  Otherwise the emails between you guys pile

15 up even more than they are right now.

16      Q  Let's talk about the medical issues for a second,

17 medical --

18      A  Sure.

19      Q  -- treatment issues.  There was a previous issue

20 regarding you not providing insurance coverage as the Court

21 ordered you; you recall that?

22      A  If we could review the order in question --

23      Q  I have asked a question of you.  Do you recall there

24 being an issue with you not providing the insurance that the

25 Court ordered?  That's a simple question.  Do you know the



57

1    answer?

2        A   I did not understand the Court's order.  If we could

3    review that now.

4        Q   No, I'm not going to review that now.  I'm asking you

5    a question.  Do you remember that inci -- that it being an

6    issue before the Court?

7        A   Yes.

8        Q   Okay.  And the Court subsequently ordered that

9    Katherine could provide the insurance, correct?

10       A   I can't testify as to the order unless we get it up in

11   front of us.  I'm happy to do that if we want to take a couple

12   minutes.  It's the final decree --

13       Q   No.  I don't --

14       A   Yeah.  So if we could --

15       Q   I don't have that much time left.  Hold on.  Hold on.

16   Your attorney can cross-examine you and he can question you

17   and he can bring that forth.  I'm asking the questions.

18       A   Okay.

19       Q   Now, Katherine -- have you -- have you ever provided

20   insurance coverage for your children?

21       A   Yes.

22       Q   Subsequent to the divorce order --

23       A   Yeah.

24       Q   -- final divorce order?

25       A   Yes.



58

1    Q   Okay.  What insurance did you provide?

2    A   Christian Care Medi-Share is the insurance they've had

3  since 2011.  I kept that active even though there was no court

4  order to do so.

5    Q   You -- your --

6    A   It was out of benefit and love for them.

7    Q   You're aware that Katherine provided -- obtained other

8  insurance coverage for the minors?

9    A   Yes.

10    Q   And in fact, Katherine hasn't asked you to pay any of

11  the unreimbursed expenses to date, has she?

12    A   She has.

13    Q   And what was your response to that, sir?

14    A   That I wanted them to go to insurance first, and that

15  we would like to see why insurance hasn't paid them.

16    Q   Do you recall if the --

17    A   And I would love -- I would love to get the insurance

18  documents from your office so we can move forward on that.

19    Q   In fact, you've been asking for access to her personal

20  insurance information, right?

21    A   Katherine's?  No.

22    Q   You haven't been asking for -- for insurance

23  informa -- for insurance information -- I mean --

24    A   Only for the children.

25    Q   Okay.  But it's insurance that she's providing,



59

1    correct?

2        A   I don't care whose parent's paying for it.  If it's

3    the children's insurance both parents should have access to

4    the records.

5        Q   Let's go back to this -- to the doctor.  You -- at one

6    point there was a discussion about the children seeing

7    Dr. Greenberg, correct?

8        A   Yes.  Katherine and I had -- that was one of the few

9    times I was able to talk to her.  We had a conference call

10   with Dr. Greenberg.

11       Q   In early June of 2019, you were informed by letter

12   through our office that, in fact, Katherine had discovered

13   that Dr. Greenberg was not one of the preferred providers, and

14   that she would have to meet a 5,000-dollar deductible before

15   any expense -- any charges of Dr. Greenberg would be paid for.

16   Do you recall receiving that letter?

17       A   Yes.

18       Q   And she suggested instead that a Dr. Hanif, who was

19   covered as a preferred provider, be seen by the children.  Do

20   you recall that as well?

21       A   Yes.

22       Q   And you recall her agreeing that Dr. Hanif could

23   provide the vaccinations at the same schedule that you and her

24   had previously agreed to, correct?

25       A   I disagree with that because we don't have a copy of



60

 1   the schedule.

 2        Q   Okay.  But from her letter --

 3        A   We would need to see Dr. Greenberg again.

 4        Q   Her letter said that she would agree to that, correct?

 5        A   I don't have it in front of me.  One moment.  Would

 6   you refer to me which exhibit that is?

 7        Q   Exhibit Number 6, the letter of June 6th.

 8        A   Okay.  What page?  17 pages in here.

 9        Q   First -- it's the first --

10        A   Okay.

11        Q   -- the decision -- there's a letter dated June 6th in

12   that exhibit.  Do you see the second sentence of that letter?

13        A   Regarding the deductible?

14        Q   Yes.

15        A   Yes.

16        Q   Okay.  So -- so she informed you that she couldn't

17   afford to pay that.  She informed you that she wanted to use

18   doctors that were covered under her insurance.  She gave you a

19   specific name.  And in fact, you didn't agree to that doctor

20   being used by them, did you?

21        A   Not until we got the vaccination schedule, no, because

22   we'd already worked it out.  She's violating an agreement; I

23   want the existing agreement, or we come to a conclusion on

24   what we're doing instead.  I would have been happy to

25   negotiate and discuss with her a different doctor.  But if

61

1   she's going to violate the agreement we came to, then we need

2   to have a conversation about it.

3      Q  Where does it say in any of your emails or your

4   responses that you were willing to consider using Dr. Hanif or

5   any other provider other than Dr. Greenberg?  Where does it

6   say that?

7      A  There's been lots of emails -- hang on -- in this

8   exhibit.  I would say -- I said if cost is a concern, I'd

9   anticipate that Medi-Cal would provide free care through an

10  in-network provider.  I don't know why we have an insurance

11  with a 5,000-dollar deductible when insu -- free insurance

12  with no deductible is available.

13         We asked for California Blue Cross Blue Shield

14  insurance cards, and didn't -- and they can verify what's

15  covered and what's not with Dr. Greenberg.  Let's see, I

16  said --

17     Q  Based on your (indiscernible) --                    Commented [DF9]: 1:09:05

18     A  -- I'm still agreeable to have my -- let me quote

19  that -- your answer of where I said it.

20         THE COURT:  *[Laughter].*                          Commented [DF10]: 1:09:12

21     A  I said, I'm still agreeable to having ███ seen by

22  Dr. Greenberg for a general physical ASAP, for ███ and

23  ███ to each get their first MMR shot -- it's already agreed

24  to by Katherine -- Dr. Greenberg, by himself -- as soon as

25  possible, and for Dr. Greenberg to provide as close to

62

1   Dr. Greenberg's proposed future vaccination schedule in

2   writing.  That's a single appointment.  I said, we can take it

3   with that.  We can take it from there.

4   BY MR. FONTAINE:

5        Q  Did you mean to say that --

6        A  If time is the primary concern --

7        Q  Wait --

8        A  If -- I'm just letting you know -- you asked a

9   question, sir, and I'm answering it.  Will you allow me to

10  answer where I said I was able to negotiate this?  I'm just

11  reading my email in the exhibit to you.

12        I appreciate that if cost is the primary concern, as

13  soon as I repeat the insurance information to you, I'll do my

14  best to look into alternatives to Dr. Greenberg and promote

15  alternative providers.

16        THE COURT:  *[Whispered] I'll be back in about an*

17  *hour.*

18        *[Whispered conversation]*

Commented [DF11]: 1:10:15

19        A  And I also wanted to know what ▇▇▇▇ and ▇▇▇▇

20  thought.  I asked for a phone number so I could see -- I mean,

21  they -- we had issues with them not wanting to see people.  I

22  wanted to talk to them and get their take on it.

23        THE COURT:  *[Whispered] Put him on mute.*

24  BY MR. FONTAINE:

25        Q  Sir, on -- in that same exhibit packet, July 2nd

63

1  letter --

2      A  Yes.

3      Q  -- first paragraph --

4          UNIDENTIFIED SPEAKER:  *[Whispered] Again, we need*

5  *(indiscernible)*.

6  BY MR. FONTAINE:

7      Q  -- last sentence reads, "after my client discovered

8  this information, she researched and found another

9  pediatrician, Dr. Hanif, that was in the network provider with

10  Blue Shield --

11          THE COURT:  *[Whispered] Not this -- not this one,*

12  *but the previous.*

13  BY MR. FONTAINE:

14      Q  -- and who had excellent reviews online.  She was also

15  willing to see the girls quickly on July 1st to administer the

16  vaccinations on the schedule agreed to by Dr. Greenberg --

17          THE COURT:  *[Whispered] Tom (phonetic) looks like*

18  *this (indiscernible)*.

19      A  I don't see that.

20  BY MR. FONTAINE:

21      Q  -- remember that?

22      A  No.

23          THE COURT:  *[Whispered] All excited.*

24  BY MR. FONTAINE:

25      Q  You see that in the letter?

Commented [DF12]: 1:10:35

Commented [DF13]: 1:10:57

64

1      A   I don't see anywhere on the -- on Dr. Greenberg --

2   which page?

3          UNIDENTIFIED SPEAKER:   *[Whispered]* *(Indiscernible)*

4   *voice.  He's got another voice.  He's got another voice.*

5          THE COURT:   *[Whispered] Sweet.  Pretty.*

6      A   Direct me to a page.

7   BY MR. FONTAINE:

8      Q   Sir, this is my Exhibit Number 6, there are several

9   letters --

10     A   Yeah, what page?  Which page of the 17 pages?

11     Q   They don't have page --

12     A   It's 17 pages, sir.  Please tell me which page in

13  Exhibit 6 and I will go there.

14     Q   The page -- the pages are not numbered, sir.

15     A   They are in the PDF I have.  If you -- we can sit here

16  and --

17     Q   No.  I apologize --

18     A   Give me a page and I'll go there.

19          THE COURT:   *[Whispered] I don't seem to have the*

20  *rest of this.*

21  BY MR. FONTAINE:

22     Q   I apologize, I don't have the same PDF.  I don't know

23  why, but mine don't have page numbers.  But there is a letter

24  dated July 2nd from my office to your attorney.  That's the

25  letter I'm referring to.

Commented [DF14]: 1:11:04

65

1      A   Dated July 2nd.  Excuse me while I look through these

2   17 pages for this letter.

3           THE COURT:   *[Laughter]*

4      A  You said -- what was the date again?

5   BY MR. FONTAINE:

6      Q   July 2nd, 2019.

7           THE COURT:   *[Whispered] And while you're looking*

8   *through that, I'm gonna go pee.*

9           *Can you imagine if this was in person?*

10          UNIDENTIFIED SPEAKER:   *Oh, my God.  I don't know if*

11  *I (indiscernible).*

> **Commented [DF15]:** 1:12:33

12     A  So I don't know.  Yes, it does say the vaccinations on

13  schedule agreed to.  I don't know how we could do that if we

14  don't have a copy of the schedule, but I would be amenable, if

15  we have a copy of the schedule, to anyone administering the

16  vaccines.

17  BY MR. FONTAINE:

18     Q   Okay.  So let me ask you this.  After this, there was

19  an appointment scheduled for Dr. -- but you --

20     A   Yeah, with --

21     Q   You canceled it, didn't you?

22     A   There was a prior appointment scheduled with

23  Dr. Greenberg that was canceled.

24          THE COURT:   *[Laughs].*

25     A   So yes, if she's canceling the appointment that we

66

1  agreed to, I will cancel the appointment that we did not agree

2  to.

3          THE COURT:  *[Laughs]*.

4  BY MR. FONTAINE:

5      Q  So you canceled the appointment with Dr. Hanif,

6  correct?

7      A  Yes.  It's the only appointment in the entire history

8  of this case I have ever canceled.

9      Q  And --

10     A  I can't say the same for Katherine.

11         UNIDENTIFIED SPEAKER:  *[Whispered] Stupid.*

12         MR. FONTAINE:  I have no further questions, Your

13  Honor, for this witness.

14         THE COURT:  Any redirect, Mr. Caulfield?

15         MR. CAULFIELD: Yes, Your Honor.  One moment,

16  please.

17                REDIRECT EXAMINATION

18  BY MR. CAULFIELD:

19     Q  Atty. Fontaine asked you about your relationship with

20  ███  deteriorating since Christmas 2018, and you said that

21  that's not correct, and you were trying to refer to some

22  exhibit?

23     A  The --

24         THE COURT:  *[Whispered] No, (indiscernible)*.     Commented [DF16]: 1:14:13

25     A  -- apology for ███?  Or the relationship since then?

67

1      Q  Well, my notes say that Atty. Fontaine asked you about

2  the relationship with ████ deteriorating since Christmas

3  2018, and I see that I have an asterisk --

                  **Commented [DF17]:** 1:14:23

4      A  Yes.  Yes.  That was the weekend -- so I have shown

5  these texts to get some advice from my therapist because I'm

6  concerned he's mentally ill.

7          THE COURT:  *[Laughs]*

8      A  So October 5th, from a different number I'm not

9  familiar, he asked me, how long does it take to hack into a

10  black phone, do you know?  I need to know how often I need to

11  replace it.  I have no idea why he thinks he needs to replace

12  his phones.  He says he's got to throw his phone out soon.

