*In the Matter Of:*

RE HONORABLE JULIE A. INTROCASO

---

MARITAL MASTER BRUCE DALPRA

January 18, 2021

---



**Certified**
**Videographers & Court Reporters**
**VIDEOCONFERENCING**

**603-666-4100**
**Toll Free: 1-888-212-2072**

814 Elm Street * Suite 400 * Manchester, NH  03101
Fax: 603-666-4145 * Email: info@avicorereporting.com
Website: www.avicorereporting.com

3

1   STIPULATIONS

2       It is agreed that the deposition shall be taken in the
first instance in stenotype and when transcribed may be used

3   for all purposes for which depositions are competent under
New Hampshire practice.

4
        Notice, filing, caption and all other formalities are

5   waived.  All objections, except as to form, are reserved and
may be taken in court at time of trial.

6
        It is further agreed that if the deposition is not

7   signed within thirty (30) days after submission to counsel,
the signature of the deponent is waived.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

---

THE STATE OF NEW HAMPSHIRE

JUDICIAL CONDUCT COMMITTEE

* * * * * * * * * * *

                        * Case Nos.:

IN RE:                  * JC-19-050-C

HONORABLE JULIE A. INTROCASO  * JC-20-010-C

                        *

* * * * * * * * * * *

        DEPOSITION OF MARITAL MASTER BRUCE DALPRA

    Zoom deposition taken by agreement of counsel on

    Monday, January 18, 2021, commencing at 1:58 p.m.

Court Reporter:  (Via Zoom)

Michele M. Allison, LCR, RPR, CRR

LCR #93 (RSA 310-A:161-181)

---

4

1           I N D E X

2

3   WITNESS:    Marital Master Bruce DalPra

4

5

6   EXAMINATION:                                    PAGE

7           By Mr. Delaney                        6, 62

8           By Mr. Waystack                          57

9

10   EXHIBITS FOR IDENTIFICATION:

11   INTROCASO    DESCRIPTION                        PAGE

12   Exhibit 22   1/9/20 Introcaso/Dabilis, et al. e-mail   51

13   Exhibit 23   1/9/20 e-mail string                 51

14   Exhibit 27   1/11/19 Temporary Hearing/Scheduling  37
                  Conference Order

15

16   Exhibit 28   1/11/19 Parenting Plan               38

17   Exhibit 29   1/16/19 Notice of Decision           45

18   Exhibit 42   10/12/18 Order on Ex Parte           17
                  (Emergency) Motion

19   Exhibit 43   10/24/18 Order on Appointment of      19
                  Guardian Ad Litem

20

21   Exhibit 44   10/24/18 Interim Order               27

22   Exhibit 45   10/25/18 Notice of Decision          30

23   Exhibit 46   11/14/18 Petitioner's Motion for      31
                      Reconsideration

---

2

1   APPEARANCES:

2

    For the Judicial Conduct Committee:

3
    WAYSTACK FRIZZELL

4   By:  Philip R. Waystack, Esq.
    251 Main Street

5   Colebrook, NH  03576
    603-237-8322

6   phil@waystackfrizzell.com

7
    For the Honorable Julie A. Introcaso:

8
    McLANE MIDDLETON, P.A.

9   By:  Michael A. Delaney, Esq.
    900 Elm Street

10   Manchester, NH  03101
    603-628-1248

11   michael.delaney@mclane.com

12

13
    For NHJB:

14
    department OF JUSTICE

15   OFFICE OF THE ATTORNEY GENERAL
    By:  James T. Boffetti, Esq.

16   33 Capitol Street
    Concord, NH  03301

17   603-271-0302
    james.boffetti@doj.nh.gov

18

19
    Also Present:  Dawn Poulson

20

21

22

23

**Page 5**

EXHIBITS FOR IDENTIFICATION CONTINUED:

| INTROCASO | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 47 | 11/20/18 Notice of Decision | 33 |
| Exhibit 48 | 2/15/19 Motion for Reconsideration | 45 |
| Exhibit 49 | 2/21/19 Notice of Decision | 46 |
| Exhibit 50 | 2/15/19 Motion for Instruction | 47 |
| Exhibit 51 | 2/21/19 Notice of Decision | 49 |
| Exhibit 52 | 2/15/19 Petitioner's Motion to Strike | 50 |
| | Respondent's Motion for Reconsideration | |
| | as Untimely | |
| Exhibit 53 | 2/21/19 Notice of Decision | 50 |

(Electronically marked exhibits were provided to counsel via Dropbox link.)

**Page 6**

         MARITAL MASTER BRUCE DALPRA
      having been duly sworn by the reporter, under
        RSA 310-A:181, Limited Notarial Function,
        was deposed and testified as follows:
            EXAMINATION
BY MR. DELANEY:

Q.   Please state your name.

A.   Bruce DalPra.

Q.   Master DalPra, my name is Michael Delaney, and I represent Judge Julie Introcaso in connection with a pending Judicial Conduct Committee proceeding.

     Could you state your occupation and review your professional background as a marital master.

A.   I'm a marital master.  I passed the bar in 1976.  I was first appointed as a per diem marital master in 1982.  I worked per diem from 1982 to the end of 1987.  I became a full-time marital master in April of 1991 to the present.

Q.   Do you continue to serve in a full-time capacity as a marital master?

A.   Yes.

Q.   You're generally aware that this JCC proceeding involves a marital case in the 9th Circuit named Campbell versus Partello?

**Page 7**

A.   We don't use versus, but yes.

Q.   We'll call it the Partello case for the purposes of this deposition.

A.   Okay.

Q.   What are your current courthouse assignments?

A.   I've been in Nashua full time beginning in 2020 and I'm still there full time this year.  Prior to then I was all over the place.

Q.   So you're now sitting five days a week in Nashua?

A.   Yes.

Q.   And you did that as well for the year 2020?

A.   Yes.

Q.   And now we get to the hard part, Master DalPra, where I'm going to ask you to put some context to your statement that before that you were all over the place.

A.   Okay.  Well, I started -- when I started full time in '91 -- you want me to go way back then?

Q.   A general sense would be good.  I'm particularly focused on 2018 and 2019, but the general background would be helpful.

A.   Okay.  19 -- in 1991 when I started full time, basically what was happening is that our assignments were in different courts every day for a period of time, and I don't

**Page 8**

remember when the year was, but then I was mostly assigned in Nashua, Hillsborough County South, and Rockingham County.

     And then on July 1st, 1996, at the inception of the family division, I was assigned to the Auburn family division, which eventually was replaced when the Derry family division opened when the courthouse was built.

     I was in Derry for three years, I guess, and then I was transferred to Salem for a couple years, and then I went back to the superior court for a period of time, and since 2006, I was in various places.  I was in Merrimack family court, let's see, Nashua family court.

     And then in 2000 -- I think it was '18, '17 or '18 I split my time among three courts which would have been Salem, Jaffrey, and Nashua.

Q.   Judge Derby began working in the Nashua courthouse in December 2018 and then into the year 2019 on a part-time basis splitting time between a couple of courts.  Do you recall his arrival and do you recollect any transitioning in your court assignments when he arrived in Nashua?

A.   I believe we received our assignments, it would have begun -- they would have begun in January.  I know he was assigned to, I think it was Merrimack and Nashua, and that's when I went -- was assigned to Nashua, I'm going to

---

9

1  say one or two -- maybe five or six days a month.  Salem,
2  most of the time and Jaffrey, about six days a month,
3  somewhere around there.
4      Q.  Before Judge Derby arrived in Nashua, were you in
5  Nashua more than five to six times a month?
6      A.  Oh, yes, yeah.
7      Q.  And did your transition to being in Salem most of
8  the time coincide with his appointment as a judicial officer
9  sitting in Nashua?
10     A.  I believe so, yes.
11     Q.  How often did you work with Judge Introcaso over
12  the course of your career as a marital master?
13     A.  I was in Nashua -- I don't remember the year she
14  started full time in Nashua, but I was there when she was
15  assigned there, I don't remember what year that was, and up
16  to the point where she left.
17     Q.  And I understand in the family practice you divide
18  cases between divorces and parenting cases, and then there
19  are other cases involving adoptions and termination of
20  parental rights and things of that nature.
21         Did your assignments cover all of those areas?
22     A.  No.
23     Q.  What areas were your assignment focused on,

---

10

1  specifically looking at 2018 and '19?
2      A.  Okay.  Marital masters' assignments include
3  divorce, custody issues, domestic violence hearings,
4  guardianship of minors, child support.  Everything except --
5  in the family arena everything except terminations, juvenile
6  delinquency, and adoptions.
7      Q.  And those are handled by judicial officers?
8      A.  Yes.
9      Q.  Did you have a good working relationship with Judge
10  Introcaso?
11     A.  I think so.
12     Q.  In your experience was she well-liked by practicing
13  members of the bar practicing in the Nashua courthouse?
14     A.  To be honest with you, I can't really comment on
15  that, because we never really talked about it.  Do you like
16  judge so and so?  Do you think judge so and so is an idiot?
17  You know.  So I don't really know.
18     Q.  In terms of her level of experience, did you
19  perceive her as a judicial officer with any degree of
20  experience in the area of divorces and parenting time?
21     A.  Well, I know that she had been a guardian ad litem
22  years ago and I think I may have appointed her when I was in
23  the superior court on a couple of occasions, so yeah, I would

---

11

1  say that she had some experience in it.
2      Q.  In terms of her personality, did you find her to be
3  a chatty person?
4      A.  Yes.
5      Q.  For the record, you're laughing and smiling when
6  you answer that question.
7      A.  Yes.
8      Q.  Why --
9      A.  I am.
10     Q.  Why did I draw a laugh or a smile out of you,
11  Master DalPra?
12     A.  Because there were times when she would come into
13  my office as I was getting ready to go to the courtroom, and
14  she would just talk about whatever it is that she was -- felt
15  like talking about at the time, and sometimes it was a little
16  bit difficult to disengage without being impolite.
17     Q.  She would share a lot of information with others?
18     A.  With others, I don't know.
19     Q.  She would share a lot of information with you?
20     A.  Yes.
21     Q.  Your sense was that she enjoyed interacting with
22  you during the time that you had?
23     A.  That was my sense, yes.

---

12

1      Q.  Do you know whether she cosigned a lot of your
2  orders in Nashua when you sat there?
3      A.  Oh, yes.  Probably most of them.
4      Q.  And how do you know that?
5      A.  She was the judicial officer that was there full
6  time.  My recollection is that I would do an order, a
7  recommendation, and it would be placed in a signing pile, and
8  she would attack the signing pile on a regular basis.
9      Q.  And -- go ahead.
10     A.  I'm sorry.  I think she was the only other judicial
11  officer there at the time that was assigned primarily to
12  family court.
13     Q.  Can you give me a sense of the volume of cases in
14  Nashua -- if you were sitting in Nashua as a marital master,
15  how many cases were you handling each day?
16     A.  Well, it all depends on the day.  Some days -- we
17  have what we call our list days and we have what we call our
18  trial days.  On the list days I would handle anywhere from
19  six to twelve.  On the trial days, they would always try to
20  shoe horn a case or two prior to the all-day case that was
21  supposed to start.  So probably two or three on those days.
22     Q.  And of the estimated six to twelve you would handle
23  on a list day, would your recommendations need to be cosigned

13

1    in all of those cases?

2        A.   Yes.

3        Q.   Do you know if the judges considering master

4    recommendations in family law cases also held their own case

5    docket on the days they had to cosign your recommendations?

6        A.   Yes.

7        Q.   We've heard some testimony that judicial officers,

8    given the volume, might skip over boilerplate language in

9    master recommendations given the volume.  Is that something

10   you experienced?

11       A.   I'm not entirely sure anybody ever told me that

12   they didn't bother reading any of my orders, but my guess

13   would be yes.  I think it's a -- it's a -- it's an

14   intelligent assumption to make.

15       Q.   And we've also heard testimony --

16       A.   In other words --

17       Q.   Go ahead.

18       A.   Like, for instance, if somebody filed a motion to

19   continue on a case that was on my docket and I would

20   recommend granting it or denying it, I'm sure the judge

21   didn't bother reading the motion and probably just signed it

22   no matter which judge it was.

23       Q.   We've also heard testimony that judges might go

14

1    quickly if your recommendations didn't seem to have anything

2    in them that were out of the ordinary; is that your

3    experience?

4        A.   I'm not sure I understand the question.

5        Q.   I think you answered it in the last question,

6    Master DalPra, so thank you.

7        A.   Okay.

8        Q.   You mentioned a pile that Judge Introcaso would

9    have to make her way through when cosigning marital master

10   recommendations.  How would that pile be developed?

11       A.   I would write the narrative or I would write an

12   order depending upon the type of case, have it printed, I'd

13   print it, sign it, put it on what we call the signing desk

14   where one pile would say "needs cosigning," and then

15   sometimes a separate pile would be with my name on it,

16   because those are cases that I would have to review, and

17   there might have been a third pile for Judge Introcaso, and

18   when Judge Quigley was there, they basically just threw all

19   her stuff on a cart, because she seemed to have to go through

20   2,000 cases a day.  That's what it looked like at times.

21       Q.   By signing desk, are you referring to a cubby on

22   the third floor of the Nashua courthouse where the files

23   would be located?

15

1        A.   Yes, they developed that system the last couple of

2    years.  Before that it would go to the same type of

3    circumstances, same type of procedure, on a desk in the

4    clerk's office.

5        Q.   Did I understand you correctly that after you had

6    signed your orders, you would personally take the

7    recommendations to the signing desk?

