**STATE OF NEW HAMPSHIRE**
**JUDICIAL CONDUCT COMMITTEE**

**JC-21-072-C**

**In RE:  Master Bruce F. DalPra**

## JCC EXHIBITS FOR HEARING (Revised 10/3/22)

1.  Statement of Charges – 6/16/22

2.  Michele Lilley, Kathleen Yee email exchange 11/12/20

3.  Judge King email to Master DalPra, November 13, 2020 (4:22 pm)

4.  Master DalPra's November 19, 2020 self-report to JCC

5.  December 10, 2021 Supreme Court Order

6.  December 16, 2021 Supreme Court Order

7.  JCC letter to Master DalPra 1/18/22

8.  Master DalPra's response to JCC letter 2/10/22

9.  Master DalPra's statements regarding statement of formal charges 8/17/22

10. Stipulation concerning admissibility of Unabridged – Revised Final Transcript

11. Unabridged – Revised Final (Transcript) with Timestamps (of November 6, 2020 hearing)

12. Timeline

13. Audio snippets attached to Judge King's 11/13/20 email to Master DalPra (flash drive provided to R. Mittelholzer by AOC)

14. Judge David King's 8/26/22 redacted deposition transcript

STATE OF NEW HAMPSHIRE
JUDICIAL CONDUCT COMMITTEE

JC-21-072-C

In RE:  Master Bruce F. DalPra



## STATEMENT OF FORMAL CHARGES PURSUANT TO
## NEW HAMPSHIRE SUPREME COURT RULE 40 (9)

The New Hampshire Supreme Court Committee on Judicial Conduct (the "Committee"), by its Committee Counsel, Philip R. Waystack, complains against now-retired Marital Master Bruce F. DalPra as follows:

### Introduction

1.  The Committee is the duly authorized Committee on Judicial Conduct established by the New Hampshire Supreme Court pursuant to the Court's constitutional and statutory authority to provide for the orderly and efficient administration of the Code of Judicial Conduct (Rule 38 of the Rules of the New Hampshire Supreme Court). See Rule 39.

2.  The Committee is proceeding against retired Marital Master Bruce F. DalPra pursuant to Rule 40 (7) (a) & (b), and this Statement of Formal Charges is issued pursuant to Rule 40 (9).

3.  These formal charges are brought on the basis of a Committee initiated complaint.

4.  On November 19, 2020, now-retired Marital Master Bruce DalPra filed a self-report with the Judicial Conduct Committee ("JCC" or "the Committee") regarding certain comments that he made during a hearing on November 6, 2020 in the matter of Albrecht v. Albrecht, No. 659-2016-DM-00288, which may have violated the Code of Judicial Conduct.

5.  The Committee subsequently voted to elevate this self-report to the level of a complaint (JC-20-062-G) and invited Master DalPra to explain his behavior and answer the Committee's questions regarding the conduct involved.

6.  Master DalPra accepted the JCC's invitation to appear before the Committee.

7. On February 16, 2021, the JCC dismissed the self-report made by Master DalPra based on the circumstances described in more detail below, "for the lack of any showing of judicial misconduct with no reasonable likelihood of a finding of judicial misconduct."

8. Following the dismissal of this complaint, the New Hampshire Supreme Court issued an order in the appeal of <u>Albrecht v. Albrecht</u>, No. 2021-0192 (Dec. 16, 2021). In that decision, the Supreme Court ruled that Master DalPra was required to recuse himself from the <u>Albrecht</u> case because of comments he made during the hearing. As explained in more detail below, based on new information contained in the Supreme Court decision, the JCC initiated an additional inquiry (JC-21-072-C), which the Committee elevated to the level of a complaint and began its investigation.

9. Master DalPra was directed to answer the complaint, which he did. Having considered all of the circumstances, the JCC alleges that Master DalPra violated the Code of Judicial Conduct Rule 1.2, Rule 2.11, Rule 2.16 and Rule 2.8.

10. The within Statement of Formal Charges centers around comments Master DalPra made during a hearing on November 6, 2020 in the matter of <u>Albrecht v. Albrecht</u>, No. 659-2016-DM-00288, and his failure to disclose the same to the disciplinary authority as required by the Code of Judicial Conduct.

11. In his self-report dated November 19, 2020, Master DalPra informed the JCC that during the telephonic hearing the father began to testify about matters that Master DalPra did not believe were relevant. Master DalPra wrote, "Under my breath, I uttered a comment that contained a vulgar expression: 'who the f***[1] cares.' During mother's testimony somewhat later, I had uttered a sentence that was completely inappropriate."

12. Master DalPra explained that Administrative Judge David King learned of the comments when the transcriptionist brought them to his attention. Judge King, in turn, informed Master DalPra of the comments. Master DalPra stated he did not remember making the comments until Judge King raised the issue. This conversation prompted Master DalPra to make his self-report.

13. At a meeting on December 11, 2020, the JCC took up the matter of Master DalPra's self-report. The Committee voted to direct the Executive Secretary to obtain a copy of the November 6, 2020 hearing so that Committee members could listen to the hearing before its next meeting. Participating Committee members reviewed the hearing. Members were able to clearly hear Master DalPra state, under his breath, "Who gives a f***?," not "Who the f*** cares," as he reported.

---

[1] The actual word stated by Master DalPra, as alleged, appears in Appendix A, which was prepared from the "Revised – Unabridged Final (Transcript) with timestamps" verbatim transcript which was transcribed by eScribers.

14. None of the members of the Committee was able to discern the content of the second comment made by Master DalPra during the mother's testimony as referenced in Master DalPra's self-report. Based on this, the Committee voted to invite Master DalPra to attend the next Committee meeting to explain his conduct and answer the Committee's questions.

15. Master DalPra accepted the JCC's invitation and addressed the Committee during a *WebEx* meeting on February 12, 2021. The Committee's questions centered around the context and reasons for the comment, "Who gives a f***?" The Committee did not explore in depth the second "inappropriate" comment made by Master DalPra during the mother's testimony because the Committee could not hear the content of that comment. Master DalPra did not mention that he was aware of the exact content of what he said during the mother's testimony.

16. The Committee accepted Master DalPra's explanation about the "Who the f*** cares?" comment. He informed the JCC that it was an isolated mistake. The statement was not audible to any of the participants because the courtroom was muted. He offered that the offending remark was the result of human error, made in a moment of frustration, during a highly contentious case. He expressed regret for the lapse. The Committee concluded that, under these circumstances, this remark did not constitute a violation of the Code of Judicial Conduct.

17. While the matter was pending before the JCC, Master DalPra issued a report and recommendation on January 20, 2021 relating to the matters covered in the November 6, 2020 hearing. He also presided over a hearing on January 27, 2021 to extend a domestic violence protective order against Dana Albrecht. (See <u>Albrecht v. Albrecht</u>, No. 659-2019-DV-00341.) (Dana Albrecht appealed the extension of the protective order, as recommended by Master DalPra.) Mr. Albrecht obtained a copy of Master DalPra's self-report and dismissal from the JCC and utilized this information to argue in his appeal before the New Hampshire Supreme Court that Master DalPra should have disclosed his comment, "Who gives a f***?," to the parties and recused himself.

18. The New Hampshire Supreme Court remanded the matter back to Circuit Court on November 10, 2021, for the Circuit Court to determine whether Master DalPra was required to recuse himself. Master DalPra issued a report and recommendation which was approved by Circuit Court Judge John Curran on November 29, 2021. In that report, Master DalPra acknowledged that he did not disclose to the parties his comments from the November 6, 2020 hearing or his self-report to the JCC. In his <u>Order Regarding Disqualification</u>, Master DalPra only refers to the comment "who the f*** cares" and does not even allude to any other inappropriate remarks he made during the mother's testimony on November 6, 2020.

JCC - DalPra - 522

19. On November 30, 2021, the Supreme Court incorporated this order into Mr. Albrecht's appeal. On December 10, 2021, the Supreme Court issued the following order:

> The transcript of the November 6, 2020 hearing held in the parties' domestic relations matter (docket no. 659-2016-DM-00288) does not include the "vulgar expression" that Master DalPra uttered during Dana Albrecht's testimony; nor does it include the "completely inappropriate" sentence that Master DalPra uttered later during Katherine Albrecht's testimony. <u>Albrecht v. Albrecht</u>, No. 2021-0192, Order (N.H. Dec. 10, 2021).

20. The Supreme Court ordered eScribers—the transcription service used by the New Hampshire Judicial Branch which originally identified the offending remarks—to "prepare an amended or additional *errata* sheet to the transcript of the November 6, 2020 hearing so as to include and identify (with page/line) those two comments." <u>Id</u>.

21. The corrected transcript was digitally signed on December 14, 2021. For the first time, it reflected that Master DalPra made the whispered comment, "Who gives a f***?," during Mr. Albrecht's testimony on page 32, line 13 of the transcript. It also established that Master DalPra whispered, "Of course not, they're a bunch of morons," during Ms. Albrecht's testimony on page 72, line 21 of the transcript.

22. Ms. Albrecht's lawyer was questioning her about the children Mr. and Ms. Albrecht have together. The lawyer asked, "Do you believe that they're mature minors?" Ms. Albrecht answered, "Yes." The lawyer asked, "How do they do in school?" Answer: "They have good grades." Question: "Have they had any problems with their conduct in school or outside of school?" Answer: "Never." Question: "Do they make wise, mature decisions in their daily lives relative to, for example, schoolwork?" Answer: "Yes." Master DalPra is then heard to whisper, "Of course not, they're a bunch of morons." The lawyer continued to question Ms. Albrecht about other topics relating to the children.

23. The JCC first learned of the exact nature of Master DalPra's second comment in an email sent by Dana Albrecht to a number of recipients on December 15, 2021. On December 16, 2021, the Supreme Court ruled that Master DalPra should have recused himself from presiding over the hearing to extend the protective order. On December 20, 2021, the JCC held a special meeting at which it voted to open a Committee Initiated Inquiry to address the new information revealed in the revised November 6, 2020 transcript. The JCC directed the Executive Secretary to obtain the unredacted transcripts, pleadings from the Supreme Court appeal, and recordings of the November 6, 2020 hearing in its native format using the "For the Record" (FTR) application.

24. At its January 14, 2022 meeting, the JCC voted to elevate the Committee Initiated Inquiry to the level of a complaint and order Master DalPra to provide an answer to questions relating to:

4

a. Master DalPra's understanding of the wording of the second comment referenced by the transcriptionist;

b. An explanation from Master DalPra as to how and when this comment was brought to his attention; and

c. His understanding as to who would have instructed the transcriptionist to not include the two comments at issue in the hearing transcript.

25. In addition to seeking an answer to this complaint from Master DalPra, the Committee directed the Executive Secretary to conduct an investigation into these matters. That investigation revealed the following facts:

The New Hampshire Judicial Branch utilizes eScribers as the official transcriptionist for court proceedings. On November 12, 2020, Michele Lilley, a Lead Client Relations Representative from eScribers, sent an email to Kathleen Yee, an employee working for the New Hampshire Administrative Office of the Courts. Ms. Lilley reported the following to Ms. Yee:

> I thought you should be aware, per our transcriber regarding the above order:

> So everyone is on Zoom/telephonic for this hearing, other than the judge. The mic is right next to the judge and I can hear everything. He talks to his clerk and himself a lot and makes some pretty bad remarks about the parties and the commentary the parties make. For instance, he whispers to himself, right in the mic, "who gives a f***" when the witness is answering a question, or calls them all a bunch of morons, and so much. It actually creates it to where I can't hear what the witness is saying because he's talking into the mic, I think, completely unaware of what he's doing. Of course we are not going to transcribe that, however, the ordering party has also ordered the audio.

> This is the order that was missing the audio that I emailed about today. The client already has most of the audio which I sent a couple of days ago. She was the one that let me know there was audio missing. I was just about to send her the rest when production let me know the above. I can't not send the audio to her but thought you should know.

26. Ms. Yee attempted to listen to the hearing but could not hear the comments on her own. She requested clarification from Ms. Lilley about the precise nature of the offending remarks. Ms. Lilley promptly responded that same day:

> Here are a couple of examples from the transcriber:

5

Here are a few examples of time stamps where you can hear the Court:

"Who gives a f***?" - **12:28:16

"Of course not, they're a bunch of morons." - **1:45:59

The first one is really hard to hear so don't know if Ms. Albrecht will even hear it in her audio. The second example is pretty clear.

27. Ms. Yee brought these matters to Judge King's attention the next day. Judge King tried to reach Master DalPra that same day, but he was on vacation. Judge King sent the audio clips of the offending remarks and the emailed examples to Master DalPra. Judge King then met with Master DalPra sometime the following week to discuss the matter. Judge King confirmed that he and Master DalPra discussed both comments, but the focus of the discussion was on the comment, "Who gives a f***?" Judge King felt that the second comment about the kids being "morons" was merely a sarcastic aside in light of the context of the questions and answers from the lawyers. Even though none of the parties heard the remarks, Judge King felt that the first comment reflected a lack of patience or dignity by Master DalPra. Judge King informed Master DalPra he had an obligation to self-report his conduct. Master DalPra convinced Judge King that he was not biased or prejudiced against either party and could continue to fairly and impartially preside over the case. Judge King notified the JCC Executive Secretary of the general nature of his conversation with Master DalPra and that Master DalPra would make a self-report, which he did on November 19, 2020.

28. At its February 11, 2022, meeting, the JCC directed the Executive Secretary to conduct additional investigation to learn about the meaning of Ms. Perkins' email remarks, noting that Master DalPra "talks to his clerk and himself a lot and makes some pretty bad remarks about the parties and the commentary the parties make.... It actually creates it to where I can't hear what the witness is saying because he's talking into the mic, I think, completely unaware of what he's doing." Members of the JCC listened to the entire November 6, 2020 hearing and did not notice the same level of comments. Ms. Lilley reported that these observations were actually made by a transcriptionist named Erin Perkins who no longer works for eScribers. During the interview with Ms. Lilley the Executive Secretary learned that the eScribers transcriptionists use noise cancelling headphones with a "booster" app or device to enhance the sound quality. Ms. Lilley contacted Erin Perkins who reported through Ms. Lilley that she believed there were other comments made by Master DalPra during the hearing. At this time Erin Perkins does not have a specific recollection of the content of those other remarks.

29. Based on this information, the JCC voted to order a complete and unabridged transcript of the November 6, 2020 hearing with all remarks transcribed with the equipment utilized

6

by Erin Perkins to capture all audible statements in written format. The additional audible statements uttered by Master DalPra, beyond the statements in the abridged transcript, are attached to this statement as Appendix A.

30. On February 17, 2022, Master DalPra submitted his answer to the JCC—*albeit* it was unsigned. Master DalPra explained that he made only passing reference to the second "inappropriate" comment because when he wrote his self-report he did "not remember making it; did not know what the comment may have referred to; and ... did not have a copy of the transcript in order to determine what point in the hearing it was made; and in what context it was made."

31. Master DalPra then explained that after review of the corrected transcript to answer the JCC complaint, he realized that the comment was a sarcastic remark meant only for himself, not intended to characterize the children in any way, and merely intended to emphasize in his own mind the "pedantic nature of the questions." Master DalPra explained that he was thinking, "What do you expect her to say, no they are a bunch of morons?" He just did not realize he had verbalized this sarcastic thought.

32. Master DalPra had no explanation for why the remarks were not transcribed or who may have made that decision.

## Violations of the Code of Judicial Conduct

33. For the reasons set forth below, the JCC alleges that Master DalPra violated Code of Judicial Conduct Rule 1.2 (Promoting Confidence in the Judiciary), Rule 2.11 (Disqualification), Rule 2.16 (Cooperation with Disciplinary Authorities), and Rule 2.8 (Decorum, Demeanor).

34. Although not a constitutionally appointed judicial officer, Master DalPra is subject to the Code of Judicial Conduct because a judicial master is specifically included within the definition of the Code of Judicial Conduct N.H. S. Ct. R. 38 (Terminology). Moreover, Master DalPra's recent retirement does not divest the JCC of its responsibility to continue to address any claims of misconduct. See In RE: Thayer, 145 N.H. 177, 181–82 (2000).

### A. Canon 2, Rule 2.11: Disqualification

35. The JCC alleges that Master DalPra violated Rule 2.11(C) by not notifying the parties of his inappropriate comments made in his self-report to the JCC and giving the parties an opportunity to move for his recusal. Master DalPra then violated Rule 2.11(A) by not disqualifying himself in light of the circumstances "in which his impartiality might reasonably be questioned."

7

36. Rule 2.11(A) of <u>N.H. S. Ct. R. 38</u>, Canon 2 states in relevant part:

> A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned. . . .

37. The Rule goes on to list a number of circumstances in which a judge must recuse himself from presiding in the case. Importantly, the comments to Rule 2.11 specifically provide that "a judge is disqualified whenever the judge's impartiality might reasonably be questioned, regardless of whether any of the specific provisions of paragraphs (A)(1) through (6) apply." <u>Id</u>. Cmt. 1. As the New Hampshire Supreme Court has explained, "[w]hether an appearance of impropriety exists is determined under an objective standard, *i.e.*, would a reasonable person, not the judge himself, question the impartiality of the court." <u>State v. Bader</u>, 148 N.H. 265, 268 (2002).

38. The New Hampshire Supreme Court has ruled that Master DalPra was required to recuse himself from these proceedings based on the objective circumstances. <u>Albrecht v. Albrecht</u>, No. 2021-0192, Order (Dec. 16, 2021). The JCC need not expound upon that conclusion in more detail because it is bound by the judicial finding of the Supreme Court.

39. Master DalPra's decision not to disqualify himself from further proceedings in the <u>Albrecht</u> case was exacerbated when he failed to disclose his inappropriate comments to the parties. Master DalPra presided over the hearing on November 6, 2020. Less than a week later, Judge King brought the offending remarks to Master DalPra's attention. He emailed Master DalPra both the audio clips of the hearing and the transcript excerpts from eScribers. After discussing the issues with Judge King, Master DalPra agreed that he was obliged to self-report his conduct to the JCC, which he did on November 19, 2020. Master DalPra did not disclose either the inappropriate comments or his decision to make a self-report to the JCC to the parties. Instead, he continued to preside over proceedings by the same parties. On January 20, 2021, he issued an order based on the evidence presented during the November 6, 2020 hearing. On January 27, 2021, he presided over a hearing to extend the domestic violence petition against Mr. Albrecht. He ultimately issued a report and recommendation that the petition be extended for another year.

40. Master DalPra was not automatically required to recuse himself from further proceedings in these matters. Rule 2.11(C) provides:

> A judge subject to disqualification under this Rule, other than for bias or prejudice under paragraph (A)(1), may disclose on the record the basis of the judge's disqualification and may ask the parties and their lawyers to consider, outside the

8

presence of the judge and court personnel, whether to waive disqualification. If, following the disclosure, the parties and lawyers agree, without participation by the judge or court personnel, that the judge should not be disqualified, the judge may participate in the proceeding. The agreement shall be incorporated into the record of the proceeding.

41. N.H. S. Ct. R. 38, Canon 2, Rule 2.11(C). The comment to this provision expands upon the judge's obligation: "A judge should disclose on the record information that the judge believes the parties or their lawyers might reasonably consider relevant to a possible motion for disqualification, even if the judge believes there is no basis for disqualification." Id. Cmt. 5.

42. Had Master DalPra made a timely disclosure of his offending remarks, the parties could have assented to his continued participation. At a minimum it would have given them an opportunity to learn of the master's offending remarks and to create a contemporaneous record. Instead, Master DalPra's decision to remain silent on the matter resulted in a considerable waste of litigation resources for both the parties and the court system. For the reasons discussed in more detail below, Master DalPra's failure to disclose all of the facts and circumstances in a timely manner undermined the integrity of the judicial process. But see In re Tapply, 162 N.H. 285, 299 (2011) (judge was not required to disclose JCC referral and letter of caution to the parties when the parties were already aware of JCC complaints made about the judge's conduct during the proceedings).

**B. Canon 2, Rule 2.16: Cooperation with Disciplinary Authorities**

43. Rule 2.16(A) mandates: "A judge shall cooperate and be candid and honest with judicial and lawyer disciplinary agencies." Master DalPra did not disclose the exact content of both of his remarks to the JCC, even though he knew what he said when he made the self-report. Rather, he only alluded cryptically to a second "inappropriate comment" during the mother's testimony. When Master DalPra appeared before the Committee on February 12, 2021, a number of Committee members remarked that they were only able to discern the "Who gives a f***?" remark. Master DalPra did not disclose the content of the second comment, "Of course not, they're a bunch of morons." He did not even suggest to the Committee that he was aware of the exact content of that remark.

44. In his answer to the Committee Initiated Complaint (21-JC-072-C), Master DalPra attempted to explain this lack of transparency as follows:

> I do not remember making it; did not know what the comment may have referred to; and … did not have a copy of the transcript in order to determine what point in the hearing it was made; and in what context it was made. Hence, the passing reference in the letter.

9

45. This explanation is simply not credible. Viewed in isolation the "morons" comment actually appears to be the more offensive remark. If Master DalPra truly did not know of the context of the second remark when he made his self-report on November 19, then he could not have made either a subjective or objective evaluation about the impact of the "morons" comment on the proceedings. His decision to withhold that information from the JCC constitutes a lack of candor to the Committee. A lack of cooperation occurs when a judicial officer not only makes overt misrepresentation to the JCC, but also by the omission of complete information. Cf. In re Coffey's Case, 157 N.H. 156, 182-85 (2008) (when considering mitigation evidence in the context of a judicial sanction judge did not fully cooperate with JCC and PCC investigation when she failed to disclose important transactions and made "evasive and misleading" statements). Omission of these facts is in violation of Rule 2.16.

46. At the time of his self-report or when he appeared before the JCC on February 12, 2022, Master DalPra could not have made his own determination that the "morons" comment did not violate the Code because claims he did not know the context of that statement until recently. Master DalPra knew from his appearance before the JCC that the Committee could not discern the content of the second "inappropriate" remark. By remaining silent and not affirmatively disclosing the content of the "morons" comment in the face of this knowledge, Master DalPra reinforced the Committee's focus on the "Who gives a f***?" remark. As a result, the JCC did not conduct its own independent analysis of the combined effect of the two remarks. Indeed, when the "morons" statement eventually came to light, the Supreme Court noted that remark reinforced its conclusion that Master DalPra was required to recuse himself. Albrecht, No. 2021-0192, supra, Order at 4. As a result of Master DalPra's lack of full transparency, the Committee initially cleared him of wrongdoing based on incomplete information.

### C. Canon 1, Rule 1.2: Promoting Confidence in the Judiciary

47. A judge does not automatically violate the Code of Judicial Conduct every time he commits an error of law. "When applying and interpreting the law, a judge sometimes may make good-faith errors of fact or law. Errors of this kind do not violate this Rule." N.H. S. Ct. R. 38, Canon 2, Rule 2.2, Cmt. 3. In other words, the Committee does not believe that Master DalPra is subject to discipline simply because he did not correctly construe the objective circumstances to require his recusal. In fact, Judge Curran reached the same conclusion on these same facts when he reviewed Master DalPra's report and recommendation on disqualification following remand from the Supreme Court. Albrecht, No. 659-2019-DV-00341, Order (Nov. 29, 2021). Master DalPra also was not obligated to disqualify himself just because he had a matter involving the same parties pending before the JCC. See In re Tapply, 162 N.H. 285, 298 (2011) (judge was not required to recuse himself from presiding over a case even though the JCC expressed concern about the tone used by the judge during a proceeding); and State v. Hall, 152 N.H. 374, 377 (2005).

10

48. Rather, other circumstances combined with Master DalPra's failure to disqualify himself lead the JCC to the conclusion that Master DalPra violated the Code of Judicial Conduct.

49. He did not simply make an isolated mistake of law by not recusing himself from these proceedings following the November 6, 2020 hearing. Master DalPra's error of law was compounded when he violated Rule 2.11(C) by not disclosing the potential basis for recusal to the parties and giving them an opportunity to move for his disqualification. In addition, he withheld complete information from the JCC during its investigation, thereby violating his obligation to fully cooperate with disciplinary authorities in violation of Rule 2.16. These errors, even if not intended to deceive either the parties or the JCC, demonstrate such a grave misjudgment that Master's DalPra's combined conduct undermines the public's confidence in the integrity of the judiciary in violation of Rule 1.2. See In re Case of Snow, 140 N.H. 618, 624 (1996) (violation of the Code of Judicial Conduct is not dependent on the judge's motive or intent).

50. Rule 1.2 states:

> A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.

N.H. S. Ct. R. 38, Canon 1, Rule 1.2. The commentary to the rule explains that "[t]he test for appearance of impropriety is whether the conduct would create in the mind of a reasonable, disinterested person fully informed of the facts a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired." Id., Cmt. 5.

51. The basis for Master DalPra's disqualification may never have come to light but for Mr. Albrecht's persistence. Parties should not be required to ferret out facts that might form a basis for a judge's recusal. Part I, Article 35 of the New Hampshire Constitution guarantees "the right of every citizen to be tried by judges as impartial as the lot of humanity will admit." To further this end, the litigants, and the public in general, should be able to rely on candid, transparent self-disclosure by judicial officers.

### D. Canon 2, Rule 2.8(B): Decorum, Demeanor

52. The complete and unabridged transcript of the November 6, 2020 hearing includes many statements and utterings made by Master DalPra during the course of the hearing. Although it appears that most of the statements and utterings made by Master DalPra on the telephonic hearing were not heard by the parties and counsel at the hearing, the complete and unabridged transcript documents that many inappropriate comments were made, beyond the two comments previously discussed herein.

11

53. Comments and utterings were made by Master DalPra about a variety of other matters unrelated to the hearing that Master DalPra was conducting. The comments and utterings are numerous. See Appendix A. It appears that Master DalPra was, at times, having a discussion with a third party at the same time that he was conducting the marital hearing.

54. Rule 2.8(B) of N.H. S. Ct. R. 38, Canon 2 states in relevant part:

> A judge shall be patient, dignified, and courteous to all litigants, jurors, witnesses, lawyers, court staff, court officials, and others with whom the judge deals in an official capacity . . . .

55. Master DalPra's numerous comments and utterings during the course of a telephonic hearing were impatient, undignified, and discourteous to the litigants and their counsel. While Master DalPra may have believed that the litigants and lawyers could not hear his comments and utterings, the revised, unabridged transcript makes it clear that his comments and utterings were made while the hearing was underway and appear on the record.

56. Rule 2.8(B) sets a standard for judges to follow in proceedings before the court. This rule is no less applicable to judges because a particular hearing may be a telephonic hearing rather than an in-person hearing in open court.

## Formal Charges

57. Based on the foregoing, there is clear and convincing evidence of violation of the following provisions of the Code of Judicial Conduct:

   a. Master DalPra, in violation of Canon 1, Rule 1.2, failed to disqualify himself thus undermining the public's confidence in the judiciary.

   b. Master DalPra, in violation of Canon 2, Rule 2.11, failed to disqualify himself in a proceeding in which his impartiality might reasonably be questioned.

   c. Master DalPra, in violation of Canon 2, Rule 2.16(A), failed to cooperate with the Committee by not fully disclosing all facts known to him concerning his utterances at the telephonic hearing in the Albrecht case.

   d. Master DalPra, in violation of Canon 2, Rule 2.8(B), failed to act in a dignified, patient and courteous manner in a court proceeding.

Within thirty (30) days of receipt of this Formal Statement of Charges, the Respondent shall file an Answer with the Executive Secretary of the Committee on Judicial Conduct in accordance with Supreme Court Rule 40(9)(F), setting forth all denials, affirmative defenses, mitigating circumstances, and other matters which Master DalPra intends to raise at the hearing.

Respectfully submitted,
Judicial Conduct Committee

By its Committee Counsel,

By: _____
Philip R. Waystack, Esquire

JUDICIAL CONDUCT COMMITTEE

Dated: June 16, 2022

By: _____
Mary E. Collins, Chair

State of New Hampshire

9th Circuit Court – Family Division – Nashua

Case No: 659-2016-DM-00288

In the Matter of Dana Albrecht and Katherine Albrecht


## Revised - Unabridged Final Transcript With Timestamps of the 11/6/20 Hearing on Motions Before the Honorable Bruce DalPra, Marital Master


## APPENDIX A

(Marital Master DalPra's Statements and Utterances not included in
Original Hearing Transcript)


Page 33; line 23 – *[Whispered] Who gives a fuck?*

Page 51; line 19 – *[Whisper] (Indiscernible) want something (indiscernible)*

Page 52; line 5 – *[Whispered] (Indiscernible)*

Page 61; line 20 *[Laughter]*

Page 62; line 16 – *[Whispered] The Court: I'll be back in about an hour.*

Page 62; line 23 – *[Whispered] Put him on mute.*

Page 63; line 4 – *[Whispered] Again, we need (indiscernible)*

Page 63; line 11 – *[Whispered] Not this – not this one, but the previous.*

Page 63; line 17 – *[Whispered] Tom, (phonetic) looks like this (indiscernible).*

Page 63; line 23– *[Whispered] All excited.*

Page 64; line 3 – *[Whispered] (indiscernible) voice. He's got another voice. He's got another voice. [Whispered] Sweet. Pretty.*

14

**Page 64; line 19** – *[Whispered] I don't seem to have the rest of this.*

**Page 65; line 7** – *[Whispered] And while you're looking through that, I'm gonna go pee. Can you imagine if this was in person?*

*Unidentified Speaker: Oh, my God. I don't know if I (indiscernible).*

**Page 65; line 3** – *[Laughter]*

**Page 66; line 11** – *Unidentified Speaker: (whispered) Stupid.*

**Page 66; line 24** – *[Whispered] No, (indiscernible)*

**Page 67; line 7** – *[Laughs]*

**Page 67; lines 13 through 16** – *Hopeless. Heartless.*
*Unidentified Speaker: No, he did.*
*He was concerned; he said he was hopeless. (Indiscernible)*

**Page 68; line 1** – *(Indiscernible).*

**Page 68; line 5** – *[Laughs]*

**Page 68; line 7** – *[Laughs]*

**Page 68; line 25 through page 69; line 2** – *[Whispered] The apology (indiscernible) to have a (indiscernible) relationship.  He doesn't think his son's (indiscernible).*

**Page 69; line 12** – *He lives on the East Coast.  They live on the West Coast. They're going to go  there (indiscernible)*

*Unidentified Speaker: [Laughs]*

**Page 69; line 25** – *[Laughs]*

**Page 70; line 20** – *[Laughs]*

**Page 71; line 22** – Unidentified Speaker:  *You're absolutely right; it sounds like Gilbert Gottfried.*

15

**Page 72; line 9 through page 73; line 22** – *[Whispered] She's probably having a hot dog [Laughter]*

So Alex Corey is back.

I wonder if they're going to do anything with the other guy with a thing like the guy from New Hampshire. Fold (phonetic)?

Unidentified Speaker: Oh, it's not -- what's his name? The guy that was the manager this year who was the bench coach, he's not coming back.

No.

Unidentified Speaker: Did they -- the first base coach and third base coach, was those new coaches?

They're back.

Unidentified Speaker: Were they the ones that worked on this (indiscernible) previously?

Yeah, they were. I think they're both back. Febles and the other guy, I think they're both back.

Unidentified Speaker: I'll be curious to see what they do to improve the team, if they even try.

I don't know. I don't -- I don't mind John Henry as an owner, but I don't like Werner at all.

Unidentified Speaker: Oh yeah.

He's too --

Unidentified Speaker: What do you think of this new GM they have?

It's hard -- it's hard to say over the first --

Unidentified Speaker: Yeah, because of the –

-- first year with what went on.

Unidentified Speaker: The way the end of the season was.

