STATE OF NEW HAMPSHIRE

9TH CIRCUIT COURT - FAMILY DIVISION - NASHUA

IN THE MATTER OF:              )   Family Division Case No.
DANA ALBRECHT,                )   659-2016-DM-00288
                           )
           Petitioner,    )   Nashua, New Hampshire
                           )   August 9, 2017
        and                )   9:04 a.m.
                           )
KATHERINE ALBRECHT,        )   Volume II of II
                           )   Pages 193 - 397
           Respondent.    )
                           )

FINAL HEARING - DAY 2
BEFORE THE HONORABLE BRUCE F. DALPRA
MARITAL MASTER OF THE CIRCUIT COURT - FAMILY DIVISION

APPEARANCES:

For the Petitioner:           Joseph Caulfield, Esq.
                         CAULFIELD LAW & MEDIATION OFFICE
                         126 Perham Corner Road
                         Lyndeborough, NH 03082-6522

For the Respondent:          Michael J. Fontaine, Esq.
                         WELTS, WHITE & FONTAINE, P.C.
                         29 Factory Street
                         Nashua, NH 03060

Also Present:                Kathleen A. Sternenberg
                         Guardian ad litem (GAL)

Audio Operator:             Electronically Recorded
                         by Aline Chasseur

TRANSCRIPTION COMPANY:       AVTranz, an eScribers Company
                         7227 N. 16th Street, Suite 207
                         Phoenix, AZ 85020
                         (800) 257-0885
                         www.avtranz.com

Proceedings recorded by electronic sound recording; transcript
produced by court-approved transcription service.

1                          I N D E X

2     WITNESS(ES)      DIRECT   CROSS    REDIRECT   RECROSS

3     FOR THE PETITIONER:

4     NONE

5

6     FOR THE RESPONDENT:

7     Tina Michael        195      210       217        218

8     Katherine Albrecht 220      305       329

9     Jack Bopp          333      342

10    Kathleen Sternenberg 348    373

11    Elaine Hodgkinson 387       393

12

13    MISCELLANEOUS                                    PAGE

14    NONE

15

16    EXHIBITS                                    ID     EVD

17    NONE

18

19

20

21

22

23

24

25


AV Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1    life.

2              MR. CAULFIELD:  No further questions.

3              THE COURT:  Attorney Sternenberg, do you have

4    anything?

5              MS. STERNENBERG:  No.

6              THE COURT:  Thank you, sir.  You can step down.

7              THE WITNESS:  Thank you, Your Honor.

8              MR. FONTAINE:  Your Honor, we'd call the guardian ad

9    litem next.  Raise your right hand.

10        KATHLEEN STERNENBERG, WITNESS FOR THE RESPONDENT, SWORN

11                        DIRECT EXAMINATION

12   BY MR. FONTAINE:

13      Q  With the Court's permission, be seated.

14             THE COURT:  Okay.  Before you start your examination,

15   I've read the report.  I don't want to hear it in conversation

16   form at this point.

17             MR. FONTAINE:  Sure.

18             THE COURT:  Okay.

19             MR. FONTAINE:  I'll keep it brief.

20             THE WITNESS:  Could I just get a pen?  I'm sorry.

21             THE COURT:  Certainly.

22             THE WITNESS:  I didn't mean to come up here without

23   one.

24             THE COURT:  You're going to carve your initials into

25   the witness stand?



1          THE WITNESS:  Yes.

2          THE COURT:  One never knows.

3   BY MR. FONTAINE:

4     Q   Good morning or afternoon, I should say.  Are you a

5   certified GAL?

6     A   I am.

7     Q   And how long have you been a certified GAL?

8     A   I've been certified since my training in 1993.

9     Q   And estimate how many cases you've served on as a GAL?

10    A   People ask me that all the time, at least hundreds.

11    Q   Okay.  And this Court's original order of appointment

12   requested that you investigate certain specific matters.

13   Correct?

14    A   Yes.

15    Q   And did you in fact do that?

16    A   I did.

17    Q   You were also asked at a later point in time to

18   investigate Ms. Albrecht's motion to relocate and provide an

19   opinion on that as well?

20    A   Yes.

21    Q   And you added that to your list as well?

22    A   I did.

23    Q   And the parties were paying 50/50?

24    A   Yes.

25    Q   And has Ms. Albrecht paid you to date?



1    A   Yes.

2    Q   Has Mr. Albrecht paid you to date?

3    A   I'm waiting for a payment that I've requested.

4    Q   Okay.  In the process of conducting this investigation,

5    did you send out questionnaires to the parties?

6    A   I did.

7    Q   And did both of them return them?

8    A   They did.

9    Q   And did you ask for their opinions as to people that

10   they should -- that you should contact or send questionnaires

11   to get further information on this issue?

12   A   I did.

13   Q   And did you in fact do that?

14   A   Yes.

15   Q   Have you in this particular case met with both parents?

16   A   I have.

17   Q   Have you had an opportunity to meet with the children?

18   A   I have.

19   Q   And have those meetings been more than one?

20   A   Multiple meetings with parents, parents together, one

21   parents-together session, and many meetings with the children.

22   Q   Okay.  And did each of the parents fill out a guardian

23   ad litem questionnaire?

24   A   They did.

25   Q   Did you put many hours into this investigation?



1      A   Yes.

2      Q   Is this one of the most time intensive cases you've had

3  as a guardian?

4      A   It's a very heavy, intensive case.

5      Q   Okay.  And you filed numerous motions to exceed your

6  fees?

7      A   I have.

8      Q   Do you feel, after completing this investigation, that

9  you were able to obtain sufficient information to be able to

10  provide this Court with your findings and your recommendations?

11      A   Yes.

12      Q   And in fact, does your report do that?

13      A   Yes.

14      Q   Does that report contain everything that came out of

15  your investigation?

