1                      STATE OF NEW HAMPSHIRE

2            9TH CIRCUIT COURT - FAMILY DIVISION - NASHUA

3
     IN THE MATTER OF:              )
4                                   )
     DANA ALBRECHT,                 ) Family Division Case No.
5                                   ) 659-2016-DM-00288
                    Petitioner,     )
6                                   ) Nashua, New Hampshire
            and                     ) May 9, 2019
7                                   ) 10:33 a.m.
     KATHERINE ALBRECHT,            )
8                                   )
                    Respondent.     )
9    _____ )

10                         MOTIONS HEARING
               BEFORE THE HONORABLE BRUCE F. DALPRA
11       MARITAL MASTER OF THE CIRCUIT COURT - FAMILY DIVISION

12   APPEARANCES:

13   For the Petitioner:          Joseph Caulfield, Esq.
                                   CAULFIELD LAW & MEDIATION
14                                 OFFICE
                                   126 Perham Corner Road
15                                 Lyndeborough, NH 03082-6522

16   For the Respondent:          Michael J. Fontaine, Esq.
                                   WELTS WHITE & FONTAINE, PC
17                                 29 Factory Street
                                   PO Box 507
18                                 Nashua, NH 03061-0507

19   Audio Operator:              Electronically Recorded
                                   Aline Chasseur
20
     TRANSCRIPTION COMPANY:        eScribers, LLC
21                                 7227 N. 16th Street, Suite 207
                                   Phoenix, AZ 85020
22                                 (800) 257-0885
                                   www.escribers.net
23
     Proceedings recorded by electronic sound recording; transcript
24   produced by court-approved transcription service.

25



1                           I N D E X

2    WITNESS(ES)        DIRECT     CROSS     REDIRECT     RECROSS

3    FOR THE PETITIONER:

4    Dana Albrecht        5         10       15,38        20,77

5

6    FOR THE RESPONDENT:

7    Katherine Albrecht 95          155

8    MISCELLANEOUS                                        PAGE

9    NONE

10

11   EXHIBITS                                         ID    EVD

12   Petitioner's 1        Emails from 9/18/17              41

13   Petitioner's 2        Sierra Madre Police Report       48

14   Petitioner's 3        High school application          55

15   Petitioner's 4        Transcript and photos            60

16   Petitioner's 5        █████'s two letters              61

17   Respondent's A        Dentist's Letter                137

18

19

20

21

22

23

24

25

1    (Proceedings commence at 10:33 a.m.)

2              THE COURT:  This is docket number 2016-DM-288

3    regarding Dana and Katherine Albrecht.

4              Counsel, identify yourselves for the record.

5              Counsel, identify yourselves for the record.

6              MR. CAULFIELD:  Joseph Caulfield attorney for

7    Petitioner Dana Albrecht.

8              MR. FONTAINE:  Michael Fontaine representing

9    Katherine Albrecht.

10              THE COURT:  Mr. and Mrs. Albrecht, stand for a

11    moment and raise your right hands.

12                         PARTIES SWORN

13              THE COURT:  Very well, you may be seated.  I think

14    we'll start off with the Petitioner's motion for contempt

15    alleging that the Respondent refuses to allow children to call

16    the Petitioner.

17              Mr. Caulfield, offers of proof.

18              MR. CAULFIELD:  Yes, Your Honor.  I call Mr.

19    Albrecht to the stand.

20              THE COURT:  Offers of proof.

21              MR. CAULFIELD:  Offer of proof?

22              THE COURT:  Yes, sir.  Did you get -- did you not

23    get the scheduling order that I issued a few weeks ago?

24              MR. CAULFIELD:  No.  I did not get any scheduling

25    order where you said offers of proof.



4

1          THE COURT:  You didn't receive one either, Mr.

2    Fontaine?

3          MR. FONTAINE:  I don't show one, Your Honor.  I

4    mean, I assume given that it was a three-hour hearing of 20

5    motions that the only way we'd be able to do it was offers of

6    proof, so that's how I planned on presenting.

7          MR. CAULFIELD:  So Your Honor, if I may.  So first,

8    I didn't get your order for the offers of proof about doing my

9    offer.  And secondly, Your Honor, respectfully, you have in

10   front of you pleadings that are sworn to by the clients.  I

11   don't know what unsworn representations by attorneys add to

12   that.  I would think, Your Honor, that you'd want to hear

13   sworn testimony to judge credibility.

14         THE COURT:  They still -- yeah, okay.  Call your

15   first witness.

16         MR. CAULFIELD:  Thank you, Your Honor.  I call Dana

17   Albrecht to the stand.

18         Bring what you need with you.  So please stand and

19   raise your right hand -- oh, you've already --

20         THE WITNESS:  We've already been sworn.

21         MR. CAULFIELD:  -- been sworn.  I'm sorry.  One

22   moment, so I can do this.  Hold on.  And I could do it even

23   without tripping over these things that you've left in the

24   middle of the path.

25         One moment, please.  Because I know that it was only

1     pure luck that I didn't trip over this.  Okay, good.

2                       DIRECT EXAMINATION

3     BY MR. CAULFIELD:

4       Q  You're the Petitioner in this case?

5       A  Yes.

6       Q  Could I direct your attention to Petitioner's Motion

7     for Contempt re Telephone Contact and Written Electronic

8     Communication.  Are you familiar with that motion, sir?

9       A  Yes.

10       Q  Okay.  Could you please tell His Honor, specifically,

11     what order of this Court that you're relying on in bringing

12     this contempt?

13       A  The Court has basically ordered that I'm supposed to

14     have telephone contact at any reasonable hour with my children

15     in California.  Given account the time difference, essentially

16     all telephone communication has been cut off.  There is no

17     number at which I may reasonably call them.  I gave my

18     children cell phones at Christmas, upon my wife's advice.

19       Q  And what happened with those cell phones?

20       A  They enjoyed them very much over Christmas.  As soon

21     as they got home at New Year, she essentially told the

22     children they were spy devices, and she caused the children

23     not to want to use them.

24       Q  So now what happens to the new cell phones that you

25     bought for your children?

1      A   Well, right now I believe they're basically kept off

2  almost all of the time.  The kids certainly don't use them.

3  I -- someone occasionally uses them to send texts.  I'm not

4  sure those are my kids' based on the content of the messages.

5      Q   Okay.  Are there any other areas that you feel that

6  Dr. Rumbrick (phonetic) has violated Master DalPra's order?

7      A   There was --

8      Q   Concerning this particular --

9      A   Yeah, there's --

10     Q   -- topic?

11     A   -- a landline at the house where she claims to live.

12  I'm actually not even sure where the kids are living now,

13  whether it's with her at her mother's or whether it's with her

14  second rental residence in Sierra Madre.  In any event, there

15  is a landline at her mother's house.  They have refused me

16  access to that.  And I believe at one point there was a

17  suggestion I just try to reach them through        's phone.

18  Fundamentally, I cannot pick up the phone and call my

19  children.

20     Q   Okay.  When is the last time you spoke -- so this --

21  they're four children?

22     A   Yes.

23     Q   What are their names?

24     A        , age 21, who lives with me.        , age 18, who

25  is still --

1    Q   Where does ███ live?

2    A   He's still with Katherine.

3    Q   Okay.

4    A   I believe he lives with her in her rental residence at

5    Sierra Madre.  ███, age 15 now, and ███, age 12.

6    Q   Okay.  When's the last time you spoke to ███?

7    A   I don't recall exactly, but it would have been within

8    the past couple of weeks, I believe last weekend, via text.

9    Q   How often do you speak with ███?

10        MR. FONTAINE:  Your Honor, I object.  ███ is an

11   adult.  ███ is over the age of 18.  He's not the subject of

12   this Court's jurisdiction at this point, and he's not the

13   subject of the particular motion.

14        THE COURT:  I'll allow it.

15        THE WITNESS:  That means I answer?

16        MR. CAULFIELD:  So you --

17        THE COURT:  Do you recall --

18        MR. CAULFIELD:  -- allow --

19        THE COURT:  -- the answer?

20        THE WITNESS:  -- him to answer?

21        THE COURT:  You already answered it.

22        MR. CAULFIELD:  Okay.

23   BY MR. CAULFIELD:

24    Q   And the next child?  ███ lives with you, so the next

25   child?

1      A   ███.

2      Q   And ███ you've spoken of.  Now --

3      A   Now, ███.

4      Q   So how often do you speak with ███?

5      A   I haven't been able to see -- speak with ███ since

6  Christmastime when Katherine retaliated when she didn't get

7  her way concerning me having my full --

8          THE COURT:  Just answer the question without the

9  editorializing, Mr. Albrecht, and we'll get through this

10  sometime today.

11         THE WITNESS:  Okay.

12  BY MR. CAULFIELD:

13     Q   When's the last time you spoke to ███?

14     A   Christmastime.

15     Q   Okay.  Have you tried to speak with them?

16     A   Absolutely.

17     Q   Okay.  Is there anything else concerning this motion

18  that you were --

19     A   Yes.  May I have the box, the other box, please?

20     Q   This box?

21     A   Yes.

22     Q   Yes.  One moment, please.  Do you want to put that on

23  the floor, or --

24     A   Yeah.

25     Q   Okay.

9

1      A   There's a double standard by which Katherine monitors

2   our children's cell phone communications.  Here's evidence of

3   that.  I'd like it admitted, please.

4      Q   So what is that you're showing?  I have no idea.  Hold

5   on.  What is that?

6      A   The email referenced in the pleading.

7      Q   Excuse me.  Let's do this right.  So you said that

8   this is evidence of what?

9      A   That Katherine, essentially, spies on our children and

10   there's evidence, that's this email that's referencing --

11          MR. FONTAINE:  Your Honor, I object.  Until I see

12   what this is.

13          MR. CAULFIELD:  I don't even know what it is.  I'm

14   about --

15          THE WITNESS:  It's --

16          MR. FONTAINE:  Then you shouldn't be able to ask

17   questions.  Can I see it, Your Honor?

18          THE COURT:  Show him the document.

19          THE WITNESS:  This email is --

20          THE COURT:  Shh, Shh, Shh, Shh, Shh, Shh, Shh, Shh,

21   Shh, Shh, Shh, Shh.

22          MR. FONTAINE:  Judge, this is from 2014.

23          THE WITNESS:  The pleading reference says the email.

24          MR. FONTAINE:  I object.

25   BY MR. CAULFIELD:



1       Q   So you're reading an email from 2014.  How do you feel

2    that that's relevant to this contempt?

3       A   It's clear that Katherine thinks it's completely

4    appropriate to monitor cell phone communications and send logs

5    to her church.

6       Q   Well, all right that's -- let me move on.

7       A   Okay.

8       Q   Okay.  So then have we covered all of that first

9    motion, or is there anything else that you feel that Dr.

10   Albrecht has violated Master DalPra's order?

11      A   I think we're done with that.

12      Q   Okay.  So now I direct your attention to --

13              MR. FONTAINE:  Can I cross-examine on this?

14              THE COURT:  Ask them.

15              MR. CAULFIELD:  Oh, on each one?  Oh, okay.

16              THE COURT:  One at a time.

17              MR. FONTAINE:  Let's do it.

18                        CROSS-EXAMINATION

19   BY MR. FONTAINE:

20      Q   So Mr. Albrecht, you're saying that the children don't

21   respond to your phone calls, correct?

22      A   Correct.

23      Q   And you're saying it's based upon the fact that they

24   believe they're spy devices, correct?

25      A   Correct.



 1        Q   What evidence do you have today?  What testimony do

 2   you have today to support that allegation?

 3        A   Katherine's own sworn pleading in which she told them

 4   the privacy implications, quote, unquote, of them using phones

 5   by their father.

 6        Q   So you're telling -- you have evidence to support that

 7   Katherine is telling them that they can't use their phones to

 8   answer your calls?

 9        A   In addition --

10        Q   You have it here today?

11        A   -- used her phone to tell them the privacy

12   implications, quote, unquote, of using phones owned by their

13   father.

14        Q   Okay.

15        A   So unless you're saying your client lied in her sworn

16   pleading, I'm going with that.

17        Q   Okay.  You have no other evidence here today to

18   support your allegations in that motion, correct?

19        A   I have other evidence that she believes they're spy --

20   that the children believe they're spy devices.  I believe it's

21   best to get with those as we go down the other motions.  Would

22   that be acceptable?  So we're not jumping all over the place?

23        Q   The Judge is making a ruling on this motion, and I'm

24   asking you what evidence you have to support your

25   allegations --

12

1      A   Well, we can go through the DCYF records now.  It's --

2      Q   I was provided with one document that would be used as

3   an exhibit; is that right?

4           MR. CAULFIELD:  Excuse me, Your Honor.  The way that

5   we thought would be best to present this was motion by motion.

6   Of course you're not going to decide each motion without

7   hearing the whole case.  So I think that's the more logical

8   way other -- so the data isn't coming from this motion, that

9   and which other way.  Motion by motion by motion.

10          MR. FONTAINE:  I object to that.  That's --

11          THE COURT:  Continue your cross-examination.

12          MR. FONTAINE:  Thank you.

13   BY MR. FONTAINE:

14     Q   What evidence do you have here today, what testimony

15   do you have to support that Katherine won't allow the children

16   to use the cell phones you gave them?

17     A   So let's go with DCYF records.  Let's go --

18     Q   What's the date of that --

19          MR. FONTAINE:  Your Honor, I asked if there was --

20          THE WITNESS:  March 2 --

21          MR. FONTAINE:  -- exhibits.

22          THE WITNESS:  It's from last year.  It's an ongoing

23   pattern, Your Honor.  Three of those.

24          MR. CAULFIELD:  So before you -- I'm sorry.  It's

25   your examination.

1              THE WITNESS:  The DCYF records, November 14, 2016,

2    Elaine Hodkinson tells New Hampshire DCYF, Mr. Albrecht is

3    bugging the phone by listening to this conversation.

4    BY MR. FONTAINE:

5        Q   That's not Katherine Albrecht, is it?

6        A   That's her mother saying they're spy devices.

7        Q   So what relevance does that have, what her mother

8    thinks, on this issue that you have said Katherine?

9        A   I think it's completely relevant when they live in the

10   same house and her mother prevents access via the house hand

11   line.  Would you like me to continue?  We can go with her EL

12   psychiatric admission.

13       Q   What date is that?

14       A   That is November 9, 2016, and --

15       Q   Is that --

16       A   -- follow with --

17       Q   -- the same -- is that the same psychiatric admissions

18   that you covered in your presentation of your evidence in the

19   trial of this matter?

20       A   Yes.  But what was not covered was what happened five

21   days later, when she told DCY, her counselor, that I stole the

22   guns from their home.  So I mean, if the kids don't want to

23   use their phones --

24       Q   So what does the guns have to do with the phones?

25       A   Well, what we fundamentally have here is an alienation

1  issue where she's bad-mouthing me.  She keeps the phones

2  turned off.  She's convinced --

3      Q  So this --

4      A  -- the kids that the better phones are --

5      Q  Sir, we're going --

6      A  -- spy devices.

7      Q  -- back to the general context of this hearing on the

8  numerous motions that you've filed.  Is that what you're

9  saying?  That this is covering everything, not just any -- I'm

10  asking you --

11     A  I could call --

12     Q  -- specific -- sir.  I'm asking you specific to this

13  motion that the Judge is hearing right now, that he's allowed

14  me to cross-examine you on.  What evidence do you have that

15  Katherine Albrecht told her children to not turn their phones

16  on, not use their phones, not answer your calls?  What

17  evidence?

18     A  I can look at my Verizon bills, sir.  They don't use

19  their phones.  Whenever I call them, it went straight to

20  voicemail.  Their phones are turned off.

21     Q  Is it possible your children don't want to speak with

22  you, sir?

23     A  It is very possible they don't want to speak with me,

24  because they've been -- been instructed by their mother not to

25  speak with me.

1            MR. FONTAINE:  I have nothing further of this.  I'd

2     like to call my client, Your Honor --

3            THE COURT:  You can --

4            MR. FONTAINE:  -- on this motion.

5            THE COURT:  -- call your client when it's your turn

6     to address all the other issues, Counsel.

7            MR. FONTAINE:  Okay.

8            THE COURT:  The next one is the 2018 summer

9     parenting time, refusal to allow the second week of parenting

10    time in the summer of 2018.

11           MR. CAULFIELD:  Yes, Your Honor.

12                       REDIRECT EXAMINATION

13    BY MR. CAULFIELD:

14    Q   Do you have that motion in front of you, Dana?

15    Petitioner's motion of contempt of court's parenting plan, the

16    Petitioner's second summer parenting plan?

17           THE COURT:  and for the record, we'll take up that

18    one and the winter parenting time at the same time.

19           MR. CAULFIELD:  Could I have one moment, please,

20    Your Honor?

21           Okay.  So those would be our numbers 2 and 3, Dana.

22           THE COURT:  Okay.  Okay.  Let me --

23           MR. CAULFIELD:  I believe, yeah, because --

24           THE COURT:  Let me backtrack just a moment.  We will

25    take up that one, which is number 283 in the Court's file --

 1  I'm sorry, number 273 in the Court's file.  The winter one is

 2  number 283, and then another one is regarding Christmas 2018.

 3  I'm sorry.  That's Respondent's.  Never mind.

 4  BY MR. CAULFIELD:

 5       Q   So, Dana, do you have the --

 6       A   Yes.

 7       Q   -- list with the --

 8       A   Yes.

 9       Q   Okay.  So you understand what --

10       A   Yes.

11       Q   -- numbers to check?

12       A   Yes.

13       Q   Okay.  Great.

14            THE COURT:  273 and 283.

15            MR. CAULFIELD:  273 and 283?

16            THE COURT:  Yeah, so summer.

17            MR. CAULFIELD:  That would be summer and the winter?

18            THE COURT:  Yes.

19            MR. CAULFIELD:  Okay.

20            THE COURT:  What's --

21  BY MR. CAULFIELD:

22       Q   Directing your attention to those two, please, what

23  specific order are you claiming that Dr. Albrecht is in

24  contempt of?

25       A   Well --



1      Q   What order is it, I guess?

2      A   Yes.  Well, the first summer, "Petitioner shall have

3   parenting time for a minimum of two," emphasizing two, "non-

4   consecutive two-week periods each summer."  I have to say I

5   got my first one.  There's no contempt on that, and the first

6   one went great.  The trouble with the second one is, she

7   drove -- excuse me.  She flew with the children across the

8   country to testify against me in the criminal trial, resulting

9   from her false accusations --

10              MR. FONTAINE:  I object --

11              THE WITNESS:  -- against me.

12              MR. FONTAINE:  -- Your Honor, to the bringing in a

13   criminal case, and there's no evidence that my client --

14              THE COURT:  So she took the children to the east

15   coast.  Continue.

16              THE WITNESS:  Yes, sir.  So while they were here,

17   she had all phone conversation cut off again.  She then

18   proceeded to drive across the country with them, did not get

19   back, I want to say, until August 6.  Until that time, she was

20   out of reach.  In fact, I believe her own counsel had trouble

21   reaching her.  So rather than get my second two-week parenting

22   time, she's on a cross-country odyssey with, again, all

23   communications cut off.

24              After that, we did try to squeeze something in at

25   the very end.  It was too late for ███████, because ███████'s

1   school was already started.  I did purchase plane tickets for

2   ▮▮▮ and ▮▮▮, and while ▮▮▮ boarded his flight, Katherine

3   caused ▮▮▮ not to board her flight.  When she was in the

4   airport, we were also refused telephone communication with

5   ▮▮▮, and her older brother was refused telephone

6   conversation with ▮▮▮ as well.

7   BY MR. CAULFIELD:

8       Q  Is that both motions?

9       A  Oh, that's summer.

10      Q  "Oh, that's summer."

11      A  Moving on to winter, so the Court's parenting plan

12  says that I'm supposed to have parenting time with the

13  children's winter school vacation.  These children have

14  exactly one winter school vacation.  For ▮▮▮ and ▮▮▮,

15  give or take a day, it's essentially 12/22, Saturday, through

16  1/6, Sunday.  Again, they're both slightly off one day.  So I

17  would expect to have parenting time for all of that.  When I

18  requested that, Katherine refused to cooperate.

19          THE COURT:  When were the dates?

20          THE WITNESS:  Specifically, ▮▮▮'s is 12/21/2018,

21  through 1/6, and ▮▮▮'s is 12/20/2018, to 1/7.

22          THE COURT:  Thank you.

23          THE WITNESS:  Very similar, just off a day.

24          She refused to, essentially, allow me more than

25  five -- excuse me, five days.  When we got there, it actually

1   made it all the way 'til nine, but the last weekend, she

2   decided that she was going to take a 600-mile round trip from

3   Pasadena to San Jose, show up at my dad's house and try to

4   harass us while we're watching Disney movies with the kids

5   BY MR. CAULFIELD:

6       Q   Did she have the police woman?

7       A   Yeah.  She got the San Jose Police.  And what was very

8   interesting, I found out then that she had lied to our

9   children about the parenting plan.

10      Q   Okay.

11      A   Because our children told me that the plan said they

12  had to be home on the 28th.  And I guess it was good for them

13  to eventually hear otherwise from San Jose PD.

14      Q   So could you tell us something about how the children

15  were when they were with you before she drove 600 miles with

16  the police and how they were after that?

17      A   Well, we had Christmas at my father's house, and their

18  older brother,      , was also there, so we were all together

19  as a family.  I'd say that went reasonably well.  My parenting

20  time tends to always improve the longer it is, simply because

21  they stop getting used to the idea that father is,

22  essentially, the monster that Katherine's created in their

23  mind.

24      Q   Okay.

25      A   And I do say, at the last weekend, I think they were



1     very upset to learn that, essentially, they'd been lied to

2     about, that the parenting plan was for the whole two-week

3     winter vacation, when they were told it was only five days.

4          Q  Okay.  Is that everything concerning those two

5     motions, sir?

6          A  I believe so.  Obviously, there's much more in the

7     written pleadings itself.

8               MR. CAULFIELD:  Okay.

9               You may inquire.

10                      RECROSS-EXAMINATION

11    BY MR. FONTAINE:

12          Q So Mr. Albrecht, isn't it true that the Court order,

13    the Court parenting plan also requires that you provide 10

14    days written notice of your intended two-week vacations?

15          A  Yes.  I did -- no.  It only requires 10-days' notice

16    if I'm going to travel to California.

17          Q  Okay.

18          A  The vacations are actually just pretty much written

19    into the plan.  With that said, I believe I did provide

20    notice, and I believe the contempt was even filed all the way

21    back on 12/8, when your client failed to cooperate.

