1

STATE OF NEW HAMPSHIRE

9TH CIRCUIT COURT - FAMILY DIVISION - NASHUA

IN THE MATTER OF:                )
                                 ) Family Division Case No.
DANA ALBRECHT,                   ) 659-2016-DM-00288
                                 )
                Petitioner,      ) Nashua, New Hampshire
                                 ) October 13, 2022
          and                    ) 9:09 a.m.
                                 )
KATHERINE ALBRECHT,              )
                                 )
                Respondent.      )
_____  )

HEARING ON JURISDICTION
BEFORE THE HONORABLE KEVIN RAUSEO
JUDGE OF THE CIRCUIT COURT - FAMILY DIVISION

APPEARANCES:

Pro Se Petitioner:          Dana Albrecht
                            (Address Unknown)

For the Respondent:         Michael Fontaine, Esq.
                            PO BOX 507
                            Nashua, NH 03061

Audio Operator:             Electronically Recorded
                            **Not Monitored**

TRANSCRIPTION COMPANY:      eScribers, LLC
                            7227 N. 16th Street, Suite 207
                            Phoenix, AZ 85020
                            (800) 257-0885
                            www.escribers.net

Proceedings recorded by electronic sound recording; transcript
produced by court-approved transcription service.



1                          I N D E X

2    WITNESS(ES)         DIRECT     CROSS     REDIRECT      RECROSS

3    FOR THE PETITIONER:

4    NONE

5

6    WITNESS(ES)         DIRECT     CROSS     REDIRECT      RECROSS

7    FOR THE RESPONDENT:

8    Katherine Albrecht  39         43                      52

9

10   MISCELLANEOUS                                          PAGE

11   Respondent's Closing Argument                          122

12   Petitioner's Closing Argument                          123

13

14   EXHIBITS                                          ID     EVD

15   Petitioner's 1 1/20/2021 email                          39

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commence at 9:09 a.m.)

2          THE COURT:  All right.  This is in the matter of

3   Dana Albrecht and Katherine Albrecht.  Case number 659-2016-

4   DM-288.

5          Would the parties identify themselves for the

6   record, starting with the Petitioner?

7          MR. ALBRECHT:  I'm the Petitioner, Dana Albrecht,

8   pro se.

9          MR. FONTAINE:  Michael Fontaine representing

10   Katherine Albrecht; Katherine Albrecht to my left.

11          THE COURT:  Okay.  Thank you.  Good morning to

12   everyone.

13          So we're scheduled for a hearing on jurisdiction.

14   And so what we're going to do, I'm going to ask each of you to

15   give a brief opening.  And then we'll proceed with each of the

16   conditions that the statute provides for me to consider on for

17   all of those conveniences as well as any other additional

18   factors that you may want to consider.  I understand attorney

19   Fontaine raised others enumerated in the statute so we'll hear

20   that as well.

21          My thought is in this -- and I'll get your opinions

22   on this in a second.  My thought is that we'll address each

23   with each party commenting on each factor, so this way I can

24   real time what each are thinking on each particular enumerated

25   factor as well as the additional factors.  And then I'll give

4

```
1   you a brief closing -- or a closing, if time permits.  But it

2   looks like it will.

3            Does that work for you, Mr. Albrecht?

4            MR. ALBRECHT:  I think it does.

5            THE COURT:  Work for you, Attorney Fontaine?

6            MR. FONTAINE:  Yes, it does.

7            THE COURT:  Okay.  All right.  So we'll proceed with

8   that.  I'm going to ask the parties to raise their right

9   hands.

10                          PARTIES SWORN

11            THE COURT:  All right.  So we'll start with brief

12  openings regarding what you want me to focus my attention to,

13  and then we'll address each issue.

14            Ms. Albrecht, your attorney may be making offer of

15  proof.

16            Is that what you're going to do, Attorney Fontaine?

17            MR. FONTAINE:  Yes.  Yes, I am.

18            THE COURT:  And so it's your responsibility, ma'am,

19  to listen to the factual representations made by Attorney

20  Fontaine.  If he says anything that's inaccurate, please let

21  him know and he can correct the record.  Okay?  You understand

22  that, ma'am?

23            THE RESPONDENT:  I do.

24            THE COURT:  All right.  I just wanted just to get it

25  for the record, okay?
```



1            All right.  So Mr. Albrecht, you are the Petitioner

2  so you'll give me your opening statement, sir -- first.

3            MR. ALBRECHT:  It is very brief.  Preliminary

4  matter, I just wanted to apologize to you for the timing on my

5  memorandum of law, getting that in.

6            With that said, I would point out, first of all,

7  Your Honor, this isn't necessarily an all or nothing deal with

8  regard to jurisdiction.  Under the UCCJEA, there's a court

9  with primary jurisdiction that can modify orders.  That

10  doesn't mean that courts in other jurisdictions such as

11  Michigan and California can't do enforcement of orders from

12  the primary court.

13            THE COURT:  Mr. Albrecht, could you -- it's not

14  being picked up by the recording.

15            MR. ALBRECHT:  I could sit down, which I've been

16  accused of --

17            THE COURT:  Yeah.  Please do so.

18            MR. ALBRECHT:  -- so meaning no disrespect, Your

19  Honor.

20            THE COURT:  No, please go ahead.  Excuse me?

21            THE CLERK:  Just ask him to raise his voice.

22            THE COURT:  Yeah.  Go ahead.

23            MR. ALBRECHT:  Okay.  So again, I would point out

24  this is not an all or nothing deal.  So you've got Section

25  458-A:9.  And I used the New Hampshire versions of this.

6

1   There are corresponding statutes in Michigan and California

2   that cite differently.

3              THE COURT:  Uh-huh.

4              MR. ALBRECHT:  But they're pretty much the same.

5   You know, where the communication between courts.  You know,

6   you've got Section A:10 taking testimony in another state.

7              You know, 11, more cooperation between courts.  I

8   believe -- I didn't have time to read this carefully so if I'm

9   wrong on this, I would stand corrected, that Your Honor, would

10  even have the ability to retain primary jurisdiction in terms

11  of modification, but to ask, you know, the court in either

12  California or Michigan to conduct an evidentiary hearing on

13  your behalf, if you feel that, you know, for one particular

14  issue, you know, having done this in Michigan or everybody's

15  in California.  Again, just pointing out things that I believe

16  you're able to do, and if I'm wrong, I will stand corrected.

17             I think -- and also I'd like to briefly address some

18  of the larger issues here and why we're even here today.  We

19  can just start -- we've been at this six and a half years.

20  I'm sure that you'd love it if we could all just agree on

21  everything and go home and save yourself the --

22             THE COURT:  No.

23             MR. ALBRECHT:  Yeah?

24             THE COURT:  That's my job is to resolve differences,

25  so.



1          MR. ALBRECHT:  Well, just -- I think our job is to

2    help try to make your work load lighter, where we're able to.

3    But I do thank you for that, Your Honor.

4          So I think just some of the nature, you know, brief

5    differences just to move forward and touch back on

6    jurisdiction.

7          We've got very poor communication over six and a

8    half years in this case.  You know, I don't know where my

9    daughter is at on a lot of issues (indiscernible).

10          So the only question I have is what does it take to

11    actually get this resolved?  You know, (indiscernible) over

12    that today but you know, as we're going through some of the

13    jurisdiction stuff.

14          I think a huge thing that hasn't been addressed,

15    both Massachusetts, Michigan, and New Hampshire, is the goal

16    that Ms. Albrecht's church has played in these proceedings,

17    and so I'd like to, at some point, just give you a brief, you

18    know, where we're at on that.  You give it whatever weight you

19    think is appropriate.

20          And I would think one of the other elephants in the

21    room is where a lot of people are at on mental health.  And

22    with that said, I think that you going through these points

23    one-by-one --

24          THE COURT:  Yes.

25          MR. ALBRECHT:  -- is a great idea.  I would



1 respectfully ask if we get further along, and I realize I have

2 forgotten something or we get to the end and I realize I had

3 forgotten something, that was prior, that maybe we can squeeze

4 that in. But I'll do my best to get everything in order.

5                THE COURT: Okay. Attorney Fontaine?

6                MR. FONTAINE: Thank you. Very briefly. Your

7 Honor, my client's position I think is stated pretty clearly

8 in her memorandum of law, that she's submitted to this court.

9 Unfortunately, I can't say the same as to Mr. Albrecht. I'm

10 not exactly sure what his position is. At one point he seems

11 to be asking this court to transfer jurisdiction to California

12 but I'm not sure what his position is relative to the state,

13 that in my opinion, the alternative state in my opinion, that

14 applies here, which is Michigan. And I think it's critical

15 for us to know his position on that.

16                I mean, there's a point, one of the factors, is

17 whether the parties can agree. If both parties say that we

18 should keep jurisdiction in New Hampshire, then I think that's

19 a factor that you have to weigh in favor of it staying in New

20 Hampshire.

21                If Mr. Albrecht, for example, takes the position

22 contrary to my client's position that it should be in

23 Michigan, then I want to know that before our presentation.

24 And I think when you offered the parties the ability to do

25 that, you obviously had the intention of each party stating



9

1    their positions if they wanted to.  And it seems to me that he

2    has put a whole bunch of information in front of you in his

3    memorandum of law but hasn't clarified what he's stating as to

4    Michigan.

5             And I would ask the Court to ask him that question

6    so that we understand whether we agree on that or don't.

7             THE COURT:  Okay.  Well, what I'm going to do,

8    Attorney Fontaine, if Mr. Albrecht does not address it in his

9    presentation --

10            And sir, if Attorney Fontaine on behalf of his

11   client doesn't address an issue in his presentation, I'll hear

12   it.

13            I'll reserve -- both parties reserve the right to

14   ask to put each other on the stand to ask them questions to

15   get into their opinion a little bit more, if we have the time.

16   And given the length of the proceedings, we've got three

17   hours.  There should be enough time to do that.

18            And so we'll proceed on that, Attorney Fontaine.

19            But I do agree that I was a little bit unsure, Mr.

20   Albrecht, as to what your position on California is.  And so

21   if you want to address that in --

22            MR. ALBRECHT:  As we go through, yes.

23            THE COURT:  -- as you go through the process on how

24   that's relevant to my decision --

25            MR. ALBRECHT:  Yeah.



1          THE COURT:  -- and as a matter of law -- I don't see

2     how California would have jurisdiction under their version of

3     the UCCJEA.  But I'm open to hearing whatever your position is

4     on that issue.

5          So let's address each one by -- and I have my own

6     notes, too, that I've taken from reviewing each parties

7     memo -- memorandum, and so I may have questions as we go along

8     as well.

9          Hold on one second.

10          I may have questions as we go along as well but

11     I'll -- I want to hear from the parties first.  You may answer

12     my question so I'm not going to presume that my question is

13     still going to be needed, given that you may address it.

14          So Mr. Albrecht?

15          MR. ALBRECHT:  One other preliminary matter, Your

16     Honor.  There are other parties in the courtroom.  I can

17     invite some friends of mine over here who are just here to

18     observe.  I see Mr. Fontaine's paralegal, Wendy, who I

19     recognize, but I don't who the other individual is.

20          THE COURT:  Okay.

21          MR. ALBRECHT:  Is she a witness?  Is she -- you

22     know --

23          THE COURT:  Do you have a witness, Attorney

24     Fontaine?

25          MR. FONTAINE:  No, she's not a witness.  She's not a

1 witness.  No, she's not.

2          THE COURT:  Okay.

3          MR. FONTAINE:  She's here for support.

4          THE COURT:  It's a public proceeding.  And so --

5          MR. ALBRECHT:  So she's just observing and she's not

6 testifying?

7          THE COURT:  I don't know.  Attorney --

8          MR. ALBRECHT:  It's an issue of sequester.

9          THE COURT:  Okay.

10          MR. ALBRECHT:  She will not be testifying.

11          THE COURT:  Yeah.  All right.  She will not be

12 testifying.

13          MR. ALBRECHT:  Okay.  Thank you.

14          THE COURT:  All right.  So previously, Mr. Albrecht,

15 the first issue element that I consider is whether domestic

16 violence has occurred and is likely to continue in the future,

17 and which state could be -- which state could best protect the

18 parties and the children.  That's the first element, sir.

19          MR. ALBRECHT:  Okay.  One moment as I turn to that

20 in my memo.  And if you'd give latitude just to sit down, it

21 makes it easier throughout the process.

22          THE COURT:  Yeah.  Please.  Go ahead.

23          MR. ALBRECHT:  So in terms of domestic violence --

24 and again, this is why I brought up the role of the church --

25 we've had a long history of that, starting with April 8th,

1   2016.  That's how this case started -- the very first

2   proceeding.  Ms. Albrecht's first DV that Judge Moore granted.

3   And as a consequence of that, the first week of that was no

4   contact with my kids.  So we started out with no contact even

5   by phone with ▆▆▆ (phonetic), ▆▆▆ (phonetic), and ▆▆▆

6   (phonetic).  ▆▆▆ at that time was 18, so I was able to reach

7   him.  So we'd go -- that's how we open this.

8           You know, a week in, after some ex partes got hashed

9   out, is I'm able to see the kids but only on the premises of

10  (indiscernible) Bible Church in Massachusetts.  So my

11  attendance there for the next six months is essentially forced

12  three times a week if I want to have any contact with my then

13  minor children at that time.  The minors were ▆▆▆, ▆▆▆,

14  and ▆▆▆.  And ▆▆▆ in these proceedings has been free at

15  all times to do what he wants.

16          I would represent to you that the church has taken

17  strong sides in this; and in favor of Ms. Albrecht and against

18  myself.

19          I would (indiscernible) Attorney Wedmire (phonetic),

20  who is, you know, the counsel at Ms. Albrecht's church in

21  Massachusetts.  So I just want to emphasize in terms of where

22  the parties disagree, and these are under the domestic

23  violence issues, that that has been very much centered around

24  the church.

25          We have two pending -- there's been four appellate



13

1      dockets on that to date, again, solely surrounding the event

2      at the church and domestic violence. Two of those are closed

3      down at the Supreme Court, and just for the record, it's in

4      the memo. You know, we've got one docket pending appeal,

5      2022-0284, making just for the record. That's concurred

6      domestic violence. Again, all rising out of November 3rd,

7      2019, okay. Some may call it the Bible Church.

8             And we have a second appeal, docket 2022-05170.

9      Again, that's just surrendered. That's on the parenting side.

10     Surrounding the motion for ex parte relief on, you know, what

11     happened at (indiscernible) Bible Church. So right now, two

12     dockets up at the Circuit Court, are on what happened at

13     Collinsville Church.

14            And I mean no disrespect to Your Honor, on those

15     appeals. I realize a lot of that was here before your time,

16     before you came on to a case. So if at any point if there's

17     something prior on the record that I or Attorney Fontaine can

18     clarify, please ask us to do so.

19            I would point out November 3rd, this no contact

20     between either of the parties at the church. I would point

21     out that I still don't understand what I did to violate the

22     statute.

23            I would point out we have our sort of second

24     encounter with Ms. Albrecht's church gone wrong at the

25     Michigan courthouse. They have sort of in their memorandum of

1    law, I realize you came to a conclusion about who was telling

2    the truth, who wasn't, concerning the event at the courthouse.

3            Meaning, again, no disrespect to Your Honor, I stand

4    by my version, and my version is that I didn't do the things I

5    was accused of there.  And my version is that I thought I was

6    entitled to have a conference with Attorney Wedmire and my

7    version is we came to a verbal disagreement and that's the

8    extent of it.

9            I think it's clear from their brief that they don't

10   want me anywhere in the State of Michigan for any reason.  I

11   wasn't that happy with the court.  I mean, there's a parent-

12   teacher conference in Michigan next week.  Am I not supposed

13   to go there not at all?  I mean, it seems to me the

14   appropriate thing to do is call the school and say, can you

15   make arrangements for both parents to meet with you separately

16   so we don't violate the order of protection?

17           My son, ████ is in college in Michigan.  Am I not

18   supposed to go there to visit it?

19           Turning back to more communication, I learned for

20   the very first time this week that my daughter, ████, is in

21   college in Michigan, from a pleading.  Always surprised to

22   learn things through pleadings, and there certainly might be a

23   better way of communicating that.

24           And so what we've got in place now, the State

25   Supreme Court has upheld, at least restrictive means, to



1    protect Ms. Albrecht, but for me to stay 2,000 feet away from

2    the church in Mass. at all times.  So I think as much as I

3    disagree with it, I think I'm bound by that until they say

4    something different.

5              And again, we don't think we should decide

6    attendance in a Michigan courtroom.  They have security.  They

7    have security cameras.  I'm a little upset that they only hold

8    their footage for something like a month.  I would sure love

9    to have the footage of what happened in that courtroom.

10             I believe New Hampshire retains footage for a year.

11   It's hard to get ahold of, as you're well aware.  At least

12   it's retained, so if there was accusations of an altercation

13   here, we will -- I'm very frustrated that we're not able to

14   pull that in Michigan.

15             And I do have to say I was respectfully completely

16   blindsided at the DV hearing.  (Indiscernible) even a month

17   because there's just no mention whatsoever of Michigan in Ms.

18   Albrecht's petition.  The very first time I heard about it was

19   when I walked into the courtroom on November the 28th.  If I'd

20   known that was going to be an issue, I would have at least

21   brought the transcript of the hearing.

22             I got that -- I have some exhibits that are up

23   there.  And if I get this wrong, forgive me, but I started

24   numbering them at 34 because we left off at 33 at the last

25   hearing.  If that's the wrong way to do it, I apologize but it

1   seemed less confusing to me.

2           So we can look at Exhibit 37 which is the transcript

3   of the July 5th hearing.

4           We can look at what I have as Exhibit 38, Michigan

5   order under on jurisdiction.

6           Number 39, the Michigan order, changing case type.

7           Those are the only two orders I'm familiar with.  I

8   understand that Mr. Fontaine, at the August 6th hearing,

9   represented there were some other orders.  So I think even

10  heartening back to the DV, not only do we not agree on what

11  happened in the courtroom on Michigan, and I realize you've

12  reached your conclusion, we don't even agree on what the

13  Michigan court ordered, to date.

14          MR. FONTAINE:  Your Honor, if I can interject.  I

15  have not objected to anything that's been stated so far but I

16  do object to the transcript and to the orders coming in.  I

17  don't know what relevance they have and again, this goes back

18  to my original point in this hearing.

