SLOCUM (FINAL) (DO NOT DELETE)                                    5/20/2010 4:56 PM

# BITING THE D.V. BULLET: ARE DOMESTIC-VIOLENCE RESTRAINING ORDERS TRAMPLING ON SECOND AMENDMENT RIGHTS?

*Peter Slocum*[*]

## I.   INTRODUCTION

In December of 2005, Colleen Nestler convinced a New Mexico court to file a restraining order against David Letterman because she claimed that his presence on television harassed her.[1]  Although the issuing court later dismissed its own outrageous protective order,[2] Mr. Letterman was placed on a national register of domestic abusers.[3]  He was prohibited from either directly or indirectly contacting the alleged victim (whom he had never met) and would have been subject to criminal prosecution for any violation.[4]  Federal law required the television host to forfeit any firearms that he may have owned.[5]  If he had come into possession of a weapon while this order was still outstanding, he could have gone to prison.[6]

While many people consider domestic-violence restraining orders important tools for combating abuse, the above example illustrates that they may be subject to inappropriate applications.  This Comment examines the implications of the Second Amendment to

---

[*]  J.D. Candidate, 2010, Seton Hall University School of Law; B.S., 2007, Rutgers University.  I would like to thank Professor Thomas Healy, Jamie Gottlieb, and Ashley Ochs for their invaluable guidance and assistance with the development of this Comment.

[1]  Gregory A. Hession, *Restraining Orders Out of Control*, NEW AM., Aug. 4, 2008, at 12, 12, *available at* http://thenewamerican.com/usnews/crime/173-restraining-orders-out-of-control.  David Letterman is a late-night television-show host.  *Id.*

[2]  *Id.* at 13.

[3]  *Id.* at 12.  The register is the Protection Order File of the National Criminal Information Center, which is maintained by the Criminal Justice Information Services Division of the Federal Bureau of Investigation.  Fed. Bureau of Investigation, NCIC National Crime Information Center, http://www.fbi.gov/hq/cjisd/ncic_brochure.htm (last visited Feb. 19, 2010).

[4]  Hession, *supra* note 1, at 12.

[5]  *See* 18 U.S.C. § 922(g)(8) (2006).

[6]  *See id.* § 924(a)(1) (providing that violation of § 922(g) is punishable by up to five years in prison).

*SETON HALL LAW REVIEW*                    [Vol. 40:639

the U.S. Constitution in state domestic-violence restraining orders. Focusing on the New Jersey Prevention of Domestic Violence Act,[7] this Comment argues that because of the laxity of the statute, the potential for abuse by plaintiffs, and the expansive provisions limiting gun ownership, the current law is overbroad and thereby infringes on defendants' right to bear arms.[8]

In June of 2008, a New Jersey Chancery Division judge found that the state's domestic-violence statute violated both the state and federal constitutions in *Crespo v. Crespo.*[9] Although the defendant had argued that the statute also violated his Second Amendment rights, the judge rejected this argument because no protection for weapon ownership exists in New Jersey.[10] Less than two weeks later, the Supreme Court of the United States declared in *District of Columbia v. Heller* that the Second Amendment protects the right of individuals to bear arms and thereby rejected the longstanding "militia right" theory.[11] This landmark decision will no doubt lead to renewed scrutiny of many laws, both at the state and federal level. Domestic-violence legislation is a prime example of statutes that require such analysis.

Part II of this Comment explains how state domestic-violence laws implicate the Second Amendment and ultimately assumes incorporation of the Second Amendment through the Fourteenth Amendment. It provides a general background on the customary features of state restraining-order statutes as they exist across the country. It then focuses specifically on New Jersey's domestic-violence statute and sets forth detailed background information on the law along with specific precedent as to how the courts have interpreted the statute. Part II then examines how the state's statute interacts with oth-

---

[7]  N.J. STAT. ANN. § 2C:25-17 to -34 (West 2005).

[8]  *See* U.S. CONST. amend. II.

[9]  Crespo v. Crespo, No. FV-09-2682-04, slip op. at 16, 19 (N.J. Super. Ct. Ch. Div. June 18, 2008), *available at* http://www.mediaradar.org/docs/crespo_decision.pdf (finding that the statute violated the separation-of-powers rules set forth in the New Jersey Constitution as well as the Due Process Clause of the U.S. Constitution), *rev'd*, 972 A.2d 1169 (N.J. Super. Ct. App. Div. 2009), *cert. granted*, 983 A.2d 196 (N.J. 2009).

[10]  *Id.* at 11; *see also* Burton v. Sills, 248 A.2d 521, 526 (N.J. 1968). New Jersey is one of only seven states that does not provide for gun-ownership rights in its state constitution. Roland H. Beason, Printz *Punts on the Palladium of Rights: It Is Time to Protect the Right of the Individual to Keep and Bear Arms*, 50 ALA. L. REV. 561, 580 (1999) (citing David B. Kopel, *Rational Basis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381, 382 (1994)).

[11]  128 S. Ct. 2783, 2797 (2008); *see also infra* Part II.A.

Case 1:23-cv-00381-JL-TSM   Document 34-5   Filed 01/23/24   Page 3 of 51

er laws, both at the state and at the federal level.  Last, it looks at how courts apply the statute in practice and the sorts of external factors that play a role in the administration of the law.

Part III analyzes New Jersey's statute in light of *Heller*.  It concludes that a "rational basis" review for Second Amendment challenges is unlikely and assumes an "intermediate scrutiny" review as the lowest plausible standard.  This Part then applies that standard of review to New Jersey's statute and concludes that it would fail a constitutional challenge for being overly broad.  Finally, Part IV recommends revisions to New Jersey's statute so that the needs of victims of domestic violence can be balanced properly against the constitutional rights of defendants.  This Comment proposes five specific alterations and discusses how each would make the law less vulnerable to Second Amendment criticism while still affording victims of domestic violence ample legal protection.

## II.  LAWS AFFECTING THE FIREARMS RIGHTS OF DOMESTIC-VIOLENCE DEFENDANTS

New Jersey passed the Prevention of Domestic Violence Act of 1991 to address the problem of violence in domestic relations.[12]  Since that time, numerous laws have emerged, at both the state and federal level, which create an intricate web of legislation that simultaneously creates tempting causes of action for plaintiffs and provides stiff penalties for defendants.[13]  To properly analyze the constitutionality of New Jersey's statute, it is necessary to set forth the law in this area generally so as to see the interplay that exists.

### A.  *Implication of the Second Amendment*

The Second Amendment to the U.S. Constitution provides that "[a] well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."[14]  For most of the past century, lower courts had interpreted the amendment as referring to a collective right held by the militias of the several states,[15] thereby excluding individuals from the concept

---

[12]   *See* N.J. STAT. ANN. § 2C:25-18 (West 2005).

[13]   *See infra* Part II.C.2.

[14]   U.S. CONST. amend. II.

[15]   *See, e.g.*, United States v. Pfeifer, 371 F.3d 430, 438 (8th Cir. 2004); United States v. Baer, 235 F.3d 561, 564 (10th Cir. 2000); United States v. Wright, 117 F.3d 1265, 1272 (11th Cir. 1997); Love v. Pepersack, 47 F.3d 120, 124 (4th Cir. 1995).

Case 1:23-cv-00381-JL-TSM   Document 34-5   Filed 01/23/24   Page 4 of 51

of "the people" as used in the Second Amendment. While some lower courts concluded otherwise,[16] the consensus among the majority of the circuits and states (at least among those that had taken part in the analysis) was that individuals had no right to bear arms.[17] In a 2008 decision, *District of Columbia v. Heller*, the Supreme Court reversed that longstanding interpretation and declared that the Second Amendment protects an individual's right to bear arms.[18] As the particular law that the Court was analyzing was not from a state but rather from the District of Columbia, the Court had no need to consider the issue of incorporation of the Second Amendment against the states through the Fourteenth Amendment.

Currently, the courts have yet to incorporate against the states only four of the liberties protected by the first eight amendments in the Bill of Rights: the restriction on quartering soldiers, the right to a civil jury, the right to a grand jury, and the Second Amendment's right to bear arms.[19] Courts that had previously addressed the possible incorporation of the Second Amendment did so under the guise of the "militia right" theory and found that incorporation was unnecessary for a freedom that did not concern individual liberties.[20] Because of the dramatic shift in the basic understanding of this protected right after *Heller*, however, those older cases will likely be of little, if any, precedential value to future courts. Indeed, some lower courts have already decided to incorporate the Second Amendment in the wake of *Heller*.[21]

In *NRA v. City of Chicago*, decided after *Heller*, the U.S. Court of Appeals for the Seventh Circuit confronted the issue of whether to incorporate the Second Amendment against the states through the Due Process Clause of the Fourteenth Amendment.[22] The Seventh Circuit declined to incorporate the right to bear arms and stated that the issue was "for the Justices rather than a court of appeals."[23] The

---

[16]   *See, e.g.*, United States v. Emerson, 270 F.3d 203, 227 (5th Cir. 2001).

[17]   *See supra* note 15 and accompanying text.

[18]   District of Columbia v. Heller, 128 S. Ct. 2783, 2797 (2008).

[19]   Beason, *supra* note 10, at 571–72.

[20]   *See, e.g.*, Quilici v. Village of Morton Grove, 695 F.2d 261, 270 (7th Cir. 1982); United States v. Tot, 131 F.2d 261, 266 (3d Cir. 1942).

[21]   *See, e.g.*, Nordyke v. King, 563 F.3d 439, 457 (9th Cir. 2009), *reh'g granted*, 575 F.3d 890 (9th Cir. 2009).

[22]   567 F.3d 856, 857 (7th Cir. 2009).

[23]   *Id.* at 860.

2010]                                    *COMMENT*                                        643

Supreme Court accepted the petition for certiorari in this case, and a decision is still pending as this Comment goes to print.[24]

The five-Justice majority that decided *Heller* is still on the Court at the time of this publication.[25] These are the same Justices who stated, "By the time of the founding, the right to have arms had become fundamental for English subjects."[26] Whether a given right is "fundamental—whether, that is, [it] is necessary to an Anglo-American regime of ordered liberty" has been cited by the Court as one basis on which to incorporate a constitutional right.[27] This Comment thus subscribes to the view that incorporation is appropriate but will go no further to make arguments in this regard.[28] Accordingly, this Comment assumes incorporation and proceeds with an analysis of domestic-violence restraining orders in light of Second Amendment rights.[29]

---

[24]   McDonald v. City of Chicago, 130 S. Ct. 48 (2009).

[25]   *See* SUPREME COURT OF THE U.S., MEMBERS OF THE SUPREME COURT OF THE UNITED STATES (2009), http://www.supremecourtus.gov/about/members.pdf.

[26]   District of Columbia v. Heller, 128 S. Ct. 2783, 2798 (2008).

[27]   Duncan v. Louisiana, 391 U.S. 145, 149 n.14 (1968) (incorporating the Sixth Amendment right to jury trial). A panel of the Ninth Circuit Court of Appeals recently cited this exact language in deciding that the Second Amendment should be incorporated against the states. Nordyke v. King, 563 F.3d 439, 449 (9th Cir. 2009). The Ninth Circuit has subsequently ordered an en banc rehearing of the case. Nordyke v. King, 575 F.3d 890 (9th Cir. 2009).

[28]   For a specific argument as to why the courts should incorporate the Second Amendment against the states, see generally Beason, *supra* note 10. For a discussion on incorporation of the Bill of Rights against the states through the Fourteenth Amendment, see generally Akhil Reed Amar, *The Bill of Rights and the Fourteenth Amendment*, 101 YALE L.J. 1193 (1992).

[29]   Notably, incorporation, while being the most direct way of attacking the validity of state restraining orders under the Second Amendment, is not the only way of implicating federal constitutional protections against state orders. For example, 18 U.S.C. § 922(g)(8) (2006) prohibits individuals with state restraining orders filed against them from possessing firearms that have traveled in interstate commerce. Some courts have already discussed Second Amendment issues with regard to state orders through this federal statute. *See, e.g.*, United States v. Emerson, 270 F.3d 203, 261–62 (5th Cir. 2001). Additionally, the federal Prevention of Violence Against Women Act requires all states and federal territories to give full faith and credit to all provisions of restraining orders issued by the states. 18 U.S.C. § 2265 (2006). Thus a state restraining order prohibiting a defendant from owning a firearm in the District of Columbia might implicate the Second Amendment. This Comment does not address alternative scenarios, however, because it assumes incorporation.

644                    *SETON HALL LAW REVIEW*                [Vol. 40:639

### B.  *Restraining Orders in the States*

All fifty states have their own domestic-violence statutes and each permits the filing of restraining orders against the alleged abuser by the plaintiff-victim.[30]  While each law is unique, many features are common to all such statutes.

As a general matter, the plaintiff-victim files with the court a petition for relief alleging that the defendant committed acts of domestic abuse.[31]  An affidavit or other sworn statement accompanies the petition.[32]  In the majority of jurisdictions, these statutes permit the judge to enter an emergency protective order ex parte the very same day without the defendant even being aware that proceedings are happening.[33]  After the defendant receives notice, the court will hold a summary hearing within a few days or weeks to decide whether to make the restraining order final.[34]  At the hearing the plaintiff nor-

---

[30]  *See* AM. BAR ASS'N COMM'N ON DOMESTIC VIOLENCE, DOMESTIC VIOLENCE CIVIL PROTECTION ORDERS (CPOS) BY STATE (2007), *available at* http://www.abanet.org/ domviol/docs/DV_CPO_Chart_8_2007.pdf.  For a basic discussion on the policy arguments underlying civil restraining orders, see generally Sally F. Goldfarb, *Reconceiving Civil Protection Orders for Domestic Violence: Can Law Help End the Abuse Without Ending the Relationship?*, 29 CARDOZO L. REV. 1487 (2008); Emily J. Sack, *Battered Women and the State: The Struggle for the Future of Domestic Violence Policy*, 2004 WIS. L. REV. 1657.  For a discussion specific to New Jersey's statute, see generally Maura Beth Johnson, Note, *Home Sweet Home?: New Jersey's Prevention of Domestic Violence Act of 1991*, 17 SETON HALL LEGIS. J. 234 (1993).

[31]  *See, e.g.*, CONN. GEN. STAT. ANN. § 46b-15(a) (West, Westlaw through 2009); IDAHO CODE ANN. § 39-6306(1) (LEXIS through 2009); MICH. COMP. LAWS ANN. § 600.2950(1) (West, Westlaw through 2009 Reg. Sess.); R.I. GEN. LAWS § 8-8.1-3 (LEXIS through ch. 365 of Jan. 2009 Sess.).

[32]  *See, e.g.*, MO. ANN. STAT. § 455.020 (West, Westlaw through 2009 1st Reg. Sess.); OR. REV. STAT. ANN. § 107.710(1) (West, Westlaw through 2009 Reg. Sess.); VA. CODE ANN. § 16.1-253.1(A) (LEXIS through 2009 Special Sess. I); WYO. STAT. ANN. § 35-21-103(b) (LEXIS through 2009 Gen. Sess.).

[33]  *See, e.g.*, CONN. GEN. STAT. ANN. § 46b-15(b) (West, Westlaw through 2009); FLA. STAT. ANN. § 741.30(5)(a) (West 2005); IOWA CODE ANN. § 236.4(2) (West, Westlaw through Jan. 21, 2010 legislation); OHIO REV. CODE ANN. § 3113.31(D)(1) (West, Westlaw through 2009, file 17 of the 128th Gen. Assem.); R.I. GEN. LAWS § 8-8.1-4 (LEXIS through ch. 365 of Jan. 2009 Sess.); S.D. CODIFIED LAWS § 25-10-6 (Westlaw through 2009 Reg. Sess. & Sup. Ct. Rule 09-09).  South Carolina is unique in that it provides for emergency hearings but does not provide for ex parte relief.  S.C. CODE ANN. § 20-4-50 (Westlaw through 2009 Reg. Sess.).

