# THE NEW STAR CHAMBER: THE NEW JERSEY FAMILY COURT AND THE PREVENTION OF DOMESTIC VIOLENCE ACT

*David N. Heleniak* **\***

Dean Roscoe Pound once said: "the powers of the star chamber were a trifle in comparison with those of our juvenile courts and courts of domestic relations."[1] The Star Chamber, so named because of the star pattern painted on the ceiling of the room in Westminster Palace where the king of England's council met, was a court of equity that had jurisdiction over criminal matters.[2] Intended to be a streamlined alternative to the common-law courts, it "became a byword for unfair judicial proceedings."[3]

It is black letter law that

> [the] Legislature cannot, by a mere change of name or form, convert that which is in its nature a prosecution for a crime into a civil proceeding and thus deprive parties of their right to a trial by jury.[4] So imperative is the right of a defendant charged with crime to a jury trial that, if denied it, he is entitled to have his conviction set aside and is not required to show that he was injured by reason of the deprivation. Such a conviction is invalid for any purpose.[5]

As the Supreme Judicial Court of Massachusetts phrased it, "Of course the Legislature cannot by a mere change of name or of form convert that which is in its nature a prosecution for a crime into a civil proceeding and thus deprive parties of their rights to a trial by jury. The Constitution cannot thus be trifled with."[6]

The Prevention of Domestic Violence Act[7] is an attempt to convert that which is in its nature a prosecution for a crime into a

---

**\*** This essay is dedicated to my client, Timothy Rodgers, whose experience with the New Jersey Family Court introduced me to an area of law mired in intellectual dishonesty and injustice.

1. Hon. Patrick R. Tamilia, *In Search of Juvenile Justice: From Star Chamber to Criminal Court*, 29 AKRON L. REV. 509, 510 (1996) (citation omitted).

2. THE COLUMBIA ENCYCLOPEDIA 2704 (Paul Lagassé ed., 6th ed. 2000).

3. *Id.*

4. 21A AM. JUR. 2D *Criminal Law* § 1071 (1998).

5. *Id.* § 1072.

6. Ashley v. Wait, 116 N.E. 961, 966 (Mass. 1917).

7. N.J. STAT. ANN. § 2C:25-17 to 25-34 (West 1995 & Supp. 2005).

civil proceeding. So far, it has been a success. The New Jersey Legislature has to date been allowed to create, in the Family Part of the Chancery Division of the New Jersey Superior Court, a modern day Star Chamber.

The Prevention of Domestic Violence Act permits a "victim" to "file a complaint alleging the commission of an act of domestic violence with the" New Jersey Family Court or, "[o]n weekends, holidays and other times when the court is closed," with a municipal court judge.[8]

Domestic violence is defined as:

[T]he occurrence of one or more of the following acts inflicted upon a person protected under this act by an adult or an emancipated minor:

    (1) Homicide . . .
    (2) Assault . . .
    (3) Terroristic threats . . .
    (4) Kidnapping . . .
    (5) Criminal restraint . . .
    (6) False imprisonment . . .
    (7) Sexual assault . . .
    (8) Criminal sexual contact . . .
    (9) Lewdness . . .
    (10) Criminal mischief . . .
    (11) Burglary . . .
    (12) Criminal trespass . . .
    (13) Harassment . . .
    (14) Stalking . . .[9]

Upon the filing of the complaint, the victim is allowed to "seek emergency, *ex parte* relief in the nature of a temporary restraining order," also known as a TRO.[10] A TRO can be issued "upon sworn testimony or complaint of an applicant who is not physically present . . . if the judge is satisfied that exigent circumstances exist sufficient to excuse the failure of the applicant to appear personally . . . ."[11] Within ten (10) days of the filing of the complaint, a summary hearing is to be held in the Family Part to determine whether the allegations in the complaint occurred.[12] The standard of

---

8. N.J. STAT. ANN. § 2C:25-28(a).
9. N.J. STAT. ANN. § 2C:25-19(a).
10. N.J. STAT. ANN. § 2C:25-28(f).
11. N.J. STAT. ANN. § 2C:25-28(h).
12. N.J. STAT. ANN. § 2C:25-29(a); Depos v. Depos, 704 A.2d 1049, 1051 (N.J. Super. Ct. Ch. Div. 1997).

proof is by a preponderance of the evidence.[13] If the court determines that an act of domestic violence occurred, it is simultaneously authorized and directed to "grant any relief necessary to prevent further abuse."[14]

Among the "civil" remedies provided for by the statute are the following:

1. An order giving the plaintiff exclusive possession of the marital home.[15]

2. "An order requiring the defendant to make" mortgage or rent payments.[16]

3. "An order restraining the defendant from making contact with the plaintiff . . . ." The defendant can even be restrained from communicating with any third party "with whom communication would be likely to cause annoyance or alarm to the victim."[17]

4. "Temporary custody of a minor child." In determining whether to award temporary custody, the court is directed by the statute to "presume that the best interests of the child are served by an award of custody to the non-abusive parent."[18]

5. The suspension of "parenting time" opportunities[19] for the defendant or limitation of visitation to supervised visitation.[20] The statute also directs the court to "consider a request by the custodial parent who has been subjected to domestic violence by a person with visitation rights to a child in the parent's custody for an investigation or evaluation by the appropriate agency to assess the risk of harm to the child . . ."[21] and consider holding "an emergency hearing upon an application made by the plaintiff certifying under oath that the defendant's access to the child . . . has threatened the safety and well-being of the child."[22]

6. Monetary compensation for losses suffered by the plaintiff to be paid for by the defendant. The monetary compensation granted to the plaintiff can include both economic and non-

13. N.J. STAT. ANN. § 2C:25-29(a).

14. N.J. STAT. ANN. § 2C:25-29(b).

15. N.J. STAT. ANN. § 2C:25-29(b)(2).

16. N.J. STAT. ANN. § 2C:25-29(b)(8).

17. N.J. STAT. ANN. § 2C:25-29(b)(7).

18. N.J. STAT. ANN. § 2C:25-29(b)(11).

19. N.J. STAT. ANN. § 2C:25-29(b)(3)(b).

20. N.J. STAT. ANN. § 2C:25-29(b)(3).

21. N.J. STAT. ANN. § 2C:25-29(b)(3)(a).

22. N.J. STAT. ANN. § 2C:25-29(b)(3)(b).

*RUTGERS LAW REVIEW* [Vol. 57:3

economic damages suffered as a result of the abuse, punitive damages, attorney fees and costs, and spousal and child support.[23]

7. "An order requiring the defendant to receive professional domestic violence counseling from . . . a source appointed by the court . . . ."[24]

8. "An order requiring the defendant to undergo a psychiatric evaluation."[25]

9. "An order prohibiting the defendant from possessing any firearms . . ." and certain other weapons.[26]

10. The award of temporary custody of "specified personal property, such as an automobile, checkbook, . . . and other personal effects" of the defendant.[27]

Turning to another section of the Act, upon finding the defendant "to have committed an act of domestic violence . . . ," a judge must order that person "to pay a civil penalty of" $50.00 to $500.00.[28] "In imposing this civil penalty, the court shall take into consideration the nature and degree of injury suffered by the victim. The court may waive the penalty in cases of extreme financial hardship."[29]

Finally, the names of defendants found to have committed an act of domestic violence are put on a list for future judicial and law enforcement utilization.[30] This list, known as "the New Jersey Judiciary's Domestic Violence Central Registry," was selected as a "Best of Breed" Program by the national Center for Digital Government.

> State executive branch Chief Information Officer Judith Teller praised the Judiciary's registry[.] "The Domestic Violence Central Registry is an example of technology working at its best," said Teller. "Information about restraining orders possessed by the courts is very useful to law enforcement. By sharing that information across the enterprise, more than 600 agencies, including local law enforcement and the State Police, are able to use the system to get real-time restraining order verification and other details in the field. This information helps us better serve victims of domestic violence by giving law enforcement background information about the scene with

---

23. N.J. STAT. ANN. § 2C:25-29(b)(4).
24. N.J. STAT. ANN. § 2C:25-29(b)(5).
25. N.J. STAT. ANN. § 2C:25-29(b)(18).
26. N.J. STAT. ANN. § 2C:25-29(b)(16).
27. N.J. STAT. ANN. § 2C:25-29(b)(9).
28. N.J. STAT. ANN. § 2C:25-29.1.
29. N.J. STAT. ANN. § 2C:25-29.1.
30. N.J. STAT. ANN. § 2C:25-34.

which they are dealing. I extend my congratulations to the Administrative Office of the Courts for this well deserved honor."[31]

Not only is the central registry readily accessible to court personnel as well as law enforcement personnel, the presence of a person's name on the list can be used against him. For example,

> [t]he Superior Court, Chancery Division, Family Part has jurisdiction to award kinship legal guardianship. Consistent with rules and procedures adopted by the Supreme Court, the determination will be based on a petition filed by the caregiver that contains a kinship caregiver assessment certifying to the ability of the petitioner to care for the child. The assessment shall also contain the results from a criminal history record background check, domestic violence central registry check and a child abuse record check of the caregiver and any adult residing in the caregiver's household.[32]

And section 25-29(e) of the Domestic Violence Act states: "Prior to the issuance of any order pursuant to this section, the court shall order that a search be made of the domestic violence central registry."

