# SUPREME COURT
# OF THE UNITED STATES

---

IN THE SUPREME COURT OF THE UNITED STATES

- - - - - - - - - - - - - - - - - -

UNITED STATES,                      )
               Petitioner,        )
           v.                 ) No. 22-915
ZACKEY RAHIMI,                      )
             Respondent.        )

- - - - - - - - - - - - - - - - - -

Pages:  1 through 105

Place:  Washington, D.C.

Date:   November 7, 2023

---

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 206
Washington, D.C.  20005
(202) 628-4888
www.hrccourtreporters.com

1

```
1       IN THE SUPREME COURT OF THE UNITED STATES
2    - - - - - - - - - - - - - - - - - -
3    UNITED STATES,                      )
4                    Petitioner,         )
5              v.                        ) No. 22-915
6    ZACKEY RAHIMI,                      )
7                    Respondent.         )
8    - - - - - - - - - - - - - - - - - -
9
10                   Washington, D.C.
11              Tuesday, November 7, 2023
12
13        The above-entitled matter came on for
14   oral argument before the Supreme Court of the
15   United States at 10:04 a.m.
16
17   APPEARANCES:
18   GEN. ELIZABETH B. PRELOGAR, Solicitor General,
19       Department of Justice, Washington, D.C.; on behalf
20       of the Petitioner.
21   J. MATTHEW WRIGHT, Assistant Federal Public Defender,
22       Amarillo, Texas; on behalf of the Respondent.
23
24
25
```

2

```
 1                    C O N T E N T S

 2   ORAL ARGUMENT OF:                          PAGE:

 3   GEN. ELIZABETH B. PRELOGAR, ESQ.

 4        On behalf of the Petitioner             3

 5   ORAL ARGUMENT OF:

 6   J. MATTHEW WRIGHT, ESQ.

 7        On behalf of the Respondent            57

 8   REBUTTAL ARGUMENT OF:

 9   GEN. ELIZABETH B. PRELOGAR, ESQ.

10        On behalf of the Petitioner           100

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2                                (10:04 a.m.)
 3             CHIEF JUSTICE ROBERTS:  We'll hear
 4      argument this morning in Case 22-915, United
 5      States versus Rahimi.
 6             General Prelogar.
 7         ORAL ARGUMENT OF GEN. ELIZABETH B. PRELOGAR
 8               ON BEHALF OF THE PETITIONER
 9             GENERAL PRELOGAR:  Mr. Chief Justice,
10      and may it please the Court:
11             Guns and domestic abuse are a deadly
12      combination.  As this Court has said, all too
13      often, the only difference between a battered
14      woman and a dead woman is the presence of a gun.
15      Armed abusers also pose grave danger to police
16      officers responding to domestic violence calls
17      and to the public at large, as Zackey Rahimi's
18      own conduct shows.
19             To address that acute threat, Congress
20      and 48 states and territories temporarily disarm
21      individuals subject to domestic violence
22      protective orders.  Congress designed Section
23      922(g)(8) to target the most dangerous domestic
24      abusers.  It applies only if, after notice and a
25      hearing, a court makes an express finding that
```

Official – Subject to Final Review

4

```
 1    the person poses a credible threat to an
 2    intimate partner's physical safety or imposes a
 3    specific prohibition on the use of physical
 4    force, and the disarmament lasts only as long as
 5    the order remains in effect.
 6            The Fifth Circuit profoundly erred in
 7    reading this Court's decision in Bruen to
 8    prohibit that widespread common-sense response
 9    to the deadly threat of armed domestic violence.
10    Like Heller and McDonald, Bruen recognized that
11    Congress may disarm those who are not
12    law-abiding, responsible citizens.
13            That principle is firmly grounded in
14    the Second Amendment's history and tradition.
15    Throughout our nation's history, legislatures
16    have disarmed those who have committed serious
17    criminal conduct or whose access to guns poses a
18    danger, for example, loyalists, rebels, minors,
19    individuals with mental illness, felons, and
20    drug addicts.
21            Rahimi offers no historical evidence
22    that those laws were thought to violate the
23    right to keep and bear arms or that the Second
24    Amendment was originally understood to prevent
25    legislatures from disarming dangerous
```

1    individuals.

2              Despite all that, the Fifth Circuit

3    held that Section 922(g)(8) is facially

4    unconstitutional because the founding generation

5    didn't disarm domestic abusers in particular.

6    But Bruen specifically approved that kind of

7    demand for a historical twin.  The Fifth

8    Circuit's approach departs from the Second

9    Amendment's original meaning and would enact the

10   very sort of regulatory straitjacket that this

11   Court disclaimed in Bruen.

12             I welcome the Court's questions.

13             JUSTICE THOMAS:  General, would you

14   just briefly define what you mean by

15   "law-abiding and responsible"?

16             GENERAL PRELOGAR:  Of course, Justice

17   Thomas.  So I would break that into its two

18   constituent components.  With respect to those

19   who are not law-abiding, history and tradition

20   shows that that's defined by those who have

21   committed serious crimes defined by the

22   felony-level punishment that can attach to those

23   crimes.

24             This case focuses on the "not

25   responsible citizens" principle, and in this

1    context, we think that history and tradition

2    show that it applies to those whose possession

3    of firearms would pose an unusual danger, beyond

4    the ordinary citizen, with respect to harm to

5    themselves or harm to others.

6            JUSTICE THOMAS:  What if someone --

7    this is a civil action.  I think we could agree

8    on the -- if this were -- these were criminal

9    proceedings.  What if someone is categorized as

10   irresponsible for not storing firearms properly?

11           GENERAL PRELOGAR:  So I think that

12   there would be a history and tradition to

13   support the idea that if someone has improperly

14   stored their firearms and thus demonstrated by

15   their conduct that they're not fit to keep and

16   bear arms, they would fit within this category

17   of those who are not responsible.  And -- and

18   there were a number of historical laws that

19   operated that way, for example, those who had

20   improperly stored gunpowder and caused the risk

21   of explosions.

22           JUSTICE THOMAS:  Below, you in your --

23   you -- you had a list of classes of individuals

24   who were excluded in -- in your opening

25   argument.  Now below you included in that class

7

1    or in those classes slaves and Native Americans.

2    Why did you drop those classes?

3            GENERAL PRELOGAR:  We haven't invoked

4    those laws at this stage of the proceedings

5    because we think that they speak to a distinct

6    principle and the textual hook that at the

7    particular point in time those categories of

8    people were viewed as being not among the people

9    protected by the Second Amendment in the first

10   instance.

11           Obviously, that was an odious

12   classification, but those laws were generally

13   accompanied by stripping of other political

14   rights or ability to -- to participate in the

15   political community, and we think they were

16   justified at that time on that basis.

17           And so the reason we haven't invoked

18   them here is because we focused on the more

19   directly relevant laws that apply to those who

20   are indisputably among the people but

21   nevertheless fit within this enduring

22   constitutional principle that the legislature

23   has authority to draw lines and make predictive

24   judgments about those whose access to firearms

25   will create that untenable risk of danger.

8

        1           CHIEF JUSTICE ROBERTS:  Is someone who
        2    drives 30 miles an hour in a 25-mile --
        3    mile-an-hour zone -- does that person qualify as
        4    law-abiding or -- or not?
        5           GENERAL PRELOGAR:  I think that that
        6    wouldn't qualify to the extent that it's
        7    classified as a misdemeanor or minor criminal
        8    conduct under state law.  And I do want to be
        9    clear that we certainly think that wouldn't
       10    apply under the not responsible category, but if
       11    you're focusing on law-abiding in particular, we
       12    think that history and tradition there support
       13    the conclusion that you can disarm those who
       14    have committed serious crimes.
       15           So it's not just that any kind of --
       16    of conduct that is an offense would qualify.
       17           CHIEF JUSTICE ROBERTS:  Is it -- are
       18    you making a misdemeanor/felony distinction?
       19           GENERAL PRELOGAR:  That's the line
       20    that history and tradition reflect, and so, yes,
       21    I think that that is the relevant category with
       22    respect to law-abiding citizens.  But, again, I
       23    would just emphasize here we're not directly
       24    invoking the law-abiding aspect of the principle
       25    because Mr. Rahimi didn't have the kind of -- of

1    criminal record that would justify disarmament

2    on that basis.  Instead, our arguments here are

3    directed at the aspect of the standard focused

4    on those who are not responsible.

5                    JUSTICE KAGAN:  You say --

6                    CHIEF JUSTICE ROBERTS:  Responsibility

7    is a very broad concept.  I mean, not taking

8    your recycling to the curb on Thursdays.  I

9    mean, if you're -- if it's a serious problem,

10   you're -- it's irresponsible.  Setting a bad

11   example, you know, by yelling at a basketball

12   game in a particular way.

13                   It seems to me that the problem with

14   responsibility is that it's extremely broad, and

15   what -- what seems responsible to some --

16   irresponsible to some people might seem like,

17   well, that's not a big deal to others.

18                   So what is the model?  I mean, is --

19   is -- do you go back to what was irresponsible

20   at the common law or what's -- take a poll and

21   see if people think it's irresponsible, you

22   know, to get into a fistfight at a -- at a, you

23   know, sports event where tempers were running

24   high or -- or what?

25                   GENERAL PRELOGAR:  So I want to be

1    really clear that we're not using the term "not

2    responsible" to describe colloquially anyone who

3    you might describe as -- as demonstrating

4    irresponsibility in many of those contexts that

5    you just described in your hypotheticals.

6    Instead, we read this Court's case law and, in

7    particular, its articulation of that principle,

8    we're tracking the Court's language here, the

9    principle of responsibility, as being

10   intrinsically tied to the danger you would

11   present if you have access to firearms.

12            And I would draw a parallel here to

13   the principles the Court has articulated with

14   respect to sensitive places or with dangerous

15   and unusual weapons.  In each of those

16   categories --

17            CHIEF JUSTICE ROBERTS:  Well, just to

18   be clear, you're -- you're using "responsible"

19   as a placeholder for dangerous with respect to

20   the use of firearms?

21            GENERAL PRELOGAR:  Correct.  So that's

22   how we understand history and tradition in this

23   context.  And the reason that we've used the

24   term "not responsible" is it -- it's because

25   it's the own -- the standard that this Court

1    itself has articulated in Heller and repeated in

2    McDonald and then re-repeated again in Bruen.

3         I think probably the reason the Court

4    has used the term "not responsible" is it gets

5    at the idea that some of the categories of

6    people who can be disarmed might not intend to

7    be dangerous.  They might not be culpable in

8    that sense, like the mentally ill or minors, and

9    so I think responsibility gets at the idea that

10   they might not actually intend to be a danger

11   but, in fact, would present a danger --

12         JUSTICE KAVANAUGH:  So there's no --

13         GENERAL PRELOGAR:  -- if they had

14   firearms.

15         JUSTICE KAVANAUGH:  -- no daylight at

16   all then between not responsible and dangerous?

17         GENERAL PRELOGAR:  Yes.  With respect

18   to responsibility in particular, our

19   understanding of what history and tradition

20   reflect and how this Court has used the term is

21   that it's identifying those whose possession of

22   firearms presents an unusual danger beyond the

23   ordinary citizen.

24         And, again, I would draw the -- the

25   analogy to sensitive places and to dangerous and

Official - Subject to Final Review

1    unusual weapons.  In each of these contexts, the

2    Court is trying to identify those arms that are

3    especially dangerous, those places where

4    carrying weapons will pose unique dangers, and

5    those categories of people who, beyond the

6    ordinary citizen, possess a -- a particular

7    danger if they have access to firearms.

8                JUSTICE BARRETT:  So it's not a

9    synonym for virtue?

10                GENERAL PRELOGAR:  No.  We're not

11    invoking a --

12                JUSTICE BARRETT:  It's not -- you're

13    not pulling in the virtuous citizenry?

14                GENERAL PRELOGAR:  We are not, no.  We

15    think that here there is a direct link under the

16    responsible citizens principle to danger, and we

17    think that the disarmament provision I'm

18    defending here, Section 922(g)(8), clearly

19    satisfies that link because it requires

20    individualized findings of dangerousness and a

21    legislative consensus that individuals in this

22    category present the requisite level of danger.

23                JUSTICE BARRETT:  Well, then how do

24    you know?  I mean, I think there would be little

25    dispute that someone who was guilty, say, or

1    even had a restraining order -- that domestic

2    violence is dangerous, okay.  So someone who

3    poses a risk of domestic violence is dangerous.

4              How does the government go about

5    showing whether certain behavior qualifies as

6    dangerous?  Because this might be in a

7    heartland, but then you can imagine more

8    marginal cases.

9              So you've invoked the consensus among

10   the states, tradition of dangerousness, and I

11   don't think you'd get a lot of push-back because

12   this is violence after all, domestic violence.

13             What about more marginal cases?

14             GENERAL PRELOGAR:  So I think that the

15   factors we think courts could apply in this

16   context -- and I should emphasize that this is

17   subject to meaningful judicial review -- would

18   fall into a couple of different categories.

19             At the outset, I would take the class

20   of disarmament provisions that require

21   individualized findings of dangerousness and say

22   those fall in the heartland, as you just

23   suggested.  We have a judicial order here that

24   specifically found that Mr. Rahimi's conduct was

25   dangerous to his intimate partner.

1          Then I think you get to the category

2    of cases where a legislature might be making

3    categorical predictive judgments that

4    individuals with a certain characteristic or

5    quality or past conduct present a danger, and

6    those, I think, can be harder cases.

7          But the factors I would point to first

8    would be the breadth of the law, because we know

9    that the Second Amendment was entire -- was

10   intended to prevent disarming wide swaths of the

11   American public.  So, if it's sweeping broadly

12   or indiscriminately and capturing people we

13   think of as ordinary citizens, that's going to

14   be a problem.

15         Next, I would look at the

16   justifications and the evidence before the

17   legislature.  This would operate like sensitive

18   places.  You could look and see is that place,

19   in fact, dangerous if there are weapons there.

20   So too you could look at the evidence the

21   legislature was consulting with respect to its

22   judgment of dangerousness.

23         And then the third factor would be

24   that legislative consensus.  And I don't want to

25   suggest that this is dispositive either way

1    because some legislatures can be the first

2    mover, and if multiple legislatures enact an

3    unconstitutional law, that doesn't give you a

4    safe harbor, but I do think that legislatures

5    are best positioned to make these kinds of

6    predictive judgments about dangerousness, and if

7    you have the kind of consensus that we see here

8    with respect to Section 922(g)(8), that's

9    entitled to a lot of weight in the analysis.

10          And I don't want to say, Justice

11   Barrett, that this is always going to be easy

12   and that these factors will cash out in obvious

13   ways.  I would say that I think that this is not

14   a close case and that Section 922(g)(8) is

15   clearly constitutional and fits within the

16   category of disarming irresponsible citizens

17   under these principles.

18          JUSTICE JACKSON:  But can I ask you --

19          JUSTICE BARRETT:  Thank you.

20          JUSTICE JACKSON:  -- a question about

21   that, though?  I guess I'm trying to understand

22   whether we can really be analyzing this

23   consistent with the Bruen test at the level of

24   generality of dangerousness.  I -- I wonder

25   whether we need to be taking into account how

1   historically domestic violence in particular was

2   treated so that if we had evidence that, you

3   know, men who engaged in domestic violence

4   historically were actually not perceived as then

5   dangerous from the standpoint of -- of

6   disarmament, what -- what -- what -- what would

7   we do with that in this situation?

8           GENERAL PRELOGAR:  So I don't think

9   that historical attitudes about dangerousness

10  would be controlling with respect to modern-day

11  circumstances, and I would draw an analogy here

12  to dangerous and unusual weapons.

13          You know, the Court has recognized,

14  for example, that handguns were not in common

15  possession at the time of the founding and might

16  have been considered unusual weapons then.  But

17  that's not what the Court would look at for

18  determining whether you could ban handguns

19  today.

20          JUSTICE JACKSON:  But is that just

21  because that's a new technology?  I mean, the --

22  the circumstance with respect to domestic

23  violence clearly existed back in the day, and

24  the question I guess -- I -- I'm just trying to

25  understand how the Bruen test works in a

1   situation in which there is at least some

2   evidence that domestic violence was not

3   considered to be, you know, subject to the kinds

4   of regulation that it is today.

5           And so, when we're looking under that

6   test for historical analogues, I guess, you

7   know, a series of regulations that relate to

8   disarming dangerous people, I -- I -- I need to

9   understand why that would be enough.

10          GENERAL PRELOGAR:  Well, so let me try

11  to respond to the methodological point, and then

12  I want to respond to the specific questions

13  you've raised about how domestic violence was

14  treated at the founding and today.

15          On the methodological point, I don't

16  think that you could read Bruen to suggest that

17  we need regulations that specifically disarm

18  domestic abusers because that would be coming

19  dangerously close to imposing on the government

20  the requirement for an identical twin of a

21  regulation.

22          And, of course, original meaning isn't

23  dictated by the happenstance of whether there

24  was a law on the books in 1791 that happened to

25  disarm domestic abusers.  I think you have to

18

```
1    come up a level of generality and use history
2    and tradition to help identify and discern the
3    enduring constitutional principles that define
4    and delimit the --
5              JUSTICE JACKSON:  But what if we had a
6    --
7              GENERAL PRELOGAR:  -- scope of the
8    Second Amendment right.
9              JUSTICE JACKSON:  -- hypothetical --
10   what if -- what if we had a hypothetical in
11   which we actually determined based on the
12   historical record that domestic violence was not
13   considered dangerousness back in the day?  I
14   mean, I -- I just don't know what we'd do with
15   that scenario.
16             GENERAL PRELOGAR:  So I think, in that
17   scenario, you would recognize that it is
18   consistent with the Second Amendment's original
19   and enduring meaning that you can disarm
20   dangerous people, and the conception of what
21   regulations that permits today is not controlled
22   by Founding-Era applications of the principle.
23             JUSTICE JACKSON:  Then what's the
24   point of going to the Founding Era?  I mean, I
25   thought it was doing some work.  But, if we're
```

Official - Subject to Final Review

19

1   still applying modern sensibilities, I don't

2   really understand the historical framing.

3          GENERAL PRELOGAR:  The work that

4   history and tradition are doing is helping to

5   discern those principles in the first place.

6   The idea, for example, that you can ban firearms

7   in sensitive places, the fact is that the

8   Framers didn't ban firearms in schools even

9   though they existed at the Founding, but the

10  Court has already recognized that those

11  analogues and the historic banning of firearms

12  in places where they present safety concerns can

13  justify a modern-day regulation that does

14  require the banning of weapons in schools.

15         And so too here, I think the Court can

16  identify the constitutional principle, which

17  it's already articulated -- we're not asking the

18  Court to break new ground here -- and say today,

19  Section 922(g)(8) is a clear application of that

20  principle that you can disarm dangerous people.

21         And, Justice Jackson, I do want to

22  push back on the idea and the premise of your

23  question that there was evidence at the

24  Founding, for example, that you couldn't disarm

25  domestic abusers.  It's true that the founders

1    didn't do that, but there's no evidence to

2    suggest that they would have thought that that

3    crossed a constitutional line.

4            And the fact that domestic violence

5    was subject to a very different legal and

6    societal regime at the time and was not viewed

7    as the kind of system that warrants systematic

8    governmental interference, I think, can't be

9    held against us now that we're looking at how

10   Congress is reacting to the profound threats

11   that armed domestic violence presents.

12           JUSTICE ALITO:  General, one

13   provision, one section of the provision at issue

14   here, applies when a court order includes a

15   finding that the person represents a credible

16   threat to the physical safety of such intimate

17   partner or child.

18           But another provision applies when the

19   order by its terms explicitly prohibits the use,

20   attempted use, or threatened use of physical

21   force.  That does not require a finding of

22   dangerousness.

23           Why is that necessary and how can that

24   be justified?

25           GENERAL PRELOGAR:  I think,

```
 1    ultimately, a court would have to find

 2    dangerousness to enter a subparagraph (c)(2)

 3    injunction based on the general equitable

 4    principle that in order to enjoin conduct, you

 5    have to think that conduct is reasonably likely

 6    to occur.

 7              This is a universal equitable

 8    principle.  It certainly applies in Texas and in

 9    virtually all of the states.  And I think what

10    it means is that a -- a judge who's considering

11    a request for a protective order wouldn't have a

12    basis in law to enter that subparagraph (c)(2)

13    prohibition on the use of physical force unless

14    the judge thought the force was sufficiently

15    likely to materialize.

16              JUSTICE ALITO:  Well, we are told in

17    some of the amicus briefs that there are

18    situations in which the family court judge who

19    has to act quickly and may not have any

20    investigative resources faces a he/she -- a he

21    said/she said situation, and the judge just

22    says:  Well, I'm going to issue an order like

23    this against both of the parties.

24              Do you agree that that occurs?

25              GENERAL PRELOGAR:  No.  I think that
```

1    that is largely a mischaracterization of what is

2    happening in the -- the state courts day in and

3    day out.  With respect to mutual protective

4    orders in particular, the vast majority of

5    states -- we cite a source that counts 48 of

6    them -- either prohibit outright or

7    substantially restrict the entry of those kinds

8    of mutual protective orders.

9              And then I think the account is

10   basically trying to suggest or insinuate that

11   these state courts are nevertheless entering

12   protective orders that are not justified by the

13   facts and the law, and that just flies in the

14   face of the presumption of regularity that this

15   Court applies in this context.

16             Even the data on the ground don't bear

17   out the assertions that family courts are just

18   reflexively entering these kinds of protective

19   orders.  By Respondent's own count in the

20   particular Tarrant County statistics he

21   collected, there were 522 requests for

22   protective orders, but that only resulted in 289

23   final protective orders.

24             So I think, even as a statistical

25   matter, it's incorrect to say that, invariably,

1     these orders are being entered without any basis

2     in fact or law to justify them.

3          JUSTICE ALITO:  Is there anything that

4     a person who is subject to one of these orders

5     can do if the person claims that there wasn't

6     really sufficient notice or that due process

7     rights were violated in some way or that any

8     need for the protective order has expired?

9          Presumably, the person could go back

10    to the state court that entered the order.  But,

11    if the state court is completely unreceptive to

12    that, is there any other avenue for relief?

13         GENERAL PRELOGAR:  So I think it's

14    important to parse out different aspects of the

15    question.  Certainly, in a Section 922(g)(8)

16    prosecution, an individual could challenge the

17    adequacy of the notice or the hearing.  And so,

18    if the argument is I didn't actually receive the

19    notice or I didn't have an opportunity to

20    participate, that would be a defense because

21    Section 922(g)(8) requires that.

22         JUSTICE ALITO:  Yes.  But --

23         GENERAL PRELOGAR:  But --

24         JUSTICE ALITO:  -- before the fact --

25    so the person -- the person thinks that he or

Official - Subject to Final Review

24

1    she is in danger and wants to have a firearm.

2    Is the person's only recourse to possess the

3    firearm and take -- you know, take their chances

4    if they get prosecuted?

5            GENERAL PRELOGAR:  No.  I mean, I

6    think the person would obviously have an ability

7    to, within the state court system, challenge the

8    entry of the protective order.  But I don't

9    think there would be any basis to say you could

10   collaterally challenge that in the federal

11   prosecution.  And, ultimately, this just

12   reflects the -- the history and tradition

13   demonstrating that there are certain categories

14   of people where we don't have to tolerate the

15   risks of armed domestic violence that they would

16   present, even in situations where they might

17   claim that they need to have a gun for other

18   reasons.

19           JUSTICE ALITO:  There's no recourse

20   before the fact in federal court?

21           GENERAL PRELOGAR:  So I think that

22   they could seek recourse in the state courts

23   themselves.  They could protest the notice and

24   the opportunity for a hearing.  But, if a court

25   has entered a protective order that complies

Official - Subject to Final Review

25

1    with the restrictions in 922(g)(8), then a

2    federal court can rely on that in enforcing this

3    prohibition.

4              JUSTICE ALITO:  Is there any

5    possibility of administrative relief?

6              GENERAL PRELOGAR:  I think that at the

7    state level, there are certain mechanisms in

8    place where people can seek relief.  And one

9    important thing to emphasize is that these

10   protective orders are inherently time-limited.

11             It varies a little bit at the state

12   level.  I've seen provisions that authorize the

13   imposition of these protective orders for six

14   months up to about five years.  I think, most

15   commonly, they're in effect for just one year.

16   But, you know -- and the federal firearms

17   prohibition tracks the length and duration of

18   the protective order, so that also, I think,

19   means that the -- the disarmament lasts only so

20   long as the danger is in effect.

21             JUSTICE ALITO:  One more question.

22   The Alameda County Public Defenders' amicus

23   brief says that some restraining orders are

24   permanent.  Is that true?  And if that is true,

25   how do you justify a permanent prohibition even

1    if the -- any danger has disappeared?

2              GENERAL PRELOGAR:  So I'm not aware of

3    state law authority to -- to -- that authorizes

4    or that routinely enters permanent protective

5    orders.  As I mentioned, this varies across

6    state law, so I don't want to suggest that

7    there's a universal answer here, but these

8    orders are generally time-limited or provide

9    mechanisms for courts to go back and review the

10   finding of dangerousness for purposes of

11   effectuating the -- the basic command of the

12   protective order.

13             JUSTICE ALITO:  Thank you.

14             JUSTICE SOTOMAYOR:  Just to be clear,

15   none of the situations that Justice Alito is

16   pointing to are the facts of this case, correct?

17             GENERAL PRELOGAR:  That's right.

18             JUSTICE SOTOMAYOR:  Or the facts of

19   this statute?

20             GENERAL PRELOGAR:  That's right.  So I

21   -- I --

22             JUSTICE SOTOMAYOR:  And the

23   constitutionality of this statute is what's at

24   issue?

25             GENERAL PRELOGAR:  Yes, and the Fifth

1    Circuit invalidated the statute on its face.  I

2    do want to suggest that to the extent the Court

3    has been left with the impression in some of

4    these amicus briefs that the protective orders

5    are routinely entered -- are routinely entered

6    without a basis to conclude that someone

7    actually presents the individualized finding of

8    danger, I do not think there is any record or

9    evidence to support that conclusion here.

10          And I would say, again, this runs

11   counter to the presumption of regularity that

12   the Court ordinarily affords in this context,

13   but I think it also runs counter to Congress's

14   recognition and circumscribing of Section

15   922(g)(8) to ensure that it's covering those who

16   had notice and an opportunity for a hearing and,

17   therefore --

18          JUSTICE SOTOMAYOR:  Counsel, in the

19   end, if there are due process failures in any

20   system, that'll be subject to a separate

21   challenge, correct?

22          GENERAL PRELOGAR:  That's correct.

23   And Mr. Rahimi hasn't made a due process claim

24   here.  He's not challenging Section 922(g)(8) on

25   that independent ground.

