

Liberty University Law Review

Volume 17 | Issue 2                                                    Article 2

October 2022

# Shuttering the New Star Chamber: Toward a Populist Strategy Against Criminal Equity in the Family Court

David N. Heleniak
dheleniak@liberty.edu

Follow this and additional works at: https://digitalcommons.liberty.edu/lu_law_review

 Part of the Law Commons

Recommended Citation
Heleniak, David N. (2022) "Shuttering the New Star Chamber: Toward a Populist Strategy Against Criminal Equity in the Family Court," *Liberty University Law Review*: Vol. 17: Iss. 2, Article 2.
Available at: https://digitalcommons.liberty.edu/lu_law_review/vol17/iss2/2

This Articles is brought to you for free and open access by the Liberty University School of Law at Scholars Crossing. It has been accepted for inclusion in Liberty University Law Review by an authorized editor of Scholars Crossing. For more information, please contact scholarlycommunications@liberty.edu.



DAVID N. HELENIAK

# Shuttering the New Star Chamber: Toward a Populist Strategy Against Criminal Equity in the Family Court

**ABSTRACT**

Representing a return to criminal equity, the American domestic violence restraining order system evokes the Anglo-American cultural memory of the Star Chamber. Turkey's recent withdrawal from the Istanbul Convention, the Council of Europe's counterpart to the United States' Violence Against Women Act, is part of a larger populist opposition to "gender ideology" that is unlikely to take hold in the United States. Hopefully, however, it will inspire a populist movement in the United States that draws upon a commitment to traditional notions of due process and the preservation of parent–child relationships to put an end to at least some of the nation's domestic violence restraining order schemes. Such a movement would find ample lessons in the ultimately successful struggle around the turn of the last century against the use of labor injunctions.

**AUTHOR**

In 2022, the author received an LL.M. in International Legal Studies from Liberty University School of Law. The author thanks Professor Stephen Baskerville, PhD., Head of Dept. of State Studies at Collegium Interarium, for suggesting that he write an article involving the Istanbul Convention, and he thanks Dean Susan K. Patrick, Associate Dean of Admissions & Financial Aid at Liberty University School of Law, for her guidance and encouragement as the article took shape. Lastly, he thanks his family, especially his wife, Donna, for their patience, help, and advice. The author is a practicing attorney in New Jersey. He can be reached at dheleniak@liberty.edu.

Helniak Final .docx (Do Not Delete)                                    5/9/23 4:45 PM

ARTICLE

SHUTTERING THE NEW STAR CHAMBER: TOWARD A POPULIST
STRATEGY AGAINST CRIMINAL EQUITY IN THE FAMILY COURT

*David N. Heleniak[†]*

ABSTRACT

*Representing a return to criminal equity, the American domestic violence restraining order system evokes the Anglo-American cultural memory of the Star Chamber. Turkey's recent withdrawal from the Istanbul Convention, the Council of Europe's counterpart to the United States' Violence Against Women Act, is part of a larger populist opposition to "gender ideology" that is unlikely to take hold in the United States. Hopefully, however, it will inspire a populist movement in the United States that draws upon a commitment to traditional notions of due process and the preservation of parent–child relationships to put an end to at least some of the nation's domestic violence restraining order schemes. Such a movement would find ample lessons in the ultimately successful struggle around the turn of the last century against the use of labor injunctions.*

I. INTRODUCTION

*[W]e are certainly aware that domestic abuse does occur and is a serious problem. . . .*

*[However,] [i]f we were to perceive the issue and take the steps the appellant and some of the amici briefs suggest, the jurisdiction of chancery court could be extended almost beyond imagination. For example, drunken driving is a serious problem. . . . The criminal laws have not stopped*

† In 2022, the author received an LL.M. in International Legal Studies from Liberty University School of Law. The author thanks Professor Stephen Baskerville, PhD., Head of Dept. of State Studies at Collegium Interarium, for suggesting that he write an article involving the Istanbul Convention, and he thanks Dean Susan K. Patrick, Associate Dean of Admissions & Financial Aid at Liberty University School of Law, for her guidance and encouragement as the article took shape. Lastly, he thanks his family, especially his wife, Donna, for their patience, help, and advice. The author is a practicing attorney in New Jersey. He can be reached at dheleniak@liberty.edu.

> *drunken driving, but we cannot use that fact as a reason to approve extending the jurisdiction of the chancery court to issue an "order of protection" against persons accused of, but not convicted of, drunk driving. Drug sales to children is a comparable problem, as is burglary. We cannot subvert the Constitution of Arkansas and allow the creation of a cause of action totally foreign to the equity jurisdiction of the chancery court just because we perceive and abhor a particular social ill. We are pledged to support the Constitution of Arkansas, and our duty is to follow it in this case as in any other.[1]*

Turkey set off shockwaves in early 2021 when it announced its withdrawal from the Istanbul Convention (less commonly known as the Council of Europe Convention on Preventing and Combating Violence Against Women and Domestic Violence).[2] Reporting on the move, *Bloomberg Buinessweek* presented the President of Turkey, Recep Tayyip Erdogan, as justifying the decision "by saying local laws already guarantee women's safety."[3] But despite allowing Erdogan to state the obvious, the news service's reaction was primarily negative.[4] It gave the last word to Turkish attorney Leyla Suren: "Women's security blanket has been taken away from them."[5]

The Convention, which owes its more common name to the city of Istanbul, Turkey—where it was opened for signatures on May 11, 2011—is the Council of Europe's counterpart to the United States' federal Violence

---

[1]  Bates v. Bates, 793 S.W.2d 788, 791–92 (Ark. 1990) (affirming a chancery court order dismissing a domestic abuse petition on the ground that the Arkansas Domestic Abuse Act of 1989 violated the Constitution of Arkansas).

[2]  Selime Büyükgöze, *Defending the Istanbul Convention: A Struggle for a Future Without Violence*, VIENNA INST. FOR INT'L DIALOGUE & COOP., https://www.vidc.org/en/detail/defending-the-istanbul-convention-a-struggle-for-a-future-without-violence (last visited Jan. 14, 2023).

[3]  Burhan Yuksekkas & Donna Aby-Nasr, *Violence Against Women Puts Turkey in an Uncomfortable Spotlight*, BLOOMBERG BUSINESSWEEK (Sept. 8, 2021, 12:01 AM) https://www.bloomberg.com/news/articles/2021-09-08/turkey-leaves-istanbul-convention-putting-violence-against-women-in-spotlight.

[4]  *See id.*

[5]  *Id.*

2023]            *SHUTTERING THE NEW STAR CHAMBER*            203

Against Women Act (VAWA),[6] which President Bill Clinton signed into law in 1994. At a webinar on April 14, 2021, examining the Istanbul Convention, Judge Diane Kiesel, Acting Supreme Court Justice for the Supreme Court of New York County, explained the similarity between the treaty and VAWA.[7] As summarized by The Catholic University of America, Judge Kiesel pointed out that "[j]ust as the Istanbul Convention creates a cohesive, integrated approach to combating violence within the member nations, VAWA strives to create a uniform approach to violence at the federal level rather than leaving it to each of the 50 states to create individual systems."[8]

By 2021, thirty-five countries had ratified the treaty.[9] Turkey was the first country to ratify the treaty, on March 14, 2012, so its withdrawal less than a decade later represents a stinging rebuke of the Convention.[10] Clearly, the momentum from the early 2010s that propelled Turkey to participate in a globalist project against domestic violence had not just stalled but reversed course.

At openDemocracy.net, Özlem Altan-Olcay and Bertil Emrah Oder commented: "While the announcement was sudden, it was not a complete surprise, given that the Convention has been a focus of the backlash against women's rights in countries with right-wing populist governments."[11] However, Turkey's rejection of the treaty is in fact part of a larger populist

---

[6]  *See The Council of Europe Convention on Preventing and Combating Violence Against Women and Domestic Violence (Istanbul Convention)*, COUNCIL OF EUR., https://www.coe.int /en/web/gender-matters/council-of-europe-convention-on-preventing-and-combating-violence-against-women-and-domestic-violence (last visited Feb. 15, 2023); 34 U.S.C. §§ 12291–514.

[7]  *Contemporary Challenges in American and Global Law Begins Its Spring Session with a Discussion on Combating Gender-Based Violence*, CATH. UNIV. OF AM. (Apr. 15, 2021), https://www.law.edu/news-and-events/2021/global-law/2021-0414-contemporary-challenges-Istanbul-convention.html.

[8]  *Id.*

[9]  *Chart of Signatures and Ratifications of Treaty 210*, COUNCIL OF EUR., https://www.coe.int/en/web/conventions/full-list?module=signatures-by-treaty&treatynum=210 (last visited Jan. 14, 2023).

[10]  *Id.*

[11]  Özlem Altan-Olcay & Bertil Emrah Oder, *Why Turkey's Withdrawal From the Istanbul Convention is a Global Problem*, OPENDEMOCRACY (June 2, 2021, 12:01 AM), https://www.opendemocracy.net/en/can-europe-make-it/why-turkeys-withdrawal-from-the-istanbul-convention-is-a-global-problem/.

opposition consisting of a non-ecumenical coalition of conservative religious groups aligned not against women's rights but against the "gender ideology" thought to be inherent in the treaty.[12] Writing for the *Guardian*, American public intellectual Judith Butler came closer to the truth than Altan-Olcay and Emrah Oder when she stated: "Turkey's withdrawal from the Istanbul [C]onvention in March sent shudders through the EU, since one of its main objections was the inclusion of protections for women and children against violence, and this 'problem' was linked to the foreign word 'gender.'"[13] Butler observed that "[t]he attacks on so-called 'gender ideology' have grown in recent years throughout the world, dominating public debate stoked by electronic networks and backed by extensive rightwing Catholic and evangelical organizations," which "concur that the traditional family is under attack, that children in the classroom are being indoctrinated to become homosexuals, and that 'gender' is a dangerous, if not diabolical, ideology threatening to destroy families, local cultures, civilization, and even 'man' himself."[14]

From an American perspective, however, it is Article 53 of the Convention that is the most troubling. Providing (1) that "[p]arties [to the treaty] shall take the necessary legislative or other measures to ensure that appropriate restraining or protection orders are available to victims of all forms of violence covered"[15] and (2) that "[p]arties shall take the necessary legislative or other measures to ensure that breaches of restraining or protection orders issued pursuant to paragraph 1 shall be subject to effective, proportionate and dissuasive criminal or other legal sanctions,"[16] Article 53 evokes the Anglo-American cultural memory of the Star Chamber. The Star Chamber, a "much-hated court of criminal equity,"[17] as

---

[12]    *See id.*

[13]    Judith Butler, *Why Is the Idea of 'Gender' Provoking Backlash the World Over?*, GUARDIAN (Oct. 23, 2021, 6:29 EDT), https://www.theguardian.com/us-news/commentisfree/2021/oct/23/judith-butler-gender-ideology-backlash?source=techstories.org.

