# THE YALE LAW JOURNAL

JEANNIE SUK

# Criminal Law Comes Home

**ABSTRACT.** Though traditionally criminal law did not reach into the home to punish domestic violence, today such intervention in the home is well accepted and steadily growing. Because we all welcome that remedial development, we have taken little notice of the legal innovations in misdemeanor domestic violence enforcement that are transforming the role of criminal law in the home beyond the criminal punishment of violence. An important legal tool in this transformation is the protection order, which bans a person from the home on pain of arrest and enables treatment of presence at home as a proxy for violence. Through prosecutors' routine deployment of protection orders in the criminal process at arraignment, plea bargaining, and sentencing, the home is becoming a space in which criminal law deliberately reorders and controls private rights and relationships in property and marriage—not as an incident of prosecution but as its goal. The growing criminal law use of protection orders to prohibit the cohabitation and contact of intimate partners (often when substantial jail time is not imposed) is a form of state-imposed de facto divorce that subjects the practical and substantive continuation of intimate relationships to criminal sanction. This displacement of the choice to live like intimate partners exemplifies the changing legal meaning of the home, wherein the archetype of private space becomes a site of intense public investment suitable for criminal law control.

**AUTHOR.** Assistant Professor of Law, Harvard Law School. For comments, advice, and discussion I am grateful to Akhil Amar, Seth Berman, Lauren Breslow, Oscar Chase, Justin Dillon, Ariela Dubler, Linda Elliott, Noah Feldman, Barry Friedman, Jeanne Fromer, Jerry Frug, David Garland, Lani Guinier, Janet Halley, Tricia Harmon, Scott Hemphill, Bert Huang, Jim Jacobs, Holly Maguigan, Deborah Malamud, Frank Michelman, Martha Minow, Ricky Revesz, Jeannie Rhee, David Rosenberg, Stephen Schulhofer, Bill Stuntz, Susan Sturm, Julie Suk, Larry Tribe, Deborah Wexler, Scott Wilkens, Mark Wu, Katrina Wyman, Kenji Yoshino, and especially Judge Harry Edwards. I also thank conference participants at the Program on Law and Social Thought, Harvard Law School, for early reactions, the NYU School of Law for research support, Gretchen Feltes for library assistance, and Rahael Seifu and the *Yale Law Journal* staff for editorial assistance.



**ARTICLE CONTENTS**

INTRODUCTION     5

I.   TERMS OF ENGAGEMENT     11

   A. Background     11

     1. It's a Crime     11
     2. The Civil Protection Order     13
     3. Protection Order Criminalization     15
       a. Criminal Enforcement of Civil Protection Orders     15
       b. The Criminal Protection Order     16

   B. Presence at Home as a Proxy for Domestic Violence     17
   C. The Proxy's Meaning     20

II. BURGLARY     22

   A. Crime and Home     22

     1. Boundary-Crossing Crime     22
     2. The House of Another     24

   B. Ousting the Spouse     26

     1. Husbands and Anti-Ousting Laws     26
     2. Reordering Property     28

   C. Burglarious Entry     31

     1. The Protection Order     31
     2. The Stranger at Home     33
     3. The Super-Stranger     34

   D. Burglary by Proxy     37

     1. The Independent Crime     37
     2. The Residue of Specific Intent     40

III. DE FACTO DIVORCE     42

   A. Enforcement Protocol     42
   B. Criminal Court Orders of Protection     47

C. Judicial Control of the Home                                        50

D. Divorce by Any Other Name                                          53

    1.  Final Orders of Protection                                   53

    2.  Divorce by Prosecutorial Demand                             56

    3.  Shadows of Protection: Living in an Illegal Relationship    60

    4.  A Fundamental Right To Marry?                               64

CONCLUSION: HOME PRIVACY, PUBLIC INTEREST, AND CONTROL                66

## INTRODUCTION

Criminal law is ever expanding. It tends to seek new frontiers of liability and to bring into its ambit areas of life previously not regulated by it. Whether in the creation of new crimes, the remolding of old crimes in new contexts, or the ratcheting upwards of criminal penalties, today the inclination of lawmakers and prosecutors is to make criminal law reach further and cover more terrain.[1]

This expansion has tended not only outward but inward. Traditionally, criminal law did not enter the intimate familial confines of the home.[2] The idea that criminal law may not reach into this quintessentially private space has been rightly criticized for enabling the state's acquiescence in violence against women.[3] During the period of over thirty years in which the criminalization of domestic violence has been in the making, feminists have sought to recast as "public" matters previously considered "private."[4] The desideratum has been

---

1. *See, e.g.*, William J. Stuntz, *The Pathological Politics of Criminal Law*, 100 MICH. L. REV. 505, 507 (2001) ("[A]ll change in criminal law seems to push in the same direction—toward more liability . . . .").

2. *See, e.g.*, State v. Black, 60 N.C. (Win.) 266, 267 (1864) ("[T]he law will not invade the domestic forum or go behind the curtain."); MICHAEL GROSSBERG, GOVERNING THE HEARTH: LAW AND THE FAMILY IN NINETEENTH-CENTURY AMERICA 6, 11 (1985); ELIZABETH PLECK, DOMESTIC TYRANNY 72 (1987); Wayne A. Logan, *Criminal Law Sanctuaries*, 38 HARV. C.R.-C.L. L. REV. 321, 338-48 (2003); Martha Minow, *Between Intimates and Between Nations: Can Law Stop the Violence?*, 50 CASE W. RES. L. REV. 851, 852 (2000) ("A conception of inviolable boundaries is used to shield . . . intimate . . . violence from public scrutiny and intervention. For husbands and wives, it was the boundary of the home; the private sphere shielding violence in the home lay beyond the reach of the law . . . ."). Of course, regulation of sexual morality was an exception, one that has been gradually eroded with the modern development of substantive due process privacy from *Griswold v. Connecticut*, 381 U.S. 479 (1965), to *Lawrence v. Texas*, 539 U.S. 558 (2003). See my discussion in the Conclusion, contrasting this development with expanding criminal law control of the home.

3. *See, e.g.*, Elizabeth M. Schneider, *The Violence of Privacy*, 23 CONN. L. REV. 973 (1991); Stephen J. Schulhofer, *The Feminist Challenge in Criminal Law*, 143 U. PA. L. REV. 2151, 2158 (1995).

4. While there is "no general feminist response to . . . domestic violence issues," Martha Minow, *Between Vengeance and Forgiveness: Feminist Responses to Violent Injustice*, 32 NEW ENG. L. REV. 967, 972 (1998), the challenge to family privacy and the call for criminalization of domestic violence are characteristically feminist goals, *see, e.g.*, CATHARINE A. MACKINNON, TOWARD A FEMINIST THEORY OF THE STATE 193-94 (1989); ELIZABETH M. SCHNEIDER, BATTERED WOMEN AND FEMINIST LAWMAKING 13 (2000); Cheryl Hanna, *No Right To Choose: Mandated Victim Participation in Domestic Violence Prosecutions*, 109 HARV. L. REV. 1849, 1869 (1996) ("[M]uch of feminist academic discourse concerning domestic violence has centered on the argument that 'private' violence must be reconceptualized as 'public' in order to compel state intervention."); Carole Pateman, *Feminist Critiques of the*

intervention by the criminal law, with its distinctive coercive power to punish and imprison, and its overt traditional identification with the public interest.[5]

This reform effort has met with remarkable and transformative success. If there is one space in which we have seen the thoroughgoing expansion of the criminal law in recent years, it is the home.[6] The recognition of domestic violence (DV) as a public issue is manifest in law reform aimed at reshaping law enforcement officials' response so that they treat DV as crime.[7] DV remains a serious problem, with estimates of women in the United States who experience assault by intimate partners each year numbering in the millions.[8]

---

*Public/Private Dichotomy, in* PUBLIC AND PRIVATE IN SOCIAL LIFE 281, 295-97 (S.I. Benn & G.F. Gaus eds., 1983).

5.   Indeed, a powerful argument challenging the public/private boundary was that public institutions and laws already regulated the so-called private realm through family law. *See* Frances E. Olsen, *The Myth of State Intervention in the Family*, 18 U. MICH. J.L. REFORM 835, 837 (1985) (arguing that the notion of state intervention in the family is redundant because "the state is deeply implicated in the formation and functioning of families" to begin with).

6.   *See, e.g.,* Deborah Epstein, *Procedural Justice: Tempering the State's Response to Domestic Violence*, 43 WM. & MARY L. REV. 1843, 1855 (2002) (noting an "astonishing reversal in law enforcement policy"); Minow, *supra* note 2, at 852 ("In this country, now, it is a distinctively minority and losing view to treat the home as beyond public scrutiny, and violence behind the veil of privacy."); Elizabeth M. Schneider, *The Dialectic of Rights and Politics: Perspectives from the Women's Movement*, 61 N.Y.U. L. REV. 589, 645-48 (1986) (describing the increasing characterization of domestic violence as a public crime).

7.   The most dramatic reforms have been the enactment since the early 1990s by about half the states of mandatory arrest laws requiring police to arrest upon probable cause in DV cases, *see* G. Kristian Miccio, *A House Divided: Mandatory Arrest, Domestic Violence, and the Conservatization of the Battered Women's Movement*, 42 HOUS. L. REV. 237, 239 n.2 (2005) (listing state mandatory arrest statutes), and the adoption by many prosecutors' offices of no-drop policies requiring prosecution even if victims are uncooperative, *see* Emily J. Sack, *Battered Women and the State: The Struggle for the Future of Domestic Violence Policy*, 2004 WIS. L. REV. 1657, 1672 & n.75 (citing sources listing jurisdictions that have adopted no-drop policies). The symbolic recognition of DV as a public issue was perhaps epitomized by the passage in 1994 of the Violence Against Women Act, which provided, inter alia, incentives for states to enforce DV laws more aggressively. *See* Violence Against Women Act of 1994, Pub. L. No. 103-322, §§ 40,001-40,703, 108 Stat. 1902 (codified as amended in scattered sections of 42 U.S.C.). The Supreme Court in 2000 held that Congress had exceeded its authority under the Commerce Clause and Section 5 of the Fourteenth Amendment in creating a federal civil remedy for gender-motivated violence. *See* United States v. Morrison, 529 U.S. 598 (2000).

8.   Estimates vary widely. *See, e.g.,* Family Violence Prevention Fund, Domestic Violence is a Serious, Widespread Social Problem in America: The Facts, http://www.endabuse.org/resources/facts/ (last visited Sept. 28, 2006) (between one and three million). Family violence accounted for 11% of all reported and unreported violence between 1998 and 2002; half of that was violence against a spouse. MATTHEW R. DUROSE ET AL., BUREAU OF JUSTICE STATISTICS, FAMILY VIOLENCE STATISTICS 9 (2005), *available at* http://www.ojp.gov/bjs/

But it is no longer marginal to prevailing notions of what crime is, or to the practice of law enforcement.[9] As police and prosecutorial habits continue to embrace and amplify that practical and conceptual development, the relation between the home and the criminal law is being remade in surprising ways that have gone largely unnoticed.

This Article identifies a legal regime in the world of misdemeanor DV, emerging under the aegis of correcting the criminal justice system's shameful past inaction, that seeks to do something meaningfully different from punishing the violence that long went unpunished. In this regime, the home is a space in which criminal law deliberately and coercively *reorders* and *controls* private rights and relationships in property and marriage—not as an incident of prosecution, but as its goal.

My primary object of study is the protection order that excludes a person accused of DV from the home.[10] Once envisioned by advocates as a civil tool—to be sought by victims themselves in civil court and enforced through contempt sanctions—the protection order now operates squarely in the arsenal of criminal enforcement in two ways. First, the state itself initiates, seeks, and obtains criminal protection orders pursuant to criminal prosecution. Second, violation of a civil or criminal protection order is prosecuted as a crime, usually a misdemeanor. These legal tools form the building blocks of the legal regime on which this Article sheds light.

---

pub/pdf/fvs.pdf. I generally refer to "spouses" and to male abusers and female victims because the legal practices I describe here operate on that general assumption, supported by statistics. DV victims are of course not always wives, women, or in heterosexual relationships, and abusers are not always male. *See, e.g.*, Ruth Colker, *Marriage Mimicry: The Law of Domestic Violence*, 47 WM. & MARY L. REV. 1841 (2006); Judith A. Smith, *Battered Non-Wives and Unequal Protection-Order Coverage: A Call for Reform*, 23 YALE L. & POL'Y REV. 93 (2005).

9. Police and prosecutors "became enthusiastic supporters of aggressive criminal interventions" in DV. Sack, *supra* note 7, at 1675. The merger of law enforcement habits and DV ideology exemplifies what Janet Halley has called "Governance Feminism." *See* Janet Halley, *Subversive Legal Moments?*, 12 TEX. J. WOMEN & L. 197, 224 (2003) (discussing "moments . . . when feminism and the state merged to wield state power together"); *see also* JANET HALLEY, SPLIT DECISIONS: HOW AND WHY TO TAKE A BREAK FROM FEMINISM 20-22 (2006).

10. The DV-related court orders have different names in various jurisdictions—protection order, order of protection, restraining order, injunction, etc. For uniformity, I generally refer to the orders as "protection orders," but I also use other terms as appropriate to the specific cases and jurisdictions that I discuss below.

The difficulty of prosecuting DV remains pervasive because of the typical unwillingness of victims to cooperate.[11] Falling short of the elusive goal of proving guilt beyond a reasonable doubt at trial, prosecutors increasingly give effect to the public policy against DV by using protection orders to command defendants to stay away from their spouses and homes on pain of arrest.[12] The policy against DV is thus expressed not only in the criminalization of violence proper, but also in the criminalization of a proxy—namely, an alleged abuser's presence in the home.[13]

Enabling the criminal law to reach ordinarily noncriminal conduct in the home, the protection order functions as a key entry point for criminal law control in that space. Beginning with the court-ordered prohibition of the alleged abuser's presence in the home, this Article ultimately points to a criminal law practice that I call "state-imposed de facto divorce," wherein prosecutors use the routine enforcement of misdemeanor DV to seek to end (in all but name) intimate domestic relationships. I show an emerging shift in emphasis from punishment of violence between spouses and intimate partners to criminalization of individuals' decisions to live like spouses or intimate partners. Even when a formal marriage may remain, the practical and substantive continuation of the intimate relationship becomes criminal. And perhaps unsurprisingly, this phenomenon is thoroughly class-contingent because it largely affects poor urban minorities and immigrants.

If a rhetoric of privacy has worked in our history to justify nonintervention in the home,[14] the new regime relies on a rhetoric of publicness to envision the home as in need of public control, like the streets.[15] The home, the archetype of

---

11.  *See, e.g.*, Tom Lininger, *Bearing the Cross*, 74 FORDHAM L. REV. 1353, 1363, 1364 & n.61 (2005) ("Approximately eighty percent of domestic violence victims recant or refuse to cooperate after initially filing criminal complaints.").

12.  *Cf.* Minow, *supra* note 2, at 851-52 ("[DV] reformers have aimed to enable separation. The goal has been to make a safe place for victims (which means, chiefly, women) to find sanctuary, and to use the power of the law either to incapacitate the violators or order them to stay away.").

13.  *Cf.* MICHAEL S. MOORE, PLACING BLAME: A GENERAL THEORY OF THE CRIMINAL LAW 783 (1997).

14.  *See* Reva B. Siegel, *"The Rule of Love": Wife Beating as Prerogative and Privacy*, 105 YALE L.J. 2117 (1996).

15.  *See* DAVID GARLAND, THE CULTURE OF CONTROL: CRIME AND SOCIAL ORDER IN CONTEMPORARY SOCIETY 15 (2001) (characterizing the criminological shift since the 1970s as a move to an understanding of crime as a problem of "inadequate controls"); *cf.* Jonathan Simon, *Governing Through Crime*, *in* THE CRIME CONUNDRUM: ESSAYS ON CRIMINAL JUSTICE 171, 173 (Lawrence M. Friedman & George Fisher eds., 1997) (using the term "governing through crime" to refer to the increasing reliance on control, surveillance, and fear of crime to shape social behavior). The goal of control in criminal justice has been associated with

private space, becomes a site of intense public investment,[16] suitable not only for the enforcement of crime therein, but for criminal law control of its core elements: property rights and family relationships. It becomes routine for the criminal law, "the heavy artillery of society,"[17] to displace individuals' private arrangements in these areas, such that they cannot contract around the state's mandates without risking arrest and punishment.

Of course the criminalization of DV must affect domestic matters, which consist of property and family arrangements. That is inevitable because DV reform constitutes revision of a traditional legal construction of the home grounded in large part on the common law of coverture and marital unity that afforded no protections to women in their familial roles. So today, unsurprisingly, the legal meaning of the home must evolve. But an examination of the actual shape the reconstruction is taking reveals state control extending beyond punishment of violence to criminal prohibition of intimate relationships in the home.

This Article consists of four Parts. Part I, which provides factual and theoretical context for what follows, begins with a description of the role and function of the legal tool that facilitates the expansion of criminal law control in the home: the DV protection order. I then discuss the distinctive way that

---

policing techniques that aim to reduce and prevent crime on the public streets. "Order-maintenance policing" or "quality of life" initiatives giving effect to the "broken windows" theory of crime reduction, *see* James Q. Wilson & George L. Kelling, *Broken Windows*, ATLANTIC MONTHLY, Mar. 1982, at 29, have been a central subject for debate in the criminal law literature in the last decade, *see, e.g.*, BERNARD E. HARCOURT, ILLUSION OF ORDER: THE FALSE PROMISE OF BROKEN WINDOWS POLICING (2001); Robert C. Ellickson, *Controlling Chronic Misconduct in City Spaces: Of Panhandlers, Skid Rows, and Public-Space Zoning*, 105 YALE L.J. 1165 (1996); Dan M. Kahan, *Social Influence, Social Meaning, and Deterrence*, 83 VA. L. REV. 349 (1997); Debra Livingston, *Police Discretion and the Quality of Life in Public Places: Courts, Communities, and the New Policing*, 97 COLUM. L. REV. 551 (1997); Tracey L. Meares & Dan M. Kahan, *Law and (Norms of) Order in the Inner City*, 32 LAW & SOC'Y REV. 805 (1998). Contextualizing criminal law control of the home alongside control-oriented approaches to crime in public space reveals a criminal justice trend that bridges the street and the home.

16. I do not suggest that the home or the family were ever totally private or privatized. *See supra* note 5. But the criminal law is commonly thought to vindicate the public interest in a way different from family law, which is of course why DV advocates have invested so much in criminal justice intervention. *See, e.g.*, LINDA GORDON, HEROES OF THEIR OWN LIVES: THE POLITICS AND HISTORY OF FAMILY VIOLENCE, BOSTON 1880-1960, at 24-26 (1988); SCHNEIDER, *supra* note 4, at 94 ("Activists have argued that . . . because criminal remedies are prosecuted by the state, they give more public force to the sanction.").

17. Francis A. Allen, *The Morality of Means: Three Problems in Criminal Sanctions*, 42 U. PITT. L. REV. 737, 738 (1981).

the protection order enables the criminalization of presence in the home as a proxy for DV.

Part II discusses the ways in which DV protection orders are transforming the law of burglary, the classic common law crime of home invasion. The contemporary policy against DV has breathed new life into burglary law, as abusers increasingly have been prosecuted for burglary for entry into their own homes or those of their intimates. Through analysis of the convergence of burglary and protection order enforcement, I make two claims. First, the drive to treat presence at home as a proxy for DV effectively engages the criminal law in the reallocation of property in the home and the enforcement of that reordering with its coercive powers. Second, the idea of presence at home as a proxy for DV has led some courts doctrinally to equate the protection order violation with the crime of burglary. This doctrinal move reflects the ideological reconstruction of the meaning of DV as an archetypal crime of home invasion by an intruder.

Part III examines a protection order practice in criminal courts in Manhattan that exemplifies criminal law control of the home. I argue that the routine issuance of criminal protection orders pursuant to a defendant's arrest and prosecution for DV—and the protection order's subsequent role in plea bargaining, conviction, and sentencing—is a form of state-imposed de facto divorce that subjects the practical and substantive continuation of the relationship to criminal sanction. In this system, the government (rather than one of the parties) initiates and dictates the end of the intimate relationship as a solution to DV.

I conclude with reflections on the autonomy consequences of the legal regime I have identified and consider the contrast between expanding criminal law control of the home and the development of the constitutional logic of privacy to protect autonomy in the choice of intimate partner.

Feminist scholars and advocates have worked prodigiously to direct the attention of our public institutions to our legal system's horrific neglect of DV and battered women. Perhaps because of the urgency and magnitude of the problem, much-needed law reform has been rapid and has resulted in novelties we do not yet fully understand. This Article is an effort to make intelligible the important conceptual, practical, and normative consequences of that law reform.

The DV regime developed over the past three decades includes criminal prohibitions on violent conduct, mandatory arrest and no-drop policies, and civil protection orders. These basic features, well addressed in the literature, are not the foci of this Article. Rather, I focus on two additional components: first, criminal courts' issuance of protection orders in criminal cases; and second, the prosecution of civil protection order violations as crimes proper. My discussion

of these practices may occasion reflection back on the basic regime out of which they have developed and within which they operate, but it does not imply a call to roll back the basic reforms that have been so hard won.

The traditional legal meaning of the home is undergoing revision, which is necessary to remedy the lack of protection for women. But the shape that revision is currently taking desperately needs evaluation. Realistic consideration of surprising aspects of the current landscape, including practices that may fly under the radar in prosecutors' offices and criminal courts, can enable us to see how the characteristic logic, ideology, rhetoric, and momentum of a law reform project can become conventional wisdom and can then be extended without reflection on their meaning. The stakes here are particularly sensitive because of the unique and complex set of vulnerabilities, interests, rights, and freedoms that inhabit the home.

