# South Carolina Law Review

Volume 48 | Issue 3                                                    Article 2

Spring 1997

# Squabbling in the Shadows: What the Law Can Learn from the Way Divorcing Couples Use Protective Orders as Bargaining Chips in Domestic Spats and Child Custody Mediation

Randy F. Kandel
*Yale Law School*

Follow this and additional works at: https://scholarcommons.sc.edu/sclr

 Part of the Law Commons

Recommended Citation
Randy Frances Kandel, Squabbling in the Shadows: What the Law Can Learn from the Way Divorcing Couples Use Protective Orders as Bargaining Chips in Domestic Spats and Child Custody Mediation, 48 S. C. L. Rev. 441 (1997).

This Article is brought to you by the Law Reviews and Journals at Scholar Commons. It has been accepted for inclusion in South Carolina Law Review by an authorized editor of Scholar Commons. For more information, please contact dillarda@mailbox.sc.edu.

# SOUTH CAROLINA LAW REVIEW

| VOLUME 48 | SPRING 1997 | NUMBER 3 |
|---|---|---|

## SQUABBLING IN THE SHADOWS:
## WHAT THE LAW CAN LEARN FROM THE WAY DIVORCING COUPLES USE PROTECTIVE ORDERS AS BARGAINING CHIPS IN DOMESTIC SPATS AND CHILD CUSTODY MEDIATION

*Randy Frances Kandel*[*]

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 441
II. PROTECTIVE ORDERS IN INTIMATE ARGUMENTS . . . . . . . . . . 445
    A. *Arguing About Protective Orders* . . . . . . . . . . . . . . . . 445
    B. *"This Is My House; This Is My Son:"*
       *The Case of David and Shoshanna* . . . . . . . . . . . . . . 450
    C. *"Safe from Screaming:" The Case of John and Laura* . . . . 456
III. PROTECTIVE ORDER TALK AT MEDIATION . . . . . . . . . . . . 462
    A. *Safeguards; Nexus Tests; and Time, Place, and*
       *Manner Restrictions* . . . . . . . . . . . . . . . . . . . . . . 462
    B. *"This Is My House; This Is My Son:"*
       *The Case of David and Shoshanna* . . . . . . . . . . . . . . 469
    C. *"Safe from Screaming:" The Case of John and Laura* . . . . 474
    D. *"Bruises and Bumps:" The Case of Craig and Alicia* . . . . 481
IV. WHAT THE LAW CAN LEARN . . . . . . . . . . . . . . . . . . . . 486
V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 493

## I. INTRODUCTION

This ethnographic article is about the strategic use of protective orders by parents to gain an advantage in child custody disputes. It examines the actual dialogue of couples participating in court-sponsored child custody mediation in Los Angeles, as they describe arguments they have had at home and

---

[*] Visiting Scholar, Yale Law School; J.D. 1982, New York University School of Law; Ph.D. 1975, City University of New York; B.A. 1966, University of Wisconsin.

441

South Carolina Law Review, Vol. 48, Iss. 3 [2020], Art. 2

negotiate custody agreements with the mediator. The examination reveals how and why some parents are able to employ or reinterpret the law of protective orders and how protective orders sometimes reinforce rather than rectify existing power imbalances.[1] It shows how successful parents use protective orders to create legally protected safety zones around themselves and their homes. Further, it shows how these parents use their protective orders as a predicate for negotiating favorable custody allocations in court-sponsored mediation. My purpose is not to prescribe, but to describe the important, often outcome determinative, disputes and negotiations that parents have between themselves when acting *pro se* or out of earshot of their lawyers. In demonstrating how legal principles, creatively interpreted and reinterpreted by parents, enter the very fiber of family disputes and alter the balance between legal power and interpersonal power,[2] these dialogues teach an objective lesson to lawyers: listen carefully to what your clients say they say and do and educate them in the substantive meaning and argumentative scope of the laws that apply to them. Mediators should take caution as well to elicit, listen actively, and respond to parents' narratives about "talking law" and the underlying interpersonal power dynamics that the narratives encode.

This article examines, in fine-grained detail, the actual language of three mediation sessions in the Los Angeles County Superior Court, Conciliation

---

1. We still know very little about how protective orders work in practice. Most empirical research has focused on telephone calls to the police and the subsequent response of the legal and criminal justice systems. (For an excellent, recent review of the empirical studies on the effect of protective orders on domestic violence, see Lisa Frohmann & Elizabeth Mertz, *Legal Reform & Social Construction: Violence, Gender and the Law*, 19 LAW & SOC. INQUIRY 829, 835-41 (1994)). But the vast majority of protective orders, perhaps most of those issued relatively routinely following flare-ups between estranged and divorcing spouses, do not result in police telephone calls or criminal sanctions. Instead, their existence is incorporated into the private ordering of marriage and divorce and "folded into" whatever negotiation or litigation takes place, as a fact, issue, or "talking point" in the package of concerns.

2. The concrete ethnographic analysis of interacting legal and lay concepts and their relationship to the dynamics of power is a cornerstone of much contemporary scholarship in legal anthropology, which has intellectually influenced the author in manifold and diffuse ways. *See, e.g.,* SALLY ENGLE MERRY, GETTING JUSTICE AND GETTING EVEN (1990); BARBARA YNGVESSON, VIRTUOUS CITIZENS, DISRUPTIVE SUBJECTS (1993). In a recent essay, Alan Hunt describes this research and analytical perspective:

Its hallmark is the contention that legal life and everyday social life are mutually conditioning and constraining and that elements of legal consciousness play an active part in popular consciousness and practices. Law enters into the way that life is imagined, discussed, argued about, and fought over; this imagining, talking, arguing and fighting shapes the law.

Alan Hunt, *Law, Community, and Everyday Life: Yngvesson's Virtuous Citizens & Disruptive Subjects*, 2 LAW & SOC. INQUIRY 173, 178-79 (1996) (book review); *see also* ALAN HUNT, EXPLORATIONS IN LAW AND SOCIETY: TOWARD A CONSTITUTIVE THEORY OF LAW (1993) (further developing this theory); Frank Munger, *Sociology of Law for a Postliberal Society*, 27 LOY. L. REV. 89, 100-05 (1993) (discussing ethnography and the constitutive theory of law).

Case 1:23-cv-00381-JL-TSM   Document 35-9   Filed 01/23/24   Page 4 of 57

Services Division. The parties are couples who had temporary restraining orders (TROs) in place at the time of mediation. The case sessions [*"This Is My House; This Is My Son:"* The Case of David and Shoshanna; *"Safe from Screaming:"* The Case of John and Laura; and *"Bruises and Bumps:"* The Case of Craig and Alicia][3] are part of a larger library of more than forty full sessions observed and taped by the author as part of an extensive research project conducted between 1991 and 1994 with follow-up research in the fall of 1996.[4] I have selected these sessions because of the significant amount of conversation devoted to protective orders during the mediation process. In each case, I use the parties' own words to trace the discussion related to the protective orders in, at least, two instances—(1) an argument or fight that occurred at home between the mother and father prior to the mediation session that triggered or involved the protective order and (2) during the mediation session when the presence of the protective order comes to bear on the issue of custody. Thus, in some sense, the parents' narratives are made to serve two functions—first, as accounts of what happened at a past time and second, as components of persuasive arguments made during the mediation session for or against a particular custody arrangement. To gain the upper hand regarding custody in the different contexts, a parent had to make successful use of the "law" of protective orders in a different way.

In Part II of this article, I discuss protective orders as legal processes that are intended to protect domestic violence victims by changing the relationships of power and place, interpersonally and between the family and the legal system. Also, I address how protective orders become issues in intimate arguments at home. I then proceed to a detailed discussion of the at-home arguments between David and Shoshanna and John and Laura. In the argument at home, the successful parent convinces the other parent that the thrust of a protective order limiting contact and communication between the spouses acts to exclude the unsuccessful parent, at least temporarily, from the protected zone. According to the successful parent, this zone includes the children and the parent himself or herself, even though no protective order with such terms

---

3. All case names are fictitious—created by the author for analytical purposes. To protect the anonymity and confidentiality of the participants, names of all participants, places, and individuals otherwise referred to are pseudonyms.

4. To protect the anonymity and confidentiality of all concerned, the audiotapes remain the property of the Los Angeles County Superior Court, Conciliation Services Division, without whose support and endorsement this research could not have been done. Transcripts of the audiotapes are available from the author. The author wishes to express thanks and gratitude to the entire professional and administrative staff of the Los Angeles County Superior Court, Conciliation Services Division, for opening their doors and their hearts to my inquiring eye. Their consummate skill and unflagging energies towards making divorce an easier life transition continue to be a source of both inspiration and fascination.

South Carolina Law Review, Vol. 48, Iss. 3 [2020], Art. 2

444                SOUTH CAROLINA LAW REVIEW              [Vol. 48:441

may actually be in force. Simply put, one parent convinces the other that the law applies to the successful parent's version of the facts.

In Part III, I discuss mediation as a more complex, although still informal, legal forum that presents different challenges for a parent who would make strategic use of a protective order in getting a preferred custodial allocation. Although the presence of the mediator as a neutral third-party facilitator mitigates emotional confrontation between the parents, the mediator also has an independent obligation to consider the child's best interests. The parent who convinces the mediator that a particular custodial allocation is best for the child's interest, thereby winning the mediator's support, has won a possibly crucial victory in negotiating a preferred agreement. Accordingly, in this forum, a successful parent's strategy involves using the protective order as a kind of informal evidence that the child's best interest lies in a particular allocation of parenting time and responsibilities. I discuss the strategies that are effective in this forum, in terms of the substantive law that constrains mediation, and then proceed to a detailed analysis of the mediation negotiations of David and Shoshanna, John and Laura, and Craig and Alicia.

In Part IV, I return to a more theoretical discussion. I argue that the substantive laws of protective orders and of child custody are linked through their common concern with the legal protection of vulnerable people by assigning them to safe, stable places.[5] This link enables parents to use protective orders as weapons in securing child custody. Once a parent has created a safe stable home by using a protective order to exclude the other parent, it becomes possible to argue for custody on the basis of the child's need for a safe stable home.

However, pre-existing interpersonal power dynamics significantly affect a parent's ability to effectively use the protective order to eject the other parent and to gain custody. The cases indicate that it is the relationally more powerful spouse who often prevails and that the relationally more powerful spouse sometimes *is* and sometimes *is not* the nominal "victim" or holder of the protective order.

As the forum changes, however, from the informal argument at home, to the court sponsored mediation context, rhetorical skill increasingly becomes the decisive weapon. Further, rhetorical skill is not a mere function of interpersonal power. Although interpersonal power is one component of

---

5. This analysis owes an intellectual debt to the contemporary theoretical concern with law, bodies, and places as a form of power and knowledge that originates with philosopher Michel Foucault. Foucault has analyzed the development and distribution of technologies of power through the social construction of bodies and their location and movement in spaces. His influence on legal anthropology has been all pervasive. *See* MICHEL FOUCAULT, MADNESS & CIVILIZATION (1965); MICHEL FOUCAULT, THE BIRTH OF THE CLINIC (A.M. Sheridan Smith trans., Pantheon Books 1973) (1963); MICHEL FOUCAULT, DISCIPLINE & PUNISH (Alan Sheridan trans., Pantheon Books 1977) (1975).

Case 1:23-cv-00381-JL-TSM   Document 35-9   Filed 01/23/24   Page 6 of 57

rhetorical skill, the educated knowledge of what to say and how to "talk law" persuasively is vitally important. Parents' arguments and behavior inevitably become progressively legalistic and legally acceptable as the forum becomes more formal, even when the balance of interpersonal power remains unchanged.

The learned substantive and stylistic components of rhetorical skill provide a means for counterbalancing and overcoming pre-existing power inequalities in the "user friendly" forums where parents speak for themselves, that have become an integral part of family law process. Attorneys can help their clients to change the balance of power and get more preferred outcomes by teaching them to understand and argue the substantive law of their case at home, at mediation, and in other forums in which they must speak for themselves. Similarly, mediators can better rectify power imbalances between the parents by listening to and encouraging narratives that reveal the strategic ways parents use and talk law between themselves, as well as the power dynamics that underlie the strategies.

## II. PROTECTIVE ORDERS IN INTIMATE ARGUMENTS

### A. Arguing About Protective Orders

Protective orders are highly potent and relatively recent remedies for domestic abuse.[6] In theory, protective orders change the balance of domestic power and control: by empowering the victim through a special right to rapid police attention and by providing legal sanctions against the abuser.[7] The

---

6. Protective orders were first introduced in the 1970's, as a consequence of activism by women's rights groups. For a brief history of the protective orders movement, see Mary Schouvieller, *Leaping Without Looking: Chapter 142's Impact on Ex Parte Protection Orders and the Movement Against Domestic Violence in Minnesota*, 14 LAW & INEQ. J. 593, 600-03 (1996).

7. For example, in California, a willful and knowing violation of a protective order is a crime. CAL. FAM. CODE § 6388 (West 1994). Pursuant to California Penal Code section 273.6, any intentional and knowing violation is a misdemeanor, punishable by a fine of not more than $1000 or imprisonment in a county jail for not more than one year, or both; a violation that results in a physical injury is punishable by a fine of not more than $2000, imprisonment, or both; and subsequent convictions entail steeper punishments. CAL. PENAL CODE § 273.6 (West Supp. 1996). Local police policies encourage or oblige officers to make arrests when responding to calls about domestic fights where protective orders are in place—situations that would otherwise be ignored as family arguments. The Violence Against Women Act of 1994, 42 U.S.C.A. § 14031 (West 1995), fosters such policies by conditioning federal aid upon the institution of arrest policies and related matters. *See* Reva B. Siegal, *"The Rule of Love:" Wife Beating as Prerogative and Privacy*, 105 YALE L.J. 2117 (1996). California law fosters police involvement and arrest by providing that "(a) A law enforcement officer shall use every reasonable means to enforce an emergency protective order . . . [and] (b) A law enforcement officer who acts in good faith to enforce an emergency protective order is not civilly or criminally liable." CAL. FAM. CODE § 6272 (West 1994). A significant amount of recent legal scholarship stresses the importance of

South Carolina Law Review, Vol. 48, Iss. 3 [2020], Art. 2

446                    SOUTH CAROLINA LAW REVIEW                    [Vol. 48:441

orders place strict limits on the abuser's ability to contact and communicate with the victim[8]—being controlled in this way destroys the abuser's satisfaction in controlling the victim.[9]

Protective or restraining orders[10] "protect" by doing three things.[11] First, they change the fluid boundaries of interpersonal space and force the estranged intimates to renegotiate their relationship subject to fixed boundaries which are illegal, even criminal, to cross. Second, they expand the victim's personal space, creating a legally defined safety zone around the victim's body and often the victim's home, property, and telephone line.[12] Third, they

---

prosecution in domestic violence cases. *See, e.g.*, Angela Corsilles, Note, *No-Drop Policies in the Prosecution of Domestic Violence Cases: Guarantee to Action or Dangerous Solution?*, 63 FORDHAM L. REV. 853, 858 (1994) (concluding "that no-drop policies can play an important role in combatting domestic violence because they account for victims' realities, counteract longstanding justifications for inaction, and transform the statutory promise of justice for battered women into a credible threat of prosecution for their batterers"); Mary Elizabeth Collins, Mahoney v. Commonwealth: *A Response to Domestic Violence*, 29 NEW ENG. L. REV. 981 (1995) (supporting the proposition that a combination of civil and criminal prosecution for domestic violence does not amount to double jeopardy); Cheryl Hanna, *No Right to Choose: Mandated Victim Participation in Domestic Violence Prosecutions*, 109 HARV. L. REV. 1849 (1996) (recommending that victims be required to testify in domestic violence prosecutions); Dorothy Carl Quinn, Comment, *Ex Parte Protection Orders: Is Due Process Locked Out?*, 58 TEMP. L.Q. 843 (1985).

8.*See, e.g.*, CAL. FAM. CODE § 6320 (West 1994) (providing that "[t]he court may issue an ex parte order enjoining a party from contacting, . . . telephoning, contacting repeatedly by mail with the intent to harass, or disturbing the peace of the other party").

9.Over the past few years, feminist legal scholarship has significantly redefined the psycho-legal portrait of abusive couples from one of men who are out of control and weak women who are too passive to resist to one of men who use force to exercise control and women who do their best to resist. *See, e.g.*, Donna K. Coker, *Heat of Passion and Wife Killing: Men Who Batter/Men Who Kill*, 2 S. CAL. REV. L. & WOMEN'S STUD. 71, 88-89 (1992) (criticizing the "heat of passion" argument as applied to mitigate the offenses of men who kill their spouses and arguing that wife-killers often have a history of being wife-beaters); Martha R. Mahoney, *Legal Images of Battered Women: Redefining the Issue of Separation*, 90 MICH. L. REV. 1, 71-93 (1991) (developing the concept of "separation abuse" and arguing that women may be at the greatest risk when they try to leave their batterers, triggering the need for increased legal rights and protections); *see also* Jeffrey T. Even, *Washington's Address Confidentiality Program: Relocation Assistance for Victims of Domestic Violence*, 31 GONZ. L. REV. 523 (1995/96).

10. In the domestic violence context, the words "protective order" and "restraining order" are virtually synonymous and will be used interchangeably in this article.

11. For a full state-by-state description of the relief that protective orders provide (or do not provide) see Catherine F. Klein & Leslye E. Orloff, *Providing Legal Protection for Battered Women: An Analysis of State Statutes and Case Law*, 21 HOFSTRA L. REV. 801 (1993); *see also* Nancy L. Hathaway & John P. Zanini, *Update and Overview of Massachusetts Case Law Considering the Scope and Meaning of the Abuse Prevention Statute and Related Issues for Prosecutors*, 30 NEW ENG. L. REV. 375 (1996); Hollis L. Webster, *Enforcement in Domestic Violence Cases*, 26 LOY. U. CHI. L.J. 663 (1995) (describing how Illinois protective orders work).

12. In regard to the relationship between the abuser and the victim, the California statutory

6

create a rapid response rescue chain—the holder of a protective order can summon the police and, at the least, expect help in warding off words and acts that would otherwise be regarded as everyday interactions.[13] In so doing, protective orders radically alter the way divorced and divorcing couples work out their post-divorce and co-parental relationships.