13          THE COURT:  *Hopeless.  Heartless.*

14          UNIDENTIFIED SPEAKER:  *No, he did.*

15          THE COURT:  *He was concerned; he said he was*

16  *hopeless.   (Indiscernible).*

                  **Commented [DF18]:** 1:15:17

17      A  I can read this in-depth, his own words, but they're

18  quite incoherent.  So long, rambling emails.

19  BY MR. CAULFIELD:

20      Q  That was after this incident?  Mr. Albrecht, that was

21  after the incident that Atty. Fontaine asked you about?

22      A  This is most recently, if we go to the incident at

23  church, that's more relevant because he's much saner at that

24  point where he just apologizes for not getting in touch with

25  me.

68

1          THE COURT:  *(Indiscernible)*.                    Commented [DF19]: 1:15:48

2   BY MR. CAULFIELD:

3      Q  So after the incident in which you have these -- which

4   the DV is outstanding, he apologized to you?

5          THE COURT:  *[Laughs]*

6      A  Correct.  No.

7          THE COURT:  *[Laughs]*

8   BY MR. CAULFIELD:

9      Q  But -- but -- but during your cross-examination, you

10  were challenged with, did you do this this way, did you do

11  that way; what did you say in your apology letter; why didn't

12  you say this in your apology letter.

13         THE COURT:  *(Indiscernible) so what?*              Commented [DF20]: 1:16:17

14         UNIDENTIFIED SPEAKER:  *(Indiscernible)*.

15  BY MR. CAULFIELD:

16     Q  If for some reason you found out that over your

17  lifetime as a parent, you didn't make the right choice every

18  single blessed time, would you accept that?

19         THE COURT:  *[Laughs]*

20     A  Yes.

21  BY MR. CAULFIELD:

22     Q  Right.  And -- and if somebody -- and if you did the

23  best you could in writing a letter and consulted with your own

24  therapist as how you should write the letter --

25         THE COURT:  *[Whispered] The apology (indiscernible)*   Commented [DF21]: 1:16:45

69

1    *to have a (indiscernible) relationship.  He doesn't think his*

2    *son's (indiscernible).*

3    BY MR. CAULFIELD:

4        Q  -- if someone else thinks that it should be written

5    differently, is that really neither here nor there,

6    Mr. Albrecht?

7        A  Only in the sense that a professional therapist,

8    professional opinion, I would think, would be better than

9    somebody who's not similarly trained.

10       Q  Okay.  Now, if Master DalPra orders this fractured

11   family to go to -- for some sort of reunification therapy --

12           THE COURT:  *He lives on the East Coast.  They live*

13   *on the West Coast.  They're going to go there (indiscernible).*

14           UNIDENTIFIED SPEAKER:  *[Laughs].*

15   BY MR. CAULFIELD:

16       Q  -- would you do what the therapist tells you to do?

17       A  Absolutely, in a heartbeat.  I would love that.

18       Q  Would -- would you send the letter the way the

19   therapist says you should do it?

20       A  Absolutely, in a heartbeat, sir.

21       Q  Okay.  Now, there was some discussion about some

22   examination about Judge -- Judge DalPra -- Master DalPra's

23   order regarding insurance, and you were saying that you -- you

24   didn't understand it --

25           THE COURT:  *[Laughs]*

Commented [DF22]: 1:17:18

70

1   BY MR. CAULFIELD:

2       Q  -- and you -- you started to try to reference it and

3   then we moved on.  Is there something about that order you

4   wanted to discuss?

5       A  Yes, if you could just briefly give me one moment to

6   bring it up.

7       Q  And while you're getting it up, assuming you can

8   multi-process, sir, if it turns out that somewhere along the

9   line in your lifetime as a parent you had made some mistake,

10  you didn't say the right thing in a letter, you held the kids

11  two more days during parenting, would it make any sense that

12  you should be punished and the children should be punished by

13  never seeing their dad again?

14      A  Yeah.

15      Q  Okay.  That would -- that would really be mentally ill

16  to think that way, wouldn't it?

17      A  Yes.

18      Q  Yes.  Okay.

19      A  Okay.  So I found the order.

20          THE COURT:  *[Laughs]*.

21      A  So I think the issue here is the uniform support order

22  that Judge Introcaso signed in paragraph 16 says, see decree

23  providing coverage under Blue Shield of California.  So the

24  order from the judge is to look at the decree for providing

25  Blue Shield coverage.  But when I look at the divorce decree



71

1   for providing coverage under Blue Shield, I can't find it

2   anywhere in there.

3         So it's unclear how I -- I -- I accept that by the

4   time we get to the order where judge -- I accepted Judge

5   Introcaso found me in contempt of that.  But again, to this

6   point, I'm not sure why, because he told me to look at the

7   decree and I can't find it in the decree.

8         MR. CAULFIELD:  Okay.  I have -- I have no further

9   questions.

10        THE COURT:  Any recross, Mr. Fontaine?

11        MR. FONTAINE:  No, I'm all set, Your Honor.  Thank

12   you.

13        THE COURT:  Very well.  At this point we're going to

14   take about a 15-minute recess.  I am going to keep my line

15   open here; you can stay on the line, or you can call back in

16   15 minutes.  Okay?

17        MR. CAULFIELD:  Thank you, Your Honor.

18        MR. FONTAINE:  Thank you.

19        THE COURT:  Very well.

20        We're going to take, like, about a three-minute

21   break because I have to --

22        UNIDENTIFIED SPEAKER:  You're absolutely right; it

23   sounds like Gilbert Godfrey.

24     (Recess at 1:20 p.m., recommencing at 1:33 p.m.)

25        MR. CAULFIELD: (Audio begins mid-sentence) yes, Your



72

1    Honor.

2           THE COURT:  Are your clients back?  Ms. Albrecht?

3           Katherine Albrecht, are you back on the line?

4           Dana Albrecht, are you back on the line?

5           THE PETITIONER: I'm here, Your Honor.

6           THE COURT:  Very well; we'll wait a few more

7    minutes.

8           MR. CAULFIELD:  (Indiscernible) now, Judge.

9           THE COURT:  *[Whispered] She's probably having a hot*

10   *dog.  [Laughter]*

11          So Alex Corey is back.

12          UNIDENTIFIED SPEAKER:  Yup.

13          THE COURT:  I wonder if they're going to do anything

14   with the other guy with a thing like the guy from New

15   Hampshire.  Fold (phonetic)?

16          UNIDENTIFIED SPEAKER:  Oh, it's not -- what's his

17   name?  The guy that was the manager this year who was the

18   bench coach, he's not coming back.

19          THE COURT:  No.

20          UNIDENTIFIED SPEAKER:  Did they -- the first base

21   coach and third base coach, was those new coaches?

22          THE COURT:  They're back.

23          UNIDENTIFIED SPEAKER:  Were they the ones that

24   worked on this (indiscernible) previously?

25          THE COURT:  Yeah, they were.  I think they're both

**Commented [DF23]:** 1:33:59

73

1 | back.  Febles and the other guy, I think they're both back.

2 | UNIDENTIFIED SPEAKER:  I'll be curious to see what

3 | they do to improve the team, if they even try.

4 | THE COURT:  I don't know.  I don't -- I don't mind

5 | John Henry as an owner, but I don't like Werner at all.

6 | UNIDENTIFIED SPEAKER:  Oh, yeah.

7 | THE COURT:  He's too --

8 | UNIDENTIFIED SPEAKER:  What do you think of this new

9 | GM they have?

10 | THE COURT:  It's hard -- it's hard to say over the

11 | first --

12 | UNIDENTIFIED SPEAKER:  Yeah, because of the --

13 | THE COURT:  -- first year with what went on.

14 | UNIDENTIFIED SPEAKER:  -- the way the end of the

15 | season was.

16 | THE COURT:  I mean, they -- they basically told him

17 | to trade Betts (phonetic), and I don't think Betts was going

18 | to stay anyway.  Didn't sound like he wanted to be in the --

19 | the Boston.

20 | UNIDENTIFIED SPEAKER:  Ken Nuke (phonetic) can

21 | pitch.

22 | *[Laughter]*

23 | THE COURT:  All right.

24 | I must have these exhibits somewhere.  Forgot to

25 | check them.



74

1      (Off the record)

2           THE RESPONDENT:  I'm here.

3           THE COURT:  You are.

4           THE RESPONDENT:  I'm here.

5           MR. FONTAINE:  Oh, good.

6           THE COURT:  Okay, so we're all --

7           THE RESPONDENT:  Sorry about that.

8           THE COURT:  We're all back, and we're on the record.

9   Mr. Caulfield, do you have any other witnesses?

10          MR. CAULFIELD:  No, Your Honor.

11                     PETITIONER RESTS

12          THE COURT:  Mr. Fontaine?

13          MR. FONTAINE:  Thank you.  Thank you, Your Honor.

14  If I could just make a brief opening before I have my client

15  testify, Judge --

16          THE COURT:  Okay.

17          MR. FONTAINE:  -- to -- to -- to summarize a few

18  points.

19          THE COURT:  Go ahead.

20                 RESPONDENT'S OPENING STATEMENT

21          MR. FONTAINE:  Thank you.  As you can see, we've

22  submitted relatively few exhibits.  And we're trying to

23  directly -- to provide exhibits that directly relate to the

24  motions before this Court and to not burden the Court with

25  having to review many others.



75

1          In previous hearings, we've covered a lot of
2   testimony that has been brought up in these pleadings.  In the
3   previous hearing, we've extensively covered the incident that
4   occurred on this December 2018 holiday visit, the attendant --
5   the incident that happened regarding the children's attendance
6   at The Wilds of New Hampshire (sic) Summer Camp in 2019, and -
7   - and Mr. Albrecht's actions regarding that same incident.
8          And we've also, in a separate hearing with Judge
9   Derby, covered, at length, the incident that occurred at the
10  Collinsville Bible Church, which resulted in him issuing a
11  detailed decision with findings and rulings.  That was
12  appealed and subsequently affirmed on appeal.  Those are final
13  orders of the Court.
14          More specifically, Judge, your order of May 30th,
15  2019 found in pertinent part that there was a reliable
16  evidence that the parties had reached a verbal agreement --
17  also, through counsel -- regarding the December vacation
18  period.  Evidence existed supporting the Respondent's
19  assertion that the Petitioner did not comply with that verbal
20  agreement, quote.
21          The Court also finds -- found in the same order,
22  quote, there is reliable evidence to show that the parties'
23  two youngest children have a problematic relationship with
24  Petitioner at times, and that the Petitioner's actions and
25  conduct is the major contributing factor to those



76

1  circumstances -- major contributor to those facts and

2  circumstances.

3  The Court also found, in denying the previously

4  filed motion for contempt by -- by Mr. Albrecht, that the

5  girls do not wish to fly to New Hampshire for parenting time

6  with Petitioner and there's insufficient reliable evidence to

7  show that the Respondent has willfully disregarded the

8  parenting plan or has acted, in any way, to discourage

9  parenting time.

10  Further, the Court's denying the -- the -- another -

11  - on the motion for contempt says that there's reliable

12  evidence disclosed that the Respondent has encouraged 

13  to travel to New Hampshire.

14  Therefore, my question to you, Judge, is whether we

15  need to cover any of the information again pertaining to the

16  December incident, The Wilds of New Hampshire (sic) incident,

17  or the November incident that resulted in the restraining

18  order.  Obviously, I'll be glad to do that if you feel that

19  it's necessary, but I think extensive testimony and findings

20  have already occurred in that regard.

21  THE COURT:  I believe they have, and I don't think

22  you have to rehash or replow old ground.

23  MR. FONTAINE:  Okay, great.  What is new and has not

24  been previously addressed in the pleadings and the -- and the

25  evidence is the abuse and neglect petition that was filed --

77

1  the abuse and neglect complaint that was filed by Mr. Albrecht

2  and the Department's findings.  The allegations of Mr.

3  Albrecht's neglect relative to their medical and dental care

4  was brought up in his motion, and the -- the Department of --

5  the -- the Division in California has specifically addressed

6  that in their findings in their investigation.  And therefore,

7  I think it's important, Judge, that you review those -- those

8  -- that -- that report that we have submitted as an exhibit in

9  regards to that specific allegation on their part.

10         In fact, what is interesting in that report, as you

11  can see, is that Mr. Albrecht claims what Ms. Albrecht was --

12  sorry, that Mr. Albrecht what Ms. Albrecht had claimed, and

13  most importantly, what the two girls in private meetings with

14  the caseworker about their father, his previous actions, and

15  their -- their desire to not visit with or have contact with

16  him.