8        A.   Yes.

9        Q.   Where would you put them when you got there?

10       A.   Well, specifically they would be in the left-hand

11   corner where the place would be for cosigning, and whatever

12   judge was available on a particular day, they would start at

13   that pile and go through it, whether it was Judge Introcaso.

14   Judge Quigley would do it periodically, and once in a while I

15   think Judge Leonard may have been there.  She would do it.

16   Whoever had the fortune to have a couple of spare minutes.

17       Q.   So there was a place where you sign at the cubby

18   where your recommendations would go for cosigning, but you

19   were not at that point involved in determining what judge was

20   available to cosign that day?

21       A.   That's correct.  If I needed something -- if it was

22   an emergency order that I would recommend, I would talk to

23   the staff person who would be assigned to me that particular

16

1    day and just say, this needs to be cosigned, and I would give

2    the file to her and then she would find a judge who would be

3    available to sign it.

4            But as a general rule, no, once I finished it and

5    left it on the desk I was done with it.

6        Q.   During a busy workday were there ever occasions

7    where you might track down a judge yourself if you needed to

8    get something going?

9        A.   If a staff person wasn't available or they were

10   particularly busy, to save them the intermediate step, yeah,

11   I would.

12       Q.   Did you work with a particular clerk at the Nashua

13   courthouse when you served as a marital master there in late

14   2018 and 2019?

15       A.   I was assigned a court monitor, court assistant who

16   would be in the courtroom taking the record.  Most of the

17   times it would be Aline Chasseur.  Oftentimes it would be

18   Julie Lodes.  And when those two weren't available,

19   periodically I would have -- they would assign someone else.

20   But those were the two primary ones that I worked with.

21       Q.   And could Aline Chasseur and Julie Lodes also

22   coordinate amongst themselves in getting master

23   recommendations processed on any given day?

17

1      A.   I believe so.
2      Q.   Master DalPra, do you keep a recusal list?
3      A.   A recusal list?
4      Q.   Yes.
5      A.   I suppose it would be the same as a conflict list.
6   I don't keep one handy, but I do know that whenever I would
7   go to a court, usually one of the court staff would ask me if
8   there are any conflicts with any of the attorneys in the --
9   that particular jurisdiction who usually practice in that
10  court.  And when I first started there were some, but I've
11  been around so long most of those folks are retired now, so I
12  don't really have one that I can -- that I have developed, I
13  guess.
14     Q.   Thank you.
15         MR. DELANEY:  Jim, if you could assist Master
16  DalPra with some of the exhibits.
17         MR. BOFFETTI:  Sure.
18         MR. DELANEY:  I'd like to start with Introcaso 42.
19         MR. BOFFETTI:  Okay.
20         (Introcaso Exhibit 42 was marked.)
21     A.   (Witness peruses document.)
22     Q.   BY MR. DELANEY:  Your Honor, this is an order on an
23  ex parte emergency motion filed in the matter of David

18

1   Campbell and Robin Partello, and I avoided the use of the
2   word versus per your suggestion.  Do you see that?
3      A.   Yes.
4      Q.   And it appears that you signed this master
5   recommendation on October 12th of 2018?
6      A.   Yes.
7      Q.   Do you have a personal recollection of this case as
8   compared to all the other cases you've worked on in
9   particular courthouses?
10     A.   Yes, I believe I was involved probably -- I did a
11  temporary hearing, which may have included whatever pleading
12  this ex parte was, but I did the temporary hearing on that
13  and issued a temporary order or temporary parenting plan,
14  probably the appointment of a guardian ad litem and a uniform
15  support order.
16     Q.   Right.  And Judge Introcaso cosigned this
17  particular order on the ex parte motion?
18     A.   Yes.
19     Q.   There is a blue "copy" stamp at the top of that
20  page; do you see it?
21     A.   Yes.
22     Q.   And I take it you have no personal knowledge of how
23  that blue "copy" stamp got on this copy of the document?

19

1      A.   I don't.
2      Q.   If you could now just reference Introcaso 43.
3         (Introcaso Exhibit 43 was marked.)
4      A.   (Witness peruses document.)
5      Q.   This was an order on the appointment of the
6   guardian ad litem in the case?
7      A.   Yes.
8      Q.   You filled out this form; is that right?
9      A.   Yes, I did.
10     Q.   And it was cosigned by Judge Introcaso on October
11  24th?
12     A.   Yes.
13     Q.   The case in paragraph two involved a four-year-old
14  child; is that right?
15     A.   2018?  Yes.
16     Q.   And in paragraph three there are X checkboxes for
17  various issues that the Court was requesting the guardian ad
18  litem to investigate and make recommendations upon?
19     A.   Yes.
20     Q.   And then in paragraph four you set a maximum fee in
21  the case at 3500?
22     A.   Yes.
23     Q.   At the beginning of a case like this one, how do

20

1   you determine the amount you're going to set the fee cap at?
2      A.   I usually get a flavor of how conflicted the case
3   is going to be, the amount of conflict usually at the
4   inception, at the temporary hearing.  Sometimes depending
5   upon who the attorneys are, and I don't -- I think there was
6   only one attorney in this particular case.  It's my
7   experience knowing that this is going to take a while, I
8   tried to set the initial cap at something that I think is
9   reasonable so that the guardian doesn't have to keep coming
10  back to court asking for extra -- an extra boost in the fee.
11         Plus, frankly, you know, if the folks are -- they
12  have decent incomes and stuff, that also enters into it,
13  because there are times when the parties don't have many
14  resources, so what I'll do is I will limit the amount of
15  hours that the guardian is required to work on it, and I make
16  that clear to the guardian ad litem that, listen, they don't
17  have much in the -- in resources, so you'll have to -- you'll
18  only have to do 20 hours at whatever the fee is, stuff like
19  that, or ten hours.
20     Q.   I'm going to take you back a couple of years on
21  this question, but what do you think the range was for a
22  divorce or parenting case in October of 2018 relative to a
23  cap and where did this 3500 fall in the range?

21

1    A.  It's high.  But it was based -- excuse me, as I
2  said, it was based upon my sense as to how difficult this was
3  going to be based on the arguments and the testimony that I
4  heard at the temporary hearing.
5    Q.  Under paragraph 4A you determined a percentage of
6  payment between the parties in the case?
7    A.  Yes.
8    Q.  How do you usually do that?
9    A.  Usually it's split, but there are cases, instances
10  rather where one party or the other earns significantly more
11  income than the other, so it's based upon the incomes of the
12  parties.
13    Q.  And do you recall whether it was an income
14  differential between the petitioner and the respondent that
15  led you to recommend a 65/35 split?
16    A.  Yes.
17    Q.  What do you recall about the background of the
18  parties to this case?
19    A.  The background?
20    Q.  Yeah, relative to the income.  Did you have a sense
21  of what the professions were or...
22    A.  I don't remember what Mr. Campbell did for work.
23  Ms. Partello worked at a hospital.  I don't know if she was

22

1  an RN or whether she was a charge nurse or exactly what she
2  was, but I think she was a nurse at a hospital at the time.
3    Q.  The guardian ad litem appointed was Kathleen
4  Sternenberg of Concord, New Hampshire?
5    A.  Yes.
6    Q.  First, Master DalPra, how do you go about deciding
7  how to appoint a guardian ad litem on any particular case?
8    A.  We have -- AOC puts a list of guardians ad litem
9  together.  Oftentimes it's a hit or miss as to whether or not
10  the guardian is going to do a good job.  As I said, I've been
11  doing this a long time, so I get a sense of who does a good
12  job, who's going to be able to withstand a pretty conflicted
13  case, pressure from both parties or from one party or the
14  other.  So it's just kind of a sense, I guess it's
15  experience, is the best way I can answer that.
16    Q.  Prior to October of 2018 had you had experiences
17  with Kay Sternenberg serving as a guardian ad litem?
18    A.  Yes.
19    Q.  Please describe your experiences.
20    A.  She does a very good job.  She's a no-nonsense
21  person.  She's not afraid to deal with attorneys who might be
22  difficult to work with or might be -- might try to bully one
23  side or the other.  I have appointed her in a couple of

23

1  pretty tough, difficult cases and she does a good job.  And
2  she doesn't file 50-page reports.  That's always a help, too.
3    Q.  Do you have any recollection as to whether you
4  randomly picked her off the list or deliberately selected her
5  for this case for a particular reason?
6    A.  I deliberately selected her for this case because I
7  could tell from the start that it was going to be a
8  highly-conflicted proceeding and I knew she was no nonsense,
9  and as I explained to you before, she does a very good job in
10  those situations under those circumstances.
11    Q.  Were you aware of any particular background she has
12  in dealing with certain types of children?
13    A.  No.  I know she was on the governor's commission
14  for I think it was mental health or something like that.  Had
15  something to do with mental health.  The mental health field.
16    Q.  And --
17    A.  And the only reason I know that is I read it in the
18  paper when she was appointed to it, so...
19    Q.  Would you have consulted with Judge Introcaso about
20  the selection of the guardian ad litem before you filled out
21  this form?
22    A.  No.
23    Q.  Were you aware of whether Judge Introcaso had a

24

1  personal relationship with Kay Sternenberg?
2    A.  I became aware at some point, but I don't know if
3  it was before or after the appointment.
4    Q.  What did you become aware of?
5    A.  Well, in Judge Introcaso's own words, they were
6  very, very good friends.  This was after the appointment I
7  found this out.  That they were very good friends, they've
8  known each other for a while.  They were in the same book
9  club, I think.  They hung out together quite a bit.
10    Q.  Appreciating that you can't recall specifically
11  when you learned that, Master DalPra, do you have any
12  personal recollection of the circumstances in which you first
13  learned that information?
14    A.  No.  I think Judge Introcaso was just talking about
15  it one day.
16    Q.  Did you have any experiences that you recall before
17  this case involving Kay Sternenberg as guardian ad litem and
18  Judge Introcaso as a reviewer of your recommendations?
19    A.  I don't believe so.  I don't recollect any.
20    Q.  And if I could refer you to page 3 of 4, Master
21  DalPra --
22    A.  Yes.
23    Q.  -- there's a certification that the judicial

25

1  officer reads when considering your recommendation; is that
2  right?
3      A.   Yes.
4      Q.   And without reading the entire certification into
5  the record, can you tell me what that certification means?
6      A.   Well, I believe there was a period of time in the
7  legislature where for some reason or another marital masters
8  were not held in particular high esteem, and the leadership
9  at the time decided that instead of firing us all that they
10  would put something like this in to make sure that the judge
11  made sure that when he or she read the recommendation, that
12  we applied the correct standard and correct law and all that
13  stuff.  Frankly -- and I believe that was enacted by the
14  legislature.  I don't remember which year.
15      Q.   So is it fair to say that the role of the judicial
16  officer is to review for the correct standard as stated in
17  that certification?
18      A.   Yes.
19      Q.   Do you have any sense when the legislative
20  deliberation requiring the cosignature occurred?
21      A.   It always -- if you're talking about this
22  particular phrase, no, but it was my understanding that it
23  was -- I don't know if it was legislative or whether it was a

26

1  court rule that prior to the enactment of this particular
2  language that all masters' recommendations had to be approved
3  by the judge.
4      Q.   When you began your career as a marital master, did
5  judicial officers have to cosign your recommendations?
6      A.   Yes.
7      Q.   Was a different standard applied at that time to
8  the best of your recollection?
9      A.   I'm smiling because there was a case that I had
10  years and years ago in Ossipee Superior Court where I had
11  heard a divorce case, issued a decree, a recommended decree,
12  and Judge Wyman was the presiding justice there at the time,
13  and I know he read the order, because he called me up and
14  thought that the property award that I had given was not
15  enough.
16      So he asked if I would mind if he changed it, and I
17  basically told him that he's the judge, he can do whatever
18  the heck he wants.  So he did change it.  It was appealed,
19  and the supreme court basically said that my recommendation,
20  because I was the finder of fact, made the findings, made the
21  recommendations, that the judge would have to enumerate the
22  reasons why he or she was going to be changing the order, and
23  what that meant is if they disagreed with any of my

27

1  recommendations, they would have to hold a separate hearing
2  on that particular issue.  And the name of the case was
3  Cornforth.
4      Q.   Cornforth?
5      A.   Yes, sir.  C-O-R-N-F-O-R-T-H.  I wish I could tell
6  you the year, but I don't remember.
7      Q.   I'll give Attorney Waystack a legal research
8  assignment to figure that out, Master DalPra.
9      A.   If anybody can find it, he can.
10      MR. WAYSTACK:  I'll jump right on it, gentlemen.
11      Q.   Can you please review Introcaso 44?
12      (Introcaso Exhibit 44 was marked.)
13      Q.   Is this an interim recommendation, Master DalPra,
14  that you authored on October 24 of 2018?
15      A.   Yes.  This would have gone along with the -- with
16  43.
17      Q.   I'm going to ask you a couple of questions about
18  it, so I'll give you a moment to briefly scan it.
19      A.   (Witness peruses document.)  Okay.
20      Q.   So the case involved an allegation that someone had
21  inserted a pen into the buttocks of the child.
22      A.   Yes.
23      Q.   And there had been some disclosures from the child

28

1  related to that and a subsequent recantation?
2      A.   Yes.
3      Q.   The Derry police and the local Child Advocacy
4  Center had been involved in investigating the matter?
5      A.   Yes.
6      Q.   And they found -- strike that.
7      And you found that there was no credible evidence
8  at the time you issued this order that anyone had abused the
9  child?
10      A.   Yes.
11      Q.   You ordered a division of parenting time and joint
12  decision-making authority for the parents, the biological
13  parents of the child?
14      A.   Yes.
15      Q.   You appointed Kay Sternenberg as guardian ad litem?
16      A.   Yes.
17      Q.   You ordered counseling through a licensed
18  professional?
19      A.   Yes.
20      Q.   And you prohibited the parties from questioning the
21  child about the incident?
22      A.   Yes, because he'd already undergone a couple of
23  interrogations from family members, the police, and the Child

29

1  Advocacy Center.  That was enough.
2    Q.  And you indicated -- and the Child Advocacy Center
3  is there specifically to ensure that the questioning can be
4  done once in a multi-disciplinary way?
5    A.  Yes.
6    Q.  And you indicated that it should be the counselor
7  and the guardian ad litem who should explore further
8  questioning if that was in the child's best interest?
9    A.  Yes.
10    Q.  And are these some of the background facts that
11  would have led you to look to Guardian Ad Litem Sternenberg's
12  experience as an appropriate guardian ad litem for this case?
13      MR. WAYSTACK:  Objection to the form.
14    A.  Well, as I mentioned before, as you can see, this
15  was going to be a difficult case.  Whether her area of
16  expertise had anything to do with this, I don't believe that
17  entered into it at all.  Just her general competence and
18  ability to handle these types of conflicts.
19    Q.  Please review Introcaso 45, Master DalPra.
20      MR. WAYSTACK:  Can I interrupt for one second,
21  Mike?  I get 46 in both 45 and 46.  If 45 is a separate
22  exhibit, is it possible for Ms. Poulson to share screen on
23  45?