16

I mean, they -- they basically told him to trade Betts (phonetic), and I don't think Betts was going to stay anyway. Didn't sound like he wanted to be in the -- the Boston.

Unidentified Speaker: Ken Nuke can pitch.

*[Laughter]*

**Page 80; line 19** – *[Whispered] Of course not; they're a bunch of morons.*

**Page 81; line 10** – *[Sigh]*

**Page 81; line 14** – *[Laughter]*

**Page 92; line 23** (Indiscernible)

**Page 126; line 21** – *[Whispered] Not in the pleading, but in his testimony, he has.*

**Page 127; line 5** – *[Wheeze or laughter] [Whispered] Okay.*

**Page 127; line 9** – *[Whispered] He's actually born on (indiscernible).*

**Page 127; line 14** – *[Whispered] Do you have to say that?*

**Page 127; line 17** *[Whispered] I'm not throwing you out, but if you have to leave --*

*[Laughter]*

**Page 128; line 1** – *[Whispered] (Indiscernible) clearly asked her that.*

**Page 130; line 12** - *[Wheeze or laughter]*

**Page 131; line 1** – *[Whispered] He's not doing it.*

**Page 133; line 18** – *[Whispered] Would you (indiscernible) and ask defense (indiscernible). Thank you.*

**Page 136; line 9** – *[Laughter]*

17

NH Judicial Branch Adminstrative Offices
Attention: Kathleen Yee
1 Granite Place
Suite N400
Concord, NH 03301
3026 (internal extension)
Cell 603 540-0174 – currently working remotely



**From:** Michele Lilley [mailto:michele.lilley@escribers.net]
**Sent:** Thursday, November 12, 2020 12:24 PM
**To:** Kathleen M. Yee
**Subject:** PLEAE READ RE NHJB-12284
**Importance:** High

EXTERNAL: Do not open attachments or click on links unless you recognize and trust the sender.

Kathy:

I thought you should be aware, per our transcriber regarding the above order:

So everyone is on Zoom/telephonic for this hearing, other than the judge.  The mic is right next to the judge and I can hear everything.  He talks to his clerk and himself a lot and makes some pretty bad remarks about the parties and the commentary the parties make.

For instance, he whispers to himself, right in the mic, "who gives a fuck" when the witness is answering a question, or calls them all a bunch or morons, and so much.  It actually creates it to where I can't hear what the witness is saying because he's talking into the mic, I think, completely unaware of what he's doing.

Of course we are not going to transcribe that however, the ordering party has also ordered the audio.

This is the order that was missing the audio that I emailed about today.  The client already has most of the audio which I sent a couple of days ago.  She was the one that let me know there was audio missing.   I was just about to send her the rest when production let me know the above.

I can't not send the audio to her but thought you should know.

Regards,



**Michele Lilley**, CET
*Lead Client Relations Representative*

602-263-0102 ¦ direct
602-263-0885 x130 ¦ office
800-257-0885 ¦ toll free
866-954-9068 ¦ fax

schedule a reporter
order a transcript

*"One Click Away from All Your Reporting and Transcription Needs"*

Legal Disclaimer-This email and any files, links, or proprietary information transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual(s) named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

**From:** Michele Lilley [mailto:michele.lilley@escribers.net]
**Sent:** Thursday, November 12, 2020 5:23 PM
**To:** Kathleen M. Yee
**Subject:** RE: PLEAE READ RE NHJB-12284

EXTERNAL: Do not open attachments or click on links unless you recognize and trust the sender.

Kathy:

Here are a couple of examples from the transcriber:

Here are a few examples of time stamps where you can clearly hear the Court:

"Who gives a fuck?" - **12:28:16

"Of course not, they're a bunch of morons." - **1:45:59

The first one is really hard to hear so don't know if Ms. Albrecht will even hear it in her audio. The second example is pretty clear.



**Michele Lilley**, CET
*Lead Client Relations Representative*

602-263-0102 | direct
602-263-0885 x130 | office
800-257-0885 x130 | toll free
866-954-9068 | fax

schedule a reporter
order a transcript

*"One Click Away from All Your Reporting and Transcription Needs"*

**From:** Kathleen M. Yee <KYee@courts.state.nh.us>
**Sent:** Thursday, November 12, 2020 1:38 PM
**To:** Michele Lilley <michele.lilley@escribers.net>
**Subject:** RE: PLEAE READ RE NHJB-12284

I have listened to the audio and I can hear him laughing quietly and mumbling, but I can't tell what he is saying. I tried playing around with listening to different channels and still couldn't understand him.

Do you know what channels she was listening to or where in the audio she is referring to?

It could just be my hearing though.

Thanks.

*Kathleen Yee*

**phil@waystackfrizzell.com**

| | |
|---|---|
| **From:** | Hon. David D. King <DKing@courts.state.nh.us> |
| **Sent:** | Tuesday, July 26, 2022 5:19 PM |
| **To:** | Richard W. Head |
| **Subject:** | FW: Albrecht hearing November 6, 2020 |
| **Attachments:** | Nashua CC CR5_20201106-1227_01d6b43829be0cfc.trm; Nashua CC CR5_20201106-1344_01d6b443031dc438.trm |

**From:** Hon. David D. King
**Sent:** Friday, November 13, 2020 4:22 PM
**To:** Master Bruce F. Dalpra <BDalPra@courts.state.nh.us>
**Subject:** Albrecht hearing November 6, 2020

EXHIBIT
*tabbies*
**3**

Bruce:

I am sorry to have to be writing this email but I'm sure you will understand that I have an obligation under the Code to deal with these situations.  On November 6, 2020 you had what I believe was a telephonic hearing in what is obviously a very difficult matter, Albrecht and Albrecht.  One of the parties requested a copy of the audio recordings from the hearing, which was provided, and subsequently ordered a transcript.

When the transcriptionist from escribers was preparing the transcript, she brought to her supervisor's attention comments that "the judge" made during the proceedings.  The supervisor in turn reached out to court administration.  I am attaching two examples that were sent to my attention, both email excerpts from escribers staff as well as snippets of the actual audio.   The audio is difficult, but not impossible, to hear on our equipment but apparently very clear on the more sophisticated equipment used by escribers.  Obviously I do not know anything about this case, other than the fact that it has a very large number of docket entries, which in and of itself is an indication that it involves difficult issues, and probably difficult parties.  For that reason it isn't clear whether your comments indicate a bias against one of the parties or are just comments made in frustration.  I think we can both agree that they do not demonstrate the patience or dignity expected of judicial officers under Rule 2.8.

I am hoping that we can speak about this next week after you have a chance to review what I have attached.  (The 2 notes pasted below are from the emails received from escribers.)

David

David D. King
Administrative Judge
New Hampshire Circuit Court
1 Granite Place, Suite N400
Concord, N.H. 03301
Telephone (603) 271-6418


I thought you should be aware, per our transcriber regarding the above order:

So everyone is on Zoom/telephonic for this hearing, other than the judge.  The mic is right next to the judge and I can hear everything.  He talks to his clerk and himself a lot and makes some pretty bad remarks about the parties and the commentary the parties make.

For instance, he whispers to himself, right in the mic, "who gives a fuck" when the witness is answering a question, or calls them all a bunch or morons, and so much.  It actually creates it to where I can't hear what the witness is saying because he's talking into the mic, I think, completely unaware of what he's doing.

Here are a few examples of time stamps where you can clearly hear the Court:

"Who gives a fuck?" - **12:28:16

"Of course not, they're a bunch of morons." - **1:45:59

November 19, 2020

Robert T. Mittelholzer, Esq.

Executive Secretary

*JC-20-062-6*

Judicial Conduct Committee

132 Chapel Street

Portsmouth, NH 03801



EXHIBIT

4

Re: IMO Albrecht November 6, 2020 hearing

Dear Atty. Mittelholzer,

It is with extreme embarrassment that I write this self-report of a possible violation of Rule 2.8. On November 6, 2020 I presided over a hearing regarding the above parties. The hearing was telephonic and each party had counsel. It was scheduled for four hours. We started at 11:30 am and finished around 3:30 pm. These parties have been involved in high conflict and contentious litigation since 2016. There are more than 420 docket entries in their file.

I shall not go into detail of their conflict, but will provide a brief overview. I have presided over dozens of hours of hearings regarding a domestic violence petition, temporary, final and post-divorce hearings. The parties live on opposite coasts but that circumstance does not dampen their conflict.

On November 6 I conducted a telephonic hearing. No parties were in attendance; the two people in the courtroom were my court recorder/monitor and me. Periodically a security officer would check in to ensure there were no security issues. During father's testimony he began speaking of issues that were not relevant to the issues to be decided-something he often did. Under my breath I uttered a comment that contained a vulgar expression: "who the f*** cares." During mother's testimony somewhat later, I had uttered a sentence that was completely inappropriate.

Until Judge King informed me that the comments were overheard by an eScriber transcriptionist, I did not even remember saying anything, let alone the comments described in the previous paragraph. I certainly do not dispute the recording. It is my voice and I made the statements. I emphasize, however, that the comments were not directed toward any individual and do not signal a bias or anything remotely close. They were made out of complete frustration. The matter had been scheduled a few days earlier for a WebEx experience. The WebEx did not work and we were required to reschedule. A few days prior to the hearing and the day of the hearing, counsel had more than 300 pages of exhibits delivered to me for my review.

Again I wish to emphasize that the comments-as inappropriate as they are-were not directed to any party. They were uttered out of frustration and under my breath. After Judge King's notification, I asked the monitor if she overheard me saying anything. She stated that she did not.

I do not excuse my comments in any way. Given my position in the court system, more is expected of me. Frankly, I expect more of myself. I can assure you that I shall not replicate my action. A reprimand is clearly in order should you deem it appropriate. When I make a mistake, I own it. I do not engage in denial.

I thank you for taking the time to read and consider this self-report. I am happy to speak further with you on this matter at your convenience should you desire to do so.

Sincerely,

Bruce F. DalPra

Marital Master

C: Honorable David King



## THE STATE OF NEW HAMPSHIRE

### SUPREME COURT

## In Case No. 2021-0192, Katherine Albrecht v. Dana Albrecht, the court on December 10, 2021, issued the following order:

The transcript of the November 6, 2020 hearing held in the parties' domestic relations matter (docket no. 659-2016-DM-00288) does not include the "vulgar expression" that Master DalPra uttered during Dana Albrecht's testimony; nor does it include the "completely inappropriate" sentence that Master DalPra uttered later during Katherine Albrecht's testimony. According to Master DalPra's November 19, 2020 letter to the New Hampshire Judicial Conduct Committee, those two comments "were overheard by an eScriber transcriptionist."

On or before December 20, 2021, eScribers shall prepare an amended or additional errata sheet to the transcript of the November 6, 2020 hearing so as to include and identify (with page/line) those two comments.

MacDonald, C.J., and Hicks, Bassett, Hantz Marconi, and Donovan, JJ., concurred.

### Timothy A. Gudas, Clerk

Distribution:
9th N.H. Circuit Court - Nashua Family Division, 659-2019-DV-00341
Transcript Center
Michael J. Fontaine, Esquire
Israel F. Piedra, Esquire
Mr. Dana Albrecht
eScribers
Transcript Recorder, Supreme Court
File

**THE STATE OF NEW HAMPSHIRE**

**SUPREME COURT**



## In Case No. 2021-0192, <u>Katherine Albrecht v. Dana Albrecht</u>, the court on December 16, 2021, issued the following order:

Having considered the briefs, memorandum of law, and record submitted on appeal, we conclude that oral argument is unnecessary in this case. <u>See</u> <u>Sup. Ct. R.</u> 18(1). The defendant appeals orders of the Circuit Court (<u>DalPra</u>, M., approved by <u>Leonard</u> and <u>Chabot</u>, JJ.), following a hearing, granting an extension of a domestic violence final order of protection to the plaintiff, <u>see</u> RSA 173-B:5, VI (Supp. 2021), and denying his motion for reconsideration. On appeal, the defendant raises several challenges to the trial court's orders. We vacate and remand.

One of the arguments advanced by the defendant is that he was denied due process of law under both Part I, Article 35 of the New Hampshire Constitution, and the Fourteenth Amendment to the United States Constitution, when the judicial officer who presided over this matter neither disqualified himself nor disclosed to the parties the basis for his potential disqualification. <u>See</u> <u>In the Matter of Tapply & Zukatis</u>, 162 N.H. 285 (2011); <u>Blaisdell v. City of Rochester</u>, 135 N.H. 589 (1992); <u>Sup. Ct. R.</u> 38.

In support of his argument, the defendant provided this court with a copy of a letter from the judicial officer to the New Hampshire Judicial Conduct Committee (JCC), in which the judicial officer reported that he may have violated the New Hampshire Code of Judicial Conduct during a telephonic hearing held in a separate family division proceeding involving the parties. In his letter, the judicial officer states, in part, that "[d]uring [defendant's] testimony he began speaking of issues that were not relevant to the issues to be decided-something he often did. Under my breath I uttered a comment that contained a vulgar expression: 'who the f*** cares.'" Thereafter, apparently without disclosing to the parties his comment, nor his decision to self-report it to the JCC, the judicial officer presided over the hearing in this matter, and subsequently recommended the dispositions set forth in the orders now on appeal.

The defendant states that he did not hear the judicial officer's comment during the family division hearing, and that he only learned of it after receiving a copy of the judicial officer's self-report letter pursuant to a request the defendant filed with the JCC. Accordingly, the defendant argues that because he "was ignorant of [the judicial officer's] self-report at the time [the judicial officer]

conducted the most recent [domestic violence] hearing, Defendant was not given any opportunity to file a motion for recusal."

In light of the defendant's arguments, we exercised our supervisory jurisdiction, see RSA 490:4 (2010), and remanded for the limited purpose of allowing the trial court to determine whether the judicial officer was disqualified, under the circumstances of this case, from presiding over the plaintiff's request to extend the protective order. Subsequently, the judicial officer issued an order on remand (DalPra, M., approved by Curran, J.), finding that there was no basis for his disqualification. The judicial officer reasoned, in part, that he is not biased, and explained that the remark was made in response to testimony that "was not relevant to the issues to be decided in the family case," that it "was not intended to be heard," and that he only reported it to the JCC "[o]ut of an abundance of caution." According to the judicial officer, the JCC has since dismissed the matter.

In light of the judicial officer's decision, we deemed the defendant's notice of appeal and brief to be challenging the determination that the judicial officer was not disqualified. Because the transcript of the family division hearing at which the judicial officer made his remark was not part of the record on appeal, on November 30, 2021, we ordered the additional transcript. Because the transcript did not contain the relevant remark, on December 10, 2021, we ordered the preparation of an amended transcript, which we received on December 14, 2021. Accordingly, we now review the merits of the disqualification decision with this additional information.

"It is the right of every citizen to be tried by judges as impartial as the lot of humanity will admit." N.H. CONST. pt. I, art. 35. The New Hampshire Code of Judicial Conduct requires a judge to avoid even the appearance of impropriety, to conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary, and to disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including, but not limited to instances where the judge has a personal bias or prejudice concerning a party or a party's lawyer. Tapply, 162 N.H. at 296, 302; Blaisdell, 135 N.H. at 593; Sup. Ct. R. 38, Canons 1, 2.

"The party claiming bias must show the existence of bias, the likelihood of bias, or an appearance of such bias that the judge is unable to hold the balance between vindicating the interests of the court and the interests of a party." Tapply, 162 N.H. at 297 (quotation omitted). "The existence of an appearance of impropriety is determined by an objective standard, i.e., would a reasonable person, not the judge himself, question the impartiality of the court." Id. at 302 (quotation omitted). "The objective standard is required in the interests of ensuring justice in the individual case and maintaining public confidence in the integrity of the judicial process which depends on a belief in the impersonality of judicial decision making." Id. (quotation omitted). "The test for an appearance of

2

partiality is whether an objective, disinterested observer, fully informed of the facts, would entertain significant doubt that justice would be done in the case." Id. (quotation omitted).

"Judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." Id. at 297 (quotation omitted). "Opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." Id. (quotation omitted). "Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." Id. (quotation omitted). However, "it is the judge's responsibility to disclose, sua sponte, all information of any potential conflict between himself and the parties or their attorneys when his impartiality might reasonably be questioned," and his "failure to disclose to the parties the basis for his or her disqualification under [the Code of Judicial Conduct] will result in a disqualification of the judge." Blaisdell, 135 N.H. at 593-94.

Here, the transcript reflects that the judicial officer was presiding over a hearing on cross-motions to modify the parties' parenting plan. The judicial officer made his remark in response to testimony of the defendant in which the defendant described his connection with the children, and the things they used to do together before the divorce that he hasn't been able to do with them since. Specifically, the defendant testified that, before the divorce, he used to make all of the family meals for the holidays, and noted that he heard from one of the children that "last year, they did get to go out and eat at a super nice place, so I think that's -- I'm glad they got to go out to eat at a super nice place. At the same time, that's not the traditional homecooked meal that I always make that they were used to. It's just sad for me. Again, just a basic, they probably miss the traditional one too." It was during this testimony that the judicial officer whispered: "Who gives a f***?"

Although "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge," Tapply, 162 N.H. at 297 (quotation omitted), in this case, the judicial officer's remark is unlike those at issue in Tapply. Here, the remark — which was not intended to be heard — was not made in order to admonish the defendant for unreasonable behavior. See id. at 299-300. Nor can we construe it as the judicial officer "merely fulfilling his duty as the finder of fact," id. at 300, and expressing skepticism about the defendant's claims or his credibility. See id. Rather, according to the judicial officer's self-report letter to the JCC, his remark was "made out of complete frustration," because the defendant "began speaking of issues that were not relevant to the issues to be decided-something he often did." Based upon our review of the transcript, we cannot conclude that the defendant's testimony was irrelevant, nor

3

so far afield as to justify such a crude remark.  Although a judicial officer is not precluded from showing frustration, see id. at 299-300, here, the judicial officer's remark would cause an objective, reasonable person to question whether the judicial officer had reached the point of frustration where he, quite literally, no longer cared about the defendant's testimony, and could no longer keep an open mind and decide the case impartially.  See id. at 302 ("The existence of an appearance of impropriety is determined by an objective standard, i.e., would a reasonable person, not the judge himself, question the impartiality of the court." (quotation omitted)).

Our decision is bolstered by another remark the judicial officer made later in the same family division hearing.  The transcript reflects that, during the plaintiff's testimony about the maturity level of the children, counsel asked her whether the children "make wise, mature decisions in their daily lives relative to, for example, schoolwork," and whether they "help[] around the house."  During this questioning, the judicial officer whispered: "Of course not, they're a bunch of morons."  This additional remark further supports our determination that an objective, reasonable person would question whether the judicial officer could keep an open mind and decide the case impartially.

Under these circumstances, we conclude that it was error for the judicial officer to have presided over the hearing in this case.  Accordingly, we vacate the trial court's orders, and remand for a new hearing on the extension of the protective order before a different judicial officer of the circuit court.  We express no opinion as to the merits of the underlying motion to extend the protective order.  However, in light of the unique circumstances of this case, the protective order shall remain in place pending the outcome of the new hearing.

Given our decision, we need not address the parties' remaining arguments.  To the extent that either party requests an award of attorneys' fees with respect to this appeal, the request is denied.  See Sup. Ct. R. 23.

Vacated and remanded.

MacDonald, C.J., and Hicks, Bassett, Hantz Marconi, and Donovan, JJ., concurred.

**Timothy A. Gudas,
Clerk**

4

Distribution:
9th N.H. Circuit Court - Nashua Family Division, 659-2019-DV-00341
Honorable Kimberly A. Chabot
Honorable John A. Curran
Honorable Elizabeth M. Leonard
Marital Master Bruce F. DalPra
Honorable David D. King
Michael J. Fontaine, Esquire
Israel F. Piedra, Esquire
Mr. Dana Albrecht
Carolyn A. Koegler, Supreme Court
Lin Willis, Supreme Court
File

STATE OF NEW HAMPSHIRE
JUDICIAL CONDUCT COMMITTEE



Mary E. Collins, Chair
Attorney Jaye L. Rancourt, Vice Chair
Judge James H. Leary
John Mullen
Alan K. Blake
Judge Neals-Erik William Delker
Judge Susan B. Carbon
Stephen R. L'Heureux
Thomas R. Eaton
Larry Gilpin
W. Michael Scanlon, Esq.



Robert T. Mittelholzer, Esquire
Executive Secretary
132 Chapel Street
Portsmouth, New Hampshire 03801

Phone: (603) 427-9295
Fax: (603) 427-9297
Email: rmittelholzer@nhjcc.com

January 18, 2022

Marital Master Bruce F. DalPra
NH Circuit Court Administrative Offices
One Granite Place, Suite 400 North
Concord, NH 03301

Re: JC-21-072-C

Master DalPra:

        I am writing to advise that, at a special meeting of December 20, 2021, the Committee voted to open a  Committee-initiated inquiry based upon the unredacted transcript of the November 6, 2020 hearing in the case entitled, In the Matter of Katherine Albrecht and Dana Albrecht, Case Number: 659-2016-DM-00288 which had recently been ordered by the New Hampshire Supreme Court wherein, referring to the litigants' children, you are reported to have commented, "... of course not, they're a bunch of morons.".

        Based upon its review of the unredacted transcript and briefing from the Supreme Court case that led to the Supreme Court's recent Order of December 16, 2021, Judge Curran's Order affirming that there was no basis for your recusal from the this case, your recommendation(s) with respect to your recusal and the associated pleadings, the Committee, at its meeting of January 14, 2022, determined to elevate this inquiry to the level of a complaint pursuant to New Hampshire Supreme Court Rule 40 (7) with respect to the second comment reportedly made by you  at the November 6, 2020 hearing which you had previously described in your self-report (JC-20-062-G)  as "completely inappropriate".

        The Committee now requests an answer to this complaint pursuant to New Hampshire Supreme Court Rule 40 (7) (c) with respect to the following questions:

1-Your understanding of the wording of the second comment referenced by the transcriptionist;

2-An explanation from you as to how and when this comment was first brought to your attention;

3- Your understanding as to who would have instructed the transcriptionist not to include the two comments at issue in the hearing transcript.

New Hampshire Supreme Court Rule 40 (7) provides in relevant part that:

(7) *Docketing the Report of Alleged Misconduct as Complaint; Procedure Following Docketing of Complaint.*

(a) Docketing of Report of Alleged Misconduct as Complaint. If the Committee determines that a report is against a judge and satisfies the requirements for docketing as a complaint as set forth in section (5)(c), it shall be docketed as a complaint.

(c) Request for Answer to Complaint. After a complaint is docketed, the Executive Secretary shall promptly forward to the judge a copy of the complaint and a request for an answer thereto or to any portion thereof specified by the Committee. Unless a shorter time is fixed by the Committee and specified in such notice, the judge shall have 30 days from the date of such notice within which to file his or her answer with the Committee. Such answer shall be filed with the Executive Secretary, who shall, upon receipt of a written request from the reporter, provide to the reporter a copy of the judge's response. In addition to the required answer, the judge may submit to the Committee such other matters as he may choose.

Whenever the Executive Secretary provides a judge with a copy of a complaint against such judge, the Executive Secretary shall at the same time send a copy of the complaint to the chief justice or administrative judge of the court system in which such person serves. In such instances, the chief justice or administrative judge shall send a copy of the complaint to the presiding justice of the particular court in which such person serves.

The Committee requests that you file your response with this office within the next 30 days in accordance with Supreme Court Rule 40 (7) (c).

The Committee has further determined to open a preliminary investigation of this complaint pursuant to New Hampshire Supreme Court Rule 40 (8), *Preliminary Investigation.* *

2

In conducting its investigation, the Chair may require that any statement or written information furnished to the Committee or its employees be given under oath or affirmation subject to the penalties for perjury or false swearing in official proceedings pursuant to RSA chapter 641.

Please be assured that any persons contacted for information shall be informed of their obligation to maintain confidentiality as set forth in section (3).

Thank you for your attention to this matter.

Yours truly,

/s/ *Robert T. Mittelholzer*

Robert T. Mittelholzer
Executive Secretary

RTM

Enc.
cc: The Honorable David D. King (w/ enc.)

*Judge Leary did not participate in this decision..

3

February 10, 2022

FEB 17 2022

Robert T. Mittelholzer
Executive Secretary
132 Chapel Street
Portsmouth, NH



Re: JC-21-072-C

Dear Atty. Mittelholzer:

I received your communication dated January 18, 2022, along with a copy of the transcript of the November 6, 2020 hearing, on January 25. The Committee has demanded that I answer the following questions:

1. My understanding of the wording of the second comment referenced by the transcriptionist;

2. An explanation from me as to how and when this comment was brought to my attention;

3. My understanding as to who would have instructed the transcriptionist not to include the two comments at issue in the hearing transcript.

I shall answer questions 1 and 2 together. Question 3 will follow. I have enclosed a copy of the self report I filed on November 19, 2020 for reference. I have also enclosed two orders with my recommendations that I shall refer to later in this communication.

On November 6, 2020 I presided at a telephonic hearing of approximately four (4) hours duration. I shall inform you that the phone was "muted" on my end so that there would be no interference with the record (papers rustling when reviewing exhibits; courthouse PA announcements; fire truck sirens, etc.). The case concerned parties who had been involved in on-going high conflict litigation since 2015. I had presided at many hearings, including the bifurcated divorce hearing that lasted several days. More than 450 pleadings, documents and orders comprise the 8 files in this matter.

Some time between the November 6 hearing and my November 19 communication with the Committee, Judge David King brought the 2 comments to my attention. The manner by which I was informed was an email from Judge King with 2 "snippets" of the audio recording containing the comments in question. I listened to the snippets and determined that it was certainly my voice. I did not have a copy of any transcript-just what Judge King had emailed.

I discussed the matter with Judge King and determined that a self report would be appropriate. As I wrote in my self report, I did not recall making the comments. To this day, I do not recall making them. However, I clearly did since the voice is mine. In my November 19 letter, I fully addressed the vulgar comment. I made a passing reference to the second comment. I did not expound upon that comment in the November 19 letter because: I do not remember making it; did not know what the comment may have referred to; I did not have a copy of the transcript in order to determine what point in the hearing it was made; and in what context it was made. Hence, the passing reference in the letter.

I reviewed the relevant portion of the transcript you forwarded with the complaint of January 18, 2022. After reviewing that portion, my recollection has been refreshed as to context and the point in the hearing the comment was made. It is essential that the comment be viewed in context and I respectfully request the members to do so.

Mother's attorney, Michael Fontaine, started his direct examination of mother on page 71 of the transcript. (The transcriptionist incorrectly identified Atty. Joseph Caulfield, father's attorney, as the person conducting the examination. Clearly it was Mr. Fontaine). One of the issues I was tasked to determine was whether the children were "mature minors" as referenced in the statute and whether the court must consider their stated preferences regarding contact with father. Both children were in their mid to late teens at the time of the hearing. Mother had raised this issue in previous hearings and pleadings.

The direct examination began approximately halfway into the hearing. Mr. Fontaine started the examination attempting to establish the children's maturity. I invite the Committee to review pages 71-75 of the transcript. As I was listening to the testimony, my thoughts were: what parent in mother's position would make negative comments about their children? However, the questions were somewhat pedantic, obvious and suggestive of the answers he sought. This observation in no way is intended to be critical as I completely understand that counsel was establishing a record in the event of an appeal. Mr. Fontaine then asked a question: "Do they make wise, mature decisions in their daily lives relative to, for example, school work?" A series of similar questions followed. At that point, my thoughts were, in effect: "what do you expect her to say: no they're a bunch of morons?" I clearly was unaware that I verbalized the sarcastic thought.

The comment was directed at no one. My court monitor-seated no more than 5 or 6 feet from me assures me that she did not hear the comment. The comment was my attempt to emphasize in my mind the pedantic nature of the questions-as necessary as the questions may have been. A sarcastic attempt at humor meant only for me. I cannot emphasize this point enough: I do not recall making that comment aloud. The comment clearly was not intended to characterize the children in any manner-again only to comment to myself as to the nature of the questions.

No comment that is contained in the transcript was directed at any person or entity. The comments did not reflect any true feelings or opinion I may have had about anyone involved in the proceedings. The comments had no bearing on any findings and recommendations I made. I have included copies of narratives with my recommendations following that November 2020 heading as well as a hearing at which I presided in August 2021.

Some people have read the comments narrowly, without regard for context. When placed in context of the hearing and the consideration of my thoughts you can clearly see that the comment was directed at no one and never intended to characterize the children in any manner whatsoever. I cannot emphasize enough that point.

Question 3.

I have no idea as to who, if anyone, instructed the transcriptionist to omit the comments from the transcript. I did not make such a request.

I have answered the questions posed by the Committee honestly. I have admitted making the comments and explained the context as well as my thoughts. The comments were not intended to characterize any person and had no bearing whatsoever on any finding or recommendation I made.

I have had the honor of serving the citizens and courts of NH for approximately 35 years–31 as a full time marital master. I have never refused to hear a case-whether high conflict or not. I have retired effective February 1, 2022. I believe that I have served honorably. I am not-and have never professed to be-perfect. I have made my share fo mistakes and gaffes along the way. I own any mistake I may have made. I do not cover up. I have never shifted blame to anyone else. I have always been honest and forthright with my supervisors and with this Committee.

I welcome any invitation to meet with the Committee at its convenience if any member should have any questions regarding this matter-under oath if required. I wish to thank the Committee for the opportunity to respond to the complaint.

Sincerely,

Bruce F. DalPra

STATE OF NEW HAMPSHIRE

JUDICIAL CONDUCT COMMITTEE

JC-21-072-C

EXHIBIT

9

In RE: Master Bruce DalPra

## Respondent's Statements Regarding Statement of Formal Charges

NOW COMES Master DalPra ("Respondent") and states the following in response to the Judicial Conduct Committee's Statement of Formal Charges Pursuant to New Hampshire Supreme Court Rule 40(9).

Master DalPra states the following in response (disputed paragraphs are **bolded**):

I.   Answer to Allegations in Statement of Formal Charges

1.  Master DalPra does not object or contest Paragraphs 1-13

2.  **Master DalPra does not dispute Paragraph 14, but responds to this paragraph in "Audio Issues" below.**

3.  Master DalPra does not object or contest Paragraphs 15-22.

4.  Paragraphs 23-29 contain information outside Master DalPra's knowledge.

5.  Master DalPra does not object or contest Paragraphs 30 and 31.

6.  Paragraph 32 calls for information outside Master DalPra's knowledge. See below.

7.  **Master DalPra does not dispute that the JCC alleges violations of the Code of Judicial Conduct in Paragraph 33, but disputes that he violated the Code as discussed below**.

8. Master DalPra does not object or contest Paragraph 34.

9. **Master DalPra does not dispute that the JCC alleges violations of the Code of Judicial Conduct in Paragraph 35, but disputes that he violated the Code as discussed below.**

10. Master DalPra does not object or contest Paragraphs 36-38.

11. **Master DalPra disputes Paragraph 39.**

12. Master DalPra does not object or contest Paragraphs 40 and 41.

13. **Master DalPra disputes Paragraph 42.**

14. **Master DalPra disputes Paragraph 43's characterization of facts.**

15. **Master DalPra disputes Paragraph 44's characterization of facts.**

16. **Master DalPra disputes Paragraphs 45 and 46.**

17. Master DalPra does not object or contest Paragraph 47.

18. **Master DalPra disputes Paragraphs 48 and 49.**

19. Master DalPra does not object or contest Paragraph 50.

20. Paragraph 51 contains information outside of Master DalPra's knowledge and involves speculation.

21. **Master DalPra disputes Paragraph 52's characterization of facts and contains information outside Master DalPra's knowledge.**

22. Master DalPra does not object or contest Paragraph 53.

23. Master DalPra does not object or contest Paragraph 54.

24. **Master DalPra disputes Paragraph 55.**

25. Master DalPra does not object or contest Paragraph 56.

26. **Master DalPra disputes Paragraph 57 and all its sub-parts.**

II. Respondent's Claims

27. This statement is proffered in response to JCC's June 16, 2022 request for additional information. I have retained representation and reviewed discovery provided to them in this case.