16      A   No, because I had to stop somewhere and 25 pages is a

17  long report.

18      Q   Okay.  And is --

19          MR. FONTAINE:  Your Honor, I'm not sure.  Do I need

20  to ask that, that be introduced into an exhibit?  Okay.

21          THE COURT:  It's part of the record.

22  BY MR. FONTAINE:

23      Q   So in this report, you provide an opinion on the

24  relocation issue, correct?

25      A   I do.



 1          A   And in summary, would you indicate what that opinion

 2    is?

 3          A   I believe, for the reasons that I have in my report and

 4    I think I've done a pretty good job of explaining that

 5    Katherine Albrecht is in need of relocating to southern

 6    California, where she has the support of her family, she's

 7    closer to the facility where she would get treatment for her

 8    cancer, and she has financial stability where she doesn't have

 9    it now.

10          Q   Okay.  And --

11          A   And I believe those meet the standard that she needs to

12    prove.

13          Q   And in doing that, you looked at the statute on

14    relocation, correct?

15          A   I have.

16          Q   And you looked at whether you thought her reason for

17    moving was legitimate --

18          A   I have.

19          Q   -- for a legitimate purpose.  And you feel that it is?

20          A   I feel that it is.

21          Q   And just again, I notice in your report, you reference

22    that both parties are from California?

23          A   Yes.

24          Q   Both parties have family in California?

25          A   Yes.



1    Q   Both parties do not have family that they regularly

2    have contact with in New Hampshire?

3    A   Yes.

4    Q   Right?  And Dana currently is unemployed, correct?

5    A   Yes.

6    Q   And your recommendation is not only that Katherine be

7    allowed to relocate, but that Dana -- it's his choice, but that

8    Dana also consider relocating to the Pasadena area.

9    A   I think that would be the best thing that could happen,

10   yes.

11   Q   And do you believe, based on all of the factors,

12   including these interviews, et cetera, that it is in fact in

13   the best interests of the children to relocate?

14   A   I do.  And I couldn't be any stronger in my

15   recommendation that this happen right away so that the children

16   can get established so they can be in school so they can get

17   out of the fray.

18   Q   And did you have discussions with Katherine about her

19   opinions on relocation?

20   A   Yes.

21   Q   And did you talk with her about investigating school

22   options, for example?

23   A   I did.

24   Q   And did she provide you with information on what she

25   had done?



AVTranz   eScribers
AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1    A   She and her mother both were former educators and they

2    know the area.

3    Q   Okay.  And do you feel that they did a thorough job on

4    finding the best schools?

5    A   It was a lot of information and they looked at a lot of

6    different schools --

7    Q   Okay.

8    A   -- and provided a lot of information.

9    Q   Okay.  Now, you've also recommended in your report that

10   Katherine be awarded primary residential parenting rights and

11   responsibilities?

12   A   I did.

13   Q   Could you give the Court a summary of your reasons that

14   you feel that, that is in the best interests of the children?

15   A   Well, at this point, the children really need

16   stability.  They need to feel secure.  They need to have a

17   nurturing environment.  They need to have an environment where

18   their developmental needs are taken into consideration and

19   their needs are placed before others.  And it's my

20   recommendation and my determination that, that would be with

21   Ms. Albrecht at this time.

22   Q   And what specific personality traits does Katherine

23   Albrecht have that Dana does not that you factored into that

24   assessment?

25   A   The biggest concern that I have is that there is a 16-



1  year-old boy -- and Your Honor, if you would make a correction,

2  the Court sent me an appointment that had C███'s date of birth

3  wrong and I just want to make sure that it's corrected for the

4  record.  I put ███████ because that was on the appointment,

5  but it's ███/2000, so there is a mistake on my first page of

6  my report.

7         C███ is 16, S███ is 13, and G███ is 10.  10-year-

8  olds are developmentally sort of at a black-and-white thinking

9  stage and oftentimes are more aligned with their mother at that

10  time in their life.  In this case, S███ and G███ are very

11  connected with their mother.  They have a secure attachment

12  with their mother from what I've observed.  And they are really

13  having difficulty with their dad.

14         And while Dana has tried, and loves them, and has

15  spent time with them, they tend to come to odds about most

16  simple decision making.  And it's been my observation that, no

17  matter what kinds of recommendations I make to try to settle

18  that down, for him to understand that 13-year-old girls are

19  really difficult -- and I've raised one, so I know they are --

20  that you have to be the parent.

21         And you have to, you know, make sure that you show

22  them that you're listening to their feelings because, at some

23  point, a 13-year-old grows up and wants to be listened to.  And

24  a 10-year-old is not like G███.  G███ is more like an 18-

25  year-old unfortunately.  G███ has the presence of an 18-year-



1  old.  She really does.

2        So this is definitely a hardship for Dana because he

3  is used to dealing with his boys, who are very similar to him

4  and his girls just are not.  They're emotive.  They're

5  emotional.  They cry.  They don't feel that he's communicating

6  with them or feel that he is listening to their needs.  And

7  this has not been something that just happened in March or

8  April.

9        This is something that I've heard about since

10  December.  I started my investigation.  Pretty much in

11  December, it was underway.  It's gotten worse over time.  And I

12  can't sit here as a guardian ad litem and recommend that these

13  girls be placed with their father with the situation getting

14  worse, not better.

15     Q   And do you have -- I notice you've commented that you

16  did not believe that alienation by the mother was the cause of

17  this.  But you can further elaborate on what you've done to try

18  and figure out whether there was alienation and figure out the

19  reasons these things are happening?