22          Q  We're talking about the summer vacation.

23          A  Oh, the winter.  I was referring to the winter.

24          Q  Right.

25          A  And you're referring to the summer?



1        Q   Correct.

2        A   Can you clarify which one we're talking about, please?

3        Q   Well, you took -- you testified that you took your

4   first two-week period, and it went fine, correct?

5        A   Yes.

6        Q   And you were also actually had a few extra days on

7   that one, didn't you?

8        A   I had a couple extra days.

9        Q   Okay.  And that was with the cooperation of my client,

10   correct?

11        A   Correct.

12        Q   Okay.  With regards to your second request --

13        A   Yes.

14        Q   -- you provided less than 10-days' notice of your

15   intentions to take the last two weeks of the summer, correct?

16        A   The 10-day notice in the Court's parenting plan only

17   refers for periods should I travel to California.

18        Q   Okay.  So you didn't give --

19        A   And they were here.

20        Q   So you didn't feel that you should provide more than

21   10-days' notice that --

22        A   Well --

23        Q   -- you were --

24        A   -- even then, we -- compared to when --

25        Q   Sir --



1       A   -- it actually happened with ███ --

2       Q   Let me --

3       A   -- we provided 10-days --

4       Q   Let me finish --

5       A   -- notice.

6       Q   -- my questions, please.

7       A   Yes.

8       Q   Don't you believe that you should be providing more

9   than 10-days' notice if you're going to be asking for two

10  weeks of time with the children?

11      A   I believe that if you insist I do so, yes, and when

12  that time actually happened, and ███ failed to board her

13  flight, it was two weeks later.  I see no harm in asking for

14  parenting time with the children while they are here in New

15  Hampshire, because your client has brought them because she is

16  testifying against me in a criminal matter of which I am not

17  guilty.

18      Q   Sir, haven't you been told on numerous occasions,

19  through correspondence from our office to your attorney's

20  office, that the children have expressed to Katherine on

21  numerous occasions that they do not want to come to California

22  to visit -- I mean to New Hampshire, to visit you.  Haven't

23  you been told that numerous times?

24      A   Yes.  Quite frankly, sir, I believe your client is

25  marketing to that.  They are certainly happy to come to --

1   with her to New Hampshire if we're testifying in a criminal

2   matter against me.

3       Q   Okay.  Well, let me restate that, then.  Thank you for

4   clarifying that.  Isn't it been made very clear to you that

5   they don't want to come to New Hampshire to visit with you?

6       A   The story keeps changing.  At first they don't even

7   want to go to my father's house to visit, and she insists they

8   go to my aunt's house.

9       Q   Your --

10      A   I, quite frankly, have not been able to talk to my

11  children live by phone to validate these accusations, sir.

12      Q   You have indicated again that Katherine cut off the

13  children's phone calls during that summer break, correct?

14      A   My summer break, or when she was on --

15      Q   Yeah.

16      A   -- the phone?  Yeah.  On the road trip.

17      Q   Yes.  On the road trip.

18      A   Yes.  We couldn't -- you couldn't reach her.

19      Q   Okay.

20      A   We have emails that said --

21      Q   Okay.

22      A   -- you'll -- you'll get back to us.

23      Q   But what evidence do you have that she cut the

24  children off from speaking with you?

25      A   I think if their phones are off, and I can't call



 1    them, and she's told the children their phones are spy

 2    devices, that that's why I can't reach the children.  And

 3    particularly when they're even at home, and she's told me I'm

 4    not allowed to use the landline at her residence.  That's

 5    cutting off phone communication.

 6        Q   Told you that you couldn't use the landline out at her

 7    mother's home didn't she?

 8        A   What?

 9        Q   She told you, you could not use the land --

10        A   Yes.

11        Q   -- line at her mother's home, at her --

12        A   Well, that's where --

13        Q   -- mother's request, correct?

14        A   Well, that's where she's living isn't it, or is she

15    living in Sierra Madre, sir?  Quite frankly, it's unclear to

16    me.  She has two residences.

17        Q   Sir, I asked you a question.

18        A   And I answered it.

19        Q   Okay.  So it was the landline you were requested not

20    to use, the mother's landline, by the mother, correct?

21        A   I don't know if your client has an issue.  She told me

22    she -- you -- your office told me I wasn't allowed to use that

23    phone.  I think a landline where my -- your client lives

24    should be fair game to contact my children.

25        Q   Your --



 1          A   And if -- and sir, if that's true --

 2          Q   Sir --

 3          A   -- then her --

 4          Q   -- I didn't ask you --

 5          A   -- mother is --

 6          Q   -- any of that --

 7          A   -- is alienation --

 8          Q   -- I didn't ask you -- I didn't ask you a question,

 9    sir.

10              MR. CAULFIELD:  But he was answering what you asked.

11              THE COURT:  Ask your next question.

12              MR. FONTAINE:  Thank you.

13    BY MR. FONTAINE:

14          Q   The parenting plan that you referred to states that

15    you shall have parenting time during Christmas holiday period

16    each year from December 27 to December 31st, correct?

17          A   Yes.  That's "and."  All of the times in the parenting

18    plan are "and."  I have that period and their winter vacation.

19          Q   Okay.  And where does it say that you will have

20    additional time for the December school vacation break beyond

21    those specific dates?  Where does it say that?

22          A   Winter school vacation.  The children have exactly one

23    winter school vacation, and I gave you the dates for those

24    already.

25          Q   So one thing that didn't get covered in your -- in the

1  presentation of this motion was that there was a written

2  agreement of your attorney, when this issue came up and this

3  dispute, as you claim, came up.  There was a written agreement

4  reached with your attorney that you would have visit -- that

5  you would be able to visit with your children, instead of what

6  you were requesting, for the 23rd through the 28th, correct?

7       A   Yes.

8       Q   And you were asked to confirm that you had purchased

9  flight for the girls.  By the way, when I'm saying children,

10  I'm talking about the girls, so those are the two that are at

11  issue here.  That's the -- you would -- that you needed to

12  show that you had purchased tickets for the girls, correct?

13      A   Yes.

14      Q   And after this visit began, you had a discussion with

15  your son, who's 18, correct?       █████?

16      A   Yes.  He doesn't have a Social Security number.  We

17  had a discussion about that.

18      Q   Sir, I didn't ask you anything about a Social Security

19  number.  Answer --

20      A   I'm just answering --

21      Q   -- the questions I'm --

22      A   -- a question.

23      Q   Is he 18 years old?

24      A   Yes.

25      Q   Has he graduated from school, high school?



1   A He dropped out and took the equivalency.

2   Q Okay.  Did he succeed in it?

3   A Yes.

4   Q So this child and you had a discussion?

5   A Yes, this child and I had a discussion, correct.

6   Q And he told you that he didn't want to come back to

7 New Hampshire with you, correct?

8   A No.  At first he told me he wanted to come to New

9 Hampshire.  I bought him a plane ticket.

10   Q Okay.  Do you have evidence of that?

11   A I don't have the plane ticket with me.

12   Q Do you have evidence that he told you that he wanted

13 to visit with you in New Hampshire?

14   A That's my sworn testimony, sir.  I talked to him on

15 the phone many times.  I asked if he wanted to come with me,

16 with &#9608;&#9608;&#9608;.

17   Q When you discovered that he wasn't going to go to New

18 Hampshire with you, you then changed your plans, your

19 agreement, to return the children on the -- the girls on the

20 28th, didn't you?

21   A He vacillated at the last minute, and told me he

22 couldn't tell me where he was going until his mother spoke

23 with his attorney.  I'm very curious why his mother needs to

24 speak with her attorney to decide -- for him to decide where

25 he's going.

1      Q   Sir, you made a unilateral decision to breach the

2   agreement that your attorney reached on your behalf, didn't

3   you, at that point?

4      A   We had a tremendous amount of trauma surrounding these

5   last minute changes --

6      Q   Sir, I'm asking you --

7      A   -- and Social Security.

8           MR. CAULFIELD:  Excuse me, Your Honor.  May he

9   finish his answer?

10          MR. FONTAINE:  He's not answering the question,

11   Counsel.

12          THE COURT:  He's not answering the questions.

13          MR. FONTAINE:  Thank you, Your Honor.

14          THE WITNESS:  Yes.  I kept him over the weekend per

15   the Court's parenting plan, when our existing plans fell

16   apart.

17   BY MR. FONTAINE:

18      Q   Let's clarify this.  You took the position prior to

19   this visit occurring that the winter break that the Judge

20   referenced meant during the Christmas break.  And you wanted

21   the whole Christmas break.  The whole Christ- --

22      A   The whole winter break.  That's their only winter

23   break.

24      Q   Okay.  You wanted that whole break, correct?

25      A   Yeah, 'cause that's what --

1      Q   And --

2      A   -- the Court's plan says here.

3      Q   And there was an objection to that interpretation by

4  my office on behalf of Katherine Albrecht, wasn't there?

5      A   I think there was an objection that she just didn't

6  want me to have the kids longer than five days.

7      Q   Sir, did -- was there an objection --

8      A   And she lied to the children what the parenting plan

9  said.

10     Q   So there was a dispute on this issue, correct?

11     A   Yes.

12     Q   And your attorney and my office reached an agreement

13  that allowed you to have five days, not four that were

14  afforded in the agreement in the parenting plan, but five days

15  and a period of time actually during Christmas.  And you

16  agreed to that through your Counsel, didn't you?

17     A   Yeah.  Well, I have to say --

18     Q   Say --

19     A   -- that taking --

20     Q   -- "yes" or --

21     A   -- only seven days as opposed to the full -- excuse

22  me, 9 days, as opposed to the full 14 that the Court orders,

23  is better than nothing.

24     Q   So you took it upon yourself to change the terms of

25  the agreement reached with your attorney --

1        A    Particularly when my children are absolutely

2    traumatized at last-minute changes, because of what your

3    client did concerning         's flight.

4        Q    And even after you were told --

5        A    So I have to calm my children down.  It's in their

6    best interests to keep them over the weekend, wind them down,

7    and have them watch Disney movies.

8        Q    When this dispute arose and your attorney was

9    contacted by my office, your attorney spoke with an attorney

10   in my office, Jack White, correct?  Do you remember that?

11       A    Yes.  And I think that was a huge waste of fees, given

12   that I asked Katherine to call me directly to try to resolve

13   the issue.

14       Q    But you didn't return those children until

15   December 30th, correct?

16       A    31st.

17       Q    Okay.  31st.  Thank you for correcting me.  So you

18   didn't return them until December 31st, even after you were

19   contacted right after December 27th, correct?

20       A    Yeah.  I mean, it's in the Court's parenting plan that

21   that actually is my parenting time.  The police said so.  And

22   your client caused huge amounts of trauma --

23       Q    The police --

24       A    -- by what she did.

25       Q    The police said so?



1       A    The police read the parenting report -- the parenting

2  plan to my children.

3       Q    Okay.

4       A    The police were there.

5       Q    And you didn't show --

6       A    She --

7       Q    -- the police, did you, that there was an agreement

8  reached with your attorneys that --

9       A    Your client did.

10      Q    -- changed the terms, correct?

11      A    Your client did.

12      Q    Okay.  So do you have --

13           MR. FONTAINE:   Strike that.

14  BY MR. FONTAINE:

15      Q    Isn't it true that during -- when it became apparent

16  that you weren't going to return those children on December

17  28th, that your girls became very upset with you, with your

18  father, and with the fact that they couldn't come back to

19  their mother by the 28th?

20      A    Absolutely, when they've been lied to by their mother

21  about the parenting plan.  That would obviously make them very

22  upset.

23      Q    So when you say that your visit went well, it went

24  well until you told them that you weren't going to return them

25  on the promised date of return, correct?



1        A   It went well until they just figured out they'd been

2    lied to by their mother.

3        Q   And why weren't they lied to by their father, sir?

4    Didn't you represent that you were going to return them on the

5    28th and you didn't?

6        A   I told them there was a change of plans, given that we

7    were all expecting to leave with ███ and ███.  So quite

8    frankly, people have to change their travel plans sometimes,

9    sir, especially when they miss their flights when they're at

10   the Social Security office trying to get a number for ███.

11       Q   To get the children back, you insisted also that my

12   client pay the return flight costs on December 31st?

13       A   Absolutely not.  I suggested I drive them down, and

14   we'd make a nice road trip of it.

15       Q   Okay.  So instead of flying them back so they could

16   back promptly, three days after the agreed-upon date --

17       A   I thought --

18       Q   -- you thought it would be okay for her to just pay

19   for them to fly back?

20       A   No.  I thought it would be best if I drove them, so we

21   could spend quality parenting time in the car and see sights

22   on the way down to LA.

23       Q   And this is despite the fact that the children were

24   upset with you for what you had done with regard to not

25   returning them on time?  You thought it was okay to do that?

1      A   I think they were upset, but having been lied to.

2      Q   Do you recall when ▊▊▊▊ left to go back to his

3   mother's residence?

4      A   Yes.  So sir, I get that your client doesn't want me

5   to have any parenting time.  Do we really need to belabor

6   this?

7      Q   Yes, I do, sir.

8      A   Sure.

9      Q   I just want to ask you questions.

10     A   Okay.

11     Q   Do you remember when ▊▊▊▊ was leaving to go on a

12  flight, he wanted to take his sisters with him, didn't he?

13     A   He was instructed by his mother to take his sisters

14  with him.

15     Q   Did ▊▊▊▊ tell you that he wanted to take his sisters

16  with him?

17     A   I told him that ▊▊▊▊ could do what he would liked,

18  but the Court parenting plan said at a minimum I had time from

19  27th to the 31st.  It's right in the plan.

20     Q   And this was on December 28th.  They were supposed to

21  be returned, and you had paid for a flight for them to be

22  returned, correct?

23     A   Yes.  And I paid for many flights for my parenting

24  plan they haven't gotten on either.

25     Q   And yet you canceled -- not only did you cancel the

```
 1   flight that you had paid for for the two girls, but you had

 2   also canceled the flight that my client had paid for for █████

 3   to return with them?

 4       A   █████ kept changing his mind back and forth, back and

 5   forth, back and forth.  Quite frankly --

 6       Q   Sir --

 7       A   -- he was traumatized trying to please both parents.

 8       Q   -- did you cancel the flight that my client had paid

 9   for for █████ --

10       A   Yes.

11       Q   -- to return?

12       A   When he told me he wasn't --

13       Q   What --

14       A   -- going to take it, I didn't want her to be stuck

15   with the extra cost.

16       Q   What authority did you have to cancel a flight that

17   was coordinated and paid for by my client?

18       A   When █████ said he wasn't going to get on it, then I

19   canceled it, so she could get a refund.  If you --

20       Q   █████ --

21       A   -- are no show, you don't get a refund.

22       Q   █████ told you, after you refused to allow those two

23   young girls to go with him.  He went with an Uber driver or a

24   Lyft driver to the airport on his own and found out that you

25   had canceled his flight, didn't he?
```



 1      A   I'm not sure, on his own, how he'd get a Lyft without

 2   a credit card.

 3      Q   Okay.  So someone paid for his Lyft.  But he went --

 4      A   Yeah, mom did.

 5      Q   Okay.  He went to the airport --

 6      A   Yes.

 7      Q   -- fully assuming he was going to take a flight back

 8   home, and you had canceled his flight?

 9      A   Because he asked me to earlier.

10      Q   Is this LAX that he was going to?

11      A   No.

12      Q   Was it the Burbank airport?

13      A   Yes.

14      Q   Okay.  And what did you do to make other plans for

15   this boy?

16      A   He had preexisting arrangements to fly with ███ and

17   meet in New Hampshire.  And when Katherine found out about

18   that and decided she didn't like it, she bought him a plane

19   ticket a week later to try and convince him to go to Pasadena.

20      Q   Isn't it true that ███ told you that he had never

21   agreed to you going -- to going to New Hampshire with --

22      A   No.

23      Q   -- you?

24      A   That is absolutely false.  He told me on the phone

25   weeks ago that he wanted to go to New Hampshire.

 1        Q   And you have no evidence of that?

 2        A   It's my sworn testimony, sir.  And, now, I know that

 3   you, after Katherine consulted with you, you convinced him to

 4   write an email.

 5        Q   I never spoke to your son, ███.

 6        A   I do know that ███ told me that he could not tell me

 7   where he was going until his mother spoke with her attorney.

 8        Q   So you're referencing an email that ███ wrote where

 9   he said that he had never --

10        A   Yes.

11        Q   -- specifically agreed to go to New Hampshire with

12   you --

13        A   That was the night --

14        Q   -- and

15        A   -- after.  Yes.  I am referencing that, because it was

16   the night after he said he couldn't tell me where he was going

17   until his mother spoke with his (sic) attorney.

18        Q   So you're acknowledging --

19        A   With her attorney.

20        Q   You're acknowledging you received something from ███

21   that said that, correct?

22        A   Yes.  Nicely done.  You write it after the fact, when

23   he changes his mind.

24        Q   What evidence do you have that someone else wrote that

25   on his behalf?

1       A   I'm not suggesting that somebody else wrote it.  I

2   suggest he was talked into writing that.

3       Q   So you think it's --

4       A   He's trying to please --

5       Q   So, sir --

6       A   -- both parents, sir.  He's very traumatized.

7       Q   You think it's okay to violate an agreement between

8   two attorneys that were reached on your behalf and the other

9   party's behalf?

10      A   I think when agreements break down, it's best to

11  revert to the Court order.

12             MR. FONTAINE:  Nothing further.

13             MR. CAULFIELD:  I have no redirect, Your Honor.

14             THE COURT:  The Petitioner's next pleading would be

15  number 294.

16             MR. CAULFIELD:  Petitioner's expedited motion for

17  contempt and to compel telephone, email, and MS text?

18             THE COURT:  Yes.  So we'll take up 294.  And we'll

19  take up 295, 296, and 297.

20             THE WITNESS:  These are --

21             THE COURT:  There was no question before you, sir.

22             THE WITNESS:  Okay.

23             THE COURT:  With all due respect, I'm --

24             THE WITNESS:  Forgive me.

25             THE COURT:  -- running the hearing here.

1              So Mr. Caulfield, you may start your examination.

2              MR. CAULFIELD:  Yes, Your Honor.

3              THE COURT:  Okay.

4                    FURTHER REDIRECT EXAMINATION

5    BY MR. CAULFIELD:

6         Q   So directing your attention to Petitioner's expedited

7    motion for contempt and to compel telephone, email and SMN

8    text communication, what specific order do you feel that

9    Dr. Albrecht has violated?

10        A   Well, so this is the same order regarding phones.  At

11   this point, there is absolutely no way for me to reach my

12   children.  When the prior order was filed, she made motions

13   about saying she would try to have them call me Monday and

14   Thursday.  Again, I'm never allowed to call them.  But by this

15   point, she's basically furious that she hasn't gotten her way

16   over winter vacation, and so she's retaliating, cutting off

17   all communication at this point together.

18             The other key things in here is she's absolutely

19   refusing to cooperatively co-parent.  I mean, the law says

20   best interests of the children involve the parents to

21   essentially cooperate together.  I forget the statute.

22        Q   I suspect the Judge knows it.

23        A   Yeah.  So it's very frustrating to me here, quite

24   frankly, that you and Mike even have to be involved with so

25   much of this, and that she's just flat out unwilling to



 1  communicate with me directly for any kind of responsible co-

 2  parenting.

 3       Q   So you're not able -- she won't talk to you on the

 4  phone?

 5       A   Correct.

 6       Q   Okay.  How about exchanging email?

 7       A   I frequently write her emails and pretty much the next

 8  thing I have is hit forward to you, so you can hit forward to

 9  Wendy so that we can respond that way.  That really runs up

10  attorney's fees.  I'm not sure why we have to do that.

11       Q   Okay.  And have you written many emails signing, why

12  can't we just email each other and stop running up attorney's

13  fees?

14       A   It hasn't -- those haven't been the nature.  They've

15  been just more polite emails like, did you get          's

16  birthday card, did she receive it, you know, stuff like that.

17       Q   What is the problems that Dr. Albrecht has with

18  communicating by email with you?

19       A   Well, apparently I once underlined some words in an

20  email, and she's very traumatized when she receives emails

21  that have, basically, any underlining in them.

22       Q   Do you have that email here that she objected to?

23       A   So yeah, I actually have two here --

24       Q   Okay.  Let me --

25       A   There's four copies of each.



 1            MR. CAULFIELD:  Let me first show it to Attorney

 2    Fontaine.  So let's just pull one of these out of each.

 3            THE WITNESS:  Right.

 4            MR. CAULFIELD:  Give me one of them, please hand one

 5    of these two emails, and the other one, just those emails.

 6            THE WITNESS:  And my water ran out.

 7            MR. CAULFIELD:  More water.  We can arrange that.

 8    These are the two emails.

 9            THE WITNESS:  Examples also.

10    BY MR. CAULFIELD:

11       Q   Okay.  So could you tell -- could you refer

12    specifically to -- you said that she doesn't -- she's offended

13    by you underlining things in emails?

14       A   She says, "I will ask a final time that you refrain

15    from sending me underlined email.  If you cannot agree to

16    that, we need to close this line of communication and go back

17    to using the composition notebook."

18            That was something we used to exchange notes when she was

19    in the same state.

20       Q   Okay.  And was there any other emails where she talked

21    about feeling intimidated by the fact that the email was

22    underlined?

23       A   Yeah.  She writes to Wendy:

24            "I do not want to receive or respond to any more of

25            these angry, accusatory, underlined, rude,

```
 1              aggressive, insulting emails from Dana.  Can you ask
 2              Mike if I have any rights here.  Since he refuses to
 3              stop writing emails, I've repeatedly asked him to
 4              stop.  Could I make good on my threat?"
 5              Again, she says threat.
 6              "And ask you guys to reply on my behalf?
 7              "What would that cost me per email?"
 8         Q    May I see those two emails, please?
 9              MR. CAULFIELD:  Your Honor, introducing these as an
10    exhibit.
11              THE COURT:  Sorry?
12              MR. CAULFIELD:  I don't know if you want to take
13    a --
14         (Petitioner's Exhibit 1 marked and received)
15    BY MR. CAULFIELD:
16         Q    Now, to support your contention that Dr. Albrecht is
17    in contempt in this motion, is there any other information
18    that you wish the Court to know?
19         A    Well, I've also got, practically speaking, able to
20    text my kids, because the only texts I get are when she turns
21    their phones on at the last minute to coach them to say that
22    they don't want to go or they're refusing to go on my
23    parenting time.
24         Q    Has Dr. Albrecht on occasion used the kids' phones to
25    text you?
```

1       A   I believe so, although I don't have proof of that.

2   The key thing is I -- is I have no way of knowing that it's my

3   own kid.  There's no evidence.  If I ask the person using --

4   whoever is using these kids' phones, if I try to call them,

5   they won't pick up.  If I ask if I can call, they won't pick

6   up.