19          I think what word depends on whether he is saying

20  Michigan is the appropriate jurisdiction or not.  He is coyly

21  not stating that to the Court.  Therefore, it's very difficult

22  for us to appropriately address the Court, and we've done so

23  obviously, in our memorandum of law, but it would be nice for

24  us to understand whether he takes the position that Michigan

25  is the appropriate jurisdiction or should be the more

1    appropriate jurisdiction or whether New Hampshire should

2    retain jurisdiction.

3            THE COURT:  So what this hearing is for is for each

4    party to present me the information they think bears on the

5    Court's decision on whether this is still the convenient

6    forum.  Whether this is the appropriate forum to address these

7    issues.  So I'm going to give each party some latitude.

8            However, I do agree with Attorney Fontaine on the

9    issue of relevance here.  And so sir, please explain to me how

10   the transcript from the July 15th, 2021 proceeding in Michigan

11   is relevant to my decision on whether Michigan is the

12   convenient forum.

13           MR. ALBRECHT:  RSA 458:A Section H, the familiarity

14   of the court of each state with the facts and issues and the

15   pending litigation.  I think that transcript speaks very much

16   directly to the familiarity of the Michigan court with the

17   facts and issues in the pending litigation.

18           THE COURT:  Okay.  Well, you kind of submitted out

19   of order the, because that's not where we are right now.

20   We're on the DV portion, okay?  So --

21           MR. ALBRECHT:  Okay.  So --

22           THE COURT:  I understand Attorney Fontaine's -- so

23   I'm going to reserve the issue for that revision if you want

24   to try to submit it then, then we'll address the relevance

25   issue and you can address it then.

1           MR. ALBRECHT:  Okay.

2           THE COURT:  But please your comments and your

3    evidence right now to A, which is the existence of domestic

4    violence, which we're not relitigating.

5           MR. ALBRECHT:  Okay.

6           THE COURT:  That's been decided.

7           MR. ALBRECHT:  Okay.

8           THE COURT:  And then the issue is which state is in

9    the best position -- whether it's New Hampshire or Michigan --

10   and if you want to say California, give me the information

11   which you think California would be --

12          MR. ALBRECHT:  Yeah.  Yeah.

13          THE COURT:  -- which state is best equipped to

14   protect the parties and the children.

15          MR. ALBRECHT:  Okay.

16          THE COURT:  So do you have any information --

17   factual information, evidentiary information that you want me

18   to consider?  Or just legal argument?

19          MR. ALBRECHT:  I would have you consider the

20   transcript on the grounds that I would have submitted it to

21   you at the DV hearing, had I had an opportunity to do so.

22   Other than that, I -- again --

23          THE COURT:  The finding that was made in the --

24          MR. ALBRECHT:  Yeah.

25          THE COURT:  -- February 18th, 2022 hearing --



1           MR. ALBRECHT:  Yeah.

2           THE COURT:  -- that we had --

3           MR. ALBRECHT:  Yeah.

4           THE COURT:  -- was based upon what happened outside

5    the courtroom, not what happened inside the courtroom, right?

6    So for the position of domestic violence, I'm not going to

7    consider the transcript, but I will give you the right to

8    attempt to re-submit it on a later factor, if you think it's

9    relevant towards that issue.

10          MR. ALBRECHT:  All right.

11          THE COURT:  Okay.  But do we have anything else on

12   point A, which is the existence of domestic violence, which is

13   a -- which is a finding?  My understanding, you say that you

14   don't understand what you did wrong.  That's not what I need

15   to consider.  What I need to consider is there is a finding.

16   There is a restraining order in place.  So which state is in

17   the best position to protect the parties and the children?

18   That's my finding I need to make.

19          MR. ALBRECHT:  Do I understand their position

20   correctly that the best way to protect Ms. Albrecht --

21          THE COURT:  How do I know what you understand?  I

22   can't possibly --

23          MR. ALBRECHT:  Okay.

24          THE COURT:  -- answer that.

25          MR. ALBRECHT:  Well, I -- I'm asking Attorney



1   Fontaine if -- because my impression is that their position is

2   the best way to protect Ms. Albrecht is for me to stay out of

3   the State of Michigan all together, just like the best way to

4   protect her before is to never go near the church, and I don't

5   know where -- where she is.  So I don't know if that's their

6   position.

7              THE COURT:  Well, you read their argument --

8              MR. ALBRECHT:  Yeah.

9              THE COURT:  -- right?

10             MR. ALBRECHT:  That's my interpretation of their

11   position, and if I've misinterpreted, I'd like to give them an

12   opportunity to respond.

13             THE COURT:  And what I have from you on that -- let

14   me read back what I have from you on that.  I have that there

15   is a parent-teacher conference next week for ████.

16             MR. ALBRECHT:  Yeah.

17             THE COURT:  And so there is --

18             MR. ALBRECHT:  I think it's next week.  I have to

19   check the calendar.

20             THE COURT:  Next week, okay.

21             MR. ALBRECHT:  Coming up.

22             THE COURT:  Next week that what you told me, that

23   your son ████ is in college in Michigan.

24             MR. ALBRECHT:  Yeah.

25             THE COURT:  That you learned today that your



1  daughter Sophia's in Michigan.

2              MR. ALBRECHT:  Yeah.

3              THE COURT:  And so those are the facts you gave me.

4              MR. ALBRECHT:  Yeah.  That's fair.

5              THE COURT:  Is that correct?

6              MR. ALBRECHT:  Yes.

7              THE COURT:  Did I recite them correctly?

8              MR. ALBRECHT:  Yes.

9              THE COURT:  Okay.  Did I leave anything out?

10             MR. ALBRECHT:  I'm sure when I drive home I'll think

11  of something, but it is what it is.

12             THE COURT:  Okay.  All right.  So anything else on

13  the issue of which state is in the best position to protect

14  the parties and the children?

15             MR. ALBRECHT:  Not that I can think of at this

16  moment, Your Honor.

17             THE COURT:  Okay.  All right.  So I'm going to give

18  Attorney Fontaine his opportunity to provide information on

19  this.

20             I will remind Counsel and his client that it is

21  recording, so if you do speak, you may want to hit that

22  button --

23             MS. ALBRECHT:  Thank you.

24             THE COURT:  -- so this way, it doesn't pick up --

25             MS. ALBRECHT:  Thank you, Your Honor.

1              THE COURT:  -- on the recording.

2              MR. FONTAINE:  Thank you, Judge.

3              THE COURT:  Attorney Fontaine.

4              MR. FONTAINE:  Judge, if I could, and I know this is

5     a little bit out of order, but I'm not sure what order it

6     would be in based on the memo of law that was filed.  So I am

7     going to just address, if the Court gives me just one or two

8     minutes --

9              THE COURT:  On what?

10             MR. FONTAINE:  The issue of California.  Again, I

11    think we got to fit that in.   That's not one of the factors

12    per se, so I guess --

13             THE COURT:  Well, so the issue of California comes

14    in, and the issue is if somehow I -- if he's trying to

15    convince me that California's a convenient forum for this

16    litigation.

17             MR. ALBRECHT:  Okay.  Okay.

18             THE COURT:  And I would think, based on the facts,

19    if I'm correct, you've lived in Michigan for -- she's lived in

20    Michigan for more than two years.  The kids haven't lived in

21    Michigan -- I'm sorry, California for more than two years,

22    correct?

23             MR. ALBRECHT:  Um-hum.

24             THE COURT:  Correct?  Yes?

25             MR. ALBRECHT:  Could you please repeat that?



```
 1                THE COURT:  The kids have not resided in California
 2   for at least two years or more?
 3                MR. ALBRECHT:  Yes.
 4                THE COURT:  Right?
 5                MR. ALBRECHT:  Yeah, starting October 15, 2020,
 6   yeah.
 7                THE COURT:  The Respondent hasn't resided in
 8   Michigan for more than two years -- two years or more?
 9                MR. ALBRECHT:  Yeah.
10                THE COURT:  Correct?
11                MR. ALBRECHT:  Correct.
12                THE COURT:  And so when you're trying to submit
13   evidence, you have to submit evidence to show me that
14   California is the more convenient forum, the more appropriate
15   forum to handle a case where the parties would -- sorry, where
16   the Respondent and the children haven't resided in two years
17   or more.
18                MR. ALBRECHT:  I --
19                MR. FONTAINE:  Your Honor, if I could just correct
20   one thing my client just pointed out.  It's been a year and a
21   half, approximately.  But again, just wanted -- correct,
22   that's --
23                THE COURT:  Well, I guess that's a factual dispute,
24   correct?  So --
25                MR. ALBRECHT:  Yes.
```



1           THE COURT:  -- I know he's saying she's lived there

2    longer --

3           MR. FONTAINE:  In Michigan?

4           THE COURT:  -- in Michigan so --

5           MR. FONTAINE:  Okay.  I guess it --

6           MR. ALBRECHT:  That's a --

7           MR. FONTAINE:  -- doesn't hurt us.

8           THE COURT:  Yeah, that's a factual issue, but for a

9    year and a half to over two years, correct?

10          MR. ALBRECHT:  Yeah.

11          THE COURT:  All right.

12          MR. FONTAINE:  And I just -- one comment on that is

13   the court still has the ability to have original jurisdiction,

14   the court that you suggest transferring it to, and they can't.

15   The parties have not lived in California within the last six

16   months or thereafter and for quite some time.  And so I don't

17   think California can have jurisdiction.  You don't have

18   authority to transfer jurisdiction to them because they can't

19   assert jurisdiction over the parties at this point.

20          THE COURT:  I think the only way California could

21   have jurisdiction is if both New Hampshire and Michigan

22   decline jurisdiction, and so that would be the -- because then

23   there's that catch-all provision in the UCCJEA that says, if

24   no other court with take jurisdiction, we will.  At least,

25   that's what New Hampshire's statute says.

1           MR. FONTAINE:  Yeah.

2           THE COURT:  And so --

3           MR. FONTAINE:  Yeah.

4           THE COURT:  -- I don't see a pathway to California.

5 If it is, it's a very difficult one.

6           MR. ALBRECHT:  Just to respond to that Your Honor, I

7 think to clarify my position at the outset, jurisdiction is

8 not all or nothing.  There's jurisdiction to modify orders.

9 There's jurisdiction to enforce orders.  There is -- you know,

10 again, even RSA 458-A:10, taking testimony in another state.

11 There's jurisdiction just to get some witnesses and

12 depositions.

13           So if we're going to talk about the UCCJEA and

14 jurisdiction, I think we need to say jurisdiction for what.

15 Jurisdiction to modify orders.  Jurisdiction to enforce

16 orders.  You know, New Hampshire can retain original

17 jurisdiction, while California and Michigan can possibly

18 enforce something or facilitate the taking of testimony.

19           THE COURT:  I think you misunderstand the basis of

20 what we're here today about.

21           MR. ALBRECHT:  Possibly.

22           THE COURT:  Yeah, and what we're here today about is

23 which state's going to be issuing orders regarding custody --

24           MR. ALBRECHT:  Okay.

25           THE COURT:  -- determinations.



1              MR. ALBRECHT:  Okay.

2              THE COURT:  And so while California may have

3    jurisdiction to take a deposition --

4              MR. ALBRECHT:  Yeah.

5              THE COURT:  -- or to facilitate a witness'

6    testimony, that's not jurisdiction over the custodial

7    determinations, which is why we're here.

8              MR. ALBRECHT:  Sure.

9              THE COURT:  Okay.

10             MR. FONTAINE:  Thank you.

11             THE COURT:  Attorney Fontaine.

12             MR. FONTAINE:  So the first factor, Judge, whether

13   domestic violence has occurred and is likely to continue in

14   the future and which state could best protect the parties and

15   the child.  That's the first factor, and that's what I'm going

16   to address.

17             THE COURT:  Yes.

18             MR. FONTAINE:  So this Court, as you correctly

19   pointed out, issued which is what is now a final protective

20   order based upon an incident that occurred at a church in

21   Massachusetts.  The incident itself and how it occurred on

22   the -- and the fear it caused to my client, and quite frankly,

23   to the children, is what's relevant, not where it happened,

24   contrary to the argument that he made.

25             That order has been subsequently extended twice.  It

1 | appears that Mr. -- I believe Mr. -- there's been so may
2 | appeals, I lose track, but I believe he's appealed the latest
3 | order of this Court relative to the extension, and that is
4 | pending before the Supreme Court.

5 | I will just say that a lot of the positions he
6 | stated in his presentation on this factor, in fact, I believe
7 | support our position on this, contrary to what he seems to be
8 | saying. This is a matter that has been pending in this court
9 | for six and a half years, as he correctly pointed out. It is
10 | a long, litigious, contested matter, including on the custody
11 | issues. The Court is well aware, as Judge, you got involved
12 | in this a bit later, but you've spent a considerable time
13 | reviewing this file and getting up to speed on it, and you
14 | therefore are well aware of the many orders that came about as
15 | a result of this case, including the domestic violence order
16 | that has now been extended twice.

17 | This is registered in Michigan, as you know how the
18 | registry works. This is registered in Michigan, and Katherine
19 | has confirmed that it's registered there. And she feels that
20 | that state is very capable of protecting her as to this
21 | domestic violence protective order and doesn't feel that the
22 | Court needs to change jurisdiction in any way to effectively
23 | protect her in that regard.

24 | In fact, as we've pointed out in our presentation,
25 | Katherine believes that the transfer of jurisdiction to

1   Michigan will provide the opportunity or the potential of

2   further violations or further harassment to her and to the

3   children.  And for that matter, my client strongly believes

4   that retaining jurisdiction in New Hampshire, despite some of

5   the prejudice to her in doing that, is going to be in the best

6   interest of not only the children, but her as to this domestic

7   violence protective order that is currently in existence.

8           We have pointed out some things in there that, based

9   on your previous orders and the findings that you had in those

10  orders, we've referenced those in pointing out that those

11  orders essentially do reference the fact that his bringing an

12  action out there and the actions that occurred in the

13  courthouse that day did create a violation, did create a

14  situation that caused my client fear.  That's what the facts

15  that you found in your order and that my client testified to.

16          So again, I think there is ample reason under this

17  factor, and this factor supports this court retaining

18  jurisdiction, not transferring jurisdiction to Michigan.

19          THE COURT:  Thank you.

20          MR. FONTAINE:  Thank you.

21          MR. ALBRECHT:  Just -- has it been extended once or

22  twice?

23          THE COURT:  So the extension was sent back for me to

24  review, and so that's what we had the hearing in February

25  about.  So it's been -- that's something the Supreme Court's

1    got to weigh in on, right, I guess, right?

2              MR. FONTAINE:  Well, it may -- whether it's one or

3    two, it's for --

4              THE COURT:  There were two separate hearings.

5              MR. FONTAINE:  -- over two years, as I understand in

6    that.

7              THE COURT:  There were two separate hearings.  There

8    were two separate findings.  The December 16th, 2021, decision

9    from the Supreme Court vacated Master DulPra's finding from, I

10   think, April of '21, somewhere around there, March of '21, and

11   sent it back for a further hearing, which we had in February.

12             MR. ALBRECHT:  But I still don't understand if it's

13   been extended a single time or extended twice?  Has there been

14   one extension or two?  I don't understand, Your Honor.

15             THE COURT:  Okay.  Okay.

16             MR. ALBRECHT:  Could you please help me out there?

17             THE COURT:  All right.  Well, I think you could

18   speak to a lawyer about that.  It's not my job to explain to

19   you the law, but that's what on appeal, Mr. Albrecht.  The

20   Supreme Court vacated the initial extension --

21             MR. ALBRECHT:  Okay.

22             THE COURT:  -- and findings by Master DulPra sent it

23   down for a rehearing.  And I addressed it in my order as to

24   how I approached it so --

25             MR. ALBRECHT:  Was your --

1          THE COURT:  -- I refer you back to my --

2          MR. ALBRECHT:  I --

3          THE COURT:  -- 11-12 page order.

4          MR. ALBRECHT:  I -- again, just, I don't have it in

5     front of me, but I don't understand from your 11- or 12-page

6     order.  Maybe I did if I would read it if it's -- if you were

7     providing a second extension or a first extension.

8          THE COURT:  Um-hum.

9          MR. ALBRECHT:  Because if you were providing a first

10    extension, then what Mr. Fontaine said is inaccurate there's

11    been two extensions.

12         THE COURT:  Okay.

13         MR. ALBRECHT:  And if you were provided that was a

14    second extension of the order and you're just able to tell me

15    that, then there is no confusion.

16         THE COURT:  And how does that weigh on the issue of

17    jurisdiction, Mr. Albrecht?  Whether --

18         MR. FONTAINE:  Well --

19         THE COURT:  -- it was one extension or two

20    extension, how does that weigh on whether which state is in

21    the best position to protect the parties and the children?

22         MR. ALBRECHT:  RSA 458-A, A, whether a domestic

23    violence has occurred.  I mean, is it so bad there's been two

24    extensions, or is it only one extension?

25         THE COURT:  Okay.  So there has been a finding of

1    domestic violence, which remains unchanged.  And there were

2    two separate findings for an extension.  One was vacated, and

3    the other one was issued by me February 25th, I believe.

4              MR. ALBRECHT:  Right, but was that a first extension

5    or a second extension?

6              THE COURT:  Why is that relevant, Mr. Albrecht, to

7    the issue of jurisdiction of -- forum of convenience?

8              MR. ALBRECHT:  It's relevant on whether domestic

9    violence has occurred and is likely to continue because you

10   know, if there's been --

11             THE COURT:  Okay.

12             MR. ALBRECHT:  -- the more extensions you have, it

13   seems the more likely it is to continue.

14             THE COURT:  I disagree.  It's not relevant.  There's

15   been a finding --

16             MR. ALBRECHT:  Okay.

17             THE COURT:  -- and there's been an extension.  And

18   so there is currently a protective order issued.

19             MR. ALBRECHT:  Okay.

20             THE COURT:  And that's the issue.

21             MR. ALBRECHT:  An extension, singular.

22             THE COURT:  Excuse me, sir?

23             MR. ALBRECHT:  An extension, singular, or

24   extensions, plural?

25             THE COURT:  There is a protective order in existence

 1  right now.

 2          MR. ALBRECHT:  Okay.

 3          THE COURT:  All right.  So let's go to the next

 4  issue --

 5          MR. FONTAINE:  Judge, if I could interrupt.  My

 6  client --

 7          THE COURT:  No, I --

 8          MR. FONTAINE:  Sorry, my client just wanted to state

 9  something on the record relative to the domestic violence

10  concern.  I --

11          THE COURT:  Well, she does have counsel, right, and

12  you've agreed to do it by offer of proof --

13          MR. FONTAINE:  Yeah.

14          THE COURT:  -- so she can submit it to you, and then

15  you can relay it.