[34]  Maryland's statute provides for the shortest return period of two days or fewer.  MD. CODE ANN., FAM. LAW § 4-504.1(e)(1)(ii) (West, Westlaw through 2009 Reg. Sess.).  Nevada's statute provides for among the longest return periods of forty-five days after the date of the application for an extended order.  NEV. REV. STAT. ANN. § 33.020(3) (West, Westlaw through 2007 74th Reg. Sess. & 25th Special Sess.).  For the remaining states, two weeks is the approximate norm.  *See, e.g.*, ALA. CODE § 30-5-6(a) (Westlaw through 2009 Reg. Sess. & 1st Special Sess.); IDAHO CODE ANN. § 39-

2010]                          *COMMENT*                                645

mally bears the burden of proving the allegations in the petition by a preponderance of the evidence.[35]  If a final restraining order issues, it will normally be limited to a specified period,[36] but some states allow the judge to make the restraining order permanent.[37]  States that do put a time limit on these protective orders generally allow extensions upon request by the plaintiff and after a hearing.[38]  Final restraining orders are normally subject to modification by either party after petition to the court and a hearing.[39]

Some features of certain states' statutes are quite unique, however.  For example, Arizona's statute provides that at an ex parte hearing, the court may enter a restraining order against the defendant if the court has "reasonable cause to believe . . . [that t]he defendant has committed an act of domestic violence"[40] or even if the court has "reasonable cause to believe . . . [that t]he defendant *may commit* an

6308(5) (LEXIS through 2009); WASH. REV. CODE ANN. § 26.50.050 (West, Westlaw through 2009 legislation).

[35] *See, e.g.*, GA. CODE ANN. § 19-13-3(c) (LEXIS through 2009 Reg. Sess.); 750 ILL. COMP. STAT. ANN. 60/205(a) (West, Westlaw through P.A. 96-875 of 2009 Reg. Sess.); IOWA CODE ANN. § 236.3 (West, Westlaw through Jan. 21, 2010 legislation); ME. REV. STAT. ANN. tit. 19-A, § 4006(1) (Westlaw through 2009 1st Reg. Sess. of 124th Leg.); MISS. CODE ANN. § 93-21-11(1) (LEXIS through 2009 Reg. Sess. & 3d Extraordinary Sess.); S.D. CODIFIED LAWS § 25-10-5 (Westlaw through 2009 Reg. Sess. & Sup. Ct. Rule 09-09); VT. STAT. ANN. tit. 15, § 1103(b) (LEXIS through 2009–2010 1st Sess. of Gen. Assem. & 2009 Special Sess.).

[36] *See, e.g.*, DEL. CODE ANN. tit. 10, § 1045(b) (1999) (providing that term may not exceed one year); KY. REV. STAT. ANN. § 403.750(2) (West, Westlaw though 2009 legislation) (stating that term may not exceed three years); S.D. CODIFIED LAWS § 25-10-5 (Westlaw through 2009 Reg. Sess. & Sup. Ct. Rule 09-09) (dictating that term may not exceed five years).

[37] *See, e.g.*, ALASKA STAT. § 18.66.100(b)(1) (LEXIS through 2009 1st Reg. Sess. & 1st Special Sess. of 26th Leg.) (providing no time limit for some provisions of protective orders); FLA. STAT. ANN. § 741.30(6)(c) (West 2005); MONT. CODE ANN. § 40-15-204(1) (Westlaw through 2009 legislation) (stating that the order may be permanent); *see also* N.J. STAT. ANN. § 2C:25-29 (West 2005) (imposing no statutory limit on restraining orders).

[38] *See, e.g.*, CONN. GEN. STAT. ANN. § 46b-15(c)–(d) (West, Westlaw through 2009); LA. REV. STAT. ANN. § 46:2136(F) (Westlaw through 2009 Reg. Sess.); MASS. GEN. LAWS ANN. ch. 209A, § 3 (West, Westlaw through ch. 19 of 2010 2d Annual Sess.); WYO. STAT. ANN. § 35-21-106(b) (LEXIS through 2009 Gen. Sess.).

[39] *See, e.g.*, CAL. FAM. CODE § 6345(a) (West 2004 &Supp. 2010); MICH. COMP. LAWS ANN. § 600.2950(13) (West, Westlaw through 2009 Reg. Sess.); N.H. REV. STAT. ANN. § 173-B:5(VII)(b) (Westlaw through Ch. 1 of the 2010 Reg. Sess.); W. VA. CODE ANN. § 48-27-501(b) (LexisNexis, LEXIS through 2009 4th Extraordinary Sess.).

[40] ARIZ. REV. STAT. ANN. § 13-3602(E)(2) (Westlaw through 1st Reg. Sess. & 5th Special Sess. of the 49th Leg. (2009)).

SLOCUM (FINAL) (DO NOT DELETE)                                    5/20/2010 4:56 PM

646                *SETON HALL LAW REVIEW*              [Vol. 40:639

act of domestic violence."[41]   An ex parte order issued after such a
hearing is more akin to a final restraining order than a temporary
one.[42]   If the defendant wants the opportunity to be heard, the de-
fendant must petition the court to obtain a hearing.[43]   Colorado's sta-
tute similarly inverts the standard procedures.  That statute provides
that after the court issues an ex parte order, the defendant must "ap-
pear before the court at a specific time and date and . . . show cause,
if any, why said temporary civil protection order should not be made
permanent."[44]   This process of shifting the burden of proof to the de-
fendant is not unique to Colorado; Hawaii similarly requires the de-
fendant to prove his own innocence.[45]

Other states have interesting features in their statutes as well.
For example, in Hawaii, a temporary restraining order prevents con-
tact with the plaintiff not only by the defendant but also by the de-
fendant's attorney.[46]   Hawaii's statute contains another provision whe-
reby the court, if it finds that the defendant has violated a restraining
order, may require a global positioning satellite tracking device to be
affixed to the defendant's person.[47]   The court may order the defen-
dant to pay for the related costs.[48]   Furthermore, in Colorado, the
underlying domestic violence that the protection-order statute ad-

[41]   § 13-3602(E)(1) (emphasis added).

[42]   *Compare* § 13-3602(G) (listing the relief available to the plaintiff after the ex
parte hearing), *with* § 13-3602(L) (stating that the order is effective for one year after
being served on the defendant), *and* § 13-3602(I) (stating that the defendant must
petition the court to obtain a hearing on the matter).

[43]   § 13-3602(I).   For similar provisions in other state statutes, see MINN. STAT.
ANN. § 518B.01(5)(b) (West, Westlaw through 2009 Reg. Sess.); NEB. REV. STAT. ANN.
§ 42-925(4) (LexisNexis, LEXIS through 101st Leg. 1st Special Sess.); OR. REV. STAT.
ANN. § 107.718(11) (West, Westlaw through 2009 Reg. Sess.).

[44]   COLO. REV. STAT. ANN. § 13-14-102(5) (West, Westlaw through 1st Reg. Sess. of
67th Gen. Assem.).

[45]   *See, e.g.*, HAW. REV. STAT. ANN. § 586-5(b) (LexisNexis, LEXIS through 2009 2d
Special Sess.) (stating that the court "shall hold a hearing on the application requir-
ing cause to be shown why the order should not continue").

[46]   *See id.* § 586-4(c); *cf.* MODEL RULES OF PROF'L CONDUCT R. 4.2 (2009) (limiting
such communications when a party has counsel but not when she is representing
herself pro se).  This communication ban would likely hinder any efforts to arrive at
an amicable property settlement agreement in a situation where the parties are seek-
ing a divorce.

[47]   § 586-4(e) (pertaining to violations of temporary restraining orders); *id.* § 586-
11(a) (pertaining to violation of final restraining orders).  For similar provisions, see
LA. REV. STAT. ANN. § 46:2143 (Westlaw through 2009 Reg. Sess.); WASH. REV. CODE
ANN. § 26.50.060(1)(i) (West, Westlaw through 2009 legislation).

[48]   HAW. REV. STAT. ANN. §§ 586-4(e), -11(a) (LexisNexis, LEXIS through 2009 2d
Special Sess.).

2010]                          *COMMENT*                          647

dresses encompasses not only physical actions and verbal threats but also acts of financial, document, and property control.[49]

States deal with the issue of gun ownership in relation to restraining orders in a variety of ways. Approximately half of the state statutes do not specifically address whether the judge may order the defendant to relinquish firearms and other weapons when entering the restraining order.[50] Such statutes, however, generally grant the judge the authority to order such "other relief" as the judge deems necessary for the protection of the victim;[51] ordering the defendant to forfeit his or her weapons is logically within the realm of such "other relief."[52] Other states explicitly grant the judge the permissive authority to order the defendant to forfeit any weapons.[53] Many of those states permit such an order either if the court makes certain factual findings or if the court considers a variety of factors.[54] Other states make forfeiture of firearms mandatory regardless of whether any reason exists to believe that the defendant would violate the restraining

---

[49]   COLO. REV. STAT. ANN. § 13-14-102(b)(I) (LEXIS through Apr. 8, 2010).

[50]   *See, e.g.*, ALA. CODE § 30-5-7 (Westlaw through 2009 Reg. Sess. & 1st Special Sess.); ARK. CODE ANN. § 9-15-205 (LEXIS through 2009 Reg. Sess.); GA. CODE ANN. § 19-13-4 (LEXIS through 2009 Reg. Sess.); IOWA CODE ANN. § 236.5 (West, Westlaw through Jan. 21, 2010 legislation); KAN. STAT. ANN. § 60-3107 (Westlaw through 2009 Reg. Sess.); MO. ANN. STAT. § 455.050(1) (West, Westlaw through 2009 1st Reg. Sess.); N.M. STAT. ANN. § 40-13-5(A) (West, Westlaw through 2009 1st Sess. of 49th Leg.); WYO. STAT. ANN. § 35-21-105 (LEXIS through 2009 Gen. Sess.).

[51]   *See, e.g.*, ALA. CODE § 30-5-7(c)(9) (Westlaw through 2009 Reg. Sess. & 1st Special Sess.); KY. REV. STAT. ANN. § 403.740(1)(f) (West, Westlaw through 2009 legislation); NEB. REV. STAT. ANN. § 42-924(1)(g) (LexisNexis, LEXIS through 101st Leg. 1st Special Sess.); OR. REV. STAT. ANN. § 107.718(1)(h) (West, Westlaw through 2009 Reg. Sess.).

[52]   *Compare* KY. REV. STAT. ANN. § 403.740(1)(f) (West, Westlaw through 2009 legislation) (authorizing the court to enter "other orders the court believes will be of assistance in eliminating future acts of domestic violence and abuse"), *with* United States v. Calor, 172 F. Supp. 2d 900, 902 (E.D. Ky. 2001) (recounting that the Kentucky state court ordered the defendant to forfeit his firearms under the emergency protective order).

[53]   *See, e.g.*, DEL. CODE ANN. tit. 10, § 1045(a)(8) (1999); MD. CODE ANN., FAM. LAW § 4-506(e) (West, Westlaw through 2009 Reg. Sess.); N.D. CENT. CODE § 14-07.1-02(4)(g) (LEXIS through 2009 Reg. Sess.); TEX. FAM. CODE ANN. § 85.022(b)(6) (Vernon, Westlaw through 2009 Reg, Sess. & 1st Called Sess. of 81st Leg.).

[54]   *See, e.g.*, ALASKA STAT. § 18.66.100(c)(6), (7) (LEXIS through 2009 1st Reg. Sess. & 1st Special Sess. of 26th Leg.); ME. REV. STAT. ANN. tit. 19-A, § 4006(2-A) (Westlaw through 2009 1st Reg. Sess. of 124th Leg.); MONT. CODE ANN. § 40-15-201(2)(f) (Westlaw through 2009 legislation); 23 PA. CONS. STAT. ANN. § 6107(b)(3) (West Supp. 2009).

648                *SETON HALL LAW REVIEW*                [Vol. 40:639

order and use the weapon against the plaintiff; one of these states is New Jersey.[55]

As discussed below, federal law moots the distinctions among the states as to whether forfeiture of weapons by the restraining order is prohibited, permissive, or even mandatory.[56]  Federal law prohibits any person who is subject to a state restraining order from possessing a firearm regardless of whether the order addresses the matter.[57]  The lingering questions are whether such a blanket prohibition is justified and, more importantly, whether it is constitutionally permissible.

### C. *New Jersey's Restraining Orders*

This Comment focuses on New Jersey's domestic-violence statute and analyzes it in light of an individual's right to bear arms as protected by the Second Amendment.  The law's mandatory and overly broad prohibitions on firearm ownership, in conjunction with the laxity of the statute, infringe on defendants' enumerated rights under the Second Amendment.[58]  Revision of the statute is necessary to properly balance the constitutional rights of the defendant with the interests of the plaintiff.

#### 1.   Status of the Law

##### a.   General Provisions

The New Jersey Legislature passed the Prevention of Domestic Violence Act of 1991 to protect adults and emancipated minors from domestic violence.[59]  To qualify for protection, a plaintiff must have either a household or a dating relationship with the alleged abuser.[60]  The statute specifies certain prohibited acts that, if committed by the

---

[55]  N.J. STAT. ANN. § 2C:25-29(b) (West 2005).  Such mandatory provisions can be found in other states as well.  *See, e.g.,* CAL. FAM. CODE § 6389(a) (West 2004); W. VA. CODE ANN. § 48-27-502(b) (LexisNexis, LEXIS through 2009 4th Extraordinary Sess.); WIS. STAT. ANN. § 813.12(4m)(2) (West, Westlaw through 2009 Act 99).

[56]  *See infra* Part II.C.2.b.

[57]  18 U.S.C. § 922(g)(8) (2006).

[58]  *See infra* Part III.B.

[59]  N.J. STAT. ANN. § 2C:25-17, -18 (West 2005).  For a discussion of various policy issues surrounding this and other related statutes, see generally Melanie L. Mecka, Note, *Seizing the Ammunition from Domestic Violence: Prohibiting the Owning of Firearms by Abusers*, 29 RUTGERS L.J. 607 (1998).

[60]  N.J. STAT. ANN. § 2C:25-19(d) (West 2005).  An "emancipated minor" is someone under the age of eighteen who is either pregnant or has a child, is married, has entered military service, or has been previously declared by a court or administrative agency to be emancipated.  § 2C:25-19(e).

2010]                          *COMMENT*                              649

defendant, would warrant the protection of the courts.[61] The statute names fourteen predicate acts (all of which are codified as substantive crimes in New Jersey) that range from the more severe crimes of homicide and sexual assault to the lesser crimes of terroristic threats, lewdness, and harassment.[62] These predicate offenses are intended to aid the court in deciding whether the plaintiff was subject to "potential abusive and controlling behavior."[63]

Plaintiffs are entitled to seek ex parte relief from the courts in the form of a temporary restraining order (TRO).[64] Generally speaking, a court may enter such ex parte relief "when necessary to protect the life, health or well-being of a victim."[65] If it "appears that the plaintiff is in danger of domestic violence" and "good cause [is] shown," the court may issue a TRO that will remain in effect until the court holds a further hearing.[66] The TRO may prevent the defendant from returning to the scene of the domestic violence (which often means evicting the defendant from his home) and "may include . . . forbidding the defendant from possessing any firearm or other weapon."[67] The definition of "other weapon" is quite broad in New Jersey law and thus allows the judge to prohibit the defendant from possessing antique daggers, swords, or even household kitchen knives.[68] The issuance of a TRO is "immediately appealable" by the defendant for de novo review,[69] but because the standard is so low (i.e., whether it "*appears* that the plaintiff is in danger of domestic violence")[70] such an appeal is arguably of little practical value.

Within ten days of the issuance of the TRO, the court holds a hearing to determine whether to extend the ex parte relief granted by issuing a final restraining order (FRO).[71] To grant an FRO, the court must make a finding that the defendant has committed an act of domestic violence—which would itself be a criminal act punishable

---

[61]  § 2C:25-19(a).

[62]  *Id.*

[63]  Tribuzio v. Roder, 813 A.2d 1210, 1214 (N.J. Super. Ct. App. Div. 2003).

[64]  N.J. STAT. ANN. § 2C:25-28(f) (West 2005).

[65]  *Id.*

[66]  § 2C:25-28(g), (i).

[67]  § 2C:25-28(j).

[68]  *Compare id.* (defining "other weapon[s]" that the court may seize as those detailed in section 2C:39-1), *with id.* § 2C:39-1(r) (liberally defining "weapon").

[69]  § 2C:25-28(i).

[70]  § 2C:25-28(g) (emphasis added).

[71]  *Id.* § 2C:25-29(a).