Upon the entry of a final restraining order ("FRO"), section 25-31 provides:

> Where a law enforcement officer finds that there is probable cause that a defendant has committed contempt of [the order]. . ., the defendant shall be arrested and taken into custody by a law enforcement officer. The law enforcement officer shall follow these procedures:
>
> The law enforcement officer shall transport the defendant to the police station or such other place as the law enforcement officer shall determine is proper. The law enforcement officer shall:
>
> a. Conduct a search of the domestic violence central registry and sign a complaint concerning the incident which gave rise to the contempt charge;
>
> b. Telephone or communicate in person or by facsimile with the appropriate judge assigned pursuant to this act and request bail be set on the contempt charge;
>
> c. If the defendant is unable to meet the bail set, take the necessary steps to insure that the defendant shall be

---

31. Domestic Violence Central Registry Awarded by Center for Digital Government, NEW JERSEY INFORMATION TECHNOLOGY, Aug. 8, 2002, http://www.state.nj.us/it/news/domestic_violence.html.

32. N.J. ADMIN. CODE § 10:90-19.2(c) (2004).

incarcerated at police headquarters or at the county jail; and

> d. During regular court hours, the defendant shall have bail set by a Superior Court judge that day. On weekends, holidays and other times when the court is closed, the officer shall arrange to have the clerk of the Family Part notified on the next working day of the new complaint, the amount of bail, the defendant's whereabouts and all other necessary details. In addition, if a municipal court judge set the bail, the arresting officer shall notify the clerk of that municipal court of this information.[33]

Pursuant to section 25-32,

> Where a person alleges that a defendant has committed contempt of an order pursuant to the provisions of [the Domestic Violence Act] , but where a law enforcement officer has found that there is not probable cause sufficient to arrest the defendant, the law enforcement officer shall advise the complainant of the procedure for completing and signing a criminal complaint alleging a violation of N.J.S. 2C:29-9.[34]

Section 25-32 further directs that "[d]uring regular court hours, the assistance of the clerk of the Family Part of the Chancery Division of the Superior Court shall be made available to such complainants."

Pursuant to section 25-30, "All contempt proceedings . . . involving domestic violence orders, other than those constituting indictable offenses, shall be heard by the Family Part of the Chancery Division of the Superior Court."[35] Additionally, the statute provides for imprisonment as a sanction for contempt for "any person convicted of a second or subsequent nonindictable domestic violence contempt."[36]

The potential for abuse of the Prevention of Domestic Violence Act is tremendous. A wife willing to commit perjury can spend months or even years with her lawyer planning to file a domestic violence complaint at an opportune moment in order to gain the upper hand in a divorce proceeding and preparing the presentation of her case, while an accused husband is given ten days *or less* to prepare a defense. Ten days is not nearly enough time to prepare for a FRO hearing. It is not even enough time for most defendants to fully understand the gravity of the situation they're in. The lack of time is compounded by the stress, alarm, and confusion caused by suddenly and without warning being thrown out of the marital home

---

33. N.J. STAT. ANN. § 2C:25-32.

34. N.J. STAT. ANN. § 2C:25-32.

35. N.J. STAT. ANN. § 2C:25-30.

36. N.J. STAT. ANN. § 2C:25-30.

by armed police officers.

Imagine the following hypothetical scenario. Following the initial enforcement of a TRO, which alleged physical abuse, a husband/defendant is thrown out of his house without so much as a toothbrush. He is allowed to take his wallet with him but is prohibited from taking his checkbook because the police officers fear that he might maliciously exhaust the marital assets. He isn't given a place to shower or sleep, and only has enough money in his wallet for a few meager meals. During this period, when his main concerns are about his physical survival, he is told that there will be a FRO hearing ten days from the filing of the complaint. Having no legal background, he has no inkling of the consequences of this hearing or of the goings on of a courtroom. He has not been advised he has the right to have an attorney represent him, and doesn't realize he needs one. He couldn't afford one if he did, but he has no right, unlike a criminal defendant, to be provided with free counsel. He arrives at court on the hearing day woefully unprepared, tired, unshowered, unkempt, and disheveled. Unaware that the Supreme Court has declared that "the ten-day provision does not preclude a continuance where fundamental fairness dictates allowing a defendant additional time,"[37] he does not ask for one.

During the hearing, our hypothetical plaintiff introduces hearsay and examples of prior bad acts that are not allowed under the rules of evidence. Unfamiliar with the law, the defendant does not object to the judge's consideration of the improper evidence, but simply insists that the evidence is untrue. Unable to take the plaintiff's deposition prior to the hearing, he is surprised when she brings up prior events that were not alleged in the complaint. Taken out of context and twisted so as to only be partially true, the introduction of this evidence hurts his defense. He hasn't thought of these events for years and, caught off-guard, cannot articulate to the judge what really happened. Unaware of the ruling in *Depos*,[38] he does not realize that because of the new allegations he has "the right to request a continuance of the trial in order to prepare a defense . . . either at the end of the plaintiff's direct testimony . . . or at the end of the plaintiff's case."[39]

After a few short hours of testimony ("[D]omestic violence proceedings normally require no more than a few hours to conduct. They are 'short' and 'concise.'"[40]), the judge declares that by a preponderance of the evidence the defendant committed the acts

---

37.  H.E.S. v. J.C.S., 815 A.2d 405, 413 (N.J. 2003) (citation omitted).

38.  *Depos*, 704 A.2d 1053.

39.  *Id.*

40.  *Id.* at 400.

*RUTGERS LAW REVIEW* [Vol. 57:3

charged in the complaint, effectively labeling the defendant as a wife-beater. He is forbidden from returning to the marital home and from seeing his children, and ordered to pay large sums of money periodically to his wife. Since he could not afford an attorney for the FRO hearing, he certainly cannot afford one for an appeal, and, not knowing the first thing about the appellate process, does not appeal the ruling. He wants desperately to see his children but he is baffled by the procedural labyrinth facing him and doesn't know what steps to take. At a subsequent proceeding regarding visitation, he is instructed to attend and participate in counseling where the court-appointed psychologist, having pre-judged him to be an abuser, continually advises the court not to grant visitation. He does not know when he will ever see his children again.

In ten days, the hypothetical husband has gone from having a normal life with a wife, children and home to being a social pariah, homeless, poor, and alone, trapped in a Kafkaesque nightmare.

In the wake of the attack on the World Trade Center and our nation's response to terrorism domestically and abroad, there has been a flurry of negative reaction in the press to the subjecting of suspected terrorists to trial by military tribunal without the constitutional protections afforded other criminals. As John F. Kearney, III, put in a recent article in the New Jersey Lawyer, "All of us want as much done by government as possible to protect us from more Sept. 11 attacks or worse. None of us wants to be nuked, poisoned or fall victim to a suicide bomber. But none of us should want, either, to give away our hard-won liberties."[41] The legitimacy of the use of military tribunals to try accused terrorists is an open question, but it is an important question, and one which is fortunately getting well-deserved attention in the media. Unfortunately, the media has been largely silent on a related topic, the legitimacy of the attempt of many state governments to battle the very real and significant problem of domestic violence through legislative schemes regarding temporary and permanent restraining orders. These schemes have been in effect much longer than the anti-terrorism measures, and affect many more people, yet one hears very little about the plight of husbands being falsely accused of domestic violence or the way these men are often denied traditional due process protections that function as an important check on government power. An exception to this silence is Cathy Young, author of the Salon.com article "Hitting Below the Belt."[42]

---

41. John F. Kearney, III, *Freedoms At Risk in War on Terror*, N.J. LAW., Mar. 24, 2003, at 7.

42. Cathy Young, *Hitting Below the Belt*, SALON, Oct. 25, 1999, http://www.salon.com/mwt/feature/1999/10/25/restraining_orders/index.xml.

Written in 1999, Ms. Young's article begins:

One day three years ago, Harry Stewart, a lay minister in Weymouth, Mass., and a divorced father of two, was bringing his 5-year-old son back from a scheduled visit. He walked the boy to the front door of the mother's apartment building and opened the door to let him in.

For this offense, 44-year-old Stewart is now serving a six-month sentence in the Norfolk House of Correction.

Stewart was convicted in June of violating a restraining order that prohibited him from exiting his car near his ex-wife's home. He got a suspended sentence conditional on completing a batterers treatment program, in which participants must sign a statement taking responsibility for their violence.