Official - Subject to Final Review

28

```
 1              JUSTICE SOTOMAYOR:  I'd like to go
 2      back to your law-abiding or responsible citizen
 3      category.  I now understand why you think it's
 4      -- it's appropriate.  You think "dangerous" is
 5      too limited because we have restrictions on the
 6      age of people possessing firearms and on the
 7      mentally ill, and they're not -- why do you --
 8      and I understand they're not necessarily
 9      dangerous, but I guess their lack of
10      responsibility or judgment could be questioned,
11      correct?
12              GENERAL PRELOGAR:  What I would say is
13      we think that they are inherently dangerous,
14      even though they might not be culpable or
15      intending to create that kind of danger with
16      firearms.
17              JUSTICE SOTOMAYOR:  Okay.
18              GENERAL PRELOGAR:  That there's an
19      inherent risk based on their qualities or
20      characteristics that demonstrates that, as
21      compared to the ordinary citizen, allowing them
22      access to firearms is going to present that risk
23      of danger to self or others.
24              JUSTICE SOTOMAYOR:  So, if we use
25      "danger" in the way you're defining it, as
```

Official - Subject to Final Review

29

         1    broadly as you're defining it, you don't need

         2    responsible citizen category?

         3            GENERAL PRELOGAR:  Yes.  I think these

         4    are essentially getting at the same concept.  I

         5    guess what I would say, Justice Sotomayor, is

         6    that we have tracked the Court's own language

         7    here.  And I think it would be important, if the

         8    Court wants to refer to concepts of

         9    dangerousness, to make clear that it's not

        10    backtracking from what it said in Heller and in

        11    McDonald and in Bruen, that you can disarm those

        12    who are not law-abiding, responsible citizens,

        13    with the mentally ill as one of the exemplar

        14    categories the Court held up to illustrate that

        15    proposition.

        16            And I think that the term

        17    "responsible" gets at the -- the broader group

        18    of people who can be disarmed even though they

        19    might not be culpable precisely because of this

        20    risk of danger.  But, if the Court --

        21            JUSTICE SOTOMAYOR:  Thank you,

        22    counsel.

        23            JUSTICE KAVANAUGH:  Can you finish

        24    that answer?

        25            GENERAL PRELOGAR:  I was going to say

1    but, if the Court were to refer to these

2    concepts of dangerousness, I just think it would

3    be important to make clear that it's not

4    backtracking from what it has said in prior

5    cases.  And it's not just that the Court has

6    referred to this concept in the abstract.  It's

7    actually embedded it in various aspects of how

8    Second Amendment analysis operates.

9             So, for example, the Court has said

10   background checks are okay because they're

11   intended to decide whether you're the kind of

12   ordinary, law-abiding, responsible citizen in

13   the first place, or that when you're looking at

14   whether a weapon is dangerous and unusual, you

15   should ask is this the kind of weapon that a

16   law-abiding, responsible citizen would need for

17   self-defense.

18             CHIEF JUSTICE ROBERTS:  Thank you.

19             GENERAL PRELOGAR:  And so I just think

20   there's a risk of creating confusion about that.

21             CHIEF JUSTICE ROBERTS:  Thank you,

22   counsel.  I guess, to get back to the beginning,

23   so why did you use the term "responsible" if

24   what you meant was dangerous?

25             I mean, "responsible" presents all

Official - Subject to Final Review

1    sorts of problems, and "dangerous" is sort of a

2    different set of considerations.  I mean, if you

3    thought that our prior precedents were talking

4    about dangerous, it was a little confusing to

5    all of a sudden find "responsible" being the

6    operative term.

7           GENERAL PRELOGAR:  Well, we relied on

8    the same phrasing the Court itself used when it

9    first articulated this -- this constitutional

10   principle in Heller.  And so I think we were

11   trying to point out that the Court itself has

12   already recognized the category of regulation

13   that's consistent with original meaning under

14   the Second Amendment, and we just followed the

15   Court's lead in using that phrase, those who are

16   not law-abiding, responsible citizens.

17           And as I was just suggesting --

18           CHIEF JUSTICE ROBERTS:  Well, but just

19   to be clear, your argument today is that it

20   doesn't apply to people who present a threat of

21   dangerousness?  Whether you want to characterize

22   them as responsible or irresponsible, whatever,

23   the test that you're asking us to adopt turns on

24   dangerousness?

25           GENERAL PRELOGAR:  Correct, for those

Official - Subject to Final Review

32

1    who are not responsible citizens.  I do want to

2    be clear that we think there are different

3    principles that apply --

4            CHIEF JUSTICE ROBERTS:  So dangerous

5    --

6            GENERAL PRELOGAR:  -- with those who

7    are not law-abiding.  So I just want to be clear

8    we don't think dangerousness is necessarily the

9    standard there, although there's obviously going

10   to be a lot of overlap.  That's defined by its

11   own history and tradition.  But we do think that

12   dangerousness defines the category of those who

13   are not responsible.

14           CHIEF JUSTICE ROBERTS:  Thank you.

15           Justice Thomas?

16           JUSTICE THOMAS:  If this were a -- a

17   criminal proceeding, then you would have a

18   determination of what you're talking about,

19   someone would be convicted of a crime, a felony

20   assault or something.

21           But, here, you have a -- something

22   that's anticipatory or predictive, where a court

23   is -- civil court is making the determination.

24   Just from an -- an analytical standpoint, would

25   there be a difference between a criminal

1    determination and a civil determination?

2                    GENERAL PRELOGAR:  So I don't think

3    that it would make a difference with respect to

4    whether the legislature can create categories of

5    people who are considered dangerous or not

6    responsible, and that's very much informed by

7    history and tradition here.

8                    It is not the case that the only

9    disarmament provisions that have existed over

10   time targeting those who are dangerous are

11   provisions that focused on those with criminal

12   convictions.  That is, of course, an important

13   component of the law-abiding standard in

14   particular, but we have a number of examples

15   from throughout history of those who were

16   disarmed even after civil adjudications or a

17   civil-like process, and that includes --

18                   JUSTICE THOMAS:  Could you give me an

19   example?

20                   GENERAL PRELOGAR:  Sure.  So, for

21   example, mental illness.  This was the category

22   that Heller held up as the quintessential

23   example of those who aren't responsible, even

24   though mental illness in our legal system has

25   always been adjudicated through civil

34

1    proceedings.

2            That was true, for example, of

3    loyalists.  The disarmament provisions on

4    loyalists were enforced through those who were

5    refusing to take a loyalty oath, and so there

6    wasn't any necessity of a criminal conviction.

7    So too with those who were intoxicated.  You

8    didn't need to show that they had actually been

9    criminally convicted in order to disarm them.

10           So I think that there is a

11   longstanding tradition here of recognizing that

12   individuals can be determined through this

13   predictive judgment to be dangerous even in the

14   absence of a criminal conviction.

15           JUSTICE THOMAS:  Just one last

16   question.  This is a judicial determination

17   here.  Would you be able to make the same

18   arguments if it had been a -- an administrative

19   determination?

20           GENERAL PRELOGAR:  I think it would be

21   far more difficult to defend an executive branch

22   or an administrative determination because of a

23   separate Second Amendment principle that guards

24   against granting executive officials too much

25   discretion to decide who and who cannot have

35

```
 1    firearms.
 2              In the -- there was some history about
 3    that in -- in England, of course, but in the
 4    American legal tradition, these principles have
 5    been deployed through legislative judgments or
 6    through express judicial findings of
 7    dangerousness.  So I don't think that we could
 8    point to the same history and tradition of
 9    giving executive branch officials that
10    discretion.
11              JUSTICE THOMAS:  Thank you.
12              CHIEF JUSTICE ROBERTS:  Justice Alito?
13              JUSTICE ALITO:  Suppose -- suppose
14    that a jurisdiction enacted a concealed carry
15    permitting regulation that is almost identical
16    to the one we invalidated in Bruen, except that
17    it requires an applicant to show -- to show that
18    he or she is sufficiently responsible.
19              Would that be constitutional?
20              GENERAL PRELOGAR:  So, if that were
21    implemented through a system of executive
22    discretion, just as I was discussing with
23    Justice Thomas, I think that there could be
24    additional principles that come into play that
25    would guard against that kind of licensing
```

1    regime.

2            Now, to the extent that that kind of

3    background system was intended just to implement

4    the -- the bases for disarmament that reflect

5    legislative judgments and, you know, in other

6    words, to check for whether you have a history

7    of -- of commitment to a mental institution or a

8    criminal record or so forth, then I think those

9    objective standards could be deployed as part of

10   a background check system, and -- and Bruen

11   specifically suggested as much.

12           JUSTICE ALITO:  One more question.  In

13   response to my question about the provision that

14   prohibits the possession of a firearm by someone

15   against whom an order prohibiting violence has

16   been entered and the provision doesn't on its

17   face require a finding of dangerousness, as I

18   recall, your answer was that state laws

19   generally do require that and anyway, equitable

20   principles require that.

21           Now suppose someone is later

22   prosecuted for violating that provision.  Could

23   -- would it be a defense for that person to say

24   that the state law in question did not require

25   such a finding and, in fact, there was no such

1    finding in my case?

2           GENERAL PRELOGAR:  I don't think that

3    that would provide a basis to collaterally

4    challenge the entry of the protective order in

5    the federal prosecution.  And we don't think

6    that this -- that there should be a system of

7    as-applied challenges in this context, because I

8    think that what we know is that Congress is

9    entitled to make categorical judgments,

10   predictive judgments of dangerousness based on

11   history and tradition even in -- if there are

12   really edge cases where that predictive judgment

13   wasn't actually necessary to guard against a

14   danger there.

15          But, if what you're suggesting is that

16   there might be a state out there that is

17   ordering judges to enter the subparagraph (c)(2)

18   prohibition without any basis to think that

19   physical force is likely, I think a person would

20   have a very strong due process challenge to that

21   kind of law, and that law would likely be

22   invalidated on the separate basis that it

23   doesn't provide due process if it's requiring

24   courts to enter relief that the facts and the

25   law don't support.

1              CHIEF JUSTICE ROBERTS:  Justice

2      Sotomayor?

3              Justice Kagan?

4              JUSTICE KAGAN:  General, there seems

5      to be a fair bit of division and a fair bit of

6      confusion about what Bruen means and what Bruen

7      requires in the lower courts.

8              And I'm wondering if you think that

9      there's any useful guidance, in addition to

10     resolving this case, but any useful guidance we

11     can give to lower courts about the methodology

12     that Bruen requires be used and how that applies

13     to cases even outside of this one?

14             GENERAL PRELOGAR:  Yes.  I think that

15     there are three fundamental errors and

16     methodology that this case exemplifies and that

17     we are seeing repeated in other lower courts and

18     that this case provides an opportunity for the

19     Court to clarify that Bruen should not be

20     interpreted in the way that Respondent is

21     suggesting.

22             The first error we see is that

23     Respondent has asserted here and other courts

24     have embraced the idea that the only thing that

25     matters under Bruen is regulation.  In other

1    words, you can't look at all of the other

2    sources of history that usually bear on original

3    meaning.

4             And I don't think that that can be

5    squared with this Court's precedents, starting

6    with Heller, which consulted a -- a wide variety

7    of historical sources, the same kind of evidence

8    we've come forward with here about English

9    practice, state constitutional precursors,

10    treatises, commentary, state judicial decisions.

11    All of that is relevant evidence about the scope

12    of the Second Amendment right, and I think the

13    Court could make clear that it's not a

14    regulation-only test.

15             Second, I think that looking just at

16    regulations themselves, one of the fundamental

17    problems with how courts are applying Bruen is

18    the level of generality at which they're parsing

19    the historical evidence.

20             Court after court has looked at the

21    government's examples and picked them apart to

22    say:  Well, taking them one by one, there's a

23    minute -- minute difference between how this

24    regulation operated in 1791 or the ensuing

25    decades and how Section 922 provisions operate

1    today.  And I think that comes very close to
2    requiring us to have a dead ringer when Bruen
3    itself said that's not necessary.
4         The way constitutional interpretation
5    usually proceeds is to use history and
6    regulation to identify principles, the enduring
7    principles that define the scope of the Second
8    Amendment right.  And so we think that you
9    should make clear the courts should come up a
10   level of generality and not nit-pick the -- the
11   historical analogues that we're offering to that
12   degree.
13        And, third and finally, I think that
14   in many instances, courts are placing
15   dispositive weight on the absence of regulation
16   in a circumstance where there's no reason to
17   think that that was due to constitutional
18   concerns.
19        So, for, example here, we don't have a
20   regulation disarming domestic abusers.  But
21   there is nothing on the other side of the
22   interpretive question in this case to suggest
23   that anyone thought you couldn't disarm domestic
24   abusers or couldn't disarm dangerous people.
25   And in that kind of context, I think to suggest

1    that the absence of regulation bears

2    substantially on the meaning of the Second

3    Amendment is to take a wrong turn.

4            It's contrary to the situation the

5    Court confronted in Bruen, where there was a lot

6    of historical evidence to say states can't

7    completely prohibit public carry, and against

8    that evidence, you might say that the absence of

9    regulation is significant.

10           But, here, there's nothing on the

11   other side of this interpretive question, and I

12   think that that just shows that you shouldn't

13   hold the absence of a direct regulation against

14   us.

15           JUSTICE KAGAN:  Thank you.

16           CHIEF JUSTICE ROBERTS:  Justice

17   Gorsuch?

18           JUSTICE GORSUCH:  Good morning,

19   General.  I want to follow up on your response

20   to Justice Kagan, I think your second response,

21   the level of generality question.

22           Do you -- do you think the level of

23   generality -- I take your point you've got

24   surety laws, you've got affray laws, you've got

25   a lot of historical evidence, maybe not the

42

1   historical twin.

2          And -- and you're saying we should

3   overlook that in the same way I think you would

4   say -- I want to make sure you'd say the

5   analysis also applies similarly to the -- to the

6   right side of the ledger, the regulation side on

7   the right side.  We're not looking for is -- is

8   it -- is it a Fowler or is it -- is it a musket.

9          Is -- is that a fair understanding of

10   -- of -- of how you see the law?

11          GENERAL PRELOGAR:  Yes.  We think that

12   it applies in both directions, both in

13   understanding the right itself and in

14   understanding the limitations that are built

15   into that right.

16          JUSTICE GORSUCH:  Okay.  And you --

17   you had a discussion about the length of time

18   that some of these orders last, and you

19   emphasized that you're only arguing for a

20   temporary dispossession.

21          And I -- I guess I -- I'm wondering,

22   on a facial challenge, do we need to get into

23   any of that, right?  Is -- normally, we ask on a

24   facial challenge, is there any set of

25   circumstances in which the dispossession would

1     be lawful?  And there may be an as-applied if
2     it's a lifetime ban.  That would come to us and
3     that would be a separate question.  Is that how
4     you see it too?
5               GENERAL PRELOGAR:  I agree that that
6     would be a separate question, yes.  I think that
7     there is good reason to reject as-applied
8     challenges if and when they come --
9               JUSTICE GORSUCH:  Sure.
10              GENERAL PRELOGAR:  -- before the Court
11    because of the categorical judgments that we
12    think history and tradition support, but I
13    acknowledge that here it's only a facial
14    challenge.
15              JUSTICE GORSUCH:  Okay.  And -- and
16    along the same lines on the facial challenge
17    aspect of it, do we need to resolve (c)(2) and
18    the questions that Justice Alito was asking
19    given that the -- the -- the defendant, the
20    plaintiff before us -- the Respondent, sorry,
21    is -- is -- is -- has been adjudicated under
22    (c)(1) and we actually have a finding of a
23    credible threat.  The dangerousness argument
24    seems most apparent there.  And we don't know
25    much about how all states administer (c)(2)

1    regimes.

2         GENERAL PRELOGAR:  So I agree that

3    this is a facial challenge, and the Court could

4    confine its analysis to (c)(1).  I guess I would

5    make just two responses to that.

6         JUSTICE GORSUCH:  Sure.

7         GENERAL PRELOGAR:  One is to say that

8    I think it's going to be difficult for the Court

9    to avoid the (c)(2) issue.

10        JUSTICE GORSUCH:  Of course.

11        GENERAL PRELOGAR:  We ourselves have a

12   pending petition where the Fifth Circuit has

13   invalidated an application of the statute in a

14   (c)(2) context.  So, unless you want to see me

15   here again next term on this issue, I would say

16   that --

17        JUSTICE GORSUCH:  Always delighted to

18   see you, General.

19        (Laughter.)

20        GENERAL PRELOGAR:  -- the issue has

21   been fully briefed, and we think it's an

22   important part of the statute.

23        But the second thing I would say is

24   that even if you wanted to confine your analysis

25   to (c)(1), I do think that at the very least,

45

 1    you would have to reject some of the key

 2    premises of Respondent's arguments in this case,

 3    and that relates to the colloquy I had with

 4    Justice Kagan, for example, the level of

 5    generality --

 6              JUSTICE GORSUCH:  Right.

 7              GENERAL PRELOGAR:  -- at which he's

 8    parsing the regulations, the fact that we don't

 9    have a domestic violence example in particular,

10    his arguments that legislatures just can't

11    disarm anybody, that persons can't be disarmed,

12    that kind of thing.

13              JUSTICE GORSUCH:  I follow all of

14    that.  Got you.  And the same thing goes with

15    due process.  We don't have a due process

16    challenge before us, and so we don't need to

17    resolve any of that either.

18              GENERAL PRELOGAR:  That's correct.  He

19    did not make a due process claim here.

20              JUSTICE GORSUCH:  Okay.  And then,

21    lastly, some lower courts have recognized a

22    duress defense in -- to 922 charges.  You know,

23    someone's invaded their home and they use it in

24    self- -- a gun that they have illegally in

25    self-defense.

46

1              What's the government's view on that?

2              GENERAL PRELOGAR:  So, you know, I --

3     I want to be careful here because I haven't

4     actually reviewed the cases that you must be

5     referring to where those defenses --

6              JUSTICE GORSUCH:  Yeah, there are a

7     few out there.

8              GENERAL PRELOGAR:  -- have been made.

9     I would have to take a look at those to provide

10    you with a well-thought-out government view on

11    that issue.  Obviously, we recognize that there

12    are distinctive legal doctrines like necessity

13    and defense that can come into play.  And so I'm

14    sorry that I don't have a --

15             JUSTICE GORSUCH:  What would you

16    counsel us to do about them?  I know it's not

17    fair standing at the podium not having reviewed

18    them, but there are these historical common-law

19    defenses of necessity and duress when it's not

20    aimed at the -- the subject of the protective

21    order, but a home invasion, for example.

22             GENERAL PRELOGAR:  So I would urge the

23    Court not to say anything about those doctrines

24    here, where we've got a facial challenge and

25    where, certainly, Mr. Rahimi isn't making that

47

1    kind of defense to a Section 922(g)(8)

2    conviction.  I would save for another day how

3    the Court might think about those issues where

4    they're squarely presented.

5                JUSTICE GORSUCH:  Thank you very much.

6                CHIEF JUSTICE ROBERTS:  Justice

7    Kavanaugh?

8                JUSTICE KAVANAUGH:  Just to follow up

9    on your colloquies with the Chief Justice and

10   Justice Sotomayor, I just want to make sure I

11   have the terminology exactly correct as you see

12   it.

13               One category you think the government

14   can prohibit possession by those who are not

15   law-abiding, and you said that encompasses

16   serious offenses, is that correct?

17               GENERAL PRELOGAR:  That's correct,

18   which we would define by felony-level

19   punishment.

20               JUSTICE KAVANAUGH:  Okay.  And the

21   second is the government can prohibit possession

22   by those who are not responsible, and by that,

23   you mean those who are dangerous, is that

24   correct?

25               GENERAL PRELOGAR:  Yes, those whose

1   possession of firearms would present a danger to

2   themselves or others, but they don't have to be

3   intentionally dangerous, which gets at the

4   culpability question.

5            JUSTICE KAVANAUGH:  Good.  Thank you.

6            CHIEF JUSTICE ROBERTS:  Justice

7   Barrett?

8            JUSTICE BARRETT:  My question is on

9   the law-abiding and responsible also.  I guess I

10  understood our use of that phrase in our prior

11  cases to describe the would-be gun owners in

12  those cases.  Like, we're not talking about who

13  might be able to be disarmed.  There might be

14  other people.  But all of those people were

15  law-abiding and responsible, and there was no

16  allegation that they weren't.

17           But it seems to me that in your brief

18  and in parts of the argument the government is

19  asking for that to be a test.  But I don't think

20  we presented it as a test.  Do you see a reason

21  for us to use that as the test, law-abiding and

22  responsible, given some of the ambiguities in

23  that phrase?

24           GENERAL PRELOGAR:  So I wouldn't

25  describe it as a test.  I guess what I would do

```
 1      is describe it as the relevant category, the
 2      shorthand to get at the idea that legislatures,
 3      consistent with the Second Amendment, can take
 4      action to disarm particular types of people
 5      whose possession of weapons present these types
 6      of concerns, either that they have committed
 7      serious crimes or present a danger.
 8              And I would use this as shorthand in
 9      the same way the Court has referred to the
10      sensitive places principle or the dangerous and
11      unusual weapons principle.
12              JUSTICE BARRETT:  So could I just say
13      it's dangerousness?  Let's say that I agree with
14      you that when you look back at surety laws and
15      the affray laws, et cetera, that it shows that
16      the legislature can make judgments to disarm
17      people consistently with the Second Amendment
18      based on dangerousness.
19              GENERAL PRELOGAR:  We certainly --
20              JUSTICE BARRETT:  Why can't I just say
21      that?
22              GENERAL PRELOGAR:  We certainly agree
23      that that's what history and tradition show.  We
24      think that defines the scope of the category of
25      those who are not responsible.  We don't think
```

```
1    dangerousness is the standard with law-abiding,

2    and I recognize you might have some different

3    views on that, Justice Barrett.  You don't need

4    to resolve that issue here.  This is a -- this

5    is a case just about someone who is not

6    responsible in the form of being dangerous.

7            So, yes, we would be happy with a

8    decision that says legislatures for time

9    immemorial throughout American history have been

10   able to disarm those who are dangerous.

11           JUSTICE BARRETT:  But you're trying to

12   save, like, the range issue.  So you're not

13   applying dangerousness to the crimes?

14           GENERAL PRELOGAR:  That's correct.  We

15   think that there are additional arguments that

16   can be made to defend felon disarmament and that

17   those depend on the unique history and tradition

18   with respect to criminal conduct.  And so we

19   would hope to have the opportunity to present

20   those arguments and perhaps --

21           JUSTICE BARRETT:  In that case

22   perhaps.

23           GENERAL PRELOGAR:  -- persuade you in

24   a future case, yes.

25           JUSTICE BARRETT:  Okay.  Thank you.
```

1           CHIEF JUSTICE ROBERTS:  Justice

2    Jackson?

3           JUSTICE JACKSON:  Yes.  Just to

4    clarify in response to what you said to Justice

5    Barrett, the determination of dangerousness

6    would be evaluated based on what modern

7    legislatures think counts as dangerous?  We're

8    not bound to what qualified as dangerous back in

9    the day?

10           GENERAL PRELOGAR:  That's correct.  We

11    think that once the Court recognizes the

12    principle that history and tradition support

13    this durable principle that you can disarm

14    dangerous people, then the question becomes for

15    any follow-on challenge whether the legislature

16    with respect to a particular category has

17    appropriately deemed these individuals dangerous

18    and, therefore, fitting within that historical

19    tradition.

20           And I think the inquiry there would

21    not be confined to how the Founders thought

22    about dangerousness.  Instead, it would turn on

23    some of the factors that I was discussing

24    earlier with Justice Barrett about the breadth

25    of the law, the evidence that supports the

1    legislative judgment --

2              JUSTICE JACKSON:  The kinds of things

3    we used --

4              GENERAL PRELOGAR:  -- and the

5    consensus.

6              JUSTICE JACKSON:  The kinds of things

7    we used to look at with the tiers of scrutiny,

8    what's the justification for this?  Is that what

9    you're saying?

10             GENERAL PRELOGAR:  No, I don't think

11   that this is just a revival of some form of

12   means-ends scrutiny because we wouldn't be

13   asking the -- a court to balance the intrusion

14   on the individual interest against the weight of

15   the government's interest.  Instead, this is

16   about whether the legislature has properly

17   classified a law as falling within the principle

18   in the first place.

19             And so it's not about balancing

20   between those two different interests but,

21   rather, about looking at the legislature's

22   predictive judgment of dangerousness and

23   determining ultimately whether it's justified.

24             JUSTICE JACKSON:  All right.  So let

25   me just ask you about your first methodology --

1    methodological error that you identified in

2    response to Justice Kagan.  You say that the

3    courts are focusing too much just on regulation,

4    legislation, and not on other indicia of what

5    the historical tradition is.

6              But, when you were talking with

7    Justice Thomas at the beginning, you seemed to

8    suggest that the tradition with respect to

9    slaves and Native Americans would not be subject

10   to consideration for this.  In other words, only

11   the regulation as it relates to certain segments

12   of society, I guess, count underneath this

13   historic traditions test?

14             GENERAL PRELOGAR:  Well, the reason we

15   haven't invoked those other laws is because we

16   think they were applications of a separate

17   principle under the Second Amendment, which is

18   that those who are not considered among the

19   people can be disarmed.  That, of course, has

20   the textual hook, and the Court in Heller

21   defined that as those who are not part of the

22   political community.  And when we looked at how

23   those laws operated, they traditionally stripped

24   the affected individuals from all rights to

25   participate in the political community --

54

```
 1              JUSTICE JACKSON:  I understand that --
 2              GENERAL PRELOGAR:  -- and, therefore
 3    --
 4              JUSTICE JACKSON:  -- but where does
 5    that leave us with respect to the application of
 6    our test?  I'm trying to understand if there's a
 7    flaw in the history and traditions kind of
 8    framework to the extent that when we're looking
 9    at history and tradition, we're not considering
10    the history and tradition of all of the people
11    but only some of the people as per the
12    government's articulation of the test?
13              GENERAL PRELOGAR:  Well, I certainly
14    think that those laws are a part of history.  We
15    don't think that they're a part of history that
16    are directly relevant to the separate question
17    at issue here.  And so we've instead pointed to
18    a variety of other laws that we think more
19    clearly bear on the issue of when legislatures
20    can disarm even those who are among the people.
21              JUSTICE JACKSON:  All right.  And,
22    finally, let me just ask you prospectively from
23    the standpoint of a legislator today -- I mean,
24    we've been talking about sort of the
25    retrospective view of this, you know, when
```

     1      there's an existing gun control measure that's

     2      being challenged, how do we determine by looking

     3      at history whether or not it's constitutional.

     4             But let's say I'm a legislator today

     5      in Maine, for example, and I'm very concerned

     6      about what has happened in that community, and

     7      my people, the constituents, are asking me to do

     8      something.

     9             Do you read Bruen as step one being go

    10      to the archives and try to determine whether or

    11      not there's some historical analogue for the

    12      kinds of legislation that I'm considering?

    13             GENERAL PRELOGAR:  No.  I think that

    14      Bruen requires a close look at history and

    15      tradition and analogue to the extent they exist

    16      and are relevant for purposes of articulating

    17      the principle.

    18             But, once you have the principle

    19      locked in -- and, here, the principle would be

    20      you can disarm those who are not responsible or

    21      dangerous, however the Court wants to phrase

    22      it -- then I don't think it's necessary to

    23      effectively repeat that same historical

    24      analogical analysis for purposes of determining

    25      whether a modern-day legislature's disarmament

56

1    provision fits within the category.