[14]    *Id.*

[15]    Convention on Preventing and Combating Violence Against Women and Domestic Violence art. 53, May 11, 2011, C.E.T.S. No. 210.

[16]    *Id.*

[17]    Morton Gitelman, *The Separation of Law and Equity and the Arkansas Chancery Courts: Historical Anomalies and Political Realities*, 17 U. ARK. LITTLE ROCK L.J. 215, 231 (1995).

2023]          *SHUTTERING THE NEW STAR CHAMBER*          205

Morton Gitelman put it, was named after the room in Westminster Palace in which it convened; it had stars painted on its ceiling.[18] Abolished by the Long Parliament in 1641 for having "undertaken to punish when no harm doth warrant and to make decrees for things having no such authority and to inflict heavier punishments than by any Law is warranted,"[19] it was said by an anonymous pamphleteer in 1768 to have "stripped the delinquent of his constitutional defense . . . and left him open to the capricious and tyrannical will and humor of arbitrary judges."[20]

In 1919, New Jersey's high court, the Court of Errors and Appeals, invalidated a 1916 statute that attempted to give chancery jurisdiction over the maintenance of houses of prostitution.[21] In finding the statute entitled "An act declaring all buildings and places wherein or upon which acts of lewdness, assignation or prostitution are permitted or occur to be nuisances, and providing for the abatement thereof by the court of chancery" unconstitutional, it stated:

> It is clear that if the legislature may bestow on the court of chancery jurisdiction to grant an injunction and abate a public nuisance of a purely criminal nature, then there can be no valid argument against the power of the legislature to confide the entire criminal code of this state to a court of equity for enforcement.[22]

For the Court of Errors and Appeals, it was "apparent that such a court would render nugatory the provisions of the constitution which guarantee the right of a presentment by a grand jury, and a trial by jury, to one accused of crime."[23]

---

[18]    Martin Gruberg, *Star Chamber*, THE FIRST AMEND. ENCYCLOPEDIA, https://mtsu.edu/first-amendment/article/820/star-chamber (last visited Jan. 15, 2023).

[19]    Daniel L. Vande Zande, *Coercive Power and the Demise of the Star Chamber*, 50 AM. J. LEGAL HIST. 326, 330 (2010) (quoting The Abolition Act, July 5, 1641, *reprinted in* THE CONSTITUTIONAL DOCUMENTS OF THE PURITAN REVOLUTION, 1625-1660 181 (Samuel R. Gardiner ed., 1900)).

[20]    *Id.* at 326 (quoting THE COURT OF STAR CHAMBER, OR SEAT OF OPPRESSION 9 (London, Staples Steare 1768)).

[21]    *See* Hedden v. Hand, 107 A. 285, 286, 291 (N.J. 1919).

[22]    *Id.* at 291.

[23]    *Id.* at 290.

206                    *LIBERTY UNIVERSITY LAW REVIEW*                    [Vol. 17:2

In 2005, *Rutgers Law Review* published an article critical of New Jersey's system of temporary and final domestic violence restraining orders.[24] The article recognized that in *Hedden*, the New Jersey high court stated that the legislature cannot "change the nature of an offense by changing the forum in which it is to be tried" and identified the threat to due process that would entail if it could.[25] Recognizing further that *Hedden* had never been overturned and seems to apply to New Jersey's Prevention of Domestic Violence Act—which gives the family court, a court of equity, jurisdiction over crimes (acts of domestic violence)—the article contended that the Act "is an attempt to convert that which is in its nature a prosecution for a crime into a civil proceeding"[26] and that "[t]he New Jersey Legislature has to date been allowed to create, in the Family Part of the Chancery Division of the New Jersey Superior Court, a modern day Star Chamber."[27]

When *The New Star Chamber: The New Jersey Family Court and the Prevention of Domestic Violence Act* was written, the author was unaware of the nation-wide use during the late nineteenth and early twentieth centuries of what was termed "criminal equity" and "government by injunction" as a tool against labor strikes and commercial vices such as prostitution and the sale of alcohol (hence the terms, typically used as terms of invective, are not found anywhere in the article).[28] The author was also unaware of the 1990 *Bates* decision, in which the Supreme Court of Arkansas struck down a law similar to the New Jersey Act using reasoning similar to that used by the court in *Hedden*, including the reason that "except in narrow circumstances not present . . . equity will not enjoin the commission of a crime because the remedy at law is adequate. . . . If the rule were otherwise, the constitutional right of trial by jury would be infringed."[29]

Whenever a court of equity takes jurisdiction in a criminal matter, there exists the danger that when a judge enjoins a person from committing a

---

[24]   *See* David N. Heleniak, *The New Star Chamber: The New Jersey Family Court and the Prevention of Domestic Violence Act*, 57 RUTGERS L. REV. 1009 (2005).

[25]   *See Hedden*, 107 A. at 285–91.

[26]   Heleniak, *supra* note 24, at 1009–10.

[27]   *Id.* at 1010.

[28]   *See id.*

[29]   Bates v. Bates, 793 S.W.2d 788, 791 (Ark. 1990). A revised statute that did not allow for domestic violence restraining orders to enjoin abuse was signed into law by Bill Clinton in 1991.

crime and then summarily tries them without a jury for contempt of the injunction, that is, for the commission of a crime, the accused—deprived of the due process protections typically afforded criminal defendants—will likely be found guilty even if innocent. Not only are judges not immune from the biases that affect the judgment of ordinary people,[30] they are often responsive to institutional pressures to see facts the way they are expected to see them. That is, of course, the exact danger faced by domestic violence defendants in the New Jersey Family Court and similarly situated defendants in most of the United States.[31]

Shortly after *The New Star Chamber* was published, in *Crespo v. Crespo,* a constitutional challenge of the New Jersey Prevention of Domestic Violence Act, the Honorable Francis B. Schultz ultimately rejected the argument that, per *Hedden*, the statute was unconstitutional on a jurisdictional basis.[32] Nevertheless, he was respectful of the argument and addressed it at length in his unpublished (and therefore nonbinding) trial court decision.[33] Additionally, in finding the statute unconstitutional "as it relates to the standard of proof" (preponderance of the evidence instead of clear and convincing), Judge Schultz noted: "One of the most significant impacts on defendants growing out of a Final Restraining Order is the defendants' inability to be with or maintain their relationship with their children. Many Final Restraining Orders contain significant limitations on the defendants' ability to be with their children."[34]

---

[30] *See* Forrest R. Black, *The Expansion of Criminal Equity Under Prohibition*, 5 WIS. L. REV. 412, 417 (1930) ("There is no safety for the defendant because he is deprived of jury trial and the whole question of his guilt or innocence is determined by the judge whose order he is accused of violating and who is likely therefore to be at least unconsciously prejudiced against him.").

[31] *Cf.* STEPHEN BASKERVILLE, FAMILY VIOLENCE IN AMERICA: THE TRUTH ABOUT DOMESTIC VIOLENCE AND CHILD ABUSE 16 (2006) ("For years, Essex County men arrested for violating such orders have been denied due process by languishing in jail . . . without a Superior Court hearing, a bail review, or counsel.") (quoting Tim O'Brien, *Restraining-Order Violators Jailed Without Hearings in Essex County: Judges, Prosecutors, and Public Defenders Concede that Some Defendants Languish in Jail Without Bail Review or Defense Counsel*, N.J. L.J. (2002)).

[32] *See* Crespo v. Crespo, No. FV-09-2682-04, slip op. at 10 (N.J. Super. Ct. Ch. Div. June 18, 2008), *rev'd*, 972 A.2d 1169 (N.J. Super. Ct. App. Div. 2009), *cert. granted*, 983 A.2d 196 (N.J. 2009).

[33] *Id.* at 4–10.

[34] *Id.* at 17, 19.

Helniak Final .docx (Do Not Delete)                                    5/9/23 4:45 PM

Anyone expecting that the appellate court in *Crespo* would at least show some sympathy to the plight of fathers thrown out of their homes on the basis of dubious allegations of abuse and kept from having a normal relationship with their children, as well as some regard for a high court decision and its concerns, would be dismayed by the high-handed tone of the appellate opinion and the utter dismissiveness shown toward the jurisdictional argument. The petition for certification submitted on behalf of the defendant focused mainly on criminal equity,[35] so it was disheartening when the New Jersey Supreme Court's two-page opinion upholding the appellate decision did not even mention the *Hedden* position.[36]

Since *Crespo*, some material critical of the domestic violence restraining order system has been published in the United States, but it is nowhere near commensurate with the scope of the problem. *Bates* proved to be the first and last of its kind. The recent significant push-back against the Istanbul Convention outside of the United States is therefore a most welcome development.