## I. TERMS OF ENGAGEMENT

This Part first briefly reviews the history of DV reform and particularly the role of protection orders in the criminalization of DV. I then argue that the protection order enables law enforcement to treat a person's presence at home as a crime that is a proxy for DV. Now-conventional understandings about the meanings of DV undergird that legal move, and the use of protection orders further generates and embeds those meanings into law enforcement convention.

### A. Background

#### 1. It's a Crime

For much of our history, DV was generally outside the reach of the criminal law.[18] Indeed wife beating, as a form of chastisement and discipline of wives, was overtly approved and reserved as a right of the man of the house.[19] As a result of feminist activism in the nineteenth century, the right of husbands to chastise their wives was formally abolished.[20] Yet in the place of the "chastisement prerogative," a judicial discourse of marital privacy emerged and continued to legitimate wife beating under a revised rhetorical and ideological

---

18. For accounts of the treatment of DV in our history, see GORDON, *supra* note 16; PLECK, *supra* note 2; and Siegel, *supra* note 14.

19. *See* Siegel, *supra* note 14, at 2122-29.

20. *See id.* at 2129-41.

framework.[21] The protective boundary of the home continued to shield DV from criminal prosecution for another century.

Although wife beating had been made formally illegal in all the states by 1920,[22] it was not until the 1970s that efforts by the women's rights movement to recast DV as a public concern began to succeed.[23] Activists and commentators have advocated increased criminalization, on the theory that defining this class of behavior as a *crime* prosecuted by the state signals strong public disapproval.[24] These efforts have led to statutory reforms aimed at increasing the criminal law response to DV and emphasizing the roles of police, prosecutors, and courts.

In addition to enforcement of traditional common law crimes such as assault and battery, most states have adopted new criminal code provisions that explicitly criminalize *domestic* assault and battery, and they have adopted sentencing provisions that enhance penalties for crimes involving DV.[25] Advocates' frustration with traditional law enforcement discretion, which was too often exercised to decline to arrest or prosecute batterers, led to efforts to limit official discretion in favor of intervention. Mandatory arrest laws that require the police to arrest when probable cause exists and that are designed to deprive police of discretion have become widespread.[26] Many prosecutors'

---

21. *See id.* at 2150-70.

22. Hanna, *supra* note 4, at 1857.

23. *See, e.g.*, Joan Zorza, *The Criminal Law of Misdemeanor Domestic Violence, 1970-1990*, 83 J. CRIM. L. & CRIMINOLOGY 46 (1992).

24. *See, e.g.*, SCHNEIDER, *supra* note 4, at 94.

25. *See* Neal Miller, Inst. for Law & Justice, Domestic Violence: A Review of State Legislation Defining Police and Prosecution Duties and Powers 14-16 & nn.40-49, 17-18 (June 2004), http://www.ilj.org/publications/DV_Legislation-3.pdf (compiling and discussing state domestic assault and sentencing laws).

26. The majority of states and the District of Columbia have enacted laws that mandate or prefer arrest for DV. *See* Miller, *supra* note 25, at 28 & n.86, 29-30 (compiling and discussing statutes); Miccio, *supra* note 7, at 239 n.2 (listing state statutes). The Violence Against Women Act includes a provision requiring mandatory arrest or pro-arrest policies as a precondition for receipt of funding by state and local governments. *See* Violence Against Women Act of 2000, Pub. L. No. 106-386, 114 Stat. 1491 (codified as amended in scattered sections of 42 U.S.C.). For discussions on the effectiveness of mandatory arrest in deterring violence, see, for example, Cynthia Grant Bowman, *The Arrest Experiments: A Feminist Critique*, 83 J. CRIM. L. & CRIMINOLOGY 201 (1992); Lisa G. Lerman, *The Decontextualization of Domestic Violence*, 83 J. CRIM. L. & CRIMINOLOGY 217 (1992); Janell D. Schmidt & Lawrence W. Sherman, *Does Arrest Deter Domestic Violence?*, *in* DO ARRESTS AND RESTRAINING ORDERS WORK? 43 (Eve S. Buzawa & Carl G. Buzawa eds., 1996); and Joan Zorza, *Must We Stop Arresting Batterers?: Analysis and Policy Implications of New Police Domestic Violence Studies*, 28 NEW ENG. L. REV. 929 (1994). On the impact of mandatory

offices have adopted no-drop prosecution policies that prevent prosecutors from dismissing charges when individual victims do not desire criminal prosecution of their intimate partners.[27]

### 2. The Civil Protection Order

The civil protection order, the "grandmother of domestic violence law," has constituted a crucial step in the criminalization of DV.[28] Since passage of Pennsylvania's Protection from Abuse Act in 1976, all the states have enacted protection order legislation, which they have amended and refined over the last thirty years.[29] These statutes enable individuals to go directly to general-purpose civil court or family court to seek protection orders against their intimate partners.

---

arrest on victims' safety and autonomy, see, for example, Donna Coker, *Crime Control and Feminist Law Reform in Domestic Violence Law: A Critical Review*, 4 BUFF. CRIM. L. REV. 801 (2001); Linda G. Mills, *Killing Her Softly: Intimate Abuse and the Violence of State Intervention*, 113 HARV. L. REV. 550 (1999); and Donna M. Welch, *Mandatory Arrest of Domestic Abusers: Panacea or Perpetuation of the Problem of Abuse?*, 43 DEPAUL L. REV. 1133 (1994). For discussions of the disparate impact of mandatory arrest on poor and minority communities, see, for example, Coker, *supra*; Kimberle Crenshaw, *Mapping the Margins: Intersectionality, Identity Politics, and Violence Against Women of Color*, 43 STAN. L. REV. 1241 (1991); Holly Maguigan, *Wading into Professor Schneider's "Murky Middle Ground" Between Acceptance and Rejection of Criminal Justice Responses to Domestic Violence*, 11 AM. U. J. GENDER SOC. POL'Y & L. 427 (2003); and Jenny Rivera, *Domestic Violence Against Latinas by Latino Males: An Analysis of Race, National Origin, and Gender Differentials*, 14 B.C. THIRD WORLD L.J. 231 (1994).

27.  *See* Donald J. Rebovich, *Prosecution Response to Domestic Violence: Results of a Survey of Large Jurisdictions*, *in* DO ARRESTS AND RESTRAINING ORDERS WORK?, *supra* note 26, at 176, 182-83 (reporting that 66% of prosecutors' offices had adopted no-drop policies). Debate in the literature on no-drop prosecution primarily concerns its impact on victims' safety and autonomy. *See, e.g.*, Coker, *supra* note 26; Hanna, *supra* note 4; Mills, *supra* note 26; Donna Wills, *Domestic Violence: The Case for Aggressive Prosecution*, 7 UCLA WOMEN'S L.J. 173 (1997); Angela Corsilles, Note, *No-Drop Policies in the Prosecution of Domestic Violence Cases: Guarantee to Action or Dangerous Solution?*, 63 FORDHAM L. REV. 853 (1994).

28.  Barbara J. Hart, *The Legal Road to Freedom*, *in* BATTERING AND FAMILY THERAPY: A FEMINIST PERSPECTIVE 13 (Marsali Hansen & Michèle Harway eds., 1993), *available at* http://www.mincava.umn.edu/documents/hart/hart.html#id2302814.

29.  EVE S. BUZAWA & CARL G. BUZAWA, DOMESTIC VIOLENCE: THE CRIMINAL JUSTICE RESPONSE 234 (3d ed. 2003); David M. Zlotnick, *Empowering the Battered Woman: The Use of Criminal Contempt Sanctions To Enforce Civil Protection Orders*, 56 OHIO ST. L.J. 1153, 1190 n.169 (1995) (compiling state civil protection order statutes). Prior to passage of these civil protection order statutes, women typically had to initiate divorce proceedings to obtain a protection order. BUZAWA & BUZAWA, *supra*, at 234.

In addition to enjoining violence against the victim, the civil protection order—often called a "stay-away" or "no-contact" order—typically prohibits contact with the victim and requires the subject of the order to vacate the shared home, even if he is the sole or joint owner of the property.[30] The order may also address custody of children, visitation rights, and child support and other economic relief.[31] On application by the victim, the civil court issues the order, usually ex parte on an emergency temporary basis, until the court holds a subsequent adversary hearing after which the order may be made permanent.[32] In most states, the permanent order remains effective for one to three years and is subject to extension.[33]

From the beginning of the battered women's movement, women's advocates understood that victims faced a particular practical obstacle to avoiding continued violence: sharing a home with their abusers. DV and the marital home were inextricably linked. Although the development of shelters was an important part of the early battered women's movement,[34] advocates concluded that short-term housing in shelters was inadequate.[35] The civil protection order would exclude the abuser instead of displacing the victim from the home. It would thereby limit disruption to her life, provide stability and safety in her own space, enhance her autonomy from her abuser, and reduce the costs of ending a marriage.

The vision for this remedy grew out of the definition of battering within the larger framework of a feminist critique of marriage, wherein DV was a form

---

30. *See* PETER FINN & SARAH COLSON, CIVIL PROTECTION ORDERS: LEGISLATION, CURRENT COURT PRACTICE, AND ENFORCEMENT 33 (1990) (describing the ability of judges to order offenders to stay away from the family home as "perhaps the key provision of protection order statutes"); Catherine F. Klein & Leslye E. Orloff, *Providing Legal Protection for Battered Women: An Analysis of State Statutes and Case Laws*, 21 HOFSTRA L. REV. 801, 910-11 (1993) (discussing the relief that civil protection orders afford). The eviction does not affect title to property. FINN & COLSON, *supra*, at 14.

31. Zlotnick, *supra* note 29, at 1191.

32. *See id.* at 1191-92. For discussions of the processes for obtaining civil protection orders, see FINN & COLSON, *supra* note 30; Klein & Orloff, *supra* note 30; and Carolyn N. Ko, *Civil Restraining Orders for Domestic Violence: The Unresolved Question of "Efficacy,"* 11 S. CAL. INTERDISC. L.J. 361 (2002). The required standard of proof in many jurisdictions is a preponderance of the evidence, but the majority of statutes are silent on the standard of proof. *See* FINN & COLSON, *supra* note 30, at 14.

33. *See* Epstein, *supra* note 6, at 1859 & n.66 (citing statutes).

34. SCHNEIDER, *supra* note 4, at 182.

35. *See* Barbara J. Hart, *State Codes on Domestic Violence: Analysis, Commentary and Recommendations*, JUV. & FAM. CT. J., 1992, No. 4, at 2, 3.

of control and domination of wives.[36] A symbol of the material and psychological difficulties of leaving abusive marriages, the marital home represented the physical locus of the gendered power inequality that was expressed in violence. Because, historically, the home had been the domain of husbands' control, giving women the legal means to take control over the home by excluding husbands carried significance beyond the practical aspects of remedying an abusive situation. The protection order was to be a legal tool that would transform the home from a wife's prison into her fortress. It would ban the husband from the space in which his power over her found expression.

### 3. *Protection Order Criminalization*

#### a. *Criminal Enforcement of Civil Protection Orders*

Because, for a long time, the criminal justice system was less than forthcoming in its response to DV, advocates looked to civil protection orders as an alternative to criminal law.[37] Early advocates felt significant ambivalence about engaging with the state, which, they believed, embodied the patriarchy that condoned and legitimated violence against women.[38] Many advocates thought the criminal system would remain crude or unresponsive. As an alternative to criminalization, the civil protection order was a prospective remedy designed to prevent future violence rather than to punish past conduct. As advocates conceived it, the protection order would empower women to bypass the criminal system and seek individualized protection from the courts.[39]

Civil protection orders were traditionally enforced through contempt proceedings in the courts that issued them.[40] State courts generally have the

---

36. *See* R. EMERSON DOBASH & RUSSELL DOBASH, VIOLENCE AGAINST WIVES: A CASE AGAINST THE PATRIARCHY, at ix (1979); SCHNEIDER, *supra* note 4, at 20 ("Domestic violence was seen as part of the larger problem of patriarchy within the marital relationship.").

37. *See* BUZAWA & BUZAWA, *supra* note 29, at 234; Andrew R. Klein, *Re-Abuse in a Population of Court-Restrained Male Batterers: Why Restraining Orders Don't Work*, *in* DO ARRESTS AND RESTRAINING ORDERS WORK?, *supra* note 26, at 192, 211.

38. *See* SCHNEIDER, *supra* note 4, at 182.

39. Klein, *supra* note 37, at 211.

40. Most states still permit protection orders to be enforced through contempt sanctions. *See* Zlotnick, *supra* note 29, at 1195 & n.186; *cf. id.* at 1195-1215 (favoring criminal contempt sanctions over criminal prosecution as a remedy for the violation of civil protection orders because the former empower women).

power to enforce orders by contempt,[41] and most jurisdictions additionally have statutes that specifically authorize contempt sanctions.[42]

The civil protection order, once envisioned as an alternative to criminal process, has now been subsumed by the criminalization strategy. Today, protection orders are primarily enforced through criminal misdemeanor charges.[43] Almost every state has made the violation of a DV protection order a crime.[44] Violations of orders are generally misdemeanors, but in some states they are felonies.[45] Laws in almost every state authorize warrantless arrests[46] and apply mandatory arrest rules to protection order violations.[47] Furthermore, in some instances, domestic abusers who violate protection orders are prosecuted for burglary, a development that I discuss in detail in Part II.

### b. The Criminal Protection Order

In a development that has rarely been studied, criminal courts, which have always had the power to set conditions of pretrial release, have increasingly come to issue protection orders as part of the courts' criminal law duties in DV cases. In most jurisdictions today, criminal courts issue protection orders at the prosecutor's request as a condition of pretrial release after a DV arrest.[48] Many

---

41. However, Florida requires all protection order violations to be prosecuted as crimes. *See* FLA. STAT. ANN. § 741.2901(2) (West 2005).

42. *See* Zlotnick, *supra* note 29, at 1195-96.

43. *See* CLARE DALTON & ELIZABETH M. SCHNEIDER, BATTERED WOMEN AND THE LAW 541 (2001); OFFICE FOR VICTIMS OF CRIMES, U.S. DEP'T OF JUSTICE, ENFORCEMENT OF PROTECTIVE ORDERS 2 (2002) [hereinafter ENFORCEMENT OF PROTECTIVE ORDERS], *available at* http://www.ojp.usdoj.gov/ovc/publications/bulletins/legalseries/bulletin4/ncj189190.pdf; *see also* Zlotnick, *supra* note 29, at 1153 ("The current trend, pushed by some battered women advocates, is to criminalize all violations of protection orders."). However, the trend "in this direction may be more the result of an unconscious drift in policy rather than a conscious and uniform decision by domestic violence reformers." Zlotnick, *supra* note 29, at 1207 n.239.

44. *See* ENFORCEMENT OF PROTECTIVE ORDERS, *supra* note 43, at 5; Epstein, *supra* note 6, at 1860 & n.68 (citing statutes); Miller, *supra* note 25, at 24 & n.64 (same). Oregon appears to be the only state that provides no criminal punishment for protection order violations. Miller, *supra* note 25, at 24 n.66.

45. *See* Miller, *supra* note 25, at 24 & n.67 (compiling and discussing statutes).

46. *See id.* at 31 & nn.103-07 (compiling and discussing warrantless arrest statutes).

47. *See id.* at 31 & n.104 (compiling and discussing mandatory arrest statutes).

48. *See* Christopher R. Frank, *Criminal Protection Orders in Domestic Violence Cases: Getting Rid of Rats with Snakes*, 50 U. MIAMI L. REV. 919, 922 (1996); Christine O'Connor, *Domestic Violence No-Contact Orders and the Autonomy Rights of Victims*, 40 B.C. L. REV. 937, 946-47 (1999).

states have statutorily authorized or mandated issuance of the criminal protection order as a condition of bail or pretrial release.[49] Criminal protection orders remain in effect while prosecution is pending and can become more permanent as part of a criminal sentence.

Whereas the civil protection order is sought voluntarily by the victim, the criminal protection order is sought and issued by the state in the public interest. The practice of criminal courts issuing protection orders pursuant to the criminal process shifts the decision to exclude an alleged abuser away from the victim and to the state. The practice and meaning of protection orders in criminal courts—initiated, requested, issued, and enforced by the state—are the focus of my discussion in Part III.

### B. *Presence at Home as a Proxy for Domestic Violence*

The protection order enables a particular mode of criminalization that is an important component of the criminalization of DV. It criminalizes conduct that is not generally criminal—namely presence at home—in order to punish or prevent the target criminal conduct.[50] Presence at home is a proxy for DV.[51] The protection order creates this proxy relation.

---

49. *See, e.g.*, ALA. CODE § 30-5-3(b)(3) (LexisNexis 1998); ALASKA STAT. § 12.30.027 (2004); COLO. REV. STAT. ANN. § 18-1-1001 (West 2004); IDAHO CODE ANN. § 18-922 (2004); 725 ILL. COMP. STAT. ANN. 5/112A-2 (West 1992); IOWA CODE ANN. §§ 236.8, 236.14(2) (West 2000); KY. REV. STAT. ANN. § 431.064 (LexisNexis 1999); LA. CODE CRIM. PROC. ANN. art. 327.1 (2003); ME. REV. STAT. ANN. tit. 15, § 321 (2003); MINN. STAT. ANN. § 629.72 (West 2003); MONT. CODE ANN. § 45-5-209 (2005); N.H. REV. STAT. ANN. § 597:2(III)(b) (LexisNexis 2003); N.J. STAT. ANN. § 2C:25-26 (West 2005); N.Y. CRIM. PROC. LAW § 530.12 (McKinney 1995); N.D. CENT. CODE § 14-07.1-13(1) (2004); OHIO REV. CODE ANN. § 2919.26 (LexisNexis 2006); OKLA. STAT. ANN. tit. 22, § 60.17 (West 2003); 18 PA. CONS. STAT. ANN. § 2711(c)(2) (West 2000); R.I. GEN. LAWS § 12-29-4(a)(1) (2002); S.D. CODIFIED LAWS § 25-10-23 (1999); TEX. CODE CRIM. PROC. ANN. art. 17.292 (Vernon 2005); UTAH CODE ANN. § 77-36-2.5(1) (2003); WASH. REV. CODE ANN. § 10.99.040 (West 2002); WIS. STAT. ANN. § 968.075(6) (West 1998).

   Though some statutes are silent on the standard of issuance, others allow courts to issue protection orders, for example, "when reasonably necessary to protect the alleged victim, when release without condition would be inimical to public safety, when the safety and protection of the petitioner may be impaired, and where there is possible danger or intimidation to the alleged victim or another." Frank, *supra* note 48, at 929 (citing statutes) (citations omitted).

50. When I speak of "presence" at home, I mean also to include the quotidian interpersonal interactions that arise from being in the same space with an intimate partner. *See* Randy Frances Kandel, *Squabbling in the Shadows: What the Law Can Learn from the Way Divorcing Couples Use Protective Orders as Bargaining Chips in Domestic Spats and Child Custody Mediation*, 48 S.C. L. REV. 441, 447 (1997) ("[T]he holder of a protective order can summon

The advantages of using presence at home as a proxy are evidentiary and preventive. The problems with prosecuting DV are well known. Evidentiary difficulties may prevent convictions because victims are typically unwilling, often out of fear, to cooperate with the prosecution.[52] Without victims' cooperation, criminal cases are weak and proof of guilt beyond a reasonable doubt at trial is elusive.[53]

Prosecutions for protection order violations can be a way of "short-circuiting proof problems for the prosecution,"[54] and thus a more efficient and

the police and, at the least, expect help in warding off words and acts that would otherwise be regarded as everyday interactions.").

51. *Cf.* MOORE, *supra* note 13, at 783-84 ("[I]n the criminal law we sometimes use one morally innocuous act as a proxy for another, morally wrongful act or mental state."); Zachary Price, *The Rule of Lenity as a Rule of Structure*, 72 FORDHAM L. REV. 885, 912 (2004) (defining "proxy crimes" as "offenses that are not blameworthy in themselves, but that stand in for more culpable activities"); Stephen Fogdall, Comment, *Exclusive Union Control of Pension Funds: Taft-Hartley's Ill-Considered Prohibition*, 4 U. PA. J. LAB. & EMP. L. 215, 226 (2001) (defining "proxy crime" as "prohibit[ing] innocent behavior as a means of reaching offensive behavior"). Examples of proxy crime include possession of burglars' tools and possession of drug paraphernalia, which may amount to possession of screwdrivers for the former, and of bowls and spoons for the latter. *See* Stuntz, *supra* note 1, at 516 (citing statutes).

52. *See, e.g.*, Lininger, *supra* note 11, at 1363, 1364 & n.61 (noting that about 80% of DV victims recant or refuse to cooperate after initially filing criminal complaints). The most common reason prosecutors dismiss DV cases is victims' unwillingness to testify. *See* Robert C. Davis et al., *Increasing Convictions in Domestic Violence Cases: A Field Test in Milwaukee*, 22 JUST. SYS. J. 61, 62 (2001). For a discussion of reasons why DV victims are unwilling to cooperate with prosecution, see Thomas L. Kirsch II, *Problems in Domestic Violence: Should Victims Be Forced To Participate in the Prosecution of Their Abusers?*, 7 WM. & MARY J. WOMEN & L. 383, 392-99 (2001), which addresses financial concerns, defendants' control over victims, fear of retaliation, low self-esteem, and sympathy and love for defendants.

53. Victims' uncooperativeness has led to the practice of "victimless prosecution" or "evidence-based prosecution," in which prosecutors introduce at trial an unavailable victim's previous statements to law enforcement under the "excited utterance" exception to hearsay. *See* Mary E. Asmus et al., *Prosecuting Domestic Abuse Cases in Duluth: Developing Effective Prosecution Strategies from Understanding the Dynamics of Abusive Relationships*, 15 HAMLINE L. REV. 115, 141-43 (1991). The constitutionality of this practice under the Confrontation Clause was in doubt after *Crawford v. Washington*, 541 U.S. 36 (2004) (holding that if a witness's out-of-court statement is "testimonial," it cannot be introduced at trial in the witness's absence, unless the defendant previously had the opportunity to cross-examine the witness, such as in a formal deposition). The Supreme Court has now clarified in *Davis v. Washington*, 126 S. Ct. 2266 (2006), that a victim's statements in a 911 call whose primary purpose is to enable police assistance in an ongoing emergency are not testimonial and can be used in her absence. However, a victim's statements to the police when there is no ongoing emergency, the primary purpose of which is to establish or prove past events potentially relevant to later criminal prosecution, are testimonial and cannot be used in her absence.