Protective orders are, necessarily, "user-friendly" remedies.[14] They can be obtained, at least temporarily, *ex parte*, quickly, and without the costly assistance of lawyers.[15] Speed and ease of obtainment are vitally necessary if restraining orders are to protect victims and potential victims from dangerous partners and ex-partners.

---

scheme divides the behaviors that may be enjoined into three categories. CAL. FAM. CODE § 6320 (West 1994 & Supp. 1996) (providing that "[t]he court may issue an ex parte order enjoining a party from contacting, molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, harassing, telephoning, . . . contacting repeatedly by mail with the intent to annoy or harass . . . or disturbing the peace of the other party"); CAL. FAM. CODE § 6321(a) (West 1994) (providing that "[t]he court may issue an ex parte order excluding a party from the family dwelling, the dwelling of the other party, the common dwelling of both parties, or the dwelling of the person who has care, custody, and control of a child to be protected from domestic violence for the period of time and on the conditions the court determines, regardless of which party holds legal or equitable title or is the lessee of the dwelling"); CAL. FAM. CODE § 6322 (West 1994) (permitting the court to enjoin any "specified behavior that the court determines is necessary to effectuate orders under Section 6320 or 6321"). Any orders that may be issued *ex parte* may, of course, also be issued after notice and a hearing. CAL. FAM. CODE § 6340 (West 1994).

13. *See supra* note 3.

14. *See, e.g.,* Regina DuFresne & Jonathan S. Greene, *Increasing Remedies for Domestic Violence: A Study of Maryland's 1992 Domestic Violence Act in the Courtroom,* 6 MD. J. CONTEMP. LEGAL ISSUES 155, 170, 172 (1995) (reporting results of an empirical study finding that after brief hearings—less than fifteen minutes long—petitions for *ex parte* protective orders were granted in 85% of the cases, and in contested hearings, petitioners prevailed 44.3% of the time).

15. The California statutory scheme provides for protective orders to be obtained in three ways. First, an "ex parte [sic] emergency protective order" can be obtained immediately, at any time of the day or night, even through a law enforcement officer's telephone call to a judicial officer. CAL. FAM. CODE § 6250 (West 1994). The law enforcement officer must assert that there is an "immediate, present danger of domestic violence, based on a . . . recent incident of abuse of threat of abuse," and the judicial officer must find that there are "reasonable grounds" to believe the immediate, present danger exists and that an emergency protective order is necessary to prevent its occurrence or recurrence. CAL. FAM. CODE §§ 6250-51 (West 1994). An *ex parte* emergency protective order expires on the earlier of five court days or seven calendar days from the date of issuance. CAL. FAM. CODE § 6256 (West 1994). Second, a protective order may be issued "to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved, if an affidavit shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse." CAL. FAM. CODE § 6300 (West 1994). The restraining order in this instance is accompanied by a notice of hearing. If the defendant fails to appear, the court may grant the requested order *ex parte* for a period of up to three years. CAL. FAM. CODE § 6302 (West 1994). Finally, a restraining order may be issued after notice and a hearing. CAL. FAM. CODE § 6340 (West 1994).

The minimal threshold of assault or threat of assault necessary to obtain a protective order without committing perjury can, unfortunately, be satisfied at some point by almost anyone undergoing even a relatively amicable divorce.[16] Protective orders can thus be used by genuinely hurt and scared people not only to provide safety, but also as an affirmative element of divorce strategy: a use considered to be both sensible and appropriate and freely discussed at mediation. As the mediation tapes demonstrate, such orders can easily be used as a method of keeping a pesky, estranged spouse at bay[17] or as a strategy of dispute escalation.[18]

Once in place, the protective order itself can become a source of tension and argument between the parties because the terms are misunderstood[19] or the restrictions impede the free flow of information between the parties and about the children[20] or one parent believes the other is using the protective

---

16. CAL. FAM. CODE § 6203 (West 1994) (stating "'[a]buse' means intentionally or recklessly to cause or attempt to cause bodily injury, or sexual assault, or to place a person in reasonable apprehension of imminent serious bodily injury to that person or another").

17. For example, consider the following dialogue:

Mediator: Yeah. Now, you're here on a restraining order. What's that all about? What happened with that? . . . [ellipsis throughout this article indicate not only the author's selective omission of intervening text but also the speaker's pause, interruption, or jump in thought].

Violet: I, umm, went to this house where he said he lived with a friend, and I was gonna tell him that if he didn't leave me alone, I was gonna put the restraining order. But instead, y'know, he went ahead and did it.

Mediator: And did it first. . . . Was there violence during the time the two of you were together? . . . Did the two of you have physical fights?

Joe: No, we . . . you see she was physical to me . . . when my car was damaged.

Mediator: Mm-hmm. And you made a police report . . . It doesn't sound as if you thought you were physically in danger.

Joe: Uh, physically in danger? No. That's ridiculous. . . . I put a restraining order on her mother also . . . because I . . . I really feel that Violet's an adult, and I'm an adult. We can have this out between ourselves, you know. We don't need other parties involved . . . . This is her and I. This is our child. Her mother wasn't there when we conceived this child. OK?

18. For example, see Craig's explanation for getting a restraining order, *infra* note 21.

19. Consider, for example, the following exchange:

Mediator: Now, the Tuesday [visit] is going to be an option and you are going to call to let her know.

Craig: Yes.

Mediator: Now, that means if you don't call, she's free to assume you're not coming . . .

Alicia: But wait a minute. If he goes along with the restraining order, that means he can't call me at all.

Mediator: Well, the restraining order is against you contacting him. Not him contacting you.

Alicia: Oh. Well, then . . .

20. For example, in the following dialogue there has been an abrupt change of the residence

order as a subterfuge to avoid telephone calls or visitation.[21] The terms and scope of the protective order itself are often contested by the parties, providing a renewed opportunity for the manipulation of interpersonal power. Changes in interpersonal spatial relations wrought by the terms of a protective order do not simply and purely keep spouses apart so that, like prize fighters in their respective corners, they will be unable to fight. Rather, they change the terms of the fight and the tokens of power from direct control of another's body to control of a critical space, so that the interpersonal boundary line fixed by the order becomes a point of contention. In the following example, the terms of

---

of two teenage children from their mother's to their father's because of the children's dislike of the mother's new live-in fiancee. The mediator proposes that it would be a good idea for the parents to stay in communication about the children, but the father (unaware that a restraining order can be modified) believes he is prohibited from communicating with the mother under the existing restraining order. The conversational exchange shows the stilted rigidity of interaction that results from his too scrupulous adherence to the literal terms of the protective order as he understands it.

Mediator: (to Eva) Would you like him to keep you informed about what they're up to?

Eva: Sure.

Mediator: Would you be willing to do that Mavic? . . . Would you give Eva that information about what is happening with your two kids? If your children have conflicts at school, would you be willing to tell her that there is a meeting at school for the children?

Mavic: No, because she doesn't come and speak. I have a restraining order. I can't call her. I can't write letters.

Mediator: You can't write letters? You can't call her? Would you want that kind of information, Eva?

Eva: I do. I want it, but I put the children first.

Mediator: [Sensing that the parents really do want to share information, the mediator moves to a blackboard and begins to explain custody options with the help of a diagram.] Joint legal custody means that both of you would share information and the right and responsibility to make decisions regarding your children's health, education, and welfare . . . .

Mavic: [laughing] This is impossible, [y]ou understand why. Because I have a restraining order. Believe me.

21. The following dialogue is illustrative:

Craig: Well, would you like to know that I haven't seen [my son] in almost, what, nine weeks?

Alicia: Craig, you haven't even made an attempt to go call my mom and see him, and you know how long I've been waiting for you to. Get a phone call from you? To even ask about the baby?

Craig: Wait! Why should I call you and tell you I'm calling?

Alicia: Because I can't call you. I can't . . . .

Craig: Yeah, but that's my instructions. That I'm not to call you at all. That comes down from the judge. He goes wait until the court date so you can settle it in court.

Alicia: Yeah, but see then you're making the choice of not wanting to see Ben.

Craig: No. I am trying to protect myself . . . .

Alicia: From what? From me?

Craig: Oh, yeah. Very much.

450                SOUTH CAROLINA LAW REVIEW                [Vol. 48:441

a protective order state that Gregory is not to come up to the house when he arrives to pick up the children. Each parent interprets the limit differently:

> Gregory: And the court order said, when I pick up the kids, no exchange of y . . . Alexa comes to my car. I am in the car, following the court order. . . . I'm not getting out of the car. I'm not yelling.
> Alexa: When he pulls into the driveway, y'know, I just hold my breath, because he's not supposed to. It's just his way of playing games.

For Gregory, the language of the protective order means that he is not to get out of the car. For Alexa, the same language means that Gregory is to stay at the curb and not drive onto the driveway—which is her property. Thus, the very provision designed to prevent a dispute provokes one, and the border becomes a flash-point for argument. Unfortunately, but inevitably, it is across this tense border—this interpersonal demilitarized zone—that parents transfer the child or children for visitation. The protective order physically separating the parties makes lawful, amicable, shared physical family affection impossible. Normal flexible and fluid child care arrangements and rearrangements are rendered problematic in the presence of protective orders. Protective orders are designed and conceptualized to prevent arguments between the parents, but they work in this way only if parents adhere literally to the "letter of the law." Often, the protective order becomes a point of tension—as every child exchange occurs across a legally demarcated and potentially policed border. The parent who reaches out to take a baby from the arms of a co-parent inevitably intrudes into that co-parent's private space.[22]

### B. "This Is My House; This Is My Son:" The Case of David and Shoshanna

The case of David and Shoshanna dramatically illustrates the predicament and the way that parents give new meaning to a protective order when they argue over its boundaries at home. The divorcing couple has an eighteen month old toddler, Joshua ("Josh"). Their marriage broke up when Shoshanna discovered that David had a girlfriend,[23] with whom he had fathered a child

---

22. This statement is neither exaggerated nor metaphorical. Numerous custody agreements in California avoid face to face contact between the parents during the child's transfer by having the delivering parent drive up and put the child in a car seat in the receiving parent's car, while the receiving parent watches from the window. After the delivering parent drives away, the second parent rushes out and takes the child from the car seat. When it is time for the child to go home, the ritual is repeated in reverse.

23. David tells the following story, revealing his attitude towards these women:
She's [referring to Shoshanna] going to a very good pediatrician right near our house . . . . Uh, good group, um, the other woman, and I don't, y'know, everything's out in the open, um, who I had a-a-child with, and uh, it's, looks like it is my child, uh, went to the same doctor, because they were born in the same hospital, and they get

at about the same time Josh was born and whom he was continuing to see.[24] Shoshanna,[25] with the help of her lawyer, had originally obtained a protective order giving her exclusive occupancy of the house. However, at the hearing on the order, the judge discovered that the house was David's separate property—purchased before the marriage—[26] and, thus modified the order. The modified order stated that both David and Shoshanna could live in the house but included mutual restraining orders to the effect that neither party could touch or speak to the other.[27]

---

kind of referred to this medic . . . . You know, they're kind of tied in, they're kind of like a referral . . . group there. So she went to the same doctor and then, and she stupidly gave my name as the father, so I guess it got around that I'm the father of both these children, two different women are bringing two different kids. And the girl, and . . . and Shoshanna, uh, suspected that they were talking behind her back. So instead of looking for a doctor nearby, she finds some doctor that's on the other side of Los Angeles.

24. Shoshanna explains that they "[a]lways argued about it. Because he'd keep telling me, 'I wanna see that daughter . . . I - I, so, and I have to go over there and meet that woman and the daughter, they need me, like you need me.'" She also tells a story about how she was attacked at David's office by David's girlfriend:

I went to the office with Josh before we go to the procedure of the divorce. And uh, David was working inside of the office . . . So I drove by; I went in. And . . . I went to the bathroom and David was there with Josh, so I came back from the bathroom, and I hear[d] noise of baby, y'know, so I thought, in the li-, the library. So I opened the door . . . and she was there, with their baby, and she jumped at me, she start calling me names, hitting me, I'm thinking "I don't know what I'm doing here. Why I have to be involved in this matter," y'know. So they [are] banding together against me, y'know, like I'm the one who [is] hitting her, I'm the one who arresting, arrested her, y'know, things like that.

25. For the most part, all of the parents discussed in this article represent themselves *pro se* [or *pro per* as it is known in California]. Only two parents, both mothers, are represented by attorneys. Shoshanna had a lawyer represent her in obtaining the original protective order and at the protective order hearing. David is an attorney and represented himself. Laura, in Case Two, was also represented by an attorney, while her husband was not. Attorneys are almost never present at mediation sessions. The mediators have the authority to exclude them and always do so when only one parent is represented. If attorneys choose to wait outside, they are typically brought in only to hear the terms of the agreement at the end of the session. Very uncharacteristically and with bad results, Shoshanna's lawyer was permitted to interject at the end of the session. Perhaps the mediator permitted this because David was a lawyer representing himself.

26. The judge was not legally obligated to reach this conclusion. Under California law, a protective order can give a party exclusive occupancy of the family residence, regardless of the form in which title is held or which party is likely to have the house after the assets are distributed. CAL. FAM. CODE § 6321(a) (West 1994). David explains, "The judge had indicated her, uh, direction of who-how she's gonna decide in this case. And she will let me keep my house that I owned for six years before she came to be, before my wife came over. It's a year and a half marriage. OK?"

27. Shoshanna explains the terms of the restraining order to the mediator as follows:
Shoshanna: Uh, we had a restraining order that he can't come to the house, but then the judge say[s] that um, we can't have a restraining order because, . . . because we haven't decided what

Returning home after the hearing, both Shoshanna and David try to play with Josh, and they engage in a tug of war across the legally enforceable boundary between them. The struggling parents attempt to exercise power over each other by pulling the baby into their own private space. In the accounts they tell during separate sessions with the mediator, each parent describes the other as being the transgressor.

> David: I was playing with him, we were playing hide and seek, we're laughing [and] she comes in and picks him up and takes him out of the room. . . . And she starts crying and he starts crying.
> Shoshanna: [H]e [was] always sitting next to me, so I was there with Josh, so he grabs him, and um, Josh starts crying. . . . He twisted my arms, y'know, and he took Josh away from me.

Each parent strives to take Josh from the other parent and keep him within his or her perceived personal and legally protected space. Thus, they reconfigure the household space in a way that reflects the power imbalances between them. The ostensible purpose of the protective order was to empower Shoshanna, a diminutive Israeli pianist and music therapist, against the verbal and physical ravages of David,[28] an athletic, two hundred pound, hard talking and highly charged trial attorney.[29] Shoshanna sits at the mediation session

---

the house is, and it's his house. So she just told him, the judge told him, just come and . . . not be a-round here. Or talk to him or something like that.

Mediator: O.K., so he's restrained from talking to you, but he's . . .

Shoshanna: Right. Or touch me or anything like that.

28. Even David's own words indicate that he has bullied her throughout the marriage: Uh, . . . she was pregnant when we got married, that's why we got married. I lost my father less than a year before she got pregnant, and I wasn't gonna have an abortion at that point. I wasn't, y'know, I emotionally, I couldn't do it. I had done it in the p-, in college, y'know a, a few times, y'know. But not at this point in my life. And, uh, and I hope that it'll work out with her, but it wasn't a loving relationship. So, so be it. Y'know, uh, it's not a fault state. I'm not gonna be punished for what I ever did or didn't do.

29. David describes himself as follows:
I'm a pretty strong individual. I'm aggressive, I-I don't know many successful attorneys who aren't. I'm a sole practitioner, I'm very successful. Every day I'm in there, burning my . . . brains out. At the end of the day, I'm, my head is spinning, 'cause I have s-, well I love it, 'cause it's so stimulating, it's intellectually stimulating, I'm helping people. I enjoy it. I'm not abusive. I'm-I'm, I do it because I like to help people. I do like to make money, I do like to have financial security . . . . I'm, I'm highly educated, I'm highly motivated, I'm very athletic.

David, in fact, uses these same points, to make an argument for custody of Josh: "[N]ow he needs a lot of time with his father, because I'm a survivor, I, I'm, I'm successful, I'm athletic, I intend to teach him how to play tennis, throw the football around, uh, teach him to be a survivor in this world, which I don't think she can do, as well as I can do."

looking almost as white, delicate, and translucent as the sheer nylon blouse she wears as she tells her story.

Yet, when the couple begins to fight, the order's intent is lost. Although both Shoshanna and David are subject to exactly the same legal restraints, their concepts of personal space and their respective abilities to defend that space differ importantly. David seems to have the bigger personal space and the greater right to intrude on Shoshanna's space. David talks as though the entire living room constituted his personal space. In his account, he and Josh are all over the floor "playing hide and seek." To him, for Shoshanna even to enter the room is an annoying intrusion that makes Josh cry. Viewed objectively, the protective order legally entitles Shoshanna to pick up Josh, provided she does not touch David.

In Shoshanna's description, David, as the aggressor who makes Josh cry, intrudes upon Shoshanna's legally protected personal space. She holds Josh in her arms as David moves closer and closer, violating first the spirit and then the letter of the protective order, and finally taking Josh away. Although David and Shoshanna's narratives seem superficially to be equal and opposite versions of the same events (each talks about the other grabbing the child and making him cry), they are not. David takes more than he deserves, and Shoshanna gets less than her entitlement.

David ultimately gets Shoshanna out of the house. She goes unhappily, leaving Josh behind. Shoshanna is, at least temporarily, excluded from the family unit as both David and Shoshanna's accounts detail.

> David: I said, "Shoshanna, you said you were gonna leave. Well, just leave." And when she's gone, one minute later, he's for-, he [Josh] forgets the person's gone.
> Shoshanna: I told him, "Please let" and Josh was . . . follow me, up to the room. And he grabbed him and he told me, "This is my son, and this is my house, and he doesn't need you." So, y'know I left. So now I don't know where he is.

Without the will to call the police, Shoshanna gains no real protection from the restraining order. Yet, why does Shoshanna not call the police? If this were merely a consequence of David's raw power and Shoshanna's relative weakness, this story would just be one more account of a bullying husband.[30] However, David is actually able to tap into the legal power of the protective

---

30. The stories of women forced to leave home, with or without their children, in order to flee from abusive husbands, are commonplace. *See, e.g.*, Martha F. Davis & Susan J. Kraham, *Protecting Women's Welfare in the Face of Violence*, 22 FORDHAM URB. L.J. 1141 (1995) (telling stories of women forced to flee from abusive spouses and how flight exacerbates their poverty and the need for welfare reform); *see also* Even, *supra* note 9.

order. He interprets and construes it to his advantage, making the law appear to be on his side as he pushes Shoshanna out of the house with his words.