17         You know, you -- you had specifically not allowed us

18  to have the guardian reappointed at this point, but I think

19  what is stated in the report helps you get a feeling of

20  exactly how these girls feel about their father, about their

21  willingness to visit with him.  You previously -- and if I

22  could, just page 1 contains -- in that report, contains Mr.

23  Albrecht's interview; page 3, the mother's interview; page 6,

24  ███████'s interview; page 7, ███████'s interview; page 10, the

25  documents and records that she gave to the Department relative



78

1   to the money she spent on dental, orthodontic, and medical

2   care; and page 5, is -- is his reference to an order that we

3   knew -- that he knew full well was no longer in existence, and

4   I think that's important.

5            The judge, in his domestic violence finding, Judge

6   Derby, made a comment about how he had misused previously

7   issued orders, and I think it's important to see that he has

8   done so again in this -- in this report to the Division in

9   California.

10           MR. CAULFIELD:  Excuse me, this is Atty. Caulfield.

11  I'm confused as to what's happening here.  Atty. Fontaine said

12  that he wanted to make an opening.  He's now making a closing

13  argument.  And I also want to point out that nothing of what

14  he says is evidence.

15           The exhibits may be accepted by the Court, but none

16  of this is evidence; correct, Your Honor?

17           THE COURT:  Mr. Caulfield, I'm aware of how to run a

18  trial.  None of it's evidence.

19           MR. CAULFIELD:  All right, Judge.  Thank you.

20           THE COURT:  Call your first witness, Mr. Fontaine.

21           MR. FONTAINE:  Thank you.  Thank you, Your Honor.

22  Katherine, could you please raise your right hand.

23           KATHERINE ALBRECHT, RESPONDENT, SWORN

24                    DIRECT EXAMINATION

25  BY MR. CAULFIELD:



79

1     Q  For the record, state your full name.

2     A  My name is Katherine Michelle Mingus, and was

3 previously Albrecht.

4     Q  Okay.  And where do you reside?

5     A  I reside at 730 West Alegria Avenue in Sierra Madre,

6 California.

7     Q  And who lives with you at that location?

8     A  My son ███, my daughters ███ and ███, and most

9 recently, my sister Laura.

10     Q  Okay.  And your sister Laura, does -- is -- does she

11 need assistance?

12     A  She is -- she has cerebral palsy.  She's in a

13 wheelchair.  She has attendant care 24 hours, and my mother

14 was her primary caregiver until she passed away last year.

15 And now I'm --

16     Q  Okay.

17     A  I'm not the primary caregiver.  She has an attendant,

18 but I'm supporting her and helping her out.

19     Q  Have you had an opportunity to discuss with the girls

20 whether they want to see their father?

21     A  Yes.

22     Q  And has that been recent?

23     A  Yes.

24     Q  And have they changed their prior position that you

25 testified to at the motion hearing a little over a year ago?

80

1      A   No.

2      Q   Have they indicated any desire to have any contact

3    with him?

4      A   No.

5      Q   Have you continued, on occasion, to encourage them to

6    reach out to him?

7      A   Yes.

8      Q   And what has their response been?

9      A   Their response has consistently been no.

10      Q   Do you believe that they're mature minors?

11      A   Yes.

12      Q   How do they do in school?

13      A   They have very good grades.

14      Q   Have they had any problems with their conduct in

15    school or outside of school?

16      A   Never, never.

17      Q   Do they make wise, mature decisions in their daily

18    lives relative to, for example, schoolwork?

19          THE COURT:   *[Whispered] Of course not; they're a*

20    *bunch of morons*.

21      A   Yes.

22    BY MR. CAULFIELD:

23      Q   Helping around the house?

24      A   Yes.

25      Q   Do they have chores?

81

1      A  Yes.

2      Q  Do they do them?

3      A  Yes.

4      Q  How about decisions about personal hygiene?

5      A  They're great.

6      Q  How about their choice of friends?

7      A  Their friends are great.

8      Q  How about choice of appropriate clothing?

9      A  Yes, fine.

10         THE COURT:  *[Sigh]*

11  BY MR. CAULFIELD:

12     Q  Do they attend church services?

13     A  Weekly.

14         THE COURT:  *[Laughter]*

15  BY MR. CAULFIELD:

16     Q  Is there anything that would cause you to question

17  them being mature minors?

18     A  No.

19     Q  Do you think they're capable of making mature,

20  independent decisions?

21     A  Yes.

22     Q  Do you believe their decisions on not wanting to have

23  contact or visits with their father is a decision that they've

24  thought carefully about and that they've made after the

25  consideration of all relevant factors?

82

1     A  Yes.

2     Q  Do you think that it's free of any influence?

3     A  Yes.

4     Q  Did you, in any way, attempted to influence their

5  decision in that regard?

6     A  I have encouraged them to go to their visits, but if

7  that's what you mean, yes.  I've tried to get them to do it.

8     Q  Have you encouraged them to not have any relationship

9  with him?

10     A  Never.

11     Q  Have you asked them -- do you know that they've

12  requested that -- that the children engage in reunification

13  counseling?

14     A  Yes.

15     Q  Have you asked them as to whether they would be

16  willing to engage in reunification counseling with their

17  father?

18     A  Yes.

19     Q  What was their response?

20     A  They said they don't want to do it.

21     Q  Okay.  And --

22     A  ███████  said -- actually, ███████  said she absolutely

23  wouldn't do it and she couldn't be made to do it.

24     Q  Okay.  And have you encouraged them to consider

25  engaging in it?



83

1       A  Yes.

2       Q  Has Dana, as far as you know and from speaking with

3   your girls, ever apologized to the girls regarding the

4   December Christmas break issue?

5       A  No.

6       Q  Has Dana ever apologized to the turmoil he caused

7   regarding The Wilds of New England incident during the summer

8   of 2019?

9       A  No.

10      Q  Has Dana ever apologized to the children regarding the

11  complaint that he filed with the Division in -- in Los

12  Angeles?

13      A  No.

14      Q  Has he ever apologized to them regarding the November

15  incident at the Collinsville Bible Church which resulted in

16  final domestic restraining orders?

17      A  No.

18      Q  Do you think that that is important to the girls?

19      A  Yes.

20      Q  Now, you understand that Dana has submitted some

21  proposed reunification counselors?

22      A  Yes.

23      Q  If the girls were to consider reunification

24  counseling, do you believe that those counselors would be the

25  good -- a good choice?



84

1     A   No.

2     Q   Have you researched them?

3     A   Yes.

4     Q   And do you believe that they are unbiased?

5     A   I believe that they are biased.

6     Q   Okay.  And why do you say that?

7     A   Well, their backgrounds primarily talk about parental

8   alienation as the thing that needs to be addressed in therapy.

9   And Mr. Albrecht's contention is that that's what the issue

10  is, so it doesn't really get to the heart of what's going on

11  between him and the girls.  And I don't -- I don't believe

12  that that's an unbiased approach.  I think an unbiased

13  approach would talk to them and figure out what they're upset

14  about.

15    Q   And do you believe that in -- based on your

16  conversations with them, that you have, in any way,

17  intentionally alienated the children from Dana?

18    A   No.

19    Q   Do you think that, based upon your -- their statements

20  to you about reunification counseling, that it would be in

21  their best interest for a court to order it, despite their

22  indicating that they don't want to be part of it?

23    A   No, I don't think that would be in their best interest

24  to have it ordered and forced on them.

25    Q   Do you think it would be emotionally harmful to them?

85

1      A   I do.

2      Q   Let's talk about Dana's claims for a minute.   You

3  heard him discuss the medical and dental care issues?

4      A   Yes.

5      Q   Start with the medical.   First of all, have you been

6  required to obtain your own health insurance for the children?

7      A   He obtained indigent insurance after failing to

8  provide them with the insurance in the parenting plan and we

9  had to go to court.   And he then came up with the indigent

10  insurance, which in California is very problematic.   So I

11  obtained insurance for them that I believe, as a parent, is

12  more appropriate for their medical care and wellbeing.

13      Q   And how much does that cost?   Okay.

14      A   Which I pay for currently.

15      Q   Okay, and how much does that cost?

16      A   I pay 400 -- I pay $488 a month for -- for both

17  children for that insurance.

18      Q   Okay.   And how much do you receive from Dana in child

19  support?

20      A   $50 a month for both children.

21      Q   Okay.   And that -- why was the -- why was he only

22  ordered to pay $50 a month?

23      A   Well, initially, it was because he stated that he was

24  unable to work because of the stress of this divorce.   And

25  it's unclear to me, since that time, why he's still not



86

1  working.

2    Q  Now, under this insurance, are there certain providers

3  that are considered preferred providers that you do not have

4  to apply towards your deductible?

5    A  Correct, there's just a $40 copay for most of them.

6  There's a big list and then that -- and a catalogue they put

7  out every year.

8    Q  And you recall the testimony regarding Dr. Greenberg?

9    A  Yes.

10    Q  Now, do you acknowledge that you actually had the

11  children see Dr. Greenberg for a visit?

12    A  Just ████.  ████ got her for a visit prior to a

13  medical procedure that required anesthesia as it required a

14  physical.  I looked in the phone book and called several

15  providers.  She was the one who could see her on short notice

16  because I had only been informed that day that I needed to

17  have the physical.  So we had it on short notice with a doctor

18  I didn't know who was Dr. Greenburg.  So she was seen by her

19  for an exam.

20    Q  This kind of dovetails with the second subject we're

21  going to talk about, dental, correct?

22    A  Yes.

23    Q  Okay.  So did she, in fact, see Dr. Greenberg for that

24  physical?

25    A  She did.



87

1     Q  Okay.  Now, did you find out at a later point in time

2 that Dr. Greenberg was not a preferred provider under the new

3 insurance that you had purchased?

4     A  Yes, I later found that out, so I paid cash for that

5 first visit.

6     Q  Okay.  And once you had insurance, did you want them

7 to be -- did you want them to see providers that were actually

8 covered -- as -- were preferred providers under your plan?

9     A  Yeah.  Just to clarify, when I made the appointment

10 with Dr. Greenberg, I currently had the Blue Shield insurance

11 for the girls, but I was unable to find a provider that could

12 see them on that short notice, so that's why I went with Dr.

13 Greenberg.  And to be honest, I was grateful she could see me

14 at all, and I didn't really bother to look into her insurance

15 credentials for a one-time visit for a physical, which was

16 reasonably priced.

17     Q  Now, at some point in time, did you have some

18 discussions with Dana about the fact that you wanted -- and

19 again, I'm talking conversations, whether it be directly with

20 -- with him or through our office -- that you wanted to use a

21 different doctor that was, in fact, a preferred provider?

22     A  Yes.

23     Q  And the letter of June 6th, 2019 from my office to

24 Atty. Caulfield that's in our Exhibit 6, was that the first

25 letter informing them of that?



88

1     A  I believe so.

2     Q  At any time at -- oh, by the way, before that time,

3  you had actually had a discussion with Dana regarding his

4  request that there be a specific schedule of vaccinations,

5  correct?

6     A  Well, what happened was, we saw -- I -- I took the

7  girls to Dr. Greenberg, and then the issue of vaccinations

8  came up from their school.  And both parents wanted the girls

9  to be vaccinated.  I made an appointment and set up a

10  conference call between Dr. Greenberg and Dana and myself to

11  discuss medical issues associated with their vaccinations.

12  And he participated in that conference call.  I was there

13  physically in her office; he was on a speakerphone.  And

14  during that visit, we discussed our concerns about vaccinating

15  the girls and she -- we hung up.  And then she proceeded to

16  write out a schedule after we had hung up of what that would

17  take and then informed that the cost would be many thousands

18  of dollars.  So --

19     Q  Okay.  And that --

20     A  So that's what happened at that visit.  And then I

21  contacted your office --

22     Q  Hold on.

23     A  -- and said --

24     Q  Wait, before you go on to that --

25     A  Okay.



89

1      Q  -- let me ask a question about that.  So explain why

2   it would be so expensive to see Dr. Greenberg for these

3   vaccinations as was discussed?

4      A  So what I learned at that visit was that she was not

5   in our network, and I knew that our -- that Blue Shield would

6   pay a portion of the visits for doctors who were not in our

7   network.  What I wasn't aware of is that her prices were

8   exorbitant, that the schedule required 13 visits for

9   vaccinations that could have been completed in three, that --

10   and that was because we wanted to monitor their response to

11   the vaccines.  And Dana and I had agreed on that.  But because

12   there were 13 required visits and she was not going to accept

13   any insurance payments, they would not make any payments.