30

1      MR. DELANEY:  Yes, it's the Notice of Decision,
2  Phil.
3      MR. WAYSTACK:  Oh, okay.
4      MR. DELANEY:  But we'll pull it up.
5      MR. WAYSTACK:  The Notice of Decision on 46, right?
6  45 is the Notice of Decision on 46?
7      MR. DELANEY:  That's correct --
8    A.  44.
9    Q.  45 is the Notice of Decision on Introcaso 44.
10      MR. WAYSTACK:  Got it.  Okay.  Thank you.
11    A.  And 43.
12    Q.  Thank you, Master DalPra.
13      (Introcaso Exhibit 45 was marked.)
14      MR. DELANEY:  Phil, do you want the screen to be
15  shared?
16      MR. WAYSTACK:  No, no.  If it's just the Notice of
17  Decision, no, no worries.  Thank you.
18    Q.  BY MR. DELANEY:  Introcaso 45 is the file copy of
19  the Notice of Decision related to the interim order in the
20  order on the appointment of the guardian ad litem?
21    A.  Yes.
22    Q.  And it appears to have been processed on October
23  25th, 2018, the day after you made your recommendation?

31

1    A.  Yes.
2    Q.  Are you familiar with the clerk's numerical
3  identification numbers affixed --
4    A.  No.
5    Q.  -- to the Notices of Decision?
6    A.  No.
7    Q.  So you don't know who processed this order?
8    A.  I do not.
9    Q.  Could you please review Introcaso 46?
10      (Introcaso Exhibit 46 was marked.)
11    A.  (Witness peruses document.)
12    Q.  This is the petitioner's motion for
13  reconsideration?
14    A.  Yes.
15    Q.  And referring you to page 6 of the motion, Master
16  DalPra, Bates No. JAI 294, it appears that you made a
17  recommendation for this motion on November 14, 2018, and
18  Judge Introcaso cosigned approving your recommendation?
19    A.  Yes.
20    Q.  In the motion the petitioner had asked for a
21  different allocation of parenting time?
22    A.  Yes.
23    Q.  And in your prayers for relief, specifically under

32

1  B and C, you denied that request?
2    A.  Yes.
3    Q.  However, in prayer for relief D, you granted some
4  additional nighttime calls between the child and the parents?
5    A.  Yes.
6    Q.  And in prayer for relief E and F, you expanded the
7  availability of counseling for the child because your first
8  preference for counselors had indicated unavailability?
9    A.  Yes, I believe the -- I believe it was represented
10  to me at the hearing that Mr. Foster was somebody that would
11  be able to do that, and then when they contacted him, he
12  stated that he was unavailable to get started on that.  So
13  yes, I wanted to make sure that the child got into
14  counseling, so I basically said that they could select a new
15  one.
16    Q.  And based on your description of your typical
17  cosigning protocols, do you believe that after you made this
18  recommendation, you would have put it in the cosigning pile
19  at the signing desk without having discussed the motion with
20  Judge Introcaso?
21    A.  Yes.
22    Q.  In the normal course, is it more ordinary than not
23  that the marital masters and the judges do not discuss these

---

33

1 types of motions between the issuance of the recommendation
2 and the approval of the recommendation by the judicial
3 officer?
4     A.   Yes, we don't usually discuss the motions that are
5 filed.
6     Q.   Could you please review Introcaso 47?
7          (Introcaso Exhibit 47 was marked.)
8     A.   (Witness peruses document.)  Okay.
9     Q.   Before I do that, let me just ask you one other
10 question about 46, Master DalPra.
11    A.   Sure.
12    Q.   You both use stamps on what we've been referring to
13 as marginal orders on the motion?
14    A.   My signature is not stamped.
15    Q.   It was an unclear question, your Honor.
16    A.   Okay.
17    Q.   You signed that and you also have some handwriting
18 in pen that was applied to the motion to make the
19 recommendation?
20    A.   Yes.
21    Q.   And in your experience in the court system is that
22 also referred to as a marginal order?
23    A.   Your description of that is the first time I've

---

34

1 ever heard that phrase.
2     Q.   And what I was getting at is that sounds like a
3 term that some people use to refer to handwriting on a motion
4 to issue a decision as opposed to drafting a separate
5 decision.
6     A.   Okay.  Then yes.
7     Q.   That's a new term to you?
8     A.   It is.
9     Q.   There is a stamp that you used that reads "Master
10 recommends" and provides a line for the date and your
11 signature; is that right?
12    A.   That's correct.
13    Q.   And that stamp is unique to you?
14    A.   Yes.
15    Q.   Where would you find it in the courthouse?
16    A.   In the drawer of my desk.
17    Q.   Does the use of that stamp give you some indication
18 that you probably signed it in your office as opposed to in
19 the court or in another location?
20    A.   I would probably sign at the signing desk because I
21 usually take it with me to the signing desk because there's
22 usually ten or twelve files that are sitting there, so I'll
23 just take it with me and when I'm finished I put it back.

---

35

1     Q.   And you would have done this at the signing desk,
2 because it does not appear that you held a hearing on the
3 motion.
4     A.   I did not hold a hearing.  It would have been done
5 at the desk.
6     Q.   And then relative to the stamp where Judge
7 Introcaso's signature is affixed, do you know where that
8 stamp for review of marital master recommendations is located
9 in the courthouse?
10    A.   I don't.
11    Q.   So you can't tell me based on your personal
12 recollection whether that's in the judge's chambers or at the
13 signing desk or in both places?
14    A.   Not at the signing desk, so I would -- if I may
15 presume something, I would presume it's in the judge's
16 office.
17    Q.   But you don't have a specific -- you have no
18 specific knowledge of where she would have reviewed that?
19    A.   No.
20    Q.   Moving further back to Introcaso 47 where I had led
21 you, Master DalPra.
22    A.   Okay.
23    Q.   This is the Notice of Decision related to your

---

36

1 review of the petitioner's motion for reconsideration?
2     A.   Yes.
3     Q.   And it was processed six days after you made the
4 order?
5     A.   Yes.
6     Q.   In your experience is it unusual for it to take the
7 clerk's office six days to process and issue a Notice of
8 Decision after an order has been finalized?
9     A.   Not really.
10    Q.   It's a busy courthouse?
11    A.   It is.
12    Q.   Sometimes the paper backs up?
13    A.   Sometimes it does.  I may have signed it on a
14 Friday.  Might have gone through a weekend.  I don't really
15 know what days of the week these were, so...
16    Q.   Sure.  And you don't receive any notification as a
17 master regarding when the recommendations you have made
18 actually get mailed to the parties, do you?
19    A.   No, I don't even know when -- unless I've asked a
20 judge to rule on something right away, I don't even know when
21 the judge rules on it.
22    Q.   In order for you to figure that out, you'd have to
23 be looking at the file, assuming the filing is up to date, or

37

1   using your case management system?
2       A.  Yes.
3       Q.  This Notice of Decision lists your name as marital
4   master under the text of the decision, which quotes your
5   handwritten order.  Do you see that?
6       A.  Yes.
7       Q.  Should Judge Introcaso's name be listed on that
8   Notice of Decision?
9       A.  Not sure what the procedure is in the clerk's
10  office, but usually it is, yes.
11      Q.  And again, you wouldn't know what clerk processed
12  this?
13      A.  I don't.
14      Q.  Please review Introcaso 48, Master DalPra -- strike
15  that.
16          MR. DELANEY:  Jim, I'm going to switch piles on
17  you.
18          MR. BOFFETTI:  Okay.
19      Q.  Could you please review Introcaso 27.
20          (Introcaso Exhibit 27 was marked.)
21      A.  (Witness peruses document.)  Okay.
22      Q.  This is a temporary hearing scheduling conference
23  order related to the Partello case?

38

1       A.  Yes.
2       Q.  And you recommended issuance of this order on
3   January 10th, which appears to be cosigned by Judge Derby on
4   January 11th?
5       A.  Yes.
6       Q.  You had indicated in paragraph 12 that the
7   likelihood of settlement was poor?
8       A.  Yes.
9       Q.  That would have been informed by your discussions
10  with the parties at the temporary hearing?
11      A.  Yes.
12      Q.  And initially the guardian ad litem report as of
13  that date was scheduled to be finalized by March 29 of 2019?
14      A.  Yes.
15      Q.  And if I could direct your attention to Introcaso
16  28.
17          (Introcaso Exhibit 28 was marked.)
18      A.  (Witness peruses document.)  Okay.
19      Q.  This is a parenting plan that you issued on January
20  11th of 2019?
21      A.  Yes.
22      Q.  Judge Derby approved that recommendation on the
23  same date?

39

1       A.  Yes.
2       Q.  And at the top it indicates that the parenting plan
3   was initially filed with the court as proposed by the
4   petitioner; is that correct?
5       A.  Yes.
6       Q.  Do I understand that if the parties cannot mutually
7   agree to a proposed parenting plan, they can each submit a
8   proposed plan separately?
9       A.  Yes.
10      Q.  And there's some language there indicating that it
11  had been amended by the Court?
12      A.  Yes.
13      Q.  Do you -- can you identify the handwriting at the
14  top of page 1 of the parenting plan that reads:  And amended?
15      A.  That's mine.
16      Q.  Is that something you likely would have done at the
17  temporary hearing when you were finalizing the parenting
18  plan?
19      A.  Yes.
20      Q.  Page 3 of 9, there are some cross-outs in paragraph
21  three?
22      A.  Yes.
23      Q.  Do you know who made those cross-outs?

40

1       A.  I did.
2       Q.  How can you identify the squiggly lines as yours?
3       A.  Because what I usually do, especially on temporary
4   parenting plans, if I use one particular plan as a guide, and
5   because it's important that -- for the children that a
6   temporary order is issued as expeditiously as possible, if I
7   don't particularly care for a particular paragraph or
8   sentence, that's what I do.
9       Q.  And if you turn to page 4 of 9, Master DalPra --
10      A.  Yes.
11      Q.  -- there's some other original handwriting just
12  above paragraph 3 on the order?
13      A.  Yes.
14      Q.  Is that your handwriting?
15      A.  It is.
16      Q.  Please reference page 6 of 9.  There's some
17  additional handwriting under section D, paragraph 1.
18      A.  Yes.
19      Q.  Do you recognize that handwriting?
20      A.  That's mine.
21      Q.  Your Honor, having had the opportunity to review
22  this parenting plan in its original form from the case file,
23  let me represent to you that although it's hard for you to

41

1  see it on the page in front of you, there's some White-Out
2  that's been applied to that paragraph and the handwriting is
3  on top of the White-Out.
4      A.  Okay.
5      MR. WAYSTACK:  Move to strike that statement, but
6  go ahead.
7      MR. DELANEY:  What did you say?
8      MR. WAYSTACK:  Move to strike.  Go ahead.
9      Q.  And there's some squiggly black lines you can sort
10  of see down below that statement?
11     A.  Yes.
12     Q.  Do you ever use White-Out correction tape or
13  White-Out correction ink when finalizing parenting plans?
14     A.  Yes.
15     Q.  Under what circumstances -- go ahead.
16     A.  Not a final parenting plan, but one that -- if I
17  just want to get rid of a few words or something, I would do
18  that, but I don't recall what -- I don't recall what I would
19  have whited out if I did this.
20     Q.  And I suppose on the topic of transportation,
21  Master DalPra, recognizing none of us had access to the
22  language at present, you would do something like that if they
23  had proposed something for transportation and either the

42

1  parents agreed otherwise during the hearing or you decided
2  otherwise during the hearing?
3      MR. WAYSTACK:  Objection, form.
4      A.  It's my experience that if the parties were to
5  write something in as an amendment to their proposal, that
6  they wouldn't put it so far down in a particular paragraph.
7  It would start pretty much where I wrote it.
8          Now, what may have happened is I may have added a
9  phrase in there that I didn't like and I just may have whited
10  it out before I presented it for cosignature.  But I don't
11  recollect that.  I have no idea what that's about.
12     Q.  How often in your practice over the years as a
13  marital master would you use White-Out correction tape and
14  White-Out fluid?  It probably didn't exist at the beginning
15  of your career.
16     A.  Let's see.  When they started to develop the forms
17  is probably when I started to use it more often -- the tape
18  more often than not.  And sometimes if it's like -- for
19  instance, the one previous with the squiggly lines in the
20  paragraph, that would just take up too much tape so I would
21  just X those out so to speak.
22          But if there were a line, I might use it because I
23  don't want that part as part of the order.