28. This statement represents my recollections as best as I can provide them, bolstered by information provided to my lawyers.

29. In my self-report statement I noted two things that were said on the record that were inappropriate. This self-report was triggered by an email sent to me from Judge King ("King Email"). The email, dated November 13, 2021, contained two audio files attached and two snippets of the transcript taken out of context, indicating that there were two statements that were problematic, one relating to "Who gives a fuck" and the other, which was only partially complete, "...bunch of morons." There was no other context provided. As I have noted in prior statements I had no independent memory of making these statements. Without context, which has since been provided to me, or memory of what was said, I could not recall why either statement was made or who the referent was in the "bunch of morons" comment.

30. I assumed that this email was provided at the outset of the process to the Committee along with the audio and two snippets from the transcript. I only recently learned that this was incorrect. This assumption informed both of my prior statements.

Conflict Statement

31. Judge King is likely to be a witness in this case. I am aware that he and Attorney Waystack were law partners. I have reviewed the Rules of Professional Conduct, the Judicial Canons, and the discovery in this case. I have also consulted with counsel.

32. Based on all of this I do not believe that Attorney Waystack service in this matter is a conflict. However, even if it were, I am willing to waive such a conflict and I believe that

this prior relationship will have no impact on my case or the determinations made by the JCC in this case.

First Comment

33. I noted making a statement during Dana Albrecht's testimony. In response to lengthy testimony about matters not relevant to the proceedings, in particular Mr. Albrecht's concern about his children being deprived of his homemade holiday dinners, I muttered under my breath something to the effect of "who gives a fuck." It is important to note that I had and have no memory of muttering this under my breath. I was not even aware I said it until Judge King provided me with audio from the proceedings with a voice that is clearly mine. The audio provided to me was inaudible. At the time I made the self-report, I mistakenly misquoted the snippet of the transcript contained in the King Email. The misquote was a slight one and completely unintentional.

34. Upon review by the transcript service with the aid of noise cancelling technology, it appears that I said "who gives a fuck" instead of "who the fuck cares." While this is a difference, I believe it is one without distinction. The recollection of what was said in my self-report was technically different than what the transcript revealed, but this was not because I was trying to deceive anyone or conceal anything. Instead, this was my attempt to reconstruct what was said based on inaudible audio and a complete lack of personal memory.

35. I also assumed, wrongly, that the King Email with the actual phrase had been provided ot the Committee from the outset, obviating the need for me, in my mind, to provide verbatim quotes.

Second Comment

36. I also noted making a statement during Katherine Albrecht's testimony. At the time of my self-report, again without any memory of making the statement and relying on a poor quality audio recording, I disclosed that I "uttered a sentence that was completely inappropriate."

37. The audio regarding the second statement was, in part, clear enough for me to hear the final portion of the phrase. The King Email also provided me with a snippet of the transcript.

38. Both the audio and the quote were separated from the full recording and transcript. Instead they were selected and provided to me in isolation. As such, I did not know at the time of my self-report what I was referencing when I said the "...bunch of morons" comment. This is why I did not expound on what was said and instead simply stated that I "uttered a sentence that was completely inappropriate."

39. As the Committee's own Formal Statement of Charges notes: "None of the members of the Committee was able to discern the content of the second comment made by Master DalPra during the mother's testimony as referenced in Master DalPra's self-report." See Paragraph 14, Formal Statement of Charges. This claim makes clear that neither myself nor the Committee had a shared understanding of the facts regarding the Second Comment. I heard it and saw the quote but did not have the context. The Committee apparently did not hear it nor did it have the quote. I did not know there was a gap between what each side understood until much later. For more on this see "Audio Issues" below.

40. I referred to the second comment as an "inappropriate comment" because: 1) I did not know the context in which it was made; 2) I had no independent memory of making the comment; 3) the audio, as I heard it, was clear; and 4) because I wrongly believed that the snippet of the transcript that described what was said was provided to the Committee

at the outset. Operating under the incorrect assumption that the King Email had been provided to the Committee, I believed there was nothing more I could add other than saying it was an inappropriate comment.

41. As the Formal Statement of Charges also makes clear, it took extraordinary technological means to clarify what was in that specific passage. See Paragraph 28, Formal Statement of Charges. Based on the timing of the comment, the nature of how I conduct hearings, and the fact that I had already said something under my breath that was both inappropriate and picked up by the microphones, I assumed the comment was inappropriate without knowing the context of the comment. I did not omit the contents of this comment intentionally nor did I intend to hide or conceal what was said. In fact, I assumed that the Committee heard the audio as I did, making it clear what was said, and saw the quote from the transcript which also made clear what was said.

42. If concealment was truly my motive, I would not have bothered to self-report in the first place, especially knowing, as all judges do, that the entire proceeding was audio recorded and had multiple witnesses.

43. It is important to note the context of the second statement now that I have had access to the full transcript, namely the claim "Of course not, they're a bunch of morons." Under RSA 461-A:11(e) a "court may give substantial weight to the preferences" of a minor in terms of which parent they wish to live with if they are qualified as a mature minor. In this case, for reasons previously litigated, two of the children had no interest in living with their father. Attorney Fontaine was walking his client, Katherine Albrecht, through facts needed to establish that her children were mature minors, thus giving them some say with whom they lived. It was clear from prior hearings that they were mature minors and quite remarkable children. It was also clear that this is what Attorney Fontaine was doing. Finally, it was equally clear that this mother, like virtually all mothers, would not say something bad about her own children.

44. The comment was a sarcastic one based on how obvious it was that they were mature minors. Both legally and factually, it was absolutely clear that they would meet the standard and it was equally clear that the mother would never say something negative. The comment then was not commentary on the children or their intelligence, but on the absurdity of the testimony in light of what the statute requires. Because of the formulaic nature of the law, in particular, in the application of statutes, it is often the case that lawyers will be required to restate the obvious multiple times simply to ensure they meet the relevant legal standard. That is what was happening here and my comment was merely a bit of self-entertainment regarding the absurdist nature of the proceedings at that point. This comment was irony and sarcasm, not denigration–these were extraordinary children living through a horrific divorce. At the time the comment was made, I was simply stating to myself how obvious the outcome of the legal argument would be.

## Audio Issues

45. I have listened to the audio as have my counsel. The two portions of audio were sent in .trm files, which is a proprietary file extension used by For the Record, an audio recording platform used by the New Hampshire Court System.

46. When I listened to the audio originally, I did so on court-provided equipment and do not recall which audio codec I used. It was likely For the Record. When I first heard the audio the first portion was inaudible but clearly my voice. The second portion was partial audible and clearly my voice. I did not know the context or referent, but I could hear "...bunch of morons." I knew the content of the first portion because of the snippet from the transcript included in the King Email.

47. My counsel and I also examined the audio. They used the most recent version of For the Record as of August 2022. The first comment is, again, completely inaudible. The last portion of the second comment is partial audible and towards the end I can be heard saying "...bunch of morons."

48. According to the Formal Statement, this is different than how this audio was heard by the Committee. I do not know how or why the audio was heard differently by the Committee. I do not know what format, file, or codec they used. Based on information and belief, the Committee may have listened to the audio on Windows Media Player.

49. In Paragraph 14 of the Formal Statement, the Committee states that it could hear the first comment, but not the second.

#### Other Issues

50. I will state now and for the record that I have no access to or knowledge of the process by which transcripts are produced. I did not direct anyone to transcribe this proceeding in a particular way. In fact, once transcripts are requested and that request is granted, I have no role in reviewing the recording or producing the document whatsoever. I don't even know who does this for the court or how I could reach out to them. I did not and would not ever attempt to alter a transcript. I did not and would not do that in this case, either.

51. Additionally, there were other comments on the revised transcript that did not appear in the original. Some of these comments were inappropriate mutterings as referenced in the revised transcript. Others were my overt attempts to redirect court staff during down time in the hearing. One was a comment I made about my need for a break ("I have to pee.").

52. Discussions of baseball are, of course, not germane to the case. However, at the time these discussions of baseball occurred, the hearing was at recess. As many lawyers and judges know, some court proceedings, such as those in this case, are exceptionally stressful, not just for litigants, but others involved. Switching topics during down time is a courtroom management technique that I have developed over decades of service that accomplishes three critical things: 1) it creates an *esprit de corp* among staff giving all of us a bit of insight into each other as people; 2) it provides a point of relief and a way of easing tension; and 3) it helps keep off-record, case-related comments to a minimum by filling the silence with something completely different than the case. I happen to be a baseball fan and court staff in this proceeding was aware of that and so, in order to ease tension and further buttress bonds among all of us, we engaged in light banter about the Red Sox, team management, and starting pitchers. This was not a sign that I was distracted or did not care about the proceedings, but instead, as stated above, a way of helping all of us on the court staff refocus when the proceedings recommenced. Filling these silences with off-topic discussions also helps limit comments made by staff during down time that could unfairly impact one side of the other, especially when some participants were not present.

53. The comment regarding the restroom was crass and more internal monologue than anything else. It was akin to an inadvertent burp on the record—inappropriate but innocent. It also has no impact on the case I was hearing whatsoever.

54. Indicative of this entire process, even the Revised Transcript contains errors and places where who and what was said is unknown.

   a. In terms of errors, starting on page 78, line 25, the transcript incorrectly reflects that Attorney Caufield, not Attorney Fontaine is conducting the direct examination of Katherine Albrecth. Both the records of the hearing and the context of the hearing make clear this is incorrect. This error occurs multiple times thereafter.

<u>See</u> Revised Unabridged Transcript at pg. 80, line 22; pg. 81, lines 11 and 15. The error was caught first on page 99, line 13, where Attorney Fontaine is noted as the questioner.

b. Additionally, even with the enhanced audio equipment many comments were marked as "indiscernible." See Revised Unabridged Transcript at pg. 15, line 20; pg. 17, line 8; pg. 19, line 19; pg. 26, line 22; pg. 51, lines 19 and 20; pg. 52, lines 2 and 5; pg. 61, line 17; pg. 63, line 18; pg. 65, line 11; pg. 68, lines 1, 13, and 25; pg. 69, lines 1 and 2; pg. 72, line 24; pg. 91; line 22; pg. 128, line 1; pg. 131, line 11; pg. 133, lines 18 and 19; pg. 134, line 19.

c. There were more than 20 instances in which the Revised Unabridged Transcript does not identify the speaker.

55. The Formal Statement references my failure to sign the second statement I submitted to the JCC. This was a simple omission and was not an attempt to disclaim the statement or conceal my identity, especially given the context in which the statement was submitted and the contents of the statement. Only I could have known those things and I had already submitted a signed self-reporting statement.

<u>Conclusions</u>

56. Simply put every human being has, at times, muttered things to themselves under their breath. In this case, these private mutterings were barely picked up by the court's audio. These mutterings, like in this case, are not wise insights or phrases worthy of poetry, but almost exclusively venting. Additionally, given the way in which human beings make these utterances, like the pain from a stubbed toe, they evaporate from the mind quickly. Virtually no one can remember the exact phrase they muttered to themselves the last time someone cut them off in traffic or almost hit them at an intersection. These

utterances are fleeting expressions of frustration. That is exactly what these two comments were, nothing more. The fact that I did not remember making them is not uncommon and a sign that they were simply fleeting expressions of frustration. The fact that no one at the time heard them is also not uncommon. I do not know why they were not included in the first transcript but show up in the second. My memory of these comments was so devoid that even after hearing a poor quality audio recording of them, I did not remember exactly what was said, only that they were inappropriate.

57. I reported myself to this committee because, upon learning that I said things that were inappropriate, I believed the Canons of Judicial Conduct required me to do so. I have no dispute with the initial findings and I accept any reasonable punishment that may be due to me because of what I disclosed in the self-report.

58. I wrongly assumed both that the Committee had heard the audio as I did and received the King email inclusive of the snippets of the transcript at the outset. I only recently learned they did not. These differences account for why the Committee could perceive my actions as being misleading when, in my mind, they were fully disclosive. I believed that my self-report was contextualized by the King Email, such that what was said was clear, even if the context was not.

59. At the time of the self-report I did not have sufficient context to explain either comment beyond what I stated in my self-report. Now I have the advantage of three different pieces of information: 1) the Committee hearing the audio differently; 2) the Committee lacking the King Email with quotes from the transcript; and 3) the full unredacted transcript. With those three things, I can make this statement with better knowledge of the situation.

60. Given that better understanding, I dispute and object to any notion of any kind that I intended to conceal or mislead this committee, Judge King, the Circuit Court, or the Supreme Court. I reject the notion that I violated Canon 2, Rule 2.16(A) wholesale and

without reservation.  I have built a career on my reputation for being honest, fair, expeditious, and forthright.

61. I have a history of taking the most difficult and most contentious family law cases and I am widely respected both for doing this and my knowledge of family law. Over the course of my career I have a record for fairness and, at the same time, creating a sense of teamwork and support among court staff who also wade into these difficult waters with me. All of this is evidenced by my self-report here and over three decades of judicial service to the families of New Hampshire.

62. As stated above I will accept any reasonable punishment for conduct contained in the self-report. There is no disputing what I did and I do not seek to diminish my conduct or avoid accountability. I do dispute that I was deceptive or tried to conceal information. These claims arise from a lack of shared understanding of the facts between myself and the Committee. With fuller knowledge of what the Committee knew I hope that this third statement provides complete and comprehensive answers to questions regarding what I did and what I knew.

Date: August 17, 2022                                   Respectfully submitted

                                                        Bruce DalPra

THE STATE OF NEW HAMPSHIRE

JUDICIAL CONDUCT COMMITTEE



Case Number: JC-21-072-C

**In RE: Marital Master Bruce F. DalPra**

**Stipulation Concerning Revised - Unabridged Final (Transcript) With Timestamps**

The State of New Hampshire Judicial Conduct Committee (JCC) and Marital Master Bruce F.
DalPra (DalPra), hereinafter referred to collectively as the Parties, stipulate and agree as follows:

1. The Parties agree that the Revised - Unabridged Final (Transcript) with Timestamps,
   dated 4/7/2022 and digitally signed by Dena Farbman, hereinafter referred to as the
   "transcript" is authentic and is what it purports to be, namely a transcript of the
   November 06, 2020 hearing in the matter of Dana Albrecht, Petitioner, and Katherine
   Albrecht, Respondent, 9th Circuit Court – Family Division – Nashua, Case Number:
   659-2016-DM-00288.

2. That DalPra admits that the utterings attributed to "the Court" on Appendix A to the
   transcript as stated in the JCC Statement of Charges, dated June 16, 2022, are
   accurate and were made by him during the course of the hearing.

3. The Parties agree that the transcript and Appendix A are admissible in any proceeding
   in this matter without the necessity of calling any authenticating witness or custodian
   of the records.

Judicial Conduct Committee,

9/6/2022

Bruce F. DalPra by,

```
                                                            1

1                 STATE OF NEW HAMPSHIRE

2          9TH CIRCUIT COURT - FAMILY DIVISION - NASHUA

3   IN THE MATTER OF:          ) Family Division Case No.
                               ) 659-2016-DM-00288
4   DANA ALBRECHT,             )
                               )
5            Petitioner,       )
                               ) Nashua, New Hampshire
6          and                 ) November 6, 2020
                               ) 11:37 a.m.
7   KATHERINE ALBRECHT,        )
                               )
8            Respondent.       )
    _____ )
9
                        HEARING ON MOTIONS
10              BEFORE THE HONORABLE BRUCE DALPRA
        MARITAL MASTER OF THE CIRCUIT COURT - FAMILY DIVISION
11
              REVISED – UNABRIDGED FINAL WITH TIMESTAMPS
12
    APPEARANCES (All present by video or telephone):
13
    For the Petitioner:         Joseph Caulfield, Esq.
14                              CAULFIELD LAW AND MEDIATION
                                OFFICE
15                              126 Perham Corner Rd
                                Lyndeborough, NH 03082
16
    For the Respondent:         Michael J. Fontaine, Esq.
17                              WELTS, WHITE & FONTAINE, P.C.
                                P.O. Box 507
18                              Nashua, NH 03061

19  Also Present:               Kathleen Sternenberg
                                GAL
20
    Audio Operator:             Electronically Recorded
21                              **Not Monitored**

22  TRANSCRIPTION COMPANY:      eScribers, LLC
                                7227 N. 16th Street, Suite 207
23                              Phoenix, AZ 85020
                                (800) 257-0885
24                              www.escribers.net
    Proceedings recorded by electronic sound recording; transcript
25  produced by court-approved transcription service.
```

2

```
1                        I N D E X

2   WITNESS(ES)      DIRECT    CROSS    REDIRECT    RECROSS

3   FOR THE PETITIONER:

4   Dana Albrecht        4        40        66

5   Dana Albrecht      126
    (rebuttal)
6

7   WITNESS(ES)      DIRECT    CROSS    REDIRECT    RECROSS

8   FOR THE RESPONDENT:

9   Katherine Albrecht 78        126

10

11  MISCELLANEOUS                            PAGE

12  Petitioner Rests                          74

13  Respondent's Opening Statement            74

14  Respondent Rests                         137

15  Matter Taken Under Advisement            130

16

17  EXHIBITS                            ID    EVD

18  NONE

19
```

3

1     (Proceedings commence at 11:37 a.m.)

2         THE COURT:  Good morning, Atty. Caulfield?

3         MR. CAULFIELD:  Yes.

4         THE COURT:  Atty. Fontaine?

5         MR. FONTAINE:  Good morning, Judge.

6         THE COURT:  My name is DalPra.  You folks are

7   connected to the courtroom, and we're here on four pleadings.

8   And they both are pretty much -- the first two pleadings filed

9   by Mr. Albrecht regarding a modification of the parenting

10  plan, and the second two pleadings filed by Mrs. Albrecht with

11  pretty much the same requests, modification of the parenting

12  plan.

13        I'll tell you at the outset that the several hundred

14  pages of exhibits have not been reviewed to date.  And for the

15  record, all the exhibits will be marked for identification,

16  and I will make a determination following the hearing as to

17  which documents should be submitted as full exhibits and which

18  aren't.  So we won't have any argument on those at this point.

19        Mr. Caulfield, these are your motions; you may

20  proceed.

21        MR. CAULFIELD:  Yes, Your Honor.  I -- I just want

22  to point out that that doesn't clear up the docket as they set

23  forth in Petitioner's --

24        THE COURT:  I don't care whether it clears the

25  docket up or not, counsel.  The order that went out said that



4

1  these four motions are what we're hearing today, and that's

2  what I'm hearing today.

3          MR. CAULFIELD:  Yes, Your Honor.  And -- and -- and

4  also, there's a couple of motions that both parties have

5  signed that are sort of in the nature of in limine motions.

6          THE COURT:  Proceed.

7          MR. CAULFIELD:  Yes, Your Honor.  Call Dana Albrecht

8  to the stand, please.

9          THE PETITIONER:  I'm here.

10          MR. CAULFIELD:  Okay.  Dana, could you raise your

11  right hand, and swear that what you testify to today will be

12  the truth, the whole truth, and nothing but the truth?

13          THE PETITIONER:  Yes.

14              DANA ALBRECHT, PETITIONER, SWORN

15                   DIRECT EXAMINATION

16  BY MR. CAULFIELD:

17      Q  Okay.  Would you please state your name for the

18  record, sir?

19      A  Dana Albrecht.

20      Q  Where do you reside, sir?

21      A  Nashua, New Hampshire.

22      Q  And are you the defendant (sic) in this divorce and

23  petition to modify?

24          THE COURT:  He's the --

25      A  I am the Petitioner in the --



5

```
1            THE COURT:  -- Petitioner.

2       A  -- divorce.

3  BY MR. CAULFIELD:

4       Q  Yes.  And you are also the moving party, the

5  Petitioner, to modify, correct?

6       A  Yes.

7       Q  Now, you have -- you have a filed a sworn offer of

8  proof in this case, have you not?

9       A  Yes.

10      Q  And if you were to testify, would that be your

11 testimony, sir?

12      A  Yes.

13      Q  Okay.  And that -- and that described, basically, why

14 you feel the Court should order this family into counseling?

15      A  Absolutely.

16      Q  Okay.  Now, in addition to your sworn offer of

17 proof --

18           MR. CAULFIELD:  And Your Honor, I -- I guess I need

19 to know if you accept that sworn offer of proof.  If not, I

20 would have my client testify to it.

21           THE COURT:  I'll need testimony, counsel.

22           MR. CAULFIELD:  Okay.

23 BY MR. CAULFIELD:

24      Q  Dana, direct -- directing -- I'm going to question you

25 on the substance of your sworn offer of proof.
```



6

1      A   All right.

2      Q   So -- so let's start with, how old are you, sir?

3      A   I'm 49.

4      Q   Okay.  And what do you do for a living?

5      A   I'm unemployed.

6      Q   Okay.  What's your education, sir?

7      A   I have a master's from Harvard in applied mathematics.

8      Q   Okay.  And were you married to Dr. Katherine Albrecht?

9      A   I was.

10     Q   Okay.  And you're divorced?

11     A   Correct.

12     Q   Okay.  And do you have any children?

13     A   Yes.

14     Q   Okay.  Could you tell us, please, about your children

15  together?

16     A   My oldest child is ███.  He is 23.  He lives with me

17  here in Nashua, New Hampshire, and has for the past couple --

18  almost couple years, since Christmas of 2018.  My next son is

19  ███.  He is currently 20.  I understand that he is with his

20  mother in Southern California due to dorms being closed at

21  college because of COVID.  My next daughter is ███.  She is

22  currently age 16, residing with her mom in Sierra Madre,

23  California.  And my youngest daughter is ███.  She is

24  currently 13, residing with her mother in Sierra Madre,

25  California.  ███ attends Maranatha High School.  ███

7

1    attends Flintrith -- Flintridge Sacred Heart Academy.

2        Q   Now, let me -- I'm sorry, were you saying something

3    else?

4        A   No, go ahead.

5        Q   Oh, okay.  Now, do you have any substance abuse

6    history?

7        A   No.

8        Q   Okay.  Have you ever been convicted of a crime?

9        A   No.

10       Q   Okay.  Have you ever had a complaint that DCYF

11   determined to be founded?

12       A   No.

13       Q   Okay.  There is -- there is a DV restraining order

14   against you, correct?

15       A   Correct.

16       Q   Okay.  Very briefly, would you tell us how that

17   occurred?

18       A   Yes.  I was at the -- putting a pleading to the court.

19   It's still outstanding from over a year ago now.  When that

20   wasn't ruled on, I went to Collinsville Bible Church on

21   Sunday, November 3rd, 2019 in an attempt to see or have some

22   contact with my children, ███, ███, and ███, who were

23   attending at that time.  There was no prior prohibition in

24   place for me to go there.  And quite frankly, I am confused

25   why I have a DV because I'm not aware of two events that would

8

1  cause one to have me (sic).  So I was there for just one day,

2  and I was just trying to see my kids.

3        Rob Cooper told me I could come back on a different

4  day --

5        MR. FONTAINE:  Your Honor, Your Honor.  Your Honor,

6  I'm going to object.  This -- there -- there was a extensive

7  trial on this matter.  There was findings and rulings by the

8  Court, which are actually at our -- are part of our exhibits.

9  This -- this shouldn't be an opportunity for him to retestify

10  and recharacterize his testimony at the previous hearing.  The

11  judge already made findings on that.  I object to this.

12        MR. CAULFIELD:  Your Honor, one -- once -- the

13  statute talks about someone being a fit parent.  I want to

14  show that Mr. Albrecht is a fit parent.  The only blemish on

15  his record is the second DV that Ms. -- that Dr. Albrecht has

16  brought.  I think he's entitled to explain what happened.

17        THE COURT:  It sounds like he's trying to relitigate

18  the -- the hearing.  I'm going to be bound solely by the

19  findings of the court in the -- the prior court in that -- in

20  that matter, at this point.  I'll note that the only

21  quote/unquote blemish on his record, as you put it, counsel,

22  is that there was a domestic violence entered against him.

23  Other --

24        MR. CAULFIELD:  Thank you, Your Honor.

25        THE COURT:  Other than that, you may proceed.



9

1          MR. CAULFIELD:  Thank you, Your Honor.

2    BY MR. CAULFIELD:

3          Q   Now, I want to -- I want to go over, Mr. Albrecht,

4    what your contacts with these children have been over the last

5    several years, to the end of how little your contact has been

6    with these children.  Would you briefly explain that to Master

7    DalPra?

8          A   So the date of separation was April 8th, 2016.  During

9    the first portion, while they were still in California, I

10   believe it was 38 days total I saw them.  They moved out --

11   they moved to Pasadena September 1st, 2017, I believe.  And

12   since Christmas 2018, which is one year and ten months, I have

13   not been able to see them at all.  And I don't even know what

14   phone number or email address I should even use to reach out

15   to them.

16         Q   Have you made any attempts to see these children?

17         A   Absolutely.

18         Q   Could you -- could -- could you -- could you go over

19   the attempts that you've made to see these children?  And if

20   you -- and if there are any exhibits that you filed in this

21   case that -- that refer to your testimony and supports your

22   testimony, could you please reference them?

23         A   Yes.  So first, I'd like to reference what I refer to

24   as exhibit group B, which are Exhibits Number 7 through 28.

25         Q   Okay.  One moment, please.  I need to slide over to my



10

1   PC to bring that up.  So this is -- this is your -- this was

2   your first exhibit list?

3        A   Yes.

4        Q   And what group is it -- would you tell me what group

5   it is again, please?

6        A   Group B, starting with Exhibit 7.

7            MR. CAULFIELD:  Your Honor, do you -- are you -- are

8   you going to be looking at these now or just making notes, or

9   should I wait for you?  Or what should we do?

10           THE COURT:  I have them with me.

11           MR. CAULFIELD:  Okay.

12  BY MR. CAULFIELD:

13       Q   So what -- so continue, Mr. Albrecht.

14       A   Okay.  So January 15th, Exhibit 7, you requested, I

15  believe twice, for the kids to come out here for their spring

16  vacation.  We provided even forms for unaccompanied minors for

17  ███████'s travel.  We never received those back, and the kids

18  did not make it on the plane.  That's starting with their

19  spring vacations.

20           When we get to summer -- hang on.  One moment here.

21  So that's starting with Exhibit 8.  I'm very frustrated

22  because the kids were here at camp, at The Wilds of New

23  England --

24           MR. FONTAINE:  Your Honor -- Your Honor, this is

25  Mike Fontaine.  I object to this.  This -- this was litigated



11

1   at length before you at a motion hearing regarding the

2   December -- Christmas -- the December 2018 Christmas fiasco.

3   And the -- the -- this information is going back in time.

4   This is -- you -- you made orders and you made findings in

5   your orders at -- after that motion hearing pertaining to the

6   December incident that took into account all these same

7   arguments.  He's rearguing this case and attempting to reargue

8   these points all over again, and they've been litigated before

9   you.  It's wasting your time and our time having to listen to

10  this all over again.

11              THE COURT:  I'll allow it as --

12              THE WITNESS:  We never discussed the summer of 2019.

13              THE COURT:  I'll allow it as background, counsel.

14              Please continue.

15              MR. CAULFIELD:  Thank you, Your Honor.  Thank you,

16  Your Honor.

17       A   In the summer of 2019, my children were in New England

18  at The Wilds of New England associated with Collinsville Bible

19  Church.  I didn't know that.  So Exhibit 8, Atty. Fontaine

20  wrote a letter that didn't include that information.  And

21  because I was unaware and we notified them I wanted parenting

22  time, we, meaning ▮▮▮▮ my older son and I, flew out to

23  Southern California in an attempt to exercise our summer

24  parenting time from July 31st, 2019 through August 14th, 2019.

25  That's two out of the four weeks that the Court awarded me.



12

1          After we got there, we were very shocked to learn that

2     Katherine had put them on a plane before I even left and sent

3     them to the east coast.

4          She told the Sierra Madre police -- one moment -- that

5     their father does not know.  That would be Exhibit 40.  So

6     even before I got there, she told the Sierra Madre Police that

7     I didn't know they were in camp.  And that's why I went, in an

8     attempt to see my children per the Court's parenting plan.

9          Should we move onto --

10    BY MR. CAULFIELD:

11        Q  I would -- I would -- I -- I -- I would move on, yes,

12    rapidly; as rapidly as you can, but still prove the case.

13    Yes.

14        A  Okay.  So -- so when we got back -- so again, this

15    exhibit group B, it's the chain of correspondence between

16    attorneys.  I missed the email that's Exhibit 9 or 10 at the

17    time.  They were alleged to be sent by my daughters.  Those

18    were sent while they were here at Collinsville Bible Church,

19    so I actually didn't see those before I left.

20        Q  If may -- if may -- if I can maybe, Mr. Albrecht, you

21    reference --

22        A  Yes.

23        Q  -- the -- the attempts that you sought to exercise the

24    parenting rights that Master DalPra gave you, the -- the

25    attempts --



13

1    A   Okay.

2    Q   -- in other words, that -- that may well be an

3    exhibit.  And then what your result was, and then I think you

4    could just reference the exhibit and Judge -- and Master

5    DalPra can -- if he wants to, can look at the letter and learn

6    more.  I -- I think that's --

7    A   Okay.

8    Q   -- probably sufficient and it would help you move --

9    A   I --

10   Q   -- and it would move the business, Mr. Albrecht.

11   A   Okay.  I tried and failed.  We flew all the way across

12   the country.

13       Moving on, November -- so moving on.  When I learned

14   that they were out here, we -- or when Katherine brought

15   ████, ████, and ████ out here, we requested that the Court

16   provide parenting time.  That motion was never ruled on, so

17   that's still pending.  So I wasn't -- and that's when I tried

18   to go to the church Sunday to see them.  So as we know, that

19   didn't work out.

20       So next up, Exhibit 14, November 7th, we had a request

21   for me to go out to California for a weekend that the Court

22   has awarded I can see them in a reasonable amount of time, ten

23   days' notice, so we did that.  I -- that was 11/7.  The

24   following day, Katherine responded by filing her DV, so that

25   didn't work out.  Or -- I believe that also references me



14

1   wanting to see them during Christmas, December 27th through

2   31st, which the Court awarded me.  That didn't work out.

3        Q  You say "that didn't work out".  What -- what do you

4   mean?

5        A  Quite frankly, it's my understanding that Katherine

6   was not amenable to that happening, and I actually didn't just

7   get off a plane that time.  I wasted my time the last time I

8   did that.

9        Q  Okay.

10       A  And there was also a lot of court pleadings going on

11  at that time.  We -- on December 13th, 2019, we proposed --

12       Q  Is there -- is there -- is there an exhibit regarding

13  that, Mr. Albrecht?

14       A  Yes, Exhibit 17.

15       Q  Thank you.  And it'd be helpful if you reference the

16  exhibits for Master DalPra.

17       A  Okay.  So Exhibit 17, December 13th, 2019, we tried to

18  get Craig Childress onboard as a reunification counselor.  If

19  there's a relationship problem with my children, I'd like to

20  see a counselor about that.  I'd like to be able to have them

21  see a counselor about that and figure out what the issue is.