20     A   These kids have heard their parents' disputes for a

21  long time.  And they've had family meetings where they've aired

22  their parents' disputes.  And each of the children has met with

23  me individually on multiple occasions and they all say

24  different things.  But one of the things that they are very

25  clear about is Dad blaming Mom, Dad yelling, Dad being rageful


AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1  (sic) at Mom, and continuing to talk about Mom in terms of

2  being crazy and being not available to parent, you know, really

3  denigrating Mom.  And that has had an effect on these kids.

4        In conjunction with not having a relationship, a

5  nurturing relationship in which they feel listened to and they

6  feel Dad wants to be in their presence, the girls are really

7  getting to a point where they don't want to be around him.  And

8  I tried to explain that to these parents.  I sat with them.  I

9  talked to them about, I go to trainings every year and one of

10  the trainings I did within the last three years was in

11  Baltimore at the University of Baltimore School of Law.

12        And they brought in a specialist on alienation.  And

13  adolescents between the age of 12 to 15 start being estranged

14  when they don't feel like they're being listened to.  They

15  start being resistant and then they start refusing.  And in

16  April, I wrote to counsel and the parties and said, "I'm really

17  concerned that these kids are going to start refusing," and

18  it's happened.  And I haven't been listened to unfortunately.

19     Q  Have you spoken specifically to Dana about things that

20  he could do differently?

21     A  Yes.

22     Q  And has Dana implemented those things?

23     A  He says he will, but then it doesn't work that way.

24     Q  The evidence that you see in subsequent meetings with

25  the children, et cetera -- does it show differently?



1       A   The big issue was if -- my preliminary report, I also

2   intended to be a part of my final report, Your Honor.  In my

3   preliminary report that I filed, I was very clear about the

4   fact that the children's pediatrician and the family's

5   pediatrician, the family doctor, was very concerned that this

6   issue of, you have to go to my church and you have to attend my

7   church, was causing the children to be really upset at their

8   father.

9           So in January, I recommended that, that not be the

10  case.  And yet, at Easter time, we're still talking about, from

11  Dana's perspective, they should come to Paskha at my church and

12  they should be overnight from 10:00 at night until 4:00 the

13  next morning, and they'd done that at the Hampshire Hills for a

14  lock-in, so I don't understand why they couldn't do it in this

15  case, not understanding that one of the children was really

16  objecting to the smell of the incense.

17          One of the children just didn't like standing for the

18  period of time that they stand.  One of the children just

19  didn't really feel comfortable with the whole congregation and

20  tells me that she was hit by one of the boys at the church.

21  Those are things that need to be listened to.  You don't have

22  to agree with your child, but you have to at least listen to

23  and take into consideration their feelings.  That was happening

24  in January and, yet, we're still talking about it into April.

25  It's still a big issue.



AVTRANZ     escribers
AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1    Q   Based upon your conversations with the children -- and

2  you can be specific in your answer as to which child -- at this

3  time, do they feel that the father is listening any more to

4  them?

5    A   No.

6    Q   Do they actually feel that the father has actually not

7  listened to them more, but actually -- strike that.  Do the

8  children actually feel that his listening has decreased?

9    A   They feel that he's punishing them.

10   Q   And could you tell us a couple?

11   A   They feel that, if they say something, he gets angry

12 and he pouts or he punishes them by not taking them to church

13 the next day.  Or he goes, and rolls up in a ball, and doesn't

14 do anything with them for the rest of the day.

15   Q   And is there any specific examples you have of that,

16 that they have described to you?

17   A   Over and over, they've described examples of that.

18   Q   Okay.  Why don't you tell us a couple?

19   A   While the children were at camp, the two older children

20 were at camp for a second week of camp.  Dana took the youngest

21 child, G███, to Cozy Tea Cart and Dana told G███ -- and this

22 is G███ talking to me about this -- you don't need to listen

23 to Mom.  You don't need to listen to the guardian ad litem.

24 You don't need to listen to the court.  And Dana now at each

25 Wednesday visit wants to go back to the Cozy Cart.  And G███

AVTRANZ  eScribers
AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1    doesn't ever want to go there again.  And G███ has told him by

2    her words to me that she doesn't like it there, she doesn't

3    want to go back, but every Wednesday, he starts with, "We're

4    going to the Cozy Tea Cart."

5         Q   Okay.

6         A   That's a complete inability to understand or listen to

7    your child.

8         Q   Okay.  Any other examples?

9         A   They went to Launch and Chipotle.  And the girls were

10   very upset because Dana follows them around very closely

11   because, at some point, I recommended to Dana that he be one on

12   one with the girls, sit and do a game, a board game on the

13   floor, do something interactive, go out and kick a ball, do

14   something directly with them because they didn't feel that he

15   was doing that.

16           So now, they feel that he gets right up to them and

17   he's kind of creepy because they feel like he's in their space.

18   At Launch, he went and jumped with them.  And one of the girls

19   said it'd be great if Dad was just jumping and throwing the

20   ball, but instead, he's blaming the way we feel on problems

21   from the girls hearing from their mother.  And the girls are

22   telling me, "No.  The problems that are existing are with our

23   dad and with our inability to get through how we're feeling."

24        Q   If there's alienation here, do you feel that it's

25   coming from Dana?



1    A   No.  I just think it's estrangement because of his

2    inability to do these things that we've talked about over

3    several months.

4    Q   Okay.  And there was also an art exhibit or a play that

5    they went to if I recall?

6    A   I heard about from one of the girls that Dana wanted to

7    take them to an art exhibition, Botticelli exhibition.  These

8    are 10-year-old and 13-year-old girls from a conservative

9    Christian upbringing and Botticelli is naked paintings.  And

10   they're large paintings.  And the girls were turned off by

11   that.

12          They didn't want to do that.  But he said, "If you

13   don't go to the art exhibit, then you can't go to church the

14   next day."  So these are girls who are just being turned off in

15   lots of ways.  And then I was told by Katherine that G████ had

16   some real problems sleeping the next day because of what she

17   had seen, you know.  It's just an inability to understand where

18   your kids are developmentally.