7           MR. FONTAINE:  Your Honor, I object.  He said he

8   doesn't know for sure, so how -- why is he testifying --

9           THE COURT:  Speculation.  Sustained.

10          MR. CAULFIELD:  Shall we move on to the next motion?

11          THE WITNESS:  SS -- I believe you wanted SSN next,

12  Your Honor?  Forgive me.

13          MR. CAULFIELD:  Okay.

14  BY MR. CAULFIELD:

15      Q   Directing your attention to Petitioner's motion to

16  compel re          's Albrecht's SNN (sic), could you please tell

17  us about that?

18      A   Well, it's really simple.  Three years ago, when I

19  filed document number 1 in here, I was --

20      Q   That was the petition for --

21      A   The petition --

22      Q   -- legal separation?

23      A   -- for legal separation.

24      Q   Okay.

25      A   April 15th.

43

1     Q   And that was filed no fault?

2     A   No fault.  No fault simple petition for --

3     Q   Yeah.

4     A   -- legal separation.

5     Q   Yeah.

6     A   I asked for two extra things on top of that, and one

7  of those things was for the Court to provide relief in

8  granting my -- in getting my children birth certificates and

9  Social Security numbers.  Here we are three years later, and

10     ███   Albrecht still lacks a Social Security number.  Without

11  that, he can't get a driver's license.  He can't open a bank

12  account.  He can't obtain legal employment.

13            THE COURT:  When did he turn 18?

14            THE WITNESS:  September 16th of the most recent

15  year, 2018.

16            THE COURT:  Okay.

17  BY MR. CAULFIELD:

18     Q   Is that all that you wish to tell the Judge on that

19  motion?

20     A   I would just simply remark that I -- while he's

21  legally 18, I perceive his emotional age as somewhat younger,

22  and I don't think it's reasonable to expect him to do that all

23  by himself without assistance from documents his parents may

24  have.

25     Q   Okay.  Do you feel that Dr. Albrecht support him



1  getting a Social Security number?

2       A   If she did, I'm not sure why she filed an objection to

3  a simple motion just asking that she cooperate and provide all

4  the necessary documents.

5       Q   But aside from the pleading, based upon your knowledge

6  of your former wife, is there some reason she would not want

7  your son to have a Social Security number?

8       A   Oh, yeah, they got 20 years of Mark of the Beast, and

9  you can't buy a soul without a number.  She didn't want them

10 to have Social Security numbers and birth certificates, and

11 that's how we kind of -- why nobody did, until we got to legal

12 separation, and I asked that we get it -- get it taken care

13 of.

14      Q   And that was the same problem with the birth

15 certificates?

16      A   Yes.

17      Q   In fact, the Court at some time issued an order

18 regarding those birth certificates?

19      A   That's correct.  So we're really just asking the Court

20 to expand that to include his Social Security number.

21      Q   Okay.  And have you done everything you can?

22      A   Yes.  In fact, that was one of the things that

23 actually caused the issues in making the scheduled flights

24 during winter vacation, 'cause he told me while he was there,

25 hey, I'm here.  Maybe we could go get it now.  And we tried

1  to.

2  Q  Do --

3  A  So we spent a whole day in Social Security working on

4  ██████ , instead of parenting time with ██████ and ██████ .

5  Q  Do you know of your own knowledge of some instances

6  when Dr. Albrecht has basically -- has blocked you getting him

7  Social Security number?

8  A  I know we also tried when he was out of New Hampshire,

9  and he didn't have the required documentation with him.

10  Q  Okay.  Was there some missing letter from the Social

11  Security Administration?

12  A  We did apply in San Jose, and the San Jose office said

13  they'd respond within two weeks.  The address we provided was,

14  of course, 2610 Deodar Circle with his mother, because that's

15  where we were expecting.  Quite frankly, I'm not sure if they

16  were going to send a letter there, why we don't have it, and

17  why he doesn't have it, and why nobody can find it.  And yet,

18  similarly, she was getting his passport, by the way, missing

19  letters.

20  Q  I see.  You've testified earlier that there's two

21  residences now they're living in?

22  A  Yeah, so --

23  Q  So let me ask you a question.  When did you learn that

24  there were two residences, that your children were actually

25  living in another residence?



1      A   The January 2nd, 2019.

2      Q   And how did you learn that?

3      A   Correspondence from Attorney Fontaine.

4      Q   Okay.  And did you later find out that the move was

5  much earlier than the notice from Attorney Fontaine?

6      A   Oh, absolutely.

7      Q   About how many months earlier did they actually move?

8      A   Well, I know they were living there July.  I have

9  to -- one moment, please.  I know they were living there on

10  August 28, 2018, which is a good four months and six days

11  before Attorney Fontaine notified us.

12      Q   Why do you know that?

13      A   Well, because we have a police report from that date.

14      Q   And what does the police report say?

15      A   Well, it talks about        screaming in fear when his

16  mother woke him up.  It talks about that --

17            MR. FONTAINE:  Your Honor, I --

18            THE WITNESS:  -- their --

19            MR. FONTAINE:  Hold.  I object.  I have not seen a

20  police report from that date.

21            MR. CAULFIELD:  Isn't that the date --

22            THE WITNESS:  Yes.

23            MR. CAULFIELD:  -- that they sent me -- that's the

24  date your office sent me.  That's that police report your

25  office sent me.

 1                MR. FONTAINE:  That was given to the landlord?

 2                MR. CAULFIELD:  Yeah.  What was said was your --

 3                MR. FONTAINE:  That was given to the landlord by

 4    your client?

 5                MR. CAULFIELD:  Yes.

 6                MR. FONTAINE:  Okay.  All right.  All right.

 7                MR. CAULFIELD:  And okay.  So -- and that's going to

 8    come in any way at the alienation and many other ways.

 9                MR. FONTAINE:  Okay.

10    BY MR. CAULFIELD:

11        Q   In fact, let's make this easy.  Do you have the police

12    report?

13        A   Yes.  Forgive me for -- just a little bit out of the

14    order.  I need the texts with that.

15        Q   I --

16        A   I placed one copy here.

17                MR. CAULFIELD:  -- gave you one copy of this this

18    morning.  So you already have the copy.

19                THE COURT:  You're putting this in for the Social

20    Security purpose?

21                MR. CAULFIELD:  I'm putting this in because it's

22    going to come in under one of these many motions, and why not

23    put it in now, since we're talking about it.

24                MR. FONTAINE:  Well, then I --I'd like an offer of

25    proof, Your Honor, as to what he plans on using it for.

1    Because there's no police officer here to testify, and I --

2              THE COURT:  I'll allow it.

3              MR. FONTAINE:  -- don't have an ability to cross-

4    examine him.

5              MR. CAULFIELD:  I can --

6              THE COURT:  I'll allow it.

7              MR. CAULFIELD:  Thank you, Your Honor.  So let me

8    introduce this, Your Honor.

9         (Petitioner's Exhibit 2 marked and received)

10             MR. FONTAINE:  Your Honor, just so I can --

11             THE WITNESS:  I brought four copies.  I need at

12   least one.

13             MR. FONTAINE:  Just so I can clarify for the record,

14   this police report, along with some other documentation, was

15   provided to the landlord unsolicited.  The landlord contacted

16   my client, said I received this from your ex-husband.  What am

17   I supposed to do with this?  In that was this police report,

18   and my client then notified Attorney Caulfield, what is your

19   client doing sending these documents to my client's landlord.

20             THE COURT:  Okay.

21   BY MR. CAULFIELD:

22        Q  So what's the substance of the police report?

23        A  May I have a copy in front of me?  I brought four.  Or

24   I can go from memory.

25        Q  No, no, no, no.

1        MR. CAULFIELD:  Can I borrow that exhibit back here?

2   Thank you.

3        THE WITNESS:  So Katherine has a history of filing

4   false police reports.

5   BY MR. CAULFIELD:

6        Q   Just cut to the chase.

7        A   Sure.  This report --

8        Q   If you could tell us, sir, what was the date of this?

9        A   The date of the report is August 28, 2018.

10       Q   Okay.  And is that about three weeks after Dr.

11   Albrecht would have learned that you were found not guilty in

12   the criminal case?

13       A   Yes.

14       Q   And is that about two days after ▮▮▮ returned from

15   being with you in New Hampshire?

16       A   Yes.

17       Q   And you were in New Hampshire at the time of this

18   police report?

19       A   Yes.

20       Q   Okay.  Tell us what it says.

21       A   First of all, it's a report concerning an alleged

22   attempted burglary.

23       Q   Yeah.  What did Dr. Albrecht do?

24       A   It says she ran into ▮▮▮'s bedroom and woke him up.

25   It said that ▮▮▮ screamed in fear when he realized somebody

1    was attempting to gain access inside.

2        Q   And how did she describe the access?  What did she say

3    was happening?

4        A   There's -- the home was fortified with numerous

5    burglar, like, determent -- deterrents, such as several

6    locking devices on all the doors and windows, local alarms,

7    and surveillance cameras.  The cameras were set up through

8    several live-feed monitors in the home and did not record.

9        Q   And what did she tell the police was happening, that

10   she called them?  What was happening?

11       A   She said the suspects were somehow affiliated with her

12   soon to be ex-husband, Dana Albrecht.  She stated that Dana

13   lives in the State of --

14       Q   Listen to --

15       A   Yeah.

16       Q   -- me carefully.  What did Dr. Albrecht tell the

17   police someone was trying to do?

18       A   Determined somebody was outside attempting to force

19   their way in.

20       Q   Anything about a drill?

21       A   Yeah.  Feared somebody was going to use the drill on

22   the door locks in an attempt to gain entry.

23       Q   Okay.  And what did the police find?

24       A   The key thing the police found is there was no

25   evidence of basically any attempted break-in.  And the other



1   thing that -- the key thing that the police found, is when

2   they queried all the kids, they got inconsistent stories.

3   So --

4           MR. FONTAINE:  Your Honor, I'm going to again

5   reassert my objection.  The police -- I wasn't aware that they

6   were introducing this exhibit.  Secondly, I was not aware --

7   these are allegations that the police officer would need to

8   address, and the police officer is not here.

9           THE COURT:  Overruled.

10          Continue.

11          MR. CAULFIELD:  Okay.

12   BY MR. CAULFIELD:

13       Q   And what did Dr. Albrecht tell the police regarding

14   you?  Anything about wanting you to be prosecuted?

15       A   Yeah.  Let me see if I can find that.  She said she

16   desired prosecution if we were able to identify and

17   substantiate a crime.

18       Q   And she told you, you were -- did she tell the police

19   you were behind this?

20       A   Yes.

21       Q   And the kids are there in the house when this happens?

22       A   Yeah.  So kids are there, and she wants me

23   prosecuted --

24       Q   Yeah, in front of --

25       A   -- for breaking into their house, when I'm in New



1  Hampshire.

2      Q   Okay.

3      A   After we'd just been through the whole criminal false

4  arrest --

5      Q   Okay

6      A   -- deal for the real estate walk-through.

7      Q   And this is in front of the kids?

8      A   I would assume so.

9      Q   Yeah, yeah.  Because the police talk about the kids?

10     A   Yeah.

11     Q   They question the kids because of her call?

12     A   Yeah.  They obtain statements from them.

13     Q   Yeah.

14     A   And the police discovered inconsistencies in their

15  statements.

16     Q   Yeah.

17     A   So I mean --

18     Q   Okay.  Now, moving right along.

19     A   Okay.

20     Q   So is there anything else regarding the motion for

21  Social Security number that you feel the Court should know?

22     A   Not that motion.

23     Q   Okay.

24         MR. CAULFIELD:  Forgive me, Your Honor.  What was

25  the next motion you wanted?



 1            THE COURT:  And then the parental plan regarding

 2   school and education choice.

 3            MR. CAULFIELD:  Okay.

 4            THE COURT:  And following that one is the motion to

 5   amend the parenting plan to return the children to New

 6   Hampshire.

 7            MR. CAULFIELD:  Okay.

 8   BY MR. CAULFIELD:

 9        Q  So would you please turn to -- so --

10        A  Yes.  So there's the amend education choice.  I

11   realize there's quite a bit of argument where they're

12   pleading.  However, this really very simple.  She's exercised

13   sole de facto decision making authority.  She has not

14   consulted with me at all on -- she has not consulted with me

15   at all on education.  When she even filed, she did █████'s

16   application to high school all on her own.  In fact, I have

17   the application here.  I think it's curious, nowhere on this

18   application is my name even mentioned.  She basically puts

19   that █████'s joint guardians are her and her mother.

20            I grant that that's probably her fantasy, but it's not

21   reality.

22        Q  Okay.  Do you have that here?

23        A  Yes.

24        Q  Okay.  Is this three copies or is --

25        A  Four.



54

1        Q   Oh, okay.

2        A   Yeah.

3        Q   So I see -- I have three in my hand.

4            THE COURT:  Police report exhibit still hasn't made

5    it back to the exhibit --

6            MR. CAULFIELD:  Thank you, Your Honor.

7            THE COURT:  -- handler.

8            MR. FONTAINE:  I'm sorry.  I need to get that, too.

9            MR. CAULFIELD:  Okay, Your Honor, I'd like to

10   move --

11           THE COURT:  I'd ask, just return the police report.

12   That's all.

13           MR. CAULFIELD:  I'm hard of hearing, not hearing

14   him.  So sorry.

15           THE COURT:  I'm answering his question.  Just keep

16   on going.

17           MR. CAULFIELD:  Okay.

18           THE COURT:  Had nothing to do with you this time.

19           MR. CAULFIELD:  Okay.  Thanks, Judge.

20   BY MR. CAULFIELD:

21       Q   So I'd like to introduce this application that was

22   filled in without consulting you.  Mr. Albrecht is not listed

23   any -- as the kids' father?

24       A   Correct.  It was very interesting communicating with

25   the school after I convinced them I existed and had any rights

1    at all.

2                MR. CAULFIELD:  May I introduce this, Your Honor?

3                THE COURT:  Yes.

4                MR. CAULFIELD:  Thank you.

5          (Petitioner's Exhibit 3 marked and received)

6    BY MR. CAULFIELD:

7        Q   Is there any other -- oh.  Is there any other --

8        A   Yes.

9        Q   -- information concerning this motion you would like

10   the Court to know?

11       A   So one thing she's able to do with her supposed sole

12   decision-making authority without consulting me, is -- this

13   actually resulted in manipulating the children's school

14   vacation schedules not to coincide.

15       Q   So there's two different --

16       A   Yeah.  For ▇▇▇▇  and ▇▇▇▇  --

17       Q   -- vacation schedules?

18       A   -- now.

19       Q   I see.

20       A   Not something I would have gone with.

21       Q   Okay.  Is that -- exhaust that?  Other than, of

22   course, what you put under oath in it?

23       A   I'd like the Judge to read sort of about the

24   Cowapowski (phonetic) case in the pleadings.  But --

25       Q   Yeah.



56

1        A    -- other than that --

2        Q    All right.  Next motion.  Is this --

3             THE COURT:  Return the children to New Hampshire,

4   motion to limit parenting plan.

5             THE WITNESS:  So, Your Honor, would it be possible

6   to cover this after the alienation?  If not, I'll do it your

7   way.

8             THE COURT:  Now, please.

9             THE WITNESS:  Okay.  So this is essentially a motion

10  in support of a parenting plan.  I have a parenting plan here.

11  So this is index 298.  However we want to do this.

12             THE COURT:  It's in the file.  All right.

13             THE WITNESS:  Okay.

14             MR. CAULFIELD:  I need to --

15             THE WITNESS:  It's in the file.

16             THE COURT:  It's in the file.

17             MR. CAULFIELD:  Okay.

18             THE WITNESS:  So this amended plan is almost

19  identical to the one that you've already issued with one very

20  substantial change that it basically flips it around so that

21  the children attend school in New Hampshire.  And their mother

22  has sort of all the vacation times.  And quite frankly, if I

23  can't get any parenting time with my children at all -- I

24  think we've had a total of 38 days since they moved to

25  California.

1  BY MR. CAULFIELD:

2      Q   When did they move to California?

3      A   September 1st, 2017.

4      Q   And you had -- and --

5      A   38 days total since then.

6      Q   And in support of you exchanging the parenting plan,

7  how are the kids doing under the current parenting plan?

8      A   Well,        's leaving me voice mails screaming about

9  being locked inside the Sierra Madre residence on zip ties.

10     Q   With the zip ties?

11     A   Yeah.

12     Q   Do you have that -- do you have that -- can you play

13 that now?

14     A   I'd have to get out and go to my speaker stuff.

15         MR. CAULFIELD:  With the Court's permission -- is

16 there a quick process?

17         THE COURT:  Sure.

18         MR. CAULFIELD:  Okay.  Thanks.

19         THE WITNESS:  Why don't we just try to do it without

20 the speakers and up here?

21         MR. CAULFIELD:  Okay.  All right.  Then I'll ask you

22 about the other two children, how they're doing.

23         THE COURT:  And this is        ?

24         MR. CAULFIELD:        --

25         THE WITNESS:  Yes

```
 1                   MR. CAULFIELD:   -- yes.

 2                   THE COURT:   The 18-year-old?

 3                   MR. CAULFIELD:   18.

 4                   MR. FONTAINE:   Your Honor, if he's going to play it,

 5     I want him to play the whole thing, not choose what section.

 6                   THE COURT:   Yeah.

 7     BY MR. CAULFIELD:

 8        Q    So please play the whole thing, Dana.

 9            (Audio played at 11:32 a.m., transcribed to the best of

10     the transcriber's ability)

11            (Indiscernible) free for the day.  So I got up.  It's

12     March 12th.  I'm on the --

13                   MR. CAULFIELD:   Aim the speaker with the Judge,

14     because I couldn't --

15                   (Audio continues)

16                   (Indiscernible).  Grandma said, text Mom.  I'm on my

17     way home.  Grandma said, did you get in touch with Mom?

18     Grandma says Mom has to be in the doctor's office in 20

19     minutes.  Mom couldn't go to the doctor's office because

20     (indiscernible).  I can't get in touch with Mom because she

21     has to do these things and doesn't carry her phone.  Okay.

22     That's the first entry in my diary.  Those are all three

23     things.  Then I get in trouble through no fault of my own.

24     They threaten me getting in trouble.  Give me so much anxiety,

25     I almost forgot my journal's (indiscernible) my pencils.  How
```

1   do you think that makes me feel?  Really, really great, right?

2   That makes me feel so awesome.  That created more stress

3   (indiscernible).  Does that seem like my fault?  That seems

4   like my fault, right?  Says that I installed it.  That's

5   harassment.  That's freaking harassment.

6           So now I cannot get a camera because my mom's door

7   is locked.  That's harassment.  That is harassment.  I cannot

8   leave the house because the door is locked.  That is

9   harassment.  My grades are so bad that I cannot look them up

10  because I have no data.  Why do you think I have no data?

11  Because I can't get data because my mom cannot pay for it.

12  That's harassment.  I should get data.  I should freaking get

13  data.  That's harassment.  Mom cannot pay for it because she's

14  almost broke.  That's harassment.

15          I should get data for my own phone.  That's

16  harassment.  She's almost broke because dad keeps filing stuff

17  against her.  I don't know if that's true, but the fact that I

18  don't have my data on my phone is harassment.  So now I cannot

19  leave the house because my mom locks both doors from the side

20  of the (indiscernible).  That is harassment.  That is

21  harassment.

22          And I'm 18.  I've been stopped.  Hear me?

23  (Indiscernible) you know about.  7:30 (indiscernible), and I

24  cannot leave the house.  That is harassment.  That's freaking

25  harassment.  What is going to happen?  I mean, (indiscernible)

1    personal freedom.  Right?  The fact that someone doesn't get

2    their basic rights of doing what they need to be able to do.

3    And so what?  I'm (indiscernible), right?  Right?  So amazing.

4    So beautifully amazing, right, that you had to hang up.  You

5    probably can't listen to this message because what, I don't

6    know.  You -- you were probably being so amazing doing your

7    wonderful things, going to your church and stuff.

8           So yeah.  This is so lovely that my life sucks.  I'm

9    sure -- I'm sure you love it.  I'm sure you think it's great.

10   I'm sure you (indiscernible).

11       (Audio ends at 11:34 a.m.)

12   BY MR. CAULFIELD:

13       Q   Now, how's ▮▮▮▮ doing in Dr. Albrecht's care?

14       A   Before that, could we just admit the transcript of

15   that and the photos?

16           MR. CAULFIELD:  Sure.  Sure.

17           MR. FONTAINE:  I don't object, Your Honor.  I mean,

18   just again, we assert the objection he's 18 years old.  He's

19   not a minor.  Not jurisdiction of this court.

20       (Petitioner's Exhibit 4 marked and received)

21   BY MR. CAULFIELD:

22       Q   Is that all we know about ▮▮▮▮, or do we have more

23   information about ▮▮▮▮'s doing?

24       A   I have more information, but I don't think it's

25   worth --

1        Q   Okay.

2        A   -- the Court's time relative to the --

3        Q   Let's now change to ████.  How's ████ doing in Dr.

4   Albrecht's care?

5        A   Well, I believe ████'s very traumatized.  It can be

6   very difficult for me to get the full extent to that given

7   that all phone communication's been cut off.  But I do have

8   some insight to that based on letters she's written.

9        Q   Okay.  Do you have the letters?

10       A   One moment, please.

11       Q   Okay.  So if I can keep one and admit these.

12           MR. FONTAINE:  Can I see what you're referring to?

13   BY MR. CAULFIELD:

14       Q   So can you summarize the letters or do you think we

15   should read them or how would we handle this, Dana?

16       A   Let me just read some excerpts.

17       Q   Okay.

18       A   Although the full letter is obviously before the

19   Court.

20           MR. CAULFIELD:  Okay.  Then may I introduce this,

21   Your Honor?  Thank you.

22       (Petitioner's Exhibit 5 marked and received)

23       A   They're in her own handwriting, but I typed a copy for

24   people's convenience.

25   BY MR. CAULFIELD:



1          Q   Okay.

2          A   So ████ says, "Nobody really noticed me the first

3     two years after break and I feel as though I've become

4     invisible.  You keep saying when I'm ready to talk, you'll

5     listen to me, but that just means you want nothing to do with

6     me.  Even at home, I can't say anything because my mom is

7     always stressed.  My sister doesn't care."  And here's the key

8     thing.  She says, "My dad is always listening."  So I'm not

9     sure why ████ believes why her dad is always listening when

10    she's at home.

11              THE COURT:  You're not reading, right?

12    BY MR. CAULFIELD:

13         Q   Just read it.

14         A   Okay.

15         Q   I'm sure the judge can draw his own inferences from

16    it.

17         A   "You know I don't have any friends either, and it's

18    not just because I've been abandoned by previous friends.  To

19    me, it feels like it's almost impossible to make friends."