16          MR. FONTAINE:  Okay.  This is a statement that my

17  client wrote.

18          "I am a victim of domestic violence and have a

19          protective order against Dana" --

20          MR. ALBRECHT:  Objection.

21          MR. FONTAINE:  -- "Albrecht."

22          MR. ALBRECHT:  I haven't seen that.

23          THE COURT:  You haven't seen what?

24          MR. ALBRECHT:  If -- if he's trying to read some --

25  is he submitting that as evidence?  I haven't --

1            THE COURT:  He's making an offer of proof for

2    what --

3            MR. ALBRECHT:  Oh --

4            THE COURT:  -- his client would testify.

5            MR. ALBRECHT:  Okay.  So what --

6            THE COURT:  Which is allowed under --

7            MR. ALBRECHT:  Oh, okay.  Got it.

8            THE COURT:  -- allowed under the rules.

9            MR. ALBRECHT:  Can I have a copy of that, Mike, at

10   least.

11           MR. FONTAINE:  No.

12           THE COURT:  No.

13           Go ahead.

14           MR. FONTAINE:  Thank you.

15           THE COURT:  It's a statement.

16           MR. ALBRECHT:  Okay.

17           MR. FONTAINE:  "I'm a victim of domestic violence,

18           and I Have a protective order against Dana Albrecht

19           for stalking and criminal trespass, which he has

20           already violated.  I've taken great pains to protect

21           myself and physically get away from Dana Albrecht,

22           given his history of stalking me, committing

23           criminal trespass, ignoring court orders, defying

24           police orders, and violating my protective order

25           while in Michigan courthouse.



1          Allowing him to have an excuse to travel to where I

2          live in Michigan in the course of a legal proceeding

3          will not only jeopardize my physical safety but will

4          have a devastating impact on my piece of mind.

5          I am in fear of my safety from Dana Albrecht and do

6          not want the New Hampshire court to give him opening

7          to pursue, intimidate, and harass me in Michigan.

8          The domestic violence extension order found that he

9          is obsessed with me, blames me for things, and is

10          unable to control himself when he does not get what

11          he wants.  The court found that he continues to pose

12          a present, credible threat to my safety.

13          The original domestic violence was issued because

14          Dana Albrecht stalked me and lied in wait for me.  I

15          currently live nearly 1,000 miles always from Dana

16          Albrecht, which provides me with safety and peace of

17          mind since he has no reason to be here and cannot

18          justify traveling here where his presence would be a

19          red flag.

20          If Dana Albrecht is legally permitted to travel to

21          Michigan for court, I will no longer have that

22          safety.  He will have an excuse to be physically

23          proximate to me and present in my surrounding area

24          on a regular basis, which increases the likelihood

25          that he will stalk me, pursue me, physically



1           confront me, and lie in wait in the places I

2           frequent.

3           The original domestic violence protection order

4           found that Dana Albrecht wants me to know that he

5           will track me and the children down and try to

6           confront us wherever we are.  Once he has done that,

7           he will not respect lawful requests from authority

8           figures, and he will push his claims up to the point

9           of a physical confrontation with police.

10          At present, his ability to do that is limited by

11          geography.  Please do not take this protection away

12          from me."

13          THE COURT:  Let me ask you, Attorney Fontaine, did

14   the extension I issued on February 25th prohibit Mr.

15   Albrecht's right to travel?

16          MR. FONTAINE:  No.

17          THE COURT:  And that you would agree that's a

18   fundamental right under the Constitution for a citizen of the

19   United States to travel within the state --

20          MR. FONTAINE:  Yes.

21          THE COURT:  -- within the States?

22          MR. FONTAINE:  Yes.

23          THE COURT:  And that he does have a child who is in

24   school -- a minor child who's in school, and does that order

25   that I issued prevent him from going to her parent-teacher

1 conference?

2          MR. FONTAINE:  I'd have to think about that and look

3 at the order, but I would assume that if it didn't violate the

4 terms of the protective order, if going to that didn't violate

5 the terms of the protective order, then probably not.

6          THE COURT:  Okay.  All right.  Thank you.

7          So we're going to the next provision, which is the

8 length that the child has resided outside the state.   I

9 reviewed Mr. Albrecht's memorandum, which indicated that the

10 children have lived outside the state since September of 2017.

11          I think that's an agreement, correct, Attorney

12 Fontaine?

13          MR. FONTAINE:  Yes.  Yes, it is.

14          THE COURT:  All right.  And that's an --

15          MR. ALBRECHT:  Yes.

16          THE COURT:  -- agreement, sir?

17          MR. ALBRECHT:  Yes.

18          THE COURT:  So they've lived outside of New

19 Hampshire for right around five years -- five years and a

20 month, a few weeks?

21          MR. FONTAINE:  Correct.

22          THE COURT:  Okay.  All right.  So anything else, Mr.

23 Albrecht, on the issue of B, which is the length of the time

24 the child has resided outside the state?

25          MR. ALBRECHT:  I mean, just for the record, I think



1    we should point out how many times they've moved, but --

2              THE COURT:  Okay.

3              MR. ALBRECHT:  -- you know, they've moved once to

4    Pasadena.  Nine months later, again within California.  And

5    then most recently, to Michigan October 2020.  So we've got,

6    you know, three years in California and then the two years in

7    Michigan.

8              THE COURT:  All right.  Attorney Fontaine, do you

9    have anything on B?

10             MR. FONTAINE:  What's that, Judge?

11             THE COURT:  Do you have anything on B?

12             MR. FONTAINE:  Yeah.  Yes, just very briefly.  My

13   client is concerned that he is misrepresenting to the Court

14   for some purpose the actual date she's relocated to Michigan.

15   And she --

16             THE COURT:  Um-hum.

17             MR. FONTAINE:  -- wants stated for the record that

18   it was --

19        (Counsel and respondent confer)

20             MR. FONTAINE:  -- '21 that she relocated her

21   residence to Michigan, not prior to that.

22             THE COURT:  Okay.  But she was spending time in

23   Michigan prior to that, correct?

24             MR. FONTAINE:  She had visited, yes, and she had

25   purchased a home but had not changed her residence.

1              THE COURT:  Okay.  Mr. Albrecht.

2              MR. ALBRECHT:  I think we've got Exhibit 35 as --

3    that I marked as 35 is an email change between counsel that

4    pretty much indicates where she was, when she moved, how I

5    found out Ms. ███████ was in the emergency room from a close

6    head injury, and it took me a week to find out that the

7    emergency room was in Michigan and not California.  I just

8    assumed it was in California because I thought that's where

9    they lived.

10             THE COURT:  Okay.  Any objection to which would be

11   Exhibit 1 if I allow it?

12             MR. FONTAINE:  Judge, this issue has been addressed

13   numerous times, including in front of you.  And there's been

14   testimony.  I don't want to have to have my client testify

15   again, but I think it's -- my client wants to testify again on

16   this point.  If this is going to be an issue, if this is going

17   to be a dispute, my client would like to clarify exactly when

18   she moved her residence for the record.

19             THE COURT:  Okay.  I'll allow it.

20             MR. FONTAINE:  Okay.  Speak.

21             THE COURT:  You should go to the stand.  We can help

22   you over to the --

23             MR. FONTAINE:  Go up to the -- go up to the witness

24   stand.

25             THE COURT:  She's already under oath.



1          I'm going to allow the January 20th, 2021 email as

2    Exhibit 1.

3          (Petitioner's Exhibit 1 received)

4           KATHERINE ALBRECHT, RESPONDENT, PREVIOUSLY SWORN

5              MR. FONTAINE:  Remind you're under oath.

6              THE WITNESS:  Yes.

7                         DIRECT EXAMINATION

8    BY MR. FONTAINE:

9      Q   Will you please explain to the Court when you

10   relocated your residence to Michigan?

11     A   So if I can just discuss the timeline --

12     Q   I will ask you questions about that.  Just answer that

13   question first.

14     A   I see.  So we became formal, official residents of

15   Michigan I want to say on March 1st of 2021 when --

16     Q   Up until that time, did you continue to retain your

17   residence for legal purposes in California?

18     A   So I had a lease in California of our home.  All of my

19   property, other than, like, a few basic items of furniture,

20   were still in California.  Our clothing and belongings were in

21   California.

22          I -- my children were attending school in California

23   remotely because as the Court will recall, that was during

24   COVID and people were on Zoom.  So my children were attending

25   school in California.  My older daughter was at Maranatha High

1    School remotely.  My younger daughter was at Flintridge high

2    school remotely.  I was paying tuition to California schools.

3         I was -- we had California health insurance, which

4    actually was a problem in the issue that Mr. Albrecht

5    continues to raise, which is that when my daughter was injured

6    in January, while we were at our vacation home in Michigan,

7    the California insurance that we had didn't even cover the

8    expenses of her injuries because we were California residents

9    with California insurance and the injury occurred in Michigan.

10   Q   Okay.  At some point in time prior to you relocating

11   your residence, did you purchase a property in Michigan?

12   A   Yes, I did.

13   Q   Okay.  And was it purchased initially as a second

14   home?

15   A   It was.

16   Q   Did you ultimately make a decision after being there

17   for a period of time that you wanted to relocate your

18   residence to Michigan?

19   A   I did.  Can I discuss how that occurred, please?

20   Q   Very briefly.

21   A   So briefly, in the summer of 2020 when everyone was in

22   lockdown and no one could travel, the children and I visited

23   our friends the Dashbys (phonetic), who I've known for many

24   years, in Michigan.  We had not previously had an opportunity

25   to visit them.  The kids and I actually really liked Michigan.

1   And in a vacation town, we discovered that property, instead

2   of being over a million dollars like it was in California were

3   we had to rent, could be obtained for about 100,000 dollars.

4        And so we decided amongst ourselves to purchase a

5   vacation home there so we could visit the Dashbys when we

6   wanted to and so that we would have a place to escape the

7   oppression of California at that time during lockdown, George

8   Floyd riots, wildfires, and a number of other things that were

9   making California a very inconvenient and horrific place for

10  us to be.

11       So when we purchased that vacation property, we said,

12  well, why don't we go, since you guys are doing remote Zoom

13  schooling, and just hang out there.  We could have

14  Thanksgiving with the Dashbys and Christmas with the Dashbys

15  because my mother has passed away.  We have --

16  Q   Okay.  Let's --

17  A   -- pretty much no family --

18  Q   Again, this is not -- you made your point.

19  A   -- so we went out there, and we -- we went out there.

20  We took just enough things to furnish the house so we could

21  have a sofa and a table and some dishes.  So we took minimal

22  amounts of things to furnish our vacation home.  We went

23  there.

24       We spent Thanksgiving and Christmas with the Dashbys.

25  And it was at that point that we all mutually decided that we

1    actually liked Michigan better than California.  And so when

2    my lease was up in February, a month before it was going to be

3    up, I informed your office and Wendy that we would like to

4    move to Michigan.

5          And at that point, I asked your office to ask

6    permission of or inform -- I didn't know if I needed Dana's

7    permission, but I said, could you please inform him that

8    within 30 days when our lease is up, we would like to transfer

9    our living space to Michigan where we've been and actually

10   really like it here.  So it was during COVID and people were

11   living in all different places and LA was terrible.

12   Q   Okay.  And did you follow through with that and

13   actually relocate your legal residence in February --

14   A   I did.

15   Q   -- of 2021?

16   A   After giving him 30 days and he did not object, so we

17   relocated our residence.  I enrolled our children after that

18   in local schools where they could attend in person instead of

19   through Zoom.  And I then went on to get our cars registered

20   and my driver's license and Michigan insurance and make all

21   the changes.  But none of that happened before I changed my

22   residence in the spring of 2021.

23   Q   And at that time, you also changed the schools for the

24   children?

25   A   Correct.



1     Q   Okay.  So it's your position that you did not change

2   your residence from California to Michigan until February of

3   2021; is that accurate?

4     A   That is absolutely accurate.

5         MR. FONTAINE:  Nothing further.

6         THE WITNESS:  Thank you.

7         MR. ALBRECHT:  Cross?

8         THE COURT:  Yeah, please.

9                    CROSS-EXAMINATION

10  BY MR. ALBRECHT:

11    Q   So you do acknowledge at the November 6th, 2020,

12  hearing that you testified under oath, to paraphrase, I reside

13  at 730 West Alegria Avenue, Sierra Madre, California; is that

14  correct?

15    A   I was physically there when I testified that --

16    Q   It's a simple --

17    A   -- and that was my home, yes.  That was my --

18    Q   It's just a simple "yes" --

19    A   -- legal residence on my driver's license.

20        THE COURT:  No.

21    A   So I did say that.

22        THE COURT:  So the way the cross works in family,

23  she's allowed to explain her answer.  Okay.

24        MR. ALBRECHT:  Okay.  Forgive me, Your Honor.

25        THE COURT:  So please respond, ma'am, again.

1    A   So --

2           THE COURT:  So which he asks --

3    A   -- in November of 2020, I was physically in Sierra

4    Madre, California, in my home during that hearing, which I

5    clearly remember because it was on Zoom.  And I truthfully

6    testified that I resided there because that was my home, and

7    at that point I had no intention, actually, of moving.  That

8    actually happened after Christmas when the Dashbys and I had

9    that conversation.

10   So I was physically in California, and I stated my

11   address because I didn't want to lie and state a different --

12   I mean, I wasn't even lying, though.  To have stated a

13   different address would have been an inaccurate statement, and

14   it didn't even cross my mind to say I lived in Michigan

15   because I didn't.

16   BY MR. ALBRECHT:

17   Q   But you had purchased a vacation home with intent to

18   travel -- how many vacations to Michigan per year at that time

19   did you intend?

20   A   So --

21          MR. FONTAINE:  She just as -- I don't think she

22   testified how often she intended, and this is

23   cross-examination.

24          THE COURT:  Well, he's allowed to expand on cross.

25          Go ahead.



1      A   I'm sorry.  Could you repeat the question?

2    BY MR. ALBRECHT:

3      Q   So in November, it's just a vacation home.  So my

4    first question is how much, roughly, did that cost as a

5    vacation home?

6      A   I'm sorry, how much what?

7      Q   How much it costs as a vacation home?

8      A   It was 158,000 dollars.

9      Q   Okay.  And so if you have a vacation home in Michigan,

10   then presumably, you intend to take vacations there.  So the

11   question is how many vacations you intended to take --

12     A   Well, Michigan --

13     Q   -- per year?

14     A   -- is very nice in the summer, and it's a wonderful

15   place to be in the summer.  Having lived there through the

16   winter, it's a little harsh.  So I -- I don't know that I

17   would have even known the answer to that until I spent time

18   there.

19     Q   Okay.  So my next question, so this harkens back to

20   Exhibit 25 from the last hearing, and just for the record, on

21   June 30th, 2022, which is the police report of the automobile

22   accident that          got in on December 16th, 2020.

23         Do you agree that          got in an automobile accident

24   on December 16th, 2020, in Michigan?

25     A   So          learned to drive in California.  We were in

1    Michigan --

2              THE COURT:  So just a yes or no, ma'am.

3         A   -- and he --

4              THE COURT:  Yes or no.

5         A   -- slipped on the snow and had --

6              THE COURT:  Ma'am.  Ma'am.

7         A   -- an automobile --

8              THE COURT:  Ma'am.

9         A   -- slid off the road, so yes.

10             MR. ALBRECHT:  Okay.

11             THE COURT:  You need to respond yes or no, and then

12   you can explain.

13             THE WITNESS:  I'm sorry.  Thank you, sir.

14             MR. ALBRECHT:  Okay.  Thank you.  I've had for yes

15   or no and then elaboration.

16             THE COURT:  Please.

17             MR. ALBRECHT:  Anyway.  Okay.  Sorry.

18             THE COURT:  Please, Mr. Albrecht --

19             MR. ALBRECHT:  Sorry.  Sorry.  Sorry.

20             THE COURT:  -- continue.

21   BY MR. ALBRECHT:

22        Q   So concerning the lease of the property at 730 West --

23        A   Alegria --

24        Q   -- Alegria Avenue, your sister Laura lived with you at

25   the time.  So it was Laura and ▮▮▮ and ▮▮▮ and ▮▮▮ all

1    November 6th living at that residence?

2        A   Well, ███, ███, ███, and I were in Michigan at

3    the time that you're referring to.

4        Q   No, I'm referring at the time when you testified, the

5    November 6th, 2020, hearing.

6        A   Yes.

7        Q   Okay.  So just again, to clarify, November 26th, you,

8    ███, ███, ███, and your sister Laura are present in the

9    home?

10       A   My sister Laura took over my lease, I believe, the

11   day -- and I didn't come prepared to know these exact dates,

12   but I believe it was March 1st, 2021, when my sister formally

13   took over my lease.  And she did stay in the house while we

14   were in Michigan.

15       Q   Okay.  So she's still living in the same house.  The

16   lease to your sister; that's correct?

17       A   I'm sorry?

18       Q   I'm just making sure I understood it correctly.  So

19   she's still living in the same house, and the lease got

20   transferred to her?

21       A   So when we moved to Michigan --

22           THE COURT:  It's a yes or no, ma'am.

23       A   I'm not sure I understand the question.  I'm sorry.

24   BY MR. ALBRECHT:

25       Q   I'm just trying to make sure I --



1           THE COURT:  How is this relevant, Mr. Albrecht?

2           MR. ALBRECHT:  It's what she testified to.  I just

3    want to make sure I understand her testimony correctly.

4    That's all.

5           THE COURT:  Okay.  But --

6           MR. ALBRECHT:  If not, I can move on.

7           THE COURT:  Yeah.  Thank you.

8    BY MR. ALBRECHT:

9       Q   Okay.  So what does formal -- you said you -- on

10   March, you changed your residence.  You formally and

11   officially in Michigan.  Could you just tell me what formal

12   and official means?

13      A   Well, first of all, I can't testify to the exact date

14   because I didn't come prepared to say that.  I'm sure Wendy

15   can tell us because she's the one who sent you the notice in

16   advance telling you that I was intending to move within 30

17   days when my lease was up.  And so Wendy would know that date.

18   I believe that my lease was up February 28th, but I do not

19   recall the exact date.

20      Q   I'm less interested in the exact date as to questions

21   what does formal and official mean?