SLOCUM (FINAL) (DO NOT DELETE)                                    5/20/2010 4:56 PM

650                 *SETON HALL LAW REVIEW*              [Vol. 40:639

by law[72]—or the defendant must admit committing such an act.[73]  Unlike criminal proceedings, where the state must prove the defendant's guilt beyond a reasonable doubt, the plaintiff in the FRO hearing only need prove the allegations by the lesser standard of a "preponderance of the evidence,"[74] the lowest standard that the law provides.[75]  Thus the court may find the defendant to have committed a criminal act (which under this statute includes even murder) by the lower, civil standard of proof.[76]  Interestingly, though, such a judicial finding of the commission of a predicate crime is divorced from criminal proceedings, and the abuser is not subject to penal sanctions unless the state files a separate indictment.[77]

While the judge may remove the defendant's weapons upon issuance of the TRO,[78] the statute mandates that, upon the issuance of an FRO, the judge order the defendant to forfeit all weapons as well as any firearms-purchaser identification card.[79]  An exception exists whereby law-enforcement officers and military personnel may be permitted to carry weapons while on duty,[80] but such exceptions are greatly curtailed by a federal law that prohibits people subject to restraining orders from possessing weapons, as the federal law does not provide these exceptions.[81]  In addition to the mandatory forfeiture of firearms, the judge may also order the defendant to surrender all knives, daggers, swords, bludgeons, slingshots, and even pepper spray

---

[72]  *Id.* § 2C:25-19(a).

[73]  § 2C:25-29(a).

[74]  *Id.*

[75]  12 SUSAN REACH WINTERS & THOMAS D. BALDWIN, NEW JERSEY PRACTICE: FAMILY LAW AND PRACTICE WITH FORMS § 47.13 (1999) (stating that "preponderance of the evidence" is the lowest evidential standard and thus below both "clear and convincing evidence" and "beyond a reasonable doubt").

[76]  *Compare* § 2C:25-19(a), *with* § 2C:25-29(a).

[77]  *Cf. id.* § 2C:25-28(a) (stating that the filing of a civil complaint for domestic violence does not prevent the separate filing of a criminal complaint for the same acts).

[78]  § 2C:25-28(j).

[79]  *Id.* § 2C:25-29(b).

[80]  *Id.*

[81]  *See* 18 U.S.C. § 922(g)(8) (2006).  In essence, then, a New Jersey restraining order results in a mandatory change of duties (or possibly dismissal) of active service personnel.  Federal law does, however, permit the defendant to petition the Attorney General for an exemption when the restrained person's possession of a firearm would not be contrary to public interest.  *Id.* § 925(c).

2010]                          *COMMENT*                                651

that the defendant may own.[82]   The FRO must withdraw the defendant's gun rights (plus any other weapon rights that the judge chooses to curtail) for the greater of either two years or the duration of the FRO;[83] New Jersey restraining orders are presumptively unlimited in duration.[84]

In addition to the mandatory and permissive restrictions on a defendant's possession of weapons, a great many other remedies are available to the plaintiff who prevails in the action.[85]   Not only will the FRO prohibit defendant from committing acts of domestic violence or otherwise contacting the plaintiff,[86] but the plaintiff may also receive exclusive possession of the residence or household, and the court may require the defendant to pay the rent or mortgage.[87]   The court may limit the parenting time that the defendant may have with the parties' children.[88]   The judge may order the defendant to reimburse the plaintiff for monetary losses suffered as a result of the domestic violence.[89]   Furthermore, the court may require the defendant to attend domestic-violence counseling and to pay personally for such expenses.[90]   The court may even order the defendant to undergo psychiatric evaluation.[91]   The list of remedies is expansive and tempting, especially when considering that the plaintiff has the power to make a soon-to-be "ex" miserable.[92]

Once issued, an FRO is presumptively valid for the remainder of the parties' lives unless the judge placed an expiration date on the order at the time of issuance.[93]   Either party may move to modify or dissolve the FRO at any time,[94] but the moving party must overcome a

---

[82]   *Compare* § 2C:25-29(b)(16) (defining "other weapon[s]" that may be seized as those detailed in section 2C:39-1), *with id.* § 2C:39-1(r) (defining "weapon" liberally).

[83]   § 2C:25-29(b).

[84]   *See* § 2C:25-29 (imposing no statutory limit on restraining orders).

[85]   *See* § 2C:25-29(b).

[86]   § 2C:25-29(b)(1), (7).

[87]   § 2C:25-29(b)(2), (8).

[88]   § 2C:25-29(b)(3), (11).

[89]   § 2C:25-29(b)(4).

[90]   § 2C:25-29(b)(5).

[91]   § 2C:25-29(b)(18).

[92]   *See* Cathy Young, *Hitting Below the Belt*, SALON.COM, Oct. 25, 1999, http://www.salon.com/mwt/feature/1999/10/25/restraining_orders/index.html. Notably, New Jersey statute imposes mandatory fines on those against whom final restraining orders are issued.  N.J STAT. ANN. § 2C:25-29.1 (West 2005).

[93]   *See* § 2C:25-29 (imposing no statutory limit on restraining orders).

[94]   § 2C:25-29(d).

*SETON HALL LAW REVIEW*                    [Vol. 40:639

fairly substantial burden to succeed on such a motion. The motion may only be heard by either (1) the same judge who originally issued the FRO or (2) a judge who has a complete record of the hearing upon which the order was based.[95]  Before the court even considers having the order dissolved, the moving party bears the burden of making a prima facie showing of good cause that the order should be dissolved[96] and must demonstrate "substantial changes in the circumstances" since the time of the issuance of the FRO.[97]  The court must then "carefully scrutinize the record and carefully consider the totality of the circumstances"[98] by weighing a series of factors to aid it in its determination.[99]  Even when the plaintiff is the party requesting the dissolution of the FRO, the court is not required to grant the motion.[100]  The court's responsibility is "to protect victims," and the court will make its decision based on whether it feels that the victim remains at risk of domestic violence.[101]  This standard for dissolving an FRO is debatably more demanding than the standard by which such an order is granted in the first instance, especially when other factors are considered.[102]

New Jersey's statute additionally imposes certain record-keeping requirements on the courts for all domestic-violence complaints, regardless of whether an FRO issues.[103]  The Administrative Office of the Courts is required to maintain a uniform record of all domestic-violence complaints and TRO filings to generate periodic reports and statistical data.[104]  Additionally, this office must keep a central registry of all people with restraining orders filed against them.[105]  While the information is confidential,[106] the records cannot be expunged even if the plaintiff drops the complaint and no criminal proceedings are

---

[95]  *Id.*

[96]  *Id.*

[97]  Kanaszka v. Kunen, 713 A.2d 565, 569 (N.J. Super. Ct. App. Div. 1998).

[98]  *Id.* at 567.

[99]  Carfagno v. Carfagno, 672 A.2d 751, 756–57 (N.J. Super. Ct. Ch. Div. 1997) (listing the eleven factors that the court should consider on a motion to dissolve a restraining order).

[100]  Stevenson v. Stevenson, 714 A.2d 986, 994 (N.J. Super. Ct. Ch. Div. 1998).

[101]  *Id.*

[102]  *See infra* Part II.C.3 (describing the other factors that militate toward the granting of a restraining order).

[103]  N.J. STAT. ANN. § 2C:25-33(a) (West 2005).

[104]  *Id.*

[105]  *Id.* § 2C:25-34.

[106]  §§ 2C:25-33, -34.

2010]                              *COMMENT*                                653

filed.[107]  In essence, the once-alleged abuser (now exonerated) is for-ever on a list of domestic abusers.  This branding is not limited to the confines of New Jersey, however, as the federal government keeps its own databases to identify those labeled as "abusers" anywhere in the country.[108]

### b.  Specific Precedent

It is generally not difficult to obtain a restraining order against one's domestic partner in an abusive relationship.  When a defendant actually strikes or otherwise physically abuses the plaintiff, such acts (sufficient for a conviction for assault)[109] would certainly justify the imposition of a restraining order.[110]  Few would seriously argue that restraining orders are anything less than clearly appropriate in cases of physical violence.  Whether to issue an FRO becomes less obvious, however, where the defendant has not physically abused the plaintiff but rather only used heated words or engaged in other nonviolent acts: the law permits the issuance of an FRO on allegations of lewd-ness, terroristic threats, and harassment.[111]

Courts have properly issued FROs on a theory of harassment against individuals who made phone calls with offensively coarse lan-guage at inconvenient hours[112] and mailed pornographic pictures of the victim to a third party, implying that the pictures might be mailed to the plaintiff's workplace and son.[113]  Situations like these represent cases where the defendant clearly sought to harass the plaintiff so as to cause emotional harm.  Thus the courts unsurprisingly issued FROs based on these facts.

What is perhaps more revealing of the arguable ease with which a plaintiff may receive a restraining order are cases where the trial court issued an FRO that was later overturned by the appellate court. In one such case, the defendant told his wife that he no longer loved or desired her, and the judge issued an FRO on a theory of harass-

---

[107]  *In re* Expungement of the Criminal Record of M.D.Z., 668 A.2d 423, 425 (N.J. Super. Ct. App. Div. 1995).

[108]  *See supra* note 3.

[109]  *See* N.J. STAT. ANN. § 2C:12-1 (West 2005) (criminalizing assault).

[110]  *Id.* § 2C:25-19(a) (including assault among the predicate crimes for a finding of domestic violence).

[111]  *Id.*

[112]  D.V. v. A.H., 926 A.2d 887, 888 (N.J. Super. Ct. Ch. Div. 2007).

[113]  McGowan v. O'Rourke, 918 A.2d 716, 717 (N.J. Super. Ct. App. Div. 2007).

ment.[114]   In another situation, the defendant and the plaintiff were having a heated argument, and the defendant slammed the door.[115]  The defendant later moved all of the plaintiff's personal possessions out of the apartment into a storage locker in the plaintiff's name, and the trial judge deemed these acts sufficient for an FRO.[116]  Another judge issued a restraining order on a claim that the defendant's method of disciplining the children differed from the plaintiff's and thereby caused the plaintiff injury.[117]  Similarly, an FRO issued after the defendant moved his wife's desk out of the common office and took the parties' children to counseling instead of choir practice.[118]  Yet another example is where the judge issued an FRO against the defendant for harassment because he left a seemingly innocuous note on his girlfriend's car that asked her to "[p]lease page [him]."[119]

In each of these cases, the trial judge issued an FRO that the appellate court later overturned.[120]  If, however, the defendants in these cases lacked the time, the motivation, or the financial wherewithal to appeal the determination, the restraining orders would have potentially remained in effect for the rest of the parties' joint lives[121] and thus permanently deprived the defendants of their constitutional right to own weapons.  An unadvisedly issued restraining order from a lower court has far-reaching effects on the defendant's liberties.

### c.   Nonjudicial Proceedings

The issuance of restraining orders in judicial proceedings is not the only way in which defendants may lose their firearm rights in New Jersey.  The statute itself permits police to seize weapons even without a court order.[122]

New Jersey's statute states that upon responding to a scene of domestic violence, law-enforcement officers are required to seize any weapon that they believe would expose the victim to a risk of serious

---

[114]   Murray v. Murray, 631 A.2d 984, 984–85 (N.J. Super. Ct. App. Div. 1993).
[115]   Grant v. Wright, 536 A.2d 319, 320 (N.J. Super. Ct. App. Div. 1988).
[116]   *Id.*
[117]   E.K. v. G.K., 575 A.2d 883, 884 (N.J. Super. Ct. App. Div. 1990).
[118]   L.D. v. W.D., 742 A.2d 588, 589 (N.J. Super. Ct. App. Div. 1999).
[119]   J.F. v. B.K., 706 A.2d 203, 204 (N.J. Super. Ct. App. Div. 1998)  (The note stated, "Please page me 290-6512.  I would like to talk to you.  It's a must.  Thanks.").
[120]   *See* sources cited *supra* notes 114–19.
[121]   *See* N.J. STAT. ANN. § 2C:25-29 (West 2005)  (imposing no statutory limit on restraining orders).
[122]   *Id.* § 2C:25-21(d)(1)(b).

bodily injury.[123]  The police may seize the alleged abuser's weapons at the request of the alleged victim even if the weapon was in no way related to the domestic-violence incident.[124]  In fact, county prosecutor offices have been known to issue policy directives under which law-enforcement officers are instructed to inquire of the victim whether the accused possesses any weapons; "[i]f so, the firearms should be kept for safe keeping."[125]  Upon petition by the county prosecutor to prevent the return of weapons to the accused, the court must hold a "summary" hearing[126] to determine whether the weapons should be retained pursuant to section 2C:58-3, which permits the court to deny the return of seized weapons if it would not be in the interest of "public health, safety or welfare."[127]

Courts are very unlikely to take seriously any argument claiming that the protections of the Second Amendment are absolute.  Even the Supreme Court mentioned in the *Heller* decision (albeit in dicta) that "nothing in [the] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places . . . , or laws imposing conditions and qualifications on the commercial sale of arms."[128]  But is New Jersey's law, with its sweeping and often mandatory restrictions on gun ownership, sufficiently crafted to avoid infringing upon defendants' Second Amendment rights?  The strict standards, when considered in conjunction with the law in practice and the arguably widespread abuse in the system, are overbroad and thereby infringe upon defendants' Second Amendment rights.[129]

### 2.  Interaction with Other Laws

No law exists in a vacuum.  To properly understand and then correctly analyze the Second Amendment implications of New Jersey's Prevention of Domestic Violence Act, seeing how other laws interact with that statute at both the state and the federal levels is ne-

---

[123]  *Id.*
[124]  Hoffman v. Union County Prosecutor, 572 A.2d 1200, 1202 (N.J. Super. Ct. Law Div. 1990).
[125]  *Id.* at 1200.
[126]  § 2C:25-21(d)(3).
[127]  *Id.* § 2C:58-3(c)(5).
[128]  District of Columbia v. Heller, 128 S. Ct. 2783, 2816–17 (2008).
[129]  *See infra* Part III.B.

cessary. Severe and oftentimes irrevocable collateral consequences occur for those who have restraining orders filed against them.[130]

### a.  Additional New Jersey Statutes

Section 2C:58-3 of New Jersey's statutes generally describes who may purchase a firearm in the state, what sorts of identification one must have, and what other procedures one must follow before obtaining a firearm.[131] No person who has been criminally convicted of an act of domestic violence may receive a permit to purchase a weapon.[132] Similarly, no person who is subject to a restraining order may obtain such a permit so long as the restraining order limits firearm rights,[133] and FROs are required to prohibit firearm ownership.[134] Even when the plaintiff drops a domestic-violence action, the court still has the discretion to deny the return of the weapons to the defendant on the theory that the defendant's possession of weapons "would not be in the interest of the public health, safety or welfare."[135] Some commentators have argued that this roundabout provision has the potential for abuse because a person initially accused in a possibly frivolous action will be subject to a second judicial proceeding and may consequently lose gun rights after having done nothing wrong in the first instance.[136]

A subprovision in this firearm statute is subsection 2C:58-3(c)(8), which states that a firearm-purchaser identification card shall not be issued to "any person whose firearm is seized pursuant to the 'Prevention of Domestic Violence Act of 1991' and whose firearm has not been returned."[137] The New Jersey Supreme Court recently interpreted this language to mean that satisfaction of any of the conditions annunciated in section 2C:25-21(d)(3) bars the court from returning a gun permit to the defendant.[138] Those conditions include a

---

[130]   *See infra* Part II.C.2.a–b.

[131]   § 2C:58-3.

[132]   § 2C:58-3(c)(1).

[133]   § 2C:58-3(c)(6).

[134]   *Id.* § 2C:25-29(b).

[135]   § 2C:58-3(c)(5); *see In re* Return of Weapons to J.W.D., 693 A.2d 92 (N.J. 1997).

[136]   Stacey Eisenberg, Recent Development, *Criminal Law—Prevention of Domestic Violence Act—Defendant Who Poses Threat to Public Health, Safety, or Welfare Is Not Entitled to a Return of Firearms Even if Domestic Violence Complaint Against That Defendant Has Been Dismissed:* In the Matter of Return of Weapons to J.W.D., *149 N.J. 108, 693 A.2d 92 (1997),* 27 SETON HALL L. REV. 1710, 1715–16 (1997).

[137]   § 2C:58-3(c)(8) (citations omitted).