That was something Stewart refused to do. He has never been charged with spousal assault and insists that the only violence in his marriage was by his ex-wife against him. (While his former wife told reporters that Stewart was dangerously unstable, her examples—that he had watched "prison movies" with his 8-and 6-year-old sons and promised to send them some live caterpillars to grow into butterflies—seem shocking only in their innocuousness.) On Aug. 18, [1999,] he appeared in Quincy District Court and again declared that he was not a batterer and would not enroll in any program that required him to admit to being one. Stewart was ordered to start serving his jail term immediately.[43]

According to Young, Stewart's plight "has become a rallying point for fathers' rights activists . . . . For years, fathers['] groups have argued that orders of protection, intended as a shield for victims of domestic violence, often are misused by unscrupulous pseudo-victims and overzealous courts."[44] Additionally, Young describes:

To battered women's advocates, and to feminists such as Boston Globe columnist Eileen McNamara, gripes about the restraining-order system are merely an anti-female backlash. At times, some men in the fathers['] groups can indeed lapse into angry rhetoric that smacks of hostility to women. But it is equally true that many women's advocates (who, unlike the divorced dads, have a good deal of influence in the legal system) seem to have a "women good, men bad" mentality that colors their view of family conflict.

What's more, the grievances of the fathers' rights activists have support from unexpected quarters, such as Elaine Epstein, former president of the Massachusetts Women's Bar

---

43. *Id.*
44. *Id.*

*RUTGERS LAW REVIEW*

Association. In 1993 Epstein, then head of the Massachusetts Bar Association, wrote a column in the association newsletter titled "Speaking the Unspeakable," which charged that the "frenzy surrounding domestic violence" had paralyzed good judgment.

"The facts have become irrelevant," she wrote. "Everyone knows that restraining orders and orders to vacate are granted to virtually all who apply, lest anyone be blamed for an unfortunate result . . . In many [divorce] cases, allegations of abuse are now used for tactical advantage."

Sheara Friend, a Needham attorney who testified before the Massachusetts Legislature in May, concurs: "I don't think there's a lawyer in domestic relations in this state who doesn't feel there has been abuse of restraining orders," she says. "It's not politically correct—lawyers don't want to be pegged as being anti-abused women, but privately they agree."

There are stories of attorneys explicitly offering to have restraining orders dropped in exchange for financial concessions. Friend says this has happened to her on two occasions; but she believes that more discreet negotiations are actually more common.

Even feminist activists are willing to allow that restraining orders can be misused as a "coercive tool"—by men. In 1995, in Somerville, Mass., Stephen Gruning broke into the apartment of his ex-girlfriend, Rhonda Stuart, and went on a shooting rampage, wounding her and killing her brother and new boyfriend. When press reports revealed that Gruning had earlier obtained two temporary restraining orders against Stuart, women's advocates were quick to point out that such orders were very easy to get, "regardless of the facts."

In the 1970s and '80s, growing public awareness of domestic violence spurred laws such as the 1978 Abuse Prevention Act in Massachusetts, which made restraining orders (usually prohibiting any contact with the complainant) easily available against current or former spouses or cohabitants. More recently, many states have moved to strengthen this legislation, extending eligibility to people who had dated but not lived together, and introducing tough measures against violators.

In Massachusetts, as in most other states, a temporary no-contact order can be issued ex parte—without the defendant being present or notified, let alone informed of the specific charges—and solely on the word of the complainant. "I think judges grant the restraining order without asking too many questions," said former state Rep. Barbara Gray, an original

sponsor of the Abuse Prevention Act, in a 1995 interview.[45]

In Massachusetts, Young explains, after a temporary restraining order is granted,

> [A] hearing must be held within 10 days to determine whether it should be vacated or extended for a year. That's when the defendant gets a chance to defend himself—in theory. The hearing, however, is usually limited to a he said/she said exchange in which, many lawyers say, the defendant is given little credit . . . . The normal rules of evidence do not apply; hearsay is commonly allowed, while exculpatory evidence can be kept out.
>
> A defendant who insists on a full evidentiary hearing[46] can be forced to wait for months. In one case, the transcript shows, the judge denied an attorney's request to call witnesses who would dispute the complaint's story, saying, "I don't need a full-scale hearing . . . I don't care about that." The judge also declared that the issue was not even "who's telling the truth," only whether he felt the woman was genuinely fearful.
>
> While a restraining order is a civil remedy, its target is subject to criminal sanctions—up to two and a half years of imprisonment—for conduct that is not only normally legal but quite benign, like getting out of the car and holding the door for a child. (This includes contact that is clearly accidental, or even initiated by the purported victim: Even if you came over to the house at your ex-spouse's invitation, you don't have a legal excuse.)
>
> Stewart has several other charges pending,[47] mainly for failing to stay confined to his vehicle: for picking up the children on foot when his car had broken down, and for exiting his car during visitation exchanges, once when his son needed help with a package and another time when one of the boys stumbled and fell while running toward the car.
>
> In 1994 . . ., Sal D'Amico, a father of three, was arrested and ordered into a batterers program because he got out of his car to pet the family dogs while picking up his kids for a visit. Five months later, he was fined nearly $600 for returning a telephone call from his son. (Like Stewart, D'Amico has never been criminally charged with assaulting his wife, whose claims of ongoing violent abuse were uncorroborated by any evidence.)
>
> And those men are the lucky ones: Other fathers have been denied all contact with their children, or allowed to see them

---

45. *Id.*

46. Full evidentiary hearings are not provided for in New Jersey.

47. Information current as of 1999.

only in a supervised visitation center – where, adding insult to injury, they must pay for the privilege.

In one of attorney Friend's recent cases, a woman claimed to be frightened by her ex-husband's search for real estate in the same town where she was moving with her children; the father, who previously had extensive visitation, was barred from all contact with the kids, even by telephone, for three weeks.

Boston-area therapist and hospital staff psychologist Abigail Maxton has a client who was not allowed to see his two children for about nine months after his ex-wife alleged, in the middle of divorce proceedings, that he had physically abused her and the children. ("The investigation consisted of a Department of Social Services worker talking to the wife and then talking to a neighbor who confirmed that she had heard loud voices," says Maxton.) The client could have only supervised visitation for the next two years, until the social worker who monitored the visits finally gave him a clean bill of health.[48]

In Young's eyes,

The situation in Massachusetts is not unique. In a 1996 column in Family Advocate, the journal of the family law section of the American Bar Association, Connecticut attorney Arnold Rutkin charged that many judges in his state approach protection orders as "a rubber-stamping exercise" and that the due process hearings held later "are usually a sham."

In Missouri, a survey of attorneys and judges for the Task Force on Gender and Justice in the early 1990s found many complaints that the "adult abuse" law was resulting in blatant disregard for due process and was commonly misused for "litigation strategy" and "harassment."[49]

Young also believes that there is:

[S]ome evidence to support the claims of fathers groups that courts show little regard for the civil rights of defendants when allegations of domestic abuse are involved. At a 1995 seminar for municipal judges, Judge Richard Russell of Ocean City, N.J., was caught on tape giving some startling advice.

"Your job is not to become concerned about the constitutional rights of the man that you're violating as you grant a restraining order," he said. "Throw him out on the street, give him the clothes on his back and tell him, see ya around . . . The woman needs this protection because the statute granted her that protection . . . They have declared domestic violence to be an evil in our society. So we don't have to worry about the

---

48.  Young, *supra* note 42.
49.  *Id.*

rights."

Judge Russell's comments, printed in the New Jersey Law Journal, earned him a mild chiding from the Administrative Office of the Courts. By contrast, in Maine two years ago, Judge Alexander MacNichol was denied reappointment by Gov. Angus King after battered women's advocates complained that he was insensitive to women applying for restraining orders—despite the lack of any evidence that his alleged insensitivity had put anybody in harm's way. Many court employees, male and female, who supported the judge said that he simply listened to both sides of the story.[50]

In Young's opinion, "the 'better safe than sorry' approach can turn into something disturbingly akin to presumption of guilt."[51] Furthermore, she observes, "women, no less than men, are capable of abusing the power they're given . . . ."[52] While "[t]he notion of women falsely crying abuse is anathema to domestic violence activists" and, "for many feminists, talk about spiteful, manipulative ex-wives sets off a misogyny alarm,"[53]

to recognize that such acts are possible, one need not see women as uniquely vindictive or devious, only as human. The advantages of a restraining order to the complainant— exclusive possession of the home (with the alleged abuser often required to continue paying the rent or mortgage), temporary and probably permanent sole custody of the children—can be tempting. So can, let's face it, the opportunity to make your ex very miserable.[54]

"Perhaps because the war on domestic violence is a more politically correct cause than the war on crime," she notes,

the plight of people abused by restraining orders has not attracted the sympathy one can usually expect for casualties of prosecutorial and judicial zeal. The American Civil Liberties Union has stayed mum on the subject . . . . The issue largely continues to be seen . . . in terms of men trying to snatch back the power newly gained by women.[55]

Young, an exception to this rule, argues that while domestic violence is a serious problem in American society, "the sympathy due a woman who lives in fear of her abusive ex-husband should also be extended to the father who can be hauled off to jail if he makes a

---

50.  *Id.*
51.  *Id.*
52.  *Id.*
53.  *Id.*
54.  *Id.*
55.  *Id.*

phone call to wish his daughter a happy birthday."[56] Furthermore, "the protection of women does not justify the surrender of civil rights any more than the protection of men."[57]

I fully agree. The rights of men accused of domestic violence ought not be sacrificed on the altar of "what if;" they ought not give way to judicial concerns over job security; and they ought not be pushed aside in the name of "the greater good," as defined by the special interest groups responsible for the Prevention of Domestic Violence Act.