2              Instead, I think you would look at the

3    factors I was articulating earlier in response

4    to Justice Barrett's question about the evidence

5    before the legislature of dangerousness, the

6    consensus view, whether legislatures routinely

7    think of this circumstance as being dangerous,

8    the breadth of the law, and other factors along

9    those lines.

10             JUSTICE JACKSON:  But, if the

11   principle has not yet been established, what do

12   I do as a legislator?

13             GENERAL PRELOGAR:  So I think, if

14   there is no relevant principle that a law would

15   slot into, like sensitive place regulation or

16   dangerous person regulation, then you would

17   conduct the Bruen analysis in order to help try

18   to identify those principles of the Constitution

19   that define the scope of the Second Amendment

20   right.

21             But it wouldn't just be a hunt for a

22   particular, precise historical analogue.  I -- I

23   think that that's really a caricature of Bruen,

24   and that would make the Second Amendment a true

25   outlier because there's no constitutional right

1    that's dictated exclusively by whether there

2    happened to be a parallel law on the books in

3    1791.

4              JUSTICE JACKSON:  Thank you.

5              CHIEF JUSTICE ROBERTS:  Thank you,

6    counsel.

7              Mr. Wright.

8               ORAL ARGUMENT OF J. MATTHEW WRIGHT

9                 ON BEHALF OF THE RESPONDENT

10             MR. WRIGHT:  Thank you, Mr. Chief

11   Justice, and may it please the Court:

12             My friend described several times the

13   government's principle that in this case, they

14   are not relying on any analogues that were

15   directed at people who were not part of the

16   people, outside the community, the national or

17   political community entirely.

18             That means loyalist laws are entirely

19   off the analogical spectrum here because

20   loyalists were also pervasively deprived of all

21   of the rights of the people and citizenship.

22   They were enemies.  The government said so in

23   its Bruen amicus brief.

24             In response to Justice Gorsuch's

25   question about how the courts of appeals handle

1    the issue of self-defense, necessity, duress, we

2    cite a case on page 11 of our brief, United

3    States versus Penn, I remember that case very

4    well, it will show you how they handle it.

5    There's effectively not one.  I mean, even brief

6    fleeting possession that lasts a little bit

7    longer while being chased by people, not enough.

8    So there is no real keeping for self-defense

9    exception to this principle.

10            And in regards to I think it was

11   Justice Alito's question of duration of

12   protective orders, by default, they can be

13   permanent in Alabama, Colorado, Montana,

14   Washington.  No specific limit in Florida,

15   Michigan, North Dakota, Vermont.  Ten years in

16   Arkansas, five years in California, Ohio, South

17   Dakota.  And in Texas, where the default is two

18   years, if the judge finds or a finding is made

19   that felony violence was committed, it can be

20   five years and the time is tolled, for instance,

21   when someone's in jail.  And so, while it may be

22   the case that if we counted noses, exactly 51 or

23   52 are around a year or so, it is not the case

24   that they are short.

25            Now the danger with any kind of

```
1    historical inquiry is like the person looking
2    down a well.  So it feels like what the
3    government is doing is looking down the dark
4    well of American history and seeing only a
5    reflection of itself in the 20th and 21st
6    Century and saying that's what history shows.
7             When Congress enacted Section
8    922(g)(8) in 1994, it acted without the benefit
9    of Heller, McDonald, and Bruen, so we shouldn't
10   be surprised that they missed the mark.  They
11   made a one-sided proceeding that is short a
12   complete proxy for a total denial of a
13   fundamental and individual constitutional right.
14             At this time, I would welcome
15   questions from the Court.
16             JUSTICE THOMAS:  Counsel, would you
17   take a few -- a bit of your time to recount
18   exactly what happened below in this case, not in
19   the district court but in state court?
20             MR. WRIGHT:  So what happened in state
21   court we know very little about for certain.  We
22   have the order, which was attached as an exhibit
23   to the federal complaint, and the order reflects
24   certain findings.
25             We have shown that those findings are
```

1    incredibly common in this one county in Texas,

2    but if you did an electronic search of appellate

3    cases in Texas with the words "credible threat"

4    and "physical safety," I think you would only

5    fine three unpublished appellate cases all from

6    this county.

7            So there are words in it, but it

8    wasn't a disputed type of finding.  It was an

9    agreed order.  So my client, who was

10   unrepresented, and a -- a district attorney, a

11   Tarrant County assistant district attorney,

12   entered into a stipulation.  The order was

13   entered.  The language is in the order.  It's in

14   the joint appendix.  You can read it.  And --

15   and that's it.

16           Now I believe that, Justice Thomas,

17   more happened.  You could -- we can figure out

18   what happened if we pulled out the records, but

19   those aren't relevant.  What happens in the

20   civil proceeding doesn't matter for purposes of

21   922(g)(8).

22           JUSTICE THOMAS:  Well, I think what's

23   -- what does matter is we're assuming

24   dangerousness or irresponsibility.  Take your

25   pick.  And we are -- we have a very thin record,

```
1     and I'm trying to get a sense of what actually
2     happened in this case.
3              MR. WRIGHT:  So there are allegations
4     that were taken in the federal pre-sentence
5     report, and -- and those are the ones that made
6     their way into the opinion below.
7              And if I could then distinguish
8     between the facts that the court found for
9     purposes of fixing a sentence in this case and
10    the facts that could be contested at a jury, the
11    facts that are the subject of the guilty plea,
12    the ones that are essential to the conviction,
13    in terms of the former category, there was a
14    finding that there was, you know, a physical
15    assault, that someone had attempted to intervene
16    and that Mr. Rahimi had fired a gun into the air
17    at that time.  Those -- and -- and -- and there
18    are pending charges right now in Tarrant County
19    for three misdemeanor offenses that are the same
20    allegations that are the -- so -- so the -- the
21    federal pre-sentence report found that those
22    actions preceded and were the cause for the
23    protective order.
24             JUSTICE SOTOMAYOR:  I --
25             JUSTICE GORSUCH:  Oh, please.
```

1          JUSTICE SOTOMAYOR:  Go ahead.

2          JUSTICE GORSUCH:  Are you sure?

3          JUSTICE SOTOMAYOR:  Yes.

4          JUSTICE GORSUCH:  Okay.  Counsel,

5    you -- you -- you mentioned the self-defense,

6    duress, necessity concerns in your opening.  But

7    this is a facial challenge, right, so we have to

8    ask is it unconstitutional in any application,

9    and that would include cases where those

10   circumstances don't exist.  We don't have to

11   address those in this case, do we?

12          MR. WRIGHT:  Your Honor, I think you

13   do have to address them because the existence of

14   such a defense is part of the crime, you know,

15   the definition of the crime.  And so, if, as the

16   lower courts have consistently held, there

17   either is no such defense or it is hen's tooth

18   rare, then that plays into --

19          JUSTICE GORSUCH:  Hen's tooth rare.  I

20   haven't heard that in a while.  I like that.

21          MR. WRIGHT:  That -- that plays into

22   the facial analysis of the statute.  And I think

23   one of the areas we diverge with my friend is

24   this facial versus as-applied distinction, which

25   even this Court I was happy to read finds that

63

```
 1    distinction amorphous sometimes.  I certainly
 2    do.
 3              But, in this case, by a facial
 4    challenge, we mean the elements specifically
 5    target conduct that is explicitly protected by
 6    the plain text of the Second Amendment.
 7              JUSTICE GORSUCH:  And if -- if --
 8    if -- if I were to disagree with you on that,
 9    though, there -- there would be an as-applied
10    challenge available later in those cases, right?
11              MR. WRIGHT:  An as-applied challenge
12    -- well, if you were to disagree with me, yes,
13    that's correct, Justice Gorsuch.
14              JUSTICE GORSUCH:  And the same thing
15    when it comes to temporary dispossession.  I
16    understand your concern about permanent
17    dispossession, but, again, that isn't what's
18    necessarily before us in a facial challenge,
19    where we have to ask is it unconstitutional in
20    all of its applications, right?
21              MR. WRIGHT:  Your Honor, that -- that
22    test for faciality, I -- I think, is primarily
23    remedial.  It typically comes up in the civil
24    context where someone is suing to enjoin the
25    enforcement of a statute and -- and so the
```

Official - Subject to Final Review

1      Salerno test it's called, you know, comes into

2      play as to, typically, that assumes there is a

3      valid application or a space of valid

4      application of the statute, and then the

5      complaint is either there's too much outside or

6      my case is outside or something like that.

7               Ours is a facial challenge in the way

8      that Lopez was a facial challenge, where the

9      facts of Lopez were clearly within Congress's

10     power under the Commerce Clause.  This Court

11     found the facts of that case were Person A was

12     going to pay Lopez $40 to give that gun to

13     Person C after school.

14              That's within the commerce power, but

15     the statute itself was not within Congress's

16     power to enact.  And so that statute failed as

17     it then existed, the pre-amendment version of

18     the Gun-Free School Zones Act, on its face.

19              JUSTICE BARRETT:  I -- I just wanted

20     to go back to your conversation with Justice

21     Thomas, and I guess this touches on what you

22     just said to Justice Gorsuch about the thinness

23     of the proceeding in state court.

24              She did submit a sworn affidavit

25     giving quite a lot of detail about the various

65

1    threats, right?  So it's not like he just showed

2    up and the judge said credible finding of

3    violence?

4              MR. WRIGHT:  So, Justice Barrett, I

5    know that to be true.  And I personally looked

6    at it.  That's correct.  And it's a matter of

7    public record that you can see that.

8              JUSTICE BARRETT:  I -- I've got it.

9              MR. WRIGHT:  Right.  So -- so -- and I

10   don't mean to suggest that.  I mean that in

11   terms of what was necessary for the federal

12   prosecution, so what we could have defended this

13   case on if it went to the jury, the federal

14   jury, I mean, for the criminal prosecution, what

15   happened before, whether it was good or bad,

16   doesn't matter under the statute.

17             And we take that as a given from this

18   Court's decision in Lewis, where there's sort of

19   a -- a conceded constitutional problem with the

20   underlying felony prosecution.

21             JUSTICE GORSUCH:  Well, you -- you

22   haven't raised a due process challenge to the

23   underlying felony prosecution either, right?

24             MR. WRIGHT:  Well, Your Honor, and,

25   again --

```
 1              JUSTICE GORSUCH:  It's a Second
 2     Amendment challenge strictly speaking.
 3              MR. WRIGHT:  That's correct, Your
 4     Honor.  And we take that from Lewis.  Lewis says
 5     what Congress intended when it passed the Gun
 6     Control Act in 1968 was those matters are off
 7     the table.
 8              So, in Lewis, there's no doubt there
 9     is a constitutional violation and a violation of
10     due process under this Court's holding.
11     However, there is no Fifth Amendment claim
12     against a felon in possession prosecution, even
13     if the underlying felony is concededly unlawful
14     and unconstitutional.
15              So we take that as a given when we
16     come to a statute like this, that even if we
17     could show a due process issue with respect to
18     the issuance of the protective order, that would
19     be no defense against the federal prosecution.
20              But, if I'm wrong about that, I'm
21     happy to hear it.
22              JUSTICE GORSUCH:  It would have been
23     in the state prosecution, though?
24              MR. WRIGHT:  I'm sorry?
25              JUSTICE GORSUCH:  It would have been
```

Official - Subject to Final Review

67

1    in the state prosecution potentially, in the

2    state protective order proceeding, and you could

3    have had a due process argument and raised it

4    there.

5            MR. WRIGHT:  You're right, Justice

6    Gorsuch, and that gets to a really important

7    point here.  Because Congress has made this sort

8    of a per se automatic disarmament and it has

9    tied it to the issuance of a protective order,

10   there is no due process required before a court

11   enters an order enjoining me from committing

12   physical abuse against someone else.  That is

13   not a protected right.

14           So what we have is a proceeding that's

15   designed to adjudicate small rights or no rights

16   at all.  And then, based on the results of that

17   proceeding and even the findings that are

18   entered in that proceeding, we take very

19   consequential actions that go against an

20   individual's fundamental right to keep arms, of

21   citizenship.

22           So I do not believe -- at least I'm

23   not aware of any due process that would apply

24   with respect to the part of the order that

25   922(g)(8) cares about, the one that says you

1    cannot abuse that person.  And so, in that

2    sense, there's no due process claim we could

3    raise.

4              So that's -- so that's the thing.

5    Congress has taken a big right, the Second

6    Amendment, and has --

7              JUSTICE GORSUCH:  You're -- you're not

8    saying that before a protective order is

9    entered, there's no due process rights that an

10   individual has, are you?  I mean, is that a

11   position you really want to take?

12             MR. WRIGHT:  For a (g)(8) order, so an

13   order that forbids further abuse.

14             JUSTICE GORSUCH:  I'm talking about in

15   state court.

16             MR. WRIGHT:  Right.  Right.  So --

17             JUSTICE GORSUCH:  You're saying

18   there's no -- the Due Process Clause is silent

19   before a protective order can be entered against

20   an individual?

21             MR. WRIGHT:  To the extent that the

22   only remedy granted by that order is forbidding

23   abuse, forbidding physical abuse, I don't think

24   that you have any right to due process before

25   that is entered because you have no right to

1    abuse anyone.  It's just not.  The incentives --
2              JUSTICE GORSUCH:  You have no right to
3    murder someone, but we give you a trial.
4              MR. WRIGHT:  Right.  So --
5              JUSTICE GORSUCH:  Right?  And so
6    there's always process before a right or life,
7    liberty, or property is taken from you of some
8    kind.  What measure of due process depends upon
9    facts, circumstances -- I -- I'm not -- I'm not
10   talking about that.  But I'm surprised to hear
11   you say that the Fifth and the Fourteenth
12   Amendments' Due Process Clauses don't apply to
13   an individual who is being subject to a
14   protective order.
15             MR. WRIGHT:  I think depending on what
16   the protective order required.  So those --
17   those probably do kick in in the same way that
18   if this were a -- a true disarmament proceeding.
19   So this Court I don't think has announced the
20   criteria that would be required in something
21   like a red flag law, but something like that.
22   So everyone's attention is focused on the loss
23   of firearm rights.
24             There would be certain requirements.
25   And -- and we could argue about it.  I would

1  submit it would probably need to be clear and

2  convincing evidence, but it would certainly need

3  to be fundamentally fair because this is a

4  fundamental right.

5       That's not what any state does for a

6  civil protective order.  There's typically no

7  incentive and often no real opportunity to

8  contest the issuance of the order.  And in many

9  cases, people are happy to consent to the orders

10  because they don't want to be around the person

11  anymore either.

12       JUSTICE BARRETT:  But, counsel, I just

13  want to clarify, you're right you don't have,

14  you know, the right to commit violence against

15  anyone, but this protective order says a whole

16  lot more than that.  I mean, he's prohibited

17  from communicating with his family, with going

18  within 200 yards of her residence.  So I think

19  that paints a little bit of a different picture

20  in the due process rights that might apply.

21       MR. WRIGHT:  I agree, Your Honor, that

22  the Due Process Clause would impose limits

23  against involuntary termination of access to

24  one's children, for instance.  So I don't mean

25  to suggest -- and -- and, Justice Gorsuch, if

1    that's what I implied, I don't mean to.  I don't

2    mean to suggest that the Due Process Clause

3    doesn't -- it doesn't matter what happens in one

4    of these proceedings.

5            JUSTICE JACKSON:  So, counsel --

6            JUSTICE KAGAN:  Mr. Wright, may -- may

7    I ask just about your basic argument here?  And

8    I'm just going to read you a sentence from the

9    brief, and I want to know whether, you know,

10   that's your essential argument.

11           It says, "The government has yet to

12   find even a single American jurisdiction that

13   adopted a similar ban while the founding

14   generation walked the earth."

15           So is that what we should be looking

16   for?  And if we don't find that similar ban, we

17   say that the government has no right to do

18   anything?

19           MR. WRIGHT:  Your Honor, I think

20   that's largely what Bruen says.  However, I

21   don't think it has to be so narrow.  So, if the

22   government could affirmatively prove from the

23   historical tradition of either American firearms

24   laws or even I would be willing to spot them the

25   way that we have treated other fundamental

Case 1:23-cv-0036 tfl. JSM Document 35-3 Filed 01/23/24 Page 73 of 116

Official - Subject to Final Review

72

1    constitutionally protected rights, if they could

2    tie it to one of those historical traditions,

3    that would be good enough under the logic of

4    Bruen, if not the exact rule we're disputing

5    now.

6         JUSTICE KAGAN:  I guess I'm not quite

7    sure what the answer means.  I mean, I took that

8    sentence to be saying we're looking for a

9    regulation that even if it's not every jot and

10   tittle is essentially targeting the same kind of

11   conduct as the regulation under review.

12         And, you know, the Solicitor General

13   told us that was the wrong approach, that what

14   Bruen really directs courts to do is to think

15   about the various principles that were operating

16   at that time, whether those principles gave rise

17   to a particular regulation that was

18   near-identical to the one under review.

19         And -- and so I guess I'm asking you

20   to comment on those two ways of understanding

21   Bruen.

22         MR. WRIGHT:  I think both

23   methodological positions lead to the same

24   result, which is affirmance of the decision

25   below.  It's not just something that is about

73

```
1    domestic violence or a ban that's punishable by
2    exactly 10 years.  In other words, that's the
3    way that some of the amici have described what
4    we're arguing for.
5              I'm saying there's no ban, there's no
6    history of bans for people who were part of the
7    national community.  They don't exist.  I'm
8    saying that the plain text of the Second
9    Amendment, the way that it distinguished from
10   the English common-law tradition, I'm saying
11   that the early commentators like St. George
12   Tucker and William Rawle, they all said, if
13   you're just keeping the firearm --
14             JUSTICE KAGAN:  So -- but that does
15   suggest, I mean, that you're looking for a ban
16   on domestic violence.  And, you know, 200 some
17   years ago, the problem of domestic violence was
18   conceived very differently.  People had a
19   different understanding of the harm.  People had
20   a different understanding of the right of
21   government to try to prevent the harm.  People
22   had different understandings with respect to
23   pretty much every aspect of the problem.
24             So, if you're looking for a ban on
25   domestic violence, it's not going to be there.
```

```
1              MR. WRIGHT:  Justice Kagan, I'm
2      looking for a ban.  I'm looking for a ban, some
3      criminal punishment for just the keeping of a
4      firearm.  That's what I'm looking for.  And it's
5      based not on the loss of status of citizenship,
6      you know, or being outside the community.  I'm
7      looking for a ban that applies to a
8      rights-holding American citizen.  I mean, that's
9      -- I'd start with that.
10             Short of that, again -- and I suspect
11     the response to that is this Court has
12     tentatively approved felon in possession.  But
13     felons are so different.  They have all kinds of
14     process.  There's a long tradition of denying
15     people convicted of infamous crimes all manner
16     of rights of citizenship or not.
17             So, if I could just set that aside,
18     there's no ban because, at the time, when the
19     people of the time actually wrote about it, they
20     wrote that there's no right to misuse a firearm.
21     So the allegations that have been made against
22     my client, we do not contend that behavior is
23     protected by the Second Amendment.
24             The behavior that's protected is the
25     keeping of arms.  The behavior that is also
```

1    protected is the carrying of arms, but I would

2    concede -- I would concede there is a strong

3    historical tradition of providing more

4    restrictions against the right to public carry

5    because that's where you encounter other people.

6              This is someone who's keeping a

7    firearm in his own home.  The oldest American

8    tradition at least of a federal government,

9    someone who everyone agreed was subject to the

10   Second Amendment, passing that kind of law, was

11   1968.  This tie is older than that so-called

12   tradition, Your Honor.  It -- it just -- it's

13   20th Century, late 20th Century.  And so we

14   disagree at a very fundamental level of whether

15   there is this tradition.

16             JUSTICE ALITO:  So you -- your

17   argument is that except for someone who has been

18   convicted of a felony, a person may not be

19   prohibited from possessing a firearm in the

20   home, is that correct?

21             MR. WRIGHT:  I would add one more

22   caveat to it, Justice Alito, and that is if

23   severe criminal punishment will result, because

24   that is something that Heller itself and Bruen

25   itself took into this balance, because what --

1    the right that's protected is the right of

2    someone who, by keeping the firearm, you know,

3    is used -- for lawful -- someone who's keeping a

4    firearm for lawful purposes, how does this

5    regulation infringe on that?  If it is a small

6    fine or even loss of the weapon, maybe that

7    doesn't violate that right.  You could make it

8    illegal, you're prohibited from keeping a

9    weapon, but if we figured out that you had a

10   weapon in your bedroom, you -- you -- you may

11   have to pay for it, you know, but you're not

12   going to go to prison for 10 or 15 years.

13   You're not going to get felony liability.

14           I think all of those things together

15   are incredibly important about this ban because

16   they are -- it is not based on loss of rights of

17   citizenship.  It is applied against

18   rights-holders.  It is a total ban.  And it is

19   punishable by an incredible amount of prison

20   time.

21           JUSTICE ALITO:  So let me give you

22   this example.  Suppose a state judge determines

23   after a hearing that a man has repeatedly

24   threatened to shoot the members of his family,

25   has brandished the gun, has terrified them, and

1    orders the man not -- enters a restraining order

2    preventing that man from possessing a firearm

3    any place, including in the home.

4            Is that constitutional?

5            MR. WRIGHT:  I think the answer is

6    probably yes if he -- I think it probably is.  I

7    would want to know more about what the

8    historical tradition showed, but, certainly,

9    courts have always had broad power against the

10   people who are brought before them.  And --

11           JUSTICE ALITO:  So --

12           MR. WRIGHT:  -- I think that would be

13   consistent with the historical --

14           JUSTICE ALITO:  So the difference you

15   see between that order and prosecution for --

16   for violating the order is the fact that the

17   latter imposes a -- a felony punishment?

18           MR. WRIGHT:  That's one difference,

19   and it's an important difference under this

20   Court's case law.

21           Another difference is that the

22   defendant had a real opportunity, you know, in

23   standing before the court to say either, number

24   one, I didn't do that or, number two, something

25   was wrong with me, I'll never do that again.

1    But -- and I'll move across the country so I can

2    assure you that they will be safe, but I'm very

3    frightened to be, you know, without my arms.  So

4    you would have a chance to entreat with the

5    person who's putting in a restriction.

6            If the restriction itself was

7    unlawful, the person would have a chance to

8    appeal it to a higher authority, to an appellate

9    court, and say this judge got it wrong, you

10   know, this is not lawful either under the

11   Constitution or under this state's substantive

12   law.

13           All of those things are different in

14   the situation that you describe, and I think

15   they are constitutionally significant

16   differences between that and what we have here.

17           CHIEF JUSTICE ROBERTS:  So are you

18   suggesting, if there's a sufficient showing of

19   dangerousness, that can be a basis for disarming

20   even with respect to possession in the home?

21           MR. WRIGHT:  Again, it's a -- it's a

22   much closer question for me because it is -- I

23   have yet to see a -- a historical example of

24   that applied against a citizen.  And it would

25   certainly be a last resort type of situation.

1    So --

2              CHIEF JUSTICE ROBERTS:  Well, to the

3    extent that's pertinent, you don't have any

4    doubt that your client's a dangerous person, do

5    you?

6              MR. WRIGHT:  Your Honor, I would want

7    to know what "dangerous person" means.  At the

8    moment --

9              CHIEF JUSTICE ROBERTS:  Well, it means

10   someone who's shooting, you know, at people.

11   That's a good start.

12             (Laughter.)

13             MR. WRIGHT:  So -- so that's fair.

14   I'll say this.  If a -- imagine a statute that

15   had been written that was the what Zackey Rahimi

16   has been accused of statute, and very prescient

17   legislatures, you know, way ahead of the game.

18             If you've done all of these nine

19   things and it's proven to a constitutionally

20   significant level of abstraction, you don't get

21   to keep your gun, we're going to come and take

22   it from you, and -- and you just -- sorry, you

23   just don't.  Constitutional, 100 percent.

24             JUSTICE KAGAN:  I thought you just

25   said no.  I thought you said there's no history

```
 1      of any kind of ban for anything that doesn't
 2      relate to felonies.
 3              MR. WRIGHT:  And -- and -- and I -- I
 4      want to be clear that the -- there is not one
 5      that I found anyway.  I think it would stem from
 6      a court's either historical equitable powers or,
 7      you know, the rights of the government to
 8      literally protect someone from imminent danger
 9      to life and limb.
10              There are examples, some of the early
11      justice of the peace manuals that talk about, if
12      you see someone who is on the way to commit a
13      crime with a weapon, you can take the weapon
14      away from them and you don't have to institute
15      proceedings immediately.  However, you do have
16      to institute them pretty quick after that.
17              JUSTICE BARRETT:  I'm so confused,
18      because I thought your argument was that there
19      was no history or tradition, as Justice Kagan
20      just said, of this kind -- of disarmament in
21      this circumstance.  But now it kind of sounds
22      like your objection is just to the process.
23              Like, are you making Judge Ho's
24      argument only?
25              MR. WRIGHT:  No, Your Honor, I'm not
```

1    making Judge Ho's argument only.  The -- the law

2    that's before us right now is a ban.  It's a ban

3    that's passed by a legislature.  And it -- it is

4    -- you -- you can't get around it.  You -- you

5    can't even ask the state court to say, you know,

6    I'll accept a protection order, a stay-away

7    order, just give me permission to keep firearms

8    for my own self-defense.  That will not prevent

9    this ban from kicking in.  And it has severe

10   penalties that result from it, and it applies

11   everywhere, even in the home.

12            I think all of those things together

13   make this statute unconstitutional.  I

14   understood the question to be, what about

15   something else?  Would that be constitutional?

16   And I think so, but we would need to know --

17   we'd need to do a full workup on the history and

18   tradition that supported that.  You know, that's

19   -- that's something that I don't think this

20   Court can answer in this case because there's no

21   such law before the Court.

22            CHIEF JUSTICE ROBERTS:  Well, but

23   it -- it's a facial challenge.