No fan of populism, Śledzińska-Simon, in *Populists, Gender, and National Identity*, stated: "Populists are not a new species of *homo politicus*, but today they are on the rise. Today's populists represent anti-globalist and anti-elitist movements that antagonize 'real' people against the 'corrupt elite.'"[37] Somewhat more sympathetically, Marcia Pally pointed out that "[p]opulisms, on the left and right, draw on the historico-cultural background of the societies in which they occur."[38] Accordingly, "[w]hile populism may critique the idea that all is well with government, a negative judgment is grounded in longstanding expectations about government and society. Precisely because populism holds to these, it balks when they are violated."[39] Observing that 81% of evangelicals voted for Donald Trump in

---

[35]    *See* Petition for Certification on Behalf of Defendant Anibal Crespo, Crespo v. Crespo, 989 A.2d 827 (N.J. 2010) (per curiam) (No. 64519).

[36]    *See Crespo*, 989 A.2d at 828.

[37]    Anna Śledzińska-Simon, *Populists, Gender, and National Identity*, 18 INT'L J. CONST. L. 447, 447 (2020).

[38]    Marcia Pally, *Why is Populism Persuasive? Populism as Expression of Religio-Cultural History with the U.S. and U.S. Evangelicals as a Case Study*, 21 POL. THEOLOGY 393, 394 (2020).

[39]    *Id.*

2023]           *SHUTTERING THE NEW STAR CHAMBER*           209

2016,[40] Pally believes that this was "not a Faustian bargain of giving *political* support in exchange for Republican party backing on *religious* matters (abortion, gay marriage),"[41] but rather that "[e]vangelicals f[ou]nd their support for Trump in their religious principles and traditional, localist small-government-ism, which has been an important value and lesson in evangelical religio-political history."[42]

Though Muslim Turkey is currently drawing the most heat in the wake of its recent withdrawal, it can be gathered from (generally hostile) scholarly literature discussing opposition to the treaty that the opposition consists of a non-ecumenical coalition of Catholics, Orthodox Christians, evangelicals, and conservative Muslims and is driven by a populist belief that the treaty is trying to introduce the "gender ideology" of globalist elites into countries where such foreign ideas are unwelcome.[43] The force most blamed for what is portrayed as the populist backlash to the well-intentioned treaty is the Vatican and its long-standing commitment to gender essentialism.[44] The

---

[40]   *Id.* at 405.

[41]   *Id.* at 407.

[42]   *Id.* at 409.

[43]   *See, e.g.*, AGNIESZKA GRAFF & ELŻBIETA KOROLCZUK, ANTI-GENDER POLITICS IN THE POPULIST MOMENT (2022); Zuzana Očenášová, *Poison in the Juice: "Gender Ideology" and the Istanbul Convention in Slovakia*, 24 POLITICKÉ VEDY 38 (2021); Elżbieta Korolczuk & Agnieszka Graff, *Gender as "Ebola from Brussels": The Anticolonial Frame and the Rise of Illiberal Populism*, 43 SIGNS 797 (2018); *see also* Elizabeth S. Corredor, *Unpacking "Gender Ideology" and the Global Right's Antigender Countermovement*, 44 SIGNS 613 (2019) (discussing the fight of different conservative religious groups against "gender ideology" in a populist fashion and the central role played by the Vatican in this fight); Mary Anne Case, *Trans Formations in the Vatican's War on "Gender Ideology"*, 44 SIGNS 639, 640 (2019) ("While far from the only conservative religious opposition to feminism and sexual rights, the Vatican's is a long-standing and globally influential one, and . . . its links to other religious efforts along similar lines have recently grown much stronger.").

[44]   *See, e.g.*, Shaban Darakchi, *"The Western Feminists Want to Make Us Gay"*: *Nationalism, Heteronormativity, and Violence Against Women in Bulgaria in Times of "Anti-gender Campaigns"*, 23 SEXUALITY & CULTURE 1208, 1220 (2019) ("The main concepts of the anti-gender campaigns are inspired mainly by the Vatican's strategy of 'anathematization of gender' initially expressed in a letter released [to the Bishops of the Catholic Church] on May 31, 2004.") (footnote omitted) (citation omitted) (citing Mary Ann Case, *The Role of the Popes in the Invention of Complementarity and the Anathematization of Gender*, 6 RELIGION & GENDER 155 (2016)); Butler, *supra* note 13 ("In Germany and throughout eastern Europe 'genderism' is likened to 'communism' or to 'totalitarianism'. . . . [R]eactionary flames have been fanned by the Vatican, which has proclaimed 'gender ideology' 'diabolical', calling it a

Helniak Final .docx (Do Not Delete)                                    5/9/23 4:45 PM

Catholic view of gender essentialism—the concept that men and women have innate, essential natures—can be drawn from an address given in 2012 by Pope Benedict XVI to a group of Catholic Church high officials known as the Roman Curia: In contrast to the "philosophy . . . [that] sex is no longer a given element of nature that man has to accept and personally make sense of . . . [but] a social role that we choose for ourselves,"[45] Catholic

---

form of 'colonizing imperialism' . . . ."); Isobel Jane Ase Squire, *Gender Ideology and the Istanbul Convention in Bulgaria* 19 (2018), https://projekter.aau.dk/projekter/files/281553551/Istanbul_Convention_in_Bulgaria_300518.pdf) ("Repeated exploratory analysis made by many academics regarding the origins of 'gender ideology' has traced its emergence to the Vatican. . . . Further study has focused on the influences of religion and the Roman Catholic Church in the mobilisation [sic], direction and sustaining of anti-gender movements in Europe."); *see also* GRAFF & KOROLCZUK, *supra* note 43, at 5 ("The present wave of global ultraconservative activism—with its characteristic focus on the word gender—is rooted in the Vatican's opposition to gender equality policies promoted on the transnational level after the 1995 Beijing World Conference on Women. . . . [A] loose-knit cooperation of multi-denominational organizations and groups coalesced around 'traditional family values.' It gradually evolved into what [Clifford] Bob (2012) calls a 'Baptist-burqa' network, an interfaith alliance that cooperates internationally on different policy goals.") (citing CLIFFORD BOB, THE GLOBAL RIGHT WING AND THE CLASH OF WORLD POLITICS (2012)). Please further note Rebecca Sanders and Laura Dudley Jenkins' contentions (1) that political actors they identify as "patriarchal populists" see "both globalism and feminism . . . as elite intrusions on the popular will" and "build on and strengthen the work of conservative governments and organizations that previously spearheaded traditionalist attacks on women's rights, often in the name of nationalism and/or religion," (2) that "[l]ong-time state critics of international women's rights principles active in international law and global governance debates include the Vatican and its UN mission, the Holy See, which has permanent UN observer status and has provided ideological leadership for decades," and (3) that many of the states whose work the patriarchal populists draw upon "challenged non-essentialist notions of gender at the 1994 Cairo and 1995 Beijing conferences and related follow-up meetings." Rebecca Sanders & Laura Dudley Jenkins, *Control, Alt, Delete: Patriarchal Populist Attacks on International Women's Rights*, 11 GLOBAL CONTITUTIONALISM 401, 407–08 (2022) (citations omitted).

[45]     Jonathan Heaps & Neil Ormerod, *Statistically Ordered: Gender, Sexual Identity, and the Metaphysics of "Normal"*, 80 THEOLOGICAL STUD. 346, 347 n.1 (2019) (quoting Benedict XVI, Address of His Holiness Benedict XVI on the Occasion of Christmas Greetings to the Roman Curia (Dec. 21, 2012), *at Address of His Holiness Benedict XVI on the Occasion of Christmas Greetings to the Roman Curia*, VATICAN PUBL'G HOUSE (2012), https://www.vatican.va/content/benedict-xvi/en/speeches/2012/december/documents/hf_ben-xvi_spe_20121221_auguri-curia.html).

gender essentialism is "the idea that [people] have a nature, given by their bodily identity, that serves as a defining element of the human being."[46]

The opposition to the Istanbul Convention, which is mainly in Central and Eastern Europe, shows that a populist movement in the United States against domestic violence restraining order schemes might be successful, but in its form, it would be markedly different. Taking into account "the Vatican's decades-long, worldwide, multifront war on what it has come to call 'gender ideology,'"[47] University of Chicago law professor Mary Ann Case averred that the way in which what she called "the pathogen of anti-'gender ideology' will grow on American soil remains to be seen,"[48] noting that "[u]p to now it seems to have little connection to populist movements in the United States."[49] Populism draws upon long-standing traditions in a particular area. Therefore, unlike in Central and Eastern Europe, where Catholicism and Orthodox Christianity dominate, successful opposition to the American laws would probably be led by evangelicals. After all, evangelicals dominate much of the areas of America that would be receptive to the message that liberal "elites," under the guise of promoting an unquestionable good, i.e., the prevention of domestic violence, have subverted traditional due process safeguards[50] and, in the process, promoted the destruction of parent–child relationships.[51]

---

[46]     *Id.*

[47]     Case, *supra* note 43, at 640.

[48]     *Id.* at 656.

[49]     *Id.*

[50]     Benjamin V. Madison, II, a law professor at Regent University, "a Christ-centered institution . . . [whose] Board of Trustees, along with the faculty and staff . . . , is committed to an evangelical interpretation and application of the Christian faith," *What Religion is Regent University?*, COLORS N.Y. (July 20, 2019), https://colors-newyork.com/what-religion-is-regent-university/, has argued that although accused terrorist detainees do not have to be provided a "lay jury," military tribunals must "provide trials consistent with the transcendent values on which our nation was founded." Benjamin V. Madison, III, *Trial by Jury or by Military Tribunal for Accused Terrorist Detainees Facing the Death Penalty? An Examination of Principles that Transcend the U.S. Constitution*, 17 U. FLA. J.L. & PUB. POL'Y 347, 428 (2006).