54. MOORE, *supra* note 13, at 784.

effective means of convicting and punishing domestic abusers. A violation of a protection order is far easier to prove than the target crime of DV.[55] The testimony of the victim is generally less important. No physical injury need be shown. The existence of the protection order and the defendant's presence in the home, to which the arresting officer can usually bear witness, are sufficient to establish violation of the protection order. With a "no-contact" order, all that may need to be shown is that the defendant made a phone call to the protected party. Thus, one function of protection orders can be to relax or circumvent the burden of proof for DV.[56]

Furthermore, using presence at home as a proxy is designed to prevent conduct that, though innocent itself, can lead to the target crime. The logic of this preventive goal is that by "isolat[ing] a convenient point in time from which it is predictable that some moral wrongs will occur, . . . such wrongs can thus be efficiently prevented by preventing the earlier, non-wrongful act."[57] Prohibiting a person's presence at home via the protection order reduces the likelihood that he will have the opportunity to engage in DV.[58]

Using presence at home as a proxy for DV differs from pretextual prosecution (of Al Capone fame), in which prosecutors suspect a defendant of a particular crime that they cannot easily prove in court and so strategically charge and convict him of an unrelated, less serious crime[59]—for example, charging tax evasion when a defendant is suspected of murder. First, presence at home is not prohibited independent of DV in the way that tax evasion is prohibited independent of murder. Presence at home itself is generally not

---

55. *See* BUZAWA & BUZAWA, *supra* note 29, at 236 ("[A] well-trained officer can easily prove a prima facie case of [a protection order] violation (usually just making contact) compared with the more difficult task of determining probable cause of commission of substantive crimes."); *cf.* MOORE, *supra* note 13, at 783 ("The state can prove knowing possession of burglary tools more easily than it can prove an intent to burgle.").

56. *See* MOORE, *supra* note 13, at 783-84 (characterizing the "proxying function" as "an evasion of our normal requirements of proof beyond a reasonable doubt").

57. *Id.* at 784.

58. *Cf. id.* ("It may be easier for the police to prevent burglaries by allowing them to arrest people for possession of burglary tools, for example, than it is to do so by waiting for the possessor to actually attempt a break-in with such tools."); Carol S. Steiker, *Foreword: The Limits of the Preventive State*, 88 J. CRIM. L. & CRIMINOLOGY 771, 774 (1998) (coining the term "the preventive state" to describe the state's "attempt to identify and neutralize dangerous individuals before they commit crimes by restricting their liberty in a variety of ways," and noting that "[i]n pursuing this goal, the state often will expand the functions of the institutions primarily involved in the criminal justice system").

59. *See* Harry Litman, *Pretextual Prosecution*, 92 GEO. L.J. 1135 (2004); Daniel C. Richman & William J. Stuntz, *Al Capone's Revenge: An Essay on the Political Economy of Pretextual Prosecution*, 105 COLUM. L. REV. 583, 584 (2005).

considered harmful or offensive—only when committed by certain designated persons suspected of DV. Tax evasion, by contrast, is considered harmful independent of murder and is criminally prohibited without reference to the goal of reaching murderers.

Second, whereas pretextual conduct is unrelated to its target crime, presence at home is not considered to be unrelated to the target crime. Rather, presence at home is tightly linked with DV, in that where the former is found, the latter is thought to follow. An alleged abuser's presence at home is causally associated with the potential for violence there. By contrast, tax evasion need not be related to murder.

Third, disapproval of an alleged abuser's presence at home does not actually function as a pretext or cover for real disapproval of the target conduct. Rather, underlying the association of presence in the home with violence is the view that an abuser's presence at home is itself threatening and causes fear and intimidation. Thus criminalization of his presence at home via the protection order is not a cover for combating violence; it is openly and candidly directed at DV.[60]

## C. *The Proxy's Meaning*

The legitimacy of criminalizing a person's presence in the home as a proxy for DV is supported by and reinforces the following assumptions: The person is a domestic abuser. His marriage or domestic relationship is abusive. His presence makes the home a dangerous place for his family.

The protection order is the legal mechanism that forges all these links. The issuance of the order identifies the subject of the order as an abuser even if he has not been convicted.[61] He is assumed to be engaged in the pattern of control and domination that is domestic abuse.[62] The protection order embodies the

---

**60.** Richman and Stuntz argue that pretextual prosecution sends "muddied signal[s]" to legislatures and voters and thereby undermines the democratic accountability of law enforcement efforts to combat crime. *See* Richman & Stuntz, *supra* note 59, at 586-87. By contrast, charging and convicting defendants for violating DV protection orders is likely to be broadly understood—and intended by legislatures—as a systematic means of reaching DV.

**61.** *Cf.* Cheryl Hanna, *The Paradox of Hope: The Crime and Punishment of Domestic Violence*, 39 WM. & MARY L. REV. 1505, 1516 (1998) ("One major concern with the criminalization movement is that evidentiary standards for proving abuse have been so relaxed that any man who stands accused is considered guilty.").

**62.** *Cf.* Karla Fischer et al., *Procedural Justice Implications of ADR in Specialized Contexts: The Culture of Battering and the Role of Mediation in Domestic Violence Cases*, 146 SMU L. REV.

view that without a state mandate the victim will not be able to leave the abusive relationship. The widespread understanding of DV as a "dynamic of power and control"[63] leads to the inference that women are coerced not only with respect to abuse, but also with respect to the decision to remain in relationships with abusive men.[64] Thus the protection order marks the relationship as not only abusive but also immutable in the absence of state intervention.

Finally, in excluding the abuser from the home, the protection order identifies the home itself as a dangerous place where the presence of the abuser causes fear in the victim. This reflects a theory of DV as operating often without actual violence but with the terrifying and inconsistent uses of the threat of violence to control the victim.[65] Banning the abuser's presence seems a logical way of attempting to make the home free of fear.

The protection order carries all of these meanings. Once it is in place, it seems fitting that the person would violate the very order that officially identifies him as an abuser. Indeed, part of the reason the order exists is to be violated, so as to set in motion criminal prosecution for proxy conduct. The protection order enables the legal conflation of presence at home and criminal violence. After all, violating the court order is a crime even if the conduct the order prohibits is ordinarily not a crime. Mediated through the crime of violating a court order, the criminal prohibition of a person's presence at home

---

2117, 2120 (1993) (rejecting a view of battering as conflict and arguing that conflict "tends to be only an expression of an attempt to control").

63. Mary Ann Dutton, *Understanding Women's Responses to Domestic Violence: A Redefinition of Battered Woman Syndrome*, 21 HOFSTRA L. REV. 1191, 1204 (1993); Martha R. Mahoney, *Legal Images of Battered Women: Redefining the Issue of Separation*, 90 MICH. L. REV. 1, 5 (1991); *cf.* LENORE E. WALKER, TERRIFYING LOVE: WHY BATTERED WOMEN KILL AND HOW SOCIETY RESPONDS 42-45 (1989) (describing the "[c]ycle of [v]iolence" that constitutes abuse).

64. The seminal work expressing this view is LENORE E. WALKER, THE BATTERED WOMAN (1979), which argues that battering produces in victims a state of learned helplessness in which they become passive and do not try to leave the relationship. For a discussion of reasons why battered women do not leave abusive relationships, see Dutton, *supra* note 63, at 1232-40, identifying, inter alia, fear of retaliation, economic dependency, concern for their children, and emotional attachment. *Cf.* Ruth Jones, *Guardianship for Coercively Controlled Battered Women: Breaking the Control of the Abuser*, 88 GEO. L.J. 605 (2000) (proposing legal guardianship for the coercively controlled battered woman to force an end to the abusive relationship).

65. *See, e.g.*, Evan Stark, *Re-Presenting Woman Battering: From Battered Woman Syndrome to Coercive Control*, 58 ALB. L. REV. 973, 986 (1995) (characterizing domestic abuse as "an *ongoing* strategy of intimidation, isolation, and control that extends to all areas of a woman's life, including sexuality; material necessities; relations with family, children, and friends; and work"); *cf.* Fischer et al., *supra* note 62, at 2120 ("A gesture that seems innocent to an observer is instantly transformed into a threatening symbol to the victim of abuse.").

becomes legitimate as a way for the criminal law to reach domestic abusers. To prosecutors and courts, an abuser's presence in the home comes to seem interchangeable with DV.

The protection order thus enables the creation of a crime out of the ordinarily innocent behavior of being at home.[66] Through this device, the criminal law gains a foothold for its supervisory presence in the home. Once the protection order is in effect, police presence is required in that space. That monitoring opens up a range of conduct in the home to criminal law control.

## II. BURGLARY

The closest traditional nexus between crime and the home exists in the common law crime of burglary. This Part discusses the ways in which DV policy, and in particular the idea of presence at home as a proxy for DV, is transforming burglary law, so that those accused or suspected of DV are increasingly prosecuted for burglary of their own homes or those of their intimates. This transformation both reflects and reinforces the legal reimagination of DV—until recently not treated as a crime because it was internal to the home—as the archetypal crime of home invasion.

### A. Crime and Home

#### 1. Boundary-Crossing Crime

Although modern law is more inclusive, the crime of burglary at common law was the breaking and entering of a dwelling house at night, and the dwelling had to be that of someone other than the defendant. Once inside the dwelling, the defendant further had to have the intent to commit a felony beyond the trespass.[67] According to Blackstone:

---

66. Compare this practice to the use of criminal trespass to arrest suspected drug dealers found in residential buildings and the use of stay-away orders to ban known drug dealers from designated neighborhoods. *See* Walter J. Dickey & Peggy A. McGarry, *The Search for Justice and Safety Through Community Engagement: Community Justice and Community Prosecution*, 42 IDAHO L. REV. 313, 364 (2006); Kimberly E. O'Leary, *Dialogue, Perspective and Point of View as Lawyering Method: A New Approach to Evaluating Anti-Crime Measures in Subsidized Housing*, 49 WASH U. J. URB. & CONTEMP. L. 133, 138-41 (1996).

67. 4 WILLIAM BLACKSTONE, COMMENTARIES *227; 3 E. COKE, INSTITUTES OF THE LAWS OF ENGLAND 63 (photo. reprint 1979) (1644); 2 EDWARD HYDE EAST, A TREATISE OF THE PLEAS OF THE CROWN 484 (photo. reprint 2004) (1803); 1 MATTHEW HALE, THE HISTORY OF THE PLEAS OF THE CROWN 549 (photo. reprint 2003) (1736).

> Burglary . . . has always been looked upon as a very heinous offense: not only because of the abundant terror that it naturally carries with it, but also as it is a forcible invasion and disturbance of that right of habitation, which every individual might acquire even in a state of nature . . . . And the law of England has so particular and tender a regard to the immunity of a man's house, that it stiles it his castle, and will never suffer it to be violated with impunity: agreeing herein with the sentiments of ancient Rome, as expressed in the words of Tully; "*quid enim sanctius, quid omni religione munitius quam domus uniuscujusque cirium?*" ["For what is more sacred, more inviolate than the house of every citizen?"].[68]

The experience of unwanted entry into one's home by an intruder is no doubt extraordinarily frightening and dangerous. But as Blackstone's comments indicate, the common law's serious treatment of burglary had to do not only with the practical threat to personal safety but also with a distinctive abstract harm. The invasion of the home constituted the violation of a right so basic that it was thought to be grounded in natural law ("that right of habitation, which every individual might acquire even in a state of nature"). The violation of the "right of habitation" was a fundamental violation, as there could be nothing "more sacred, more inviolate" than a person's home. In this sense, I read Blackstone to understand burglary as the archetypal crime.

A person in his home had the right to be free from intrusion, and thus the law of burglary made the forcible entry into another person's home a crime. But that is not all, as burglary was not accomplished simply by crossing the boundary into a dwelling, or trespassing. To commit burglary, the intruder had to enter with the specific intent to commit a distinct crime — different from trespass — once inside.

The extra requirement of the intent to commit a crime once inside is telling. A prohibition on unlawful entry would completely address the concern to protect the home boundary from breach.[69] But the additional specific intent requirement constructs the home as a space that should be especially free not

---

68. 4 BLACKSTONE, *supra* note 67, at \*223.

69. *Cf.* JOSHUA DRESSLER, UNDERSTANDING CRIMINAL LAW 351 (2d ed. 2000) ("To the extent that the purpose of burglary law is to prohibit trespasses to dwellings and to protect dwellers from the emotional distress of home-invasions, the specific intent of the offense — intent to commit a felony inside the dwelling — is superfluous.").

only from intrusion, but from *crime*.[70] The home is a spatial metaphor of private refuge from crime—a crime-free zone. Its sacredness and inviolability consist not only in the integrity of its boundary but also in the freedom from crime within.

## 2. The House of Another

The common law definition of burglary required that the house entered be that "of another."[71] It followed straightforwardly that a person could not burglarize his own home. Showing that the house entered was one's own home was a defense to burglary. If several people resided in the same dwelling, then none of them could commit burglary of that shared dwelling.[72]

Modern burglary statutes have pared down the traditional definition of burglary.[73] Two key elements of the crime remain constant in contemporary incarnations: an unlawful entry[74] and the intent to commit a crime inside. As central as the idea of home was to the common law crime,[75] today, burglary usually need not involve a dwelling, as statutes typically use broader terms like "structure" or "building."[76] But out of "deference to the momentum of historical tradition[,] . . . the maintenance of a crime of burglary reflects a considered judgment that especially severe sanctions are appropriate for criminal invasion of premises under circumstances likely to terrorize

---

70. *Cf.* C.S. Parnell, Annotation, *Burglary: Outbuildings or the Like as Part of "Dwelling House,"* 43 A.L.R.2d 831, 833 (1955) ("It was one of the fundamental principles of the common law that a person should find sanctuary in his home against the unlawful acts of any person.").

71. 4 BLACKSTONE, *supra* note 67, at *227.

72. *See, e.g.*, People v. Gauze, 542 P.2d 1365, 1366 (Cal. 1975) ("It was clear under common law that one could not be convicted of burglary for entering his *own* home with felonious intent. This rule applied not only to sole owners of homes, but also to joint occupants.").

73. *See* 3 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 21.1 (2d ed. 2003) (noting that the traditional elements of burglary have been modified over time to such an extent that "the modern-day offense commonly known as burglary bears little relation to its common-law ancestor"). The Model Penal Code defines burglary as entry into a "building or occupied structure" without "license[] or privilege[]" with "purpose to commit a crime therein." MODEL PENAL CODE § 221.1(1) (1985).

74. Most statutory definitions of burglary today require neither a breaking nor a nighttime entry. The most common statutory term for the kind of entry required is "unlawful[]," but "unauthorized," "without authority," "without consent," and "by trespass" are also used. 3 LAFAVE, *supra* note 73, § 21.1(c) (internal quotation marks omitted).

75. *See id.* § 21.1(a) ("[C]ommon-law burglary found its theoretical basis in the protection of a man's right of habitation.").

76. *See id.* at nn.83-87 (citing statutes and cases).

occupants."[77] Hence the Model Penal Code and many statutes treat burglary of a dwelling as a more serious felony than that of other structures.[78]

Even with the abandonment in most modern statutory formulations of the explicit requirement that the house entered be that "of another," the idea that a person cannot burglarize his own home is preserved within the requirement of unlawful entry.[79] One way of establishing that a person's entry was lawful and not burglarious is to show that the dwelling was his own home.[80] Thus, every burglary case at least implicitly involves a delineation of the boundary of the home and the entrant's relation to it.

The criminal law of burglary has traditionally relied on principles of private property. The underlying private interests of individuals with respect to property determined whether burglary was committed. But because the idea of home animates burglary law, it has often been noted that burglary is best understood not as a crime against property itself, but rather as a crime against a person's "right of habitation."[81]

Consistent with the distinction between habitation and property, it has traditionally been "occupancy" or "possession" rather than ownership that determined whether an entry was burglarious.[82] Courts in burglary cases typically have not equated ownership of property with authorization to enter that property. A landlord who owned a property could be convicted of burglary against the tenant to whom he leased the property if the lease agreement between the two excluded the landlord from the premises. Implementing the

---

77. MODEL PENAL CODE §§ 221.1-.2 explanatory note (1985).

78. *See id.* § 221.1(2) (treating burglary of a dwelling at night as a second-degree felony and burglary of other structures or a dwelling during the day as a third-degree felony); *see, e.g.*, N.Y. PENAL LAW §§ 140.20, 140.25 (McKinney 1999) (treating burglary of a "building" as a third-degree felony and burglary of a "dwelling" as a second-degree felony). My discussion of burglary in this Article proceeds on the understanding that the structure in question is a home.

79. *See* 3 LAFAVE, *supra* note 73, § 21.1(c).

80. *See, e.g.*, Mitchell v. State, 720 So. 2d 492, 495 (Miss. Ct. App. 1998) ("One cannot break and enter his own home, nor can one's own home be the dwelling house of another.").

81. 3 LAFAVE, *supra* note 73, § 21.1(c); *see* Parnell, *supra* note 70, at 834-35 ("It is evident that the offense of burglary at common law was considered one aimed at the security of the habitation rather than against property. That is to say, it was the circumstance of midnight terror aimed toward a man or his family who were in rightful repose in the sanctuary of the home, that was punished, and not the fact that the intended felony was successful.").

82. *See, e.g.*, Commonwealth v. Majeed, 694 A.2d 336, 338 n.2 (Pa. 1997) ("The historical principle underlying the law of burglary is the protection of the right of *habitation*. Today...the focus remains the protection of occupancy or possession, not merely ownership." (citation omitted)).

traditional concern for the right of habitation rather than property ownership, courts have approached the question of unlawful entry by asking whether a burglary defendant lawfully "possessed" the property.

### B.  Ousting the Spouse

#### 1.  Husbands and Anti-Ousting Laws

Burglary law and DV policy have come into close contact. Many courts have recently addressed the question of whether a DV defendant's entry into the home of his wife or girlfriend gives rise to criminal liability for burglary.[83] Prosecutors charging alleged abusers with burglary are certainly driven by the need to combat DV. But we must not overlook the prosecutorial orientation to charge the most serious crime possible. Whereas a conviction for misdemeanor assault or violation of a protection order may result in a negligible sentence, residential burglary is a serious crime that carries felony sanctions in every jurisdiction. What is often at stake in the decision to charge burglary then is a felony sentence of years for conduct that might otherwise result in a sentence of days or months.[84]

Sometimes the crime the defendant has committed inside the home is heinous, and prosecutors charge burglary alongside far more serious crimes such as murder. Not only will a burglary conviction increase the sentences in

---

83. *See* VIOLENCE AGAINST WOMEN 31-5 to -11, 31-22 to -24 (Joan Zorza ed., 2002). For commentary on spousal burglary, see Marc M. Schifalacqua, *Criminal Law—The Restraint of Common Sense, Not Violent Abusers: The Minnesota Supreme Court's Misguided Analysis in* State v. Colvin, 30 WM. MITCHELL L. REV. 699 (2003); Jane M. Keenan, Comment, *The End of an Era: A Review of the Changing Law of Spousal Burglary*, 39 DUQ. L. REV. 567 (2001); and Marjorie Ann McKeithen, Note, State v. Woods: *Interspousal Burglary in Louisiana—Too Many Doors Left Open?*, 51 LA. L. REV. 161 (1990).

84. *See, e.g.*, State v. Evenson, 554 N.W.2d 409, 412 (Minn. Ct. App. 1996) (rejecting the defendant's contention that "it is fundamentally unfair to convict him of felony burglary when the order for protection specifies that violation of the order is a misdemeanor offense"). Sometimes defendants are convicted of felony burglary on *less* evidence than that required for a misdemeanor protection order violation. *See, e.g.*, People v. Smith, 943 P.2d 31, 32-33 (Colo. Ct. App. 1996) (holding that, while the victim's verbal warning to the defendant that she had a restraining order was insufficient notice for purposes of a misdemeanor restraining order violation, it was sufficient to establish that the defendant knew that his entry was unlawful for burglary purposes). Several state courts have concluded that double jeopardy does not bar prosecution for burglary when the defendant was also convicted of criminal contempt for entering the residence in violation of a protection order. *E.g.*, People v. Allen, 868 P.2d 379 (Colo. 1994) (en banc); Commonwealth v. Burge, 947 S.W.2d 805 (Ky. 1996), *modified on denial of reh'g*, 947 S.W.2d 805 (Ky. 1997).

these cases, but it may also be a factor necessary to render the defendant eligible for the death penalty.[85] The charge of burglary then is not only symbolically or ideologically significant, but practically crucial to both prosecutors and defendants.

At common law, it would have been unimaginable to prosecute a husband for burglary of the marital home. Under the law of coverture—which limited a married woman's rights to own and dispose of property, to make binding contracts, and to sue and be sued in her own capacity—a husband's property interests superseded and included those of his wife. The husband's entry into the marital home, by definition, could not have satisfied burglary's requirement of entry into the home "of another."

The married women's property acts, enacted beginning in the 1840s, purported to reform the common law of marital status and to individuate husbands' and wives' legal identities.[86] In the late nineteenth century, a number of states passed legislation that specifically prohibited a spouse from excluding the other spouse from the home.[87] These anti-ousting laws appear to be directly responsive to the separation of the legal identities of husband and wife. In each state where such a provision was adopted, it accompanied, in the same or an adjoining provision, the statement that neither spouse had any interest in the property of the other. This context suggests that the anti-ousting provisions were designed to preserve the unity of the marital home in the face of the newly separated legal identities of husband and wife in the gradual demise of coverture.[88] The apparent purpose was to prevent newly entitled married women from excluding their husbands from the marital home,

---

85. The Model Penal Code, which is mirrored in many state death penalty statutes, lists burglary as an aggravating circumstance for a murder conviction. MODEL PENAL CODE § 210.6(3)(e) (1985).