As the next excerpt from Shoshanna's narrative reveals, when David says, "This is my son, and this is my house, and he doesn't need you," she leaves because she hears in those words not only David's powerful insistence but also a claim of legal right. She hears David as claiming that because the judge said that the house belongs to David, that the judge will also say that Josh belongs to David, that David should stay in the house, and that David will get custody. Shoshanna quotes David as using the protective order to support his claim to custody: as a vehicle to aggrandize his personal space to include the entire house, to keep Josh within that space, and to exclude Shoshanna from the family unit.

> Shoshanna: I told him, "Please," you know, "don't take him away." And he [said], "[T]his is my house, this is my son. You don't know what happened in court today. The judge likes me and he won't like you, and I'm gon-, I'm likely to get custody, . . . and you get [a] hundred dollars and find a place to live, because this is my house.[31] You better get used to the idea."

As Shoshanna tells the story during the mediation session, David has literally used the words and logic of the law to create an informal legal argument against Shoshanna's remaining in the house.[32] David has manipulat-

---

31. One may quibble that David's argument is not strictly speaking a "legal argument," emphasizing points of law, but a confabulation of a legal position with a judge's personal preference or "liking" for one party rather than another. Effectively, this difference is irrelevant since it is the law's power and authority, whether personalized or abstract, that David now brings to bear on Shoshanna. Further, empirical studies of what divorce lawyers and clients actually say to each other have revealed the same confabulation. Austin Sarat & William L.F. Felstiner, *Law and Strategy in the Divorce Lawyer's Office*, 20 L. & SOC'Y REV. 93 (1986); Austin Sarat & William L.F. Felstiner, *Legal Realism in Lawyer-Client Communications*, *in* LANGUAGE AND THE JUDICIAL PROCESS 131 (Judith N. Levi & Anne Graffam Walker eds., 1990); AUSTIN SARAT & WILLIAM F. FELSTINER, DIVORCE LAWYERS AND THEIR CLIENTS (1995).

32. It is not necessary, and in fact is highly unlikely, that Shoshanna's report of David's statement is a verbatim repetition of what he actually said the night before. In a previous article discussing some of the Los Angeles County court sponsored mediation tapes, I have argued that such reported speech is actually "constructed dialogue"—a present memory of past perception spontaneously retold to meet the moods and purposes of the ongoing conversation. Randy Frances Kandel, *Power Plays: A Sociolinguistic Study of Inequality in Child Custody Mediation and a Hearsay Analog Solution*, 36 ARIZ. L. REV. 879, 898-903 (1994). In reaching this conclusion, I have followed sociolinguist Deborah Tannen and a long line of scholars who have dealt with the multi-layered complexities and shifts of meaning in reported speech as it moves from speaker to speaker and context to context. *See* DEBORAH TANNEN, TALKING VOICES (1989); RESPONSIBILITY AND EVIDENCE IN ORAL DISCOURSE (Jane H. Hill & Judith T. Irvine eds., 1993); M.M. BAKHTIN, THE DIALOGIC IMAGINATION: FOUR ESSAYS (1981); V. N. VOLOSHINOV, REPORTED SPEECH (1927).

Case 1:23-cv-00381-JL-TSM   Document 35-9   Filed 01/23/24   Page 16 of 57

ed a situation, on the general aspects of which his and Shoshanna's accounts agree, so as to force Shoshanna out of the family circle by giving her the impression that his power is now backed by the law's authority.[33] Shoshanna leaves, feeling that the law is not on her side, that she needs to tread carefully, and that it was a strategic error for her to have obtained the initial temporary restraining order giving her exclusive occupancy of the house.

The twists in interpretation and efficacy that the protective order assumes as David and Shoshanna argue in their own living room are characteristic of their particular family history. For example, David, who describes himself as "aggressive" and a "survivor" and Shoshanna as "young, naïve, and stubborn," has always wielded the upper hand. Having married Shoshanna because she was pregnant, he simultaneously continued a relationship and bore a child with another woman. David complains that Shoshanna does not take child rearing advice from David's mother and that she arbitrarily changed pediatricians when she learned that David's girlfriend was using the same one. Shoshanna is an immigrant, speaks English as a second language, and is an undergraduate student. David is a high income attorney, who supports the entire family. Shoshanna explains that when she discovered David's girlfriend she lost so much weight that she had to stop nursing Josh.[34] She complains that David leaves her alone in order to work long hours and engage in sports, tells her that his girlfriend and her child are as important to him as she is, and, in essence, turns his legal skills against her in a personal way—trying to get her to make admissions into his dictaphone and having his mother write an affidavit in David's petition for sole custody of Josh stating that Shoshanna is an impatient and immature mother.

If David, the stronger and controlling spouse, appears the victor at this point, has the protective order accomplished anything? The answer must be: Yes, it has changed the discourse. To summarize, the law of the protective order has changed the struggle from fighting to legal argument and from a discourse of violence, in which one parent tries to forcefully control the other's body, to a discourse of separate and private spaces defined by law. David and Shoshanna are forced to change the discourse of their dispute to a struggle over who controls the larger space, the home, and the body of their

---

33. It is also irrelevant whether David's statement is "correct" from the point of view of legal analysis. What is significant is that Shoshanna *believes* his legal analysis is correct. David reports himself as saying to Shoshanna, "Y-you, don't have to leave, but if you're uncomfortable, you brought it upon yourself. But Josh is staying here in his home." Even this more softly toned account, which is equally unlikely to be a verbatim report of actual conversation, includes insinuations that are sufficient under the circumstances for Shoshanna to conclude that the law has turned against her and that she is responsible for it.

34. Shoshanna explains, "I nursed him, y'know. And I nursed him through six months. And then when I found out about that woman he has, I-I lost weight, I couldn't nurse anymore, y'know."

South Carolina Law Review, Vol. 48, Iss. 3 [2020], Art. 2

456            SOUTH CAROLINA LAW REVIEW            [Vol. 48:441

child, Josh. David wins; the balance of power has not tipped but the terms of argument have—now emerging in the language of the law are concepts such as home and stability, which are important factors in determining custody.[35]

Given the family dynamics and David's legal career, it might seem predictable, almost inevitable, that Shoshanna perceive the antagonistic authority of the law and David's personal power as alter egos of one another. Likewise, David interprets the law in the light most favorable to him so that the meaning and effect of the protective order works to his advantage. This case might seem to be so atypical as to constitute a poor example. The following case, however, reveals a positive relationship between interpersonal power, family history, and strategic use of the protective order that is not so seemingly predictable from demographic characteristics like gender, size, and education.

### C. "Safe from Screaming:" The Case of John and Laura

In this case, Laura, a fiery, five-foot Salvadoran immigrant mother with a grade school education, successfully wields her verbal power and strategically manipulates the presence of a protective order. She portrays herself as the victim of her college-educated former husband, John. At mediation, Laura ultimately negotiates a revised visitation schedule that significantly reduces John's contact with the couple's six year old daughter and seven year old son. Just as the previous case illustrates a victim further victimized by a protective order in which the interpretation and meaning are co-opted by the more powerful spouse, this case reveals a victim who becomes empowered by a protective order, as the legal paradigm intends. Again, the result is due at least partly to the interpersonal power long wielded by one party during and after the marriage, a power that exists despite that party's categorization as a victim.

---

35. It is significant that in some legalistic way David's "house" becomes synonymous with Josh's "home," frightening Shoshanna with the possibility that she may be denied custody. Even "house" and "home" are subject to social construction and redefinition in the contexts of dominance and subordination. According to authors Akhil Gupta and James Ferguson,

> The idea that space is made meaningful is of course a familiar one. . . . The more urgent task . . . is to politicize this uncontestable observation. With meaning making understood as a practice, how are spatial meanings established? Who has the power to make places of spaces? Who contests this? What is at stake? . . . The ability of people to confound the established spatial orders, either through physical movement or through their own conceptual and political acts of re-imagination means that space and place can never be 'given,' and that the process of their sociopolitical construction must always be considered.

Akhil Gupta & James Ferguson, *Beyond "Culture:" Space, Identity, and the Politics of Difference*, 7 CULTURAL ANTHROPOLOGY 6, 11, 17-18 (1992).

The couple has been divorced for five years. The mediation session between John and Laura follows a fight, after which Laura obtained a temporary restraining order preventing John from calling or visiting the house and, in effect, from seeing or talking to his children. The fight began when Laura's cousin, who was living with Laura, invited John over to visit and help babysit. The babysitter and the cousin had to leave early and John agreed to stay until Laura came home from work. Laura came home and was surprised to find John at the house. They started yelling at each other. Although each insists the other started it and their respective accounts differ—Laura claims John was drunk and threw a wine glass at her,[36] while John insists that he was sober and that the glass was accidentally dropped[37]—they agree on certain basic facts. Laura deliberately hit John over the head with a wine bottle, causing an injury that required stitches, and Laura received a bruise.[38]

> Laura: I picked up a bottle and I hit him on the head. . . . I don't know if he fell down or what.
> John: [A]ctually she sent me to the hospital. . . . [S]he hit me over the head with some type of glass object that broke and, uh, uh, fractured my skull and I had to get stitched up at a hospital. . . . I had blood flowing all over me, one of the neighbors gave me a few napkins and, uh, I went to the emergency hospital and . . . six hundred bucks, they stitched me up. . . . She hit me over the head with something that had wine in it, I didn't even know if it was [a] decanter or a wine bottle, and once it was on me, it was wet.

On these facts, either John or Laura could easily meet the threshold for obtaining a temporary restraining order, or a judicial officer could issue mutual protective orders. Laura and John, however, respond very differently to the crisis. Laura makes a police report, has x-rays taken, gathers evidence, and obtains a temporary protective order that, in effect, denies John access and contact not merely as to her, but also as to their children.

> Laura: "I have a doctor's report and, uh, pictures to prove that. . . . [T]he police came . . . my attorney has the pictures, you can see, y'know . . . .

---

36. Laura states, "[H]e picked up a glass, y'know, I guess obviously that's what it was, a gla—wine glass, and threw it at me, caught me like, were, like from there to that door, that's where he caught me, and hit me right here. I didn't even know, I mean, I just put my leg like that, I was wearing boots and blue jeans."

37. John states, "I put the shoulder bag on my, uh, athletic bag on my shoulder and I walked by this little case, knocked over a wine glass, y'know, I caught it, and then I was angry, threw it on the floor, broke it."

38. Laura relates, "[A]ll of a sudden I have blood all over me . . . and it didn't look that bad, it's like, I couldn't feel the pain . . . and it was just a bruise . . . the next day it was a real bad bruise."

I had been going to my chiropractor for my back, and I had an appointment
on, um, y'know, the following, um, Monday, Tuesday, whatever, and I
understand by law that they have to report those things. So I had to be there
for a physician and x-rays . . . the week before. So what they took of it,
because I don't have, my body was so sore, and uh, they started doing the,
uh, physical again and they took more x-rays of my neck, inside, swollen,
or something that could have only happened by, y'know, my doctor says is
from some kind of something and that's why I don't want him in my house.

By contrast, John's approach is to stay out of Laura's way until she clams
down.

John: I've never been one to go to court and, um, y'know, make com-
plaints. . . . And uh, y'know, none of these things when they, I mean, I just
kind of learn to live with it. . . . When I broke the wine glass, she was in
this panic state, and all I wanted was to get out of there, y'know. . . .
[A]fter she gets mad, and she goes through these tirades, and then she'll
loosen up later. Um, if she is, if she is phobic and really afraid, y'know,
I . . . should stay as far apart as possible.

By giving Laura a chance to calm down, John hopes to pave the way for
further consensual visitation with the children. By staying away, however,
John actually distances himself from the family circle. He is unable to visit
with or talk to his children; thus he risks damaging his relationship with them
socially, emotionally, and possibly even legally.

Laura, by contrast, seizes upon the opportunity to obtain a restraining
order against John, thus legalizing a *de facto* zone of protected privacy that
includes her house and children. If John's statement that he tends to lie low in
such situations is a roughly accurate statement of his actual behavior, Laura
might even know that she does not need to seek a restraining order to keep
John away. Even if genuinely and legitimately terrified, Laura is strategic
enough to use the opportunity to obtain a temporary restraining order that
enhances her position.[39]

As in the case of David and Shoshanna, the introduction of a protective
order changes the discourse of the dispute which must now take place on the
law's terms. Rather than striving to control one another's bodies, by throwing
wine glasses and wine bottles, the struggle is now about who controls the
home place in which the children reside. As in the previous case, the "law"

---

39. At one point during the mediation session, Laura says that she has filed about six police
reports. Her narrative indicates that she has learned (perhaps from talking to police, court clerks,
or domestic violence volunteers) how to "make a case" for obtaining a protective order and to
bring all of the supporting documentation, including photographs and police reports, to the
mediation session. John, who actually had to receive stitches in his head after the fight, does none
of these things.

Case 1:23-cv-00381-JL-TSM  Document 35-9  Filed 01/23/24  Page 20 of 57

has won a victory, as has the spouse who can speak in the law's terms. Significantly, Laura, a Salvadoran immigrant of limited education, by availing herself of the user-friendly legal process, is as able as David, a practicing attorney, to speak in the law's terms, although she does so in a different way. While David actually constructs a legal argument that links together legal rights and the judge's possible preferences, Laura uses the law by applying for the legal remedy of the protective order and by bringing x-rays, photographs, and police reports with her to make her case.[40] John, like Shoshanna, turns away, leaving his children and his legal rights behind. Thus, in both David and Shoshanna's case and in John and Laura's case, the spouse who convinces the other that the law of the protective order is on his or her side prevails.

Are the dynamics of interpersonal power surrounding the use of the protective order the same or different in these two cases? On a superficial level, they seem to be very different. Granted, Shoshanna and Laura are both tiny immigrant women, and they each hold a restraining order against their bigger, better educated, U.S. born husbands. Yet, Shoshanna leaves home, while Laura keeps John away. The protective order, in accordance with its intended purpose, does, in fact, protect tiny and emotionally sensitive Laura and her children from John's threatening outbursts. This is, however, a matter different from the question of whether Laura is able to seek the order while John slinks away because of the power Laura already possesses within the terms of the relationship.

The dialogue indicates that Laura's response to the fight builds on a preexisting pattern, through which Laura has been consistently edging John out of the family circle. For example, although it is likely that John and Laura have joint legal custody, the most common custody arrangement in California, both of them act as though Laura has sole custody[41] and John has only

---

40. Volunteers and clerks who assist petitioners for protective orders in drafting their affidavits and in completing the requisite forms often teach them to use such concrete evidentiary details and to transform their domestic fight stories into narratives of abuse and victimization. *See* Robert Emerson, *Constructing Serious Violence and Its Victims: Processing a Domestic Violence Restraining Order*, 6 PERSP. ON SOC. PROBS. 3 (1994).

41. Laura: I don't know if physical custody, is like, joint; I don't know how that works, but, like I couldn't take them out of the country without his permission.

Mediator: Do you have joint custody or, . . .

Laura: No. I have sole custody.

Mediator: You have sole custody.

Laura: Sole physical custody.

Mediator: But you can't take them out of the country.

Laura: Uh-huh, right.

Mediator: You have sole physical but you have joint legal custody or . . .

Laura: What does the legal custody mean?

Mediator: Because, um, legal custody means who is to make major decisions about the children's lives, such as their schooling, their religion, um, any kind

South Carolina Law Review, Vol. 48, Iss. 3 [2020], Art. 2

460          SOUTH CAROLINA LAW REVIEW          [Vol. 48:441

visitation rights.[42] In fact, both Laura *and* John describe the incident as
though Laura already had a protective order prohibiting John from crossing
her threshold, although Laura admits and even complains about the fact that
no such protective order exists. John complains of always being uncomfortable
in Laura's house.

> John: It's always a little bit difficult for me even to be at the house, y'know,
> the kids would ask me to stay, and I would never stay when she would, she
> asked me to leave I'd leave. Sometimes the kids would, would prolong it
> five minutes. . . . Uh, so when she came in the door, she was angry, she
> says, "What are you doing here, uh, you just can't waltz in and out anytime
> you want" and uh, uh, I started to pick up my stuff. . . . But so as not going
> over there, I mean . . . it was never that great for me, uh, I, uh, I did that
> because the kids wanted [me] to.
> Laura: I just said, "Hey, this is my house, and I want you to get, you know,
> leave my house." . . . I, when I was here I was told the last time that I had
> a restraining order, and every time anything happened the police said "No,
> this is not a restraining order." It was like whatever you give here, and it
> gets signed by the judge. . . . That's all I ever had . . . and I-I was under
> the impression that I had a restraining order . . . so that's what I wanted
> right now. . . . We have a temporary one now, that we are—hoping . . . to
> get.

Laura's words, "This is my house . . . leave my house," echo those of
David in the previous case, as Laura succeeds in "protecting" the domestic
zone and the children from John's intrusions.[43] John justifies Laura's

---

of medical issues that are non- that are not emergencies.
Laura: Mmm
Mediator: Who's going to make these decisions?
Laura: I have, um, decision making . . .
Mediator: Oh?
Laura: I remember this from my divorce, y'know, that I could do all these
things.
Mediator: You don't have?
Laura: No.
Mediator: You don't have to inform him.
Laura: I don't have to inform him. As far as I know.
Mediator: OK. We'll double-check on that just to make sure.
Laura: OK.

42.  John: She has custody, and, uh, she really has the final say-so, if she wants
them for a weekend. If I want them, I speak up, and if she doesn't have plans,
y'know.

43.  Although John does not have the same legal right to be in Laura's house that Shoshanna
has to be in David's, he is not a trespasser; he is the invited guest of Laura's nephew who is
living in Laura's house. In either event, as in the previous case, what is important is not that
Laura's legal analysis is correct, but that John thinks it is.

hysterical behavior as a recurrent emotional problem, resulting from childhood trauma in violent and politically troubled El Salvador. He takes the blame for the incident by saying, "The buck stops with me!" John, tends more than anything else, to withdraw when Laura is angry.