14          And she also was going to charge me the full cost of

15   the actual vaccine drugs themselves, which was very high.  And

16   that was when I discovered that we were talking about

17   literally many thousands of dollars that would not be covered

18   by my insurance until we hit a deductible of $5,000, at which

19   point they would then still only pay us a percentage of her

20   fee, not the full fee.

21      Q  Okay.  And did that result in you sending that June

22   6th letter?

23      A  Yes.

24      Q  Okay.  And at any time after that June 6th letter, did

25   Dana agree that you could see Dr. Hanif, who you had asked



90

1    that he -- him to -- the girls to be able to see and follow

2    the schedule that had been agreed to regarding vaccinations?

3        A   Yeah, I believe that -- my recollection is that we

4    offered two options:  for him to either pay Dr. Greenberg's

5    fees himself or for him to allow me to choose a different

6    provider who would follow the same vaccination schedule we had

7    agreed on, but under my insurance.

8        Q   And you, in fact -- you, in fact -- well, let me ask

9    you this.  Could you afford -- could you have afforded to pay

10   that $5,000 deductible for all of these visits, et cetera?

11       A   No.

12       Q   Was the -- did Dana ever respond saying that your

13   proposal that you see Dr. Hanif and that they -- and that you

14   follow the schedule that had already been agreed to for

15   vaccinations, did he ever respond saying he was agreeable to

16   it?

17       A   No.

18       Q   Did he ever respond saying he wasn't agreeable to it?

19       A   He responded saying he wasn't agreeable; then we

20   followed up and said unless you have a better proposal or, I

21   believe, will pay for Dr. Greenberg, that Katherine needs to

22   proceed with these vaccinations, so we've made an appointment.

23   And at that point, I think a couple weeks went by where we

24   heard literally nothing.  He didn't respond to that in any

25   way.



91

1      Q   Okay.  And when you ended up scheduling the

2  appointment, did you -- with Dr. Hanif, did you actually get

3  to go to it?

4      A   No, I scheduled the appointment, and we informed Dana

5  of that.  We then heard nothing back.  Two weeks went by,

6  during which I had to prepare the girls for their

7  vaccinations, which they were very nervous about.  And on the

8  day of the vaccines, they woke up bright and early a little

9  stressed, but ready to do it.  And then I checked my email on

10  that morning -- I believe our appointment was around noon --

11  and there was an email from -- from Dana to me saying, "I have

12  cancelled your appointment today with Dr. Hanif."  And I --

13  "You will not be able to vaccinate those girls today.  I

14  cancelled the appointment."

15     Q   Did you continue to want Dr. Hanif to be able to see

16  the girls after that cancellation?

17     A   Yes.  I actually called his office to find out what

18  had happened or to see if the appointment had been cancelled;

19  they informed me that it had, indeed, been cancelled.  And I

20  then pretty much said to him --

21     Q   Did they --

22     A   -- (indiscernible) the girls --

23     Q   -- inform you -- did they inform you who cancelled it?

24         Hello?

25     A   It was from Dana.  Can you hear me?  Am I here?  Yeah.

**Commented [DF24]:** 2:00:39

92

1   Hello?

2       Q   Did they inform -- yes, can you hear me?

3       A   Yeah, they informed me that they had received legal

4   documents from Dana.  And then I spoke to Dr. Hanif directly,

5   and he said that he was unwilling to see the girls.  And I

6   said what if I got a court to order that they could -- they

7   could be seen?  And he said he would still be unwilling to see

8   them because he did not want the risk of a lawsuit from Dana.

9   And so he told me that he would not see the girls under any

10  circumstances at that point.

11      Q   Was that one of the reasons that you filed your motion

12  to modify the parenting plan?

13      A   Yes.

14      Q   Have you been able, up to this point in time, to get

15  the girls vaccinated?

16      A   No, because my options were to violate a court order

17  to vaccinate them, and I thought this hearing would be held a

18  long time ago.  So I've been just waiting for this hearing so

19  the judge could decide how we're going to proceed on the

20  vaccinations.

21      Q   Do you feel that Dana's actions with regards to the

22  girls --

23          THE COURT:   (Indiscernible).

24  BY MR. FONTAINE:

25      Q   -- receiving medical treatment was done with the

Commented [DF25]: 2:01:58

93

1  intent of trying to impede your ability to obtain appropriate

2  treatment?

3      A  I do.

4      Q  Has that frustrated you in your desire to get the

5  girls appropriate treatment?

6      A  Yes, it has.

7      Q  Has it resulted in any issues with you with regards to

8  them not being vaccinated?

9      A  Well, they're not vaccinated currently, and their

10  schools are asking about it.  I'm also just -- they don't have

11  a primary care physician because I thought Dr. Hanif would be

12  a great choice.  He was willing to be their primary physician,

13  and they currently don't have a primary physician.  So if

14  something happens with their health, my only option is that I

15  take them to a walk-in clinic or to an emergency room because

16  I don't have a doctor for them.

17      Q  Now, had you -- have you had to do that on occasion

18  when they've had --

19      A  Yes, I have.  Yeah.

20      Q  And explain.

21      A  Christmas of, I believe, last year,  had a cold,

22  and we were concerned and just wanted to rule out anything

23  serious, so we took her to a walk-in clinic, and the doctor

24  physically examined, said she'd be fine, it was just a cold,

25  and sent us home.

94

1    Since that time, there have been -- like last week,

2    ███ sprained her finger, and normally, I would have

3    simply -- it was on a Thursday, and normally, on Friday I

4    would have simply taken her to her family physician and had it

5    looked at, but because I don't have a family physician, I did

6    not want to take her to a walk-in clinic because I don't know

7    what's up with her, and there's COVID around, and other

8    issues.  So I literally went online and subscribed to a

9    physician referral system that just answers generic questions,

10   and I got the -- the answer that she should buy an over-the-

11   counter splint, leave it on for a day or two, and it should be

12   fine, and it is.  And she's fine.

13       I guess the issue, though, about not having a primary

14   care physician is even though all is well with that, I didn't

15   have an opportunity to see an actual (audio interference).

16   And so now I'm -- it's (audio interference).  Do you go all

17   the way to the emergency room?  Or do you just wait things

18   out?  And I'd really like to be able to just have a doctor I

19   can take the girls to.

20       Q   And when you go to the emergency room, does it cost

21   you more, personally, to have them treated, or to a walk-in

22   clinic to have them treated than if, say, you'd gone to a

23   primary care physician?

24       A   I haven't had occasion to take anyone to the emergency

25   room.  We've only been into walk-in care that one time.   The



95

 1  girls are in good health, and we don't have a lot of medical

 2  needs, but what (audio interference) is two-to-three-hour wait

 3  in the waiting room of the walk-in clinic here in Los Angeles,

 4  during which we could be exposed to COVID in the waiting room;

 5  I don't know.

 6      But as far as the cost goes, typically, the insurance

 7  will cover that, but not at the same rate as if I had gone to

 8  a doctor covered in the network.

 9      Q  Based upon the problems that you've had in having

10  joint decision-making --

11      A  I'm sorry, one more time?

12      Q  Based on the problems that you have had in joint

13  decisions regarding medical treatment, are you asking this

14  Court to provide you with either sole decision-making or

15  decision-making along the lines that you currently have

16  relative to education?

17      A  Yes, so that I can at least get them the care they

18  need even if Dana tries to impede it.  Yes.

19      Q  Okay.  And if -- currently, the order for -- the order

20  relative to education decision-making is that you need to

21  inform Dana of it, of the decisions, but that you are

22  ultimately able to make the decision in the event that the two

23  of you can (sic) agree, correct?

24      A  It does state that, in the event of a disagreement, I

25  can make the decision, correct.



(973) 406-2250 | operations@escribers.net | www.escribers.net

96

```
 1      Q   Okay.  Now, you've asked the Court in this -- in your
 2   motion to award you sole decision-making regarding both
 3   education and medical without that kind of a -- alternative,
 4   correct?
 5      A   Correct.
 6      Q   Why has that option that's allowed in the education
 7   arena caused you issues?
 8      A   Because Dana has used his joint decision-making
 9   regarding education to essentially cause a lot of problems for
10   the girls at their schools.  He has used information that he
11   has gotten from the schools through that in order to contact
12   the schools and, I mean -- I guess I'll say it -- just what
13   feels to them like harassment.  He has created emergency
14   meetings for me to come in and talk to them.  He's forwarded
15   them private emails that ████ has written to him.  He has
16   essentially made their lives at all of their schools very,
17   very difficult.  Our kids are noted by the schools as being
18   problem students.  There are attorneys involved, at great
19   expense to the schools.  And it's really been a problematic
20   issue.
21      Q   We'll talk about the education and the education
22   choice for your daughter in a little bit, but I want to get on
23   to the -- on to the dental.  But before I do that, one last
24   question.  So your preference is to have complete decision-
25   making relative to medical, education, et cetera, correct?
```



97

1      A   That is correct.

2      Q   But you -- but as an alternative, if -- if the Court

3  is not so inclined, you would like the -- the ability to make

4  the final decision in the event you can't agree, correct?

5      A   Yes.

6      Q   So let's talk about dental.  For den -- you heard

7  Dana's testimony about your treatment of the girls relative to

8  dental treatment?

9      A   Yes.

10     Q   Okay.  Why don't you give us some background as to

11  what's occurred relative to their treatment, including the

12  issue you have with ████?

13     A   So starting back in 2016, or even prior, with ████,

14  ████  has severe dental phobia.  So she's unable to have a

15  teeth cleaning.  She's kind of successfully had a few of

16  those, but she's been unable to have any fillings filled,

17  except by one doctor that Dana and I found in either Nashua or

18  Amherst, who's Dr. Andrew Cheifetz.  She was seen by Dr.

19  Cheifetz up until 2016, and he was able to fill her cavities.

20  He was able to do all the treatments with her.

21         And then in 2016, we had an appointment with -- I made

22  an appointment with Dr. Cheifetz for her regular six-month

23  exam, and Dana contacted their office, and that was the first

24  time he contacted an office and said he had legal authority

25  and that things had to be done his way, not my way.  And he



98

1    essentially caused their office, because he spoke to their

2    office manager, to determine that -- that there would be a

3    threat of their being sued and they fired ████ as a patient.

4    So I was unable to get ████ the dental care that she had

5    previously been able to get.

6         From there, Dr. -- excuse me, Dana wanted me to go to

7    Dr. Machell, the family doctor.  I could not afford his rates

8    at that time.  He was extremely expensive.  He's a great

9    dentist, but he's very, very costly.  So I found a dentist

10   that was covered under our New Hampshire insurance.  We had

11   New Hampshire Children and Family Insurance that I had

12   obtained at that time due to low income.  And they were seen

13   at Sterling Smiles in Nashua.  From that point -- but they

14   were unable to treat ████ because of her phobia.

15        So then we moved to California, and we -- I had them

16   seen at Hastings Ranch Dental, but during the period when we

17   moved to California, I did not have dental insurance for the

18   girls.  I had had dental insurance under the California Family

19   and Children Insur -- or excuse me, New Hampshire Family and

20   Children Insurance, but when we moved here in September of

21   2017, I no longer had that insurance.

22   Q   Okay.  And did that create -- did that create any --

23   did you have any financial issues with regards to paying for

24   dental privately?

25   A   Yeah, I had financial issues with pretty much



99

1    everything on coming out here to California.  As the Court is

2    aware, I get around $1,600 a month in disability because I

3    have stage IV breast cancer.  I have no other income --

4         (Phone ringing)

5              THE WITNESS:  One second.  And so -- I'm sorry,

6    but -- I'm sorry about that.

7         A  So I did not have insurance coming out here.  I had a

8    court order saying that Dana needed to pay for the insurance,

9    but we didn't have it and we were experiencing some financial

10   difficulty, which is pretty -- pretty (audio interference).

11   Yeah, I -- I think I answered your question.  I'm sorry, I got

12   distracted by the phone, but I turned it off.

13   BY MR. FONTAINE:

14        Q  Yeah, and -- that's okay.  That's okay.  And so with

15   regards to the dental coverage for -- for ████, does that

16   cost -- typically cost more than would be for a child that

17   doesn't have that fear?

18        A  Yeah.  It does because, okay, she can't just have a

19   cavity filled for two or three (audio interference) filled in

20   all the cavities.  It's literally thousands of dollars because

21   she requires full anesthesia at this point because we've been

22   unable to find a doctor that can do it any other way.

23        Q  Okay.  And so did you -- you acknowledge that you put

24   off some of that care because you couldn't afford it?

25        A  Correct.



100

1      Q   And have you shut your phone off, by the way?

2      A   Yes.

3      Q   Okay, thank you.  So with regards to the dental care -

4  - we'll stick with ███ for right now.  With regards to

5  dental care for ███, did you, at some point, obtain care for

6  her?