43

1      Q.  And why is it that you associate the beginning of
2  the use of the forms with the use of White-Out correction
3  tape?
4      A.  Because prior to then we had the luxury of having
5  court monitors.  We had a form that we would mark up and the
6  court monitor would just type the order out.
7      Q.  The form wasn't preprinted before it got into the
8  court?
9      A.  No, this form would have been -- this particular
10  one you're talking about here?
11     Q.  Yes.
12     A.  That's a preprinted form that you can get off the
13  court's website or if some of the attorneys' offices have
14  software that develops the form, that they can take care of.
15  For instance, the typed portions of this would be Mr. --
16  would be the petitioner's proposal.
17     Q.  Right.
18     A.  Proposed by his attorney.  So yes, the forms are
19  preprinted and you can run them off, print them off the
20  website.
21     Q.  And why is it that you didn't use the White-Out
22  correction tape when the court monitor handled the forms?
23     A.  They weren't these forms.  It was like a checklist.

44

1  Sometimes I would write out specific phrases in longhand and
2  hand it to the court monitor or sometimes I would dictate
3  when the court monitor was able to type the forms.
4      Q.  In your current practice, how often do you believe
5  you use White-Out correction tape or White-Out correction
6  fluid to correct errors on court forms or orders?
7      A.  Errors?
8      Q.  To make corrections on court forms or orders.
9      A.  I don't make corrections on orders.  Maybe I'm
10  misunderstanding your question.  I would take this form, for
11  instance.  And let's assume they had a phrase in there that I
12  didn't want and it was only a few words.  I would use the
13  correction tape, because it looks better when it's printed
14  out than having somebody draw a line and stuff through it.
15     Q.  Right.
16     A.  But as I said, if there are full paragraphs that I
17  don't want, then I just draw the lines through it.
18     Q.  Understood.  And do I understand your testimony,
19  Master DalPra, that you'll use that on this type of parenting
20  plan form, but you won't use it on other types of court
21  orders?
22     A.  Just on the forms, that's correct.  Once in a great
23  while on a uniform support order, if I use a proposed uniform

45

1  support order, there are a couple of boxes that say that
2  the -- the court-ordered amount complies with the guidelines
3  and it might not, so I'll just white out the checkmark that
4  they put in for that, and then I'll add my own specific
5  language.
6      I don't think I'm being particularly clear on that,
7  but I'm trying to answer the best I can.
8      Q.  Thank you.  Please review Introcaso 29.
9          (Introcaso Exhibit 29 was marked.)
10     A.  (Witness peruses document.)  Okay.
11     Q.  It appears this Notice of Decision was issued five
12  days after the parenting plan was approved?
13     A.  Yes.
14     Q.  Now I'd like to refer you back to Introcaso 48,
15  Master DalPra.
16         (Introcaso Exhibit 48 was marked.)
17     A.  (Witness peruses document.)  Okay.
18     Q.  This is a motion for reconsideration of the
19  parenting plan that had been adopted?
20     A.  Yes.
21     Q.  And it's time stamped at the top as having been
22  received by the court on January 28th, 2019?
23     A.  Yes.

46

1      Q.  You denied the motion for reconsideration using
2  your stamp on page 4?
3      A.  Yes.
4      Q.  And Judge Introcaso reviewed the recommendation and
5  cosigned using a stamp on the same day, February 15th, 2019?
6      A.  Yes.
7      Q.  Do you have any recollection of having any
8  discussions with Judge Introcaso about this motion for
9  reconsideration?
10     A.  In all likelihood I did not have any discussion
11  with her about this.
12     Q.  Please review Introcaso 49.
13         (Introcaso Exhibit 49 was marked.)
14     A.  (Witness peruses document.)  Yes.
15     Q.  This is the final copy of the Notice of Decision
16  related to your denial of the motion for reconsideration?
17     A.  Yes.
18     Q.  This was issued six days after you finalized the
19  order on the denial of the motion for reconsideration?
20     A.  Yes.
21     Q.  And this Notice of Decision lists both the marital
22  master and the judicial officer?
23     A.  Yes.

47

1      Q.  So it seems fairly common that these Notices of
2  Decisions may not go out for a number of days after you've
3  issued the order.
4          MR. WAYSTACK:  Objection to the form.
5      A.  Well, it would seem that way, yeah.
6      Q.  Please review Introcaso 50.
7          (Introcaso Exhibit 50 was marked.)
8      A.  (Witness peruses document.)
9      Q.  This is a motion for instruction from the guardian
10  ad litem that was filed on February 7 of 2019 based on the
11  date stamp on the first page.  Do you see that?
12     A.  Yes.
13     Q.  And on page 3 of the motion, the guardian ad litem
14  has difficulty in arranging time for a home visit with the
15  respondent?
16     A.  You're talking about the attachments?
17     Q.  I'm talking about paragraph three of the motion
18  itself, your Honor.
19     A.  Paragraph.  I'm sorry, paragraph three.  I thought
20  you said page 3.
21     Q.  My apologies.
22     A.  Okay.  Yes.
23     Q.  Paragraph four references a need for the respondent

48

1  to replenish a retainer amount for the guardian ad litem fee?
2      A.  Yes.
3      Q.  And you considered the motion by recommendation on
4  page 2 dated February 15, 2019?
5      A.  Yes.
6      Q.  Same question, do you have any recollection of
7  speaking to Judge Introcaso about this motion for instruction
8  on JAI 211?
9      A.  No, I don't.
10     Q.  And there's a cosignature that she made below your
11  handwritten order?
12     A.  Yes.
13     Q.  Just curiously, the -- it appears the motion was
14  received on February 7, and you made recommendation on the
15  15th?
16     A.  Yes.
17     Q.  Which appears to be prior to the ten-day window.
18  Would there be any particular reason on this type of motion
19  that you might address it before a deadline for an objection
20  had expired?
21     A.  Probably because the motion spoke for itself, that
22  the guardian ad litem had made a representation that one of
23  the parties wasn't being particularly cooperative, and I know

49

1  everybody talks about the ten-day window to file an objection
2  but it's really to ask for a hearing if you want one.  The
3  court doesn't need to hold it for ten days.  So it was my
4  experience to, I wanted to get the thing -- get the
5  investigation finished so that the child would have some
6  closure to the dispute between his mother and father.
7      Q.   You wanted to keep the case moving and you needed
8  the guardian ad litem visits to be completed in order for
9  that to happen?
10     A.   Yes.
11     Q.   So there was likely some urgency in getting the
12  case going that led you to rule on it when you did?
13          MR. WAYSTACK:  Objection to form.
14     A.   Yes.  I just wanted to keep the case moving, as I
15  said.
16     Q.   And then we see that Notice of Decision for that
17  motion, your Honor, at Introcaso 51.
18          (Introcaso Exhibit 51 was marked.)
19     A.   (Witness peruses document.)  Yes.
20     Q.   And that was processed on February 21st, six days
21  after you signed your recommendation?
22     A.   Right.
23     Q.   Please refer to Introcaso 52.

50

1          (Introcaso Exhibit 52 was marked.)
2      A.   (Witness peruses document.)
3      Q.   This is entitled:  Petitioner's Motion to Strike
4  Respondent's Motion for Reconsideration As Untimely and it's
5  date stamped February 8th of 2019?
6      A.   Yes.
7      Q.   Based on your recommendation dated February 15th,
8  it appears you were denying the motion to strike requested in
9  prayer for relief A, but you were not yet determining the
10  merits of the motion for reconsideration --
11     A.   Yes.
12     Q.   -- in this order?
13     A.   Yes.
14     Q.   And Judge Introcaso used a stamp to cosign your
15  recommendation above where you had entered your
16  recommendation with your personal stamp?
17     A.   Yes.
18     Q.   And finally, Introcaso 53 is a file copy of the
19  Notice of Decision related to that motion to strike dated
20  February 21st of 2019?
21          (Introcaso Exhibit 53 was marked.)
22     A.   (Witness peruses document.)  Yes.
23     Q.   And that also went out six days after you had

51

1  issued the order?
2      A.   Yes.  And it looks like the same person processed
3  all three of those orders.
4      Q.   Just give me one second, Master DalPra, while I
5  transition.
6      A.   Sure.
7      Q.   Do you have any personal interactions of dealing
8  with the respondent, Robin Partello, in this case?
9      A.   Outside of the fact -- dealing with her?  I'm not
10  sure what you mean by that.
11     Q.   Do you have any current recollections of your
12  personal interactions with her in the courthouse?
13     A.   Just in the courtroom.
14     Q.   Could you please review Introcaso 22 and 23, Master
15  DalPra?
16          (Introcaso Exhibits 22 and 23 were marked.)
17     Q.   While you're doing that, I'm going to ask Dawn to
18  share her screen for the monthly calendar of January 2020.
19     A.   (Witness peruses document.)
20          (Calendar displayed on screen.)
21     Q.   Master DalPra, can you see the calendar for January
22  of 2020 that has been displayed on the screen?
23     A.   Yes.

52

1      Q.   The e-mails that I just showed you were sent by
2  Judge Introcaso to a group of clerks, you as marital master,
3  and some judicial officers on January 9th of 2020 at 10:12
4  a.m.  Do you see that?
5      A.   Yes.
6      Q.   Before I ask you about the e-mail and referencing
7  the calendar on the screen, do you have any recollection of
8  what your judicial assignment calendar would have been during
9  the week of January 6th, 2020?
10     A.   I was probably in Nashua, because I think 2020 I
11  spent full-time in Nashua.
12     Q.   So that could be a period of time when you had
13  transitioned back to the courthouse on a full-time basis
14  after I think you said you'd been all over the place for a
15  while?
16     A.   Yes.
17     Q.   And do you maintain your judicial calendar on a
18  daily basis in the case management system?
19     A.   Yes.
20     Q.   So we could look to the case management system to
21  learn exactly when you sat during the month of January 2020?
22     A.   Yes.
23     Q.   Do you recall receiving this e-mail from Judge

53

1 Introcaso on January 9th?
2    A.  I may have.  I mean, if it's addressed to me and it
3 was on my e-mail -- on my computer, I would have read it.
4    Q.  Right.  And recognizing that we all can see your
5 name in the cc of the e-mail itself, do you have any personal
6 recollection independent of looking at the e-mail on
7 Introcaso 22 of receiving it?
8    A.  No.
9    Q.  The second e-mail in Introcaso 23 corrects the
10 subject line --
11    A.  Yes.
12    Q.  -- of the first e-mail?
13    A.  Yes.
14    Q.  And that was sent about ten minutes after the
15 first?
16    A.  Yes.
17    Q.  Do you know if you had any discussions with Judge
18 Introcaso concerning this e-mail?
19    A.  She may have mentioned something to me about
20 Ms. Partello coming to the court and complaining about
21 something or other, but I -- specifics, no, I don't have any.
22 I'm sorry.
23    Q.  That's okay, Master DalPra.  You did indicate some

54

1 possible discussion about the respondent coming to the court
2 and complaining about something.  Do you have any more
3 specific recollection about what that was about?
4    A.  I don't.  I'm sorry, I don't.
5    Q.  That's okay.  Do you know at all when it may have
6 occurred in relation to when this e-mail was sent on
7 January --
8    A.  No.
9    Q.  -- 9th?
10    A.  Sorry.  No, I don't.
11    Q.  And have I exhausted your present memory on whether
12 you have a recollection of interacting with Judge Introcaso
13 on or about January 9th related to this e-mail?
14    A.  Well, as we said at the very beginning, Judge
15 Introcaso would often stop by my office to talk about various
16 things.  This might have been one of the subjects she might
17 have mentioned, but I have no specific recollection of any --
18 of anything like that.
19    Q.  That's helpful, and I recognize I'm taking you back
20 a ways, Master DalPra, and really, all I can do is ask the
21 questions and test your memory --
22    A.  Sure.
23    Q.  -- and get your responses.  Do you recall having

55

1 any discussions with clerks either about this e-mail or about
2 the Partello case file around this time?
3    A.  No.
4    Q.  Do you recall having -- (Zoom connection
5 disconnected.)
6        (Discussion held off the record.)
7    Q.  BY MR. DELANEY:  Back on the record.  There was
8 just a brief technology difficulty with the video stream.  My
9 video went off, so Zoom decided to turn off my video at that
10 moment for reasons that aren't entirely clear.
11        With that being placed on the record, do you have
12 any recollection of having discussions with anyone else in
13 the courthouse, other judges, regarding the Partello case
14 file around the time Judge Introcaso sent this e-mail?
15    A.  No, I don't.
16    Q.  Did you at some time learn at all that clerks had
17 made -- had brought concerns to Judge King concerning the
18 handling of this file in January 2020?
19    A.  I think the first I heard anything of it was when
20 the findings, or whatever you call it, were published.
21    Q.  Are you referring to the statement of formal
22 charges in the JCC investigation?
23    A.  Yes.