22  So Exhibit 17, trying to get Craig Childress, whom Katherine

23  rejected, so that didn't work out.  Moving on to --

24       Q  So by -- excuse -- excuse -- excuse me, Mr. Albrecht.

25  "That didn't work out" --



15

1   A   Yeah.

2   Q   -- "that didn't work out", "that didn't work out".
3   You mean that you didn't have parenting?

4   A   I didn't have parenting and Katherine didn't
5   cooperate.

6   Q   Thank you.

7   A   Exhibit 18, we sent a letter quoting that the Court
8   order asking for me to be able to place calls to both █████
9   and █████ on phone numbers.  The Court wanted us to work out
10   phones, Skype, and FaceTime with them December 20th, 2019, so
11   close to a year ago.  And Katherine was uncooperative with
12   that and was unwilling to set up any phones, Skype, or
13   FaceTime with █████.  So I wasn't even -- was unable to
14   discuss the Christmas holiday period with them.

15        Exhibit 18, we also offered to travel to Southern
16   California for the weekend of January 11th and 12th, 2020, for
17   parenting time.  And Katherine basically refused to have that
18   happen.

19        And also notes we gave them, I do believe
20   (indiscernible) any reunified -- reunification counselor, but        █████ **[DF1]:** 11:58:08
21   Katherine was not amenable to that.

22        Moving on to Exhibit 19, we requested parenting time
23   for the children's spring and school vacations 2020 as awarded
24   by the Court.  I was hoping that my entire extended family --
25   my Aunt Karen, my cousin Liz, Linda, Karen's granddaughter,

16

1   Valerie -- all the people on my side of the family that ████

2   and ████ have historically been able to see would be

3   delighted to see them.  I was also hopeful that they would

4   want to spend time with their brother ████ who lives with me.

5   And Katherine again refused reunification counseling and did

6   not want to follow the Court's parenting plan for those spring

7   vacations.

8        And the only response we got from Atty. Fontaine was

9   if I wish to communicate with them, it would have to be postal

10  mail only.  And he asked that I send letters and cards, which

11  I did.

12      Q  Excuse me, Mr. Albrecht; is -- is there some exhibit

13  that supports that testimony?

14      A  Yes.

15      Q  Would you tell us --

16      A  Yes, Exhibit 23 is the card I sent to ████ and

17  Exhibit 24 -- excuse me, the card and letter I sent to ████,

18  and Exhibit 24 is the card and letter I sent to ████ (sic).

19      Q  What happened next, Mr. Albrecht?

20      A  July -- we also asked for the four weeks of court-

21  awarded parent -- parenting time July 8th, 2020 through August

22  1st, and also August 8th through August 22nd.  We proposed

23  those dates specifically, noting that we were, of course,

24  amicable to alternate dates if those would work better for

25  Katherine.  And we asked Katherine to bring ████ and ████

17

1   to Sierra Madre Police Department, Sierra Madre, California,

2   for a parenting stage, and Katherine did not agree.

3       Q   Is that memoral -- memorialized in --

4       A   So I didn't fly out.

5       Q   Is that memoral -- memorialized in an exhibit?

6       A   The request is Exhibit 21, and the response from Atty.

7   Fontaine is Exhibit 22.

8       Q   That's (indiscernible).                           **Commented [DF2]:** 12:00:55

9       A   So there was some concern whether they actually got

10  that because Exhibit 25 --

11      Q   Got -- got -- excuse -- excuse me, Mr. Albrecht.  Got

12  what?

13      A   That the children even got the cards because Exhibit

14  25, they're signed for her agent, and it's not until almost

15  three weeks later that we get a response from Nadine

16  (phonetic) -- that's Exhibit 26 -- that Katherine said that

17  the girls' weren't received.  So I'm not sure it took them

18  three weeks after they arrived to the girls to get those, but

19  that's neither here nor there.

20          We next asked on Dec -- on September 18th, 2020,

21  because Katherine rejected our first proposed counselor, Dr.

22  Craig Childress.  We proposed four more; that's Exhibit 27.

23      Q   So what -- excuse me for one moment.

24      A   And --

25      Q   Excuse me one moment.  So you -- you proposed a Dr.

18

1  Craig Childress.  Now, is -- is -- how did you find him?

2       A  I simply went on the internet looking for who I

3  thought was the best qualified person in the immediate

4  geographic area.  So -- which is in --

5       Q  Okay.

6       A  -- Claremont --

7       Q  And so --

8       A  -- you know, (indiscernible) California.

9       Q  Okay.  And Dr. Albrecht rejected him?

10      A  Correct.

11      Q  Now, did -- now, you propose some other people?

12      A  Yes.  So again, we're on Exhibit 27 where we proposed

13  Carey Edwards, attorney (phonetic), Renee A. Cohen, Ph.D.,

14  Lynn Steinberg, Ph.D., and Alan Yellin, Ph.D.

15      Q  And -- and --

16      A  I --

17      Q  And excuse me for a moment.  And are their curricular

18  vitaes and their fees set forth in the exhibit?

19      A  Yes, I was just --

20      Q  Not the exhibit --

21      A  -- about to get there, that their CVs are set forth in

22  Exhibits 1 through 5, one CV for each reunification counselor.

23  And Exhibit 6 is their fees.

24      Q  And what was Dr. Albrecht's response to these

25  additional five reunification therapists you proposed?

**Commented [DF3]:** 12:02:25

19

1        A   She did ask for fees, which she provided.   After that,
2    we attempt --
3        Q   You mean -- you mean, their -- you mean -- excuse me;
4    you mean their fees, correct?
5        A   Their fees, yeah.
6        Q   Okay.   Gotcha.
7        A   But after that, repeated requests, I believe, through
8    counsel, did not get any response back from her on those.
9        Q   I see.
10       A   So that would be -- I would refer the judge to my
11   Exhibit 28, which is the email chain of us attempting to get a
12   response.
13       Q   Regarding these five additional reunification
14   therapists?
15       A   Four additional after the first one --
16       Q   Oh, I'm sorry.
17       A   -- was rejected.
18       Q   I'm sorry, yes.
19       A   Yeah, so five total with the (indiscernible).   So          `Commented [DF4]: 12:04:14`
20   we've got no cooperation on getting reunification therapy for
21   the kids.   Does that answer your question?
22       Q   I -- I think so.   So now -- so -- so now we'll pose
23   another one.   One of the issues brought -- brought up in this
24   case is the children's teeth.   And from --
25       A   Yes.

20

1    Q  -- the pleadings -- from the pleadings, I'm sure the

2  Court will notice that Dr. Albrecht is -- is blaming you for

3  the children's teeth and, I believe, wants to take away joint

4  medical deciding ability from you, if I remember correctly.

5  And you're blaming her for the teeth and saying she's not

6  cooperating; is that a fair statement?

7    A  That's a fair statement.

8    Q  Okay.  Could you please tell Doc -- could you please

9  tell Master DalPra your position as to the children's dental

10  needs and what has been happening with them?

11    A  One moment, let me find the relative (sic) exhibits.

12  So I would characterize my position is I've agreed to all

13  medical and dental care that Katherine has proposed with a

14  single exception.  So we had an -- I'm going to cover teeth

15  and vaccinations at once, if you don't mind?

16    Q  I don't mind.

17    A  Okay.  So Exhibit 89 represents an agreement that we

18  had to obtain a vaccination schedule in writing from Dr.

19  Greenberg.  Exhibit 87 is Katherine's proposing Dr. Greenberg.

20  So she proposed Dr. Greenberg; I accepted; we had an

21  agreement.  And after that agreement was violated by

22  Katherine, I did not consent to start over with Dr. Hanif.

23  Quite frankly, given the amount of trouble that caused, at

24  this stage, I -- I would reconsider.  But anyway, the

25  different tracks that Katherine --



21

1    Q  Excuse -- excuse -- excuse me, Mr. Albrecht.  What do

2  you mean the --

3    A  Yes.

4    Q  -- agreement was violated by Dr. Albrecht?

5    A  So we agreed that Dr. Greenberg was going to provide

6  us with a schedule for vaccinations.  Now, I don't care where

7  the kids actually get them, but after spending two or three

8  hours on the phone with Dr. Greenberg together going over

9  that, I'd at least like to get the vaccination schedules in

10  writing.  At that point, we can go to Walgreens and get it for

11  free; I don't care where we go.  But there were real medical

12  issues that she had to address, and the schedule was not the

13  usual one.  And she never even got either kids for a single

14  appointment.  You know, what's an appointment cost, a couple

15  hundred bucks?  For a single appointment so we could get that

16  schedule so we could receive the total visit.

17    Q  Mr. Albrecht, you mentioned -- so -- so you said there

18  were real medical issues regarding getting the kids

19  vaccinated.  Would you explain that to Master DalPra this

20  morning?

21    A  Yes, there is a family history of allergic reactions.

22  That is the only time I have ever been admitted to a hospital

23  was ICU 20 years ago when I had a reaction to vaccines.  What

24  that means is I'm not opposed to them.  I just want the doctor

25  who's doing this to be well aware of that and to give them



22

1  separately, not all at once, on a schedule that takes that

2  into account.

3      Q  So you -- so you feel that this is -- I --

4      A  I feel that we worked that all out, and then it got

5  canned.

6      Q  Okay, all right.  All right.

7      A  And it got canned over failure to want to spend a

8  couple hundred bucks on one more appointment.

9      Q  All right.  Please continue.

10     A  So my greater concern for the children is their

11  dental.  She's resisted, canceled, and changed appointments

12  since the beginning of this case.  So if I may refer to

13  Exhibit 92.  This is way back in the first DV where I set up

14  an appointment with Dr. Cheifetz for ██████, needing an exam

15  and X-ray.  I paid for that in full in advance on my credit

16  card.  And when she took ██████ there, she refused to have a

17  cleaning done.  If I wasn't under a DV, I would have taken

18  ██████ myself because I normally, throughout the marriage, was

19  the one who took these kids to the dentist.

20     Q  This -- by this -- when you mean "under a DV", you're

21  talking about the temporary orders of the first DV which was

22  with the -- the DV was eventually dismissed, correct?

23     A  Right.  So the first one --

24     Q  Okay.

25     A  -- had me required to go to the church; the second one

23

1  prohibited me from going to church.

2      Q  Okay.  So that -- so those are the -- so when you say

3  "under the DV", you mean the temporary orders on the first DV?

4      A  Temporary, yes.

5      Q  Okay.

6      A  Yeah, so back in 2016, we -- we had this going on

7  already when Katherine -- when we start to schedule dental

8  appointments, and basically Katherine's not getting them

9  there.  The response --

10     Q  You --

11     A  -- we got from --

12     Q  Excuse me.

13     A  -- Atty. Font --

14     Q  Excuse me.

15     A  Yes.

16     Q  Excuse me just one second.  I'm sorry to interrupt

17  you, but I want to -- just want to ask you a question.

18     A  Sure.

19     Q  So before -- before you were removed from the

20  household ex parte way back when, who used to --

21     A  Yeah.

22     Q  -- handle the -- who used to handle the kids' dental

23  needs?

24     A  Me.

25     Q  Okay.  Continue, please.



24

1      A   So after that, Exhibit 93, Katherine believed that

2   these -- says these are not essential appointments.  They also

3   got cancelled for ███████ and ██████, so that's why they didn't

4   get there.  So starting out with cancellations of appointments

5   I make.  So yeah, she cancelled the appointments for ███████

6   and ██████ with their dentist, Dr. Machell, on July 26th.

7           Exhibit 94, we put Katherine essentially on notice;

8   that's your letter to her that you were expecting regular

9   dental care for the kids every six months.  Again, I never

10  hindered any dental or orthodontics appointment she set up.

11  That Katherine (sic) has gone over a year in braces, about 15

12  months without any cleanings and exams.

13      Q   Who -- who is -- who is not -- start over again.

14      A   ██████.  ██████ --

15      Q   Okay.

16      A   -- went over a year in braces without any cleaning or

17  exam at all, and she wound up needing two crowns.  ██████ has

18  gone 15 months without any appointments whatsoever, and that

19  resulted in ██████ having 11 cavities.  It required full

20  general anesthesia.  It cost $2,550.  That's my Exhibit 32.

21  And Katherine didn't even -- hasn't even submitted that bill

22  to insurance.

23          So there's one other exhibit here.

24      Q   Now, in --

25      A   Oh, and she -- yes.



25

1    Q   I -- I was -- don't mean to interrupt you, but some of

2    the pleadings in this case allege that you've been spiting the

3    dental appointments by sending threatening letters to -- to

4    the providers or something.  Could you address that, Mr.

5    Albrecht?

6    A   Yes, one moment.  Let me find the appropriate exhibit

7    here.  So if we can go to Exhibit 84.  This is a letter I sent

8    to Hastings Ranch Dental Group in Pasadena.  And to summarize

9    it, it's just to let them know that I'm dad and to provide

10   them with the parenting plan, and all I ask they do is to

11   update their records with my name and contact information.

12   And I thanked them for the care they've provided my daughters.

13   I think they were surprised to learn that the kids had a dad,

14   but the letter's polite.  It's Exhibit 84.

15        The one other letter I sent Hastings Ranch is Exhibit

16   85 in which I'm making an effort to get them all of ██████ 's

17   dental records from her prior providers.  I just thought that

18   her current dentist should have all of the old records, that

19   it's in her best interest.

20        And I'm very disappointed -- I will direct your

21   attention to 87 -- that this is characterized as harassing

22   them and that these letters were legal threats.  I don't

23   think --

24   Q   So did you -- did you --

25   A   -- they're legal threats.



26

1    Q  -- did you mean them to be threats?

2    A  Not at all.  I meant them to let the kid -- the

3  dentist know that the kids had a dad, what the parenting plan

4  is, that I have no objection to their treatment, and oh, by

5  the way, here's their prior providers so you can even get all

6  the old records so you can treat them better.

7    Q  And exact -- and exactly which is said to the -- to

8  the dentist is memorialized in those exhibits?

9    A  Yes.

10    Q  Okay.  Now, is there anything else concerning --

11  before I move onto something else, Mr. Albrecht, is there

12  anything else concerning the children's dental and medical

13  issues that you think are important for Master DalPra to know?

14    A  Yes, I would refer the judge to Exhibit 96, which is

15  an --

16    Q  What is that?

17    A  -- email chain.  It's an email chain.  It -- it starts

18  where I email Katherine.  She's always unwilling to respond

19  directly.  I always continue to try.  It goes to you; it goes

20  to her counsel.  But the bottom line is we're just trying to

21  make sure we've got a list of all the dentists.  And it went

22  for over a year, and my (indiscernible) you never responded,       Commented [DF5]: 12:15:44

23  even February this year, we asked again, and we've (sic) never

24  responded.  So the point is, is when we just ask some

25  reasonable questions about who the children have even seen, we



27

1   get silence.

2        The last -- I think if I can just say one more thing

3   on this issue, I think the issue -- and I refer the judge to

4   Exhibit 62, which is her admissions, is we've got a pattern

5   where we're (sic) misrepresenting to schools and the kids'

6   providers that I don't have custody, and -- or any kind of

7   legal decision at all, that I'm just not in the picture.  And

8   when the providers find out, they kind of scratch their heads,

9   but I -- I don't have any issue with them treating the kids.

10        Anything else surface?

11    Q   Well, since you brought up the school, why don't we

12   segue into the school because that -- that's another issue

13   that's been raised by both parties' pleadings.  You mention --

14   you -- you were saying, regarding the dentist, that Dr.

15   Albrecht doesn't let these -- the provider know that you even

16   exist.  Have you experienced that same issue concerning the

17   schools?

18    A   Yes.  So it's --

19    Q   And tell us -- can you tell us about that, please?

20    A   Yes.  So -- so Katherine, without any input from me,

21   submitted an application to (sic)  to Flintridge Sacred

22   Heart Academy.  If I may refer to that henceforth as just FHHA

23   (sic) or Flintridge, we'd all be happier.  So that school

24   application here is Exhibit 29.  And if I may direct your

25   attention to page 4 of that exhibit, that's the information

28

1   she provided for me.  She said I'm not the custodial parent,

2   that I don't have legal custody, that I'm not responsible for

3   any school-related decisions, I'm not responsible for any

4   communications, and she doesn't even provide any contact

5   information for the -- the school to be able to contact me.

6   The issue's, you know, again, so that leaves the school in a

7   state of confusion.

8           I would also direct the Court to Exhibit 62 with

9   respect for admissions in which she basically acknowledges

10  that she did this.  So again, that's Exhibit 62, admissions 42

11  through 53.

12          Going specifically to 53, again, admission 53 on

13  Exhibit 62, the issue here:  we're in the age of COVID and

14  everything is being done remotely.  We're also in an age where

15  it's customary for parents just to be able to log on to see

16  there is assignments, to get their grades.  This is standard.

17  I'm able to do it for ███.  I've been able to do it for

18  ███ and ███ since day one.  Flintridge Sacred Heart

19  customarily provides online access for this.  They've never

20  not done it.  I mean, aside from a termination of parental

21  rights, they've never not done it.  I think they are confused,

22  and they're in a very hard place now because I have to email

23  them manually.  They have to go into the system, they have to

24  print it out, and then they have to send back the request

25  because they've got to -- they need to provide me with what --



29

1  the school records, and we're putting them in the middle.

2       So I guess --

3    Q  Excuse me.

4    A  -- it's Katherine's position that I'm not -- that she

5  wants me to be different from all the other parents and not

6  have access to this and to have to email the school, have the

7  school go into it, print it out, send it to me, and it's just

8  causing everybody a lot of headaches.

9    Q  All right.  And -- and concerning that issue with

10  Flint (sic), did Master DalPra grant Respondent's verified

11  expedited motion concerning that issue, prevent -- preventing

12  you from access to Flint (sic)?

13    A  It was granted as a temporary order, which is why I

14  had to email them and have them print it all out for me.

15    Q  And so it was -- it was -- it was --

16    A  But it's per the order.

17    Q  It was granted by Master DalPra; it says granted on a

18  temporary basis?

19    A  Yes.  So I'm hoping we can vacate that so the school

20  doesn't have to do it for me.

21    Q  Okay, okay.  Now, is there anything else concerning

22  the school issue that you wish to testify about?

23    A  No.

24    Q  Okay.  Now, you did file a written offer of proof, and

25  Master DalPra said that he -- he wishes oral testimony.  So in



30

1   that written oral -- offer of proof, I think you told the

2   Court what you feel you're missing in the children's lives and

3   what the children are missing not having a dad; is that

4   correct?

5       A   Yeah.  So if I can just --

6       Q   Could you -- could -- could -- could --

7       A   Yeah, sorry.

8       Q   Yeah.  So -- so -- so could you please tell us that,

9   what you -- why you feel the children should have a dad, why

10  you feel you should be in the children's lives and what you've

11  missed by the fact that you haven't seen your children, what

12  is it, about two years now?

13      A   Yes, two years --

14      Q   Okay.

15      A   -- close to two years in fall; it's close to four

16  years for any kind of normal relationship.

17      Q   Okay.  So how --

18      A   Before the divorce, and I'm going to talk about ███,

19  ███, and ███ because ███ lives with me.  He's not the

20  issue.  ███, ███, and ███ had me, I'm a dad.  I drove

21  them every week to their piano lessons.  I was a former

22  pianist myself.  I helped them practice.  I played music with

23  them.  I played the duet parts with them.  They played music

24  for me.  The last time we got to do that together was at my

25  dad's house in San Jose and that's the ghetto I grew up in.

31

 1   And that's close to two years ago.  And I respect Katherine,

 2   she's got lots of talent, but that's not something she can do.

 3   She doesn't play an instrument.

 4        I mean, I was the dad.  I drove up to New Hampshire

 5   Hills.  Got the house club in Milford, New Hampshire here, as

 6   the Court is unfamiliar, and I went swimming with them.  All

 7   four of the kids were on the swim team during our marriage,

 8   and I'm the one who took them and did all the swimming with

 9   them.  And I understand that ▮▮▮▮ is on the swim team now at

10   Maranatha High School where she's going, and I've never been

11   able to be there for that.  I used to be there for all her

12   competitions, but I've never been -- before the divorce, I

13   went to all her swim meets.  But -- and saw her compete and

14   I've never been able to see ▮▮▮▮ compete since the divorce.

15        All remarks either -- them or myself.  ▮▮▮▮, again,

16   he lives with me.  We do distance open water swimming at

17   Walden Pond practically every week regularly.  ▮▮▮▮ has even

18   been here for that.  It's been a while since he doesn't live

19   with us.  And I've never been able to take ▮▮▮▮ and ▮▮▮▮.

20   They were -- I used to do that with them and before the

21   divorce.

22        I regularly took them camping, and I took them on

23   outdoor hikes.  And in particular, we used to go together as a

24   family with my dad, that's their paternal grandfather.  We

25   went to our family property in Northern California every



32

1  summer with the kids on vacation.  And there is an exhibit

2  relative to that.  I'd like to direct the judge to Exhibit 76.

3  And --

4      Q  What is that, sir?

5      A  That's her -- Katherine's first request for

6  admissions, and it's very long.  It's relative to the

7  vacation.  I'm directing to just answers 35 through 41.  And

8  that's just to establish that we're all on the same page, that

9  summer of 2015, I took the kids on their normal vacation for

10 two, two-and-a-half weeks, whatever the dates are, while

11 Katherine stayed home in New Hampshire.  So again, that's

12 something I was always able to do.  And we've only been able

13 to do that once since the divorce.  That was two weeks in the

14 summer of 2018.  And those two weeks were the longest period

15 of time I've had with my daughters for over four years now.

16 Other than those two weeks, I've never seen them more than

17 five days, and even that's just a couple times.

18      But, you know, moving on.  Before the divorce, I read

19 out loud to them in bed every night.  I'm guessing four years

20 now, they've outgrown that.  I haven't.  If they're still

21 inclined, I still would, but you know, that was the life we

22 had.  I read to them in bed every night.

23      Before the divorce, I made all the family meals for

24 holidays, and Thanksgiving, Christmas.  And the last time we

25 had that together was our Christmas dinner at my dad's house



33

1  for Christmas 2018.  If we --

2      Q  Do you have any photographs of that?

3      A  Yes.  One moment, please.  I would direct the Judge to

4  -- Exhibit would be -- there's two sets of photographs.

5  Exhibit 47 is the first batch taken from 12/23 through 12/27.

6  And Exhibit 48 is just an email from Dr. Albrecht's is in the

7  middle chronologically, just to be chronological.  And then

8  the next set of photographs is Exhibit 49, which were taken on

9  the 31st, where I'm opening the last presents they gave me,

10  and we're altogether at the airport.  And ███ is hanging out

11  watching TV at my dad's house.  And that's the last I've ever

12  been able to see them.

13      And again, that's when ███ also came back with me

14  and moved to New Hampshire after that.  So he's been okay for

15  those two years, but it's the other kids.  And there's

16  pictures of the dinner there, if anybody cares, but the point

17  is, is I'm always the one that made it.

18      I heard from ███ that last year, they did get to go

19  out and eat at a super nice place, so I think that's what --

20  I'm glad they got to go out to eat at a super nice place.  At

21  the same time, that's not the traditional homecooked meal that

22  I always make --

23          THE COURT:  *[Whispered] Who gives a fuck?*

24      A  -- that they were used to.  So it's just sad for

25  me.  Again, just a basic, they probably miss the traditional



34

1  one too.

2          Other stuff I think of, I helped them with their

3  schoolwork.  And what I mean by that is the actual concrete

4  details.  Caring in the individual math problems, actually

5  looking at what they've written, you know, for English, help

6  them edit to the degree that's ethical and it's still their

7  own work.  And I haven't been able to do that since the

8  divorce.  And even finding out what ████'s daily schoolwork

9  is now -- is problematic because why -- it's within my rights,

10  I guess, to email whatever teachers every day and ask, that's

11  obnoxious to them, they don't want to deal with that.  They're

12  used to having the parents just log onto the system and look.

13  But when I have emailed their teachers, they've responded.  I

14  mean, I just don't want to do it regularly and put an undue

15  burden on them.  So it's hard losing the kids.  Or I guess,

16  losing all but one.  So again, I have ████ here close to two

17  years now.

18          I'm just thinking of other stuff I've missed.  The

19  only pictures I have of ████, , and ████ are from when

20  they've been with me.  I don't get any pictures from when

21  they're with Katherine.  ████ was 10 when she lost -- when

22  she lost her dad.  She's 13, almost 14 now.  So just a few

23  pictures I have during the very minimal parenting time, almost

24  nothing the last two years.

25  BY MR. CAULFIELD:

35

1     Q  Excuse me.

2     A  I guess, ███ --

3     Q  Excuse me.

4     A  Yes.

5     Q  Excuse me, Mr. Albrecht.  You're telling us that Dr.

6 Albrecht has never sent you a single picture of the kids in

7 two years?

8     A  Correct.

9     Q  Okay, thank you.

10     A  So, you know, one minor spot in that, so when ███

11 had her eighth-grade graduation from Gooden, I just clarified

12 to the Court that ███ was -- last year, was in Gooden

13 School, which only goes through eighth grade.  This year she's

14 at Flintridge, which is ninth through twelfth.  So this

15 spring, ███ and I, her brother, are in our living room.

16 We're sitting on the TV, we did get to see her graduation

17 because it was broadcast live on Zoom.  So ███ and I are

18 sitting on the couch together watching it.  Again, a little

19 rough because while we can see it, there was no mechanism to

20 communicate anything back to ███.  And that's nobody's --

21 that's not the school's fault, a million parents, you know,

22 going back in to that.

23     Forgive me, I probably misspoke about a million

24 parents because it's actually a very, very small school.  But

25 still.  So just, you know, that once I got to see how much

36

1   █████ has grown, you know, how she's matured, how she's

2   becoming a young lady, but I haven't been there for that.  She

3   doesn't have a dad for that.

4         The one thing I did notice at her graduation is she

5   seems very quiet and withdrawn.  So what I point out is,

6   again, this is a very small school and during that ceremony,

7   the teachers were able to devote, you know, maybe five, ten

8   minutes per student, just talked about the students.  And what

9   they were like, and what they appreciated about each student,

10  and just a really nice human.  And the thing that struck me is

11  that █████'s teachers really couldn't find much to say about

12  her, other than she worked very hard and was a very thoughtful

13  young lady.  So again, she struck me as very withdrawn.  The

14  teachers didn't talk about her outside interests, dreams,

15  hobbies, much even about her friends, and they were talking

16  about these sorts of things for all the other students.  And

17  this was sort of a very bland about █████; a good student,

18  thoughtful, pleasure to have in class, so these very nice

19  things, but so generic.

20       Q  Are there any other -- you of course, Mr. Albrecht,

21  set this out in the -- your offer of proof.  Is there a --

22  since we're limited -- we're limited, is there anything else

23  very relevant that you want to talk about on this issue?

24       A  I just thought -- I understand that they participate

25  in band and orchestra, that they do plays.  I never got to see



37

1    play Gertrude in Hamlet.  I never got to see her perform

2   in Romeo and Juliet the year before that.  When you see a

3   brief mention of her report card, you know, it's hard to

4   remember stuff.  When you see it live, you remember the rest

5   of your life.  I've never been there for that.

6           Even miss going with the kids to church.  I know

7   there's issues with the church now, but that's something we

8   always did as a family.  And the last time I got to go to

9   church with them was Christmas 2018 in California.  I get to

10  go every Sunday, even every Monday I would be there to our new

11  church, but --

12      Q   Let me –

13      A   -- even to pray.

14      Q   -- let me -- these things, of course, are very

15  important, but again, we only --

16      A   Yeah.

17      Q   -- have a limited amount of time.

18      A   Okay.

19      Q   So let me -- so let me bring you to some other issues.

20  So you --

21      A   Sure.

22      Q   -- you're asking the -- I want to discuss specifically

23  what you're asking the Court to do.  And of course, in your

24  answer -- because you've read the pleadings, you understand

25  that Dr. Albrecht's position appears to be "I can't get the

38

1   kids to do it"?

2        A   Right.

3        Q   So you're going to address specifically what you want

4   the Court to do, and how you think it's going to play out.

5        A   Well, so specifically, this is a fractured family.  I

6   think we even have issues between ███ and the younger

7   siblings in which -- but the bottom line is these kids need

8   counseling.  These kids need reunification counseling with

9   their dad.  To the degree there's an issue with the

10  relationship between me and them and ███ and ███, we need

11  a professional who has dealt with these kind of things before.

12  It's all over the CVs in the exhibits we've already

13  referenced.  And so we're really just looking for the Court to

14  get some cooperation or even compel Katherine that -- to

15  cooperate with therapy for myself and the kids together with a

16  qualified reunification therapist.

17           Does that answer your question?

18       Q   Well, sort of.  What are you -- so how do you -- what

19  do you do when you're going to, as I'm sure shortly hear, "I

20  can't get the kids to do it"?  What's your position?

21           Hello?  Oh, okay.

22       A   Yes.  Yeah.

23       Q   I thought I lost you, okay.

24       A   Well, so we've gotten -- Katherine has been able to

25  get the kids to her own therapist.  So her therapist was

39

1    Cherylynne Berger that she treated with.  And Katherine

2    also -- oh, I forget her name, the other one she treated with.

3    Katherine also got the kids to go there.  So if Katherine gets

4    the kids to go to her treating therapist, I can't imagine why

5    she couldn't get the kids to go to a therapist that we -- the

6    Court selects or that is involved in reunification.

7        Q  Do you anticipate that these children are compliant,

8    that if Katherine were to say, "I'd like you to do it," that

9    they would do it?

10       A  Yes.

11       Q  Okay.

12       A  If she wants -- I think if Katherine wants the kids to

13   go to this therapy and I think if Katherine wants this

14   relationship to be repaired, I would anticipate that these

15   therapists would be doing a bang-up job of that, so we'd be

16   miles ahead of where we are now.

17       Q  All right.  Mr. Albrecht, I don't really think that I

18   have anything more, unless you feel like I've forgotten

19   something.  So I'm inclined to let Atty. Fontaine inquire.

20   Would that be a fair thing for me to do, Mr. Albrecht?

21       A  Yes.

22           MR. CAULFIELD:  Turn it over to Atty. Fontaine.

23           THE COURT:  Cross-examine.

24           MR. CAULFIELD:  Your witness.

25           MR. FONTAINE:  Thank you.  Okay, Judge.  Am I okay



40

1  to go forward?

2        THE COURT:  Yes.

3        MR. FONTAINE:  Okay, thank you.

4                    CROSS-EXAMINATION

5  BY MR. FONTAINE:

6        Q   Mr. Albrecht, you testified -- you made a statement,

7  "To the degree there is an issue between me and the children."

8        A   Yes.

9        Q   Do you recognize there's an issue?

10       A   Yes.

11       Q   You admit there's an issue?

12       A   I think -- what?

13       Q   Do you admit that there is an issue in your

14  relationship with your two girls?

15       A   Yes.

16       Q   As you recall, at a 2019 extensive hearing, hearing

17  testimony at length about how your pair of girls felt about

18  the Christmas break 2018 visit with you?

19       A   I recall hearing testimony.  I can't characterize it

20  as to the length.

21       Q   Do you recall that it was testified that the girls, as

22  well as ████, your now over 18-year-old son, were very, very

23  troubled with your behavior at the December visit?

24       A   Excuse me, whose testimony are we referring to?

25       Q   The testimony of Katherine in describing the



41

1 children's reaction to the visit of 2018.

2      A   Yes.

3      Q   And you understood from that testimony, did you not,

4 that the children were very bothered by the fact that you had

5 not allowed them to return on the day that was specifically

6 agreed to?

7      A   I understand that Katherine said that's what they

8 said.

9      Q   Okay.  So you have not acknowledged that your children

10 were troubled by that, are you?

11     A   I acknowledge they were troubled, but under any normal

12 circumstances, spending a weekend where they wouldn't want to

13 be, they may be annoyed, but they would quickly get over it.

14 That's what normal kids do if they spend a weekend where they

15 don't want to be, they're annoyed and then they quickly get

16 over it.

17     Q   How has your relationship -- because you've talked

18 about Katherine and her alleged control over the girls.  How

19 has your relationship been with ███ since that December

20 visit in 2018?