19   Q   Do you feel that Katherine does listen to them?

20   A   I know I've seen her listen to them and I have

21   experience with her listening to them.

22   Q   Is she a nurturer?

23   A   She is.

24   Q   And does she put the kids' interests before hers?

25   A   She tries to.  Sometimes, she doesn't.



1     Q  But does she do it more than Dana?

2     A  She does.

3     Q  And have you had any recent discussions with the

4  children that would further provide this Court with an

5  understanding of what's happening?

6     A  Well, there are two things that I've learned recently.

7  One is about Dana's recent visit with the kids, wherein they

8  went to the Casual Cat and A&E to eat.

9          And the kids told me that they got in the car, that

10  G█████ determined that there was a microphone with a red light

11  and a counter on in the car, and that they each, all three of

12  them, asked their father not to be recording them, and that he

13  continued to record them, and that, when they got to a point

14  where they were really insisting about that, that he then took

15  out his phone and started videotaping them, and that he

16  videotaped them all the way through at the Casual Cat, which is

17  apparently a store.  I don't -- I've never been there and at

18  the place where they eat, and that it was very upsetting, and

19  that they cried, and that Dana didn't understand how upsetting

20  it was to them, didn't do anything to comfort them.

21     Q  Did that include C█████?

22     A  It included C████.  He was very angry and eventually

23  convinced his dad to turn off his phone.  But all three of them

24  told me that, that was just over the top, and that their father

25  was crying at times, and just it was a very scary thing.  And



1   then C███ told me that he really wants -- he doesn't feel

2   listened to.  He doesn't feel like he's able to talk because he

3   doesn't want to anger his dad or anger his mother, and he's

4   really feeling very much in the middle, and he's 16, and he's

5   very concerned that he wants to go on to college, and he wants

6   his parents to support that.

7        Q   Okay.

8        A   He told me that, with regard to hacking, it isn't what

9   his mother has told him about hacking.  It's what he's actually

10  observed on his own devices that worries him, that he's seen a

11  log where a Linux machine from Nashua was on the log.  He's

12  seen things happen on his computer.  He's seen the root

13  administrator change.

14           He's seen, you know, what Katherine was talking about

15  on his phone with regard to things changing right in front of

16  him.  He's seen a phone call come in and not be able to

17  disconnect it.  So whatever that is, he feels that his father

18  is hacking his devices.  And he told me, "This is not my

19  mother.  This is me.  I feel this way.  And Dad completely

20  denies it, but I still feel this way."

21           So those are the reasons that I think these kids are

22  really in the middle of battle, but they really need a place

23  where they can be in one place with one parent.  And I want

24  them to have a relationship.  I talked to each one of them

25  about the fact that it's really important in their life to have


AVTRANZ ◆ eScribers
AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1   a relationship with both parents, they only have two parents,

2   and that they need to work on that, and that counseling will

3   help that, and I hope that they get into counseling.

4        Q   You've recommended family systems counseling?

5        A   I did that in May.

6        Q   Right.  And did Dana take any steps that you're aware

7   of to actually commence with that?

8        A   He came back to see -- he wanted to think about it.  I

9   gave him a bunch of different people that I had researched who

10  might be able to do it.  And then he came back to me on June

11  7th and I made calls to the two people that I thought could do

12  it locally.  And neither of them was available.  And I didn't

13  hear back from one until, like, the 22nd of June.  The problem

14  with family systems work is, you can't just start it and think

15  it's going to happen overnight.  It takes quite a while to get

16  that underway.

17       Q   If this Court were to follow your recommendation and

18  allow Katherine to relocate with the children to California, is

19  there any reason that you're aware of that family systems

20  counseling can't continue to go on and the individual

21  counseling that you've also recommended for the children to go

22  on and for them to be able to speak to each other by phone, or

23  online, or --

24       A   I think the family systems work would be better if

25  everybody was in one place.



AVTRANZ   eScribers
AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1      Q   Sure.

2      A   I think that the kids have to have their own therapy.

3  And I think that has to happen right away.  Family systems work

4  can be done telephonically.  These days, there are a lot of

5  people who do Skype sessions.  But I think that it'd be better

6  off if everybody was in one place.

7      Q   And that's why you're recommending that Dana move to --

8      A   I am.  And even if he doesn't, if he were to come in

9  for once-a-month-long weekends, where he could be in town for

10 Thursday, have a session with the kids on Friday, that would

11 be, you know, something that could happen in this case.

12     Q   And do you agree with the language that we put into our

13 proposed parenting plan that the individual counselors be able

14 to consult with the family systems counselors to try to

15 maximize the possibility of the relationship being improved?

16     A   I think it's really important for therapists who are

17 involved with the family members to all be able to collaborate.

18 That's what they call that.  And I have recommended both

19 parents also continuing therapy.

20     Q   Is there anything else that you think that you've heard

21 from the children on these issues.  I don't want to have you

22 address legal parenting -- I'm sorry.

23     A   Decision making.

24         MR. CAULFIELD:  Your Honor, I object.

25 BY MR. FONTAINE:



1     Q  Decision making in a second, but on the residential

2  portion --

3          MR. CAULFIELD:  Could I just have the question

4  repeated?

5          MR. FONTAINE:  Sure, sure.

6          MR. CAULFIELD:  Thanks.

7          MR. FONTAINE:  Yeah.  I asked if there was any

8  additional information that she wanted to include --

9          MR. CAULFIELD:  Okay.

10          MR. FONTAINE:  -- on the residential portion.

11          MR. CAULFIELD:  Thank you.

12          THE WITNESS:  No.

13  BY MR. FONTAINE:

14     Q  With regards to the legal decision making, you've

15  indicated in your proposal that you believe the parties should

16  work together, try to make mutual decisions, important

17  decisions.