20              THE COURT:  You don't have to read the letter

21    anymore.

22              THE WITNESS:  Right.

23              THE COURT:  Counsel, will you just --

24              MR. CAULFIELD:  I didn't hear you.

25              THE COURT:  I can read the letter.  He doesn't have

63

1      to read it.

2              MR. CAULFIELD:  Very good.

3              THE WITNESS:  Acceptable.

4      BY MR. CAULFIELD:

5          Q  Now, let me direct your -- is there anything else on

6      ███████ or should we move on to ██████?

7          A  Let's move on to ██████.

8          Q  Okay.  Now, I'm just looking at one of Dr. Albrecht's

9      pleadings.  Respondent's verified objection to Petitioner's

10     motion to compel re: ████████ Albrecht's spring school vacation,

11     which may well be one of the motions we're handling now.

12              Just let me show you.  Just see if I'm reading this

13     accurately, Dana.  She says, quite frankly, Ms. Albrecht is

14     physically unable to drag a 15-year-old kicking and screaming

15     through an international airport.

16         A  Well, that's -- that's ██████.

17         Q  This is ██████?

18         A  Yes.  With that --

19         Q  So ██████ is the one talking about the emotional harm?

20         A  Yes.

21         Q  Oh, so this is about ██████.  It says --

22         A  Yes.  Forgive me.  I missed that.

23         Q  -- and attempt to physically force her onto an

24     airplane, nor is she willing so due to the emotional harm that

25     may result to the child.  Okay.  Has she also said that the

64

1   other child, ███, is having emotional problems?

2       A   Yes.  I believe so, although I don't have the

3   pleading.

4       Q   Okay.

5       A   Can't find in the pleading on short notice.

6       Q   But in one of her pleadings, she says --

7       A   Yes.

8       Q   -- that if she --

9       A   Yes.

10      Q   -- she's concerned about ███'s emotional health,

11  right?

12      A   Yes.

13      Q   And that's her own pleading?

14      A   Yes.

15      Q   Okay.  Do you have any other information about ███?

16      A   I think the key thing is ███ has undergone a

17  tremendous amount of dental trauma.  We've had years of

18  neglect.  And that finally resulted in her needing to undergo

19  hours of sedation dentistry to -- under full anesthesia to

20  restore 11 caries, meaning cavities.  That was recently --

21  even in January, I understand there were six.  I know she went

22  almost 15 months in Katherine's care without seeing any

23  dentist at all.

24          And this really just started back when -- during the

25  fraudulent domestic violence petition.  And I wasn't allowed

1   to take my daughter to the dentist.  She did.  I had already

2   paid in full for a cleaning over the credit card, and

3   Katherine refused to have that done.  And that's kind of when

4   this started.  It went from downhill from there.

5       Q   Is it fair to say that Katherine told you she didn't

6   have enough money to pay for the dentistry herself?

7       A   Yes.

8       Q   And did you learn something surprising about that

9   contention of Dr. Albrecht?

10      A   Well, I thought it was interesting that earlier she

11  paid --

12      Q   How earlier?

13      A   A few months.

14      Q   A few months ago, what did she pay?

15      A   900 --

16      Q   A few months before she told you she didn't have money

17  to take your children to the dentist, what did she do?

18      A   She paid 900 dollars for Bob Cooper (phonetic) of her

19  church to take his --

20      Q   His children.

21      A   -- children to the dentist.

22      Q   So she had money for his children, but not for your

23  children?

24      A   Correct.

25      Q   Your collectively.



1      A   Correct.

2      Q   I understand.  Anything else regarding this motion?

3      A   We're on contempt for ███ 's spring school vacation.

4      Q   I think so.

5          THE COURT:  While we're on the subject, we're take

6  up the parental alienation and the two spring school vacation

7  issues.

8  BY MR. CAULFIELD:

9      Q   Now, Dana, I want to remind you that you created a

10  chart, a demonstrative exhibit there, to elucidate your

11  testimony today so that Master DalPra could more easily follow

12  along.  And we've been doing this and running back, and I

13  don't want you to forget that you've got it back there.

14     A   Yes.

15         MR. CAULFIELD:  And you've also got a laser pointer,

16  which will make it easier.  And also he has -- I filed a copy

17  of this time line with my trial pleading, so you have, Judge,

18  a copy of this.

19         THE COURT:  Yes, I do so.

20         THE WITNESS:  So -- so --

21  BY MR. CAULFIELD:

22     Q   If you need this, I mean.

23     A   I think it's --

24     Q   It's pretty at a stage we should do something with it.

25     A   -- good to have that up there, but I'm realizing that



1   I need my glasses to read this, and I need to take them off to

2   read that.  And it will take too much time.

3       Q   Okay.

4       A   So if I can refer to --

5       Q   Absolutely.

6       A   They have the same information.

7       Q   Great.  Fine.  Okay.  All right.

8       A   So --

9       Q   So now we're talking about why you contend that Dr.

10  Albrecht is alienating the children as opposed to the children

11  just decided that they hate their dad?

12      A   Well, we start out April 8 -- 8th, 2016, and we go a

13  whole week where she prevents all contact, all phone.

14      Q   Well, what was your -- excuse me, then.  I'm sorry

15  to -- what was your contact with these children like before

16  the domestic violence was -- let me finish my question --

17  before the domestic violence was filed in this --

18          MR. FONTAINE:  Your Honor.  Your Honor, I object.  I

19  mean, we're talking about matters that were litigated,

20  decided.  We had a full-blown hearing on parental rights.

21  These issues were discussed at length in those hearings.  And

22  now we're going back and rediscussing them?  And there's

23  numerous false statements on this -- whatever this document

24  is.

25          MR. CAULFIELD:  It's called a time line.



1           MR. FONTAINE:  False domestic violence petition.

2           THE WITNESS:  May I respond?

3           MR. FONTAINE:  You never filed that there was any

4  false domestic violence petition, Judge, when you heard that

5  case.  That's the second entry.

6           MR. CAULFIELD:  Judge had dismissed the domestic

7  violence petition because you didn't believe that she proved

8  her case.  If my client wants to characterize that as the

9  allegations were false because after a hearing the Court

10  didn't believe them, I think that's false (sic).

11          But anyway, to make a long story short, he briefly

12  needs to show what closer relationship he had with the

13  children before this began and show you what she's done step

14  by step to destroy it.  So you have to start a steady state to

15  begin with.

16          THE COURT:  Counsel, on August 2017, I heard all of

17  this for two days.

18          MR. CAULFIELD:  Okay.  Fine.

19          THE COURT:  Objection is sustained.

20          MR. CAULFIELD:  Judge, okay.  I understand.  Okay.

21  All right.

22  BY MR. CAULFIELD:

23     Q   Then just zero in on what you feel, if anything, Dr.

24  Albrecht has done to alienate the children.  And I think His

25  Honor wants it current, not historic.

 1      A   Respectfully, Joe, I'd like an offers of proof on DCYF

 2   because we didn't have that information back at that hearing.

 3   At the original parenting hearing, you didn't have the DCYF

 4   records, and I'd like an offers of proof of that.

 5      Q   Please tell me what you mean.

 6      A   To preserve the issue if the judge --

 7      Q   No, no, no.

 8      A   -- doesn't want to hear --

 9      Q   What in the DCYF records do you want to preserve?

10      A   There are things in the DCYF records --

11      Q   Specifically, what do you want to preserve?

12      A   Oh, that on November 14th, 2016, Dr. Albrecht reports

13   that Mr. Albrecht stole the guns from their home.  On November

14   14th, 2016, Dr. Albrecht files a second false accusation of

15   sexual abuse against Mr. Albrecht.

16           MR. FONTAINE:  This is more -- Your Honor, this

17   is --

18      A   On October 13th, 2016 --

19           MR. FONTAINE:  Object.  I object.

20           MR. CAULFIELD:  Dana, stop.  Let him talk.

21           MR. FONTAINE:  These are his words.  These are not

22   the words of the DCYF report.

23           THE WITNESS:  I can read from the DCYF report --

24           MR. FONTAINE:  Your Honor --

25           THE WITNESS:  -- exactly if you'd like.



1          MR. FONTAINE:  -- again, these are things that

2    predated the --

3          THE COURT:  Sustained.

4          MR. CAULFIELD:  Okay.

5          MR. FONTAINE:  Thank you.

6    BY MR. CAULFIELD:

7     Q   As I said, His Honor feels he's heard that already --

8     A   Okay.

9     Q   -- and wants to hear more recent things.  So please

10   confine your testimony, even though I understand you feel

11   that's important.  I get it.

12    A   Okay.

13    Q   Please confine your testimony to more recent things.

14    A   Forgive me.  Where are we starting?

15          MR. CAULFIELD:  Where would you like to hear, Judge?

16          THE WITNESS:  How about July 27th, 2017?  Dr.

17   Albrecht blames Mr. Albrecht for her security concerns.

18          THE COURT:  No.  How about starting from the

19   issuance of the parenting plan, which would have been

20   September --

21          MR. CAULFIELD:  Okay.

22          THE COURT:  -- October 2017.

23          THE WITNESS:  Okay.

24          MR. CAULFIELD:  Thank you, Your Honor.

25          THE WITNESS:  One moment, please.



```
 1   BY MR. CAULFIELD:

 2       Q   That's the start.

 3       A   So in my parenting time from September 14th, 2017 to

 4   September 18th, 2017, five days, I fly to Pasadena.  She

 5   demands the children return to her each night by 8 p.m.  So

 6   she basically won't let me have my full parenting time then.

 7       Q   And you were entitled to overnights?

 8       A   Correct.

 9       Q   And Dr. Albrecht wouldn't permit?

10       A   Correct.

11       Q   And you acceded to that?

12       A   Again, you know, better to see the kids under some

13   circumstances.

14       Q   Okay.  Yeah.  So you were as reasonable as you

15   possibly could to cater to her?

16           MR. FONTAINE:  I object.

17       A   Yes.

18           MR. FONTAINE:  Characterization.

19           MR. CAULFIELD:  Reasonable or cater?

20           MR. FONTAINE:  You're leading your witness.  I

21   object.

22           THE COURT:  Continue.  Next question.

23   BY MR. CAULFIELD:

24       Q   What event happened next that that you want Master

25   DalPra know?
```



 1       A   I think on October 17th, 2017, the day after her

 2   cross-examine, she had me wrongfully arrested and falsely

 3   charged with criminal trespass and invasion of privacy.

 4       Q   Okay.

 5       A   Because of an agreed upon walkthrough of the marital

 6   home with a realtor.

 7       Q   And you were found not guilty after the trial?

 8       A   Correct.

 9       Q   Okay.  Yeah.

10       A   So --

11       Q   Next?  Next?  Moving along.  Next?

12       A   We already talked about ████'s application to remain

13   at the high school.  That was November 14th, 2017 --

14       Q   In evidence.

15       A   -- for the record.

16       Q   Yeah.  Um-hum.

17       A   Now we get to December 26, 2017.  In her pleading,

18   you'd have to find it, but she states, quote, has suggested on

19   numerous occasions that Mr. Albrecht provide the girls with a

20   phone, but he's not done so.  That's December 26th.  December

21   27th is my parenting time in San Jose.  It went well.  Five

22   days.  There's no contempt for that.  That's when I got them

23   their cell phones for Christmas presents.  They loved their

24   cell phones when I got them.

25           The minute they get home, January 8th, she convinces



1   that their phones are spying devices.

2       Q   How do you feel, Dana, that a gift that you gave to

3   your children and they enjoyed, now they think it's an evil

4   mechanism of some sort?  How does that make you feel?

5       A   I mean, it makes me feel horrible.  I get them

6   something nice, and she spites it.

7       Q   Okay.  Go on, please.

8       A   Probably the same thing with the Kindles they got last

9   Christmas.  So now by March 30th, she further and severely

10  limits phone contact between me and them, the children.

11  Summer vacation does go well, the first one.  I think I'd

12  actually like to remark that because I got a full 19 days that

13  this gets them the opportunity to spend more and more time

14  with me and realize that I'm basically not the person that

15  they've been led to believe.  So the longer that goes on, the

16  better it gets.

17          So but immediately after that, you know, we've got to

18  do something to spite it.  So immediately after that, that's

19  when she come -- drives them across the country, you know, to

20  come testify against me in a criminal case.  I certainly

21  wonder what they heard in the car.  I don't know, but --

22          MR. FONTAINE:  Again, Your Honor.  Object to him

23  going outside of the questions and --

24          THE WITNESS:  We're following --

25          THE COURT:  Continue.



1          THE WITNESS:  -- alienation.

2      A   So, you know, 19 days.  Again, we have all phone

3   contact cut off between mister -- between me and their

4   children while she's taking a cross-country road trip from New

5   Hampshire back to California.

6          So August 13th, you know, that's one of the

7   contempts.  She caused ███ not to get her -- or the flight

8   that I purchased to come back with me, although ███ did

9   come.  As soon as ███ gets home, two days later, you know,

10  there's the police report incident.  We've already discussed

11  that in Sierra Madre where he's screaming.

12         So again, moving on, I guess we have the winter

13  school vacation.  We already discussed that.  And then it

14  really devolves from there because, you know, she basically

15  didn't get her way.  Her way is to limit parent -- parenting

16  time as much as possible.  So even two extra days, even one

17  extra weekend is unacceptable to her.

18         So now we're in full-blown retaliation mode.  She

19  cuts off phone contact altogether.  And she notifies me of her

20  additional residence, and that's actually when ███ decides

21  that he's basically moving back in with me, so, you know.

22  BY MR. CAULFIELD:

23      Q   How long has ███ been with you now?

24      A   Since January 2nd, 2019.  That's when he flew back.

25      Q   How's it like --



1          A    And he's been here --

2          Q    -- to be a dad again?

3          A    It's great.  I'm really happy to have at least one of

4    my kids.

5          Q    Okay.

6          A    You know, one down.  I think it's a shame that all

7    this has resulted in cutting off all contact.  Not -- almost

8    all contact, excuse me, between him and his siblings.  And I

9    think it's also a shame on all these parenting contempts for

10   time that that means that they've not only -- not only gotten

11   to see me, they haven't even gotten to see their oldest

12   brother.

13         Q    Okay.

14         A    And again, you know, we're in full-blown obviously

15   doc -- my wife's --

16         Q    Just --

17         A    -- furious.

18         Q    Just stick --

19         A    Yeah.

20         Q    -- to the facts, Dana.

21         A    Okay.

22         Q    Because that's what's important.

23         A    Yeah.  January 15th.  Asked the court for sole

24   decision-making authority.  January 16th, she wants the court

25   to suspend my parenting rights.  I mean --



76

1      Q   Got it.

2      A   -- this isn't responsible --

3      Q   Got it.

4      A   -- co-parenting.

5      Q   Got it.

6      A   January 31st, you know, with ▮▮▮▮'s handwritten

7  letters.  They may have been written a little earlier.  We've

8  already gone over those.  March 12th, you know, we've got

9  ▮▮▮▮'s voice mail.  We've already gone over that.

10         And so now we're up to ▮▮▮▮'s spring school vacation,

11  March 22nd through March 30th.  I bought a plane ticket.  I

12  bought that plane ticket way back in January 15th, so, you

13  know, talk about notice.

14     Q   Um-hum.

15     A   Talk about notice.  And I think it's even interesting.

16  She said it's from an international airport, and this plane

17  ticket was from the Burbank airport, a small regional airport.

18  I wonder if she even looked at the plane reservation.

19     Q   Um-hum.  Um-hum.

20     A   Same thing with ▮▮▮▮, again, though, on different

21  school breaks because I didn't get to pick the schools or have

22  any input on that.

23     Q   Um-hum.  That it?

24     A   I believe so --

25     Q   Okay.



1        A   -- if I'm not allowed to admit DCYF records.

2        Q   Well, because His Honor said he wants to just go from

3    the parenting plan forward.

4        A   Okay.

5              MR. CAULFIELD:  You want to examine, cross?

6              THE COURT:  Cross-examine.

7              MR. CAULFIELD:  Thank you.  Is that mine or yours?

8    Yours?

9              MR. FONTAINE:  This is mine.

10             MR. CAULFIELD:  Okay.  Good.

11             MR. FONTAINE:  Yeah.

12                    FURTHER RECROSS-EXAMINATION

13   BY MR. FONTAINE:

14       Q   You acknowledge that this is a highly contested

15   matter, correct?

16       A   Yes.

17       Q   You filed 32 motions, 18 replications since this

18   decree was issued.

19       A   I don't know if that's the exact number, but I

20   acknowledge many motions have been filed.  In fact, in one of

21   my pleadings, I believe when you have a case this contested it

22   can be a strong indication that at least one of the parties

23   suffers from some kind of cluster B personality disorder.

24       Q   Do you --

25       A   You know, maybe it's me.  Maybe we should have me



1    tested.  I don't know.

2         Q   You raised the issue of her saying that she didn't

3    want to deal with you directly because of the nature of the

4    emails.  She didn't say to you that she was cutting off all

5    contact.  She said that she wanted you to deal through our

6    office, correct?

7         A   Yeah.  So I'm not sure why she's complaining about

8    attorneys' fees if she insists everything go through your

9    office.

10        Q   But you, sir, acknowledge that this is a highly

11   contested case where you have filed 32 motions since the

12   decree and the parenting plan were issued.  And there have

13   been emails that went back and forth between the two of you

14   that she specifically referenced that she took offense to and

15   that you continued.  Isn't that true?

16        A   I think we're talking about underlyings.  And if I

17   think -- think we could just follow the parenting plan that

18   we've even been given and talk to each other that we wouldn't

19   have any of these motions.  And if I could just talk to the

20   kids, we wouldn't have any of these motions.

21        Q   With regards to the Social Security, sir, isn't it

22   true that your two daughters have their Social Security

23   numbers now?

24        A   Yeah.  So I'm wondering if she doesn't favor the

25   daughters over her sons.

1     Q   Isn't it true that on numerous occasions through our

2  office you have been told about the steps that Katherine has

3  taken to try and obtain ▮▮▮▮'s Social Security number?  Isn't

4  that true?

5     A   I recall that you have given some responses on that.

6  I don't recall their exact nature.

7     Q   So you forgot to mention that you did have evidence

8  that Katherine was trying to get ▮▮▮▮'s number and was having

9  problems?

10    A   Yeah.  She said, you know, that one of the reasons he

11 shouldn't come to New Hampshire was because she had to get him

12 his Social Security number.

13    Q   Okay.  ▮▮▮▮ is now 18 years old, correct?

14    A   Yes.

15    Q   ▮▮▮▮ is an adult, correct?

16    A   You referred to him as a child earlier, sir, but I

17 suppose --

18    Q   Your child, sir.

19    A   -- he's legally an adult.

20    Q   He's your child, right?

21    A   Yes.

22    Q   But he's a legal adult, correct?

23    A   Yes, and it's awfully hard to operate as -- as a legal

24 adult in this society if you cannot get a job, cannot get a

25 driver's license, and cannot open a bank account.



1        Q   Sir, I asked you a question.  Please answer the

2   questions.

3        A   Yes, I agree.

4        Q   Okay.  So Katherine tried to get him a Social Security

5   number on several occasions, and we documented what she was

6   doing and the fact that she had problems and couldn't get it.

7   Isn't it now the responsibility of          --

8        A   She --

9        Q   -- to try and get it?

10       A   She claimed she tried.  I dispute that she tried very

11   hard, and I don't think it's reasonable to expect someone to

12   solve this problem when he's basically been left with it, you

13   know, from birth.

14       Q   Are you aware that she's still taking actions at this

15   time to try and get that issue resolved?  Are you aware of

16   that?

17       A   I'd love to know exactly what those are, and I'd love

18   for your office to just give me all required documentation,

19   and that's all this motion asked for is that you just give me

20   documentation necessary for that and cooperate.

21       Q   You reference a police report from the San (sic) Madre

22   Police Department?

23       A   Yes.

24       Q   That police report was obtained by you; wasn't it?

25       A   Yes.



1      Q  And you provided that police report along with birth

2  certificates and other personal information about Katherine or

3  her children to the landlord where she is currently living.

4      A  If Katherine has -- yes, I did.  And if Katherine has

5  any police reports in her possession concerning an alleged

6  break-in at my property, I would have no issue with her

7  providing those reports to my landlord.

8      Q  You didn't ask --

9      A  It's a safety issue.

10      Q  Sir, you didn't ask permission of Katherine, right,

11  for you to disclose that information to her landlord,

12  including the personal information about your children?

13      A  I don't think I need Katherine's permission to give my

14  children's birth certificates to someone.

15      Q  What purpose could there possibly have been in you

16  providing birth certificates of your children to this landlord

17  or the police report where she's reporting that someone broke

18  into the house?  What purpose would you have in doing that?

19      A  Well, I get, sir, that your client hates birth

20  certificates, but I think a landlord should have basic

21  biographical information on who's living at their property,

22  particularly if they're minors and they're my children.

23      Q  So this is your opinion.

24      A  That is my opinion, sir.

25      Q  You mentioned the school education choice.  Isn't it



1    true that our office through your attorney's office notified

2    you of the schools that Katherine was considering for the

3    children?

4        A   The only one that she was willing to consider was

5    Maranatha, the high school.  When I asked for materials to

6    apply for other schools during the very limited five days I

7    had, those were not provided --

8        Q   So once --

9        A   -- to me in a timely fashion, and we missed the

10   deadlines.

11       Q   Once again, in your presentation to this Court, you

12   forgot to mention that you had in fact been notified of the

13   schools that she was hoping that those children could go to.

14       A   Yes.  Notified the ones she picked, and I didn't get

15   any input on choosing anything else.

16       Q   Was --

17       A   I was notified where they were going.

18       Q   And --

19       A   She picks them, and she tells me.

20       Q   And it was done before the choice was made; wasn't it?

21       A   No.

22       Q   You're saying that they had already --

23       A   Oh --

24       Q   -- applied and been admitted?

25       A   That -- excuse me, sir.  I may have misspoke on that.

1    Forgive me.

2         Q   Okay.  So she did in fact notify you of the schools

3    she was considering for them before the admission was

4    submitted and granted; didn't she?

5         A   And she never gave me an opportunity to do

6    applications to any other schools or cooperated me -- with me

7    in any way --

8         Q   And what --

9         A   -- on doing the applications with other schools.

10        Q   And what evidence do you have here today to show that

11   you had suggested other schools for her to consider?

12        A   Well, I wish I'd known you would have asked me that.

13   Then I would have brought the emails.

14        Q   You're the one that brought this issue up, sir.

15   You're the one that's raising this issue for the Court.  You

16   don't have anything here today?

17        A   Actually, why don't I get my -- I don't have them

18   printed.  Would it be acceptable for me to fire up my laptop

19   quickly and find that email?