22      A   So I don't know that there's, like, a registration in

23   the state where you tell them where you live, but we made a

24   decision.  I guess the formal and official decision was the

25   one that we made when we informed you that I had made the

```
 1   formal and official decision to move to Michigan.  And after

 2   that date, I enrolled the children in Michigan schools as a

 3   resident of Michigan.

 4       Q   So formal and official is when you told me after I

 5   learned about the ER visit?

 6       A   I don't understand what you're saying.

 7       Q   Well, I'm referring to Exhibit 35, the email chain

 8   between counsel.  And if I could maybe --

 9           THE COURT:  Just want to remind the parties, we have

10   three hours and that's it.  So --

11           MR. ALBRECHT:  Yeah.

12           THE COURT:  -- if you want to continue this line of

13   questioning and take time away from your rest of your

14   presentation, that's fine, but just be mindful that we do have

15   limited time.  We don't have to break.  We'll work through the

16   break.  But please be efficient in your management of time.

17           MR. ALBRECHT:  Never one of my strong suits, Your

18   Honor.

19   BY MR. ALBRECHT:

20       Q   There are also --

21           MR. ALBRECHT:  Never mind.

22       So then the January 20, '21st email chain between

23   counsel, I'm going to interpret -- and that was marked as --

24           THE COURT:  Exhibit 1.

25           MR. ALBRECHT:  Okay.  Is when I was notified and how
```

1    I was notified, and that's what it means for formal, official

2    is when you told me -- no further questions on this issue,

3    Your Honor.  If she's got --

4              THE COURT:  Okay.

5              MR. ALBRECHT:  -- something else then --

6              THE COURT:  All right.

7              MR. ALBRECHT:  Yeah.

8              THE COURT:  Thank you.

9              Ms. Albrecht, when did you purchase the house in

10   Michigan?

11             THE WITNESS:  He knows the date probably better

12   than me.  It was -- I thought it was late September.  I know I

13   was in negotiations --

14             THE COURT:  All right.

15             THE WITNESS:  -- in September, and I guess the

16   official date was October 15th, according to Mr. Albrecht,

17   (indiscernible) this closely.

18             THE COURT:  And after the purchase date, sometime in

19   September of 2020, how many times did you travel to Michigan

20   to visit the house -- to stay in the house?

21             THE WITNESS:  Well, we traveled out there together

22   to get away from COVID and stay in the house.

23             THE COURT:  How many times?

24             THE WITNESS:  We literally went, and then we decided

25   to hang out.



 1                    THE COURT:  Okay.

 2                    THE WITNESS:  And spent Thanksgiving and Christmas

 3     with our friends who invited us to say.  And there was no

 4     reason for us to go back.

 5                    THE COURT:  Okay.  So when did you go out to

 6     Michigan then?  So you went once.  When was that?

 7                    THE WITNESS:  Sometime in October.

 8                    THE COURT:  So you flew out to Michigan sometime in

 9     October of 2020?

10                    THE WITNESS:  We drove.

11                    THE COURT:  You drove?

12                    THE WITNESS:  Yeah --

13                    THE COURT:  And you didn't -- and you didn't return

14     to California?

15                    THE WITNESS:  We did not.

16                    THE COURT:  Okay.  All right.

17                    THE WITNESS:  That was a choice because of COVID.  I

18     don't think it would have been that way had it not been COVID

19     and my kids been in school in person.  But they were in school

20     remotely.

21                    THE COURT:  Okay.

22                    THE WITNESS:  And they didn't want to go back to

23     California.

24                    THE COURT:  And they stayed enrolled in California

25     schools --



52

```
 1                    THE WITNESS:  California schools until March.
 2                    THE COURT:  Until March?
 3                    THE WITNESS:  Yeah.
 4                    THE COURT:  Okay.
 5                    THE WITNESS:  And I had to pay a whole year of
 6      tuition for them, too, because of the contract.
 7                    THE COURT:  Attorney Fontaine, do you have anything
 8      else?
 9                    MR. FONTAINE:  No, Your Honor.
10                    MR. ALBRECHT:  Your Honor, I do, based on your line
11      of questioning.
12                    THE COURT:  Okay.  Go ahead.
13                          RECROSS-EXAMINATION
14      BY MR. ALBRECHT:
15         Q   So I just heard you testify that in October you drove
16      out to Michigan, and you didn't come back; is that correct?
17         A   That's correct.
18         Q   And you decided you just wanted to hang out with
19      Tiffany (phonetic) -- with the Dashbys and that's how you made
20      the decision?
21         A   So my mother had just died in 2019, and yes, I did
22      want family.  And so --
23         Q   Okay.
24         A   -- I wanted my kids to have Thanksgiving and Christmas
25      with our friends, and that's what we did.
```



```
1                 MR. ALBRECHT:  Okay.  Your Honor --

2                 THE COURT:  Please, Mr. Albrecht.  No, let her

3     finish her statement before you interject.  She deserves that

4     curtesy, as you would as well, okay.

5                 Any other questions?

6                 MR. ALBRECHT:  If I may approach, Your Honor, the

7     bench or Ms. -- the witness?  I have just a question about

8     this.  Or if the bailiff would prefer to do it?

9                 THE COURT:  Yeah.  Court Officer, could you please

10    give the exhibit to Ms. Albrecht.  Oh, the document?

11                MR. ALBRECHT:  Yeah.

12                THE COURT:  What is it?  Show it to Attorney

13    Fontaine first.

14                MR. FONTAINE:  Yeah, I'd like -- can I have an offer

15    of proof --

16                THE COURT:  Yeah.  Yeah.

17                MR. FONTAINE:  -- as to what relevance this has as

18    to your line of questions?

19                MR. ALBRECHT:  Why she's in Michigan because we just

20    discussed Tiffany Dashby, and her name's on the cover so --

21                THE COURT:  So your questioning is limited to mine.

22                MR. ALBRECHT:  Right.

23                THE COURT:  And my question was, when did she drive

24    out there, and she said October of 2020.

25                MR. ALBRECHT:  And she was --
```

 1              THE COURT:  So what does that -- what does that have

 2    to do with when she went out to Michigan?

 3              MR. ALBRECHT:  You asked when she stayed and she

 4    answered something about Tiffany Dashby, and that's directly

 5    relevant to the Dashbys.

 6              THE COURT:  Attorney Fontaine.

 7              MR. FONTAINE:  Again, I don't that's as a valid

 8    offer of proof as to relevancy.  I mean, just because she

 9    wrote a book that he's handing to her, that --

10              THE COURT:  Yeah, I don't --

11              MR. ALBRECHT:  I just heard she stayed Michigan

12    because of a conversation at the Dashbys and never went back

13    to California.  And that's the Dashbys, and that's the

14    relevancy.

15              THE COURT:  So the fact that one of the Dashbys

16    wrote a book is relevant how?

17              MR. ALBRECHT:  Well, in the first place, it cuts to

18    the theme of why they're in Michigan in the first place.  It

19    cuts to the theme of this entire course of our dispute over

20    religion.  And I would just ask you take it and give it

21    whatever weight you think it deserves.

22              THE COURT:  Attorney Fontaine.

23              MR. FONTAINE:  Again, I just don't think there's any

24    relevancy that's been spelled out here.

25              MR. ALBRECHT:  You know, again, Your Honor, if you

1  determine there's no relevancy after you --

2          THE COURT:  I don't understand what relevancy the

3  Dashbys have to whether New Hampshire or Michigan is a

4  convenient forum so --

5          MR. ALBRECHT:  I think we --

6          THE COURT:  -- I'm going to sustain the objection.

7          MR. ALBRECHT:  We can get to that, I guess, when it

8  comes to witnesses and --

9          THE COURT:  Thank you.

10          MR. ALBRECHT:  -- testimony which is --

11          THE COURT:  All right.

12          MR. ALBRECHT:  Yeah.

13          THE COURT:  Do you have any other questions based on

14  my line of questioning?

15          MR. ALBRECHT:  No.

16          THE COURT:  All right.  Ma'am, you may step down.

17          MS. ALBRECHT:  Thank you.

18          THE COURT:  All right.  So that's it on B, correct,

19  Attorney Fontaine?  You're still --

20          MR. FONTAINE:  I didn't really even make my

21  presentation in the beginning.

22          THE COURT:  Well, I mean --

23          MR. FONTAINE:  Can I just -- very briefly.  It will

24  be --

25          THE COURT:  All right.



1          MR. FONTAINE:  -- very brief.

2          The length of time that the child in question,

3    ███, lived in the State of New Hampshire is 11 years.

4          THE COURT:  Okay.

5          MR. FONTAINE:  She lived in New Hampshire for 11

6    years.  This matter, which has been pending for about five

7    years since the orders were issued by the Court on -- final

8    orders issued on parenting, since then, all the orders, all

9    the litigation regarding parenting has occurred in this state.

10   And it has, up to this point in time, never interfered with

11   Mr. Albrecht's ability to present his positions, presents his

12   evidence, and in fact, Mr. Albrecht has never filed anything

13   to request a relocation of the jurisdiction to Michigan, or

14   California, for that matter.  And so I think those are both

15   extremely relevant on this issue.

16         At best, it's neutral, meaning it doesn't favor one

17   or the other, or I would argue it might even favor my client

18   given the length of the litigation and post-final parenting

19   litigation that's occurred in this matter being for five years

20   in this state.

21         THE COURT:  Let me ask you, Attorney Fontaine, how

22   many visits has ███ had with Mr. Albrecht in New Hampshire

23   since September of 2017?

24         MR. FONTAINE:  I wouldn't be able to answer that

25   without consulting.  I don't know.

1             THE COURT:  Do you mind consulting?

2             MR. FONTAINE:  Sure.

3             THE COURT:  You may want to hit the button, Attorney

4    Fontaine, so it doesn't pick up.

5         (Counsel and respondent confer)

6             MR. FONTAINE:  My client's best recollection is that

7    the visits that he did have were in California.  And there was

8    a visit that he had per Master DalPra's previous order in New

9    Hampshire, I think, to come to dinner at a Chinese restaurant

10   if I recall.

11            THE COURT:  That was in 2021, right, the summer of

12   '21?

13            MR. FONTAINE:  I believe so.

14            THE COURT:  And it was a -- I think the prior visit

15   before that was in December of '18?

16            MR. FONTAINE:  Yes.

17            THE COURT:  Right?

18            MR. FONTAINE:  Yes.

19            THE COURT:  Am I correct, Mr. Albrecht?

20            MR. ALBRECHT:  Yes, and you know, the transcript of

21   that hearing where it talks about the restaurant and whatever

22   is included in the stuff I gave you if you, again, need any

23   information.

24            MR. FONTAINE:  Can he speak up?  I'm having a hard

25   time hearing.



1          MR. ALBRECHT:  I'm just pointing out that there --

2    the transcript of what was just discussed was provided to you.

3          MR. FONTAINE:  Okay.

4          THE COURT:  All right.  And so since 2017,

5    approximately two visits have been in New Hampshire with

6    █████?

7          MR. ALBRECHT:  I didn't see them at all -- till

8    after Christmas 2018, I didn't see them at all until that

9    summer.  We showed up in a parking lot.

10         THE COURT:  I'm so sorry.  I'm just --

11         MR. ALBRECHT:  Yeah.

12         THE COURT:  -- just like with Ms. Albrecht when I

13   said, yes or no, has there been about two visits in New

14   Hampshire since 2017?

15         MR. ALBRECHT:  Since 2018, I would say yes.

16         THE COURT:  Okay.

17         MR. ALBRECHT:  Going back before that, I need to

18   check my --

19         THE COURT:  Okay.

20         MR. ALBRECHT:  -- recollection and memory.

21         THE COURT:  So since 2018, there's been two visits

22   in New Hampshire?

23         MR. ALBRECHT:  Yeah.

24         THE COURT:  Attorney Fontaine, I think it's

25   uncontroverted for both of you.  She's going to school --

1      ███████ is going to school in Michigan, correct?

2              MR. FONTAINE:  Yes.

3              MS. ALBRECHT:  Yes.

4              THE COURT:  Right, sir?

5              MR. ALBRECHT:  Yes.

6              THE COURT:  Her medical providers are in Michigan?

7              MS. ALBRECHT:  Yes.

8              MR. ALBRECHT:  Yes.

9              THE COURT:  Her counselor's in Michigan?

10             MS. ALBRECHT:  Yes.

11             MR. ALBRECHT:  No.

12             THE COURT:  Her counselor is not in Michigan?

13             MR. ALBRECHT:  Her current one may be, but for

14     the -- up until August, her -- when she was in -- August 2021,

15     in the transcript of the August 2021 hearing, we're still

16     talking about her counselor who's in California, Denise

17     Ballnik.

18             THE COURT:  Okay.  So her current counselor is in

19     Michigan?

20             MR. ALBRECHT:  The last I heard, I'm not even sure

21     if she's still with renew a counselor.  I said at the

22     beginning, part of the issue is there's no communication, and

23     I don't get information.

24             THE COURT:  Let me phrase it this way.  Her most

25     recent counselor is from Michigan?

1            MR. ALBRECHT:  That I know about.

2            THE COURT:  Okay.  Right?

3            MR. ALBRECHT:  That I know about.

4            THE COURT:  All right.  Is she still attending

5    counseling, ma'am?

6            MS. ALBRECHT:  She is currently not attending

7    counseling --

8            THE COURT:  Okay.

9            MS. ALBRECHT:  -- at her request.

10           THE COURT:  When did she stop?

11           MR. FONTAINE:  Stand up when you talk.

12           MS. ALBRECHT:  I'm sorry, sir.

13           THE COURT:  And just louder so we can pick it up.

14           MS. ALBRECHT:  At the end of the last school year,

15   before the summer --

16           MR. FONTAINE:  State --

17           MS. ALBRECHT:  -- or during the summer.

18           MR. FONTAINE:  State what you just said --

19           THE COURT:  So this year, June of 2022?

20           MS. ALBRECHT:  Yes.

21           THE COURT:  But that counselor was in Michigan?

22           MS. ALBRECHT:  So that counselor was in Michigan,

23   and then we had summer vacation.  She wanted a break, and we

24   have not yet resumed at her --

25           THE COURT:  Okay.



1              MS. ALBRECHT:  -- request --

2              THE COURT:  Okay.

3              MS. ALBRECHT:  -- because she is -- yeah so --

4              THE COURT:  All right.  So Mr. Albrecht, this is a

5  good time for me to raise what's going on with family system

6  counseling.  Last time, I understood California was not -- the

7  counselor in California would not provide services because no

8  one lived in California.  What's the status with family

9  systems counseling?

10             MR. ALBRECHT:  No, they wouldn't provide services

11  because they weren't available.

12             THE COURT:  Okay.

13             MR. ALBRECHT:  The trouble is, Your Honor, getting

14  in to see anybody.  And --

15             THE COURT:  Have you looked for anyone in Michigan?

16             MR. ALBRECHT:  Unfortunately, I have not had an

17  opportunity -- I mean, I've put some phone calls in, but

18  that's it.  People don't return my calls.

19             THE COURT:  Okay.  And have you looked for anyone in

20  New Hampshire?

21             MR. ALBRECHT:  I've been given a couple suggestions.

22  The person I am seeing, Kate Ledoux, who's a recommendation of

23  the kids' prior pediatrician the whole time they grew up,

24  might be available to do something.  So I'm happy to explore

25  that as an option.

1                THE COURT:  Okay.  All right.

2                MR. FONTAINE:  Judge, if I can comment on that.

3                THE COURT:  Yeah, you may go ahead.  Go ahead,

4    Attorney Fontaine.

5                MR. FONTAINE:  Thank you, Judge.

6                Your order specifically referenced the previous

7    order of the California counselors.  My client just wants the

8    Court to be aware that if, in fact, there was any suggestion

9    that we going to be picking counselors elsewhere, we would

10   want to be heard on that.

11               THE COURT:  Okay.

12               MR. FONTAINE:  My client would like some involvement

13   in the choice of the counselor --

14               THE COURT:  Oh, absolutely.  Yeah.

15               MR. FONTAINE:  -- and the right to object to --

16               THE COURT:  Has she done any investigation as to --

17               MR. FONTAINE:  She hasn't because we were --

18               THE COURT:  Okay.

19               MR. FONTAINE:  -- assuming that he was -- it was in

20   his hands at this point, and we hadn't heard anything.

21               THE COURT:  Okay.  That's fair.

22               Mr. Albrecht, briefly, because we're got to move on.

23               MR. ALBRECHT:  Just, why did ████ stop counseling?

24   I -- and how come I wasn't notified of that?

25               THE COURT:  I heard the testimony was she asked not



1    to go back.  They stopped for the summer.  So that can be

2    addressed outside of this.  This isn't my time --

3              MR. ALBRECHT:  Okay.

4              THE COURT:  -- to coparent with you two --

5              MR. ALBRECHT:  Okay.

6              THE COURT:  -- as I determine jurisdiction.

7              So the next one is the distance between the courts

8    in this state and the court in the state that would assume

9    jurisdiction, which I think Attorney Fontaine and I both share

10   that it would be Michigan, but I'm here to hear your

11   opportunity of why you think California would be even

12   statutorily authorized to assume jurisdiction.  But so let's

13   address C.

14             MR. ALBRECHT:  So just as a preliminary matter,

15   there's a scrivener's error in paragraph 41 of my memorandum.

16   It should read, while California is geographically further

17   from New Hampshire than Michigan.  So all I just point out is,

18   yes, Michigan's geographically closer, but my position would

19   be if people have to hop planes to go somewhere that there's

20   not a huge difference between the hassle of getting from

21   Michigan to Boston or the hassle of getting from California to

22   Boston.

23             And again, on jurisdiction, I'm just coming back to

24   it being an -- it's not an all-or-nothing matter.  Other than

25   that, nothing further on C, Your Honor.

64

```
1                    THE COURT:  Okay.  Thank you.

2                    Attorney Fontaine.

3                    MR. FONTAINE:  Thank you.

4                    My client has litigated this case, this custody

5      matter and parenting matter, for over five years.

6                    THE COURT:  I think that's for later in your

7      presentation.

8                    MR. FONTAINE:  No, but I just wanted to point that.

9                    THE COURT:  Okay.  Yeah.

10                   MR. FONTAINE:  And she's the only one, quite

11     frankly, that would be prejudiced by the relocation in this

12     matter.  Mr. Albrecht right now has lived --

13                   THE COURT:  Well, why don't you save that one

14     because I have questions for that --

15                   MR. FONTAINE:  Okay.

16                   THE COURT:  That one, too --

17                   MR. FONTAINE:  Okay.

18                   THE COURT:  -- that I want to address, but I don't

19     think it's appropriate here.

20                   MR. FONTAINE:  Okay.

21                   THE COURT:  But --

22                   MR. FONTAINE:  So I guess my point on this is my

23     client's position is let's not change anything, and therefore

24     there would be no concern about the distance for Mr. Albrecht.

25     It would only be my client's concern, and she's obviously
```



 1    willing to assume that responsibility.