[138]   M.S. v. Millburn Police Dep't, 962 A.2d 515, 524 (N.J. 2008).

showing by the prosecutor that the "owner is unfit or that the owner poses a threat to the public in general or a person or persons in particular."[139]   Because restraining orders require the defendant to surrender any firearms, this particular provision generally applies only in situations where the police seize the defendant's guns upon responding to a domestic-violence complaint, where the plaintiff does not seek a restraining order, and where the prosecutor later makes a motion to prevent the weapons from being returned to the defendant.[140]

### b.   Federal Statutes on Domestic Violence

The list of laws that interact with New Jersey's domestic-violence statute is not limited to state legislation.[141]   The federal government, in another all too common extension of its power through the Commerce Clause, has also passed a series of statutes relating to domestic-violence restraining orders.[142]   One such statute is 18 U.S.C. §§ 2261–2266, which makes it a crime punishable in federal court to travel in interstate commerce with the intent to commit an act of violence or harassment in contravention of a state restraining order if the defendant actually engages in the prohibited conduct (i.e., assaults or harasses the protected person).[143]   Because this particular provision is conditioned not only on the existence of a valid restraining order but also on the physical violation of the terms of the order by the commission of a substantive crime,[144] this law is vulnerable to comparatively less criticism.   Other provisions, however, are perhaps not so unassailable.

A subsection of this particular statute requires that all states give "full faith and credit" to every portion of a restraining order issued by any state provided that certain minimum due process requirements are met.[145]   Thus a state with very lax standards for issuing a restraining order[146] may enter such a protective order, and every state and

---

[139]   N.J. STAT. ANN. § 2C:25-21(d)(3) (West 2005).

[140]   *Compare id.* § 2C:25-29(b) (requiring the FRO to remove the defendant's gun rights), *with id.* § 2C:25-21(d)(3) (stating that weapons seized in accordance with the Act "shall be returned to the owner except upon order of the Superior Court" and granting the prosecutor the right to petition the court to obtain title to the firearms).

[141]   *See, e.g.,* 18 U.S.C. §§ 922, 2261–2266 (2006).

[142]   *See, e.g., id.*

[143]   § 2262(a)(1).

[144]   *Id.*

[145]   § 2265(a).

[146]   *See, e.g.,* ARIZ. REV. STAT. ANN. § 13-3602(E) (Westlaw through 1st Reg. Sess. & 5th Special Sess. of the 49th Leg. (2009)) (permitting a restraining order on a find-

658                      *SETON HALL LAW REVIEW*                    [Vol. 40:639

federal territory would be required to adhere to every provision, including any limitations on gun ownership.

The federal statute that generally restricts and defines firearm ownership also addresses domestic-violence actions in a variety of ways.[147] That law, 18 U.S.C. § 922(d), makes it illegal for any person to sell or otherwise dispose of any firearm or ammunition to a person who either has been convicted of an act of domestic violence or is subject to a restraining order.[148] Similarly, § 922(g)(9) prohibits anyone from possessing a firearm following conviction for a crime of domestic violence.[149] Because this latter section is a prohibition conditioned on an actual criminal conviction,[150] it is less vulnerable to attack because it reasonably relates to the general policy of keeping firearms out of the hands of those who present a credible threat to the safety of others.[151] For that reason, courts that have examined the constitutionality of this provision have found it to be valid.[152]

Yet another federal prohibition relates to the employment of the defendant. Under § 922(h), a person either subject to a restraining order or convicted of a crime of domestic violence may not "receive, possess, or transport any firearm or ammunition" through the course of employment.[153] This provision would clearly prohibit such an individual from working at a firearm retail store, a weapons manufacturing facility, or a shooting range.[154] Such prohibitions would seem reasonable enough in that those employment contexts are directly

---

ing that the defendant *may* commit an act of domestic violence). For a more detailed discussion of this particular statute, see *supra* Part II.B.

[147] 18 U.S.C. § 922(d), (g), (h).

[148] § 922(d)(8), (9).

[149] § 922(g)(9).

[150] *Id.*

[151] *See, e.g.*, H.R. REP. No. 103-395, at 14 (1993) ("[I]ndividuals with a history of domestic violence should not have easy access to firearms.").

[152] *See, e.g.*, United States v. Lewis, 236 F.3d 948, 950 (8th Cir. 2001) (finding that the statute does not violate the Second Amendment); Gillespie v. City of Indianapolis, 185 F.3d 693, 711 (7th Cir. 1999) (holding that such proscription does not violate the Second Amendment but focusing on a militia right theory). For similar holdings, see also United States v. Pfeifer, 371 F.3d 430, 438 (8th Cir. 2004) (relying on a militia-right theory); United States v. Smith, 171 F.3d 617, 624 (8th Cir. 1999) (same); Fraternal Order of Police v. District of Columbia, 173 F.3d 898, 906 (D.C. 1999) (same). For post-*Heller* decisions upholding the constitutionality of this statute, see United States v. Booker, 570 F. Supp. 2d 161 (D. Me. 2008); United States v. White, No. 07-00361-WS, 2008 WL 3211298, at *1 (S.D. Ala., Aug. 6, 2008).

[153] 18 U.S.C. § 922(h)(1) (2006).

[154] *See id.*

2010]                        *COMMENT*                         659

related to the use of firearms.  But what about a professional truck driver whose employer needs sealed crates of weapons delivered to a customer?  What about an employee of a large retail store (such as K-Mart or Walmart) that happens to have a sporting section that sells hunting equipment—albeit in a section of the store where the employee is not assigned?  And what about a server at an establishment that keeps a firearm behind the bar?  The employment implications are potentially far-reaching and could easily be extended to any context where a firearm or ammunition may be either necessary or collaterally related.  Arguably, denying people these sorts of job opportunities merely because they are subject to restraining orders that may not even find that they pose a threat to the physical safety of the plaintiff would be unreasonable.  This particular provision casts the net far wider than is reasonably necessary.

The last, and perhaps most troubling, federal law in this area is § 922(g)(8).  This law prohibits anyone from possessing a firearm if that person is subject to a state restraining order.[155]  In theory, this provision seems reasonable in that it prevents those who might present a colorable threat to the safety of others from possessing a dangerous weapon.[156]  It is dependent, however, on the existence of valid restraining orders issued by the states[157] because no federal law (except for the District of Columbia)[158] authorizes the issuance of a domestic-violence restraining order by a federal court.  If a state should issue an outrageous restraining order against a defendant, then the federal law would operate where it may not have been intended to do so.[159]

With this in mind, Congress included a restriction whereby protective orders will be recognized for the purpose of this statute only if (1) a hearing was held on the matter, (2) the defendant received notice and an opportunity to be heard, and (3) the order restrains the defendant from engaging in conduct that would place a reasonable person in fear of bodily injury.[160]  Additionally, the state protective

---

[155]   § 922(g)(8).

[156]   *See, e.g.*, H.R. REP. No. 103-395, at 14 (1993).

[157]   § 922(g)(8).

[158]   D.C. CODE § 16-1005(c) (Westlaw through Jan. 3, 2010) (authorizing the issuance of domestic-violence restraining orders in the District of Columbia).

[159]   *See, e.g.*, Hession, *supra* note 1, at 12–13 (describing a restraining order issued against David Letterman for the protection of a woman whom he had never met on a theory that his presence on television harassed her).

[160]   § 922(g)(8).

660               *SETON HALL LAW REVIEW*               [Vol. 40:639

order must either include a finding that the defendant "represents a credible threat to the physical safety" of the plaintiff[161] or explicitly prohibit the use or threat of physical force against the plaintiff.[162] Provided that a state meets these minimal burdens, the federal government will prevent the defendant from possessing a firearm even where the state court did not find such a prohibition to be necessary or otherwise justified.[163]   Whether these procedural safeguards are sufficient to protect the constitutional rights of defendants has led courts to yield conflicted results.[164]

Many of the federal courts that have upheld this particular provision under a Second Amendment analysis did so under the now outdated "militia right" theory.[165]   One court stated in dicta that even if an individual right to bear arms existed and strict scrutiny were to apply, the statute would be narrowly tailored to serve a compelling governmental interest.[166]   That particular court, however, was dealing with a restraining order of limited duration, unlike New Jersey's orders, which have no such expiration dates.[167]   Some post-*Heller* cases have also upheld the constitutionality of this federal statute, but they often relied on restraining-order limitations that do not exist in New Jersey's FROs.[168]

---

[161]   § 922(g)(8)(C)(i).

[162]   § 922(g)(8)(C)(ii).

[163]   *See* § 922(g)(8).

[164]   *See infra* notes 167–75 and accompanying text.

[165]   *See, e.g.*, United States v. Bayles, 310 F.3d 1302, 1307 (10th Cir. 2002); United States v. Napier, 233 F.3d 394, 402–03 (6th Cir. 2000).

[166]   United States v. Lippman, 369 F.3d 1039, 1044 (8th Cir. 2004).  For a similar result, see United States v. Miles, 238 F. Supp. 2d 297, 301, 303 (D. Me. 2002), which held that even if the Second Amendment protected a fundamental, individual right, the statute would be narrowly tailored to a compelling governmental interest because it requires a finding that someone poses a threat of violence.  In *Miles*, however, the district court relied in part on a factual finding made by the state court that the defendant posed a threat of committing acts of violence.  *Id.* at 302–03.  This ruling is thus limited because the federal statute requires *either* that (1) the person pose a threat of violence *or* (2) the state restraining order prohibit the defendant from committing an act of violence.  *See* 18 U.S.C. § 922(g)(8) (2006).  Thus the federal government possibly would deny someone the right to possess weapons based on a restraining order that does not find that he poses a threat of violence.  Rather, he could simply be subject to a restraining order that prohibits him from committing acts of violence.

[167]   *Lippman*, 369 F.3d at 1044; *see* N.J. STAT. ANN. § 2C:25-29 (West 2005) (imposing no statutory limit on restraining orders).

[168]   *See, e.g.*, United States v. Montalvo, No. 08-CR-004S, 2009 WL 667229, at *3–4 (W.D.N.Y. Mar. 12, 2009) (stating that no post-*Heller* decisions have found the statute to be unconstitutional but focusing mainly on the fact that the indictment met the

SLOCUM (FINAL) (DO NOT DELETE)                                                5/20/2010 4:56 PM

A district court in the Fifth Circuit analyzing this law reached a different conclusion. The court in *United States v. Emerson* (a case preceding *Heller*) first found that an individual right to bear arms existed.[169] The court then found that because the federal law "allows a state court divorce proceeding, without particularized findings of the threat of future violence, to automatically deprive a citizen of his Second Amendment rights," this statute violated the defendant's constitutional rights.[170] "That such a routine civil order has such extensive consequences totally attenuated from divorce proceedings makes the statute unconstitutional."[171]

Examining the case on appeal, the Fifth Circuit affirmed the finding of an individual right to bear arms in the Second Amendment[172] but reversed the determination that the federal statute violated that right.[173] The court noted that, even without specific findings, the state restraining order was constitutional because the defendant received notice and a hearing.[174] The court then found a sufficient nexus between firearm possession by the defendant and the threat of lawless violence to make constitutional such restrictions on his Second Amendment rights.[175] But the mere presence of notice and a hearing is arguably too low of a standard by which to deprive the defendant of specifically enumerated rights. In some jurisdictions the hearing may be more akin to an administrative step in which the defendant is presumed guilty.[176]

---

requirements of the statute rather than discussing the unconstitutionality argument raised by the defendant); United States v. Luedtke, 589 F. Supp. 2d 1018, 1021–23 (E.D. Wis. 2008) (finding the statute constitutional but relying in part on the limited duration of the state restraining order); United States v. Erwin, No. 1:07-CR-556, 2008 WL 4534058, at *2–3 (N.D.N.Y. Oct. 6, 2008) (finding the statute "narrowly crafted" to a "compelling governmental interest" but relying on the fact that the limitation is a "temporary prohibition"); United States v. Knight, 574 F. Supp. 2d 224, 226–27 (D. Me. 2008) (finding that the statute was narrowly tailored to a compelling governmental interest although the case actually involved the making of false statements on an application to purchase firearms).

[169] 46 F. Supp. 2d 598, 610 (N.D. Tex. 1999), *rev'd*, 270 F.3d 203 (5th Cir. 2001).

[170] *Id.*

[171] *Id.* at 611.

[172] United States v. Emerson, 270 F.3d 203, 229 (5th Cir. 2001).

[173] *Id.* at 265.

[174] *Id.* at 262.

[175] *Id.* at 264.

[176] See *infra* Part II.C.3 for a discussion of this issue as it relates to New Jersey. *See also supra* notes 44–45 and accompanying text (discussing states where the defendant bears the burden of proving innocence).

662                *SETON HALL LAW REVIEW*                [Vol. 40:639

When New Jersey defendants have restraining orders filed against them, the collateral consequences extend far beyond the specifics of those restrictions listed on the face of the orders. The defendants will lose their right to own any weapons and must turn over any firearms that they may have owned in the past.[177] If they are employed in any business where firearms or ammunition relate even remotely to the operation of the business, they may either have to resign or transfer[178] lest they be subject to criminal prosecution.[179] The government places their names in a national database of domestic abusers,[180] and they are permanently stigmatized as "wife beaters."[181] With all of these severe and oftentimes permanent collateral consequences, ensuring that every restraining order issued is justified and not (as discussed in the next section) the product of an overzealous court or an unscrupulous plaintiff abusing the system is all the more important.[182]

### 3. Restraining Orders in Practice

"A litmus test of how vulnerable TROs are to abuse is how easy they are to obtain."[183] In perhaps no other area of the law is the temptation for abuse quite as great as it is in domestic-violence actions.[184] A plaintiff willing to exaggerate past incidents or even com-

---

[177] 18 U.S.C. § 922(g)(8) (2006); N.J. STAT. ANN. § 2C:25-29 (West 2005).

[178] *See* § 922(h).

[179] *See id.* § 924(a) (setting forth applicable criminal penalties).

[180] *See supra* note 3.

[181] *In re* Expungement of the Criminal Record of M.D.Z., 668 A.2d 423, 425 (N.J. Super. Ct. App. Div. 1995) (stating that the defendant's name need not be removed from New Jersey's register of domestic abusers even if no charges are filed and the restraining order is later vacated).

[182] *See infra* Part II.C.3.

[183] Wendy McElroy, *Abuse of Temporary Restraining Orders Endangers Real Victims*, FOXNEWS.COM, Dec. 27, 2005, http://www.foxnews.com/story/ 0,2933,179842,00.html.

[184] *See* David N. Heleniak, *The New Star Chamber: The New Jersey Family Court and the Prevention of Domestic Violence Act*, 57 RUTGERS L. REV. 1009, 1014 (2005) (characterizing the potential for abuse as "tremendous"). *See generally* Scott A. Lerner, *Combating Orders-of-Protection Abuse in Divorce*, 95 ILL. B.J. 590 (2007) (describing the temptation for abuse by plaintiffs of the domestic-violence statutes of Illinois, which provide much of the same relief as the divorce statutes but at a fraction of the time and with lower burdens of proof); Charles E. Corry, Abuse of Protection Orders, http://www.dvmen.org/dv-16.htm#restraint (last visited Feb. 15, 2010) (stating that "the law encourages the [plaintiff] to lie" and that "the temptation [for abuse] may well be irresistible").

2010]                                 *COMMENT*                                    663

mit perjury can have access to a responsive support group, a sympathetic court, and a litany of immediate relief.[185]

The current situation of New Jersey restraining orders is perhaps best understood by means of a hypothetical example. A New Jersey couple has been married for a number of years, but their relationship has taken a turn for the worse. The husband and wife have gradually grown to dislike one another and frequently argue. One of the spouses decides that they should divorce. After one final argument, the husband leaves the house for a few hours. The wife wants him out of her life immediately and thus goes to court and files a domestic-violence complaint. The theory could be one of harassment, and she could simply embellish their last argument, or she could claim that he threatened to hit her. The wife fills out a few forms, stands in front of a judge very shortly afterwards, and obtains an ex parte restraining order against her husband that very same day.[186]

The court has just evicted the husband from his home and declared that he will only be permitted to return to pick up a few personal belongings if a law-enforcement officer accompanies him.[187] Maybe the husband has the money to move into a motel for a few days, or maybe he does not. The order says that within ten days a hearing on the matter will be held before a judge to determine whether to make the restraining order permanent.[188] Perhaps he does not think to hire a lawyer, or perhaps he simply does not have the money to pay for one. The police search his home and confiscate his hunting rifles and his antique saber from the Civil War that had been passed down in his family for generations.[189]

In about a week, he shows up to court after living in a motel for the past ten days (if he is lucky), and his wife formally accuses him of being a domestic abuser.[190] She claims that he threatened to hit her; he denies the allegation. Because the standard of proof is very low[191]

---

[185]   *See* Heleniak, *supra* note 184, at 1014; Young, *supra* note 92.