In 1916, the New Jersey Legislature passed a law remarkably similar to the Prevention of Domestic Violence Act. This law, entitled "An act declaring all buildings and places wherein or upon which acts of lewdness, assignation or prostitution are permitted or occur to be nuisances, and providing for the abatement thereof by the Court of Chancery"[58] was declared unconstitutional by New Jersey's then highest court, the Court of Errors and Appeals, in *Hedden v. Hand* because it attempted to give the Chancery Court the authority to abate the criminal offenses enumerated in the title.[59]

The *Hedden* court described the purpose and nature of the invalid statute this way:

> The fixed purpose of the statute, evidenced by its title, is to declare that certain buildings or places in or upon which the acts specified in the title are permitted or occur to be nuisances and to be abated in the Court of Chancery.
>
> The first section of the act substantially follows its title. The specific violations denounced therein are nuisances, indictable and punishable at common law under the [C]rimes act. The third and fourth sections of the statute confer power and authority on the prosecutor of the pleas or any resident of the county where the nuisance is alleged to exist, to maintain an *action* in the Court of Chancery to abate and prevent such nuisance, and provide that the *action* shall be brought in the name of the prosecutor, and that it shall be unnecessary to allege or prove special damage. The fifth and sixth sections make the further provision that the *action* shall be commenced by filing a verified bill of complaint and the issue of subpoena, and that all proceedings in such action shall be in accordance with the usual practice in the Court of Chancery; that the chancellor, being satisfied of the sufficiency of the bill shall issue an order to show cause on a certain day why an injunction should not issue against the defendant in accordance with the

---

56. *Id.*
57. *Id.*
58. 107 A. 285, 286 (N.J. 1919).
59. *Id.* at 291.

prayer of the bill, with restraint of the alleged nuisance and the removal of any furniture, furnishings, musical instruments, or other personal property, except clothing, from such building or place complained of until further order of the court, and that on the return of the rule, if the chancellor is satisfied of the sufficiency of the proofs submitted, he shall issue a temporary injunction, without bond, enjoining and abating the nuisance in accordance with the restraint prayed for. Then follow provisions for the carrying into effect the final decree of the Court of Chancery that the nuisance by abated by a forfeiture of the personal property found on the premises, the disuse of the premises for any purpose for one year, unless sooner released by the Court of Chancery, etc., and a further provision that the violation or disobedience of either any injunction or order provided for by the act shall be punishable as a contempt of court, by a fine not less than $200 nor more than $1,000, or by imprisonment in the county jail for not less than one month nor more than six months, or by both fine and imprisonment.

Thus it follows, as a matter of course, after a temporary injunction has been issued, or an order made in the case, an allegation that the nuisance still continues may, on proof thereof, be heard in a summary manner, and be punished, as a contempt of court, by fine and imprisonment. But the startling feature of the operation of the statute is that the temporary restraint makes the removal of any personal property (except clothing), no matter how innocuous in character it may be, whether it be the portrait of a family ancestor or a copy of the Holy Scriptures, punishable by fine and imprisonment.[60]

The court stated:

It is difficult from a plain reading of the statute to escape the conclusion that it attempts to add to the equitable powers possessed by the Court of Chancery, the power to deal with a certain class of criminal cases by the writ of injunction, and the summary process of contempt.[61]

It stated further:

It is clear that if the Legislature may bestow on the Court of Chancery jurisdiction to grant an injunction and abate a public nuisance of a purely criminal nature, then there can be no valid argument against the power of the Legislature to confide the entire Criminal Code of this state to a court of equity for enforcement. It is apparent that such a court would render nugatory the provisions of the Constitution, which guarantee the right of a presentment by a grand jury, and a trial by jury,

---

60. *Id.* at 287-88 (emphasis added).

61. *Id.* at 288.

to one accused of crime.[62]

In sum, it concluded:

> Keeping in view that the maintenance of disorderly house was a crime at common law and was punishable and abatable in the courts of criminal jurisdiction only, it is clear that the effect of making such a crime punishable and abatable in the Court of Chancery is to deprive a defendant of his constitutional right to have an indictment preferred against him by a grand jury of the county, in which such nuisance is alleged to exist, and a trial by jury. It is idle to entertain the thought for a single moment that the Legislature can change the nature of an offence by changing the forum in which it is to be tried.[63]

In *Cesare v. Cesare*,[64] the Appellate Division set aside the domestic violence order that had been entered by the trial court on the apparent grounds that a husband had committed either a terroristic threat or harassment.[65] Importantly, it commented:

> While terroristic threats and harassment are crimes, the thrust of the Act is to somehow transmogrify those crimes into some lesser offense not a "crime," but nonetheless with potential serious penal consequences, when the victim signs the complaint. *See N.J.S.A.* 2C:25-28. Because of the references to criminal acts as being acts of domestic violence and the internal conflicts in the statute and its placement in the Penal Code, some brief comment is in order. The Act, although codified in the Penal Code, effectively requires what might otherwise be criminal acts to be then treated as if born of a civil cause of action and under the burden of proof standard for civil cases, *i.e.*, a preponderance of the evidence, *see N.J.S.A.* 2C:25-29, rather than proof beyond a reasonable doubt as in criminal cases. Thus, to be found to have committed an act of domestic violence, a party must have committed what is in effect or would have been a crime under the Penal Code.
>
> The Penal Code in *N.J.S.A.* 2C:25-28 treats domestic violence complaints signed by non-law enforcement officers, *i.e.*, persons claiming to be victims, and alleging what are criminal acts, as something other than a criminal offense and directs the use of the lesser burden of proof of preponderance of the evidence. *N.J.S.A.* 2C:25-28. The result is to circumvent the protections normally accorded an accused in a criminal case, including the right to a jury trial and the potential defense of double

---

62. *Id.* at 290.
63. *Id.* at 291.
64. 694 A.2d 603 (N.J. Super. Ct. App. Div. 1997), *rev'd* 713 A.2d 390 (N.J. 1998).
65. *Id.* at 606-07.

jeopardy.[66]

Because it found that the trial court had erred as a matter of law in finding that the defendant had committed an act of violence, it did not rule on the constitutionality of the Domestic Violence Act.[67] It did note, however, that "[a] closer examination of the Act and whether the Legislature can properly make what would be a criminal act for some, an act not criminal for others, perhaps even depending on who signs the complaint, and whether this implicates constitutional issues, are left for another case."[68]

The Appellate Division decision was reversed by the New Jersey Supreme Court in *Cesare v. Cesare*.[69] The Supreme Court ruled that the trial court had not erred in entering the domestic violence order.[70] Unfortunately, it did not address the constitutionality of the Domestic Violence Act. "Yet, happily," to quote Justice Douglas's concurrence in *Gideon v. Wainwright*,[71] "all constitutional questions are always open."[72]

The Prevention of Domestic Violence Act is not distinguishable from the statute in *Hedden*. While it may be argued that the *Hedden* statute is distinguishable because there the state was the plaintiff while this matter involves two private citizens, this argument fails.

The *Hedden* statute conferred "power and authority on the prosecutor . . . *or any resident of the county where the nuisance is alleged to exist*, to maintain an *action* in the Court of Chancery to abate and prevent such nuisance, and provide that the *action* shall be brought in the name of the prosecutor . . . ."[73] There, any private citizen could prosecute the action. Though the action had to be brought in the name of the prosecutor, while here a private citizen prosecutes the crime of domestic violence in his or her own name, this is a distinction without a difference.

As Roger Roots points out in his article *Are Cops Constitutional?*:

> For decades before and after the Revolution, the adjudication of criminals in America was governed primarily by the rule of private prosecution: (1) victims of serious crimes approached a community grand jury, (2) the grand jury investigated the matter and issued an indictment only if it concluded that a crime should be charged, and (3) the victim himself or his

---

66.  *Id.* at 608 (footnote and citations omitted).

67.  *Id.*

68.  *Id.* at 608.

69.  713 A.2d 390 (N.J. 1998).

70.  *Id.* at 391.

71.  372 U.S. 335 (1963).

72.  *Id.* at 346 (Douglas, J., concurring).