24            MR. WRIGHT:  Right.

25            CHIEF JUSTICE ROBERTS:  And I

1    understand your answer to say that there will be
2    circumstances where someone could be shown to be
3    sufficiently dangerous that the firearm can be
4    taken from him.
5                MR. WRIGHT:  Yes.
6                CHIEF JUSTICE ROBERTS:  And why isn't
7    that the end of the case?
8                MR. WRIGHT:  Because --
9                CHIEF JUSTICE ROBERTS:  All you need
10   to do is show that there are circumstances in
11   which the statute can be constitutionally
12   applied.
13               MR. WRIGHT:  Because this statute is
14   -- it -- it doesn't take anyone's firearm from
15   them.  I mean -- I mean, that's -- that's one
16   way that it would be different, because there is
17   a historical tradition of separating people from
18   their firearms when there's an imminent threat
19   of lawful violence on the way to do it.
20               And I think, again, it's consistent
21   with the Court's traditional equitable powers
22   that if nothing short of surrender would protect
23   life and limb, the court's going to be able to
24   order surrender in the same way that if the
25   police see that someone has, you know, suicidal,

83

```
1    they have reason to believe they're suicidal, of
2    course, the police can go and take the firearm
3    away from them.  They can't keep it forever, and
4    they can't put somebody in prison for 10 years
5    because he had the firearm there.
6              JUSTICE JACKSON:  So I hear you
7    isolating bans by the legislature as opposed to
8    circumstances in which a court might have
9    particular facts in this way.
10             Is that what you're doing?  You're
11   sort of saying, bans by the legislature are a
12   different thing than we have facts of imminent
13   potential danger and someone runs to the court.
14   There might be a history and tradition of that,
15   but you see that as different than a ban by the
16   legislature such as what is happening here?
17             MR. WRIGHT:  Yes.
18             JUSTICE JACKSON:  All right.  So I
19   guess I'm just trying to understand, maybe this
20   is an aside, but your brief does indicate that
21   you are aware of historical bans, laws banning
22   firearm possession by disfavored categories of
23   people.
24             And -- and the government talks about
25   this as well.  And so do you agree with the
```

84

```
 1    government that those kinds of bans we don't
 2    look at or care about when we're trying to
 3    figure out whether or not there's history and
 4    tradition here?
 5              MR. WRIGHT:  Yes.  And I don't want to
 6    speak for my friend.  I understood the
 7    government's position to be we don't look at
 8    those laws in this case.  It sounds like they
 9    may still be on the table for some other person
10    who's outside the political community.
11              I say you don't look at them at all
12    because, number one, they're awful, they're
13    terrible laws.  We should not give credence to a
14    suggestion that a -- a legislator in 1870 in the
15    south -- you know, we should -- so we should not
16    --
17              JUSTICE JACKSON:  But we have a
18    history and traditions test.  I -- I guess I --
19    I'm a little troubled by having a history and
20    traditions test that also requires some sort of
21    culling of the history so that only certain
22    people's history counts.
23              So what do we do with that?  Isn't
24    that a flaw with respect to the test?
25              MR. WRIGHT:  Your Honor, I think what
```

1    you do is the Bruen test starts with the text.

2    And so, ultimately, historical tradition as I

3    understand it is something the Court does to

4    make sure its textual interpretation is correct

5    and consistent with the original understanding

6    of the amendment.

7            So, in the situation that you're

8    describing, those laws, they were not people who

9    were part of the community.  They never -- they

10   weren't seen as the people.  And when these laws

11   were challenged, including in this very Court,

12   that was the reason.  Well -- well, this Court

13   was not dealing with a disarmament law but other

14   laws that targeted those groups.

15           JUSTICE JACKSON:  So does that mean

16   only Reconstruction Era as opposed to -- sorry,

17   only Foundational Era as opposed to

18   Reconstruction Era sources are on the table

19   here?

20           MR. WRIGHT:  For purposes of the

21   Second Amendment, as -- and applied against the

22   federal government, yes, absolutely, it is only

23   Founding Era sources and immediately after the

24   Founding Era, so people who understood they were

25   bound by that.

```
 1              Like, again, I don't see these two
 2       steps of Bruen as completely separate pieces.
 3       You know, you pass the text point and you move
 4       on.  The Court is trying to get at the meaning
 5       of the text, the original public meaning of the
 6       text.
 7              JUSTICE JACKSON:  And in your view
 8       with respect to domestic violence, are we
 9       looking for history and tradition in the
10       Reconstruction Era about how regulation was
11       happening in the circumstance of domestic
12       violence or no?
13              MR. WRIGHT:  I don't --
14              JUSTICE JACKSON:  I mean, the
15       government says it can be done at the level of
16       regulation of dangerous people with respect to
17       firearms.  But you seem to be suggesting -- and
18       I think this is going back to a question that
19       Justice Kagan asked -- that what we're looking
20       for is Reconstruction Era sources, I suppose,
21       that applied to the regulation of white
22       Protestant men related to domestic violence.
23              Is that sort of the level that we are
24       focused on when we're trying to find a history
25       and tradition?
```

1           MR. WRIGHT:  No, Your Honor.  And --
2    and -- and I may not have been clear before.  I
3    think it's the Founding Era and not the
4    Reconstruction Era when we're talking about the
5    -- the federal government.
6           JUSTICE JACKSON:  I apologize, the
7    Founding Era.
8           MR. WRIGHT:  And -- and -- and it has
9    got to be the people, someone who would have
10   been understood to be part of the people, a
11   rights-holding citizen of the United States.
12          JUSTICE JACKSON:  Right.  The people
13   doing what, though?  Do we drill down further
14   and say it's the people, which in that case did
15   not include all the people, but, fine, we've
16   identified the relevant people who are being
17   regulated.  Is it enough that they were being
18   regulated with respect to just dangerousness?
19   Or are we looking for a regulation concerning
20   this set of circumstances?
21          MR. WRIGHT:  It doesn't have to be
22   specific to domestic violence.  I'm not saying
23   that.
24          JUSTICE JACKSON:  Okay.
25          MR. WRIGHT:  Violence, interpersonal

1    violence, dueling, any -- robbery.  So, in other

2    words, society understood violence, understood

3    dangerous people.  Danger existed.  But they

4    rejected at every point the type of

5    dangerousness disarmament principle that the

6    government is advocating.

7            JUSTICE KAGAN:  Do you think that the

8    Congress can disarm people who are mentally ill,

9    who have been committed to mental institutions?

10           MR. WRIGHT:  Setting aside an

11   enumerated powers problem, so they're in the

12   District of Columbia or something like that,

13   there's definitely a tradition for restricting

14   sale or provision of weapons to the mentally ill

15   that -- all the -- all the -- all the examples

16   that the government has cited are late.  They're

17   post-Civil War sources, I think, for that.  If

18   not -- so I think maybe is the answer to the

19   tradition.

20           JUSTICE KAGAN:  I'll tell you the

21   honest truth, Mr. Wright.  I feel like you're

22   running away from your argument, you know,

23   because the implications of your argument are

24   just so untenable that you have to say no,

25   that's not really my argument.

1        I mean, it just seems to me that your

2    argument applies to a wide variety of disarming

3    actions, bans, what have you, that -- that we

4    take for granted now because it's -- it's so

5    obvious that people who have guns pose a great

6    danger to others and you don't give guns to

7    people who have the kind of history of domestic

8    violence that your client has or to the mentally

9    ill or what have you.

10       So I guess -- you know, I guess I'm

11   asking you to clarify your argument because you

12   seem to be running away from it because you

13   can't stand what the consequences of it are.

14       MR. WRIGHT:  Your Honor, I am running

15   away from interest balancing because I

16   understand that that same sort of argument could

17   have been made in Bruen, could have been made in

18   Heller, could have been made in McDonald, and,

19   in fact, were made in all of those cases, right?

20       Legislatures have made a judgment that

21   it is dangerous to have people carrying weapons

22   about.  Legislatures made a judgment it's

23   dangerous for handguns specifically to be

24   possessed.  And the Court didn't defer to those

25   late or mid-20th Century judgments or even early

1    20th Century judgments about dangerousness in

2    that scenario.

3              Instead, the Court said we are going

4    to follow our understanding of the original

5    public meaning of the text and -- as illuminated

6    by the historical tradition of firearms

7    regulation at the margins.  So I -- I guess

8    that's what I want to say, is that if there's no

9    such tradition -- so if you couldn't -- I -- I'm

10   supposing that we would find examples of people

11   having firearms removed from them if they are an

12   imminent danger to others.

13             That historical record has not been

14   built in this case because that's not the kind

15   of law that we have.  I do believe that it's

16   there, and I could give some additional examples

17   where I think we can find support for that.

18   But, if not, if there were no historical support

19   for that, we would be left with what the text

20   says, which is you have a right to keep arms.

21             And so, in that sense, that would --

22   that would end.

23             CHIEF JUSTICE ROBERTS:  Thank you,

24   counsel.

25             Justice Thomas, anything further?

1           JUSTICE THOMAS:  Briefly.  You -- just

2      to be clear, what you're arguing, you say that

3      the proceedings in state court -- let's assume

4      that -- that there was no 922 consequence.  What

5      would be the effect of that order?  You -- would

6      you -- you would not be challenging that order?

7           MR. WRIGHT:  Well, I wouldn't be

8      challenging the order, but --

9           JUSTICE THOMAS:  Yeah.

10          MR. WRIGHT:  -- but -- but -- but Mr.

11     Rahimi might.

12          JUSTICE THOMAS:  My -- my question --

13     the reason I'm asking you that, you made the

14     point that that was a -- a small matter and it

15     has huge consequences.  I think you said that

16     even if Respondent moved to another state or

17     across the country, the consequences would be

18     the same, even though he would present no danger

19     in Texas.

20          And just to be clear, are you --

21     you're not challenging the state court aspect of

22     this?

23          MR. WRIGHT:  That's -- that's correct,

24     Your Honor.

25          JUSTICE THOMAS:  But solely -- and

     1     your language was it was a per se violation or

     2     automatic violation of 922, and that is your

     3     problem?

     4          MR. WRIGHT:  The -- the possession of

     5     firearms.  It's the bootstrapping of what is a

     6     proceeding that is one-sided and does not have

     7     any kind of historical connection to the loss of

     8     citizenship rights, bootstrapping that as like a

     9     conclusive presumption to a right that the

    10     federal Constitution guarantees against

    11     Congress.

    12          JUSTICE THOMAS:  So there was some

    13     talk about possibly challenging this under the

    14     Due Process Clause later on or a as-applied

    15     challenge to this.  How would -- how would you

    16     see that taking place if this is an automatic

    17     disarmament?

    18          MR. WRIGHT:  I -- I will be interested

    19     to read how it would proceed.  My understanding

    20     is that you can't raise it in a 922(g)

    21     prosecution.  I base that on Lewis and on what

    22     we understand Congress's intent to be in

    23     enacting these categorical bans.

    24          In the state court itself, when it's

    25     been raised in state courts, they typically

1    point to the federal statute and say, well,

2    Congress -- you know, Congress, you know, said

3    it's okay, so -- so, you know, if you have this

4    kind of order, then you lose.  So I think

5    922(g)(8) plays a role in that sense.

6            And if the issue is that you have tied

7    a larger constitutional right to sort of a

8    smaller right, it's not clear what -- what

9    imposes that due process requirement on the

10   state court.  And so I think that this was an

11   agreed order because he doesn't have counsel, he

12   doesn't have the ability to do it, and -- and --

13   and he's ultimately willing, I guess, to -- to

14   -- to submit, maybe to avoid the attorneys'

15   fees, which is a way that they apparently get

16   people to agree to these orders.

17            That would not be a fundamentally fair

18   system if it were a red flag or a disarmament

19   provision.

20            CHIEF JUSTICE ROBERTS:  Justice Alito?

21            Justice Sotomayor?

22            Justice Kagan?

23            Justice Gorsuch?

24            Justice Kavanaugh?

25            JUSTICE KAVANAUGH:  One specific thing

94

1    in the government's reply brief that I want to

2    get your response to.  At page 21 of the reply

3    brief, the government notes the background check

4    system that Congress has created to prevent the

5    sale of firearms to prohibited persons.

6    Domestic violence protective orders are promptly

7    incorporated into that system.  It's resulted in

8    more than 75,000 denials, the government says,

9    based on these protective orders in the last 25

10   years.

11          According to the government, under

12   your argument, that system could no longer stop

13   persons subject to those domestic violence

14   protective orders from buying firearms.  Just

15   want to get your response to that.

16          MR. WRIGHT:  I think that's wrong for

17   a couple of reasons, Justice Kavanaugh.  First

18   of all, the same system incorporates state

19   prohibitions against firearm possession, and so,

20   if there is a lawful provision imposed by state

21   law or by a judge in a court, it could be

22   incorporated into the background check system.

23          Second, I would have to concede that

24   there is a historical tradition of limiting who

25   citizens, people within the community, could

1    provide weapons to outside the community, if you

2    will.  And so it could be that that historical

3    tradition would support a restriction on

4    commercial sale of arms.  That's an example that

5    -- LRJ was one that's -- maybe has a different

6    framework.  So that would -- that's an argument

7    that could be made in favor of that sort of

8    provision or sort of background check process

9    that would not go away with 922(g)(8).

10        And just as a highly technical matter,

11   I understand that to be a function of 922(d)(8),

12   which, again, is restricting what the licensed

13   firearms dealer can do, not (g)(8), which is the

14   restriction on possession by the citizen.  This

15   is what my client went to prison for.

16        And so I -- but, on the other hand, if

17   you have a right to possess a firearm, then,

18   certainly, the acquisition of a firearm is

19   closely connected to that and constitutional

20   implications would come into play.  So I just

21   don't have a firm view on whether or not a law

22   that operated more like some of the earliest

23   20th Century laws that sort of dealt with

24   acquisition of firearms, that might survive

25   constitutional scrutiny.

     1              JUSTICE KAVANAUGH:  So it's possible
     2     the government's correct in what it says?
     3              MR. WRIGHT:  It's possible?  No, I
     4     don't think --
     5              JUSTICE KAVANAUGH:  Is that what you
     6     just said?
     7              MR. WRIGHT:  No, I don't think it's
     8     possible.  It is possible that it would be
     9     unconstitutional to deny people the right to
    10     purchase a firearm from a licensed dealer, yes,
    11     I think that is possible.
    12              But I suspect that both existing law
    13     and constitutional laws would allow many of
    14     those same people to be denied if we worked our
    15     way through the relevant provisions that are
    16     keeping them from doing it.
    17              JUSTICE KAVANAUGH:  Okay.  Thank you.
    18              CHIEF JUSTICE ROBERTS:  Justice
    19     Barrett?
    20              JUSTICE BARRETT:  So the restraining
    21     order prevented your client from possessing a
    22     firearm, and it also immediately suspended his
    23     handgun license.  Was that unconstitutional?
    24              MR. WRIGHT:  Your Honor, just to take
    25     issue with the second part of the question

```
 1      first, that language, suspending handgun
 2      license, that's in all of these Tarrant County
 3      orders.  That's part of the boilerplate --
 4              JUSTICE BARRETT:  But, still, it says
 5      it's ordered that his handgun license is
 6      immediately suspended.
 7              MR. WRIGHT:  Right.
 8              JUSTICE BARRETT:  So just let's --
 9      let's go with the -- with the order's language.
10      Did that violate the Second Amendment, putting
11      922 aside?
12              MR. WRIGHT:  I think, to answer that
13      question, then we -- we would bring the whole
14      record, the record that was before the court and
15      terms, and -- and the client agreed to the
16      order.  So it would be very difficult to --
17              JUSTICE BARRETT:  But you're going --
18      you're going back to the process.
19              MR. WRIGHT:  Right.
20              JUSTICE BARRETT:  You know, she had
21      the affidavit.  Let's -- let's imagine they --
22      they go back and forth.  Let's -- let's imagine
23      it's a more fulsome process and she actually
24      testifies and he cross-examines her.  Whatever.
25      Let's assume there's no process problem.
```

1          Would it be unconstitutional then to

2     deprive your client of his handgun license and

3     his -- his -- prohibit him from possessing a

4     firearm?  Because I assume that -- you've said

5     there's no analogue of -- of this kind of

6     domestic violence thing.

7          MR. WRIGHT:  Right.  Or the analogue

8     would be in terms of what courts could do

9     through equitable powers otherwise.  I think

10    that would have to be the analogue.

11         JUSTICE BARRETT:  But -- but they

12    can't, through their equitable powers, do

13    something that would violate the Constitution,

14    right?

15         MR. WRIGHT:  Right.  Right.  So, if

16    the finding was that nothing short of surrender

17    of firearms would prevent damage to life and

18    limb, that would be constitutional.  So I -- I

19    don't know if that answers your question or not.

20         CHIEF JUSTICE ROBERTS:  Justice

21    Jackson?

22         JUSTICE JACKSON:  I guess I'm just

23    trying to get a clear answer to whether or not

24    we're looking for historical analogues related

25    to domestic violence or something broader.

1          You -- you -- you suggested -- and

2     your brief I'm now revisiting suggests that the

3     government cites no laws punishing members of

4     the American political community for possessing

5     firearms in their own homes based on

6     dangerousness, irresponsibility, crime

7     prevention, violent history, or any other

8     character trait.

9          So you just say there are no bans that

10    relate to any of those things.

11          MR. WRIGHT:  That's my understanding

12    of the historical record that we have in this

13    case, yes.

14          JUSTICE JACKSON:  And if the

15    government were to convince us that there was a

16    ban related to, say, dangerousness, do you lose?

17    I thought your point was, even if there is some

18    dangerousness tradition, it has to be about

19    domestic violence.

20          MR. WRIGHT:  That's not my point, Your

21    Honor.

22          JUSTICE JACKSON:  Okay.

23          MR. WRIGHT:  That's -- that's --

24    that's not something that we're -- people could

25    argue that, but I don't think anybody -- none of

1     our amici have argued that.  Certainly, there's

2     some point at which someone could be separated

3     from a firearm.

4              This law doesn't do that at all for

5     anyone.  This is just:  Can you be punished for

6     keeping a firearm?  And I think that the -- the

7     text of the Constitution says no, the early

8     commentators would say no at least as far as

9     Congress doing it, and the historical tradition

10    all say no.

11             So, in terms the level of abstraction,

12    I don't see how this case presents that because

13    there's just nothing, no bans.  No bans against

14    rights-holders.

15             JUSTICE JACKSON:  Thank you.

16             CHIEF JUSTICE ROBERTS:  Thank you,

17    counsel.

18             Rebuttal, General?

19        REBUTTAL ARGUMENT OF GEN. ELIZABETH B. PRELOGAR

20                ON BEHALF OF THE PETITIONER

21             GENERAL PRELOGAR:  Thank you, Mr.

22    Chief Justice.

23             My friend began his argument this

24    morning in response to a question from Justice

25    Kagan saying that he does read Bruen to require

Official - Subject to Final Review

101

1      the government to come forward with a precise

2      historical analogue in order to justify a

3      modern-day firearms regulation.

4               I think that is a clearly incorrect

5      reading of Bruen.  Unfortunately, it's a

6      profound misreading that many lower courts have

7      been adopting.  And I think that it's important

8      for the Court to understand the destabilizing

9      consequences of that reading in the lower

10     courts.

11              Just last week, a court invalidated

12     Section 922(g)(1), the felon prohibition

13     statute, on its face as applied to the most

14     violent and horrific crimes imaginable on the

15     theory that the government didn't have a

16     sufficiently precise historical analogue to

17     justify a permanent ban on felons.

18              Many courts now, several district

19     courts, have credited as-applied challenges to

20     Section 922(g)(1) by armed career criminals who

21     have multiple convictions for aggravated

22     assault, drug trafficking, armed robbery,

23     clearly violent crimes, because we don't have a

24     sufficient historical analogue disarming those

25     subject to precisely those crimes at the

 1    Founding.  And a court has also invalidated on

 2    its face the provision of federal law that

 3    prohibits possession of firearms with

 4    obliterated serial numbers, again, on the theory

 5    that we don't have a Founding Era analogue that

 6    is sufficiently precise that says you have to

 7    serialize firearms possession.

 8             I think that those are clearly

 9    untenable results.  They are profoundly

10    destabilizing, and Bruen doesn't require them.

11             Once the Court corrects the

12    misinterpretation of Bruen, then I think the

13    constitutional principle is clear.  You can

14    disarm dangerous persons.  And under that

15    principle, Section 922(g)(8) is an easy case.

16    It's an easy case for three reasons.

17             First, it requires an individualized

18    finding of dangerousness.  Now I think I heard

19    my friend to concede today that those kinds of

20    individualized findings of dangerousness do

21    suffice for disarmament, and he questions

22    whether the process in state court judicial

23    proceedings is sufficient.

24             But that ultimately is a procedural

25    claim that should be adjudicated under the Due

103

1    Process Clause, and I think that it ignores two

2    fundamental features that are relevant here.

3    First, the Section 922(g)(8) guarantees notice

4    and a hearing.  It only permits disarmament in

5    those situations, so the most fundamental

6    protection of due process is validated under

7    this provision.

8              And, second, that there is a

9    presumption of regularity that exists in this

10   context.  And to -- to say or suggest that all

11   of these state court procedural orders,

12   protective orders, are fundamentally flawed or

13   inherently unreliable, I think, would override

14   that presumption in this case and be profoundly

15   unsettling for the state courts that are on the

16   front lines here trying to protect victims of

17   domestic violence.

18             I think as well that these principles

19   equally demonstrate subparagraph (c)(2)'s

20   validity.  We think that there is an inherent

21   requirement that the Court find that the threat

22   of physical force is likely to occur in order to

23   justify entering that kind of judicial finding,

24   and that provides a basis to uphold Section

25   922(g)(8) with respect to all of its

104

1    applications.

2              The second reason why this is an easy

3    case is because there is a legislative

4    consensus.  It is not just Congress, but 48

5    states and territories share this view that

6    armed domestic violence needs to be guarded

7    against and that disarmament is a permissible

8    legislative response.  And so I think that

9    further fortifies the congressional judgment.

10             And the third reason why Section

11   922(g)(8) should be an easy case is because it

12   does guard against a profound harm.  A woman who

13   lives in a house with a domestic abuser is five

14   times more likely to be murdered if he has

15   access to a gun.

16             And it's not just the harms in the

17   home.  It extends to the public and to police

18   officers as well.  I was struck by the data

19   showing that armed -- that domestic violence

20   calls are the most dangerous type of call for a

21   police officer to respond to in this country.

22   And for those officers who die in the line of

23   duty, virtually all of them are murdered with

24   handguns.

25             Section 922(g)(8) takes account of

1    those concerns, and, here, history and tradition

2    confirm common sense.  Congress can disarm armed

3    domestic abusers in light of those profound

4    concerns.

5              So we'd ask the Court to correct the

6    Fifth Circuit's methodological errors and

7    reverse.

8              CHIEF JUSTICE ROBERTS:  Thank you,

9    counsel.

10              The case is submitted.

11              (Whereupon, at 11:37 a.m., the case

12    was submitted.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Official - Subject to Final Review

**$**

**$40** [1] 64:12

**1**

**10** [3] 73:2 76:12 83:4
**10:04** [2] 1:15 3:2
**100** [2] 2:10 79:23
**11** [1] 58:2
**11:37** [1] 105:11
**15** [1] 76:12
**1791** [3] 17:24 39:24 57:3
**1870** [1] 84:14
**1968** [2] 66:6 75:11
**1994** [1] 59:8

**2**

**200** [2] 70:18 73:16
**2023** [1] 1:11
**20th** [5] 59:5 75:13,13 90:1 95:23
**21** [1] 94:2
**21st** [1] 59:5
**22-915** [1] 3:4
**25** [1] 94:9
**25-mile** [1] 94:11
**289** [1] 22:22

**3**

**3** [1] 2:4
**30** [1] 8:2

**4**

**48** [3] 3:20 22:5 104:4

**5**

**51** [1] 58:22
**52** [1] 58:23
**522** [1] 22:21
**57** [1] 2:7

**7**

**7** [1] 1:11
**75,000** [1] 94:8

**9**

**922** [5] 39:25 45:22 91:4 92:2 97:11
**922(d)(8** [1] 95:11
**922(g** [1] 92:20
**922(g)(1** [2] 101:12,20
**922(g)(8** [22] 3:23 5:3 12:18 15:8,14 19:19 23:15,21 25:1 27:15,24 47:1 59:8 60:21 67:25 93:5 95:9 102:15 103:3,25 104:11,25

**A**

**a.m** [3] 1:15 3:2 105:11
**ability** [3] 7:14 24:6 93:12
**able** [4] 34:17 48:13 50:10 82:23
**above-entitled** [1] 1:13
**absence** [5] 34:14 40:15 41:1,8,13

**absolutely** [1] 85:22
**abstract** [1] 30:6
**abstraction** [2] 79:20 100:11
**abuse** [7] 3:11 67:12 68:1, 13,23,23 69:1
**abuser** [1] 104:13
**abusers** [9] 3:15,24 5:5 17:18,25 19:25 40:20,24 105:3
**accept** [1] 81:6
**access** [7] 4:17 7:24 10:11 12:7 28:22 70:23 104:15
**accompanied** [1] 7:13
**According** [1] 94:11
**account** [3] 15:25 22:9 104:25
**accused** [1] 79:16
**acknowledge** [1] 43:13
**acquisition** [2] 95:18,24
**across** [3] 26:5 78:1 91:17
**act** [3] 21:19 64:18 66:6
**acted** [1] 59:8
**action** [2] 6:7 49:4
**actions** [3] 61:22 67:19 89:3
**actually** [11] 4:10 16:4 18:11 23:18 27:7 30:7 34:8 37:13 43:22 46:4 61:1 74:19 97:23
**acute** [1] 3:19
**add** [1] 75:21
**addicts** [1] 4:20
**addition** [1] 38:9
**additional** [3] 35:24 50:15 90:16
**address** [3] 3:19 62:11,13
**adequacy** [1] 23:17
**adjudicate** [1] 67:15
**adjudicated** [3] 33:25 43:21 102:25
**adjudications** [1] 33:16
**administer** [1] 43:25
**administrative** [3] 25:5 34:18,22
**adopt** [1] 31:23
**adopted** [1] 71:13
**adopting** [1] 101:7
**advocating** [1] 88:6
**affected** [1] 53:24
**affidavit** [2] 64:24 97:21
**affirmance** [1] 72:24
**affirmatively** [1] 71:22
**affords** [1] 27:12
**affray** [2] 41:24 49:15
**age** [1] 28:6
**aggravated** [1] 101:21
**ago** [1] 73:17
**agree** [9] 6:7 21:24 43:5 44:2 49:13,22 70:21 83:25 93:16
**agreed** [4] 60:9 75:9 93:11

**97:15
ahead** [2] 62:1 79:17
**aimed** [1] 46:20
**air** [1] 61:16
**Alabama** [1] 58:13
**Alameda** [1] 25:22
**ALITO** [20] 20:12 21:16 23:3,22,24 24:19 25:4,21 26:13,15 35:12,13 36:12 43:18 75:16,22 76:21 77:11,14 93:20
**Alito's** [1] 58:11
**allegation** [1] 48:16
**allegations** [3] 61:3,20 74:21
**allow** [1] 96:13
**allowing** [1] 28:21
**almost** [1] 35:15
**already** [3] 19:10,17 31:12
**although** [1] 32:9
**Amarillo** [1] 1:22
**ambiguities** [1] 42:24
**Amendment** [25] 4:24 7:9 14:9 18:8 30:8 31:14 34:23 39:12 40:8 41:3 49:3, 17 53:17 56:19,24 63:6 66:2,11 68:6 73:9 74:23 75:10 85:6,21 97:10
**Amendment's** [4] 4:14 5:9 18:18
**Amendments'** [1] 69:12
**American** [9] 14:11 35:4 50:9 59:4 71:12,23 74:8 75:7 99:4
**Americans** [2] 7:1 53:9
**amici** [2] 73:3 100:1
**amicus** [4] 21:17 25:22 27:4 57:23
**among** [5] 7:8,20 13:9 53:18 54:20
**amorphous** [1] 63:1
**amount** [1] 76:19
**analogical** [2] 55:24 57:19
**analogue** [10] 55:11,15 56:22 98:5,7,10 101:2,16,24 102:5
**analogues** [5] 17:6 19:11 40:11 57:14 98:24
**analogy** [2] 11:25 16:11
**analysis** [8] 15:9 30:8 42:5 44:4,24 55:24 56:17 62:22
**analytical** [1] 32:24
**analyzing** [1] 15:22
**announced** [1] 67:16
**another** [4] 20:18 47:2 77:21 91:16
**answer** [10] 26:7 29:24 36:18 72:7 77:5 81:20 82:1 88:18 97:12 98:23
**answers** [1] 98:19
**anticipatory** [1] 32:22
**anybody** [2] 45:11 99:25