[51]     *See, e.g.*, Daniel K. Williams, *Parental Rights: Conservative Evangelicals' Approach to Protecting Children in the 1970s*, 45 FIDES ET HISTORIA 69, 69 (2013) ("Conservative evangelicals' campaign [of the 1970s] to protect children was . . . a campaign to free parents from the regulatory power of the liberal state and give parents the authority to shape the values of their own children.").

Helniak Final .docx (Do Not Delete)                                        5/9/23 4:45 PM

212            *LIBERTY UNIVERSITY LAW REVIEW*            [Vol. 17:2

Georgetown University professor John Hasnas has contended that typically "people . . . regard[] the law as a body of definite, politically neutral rules amenable to an impartial application,"[52] but in fact, "[t]he way one interprets the rules of law is always determined by one's underlying moral and political beliefs"[53] Accepting Hasnas' position as true, there is, thankfully, an approximate model that can offer guidance—the labor movement's fight, ultimately successful, in the late nineteenth and early twentieth centuries against the use of injunctions that thwarted labor strikes and thereby hurt working class Americans on behalf of the favored few, that is, the elite.

## II. BACKGROUND

*"Up to now, America has not been a good milieu for the rise of a mass movement. What starts out here as a mass movement ends up as a racket, a cult, or a corporation."*[54]

- Eric Hoffer

To combat the crimes collectively known as domestic violence, so-called orders of protection can be obtained in every jurisdiction of the United States.[55] The first civil protection order statute in the nation, the District of Columbia Intrafamily Offenses Act, was passed by the U.S. Congress on July 29, 1970.[56] However, in the late 1960s when the spark for the nation's domestic violence restraining order system—the battered women's movement—began to enter the national stage, the crusade against domestic violence was, in the words of Elizabeth M. Schneider, "an outsider movement, a grassroots movement that developed from the civil rights and

---

[52]  John Hasnas, *The Myth of the Rule of Law*, 1995 WIS. L. REV. 199, 200 (1995).

[53]  *Id.* at 210–11.

[54]  WILLIAM A. BECKHAM, THE SECOND REFORMATION: STAGE 2 99 (2014) (quoting ERIC HOFFER, THE TEMPER OF OUR TIME 50 (1976)).

[55]  Julia Henderson Gist, Reducing Intimate Partner Violence Against Women: Evaluating the Effectiveness of Protection Orders 12 (May 2000) (Ph.D. dissertation, Texas Woman's University) (ProQuest).

[56]  Tamara L. Kuennen, "*No-Drop*" *Civil Protection Orders: Exploring the Bounds of Judicial Intervention in the Lives of Domestic Violence Victims*, 16 UCLA WOMEN'S L.J. 39, 47 n.26 (2007).

2023]          *SHUTTERING THE NEW STAR CHAMBER*          213

feminist movements of the 1960s."[57] With many feminists viewing domestic violence as "the product of patriarchy, as male control over women," the state was seen by many in the battered women's movement "as maintaining, enforcing, and legitimizing male violence against women, not remedying it."[58] "[S]keptical of an affirmative role for the state," many "rejected the idea that battered women activists ought to trust the state, expect much from the state, or engage with the state in any way."[59] Consequently, "[t]he movement developed shelters, safe houses, and alternative institutions. Groups rejected governmental funding for battered women's services and programs."[60]

As law professor Jane Murphy explained, what was begun by die-hards distrustful of the government came to be "dominated by lawyers, elected officials and courts. The work shifted from establishing shelters, safe houses, and hotlines to drafting legislation, lobbying elected officials, and litigating cases to create and expand legal protections for battered women."[61] In the mid-'70s, Pennsylvania passed the Pennsylvania Protection from Abuse Act following the passage of a domestic violence restraining order statute in New York.[62] Activist Susan Kelly-Dreiss recalls in a memoir of sorts that Pennsylvania's law, "although not technically the first restraining order law, rapidly became the model for domestic violence restraining order laws through the country. . . . "[63] Janice Grau, Jeffrey Fagan, and Sandra Wexler provided extra precision on this point: "After

---

[57]     Jane C. Murphy, *Engaging With the State: The Growing Reliance on Lawyers and Judges to Protect Battered Women*, 11 Am. U. J. Gender, Soc. Pol'y & L. 499, 500 (2003) (quoting Elizabeth M. Schneider, Battered Women & Feminist Lawmaking 182 (2000)).

[58]     *Id.* at 500–01 (quoting Schneider, *supra* note 57, at 182).

[59]     *Id.* at 500, 501 (quoting Schneider, *supra* note 57, at 182).

[60]     *Id.* at 501 (quoting Schneider, *supra* note 57, at 182).

[61]     *Id.*

[62]     *See* Margaret Klaw & Mary Scherf, *Feminist Advocacy: The Evolution of Pennsylvania's Protection from Abuse Act*, 1 Hybrid 21, 22 (1993); Act of Oct. 7, 1976, No. 218, 1976 Pa. Laws 1090 (repealed 1990); *see also* Protection from Abuse Act, No. 2029, 1990 Pa. Laws 111.

[63]     Susan Kelly-Dreiss, *A Retrospective: The Nation's Landmark Restraining Order Law and First State Domestic Violence Coalition*, 7 Fam. & Intimate Partner Violence Q. 275, 279 (2015).

214          *LIBERTY UNIVERSITY LAW REVIEW*          [Vol. 17:2

1976, passage of the Pennsylvania Protection from Abuse Act provided the stimulus for the enactment of similar legislation in 31 states."[64]

In 1992, in *State Codes on Domestic Violence: Analysis, Commentary and Recommendations*, Barbara Hart analyzed the civil protection codes then in effect in every state as well as the District of Columbia.[65] Using language presumptive of guilt, she expressed the conclusion that they generally "authorize orders restraining the defendant from future acts of domestic violence, orders granting exclusive possession of the victim's residence to the victim and/or eviction of the perpetrator, orders awarding temporary custody to the non-abusing parent, orders for spousal or child support and stay-away or no-contact orders."[66] She concluded as well that in thirty-one jurisdictions, violations of the orders could be considered civil contempt and, in twenty-one, criminal contempt.[67] While it is beyond the scope of this article to parse out the nuances of each code, it seems fair to say that the dangers of criminal equity in the family court are faced by a great number of Americans.[68]

A.    *Criminal Equity*

> *The right to a jury trial, in the Anglo-American tradition, has its roots in the effort to provide a mechanism to promote impartial decision-making by providing a buffer between judges and parties. From its heritage as one of the key provisions in [the] Magna Carta to the founding of the American Republic, the jury has been a primary tool for offsetting the fallibility of human nature in decision-*

---

[64]   Janice Grau, Jeffrey Fagan & Sandra Wexler, *Restraining Orders for Battered Women: Issues of Access and Efficacy*, *in* Criminal Justice Politics and Women: The Aftermath of Legally Mandated Change 13, 14 (Claudine SchWeber & Clarice Feinman eds., 1985).

[65]   Barbara J. Hart, *State Codes on Domestic Violence: Analysis, Commentary and Recommendations*, 43 Juv. & Fam. Ct. J. 3, 5 (1992).

[66]   *Id.* at 15.

[67]   *Id.* at 20.

[68]   Though "[r]eliable data on the rate of abuse by plaintiffs is difficult to obtain, . . . [t]o argue that, despite the enormous opportunities presented to a would be plaintiff, no one would choose to misuse the summary processes afforded by the courts is at best naive and at worst disingenuous." Peter Slocum, *Biting the D.V. Bullet: Are Domestic-Violence Restraining Orders Trampling on Second Amendment Rights?*, 40 Seton Hall L. Rev. 639, 665–66 (2010).

2023]          *SHUTTERING THE NEW STAR CHAMBER*          215

> *making—protecting persons against bias, prejudice, and*
> *other of the less noble qualities of human nature.*[69]

> - Benjamin V. Madison, III

In 1947, the legal historian F. W. Maitland remarked: "Since the destruction of the Star Chamber we have had no criminal equity. . . ."[70] As detailed below, Mailand was wrong. Not only have we had criminal equity in the past, we have it now in the realm of domestic violence,[71] a sad circumstance that prompted political scientist Stephen Baskerville to pronounce:

> Rhetorically, advocacy groups . . . emphasize that domestic violence is a "crime." Yet . . . domestic violence is often adjudicated not as a criminal but as a civil matter. Because of this distinction of words, the civil liberties protections that are guaranteed by the Constitution to all Americans accused of crimes are simply deemed, without further explanation, not to apply.[72]

In 1930, Forrest Revere Black, a law professor at the University of Kentucky, wrote:

> Two centuries ago, Lord Hardwicke declared that " . . . the fears of mankind, though they may be reasonable ones, will not create a nuisance". [sic] We submit that this is a sound statement of what the law ought to be, but Lord Hardwicke was not acquainted with the type of modern legislator that believes that morality can be created by law and that it is possible to pass a law and save a soul. To those of this persuasion, there is nothing unusual in the statutory expansion of criminal equity even in cases where conviction at law and abatement would be equally effective.

---

[69]   Benjamin V. Madison, III, *Color-Blind: Procedure's Quiet But Crucial Role in Achieving Racial Justice*, 78 UMKC L. REV. 617, 656–57 (2010).

[70]   Peter C. Hennigan, *Property War: Prostitution, Red-Light Districts, and the Transformation of Public Nuisance Law in the Progressive Era*, 16 YALE J.L. & HUMAN. 123, 133 n.50 (2004) (quoting F. W. MAITLAND, EQUITY: A COURSE OF LECTURES 19 (1947)).

[71]   *See* BASKERVILLE, *supra* note 31, at 13–18.

[72]   *Id.* at 12.