86. But married women's legal identities continued to be constrained by marital status long after passage of the married women's property acts. *See* NANCY F. COTT, PUBLIC VOWS: A HISTORY OF MARRIAGE AND THE NATION 156-79 (2000); GROSSBERG, *supra* note 2; Reva B. Siegel, *Home as Work: The First Woman's Rights Claims Concerning Wives' Household Labor, 1850-1880*, 103 YALE L.J. 1073, 1084-85 (1994).

87. *See, e.g.*, CAL. FAM. CODE §§ 752-753 (West 2004); GUAM CODE ANN. tit. 19, § 6101(h) (1995); MONT. CODE ANN. § 40-2-201 (2005); N.D. CENT. CODE § 14-07-04 (2004); OHIO REV. CODE ANN. § 3103.04 (LexisNexis 2003); OKLA. STAT. ANN. tit. 43, § 203 (West 2001); S.D. CODIFIED LAWS § 25-2-4 (1999).

88. *See* State v. Lilly, 717 N.E.2d 322, 326 (Ohio 1999) ("[O]ne can reasonably conclude that the basis behind the spousal exclusion is the fear that one spouse would eject the other from the marital dwelling."). A historical study of the circumstances of the enactment of the nineteenth-century anti-ousting statutes is far beyond the scope of this Article.

although one could imagine a corresponding interest in protecting women from exclusion as well.

As the exclusion of the abuser from the marital home has come to be seen as a desirable way to combat DV, one way that the exclusion is increasingly enforced is through prosecution of abusers for burglary. On some occasions, when charged with burglary for entering their wives' homes, husbands have invoked the nineteenth-century anti-ousting statutes.[89] These husbands have argued that the burglary charge contravenes the anti-ousting statute: if a spouse cannot oust the other spouse, then a spouse's entry is not unlawful, and therefore a burglary conviction cannot stand. The argument rests on the traditional assumption that the law of property underlies the law of burglary; that is, if a person is in a place lawfully as a matter of property law, then his presence there is lawful for burglary purposes.

Cases confronting this defense involve courts in the project of reconciling the anti-ousting property rule—intended to preserve the unified marital home—with contemporary DV policy—a wholly different conception of the marital home in which the exclusion of one spouse is not only desirable but criminally enforced. When the two visions collide, something has to give.

### 2. *Reordering Property*

In the 1999 case of *State v. Lilly*,[90] the Supreme Court of Ohio confronted the conflict between a husband's conviction for burglary of his wife's home and a nineteenth-century anti-ousting statute. The statute, which appeared in the Domestic Relations chapter of the Ohio Legal Code, provided, in relevant part: "Neither husband nor wife has any interest in the property of the other . . . . Neither can be excluded from the other's dwelling, except upon a decree or order of injunction made by a court of competent jurisdiction."[91] The property

---

89. *See, e.g.*, People v. Davenport, 268 Cal. Rptr. 501, 503 (Ct. App. 1990); State v. O'Neal, 721 N.E.2d 73, 81 (Ohio 2000); *Lilly*, 717 N.E.2d at 325; State v. Shinn, No. 99CA29, 2000 WL 781106, at *5 (Ohio Ct. App. June 14, 2000); State v. Allen, No. L-98-1383, 1999 WL 1101849, at *1 (Ohio Ct. App. Dec. 3, 1999); State v. Brooks, 655 N.E.2d 418, 423 (Ohio Ct. App. 1995); State v. Middleton, 619 N.E.2d 1113, 1116 (Ohio Ct. App. 1993); *cf.* State v. Herder, 415 N.E.2d 1000, 1003-04 (Ohio Ct. App. 1979) (considering the application of an anti-ousting statute in criminal trespass).

90. 717 N.E.2d 322.

91. *Id.* at 326 (quoting OHIO REV. CODE ANN. § 3103.04 (West 1996)) (internal quotation marks omitted).

at issue was the marital home, from which the husband had moved out, and there was no court order excluding him from the residence.[92]

The wife testified that after she and her husband spent the day together doing errands, he "slapped her repeatedly, and burned her with a cigarette"; "to avoid further harm, she engaged in various sexual acts . . . against her will"; and he drove her to a bar, where she asked a bar employee to call the police.[93] Upon fleeing the bar, the defendant returned to the residence, entered through a door he had purposely left unlocked, ripped up several of his wife's jeans, yanked the spark plugs from her car, and took her purse.[94] Indicted on nineteen total counts of rape, attempted rape, possessing criminal tools, kidnapping, and burglary, the defendant was acquitted of all charges except burglary[95] and sentenced to five years' imprisonment for the burglary conviction.[96]

The question on appeal was whether the anti-ousting statute prohibiting his exclusion from his wife's home precluded his prosecution for burglary.[97] The Ohio Supreme Court took the position that the criminal law would ignore the anti-ousting statute.[98] The anti-ousting provision "was intended to address property ownership rights of married persons, matters of a civil nature. Privileges of a husband and wife with respect to the property of the other were not meant to be enforced criminally and do not affect criminal liabilities."[99] Because the anti-ousting statute regulated in the domains of property and family relations, it simply did not apply in a criminal case.[100] Consequently, a husband's conviction for burglary of his wife's home could stand.[101]

What is notable here is the purportedly easy division of the world into criminal and civil spheres of regulation. If applied, the anti-ousting statute would have directly conflicted with the spousal burglary conviction. According to the theory the court adopted, criminal and civil spheres were mutually exclusive and thus the civil anti-ousting statute, which regulated property interests, could have no effect on the criminal law question of burglary.

---

92. *See* State v. Lilly, 744 N.E.2d 1222, 1223 (Ohio Ct. App. 2000) (appeal after remand).

93. *Lilly*, 717 N.E.2d at 324.

94. *Id.*

95. *Id.* at 323, 325.

96. *Lilly*, 744 N.E.2d at 1223.

97. *Lilly*, 717 N.E.2d at 325.

98. *See id.* at 327.

99. *Id.* at 326.

100. *Id.*

101. *See id.* at 327-28.

But the crime of burglary does not operate apart from a property regime. The court's assertion that property law and criminal law represented wholly separate spheres deviated from the common law relation between burglary and property law. Classically, burglary law was dependent upon the underlying allocation of property rights. The criminal law question of whether a person committed burglary depended on property law for its application. The underlying property arrangement determined whether his entry was burglarious.

The *Lilly* court indicated its intention to treat the criminal and civil spheres as wholly separate for purposes of this case.[102] But by declining to apply the anti-ousting statute in a burglary case, the court was actually allowing criminal law, as DV policy, to trump the law of property. The effect was to reallocate property rights between spouses such that burglary would lie.[103]

The anti-ousting statute explicitly barred a spouse from excluding the other spouse. But a husband's conviction of burglary of his wife's home rests on his unprivileged entry therein, which must mean that he was previously excluded. This anti-ousting statute, then, is no longer applicable in criminal cases. This overruling of the anti-ousting statute necessarily constitutes a reallocation of rights to possess property relative to the way they stood prior to *Lilly*. This reallocation of property has not only been effected by the criminal law; it has occurred in the explicit overruling of property law in order to satisfy an element of burglary—unprivileged entry—that would have been determined with respect to the existing property arrangement.

What we see here is a reversal of the dependence of burglary law on the law of property. Whereas traditionally, burglary depended on the prior allocation of possessory rights determined by property law, we now see the criminal law subordinating property law to its interests, in effect reallocating private rights. While property law had previously set the conditions for burglary, criminal law now takes precedence in defining property rights in this DV context.

*Lilly* illustrates the way in which the imperative to treat presence at home as a proxy for DV engages the criminal law in the reordering of property rights. The court noted that a majority of other jurisdictions "have found that the entry of an estranged spouse upon the property of the other spouse constitutes an unauthorized entry to support charges of trespass and burglary."[104] These

---

102. *Id.* at 326.

103. In speaking of the reallocation of property rights, I refer to possessory rights, not ownership or title. *See supra* text accompanying notes 81-82 (noting that occupancy or possession, rather than ownership or title, controlled whether an entry was burglarious).

104. *Lilly*, 717 N.E.2d at 327.

other cited cases, all from the 1980s and 1990s, involved DV,[105] but the states in those cases did not have similar anti-ousting statutes that could have conflicted with the conclusion that a husband's entry into his wife's home could be burglarious. Rather than providing strong doctrinal support for the court's holding, the citation of these other jurisdictions signaled that the court was reasoning out of general sympathy for the widely shared policy against DV.

The court thereby tethered its reasoning to DV policy in holding burglary law to achieve a result prohibited by a property statute. This deployment of the criminal law to rearrange property foreshadows a structure of criminal law intervention that recurs in the areas under investigation in this Article. Even as it claims to treat civil interests as a separate sphere, the criminal law, through its coercive power and its claim to the public interest, has an unmatched capacity to reorganize private interests.

## C. Burglarious Entry

### 1. The Protection Order

The criminalization of presence at home as a proxy for DV does not only affect the law of burglary on the margins. It reaches centrally and directly into the elements of burglary. The most important driver in this process has been the DV protection order. In recent years, prosecutors in many jurisdictions have used the existence of a protection order excluding a person from a residence to establish that his entry into what he may consider his own home is burglarious. Deployed in this way, the protection order does more than exclude. It transforms a person's legal status in his home into that of a stranger and his presence at home into a stranger's intrusion.

Typically, in burglary cases involving spouses, a court has issued a protection order prohibiting a husband from contacting his wife and going to her home. The husband has subsequently been present in the home. The husband's violation of the protection order being undisputed, the legal question is whether his entry was unlawful for the purpose of burglary law. The defendant argues in his defense that he cannot be prosecuted for burglary because—by virtue of his marriage or his actual residence in or ownership of the dwelling—his entry was into his own home.[106]

---

105. *See id.*

106. *See, e.g.*, State v. Suarez-Mesa, 662 So. 2d 735, 735-36 (Fla. Dist. Ct. App. 1995); State v. Peck, 539 N.W.2d 170, 173 (Iowa 1995); State v. Bishop, 574 P.2d 1386, 1391 (Kan. 1978);

When courts ask whether a person is liable for burglary of the dwelling of his spouse, the fact of the marital relationship does not preclude a burglary conviction because the separateness of spouses' property interests is now well established.[107] Nor does a burglary defendant's exclusive or shared ownership of the residence preclude conviction, as burglary concerns the right of habitation or possession rather than title to property.[108] The existence of a protection order is often determinative[109] — the protection order violation is usually treated as sufficient to satisfy the unlawful entry element of burglary.[110] Sometimes a spouse's entry is considered burglarious despite the absence of a protection order when a court finds that other circumstances suggest unauthorized entry.[111] But the existence of a protection order is the most

---

People v. Szpara, 492 N.W.2d 804, 805 (Mich. Ct. App. 1992); State v. Evenson, 554 N.W.2d 409, 410 (Minn. Ct. App. 1996); Calhoun v. State, 820 P.2d 819, 821 (Okla. Crim. App. 1991).

107. *See, e.g.*, Folsom v. State, 668 So. 2d 114, 116 (Ala. Crim. App. 1995); Cladd v. State, 398 So. 2d 442, 443-44 (Fla. 1981); State v. Dively, 431 N.E.2d 540, 543 (Ind. Ct. App. 1982); State v. Hagedorn, 679 N.W.2d 666, 670-71 (Iowa 2004); State v. Woods, 526 So. 2d 443, 445 (La. Ct. App. 1988); Parham v. State, 556 A.2d 280, 284-85 (Md. Ct. Spec. App. 1989); State v. Cox, 326 S.E.2d 100, 102-03 (N.C. 1985); State v. Herrin, 453 N.E.2d 1104, 1106 (Ohio Ct. App. 1982); Stanley v. State, 631 S.W.2d 751, 753-54 (Tex. Crim. App. 1982).

108. *See, e.g.*, People v. Williams, 582 N.E.2d 1158, 1161-62 (Ill. App. Ct. 1991) ("[T]he Illinois Domestic Violence Act expressly states that the owner of a home may be prohibited from entering the premises if the protected party has a right to exclusive occupancy of the residence."); *Evenson*, 554 N.W.2d at 412 (concluding that burglary is defined without regard to ownership); *Calhoun*, 820 P.2d at 822 (finding that a protection order divested a husband of his possessory interest in the home); Commonwealth v. Majeed, 694 A.2d 336, 338 (Pa. 1997) ("[L]egal ownership is not synonymous with license or privilege; an owner of property may relinquish his or her license or privilege to enter."); *Ex parte* Davis, 542 S.W.2d 192, 195-96 (Tex. Crim. App. 1976) (concluding that despite the defendant's ownership interest, his wife's exclusive possession defeated his ownership capacity to grant consent to enter).

109. *See* VIOLENCE AGAINST WOMEN, *supra* note 83, at 31-35; *see, e.g.*, Fortes v. Sacramento Mun. Court, 113 Cal. App. 3d 704, 704-05 (1980) (holding that the defendant could not be convicted of burglary of his family dwelling given that the restraining order was no longer in effect when the entry took place); Mitchell v. State, 720 So. 2d 492, 494 (Miss. Ct. App. 1998) (reversing the defendant's burglary conviction when "[t]here were no restraining orders or other legal writs keeping Mitchell from going to and pushing open the door of his own house"); *Calhoun*, 820 P.2d at 822 (finding that the protective order was "determinative" of the proposition that the burglary defendant entered into the dwelling of another).

110. *See, e.g.*, *Suarez-Mesa*, 662 So. 2d at 736; *Williams*, 582 N.E.2d at 1161; *Peck*, 539 N.W.2d at 173; *Szpara*, 492 N.W.2d at 805-06; *Evenson*, 554 N.W.2d at 411-12; *Calhoun*, 820 P.2d at 822; *Majeed*, 694 A.2d at 338-39; *Ex parte* Davis, 542 S.W.2d at 195-96.

111. *See, e.g.*, *Folsom*, 668 So. 2d at 116; People v. Davenport, 219 Cal. App. 3d 885, 892 (1990) (considering, inter alia, evidence that the defendant lived elsewhere, relinquished keys, and

important factor in sustaining a spousal burglary charge, and the absence of a protection order is the factor most likely to invalidate the charge.

### 2. *The Stranger at Home*

It may seem obvious that a court order prohibiting a person from entering a property must render his entry therein unlawful. But a formally unauthorized entry is distinguishable from a burglarious entry, which classically entails the determination that the place the person entered was not his home. A protection order may prohibit a person from going to a particular place, but it is not a declaration that the property in question is not his home; he could be formally prohibited from a place that remains his home.[112] But a burglary conviction amounts to a legal judgment that the defendant was not at home. The use of the protection order to satisfy the unlawful entry element of burglary legally estranges the defendant from the home.[113]

A factor that leads courts to render violation of a protection order burglarious is a form of words. Modern statutory definitions of burglary speak of unlawful entry instead of the traditional common law formulation of entry into the dwelling of another.[114] Unlawful entry is easily satisfied by the protection order, which formally does make entry unlawful. Whatever the particular statutory language, DV defendants charged with burglary advert to

---

took possession of some of his personal property); State v. Johnson, 906 P.2d 122, 126 (Colo. 1995) (considering evidence that the apartment was leased in the wife's name and not the defendant's and that she had filed for divorce); Ellyson v. State, 603 N.E.2d 1369, 1372-73 (Ind. Ct. App. 1992) (considering evidence that the defendant moved out and his wife controlled access to the home); *Hagedorn*, 679 N.W.2d at 671 (considering evidence that the defendant's "personal belongings had been boxed and were on the porch for him to pick up"; that the "defendant had been told emphatically on multiple occasions that he was no longer welcome and should stay away"; and that "his wife had changed the locks after an earlier incident when he had appeared uninvited in the house"); *Stanley*, 631 S.W.2d at 753 (considering the couple's separation and the wife's having filed for divorce).

112. *See, e.g.*, *Peck*, 539 N.W.2d at 172 (noting the defendant's concession that "under some circumstances a party may not have a right to enter a home, even if it is his own"); People v. Pohl, 507 N.W.2d 819, 820-21 (Mich. Ct. App. 1993) ("[T]here is no right to enter into one's home, in violation of a restraining order . . . ."); *Mitchell*, 720 So. 2d at 494 (noting that there were no restraining orders prohibiting the defendant from entering his own home).

113. Courts in burglary cases involving married couples frequently speak of the "estranged" spouse—not a legally significant category in family law or property law—thus estranging married couples rhetorically as well as legally. *See, e.g.*, Cladd v. State, 398 So. 2d 442, 443 (Fla. 1981); Hedges v. Commonwealth, 937 S.W.2d 703, 704 (Ky. 1996); State v. Lilly, 717 N.E.2d 322, 325 (Ohio 1999); *Calhoun*, 820 P.2d at 821.

114. *See* 3 LAFAVE, *supra* note 73, § 21.1(a).

the common law principle that because the property entered must be that of another, a person cannot be convicted of burglary of his own home. Courts could explicitly dismiss this common law conception as outdated. But they do not. Instead, courts effectively treat the unlawful entry as entry into the dwelling of another and thus not the defendant's own home.[115]

The policy against DV drives the legal move from the protection order to burglary.[116] Through the law of burglary, the protection order not only ousts its subject physically but legally renders him a stranger to a home. Burglary carries this meaning in a way that a simple protection order violation does not, because it is burglary law that, at common law and today, requires a legal determination that a stranger has crossed the boundary into the home of another. DV becomes legible as the archetypal crime of home invasion.[117]

### 3. The Super-Stranger

Let us turn to one exemplary case that makes visible the seams of the legal convergence of the entry in violation of a protection order with the burglarious entry. *Ex parte Davis* was a Texas appeal from a habeas corpus proceeding instituted to secure bail in a capital murder case in which the indictment alleged murder in the course of burglary and attempted burglary.[118] The defendant and his wife lived in a residence that he owned with his brother.[119] Pursuant to a pending divorce suit, a court order barred the defendant from the premises.[120] The defendant entered the residence with his brother's consent.[121]

---

115. *See, e.g., Ellyson*, 603 N.E.2d at 1373 ("[T]he burglary statute's requirement [that] the dwelling be that 'of another person' is satisfied if the evidence demonstrates the entry was unauthorized, even though the accused may have had a right to possession of the house co-equal with his wife at the time of the breaking.").

116. *See, e.g., Peck*, 539 N.W.2d at 173 ("Application of our burglary law in these circumstances will tend to discourage domestic violence and promote security in the home."); Commonwealth v. Majeed, 694 A.2d 336, 340 n.6 (Pa. 1997) ("A violation of a [protection order] is a violation of the law, a public wrong . . . . Because the Commonwealth has an interest in enforcing a [protection order], Appellant's contention that the Commonwealth is precluded from using a violation of the order to create an element of burglary is meritless.").

117. *See, e.g., Majeed*, 694 A.2d at 339 ("[A]pplication of the law of burglary . . . discourag[es] domestic violence and unauthorized invasions of the home."); McKeithen, *supra* note 83, at 175 ("[T]he potentially dangerous situation created by the unexpected and unauthorized invasion by one spouse into the abode of the other is exactly the type of situation burglary law was designed to guard against . . . .").

118. 542 S.W.2d 192, 194 (Tex. Crim. App. 1976).

119. *Id.* at 195.

120. *Id.*

Inside he killed two people and wounded several others, including his wife.[122] The defendant challenged the burglary charge upon which his capital murder charge was based, claiming that his entry into his home was not burglarious, and that the charge of capital murder represented a "wanton and freakish" application of the law.[123]

The Texas burglary statute provided that a person commits burglary if, "without the effective consent of the owner," he "enters a habitation . . . with intent to commit a felony or theft."[124] The statute further defined "owner" as "a person who has title[,] . . . possession[,] . . . or a greater right to possession of the property than the actor."[125] Reciting the principle that "ownership" for burglary purposes does not merely involve title to property, the Texas Court of Criminal Appeals reasoned that the court order barring the defendant from the premises gave his wife "exclusive right of possession of the residence," which defeated his ability to enter legally despite his title interest in the property: "All rights to enter the house held by [the defendant] were negated by the order of the court."[126]

So by operation of the protection order, the defendant, who owned the property, was not the "owner" of the home for the purpose of the burglary statute; his wife was. Furthermore, the court held that the defendant's brother, who was not a party to the protection order, could not validly consent to the defendant's entry despite his own title interest in the property because then the "order could be circumvented extrajudicially."[127] The court refused to "permit an injunction to be invalidated in this injudicious manner."[128] The brother's consent was "rendered meaningless by the injunction enjoining [the defendant] from coming near the property."[129] The burglary charge was upheld as was the capital murder charge with it.

So despite being an actual owner of the property himself, the defendant was not considered an "owner" for purposes of burglary. Nor did the couple's married status preclude a burglary charge. So far, *Davis* appears to be a typical instance of the application of burglary law to the spousal violence scenario.

---

121. *Id.* at 195 & n.1.

122. *Id.* at 195.

123. *Id.*

124. TEX. PENAL CODE ANN. § 30.02(a) (Vernon 2006).

125. *Id.* § 1.07(a)(35).

126. *Ex parte Davis*, 542 S.W.2d at 196.

127. *Id.*

128. *Id.*

129. *Id.* at 195 n.1.

But *Davis* went further. The facts featured another actual owner, the defendant's brother, who was a nonparty to the court order and who, as the court acknowledged, consented to the defendant's entry.[130] The order barring the defendant from the residence effectively gave the defendant's wife exclusive possession as against the defendant, but it did not appear to affect the brother's property rights. Tellingly, the court did not say that the brother was not an "owner"; he must, on any reading, have been an owner for burglary purposes because he retained, in the words of the burglary statute, "a greater right of possession than the actor." Indeed, the brother was an owner under the statutory definition and had consented to the defendant's entry.