> John: [S]he would, I think, let things build up inside her. Her father died in a gun battle when she was two, and she used to . . . I just call it freak out, there [were] seven or eight times she was hospitalized in San Sebastian County in an institution, where she would—a lot of alcohol, and then she'd just lose touch, where if [you] didn't hold her down, she'd actually come after you. Her nephew . . . who was watching the kids that day, he remembers all these times, y'know, she bit him. Uh, she's chased me with a machete . . . I wouldn't know what to do to hold her, and then she'd get up and just start breaking things and tearing things. . . . I remember I took her to a psychologist, y'know, whenever she sees a rat, she just freaks and panics. If we're watching a movie and she had her hand on my arm, she would literally dig her nails into my arm and draw blood.

Moreover, by having the children's primary residence with her, Laura has succeeded in gaining a measure of control over John. Laura regards John's presence in the house as a dangerous intrusion, but her resentment of him is such that she is not willing to bring the children to him. Changes in his residential and employment situation have rendered John unable to keep the terms and times of the original custody agreement. John has been working, with no great success, as a commissioned salesperson. He is obligated to see his customers when they want to be seen and, thus, to work irregular hours that make adherence to a strict visitation schedule difficult. Consequently, John has to ask to see the children, and Laura controls access. Thus, John envisions himself as becoming increasingly dependent on Laura.

> John: We haven't followed it [the agreement] strictly, but I think it's been, there've been times that I, uh, depending on where I was working, where I saw more, and other times less. . . . B-before . . . we would just talk and work it out. She wanted to get as much scheduled in advance, uh, lately, when I've worked it's been very sporadic, so it's been dependent on, uh, y'know, when and if I work, and, uh, she really has the final say-so, if she wants them for a weekend. If I want them, I speak up, and if she doesn't have plans, you know. . . . I was seeing them, uh, before, uh, this incident . . . [j]ust on a call basis, y'know. It wasn't scheduled the way it used to be . . . It was whatever she wanted, and she always got them for the holidays, and she dictated policy. . . . She usually gets what she wants, and I get what's left over.

Ironically, John's predicament merely makes Laura regard him as undependable. She tells the mediator, "He's gotten so he doesn't keep the

462                SOUTH CAROLINA LAW REVIEW            [Vol. 48:441

agreement." The erratic visitation pattern gives Laura the upper hand. John feels he is intruding even when, as with the visit that started the fight, he is an invited guest of someone residing in the house (Laura's nephew) and doing Laura a favor by babysitting. John's entry into the house, and especially the altercation that follows, reaffirms and intensifies Laura's ring of personal power. This dynamic is both evident and exacerbated through Laura's and John's responses to the fight—responses which have occurred so often that they have become habitual. In effect, through the temporary restraining order, Laura has succeeded in "legalizing" the *de facto* ring of power that she has steadily been building around herself, her house, and her children.

In sum, if one looks only at the externally visible characteristics of these two cases, such as who is the petitioner and who is the respondent, or the gender and socioeconomic background of the victorious party, the cases seem to have very different results. By looking more deeply into the actual dialogic and interpersonal dynamics of the parties, however, marked similarities emerge. In each case, the spouse with the, at least temporary, psychological advantage wins, but only by speaking in the "law's language" and convincing the other parent that the sanction of the law, rather than sheer physical might, is on his or her side.

Because she was the stronger person in the relationship, Laura was able to function as an empowered victim and to use the restraining order that she held against John as a means of securing a protected safety zone, which included her house and the children. By contrast, Shoshanna, as the weaker party, was unable to turn a protective order to her advantage. In fact, it was David who purloined the power of the protective order, forging a protected zone that included the house and the child.

## III. PROTECTIVE ORDER TALK AT MEDIATION

### A. *Safeguards; Nexus Tests; and Time, Place, and Manner Restrictions*

California law requires mandatory court sponsored mediation on any outstanding child custody claim prior to a judicial hearing.[44] The mediator's

---

44. "If it appears on the face of a petition, application, or other pleading to obtain or modify a temporary or permanent custody or visitation order that custody, visitation, or both are contested, the court shall set the contested issues for mediation." CAL. FAM. CODE § 3170 (West 1994). An agreement reached during mediation and signed by the parents goes to the judge for signature, becoming a legally binding court order. CAL. FAM. CODE § 3186 (West 1994). The policy of the Los Angeles County Superior Court, Conciliation Services Division, is to give parents ten days in which they can rethink the agreement or discuss it with their attorneys and to notify the court in writing if they wish to have the agreement cancelled. According to David Kuroda, this policy implements section 3186(a) of the California Family Code. Interview with David Kuroda, Division Chief of the Los Angeles County Superior Court, Mediation and Conciliation Services (Feb. 13, 1997). Section 3186(a) provides that an agreement reached in

Kandel: Squabbling in the Shadows: What the Law Can Learn from the Way Di

statutory role is to enable the parents to reach a self-determined custody agreement, called a "parenting plan," that is in the "best interest of the child"—an amorphous standard that includes, *inter alia*, both "close and continuing contact" with each parent[45] and the child's stability[46] and safety. Parents almost always participate in the mediation sessions *pro se:* the mediators have the right to exclude attorneys and typically do so, unless each parent has counsel and both parents want their counselors present.[47] In the cases discussed thus far, Laura and Shoshanna are represented by counsel, while their children and husbands are not,[48] but the attorneys enter only at the conclusion of the substantive mediation session.[49]

The mediators are skilled professionals[50] with graduate degrees in the

---

mediation "shall be reported to counsel for the parties by the mediator on the day set for mediation or as soon thereafter as practical, but before the agreement is reported to the court." CAL. FAM. CODE § 3186(a) (West 1994).

45. CAL. FAM. CODE § 3161 (West 1994). Section 3161 provides in pertinent part that "[t]he purposes of a mediation proceeding are as follows: (a) To reduce acrimony that may exist between the parties. (b) To develop an agreement assuring the child close and continuing contact with both parents that is in the best interests of the child." *Id.*

46. *See infra* note 66.

47. CAL. FAM. CODE § 3182(a) (West 1994) (providing that "[t]he mediator has authority to exclude counsel from participation in the mediation proceedings . . . if in, the mediator's discretion, exclusion of counsel is appropriate or necessary"). During the entire course of my research, I observed only one session in which attorneys participated. Lawyers sometimes wait outside or "drop by" if they are in the courthouse on other business. Typically the mediator will speak with the attorney at the end of the session to summarize the agreement that has been reached.

48. David, as a lawyer, is representing himself.

49. *See infra* note 75 (describing the entrance and rather unusual intervention by Shoshanna's attorney).

50. Pursuant to the California Family Code, as a counselor of conciliation, a mediator must possess the following minimum qualifications:
    (1) A master's degree in psychology, social work, marriage, family and child counseling, or other behavioral science substantially related to marriage and family interpersonal relationships[;]
    (2) [a]t least two years of experience in counseling or psychotherapy, or both, preferably in a setting related to the areas of responsibility of the family conciliation court and with the ethnic population to be served[;]
    (3) [k]nowledge of the court system of California and the procedures used in family law cases[;]
    (4) [k]nowledge of other resources in the community to which clients can be referred for assistance[;]
    (5) [k]nowledge of adult psychopathology and the psychology of families[;]
    (6) [k]nowledge of child development, child abuse, clinical issues relating to children, the effects of divorce on children, the effects of domestic violence on children, and child custody research sufficient to enable a counselor to assess the mental health needs of children.

South Carolina Law Review, Vol. 48, Iss. 3 [2020], Art. 2

464                    SOUTH CAROLINA LAW REVIEW                 [Vol. 48:441

mental health professions and, for the most part, years of mediation experi-
ence. They are alert to rectifying power imbalances[51] through skillful
interventions, regulation of turns of talk, proposing options, framing and
reframing issues, and meeting with the parents in separate sessions. Mediators
have neither the authority to render decisions nor, in Los Angeles county, to
make recommendations to the court.[52] They can, however, propose or elicit
options and assist parties in fully considering such options, including the
implications of various options for the child's best interests. Agreements in
mediation are ideally reached through a series of often subtle micro-persuasive
steps, as each parent and the mediator offers and considers options.[53]

The mediation forum potentially provides a safer and more neutral arena[54]

---

CAL. FAM. CODE § 1815(a) (West 1994). The Los Angeles county mediators have considerably
more experience than the statutory minimum. In addition, the conciliation services runs an
intensive internship program lasting approximately nine months and including observation, co-
mediation, and supervised mediation. At present, part-time mediators are hired only after
completing this internship program.

51. Numerous statutory provisions obligate the mediator to be neutral and impartial and to
rectify power imbalances. For example, uniform standards of practice for mediators must include
"[t]he conducting of negotiations in such a way as to equalize power relationships between the
parties." CAL. FAM. CODE § 3162(a)(3) (West 1994). Mediators should maintain a neutral stance
and be knowledgeable about their own biases and sensitive to individual gender, racial, ethnic,
and cultural values, as well as differences. CAL. R. CT. APP. DIV. I  26(c) & 26(c)(3); In
addition, the mediator "should be vigilant about a power imbalance in the parental relation-
ship . . . including gender-biased attributions regarding parental role, intimidation, and economic
advantage." *Id.* at 26(h). The degree to which mediators can or should be neutral and impartial,
sensitive to gender imbalances, and interventionist in the proposal of particular options has been
a subject of considerable academic debate that need not be revisited here. *See, e.g., infra* note
85. This article investigates the question of how the parents' strategies in using existing protective
orders differ during the court-sponsored mediations as opposed to confrontations at home.

52. In California, whether or not a mediator can make recommendations to a judge is a matter
of local rule. CAL. FAM. CODE § 3183(a) (West 1994) (providing "[t]he mediator may, consistent
with local court rules, submit a recommendation to the court as to the custody of or visitation
with the child"). Although Los Angeles county is a "non-recommending" jurisdiction that
prohibits mediators from making recommendations to judges or hearings officers, mediators may
recommend a child custody or psychiatric evaluation. L.A. COUNTY R. 14.5.

53. Furthermore, at any time during the child's minority, parents may request a mediation
session to modify an existing custody agreement or to work out a specific problem. Mediation
can thus be used as a virtually perpetual resource. One mediator audiotaped by the author
explained to a parent:

I don't know if you've read anything about the fact that you can come back as often as
you want. You don't have to have anything litigating; uh, all you have to do is to have
a file with us, and you can make an appointment anytime you need to come back. For
example, we have a lot of parents who work on step-up plans. They might start with
a plan when the child is very young; that is one way, and that might be drastically
altered by the time the child is 3 or 4; again, maybe altered again when the child is in
kindergarten and has vacation schedules and things like that.

54. In making this statement, I am not insensitive to the views of those who regard

Kandel: Squabbling in the Shadows: What the Law Can Learn from the Way Di

than "the home" for couples with protective orders to work out their differences.[55] In addition, the presence of a protective order, or other indicia of domestic violence in the case file, triggers certain special protections. By statute, in such circumstances, victims have a right to mediate entirely through separate sessions in which the co-parents never meet face-to-face and the mediator acts as a shuttle diplomat between them. The statute obliges mediators to notify parents of this right and to honor their request for separate sessions.[56] Signs are posted in all the offices giving notice of this right. The majority of mediators strongly recommend that such parents meet separately, at least during the beginning of the session.[57]

---

court-sponsored mediation as dangerous and unfair to women in general, Martha Fineman, *Dominant Discourse: Professional Language and Legal Change in Child Custody Decisionmaking*, 101 HARV. L. REV. 727 (1988); Trina Grillo, *The Mediation Alternative: Process Dangers for Women*, 100 YALE L.J. 1545 (1991), or those who would regard it as dangerous to female victims of domestic violence, Charlotte Germane, et. al., *Mandatory Custody Mediation and Joint Custody Orders in California: The Danger for Victims of Domestic Violence*, 2 BERKELEY WOMEN'S L.J. 175 (1985); Penny L. Willrich, *Resolving the Legal Problems of the Poor: A Focus on Mediation in Domestic Relations Cases*, 22 CLEARINGHOUSE REV. 1373, 1377 (1989) (pointing out that "[i]n the domestic violence situation, mediation has been deemed dangerous for the battered woman, because neither good faith nor equality of bargaining power exists in a battering relationship"). While recognizing mediation's imperfections, I clearly come down on the side of mediation's more numerous supporters. I believe that my own ethnographic work shows both mediation's relative sensitivity and flexibility as a dispute resolution system that recognizes and rectifies power imbalances and the fact that interspousal power is both more complex and less gendered than these scholars claim. It is, in any event, not germane to revisit that hoary argument here—for mediation's detractors inevitably contrast their negative views of mediation with a rather idealized vision of third party decision making. My point here is only to observe that court-sponsored, child-custody mediation provides a safer and more neutral environment than an at-home argument between a divorcing husband and wife when one of them holds a restraining order against the other.

55. When a dispute is moved from one forum to another, the discourse, the conceptualization of the issues, and the points of argument often shift. This is especially perceptible as one moves from less to more formal forums. Barbara Ynguesson & Lynn Mather, *Courts, Moots, and the Disputing Process, in* EMPIRICAL THEORIES ABOUT COURTS 51 (Keith O. Boyun & Lynn Mather eds., 1983); Lynn Mather & Barbara Yngvesson, *Language, Audience, and the Transformation of Disputes*, 15 L. & SOC'Y REV. 775 (1980-81).

56. CAL. FAM. CODE § 3181 (West 1996).

57. Mediators also typically provide holders of restraining orders with information about domestic violence services. For example, the mediator gives Shoshanna a long explanation about such services:

I have a brochure that I want to give you. It has a lot of resources in it on, uh, counseling and that kind of thing. There is a women's survival card. The booklet is this thick. O.K. That's the Surviving Domestic Violence, uh, part of it that was put [out] by the L.A. Commission on Assault Against Women and the Family Violence Project of Jewish Family Services. . . . Dad will be interested that you might find some of the resources, um, helpful to you. And Information and Referral is a number that you can call, um, to make referrals to, for all the different shelters, for all the different counseling programs. Um, I've also underlined in yellow here a list of women who

South Carolina Law Review, Vol. 48, Iss. 3 [2020], Art. 2

466            SOUTH CAROLINA LAW REVIEW            [Vol. 48:441

Ironically, however, the protective separation of the parties places a stronger communicative burden on each parent. While the mediator's verbal or tacit support for a parent's requests is always helpful in procuring a preferred agreement, it is significantly more so when the parents do not meet face-to-face because in such "shuttle diplomacy" mediation, a parent must rely on the mediator to favorably summarize his or her position to the co-parent.[58] Since the mediator is under a statutory obligation that requires both equal empowerment of the parents and furtherance of the child's best interests[59] and, moreover, because the mediator is operating under significant time pressures and is constrained by specific laws and policies,[60] the mediator will most fully understand and appreciate a parent's request for a particular custody arrangement if the request intersects with the mediator's own concern for the child's well-being and general ideas about appropriate agreements.

The parent who would be an "empowered victim" must work the existence of the protective order into the conversation. That is, at mediation, the protective order must become a kind of informal evidence about the parents' legal and interpersonal relationship that the empowered parent uses to support a particular parenting plan, that is advantageous in terms of the laws and policies that guide and constrain the mediator in facilitating an agreement. My analysis of numerous mediation transcripts reveals that there are three principal approaches or tactics: linking the protective order to possible danger to the child; limiting the co-parent's time by manipulating the custody and visitation schedule; and making arguments based on the stability of the home.

As to linking a protective order directly to possible danger to the child, the legal context of such a connection is that protective orders may be indicia of violence by one parent against the other. California law provides that, in making a determination of the best interests of the child, the court must consider "[a]ny history of abuse by one parent . . . against the other

---

have [been] in domestic violence situations. And there are a lot of resources here.

58. *See* Randy Frances Kandel, *Time and Structure of Mediation Sessions in the Los Angeles County Conciliation Court*, 30 FAM. & CONC. CTS. REV. 474 (1992) (discussing how separate sessions alter the balance of power between mediators and parents because although the parents are empowered relative to each other, they are relatively disempowered in comparison to the mediator who is the only person who fully knows what each parent has said).

59. *See supra* notes 44 and 45.

60. For example, mediators guide parents towards agreements that are in general accord with public policy, as expressed in California statutes. CAL. FAM. CODE § 3020 (West 1994) (stating "[t]he Legislature finds and declares that it is the pubic policy . . . to assure minor children frequent and continuing contact with both parents . . . and to encourage parents to share the rights and responsibilities of child rearing"). As a matter of practice, they also facilitate and encourage agreements that are in accord with concepts of what is "developmentally appropriate" for children, that are based on, *inter alia*, contemporary views on developmental psychology. Randy Frances Kandel, *'Developmental Appropriateness' as Law in California Child Custody Mediation*, 35 J. LEGAL PLURALISM & UNOFFICIAL L. 75 (1995).

1997]                          SQUABBLING IN THE SHADOWS                          467

parent."[61] Mediators, in my observation, appear to implicitly employ a "nexus test:" questioning and probing the victim parent to determine whether they see or believe there is a connection between violence towards the parent and violence, abuse, emotional disturbance, or other danger to the child. This test is, however, hard to meet for several reasons.

Many parents, including the three couples discussed in this article, come to mediation with temporary restraining orders that have been obtained *ex parte* upon the affidavit of only one of the parents. Under local scheduling practices in the family law section of the downtown Los Angeles County Superior Court, typically, if parents come to court with both outstanding custody issues and a temporary restraining order, the parents will be referred first to custody mediation, and then to "Department 8" for a hearing on the restraining order.[62] Although the presence of a temporary restraining order is sufficient to trigger the alleged victimized parent's right to mediation in separate sessions, statutory law will not allow it to be used as evidence of the acts alleged.[63] And while evidentiary rules do not apply in mediation, the persuasive value of a temporary restraining order in raising a specter of possible danger to the child is minimal, especially to mediators familiar with its ease of obtainment.

Further, the level of abuse, to either the co-parent or the child, contemplated by the statute as being a mandatory factor for consideration in making a best interest determination is that which rises to a level of criminality.[64] As interpreted in practice, the statute does not establish a presumption that abuse to the co-parent is abuse to the child. Rather, the abuse to the child must be a reality or at least a serious risk.[65] Thus, a parent may come under the statute where the abuse that parent has inflicted on the co-parent evidences that the parent will be a danger to the child, or where the child has emotionally or psychologically suffered as a consequence of witnessing domestic violence.