7      A   Yes, in June, I think, the 18th, I took her to

8  Hastings Ranch to go for a full set of X-rays and cleaning.

9      Q   Who paid for that?

10     A   I did.  Actually, my -- my mother helped me.

11         UNIDENTIFIED SPEAKER:  We paid -- but yeah, I --

12  Dana didn't.  I -- we did.

13  BY MR. FONTAINE:

14     Q   Okay.  And did they -- and what did they find?

15     A   They found six cavities for ███.

16     Q   Okay.  At some point in time, were they able to fix

17  those cavities?

18     A   They tried to do some procedures with her, but it

19  wound up the same way it always does.  She's hysterical, and

20  they give up.  And they then said this child needs medical

21  anesthesia to have her cavities filled under anesthesia.  And

22  they gave me the name of La Habra Family Dentistry, or I

23  believe, La Habra Modern Dentistry in La Habra, which is about

24  an hour away from here.  And they referred me to their office

25  and said I should make an appointment and have her go in and

101

1   get the full anesthesia and have the six cavities treated

2   then.

3        Q   And did you do that?

4        A   We did.  So I made the appointment with La Habra

5   Family Dentistry, and I then contacted your office, who then

6   contacted Dana, and we explained the situation that she had

7   six cavities, needed to go La Habra Modern Family -- needed to

8   have dental anesthesia.  And I said that I had let -- on the

9   advice of my dentist, they had referred to me to the La Habra

10  Modern Family Dentistry location.  I provided a link to their

11  website and information about them, and I told Dana that I

12  needed his permission to proceed.  And he said he -- that I

13  already had an appointment on a certain date, and that I

14  needed his approval to keep the appointment or he could review

15  the information if he did not like that doctor and present an

16  alternative doctor that I could take them to.  So that was

17  sent out after I discovered the six cavities and got the

18  referral.

19       Q   And did Dana, in fact, agree that you could get the

20  treatment?

21       A   He did not agree to the treatment.  And I reluctantly

22  had to cancel the appointment with La Habra Family Dentistry.

23       Q   Okay.  And has , at any point, received the

24  treatment that she needed?

25       A   Yes.  So that was in June, and then all that fall, I

102

 1   tried to get Dana's permission, and I made two separate

 2   appointments with La Habra Family Dentistry, both of which I

 3   was unable to keep because of Dana's not giving permission.  I

 4   then took the kids back for their six-month checkup in January

 5   of 20- -- what would it have been -- 2018.  Switching track of

 6   years, but that was in June.  So yeah, of 2018 -- 2019.  So I

 7   took them back in January of 2019.

 8        At that point, the doctor at Hastings Ranch Dental,

 9   where I was taking them every six months, gave ████ another

10   set of X-rays and said this child now doesn't have six

11   cavities like in June.  She has 11 cavities.  Why have you not

12   fixed her cavities?  We gave you a referral; why did you not

13   fix them?  And I answered to her that I, under a -- a New

14   Hampshire family order, have to get my -- the -- her father's

15   permission to proceed, and he has not provided permission.

16        She then said this is urgent enough that you should

17   probably do it even without permission.  And I said that would

18   be a violation of the court order.  And she then wrote a -- a

19   fairly straight-up letter at my request because I said can you

20   write a letter stating this so I can send it to the court and

21   get the court's permission to get her treated, if Dana won't

22   agree?  She wrote a letter in January of 2019 stating that

23      had had 6 cavities in June, now had 11 cavities, and

24   that it was absolutely urgent that she receive the care.

25        So I got that letter -- I requested the letter; I got

103

1  the letter to send to the court.  And we tried again to

2  contact Dana and to suggest a different dentist, which is one

3  in Pasadena.  He agreed to that.

4       Oh, let me back up.  So after I got the letter from

5  her, I went -- I took ███, physically, to La Habra Family

6  Medical Dentistry and had an appointment with her with the

7  doctor to consult, even without Dana's permission.  I took her

8  at least for the consultation.  And then we came back, and we

9  thought let's propose a different dentist; maybe he'll agree

10 with a different anesthesiologist and dentist, so we proposed

11 that.  And I did that combined with the fact that there were

12 now 11 cavities, he agreed to that.  And then we proceeded and

13 had the procedure done.

14       As he says, it was $2,500.  I did submit it to

15 insurance; they paid a portion of it.  They paid something

16 like the first 15 minutes of anesthesia, not the whole thing,

17 and I wound up having to pay the majority of that out of

18 pocket.  I've asked him to reimburse me, and he hasn't.

19     Q  Has Dana -- has -- and how did you get money for -- to

20 be able to afford that?

21     A  I had to ask my mom, kind of on bended knee at that

22 point.

23     Q  Has Dana --

24     (Phone ringing)

25            THE WITNESS:  Oh, I guess I didn't turn my phone



104

1    off; sorry.  I'm so sorry; I thought I had it off.  Okay, go

2    ahead.

3    BY MR. FONTAINE:

4        Q   So do you believe that Dana's actions with regards to

5    the -- the dental treatment of the -- first of all, the

6    insurance that would have covered some of the dental treatment

7    and then, subsequently, the dental treatment itself has

8    inhibited your ability to get prompt dental treatment?

9        A   Yes, it caused ███ to go from 6 cavities to 11 at --

10   at great trauma and distress to both me and ███ -- and my

11   dentist.

12       Q   Let's talk about ███ for a second.  Did she also

13   require any -- any dental work?

14       A   So I had purchased braces for ███ on the

15   recommendation of our dentist.  I took her to an orthodontist

16   and purchased braces for her, which were close to $6,000.  I

17   did this back in New Hampshire.  And my mother helped me to

18   pay for a portion of that expense.

19           I -- we saw that --

20       Q   Did Dana -- did Dana contribute to that expense at

21   all?

22       A   Not one penny, no.  And now ███ needs braces too,

23   and I'm sure he's not going to pay for that either.  I've got

24   to figure that out.  But anyway, so I got ███ braces and

25   took her to her regular appointments for tightening and

105

1   adjustments all throughout our stay in New Hampshire.

2          When we moved to California, obviously, I couldn't

3   take her to the orthodontist we'd been seeing, so I took her

4   to two separate orthodontists here in California and said can

5   you take over ████'s -- or excuse me, ████'s braces.  And

6   both orthodontists gave me exorbitantly high prices of

7   thousands of dollars which, at that point, I did not have and

8   was unable to pay for it.  So I asked that -- the orthodontist

9   that I saw, I said what would -- what's the worst-case

10  scenario if I just wait until I get some money?  Because if

11  the Court will recall, I was awarded proceeds from the sale of

12  the house, but Dana had put in an appeal causing all of those

13  proceeds to be on hold.  So we were absolutely broke during

14  that period of time, which was a long period of time, until

15  finally that was decided and those funds were released.  So

16  that was during that time when I had just no money and I could

17  not afford thousands of dollars for orthodontic care for

18  ████ at that point in California.

19         What -- what -- like I said, I asked the orthodontist

20  what's the worst that would happen if we just left it alone?

21  And they said, well, they won't get better, but they won't get

22  worse.  And you can do that until you can afford it.  And I

23  kept thinking any month now I would be able to afford it.

24      Q  After you received your money from the -- from the

25  property settlement after the appeal was denied, did you end



106

1    up proceeding with having some work done for ████ ?

2       A  Yes, which I paid for out of pocket.  So I took ████

3    to an orthodontist once I had that money, and we had her

4    braces adjusted and then removed and a retainer made, again,

5    all at my expense in cash.

6       Q  Did Dana contribute anything for that expense?

7       A  Nothing.

8       Q  So in regards to the -- this -- the request in your

9    motion for decision-making relative to medical and -- medical

10   decisions, do you feel that his -- the -- the -- the -- the

11   difficulty that you've had relative to Dana's cooperation with

12   dental care is part of that request as well?

13      A  Yes.

14      Q  I'm going to refer you to our Exhibit Number 5

15   regarding the landlord.  At some point in time, did your

16   landlord contact you regarding a packet of information that

17   Dana had -- had sent to them?

18      A  He sent me an email, yes.

19      Q  Okay.  And was it your landlord -- first of all, who

20   are you landlords?

21      A  My -- the home I live in is owned by a -- a -- a

22   Chinese couple whose last name is Lin (phonetic).  And the

23   person who manages the property is their son, George Tsai.

24      Q  Who contacted you?

25      A  George Tsai contacted me, the son.



107

1     Q  Did he indicate to you that -- that the package he

2  received had caused him concern?

3     A  Yes.

4     Q  And explain that conversation.

5     A  So he told me that he had received an unsolicited

6  package by postal mail that he did not know how, but -- but

7  appeared to be from my ex-husband, Dana Albrecht; that's the

8  return name on it.  He said it contained sensitive information

9  about my children, including their birth certificates, and it

10  made him extremely uncomfortable.  He felt it was

11  inappropriate.  And he said it was unsolicited.  He didn't

12  know how Mr. Albrecht got his name or address, but I guess

13  through property records, and that he wanted me to know that

14  in no way did this affect his high estimation of me or my

15  family, my children.

16       And then I spoke to him on the phone after receiving

17  this email, and I learned from him that the -- that this

18  packet of information was sent to that family -- or to my

19  landlord a month before my lease was up for renewal and that

20  his parents, his Chinese conservative parents, had said that

21  on the day he got this packet from Mr. Albrecht, that they

22  were not going to renew my lease.  So I would have had like 30

23  days to not have a home.

24       George, who's very kind, actually spoke to his parents

25  on my behalf and said please don't hold the bad actions of Mr.



108

1    Albrecht against this woman and her children.  And he was able

2    to persuade his parents to relent and allow me to renew my

3    lease and remain in my home.

4         Q   And -- and what did you consider that packet to be

5    from Mr. Albrecht?

6         A   I think it was an attempt to -- given the timing,

7    especially, to having exactly that outcome:  for me to lose my

8    lease and lose my home.  For me and the children to lose our

9    home.  I think it was just designed to -- to create hardship

10   for me.

11        Q   Now, let's talk a little bit about Exhibit Number 4.

12   This is a couple documents relative to The Wilds -- addressed

13   to The Wilds of New England.

14        A   Yes.

15        Q   And these are from Dana, correct?

16        A   Yes.

17        Q   And did you have any conversation with this gentleman,

18   Rand Hummel?

19        A   I did.  During -- it's kind of a blur because it's

20   right when my mom died, but I had sent my kids to the summer

21   camp.  They always attend.  So -- because for a couple

22   reasons.  That was the week that their friends were going to

23   be there, and they historically always go when their friends

24   are there.  And also, I wanted them to get a little break

25   because at that time, my mother was in hospice, and -- I'm



109

1  sorry.  At that time, my mother was very sick, and I was

2  administering morphine to her.

3       Q   Okay.

4       A   Should I go on?

5       Q   Take your time.  So what -- what -- how did this --

6  how did the -- these -- their visit at The Wilds of New

7  England result in these letters?

8       A   Okay.  So Mr. Albrecht flew out here with  to

9  California and went to the Sierra Madre Police, who I guess

10 informed him or maybe it was DCFS, the child abuse report he

11 filed an hour later.  But one of them, he said my children are

12 missing, help, help.  And I guess they contacted The Wilds

13 directly, and my kids, at DCFS, the day after my mom died, I

14 had to go in and meet with them.  So I put on a dress and

15 makeup and high heels, and I went in and smiled and met the

16 lady and brought my daughters, and she -- oh, excuse me, I

17 didn't bring my -- just communicated with my daughters.  She

18 put us on FaceTime with Rand Hummel and the staff at The

19 Wilds, and -- who then went out and got my girls in from where

20 they were participating in a -- in a fun camp activity.  They

21 came in.  I was in this woman's office in the DCFS government

22 building, and I had FaceTime.

23       And the staff at The Wilds had the girls, you know,

24 FaceTime on the phone, and the girls saw me and said, "Hi,

25 mom.  We're having such a great time.  Hi, how are you?"  And

110

1  then they looked at the background of where I was standing and

2  said, "Wait a minute, where are you?"  And at that moment, the

3  DCFS worker, Veronica, comes to the phone and said, "Hi,

4  girls.  I am a child abuse investigator caseworker,

5  basically."  And the girls went from totally happy to

6  completely stressed out.

7          And at that point, she said, "Are you safe?"

8          And they said, "Of course we're safe."

9          And then we ended that call.  And I guess it was at

10  that point that -- I -- I don't remember exactly how he got

11  informed that they were at The Wilds, but I then talked to

12  Rand Hummel and learned that he was trying to, like, talk to

13  them at The Wilds, go see them at The Wilds.  And there was

14  like a whole -- Mr. Hummel told me that he was extraordinarily

15  aggressive and rude to him on the phone.  And the whole Wilds

16  was upset about the way Mr. Albrecht was treating them and, I

17  guess, letters followed.