56

1    Q.  And do I understand your testimony that really you
2 didn't notice it was going on until you read that statement
3 of formal charges that was made public?
4        MR. WAYSTACK:  Objection to the form.
5    Q.  Let me rephrase that a little bit.
6    Q.  Sure.
7    A.  I had heard that there were some issues with a
8 complaint that someone had made about Judge Introcaso.  For
9 the longest time I didn't know who made the complaint or what
10 the complaint was.  I never spoke with anyone specifically
11 about any complaints that were made about Judge Introcaso,
12 and at some point -- at some point -- and I don't remember
13 when, and I don't remember whether it was the formal charges
14 part, I realized it was Partello, the Partello/Campbell case.
15 I can't be more specific and I apologize.
16    Q.  When do you think you read the statement of formal
17 charges in relation to when it was issued?
18    A.  Within three or four days.
19    Q.  What was your reaction to having reviewed the
20 statement of formal charges?
21    A.  My reaction was sounds like she was in trouble.
22 Whenever anyone makes formal charges, then somebody's in
23 trouble.  But that's -- I think that's just a natural

57

1  reaction. I didn't have an opinion one way or another. And
2  frankly, I read it the one time when it first came out and I
3  haven't read anything about it since.
4      Q. And have you had any conversations with anyone
5  regarding the matter since you reviewed the statement of
6  formal charges?
7      A. No. The only -- if you want to call it a
8  conversation I had was with Mr. Boffetti last week when he
9  told me --
10         MR. BOFFETTI: Don't reveal our conversation.
11         THE WITNESS: Okay. All right. You told me the
12  time of the deposition.
13         MR. BOFFETTI: Okay.
14     Q. If you can just give me one moment, Master DalPra.
15     A. Sure.
16         MR. DELANEY: With the understanding that Master
17  DalPra will be available to testify at the time of trial, I
18  have no further questions. Thank you very much for your
19  time.
20         THE WITNESS: You're welcome.
21              EXAMINATION
22  BY MR. WAYSTACK:
23     Q. I have a few, Master DalPra. I hope not to be too

58

1  long. Good afternoon. Good to see you still serving the
2  State of New Hampshire. When you made your comment about
3  being all over, I can remember when you were in Coos County
4  more years ago than I want to remember, and you're still
5  doing it. Good for you.
6         So just a few quick questions. As I understand
7  your response to Attorney Delaney's question, your use of
8  White-Out was primarily with the forms that the court has
9  that you would fill out; is that right?
10     A. I didn't white out any part of the form
11  necessarily, but when the folks would send their proposals
12  in, if there was a phrase or something that I was not going
13  to order, I would periodically use White-Out for that.
14     Q. Sure.
15     A. So it was --
16     Q. In terms --
17     A. -- in other words, I would make the form in the
18  proposal my own order as opposed to theirs.
19     Q. Sure. In terms of a longer narrative order that
20  you would write, if I understand this right, it was not your
21  habit to use White-Out to change that?
22     A. Never did.
23     Q. Okay. Do you have any thoughts about the

59

1  appropriateness of a judicial officer using White-Out to
2  alter an order after it had been sent out to the litigants,
3  to the parties?
4         MR. DELANEY: Objection to form. You may answer
5  the question.
6      A. I don't think -- I don't think it's the right thing
7  to do. If you were going to change an order -- I know this
8  has happened before. I've sent something out and then
9  somebody would bring to my attention that I may have
10  transposed petitioner or defendant or I may have done
11  something -- you know, something similar to that. I would
12  issue another order, a corrective order that says the order
13  that went out is in error, so consequently this is the
14  corrective order. I mean, that's what I have done.
15     Q. Sure. In terms of the judicial officer altering an
16  order with White-Out without notifying the parties and
17  changing the order, what would you view of that -- such a
18  procedure be?
19     A. It's not right. I've never heard of that, anybody
20  doing that.
21     Q. Do you have a recollection of when you first heard
22  that Judge Introcaso had a judicial conduct matter that was
23  pending?

60

1      A. Specifically, no.
2      Q. Okay. Do you ever -- do you recall a hearing, I
3  want to say in October of '19, that you conducted in this
4  matter where Robin Partello made many complaints about Judge
5  Introcaso, including a complaint about conflict of interest
6  relative to substantive orders made concerning GAL Kathleen
7  Sternenberg?
8      A. A hearing that I conducted?
9      Q. Yes.
10     A. I'd have to go back and check my notes. Offhand
11  she may have -- she may have raised it, but just in the
12  context of she didn't like what the guardian was ordering, I
13  guess. But specifically, no, I don't -- don't recall that.
14     Q. Attorney Delaney used the words "marginal order,"
15  and let me first say that -- to be open with words with
16  you -- I don't think any orders you ever issued, Master
17  DalPra, were marginal, but I'm going to use the term "margin
18  order" for just a moment, and there's a specific -- hold on
19  one second.
20         If you would go to Exhibit Introcaso 48 for a
21  moment.
22     A. Okay.
23     Q. You looked at that a few minutes ago.

61

1    A.   Okay.  (Witness peruses document.)  Okay.
2    Q.   The last page, it's the fourth page of Exhibit 48.
3    A.   Yes.
4    Q.   This is not a terrific example.  You see in the
5  middle of the page where -- it looks like it's your stamp,
6  Master recommends, and then --
7    A.   Yes.
8    Q.   -- I'm assuming that's your handwriting, denied --
9    A.   Yes.
10   Q.   -- and then you date it and sign it, correct?
11   A.   Yes.
12   Q.   Let's assume -- this is not a great example, but
13 let me call that a marginal, meaning an order on the motion
14 where you write something.  I know others where you wrote
15 more.  Have you ever whited out an order where you use your
16 stamp and you actually write information to your knowledge?
17   A.   Could you restate that question?  I don't think I
18 understand it.
19   Q.   Okay.  I'm trying to define the words "margin
20 order" as one in which on the body of a motion or an
21 objection, you actually write something in your handwriting.
22 And my question is -- and it appears as though you do that
23 relatively regularly, fine process.  My question is whether

62

1  you remember whiting out a margin order where you've written
2  out the text in handwriting.
3    A.   You mean before or after it was issued?
4    Q.   After it was issued.
5    A.   No, never done that.
6    Q.   Are you -- is it a regular practice that you would
7  white out your handwritten text in a margin before it was
8  issued, regular practice?
9    A.   If I meant to -- if I meant to grant the order and
10 I wrote denied, I mean, I was a baseball umpire, sometimes I
11 gave the safe sign and I called them out, I mean, you know.
12   Q.   Sure.
13   A.   That's the only time it would happen.  I would
14 never, and I have to emphasize that, never white out
15 something on an order that was already issued.  If I had made
16 a mistake, as I mentioned earlier, I would issue a corrective
17 order so that there's a record in the file as to a mistake
18 was made.
19   Q.   That's all I have, Judge -- Master DalPra.  Thank
20 you very much for your time.
21          FURTHER EXAMINATION
22 BY MR. DELANEY:
23   Q.   Master DalPra, Attorney Waystack just asked you a

63

1  bunch of questions about White-Out after orders had been sent
2  to the parties; is that right?
3    A.   Yes.
4    Q.   And I think you've previously told me as a marital
5  master, you don't get an affirmative notice from the clerk's
6  office when the order has been sent to the parties.
7    A.   That's correct.
8    Q.   And if you had a case where you had a conflict and
9  you had cosigned a marital master recommendation, then
10 decided you hadn't intended to issue it and recused yourself
11 from the case, assuming for the purpose of this question that
12 the order had not been issued, do you see any problem with
13 the use of White-Out tape in that scenario?
14       MR. WAYSTACK:  Objection to form.
15   A.   Once an order has been -- once my recommendation
16 has been approved, it becomes an order, and whether the order
17 is issued or not, it's an order and I would not, I,
18 personally, would not white that out.  I would issue another
19 order basically stating that in error I did this, and this is
20 the corrective order is that it's going to be referred to
21 somebody else because I have a conflict for approval, but I
22 would -- once -- if I were a judge, once I approved an order
23 and I realized there was a mistake, I would not just white it

64

1  out.
2    Q.   Would you agree with me generally that corrections
3  made prior to orders having been sent to the parties is a
4  different ball of wax than corrections made after an order
5  has been issued?
6        MR. WAYSTACK:  Objection to the form.
7    A.   Not necessarily, no.
8    Q.   And why do you say not necessarily?
9    A.   If you meant to grant a continuance -- I guess it
10 all depends on the order itself.  If you meant to grant a
11 continuance and you went, oh, I should have denied it, then I
12 think you can do that.  But if it has to do with a conflict
13 or it has to do with a substantive issue and you've already
14 approved an order, if that's an order, whether it goes out or
15 not, then I think the best practice would be to issue a
16 corrective order stating that this was a mistake, this is how
17 it's going to be corrected.
18   Q.   And you're identifying --
19   A.   And --
20   Q.   You're identifying what you consider to be best
21 practices?
22       MR. WAYSTACK:  Objection to form.
23   A.   Yes.

65

1    Q.  Are you aware of any policies and procedures
2  governing the use of White-Out in the 9th Circuit?
3    A.  No.
4    Q.  Thank you.
5    A.  But from now on I'm not going to use it.
6      MR. WAYSTACK:  Good to see you, Master DalPra.  I
7  have no further questions.
8      THE WITNESS:  Same here.  Thank you very much.
9      (At 3:31 p.m. the deposition concluded.)
10              * * *
11
12
13
14
15
16
17
18
19
20
21
22
23

66

1              CERTIFICATE OF WITNESS
2        I, MARITAL MASTER BRUCE DALPRA, do hereby
3  swear/affirm I have read the foregoing transcript of my
4  testimony, and further certify that it is a true and accurate
5  record of my testimony (with the exception of corrections
6  listed below):
7  Page    Line        Correction
8  _____   _____       _____
9  _____   _____       _____
10 _____   _____       _____
11 _____   _____       _____
12 _____   _____       _____
13 _____   _____       _____
14 _____   _____       _____
15 _____   _____       _____
16                     _____
17              MARITAL MASTER BRUCE DALPRA
18 Subscribed and sworn to before me this _____ day
19 of_____, 2021.
20        _____
21        Notary Public/Justice of the Peace
22        My commission expires_____
23

67

1              CERTIFICATE
2
3        I, Michele M. Allison, a Licensed Court Reporter,
4  Registered Professional Reporter and Certified Realtime
5  Reporter, do hereby certify that the foregoing is a true and
6  accurate transcript of my stenotype notes of the deposition
7  of MARITAL MASTER BRUCE DALPRA, who was duly sworn, taken
8  place on the date hereinbefore set forth.
9        I further certify that I am neither attorney nor
10 counsel for, nor related to or employed by any of the parties
11 in the action to which this deposition was taken, and further
12 that I am not a relative or employee of any attorney or
13 counsel employed in this case, nor am I financially
14 interested in this action.
15        THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES
16 NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS
17 UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING
18 REPORTER.
19                *Michele A Allison*
20        Michele M. Allison, LCR, RPR, CRR
        N.H. Licensed Court Reporter
21        No. 93 (RSA 310-A:161-181)
22
23

**1**

**1** 39:14 40:17
**10:12** 52:3
**10th** 38:3
**11th** 38:4,20
**12** 38:6
**12th** 18:5
**14** 31:17
**15** 48:4
**15th** 46:5 48:15 50:7
**17** 8:12
**18** 8:12
**19** 7:21 10:1 60:3
**1976** 6:14
**1982** 6:15,16
**1987** 6:16
**1991** 6:17 7:21
**1996** 8:3
**1st** 8:3

**2**

**2** 48:4
**2,000** 14:20
**20** 20:18
**2000** 8:12
**2006** 8:10
**2018** 7:19 8:16 10:1
16:14 18:5 19:15 20:22
22:16 27:14 30:23 31:17
**2019** 7:19 8:16 16:14
38:13,20 45:22 46:5
47:10 48:4 50:5,20
**2020** 7:6,11 51:18,22
52:3,9,10,21 55:18
**211** 48:8
**21st** 49:20 50:20
**22** 51:14,16 53:7
**23** 51:14,16 53:9
**24** 27:14
**24th** 19:11
**25th** 30:23
**27** 37:19,20
**28** 38:16,17
**28th** 45:22
**29** 38:13 45:8,9
**294** 31:16

**3**

**3** 24:20 39:20 40:12
47:13,20
**310-A:181** 6:3
**3500** 19:21 20:23
**3:31** 65:9

**4**

**4** 24:20 40:9 46:2
**42** 17:18,20
**43** 19:2,3 27:16 30:11
**44** 27:11,12 30:8,9
**45** 29:19,21,23 30:6,9,13,
18
**46** 29:21 30:5,6 31:9,10
33:10
**47** 33:6,7 35:20
**48** 37:14 45:14,16 60:20
61:2
**49** 46:12,13
**4A** 21:5

**5**

**50** 47:6,7
**50-page** 23:2
**51** 49:17,18
**52** 49:23 50:1
**53** 50:18,21

**6**

**6** 31:15 40:16
**65/35** 21:15
**6th** 52:9

**7**

**7** 47:10 48:14

**8**

**8th** 50:5

**9**

**9** 39:20 40:9,16
**91** 7:17
**9th** 6:22 52:3 53:1 54:9,
13 65:2

**A**

**a.m.** 52:4
**ability** 39:18
**abused** 28:8
**access** 41:21
**ad** 10:21 18:14 19:6,17
20:16 22:3,7,8,17 23:20
24:17 28:15 29:7,11,12
30:20 38:12 47:10,13
48:1,22 49:8
**add** 45:4
**added** 42:8
**additional** 32:4 40:17
**address** 48:19
**addressed** 53:2