21     A   My -- excuse me, my relationship with ███ in 2018 or

22 now?

23     Q   How has your relationship been with ███ since the

24 visit of 2018?

25     A   I believe it's deteriorated.  If I may refer to some

42

1   texts?

2       Q   No, you may not, sir.  You can answer the question I

3   ask of you, which --

4       A   Okay.

5       Q   -- you've already done.  You -- you, in fact, were

6   told by ▇▇▇ that he was very upset with your behavior during

7   that December 2018 visit, didn't he?  Did he --

8       A   No.

9       Q   He's never told you that?

10      A   If he has, I don't recall.  The last thing I recall

11  him referring to on visits was at the church on November 3rd.

12  I don't recall ▇▇▇ and I discussing Christmas after

13  Christmas happened.

14      Q   Do you recall -- let's move on.  Do you recall the

15  incident with regards to The Wilds of New England summer camp?

16      A   So one moment here, because there's been a lot of

17  stuff at The Wilds.  So we've got --

18          MR. CAULFIELD:  So excuse --

19      A   -- tickets -- 77 proof -- on the --

20          MR. CAULFIELD:  Excuse me.

21          THE WITNESS:  Yes.

22          MR. CAULFIELD:  Excuse me.  This is Atty. Caulfield.

23  Perhaps Atty. Fontaine could tell which visit he's talking

24  about?

25          THE WITNESS:  Yes, because there's been so many.

43

1   BY MR. FONTAINE:

2       Q   In the -- in the -- in the late July going into August

3   of 2019, the children attended the Wilds of New England summer

4   camp; isn't that correct?

5       A   That's my understanding.  I'm not sure why Katherine

6   denied that on her admission, so.

7       Q   Your understanding was that you, in fact, attempted to

8   contact your children during that visit when they were at the

9   Wilds of New England summer camp during that late July through

10  August?

11      A   Indirectly, yeah.  I attempted to contact the camp.

12      Q   You also filed a DCYF complaint, or a department -- I

13  don't have it in front of me right now, but Department of

14  Children and Family Services complaint in late July of 2018,

15  didn't you?  2019.

16      A   If you're referring to L.A. DCSF, then yes.  And for

17  everybody's clarification, it's DCSF in California and DCYF in

18  New Hampshire.

19      Q   And you filed the complaint in California while you

20  were in California, correct?

21      A   Yes.

22      Q   And was that the same time that you claim that you

23  went out to visit with your children?

24      A   Yes.

25      Q   And isn't that the same time that Katherine's mother



44

1    passed away?

2        A   Yes.  I was not aware of that at the time though.

3        Q   So while you were out there for the purpose of

4    visiting with your children, instead you sidetracked and went

5    to the Department of Children and Family Services in L.A. and

6    filed a complaint with them?

7        A   Well, the first thing I did when they weren't there is

8    I went to ask them simply what they thought I should do.  I

9    did not file a complaint at all, I just said I'm here to see

10   my kids, they're not here, what do you recommend.  They said,

11   we recommend that you go talk to Sierra Madre police.  So

12   Sierra Madre -- and then come back and talk to us.

13            Sierra Madre police went out there and, again, that

14   was the first I learned that Katherine took them to the other

15   side of the country.  After I learned that, I forget what

16   night it was, L.A. DCSF did call me.  They wanted -- and I

17   went and met with them and they wanted more information on

18   what was going on.  One other thing --

19       Q   And this -- what --

20       A   Let me just finish.  In terms of contacting them, I

21   also in --

22       Q   I didn't ask anything about the police.  I didn't ask

23   anything about the police, sir.  I'll ask that --

24       A   Okay.

25       Q   -- in a separate question.



46

1   last week.

2        Q   Now, you acknowledge, sir, that prior to your visiting

3   them, in California you presented a request to exercise

4   visitation and you were informed that the children did not

5   want to visit with you, correct?

6        A   I was informed that Katherine said they didn't.   My

7   position is that if they didn't, then when I went out there if

8   they told me at that time they didn't, then we'd take that

9   bridge if we come with it and maybe there we would want to be.

10     and I went out to see the kids.   If we're there and they

11  don't want to visit, that's one thing.   But my position is

12  we're going to go out there and make sure that they realize

13  that we're there and we want to see them.   And if at that

14  point --

15       Q   You didn't --

16       A   -- they don't, they don't, but we could do that

17  exchange at Sierra Madre PD.

18       Q   And sir, you're --

19       A   Yes.

20       Q   -- you're aware that from the May hearing, the May

21  motion hearing where there was extensive testimony as to what

22  the girls' feelings were about visiting or having contact with

23  you, and that they didn't want it, you insisted on going out

24  and visiting them anyway, didn't you?

25       A   I believe the testimony at that hearing was they

47

1   didn't want to get on the plane to come to Sierra.  And if

2   they don't want to get on the plane to come to Sierra then

3   I'll get on the plane to go there.

4       Q  So you're testifying under oath that you were not

5   aware that your children, based upon what occurred at the

6   December 2018 Christmas break visit with you, that your

7   children, your girls specifically did not want to have any

8   contact or any visit with you?  Are you saying you weren't

9   aware of that?

10      A  I'm aware there's issues, but if they don't want to

11  have contact then we can discuss that when they're aware, and

12  they're fully aware that I'm available, near them physically,

13  and they can make their choice at that time.  Kids change

14  their minds.  If they know I was there they might have changed

15  their mind.

16      Q  And so you thought it was wise --

17      A  Particularly with ███ with me, yes.

18      Q  I'm asking a question, sir.  You figure as why after

19  your children -- after you understood from the May hearing

20  that they wanted no contact with you, they wanted no visit

21  with you, and after being informed in a letter by my office

22  after you requested a visit in July, you stuck -- you thought

23  it was wise to go out and visit with them anyway?

24      A  Absolutely, because at that time I had ███ with me,

25  who they might want to see.  Even if they don't want to see



48

 1   me, maybe they want to see their older brother.  And my dad

 2   was coming down, and even if they don't want to see me, maybe

 3   they want to see their grandfather.  And we have extended

 4   family in California, and even if they don't want to see me

 5   maybe they want to see their extended family.

 6        Q   So instead of that happening, you go and file a DCYF

 7   complaint that results in them receiving a call while they're

 8   away at summer camp.  Did you --

 9        A   Again, if I had known they were at summer camp, none

10   of this would ever have happened.  Yeah.  Because I -- my kids

11   are missing, I was very surprised.  Very surprised that they

12   were at summer camp when I showed up.

13        Q   Can you cite me to the section of any order that

14   requires Katherine to inform you of where her children are at

15   all times when they're in her care?

16        A   I would anticipate that she would inform me where they

17   are when it's my parenting time that we requested.

18        Q   Do you understand why Katherine might have concerns

19   about you informing -- to telling you of where she is at with

20   the children?

21        A   I see the paranoia, medical reports.  I see all the

22   police reports in evidence where she falsely accuses me of --

23        Q   I didn't ask you that, sir -- I -- sir --

24        A   -- breaking in.

25        Q   I didn't ask you that.  Sir, you --



49

1      A   So yes.  So those would be concerns, yes.

2      Q   You --

3      A   Yeah.

4      Q   Sir, do you understand from your actions, from what

5  you are doing in going and insisting on seeing them when they

6  have expressed to you that they don't want to see you, that

7  they don't want to spend time with you, do you see why to have

8  a concern about informing you of where they are at?

9      A   ███████ and ███████ have never expressed that to me

10 directly.  We're going just from what their mother said.

11     Q   Did you ever --

12     A   To the degree they have -- go on.

13     Q   Have you ever issued an apology to them for the

14 December Christmas visit incident?

15     A   Yes.  There were the letters and cards I sent

16 referenced in prior testimony to --

17     Q   Show me --

18     A   -- the exhibit numbers again?

19     Q   Show me in those -- show me in those cards -- it's

20 Exhibit Number 22, it looks like.  Show me in those cards

21 where it says you apologize for your behavior in not allowing

22 the girls and your son to return?  Where does it say it?

23     A   First of all, my son was 18 and he was entitled to do

24 what he wants, so I object to the form of the question.

25     Q   Then answer it as to the girls.  Where does it say in

50

1 that -- that card you -- that you submitted as an exhibit,

2 where does it say anything about you apologizing for your

3 behavior, which you understood from Katherine's testimony was

4 the cause of them not wanting to see you?

5     A  I don't believe Katherine, that that's the primary

6 cause because it says -- sir --

7     Q  No.  Sir, I'm asking you --

8     A  Okay, let me find the exhibit.  Hang on.  Hang on.  If

9 you give me one moment.  Okay.  "I'm so sorry things are so

10 strange between us."

11     Q  That's your way of apologizing for failing to return

12 them on an agreed-upon time?

13     A  Absolutely, when that's the advice of my professional

14 therapist on how best to patch things up.

15     Q  Okay.  Where in the second card that's attached from

16 July 7th of 2020, is there any apology to them in the prior --

17     A  "I'm so sorry things are so strange between us."

18     Q  That's the extent of your apology?

19     A  Absolutely.  I mean, my prior behavior, there they

20 were.  I have not done anything -- I have treated these kids

21 well.  So as my -- again, on the advice of my therapist,

22 what's in their best interest, my therapist was quite clear

23 that any -- normal kids under any normal circumstance who were

24 upset at being a single weekend where they wanted to be

25 someplace else would normally quickly get over that, and it



51

1  would not be an issue.  And --

2      Q  So it's --

3      A  -- she's shocked that they haven't.

4      Q  So in --

5      A  That's what we get from Katherine.  I haven't heard --

6  I've heard very little -- I've heard nothing directly from my

7  children.

8      Q  So in the --

9      A  Only from Katherine.  So you're kind of asking me to

10 testify to what I heard from Katherine --

11     Q  Sir, I'm not asking you -- I'm not asking a question

12 at this point.  Can you let me --

13     A  Okay.

14     Q  -- ask the questions, please?

15     A  Sure.

16     Q  So in no document that you've ever given to your

17 children:  ███, your adult son, or the girls, have you ever

18 admitted that your failure --

19         THE COURT:  *[Whisper] (Indiscernible) want something*    Commented [DF6]: *12:55:23*

20 *(indiscernible).*

21 BY MR. FONTAINE:

22     Q  -- to return them on an agreed-upon time in December

23 of 2018 was a mistake on your part --

24     A  I think that --

25     Q  -- and then that you apologized.  There's no --

52

1     A  I think that --

2     Q  -- way (indiscernible) back to Katherine.

**Commented [DF7]:** 12:55:33

3     A  -- that that was handled verbally, and I've had no way

4  to verbally --

5        THE COURT:  *[Whispered]* *(Indiscernible)*.

**Commented [DF8]:** 12:55:38

6     A  -- contact ▮▮▮▮ and ▮▮▮▮.

7  BY MR. FONTAINE:

8     Q  Okay.  Now let's move up to the incident where you

9  filed the complaint with the DCYF.

10    A  Sure.

11    Q  You're aware that the -- the girls were involved in

12  that investigation?

13    A  Yes.  I'm surprised ▮▮▮▮ wasn't, though.

14    Q  You're aware that the girls were involved you said,

15  right?

16    A  Yes.  Yes.

17    Q  And did you ever -- and you've read the report that's

18  now been filed, correct?

19    A  I have gone over it briefly.

20    Q  And you see that --

21    A  I -- I --

22    Q  -- there's no findings -- there was no finding of

23  neglect by them, right?

24    A  Actually, it's indeterminate.

25    Q  Sir, did they conclude that the file was being

53

1    closed -- that their file was being closed?

2        A  They concluded that it was insufficient evidence and

3    that the complaint was not unfounded.

4        Q  And did you ever apologize to your children, your

5    girls specifically, relative to involving them in that DCYF

6    investigation, including when they were at summer camp?

7        A  So first of all, until I had the records, I don't know

8    to what degree they were involved.  The -- to the degree I

9    know they've been involved in an investigation it's been here

10   in New Hampshire, Exhibit 63.  I've -- not for a while.  You

11   gave me this last week, even though it's dated November 1,

12   2019.  You know, if I had it earlier, you know, maybe we could

13   have done something.

14       Q  Well, you've had it for -- now for a week.  Did you do

15   anything after that?  Did you send them anything --

16       A  I have no --

17       Q  -- like a card -- hold on, let me finish, sir.  I'm

18   asking a question.  Did you ever write them a note or a letter

19   or send them a card saying, I'm so sorry that you got involved

20   in this investigation?  Were you --

21       A  I'd love to call them up and even send them -- I --

22   I'd love an email.  Give me an email, I'll write them an

23   email.  Postal mail is slow, and the last time I sent a postal

24   mail it took them three weeks to get it.

25       Q  Have you ever apologized for the incident that



54

1   occurred at the Collinsville Bible Church that resulted in you

2   having a one-year final domestic violence restraining order

3   issued against you?

4       A   I had no way to contact ████ and ████.   With regard

5   to ████, he apologized to me for not contacting me while I

6   was there.

7       Q   So -- so your answer is you didn't -- you didn't send

8   any apologies.  You never wrote a card, you never wrote -- I

9   mean, you never attempted it even.  You never did anything,

10  did you, with regard to apologizing for your behavior?

11      A   I was sitting in a church pew quietly by myself.  I

12  don't feel a need to chur -- to say -- to apologize for

13  sitting in a church pew quietly by myself hoping to see my

14  daughters.

15      Q   Okay.  In fact, do you recall -- and this is at our

16  Exhibit Number 10 -- do you see the transcript --

17      A   On yours?

18      Q   Yes.

19      A   Yours?

20      Q   Yes.  Do you see this -- the domestic violence

21  transcript?

22      A   I don't see an exhibit.  One moment, please, I don't

23  see an Exhibit 10 from you.  I only see Exhibits 1 through 9.

24      Q   Well, let me ask you the question then.  Do you

25  remember testifying, and I asked you at that hearing, did you



55

1   ever --

2       A  Where we were -- which?

3       Q  Domestic violence hearing, sir.

4       A  Yes.

5       Q  Do you remember me asking you, had you ever apologized

6   to or contacted the children regarding the incident on

7   November 3, 2019, and your response was, "No.  I don't think I

8   need to."  Do you remember saying that?

9       A  Yes.

10      Q  And you still think you don't need to, don't you?

11      A  When they spent ten years being there with their

12  father, sitting with their father in a pew, one would

13  anticipate that their father sitting quietly in a pew like

14  they have been used to for ten years of their life would not

15  upset them.

16      Q  That's your -- that's your belief, correct?

17      A  That's my belief, unless Katherine or the church

18  pastor has done something to cause them to be upset by my

19  presence.  Just seeing Dad sitting in a church pew.

20      Q  Do you --

21      A  People sit in church pews quietly.

22      Q  You mentioned something --

23      A  Yeah.

24      Q  You mentioned something about contacting -- pictures.

25  You said you wanted -- you haven't been sent any pictures.



56

1   Have you ever requested of Katherine directly or my office

2   directly for pictures of the children, harmless, are sent --

3       A   Yes.  I don't -- it's not in an exhibit but I

4   requested recordings of their performances in the VBS.  I'd

5   have to check my email for other requests.  And quite frankly,

6   I don't think I should have to request it through your office,

7   I think I should be able to request it from Katherine

8   directly.

9       Q   Okay.  But beyond your requesting video recordings of

10  them, you've never asked for, as you testified, that you never

11  received photographs or pictures.  You've never asked --

12      A   Well, it's -- most of my requests go ignored, so after

13  I request them a couple of times, if I don't get anything you

14  kind of give up.  Otherwise the emails between you guys pile

15  up even more than they are right now.

16      Q   Let's talk about the medical issues for a second,

17  medical --

18      A   Sure.

19      Q   -- treatment issues.  There was a previous issue

20  regarding you not providing insurance coverage as the Court

21  ordered you; you recall that?

22      A   If we could review the order in question --

23      Q   I have asked a question of you.  Do you recall there

24  being an issue with you not providing the insurance that the

25  Court ordered?  That's a simple question.  Do you know the



57

1  answer?

2      A  I did not understand the Court's order.  If we could

3  review that now.

4      Q  No, I'm not going to review that now.  I'm asking you

5  a question.  Do you remember that inci -- that it being an

6  issue before the Court?

7      A  Yes.

8      Q  Okay.  And the Court subsequently ordered that

9  Katherine could provide the insurance, correct?

10     A  I can't testify as to the order unless we get it up in

11 front of us.  I'm happy to do that if we want to take a couple

12 minutes.  It's the final decree --

13     Q  No.  I don't --

14     A  Yeah.  So if we could --

15     Q  I don't have that much time left.  Hold on.  Hold on.

16 Your attorney can cross-examine you and he can question you

17 and he can bring that forth.  I'm asking the questions.

18     A  Okay.

19     Q  Now, Katherine -- have you -- have you ever provided

20 insurance coverage for your children?

21     A  Yes.

22     Q  Subsequent to the divorce order --

23     A  Yeah.

24     Q  -- final divorce order?

25     A  Yes.

58

1  Q Okay. What insurance did you provide?

2  A Christian Care Medi-Share is the insurance they've had

3 since 2011. I kept that active even though there was no court

4 order to do so.

5  Q You -- your --

6  A It was out of benefit and love for them.

7  Q You're aware that Katherine provided -- obtained other

8 insurance coverage for the minors?

9  A Yes.

10  Q And in fact, Katherine hasn't asked you to pay any of

11 the unreimbursed expenses to date, has she?

12  A She has.

13  Q And what was your response to that, sir?

14  A That I wanted them to go to insurance first, and that

15 we would like to see why insurance hasn't paid them.

16  Q Do you recall if the --

17  A And I would love -- I would love to get the insurance

18 documents from your office so we can move forward on that.

19  Q In fact, you've been asking for access to her personal

20 insurance information, right?

21  A Katherine's? No.

22  Q You haven't been asking for -- for insurance

23 informa -- for insurance information -- I mean --

24  A Only for the children.

25  Q Okay. But it's insurance that she's providing,



59

1    correct?

2        A   I don't care whose parent's paying for it.  If it's

3    the children's insurance both parents should have access to

4    the records.

5        Q   Let's go back to this -- to the doctor.  You -- at one

6    point there was a discussion about the children seeing

7    Dr. Greenberg, correct?

8        A   Yes.  Katherine and I had -- that was one of the few

9    times I was able to talk to her.  We had a conference call

10   with Dr. Greenberg.

11       Q   In early June of 2019, you were informed by letter

12   through our office that, in fact, Katherine had discovered

13   that Dr. Greenberg was not one of the preferred providers, and

14   that she would have to meet a 5,000-dollar deductible before

15   any expense -- any charges of Dr. Greenberg would be paid for.

16   Do you recall receiving that letter?

17       A   Yes.

18       Q   And she suggested instead that a Dr. Hanif, who was

19   covered as a preferred provider, be seen by the children.  Do

20   you recall that as well?

21       A   Yes.

22       Q   And you recall her agreeing that Dr. Hanif could

23   provide the vaccinations at the same schedule that you and her

24   had previously agreed to, correct?

25       A   I disagree with that because we don't have a copy of



60

1    the schedule.

2          Q   Okay.  But from her letter --

3          A   We would need to see Dr. Greenberg again.

4          Q   Her letter said that she would agree to that, correct?

5          A   I don't have it in front of me.  One moment.  Would

6    you refer to me which exhibit that is?

7          Q   Exhibit Number 6, the letter of June 6th.

8          A   Okay.  What page?  17 pages in here.

9          Q   First -- it's the first --

10         A   Okay.

11         Q   -- the decision -- there's a letter dated June 6th in

12   that exhibit.  Do you see the second sentence of that letter?

13         A   Regarding the deductible?

14         Q   Yes.

15         A   Yes.

16         Q   Okay.  So -- so she informed you that she couldn't

17   afford to pay that.  She informed you that she wanted to use

18   doctors that were covered under her insurance.  She gave you a

19   specific name.  And in fact, you didn't agree to that doctor

20   being used by them, did you?

21         A   Not until we got the vaccination schedule, no, because

22   we'd already worked it out.  She's violating an agreement; I

23   want the existing agreement, or we come to a conclusion on

24   what we're doing instead.  I would have been happy to

25   negotiate and discuss with her a different doctor.  But if



61

1  she's going to violate the agreement we came to, then we need

2  to have a conversation about it.

3      Q  Where does it say in any of your emails or your

4  responses that you were willing to consider using Dr. Hanif or

5  any other provider other than Dr. Greenberg?  Where does it

6  say that?

7      A  There's been lots of emails -- hang on -- in this

8  exhibit.  I would say -- I said if cost is a concern, I'd

9  anticipate that Medi-Cal would provide free care through an

10  in-network provider.  I don't know why we have an insurance

11  with a 5,000-dollar deductible when insu -- free insurance

12  with no deductible is available.

13          We asked for California Blue Cross Blue Shield

14  insurance cards, and didn't -- and they can verify what's

15  covered and what's not with Dr. Greenberg.  Let's see, I

16  said --

17      Q  Based on your (indiscernible) --                    Commented [DF9]: 1:09:05

18      A  -- I'm still agreeable to have my -- let me quote

19  that -- your answer of where I said it.

20          THE COURT:  *[Laughter].*                          Commented [DF10]: 1:09:12

21      A  I said, I'm still agreeable to having ███ seen by

22  Dr. Greenberg for a general physical ASAP, for ███ and

23  ███ to each get their first MMR shot -- it's already agreed

24  to by Katherine -- Dr. Greenberg, by himself -- as soon as

25  possible, and for Dr. Greenberg to provide as close to

62

1    Dr. Greenberg's proposed future vaccination schedule in

2    writing.  That's a single appointment.  I said, we can take it

3    with that.  We can take it from there.

4    BY MR. FONTAINE:

5        Q  Did you mean to say that --

6        A  If time is the primary concern --

7        Q  Wait --

8        A  If -- I'm just letting you know -- you asked a

9    question, sir, and I'm answering it.  Will you allow me to

10   answer where I said I was able to negotiate this?  I'm just

11   reading my email in the exhibit to you.

12        I appreciate that if cost is the primary concern, as

13   soon as I repeat the insurance information to you, I'll do my

14   best to look into alternatives to Dr. Greenberg and promote

15   alternative providers.

16        THE COURT:  *[Whispered] I'll be back in about an*

17   *hour.*

18        *[Whispered conversation]*

Commented [DF11]: 1:10:15

19       A  And I also wanted to know what ▮▮▮▮ and ▮▮▮▮

20   thought.  I asked for a phone number so I could see -- I mean,

21   they -- we had issues with them not wanting to see people.  I

22   wanted to talk to them and get their take on it.

23        THE COURT:  *[Whispered] Put him on mute.*

24   BY MR. FONTAINE:

25       Q  Sir, on -- in that same exhibit packet, July 2nd

63

1  letter --

2      A  Yes.

3      Q  -- first paragraph --

4          UNIDENTIFIED SPEAKER:  *[Whispered] Again, we need*

5  *(indiscernible)*.

6  BY MR. FONTAINE:

7      Q  -- last sentence reads, "after my client discovered

8  this information, she researched and found another

9  pediatrician, Dr. Hanif, that was in the network provider with

10  Blue Shield --

11          THE COURT:  *[Whispered] Not this -- not this one,*

12  *but the previous.*

13  BY MR. FONTAINE:

14      Q  -- and who had excellent reviews online.  She was also

15  willing to see the girls quickly on July 1st to administer the

16  vaccinations on the schedule agreed to by Dr. Greenberg --

17          THE COURT:  *[Whispered] Tom (phonetic) looks like*

18  *this (indiscernible)*.

19      A  I don't see that.

20  BY MR. FONTAINE:

21      Q  -- remember that?

22      A  No.

23          THE COURT:  *[Whispered] All excited.*

24  BY MR. FONTAINE:

25      Q  You see that in the letter?

Commented [DF12]: 1:10:35

Commented [DF13]: 1:10:57

64

1     A  I don't see anywhere on the -- on Dr. Greenberg --

2  which page?

3        UNIDENTIFIED SPEAKER:  *[Whispered]* *(Indiscernible)*        Commented [DF14]: 1:11:04

4  *voice.*  *He's got another voice.*  *He's got another voice.*

5        THE COURT:  *[Whispered]* *Sweet.*  *Pretty.*

6     A  Direct me to a page.

7  BY MR. FONTAINE:

8     Q  Sir, this is my Exhibit Number 6, there are several

9  letters --

10     A  Yeah, what page?  Which page of the 17 pages?

11     Q  They don't have page --

12     A  It's 17 pages, sir.  Please tell me which page in

13  Exhibit 6 and I will go there.

14     Q  The page -- the pages are not numbered, sir.

15     A  They are in the PDF I have.  If you -- we can sit here

16  and --

17     Q  No.  I apologize --

18     A  Give me a page and I'll go there.

19        THE COURT:  *[Whispered]* *I don't seem to have the*

20  *rest of this.*

21  BY MR. FONTAINE:

22     Q  I apologize, I don't have the same PDF.  I don't know

23  why, but mine don't have page numbers.  But there is a letter

24  dated July 2nd from my office to your attorney.  That's the

25  letter I'm referring to.

65

1      A   Dated July 2nd.   Excuse me while I look through these

2   17 pages for this letter.

3           THE COURT:   *[Laughter]*

4      A   You said -- what was the date again?

5   BY MR. FONTAINE:

6      Q   July 2nd, 2019.

7           THE COURT:   *[Whispered] And while you're looking*

8   *through that, I'm gonna go pee.*

9           *Can you imagine if this was in person?*

10          UNIDENTIFIED SPEAKER:   *Oh, my God.   I don't know if*

11   *I (indiscernible).*

          **Commented [DF15]:** 1:12:33

12     A   So I don't know.   Yes, it does say the vaccinations on

13   schedule agreed to.   I don't know how we could do that if we

14   don't have a copy of the schedule, but I would be amenable, if

15   we have a copy of the schedule, to anyone administering the

16   vaccines.

17   BY MR. FONTAINE:

18     Q   Okay.   So let me ask you this.   After this, there was

19   an appointment scheduled for Dr. -- but you --

20     A   Yeah, with --

21     Q   You canceled it, didn't you?

22     A   There was a prior appointment scheduled with

23   Dr. Greenberg that was canceled.

24          THE COURT:   *[Laughs].*

25     A   So yes, if she's canceling the appointment that we

66

```
 1   agreed to, I will cancel the appointment that we did not agree
 2   to.
 3            THE COURT:  [Laughs].
 4   BY MR. FONTAINE:
 5       Q  So you canceled the appointment with Dr. Hanif,
 6   correct?
 7       A  Yes.  It's the only appointment in the entire history
 8   of this case I have ever canceled.
 9       Q  And --
10       A  I can't say the same for Katherine.
11            UNIDENTIFIED SPEAKER:  [Whispered] Stupid.
12            MR. FONTAINE:  I have no further questions, Your
13   Honor, for this witness.
14            THE COURT:  Any redirect, Mr. Caulfield?
15            MR. CAULFIELD:  Yes, Your Honor.  One moment,
16   please.
17                     REDIRECT EXAMINATION
18   BY MR. CAULFIELD:
19       Q  Atty. Fontaine asked you about your relationship with
20   ▮▮▮▮ deteriorating since Christmas 2018, and you said that
21   that's not correct, and you were trying to refer to some
22   exhibit?
23       A  The --
24            THE COURT:  [Whispered] No, (indiscernible).
25       A  -- apology for ▮▮▮▮?  Or the relationship since then?
```

Commented [DF16]: 1:14:13

67

```
1      Q  Well, my notes say that Atty. Fontaine asked you about

2  the relationship with ████ deteriorating since Christmas

3  2018, and I see that I have an asterisk --
```

Commented [DF17]: 1:14:23

```
4      A  Yes.  Yes.  That was the weekend -- so I have shown

5  these texts to get some advice from my therapist because I'm

6  concerned he's mentally ill.

7          THE COURT:  [Laughs]

8      A  So October 5th, from a different number I'm not

9  familiar, he asked me, how long does it take to hack into a

10 black phone, do you know?  I need to know how often I need to

11 replace it.  I have no idea why he thinks he needs to replace

12 his phones.  He says he's got to throw his phone out soon.

13         THE COURT:  Hopeless.  Heartless.

14         UNIDENTIFIED SPEAKER:  No, he did.

15         THE COURT:  He was concerned; he said he was

16 hopeless.  (Indiscernible).
```

Commented [DF18]: 1:15:17

```
17     A  I can read this in-depth, his own words, but they're

18 quite incoherent.  So long, rambling emails.

19 BY MR. CAULFIELD:

20     Q  That was after this incident?  Mr. Albrecht, that was

21 after the incident that Atty. Fontaine asked you about?

22     A  This is most recently, if we go to the incident at

23 church, that's more relevant because he's much saner at that

24 point where he just apologizes for not getting in touch with

25 me.
```

68

1          THE COURT:  *(Indiscernible)*.                    Commented [DF19]: 1:15:48

2    BY MR. CAULFIELD:

3      Q  So after the incident in which you have these -- which

4    the DV is outstanding, he apologized to you?

5          THE COURT:  *[Laughs]*

6      A  Correct.  No.

7          THE COURT:  *[Laughs]*

8    BY MR. CAULFIELD:

9      Q  But -- but -- but during your cross-examination, you

10   were challenged with, did you do this this way, did you do

11   that way; what did you say in your apology letter; why didn't

12   you say this in your apology letter.

13         THE COURT:  *(Indiscernible) so what?*            Commented [DF20]: 1:16:17

14         UNIDENTIFIED SPEAKER:  *(Indiscernible)*.

15   BY MR. CAULFIELD:

16     Q  If for some reason you found out that over your

17   lifetime as a parent, you didn't make the right choice every

18   single blessed time, would you accept that?

19         THE COURT:  *[Laughs]*

20     A  Yes.

21   BY MR. CAULFIELD:

22     Q  Right.  And -- and if somebody -- and if you did the

23   best you could in writing a letter and consulted with your own

24   therapist as how you should write the letter --

25         THE COURT:  *[Whispered] The apology (indiscernible)*   Commented [DF21]: 1:16:45

69

1    *to have a (indiscernible) relationship.  He doesn't think his*

2    *son's (indiscernible).*

3    BY MR. CAULFIELD:

4        Q  -- if someone else thinks that it should be written

5    differently, is that really neither here nor there,

6    Mr. Albrecht?

7        A  Only in the sense that a professional therapist,

8    professional opinion, I would think, would be better than

9    somebody who's not similarly trained.

10       Q  Okay.  Now, if Master DalPra orders this fractured

11   family to go to -- for some sort of reunification therapy --

12           THE COURT:  *He lives on the East Coast.  They live*

13   *on the West Coast.  They're going to go there (indiscernible).*

14           UNIDENTIFIED SPEAKER:  *[Laughs].*

15   BY MR. CAULFIELD:

16       Q  -- would you do what the therapist tells you to do?

17       A  Absolutely, in a heartbeat.  I would love that.

18       Q  Would -- would you send the letter the way the

19   therapist says you should do it?

20       A  Absolutely, in a heartbeat, sir.

21       Q  Okay.  Now, there was some discussion about some

22   examination about Judge -- Judge DalPra -- Master DalPra's

23   order regarding insurance, and you were saying that you -- you

24   didn't understand it --

25           THE COURT:  *[Laughs]*

Commented [DF22]: 1:17:18

70

1  BY MR. CAULFIELD:

2      Q  -- and you -- you started to try to reference it and

3  then we moved on.  Is there something about that order you

4  wanted to discuss?

5      A  Yes, if you could just briefly give me one moment to

6  bring it up.

7      Q  And while you're getting it up, assuming you can

8  multi-process, sir, if it turns out that somewhere along the

9  line in your lifetime as a parent you had made some mistake,

10  you didn't say the right thing in a letter, you held the kids

11  two more days during parenting, would it make any sense that

12  you should be punished and the children should be punished by

13  never seeing their dad again?