18     A  It's a really close one, but you know, both parents

19  need to be involved in decision making for their kids,

20  especially major decisions.  These people have such a hard time

21  making a decision, so somebody has to make the -- somebody has

22  to have a way to break the tie.  And this is about everything.

23  I've noticed this about very small things.

24     Q  I understand the importance of you trying to remain

25  neutral in this investigation.  It's your obligation ethically.


AVTRANZ eScribers
AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1   But do you feel that, when some disagreements have occurred in

2   the midst of this legal separation matter relative to

3   residential parenting that Katherine has been willing to make

4   compromises more so than Dana?

5        A   I think Katherine usually suggests something.  Then it

6   goes to Dana and he suggests something much bigger or

7   different.  And then it goes back to Katherine and she tries to

8   make some sort of halfway compromise.  And then it breaks down.

9             So I think, what happens is -- a good example of this

10  is with David Albrecht in town and he hasn't seen the kids in

11  several years.  And the kids are with Dana tonight from 4:00 to

12  6:00 for a Wednesday visit.  Dana said, "My dad's in town.  Can

13  we have time with Dad?"  Katherine said, "Well, we're not going

14  to get out of court today, but we could expand your time today

15  from 5:10 to 9:10.  That gives you four hours to go to dinner."

16            Dana came back and said, "Well, I want the kids for

17  from 5:10 until Sunday."  Then there was a breakdown.  That's

18  basically what happens here.  And then this morning, Mr.

19  Caulfield came to me and I think, after two years of not seeing

20  your grandfather, in the middle of trial, a four-hour visit may

21  be a good start.  And I don't know what after that, but at

22  least there should be something.  That's what I've done

23  continually with this case because it just breaks down.  They

24  can't make a decision.

25        Q   Was the weekend of the rehearsal of the play that you



1  heard testimony about another example of that?

2      A   I don't work on Sundays and I try not to work on

3  Saturdays.  But the kids had the opportunity to be in a play

4  and, apparently, the play has been something they've been to at

5  least for some years.  And while Dana doesn't particularly like

6  Collinsville anymore, these are the kids and they've been

7  involved with this congregation, so I thought it was a good

8  idea.

9          So Katherine said, "Hey, we've got this play, and

10 it's a lot of rehearsals and a lot of getting ready for.

11 What's a good idea about how to try to deal with parenting time

12 for Dana but also allow the kids to participate?"  My thought

13 was, she take the weekend that he should have the kids, and you

14 give him the next weekend, and you swap weekends.

15         And then there's no getting all over each other.  And

16 if he wanted to go over to the play and watch the play, I have

17 no problem with that.  It just can't happen because that's the

18 suggestion that's made.  And then the next thing is, "I'll take

19 them to the play."  And then they're all over each other, which

20 happened, and it --

21     Q   All right.

22     A   -- broke down badly.

23     Q   And it was also that there was the discussion, I think,

24 that was confirmed with the children, that the father was

25 indicating he was going to come every night that the play was


AVTRANZ   escribers
AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1  playing.

2      A   Well, this is what happens when they start having

3  disagreements, the 10- and 13-year-old and Dana, that things

4  just spiral.  And having raised a child myself, I know that, at

5  13, sometimes they're not very rational.  So it just gets

6  spiraled into, you know, okay, then you can't go at all.  Well,

7  that's not what should be going on.  It really should be, this

8  is something I'm going to do for my kids because I've always

9  done it.

10     Q   Yeah.

11     A   And I'm going to put their needs first.  And I'm going

12  to put my needs second.

13     Q   So your recommendation, then, is for them to work

14  together at making joint decisions.

15     A   Identify that there's a joint decision that has to be

16  made -- give the opportunity for both of them to be involved,

17  and discuss the issue, and then if there is absolutely not

18  agreement, I've said Katherine, but I don't have -- if this

19  Court decides that it should be a third party, that's fine with

20  me.  I just think there has to be a deal breaker.  Something

21  has to happen because, in my experience with this case, it's

22  been me.

23     Q   And if it's not addressed in some fashion like you just

24  said, will it increase the anxiety level of these children?

25     A   It's horrible for them.  Yes.



1    Q  So this is a way to try to avoid that.  Is there -- you

2    did not specifically address in your report what residential

3    parenting, non-residential parenting arrangement Dana would

4    have if he were to move to California.  Currently, under the

5    plan of this Court, he sees the children on Wednesday evenings

6    from 4:00 to 6:00 and every other weekend from Saturday at

7    10:00 to Sunday at 6:00.  Is it your recommendation that, if

8    they move to California and if Dana moves to the Pasadena area,

9    that, that same schedule be followed together with the

10   counseling, et cetera that you would recommend?

11   A  I think that has to be in place if he's local and that

12   he has to be in family systems therapy with the kids.  And

13   maybe they can expand that over time, which even in January, I

14   had hoped to eventually get to a point where they could do an

15   every-other-weekend-type arrangement.

16   Q  All right.  If he chooses not to go to California and

17   to stay here in New Hampshire and the Court allows Katherine to

18   relocate, you've also suggested an alternative residential

19   parenting arrangement.

20   A  I would want the kids to see Dana on their school

21   vacations.  And here, I know what they are, but in California,

22   I really don't know what they are.  But here, it would be,

23   December, they have a break, February and April.  So I would

24   think that, that would be time for them to be able to see their

25   father.



1        I would want him to have the regular summer trip to

2   the Cow Creek hiking adventure that they've done in their

3   lives.  And I would like him to commit to coming to them and

4   being present with them so that he can have some relationship

5   with their schools and their activities on the ground in

6   California.

7        Q   Okay.  And you had said something about, on long

8   weekends, et cetera, you could try to coordinate them around

9   that long weekend?