20             THE COURT:  Not at this time, no.

21   BY MR. FONTAINE:

22        Q   Yeah.  We're already gone well beyond the halfway

23   point of this hearing.  So my client did in fact obtain the

24   birth certificates for her girls, correct?

25        A   Yes.



1      Q   And the Social Security numbers for her girls,

2   correct?

3      A   Yes.

4      Q   And she's notified you ahead of time about the

5   problems she's having with the Social Security for ███,

6   correct?

7      A   I think she's been stonewalling that and making up

8   excuses.  She keeps telling me about problems she's having.

9   Then she's --

10      Q   She's continued to fill you in; hasn't she, though?

11      A   No.  She won't communicate with me at all, sir.  It's

12   only through your office.

13      Q   Okay.  So you don't like --

14      A   And -- and I believe your office even said that you're

15   not going to deal with it because he's 18.

16      Q   We told you that he was 18, correct?

17      A   Yes.  And as a result, you said you weren't going to

18   deal with it.

19      Q   The recording of ███.

20      A   Yes.

21      Q   That frustration was hard to hear; wasn't it?

22      A   What do you mean?

23      Q   ███'s frustration level was hard to hear.

24      A   I quite frankly don't understand the question, sir.

25              THE COURT:  Not the volume.  He's talking --

1          MR. CAULFIELD:  Do you mean loud volume-wise or

2     emotional?

3          THE COURT:  He's not talking about the volume.  He's

4     talking about emotionally.

5     BY MR. FONTAINE:

6     Q   I said frustration.  I'm sorry.

7     A   Yes.  So --

8     Q   That was tough to hear; wasn't it?

9     A   Yes.  Absolutely.

10    Q   But there was nothing that specifically directed it to

11    anything that Katherine was doing that was harmful or anything

12    of that nature; was there?

13    A   I completely disagree.  If he says he's locked inside,

14    that's an issue.

15    Q   Okay.

16    A   And if he says that he's hearing all about court

17    pleadings, that's an issue.  If he's hearing about them, I'm

18    sure my daughters are too.

19    Q   Where does he say that he heard about court pleadings?

20    A   I'd have to find the transcript in front of me.  He

21    says mom keeps filing stuff against me or dad keeps filing

22    stuff against mom or something like that.

23    Q   Yeah.

24    A   Whatever the quote is in the transcript.

25    Q   Well, sir, let's be honest.  He said that you keep



1  filing things; didn't he?

2      A   Yeah.  How does he know that?

3      Q   Okay.  Well, you filed 32 pleadings?

4      A   Right.  How does he know?

5      Q   32 motions.  18 replications.

6      A   And how many is counter-filed.

7      Q   He's 18 years old.

8      A   So --

9      Q   How do we know that you haven't been talking to him?

10     A   I haven't.

11     Q   How do we know that?

12         MR. CAULFIELD:  Because he said so.  He testified

13  under oath.

14     A   Because I said so.  It's my sworn testimony.

15  BY MR. FONTAINE:

16     Q   Okay.  So that's the extent of the proof that you have

17  that you haven't been discussing these things with him?

18     A   I haven't been discussing them with ▮▮▮▮ either.

19  ▮▮▮▮'s 21.  I think it's a really bad idea, sir, to discuss

20  divorce pro -- proceedings with children.  I mean, about the

21  only thing I've tried to discuss with them is the particulars

22  of dates and the parenting plan.

23     Q   ▮▮▮▮'s letters.  These were written soon after the

24  visit at Christmastime that was discussed.

25     A   Yes.



1       Q   Correct?

2       A   Yes.

3       Q   And you admitted that ▮▮▮ and ▮▮▮ were both very

4 upset with you after you refused to return them on the date

5 that you had agreed to, correct?

6       A   Yes, they found out they'd been lied to about the

7 court's parenting plan.

8       Q   So the issues that ▮▮▮ is having that you were

9 referencing, the issues that ▮▮▮ is having that you

10 referenced, why do you not take responsibility for the fact

11 that you may have contributed to that through your actions in

12 the December -- the vacation?

13       A   I think when I have 38 days parent -- total of

14 parenting time and there's testimony in the prior court

15 proceeding where ▮▮▮ says most of the problems happen when

16 I'm not with the girls -- that is in the transcript of the

17 last hearing, that this is stuff going on when they're not in

18 my presence.

19       Q   Do you remember the --

20       A   That's what ▮▮▮ told me.  And it's sworn testimony

21 in the last hearing.

22       Q   Do you remember the guardian ad litem's report in this

23 matter?

24       A   I have some recollection of that.  I don't have it in

25 front of me.

 1          MR. CAULFIELD:  Excuse me.  I thought we weren't

 2   going to go past --

 3          THE COURT:  I don't know what the question is.

 4          MR. CAULFIELD:  Okay.  All right.

 5   BY MR. FONTAINE:

 6     Q   Isn't it true that the guardian had indicated in her

 7   findings that you had a difficult time acknowledging your

 8   contribution to the problems of the children?

 9          MR. CAULFIELD:  Objection.

10          THE COURT:  Sustained.

11   BY MR. FONTAINE:

12     Q   ███  is living with you right now temporarily,

13   correct?

14     A   He's living with me.  I think he'd like to live on the

15   East Coast full time.

16     Q   ███  had some issues with his school, correct?

17     A   I believe so, yes.

18     Q   And that schools in California just a short distance

19   from where Katherine lives, correct?

20     A   Yes.

21     Q   And ███  had previous to moving to California had

22   taken courses in the Harvard extension program; hadn't he?

23     A   Yes.

24     Q   And in fact, ███  was required by his school in

25   California, because of the problems he was having, to take

 1    some additional courses at a different college, prove that he

 2    could succeed before they would allow him back.  Isn't that

 3    correct?

 4        A  Yes, and he's certainly not going to do that in

 5    Pasadena near mom.  He took that as an opportunity to come

 6    home.

 7        Q  Okay.  And he took that to come home, as you say, to

 8    New Hampshire.

 9        A  Yes.

10        Q  Right?  He came here to take courses at the Harvard

11    extension school; hasn't he?

12        A  Yes.

13        Q  Okay.  So there's a very logical reason that he did

14    that, correct?  Because he had gone there before, taken

15    courses there before, and he was required to take courses to

16    be able to get readmitted into the California school.

17        A  Yeah.  But why doesn't he just do it in California

18    where it's close?  He could do it at PCC.  He could hang out

19    with         .  I think the trouble is is he wants to get away

20    from -- he wants to get away from mom, quite frankly.

21        Q  Okay.  Let's talk about the allegations regarding the

22    dental care.  You were required to pay for insurance through

23    Blue Cross -- I'm sorry, Blue Shield in California, correct,

24    under the uniform support order?

25        A  I dispute that.



1      Q   You don't think that the court order said that?

2      A   That's correct.  I dispute that.  May I make my case?

3      Q   Sure.  Love to hear your argument.

4      A   Okay.  Well, so what happened on Katherine's amended

5  final decree and petition for divorce, it is in the docket,

6  but I have extra copies here.  I don't know if the --

7      Q   What we're talking about -- I'm asking you a question

8  about --

9      A   I'm making my case.

10     Q   -- the decree that this court issued.

11     A   That is correct.  May I make my case, please, sir?  So

12  what the court did is she took your USO that Katherine wanted

13  that you filed as your proposed.  And in this proposed decree,

14  that's where you see in your proposed decree, the text

15  continuing see decree providing pro -- coverage under Blue

16  Shield of California.  Continuing.  These kids have never had

17  coverage under Blue Shield of California.

18        They've only had coverage un -- under Medi-Share.

19  They've had coverage on Medi-Share since 2011.  I've paid that

20  consistently every month.  That coverage covers ████, ████,

21  ████, and ████.  It costs me $434 a month.  They've been on

22  it since 2011.  It's the only insurance they've ever had, and

23  I've paid for it consistently since the start of this action.

24  It's your client who suddenly decided she wanted Blue Cross

25  Blue Shield.  She put it on her proposed amended final decree,

1   and we've got a scrivener's error by the court where they

2   crossed out her signature on their USO, and they forgot to

3   cross out that.

4       Q   Did you raise that in a motion to reconsider?

5       A   I raised it in your objection on the contempt.

6       Q   Okay.

7       A   Until then, there was a bunch of back and forth with

8   your office about getting them cheaper medical insurance.

9       Q   Were you told through our office, through your

10  attorney, that you were expected to get the Blue Shield

11  coverage that the court had ordered?

12      A   At one point, yes.  Prior to that, you kept telling me

13  that you had advised your client to obtain cheaper coverage

14  through basically Medi-Cal, and that's what I was after.  So

15  we were on the same page, and then you changed your mind.  And

16  you found this.

17      Q   So I'm not going to get into what you allege I

18  personally told you.  I believe --

19      A   We -- we don't have time, but we could go to the

20  emails.

21      Q   So --

22      A   I can't predict everything I need in court.

23      Q   Did you in fact -- were you in fact asked to obtain

24  the coverage that this court ordered?  And did you do that?

25      A   I dispute that this is really a court order other than



1   scrivener's error where the court crossed out her signature

2   and forgot to cross out --

3       Q   So --

4       A   -- see -- see coverage.

5       Q   So you're interpreting it the way that you see it and

6   following it the way you see it, not the way that it says?

7       A   Well, these children have never had Blue Cross Blue

8   Shield.  The only place that came from was your client.  And

9   why the court would even decide it must be that specific

10  coverage.

11      Q   You're concerned about the fact that Katherine hasn't

12  obtained --

13      A   Can I also admit basically their -- the Medi-Share

14  coverage that they had.

15            THE COURT:  No, sir.

16            THE WITNESS:  Okay.

17            THE COURT:  No.

18  BY MR. FONTAINE:

19      Q   You've complained about the level of dental care that

20  the girls have received, correct?

21      A   Primarily ███ , but yes.  Haven't had time to --

22      Q   Have you --

23      A   -- track down ███ .

24      Q   Have you purchased dental insurance for them?

25      A   I believe there's a dental discount on Medi-Share.



 1      Q   Okay.  Have you purchased dental insurance for them?

 2  I'm asking you a simple question.  Yes or no.

 3      A   No.  I understand, though, when they were in New

 4  Hampshire, Katherine had free state New Hampshire care for

 5  them.  And so the result of moving from California, they lost

 6  that.

 7      Q   Have you been paying child support to Katherine?

 8      A   Yes.

 9      Q   How much?

10      A   $50 a month.

11      Q   $50 a month in total.  And for how long has that been

12  paid?

13      A   Since the date of the decree.

14      Q   Okay.  So for the last year, you've paid a total of

15  $600 to her for support of your children, correct?

16      A   I think you're not counting the $434 a month on top of

17  that that gets paid for their Medi-Share.

18      Q   Okay.

19      A   You know, health coverage.

20      Q   That also cover you?

21      A   I believe it does, but it's only secondary.  It's

22  primarily for the children.

23      Q   And that is one of those Christian health plans,

24  correct?

25      A   Yes.  It's the one Katherine selected for our family

```
 1   in 2011.

 2       Q   And that's the year that you were struggling

 3   financially, correct?

 4       A   No.

 5       Q   You weren't struggling financially in 2011?

 6       A   I don't believe so.  Hang on.  I have on here -- we

 7   can get her history of payments if we need it.

 8           MR. CAULFIELD:  So Your Honor, we're now in 2011.

 9           MR. FONTAINE:  I'll move on.

10           THE COURT:  Thank you.

11           MR. FONTAINE:  Thank you.

12           Nothing further.  I'll spend my time with my client.

13           THE COURT:  You may step down, sir.

14           We'll recess now until 1 o'clock.  You'll have about

15   an hour and 15 minutes this afternoon.

16           MR. FONTAINE:  Your Honor, my client's here from

17   California.  Very expensive to come here.

18           THE COURT:  I have two hearings scheduled this

19   afternoon.

20           MR. FONTAINE:  No, I understand.  I understand your

21   issue.  I'm just saying that I would like the time to be

22   utilized by myself.  He's gone well beyond the halfway point.

23   I've used very little of the time.

24           THE COURT:  You'll put your case on this afternoon.

25           MR. FONTAINE:  Thank you.
```



1           THE COURT:  You can leave your stuff here.  We'll

2    lock up the courtroom.  Okay.

3           THE WITNESS:  If I'm not coming back, should I

4    remove this stuff from --

5           THE COURT:  Yeah.

6           THE WITNESS:  Thank you, Your Honor.

7           THE COURT:  Okay.

8       (Recess at 12:12 p.m., recommencing at 1:09 p.m.)

9           THE COURT:  You may proceed, Mr. Fontaine.

10           MR. FONTAINE:  Thank you.

11           I'd like to call Katherine Albrecht to the stand.

12    Before you're seated, would you raise your right hand?

13              KATHERINE ALBRECHT, RESPONDENT, SWORN

14           MR. FONTAINE:  Permission to be seated.

15                      DIRECT EXAMINATION

16    BY MR. FONTAINE:

17       Q   Please state your name for the record.

18       A   Katherine Minges (phonetic) Albrecht.

19       Q   Where do you currently reside, Ms. Albrecht?

20       A   2610 Deodar Circle, Pasadena, California 91107.  And

21    we also spend time at 730 West Alegria in Sierra Madre,

22    California.

23       Q   Okay.  And how long have you also spent time at the

24    second location?

25       A   My mother rented that second location in March of

1   2018.   It was originally rented as a home for my sister who is

2   disabled.   She had a wheelchair ramp built.   And my sister had

3   a series of health problems.   So my mother said you guys

4   probably would like to have your own space.   You're welcome to

5   share that place.   So we had been spending time in both

6   places.

7        Q   Okay.   Is your mother also suffering from some illness

8   at this point?

9        A   My mother has stage four ampullary cancer, which is

10   related to pancreatic cancer.

11       Q   Okay.   And therefore you've been also spending time

12   there?

13       A   A considerable amount taking care of my mom.

14       Q   Okay.   And I want to go through this quickly because

15   we have a lot of information to cover.   Let's just talk about

16   some of the points that were raised in the direct examination

17   by Dana.   There was a discussion about how last summer there

18   were two requested periods of vacation time by Dana.

19       A   Yes.

20       Q   You recall that?   And the first vacation, did you have

21   trouble getting any of your children to go with him on that

22   vacation?

23       A   No.

24       Q   First of all, where was that vacation?

25       A   That vacation took place in San Jose at their



1  grandfather's house and then went up to their grandfather's

2  ranch at Cow Creek up near Whitmore.

3      Q   Okay.  And were you requested to extend that vacation

4  time?

5      A   Yes.

6      Q   And did you agree to that?

7      A   He was, according to the court order, given 14 days

8  and wound up having 19 days, and I agreed to that.

9      Q   Okay.  And at that time, had the children expressed

10  any concerns with being with him?

11     A   They both have -- both girls have adamantly stated

12  that they would not travel to New Hampshire for any visitation

13  at any time.

14     Q   Okay.

15     A   And when I shared that with Dana, he arranged for it

16  to take place in San Jose.

17     Q   Okay.  And let me ask you a few preliminary questions.

18  What are your thoughts about the children and their

19  relationship with their father?

20     A   As a mother who loves them and knowing the importance

21  of a good relationship with their father, there's nothing I

22  want more in the entire world than to have them have a good

23  relationship with their father.

24     Q   Okay.  Have you ever discouraged them from having

25  communication with their father?



1       A   To the contrary.  No, I have not.

2       Q   Have you ever encouraged them to have communication

3   with their father?

4       A   Frequently.

5       Q   At any point in time have you had difficulty when have

6   expressed that to them?

7       A   Yes.

8       Q   Describe.

9       A   So when we moved to California, I encouraged them to

10   regularly contact him.  When they had problems with him,

11   especially after the first 10-day parenting visit which went

12   badly, they did not want to talk to him.  I cajoled and did

13   everything to encourage them to do that.  Eventually that

14   communication was reestablished.  In -- I'm just trying to put

15   the chronology together.  There have been periods of time when

16   they've said after an incident where they were unhappy about

17   something that had happened with him, that they did not want

18   to talk to him, I then said you need to call your dad, you

19   need to keep your phones on, you need to be in contact with

20   him.

21           And most recently this last -- I want to say we

22   started in the summer where I said, okay, this has gone far

23   enough.  You're not calling him.  So let's at least set a

24   schedule that at minimum you need to call him on Mondays and

25   Thursday evenings.  And so I actually set a timer on my own

1    phone and reminded them every single Monday and Thursday for

2    literally months, and they called him faithfully at those

3    times.  I also encouraged them to contact him at other times,

4    and I don't know if they did or not.

5        Q   Okay.  Have you ever told them that their phones were

6    spy devices?

7        A   No.

8        Q   Have you told them that they should shut their phones

9    off so that their father couldn't contact them?

10       A   Never.

11       Q   Have you ever told them that they should shut their

12   phones off at extended periods of time?

13       A   Only in church when I tell everybody to turn off their

14   phones.  But other than that, never.

15       Q   Have you ever told the girls that they should not go

16   on the visits that are allowed under the parenting plan?

17       A   I have never told them that.

18       Q   Have you ever discouraged them from going to New

19   Hampshire on visits?

20       A   No.

21       Q   Have the girls expressed opinions of what they feel

22   about visiting with their father to you?

23       A   Yes.

24       Q   And tell me what those opinions are.

25       A   Well,  █████  has told me that she never wants to visit



1    with her father without her sister ▮▮▮▮ present because of

2    past bad experiences.  So she's very adamant about that.  Both

3    girls have also told me very adamantly that they do not want

4    to travel to New Hampshire and visit with him in New

5    Hampshire.  That was the sort of initial situation.

6            And ever since, ▮▮▮▮ had grave reservations about the

7    Christmas visit that turned out to be maybe prescient.  But

8    she had concerns about them.  I tried to reassure her.  And

9    since the Christmas parenting problems that took place, both

10   girls have said to me that not only are they unwilling to

11   visit with their father, but they are not even comfortable

12   speaking to him on the phone and they do not want to.  And

13   they've adamantly refused to.

14       Q   And have you continued to encourage them to try and

15   work through that?

16       A   For -- well, that was at Christmas.  So I would say

17   for about the first three months I did.  And at one point, it

18   hit where my girls would actually start crying and become

19   really distraught and very angry with me and say you need to

20   stop, you're hurting us.  You need to stop.  And so I have

21   dropped down to where now I just occasionally mention it.  But

22   I had been mentioning it every time the alarm went off.

23       Q   You mentioned a visit that occurred in Los Angeles

24   area with Dana that there were issues.  Do you recall that?

25       A   I do.



1    Q   Can you describe the backdrop of when that occurred

2    and what the agreements were and the problems that developed?

3    A   Well, under the parenting plan with 10 days' notice,

4    he could come to California to visit with the children at any

5    time.  He gave us 10 days' notice.  And the girls said we're

6    willing to see him, but we're not willing to spend the night

7    in some hotel or wherever he would put us.  We want to be

8    returned by 8 p.m.  And I talked to -- I don't remember if I

9    talked to Dana directly or through counsel, but I said that

10   that's the girls' condition, and they agreed to it.

11        That visit took place over several days.  And on the

12   last day of that visit, there was an incident at the Hastings

13   Ranch library in Pasadena.

14   Q   Tell me what happened.

15   A   At that incident, I had brought the girls after school

16   to be with their father.  He -- they said with the four or

17   five, however many days we've spent with you so far, we're

18   behind on our homework.  We want to do homework tonight with

19   mom, so please return us in time that we can get in a little

20   homework with mom.

21        He then said you may not do homework with mom.  You

22   have to do it with me.  The girls got upset, began arguing

23   about not wanting to do that.  And they -- at that point, they

24   were standing outside the car, and he grabbed ███████'s

25   backpack off the ground and walked over to his rental car,

1  popped open the trunk, and looked at her with, like, kind of a

2  grin, I guess.  It wasn't a pleasant one.  And said now I

3  have --

4       Q  Were you observing this?

5       A  I was observing it.  I was standing there.  And said,

6  now I have your backpack.  Now you can't do homework with your

7  mom.  Now you have to go with me.  And then as he was about

8  to -- I'm sorry.  That was ████'s backpack.  And as he was

9  about to lock the trunk, ████ went over and tried to wrest

10  the backpack out of the trunk.  And they had a physical

11  altercation in parking lot.

12       Q  And did the police get called to that?

13       A  Well, after that, it -- it wound up getting locked in

14  the trunk.  And then the girls went over and got in my car and

15  said that they refused to go with him at all.  And I sat in

16  the parking lot at the library and tried to get them out of

17  the car.  Dana's father, the girl's grandfather, was there was

18  well.  And at one point, he came over to the passenger or the

19  driver window and was talking.  And then the girls -- ████

20  said I guess to Dana who was standing there.  ████ said,

21  you're a devil dad.

22          And then grandpa came over and started shouting.

23  Actually went around to ████'s side in the backseat

24  passenger side and started shouting at ████ at the top of

25  his lungs red-faced saying, if he's devil dad then I'm devil



1  grandpa and screaming and screaming.  And both girls

2  hysterically were crying in the car.  And I then said as

3  calmly as I could, Dave, please, please don't yell at the

4  girls.  Please calm down.

5         It was not long after that that Dana sent me a text

6  saying that if I did not make the girls get out of the car and

7  go with him that he would hold me in contempt of court.  And

8  so I told the girls -- they were in tears.  And I said you

9  have to go out of the car and go with your dad.  They said

10  they didn't want to.  I said that if they felt unsafe, they

11  could always go into the ladies' room and that someone would

12  probably help them there, but the men couldn't go in after

13  them.

14         So they went apparently.  So I was being told I had to

15  leave.  I was worried for the girls.  I was scared.  At one

16  point in the li -- this went on for, like, an hour.  At one

17  point in the library, █████ called 911 herself.  And actually

18  we were in the library trying to get help from the library

19  staff and handed the phone to me.  It was the 911 operator.  I

20  said we're having a conflict here.  I -- and then Dave started

21  walking towards me.  I was afraid of Dave.  So I ended that

22  call.

23         And I then told the girls, I'll tell you what I'm

24  going to do.  I'm going to drive away, but I'm actually going

25  to be just down the street.  And I -- if anything happens, you

1 can just reach out to me, and I will come back.  So I did

2 that.  And apparently while I was gone, they went in the

3 bathroom.  There was a lady in the bathroom who saw them

4 crying.  And I believe she is one of the people who called

5 911.

6        There was a second person who I believe was a library

7 staffer who also called 911.  And they both reported that

8 there were two girls who were being menaced by men who seemed

9 threatening to them.  By the time I actually circled back

10 around, the police were there talking to my girls.  I drove

11 in, and the police officer asked me who I was, said that he

12 had been talking to the girls, said that there was a problem

13 with their father and grandfather and asked me to please take

14 them, suggested that I take them, and I did.