 2              THE COURT:  Actually, I just looked.  You did raise

 3    that in C.  So I apologize.

 4              MR. FONTAINE:  Yeah.  Yeah, no problem.

 5              THE COURT:  So go ahead, Attorney Fontaine.

 6              MR. FONTAINE:  And I just -- again, I think the

 7    issue is that this matter has been going on five years.  My

 8    client is comfortable with this court retaining jurisdiction,

 9    this matter staying here, and therefore the distance factor,

10    if anything, is in favor of it staying here at this point.

11    Again, it would be helpful if we knew his position as to

12    Michigan, but we don't so --

13              THE COURT:  Okay.  Well, let me -- these are the

14    questions I had for you, Attorney Fontaine, on this issue

15    because --

16              MR. FONTAINE:  Sure.

17              THE COURT:  -- you raised it is that I don't see

18    it -- and you tell me how I'm wrong.  I don't see that it only

19    affects your client.  I see it affecting        .  Right.  Part

20    of the motion that your client filed to appear telephonically

21    included that she's in school, you want to take her out of

22    school, and so she's in Michigan, correct?

23              MR. FONTAINE:  Yes.

24              THE COURT:  And so why wouldn't I factor in the fact

25    that the person whom we're here to discuss and here to make

1   decisions for, who will be 16 coming up in six weeks so --

2   eight weeks, why shouldn't I factor in the fact that she is in

3   Michigan, and it's much harder for her to participate in any

4   proceedings if, for example, if a judge wanted to interview

5   her, to do it in Michigan as opposed to New Hampshire?

6           MR. FONTAINE:  Well, first of all, I guess on that

7   point, yes.  Obviously, it's a closer distance for ▆▆▆ to --

8   if she were -- if the case was in Michigan to --

9           THE COURT:  Sure.

10          MR. FONTAINE:  -- go to the court in Michigan.

11  However, the Court has not ruled up to this point, and we even

12  asked for it, that ▆▆▆ would be interviewed.

13          THE COURT:  Um-hum.

14          MR. FONTAINE:  He objected to it, as I recall.

15          THE COURT:  Um-hum.

16          MR. FONTAINE:  And so that has not been a factor

17  that we've even considered in this matter based on the Court's

18  ruling.  If, in fact, that happens, then my client is fully

19  prepared to do whatever it takes, and we work with the Court,

20  too, to try to minimize any effect on her school or whatever,

21  as I'm sure the Court would do.

22          But the traveling from Michigan to New Hampshire,

23  she's done several times.

24          THE COURT:  Um-hum.

25          MR. FONTAINE:  They've vacationed here.



1          THE COURT:  Um-hum.

2          MR. FONTAINE:  And so this is not an unusual trip

3    for her.  It's not a really long trip for her.  And if she

4    needed to do it, my client would do everything necessary to

5    ensure that it doesn't affect her school, doesn't affect her

6    ability to do whatever is required by you as far as meeting

7    with her or testifying in court, if you ever made a

8    determination like that.  I don't think I've ever seen that.

9          But anyway, my client would do everything within her

10   power to have minimal effect on her.

11         THE COURT:  And I did my initial court ruling,

12   Attorney Fontaine, and it's been my position uniformly, is I

13   only interview children in guardianships of minors where I

14   have that requirement, I guess, and such.  But in DM cases,

15   marital cases, I usually don't.

16         But in this situation, when I made that initial

17   decision, the idea is that ███████ and Mr. Albrecht were going

18   to go to family systems counseling.  ███████ was in counseling

19   on her own.  Now, I'm hearing today that it's been eight

20   months since I issued my order, or pretty close to eight

21   months, and nothing has moved on family systems counseling.  I

22   have a child who's not going to counseling currently since the

23   end of the school year.

24         And so that opens up the possibility of a judge,

25   whether it be this Court, may not be me because we'll to get



1    that later on in the next -- other elements, but it is a

2    factor that if the judge wants to interview ▮▮▮, it is much

3    easier to do it in Michigan than here, as well as her

4    teachers, her medical providers, when she had a counselor,

5    were all in Michigan.  And so doesn't that favor Michigan as

6    being the state that's best able to address the issues with

7    ▮▮▮?

8          MR. FONTAINE:  Well, we can only -- we can only

9    guess what issues there could be because there is nothing

10   pending before this Court right now on any parenting issues,

11   other than jurisdiction.  So I suppose, sure, there's a

12   possibility if something came up and we did want them as

13   witnesses and a court would not entertain the idea of doing it

14   by Webex or some other method like that, which has been become

15   very common in long distance relationships -- long distance

16   witnesses' testimony.

17         Again, I just think these things can all be worked

18   around.  My client's pointed out that the flight from

19   Michigan --

20         MS. ALBRECHT:  Detroit.

21         MR. FONTAINE:  -- to -- from Detroit to here is an

22   hour and 20 minutes.  It's not a lengthy flight.  And it can

23   be -- the effect on the child could be minimized by

24   coordinating with the school, coordinating with this Court as

25   to when is the best time for her to do this trip.



 1              THE COURT:  Um-hum.

 2              MR. FONTAINE:  I think it'll have a minimal effect,

 3    and we can -- and again, guessing as to what could happen in

 4    the future I don't think is appropriate.  There's nothing

 5    before this Court right now that would indicate that we would

 6    need witnesses on these points.

 7              THE COURT:  Okay.  Well, and that was my questions

 8    for later.  But it's been brought to the forefront in this

 9    element, so I'm going to address it now.

10              So it's your position the status of this case is,

11    other than jurisdiction, there's nothing else for me to do

12    that I'm -- ought to --

13              MR. FONTAINE:  Well, I mean, this orders in effect,

14    I suppose, but --

15              THE COURT:  Well --

16              MR. FONTAINE:  -- none of them have -- there's no

17    motions for contempt or no motions pertaining to those orders,

18    and in fact, some of those orders are on appeal.

19              THE COURT:  Okay.  So the orders on appeal is on the

20    DV and on a contempt finding.

21              MR. FONTAINE:  Yeah.

22              THE COURT:  But the issue of what parenting time Mr.

23    Albrecht, it's your position is that's resolved, the order

24    that I issued back in February governs, and there's no other

25    proceedings to be heard on that issue?

1              MR. FONTAINE:  It's my understanding.

2              THE COURT:  Okay.

3              MR. FONTAINE:  Yeah.

4              THE COURT:  Mr. Albrecht, is that your position too,

5     sir?

6              MR. ALBRECHT:  Absolutely not.

7              THE COURT:  Okay.  Well, so we don't have an

8     agreement on that.

9              MR. FONTAINE:  Can we have a -- can we at least have

10    an understanding of what -

11             THE COURT:  Yeah.  Yeah.

12             MR. FONTAINE:  -- he claims?

13             THE COURT:  I think --

14             MR. FONTAINE:  I think that's only fair.

15             THE COURT:  Yeah.  Yeah.  Mr. Albrecht.

16             MR. ALBRECHT:  Before this started, I was a stay-at-

17    home dad, and I had a great relationship with my daughter.

18             THE COURT:  So that's a factual issue.  What

19    we're --

20             MR. ALBRECHT:  Well --

21             THE COURT:  -- asking right here -- just listen to

22    the question --

23             MR. ALBRECHT:  Yeah.

24             THE COURT:  -- so you can give me your position on

25    this.

1          The position is the order that I issued in February

2    regarding your parenting time, okay, after issuing the

3    motions -- after issuing an order on the vacate or --

4          MR. ALBRECHT:  Yeah.

5          THE COURT:  -- yeah, I issued out orders.

6          It's Attorney Fontaine's position, correct me wrong,

7    Attorney Fontaine, that that's the final order, and there's no

8    other proceedings to be addressed on custody at this point; is

9    that your understanding?

10         MR. ALBRECHT:  In terms of what's on the docket, but

11   in terms of anticipating this case moving forward, the minute

12   we move forward with the family systems counseling, I'm going

13   to want time with my daughter.  If the past six and a half

14   years are any indication of the track record, Ms. Albrecht is

15   going to adamantly opposed any time with my daughter under any

16   circumstances, and we're going to be right back in front of

17   some judge to settle that dispute.

18         THE COURT:  Okay.

19         MR. FONTAINE:  Judge, he didn't answer the question

20   that you asked him of.  But his --

21         THE COURT:  Well, so what I heard him say, and Mr.

22   Albrecht, correct me if I'm wrong.  I heard him saying he

23   agreed with you, except that he may be filing a pleading in

24   the future to address the issue of parenting time if family

25   system counseling begins --

1           MR. ALBRECHT:  That's --

2           THE COURT:  -- and the relationship improves --

3           MR. ALBRECHT:  Correct.

4           MR. FONTAINE:  And we can't work -- yeah.

5           THE COURT:  Am I correct?

6           MR. ALBRECHT:  Correct, and just one clarification.

7    I don't think there's anything in your current order that

8    would prevent me from having parenting time if Ms. Albrecht

9    just wants to cooperate and let me have it.

10          THE COURT:  Well, Attorney Fontaine, if your client

11   agreed to parenting time, do you think under the existing

12   orders that she'd be allowed to do that?

13          MR. FONTAINE:  Honestly, Judge, I can't answer that.

14   I'd have to look at the order.  I don't want to answer that

15   off the cuff.

16          THE COURT:  Yeah.

17          MR. FONTAINE:  I think it's --

18          THE COURT:  My initial reaction to it is usually

19   with orders like this, that's the requirement you got to

20   follow.  But if you agree otherwise -- I don't think I put an

21   order saying that he shall not see ████, and even if she

22   agreed.

23          MR. FONTAINE:  Under any circumstance at all.

24          THE COURT:  Under any --

25          MR. FONTAINE:  He didn't say that.



1          THE COURT:  I don't believe I wrote that so --

2          MR. ALBRECHT:  Yeah.

3          THE COURT:  It's not an advanced ruling, but it's

4     possible.

5          MR. FONTAINE:  Well, and if I could just say

6     something kind of on that point is he's assuming that if their

7     family systems counseling occurs and goes on for a period of

8     time, that if there was some proposal on parenting based on

9     that family systems counseling that my client would not agree

10    to it.  That's not a reasonable assumption at all.

11         My client is fine with proceeding with the family

12    systems counseling to the extent that she gets to be involved

13    in that process --

14         THE COURT:  Okay.

15         MR. FONTAINE:  -- for her, but beyond that, I don't

16    think it's reasonable to assume there's going to be a

17    contested matter based on that.

18         THE COURT:  Okay.

19         MR. FONTAINE:  We don't know.

20         THE COURT:  All right.  Thank you.

21         All right.  So the next element is D, which is the

22    relative financial circumstances of the parties.

23         MR. ALBRECHT:  I been trying to find her financial

24    circumstances.  There have been issues with that.  There is a

25    pending motion for contempt.  I don't know if you want to dive

1  into that now but --

2                THE COURT:  Well, I think it's -- I think it's

3  pertinent.

4                MR. ALBRECHT:  Or we just move forward.

5                THE COURT:  So let me ask --

6                MR. ALBRECHT:  Okay.

7                THE COURT:  Attorney Fontaine, it was indicated that

8  on September 9th, your office requested him to provide certain

9  financial information; is that correct?

10               MR. FONTAINE:  Yeah.  Based on the original orders

11  of the Court --

12               THE COURT:  Yeah.

13               MR. FONTAINE:  -- saying that she had to provide

14  those, we did send him interrogatories and asked for the exact

15  same documents.

16               THE COURT:  Okay.

17               MR. FONTAINE:  And then you subsequently issued your

18  order denying our motion to reconsider --

19               THE COURT:  Yeah.

20               MR. FONTAINE:  -- where we had indicated my client's

21  concerns --

22               THE COURT:  Um-hum.

23               MR. FONTAINE:  -- from a domestic violence

24  perspective --

25               THE COURT:  Yeah.



1            MR. FONTAINE:   -- that revealing the information to

2   him could put him in a position of knowing her regular

3   whereabouts, her children's regular whereabouts, et cetera,

4   which would create a concern on her part.  And you denied that

5   motion.

6            THE COURT:   Um-hum.

7            MR. FONTAINE:   And so that is a standing order, and

8   I will let her address that.  But I'm not sure that it's

9   appropriate for us to be going forward on a motion that was

10   filed yesterday afternoon, I believe --

11            THE COURT:   Well --

12            MR. FONTAINE:   -- on contempt.

13            THE COURT:   -- it is appropriate to the issue of

14   whether I'm going to allow her to present evidence regarding

15   her financial circumstance.

16            MR. FONTAINE:   I don't think my client needs to.  My

17   client is --

18            THE COURT:   Well, she did in your -- in your memo,

19   you did.  So I'm probably going to exclude or bar her from

20   printing any evidence regarding her financial circumstance

21   because I can't ignore the fact that she hasn't produced.

22   He's produced, from what he represents, which --

23            MR. ALBRECHT:   Yes.

24            MS. ALBRECHT:   I have that.

25            MR. FONTAINE:   Yesterday.



1              THE COURT:  -- he did.  Oh --

2              MR. FONTAINE:  Box.

3              THE COURT:  Okay.

4              MR. FONTAINE:  I mean, we haven't had a chance to go

5    through --

6              THE COURT:  Well, then --

7              MR. FONTAINE:  -- a box of information.  So we're

8    at --

9              THE COURT:  Then --

10             MR. FONTAINE:  -- essentially the same position.

11             THE COURT:  Then I'm likely to exclude both parties

12   from presenting information regarding finances.

13             MR. ALBRECHT:  That's fine.  I would just address a

14   minor point.  Filing of a motion for reconsideration shall not

15   stay respondent's obligation to produce the discovery within

16   14 days of 9/6, and he asked for it within 30 days of 9/9

17   so -- and if we're just --

18             THE COURT:  But my court order --

19             MR. ALBRECHT:  -- excluding all that right now,

20   that's fine but --

21             THE COURT:  My court order required both parties to

22   exchange, independent of his request.

23             MR. ALBRECHT:  I -- if it did, I misunderstood it

24   and --

25             THE COURT:  Well, you had --

1          MR. FONTAINE:  I actually don't think it did, Judge

2    but --

3          THE COURT:  Excuse me?

4          MR. FONTAINE:  I'm not sure it did.

5          THE COURT:  Okay.  Well, then, thank you for that.

6    And --

7          MR. FONTAINE:  Yeah, I think you should check it

8    because I don't think it did.

9          MR. ALBRECHT:  Yeah.  My understanding, and if I'm

10   wrong, forgive me, was that she was obligated to produce and I

11   wasn't, but I did produce.

12         THE COURT:  Okay.  Well, then, that's -- you are

13   correct.  I did not so -- so Attorney Fontaine, in light of

14   the fact that I did order back on September 6th that she

15   produce the information, I'm not going to allow her to present

16   any evidence regarding her financial circumstance because she

17   hasn't complied with the court order.

18         MR. FONTAINE:  And again, Judge --

19         THE COURT:  And I won't address the contempt issue.

20   I'm not going to address the --

21         MR. FONTAINE:  If I could just make one statement on

22   that in general, and I won't address the financials at all --

23         THE COURT:  Yeah.

24         MR. FONTAINE:  -- but in general, just, the point is

25   my client, now, she is taking the position, which quite

1  frankly is a recent decision on her part -- she is taking the

2  position that New Hampshire should retain jurisdiction.

3          THE COURT:  All right.

4          MR. FONTAINE:  If New Hampshire retains

5  jurisdiction, the only financial burden, the only relevance to

6  the financial situation of the parties would be if she's

7  saying, no, I want this case in Michigan, and it's affecting

8  Dana, Mr. Albrecht, and putting him in a position of financial

9  burden to have to go to Michigan.  The only burden here is on

10  her, and she's saying, I'm willing to undertake that burden.

11  And so I don't know how at this point given her position that

12  financials are even relevant.

13          THE COURT:  Well, they are relevant to the analysis.

14  You --

15          MR. FONTAINE:  Well, it says that it's --

16          THE COURT:  You may be waiving it but they are

17  relevant to the analysis.

18          MR. FONTAINE:  Oh, I agree.  It's in the statute.

19          THE COURT:  Yeah.

20          MR. FONTAINE:  But I'm just saying, I don't think

21  because of my client's position that it's really -- her

22  finances are really relevant.  She's saying, I'm the one

23  that's traveling all the way to New Hampshire; I'm willing to

24  do that.

25          THE COURT:  Okay.



1        MR. FONTAINE:  And so it's not -- I believe that

2   that circumstance is in the statute for the situation where

3   someone like Mr. Albrecht would be saying, I don't want to

4   have to go to Michigan because it's going to create a

5   financial burden for me and here's the financials to support

6   that.  That's what I believe that that point is in there for.

7        THE COURT:  Well, I think it's more far reaching

8   then the issue of just travel.  It also addresses, you know, I

9   think the issues of the parties to afford counsel.  I think it

10  addresses the issues of litigation cost.

11       But my ruling is she's not going to be allowed to

12  present any evidence regarding her financial circumstances

13  because she has not produced the discovery, so.  But --

14       MR. FONTAINE:  Just to be aware --

15       THE COURT:  -- I'm not addressing the contempt issue

16  at this time.  The 10 days has not lapsed.

17       MR. FONTAINE:  And just to be aware, we did submit a

18  financial affidavit.

19       THE COURT:  You did, and I'm not going to review it

20  or consider it because financial affidavits will be reviewed

21  and considered if you complied with the discovery, and she

22  hasn't.  And so he has the right to verify information not

23  just on the affidavit.

24       So Mr. Albrecht, do you have anything on finances

25  that you want me to consider, sir?



1           MR. ALBRECHT:  The only thing I'd add is RSA 458-

2    A:11 section III, on cooperation between courts also discusses

3    travel and other necessary reasonable expenses to the degree

4    that that statute's relevant.  That's -- that's it.  We can

5    move on to --

6           THE COURT:  Okay.

7           MR. ALBRECHT:  -- E.

8           THE COURT:  Okay.  E.  Any agreement of the parties

9    as to which state should assume jurisdiction.  Attorney

10   Fontaine indicated in his memorandum on behalf of his client

11   that he believed that because it was never requested by Mr.

12   Albrecht, that there's an agreement, so to speak, paraphrasing

13   the argument.  Mr. Albrecht in his memorandum says, we have no

14   agreement.  So anything else that needs to be said on E?