[186]   For a discussion of the exact procedure, see N.J. STAT. ANN. § 2C:25-28 (West 2005).

[187]   *See* § 2C:25-28(j), (k).

[188]   Continuances are sometimes allowed in the interest of "fundamental fairness." H.E.S. v. J.C.S., 815 A.2d 405, 413 (N.J. 2003). Many husbands are no doubt unaware of this option as not all men hire attorneys. *See* Heleniak, *supra* note 184, at 1014–15.

[189]   *See* § 2C:25-28(j) (authorizing the removal of other weapons in addition to firearms).

[190]   *See id.* § 2C:25-29(a).

[191]   *Id.* (setting the standard as by a "preponderance of the evidence").

SLOCUM (FINAL) (DO NOT DELETE)                                              5/20/2010  4:56 PM

664                    *SETON HALL LAW REVIEW*                    [Vol. 40:639

and because the judge is very cautious about denying the request for fear that the plaintiff could be telling the truth,[192] the judge issues a final restraining order.  The terms of the restraining order grant the wife exclusive possession of the home[193] and require the husband to keep paying the mortgage.[194]  He is told that he can only see his children at designated times when a court-ordered supervisor is present.[195]  The wife is permitted to have sole possession of the family car and other personal property that she had petitioned from the court, including the checkbook.[196]  He is denied the return of his hunting rifles and antique saber, and he is told that he might never be permitted to purchase any other weapons for the rest of his life.[197]  And as a final blow, the husband is told that he needs to undergo psychiatric evaluation[198] and attend domestic-violence counseling;[199] the court orders him to pay the counselor personally.[200]

Advocate groups and commentators have been arguing for years about the potential for abuse inherent within the domestic-violence system.[201]  If a spouse is willing to fill out an inaccurate affidavit and exaggerate past facts that, like an allegation of a verbal threat, may be impossible to disprove, the spouse can gain the upper hand in a di-

---

[192]  For a more detailed discussion of this issue, see *infra* notes 213–27 and accompanying text.

[193]  *See* § 2C:25-29(b)(2).

[194]  *See* § 2C:25-29(b)(8).

[195]  *See* § 2C:25-29(b)(3).

[196]  *See* § 2C:25-29(b)(9).

[197]  *See* § 2C:25-29 (imposing no statutory limit on restraining orders).

[198]  *See* § 2C:25-29(b)(16).

[199]  *See* § 2C:25-29(b)(5).

[200]  *See id.*

[201]  *See, e.g.*, RADAR SERVS., INC., WITHOUT RESTRAINT: THE USE AND ABUSE OF DOMESTIC RESTRAINING ORDERS 6, http://www.radarsvcs.org/docs/RADARreport-VAWA-Restraining-Orders.pdf (last visited Feb. 15, 2010) (stating that restraining orders are used as bargaining chips in divorce proceedings); Heleniak, *supra* note 184, at 1014; Thomas J. Kasper, *Obtaining and Defending Against an Order of Protection*, 93 ILL. B.J. 290, 290 (2005), *available at* http://www.fathersunite.org/Restraining%20Orders%20and%20Domestic%20Violence/RestrainingOrderIL.html (stating that protection orders "can also become part of the gamesmanship of divorce"); Cathy Young, *The Abuse of Restraining Orders*, BOSTON GLOBE, Aug. 30, 1999, at A19 (stating that FROs are abused as a tactical advantage); Young, *supra* note 92; Corry, *supra* note 184 (stating that FROs "have also been abused in divorces to keep assets" and quoting the California bar as having expressed concern that "protective orders are increasingly being used in family law cases to help one side jockey for an advantage in child custody").  *See generally* Lerner, *supra* note 184 (describing cases of abuse discussed by the Illinois appellate courts).

vorce proceeding after years of planning while the other spouse will have fewer than ten days to prepare for the hearing.[202]   Many practitioners in this field and defendants' rights groups vehemently argue that the law is abused,[203] and some posit that restraining orders are commonly used as leverage tools by pseudo-victims to seek financial concessions in return for dropping the FRO.[204]

Naturally, other scholars and advocate groups argue that allegations of abuse of the system by plaintiffs are unfounded.[205]   Reliable data on the rate of actual abuse by plaintiffs is difficult to obtain,[206] and personal opinions by practitioners are subject to being tainted by the individual's predispositions.   But while *actual* abuse is difficult to

---

[202]   *See* Heleniak, *supra* note 184, at 1014.

[203]   *See, e.g.*, RADAR SERVS., INC., *supra* note 201, at 9 (quoting Dorothy Wright, a New Jersey attorney and former board member of a women's shelter, as estimating that forty to fifty percent of all restraining orders are requested "purely as a legal maneuver"); Jeffrey M. Leving & Glenn Sacks, *Electronic Tagging Device Bill Will Harm Innocent Men*, BUFFALO NEWS, May 30, 2007, at A6 (discussing the abuse of restraining orders from the perspective of a family-law attorney); Mike McCormick & Glenn Sacks, *Restraining Orders Can Be Straitjackets on Justice*, STAR-LEDGER (N.J.), July 28, 2008, at 15 ("Anybody who practices family law sees people who abuse the restraining order process.   Some create false allegations or take minor insignificant acts and use them to remove their spouse or partner from the home for advantage in litigation. Such abuses undermine victims of real abuse and violence who seek protection."); *see also* Young, *supra* note 92.

[204]   *See* RADAR SERVS., INC., *supra* note 201, at 6, 8 (stating that many restraining orders are used for tactical advantages in litigation); Heleniak, *supra* note 184, at 1014; Kasper, *supra* note 201, at 290 (arguing that FROs have become "part of the gamesmanship of divorce"); Young, *supra* note 92.

[205]   *See* McElroy, *supra* note 183 (stating that women's groups maintain that the abuse of TROs is rare); Paul Moreno, *Groups Fight to End Abuse of Restraining Orders, Most Mass. Media Ignore the Story: Cellucci and Feminists Want to Add to Existing Laws*, MASS. NEWS, June 23, 2000, http://www.massnews.com/past_issues/2000/10_Oct/ 1009aw.htm (quoting an attorney from the Battered Women's Legal Assistance Project as having stated that "there is no evidence that restraining orders are commonly abused"); Young, *supra* note 92 (stating that some feminist activists claim that restraining orders are abused by men rather than women).

[206]   Such "statistics" do exist in one form or another, however.   For example, Professor Benjamin Foster, Ph.D., CPA, CMA, estimated that 80.6 percent of all of the restraining orders issued in Virginia during 2006 were "false or unnecessary."   Hession, *supra* note 1, at 14; *see also* RADAR SERVS., INC., *supra* note 201, at 9 (providing that, as estimated by Dorothy Wright, a New Jersey attorney and former board member of a women's shelter, forty to fifty percent of restraining orders are requested "purely as a legal maneuver"); Young, *supra* note 92 (quoting Sheara Friend, a Massachusetts attorney, who estimates that forty to fifty percent of restraining orders are strategic ploys).   This Comment expresses no opinion about the trustworthiness of such statistics.

666            *SETON HALL LAW REVIEW*            [Vol. 40:639

prove, the *potential* for abuse inherent in the system (as demonstrated in the above discussion) is nonetheless undeniable.

Those who are contemplating a divorce face the possibility of extensive legal fees, months or even years of litigation, and an ever-present awareness that they may not walk away with everything they wanted from the divorce.  Many people simply do not have the money, time, patience, or moral fortitude to wait to follow the proper legal procedures of divorce.  Furthermore, many divorce proceedings are inherently hostile, and the adversarial environment might lead someone to commit an illegal act (i.e., file an exaggerated or false petition) who normally would never have thought to do so.  New Jersey's domestic-violence law, much like every other such law in the country, permits a person to circumvent the lengthy divorce procedures and obtain immediate relief on the *same day* she fills out the application for protection.[207]

Both men and women alike are subject to the temptation to abuse the system—everyone is human and, as such, fallible.[208]  To argue that, despite the enormous opportunities presented to a would-be plaintiff, no one would choose to misuse the summary processes afforded by the courts is at best naïve and at worst disingenuous.  Even avid pro-victim groups and feminists admit that abuse occurs, but they argue that at most the rate is around five percent of all orders issued.[209]  But even that low estimate (which, like many statistics, is likely based on supposition) means that approximately 100,000 defendants nationwide have their liberties unjustly restricted by restraining orders every year.[210]  "The highest purpose of law is not to punish the guilty, but to protect the innocent.  This must include protecting the innocent from the law."[211]

The logical conclusion that at least some abuse is inherent within the system is undeniable, and it ignores the fundamental flaws of

---

[207]   *See supra* Part II.C.1.a (discussing the available relief and the applicable procedures).

[208]   *See* Young, *supra* note 201 (stating that men, just like women, have abused restraining orders).

[209]   *Id.* (quoting defenders of domestic-violence laws).

[210]   According to a recent news article, the Justice Department estimates that two million restraining orders are issued each year.  Leving & Sacks, *supra* note 203.  Applying the conservative estimate of five percent to that number would mean that 100,000 people each year in the United States are subject to restraining-order abuse.  In New Jersey alone, 30,000 restraining orders are issued annually.  McCormick & Sacks, *supra* note 203.  Five percent of that number is 1500.

[211]   Corry, *supra* note 184 (quoting Steven William Rimmer).

Case 1:23-cv-00381-JL-TSM   Document 34-5   Filed 01/23/24   Page 29 of 51

humanity to argue otherwise.  Thus the focal point of the remaining debate between various groups should not be whether the abuse exists but rather at what rate the abuse of the system occurs.  Even so, abuse by unscrupulous plaintiffs is not the only reason for unease associated with the law.  The legislature and the judiciary must also bear their fair share of the responsibility for the current state of domestic-violence actions.

When a plaintiff alleges an act of domestic violence, some practitioners argue that the system essentially presumes the accused to be guilty.  One commentator argues that "[f]acts have become irrelevant" and that restraining orders are granted as a matter of course.[212]  A plausible explanation for this possible phenomenon is the judge's own personal interest in being overly cautious.[213]  If a judge should grant a restraining order against someone who might not warrant it, the only repercussion is that the defendant might appeal the order.[214]  If, on the other hand, the judge denies a restraining order and the plaintiff is killed or injured the very next day, sour publicity and an enraged community may very well ensure that the jurist's career will be both unpleasant and short.[215]  New Jersey case law is full of examples of trial judges granting outrageous restraining orders based on

---

[212]   Heleniak, *supra* note 184, at 1018.

[213]   *See* Russ Bleemer, *N.J. Judges Told to Ignore Rights in Abuse TROs*, 140 N.J. L.J. 281, 295 (1995) (quoting a municipal court judge as having said that "[a] newspaper headline can be death to a municipal court judge's career . . . and the prospect of an unfavorable newspaper headline is a frightening one.").

[214]   The issuance of a TRO is immediately appealable for "plenary hearing de novo," but the same standards would apply to the appellate review as were applied to the initial hearing.  N.J. Stat. Ann. § 2C:25-28(i) (West 2005).  FROs are appealable in the same manner as any other order from a New Jersey trial judge.  *See* N.J. Ct. R. 2:2-3(a)(1) (2009).

[215]   *See* Bleemer, *supra* note 213, at 295; Heleniak, *supra* note 184, at 1041.

668              *SETON HALL LAW REVIEW*              [Vol. 40:639

strained, if not ridiculous, allegations.[216]   Other states have noted a similar problem of lax standards.[217]

This possible phenomenon is further explained and supplemented by the mandatory training that judges receive on the issue of domestic violence.[218]   At one such training session in 1995, the new judges were told to think about the unfavorable publicity of an unfortunate result when deciding whether to issue a TRO.[219]   One of the instructing judges at this particular session was quoted to have said, "Your job is not to become concerned about all the constitutional rights of the man you're violating as you grant a restraining order. Throw him out on the street, give him the clothes on his back and tell him, 'See ya' around.'"[220]   Another judge stated, "If there is any doubt in your mind about what to do, you should issue the restraining order."[221]   These troubling sentiments are further compounded by the fact that judges are trained to focus on the legislative findings,[222] which are very pro-plaintiff,[223] when making their decisions.

These legislative findings declare that "domestic violence is a serious crime against society"[224] and that it is the "intent of the Legisla-

---

[216]   *See, e.g.*, Murray v. Murray, 631 A.2d 984, 984–85 (N.J. Super. Ct. App. Div. 1993) (granting a restraining order because the husband told his wife that he did not love her and had no sexual feelings toward her); E.K. v. G.K., 575 A.2d 883, 884 (N.J. Super. Ct. App. Div. 1990) (granting a restraining order on a theory that the defendant's methods of disciplining the parties' children adversely impacted the plaintiff because these methods differed from the plaintiff's); Grant v. Wright, 536 A.2d 319, 320–21 (N.J. Super. Ct. App. Div. 1988) (issuing a restraining order based on the defendant's acts of slamming a door during an argument with the plaintiff as well as later placing the plaintiff's possessions into a storage locker in her name); *see also* Hession, *supra* note 1, at 12–13 (stating that a New Mexico judge issued a restraining order against David Letterman on a theory that his presence on television harassed the plaintiff).

[217]   *See, e.g.*, Heleniak, *supra* note 184, at 1020.   Examples include a Connecticut attorney who argues that the state judges "approach protection orders as 'a rubber-stamping exercise' and that the due process hearings held later 'are usually a sham.'" *Id.*   Missouri has been accused of having similar problems. *Id.*   Massachusetts is accused of giving the defendant "little credit." *Id.* at 1019.   *See also* Young, *supra* note 92 (discussing similar problems in multiple states).

[218]   *See* N.J. STAT. ANN. § 2C:25-20(b)(2) (West 2005) (requiring judges to be trained on domestic-violence issues within ninety days of appointment or transfer as well as annually thereafter).

[219]   Bleemer, *supra* note 213, at 295.

[220]   *Id.* at 294.

[221]   *Id.* at 295.

[222]   *Id.* at 294.

[223]   *See* N.J. STAT. ANN. § 2C:25-18 (West 2005).

[224]   *Id.*

SLOCUM (FINAL) (DO NOT DELETE)                                        5/20/2010 4:56 PM

2010]                        *COMMENT*                              669

ture to assure the victims of domestic violence the maximum protection from abuse the law can provide."[225]   The legislature stresses that the primary duty of police officers is to "protect the victim" and similarly that "it is the responsibility of the courts to protect victims."[226] Many courts cite this "maximum protection" language as a guiding principle in their decision-making processes.[227]   These legislative findings and assigned purposes are not the last of the sources of troubling laxity, however.   The statute itself is another source of the potential for abuse.

The standard for determining whether to grant a restraining order is a preponderance of the evidence,[228] the lowest standard available in the law.[229]   This burden is applicable not only to violent crimes of physical abuse[230] but also to nonviolent crimes, such as harassment.[231]   In the past "harassment" has been the basis for over forty percent of the allegations of abuse in New Jersey.[232]   Other states have even higher rates.[233]   Trial judges have granted restraining orders on very thin allegations of harassment, such as for one husband telling his wife that he did not love her any longer and had no sexual feelings for her,[234] for another telling his wife that he would "bury" her if she sold more marital assets,[235] and for another threatening to take "drastic measures" if she did not pay a bill and then subsequently cut-

---

[225]   *Id.*

[226]   *Id.*

[227]   *See, e.g.*, Kanaszka v. Kunen, 713 A.2d 565, 567 (N.J. Super. Ct. App. Div. 1998); M.V. v. J.R.G., 711 A.2d 1379, 1381 (N.J. Super. Ct. App. Div. 1998), *overruled on other grounds by* Kanaszka, 713 A.2d 565.

[228]   N.J. STAT. ANN. § 2C:25-29(a) (West 2005).

[229]   WINTERS & BALDWIN, *supra* note 75, § 47.13.

[230]   For example, homicide, sexual assault, and assault are enumerated as predicate crimes.  N.J. STAT. ANN. § 2C:25-19(a) (West 2005).

[231]   § 2C:25-19(a)(13).

[232]   In 2007, allegations of harassment accounted for forty-two percent of all such reported offenses.  UNIFORM CRIME REPORTING UNIT, N.J. STATE POLICE, DOMESTIC VIOLENCE OFFENSE REPORT 2 (2007), *available at* http://www.njsp.org/info/pdf/ 2007_domestic_violence.pdf (reporting that 30,055 of the 71,901 offenses in the state were for alleged harassment).