73.  107 A. 285, 288 (emphasis added).

representative (generally an attorney but sometimes a state attorney general) prosecuted the defendant before a petit jury of twelve men. Criminal actions were only a step away from civil actions—the only material difference being that criminal claims ostensibly involved an interest of the public at large as well as the victim. Private prosecutors acted under authority of the people and in the name of the state—but for their own vindication. The very term "prosecutor" meant criminal plaintiff and implied a private person. A government prosecutor was referred to as an attorney general and was a rare phenomenon in criminal cases at the time of the nation's founding. . . .

Private prosecution meant that criminal cases were for the most part limited by the need of crime victims for vindication. Crime victims held the keys to a potential defendant's fate and often negotiated the settlement of criminal cases. After a case was initiated in the name of the people, however, private prosecutors were prohibited from withdrawing the action pursuant to private agreement with the defendant. Court intervention was occasionally required to compel injured crime victims to appear against offenders in court and "not to make bargains to allow [defendants] to escape conviction, if they . . . repair the injury."[74]

Clearly, in this country's early history, the fact that a crime was prosecuted in the state's name was often a mere formality. Substantively, criminal prosecutions often consisted solely of a private citizen's quest for retribution where the state's involvement was quite literally nominal. Nevertheless, the *procedures* in serious criminal matters differed from those of civil matters; namely, the defendant was protected from malicious or wrongful prosecution by the independent opinion of a grand jury and was entitled to a trial by jury.[75] It should be noted that while the Family Court hears the original domestic violence case as a matter prosecuted in the name of the plaintiff, a "convicted" defendant who then is alleged to have violated the FRO is prosecuted by the state through the county prosecutor's office, again without a jury, despite the risk of incarceration.[76]

In *Hedden*, a finding of "guilt" against a defendant under the unconstitutional statute (determined after a summary hearing before a single judge) meant that a defendant could be barred from using a particular building for one year and all his personal property (except

74. 11 SETON HALL CONST. L.J. 685, 689-91 (2001) (alteration in original) (footnotes omitted).

75. *Id.* at 689.

76. *See supra* notes 33-40 and accompanying text.

clothing) on the premises could be taken.[77] Further, if he disobeyed the final order, he could be fined and imprisoned.[78] This, the *Hedden* court plainly observed, was criminal punishment inflicted by a civil court.[79]

"What is punishment?" asked Justice Musmanno in his impassioned and scathing dissent in *In re Holmes,*[80] a case in which the majority of the Pennsylvania Supreme Court upheld a juvenile court's commitment of a minor to a reform school (described by counsel for Pennsylvania as an "industrial school")[81] despite certain "relaxations" of, as the majority put it, "many of the legalistic features of the rules of evidence customarily applicable to other judicial hearings."[82] "It is the infliction," Justice Musmanno answered,

> of pain, sorrow, and grief. To take a child from the comfort of his home, the joy of his companions and the freedom of field, river and wood, and confine him to a building with whitewashed walls, regimented routine and institutional hours is punishment in the strictest sense of the word. To say, as the Commonwealth says, that this institutionalized incarceration is "for the care and treatment" of the juvenile does not make it any less abhorrent to the boy of spirit, health and energy.[83]

Declaring that "commitment to an industrial school is not punishment," as the appellee Commonwealth did in its brief, does not make it "come under the classification of pleasure."[84] Nor does "[c]alling a reformatory an 'industrial school' . . . mitigate its bleakness, loneliness [sic] and destitution of parental love and care."[85]

The Prevention of Domestic Violence Act authorizes a chancery judge to make a factual finding that a defendant committed an act of domestic violence.[86] This could entail finding that a defendant committed rape or even murder! Having made such a finding, the judge may bar a defendant from ever setting foot in a particular house again (even if he was born and raised in that house and bought the house from his parents),[87] yet make him pay the mortgage

---

77.   107 A. at 288.

78.   *Id.*

79.   *Id.*

80.   109 A.2d 523, 530 (Pa. 1954) (Musmanno, J., dissenting).

81.   *Id.* at 530 (Musmanno, J., dissenting).

82.   *Id.* at 526.

83.   *Id.* at 530 (Musmanno, J., dissenting).

84.   *Id.* (Musmanno, J., dissenting).

85.   *Id.* (Musmanno, J., dissenting).

86.   N.J. STAT. ANN. § 2C: 25-29(a) (West 1995 & Supp. 2005).

87.   N.J. STAT. ANN. § 2C: 25-29(b)(6).

payments;[88] make him pay a large sum or large sums of money to the plaintiff;[89] bar him from seeing his children;[90] force him to see a psychologist and/or psychiatrist against his will (persons who may very well have preconceived notions about anyone sent to them by the court, strongly held political views, and an interest in "business development" (they want to find something wrong with the people sent to them so they can cash in: weekly sessions at 150 bucks a pop . . . indefinitely (Cha ching!)) and who can essentially interrogate the defendant and write a report to the judge that can be used against him in a subsequent proceeding, such as a child visitation hearing);[91] temporarily give the plaintiff exclusive possession of the defendant's car, checkbook, and other personal effects (which could include a beloved pet);[92] bar the defendant from ever speaking to any individual that the plaintiff does not want him to speak to (which could include a beloved friend or relative);[93] force him to turn any firearms he has into the hands of the proper authorities and bar him from ever possessing another firearm in his life;[94] and make the defendant pay a "civil penalty" of $500.00.[95] If the defendant refuses to comply with any aspect of the judge's order, he can be tried for contempt and imprisoned.[96] Lastly, he is labeled an abuser and his name is put on a list of domestic abusers known as the New Jersey Judiciary's Domestic Violence Central Registry.[97]

The existence of the Central Registry is extremely significant. According to legal scholar Joshua Dressler,

> When the factfinder—ordinarily, a jury—determines that a person is guilty of an offense, the resulting conviction is an expression of the community's moral outrage, directed at the criminal actor for her act. The hardship suffered as a result of the criminal conviction may be no greater (or even less) than that which results from a civil judgment; *it is the societal condemnation and stigma that accompanies the conviction that most of all distinguishes the civil from the criminal process.*[98]

In this context, it is also significant that throughout section

---

88.   N.J. Stat. Ann. § 2C: 25-29(b)(8).
89.   N.J. Stat. Ann. § 2C: 25-29(b)(4).
90.   N.J. Stat. Ann. § 2C: 25-29(b)(3)(b).
91.   N.J. Stat. Ann. § 2C: 25-29(b)(18).
92.   N.J. Stat. Ann. § 2C: 25-29(b)(9).
93.   N.J. Stat. Ann. § 2C: 25-29(b)(7).
94.   N.J. Stat. Ann. § 2C: 25-29(b).
95.   N.J. Stat. Ann. § 2C: 25-29.1.
96.   N.J. Stat. Ann. § 2C: 25-30.
97.   N.J. Stat. Ann. § 2C: 25-34.
98.   Joshua Dressler, Understanding Criminal Law 1-2 (1995) (emphasis added).

2C:25-9, the plaintiff is referred to as "the victim."

In *In re Holmes,*[99] the minor had been charged with participating in the armed robbery of a church.[100] On the issue of the stigma attached to being found guilty of armed robbery in a Juvenile Court, Justice Musmanno wrote:

> The Majority is of the impression that the adjudication of delinquency of a minor is not a very serious matter because "No suggestion or taint of criminality attaches to any finding of delinquency by a Juvenile Court." This statement stamps the judicial imprimatur on the declaration in Section 19 of the Juvenile Court Act that: "No order made by any juvenile court shall operate to impose any of the civil disabilities ordinarily imposed by the criminal laws of the Commonwealth, nor shall any child be deemed a criminal by reason of any such order or be deemed to have been convicted of crime." These words are put together so as to form beautiful language but unfortunately the charitable thought expressed therein does not square with the realities of life. To say that a graduate of a reform school is not to be "deemed a criminal" is very praiseworthy but this placid bromide commands no authority in the fiercely competitive fields of every-day modern life.
>
> A most disturbing fallacy abides in the notion that a Juvenile Court record does its owner no harm. The grim truth is that a Juvenile Court record is a lengthening chain that its riveted possessor will drag after him through childhood, youthhood, adulthood and middle age. Even when the ill-starred child becomes an old man the record will be there to haunt, plague and torment him. It will be an ominous shadow following his tottering steps, it will stand by his bed at night and it will hover over him when he dozes fitfully in the dusk of his remaining day.
>
> It is equally a delusion to say that a Juvenile Court record does not handicap because it cannot be used against the minor in any court. In point of fact it will be a witness against him in the court of business and commerce, it will be a bar sinister to him in the court of society where the penalties inflicted for deviation from conventional codes can be as ruinous as those imposed in any criminal court, it will be a sword of Damocles hanging over his head in public life, it will be a weapon to hold him at bay as he seeks respectable and honorable employment. It is easy to say that the record will not be used in Court but it already has been introduced in this case against Joseph Holmes in the imperishable dockets of several Courts, it has been printed in the briefs which the world can read, and it will be

---

99.  109 A.2d 523 (Pa. 1954).