**anyone's** [1] 82:14
**anyway** [2] 36:19 80:5
**apart** [1] 39:21
**apologize** [1] 87:6
**apparent** [1] 43:24
**apparently** [1] 93:15
**appeal** [1] 78:8
**appeals** [1] 57:25
**APPEARANCES** [1] 1:17
**appellate** [2] 60:2,5 78:8
**appendix** [1] 60:14
**applicant** [1] 35:17
**application** [6] 19:19 44:13 54:5 62:8 64:3,4
**applications** [4] 18:22 53:16 63:20 104:1
**applied** [6] 76:17 78:24 82:12 85:21 86:21 101:13
**applies** [12] 3:24 6:2 20:14, 18 21:8 22:15 38:12 42:5, 12 74:7 81:10 89:2
**apply** [8] 7:19 8:10 13:15 31:20 32:3 67:23 69:12 70:20
**applying** [3] 19:1 39:17 50:13
**approach** [2] 5:8 72:13
**appropriate** [1] 28:4
**appropriately** [1] 51:17
**approved** [2] 5:6 74:12
**archives** [1] 55:10
**areas** [1] 62:23
**aren't** [2] 33:23 60:19
**argue** [2] 69:25 99:25
**argued** [1] 100:1
**arguing** [3] 42:19 73:4 91:2
**argument** [29] 1:14 2:2,5,8 3:4,7 6:25 23:18 31:19 43:23 48:18 57:8 67:3 71:7, 10 75:17 80:18,24 81:1 88:22,23,25 89:2,11,16 94:12 95:6 100:19,23
**arguments** [9] 9:2 34:18 45:2,10 50:15,20
**Arkansas** [1] 58:16
**Armed** [3] 3:15 4:9 20:11 24:15 101:20,22 104:6,19 105:2
**arms** [4] 4:23 6:16 12:2 67:20 74:25 75:1 78:3 90:20 95:4
**around** [3] 58:23 70:10 81:4
**articulated** [4] 10:13 11:1 19:17 31:9
**articulating** [2] 55:16 56:3
**articulation** [2] 10:7 54:12
**as-applied** [6] 37:7 43:1,7 62:24 63:9,11 92:14 101:19
**aside** [4] 74:17 83:20 88:10

**97:11
aspect** [5] 8:24 9:3 43:17 73:23 91:21
**aspects** [2] 23:14 30:7
**assault** [3] 32:20 61:15 101:22
**asserted** [1] 38:23
**assertions** [1] 22:17
**Assistant** [2] 1:21 60:11
**assume** [3] 91:3 97:25 98:2
**assumes** [1] 64:2
**assuming** [1] 60:23
**assure** [1] 78:2
**attach** [1] 5:22
**attached** [1] 59:22
**attempted** [2] 20:20 61:15
**attention** [1] 69:22
**attitudes** [1] 16:9
**attorney** [2] 60:10,11
**attorneys'** [1] 93:14
**authority** [3] 7:23 26:3 78:2
**authorize** [1] 25:12
**authorizes** [1] 26:3
**automatic** [2] 87:8 92:2,16
**available** [1] 64:3
**avenue** [1] 23:12
**avoid** [2] 44:9 93:14
**aware** [3] 26:2 67:23 83:21
**away** [6] 80:14 83:3 88:22 89:12,15 95:9
**awful** [1] 84:12

**B**

**back** [14] 9:19 16:23 18:13 19:22 23:9 26:9 28:2 30:22 49:14 51:8 64:20 86:18 97:18,22
**background** [6] 30:10 36:3,10 94:3,22 95:8
**backtracking** [2] 29:10 30:4
**bad** [2] 9:10 65:15
**balance** [2] 52:13 75:25
**balancing** [2] 52:19 89:15
**ban** [23] 16:18 19:6,8 43:2 71:13,16 73:1,5,15,24 74:2, 2,7,18 76:15,18 80:1 81:2, 2,9 83:15 99:16 101:17
**banning** [3] 19:11,14 83:21
**bans** [10] 73:6 83:7,11,21 84:1 89:3 92:23 99:9 100:13,13
**BARRETT** [27] 12:8,12,23 15:11,19 48:7,8 49:12,20 50:3,11,21,25 51:5,24 64:16 65:4,8 70:12 80:17 96:19,20 97:4,8,17,20 98:11
**Barrett's** [1] 56:4
**base** [1] 92:21
**based** [11] 18:11 21:3 28:

Heritage Reporting Corporation
(202) 628-4888

19 **37:**10 **49:**18 **51:**6 **67:**16
**74:**5 **76:**16 **94:**9 **99:**5
**bases** [1] 36:4
**basic** [4] 26:11 71:7
**basically** [1] 22:10
**basis** [11] 7:16 9:2 21:12
23:1 24:9 27:6 37:3,18,22
78:19 103:24
**basketball** [1] 9:11
**battered** [1] 3:13
**bear** [5] 4:23 6:16 22:16 39:
2 54:19
**bears** [1] 41:1
**becomes** [1] 51:14
**bedroom** [1] 76:10
**began** [1] 100:23
**beginning** [2] 30:22 53:7
**behalf** [8] 1:19,22 2:4,7,10
3:8 57:9 100:20
**behavior** [4] 13:5 74:22,24,
25
**believe** [4] 60:16 67:22 83:
1 90:15
**Below** [5] 6:22,25 59:18 61:
6 72:25
**benefit** [1] 59:8
**best** [1] 15:5
**between** [8] 3:13 11:16 32:
25 39:23 52:20 61:8 77:15
78:16
**beyond** [3] 6:3 11:22 12:5
**big** [1] 9:17 68:5
**bit** [6] 25:11 38:5,5 58:6 59:
17 70:19
**boilerplate** [1] 97:3
**books** [2] 17:24 57:2
**bootstrapping** [2] 92:5,8
**both** [5] 21:23 42:12,12 72:
22 96:12
**bound** [2] 51:8 85:25
**branch** [2] 34:21 35:9
**brandished** [1] 76:25
**breadth** [3] 14:8 51:24 56:
8
**break** [2] 5:17 19:18
**brief** [10] 25:23 48:17 57:23
58:2,5 71:9 83:20 94:1,3
99:2
**briefed** [1] 44:21
**briefly** [5] 5:14 91:1
**briefs** [2] 21:17 27:4
**bring** [1] 97:10
**broad** [3] 9:7,14 77:9
**broader** [2] 29:17 98:25
**broadly** [2] 14:11 29:1
**brought** [1] 77:10
**Bruen** [37] 4:7,10 5:6,11 11:
2 15:23 16:25 17:16 29:11
35:16 36:10 38:6,6,12,19,
25 39:17 40:2 41:5 55:9,
14 56:17,23 57:23 59:9 71:
20 72:4,14,21 75:24 85:1

86:2 89:17 100:25 101:5
102:10,12
**built** [2] 42:14 90:14
**buying** [1] 94:14

---

# C

**c)(1** [3] 43:22 44:4,25
**c)(2** [7] 21:2,12 37:17 43:17,
25 44:9,14
**c)(2)'s** [1] 103:19
**California** [1] 58:16
**call** [1] 104:20
**called** [1] 64:1
**calls** [2] 3:16 104:20
**came** [1] 1:13
**cannot** [2] 34:25 68:1
**capturing** [1] 14:12
**care** [1] 84:2
**career** [1] 101:20
**careful** [1] 46:3
**cares** [1] 67:25
**caricature** [1] 56:23
**carry** [3] 35:14 41:7 75:4
**carrying** [3] 12:4 75:1 89:
21
**Case** [43] 3:4 5:24 10:6 15:
14 26:16 33:8 37:1 38:10,
16,18 40:22 45:2 50:5,21,
24 57:13 58:2,3,22,23 59:
18 61:2,9 62:11 63:3 64:6,
11 65:13 77:20 81:20 82:7
84:8 87:14 90:14 99:13
100:12 102:15,16 103:14
104:3,11 105:10,11
**cases** [16] 13:8,13 14:2,6
30:5 37:12 38:13 46:4 48:
11,12 60:3,5 62:9 63:10
70:9 89:19
**cash** [1] 15:12
**categorical** [4] 14:3 37:9
43:11 92:23
**categories** [9] 7:7 10:16
11:5 12:5 13:18 24:13 29:
14 33:4 83:22
**categorized** [1] 6:9
**category** [17] 6:16 8:10,21
12:22 14:1 15:16 28:3 29:
2 31:12 32:12 33:21 47:13
49:1,24 51:16 56:1 61:13
**cause** [1] 61:22
**caused** [1] 6:20
**caveat** [1] 75:22
**Century** [6] 59:6 75:13,13
89:25 90:1 95:23
**certain** [9] 13:5 14:4 24:13
25:7 53:11 59:21,24 69:24
84:21
**certainly** [13] 8:9 21:8 23:
15 46:25 49:19,22 54:13
63:1 70:2 77:8 78:25 95:
18 100:1
**cetera** [1] 49:15
**challenge** [25] 23:16 24:7,

10 27:21 37:4,20 42:22,24
43:14,16 44:3 45:16 46:24
51:15 62:7 63:4,10,11,18
64:7,8 65:22 66:2 81:23
92:15
**challenged** [2] 55:2 85:11
**challenges** [3] 37:7 43:8
101:19
**challenging** [5] 27:24 91:6,
8,21 92:13
**chance** [2] 78:4,7
**chances** [1] 24:3
**character** [1] 99:8
**characteristic** [1] 14:4
**characteristics** [1] 28:20
**characterize** [1] 31:21
**charges** [2] 45:22 61:18
**chased** [1] 58:7
**check** [5] 36:6,10 94:3,22
95:8
**checks** [1] 30:10
**CHIEF** [34] 3:3,9 8:1,17 9:6
10:17 30:18,21 31:18 32:4,
14 35:12 38:1 41:16 47:6,
9 48:6 51:1 57:5,10 78:17
79:2,9 81:22,25 82:6,9 90:
23 93:20 96:18 98:20 100:
16,22 105:8
**child** [1] 20:17
**children** [1] 70:24
**Circuit** [4] 4:6 5:2 27:1 44:
12
**Circuit's** [2] 5:8 105:6
**circumscribing** [1] 27:14
**circumstance** [5] 16:22
40:16 56:7 80:21 86:11
**circumstances** [8] 16:11
42:25 62:10 69:9 82:2,10
83:8 87:20
**cite** [2] 22:5 58:2
**cited** [1] 88:16
**cites** [1] 99:3
**citizen** [12] 6:4 11:23 12:6
28:2,21 29:2 30:12,16 74:
8 78:24 87:11 95:14
**citizenry** [1] 12:13
**citizens** [10] 4:12 5:25 8:22
12:16 14:13 15:16 29:12
31:16 32:1 94:25
**citizenship** [6] 57:21 67:
21 74:5,16 76:17 92:8
**civil** [6] 6:7 32:23 33:1,16,
25 60:20 63:23 70:6
**civil-like** [1] 33:17
**claim** [6] 24:17 27:23 45:19
66:11 68:2 102:25
**claims** [1] 23:5
**clarify** [4] 38:19 51:4 70:13
89:11
**class** [2] 6:25 13:19
**classes** [3] 6:23 7:1,2
**classification** [1] 7:12

**classified** [2] 8:7 52:17
**Clause** [6] 64:10 68:18 70:
22 71:2 92:14 103:1
**Clauses** [1] 69:12
**clear** [20] 8:9 10:1,18 19:19
26:14 29:9 30:3 31:19 32:
2,7 39:13 40:9 70:1 80:4
87:2 91:2,20 93:8 98:23
102:13
**clearly** [8] 12:18 15:15 16:
23 54:19 64:9 101:4,23
102:8
**client** [7] 60:9 74:22 89:8
95:15 96:21 97:15 98:2
**client's** [1] 79:4
**close** [4] 15:14 17:19 40:1
55:14
**closely** [1] 95:19
**closer** [1] 78:22
**collaterally** [2] 24:10 37:3
**collected** [1] 22:21
**colloquially** [1] 10:2
**colloquies** [1] 47:9
**colloquy** [1] 45:3
**Colorado** [1] 58:13
**Columbia** [1] 88:12
**combination** [1] 3:12
**come** [11] 18:1 35:24 39:8
40:9 43:2,8 46:13 66:16
79:21 95:20 101:1
**comes** [4] 40:1 63:15,23
64:1
**coming** [1] 17:18
**command** [1] 26:11
**comment** [1] 72:20
**commentary** [1] 39:10
**commentators** [2] 73:11
100:8
**Commerce** [2] 64:10,14
**commercial** [1] 95:4
**commit** [2] 70:14 80:12
**commitment** [1] 36:7
**committed** [6] 4:16 5:21 8:
14 49:6 58:19 88:9
**committing** [1] 67:11
**common** [4] 9:20 16:14 60:
1 105:2
**common-law** [2] 46:18 73:
10
**common-sense** [1] 4:8
**commonly** [1] 25:15
**communicating** [1] 70:17
**community** [13] 7:15 53:
22,25 55:6 57:16,17 73:7
74:6 84:10 85:9 94:25 95:
1 99:4
**compared** [1] 28:21
**complaint** [2] 59:23 64:5
**complete** [1] 59:12
**completely** [3] 23:11 41:7
86:2
**complies** [1] 24:25

**component** [1] 33:13
**components** [1] 5:18
**concealed** [1] 35:14
**concede** [4] 75:2,2 94:23
102:19
**conceded** [1] 65:19
**concededly** [1] 66:13
**conceived** [1] 73:18
**concept** [3] 9:7 29:4 30:6
**conception** [1] 18:20
**concepts** [2] 29:8 30:2
**concern** [1] 63:16
**concerned** [1] 55:5
**concerning** [1] 87:19
**concerns** [6] 19:12 40:18
49:6 62:6 105:1,4
**conclude** [1] 27:6
**conclusion** [2] 8:13 27:9
**conclusive** [1] 92:9
**conduct** [35] 3:18 4:17 6:
15 8:8,16 13:24 14:5 21:4,
5 50:18 56:17 63:5 72:11
**confine** [2] 44:4,24
**confined** [1] 51:21
**confirm** [1] 105:2
**confronted** [1] 41:5
**confused** [1] 80:17
**confusing** [1] 31:4
**confusion** [2] 30:20 38:6
**Congress** [17] 3:19,22 4:
11 20:10 37:8 59:7 66:5
67:7 68:5 88:8 92:11 93:2,
2 94:4 100:9 104:4 105:2
**Congress's** [4] 27:13 64:9,
15 92:22
**congressional** [1] 104:9
**connected** [1] 95:19
**connection** [1] 92:7
**consensus** [7] 12:21 13:9
14:24 15:7 52:5 56:6 104:
4
**consent** [1] 70:9
**consequence** [1] 91:4
**consequences** [4] 89:13
91:15,17 101:9
**consequential** [1] 67:19
**consideration** [1] 53:10
**considerations** [1] 31:2
**considered** [6] 16:16 17:3
18:13 33:5 53:18
**considering** [3] 21:10 54:
9 55:12
**consistent** [7] 15:23 18:18
31:13 49:3 77:13 82:20 85:
5
**consistently** [2] 49:17 62:
16
**constituent** [1] 5:18
**constituents** [1] 55:7
**Constitution** [5] 56:18 78:
11 92:10 98:13 100:7
**constitutional** [24] 7:22

**15:**15 **18:**3 **19:**16 **20:**3 **31:**9 **35:**19 **39:**9 **40:**4,17 **55:**3 **56:**25 **59:**13 **65:**19 **66:**9 **77:**4 **79:**23 **81:**15 **93:**7 **95:**19, 25 **96:**13 **98:**18 **102:**13

**constitutionally** [1] **26:**23

**constitutionally** [4] **72:**1 **78:**15 **79:**19 **82:**11

**consulted** [1] **39:**6

**consulting** **14:**21

**contend** [1] **74:**22

**contest** [1] **70:**8

**contested** [1] **61:**10

**context** [10] **6:**1 **10:**23 **13:**16 **22:**15 **27:**12 **37:**7 **40:**25 **44:**14 **63:**24 **103:**10

**contexts** [2] **10:**4 **12:**1

**contrary** [1] **41:**4

**control** [2] **55:**1 **66:**6

**controlled** [1] **18:**21

**controlling** [1] **16:**10

**conversation** [1] **64:**20

**convicted** [4] **32:**19 **34:**9 **74:**15 **75:**18

**conviction** [4] **34:**6,14 **47:**2 **61:**12

**convictions** [2] **33:**12 **101:**21

**convince** [1] **99:**15

**convincing** [1] **70:**2

**Correct** [21] **10:**21 **26:**16 **27:**21,22 **28:**11 **31:**25 **45:**18 **47:**11,16,17,24 **50:**14 **51:**10 **63:**13 **65:**6 **66:**3 **75:**20 **85:**4 **91:**23 **96:**2 **105:**5

**corrects** [1] **102:**11

**couldn't** [4] **19:**24 **40:**23,24 **90:**9

**Counsel** [13] **27:**18 **29:**22 **30:**22 **46:**16 **57:**6 **59:**16 **62:**4 **70:**12 **71:**5 **90:**24 **93:**11 **100:**17 **105:**9

**count** [2] **22:**19 **53:**12

**counted** [1] **58:**22

**counter** [2] **27:**11,13

**country** [3] **78:**1 **91:**17 **104:**21

**counts** [3] **22:**5 **51:**7 **84:**22

**County** [7] **22:**20 **25:**22 **60:**1,6,11 **61:**18 **97:**2

**couple** [2] **13:**18 **94:**17

**course** [7] **5:**16 **17:**22 **33:**12 **35:**3 **44:**10 **53:**19 **83:**2

**COURT** [93] **1:**1,14 **3:**10,12, 25 **5:**11 **10:**13,25 **11:**3,20 **12:**2 **16:**13,17 **19:**10,15,18 **20:**14 **21:**1,18 **22:**15 **23:**10, 11 **24:**7,20,24 **25:**2 **27:**2,12 **29:**8,14,20 **30:**1,5,9 **31:**8, 11 **32:**22,23 **38:**19 **39:**13, 20,20 **41:**5 **43:**10 **44:**3,8

**46:**23 **47:**3 **49:**9 **51:**11 **52:**13 **53:**20 **55:**21 **57:**11 **59:**15,19,19,21 **61:**8 **62:**25 **64:**10,23 **67:**10 **68:**15 **69:**19 **74:**11 **77:**23 **78:**9 **81:**5,20, 21 **83:**8,13 **85:**3,11,12 **86:**4 **89:**24 **90:**3 **91:**3,21 **92:**24 **93:**10 **94:**21 **97:**14 **101:**8, 11 **102:**1,11,22 **103:**11,21 **105:**5

**Court's** [13] **4:**7 **5:**12 **10:**6, 8 **29:**6 **31:**15 **39:**5 **65:**18 **66:**10 **77:**20 **80:**6 **82:**21,23

**courts** [27] **13:**15 **22:**2,11, 17 **24:**22 **26:**9 **37:**24 **38:**7, 11,17,23 **39:**17 **40:**9,14 **45:**21 **53:**3 **57:**25 **62:**16 **72:**14 **77:**9 **92:**25 **98:**8 **101:**6,10, 18,19 **103:**15

**covering** [1] **27:**15

**create** [3] **7:**25 **28:**15 **33:**4

**created** [1] **94:**4

**creating** [1] **30:**20

**credence** [1] **84:**13

**credible** [5] **4:**1 **20:**15 **43:**23 **60:**3 **65:**2

**credited** [1] **101:**19

**crime** [5] **32:**19 **62:**14,15 **80:**13 **99:**6

**crimes** [9] **5:**21,23 **8:**14 **49:**7 **50:**13 **74:**15 **101:**14,23, 25

**criminal** [14] **4:**17 **6:**8 **8:**7 **9:**1 **32:**17,25 **33:**11 **34:**6,14 **36:**8 **50:**18 **65:**14 **74:**3 **75:**23

**criminally** [1] **34:**9

**criminals** [1] **101:**20

**criteria** [1] **69:**20

**cross-examines** [1] **97:**24

**crossed** [1] **20:**3

**culling** [1] **84:**21

**culpability** [1] **48:**4

**culpable** [3] **11:**7 **28:**14 **29:**19

**curb** [1] **9:**8

---

## D

**D.C** [2] **1:**10,19

**Dakota** [2] **58:**15,17

**damage** [1] **98:**17

**danger** [30] **3:**15 **4:**18 **6:**3 **7:**25 **10:**10 **11:**10,11,22 **12:**7, 16,22 **14:**5 **24:**1 **25:**20 **26:**1 **27:**8 **28:**15,23,25 **29:**20 **37:**14 **48:**1 **49:**7 **58:**25 **80:**8 **83:**13 **88:**3 **89:**6 **90:**12 **91:**18

**dangerous** [51] **3:**23 **4:**25 **10:**14,19 **11:**7,16,25 **12:**3 **13:**2,3,6,25 **14:**19 **16:**5,12 **17:**8 **18:**20 **19:**20 **28:**4,9, 13 **30:**14,24 **31:**1,4 **32:**4

**33:**5,10 **34:**13 **40:**24 **47:**23 **48:**3 **49:**10 **50:**6,10 **51:**7,8, 14,17 **55:**21 **56:**7,16 **79:**4,7 **82:**3 **86:**16 **88:**3 **89:**21,23 **102:**14 **104:**20

**dangerously** [1] **17:**19

**dangerousness** [39] **12:**20 **13:**10,21 **14:**22 **15:**6,24 **16:**9 **18:**13 **20:**22 **21:**2 **26:**10 **29:**9 **30:**2 **31:**21,24 **32:**8,12 **35:**7 **36:**17 **37:**10 **43:**23 **49:**13,18 **50:**1,13 **51:**5, **52:**22 **56:**5 **60:**24 **78:**19 **87:**18 **88:**5 **90:**1 **99:**6,16, 18 **102:**18,20

**dangers** [1] **12:**4

**dark** [1] **59:**3

**data** [2] **22:**16 **104:**18

**day** [6] **16:**23 **18:**13 **22:**2,3 **47:**2 **51:**9

**daylight** [1] **11:**15

**dead** [2] **3:**14 **40:**2

**deadly** [2] **3:**11 **4:**9

**deal** [1] **9:**17

**dealer** [2] **95:**13 **96:**10

**dealing** [1] **85:**13

**dealt** [1] **95:**23

**decades** [1] **39:**25

**decide** [2] **30:**11 **34:**25

**decision** [4] **4:**7 **50:**8 **65:**18 **72:**24

**decisions** [1] **39:**10

**deemed** [1] **51:**17

**default** [2] **58:**12,17

**defend** [2] **34:**21 **50:**16

**defendant** [2] **43:**19 **77:**22

**defended** [1] **65:**12

**Defender** [1] **1:**21

**Defenders'** [1] **25:**22

**defending** [1] **12:**18

**defense** [8] **23:**20 **36:**23 **45:**22 **46:**13 **47:**1 **62:**14,17 **66:**19

**defenses** [2] **46:**5,19

**defer** [1] **89:**24

**define** [5] **5:**14 **18:**3 **40:**7 **47:**18 **56:**19

**defined** [4] **5:**20,21 **32:**10 **53:**21

**defines** [2] **32:**12 **49:**24

**defining** [2] **28:**25 **29:**1

**definitely** [1] **88:**13

**definition** [1] **62:**15

**degree** [1] **40:**12

**delighted** [1] **44:**17

**delimit** [1] **18:**4

**demand** [1] **5:**7

**demonstrate** [1] **103:**19

**demonstrated** [1] **6:**14

**demonstrates** [1] **28:**20

**demonstrating** [2] **10:**3 **24:**13

**denial** [1] **59:**12

**denials** [1] **94:**8

**denied** [1] **96:**14

**deny** [1] **96:**9

**denying** [1] **74:**14

**Department** [1] **1:**19

**departs** [1] **5:**8

**depend** [1] **50:**17

**depending** [1] **69:**15

**depends** [1] **69:**8

**deployed** [2] **35:**5 **36:**9

**deprive** [1] **98:**2

**deprived** [1] **57:**20

**describe** [6] **10:**2,3 **48:**11, 25 **49:**1 **78:**14

**described** [3] **10:**5 **57:**12 **73:**3

**describing** [1] **85:**8

**designed** [2] **3:**22 **67:**15

**Despite** [1] **5:**2

**destabilizing** [2] **101:**8 **102:**10

**detail** [1] **64:**25

**determination** [8] **32:**18, 23 **33:**1,1 **34:**16,19,22 **51:**5

**determine** [2] **55:**2,10

**determined** [2] **18:**11 **34:**12

**determines** [1] **76:**22

**determining** [5] **16:**18 **52:**23 **55:**24

**dictated** [2] **17:**23 **57:**1

**die** [1] **104:**22

**difference** [8] **3:**13 **32:**25 **33:**3 **39:**23 **77:**14,18,19,21

**differences** [1] **77:**16

**different** [17] **13:**18 **20:**5 **23:**14 **31:**2 **32:**2 **50:**2 **52:**20 **70:**19 **73:**19,20,22 **74:**13 **78:**13 **82:**16 **83:**12,15 **95:**5

**differently** [1] **73:**18

**difficult** [3] **34:**21 **44:**8 **97:**16

**direct** [2] **12:**15 **41:**13

**directed** [2] **9:**3 **57:**15

**directions** [1] **42:**12

**directly** [3] **7:**19 **8:**23 **54:**16

**directs** [1] **72:**14

**disagree** [3] **63:**8,12 **75:**14

**disappeared** [1] **26:**1

**disarm** [23] **3:**20 **4:**11 **5:**5 **8:**13 **17:**17,25 **18:**19 **19:**20, 24 **29:**11 **34:**9 **40:**23,24 **45:**11 **49:**4,16 **50:**10 **51:**13 **54:**20 **55:**20 **88:**8 **102:**14 **105:**2

**disarmament** [21] **4:**4 **9:**1 **12:**17 **13:**20 **16:**6 **25:**19 **33:**9 **34:**3 **36:**4 **50:**16 **55:**25 **67:**8 **69:**18 **80:**20 **85:**13 **88:**5 **92:**17 **93:**18 **102:**21 **103:**