216             *LIBERTY UNIVERSITY LAW REVIEW*             [Vol. 17:2

'Tis the fear of juries which haunts them, and motivated by
this fear they are interested only in results.[73]

A good example of the fear of juries that Black spoke of is found in a
1997 law review article by law professor Virginia E. Hench:

> Under present law, a first offense of abuse of family and
> household members without serious physical injury is
> classified as a full misdemeanor, carrying a possible one
> year jail sentence, which automatically triggers the
> constitutional right to a jury trial under both the Hawai'i
> and United States Constitutions. Defendants charged under
> the present law ask for jury trials because jury trials are
> inherently more expensive and time-consuming than
> bench trials. With *forty to fifty new cases coming into the
> system weekly, courts quickly become backlogged, resulting
> in as* many as one-third of those charged with abuse of
> family and household members having their cases
> dismissed before trial because of the courts' backlogs. In 92
> percent of the cases that do go to trial, the jury acquits the
> defendant, in part because juries in domestic violence cases
> tend to blame the victim and exonerate the attacker. (This
> is in stark contrast with other criminal cases, in which
> roughly 90 percent of those charged are convicted).
>
> Simple mathematics tell a shocking story: under our
> present misdemeanor law, of 100 men arrested for
> misdemeanor household violence, 66 will go to trial, and 61
> will be acquitted. With such a high probability of acquittal
> at trial, few plead guilty. For every 100 arrests resulting in
> charges filed, we bear the burden of 66 jury trials to get five
> convictions. The five who are convicted will be sentenced
> to approximately 48 hours. Most of those who are
> sentenced will have served that time during their initial
> pre-trial detention, so they will walk out of the courtroom
> free and clear. This is not the fault of the courts. The

---

[73]   Black, *supra* note 30, at 412 (footnotes omitted).

> problem is simply that the sentencing range for a first
> offense is set at a level that triggers the right to jury trial.[74]

The article does not consider the radical notion of juries functioning within
an otherwise politicized legal system to protect innocent defendants from
overzealous prosecution. Instead, individuals presumed guilty of domestic
violence are deemed even worse for insisting on their constitutional right to
a jury. Reading into Hench's text, one senses frustration at relics of a less
progressive age, i.e., juries, standing in the way of the savior state working
its magic.

Perceiving that "[t]here seems to be a wide-spread belief that courts of
equity, through the injunctive process, have a mysterious power capable of
preventing acts in some manner other than by fear of the penalties
attending the violation of an injunction,"[75] Black offered as an example a
California case involving an injunction that ordered:

> the Industrial Workers of the World and various parties
> known and unknown . . . to refrain from conspiring to
> injure or damage property in the state, or to circulate books
> and pamphlets teaching criminal syndicalism, sabotage, or
> the destruction of property for the purpose of taking over
> industry, or from organizing or aiding to organize or
> increase any society or association of persons which
> advocates criminal syndicalism.[76]

A man arrested for violating the injunction, with "[t]he only definite
charge . . . that of procuring new members for the I. W. W.," was fined for
contempt.[77] After he was "imprisoned for non-payment," he "sought release
from custody by *habeas corpus* on the ground that the acts forbidden by the
terms of the injunction were the precise acts which are denounced as a
felony by the provisions of the law"[78] and that "the sole purpose and effect
of the injunction were to take away from one charged with the commission

---

[74]   Virginia E. Hench, *When Less is More—Can Reducing Penalties Reduce Household
Violence?*, 19 U. Haw. L. Rev. 37, 39–41 (1997) (footnotes omitted).

[75]   Black, *supra* note 30, at 416.

[76]   *Id.* at 417–18.

[77]   *Id.* at 418.

[78]   *Id.*

218                     *LIBERTY UNIVERSITY LAW REVIEW*                 [Vol. 17:2

of this particular crime his rights to a trial by jury."[79] However, "the right to invoke the powers of equity" was upheld.[80] The court "declared that the mere arrest and punishment of the petitioner would not afford adequate protection to the property of citizens from threatened injury and destruction."[81] This inadequate protection was because "the remaining members of the conspiracy would be left at large to carry on their criminal activities, together with the twenty-four new members who had been procured by petitioner in contemptuous violation of the injunction."[82] As Black pointed out, contrary to the court's at least implicit belief, "the practical effectiveness of [labor] injunctions ha[d] been greatly overestimated."[83] After all, "[i]t is only through arrest and punishment for contempt after violations have occurred that injunctions can be enforced. There is no necessity for enjoining a threatened murder; the penalty and police protection afforded by the criminal law are just as preventive as any injunction."[84] Anticipating Erdogan's defense of Turkey's decision to rely on local laws to protect women against domestic violence noted at the beginning of this article, Black concluded: "The most drastic, severe, and permanent of all injunctions against violence is the penal law."[85]

Taking a stand against what he saw in 1930 as "the expansion of criminal equity,"[86] Black warned:

> It should be noted first of all that [it] affords a "handy detour" around other constitutional provisions than that of jury trial. Considering the problem from the standpoint of the federal Constitution as it limits federal courts, the following constitutional safeguards are removed in all cases where the defendant is dealt with by the injunctive process rather than by criminal proceedings: (1) jury trial; (2) indictment by grand jury; (3) that the accused shall enjoy

---

[79]   *Id.*

[80]   *Id.*

[81]   Black, *supra* note 30, at 418.

[82]   *Id.*

[83]   *Id.* at 419.

[84]   *Id.*

[85]   *Id.*

[86]   *Id.* at 414.

the right to a speedy and public trial; (4) to be informed of the nature and cause of the accusation against him; (5) to be confronted with witnesses against him; (6) to have compulsory process for obtaining witnesses in his favor; (7) to have the assistance of counsel for his defense. It should be understood that we are discussing constitutional safeguards. It may be that in fact many of these safeguards are provided in equity proceedings either by virtue of statute or equitable rule, but if so, they are subject to change. They do not have a constitutional status.[87]

According to Peter C. Hennigan, author of *Property War: Prostitution, Red-Light Districts, and the Transformation of Public Nuisance*, "[p]rior to 1641, equity had exercised criminal jurisdiction in the Court of Star Chamber."[88] The Star Chamber's "rules of procedure . . . were the same as those used in the Court of Chancery—defendants were brought to court by a writ of subpoena, the Court was empowered to examine them, and facts were ascertained by the examination of the accused and witnesses."[89] Additionally, "[p]roceedings were tried summarily and there was no need for a grand jury or jury trial."[90] Although "initially popular, . . . by the seventeenth century it had become an increasingly unpopular enforcer of

---

[87]   Black, *supra* note 30, at 414 (footnotes omitted). In this vein, in what has been called "[t]he most famous diatribe on the juveline system," the dissenting opinion in a Pennsylania case regarding the constitutionality of The Juvenile Court Law of June 2, 1933, (in which bench proceedings to adjudicate delinquency were viewed as civil, not criminal, and hearsay was permitted), Justice Michael Angelo Musmanno pointed out that "no matter how trained and experienced a Juvenile Court judge may be, he cannot by any magical fishing rod draw forth the truth out of a confused sea of speculation, rumor, suspicion and hearsay. He must follow certain procedures which the wisdom of centuries have established." Karen L. Atkinson, *Constitutional Rights of Juveniles: Gauly and Its Application*, 9 Wm. & Mary L. Rev. 492, 496 (1967) (*quoting In re Holmes*, 109 A.2d 523, 529 (1954), *cert. denied*, 348 U.S. 973 (1954)). It is worth noting that, in the opinion, Justice Musmanno favorably quoted the *Hedden* decision for the following proposition: "'It is idle to entertain the thought for a single moment that the legislature can change the nature of an offense by changing the forum in which it is tried.'" *In re Holmes*, 109 A.2d at 529 (Musmanno, J, dissenting) (citation omitted).

[88]   Hennigan, *supra* note 70, at 133 n.49.

[89]   *Id.*

[90]   *Id.*

220                 *LIBERTY UNIVERSITY LAW REVIEW*                 [Vol. 17:2

state proclamations and was viewed as an engine of tyranny in the hands of the Stuart monarchy."[91]

Following the dissolution of the Star Chamber in England, "[i]n the United States, the abolition of criminal equity was made permanent in the Sixth Amendment, which entitles the accused in criminal prosecutions to a trial by jury."[92] Per Hennigan:

> The practical impact of the abolition of criminal equity meant that as long as the remedy at law was considered adequate to address the plaintiff's injury, equity would not interfere. . . . When confronted with attempts to revive criminal equity, courts could rely upon a well-developed line of argumentation that had its origins in the historical experience with the Court of Star Chamber:
>
> "The objections to 'criminal equity' are that it deprives the defendant of his jury trial; that it substitutes for the definite penalties fixed by the Legislature whatever punishment for contempt a particular judge may see fit to exact; that it is often no more than an attempt to overcome by circumvention the supposed shortcomings of jurors; and that it may result, or induce the public to believe that it results, in the arbitrary exercise of power and in 'government by injunction.'"[93]

A 1987 decision by the United States District Court for the Eastern District of Wisconsin represents a clear line of precedent repudiating criminal equity. The court stated that "one of the principles of our jurisprudence is that 'equity will not enjoin a crime.'"[94] However, already in 1884, an *American Law Review* publication observed that "[t]here are really many cases in which the jurisdiction of a court of equity to protect property

---

[91]   *Id.*

[92]   *Id.* at 133.

[93]   *Id.* at 133–34 (footnote omitted) (quoting Commonwealth v. Stratton Fin. Co., 38 N.E. 640, 643 (Mass. 1941)).

[94]   W. Allis Mem'l Hosp., Inc. v. Bowen, 660 F. Supp. 936, 939 (E.D. Wis. 1987).