In an ordinary situation in which a stranger is given consent to enter by an owner, he cannot be charged with burglary. To hold that the burglary charge was valid here, the court had to treat this husband as even more of a stranger, as it were, than a true stranger would have been. That is, the court had to find lack of consent even when a lawful owner had consented. This was not merely a legal nicety; the defendant's capital murder charge depended on it.

What enabled the super-estrangement of the defendant from the home to this maximum degree was the protection order. In the first instance, the protection order functioned to establish that, as between the wife and the husband, the wife's right of possession was greater than the husband's, thereby rendering him no longer an "owner" for the purposes of the burglary law, despite his title interest. But the protection order did much more. It rendered *any* entry by the defendant unauthorized for burglary purposes by nullifying the exercise of a property right (consent) of an owner (the brother) who was not a party to the order.

To convict this defendant of burglary, the court treated the protection order as if it amended the burglary statute to the effect that entry in violation of a protection order would automatically constitute burglarious entry even where actual consent to enter was given. In the course of so doing, the court nullified a property owner's ability to consent to entry and rewrote the burglary statute's requirement of nonconsent. The effect was to pry loose burglary's dependence on preexisting property rights.

The court justified its decision by adverting to the policy interest in the enforcement of court orders.[131] But this policy could be satisfied by punishing violations of those orders themselves. It is not obvious that convicting those who have violated protection orders of the far more serious crime of burglary is necessary to the enforcement of court orders. Furthermore, it is uncertain that

---

**130.** *Id.* at 195 & n.1.

**131.** *Id.* at 195-96.

charging a defendant with capital murder as opposed to murder is necessary to serve that policy interest. Rather, the policy interest in enforcing court orders in the context of spousal burglary is the interest in punishing DV through the proxy of presence in the home.

The violent husband becomes the super-stranger who is a burglar even when ordinary burglary law and the statutory definition of burglary would not treat him as one. The entry in violation of a DV protection order itself becomes a burglarious entry even when consent is given. The husband must become an intruder, even when that necessitates the transformation of an element of burglary itself.

### D. Burglary by Proxy

The previous Section focused on the unlawful entry element of burglary. This Section focuses on the second element of burglary: the intent to commit a crime inside.

#### 1. The Independent Crime

Burglary is more than unlawful entry and presence in a property. It also requires the intent to commit a crime inside. At common law, the crime the defendant intended to commit had to be distinct from his trespass therein.[132] The distinction between these two elements of burglary is the reason burglary is classically understood as a specific intent crime.

The DV protection order challenges and sometimes blurs the distinction between the elements of burglary. Burglary charges in cases that involve DV sometimes rely on the protection order to satisfy the requirements of both unlawful entry *and* intent to commit a crime inside.[133] That is, the protection order, which often prohibits a range of conduct that is not ordinarily criminal, can alone serve as the basis for the crime of burglary. This move effectively

---

132. *See* 4 BLACKSTONE, *supra* note 67, at *227; 3 COKE, *supra* note 67, at 63; 2 EAST, *supra* note 67, at 484; 1 HALE, *supra* note 67, at 549; 3 LAFAVE, *supra* note 73, § 21.1(e).

133. *See, e.g.*, People v. Rhorer, 967 P.2d 147 (Colo. 1998) (en banc); People v. Widhalm, 991 P.2d 291, 293-94 (Colo. Ct. App. 1999); People v. Lewis, 840 N.E.2d 1014, 1018 (N.Y. 2005); People v. Tillman, 709 N.Y.S.2d 765, 766 (N.Y. App. Div. 2000); State v. Knight, 981 P.2d 819, 821 (Or. Ct. App. 1999); State v. Hahn, No. 23072-4-III, 2005 WL 2234757, at *2 (Wash. Ct. App. Sept. 15, 2005); State v. Forsythe, No. 22819-III, 2005 WL 1041194, at *1-2 (Wash. Ct. App. May 5, 2005); State v. Spencer, 114 P.3d 1222, 1225-26 (Wash. Ct. App. 2005); State v. Stinton, 89 P.3d 717, 720-21 (Wash. Ct. App. 2004); State v. Ayler, No. 23400-9-II, 2000 WL 132796, at *2 (Wash. Ct. App. Feb. 4, 2000).

equates violation of a protection order with the wholly completed crime of burglary.

The leading case to embrace this move is the 1998 Colorado case of *People v. Rhorer*.[134] The Colorado burglary statute provided that a person commits second-degree burglary "if he knowingly breaks an entrance into, or enters, or remains unlawfully in a building or occupied structure with intent to commit therein a crime against a person or property."[135] The defendant broke through a window into his ex-girlfriend's home while there was a no-contact restraining order in effect.[136] He was charged with burglary and menacing, but a jury acquitted him of the menacing charge.[137] The defendant was convicted of burglary based on his intent to commit the misdemeanor crime of violating a restraining order and was sentenced to twenty-five years imprisonment.[138]

A unanimous Colorado Supreme Court held that the entry in violation of the restraining order could serve as the crime the defendant intended to commit inside the dwelling.[139] The court reasoned that the restraining order, issued pursuant to the state's Domestic Abuse Act, was intended to protect DV victims.[140] The violation of a restraining order constituted a misdemeanor crime.[141] Therefore, the court concluded, the "intent to violate the no-contact order by breaking into [the victim's] home constituted an 'intent to commit therein a crime against person or property' and fulfilled that element of the crime" of burglary.[142]

Making no mention of the common law's rejection of the parallel reasoning with respect to trespass, the court found it consistent with DV policy to treat the entry in violation of a protection order as burglary. Under the court's formalistic reasoning, entry in violation of a protection order would become the crime of burglary, even though the state legislature had not stated an intent to punish a protection order violation as harshly as burglary. The holding converted a misdemeanor crime into a serious felony crime. Because the jury

---

134. 967 P.2d 147.

135. COLO. REV. STAT. § 18-4-203 (1998), *quoted in Rhorer*, 967 P.2d at 149.

136. *Rhorer*, 967 P.2d at 148.

137. *Id.* at 148.

138. *See id.*; *id.* at 149. The defendant's sentence also reflected his guilty plea to two counts of being a habitual offender. *Id.* at 148. The court of appeals vacated the burglary conviction. *Id.*

139. *See id.* at 150.

140. *See id.*

141. *Id.*

142. *Id.* at 151 (citation omitted).

had acquitted the defendant of the menacing charge and there was no other criminal intent explicitly at issue, the only culpable intent on which this felony conviction was actually based was the unlawful entry.[143]

In the 2002 case of *State v. Colvin*, the Supreme Court of Minnesota reached the opposite answer on the same question of whether entry in violation of a restraining order satisfies the independent crime element of burglary.[144] The defendant's ex-wife had obtained an emergency ex parte civil order prohibiting him from contacting her or going to her home.[145] The defendant entered her residence through an unlocked window, watched television, drank a beer, and left when asked to leave.[146] The predicate crime alleged and proven was the entry in violation of the protection order.[147] The defendant was charged and convicted of first-degree burglary, which Minnesota law defined as the entry of a dwelling while another person is inside "without consent and with intent to commit a crime," or such entry coupled with actual commission of a crime inside.[148]

The Minnesota Supreme Court reversed the conviction, concluding that entry in violation of a protection order, which did satisfy the unconsented entry element of burglary, could not also satisfy the independent crime requirement.[149] The court observed "the legislature's intent to treat domestic abuse seriously and severely," as evidenced by the differential penalties for third-time violations of trespass (a misdemeanor) and third-time violations of protection orders (a felony).[150] Thus, "[i]f the legislature chooses to sanction violation of [a protection order] based solely on entering a home similarly to

---

143. The unlawful entry, of course, may itself have suggested to the jury and to the court that the defendant was up to no good and intended to commit a violent crime against his ex-girlfriend, and it may have led to the conviction and the court's result on review. I do not suggest otherwise. The specific legal question actually decided in *Rhorer*, however, was whether the sole intent to enter in violation of a protection order could constitute the predicate crime for burglary. Apart from the menacing charge, on which the jury acquitted, intent to commit a violent crime was not at issue.

144. 645 N.W.2d 449 (Minn. 2002); *see also* Hedges v. Commonwealth, 937 S.W.2d 703, 706 (Ky. 1996) (holding that entry in violation of a protection order without other evidence of intent to commit an independent crime is insufficient to satisfy the elements of burglary); People v. Lewis, 840 N.E.2d 1014, 1017 (N.Y. 2005) (finding that unlawful entry cannot itself satisfy the "intent to commit a crime therein" element of burglary).

145. *Colvin*, 645 N.W.2d at 450-51.

146. *Id.* at 451.

147. *Id.* at 452.

148. MINN. STAT. § 609.582(1) (2006), *quoted in Colvin*, 645 N.W.2d at 452.

149. *Colvin*, 645 N.W.2d at 453-54.

150. *Id.* at 455.

first-degree burglary . . . it can do so by amending the appropriate statutes."[151] Entry in violation of the protection order could not be the sole basis for the burglary charge;[152] it also required evidence of intent to commit, or the actual commission of, an additional, separate crime.[153]

In dissent, Justice Anderson took issue with the court's view that the defendant's entry in violation of the protection order was tantamount to a trespass.[154] Justice Anderson inferred from the defendant's past behavior around his ex-wife—specifically, stealing, threatening violence, intoxication, and bringing drugs, alcohol, and inappropriate friends to the home[155]—that he intended more than mere entry into the home, at the very least, to contact her and to "cause fear of harm."[156] Indeed, Justice Anderson wondered why the defendant did not leave after not finding his ex-wife home (instead "staying for two hours while drinking a beer and watching TV"[157]) if his only intent was to enter the home.[158] A "court-prohibited entry into a home by a person with a court-identified propensity to harm or cause fear of harm to the home-owner"—an abuser—was not "a mere trespass into a building by a stranger."[159] The entry of a stranger would not have been burglary. But a domestic abuser was a super-stranger for burglary purposes.[160] And an abusive super-stranger's intent to commit a crime other than the unlawful entry could be inferred from his unlawful presence in the home even when an ordinary stranger's intent could not.

### 2. The Residue of Specific Intent

What motivates the desire in this domain to remake the protection order violation into burglary? A functional answer, of course, is that the drive to punish DV harshly motivates courts to punish the protection order violation

---

**151.** *Id.*

**152.** *Id.* at 456.

**153.** *Id.*

**154.** *Id.* (Anderson, J., dissenting).

**155.** *Id.* at 457 ("About this mere trespasser, Michelle stated, 'I am afraid.'").

**156.** *Id.* at 457-58.

**157.** *Id.* at 457 n.2, 458.

**158.** *Id.* at 457 n.2.

**159.** *Id.* at 458. See my discussion *supra* Section I.C of the protection order's function to identify the person, relationship, and home as, respectively, an abuser, an abusive relationship, and a dangerous place.

**160.** See my discussion of the "super-stranger," *supra* Subsection II.C.3.

far more harshly than the law would otherwise provide. If presence at home is a proxy for DV, burglary becomes a magnified proxy crime with far more serious punitive consequences than a misdemeanor protection order violation.

*Rhorer* and Justice Anderson's *Colvin* dissent reveal the ideological stakes surrounding the relationship between presence at home and the specific intent element of burglary. The implication resting just below the surface is that the defendant does not have much good reason to be present in the home other than to engage in violence. The specific intent, so to speak, is DV.

While *Rhorer* represents the extreme instance of the explicit legal conflation of burglary's unlawful entry and specific intent elements, courts have generally not found it necessary to go that far to achieve the goal of equating the protection order violation with burglary. The protection order typically prohibits a range of conduct including entry into the home and contact with the victim, and it is possible to infer from a defendant's presence in the home that he must also intend to make contact with the victim while there. If the two prohibitions are in a protection order, by his presence in the home, the defendant violates one and at least intends to violate the other. Thus the protection order itself becomes the sole basis on which the wholly completed crime of burglary can be established.[161]

The doctrinal developments I have discussed suggest the imaginative equation between burglary, the archetypal crime of a stranger's intrusion into the home,[162] and DV, which was for a long time noncriminal conduct within the home.[163] The doctrinal convergence of burglary with the protection order violation represents the evolution of DV, once barely considered a crime, into the very archetype of crime at common law: crossing the boundary into the home. It is, perhaps unsurprisingly, still useful for an action inside the home to be imagined as coming from outside the home boundary if it is to be cognizable as a crime. As violence within the home begins to be considered a crime, it takes on the legal characteristics of crime that crosses in from outside.

As we have seen, this process required the casting of the alleged domestic abuser as a stranger, even a super-stranger, through operation of a legal exclusion from property. The abuser is constructed, juridically and

---

**161.** *See* sources cited *supra* note 132. For example, in New York, entry in violation of a protection order cannot satisfy both the entry and intent elements of burglary, *see* People v. Lewis, 840 N.E.2d 1014, 1017 (N.Y. 2005), but the state is not required to specify the precise crime that the defendant intended to commit inside the premises, *see id.* at 1018. A prosecutor can point to the circumstances and prior acts of DV to invite an inference of intent to violate the protection order beyond the unlawful entry. *See id.* at 1017-18.

**162.** *See* discussion *supra* Section II.A.

**163.** *See* discussion *supra* Subsection I.A.1.

imaginatively, as the intruding stranger. His presence becomes the basic criminal breach of the home space that Blackstone thought sacred and inviolate. The home boundary that once shielded the abuser from criminal law is now drawn by the criminal law to exclude him.[164] The state thereby reallocates property in the home and enters to enforce that reallocation, protecting the boundary from incursion by the newly designated intruder. The abuser is out, and the state is in.

## III. DE FACTO DIVORCE

When the state is in the home, what does it do there? This Part focuses on the reordering and control of family relationships through the criminal law. I turn to a leading jurisdiction, New York County (i.e., Manhattan), that is considered to be "in the forefront of efforts to combat domestic violence," and that has seen significant changes in its enforcement approach in the last decade.[165] In this jurisdiction, a routine practice in the prosecution of misdemeanor DV exemplifies the expanding criminal law control of the home: the prosecutorial use of criminal court protection orders to seek to end intimate relationships. Prosecutors' deployment of protection orders in the normal course of misdemeanor DV prosecution amounts in practice to state-imposed de facto divorce.[166]

### A. Enforcement Protocol

The Manhattan District Attorney's Office (D.A.'s Office) defines domestic violence as "*any* crime or violation committed by a defendant against . . . a member of his or her same family or household," including "people living

---

164. The phenomenon of reallocating property rights in the home to DV victims through protection orders has given rise to the idea of a property right to police enforcement of a protection order. *See, e.g.*, Gonzales v. City of Castle Rock, 366 F.3d 1093 (10th Cir. 2004) (en banc) (holding that a restraining order confers a property interest in police enforcement that cannot be denied without due process), *rev'd*, 545 U.S. 748 (2005).

165. RICHARD R. PETERSON, N.Y. CITY CRIMINAL JUSTICE AGENCY, THE IMPACT OF MANHATTAN'S SPECIALIZED DOMESTIC VIOLENCE COURT 1 (2004), http://www.cjareports.org/reports/manhat46.pdf.

166. I use the term "de facto divorce" to refer to the treatment not only of married couples, but also of cohabiting intimates who are not married, some of whom have children together. In other words, my discussion encompasses couples with ordinary attributes of pursuing a life in common, whether formally married or not.

together or who formerly lived together as a domestic unit."[167] After arraignment, misdemeanor DV cases are prosecuted in a special DV court within the criminal court system.[168] The vast majority of DV cases involve charges of misdemeanor or lesser severity.[169] These include misdemeanor assault, which requires "physical injury to another person."[170] Felony assault requires "serious physical injury."[171]

By definition, misdemeanors do not involve serious physical injury. Many DV misdemeanor cases charged in criminal court do not allege physical harm.[172] The harm alleged may instead be psychological, financial, or to

---

**167.** 2004 CRIMINAL COURT CRIMES MANUAL 18 (2004) [hereinafter MANUAL] (on file with author). This definition of DV includes but is broader than "family offenses," statutorily defined as the following crimes between "members of the same family or household": disorderly conduct, harassment, aggravated harassment, menacing, reckless endangerment, assault, attempted assault, and stalking. N.Y. CRIM. PROC. LAW § 530.11 (Consol. 2006). "Members of the same family or household" include "(a) persons related by consanguinity or affinity; (b) persons legally married to one another; (c) persons formerly married to one another; and (d) persons who have a child in common, regardless whether such persons have been married or have lived together at any time." *Id.* Of the 104,857 cases arraigned in Manhattan in 2004, 4512 were arraigned on DV charges. *See* Karen Freifeld, *Toughening Domestic Violence Laws*, NEWSDAY, Mar. 11, 2005, at A19; HON. JUANITA BING NEWTON & WILLIAM H. ETHERIDGE III, CRIMINAL COURT OF THE CITY OF NEW YORK: ANNUAL REPORT 2004, at 15, http://www.nycourts.gov/courts/nyc/criminal/NYCCD-Annual-Report-2004.pdf (last visited Sept. 28, 2006).

**168.** The Manhattan Misdemeanor DV Court was established in 2000. PETERSON, *supra* note 165, at 2. Felony cases are heard in the supreme courts. *Id.* at 12.

**169.** About 96% of DV cases in Manhattan in 1998 and 2001 were disposed in criminal court, where only charges of misdemeanor or lesser severity are disposed. *Id.* About 74% of DV cases in the third quarter of 1998 and 83% in the first quarter of 2001 involved charges of misdemeanor or lesser severity. *Id.*

**170.** N.Y. PENAL LAW § 120.00 (Consol. 2006) (defining assault in the third degree as causing physical injury intentionally, recklessly, or with criminal negligence by means of a deadly weapon or dangerous instrument).

**171.** *Id.* §§ 120.05, 120.10.

**172.** *See* RICHARD R. PETERSON, N.Y. CITY CRIMINAL JUSTICE AGENCY, COMPARING THE PROCESSING OF DOMESTIC VIOLENCE CASES TO NON-DOMESTIC VIOLENCE CASES IN NEW YORK CITY CRIMINAL COURTS 30 (2001), http://www.cjareports.org/reports/dv01.pdf (indicating that 65% of DV cases in the third quarter of 1998 were charged as assault, 15% as criminal contempt, and the remainder as other crimes such as harassment, criminal mischief, and larceny); PETERSON, *supra* note 165, at 28 (indicating that 63% of DV cases in Manhattan in the first quarter of 2001 were charged as assault and 15% as criminal contempt); *see also* CHANDRA GAVIN & NORA K. PUFFETT, CTR. FOR COURT INNOVATION, CRIMINAL DOMESTIC VIOLENCE CASE PROCESSING: A CASE STUDY OF THE FIVE BOROUGHS OF NEW YORK CITY 35 (2005), http://www.courtinnovation.org/_uploads/documents/Citywide%20Final1.pdf (noting the view held by members of the defense bar that many DV

property.[173] Common charges in cases in which no physical violence is alleged include criminal mischief (damaging property), larceny, criminal contempt (violation of a protection order), and harassment (a violation, not a crime).[174] Because most DV cases are misdemeanors, my discussion here primarily concerns the enforcement of misdemeanor DV, for which serious physical injury is not at issue.

DV as a category of crime is considered very serious and distinctive.[175] Cases deemed to fall in the category of DV trigger application of a "mandatory domestic violence protocol" different from other crimes.[176] Even as the "violence" of DV has been defined down to include even cases without physical violence or injury, the mandatory protocol applies in all cases falling in the category, regardless of the seriousness or injuries in the particular case.[177]

The uniform application of a mandatory protocol in every case represents the prosecutorial response to a paradigm story in which DV victims can turn into murder victims overnight. In the oral culture of a prosecutor's office, a misdemeanor DV defendant has the potential to turn out to be an O.J. Simpson.[178] In other words, every case is to be treated as a potential prelude to murder. Rookie prosecutors are warned that their DV misdemeanors are the

---

cases "do not meet the definition of domestic violence as a cycle of violence involving an acute power imbalance, even if there has been an assault").

173. *See* PETERSON, *supra* note 172, at 11, 17 (noting that the definition of DV now includes acts that inflict financial or psychological harm).

174. *See* GAVIN & PUFFETT, *supra* note 172, at 35 (noting a defense attorney's view of the incongruity of putting "an ex-boyfriend who allegedly called his ex-girlfriend once on the phone and threatened her" in the DV category along with "a married couple, married ten years with children, and he's put her in the hospital").

175. For overviews of misdemeanor DV enforcement practice in New York City, see RICHARD R. PETERSON, N.Y. CITY CRIMINAL JUSTICE AGENCY, COMBATING DOMESTIC VIOLENCE IN NEW YORK CITY: A STUDY OF DV CASES IN THE CRIMINAL COURTS (2003), http://www.cjareports. org/reports/ressum43.pdf; PETERSON, *supra* note 172; and PETERSON, *supra* note 165.

176. MANUAL, *supra* note 167, at 19.

177. *See* Symposium, *Women, Children and Domestic Violence: Current Tensions and Emerging Issues*, 27 FORDHAM URB. L.J. 565, 663 (2000) [hereinafter *Women, Children and Domestic Violence*] (remarks of Carol Stokinger) ("[W]e are stepping in and making an arrest when [the victim] has asked us not to and where there has been no physical violence. . . . [T]hose are the cases that are now coming into the criminal justice system.").

178. *Cf.* Elaine Chiu, *Confronting the Agency in Battered Mothers*, 74 S. CAL. L. REV. 1223, 1223 n.1 (2001) ("The most dramatic increase in public concern for domestic violence occurred in the summer of 1994 when the O.J. Simpson trial became 'a national "teach-in" on the issue of domestic violence.'" (citation omitted)); Miccio, *supra* note 7, at 238 (noting that after the O.J. Simpson case, "politicians raced to the state house to invoke DV laws, jumping on the 'zero tolerance' bandwagon").

cases that could get their names in the newspaper for failure to prevent something more serious. Thus in DV cases, prosecutors make decisions in the shadow of public oversight and have an enhanced incentive to use every means available to protect victims.