---

61. CAL. FAM. CODE § 3011(b) (West 1994).

62. Personal knowledge of the author, based on field research.

63. CAL. FAM. CODE § 234 (West 1994) (stating in pertinent part, "[t]he automatic granting of the ex parte temporary restraining order . . . is not . . . competent evidence in any proceeding of any prior history of the conduct so proscribed occurring between the parties").

64. CAL. FAM. CODE § 3011(b) (West 1994). For these purposes, abuse against the co-parent is defined as "intentionally or recklessly to cause or attempt to cause bodily injury, or sexual assault, or to place a person in reasonable apprehension of imminent serious bodily injury to that person or to another." CAL. FAM. CODE § 6203 (West 1994).

65. Although currently there is no published case law regarding the statute, the language seems to contemplate an evidentiary finding on the issue of abuse to the child in which the person alleging the abuse carries the burden of persuasion. It, thus, significantly differs from presumptive statutes. *See, e.g., Report of the Missouri Task Force on Gender and Justice*, 58 MO. L. REV. 485, 495 (1993) (concluding that under the Missouri Adult Abuse Act, "[o]nce abuse is found, [following a hearing] the statute creates a presumption that the best interest of a child is served by placing the child in the care and custody of the non-abusive parent").

South Carolina Law Review, Vol. 48, Iss. 3 [2020], Art. 2

468                SOUTH CAROLINA LAW REVIEW                [Vol. 48:441

The statute, however, is not interpreted to mean that the child's custody is awarded as compensation to the parent who is a victim of domestic violence. Further, mediators often assume that a parent who has obtained a temporary restraining order against the co-parent without also naming the child as a protected party and/or seeking temporary sole custody and/or making a child abuse report to the Department of Children's Protective Services, does not really believe that the co-parent presents a danger to the child.[66]

Hence, a parent trying to use this implicit nexus test to obtain a more favorable custody allocation faces an uphill battle. Significantly, the mediators in the audiotaped sessions neither assume nor presume this connection. Rather, it is completely up to the parent to "make the case" for any limitations or restrictions on the other parent's visitation or custody rights as a consequence of domestic violence.

The second approach provides an indirect or backdoor route to limiting a co-parent's custodial allocation. There is a rule—one of policy at the time these sessions were transcribed and shortly thereafter codified and mandated[67]—that when either one or both parents are subject to restraining orders, the parenting plan must specify strict schedules for the time that the child will spend with each parent and state precisely the dates and times of the child's transfer. The problems involved in working out the strict scheduling, especially for parents whose occupations and lifestyles require temporal flexibility, may result in significant *de facto* limitations on parenting time and parental contact—accomplishing indirectly what the mediators will not directly propose as an option in the absence of a strong nexus test. Again, the practice of making agreements with strict schedules in the presence of protective orders provides an opportunity for successful strategizing on the part of skillful

---

66. Under Los Angeles County Superior Court policy, no child custody case can be mediated where there is an ongoing investigation or open file regarding possible child abuse by one of the parents. Mediators are "mandated reporters" of child abuse and must report their knowledge of it to state authorities. All parents are advised at the beginning of child custody mediation that this is one of a few situations not covered by the confidentiality provisions. During a session, if a mediator suspects child abuse or neglect, the mediator has discretion to suspend the mediation. CAL. R. CT. APP. DIV. I 26(f)(2).

67. Section 3031(b) of the California Code states in pertinent part:
Whenever custody or visitation is granted to a parent in a case in which domestic violence is alleged and an emergency protective order, protective order, or other restraining order has been issued, the custody or visitation order shall specify the time, day, place, and manner of transfer of the child for custody or visitation to limit the child's exposure to potential domestic conflict or violence and to ensure the safety of all family members.
CAL. FAM. CODE § 3031(b) (West Supp. 1996). Section 6323(b) contains an identical provision regarding temporary custody and visitation orders issued in conjunction with *ex parte* temporary restraining orders. CAL. FAM. CODE § 6323(b) (West Supp. 1996).

victims—as "protections" for victims are reformulated by their users into parental rights and entitlements.

The third approach argues that because stability and status quo are so important to a child's well-being and adjustment, the parent with the more stable residential situation should have the majority of custodial time. It is a virtual axiom of child custody law that, all other things being equal, the best custodial placement requires maintenance of the status quo.[68] While this policy almost always gives the parent with *de facto* primary custody an advantage, that advantage can be considerably amplified for a parent who holds a restraining order against the co-parent that prohibits coming to or calling the house (even where the restraining order does not also award temporary custody). The parent holding the protective order can argue both that the child is well-adjusted to a stable primary home and that the maintenance of that very stability requires that the co-parent's access and visitation be strictly limited and scheduled.

### B. "This Is My House; This Is My Son:" The Case of David and Shoshanna

David and Shoshanna's mediation session takes place the morning after the argument discussed in Part II (A) above. Shoshanna has spent the night in a motel. She has still not seen Josh. David has kept Josh out of daycare, taking him instead to his own mother's house.[69] Shoshanna comes to mediation with

---

68. *See, e.g.*, Burchard v. Garay, 724 P.2d 486, 493 (Cal. 1986); *In re* Marriage of Carney, 598 P.2d 36, 38 (Cal. 1979); *In re* Stephanie M., 867 P.2d 706, 716 (Cal. 1994). Stability and status quo are axioms of custody law often taken for granted; however, such axioms are often assumed, rather than stated, in decisions. As such, no handful of case citations can do justice to the importance of such axioms in custody practice. A more accurate assessment of the significance of these principles can be gained from the statements in a popular California practice guide, authored mostly by present and former California family law judges. "Generally, courts are reluctant to upset the custodial arrangement in existence prior to the hearing (particularly in regard to young children); quite the contrary, absent a showing of detriment to the child, courts will favor *maintenance of the status quo*." William P. Hogoboom & Donald B. King, CALIFORNIA PRACTICE GUIDE FAMILY LAW 7-47 (student ed. 1995). "Although not reduced to express statutory terms, a primary component of the 'best interests' rule is the goal of protecting a *stable* custody arrangement. When a particular type of custody has continued over a significant period, the child's need for stability and continuity assumes an *increasingly important role*, and the need will often dictate the conclusion that it is in the child's best interests to *maintain* the current arrangement." *Id.* at 7-79.

69. David explains,

> [L]ast night we were, we were hanging out together this morning, I, y'know, took him to my mother's house there, 'cause it was too late to, to go to the, the daycare, and we didn't know when we could be coming back, and, and he's a little sick, so my mother would take better care of him, um, today, anyway.

Shoshanna and David's mother are wary, jealous, and suspicious of one another. David's mother, naturally siding with her son in the divorce, has written an affidavit saying that Shoshanna is "an

South Carolina Law Review, Vol. 48, Iss. 3 [2020], Art. 2

470       SOUTH CAROLINA LAW REVIEW       [Vol. 48:441

an immediate custodial concern that is uppermost on her mind—to reunite with Josh and bring him back under her temporary physical custody.[70] Shoshanna chooses not to mediate in a face-to-face joint session with David but does meet with him toward the very end of the session. The mediator acts as go-between, and Shoshanna must be articulate enough to get the mediator to present to David the issues that are most important to her. The following paragraphs examine Shoshanna's conversation with the mediator and ponder whether this forum assists her in getting more custody "mileage" from the protective order.

The mediator questions Shoshanna in several ways about the possible nexus between David's violence towards her and his relationship to Josh. She first asks about any possible direct consequences to Josh from having witnessed domestic violence. But Shoshanna concedes that there has been no physical violence and alleges no extraordinary effects on Josh.

> Mediator: Now, one of the things that I'm concerned about is whether or not any of this um, . . . has there been any violence in front of the child?
> Shoshanna: Um, not that he hit me, but many times he yells at me in front of the child. Many times.
> Mediator: And what happens to your son?
> Shoshanna: He start[s] crying.

Shoshanna does not elaborate on her answers, and the mediator does not press the point. To the mediator, who listens to numerous divorce stories each week, yelling and crying seem to be only the normal and temporary side effects of divorce. Shoshanna volunteers nothing further, so the mediator proceeds to ask about more indirect and speculative effects, such as the kind of co-parental relationship Shoshanna is likely to have with David in the future. Without flagging the issue, the mediator is providing Shoshanna with a window of opportunity to use the abuse nexus test to advance her arguments for custody.[71]

---

immature and impatient person" who could not nurse the baby because she was too impatient. For Shoshanna, visiting Josh at David's mother's house is a practical and emotional impossibility.

70. Although no temporary order giving David custody of Josh has been issued with the protective order in this case, it is evident that David's having sole possession of the house gives him interim *de facto* custody of Josh. Shoshanna is scared to return to the house by herself, despite her legal entitlement to do so. She explains, "I, y'know, I called the police today, I said, 'Please if I need . . . 'I need to take few things from the house.' . . . [My attorney] told me, y'know, try not to, just, y'know, if you need some things, go over there and take it, y'know? And I also called my aunt, and I told her, 'Please come t-today, y'know, be with me today, please.'"

71. It is of some significance that this particular mediator phrases the issue of the effects of domestic violence in such an impartial way. The mediator for this session had some particular expertise in the handling of domestic violence issues; was among those most concerned about the mediation of cases involving domestic violence; and mentioned to me during an informal

Mediator: [O]ne of the things that would be important for you to help me understand is, can this dad, does he have potential? I mean, obviously, you want, you, you're saying you want custody, but we have to figure something out. If he's a danger to this child, or if he has been very, um, inappropriate in front of the child and you think he's going to continue to do that kind of thing, that's one thing. But assuming you're going to get over all of this and that the relationship will somehow stabilize, where each of you get on with your life, I'-I'd like to get a feel from you if that is what you think is going to happen, or whether or not you think there's going to be a continuation of some domestic violence issues. In other words, it sounds like he's been a kind of a controlling person to you. But do you think that once the divorce is over with, that the two of you will be able to establish a good parenting relationship?

Shoshanna takes no advantage of this opportunity. She responds common-sensically.

Shoshanna: David, he, there is no reason that he will be, um, domestic, y'know, uh, like, violence toward me, because I won't be around, O.K.?

Whether because of reticence, honesty, subordination, or lack of the ability to articulately tie together her underlying concerns with the issues raised and tactics implied in the mediator's questions, Shoshanna does not use the restraining order as a basis for trying to limit David's contact with Josh. Instead of expressing concern to the mediator that David's violent propensities[72] may be harmful to Josh, Shoshanna shares her anxiety that David may win sole custody and that this will be tantamount to a *de facto* custody award to David's mother. But Shoshanna's distrust of David's mother and sense of having been betrayed by her does not trigger any special concern from the mediator about Josh's well-being. Shoshanna's big concern is that she, not

---

interview that one of the problems with Los Angeles court sponsored mediation was the lack of time for the slow and sensitive case handling that cases involving domestic violence require. This mediator also habitually read the case records, with their detailing of protective orders and domestic violence allegations, more closely than the majority of mediators. If anything, this mediator would have been more likely than most to "red flag" the implications of domestic violence for custody and visitation.

72. The only physical violence by David that is mentioned during the mediation session occurs towards a third party in the interest of protecting Shoshanna. The mediator, having read about it in the declaration in the file, brings up the issue of David "being violent with a young man who accidentally ran into him in his Chrysler." Shoshanna explains "Well, y'know . . . he denied it on, on the . . . courthouse, a-and he said that I was bleeding. I was bleeding . . . right? But I was . . . constantly telling David, 'David please stop. Come on, let him go already, OK?' . . . I said 'Stop' . . . But, so he told, uh, the judge that . . . he was scared, he was scared when he saw me bleeding. So this is the reason he got really violent. But I told David, 'David, stop!' Y'know, 'Stop hitting the guy in already.'"

Case 1:23-cv-00381-JL-TSM   Document 35-9   Filed 01/23/24   Page 33 of 57

David's mother, should be Josh's primary caretaker, both immediately and permanently.

> Shoshanna: I'm just saying that uh, the funny thing is, every time when I had to go, or, y'know, my mother came over, and we had to go to Las Vegas, he said, "OK, I'm watching Josh. Finally, I'm gonna watch Josh, and you won't be home." So I came home, his mother was sleeping overnight over there, bathing Josh, feeding Josh . . . [H]e, I mean, . . . yesterday, even, when he came out of the house, told me, "My mother is on her way. She will take care of him." . . . [T]o tell the truth, that they would have co-, she will, he will have custody, but I know what will happen in that custody: she will move over there, and she will take care of Josh. . . . OK? But as, as [far as] David's concerned, sh-his mother can move over there, and she will bathe him and feed him, and he can sit over there, and when Josh is done and clean and, and he can play with him. He wanna have the fun parts, that's it. So he can have the fu-fun parts, and, and so I will congratulate him, have him on the weekend and, and fun, fun part.

Shoshanna's wish to have Josh returned to her immediate physical custody is sensible in light of the fact that she has been Josh's primary caretaker since birth. But, unlinked to the domestic violence issues, Shoshanna fails to convey her request for Josh's immediate return with the sense of urgency that would induce the mediator to be her avid spokesperson in this shuttle diplomacy style mediation, as the following dialogue, which takes place at the end of Shoshanna's separate session, shows. Without the shadow of danger, Shoshanna's plea seems scarcely more than a whining wish to remove a child from a loving grandmother who is babysitting.

> Shoshanna: Just ask him, please, I wou-, I would like to go and get Josh. Y'know, I-I bet his mother is watching him. And . . .
> Mediator: [interrupting] OK. I think you . . .
> Shoshanna: [overlapping with the mediator's speech] Tell him . . .
> Mediator: [overlapping with Shoshanna's speech] Really ought to talk to your attorney about that. . . . As a mediator, it's not my role to advise him to give the child back to you one way or the other. Until there's a court order, you're both parents.[73]

---

73. This is, of course, the correct statement of the law. Parents have equal and alternative rights to care and custody of the child until there is an agreement or order to the contrary. Mediators must give this answer when parents ask about their rights. For example, the following dialogue took place in a different case:
> Craig: Legally, um, I meant to ask a question . . . Legally, um . . . I'm authorized to see my son correct? I'm allowed to see my son at any time?
> Mediator: Well, until there's a separation, you're considered a legally married couple. OK. So there's nothing saying "Yes" and there is nothing saying "No." It's just as though you were still married and living in the same house until somebody files some-

Case 1:23-cv-00381-JL-TSM Document 35-9 Filed 01/23/24 Page 34 of 57

Shoshanna does not get from the mediation session what she seems to most poignantly want—an immediate reunification with Josh. David refuses to transfer Josh to Shoshanna's physical custody until she has a permanent place to live.

> David: She's floating now. I don't even know where she stayed last night; she won't tell me, whether she stayed at her aunt's or, or I think her piano teacher's. While she's floating, I don't want him living with her. Until she finds a house that she, or . . . a residence. . . . That means . . . a good . . . and, y'know, furniture moved in. . . . Josh should live with me. I don't think he should be going house to house, or . . . location to location like a gypsy.

Not surprisingly, considering the emphasis the law places on stability and status quo in determining the child's best interests,[74] the mediator does not question this suggestion. But Shoshanna has now been doubly victimized by David. She is "floating"[75] like a "gypsy" now (as David puts it) only because David has pushed her out of the family home. Once again, David avails himself of the legal discourse of bodies and spaces. Turning her own involuntary banishment against her, he argues that her unstable residential situation makes her, at least for the present, an inappropriate custodian.[76]

---

thing.
Although mediators must, perforce, adopt this position as the baseline, it does not prevent them from frequently and persistently presenting and recommending alternative options, which the mediator in David and Shoshanna's case, did not do.

74. *See supra* note 66.

75. "Watery" words, used metaphorically, such as "stream," "tide," and "flood," attach in contemporary American English to undesireables, in contrast, for example, to good citizens who are "rooted" in the community. *See* Lisa Malkki, *National Geographic: The Rooting of Peoples and The Territorialization of National Identity Among Scholars and Refugees*, 7 CULTURAL ANTHRO. 24, 33 (1992) (stating that "[o]ur sedentarist assumptions about attachment to place lead us to define displacement not as a fact about sociopolitical context, both rather as an inner, pathological condition of the displaced").

76. During the separate session with David, the mediator presents Shoshanna's proposal for a long range custody arrangement. Shoshanna has proposed a parenting plan in which she has primary physical custody and David has one weekend overnight each week and one weekday overnight on the evening that Shoshanna takes English lessons. This custodial arrangement is actually more favorable to David than the usual plan for a child Josh's age developed in the conciliation court. While the weekend, midweek overnight pattern is quite typical, mediators usually and actively advise against overnights for children younger than two and a half. The mediator considers the overnight visit in this case to be appropriate because Josh is, at that very moment, staying overnight alone with David as Shoshanna indicates he has done before. At first, David agrees to this plan with surprising readiness, but it is disrupted when Shoshanna's attorney comes in to review the agreement. The attorney says that Shoshanna needs money to find a place to live. When David makes an offer, the attorney first tells David that he has not offered enough, and then, when David asks for a counter-offer, the attorney tells him that money should not be

South Carolina Law Review, Vol. 48, Iss. 3 [2020], Art. 2

474                SOUTH CAROLINA LAW REVIEW              [Vol. 48:441

If Shoshanna were more knowledgeable in the substantive categories and values of the law of custody, she could have made a stronger case for herself, perhaps winning over the mediator as an ally. The law understands stability and status quo as referring not merely to the place of care but also to the continuity of care with the primary caretaker.[77] Since Shoshanna has been the primary caretaker, she might have been able to make a stronger argument that David's being the interim primary caretaker would be destabilizing for Josh. But her chatter about David's mother's extensive caretaking and ubiquitous presence excludes this approach. Shoshanna does not succeed in either informal forum in bringing Josh back into her family circle or in creating her protected privacy zone. At least until the court hearing, Shoshanna remains a disempowered outsider.