18     Q  So the letters that we've attached to Exhibit 4 are

19  letters that The Wilds received from Dana, correct?

20     A  That is correct.

21     Q  You said that was the --

22     A  I believe that they were -- I'm sorry.

23     Q  Go ahead.

24     A  Mr. Hummel told me that he would not -- that he was

25  not -- because of the girls' request, he was not allowing

111

1  them -- allowing Mr. Albrecht to speak to them.  And then we

2  had an emergency motion in court, and Mr. Hummel said that he

3  was going to await the outcome of that motion before requiring

4  the girls to talk to their dad.  And he told that to Dana, and

5  I guess that made Dana very angry.  And then this was his form

6  of retaliation within these letters, requesting all of these

7  government documents, or whatever documents, from The Wilds.

8      Q  So now let's switch gears for a second and go to this

9  -- the -- the -- ████'s choice of school.

10     A  Yeah.

11     Q  Can you give us some background how that all occurred?

12 First of all, where was she going --

13     A  So in --

14     Q  -- before she went to the school in question?

15     A  So in California, where we live, there is a very

16 selective process for getting into private high schools.

17 ████ had -- ████ and ████ both had attended the Gooden

18 School for middle school, and then it was time for high school

19 applications, which is a big thing in 8th grade.  They have

20 (audio interference), they have tutoring about it, (audio

21 interference).  So ████ (audio interference).  And ████

22 applied to a number of different schools around -- around

23 December of January for a decision about admission that would

24 come in, in March, to attend a private high school in the

25 fall.



112

1          These are extraordinarily exclusive and competitive

2    schools, and some of them only take a very small percentage of

3    students who apply.  So they have to have great grades, really

4    good test scores on the admissions test, and the applications

5    have to be perfect.  So ███, in January --

6          Q  Okay.  Hold on, before you go there.  Hold on.

7          A  -- (audio interference) about that.

8          Q  Hold on, before you go there.  So the Gooden School

9    that they were attending previous to this, who paid for that?

10         A  I did.  My mother --

11         Q  Okay.

12         A  -- my mother and I did.  Yeah.  Actually, my mother

13   did, but --

14         Q  Okay.

15         A  -- Dana didn't.

16         Q  Okay.  Okay.  Dana didn't contribute anything for it;

17   is that correct?

18         A  Not a penny.

19         Q  Okay.  Now, was it your intention that if they got

20   into any of the schools -- first of all, did they choose these

21   schools to apply to?

22         A  Yes, I -- they -- well, ███ had already been

23   through it.  She was already in high school.  And then ███,

24   on the basis of her own research and the visits from the

25   schools and to the schools, decided which ones she wanted to

113

1    apply to.

2         Q   Okay.  And did you assist her with that?

3         A   I did.  I used to tutor in this area, so I know the

4    schools really well, and I drove her to the visits at the

5    schools and helped her with the research.

6         Q   Okay.  And did she get into -- what -- what schools

7    did she end up getting into?

8         A   She was admitted to (Indiscernible) High School to

9    Mayfield Junior School, to Flintridge Sacred Heart Academy,

10   and I believe those are the three that she applied to, or at

11   least the three she was most interested in; those are the ones

12   she applied to.

13        Q   And did --

14        A   Oh, and also the high school where her sister attends,

15   so she applied to four schools.

16        Q   Okay.  And did she -- did she make a decision on where

17   she wanted to attend?

18        A   Yes, her choice was Flintridge Sacred Heart Academy.

19        Q   Okay.  And in that regard, who is going to pay for

20   that school?

21        A   I -- I -- me.

22        Q   Okay.

23        A   I -- I was going to, and I do.

24        Q   Okay.  And have you applied for financial assistance

25   to be able to go there?

**Commented [DF26]:** 2:31:28

114

1    A  Yes.

2    Q  Okay.

3    A  And I receive --

4    Q  And --

5    A  -- some, but it's expensive.  I pay a lot of money to

6 them, yes.

7    Q  At some point in time -- first of all, did you inform

8 Dana, early on in that process, that ██████ was applying to

9 these schools?

10    A  I did not.

11    Q  And why did you not inform him?

12    A  So ██████ was so nervous about these applications, and

13 she begged me to make sure that her dad didn't keep her from

14 getting admitted to her schools.  And so I thought long and

15 hard about it, I talked to other people about it, I prayed

16 about it, and I was so concerned that he would contact the

17 schools and do what he's done before to Maranatha, where

18 ██████ attends, what he's done at -- what he did at The Wilds,

19 what he did to my landlord, what he's done to the doctors,

20 what he's done to the dentists, what he's done to pretty much

21 anybody in family he has contact with, and I -- I mean, I -- I

22 can't say I knew, but I pretty much knew that Dana, if he knew

23 the schools she was applying to, would contact them in the

24 guise of being a caring parent and cause them also to reject

25 our family from participating and would reject ██████'s

115

1 applications, and she would get into none of these exclusive

2 high schools.

3     Q   When -- at -- at some point in time, we received a

4 letter from Dana inquiring as to whether she had chosen a

5 school, correct?

6     A   Yes.

7     Q   And at that point, she had actually not made her final

8 choice, correct?

9     A   Correct.

10     Q   And did you inform him of the school that she was in?

11     A   Once she had -- yeah, once she selected Flintridge

12 Sacred Heart Academy and had basically been admitted, then I

13 informed him of that.

14     Q   You've expressed some -- now -- now -- now, she's

15 actually started there, correct?

16     A   Yes, yep.

17     Q   And do they have in-person attendance?

18     A   No, it's all COVID.  It's the Zoom, long-distance

19 learning on the computer.

20     Q   And how is -- does she like the school?

21     A   She -- she is a people person; she's an extravert, so

22 she really hates Zoom.  And it's difficult for her to be

23 schooled from home and not be experiencing all the art classes

24 and P.E. and those things.  So she -- I -- I'll be honest,

25 she's not enjoying school this year.  Her sister, on the other



116

1   hand, who's an introvert loves long-distance learning, so

2   █████'s happy.  But █████ is not enjoying this.

3        Q   Okay.  But beyond that, is -- but beyond that, is

4   there -- is -- is -- does she have any complaints about her

5   school beyond the fact that it's --

6        A   It's all -- it's all intermingled.  I think -- I think

7   she's -- I think she's just struggling with the Zoom thing,

8   and I don't -- I don't really know if it's the school or Zoom.

9        Q   Okay.  Have you been working with her to try to get

10  past that?

11       A   Yeah, we've -- she has a lot of homework, and I've

12  been trying to help her with that.  And I've also talked to

13  the school nurse and communicated with some of her teachers at

14  the school about ways that maybe it could be made a little bit

15  easier on -- on the kids to be doing distance-learning.

16       Q   So it's not just part of the experiencing issues?

17       A   No, I think everybody's having a hard time.

18       Q   Now, there was a question on the applications that

19  they requested a copy of that you provided them.

20       A   Yes.

21       Q   You referenced legal custody.  Was -- was -- that Dana

22  didn't have legal custody.  Do you recall that?

23       A   Right, yes.

24       Q   Why did you say that?

25       A   Well, because I didn't really know the California term

117

1   of "legal custody". I know that in the State of New

2   Hampshire, we have primary parenting, and I have been awarded

3   primary parenting. I did not -- I was not really familiar

4   with the California language. I -- it's since been explained

5   to me that there is custodial -- what is it? I can't -- now I

6   can't remember. There's legal custody and then there's

7   physical custody. Anyway, I have one kind of custody, but not

8   the other kind of custody, and I wasn't aware that there were

9   two different custodies here. So I said that I had legal

10  custody, even though it's shared with Dana, I've now learned.

11      Q  And you are -- you were involved in a domestic

12  violence incident back on November 3rd --

13      A  Yes.

14      Q  -- of 2019.  Do you recall that?

15      A  Yes.

16      Q  Okay.  Did that incident cause your girls emotional

17  trauma?

18      A  Yes.

19      Q  Did it contribute, do you believe, in their poor

20  relationship with their father?

21      A  Well, it was already poor.  I think -- I think it

22  definitely made it worse.

23      Q  Since that time, has anything changed for the better

24  relative to their relationship with their father?

25      A  No.



118

1      Q   Have the girls, otherwise, been doing well without

2   having contact with their father?

3      A   Yes, and in fact, as noted, I believe, by their

4   counselor, their -- it was either the counselor or the DCFS

5   report, they're actually doing much better than when they had

6   threats of having to deal with visits with him.  So in my

7   observation, they're happier, they're sunnier, you know,

8   they're not crying at night like they used to before visits.

9   They're -- they're -- they just seem healthier.  I mean, it's

10  really sad, but -- yeah, they -- they seem to be doing better.

11  I mean, it's sad for me, but they seem to be doing a whole lot

12  better.

13     Q   In the -- in the DCY -- in the Division report, Dana

14  made a point of saying that the finding was inconclusive.

15     A   Yes.

16     Q   Do you remember that moment?

17     A   Yes, yes.

18     Q   Did you have a discussion with the caseworker on this

19  matter at the end of the case?

20          MR. CAULFIELD:  Objection.

21     A   I did because --

22          MR. CAULFIELD:  This is Caulfield; objection.

23          THE COURT:  State --

24     A   Well --

25          THE COURT:  Excuse me.



119

```
 1          MR. FONTAINE:  Hold on.  Hold on.

 2          THE COURT:  Excuse me.

 3     A  -- wanting that what I did, not what I was told.

 4          MR. FONTAINE:  Hold -- hold on.

 5          THE COURT:  Excuse me.

 6          MR. FONTAINE:  Hold on, wait.  Don't answer the

 7  question.

 8          THE COURT:  State the basis of your objection.

 9          MR. CAULFIELD:  That it's -- that -- that it's

10  unpermissible (sic), unreliable hearsay.

11          THE COURT:  Overruled.  Continue.

12  BY MR. FONTAINE:

13     Q  Did you have a discussion with -- and what was the

14  name of the caseworker?

15     A  Veronica Coss -- C-O-S-S.

16     Q  Is she the same lady that you -- that -- that called

17  the girls with you present, when they were at The --

18     A  Yes.

19     Q  Okay.

20     A  Yes.

21     Q  And has she been the caseworker throughout this

22  investigation?

23     A  Yes.

24     Q  And -- and has she been the caseworker that

25  interviewed the girls?
```



120

1   A  Yes.

2   Q  And at -- at -- at the conclusion of this, did she

3   indicate whether she felt that your failure to -- that --

4   that --

5        MR. FONTAINE:  Strike that.

6   BY MR. FONTAINE:

7   Q  Did she indicate whether she felt that your obtaining

8   of medical treatment or your obtaining of dental treatment or

9   lack thereof had been neglectful?

10   A  No.

11   Q  Did she indicate that there was any remedial action

12   that you needed to take relative to the --

13   A  No.

14   Q  -- way that you parented your children?

15   A  No.

16   Q  Did she indicate that she had planned on taking any

17   further action in the future relative to this investigation?

18   A  She gave a warning in my house, sitting --

19   Q  Okay.

20   A  -- on my sofa, during our investigation.  And the

21   warning was that if the girls continued to have to see their

22   father, that I should be on notice that DCFS could literally

23   take my children away from me if I could not protect them from

24   Dana.  And that's what she told me in person.  And I said it's

25   not up to me.  I'm doing everything I can to protect them, and

121

1  she gave me that warning.

2      Q  Has anything occurred since they closed their

3  investigation?

4      A  No.

5      Q  In -- in regards to your motion to modify, you're

6  asking that the Court remove Dana's rights to have parenting

7  time with his girls, correct?

8      A  Yes, in part because of that warning.

9      Q  Well, let's -- but let's just talk about it.  So

10  you've asked the Court, in your motion, to -- or currently, he

11  has the ability -- he has rights, under the current parenting

12  plan, to exercise parenting time with his girls at different

13  times throughout the year, correct?

14      A  Yes.

15      Q  You've asked that that be removed, correct?

16      A  Yes.

17      Q  And you've heard Dana's testimony about all of the

18  attempts that he's made to exercise those parenting rights

19  after the girls had stated to him that they didn't want to

20  visit with him, correct?

21      A  Yes, yes.

22      Q  And do you -- can you describe what the girls'

23  reactions are when he has requested that time and you've

24  informed them of that?

25      A  Yeah.  The girls have said no, and I think they're



122

1  very upset that, rather than listening to that, apologizing to

2  them, or trying to do constructive things, that he disrupted

3  their time at The Wilds, filed bogus reports against me that

4  involved them in an investigation, showed up at their church

5  causing a huge scene at the church with police in front of all

6  their friends, refused to leave, stood outside in the parking

7  lot.  I mean, it's just thing, after thing, after thing.