**adopted** 45:19
**adoptions** 9:19 10:6
**Advocacy** 28:3 29:1,2
**affirmative** 63:5
**affixed** 31:3 35:7
**afraid** 22:21
**afternoon** 58:1
**agree** 39:7 64:2
**agreed** 42:1
**ahead** 12:9 13:17 41:6,8,
15
**Aline** 16:17,21
**all-day** 12:20
**allegation** 27:20
**allocation** 31:21
**alter** 59:2
**altering** 59:15
**amended** 39:11,14
**amendment** 42:5
**amount** 20:1,3,14 45:2
48:1
**AOC** 22:8
**apologies** 47:21
**apologize** 56:15
**appealed** 26:18
**appears** 18:4 30:22
31:16 38:3 45:11 48:13,
17 50:8 61:22
**applied** 25:12 26:7 33:18
41:2
**appoint** 22:7
**appointed** 6:15 10:22
22:3,23 23:18 28:15
**appointment** 9:8 18:14
19:5 24:3,6 30:20
**Appreciating** 24:10
**appropriateness** 59:1
**approval** 33:2 63:21
**approved** 26:2 38:22
45:12 63:16,22 64:14
**approving** 31:18
**April** 6:17
**area** 10:20 29:15
**areas** 9:21,23
**arena** 10:5
**arguments** 21:3
**arranging** 47:14
**arrival** 8:18
**arrived** 8:19 9:4
**assign** 16:19
**assigned** 8:1,4,22,23
9:15 12:11 15:23 16:15
**assignment** 9:23 27:8
52:8
**assignments** 7:5,22
8:19,20 9:21 10:2
**assist** 17:15
**assistant** 16:15
**associate** 43:1

**assume** 44:11 61:12
**assuming** 36:23 61:8
63:11
**assumption** 13:14
**attachments** 47:16
**attack** 12:8
**attention** 38:15 59:9
**attorney** 20:6 27:7 43:18
58:7 60:14 62:23
**attorneys** 17:8 20:5
22:21
**attorneys'** 43:13
**Auburn** 8:4
**authored** 27:14
**authority** 28:12
**availability** 32:7
**avoided** 18:1
**award** 26:14
**aware** 6:21 23:11,23
24:2,4 65:1

**B**

**back** 7:17 8:9 20:10,20
34:23 35:20 45:14 52:13
54:19 55:7 60:10
**background** 6:13 7:19
21:17,19 23:11 29:10
**backs** 36:12
**ball** 64:4
**bar** 6:14 10:13
**baseball** 62:10
**based** 21:1,2,3,11 32:16
35:11 47:10 50:7
**basically** 7:22 14:18
26:17,19 32:14 63:19
**basis** 8:17 12:8 52:13,18
**Bates** 31:16
**began** 8:15 26:4
**beginning** 7:6 19:23
42:14 43:1 54:14
**begun** 8:21
**biological** 28:12
**bit** 11:16 24:9 56:5
**black** 41:9
**blue** 18:19,23
**body** 61:20
**Boffetti** 17:17,19 37:18
57:8,10,13
**boilerplate** 13:8
**book** 24:8
**boost** 20:10
**bother** 13:12,21
**boxes** 45:1
**briefly** 27:18
**bring** 59:9
**brought** 55:17
**Bruce** 6:1,8
**built** 8:6

**bully** 22:22
**bunch** 63:1
**busy** 16:6,10 36:10
**buttocks** 27:21

**C**

**C-O-R-N-F-O-R-T-H** 27:5
**calendar** 51:18,20,21
52:7,8,17
**call** 7:2 12:17 14:13
55:20 57:7 61:13
**called** 26:13 62:11
**calls** 32:4
**Campbell** 6:22 18:1
21:22
**cap** 20:1,8,23
**capacity** 6:18
**care** 40:7 43:14
**career** 9:12 26:4 42:15
**cart** 14:19
**case** 6:22 7:2 12:20 13:4,
19 14:12 18:7 19:6,13,
21,23 20:2,6,22 21:6,18
22:7,13 23:5,6 24:17
26:9,11 27:2,20 29:12,15
37:1,23 40:22 49:7,12,14
51:8 52:18,20 55:2,13
56:14 63:8,11
**cases** 9:18,19 12:13,15
13:1,4 14:16,20 18:8
21:9 23:1
**Center** 28:4 29:1,2
**certification** 24:23 25:4,
5,17
**chambers** 35:12
**change** 26:18 58:21 59:7
**changed** 26:16
**changing** 26:22 59:17
**charge** 22:1
**charges** 55:22 56:3,13,
17,20,22 57:6
**Chasseur** 16:17,21
**chatty** 11:3
**check** 60:10
**checkboxes** 19:16
**checklist** 43:23
**checkmark** 45:3
**child** 10:4 19:14 27:21,23
28:3,9,13,21,23 29:2
32:4,7,13 49:5
**child's** 29:8
**children** 23:12 40:5
**Circuit** 6:22 65:2
**circumstances** 15:3
23:10 24:12 41:15
**clear** 20:16 45:6 55:10
**clerk** 16:12 37:11
**clerk's** 15:4 31:2 36:7
37:9 63:5
**clerks** 52:2 55:1,16
**closure** 49:6

**club** 24:9

**coincide** 9:8

**comment** 10:14 58:2

**commission** 23:13

**Committee** 6:11

**common** 47:1

**compared** 18:8

**competence** 29:17

**complaining** 53:20 54:2

**complaint** 56:8,9,10 60:5

**complaints** 56:11 60:4

**completed** 49:8

**complies** 45:2

**computer** 53:3

**concerns** 55:17

**concluded** 65:9

**Concord** 22:4

**conduct** 6:11 59:22

**conducted** 60:3,8

**conference** 37:22

**conflict** 17:5 20:3 60:5
63:8,21 64:12

**conflicted** 20:2 22:12

**conflicts** 17:8 29:18

**connection** 6:10 55:4

**considered** 48:3

**consulted** 23:19

**contacted** 32:11

**context** 7:14 60:12

**continuance** 64:9,11

**continue** 6:18 13:19

**conversation** 57:8,10

**conversations** 57:4

**cooperative** 48:23

**coordinate** 16:22

**Coos** 58:3

**copy** 18:19,23 30:18
46:15 50:18

**corner** 15:11

**Cornforth** 27:3,4

**correct** 15:21 25:12,16
30:7 34:12 39:4 44:6,22
61:10 63:7

**corrected** 64:17

**correction** 41:12,13
42:13 43:2,22 44:5,13

**corrections** 44:8,9 64:2,4

**corrective** 59:12,14
62:16 63:20 64:16

**correctly** 15:5

**corrects** 53:9

**cosign** 13:5 15:20 26:5
50:14

**cosignature** 25:20 42:10
48:10

**cosigned** 12:1,23 16:1
18:16 19:10 31:18 38:3
46:5 63:9

**cosigning** 14:9,14 15:11,
18 32:17,18

**counseling** 28:17 32:7,
14

**counselor** 29:6

**counselors** 32:8

**County** 8:2 58:3

**couple** 8:8,17 10:23 15:1,
16 20:20 22:23 27:17
28:22 45:1

**court** 8:9,11,19 10:23
12:12 16:15 17:7,10
19:17 20:10 26:1,10,19
33:21 34:19 39:3,11
43:5,6,8,22 44:2,3,6,8,20
45:22 49:3 53:20 54:1
58:8

**court's** 43:13

**court-ordered** 45:2

**courthouse** 7:5 8:6,15
10:13 14:22 16:13 34:15
35:9 36:10 51:12 52:13
55:13

**courthouses** 18:9

**courtroom** 11:13 16:16
51:13

**courts** 7:23 8:13,17

**cover** 9:21

**credible** 28:7

**cross-outs** 39:20,23

**cubby** 14:21 15:17

**curiously** 48:13

**current** 7:5 44:4 51:11

**custody** 10:3

**D**

**daily** 52:18

**Dalpra** 6:1,8,9 7:13 11:11
14:6 17:2,16 22:6 24:11,
21 27:8,13 29:19 30:12
31:16 33:10 35:21 37:14
40:9 41:21 44:19 45:15
51:4,15,21 53:23 54:20
57:14,17,23 60:17 62:19,
23 65:6

**date** 34:10 36:23 38:13,
23 47:11 50:5 61:10

**dated** 48:4 50:7,19

**David** 17:23

**Dawn** 51:17

**day** 7:23 12:15,16,23
14:20 15:12,20 16:1,23
24:15 30:23 46:5

**days** 7:9 9:1,2 12:16,17,
18,19,21 13:5 36:3,7,15
45:12 46:18 47:2 49:3,20
50:23 56:18

**deadline** 48:19

**deal** 22:21

**dealing** 23:12 51:7,9

**December** 8:16

**decent** 20:12

**decided** 25:9 42:1 55:9
63:10

**deciding** 22:6

**decision** 30:1,5,6,9,17,19
31:5 34:4,5 35:20 36:8
37:3,4,8 45:11 46:15,21
49:16 50:19

**decision-making** 28:12

**Decisions** 47:2

**decree** 26:11

**defendant** 59:10

**define** 61:19

**degree** 10:19

**Delaney** 6:6,9 17:15,18,
22 30:1,4,7,14,18 37:16
41:7 55:7 57:16 59:4
60:14 62:22

**Delaney's** 58:7

**deliberately** 23:4,6

**deliberation** 25:20

**delinquency** 10:6

**denial** 46:16,19

**denied** 32:1 46:1 61:8
62:10 64:11

**denying** 13:20 50:8

**depending** 14:12 20:4

**depends** 12:16 64:10

**deposed** 6:4

**deposition** 7:3 57:12
65:9

**Derby** 8:15 9:4 38:3,22

**Derry** 8:5,7 28:3

**describe** 22:19

**description** 32:16 33:23

**desk** 14:13,21 15:3,7
16:5 32:19 34:16,20,21
35:1,5,13,14

**determine** 20:1

**determined** 21:5

**determining** 15:19 50:9

**develop** 42:16

**developed** 14:10 15:1
17:12

**develops** 43:14

**dictate** 44:2

**diem** 6:15,16

**differential** 21:14

**difficult** 11:16 21:2 22:22
23:1 29:15

**difficulty** 47:14 55:8

**direct** 38:15

**disagreed** 26:23

**disclosures** 27:23

**disconnected** 55:5

**discuss** 32:23 33:4

**discussed** 32:19

**discussion** 46:10 54:1
55:6

**discussions** 38:9 46:8
53:17 55:1,12

**disengage** 11:16

**displayed** 51:20,22

**dispute** 49:6

**divide** 9:17

**division** 8:4,5,6 28:11

**divorce** 10:3 20:22 26:11

**divorces** 9:18 10:20

**docket** 13:5,19

**document** 17:21 18:23
19:4 27:19 31:11 33:8
37:21 38:18 45:10,17
46:14 47:8 49:19 50:2,22
51:19 61:1

**domestic** 10:3

**drafting** 34:4

**draw** 11:10 44:14,17

**drawer** 34:16

**duly** 6:2

**E**

**e-mail** 52:6,23 53:3,5,6,9,
12,18 54:6,13 55:1,14

**e-mails** 52:1

**earlier** 62:16

**earns** 21:10

**emergency** 15:22 17:23

**emphasize** 62:14

**enacted** 25:13

**enactment** 26:1

**end** 6:16

**enjoyed** 11:21

**ensure** 29:3

**entered** 29:17 50:15

**enters** 20:12

**entire** 25:4

**entitled** 50:3

**enumerate** 26:21

**error** 59:13 63:19

**errors** 44:6,7

**esteem** 25:8

**estimated** 12:22

**eventually** 8:5

**evidence** 28:7

**EXAMINATION** 6:5 57:21
62:21

**excuse** 21:1

**exhausted** 54:11

**exhibit** 17:20 19:3 27:12
29:22 30:13 31:10 33:7
37:20 38:17 45:9,16
46:13 47:7 49:18 50:1,21
60:20 61:2

**exhibits** 17:16 51:16

**exist** 42:14

**expanded** 32:6

**expeditiously** 40:6

**experience** 10:12,18,20
11:1 14:3 20:7 22:15
29:12 33:21 36:6 42:4
49:4

**experienced** 13:10

**experiences** 22:16,19
24:16

**expertise** 29:16

**expired** 48:20

**explained** 23:9

**explore** 29:7

**extra** 20:10

**F**

**fact** 26:20 51:9

**facts** 29:10

**fair** 25:15

**fairly** 47:1

**fall** 20:23

**familiar** 31:2

**family** 8:4,5,10,11 9:17
10:5 12:12 13:4 28:23

**father** 49:6

**February** 46:5 47:10
48:4,14 49:20 50:5,7,20

**fee** 19:20 20:1,10,18 48:1

**felt** 11:14

**field** 23:15

**figure** 27:8 36:22

**file** 16:2 23:2 30:18 36:23
40:22 49:1 50:18 55:2,
14,18 62:17

**filed** 13:18 17:23 33:5
39:3 47:10

**files** 14:22 34:22

**filing** 36:23

**fill** 58:9

**filled** 19:8 23:20

**final** 41:16 46:15

**finalized** 36:8 38:13
46:18

**finalizing** 39:17 41:13

**finally** 50:18

**find** 11:2 16:2 27:9 34:15

**finder** 26:20

**findings** 26:20 55:20

**fine** 61:23

**finished** 16:4 34:23 49:5

**firing** 25:9

**flavor** 20:2

**floor** 14:22

**fluid** 42:14 44:6

**focused** 7:19 9:23

**folks** 17:11 20:11 58:11

**form** 19:8 23:21 29:13
40:22 42:3 43:5,7,9,12,
14 44:10,20 47:4 49:13
56:4 58:10,17 59:4 63:14
64:6,22

**formal** 55:21 56:3,13,16,
20,22 57:6

**forms** 42:16 43:2,18,22,
23 44:3,6,8,22 58:8

**fortune** 15:16

**Foster** 32:10
**found** 24:7 28:6,7
**four-year-old** 19:13
**fourth** 61:2
**frankly** 20:11 25:13 57:2
**Friday** 36:14
**friends** 24:6,7
**front** 41:1
**full** 7:6,7,16,21 9:14 12:5 44:16
**full-time** 6:17,18 52:11, 13
**Function** 6:3