14      A  Yeah.

15      Q  Okay.  That would -- that would really be mentally ill

16  to think that way, wouldn't it?

17      A  Yes.

18      Q  Yes.  Okay.

19      A  Okay.  So I found the order.

20          THE COURT:  *[Laughs]*.

21      A  So I think the issue here is the uniform support order

22  that Judge Introcaso signed in paragraph 16 says, see decree

23  providing coverage under Blue Shield of California.  So the

24  order from the judge is to look at the decree for providing

25  Blue Shield coverage.  But when I look at the divorce decree



71

1   for providing coverage under Blue Shield, I can't find it

2   anywhere in there.

3        So it's unclear how I -- I -- I accept that by the

4   time we get to the order where judge -- I accepted Judge

5   Introcaso found me in contempt of that.  But again, to this

6   point, I'm not sure why, because he told me to look at the

7   decree and I can't find it in the decree.

8        MR. CAULFIELD:  Okay.  I have -- I have no further

9   questions.

10        THE COURT:  Any recross, Mr. Fontaine?

11        MR. FONTAINE:  No, I'm all set, Your Honor.  Thank

12   you.

13        THE COURT:  Very well.  At this point we're going to

14   take about a 15-minute recess.  I am going to keep my line

15   open here; you can stay on the line, or you can call back in

16   15 minutes.  Okay?

17        MR. CAULFIELD:  Thank you, Your Honor.

18        MR. FONTAINE:  Thank you.

19        THE COURT:  Very well.

20        We're going to take, like, about a three-minute

21   break because I have to --

22        UNIDENTIFIED SPEAKER:  You're absolutely right; it

23   sounds like Gilbert Godfrey.

24     (Recess at 1:20 p.m., recommencing at 1:33 p.m.)

25        MR. CAULFIELD: (Audio begins mid-sentence) yes, Your



72

1   Honor.

2          THE COURT:  Are your clients back?  Ms. Albrecht?

3          Katherine Albrecht, are you back on the line?

4          Dana Albrecht, are you back on the line?

5          THE PETITIONER: I'm here, Your Honor.

6          THE COURT:  Very well; we'll wait a few more

7   minutes.

8          MR. CAULFIELD:  (Indiscernible) now, Judge.                    Commented [DF23]: 1:33:59

9          THE COURT:  *[Whispered] She's probably having a hot*

10  *dog.  [Laughter]*

11         So Alex Corey is back.

12         UNIDENTIFIED SPEAKER:  Yup.

13         THE COURT:  I wonder if they're going to do anything

14  with the other guy with a thing like the guy from New

15  Hampshire.  Fold (phonetic)?

16         UNIDENTIFIED SPEAKER:  Oh, it's not -- what's his

17  name?  The guy that was the manager this year who was the

18  bench coach, he's not coming back.

19         THE COURT:  No.

20         UNIDENTIFIED SPEAKER:  Did they -- the first base

21  coach and third base coach, was those new coaches?

22         THE COURT:  They're back.

23         UNIDENTIFIED SPEAKER:  Were they the ones that

24  worked on this (indiscernible) previously?

25         THE COURT:  Yeah, they were.  I think they're both

73

1    back.  Febles and the other guy, I think they're both back.

2          UNIDENTIFIED SPEAKER:  I'll be curious to see what

3    they do to improve the team, if they even try.

4          THE COURT:  I don't know.  I don't -- I don't mind

5    John Henry as an owner, but I don't like Werner at all.

6          UNIDENTIFIED SPEAKER:  Oh, yeah.

7          THE COURT:  He's too --

8          UNIDENTIFIED SPEAKER:  What do you think of this new

9    GM they have?

10          THE COURT:  It's hard -- it's hard to say over the

11    first --

12          UNIDENTIFIED SPEAKER:  Yeah, because of the --

13          THE COURT:  -- first year with what went on.

14          UNIDENTIFIED SPEAKER:  -- the way the end of the

15    season was.

16          THE COURT:  I mean, they -- they basically told him

17    to trade Betts (phonetic), and I don't think Betts was going

18    to stay anyway.  Didn't sound like he wanted to be in the --

19    the Boston.

20          UNIDENTIFIED SPEAKER:  Ken Nuke (phonetic) can

21    pitch.

22          [Laughter]

23          THE COURT:  All right.

24          I must have these exhibits somewhere.  Forgot to

25    check them.



74

```
1       (Off the record)

2            THE RESPONDENT:  I'm here.

3            THE COURT:  You are.

4            THE RESPONDENT:  I'm here.

5            MR. FONTAINE:  Oh, good.

6            THE COURT:  Okay, so we're all --

7            THE RESPONDENT:  Sorry about that.

8            THE COURT:  We're all back, and we're on the record.

9   Mr. Caulfield, do you have any other witnesses?

10           MR. CAULFIELD:  No, Your Honor.

11                    PETITIONER RESTS

12           THE COURT:  Mr. Fontaine?

13           MR. FONTAINE:  Thank you.  Thank you, Your Honor.

14  If I could just make a brief opening before I have my client

15  testify, Judge --

16           THE COURT:  Okay.

17           MR. FONTAINE:  -- to -- to -- to summarize a few

18  points.

19           THE COURT:  Go ahead.

20               RESPONDENT'S OPENING STATEMENT

21           MR. FONTAINE:  Thank you.  As you can see, we've

22  submitted relatively few exhibits.  And we're trying to

23  directly -- to provide exhibits that directly relate to the

24  motions before this Court and to not burden the Court with

25  having to review many others.
```



75

1        In previous hearings, we've covered a lot of

2   testimony that has been brought up in these pleadings.  In the

3   previous hearing, we've extensively covered the incident that

4   occurred on this December 2018 holiday visit, the attendant --

5   the incident that happened regarding the children's attendance

6   at The Wilds of New Hampshire (sic) Summer Camp in 2019, and -

7   - and Mr. Albrecht's actions regarding that same incident.

8        And we've also, in a separate hearing with Judge

9   Derby, covered, at length, the incident that occurred at the

10  Collinsville Bible Church, which resulted in him issuing a

11  detailed decision with findings and rulings.  That was

12  appealed and subsequently affirmed on appeal.  Those are final

13  orders of the Court.

14       More specifically, Judge, your order of May 30th,

15  2019 found in pertinent part that there was a reliable

16  evidence that the parties had reached a verbal agreement --

17  also, through counsel -- regarding the December vacation

18  period.  Evidence existed supporting the Respondent's

19  assertion that the Petitioner did not comply with that verbal

20  agreement, quote.

21       The Court also finds -- found in the same order,

22  quote, there is reliable evidence to show that the parties'

23  two youngest children have a problematic relationship with

24  Petitioner at times, and that the Petitioner's actions and

25  conduct is the major contributing factor to those



76

1   circumstances -- major contributor to those facts and

2   circumstances.

3         The Court also found, in denying the previously

4   filed motion for contempt by -- by Mr. Albrecht, that the

5   girls do not wish to fly to New Hampshire for parenting time

6   with Petitioner and there's insufficient reliable evidence to

7   show that the Respondent has willfully disregarded the

8   parenting plan or has acted, in any way, to discourage

9   parenting time.

10        Further, the Court's denying the -- the -- another -

11  - on the motion for contempt says that there's reliable

12  evidence disclosed that the Respondent has encouraged 

13  to travel to New Hampshire.

14        Therefore, my question to you, Judge, is whether we

15  need to cover any of the information again pertaining to the

16  December incident, The Wilds of New Hampshire (sic) incident,

17  or the November incident that resulted in the restraining

18  order.  Obviously, I'll be glad to do that if you feel that

19  it's necessary, but I think extensive testimony and findings

20  have already occurred in that regard.

21        THE COURT:  I believe they have, and I don't think

22  you have to rehash or replow old ground.

23        MR. FONTAINE:  Okay, great.  What is new and has not

24  been previously addressed in the pleadings and the -- and the

25  evidence is the abuse and neglect petition that was filed --

77

1   the abuse and neglect complaint that was filed by Mr. Albrecht

2   and the Department's findings.  The allegations of Mr.

3   Albrecht's neglect relative to their medical and dental care

4   was brought up in his motion, and the -- the Department of --

5   the -- the Division in California has specifically addressed

6   that in their findings in their investigation.  And therefore,

7   I think it's important, Judge, that you review those -- those

8   -- that -- that report that we have submitted as an exhibit in

9   regards to that specific allegation on their part.

10          In fact, what is interesting in that report, as you

11  can see, is that Mr. Albrecht claims what Ms. Albrecht was --

12  sorry, that Mr. Albrecht what Ms. Albrecht had claimed, and

13  most importantly, what the two girls in private meetings with

14  the caseworker about their father, his previous actions, and

15  their -- their desire to not visit with or have contact with

16  him.

17          You know, you -- you had specifically not allowed us

18  to have the guardian reappointed at this point, but I think

19  what is stated in the report helps you get a feeling of

20  exactly how these girls feel about their father, about their

21  willingness to visit with him.  You previously -- and if I

22  could, just page 1 contains -- in that report, contains Mr.

23  Albrecht's interview; page 3, the mother's interview; page 6,

24  ███'s interview; page 7, ███'s interview; page 10, the

25  documents and records that she gave to the Department relative



78

1  to the money she spent on dental, orthodontic, and medical

2  care; and page 5, is -- is his reference to an order that we

3  knew -- that he knew full well was no longer in existence, and

4  I think that's important.

5          The judge, in his domestic violence finding, Judge

6  Derby, made a comment about how he had misused previously

7  issued orders, and I think it's important to see that he has

8  done so again in this -- in this report to the Division in

9  California.

10         MR. CAULFIELD:  Excuse me, this is Atty. Caulfield.

11  I'm confused as to what's happening here.  Atty. Fontaine said

12  that he wanted to make an opening.  He's now making a closing

13  argument.  And I also want to point out that nothing of what

14  he says is evidence.

15         The exhibits may be accepted by the Court, but none

16  of this is evidence; correct, Your Honor?

17         THE COURT:  Mr. Caulfield, I'm aware of how to run a

18  trial.  None of it's evidence.

19         MR. CAULFIELD:  All right, Judge.  Thank you.

20         THE COURT:  Call your first witness, Mr. Fontaine.

21         MR. FONTAINE:  Thank you.  Thank you, Your Honor.

22         Katherine, could you please raise your right hand.

23              KATHERINE ALBRECHT, RESPONDENT, SWORN

24                      DIRECT EXAMINATION

25  BY MR. CAULFIELD:



79

1      Q  For the record, state your full name.

2      A  My name is Katherine Michelle Mingus, and was

3  previously Albrecht.

4      Q  Okay.  And where do you reside?

5      A  I reside at 730 West Alegria Avenue in Sierra Madre,

6  California.

7      Q  And who lives with you at that location?

8      A  My son ████, my daughters ████ and ████, and most

9  recently, my sister Laura.

10     Q  Okay.  And your sister Laura, does -- is -- does she

11  need assistance?

12     A  She is -- she has cerebral palsy.  She's in a

13  wheelchair.  She has attendant care 24 hours, and my mother

14  was her primary caregiver until she passed away last year.

15  And now I'm --

16     Q  Okay.

17     A  I'm not the primary caregiver.  She has an attendant,

18  but I'm supporting her and helping her out.

19     Q  Have you had an opportunity to discuss with the girls

20  whether they want to see their father?

21     A  Yes.

22     Q  And has that been recent?

23     A  Yes.

24     Q  And have they changed their prior position that you

25  testified to at the motion hearing a little over a year ago?

80

1     A  No.

2     Q  Have they indicated any desire to have any contact

3  with him?

4     A  No.

5     Q  Have you continued, on occasion, to encourage them to

6  reach out to him?

7     A  Yes.

8     Q  And what has their response been?

9     A  Their response has consistently been no.

10     Q  Do you believe that they're mature minors?

11     A  Yes.

12     Q  How do they do in school?

13     A  They have very good grades.

14     Q  Have they had any problems with their conduct in

15  school or outside of school?

16     A  Never, never.

17     Q  Do they make wise, mature decisions in their daily

18  lives relative to, for example, schoolwork?

19         THE COURT:  *[Whispered] Of course not; they're a*

20  *bunch of morons*.

21     A  Yes.

22  BY MR. CAULFIELD:

23     Q  Helping around the house?

24     A  Yes.

25     Q  Do they have chores?

81

1      A  Yes.

2      Q  Do they do them?

3      A  Yes.

4      Q  How about decisions about personal hygiene?

5      A  They're great.

6      Q  How about their choice of friends?

7      A  Their friends are great.

8      Q  How about choice of appropriate clothing?

9      A  Yes, fine.

10         THE COURT:  *[Sigh]*

11  BY MR. CAULFIELD:

12     Q  Do they attend church services?

13     A  Weekly.

14         THE COURT:  *[Laughter]*

15  BY MR. CAULFIELD:

16     Q  Is there anything that would cause you to question

17  them being mature minors?

18     A  No.

19     Q  Do you think they're capable of making mature,

20  independent decisions?

21     A  Yes.

22     Q  Do you believe their decisions on not wanting to have

23  contact or visits with their father is a decision that they've

24  thought carefully about and that they've made after the

25  consideration of all relevant factors?



82

```
 1        A  Yes.

 2        Q  Do you think that it's free of any influence?

 3        A  Yes.

 4        Q  Did you, in any way, attempted to influence their

 5   decision in that regard?

 6        A  I have encouraged them to go to their visits, but if

 7   that's what you mean, yes.  I've tried to get them to do it.

 8        Q  Have you encouraged them to not have any relationship

 9   with him?

10        A  Never.

11        Q  Have you asked them -- do you know that they've

12   requested that -- that the children engage in reunification

13   counseling?

14        A  Yes.

15        Q  Have you asked them as to whether they would be

16   willing to engage in reunification counseling with their

17   father?

18        A  Yes.

19        Q  What was their response?

20        A  They said they don't want to do it.

21        Q  Okay.  And --

22        A  ███    said -- actually, ███    said she absolutely

23   wouldn't do it and she couldn't be made to do it.

24        Q  Okay.  And have you encouraged them to consider

25   engaging in it?
```



(973) 406-2250 | operations@escribers.net | www.escribers.net

83

1    A  Yes.

2    Q  Has Dana, as far as you know and from speaking with
3  your girls, ever apologized to the girls regarding the
4  December Christmas break issue?

5    A  No.

6    Q  Has Dana ever apologized to the turmoil he caused
7  regarding The Wilds of New England incident during the summer
8  of 2019?

9    A  No.

10    Q  Has Dana ever apologized to the children regarding the
11  complaint that he filed with the Division in -- in Los
12  Angeles?

13    A  No.

14    Q  Has he ever apologized to them regarding the November
15  incident at the Collinsville Bible Church which resulted in
16  final domestic restraining orders?

17    A  No.

18    Q  Do you think that that is important to the girls?

19    A  Yes.

20    Q  Now, you understand that Dana has submitted some
21  proposed reunification counselors?

22    A  Yes.

23    Q  If the girls were to consider reunification
24  counseling, do you believe that those counselors would be the
25  good -- a good choice?



(973) 406-2250 | operations@escribers.net | www.escribers.net

84

1     A   No.

2     Q   Have you researched them?

3     A   Yes.

4     Q   And do you believe that they are unbiased?

5     A   I believe that they are biased.

6     Q   Okay.  And why do you say that?

7     A   Well, their backgrounds primarily talk about parental

8  alienation as the thing that needs to be addressed in therapy.

9  And Mr. Albrecht's contention is that that's what the issue

10 is, so it doesn't really get to the heart of what's going on

11 between him and the girls.  And I don't -- I don't believe

12 that that's an unbiased approach.  I think an unbiased

13 approach would talk to them and figure out what they're upset

14 about.

15    Q   And do you believe that in -- based on your

16 conversations with them, that you have, in any way,

17 intentionally alienated the children from Dana?

18    A   No.

19    Q   Do you think that, based upon your -- their statements

20 to you about reunification counseling, that it would be in

21 their best interest for a court to order it, despite their

22 indicating that they don't want to be part of it?

23    A   No, I don't think that would be in their best interest

24 to have it ordered and forced on them.

25    Q   Do you think it would be emotionally harmful to them?

85

1     A  I do.

2     Q  Let's talk about Dana's claims for a minute.  You

3  heard him discuss the medical and dental care issues?

4     A  Yes.

5     Q  Start with the medical.  First of all, have you been

6  required to obtain your own health insurance for the children?

7     A  He obtained indigent insurance after failing to

8  provide them with the insurance in the parenting plan and we

9  had to go to court.  And he then came up with the indigent

10  insurance, which in California is very problematic.  So I

11  obtained insurance for them that I believe, as a parent, is

12  more appropriate for their medical care and wellbeing.

13     Q  And how much does that cost?  Okay.

14     A  Which I pay for currently.

15     Q  Okay, and how much does that cost?

16     A  I pay 400 -- I pay $488 a month for -- for both

17  children for that insurance.

18     Q  Okay.  And how much do you receive from Dana in child

19  support?

20     A  $50 a month for both children.

21     Q  Okay.  And that -- why was the -- why was he only

22  ordered to pay $50 a month?

23     A  Well, initially, it was because he stated that he was

24  unable to work because of the stress of this divorce.  And

25  it's unclear to me, since that time, why he's still not



86

1  working.

2      Q  Now, under this insurance, are there certain providers

3  that are considered preferred providers that you do not have

4  to apply towards your deductible?

5      A  Correct, there's just a $40 copay for most of them.

6  There's a big list and then that -- and a catalogue they put

7  out every year.

8      Q  And you recall the testimony regarding Dr. Greenberg?

9      A  Yes.

10     Q  Now, do you acknowledge that you actually had the

11  children see Dr. Greenberg for a visit?

12     A  Just ████.  ████ got her for a visit prior to a

13  medical procedure that required anesthesia as it required a

14  physical.  I looked in the phone book and called several

15  providers.  She was the one who could see her on short notice

16  because I had only been informed that day that I needed to

17  have the physical.  So we had it on short notice with a doctor

18  I didn't know who was Dr. Greenburg.  So she was seen by her

19  for an exam.

20     Q  This kind of dovetails with the second subject we're

21  going to talk about, dental, correct?

22     A  Yes.

23     Q  Okay.  So did she, in fact, see Dr. Greenberg for that

24  physical?

25     A  She did.



87

1    Q  Okay.  Now, did you find out at a later point in time

2  that Dr. Greenberg was not a preferred provider under the new

3  insurance that you had purchased?

4    A  Yes, I later found that out, so I paid cash for that

5  first visit.

6    Q  Okay.  And once you had insurance, did you want them

7  to be -- did you want them to see providers that were actually

8  covered -- as -- were preferred providers under your plan?

9    A  Yeah.  Just to clarify, when I made the appointment

10  with Dr. Greenberg, I currently had the Blue Shield insurance

11  for the girls, but I was unable to find a provider that could

12  see them on that short notice, so that's why I went with Dr.

13  Greenberg.  And to be honest, I was grateful she could see me

14  at all, and I didn't really bother to look into her insurance

15  credentials for a one-time visit for a physical, which was

16  reasonably priced.

17    Q  Now, at some point in time, did you have some

18  discussions with Dana about the fact that you wanted -- and

19  again, I'm talking conversations, whether it be directly with

20  -- with him or through our office -- that you wanted to use a

21  different doctor that was, in fact, a preferred provider?

22    A  Yes.

23    Q  And the letter of June 6th, 2019 from my office to

24  Atty. Caulfield that's in our Exhibit 6, was that the first

25  letter informing them of that?



88

1      A  I believe so.

2      Q  At any time at -- oh, by the way, before that time,

3  you had actually had a discussion with Dana regarding his

4  request that there be a specific schedule of vaccinations,

5  correct?

6      A  Well, what happened was, we saw -- I -- I took the

7  girls to Dr. Greenberg, and then the issue of vaccinations

8  came up from their school.  And both parents wanted the girls

9  to be vaccinated.  I made an appointment and set up a

10 conference call between Dr. Greenberg and Dana and myself to

11 discuss medical issues associated with their vaccinations.

12 And he participated in that conference call.  I was there

13 physically in her office; he was on a speakerphone.  And

14 during that visit, we discussed our concerns about vaccinating

15 the girls and she -- we hung up.  And then she proceeded to

16 write out a schedule after we had hung up of what that would

17 take and then informed that the cost would be many thousands

18 of dollars.  So --

19     Q  Okay.  And that --

20     A  So that's what happened at that visit.  And then I

21 contacted your office --

22     Q  Hold on.

23     A  -- and said --

24     Q  Wait, before you go on to that --

25     A  Okay.



89

1     Q  -- let me ask a question about that.  So explain why

2   it would be so expensive to see Dr. Greenberg for these

3   vaccinations as was discussed?

4     A  So what I learned at that visit was that she was not

5   in our network, and I knew that our -- that Blue Shield would

6   pay a portion of the visits for doctors who were not in our

7   network.  What I wasn't aware of is that her prices were

8   exorbitant, that the schedule required 13 visits for

9   vaccinations that could have been completed in three, that --

10  and that was because we wanted to monitor their response to

11  the vaccines.  And Dana and I had agreed on that.  But because

12  there were 13 required visits and she was not going to accept

13  any insurance payments, they would not make any payments.

14        And she also was going to charge me the full cost of

15  the actual vaccine drugs themselves, which was very high.  And

16  that was when I discovered that we were talking about

17  literally many thousands of dollars that would not be covered

18  by my insurance until we hit a deductible of $5,000, at which

19  point they would then still only pay us a percentage of her

20  fee, not the full fee.

21    Q  Okay.  And did that result in you sending that June

22  6th letter?

23    A  Yes.

24    Q  Okay.  And at any time after that June 6th letter, did

25  Dana agree that you could see Dr. Hanif, who you had asked



90

1   that he -- him to -- the girls to be able to see and follow

2   the schedule that had been agreed to regarding vaccinations?

3       A   Yeah, I believe that -- my recollection is that we

4   offered two options:   for him to either pay Dr. Greenberg's

5   fees himself or for him to allow me to choose a different

6   provider who would follow the same vaccination schedule we had

7   agreed on, but under my insurance.

8       Q   And you, in fact -- you, in fact -- well, let me ask

9   you this.   Could you afford -- could you have afforded to pay

10  that $5,000 deductible for all of these visits, et cetera?

11      A   No.

12      Q   Was the -- did Dana ever respond saying that your

13  proposal that you see Dr. Hanif and that they -- and that you

14  follow the schedule that had already been agreed to for

15  vaccinations, did he ever respond saying he was agreeable to

16  it?

17      A   No.

18      Q   Did he ever respond saying he wasn't agreeable to it?

19      A   He responded saying he wasn't agreeable; then we

20  followed up and said unless you have a better proposal or, I

21  believe, will pay for Dr. Greenberg, that Katherine needs to

22  proceed with these vaccinations, so we've made an appointment.

23  And at that point, I think a couple weeks went by where we

24  heard literally nothing.   He didn't respond to that in any

25  way.



91

1    Q   Okay.  And when you ended up scheduling the

2    appointment, did you -- with Dr. Hanif, did you actually get

3    to go to it?

4    A   No, I scheduled the appointment, and we informed Dana

5    of that.  We then heard nothing back.  Two weeks went by,

6    during which I had to prepare the girls for their

7    vaccinations, which they were very nervous about.  And on the

8    day of the vaccines, they woke up bright and early a little

9    stressed, but ready to do it.  And then I checked my email on

10   that morning -- I believe our appointment was around noon --

11   and there was an email from -- from Dana to me saying, "I have

12   cancelled your appointment today with Dr. Hanif."  And I --

13   "You will not be able to vaccinate those girls today.   I

14   cancelled the appointment."

15   Q   Did you continue to want Dr. Hanif to be able to see

16   the girls after that cancellation?

17   A   Yes.  I actually called his office to find out what

18   had happened or to see if the appointment had been cancelled;

19   they informed me that it had, indeed, been cancelled.  And I

20   then pretty much said to him --

21   Q   Did they --

22   A   -- (indiscernible) the girls --

23   Q   -- inform you -- did they inform you who cancelled it?

24       Hello?

25   A   It was from Dana.  Can you hear me?  Am I here?  Yeah.

Commented [DF24]: 2:00:39

92

1  Hello?

2      Q   Did they inform -- yes, can you hear me?

3      A   Yeah, they informed me that they had received legal

4  documents from Dana.  And then I spoke to Dr. Hanif directly,

5  and he said that he was unwilling to see the girls.  And I

6  said what if I got a court to order that they could -- they

7  could be seen?  And he said he would still be unwilling to see

8  them because he did not want the risk of a lawsuit from Dana.

9  And so he told me that he would not see the girls under any

10  circumstances at that point.

11      Q   Was that one of the reasons that you filed your motion

12  to modify the parenting plan?

13      A   Yes.

14      Q   Have you been able, up to this point in time, to get

15  the girls vaccinated?

16      A   No, because my options were to violate a court order

17  to vaccinate them, and I thought this hearing would be held a

18  long time ago.  So I've been just waiting for this hearing so

19  the judge could decide how we're going to proceed on the

20  vaccinations.

21      Q   Do you feel that Dana's actions with regards to the

22  girls --

23          THE COURT:  (Indiscernible).                          Commented [DF25]: 2:01:58

24  BY MR. FONTAINE:

25      Q   -- receiving medical treatment was done with the

93

1    intent of trying to impede your ability to obtain appropriate

2    treatment?

3        A   I do.

4        Q   Has that frustrated you in your desire to get the

5    girls appropriate treatment?

6        A   Yes, it has.

7        Q   Has it resulted in any issues with you with regards to

8    them not being vaccinated?

9        A   Well, they're not vaccinated currently, and their

10   schools are asking about it.  I'm also just -- they don't have

11   a primary care physician because I thought Dr. Hanif would be

12   a great choice.  He was willing to be their primary physician,

13   and they currently don't have a primary physician.  So if

14   something happens with their health, my only option is that I

15   take them to a walk-in clinic or to an emergency room because

16   I don't have a doctor for them.

17       Q   Now, had you -- have you had to do that on occasion

18   when they've had --

19       A   Yes, I have.  Yeah.

20       Q   And explain.

21       A   Christmas of, I believe, last year,  had a cold,

22   and we were concerned and just wanted to rule out anything

23   serious, so we took her to a walk-in clinic, and the doctor

24   physically examined, said she'd be fine, it was just a cold,

25   and sent us home.

94

1          Since that time, there have been -- like last week,

2   ████   sprained her finger, and normally, I would have

3   simply -- it was on a Thursday, and normally, on Friday I

4   would have simply taken her to her family physician and had it

5   looked at, but because I don't have a family physician, I did

6   not want to take her to a walk-in clinic because I don't know

7   what's up with her, and there's COVID around, and other

8   issues.  So I literally went online and subscribed to a

9   physician referral system that just answers generic questions,

10  and I got the -- the answer that she should buy an over-the-

11  counter splint, leave it on for a day or two, and it should be

12  fine, and it is.  And she's fine.

13          I guess the issue, though, about not having a primary

14  care physician is even though all is well with that, I didn't

15  have an opportunity to see an actual (audio interference).

16  And so now I'm -- it's (audio interference).  Do you go all

17  the way to the emergency room?  Or do you just wait things

18  out?  And I'd really like to be able to just have a doctor I

19  can take the girls to.

20     Q   And when you go to the emergency room, does it cost

21  you more, personally, to have them treated, or to a walk-in

22  clinic to have them treated than if, say, you'd gone to a

23  primary care physician?

24     A   I haven't had occasion to take anyone to the emergency

25  room.  We've only been into walk-in care that one time.  The



95

1 girls are in good health, and we don't have a lot of medical

2 needs, but what (audio interference) is two-to-three-hour wait

3 in the waiting room of the walk-in clinic here in Los Angeles,

4 during which we could be exposed to COVID in the waiting room;

5 I don't know.

6       But as far as the cost goes, typically, the insurance

7 will cover that, but not at the same rate as if I had gone to

8 a doctor covered in the network.

9    Q  Based upon the problems that you've had in having

10 joint decision-making --

11    A  I'm sorry, one more time?

12    Q  Based on the problems that you have had in joint

13 decisions regarding medical treatment, are you asking this

14 Court to provide you with either sole decision-making or

15 decision-making along the lines that you currently have

16 relative to education?

17    A  Yes, so that I can at least get them the care they

18 need even if Dana tries to impede it. Yes.

19    Q  Okay. And if -- currently, the order for -- the order

20 relative to education decision-making is that you need to

21 inform Dana of it, of the decisions, but that you are

22 ultimately able to make the decision in the event that the two

23 of you can (sic) agree, correct?

24    A  It does state that, in the event of a disagreement, I

25 can make the decision, correct.



96

1      Q   Okay.  Now, you've asked the Court in this -- in your

2   motion to award you sole decision-making regarding both

3   education and medical without that kind of a -- alternative,

4   correct?

5      A   Correct.

6      Q   Why has that option that's allowed in the education

7   arena caused you issues?

8      A   Because Dana has used his joint decision-making

9   regarding education to essentially cause a lot of problems for

10  the girls at their schools.  He has used information that he

11  has gotten from the schools through that in order to contact

12  the schools and, I mean -- I guess I'll say it -- just what

13  feels to them like harassment.  He has created emergency

14  meetings for me to come in and talk to them.  He's forwarded

15  them private emails that ██████ has written to him.  He has

16  essentially made their lives at all of their schools very,

17  very difficult.  Our kids are noted by the schools as being

18  problem students.  There are attorneys involved, at great

19  expense to the schools.  And it's really been a problematic

20  issue.

21     Q   We'll talk about the education and the education

22  choice for your daughter in a little bit, but I want to get on

23  to the -- on to the dental.  But before I do that, one last

24  question.  So your preference is to have complete decision-

25  making relative to medical, education, et cetera, correct?



97

1       A   That is correct.

2       Q   But you -- but as an alternative, if -- if the Court

3   is not so inclined, you would like the -- the ability to make

4   the final decision in the event you can't agree, correct?

5       A   Yes.

6       Q   So let's talk about dental.  For den -- you heard

7   Dana's testimony about your treatment of the girls relative to

8   dental treatment?

9       A   Yes.

10      Q   Okay.  Why don't you give us some background as to

11  what's occurred relative to their treatment, including the

12  issue you have with ██?

13      A   So starting back in 2016, or even prior, with ██,

14  ██  has severe dental phobia.  So she's unable to have a

15  teeth cleaning.  She's kind of successfully had a few of

16  those, but she's been unable to have any fillings filled,

17  except by one doctor that Dana and I found in either Nashua or

18  Amherst, who's Dr. Andrew Cheifetz.  She was seen by Dr.

19  Cheifetz up until 2016, and he was able to fill her cavities.

20  He was able to do all the treatments with her.

21          And then in 2016, we had an appointment with -- I made

22  an appointment with Dr. Cheifetz for her regular six-month

23  exam, and Dana contacted their office, and that was the first

24  time he contacted an office and said he had legal authority

25  and that things had to be done his way, not my way.  And he



98

1  essentially caused their office, because he spoke to their

2  office manager, to determine that -- that there would be a

3  threat of their being sued and they fired ▮▮▮ as a patient.

4  So I was unable to get ▮▮▮ the dental care that she had

5  previously been able to get.

6       From there, Dr. -- excuse me, Dana wanted me to go to

7  Dr. Machell, the family doctor.  I could not afford his rates

8  at that time.  He was extremely expensive.  He's a great

9  dentist, but he's very, very costly.  So I found a dentist

10 that was covered under our New Hampshire insurance.  We had

11 New Hampshire Children and Family Insurance that I had

12 obtained at that time due to low income.  And they were seen

13 at Sterling Smiles in Nashua.  From that point -- but they

14 were unable to treat ▮▮▮ because of her phobia.