10       A   Right.  I think that was the reason that my thought

11  was, in months that there isn't a holiday week, that he come

12  for a long weekend so that at least he could get there by

13  Thursday and have the ability to meet with a therapist on

14  Friday, go to the school or do whatever he could do for that

15  day once a month.

16           MR. FONTAINE:  Give me one minute.

17  BY MR. FONTAINE:

18       Q   Have you had an opportunity -- I think you said this in

19  your report, but did you speak with the counselor at the school

20  that the children attend?

21       A   I did.

22       Q   And her name is Laura Burback (phonetic)?

23       A   Audra --

24       Q   Audra, sorry.

25       A   -- Burback.


AVTRANZ   eScribers
THE COURT RECORD ONLINE
AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1      Q   And what did she say about the children?

2      A   I didn't speak with her once.  I spoke with her

3   multiple times.  G█████ and S█████ started at the school and

4   they were quite socially awkward and not used to following a

5   routine.  And she had worked with them for two years, so I

6   thought she was a good person to tell me about them.  But then,

7   when I met with her, I found that they really go down to her

8   office often.  They kind of hang out down in the office.  And

9   so she had the opportunity to meet with them and talk to them

10  most days in their school year.

11     Q   And how did she think over the course of those two

12  years they were doing?

13     A   She was concerned about the children and their real

14  emotional distress of their trying to work out a relationship

15  with their dad.

16     Q   Yeah.  Did she have an opportunity to speak to you

17  about their academic performance?

18     A   Yes.

19     Q   And what did she say about that?

20     A   All of the Albrecht children are very gifted

21  academically.  They're all gifted academically.  The two girls

22  are less interested in being nerds than the two boys and the

23  two girls were not used to doing homework, and having a

24  routine, and sitting, and having demands placed upon them

25  academically.  And so that was a real adjustment, but they have



1    really adjusted well.

2         Q   Now, I know that you've recommended in your decision

3    making that the parties discuss important decisions.  And that

4    would, I guess, include education, but if this Court allows

5    them to relocate to California and Katherine were to discuss

6    with Dana her proposal relative to their schooling there, that

7    is, the girls go to the Gooden School and that C███ be allowed

8    to take classes at the community college, with the idea of

9    going into a four-year college, do you think that's a good

10   plan?

11        A   From what I can see it is, but I think that the parents

12   need to really look at that.  These parents are very able to do

13   that.  They are.  I don't know if they're able to agree with

14   each other, but they're very able to do what's best for their

15   kids.

16             MR. FONTAINE:  Thank you.  No further questions.

17             THE COURT:  Cross-examine?

18                       CROSS-EXAMINATION

19   BY MR. CAULFIELD:

20        Q   Attorney Sternenberg, did you suggest to Dana that he

21   take the children last Christmas to the Orthodox Christian

22   celebration?

23        A   Not to the actual -- he told me that they have a big

24   meal in celebration around Christmas, so I did suggest that.

25        Q   You did or didn't?



1      A   I did.

2      Q   Okay.  You suggested that they go to the Orthodox --

3      A   That's what I said.  Yes.  I did.

4      Q   -- Christian -- okay.  And in your guardian ad litem

5  report, you first recommended that joint decision making, but

6  if they can't agree, Ms. Albrecht makes the call.  And you put

7  it in your report.

8      A   That's what I -- yes.

9      Q   But on the stand, you started thinking that might not

10  be the best idea?

11     A   On the stand, I said that the man with the black robe

12  could make a decision that a third party would be a better

13  tiebreaker.

14     Q   Right, because they haven't -- unfortunately, your own

15  experience you testified to, these parents haven't been able to

16  make a decision on their own.  Right?

17     A   Unfortunately, they do make decisions, and they make

18  good decisions around medical care and other things when they

19  don't realize that they're fighting.  But when they're in the

20  middle of battle, they have to take positions.

21     Q   Not having birth certificates and Social Security

22  numbers for their children, you consider a good decision among

23  other things?

24     A   It's not my life, but --

25     Q   No.  But you think that was a good decision.


AVTRANZ    eScribers
AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1        A   I don't know how to say -- I don't --

2        Q   Okay.

3        A   I think they do now have birth certificates and Social

4    Security numbers are on the way.  That's what I heard, so --

5        Q   Well, I think one of them still doesn't have a birth

6    certificate.

7        A   All right.  My thought is this.

8        Q   Yeah.

9        A   I don't parent for these kids.  I just try to do an

10   overview investigation as to what's in their best interest.

11       Q   So if this history of the case -- and would it be fair

12   -- and we're both guardian ad litems.  Would it be fair to say

13   this is a highly conflicted family law case?

14       A   That would be fair.

15       Q   Okay.  And is it fair to say that there's been a

16   dialectic, a struggle between Ms. Albrecht and Mr. Albrecht

17   regarding just about every single parenting exchange?

18       A   Yeah.

19       Q   And they all take place at the Hollis Police

20   Department?

21       A   Not all of them.

22       Q   Do the majority of them take place at the Hollis --

23       A   Majority, not all of them.

24       Q   Okay.  And is it fair to say that the majority of the

25   ones that take place result in mutual complaints to the police,



1   police reports being generated -- let me finish the question --

2   you being provided the police reports, strong lawyer letters

3   from Attorney Fontaine, strong loyal letters from me, all

4   copied to you?  Is that a fair statement?