15      Q   Okay.  And at any point in time did you tell the girls

16 not to go with their father --

17      A   I told them --

18      Q   -- so they could do their homework?

19      A   -- the opposite.  I told them the opposite.  I said

20 you have to go with your dad.  This is his visiting time.  And

21 after I got the text to say -- kept saying you have to get out

22 of the car, you cannot go with me, you must go to your

23 visit --

24      Q   After this --

25      A   -- with your dad.



(973) 406-2250 | operations@escribers.net | www.escribers.net

1      Q   I'm sorry.  After this incident, did the girls express

2   an opinion of this incident and their feeling about their

3   father?

4      A   Absolutely.  They were very upset.  They were

5   extremely upset.  They were hurt and angry.

6      Q   Okay.

7      A   And scared.

8      Q   And did they say anything about future visits at that

9   time?

10      A   They said that they -- that if he came back, they

11   wouldn't see him.

12      Q   Okay.  And did you say to them I agree with you, you

13   shouldn't see your father?

14      A   I did not.  I said let -- that was a bad thing that

15   happened, let's try to work it through and I'm sure your dad

16   cares about you.  Let's try to fix it.

17      Q   Okay.  Did Dana ever do anything as far as you know to

18   try to address what occurred in that parking lot to try to fix

19   it?

20      A   No.  In fact, I remember seeing a document he filed in

21   which he said it was -- it was          being a disrespectful

22   and bad person that caused them to call 911.  So he didn't

23   take responsibility for it and blamed her that somehow she was

24   some kind of teenage delinquent for -- for that -- those

25   calls.

1       Q  Okay.  And let's talk about the second requested

2  two-week summer visit that Dana discussed.  Do you recall

3  that?

4       A  I do.

5       Q  Do you recall the backdrop of that?

6       A  Yes.

7       Q  Did Dana provide you with what you consider reasonable

8  notice?

9       A  Not at all.

10      Q  When did you get notice?

11      A  I don't remember, but it was very short notice.  And

12  the dates that he proposed for his two-week vacation, it was

13  so late in the summer that they ran over past the beginning of

14  school for ███████, meaning that ███████ could not participate

15  in those two weeks.

16      Q  At that point, did Dana know what ███████'s calendar

17  was at school?

18      A  Well, he certainly knew where she would be attending

19  school, so he would be expected to know that.

20      Q  Okay.  And did you immediately inform Dana on his

21  request that ███████ wouldn't be able to go because of her

22  starting school?

23      A  Yeah.  Wendy and I talked about it.  We went over the

24  dates.  And we said that these dates don't work.  ███████ won't

25  be able to attend because of these events that she must be at.

1    Q   Okay.  And then --

2         MR. CAULFIELD:  So excuse me.  That wasn't

3   responsive.  This is a conversation had between Dr. Albrecht

4   and attorney --

5         THE WITNESS:  No, Wendy.  Wendy informed him.

6         MR. FONTAINE:   Hold on.

7         MR. CAULFIELD:  -- to the paralegal.

8         THE WITNESS:  We -- Wendy informed him.

9         MR. FONTAINE:  Okay.

10        MR. CAULFIELD:  Wendy.

11  BY MR. FONTAINE:

12    Q   Was Attorney Caulfield notified by our office --

13    A   Yes.

14    Q   -- that that was an issue?

15    A   Yes.

16    Q   And did you discuss with ▮▮▮▮ after that request was

17  made going to New Hampshire to visit with Dana as was

18  requested?

19    A   So I told Dana through counsel that ▮▮▮▮ had made it

20  very clear she was not willing to go to New Hampshire.  ▮▮▮▮

21  reiterated that to me.  And she reiterated the fact that she

22  was not willing to visit with her father without her sister

23  present.  And we communicated both of those things.

24    Q   Okay.  So am I understanding you that she wouldn't

25  visit her father at all without her sister there?

1        A   Correct.

2        Q   But definitely wouldn't visit in New Hampshire at all?

3        A   Correct.

4        Q   Okay.  And did you express that through our office

5    to --

6        A   Yes.

7        Q   And did Dana change his position?  Did he try and say,

8    well, let's try to work some other alternative way of visiting

9    out?

10       A   No, he did not.  And I had wished that he would simply

11   shorten the visit so all three children would be able to go

12   and maybe have it where they were willing to have it.

13       Q   Okay.  And did in fact you propose an alternative for

14   that visit?

15       A   Well, I proposed those alternatives.  I'm not sure

16   exactly what got communicated via email, but my alternatives

17   were to shorten the visit so that all three children could go

18   and it -- it wouldn't cut off with ▮▮▮▮▮ and to propose that

19   it take place in San Jose.  And I'm specific that we did

20   propose that.

21       Q   Okay.  And did Dana agree to that?

22       A   He did not.

23       Q   And so did you then encourage your daughter to visit

24   with her father as was requested?

25       A   I did.  And in fact, we got back to Dana and told him



1   that I would be able to take ███ and ███ to the airport

2   any time except for I believe it was, like, a four-hour window

3   when I was having medical testing.  So --

4      Q   And that was after you had convinced her to go to the

5   airport?

6      A   I never convinced her to go to the airport.  She never

7   expressed a willingness to go and always said she would not

8   go.

9      Q   Okay.  But did Dana during this time continue to

10  insist that she come --

11     A   Yes.

12     Q   -- per the plan?

13     A   Yes.

14     Q   And so did you in fact -- and by the way, was ███

15  agreeing to go to New Hampshire?

16     A   He was.

17     Q   Okay.  And did you bring ███ and ███ to the

18  airport?

19     A   I took all three children to the airport.  And just to

20  back up about that window, he scheduled her flight during the

21  one four-hour window that I said I would not be able to take

22  them to the airport.  He then said that, well, since mom

23  can't --

24     Q   And let me just make sure we're clear to the Court.

25  Your attorney's office had sent a letter to them saying that

1  you were not available to bring them to the airport during

2  this one particular time?

3      A   So I said any time this week is fine to take them to

4  the airport except for this one small window because I was

5  having previously scheduled medical testing for cancer.  And

6  to my dismay, the plane ticket that he purchased was during

7  that window.  And then he said since mom won't be able to take

8  the kids to the airport, I will send an airport shuttle to

9  pick up ████ and ████ and take them to the airport alone so

10 they can take this flight.

11     Q   And did you have any reservations about a shuttle

12 picking them up?

13     A   I absolutely did.  I knew that ████ already said she

14 wasn't willing to go.  And I knew if I wasn't there to control

15 her and take her that there's no way she was going to get in a

16 shuttle when I wasn't there.  So I canceled all of my medical

17 testing and instead I took them to the airport at that time.

18     Q   Okay.  And when you get to the airport -- first of

19 all, before you were going to the airport, was it your

20 intention to try to convince ████ to go with ████?

21     A   I packed her bag.

22     Q   Okay.

23     A   Yeah.

24     Q   And at the airport, did you have discussions with her

25 about going on the flight?

1        A   I did.  So the whole way in the car she said I will go

2   with you to the airport, but I'm not getting in the plane.

3   And I said, well, let's just go and maybe you'll change your

4   mind.

5        Q   Okay.  And when she got to the airport, did you then

6   say --

7        A   We parked.

8        Q   -- you're going to go on the plane?

9        A   We parked.  The three of us got out.  We walked over

10  to check in for the flight.  I had the reservation

11  information.  I checked both of them in for the flight.  And

12  the reservation agent or the gate agent who checks you in for

13  flights when you first get there saw that ██████ was crying and

14  distraught and asked me what the problem was.  And ██████ said

15  I don't want to go on this flight.

16        The woman then asked me what's going on, and I said,

17  well, she doesn't want to go on a flight, but she has to go on

18  this flight.  And the woman said, well, I don't even think

19  they're going to let her on the flight with how upset she is,

20  and I'm going to make a note of this in her passenger manifest

21  that this child does not want to go on this flight.

22        Q   Did you then proceed to go through security and --

23        A   We did.  So I took all three children through

24  security.  We walked all the way to the gate with me carrying

25  ██████'s carry-on.  We got to the gate, and when it was time to



1   check in for our flight,  ████  refused to check in for the

2   flight.

3       Q   Did you again encourage her to go?

4       A   I went to the gate agent and I said this is my

5   daughter.  She's 12.  She has a ticket on this flight.  She

6   needs to get on this flight.  ████  said to him pretty point

7   blank I am not going to go on the flight.  He asked why.  She

8   explained.  And at that point, he said, well, the flight's not

9   so bad.  Here, let me show you.  And he actually took her on

10  the plane to meet the pilot and, I mean, walked her down the

11  gangway.  Walked in.  Talked to the pilot.

12          She came back out and said, mom, I'm just still not

13  going to do it.  And as a result of all of that back and forth

14  trying to convince  ████  to get on the flight, the actual

15  departure of the plane was delayed by over 10 minutes.  So all

16  of the passengers were  - were delayed.

17      Q   Okay.  And did  ████  end up not going?

18      A   Yeah.  So she continued to say she wouldn't go.  By

19  this point, she was crying pretty hysterically, and the gate

20  agent said that I -- we cannot force this child to in this

21  plane.  And the plan needs to depart.  You have to leave now.

22      Q   Okay.  And did  ████  go?

23      A   ████  did go.

24      Q   Okay.  And did Dana, as far as you know, ever call and

25  try to work through  ████ 's feelings about this whole

1  attempted visit?

2      A   No, I believe his response was to file a contempt

3  motion against me, and that's pretty much it.

4      Q   Okay.  Did Dana ever reach out to you and say are you

5  encouraging our children to come and visit me?

6      A   No.

7      Q   Let's talk about the Christmas break.  At some point

8  in time, did you receive a letter through our office from

9  Dana's attorney saying that they wanted to visit for

10  essentially the whole Christmas break?

11      A   I did.

12      Q   And did you and our office discuss that?

13      A   Right.

14      Q   And we read the parenting plan, correct?

15      A   Yes.

16      Q   And did you -- did we -- did you -- did we, on your

17  behalf, respond and say that we disagreed that they were

18  entitled to this full time?

19      A   Yes.

20      Q   And that -- but offered an alternative?

21      A   Right.  So the court plan said for Christmas it was

22  from -- to be from December 27th through the 31st, which we

23  did last year without incident, and because he -- Dana seemed

24  to be upset about that and want more time, I was trying to be

25  gracious.  And so I realized that that did not give him

```
 1   Christmas Eve or Christmas Day.  So as a way to compromise, I
 2   proposed that he have the children from the 23rd to the 28th,
 3   which would give him Christmas Eve, Christmas Day, and an
 4   additional day.  So instead of the five days the court had
 5   said, it would give him six, and we were told in the court
 6   order that we could agree to other terms.  So that's what I
 7   proposed.
 8        Q   Okay.  And did -- was there an agreement to resolve
 9   this dispute by agreeing to those dates?
10        A   Yes, they agreed to those dates.
11        Q   And at some point, did you ask for additional
12   information from them to confirm --
13        A   Yeah.  So --
14        Q   -- that agreement.
15        A   -- when I told this to the girls,        , who is 12
16   years old and pretty sharp and very, I think, just worried
17   about things with her father, she said, mom, in the past, he
18   has not returned us when he was supposed to from visits, and I
19   don't feel confident that if we go on this flight that he will
20   return us.  So I want to see a plane ticket before I will
21   agree to go.
22        Q   And so did our office then subsequently request --
23        A   So I talked --
24        Q   -- the plane --
25        A   -- to Wendy, and then Dana provided a plane ticket.
```



1  And I then showed the actual plane reservation on Southwest

2  Airlines with the confirmation number, I showed it to ████,

3  and -- and I -- she -- it wasn't good enough for her.

4      Q   Okay.  Were they expressing concerns at all about that

5  visit?

6      A   Yeah.  So ████, in response to having the plane

7  ticket, said, mom, even with a plane ticket ,I don't think

8  he's going to send us home.  I want a written promise from him

9  that he will send us home.

10     Q   But I'm talking about the visit itself.  Did they

11  express any concerns about going to visit him?

12     A   Their only concern was that they weren't willing to go

13  to New Hampshire, and since it was going to be at grandpa's

14  house and they'd already done it the previous year, they did

15  not express other concerns.

16     Q   Okay.  And so once this agreement was reached and the

17  tickets obtained, did our office, on your behalf, agree to

18  those terms after you discussed it with your girls?

19     A   Only after we received a letter from Dana in his email

20  stating I promise to put the girls on this flight number to

21  the Burbank Airport on -- at this time on December 28th.

22     Q   Okay.

23     A   And once we had that and once I actually read it to my

24  daughter ████, then they agreed to go.

25     Q   Okay.



1        A   And I thought we were all set.

2        Q   Okay.  And then at some point during the -- first of

3    all, did he get the children on December 23rd?

4        A   Yes.

5        Q   Okay.  And how did that occur?

6        A   I took them to the airport, and the three of them flew

7    up to San Jose.  And he picked them up.

8        Q   So the girls and    ████    ?

9        A   The girls and    ████    went.

10       Q   Okay.  At some point in time, did a problem develop

11   that you became aware of?

12       A   They were slated to come on the evening of the 28th,

13   and there was a problem on the 27th.

14       Q   Okay.  And tell me what -- how you found out about it?

15       A   The girls told me.  Well, they called me in tears that

16   night and told me that it had been a horrible day.

17              THE COURT:  What night?

18              THE WITNESS:  And -- it was --

19   BY MR. FONTAINE:

20       Q   What day was it?

21       A   -- the evening of the 27th, so the --

22              THE COURT:  Thank you.

23              THE WITNESS:  -- day before the flight.  They called

24   me frantic, crying, hysterical.  There were probably 20 phone

25   calls that night that went on for hours.  They told me that

1   what had happened was they were in the car with -- with their

2   grandpa, their father and their brothers, and the topic came

3   up of going to the airport the following day.  And ████ told

4   me that, I guess, Dad or Grandpa had said, well, how are the

5   girls going to get through security, and ████ then said,

6   well, ████'s 18.  He'll get us through security, and Dana

7   said, but ████ is going to New Hampshire with me and ████.

8   And everybody looked at everybody, because that had been

9   arranged ages in advance that ████ was coming home with the

10  girls and would be with us at the Rose Parade.  And we had all

11  kinds of plans for New Year's, and so they then said, what?

12  ████ has a flight to go -- I mean, ████ is going back to --

13  with us.  He's already got a ticket.  He's not going to New

14  Hampshire, and then I guess --

15  BY MR. FONTAINE:

16      Q  Who purchased ████'s ticket?

17      A  I did.

18      Q  Did ████, at any point -- I'm sorry to interrupt you,

19  but did ████, at any point prior to that tip, tell you that

20  he had made plans to go to New Hampshire with his father?

21      A  He did not, at no point.

22      Q  And --

23      A  In fact, ████ -- I asked ████ if he wanted me to buy

24  him a ticket to go home with the girls, because we have these

25  New Year's plans, and he said, yes.  And so I purchased the

1  ticket after he told me yes.  He did not say anything about

2  his father wanting him --

3       Q  Do you recall --

4       A  -- to go.

5       Q  -- the date you purchased that ticket?

6       A  It as at least 10 days before the trip.  I think it

7  was --

8       Q  Okay.

9            THE WITNESS:  Do you know, Wendy, off hand, when I

10  bought the --

11            THE COURT:  No.

12            MR. FONTAINE:  That's okay.

13            THE WITNESS:  -- ticket?

14            THE COURT:  No.  No.  You answered --

15            MR. FONTAINE:  That's all right.  Just --

16            THE COURT:  -- the question.

17            THE WITNESS:  It was -- it was -- it was well, well

18  in advance --

19            MR. FONTAINE:  You answered it.

20            THE WITNESS:  -- of the trip.

21  BY MR. FONTAINE:

22       Q  Okay.  And so keep -- continue with your story --

23       A  So --

24       Q  -- of how you found out.

25       A  -- apparently, when Dana and his father learned,

1    apparently for the first --

2              MR. FONTAINE:  If I may approach, Your Honor?

3              THE WITNESS:  -- time that ▇▇▇ would -- thank you,

4    that ▇▇▇ would not be going to New Hampshire and would be

5    returning to Pasadena with the girls to spend New Year's

6    with -- doing our plans, he -- they both became extremely

7    upset and angry and began behaving, from what the girls

8    describe, as in -- abusively and irrationally.

9         Q  So you -- when you say "both," you mean the father --

10   Dana and his father?

11        A  Correct.

12        Q  And during that time, what -- was ▇▇▇ also talking

13   with you?

14        A  I did talk to ▇▇▇ in the evening.  So I -- they were

15   apparently out, and I don't -- I didn't talk to any of them

16   until that evening when they called me.  But they called me

17   because the whole day had been what they called a complete

18   meltdown.  They were trying to hide in their rooms, but Dana

19   kept coming in.  Their grandfather was yelling and cussing and

20   badmouthing me.  It was just a disaster of a day.

21        Q  This is what the girls were telling you?

22        A  And I was actually hearing it, because I was on the

23   phone with them, and I heard, like, the door open.  I heard

24   Dana's voice.  I heard them say, Dad, get out.  We've asked

25   you over and over.  Get out.  You know, don't -- don't bother

1  us.  Please.  Please.  Please.  And then them saying, we have

2  to go.  We have to go and hanging up.

3       I talked to ███.  At one point, he said his father

4  was listening outside the door.  At one point, the girls

5  opened the door, and Dana was standing there with his ear to

6  the door.  ███ actually wound up talking to me from under a

7  pillow because he did not feel he could talk about what was

8  happening.  They were begging me to -- to rescue them, and

9  at -- ███, at one point, said he put a sign on his door

10  saying do not come in this room.  And his dad just disregarded

11  it, and they literally kept them up for hours.  And ███

12  told me she did not get to sleep until after 3 in the morning.

13     Q  Okay.  And so the next day, December 28th, did you

14  have any continuing conversations with them?

15     A  I did.  So I kept telling them that night -- I was

16  doing my level best not being there to say focus on good

17  things.  I want you to think of good things.  Think of every

18  good adjective: mercy and love and light.  I want you to be

19  calm in your rooms.  Stay away from the conflict and focus on

20  good things, and you're going to be home tomorrow.  This --

21  this can't go on forever.  You'll be home tomorrow.

22  Everything will be okay.

23     Q  Did you contact --

24     A  So --

25     Q  -- our office?



1    A   I did not at that time, yet.  I don't think I

2  contacted you until the next day, when they told me that Dana

3  had said he wasn't going to let them go home.  So the

4  following morning --

5    Q   Now, what day are we on, just so we're clear?

6    A   The 28th.

7    Q   Okay.

8    A   So they had the flight the evening of the 28th.

9    Q   Okay.

10    A   And this was in the morning of the 28th.  So Dana --

11  excuse me, ███    and the girls both were on the phone with me,

12  and Dana apparently had said to ███    that unless you go to

13  New Hampshire with me on the flight that I booked you, I will

14  not allow the girls to go home.

15    Q   Okay.  And so then what happened?

16    A   So --

17    Q   So just try to speed it up, because we're going to run

18  out of time?

19    A   Sure.  So he said, I won't let the girls go home

20  unless you go with me.  ███    was worried for their safety.

21  So he called me and said if I leave myself and go to -- and he

22  doesn't let them go home, but I come home, then I'm worried

23  the girls won't be safe.  So I actually spoke to ███ , their

24  older brother, and said will you protect the girls if ███

25  comes home, if Dana won't allow the girls to come home, and

1  █████  said he would.  So I said to  █████ , you're 18.  You can

2  make your own decision.  You can go with your dad to New

3  Hampshire.  You can come down here.  You can stay there.  You

4  decide, and he said, mom, I have to get out of here.  It's not

5  safe.

6      Q  Okay.  Now, you had purchased a return flight for him

7  as well, correct?

8      A  Ages before.

9      Q  Okay.  And so --

10      A  The -- all three children were booked on the same

11  flight, which was supposed to leave at, like, 8 p.m.

12      Q  Okay.

13      A  I don't know the exact time.

14      Q  All right.

15      A  And --

16      Q  So after this, did  █████  discuss how he was going to

17  make this arrangement to get out?

18      A  Yeah.  So the day got worse, and  █████  was locked out

19  of the house.  And other bad things happened during that day

20  that caused  █████  to believe that not only he needed to leave,

21  but the girls needed to leave and be on the flight that Dana

22  had promised to put them on.  So he called me.  I had given

23  him a credit card on my account with his name on it.  You

24  know, you can give your kids a -- a card.  So he had a card

25  that said  █████  Albrecht, and he called me and said, how do I

 1  get Lyft or Uber?  And I said, well, you just install the app
 2  and call them.  So he installed the Lyft app.  He called Lyft.
 3  They came to the house.  He had ordered a van with three seats
 4  or a car with --
 5       Q   Did you know this ahead of time?
 6       A   He told me he was doing it.
 7       Q   Okay.
 8       A   But I didn't know he had got one for the girls.  I had
 9  no idea he was trying to get the girls out of there.  I was --
10  I was surprised.  So he told me he was leaving.  I supported
11  that.  I said, you can use the credit card for that and do
12  what you think makes sense.  So when the Lyft driver arrived,
13  he apparently tried to have the Lyft driver take all three of
14  them to the airport.
15       Q   And did Dana refuse?
16       A   He did refuse.  So previous to that, the girls had
17  packed their suitcases and taken them outside to put in the
18  car and said, Dad, even if you don't want us to leave, we're
19  leaving.  Here's our suitcases, and what they tell me is that
20  he locked the suitcases in the car and then laughed at them
21  and said, now you can't have your stuff back.  And you're
22  still not going to the airport.
23       Q   The girls told you this?
24       A   The girls.  And then at that point, he went inside and
25  locked the door and locked my daughter ▮▮▮▮ out in the dark.

124

1    Q  Okay.

2    A  And she called me in fear, locked out of the house,

3  unable to get back in, with her stuff in the -- in the --

4    Q  Can --

5    A  -- car, and her dad laughing.

6    Q  I'm just going to ask you.  How were you feeling

7  during this whole December 27th --

8    A  I wanted to --

9    Q  -- thing?

10   A  -- get -- I wanted to go up and help my daughters.  I

11  was terrified for them.

12   Q  Okay.

13   A  And I thought about calling 911 when she was locked

14  out of the house or having her call or something, because I

15  just -- I was worried that they were --

16   Q  Yeah.

17   A  -- in danger.

18   Q  At some point in time, did ▮▮▮ -- ▮▮▮ leave to go

19  to the airport?