15          MR. ALBRECHT:  Well, I would point out that

16   (indiscernible) memorandum late.  I only learned their

17   position.  And maybe if I learned it a month ago, we could've

18   avoided this hearing.  But my position is New Hampshire --

19          THE COURT:  So I --

20          MR. ALBRECHT:  -- should retain --

21          THE COURT:  I asked for the hearing, Mr. Albrecht.

22          MR. ALBRECHT:  Oh, okay.

23          THE COURT:  And the statute allows the Court on its

24   on sua sponte to raise the issue.

25          MR. ALBRECHT:  Right.



1          THE COURT:  So both of you can agree that New

2    Hampshire should keep jurisdiction and the Court decide

3    otherwise.

4          MR. ALBRECHT:  Correct.  So I think Your Honor

5    should take into account that my position is that New

6    Hampshire should retain primary jurisdiction for modification

7    of orders just like it's got now.

8          THE COURT:  Okay.

9          MR. ALBRECHT:  And if we need something enforced,

10   we've got Michigan and California, there's counselors.  If we

11   need to take testimony in another state, we've got RSA

12   458-A:10 to do it in Michigan.  You can even retain primary

13   jurisdiction and ask Michigan via RSA 458-A:11(I)(a) to hold

14   an evidentiary hearing for it.  So it's been -- I mean, if we

15   both want New Hampshire to retain primary jurisdiction and

16   just use these other provisions as needed, I'd have to ask if

17   this is a question of whether New Hampshire's basically trying

18   to get rid of an ugly family law case, and pawn it off on

19   another state.  And not you personally, but the state.

20          THE COURT:  Okay.

21          MR. FONTAINE:  I have nothing on that.

22          THE COURT:  Okay.  F.  The nature and location of

23   evidence required to resolve the pending litigation, including

24   testimony of the child, which we seemed to have addressed.

25          MR. FONTAINE:  I think you jumped ahead.  Didn't you



1  say you were jumping ahead?

2      THE COURT:  Well, I did because you raised it.

3      MR. FONTAINE:  Right.  And which is fine and I think

4  we have addressed it.  I don't know if Mr. Albrecht feels

5  comfortable that he's addressed it, but.

6      THE COURT:  Okay.  Mr. Albrecht?

7      MR. ALBRECHT:  This overturns some key witnesses,

8  Ms. Ballnik, who was doing reports and counseling

9  recommendations.

10      THE COURT:  California, right?

11      MR. ALBRECHT:  It's California, and that's as

12  recently as August 5th, 2021.  And I've never been -- you

13  know, there was a no contact order for -- with me with her, so

14  I never had the ability to cross-examine or depose her, take

15  anything from her, get any information.

16      I would just point out -- one moment here.  You

17  know, in proceedings on this sort of thing, you know, Goldberg

18  v. Kelly, U.S. Supreme Court, 397 U.S. 254, 1970, you know,

19  there's kind of a due process right to kind of be able to

20  examine, and depose, and all that, witnesses, and Ms.

21  Ballnik's in California.

22      THE COURT:  Okay.  So what's your point, Mr.

23  Albrecht?  And whether it's Michigan --

24      MR. ALBRECHT:  On evidence.

25      THE COURT:  -- or this case?



1            MR. ALBRECHT:  Well, so my point, Your Honor, is a

2     whole lot of the evidence is in California, but --

3            THE COURT:  So what --

4            MR. ALBRECHT:  -- I can't --

5            THE COURT:  -- what I'm hearing you say, Mr.

6     Albrecht, is that New Hampshire should keep jurisdiction.

7            MR. ALBRECHT:  Yes.

8            THE COURT:  And that if I want evidentiary hearings

9     for witnesses in Michigan, I should ask the Michigan court to

10    conduct evidentiary hearings.  And if I want evidentiary

11    hearings from a witness in California, I should ask a

12    California court to hold an evidentiary hearing.  So what

13    you're requesting is that for this one case you want three

14    separate courts to conduct hearings, correct?

15            MR. ALBRECHT:  That's a -- may is permissive, not

16    shall, and it's --

17            THE COURT:  Okay.

18            MR. ALBRECHT:  -- right in the RSA 458-A:11.

19            THE COURT:  So let me ask you this, Mr. Albrecht.

20            MR. ALBRECHT:  Yeah.

21            THE COURT:  Instead of your allegation that the

22    state wants to get rid of a complicated family case, which is

23    not true.

24            MR. ALBRECHT:  Okay.

25            THE COURT:  All right.  Don't you think it makes

1  more sense for judicial economy, instead of having two states

2  conduct hearings, or potential three states, that we transfer

3  it over to Michigan where the witnesses -- predominantly where

4  the witnesses are --

5           MR. ALBRECHT:  Which are --

6           THE COURT:  -- to hold these proceedings and not do

7  it where New Hampshire has jurisdiction, and then Michigan

8  courts got to have evidentiary hearings on the medical

9  providers, and the teachers, and the counselor -- the

10  counselor in Michigan.  And then have another evidentiary

11  hearing in California with another court saying, well, Ms.

12  Ballnik needs to be deposed or asked questions.  How is that

13  judicially economic to have three separate courts conduct

14  three separate hearings?

15           MR. ALBRECHT:  In the first instance, it's

16  permissive and not shall.  And the second issue instance, we

17  haven't gotten to, you know, part A, the familiarity of the

18  courts.  And third instance on E, I believe Attorney Fontaine

19  and I are in agreement --

20           THE COURT:  Um-hum.

21           MR. ALBRECHT:  -- that New Hampshire should retain

22  primary jurisdiction to modify orders.

23           THE COURT:  Okay.

24           MR. ALBRECHT:  And as you point out, this was raised

25  sue sponte, and you have two pe -- and we are going through

```
 1    all these at your request.  But you have two people here on
 2    part E, who it seems to me, our -- our positions are the same,
 3    that --
 4              THE COURT:  So --
 5              MR. ALBRECHT:  -- this court -- and I'm just giving
 6    you an alternative.
 7              THE COURT:  Okay.
 8              MR. ALBRECHT:  If you need something done in
 9    Michigan, you already have the ability to do that without
10    moving this whole case to Michigan.
11              THE COURT:  Okay.  All right.  So let me ask you
12    this, Mr. Albrecht.  You would agree that most of the current
13    information regarding        , her health, her wellbeing, how
14    she's doing, how she's feeling is in Michigan?
15              MR. ALBRECHT:  No.
16              THE COURT:  No?  It's in New Hampshire?
17              MR. ALBRECHT:  I believe a lot of it's in
18    California.
19              THE COURT:  Okay.  She hasn't lived in California by
20    your belief since October of 2020.  So coming up on two years.
21    And it's your position that California has the most current
22    information regarding        's wellbeing, current wellbeing?
23              MR. ALBRECHT:  She was seeing Denise Ballnik through
24    August 6th, 2021.  Her -- you know, again, I hear nothing.
25    You know, all the witnesses, and how they were doing, how
```

1    she's done those three years are there.  All the police

2    reports that, you know, as we get to H, familiarity with the

3    court, are there.  The DCF -- the LADCFS records are there.

4              THE COURT:  So --

5              MR. ALBRECHT:  And that, I -- I think current

6    wellbeing is very much contingent on where's she been over the

7    course of these past six years.  She didn't get to where she

8    is now without them.

9              THE COURT:  Let me ask you this question, Mr.

10   Albrecht.  And I'm going to ask Attorney Fontaine this

11   question next.  What evidence is in New Hampshire -- question.

12   What evidence is in New Hampshire regarding ████' current

13   wellbeing?

14             MR. ALBRECHT:  ████ was -- we have a lot -- well,

15   Massachusetts, close enough, right over the border.  You know,

16   the church in Collinsville sees her.  They talk about her

17   regularly.  You know, again, all coming back to the church.

18             The last time I saw ████, again, last time -- the

19   last time I've been able to speak to ████ in my entire life

20   is in Pheasant Lane Mall where the pastor, Heidi Smith --

21   excuse me, Heidi Smith, who's the pastor's wife from

22   Collinsville Bible Church, escorts her to Pheasant Lane Mall

23   and has ████ read the script, you know, prewritten off of,

24   you know, a thing of why ████ doesn't want to see me, and

25   then the pastor's wife escorts her away.  That's all -- that's

1  (indiscernible) splitting hairs on (indiscernible)

2  Massachusetts in terms of getting a witness into court in New

3  Hampshire.

4          So -- and again, I would reject the notion that race

5  at the present time got there in a vacuum; race at the present

6  time got there over the past six and half a years of what

7  she's been through.  And even any reasonable family systems

8  therapist is going to want to know how she got from point A to

9  point B.

10          THE COURT:  In over five of those years has been

11  outside the state of New Hampshire?

12          MR. ALBRECHT:  Yeah.  And that's why I'm pointing

13  out California.

14          THE COURT:  Ma'am.

15          UNIDENTIFIED SPEAKER:  I thought I had it off.

16  Sorry.

17          THE COURT:  And the last five of those has been out

18  of New Hampshire.  And since 2018 you had two parenting times

19  with ▮▮▮▮ in New Hampshire?

20          MR. ALBRECHT:  In -- in -- in current times, they've

21  been here a lot to go to the church.  There's witnesses there.

22          THE COURT:  Which ones?

23          MR. ALBRECHT:  Eric -- well, Pastor Eric Smith,

24  Pastor Heidi Smith, Albert Cooper, ▮▮▮▮ and the DCYF

25  records.  They talk to them all the time over phone.

```
1                    THE COURT:  Okay.

2                    MR. ALBRECHT:  The DCYF records says he's talked

3    about her not having a relationship with my father, and he's

4    subbed in, and providing her advice.

5                    THE COURT:  Okay.  Let me get to Attorney Fontaine.

6    What evidence is in New Hampshire compared to what's in

7    Michigan?

8                    MR. FONTAINE:  So again, I'll just point out that

9    there is nothing pending before this court right now on any of

10   these issues and we don't --

11                   THE COURT:  Okay.

12                   MR. FONTAINE:  -- know without assuming that this

13   issue comes forward in a contested matter.

14                   THE COURT:  All right.  So let's address that then,

15   Attorney Fontaine.  Because that presents to be a separate and

16   even more difficult issue, right?  Because you would agree

17   under the current orders, Mr. Albrecht has no parenting time,

18   correct?

19                   MR. FONTAINE:  Correct.

20                   THE COURT:  No parenting time.  And if this is

21   final, correct, if the orders are final that are in existing,

22   meaning subject to modification, nothing's ever really final

23   in a custody matter, but if -- the current state of the case

24   is in essence closed, correct?

25                   MR. FONTAINE:  Yes.
```

1          THE COURT:  On custody determinations, then how does

2     New Hampshire have jurisdiction anymore?

3          MR. FONTAINE:  Well --

4          THE COURT:  Didn't he actually --

5          MR. FONTAINE:  You're making a statement.  I'm

6     not --

7          THE COURT:  Well, that's what you're saying, right?

8     You're saying --

9          MR. FONTAINE:  Well --

10          THE COURT:  -- this matter's closed.

11          MR. FONTAINE:  There's a final parenting plan --

12     there's a parenting plan.

13          THE COURT:  Final parenting orders.

14          MR. FONTAINE:  Again, I apologize.  I wasn't

15     prepared to actually look back at your order --

16          THE COURT:  Okay.

17          MR. FONTAINE:  -- to see what your order

18     specifically stated.  And I'll --

19          THE COURT:  Okay.

20          MR. FONTAINE:  -- leave it what the order states as

21     to whether it's to be treated as a temporary or final.  But

22     that order -- I guess I misunderstood what you were saying.

23     That order is a final order from the perspective of the

24     authority of the court.

25          THE COURT:  Okay.

1          MR. FONTAINE:  Okay.  So from that perspective,

2    there is an order in effect that says to the parties, this is

3    what you must do.  And the parties -- at this point, it's in

4    his hands as to accomplishing what you ordered relative to the

5    family systems counseling, which as you know, Judge, is

6    something that is commonly done when a party has problems with

7    the relationship with their child.  It's in his hands to

8    resolve that.  It hasn't been resolved, nor has he brought

9    that issue forward.  So there is nothing pending based on the

10   current orders.

11          And yes, there could be something in the future,

12   it's just you, respectfully, should not assume that there is

13   going to be something.  We have a almost 16 year old girl; we

14   have two years left until she's of majority.  We don't know

15   that this going to end up with any more litigation.  This

16   could in fact resolve if in fact that counseling occurs and if

17   in fact the parties are then able to figure out some way with

18   the counselors involvement to have him spend time.

19          So I don't think we should assume, and it's very

20   easy in this case to assume it will result in litigation, but

21   I don't think we should for purposes of changing jurisdiction.

22          I'm anxious to get onto the other points though --

23          THE COURT:  Well, I --

24          MR. FONTAINE:  -- because some of those --

25          THE COURT:  But I don't want to get off this for a



1    second.

2              MR. FONTAINE:  Sure.

3              THE COURT:  Because this is an important issue.  You

4    would agree that under the definition in UCCJEA, Michigan is

5    ██████'s home state at this point, correct?

6              MR. FONTAINE:  Yes.

7              THE COURT:  And New Hampshire's jurisdiction is

8    limited to continuing jurisdiction, correct?

9              MR. FONTAINE:  Which is, what, how the UCCJEA

10   reads --

11             THE COURT:  Yeah.

12             MR. FONTAINE:  -- correct?

13             THE COURT:  Okay.  And so --

14             MR. FONTAINE:  But it's not supposed to change

15   jurisdictions unless the court goes through this process and

16   determines, after reviewing all the factors, that New

17   Hampshire is not a convenient forum and that there's a more

18   appropriate forum.  That's the whole point.

19             THE COURT:  No.  I misphrased my question.

20             MR. FONTAINE:  Sorry.

21             THE COURT:  So the only way New Hampshire could keep

22   jurisdiction on any future issue is if it finds that it still

23   has continuing jurisdiction.  Because right now from home

24   state jurisdiction, the child's home state, that is Michigan.

25             MR. FONTAINE:  Yeah.



1              THE COURT:      's home --

2              MR. FONTAINE:  But this happens all the time in

3    cases where the court that made the original orders continue

4    to make orders relative to any continuing issues that might

5    develop as a result of those orders.

6              THE COURT:  Okay.

7              MR. FONTAINE:  And it --

8              THE COURT:  Well, that's not quite how I read the

9    statute on continuing jurisdiction.  It limits New Hampshire's

10   jurisdiction on continuing orders unless it has a substantial

11   connection.

12             MR. FONTAINE:  Well, I --

13             THE COURT:  That's the --

14             MR. FONTAINE:  Again, that's why I'm anxious to get

15   on to the other points.  I think there is still --

16             THE COURT:  Okay.

17             MR. FONTAINE:  And this isn't a situation where New

18   Hampshire is a jurisdiction where neither party resides, the

19   child doesn't reside there.  Mr. Albrecht has continued to

20   reside here and continues to this date.  So I think there is a

21   connection still to this state that --

22             THE COURT:  Okay.

23             MR. FONTAINE:  -- allows it to --

24             MR. ALBRECHT:  I continue to live --

25             THE COURT:  Well, hold on a second, Mr. Albrecht.



```
 1                    Attorney Fontaine, is that what you --

 2                    MR. FONTAINE:  That was point.  But --

 3                    THE COURT:  So --

 4                    MR. FONTAINE:  -- if you have more questions for me,

 5       I'm glad to.

 6                    THE COURT:  Yeah.  So what evidence --

 7                    MR. ALBRECHT:  They still go to camp at The Wilds in

 8       New Hampshire.

 9                    THE COURT:  Please hold off.

10                    MR. ALBRECHT:  I'm sorry.

11                    THE COURT:  It's Attorney Fontaine's time.

12                    So Attorney Fontaine --

13                    MR. FONTAINE:  We're both advocating, Judge,

14       obviously.

15                    THE COURT:  Well, no.

16                    MR. FONTAINE:  Same position, I think.

17                    MR. ALBRECHT:  I think we are.

18                    THE COURT:  So --

19                    MR. FONTAINE:  Right.

20                    THE COURT:  So there's a different -- a very

21       significant difference between what we're talking about.

22       Found all conveniences is to the Court's discretion.  Whether

23       New Hampshire remains -- whether there's a substantial

24       connection to New Hampshire is jurisdictional, meaning I don't

25       have the authorize to hear the case.  That's a big difference.
```

1    And so --

2            MR. FONTAINE:  I disagree, respectfully.  I think

3    you do have jurisdiction to continue to hear this case.  I

4    don't think there's anything to change it.

5            THE COURT:  That's what I'm looking for.  I'm

6    looking for the factual basis for you to say what substantial

7    connection New Hampshire has other than Mr. Albrecht still

8    residing in the state, because by case law that's not enough,

9    the fact that he still lives in New Hampshire.

10           MR. FONTAINE:  I mean --

11           THE COURT:  I'll give you a chance, Mr. Albrecht, so

12   you can write what you want down.

13           MR. FONTAINE:  So this court issued final parenting

14   orders and modifications thereof, and then this court struck

15   some of those per the Supreme Court orders and issued new

16   orders.

17           THE COURT:  Um-hum.

18           MR. FONTAINE:  Okay.  All of which are still in

19   effect.  All of which are still the controlling law of this

20   case.

21           THE COURT:  Which hasn't been appealed, correct?

22           MR. FONTAINE:  Which I don't believe they've been

23   appealed.

24           THE COURT:  They haven't appealed, so they're final.

25           MR. FONTAINE:  Final orders of the court.



1          THE COURT:  Yeah.

2          MR. FONTAINE:  I don't know that they've been -- the

3    court treated it as a final order, meaning they would never

4    hear -- I think the court's intention -- this is my

5    understanding, is the court intended the parties to engage in

6    family systems counseling; they provided an order relative to

7    that.  I believe the court's expectation was to then have

8    further hearings maybe in the future as to how those were

9    going if there were issued, or if there was no further

10   feedback from the parties.  I don't believe the court was

11   saying, okay, we're done now, we're going to move on, and it's

12   no longer our jurisdiction.  I don't believe that's what was

13   intended by the order.  I may be wrong.  But I believe your

14   order was to take a step in trying to help repair the

15   relationship between Mr. Albrecht and his children.

16          THE COURT:  And so what --

17          MR. FONTAINE:  Or child, I should say.

18          THE COURT:  What evidence is in New Hampshire

19   besides the kids going to two week in camp, not with Mr.

20   Albrecht, at The Wilds of New England?  What other evidence is

21   there in New Hampshire that says that this is the better forum

22   to address ████'s current needs compared to Michigan?

23          MR. FONTAINE:  So the relationship that's at issue

24   here is between Mr. Albrecht, who is a resident of New

25   Hampshire, lives a few minutes from the court as I understand

1    it, and therefore there's a very important part that is here.