[233]   For example, in Massachusetts the majority of restraining orders did not involve even an allegation of any physical abuse. Young, *supra* note 92.  Many simply state that there was yelling during the course of an argument.  *Id.*

[234]   Murray v. Murray, 631 A.2d 984, 984–85 (N.J. Super. Ct. App. Div. 1993).

[235]   Peranio v. Peranio, 654 A.2d 495, 500 (N.J. Super. Ct. App. Div. 1995).  The court vacated the order because the phrase used in the specific context was insufficient as a matter of law to constitute harassment.  *Id.*

SLOCUM (FINAL) (DO NOT DELETE)                                                5/20/2010 4:56 PM

ting off her phone service.[236]   The appellate division ultimately over-turned each of these trial-level determinations and vacated the re-straining orders issued below.[237]   In so doing, the appellate courts li-mited the widespread use—and possible abuse—of "harassment" as the means for obtaining restraining orders by altering the standards for that theory.[238]   The New Jersey Legislature, however, is currently considering a bill that would even further expand the types of acts sufficient to warrant the issuance of a restraining order,[239] which would thus perhaps render the appellate courts' efforts moot.

Aside from the concerns already discussed, scholars and com-mentators have drawn attention to some other, ancillary issues in re-straining orders.  One author pointed out that the plight of defen-dants who work at home is yet another concern because a restraining order not only evicts them from their homes but also greatly restricts, if not destroys, their ability to work.[240]   Other commentators have ar-gued that restraining orders inject comparatively more hostility and conflict into domestic relations and thus have the effect of actually *increasing* the commissions of domestic violence.[241]   Some argue that restraining orders do not even serve the limited purpose for which they are intended because someone who is determined to kill his spouse will likely not care that a judge ordered him not to do so, and thus protective orders only serve to protect "victims" who were not in any real danger in the first place.[242]   Some further claim that legisla-tors advance restraining orders not for the sake of the victims but ra-

---

[236]  Corrente v. Corrente, 657 A.2d 440, 441 (N.J. Super. Ct. App. Div. 1995). Note, however, that the New Jersey Legislature has proposed making cutting off tele-phone service grounds for a restraining order. Gen. Assem. A449, 214th Leg., 2010–2011 Sess. (N.J. 2010).

[237]  *Corrente*, 657 A.2d at 444; *Peranio*, 654 A.2d at 500; Murray v. Murray, 631 A.2d 984, 991–92 (N.J. Super. Ct. App. Div. 1993).

[238]  For a discussion of this development in harassment as a theory for domestic violence, see generally Tricia M. Lawrence, Note, *The Domestic Violence Pendulum: Has it Swung Too Far? Are Harassment Charges Now Being Used as a Sword Rather than a Shield?*, 29 SETON HALL L. REV. 342 (1998).

[239]  The New Jersey Legislature has proposed making a defendant who impairs the plaintiff's means of communication subject to a restraining order. Gen. Assem. A449.

[240]  Hession, *supra* note 1, at 16.

[241]  David R. Usher, *Restraining Orders Unconstitutional in New Jersey?*, OPEDNEWS.COM, July 25, 2008, http://www.opednews.com/articles/Restraining-Orders-Unconst-by-David-R-Usher-080725-854.html (stating that "the vast majority of domestic violence occurs after issuance of a restraining order").

[242]  Young, *supra* note 92.

2010]                            *COMMENT*                                  671

ther for the sake of a burgeoning, multibillion dollar domestic-violence industry, upon which countless attorneys, adoption service employees, psychologists, therapists, and other related professionals rely for their livelihood.[243]

In sum, domestic-violence restraining orders are particularly susceptible to abuse by people who might fabricate allegations of domestic violence to gain an advantage in divorce proceedings. The legislative laxity of the statute, the temptation provided for unscrupulous plaintiffs, the possible overzealousness of the courts, the legislative purposes from the legislature, and the pressure from victim-advocate groups stack up against defendants and threaten permanently to deprive them of their constitutional rights afforded by the Second Amendment.[244]

## III. ANALYSIS OF NEW JERSEY'S STATUTE AND THE RIGHT TO BEAR ARMS

The preceding portions of this Comment discussed how New Jersey's domestic-violence statute affects defendants' firearm rights both in isolation and in conjunction with numerous other laws. This Part first concludes that the Supreme Court will likely adopt nothing less than an intermediate-scrutiny level of review for Second Amendment challenges.[245] Assuming and applying midlevel scrutiny as the standard, New Jersey's Prevention of Domestic Violence Act would likely fail a challenge in the courts.[246]

### A. *Appropriate Level of Scrutiny for Second Amendment Challenges*

As is the case with all scrutiny of statutes under the U.S. Constitution, one of the first steps is to identify the level of review, because the fate of such laws is normally dependent on the standard that the courts apply.[247] In the landmark case of *Heller*, however, the Supreme Court explicitly declined to adopt a standard of review for Second Amendment challenges.[248] The language of the opinion does, never-

---

[243] Usher, *supra* note 241; *see also* Hession, *supra* note 1, at 16 (stating that domestic violence has grown into a multibillion-dollar business in the past thirty years).

[244] *See infra* Part III.B.

[245] *See infra* Part III.A.

[246] *See infra* Part III.B.

[247] *See* ERWIN CHEMERINSKY, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES 671–72 (3d ed. 2006).

[248] District of Columbia v. Heller, 128 S. Ct. 2783, 2817–18, 2821 (2008). The Court noted that choosing a standard of review was unnecessary because under any

672                    *SETON HALL LAW REVIEW*                    [Vol. 40:639

theless, give some insight into how the Court might eventually rule on this issue.

The majority noted that "rational basis" review[249] is appropriate for some instances of judicial review of constitutional issues,[250] but stated the following:

> Obviously, the same test could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms. If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect.[251]

Thus assuming that the Court will not choose rational basis as the standard of review is appropriate.

Justice Breyer argued in his dissent that the Court should adopt a judge-empowering "interest-balancing inquiry" that "asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests."[252] The majority in *Heller* specifically rejected this proposition as being "no constitutional guarantee at all."[253]

Undoubtedly, much scholarly debate and litigation will ensue after *Heller*, specifically on the appropriate standard of review. This Comment will go no further, however, to dissect the positions of the Justices on this issue and will not attempt to make a compelling case as to why one particular standard of review should be chosen over another. The Court has stated that both "rational basis" and an "interest-balancing inquiry" are not demanding enough. Consequently, this Comment assumes that the Court will likely either fashion a new test or will draw from preexisting doctrine to adopt a test somewhere

---

of the standards that it could apply to enumerated rights, the law at issue would fail constitutional muster. *Id.* at 2817–18.

[249] Under this standard of review, courts will uphold a law if it "bears a reasonable relationship to the attainment of some legitimate governmental objective." BLACK'S LAW DICTIONARY 1269 (7th ed. 1999).

[250] The Court stated that these instances include the constitutional command against the enforcement of irrational laws. *Heller*, 128 S. Ct. at 2817 n.27.

[251] *Id.* (citation omitted).

[252] *Id.* at 2852 (Breyer, J., dissenting).

[253] *Id.* at 2817–18, 2821 (majority opinion).

2010]                         *COMMENT*                              673

between "intermediate scrutiny" and "strict scrutiny."[254]   This Comment concludes, however, that even if the Court ultimately chooses the lower "intermediate-scrutiny" standard, New Jersey's Prevention of Domestic Violence Act violates defendants' rights under the Second Amendment because the Act is overly broad.[255]

### B.  *Analysis of New Jersey's Statute under the Second Amendment*

New Jersey's Prevention of Domestic Violence Act has been criticized for some time.  Many argue that such statutes are simply lacking on policy grounds;[256] others argue that they are constitutionally infirm.[257]   One of the more common objections is that New Jersey's statute is actually a prosecution for a crime turned into a civil proceeding.[258]   And in fact, in a recent state case, *Crespo v. Crespo*, the trial judge found the statute violative of both the state and federal constitutions but not on Second Amendment grounds.[259]

---

[254]   For a discussion of these various types of scrutiny, see CHEMERINSKY, *supra* note 247, at 671–73.  For a post-*Heller* case suggesting that strict scrutiny might be appropriate, see United States v. Booker, 570 F. Supp. 2d 161, 163 (D. Me. 2008) ("The individual right to bear arms might well be a fundamental right, the restriction of which requires strict scrutiny.  This conclusion is supported by the placement of the Second Amendment within the Bill of Rights alongside this Country's most precious freedoms.").

[255]   *See infra* Part III.B.

[256]   *See, e.g.*, Sack, *supra* note 30, at 1676–1721 (describing in general various policy-related discussions of domestic-violence statutes).

[257]   *See, e.g.*, Heleniak, *supra* note 184, at 1042 (arguing that the statute has six deficiencies: "lack of notice; the denial of the right of poor defendants to free counsel; the denial of the right to take the depositions; the lack of a full evidentiary hearing; an improper standard of proof; and, most importantly, the failure to provide a defendant with a trial by jury").

[258]   *See, e.g.*, Crespo v. Crespo, No. FV-09-2682-04, slip op. at 7 (N.J. Super. Ct. Ch. Div. June 18, 2008), *available at* http://www.mediaradar.org/docs/crespo_decision.pdf (addressing the defendant's arguments on this point), *rev'd*, 972 A.2d 1169 (N.J. Super. Ct. App. Div. 2009), *cert. granted*, 983 A.2d 196 (N.J. 2009); Heleniak, *supra* note 184, at 1009–10 (stating that New Jersey's law attempts to convert the prosecution for a crime into a civil proceeding).  Interestingly, the New Jersey Appellate Division at one point commented on the fact that the statute requires a judge to make a judicial finding that the defendant committed a crime and that the court must do so at a standard lower than "beyond a reasonable doubt."  Cesare v. Cesare, 694 A.2d 603, 606–07 (N.J. Super. Ct. App. Div. 1997), *overruled on other grounds by* 713 A.2d 390 (N.J. 1998) (overturning the appellate decision on other grounds and not addressing this particular issue).

[259]   *Crespo*, No. FV-09-2682-04, at 15, 19 (stating that the statute violated the separation-of-powers principle under the New Jersey Constitution and the Due Process Clause of the U.S. Constitution).

674            *SETON HALL LAW REVIEW*            [Vol. 40:639

The Supreme Court in *Heller* declared that the Second Amendment protects an individual right to keep a handgun in the home for personal protection.[260]   This right is not absolute, however, as the Court noted.[261]   Convicted felons, for example, are roundly regarded to have forfeited this right.[262]   But merely because someone is a party in a divorce proceeding and has a soon-to-be-ex-spouse who chooses to abuse the system, saying that this individual should lose all rights to possess weapons, potentially for life, goes too far.

Assuming, for the sake of argument, that the Court were eventually to apply an "intermediate scrutiny" standard to Second Amendment challenges,[263] then the government would have to justify the law by showing the existence of "important" governmental objectives and must meet a "demanding" burden of justification by showing that the law is "substantially related" to the achievement of those objectives.[264]   New Jersey's law, when viewed not only in isolation but also in tandem with all of the collateral consequences that befall the defendants the law ensnares, is clearly deficient in these regards.

The "important governmental objective" is the prevention of domestic violence.[265]   Few would seriously argue that this is not justifiable as such.[266]   Where New Jersey's law fails constitutional muster, however, is the second prong of the analysis: whether the law is "substantially related" to this objective.

The laxity of the statute is clearly egregious considering all that the defendant stands to lose upon the issuance of an FRO.   Many practitioners argue that restraining orders are granted as a matter of reflex in many instances.[267]   First, at the ex parte hearing, the judge need only be convinced that it "*appears* that the plaintiff is in danger of domestic violence."[268]   Many of the predicate crimes (e.g., harass-

---

[260]   District of Columbia v. Heller, 128 S. Ct. 2783, 2797 (2008).

[261]   *Id.* at 2816–17.

[262]   *Id.* (assuming the validity of such "longstanding prohibitions").

[263]   *See supra* Part III.A.

[264]   CHEMERINSKY, *supra* note 247, at 671; *see also* BLACK'S LAW DICTIONARY 820 (7th ed. 1999) (defining "intermediate scrutiny").

[265]   *See* N.J. STAT. ANN. § 2C:25-18 (West 2005) ("It is therefore, the intent of the Legislature to assure the victims of domestic violence the maximum protection from abuse the law can provide.").

[266]   *See id.* (finding that domestic violence is a "serious crime against society").

[267]   *See supra* Part II.C.3.

[268]   N.J. STAT. ANN. § 2C:25-28(g) (West 2005) (emphasis added).

ment and terroristic threats)[269] are so easy to allege and difficult to disprove[270] that the burden on the plaintiff (who testifies without the defendant being present)[271] is virtually nonexistent.[272]  The plaintiff is provided with many tempting reasons to embellish, if not completely fabricate, the alleged abusive encounter.[273]  Judges are trained and encouraged to grant such restraining orders not only as a matter of legislatively mandated public policy but also as a matter of personally motivated interest in job security.[274]  At this point, the defendant's weapons may be seized under the TRO.[275]

Within an extremely short period of time[276] (during which the defendant has likely been evicted from his home)[277] the defendant is formally accused of being a domestic abuser by his estranged spouse or partner.[278]  While the plaintiff must technically meet the minimal burden of a "preponderance of the evidence,"[279] numerous commentators argue that the defendant is, as a matter of practice, presumed to be guilty.[280]  After a summary hearing,[281] the court (erring on the

---

[269]   *Id.* § 2C:25-19(a).

[270]   *See* Lawrence, *supra* note 238, at 351 (discussing restraining orders based on harassment allegations that were later overturned on appeal).

[271]   *See* § 2C:25-28 (permitting a temporary restraining order to be granted after an ex parte hearing).

[272]   *See* Bleemer, *supra* note 213, at 294 (stating that judges are encouraged to grant every order).

[273]   *See* N.J. STAT. ANN. § 2C:25-29(b) (West 2005) (listing the relief available to the plaintiff).  Much of this relief permits the plaintiff to receive the benefits of a lengthy divorce proceeding simply by alleging that the defendant threatened to physically abuse her.  *See id.*; *see also* Heleniak, *supra* note 184, at 1042.

[274]   *See* Bleemer, *supra* note 213, at 295 (stating that some judges are motivated by the desire to avoid bad publicity that might jeopardize their careers); *supra* Part II.C.3.

[275]   N.J. STAT. ANN. § 2C:25-28(j) (West 2005).

[276]   Ten days is the return period for the hearing.  *Id.* § 2C:25-29(a).

[277]   *See* § 2C:25-28(j) (permitting the judge to forbid the defendant "from returning to the scene of the domestic violence," which oftentimes is the home).

[278]   *See* § 2C:25-29(a).

[279]   *Id.*

[280]   Elaine Epstein, former president of the Massachusetts Women's Bar Association, stated, "The facts have become irrelevant . . . . Everyone knows that restraining orders . . . are granted to virtually all who apply, lest anyone be blamed for an unfortunate result . . . ."  Heleniak, *supra* note 184, at 1017–18 (quoting Young, *supra* note 92); *see also* Lerner, *supra* note 184, at 592 ("If a parent is willing to abuse the system, it is unlikely the trial court could discover their improper motives in an order of protection hearing . . . ."); Hession, *supra* note 1, at 13 ("Courts routinely issue [temporary] orders on sworn statements like, 'I just don't know what he may do,' or, 'he has a long history of verbal and emotional abuse.' . . . To some judges, evidence is irrele-

676                    *SETON HALL LAW REVIEW*                    [Vol. 40:639

side of caution) judicially finds him to have committed a criminal act,[282] although no criminal charges have been filed against him and no grand jury has issued an indictment.[283]   The judge is then *required* to remove the defendant's firearm rights[284] even if no reason warrants believing that the defendant might use physical violence against the plaintiff.   Furthermore, the court is under no obligation to place any sort of time limit on the prohibition.[285]   Should the judge so choose, the judge may not only order that the defendant be barred from owning a firearm but also that the defendant be barred from owning *any* item that could be used as a weapon, including possibly family heirlooms or kitchen knives.[286]   New Jersey's statute deprives defendants of their specifically enumerated Second Amendment rights in a summary manner, provides no exception for nonviolent defendants, and presumes that the deprivation will last for the rest of the defendant's life.   As such, it is patently overbroad and constitutionally deficient.