100.  *Id.* at 524.

published in the decisions of the Superior and Supreme Courts.

    It would not be kind to name the many figures in the world of sports, politics, entertainment and letters who have been embarrassed, harassed and encumbered because of a Juvenile Court record. And when I see how the intended guardian angel of the Juvenile Court sometimes nods at the time that the most important question of all—innocence or guilt—is being considered, I wonder whether some of these public figures may not have been unjustly tainted in their childhood.[101]

Likewise, following a FRO hearing, a defendant may be left shamed, his reputation besmirched, forced to face the opprobrium of the community, forever branded with the Scarlet Letter "A." A for abuser.

The premium placed by New Jersey courts on preserving a defendant's good name was noted by the New Jersey Court of Errors and Appeals in affirming an appellate court's decision to reverse the conviction of Emma Richardson, the executive officer of the Mary J. Ball Home and Day Nursery, in *Richardson v. State Board of Control of Institutions and Agencies*.[102] Ms. Richardson had been tried before the judge of the Court of Quarter Sessions in a summary proceeding without a jury or even an indictment from a grand jury.[103] She was found guilty as charged and fined $100.00.[104] The charge? She was accused by the State Board of Control of Institutions and Agencies of

    cruelly ill treating and abusing one Arthur Reed, an inmate of the home, by striking him with her clenched fist on the back of his neck, at the base of the brain, not less than 4 times, and by beating him repeatedly with not less than 12 strokes of a whip, known as a cat-o'-nine-tails, on various parts of his body, namely, on his back and buttocks and across one of his eyes, contrary to paragraph B, § 1, of "An act concerning the welfare of children," approved April 8, 1915, its supplements and amendments.[105]

As the New Jersey Supreme Court noted, "It is quite apparent from the above recital that the charge made against Mrs. Richardson before the judge of the [Q]uarter [S]essions was that of an assault and battery committed upon an infant under her care, and that the assault was of a peculiarly vicious character."[106] In approving the reversal of the conviction, it commented:

---

101.   *Id.* at 528-29 (Musmanno, J., dissenting).
102.   123 A. 720, 720-21 (N.J. 1924).
103.   *Id.* at 720.
104.   *Id.*
105.   *Id.* (citation omitted).
106.   *Id.*

An assault and battery, no matter under what circumstances it may have been committed, is a crime indictable at common law, punishable by fine or imprisonment or both. Whether a person who has committed a crime indictable at common law can be tried, convicted and punished, in this state, in a summary proceeding, is not an open question. It was considered and decided in the case of *State v. Anderson*, . . . , adversely to the contention of the present appellant, and the soundness of that decision has never been challenged in any subsequent judicial pronouncement. The statement of [Chief Justice Beasley], delivering the opinion of the court, may well be repeated here. It is as follows:

"It is clear that if this offense can, for the purpose of crimination, trial and punishment, be put into the hands of these municipal authorities, it follows that all common law offenses of the same grade can be, in like manner, so deposited. This, I think, cannot be conceded. Such an arrangement would, in a very plain way, infringe an important provision of the constitution of this state. Article I, §9 of that instrument declares that 'no person shall be held to answer for a criminal offense, unless on the presentment or indictment of a grand jury, except in cases of impeachment, or in cases cognizable by justices of the peace,' etc. The purpose of this clause was to prevent the bringing of any citizen under the reproach of being arraigned for crime before the public, unless, by a previous examination taken in private, the grand inquest had certified that there existed some solid ground for making the charge. The reputation of every man was thus put under the care of a single specified body. The language of the constitutional clause is very comprehensive, and the specified exceptions show conclusively that it was intended to cover the residue of the entire field of criminal accusation. In the presence of such a prohibition, how then is it permissible to put a man on trial before a city court, charged with this common law offense, without the preliminary sanction of a grand jury? If it be said the punishment is only a fine, the answer is: The restraining clause in question has nothing to do with the result or effect of the trial, its object being to save from the shame of being brought before the bar of a criminal court, except in the authorized method after an antecedent inquisition." The logic of this declaration is irresistible, and it demonstrates that in the proceeding now under review the prosecution of Mrs. Richardson before Judge Kates, based only on a complaint of the appellant, was a conspicuous violation of her constitutional rights. This being so, we do not hesitate to say that the judgment of the Supreme Court reversing the conviction had against her was entirely

justified.[107]

Clearly, the court felt that it was the judge's finding that Ms. Richardson was guilty as charged rather than the $100.00 fine that was determinative. Even though the finding was in the context brought by a state agency in its own name, the effect of the conviction in terms of stigma was the same, or virtually the same, as if a public prosecutor in the name of New Jersey had brought the action.

Echoing the *Hedden* court, Justice Musmanno declared in Holmes' Appeal:

> Armed robbery is a crime. The Legislature may not, by changing the name of armed robbery to "juvenile delinquency," strip from any citizen the constitutional guarantees which are his when he is tried for armed robbery. If the Legislature may, by a mere change in terminology, take away from a 17-year old boy the safeguards which the parent law of the land assures to him, then it can take it away from 18-year old boys and 25-year old men. Who is to decide the dividing line?[108]

Similarly, an act of domestic violence, as defined by section 2C:25-29(a), is a crime.

The Prevention of Domestic Violence Act authorizes a Chancery Division judge to make a finding of fact at a summary proceeding that an individual committed an act of domestic violence (which can include rape and murder). Then, in order to penalize a defendant for being an abuser, section 2C:25-29 authorizes the judge to impose basically everything but prison time, and even that can be imposed if the defendant deviates just slightly from the order.

Regarding due process, the New Jersey Supreme Court has recently stated:

> The Fourteenth Amendment of the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." This Court has held that although "Article I, paragraph 1 of the New Jersey Constitution does not [specifically] enumerate the right to due process, [it] protects against injustice and, to that extent, protects 'values like those encompassed by the principles of due process.'" Due process is "a flexible [concept] that depends on the particular circumstances." At a minimum, due process requires that a party in a judicial hearing receive "notice defining the issues and an adequate opportunity to prepare and respond."[109]

107.  *Id.* at 720-21.

108.  *In re* Holmes, 109 A.2d 523, 535 (Pa. 1954) (Musmanno, J., dissenting).

109.  *H.E.S.*, 815 A.2d at 412 (alteration in original) (citation omitted).

Even if the Prevention of Domestic Violence Act was not an unconstitutional attempt to give the Chancery Division jurisdiction over crimes related to domestic violence, it would be unconstitutional because it denies defendants due process. In addition to a man's right to his good name (hereinafter I will assume defendants are male, married, and have children), there are four other rights that can be affected by the entry of the FRO, namely: a man's right to raise his children; a man's First Amendment right to speak freely to his wife and children;[110] a man's right to use and enjoy the marital home; and a man's Second Amendment right to bear arms.[111]

As to the right to raise one's children, it has been noted that "[t]he preservation of the parent-child relationship as reflected in the right to raise one's children has been deemed 'essential,' a 'basic civil right of man. . . .'"[112] As to freedom of speech, because of the imposition of an FRO, a man can be limited to the subjects about which he can speak to his wife and children, certainly a heavy burden to bear. As to the right to use and enjoy the marital home, the Appellate Division, in *Grant v. Wright*,[113] agreed with a defendant in a domestic violence dispute "that removal from his residence implicated a deprivation of a protected right."[114] Lastly, as to a man's Second Amendment right to bear arms, although the courts in New Jersey do not currently recognize the right, as I argue below, it nevertheless exists.

In the fall of 2001, the Fifth Circuit noted in *United States v. Emerson*[115] that

> [i]n the last few decades, courts and commentators have offered what may fairly be characterized as three different basic interpretations of the Second Amendment. The first is that the Second Amendment does not apply to individuals; rather, it merely recognizes the right of a state to arm its militia. This "states' rights" or "collective rights" interpretation of the Second Amendment has been embraced by several of our sister circuits . . . .
>
>          . . . .
>
> Proponents of the next model admit that the Second Amendment recognizes some limited species of individual right. However, this supposedly "individual" right to *bear* arms can

---

110.  U.S. CONST. amend. I.

111.  U.S. CONST. amend. II.

112.  Robinson v. St. Peter's Med. Ctr., 564 A.2d 140, 145 (N.J. Super. Ct. Law Div. 1989) (citation omitted).

113.  536 A.2d 319 (N.J. Super. Ct. App. Div. 1988).

114.  *Id.* at 322.