**4** **104:**7

**disarmed** [7] **4:**16 **11:**6 **29:**18 **33:**16 **45:**11 **48:**13 **53:**19

**disarming** [8] **4:**25 **14:**10 **15:**16 **17:**8 **40:**20 **78:**19 **89:**2 **101:**24

**discern** [2] **18:**2 **19:**5

**disclaimed** [1] **5:**11

**discretion** [3] **34:**25 **35:**10, 22

**discussing** [2] **35:**22 **51:**23

**discussion** [1] **42:**17

**disfavored** [1] **83:**22

**dispositive** [2] **14:**25 **40:**15

**dispossession** [4] **42:**20, 25 **63:**15,17

**dispute** [1] **12:**25

**disputed** [1] **60:**8

**disputing** [1] **72:**4

**distinct** [1] **7:**5

**distinction** [3] **8:**18 **62:**24 **63:**1

**distinctive** [1] **46:**12

**distinguish** [1] **61:**7

**distinguished** [1] **73:**9

**district** [5] **59:**19 **60:**10,11 **88:**12 **101:**18

**diverge** [1] **62:**23

**division** [1] **38:**5

**doctrines** [2] **46:**12,23

**doing** [7] **18:**25 **19:**4 **59:**3 **83:**10 **87:**13 **96:**16 **100:**9

**domestic** [43] **3:**11,16,21, 23 **4:**9 **5:**5 **13:**1,3,12 **16:**1, 3,22 **17:**2,13,18,25 **18:**12 **19:**25 **20:**4,11 **24:**15 **40:**20, 23 **45:**9 **73:**1,16,17,25 **86:**8, 11,22 **87:**22 **89:**7 **94:**6,13 **98:**6,25 **99:**19 **103:**17 **104:**6,13,19 **105:**3

**done** [2] **79:**18 **86:**15

**doubt** [2] **66:**8 **79:**4

**down** [3] **59:**2,3 **87:**13

**draw** [4] **7:**23 **10:**12 **11:**24 **16:**11

**drill** [1] **87:**13

**drives** [1] **8:**2

**drop** [1] **7:**2

**drug** [2] **4:**20 **101:**22

**due** [28] **23:**6 **27:**19,23 **37:**20,23 **40:**17 **45:**15,15,19 **65:**22 **66:**10,17 **67:**3,10,23 **68:**2,9,18,24 **69:**8,12 **70:**20, 22 **71:**2 **92:**14 **93:**9 **102:**25 **103:**6

**dueling** [1] **88:**1

**durable** [1] **51:**13

**duration** [2] **25:**17 **58:**11

**duress** [4] **45:**22 **46:**19 **58:**

1 62:6
duty [1] 104:23

**E**

each [2] 10:15 12:1
earlier [2] 51:24 56:3
earliest [1] 95:22
early [4] 73:11 80:10 89:25
100:7
earth [1] 71:14
easy [5] 15:11 102:15,16
104:2,11
edge [1] 37:12
effect [4] 4:5 25:15,20 91:5
effectively [2] 55:23 58:5
effectuating [1] 26:11
either [12] 14:25 22:6 45:
17 49:6 62:17 64:5 65:23
70:11 71:23 77:23 78:10
80:6
electronic [1] 60:2
elements [1] 63:4
ELIZABETH [5] 1:18 2:3,9
3:7 100:19
embedded [1] 30:7
embraced [1] 38:24
emphasize [3] 8:23 13:16
25:9
emphasized [1] 42:19
enact [3] 5:9 15:2 64:16
enacted [2] 35:14 59:7
enacting [1] 92:23
encompasses [1] 47:15
encounter [1] 75:5
end [2] 27:19 82:7 90:22
enduring [4] 7:21 18:3,19
40:6
enemies [1] 57:22
enforced [1] 34:4
enforcement [1] 63:25
enforcing [1] 25:2
engaged [1] 16:3
England [1] 35:3
English [2] 39:8 73:10
enjoin [2] 21:4 63:24
enjoining [1] 67:11
enough [4] 17:9 58:7 72:3
87:17
ensuing [1] 39:24
ensure [1] 27:15
enter [4] 21:2,12 37:17,24
entered [2] 23:1,10 24:25
27:5,5 36:16 60:12,13 67:
18 68:9,19,25
entering [2] 22:11,18 103:
23
enters [3] 26:4 67:11 77:1
entire [1] 14:9
entirely [2] 57:17,18
entitled [2] 16:9 37:9
entreat [1] 78:4
entry [3] 22:7 24:8 37:4
enumerated [1] 88:11

equally [1] 103:19
equitable [7] 21:3,7 36:19
80:6 82:21 98:9,12
Era [12] 18:24 85:16,17,18,
23,24 86:10,20 87:3,4,7
102:5
erred [1] 4:6
error [2] 38:22 53:1
errors [2] 38:15 105:6
especially [1] 12:3
ESQ [3] 2:3,6,9
essential [2] 61:12 71:10
essentially [2] 29:4 72:10
established [1] 56:11
et [1] 49:15
evaluated [1] 51:6
even [31] 13:1 19:8 22:16,
24 24:16 25:25 28:14 29:
18 33:16,23 34:13 37:11
38:13 44:24 54:20 58:5 62:
25 66:12,16 67:17 71:12,
24 72:9 76:6 78:20 81:5,
11 89:25 91:16,18 99:17
event [1] 9:23
everyone [1] 75:9
everyone's [1] 69:22
everywhere [1] 81:11
evidence [17] 4:21 14:16,
20 16:2 17:2 19:23 20:1
27:9 39:7,11,19 41:6,8,25
51:25 56:4 70:2
exact [1] 72:4
exactly [4] 47:11 58:22 59:
18 73:2
example [19] 4:18 6:19 9:
11 16:14 19:6,24 30:9 33:
19,21,23 34:2 40:19 45:4,9
46:21 55:5 76:22 78:23 95:
4
examples [6] 33:14 39:21
80:10 88:15 90:10,16
except [2] 35:16 75:17
exception [1] 58:9
excluded [1] 6:24
exclusively [1] 57:1
executive [4] 34:21,24 35:
9,21
exemplar [1] 29:13
exemplifies [1] 38:16
exhibit [1] 59:22
exist [3] 55:15 62:10 73:7
existed [5] 16:23 19:9 33:9
64:17 88:3
existence [1] 62:13
existing [2] 55:1 96:12
exists [1] 103:9
expired [1] 23:8
explicitly [2] 20:19 63:5
explosions [1] 6:21
express [3] 3:25 35:6
extends [1] 104:17
extent [7] 8:6 27:2 36:2 54:

8 55:15 68:21 79:3
extremely [1] 9:14

**F**

face [6] 22:14 27:1 36:17
64:18 101:13 102:2
faces [1] 21:20
facial [14] 42:22,24 43:13,
16 44:3 46:24 62:7,22,24
63:3,18 64:7,8 81:23
faciality [1] 63:22
facially [1] 5:3
fact [11] 11:11 14:19 19:7
20:4 23:2,24 24:20 36:25
45:8 77:16 89:19
factor [1] 14:23
factors [6] 13:15 14:7 15:
12 51:23 56:3,8
facts [12] 22:13 26:16,18
37:24 61:8,10,11 64:9,11
69:9 83:9,12
failed [1] 64:16
failures [1] 27:19
fair [7] 38:5,5 42:9 46:17
70:3 79:13 93:17
fall [2] 13:18,22
falling [1] 52:17
family [4] 21:18 22:17 70:
17 76:24
far [3] 34:21 100:8
favor [1] 95:7
features [1] 103:2
Federal [18] 1:21 24:10,20
25:2,16 37:5 59:23 61:4,
21 65:11,13 66:19 75:8 85:
22 87:5 92:10 93:1 102:2
feel [1] 88:21
feels [1] 59:2
fees [1] 93:15
felon [4] 50:16 66:12 74:12
101:12
felonies [1] 80:2
felons [3] 4:19 74:13 101:
17
felony [8] 32:19 58:19 65:
20,23 66:13 75:18 76:13
77:17
felony-level [2] 5:22 47:18
few [4] 46:7 59:17
Fifth [8] 4:6 5:2,7 26:25 44:
12 66:11 69:11 105:6
figure [2] 60:17 84:3
figured [1] 76:9
final [1] 22:23
finally [2] 40:13 54:22
find [8] 21:1 31:5 71:12,16
86:24 90:10,17 103:21
finding [16] 3:25 20:15,21
26:10 27:7 36:17,25 37:1
43:22 58:18 60:8 61:14 65:
2 98:16 102:18 103:23
findings [2] 12:20 13:21
35:6 59:24,25 67:17 102:

20
finds [2] 58:18 62:25
fine [3] 60:5 76:6 87:15
finish [1] 29:23
firearm [25] 24:1,3 36:14
69:23 73:13 74:4,20 75:7,
19 76:2,4 77:2 82:3,14 83:
2,5,22 94:19 95:17,18 96:
10,22 98:4 100:3,6
firearms [34] 6:3,10,14 7:
24 10:11,20 11:14,22 12:7
19:6,8,11 25:16 28:6,16,22
35:1 48:1 71:23 81:7 82:
18 86:17 90:6,11 92:5 94:
5,14 95:13,24 98:17 99:5
101:3 102:3,7
fired [1] 61:16
firm [1] 95:21
firmly [1] 4:13
first [13] 7:9 14:7 15:1 19:5
30:13 31:9 38:22 52:18,25
94:17 97:1 102:17 103:3
fistfight [1] 9:22
fit [3] 6:15,16 7:21
fits [2] 15:15 56:1
fitting [1] 51:18
five [4] 25:14 58:16,20 104:
13
fixing [1] 61:9
flag [2] 69:21 93:18
flaw [2] 54:7 84:24
flawed [1] 103:12
fleeting [1] 58:6
flies [1] 22:13
Florida [1] 58:14
focused [5] 7:18 9:3 33:11
69:22 86:24
focuses [1] 5:24
focusing [2] 8:11 53:3
follow [4] 41:19 45:13 47:8
90:4
follow-on [1] 51:15
followed [1] 31:14
forbidding [2] 68:22,23
forbids [1] 68:13
force [6] 4:4 20:21 21:13,
14 37:19 103:22
forever [1] 83:3
form [2] 50:6 52:11
former [1] 61:13
forth [2] 36:8 97:22
fortifies [1] 104:9
forward [2] 39:8 101:1
found [5] 13:24 61:8,21 64:
11 80:5
Foundational [1] 57:9
founders [1] 19:25 51:21
founding [13] 5:4 16:15 17:
14 18:24 19:9 34:7,13 85:
23,24 87:3,7 102:1,5
Founding-Era [1] 18:22
Fourteenth [1] 69:11

Fowler [1] 42:8
Framers [1] 19:8
framework [2] 54:8 95:6
framing [1] 19:2
friend [5] 57:12 62:23 84:6
100:23 102:19
frightened [1] 78:3
front [1] 103:16
full [1] 81:17
fully [1] 44:21
fulsome [1] 97:23
function [1] 95:11
fundamental [9] 38:15 39:
16 59:13 67:20 70:4 71:25
75:14 103:2,5
fundamentally [3] 70:3 93:
17 103:12
further [4] 68:13 87:13 90:
25 104:9
future [1] 50:24

**G**

g)(8 [2] 68:12 95:13
game [2] 9:12 79:17
gave [1] 72:16
GEN [5] 1:18 2:3,9 3:7 100:
19
General [82] 1:18 3:6,9 5:
13,16 6:11 7:3 8:5,19 9:25
10:21 11:13,17 12:10,14
13:14 16:8 17:10 18:7,16
19:3 20:12,25 21:3,25 23:
13,23 24:5,21 25:6 26:2,17,
20,25 27:22 28:12,18 29:3,
25 30:19 31:7,25 32:6 33:
4,14 41:19 42:11 43:5,10
44:2,7,11,18,20 45:17,18 46:
2,8,22 47:17,25 48:24 49:
19,22 50:14,23 51:10 52:4,
10 53:14 54:2,13 55:13 56:
13 72:12 100:18,21
generality [7] 15:24 18:1
39:18 40:10 41:21,23 45:25
generally [3] 7:12 26:8 36:
19
generation [2] 5:4 71:14
George [1] 73:11
gets [5] 11:4,9 29:17 48:3
67:6
getting [1] 29:4
give [10] 15:3 33:18 38:11
64:12 69:3 76:21 81:7 84:
13 89:6 90:16
given [4] 43:19 48:22 65:
17 66:15
giving [2] 35:9 64:25
Gorsuch [34] 41:17,18 42:
16 43:9,15 44:6,10,17 45:6,
13,20 46:6,15 47:5 61:25
62:2,4,19 63:7,13,14 64:22
65:21 66:1,22,25 67:6 68:
7,14,17 69:2,5 70:25 93:23

**Gorsuch's** [1] 57:24
**got** [8] 41:23,24,24 45:14
46:24 65:8 78:9 87:9
**government** [28] 13:4 17:
19 46:10 47:13,21 48:18
57:22 59:3 71:11,17,22 73:
21 75:8 80:7 83:24 84:1
85:22 86:15 87:5 88:6,16
94:3,8,11 99:3,15 101:1,15
**government's** [8] 39:21
46:1 52:15 54:12 57:13 84:
7 94:1 96:2
**governmental** [1] 20:8
**granted** [2] 68:22 89:4
**granting** [1] 34:24
**grave** [1] 3:15
**great** [1] 89:5
**ground** [3] 19:18 22:16 27:
25
**grounded** [1] 4:13
**group** [1] 29:17
**groups** [1] 85:14
**guarantees** [2] 92:10 103:
3
**guard** [3] 35:25 37:13 104:
12
**guarded** [1] 104:6
**guards** [1] 34:23
**guess** [21] 15:21 16:24 17:
6 28:9 29:5 30:22 42:21
44:4 48:9,25 53:12 64:21
72:6,19 83:19 84:18 89:10,
10 90:7 93:13 98:22
**guidance** [2] 38:9,10
**guilty** [2] 12:25 61:11
**gun** [3] 3:14 24:17 45:24
48:11 55:1 61:16 64:12 66:
5 76:25 79:21 104:15
**Gun-Free** [1] 64:18
**gunpowder** [1] 6:20
**Guns** [4] 3:11 4:17 89:5,6

**H**

**hand** [1] 95:16
**handgun** [4] 96:23 97:1,5
98:2
**handguns** [4] 16:14,18 89:
23 104:24
**handle** [2] 57:25 58:4
**happened** [9] 17:24 55:6
57:2 59:18,20 60:17,18 61:
2 65:15
**happening** [3] 22:2 83:16
86:11
**happens** [2] 60:19 71:3
**happenstance** [1] 17:23
**happy** [4] 50:7 62:25 66:21
70:9
**harbor** [1] 15:4
**harder** [1] 14:6
**harm** [5] 6:4,5 73:19,21
104:12
**harms** [1] 104:16

**he/she** [1] 21:20
**hear** [4] 3:3 66:21 69:10 83:
6
**heard** [2] 62:20 102:18
**hearing** [6] 3:25 23:17 24:
24 27:16 76:23 103:4
**heartland** [2] 13:7,22
**held** [5] 5:3 20:9 29:14 33:
22 62:16
**Heller** [10] 4:10 11:1 29:10
31:10 33:22 39:6 53:20 59:
9 75:24 89:18
**help** [2] 18:2 56:17
**helping** [1] 19:4
**hen's** [2] 62:17,19
**high** [1] 9:24
**higher** [1] 78:8
**highly** [1] 95:10
**historic** [2] 19:11 53:13
**historical** [24] 4:21 5:7 6:
18 16:9 17:6 18:12 19:2
39:7,19 40:11 41:6,25 42:
1 46:18 51:18 53:5 55:11,
23 56:22 59:1 71:23 72:2
75:3 77:8,13 78:23 80:6
82:17 83:21 85:2 90:6,13,
18 92:7 94:24 95:2 98:24
99:12 100:9 101:2,16,24
**historically** [2] 16:1,4
**history** [50] 4:14,15 5:19 6:
1,12 8:12,20 10:22 11:19
18:1 19:4 24:12 32:11 33:
7,15 35:2,8 36:6 37:11 39:
2 40:5 43:12 49:23 50:9,
17 51:12 54:7,9,10,14,15
55:3,14 59:4,6 73:6 79:25
80:19 81:17 83:14 84:3,18,
19,21,22 86:9,24 89:7 99:7
105:1
**Ho's** [2] 80:23 81:1
**hold** [1] 41:13
**holding** [1] 66:10
**home** [8] 45:23 46:21 75:7,
20 77:3 78:20 81:11 104:
17
**homes** [1] 99:5
**honest** [1] 88:21
**Honor** [15] 62:12 63:21 65:
24 66:4 70:21 71:19 75:12
79:6 80:25 84:25 87:1 89:
14 91:24 96:24 99:21
**hook** [2] 7:6 53:20
**hope** [1] 50:19
**horrific** [1] 101:14
**hour** [1] 8:2
**house** [1] 104:13
**however** [4] 55:21 66:11
71:20 80:15
**huge** [1] 91:15
**hunt** [1] 56:21
**hypothetical** [2] 18:9,10
**hypotheticals** [1] 10:5

**I**

**idea** [7] 6:13 11:5,9 19:6,22
38:24 49:2
**identical** [2] 17:20 35:15
**identified** [2] 53:1 87:16
**identify** [5] 12:2 18:2 19:16
40:6 56:18
**identifying** [1] 11:21
**ignores** [1] 103:1
**ill** [5] 11:8 28:7 29:13 88:8,
14 89:9
**illegal** [1] 76:8
**illegally** [1] 45:24
**illness** [3] 4:19 33:21,24
**illuminated** [1] 90:5
**illustrate** [1] 29:14
**imaginable** [1] 101:14
**imagine** [4] 13:7 79:14 97:
21,22
**immediately** [4] 80:15 85:
23 96:22 97:6
**immemorial** [1] 50:9
**imminent** [4] 80:8 82:18
83:12 90:12
**implement** [1] 36:3
**implemented** [1] 35:21
**implications** [2] 88:23 95:
20
**implied** [1] 71:1
**important** [10] 23:14 25:9
29:7 30:3 33:12 44:22 67:
6 76:15 77:19 101:7
**impose** [1] 70:22
**imposed** [1] 94:20
**imposes** [3] 4:2 77:17 93:
9
**imposing** [1] 17:19
**imposition** [1] 25:13
**impression** [1] 27:3
**improperly** [2] 6:13,20
**incentive** [1] 70:7
**incentives** [1] 69:1
**include** [2] 62:9 87:15
**included** [1] 6:25
**includes** [2] 20:14 33:17
**including** [2] 77:3 85:11
**incorporated** [2] 94:7,22
**incorporates** [1] 94:18
**incorrect** [2] 22:25 101:4
**incredible** [1] 76:19
**incredibly** [2] 60:1 76:15
**independent** [1] 27:25
**indicate** [1] 83:20
**indicia** [1] 53:4
**indiscriminately** [1] 14:12
**indisputably** [1] 7:20
**individual** [6] 23:16 52:14
59:13 68:10,20 69:13
**individual's** [1] 67:20
**individualized** [1] 12:20
13:21 27:7 102:17,20
**individuals** [9] 3:21 4:19 5:

1 6:23 12:21 14:4 34:12
51:17 53:24
**infamous** [1] 74:15
**informed** [1] 33:6
**infringe** [1] 76:5
**inherent** [2] 28:19 103:20
**inherently** [3] 25:10 28:13
103:13
**injunction** [1] 21:3
**inquiry** [2] 51:20 59:1
**insinuate** [1] 22:10
**instance** [3] 7:10 58:20 70:
24
**instances** [1] 40:14
**Instead** [7] 9:2 10:6 51:22
52:15 54:17 56:2 90:3
**institute** [2] 80:14,16
**institution** [1] 36:7
**institutions** [1] 88:9
**intend** [2] 11:6,10
**intended** [4] 14:10 30:11
36:3 66:5
**intending** [1] 28:15
**intent** [1] 92:22
**intentionally** [1] 48:3
**interest** [3] 52:14,15 89:15
**interested** [1] 92:18
**interests** [1] 52:20
**interference** [1] 20:8
**interpersonal** [1] 87:25
**interpretation** [2] 40:4 85:
4
**interpreted** [1] 38:20
**interpretive** [2] 40:22 41:
11
**intervene** [1] 61:15
**intimate** [3] 4:2 13:25 20:
16
**intoxicated** [1] 34:7
**intrinsically** [1] 10:10
**intrusion** [1] 52:13
**invaded** [1] 45:23
**invalidated** [6] 27:1 35:16
37:22,44:13 101:11 102:1
**invariably** [1] 22:25
**invasion** [1] 46:21
**investigative** [1] 21:20
**invoked** [4] 7:3,17 13:9 53:
15
**invoking** [6] 8:24 12:11
**involuntary** [1] 70:23
**irresponsibility** [3] 10:4
60:24 99:6
**irresponsible** [6] 6:10 9:
10,16,19,21 15:16 31:22
**isn't** [5] 17:22 46:25 63:17
82:6 84:23
**isolating** [1] 83:7
**issuance** [3] 66:18 67:9 70:
8
**issue** [15] 20:13 21:22 26:
24 44:9,15,20 46:11 50:4,

12 54:17,19 58:1 66:17 93:
6 96:25
**issues** [1] 47:3
**itself** [11] 11:1 31:8,11 40:3
42:13 59:5 64:15 75:24,25
78:6 92:24

**J**

**JACKSON** [32] 15:18,20
16:20 18:5,9,23 19:21 51:
2,3 52:2,6,24 54:1,4,21 56:
10 57:4 71:5 83:6,18 84:
17 85:15 86:7,14 87:6,12,
24 98:21,22 99:14,22 100:
15
**jail** [1] 58:21
**joint** [1] 60:14
**jot** [1] 72:9
**judge** [11] 21:10,14,18,21
58:18 65:2 76:22 78:9 80:
23 81:1 94:21
**judges** [1] 37:17
**judgment** [9] 14:22 28:10
34:13 37:12 52:1,22 89:20,
22 104:9
**judgments** [11] 7:24 14:3
15:6 35:5 36:5 37:9,10 43:
11 49:16 89:25 90:1
**judicial** [7] 13:17,23 34:16
35:6 39:10 102:22 103:23
**jurisdiction** [2] 35:14 71:
12
**jury** [3] 61:10 65:13,14
**Justice** [219] 1:19 3:3,9 5:
13,16 6:6,22 8:1,17 9:5,6
10:17 11:12,15 12:8,12,23
15:10,18,19,20 16:20 18:5,
9,23 19:21 20:12 21:16 23:
3,22,24 24:19 25:4,21 26:
13,14,15,18,22 27:18 28:1,
17,24 29:5,21,23 30:18,21
31:18 32:4,14,15,16 33:18
34:15 35:11,12,12,13,23
36:12 38:1,1,3,4 41:15,16,
18,18,20 42:16 43:9,15,18
44:6,10,17 45:4,6,13,20 46:
6,15 47:5,6,6,8,9,10,20 48:
5,6,6,8 49:12,20 50:3,11,
21,25 51:1,1,3,4,24 52:2,6,
24 53:2,7 54:1,4,21 56:4,
10 57:4,5,11,24 58:11 59:
16 60:16,22 61:24,25 62:1,
2,3,4,19 63:7,13,14 64:19,
20,22 65:4,8,21 66:1,22,25
67:5 68:7,14,17 69:2,5 70:
12,25 71:5,6,8 72:6 73:14
74:1 75:16,22 76:21 77:11,
14 78:17 79:2,9,24 80:11,
17,19 81:22,25 82:6,9 83:6,
18 84:17 85:15 86:7,14,19
87:6,12,24 88:7,20 90:23,
25 91:1,9,12,25 92:12 93:
20,20,21,22,23,24,25 94:

17 96:1,5,17,18,18,20 97:4,
8,17,20 98:11,20,20,22 99:
14,22 100:15,16,22,24 105:
8

**justification** [1] 52:8

**justifications** [1] 14:16

**justified** [4] 7:16 20:24 22:
12 52:23

**justify** [7] 9:1 19:13 23:2
25:25 101:2,17 103:23

## K

**KAGAN** [18] 9:5 38:3,4 41:
15,20 45:4 53:2 71:6 72:6
73:14 74:1 79:24 80:19 86:
19 88:7,20 93:22 100:25

**KAVANAUGH** [13] 11:12,
15 29:23 47:7,8,20 48:5
93:24,25 94:17 96:1,5,17

**keep** [7] 4:23 6:15 67:20
79:21 81:7 83:3 90:20

**keeping** [10] 58:8 73:13 74:
3,25 75:6 76:2,3,8 96:16
100:6

**key** [1] 45:1

**kick** [1] 69:17

**kicking** [1] 81:9

**kind** [29] 5:6 8:15,25 15:7
20:7 28:15 30:11,15 35:25
36:2 37:21 39:7 40:25 45:
12 47:1 54:7 58:25 69:8
72:10 75:10 80:1,20,21 89:
7 90:14 92:7 93:4 98:5
103:23

**kinds** [10] 15:5 17:3 22:7,
18 52:2,6 55:12 74:13 84:
1 102:19

## L

**lack** [1] 28:9

**language** [6] 10:8 29:6 60:
13 92:1 97:1,9

**large** [1] 3:17

**largely** [2] 22:1 71:20

**larger** [1] 93:7

**last** [5] 34:15 42:18 78:25
94:9 101:11

**lastly** [1] 45:21

**lasts** [3] 4:4 25:19 58:6

**late** [3] 75:13 88:16 89:25

**later** [3] 36:21 63:10 92:14

**latter** [1] 77:17

**Laughter** [2] 44:19 79:12

**law** [34] 8:8 9:20 10:6 14:8
15:3 17:24 21:12 22:13 23:
2 26:3,6 36:24 37:21,21,25
42:10 51:25 52:17 56:8,14
57:2 69:21 75:10 77:20 78:
12 81:1,21 85:13 90:15 94:
21 95:21 96:12 100:4 102:
2

**law-abiding** [19] 4:12 5:15,
19 8:4,11,22,24 28:22 29:12

30:12,16 31:16 32:7 33:13
47:15 48:9,15,21 50:1
82:19 94:20

**lawful** [6] 43:1 76:3,4 78:
10 82:19 94:20

**laws** [25] 4:22 6:18 7:4,12,
19 36:18 41:24,24 49:14,
15 53:15,23 54:14,18 57:
18 71:24 83:21 84:8,13 85:
8,10,14 95:23 96:13 99:3