2023]        *SHUTTERING THE NEW STAR CHAMBER*                221

or other rights by injunction is not ousted by the fact that the thing complained of incidentally involves the commission of a crime."[95]

Holly J. McCammon discerned that, beginning in the late 1880s, "strikes in the railroad industry . . . , particularly the Pullman strike of 1894, established precedent that would be applied for the next 40 odd years."[96] According to that precedent, a court of equity could issue an order enjoining "unlawful conspiracies in the restraint of trade" and then issue punishment for failure to abide by the injunction, all in the absence of a jury trial.[97] In 1932, however, "[a]fter nearly a decade of debate on the issue and in the midst of depression, . . . labor and legal reformers succeeded in persuading Congress to pass anti-injunction legislation. The Norris-LaGuardia Act barred federal courts from issuing injunctions to halt strike action."[98] Additionally, "[a] number of state legislatures passed 'little Norris-LaGuardia Acts' limiting state courts."[99]

Opposition to a similar example of criminal equity, the passage and implementation of red light abatement and liquor abatement laws, was far less successful. As Hennigan notes, "[t]he only serious challenge to the constitutionality of the Red Light Abatement laws came in New Jersey . . . [i]n *Hedden v. Hand*."[100] "Whereas most major American cities had red-light districts in 1910, by 1920 almost all of them were gone. The war against the segregated vice district had been won."[101]

Why did labor succeed against criminal equity when vice failed? A superficial explanation comes readily to mind. While both causes found support in law reviews and journals, the struggle of the American workers for better wages and working conditions is obviously more sympathetic than the plight of pimps and pushers unable to effectively peddle their respective wares. A deeper, more complete explanation is provided by legal

---

95   Seymour D. Thompson, *Injunction Against Criminal Acts*, 18 AM. L. REV. 599, 603–04 (1884).

96   Holly J. McCammon, *"Government by Injunction": The U.S. Judiciary and Strike Action in the Late 19th and Early 20th Centuries*, 20 WORK & OCCUPATIONS 174, 178–79 (1993).

97   *Id.* at 178.

98   *Id.* at 180.

99   *Id.*

100   Hennigan, *supra* note 70, at 188.

101   *Id.* at 192.

222                *LIBERTY UNIVERSITY LAW REVIEW*                [Vol. 17:2

historian William E. Forbath. Believing that "[t]he early twentieth-century labor movement's anti-injunction battles constitute a major but neglected chapter in the history of civil disobedience in America,"[102] Forbath identified that there were "thousands of editorials, speeches, and protests . . . by trade unionists" about what they viewed as "judge-made law."[103] For example:

> In Denver, . . . to protest an equity judge's jailing of sixteen miners for one year sentences, the city's trade unions mounted a "monster" march on the State capitol building. "We had more than 19,000 people in the parade . . . six bands and more than 200 banners," an organizer reported. The banners bore such inscriptions as "We do not believe in judge-made laws," "Who's afraid?," "O justice, what crimes are committed in thy name," "Liberty is in the air, and insurgency is in the saddle," and "Government by injunction must go."[104]

In accord, labor leader John Mitchell wrote in his 1903 book *Organized Labor*:

> [W]hen an injunction . . . forbids the doing of a thing which is lawful, I believe that it is the duty of all patriotic and law-abiding citizens to resist . . . . It is better that half of the workingmen of the country remain constantly in jail than that trial by jury and other inalienable and constitutional rights . . . be . . . nullified.[105]

Moreover, "'[c]ontempt of court,' [labor leader Samuel] Gompers proclaimed, was 'obedience to the law.'"[106]

---

[102]   William E. Forbath, *The Shaping of the American Labor Movement*, 102 HARV. L. REV. 1109, 1214 n.476 (1989).

[103]   *Id.* at 1202.

[104]   *Id.* at 1214 n.476 (citing *Report of Benjamin F. Perry from Denver, Colorado*, 23 MACHINISTS' MONTHLY J. 269, 269 (1911)).

[105]   *Id.* at 1215 (citation omitted) (quoting JOHN MITCHELL, ORGANIZED LABOR 336 (1903)).

[106]   *Id.* at 1215–16.

As Forbath noted, "[a]lternative constitutional interpretations can be left in the margins. Large numbers of people committed to those interpretations in the face of state violence and prison terms[, however,] are harder to ignore."[107] On occasion, "only the latter kind of tenacity can test and undermine the political elite's commitment to an existing order. From the 1900's through the 1920's, a widening campaign of massive and articulate defiance of the courts helped the labor movement win support for its exiled constitutional claims."[108]

Additionally, in what could be described as an emerging polycentric legal order,[109] labor activists "promulgated rules of workers' controls which they dubbed 'laws.'"[110] According to Forbath, "[l]abor had . . . erected itself as a rival law-maker, challenging the courts' and the state's normative authority,"[111] and "[j]udges shrewdly understood [the threat] that trade unionists presented . . . to the courts' definition of law and order, insofar as they believed that their unions stood for an alternative, and truer, 'legal' order."[112] They "realized that such 'higher law' thinking on labor's part did much to embolden workers to act in defiance of the state."[113]

As the battle of wills between the courts and labor intensified, "increasing defiance of increasingly frequent injunctions made sustained legal and constitutional arguments and protests an ever more common accompaniment of strikers' arrests. Such protests demonstrated that

---

[107]  *Id.* at 1214.

[108]  Forbath, *supra* note 102, at 1214.

[109]  David VanDrunen, the Robert B. Strimple Professor of Systematic Theology and Christian Ethics at Westminster Seminary California, pointed out that in contrast to the dominant monocentric point of view, "polycentrism holds that there are multiple sources of law, of which state sources are (at most) one, and perhaps not even the most important." David VanDrunen, *Legal Polycentrism: A Christian Theological and Jurisprudential Evaluation*, 32 J.L. & Religion 383, 386 (2017). "To [his] knowledge, . . . no contemporary writer has examined polycentrism from a Christian theological perspective." *Id.* at 384. He contended that "from important biblical-theological considerations, . . . polycentrism is a more satisfactory view of law than a monocentrist conception." *Id.* at 405. He also noted that it "has some affinities with classical natural-law theory," so it seems to be compatible with the Christian natural law tradition. *Id.* at 386.

[110]  Forbath, *supra* note 102, at 1154.

[111]  *Id.*

[112]  *Id.*

[113]  *Id.* (footnote omitted).

224              *LIBERTY UNIVERSITY LAW REVIEW*              [Vol. 17:2

workers found the judge-made rules of the game not merely inconvenient but illegitimate."[114] As a consequence, "[l]awmakers and reformers laid at the courthouse door a growing part of the blame for the ungovernability of the American industrial order."[115] In 1932, historical conditions associated with the mobilization of working-class immigrants and the Great Depression "combined with the . . . disrepute of the old labor law regime to produce . . . remarkably broad support [of] the Norris and LaGuardia anti-injunction bills . . . when they finally reached the Senate and House floors."[116] In the House, the vote was 362 to 14.[117] In the Senate, the vote was 75 to 5.[118]

B.      *Opposition to the Istanbul Convention*

In *Gender, Violence and Human Rights*, University of Melbourne's Dianne Otto notes that "[i]n Europe, widespread opposition to the Istanbul Convention has emerged . . . in Poland[,] . . . Bulgaria, the Czech Republic, Croatia, Denmark, Estonia, Hungary, Latvia, Lithuania, Romania, Slovenia and Ukraine."[119] Indeed, as part of what the Carnegie Endowment for International Peace's Saskia Brechenmacher called "[g]rowing pushback"[120] to the convention that she believes "reflects the success of a broader transnational movement that has spread across Europe, Latin America, and other parts of the world over the past decade . . . [that] see[s] [it]sel[f] in a global battle against . . . 'genderism' or 'gender ideology.'"[121] In 2018, three years before Turkey's withdrawal, the ratification of the treaty was declared unconstitutional by the Bulgarian Constitutional Court; Slovakia and Hungary's legislatures declined to ratify the convention in November 2019

---

[114]    *Id.* at 1214.

[115]    *Id.* at 1214–15.

[116]    Forbath, *supra* note 102 at 1231.

[117]    *Id.*

[118]    *Id.*

[119]    Dianne Otto, *Gender, Violence and Human Rights*, *in* HANDBOOK ON GENDER AND VIOLENCE 357, 371 (Laura J. Shepherd ed., 2019).

[120]    Saskia Brechenmacher, *Why Are Governments Weakening Protections Against Domestic Violence?*, CARNEGIE ENDOWMENT FOR INT'L PEACE (Sep. 01, 2020), https://carnegie endowment.org/2020/09/01/why-are-governments-weakening-protections-against-domestic-violence-pub-82632.

[121]    *Id.*

2023]          *SHUTTERING THE NEW STAR CHAMBER*          225

and May 2020, respectively; and, in July 2020, Polish Prime Minister Mateusz Morawiecki requested that Poland's Constitutional Tribunal opine upon the treaty's constitutionality.[122] As explained by Dr. Anna Śledzińska-Simon of the University of Wrocław, Poland, the populists' "main objection concentrates on the non-binary concept of gender on which the Convention is based and the obligation of state parties to change social and cultural norms concerning the roles of men and women."[123] Accordingly, "the Bulgarian Constitutional Court ruled that the ratification of the Istanbul Convention is unconstitutional because it promotes a concept of gender which is contrary to the clear distinction between biological males and females under Bulgarian law."[124]

III. ANALYSIS

> *[C]ivil libertarians should be alarmed by domestic violence law. A criminal act—domestic violence—is relabeled a civil offense, thereby stripping the defendant of all the protections available to criminal defendants. The "defendant" is summarily "convicted" and then pays a fearsome price: instant eviction, loss of access to and control of his assets, and enforced separation from his children.*[125]
>
> - Ned Holstein

According to Massachusetts attorney Gregory A. Hession, "[t]he restraining-order laws of the several states are remarkably similar in their wording, as though an invisible hand were guiding them."[126] One week after an initial secret hearing in which a petitioner obtains a temporary

---

[122]    *See id.*; Ben Koschalka, *Polish Tribunal to Examine Constitutionality of Treaty Against Domestic Violence*, NOTES FROM POL. (July 31, 2020), https://notesfrompoland.com/2020/07/31/polish-tribunal-to-examine-constitutionality-of-treaty-against-domestic-violence/.