The enforcement protocol consists of the following practices. Police officers must make an arrest if there is reasonable cause to believe that a DV crime, including violation of a protection order, has been committed.[179] Officers therefore sometimes make DV arrests without inquiry into the victims' wishes.[180] Once a DV arrest is made, the D.A.'s Office has a no-drop prosecution policy, according to which the decision to charge and prosecute does not hinge on the victim's willingness to cooperate. Prosecutors continue to pursue cases in the face of the victim's opposition and routinely inform victims that the choice to prosecute belongs to the state.[181]

The mandatory practice in this area includes a set of rules that do not generally apply in non-DV cases.[182] The police department requires arresting officers in every DV case to appear personally at the D.A.'s Office's complaint room (where prosecutors screen arrests, decide what charges to file, and draw up criminal complaints around the clock) to speak with the prosecutor shortly

---

179. *See* N.Y. CRIM. PROC. LAW § 140.10(4)(a)-(b) (McKinney 2006) (providing that "a police officer shall arrest a person, and shall not attempt to reconcile the parties or mediate" for a felony against family members and for a protection order violation). For a misdemeanor family offense when there is no protection order in effect, arrest is mandatory "unless the victim requests otherwise," but the "officer shall neither inquire as to whether the victim seeks an arrest of such person nor threaten the arrest of any person for the purpose of discouraging requests for police intervention." *Id.* § 140.10(4)(c). Because it is the prosecutor's, rather than the officer's, decision whether to charge misdemeanor assault or felony assault, query whether the statutory differentiation between misdemeanor and felony mandatory arrest requirements makes a practical difference in arrest practices.

     When the parties have committed misdemeanors against each other, the police have discretion to arrest the primary physical aggressor, based on the extent of injuries, threats of future harm, history of DV, and need for self-defense. *Id.* When the parties are a man and a woman, the police usually arrest the man. *See* GAVIN & PUFFETT, *supra* note 172, at 34.

180. It is not uncommon for the police to make arrests in a domestic incident even when they do not believe a crime occurred, and to defer the judgment to the prosecutor. One criminal defense firm believes that "'Arrest Everyone and Let the Prosecutor Sort 'Em Out' is a fair summary of the Police policy." Shalley & Murray, New York City Domestic Violence Cases, http://www.queensdefense.com/domestic_violence_cases.htm (last visited Aug. 31, 2006).

181. *See* PETERSON, *supra* note 175, at 4 ("[V]irtually all DV cases are prosecuted, even if the victim does not want the defendant prosecuted. Charges are not dropped at the victim's request except in rare cases.").

182. *See* MANUAL, *supra* note 167, at 55 (laying out a "mandatory domestic violence checklist" for Assistant District Attorneys (A.D.A.s) to follow).

after the defendant's arrest and before his arraignment.[183] For every DV arrest, the prosecutor in the complaint room must interview the arresting officer in person and interrogate the defendant in person before drafting the criminal complaint.[184] That prosecutor must attempt to contact and meet with the victim as soon as possible.[185] The prosecutor must further direct the arresting officer to go to the victim's home immediately to try to obtain her signature on an affidavit corroborating the criminal complaint.[186] And unlike in other misdemeanor cases, the prosecutor who drafts the complaint when the arrest comes into the complaint room is the one who keeps the case until its disposition.[187]

As I discuss in more detail below, at the defendant's arraignment, the D.A.'s Office requires prosecutors to request from the criminal court a temporary order of protection that prohibits the defendant from contacting the victim and from going to her home, regardless of whether the defendant also lives there.[188] These special ground rules, not applicable to other crimes (including violent crimes), are designed to ensure that the police and prosecutors treat DV cases as particularly serious.

There are also evidentiary reasons for the special rules. Prosecutors generally expect that DV victims will be unwilling to cooperate in prosecution.[189] Thus, on the assumption of victimless prosecution, prosecutors

---

**183.** *See id.* at 20.

**184.** *See id.* This is in contrast to the ordinary practice, in which the prosecutor in the complaint room gathers the facts of the incident and arrest by speaking to the arresting officer on the telephone, without interviewing the defendant.

**185.** *See* GAVIN & PUFFETT, *supra* note 172, at 25 (noting that a rationale for this practice is "to forge a relationship with the complainant close to the point of crisis, when trust and cooperation may be more easily established").

**186.** *See* MANUAL, *supra* note 167, at 21. For crimes not involving DV, the D.A.'s Office's normal practice is to fax or mail corroborating affidavits to witnesses for signature. If a complainant does not corroborate a complaint based on a police report within five days of arraignment, the defendant is released from jail on his own recognizance pending disposition of the case. *See* N.Y. CRIM. PROC. LAW § 170.70 (McKinney 1993).

**187.** *See* GAVIN & PUFFETT, *supra* note 172, at 16; MANUAL, *supra* note 167, at 30.

**188.** *See* MANUAL, *supra* note 167, at 55. The issuance of orders of protection is authorized by N.Y. CRIM. PROC. LAW § 530.12 (McKinney 1995 & Supp. 2006), which provides that in a criminal action "involving a complaint charging any crime or violation between spouses, parent and child, or between members of the same family or household . . . the court . . . may issue a temporary order of protection as a condition of any order of recognizance or bail." Such an order may require the defendant "to stay away from the home, school, business or place of employment of the family or household member or of any designated witness." *Id.*

**189.** *See* MANUAL, *supra* note 167, at 19.

must seek ways to build the case to cope with the lack of victim participation.[190] For example, prosecutors are instructed to dispense with the office norm of drafting bare-bones criminal complaints; the complaint must stand even if a victim will not sign an affidavit corroborating her hearsay in the complaint.[191] To that end, prosecutors are trained to draft DV complaints using hearsay exceptions, such as the victim's excited utterances at the scene,[192] in addition to any admissions by the defendant and the officer's observations of the victim's injuries, appearance, and the state of the apartment.[193] The police department requires officers to take photographs of the victim's injuries at the scene and encourages them to go back to the victim's home to take follow-up photographs.[194] The aim is to establish a strong evidentiary case on the expectation that the victim will become uncooperative or unavailable.[195]

## B. Criminal Court Orders of Protection

Even with the increased shift toward victimless or evidence-based prosecution, the vast majority of cases do not proceed to trial or result in conviction because proof of the crime beyond a reasonable doubt may be difficult without a victim's participation.[196] Here, the routine practice of

---

190. *See id.* ("[T]he Assistant should always attempt to gather enough circumstantial evidence to enable a prosecution of the case without the victim."); *see also* Hanna, *supra* note 4, at 1899-1905 (arguing that prosecutors in DV cases should reduce their reliance on victim testimony and put more emphasis on physical evidence, 911 tapes, medical records, and out of court statements).

191. *See* MANUAL, *supra* note 167, at 19-20.

192. *See id.* at 20, 26, 55. This drafting practice will undoubtedly have to be modified after *Davis v. Washington*, 126 S. Ct. 2266 (2006). Though victims' crime scene statements that are testimonial may not be used, *Davis* was clear that a crime scene may also produce nontestimonial statements whose purpose is immediately to end a threatening situation.

193. *See* MANUAL, *supra* note 167, at 20.

194. *See id.* at 23.

195. *Cf.* GAVIN & PUFFETT, *supra* note 172, at 16 ("In cases where the evidence is insufficient, the ADA may decide to prosecute the case with the complainant as a hostile witness.").

196. More than half of all DV cases result in dismissal, a fact that the D.A.'s Office attributes to its policy of prosecuting "almost everyone arrested in a domestic violence incident . . . even if the victim does not cooperate." Leslie Eaton, *Violence in the Home Is Issue in Race for Prosecutor*, N.Y. TIMES, Aug. 21, 2005, at N29; *see also* GAVIN & PUFFETT, *supra* note 172, at 21 (indicating that in 2002, 47.8% of DV cases were dismissed, 33.5% were convictions by guilty plea, slightly over 1% went to trial, and 13.3% were adjourned in contemplation of dismissal); PETERSON, *supra* note 165, at 22-23 (indicating that in the third quarter of 1998 and the first quarter of 2001, over half of DV cases were dismissed, about 29% resulted in conviction, and about 15% were adjourned in contemplation of dismissal).

obtaining criminal court orders of protection at the start of prosecution effectuates DV policy by means other than trial and traditional punishment.

At the arraignment of any defendant charged with a DV crime, the D.A.'s Office's mandatory practice involves asking the criminal court to issue a temporary order of protection (TOP) as a condition of bail or pretrial release.[197] The order of protection, issued on a standard form for a "family offense," normally prohibits any contact whatsoever with the victim, including phone, e-mail, voice-mail, or third-party contact.[198] Contact with children is also banned.[199] The order excludes the defendant from the victim's home, even if it is the defendant's home. It also bans the defendant from the victim's school, business, and place of employment. Ascertaining whether the victim wants the order is not part of the mandatory protocol.[200] The prosecutor generally requests a full stay-away order even if the victim does not want it.[201]

The criminal court routinely issues the order of protection at arraignment, the defendant's first court appearance.[202] The brief, formulaic, and compressed

---

**197.** *See* MANUAL, *supra* note 167, at 55 (including in the "Mandatory Domestic Violence Checklist" the instruction that an order of protection "must be filled out for each case"). A.D.A.s request TOPs in almost every DV case. Telephone Interview with Audrey Moore, Deputy Bureau Chief, Child Abuse & Family Violence Bureau, Manhattan Dist. Attorney's Office (Aug. 8, 2006). For comparison, "[t]he policy of the Los Angeles City Attorney is that protective orders should be sought as a condition of release in any situation where there is a reasonable likelihood that the abuser may try to harm the victim," with 75% to 80% of defendants becoming subject to such orders at arraignment. DALTON & SCHNEIDER, *supra* note 43, at 615. "In San Francisco, the prosecutor automatically requests a stay-away order at the defendant's first appearance, unless the victim specially indicates she does not want one." *Id.*

**198.** *See* MANUAL, *supra* note 167, at 32 ("The Assistant should indicate that there must not be any contact with the victim by phone, mail or third parties. . . . This should apply whether or not the defendant is in jail.").

**199.** *See id.* ("[C]hildren and other persons in the household who are at risk[] must be included in the TOP.").

**200.** *See id.* at 21 (instructing A.D.A.s simply to tell the victim that "[a]n order of protection will be requested at the defendant's arraignment").

**201.** GAVIN & PUFFETT, *supra* note 172, at 10 ("The ADA will generally request a full order of protection whether the complainant wishes it or not . . . .").

**202.** *See id.* ("Every domestic violence case receives an order of protection at arraignment; the order is renewed at subsequent court appearances, and a final order is usually issued at disposition or sentencing."); *id.* at 4 ("[C]riminal orders are imposed at the request of a prosecutor, often against the complainant's wishes."); *id.* at 24 ("The courts are extremely consistent in their policies and practices regarding orders of protection; all routinely issue full orders in all cases, granting very few limited orders, and then often only at or after sentencing."); RICHARD R. PETERSON, N.Y. CITY CRIMINAL JUSTICE AGENCY, THE IMPACT OF CASE PROCESSING ON RE-ARRESTS AMONG DOMESTIC VIOLENCE OFFENDERS IN NEW YORK

nature of arraignments in criminal court, which run around the clock to ensure that all defendants are arraigned within twenty-four hours of arrest, means that courts often issue orders with little detailed consideration of the particular facts.[203] DV orders are generally requested and issued as a matter of course.[204]

When the protection order goes into effect, the defendant cannot go home or have any contact with the victim (usually his wife) and his children. If the defendant does go home or contact the protected parties, he could be arrested, prosecuted, and punished for a fresh crime.[205] This is so even if the victim

---

CITY 21 (2003), http://www.cjareports.org/reports/recidrev7.pdf ("Virtually all DV defendants in New York City are subject to an order of protection, the violation of which can lead to re-arrest."). One criminal defense law firm explains on its website:

> Judges in New York City issue TOPs in virtually (almost without exception) every case in which the Prosecutor requests one. Right or wrong, that's the way it is. Not issuing an Order of Protection is perceived as an extremely dangerous thing to do. The New York Post would have a field day if something happened in a case in which a judge refused to issue a requested TOP.

Shalley & Murray, *supra* note 180; *see also* GAVIN & PUFFETT, *supra* note 172, at 36 (noting the belief among some members of the defense bar that the issuance of protection orders at arraignment indicates that "the presumption of guilt is made evident at arrest"); *id.* ("Critics felt that the relaxed rules of evidence for an order of protection are also evidence of a systematic bias towards the complainant. By issuing a full order of protection at arraignment, the judge may be evicting the defendant from his home, yet there has been no guilty verdict or even a hearing."). In 2005, 6660 DV temporary orders of protection, of which 5469 were full no-contact orders, were issued in criminal court in Manhattan. E-mail from Karen Kane, N.Y. State Office of Court Admin., to author (Sept. 15, 2006, 16:29:56 EST) (on file with author).

203. Defense attorneys generally do not object to the order or seek a hearing on the matter because their priority is to get their clients out of jail, where they have been held since arrest. *See* GAVIN & PUFFETT, *supra* note 172, at 36 (noting the defense bar's view that hearings are "impossible to get" and that defense attorneys tend to choose "to secure the immediate freedom of their clients" rather than seek a hearing on the protection order).

204. The statute authorizing issuance of protection orders pending disposition of non-family offenses provides that the court may issue the order "for good cause shown." N.Y. CRIM. PROC. LAW § 530.13 (McKinney 1995). However, for family offenses, the statute does not require a showing of "good cause." *Id.* § 530.12.

205. *See* MANUAL, *supra* note 167, at 32 ("If the defendant then contacts the victim, the Assistant will have the option of charging the defendant with Criminal Contempt in the First or Second Degree."); *id.* at 38-39 (instructing that when the defendant has been arrested for violating an order of protection, the A.D.A. should draft a complaint for criminal contempt and "[a]sk for higher bail than what would normally be sought on a straight domestic violence case"). A violation of the order constitutes misdemeanor criminal contempt, *see* N.Y. PENAL LAW § 215.50 (McKinney 1999), or felony criminal contempt if the defendant has previously been convicted of criminal contempt in the last five years, *see id.* § 215.51(c). Furthermore, while the order is in effect, certain acts against the victim that would normally

initiates contact or invites the defendant to come home. Police officers then make routine unannounced visits to homes with a history of domestic violence.[206] If a defendant subject to a protection order is present there, he is arrested.

Thus even when a DV case is destined ultimately to end in dismissal because the victim is uncooperative and there is insufficient evidence for conviction, keeping the case active for as long as possible enables the prosecutor and the court to monitor the defendant for months prior to dismissal.[207] The protection order remains in effect while the case is ongoing.[208] A violation of the order can lead to arrest and punishment for the more easily proven criminal charge. But in addition to the prospect of punishment for the proxy conduct of being present at home, the protection order shifts the very goal of pursuing criminal charges away from punishment to control over the intimate relationship in the home.[209]

## C. Judicial Control of the Home

The protection order practice has been the subject of a constitutional challenge by a DV defendant. He argued that the issuance at arraignment of the temporary order of protection excluding him from the marital home amounted to a deprivation of his property interest in his home without procedural due process.[210] The decision rejecting this claim, *People v. Forman*, reflects the routine practice of excluding defendants from their homes and illustrates the way in which criminalization of presence at home is congruent with a justification of criminal law control of the home.

---

be misdemeanors can be charged as felony criminal contempt. *See id.* § 215.51(b). About 15% of all DV cases are charged as criminal contempt. *See* PETERSON, *supra* note 165, at 28.

206. The New York Police Department made 53,359 such home visits in 2004. Alison Gendar, *Domestic Murders Drop Again; Credit Law's Helping Hand and Visits to Troubled Homes*, N.Y. DAILY NEWS, Jan. 10, 2005, at 26 ("A loud family argument could be enough for officers to note an address and make an unannounced return visit."). The police "don't wait for a crime to happen. It is a preventative visit." *Id.* (quoting Deputy Chief Kathy Ryan, head of NYPD's domestic violence unit).

207. *See* PETERSON, *supra* note 175, at 4.

208. *See* Eaton, *supra* note 196 (reporting the D.A.'s Office's view that prosecuting many cases that are ultimately dismissed enables issuance of orders of protection).

209. *See* PETERSON, *supra* note 175, at 10 (reporting prosecutors' and court personnel's view that the goal in pursuing weak DV cases is "to gain control over the defendant's behavior for a period of time").

210. *See* People v. Forman, 546 N.Y.S.2d 755 (Crim. Ct. 1989).

After punching his wife, the defendant in *Forman* was arrested and charged with misdemeanor assault and harassment.[211] At arraignment, the prosecutor requested and the court issued a temporary order of protection as a condition of pretrial release, without argument, testimony, or opposition.[212] The order, issued on the standard form, directed the defendant to stay away from the home and "to refrain from acts of omission or commission that tend to make the home not a proper place for" his wife.[213] When the police sought to arrest the defendant anew for violating the order, he challenged the legality of the order, claiming that under the Due Process Clause of the Fourteenth Amendment, a defendant could not be excluded from his home without a prior evidentiary hearing.[214]

The content of the order was completely routine, as was its issuance in DV cases in criminal court. The court noted the reality that "[e]ach year thousands of relatively short-lived temporary orders of protection, restricting the liberty and property of the accused, are and will be issued by the Criminal Courts of the City of New York," and that "as a matter of practice, a new TOP is issued on each adjourned date in a criminal proceeding."[215]

The court readily acknowledged that the order of protection affected "the defendant's use and enjoyment of his property interest in the home he owns jointly with his wife."[216] The court accorded the strong private interest in the home particular attention: "Beyond its value as property, a person's special interest in his/her home as an enclave of personal security and privacy has repeatedly been recognized under the Fourth and Fourteenth Amendments. Being suddenly deprived of one's home, even temporarily, is a traumatic experience."[217]

Against that substantial private interest stood the state's interest in combating DV—which had "come to be recognized as a social scourge of the first order"—through criminal prosecutions.[218] This interest, which would be severely undermined if victims were too frightened by DV threats to participate

---

211. *Id.* at 758.

212. *Id.* The order was issued pursuant to N.Y. Crim. Proc. Law § 530.12 (McKinney 1995).

213. *Forman*, 546 N.Y.S.2d at 758.

214. *Id.* at 763.

215. *Id.* at 761.

216. *Id.* at 764.

217. *Id.* (internal citations omitted) (citing Payton v. New York, 445 U.S. 573, 588-90, 601 (1980); Stanley v. Georgia, 394 U.S. 557, 566 (1969); and Griswold v. Connecticut, 381 U.S. 479, 486 (1965)).

218. *Id.*

in criminal prosecution, was "closely linked to the interest of courts, as state instrumentalities, in protecting the integrity of judicial proceedings. The great potential for violence and intimidation that is present when both the victim and the perpetrator of domestic violence continue to live under the same roof is self-evident."[219] Because the defendant's presence in the home could interfere with the victim's ability to participate, the exclusion of the defendant from the home was indispensable to criminal prosecution.[220] The state therefore had an emergency interest in excluding the defendant from the home as soon as possible—at arraignment as a condition of bail or recognizance.[221] Because "the need for expeditious assumption of judicial control following a defendant's arrest outweighs the need to minimize risk of error through adversary procedures,"[222] the court concluded that, despite the strength of the defendant's private interest in his home, a hearing before the issuance of the order was not constitutionally required.[223]

In the court's reasoning, judicial control of the home was an extension of the traditional need for judicial control over a defendant following arrest for a crime. The routine practice of the criminal court was to ban the DV defendant from his home on pain of further criminal charges. The home then became subject to the supervision of the criminal court, which would ensure that the defendant would not be present there. So strong was the public interest in the supervision of home space that it outweighed the defendant's private interest in his home—indeed his interest in having a home.

The formulation of the public interest here and its assertion as early as arraignment was justified by a self-evident risk of intimidation. A background understanding about DV and the general state interest in combating it substituted for a particularized inquiry about the risk the defendant posed. As previously discussed, an alleged abuser's presence in the home functioned as a

---

**219.** *Id.*

**220.** *Id.* at 764-65.

**221.** *Id.* at 765.

**222.** *Id.* (citing Gerstein v. Pugh, 420 U.S. 103, 119-23 (1975); and Williams v. Ward, 845 F.2d 374 (2d Cir. 1988)).

**223.** The court went on to hold that the defendant was entitled to a prompt trial-type evidentiary hearing *after* issuance of the order, to contest its continuance. *Id.* at 766. At the hearing, the defendant must first establish standing by showing that "his personal or property rights will be directly and specifically affected" by the court order, *id.* at 760 (internal quotation marks omitted), and then the court must determine "whether there is a 'danger of intimidation or injury'" to the victim, *id.* at 762 (quoting People *ex rel.* Klein v. Krueger, 25 N.Y.2d 497, 499 (1969)). In practice, such hearings are only occasionally ordered, and A.D.A.s are instructed to "oppose these hearings since they inconvenience victims and expose them to cross-examination very early in the proceedings." MANUAL, *supra* note 167, at 38.

proxy for DV. Had courts perceived individual defendants differently with respect to future threats and violence toward victims, there would presumably have been strong reason to require a detailed factual hearing before depriving a defendant of his home. But the logic that the presence of the accused would be synonymous with DV proper confirmed the generalized risk of intimidation.

Thus, this logic enabled conflation of a defendant's presence at home with his obstruction of the ongoing criminal process. Just as the exclusion of an abuser from his home was necessary to prevent DV, his exclusion was, by the same logic, indispensable to the criminal prosecution of DV; his presence at home simply was obstruction. Traditional judicial control over the criminal process was in turn coextensive with judicial control of the home.