## C.  *"Safe from Screaming:" The Case of John and Laura*

John and Laura's mediation takes place in a combination of face-to-face and separate sessions about two months after the incident described in Part II (B) above. Unlike Shoshanna, Laura is able to use her story about the fight and her subsequent temporary restraining order to significantly enhance her custody position. Under the earlier agreement, which is legally in place at the time the session opens, although not strictly followed by the parties, John has weekend visitation on alternate weekends and midweek visitation on Wednesday afternoons and evenings. At the conclusion of the mediation session, a new agreement is signed that reduces John's visitation for the next three months to three hours in the afternoon on alternate Saturdays or Sundays and deprives him of a subsequent visitation if he fails to appear without having timely called to cancel.[78]

---

discussed during mediation. This game playing angers David who declares, "[A]ll bets are off, and we're going to court tomorrow morning." The mediator begs David to resume negotiations, urging him to act like an adult and separate the child's needs from his own, but she cannot convince him and lacks legal authority to compel him. David leaves.

77. "Custodial stability, continuity and a loving parent-child relationship have been classified as the *most important criteria* for determining the child's best interests. Courts are reluctant to disrupt *established patterns* of care and emotional bonds except for very compelling reasons." William P. Hogoboom & Donald B. King, CALIFORNIA PRACTICE GUIDE FAMILY LAW 7-97 (student ed. 1995).

78. John repeatedly says that he is only agreeing to the change in scheduling and the cessation of overnights on an interim basis until he knows whether and where he is working, until he has suitable living space, and until Laura has calmed down. At the end of the session, the couple schedules an appointment to review the agreement three months in the future. However, the agreement includes only a clause stipulating that the agreement will be reviewed, not a sunset provision. If Laura does not cooperate in coming to the second appointment, John may have to serve Laura with a custody petition to get her to reconsider.

Case 1:23-cv-00381-JL-TSM   Document 35-9   Filed 01/23/24   Page 36 of 57

Laura's singular achievement is that she is able, in essence, to reinterpret the implicit nexus test and convince the mediator to align with her position that there is a need to regulate and control John's visitation. Laura succeeds in this task even though the violence between John and Laura is mutual and even though she admits that her motivations towards John are partly punitive.[79] Further, as John states without contradiction by Laura: "[I]n the four years that I've had them, they've never so much as gotten a scratch." Both parents agree, also, that the children are enthusiastic· about spending time with John.[80]

The argument through which Laura brings the domestic violence issue within the concerns of the implicit nexus test is conceptually simple. It is the link of fear. She says, and repeats at different points in the session, that the children are frightened when she and John fight.

> Laura: [T]he children are very scared. . . . The children are scared, y'know, they say, 'Oh Mommy, y'know, we don't like Daddy anymore; he hurts Mommy.' . . . But they're scared. . . . They were feeling scared, and I

---

79. In explaining to the mediator why she wants the agreement to state that if John fails to exercise his visitation without formally canceling it, he forfeits his next visitation, Laura tells the mediator, "I have never been able to enforce anything with him, he- there were never consequences. Every single time I file a police report, he goes, 'Well, you're the one who's going to be wasting your time in court, not me. I get bailed out; I get a public defender, and you're the one who has to pay attorneys' fees.' And the whole thing, and I go, like, uh—and never has ever happened, I mean, I never got, he's never been punished if you wanna put it that way."

80. Laura: [T]hey have asked about him . . . and they want to see him, 'cause he's their dad, and they can't forget about him, just, y'know in two months . . . I don't want to say they couldn't care less if they never saw him again.

In fact, Laura both concedes and resents the extent to which the children enjoy staying with John.

Laura: And the weekends the same thing. This is very typical. I made my plans for the kids, and he will call the kids and say, 'Do you want to come with Dad?' And of course they want to go with Dad, so my plans get, like, all y'know, thrown away . . . They usually have a good time with him. I'm the one who's uptight about it because . . .

John: Usually they don't wanna go home.

Laura: Yeah, of course not! I mean, they love you, I mean, they're your kids. I'm not . . .

John: Yeah, but I'm also active with them. Y'know, with the Superbowl, I'm, I'm at the park with my son, y'know.

Laura: [interrupting] Absolutely

Mediator: Well, that's . . .

Laura: Right, I—here is the parent who has to work, y'know, 60-70 hours a week to support them to give them what they want and need. He doesn't do that. So he can play with them. I work too many hours, you know. I try to give them as much as I can, but I - I know it's not enough. But I-I'm the breadwinner in this family. Y'know, I have to put them through college. So, I, y'know, what can I say? I am, uh, I'm guilty of that. I'll say that. So, fine, so they don't wanna come home.

South Carolina Law Review, Vol. 48, Iss. 3 [2020], Art. 2

476                SOUTH CAROLINA LAW REVIEW          [Vol. 48:441

don't want anything like that. . . . [T]he children are all scared and
everything. . . . I mean I can get killed by a car tomorrow, and I don't
know what would happen to my children, but they're scared for me, so I'm
afraid that [if] he hurts me, I'm out of a job . . . . I can't support my
children, and who's gonna take care of them?

The fear that Laura speaks of neither constitutes a risk that John might
abuse the children nor does it, on these facts, evidence serious psychological
or emotional harm to the children. But Laura, a good *pro se* advocate, brings
her concerns within the spirit, if not the letter, of the implicit nexus test and
wins the mediator's alliance.

Mediator: [to Laura] I think it's important for you all to feel safe, and
[there's] . . . also laws so that the kids can feel safe.
Mediator: [to John] [I]t's important that . . . everybody feels like, y'know,
that during the time when they meet there aren't going to be any problems,
people aren't going to be screaming and yelling at each other; y'know,
maybe the two of you haven't been physically y'know violent for a long time
except for this one incident, now, but if people are screaming and yelling at
each other, y'know, these kids are watching all of that . . . and I don't know
what the kids are gonna feel, but as long as the kids feel safe, that's really
the most important.

But why is Laura more convincing than Shoshanna? After all, it is not self-
evident that Laura and John's children should be more frightened by such
scenes than David and Shoshanna's son. Laura's ability to get the mediator to
align with her is a function of both Laura's good rationale for her position and
her furthering that rationale with rhetorical skill. In comparison with
Shoshanna, who briefly touches on the "yelling" and "crying" and then moves
on to concerns about her mother-in-law, Laura insistently harps on the
children's "fear" until the mediator begins to associate "fear" with yelling and
screaming. Laura's rhetorical skills also far surpass John's, in ways perhaps
related to the psychodynamics of their relationship.[81]

---

81. The academic debate over how language, gender, and power are related, and what this
implies in legal contexts, has been a longstanding one. *See, e.g.*, ROBIN LAKOFF, LANGUAGE
AND WOMEN'S PLACE (1975) (defining certain characteristics of women's speech as indicating
and substantiating sexual subordination); WILLIAM M. O'BARR, LINGUISTIC EVIDENCE:
LANGUAGE, POWER, AND STRATEGY IN THE COURTROOM (1982) (looking for Lakoff's speech
characteristics in legal settings and finding them to be indices more of powerlessness than
gender); GENDER ARTICULATED: LANGUAGE AND THE SOCIALLY CONSTRUCTED SELF 1 (Kira
Hall & Mary Bucholtz, eds., 1995); Susan Gal, *Language, Gender, and Power: An Anthropologi-
cal Review in* GENDER ARTICULATED: LANGUAGE AND THE SOCIALLY CONSTRUCTED SELF 169
(Kira Hall & Mary Bucholtz, eds., 1995) (reviewing and critiquing the current state of knowledge
on the subject). The cases discussed above suggest that powerful—understood as convinc-
ing—speech is correlated more with situational and contextualized interpersonal power, at least

Laura is organized.[82] From the very first joint meeting with the mediator she proposes a concise plan including the drastically reduced visitation time. Laura uses concise stories of recent events to emphasize her points. John, on the other hand, rambles and rationalizes present circumstances with lengthy accounts of the relationship's ancient history. Laura makes skillful use of reported speech (having the children make their own case as characters in her stories), implying causality through juxtaposition and other techniques, while John bumbles about—sometimes not even finishing his sentences. At this level of generality, rhetorical skill and power of personality seem inextricably intertwined. Laura succeeds not only because she speaks well but also because she continues speaking and insists on advancing her position. John loses not only because he does not speak well (a lack of talent which may be at least partially induced by his subordinate position) but also because he gives in too readily and fails to address himself directly to the subject on the table. Thus, Laura and John's respective approaches during the mediation session itself seem to parallel, on a verbal level, their behavioral strategies (John's avoidance and Laura's assertiveness) after the fight in Laura's house.

Against the background of the children's fear, it is easy to get the mediator to focus on the importance of a rigid schedule. The aim becomes making the children feel safe (and not merely to keeping John and Laura from fighting). Thus, Laura has a relatively easy task in achieving an agreement that significantly limits the quantity and timing of John's visitation with the children. Laura needs only to support her desires by reference to the family's weekly schedule of school, work, shopping, and karate lessons. Eventually it appears as though the few brief hours on Saturday or Sunday afternoon are the only place where John's annoying visit can fit.

> Laura: I am on a schedule . . . So, and the children are used to my schedule, so I think it would be best for everything. . . . I pick the time on Saturdays, every other Saturday between, like 2:00 and 5:30. . . . So he can have the afternoon. I'm willing, you know, if he wants more time with them, but, uh, on Saturdays my children have a karate class, and they're not free until, like 12:30, so that's why I figure 2:00. . . . I work full-time, I leave my house at 6:30 in the morning with the children. . . . [I] don't pick them up until 6:00 or 6:30 and have to have them in bed by 8:30, do home-work . . . and get up . . . and do the . . . same thing, the, the next day. And sometimes I work on Saturdays. . . . And I always get a sitter, but he always says, 'Well, maybe I can watch them, maybe, maybe.' So to me, the schedule is important because I can schedule my time . . . and then, just my

---

in the mediation context, than with gender or other broad factors.

82. For example, she comes to the mediation session with supporting documentation. "I have all my papers here. I have all the police reports."

South Carolina Law Review, Vol. 48, Iss. 3 [2020], Art. 2

478                SOUTH CAROLINA LAW REVIEW                [Vol. 48:441

week and my Saturday[,] . . . just to do my grocery shopping around that, and the children also feel more comfortable when they know what they're doing. It's hard for them to go to school on Wednesdays, 'Is my dad gonna pick me up?' and I go, 'I don't know, honey. If he doesn't, I'll be there. And he always lets me know, like, at 5:00, when, like, I have to drop everything and leave my office to run over to the suburbs to pick up my children at 6:00. . . . So for that reason, I need a schedule. . . . I don't want [the Wednesday] anymore; it's too difficult for us, uh, y'know.

John feebly opposes this plan, repeatedly trying to explain that his present work schedule (or lack thereof) makes strict scheduling burdensome, if not impossible, and requesting a two week adjournment until he knows whether he will get the job he is currently seeking.

John: Well, y'know, I, I lost my job because I didn't . . . I was off, and it was commission sales, and they don't wait around, and I haven't been employed since, and uh, uh, I interviewed for several positions and the hours are always different, and sometimes it's the weekends, sometimes it's nights, some are 9:00 to 5:00, and nothing is set yet. . . . [After rambling on through twenty minutes of talk, John is finally able to say] I'd like to be able, like I told you, to, uh, uh . . . I assume within the next two weeks I'll be working, and when I know a schedule, to work it out.

Further, at least in part because of Laura's high-strung intrusions,[83] John has had to leave his ideal residence "setup" with "a guy who did children's parties,"[84] and move temporarily into a "very small place" where "there's no, really, cooking facilities or whatsoever."[85] All this makes overnight visitation difficult. And Laura, like David, uses John's temporary housing conditions as a legalistic rationale for limiting John's visitation with the children because, "He really has no place to take them."

John's style of speaking and his unfinished sentences fail to make his case. He loses sight of the specifics at issue as his requests for flexibility get tangled up in his explanations about his work predicament. Again and again, he states, almost as a wishful thought, that Laura's proposal is acceptable to him because Laura has said she would be flexible. In fact, during the session, Laura has

---

83. John explains, "Anyway, uh, so she accused me of being on drugs to take the kids, and I said 'I'm not, y'know, and uh, and uh, y'know, my son wants to stay overnight. And so she calls the police, the police come and search the house at the time we weren't there. My roommate got very upset, he asked me to move, he said, 'I don't want the police coming into my house for you and your ex's problems.'"

84. John: And where I was living, I lived—my roommate, uh, he did children's parties. Very successful. I like this, I even took my kid, my kid met Meryl Streep and got her autograph on a baseball, Tom Hanks, the magic.

85. *See supra* notes 36-37 and accompanying text.

repeated that she must have a rigid and specific schedule. In the process of rejecting the very idea of scheduling, John seems to lose sight of the very reduced *quantity* of time he will receive under Laura's proposed arrangement.[86] Above and beyond his inarticulateness, in arguing for a flexible schedule John has an uphill task. He is espousing a position that the law disfavors. Moreover, with regard to the laws and policies of California, Laura's concerns fit hand-in-glove with an accepted position.

Laura's rhetorical strength (her dramatic style, consistency, and persistence) and the wisdom which lead her to ask for things (such as strict schedules) that custody law and mediation practice favor convince the mediator that a strictly scheduled agreement is the best one for these parents. Laura's approach also makes the mediator aware that there is no room for compromise on these issues and that no other type of agreement is likely. Accordingly, when the mediator begins the separate session with John, he is already at a disadvantage. The mediator, concerned with filling in the substance of a strict schedule, repeatedly asks John what days and times he would prefer. But John keeps pleading for flexibility so that John and the mediator talk for some time at cross-purposes.

The mediator, whose style is more supportive than proactive, does not suggest any time plans to John; rather, she keeps trying to get him to suggest something.[87] But John, whose responses to Laura (as we have seen) are

---

86. Mediator: What about the time issue? Is that acceptable to you?
John: [interrupting] 2:00 to 5:30, I mean, w-she said she'd be somewhat flexible there, so I mean, I think we can, uh . . .
Laura: On Saturdays, or do you want Sundays?
John: Well, that's a question where it's hard to say. This last job I applied for, I went for three interviews, I was going to work all day Saturday from 9:00 to 6:00.
Laura: So maybe you want Sunday.
John: My third interview, I-I didn't get it, you know, if it's . . .
Laura: [interrupting] What I want to make sure is that we do get a schedule here, [if] he's gonna call them or see them . . .
John: Yeah . . .
Laura: I don't wanna leave it up in the air.
Mediator: I think you may, I think you do need one. That's, that's what we'll look at . . . 2:00 to 5:30 either day?
John [to Laura]: You said you might be a little bit flexible, if we have a plan, or somewhere to go, something to do, I can talk . . .
Laura: [interrupting] Yeah, but I want it to be on paper, so that we can say these are the times. Whatever it is you want, you want them from 10:00, 11:00, 8:00 until 3:00, 5:00 you just tell her. . . .
John: Like I say, [2:00 to 5:30 on Saturdays is] flexible, as long as, y'know, if you're willing to talk, if there's somewhere they're gonna go . . .
Laura: [interrupting] That's what we're trying to, No. I want a time here.

87. A considerable controversy exists in the mediation literature between such a directive, problem-focused, style of mediation and a less directive self-determining style. *Compare* JOSEPH FOLBERG & ROBERT A. BARUCH BUSH, THE PROMISE OF MEDIATION (1994) *and* ROBERT A.

South Carolina Law Review, Vol. 48, Iss. 3 [2020], Art. 2

basically reactive, is unable to come up with a specific counterproposal and instead keeps trying to get someone to understand his job situation.

> Mediator: Now, the other times are OK? The alternate Saturdays?
> John: Well, . . .
> Mediator: Or, she said all day Sunday is fine.
> John: [interrupting] Yeah, I mean, if she-she's flexible there, . . . I'm still waiting, um, I don't think the one position the guy hired a relative, I went down to meet the owner my third interview, uh, I was going to work all day Saturdays, and I went down, just assumed I was gonna be hired, and they, they said, uh, they hired a nephew or something, so I think I'm out of luck on one job and, uh, y'know, I don't know, I mean . . . I just want to be able to see 'em, and uh, maybe like to come back in, uh, three months, and uh, maybe see how *she* feels. I mean, this whole thing, in essence is, is, uh, this hasn't done me a lot of good.

Finally, the mediator seizes upon John's one specific proposal, that the agreement be only for a three month period, and gives it her backing, presenting it to Laura as the mediator's own idea (perhaps to make it more acceptable): "One thought that I had was, we could make this agreement temporary and come back in three or four months to review it and see how things are going." Thus, John's one specific request does in fact become part of the agreement, although given the law's preference for existing custody arrangements and John's reluctance to take the initiative, it is unclear whether making the agreement reviewable after several months will actually help John in getting more time with his children.

As this passage reveals, John's behavior, both at the mediation session and outside of it, continues to be one of retreating from Laura's emotional outbursts and letting Laura call the shots while he waits in the shadows. In the end, John signs an agreement that gives Laura almost everything she wants. Laura, on the other hand, has consistently used her status as an empowered victim to make her version of the facts fit the law and mediation principles. Moreover, Laura uses her position to fortify the ring of power around her, which includes her house and the couple's children.

---

BARUCH BUSH, *Efficiency and Protection, or Empowerment and Recognition?: The Mediator's Role and Ethical Standards in Mediation*, 41 FLA. L. REV. 253, 268 (1989) (espousing a form of self-determinative mediation the authors call "transformative" in which the mediator's goal is not to help people solve problems but to transform them through empowerment and recognition of the needs of others) *with* George Ferrick, *Three Critical Questions*, 13 MEDIATION Q. 61 (1986) (recommending a task focused approach). In the spring of 1996, the author attended an informal meeting at the home of one of the Los Angeles County mediators. Several conciliation court mediators, as well as mediators from outside the court system attended, and the various pros and cons of problem focused and self-determination focused mediation were discussed and debated for several hours, with a great range of options and opinions being expressed.

Case 1:23-cv-00381-JL-TSM   Document 35-9   Filed 01/23/24   Page 42 of 57

Throughout a session like John and Laura's, a mediator must give due heed to certain legal constraints. The best interest of the child is particularly important. Courts interpret this standard as calling for, among other things, a stable, tranquil home and, in the context of protective orders, specified schedules for transfer between the parents' homes, even if such a routine disadvantages one parent. The parent who controls the children within the protected zone of the family home enters mediation with a legal, *de facto* advantage. The parent who speaks to the factors that mediators habitually associate with a child's best interests, as Laura does but Shoshanna does not, gains an additional conversational advantage.