8  Contacted their schools, contacted -- it's just -- I think the

9  girls are truly believing that his desire to -- I think at

10  this point, they believe it's -- it's harmed them, but it's

11  certainly to harm me.  I think that they believe that that has

12  gotten to such an extreme that they are not safe.  And they've

13  been very, very consistent in stating that they will not --

14  that they don't want to see him.  And these efforts that he's

15  making have made things a lot worse.

16      Q   Is -- when you bring this to their attention that he

17  has requested these additional times to visit with them after

18  they've expressly indicated that they don't want to visit with

19  him, what is their emotional state when you're -- they're

20  informed of that?

21      A   Well, █████, who's now 16, just gets very angry.  And

22  █████, who's 13, just says I don't want to talk about this,

23  and you're just -- it's just going to upset me even more, and

24  I don't want to talk about it.  You know every time you talk

25  about this, I get upset.  And then I try to talk about it to



123

1  encourage them, and I -- ▮▮▮ seems just very emotionally

2  distraught.  And ▮▮▮ has gone from being emotionally

3  distraught a couple years ago to just seeming extraordinarily

4  angry.  And that anger sometimes come out at me too.  But

5  yeah.

6          And it's -- it's anger at him; it's anger at the

7  process; it's anger at why won't anybody listen to them.

8      Q  If the -- if the -- if the Court were not to remove

9  the current orders allowing him to exercise this time, and he

10 were to continue to assert his rights to exercise those times,

11 do you think emotional harm would result to the girls?

12     A  I think it already has, and -- and certainly, it would

13 be more.

14     Q  And is that why you're asking for that to be removed?

15     A  Yes.  If -- if they want to repair their relationship,

16 I don't think it should be us mandating that they have to do

17 it.  It just -- they'll then refuse, and then they want to --

18 then they feel the need to argue with me, against the Court,

19 against their father, and it just brings them through a whole

20 ton of emotional turmoil.  They've made it very clear that no

21 matter what anyone does, they're not going to have these

22 visits, and to have them continue to come up every couple

23 months is extraordinarily stressful for them, for me, for the

24 family, and it's -- it's -- it's leading to a bad outcome for

25 them.



124

1    Q  You already indicated that you thought it would not be

2  emotionally good for them to be forced to do reunification

3  counseling.  But if the judge decides that he is going to

4  order it, do you have a preference on how the choice of that

5  counselor would occur?

6    A  Well, first of all, the counselors that he

7  recommended, some of them are like $375, I think -- just

8  exorbitant -- an hour, or 45 minutes; I can't remember, but

9  they -- they were extraordinarily expensive.  He has not

10  reimbursed any of the over $9,000 of medical expenses I've

11  spent on the kids since moving to California.  He has not

12  reimbursed any of it, so I have no reason to believe that he

13  would contribute, in any way, to paying for the counseling.

14  Since I would be the one taking them to the counseling, that

15  burden would fall on me, and I can't afford to pay, nor should

16  I have to pay, $400 an hour to people to counsel them.  So I

17  would want that, obviously, it be an unbiased counselor and

18  one covered by our insurance, the children's insurance, and

19  one that was reasonably priced.

20    Q  Would you like to be part of that decision on -- on

21  who their reunification counselor would be if the Court were

22  to order that?

23    A  Yes, I would.

24    Q  Okay.  But you still object -- you would object to the

25  Court doing that, though, correct?



125

1   A  Well, I think "forcing" is the operative word here.  I

2   think forcing the girls to do anything at this point, when

3   they're 13, almost 14, and 16 and have already had --

4   everything that has happened has already happened.  I think

5   forcing them to do anything at this point is probably going to

6   be counterproductive to their relationship with their father

7   and their emotional health.

8   Q  Okay.

9           MR. FONTAINE:  Give me one second, Judge?

10          THE COURT:  Sure.

11          MR. FONTAINE:  Just at this point, Your Honor, I

12   would ask that all -- all of our exhibits be accepted as full

13   exhibits.  I understand you'll be making that decision later,

14   but I just wanted to make a formal request for that.

15          Thank you.  I have no further questions at this

16   time.

17          THE COURT:  Okay.  Mr. Caulfield, before you begin

18   your cross-examination, I want to inform both counsel and the

19   parties that the conversation that the Respondent had with Ms.

20   Coss from the Los Angeles Department of -- excuse me --

21   Children and Family Services, specifically the warning, the

22   Court is going to disregard.  I'm not saying that it -- that

23   she didn't --

24          MR. CAULFIELD:  Thank you, Your Honor.

25          THE COURT:  -- I'm not saying she didn't say that.



126

```
 1  I'm just saying that I am disregarding that particular

 2  warning, okay?

 3          You may cross --

 4          MR. CAULFIELD:  Thank you, Your Honor.

 5          THE COURT:  -- you may cross-examine.

 6          MR. CAULFIELD:  Yes, Your Honor.

 7                  CROSS-EXAMINATION

 8  BY MR. CAULFIELD:

 9      Q  Dr. Albrecht, you testified on direct examination that

10  Mr. Albrecht's position is that you've alienated the children,

11  correct?

12      A  He filed words to that effect in many filings.

13      Q  Right, right.  Isn't it true that what he really has

14  said in his filings is -- and I'm reading from page -- from

15  paragraph 31 of the case we're trying right now, the amended

16  petition to bring forward and modify, and I'll read it to you.

17  He says, "It is clear that their children are either being

18  alienated by Dr. Albrecht, estranged by Mr. Albrecht, or some

19  combination thereof."  So he's not saying what you're saying

20  he says, is he, Dr. Albrecht?

21          THE COURT:  *[Whispered] Not in the pleading, but in*

22  *his testimony, he has.*

23      A  Not there.

24  BY MR. CAULFIELD:

25      Q  Sorry?
```



127

1      A  He's not saying that there.

2      Q  Well, he's not saying it in the -- in the petition

3  that we're -- that we're trying today, right?

4      A  Correct.

5          THE COURT:  *[Wheeze or laughter] [Whispered]  Okay.*

6  BY MR. CAULFIELD:

7      Q  Okay.  Now, you mentioned that -- one second.  There

8  we are.

9          THE COURT:  *[Whispered] He's actually born on*

10  *(indiscernible).*                              **Commented [DF27]:** 2:50:34

11  BY MR. CAULFIELD:

12     Q  You mentioned that all five of the reunification

13  counselors that have been --

14         THE COURT:  *[Whispered] Do you have to say that?*

15  BY MR. CAULFIELD:

16     Q  -- proposed by Mr. Albrecht are biased?

17         THE COURT:  *[Whispered] I'm not throwing you out,*

18  *but if you want to leave --*

19         *[Laughter]*

20     A  I believe that my attorney asked me if I thought that

21  his list of counselors recommended was biased, and I answered

22  that I did.

23  BY MR. CAULFIELD:

24     Q  I see.  And the -- these counselors are all certified

25  by the court, right, to conduct investigations --

128

1          THE COURT:  *[Whispered] (Indiscernible) clearly*

2    *asked her that.*

3    BY MR. CAULFIELD:

4        Q  -- of the Los Angeles Superior Court; they're all 730

5    evaluators, correct?

6        A  If you say that, yeah, I'm sure it's accurate.

7        Q  Okay.  And when you said earlier in direct examination

8    that they were biased, that's when you thought that Mr.

9    Albrecht's position was that this is all your fault, right,

10   that the children have been -- have been alienated by you,

11   correct?

12       A  I believe that is his position.  I haven't changed

13   that belief.

14       Q  Right.  So -- so -- so now that you -- now that you

15   realize that the pleadings, the case we're trying today says

16   the opposite, do you still feel that these five evaluators are

17   biased against you?

18       A  That question doesn't make sense.  They don't know me.

19       Q  Well, why do you think they're biased then?

20       A  Well, I don't think they're biased against me, but

21   when I go back and look at, I believe, Craig Childress and

22   some of the other names on there, it appears that their

23   specialty is parental alienation.  And that --

24       Q  And if I said -- I'm sorry.

25       A  Yeah.  In previous pleadings, in -- in numerous, many,



129

1  many previous pleadings, it has been Mr. Albrecht's position

2  that the reason that the girls and his relationship is

3  strained is because of actions that I have taken, which would

4  be -- constitute parental alienation.  So a counselor who

5  specializes in that would appear to be biased towards that

6  position.

7      Q  And these -- these -- these five therapists, their --

8  their curriculum vitaes, and the links to their websites have

9  been made exhibits in this case.  And are you representing

10  that when -- when Master DalPra reviews these -- these

11  curriculum vitaes, he will find that these evaluators' sole

12  expertise is in alienation cases?

13      A  No.

14      Q  Okay.  Now, when you -- when you mentioned that Mr.

15  Albrecht keeps sending legal documents to the school and legal

16  documents to providers, is -- is -- is there -- has he sent

17  any legal documents, other than Master DalPra's parenting

18  plan?

19      A  I haven't seen the documents that have been sent or

20  been privy to those conversations.  I only know what the

21  providers have told me.

22      Q  Did the providers tell you that Mr. Albrecht sent any

23  other legal document, other than Master DalPra's parenting

24  plan?

25      A  I don't know what they sent.  They simply said that



130

1    they've received legal packets and are afraid of litigation.

2        Q  Right.  So you don't know is the answer, correct?

3        A  I do not know.

4        Q  Right.  Okay.  Now, let's talk briefly about your

5    children's teeth.  So is it your position that your children's

6    teeth are all Dana's fault?

7        A  No.

8        Q  Okay.  Is it your position that the children not being

9    vaccinated is all Dana's fault?

10       A  Yes.

11       Q  I see, okay.

12           THE COURT:  *[Wheeze or laughter]*

13   BY MR. CAULFIELD:

14       Q  And how long -- so -- so you -- you said that you

15   didn't get them vaccinated, yet, surely, you've done other

16   things without consulting with Mr. Albrecht.  You haven't got

17   them vaccinated because you're waiting for Master DalPra's

18   order?

19       A  Yes.

20       Q  Is that somehow in the parenting plan that Master

21   DalPra is to determine the children's vaccination schedules?

22       A  No.

23       Q  That's something that a mom and dad does, right?

24       A  Yes.

25       Q  Right.



131

1          THE COURT:  *[Whispered] He's not doing it.*

2    BY MR. CAULFIELD:

3      Q  Now, you mentioned that you haven't taken the children

4    to get their teeth done because you can't afford it?

5      A  No, I have taken the children to many dental visits,

6    including one just recently.

7      Q  So is that because of money?

8      A  No, it's since there's not insurance, I've taken them

9    every six months to the dentist.

10     Q  Oh.  Oh, so you do have -- but so you do have money --

11         THE COURT:  *[Whispered] (Indiscernible) agree.*

12   BY MR. CAULFIELD:

13     Q  -- to take the children to the dentist, if you chose

14   so?

15     A  I have dental insurance now.

16     Q  Right, okay.  So it's not a financial issue?  It's not

17   that Dana is not paying anything, or it's all -- it's all you

18   can do it any time you want to, correct?

19     A  Well, I take them on the recommended schedule, which

20   is a cleaning every six months.  And that's --

21     Q  Right.

22     A  -- covered by insurance.

23     Q  Right.  So that's -- we don't blame Dana for that?

24     A  Blame him for what?

25     Q  For -- for the teeth?

132

1       A   I don't understand your question.

2       Q   Okay, that's all right.  I'll withdraw it.

3           How much do you pay to send the kids to private

4   school?

5       A   Thousands.

6       Q   Thousands, okay.  Thousands.  Now, you testified under

7   -- under direct that Dana contacted the providers and his

8   children's schools in the guise of being a caring parent.  Do

9   you remember saying that?

10      A   No, I did not say that.

11      Q   Oh, you didn't -- you never said "in the guise of

12  being a caring parent"?

13          THE COURT:  *[Whispered]* *(Indiscernible).*            | Commented [DF28]: 2:56:42

14      A   I did say that phrase.

15  BY MR. CAULFIELD:

16      Q   You did say it?

17      A   I said that phrase, but not in the way you're asking.

18      Q   Well, let's -- let's ask the question again.  Did you

19  testify in direct examination that Dana contacted the

20  providers and the schools, and I'm -- and I quote, "in the

21  guise of being a caring parent"?  Did you testify to that?

22          THE COURT:  *[Whispered]* *She did say that.*

23      A   I did not say that.

24          THE COURT:  *[Whispered]* *Yes, you did.*

25  BY MR. CAULFIELD:

133

1    Q   Okay.  Now --

2    A   What I -- can I say what I did say?

3    Q   No, your lawyer can put you back on the stand for

4    that.