**G**

**GAL** 60:6
**gave** 62:11
**general** 7:18,19 16:4 29:17
**generally** 6:21 64:2
**gentlemen** 27:10
**give** 12:13 16:1 27:7,18 34:17 51:4 57:14
**good** 7:18 10:9 22:10,11, 20 23:1,9 24:6,7 58:1,5 65:6
**governing** 65:2
**governor's** 23:13
**grant** 62:9 64:9,10
**granted** 32:3
**granting** 13:20
**great** 44:22 61:12
**group** 52:2
**guardian** 10:21 18:14 19:6,17 20:9,15,16 22:3, 7,10,17 23:20 24:17 28:15 29:7,11,12 30:20 38:12 47:9,13 48:1,22 49:8 60:12
**guardians** 22:8
**guardianship** 10:4
**guess** 8:7 13:12 17:13 22:14 60:13 64:9
**guide** 40:4
**guidelines** 45:2

**H**

**habit** 58:21
**Hampshire** 22:4 58:2
**hand** 44:2
**handle** 12:18,22 29:18
**handled** 10:7 43:22
**handling** 12:15 55:18
**handwriting** 33:17 34:3 39:13 40:11,14,17,19 41:2 61:8,21 62:2
**handwritten** 37:5 48:11 62:7
**handy** 17:6

**happen** 49:9 62:13
**happened** 42:8 59:8
**happening** 7:22
**hard** 7:13 40:23
**health** 23:14,15
**heard** 13:7,15,23 21:4 26:11 34:1 55:19 56:7 59:19,21
**hearing** 18:11,12 20:4 21:4 27:1 32:10 35:2,4 37:22 38:10 39:17 42:1,2 49:2 60:2,8
**hearings** 10:3
**heck** 26:18
**held** 13:4 25:8 35:2 55:6
**helpful** 7:20 54:19
**high** 21:1 25:8
**highly-conflicted** 23:8
**Hillsborough** 8:2
**hit** 22:9
**hold** 27:1 35:4 49:3 60:18
**home** 47:14
**honest** 10:14
**Honor** 17:22 33:15 40:21 47:18 49:17
**hope** 57:23
**horn** 12:20
**hospital** 21:23 22:2
**hours** 20:15,18,19
**hung** 24:9

**I**

**idea** 42:11
**identification** 31:3
**identify** 39:13 40:2
**idiot** 10:16
**impolite** 11:16
**important** 40:5
**inception** 8:3 20:4
**incident** 28:21
**include** 10:2
**included** 18:11
**including** 60:5
**income** 21:11,13,20
**incomes** 20:12 21:11
**independent** 53:6
**indicating** 39:10
**indication** 34:17
**information** 11:17,19 24:13 61:16
**informed** 38:9
**initial** 20:8
**initially** 38:12 39:3
**ink** 41:13
**inserted** 27:21
**instance** 13:18 42:19 43:15 44:11

**instances** 21:9
**instruction** 47:9 48:7
**intelligent** 13:14
**intended** 63:10
**interacting** 11:21 54:12
**interactions** 51:7,12
**interest** 29:8 60:5
**interim** 27:13 30:19
**intermediate** 16:10
**interrogations** 28:23
**interrupt** 29:20
**introcaso** 6:10 9:11 10:10 14:8,17 15:13 17:18,20 18:16 19:2,3,10 23:19,23 24:14,18 27:11, 12 29:19 30:9,13,18 31:9,10,18 32:20 33:6,7 35:20 37:14,19,20 38:15, 17 45:8,9,14,16 46:4,8, 12,13 47:6,7 48:7 49:17, 18,23 50:1,14,18,21 51:14,16 52:2 53:1,7,9, 18 54:12,15 55:14 56:8, 11 59:22 60:5,20
**Introcaso's** 24:5 35:7 37:7
**investigate** 19:18
**investigating** 28:4
**investigation** 49:5 55:22
**involved** 15:19 18:10 19:13 27:20 28:4
**involves** 6:22
**involving** 9:19 24:17
**issuance** 33:1 38:2
**issue** 27:2 34:4 36:7 59:12 62:16 63:10,18 64:13,15
**issued** 18:13 26:11 28:8 38:19 40:6 45:11 46:18 47:3 51:1 56:17 60:16 62:3,4,8,15 63:12,17 64:5
**issues** 10:3 19:17 56:7

**J**

**Jaffrey** 8:14 9:2
**JAI** 31:16 48:8
**January** 8:21 38:3,4,19 45:22 51:18,21 52:3,9,21 53:1 54:7,13 55:18
**JCC** 6:21 55:22
**Jim** 17:15 37:16
**job** 22:10,12,20 23:1,9
**joint** 28:11
**judge** 6:10 8:15 9:4,11 10:9,16 13:20,22 14:8, 17,18 15:12,13,14,15,19 16:2,7 18:16 19:10 23:19,23 24:5,14,18 25:10 26:3,12,17,21 31:18 32:20 35:6 36:20, 21 37:7 38:3,22 46:4,8 48:7 50:14 52:2,23 53:17 54:12,14 55:14,17 56:8, 11 59:22 60:4 62:19

63:22
**judge's** 35:12,15
**judges** 13:3,23 32:23 55:13
**judicial** 6:11 9:8 10:7,19 12:5,10 13:7 24:23 25:15 26:5 33:2 46:22 52:3,8, 17 59:1,15,22
**Julie** 6:10 16:18,21
**July** 8:3
**jump** 27:10
**jurisdiction** 17:9
**justice** 26:12
**juvenile** 10:5

**K**

**Kathleen** 22:3 60:6
**Kay** 22:17 24:1,17 28:15
**kind** 22:14
**King** 55:17
**knew** 23:8
**knowing** 20:7
**knowledge** 18:22 35:18 61:16

**L**

**language** 13:8 26:2 39:10 41:22 45:5
**late** 16:13
**laugh** 11:10
**laughing** 11:5
**law** 13:4 25:12
**leadership** 25:8
**learn** 52:21 55:16
**learned** 24:11,13
**left** 9:16 16:5
**left-hand** 15:10
**legal** 27:7
**legislative** 25:19,23
**legislature** 25:7,14
**Leonard** 15:15
**level** 10:18
**licensed** 28:17
**likelihood** 38:7 46:10
**limit** 20:14
**Limited** 6:3
**lines** 40:2 41:9 42:19 44:17
**list** 12:17,18,23 17:2,3,5 22:8 23:4
**listed** 37:7
**listen** 20:16
**lists** 37:3 46:21
**litem** 10:21 18:14 19:6,18 20:16 22:3,7,8,17 23:20 24:17 28:15 29:7,11,12 30:20 38:12 47:10,13

48:1,22 49:8
**litigants** 59:2
**local** 28:3
**located** 14:23 35:8
**location** 34:19
**Lodes** 16:18,21
**long** 17:11 22:11 58:1
**longer** 58:19
**longest** 56:9
**longhand** 44:1
**looked** 14:20 60:23
**lot** 11:17,19 12:1
**luxury** 43:4

**M**

**made** 25:11 26:20 30:23 31:16 32:17 36:3,17 39:23 48:10,14,22 55:17 56:3,8,9,11 58:2 60:4,6 62:15,18 64:3,4
**mailed** 36:18
**maintain** 52:17
**make** 13:14 14:9 19:18 20:15 25:10 32:13 33:18 44:8,9 58:17
**makes** 56:22
**management** 37:1 52:18, 20
**March** 38:13
**margin** 60:17 61:19 62:1, 7
**marginal** 33:13,22 60:14, 17 61:13
**marital** 6:1,13,14,15,17, 19,22 9:12 10:12 11:11 12:14 13:3,9 14:6,9 16:13,22 17:2,15 18:4 22:6 24:11,20 26:4 27:8, 13 29:19 30:12 31:15 33:10 34:9 35:8,21 36:17 37:4,14 40:9 41:21 42:13 44:19 45:15 46:22 51:4, 14,21 52:2 53:23 54:20 57:14,16,23 60:16 61:6 62:19,23 63:5,9 65:6
**mark** 43:5
**marked** 17:20 19:3 27:12 30:13 31:10 33:7 37:20 38:17 45:9,16 46:13 47:7 49:18 50:1,21 51:16
**master** 6:1,9,13,14,15, 17,19 7:13 9:12 11:11 12:14 13:3,9 14:6,9 16:13,22 17:2,15 18:4 22:6 24:11,20 26:4 27:8, 13 29:19 30:12 31:15 33:10 34:9 35:8,21 36:17 37:4,14 40:9 41:21 42:13 44:19 45:15 46:22 51:4, 14,21 52:2 53:23 54:20 57:14,16,23 60:16 61:6 62:19,23 63:5,9 65:6
**masters** 25:7 32:23
**masters'** 10:2 26:2
**matter** 13:22 17:23 28:4 57:5 59:22 60:4
**maximum** 19:20
**meaning** 61:13
**means** 25:5
**meant** 26:23 62:9 64:9,10
**members** 10:13 28:23

**memory** 54:11,21
**mental** 23:14,15
**mentioned** 14:8 29:14
53:19 54:17 62:16
**merits** 50:10
**Merrimack** 8:10,22
**Michael** 6:9
**middle** 61:5
**Mike** 29:21
**mind** 26:16
**mine** 39:15 40:20
**minors** 10:4
**minutes** 15:16 53:14
60:23
**mistake** 62:16,17 63:23
64:16
**misunderstanding** 44:10
**moment** 27:18 55:10
57:14 60:18,21
**monitor** 16:15 43:6,22
44:2,3
**monitors** 41:5
**month** 9:1,2,5 52:21
**monthly** 51:18
**mother** 49:6
**motion** 13:18,21 17:23
18:17 31:12,15,17,20
32:19 33:13,18 34:3 35:3
36:1 45:18 46:1,8,16,19
47:9,13,17 48:3,7,13,18,
21 49:17 50:3,4,8,10,19
61:13,20
**motions** 33:1,4
**Move** 41:5,8
**moving** 35:20 49:7,14
**multi-disciplinary** 29:4
**mutually** 39:6

**N**

**named** 6:22
**narrative** 14:11 58:19
**Nashua** 7:6,9 8:2,11,14,
15,19,22,23 9:4,5,9,13,
14 10:13 12:2,14 14:22
16:12 52:10,11
**natural** 56:23
**nature** 9:20
**necessarily** 58:11 64:7,8
**needed** 15:21 16:7 49:7
**nighttime** 32:4
**no-nonsense** 22:20
**nonsense** 23:8
**normal** 32:22
**Notarial** 6:3
**notes** 60:10
**notice** 30:1,5,6,9,16,19
35:23 36:7 37:3,8 45:11
46:15,21 49:16 50:19
56:2 63:5
**Notices** 31:5 47:1

**notification** 36:16
**notifying** 59:16
**November** 31:17
**number** 47:2
**numbers** 31:3
**numerical** 31:2
**nurse** 22:1,2

**O**

**objection** 29:13 42:3
47:4 48:19 49:1,13 56:4
59:4 61:21 63:14 64:6,22
**occasions** 10:23 16:6
**occupation** 6:12
**occurred** 25:20 54:6
**October** 15:8 19:10
20:22 22:16 27:14 30:22
60:3
**Offhand** 60:10
**office** 11:13 15:4 34:18
35:16 36:7 37:10 54:15
63:6
**officer** 9:8 10:19 12:5,11
25:1,16 33:3 46:22 59:1,
15
**officers** 10:7 13:7 26:5
52:3
**offices** 43:13
**Oftentimes** 16:17 22:9
**open** 60:15
**opened** 8:6
**opinion** 57:1
**opportunity** 40:21
**opposed** 34:4,18 58:18
**order** 12:6 14:12 15:22
17:22 18:13,15,17 19:5
26:13,22 28:8 30:19,20
31:7 33:22 36:4,8,22
37:5,23 38:2 40:6,12
42:23 43:6 44:23 45:1
46:19 47:3 48:11 49:8
50:12 51:1 58:13,18,19
59:2,7,12,14,16,17
60:14,18 61:13,15,20
62:1,9,15,17 63:6,12,15,
16,17,19,20,22 64:4,10,
14,16
**ordered** 28:11,17
**ordering** 60:12
**orders** 12:2 13:12 15:6
33:13 44:6,8,9,21 51:3
60:6,16 63:1 64:3
**ordinary** 14:2 32:22
**original** 40:11,22
**Ossipee** 26:10