15      So then we moved to California, and we -- I had them

16 seen at Hastings Ranch Dental, but during the period when we

17 moved to California, I did not have dental insurance for the

18 girls.  I had had dental insurance under the California Family

19 and Children Insur -- or excuse me, New Hampshire Family and

20 Children Insurance, but when we moved here in September of

21 2017, I no longer had that insurance.

22  Q  Okay.  And did that create -- did that create any --

23 did you have any financial issues with regards to paying for

24 dental privately?

25  A  Yeah, I had financial issues with pretty much



99

1   everything on coming out here to California.  As the Court is

2   aware, I get around $1,600 a month in disability because I

3   have stage IV breast cancer.  I have no other income --

4        (Phone ringing)

5            THE WITNESS:  One second.  And so -- I'm sorry,

6   but -- I'm sorry about that.

7        A  So I did not have insurance coming out here.  I had a

8   court order saying that Dana needed to pay for the insurance,

9   but we didn't have it and we were experiencing some financial

10  difficulty, which is pretty -- pretty (audio interference).

11  Yeah, I -- I think I answered your question.  I'm sorry, I got

12  distracted by the phone, but I turned it off.

13  BY MR. FONTAINE:

14       Q  Yeah, and -- that's okay.  That's okay.  And so with

15  regards to the dental coverage for -- for ███, does that

16  cost -- typically cost more than would be for a child that

17  doesn't have that fear?

18       A  Yeah.  It does because, okay, she can't just have a

19  cavity filled for two or three (audio interference) filled in

20  all the cavities.  It's literally thousands of dollars because

21  she requires full anesthesia at this point because we've been

22  unable to find a doctor that can do it any other way.

23       Q  Okay.  And so did you -- you acknowledge that you put

24  off some of that care because you couldn't afford it?

25       A  Correct.



100

1    Q   And have you shut your phone off, by the way?

2    A   Yes.

3    Q   Okay, thank you.  So with regards to the dental care -

4  - we'll stick with ███   for right now.  With regards to

5  dental care for ███  , did you, at some point, obtain care for

6  her?

7    A   Yes, in June, I think, the 18th, I took her to

8  Hastings Ranch to go for a full set of X-rays and cleaning.

9    Q   Who paid for that?

10   A   I did.  Actually, my -- my mother helped me.

11        UNIDENTIFIED SPEAKER:  We paid -- but yeah, I --

12  Dana didn't.  I -- we did.

13  BY MR. FONTAINE:

14   Q   Okay.  And did they -- and what did they find?

15   A   They found six cavities for ███ .

16   Q   Okay.  At some point in time, were they able to fix

17  those cavities?

18   A   They tried to do some procedures with her, but it

19  wound up the same way it always does.  She's hysterical, and

20  they give up.  And they then said this child needs medical

21  anesthesia to have her cavities filled under anesthesia.  And

22  they gave me the name of La Habra Family Dentistry, or I

23  believe, La Habra Modern Dentistry in La Habra, which is about

24  an hour away from here.  And they referred me to their office

25  and said I should make an appointment and have her go in and

101

1  get the full anesthesia and have the six cavities treated

2  then.

3      Q  And did you do that?

4      A  We did.  So I made the appointment with La Habra

5  Family Dentistry, and I then contacted your office, who then

6  contacted Dana, and we explained the situation that she had

7  six cavities, needed to go La Habra Modern Family -- needed to

8  have dental anesthesia.  And I said that I had let -- on the

9  advice of my dentist, they had referred to me to the La Habra

10 Modern Family Dentistry location.  I provided a link to their

11 website and information about them, and I told Dana that I

12 needed his permission to proceed.  And he said he -- that I

13 already had an appointment on a certain date, and that I

14 needed his approval to keep the appointment or he could review

15 the information if he did not like that doctor and present an

16 alternative doctor that I could take them to.  So that was

17 sent out after I discovered the six cavities and got the

18 referral.

19     Q  And did Dana, in fact, agree that you could get the

20 treatment?

21     A  He did not agree to the treatment.  And I reluctantly

22 had to cancel the appointment with La Habra Family Dentistry.

23     Q  Okay.  And has , at any point, received the

24 treatment that she needed?

25     A  Yes.  So that was in June, and then all that fall, I

102

1  tried to get Dana's permission, and I made two separate

2  appointments with La Habra Family Dentistry, both of which I

3  was unable to keep because of Dana's not giving permission.  I

4  then took the kids back for their six-month checkup in January

5  of 20- -- what would it have been -- 2018.  Switching track of

6  years, but that was in June.  So yeah, of 2018 -- 2019.  So I

7  took them back in January of 2019.

8        At that point, the doctor at Hastings Ranch Dental,

9  where I was taking them every six months, gave ███ another

10  set of X-rays and said this child now doesn't have six

11  cavities like in June.  She has 11 cavities.  Why have you not

12  fixed her cavities?  We gave you a referral; why did you not

13  fix them?  And I answered to her that I, under a -- a New

14  Hampshire family order, have to get my -- the -- her father's

15  permission to proceed, and he has not provided permission.

16        She then said this is urgent enough that you should

17  probably do it even without permission.  And I said that would

18  be a violation of the court order.  And she then wrote a -- a

19  fairly straight-up letter at my request because I said can you

20  write a letter stating this so I can send it to the court and

21  get the court's permission to get her treated, if Dana won't

22  agree?  She wrote a letter in January of 2019 stating that

23   had had 6 cavities in June, now had 11 cavities, and

24  that it was absolutely urgent that she receive the care.

25        So I got that letter -- I requested the letter; I got

103

1 the letter to send to the court.  And we tried again to

2 contact Dana and to suggest a different dentist, which is one

3 in Pasadena.  He agreed to that.

4        Oh, let me back up.  So after I got the letter from

5 her, I went -- I took ████, physically, to La Habra Family

6 Medical Dentistry and had an appointment with her with the

7 doctor to consult, even without Dana's permission.  I took her

8 at least for the consultation.  And then we came back, and we

9 thought let's propose a different dentist; maybe he'll agree

10 with a different anesthesiologist and dentist, so we proposed

11 that.  And I did that combined with the fact that there were

12 now 11 cavities, he agreed to that.  And then we proceeded and

13 had the procedure done.

14        As he says, it was $2,500.  I did submit it to

15 insurance; they paid a portion of it.  They paid something

16 like the first 15 minutes of anesthesia, not the whole thing,

17 and I wound up having to pay the majority of that out of

18 pocket.  I've asked him to reimburse me, and he hasn't.

19     Q  Has Dana -- has -- and how did you get money for -- to

20 be able to afford that?

21     A  I had to ask my mom, kind of on bended knee at that

22 point.

23     Q  Has Dana --

24     (Phone ringing)

25        THE WITNESS:  Oh, I guess I didn't turn my phone



104

1    off; sorry.  I'm so sorry; I thought I had it off.  Okay, go

2    ahead.

3    BY MR. FONTAINE:

4        Q   So do you believe that Dana's actions with regards to

5    the -- the dental treatment of the -- first of all, the

6    insurance that would have covered some of the dental treatment

7    and then, subsequently, the dental treatment itself has

8    inhibited your ability to get prompt dental treatment?

9        A   Yes, it caused ███ to go from 6 cavities to 11 at --

10   at great trauma and distress to both me and ███ -- and my

11   dentist.

12       Q   Let's talk about ███ for a second.  Did she also

13   require any -- any dental work?

14       A   So I had purchased braces for ███ on the

15   recommendation of our dentist.  I took her to an orthodontist

16   and purchased braces for her, which were close to $6,000.  I

17   did this back in New Hampshire.  And my mother helped me to

18   pay for a portion of that expense.

19           I -- we saw that --

20       Q   Did Dana -- did Dana contribute to that expense at

21   all?

22       A   Not one penny, no.  And now ███ needs braces too,

23   and I'm sure he's not going to pay for that either.  I've got

24   to figure that out.  But anyway, so I got ███ braces and

25   took her to her regular appointments for tightening and

105

 1   adjustments all throughout our stay in New Hampshire.

 2         When we moved to California, obviously, I couldn't

 3   take her to the orthodontist we'd been seeing, so I took her

 4   to two separate orthodontists here in California and said can

 5   you take over ▮▮▮'s -- or excuse me, ▮▮▮'s braces.  And

 6   both orthodontists gave me exorbitantly high prices of

 7   thousands of dollars which, at that point, I did not have and

 8   was unable to pay for it.  So I asked that -- the orthodontist

 9   that I saw, I said what would -- what's the worst-case

10   scenario if I just wait until I get some money?  Because if

11   the Court will recall, I was awarded proceeds from the sale of

12   the house, but Dana had put in an appeal causing all of those

13   proceeds to be on hold.  So we were absolutely broke during

14   that period of time, which was a long period of time, until

15   finally that was decided and those funds were released.  So

16   that was during that time when I had just no money and I could

17   not afford thousands of dollars for orthodontic care for

18   ▮▮▮ at that point in California.

19         What -- what -- like I said, I asked the orthodontist

20   what's the worst that would happen if we just left it alone?

21   And they said, well, they won't get better, but they won't get

22   worse.  And you can do that until you can afford it.  And I

23   kept thinking any month now I would be able to afford it.

24     Q  After you received your money from the -- from the

25   property settlement after the appeal was denied, did you end



106

1    up proceeding with having some work done for ████?

2        A  Yes, which I paid for out of pocket.  So I took ████

3    to an orthodontist once I had that money, and we had her

4    braces adjusted and then removed and a retainer made, again,

5    all at my expense in cash.

6        Q  Did Dana contribute anything for that expense?

7        A  Nothing.

8        Q  So in regards to the -- this -- the request in your

9    motion for decision-making relative to medical and -- medical

10   decisions, do you feel that his -- the -- the -- the -- the

11   difficulty that you've had relative to Dana's cooperation with

12   dental care is part of that request as well?

13       A  Yes.

14       Q  I'm going to refer you to our Exhibit Number 5

15   regarding the landlord.  At some point in time, did your

16   landlord contact you regarding a packet of information that

17   Dana had -- had sent to them?

18       A  He sent me an email, yes.

19       Q  Okay.  And was it your landlord -- first of all, who

20   are you landlords?

21       A  My -- the home I live in is owned by a -- a -- a

22   Chinese couple whose last name is Lin (phonetic).  And the

23   person who manages the property is their son, George Tsai.

24       Q  Who contacted you?

25       A  George Tsai contacted me, the son.



107

1      Q   Did he indicate to you that -- that the package he

2   received had caused him concern?

3      A   Yes.

4      Q   And explain that conversation.

5      A   So he told me that he had received an unsolicited

6   package by postal mail that he did not know how, but -- but

7   appeared to be from my ex-husband, Dana Albrecht; that's the

8   return name on it.  He said it contained sensitive information

9   about my children, including their birth certificates, and it

10   made him extremely uncomfortable.  He felt it was

11   inappropriate.  And he said it was unsolicited.  He didn't

12   know how Mr. Albrecht got his name or address, but I guess

13   through property records, and that he wanted me to know that

14   in no way did this affect his high estimation of me or my

15   family, my children.

16          And then I spoke to him on the phone after receiving

17   this email, and I learned from him that the -- that this

18   packet of information was sent to that family -- or to my

19   landlord a month before my lease was up for renewal and that

20   his parents, his Chinese conservative parents, had said that

21   on the day he got this packet from Mr. Albrecht, that they

22   were not going to renew my lease.  So I would have had like 30

23   days to not have a home.

24          George, who's very kind, actually spoke to his parents

25   on my behalf and said please don't hold the bad actions of Mr.



108

1  Albrecht against this woman and her children.  And he was able

2  to persuade his parents to relent and allow me to renew my

3  lease and remain in my home.

4       Q  And -- and what did you consider that packet to be

5  from Mr. Albrecht?

6       A  I think it was an attempt to -- given the timing,

7  especially, to having exactly that outcome:  for me to lose my

8  lease and lose my home.  For me and the children to lose our

9  home.  I think it was just designed to -- to create hardship

10  for me.

11      Q  Now, let's talk a little bit about Exhibit Number 4.

12  This is a couple documents relative to The Wilds -- addressed

13  to The Wilds of New England.

14      A  Yes.

15      Q  And these are from Dana, correct?

16      A  Yes.

17      Q  And did you have any conversation with this gentleman,

18  Rand Hummel?

19      A  I did.  During -- it's kind of a blur because it's

20  right when my mom died, but I had sent my kids to the summer

21  camp.  They always attend.  So -- because for a couple

22  reasons.  That was the week that their friends were going to

23  be there, and they historically always go when their friends

24  are there.  And also, I wanted them to get a little break

25  because at that time, my mother was in hospice, and -- I'm



109

1  sorry.  At that time, my mother was very sick, and I was

2  administering morphine to her.

3      Q  Okay.

4      A  Should I go on?

5      Q  Take your time.  So what -- what -- how did this --

6  how did the -- these -- their visit at The Wilds of New

7  England result in these letters?

8      A  Okay.  So Mr. Albrecht flew out here with  to

9  California and went to the Sierra Madre Police, who I guess

10  informed him or maybe it was DCFS, the child abuse report he

11  filed an hour later.  But one of them, he said my children are

12  missing, help, help.  And I guess they contacted The Wilds

13  directly, and my kids, at DCFS, the day after my mom died, I

14  had to go in and meet with them.  So I put on a dress and

15  makeup and high heels, and I went in and smiled and met the

16  lady and brought my daughters, and she -- oh, excuse me, I

17  didn't bring my -- just communicated with my daughters.  She

18  put us on FaceTime with Rand Hummel and the staff at The

19  Wilds, and -- who then went out and got my girls in from where

20  they were participating in a -- in a fun camp activity.  They

21  came in.  I was in this woman's office in the DCFS government

22  building, and I had FaceTime.

23          And the staff at The Wilds had the girls, you know,

24  FaceTime on the phone, and the girls saw me and said, "Hi,

25  mom.  We're having such a great time.  Hi, how are you?"  And

110

1  then they looked at the background of where I was standing and

2  said, "Wait a minute, where are you?"  And at that moment, the

3  DCFS worker, Veronica, comes to the phone and said, "Hi,

4  girls.  I am a child abuse investigator caseworker,

5  basically."  And the girls went from totally happy to

6  completely stressed out.

7          And at that point, she said, "Are you safe?"

8          And they said, "Of course we're safe."

9          And then we ended that call.  And I guess it was at

10  that point that -- I -- I don't remember exactly how he got

11  informed that they were at The Wilds, but I then talked to

12  Rand Hummel and learned that he was trying to, like, talk to

13  them at The Wilds, go see them at The Wilds.  And there was

14  like a whole -- Mr. Hummel told me that he was extraordinarily

15  aggressive and rude to him on the phone.  And the whole Wilds

16  was upset about the way Mr. Albrecht was treating them and, I

17  guess, letters followed.

18     Q  So the letters that we've attached to Exhibit 4 are

19  letters that The Wilds received from Dana, correct?

20     A  That is correct.

21     Q  You said that was the --

22     A  I believe that they were -- I'm sorry.

23     Q  Go ahead.

24     A  Mr. Hummel told me that he would not -- that he was

25  not -- because of the girls' request, he was not allowing



111

1    them -- allowing Mr. Albrecht to speak to them.  And then we

2    had an emergency motion in court, and Mr. Hummel said that he

3    was going to await the outcome of that motion before requiring

4    the girls to talk to their dad.  And he told that to Dana, and

5    I guess that made Dana very angry.  And then this was his form

6    of retaliation within these letters, requesting all of these

7    government documents, or whatever documents, from The Wilds.

8         Q  So now let's switch gears for a second and go to this

9    -- the -- the -- ███'s choice of school.

10        A  Yeah.

11        Q  Can you give us some background how that all occurred?

12   First of all, where was she going --

13        A  So in --

14        Q  -- before she went to the school in question?

15        A  So in California, where we live, there is a very

16   selective process for getting into private high schools.

17   ███ had -- ███ and ███ both had attended the Gooden

18   School for middle school, and then it was time for high school

19   applications, which is a big thing in 8th grade.  They have

20   (audio interference), they have tutoring about it, (audio

21   interference).  So ███ (audio interference).  And ███

22   applied to a number of different schools around -- around

23   December of January for a decision about admission that would

24   come in, in March, to attend a private high school in the

25   fall.



112

1          These are extraordinarily exclusive and competitive

2     schools, and some of them only take a very small percentage of

3     students who apply.  So they have to have great grades, really

4     good test scores on the admissions test, and the applications

5     have to be perfect.  So ███, in January --

6          Q   Okay.  Hold on, before you go there.  Hold on.

7          A   -- (audio interference) about that.

8          Q   Hold on, before you go there.  So the Gooden School

9     that they were attending previous to this, who paid for that?

10         A   I did.  My mother --

11         Q   Okay.

12         A   -- my mother and I did.  Yeah.  Actually, my mother

13    did, but --

14         Q   Okay.

15         A   -- Dana didn't.

16         Q   Okay.  Okay.  Dana didn't contribute anything for it;

17    is that correct?

18         A   Not a penny.

19         Q   Okay.  Now, was it your intention that if they got

20    into any of the schools -- first of all, did they choose these

21    schools to apply to?

22         A   Yes, I -- they -- well, ███ had already been

23    through it.  She was already in high school.  And then ███,

24    on the basis of her own research and the visits from the

25    schools and to the schools, decided which ones she wanted to

113

1   apply to.

2       Q   Okay.  And did you assist her with that?

3       A   I did.  I used to tutor in this area, so I know the

4   schools really well, and I drove her to the visits at the

5   schools and helped her with the research.

6       Q   Okay.  And did she get into -- what -- what schools

7   did she end up getting into?

8       A   She was admitted to (Indiscernible) High School to    Commented [DF26]: 2:31:28

9   Mayfield Junior School, to Flintridge Sacred Heart Academy,

10  and I believe those are the three that she applied to, or at

11  least the three she was most interested in; those are the ones

12  she applied to.

13      Q   And did --

14      A   Oh, and also the high school where her sister attends,

15  so she applied to four schools.

16      Q   Okay.  And did she -- did she make a decision on where

17  she wanted to attend?

18      A   Yes, her choice was Flintridge Sacred Heart Academy.

19      Q   Okay.  And in that regard, who is going to pay for

20  that school?

21      A   I -- I -- me.

22      Q   Okay.

23      A   I -- I was going to, and I do.

24      Q   Okay.  And have you applied for financial assistance

25  to be able to go there?

114

1      A   Yes.

2      Q   Okay.

3      A   And I receive --

4      Q   And --

5      A   -- some, but it's expensive.  I pay a lot of money to

6  them, yes.

7      Q   At some point in time -- first of all, did you inform

8  Dana, early on in that process, that ███ was applying to

9  these schools?

10     A   I did not.

11     Q   And why did you not inform him?

12     A   So ███ was so nervous about these applications, and

13 she begged me to make sure that her dad didn't keep her from

14 getting admitted to her schools.  And so I thought long and

15 hard about it, I talked to other people about it, I prayed

16 about it, and I was so concerned that he would contact the

17 schools and do what he's done before to Maranatha, where

18 ███ attends, what he's done at -- what he did at The Wilds,

19 what he did to my landlord, what he's done to the doctors,

20 what he's done to the dentists, what he's done to pretty much

21 anybody in family he has contact with, and I -- I mean, I -- I

22 can't say I knew, but I pretty much knew that Dana, if he knew

23 the schools she was applying to, would contact them in the

24 guise of being a caring parent and cause them also to reject

25 our family from participating and would reject ███'s

1   applications, and she would get into none of these exclusive

2   high schools.

3       Q   When -- at -- at some point in time, we received a

4   letter from Dana inquiring as to whether she had chosen a

5   school, correct?

6       A   Yes.

7       Q   And at that point, she had actually not made her final

8   choice, correct?

9       A   Correct.

10      Q   And did you inform him of the school that she was in?

11      A   Once she had -- yeah, once she selected Flintridge

12  Sacred Heart Academy and had basically been admitted, then I

13  informed him of that.

14      Q   You've expressed some -- now -- now -- now, she's

15  actually started there, correct?

16      A   Yes, yep.

17      Q   And do they have in-person attendance?

18      A   No, it's all COVID.  It's the Zoom, long-distance

19  learning on the computer.

20      Q   And how is -- does she like the school?

21      A   She -- she is a people person; she's an extravert, so

22  she really hates Zoom.  And it's difficult for her to be

23  schooled from home and not be experiencing all the art classes

24  and P.E. and those things.  So she -- I -- I'll be honest,

25  she's not enjoying school this year.  Her sister, on the other



116

 1  hand, who's an introvert loves long-distance learning, so

 2  ███████ 's happy.  But ███████ is not enjoying this.

 3      Q   Okay.  But beyond that, is -- but beyond that, is

 4  there -- is -- is -- does she have any complaints about her

 5  school beyond the fact that it's --

 6      A   It's all -- it's all intermingled.  I think -- I think

 7  she's -- I think she's just struggling with the Zoom thing,

 8  and I don't -- I don't really know if it's the school or Zoom.

 9      Q   Okay.  Have you been working with her to try to get

10  past that?

11      A   Yeah, we've -- she has a lot of homework, and I've

12  been trying to help her with that.  And I've also talked to

13  the school nurse and communicated with some of her teachers at

14  the school about ways that maybe it could be made a little bit

15  easier on -- on the kids to be doing distance-learning.

16      Q   So it's not just part of the experiencing issues?

17      A   No, I think everybody's having a hard time.

18      Q   Now, there was a question on the applications that

19  they requested a copy of that you provided them.

20      A   Yes.

21      Q   You referenced legal custody.  Was -- was -- that Dana

22  didn't have legal custody.  Do you recall that?

23      A   Right, yes.

24      Q   Why did you say that?

25      A   Well, because I didn't really know the California term

117

1    of "legal custody".  I know that in the State of New

2    Hampshire, we have primary parenting, and I have been awarded

3    primary parenting.  I did not -- I was not really familiar

4    with the California language.  I -- it's since been explained

5    to me that there is custodial -- what is it?  I can't -- now I

6    can't remember.  There's legal custody and then there's

7    physical custody.  Anyway, I have one kind of custody, but not

8    the other kind of custody, and I wasn't aware that there were

9    two different custodies here.  So I said that I had legal

10   custody, even though it's shared with Dana, I've now learned.

11       Q  And you are -- you were involved in a domestic

12   violence incident back on November 3rd --

13       A  Yes.

14       Q  -- of 2019.  Do you recall that?

15       A  Yes.

16       Q  Okay.  Did that incident cause your girls emotional

17   trauma?

18       A  Yes.

19       Q  Did it contribute, do you believe, in their poor

20   relationship with their father?

21       A  Well, it was already poor.  I think -- I think it

22   definitely made it worse.

23       Q  Since that time, has anything changed for the better

24   relative to their relationship with their father?

25       A  No.



118

1      Q   Have the girls, otherwise, been doing well without

2   having contact with their father?

3      A   Yes, and in fact, as noted, I believe, by their

4   counselor, their -- it was either the counselor or the DCFS

5   report, they're actually doing much better than when they had

6   threats of having to deal with visits with him.  So in my

7   observation, they're happier, they're sunnier, you know,

8   they're not crying at night like they used to before visits.

9   They're -- they're -- they just seem healthier.  I mean, it's

10  really sad, but -- yeah, they -- they seem to be doing better.

11  I mean, it's sad for me, but they seem to be doing a whole lot

12  better.

13     Q   In the -- in the DCY -- in the Division report, Dana

14  made a point of saying that the finding was inconclusive.

15     A   Yes.

16     Q   Do you remember that moment?

17     A   Yes, yes.

18     Q   Did you have a discussion with the caseworker on this

19  matter at the end of the case?

20          MR. CAULFIELD:  Objection.

21     A   I did because --

22          MR. CAULFIELD:  This is Caulfield; objection.

23          THE COURT:  State --

24     A   Well --

25          THE COURT:  Excuse me.



119

```
1              MR. FONTAINE:  Hold on.  Hold on.

2              THE COURT:  Excuse me.

3        A  -- wanting that what I did, not what I was told.

4              MR. FONTAINE:  Hold -- hold on.

5              THE COURT:  Excuse me.

6              MR. FONTAINE:  Hold on, wait.  Don't answer the

7    question.

8              THE COURT:  State the basis of your objection.

9              MR. CAULFIELD:  That it's -- that -- that it's

10   unpermissible (sic), unreliable hearsay.

11             THE COURT:  Overruled.  Continue.

12   BY MR. FONTAINE:

13       Q  Did you have a discussion with -- and what was the

14   name of the caseworker?

15       A  Veronica Coss -- C-O-S-S.

16       Q  Is she the same lady that you -- that -- that called

17   the girls with you present, when they were at The --

18       A  Yes.

19       Q  Okay.

20       A  Yes.

21       Q  And has she been the caseworker throughout this

22   investigation?

23       A  Yes.

24       Q  And -- and has she been the caseworker that

25   interviewed the girls?
```



120

1    A  Yes.

2    Q  And at -- at -- at the conclusion of this, did she

3  indicate whether she felt that your failure to -- that --

4  that --

5         MR. FONTAINE:  Strike that.

6  BY MR. FONTAINE:

7    Q  Did she indicate whether she felt that your obtaining

8  of medical treatment or your obtaining of dental treatment or

9  lack thereof had been neglectful?

10   A  No.

11   Q  Did she indicate that there was any remedial action

12  that you needed to take relative to the --

13   A  No.

14   Q  -- way that you parented your children?

15   A  No.

16   Q  Did she indicate that she had planned on taking any

17  further action in the future relative to this investigation?

18   A  She gave a warning in my house, sitting --

19   Q  Okay.

20   A  -- on my sofa, during our investigation.  And the

21  warning was that if the girls continued to have to see their

22  father, that I should be on notice that DCFS could literally

23  take my children away from me if I could not protect them from

24  Dana.  And that's what she told me in person.  And I said it's

25  not up to me.  I'm doing everything I can to protect them, and



121

 1    she gave me that warning.

 2        Q   Has anything occurred since they closed their

 3    investigation?

 4        A   No.

 5        Q   In -- in regards to your motion to modify, you're

 6    asking that the Court remove Dana's rights to have parenting

 7    time with his girls, correct?

 8        A   Yes, in part because of that warning.

 9        Q   Well, let's -- but let's just talk about it.  So

10    you've asked the Court, in your motion, to -- or currently, he

11    has the ability -- he has rights, under the current parenting

12    plan, to exercise parenting time with his girls at different

13    times throughout the year, correct?

14        A   Yes.

15        Q   You've asked that that be removed, correct?

16        A   Yes.

17        Q   And you've heard Dana's testimony about all of the

18    attempts that he's made to exercise those parenting rights

19    after the girls had stated to him that they didn't want to

20    visit with him, correct?

21        A   Yes, yes.

22        Q   And do you -- can you describe what the girls'

23    reactions are when he has requested that time and you've

24    informed them of that?

25        A   Yeah.  The girls have said no, and I think they're



122

1  very upset that, rather than listening to that, apologizing to

2  them, or trying to do constructive things, that he disrupted

3  their time at The Wilds, filed bogus reports against me that

4  involved them in an investigation, showed up at their church

5  causing a huge scene at the church with police in front of all

6  their friends, refused to leave, stood outside in the parking

7  lot.  I mean, it's just thing, after thing, after thing.

8  Contacted their schools, contacted -- it's just -- I think the

9  girls are truly believing that his desire to -- I think at

10 this point, they believe it's -- it's harmed them, but it's

11 certainly to harm me.  I think that they believe that that has

12 gotten to such an extreme that they are not safe.  And they've

13 been very, very consistent in stating that they will not --

14 that they don't want to see him.  And these efforts that he's

15 making have made things a lot worse.

16     Q   Is -- when you bring this to their attention that he

17 has requested these additional times to visit with them after

18 they've expressly indicated that they don't want to visit with

19 him, what is their emotional state when you're -- they're

20 informed of that?

21     A   Well, ███████, who's now 16, just gets very angry.  And

22 ██████, who's 13, just says I don't want to talk about this,

23 and you're just -- it's just going to upset me even more, and

24 I don't want to talk about it.  You know every time you talk

25 about this, I get upset.  And then I try to talk about it to



123

1   encourage them, and I -- ███ seems just very emotionally

2   distraught.  And ███ has gone from being emotionally

3   distraught a couple years ago to just seeming extraordinarily

4   angry.  And that anger sometimes come out at me too.  But

5   yeah.

6           And it's -- it's anger at him; it's anger at the

7   process; it's anger at why won't anybody listen to them.

8       Q   If the -- if the -- if the Court were not to remove

9   the current orders allowing him to exercise this time, and he

10  were to continue to assert his rights to exercise those times,

11  do you think emotional harm would result to the girls?

12      A   I think it already has, and -- and certainly, it would

13  be more.

14      Q   And is that why you're asking for that to be removed?

15      A   Yes.  If -- if they want to repair their relationship,

16  I don't think it should be us mandating that they have to do

17  it.  It just -- they'll then refuse, and then they want to --

18  then they feel the need to argue with me, against the Court,

19  against their father, and it just brings them through a whole

20  ton of emotional turmoil.  They've made it very clear that no

21  matter what anyone does, they're not going to have these

22  visits, and to have them continue to come up every couple

23  months is extraordinarily stressful for them, for me, for the

24  family, and it's -- it's -- it's leading to a bad outcome for

25  them.



124

1    Q  You already indicated that you thought it would not be

2  emotionally good for them to be forced to do reunification

3  counseling.  But if the judge decides that he is going to

4  order it, do you have a preference on how the choice of that

5  counselor would occur?

6    A  Well, first of all, the counselors that he

7  recommended, some of them are like $375, I think -- just

8  exorbitant -- an hour, or 45 minutes; I can't remember, but

9  they -- they were extraordinarily expensive.  He has not

10  reimbursed any of the over $9,000 of medical expenses I've

11  spent on the kids since moving to California.  He has not

12  reimbursed any of it, so I have no reason to believe that he

13  would contribute, in any way, to paying for the counseling.

14  Since I would be the one taking them to the counseling, that

15  burden would fall on me, and I can't afford to pay, nor should

16  I have to pay, $400 an hour to people to counsel them.  So I

17  would want that, obviously, it be an unbiased counselor and

18  one covered by our insurance, the children's insurance, and

19  one that was reasonably priced.

20    Q  Would you like to be part of that decision on -- on

21  who their reunification counselor would be if the Court were

22  to order that?

23    A  Yes, I would.

24    Q  Okay.  But you still object -- you would object to the

25  Court doing that, though, correct?



125

1      A  Well, I think "forcing" is the operative word here.  I
2  think forcing the girls to do anything at this point, when
3  they're 13, almost 14, and 16 and have already had --
4  everything that has happened has already happened.  I think
5  forcing them to do anything at this point is probably going to
6  be counterproductive to their relationship with their father
7  and their emotional health.
8      Q  Okay.
9          MR. FONTAINE:  Give me one second, Judge?
10          THE COURT:  Sure.
11          MR. FONTAINE:  Just at this point, Your Honor, I
12  would ask that all -- all of our exhibits be accepted as full
13  exhibits.  I understand you'll be making that decision later,
14  but I just wanted to make a formal request for that.
15          Thank you.  I have no further questions at this
16  time.
17          THE COURT:  Okay.  Mr. Caulfield, before you begin
18  your cross-examination, I want to inform both counsel and the
19  parties that the conversation that the Respondent had with Ms.
20  Coss from the Los Angeles Department of -- excuse me --
21  Children and Family Services, specifically the warning, the
22  Court is going to disregard.  I'm not saying that it -- that
23  she didn't --
24          MR. CAULFIELD:  Thank you, Your Honor.
25          THE COURT:  -- I'm not saying she didn't say that.