5        A  I don't think it's every week --

6        Q  All right.

7        A  -- because if it were I'd probably pull out my hair.

8        Q  But once a month, every six weeks, yes.

9        Q  Okay.  All right.  So what do you think it would look

10  like if Ms. Albrecht moves to California and Mr. Albrecht

11  remains here?  If you could just let me answer the question --

12       A  Well, I don't want you to answer the question.

13       Q  I'm sorry, ask it.

14       A  I want to answer the question.

15       Q  Yeah, but let me ask it.

16       A  I thought it was a question.

17       Q  No.  I haven't finished.

18       A  Okay.

19       Q  Okay.  What do you think it's going to look like?

20       A  Okay.  Now, can I --

21       Q  Now, I'm finished.  Now, you can answer.

22       A  All right.  I think that these children desperately

23  need space.

24       Q  Space?

25       A  Space.


AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1       Q   Different from stability, space now?

2       A   It's not different than stability.

3       Q   Okay.  It was stability in your report.  Right?

4       A   I think these children need peace, and space, and

5   stability --

6       Q   Yeah.

7       A   -- and consistency, and predictability.  And that means

8   I think they need this Court to make an order that's very

9   specific about what happens and not have the parents do

10  whatever they want to do.

11      Q   Space from whom, Attorney Sternenberg?

12      A   Space.

13      Q   Space from whom, from Dad?

14      A   Space from the conflict that they're involved with --

15      Q   Okay.

16      A   -- all of the time.

17      Q   Okay.  Now, explain to me, explain to His Honor, not

18  me -- I'm insignificant here -- how moving Ms. Albrecht and the

19  children to California will stop these two contentious people

20  from contending.

21      A   Okay.

22      Q   Yeah.

23      A   I don't know that it will.

24      Q   Uh-huh.

25      A   I do know, in other cases that I've had in 24 years of



 1  doing guardian ad litem work --

 2      Q  Yeah.

 3      A  -- that, when there is a move, when these people cannot

 4  do day-to-day communication, that sometimes it calms down.

 5      Q  Yeah.  And thank you.  And based upon your 24 years of

 6  experience, does it sometimes go the other way?

 7      A  Sometimes.

 8      Q  Yeah, yeah, yeah.  What do you think is going to happen

 9  in this case?

10      A  I think that the kids really desperately want to go to

11  live with their mother no matter what happens.

12      Q  Yeah.

13      A  And so they're always going to have to deal with their

14  father not feeling that he got the fair end of the shake and

15  that their mother got the --

16      Q  Okay.

17      A  -- you know, one.  And this isn't a win or lose for

18  them.

19      Q  All right.

20      A  I also feel that it would be wonderful if the

21  children's parents were able to look at this, not at each other

22  as a winner and a loser, but at the need for one parent to have

23  support so that she can deal with her medical issues and other

24  issues and be available to these little girls for as long as

25  possible.  But that's not possible in this case.


AVTRANZ ◆ eScribers
AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1    Q   But you do admit in your report you talked about

2    stability?

3    A   I did, I do.

4    Q   Okay.  Now, do you agree with me that there's a

5    substantial chance that, if Ms. Albrecht moves with the

6    children to California, that Dad's going to have less and less

7    contact with the children?

8    A   Not if this Court makes a very strong order about what

9    his contact is and that it's not going to be changed every

10   week.

11   Q   And was there something weak with the Court's order

12   that's been going on for the last year, which hasn't been

13   working?

14   A   The problem with the Court's order in the last year has

15   been that Dana has not been interested in just doing it.  And a

16   lot of times, as a guardian ad litem, I tell people at a

17   temporary stage, "Do have good visits, and use the time, and

18   make them good because then they will get bigger.  Then it will

19   increase."  And in this case, unfortunately, it hasn't worked

20   that way --

21   Q   Okay.

22   A   -- because, every time there's a visit, something

23   occurs that just causes the kids to be unhappy.

24   Q   Let's look at another stability piece.  So Ms. Albrecht

25   has told us all that she's basically terminal.  Correct?



AVTRANZ ◆ eScribers
AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1      A   Yes.

2      Q   Okay.

3      A   That's what she said and that's what her doctor has

4   said.

5      Q   So now -- and we don't have a prognosis of when that

6   sad event will happen.  Right?

7      A   I don't think any of us do, no.

8      Q   All right.  Okay.  So tell me how Ms. Albrecht moving

9   the children, the children I guess have -- three of them --

10  well, there's three children.  Two of them have never lived in

11  California and one lived in California for a year.  Right?

12          THE PETITIONER:  Six months.

13  BY MR. CAULFIELD:

14     Q   Six months -- they're New Hampshire children.  Right?

15     A   The children have lived in New Hampshire.  The two

16  girls have lived in New Hampshire their lives, but they have

17  connections with California because they've been there every

18  year for vacation, on extended vacation.

19     Q   Right.  And the younger boy?

20     A   C███   has lived out here most of his life.

21     Q   Right.  Okay.  So they're really New Hampshire

22  residents.  You don't want to acknowledge they're New Hampshire

23  residents?

24     A   They're New Hampshire residents.  I don't know why

25  that's relevant to --



AVTRANZ ◆ eScribers
AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1      Q   Okay.  So if Ms. Albrecht may be terminal, and she

2   moves with the children to California, and Dad stays here, how

3   does that give the children stability?

4      A   It's my understanding that Ms. Albrecht has a close and

5   loving relationship with her mother and her sister --

6      Q   Okay.

7      A   -- that her mother is going to support her in her

8   housing --

9      Q   Yeah.

10     A   -- support her in her care for the children --

11     Q   Yeah.

12     A   -- and for herself --

13     Q   Uh-huh.

14     A   -- and that Pasadena is her environment.  That's where

15   she grew up.