20   A  Yeah.  So the -- when the -- when the Lyft driver

21  arrived, ▮▮▮ said, girls, the Lyft is here.  Let's go, and

22  Dana then came outside and talked to the Lyft driver and said,

23  ▮▮▮'s 18.  But these girls are underage, and I'm their legal

24  guardian.  And they may not get in this Lyft car, and the

25  driver said, fine.  And he drove away with ▮▮▮.



1    Q   Okay.  And he --  ▮▮▮▮  gets to the airport.  Is there

2  a problem?

3    A   Well, as  ▮▮▮▮  was getting in the Lyft to drive away,

4  Dana came out and said, by the way,  ▮▮▮▮ , I cancelled your

5  flight.  And  ▮▮▮▮  drove away in the Lyft, and when he got to

6  the airport, he called me and said, mom -- because he's never

7  flown alone, he said, mom, I have this confirmation number.

8  And they're telling me I'm not on the flight.  They're telling

9  me I -- I -- I don't have a flight.  Did dad actually cancel

10  it?

11       So I got on the line with the reservation -- the gate

12  agent and spent 45 minutes figuring out that someone from San

13  Jose an hour before that had actually cancelled the flight

14  online using the confirmation code, which Jack White from your

15  office had provided --

16    Q   So at --

17    A   -- to Dana.

18    Q   -- that point, Jack White of my office was involved

19  because Dana was threatening to not return the girls?

20    A   Correct.

21    Q   Correct?

22    A   So they had been talking all day.  Dana claimed that I

23  never had bought a ticket or had bought it at the wrong time,

24  and so got Jack to give him the confirmation code, and he then

25  used the confirmation code to log in and cancel  ▮▮▮▮ 's

 1   flight --

 2       Q   Okay.

 3       A   -- an hour before he left for the --

 4       Q   So did you --

 5       A   -- airport.

 6       Q   -- did you have to go -- jump through hoops to get

 7   ███   to come back?

 8       A   I did.  So  ███   is stranded alone and scared in an

 9   international airport, and San Jose is an international

10   airport, all alone three days before New Year's at 8:00 at

11   night.

12       Q   Okay.  And did ultimately  ███   make it home?

13       A   He did.  I got him booked on a flight.  He was able to

14   come home, and when he came home, he was extremely worried for

15   the girls.  So we went directly from the Burbank Airport

16   directly to the Pasadena police to report that the girls were

17   stuck up there.

18       Q   And, again, we're running out of time.  So keep it

19   quick.  What did the Pasadena police end up telling you?

20       A   The Pasadena police said to come back at 8 a.m.  When

21   I came back at 8 a.m., they called Dana, and he said that he

22   was keeping them until the 6th of January.

23       Q   And on what basis did he tell them what -- upon what

24   basis he was doing that?

25       A   That it was a court order.  He had winter break, and

1  he was going to keep them until then.

2      Q   As far -- according to the police, did he reference

3  the agreement that his attorney and our office had reached?

4      A   He didn't, but when I showed them the agreement, they

5  said that I should get the San Jose police involved.  So they

6  have me the number, and I called the San Jose police.

7      Q   Okay.

8      A   And the San Jose police agreed, and they said that if

9  I drove up -- they advised me to drive up there, park a block

10  away from the house, call them.  And they would execute a

11  civil standby and get the girls back on the --

12      Q   Okay.  And how --

13      A   -- 28th -- 29th.

14      Q   -- long of a -- how long of a drive is that for you?

15      A   It's about seven hours.

16      Q   Did you make the drive --

17      A   I did.

18      Q   -- that day?  When you got there, did you contact the

19  San Jose police?

20      A   I did.

21      Q   And did the police actually meet you?

22      A   They did.

23      Q   Did they review your agreement?

24      A   They did.

25      Q   And did they, at that point, feel that they could take



 1    the children?

 2        A   Yes.

 3        Q   Did, in fact, they go to the home?

 4        A   Yes.

 5        Q   Where were you at that time?

 6        A   They asked me to park a few houses down and wait in

 7    the car.

 8        Q   Okay.  And did the police ultimately come back to you?

 9        A   Yes.

10        Q   And what did they tell you?

11        A   They said that they could tell from his written

12    agreement, which was an email, that he would return them the

13    28th, and it was now the 29th.  That he had agreed, but he had

14    then taken out the court order, which said he had them from

15    the 27th to the 31st.  And so he said, I have them until the

16    31st, based on this court order.

17            The police then said to me, we --

18        Q   So you're talking the original December the 27th --

19        A   The original that the --

20        Q   -- through 31st timeframe --

21        A   Correct.

22        Q   -- court ordered?

23        A   He referred not to our agreement or our writing or the

24    email I had, but he referred to the original, judge-issued

25    court order that said the 27th to the 31st.



1      Q   Yeah.

2      A   And he told them that he had them until the 31st under

3  that order.   They told me that they could tell the order had

4  been amended, but that they had to revert to a judge's

5  signature over an email and that there was nothing they could

6  do until the 31st.

7      Q   At that point, did you have any contact with your

8  girls?

9      A   I did.   So ███████ -- I actually called them when I was

10  in the car, and I said, the police are here.   I'm getting you

11  out, because all day long they had been calling me frantically

12  begging me to get them.   And so I called and said, I have

13  great news.   I'm here.   You're going to come home tonight.

14  The police are going to help us, and so ███████ ran out of the

15  house, threw her arms around me and said, thank God you're

16  here.   And at that point, the police came over and said, I'm

17  so sorry, ███████, but you have to go back in the house.   You

18  can't go home tonight, and ███████ then began crying

19  hysterically in the street.

20      Q   Okay.   And did you end up having instructions from the

21  police to do with --

22      A   It was probably one of the hardest things I've ever

23  experienced.   I stood in the -- after driving seven hours and

24  getting the police involved, I stood in the street with my

25  daughter crying hysterically begging me, begging me not to



1    have to make her go back in the house and please let me -- let

2    her go home.  And the police officer said, ma'am, I'm so

3    sorry, but you have to leave now.   ████, go in the house.

4    Ma'am, you have to leave, and they made me drive away.

5         Q   Did you see ████ at all at that time?

6         A   I did not.

7         Q   Did you talk to ████ at all after that?

8         A   I talked to them on the phone.

9         Q   Okay.  And what did you do after that?

10        A   I drove around San Jose for a while.  I tried to get

11   some dinner, and I drove home.

12        Q   So you drove seven hours back?

13        A   Yeah.

14        Q   At that point, did you inform our office of what had

15   occurred?

16        A   Yeah.

17        Q   When -- and did -- was there discussions back and

18   forth?

19        A   A lot.

20        Q   When did you end up getting your girls back?

21        A   On the 31st.

22        Q   So three days after the agreed upon date?

23        A   Yeah.  But that was better than the 7th, which was --

24   or the 6th, which was when he said he was going to return

25   them.  So at least by getting the police there and him saying

1    the 31st, I got them back --

2         Q   Okay.

3         A   -- a little earlier.

4         Q   After this incident, when the girls were returned,

5    what were the girls' -- did the girls talk to you about what

6    had happened?

7         A   A lot.

8         Q   And what was their feelings about what had occurred?

9         A   I -- I don't even have words.  I mean, they came back

10   so incredibly distraught and so upset, and, I mean, ▆▆▆ was

11   just crying nonstop.  And they were both saying they never

12   wanted to talk to him again.  They didn't -- they didn't trust

13   him, that he had been so horrible to them, that they were

14   scared of him, that he enjoyed watching them suffer, that he

15   set up situations to make them suffer, that he stole their

16   stuff, locked them out of the house, kept them up all night,

17   harangued them and then wouldn't return them, and that he was

18   enjoying causing them pain.

19        Q   They said that they --

20        A   They said that to me.

21        Q   Did you also speak to ▆▆▆ about Dana's apparent

22   position that he had agreed to go to New Hampshire?

23        A   I did.

24        Q   And what did ▆▆▆ say?

25        A   ▆▆▆ said that a couple of weeks before the trip that



1  his dad had asked if he wanted to go to New Hampshire, and he

2  said, yeah, maybe, but that there had been no further

3  discussion.  And he hadn't agreed.  There wasn't a plane

4  flight that he knew about.  There was nothing beyond yeah,

5  maybe, but right now I'm really busy in finals.  And then he

6  said that after all this happened, he went back and checked

7  his email, and there -- and he hadn't seen his email because

8  he had been in finals.  And there was an email from his dad

9  that he had not seen --

10      Q  And what did that --

11      A  -- that said --

12      Q  And that email said what?

13      A  Apparently, it said, you know, you're coming to New

14  Hampshire with me, but ▇▇▇▇ hadn't seen it.

15      Q  Okay.  And did ▇▇▇▇ confirm with you that when the

16  father said this to him on December 27th that he had said, no,

17  I didn't agree?

18      A  He did confirm that because he hasn't agreed.

19      Q  Okay.

20      A  And -- and he was not aware that his dad had a ticket

21  for him, and he had made extensive plans with our church to

22  camp out for -- for the Rose Parade.

23      Q  Did you end up going with your church to the Rose

24  Parade with your children?

25      A  We did, but since I didn't even get them back until



 1    the evening of the 31st, we had to go directly, without a lot

 2    of preparation, to the Rose Parade celebration.  It was kind

 3    of a fiasco.

 4         Q  Okay.  All right.  So let's talk about some of the

 5    other issues that were raised.  Do you recall the discussion

 6    about the dentist?

 7         A  Yes.

 8         Q  Did ███████ have some dental issues?

 9         A  ██████ -- it was ████████ who has --

10         Q  I'm sorry.

11         A  -- the sedation dentistry.  So ███████ has always had

12    dental issues, and we were fired by our dentist in New

13    Hampshire because Dana basically threatened to sue them.  They

14    wrote a letter and called me and said that they were no longer

15    willing to work with our family, and that's the only dentist

16    that had been successfully able to treat ██████ 's teeth.

17         Q  Okay.  Is the sedation because she's scared of going

18    to the dentist?

19         A  She -- she's only found one dentist she can work with,

20    and other than that, she can't go to the dentist.  She -- she

21    just freaks out.

22         Q  Okay.  And was there correspondence between our office

23    and Dana's attorney's office about her needing that sedation?

24         A  Correct.  So he -- he's known that for a long time,

25    and so I took her to Hastings Ranch Dental down the street

1    from us, which is a fine dentist.  And they diagnosed her with

2    six cavities, and they tried to work on her mouth.  They were

3    unable to, and they were unable to even complete a cleaning

4    without her getting upset.  So they suggested that we do

5    sedation dentistry, and they recommended a location and a

6    dentist to perform it.

7        Q   Since this decree, you've continued to received Social

8    Security Disability benefits?

9        A   Yes.

10       Q   And you also get $50 a month from Dana for child

11   support?

12       A   That's my only income.  Yeah.

13       Q   And has that created financial problems for you?

14       A   Substantially.  Yeah.

15       Q   You've submitted a financial affidavit to this Court

16   today?

17       A   Yes.

18       Q   And on that financial affidavit, you list that you owe

19   your mother, not what you owe your mother relating to your

20   failed -- your business that closed, but relating to outside

21   of that, you owe $285,000?

22       A   That is true.

23       Q   Is that money that you have been given by your mother

24   to allow you to live on a daily basis?

25       A   Loaned I think is the better word, because she has to



1  provide for my disabled sister.

2      Q   Okay.

3      A   So I have promised her that I'd be able to pay that

4  back.

5      Q   Okay.

6      A   But, yes, she has been helping us with day

7      Q   Okay.

8      A   -- day-to-day expenses.

9          MR. CAULFIELD:  I couldn't -- excuse me.  I just

10  couldn't hear the last answer.  And what?

11         MR. FONTAINE:  Go ahead.  Repeat your answer --

12         THE WITNESS:  That --

13         MR. FONTAINE:  -- the last part.

14         THE WITNESS:  -- my mother needs the money back, but

15  she has been providing for our day-to-day expenses.

16         MR. FONTAINE:  Okay.

17         THE WITNESS:  And helping us.

18         MR. CAULFIELD:  Thank you.

19         MR. FONTAINE:  How --

20         MR. CAULFIELD:  Sorry.

21  BY MR. FONTAINE:

22     Q   And has the $50 a month support that Dana's been

23  paying been sufficient to help you support your children?

24     A   No.

25     Q   Do you believe that Dana has the ability to earn

1   substantially more than that?

2        A   I do.

3        Q   And are you asking this Court to order him to pay

4   child support based upon what your expert at the trial had

5   said was his imputed -- was his earning capacity?

6        A   Yes.

7        Q   And if you had been receiving a sufficient child

8   support and other support, would you have been able to provide

9   more regular dental care for --

10       A   Well, not only dental care --

11       Q   -- your children?

12       A   -- but -- but schooling, outings.  Just pretty much

13   every single thing that has come up over these years, I've had

14   to -- I've had to reach out to my mom and get help for.  So in

15   the case of the dentistry, what happened was that when they

16   identified these cavities we then reached out to Dana and

17   said, here is the dentist we've identified, but sedation

18   dentistry involves an anesthesiologist.  It's a big deal, and

19   I don't want to do that without your input.  So please review

20   this dentist.  Please suggest alternative dentists, but we

21   need to do this immediately.  And he did not give the

22   permission, and so months went by.  And then our dentist saw

23   ███████ again, and she then had 11 cavities instead of 6.

24                  MR. FONTAINE:  Your Honor, may I approach?

25                  THE WITNESS:  And I was unable to -- to fix them.



1    So finally, I had to make the decision to simply take her for

2    that sedation dentistry and get it done.  So --

3    BY MR. FONTAINE:

4        Q   Did your dentist that had seen ███████ earlier and then

5    again when the 11 were discovered write a letter for you?

6        A   She did.

7        Q   And does -- is that the letter you have in your hand?

8        A   It does -- yeah.

9        Q   And does that letter indicate that those additional

10   five cavities came about during that six-month period?

11       A   Correct, when we didn't have permission to get them

12   treated.

13       Q   Okay.

14       A   Yeah.

15       Q   And have you had them treated at this point?

16       A   Yeah.  We have.

17       Q   And who paid for it?

18       A   I did.

19       Q   Did Dana reimburse you at all?

20       A   He did not.

21       Q   Is Dana aware that you had this work done?

22       A   Yes.

23            MR. FONTAINE:  Your Honor, if I may submit this?

24            MR. CAULFIELD:  No objection.

25        (Respondent's Exhibit A received)



1  BY MR. FONTAINE:

2      Q  Let's talk about the Social Security.  I'll -- before

3  I do that --

4          MR. FONTAINE:  Strike that.

5  BY MR. FONTAINE:

6      Q  You're requesting a modification of parenting -- of

7  the parenting plan, correct?

8      A  Yes.

9      Q  And you're also requesting a modification of the

10  decision making relative to medical and dental?

11     A  Correct.

12     Q  Is -- describe what is causing you to request that

13  modification for the decision making relative to medical and

14  dental?

15     A  Well, I think it's this incident where my daughter

16  went from having six cavities that were treatable, and we had

17  somebody to do it.  And then months went by, and we could not

18  act on them, because we didn't have the permission of        's

19  father.

20     Q  Can you afford to provide this -- the needed dental

21  care of your children?

22     A  I'm having difficulty providing for the needed

23  anything for my children.  So it's not only that, but I had to

24  borrow a couple of thousand dollars to pay for my daughter's

25  dental care, which was much more expensive because it was 11

1  rather than 6 cavities.

2      Q   And where did you borrow that from?

3      A   My mom.

4      Q   All right.  Let's move on to the Social Security.

5      A   All right.

6      Q   Have you ever, after this Court issued its orders and

7  you proceeded with trying to get birth certificates and Social

8  Security numbers, have you ever told anyone that you were of

9  the belief that your children should not have Social Security

10 numbers?

11     A   I have not.

12     Q   Did you in fact pursue all three of your children's

13 Social Security numbers?

14     A   I personally obtained Social Security numbers for the

15 other three children, and in ██████'s case, I had to go through

16 quite a bit of effort to get all the paperwork together.  We

17 went together to the Social Security Office.  We submitted it.

18 The Social Security Office denied him.  We then did an appeal.

19 We talked to supervisors.  We have made multiple trips there,

20 and the letter that Dana says I didn't get, actually that

21 letter came from Social Security and said you have failed to

22 prove -- you have failed to adequately prove that you have

23 been alive since your birth.

24         And so when I hit that dead end, I then asked Dana to

25 please provide a letter from Dr. Oteri, the kids'

1    pediatrician, who's a personal friend of his, which is one of

2    the things they requested.  He refused to --

3         Q   Dr. Oteri is a doctor from back here?

4         A   Correct.

5         Q   Correct?

6         A   That the kids saw that's a friend of Dana's, and he

7    refused to provide that letter.  And has still refused.  So

8    Social Security says that until they have that letter, they

9    can't proceed.  So I have now --

10        Q   Doctor --

11        A   -- because I can't --

12        Q   Oteri -- excuse me for interrupting.  Dr. Oteri can

13   confirm that she treated --

14        A   Correct.

15        Q   -- him --

16        A   And that's what they want.

17        Q   -- from his birth on, correct?

18        A   They want a letter stating that she treated him for

19   years, and Dana wouldn't provide the letter.  I had a copy at

20   one point, which was misplaced when I moved.  So I simply

21   asked for a duplicate, and he has not responded to that.

22        Q   Okay.

23        A   So instead, at this point, I --          and I have

24   contacted Congresswoman Judy Chu of our congress district, who

25   has a division in her office that helps with federal agencies.



1    We've been assigned a caseworker, whose name is Lauren, who is

2    working with us to try to compel Social Security to provide

3    ███████ with a Social Security because he has the documents

4    required, according to their own written documentation.

5    They're just being recalcitrant and hard to work with.  So if

6    that doesn't work, I will -- I -- I will try other things, but

7    I am doing everything in my power and have been for months.

8        Q   Have you ever told ███████ to not discuss any of this

9    with his father?

10       A   Never.  In fact, I told ███████, if your dad can help

11   you, have him help you, and that's why they went.   I

12   encouraged them to go in New Hampshire and see if they could

13   work it out.

14       Q   Did you tell ███████ that he --

15       A   I did.

16       Q   -- needed --

17       A   I said --

18       Q   -- to get this letter?

19       A   -- ███████ --

20       Q   Hold on.  Hold on.  Did you tell ███████ that he needed

21   to get this letter from Dr. Oteri as well?

22       A   Probably a hundred times.

23       Q   Okay.

24       A   Yeah.

25       Q   So do you feel that you've done anything to inhibit

1  him getting a Social Security number?

2      A   Absolutely not.  I've done everything --

3      Q   Do you feel --

4      A   -- I can do.

5      Q   -- that you've done your best to get a Social Security

6  number?

7      A   Everything I know how to do.

8      Q   Okay.  Let's talk about the police report that they

9  introduced.  Do you recall that incident and that day?

10      A   I do.

11      Q   Can you tell us what happened on that day?

12      A   So it was around 5 in the morning, and I was awoken by

13  noises at my front door.  They were at the door off the

14  kitchen.  I heard somebody doing something to the doorknob,

15  and then I heard the sounds that's -- was something mechanical

16  at -- right literally outside my door.  There's a fence and a

17  gate.  So there could be no one there.

18      Q   Did you wake the children up at that point?

19      A   I did.  I woke up ████, because he's the man of the

20  house, and I said, ████, I think there's someone at the door.

21  He woke up and heard the sounds and started screaming.

22      Q   Okay.  And did the girls get up as a result of the

23  screaming?

24      A   Probably not right away, but ████ and I both -- we

25  turned on the kitchen light.  We cautiously went to the door,

1    and by the time we looked outside, there was no nothing there.

2         Q   Okay.  Had you seen a car at any point in time?

3         A   I had not.  In that report, that part -- I talked to

4    the police sergeant at -- in Sierra Madre about that report,

5    and --

6         Q   You're talking after the report?

7         A   After.  This was like --

8         Q   After you obtained the report?

9         A   -- this last week.  I went to him, and I said, I don't

10   understand why it says that there are inconsistencies.  And he

11   reviewed it as well and said that Ofc. Bailey had referred to

12   something as an inconsistency, which was simply the fact that

13   when         and I were outside reviewing the house, we went in

14   the backyard.  We went in the garage to try to see what had

15   happened, that the girls were watching through a little --

16   it's a like a doorbell cam that just tells you who's at the

17   door.  And they -- they say that they saw two cars that either

18   pulled into the driveway or out of the driveway and then drove

19   away.  I did not see that, because I was in the backyard, and

20   the sergeant confirmed that that was not an inconsistency.  It

21   was just different people seeing things at different times.

22        Q   Okay.  And in that report, Dana referenced a section

23   where he alleged that you said that it was Dana that did this.

24   Is that what you said?

25        A   No.  I asked the sergeant about that as well, and he



1   said that it is their policy that if someone is experiencing a

2   crime and they don't know who it is that they ask do you have

3   anyone you think this might be?

4       Q   And is that how they asked you?

5       A   They did.  They said is there anyone who this -- you

6   think this might be?  And I said, well, I'm in a contentious

7   divorce with my ex-husband.  They asked for his name.  I told

8   them.  I later asked him if I did anything wrong, and he said,

9   no.  You answered our question honestly.  That's what we had

10  asked you.

11      Q   Okay.  There was also a discussion about you -- well,

12  let's talk about the audio that you heard of ███.

13      A   ███.

14      Q   Tell me what you think of that?

15      A   It's heartbreaking.  That's -- that was a

16  heartbreaking audio.

17      Q   Do you know of anything that ███ was referencing in

18  there about being locked in the house?

19      A   So because of that incident that had happened at 5 in

20  the morning, I have grown concerned that someone is trying to

21  get into my -- or would -- at least once tried to get in my

22  house and that it could happen again.  Since my mother has

23  become ill, I have been going down to her house at 4 in the

24  morning to give her medication, to clean her house, to help

25  comfort her, to help her any way I can before I come back at

1  6:30 to get my kids out of school.

2          During those times, I had been asking my children to

3  come up and slide the slide bolt, but then I realized I don't

4  want to wake up my kids at 4 in the morning and make them do

5  that.  So I came up with a way to secure a tie that goes from

6  the inside of the house to the outside that they can cut, and

7  I put a cutter there.  And it was simply so that I could leave

8  the house and not have to wake them up and slide a slide bolt,

9  that I could secure the door, so I could leave in the morning.

10     Q   The zip ties that you used, did you tell them that you

11  were doing this?

12     A   I did.  I explained it to them.  I'm not sure ▮▮▮▮▮

13  understood it.  So I replaced the note, and it says cut the

14  zip tie as soon as you get up.

15     Q   Okay.

16     A   So it's very clear --

17     Q   So this was --

18     A   -- that it's not there to lock them in, in any way.

19  It is there simply to keep me from having to wake them up when

20  I leave.

21     Q   Can the zip tie be broken with just force by pulling

22  the door open?