2    Yes,        is in Michigan -- resides in Michigan.  My client

3    resides in Michigan.  But without knowing what the issue is,

4    or who ultimately is going to be the family systems counselor

5    and where that family systems counselor is located, I can't

6    fully answer that question.  I mean, if in fact the issue is

7    what the family systems counselor is recommending and there's

8    some dispute about that, and your order subsequently is that

9    the family systems counselor is from Michigan, then, yes, that

10   family systems counselor's in Michigan.  If on the other hand

11   you say the family systems counselor will be in New Hampshire

12   so long as it can be provided tele -- not telephonically, but

13   WebEx wise, or whatever it's called.

14              THE COURT:  Video conferencing.

15              MR. FONTAINE:  Video, thank you.  Zoom conferencing,

16   then that -- because I can't --

17              THE COURT:  Okay.

18              MR. FONTAINE:  -- speak to all who could be

19   witnesses because I don't know what the issue is.  There are

20   no issues pending before the Court right now.  The issue you

21   resolved was, hey, parties, let's get you in family -- or Mr.

22   Albrecht and the child, let's get you in family systems

23   counseling to work on your relationship.

24              THE COURT:  Well, I remember at a prior hearing it

25   was your suggestion that California wouldn't do it because the

1 | parties had to be there, meaning ███ and Mr. Albrecht had to
2 | be there.
3 |      MR. FONTAINE:  That was my client's understanding
4 | from speaking with them.
5 |      THE COURT:  Is that your understanding in Michigan
6 | as well, that they would both need to be in state in order to
7 | have counseling?
8 |      MR. FONTAINE:  Again, we haven't --
9 |      THE COURT:  Okay.
10 |      MR. FONTAINE:  We haven't investigated that.
11 |      THE COURT:  All right.  Thank you.
12 |      So Mr. Albrecht, let me ask you.  I --
13 |      MR. ALBRECHT:  (Indiscernible) him first or you want
14 | to ask me?
15 |      THE COURT:  You first, sir.  I wasn't aware that
16 | ███ sought counseling, and so --
17 |      MR. ALBRECHT:  Neither was I.
18 |      THE COURT:  -- I understood that you were having
19 | conversations with the -- telephone conversations with ███
20 | and the counselor was monitoring or participating.  Are those
21 | phone calls happening?
22 |      MR. ALBRECHT:  They haven't happened since the one
23 | we had that last (indiscernible).
24 |      THE COURT:  Excuse me, sir?  You got --
25 |      MR. ALBRECHT:  They haven't happened --

1          THE COURT:  -- to speak louder.

2          MR. ALBRECHT:  -- since we had the conversation

3    about the passport before the last hearing.

4          THE COURT:  What was that date, sir?

5          MR. ALBRECHT:  The last hearing was June 30th, and

6    it would've been shortly prior to that, off the top of my

7    head.  I --

8          THE COURT:  Okay.

9          MR. ALBRECHT:  Just shortly prior to that hearing.

10          THE COURT:  So you haven't had any conversations

11   with your daughter telephonically --

12          MR. ALBRECHT:  In --

13          THE COURT:  -- for three --

14          MR. ALBRECHT:  -- July.

15          THE COURT:  -- more than --

16          MR. ALBRECHT:  Yeah.

17          THE COURT:  -- three months?

18          MR. ALBRECHT:  Yes.  That's correct.

19          THE COURT:  Okay.  All right.  What do you want to

20   add, sir?

21          MR. ALBRECHT:  I would add that in six and half

22   years, it appears to me that hell has frozen over because

23   quite frankly I respectfully disagree with Your Honor, as does

24   Attorney Fontaine, and I practically agreed with 100 percent

25   everything that just came out of Attorney Fontaine's mouth.



1           THE COURT:  Okay.  Is that --

2           MR. ALBRECHT:  That's -- that's shocking.  Six and

3 half years.

4           THE COURT:  All right. Is that all you have, sir?

5           MR. ALBRECHT:  Where -- where are we on --

6           THE COURT:  Is that all you have on E?

7           MR. ALBRECHT:  Yes.  That's what I have on E.  Oh, I

8 would stipulate to his proposed order.

9           THE COURT:  Okay.  I'm not done yet.  The ability of

10 each court to decide expeditiously, and the process is

11 necessary to present evidence, it seems like we've covered

12 that, Attorney Fontaine.

13           MR. FONTAINE:  Yeah.  I mean, quite honestly, I

14 think both courts are able to expeditiously, but you have

15 obviously, this court, which has handled this matter for over

16 five years, this custody matter, has been able to

17 expeditiously handle all of these matters.  I don't think the

18 distance of witnesses or any of that stuff has ever held this

19 court up in making final orders.

20           THE COURT:  Let me ask you something, Attorney

21 Fontaine.  One of the things that you -- well, we'll address

22 that in the next one.

23           Mr. Albrecht, do you have anything on E?

24           MR. ALBRECHT:  E?

25           THE COURT:  I'm sorry.  G.



1                MR. FONTAINE:  G.

2                THE COURT:  I apologize.  G.

3                MR. ALBRECHT:  G.  One moment.  I think as I

4    remarked in my memorandum, my abil --

5                THE COURT:  Is it about the pay grade?

6                MR. ALBRECHT:  Yeah.

7                THE COURT:  Is that the --

8                MR. ALBRECHT:  About my pay -- about my pay grade.

9                THE COURT:  All right.  So noted.

10               All right.  So H, familiarity with the court of each

11   state with the facts and issues pending litigation.

12               Mr. Albrecht?

13               MR. ALBRECHT:  So I think the transcript of the

14   Michigan court speaks volumes to that, Your Honor.

15               THE COURT:  Okay.  Any objection to the transcript

16   coming in?

17               MR. FONTAINE:  Well, can I just have -- without

18   reading the whole transcript, what is your point on that?  It

19   speaks volumes on what way?

20               MR. ALBRECHT:  Just one moment, please.  So one of

21   the things I asked the judge to do at the Michigan hearing was

22   to enforce this court's orders.  I have -- in Calif -- I've

23   never asked California to do anything other than register

24   them, so I've never asked California for any relief.  And the

25   only thing I ever asked Michigan for was enforcement of

1  existing orders.

2          It was my understanding, and I might've been

3  mistaken, that they had limited jurisdiction to fine tune

4  something, not just where are we going to have a parenting

5  exchange take place, because at that time I still had

6  parenting time.  And I had asked that parenting exchanges take

7  place at the police station, and that seemed to make sense to

8  me because there was a DV in place.  And Judge Brown

9  (phonetic) in Michigan inherently disagreed, he said -- I'm

10 quoting Judge Brown, "I'd like to indicate that your motion,

11 Mr. Albrecht, not only asks me to enforce the order, but asks

12 me to require the Respondent to bring the minor children to

13 law enforcement for the purpose of exchanges."  And again, at

14 that point we had exchanges.  "Too, frankly," he says, "I

15 think it's unconscionable to involve children with the police,

16 and I think it's unconscionable that you even asked that your

17 children be taken to the police station and have them

18 involved.  I think that would be detrimental to the children,

19 period, to have -- to be gone, taken to a police station.

20         "I want to indicate that your motion, Mr. Albrecht,

21 not only asks me to enforce the order, but asks me to reply to

22 Respondent to bring the minor four children to law enforcement

23 for purposes of the exchanges.  Too, frankly, I think that's

24 unconscionable to involve children with the police.  And I

25 think it's unconscionable you even asked that your children be

1 taken to the police station and have them involved. I think
2 that would be detrimental to the children, period, to have
3 gone and taken to a police station."

4 So that tells me, number one, even though I notified
5 him in the pleadings, that Judge Brown wasn't even aware there
6 was DV. And number two, he wasn't even aware, also in his
7 background, you know, (indiscernible) pleadings provided to
8 the court that, you know, August 28th, 2018, Sierra Madre,
9 California, we've got the police report where she takes them
10 to the police station. And that was Exhibit 39 at the
11 November 6th, 2020 hearing.

12 So you know, frankly, I -- I think Judge Brown did a
13 great job running his courtroom, I mean no disrespect, but he
14 was clearly out of touch with a lot of facts of the case, even
15 though he had a lot of transcripts, and orders, and stuff that
16 I had provided him in advance. And I'm not going to fault him
17 because I think both of you, probably rightfully so, often ask
18 relevancy, and I'm -- I'm not a lawyer, and he was focused
19 very much on jurisdiction. But my sense is he wasn't familiar
20 that -- you know, that didn't go so well in terms of his
21 familiarity. And I think the transcript speaks volumes to
22 that.

23 THE COURT: Okay. Attorney Fontaine?

24 MR. FONTAINE: I guess I object to that. I don't
25 know what relevance that transcript has to what is being asked

1 for us to address. I think we can address it in a different

2 way and that's what I propose to do. But I don't know that

3 because a judge issued an order on -- he was clearly ruling on

4 an enforcement of a court order in Michigan -- a New Hampshire

5 order in Michigan, and it wasn't broader than that. So I

6 personally would not want to draw conclusions as to that

7 court's ability to handle this matter as well as this court

8 based upon that limited involvement. I wouldn't do that.

9 But --

10 THE COURT: Well, I agree. Objection sustained.

11 You know, it was a limited hearing on jurisdiction that Judge

12 Brown was hearing, and so the fact that he wasn't made aware

13 of certain facts before that hearing -- I don't know how much

14 time he had to prepare for the hearing. And so I'm going to

15 sustain the objection because it's not relevant to the issue

16 of section H.

17 So anything else, Mr. Albrecht?

18 MR. ALBRECHT: For purposes of preservation, I would

19 just like to point out that I wanted that in evidence. And if

20 you're telling me it's not relevant, I respectfully disagree

21 with Your Honor, and I would respectfully ask that you would

22 admit it and give it whatever weight it deserves.

23 THE COURT: Well, I've already --

24 MR. ALBRECHT: Yeah.

25 THE COURT: -- made my ruling that --



1            MR. ALBRECHT:  Okay.

2            THE COURT:  -- that I'm sustaining the objection.

3            So Attorney Fontaine?

4            MR. FONTAINE:  Sure.  Thank you, Judge.

5            So my point of that objection was that I think

6    there's a bigger and more important point in this case

7    relative to factor H.  This court has a much greater

8    familiarity with the complicated facts and history of this

9    case.  And as this court knows, no disrespect to Mr. Albrecht,

10   but Mr. Albrecht regularly references the history of this case

11   in making the arguments he has made to this point.  And in

12   that sense I think the familiarity of the court is important

13   when it's ruling on whether to allow any of that based on the

14   issues before the court.  But also based on the prior orders

15   of this court, I think it would a monumental task for a judge

16   from Michigan to get involved in this case, and get their arms

17   around this case to the extent that you have your arms around

18   this case, or the judges previously had their arms around this

19   case.

20           So from the perspective I think the familiarity of

21   the court, this court, weighs strongly in favor of this court

22   retaining jurisdiction in this matter and not finding that

23   this is an inconvenient forum.

24           And I don't know if you want me to talk about the

25   additional factor that we raised in our memo --



 1                    THE COURT:  We'll do that separate.

 2                    MR. FONTAINE:  Okay.

 3                    THE COURT:  Well, I do have questions for you

 4      though.

 5                    MR. FONTAINE:  Sure.

 6                    THE COURT:  What guarantee is there, Attorney

 7      Fontaine, that I'm going to continue as a judge in this case?

 8                    MR. FONTAINE:  There's none, but the vast amount of

 9      records are here in the court.  I'm sure that you spent a

10      large amount of time when you were appointed to -- or assigned

11      to this case getting up to speed, and I think it would be a

12      lot easier for that to occur here in New Hampshire.

13                    THE COURT:  So --

14                    MR. FONTAINE:  And I understand electronically, et

15      cetera, now there's a lot of other methods that are available

16      to minimize that, but it's still -- the other piece of it is

17      that the laws are different, you know -- the rules are

18      different I should say, not the laws, but rules are different

19      in that court, and that there would be a requirement of, you

20      know, us all becoming -- or somebody becoming familiar with

21      those rules and how those rules then affect whatever might

22      come before the court.  And I think that would create a much

23      more complicated situation for these parties.

24                    And I'm just going to say one thing, and my client

25      asked me to say this.  When the issues happened in the past

1    with this court that resulted in you being assigned to this

2    case, my client was prejudiced.  My client was prejudiced and

3    had to spend a lot of money to readdress issues that had been

4    addressed.  And I understand that's a lot of this case, and

5    there's nothing we can do about that.  But you know, there's

6    been a lot of focus on how Mr. Albrecht's been affected by

7    this.  But my client spent a lot more money to have to

8    readdress issues that had already been decided from her

9    perspective by the court, and that is going to also be a

10   factor here because if my client has to retain a new attorney

11   in -- and again, if you want me save this I will -- but if my

12   client has to retain an attorney to represent her in Michigan,

13   it's going to, once again, cause a large incurring of

14   attorney's fees by her for an attorney to just get up to

15   speed.

16           And this is a case where you can't just say, okay,

17   we'll wait until something happens to get a lawyer.  This is a

18   case, especially with the pending domestic violence order,

19   where she's going to need to find a lawyer.  If you decide

20   that this matter needs to be changed to -- jurisdiction to

21   Michigan, she's going to need to find a lawyer, and that

22   lawyer's going to want to charge her to be able to get

23   completely up to speed on this case so that they're ready to

24   go if something gets filed.  And so that could be an expensive

25   proposition from her perspective.



1          She's also had an attorney in Michigan who

2     represented her in that enforcement action, who Mr. Albrecht

3     filed a Bar complaint against, and who is now telling my

4     client he cannot represent her.  She has met with two

5     attorneys to see if she can obtain representation in this

6     matter, and as soon as they hear anything about this case,

7     they don't want to be representing her.  So my client is very

8     concerned that if jurisdiction is changed, she'll be left

9     without counsel in Michigan, or have a very difficult time, or

10    be a very expensive proposition in finding counsel to

11    represent her out there and get up to speed.  So that's, I

12    guess, somewhat related to that.

13          THE COURT:  You combined two of them but that's

14    okay.

15          MR. FONTAINE:  Okay.

16          THE COURT:  I didn't want to interrupt you given

17    that you were trying to make a connection there.

18          So but my question is, Judge Derby sat here, heard

19    the DV, got transferred to Merrimack, right.  It's very common

20    for judges to get shift around.  Every year we get shifted

21    around.  Everywhere certain judges get shifted around and it

22    changes the dynamics, for example.  For example, next year

23    Judge Chabot won't be here.  So it's not uncommon to get

24    changed in the middle of the year.

25          So how is it any different than the situation that



108

1    you are saying favors New Hampshire when there's no guarantee

2    that you'll have the same judge, there won't be -- by the time

3    ████ turns 18, there won't be three other judges who hears

4    this case?  So how's that any different?

5             MR. FONTAINE:  I guess my client is more comfortable

6    that the New Hampshire system -- the New Hampshire court

7    system will allow her to make that transition in the easiest,

8    most economical sense, and in a way that won't prejudice her.

9    She is concerned -- although she loves the state of Michigan,

10   she is concerned that if this matter gets transferred to a

11   judge in Michigan, that this complicated matter, that

12   something might get lost in the translation that she believes,

13   and I'm stressing she believes, will not happen here.  And

14   that's all I can say on that.

15            I mean, I've been doing this for 35-plus years.  I'm

16   very familiar with the fact that that can happen, we might get

17   a new judge.  We also have the right, as you know, to request

18   that a case follow a judge even if it's to a different

19   courthouse because of the complexity of the case.  That is

20   something that we probably would consider if that happened if

21   you were to move to a different court.  But again, that is

22   the -- I guess, the answer to your question as best I can.

23            THE COURT:  The other issue you raised in your

24   memorandum of law on H was the res judicata issue.  From

25   taking over the case, when I read a pleading, most of the time



```
 1  I wasn't aware there was a prior order.  It was done by you or
 2  Mr. Albrecht pointing out, hey, we've already addressed this.
 3  This has already been addressed, you can't revisit it.  So why
 4  can't that happen in Michigan as opposed to, you know,
 5  happening here?
 6            MR. FONTAINE:  Honestly, I think it probably could.
 7  I --
 8            THE COURT:  Um-hum.
 9            MR. FONTAINE:  I don't want to make a big -- that
10  was a --
11            THE COURT:  Yeah.
12            MR. FONTAINE:  -- a point that we raised.  I think
13  the point was more to that the court has such familiarity with
14  this case, and you do have familiarity with the history,
15  Judge.
16            THE COURT:  Um-hum.
17            MR. FONTAINE:  I know you do based on --
18            THE COURT:  I've been on it for 10 months.
19            MR. FONTAINE:  Yeah.  But you also have had to go
20  back in time, review quite a bit of the previous orders of
21  this court.  Whereas, as you pointed out, a judge getting
22  involved in the future might not have that same background,
23  might not have that same level of background because they're
24  dealing with a specific motion on a specific limited item.
25  And I do think because you have that background, that it would
```

1  potentially put us at a great advantage to have this court

2  retain jurisdiction.

3            THE COURT:  Thank you, Attorney Fontaine.

4            Mr. Albrecht, do you have anything on that point,

5  sir?

6            MR. ALBRECHT:  Yeah.  So about the first third and

7  last third of Attorney Fontaine's speech --

8            THE COURT:  That's --

9            MR. ALBRECHT:  -- I 100 percent agree.

10           THE COURT:  But that's not helpful to me.  When you

11 break it up into first third and second third --

12           MR. ALBRECHT:  Well, let -- let me finish.

13           THE COURT:  Okay.

14           MR. ALBRECHT:  So until he got to the part about his

15 client being prejudiced, I have 100 percent agreement.  And

16 sort of after we got past that part --

17           THE COURT:  So --

18           MR. ALBRECHT:  -- I have 100 percent agreement.

19           THE COURT:  All right.  So tell me what you don't

20 agree about his statement.  Maybe that's the best way to

21 handle it.

22           MR. ALBRECHT:  Just the part about the prejudice and

23 I don't even want to --

24           THE COURT:  What don't you agree about that?

25           MR. ALBRECHT:  I don't even want to dispute that.

1    I'm just saying I want to stipulate to the rest of what he
2    said is (indiscernible).

3            THE COURT:  Okay.  So tell me why you don't agree
4    that his client would be prejudiced.

5            MR. ALBRECHT:  No, no, no.  He talked about his
6    client having the prejudice by the (indiscernible) stuff, and
7    that's just the part I didn't agree with, and I don't think
8    it's even relevant that I don't agree with that because we
9    agreed on the rest.