To add insult to injury, even if the New Jersey Legislature were to amend the statute to make the prohibition on gun ownership

---

vant; they just issue [final restraining] orders."); Arnold H. Rutkin, *From the Editor*, FAMILY ADVOCATE, Winter 1996, at ii, iii (stating that the issuance of a TRO is a "rubber-stamping exercise" and arguing that subsequent hearings "are usually a sham"); Young, *supra* note 201 (stating that "judges who worry about being perceived as insensitive to women are satisfied with an affirmative reply to 'Are you afraid of bodily harm by the defendant?'" and quoting former Massachusetts state Representative Barbara Gray as having said that "judges grant the restraining orders without asking too many questions").

[281]   Depos v. Depos, 704 A.2d 1049, 1051 (N.J. Super. Ct. Ch. Div. 1997) (concluding that the hearings are summary in nature).   These summary hearings are "short and concise" and last only a few hours.   Heleniak, *supra* note 184, at 1015.   Judges often make their determinations based on "hunches, gut feelings, intuition, and preconceived notions."   *Id.* at 1037.   Notably, "prior bad acts" are admissible into evidence at these proceedings (in contravention of the normal evidentiary rules, e.g., FED. R. EVID. 404(b)), and no right to depose the opposing party before the hearing exists.   Heleniak, *supra* note 184, at 1037; *see also Depos*, 704 A.2d at 1051.

[282]   N.J. STAT. ANN. § 2C:25-29(a) (West 2005).   Notably, however, some jurisdictions require only a finding that the individual *may* commit a crime, e.g., ARIZ. REV. STAT. ANN. § 13-3602(E)(1) (Westlaw through 1st Reg. Sess. & 5th Special Sess. of the 49th Leg. (2009)), and thus seek to stop crimes before any criminal attempt is made. *See also* Hession, *supra* note 1, at 13–16 (describing the consequences of restraining orders).

[283]   *See* N.J. STAT. ANN. § 2C:25-28(a) (West 2005).

[284]   § 2C:25-29(b).

[285]   *See* § 2C:25-29 (imposing no statutory limit on restraining orders).

[286]   *Compare* § 2C:25-29(b)(16) (granting the court the authority to order the removal of other "weapon[s]"), *with id.* § 2C:39-1(r) (broadly defining "weapon").

2010]                          *COMMENT*                          677

merely permissive upon the issuance of an FRO, the Congress would pick up where the state legislature left off with collateral federal consequences. Federal statutes prevent the defendant from purchasing or possessing a weapon[287] and from even working in an environment in which a weapon may be minimally involved[288] even though the defendant may have no personal contact whatsoever with the weapon.[289] If the New Jersey court had granted an exemption to permit a police officer or a member of the armed services to carry a firearm while on duty, the federal government takes away that permission and thus forces the defendant either to resign or transfer.[290]

The trial court in *Emerson* found with regard to Texas's restraining-order statute "[t]hat such a routine civil order has such extensive consequences totally attenuated from divorce proceedings makes the statute unconstitutional."[291] Retroactive support for this proposition comes from the Supreme Court in the closing paragraph of the majority opinion of *Heller*:

> We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised by the many *amici* who believe that prohibition of handgun ownership is a solution. The Constitution leaves the [the legislature] a variety of tools for combating that problem, including some measures regulating handguns. *But the enshrinement of constitutional rights necessarily takes certain policy choices off the table.* These include the absolute prohibition of handguns held and used for self-defense in the home.[292]

While the Court here was speaking of absolute bans on all weapons kept in the home for self-defense, an argument can be made that similar logic should apply with respect to a law that, in essence, denies the right to armed self-defense to people whose estranged partners

---

[287] 18 U.S.C. § 922(g)(8) (2006).

[288] § 922(h).

[289] For examples of this sort of situation, see *supra* Part II.C.2.b.

[290] *See* § 922(g)(8) (prohibiting persons with restraining orders filed against them from possessing weapons and not providing an exception for police and military personnel).

[291] United States v. Emerson, 46 F. Supp. 2d 598, 611 (N.D. Tex. 1999), *rev'd*, 270 F.3d 203 (5th Cir. 2001).

[292] District of Columbia v. Heller, 128 S. Ct. 2783, 2822 (2008) (citation omitted) (second emphasis added).

are using the "gamesmanship of divorce"[293] to gain an upper hand in separation proceedings.

Further compounding the laxity of the statute itself, the current system in New Jersey provides tantalizing incentives for abuse by plaintiffs to gain the upper hand in divorce proceedings.[294]  According to numerous practitioners as well as simple logic, plaintiffs consequently abuse the system.[295]  Lax statutory standards and personally motivated judicial bias militate toward the issuance of restraining orders based on very thin and sometimes outrageous allegations.[296]  The collateral consequences that befall the defendant extend far beyond those restrictions listed on the face of the order and may very well stay with the defendant for life.[297]  Among these are the stigma of being labeled a domestic abuser and having one's name placed in a national database of registered offenders[298] for an act for which no indictment was ever issued and on which no jury ever returned a guilty verdict.  Thus ensuring that every restraining order issued is fully justified is all the more imperative.

The law as currently written encourages false filings with the enticing incentives available in the FRO.[299]  The statute then places on the plaintiff the most minimal burden that it can.[300]  Judicial training and personal motivation encourage the judges to grant every order lest they be blamed for making a mistake.[301]  Upon granting the order, the defendant loses the right to bear arms, presumptively for life.[302]  No exception is made for nonviolent defendants.[303]  For all of these reasons, the law is patently unreasonable and overbroad.  Therefore, New Jersey's statute is not "substantially related" to an

---

[293]   *See* Kasper, *supra* note 201, at 290 (stating that protective orders "can also become part of the gamesmanship of divorce").

[294]   *See* N.J. STAT. ANN. § 2C:25-29(b) (West 2005) (listing the remedies available to plaintiffs).

[295]   *See supra* Part II.C.3.

[296]   *Id.*

[297]   *See, e.g.*, 18 U.S.C. § 922(h) (2006) (prohibiting those with restraining orders filed against them from coming into contact with weapons at their places of employment).

[298]   *See supra* note 3.

[299]   *See supra* Part II.C.3.

[300]   WINTERS & BALDWIN, *supra* note 75, § 47.13.  This is the burden placed on plaintiffs in FRO hearings.  N.J. STAT. ANN. § 2C:25-29(a) (West 2005).

[301]   *See supra* Part II.C.3.

[302]   *See* § 2C:25-29 (imposing no statutory limit on restraining orders).

[303]   *See* § 2C:25-29(b).

"important governmental interest" and thus violates the Second Amendment.

In an intermediate-scrutiny analysis, the underinclusiveness and overinclusiveness of the law is a factor in deciding constitutionality.[304] Numerous other ways exist to meet the societal goal of preventing domestic violence that do not run such an incredible risk of ensnaring innocent defendants and depriving them of their Second Amendment rights.[305]   The fact that New Jersey could meet these goals while still respecting the rights of defendants makes the current provisions of the statute all the more unreasonable.

## IV. RECOMMENDED REVISIONS TO NEW JERSEY'S STATUTE

The government's goal of preventing domestic violence is certainly legitimate if not compelling.   When abusive relationships actually exist, they are justifiably despicable and should be subject to criminal prosecution, as with every other crime.   Yet because the goal is not only to *punish* acts of domestic violence but also to *prevent* them,[306] some further protection beyond mere prosecution for the underlying crime is necessary to properly shield actual victims from oppression.   But New Jersey's statute has gone too far and, in so doing, has infringed on the Second Amendment rights of individual defendants.[307]   Substantial alternatives to the current law exist that would properly balance not only the protection interests of the plaintiff but also the constitutional rights of the defendant.

One commentator passively suggests as a possible solution the simple abolition of all civil restraining-order statutes.[308]   According to that author, when a real need for a protective order exists (i.e., when actual assault or threatened assault has occurred), the court likely will issue a criminal restraining order after the filing of criminal charges.[309]   Nevertheless, complete abolition, while certainly administrable and straightforward, is somewhat extreme.   Public sentiment leans toward the provision of some form of extra protection—a fact evidenced by the very existence of domestic-violence statutes not only

---

[304]   *See* CHEMERINSKY, *supra* note 247, at 674.

[305]   *See infra* Part IV.

[306]   *See* § 2C:25-18 ("It is therefore, the intent of the Legislature to assure the victims of domestic violence the maximum protection from abuse the law can provide.").

[307]   *See supra* Part III.B.

[308]   Hession, *supra* note 1, at 17.

[309]   *Id.*

in every single state but also at the federal level.[310]  In fact, New Jersey's statute specifically states that some form of additional legal protection is needed.[311]  Direct abolition would be not only a legislative task of herculean proportion but also perhaps an act of political suicide.  Therefore, an alternative more reasonable than abolition is required.  That alternative is modification.

A great many modifications are possible through which New Jersey's statute could properly balance the Second Amendment rights of the defendant with both the individual needs of the plaintiff for protection and the larger societal interests of discouraging the reprehensible behavior of domestic abuse.  The first modification would be to make the prohibition on firearm ownership after an FRO is issued permissive as opposed to mandatory.[312]  After all, someone may be harassing or being lewd to the plaintiff (acts that would justify the imposition of a restraining order)[313] but all of the surrounding circumstances could possibly indicate that the plaintiff was not in any physical danger from the defendant.

Alaska's statute is illustrative of the proposition for conditional removal of weapons.  It provides that a court may order the defendant to surrender any firearms "if the court finds that the respondent was in the actual possession of or used a firearm during the commission of the domestic violence."[314]  Many other states have similar provisions that grant courts the power to protect the plaintiff while simultaneously recognizing that the defendant has rights at stake as well.[315]  To provide additional protection to potential victims, the law

---

[310]   *See* AM. BAR ASS'N COMM'N ON DOMESTIC VIOLENCE, *supra* note 30 (listing all fifty states' restraining-order statutes along with the version enacted by the District of Columbia).

[311]   *See* § 2C:25-18 (stating that New Jersey's law prior to the enactment of the Prevention of Domestic Violence Act was insufficient to deal with domestic violence).

[312]   *See id.* § 2C:25-29(b) (requiring the judge issuing the FRO to remove the defendant's gun rights and providing a limited exception for law-enforcement officers and military personnel).

[313]   *See id.* § 2C:25-19(a) (listing lewdness and harassment among the predicate offenses).

[314]   ALASKA STAT. § 18.66.100(c)(7) (LEXIS through 2009 1st Reg. Sess. & 1st Special Sess. of 26th Leg.).

[315]   *See, e.g.,* ARIZ. REV. STAT. ANN. § 13-3602(G)(4) (Westlaw through 1st Reg. Sess. & 5th Special Sess. of the 49th Leg. (2009)) (permitting the removal of weapons if the court finds that the defendant poses a credible threat to the physical safety of the plaintiff); ME. REV. STAT. ANN. tit. 19-A, § 4006(2-A) (Westlaw through 2009 1st Reg. Sess. of 124th Leg.) (permitting the removal of weapons if the incident of abuse involved a firearm or if a heightened risk of immediate abuse exists); MASS. GEN. LAWS

2010]                                    *COMMENT*                                    681

could permit the courts to seize the weapons if the defendant specifi-
cally threatened to use the weapons against the plaintiff even though
the weapons were not in the defendant's possession at the time of the
domestic-violence incident that gave rise to the complaint.  Some re-
quirement, no matter how slight, that the defendant pose a credible
threat of using a firearm against the plaintiff would keep weapons out
of the hands of defendants who legitimately threaten the safety of the
victim but would simultaneously permit nonviolent defendants to re-
tain their constitutional rights.  This modification is more reasonable
than a mandatory surrender of all weapons by every defendant re-
gardless of whether any reason exists to believe that the defendant
might use a weapon against the plaintiff.

   Opponents of this first revision would necessarily argue that all
people against whom restraining orders are issued should have their
weapons taken away.[316]  After all, the very existence of an FRO might
tend to indicate that a person is dangerous.  That proposition, how-
ever, is overly broad and unnecessarily binds the courts' hands from
dealing with defendants as individuals.  The circumstances may very
well indicate that a defendant who has been lewd to the plaintiff or
has harassed the plaintiff with inappropriate phone calls (both of

---

ANN. ch. 209A, § 3B (West, Westlaw through ch. 19 of 2010 2d Annual Sess.) (condi-
tioning the removal of firearms upon a showing of a substantial likelihood of imme-
diate danger of abuse); MINN. STAT. ANN. § 518B.01(14)(j) (West, Westlaw through
2009 Reg. Sess.) (conditioning the removal of firearms upon a finding that the de-
fendant subsequently violated the order while using a firearm); MONT. CODE ANN. §
40-15-201(2)(f) (Westlaw through 2009 legislation) (permitting the removal of a
firearm used in the alleged assault); NEV. REV. STAT. ANN. § 33.031 (West, Westlaw
through 2007 74th Reg. Sess. & 25th Special Sess.) (requiring the court to consider
three factors in deciding whether to remove the defendant's weapons); N.Y. FAM. CT.
ACT § 842-a (McKinney, Westlaw through Laws of 2009) (providing a lengthy set of
conditions for the removal of firearms under varying conditions); N.C. GEN. STAT.
ANN. § 50B-3.1(a) (LEXIS through 2009 Reg. Sess.) (conditioning the removal of
firearms upon the finding of any of four factors); 23 PA. CONS. STAT. ANN. § 6107(b)
(West Supp. 2009) (permitting the removal of firearms if either the abuse involved a
weapon or an immediate and present danger of abuse exists); UTAH CODE ANN. §
78B-7-106(2)(d) (LEXIS through 2009 1st Special Sess.) (permitting the court to
remove the defendant's weapons if his or her use or possession of firearms may pose
a serious threat of harm to the victim).

   [316]  *See, e.g.*, Editorial, *Armed and Dangerous; Domestic Abuse Suspects Shouldn't Be Able
to Keep Their Guns*, WASH. POST, Feb. 17, 2009, at A12, *available at*
http://www.washingtonpost.com/wp-dyn/content/article/2009/02/16/
AR2009021601103.html (arguing that Maryland restraining-order suspects should be
stripped of their gun rights).

which would warrant a protective order)[317] poses no credible threat to the physical safety of the plaintiff.

By analogy, if the logic were to prevail that people with restraining orders against them should be prohibited from possessing firearms under any circumstances because they are inherently dangerous, then surely all those actually convicted of crimes should therefore have their gun rights taken away. After all, those people have, by definition, either pled guilty to a crime or have been found guilty by a jury beyond a reasonable doubt—a standard far more demanding than a mere preponderance of the evidence.[318] But the law does not deprive all people with criminal convictions from possessing weapons. Federal law, for example, permits those with misdemeanor convictions or even certain felony convictions (e.g., "business practices" crimes) to possess weapons.[319] At the very core of that permission is the implicit recognition that not all convicted criminals pose a threat to the physical safety of others. Similar logic should apply to those with restraining orders filed against them. The argument that all domestic-violence defendants are inherently dangerous is overly broad, fatally simplistic, and unduly restrictive and thus gives the court no discretion on decisions that affect the constitutional rights of defendants.

The second modification would be to place a presumptive time limit on FROs. Virtually every state in the country places such time limits on their orders,[320] but New Jersey does not.[321] The result is that

---

[317] *See* N.J. STAT. ANN. § 2C:25-19(a) (West 2005) (listing lewdness and harassment among the predicate offenses).

[318] *Compare* BLACK'S LAW DICTIONARY 1201 (7th ed. 1999) (defining "preponderance of the evidence," the standard used in civil proceedings), *with id.* at 1272–73 (defining "reasonable doubt," the standard used in criminal proceedings).

[319] *Compare* 18 U.S.C. § 922(g)(1) (2006) (prohibiting firearm ownership by anyone convicted of a crime punishable by more than one year in prison), *with id.* § 921(a)(20) (excluding from the definition of § 922(g)(1) predicate offenses that relate to "business practices"). Thus people convicted of misdemeanor offenses or business felonies may still possess firearms under federal law.

[320] *See, e.g.,* IDAHO CODE ANN. § 39-6306(1) (LEXIS through 2009) (limiting the order to one year); IND. CODE ANN. § 34-26-5-9(e) (West, Westlaw through 2009 1st Special Sess.) (providing for a presumptive limit of two years); R.I. GEN. LAWS § 15-15-3(h)(2) (LEXIS through ch. 365 of Jan. 2009 Sess.) (limiting duration of the order to three years); TENN. CODE ANN. § 36-3-605(b) (LEXIS through 2009 Reg. Sess.) (placing a one-year limit on the extension of the temporary protective order); WYO. STAT. ANN. § 35-21-106(b) (LEXIS through 2009 Gen. Sess.) (placing a one-year limit on the protective order); *see also* sources cited *supra* note 36.