115.  270 F.3d 203 (5th Cir. 2001).

only be exercised by members of a functioning, organized state militia who bear the arms while . . . actively participating in the organized militia's activities. The "individual" right to *keep* arms only applies to members of such a militia, and then only if the federal and state governments fail to provide the firearms necessary for such militia service. At present, virtually the only such organized and actively functioning militia is the National Guard, and this has been the case for many years. Currently, the federal government provides the necessary implements of warfare, including firearms, to the National Guard, and this likewise has long been the case. Thus, under this model, the Second Amendment poses no obstacle to the wholesale disarmament of the American people. A number of our sister circuits have accepted this model, sometimes referred to by commentators as the sophisticated collective rights model . . . .

The third model is simply that the Second Amendment recognizes the right of individuals to keep and bear arms . . . . None of our sister circuits has subscribed to this model, known by commentators as the individual rights model or the standard model. The individual rights view has enjoyed considerable academic endorsement, especially in the last two decades.[116]

In 1968, the New Jersey Supreme Court embraced the sophisticated collective rights model. It wrote:

During the American colonial days there was great fear of military rule; the colonists believed that standing armies were acceptable only in extraordinary circumstances and under control of civil authorities, and that the Militia was the proper organ for defense of the individual States. When the Constitution was adopted, it expressly granted to Congress the power to provide for calling forth the Militia to execute the laws, suppress insurrections and repel invasions, along with the power to provide for organizing the Militia and for governing such part as may be employed in the service of the United States, "reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress." With their historic distrust of standing armies and the desire that the Militia be protected from federal encroachment, the States quickly obtained the adoption of the second amendment. As the language of the amendment itself indicates it was not framed with individual rights in mind. Thus it refers to the collective right "of the people" to keep and bear arms in connection with "a well-regulated militia." Most students of the subject would undoubtedly express agreement with the substance of the currently expressed view that "the term 'well-regulated militia' must be taken to mean the active, organized militia of each

---

116.   *Id.* at 218-20 (footnotes omitted).

state, which today is characterized as the state National Guard."[117]

In contrast, upon its examination of the historical record, the Fifth Circuit in *Emerson* concluded that the Second Amendment bestows an individual right to bear arms. It wrote:

> We have found no historical evidence that the Second Amendment was intended to convey militia power to the states, limit the federal government's power to maintain a standing army, or applies only to members of a select militia while on active duty. All of the evidence indicates that the Second Amendment, like other parts of the Bill of Rights, applies to and protects individual Americans.[118]

Moreover, the Fifth Circuit opined: "[w]hile there is no historical evidence that the states' rights view of the Second Amendment is correct, we are struck by the absence of any indication that the result contemplated by the sophisticated collective rights view was desired, or even conceived, by anyone."[119] In short, it found "that the history of the Second Amendment reinforces the plain meaning of its text, namely that it protects individual Americans in their right to keep and bear arms whether or not they are a member of a select militia or performing active military service or training" and rejected "the collective rights and sophisticated collective rights models for interpreting the Second Amendment."[120] It held, therefore, that the Second Amendment "protects the right of individuals, including those not then actually a member of any militia or engaged in active military service or training, to privately possess and bear their own firearms . . . ."[121]

When the *Burton* court made its decision on the meaning of the Second Amendment, it relied heavily on a 1966 law review article entitled "The Second Amendment: A Second Look."[122] Subsequent scholarship, such as contained in Stephen P. Halbrook's *That Every Man Be Armed*,[123] has proven that Feller and Gotting, and hence, the Justices of the New Jersey Supreme Court, were mistaken.

The right to bear arms is an important individual right explicitly listed in the Bill of Rights. It and the other rights noted above demand more protection than what is provided by the statute. Given

---

117.   Burton v. Sills, 248 A.2d 521, 526 (N.J. 1968) (citations omitted).

118.   *Emerson*, 270 F.3d at 260 (footnote omitted).

119.   *Id.* at 260 n.60.

120.   *Id.* at 260.

121.   *Id.*

122.   Peter B. Feller & Karl L. Gotting, *The Second Amendment: A Second Look*, 61 Nw. U. L. Rev. 46 (1966).

123.   *See generally* Stephen P. Halbrook, That Every Man Be Armed (Univ. of N.M. Press 1984).

the stakes of the subject FRO hearing, the process provided for by the Domestic Violence Act is woefully lacking.

To begin with, ten days is not enough time to prepare a defense against a charge of domestic violence; nor is a defendant, so charged, adequately informed of the rights that are at stake at an FRO hearing. That is clear enough. The fact that the New Jersey Supreme Court has softened this aspect of the Act by allowing for occasional extensions in the name of "fundamental fairness" does not, by itself, make the Act constitutional, especially when we consider that the Act does not provide for the free assistance of counsel that would make an indigent and unsophisticated defendant's right to an extension meaningful.

As Justice Sutherland observed in *Powell v. Alabama*[124]:

> Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he had a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence. If that be true of men of intelligence, how much more true is it of the ignorant and illiterate, or those of feeble intellect.[125]

If a defendant cannot afford an attorney to defend him at an FRO hearing, one should be provided, but, at present, even the most ignorant and destitute defendants are on their own.

Moving on, the deposition is usually the most important discovery tool in a civil litigator's toolbox. Upon hearing a plaintiff's sworn and recorded assertions, a defendant's attorney can investigate their veracity as well as assess them for internal consistency. The plaintiff can also be confronted at a later proceeding with the deposition testimony if the new testimony conflicts with the prior testimony. In an FRO hearing, a defendant is deprived this valuable discovery because, according to the Chancery Division, "[t]he Act does not authorize the taking of a deposition or any other discovery,"[126] and "allowing the represented alleged perpetrator to depose a victim, represented or unrepresented, perpetuates the cycle

124. 287 U.S. 45 (1932).
125. *Id.* at 69.
126. *Depos*, 704 A.2d at 1051.

of power and control whereby the perpetrator remains the one with the power and the victim remains powerless."[127] Thus, a defendant is unable to anticipate all of the things the plaintiff says at the hearing, is unable to analyze her version of the events alleged in the complaint prior to the hearing, and is unable to test the veracity of her testimony by comparing it to prior testimony. He is flying blind. The judge is flying blind as well.

Family Part judges are mandated by the Prevention of Domestic Violence Act to swiftly dispose of the domestic violence actions,[128] defined by the Act as "summary actions,"[129] even though they involve whether or not a crime has been committed, hardly a simple issue (criminal trials can last for months). But while judges are mandated to streamline a hearing down to its bare essentials, there is no record of interrogatory answers, nor deposition transcripts, for them to draw upon to identify the bare essentials. Judges are forced to make relevancy determinations on the basis of hunches, gut feelings, intuition, and preconceived notions.

In *Addington v. Texas*,[130] the United States Supreme Court stated: "In cases involving individual rights, whether criminal or civil, '[t]he standard of proof [at a minimum] reflects the value society places on individual liberty.'"[131] Subsequent to its decision in *Addington*, in *Santosky v. Kramer*, the court noted that "[r]etrospective case-by-case review cannot preserve fundamental fairness when a class of proceedings is governed by a constitutionally defective evidentiary standard."[132] The court further noted that:

> In *Addington* . . . , the Court, by a unanimous vote of the participating Justices, declared: "The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.'" *Addington* teaches that, in any given proceeding, the minimum standard of proof tolerated by the due process requirement reflects not only the weight of the private and public interests affected, but also a societal judgment about how the risk of error should be distributed between the litigants.
>
> Thus, while private parties may be interested in a civil dispute over money damages, application of a "fair

---

127.   *Id.* at 1052.
128.   *Id.* at 1051.
129.   *Id.*
130.   441 U.S. 418 (1979).
131.   *Id.* at 425 (citation omitted).
132.   455 U.S. 745, 757 (1982).

*RUTGERS LAW REVIEW*

preponderance of the evidence" standard indicates both society's "minimal concern with the outcome," and a conclusion that the litigants should "share the risk of error in roughly equal fashion." When the State brings a criminal action to deny a defendant liberty or life, however, "the interests of the defendant are of such magnitude that historically and without any explicit constitutional requirement they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment." The stringency of the "beyond a reasonable doubt" standard bespeaks the "weight and gravity" of the private interest affected, society's interest in avoiding erroneous convictions, and a judgment that those interests together require that "society impos[e] almost the entire risk of error upon itself."[133]

Domestic violence actions are not mere civil disputes over money damages. Defendants have fundamental rights at stake. The preponderance standard does not reflect the importance of these rights.

More critical than the standard of proof however, is who is to apply it. If a Family Court judge is biased against defendants accused of domestic violence, there is very little to prevent him from solemnly reciting whatever the standard of proof happens to be before finding against them. Assuming he can articulate a plausible justification for his decision, the protection afforded by retrospective review would be limited. Thus, the last and most important due process deficiency of the Prevention of Domestic Violence Act I shall discuss is the denial of the right to a trial by jury.