**lead** [2] 31:15 72:23

**least** [5] 17:1 44:25 67:22
75:8 100:8

**leave** [1] 54:5

**ledger** [1] 42:6

**left** [2] 27:3 90:19

**legal** [4] 20:5 33:24 35:4
46:12

**legislation** [2] 53:4 55:12

**legislative** [7] 12:21 14:24
35:5 36:5 52:1 104:3,8

**legislator** [4] 54:23 55:4
56:12 84:14

**legislature** [13] 7:22 14:2,
17,21 33:4 49:16 51:15 52:
16 55:1 83:3 83:7,11,16

**legislature's** [5] 52:21 55:
25

**legislatures** [14] 4:15,25
15:1,2,4 45:10 49:2 50:8
51:7 54:19 56:6 79:17 89:
20,22

**length** [2] 25:17 42:17

**level** [15] 12:22 15:23 18:1
25:7,12 39:18 40:10 41:21,
22 45:4 75:14 79:20 86:15,
23 100:11

**Lewis** [5] 65:18 66:4,4,8 92:
21

**liability** [1] 76:13

**liberty** [1] 69:7

**license** [4] 96:23 97:2,5 98:
2

**licensed** [2] 95:12 96:10

**licensing** [1] 35:25

**life** [4] 69:6 80:9 82:23 98:
17

**lifetime** [1] 43:2

**light** [1] 105:3

**likely** [4] 21:5,15 37:19,21
103:22 104:14

**limb** [3] 80:9 82:23 98:18

**limit** [1] 58:14

**limitations** [1] 42:14

**limited** [1] 28:5

**limiting** [1] 94:24

**limits** [1] 70:22

**line** [3] 8:19 20:3 104:22

**lines** [4] 7:23 43:16 56:9
103:16

**link** [2] 12:15,19

**list** [1] 6:23

**literally** [1] 80:8

**little** [7] 12:24 25:11 31:4
58:6 59:21 70:19 84:19

**lives** [1] 104:13

**locked** [1] 55:19

**logic** [1] 72:3

**long** [3] 4:4 25:20 74:14

**longer** [2] 58:7 94:12

**longstanding** [1] 34:11

**look** [13] 14:15,18,20 16:17
39:1 46:9 49:14 52:7 55:
14 56:2 84:2,7,11

**looked** [3] 39:20 53:22 65:
5

**looking** [22] 17:5 20:9 30:
13 39:15 42:7 52:2 54:8
55:2 59:1,3 71:15 72:8 73:
15,24 74:2,2,4,7 86:9,19
87:19 98:24

**Lopez** [2] 64:8,9,12

**lose** [2] 93:4 99:16

**loss** [5] 69:22 74:5 76:6,16
92:7

**lot** [7] 13:11 15:9 32:10 41:
5,25 64:25 70:16

**lower** [7] 38:7,11,17 45:21
62:16 101:6,9

**loyalist** [1] 57:18

**loyalists** [4] 4:18 34:3,4 57:
20

**loyalty** [1] 34:5

**LRJ** [1] 95:5

## M

**made** [16] 27:23 46:8 50:16
58:18 59:11 61:5 67:7 74:
21 89:17,17,18,19,20,22
91:13 95:7

**Maine** [1] 55:5

**majority** [1] 22:4

**man** [3] 76:23 77:1,2

**manner** [1] 74:15

**manuals** [1] 80:11

**many** [6] 10:4 40:14 70:8
96:13 101:6,18

**marginal** [2] 13:8,13

**margins** [1] 90:7

**mark** [1] 59:10

**materialize** [1] 21:15

**matter** [9] 1:13 22:25 60:20,
23 65:6,16 71:3 91:14 95:
10

**matters** [2] 38:25 66:6

**MATTHEW** [3] 1:21 2:6 57:
8

**McDonald** [5] 4:10 11:2 29:
11 59:9 89:18

**mean** [9] 5:14 9:7,9,18 12:
24 16:21 18:14,24 24:5 30:
25 31:2 47:23 54:23 58:5
63:4 65:10,10,14 68:10 70:
16,24 71:1,2 72:7 73:15
74:8 82:15,15 85:15 86:14
89:1

**meaning** [9] 5:9 17:22 18:
19 31:13 39:3 41:2 86:4,5
90:5

**meaningful** [1] 13:17

**means** [7] 21:10 25:19 38:
6 57:18 72:7 79:7,9

**means-ends** [1] 52:12

**meant** [1] 30:24

**measure** [2] 55:1 69:8

**mechanisms** [2] 25:7 26:9

**members** [3] 76:24 99:3

**men** [2] 16:3 86:22

**mental** [4] 4:19 33:21,24
36:7 88:9

**mentally** [6] 11:8 28:7 29:
13 88:8,14 89:8

**mentioned** [2] 26:5 62:5

**methodological** [5] 17:11,
15 53:1 72:23 105:6

**methodology** [3] 38:11,16
52:25

**Michigan** [1] 58:15

**mid-20th** [1] 89:25

**might** [22] 9:16 10:3 11:6,7,
10 13:6 14:2 16:15 24:16
28:14 29:19 37:16 41:8 47:
3 48:13,13 50:2 70:20 83:
8,14 91:11 95:24

**mile-an-hour** [1] 8:3

**miles** [1] 8:2

**minor** [1] 8:7

**minors** [2] 4:18 11:8

**minute** [2] 39:23,23

**mischaracterization** [1]
22:1

**misdemeanor** [2] 8:7 61:
19

**misdemeanor/felony** [1]
8:18

**misinterpretation** [1] 102:
12

**misreading** [1] 101:6

**missed** [1] 59:10

**misuse** [1] 74:20

**model** [1] 9:18

**modern** [2] 19:1 51:6

**modern-day** [4] 16:10 19:
13 55:25 101:3

**moment** [1] 79:8

**Montana** [1] 58:13

**months** [1] 25:14

**morning** [3] 3:4 41:18 100:
24

**most** [6] 3:23 25:14 43:24
101:13 103:5 104:20

**move** [2] 78:1 86:3

**moved** [1] 91:16

**mover** [1] 15:2

**much** [9] 33:6 34:24 36:11
43:25 47:5 53:3 64:5 73:
23 78:22

**multiple** [2] 15:2 101:21

**murder** [1] 69:3

**murdered** [2] 104:14,23

**musket** [1] 42:8

**must** [1] 46:4

**mutual** [2] 22:3,8

## N

**narrow** [1] 71:21

**nation's** [1] 4:15

**national** [2] 74:16 73:7

**Native** [2] 7:1 53:9

**near-identical** [1] 72:18

**necessarily** [3] 28:8 32:8
63:18

**necessary** [5] 20:23 37:13
40:3 55:22 65:11

**necessity** [5] 34:6 46:12,
19 58:1 62:6

**need** [17] 15:25 17:8,17 23:
8 24:17 29:1 30:16 34:8
42:22 43:17 45:16 50:3 70:
1,2 81:16,17 82:9

**needs** [1] 104:6

**never** [2] 77:25 85:9

**nevertheless** [2] 7:21 22:
11

**new** [2] 16:21 19:18

**Next** [2] 14:15 44:15

**nine** [1] 79:18

**nit-pick** [1] 40:10

**none** [2] 26:15 99:25

**normally** [1] 42:23

**North** [1] 58:15

**noses** [1] 58:22

**notes** [1] 94:3

**nothing** [5] 40:21 41:10 82:
22 98:16 100:13

**notice** [7] 3:24 23:6,17,19
24:23 27:16 103:3

**November** [1] 1:11

**number** [5] 6:18 33:14 77:
23,24 84:12

**numbers** [1] 102:4

## O

**oath** [1] 34:5

**objection** [1] 80:22

**objective** [1] 36:9

**obliterated** [1] 102:4

**obvious** [2] 15:12 89:5

**Obviously** [4] 7:11 24:6 32:
9 46:11

**occur** [2] 21:6 103:22

**occurs** [1] 21:24

**odious** [1] 7:11

**offense** [1] 8:16

**offenses** [2] 47:16 61:19

**offering** [1] 40:11

**offers** [1] 4:21

**officer** [1] 104:21

**officers** [3] 3:16 104:18,22

**officials** [2] 34:24 35:9

**often** [2] 3:13 70:7

**Ohio** [1] 58:16

**okay** [13] 13:2 28:17 30:10 42:16 43:15 45:20 47:20 50:25 62:4 87:24 93:3 96: 17 99:22

**older** [1] 75:11

**oldest** [1] 75:7

**once** [3] 51:11 55:18 102: 11

**one** [32] 20:12,13 23:4 25:8, 15,21 29:13 34:15 35:16 36:12 38:13 39:16,22,22 44:7 47:13 55:9 58:5 60:1 62:23 67:25 71:3 72:2,18 75:21 77:18,24 80:4 82:15 84:12 93:25 95:5

**one's** [1] 70:24

**one-sided** [2] 59:11 92:6

**ones** [2] 61:5,12

**only** [22] 3:13,24 4:4 22:22 24:2 25:19 33:8 38:24 42: 19 43:13 53:10 54:11 59:4 60:4 68:22 80:24 81:1 84: 21 85:16,17,22 103:4

**opening** [2] 64:12 75:6

**operate** [2] 14:17 39:25

**operated** [4] 6:19 39:24 53: 23 95:22

**operates** [1] 30:8

**operating** [1] 72:15

**operative** [1] 31:6

**opinion** [1] 61:6

**opportunity** [7] 23:19 24: 24 27:16 38:18 50:19 70:7 77:22

**opposed** [3] 83:7 85:16,17

**oral** [5] 1:14 2:2,5 3:7 57:8

**order** [55] 4:5 13:1,23 20: 14,19 21:4,11,22 23:8,10 24:8,25 25:18 26:12 34:9 36:15 37:4 46:21 56:17 59: 22,23 60:9,12,13 61:23 66: 18 67:2,9,11,24 68:8,12,13, 19,22 69:14,16 70:6,8,15 77:1,15,16 81:6,7 82:24 91:5,6,8 93:4,11 96:21 97: 16 101:2 103:22

**order's** [1] 97:9

**ordered** [1] 97:5

**ordering** [1] 37:17

**orders** [26] 3:22 22:4,8,12, 19,22,23 23:1,4 25:10,13, 23 26:5,8 27:4 42:18 58: 12 70:9 77:1 93:16 94:6,9, 14 97:3 103:11,12

**ordinarily** [1] 27:12

**ordinary** [6] 6:4 11:23 12:6 14:13 28:21 30:12

**original** [8] 5:9 17:22 18: 18 31:13 39:2 85:5 86:5 90:4

**originally** [1] 4:24

**other** [24] 7:13 23:12 24:17 36:5 38:17,23,25 39:1 40: 21 41:11 48:14 53:4,10,15 54:18 56:8 71:25 73:2 75: 5 84:9 85:13 88:1 95:16 99:7

**others** [6] 6:5 9:17 28:23 48:2 89:6 90:12

**otherwise** [1] 98:9

**ourselves** [1] 44:11

**out** [15] 12:2 22:3,17 23: 14 31:11 37:16 46:7 60:17, 18 76:9 84:3

**outlier** [1] 56:25

**outright** [1] 22:6

**outset** [1] 13:19

**outside** [7] 38:13 57:16 64: 5,6 74:6 84:10 95:1

**over** [1] 33:9

**overlap** [1] 32:10

**overlook** [1] 42:3

**override** [1] 103:13

**own** [8] 3:18 10:25 22:19 29:6 32:11 75:7 81:8 99:5

**owners** [1] 48:11

### P

**PAGE** [3] 2:2 58:2 94:2

**paints** [1] 70:19

**parallel** [2] 10:12 57:2

**parse** [1] 23:14

**parsing** [2] 39:18 45:8

**part** [13] 36:9 44:22 53:21 54:14,15 57:15 62:14 67: 24 73:6 85:9 87:10 96:25 97:3

**participate** [3] 7:14 23:20 53:25

**particular** [17] 5:5 7:7 8:11 9:12 10:7 11:18 12:6 16:1 22:4,20 33:14 45:9 49:4 51:16 56:22 72:17 83:9

**parties** [1] 21:23

**partner** [2] 13:25 20:17

**partner's** [1] 14:2

**parts** [1] 48:18

**pass** [1] 86:3

**passed** [2] 66:5 81:3

**passing** [1] 75:10

**past** [1] 14:5

**pay** [2] 64:12 76:11

**peace** [1] 80:11

**penalties** [1] 81:10

**pending** [2] 44:12 61:18

**Penn** [1] 58:3

**people** [65] 7:8,8,20 9:16, 21 11:6 12:5 14:12 17:8 18:20 19:20 24:14 25:8 28: 6 29:18 31:20 33:5 40:24 48:14,14 49:4,17 51:14 53: 19 54:10,11,20 55:7 57:15, 16,21 58:7 70:9 73:6,18,19, 21 74:15,19 75:5 77:10 79:

10 82:17 83:23 85:8,10,24 86:16 87:9,10,12,14,15,16 88:3,8 89:5,7,21 90:10 93: 16 94:25 96:9,14 99:24

**people's** [1] 84:22

**per** [3] 54:11 67:8 92:1

**perceived** [1] 16:4

**percent** [1] 79:23

**perhaps** [2] 50:20,22

**permanent** [6] 25:24,25 26:4 58:13 63:16 101:17

**permissible** [1] 104:7

**permission** [1] 81:7

**permits** [2] 18:21 103:4

**permitting** [1] 35:15

**person** [23] 4:1 8:3 20:15 23:4,5,9,25,25 24:6 36:23 37:19 56:16 59:1 64:11,13 68:1 70:10 75:18 78:5,7 79:4,7 84:9

**person's** [1] 24:2

**personally** [1] 65:5

**persons** [4] 45:11 94:5,13 102:14

**persuade** [1] 50:23

**pertinent** [1] 79:3

**pervasively** [1] 57:20

**petition** [1] 44:12

**Petitioner** [6] 1:4,20 2:4, 10 3:8 100:20

**phrase** [4] 31:15 48:10,23 55:21

**phrasing** [1] 31:8

**physical** [11] 4:2,3 20:16, 20 21:13 37:19 60:4 61:14 67:12 68:23 103:22

**pick** [1] 60:25

**picked** [1] 39:21

**picture** [1] 70:19

**pieces** [1] 86:2

**place** [8] 14:18 19:5 25:8 30:13 52:18 56:15 77:3 92: 16

**placeholder** [1] 10:19

**places** [7] 10:14 11:25 12: 3 14:18 19:7,12 49:10

**placing** [1] 40:14

**plain** [2] 63:6 73:8

**plaintiff** [1] 43:20

**play** [4] 35:24 46:13 64:2 95:20

**plays** [3] 62:18,21 93:5

**plea** [1] 61:11

**please** [3] 3:10 57:11 61: 25

**podium** [1] 46:17

**point** [16] 7:7 14:7 17:11,15 18:24 31:11 35:8 41:23 67: 7 86:3 88:4 91:14 93:1 99: 17,20 100:2

**pointed** [1] 54:17

**pointing** [1] 26:16

**police** [5] 3:15 82:25 83:2 104:17,21

**political** [7] 7:13,15 53:22, 25 57:17 84:10 99:4

**poll** [1] 9:20

**pose** [4] 3:15 6:3 12:4 89:5

**poses** [3] 4:1,17 13:3

**position** [2] 68:11 84:7

**positioned** [1] 15:5

**positions** [1] 72:23

**possess** [3] 12:6 24:2 95: 17

**possessed** [1] 89:24

**possessing** [6] 28:6 75:19 77:2 96:21 98:3 99:4

**possession** [18] 6:2 11:21 16:15 36:14 47:14,21 48:1 49:5 58:6 66:12 74:12 78: 20 83:22 92:4 94:19 95:14 102:3,7

**possibility** [1] 25:5

**possible** [5] 96:1,3,8,8,11

**possibly** [1] 92:13

**post-Civil** [1] 88:17

**potential** [1] 83:13

**potentially** [1] 67:1

**power** [4] 64:10,14,16 77:9

**powers** [5] 80:6 82:21 88: 11 98:9,12

**practice** [1] 39:9

**pre-amendment** [1] 64:17

**pre-sentence** [2] 61:4,21

**preceded** [1] 61:22

**precedents** [2] 31:3 39:5

**precise** [4] 56:22 101:1,16 102:6

**precisely** [2] 29:19 101:25

**precursors** [1] 39:9

**predictive** [8] 7:23 14:3 15: 6 32:22 34:13 37:10,12 52: 22

**PRELOGAR** [78] 1:18 2:3, 9 3:6,7,9 5:16 6:11 7:3 8:5, 19 9:25 10:21 11:13,17 12: 10,14 13:14 16:8 17:10 18: 7,16 19:3 20:25 21:25 23: 13,23 24:5,21 25:6 26:2,17, 20,25 27:22 28:12,18 29:3, 25 30:19 31:7,25 32:6 33: 2,20 34:20 35:20 37:2 38: 14 42:11 43:5,10 44:2,7,11, 20 45:7,18 46:2,8,22 47:17, 25 48:24 49:19,22 50:14, 23 51:10 52:4,10 53:14 54: 2,13 55:13 56:13 100:19, 21

**premise** [1] 19:22

**premises** [1] 45:2

**prescient** [1] 79:16

**presence** [1] 3:14

**present** [13] 10:11 11:11 12:22 14:5 19:12 24:16 28:

22 31:20 48:1 49:5,7 50: 19 91:18

**presented** [2] 47:4 48:20

**presents** [5] 11:22 20:11 27:7 30:25 100:12

**Presumably** [1] 23:9

**presumption** [5] 22:14 27: 11 92:9 103:9,14

**pretty** [2] 73:23 80:16

**prevent** [6] 4:24 14:10 73: 21 81:8 94:4 98:17

**prevented** [1] 96:21

**preventing** [1] 77:2

**prevention** [1] 99:7

**primarily** [1] 63:22

**principle** [14] 4:13 5:25 7:6, 22 8:24 10:7,9 12:16 18: 22 19:16,20 21:4,8 31:10 34:23 49:10,11 51:12,13 52:17 53:17 55:17,18,19 56:11,14 57:13 58:9 88:5 102:13,15

**principles** [14] 10:13 15:17 18:3 19:5 32:3 35:4,24 36: 20 40:6,7 56:18 72:15,16 103:18

**prior** [3] 30:4 31:3 48:10

**prison** [4] 76:12,19 83:4 95: 15

**probably** [5] 11:3 69:17 70: 1 77:6,6

**problem** [9] 9:3,13 14:14 65:19 73:17,23 88:11 92:3 97:25

**problems** [2] 31:1 39:17

**procedural** [2] 102:24 103: 11

**proceed** [1] 92:19

**proceeding** [10] 32:17 59: 11 60:20 64:23 67:2,14,17, 18 69:18 92:6

**proceedings** [7] 6:9 7:4 34:1 71:4 80:15 91:3 102: 23

**proceeds** [1] 40:5

**process** [36] 23:6 27:19,23 33:17 37:20,23 45:15,15, 19 65:22 66:10,17 67:3,10, 23 68:2,9,18,24 69:6,8,12 70:20,22 71:2 74:14 80:22 92:14 93:9 95:8 97:18,23, 25 102:22 103:1,6

**profound** [4] 20:10 101:6 104:12 105:3

**profoundly** [4] 4:6 102:9 103:14

**prohibit** [4] 4:8 22:6 41:7 47:14,21 98:3

**prohibited** [4] 70:16 75:19 76:8 94:5

**prohibiting** [1] 36:15

**prohibition** [7] 4:3 21:13

Official - Subject to Final Review

**25**:3,17,25 **37**:18 **101**:12
**prohibitions** [1] **94**:19
**prohibits** [3] **20**:19 **36**:14
**102**:3
**promptly** [1] **94**:6
**properly** [2] **6**:10 **52**:16
**property** [1] **69**:7
**proposition** [1] **29**:15
**prosecuted** [2] **24**:4 **36**:22
**prosecution** [13] **23**:16 **24**:
11 **37**:5 **65**:12,14,20,23 **66**:
12,19,23 **67**:1 **77**:15 **92**:21
**prospectively** [1] **54**:22
**protect** [3] **80**:8 **82**:22 **103**:
16
**protected** [8] **7**:9 **63**:5 **67**:
13 **72**:1 **74**:23,24 **75**:1 **76**:
1
**protection** [2] **81**:6 **103**:6
**protective** [34] **3**:22 **21**:11
**22**:3,8,12,18,22,23 **23**:8 **24**:
8,25 **25**:10,13,18 **26**:4,12
**27**:4 **37**:4 **46**:20 **58**:12 **61**:
23 **66**:18 **67**:2,9 **68**:8,19
**69**:14,16 **70**:6,15 **94**:6,9,14
**103**:12
**protest** [1] **24**:23
**Protestant** [1] **86**:22
**prove** [1] **71**:22
**proven** [1] **79**:19
**provide** [5] **26**:8 **37**:3,23
**46**:9 **95**:1
**provides** [2] **38**:18 **103**:24
**providing** [1] **75**:3
**provision** [14] **12**:17 **20**:13,
13,18 **36**:13,16,22 **56**:1 **88**:
14 **93**:19 **94**:20 **95**:8 **102**:2
**103**:7
**provisions** [7] **13**:20 **25**:12
**33**:9,11 **34**:3 **39**:25 **96**:15
**proxy** [1] **59**:12
**Public** [10] **1**:21 **3**:17 **14**:11
**25**:22 **41**:7 **65**:7 **75**:4 **86**:5
**90**:5 **104**:17
**pulled** [1] **60**:18
**pulling** [1] **12**:13
**punishable** [2] **73**:1 **76**:19
**punished** [1] **100**:5
**punishing** [1] **99**:3
**punishment** [5] **5**:22 **47**:
19 **74**:3 **75**:23 **77**:17
**purchase** [1] **96**:10
**purposes** [7] **26**:10 **55**:16,
24 **60**:20 **61**:9 **76**:4 **85**:20
**push** [1] **19**:22
**push-back** [1] **13**:11
**put** [1] **83**:4
**putting** [2] **78**:5 **97**:10

**Q**

**qualified** [1] **51**:8
**qualifies** [1] **13**:5
**qualify** [3] **8**:3,6,16

**qualities** [1] **28**:19
**quality** [1] **14**:5
**question** [29] **15**:20 **16**:24
**19**:23 **23**:15 **25**:21 **34**:16
**36**:12,13,24 **40**:22 **41**:11,
21 **43**:3,6 **48**:4,8 **51**:14 **54**:
16 **56**:4 **57**:25 **58**:11 **78**:22
**81**:14 **86**:18 **91**:12 **96**:25
**97**:13 **98**:19 **100**:24
**questioned** [1] **28**:10
**questions** [5] **5**:12 **17**:12
**43**:18 **59**:15 **102**:21
**quick** [1] **80**:16
**quickly** [1] **21**:19
**quintessential** [1] **33**:22
**quite** [2] **64**:25 **72**:6

**R**

**RAHIMI** [9] **1**:6 **3**:5 **4**:21 **8**:
25 **27**:23 **46**:25 **61**:16 **79**:
15 **91**:11
**Rahimi's** [2] **3**:17 **13**:24
**raise** [2] **68**:3 **92**:20
**raised** [4] **17**:13 **65**:22 **67**:3
**92**:25
**range** [1] **50**:12
**rare** [2] **62**:18,19
**rather** [1] **52**:21
**Rawle** [1] **73**:12
**re-repeated** [1] **11**:2
**reacting** [1] **20**:10
**read** [8] **10**:6 **17**:16 **55**:9 **60**:
14 **62**:25 **71**:8 **92**:19 **100**:
25
**reading** [3] **4**:7 **101**:5,9
**real** [3] **58**:8 **70**:7 **77**:22
**really** [10] **10**:1 **15**:22 **19**:2
**23**:6 **37**:12 **56**:23 **67**:6 **68**:
11 **72**:14 **88**:25
**reason** [12] **7**:17 **10**:23 **11**:
3 **40**:16 **43**:7 **48**:20 **53**:14
**83**:1 **85**:12 **91**:13 **104**:2,10
**reasonably** [1] **21**:5
**reasons** [3] **24**:18 **94**:17
**102**:16
**rebels** [1] **4**:18
**REBUTTAL** [3] **2**:8 **100**:18,
19
**recall** [1] **36**:18
**receive** [1] **23**:18
**recognition** [1] **27**:14
**recognize** [3] **18**:17 **46**:11
**50**:2
**recognized** [5] **4**:10 **16**:13
**19**:10 **31**:12 **45**:21
**recognizes** [1] **51**:11
**recognizing** [1] **34**:11
**Reconstruction** [5] **85**:16,
18 **86**:10,20 **87**:4
**record** [10] **9**:1 **18**:12 **27**:8
**36**:8 **60**:25 **65**:7 **90**:13 **97**:
14,14 **99**:12
**records** [1] **60**:18

**recount** [1] **59**:17
**recourse** [3] **24**:2,19,22
**recycling** [1] **9**:8
**red** [2] **69**:21 **93**:18
**refer** [2] **29**:8 **30**:1
**referred** [2] **30**:6 **49**:9
**referring** [1] **46**:5
**reflect** [3] **8**:20 **11**:20 **36**:4
**reflection** [1] **59**:5
**reflects** [2] **24**:12 **59**:23
**reflexively** [1] **22**:18
**refusing** [1] **34**:5
**regards** [1] **58**:10
**regime** [2] **20**:6 **36**:1
**regimes** [1] **44**:1
**regularity** [3] **22**:14 **27**:11
**103**:9
**regulated** [2] **87**:17,18
**regulation** [28] **17**:4,21 **19**:
13 **31**:12 **35**:15 **38**:25 **39**:
24 **40**:6,15,20 **41**:1,9,13 **42**:
6 **53**:3,11 **56**:15,16 **72**:9,11,
17 **76**:5 **86**:10,16,21 **87**:19
**90**:7 **101**:3
**regulation-only** [1] **39**:14
**regulations** [5] **17**:7,17 **18**:
21 **39**:16 **45**:8
**regulatory** [1] **5**:10
**reject** [2] **43**:7 **45**:1
**rejected** [1] **88**:4
**relate** [3] **17**:7 **80**:2 **99**:10
**related** [3] **86**:22 **98**:24 **99**:
16
**relates** [2] **45**:3 **53**:11
**relevant** [11] **7**:19 **8**:21 **39**:
11 **49**:1 **54**:16 **55**:16 **56**:14
**60**:19 **87**:16 **96**:15 **103**:2
**relied** [1] **31**:7
**relief** [4] **23**:12 **25**:5,8 **37**:
24
**rely** [1] **25**:2
**relying** [1] **57**:14
**remains** [1] **4**:5
**remedial** [1] **63**:23
**remedy** [1] **68**:22
**remember** [1] **58**:3
**removed** [1] **90**:11
**repeat** [1] **55**:23
**repeated** [2] **11**:1 **38**:17
**repeatedly** [1] **76**:23
**reply** [2] **94**:1,2
**report** [1] **61**:5,21
**represents** [1] **20**:15
**request** [1] **21**:11
**requests** [1] **22**:21
**require** [8] **13**:20 **19**:14 **20**:
21 **36**:17,19,20,24 **100**:25
**102**:10
**required** [2] **67**:10 **69**:16,
20
**requirement** [2] **17**:20 **93**:
9 **103**:21