[123]    Śledzińska-Simon, *supra* note 37, at 451.

[124]    *Id.*

[125]    Robert Franklin, *Holstein in Lawyers Weekly: 'Restraining Orders Are Used to Keep Innocent Men from Their Kids'*, NPO IN THE MEDIA (May 18, 2009), https://sharedparenting.com/holstein-in-lawyers/. Edwin "Ned" Holstein is a physician and the chairman of the National Parents Organization.

[126]    Gregory A. Hession, *Restraining Orders Out of Control*, NEW AM. (July 28, 2008), https://thenewamerican.com/restraining-orders-out-of-control/.

226           *LIBERTY UNIVERSITY LAW REVIEW*                [Vol. 17:2

restraining order, "a 'return' hearing is held, where the defendant gets to tell his side of the story. He is usually allowed to present evidence and testimony, but it is often difficult to assemble needed documents and witnesses in that short period."[127] Hession gives the experience of his client Mr. L as an example of the due process a defendant can expect.[128] Hession filed a motion to vacate a restraining order, and Mr. L's ex-wife filed a motion to extend it. Here is the pertinent part of the actual transcript of the hearing to vacate the order:

> **Mr. Hession:** Can you please state your name and your address for the record? [The Court argues with counsel as to whether Mr. L can testify.]

> **The Court:** I don't believe I need to hear any evidence from your client. I'm going to deny your request to vacate the restraining order.

The hearing on whether to extend the order was no better:

> **The Court:** Mrs. L_____, do you remain fearful of your husband?

> **Mrs. L_____:** Yes. [Weeping]

> **The Court:** Thank you.

The judge then extended the restraining order for a year without Mr. L uttering his name on the witness stand and with one generalized question to the wife about "fear."[129]

"Restraining orders," in Hession's opinion, "especially impact the children. These orders are frequently used as a quick and dirty custody hearing, without the trouble of going to family court. In one minute, the father can lose the right to see his children for a year or longer."[130] Meanwhile, "children often have no understanding of why they are being kept from their father because the father cannot even speak to them."[131]

---

[127]   *Id.*

[128]   *Id.*

[129]   *Id.*

[130]   *Id.*

[131]   *Id.*

And, "[w]hile judges certainly know that falsely obtained orders are pervasive, they care little for the well-being of the children who are harmed by losing their father for long periods."[132]

Citing *Erring on the Side of Hidden Harm,* the authors of *Real World Divorce* bolster Hession's opinion:

> The journal article notes that new judges are urged by trainers to be "cautious" where cautious means to grant orders: "It'll be the one time that you don't grant the restraining order that you'll be tomorrow's headlines." A judge is quoted telling a defendant "If I have to make a mistake I have to make a mistake in favor of safety . . . and if I make a mistake that's going to hurt somebody, I'll never forgive myself." The head of the Massachusetts Bar Association was quoted in 1993 saying that restraining orders are granted to "virtually all who apply, lest anyone be blamed for an unfortunate result." What's the "hidden harm" of the title that judges don't worry about? That is the suffering of a child who is separated from a defendant parent for months or years, depending on how slowly a state's courts work, based on a false allegation. Attorneys interviewed confirmed the paper's perspective on the insignificance of the hidden harm: "Nobody in the system cares if a child doesn't see her father for a couple of years," was a typical summary.[133]

Capital Research Center's Michael Volpe's exposé, *The Violence Against Women Act and the War for Tax Dollars*, revealed a web of state officials and their cohorts financially incentivized to label fathers as abusers and separate them from their children; this includes fees for useless "therapy" and funding through the VAWA.[134] Consider, for example, the case study of

---

[132]    Hession, *supra* note 126.

[133]    ALEXA DANKOWSKI ET AL., REAL WORLD DIVORCE: CUSTODY, CHILD SUPPORT, AND ALIMONY IN THE 50 STATES 111 (2017) (ebook) (citing David N. Heleniak, *Erring on the Side of Hidden Harm: The Granting of Domestic Violence Restraining Orders*, 1 PARTNER ABUSE 220 (2010)).

[134]    *See* Michael Volpe, *The Violence Against Women Act and the War for Tax Dollars,* CAP. RSCH. CTR. (2016), https://capitalresearch.org/app/uploads/OT0416.pdf.

228                *LIBERTY UNIVERSITY LAW REVIEW*                [Vol. 17:2

Ronald Pierce presented by Volpe. At the time of his divorce in 2008, Pierce had three kids and a $200,000 home in Tulare County, California.[135] During the course of the marriage, both he and his wife committed adultery.[136] "Pierce had no history of physical violence,"[137] but his wife "used a tactic in the legal battle . . . so common . . . that it . . . has a name, 'the silver bullet': She said she was scared."[138] On "[t]he same day he filed for divorce, his soon to be ex-wife filed for an emergency protective order."[139] The subsequent hearing "was a rubber stamp for the restraining order, which was renewed repeatedly for the next two years."[140] In addition:

> He was forced into a battery of services at his expense, all to be conducted at the local domestic violence shelter, Family Services of Tulare. The shelter ordered an assessment on him, his ex-wife, and their children, all at Pierce's expense, and if he didn't go along and pay, the program implied that he would be punished with denial of access to his children.
>
> When the assessment couldn't find any hint of anger issues, the shelter became creative: "I was accused of creating an 'atmosphere of abuse' because I wouldn't leave the home when she demanded it," Pierce said.
>
> "The DV [domestic violence] shelter recommended its next service be court ordered—reunification therapy. Of course the court ordered it, and for the next year and some, I attended reunification therapy as did my children—separately. We were never reunited in this therapy. Always the promise dangled out there, but never actually happened."[141]

When the price-tag for these services exceeded $10,000, he was unable to pay his rent and was forced to live out of his car.[142] "About a year and a half

---

135   *Id.* at 4–5.
136   *Id.* at 5.
137   *Id.*
138   *Id.*
139   *Id.*
140   Volpe, *supra* note 134, at 5.
141   *Id.*
142   *Id.*

2023]          *SHUTTERING THE NEW STAR CHAMBER*          229

into the process, penniless, homeless, and still with no access to his children, Pierce had had enough; he pulled records on his judge and all the financial records of all the judges in his courthouse" as well as Family Services of Tulare's tax filings.[143] "In the IRS filings, Pierce found a line item which explained the source of his problems: VAWA. Family Services of Tulare had contracted with the courthouse to provide domestic violence services for anyone deemed a victim or perpetrator by the court."[144] Out of a total revenue stream in 2009 of $2,109,647, family services brought in $1,716,138 through "violence and abuse response, prevention, and intervention grants."[145] The VAWA had "accounted for nearly all the group's grant funding that year."[146] What Pierce had found was "an insidious conflict of interest: The more cases of domestic violence identified and put through the bureaucratic process, the more grant money Family Services of Tulare County received. . . . [I]t was financially beneficial for this nonprofit to deem as many men domestic abusers as possible."[147]

Eve S. Buzawa and Carl G. Buzawa observed in *Domestic Violence: The Criminal Justice Response,* "Courts have had the power to issue injunctive decrees for many decades[,] . . . [but] [u]ntil specific domestic violence statutes were passed, . . . their use was infrequent in the context of domestic assault in that they were considered an exceptional imposition on citizenry rights."[148] In effect, the courts "required high standards of proof, often to the degree of a criminal law standard—for example, beyond a reasonable doubt that the respondent posed a threat to the complainant."[149] Additionally, they wrote in 1996, "judges, and to a lesser extent, prosecutors have tended to be process oriented. As such, they remain acutely aware of the courts' limited authority to issue prior restraints without notice and the risk of infringing on the respondent's constitutional rights."[150]

---

[143]   *Id.*

[144]   *Id.*

[145]   *Id.*

[146]   Volpe, *supra* note 134, at 5.

[147]   *Id.*

[148]   Eve S. Buzawa & Carl G. Buzawa, Domestic Violence: The Criminal Justice Response 187 (James A. Inciardi ed., 2d ed. 1996).

[149]   *Id.*

[150]   *Id.*

In 1997, a few years before *Crespo* was decided, the New Jersey Appellate Division vacated a restraining order based on terroristic threats and harrassment and stated: "While terroristic threats and harassment are crimes, the thrust of the [Prevention of Domestic Violence] Act is to somehow transmogrify those crimes into some lesser offense not a 'crime,' but nonetheless with potential serious penal consequences, when the victim signs the complaint."[151] The Act, the court continued, "effectively requires what might otherwise be criminal acts to be then treated as if born of a civil cause of action and under the burden of proof standard for civil cases, *i.e.*, a preponderance of the evidence, rather than proof beyond a reasonable doubt as in criminal cases."[152] In other words, "domestic violence complaints signed by non-law enforcement officers, *i.e.*, persons claiming to be victims, and alleging what are criminal acts, [are treated] as something other than a criminal offense and directs the use of the lesser burden of proof of preponderance of the evidence,"[153] resulting in the "circumvent[ion] [of] the protections normally accorded an accused in a criminal case, including the right to a jury trial."[154] Since the Appellate Division found error in the trial court's fact-finding, it did not rule on the constitutionality of the Act, but stated instead that "[a] closer examination of the Act and whether the Legislature can properly make what would be a criminal act for some, an act not criminal for others, perhaps even depending on who signs the complaint, and whether this implicated constitutional issues, are left for another case."[155]

In reversing the appellate court's decision, the New Jersey Supreme Court did not see the need to address the constitutional issues raised at the appellate level even though, having restored the trial court's findings of fact, they were no longer merely academic.[156] In *Crespo*, at the trial level, Judge Schultz declared:

---

[151] Cesare v. Cesare, 694 A.2d 603, 608 (N.J. Super. Ct. App. Div. 1997) (footnote omitted), *rev'd on other grounds*, 713 A.2d 390 (N.J. 1998).

[152] *Id.* (citation omitted).