What we see is the confluence of the public interest in the criminal prosecution of DV and the criminal law interest in control of the home. It is as if by reach of the protection order, the home has become an extension of the courthouse.

### D. Divorce by Any Other Name

The conventional wisdom is that the criminal court protection order practice is meant to safeguard the integrity of criminal proceedings by protecting the victim from violence and intimidation. But the practice of separating couples in DV cases by way of criminal protection orders extends beyond the needs of the judicial process. The idea that a defendant's presence at home begets or constitutes violence leads prosecutors to view separation as a significant alternative to traditional judicial process and punishment. Court-ordered separation becomes a goal of prosecutors in bringing criminal charges—a substitute for, rather than a means of, increasing the likelihood of imprisonment. Punishment as a goal can be put on the backburner because separation is a more direct and achievable way to stop or prevent violence. The practice that results amounts to what I term state-imposed de facto divorce, a phenomenon that is so routine in criminal court that it disappears in plain sight.

#### 1. Final Orders of Protection

The full and final order of protection formally transforms the temporary order, issued at the defendant's arraignment and continually renewed while the

case is pending, into a final order of lengthy duration.[224] Like the temporary order, the full and final order bars the defendant from the home and from having any contact whatsoever with the victim.[225]

Of course prosecutors prefer to see criminal defendants tried, convicted, and punished with imprisonment. But the difficulty of trying DV cases because of the reluctance of victims to cooperate leads prosecutors to look to plea bargains imposing alternatives to imprisonment. The protection order is the most significant tool. Even if the defendant does not get jail time as part of the plea, at the very least, the protection order can provide the basis for new criminal liability on the more easily proven crime of violating the order.[226]

Already in effect on a temporary basis since the defendant's arraignment, the protection order is deployed as follows: the prosecutor offers the defendant a plea bargain consisting of little or no jail time (or time served) and a reduction of the charge,[227] or even an adjournment in contemplation of dismissal,[228] in exchange for the defendant's acceptance of a final order of

---

**224.** Upon conviction of a DV crime, the court can enter a final order of protection and specify the duration. For a felony, the duration is up to five years, or three years from the expiration date of the maximum term of an indeterminate sentence or the term of a determinate sentence actually imposed. For a class A misdemeanor, the duration is up to three years. For other offenses, the duration is up to one year. *See* N.Y. CRIM. PROC. LAW § 530.12(5) (McKinney Supp. 2006). The Manhattan D.A. has announced a legislative initiative to allow judges to extend final orders for up to ten years and renew as needed. *See* Press Release, Robert M. Morgenthau, Manhattan Dist. Attorney (Mar. 10, 2005), http://www.manhattanda.org/whatsnew/press/2005-03-10.htm.

**225.** As with the temporary order, the consequence of disobedience is arrest and prosecution for misdemeanor criminal contempt punishable by a maximum of one year in jail, or for felony criminal contempt for repeat violation punishable by a maximum of four years. N.Y. PENAL LAW §§ 215.50-.51 (McKinney 1999); *id.* §§ 70.00.2(e), 70.15.1 (McKinney 2004).

**226.** *See* GAVIN & PUFFETT, *supra* note 172, at 26 ("All Assistant District Attorneys will return to court if they become aware of a violation of an order of protection . . . ."); *id.* at 30 (noting prosecutors' view that "should the complainant decline to cooperate, it is easier to win a conviction on a criminal contempt charge than on charges such as assault and harassment" because "the testimony of police or witnesses that the defendant was at the complainant's house on a date when a stay-away order was in effect is sufficient for conviction").

**227.** The charge might be reduced from felony to misdemeanor or misdemeanor to violation. A violation is not a crime and carries a maximum sentence of fifteen days imprisonment. N.Y. PENAL LAW §§ 10.00.3, 10.00.6 (McKinney 2004). The most common violation pleas in DV are disorderly conduct, *id.* § 240.20, and harassment in the second degree, *id.* § 240.26. MANUAL, *supra* note 167, at 49.

**228.** An adjournment in contemplation of dismissal, which does not require the defendant's acknowledgment of guilt, lasts one year for a family offense, whereupon the case is dismissed and the arrest and prosecution are "deemed a nullity" if the defendant has met conditions specified by the prosecutor. *See* N.Y. CRIM. PROC. LAW § 170.55 (McKinney Supp. 2006). If the defendant violates the conditions, "the Assistant has the difficult task of

protection prohibiting his presence at home and contact with the victim. This is an attractive offer. It presents the opportunity to dispose of the criminal case immediately with little or no jail time, and in some cases, no criminal conviction or record. The offer is particularly attractive for a defendant who has remained in jail since arraignment pending disposition of his case; if he agrees he will be released.[229]

Depending on the terms of the plea bargain, the court issues the final protection order as part of the defendant's sentence pursuant to a guilty plea, or as a condition of an adjournment in contemplation of dismissal.[230] In light of the evidentiary difficulties of obtaining a DV conviction at trial, especially when victims are uncooperative, many defendants do not take pleas, in anticipation of eventual acquittal or dismissal.[231] But many do.[232]

As the literature on plea bargaining increasingly recognizes, plea bargains are not struck narrowly in the shadow of the strength of the evidence and the likely results of full-dress trials.[233] The motives for defendants' acceptance of

---

restoring the case to the calendar, and then proving the case" after months have passed; as such, the adjournment in contemplation of dismissal is akin to or "hardly better than an immediate dismissal." MANUAL, *supra* note 167, at 50.

229. *See* GAVIN & PUFFETT, *supra* note 172, at 36 ("Defense attorneys . . . report that domestic violence defendants are more likely to be held at arraignment. This hampers the defense attorneys' negotiating leverage, because the clients will 'agree to almost anything' in order to get out of jail.").

230. *See id.* at 10 ("[A] final order is usually issued at disposition or sentencing."); U.S. ATTORNEY'S OFFICE, W. DIST. OF N.Y., OBTAINING AND ENFORCING *VALID* ORDERS OF PROTECTION IN NEW YORK STATE 20, *available at* http://www.usdoj.gov/usao/nyw/victim_witness/pdf/OOPmanual.pdf ("[J]udges may issue a *permanent* order of protection . . . . The order may be issued as a condition of pre-trial release, bail, an adjournment in contemplation of dismissal, conditional discharge, an adjournment, or as part of the sentence."). Defendants sentenced to jail are also usually subject to a full no-contact order; they can be re-arrested and charged anew for calling or writing to the victim while in jail. *See* PETERSON, *supra* note 202, at 21. In 2005, 945 DV final orders of protection, of which 688 were full no-contact orders, were issued in criminal court in Manhattan. E-mail from Karen Kane, N.Y. State Office of Court Admin., to author (Sept. 15, 2006, 16:29:56 EST) (on file with author).

231. Over half of all DV cases result in dismissal. *See* sources cited *supra* note 196.

232. About a third of all DV misdemeanor defendants plead guilty and roughly 15% more take adjournments in contemplation of dismissal. *See* sources cited *supra* note 196. Only about a third of convicted DV defendants get jail sentences; most get conditional discharges, which may include requirements such as batterer intervention programs. *See* GAVIN & PUFFETT, *supra* note 172, at 15; PETERSON, *supra* note 165, at 23-24.

233. *See* Stephanos Bibas, *Plea Bargaining Outside the Shadow of Trial*, 117 HARV. L. REV. 2463 (2004) (arguing that the "shadow-of-trial" model of plea bargaining is oversimplified); William J. Stuntz, *Plea Bargaining and Criminal Law's Disappearing Shadow*, 117 HARV. L. REV. 2548, 2550 (2004) (arguing that for many crimes, "plea bargains take place in the

plea bargains are incompletely understood, but in the context of the final protection order, they involve defendants' desire to resolve their cases quickly without much or any jail time and defense attorneys' need to manage large case loads as repeat players in the criminal justice system.[234] And because prosecutors can threaten victimless prosecution, defendants may be unwilling to wait the time leading to trial.[235] As the case continues, the defendant may fear losing his job because of the days he must take off to make repeated court appearances. A plea bargain that immediately ends the case, takes jail off the table, often reduces the charge down to a violation, and leaves no criminal record is similar enough to dismissal that defendants may readily accept. The idea that "law's shadow may disappear altogether"[236] has particular resonance for misdemeanor DV, in which the final order of protection is so common that it is plausible to consider it a standard disposition sought by prosecutors.[237]

### 2. Divorce by Prosecutorial Demand

The full and final order of protection prohibits contact between the parties, and violation of the order constitutes commission of a fresh crime. It is unlawful for the party subject to the order to see or to speak to his spouse, or to go to the home in which they reside together. Even a phone call, letter, or e-mail risks arrest and criminal charges. Regardless of whether parties are formally married, it is therefore criminal for them to continue, in any substantive way, their marital, domestic, or intimate relationship. With these prohibitions, the state—the prosecutor and the criminal court—effectively seeks to impose de facto divorce.

---

shadow of prosecutors' preferences, voters' preferences, budget constraints, and other forces—but not in the shadow of the law").

**234.** *See* Bibas, *supra* note 233, at 2479 (noting that the volume of overburdened public defenders' cases makes pleas the norm and trials "a less realistic threat in plea bargaining").

**235.** After *Davis v. Washington*, 126 S. Ct. 2266 (2006), prosecutors may place more emphasis on physical evidence and officer observations, and less emphasis on victims' statements in threatening victimless prosecution. A reduction in the victim statements that can be introduced at trial may have the effect of increasing prosecutors' eagerness to pursue protection orders, violations of which, compared to traditional DV, are easier to prove without victims' testimony.

**236.** Stuntz, *supra* note 233, at 2549.

**237.** *Cf.* Gerard E. Lynch, *Screening Versus Plea Bargaining: Exactly What Are We Trading Off?*, 55 STAN. L. REV. 1399, 1401 (2003) ("In a system where ninety percent or more of cases end in a negotiated disposition, it is unclear why the 'discounted' punishment imposed in that ninety percent of cases should not rather be considered the norm.").

De facto divorce is of course not de jure divorce.[238] The order of protection does not have the effect of ending formal marriage. And many intimate partners affected by orders are not married. Spouses can surely remain legally married even as they obey all the prohibitions of the order, but cannot live or act like they are married.[239] Indeed they cannot live in substance like they are in any intimate relationship, whether marital or nonmarital.

Furthermore, the separation is not accompanied by the actual family law divorce regime of property division, alimony, child custody, and support.[240] Ordinarily the order of protection makes no mention of alimony, child custody, visitation, or support. Thus, although the practical effect of the order is de facto divorce, the family law apparatus that surrounds divorce is not applied.[241]

---

238. Our legal system has no counterpart to common law marriage in the divorce realm. Couples who want to end a legal marriage cannot become divorced by living as if divorced; they must seek a formal legal divorce. *See* Mary Ann Glendon, The Transformation of Family Law 148 n.2 (1989); Theodore F. Haas, *The Rationality and Enforceability of Contractual Restrictions on Divorce*, 66 N.C. L. Rev. 879, 881 n.13 (1988).

239. *Cf.* Ariela R. Dubler, *Wifely Behavior: A Legal History of Acting Married*, 100 Colum. L. Rev. 957 (2000) (discussing the decline of common law marriage as a shift in the legal significance of acting married).

240. *Cf.* Siegel, *supra* note 14, at 2132 (observing that in 1879 the Massachusetts legislature rejected a bill allowing wives whose husbands were convicted of aggravated assault to apply for court orders forbidding unwanted visits and granting the wives custody and support, on the grounds that it "would be granting to police and district courts the power of decreeing divorce" (internal quotation marks omitted)).

241. Instructing that "[a]s a rule, criminal courts are not well-suited to determine issues of custody and visitation," the Manual, *supra* note 167, at 31, requires A.D.A.s to prohibit DV defendants from contacting the children "except as permitted by a Family Court order. However, in cases where there is danger of the defendant harming, intimidating, or improperly influencing the children, it is appropriate for the court to prohibit any contact . . . ." *Id.* at 31-32. Thus the rule is no contact with the children unless the family court modifies the particular criminal court order (which itself occurs in the unlikely event that an A.D.A. anticipates no negative impact on the children).

In theory, a victim of a "family offense" may proceed in family court in addition to, or instead of, criminal court, *see* N.Y. Crim. Proc. Law § 530.11(2)(i) (McKinney 1995), but in practice, the police bring arrests to the D.A.'s office and the cases proceed by default in criminal court. The D.A.'s Office gives victims notice of their legal rights, *see id.* § 530.11(6), with a packet of pamphlets, *see* Manual, *supra* note 167, at 46.

Integrated Domestic Violence (IDV) courts, which bring together in one court all the cases involving a single family, including DV, matrimonial, divorce, custody, and visitation matters, have been established in Queens and the Bronx. Plans are under way to establish IDV courts in Manhattan and throughout the State of New York. *See* Peterson, *supra* note 165, at 2; *see also* Ctr. for Court Innovation, Integrated Domestic Violence Courts, http://www.courtinnovation.org/index.cfm?fuseaction=Page.ViewPage&PageID=604&curr entTopTier2=true (last visited Aug. 31, 2006). Because IDV judges must handle criminal

Apart from the fact that the criminal court does not have jurisdiction to enter new orders regarding child custody, visitation, or support,[242] the main reason for the displacement through neglect of family law issues is that the order of protection is administered by prosecutors, who have neither interest nor experience in dealing with family law.

But de facto divorce does entail de facto arrangements regarding custody, visitation, and support—that is, no custody, no visitation, and no support. Thus in the imposition of de facto divorce, criminal law becomes a new family law regime. But because it is criminal law regulation, the parties cannot contract around the result except by risking arrest and punishment of one of them.

Though state-imposed de facto divorce has no formal effect on marriage, it seeks in practice to end the relationship. Indeed, the order goes much further than would ordinary divorce, prohibiting any contact, even by express permission of the protected party.[243] It is super-divorce. But it need not be initiated by either of the parties to the relationship.[244] Unlike actual divorce, in which a general principle of autonomy governs so that one or both parties in the marriage must initiate it, here the separation is forced by the state.[245] Neither party's consent is required.[246]

---

and family law issues at once, the IDV court has the potential to improve the situation with respect to the de facto or sub silentio adjudication of family law issues in criminal cases. However, because the IDV court will only hear cases for families that have cases pending simultaneously in multiple courts, most DV, in which just a misdemeanor case is pending, will continue to be processed in the specialized misdemeanor DV courts currently in place. PETERSON, *supra* note 165, at 2.

242. *Compare* N.Y. CRIM. PROC. LAW § 530.12(1)(a)-(e) (McKinney Supp. 2006), *with* N.Y. FAM. CT. ACT § 842(a-i) (McKinney Supp. 2006).

243. Even the incarceration of a married person, which incidentally separates him from his spouse and thus burdens the marriage, does not normally prohibit all contact and does not specifically have the separation of spouses as its goal. *See* discussion *infra* Subsection III.D.3.

244. This is not to suggest that DV victims never want protection orders, but rather that in many cases prosecutors request and the court issues orders even when victims do not want them.

245. State imposition of actual divorce is anathema to our legal system. There is a controversial instance of state-imposed divorce in recent Egyptian law: under a rule of automatic termination of a marriage upon the apostasy of one spouse, Nasr Hamid Abu Zayd, an Islamic studies professor at Cairo University, was forcibly divorced from his wife upon an Egyptian family court's finding that his writing was heretical. For discussions of this case, see ANN ELIZABETH MAYER, ISLAM AND HUMAN RIGHTS 154-56 (3d ed. 1999); and Kristen A. Stilt, *Islamic Law and the Making and Remaking of the Iraqi Legal System*, 36 GEO. WASH. INT'L L. REV. 695, 734-39 (2004).

246. Imposition of de facto divorce is especially striking in New York, where a spouse cannot obtain an actual divorce without showing fault of the other spouse or mutual consent. *See* N.Y. DOM. REL. LAW § 170 (McKinney 1999) (listing fault grounds for divorce, and in the

The criminal law does not purport to give effect to private orderings, nor does it tolerate parties' contracting around default rules; rather, it regulates individuals' conduct through the threat of punishment to serve the public interest. The prosecutor is of course concerned with protecting the safety of individuals, but this concern for the victim is on behalf of the state and does not depend on the victim's perception of her interests. This reality is equally true when the criminal law seeks de facto divorce. The matter is conceived as a public one concerning the state, the crime, and the criminal defendant. Mandatory arrest and no-drop ideologies have acclimated prosecutors to the norm of not allowing victims' wishes to control in making decisions in DV. A decision to effectively end a relationship is initiated by the prosecutor on behalf of the state, adjudicated as a criminal matter, and criminally enforced. It becomes an extension of the imperative to treat DV as crime.

In the world of misdemeanor DV, then, prosecutors routinely use arraignment, bail, and plea bargaining to obtain defendants' agreements to protection orders forcing long-term separation — de facto divorce — from their spouses. As a product of the plea bargain, de facto divorce goes into effect without the benefit of traditional criminal process or proof of the crime. The arrest may have come at the behest of neighbors rather than the victim herself. Or the victim may have called the police to seek specific intervention in that moment. But as a result of the initial arrest and through the operation of mandatory arrest and no-drop prosecution policies, the relationship can be, for practical purposes, dissolved by the force of the criminal law. Recall that this is a world in which the violence of DV has been defined down, and in which a mandatory protocol designed to deal with dangerous batterers applies in every case.[247] De facto divorce is thus by and large imposed in misdemeanor cases, which by definition do not involve serious physical injury, and often involve little or no physical injury.

Finally, state-imposed de facto divorce is so class-contingent that it could be called poor man's divorce.[248] The initial DV arrest that sets the wheels in

---

alternative, requiring separation for a year pursuant to a decree or written agreement before filing for divorce); *see also* Leslie Eaton, *A New Push To Loosen New York's Divorce Law,* N.Y. TIMES, Nov. 30, 2004, at A1 (discussing a New York court's refusal to grant a divorce to a couple who could not show fault). New York has a procedure to dissolve a marriage on the ground of a five-year unexplained absence of one spouse. See N.Y. DOM. REL. LAW §§ 220-221 (McKinney 1999).

**247.** *See* discussion *supra* Section III.A.

**248.** *Cf.* GLENDON, *supra* note 238, at 148 ("In the United States, the term 'poor man's divorce' came into being to describe marriage dissolution by the simple departure of a husband (or wife) in the days when access to the judicial system seemed foreclosed to large groups of the population for financial reasons."). For discussions of the disparate impact of mandatory

motion is much more likely to occur if people live in close quarters in buildings with thin walls, and neighbors can easily hear a disturbance and call the police.[249] Those arraigned in New York County criminal court for DV crimes are by and large minorities who live in the poorest part of Manhattan.[250] The D.A.'s Office maintains a branch office located in northern Manhattan, where many DV victims live, and the main purpose of this office is to deal with DV cases.[251]

### 3. *Shadows of Protection: Living in an Illegal Relationship*

In practice, some, perhaps many, couples do stay together and live together in disobedience of the criminal protection order.[252] But couples who choose to continue their relationships do so in the shadow of the potential arrest and criminal prosecution of the person subject to the order.[253] The enforcement of the order does not depend solely on the protected party's wishes, as the police

---

DV enforcement policies on poor minority communities, see Coker, *supra* note 26, at 808-12; Rivera, *supra* note 26, at 245-46; and Laureen Snider, *Towards Safer Societies: Punishment, Masculinities and Violence Against Women*, 38 BRIT. J. CRIMINOLOGY 1, 9-10 (1998). For a fascinating discussion of nineteenth-century class and race bias in the criminal prosecution of wife beaters, see Siegel, *supra* note 14, at 2134-41. *See also id.* at 2140 (observing that "[b]y the 1890s, the conception of wife beaters was sufficiently racialized that" some state constitutions "listed it among the crimes warranting disenfranchisement").

249. *See* PETERSON, *supra* note 202, at 18; *see also* Jennifer Nou & Christopher Timmins, *How Do Changes in Welfare Law Affect Domestic Violence?: An Analysis of Connecticut Towns, 1990-2000*, 34 J. LEGAL STUD. 445, 449 n.4 (2005); Wendy Boka, Note, *Domestic Violence in Farming Communities: Overcoming the Unique Problems Posed by the Rural Setting*, 9 DRAKE J. AGRIC. L. 389, 396 (2004).

250. Over 80% of those arrested for DV in Manhattan are black and Hispanic. *See* PETERSON, *supra* note 165, at 30.

251. *See* Eaton, *supra* note 196 (reporting the D.A.'s Office's statement that 70% of the cases at the Northern Manhattan office involve DV); Press Release, Robert M. Morgenthau, *supra* note 224 ("Much of the work of the Domestic Violence Unit is enhanced through the District Attorney's Northern Manhattan Office . . . .").

252. *See* Kandel, *supra* note 50, at 449 (stating that protection orders "do not simply and purely keep spouses apart," but rather "change the terms of the fight and the tokens of power from direct control of another's body to control of a critical space, so that the interpersonal boundary line fixed by the order becomes a point of contention"). It is difficult to ascertain how many couples do stay together. Doubtless the numbers vary across different communities with their different relationships to the police, the criminal justice system, and the rule of law.

253. Here I allude, of course, to Robert H. Mnookin & Lewis Kornhauser, *Bargaining in the Shadow of the Law: The Case of Divorce*, 88 YALE L.J. 950, 951 (1979) ("[T]he rules and procedures used in court for adjudicating disputes affect the bargaining process that occurs between divorcing couples *outside* the courtroom.").

do make surprise home visits[254] and arrest people who are present in homes from which they are banned. The couples live in marriages or intimate relationships whose practical continuation is criminal.

In theory, sophisticated users of the DV and criminal justice systems could use the protection order as a strategic threat within the intimate relationship. The protection order might facilitate bargaining about the details of domestic and intimate life in the shadow of the possibility of arrest and criminal punishment.[255] If the protected party were to call the police and report a violation, mandatory arrest and no-drop prosecution would all but guarantee at least a night in jail and arraignment on criminal charges.