### D. "Bruises and Bumps:" The Case of Craig and Alicia

Craig and Alicia's case is presented here because it contrasts with the two preceding cases in two important ways. First, there appears to be no significant disparity in interpersonal power between Craig and Alicia. Although the couple has a long history of domestic violence and each has taken legal action against the other (Alicia has had Craig "jailed" and Craig has obtained a protective order), they exhibit equal rhetorical skills and seem to relish arguing with one another.[88] Second, Craig and Alicia's arguments do not fit under the three approaches discussed above and/or are inconsistent with the mediator's general ideas of the child's best interests. The mediator facilitating the session is relatively directive in proposing alternatives, and the

---

88. At the beginning of the session they even argue about who will have the first turn in talking:

Mediator: You'll both have a chance to talk. It doesn't matter who goes first. I just want to know what each of you would like to do.

Alicia [to Craig]: You can go first.

Craig [to Alicia]: Why don't you go first?

Mediator: Shall we flip a coin? We'll flip a coin. Call it heads or tails.

At the conclusion of the session they argue the same way over the time of transfer of the child on Thanksgiving day:

Mediator: All Right. Thanksgiving from 9:00 to what . . . 2:30?

Craig: Yeah.

Alicia: 2:00.

Craig: 2:30.

Alicia: 2:00.

Mediator: Oh, come on!!!

Craig: At Easter it'll be at 3:00.

Alicia: No, 2:00! . . .

Mediator: . . . [W]hat do you want to do?

Craig: 2:30.

Alicia: 2:15! 2:15!

Mediator: All right. Do you want to say 2:15? All right. Thanksgiving from 9:30 to 2:15. It's going to be very obvious that was a compromise. I mean, that's a bizarre time.

South Carolina Law Review, Vol. 48, Iss. 3 [2020], Art. 2

result is that neither parent gets what he or she wants. The final agreement is
a compromise arrangement proposed by the mediator.

Craig and Alicia, who have been separated for three weeks at the time of
mediation, have an eighteen month old son, Ben. Both Craig and Alicia tell
the mediator of Craig's history of violence towards Alicia (although Craig
denies the most recent assault alleged by Alicia).

> Craig: . . . We weren't married at the time and she was living at my
> mother's house and it was one night. I came home and she was there and my
> parents had jumped on me for her not helping out around the house. So, I
> went into the living room to smoke myself a cigarette, and she just kept on
> harping and harping and kicking me in the feet. And I told her, 'If you don't
> leave me alone, I'm going to hit you.' Well, she kept it up and kept it up for
> about five minutes. Well, a person can only take so much. So I stood up and
> I broke her leg. OK. And then from there, that was it. And, um . . . I said
> I was very sorry and I didn't mean to do it, but anger took over.
> Alicia: You know the one time that he hit me when I was pregnant, he was
> high on cocaine and he was drunk, and it's like two drugs when they mix,
> and everything. . . . [H]e's even hit me when I had the baby in my arms.
> He even hit me then. . . . Yeah, this was like the fourth time he hit me. . . .
> And it's like . . . he hit me on the 31st and I called the police.

Craig also alleges that Alicia has been violent towards him, which she
denies.

> Craig: Nothing like waking up with a knife to your throat. . . . We got into
> a big argument one day and I'm in the living room asleep. . . . And when
> a woman tends to hover over your body, and stomp on
> your . . . (hesitates) . . . manhood? . . . Yeah, that . . . that very much
> hurts. Or, pulling a knife. . . . That went on through the whole marriage.

Both Craig and Alicia have taken action to protect themselves from
domestic violence. Alicia has recently had Craig put in jail. Craig denies any
incident and out of self-defense and retaliation obtains a protective order
himself.

> Alicia: And then it's like, when he hit me, I was like "You messed up
> dude!" He's on probation right now and I was like, "You hit me. How do
> you think that's going to go towards your record[?] You're in jail for grand
> theft and now for spousal abuse?" I'm like[,] "Come on!" You know, for
> assault. I'm like, "Come on!"
> Craig: She has put me in jail for spousal abuse. Something that I never
> did. . . . That's why I filed the restraining order, because after she said that
> I supposedly hit her, I told her to get the hell out of my fucking house. . . .
> And when she was leaving, she goes, "Just - Craig, don't worry about it
> 'cause you're going to pay with your life." She has made threats to me many

Case 1:23-cv-00381-JL-TSM   Document 35-9   Filed 01/23/24   Page 44 of 57

times with my life. . . . She's just talking[,] but the way I know her, her type can turn into something else. . . . How did she know I went out last night unless she's trailing me? That's why I'm afraid of her.

The cases of David and Shoshanna and John and Laura illustrate the tenuous relationship between the actual balance of power between parents and the technical issue of which parent is the petitioner on a protective order. Craig and Alicia's case makes this point even more apparent. The case record (as it would be given to the mediator in this case) would indicate that Craig holds a protective order against Alicia. Yet, as the dialogue makes clear, this case is one in which there has been mutual violence and mutual resort to the law for assistance. There seems a general parity of power. One of the most important factors in this equality, from the perspective of what the law deems significant at child custody mediation, is that each parent has a home to share with the child. Unlike Shoshanna and John who are "floating" and, therefore, unsuitable custodial bases for their respective children, Alicia, immediately after being kicked out of the house by Craig, rents an apartment near her mother (who can help with childcare).

> Mediator: [to Alicia] [There] are things you can do to keep yourself safe. . . . You know there are places called battered women's shelters . . . .
> Alicia: Yeah, I know, but I have a place of my own.

This case shows some surprising twists regarding the approaches a parent can use to limit the co-parent's time with the child. Alicia says she wants Craig to have monitored visitation[89] and tries to establish some nexus between the domestic violence and her request. Monitored visitation is typically awarded only where there is some extreme risk to the child.[90] Thus,

---

89. Monitored visitation means that Craig would only be able to visit with the baby in the presence of a third party.

90. Statutes oblige courts to consider the possibility of supervised visitation in cases involving protective orders. The California Code states:

> When making an order for custody or visitation in a case in which domestic violence is alleged and an emergency protective order, protective order, or other restraining order has been issued, the court shall consider whether the best interest of the child, based upon the circumstances of the case, requires that any custody or visitation arrangement shall be limited to situations in which a third person, specified by the court, is present, or whether custody or visitation shall be suspended or denied.

CAL. FAM. CODE § 3031(c) (West Supp. 1996). To so seriously curtail the rights of a parent, however, the courts require a steep evidentiary showing. For example, one provision in the California Family Code states in pertinent part:

> As a prerequisite to the consideration of allegations of abuse, the court may require substantial independent corroboration, including, but not limited to, written reports by law enforcement agencies, child protective services or other social welfare agencies, courts, medical facilities, or other public agencies or private nonprofit organizations

South Carolina Law Review, Vol. 48, Iss. 3 [2020], Art. 2

484                    SOUTH CAROLINA LAW REVIEW                    [Vol. 48:441

this requires a steeper showing than making a connection between domestic violence and strict schedules and limited visitation time, as Laura did in the previous case. Alicia is unable to meet this threshold, and the mediator successfully talks her out of her request.

> Alicia: To tell you the truth, I just don't think he's a good influence on him. . . . He shows the child no discipline. H[e] and his family show the child no. . . . I mean they let him run around and they let him do whatever the heck he wants to. [The mediator tells Alicia that this is an insufficient reason. After some further probing and prompting by the mediator Alicia elaborates her narrative.]
> Alicia: [F]or a time he was taking care of the baby and it's like, I was like "Well, how did he get this and how did he get that?" And he said "Oh, he fell. He fell. Oh, he bumped himself." . . . And it's like, he had bruises on him and I ask, and it's like "Oh, he fell. Oh, he scraped himself. Oh, he cut himself." Or "Oh, he was playing with a fork and he stabbed himself or something." And I'm like "Weren't you watching him?" He said, "Well, I was watching TV you know, and I got into the program."

But the mediator lets Alicia know that her reasons are still insufficient.

> Mediator: Well, look, one of the things I wanted to tell you is there are times when judges will order third parties present—you know, monitored visitation . . . . Um . . . generally that's done in cases where there's been child abuse or sexual abuse or some kind of abuse of the child so that the child is in danger. So I'm not unsympathetic to what you're saying in terms of you want somebody there, but what you need to understand is that judges . . . [are] reluctant to order any kind of third party present unless there's some kind of danger to the child. Like if he had been beating the child or something, that would be a different story. . . .
> Alicia: You know, other than the drugs and the alcohol and because he is a very abusive person . . . he has a very violent temper.
> Mediator: But he's never abused the child. . . . I understand what you're saying but I'm not going to suggest the monitoring, . . . primarily because I'm not hearing of any—what we would call "immediate danger" to the child—as far as danger of abuse.[91]

---

providing services to victims of sexual assault or domestic violence.
CAL. FAM. CODE § 3011(b) (West 1994). An evidentiary provision of this type virtually mandates that supervised visitation will be awarded only where a family has already been "caught up" in the system as a result of violence and abuse, and neutral third party professionals are prepared to testify about the situation. It also minimizes the likelihood that requests for supervised visitation will be grounded in allegations of inadequate or inappropriate parenting hurled by one estranged divorcing parent at the other.
     91. In using her idea of what the judge might require to order supervised visitation as a standard against which to judge the appropriateness of the mediated agreement, the mediator

Similarly, Craig asks, quite insistently, for overnight visitation. But the mediator talks him out of it, repeatedly explaining that overnights are regarded as developmentally inappropriate for children under two.

> Mediator: [G]enerally kids of this age don't go overnight. Usually just developmentally, there's a separation problem with—from what we call the primary caretaking parent. . . . [U]sually we don't suggest overnights until the child is maybe two or two and a half or so. It's sometimes hard for them to be away . . . but generally . . . generally, a year and a half is a little young to be starting over-nights. . . . Yeah, well, as I said, generally we don't suggest overnights with a kid this young. . . . [I]t's a little young and sometimes there's a separation problem. You know, the kids become a little clingy-er and sometimes start having sleeping problems or something like that. And, again, I'm not saying this has to happen or that he'll be irreparably scarred for life, but it's generally . . . it's a little bit young.

Finally, although both parents ask for flexible visitation, the mediator insistently talks them into a fixed schedule.

> Alicia: Well, I don't see what's wrong with me having sole custody of him and him seeing him whenever he wants to because the child . . .
> Mediator: [interrupting] You mean on a flexible basis? . . . But what happens if, say he wants to see him and you get mad at him or something? I'm not saying you'd keep the child from him, but generally it seems to work a little better if there's a structure with it. Now, that doesn't mean that the two of you, as mature adults, can't, you know, arrange additional time. . . . But at least this way, there's verified time that you know you have and verified time that he knows he has.
> Mediator: [to Craig] OK, just tell me what you want.
> Craig: Joint custody. . . . I could pick him up at my convenience and when I want to pick him up. . . . No schedule.
> Mediator: OK. Some families do make arrangements like that. Most families find that they are better off with some kind of schedule so that each of them can do some planning and know in advance when the child is going to be with them. . . . What I'm saying though is that especially in cases where there's a restraining order, judges tend to find that it works better if there's a very defined schedule, not just, "Well, I'm going to drop him off," or "Can I see him?" or "Can I pick him up?" Because usually it prevents arguments if there's a more defined time, so that each of you knows in advance.

---

probably has in mind factors such as those announced in CAL. FAM. CODE § 3100 (West. Supp. 1996).

South Carolina Law Review, Vol. 48, Iss. 3 [2020], Art. 2

In sum, Craig and Alicia's case shows a very different combination of interpersonal powers, protective order dynamics, and the laws and policies constraining mediation. Craig and Alicia are equally assertive, insistent, and articulate in stating what they want; they are not afraid to confront one another; and each can advance the argument of the protective order or of having been a victim of domestic violence. Yet, neither succeeds in getting what he or she asks for (even when they both agree) because their requests are not consistent with the legal norms and values. As a result, their relatively interventionist mediator convinces them to make a different compromise.

At the same time, Craig and Alicia's case reveals a permutation on the relationship between personal power and the legal strategies it accomplishes. Alicia, like Shoshanna and John, has been turned out of the family home when her estranged spouse drew upon the legal authority of the protective order to claim sole proprietary rights. Craig's statement, "I told her to get the hell out of *my* fucking house" [emphasis added] resonates with the language of Laura's statement, "This is my house . . . leave my house," and David's, "This is my house; this is my son." However, unlike Shoshanna who is "floating" or John who lives in a "very small place" with no real cooking facilities, Alicia has "a place of [her] own." She has established a stable home, and apparently with Craig's acquiescence, she has taken the baby with her. Consequently, Craig (the petitioner on the protective order) has succeeded only in isolating himself. The mediator seriously discourages his request for flexible access to his son because, although Alicia concurs with him, California law and mediation practice deem it inappropriate in the presence of a protective order. Further, he fails to get the overnight visitation he seeks. The mediator, following typical Los Angeles county mediation views about what is developmentally appropriate, maintains that Ben is too young for overnights away from his primary parent. In contrast, the mediator in David and Shoshanna's case does not discourage the parents from agreeing to overnights in the long range plan for Josh, who is also eighteen months old, because to do so would be contrary to logic. Although Shoshanna is the primary parent, Josh is, at the very moment of the mediation session, residing with David overnight.

## IV. WHAT THE LAW CAN LEARN

It is now possible to answer the question posed at the beginning of this article: what is the spillover effect of protective orders on child custody? As we have seen, the substantive law of protective orders and of child custody concerns the legal protection of vulnerable bodies by assigning them to stable places. In the first instance, protective orders protect the body of an abused spouse by creating a safety zone around the abused spouse's person and home and by making it unlawful for the abuser spouse to cross into that zone (except for explicitly delimited channels of contact or communication). In the second instance, laws of child custody strive to place children in stable, tranquil

Case 1:23-cv-00381-JL-TSM   Document 35-9   Filed 01/23/24   Page 48 of 57
Kandel: Squabbling in the Shadows: What the Law Can Learn from the Way Di

homes, and attempt to assure orderly scheduled times and places for transfer and stay with the non-primary custodial parent. The strong preference for the stable status quo in custody laws often means that a *de facto* custodial arrangement will be confirmed by the court as permanent.

It follows as a matter of legal logic that a parent who takes certain steps prior to a custody determination can garner a definite advantage. That is if a parent has exclusive occupancy of the family home, has *de facto* custody or primary caretaking responsibility for the child or children living in that family home, and has been able to safeguard the stability and tranquility of that home by excluding or limiting the access of the other parent through a protective order, a favorable custodial allocation becomes more likely. The parent who is excluded by the protective order is "homeless" and is afforded limited contact with the child or children. This parent is in a correspondingly disadvantaged situation.

This link between the securing of safe bodies and stable places through protective orders and the allocation of children to safe, stable homes seems perfectly appropriate in what most of us probably imagine as the typical situation: the primary caretaking parent (usually the mother) as the victim who has been abused by the non-primary caretaking parent (usually the father) obtains a protective order controlling the access of her abusive partner and giving her exclusive control of the house and children. The cases discussed above demonstrate, however, that real life examples differ from the stereotypical scenario. More complex and nuanced relationships between interpersonal power and legal power are in fact common. Although pre-existing power inequalities between the parents in each case seem to play an important role in the final outcomes, the cases and especially the achievements of Laura and Alicia do not support the positions of the many feminist writers who assert that mediation is always inappropriate where there has been a history of domestic violence.[92] Rather, the relationship between legal and interpersonal power and domestic violence must be more fully contextualized. Not every victim or participant in domestic violence is battered; nor is it always the weaker party who holds the protective order.

In addition, many parents who have protective orders and child custody disputes do not call directly upon legal authorities such as police or judges. Rather, parents draw upon the law as a source of self-help, making their own legalistic arguments when they squabble with each other or availing themselves of more "user-friendly" legal processes, such as protective order hearings and court sponsored child custody mediation where parents can represent them-

---

92. *See, e.g.*, Mary Pat Treuthart, *In Harm's Way? Family Mediation and the Role of the Attorney Advocate*, 23 GOLDEN GATE U. L. REV. 717 (1993); Andree G. Gagnon, Note, *Ending Mandatory Divorce Mediation for Battered Women*, 15 HARV. WOMEN'S L.J. 272 (1992); Germane et. al., *supra* note 54; Willrich, *supra* note 54.

South Carolina Law Review, Vol. 48, Iss. 3 [2020], Art. 2

488          SOUTH CAROLINA LAW REVIEW          [Vol. 48:441

selves. In such circumstances, which party is the petitioner for a protective order depends more upon strategic predisposition and the division of interpersonal authority than who is the perceived "victim." Sometimes the more powerful party is indeed the abusing spouse, and like David, this party is able to avoid the disciplines and constraints of a protective order. In other cases, however, the technical victim is the stronger (Laura) or an equal (Alicia), and it is this party who wields the shield of law to a greater advantage. The stronger parent in the relationship may manage to make use of a protective order to control the other parent either by obtaining it (like Laura) or by interpreting it (like David), even where the stronger parent is the respondent. It also seems that rhetorical skills and strategies—the ability to persuasively argue that the law is on one's side—become increasingly important to what a parent "gets" from having a protective order. The increase in importance comes as one moves from domestic arguments to mediation and as rhetorical skill is more positively, but not unambiguously, related to dominance within the relationship.[93]

Interpersonal power and legal power manifest themselves as two different dimensions in these cases. The power relationship can be best understood by visualizing it within a matrix that has two, crossing axes. The first axis represents a division in the dimension of interpersonal power. It extends from one parent to the other and points along the line quantifying each party's dominance or subordination. The second axis shows the division of legal power. It defines the balance of power between individuals' freedom to act as they please and the law's power, not merely to punish wrongdoing but to induce behavior it considers desirable. This second axis extends from individuals and individualism to the state and state sanctioned behavioral forms. And it is along this second axis—in altering the behavior of the parties towards conformity with legally preferred norms—that protective orders and the "user friendly" legal process have a profound impact that the cases make visible. Paradoxically,[94] even when the law is used to enhance the power of

---

93. In addition, a methodological caveat must be recognized here. The dialogues are not simultaneous accounts of actual happenings in real time as told by an objective observer who witnessed each relationship's development from its inception. Rather, they are autobiographical narratives told during mediation and can, thus, only reflect each parent's view of the interparental power dynamics at the time of mediation. The dialogues cannot tell us with any reliability whether one of these parents, such as Laura or Alicia, was previously transformed, through the help of a legal remedy such as a protective order, from being the subordinate spouse to being the stronger one. What the narratives do tell us is that for events occurring within a single slice of time, interpersonal power dynamics seem to be major determinants of the way protective orders are interpreted to reconfigure family arrangements. They also shed light on the way rhetorical skills affect mediation and the way in which parents' wishes are most favored in the parenting plan agreement.