5        Now, if I understand, you -- you admitted on direct

6    examination that you haven't followed the parenting plan in

7    certain areas because the children didn't want you to, you

8    talked to people, and you prayed on it, correct?

9    A   In exactly one instance, yes.

10   Q   Okay.  And so you didn't follow the parenting plan,

11   correct?

12   A   Under that one instance, I did not.

13   Q   Right.  But if Dana doesn't follow the parenting plan,

14   he should have his rights stripped away and he shouldn't see

15   the children; is that your testimony?

16   A   I never said that.

17   Q   Okay.  So then -- so then if Dana doesn't follow --

18       THE COURT:  *[Whispered] Would you (indiscernible)*

19   *and ask defense (indiscernible).  Thank you.*

20   BY MR. CAULFIELD:

21   Q   -- the parenting plan, say, on the Christmas when he

22   kept the kids a couple of extra days, that's -- that's no more

23   of a horrible crime than you not following the parenting plan,

24   correct?

25   A   Those are very different circumstances, and what he

**Commented [DF29]:** 2:58:12

134

1  did harmed the kids.

2        UNIDENTIFIED SPEAKER:  *[Whispered] Thank you.*

3  BY MR. CAULFIELD:

4     Q  But what you do doesn't harm the kids?

5     A  In that one instance where I --

6     Q  I see.

7     A  -- waited until ███ was admitted to a school before

8  telling Dana when she hadn't even accepted that admission, I

9  don't think what I did was that bad and did not harm her.

10    Q  Okay.  But what Dana did was very bad, you think?

11    A  Yes, I do think that.

12    Q  Okay.  Now, you mentioned that the children are crying

13 at night and you feel that they're better off without their

14 dad?

15    A  No, I didn't say that.

16    Q  You didn't say that you thought that they were better

17 off without their dad?

18        THE COURT:  *[Whispered] I remember seeing that*

19 (*indiscernible*) *afterwards.*                          Commented [DF30]: 2:59:09

20    A  I didn't say that.

21 BY MR. CAULFIELD:

22    Q  Okay.  Now, do -- do -- do you -- do you agree that

23 Dana has never been found unfit to be a parent?

24    A  I agree.

25    Q  Okay.  And do you agree that it's the policy of New

135

1  Hampshire to support frequent and continuing contact between

2  children and --

3          MR. FONTAINE:  I object.  I object, Judge.  She's

4  not a lawyer.

5          THE COURT:  I'm not sure --

6          MR. CAULFIELD:  I'm asking if she agrees.

7          THE COURT:  -- I'm not sure the witness knows what

8  the policy of the State of New Hampshire is, Counsel.  So you

9  can either --

10         MR. CAULFIELD:  I was -- I was --

11         THE COURT:  -- you can either rephrase the questions

12 or I'll -- I'll sustain the objection.

13 BY MR. CAULFIELD:

14     Q  Dr. Albrecht, do you personally agree that children do

15 well when they have contact with both parents?

16     A  Yes.

17         MR. CAULFIELD:  One second, please.

18     (Pause)

19         MR. CAULFIELD:  Give me one moment, please.

20 BY MR. CAULFIELD:

21     Q  Now, you mentioned about a big scene when Dana went to

22 church to try to visit with the children, right?

23     A  In November, yes.

24     Q  Well, the -- the -- the one that's spun out in this

25 DV, whatever the date is, correct?  We're talking about the

136

```
1   same incident?  Okay, all right, all right, all right.

2           And you said the police were called?

3       A  Yes.

4       Q  Who called the police?

5       A  The leadership of the church.

6       Q  Right.  He a friend of yours?

7       A  Our family's attended there for 12 years, so yes.

8       Q  So he's a friend of yours, right?

9           THE COURT:  [Laughter]

10      A  Well, it was the pastor.

11  BY MR. CAULFIELD:

12      Q  Now, you said that when the children contemplate

13  seeing their father every few months, it's -- it's a huge

14  issue in your household, right?

15      A  It has been in the past, yes.

16      Q  Every few months; is that right?

17      A  Okay, yeah.

18      Q  Okay.

19          MR. CAULFIELD:  I -- I have no further questions.

20          THE COURT:  Do you have any redirect, Atty.

21  Fontaine?

22          MR. FONTAINE:  No, no, Judge.

23          THE COURT:  Very well.

24          MR. CAULFIELD:  I would like to put my -- I'd like

25  to put my client back briefly on -- on -- on the stand for
```

137

1  rebuttal, Your Honor.

2          THE COURT:  One moment.  Mr. Fontaine, do you have

3  any other -- other witnesses?

4          MR. FONTAINE:  I don't.

5                  RESPONDENT RESTS

6          THE COURT:  Very well.  Yep, go ahead.

7          Mr. Albrecht, you're still under oath.

8          MR. CAULFIELD:  So if I could get --

9          THE WITNESS:  Yes.

10          MR. CAULFIELD:  Thank you.

11          DANA ALBRECHT, PETITIONER, PREVIOUSLY SWORN

12                  DIRECT EXAMINATION (REBUTTAL)

13  BY MR. CAULFIELD:

14     Q  So Mr. Albrecht, you heard your ex, Dr. Albrecht,

15  testify that you sent a letter to her landlord, and she -- she

16  drew an inference from that that your intention -- and I --

17  and I'm not quoting her directly here as I did previously, but

18  my notes tell me that she said that she thought that the --

19  that you were doing this to make her homeless or something?

20  Something close to that.  Do you remember that testimony?

21     A  Yes.

22     Q  Okay.  Well, could you tell us -- could you tell --

23  tell Master -- Master DalPra why you sent the letter to the

24  landlord?

25     A  I was concerned for the safety of my children.



138

1  There's a police report.  It is one of the exhibits here,

2  Exhibit 39, concerning break-ins, people going at the door

3  with a drill.  I was also concerned that my children might not

4  be able to exit this property.  We've got photos -- photos of

5  them being restrained and the doors being secured from the

6  inside with a zip tie, Exhibit 71.  So I was concerned it was

7  a safety issue.  And quite frankly, I have no idea what her

8  lease arrangement is.  If that caused problems with the lease,

9  I do apologize.  I -- I've never seen her lease, don't know

10  anything about that, but it was just concern for the safety of

11  the children.  I just wanted them to have this police report

12  and the two photos and to be aware of who my children were and

13  they're staying at the property.

14      Q   And -- and -- and you said something, you said that

15  you -- that the children were being zip-tied into the

16  apartment, but there's -- but there's been testimony here --

17  here that she was -- that what Dr. Albrecht was doing was

18  trying to prevent people from outside the apartment getting

19  in.  Do you -- do you have any evidence that your children --

20          MR. CAULFIELD:  Your Honor -- hold on, hold on.

21          Your Honor, I object.  This was already litigated.

22  This was already before you.  You made orders.

23          THE COURT:  It was.  Objection sustained.

24          MR. CAULFIELD:  It was, Your Honor, except on cross-

25  examine -- on direct examination, Atty. Fontaine specifically



139

1   asked her about the letter to the landlord and implied -- and

2   attributed to my client evil intents of why he did it.

3              THE COURT:  And he's test --

4              MR. CAULFIELD:  I think he's entitled to explain why

5   he did it.

6              THE COURT:  But he's testified as to why he did it.

7              MR. CAULFIELD:  But -- but there was one other thing

8   she said, Your Honor, that when she zip-tied the doors, it was

9   to lock people out.  And I just want him to direct you to an

10  exhibit that says the exact opposite from the children

11  themselves, that it was to lock them in.

12             THE COURT:  I've seen the exhibit.

13             THE WITNESS:  Exhibit 72.

14             THE COURT:  I've -- I've dealt with that issue.

15             MR. FONTAINE:  It has nothing to do with --

16             THE COURT:  Excuse me, hello?  I've dealt with that

17  issue at a prior hearing.  Objection is sustained with regard

18  to this hearing.

19             MR. FONTAINE:  Thank you.

20             MR. CAULFIELD:  Your Honor, then would you please

21  strike her testimony regarding this incident?  Because she

22  told -- she testified about the landlord and the letter.

23             THE COURT:  The letter is -- I -- I -- as I

24  mentioned earlier -- no, I'm not going to strike the

25  testimony.  But as I mentioned earlier, if I determine that



140

1  the letter to the landlord is irrelevant, it's not going to be

2  admitted as an exhibit.  I must have 400 pages of exhibits in

3  front of me here.

4         MR. CAULFIELD:  I think that's true.  All right.

5  Well, Your Honor, I -- I -- I -- as I've -- just for the

6  record, Your Honor, I -- I think that I should maybe show that

7  the children themselves say that they wouldn't -- she was not

8  locking someone out in this incident; she was locking them in.

9  But be that as it may, I'll move on.

10         THE COURT:  Very well.

11         MR. CAULFIELD:  Yes.

12  BY MR. CAULFIELD:

13     Q  So these -- Mr. Albrecht, you heard testimony about

14  these reunification counselors and what's your position in

15  this case as to whether they're biased.  What is your position

16  in this case regarding why you want a reunification counselor?

17         MR. FONTAINE:  Well, Judge --

18     A  I just --

19         MR. FONTAINE:  I -- I object.  This -- this is not

20  rebuttal testimony.  This is re -- this is him testifying.  He

21  could have easily addressed this in -- in direct examination.

22  This is his request.

23         THE COURT:  Well, perhaps I'm wrong, Atty.

24  Caulfield -- excuse me for a moment.  Perhaps I'm wrong, Atty.

25  Caulfield, but I'm assuming that he wants reunification



141

1  counseling to try to repair his relationship with his children

2  and try to make a determination as to why their relationship

3  has deteriorated.

4          MR. CAULFIELD:  Absolutely correct.

5          THE COURT:  And I believe --

6          MR. CAULFIELD:  What I was getting at --

7          THE COURT:  I believe he test -- I believe he

8  testified to that on direct examination.

9          MR. CAULFIELD:  Correct.  And on -- and on Dr.

10 Albrecht's direct examination, she testified that these

11 reunification counselors were biased and were only experts in

12 the area of alienation.  And now I have Dana back on the stand

13 to try -- to testify that that's not at all true.

14         THE COURT:  Okay.  Well, with all due respect to

15 both counsel and both witnesses, I'm not sure that any of them

16 know what these counselors' areas of expertise are or whether

17 they are slanted one way or another with respect to the

18 alienation issue.  So the objection is sustained.

19         MR. CAULFIELD:  We have no -- okay.

20 BY MR. CAULFIELD:

21    Q  Now, Mr. Albrecht, I direct your attention to Exhibit

22 91.  How is that relevant to what -- what Dr. Albrecht just

23 testified to?

24    A  So this is a letter we sent them that they never gave

25 us an adequate response to.  But in short, I believe that



142

1   she's the beneficiary of her mother's estate, so that's got

2   ten rental properties worth $2.8 million.

3          MR. FONTAINE:  Your Honor, I object.  This is --

4   this is completely inappropriate --

5          THE COURT:  Sustained.

6          MR. FONTAINE:  -- for rebuttal.  This is not a

7   financial case.

8          THE COURT:  Sustained.

9          MR. CAULFIELD:  I don't have any other questions,

10   Your Honor.

11          THE COURT:  Very well.  Any redirect on -- recross,

12   Mr. Fontaine?

13          MR. FONTAINE:  No, I don't, Your Honor.

14          THE COURT:  Very well.  I'm going to take the

15   matters under advisement.  Don't expect a -- an order any time

16   real soon because I do have to plow through those exhibits

17   that were proffered, not necessarily admitted at this point.

18   But the -- the record will reflect that all the exhibits would

19   be marked as ID until I have an opportunity to determine the

20   relevant ones and the ones that don't apply.

21          So with that said, I want to commend all four of you

22   for a very comprehensive, civil hearing under difficult

23   circumstances.  And I wish everyone to stay safe.  I'll take

24   the matters under advisement.

25          This hearing is adjourned.  I'm going to terminate

143

1  the telephone call at this time.  Thank you.

2          MR. CAULFIELD:  Thank you, Your Honor.

3          THE PETITIONER:  Okay, thank you.

4      (Proceedings concluded at 3:10 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

144

<u>CERTIFICATE</u>

I, Dena Farbman, a court-approved proofreader, do hereby

certify that the foregoing is a correct transcript from the

official electronic sound recording of the proceedings in the

above-entitled matter, to the best of my professional skills

and abilities.

Karen Raile, CDLT-105, Transcriptionist
Erin Perkins, CET-601, Proofreader

Dena Farbman



Digitally signed
by Dena Farbman
Date: 2022.04.07
15:07:43 -04'00'

DENA FARBMAN, CET-629                        April 6, 2022
Proofreader/Quality Control Manager

**Original transcript signed on November 12, 2020**