**P**

**p.m.** 65:9
**paper** 23:18 36:12
**paragraph** 19:13,16,20
21:5 38:6 39:20 40:7,12,
17 41:2 42:6,20 47:17,
19,23

**paragraphs** 44:16
**parental** 9:20
**parenting** 9:18 10:20
18:13 20:22 28:11 31:21
38:19 39:2,7,14,17 40:4,
22 41:13,16 44:19 45:12,
19
**parents** 28:12,13 32:4
42:1
**part** 7:13 42:23 56:14
58:10
**part-time** 8:16
**parte** 17:23 18:12,17
**Partello** 6:23 7:2 18:1
21:23 27:23 51:8 53:20
55:2,13 56:14 60:4
**Partello/campbell** 56:14
**parties** 20:13 21:6,12,18
22:13 28:20 36:18 38:10
39:6 42:4 48:23 59:3,16
63:2,6 64:3
**party** 21:10 22:13
**passed** 6:14
**payment** 21:6
**pen** 27:21 33:18
**pending** 6:10 59:23
**people** 34:3
**perceive** 10:19
**percentage** 21:5
**period** 7:23 8:9 25:6
52:12
**periodically** 15:14 16:19
58:13
**person** 11:3 15:23 16:9
22:21 51:2
**personal** 18:7,22 24:1,12
35:11 50:16 51:7,12 53:5
**personality** 11:2
**personally** 15:6 63:18
**peruses** 17:21 19:4
27:19 31:11 33:8 37:21
38:18 45:10,17 46:14
47:8 49:19 50:2,22 51:19
61:1
**petitioner** 21:14 31:20
39:4 59:10
**petitioner's** 31:12 36:1
43:16 50:3
**Phil** 30:2,14
**phrase** 25:22 34:1 42:9
44:11 58:12
**phrases** 44:1
**picked** 23:4
**pile** 12:7,8 14:8,10,14,15,
17 15:13 32:18
**piles** 37:16
**place** 7:8,15 15:11,17
52:14
**places** 8:10 35:13
**plan** 18:13 38:19 39:2,7,
8,14,18 40:4,22 41:16
44:20 45:12,19
**plans** 40:4 41:13

**pleading** 18:11
**point** 9:16 15:19 24:2
56:12
**police** 28:3,23
**policies** 65:1
**poor** 38:7
**portions** 43:15
**Poulson** 29:22
**practice** 17:17:9 42:12
44:4 62:6,8 64:15
**practices** 64:21
**practicing** 10:12,13
**prayer** 32:3,6 50:9
**prayers** 31:23
**preference** 32:8
**preprinted** 43:7,12,19
**present** 6:17 41:22 54:11
**presented** 42:10
**presiding** 26:12
**pressure** 22:13
**presume** 35:15
**pretty** 22:12 23:1 42:7
**previous** 42:19
**previously** 63:4
**primarily** 12:11 58:8
**primary** 16:20
**print** 14:13 43:19
**printed** 14:12 44:13
**prior** 7:7 12:20 22:16
26:1 43:4 48:17 64:3
**problem** 63:12
**procedure** 15:3 37:9
59:18
**procedures** 65:1
**proceeding** 6:11,21 23:8
**process** 36:7 61:23
**processed** 16:23 30:22
31:7 36:3 37:11 49:20
51:2
**professional** 6:13 28:18
**professions** 21:21
**prohibited** 28:20
**property** 26:14
**proposal** 42:5 43:16
58:18
**proposals** 58:11
**proposed** 39:3,7,8 41:23
43:18 44:23
**protocols** 32:17
**public** 56:3
**published** 55:20
**pull** 30:4
**purpose** 63:11
**purposes** 7:2
**put** 7:14 14:13 15:9 25:10
32:18 34:23 42:6 45:4
**puts** 22:8

**Q**

**question** 11:6 14:4,5
20:21 33:10,15 44:10
48:6 58:7 59:5 61:17,22,
23 63:11
**questioning** 28:20 29:3,8
57:18 58:6 63:1 65:7
**questions** 27:17 54:21
57:18 58:6 63:1 65:7
**quick** 58:6
**quickly** 14:1
**Quigley** 14:18 15:14
**quotes** 37:4

**R**

**raised** 60:11
**randomly** 23:4
**range** 20:21,23
**reaction** 56:19,21 57:1
**read** 23:17 25:11 26:13
53:3 56:2,16 57:2,3
**reading** 13:12,21 25:4
**reads** 25:1 34:9 39:14
**ready** 11:13
**realized** 56:14 63:23
**reason** 23:5,17 25:7
48:18
**reasonable** 20:9
**reasons** 26:22 55:10
**recall** 8:18 21:13,17
24:10,16 41:18 52:23
54:23 55:4 60:2,13
**recantation** 28:1
**receive** 36:16
**received** 8:20 45:22
48:14
**receiving** 52:23 53:7
**recognize** 40:19 54:19
**recognizing** 41:21 53:4
**recollect** 8:18 24:19
42:11
**recollection** 12:6 18:7
23:3 24:12 26:8 35:12
46:7 48:6 52:7 53:6 54:3,
12,17 55:12 59:21
**recollections** 51:11
**recommend** 13:20 15:22
21:15
**recommendation** 12:7
18:5 25:1,11 26:19 27:13
30:23 31:17,18 32:18
33:1,2,19 38:22 46:4
48:3,14 49:21 50:7,15,16
63:9,15
**recommendations** 12:23
13:4,5,9 14:1,10 15:7,18
16:23 19:18 24:18 26:2,
5,21 27:1 35:8 36:17
**recommended** 26:11
38:2
**recommends** 34:10 61:6
**reconsideration** 31:13

36:1 45:18 46:1,9,16,19
50:4,10
record 11:5 16:16 25:5
55:6,7,11 62:17
recusal 17:2,3
recused 63:10
refer 24:20 34:3 45:14
49:23
reference 19:2 40:16
references 47:23
referencing 52:6
referred 33:22 63:20
referring 14:21 31:15
33:12 55:21
regular 12:8 62:6,8
regularly 61:23
related 28:1 30:19 35:23
37:23 46:16 50:19 54:13
relation 54:6 56:17
relationship 10:9 24:1
relative 20:22 21:20 35:6
60:6
relief 31:23 32:3,6 50:9
remember 8:1 9:13,15
21:22 25:14 27:6 56:12,
13 58:3,4 62:1
rephrase 56:5
replaced 8:5
replenish 48:1
report 38:12
reporter 6:2
reports 23:2
represent 6:10 40:23
representation 48:22
represented 32:9
request 32:1
requested 50:8
requesting 19:17
required 20:15
requiring 25:20
research 27:7
resources 20:14,17
respondent 21:14 47:15,
23 51:8 54:1
Respondent's 50:4
response 58:7
responses 54:23
restate 61:17
retainer 48:1
retired 17:11
reveal 57:10
review 6:12 14:16 25:16
27:11 29:19 31:9 33:6
35:8 36:1 37:14,19 40:21
45:8 46:12 47:6 51:14
reviewed 35:18 46:4
56:19 57:5
reviewer 24:18
rid 41:17

**S**

safe 62:11
Salem 8:8,14 9:1,7
sat 12:2 52:21
save 16:10
scan 27:18
scenario 63:13
scheduled 38:13
scheduling 37:22
screen 29:22 30:14
51:18,20,22 52:7
section 40:17
select 32:14
selected 23:4,6
selection 23:20
send 58:11
sense 7:18 11:21,23
12:13 21:2,20 22:11,14
25:19
sentence 40:8
separate 14:15 27:1
29:21 34:4
separately 39:8
serve 6:18
served 16:13
serving 22:17 58:1
set 19:20 20:1,8
settlement 38:7
share 11:17,19 29:22
51:18
shared 30:15
shoe 12:20
showed 52:1
side 22:23
sign 14:13 15:17 16:3
34:20 61:10 62:11
signature 33:14 34:11
35:7
signed 13:21 15:6 18:4
33:17 34:18 36:13 49:21
significantly 21:10
signing 12:7,8 14:13,21
15:7 32:19 34:20,21
35:1,13,14
similar 59:11
sir 27:5
sitting 7:9 9:9 12:14
34:22

rights 9:20
RN 22:1
Robin 18:1 51:8 60:4
Rockingham 8:2
role 25:15
RSA 6:3
rule 16:4 26:1 36:20
49:12
rules 36:21
run 43:19

situations 23:10
skip 13:8
smile 11:10
smiling 11:5 26:9
software 43:14
somebody's 56:22
sort 41:9
sounds 34:2 56:21
South 8:2
spare 15:16
speak 42:21
speaking 48:7
specific 35:17,18 44:1
45:4 54:3,17 56:15 60:18
specifically 10:1 15:10
24:10 29:3 31:23 56:10
60:1,13
specifics 53:21
spent 52:11
split 8:13 21:9,15
splitting 8:17
spoke 48:21 56:10
squiggly 40:2 41:9 42:19
staff 15:23 16:9 17:7
stamp 18:19,23 34:9,13,
17 35:6,8 46:2,5 47:11
50:14,16 61:5,16
stamped 33:14 45:21
50:5
stamps 33:12
standard 25:12,16 26:7
start 12:21 15:12 17:18
23:7 42:7
started 7:16,21 9:14
17:10 32:12 42:16,17
state 6:7,12 58:2
stated 25:16 32:12
statement 7:15 41:5,10
55:21 56:2,16,20 57:5
stating 63:19 64:16
step 16:10
Sternenberg 22:4,17
24:1,17 28:15 60:7
Sternenberg's 29:11
stop 54:15
stream 55:8
strike 28:6 37:14 41:5,8
50:3,8,19
stuff 14:19 20:12,18
25:13 44:14
subject 53:10
subjects 54:16
submit 39:7
subsequent 28:1
substantive 60:6 64:13
suggestion 18:2
superior 8:9 10:23 26:10
support 10:4 18:15 44:23
45:1

suppose 17:5 41:20
supposed 12:21
supreme 26:19
switch 37:16
sworn 6:2
system 15:1 33:21 37:1
52:18,20

**T**

taking 16:16 54:19
talk 11:14 15:22 54:15
talked 10:15
talking 11:15 24:14 25:21
43:10 47:16,17
talks 49:1
tape 41:12 42:13,17,20
43:3,22 44:5,13 63:13
technology 55:8
temporary 18:11,12,13
20:4 21:4 37:22 38:10
39:17 40:3,6
ten 20:19 34:22 49:3
53:14
ten-day 48:17 49:1
term 34:3,7 60:17
termination 9:19
terminations 10:5
terms 10:18 11:2 58:16,
19 59:15
terrific 61:4
test 54:21
testified 6:4
testify 57:17
testimony 13:7,15,23
21:3 44:18 56:1
text 37:4 62:2,7
thing 49:4 59:6
things 9:20 54:16
thought 26:14 47:19
thoughts 58:23
threw 14:18
time 7:6,7,16,21,23 8:9,
13,17 9:2,8,14 10:20
11:15,22 12:6,11 22:2,11
25:6,9 26:7,12 28:8,11
31:21 33:23 45:21 47:14
52:12 55:2,14,16 56:9
57:2,12,17,19 62:13,20
times 9:5 11:12 14:20
16:17 20:13
told 13:11 26:17 57:9,11
63:4
top 18:19 39:2,14 41:3
45:21
topic 41:20
tough 23:1
track 16:7
transferred 8:8
transition 9:7 51:5
transitioned 52:13

transitioning 8:18
transportation 41:20,23
transposed 59:10
trial 12:18,19 57:17
trouble 56:21,23
turn 40:9 55:9
twelve 12:19,22 34:22
type 14:12 15:2,3 43:6
44:3,19 48:18
typed 43:15
types 23:12 29:18 33:1
44:20
typical 32:16

**U**

umpire 62:10
unavailability 32:8
unavailable 32:12
unclear 33:15
undergone 28:22
understand 9:17 14:4
15:5 39:6 44:18 56:1
58:6,20 61:18
understanding 25:22
57:16
Understood 44:18
uniform 18:14 44:23
unique 34:13
Untimely 50:4
unusual 36:6
urgency 49:11

**V**

versus 6:23 7:1 18:2
video 55:8,9
view 59:17
violence 10:3
visit 47:14
visits 49:8
volume 12:13 13:8,9

**W**

wanted 32:13 49:4,7,14
wax 64:4
ways 54:20
Waystack 27:7,10 29:13,
20 30:3,5,10,16 41:5,8
42:3 47:4 49:13 56:4
57:22 62:23 63:14 64:6,
22 65:6
website 43:13,20
week 7:9 36:15 52:9 57:8
weekend 36:14
well-liked 10:12
white 45:3 58:10 62:7,14
63:18,23
White-out 41:1,3,12,13
42:13,14 43:2,21 44:5

58:8,13,21 59:1,16 63:1,
13 65:2

**whited**  41:19 42:9 61:15

**whiting**  62:1

**window**  48:17 49:1

**withstand**  22:12

**word**  18:2

**words**  13:16 24:5 41:17
44:12 58:17 60:14,15
61:19

**work**  9:11 16:12 20:15
21:22 22:22

**workday**  16:6

**worked**  6:16 16:20 18:8
21:23

**working**  8:15 10:9

**worries**  30:17

**write**  14:11 42:5 44:1
58:20 61:14,16,21

**written**  62:1

**wrote**  42:7 61:14 62:10

**Wyman**  26:12

Y

**year**  7:7,11 8:1,16 9:13,
15 25:14 27:6

**years**  8:7,8 10:22 15:2
20:20 26:10 42:12 58:4

Z

**zoom**  55:4,9