126

1  I'm just saying that I am disregarding that particular

2  warning, okay?

3          You may cross --

4          MR. CAULFIELD:  Thank you, Your Honor.

5          THE COURT:  -- you may cross-examine.

6          MR. CAULFIELD:  Yes, Your Honor.

7                     CROSS-EXAMINATION

8  BY MR. CAULFIELD:

9      Q  Dr. Albrecht, you testified on direct examination that

10  Mr. Albrecht's position is that you've alienated the children,

11  correct?

12     A  He filed words to that effect in many filings.

13     Q  Right, right.  Isn't it true that what he really has

14  said in his filings is -- and I'm reading from page -- from

15  paragraph 31 of the case we're trying right now, the amended

16  petition to bring forward and modify, and I'll read it to you.

17  He says, "It is clear that their children are either being

18  alienated by Dr. Albrecht, estranged by Mr. Albrecht, or some

19  combination thereof."  So he's not saying what you're saying

20  he says, is he, Dr. Albrecht?

21         THE COURT:  *[Whispered] Not in the pleading, but in*

22  *his testimony, he has.*

23     A  Not there.

24  BY MR. CAULFIELD:

25     Q  Sorry?



127

1       A   He's not saying that there.

2       Q   Well, he's not saying it in the -- in the petition

3   that we're -- that we're trying today, right?

4       A   Correct.

5           THE COURT:   *[Wheeze or laughter] [Whispered]   Okay.*

6   BY MR. CAULFIELD:

7       Q   Okay.  Now, you mentioned that -- one second.   There

8   we are.

9           THE COURT:   *[Whispered] He's actually born on*

10  *(indiscernible)*.

Commented [DF27]: 2:50:34

11  BY MR. CAULFIELD:

12      Q   You mentioned that all five of the reunification

13  counselors that have been --

14          THE COURT:   *[Whispered] Do you have to say that?*

15  BY MR. CAULFIELD:

16      Q   -- proposed by Mr. Albrecht are biased?

17          THE COURT:   *[Whispered] I'm not throwing you out,*

18  *but if you want to leave --*

19          *[Laughter]*

20      A   I believe that my attorney asked me if I thought that

21  his list of counselors recommended was biased, and I answered

22  that I did.

23  BY MR. CAULFIELD:

24      Q   I see.  And the -- these counselors are all certified

25  by the court, right, to conduct investigations --

128

1        THE COURT:  *[Whispered] (Indiscernible) clearly*

2  *asked her that.*

3  BY MR. CAULFIELD:

4      Q  -- of the Los Angeles Superior Court; they're all 730

5  evaluators, correct?

6      A  If you say that, yeah, I'm sure it's accurate.

7      Q  Okay.  And when you said earlier in direct examination

8  that they were biased, that's when you thought that Mr.

9  Albrecht's position was that this is all your fault, right,

10  that the children have been -- have been alienated by you,

11  correct?

12      A  I believe that is his position.  I haven't changed

13  that belief.

14      Q  Right.  So -- so -- so now that you -- now that you

15  realize that the pleadings, the case we're trying today says

16  the opposite, do you still feel that these five evaluators are

17  biased against you?

18      A  That question doesn't make sense.  They don't know me.

19      Q  Well, why do you think they're biased then?

20      A  Well, I don't think they're biased against me, but

21  when I go back and look at, I believe, Craig Childress and

22  some of the other names on there, it appears that their

23  specialty is parental alienation.  And that --

24      Q  And if I said -- I'm sorry.

25      A  Yeah.  In previous pleadings, in -- in numerous, many,



129

1   many previous pleadings, it has been Mr. Albrecht's position

2   that the reason that the girls and his relationship is

3   strained is because of actions that I have taken, which would

4   be -- constitute parental alienation.  So a counselor who

5   specializes in that would appear to be biased towards that

6   position.

7       Q   And these -- these -- these five therapists, their --

8   their curriculum vitaes, and the links to their websites have

9   been made exhibits in this case.  And are you representing

10  that when -- when Master DalPra reviews these -- these

11  curriculum vitaes, he will find that these evaluators' sole

12  expertise is in alienation cases?

13      A   No.

14      Q   Okay.  Now, when you -- when you mentioned that Mr.

15  Albrecht keeps sending legal documents to the school and legal

16  documents to providers, is -- is -- is there -- has he sent

17  any legal documents, other than Master DalPra's parenting

18  plan?

19      A   I haven't seen the documents that have been sent or

20  been privy to those conversations.  I only know what the

21  providers have told me.

22      Q   Did the providers tell you that Mr. Albrecht sent any

23  other legal document, other than Master DalPra's parenting

24  plan?

25      A   I don't know what they sent.  They simply said that



130

1    they've received legal packets and are afraid of litigation.

2       Q  Right.  So you don't know is the answer, correct?

3       A  I do not know.

4       Q  Right.  Okay.  Now, let's talk briefly about your

5    children's teeth.  So is it your position that your children's

6    teeth are all Dana's fault?

7       A  No.

8       Q  Okay.  Is it your position that the children not being

9    vaccinated is all Dana's fault?

10      A  Yes.

11      Q  I see, okay.

12          THE COURT:  *[Wheeze or laughter]*

13   BY MR. CAULFIELD:

14      Q  And how long -- so -- so you -- you said that you

15   didn't get them vaccinated, yet, surely, you've done other

16   things without consulting with Mr. Albrecht.  You haven't got

17   them vaccinated because you're waiting for Master DalPra's

18   order?

19      A  Yes.

20      Q  Is that somehow in the parenting plan that Master

21   DalPra is to determine the children's vaccination schedules?

22      A  No.

23      Q  That's something that a mom and dad does, right?

24      A  Yes.

25      Q  Right.



131

1          THE COURT:   *[Whispered] He's not doing it.*

2   BY MR. CAULFIELD:

3      Q   Now, you mentioned that you haven't taken the children

4   to get their teeth done because you can't afford it?

5      A   No, I have taken the children to many dental visits,

6   including one just recently.

7      Q   So is that because of money?

8      A   No, it's since there's not insurance, I've taken them

9   every six months to the dentist.

10     Q   Oh.  Oh, so you do have -- but so you do have money --

11         THE COURT:   *[Whispered] (Indiscernible) agree.*

12  BY MR. CAULFIELD:

13     Q   -- to take the children to the dentist, if you chose

14  so?

15     A   I have dental insurance now.

16     Q   Right, okay.  So it's not a financial issue?  It's not

17  that Dana is not paying anything, or it's all -- it's all you

18  can do it any time you want to, correct?

19     A   Well, I take them on the recommended schedule, which

20  is a cleaning every six months.  And that's --

21     Q   Right.

22     A   -- covered by insurance.

23     Q   Right.  So that's -- we don't blame Dana for that?

24     A   Blame him for what?

25     Q   For -- for the teeth?

132

```
 1        A  I don't understand your question.

 2        Q  Okay, that's all right.  I'll withdraw it.

 3           How much do you pay to send the kids to private

 4   school?

 5        A  Thousands.

 6        Q  Thousands, okay.  Thousands.  Now, you testified under

 7   -- under direct that Dana contacted the providers and his

 8   children's schools in the guise of being a caring parent.  Do

 9   you remember saying that?

10        A  No, I did not say that.

11        Q  Oh, you didn't -- you never said "in the guise of

12   being a caring parent"?

13           THE COURT:  [Whispered] (Indiscernible).

14        A  I did say that phrase.

15   BY MR. CAULFIELD:

16        Q  You did say it?

17        A  I said that phrase, but not in the way you're asking.

18        Q  Well, let's -- let's ask the question again.  Did you

19   testify in direct examination that Dana contacted the

20   providers and the schools, and I'm -- and I quote, "in the

21   guise of being a caring parent"?  Did you testify to that?

22           THE COURT:  [Whispered] She did say that.

23        A  I did not say that.

24           THE COURT:  [Whispered] Yes, you did.

25   BY MR. CAULFIELD:
```

**Commented [DF28]:** 2:56:42

133

1    Q   Okay.  Now --

2    A   What I -- can I say what I did say?

3    Q   No, your lawyer can put you back on the stand for

4  that.

5        Now, if I understand, you -- you admitted on direct

6  examination that you haven't followed the parenting plan in

7  certain areas because the children didn't want you to, you

8  talked to people, and you prayed on it, correct?

9    A   In exactly one instance, yes.

10   Q   Okay.  And so you didn't follow the parenting plan,

11  correct?

12   A   Under that one instance, I did not.

13   Q   Right.  But if Dana doesn't follow the parenting plan,

14  he should have his rights stripped away and he shouldn't see

15  the children; is that your testimony?

16   A   I never said that.

17   Q   Okay.  So then -- so then if Dana doesn't follow --

18       THE COURT:  *[Whispered] Would you (indiscernible)*

19  *and ask defense (indiscernible).  Thank you.*

20  BY MR. CAULFIELD:

21   Q   -- the parenting plan, say, on the Christmas when he

22  kept the kids a couple of extra days, that's -- that's no more

23  of a horrible crime than you not following the parenting plan,

24  correct?

25   A   Those are very different circumstances, and what he

> **Commented [DF29]:** 2:58:12

134

1   did harmed the kids.

2          UNIDENTIFIED SPEAKER:   *[Whispered] Thank you.*

3   BY MR. CAULFIELD:

4       Q  But what you do doesn't harm the kids?

5       A  In that one instance where I --

6       Q  I see.

7       A  -- waited until ███ was admitted to a school before

8   telling Dana when she hadn't even accepted that admission, I

9   don't think what I did was that bad and did not harm her.

10      Q  Okay.  But what Dana did was very bad, you think?

11      A  Yes, I do think that.

12      Q  Okay.  Now, you mentioned that the children are crying

13  at night and you feel that they're better off without their

14  dad?

15      A  No, I didn't say that.

16      Q  You didn't say that you thought that they were better

17  off without their dad?

18         THE COURT:  *[Whispered] I remember seeing that*

19  (*indiscernible*) *afterwards.*

Commented [DF30]: 2:59:09

20      A  I didn't say that.

21  BY MR. CAULFIELD:

22      Q  Okay.  Now, do -- do -- do you -- do you agree that

23  Dana has never been found unfit to be a parent?

24      A  I agree.

25      Q  Okay.  And do you agree that it's the policy of New

135

1  Hampshire to support frequent and continuing contact between

2  children and --

3        MR. FONTAINE:  I object.  I object, Judge.  She's

4  not a lawyer.

5        THE COURT:  I'm not sure --

6        MR. CAULFIELD:  I'm asking if she agrees.

7        THE COURT:  -- I'm not sure the witness knows what

8  the policy of the State of New Hampshire is, Counsel.  So you

9  can either --

10       MR. CAULFIELD:  I was -- I was --

11       THE COURT:  -- you can either rephrase the questions

12  or I'll -- I'll sustain the objection.

13  BY MR. CAULFIELD:

14    Q  Dr. Albrecht, do you personally agree that children do

15  well when they have contact with both parents?

16    A  Yes.

17       MR. CAULFIELD:  One second, please.

18    (Pause)

19       MR. CAULFIELD:  Give me one moment, please.

20  BY MR. CAULFIELD:

21    Q  Now, you mentioned about a big scene when Dana went to

22  church to try to visit with the children, right?

23    A  In November, yes.

24    Q  Well, the -- the -- the one that's spun out in this

25  DV, whatever the date is, correct?  We're talking about the

136

1  same incident?  Okay, all right, all right, all right.

2          And you said the police were called?

3      A  Yes.

4      Q  Who called the police?

5      A  The leadership of the church.

6      Q  Right.  He a friend of yours?

7      A  Our family's attended there for 12 years, so yes.

8      Q  So he's a friend of yours, right?

9          THE COURT:  *[Laughter]*

10     A  Well, it was the pastor.

11  BY MR. CAULFIELD:

12     Q  Now, you said that when the children contemplate

13  seeing their father every few months, it's -- it's a huge

14  issue in your household, right?

15     A  It has been in the past, yes.

16     Q  Every few months; is that right?

17     A  Okay, yeah.

18     Q  Okay.

19         MR. CAULFIELD:  I -- I have no further questions.

20         THE COURT:  Do you have any redirect, Atty.

21  Fontaine?

22         MR. FONTAINE:  No, no, Judge.

23         THE COURT:  Very well.

24         MR. CAULFIELD:  I would like to put my -- I'd like

25  to put my client back briefly on -- on -- on the stand for



137

1  rebuttal, Your Honor.

2          THE COURT:  One moment.  Mr. Fontaine, do you have

3  any other -- other witnesses?

4          MR. FONTAINE:  I don't.

5                    RESPONDENT RESTS

6          THE COURT:  Very well.  Yep, go ahead.

7          Mr. Albrecht, you're still under oath.

8          MR. CAULFIELD:  So if I could get --

9          THE WITNESS:  Yes.

10          MR. CAULFIELD:  Thank you.

11          DANA ALBRECHT, PETITIONER, PREVIOUSLY SWORN

12                DIRECT EXAMINATION (REBUTTAL)

13  BY MR. CAULFIELD:

14     Q  So Mr. Albrecht, you heard your ex, Dr. Albrecht,

15  testify that you sent a letter to her landlord, and she -- she

16  drew an inference from that that your intention -- and I --

17  and I'm not quoting her directly here as I did previously, but

18  my notes tell me that she said that she thought that the --

19  that you were doing this to make her homeless or something?

20  Something close to that.  Do you remember that testimony?

21     A  Yes.

22     Q  Okay.  Well, could you tell us -- could you tell --

23  tell Master -- Master DalPra why you sent the letter to the

24  landlord?

25     A  I was concerned for the safety of my children.



138

1  There's a police report.  It is one of the exhibits here,

2  Exhibit 39, concerning break-ins, people going at the door

3  with a drill.  I was also concerned that my children might not

4  be able to exit this property.  We've got photos -- photos of

5  them being restrained and the doors being secured from the

6  inside with a zip tie, Exhibit 71.  So I was concerned it was

7  a safety issue.  And quite frankly, I have no idea what her

8  lease arrangement is.  If that caused problems with the lease,

9  I do apologize.  I -- I've never seen her lease, don't know

10  anything about that, but it was just concern for the safety of

11  the children.  I just wanted them to have this police report

12  and the two photos and to be aware of who my children were and

13  they're staying at the property.

14      Q  And -- and -- and you said something, you said that

15  you -- that the children were being zip-tied into the

16  apartment, but there's -- but there's been testimony here --

17  here that she was -- that what Dr. Albrecht was doing was

18  trying to prevent people from outside the apartment getting

19  in.  Do you -- do you have any evidence that your children --

20          MR. CAULFIELD:  Your Honor -- hold on, hold on.

21          Your Honor, I object.  This was already litigated.

22  This was already before you.  You made orders.

23          THE COURT:  It was.  Objection sustained.

24          MR. CAULFIELD:  It was, Your Honor, except on cross-

25  examine -- on direct examination, Atty. Fontaine specifically



139

1    asked her about the letter to the landlord and implied -- and

2    attributed to my client evil intents of why he did it.

3          THE COURT:  And he's test --

4          MR. CAULFIELD:  I think he's entitled to explain why

5    he did it.

6          THE COURT:  But he's testified as to why he did it.

7          MR. CAULFIELD:  But -- but there was one other thing

8    she said, Your Honor, that when she zip-tied the doors, it was

9    to lock people out.  And I just want him to direct you to an

10   exhibit that says the exact opposite from the children

11   themselves, that it was to lock them in.

12         THE COURT:  I've seen the exhibit.

13         THE WITNESS:  Exhibit 72.

14         THE COURT:  I've -- I've dealt with that issue.

15         MR. FONTAINE:  It has nothing to do with --

16         THE COURT:  Excuse me, hello?  I've dealt with that

17   issue at a prior hearing.  Objection is sustained with regard

18   to this hearing.

19         MR. FONTAINE:  Thank you.

20         MR. CAULFIELD:  Your Honor, then would you please

21   strike her testimony regarding this incident?  Because she

22   told -- she testified about the landlord and the letter.

23         THE COURT:  The letter is -- I -- I -- as I

24   mentioned earlier -- no, I'm not going to strike the

25   testimony.  But as I mentioned earlier, if I determine that



140

1  the letter to the landlord is irrelevant, it's not going to be

2  admitted as an exhibit.  I must have 400 pages of exhibits in

3  front of me here.

4          MR. CAULFIELD:  I think that's true.  All right.

5  Well, Your Honor, I -- I -- I -- as I've -- just for the

6  record, Your Honor, I -- I think that I should maybe show that

7  the children themselves say that they wouldn't -- she was not

8  locking someone out in this incident; she was locking them in.

9  But be that as it may, I'll move on.

10          THE COURT:  Very well.

11          MR. CAULFIELD:  Yes.

12  BY MR. CAULFIELD:

13     Q  So these -- Mr. Albrecht, you heard testimony about

14  these reunification counselors and what's your position in

15  this case as to whether they're biased.  What is your position

16  in this case regarding why you want a reunification counselor?

17          MR. FONTAINE:  Well, Judge --

18     A  I just --

19          MR. FONTAINE:  I -- I object.  This -- this is not

20  rebuttal testimony.  This is re -- this is him testifying.  He

21  could have easily addressed this in -- in direct examination.

22  This is his request.

23          THE COURT:  Well, perhaps I'm wrong, Atty.

24  Caulfield -- excuse me for a moment.  Perhaps I'm wrong, Atty.

25  Caulfield, but I'm assuming that he wants reunification



141

 1  counseling to try to repair his relationship with his children

 2  and try to make a determination as to why their relationship

 3  has deteriorated.

 4          MR. CAULFIELD:  Absolutely correct.

 5          THE COURT:  And I believe --

 6          MR. CAULFIELD:  What I was getting at --

 7          THE COURT:  I believe he test -- I believe he

 8  testified to that on direct examination.

 9          MR. CAULFIELD:  Correct.  And on -- and on Dr.

10  Albrecht's direct examination, she testified that these

11  reunification counselors were biased and were only experts in

12  the area of alienation.  And now I have Dana back on the stand

13  to try -- to testify that that's not at all true.

14          THE COURT:  Okay.  Well, with all due respect to

15  both counsel and both witnesses, I'm not sure that any of them

16  know what these counselors' areas of expertise are or whether

17  they are slanted one way or another with respect to the

18  alienation issue.  So the objection is sustained.

19          MR. CAULFIELD:  We have no -- okay.

20  BY MR. CAULFIELD:

21      Q  Now, Mr. Albrecht, I direct your attention to Exhibit

22  91.  How is that relevant to what -- what Dr. Albrecht just

23  testified to?

24      A  So this is a letter we sent them that they never gave

25  us an adequate response to.  But in short, I believe that



142

1    she's the beneficiary of her mother's estate, so that's got

2    ten rental properties worth $2.8 million.

3              MR. FONTAINE:  Your Honor, I object.  This is --

4    this is completely inappropriate --

5              THE COURT:  Sustained.

6              MR. FONTAINE:  -- for rebuttal.  This is not a

7    financial case.

8              THE COURT:  Sustained.

9              MR. CAULFIELD:  I don't have any other questions,

10   Your Honor.

11             THE COURT:  Very well.  Any redirect on -- recross,

12   Mr. Fontaine?

13             MR. FONTAINE:  No, I don't, Your Honor.

14             THE COURT:  Very well.  I'm going to take the

15   matters under advisement.  Don't expect a -- an order any time

16   real soon because I do have to plow through those exhibits

17   that were proffered, not necessarily admitted at this point.

18   But the -- the record will reflect that all the exhibits would

19   be marked as ID until I have an opportunity to determine the

20   relevant ones and the ones that don't apply.

21             So with that said, I want to commend all four of you

22   for a very comprehensive, civil hearing under difficult

23   circumstances.  And I wish everyone to stay safe.  I'll take

24   the matters under advisement.

25             This hearing is adjourned.  I'm going to terminate

143

1   the telephone call at this time.   Thank you.

2           MR. CAULFIELD:   Thank you, Your Honor.

3           THE PETITIONER:   Okay, thank you.

4       (Proceedings concluded at 3:10 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

144

<u>CERTIFICATE</u>

I, Dena Farbman, a court-approved proofreader, do hereby

certify that the foregoing is a correct transcript from the

official electronic sound recording of the proceedings in the

above-entitled matter, to the best of my professional skills

and abilities.

Karen Raile, CDLT-105, Transcriptionist
Erin Perkins, CET-601, Proofreader



Dena Farbman

Digitally signed
by Dena Farbman
Date: 2022.04.07
15:07:43 -04'00'

DENA FARBMAN, CET-629                    April 6, 2022
Proofreader/Quality Control Manager


**Original transcript signed on November 12, 2020**

**STATE OF NEW HAMPSHIRE**
**JUDICIAL CONDUCT COMMITTEE**



**JC-21-072-C**

**In RE:  Master Bruce F. DalPra**

## JCC TIMELINE

November 6, 2020     - telephone hearing in the matter of Albrecht v. Albrecht, No. 659-2016-DM00288

November 12, 2020     - email correspondence initiated by Michele Lilley from eScribers transcription service to AOC (Yee) concerning whispered comments by judge in Albrecht hearing.

November 13, 2020     - email from Judge David King to Master Bruce DalPra about his whispered comments

November 18, 2020     - telephone conversation between Judge King and Master DalPra about his comments, self-report to JCC

November 19, 2020     - Master DalPra self-report to JCC concerning his whispered comments in Albrecht hearing

December 11, 2020     - JCC considers DalPra self-report, listens to audio of hearing, unable to hearing second DalPra comment

January 20, 2021     - Master DalPra issues report and recommendation of November 6, 2020 Albrecht Hearing

January 27, 2021     - Master DalPra presides over another hearing in the Albrecht matter.  This hearing is to extend Domestic Violence Order against Dana Albrecht.  He appeals the order in this hearing to the New Hampshire Supreme Court using information from Master DalPra's self-report to JCC to support his appeal.

February 12, 2021     - JCC virtual meeting, Master DalPra joins and responds to JCC questions.

February 16, 2021     - JCC advises Master DalPra of its dismissal of his self-report of November 19, 2020

July 21, 2021     - Dana Albrecht requests copies of all publically available records of JCC relating to Judge Introcaso, Master DalPra, et al (Carbon, Derby) S. Ct. Rule 40 (16)

*JCC records to support Albrecht brief to Supreme Court*

August 30, 2021     - Dana Albrecht files appeal with Supreme Court, 12/21/20 Order extending DV Order for another year (Curran, J) DalPra? uses DalPra "who the fuck cares" comment.

November 10, 2021    - Supreme Court (Sup Ct) opinion-remanded to CC to determine whether DalPra was
                       Disqualified from hearing DM matter.

November 29, 2021    - DalPra Order – no basis for *disqualification,* approved by Curran, J.

December 16, 2021    - Sup. Ct. Order – transcript of 11/6/20 hearing lack "vulgar expression" and
                       "completely inappropriate" sentence but heard by transcriptionist eScribers –
                       amend transcript

March 11, 2022       - JCC Ex. Sec. requests complete unabridged transcript noting all sounds and comments
                       with locus of such comments.

**STATE OF NEW HAMPSHIRE**
**JUDICIAL CONDUCT COMMITTEE**



EXHIBIT

*13*

JC-21-072-C

In RE:  Master Bruce F. DalPra

Audio snippets attached to Judge David King's 11/13/20 email to Master DalPra (flash drive
provided to R. Mittelholzer by AOC)

USB Thumb drive
2 Audio Recordings
Sent to Master DalPra from Judge
King 11-13-20

#13

EXHIBIT

14

THE STATE OF NEW HAMPSHIRE
Judicial Conduct Committee

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
STATE OF NEW HAMPSHIRE          \*
                                \*
        V.                      \*          DOCKET JC-21-072-C
                                \*
MASTER BRUCE DALPRA             \*
                                \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DEPOSITION OF THE HONORABLE DAVID KING

August 26, 2022, 9:59 a.m.

The deposition took place at the Office of the Judicial Conduct Committee,
Concord, New Hampshire

## DEPOSITION TRANSCRIPTION VERBATIM
Audio & Video Recording and Transcription Service
Paralegal, Notary Public, Medical Transcription

Jan-Robin Brown, CER-415 & CET-415
Weare, NH 03281

Telephone: 603.529.7212
E-mail: AudioDepos@gsinet.net

MEMBER: AMERICAN ASSOCIATION OF ELECTRONIC REPORTERS & TRANSCRIBERS, INC.

## IN ATTENDANCE

FOR THE JUDICIAL COUNCIL:

Philip Waystack Esquire
Waystack Frizzell
251 Main Street
Colebrook, NH 03576
603.237.8322

FOR MASTER DALPRA:

Anthony Sculimbrene, Esquire
Leslie Gill, Esquire
Gill & Sculimbrene, PLLC
39 East Pearl Street
Nashua, NH 03060
603.889.5959

FOR JUDGE KING:

Mary Ann Dempsey, Esquire
1 Granite Place, Suite N400
Concord, NH 03301
603.415-0660

THE STATE OF NEW HAMPSHIRE
Judicial Conduct Committee

*******************************
STATE OF NEW HAMPSHIRE    *
                                 *
       V.                    *           DOCKET JC-21-072-C
                                  *
MASTER BRUCE DALPRA      *
                                  *
*******************************

## DEPOSITION OF THE HONORABLE DAVID KING

August 26, 2022, 9:59 a.m.

This deposition excerpt is relevant to the issues in this matter. The balance of the deposition transcript is not relevant to the issues and thus has been redacted by agreement of counsel.

24



1

2

3    Q

4

5

6    A

7

8

9

10

11

12

13

14

15   Q    How about this:  When you are deciding what to do vis-

16        à-vis Bruce DalPra and sending this email, did you

17        have in your mind, guiding your actions in this

18        specific case, Rule 2.15?

19   A    Yes, I did.

20   Q    Okay.  And did you have in mind the difference between

21        2.15(A) and 2.15(C)?

22   A    Yes.

23   Q    Okay.  And at the time that you sent this email, in

24        your mind, did you believe that it rose to the level

```
 1        of a 2.15(A) mandatory report?
 2    A   I would say at the time I made the call, I hadn't
 3        decided that.  I mean, I needed to gather some more
 4        information.  I needed to talk to Master DalPra, find
 5        out what happened.  I was going on pretty limited
 6        information at that point.  So I would - You're asking
 7        me at a specific point in time.  I would say at that
 8        time, I didn't know if I had a 2.15(A) or (C), or none
 9        of the above.
10    Q   Okay.  And at some point, you did talk to Master
11        DalPra, correct?
12    A   I did.
13    Q   And did that conversation clarify what obligations you
14        had in this specific case vis-à-vis Rule 2.15?
15    A   Yes.
16    Q   Okay.  And so, in this case, - this leads me to my
17        next set of questions - did you believe that 2.15(A)
18        or 2.15(C) required you to provide this information to
19        the Judicial Conduct Committee?
20    A   So I, after speaking to Master DalPra and reviewing
21        the rule, concluded that "A" was not the applicable
22        section.  I did not have a belief, and don't have a
23        belief, as I sit here today, that the rule had been
24        violated raises a substantial question regarding his
```

```
 1          honesty.  He was pretty forthright with me about what

 2          had occurred.  His trustworthiness, I had no reason

 3          not to trust him at that point.  And when I think of

 4          fitness as a judge, I think that's a pretty high bar

 5          to meet.  And I didn't, at that time, have a concern

 6          about his fitness to serve as a judge.  I had already

 7          decided under "C," however, that this was something

 8          that, even though it was a set of facts that I had

 9          never seen before in my 30+ years as a judge, I felt

10          there was an obligation to let the Judicial Conduct

11          Committee know about it.

12   Q      Did you tell the Judicial Conduct Committee?

13   A      Did I tell the Judicial Conduct Committee what?

14   Q      About what you had found regarding the transcript in

15          the Albrecht case?

16   A      Yes.

17   Q      Okay.  Did you provide this email to the Judicial

18          Conduct Committee?

19   A      No.

20   Q      Okay.

21   A      And let me just be clear.  When I say "Judicial

22          Conduct Committee," I had a conversation with Robert

23          Mittelholzer after I spoke with Master DalPra about

24          this incident.  So I didn't have any communication
```

1       with the committee itself.  I didn't send them

2       anything.  I had a phone conversation with Robert

3       Mittelholzer.

4    Q  Did you - STRIKE THAT.  Were you aware of the fact

5       that Master DalPra had decided to self-report?

6    A  I was aware that Master DalPra was going to self-

7       report.  I had a conversation with him on Wednesday,

8       November 18th.  I had sent him the email on Friday.  I

9       think he was either - he either had a writing day that

10      day or he was on vacation.  I had tried to call him on

11      his extension, which is typically how I try to reach a

12      judge.  I don't like to call the clerk's office and,

13      you know, "The administrative judge is calling.

14      What's going on?"  So I'm usually pretty low key about

15      these things.  I was not able to get him.  I tried a

16      couple of times during the day on Friday.  So I sent

17      the email that's been marked as Exhibit 1.  Didn't

18      hear back from him, I think until Tuesday, the 17th.

19      He said he had left his laptop at work and he'd been

20      working from home - circumstances that he didn't see

21      my email.  So I think we spoke on Tuesday, or we

22      exchanged emails on Tuesday, and we agreed to speak on

23      Wednesday, the 18th at 12:30 during a break in his

24      cases.

28

1  Q   Okay.  Two questions about what you just said.  For
2      people who are unaware, what is a writing day for a
3      judge?
4  A   Rare.  But it's a day when the judge is scheduled to
5      not have any scheduled cases so that they can catch up
6      on writing orders for cases that they've already
7      heard.
8  Q   And then second, is it uncommon for judges to work
9      outside the courtroom on a writing day?
10 A   Not during COVID-19, it wasn't.
11 Q   And for the record, this took place in November of
12     2020, which was during the pandemic?
13 A   Correct.
14 Q   Okay.  Did anything about the delay between when you
15     sent the email and when Master DalPra got back to you
16     indicate that he was trying to be deceptive or
17     concealing?  Did you have any reason to believe that?
18 A   No.
19 Q   Okay.  To this day, do you know whether or not the
20     committee has seen this email?
21 A   I have no idea.
22 Q   Okay.  To this day, are you aware of whether or not
23     the committee has accessed and listened to either of
24     the two audio files contained in this email?

29

```
 1   A    I don't.  I do know that in December of 2020, I

 2        provided those to Robert Mittelhozer.  It took me a

 3        couple of tries because I sent them the first time in

 4        a - probably use the wrong word here - but format that

 5        he couldn't open.  And so Kathy Yee was kind enough to

 6        help me re-send them in a different format so that he

 7        was able to open them.

 8   Q    Okay.  And the same goes for the - the same question

 9        for the two snippets.  To your knowledge, do you know

10        if they've seen these snippets as like set apart from

11        the rest of the transcript in the way that you did in

12        this email?

13   A    I do not.

14   Q    Okay.
```



<u>Corrections</u>

Page No. <u>9</u> , Line No. <u>15</u>
Correction: <u>"Cosign" should be "cosigned"</u>

Page No. <u>11</u> , Line No. <u>3</u>
Correction: <u>"as" should be "has"</u>

Page No.___ , Line No.___
Correction:_____

Page No.___ , Line No.___
Correction:_____

Page No.___ , Line No.___
Correction:_____

Page No.___ , Line No.___
Correction:_____

Page No.___ , Line No.___
Correction:_____

Page No.___ , Line No.___
Correction:_____

32

_____
Deponent

STATE OF NEW HAMPSHIRE
COUNTY OF _____ Merrimack _____

Subscribed and sworn to before me this 27 day of
_September_____ 2022.

_____
JUSTICE OF THE PEACE/NOTARY PUBLIC
My Commission Expires _____
PATRICIA M. COLE, Notary Public
State of New Hampshire
My Commission Expires October 3, 2023