16     Q   Right.

17     A   It's my understanding that, that would be, from my

18   position, a very good stabilizing thing for these kids, whereas

19   right now, Ms. Albrecht doesn't have income, cannot afford the

20   house that they live in, cannot afford the travel that she's

21   doing right now to try to get treatment, and doesn't have any

22   support.  So the support and the stability that you're talking

23   about, I think, is in California.  And if for some reason these

24   children go from 13 to 16 with their mother and then their

25   mother passes away --



1     Q   Right.

2     A   -- I will still feel that that's better for the

3  children, to have had that time of stability --

4     Q   So --

5     A   -- at 10 to 13 and 16 to 19.

6     Q   Right.   Okay.   So let me parse this into two pieces,

7  Attorney Sternenberg.   First, you feel that the children will

8  be stable if either they're 3,000 miles away from Dad or -- let

9  me finish -- Dad moves to California.   Correct?

10    A   I think the children will be more stable with their

11 mother in California than they are now.

12    Q   Okay.

13    A   And I think that I would hope that Dana, not having a

14 lot of significant connections right now to New Hampshire,

15 would move and be in California near his children.   That would

16 be the best thing in my mind to happen in this case.

17    Q   Okay.   Now, if Mother is unable to take care of the

18 children, wouldn't you anticipate that Dad is going to say,

19 "Give me back my children"?

20    A   He needs to do some work so that he can say that.

21    Q   Isn't it really - isn't really what you're foreseeing

22 is that Ms. Albrecht's mother seek a guardianship over these

23 children in California?

24    A   I have --

25    Q   Isn't that really what you're seeking?



```
 1        A   No.  And I have not any --

 2        Q   No?

 3        A   I haven't gone near that.  I don't even know where that

 4   comes from.  That hasn't been asked of me.

 5        Q   Okay.  So let me ask you now, let's assume that, sad as

 6   it is, Ms. Albrecht dies in California.

 7        A   Okay.

 8        Q   And maybe she doesn't die in the two years you think.

 9   Maybe she's actually iller (sic) than you think and she does

10   sooner.  Okay?

11        A   Okay.

12        Q   Okay.  Now, the children are in California.  Dad is

13   here.  What do you think Ms. Albrecht's mother is going to do

14   next?

15              MR. FONTAINE:  Your Honor, I object.  That's --

16              THE COURT:  Sustained.

17              MR. FONTAINE:   -- irrelevant.

18              MR. CAULFIELD:  Your Honor, I think on the issue

19   of --

20              THE COURT:  The objection is sustained.

21   BY MR. CAULFIELD:

22        Q   Would it be --

23              THE COURT:  We all could get hit by a bus when we

24   leave the courtroom today also.  The objection is sustained.

25   BY MR. CAULFIELD:
```



1      Q   Are you troubled by these children being in the middle

2    of a parenting dispute?

3            THE COURT:  Are you talking to me?

4            MR. CAULFIELD:  No.

5            THE COURT:  Well, you're looking at me.

6            MR. CAULFIELD:  Well, because you're the most

7    important person here, Judge.

8            THE COURT:  No.  I'm not.  The most important people

9    are here at the -- the most important people in this case

10   aren't in here today.  Ask your question of the guardian ad

11   litem.

12           MR. CAULFIELD:  Yeah.  I really -- what it was --

13   okay.

14   BY MR. CAULFIELD:

15     Q   Do you think the effect that these children are in the

16   middle of a parenting dispute is a problem?

17     A   I think the fact that the children have been exposed to

18   their parents' rages, and fighting, and blaming, and

19   manipulating is a problem.

20     Q   Don't you foresee that, if Ms. Albrecht dies and she's

21   in California, you're going to have another parenting dispute

22   with the children?  You don't foresee that as a guardian ad

23   litem?

24           MR. FONTAINE:  Your Honor, I'm going to object.

25           THE COURT:  Sustained.



 1          MR. CAULFIELD:  Okay.

 2   BY MR. CAULFIELD:

 3      Q   Is spying a big issue in this case, Attorney

 4   Sternenberg?

 5      A   It's an issue.  It's not a big issue, but it's

 6   something that I addressed, yes.

 7      Q   Right.  How has it affected the children in that the

 8   mother thinks that the dad is spying on her?  And one of the, I

 9   guess, boys thinks that their dad is spying on them.  How has

10   that affected this case?

11      A   It's not one of the boys.  It's both of the boys.

12      Q   So you're saying that the older boy --

13      A   I met with P█████.

14      Q   -- in college says that Dad is spying on the family?

15      A   Yes.  He did not want to bring his computer home and,

16   when he did and he had to use it at Dad's house, he was going

17   wipe it before he took it home.

18      Q   Is that in your report?

19      A   No.

20      Q   I see.

21      A   You just asked me a question about how it's affected

22   the children.

23      Q   I see.  So you believe that Dana is spying on

24   everybody?

25      A   I believe from what my investigation has led me to that


AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1  he's definitely able to spy on the children.

2      Q  But able -- we're all able to do things, Attorney

3  Sternenberg.  That doesn't mean we're doing them.  Right?

4      A  Sure, no.

5      Q  No.  Okay.  No.

6      A  If you were mistaken, and it turned out that Dana

7  wasn't spying on anyone, and that this was either a fantasy of

8  Ms. Albrecht's or maliciousness of Ms. Albrecht, would that

9  change your opinion in this case in any way?

10     A  It won't change my recommendations to this Court.

11     Q  I see.

12     A  No.  It won't.

13         MR. CAULFIELD:  Okay.  One moment, please.  I think

14  I'm done.

15     (Counsel confer)

16         MR. CAULFIELD:  I'm done.  Thank you.

17         THE COURT:  You may step down.

18         MR. CAULFIELD:  Thank you, Attorney Sternenberg.

19         THE WITNESS:  Thank you, Your Honor.

20         MR. FONTAINE:  Your Honor, could we take a five-

21  minute break?

22         THE COURT:  We can.

23     (Recess taken from 2:32 p.m. to 2:40 p.m.)

24         THE COURT:  Next witness?

25         MR. FONTAINE:  Yes.  In fact, I'm going to call