23     A   Presumably.

24     Q   Okay.  Have you stopped doing that since he filed the

25  ex parte?



1          A   I did it on one other occasion, not to lock them in,

2    but I put a sign saying cut this as soon as you get up.  And

3    the kids got up and cut it.

4          Q   Okay.

5          A   So I have not locked the kids in the house.  That

6    doesn't lock them in the house.

7          Q   Okay.

8          A   That's -- that makes them safe.

9          Q   All right.  Do you have any other way that you feel

10   that you can keep them safe that -- when you're not there?

11         A   I mean, you do what you can, you know?

12         Q   Okay.

13         A   I --

14         Q   With regards to the overall conversation that ███

15   had with his father and that message --

16         A   Oh, ███.

17         Q   I'm sorry.  ███.  Did you -- are you aware of

18   anything that you did that caused him that level of

19   frustration?

20         A   Short of not having money --

21         Q   Okay.

22         A   -- I -- I -- yeah.  I mean, I -- there's frustration

23   over lack of money in our home.

24         Q   Okay.  And do you try not to bring the kids into that?

25         A   Well, I -- I definitely try to not mention that to the

 1   kids.  I --

 2       Q   Okay.

 3       A   -- smile, and everything's great.

 4       Q   Do they ask you for things that you can't do

 5   financially?

 6       A   Don't all kids?  Yes.

 7       Q   Okay.  But, I mean, is it -- you referenced that

 8   there -- you have financial issues.  You're not getting enough

 9   support.  Is that part of the issue that prevents you from

10   doing things that the kids often ask for?

11       A   It is.

12       Q   Can you give me some examples?

13       A   I mean, they ask for, like, lunch money, but they --

14   I -- we have to pack lunches rather than buy lunches at the

15   cafeteria.

16       Q   Okay.

17       A   They want to go on, you know, trips, and I can't send

18   them on a trip that costs $100 with their school, because

19   we'll just do a different trip that's cheaper among ourselves

20   at home kind of thing.

21       Q   Okay.  You filed five motions that are currently

22   before this Court today, correct?

23       A   Yes.

24       Q   One of them was a motion for contempt and the request

25   that a guardian be reappointed --



1    A   Yes.

2    Q   -- relative to the children -- the girls, because the

3    girls are the ones that are at issue here, their concerns and

4    their feelings about their father at this point?

5    A   Correct.  And that's in ▇▇▇▇▇ 's letter to her school

6    that it's all about her dad.  I mean, everything.  It's just

7    worried about having to see him, telling me that she refuses,

8    that they won't call him.

9    Q   Yeah.  If Dana were to back off and try to gradually

10   work through whatever difficulties he's having with his

11   children, would you have filed this motion for contempt?

12   A   No.

13   Q   Is it his continued insistence on exercising these

14   rights when the girls are telling you they don't want to visit

15   with him?

16   A   Not only exercising them, but exercising them in ways

17   that go counter to what they want.  So when they say we want

18   to be back on the 28th, and he doesn't do that, or when they

19   say, we don't want to see him in New Hampshire, and mom can't

20   take us to the airport at this time, and he schedules a

21   shuttle to take them at the exact time I can't go and says, I

22   know you don't want to go with us, but I won't shorten the

23   visit, you must go by yourself without ▇▇▇▇ , and you must go

24   to New Hampshire where you don't want to --

25   Q   Last minute?



1       A   -- last minute, all of that together is making them

2 feel as though he doesn't want to repair the relationship with

3 him, and it's making them feel, as they've told me, that they

4 feel that they're being used as pawns, that he's setting up

5 impossible situations that will fail just to continue his war

6 against me.

7       Q   Do you feel that that has caused the children

8 emotional --

9       A   Tremendously.

10       Q   -- issues?

11       A   Tremendous -- there's a second letter to Maranatha

12 High School in which        specifically addresses that -- the

13 trauma that she's experiencing --

14       Q   You're talking the letters --

15       A   -- because of this.

16       Q   -- that Dana submitted?

17       A   Yes.

18         MR. FONTAINE:  If I may approach, Your Honor?

19 BY MR. FONTAINE:

20       Q   Can you read the second letter, the section that

21 you're referring to?

22       A     "I can't take this anymore.  Why is my dad getting

23            away with bullying us?  Why were we even put on

24            Earth if we're going to die eventually?  You

25            probably don't -- can't answer those questions.  So

1          there's no point in asking them, but I can't keep

2          sitting in my own head.  I just wish there was some

3          way out of this."

4     Q   Do you have concerns about her emotional state from

5    reading those letters?

6     A   I do.

7     Q   Okay.  Do you feel that harm will result to the

8    children, emotional harm will result to the children, if

9    they're forced to go with their father against their wishes?

10    A   I think it's already occurred, and I'm trying to

11   mitigate it.  And I think it will get much worse.

12    Q   Do you feel that the continued attempts by you that

13   you've been doing to try to encourage them is only making

14   matters worse at this point?

15    A   Absolutely.

16    Q   And have you seen your attempts being met with that

17   kind of a reaction?

18    A   I have.  So we've gotten to the point, as I've

19   mentioned, for a couple months I kept reminding them on

20   Mondays and Thursdays, to the point where they would just cry,

21   shut down, not talk for the rest of the night, go in their

22   room, shut their door.  They said, mom, you don't even

23   understand.  You don't care about us.  You are not trying to

24   protect us, saying that we --         has actually said to me

25   that if she's forced to visit her father again that she will

1  literally run away, and she's young and naive.  And she

2  doesn't even know what kind of risk that would put her in, but

3  it scares me to death.  And she means it.

4      Q  You've also filed a motion to modify child support and

5  to order alimony?

6      A  Yeah.

7      Q  And the -- your request is being made at -- on the

8  basis of Dana's -- your belief that Dana has the ability to

9  earn 90,000 per year?

10     A  Especially, a year after his divorce --

11          THE COURT:  Excuse me.

12          THE WITNESS:  -- was completed.

13          THE COURT:  That issue will be put off to another

14  day.  We don't have time to go through that --

15          MR. FONTAINE:  Okay.  All right.

16          THE COURT:  -- issue today.

17          THE WITNESS:  All right.

18          MR. FONTAINE:  Fine.

19  BY MR. FONTAINE:

20     Q  You've also requested the Court, in your fourth motion

21  on this list, filed on January 25th, to modify the parenting

22  plan, correct?

23     A  Yes.

24     Q  And that is to -- in conjunction with the motion for

25  contempt and appointment of the guardian, correct?



 1          A   Right.

 2          Q   So you're asking the Court, for the time being anyway,

 3     to put a hold on the girls' requirements to visit with their

 4     father, based upon the feelings that they're having?

 5          A   Yes.

 6          Q   And you understand that the Court is probably going to

 7     want someone's view other than yours on that?

 8          A   Right.

 9          Q   And you're asking that Kate -- Kay Sternenberg get

10     back involved in this case to interview the children or

11     whoever she feels necessary, right?

12          A   Yes.

13          Q   And are you doing that for your personal benefit or

14     for the children's?

15          A   For the children.

16          Q   Okay.  Has this caused -- have these problems that

17     you've described caused problems in your household?

18          A   Yes.

19          Q   You're still treating for cancer?

20          A   Yes.

21          Q   Has it created stress for you?

22          A   I worry about my own health because of the stress.

23     This -- the kids were doing great, and then after Christmas,

24     the kids are doing really badly.  So they came back from that

25     trip broken, I mean just broken, and it's been all I can do to

1  keep the pieces together.  That's where you get these phone

2  calls from ████.  That's where you get ████ melting down

3  and writing letters and talking about why are we even alive.

4  It all happened after Christmas.  That was a devastating,

5  horrible visit.

6      Q  Okay.  Have you -- I know that ████ is not the

7  subject of these motions, but have you seen ████ also

8  disintegrate or whatever word you used?

9      A  ████ actually developed a -- a problem called

10  depersonalization, which is -- I talked to a counselor about

11  it, and it happens as a result of abuse.  And it is when you

12  do not express your anger over situations that are harmful to

13  you as a child, and you become cutoff from your own feelings.

14  And he had a very severe case of that.  I took him to

15  counseling, met repeatedly with a counselor who specializes in

16  that -- in that issue, and he was able to resolve that.  But

17  it's been replaced with a tremendous amount of anger, and he's

18  really, really struggling.  He's struggling in school.  He's

19  struggling in life, and all of this, again, happened after the

20  January visit when his dad cancelled his flight and told him

21  he had to go with him or basically blackmailed him and --

22      Q  Have you taken steps for -- to help him in that

23  regard?

24      A  I have.  He now has a new counselor to deal with anger

25  management and to try to deal with the -- the -- the harm

1  that's happened to him.

2       Q   Okay.  How about your girls?  Have you taken steps --

3       A   They're both in counseling as well.

4       Q   Okay.

5       A   So, yeah.  ████████  has refused to continue to see a

6  counselor.  So I'm working very hard --

7                THE COURT:  Refused what?

8                THE WITNESS:  She's -- she's seen a counselor, and

9  she now refuses to see one.  But I've got her talking to

10  someone to helps with these issues, who's kind of a social

11  worker, not a "counselor", and she's been helping ████.

12               MR. FONTAINE:  Okay.

13               THE WITNESS:  I'm doing what I can.

14               MR. FONTAINE:  Do you want me to deal with the

15  attorney's fees issue, Judge, or do you want to put that off,

16  too?

17               THE COURT:  No.

18               MR. FONTAINE:  Okay.

19  BY MR. FONTAINE:

20      Q   So at the very beginning of this, you said to the

21  Court that you don't -- that you want these children to have a

22  good relationship with their father?

23      A   I want him to be a good father to them.  Yes.

24      Q   Okay.  Do you feel that Dana is -- has difficulty

25  recognizing the issues he's having with his children?



1          A   I don't know why he's having these issues.   He --

2     based on his testimony earlier today, I don't think he's

3     understanding or acknowledging the problems that he's having

4     with them.

5          Q   Do you feel that you're a perfect mother?

6          A   I wish I was, but I'm pretty human.   So I'm not a

7     perfect mom, but I love my kids.   And I do my best, and I want

8     the best for them.

9               MR. FONTAINE:   I have nothing further.

10               THE COURT:   Cross-examine.

11                         CROSS-EXAMINATION

12     BY MR. CAULFIELD:

13          Q   Do you understand Master DalPra's parenting plan?

14          A   I do.

15          Q   Have you --

16          A   I believe I do.

17          Q   -- obeyed -- I'm sorry?

18          A   I believe I do.   I try to.

19          Q   Yeah.   Yeah.   Have you obeyed Master DalPra's

20     parenting plan?

21          A   The absolute best of my ability.   Yes.

22          Q   To the best of your ability?

23          A   I have done everything I know how to do to obey it.

24          Q   Well, the -- you've -- Master DalPra told the parties

25     to have parenting the day they're in New Hampshire, correct?

1       A   Does it say that in the parenting plan?

2       Q   Yes.

3       A   Can you read it?

4       Q   Yeah.  He gets parenting in New Hampshire.

5       A   Can you read that portion?

6       Q   If someone would give you parenting plan, I guess.  Is

7    that -- so you don't think he has any parenting time in New

8    Hampshire, in the -- in Master DalPra's parenting plan?

9       A   Well, if it does say that in the parenting plan, then

10   certainly he should have the time in New Hampshire, but if my

11   girls say that they will not go, then I try --

12      Q   Okay.

13      A   -- to do the best I can to convince them --

14      Q   Okay.

15      A   -- to do anything.

16      Q   So for the sake of argument, and we'll say that it

17   does provide for parenting time for Dana in New Hampshire, now

18   the -- you tell -- you say that you've told the children to

19   have parenting time with their dad in New Hampshire?

20      A   Well, when he buys them plane tickets and says they're

21   going to New Hampshire, I say, you have parenting time with

22   your dad on this plane ticket on these dates in New Hampshire.

23      Q   Right.  You do -- and you've testified under oath a

24   few minutes ago the -- that the children refuse to go to New

25   Hampshire to have parenting time with their dad.  Didn't you



1   just say that?

2       A   I did.

3       Q   Okay.  What consequence does each child have when they

4   refuse to do what you tell them to do?

5       A   Well, when I take ▮▮▮▮  to the airport to get in a

6   plane to New Hampshire --

7       Q   Yeah.

8       A   -- and the actual airport authorities tell me that I

9   cannot force her on the plane --

10      Q   Yeah.

11      A   -- then what consequences can I put in place?  I can't

12   drag her on the plane.

13      Q   Well, could you punish her in some way for disobeying

14   you and disobeying Master DalPra's orders?

15      A   Attorney Caufield, my children are suffering so very

16   much right now --

17      Q   He is --

18      A   -- because of the trauma of these family situations --

19      Q   Yes.

20      A   -- with -- the last thing I would want to do would be

21   to visit more punishment and harm on them.  I think they're

22   already suffering an awful lot.

23      Q   I see.

24      A   So --

25      Q   So there's no consequence for -- from you of them



1   saying I'm not going to go to New Hampshire to see my dad?

2       A   That's not how I parent.

3       Q   Well, right.  There's no consequence?

4       A   That's not how I parent.

5       Q   Okay.

6       A   What -- I took her --

7       Q   Is there consequence --

8       A   -- to the airport.

9       Q   -- for anything that the children disobey you in?

10      A   We mostly just have discussions when they disobey.

11      Q   You discuss them?

12      A   Yeah.

13      Q   Oh, but there's no consequence?

14      A   I mean, there's no formal punishment system of

15  spanking or timeouts in my house.

16      Q   Right.  Uh-hum.  And for the high drama at the

17  airport, there was no consequence for the children for that?

18      A   My daughter went home sobbing her guts out.  No, I did

19  not punish her after that.

20      Q   I see.  Okay.  And it's your -- it's a truthful

21  statement that during the Christmas break, your daughters were

22  frantic, crying, hysterical and called you 20 times?

23      A   I don't know the exact number of times they called,

24  but we spent a lot of time on the phone the evening of the

25  27th.

1    Q   So -- but it wasn't 20?

2    A   I don't know how many times it was.

3    Q   But you did testify 20?

4    A   Maybe I said around 20.  Maybe it was 20.

5    Q   Oh.

6    A   Maybe it was 12.

7    Q   Right.  Right.

8    A   It was -- it was a long --

9    Q   Okay.

10   A   -- time.  It was hours.  I know that.

11   Q   Okay.  But --

12   A   I don't know how many times we hung up and restarted

13   the conversation.

14   Q   Right.  Now, you testified that you feel the children

15   are not safe with Dana, and then you also used the word that

16   it was "dangerous" for the children to be with Dana.  Do you

17   remember testifying to that a few minutes ago?

18   A   I believe I said that when ████ called me locked out

19   of the house, I felt that was unsafe and dangerous.

20   Q   So it was unsafe that she was outside.  That's the

21   limit of the safeness?

22   A   When she was outside, he went inside and then locked

23   the deadbolt and locked her out in the dark.

24   Q   Yeah.  Okay.  There's nothing else that Dana's doing

25   that's unsafe; is there?

1      A   I don't know.

2      Q   You don't know?  Okay.  Now, you testified under oath

3   that ██████ had never flown alone.  Do you remember testifying

4   that a few minutes ago?

5      A   He's never gone to the airport by himself and flown

6   alone.

7      Q   Oh, so that wasn't quite true either.  In fact, he

8   flew to New Hampshire; didn't he?

9      A   And I walked him through security and stayed on the

10  cell phone with him the entire --

11     Q   Yup.

12     A   -- time.

13     Q   So -- but it wasn't true what you said, what you

14  testified to?  I understand.  Moving on.  Now, in your

15  financial statement, you testified under oath that you live on

16  a daily basis day-to-day expenses, remember?  Do you remember

17  testifying under oath a few minutes ago to that?

18     A   I did.

19     Q   Okay.  And I notice on your financial statement, you

20  don't mention anything about legal expenses?

21          MR. FONTAINE:  Is that a question?

22          MR. CAULFIELD:  Yes.

23  BY MR. CAULFIELD:

24     Q   What are your legal expenses?

25     A   They're a lot.



1    Q   I'm sorry?

2    A   They're a lot.

3    Q   Oh, so you're making choices, right, where you put

4  your money?  It's not that you don't have the money.  It's you

5  make a choice where to spend it, correct?

6    A   I struggle financially to pay all my bills.  Right

7  now, I have outstanding bills due to my attorney that I cannot

8  pay.

9    Q   I see.

10   A   So I do the best I can with the --

11   Q   Okay.

12   A   -- funds I have.

13   Q   Right.  But it's not a complete financial view of you

14 to say that you're struggling day to day and not to mention

15 the amount of money you're paying in attorneys' fees; is it?

16   A   I'm not sure I understand the question.

17   Q   That's all right.  Now, are you contending that the

18 police report is not accurate?

19   A   I spoke to the sergeant and --

20   Q   Yeah.

21   A   -- had a discussion about it.

22   Q   Yup.  Let me ask you the question again.  Are you

23 contending that the police report is not accurate?

24   A   Which portion of it?

25   Q   Any of it.



162

1      A   The sergeant recommended that I speak --

2      Q   So you're not --

3      A   -- to Ofc. Bailey.

4      Q   So you won't answer that question?  Okay.

5      A   Well --

6      Q   Let me ask you another question.

7              MR. FONTAINE:  Just answer the questions.  Just

8      answer.

9              MR. CAULFIELD:  Yeah.  This is how we ended up,

10     remember, not finishing the hearing --

11             THE WITNESS:  Uh-hum.

12             MR. CAULFIELD:  -- last time.

13             THE WITNESS:  Go ahead.

14             MR. CAULFIELD:  Dr. Albrecht and you had to come

15     back.  Yeah, just to let you know.

16     BY MR. CAULFIELD:

17       Q  So let me ask you if you feel that this is accurate,

18     and I'm reading from the police report.

19             "She'd also told me none of her video monitoring

20             devices record because Dana had the expertise to

21             disable them and had bugged her house.  When I asked

22             her why she felt Dana was responsible for the

23             incident today, she told me that it was because they

24             were going through a divorce.  She also stated that

25             she had recently testified against him in a criminal

1                proceeding, which she refused to elaborate further

2                on.  She said she desired prosecution if we were

3                able to identify suspects and substantiate a crime."

4       Was that accurate?

5    A  I believe so.

6    Q  What?

7    A  Yes.

8    Q  I'm deaf.  As you know, I can't hear.  Just talk up a

9 little louder, please.

10    A  I think so.

11    Q  Yes?

12    A  Yeah.

13    Q  Okay.  That's accurate.  Now, is it accurate that you

14 told the police you believed the suspects, plural, were

15 somehow affiliated with your soon-to-be ex-husband Dana

16 Albrecht?

17    A  I was asked who might have done it, and I --

18    Q  I see.

19    A  -- gave that answer.

20    Q  Okay.  And did -- is it accurate that you told them

21 that he had been essential in -- that Dana had essentially

22 been stalking you?

23    A  Yes.

24    Q  Okay.  And is it accurate in the police report that

25 the -- when the police said,

164

```
 1              "I spoke to        Albrecht, who told me at 5:30

 2              a.m. she was asleep in the same room as her sister

 3                     .   She heard her mother freaking out and

 4              someone scream."

 5         Is that accurate?

 6    A    Yes.

 7    Q    Okay.  And the same question was asked of        , and

 8  her --        also reports you freaking out and hearing a

 9  scream, correct?

10    A    Yes.

11    Q    Okay.  Now, are the children in private school?

12    A    Yes.

13    Q    Who's paying the school tuition?

14    A    They have very large financial aid awards and

15  scholarships.

16    Q    Oh.

17    A    And my mother is paying the difference.

18    Q    Could you -- I, again, I --

19    A    My mother is paying their tuition.

20    Q    Okay.  Now, you -- Dr. Oteri sent you a letter for the

21  Social Security, correct?

22    A    Yes.

23    Q    And you lost it?

24    A    I moved, and there are about a hundred --

25    Q    Yeah.
```

1       A    -- unpacked boxes.

2       Q    Right.  Yeah.

3       A    That's an exaggeration, but there are many boxes

4  containing paperwork.  I assume it's in --

5       Q    I see.

6       A    -- one of them.

7       Q    Yeah.  Okay.  So have you asked Dr. Oteri for another

8  copy of the letter?

9       A    I have repeatedly tried to contact her office, and I

10  can only conclude it's closed because I can't reach anyone and

11  just get the runaround through the phone.

12      Q    I see.  Now, by repeatedly, let me -- since before we

13  had the conversation about the 20 calls that I guess were

14  less, what do you mean by repeat --

15           MR. FONTAINE:  She didn't say that they were less,

16  Your Honor.

17           THE COURT:  Continue.

18  BY MR. CAULFIELD:

19      Q    What do you mean by, Dr. Albrecht, repeatedly?

20      A    I'd say six or seven times over three months.

21      Q    Okay.  And you've never received one call back?

22      A    Not one.

23      Q    Okay.  Now, the children are in counseling?

24      A    Yes.

25      Q    That's a decision that Master DalPra said has to be



1    made jointly, right?

2        A   We informed --

3        Q   Could -- just answer the yes or no, please.

4        A   It is, but not in California.

5        Q   I see.  I understand.  I'll let that one stand.

6        A   Can I say something to that?

7        Q   I'm not asking --

8        A   You're right.

9        Q   -- you the question.

10           MR. CAULFIELD:  I think I'm done, but just give me

11   one moment please, Your Honor.  I'm done, Your Honor.

12           THE COURT:  Okay.  Step down, ma'am.

13           MR. FONTAINE:  Can I just ask one question on the

14   California thing, Judge, just a clarification?

15           THE COURT:  No.

16           MR. FONTAINE:  On the California --

17           THE COURT:  You can step down, ma'am.

18           MR. FONTAINE:  Oh, sorry.

19           THE COURT:  I'll take the matters under advisement.

20   This hearing is adjourned.

21           MR. CAULFIELD:  Thank you, Your Honor.

22           MR. FONTAINE:  Thank you.

23       (Proceedings concluded at 2:22 p.m.)

24

25



CERTIFICATE

I, Frances Marcu, a court-approved proofreader, do hereby

certify that the foregoing is a correct transcript from the

official electronic sound recording of the proceedings in the

above-entitled matter, to the best of my professional skills

and abilities.

TRANSCRIPTIONIST(S):   Jean Knowlton, CDLT-126
                       Carrie Clouse, CDLT-143
                       Kari Watford, CET-979

Frances
Marcu

Digitally signed by Frances
Marcu
DN: cn=Frances Marcu,
o=eScribers, ou=Production,
email=production@escribers.
net, c=US
Date: 2019.05.21 10:51:29
-04'00'

FRANCES MARCU, CDLT-136                    May 20, 2019
Proofreader