10           If I look at the docket summary of this, you know,
11   we've got -- we're up to 51 pages and 618 pleadings.  And as
12   you pointed out on res judicata, (indiscernible) or whatever,
13   at least if we're both going back to reference something, it's
14   in the file here.  I mean, even if Attorney Fontaine went to
15   stipulate to something, or argue about it, whatever it is, we
16   can go back and say, you know, final parenting plan, docket
17   entry -- I forget which one that is.  That's -- I thought I
18   had that right -- let me just verify it here.  Yeah -- docket
19   entry 176.  How are we supposed to do that in Michigan?

20           THE COURT:  Why can't the file be transferred to
21   Michigan, Mr. Albrecht?

22           MR. ALBRECHT:  50 cents a page; it's a big file,
23   Your Honor.  Also I believe the issue was raised about whether
24   the Michigan court ordered that I wasn't allowed to do that.

25           THE COURT:  You're talking about in a jurisdiction



1  issue that you filed back in 2021.  This is a different issue,

2  right?

3          MR. ALBRECHT:  Okay.

4          THE COURT:  So you would agree that the files in

5  Michigan, whoever the Michigan judge is, he or she can look at

6  whatever pleading that you're referencing, correct?

7          MR. ALBRECHT:  Sure.  And back in 2017, you could

8  have transferred sua sponte the file to California.  I have to

9  ask why we didn't do that.

10         Oh, and concerning representation.  I've been here

11  six years in New Hampshire as a -- as a pro se litigant.  I've

12  spent a lot of time trying to learn the law in New Hampshire,

13  and now you're telling me I got to go basically start from

14  scratch and relearn the law in Michigan.  I would say that

15  would be extremely unfairly prejudicial to me.

16         THE COURT:  How?

17         MR. ALBRECHT:  It takes how -- how many years did

18  you spend law school, sir?  It takes time to --

19         THE COURT:  So --

20         MR. ALBRECHT:  -- learn the law.

21         THE COURT:  So you don't get to -- you seem to have

22  the idea that --

23         MR. ALBRECHT:  It's a rhetorical question.

24         THE COURT:  -- you can ask me questions.

25         MR. ALBRECHT:  It's a rhetorical question.



1          THE COURT:  So stick to answering the question.  So

2     it's not appropriate to answer a question with a question.  So

3     how?

4          MR. ALBRECHT:  I've lived in New Hampshire since

5     2020.  This action was brought in New Hampshire.  I've read

6     the vast majority of these 600 and whatever docket entries.

7     I've had to research case law.  I have some familiarity with

8     the law in New Hampshire.  I have almost no familiarity with

9     the law in Michigan  I even walked into the courtroom and got

10    blindsided that New Hampshire and Michigan have completely

11    opposite positions on whether you're supposed to attach stuff

12    to pleadings.  And it doesn't say that, you know, maybe one of

13    them is right, one of them is what it is, so completely

14    opposite position.  So things are different.

15          And I 100 percent agree with Attorney Fontaine's

16    point about people coming up to speed.  And I'm just kind of

17    piling on in support of what he's saying that, you know, if

18    she's going to go to Michigan and retain counsel, at least

19    Michigan counsel licensed in Michigan is presumably pretty

20    familiar with Michigan law, and I'm not.  And so now, you

21    know -- we've got that that's just going to add to how long it

22    takes to get any kind of resolution, or any kind of repair to

23    this family if I've got to come up to speed on Michigan law.

24          THE COURT:  Okay.

25          MR. ALBRECHT:  And I -- I would love for this case



1    to be over.  I would love to have a relationship with my

2    daughter.  I would love us to get through family systems

3    counseling.  I would -- I would love for Ms. Albrecht right

4    now to just say, you know what, I think you should have

5    parenting time with ▮▮▮▮ and let me do whatever it takes to

6    get that for you.

7               THE COURT:  Okay.

8               MR. ALBRECHT:  And I think that moving this to

9    Michigan is only going to delay that, and we've got two years

10   left.

11              THE COURT:  Anything else?

12              MR. ALBRECHT:  Do just remind me procedurally where

13   we are, because we've discussed H.

14              THE COURT:  We're on H.  And --

15              MR. ALBRECHT:  And --

16              THE COURT:  -- he addressed the other --

17              MR. ALBRECHT:  -- how we want to conduct --

18              THE COURT:  He addressed --

19              MR. ALBRECHT:  -- the rest of this.

20              THE COURT:  So he combined H with other issues,

21   so -- and you addressed both the issues he raised.

22              MR. ALBRECHT:  Okay.  So where -- where do we go

23   from here procedurally in this hearing?

24              THE COURT:  Okay.  So do you have anything else

25   regarding H or his other request?

1           MR. ALBRECHT:  I'm sorry, I got a little wound up.

2    What as his other request?

3           MR. FONTAINE:  A reference --

4           THE COURT:  The attorney fees.

5           MR. FONTAINE:  Attorney fees.

6           THE COURT:  The --

7           MR. FONTAINE:  Cost to my client.

8           THE COURT:  Hiring an attorney in Michigan.  That he

9    can't find another attorney because you filed a complaint

10   against Wedmire, and she spoke to two other attorneys that --

11          MR. ALBRECHT:  Well --

12          MR. FONTAINE:  Just to be clear, she didn't say she

13   couldn't find a lawyer, she is having difficulty.

14          THE COURT:  Oh, difficultly.  Thank you for

15   correcting that.

16          MR. ALBRECHT:  Also fees go back to D, and she's

17   having difficulty, and it would be -- I represent that it

18   would be even harder for me, and I'd be unfairly prejudiced.

19   So --

20          THE COURT:  What do you mean it goes back to D?

21          MR. ALBRECHT:  Issue of fees goes back to the

22   relative financial circumstances of the parties if we're not.

23          THE COURT:  Well, I understood the argument as not

24   as that she couldn't financially afford it.  I was listening

25   very carefully, it was it would cost more.

1           MR. ALBRECHT:  Yeah.

2           THE COURT:  But that's not financial affording, that

3    she couldn't --

4           MR. ALBRECHT:  Right.

5           THE COURT:  -- financially afford.  So she's just

6    saying it's going to cost me more money in order to do it.  Am

7    I --

8           MR. FONTAINE:  Right.

9           THE COURT:  -- understanding that?

10          MR. FONTAINE:  Yeah.  And I would just maybe add

11   that it would be a financial burden.

12          THE COURT:  Well, see --

13          MR. FONTAINE:  But that --

14          THE COURT:  But that I'm not going to consider

15   because, you know, she didn't produce her financials.  So I

16   was listening to that very carefully.  And then you also said

17   that --

18          MR. FONTAINE:  Oh, but Judge, I think -- and with

19   all due respect, I think that's a little different.  I mean,

20   if -- I'm saying that she is going to incur more attorney's

21   fees because an attorney will have to get up to speed,.  Any

22   attorney's going to have to get up to speed on this file, I

23   think that's just a given.

24          THE COURT:  And that's appropriate.  What you were

25   saying was a burden though.  A burden is that she doesn't have

117

1  the ability to do it.

2          MR. FONTAINE:  Okay.

3          THE COURT:  That's how I'm reading it.  So --

4          MR. FONTAINE:  Yeah.

5          THE COURT:  -- to the issue on whether she doesn't

6  have the financial ability to afford it, I won't consider.

7  The fact that it's going to cost money is independent of

8  whether she can afford it or not, right?  So --

9          MR. FONTAINE:  Yes.

10         THE COURT:  Is that my understanding of it though?

11         MR. FONTAINE:  Yeah.  When I said burden, I didn't

12  mean she couldn't afford it.  I just meant that obviously when

13  someone has to send $10,000, $5,000 more than they would

14  otherwise have to pay, say for example, if I stayed on the

15  case, then that's going to create a financial burden to her.

16  It's going to create an outlay of money that she doesn't have

17  to do at this point if I --

18         THE COURT:  Yeah.

19         MR. FONTAINE:  -- if I stay involved.

20         THE COURT:  And the other issue was that she was

21  having difficulty finding another attorney to take over?

22         MR. FONTAINE:  Correct.

23         THE COURT:  So those are the two issues that she

24  raised, Mr. Albrecht.

25         MR. ALBRECHT:  Okay.  Yeah.



1              THE COURT:  Yeah.

2              MR. ALBRECHT:  Nothing further on those.

3              THE COURT:  Nothing further on those?

4              MR. ALBRECHT:  No.

5              THE COURT:  All right.  So I'm going to give you the

6    opportunity for a closing argument on jurisdiction.

7              MR. FONTAINE:  Judge, can I just make one final

8    point before we get to that.  Just something --

9              THE COURT:  You may.  Go ahead.

10             MR. FONTAINE:  -- something that was mentioned I

11   believe in the memo.  Just one thing is if this court were to

12   transfer this case to Michigan at this point, there is two

13   appeals; one regarding a parenting matter that's still in New

14   Hampshire.

15             THE COURT:  The contempt issue.

16             MR. FONTAINE:  Contempt issue.

17             MR. ALBRECHT:  Yes.

18             MR. FONTAINE:  Correct.  So in essence, my client at

19   least for some period of time, would probably have to retain

20   counsel out in Michigan and retain counsel here-- or continue

21   to retain counsel here for at least continuing to represent in

22   that.  I just want to point that out.

23             THE COURT:  Yeah.  And you did address that in the

24   memorandum.

25             Do you see that portion in his memorandum, Mr.

1    Albrecht?

2            MR. ALBRECHT:  I'm -- what question is that?

3            THE COURT:  The position that she would need to --

4    if the case is transferred to Michigan, that Ms. Albrecht

5    would need to still retain a lawyer in New Hampshire to

6    address the appeal on the contempt issue.

7            MR. ALBRECHT:  I -- I agree.

8            THE COURT:  Okay.

9            MR. ALBRECHT:  It would be a great cost to her.

10           THE COURT:  Excuse me?

11           MR. ALBRECHT:  That would be a great cost to her.

12   We prefer to avoid that, and spend it on the children.

13           MR. FONTAINE:  Judge, just one thing that my client

14   just mentioned that I was unaware of.  And please correct

15   if --

16           Dana, please correct me if -- Mr. Albrecht, if I'm

17   wrong.

18           MR. ALBRECHT:  You can call me Dana.

19           THE COURT:  Well --

20           MR. FONTAINE:  Well, that would be -- yeah.  I will

21   call him Mr. Albrecht --

22           THE COURT:  Yeah.

23           MR. FONTAINE:  -- anyway for the record.

24           But my client believes that that case that was

25   brought in Michigan has actually been appealed by him.  So

1  there is actually an appeal going on out there, so she's

2  already having to take --

3          THE PETITIONER:  No, not in Michigan.  I'm saying

4  here.  I have an attorney (indiscernible).

5          THE COURT:  Did you appeal the Michigan decision?

6          MR. ALBRECHT:  No.

7          MR. FONTAINE:  Wait a minute.

8          MR. ALBRECHT:  And I get that's --

9          MR. FONTAINE:  I'm confused.  I'm sorry.

10          THE PETITIONER:  I'm sorry.

11          MR. ALBRECHT:  I --

12          THE COURT:  Attorney Fontaine, do you want to hit

13  the button if you --

14          MR. FONTAINE:  Yeah.  To just clarify.  Sure.

15          THE COURT:  You may.  Go ahead.

16          MR. FONTAINE:  I think she's dis -- I'm sorry, I

17  misunderstood.  She's distinguishing me and Attorney Piedra,

18  who handles our appeals in my office as separate attorneys.

19  But --

20          THE PETITIONER:  That's separate.

21          THE COURT:  Oh, okay.  (Indiscernible).

22          MR. FONTAINE:  That's what I misunderstood.  I

23  apologize.

24          THE COURT:  Yeah.  That's all right.

25          MR. FONTAINE:  So there's no appeal going on in

1   Michigan.

2           THE COURT:  All right.  Mr. Albrecht, just for the

3   record again, on the issue of family systems counseling.

4           MR. ALBRECHT:  Yes.

5           THE COURT:  You know, it's coming up on -- it's more

6   than seven months, coming up on eight months since that

7   initial order.  Can you describe what efforts you've taken to

8   find a counselor who can perform these services?

9           MR. ALBRECHT:  So rather than be defensive, let me

10  just start by saying I've fall --

11          THE COURT:  I'm not asking you to be defensive.

12          MR. ALBRECHT:  No, no.  But --

13          THE COURT:  I'm trying to figure out information

14  here.

15          MR. ALBRECHT:  I've probably fallen seriously short.

16  I've placed multiple phone calls to California that haven't

17  been returned.  I've asked my own therapist to look into --

18  she's reached out to people here who were unavailable on my

19  behalf.  And you pointed out, and rightly so, I should be on

20  the phone every day to Michigan and --

21          THE COURT:  Well, I didn't say that.

22          MR. ALBRECHT:  No.  But --

23          THE COURT:  I'm just --

24          MR. ALBRECHT:  Well, I'm inferring that -- you know,

25  I think both -- I mean, maybe the responsibility does fall on

1  me, but we need to get our ass in gear, excuse my French, to

2  get this going.

3  　　　　THE COURT:  Okay.  All right.  Is everyone ready to

4  proceed to their closings or do you need a minute to organize

5  your thoughts?

6  　　　　MR. FONTAINE:  I'm ready to proceed.

7  　　　　THE COURT:  You good?

8  　　　　MR. ALBRECHT:  Yeah.

9  　　　　THE COURT:  Okay.  Attorney Fontaine, why don't you

10  go first on the closing.

11  　　　　　　　　RESPONDENT'S CLOSING ARGUMENT

12  　　　　MR. FONTAINE:  So Judge, as we've indicated in our

13  memorandum of law and our presentation today, we believe that

14  when you look at all the factors, including the additional

15  factors that we've outlined, and you look at the balancing of

16  those factors, it favors this court retaining jurisdiction.

17  When you look at prejudice that would result to my client in

18  having this matter transferred.  If you look at the fact that

19  the parties are both in agreement that this court should

20  retain jurisdiction.  If you look at the fact that there's

21  only two more years where the question of parenting of ▮

22  would be before any court.  If you look at the ability of the

23  court to work around some of the issues that they raised

24  regarding witnesses or evidence, and to do so like we did it

25  during COVID, and like we did when other hearings in this

1  matter were held where witnesses testified by video

2  conference.

3          So I think when you look at those factors, and you

4  look at the equities of those, I think that it supports my

5  client's position that this matter should remain in New

6  Hampshire for any issues that may come up come about in the

7  future on parenting.  I don't know that there will be any,

8  hopefully there won't, hopefully the issues are resolved

9  through this family systems counseling, and we never have to

10 be before a judge again.  But if we do, we think that it would

11 be best for this to do so before this court for those reasons

12 that we've outlined.

13         THE COURT:  Thank you, Attorney Fontaine.

14         MR. FONTAINE:  Thank you.

15         THE COURT:  Mr. Albrecht.

16              PETITIONER'S CLOSING ARGUMENT

17         MR. ALBRECHT:  So I think throughout these

18 proceedings my position would be if the Court disagrees sua

19 sponte with what Attorney Fontaine and I appear to agree on,

20 that those concerns can definitely addressed with RSA

21 458-A:10, taking testimony in another state, and A:11,

22 cooperation between courts.

23         As you pointed out earlier, it is your job to

24 resolve disputes.  I think the simplest thing we could do

25 moving forward for this case would be for you to sign attorney

1  Fontaine's proposed order on jurisdiction because I'm not sure

2  that we really have a dispute on jurisdiction.

3          THE COURT:  Okay.  Is that all?

4          MR. ALBRECHT:  Yes.

5          THE COURT:  All right.  Thank you Mr. Albrecht.

6          So I'll take the issue under advisement.  I will

7  review my notes regarding the testimony here today.  Exhibit 1

8  has been admitted into evidence, which is an email chain

9  between Attorney Caufield (phonetic), and it looks like a

10  paralegal from Attorney Fontaine's office, and then I'll issue

11  a written decision.

12          In the meantime, I hope progress is made on the

13  family systems counseling.  It was my hope when I ordered it

14  back in February of 2022, if my recollection serves me, I

15  issued that within a few days after the hearing before I

16  issued the final orders, that there would be some movement on

17  that end, so this way we can understand what needs and what

18  can be repaired in the relationship between Mr. Albrecht and

19  █████.  So from that position it's why I hoped and why I wish

20  it was done.  I'm not casting any blame on any of the parties

21  here but that's why I expedited that order because I thought

22  it was important to begin that process, and I'd just like to

23  see some movement on that end.

24          MR. ALBRECHT:  Okay.

25          THE COURT:  Whether this court returns jurisdiction

1    or not, we're not going to get to the bottom of what needs to

2    be fixed in the relationship between [ ] and Mr. Albrecht

3    unless we get some professional help to do it.

4           So other than that, I'll get an order as soon as I

5    can.  Please be patient.  We are short staffed so I don't know

6    when the order will be out.  Until then, New Hampshire still

7    has jurisdiction.  And so anything that needs to be filed,

8    please don't hesitate to do so.

9           And Attorney Fontaine, will you be filing an

10   objection to the motion for contempt.

11          MR. FONTAINE:  I will be.

12          THE COURT:  Okay.  All right.  so I'll wait for

13   that.  The 10 days started yesterday I believe.

14          Mr. Albrecht you filed it yesterday?

15          MR. ALBRECHT:  Yes.

16          THE COURT:  All right.  So just file within the 10

17   days.  If it's done sooner, I may look at it sooner.  No

18   guarantee that will happen either.  But I'll get an order out

19   on that as well.  Okay.

20          Any questions, sir?

21          MR. ALBRECHT:  I think any time you can add, or as

22   the parties otherwise agree in your order, it may be helpful

23   to both of us because it keeps us out of court.  Yeah.

24   Because we had some discussion on that.  Other than that,

25   thank you.

1          THE COURT:  Okay.  And attorney Fontaine, anything

2    else?

3          MR. FONTAINE:  I understand.  I understand that.

4          THE COURT:  All right.  Thank you.  We're adjourned.

5          THE BAILIFF:  All rise.

6       (Proceedings concluded at 11:31 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE</u>

I, TreLinda Wilson, a court-approved proofreader, do hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, to the best of my professional skills and abilities.

TRANSCRIPTIONIST(S):   River Wolfe, CDLT-265
                        Deanna Hinchy, CDLT-254
                        Anneliese Grassi, CDLT-264

TreLinda Wilson

Digitally signed by TreLinda Wilson
Date: 2022.10.19 09:07:18 -04'00'

TRELINDA WILSON, CDLT-148          October 18, 2022
Proofreader