[321] *See* N.J. STAT. ANN. § 2C:25-29 (West 2005) (imposing no statutory limit on restraining orders).

2010]                            *COMMENT*                              683

if either party wishes to vacate the outstanding order, he or she will likely need to hire an attorney and then must attend a hearing,[322] even though perhaps decades have passed without incident between the parties.  This modification would not only free up the courts and reduce the legal expenses of the parties but would also place a cap on how long a defendant may be deprived of Second Amendment rights and thus bring the statute closer to the realm of being a reasonable restriction on such liberties.  Support for this amendment additionally derives from post-*Heller* decisions that, in finding certain restraining-order statutes constitutional, have relied in part on the existence of such time limits.[323]

A counterargument that opponents to this amendment will likely raise is that the defendant might still pose a threat to the plaintiff even after the restraining order expires.  That concern is easily addressed by permitting the court to extend the restraining order after its expiration provided that the court finds that such a threat continues to exist.  Most states that place time limits on restraining orders grant the court such authority.[324]  This amendment thus would continue to protect victims just as effectively but would place a presumptive limit on how long a defendant may be deprived of constitutional rights, which would again make the statute more reasonable.

Third, the standard of proof should be raised above that of a mere "preponderance of the evidence,"[325] the lowest standard of

---

[322]  § 2C:25-29(d).

[323]  *See, e.g.*, United States v. Luedtke, 589 F. Supp. 2d 1018, 1024 (E.D. Wis. 2008) (taking into account the time limit on the restraining order in finding that the federal government's restriction on the defendant's gun rights based on a Wisconsin restraining order was constitutional); United States v. Erwin, No. 1:07-CR-556, 2008 WL 4534058, at *2–3 (N.D.N.Y. Oct. 6, 2008) (finding the statute "narrowly crafted" to a "compelling governmental interest" and relying in part on the fact that the limitation is a "temporary prohibition").

[324]  *See, e.g.*, ARK. CODE ANN. § 9-15-205(b) (LEXIS through 2009 Reg. Sess.) (permitting the court to renew the restraining order if the threat of domestic abuse still exists); CONN. GEN. STAT. ANN. § 46b-15(d) (West, Westlaw through 2009) (permitting the court to extend the order when necessary); 750 ILL. COMP. STAT. ANN. § 60/220(e) (West, Westlaw through P.A. 96-875 of 2009 Reg. Sess.) (permitting the extension of the restraining order upon the satisfaction of certain conditions); MINN. STAT. ANN. § 518B.01(6a) (West, Westlaw through 2009 Reg. Sess.) (permitting the court to extend the order if any of four conditions are met); N.H. REV. STAT. ANN. § 173-B:5(VI) (Westlaw through Ch. 1 of the 2010 Reg. Sess.) (permitting extensions for "good cause"); TENN. CODE ANN. § 36-3-605(b) (LEXIS through 2009 Reg. Sess.) (allowing for extensions "on proper showing of cause").

[325]  *See* N.J. STAT. ANN. § 2C:25-29(a) (West 2005) (allocating to the plaintiff the burden of proving his or her allegations by a preponderance of the evidence).

684                        *SETON HALL LAW REVIEW*                    [Vol. 40:639

proof that exists in the judicial system.[326]   The trial court in *Crespo* decided that the standard should be higher because the right to see one's family is a "fundamental right" that should not be deprived on the basis of a "preponderance of the evidence."[327]   The right to bear arms is arguably even more fundamental than the right to see one's family because it is specifically protected in the Bill of Rights.   Thus the same logic (i.e., apply a higher level of proof before taking away the right) should apply to it as to other such rights.   Post-*Heller* decisions provide support for this proposition.[328]   This higher standard would reduce the risk of defendants falling prey to unscrupulous plaintiffs and overzealous courts but is still not so high that plaintiffs will find it insurmountable.

Opposition to this third amendment is likely to be fierce.   The prevailing argument among victims'-rights advocates is that accusations of abuse are inherently difficult to prove (or perhaps to disprove, as the case may be), especially when no physical violence is present.[329]   To require victims to prove their allegations by a standard higher than the lowest allowed by law would be to run the risk that true victims would be unable to meet this burden and thus would be denied necessary relief.[330]   Although that is certainly a legitimate argument, it does seem to patently ignore the interests of the defendant.   But another option is available to a legislature that remains concerned about victims' abilities to prove their allegations: apply the lower standard of "preponderance of the evidence" to portions of the plaintiff's allegations that would not deprive the defendant of fundamental rights (i.e., virtually everything in the petition), and apply the higher standard of "clear and convincing evidence" to the consideration of whether the defendant should have any weapons taken away.[331]   This alternative revision would permit the plaintiff to obtain

---

[326]   WINTERS & BALDWIN, *supra* note 75, § 47.13.

[327]   Crespo v. Crespo, No. FV-09-2682-04, slip op. at 17, 19 (N.J. Super. Ct. Ch. Div. June 18, 2008), *available at* http://www.mediaradar.org/docs/crespo_decision.pdf, *rev'd*, 972 A.2d 1169 (N.J. Super. Ct. App. Div. 2009), *cert. granted*, 983 A.2d 196 (N.J. 2009).

[328]   *See, e.g.*, United States v. Booker, 570 F. Supp. 2d 161, 163 (D. Me. 2008).

[329]   *See, e.g.*, Roe v. Roe, 601 A.2d 1201, 1206 (N.J. Super. Ct. App. Div. 1992) (expressing these concerns).

[330]   *Id.*

[331]   *See supra* notes 312–19 and accompanying text (proposing that the legislature set forth a list of factors to satisfy the court that the defendant poses a danger of using weapons against the plaintiff before the court orders the defendant to forfeit his or her firearms).

2010]                          *COMMENT*                            685

the majority of relief requested and would only place a higher burden on the plaintiff if the plaintiff additionally wished to have the court take away the defendant's guns.

Arguments that this standard would be difficult to administer are weak because the court surely has the institutional competence to distinguish between the two standards and because a separate finding by the judge that the possession of weapons by the defendant poses a threat to the plaintiff already requires independent consideration. Thus, in actuality, this modification would place no extra burden on the court that would not already exist by the adoption of the first proposed amendment (i.e., making the removal of weapons conditional on the finding of certain facts). Such a modification is reasonable in that it only places an extra onus on plaintiffs who wish to curtail the constitutional rights of the defendant but simultaneously prevents the courts from depriving the defendant of Second Amendment firearm rights by the lowest standard available in the law.

The fourth alteration would be to combat the temptation for abuse by plaintiffs specifically by providing for penalties for false accusations by either party within the text of the statute. Many states already outline such penalties in their domestic-violence laws.[332] While New Jersey already has a general prohibition on perjury among its other substantive crimes,[333] independent prosecution in relation to domestic-violence complaints is rare.[334] By providing for specific pe-

---

[332] For states that expressly give the court the authority to assess costs and fees against a party making false statements, see, for example, ARK. CODE ANN. § 9-15-202(c)(2) (LEXIS through 2009 Reg. Sess.); 750 ILL. COMP. STAT. ANN. 60/226 (West, Westlaw through P.A. 96-875 of 2009 Reg. Sess.); LA. REV. STAT. ANN. § 46:2136.1(B) (Westlaw through 2009 Reg. Sess.); N.D. CENT. CODE § 14-07.1-02.1 (LEXIS through 2009 Reg. Sess.); OKLA. STAT. ANN. tit. 22, § 60.2(C)(2) (West, Westlaw through Ch. 460 of the 1st Reg. Sess. of 52nd Leg.). For a statute that grants the court authority to place such individuals in contempt of court, see, e.g., MICH. COMP. LAWS ANN. § 600.2950(24) (West, Westlaw through 2009 Reg. Sess.). For states that make false statements punishable as crimes, see, e.g., N.H. REV. STAT. ANN. § 173-B:3(I) (Westlaw through Ch. 1 of the 2010 Reg. Sess.); 23 PA. CONS. STAT. ANN. § 6106(a.1) (West 2001 & Supp. 2009).

[333] N.J. STAT. ANN. § 2C:28-1(a) (West 2005) (providing that the making of false statements under oath is a crime of the third degree).

[334] *See generally* Aisling Swift, *Collier Courts Consider Perjury Charges for Use of False Names*, NAPLESNEWS.COM, June 30, 2007, http://www.naplesnews.com/news/2007/jun/30/special_report_collier _courts_consider_perjury_cha/ (stating that perjury charges are rare in a variety of proceedings); Valerie D. Nixon, *Perjury: A Very Serious Crime?*, TRUTH AND JUSTICE: FAMILY COURT REFORM, Oct. 3, 2006, http://truthinscotsthistle.blogspot.com/

nalties outside of criminal prosecution (such as monetary sanctions by the court) and by making the parties aware of the consequences before the proceeding, a judge (convinced that a particular plaintiff is abusing the system) will far more likely actually sanction the individual attempting to misuse the judicial process. Allowing courts to sanction either of the parties with monetary fines at the hearings will decrease the likelihood that unscrupulous plaintiffs (or defendants, for that matter) will go unchecked by the system. Furthermore, the specific knowledge that one could be penalized for a fraudulent filing will not only reduce the number of possibly frivolous petitions and thus relieve congestion in the courts but will also reduce the risk of false testimony at the hearings and thereby serve the fundamental interests of truth and justice.

Any opposition to this amendment would be on very shaky ground in that it would seek to protect those who are abusing the judicial system—thereby detracting time and resources that could be spent on true victims—and improperly curtailing the liberties of innocent defendants. Furthermore, permitting the court to issue sanctions against any perjuring party results in an evenhanded application of the law. Granting the court the authority to deal with what it finds to be fraudulent filings with immediate monetary sanctions is certainly reasonable to curtail the temptation for abuse of the system by either party. Because it would concomitantly reduce the temptation for abuse by plaintiffs, it would thus limit the number of possibly innocent defendants affected by the system and make the statute more reasonable.

Finally, the mandatory yearly training of judges[335] should be modified to bring the constitutional rights of the defendant to the direct consideration of the court. Judges should not only be aware that domestic violence is a societal problem and that they are to provide the "maximum protection" to victims that the law can provide,[336] but

---

2006_10_01_archive.html (expressing the opinion that perjury in family court often goes unaddressed). Additionally, common sense indicates that many judges would honestly believe that a party has lied under oath (or perhaps simply exaggerated the truth) based on all of the facts and circumstances but would choose not to take the extra step of attempting to bring the declarant up on criminal charges. The circumstances may be sufficient to convince a court of equity of malfeasance but would be insufficient for the return of an indictment, let alone an ultimate conviction.

[335] *See* N.J. STAT. ANN. § 2C:25-20(a)(2) (West 2005) (mandating judicial training on domestic-violence issues both within ninety days of appointment or transfer and annually thereafter).

[336] For a discussion of the training required for judges, see *supra* Part II.C.3.

2010]                          *COMMENT*                          687

that they must also be wary of trampling on the constitutional rights of defendants.[337]   Additionally, judges should be aware that the system has a great potential for abuse and that plaintiffs are provided with many incentives to be overly zealous if not unscrupulous in their petitions for protection.[338]   Addressing such concerns during judicial training is certainly reasonable in an effort to balance the needs of the plaintiff with the rights of the defendant.   Counterarguments to this proposed amendment would, in essence, insist that the court only hear the interests of one side and ignore the other.   Such a position is clearly not in line with the interests of equity and justice.

Notably, however, even if the New Jersey Legislature were to adopt all of the aforementioned suggestions for modification, defendants against whom restraining orders are issued would still be subject to federal curtailment of their gun rights.[339]   A state's proper protection of the defendant's constitutional rights is worthless if the federal government immediately takes away that protection.   Consequently, courts and commentators should analyze the federal prohibition on firearm ownership by those with restraining orders filed against them to find the proper balance of all of the competing interests.

One possible solution is to make such restrictions on firearms ownership conditioned on factors similar to those in Alaska's legislation[340] or perhaps to provide exceptions for nonviolent defendants.   Indeed, prohibition on gun ownership by felons under § 922 explicitly provides for a "business crimes" exception and thus permits people with such nonviolent criminal histories to own firearms.[341]   After all, possession of weapons by those defendants is not the harm that the statute is designed to prevent (i.e., keeping guns out of the hands of dangerous individuals).   Perhaps in the same spirit, analogous exceptions are appropriate where the person against whom a restraining order is filed does not represent the danger targeted by the statute

---

[337]   *See* Bleemer, *supra* note 213, at 294–95 (noting that some judges have already expressed concern about the short shrift that is given to defendants' constitutional rights in such hearings).

[338]   For a discussion of abuse by plaintiffs and such temptations, see *supra* Part II.C.3.

[339]   *See* 18 U.S.C. § 922(g)(8) (2006) (prohibiting persons with restraining orders filed against them from possessing firearms).

[340]   *See* ALASKA STAT. § 18.66.100(c)(7) (LEXIS through 2009 1st Reg. Sess. & 1st Special Sess. of 26th Leg.) (defining the conditions under which a court may order defendants to surrender their firearms).

[341]   *See supra* note 319.

688                          *SETON HALL LAW REVIEW*                    [Vol. 40:639

(i.e., does not pose a threat of using weapons against the plaintiff). Whatever the case, the blanket prohibition of the federal law likely goes too far, an observation already made by district courts.[342]  Further analysis is clearly appropriate in light of *Heller*.[343]

## V.  CONCLUSION

Domestic violence is a legitimate societal concern that no one should trivialize.  When it occurs, the appropriate response is to take it seriously and use the tools afforded by the legislature and the judicial system to correct past incidents and prevent recurrences.  The current New Jersey statute, however, is arranged in such a way that it provides an enormous incentive for plaintiffs to abuse the process.[344]  The abuse of civil protection orders not only trivializes the plight of true victims of domestic violence, but it also subjects innocent defendants to unwarranted deprivations of their liberties and rights.  Among these lost liberties is the right to possess firearms.[345]

The Supreme Court has dramatically altered the understanding of the Second Amendment, and a constitutionally protected right for the individual to keep and bear arms now exists.[346]  Incorporation of this right against the states is not only reasonable but inevitable.[347]  When this right is applied against the states, many laws will come under scrutiny in an area where they had previously been shielded from any judicial review.  Domestic-violence statutes are a prime example of laws that affect in a sweeping manner the right of individuals to possess guns, and Second Amendment challenges are certain to fol-

---

[342]  *See, e.g.*, United States v. Emerson, 46 F. Supp. 2d 598, 611 (N.D. Tex. 1999) (declaring the federal statute as violative of the Second Amendment), *rev'd*, 270 F.3d 203 (5th Cir. 2001).  For post-*Heller* decisions discussing the issue, see United States v. Luedtke, 589 F. Supp. 2d 1018, 1021–24 (E.D. Wis. 2008) (finding constitutional the federal gun prohibitions on those subject to restraining orders but relying in part on the existence of the limited duration of the state restraining order); United States v. Knight, 574 F. Supp. 2d 224, 226 (D. Me. 2008) (declaring constitutional the federal prohibition on those subject to restraining orders from possessing firearms but dealing with the subject in the light of false statements by the defendant in trying to purchase a firearm); United States v. White, No. 07-00361-WS, 2008 WL 3211298, at *1 (S.D. Ala. Aug. 6, 2008) (finding constitutional the federal law prohibiting those with domestic-violence convictions from possessing weapons).

[343]  District of Columbia v. Heller, 128 S. Ct. 2783 (2008).

[344]  *See supra* Part II.C.3.

[345]  *See* N.J. STAT. ANN. § 2C:25-29(b) (West 2005) (requiring the court to remove the defendant's weapons upon issuing an FRO).

[346]  *Heller*, 128 S. Ct. at 2797.

[347]  *See supra* Part II.A.

2010]                              *COMMENT*                                   689

low.  New Jersey's law in particular is overly broad and violates defendants' Second Amendment rights by virtue of the laxity of the statute, the temptation for abuse by plaintiffs, and the overzealousness of the courts.  Overreaction to a legitimate societal concern does not warrant the de facto extinction of an enumerated constitutional right.  The New Jersey Legislature should amend the Prevention of Domestic Violence Act.  Other states and the federal government should follow suit.