Justice Sutherland stated in *Dimick v. Schiedt*:[134]

The right to trial by jury is of ancient origin, characterized by [Sir William] Blackstone as "the glory of the English law" and "the most transcendent privilege which any subject can enjoy;" and, as Justice Story said, ". . . the Constitution would have been justly obnoxious to the most conclusive objection if it had not recognized and confirmed in the most solemn terms." With, perhaps, some exceptions, trial by jury has always been, and still is, generally regarded as the normal and preferable mode of disposing of issues of fact in civil cases at law as well as in criminal cases. Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care.[135]

In his *Commentaries on the Laws of England*, Blackstone wrote:

133. *Id.* at 754-55 (internal citations omitted).

134. 293 U.S. 474 (1935).

135. *Id.* at 485-86 (internal citations omitted).

Our law has therefore wisely placed this strong and two-fold barrier, of a presentment and a trial by jury, between the liberties of the people and the prerogative of the crown. It was necessary, for preserving the admirable balance of our constitution, to vest the executive power of the laws in the prince: and yet this power might be dangerous and destructive to that very constitution, if exerted without check or control, by justices of *oyer* and *terminer* occasionally named by the crown; who might then, as in France or Turkey, imprison, dispatch, or exile any man that was obnoxious to the government, by an instant declaration that such is their will and pleasure. But the founders of the English law have, with excellent forecast, contrived that . . . the truth of every accusation, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of his equals and neighbours, indifferently chosen and superior to all suspicion.[136]

The right to a jury trial was an important development in the history of freedom. "Those who emigrated to this country from England brought with them this great privilege 'as their birthright and inheritance, as part of that admirable common law which had fenced around and interposed barriers on every side against the approaches of arbitrary power.'"[137] Accordingly, the Declaration of Independence objected to the King making "Judges dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries" and to his "depriving us in many cases, of the benefits of Trial by Jury."[138] And,

[t]hose who wrote our constitutions knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voice of higher authority. The framers of the constitutions strove to create an independent judiciary but insisted upon further protection against arbitrary action. . . . Beyond this, the jury trial provisions in the Federal and State Constitutions reflect a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges. Fear of unchecked power, so typical of our State and Federal Governments in other respects, found expression in the criminal law in this insistence upon community participation in the determination of guilt or

---

136. Duncan v. Louisiana, 391 U.S. 145, 151-52 (1968) (quoting WILLIAM BLACKSTONE, 4 COMMENTARIES ON THE LAWS OF ENGLAND 349-50 (Cooley ed. 1899)).

137. *Duncan*, 391 U.S. at 154 (citation omitted).

138. *Id.* at 152.

*RUTGERS LAW REVIEW* [Vol. 57:3

innocence.[139]

In our constitutional framework, the jury is expected "to serve the people by checking the judge as 'much as the legislature was to check the executive, the House to check the Senate, and the states to check the national government.'"[140]

Gilbert Keith Chesterton, writing on institutional bias, stated in 1917:

> Strictly, [judges] do not see the prisoner in the dock; all they see is the usual man in the usual place. They do not see the awful court of judgment; they see only their own workshop. Therefore, the instinct of Christian civili[z]ation has most wisely declared that into their judgments there shall upon every occasion be infused fresh blood and fresh thoughts from the streets. Men shall come in who can see the court and the crowd, and coarse faces of the policeman and professional criminals, the wasted faces of the wastrels, the unreal faces of the gesticulating counsel, and see it all as one sees a new picture or a ballet hitherto unvisited.[141]

To paraphrase Chesterton's argument, a jury brings "'freshness' to adjudication that professional judges may not possess, having heard the same sorts of cases many times."[142] Put another way, "[a]s a one-time actor in the justice system, the jury is not susceptible to the cynicism that may beset a judge who routinely hears testimony."[143]

Not only do institutional biases make it extremely difficult for a single judge to remain impartial, so does the unique nature of domestic violence actions. In addition to institutional bias, the other pervasive problem with entrusting a single judge to decide domestic violence actions is that all such actions invariably involve the unspoken question: "Do I, the judge, dare risk putting this man back in the marital home?"[144]

In a 1995 article of the *New Jersey Law Journal*, some of the advice given at an April 1994 training session and recorded on a tape obtained by the *Law Journal* was quoted verbatim. The following is some of what the trainers had to say to the newly appointed judges:

---

139. *Id.* at 156.

140. Elizabeth G. Thornburg, *The Power and the Process: Instructions and the Civil Jury*, 66 FORDHAM L. REV. 1837, 1864 (1998) (citation omitted).

141. Douglas G. Smith, *Structural and Functional Aspects of the Jury: Comparative Analysis and Proposals for Reform*, 48 ALA. L. REV. 441, 486 n.135 (1997) (citation omitted).

142. *Id.* at 486.

143. *Id.* at 486 n.134 (quoting Colleen P. Murphy, *Integrating the Constitutional Authority of Civil and Criminal Juries*, 61 GEO. WASH. L. REV. 723, 734 (1993)).

144. The question must never be spoken because of the obvious illegitimacy of judging a man for what he might do rather than what he has done.

- "So don't get callous about the fact that these people are pestering you again. You know, grant the restraining order. It'll be the one time that you don't grant the restraining order that you'll be tomorrow's headlines."

- "You don't wanna be tomorrow's headlines . . . ."

- "So if anybody ever came back at you and said, 'Well, gee, that's a real reach in terms of probable cause,' you have a legislatively mandated response which is. 'I erred on the side of caution for the victim.'"

- "Quite frankly, the standard really is by a preponderance of credible evidence. That's what the law is. But what he's saying to ya, 'Don't make that mistake at three o'clock in the morning.' You may be a little tired. Err on the side of being cautious."

- "The law is, this is the standard, but that's not quite frankly what perhaps [is] the right thing to do."

- "The bottom line is we're trying to protect the victim. We don't want the victim hurt. We don't want the victim killed. So yes, you don't want your name in the paper, but you'd feel worse than that if the victim was dead."

- "If you got any hint whatsoever there's a problem, sign the TRO. Don't take the chance."

- "Let the family division sort it out."[145]

A serious problem should now be apparent. When it comes time for the family division to "sort it out," the Family Part judge is plagued by the same concerns that weigh on a municipal judge deciding whether to grant a TRO. From the perspective of job security, a judge has much to lose and little to gain from ruling in favor of the defendant. If he rules in favor of the defendant, and the defendant then does something to hurt the plaintiff, the judge might be sharply criticized for failing to prevent the harm. If he rules against the defendant, and the defendant is really innocent, so what? The defendant's life might be ruined for something he did not do, but who cares? There will be no headlines, no angry activists protesting on the courthouse steps. "Mad dads," as I call them, have no voice, except on a few obscure websites[146] and through a small handful of writers like Cathy Young.

Similarly, from the perspective of going to bed worrying about

---

145.  *Judicial Training: "Your Job Is To Be a Wall,"* N.J. L.J., Apr. 24, 1995, at 14.
146.  *See, e.g.,* Steve Cloer, *My Domestic Abuse Story,* American Center for Child Support Reform, http://www.childsupportreform.org/articles/ScdomesticViolence Gender.php.

*RUTGERS LAW REVIEW* [Vol. 57:3

whether he did "the right thing," a judge has much to lose and little to gain from ruling in favor of the defendant. Only a jury, composed of one-time actors in the justice system, immune from political pressures, can protect a defendant from judicial concerns over job security. And only by amending the Prevention of Domestic Violence Act to spread the responsibility for guessing whether something bad will happen if the TRO is lifted amongst the members of a jury deliberating as a group could the New Jersey Legislature ever hope to provide a defendant with an objective factfinder as opposed to one tending to "err on the side of caution." The six deficiencies of the Prevention of Domestic Violence Act—the lack of notice; the denial of the right of poor defendants to free counsel; the denial of the right to take the depositions; the lack of a full evidentiary hearing; an improper standard of proof; and, most importantly, the failure to provide a defendant with a trial by jury—conspire to create a due process fiasco. Question: Where, in FRO hearings, is there a check against the court's exercise of arbitrary power? Answer: There is none.

Authorities on the Star Chamber "agree . . . that the most objectionable of the Star Chamber's practices was its asserted prerogative to disregard the common law rules of criminal procedure when the occasion demanded."[147] Today, the Family Part of the Chancery Division of the New Jersey Superior Court is not bound by the procedures of the Criminal Division in determining whether an individual committed an act of domestic violence. Indeed, it is instructed by the Prevention of Domestic Violence Act to ignore them.

Calling an action civil does not make it so. "It is idle to entertain the thought for a single moment that the legislature can change the nature of an offence by changing the forum in which it is to be tried."[148] "[T]he Legislature cannot by mere change of name or of form convert that which is in its nature a prosecution for a crime into a civil proceeding and thus deprive parties of their rights to a trial by jury. The Constitution cannot thus be trifled with."[149]

---

147. *In re* Oliver, 333 U.S. 257, 269 n.22 (1948) (citations omitted).

148. *Hedden*, 107 A. at 291; *see also supra* text accompanying note 59.

149. *See supra* text accompanying note 6.