**requirements** [1] **69**:24
**requires** [8] **12**:19 **23**:21
**35**:17 **38**:7,12 **55**:14 **84**:20
**102**:17
**requiring** [2] **37**:23 **40**:2
**requisite** [1] **12**:22
**residence** [1] **70**:18
**resolve** [3] **43**:17 **45**:17 **50**:
4
**resolving** [1] **38**:10
**resort** [1] **78**:25
**resources** [1] **21**:20
**respect** [25] **5**:18 **6**:4 **8**:22
**10**:14,19 **11**:17 **14**:21 **15**:8
**16**:10,22 **22**:3 **33**:3 **50**:18
**51**:16 **53**:8 **54**:5 **66**:17 **67**:
24 **73**:22 **78**:20 **84**:24 **86**:8,
16 **87**:18 **103**:20
**respond** [3] **17**:11,12 **104**:
21
**Respondent** [8] **1**:7,22 **2**:7
**38**:20,23 **43**:20 **57**:9 **91**:16
**Respondent's** [2] **22**:19
**45**:2
**responding** [1] **3**:16
**response** [13] **4**:8 **36**:13
**41**:19,20 **51**:4 **53**:2 **56**:3
**57**:24 **74**:11 **94**:2,15 **100**:
24 **104**:8
**responses** [1] **44**:5
**Responsibility** [6] **9**:6,14
**10**:9 **11**:9,18 **28**:10
**responsible** [36] **4**:12 **5**:15,
25 **6**:17 **8**:10 **9**:4,15 **10**:2,
18,24 **11**:4,16 **12**:16 **28**:2
**29**:2,12,17 **30**:12,16,23,25
**31**:5,16,22 **32**:1,13 **33**:6,23
**35**:18 **47**:22 **48**:9,15,22 **49**:
25 **50**:6 **55**:20
**restraining** [4] **13**:1 **25**:23
**77**:1 **96**:20
**restrict** [1] **22**:7
**restricting** [2] **88**:13 **95**:12
**restriction** [4] **78**:5,6 **95**:3,
14
**restrictions** [3] **25**:1 **28**:5
**75**:4
**result** [3] **72**:24 **75**:23 **81**:
10
**resulted** [2] **22**:22 **94**:7
**results** [2] **67**:16 **102**:9
**retrospective** [1] **54**:25
**reverse** [1] **105**:7
**review** [4] **13**:17 **26**:9 **72**:
11,18
**reviewed** [2] **46**:4,17
**revisiting** [1] **99**:2
**revival** [1] **52**:11
**rights** [14] **7**:14 **23**:7 **53**:24
**57**:21 **67**:15,15 **68**:9 **69**:23
**70**:20 **72**:1 **74**:16 **76**:16 **80**:
7 **92**:8

**rights-holders** [2] **76**:18
**100**:14
**rights-holding** [2] **74**:8 **87**:
11
**ringer** [1] **40**:2
**rise** [1] **72**:16
**risk** [6] **20**:7 **25**:13 **3**:28:
19,22 **29**:20 **30**:20
**risks** [1] **24**:15
**robbery** [2] **88**:1 **101**:22
**ROBERTS** [30] **3**:3 **8**:1,17
**9**:6 **10**:17 **30**:18,21 **31**:18
**32**:4,14 **35**:12 **38**:1 **41**:16
**47**:6 **48**:6 **51**:1 **57**:5 **78**:17
**79**:2,9 **81**:22,25 **82**:6,9 **90**:
23 **93**:20 **96**:18 **98**:20 **100**:
16 **105**:8
**role** [1] **93**:5
**routinely** [4] **26**:4 **27**:5,5
**56**:6
**rule** [1] **72**:4
**running** [4] **9**:23 **88**:22 **89**:
12,14
**runs** [3] **27**:10,13 **83**:13

**S**

**safe** [2] **15**:4 **78**:2
**safety** [4] **4**:2 **19**:12 **20**:16
**60**:4
**said/she** [1] **21**:21
**sale** [3] **88**:14 **94**:5 **95**:4
**Salerno** [1] **64**:1
**same** [20] **29**:4 **31**:8 **34**:17
**35**:8 **39**:7 **42**:3 **43**:16 **45**:
14 **49**:9 **55**:23 **61**:19 **63**:14
**69**:17 **72**:10,23 **82**:24 **89**:
16 **91**:18 **94**:18 **96**:14
**satisfies** [1] **12**:19
**save** [2] **47**:2 **50**:12
**saying** [12] **42**:2 **52**:9 **59**:6
**68**:8,17 **72**:8 **73**:5,8,10 **83**:
11 **87**:22 **100**:25
**says** [15] **21**:22 **25**:23 **50**:8
**66**:4 **67**:25 **70**:15 **71**:11,20
**86**:15 **90**:20 **94**:8 **96**:2 **97**:
4 **100**:7 **102**:6
**scenario** [3] **18**:15,17 **90**:2
**school** [2] **64**:13,18
**schools** [2] **19**:8,14
**scope** [5] **18**:7 **39**:11 **40**:7
**49**:24 **56**:19
**scrutiny** [3] **52**:7,12 **95**:25
**se** [2] **67**:8 **92**:1
**search** [1] **60**:2
**Second** [9] **4**:14,23 **5**:8 **7**:
9 **14**:9 **18**:8,18 **30**:8 **31**:14
**34**:23 **39**:12,15 **40**:7 **41**:2,
20 **44**:23 **47**:21 **49**:3,17 **53**:
17 **56**:19,24 **63**:6 **66**:1 **68**:
5 **73**:8 **74**:23 **75**:10 **85**:21
**94**:25 **96**:25 **97**:10 **103**:8
**104**:2
**Section** [21] **3**:22 **5**:3 **12**:18

Official - Subject to Final Review

**15**:8,14 **19**:19 **20**:13 **23**:15, 21 **27**:14,24 **39**:25 **47**:1 **59**:7 **101**:12,20 **102**:15 **103**:3, 24 **104**:10,25

**see** [19] **9**:21 **14**:18 **15**:7 **38**:22 **42**:10 **43**:4 **44**:14,18 **47**:11 **48**:20 **65**:7 **77**:15 **78**:23 **80**:12 **82**:25 **83**:15 **86**:1 **92**:16 **100**:12

**seeing** [2] **38**:17 **59**:4

**seek** [2] **24**:22 **25**:8

**seem** [3] **9**:16 **86**:17 **89**:12

**seemed** [1] **53**:7

**seems** [9] **9**:13,15 **38**:4 **43**:24 **48**:17 **89**:1

**seen** [2] **25**:12 **85**:10

**segments** [1] **53**:11

**self** [2] **28**:23 **45**:24

**self-defense** [6] **30**:17 **45**:25 **58**:1,8 **62**:5 **81**:8

**sense** [6] **11**:8 **61**:1 **68**:2 **90**:21 **93**:5 **105**:2

**sensibilities** [1] **19**:1

**sensitive** [6] **10**:14 **11**:25 **14**:17 **19**:7 **49**:10 **56**:15

**sentence** [3] **61**:9 **71**:8 **72**:8

**separate** [8] **27**:20 **34**:23 **37**:22 **43**:3,6 **53**:16 **54**:16 **86**:2

**separated** [1] **100**:2

**separating** [1] **82**:17

**serial** [1] **102**:4

**serialize** [1] **102**:7

**series** [1] **17**:7

**serious** [6] **4**:16 **5**:21 **8**:14 **9**:9 **47**:16 **49**:7

**set** [4] **31**:2 **42**:24 **74**:17 **87**:20

**Setting** [2] **9**:10 **88**:10

**several** [2] **57**:12 **101**:18

**severe** [2] **75**:23 **81**:9

**share** [1] **104**:5

**shoot** [1] **76**:24

**shooting** [1] **79**:10

**short** [5] **58**:24 **59**:11 **74**:10 **82**:22 **98**:16

**shorthand** [2] **49**:2,8

**shouldn't** [2] **41**:12 **59**:9

**show** [8] **6**:2 **34**:8 **35**:17,17 **49**:23 **58**:4 **66**:17 **82**:10

**showed** [2] **65**:1 **77**:8

**showing** [3] **13**:5 **78**:18 **104**:19

**shown** [2] **59**:25 **82**:2

**shows** [5] **3**:18 **5**:20 **41**:12 **49**:15 **59**:6

**side** [5] **40**:21 **41**:11 **42**:6,6, 7

**significant** [3] **41**:9 **78**:15 **79**:20

**silent** [1] **68**:18

---

**similar** [2] **71**:13,16

**similarly** [1] **42**:5

**single** [1] **71**:12

**situation** [3] **16**:7 **17**:1 **21**:1 **41**:4 **78**:14,25 **85**:7

**situations** [4] **21**:18 **24**:16 **26**:15 **103**:5

**six** [1] **25**:13

**slaves** [2] **7**:1 **53**:9

**slot** [1] **56**:15

**small** [3] **67**:15 **76**:5 **91**:14

**smaller** [1] **93**:8

**so-called** [1] **15**:11

**societal** [1] **20**:6

**society** [2] **53**:12 **88**:2

**solely** [1] **91**:25

**Solicitor** [2] **1**:18 **72**:12

**somebody** [1] **83**:4

**someone** [28] **6**:6,9,13 **8**:1 **12**:25 **13**:2 **27**:6 **32**:19 **36**:14,21 **50**:5 **61**:15 **63**:24 **67**:12 **69**:3 **75**:6,9,17 **76**:2,3 **79**:10 **80**:8,12 **82**:2,25 **83**:13 **87**:9 **100**:2

**someone's** [2] **45**:23 **58**:21

**sometimes** [1] **63**:1

**sorry** [5] **43**:20 **46**:14 **66**:24 **79**:22 **85**:16

**sort** [13] **5**:10 **31**:1 **54**:24 **65**:18 **67**:7 **83**:11 **84**:20 **86**:23 **89**:16 **93**:7 **95**:7,8,23

**sorts** [1] **31**:1

**SOTOMAYOR** [15] **26**:14, 18,22 **27**:18 **28**:1,17,24 **29**:5,21 **38**:2 **47**:10 **61**:24 **62**:1,3 **93**:21

**sounds** [2] **80**:21 **84**:8

**source** [1] **22**:5

**sources** [4] **39**:2,7 **85**:18, 23 **86**:20 **88**:17

**South** [2] **58**:16 **84**:15

**space** [1] **64**:3

**speaking** [1] **66**:2

**specific** [5] **4**:3 **17**:12 **58**:14 **87**:22 **93**:25

**specifically** [6] **5**:6 **13**:24 **17**:17 **36**:11 **63**:4 **89**:23

**spectrum** [1] **57**:19

**sports** [1] **9**:23

**spot** [1] **71**:24

**squared** [1] **39**:5

**squarely** [1] **47**:4

**St** [1] **73**:11

**stage** [1] **7**:4

**stand** [1] **89**:13

**standard** [5] **9**:3 **10**:25 **32**:9 **33**:13 **50**:1

**standards** [1] **36**:9

**standing** [2] **46**:17 **77**:23

**standpoint** [3] **16**:5 **32**:24 **54**:23

---

**start** [3] **74**:9 **79**:11

**starting** [1] **39**:5

**starts** [1] **85**:1

**state** [37] **8**:8 **22**:2,11 **23**:10, 11 **24**:7,22 **25**:7,11 **26**:3,6 **36**:18,24 **37**:16 **39**:9,10 **59**:19,20 **64**:23 **66**:23 **67**:1,2 **68**:15 **70**:5 **76**:22 **81**:5 **91**:3,16,21 **92**:24,25 **93**:10 **94**:18,20 **102**:22 **103**:11,15

**state's** [1] **78**:11

**STATES** [13] **1**:1,3,15 **3**:5, 20 **13**:10 **21**:9 **22**:5 **41**:6 **43**:25 **58**:3 **87**:11 **104**:5

**statistical** [1] **22**:24

**statistics** [1] **22**:20

**status** [1] **74**:5

**statute** [19] **26**:19,23 **27**:1 **44**:13,22 **62**:22 **63**:25 **64**:4, 15,16 **65**:16 **66**:16 **79**:14, 16 **81**:13 **82**:11,13 **93**:1 **101**:13

**stay-away** [1] **81**:6

**stem** [1] **80**:5

**step** [1] **55**:9

**steps** [1] **86**:2

**still** [3] **19**:1 **84**:9 **97**:4

**stipulation** [1] **60**:12

**stop** [1] **94**:12

**stored** [2] **6**:14,20

**storing** [1] **6**:10

**straitjacket** [1] **5**:10

**strictly** [1] **66**:2

**stripped** [1] **53**:23

**stripping** [1] **7**:13

**strong** [2] **37**:20 **75**:2

**struck** [1] **104**:18

**subject** [13] **3**:21 **13**:17 **17**:3 **20**:5 **23**:4 **27**:20 **46**:20 **53**:9 **61**:11 **69**:13 **75**:9 **94**:13 **101**:25

**submit** [3] **64**:24 **70**:1 **93**:14

**submitted** [2] **105**:10,12

**subparagraph** [4] **21**:2,12 **37**:17 **103**:19

**substantially** [2] **22**:7 **41**:2

**substantive** [1] **78**:11

**sudden** [1] **31**:5

**suffice** [1] **102**:21

**sufficient** [4] **23**:6 **78**:18 **101**:24 **102**:23

**sufficiently** [5] **21**:14 **35**:18 **82**:3 **101**:16 **102**:6

**suggest** [14] **14**:25 **17**:16 **20**:2 **22**:10 **26**:6 **27**:2 **40**:22,25 **53**:8 **65**:10 **70**:25 **71**:2 **73**:15 **103**:10

**suggested** [3] **13**:23 **36**:11 **99**:1

**suggesting** [5] **31**:17 **37**:15 **38**:21 **78**:18 **86**:17

---

**suggestion** [1] **84**:14

**suggests** [1] **99**:2

**suicidal** [2] **82**:25 **83**:1

**suing** [1] **63**:24

**support** [9] **6**:13 **8**:12 **27**:9 **37**:25 **43**:12 **51**:12 **90**:17, 18 **95**:3

**supported** [1] **81**:18

**supports** [1] **51**:25

**Suppose** [5] **35**:13,13 **36**:21 **76**:22 **86**:20

**supposing** [1] **90**:10

**SUPREME** [2] **1**:1,14

**surety** [2] **41**:24 **49**:14

**surprised** [2] **59**:10 **69**:10

**surrender** [3] **82**:22,24 **98**:16

**survive** [1] **95**:24

**suspect** [2] **74**:10 **96**:12

**suspended** [2] **96**:22 **97**:6

**suspending** [1] **97**:1

**swaths** [1] **14**:10

**sweeping** [1] **14**:11

**sworn** [1] **64**:24

**synonym** [1] **12**:9

**system** [14] **20**:7 **24**:7 **27**:20 **33**:24 **35**:21 **36**:3,10 **37**:6 **93**:18 **94**:4,7,12,18,22

**systematic** [1] **20**:7

---

**T**

**table** [3] **66**:7 **84**:9 **85**:18

**talks** [1] **83**:24

**target** [2] **3**:23 **63**:5

**targeted** [1] **85**:14

**targeting** [2] **33**:10 **72**:10

**Tarrant** [4] **22**:20 **60**:11 **61**:18 **97**:2

**technical** [1] **95**:10

**technology** [1] **16**:21

**tempers** [1] **9**:23

**temporarily** [1] **3**:20

**temporary** [2] **42**:20 **63**:15

**Ten** [1] **58**:15

**tentatively** [1] **74**:12

**term** [8] **10**:1,24 **11**:4,20 **29**:16 **30**:23 **31**:6 **44**:15

**termination** [1] **70**:23

**terminology** [1] **47**:11

**terms** [6] **20**:19 **61**:13 **65**:11 **97**:15 **98**:8 **100**:11

**terrible** [1] **84**:13

**terrified** [1] **76**:25

**territories** [2] **3**:20 **104**:5

**test** [18] **15**:23 **16**:25 **17**:6 **31**:23 **39**:14 **48**:19,20,21, 25 **53**:13 **54**:6,12 **63**:22 **64**:1 **84**:18,20,24 **85**:1

**testifies** [1] **97**:24

**Texas** [4] **1**:22 **21**:8 **58**:17 **60**:1,3 **91**:19

**text** [7] **63**:6 **73**:8 **85**:1 **86**:3, 5,6 **90**:5,19 **100**:7

---

**textual** [3] **7**:6 **53**:20 **85**:4

**that'll** [1] **27**:20

**themselves** [4] **6**:5 **24**:23 **39**:16 **48**:2

**theory** [2] **101**:15 **102**:4

**there's** [40] **11**:12 **20**:1 **24**:19 **26**:7 **28**:18 **30**:20 **32**:9 **38**:9 **39**:22 **40**:16 **41**:10 **54**:6 **55**:1,11 **56**:25 **58**:5 **64**:5 **65**:18 **66**:8 **68**:2,9,18 **69**:6 **70**:6 **73**:5,5 **74**:14,18,20 **78**:18 **79**:25 **81**:20 **82**:18 **84**:3 **88**:13 **90**:8 **97**:25 **98**:5 **100**:1,13

**therefore** [3] **27**:17 **51**:18 **54**:2

**thin** [1] **60**:25

**thinks** [1] **23**:25

**thinness** [1] **64**:22

**third** [4] **14**:23 **40**:13 **104**:10

**THOMAS** [21] **5**:13,17 **6**:6, 22 **32**:15,16 **33**:18 **34**:15 **35**:11,23 **53**:7 **59**:16 **60**:16, 22 **64**:21 **90**:25 **91**:1,9,12, 25 **92**:12

**though** [5] **15**:21 **19**:9 **28**:14 **29**:18 **33**:24 **63**:9 **66**:23 **87**:13 **91**:18

**threat** [9] **3**:19 **4**:1,9 **20**:16 **31**:20 **43**:23 **60**:3 **82**:18 **103**:21

**threatened** [2] **20**:20 **76**:24

**threats** [2] **20**:10 **65**:1

**three** [4] **38**:15 **60**:5 **61**:19 **102**:16

**Throughout** [2] **4**:15 **33**:15 **50**:9

**Thursdays** [1] **9**:8

**tie** [2] **72**:2 **75**:11

**tied** [3] **10**:10 **67**:9 **93**:6

**tiers** [1] **52**:7

**time-limited** [2] **25**:10 **26**:8

**tittle** [1] **72**:10

**today** [10] **16**:19 **17**:4,14 **18**:21 **19**:18 **31**:19 **40**:1 **54**:23 **55**:4 **102**:19

**together** [2] **76**:14 **81**:12

**tolerate** [1] **24**:14

**tolled** [1] **58**:20

**took** [2] **72**:7 **75**:25

**tooth** [2] **62**:17,19

**total** [2] **59**:12 **76**:18

**touches** [1] **64**:21

**tracked** [1] **29**:6

**tracking** [1] **10**:8

**tracks** [1] **25**:17

**tradition** [5] **4**:14 **5**:19 **6**:1, 12 **8**:12,20 **10**:22 **11**:19 **13**:10 **18**:2 **19**:4 **24**:12 **32**:11

**33:**7 **34:**11 **35:**4,8 **37:**11
**43:**12 **49:**23 **50:**17 **51:**12,
19 **53:**5,8 **54:**9,10 **55:**15
**71:**23 **73:**10 **74:**14 **75:**3,8,
12,15 **77:**8 **80:**19 **81:**18 **82:**
17 **83:**14 **84:**4 **85:**2 **86:**9,
25 **88:**13,19 **90:**6,9 **94:**24
**95:**3 **99:**18 **100:**9 **105:**1
**traditional** [1] **82:**21
**traditionally** [1] **53:**23
**traditions** [5] **53:**13 **54:**7
**72:**2 **84:**18,20
**trafficking** [1] **101:**22
**trait** [1] **99:**8
**treated** [3] **16:**2 **17:**14 **71:**
25
**treatises** [1] **39:**10
**trial** [1] **69:**3
**troubled** [1] **84:**19
**true** [7] **19:**25 **25:**24,24 **34:**
2 **56:**24 **65:**5 **69:**18
**truth** [1] **88:**21
**try** [4] **17:**10 **55:**10 **56:**17 **73:**
21
**trying** [14] **12:**2 **15:**21 **16:**
24 **22:**10 **31:**11 **50:**11 **54:**
61:1 **83:**19 **84:**2 **86:**4,24
**98:**23 **103:**16
**Tucker** [1] **73:**12
**Tuesday** [1] **1:**11
**turn** [2] **41:**3 **51:**22
**turns** [1] **31:**23
**twin** [3] **5:**7 **17:**20 **42:**1
**two** [8] **5:**17 **44:**5 **52:**20 **58:**
17 **72:**20 **77:**24 **86:**1 **103:**1
**type** [4] **60:**8 **78:**25 **88:**4
**104:**20
**types** [2] **49:**4,5
**typically** [4] **63:**23 **64:**2 **70:**
6 **92:**25

## U

**ultimately** [6] **21:**1 **24:**11
**52:**23 **85:**2 **93:**13 **102:**24
**unconstitutional** [9] **5:**4
**15:**3 **62:**8 **63:**19 **66:**14 **81:**
13 **96:**9,23 **98:**1
**under** [23] **8:**8,10 **12:**15 **15:**
17 **17:**5 **31:**13 **38:**25 **43:**21
**53:**17 **64:**10 **65:**16 **66:**10
**72:**3,11,18 **77:**19 **78:**10,11
**92:**13 **94:**11 **102:**14,25
**103:**6
**underlying** [3] **65:**20,23 **66:**
13
**underneath** [1] **53:**12
**understand** [17] **10:**22 **15:**
21 **16:**25 **17:**9 **19:**2 **28:**3,8
**54:**1,6 **63:**16 **82:**1 **83:**19
**85:**3 **89:**16 **92:**22 **95:**11
**101:**8
**understanding** [11] **11:**19
**42:**9,13,14 **72:**20 **73:**19,20

**85:**5 **90:**4 **92:**19 **99:**11
**understandings** [1] **73:**22
**understood** [8] **4:**24 **48:**10
**81:**14 **84:**6 **85:**24 **87:**10 **88:**
2,2
**Unfortunately** [1] **101:**5
**unique** [2] **12:**4 **50:**17
**UNITED** [6] **1:**1,3,15 **3:**4 **58:**
2 **87:**11
**universal** [2] **21:**7 **26:**7
**unlawful** [2] **66:**13 **78:**7
**unless** [2] **21:**13 **44:**14
**unpublished** [1] **60:**5
**unreceptive** [1] **23:**11
**unreliable** [1] **103:**13
**unrepresented** [1] **60:**10
**unsettling** [1] **103:**15
**untenable** [3] **7:**25 **88:**24
**102:**9
**unusual** [6] **6:**3 **10:**15 **11:**
22 **12:**1 **16:**12,16 **30:**14 **49:**
11
**up** [9] **18:**1 **25:**14 **29:**14 **33:**
22 **40:**9 **41:**19 **47:**8 **63:**23
**65:**2
**uphold** [1] **103:**24
**urge** [1] **46:**22
**useful** [2] **38:**9,10
**using** [3] **10:**1,18 **31:**15

## V

**valid** [2] **64:**3,3
**validated** [1] **103:**6
**validity** [1] **103:**20
**varies** [2] **25:**11 **26:**5
**variety** [3] **39:**6 **54:**18 **89:**2
**various** [3] **30:**7 **64:**25 **72:**
15
**vast** [1] **22:**4
**Vermont** [1] **58:**15
**version** [1] **64:**17
**versus** [3] **3:**5 **58:**3 **62:**24
**victims** [1] **103:**16
**view** [7] **46:**1,10 **54:**25 **56:**6
**86:**7 **95:**21 **104:**5
**viewed** [2] **7:**8 **20:**6
**views** [1] **50:**3
**violate** [4] **4:**22 **76:**7 **97:**10
**98:**13
**violated** [1] **23:**7
**violating** [2] **36:**22 **77:**16
**violation** [4] **66:**9,9 **92:**1,2
**violence** [42] **3:**16,21 **4:**9
**13:**2,3,12,12 **16:**1,3,23 **17:**
2,13 **18:**12 **20:**4,11 **24:**15
**35:**15 **45:**9 **58:**19 **65:**3 **70:**
14 **73:**1,16,17,25 **82:**19 **86:**
8,12,22 **87:**22,25 **88:**1,2 **89:**
8 **94:**6,13 **98:**6,25 **99:**19
**103:**17 **104:**6,19
**violent** [3] **99:**7 **101:**14,23
**virtually** [2] **21:**9 **104:**23
**virtue** [1] **12:**9

**virtuous** [1] **12:**13

## W

**walked** [1] **71:**14
**wanted** [2] **44:**24 **64:**19
**wants** [3] **24:**1 **29:**8 **55:**21
**War** [1] **88:**17
**warrants** [1] **20:**7
**Washington** [3] **1:**10,19
**58:**14
**way** [23] **6:**19 **9:**12 **14:**25 **23:**
7 **28:**25 **38:**20 **40:**4 **42:**3
**49:**9 **61:**6 **64:**7 **69:**17 **71:**
25 **73:**3,9 **79:**17 **80:**12 **82:**
16,19,24 **83:**9 **93:**15 **96:**15
**ways** [2] **15:**13 **72:**20
**weapon** [7] **30:**14,15 **76:**6,
9,10 **80:**13,13
**weapons** [12] **10:**15 **12:**1,4
**14:**19 **16:**12,16 **19:**14 **49:**5,
11 **88:**14 **89:**21 **95:**1
**week** [1] **101:**11
**weight** [3] **15:**9 **40:**15 **52:**
14
**welcome** [2] **5:**12 **59:**14
**well-thought-out** [1] **46:**
10
**whatever** [2] **31:**22 **97:**24
**Whereupon** [1] **105:**11
**whether** [26] **13:**5 **15:**22,25
**16:**18 **17:**23 **30:**11,14 **31:**
21 **33:**4 **36:**6 **51:**15 **52:**16,
23 **55:**3,10,25 **56:**6 **57:**1
**65:**15 **71:**9 **72:**16 **75:**14 **84:**
3 **95:**21 **98:**23 **102:**22
**white** [1] **86:**21
**who's** [6] **21:**10 **75:**6 **76:**3
**78:**5 **79:**10 **84:**10
**whole** [2] **70:**15 **97:**13
**whom** [1] **36:**15
**wide** [3] **14:**10 **39:**6 **89:**2
**widespread** [1] **4:**8
**will** [10] **7:**25 **12:**4 **15:**12 **58:**
4 **75:**23 **78:**2 **81:**8 **82:**1 **92:**
18 **95:**2
**William** [1] **73:**12
**willing** [2] **71:**24 **93:**13
**within** [12] **6:**16 **7:**21 **15:**15
**24:**7 **51:**18 **52:**17 **56:**1 **64:**
9,14,15 **70:**18 **94:**25
**without** [5] **23:**1 **27:**6 **37:**
18 **59:**8 **78:**3
**woman** [3] **3:**14,14 **104:**12
**wonder** [1] **15:**24
**wondering** [2] **38:**8 **42:**21
**words** [7] **36:**6 **39:**1 **53:**10
**60:**3,7 **73:**2 **88:**2
**work** [2] **18:**25 **19:**3
**worked** [1] **96:**14
**works** [1] **16:**25
**workup** [1] **81:**17
**would-be** [1] **48:**11
**WRIGHT** [69] **1:**21 **2:**6 **57:**7,

8,10 **59:**20 **61:**3 **62:**12,21
**63:**11,21 **65:**4,9,24 **66:**3,24
**67:**5 **68:**12,16,21 **69:**4,15
**70:**21 **71:**6,19 **72:**22 **74:**1
**75:**21 **77:**5,12,18 **78:**21 **79:**
6,13 **80:**3,25 **81:**24 **82:**5,8,
13 **83:**17 **84:**5,25 **85:**20 **86:**
13 **87:**1,8,21,25 **88:**10,21
**89:**14 **91:**7,10,23 **92:**4,18
**94:**16 **96:**3,7,24 **97:**7,12,19
**98:**7,15 **99:**11,20,23
**written** [1] **79:**15
**wrote** [2] **74:**19,20

## Y

**yards** [1] **70:**18
**year** [2] **25:**15 **58:**23
**years** [10] **25:**14 **58:**15,16,
18,20 **73:**2,17 **76:**12 **83:**4
**94:**10
**yelling** [1] **9:**11

## Z

**ZACKEY** [3] **1:**6 **3:**17 **79:**
15
**zone** [1] **8:**3
**Zones** [1] **64:**18