[153] *Id.* (footnote omitted).

[154] *Id.*

[155] *Id.*

[156] *See* Cesare v. Cesare, 713 A.2d 390 (N.J. 1998).

> [I]t is important to acknowledge that the Appellate Division . . . briefly addressed the jurisdictional problems posed by the apparent anomaly of the [Act], which treats domestic violence complaints signed by alleged victims (as opposed to law enforcement officers), and claiming criminal acts, as something other than a criminal offense with potential serious penal consequences and directs the use of a civil standard of proof. . . . The [Act] requires a law enforcement officer to file a *criminal* complaint, whereas if an alleged victim files a domestic violence complaint based on the same incident of domestic violence, it is treated as if it is not a crime but as a *civil* cause of action. Nonetheless, the court decided the matter before it on other grounds and left for another case a closer examination of the constitutional issues implicated by the [Act]. This is that case.[157]

In view of Judge Schultz's emphatic assertion that *Crespo* is the case in which the jurisdictional issue recognized in 1997 would finally be addressed, the New Jersey Supreme Court's resolution of the question would have appeared conspicuously absent to anyone who carefully read the trial decision. A reasonable speculation is that the court decided to utilize the power of non-engagement, relying on "occupational prestige" to persuade the public that the Act is constitutional instead of methodically debunking any flaws that might exist in the *Hedden* argument.[158]

---

[157]   Crespo v. Crespo, No. FV-09-2682-04, slip op. at 6 (N.J. Super. Ct. Ch. Div. June 18, 2008) (citation omitted), *rev'd*, 972 A.2d 1169 (N.J. Super. Ct. App. Div. 2009), *cert. granted*, 983 A.2d 196 (N.J. 2009).

[158]   *Cf.* Slate.com's commendation of Michigan State University's tactical ignoring of a summit on creationism. While "[t]he summit's leaders were expecting an uproar," Mark Joseph Stern wrote:

> MSU's scientists . . . refused to take the bait. To debate creationism and evolution, they realized, was to imply that evolution is plausibly disputable. To ignore creationist calls for debate, on the other hand, relegates the theory to the lowest rung of evangelical pseudoscience, where it so obliviously belongs.

Mark Joseph Stern, *"It's Not Debatable": Michigan State University's Perfect Response to a Creationist Conference on Campus*, Slate (Nov. 3, 2021, 12:33 P.M.), https://slate.com/techn

As noted above, in at least one jurisdiction, Arkansas, orders of protection cannot theoretically be used to enjoin an act of abuse because the Arkansas Supreme Court has "held that an adequate remedy at law exists for spousal abuse, and since equity may not issue an order prohibiting a crime, [Arkansas's] Domestic Abuse Act impermissibly enlarged the jurisdiction of the chancery courts."[159] Unfortunately, in New Jersey, the home of *Hedden v. Hand*, the Appellate Division rejected the jurisdictional argument against New Jersey's Prevention of Domestic Violence Act in a footnote:

> Defendant has also argued that the Act improperly converts what is a criminal prosecution into a civil proceeding, damages his reputation, and interferes with his right to raise his children, to speak freely with his wife and children, and to enjoy the marital home. We find these arguments to have insufficient merit to warrant discussion in a written opinion.[160]

As Pierce's case shows, not only does the domestic violence restraining order system violate traditional American notions of due process and contribute to the destruction of parent–child relationships, it also unjustly benefits elites—in this case, divorce attorneys and the domestic violence industry. Speaking plainly, the current system is anathema to real America.

While establishment media outlets, most of academia, and the court system would not be persuaded—to put it mildly—by a message of American populist family law reform, alternative media outlets, some law reviews, certain religious institutions and think tanks, lawyers respectful of due process protections, and populist-minded politicians might be. For example, the Abbeville Institute is sympathetic to America's populist

---

ology/2014/11/michigan-state-origin-summit-the-universitys-perfect-response-to-the-creationist-conference.html. Stern gives credit to "the university's emphatic silence," because of which "the conference drew fewer that 100 attendees." *Id.*

159    Shayne D. Smith, *The Domestic Abuse Act of 1989: An Impermissible Expansion of Chancery Jurisdiction*, 13 U. ARK. LITTLE ROCK L.J. 537, 537 (1991). It is beyond the scope of this article to determine the extent to which the *Bates* precedent has been ignored in practice.

160    *Crespo*, 972 A.2d at 1177 n.7.

tradition[161] and may therefore be receptive. The Mises Institute, which recently released a Radio Rothbard podcast episode entitled *This Is Why Murray Rothbard Was a Populist*,[162] might also be a place where such a message could be amplified. Perhaps there is even a judge in the red state hinterlands that could be coaxed to follow the currently memory-holed *Bates* decision.

## IV. CONCLUSION

> *"Few lives, if any, have been saved, but much harm, and possibly loss of lives, has come from the issuance of restraining orders and the arrests and conflicts ensuing therefrom," [retired Massachusetts judge] Milton Raphaelson writes. "This is not only my opinion; it is the opinion of many who remain quiet due to the political climate. Innocent men and their children are deprived of each other."*[163]

It was not until after *The New Star Chamber* was published that the author realized that the title had been first used by Edgar Lee Masters in his 1904 book *The New Star Chamber and Other Essays*. Masters, an attorney, is best known for his 1915 book of poems, *Spoon River Anthology*.[164] *In a charming review of Jason Stacy's Spoon River America: Edgar Lee Masters and the Myth of the American Small Town, Benjamin Myers describes Spoon River Anthology as "[a]n immediate literary sensation that became a staple of high school curricula in the century following its publication."*[165] *An interesting thread Myers found* "throughout Stacy's study is the populism

---

[161]   John Devanny, *Southern Populism and the South's Agrarian Identity*, THE ABBEVILLE INST. (Sep. 2, 2019), https://www.abbevilleinstitute.org/southern-populism-and-the-souths-agrarian-identity/.

[162]   Radio Rothbard, *This Is Why Murray Rothbard Was a Populist*, THE MISES INST. (Oct. 28, 2020), https://mises.org/library/why-murray-rothbard-was-populist.

[163]   See Baskerville, *supra* note 31, at 37 (quoting Milton H. Raphaelson, *Time to Revisit Abuse Statute*, 2 W. MASS. L. TRIB. 4 (2001)).

[164]   *Edgar Lee Masters*, POETRY FOUND., https://www.poetryfoundation.org/poets/edgar-lee-masters (last visited Jan. 21, 2022).

[165]   *Benjamin Myers, Living In the Myth: A Review of Jason Stacy's Spoon River America*, FRONT PORCH REPUBLIC (July 19, 2021), https://www.frontporchrepublic.com/2021/07/living-in-the-myth-a-review-of-jason-stacys-spoon-river-america/.

Helniak Final .docx (Do Not Delete)                                        5/9/23 4:45 PM

that both shaped Masters's work and was perpetuated in the poems' long reception."[166] Throughout his life (1868-1950),[167] "Masters stayed loyal . . . to a populism that was rooted in his father's experiences during the Civil War."[168] His father, although opposed to slavery, had:

> developed Southern sympathies during the course of the war, and the poet believed throughout his life that his father being branded a "copperhead" was the cause of his family's financial struggles. . . . The Masters men, and many others in their social and financial rank, came to believe that a wealthy elite was bleeding the common man dry while attempting to force a latter-day New England puritanism on the rest of the country.[169]

Suitably, "[t]he two great villains of the *Spoon River Anthology* are the banker Thomas Rhodes and the prohibitionist A.D. Blood."[170]

In his essay *The New Star Chamber*, Masters decried the use of the labor injunction with impassioned (and populist) aplomb:

> The labor injunction is what Lord Tennyson called a "new-old revolution." It is the skeleton of the Star Chamber drawing about its tattered cerements the banner of a free people and masking its face with a similitude of the republic. The labor injunction is insidious and plausible. It speaks the language of liberty. It disarms criticism because brought into use in times of disorder; and because it avows nothing but salutary purposes. It has put itself upon such a footing that the irrelevant conclusion is drawn against its enemies that because they are opposed to it they must be opposed to law and order; while those who favor it are the friends of law and order. So that, as in many similar instances, people forget that to overthrow the law to punish a breach of the law is to meet anarchy with anarchy itself.

---

[166] *Id.*

[167] *Edgar Lee Masters*, *supra* note 164

[168] Myers, *supra* note 164.

[169] *Id.*

[170] *Id.*

Helniak Final .docx (Do Not Delete)                                      5/9/23 4:45 PM

> Why should not the lawful way already provided be followed in the punishment of wrong? The spirit which advocates the lawless labor injunction is the same essential spirit which animates the mob. The spirit cannot successfully hide itself behind the high sounding acclaims of law and order. It will be ultimately dragged to the light for every eye to see. When that time shall arrive the fact will be recognized that the same tyrannical purpose which erected the Star Chamber, turned a court of chancery into an engine of lawless power.[171]

While few can compete with the old-timey grace of Master's *The New Star Chamber*, successful populist opposition to criminal equity in the family court—which would likely be led by the evangelicals because they have a tradition of populism, are committed to traditional American concerns for due process and are located in the areas of America where opposition would most likely take hold—must possess a quality that shines through not only Master's but all of the turn of the last century's resistance to government by injunction that the author is familiar with, i.e., moral confidence.

In an early time in American history, criminal equity in the family court would have been inconceivable. Although it appears unlikely that the current powers-that-be will end the practice, a feasible path to ending it is through populist opposition. After all, opposition to the Istanbul Convention has shown that populism can have a positive effect in the face of academic and Establishment media hostility. The nation awaits the emergence of a populist coalition that sees criminal equity in the family court for what it is, evil, and mobilizes to shut it down.

---

[171]   Edgar Lee Masters, *The New Star Chamber*, *in* THE NEW STAR CHAMBER AND OTHER ESSAYS 10–11 (1904).