In this context, the reallocation of rights discussed above accompanies a reallocation of power within an intimate relationship. One party can sanction the other with arrest and jail at will. But the threat of sanction is highly inflexible. Once the call to the police is made, whatever the initial motivation, the mandatory enforcement policies mean that prosecution will ordinarily go forward even if the protected party changes her mind. The protection order may be a strategic instrument, but under the existing legal regime it is a blunt one.[256] It can potentially structure interactions in domestic relationships on matters small and large, from taking out the garbage, all the way to violence. But the criminal sanction cannot actually be invoked in a stepwise fashion: reporting a violation triggers the full consequences of enforcement.

---

254. *See* Gendar, *supra* note 206.

255. *See* Kandel, *supra* note 50, at 446 (stating that protection orders force couples "to renegotiate their relationship subject to fixed boundaries which are illegal, even criminal, to cross"); *cf.* Duncan Kennedy, *Sexual Abuse, Sexy Dressing and the Eroticization of Domination*, 26 NEW ENG. L. REV. 1309, 1327 (1992) ("There's no marriage without an understratum of bargaining where the parties see each other as having opposing interests."); *id.* at 1328 ("[I]ncreasing protection from sexual abuse should increase the bargaining power of women vis a vis men, *whether or not those men are seen as potentially abusive*, both in domestic situations and in the workplace. Reducing protection, on the other hand, should make women more dependent on men who don't abuse, by making leaving riskier, and thereby make them more willing to make concessions.").

256. *Cf. Women, Children and Domestic Violence*, *supra* note 177, at 663 (remarks of Carol Stokinger) ("[O]nce there is an arrest, the criminal justice system is a very blunt instrument."). In theory, an experienced, strategically acting protected party could plan to report a protection order violation and then refuse to testify about it, thereby invoking some but not all of the enforcement consequences. If the police lack sufficient other evidence of the violation, a conviction could be thwarted. Under these circumstances, she may exercise an option to teach her husband a lesson short of having him convicted—having him arrested and forced to spend the night in jail. However, this outcome turns on factors outside her control, including the availability of other evidence to prove the protection order violation. Invoking the protection order strategically is not a fine-grained technique to regulate the behavior of the defendant.

A further strategic feature of the protection order arises when the protected party intends to initiate or has already initiated divorce proceedings.[257] A protection order confers de facto control of the marital home to the protected party and can be a powerful strategic tool in custody disputes.[258] But unlike a civil protection order obtained at one party's initiative, the criminal protection order cannot be lifted on her motion.[259] It is therefore less useful as a tool in divorce negotiations than a civil order maintained at the discretion of the protected party.

This difference between civil and criminal protection orders highlights the distinctive aspect of the criminal order that is of particular importance here: although the order may be used strategically in some circumstances, the issuance of the order does not derive from an autonomous decision of the protected party. She may have made the phone call to the police reporting an incident that gave rise to the order in the first place, but it is also possible that neighbors made the call upon hearing a disturbance. She may report a subsequent violation of the order, but again, the report may be made by a third party.[260] Furthermore, the report of the violation may come directly from the police, who monitor the home and make routine visits to check whether the defendant is present where he should not be.

The police surveillance, coupled with the possibility of third-party reports of violations, means that the protected party is not simply the recipient of a strategic tool that shifts power from the abuser to her. Power in the relationship is reallocated to her benefit, but not in a way that necessarily maximizes her autonomous decision-making ability. The criminal protection

---

257. Many divorce lawyers routinely recommend pursuit of civil protection orders for clients in divorce proceedings, either because they assume abused women are not candid about being abused or as a tactical leverage device. *See* Kandel, *supra* note 50, at 448 (describing protection orders as "an affirmative element of divorce strategy: a use considered to be both sensible and appropriate and freely discussed at mediation"). A criminal protection order of course cannot be pursued by the woman except by reporting a crime that would lead to the abuser's arrest.

258. *See id.* (describing strategic uses of DV protection orders by parents to gain an advantage in child custody disputes).

259. In most jurisdictions, a complainant can seek to vacate a civil protection order. DALTON & SCHNEIDER, *supra* note 43, at 531.

260. In addition to the exclusion of abusers from victims' homes, the confluence of zero-tolerance attitudes and protection orders has resulted in the eviction of victims from public housing in the interests of other residents. Because it is so common for victims to allow their abusers to come back home, "the eviction of the entire household completely eliminates the cycle of violent disturbances and maintains residential tranquility." Tara M. Vrettos, Note, *Victimizing the Victim: Evicting Domestic Violence Victims from Public Housing Based on the Zero-Tolerance Policy*, 9 CARDOZO WOMEN'S L.J. 97, 99 (2002).

order regime curtails the autonomy of the protected party even as it may confer on her some powers.

The strategic scenarios just sketched, however, are by no means always in play. Many of the parties protected by protection orders are not repeat players with sophistication about the operation of the enforcement protocol. They may not speak English well.[261] They may be illegal immigrants for whom contact with government authorities is highly undesirable, frightening, and risky.[262] Under these conditions, the overall effect of the protection order is not to confer power on victims, but rather to decide for them that they must discontinue their intimate relationship.[263]

Indeed it would seem that some protected parties mistakenly believe that they themselves might be subject to criminal sanction should they allow their partner to live with them.[264] In their perception, they are subject to the order as well. For a person who has substantial reason to fear running afoul of the law but lacks the sophistication to understand that the legal sanction applies only to the defendant, the shadow of the law operates quite differently than for the strategic consumer of the protection order. For the former, the shadow of protection can practically end the relationship without her consent.

---

**261.** *Cf.* PETERSON, *supra* note 165, at 30 (indicating that over 40% of DV defendants are Hispanic).

**262.** This may intensify the problem, already associated with mandatory arrest, of deterring victims familiar with the consequences of calling the police. *See* Linda L. Ammons, *Dealing with the Nastiness: Mixing Feminism and Criminal Law in the Review of Cases of Battered Incarcerated Women—A Tenth-Year Reflection*, 4 BUFF. CRIM. L. REV. 891, 915 (2001) (stating that African-American women are deterred from calling 911 "for fear that law enforcement officials will [be] more zealous than necessary in prosecuting the case"); Rivera, *supra* note 26, at 245-46 (arguing that because of the history of racism, Latinas are reluctant to turn to the criminal justice system).

**263.** The final order of protection is of course not actually forever but is time-limited. *See supra* note 224 (describing possible durations). Suppose a particular final order lasts one year. If the parties obey, there will be no contact whatsoever between them for one year, including through any third parties. In theory, the parties can obey the order and resume the relationship a year later, but it is difficult to imagine that two people who cannot communicate at all for that period of time are not effectively broken up, even if they hope to get back together. The more likely result is the end of the relationship or disobedience and repeated arrests resulting in felony charges.

**264.** Some jurisdictions have mutual protection orders, which command both parties to stay away from each other. *See* Elizabeth Topliffe, Note, *Why Civil Protection Orders Are Effective Remedies for Domestic Violence but Mutual Protective Orders Are Not*, 67 IND. L.J. 1039, 1054 (1992).

### 4. A Fundamental Right To Marry?

When DV protection orders separate couples without their initiation or consent and make it a crime to continue their relationship, the question may arise whether such orders violate the fundamental right to marry.[265] At least one state court has addressed the constitutional dimensions of state-imposed de facto divorce. *State v. Ross* was a 1996 Washington case in which a criminal sentence after the defendant's trial and conviction for felony harassment and assault included a no-contact order.[266] Between the defendant's trial and his sentencing, the defendant and the victim married, in violation of a temporary no-contact order that had been in effect since criminal charges were filed.[267] As part of the defendant's sentence, the court ordered that the convicted felon have no contact for ten years with his wife, who opposed the order.[268] The defendant challenged that no-contact order as nullifying his marriage and thereby violating his right to marry.[269]

The Washington appellate court upheld the sentence.[270] The court acknowledged that the no-contact order interfered with the fundamental right to marry.[271] But against this right, the court weighed the state's "compelling interest in preventing future crimes."[272] The defendant argued that the assault statutes already provide a deterrent to future assaults.[273] But the court reasoned that by prohibiting non-assaultive conduct, "the no-contact order goes much further than the assault statute toward preventing violent acts."[274] The less intrusive alternative of DV treatment alone was inadequate because it would

---

265. One might expect extensive litigation on this question, but the opposite appears to be the case. There are several possible reasons. Defendants and victims tend to be poor and lacking in access to sophisticated legal representation. Many defendants consent to the protection order as part of a plea bargain, making a future challenge unlikely. Finally, DV advocates and commentators, who take the closest interest in the protection order as a legal phenomenon, have largely embraced it as a crucial part of DV criminalization, and there is no obvious group that would likely take up the challenging of such orders.

266. No. 35448-5-I, 1996 WL 524116, at *2 (Wash. Ct. App. Sept. 16, 1996).

267. *Id.*

268. *Id.* at *2, *4.

269. *Id.* at *3.

270. *Id.* at *4.

271. *Id.* at *3.

272. *Id.* at *4.

273. *Id.*

274. *Id.*

create a greater risk of reoffense than the no-contact order.[275] Thus the court concluded that the no-contact order was constitutional as a matter of compelling state interest notwithstanding its interference with the fundamental right to marry.

The *Ross* court was strikingly nonchalant about the interference of the no-contact order with the right to marry because it accepted the imperative to separate couples when DV is involved. Indeed the court's opinion has remained unpublished notwithstanding its evident relevance to the areas of criminal law, family law, and constitutional law. The court's tone and brevity suggested that it perceived the case as a nearly frivolous claim of the kind that the courts constantly dispose of with cursory analysis.

Of course, incarceration effectively separates a prisoner from his spouse and family. But that separation is one incident of criminal punishment and the wide deprivation of liberty it entails. By seeking incarceration, the state does not normally pursue the goal of severing prisoners' family relationships. Accordingly, prisoners are normally allowed to have some contact through which they can maintain their relationships. For example, they can write and receive letters, make phone calls, and have visitors, all of which would be criminal under a no-contact order. Thus, even incarceration, which undoubtedly burdens the relationship, does not seek to end it. By contrast, the no-contact order intends the termination of the relationship as the objective of criminal enforcement, and as such, directly and completely attacks the means of conducting an intimate relationship.

Recognizing that the fundamental right to marry applies to prisoners even though the right is "subject to substantial restrictions as a result of incarceration," the Supreme Court in *Turner v. Safley* noted that "[m]any important attributes of marriage remain."[276] To determine whether a marriage regulation impermissibly burdens the constitutional right to marry, *Turner*—which struck down a state regulation prohibiting inmates from marrying unless the prison superintendent found compelling reasons—required courts to ask whether the regulation was "reasonably related to legitimate penological objectives."[277]

---

275. *Id.*

276. 482 U.S. 78, 95-96 (1987).

277. *Id.* at 99. Tellingly, the penological interests Missouri identified in *Turner* were in protecting women from men. Female prisoners "often were subject to abuse at home or were overly dependent on male figures" and "needed to concentrate on developing skills of self-reliance, and . . . the prohibition on marriage furthered this rehabilitative goal." *Id.* at 97 (citations omitted).

*Turner* of course concerned formal marriage, a right that can be exercised apart from the more substantive attributes of the marital relationship that incarceration must burden (though not necessarily to the full extent of a no-contact order). But *Turner* suggested that an individual's choice of intimate partner is so important that even in the extremely freedom-limiting context of imprisonment, the right to marry is not extinguished. Protection orders do not formally dissolve a legal marriage (though they would prohibit an unmarried couple from marrying). Nevertheless, state-imposed de facto divorce burdens precisely the individual's choice of partner, which lies at the heart of autonomy in intimate relationships.[278]

## CONCLUSION: HOME PRIVACY, PUBLIC INTEREST, AND CONTROL

A distinctive feature of the criminal law expansion described in this Article is the invocation of the public interest to justify the control of home space and intimate relationships within it. This expansion, often on the basis of an alleged misdemeanor, takes place in a world in which "violence" is defined down to include incidents not causing physical injury. Through it, the state excludes people from their homes, reallocates property interests, reorders intimate relationships, and imposes de facto divorce—without seeking the consent of the parties involved and through the coercive power of the criminal law.

The expanding criminal law control of the home described above is in tension with the most powerful legal trend in the relationship between criminal law and the home over the last fifty years. Beginning with the fundamental right to marry and the right to privacy in personal sexual matters, the notion that the Constitution disfavors the criminalization of intimate relationships between consenting adults has gained ground. In the words of Justice Douglas in *Griswold v. Connecticut*, "Would we allow the police to search the sacred precincts of marital bedrooms for telltale signs of the use of contraceptives? The very idea is repulsive to the notions of privacy surrounding the marriage

---

**278.** The public interest in combating DV by proxy methods is so great that we have recently seen its extension to a prohibition on cohabitation with *any* woman. In a marijuana possession case, the Sixth Circuit affirmed a district court's imposition of special conditions on supervised release that required the defendant, who had a prior history of DV, to notify his parole officer within twelve hours of any "social contact" with a female and prohibited cohabitation with any female. *See* United States v. Brandenburg, No. 05-1261, 2005 WL 3419999 (6th Cir. Dec. 14, 2005) (holding that the "social contact" notification provision is not unduly vague in violation of the Due Process Clause of the Fourteenth Amendment and that the cohabitation prohibition does not violate a First Amendment right to intimate association).

relationship."[279] As Laurence Tribe famously stated, discussing *Bowers v. Hardwick*,[280] the question was not what Hardwick "was doing in the privacy of his bedroom, but what the State of Georgia was doing there."[281] This logic has progressed to the holding in *Lawrence v. Texas* that the criminal law may not prohibit private consensual sexual conduct between adults.[282] This trend connects home privacy with individual autonomy in matters of intimate relationships.

In *Lawrence*, Justice Kennedy relied on the concept and rhetoric of the home to invoke the metaphorical sphere of constitutional liberty.[283] He leveraged the idea of home to mark off a private space for autonomous decisions with respect to intimate relationships.[284] Justice Kennedy first depicted the home as a protected space and then went further in emphasizing a "relationship" between the sexual partners.[285] He spoke of the protected right as the right to engage in "intimate conduct with another person" that "can be but one element in a personal bond that is more enduring."[286] The effect of this much-noticed move was to suggest that the state ought not prohibit the exercise of private choice of intimate partner—quite apart from state recognition of that choice in the form of marriage.[287]

In the context of constitutional due process, autonomy in intimate relationships is flourishing at the expense of criminal law regulation. *Lawrence*'s sensibility is to abhor the idea of the state as an omnipresence regulating intimate choices in the home. Meanwhile, under the DV rubric, the criminal law actively prohibits some individuals' choices to live as domestic

---

**279.** 381 U.S. 479, 485-86 (1965).

**280.** 478 U.S. 186 (1986).

**281.** Petition for Rehearing of Respondent at 10, *Bowers*, 478 U.S. 186 (No. 85-140).

**282.** 539 U.S. 558 (2003).

**283.** *See id.* at 562 ("Liberty protects the person from unwarranted government intrusions into a dwelling or other private places. In our tradition the State is not omnipresent in the home.").

**284.** *Id.* ("And there are other spheres of our lives and existence, outside the home, where the State should not be a dominant presence. Freedom extends beyond spatial bounds. Liberty presumes an autonomy of self that includes . . . certain intimate conduct.").

**285.** *Id.* at 567, 573, 580.

**286.** *Id.* at 567. On *Lawrence* and its uncoupling of the relationship between licit sex/illicit sex and marriage/non-marriage, see Ariela R. Dubler, *Immoral Purposes: Marriage and the Genus of Illicit Sex*, 115 YALE. L.J. 756 (2006).

**287.** The broader implication of course led Justice Scalia to insist in his dissent that Justice Kennedy's opinion for the Court already contained an inexorable logic favoring constitutional protection of same-sex marriage. *Lawrence*, 539 U.S. at 604 (Scalia, J., dissenting).

intimates, criminalizing most if not all practical aspects of sharing a life in common. To make good on the prohibition, the state must become a dominant presence in the home, with the police on the lookout for telltale signs of husbands. These two trends stand in tension at the intersection of criminal law and family law.

The simultaneous expansion and contraction of the criminal law in the home could of course be rationalized: consensual sex between adults in private space does not cause harm, whereas DV, a nonconsensual phenomenon, does. But it would be too simple to pigeonhole the competing developments as joint manifestations of the principles of harm and consent, because state-imposed de facto divorce goes meaningfully beyond the prohibition and punishment of violence per se. It seeks to criminalize intimate relationships that adults have chosen for themselves and have not chosen to end. One would need to take a strong view of gendered coercion in intimate relationships generally to rationalize a world in which this kind of state control is regularly triggered by misdemeanor arrests not involving serious physical injury, particularly as the category of nonviolent conduct that constitutes DV expands.

The existing debate in the literature over the tension between protecting women from intimate violence and promoting their self-determination[288] contains an underlying disagreement about women's capacity to make autonomous judgments and decisions about their relationships. While the academic debate continues, prosecutors, police, and courts operate in a world primarily motivated by the distinctive interests of the criminal law. In the language of the cases, in the oral culture of police and prosecutors, and in the structuring ideology of the criminal justice system, a powerful rhetoric of public interest informs reluctance to allow the particular desires of individual women to control.[289] We can see a distinctive nexus between the objective of state control backed by the public interest and the derogation of individual autonomy. The coercive reordering of property and intimate relationships in the home becomes a normal use of the "heavy artillery" of the criminal law.[290]

---

**288.** *See, e.g.*, Hanna, *supra* note 4; Mills, *supra* note 26; Sack, *supra* note 7; Jessica Dayton, Note, *The Silencing of a Woman's Choice: Mandatory Arrest and No Drop Prosecution Policies in Domestic Violence Cases*, 9 CARDOZO WOMEN'S L.J. 281 (2003).

**289.** *Cf.* Anne M. Coughlin, *Excusing Women*, 82 CAL. L. REV. 1, 6 (1994) (arguing in a different context that battered woman syndrome reaffirms an "invidious understanding of women's incapacity for rational self-control[,] . . . denies that women have the same capacity for self-governance that is attributed to men, and . . . thereby exposes women to forms of interference against which men are safe.").

**290.** Allen, *supra* note 17, at 738.

The public interest in enforcement of DV crime becomes a public interest in control of the home. Criminalizing presence at home and imposing de facto divorce are crime control strategies. They reflect a view of using criminal law to control space and family arrangements—by excluding the potential criminal from the home and by inserting the police to monitor even nonviolent conduct there. In that sense they bear a resemblance to the much-debated urban policing techniques of crime control in the public streets, such as "broken windows" policing, that have become prevalent in the last decade.[291] It is not coincidental that we see law enforcement tending toward control of the home as we have seen the rise of techniques of control in the policing of public space.

The project of this Article has been to interpret the moves of a still developing legal regime that has largely not been recognized. Prosecutors, police, and judges in many jurisdictions have at long last adopted a feminist theory of DV as a manifestation of gendered power inequality in the marital relationship. But we see the over-literalization of this theory exemplified in the practice of state-imposed de facto divorce: if the root of DV is marriage, end marriages that have signs of DV.

This solution to the DV problem—which I suspect most feminist advocates did not expect—need not inevitably follow from strong, consistent, even mandatory, enforcement of DV crimes. Of course, alternative approaches may create costs of their own, namely that violent crime might go unprevented. I have not meant to offer a law reform proposal here, but rather to give shape and texture to surprising novelties of the law reform we have had, in order to make visible the meanings and costs of a developing regime. We might well ultimately conclude that this regime is worth its costs. But my goal here, antecedent to that conclusion, has been to show the dramatic changes in how the criminal law is giving effect to a well-accepted anti-violence policy.

State-imposed de facto divorce may well be appropriate for truly violent and dangerous abusive relationships; in these cases, the state may more readily conclude that victims' autonomy and consent are already worn so thin that

---

**291.** Today the idea that aggressively enforcing small crimes and violations leads to a dramatic reduction in serious violent crimes pervasively and definitively informs the training, practice, and ideology of prosecutors in leading jurisdictions such as Manhattan. *See, e.g.*, MANHATTAN DIST. ATTORNEY'S OFFICE, ORIENTATION PROGRAM, QUALITY OF LIFE CRIMES 1-13 (2004) (featuring the original "Broken Windows" article by Wilson & Kelling, *supra* note 15, in training materials for A.D.A.s) (on file with author); MANUAL, *supra* note 167, at 757 (noting that "[i]n order to combat violent crime and other serious crimes such as drug dealing, the NYPD frequently turns to quality of life enforcement" including vertical patrols for trespassers, sweeps in parks, and targeting public drinking, and that "attention to these low-level crimes is often credited with New York City's steep drop in serious and violent crime").

paternalism will best enhance them. But the extraordinary legal innovation wherein de facto divorce becomes a standard prosecutorial tool needs close interrogation before it becomes a uniform, mechanical solution for the large number of cases now coming into the criminal system under the rubric of DV that do not involve serious physical injury.

The expanding definition of violence, mandatory arrest, no-drop policies, the prosecution of many more cases than can ultimately be proven, and the decreasing emphasis on imprisonment are all developments that contribute to making de facto divorce a de facto solution to DV. As de facto divorce becomes a more prevalent alternative to traditional punishment, it is likely to reinforce the expansion of the definition of DV crime and an increase in DV arrests and prosecutions for nonviolent conduct, as law enforcement personnel increasingly imagine the consequences of bringing such domestic incidents into the criminal system to be less draconian than incarceration. A wide range of nonviolent conduct in the domestic space then becomes subject to criminal law regulation, down to the existence of an intimate relationship itself.

What becomes visible is a shift in emphasis from the goal of punishing violence to state control of intimate relationships in the home. This shift is not completely accomplished, but it is underway. Of course, we must continue to pursue remediation of the flawed criminal justice models of the past that simply reified the distinction between private and public. But the ongoing change explored in this Article creates an opportunity for critical reflection on the increasing subordination of individual autonomy in domestic space to state control in the public interest.