94. This paradox of legal power has been observed and discussed by many ethnographers. *See, e.g.,* SALLY ENGLE MERRY, GETTING JUSTICE AND GETTING EVEN (1990). In this

the dominant spouse, it "legalizes" the discourse of the dispute, obliging the parents to behave in legally acceptable ways (arguing rather than throwing wine glasses) and to think in legally acceptable categories (such as specific schedules for child transfer).[95]

The fascinating process revealed by the data is that protective orders work—even when they are not "working" as the law anticipates they should.

---

ethnography of community mediation in working-class New England, Merry explains that a paradox of power is created when people bring their interpersonal disputes to court-annexed mediation because in gaining power over their adversaries, parties lose power to the legal process. Yet, as they adapt to using the law, they acquire a facility with its ways and concepts that gives them a new means of power and control over their adversaries. *See id.*

95. This paradoxical capitulation to the legal perspective as a means to maintain interpersonal power within the relationship instantiates philosopher Michel Foucault's concept of power/knowledge. In the term "power/knowledge," Foucault maintains that certain ways of looking at the world produce certain kinds of knowledge and that such knowledge, because it determines the very categories of value and understanding, is power.

> We should admit rather that power produces knowledge (and not simply by encouraging it because it serves power or by applying it because it is useful); that power and knowledge directly imply one another; that there is no power relation without the correlative constitution of a field of knowledge, nor any knowledge that does not presuppose and constitute at the same time power relations. These 'power-knowledge relations' are to be analyzed, therefore, not on the basis of a subject of knowledge who is or is not free in relation to the power system, but, on the contrary, the subject who knows, the objects to be known and the modalities of knowledge must be regarded as so many effects of these fundamental implications of power-knowledge and their historical transformations. In short, it is not the activity of the subject of knowledge that produces a corpus of knowledge, useful or resistant to power, but power-knowledge, the processes and struggles that traverse it and of which it is made up, that determines the forms and possible domains of knowledge.

MICHEL FOUCAULT, DISCIPLINE AND PUNISH 27-28 (Alan Sheridan trans., Pantheon Books 1977) (1975) [hereinafter DISCIPLINE]; *see* MICHEL FOUCAULT, POWER/KNOWLEDGE (Colin Gordon ed., Gordon et. al. trans., Pantheon Books 1980). As Foucault's biographer, Paul Rabinow writes "[T]here is a consistent imperative, played out with varying emphases, which runs through Foucault's historical studies: to discover the relations of specific scientific disciplines and particular social practices . . . ." Paul Rabinow, *Introduction* to THE FOUCAULT READER 4-5 (Paul Rabinow ed., Pantheon Books 1984). "Foucault confronts this challenge, this threat, by refusing to separate off knowledge from power. His strategy has been to focus his work, both political and intellectual, on what he sees as the greatest threat—that strange, somewhat unlikely, mixing of the social science and social practices developed around subjectivity." *Id.* at 4-7. In Foucault's writing, much of which focused on the development of contemporary professional knowledge, the professions are sites of power/knowledge but the knowledge they produce is reproduced throughout the society, becoming itself a form of domination. *See generally*, MICHEL FOUCAULT, MADNESS AND CIVILIZATION (1965) (on psychiatry); MICHEL FOUCAULT, THE BIRTH OF THE CLINIC (A. M. Sheridan Smith trans., Pantheon Books 1973) (1963) (on the development of clinical medicine); MICHEL FOUCAULT, DISCIPLINE AND PUNISH (Alan Sheridan trans., Pantheon Books 1977) (1975) (on the penal system and the social sciences) [hereinafter DISCIPLINE]. Foucault's thought has exerted a strong influence on legal ethnography because of his concern with the construction and manipulation of power.

South Carolina Law Review, Vol. 48, Iss. 3 [2020], Art. 2

490                SOUTH CAROLINA LAW REVIEW                [Vol. 48:441

That is, couples are neither staying apart nor calling the police, yet the discourse of their disputes is changed and transformed into a more legally acceptable form. Their conversations reveal the educating and sanctioning power of "user friendly" legal processes, such as protective orders and mediation—again even when these processes do not work in intended and paradigmatic ways. In using and reinterpreting legal ideas, parents' ways of thinking and acting come into conformity with legal norms. This is true even when conforming does not also change the balance of power between them. Further, the successful parent's way of speaking becomes more legalistic as the forum becomes more formal.

As a first step in this legalization, the issuance of a temporary restraining order changes the discourse of the power struggle from one of physical violence and control over the co-parent's body (upon threat of police response and imprisonment) to a contest over a critical space that contains the children.[96] Thus, David may be able to nudge Shoshanna out of the house with his words, but he cannot abuse her body. Similarly, Laura can summon the police if John crosses her doorstep, rather than hitting him on the head with a bottle of wine. The authority to use force is transferred to the legal system, but the ability to defend personal space is strengthened. Concomitant with this transfer, the parents' disputes become coded in the language of the law. Thus, David, Laura, and Craig all edge their respective spouses out of the family home by pegging their positions to a legal claim of proprietary exclusiveness.[97] Even during arguments at home, the presence of a protective order channels the dispute into a more legally acceptable form, regardless of whether the more or less powerful spouse prevails.

---

96. *See supra* text accompanying notes 30-32.

97. This change from the control of bodies to the control of spaces instantiates another of Foucault's basic ideas—that systems of power/knowledge operate by defining and manipulating social spaces and the social meanings of human bodies. For example in DISCIPLINE AND PUNISH, Foucault traces the history of modern state social control as a progression from punishment of the body (capital punishment and torture), to spatial confinement and surveillance (prison), to discipline of the mind and body according to the dictates of the social sciences. DISCIPLINE, *supra* note 95.

> Foucault has been consistently interested in the shifting ways that the body and the social institutions related to it have entered into political relations. In the first mode of objectification (the dividing practices), the constituted subject can be seen as a victim caught in the processes of objectification and constraint—most obviously the case for prisoners and mental patients. Although there are parallel developments associated with the second mode of objectification (scientific classification), the relation to domination is more oblique. For example, in *The Birth of the Clinic* Foucault demonstrates how the body was increasingly treated as a thing during the nineteenth century, and how this objectification was paralleled and complemented by the dividing practices instituted in the clinic's spatial, temporal, and social compartamentalizations.

Rabinow, *supra* note 95, at 10.

Case 1:23-cv-00381-JL-TSM   Document 35-9   Filed 01/23/24   Page 52 of 57

In mediation, the discourse of the parties is further induced to conform to legally preferred standards. In arguments at home, the stronger parent can prevail by "talking law" in a rather loose way and convincing the other parent that his or her legal interpretation is correct. Thus, Laura can get John out of the house by acting as though she has a protective order, even when she does not, and David can get Shoshanna out of the house by convincing her that he will get custody because the house is his separate property and because the judge likes him. By contrast, to make "mileage points" towards a desired custodial allocation out of the presence of a protective order, a parent must peg his or her position to either the implicit nexus test, the specific scheduling rule, or the stable home issue—that is, to a genuine legal principle that is of concern to the mediator.[98] Thus, Laura is easily able to establish a strict visitation schedule because she is able to satisfy the nexus test and because her desire for a strict schedule conforms to a legally favored policy. By contrast, Craig is unable to convince the mediator to support his request for open and flexible visitation despite the fact that he, like Laura, holds a temporary protective order. Finally, although the mediator regards Alicia as a genuine domestic violence victim, she does not get support for her request for monitored visitation because, in the mediator's mind, this requires a steeper nexus test—a danger of serious physical abuse.

Even more than in arguments at home, the complexities of mediation create a forum where legal power and interpersonal power intersect, making it less likely that sheer interpersonal power will prevail. True enough, rhetorical skill is vital to obtaining a desired custodial allocation, and as we have seen, rhetorical skill is to some extent related to interpersonal power. Thus, Laura is successful in limiting John's visitation by pegging her requests to the nexus test: by talking about how frightened the children are. Achieving

---

98. Several anthropologists who have studied *pro se* litigants in various forums have observed that those who talk of rights, rather than simply of relationships, are more successful with legal personnel. *See, e.g.*, JOHN M. CONLEY & WILLIAM M. O'BARR, RULES VERSUS RELATIONSHIPS (1990); BARBARA YNGVESSON, VIRTUOUS CITIZENS, DISRUPTIVE SUBJECTS: ORDER AND COMPLAINT IN A NEW ENGLAND COURT (1993); John M. Conley & William M. O'Barr, *Rules Versus Relationships in Small Claims Disputes in* CONFLICT TALK 178 (Allen D. Grimshaw ed., Cambridge University Press 1990); John M. Conley & William M. O'Barr, *Fundamentals of Jurisprudence: An Ethnography of Judicial Decision Making in Informal Courts*, 66 N.C. L. REV. 467 (1988). In reviewing Yngvesson's book, Alan Hunt writes, "I was struck by a number of incidents described where there was an interesting interplay in which complainants and officials both invoked the discourses of rights. Complainants made use of a broad extralegal 'rights talk' in the form of a normative justification of their conduct while officials spoke in the narrower language of legal rights." Alan Hunt, *Law Community and Everyday Life*, 21 L. & SOC. INQUIRY 173, 179 (1996). Hunt's insight and the data discussed in this article suggest a need to refine the current wisdom on the importance of "talking rights." It is not simply "rights talk" that is successful in legal situations, but what I would call "closeness of fit." Even in so informal a forum as a mediation, the more a participant speaks to specific issues, principles, and concerns, the more successful that participant will be.

South Carolina Law Review, Vol. 48, Iss. 3 [2020], Art. 2

492                    SOUTH CAROLINA LAW REVIEW                [Vol. 48:441

this limitation, however, requires a certain legalistically calculated verbal assertiveness. Shoshanna is unable to do likewise by merely responding that Josh cries. Rhetorical skill in mediation is more than having the ability to speak persuasively—it is knowing what to say. Thus, Craig is as unable as John to obtain the flexible visitation he seeks, although Craig is outspoken, insistent, and even argumentative, while John is powerlessly inarticulate. Along similar lines, Laura successfully limits John's visitation time by concentrating on the children's need for stable, predictable schedules, whereas Shoshanna's concern that her mother-in-law is usurping her parental function fails to impress the mediator because it reveals that Josh is receiving proper care. In mediation, interpersonal power and legal power are more intimately intertwined, and the balance can be tipped by learning what to say and how to say it.

In their classic article, *Bargaining in the Shadow of the Law*,[99] Professors Mnookin and Kornhauser posited that the introduction of no-fault divorce and gender neutral custody law brought an indeterminacy to family law decision-making that would result in more lawyer-negotiated (as opposed to judge-decided) divorce arrangements and more private ordering of divorce agreements in the light of general legal principles. While emphasizing a process of private ordering that approximated contract negotiations, Mnookin and Kornhauser apparently thought that the negotiating would be done by attorneys acting as zealous but emotionally detached advocates. In slighting the role that men and women play in negotiating their own divorces and shaping their own agreements, Mnookin and Kornhauser's revolutionary imagining of family law fell short of being prophetic.

Contemporary empirical and ethnographic scholarship revealing the voice and action of law's everyday users demonstrates that ordinary people both incorporate legal concepts into their daily negotiations and reinterpret and reintroduce those concepts to the law.[100] Family law has recently accelerated this dynamic interaction by breaking down the division between formal and informal legal systems through the development of "user friendly" legal processes,[101] such as temporary restraining orders and court sponsored

---

99. Robert H. Mnookin & Lewis Kornhauser, *Bargaining in the Shadow of the Law: The Case of Divorce*, 88 YALE L.J. 950 (1979).

100. *See, e.g.*, SUSAN COUTIN, THE CULTURE OF PROTEST: RELIGIOUS ACTIVISM AND THE U.S. SANCTUARY MOVEMENT (1993) (describing how activists reinterpret the meaning of immigration laws and decisions); CONTESTED STATES (Mindie Lazarus-Black & Susan F. Hirsch eds., 1994); *supra* note 2 and sources cited.

101. I am decidedly not the first to use the computer lingo "user-friendly" to refer to protective orders and mediation. *See, e.g.*, Alan Kirtley, *The Mediation Privilege's Transition from Theory to Implementation: Designing a Mediation Privilege Standard to Protect Mediation Participants, the Process and the Public Interest*, 1995 J. DISP. RESOL. 1 (1995).

Mediation is user-friendly. Legal rules of procedure and evidence do not apply, witnesses are not called, attorneys often are not present, there are no limits on what

mediation, which feuding couples can access and employ either *pro se* or outside the presence of their attorneys. There is a porous boundary between such "user friendly" legal processes and the domestic squabbles and power dynamics of estranged couples that allows legal principles to percolate into and be altered by their everyday users.

Even when this boundary does not alter interpersonal power relationships, it changes the discourse of disagreement to conform more closely to the law's preferred behavioral norms. Its significance and limits in shaping the private ordering of family law agreements deserve more recognition by legal scholars and lawyers alike. For ill or good, putting more of family law into people's hands also puts more of the law into people's heads. When this occurs, ordinary people do not merely become obedient to the law's dictates, but interpret its postulates, as lawyers do, in innovative ways that further their own interests.

## V. CONCLUSION

This ethnographic article has analyzed in detail the actual language of three child custody mediation sessions observed and audiotaped by the author in the Los Angeles County Superior Court, Conciliation Services Division. The analysis has focused on the effects of temporary protective orders on child custody allocations. It has demonstrated that these effects are significant because protective orders create legally protected zones around the petitioner/victim and often around the house where he or she may reside with the children. This protective zone closely parallels the goal of custody law to place children in stable, tranquil homes. Yet, the effect is not necessarily to protect the weaker party. In "user friendly" legal processes, where parents represent themselves and interpret the law on their own, interpersonal power dynamics play an important role in determining whose version of correctness prevails.

Every site at which the parents interact, whether in arguments at home or at child custody mediation, becomes a forum in which the significance of the protective order is contested. The advantage, especially in arguments at home, often goes to the dominant party. The identity of the dominant party, however, may not be predictable from gender or legal posture (as petitioner or respondent on the protective order). Furthermore, even when the interpersonal power balance is not altered, the discourse is altered. To prevail, even in an argument at home, one parent must convince the other that the law is on his

---

information may be presented, [and] no record is made . . . . Because of its informality mediation is a faster, cheaper and less adversarial method of resolving disputes than traditional legal proceedings. This informality is not without its risks.

*Id.* at 8. I may, however, be the first scholar to call attention to the burgeoning development of a full-fledged "user-friendly" legal track and the importance, for family lawyers, of knowing what their clients do with it.

Case 1:23-cv-00381-JL-TSM   Document 35-9   Filed 01/23/24   Page 55 of 57

or her side. Thus, the ability to talk and argue about the law becomes important.

In mediation, rhetorical skill, interpersonal power, and legal power are related on a more complex level. Rhetorical skill is not merely a function of the ability and will to speak; it is a function of the knowledge necessary to bring one's statements under the umbrella of legal concerns that govern child custody. Such a composite still can be crucial, especially when a mediator's support is not readily forthcoming. Thus, legal knowledge becomes a weapon of interpersonal power.

This suggestion indicates the vital importance of a new and broader kind of client education. Legal scholars and practicing lawyers need to be aware that the "user friendly" legal process means that clients are "talking law" at home and that whoever wins these un-counselled arguments may affect the final custody and residence agreements as much as a lawyer's actions. Further, they need to educate their clients in the substantive law to an extent that goes beyond mere knowledge of rights. The substantive knowledge necessary to debate the legal limits of a protective order, or to argue for a specific custodial allocation in terms that conform to underlying legal concerns (such as stability, developmental appropriateness, or predictability) may work to tip the balance of interpersonal power for a client and may ultimately be outcome determinative.

Similarly, mediators, in striving to rectify power imbalances between contesting parties, should look to the deep ways in which interpersonal power dynamics and rhetorical skill are interwoven in patterns that are not self-evident from superficial categories, such as who is the petitioner or respondent on a protective order. Mediators need to be aware that for many couples mediation is merely one link in a chain of user-friendly legal resources and remedies that parents access and incorporate into intimate arguments and fights, often to the advantage of the dominant parent.

Protective orders, for example, may be used by a parent strategically (not merely defensively) to position that parent as the exclusive occupant of the family home, with *de facto* custody of the children. Similarly, because the subordinate spouse is often the shier spouse, mediators should consider employing techniques to elicit the full stories from reluctant spouses, thereby facilitating the achievement of narrative equality between them.[102] By actively listening to such stories, mediators can come to understand how the

---

102. For fuller discussion of the significance and technique of eliciting stories of comparable fullness from mediation participants see Sara Cobb, *A Narrative Perspective on Mediation: Toward the Materialization of the 'Storytelling' Metaphor, in* NEW DIRECTIONS IN MEDIATION: COMMUNICATION RESEARCH AND PERSPECTIVES 48 (Joseph P. Folger & Tricia S. Jones eds., 1994); Sara Cobb, *Empowerment and Mediation: A Narrative Perspective*, 9 NEGOTIATION J. 245 (1993); Randy Frances Kandel, *Power Plays: A Sociolinguistic Study of Inequality in Child Custody Mediation and a Hearsay Analog Solution*, 36 ARIZ. L. REV. 879 (1994).

Kandel: Squabbling in the Shadows: What the Law Can Learn from the Way Di

1997]                    SQUABBLING IN THE SHADOWS                    495

parents have "talked law" or "manipulated law" prior to the mediation session and how that has affected their *de facto* custodial allocations.

Unfortunately, such deeper knowledge of interparental power dynamics poses a dilemma to child custody mediators because of the ambiguities inherent in the responsibility to simultaneously empower parents, protect children's best interests, and facilitate harmonious agreements. However, enhanced insight can only lead to sharpened judgment as mediators inevitably and continuously balance these responsibilities in accordance with personal ethical standards, techniques, and case-by-case contexts.

South Carolina Law Review, Vol. 48, Iss. 3 [2020], Art. 2