## THE STATE OF NEW HAMPSHIRE
## SUPREME COURT

No. 2022-0517

**Dana Albrecht**
v.
**Katherine Albrecht**

### Motion for Rehearing and Reconsideration

NOW COMES Dana Albrecht, *Appellant-Petitioner Pro Se*, and respectfully requests this Court for rehearing and reconsideration of its July 25, 2023 order.

In support thereof it is stated:[1]

1. How hard can it be to decide that, *not* providing *any* hearing *to enforce a parenting plan*, for nearly three years, is uncool?

2. And how much work does it take to *justify* that *not* providing *any* hearing, for nearly three years, is all just fine and dandy, just because the N.H. Supreme Court said so?

3. To (mis)quote Emily Dickinson, "the ~~heart~~ NHJB wants, what the ~~heart~~ NHJB wants, or else it does not care."

4. Is the <u>real reason</u>, for not addressing this authors's November 2019 parenting motion, is *because it was already decided*, long ago by Judge Derby, that the author *even filing it in the first place*, <u>was the reason Respondent was able to get her DV against the author?</u>

---

[1] The reader is invited to review the comprehensive electronic navigation aids. *Sup. Ct. Supp. R. 11(f)*. A copy of this pleading is also available online at:
<u>https://dvsas.com/nh/files/2023_08_04_MTR/Motion.pdf</u>

5. Respondent was clearly upset that the author asked for parenting time, and explicitly expressed her ire by claiming *the very pleading at issue in this appeal*, <u>was the reason</u> she wanted a DV order of protection. <u>She even said so</u> in the five-page single spaced typed DV petition <u>she filed in response</u> to the November 2019 contempt motion:

> Additionally, November 1, 2019, Mr. Albrecht filed an Ex Parte Motion for Contempt and to Compel with the 9th Circuit – Family Division – Nashua, Docket No.: 659-2016-DM-00288, asking, in part, that I be compelled to disclose our precise location, and that I be compelled to provide him with parenting time before I returned to California. There is no requirement in the Court-ordered Parenting Plan that I have to notify Mr. Albrecht if I pull the girls out of school for a few days; there is no requirement in the Parenting Plan that I have to notify Mr. Albrecht if I travel in or outside the State of California; and there is no requirement in the Parenting Plan that I have to provide Mr. Albrecht with an itinerary of my travel plans.
>
> The Court issued an Order dated November 1, 2019, denying Mr. Albrecht's Motion for Ex Parte Relief finding that "No ex parte or emergency orders are issued no showing of imminent danger of irreparable harm. The case shall be scheduled in the ordinary course."

6. Judge Derby long ago *agreed* with Respondent that the author *even asking* for parenting time was, *in and of itself*, an act of "domestic violence!"

7. Judge Derby *long ago* refused to hear the November 2019 contempt, because:

> Case Name:   **In the Matter of Katherine Albrecht v. Dana Albrecht**
> Case Number:   **659-2019-DV-00341**
>
> Enclosed please find a copy of the Court's Order dated December 04, 2019 relative to:
>
> > **Defendant's Motion to Consilidate for Hearing - Motion is Denied. Parties cautioned that 12-9-19 hearing is scheduled for 30 min & double-booked with another DV case, and should plan accordingly.**
>
> **Derby, J**

8. And, in the related docket, No. 2022-0284, this Court already said all those prior DV orders were "final."

9. So, any finding by this Court, *at this time*, that the author's November 2019 Motion ought ever actually to have been heard would ... undermine Respondent's DV Order. <u>And we can't have that, now can we?</u>

10. In any event, this Court continues to ignore the real elephant in the room!

11. Marital Master DalPra, *likely long before he openly said so*, <u>simply did not</u> <u>"give a fuck"</u> about this case, *or* the author's innocent children, who are the real victims.

12. Worse, the chief administrative judge, David King, <u>likely lied under oath to</u> <u>cover it up</u>. But *now* what do "all the magistrates and officers of government" do? Attempt to write a five <u>page</u> *Order* to "deflect?" – <u>Боже мой</u>!

13. The harsh reality is that these five <u>lines</u> (*Tr. 26:12-16*) explain *a whole lot more* than this Court's five <u>pages</u>:

```
12   Q   Did you tell the Judicial Conduct Committee?
13   A   Did I tell the Judicial Conduct Committee what?
14   A   About what you had found regarding the transcript in
15       the Albrecht case?
16   A   Yes.
```

14. The documents speak for themselves, and anyone can basically just Google "judge david king deposition" …

   • https://www.google.com/search?q=judge+david+king+deposition

15. Anyway, *what* did Judge King tell the JCC "about what [he] had found regarding the transcript" anyway? *Inquiring minds want to know!*

16. In any event, the reasons the trial court did not schedule the November 2019 contempt motion are *crystal clear* from the record of the "Sixth of November Hearing." It's on <u>page one</u>[2] of the transcript!

17. When this author's counsel *immediately* raised the issue that the pleadings before the trial court were "wrong" and wouldn't clear the docket, Master DalPra replied "<u>I don't care</u> whether it clears the docket up or not, counsel" (*Tr.*

---

2   Well, the first "real" page anyway, after the cover and index, so technically page 3.

*3:24-25*)[3] – a splendid example of <u>literary foreshadowing</u> for Master DalPra's more ... *direct* .. language that subsequently followed. *Tr. 33:23*.

18. Why did Respondent get a full second hearing for a pleading *already completely decided* – because it didn't go her way the first time? And why didn't the author get *any hearing at all*, for nearly three years, for a pleading *not decided*?

19. This only makes sense if a court needs to reach a pre-determined outcome!

20. In such circumstances, the proper inquiry is <u>why there was never any hearing at all to decide the issue</u>. Under such circumstances, reliance on *Ndyaija* is not entirely unwarranted. But, if we're going to rely on *Ndyaija* for this sort of thing, perhaps the *100 page JCC complaint*, No. JC-20-035-C, <u>filed by Joshua Ndyaija</u>, might be more helpful?

21. Or, the <u>actual opinion of *Ndyaija*</u>, rather than the bit published in some dusty law library book at <u>173 N.H. 127, 138 (2020)</u>?

> **Subject:** Re: Marital Master Bruce F. DalPra - $12,680.52 reimbursement
> **From:** Joshua iNdyaiJa <ayijuka@gmail.com>
> **Date:** 1/5/23, 14:32
> **To:** Dana Albrecht <dana.albrecht@hushmail.com>
>
> These guys need to be arrested like any other citizens, not treated with such deference.
>
> Now do King and Curran.
>
> ~Joshua
>
> On Thu, 5 Jan 2023, 11:57 Dana Albrecht, <dana.albrecht@hushmail.com> wrote:
>> Hi everyone,
>>
>> Please see the attached N.H. Supreme Court Order (November 10, 2022), with invoices.
>>
>> Thanks,
>>
>> -Dana

---

3   Master DalPra then <u>demanded</u> to re-hear Respondent's *Ex Parte Motion to Temporarily Suspend Petitioner's Parenting Time* (#374) that was <u>already denied</u> by Judge Patricia Quigley (#376), who had further already ordered (on November 22, 2019) that "Request for *ex parte* orders is denied. <u>No hearing is required</u>." ApxI. 93-99. This was spelled out in Petitioner's brief, at 18-21.

22. Now, the appeal in this matter was about *parenting*, since for nearly seven years, the parties' children have been schlepped all over the country.

23. Which, of course, is why this Court apparently chose to make much ado about a prior appeal (2018-0379) concerning *property division*, that *had nothing to do with parenting*.

24. But, completely <u>absent</u> from this Court's recent *Order*, is any mention of the *one prior appeal* (No. 2019-0436) concerning <u>enforcing parenting rights!</u>

25. The proper inquiry, is why <u>nobody</u> (certainly not Master DalPra) bothered to read the relevant trial court orders for that prior appeal, No. 2019-0426. Judge Derby even said on the record he knew nothing about them, despite signing them. *[Witte v. Justices of New Hampshire Superior Court](), 831 F. 2d 362 (1st Cir. 1987)*.

26. Another proper inquiry, is why <u>nobody</u> (certainly not Master DalPra) bothered to read any relevant police reports either.

27. And, the proper inquiry, is why, <u>the last time</u>, this Court did *not* accept an appeal of Master DalPra's decision refusing to enforce the *Parenting Plan*, making this a "textbook example" of an issue that would be "capable of repetition, yet evading review." *[State v. Luwal](), 175 N.H. 467, 470 (2022)*.

28. In any event, this author "gets it." <u>Nobody</u>, and especially members of the judiciary, even if they are honest, decent jurists (which many are, despite this author's harsh criticism of certain "bad apples") *has the time or resources ever actually to read the evidence* submitted.

29. So, of course, nobody likely will read the attached police reports this time around either.

30. Trial courts are too busy holding three hour *sua sponte* hearings to override stipulations by both parties, and this Court certainly likely has neither the time, resources, or inclination to "fix" a case after a trial court has hopelessly botched it, with multiple instances of judicial misconduct, for years.

31. So, the judiciary asks for more resources and money. We all "get it." And we can all watch it here:

   • https://www.youtube.com/watch?v=vbFOdcRT_XA

32. The trouble, of course, is when such resources are poorly allocated.

33. In this case, the judiciary has devoted *all of its resources* to Respondent's DV, including providing her with a three day trial, before Judge Derby, despite that the whole reason she filed her DV petitions in the first place, was because she did not want this author to have any contact with their children.

34. But, so long as DV cases are more profitable than parenting cases for the State than parenting cases, nothing will get fixed.

35. We'll still have the *Albrecht* comedy, wherein the whole point of the DV in the first place, is all about a Massachusetts church, and parenting.

36. We'll still have repeats, albeit likely not quite so overt, of *Kristin Ruggiero*. Because bad actors will continue to manipulate the system, to gain the upper hand in parenting disputes.

37. We'll unfortunately even still likely have repeats of *Lindsay Smith*, because in a world without objective standards, where the goal is to protect the jobs of state employees, that can happen again also.

38. In any event, having been denied the opportunity for any hearing, the author attaches relevant evidence, directly contradicting many of the so-called "factual" findings, that were arrived at without ever holding a hearing.

39. But, as with other such appellate pleadings, the reader is forewarned to anticipate that this Court likely will issue another one line order denying this motion, and blandly stating that it "has not overlooked or misapprehended any facts or points of law."

40. And, that's *why*, this author wonders, whether it might be possible for the federal judiciary to assist in any capacity?

WHEREFORE, Appellant-Defendant Dana Albrecht respectfully requests that this Honorable Court grant this motion, vacate its July 25, 2023 order, and for such other relief as is consistent with ¶¶1-40 as previously set forth.

Respectfully submitted,

_____

DANA ALBRECHT
    *Appellant-Defendant Pro Se*
131 D.W. Hwy #235
Nashua, NH 03060
(603) 809-1097
dana.albrecht@hushmail.com

August 4, 2023

## CERTIFICATE OF SERVICE

I, Dana Albrecht, certify that this motion has been served on all parties of record via the electronic filing system on this 4th day of August 2023.

_____

DANA ALBRECHT

STATE OF NEW HAMPSHIRE

9TH CIRCUIT COURT - FAMILY DIVISION - NASHUA


IN THE MATTER OF:              )   Family Division Case No.
DANA ALBRECHT,                 )   659-2016-DM-00288
                               )
            Petitioner,        )   Nashua, New Hampshire
                               )   August 9, 2017
        and                    )   9:04 a.m.
                               )
KATHERINE ALBRECHT,            )   Volume II of II
                               )   Pages 193 - 397
            Respondent.        )
_____)


                FINAL HEARING - DAY 2
        BEFORE THE HONORABLE BRUCE F. DALPRA
   MARITAL MASTER OF THE CIRCUIT COURT - FAMILY DIVISION


APPEARANCES:

For the Petitioner:           Joseph Caulfield, Esq.
                              CAULFIELD LAW & MEDIATION OFFICE
                              126 Perham Corner Road
                              Lyndeborough, NH 03082-6522


For the Respondent:           Michael J. Fontaine, Esq.
                              WELTS, WHITE & FONTAINE, P.C.
                              29 Factory Street
                              Nashua, NH 03060


Also Present:                 Kathleen A. Sternenberg
                              Guardian ad litem (GAL)


Audio Operator:               Electronically Recorded
                              by Aline Chasseur


TRANSCRIPTION COMPANY:        AVTranz, an eScribers Company
                              7227 N. 16th Street, Suite 207
                              Phoenix, AZ 85020
                              (800) 257-0885
                              www.avtranz.com


Proceedings recorded by electronic sound recording; transcript
produced by court-approved transcription service.

1                          I N D E X

2     WITNESS(ES)      DIRECT    CROSS    REDIRECT    RECROSS

3     FOR THE PETITIONER:

4     NONE

5

6     FOR THE RESPONDENT:

7     Tina Michael       195      210      217        218

8     Katherine Albrecht 220      305      329

9     Jack Bopp          333      342

10    Kathleen Sternenberg 348    373

11    Elaine Hodgkinson 387       393

12

13    MISCELLANEOUS                                  PAGE

14    NONE

15

16    EXHIBITS                               ID      EVD

17    NONE

18

19

20

21

22

23

24

25



348

1   life.

2           MR. CAULFIELD:  No further questions.

3           THE COURT:  Attorney Sternenberg, do you have

4   anything?

5           MS. STERNENBERG:  No.

6           THE COURT:  Thank you, sir.  You can step down.

7           THE WITNESS:  Thank you, Your Honor.

8           MR. FONTAINE:  Your Honor, we'd call the guardian ad

9   litem next.  Raise your right hand.

10      KATHLEEN STERNENBERG, WITNESS FOR THE RESPONDENT, SWORN

11                      DIRECT EXAMINATION

12  BY MR. FONTAINE:

13      Q  With the Court's permission, be seated.

14          THE COURT:  Okay.  Before you start your examination,

15  I've read the report.  I don't want to hear it in conversation

16  form at this point.

17          MR. FONTAINE:  Sure.

18          THE COURT:  Okay.

19          MR. FONTAINE:  I'll keep it brief.

20          THE WITNESS:  Could I just get a pen?  I'm sorry.

21          THE COURT:  Certainly.

22          THE WITNESS:  I didn't mean to come up here without

23  one.

24          THE COURT:  You're going to carve your initials into

25  the witness stand?


AVTRANZ ◆ eScribers
AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

 1              THE WITNESS:  Yes.

 2              THE COURT:  One never knows.

 3  BY MR. FONTAINE:

 4      Q   Good morning or afternoon, I should say.  Are you a

 5  certified GAL?

 6      A   I am.

 7      Q   And how long have you been a certified GAL?

 8      A   I've been certified since my training in 1993.

 9      Q   And estimate how many cases you've served on as a GAL?

10      A   People ask me that all the time, at least hundreds.

11      Q   Okay.  And this Court's original order of appointment

12  requested that you investigate certain specific matters.

13  Correct?

14      A   Yes.

15      Q   And did you in fact do that?

16      A   I did.

17      Q   You were also asked at a later point in time to

18  investigate Ms. Albrecht's motion to relocate and provide an

19  opinion on that as well?

20      A   Yes.

21      Q   And you added that to your list as well?

22      A   I did.

23      Q   And the parties were paying 50/50?

24      A   Yes.

25      Q   And has Ms. Albrecht paid you to date?



1     A  Yes.

2     Q  Has Mr. Albrecht paid you to date?

3     A  I'm waiting for a payment that I've requested.

4     Q  Okay.  In the process of conducting this investigation,

5  did you send out questionnaires to the parties?

6     A  I did.

7     Q  And did both of them return them?

8     A  They did.

9     Q  And did you ask for their opinions as to people that

10  they should -- that you should contact or send questionnaires

11  to get further information on this issue?

12     A  I did.

13     Q  And did you in fact do that?

14     A  Yes.

15     Q  Have you in this particular case met with both parents?

16     A  I have.

17     Q  Have you had an opportunity to meet with the children?

18     A  I have.

19     Q  And have those meetings been more than one?

20     A  Multiple meetings with parents, parents together, one

21  parents-together session, and many meetings with the children.

22     Q  Okay.  And did each of the parents fill out a guardian

23  ad litem questionnaire?

24     A  They did.

25     Q  Did you put many hours into this investigation?



AVTRANZ   eScribers

AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1      A   Yes.

2      Q   Is this one of the most time intensive cases you've had

3  as a guardian?

4      A   It's a very heavy, intensive case.

5      Q   Okay.  And you filed numerous motions to exceed your

6  fees?

7      A   I have.

8      Q   Do you feel, after completing this investigation, that

9  you were able to obtain sufficient information to be able to

10  provide this Court with your findings and your recommendations?

11      A   Yes.

12      Q   And in fact, does your report do that?

13      A   Yes.

14      Q   Does that report contain everything that came out of

15  your investigation?

16      A   No, because I had to stop somewhere and 25 pages is a

17  long report.

18      Q   Okay.  And is --

19          MR. FONTAINE:  Your Honor, I'm not sure.  Do I need

20  to ask that, that be introduced into an exhibit?  Okay.

21          THE COURT:  It's part of the record.

22  BY MR. FONTAINE:

23      Q   So in this report, you provide an opinion on the

24  relocation issue, correct?

25      A   I do.



 1      A   And in summary, would you indicate what that opinion

 2   is?

 3      A   I believe, for the reasons that I have in my report and

 4   I think I've done a pretty good job of explaining that

 5   Katherine Albrecht is in need of relocating to southern

 6   California, where she has the support of her family, she's

 7   closer to the facility where she would get treatment for her

 8   cancer, and she has financial stability where she doesn't have

 9   it now.

10      Q   Okay.  And --

11      A   And I believe those meet the standard that she needs to

12   prove.

13      Q   And in doing that, you looked at the statute on

14   relocation, correct?

15      A   I have.

16      Q   And you looked at whether you thought her reason for

17   moving was legitimate --

18      A   I have.

19      Q   -- for a legitimate purpose.  And you feel that it is?

20      A   I feel that it is.

21      Q   And just again, I notice in your report, you reference

22   that both parties are from California?

23      A   Yes.

24      Q   Both parties have family in California?

25      A   Yes.



1      Q   Both parties do not have family that they regularly

2  have contact with in New Hampshire?

3      A   Yes.

4      Q   Right?  And Dana currently is unemployed, correct?

5      A   Yes.

6      Q   And your recommendation is not only that Katherine be

7  allowed to relocate, but that Dana -- it's his choice, but that

8  Dana also consider relocating to the Pasadena area.

9      A   I think that would be the best thing that could happen,

10  yes.

11      Q   And do you believe, based on all of the factors,

12  including these interviews, et cetera, that it is in fact in

13  the best interests of the children to relocate?

14      A   I do.  And I couldn't be any stronger in my

15  recommendation that this happen right away so that the children

16  can get established so they can be in school so they can get

17  out of the fray.

18      Q   And did you have discussions with Katherine about her

19  opinions on relocation?

20      A   Yes.

21      Q   And did you talk with her about investigating school

22  options, for example?

23      A   I did.

24      Q   And did she provide you with information on what she

25  had done?

AVTRANZ ◇ eScribers
AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

 1      A   She and her mother both were former educators and they

 2   know the area.

 3      Q   Okay.  And do you feel that they did a thorough job on

 4   finding the best schools?

 5      A   It was a lot of information and they looked at a lot of

 6   different schools --

 7      Q   Okay.

 8      A   -- and provided a lot of information.

 9      Q   Okay.  Now, you've also recommended in your report that

10   Katherine be awarded primary residential parenting rights and

11   responsibilities?

12      A   I did.

13      Q   Could you give the Court a summary of your reasons that

14   you feel that, that is in the best interests of the children?

15      A   Well, at this point, the children really need

16   stability.  They need to feel secure.  They need to have a

17   nurturing environment.  They need to have an environment where

18   their developmental needs are taken into consideration and

19   their needs are placed before others.  And it's my

20   recommendation and my determination that, that would be with

21   Ms. Albrecht at this time.

22      Q   And what specific personality traits does Katherine

23   Albrecht have that Dana does not that you factored into that

24   assessment?

25      A   The biggest concern that I have is that there is a 16-


AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

 1  year-old boy -- and Your Honor, if you would make a correction,

 2  the Court sent me an appointment that had C████'s date of birth

 3  wrong and I just want to make sure that it's corrected for the

 4  record.  I put ████████ because that was on the appointment,

 5  but it's ███/2000, so there is a mistake on my first page of

 6  my report.

 7          C███ is 16, S███ is 13, and G███ is 10.  10-year-

 8  olds are developmentally sort of at a black-and-white thinking

 9  stage and oftentimes are more aligned with their mother at that

10  time in their life.  In this case, S███ and G███ are very

11  connected with their mother.  They have a secure attachment

12  with their mother from what I've observed.  And they are really

13  having difficulty with their dad.

14          And while Dana has tried, and loves them, and has

15  spent time with them, they tend to come to odds about most

16  simple decision making.  And it's been my observation that, no

17  matter what kinds of recommendations I make to try to settle

18  that down, for him to understand that 13-year-old girls are

19  really difficult -- and I've raised one, so I know they are --

20  that you have to be the parent.

21          And you have to, you know, make sure that you show

22  them that you're listening to their feelings because, at some

23  point, a 13-year-old grows up and wants to be listened to.  And

24  a 10-year-old is not like G███.  G███ is more like an 18-

25  year-old unfortunately.  G███ has the presence of an 18-year-



1   old.  She really does.

2            So this is definitely a hardship for Dana because he

3   is used to dealing with his boys, who are very similar to him

4   and his girls just are not.  They're emotive.  They're

5   emotional.  They cry.  They don't feel that he's communicating

6   with them or feel that he is listening to their needs.  And

7   this has not been something that just happened in March or

8   April.

9            This is something that I've heard about since

10  December.  I started my investigation.  Pretty much in

11  December, it was underway.  It's gotten worse over time.  And I

12  can't sit here as a guardian ad litem and recommend that these

13  girls be placed with their father with the situation getting

14  worse, not better.

15     Q   And do you have -- I notice you've commented that you

16  did not believe that alienation by the mother was the cause of

17  this.  But you can further elaborate on what you've done to try

18  and figure out whether there was alienation and figure out the

19  reasons these things are happening?

20     A   These kids have heard their parents' disputes for a

21  long time.  And they've had family meetings where they've aired

22  their parents' disputes.  And each of the children has met with

23  me individually on multiple occasions and they all say

24  different things.  But one of the things that they are very

25  clear about is Dad blaming Mom, Dad yelling, Dad being rageful



 1  (sic) at Mom, and continuing to talk about Mom in terms of

 2  being crazy and being not available to parent, you know, really

 3  denigrating Mom.  And that has had an effect on these kids.

 4          In conjunction with not having a relationship, a

 5  nurturing relationship in which they feel listened to and they

 6  feel Dad wants to be in their presence, the girls are really

 7  getting to a point where they don't want to be around him.  And

 8  I tried to explain that to these parents.  I sat with them.  I

 9  talked to them about, I go to trainings every year and one of

10  the trainings I did within the last three years was in

11  Baltimore at the University of Baltimore School of Law.

12          And they brought in a specialist on alienation.  And

13  adolescents between the age of 12 to 15 start being estranged

14  when they don't feel like they're being listened to.  They

15  start being resistant and then they start refusing.  And in

16  April, I wrote to counsel and the parties and said, "I'm really

17  concerned that these kids are going to start refusing," and

18  it's happened.  And I haven't been listened to unfortunately.

19      Q  Have you spoken specifically to Dana about things that

20  he could do differently?

21      A  Yes.

22      Q  And has Dana implemented those things?

23      A  He says he will, but then it doesn't work that way.

24      Q  The evidence that you see in subsequent meetings with

25  the children, et cetera -- does it show differently?



1          A    The big issue was if -- my preliminary report, I also

2    intended to be a part of my final report, Your Honor.   In my

3    preliminary report that I filed, I was very clear about the

4    fact that the children's pediatrician and the family's

5    pediatrician, the family doctor, was very concerned that this

6    issue of, you have to go to my church and you have to attend my

7    church, was causing the children to be really upset at their

8    father.

9          So in January, I recommended that, that not be the

10   case.   And yet, at Easter time, we're still talking about, from

11   Dana's perspective, they should come to Paskha at my church and

12   they should be overnight from 10:00 at night until 4:00 the

13   next morning, and they'd done that at the Hampshire Hills for a

14   lock-in, so I don't understand why they couldn't do it in this

15   case, not understanding that one of the children was really

16   objecting to the smell of the incense.

17          One of the children just didn't like standing for the

18   period of time that they stand.   One of the children just

19   didn't really feel comfortable with the whole congregation and

20   tells me that she was hit by one of the boys at the church.

21   Those are things that need to be listened to.   You don't have

22   to agree with your child, but you have to at least listen to

23   and take into consideration their feelings.   That was happening

24   in January and, yet, we're still talking about it into April.

25   It's still a big issue.


AVTRANZ ◆ eScribers
AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

```
 1        Q   Based upon your conversations with the children -- and

 2   you can be specific in your answer as to which child -- at this

 3   time, do they feel that the father is listening any more to

 4   them?

 5        A   No.

 6        Q   Do they actually feel that the father has actually not

 7   listened to them more, but actually -- strike that.  Do the

 8   children actually feel that his listening has decreased?

 9        A   They feel that he's punishing them.

10        Q   And could you tell us a couple?

11        A   They feel that, if they say something, he gets angry

12   and he pouts or he punishes them by not taking them to church

13   the next day.  Or he goes, and rolls up in a ball, and doesn't

14   do anything with them for the rest of the day.

15        Q   And is there any specific examples you have of that,

16   that they have described to you?

17        A   Over and over, they've described examples of that.

18        Q   Okay.  Why don't you tell us a couple?

19        A   While the children were at camp, the two older children

20   were at camp for a second week of camp.  Dana took the youngest

21   child, G    , to Cozy Tea Cart and Dana told G      -- and this

22   is G     talking to me about this -- you don't need to listen

23   to Mom.  You don't need to listen to the guardian ad litem.

24   You don't need to listen to the court.  And Dana now at each

25   Wednesday visit wants to go back to the Cozy Cart.  And G
```

AVTRANZ  eScribers
AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1   doesn't ever want to go there again.  And G███ has told him by

2   her words to me that she doesn't like it there, she doesn't

3   want to go back, but every Wednesday, he starts with, "We're

4   going to the Cozy Tea Cart."

5          Q   Okay.

6          A   That's a complete inability to understand or listen to

7   your child.

8          Q   Okay.  Any other examples?

9          A   They went to Launch and Chipotle.  And the girls were

10  very upset because Dana follows them around very closely

11  because, at some point, I recommended to Dana that he be one on

12  one with the girls, sit and do a game, a board game on the

13  floor, do something interactive, go out and kick a ball, do

14  something directly with them because they didn't feel that he

15  was doing that.

16          So now, they feel that he gets right up to them and

17  he's kind of creepy because they feel like he's in their space.

18  At Launch, he went and jumped with them.  And one of the girls

19  said it'd be great if Dad was just jumping and throwing the

20  ball, but instead, he's blaming the way we feel on problems

21  from the girls hearing from their mother.  And the girls are

22  telling me, "No.  The problems that are existing are with our

23  dad and with our inability to get through how we're feeling."

24          Q   If there's alienation here, do you feel that it's

25  coming from Dana?



AVTRANZ ◇ eScribers
AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1          A   No.   I just think it's estrangement because of his

2   inability to do these things that we've talked about over

3   several months.

4          Q   Okay.   And there was also an art exhibit or a play that

5   they went to if I recall?

6          A   I heard about from one of the girls that Dana wanted to

7   take them to an art exhibition, Botticelli exhibition.   These

8   are 10-year-old and 13-year-old girls from a conservative

9   Christian upbringing and Botticelli is naked paintings.   And

10   they're large paintings.   And the girls were turned off by

11   that.

12          They didn't want to do that.   But he said, "If you

13   don't go to the art exhibit, then you can't go to church the

14   next day."   So these are girls who are just being turned off in

15   lots of ways.   And then I was told by Katherine that G      had

16   some real problems sleeping the next day because of what she

17   had seen, you know.   It's just an inability to understand where

18   your kids are developmentally.

19          Q   Do you feel that Katherine does listen to them?

20          A   I know I've seen her listen to them and I have

21   experience with her listening to them.

22          Q   Is she a nurturer?

23          A   She is.

24          Q   And does she put the kids' interests before hers?

25          A   She tries to.   Sometimes, she doesn't.



1          Q   But does she do it more than Dana?

2          A   She does.

3          Q   And have you had any recent discussions with the

4    children that would further provide this Court with an

5    understanding of what's happening?

6          A   Well, there are two things that I've learned recently.

7    One is about Dana's recent visit with the kids, wherein they

8    went to the Casual Cat and A&E to eat.

9              And the kids told me that they got in the car, that

10   G▮▮▮▮   determined that there was a microphone with a red light

11   and a counter on in the car, and that they each, all three of

12   them, asked their father not to be recording them, and that he

13   continued to record them, and that, when they got to a point

14   where they were really insisting about that, that he then took

15   out his phone and started videotaping them, and that he

16   videotaped them all the way through at the Casual Cat, which is

17   apparently a store.  I don't -- I've never been there and at

18   the place where they eat, and that it was very upsetting, and

19   that they cried, and that Dana didn't understand how upsetting

20   it was to them, didn't do anything to comfort them.

21         Q   Did that include C▮▮▮▮?

22         A   It included C▮▮▮.  He was very angry and eventually

23   convinced his dad to turn off his phone.  But all three of them

24   told me that, that was just over the top, and that their father

25   was crying at times, and just it was a very scary thing.  And



1    then C███ told me that he really wants -- he doesn't feel

2    listened to.  He doesn't feel like he's able to talk because he

3    doesn't want to anger his dad or anger his mother, and he's

4    really feeling very much in the middle, and he's 16, and he's

5    very concerned that he wants to go on to college, and he wants

6    his parents to support that.

7       Q  Okay.

8       A  He told me that, with regard to hacking, it isn't what

9    his mother has told him about hacking.  It's what he's actually

10    observed on his own devices that worries him, that he's seen a

11    log where a Linux machine from Nashua was on the log.  He's

12    seen things happen on his computer.  He's seen the root

13    administrator change.

14       He's seen, you know, what Katherine was talking about

15    on his phone with regard to things changing right in front of

16    him.  He's seen a phone call come in and not be able to

17    disconnect it.  So whatever that is, he feels that his father

18    is hacking his devices.  And he told me, "This is not my

19    mother.  This is me.  I feel this way.  And Dad completely

20    denies it, but I still feel this way."

21       So those are the reasons that I think these kids are

22    really in the middle of battle, but they really need a place

23    where they can be in one place with one parent.  And I want

24    them to have a relationship.  I talked to each one of them

25    about the fact that it's really important in their life to have



1  a relationship with both parents, they only have two parents,

2  and that they need to work on that, and that counseling will

3  help that, and I hope that they get into counseling.

4      Q  You've recommended family systems counseling?

5      A  I did that in May.

6      Q  Right.  And did Dana take any steps that you're aware

7  of to actually commence with that?

8      A  He came back to see -- he wanted to think about it.  I

9  gave him a bunch of different people that I had researched who

10  might be able to do it.  And then he came back to me on June

11  7th and I made calls to the two people that I thought could do

12  it locally.  And neither of them was available.  And I didn't

13  hear back from one until, like, the 22nd of June.  The problem

14  with family systems work is, you can't just start it and think

15  it's going to happen overnight.  It takes quite a while to get

16  that underway.

17      Q  If this Court were to follow your recommendation and

18  allow Katherine to relocate with the children to California, is

19  there any reason that you're aware of that family systems

20  counseling can't continue to go on and the individual

21  counseling that you've also recommended for the children to go

22  on and for them to be able to speak to each other by phone, or

23  online, or --

24      A  I think the family systems work would be better if

25  everybody was in one place.


AVTRANZ ◆ eScribers
AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1     Q   Sure.

2     A   I think that the kids have to have their own therapy.

3  And I think that has to happen right away.  Family systems work

4  can be done telephonically.  These days, there are a lot of

5  people who do Skype sessions.  But I think that it'd be better

6  off if everybody was in one place.

7     Q   And that's why you're recommending that Dana move to --

8     A   I am.  And even if he doesn't, if he were to come in

9  for once-a-month-long weekends, where he could be in town for

10  Thursday, have a session with the kids on Friday, that would

11  be, you know, something that could happen in this case.

12     Q   And do you agree with the language that we put into our

13  proposed parenting plan that the individual counselors be able

14  to consult with the family systems counselors to try to

15  maximize the possibility of the relationship being improved?

16     A   I think it's really important for therapists who are

17  involved with the family members to all be able to collaborate.

18  That's what they call that.  And I have recommended both

19  parents also continuing therapy.

20     Q   Is there anything else that you think that you've heard

21  from the children on these issues.  I don't want to have you

22  address legal parenting -- I'm sorry.

23     A   Decision making.

24          MR. CAULFIELD:  Your Honor, I object.

25  BY MR. FONTAINE:


AVTRANZ ⬦ eScribers
AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1  Q  Decision making in a second, but on the residential

2  portion --

3          MR. CAULFIELD:  Could I just have the question

4  repeated?

5          MR. FONTAINE:  Sure, sure.

6          MR. CAULFIELD:  Thanks.

7          MR. FONTAINE:  Yeah.  I asked if there was any

8  additional information that she wanted to include --

9          MR. CAULFIELD:  Okay.

10         MR. FONTAINE:  -- on the residential portion.

11         MR. CAULFIELD:  Thank you.

12         THE WITNESS:  No.

13  BY MR. FONTAINE:

14  Q  With regards to the legal decision making, you've

15  indicated in your proposal that you believe the parties should

16  work together, try to make mutual decisions, important

17  decisions.

18  A  It's a really close one, but you know, both parents

19  need to be involved in decision making for their kids,

20  especially major decisions.  These people have such a hard time

21  making a decision, so somebody has to make the -- somebody has

22  to have a way to break the tie.  And this is about everything.

23  I've noticed this about very small things.

24  Q  I understand the importance of you trying to remain

25  neutral in this investigation.  It's your obligation ethically.



1  But do you feel that, when some disagreements have occurred in

2  the midst of this legal separation matter relative to

3  residential parenting that Katherine has been willing to make

4  compromises more so than Dana?

5      A  I think Katherine usually suggests something.  Then it

6  goes to Dana and he suggests something much bigger or

7  different.  And then it goes back to Katherine and she tries to

8  make some sort of halfway compromise.  And then it breaks down.

9          So I think, what happens is -- a good example of this

10  is with David Albrecht in town and he hasn't seen the kids in

11  several years.  And the kids are with Dana tonight from 4:00 to

12  6:00 for a Wednesday visit.  Dana said, "My dad's in town.  Can

13  we have time with Dad?"  Katherine said, "Well, we're not going

14  to get out of court today, but we could expand your time today

15  from 5:10 to 9:10.  That gives you four hours to go to dinner."

16          Dana came back and said, "Well, I want the kids for

17  from 5:10 until Sunday."  Then there was a breakdown.  That's

18  basically what happens here.  And then this morning, Mr.

19  Caulfield came to me and I think, after two years of not seeing

20  your grandfather, in the middle of trial, a four-hour visit may

21  be a good start.  And I don't know what after that, but at

22  least there should be something.  That's what I've done

23  continually with this case because it just breaks down.  They

24  can't make a decision.

25      Q  Was the weekend of the rehearsal of the play that you



1  heard testimony about another example of that?

2      A  I don't work on Sundays and I try not to work on

3  Saturdays.  But the kids had the opportunity to be in a play

4  and, apparently, the play has been something they've been to at

5  least for some years.  And while Dana doesn't particularly like

6  Collinsville anymore, these are the kids and they've been

7  involved with this congregation, so I thought it was a good

8  idea.

9          So Katherine said, "Hey, we've got this play, and

10  it's a lot of rehearsals and a lot of getting ready for.

11  What's a good idea about how to try to deal with parenting time

12  for Dana but also allow the kids to participate?"  My thought

13  was, she take the weekend that he should have the kids, and you

14  give him the next weekend, and you swap weekends.

15          And then there's no getting all over each other.  And

16  if he wanted to go over to the play and watch the play, I have

17  no problem with that.  It just can't happen because that's the

18  suggestion that's made.  And then the next thing is, "I'll take

19  them to the play."  And then they're all over each other, which

20  happened, and it --

21      Q  All right.

22      A  -- broke down badly.

23      Q  And it was also that there was the discussion, I think,

24  that was confirmed with the children, that the father was

25  indicating he was going to come every night that the play was



1  playing.

2       A  Well, this is what happens when they start having

3  disagreements, the 10- and 13-year-old and Dana, that things

4  just spiral.  And having raised a child myself, I know that, at

5  13, sometimes they're not very rational.  So it just gets

6  spiraled into, you know, okay, then you can't go at all.  Well,

7  that's not what should be going on.  It really should be, this

8  is something I'm going to do for my kids because I've always

9  done it.

10      Q  Yeah.

11      A  And I'm going to put their needs first.  And I'm going

12  to put my needs second.

13      Q  So your recommendation, then, is for them to work

14  together at making joint decisions.

15      A  Identify that there's a joint decision that has to be

16  made -- give the opportunity for both of them to be involved,

17  and discuss the issue, and then if there is absolutely not

18  agreement, I've said Katherine, but I don't have -- if this

19  Court decides that it should be a third party, that's fine with

20  me.  I just think there has to be a deal breaker.  Something

21  has to happen because, in my experience with this case, it's

22  been me.

23      Q  And if it's not addressed in some fashion like you just

24  said, will it increase the anxiety level of these children?

25      A  It's horrible for them.  Yes.



1    Q  So this is a way to try to avoid that.  Is there -- you

2    did not specifically address in your report what residential

3    parenting, non-residential parenting arrangement Dana would

4    have if he were to move to California.  Currently, under the

5    plan of this Court, he sees the children on Wednesday evenings

6    from 4:00 to 6:00 and every other weekend from Saturday at

7    10:00 to Sunday at 6:00.  Is it your recommendation that, if

8    they move to California and if Dana moves to the Pasadena area,

9    that, that same schedule be followed together with the

10   counseling, et cetera that you would recommend?

11   A  I think that has to be in place if he's local and that

12   he has to be in family systems therapy with the kids.  And

13   maybe they can expand that over time, which even in January, I

14   had hoped to eventually get to a point where they could do an

15   every-other-weekend-type arrangement.

16   Q  All right.  If he chooses not to go to California and

17   to stay here in New Hampshire and the Court allows Katherine to

18   relocate, you've also suggested an alternative residential

19   parenting arrangement.

20   A  I would want the kids to see Dana on their school

21   vacations.  And here, I know what they are, but in California,

22   I really don't know what they are.  But here, it would be,

23   December, they have a break, February and April.  So I would

24   think that, that would be time for them to be able to see their

25   father.



AVTRANZ  eScribers
AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

 1          I would want him to have the regular summer trip to

 2   the Cow Creek hiking adventure that they've done in their

 3   lives.  And I would like him to commit to coming to them and

 4   being present with them so that he can have some relationship

 5   with their schools and their activities on the ground in

 6   California.

 7      Q   Okay.  And you had said something about, on long

 8   weekends, et cetera, you could try to coordinate them around

 9   that long weekend?

10      A   Right.  I think that was the reason that my thought

11   was, in months that there isn't a holiday week, that he come

12   for a long weekend so that at least he could get there by

13   Thursday and have the ability to meet with a therapist on

14   Friday, go to the school or do whatever he could do for that

15   day once a month.

16          MR. FONTAINE:  Give me one minute.

17   BY MR. FONTAINE:

18      Q   Have you had an opportunity -- I think you said this in

19   your report, but did you speak with the counselor at the school

20   that the children attend?

21      A   I did.

22      Q   And her name is Laura Burback (phonetic)?

23      A   Audra --

24      Q   Audra, sorry.

25      A   -- Burback.



AVTRANZ   eScribers
AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1       Q   And what did she say about the children?

2       A   I didn't speak with her once.  I spoke with her

3    multiple times.  G    and S    started at the school and

4    they were quite socially awkward and not used to following a

5    routine.  And she had worked with them for two years, so I

6    thought she was a good person to tell me about them.  But then,

7    when I met with her, I found that they really go down to her

8    office often.  They kind of hang out down in the office.  And

9    so she had the opportunity to meet with them and talk to them

10   most days in their school year.

11      Q   And how did she think over the course of those two

12   years they were doing?

13      A   She was concerned about the children and their real

14   emotional distress of their trying to work out a relationship

15   with their dad.

16      Q   Yeah.  Did she have an opportunity to speak to you

17   about their academic performance?

18      A   Yes.

19      Q   And what did she say about that?

20      A   All of the Albrecht children are very gifted

21   academically.  They're all gifted academically.  The two girls

22   are less interested in being nerds than the two boys and the

23   two girls were not used to doing homework, and having a

24   routine, and sitting, and having demands placed upon them

25   academically.  And so that was a real adjustment, but they have



AVTRANZ ◇ eScribers
AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1   really adjusted well.

2       Q   Now, I know that you've recommended in your decision

3   making that the parties discuss important decisions.  And that

4   would, I guess, include education, but if this Court allows

5   them to relocate to California and Katherine were to discuss

6   with Dana her proposal relative to their schooling there, that

7   is, the girls go to the Gooden School and that C███ be allowed

8   to take classes at the community college, with the idea of

9   going into a four-year college, do you think that's a good

10  plan?

11      A   From what I can see it is, but I think that the parents

12  need to really look at that.  These parents are very able to do

13  that.  They are.  I don't know if they're able to agree with

14  each other, but they're very able to do what's best for their

15  kids.

16          MR. FONTAINE:  Thank you.  No further questions.

17          THE COURT:  Cross-examine?

18                      CROSS-EXAMINATION

19  BY MR. CAULFIELD:

20      Q   Attorney Sternenberg, did you suggest to Dana that he

21  take the children last Christmas to the Orthodox Christian

22  celebration?

23      A   Not to the actual -- he told me that they have a big

24  meal in celebration around Christmas, so I did suggest that.

25      Q   You did or didn't?



1      A   I did.

2      Q   Okay.  You suggested that they go to the Orthodox --

3      A   That's what I said.  Yes.  I did.

4      Q   -- Christian -- okay.  And in your guardian ad litem

5  report, you first recommended that joint decision making, but

6  if they can't agree, Ms. Albrecht makes the call.  And you put

7  it in your report.

8      A   That's what I -- yes.

9      Q   But on the stand, you started thinking that might not

10  be the best idea?

11     A   On the stand, I said that the man with the black robe

12  could make a decision that a third party would be a better

13  tiebreaker.

14     Q   Right, because they haven't -- unfortunately, your own

15  experience you testified to, these parents haven't been able to

16  make a decision on their own.  Right?

17     A   Unfortunately, they do make decisions, and they make

18  good decisions around medical care and other things when they

19  don't realize that they're fighting.  But when they're in the

20  middle of battle, they have to take positions.

21     Q   Not having birth certificates and Social Security

22  numbers for their children, you consider a good decision among

23  other things?

24     A   It's not my life, but --

25     Q   No.  But you think that was a good decision.



AVTRANZ  eScribers
AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1      A   I don't know how to say -- I don't --

2      Q   Okay.

3      A   I think they do now have birth certificates and Social

4  Security numbers are on the way.  That's what I heard, so --

5      Q   Well, I think one of them still doesn't have a birth

6  certificate.

7      A   All right.  My thought is this.

8      Q   Yeah.

9      A   I don't parent for these kids.  I just try to do an

10  overview investigation as to what's in their best interest.

11      Q   So if this history of the case -- and would it be fair

12  -- and we're both guardian ad litems.  Would it be fair to say

13  this is a highly conflicted family law case?

14      A   That would be fair.

15      Q   Okay.  And is it fair to say that there's been a

16  dialectic, a struggle between Ms. Albrecht and Mr. Albrecht

17  regarding just about every single parenting exchange?

18      A   Yeah.

19      Q   And they all take place at the Hollis Police

20  Department?

21      A   Not all of them.

22      Q   Do the majority of them take place at the Hollis --

23      A   Majority, not all of them.

24      Q   Okay.  And is it fair to say that the majority of the

25  ones that take place result in mutual complaints to the police,


AVTRANZ  eScribers
AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

```
 1   police reports being generated -- let me finish the question --
 2   you being provided the police reports, strong lawyer letters
 3   from Attorney Fontaine, strong loyal letters from me, all
 4   copied to you?  Is that a fair statement?
 5        A  I don't think it's every week --
 6        Q  All right.
 7        A  -- because if it were I'd probably pull out my hair.
 8        Q  But once a month, every six weeks, yes.
 9        Q  Okay.  All right.  So what do you think it would look
10   like if Ms. Albrecht moves to California and Mr. Albrecht
11   remains here?  If you could just let me answer the question --
12        A  Well, I don't want you to answer the question.
13        Q  I'm sorry, ask it.
14        A  I want to answer the question.
15        Q  Yeah, but let me ask it.
16        A  I thought it was a question.
17        Q  No.  I haven't finished.
18        A  Okay.
19        Q  Okay.  What do you think it's going to look like?
20        A  Okay.  Now, can I --
21        Q  Now, I'm finished.  Now, you can answer.
22        A  All right.  I think that these children desperately
23   need space.
24        Q  Space?
25        A  Space.
```



1     Q   Different from stability, space now?

2     A   It's not different than stability.

3     Q   Okay.  It was stability in your report.  Right?

4     A   I think these children need peace, and space, and

5  stability --

6     Q   Yeah.

7     A   -- and consistency, and predictability.  And that means

8  I think they need this Court to make an order that's very

9  specific about what happens and not have the parents do

10  whatever they want to do.

11     Q   Space from whom, Attorney Sternenberg?

12     A   Space.

13     Q   Space from whom, from Dad?

14     A   Space from the conflict that they're involved with --

15     Q   Okay.

16     A   -- all of the time.

17     Q   Okay.  Now, explain to me, explain to His Honor, not

18  me -- I'm insignificant here -- how moving Ms. Albrecht and the

19  children to California will stop these two contentious people

20  from contending.

21     A   Okay.

22     Q   Yeah.

23     A   I don't know that it will.

24     Q   Uh-huh.

25     A   I do know, in other cases that I've had in 24 years of



1   doing guardian ad litem work --

2       Q   Yeah.

3       A   -- that, when there is a move, when these people cannot

4   do day-to-day communication, that sometimes it calms down.

5       Q   Yeah.  And thank you.  And based upon your 24 years of

6   experience, does it sometimes go the other way?

7       A   Sometimes.

8       Q   Yeah, yeah, yeah.  What do you think is going to happen

9   in this case?

10      A   I think that the kids really desperately want to go to

11  live with their mother no matter what happens.

12      Q   Yeah.

13      A   And so they're always going to have to deal with their

14  father not feeling that he got the fair end of the shake and

15  that their mother got the --

16      Q   Okay.

17      A   -- you know, one.  And this isn't a win or lose for

18  them.

19      Q   All right.

20      A   I also feel that it would be wonderful if the

21  children's parents were able to look at this, not at each other

22  as a winner and a loser, but at the need for one parent to have

23  support so that she can deal with her medical issues and other

24  issues and be available to these little girls for as long as

25  possible.  But that's not possible in this case.


AVTRANZ    eScribers
AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1       Q   But you do admit in your report you talked about

2    stability?

3       A   I did, I do.

4       Q   Okay.  Now, do you agree with me that there's a

5    substantial chance that, if Ms. Albrecht moves with the

6    children to California, that Dad's going to have less and less

7    contact with the children?

8       A   Not if this Court makes a very strong order about what

9    his contact is and that it's not going to be changed every

10   week.

11      Q   And was there something weak with the Court's order

12   that's been going on for the last year, which hasn't been

13   working?

14      A   The problem with the Court's order in the last year has

15   been that Dana has not been interested in just doing it.  And a

16   lot of times, as a guardian ad litem, I tell people at a

17   temporary stage, "Do have good visits, and use the time, and

18   make them good because then they will get bigger.  Then it will

19   increase."  And in this case, unfortunately, it hasn't worked

20   that way --

21      Q   Okay.

22      A   -- because, every time there's a visit, something

23   occurs that just causes the kids to be unhappy.

24      Q   Let's look at another stability piece.  So Ms. Albrecht

25   has told us all that she's basically terminal.  Correct?


AVTRANZ + eScribers
AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

380

1     A   Yes.

2     Q   Okay.

3     A   That's what she said and that's what her doctor has

4  said.

5     Q   So now -- and we don't have a prognosis of when that

6  sad event will happen.  Right?

7     A   I don't think any of us do, no.

8     Q   All right.  Okay.  So tell me how Ms. Albrecht moving

9  the children, the children I guess have -- three of them --

10  well, there's three children.  Two of them have never lived in

11  California and one lived in California for a year.  Right?

12          THE PETITIONER:  Six months.

13  BY MR. CAULFIELD:

14     Q   Six months -- they're New Hampshire children.  Right?

15     A   The children have lived in New Hampshire.  The two

16  girls have lived in New Hampshire their lives, but they have

17  connections with California because they've been there every

18  year for vacation, on extended vacation.

19     Q   Right.  And the younger boy?

20     A   C█████ has lived out here most of his life.

21     Q   Right.  Okay.  So they're really New Hampshire

22  residents.  You don't want to acknowledge they're New Hampshire

23  residents?

24     A   They're New Hampshire residents.  I don't know why

25  that's relevant to --



1    Q   Okay.  So if Ms. Albrecht may be terminal, and she

2   moves with the children to California, and Dad stays here, how

3   does that give the children stability?

4    A   It's my understanding that Ms. Albrecht has a close and

5   loving relationship with her mother and her sister --

6    Q   Okay.

7    A   -- that her mother is going to support her in her

8   housing --

9    Q   Yeah.

10   A   -- support her in her care for the children --

11   Q   Yeah.

12   A   -- and for herself --

13   Q   Uh-huh.

14   A   -- and that Pasadena is her environment.  That's where

15   she grew up.

16   Q   Right.

17   A   It's my understanding that, that would be, from my

18  position, a very good stabilizing thing for these kids, whereas

19  right now, Ms. Albrecht doesn't have income, cannot afford the

20  house that they live in, cannot afford the travel that she's

21  doing right now to try to get treatment, and doesn't have any

22  support.  So the support and the stability that you're talking

23  about, I think, is in California.  And if for some reason these

24  children go from 13 to 16 with their mother and then their

25  mother passes away --



AVTRANZ   eScribers
AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1       Q   Right.

2       A   -- I will still feel that that's better for the

3   children, to have had that time of stability --

4       Q   So --

5       A   -- at 10 to 13 and 16 to 19.

6       Q   Right.  Okay.  So let me parse this into two pieces,

7   Attorney Sternenberg.  First, you feel that the children will

8   be stable if either they're 3,000 miles away from Dad or -- let

9   me finish -- Dad moves to California.  Correct?

10      A   I think the children will be more stable with their

11  mother in California than they are now.

12      Q   Okay.

13      A   And I think that I would hope that Dana, not having a

14  lot of significant connections right now to New Hampshire,

15  would move and be in California near his children.  That would

16  be the best thing in my mind to happen in this case.

17      Q   Okay.  Now, if Mother is unable to take care of the

18  children, wouldn't you anticipate that Dad is going to say,

19  "Give me back my children"?

20      A   He needs to do some work so that he can say that.

21      Q   Isn't it really - isn't really what you're foreseeing

22  is that Ms. Albrecht's mother seek a guardianship over these

23  children in California?

24      A   I have --

25      Q   Isn't that really what you're seeking?



AVTRANZ ◆ eScribers
AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

```
 1        A  No.  And I have not any --

 2        Q  No?

 3        A  I haven't gone near that.  I don't even know where that

 4   comes from.  That hasn't been asked of me.

 5        Q  Okay.  So let me ask you now, let's assume that, sad as

 6   it is, Ms. Albrecht dies in California.

 7        A  Okay.

 8        Q  And maybe she doesn't die in the two years you think.

 9   Maybe she's actually iller (sic) than you think and she does

10   sooner.  Okay?

11        A  Okay.

12        Q  Okay.  Now, the children are in California.  Dad is

13   here.  What do you think Ms. Albrecht's mother is going to do

14   next?

15             MR. FONTAINE:  Your Honor, I object.  That's --

16             THE COURT:  Sustained.

17             MR. FONTAINE:  -- irrelevant.

18             MR. CAULFIELD:  Your Honor, I think on the issue

19   of --

20             THE COURT:  The objection is sustained.

21   BY MR. CAULFIELD:

22        Q  Would it be --

23             THE COURT:  We all could get hit by a bus when we

24   leave the courtroom today also.  The objection is sustained.

25   BY MR. CAULFIELD:
```



AVTRANZ  eScribers
AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1    Q  Are you troubled by these children being in the middle

2  of a parenting dispute?

3          THE COURT:  Are you talking to me?

4          MR. CAULFIELD:  No.

5          THE COURT:  Well, you're looking at me.

6          MR. CAULFIELD:  Well, because you're the most

7  important person here, Judge.

8          THE COURT:  No.  I'm not.  The most important people

9  are here at the -- the most important people in this case

10  aren't in here today.  Ask your question of the guardian ad

11  litem.

12          MR. CAULFIELD:  Yeah.  I really -- what it was --

13  okay.

14  BY MR. CAULFIELD:

15    Q  Do you think the effect that these children are in the

16  middle of a parenting dispute is a problem?

17    A  I think the fact that the children have been exposed to

18  their parents' rages, and fighting, and blaming, and

19  manipulating is a problem.

20    Q  Don't you foresee that, if Ms. Albrecht dies and she's

21  in California, you're going to have another parenting dispute

22  with the children?  You don't foresee that as a guardian ad

23  litem?

24          MR. FONTAINE:  Your Honor, I'm going to object.

25          THE COURT:  Sustained.



```
 1          MR. CAULFIELD:  Okay.

 2   BY MR. CAULFIELD:

 3      Q  Is spying a big issue in this case, Attorney

 4   Sternenberg?

 5      A  It's an issue.  It's not a big issue, but it's

 6   something that I addressed, yes.

 7      Q  Right.  How has it affected the children in that the

 8   mother thinks that the dad is spying on her?  And one of the, I

 9   guess, boys thinks that their dad is spying on them.  How has

10   that affected this case?

11      A  It's not one of the boys.  It's both of the boys.

12      Q  So you're saying that the older boy --

13      A  I met with P      .

14      Q  -- in college says that Dad is spying on the family?

15      A  Yes.  He did not want to bring his computer home and,

16   when he did and he had to use it at Dad's house, he was going

17   wipe it before he took it home.

18      Q  Is that in your report?

19      A  No.

20      Q  I see.

21      A  You just asked me a question about how it's affected

22   the children.

23      Q  I see.  So you believe that Dana is spying on

24   everybody?

25      A  I believe from what my investigation has led me to that
```


AVTRANZ ◆ eScribers
THE COURT RECORD ONLINE
AV/Tranz, an eScribers Company
www.avtranz.com · www.escribers.net · (800) 257-0885

1  he's definitely able to spy on the children.

2      Q  But able -- we're all able to do things, Attorney

3  Sternenberg.  That doesn't mean we're doing them.  Right?

4      A  Sure, no.

5      Q  No.  Okay.  No.

6      A  If you were mistaken, and it turned out that Dana

7  wasn't spying on anyone, and that this was either a fantasy of

8  Ms. Albrecht's or maliciousness of Ms. Albrecht, would that

9  change your opinion in this case in any way?

10     A  It won't change my recommendations to this Court.

11     Q  I see.

12     A  No.  It won't.

13         MR. CAULFIELD:  Okay.  One moment, please.  I think

14  I'm done.

15     (Counsel confer)

16         MR. CAULFIELD:  I'm done.  Thank you.

17         THE COURT:  You may step down.

18         MR. CAULFIELD:  Thank you, Attorney Sternenberg.

19         THE WITNESS:  Thank you, Your Honor.

20         MR. FONTAINE:  Your Honor, could we take a five-

21  minute break?

22         THE COURT:  We can.

23     (Recess taken from 2:32 p.m. to 2:40 p.m.)

24         THE COURT:  Next witness?

25         MR. FONTAINE:  Yes.  In fact, I'm going to call





# SIERRA MADRE POLICE

**242 WEST SIERRA MADRE BOULEVARD**
**SIERRA MADRE, CA 91024**
**626-355-1414**

| INCIDENT REPORT | |
|---|---|
| CASE NUMBER **180537** | SUPPLEMENT NUMBER |
| CASE TYPE **SUSP CIRCS** | CAD EVENT NUMBER **1808280005** |
| REPORTING OFFICER **10906 - BAILEY, KYLE** | REPORT DATE **08/28/2018** |

## INCIDENT

| LOCATION | | | | | | OCCURRED | DATE | TIME | DAY |
|---|---|---|---|---|---|---|---|---|---|
| PREMISE NAME | | | | | | ON OR FROM | 08/28/2018 | 05:55 | TUE |
| RD **1** | | | | JURISDICTION **SMPD** | | TO | 08/28/2018 | 05:55 | TUE |
| | | | | | | REPORTED | 08/28/2018 | 05:55 | TUE |

| NATURE OF INCIDENT | | | |
|---|---|---|---|
| ☐ ALCOHOL RELATED | ☐ SENIOR CITIZEN | ☐ HATE / BIAS | ☐ ARSON |
| ☐ CHILD ABUSE | ☐ GANG RELATED | ☐ OFFICER ASSAULT | |
| ☐ DRUG RELATED | ☐ DOMESTIC VIOLENCE | ☐ JUVENILE | |

| RELATED CASE NUMBERS |
|---|
| |

## SYNOPSIS

R/P ▓▓▓▓▓ responded to the Sierra Madre Police Department to report unknown person(s) attempting to break into her residence on Alegria. SMPD Officers were dispatched to the location and during their investigation discover inconsistencies and are unable to substantiate an attempt burglary that had occurred. Due to the nature of the incident, a report is taken for documentation purposes only.

THIS IS A TRUE AND ACCURATE COPY OF THE ORIGINAL DOCUMENT MAINTAINED IN THE FILES OF THE SIERRA MADRE POLICE DEPARTMENT
NAME H. Amos ID 130 DATE 4-3-19
TITLE SERGEANT
RELEASED TO: DANA ALBRECHT

## ADDITIONAL INFORMATION

| ☐ USE OF FORCE | ☐ MEDICALLY TREATED | ☐ CITY PROPERTY INVOLVED |
|---|---|---|
| ☐ FIREARM INVOLVED | | |
| ABC ESTABLISHMENT | | |

## STATUS

| CASE STATUS **CLOSED DET** | CASE STATUS DATE **01/15/2019** | DISPOSITION **INFO** | DISPOSITION DATE **01/15/2019** | APPROVAL **130 - AMOS, HENRY** | APPROVAL DATE **08/29/2018** |
|---|---|---|---|---|---|

| INCIDENT REPORT | SIERRA MADRE POLICE DEPARTMENT | CASE NUMBER<br>180537 |
|---|---|---|

**OTHERS**

| ENTRY NO | INVOLVEMENT | NAME-LAST FIRST MIDDLE |
|---|---|---|
| 1 | RP | |

| HOME ADDRESS | | MAILING ADDRESS |
|---|---|---|

**ADDITIONAL INFORMATION**

☐ TRANSIENT          ☐ HOMELESS          ☐ FOREIGN

| INCIDENT REPORT | SIERRA MADRE POLICE DEPARTMENT | CASE NUMBER 180537 |
|---|---|---|

**NARRATIVE**

On 8-28-18 at approximately 0555 hours, Sgt. Amos #130 and Officer Deem #10831 were dispatched to [redacted] regarding a possible burglary in progress. The R/P, [redacted] came into the SMPD lobby to report unknown suspect(s) attempted to force their way into her home. [redacted] said her son, [redacted] was still at the location, and she was concerned for his welfare. Officer Berry #117 and I were in the process of starting our day shift, when Sgt. Amos requested our assistance at the location. Officer Berry and I responded to the location to assist. [redacted] also left the lobby and met us at her residence.

Upon our arrival at the location, [redacted] home was checked. Officers made contact with [redacted] and also rendered the location safe. During our check of the residence we were unable to locate any signs of forced entry or tampering that would suggest an attempt burglary occurred. We also noticed that the home was fortified with numerous burglary like deterrents, such as several locking devices on all the doors and windows, local alarms, and surveillance cameras. The cameras were set up to several live-feed monitors inside the home and did not record.

I spoke to [redacted] about the incident and she provided the following information:

[redacted] said she and her three children were sleeping inside of her home. All doors and windows at the location were locked and secured. At approximately 0530 she heard the sounds of something aggressively impacting the east facing door of her residence. She went to check on the disturbance and determined somebody was outside attempting to force their way in. She said she also heard the sound of a drill being operated and feared somebody was going to use the drill on the door locks in an attempt to gain entry. As a result, she ran into [redacted]'s bedroom and woke him up. [redacted] said that [redacted] screamed in fear when he realized somebody was attempting to gain access inside. He also turned on a light in the kitchen. According to [redacted] these actions caused the Suspect(s) to stop their activities and flee the location. [redacted] said that she and [redacted] exited the home and checked around the home. She then told [redacted] to go back inside, while she drove to the Sierra Madre Police Department to report the incident.

[redacted] said she believed the suspect(s) were somehow affiliated with her soon to be ex-husband, "Dana Albrecht." She stated that Dana lives in the state of New Hampshire and has essentially been stalking her. She said this was the reason she had so many monitoring devices placed in and around the house. She also stated there have been several other crime reports made with the Sierra Madre Police Department concerning similar incidents.

I had Dispatcher Taylor #106 check for prior calls for service involving [redacted] and her residence. I determined there were no prior Police reports taken, however, she had made similar claims in calls for service. I also had [redacted] walk with me around the property to determine if anything was out of place or had been tampered with. [redacted] was unable to show me anything around the property that was either freshly disturbed, or was missing. She also told me none of her video monitoring devices record because "Dana" had the expertise to disable them and had "bugged" her house. When I asked her why she felt Dana was responsible for the incident today, she told me that it was because they were going through a divorce. She also stated she had recently testified against him in a criminal proceeding which she refused to elaborate further on. [redacted] said she desired prosecution if we were able to identify Suspect(s) and substantiate a crime.

Officer Berry spoke with [redacted] children and obtained statements from them. He discovered inconsistencies in their statements. See his supplemental report for further details.

| INCIDENT REPORT | SIERRA MADRE POLICE DEPARTMENT | CASE NUMBER 180537 |
|---|---|---|

Based on the totality of the circumstances, a report was taken for documentation purposes only and we were unable to confirm a crime had occurred. ▉▉▉▉ was provided with additional information to help her with her situation, including details with how to obtain a restraining order and considerations of either a third party alarm monitoring system, or upgrading her current surveillance system so that it records.

NFI

Sgt. K. Bailey #10906



# SIERRA MADRE POLICE

**242 WEST SIERRA MADRE BOULEVARD**
**SIERRA MADRE, CA 91024**
**626-355-1414**

## SUPPLEMENTAL INCIDENT REPORT

| CASE NUMBER | SUPPLEMENT NUMBER |
|---|---|
| 180537 | 1 |
| CASE TYPE | CAD EVENT NUMBER |
| SUSP CIRCS | 1808280005 |
| REPORTING OFFICER | SUPPLEMENT DATE |
| 117 - BERRY, KENNETH | 08/28/2018 |

## INCIDENT

| LOCATION | | DATE | TIME |
|---|---|---|---|
| | | 08/28/2018 | 17:00 |

| PREMISE NAME | | | |
|---|---|---|---|

| RD | | | JURISDICTION |
|---|---|---|---|
| 1 | | | SMPD |

## STATUS

| WORK FLOW STATUS | APPROVAL | APPROVAL DATE |
|---|---|---|
| APPROVED | 10906 - BAILEY, KYLE | 08/29/2018 |

## OTHERS

| ENTRY NO | INVOLVEMENT | NAME: LAST, FIRST, MIDDLE |
|---|---|---|
| 2 | C | A_____, C_____ |

| HOME ADDRESS | MAILING ADDRESS |
|---|---|

COMMENT

| ENTRY NO | INVOLVEMENT | NAME: LAST, FIRST, MIDDLE |
|---|---|---|
| 3 | C | A_____, S_____ |

| HOME ADDRESS | MAILING ADDRESS |
|---|---|

COMMENT

| ENTRY NO | INVOLVEMENT | NAME: LAST, FIRST, MIDDLE |
|---|---|---|
| 4 | C | A_____, G_____ |

| HOME ADDRESS | MAILING ADDRESS |
|---|---|

COMMENT

## MEDIA LIST REPORT

| TITLE | MEDIA DATE | ENTERED DATE |
|---|---|---|
| | 08/29/2018 10:50 | 08/29/2018 10:49 |

CONTEXT
INCIDENT
COMMENTS

| TITLE | MEDIA DATE | ENTERED DATE |
|---|---|---|
| | 08/29/2018 10:50 | 08/29/2018 10:50 |

CONTEXT
INCIDENT
COMMENTS

| TITLE | MEDIA DATE | ENTERED DATE |
|---|---|---|
| | 08/29/2018 10:50 | 08/29/2018 10:50 |

CONTEXT
INCIDENT
COMMENTS

| TITLE | MEDIA DATE | ENTERED DATE |
|---|---|---|
| | 08/29/2018 10:50 | 08/29/2018 10:50 |

CONTEXT
INCIDENT
COMMENTS

| TITLE | MEDIA DATE | ENTERED DATE |
|---|---|---|
| | 08/29/2018 10:50 | 08/29/2018 10:50 |

CONTEXT
INCIDENT
COMMENTS

| TITLE | MEDIA DATE | ENTERED DATE |
|---|---|---|
| | 08/29/2018 10:50 | 08/29/2018 10:50 |

CONTEXT
INCIDENT
COMMENTS

| TITLE | MEDIA DATE | ENTERED DATE |
|---|---|---|
| | 08/29/2018 10:51 | 08/29/2018 10:51 |

CONTEXT
INCIDENT
COMMENTS

| TITLE | MEDIA DATE | ENTERED DATE |
|---|---|---|
| | 08/29/2018 10:51 | 08/29/2018 10:51 |

CONTEXT
INCIDENT
COMMENTS

| TITLE | | MEDIA DATE 08/29/2018 10:51 | ENTERED DATE 08/29/2018 10:51 |
|---|---|---|---|
| CONTEXT | | | |
| INCIDENT | | | |
| COMMENTS | | | |

| TITLE | | MEDIA DATE 08/29/2018 10:51 | ENTERED DATE 08/29/2018 10:51 |
|---|---|---|---|
| CONTEXT | | | |
| INCIDENT | | | |
| COMMENTS | | | |

| TITLE | | MEDIA DATE 08/29/2018 10:52 | ENTERED DATE 08/29/2018 10:52 |
|---|---|---|---|
| CONTEXT | | | |
| INCIDENT | | | |
| COMMENTS | | | |

| TITLE | | MEDIA DATE 08/29/2018 10:52 | ENTERED DATE 08/29/2018 10:52 |
|---|---|---|---|
| CONTEXT | | | |
| INCIDENT | | | |
| COMMENTS | | | |

| TITLE | | MEDIA DATE 08/29/2018 10:52 | ENTERED DATE 08/29/2018 10:52 |
|---|---|---|---|
| CONTEXT | | | |
| INCIDENT | | | |
| COMMENTS | | | |

## NARRATIVE

On Tuesday, August 28, 2018, at 6:11 a.m., I was dispatched to ▮▮▮▮▮▮ to assist Sergeant Kyle Bailey #10906, Sergeant Henry Amos #130, and Officer Mark Deem #10831 with a suspicious circumstances call for service.

I arrived and I met with Sgt. Bailey who requested that I get statements from the three children.  I spoke to C▮▮ A▮▮▮▮, who told me at about 5:30 a.m., he was awakened by his mother ▮▮▮▮▮▮ ▮▮▮▮▮▮ because she told him she heard someone at the front door.  C▮▮ said he and his mother went outside and walked around the house, but they did not notice anything unusual.  C▮▮ stayed home while his mother and two sisters, S▮▮ A▮▮▮▮ and G▮▮ A▮▮▮▮, drove to the police department.  He said he did not see any cars parked behind his mother's car in the driveway, any cars parked in the street or any persons on the property.

I spoke to S▮▮ Albrecht, who told me at about 5:30 a.m., she was asleep in the same room as her sister, G▮▮.  She heard her mother "freaking out" and someone scream.  Her mother told her to lock the front door while she (mother) and her brother (C▮▮) went to check outside.  S▮▮ said after she locked the front door, she saw on the camera monitor, which was on the counter next to the front door, lights come on from a car parked behind mom's car in the driveway, reverse out of the driveway

and drive westbound. She said she saw a second car that was parked in front of the house drive eastbound. S▮▮▮ said she could not describe either car and she could not describe anyone who was inside either car.

I then spoke to G▮▮ A▮▮▮▮, who told me at about 5:30 a.m., she was asleep in her bedroom and she was awakened by her mother "freaking out" and her brother's scream. She stood at the front door with her sister, S▮▮▮, while her mother and brother went outside. She thought she saw a car back out of the driveway while she was looking at the camera monitor. She could not describe the car and she did not describe anyone inside the car.

At the request of Sgt. Bailey, I took thirteen (13) digital colored photographs of the property, which were attached with this supplemental report.

## STATE OF NEW HAMPSHIRE

9th Circuit-Family Division-Nashua

Dana Albrecht and Katherine Albrecht

659-2016-DM-00288

2019 JUN 21  P 3: 52

### Petitioner's Motion for Reconsideration

Now comes Dana Albrecht, Petitioner, by and through his attorney, requests that this honorable court reconsider its order dated May 30, 2019, and states:

1. This *Motion for Reconsideration* is being filed because Petitioner believes that this honorable court has misapprehended some of the evidence submitted during trial on May 9, 2019, as well as certain points of law and fact.

2. The trier of fact considers not only the facts, but the reasonable inferences from those facts. Consequently, Petitioner believes this honorable court has not correctly applied the law, and has held Petitioner to a higher standard of proof than "more likely than not."

3. It is not frivolous to question whether the court has made a mistake, or misapprehended the facts or reasonable inferences from these facts.

4. It is also required by our rules that a motion for reconsideration be filed in order to preserve issues for appellate review.

### Telephone Contact

5. In its order, this court states that "Petitioner … has failed to prove his allegations that Respondent has refused to allow the children to telephone, text, or write."

6. However, RSA 461-A:6, I(f) requires that the court shall consider "The support of each parent for the child's contact with the other parent as shown by allowing and promoting such contact." RSA 461-A:6, I(f) requires that the court shall consider "the ability and disposition of each parent to foster a positive relationship and frequent and continuing physical, written, and telephonic contact with the other parent."

7. Pursuant to the transcript of the hearing of May 9, 2019 (henceforth *transcript*), Petitioner reminded this court of "Katherine's own sworn pleading in which she told them the privacy implications, quote, unquote, of them using phones [owned] by their father." (*see transcript at 11*).

345

8. In Respondent's own sworn pleading (document #244), Respondent admitted (see paragraphs 11 & 12) that:

> When S███ and G███ returned from Christmas [December 2017] with new phones from their father, Ms. Albrecht said they were welcome to use them. However, since they had previously told her they did not want their father monitoring their communications, she felt it important to tell them the privacy implications of using phones that are owned by him. She explained that all phones (except pre-paid phones) allow the account holder to view usage logs, which include the time, date, phone number, and duration of all phone calls and SMS messages sent or received, although they cannot listen to the calls or read the texts themselves.
>
> The girls were unhappy to learn that their father, as the account holder, could determine who they called and texted on their new phones. They felt tricked that their father had not discussed it with them, and were concerned that he would use the phones to monitor them and then abuse the information. Both girls emphatically stated they no longer wanted the phones. Ms. Albrecht reminded them that their father had given them phones to regularly speak to him, not call their friends, and said they had to keep them and use them to speak to him. The girls grudgingly agreed.

9. The undisputed evidence is that Respondent caused "both girls to emphatically state they no longer wanted the phones" provided by Petitioner. The court's claim in paragraph 1 of its order that "the allegations are simply speculation or suspicion" is inaccurate.

10. The reasonable inference from the fact that Dr. Albrecht told their children about the "privacy implications of using phones that are owned by [their father]" was that Dr. Albrecht caused the children to be convinced of Dr. Albrecht's own paranoid delusions, and also caused the children to be frightened and distrustful of their father.

11. To act accordingly is alienation. The most common cause of parental alienation is one parent wishing to exclude the other parent from the life of their child, though family members or friends, as well as professionals involved with the family (including psychologists, lawyers and judges)[1].

12. Parental alienation is the process, and the result, of psychological manipulation of a child into showing unwarranted fear, disrespect or hostility towards a parent and/or other family members. It is a distinctive form of psychological abuse and family violence, towards both the child and the rejected family member, that occurs almost exclusively in association with family separation or divorce, particularly where legal action is involved.[2]

13. Parental alienation often leads to the long-term, or even lifelong, estrangement of a child from one parent and other family members, and, as a significant adverse childhood experience and

---

1    See https://en.wikipedia.org/wiki/Parental_alienation (internal citations omitted.)
2    Id.

form of childhood trauma, results in significantly increased lifetime risks of both mental and physical illness.[3]

14. The court also states in paragraph 7 of its order that Petitioner "has not proven that Respondent does not allow the children to turn on their phones or willfully interferes with any calls."

15. Petitioner observes that it is not necessary for Respondent to have done so, as she long ago caused caused "both girls to emphatically state they no longer wanted the phones" provided by Petitioner.

## The Sierra Madre Police Incident on August 28, 2018

16. On September 1, 2017, this court permitted Respondent to relocate with their minor children to Pasadena, CA. Respondent represented that she and their children would reside with Respondent's mother, Ms. Elaine Hodgkinson, at Ms. Hodgkinson's residence at 2610 Deodar Circle, Pasadena, CA.

17. In March 2018, Respondent and their children began spending time in a second home at 730 W Alegria Ave, Sierra Madre, CA. *See Transcript at 95-96.*

18. On August 28, 2019, at approximately 0500 hours, Sgt. Amos (#130) and Officer Deem (#10831) of the Sierra Madre Police Department were dispatched to Respondent's home at 730 W Alegria Ave, Sierra Madre, CA as a consequence of Respondent reporting a burglary in progress. Officer Kenneth Berry (#117) was then dispatched at 6:11 am to assist Sgt. Bailey (#10906), Sgt. Amos, and Ofc. Deem. The relevant police report (#180537) was admitted into evidence as Petitioner's "Exhibit 2."

19. On August 28, 2019 Petitioner was unaware that Respondent and their children had moved. Respondent did not disclose to Petitioner that she and their children had moved to Sierra Madre, CA until January 2, 2019, nine months later. *See Transcript at 46.*

20. Respondent reported to the Sierra Madre Police that on Tuesday, August 29, 2019, at approximately 5:30 a.m. she heard the sounds of something aggressively impacting the east facing door of the residence. Respondent reported that she went to check on the disturbance and also reported that somebody was outside attempting to force their way in.

21. Respondent said she also heard the sound of a drill being operated and feared somebody was going to use the drill on the door locks in an attempt to gain entry.

22. As a result, Respondent ran into C███'s bedroom and woke him up. Respondent said that C███ screamed in fear when he realized somebody was attempting to gain access inside. C███ also turned on a light in the kitchen. According to Respondent, these actions caused the suspect(s) to stop their activities and flee the location.

3    *Id.*

23. Respondent said she believed the suspect(s) were somehow affiliated with Petitioner. She said this was the reason she had so many monitoring devices placed in and around the house. She also stated there have been several other crime reports made with the Sierra Madre Police Department.

24. ==Respondent, however, was unable to show the police anything around the property that was either freshly disturbed or was missing.==

25. Officer Kenneth Berry (#117) reported[4] that:



> *I arrived and I met with Sgt. Baily who requested that I get statements from the three children. I spoke to C___ A___ who told me that* ==*at about 5:30 a.m., he was awakened by his mother Katherine Albrecht because she told him she head someone at the front door.*== *C___ said he and his mother went outside and walked around the house, but they did not notice anything unusual. C___ stayed home while his mother and two sisters, S___ A___ and G___ A___, drove to the police department. C___ said he did not see any cars parked behind his mother's car in the driveway, any cars parked in the street, or any persons on the property.*

> *I spoke to S___ A___, who told me at about 5:30 a.m.,* ==*she was asleep in the same room as her sister, G___. S___ heard her mother "freaking out" and someone scream.*== *Respondent told S___ to lock the front door while Respondent and C___ went to check outside. S___ said after she locked the front door, she* ==*saw on the camera monitor,* which was on the counter next to the front door, lights come on from a car parked== *behind mom's car in the driveway, reverse out of the driveway, and drive westbound. She said she saw a second car that was parked in front of the house drive eastbound. S___ said she could not describe either car and she could not describe anyone who was inside either car.*

26. ==The police further noted that Respondent's extensive surveillance system was non-operational and could not record.== Respondent told the police that the reason she had so many monitoring devices placed in and around the house was because Petitioner, who lives in New Hampshire, had "essentially been stalking her." ==Respondent told the police that none her video monitoring devices record because Petitioner had the expertise to disable them and had "bugged" her house.==

27. Consequently, ==S___ reported to the Sierra Madre police that S___ "saw" events occur on a non-operation camera monitor.==

28. The reasonable inference from these facts is that Dr. Albrecht has caused their daughter S___ to be convinced of Dr. Albrecht's own paranoid delusions.

29. Officer Kenneth Berry (#117) also reported[5] that:

---

4       See the police report in evidence.

5       *Id.*

> *I then spoke to G██ A████, who told me at about 5:30 a.m., ==she was asleep in her bedroom and she was awakened by her mother "freaking out" and her brother's scream.== She stood at the front door with her sister, S████, while her mother and brother went outside. She thought she saw a car back out of the driveway while she was looking at looking at the camera monitor. She could not describe the car and she did not describe anyone inside the car.*

30. Consequently, G██ reported to the Sierra Madre police that G██ "thought she saw" events occur on a non-operation camera monitor.

31. The reasonable inference from these facts is that Dr. Albrecht has caused their daughter G██ to be convinced of Dr. Albrecht's own paranoid delusions.

32. ==The Sierra Madre Police further documented that Officer Baily discovered "inconsistencies" in the children's statements.==

33. ==Dr. Albrecht "heard" the "sound of a drill, … fearing that somebody was going to use the drill on the door locks in an attempt to gain entry," woke up screaming, and caused their children to report that she was "freaking out." Dr. Albrecht then drove to the police station with S██ and G██, all while blaming Petitioner for this incident.==

34. Respondent testified that the Sierra Madre Police Report accurately characterized these events. *See transcript at 161-164.*

35. The reasonable inference from these facts is that Respondent has caused the children to be frightened and distrustful of their father. To act accordingly is alienation.

### Paragraphs 10 and 13 of the court's order.

36. Petitioner acknowledges that "the parties' two youngest children have a problematic relationship with Petitioner at times."

37. However, the court claims (paragraph 10) that "Petitioner's actions and conduct is the major contributor to these circumstances," and (paragraph 13) "any estrangement that exists between Petitioner and his two youngest daughters is largely the result of his actions." Petitioner continues to deny this.

38. ==The court did not explain how Petitioner's actions contributed to the Sierra Madre Police Incident, or how Petitioner's actions caused their children to "to emphatically state they no longer wanted the phones" provided by Petitioner.==

39. Petitioner also testified at trial on May 9, 2019 that more recently he had not been able to contact his daughters S██ or G██ at all since Christmas in 2018. *See Transcript at 8.* This is not disputed. By a reasonable inference, consequently Petitioner's actions since Christmas 2018 could not in any way have contributed to his problematic relationship with their daughters.

40. The court should have explained how Respondent's actions have contributed to these circumstances.

## Education Decisions

41. The court granted Dr. Albrecht the final authority to make educational decisions for the parties' children in the event the parties do not agree. This has amounted to de-facto sole-decision making authority exercised by Dr. Albrecht, without any participation by Petitioner.

42. Petitioner has previously advised this court that it should refer to In the Matter of Kurowski & Kurowski, 161 NH 578 (2011) for guidance, most recently testifying that "I'd like the Judge to read sort of about the Cowapowski (phonetic) case in the pleadings." *See transcript at 55.*

43. Paragraph 5 of the court's order notes that:

> *In the narrative regarding the Parenting Plan (doc. 176) the court was reluctant to issue and order for sole decision-making due to the potential that the party with such authority would abuse it. The conduct of the parties and these proceedings since the issuance of that order has reinforced that finding.*

44. The party to whom the court gave more decision making authority is Dr. Albrecht. The court has found this decision making authority has been abused. By a logical necessity, the court has found that Dr. Albrecht has abused her decision making authority.

45. Respondent also testified that decisions concerning counseling for the children do not need to be made jointly in California. *See transcript at 166.* She has refused to cooperate with Petitioner concerning joint decision making for counseling for their children.

46. The only remedy the court has ordered is to require that "Respondent shall ensure Petitioner is listed as an emergency contact on all the children's school and health records."

47. This ineffective remedy in no way curtails Dr. Albrecht's abuse of her de-facto sole-decision making authority.

## Counseling

48. On September 1, 2017, Petitioner requested that this court "order the parties and their children to attend Family Systems Therapy; or as the parties otherwise agree." *See Petitioner's Verified Motion for Reconsideration (document #180), Prayer (H).*

49. In its order dated October 2, 2017, this court denied Petitioner's request.

50. On May 9, 2019, Respondent testified that their daughter S███ now refuses to see a counselor. *See transcript at 154.*

51. In its most recent order, this court has re-iterated that it will not "order the parties and their children to attend Family Systems Therapy; or as the parties otherwise agree," by stating that "there is no order the court can issue that will ease the tension and utter disdain these parties have for one another."

52. Petitioner has previously raised the issue that high-conflict divorce is highly correlated with one or both parents having a "cluster B" personality disorder, such as borderline or narcissistic personality disorder. He wishes to do so again here.

53. Mr. Albrecht's treating therapist, Dr. Hildreth Grossman, has not diagnosed Mr. Albrecht with any personality disorder.

54. The court did not order any form of court-ordered counseling or mental health evaluation for either of the parties or their children. Based upon the facts about and the reasonable inferences thereof, the court should have done so.

## Frequent and continuing contact between each child and both parents

55. RSA 461-A:6, I(l) requires that this court consider whether its parenting plan and subsequent orders have supported "frequent and continuing contact between each child and both parents" pursuant to the policy of the state regarding the determination of parental rights and responsibilities described in RSA 461-A:2.

56. Since the court issued its *Final Parenting Plan*, Petitioner has had a total of 38 days of parenting time with S███ and G███ from September 1, 2017, to the present time, a period of over one and a half years. *See document #322, paragraphs 39-42.*

57. Petitioner testified at trial on May 9, 2019 that more recently he had not been able to contact his daughters S███ or G███ at all since Christmas in 2018. *See Transcript at 8.*

58. Respondent has caused their daughters S███ and G███ to have separate school vacations by enrolling them, against Petitioner's wishes, in two different private schools. Neither private school's vacation schedule comports with the public school vacation schedule where their children reside. *See Transcript at 55.*

59. The court's present Parenting Plan does not "frequent and continuing contact between each child and both parents." The court has not amended its Parenting Plan. Based upon the facts above and the reasonable inferences thereof, the court should amend its Parenting Plan to support "frequent and continuing contact between each child and both parents."

## Heinrich and Curotto, 160 NH 650 (2010)

60. Petitioner has been unemployed for the duration of these proceedings, and remains so.

61. Respondent is currently on SSDI.

62. This court has found the parties cannot effectively communicate.

63. In Heinrich and Curotto, 160 NH 650 (2010), our Supreme Court noted that the Derry Family Division trial court:

> worried that the Florida parenting plan "would require significant air travel, which involves a cost factor that the parties may or may not be able to realistically afford, as well as requiring the parties to effectively communicate, which they have been unable to do so to date."

when it upheld the trial court's decision to deny a mother's request to relocate their family's minor children to Florida.

64. Consequently, the court's current *Parenting Plan* is not consistent with Heinrich in light of how well the parties can "effectively communicate" and whether they can "realistically afford significant air travel."

## Tomasko v. Dubuc, 145 NH 169, 172 (2000)

65. In paragraph 10 of its order denying P*etitioner's Motion to Amend the Parenting Plan (document #297)*, this court did not properly examine the factors set forth in Tomasko v. Dubuc, 145 NH 169, 172 (2000), which include:

(1) each parent's reasons for seeking or opposing the move; (2) the quality of the relationships between the child and the custodial and noncustodial parents; (3) the impact of the move on the quantity and quality of the child's future contact with the noncustodial parent; (4) the degree to which the custodial parent's and child's life may be enhanced economically, emotionally, and educationally by the move; (5) the feasibility of preserving the relationship between the noncustodial parent and child through suitable visitation arrangements; (6) any negative impact from continued or exacerbated hostility between the custodial and noncustodial parents; and (7) the effect that the move may have on any extended family relations.

## The Family's Medical Needs and RSA 461-A:6, I(b)

66. In determining the best interests of the child, RSA 461-A:6, I(b) requires that the court consider "the ability of each parent to assure that the child receives adequate food, clothing, shelter, medical care, and a safe environment."

67. Respondent did not allow any dental treatment at all for their daughter G███ for over fifteen months, causing G███ to have eleven dental caries ("cavities") and require costly sedation dentistry.

68. Respondent Dr. Albrecht has been diagnosed with stage IV breast cancer with brain metastases.

69. Respondent testified that her mother, Ms. Elaine Hodgkinson, has stage IV ampullary cancer, which is related to pancreatic cancer, and that Respondent spends "a considerable amount [of time] taking care of my mom." *See transcript at 95-96*. Respondent did not disclose this information to Petitioner prior to trial. Respondent also did not elaborate on her mother's prognosis, but as this is a terminal condition, it does not appear to be positive.

70. Respondent also testified that her sister, Ms. Laura Minges, "is disabled," and "had a series of health problems." *See transcript at 95-96*.

71. Respondent has been locking their children, alone, inside her residence at 730 W Alegria Ave in Sierra Madre, CA with zip ties while traveling to 2610 Deodar Circle in Pasadena, CA to care for her mother. *See transcript at 144-146*.

72. It is unclear, under these circumstances, who is caring for the parties' children.

## Petitioner is unemployed

73. Petitioner has not worked outside the parties' home or family business since 2004 and is presently unemployed. Petitioner submitted to this court, as evidence, a report by his treating therapist, Dr. Hildreth Grossman. In her report dated May 6, 2019 , Dr. Grossman stated:

> *I have seen Mr. Albrecht in psychotherapy since April 11, 2016. He came to therapy under severe stress caused by marital conflicts. At the time, his wife had taken out a restraining order after having the police come and remove him from their home. That began a series of court battles and police filings by Mrs. Albrecht in which Mr. Albrecht had to continually defend himself. The outcome of these accusations has been to exonerate Mr. Albrecht. Clearly the effect of having to continually defend himself against unwarranted accusations has exacerbated the stress, anxiety and depression Mr. Albrecht has struggled with through this process.*

74. Dr. Grossman also stated:

> *Mr. Albrecht's stress and strain emotionally and financially have made it difficult if not impossible to seek adequate employment. He has relied on the generosity of his father to support him through his tribulations. The oldest Albrecht son, P⬛ has chosen to spend time with his father working on university courses toward his bachelor's degree. Mr. Albrecht is enjoying spending time with P⬛ and working to restore their relationship. He has made it a point to avoid putting his son in the middle of the enduring difficulties between himself and Mrs. Albrecht. P⬛ was witness to some of the falsehoods Mrs. Albrecht rendered during a visit between the children and their father in California. Mr. Albrecht has avoided asking P⬛ to testify in court to eliminate the potential wrath by his mother for being disloyal.*
>
> *Mr. Albrecht is a forthright person who works very hard in therapy and is always willing to look at himself as well as his situation in order to understand what has been happening to him. He has a deep and sincere need to know and tell the truth.*

75. As to Petitioner's prognosis, Dr. Grossman remarked:

> *Mr. Albrecht has a strong motivation to get his life in order. I experience him as very hard working in therapy. I believe that <u>when access to his children is stable</u> and follows the judgment in his divorce decree, and when he finds employment in a field of his expertise and interest, an enormous amount of anxiety and depression will lift. He is also willing to do more work looking at his acceptance of a harmful spousal relationship and work on how to look for and feel entitled to healthier and more rewarding connections.*

## The children's health insurance and the USO

76. Petitioner, who has been unemployed for the duration of these proceedings, nevertheless faithfully paid $350/month in child support to Respondent from September 9, 2016 through February 14, 2018 under the courts temporary USO (document #42).

77. Petitioner also faithfully paid $50/month in child support to Respondent from February 14, 2018 to the present time under the court's final USO (document #247).

78. Petitioner has also faithfully paid for Medi-share to cover <u>all four</u> of the parties children from the commencement of this action on April 15, 2016 to the present time. The current cost is $434 per month. *See transcript at 90.*

79. On December 22, 2018, Petitioner obtained Medi-Cal coverage under the Affordable Care Act (ACA) for S██ and G██ through "Covered California," the "Official Site of California's Health Insurance Marketplace." Petitioner also continued to maintain the Medi-Share coverage for all four of the parties children (P██, C██, S██, and G██) that Petitioner has paid for for the duration of these proceedings and that has been the primary coverage for all four children since 2011.

80. With no finding concerning Petitioner's ability to pay, the court in paragraph 6 of its order has now found Petitioner in contempt, and required him to pay $700 in attorneys' fees, as well as to reimburse Respondent "for the cost of health insurance for the children from when Respondent purchased same through May 31, 2019," an <u>undetermined amount,</u> even though the parties' minor daughters S██ and G██ were <u>already covered</u> through <u>both</u> Medi-Cal and Medi-Share.

81. Paragraph 16A of the USO (document #247) stated that "Obligor is ordered to provide private health insurance for the child(ren) effective <u>Continuing – See Decree re providing coverage under Blue Shield of California</u>"

82. However, Petitioner could not find any place in the Decree (document #248) the court described "providing coverage under Blue Shield of California."

83. Consequently, it appears that Petitioner did not understand this court's order, believing in good faith that this court had made a scrivener's error on the USO (document #247) in paragraph 16A.

84. Consequently, this court should now explain why it failed to describe "providing coverage under Blue Shield of California" in its Decree (document #248) when its USO (document #247) referenced this.

85. If the court did not make a scrivener's error, then Petitioner now asserts the court's USO order was "vague and indefinite" and was incomprehensible to Petitioner.

86. Blue Shield of California is a private California not-for-profit mutual benefit corporation.

87. Medi-Cal and Blue Shield of California are both controlled by California and Federal Law, not New Hampshire law.

88. Based upon the facts above, the reasonable inference is that requiring Petitioner, who is unemployed, to have purchased a new, and higher-cost health plan for their children directly from a private California not-for-profit mutual benefit corporation, rather than under the Affordable Care Act (ACA) from "Covered California," the "Official Site of California's Health Insurance Marketplace," was an unsustainable exercise of discretion.

## RSA 461-A:6, I(m)

89. RSA 461-A:6, I(m) requires, when determining the "best interests of the child," that the court shall consider "any other additional factors the court deems relevant."

90. Concerning a "Judicial Enforcement of Parenting Plan," RSA 461-A:4-a requires that "Any motion for contempt or enforcement of an order regarding an approved parenting plan under this chapter, if filed by a parent, shall be reviewed by the court within 30 days."

91. On March 30, 2018, Petitioner filed *Petitioner's Motion for Contempt re Telephone Contact and Written/Electronic Communication with Children* (document #241).

92. On August 21, 2018, Petitioner filed *Petitioner's Motion to Schedule Outstanding Parenting Motions* (document #274).

93. On May 9, 2019, this court heard *Petitioner's Motion for Contempt re Telephone Contact and Written/Electronic Communication with Children* (document #241).

94. Petitioner believes the court should state whether it considered any "additional factor" that is "relevant" to the best interests of the child pursuant to RSA 461-A:6, I(m).

## Paragraphs 15 and 16 of the court's order

95. Petitioner also wishes to remind the court that he filed a no-fault petition for Legal Separation on April 15, 2016 (document #1) in response to Respondent's DV action filed against him a week earlier on April 8, 2016. Respondent then filed her cross-petition alleging fault grounds on April 27, 2017 (document #7).

96. Respondent has also filed numerous "potty pleadings" with this court, and has continued to do so as recently as January 25, 2019. The court may refer to paragraph 7 of document #290, filed by Respondent.

97. The court has made no finding why Respondent's motion for attorney's fees was denied without prejudice, but Petitioner's motion was apparently denied "with prejudice."

98. Petitioner notes that many of his motions have been made simply to defend himself against Respondent's numerous "potty pleadings."

99. Petitioner notes that his other motions, which the court now describes as "border[ing] on vexatious and frivolous," have been limited in scope to parenting and financial issues.

100.     The court should advise whether it finds paragraph 7 of document #290 filed by Respondent either "vexatious" or "frivolous."


WHEREFORE, the Petitioner prays this Honorable Court for relief as follows:

A) Reconsider its order dated May 30, 2019; and,

B) Find that Respondent caused both S███ and G███ "to emphatically state they no longer wanted the phones" provided by Petitioner; and,

C) Grant Petitioner's Motions for Contempt (documents #241 and #294) regarding phone calls; and,

D) Adopt Petitioner's proposed Parenting Plan (document #298); or,

E) Develop a new parenting plan that "supports frequent and continuing contact between each child and both parents," comports with RSA 461-A:4, VI, and is in the best interests of the children; and,

F) Order the parties and their children to attend Family Systems Therapy; or as the parties otherwise agree,

G) Deny Respondent's Motion for Contempt (document #291) concerning the USO; and,

H) Vacate paragraphs 15 and 16 of its order; and,

I) Deny Respondent's Motion for Attorneys' Fees (document #324) with prejudice; and,

J) Set forth the reasons for its decision in a written order; and,

K) For such other relief as this Court deems just and reasonable.

Respectfully submitted,

June 21, 2019

Dana Albrecht
by his attorney

MASTER RECOMMENDS: Denied.

6/26/19
Date    Bruce F. DalPra, Master

Approved & so ordered.

JUN 30 2019

MARK S. DERBY

Joseph Caulfield, Esq.
NH Bar #262
Caulfield Law & Mediation Office
126 Perham Corner Rd.
Lyndeborough, NH  03082
603-505-8749

State of New Hampshire
Hillsborough, SS

Now comes Dana Albrecht and swears that the foregoing is true to the best of his knowledge and belief.

June 21, 2019

Joseph Caulfield
NH Justice of the Peace
Comm. expires Dec. 3, 2019

Certification

I sent this date a copy of this  Motion to Atty. Fontaine.

Joseph Caulfield, Esq.



# SIERRA MADRE
# POLICE DEPARTMENT
**242 WEST SIERRA MADRE BOULEVARD**
**SIERRA MADRE, CA 910242395**
**1-626-355-1414**

| CFS EVENT DETAIL |
|---|
| CAD EVENT NUMBER |
| 1907300027 |
| CALL TYPE |
| 911C |

## CALLS FOR SERVICE INFORMATION

| AGENCY | CAD EVENT NUMBER | CASE NUMBER | AGENCY NUMBER | DATE AND TIME | CALL TYPE | CALL TYPE EXPLAINED | | FINAL CALL TYPE |
|---|---|---|---|---|---|---|---|---|
| SMPD | 1907300027 | | | 07/30/2019 19:46 | 911C | CONTACT CITIZEN | | |
| LOCATION | | | | APT/SUITE/BOX | CITY | | RESPONSE ZONE | RESPONSE AREA |
| 730 W ALEGRIA AVE | | | | | SM | | | |
| CALL SOURCE | LOCATION COMMENT | | | | | | | |
| P | | | | | | | | |

**COMMENTS**

RP CAME 10-19 REQ TO SPEAK WITH AN DET REG A DOMESTIC ISSUE THAT MAY OCCUR AT LOC INVOLVING HER AND HER EX-BF

RP EMPHASIZED THAT NO DOMESTIC HAD OCCURRED YET
————————————[CAD1/10893 07/30/19 19:48:23]

DL/NO:Y5489439*B/D:08-17-1966*NAME:MINGES KATHERINE MICHELLE*
MAIL ADDR AS OF 07-17-18:2610 DEODAR CIR PASADENA 91107*
AKA:MINGES KATHERINE M*
————————————[CAD1/10893 07/30/19 19:52:27]
RP SPEAKING WITH D1
————————————[CAD1/10893 07/30/19 20:05:11]
R/P WANTED TO ADVISE THAT HER EX-HUSBAND DANA ALBRECHT IS ON HIS WAY FROM NEW HAMPSHIRE TO TRY AND SPEAK TO HIS DAUGHTERS, G█████ AND S█████. R/P SAID THEIR DAUGHTERS DO NOT WANT TO STAY WITH DANA AND ARE AFRAID OF HIM. R/P SAID DAUGHTERS ARE CURRENTLY IN SUMMER CAMP IN NEW HAMPSHIRE. R.P SAID FATHER DOES NOT KNOW DAUGHTERS ARE IN NEW HAMPSHIRE. R/P SAID SHE WANTED TO LET US KNOW IN ADVANCE BECAUSE DANA WILL TRY TO MAKE FALSE CLAIMS ABOUT THEIR DAUGHTERS MISSING OR R/P VIOLATING COURT ORDER. R/P EXCEPTS DANA TO GO TO HER HOUSE AT 730 W ALEGRIA SOMETIME ON 7/31/19. R/P SAID SHE WILL NOT BE HOME AND HER FRIEND,
FRIEND : ALEX BEER
————————————[CAD1/10893 07/30/19 20:16:26]
***** EVENT CLOSED BY CAD1 WITH COMMENT-NOTES ADDED TO THE CALL

| REPORTING PARTY | | | | | AREA CODE | PHONE NUMBER |
|---|---|---|---|---|---|---|
| KATHERINE MICHELLE MINGES | | | | | 626 | 9457986 |
| REPORTING ADDRESS | | | | | | |
| 2610 DEODAR CIR PASADENA | | | | | | |
| PRIMARY UNIT | DISPOSITION | DISPOSITION COMMENTS | | | | |
| D1 | COMP | NOTES ADDED TO THE CALL | | | | |
| E-911 | DISPATCH | ARRIVED | CLEARED | CLOSED | | |
| | 19:46:40 | 19:48:01 | 00:00:00 | 20:28:02 | | |

## UNITS STATUS RECORDSxxx

| TIME | UNIT | STATUS | COMMENT | LOCATION | DISPO |
|---|---|---|---|---|---|
| 7/30/2019 7:46:40 PM | D1 | D | | 730 W ALEGRIA AVE | |
| 7/30/2019 7:48:01 PM | D1 | AR | | 730 W ALEGRIA AVE | |
| 7/30/2019 8:12:16 PM | D1 | F | FREED BY CAD1 | | |
| 7/30/2019 8:12:28 PM | D1 | AR | | 730 W ALEGRIA AVE | |
| 7/30/2019 8:14:53 PM | D1 | 19 | | | |
| 7/30/2019 8:17:47 PM | D1 | AR | | 730 W ALEGRIA AVE | |
| 7/30/2019 8:28:02 PM | D1 | F | EVENT CLOSED BY CAD1 | | |

## LINKED NAMES

| UNIT | REASON | NAME ( OR DL) | DOB |
|---|---|---|---|
| | RP | MINGES, KATHERINE MICHELLE | |
| | | Y5489439 | |



# SIERRA MADRE
# POLICE DEPARTMENT
**242 WEST SIERRA MADRE BOULEVARD**
**SIERRA MADRE, CA 910242395**
**1-626-355-1414**

| CFS EVENT DETAIL |
|---|
| CAD EVENT NUMBER |
| 1907310019 |
| CALL TYPE |
| 819 |

## CALLS FOR SERVICE INFORMATION

| AGENCY | CAD EVENT NUMBER | CASE NUMBER | AGENCY NUMBER | DATE AND TIME | | CALL TYPE | CALL TYPE EXPLAINED | | FINAL CALL TYPE |
|---|---|---|---|---|---|---|---|---|---|
| SMPD | 1907310019 | | | 07/31/2019 15:12 | | 919 | KEEP THE PEACE | | 919 |
| LOCATION | | | | | APT/SUITE/BOX | CITY | | RESPONSE ZONE | RESPONSE AREA |
| 730 W ALEGRIA AVE | | | | | | SIERRA MADRE | | | |
| CALL SOURCE | LOCATION COMMENT | | | | | | | | |
| P | | | | | | | | | |

| COMMENTS |
|---|
| ----------------[CAD1/117  07/31/19 15:32:30] |
| D1 ADV REF CAD 190730-0027 |
| ----------------[CAD1/117  07/31/19 15:34:04] |
| C1 ADV DOOR KNOCKING |
| ----------------[CAD1/117  07/31/19 15:47:30] |
| C1 ADV CODE 4 |
| ----------------[CAD1/117  07/31/19 16:50:22] |
| SPOKE TO MOTHER, KATHERINE ALBRECHT, AND SHE ADVISED DAUGHTERS ARE IN SUMMER CAMP AT THE WILD OF NEW ENGLANDS IN DEERFIELD, NEW ENGLAND. I CALLED THE SUMMER CAMP AND SPOKE TO WORKER SARAH SMITLEY. SARAH SAID THE DAUGHTERS WERE SAFE AND AT THE CAMP. THE COURT ORDER IS OUT OF NEW HAMPSHIRE AND THERE IS NO VIOLATION. CASE IS CURRENLTY BEING HANDLED BY BOTH PARTIES ATTORNEYS. |

| REPORTING PARTY | | | | | AREA CODE | PHONE NUMBER |
|---|---|---|---|---|---|---|
| DANA ALBRECHT | | | | | 626 | |
| REPORTING ADDRESS | | | | | | |
| | | | | | | |

| PRIMARY UNIT | DISPOSITION | DISPOSITION COMMENTS | | | |
|---|---|---|---|---|---|
| C1 | | | | | |
| E-911 | DISPATCH | ARRIVED | CLEARED | CLOSED | |
| | 15:12:27 | 15:14:00 | 15:55:16 | 15:55:16 | |

## UNITS STATUS RECORDSxxx

| TIME | UNIT | STATUS | COMMENT | LOCATION | DISPO |
|---|---|---|---|---|---|
| 7/31/2019 3:12:27 PM | C1 | D | | 730 W ALEGRIA AVE | |
| 7/31/2019 3:12:27 PM | S4 | D | | 730 W ALEGRIA AVE | |
| 7/31/2019 3:13:06 PM | S4 | F | RE-ASSIGNED | | |
| 7/31/2019 3:14:00 PM | C1 | AR | | 730 W ALEGRIA AVE | |
| 7/31/2019 3:15:17 PM | A2 | D | | 730 W ALEGRIA AVE | |
| 7/31/2019 3:15:17 PM | D1 | D | | 730 W ALEGRIA AVE | |
| 7/31/2019 3:16:51 PM | S4 | D | | 730 W ALEGRIA AVE | |
| 7/31/2019 3:17:03 PM | S4 | D | | 730 W ALEGRIA AVE | |
| 7/31/2019 3:17:11 PM | D1 | F | FREED BY CAD1 | | |
| 7/31/2019 3:18:17 PM | A2 | F | FREED BY CAD1 | | |
| 7/31/2019 3:29:52 PM | S4 | AR | | 730 W ALEGRIA AVE | |
| 7/31/2019 3:31:28 PM | D1 | AR | | 730 W ALEGRIA AVE | |
| 7/31/2019 3:34:35 PM | D1 | QV | | | |
| 7/31/2019 3:35:26 PM | D1 | QV | | | |
| 7/31/2019 3:36:22 PM | C1 | TM | UNIT TIMER: TIMER CANCELLED | | |
| 7/31/2019 3:51:13 PM | S4 | TM | UNIT TIMER: TIMER CANCELLED | | |
| 7/31/2019 3:51:16 PM | D1 | TM | UNIT TIMER: TIMER CANCELLED | | |
| 7/31/2019 3:54:44 PM | S4 | C | CLEARED BY CAD1 | | ASST |
| 7/31/2019 3:54:57 PM | C1 | C | CLEARED BY CAD1 | | ASST |
| 7/31/2019 3:55:16 PM | D1 | C | CLEARED BY CAD1 | | ASST |

| CFS EVENT DETAIL | SIERRA MADRE POLICE DEPARTMENT | CAD EVENT NUMBER<br>1907310019 |
|---|---|---|

## LINKED NAMES

| UNIT | REASON | NAME ( OR DL) | DOB |
|---|---|---|---|
| | RP | ALBRECHT, DANA | |

## LINKED VEHICLES

| UNIT | REASON | LICENSE NO. | ST | MAKE | YEAR | COLOR |
|---|---|---|---|---|---|---|
| D1 | QV | 8LIW149 | CA | | | / |
| D1 | QV | 8LAW149 | CA | | | / |

# THE STATE OF NEW HAMPSHIRE

## SUPREME COURT

**In Case No. 2019-0436, <u>In the Matter of Dana Albrecht and Katherine Albrecht</u>, the court on September 16, 2019, issued the following order:**

Notice of appeal is declined.  <u>See</u> Rule 7(1)(B).

Under Supreme Court Rule 7(1)(B), the supreme court may decline to accept a notice of discretionary appeal from the superior or circuit court.  No appeal, however, is declined except by unanimous vote of the court with at least three justices participating.

This matter was considered by each justice whose name appears below.  If any justice who considered this matter believed the appeal should have been accepted, this case would have been accepted and scheduled for briefing.

Katherine Albrecht's motion for summary affirmance is therefore moot.  Her request for attorney's fees is denied.

<u>Declined</u>.

Hicks, Bassett, Hantz Marconi, and Donovan, JJ., concurred.

**Eileen Fox,
Clerk**

Distribution:
9th N.H. Circuit Court - Nashua Family Division, 659-2016-DM-00288
Honorable Mark S. Derby
Honorable Julie A. Introcaso
Marital Master Bruce F. DalPra
Mr. Dana Albrecht
Michael J. Fontaine, Esquire
Israel F. Piedra, Esquire
Kathleen A. Sternenberg, Esquire
File

# THE STATE OF NEW HAMPSHIRE

## SUPREME COURT

### In Case No. 2019-0436, <u>In the Matter of Dana Albrecht and Katherine Albrecht</u>, the court on October 25, 2019, issued the following order:

Supreme Court Rule 22(2) provides that a party filing a motion for rehearing or reconsideration shall state with particularity the points of law or fact that he claims the court has overlooked or misapprehended.

We have reviewed the claims made in the petitioner's motion for reconsideration and conclude that no points of law or fact were overlooked or misapprehended in the decision to decline the petitioner's appeal. Accordingly, upon reconsideration, we affirm the September 16, 2019 decision and deny the relief requested in the motion.

Respondent's request for attorney's fees is denied.

<u>Relief requested in motion for reconsideration denied</u>.

Hicks, Bassett, Hantz Marconi, and Donovan, JJ., concurred.

**Eileen Fox,**
**Clerk**

Distribution:
9th N.H. Circuit Court - Nashua Family Division, 659-2016-DM-00288
Honorable Mark S. Derby
Honorable Julie A. Introcaso
Marital Master Bruce F. DalPra
Mr. Dana Albrecht
Michael J. Fontaine, Esquire
Israel F. Piedra, Esquire
Kathleen A. Sternenberg, Esquire
Allison R. Cook, Supreme Court
File



# SIERRA MADRE
# POLICE DEPARTMENT
**242 WEST SIERRA MADRE BOULEVARD**
**SIERRA MADRE, CA 910242395**
**1-626-355-1414**

| CFS EVENT DETAIL |
|---|
| CAD EVENT NUMBER |
| 1910310022 |
| CALL TYPE |
| WELFARE |

## CALLS FOR SERVICE INFORMATION

| AGENCY | CAD EVENT NUMBER | CASE NUMBER | AGENCY NUMBER | DATE AND TIME | CALL TYPE | CALL TYPE EXPLAINED | | FINAL CALL TYPE |
|---|---|---|---|---|---|---|---|---|
| SMPD | 1910310022 | | | 10/31/2019 10:21 | WELFARE | WELFARE CHECK | | |

| LOCATION | | APT/SUITE.BOX | CITY | | RESPONSE ZONE | RESPONSE AREA |
|---|---|---|---|---|---|---|
| 730 W ALEGRIA AVE | | | SM | | | |

| CALL SOURCE | LOCATION COMMENT |
|---|---|
| P | |

**COMMENTS**

RP IS CONCERNED FOR THE WELFARE OF HIS CHILDREN ███████ AND ███████ WHO HAVE NOT BEEN TO SCHOOL FOR 3 DAYS. RP IS UNABLE TO CONTACT HIS CHILDREN OR THE ATTORNEY FOR THE MOTHER.

███████ ATTENDS GOODEN SCHOOL IN THE CITY. ATTEMPTED TO CONTACT HOWEVER NO ANSWER AT THE SCHOOL.

RP IS ADVISING HE HAS CONTACTED ███████ IN PASADENA FOR DAUGHTER ███████ AND THEY ADVISED SHE HAS NOT BEEN TO SCHOOL AND HAD AN EXCUSED ABSENCE BY THE MOTHER.

MOTHER'S NAME IS ███████████████████ , ████████
CELL PHONE# ████████████████

RP LAST SPOKE TO MOM THROUGH ATTRONEYS LAST FRIDAY.
————————[CAD1/10920  10/31/19 10:33:44]
10-21 PROVIDED GOES TO VOICEMAIL
————————[CAD1/10920  10/31/19 10:53:30]
MADE CONTACT WITH GOODEN SCHOOL AND THEY ADVISED THE CHILD HAS NOT BEEN IN SCHOOL HOWEVER THERE ARE NO SUSPICIOUS CIRCUMSTANCES TO FURTHER INVESTIGATE
————————[CAD1/10920  10/31/19 10:55:35]
==THE MOTHER OF THE CHILDREN CALLED AND ADVISED SHE IS ON VACATION WITH HER CHILDREN AND IS NOT HOME. SHE ALSO ADVISED HER ATTORNEYS ADVISED HER EX HUSBAND THAT THEY ARE ON VACATION AND HE IS ONLY CALLING TO DISTURB THEM. SHE ADVISED SHE HAS FULL CUSTODY OF THE CHILDREN.==

| REPORTING PARTY | | | | | AREA CODE | PHONE NUMBER |
|---|---|---|---|---|---|---|
| DANA ALBRECHT | | | | | | |

| REPORTING ADDRESS |
|---|
| NEW HAMPSHIRE |

| PRIMARY UNIT | DISPOSITION | DISPOSITION COMMENTS |
|---|---|---|
| P2 | | |

| E-911 | DISPATCH | ARRIVED | CLEARED | CLOSED |
|---|---|---|---|---|
| | 10:20:35 | 10:28:29 | 10:52:48 | 10:52:48 |

## UNITS STATUS RECORDS xxx

| TIME | UNIT | STATUS | COMMENT | LOCATION | DISPO |
|---|---|---|---|---|---|
| 10/31/2019 10:20:35 AM | P2 | | | ████████ | |
| 10/31/2019 10:23:44 AM | L1 | D | | ████████ | |
| 10/31/2019 10:28:29 AM | P2 | AR | | ████████ | |
| 10/31/2019 10:28:29 AM | L1 | AR | | ████████ | |
| 10/31/2019 10:41:13 AM | P2 | C4 | | | |
| 10/31/2019 10:48:00 AM | L1 | C | CLEARED BY CAD1 | | ASST |
| 10/31/2019 10:52:48 AM | P2 | C | CLEARED BY CAD1 | | UNF |

## LINKED NAMES

| UNIT | REASON | NAME (OR DL) | DOB |
|---|---|---|---|
| | RP | ALBRECHT, DANA | |

SIERRA MADRE PD COPY

**STATE OF NEW HAMPSHIRE**

9th Circuit-Family Division-Nashua

Dana Albrecht and Katherine Albrecht

659-2016-DM-00288

RECEIVED
NH CIRCUIT COURT
9TH CIRCUIT NASHUA

2019 NOV -1 AM 9: 00

## Petitioner's *Ex Parte* Motion for Contempt and to Compel

Now comes Dana Albrecht, Petitioner, by and through his attorney, and states:

1. RSA 461-A:2 requires that "Because children do best when both parents have a stable and meaningful involvement in their lives, it is the policy of this state, unless it is clearly shown that in a particular case it is detrimental to a child, to support frequent and continuing contact between each child and both parents."

2. RSA 461-A:4-a requires that "Any motion for contempt or enforcement of an order regarding an approved parenting plan under this chapter, if filed by a parent, shall be reviewed by the court within 30 days."

3. Mr. Albrecht has not seen the parties' daughters S████ (now age 15) and G████ (now age 12) since December 2018. The children reside with their mother Dr. Albrecht in Sierra Madre, California.

4. Pursuant to this court's parenting plan, Mr. Albrecht last arranged to have summer parenting time with their daughters S████ and G████ from July 31, 2019 through August 14, 2019 in California and provided more than 10 days' written notice on July 18, 2019.

5. However, on July 31, 2019, and while in southern California to see their daughters, Mr. Albrecht learned for the first time from the Sierra Madre Police that Dr. Albrecht had instead sent S████ and G████ to "The Wilds of New England" camp in Deering, New Hampshire in order to prevent Mr. Albrecht from seeing their children.

6. Most recently, and without consulting with or even notifying Mr. Albrecht, Dr. Albrecht made arrangements with each of their daughters' schools to remove both S████ and G████ from school for an unscheduled "vacation" from October 28, 2019 through November 4, 2019 on the east coast.

7. Consequently, Dr. Albrecht is in contempt of this court's parenting plan requiring joint decision making authority.

8. Mr. Albrecht believes that on or before Tuesday, October 29, 2019, Dr. Albrecht again flew across the country from California to the east coast with their minor children.

9. Dr. Albrecht made every effort to keep this present east coast "vacation" a secret from Mr. Albrecht. She has likely caused both of their adult sons' emotional distress by threatening retribution or punishment for discussing this "vacation" with Mr. Albrecht

10. . Mr. Albrecht's counsel has sought the present location of the children from Dr. Albrecht's counsel, receiving only:

   *I have passed your email on to Katherine and await her response. Mike would like to know what information Dana has that would lead him to believe that Katherine and the girls are on the East coast.*

11. This is now the third time Dr. Albrecht has transported their children across the country from California to the east coast and attempted to keep the trip secret from Mr. Albrecht. The first was in July 2018; the second was in July 2019, already described in paragraphs 4-5.

12. The court's parenting plan requires that:

   **Each parent shall promote a healthy and beneficial relationship between the children and the other parent.**

13. Dr. Albrecht's most recent actions have caused further damage to Mr. Albrecht's relationship with their daughters. Consequently, Dr. Albrecht is also in contempt of this provision of the court's parenting plan.

14. Further, Dr. Albrecht has refused to provide the telephone number(s) that their minor daughters S███ and G███ now customarily use to make and receive calls; consequently, Mr. Albrecht is unable to place telephone calls to his daughters.

15. The most common cause of parental alienation is one parent wishing to exclude the other parent from the life of their child, though family members or friends, as well as professionals involved with the family, including psychologists, lawyers and judges.

16. Parental alienation often leads to the long-term, or even lifelong, estrangement of a child from one parent and other family members, and, as a significant adverse childhood experience and form of childhood trauma, results in significantly increased lifetime risks of both mental and physical illness.

17. Nevertheless, Mr. Albrecht has made every effort to encourage Dr. Albrecht to have their daughters see a licensed therapist for counseling; however, Dr. Albrecht has refused to cooperate with Mr. Albrecht. For over three and half years, none of the parties' children have ever received regular counseling sessions.

18. Consequently, Mr. Albrecht is also requesting this court now compel Dr. Albrecht's cooperation in commencing immediately individual therapy for these children and commencing immediately reunification therapy for these children and Mr. Albrecht to repair the parent-child relationships which has been disrupted during high conflict divorce.

19. Since it is anticipated that Dr. Albrecht will continue her disingenuous "defense" that she encourages the children to obey the court orders but that she just can't control these children, that the court also order these children to attend this therapy.

20. The court's next explicitly ordered parenting time for Mr. Albrecht is from December 27, 2019 through December 31, 2019, which is nearly two months away and is only five days long.

21. Because Dr. Albrecht has caused Mr. Albrecht to be unable to see their daughters for the past <u>ten months</u>, Mr. Albrecht is requesting this court now compel Dr. Albrecht to provide <u>immediate</u> parenting time for Mr. Albrecht to see their children while they are on the east coast and before they return to California for school on Tuesday, November 5, 2019.

22. Otherwise, there would be an immediate risk of further childhood trauma and significantly increased lifetime risks of both mental and physical illness for their minor children resulting from further parental alienation caused by Dr. Albrecht's most recent actions.


WHEREFORE, the Petitioner prays this Honorable Court for relief as follows:

A) Grant Petitioner's *Ex Parte* Motion for Contempt and to Compel; and,

B) Find Respondent Katherine Albrecht in contempt of the court's parenting plan requiring joint decision making authority; and,

C) Find Respondent Katherine Albrecht in contempt of the court's parenting plan requiring each parent to promote a healthy and beneficial relationship between each child and the other parent; and,

D) Compel Dr. Albrecht's cooperation in commencing immediately individual therapy for these children with duly licensed and qualified therapists and commencing immediately reunification therapy for these children and Mr. Albrecht with a duly licensed and qualified therapist to repair the parent-child relationships which has been disrupted during high conflict divorce.

E) Compel the parties' minor children S█████ and G█████ to attend regular counseling sessions for individual therapy and reunification therapy; and,

F) Compel Respondent Katherine Albrecht to disclose the precise location of their minor children; and,

G) Compel Respondent Katherine Albrecht to disclose all telephone number(s) their minor children customarily use to make and receive calls; and,

H) Order that Petitioner Dana Albrecht have parenting time with their minor children on the east coast prior to the children's return to California on November 5, 2019; and,

I) Award Petitioner his reasonable attorney's fees and court costs occasioned by Respondent's contempt; and,

J) For such other relief as this court deems just and reasonable.

Respectfully submitted,

November 1, 2019

Dana Albrecht
by his attorney

Joseph Caulfield, Esq.
NH Bar #262
Caulfield Law & Mediation Office
126 Perham Corner Rd.
Lyndeborough, NH 03082
603-505-8749

State of New Hampshire
Hillsborough, SS

Now comes Dana Albrecht and swears that the foregoing is true to the best of his knowledge and belief.

November 1, 2019

Joseph Caulfield
NH Justice of the Peace
Comm. expires Dec. 3, 2019

Certification

I emailed this date a copy of this Motion to Atty. Fontaine. Because of the nature of this emergency, the history of this case, and my inability even to learn the present location of the children, no concurrence was sought.

Joseph Caulfield, Esq.


STATE OF
**MICHIGAN**
St Clair County
October 30 2020
Receipt # 90976



**REAL ESTATE TRANSFER TAX**
$173.80 - CO
$1 185.00 - ST
Stamp # 53423

Jay De Boyer Register Of Deeds
St Clair County, Michigan

Rec        $26.00
Remon     $4.00
Tax Crt $0.00

Recorded
October 30, 2020  02:50:02 PM
Liber 5264 Page 710-711
Receipt # 90976    WD  #2020027111



Seal

Liber 5264 Page 710

---

## WARRANTY DEED
File No.: 20-24195-19

THE GRANTOR, Jennifer L. DeWolf

whose address is: 5374 Orchard Drive, East China, MI 48054

conveys and Warrants to Katherine Minges

whose address is: 730 West Alegria Avenue, Sierra Madre, CA 91024

Property is situated in the Township of East China, County of St. Clair and State of Michigan described as:

Lots 16 and 17, Supervisor's Robert Baker Canal Plat, according to the plat thereof as recorded in Liber 55 of Plats, page 2, St. Clair County Register of Deeds Office.

Tax Parcel No.:
74-18-749-0009-000
Commonly known as:  5374 Orchard Drive, East China, MI 48054

for the sum of ONE HUNDRED FIFTY EIGHT THOUSAND AND 00/100 Dollars ($158,000.00)

Subject to easements, reservations, use, building and other restrictions of record, if any.

Date: 10 22 20 20

This is to certify that there are no tax liens or titles on
This property and that the taxes are paid for FIVE YEARS
previous to the date of this instrument. This certification
does not include taxes, if any now in the process of
collection by the City, Village or Township Treasurer.
ST. CLAIR COUNTY TREASURER

*[signature]*

Warranty Deed (April 10, 2018)                                                          Page 1 of 2

CISLO TITLE CO.
20-24195-19

Liber: 5264 Page: 71
Liber/Page stamp electronically added
Case 1:23-cv-00381-JL-TSM   Document 36-16   Filed 01/25/24   Page 83 of 112

Dated:  October 15, 2020

Jennifer L. DeWolf

DEANNA NOWAK
Notary Public - State of Michigan
County of Macomb
My Commission Expires Mar 15, 2025
Acting in the County of _Macomb_

STATE OF MICHIGAN
COUNTY OF MACOMB

Acknowledged by Jennifer L. DeWolf before me on 15th day of October, 2020.

Notary Public Signature

Deanna Nowak
Notary name

Notary public, State of Michigan, COUNTY OF MACOMB

My Commission Expires:  march 15, 2025

Recording Fee  $30.00          Transfer Tax  $1,185.00          County Revenue Stamps  $173.80

Drafted by:

Jennifer L. DeWolf
5374 Orchard Drive
East China, MI 48054

When recorded return to:

Katherine Minges
730 West Alegria Avenue
Sierra Madre, CA 91024

# PLATINUMFIRST
## T I T L E

Warranty Deed (April 10, 2018)                                                  Page 2 of 2

File No   20-24195-19

1

1          STATE OF NEW HAMPSHIRE

2      9TH CIRCUIT COURT - FAMILY DIVISION - NASHUA

3  IN THE MATTER OF:          ) Family Division Case No.
                              ) 659-2016-DM-00288
4  DANA ALBRECHT,             )
                              )
5          Petitioner,        )
                              ) Nashua, New Hampshire
6          and                ) November 6, 2020
                              ) 11:37 a.m.
7  KATHERINE ALBRECHT,        )
                              )
8          Respondent.        )
   _____ )

9
                 HEARING ON MOTIONS
10      BEFORE THE HONORABLE BRUCE DALPRA
   MARITAL MASTER OF THE CIRCUIT COURT - FAMILY DIVISION

11
           **REVISED – UNABRIDGED FINAL WITH TIMESTAMPS**

12
   APPEARANCES (All present by video or telephone):

13

14  For the Petitioner:        Joseph Caulfield, Esq.
                               CAULFIELD LAW AND MEDIATION
15                             OFFICE
                               126 Perham Corner Rd
16                             Lyndeborough, NH 03082

17  For the Respondent:        Michael J. Fontaine, Esq.
                               WELTS, WHITE & FONTAINE, P.C.
18                             P.O. Box 507
                               Nashua, NH 03061

19  Also Present:              Kathleen Sternenberg
                               GAL
20
   Audio Operator:            Electronically Recorded
21                            **Not Monitored**

22  TRANSCRIPTION COMPANY:     eScribers, LLC
                               7227 N. 16th Street, Suite 207
23                             Phoenix, AZ 85020
                               (800) 257-0885
24                             www.escribers.net
   Proceedings recorded by electronic sound recording; transcript
25  produced by court-approved transcription service.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

2

 1                          I N D E X

 2   WITNESS(ES)       DIRECT     CROSS    REDIRECT    RECROSS

 3   FOR THE PETITIONER:

 4   Dana Albrecht        4         40        66

 5   Dana Albrecht      126
     (rebuttal)
 6

 7   WITNESS(ES)       DIRECT     CROSS    REDIRECT    RECROSS

 8   FOR THE RESPONDENT:

 9   Katherine Albrecht 78        126

10

11   MISCELLANEOUS                              PAGE

12   Petitioner Rests                            74

13   Respondent's Opening Statement             74

14   Respondent Rests                          137

15   Matter Taken Under Advisement             130

16

17   EXHIBITS                             ID    EVD

18   NONE

19

20

21

22

23

24

25

3

1          (Proceedings commence at 11:37 a.m.)

2              THE COURT:  Good morning, Atty. Caulfield?

3              MR. CAULFIELD:  Yes.

4              THE COURT:  Atty. Fontaine?

5              MR. FONTAINE:  Good morning, Judge.

6              THE COURT:  My name is DalPra.  You folks are

7     connected to the courtroom, and we're here on four pleadings.

8     And they both are pretty much -- the first two pleadings filed

9     by Mr. Albrecht regarding a modification of the parenting

10    plan, and the second two pleadings filed by Mrs. Albrecht with

11    pretty much the same requests, modification of the parenting

12    plan.

13             I'll tell you at the outset that the several hundred

14    pages of exhibits have not been reviewed to date.  And for the

15    record, all the exhibits will be marked for identification,

16    and I will make a determination following the hearing as to

17    which documents should be submitted as full exhibits and which

18    aren't.  So we won't have any argument on those at this point.

19             Mr. Caulfield, these are your motions; you may

20    proceed.

21             MR. CAULFIELD:  Yes, Your Honor.  I -- I just want

22    to point out that that doesn't clear up the docket as they set

23    forth in Petitioner's --

24             THE COURT:  I don't care whether it clears the

25    docket up or not, counsel.  The order that went out said that

33

1  for Christmas 2018.  If we --

2      Q  Do you have any photographs of that?

3      A  Yes.  One moment, please.  I would direct the Judge to

4  -- Exhibit would be -- there's two sets of photographs.

5  Exhibit 47 is the first batch taken from 12/23 through 12/27.

6  And Exhibit 48 is just an email from Dr. Albrecht's is in the

7  middle chronologically, just to be chronological.  And then

8  the next set of photographs is Exhibit 49, which were taken on

9  the 31st, where I'm opening the last presents they gave me,

10 and we're altogether at the airport.  And G█████ is hanging out

11 watching TV at my dad's house.  And that's the last I've ever

12 been able to see them.

13      And again, that's when P████ also came back with me

14 and moved to New Hampshire after that.  So he's been okay for

15 those two years, but it's the other kids.  And there's

16 pictures of the dinner there, if anybody cares, but the point

17 is, is I'm always the one that made it.

18      I heard from G████ that last year, they did get to go

19 out and eat at a super nice place, so I think that's what --

20 I'm glad they got to go out to eat at a super nice place.  At

21 the same time, that's not the traditional homecooked meal that

22 I always make --

23          THE COURT:  *[Whispered] Who gives a fuck?*

24      A  -- that they were used to.  So it's just sad for

25 me.  Again, just a basic, they probably miss the traditional



65

1      A   Dated July 2nd.  Excuse me while I look through these

2  17 pages for this letter.

3           THE COURT:  *[Laughter]*

4      A  You said -- what was the date again?

5  BY MR. FONTAINE:

6      Q  July 2nd, 2019.

7           THE COURT:  *[Whispered] And while you're looking*

8  *through that, I'm gonna go pee.*

9           *Can you imagine if this was in person?*

10           UNIDENTIFIED SPEAKER:  *Oh, my God.  I don't know if*

11  *I (indiscernible).*

> **Commented [DF15]:** 1:12:33

12      A  So I don't know.  Yes, it does say the vaccinations on

13  schedule agreed to.  I don't know how we could do that if we

14  don't have a copy of the schedule, but I would be amenable, if

15  we have a copy of the schedule, to anyone administering the

16  vaccines.

17  BY MR. FONTAINE:

18      Q  Okay.  So let me ask you this.  After this, there was

19  an appointment scheduled for Dr. -- but you --

20      A  Yeah, with --

21      Q  You canceled it, didn't you?

22      A  There was a prior appointment scheduled with

23  Dr. Greenberg that was canceled.

24           THE COURT:  *[Laughs].*

25      A  So yes, if she's canceling the appointment that we

66

1  agreed to, I will cancel the appointment that we did not agree

2  to.

3          THE COURT:  *[Laughs]*.

4  BY MR. FONTAINE:

5      Q  So you canceled the appointment with Dr. Hanif,

6  correct?

7      A  Yes.  It's the only appointment in the entire history

8  of this case I have ever canceled.

9      Q  And --

10     A  I can't say the same for Katherine.

11         UNIDENTIFIED SPEAKER:  *[Whispered] Stupid.*

12         MR. FONTAINE:  I have no further questions, Your

13  Honor, for this witness.

14         THE COURT:  Any redirect, Mr. Caulfield?

15         MR. CAULFIELD: Yes, Your Honor.  One moment,

16  please.

17                 REDIRECT EXAMINATION

18  BY MR. CAULFIELD:

19     Q  Atty. Fontaine asked you about your relationship with

20  C███ deteriorating since Christmas 2018, and you said that

21  that's not correct, and you were trying to refer to some

22  exhibit?

23     A  The --

24         THE COURT:  *[Whispered] No, (indiscernible).*

Commented [DF16]: 1:14:13

25     A  -- apology for C███?  Or the relationship since then?

67

1    Q  Well, my notes say that Atty. Fontaine asked you about

2  the relationship with ███ deteriorating since Christmas

3  2018, and I see that I have an asterisk --

4    A  Yes.  Yes.  That was the weekend -- so I have shown

5  these texts to get some advice from my therapist because I'm

6  concerned he's mentally ill.

7          THE COURT:  *[Laughs]*

8    A  So October 5th, from a different number I'm not

9  familiar, he asked me, how long does it take to hack into a

10 black phone, do you know?  I need to know how often I need to

11 replace it.  I have no idea why he thinks he needs to replace

12 his phones.  He says he's got to throw his phone out soon.

13         THE COURT:  *Hopeless.  Heartless.*

14         UNIDENTIFIED SPEAKER:  *No, he did.*

15         THE COURT:  *He was concerned; he said he was*

16 *hopeless.  (Indiscernible).*

17   A  I can read this in-depth, his own words, but they're

18 quite incoherent.  So long, rambling emails.

19 BY MR. CAULFIELD:

20   Q  That was after this incident?  Mr. Albrecht, that was

21 after the incident that Atty. Fontaine asked you about?

22   A  This is most recently, if we go to the incident at

23 church, that's more relevant because he's much saner at that

24 point where he just apologizes for not getting in touch with

25 me.

Commented [DF17]: 1:14:23

Commented [DF18]: 1:15:17

68

1          THE COURT:  *(Indiscernible).*                    Commented [DF19]: 1:15:48

2    BY MR. CAULFIELD:

3        Q  So after the incident in which you have these -- which

4    the DV is outstanding, he apologized to you?

5          THE COURT:  *[Laughs]*

6        A  Correct.  No.

7          THE COURT:  *[Laughs]*

8    BY MR. CAULFIELD:

9        Q  But -- but -- but during your cross-examination, you

10   were challenged with, did you do this this way, did you do

11   that way; what did you say in your apology letter; why didn't

12   you say this in your apology letter.

13         THE COURT:  *(Indiscernible) so what?*           Commented [DF20]: 1:16:17

14         UNIDENTIFIED SPEAKER:  *(Indiscernible).*

15   BY MR. CAULFIELD:

16       Q  If for some reason you found out that over your

17   lifetime as a parent, you didn't make the right choice every

18   single blessed time, would you accept that?

19         THE COURT:  *[Laughs]*

20       A  Yes.

21   BY MR. CAULFIELD:

22       Q  Right.  And -- and if somebody -- and if you did the

23   best you could in writing a letter and consulted with your own

24   therapist as how you should write the letter --

25         THE COURT:  *[Whispered] The apology (indiscernible)*   Commented [DF21]: 1:16:45

69

1   *to have a (indiscernible) relationship.  He doesn't think his*

2   *son's (indiscernible).*

3   BY MR. CAULFIELD:

4       Q  -- if someone else thinks that it should be written

5   differently, is that really neither here nor there,

6   Mr. Albrecht?

7       A  Only in the sense that a professional therapist,

8   professional opinion, I would think, would be better than

9   somebody who's not similarly trained.

10      Q  Okay.  Now, if Master DalPra orders this fractured

11  family to go to -- for some sort of reunification therapy --

12          THE COURT:  *He lives on the East Coast.  They live*

13  *on the West Coast.  They're going to go there (indiscernible).*

14          UNIDENTIFIED SPEAKER:  *[Laughs].*

15  BY MR. CAULFIELD:

16      Q  -- would you do what the therapist tells you to do?

17      A  Absolutely, in a heartbeat.  I would love that.

18      Q  Would -- would you send the letter the way the

19  therapist says you should do it?

20      A  Absolutely, in a heartbeat, sir.

21      Q  Okay.  Now, there was some discussion about some

22  examination about Judge -- Judge DalPra -- Master DalPra's

23  order regarding insurance, and you were saying that you -- you

24  didn't understand it --

25          THE COURT:  *[Laughs]*

Commented [DF22]: 1:17:18

70

1  BY MR. CAULFIELD:

2      Q  -- and you -- you started to try to reference it and

3  then we moved on.  Is there something about that order you

4  wanted to discuss?

5      A  Yes, if you could just briefly give me one moment to

6  bring it up.

7      Q  And while you're getting it up, assuming you can

8  multi-process, sir, if it turns out that somewhere along the

9  line in your lifetime as a parent you had made some mistake,

10  you didn't say the right thing in a letter, you held the kids

11  two more days during parenting, would it make any sense that

12  you should be punished and the children should be punished by

13  never seeing their dad again?

14      A  Yeah.

15      Q  Okay.  That would -- that would really be mentally ill

16  to think that way, wouldn't it?

17      A  Yes.

18      Q  Yes.  Okay.

19      A  Okay.  So I found the order.

20          THE COURT:  *[Laughs]*.

21      A  So I think the issue here is the uniform support order

22  that Judge Introcaso signed in paragraph 16 says, see decree

23  providing coverage under Blue Shield of California.  So the

24  order from the judge is to look at the decree for providing

25  Blue Shield coverage.  But when I look at the divorce decree



71

1  for providing coverage under Blue Shield, I can't find it

2  anywhere in there.

3       So it's unclear how I -- I -- I accept that by the

4  time we get to the order where judge -- I accepted Judge

5  Introcaso found me in contempt of that.  But again, to this

6  point, I'm not sure why, because he told me to look at the

7  decree and I can't find it in the decree.

8       MR. CAULFIELD:  Okay.  I have -- I have no further

9  questions.

10       THE COURT:  Any recross, Mr. Fontaine?

11       MR. FONTAINE:  No, I'm all set, Your Honor.  Thank

12  you.

13       THE COURT:  Very well.  At this point we're going to

14  take about a 15-minute recess.  I am going to keep my line

15  open here; you can stay on the line, or you can call back in

16  15 minutes.  Okay?

17       MR. CAULFIELD:  Thank you, Your Honor.

18       MR. FONTAINE:  Thank you.

19       THE COURT:  Very well.

20       We're going to take, like, about a three-minute

21  break because I have to --

22       UNIDENTIFIED SPEAKER:  You're absolutely right; it

23  sounds like Gilbert Godfrey.

24     (Recess at 1:20 p.m., recommencing at 1:33 p.m.)

25       MR. CAULFIELD: (Audio begins mid-sentence) yes, Your



72

1  Honor.

2          THE COURT:  Are your clients back?  Ms. Albrecht?

3          Katherine Albrecht, are you back on the line?

4          Dana Albrecht, are you back on the line?

5          THE PETITIONER: I'm here, Your Honor.

6          THE COURT:  Very well; we'll wait a few more

7  minutes.

8          MR. CAULFIELD:  (Indiscernible) now, Judge.

9          THE COURT:  *[Whispered] She's probably having a hot*

10 *dog.  [Laughter]*

11         So Alex Corey is back.

12         UNIDENTIFIED SPEAKER:  Yup.

13         THE COURT:  I wonder if they're going to do anything

14 with the other guy with a thing like the guy from New

15 Hampshire.  Fold (phonetic)?

16         UNIDENTIFIED SPEAKER:  Oh, it's not -- what's his

17 name?  The guy that was the manager this year who was the

18 bench coach, he's not coming back.

19         THE COURT:  No.

20         UNIDENTIFIED SPEAKER:  Did they -- the first base

21 coach and third base coach, was those new coaches?

22         THE COURT:  They're back.

23         UNIDENTIFIED SPEAKER:  Were they the ones that

24 worked on this (indiscernible) previously?

25         THE COURT:  Yeah, they were.  I think they're both

Commented [DF23]: 1:33:59

73

1  back.  Febles and the other guy, I think they're both back.

2          UNIDENTIFIED SPEAKER:  I'll be curious to see what

3  they do to improve the team, if they even try.

4          THE COURT:  I don't know.  I don't -- I don't mind

5  John Henry as an owner, but I don't like Werner at all.

6          UNIDENTIFIED SPEAKER:  Oh, yeah.

7          THE COURT:  He's too --

8          UNIDENTIFIED SPEAKER:  What do you think of this new

9  GM they have?

10          THE COURT:  It's hard -- it's hard to say over the

11  first --

12          UNIDENTIFIED SPEAKER:  Yeah, because of the --

13          THE COURT:  -- first year with what went on.

14          UNIDENTIFIED SPEAKER:  -- the way the end of the

15  season was.

16          THE COURT:  I mean, they -- they basically told him

17  to trade Betts (phonetic), and I don't think Betts was going

18  to stay anyway.  Didn't sound like he wanted to be in the --

19  the Boston.

20          UNIDENTIFIED SPEAKER:  Ken Nuke (phonetic) can

21  pitch.

22          [Laughter]

23          THE COURT:  All right.

24          I must have these exhibits somewhere.  Forgot to

25  check them.



(973) 406-2250 | operations@escribers.net | www.escribers.net

79

1      Q   For the record, state your full name.

2      A   My name is Katherine Michelle Mingus, and was

3   previously Albrecht.

4      Q   Okay.  And where do you reside?

5      A   I reside at 730 West Alegria Avenue in Sierra Madre,

6   California.

7      Q   And who lives with you at that location?

8      A   My son C███, my daughters S███ and G███, and most

9   recently, my sister Laura.

10     Q   Okay.  And your sister Laura, does -- is -- does she

11  need assistance?

12     A   She is -- she has cerebral palsy.  She's in a

13  wheelchair.  She has attendant care 24 hours, and my mother

14  was her primary caregiver until she passed away last year.

15  And now I'm --

16     Q   Okay.

17     A   I'm not the primary caregiver.  She has an attendant,

18  but I'm supporting her and helping her out.

19     Q   Have you had an opportunity to discuss with the girls

20  whether they want to see their father?

21     A   Yes.

22     Q   And has that been recent?

23     A   Yes.

24     Q   And have they changed their prior position that you

25  testified to at the motion hearing a little over a year ago?

80

1     A  No.

2     Q  Have they indicated any desire to have any contact

3 with him?

4     A  No.

5     Q  Have you continued, on occasion, to encourage them to

6 reach out to him?

7     A  Yes.

8     Q  And what has their response been?

9     A  Their response has consistently been no.

10     Q  Do you believe that they're mature minors?

11     A  Yes.

12     Q  How do they do in school?

13     A  They have very good grades.

14     Q  Have they had any problems with their conduct in

15 school or outside of school?

16     A  Never, never.

17     Q  Do they make wise, mature decisions in their daily

18 lives relative to, for example, schoolwork?

19     THE COURT:  *[Whispered] Of course not; they're a*

20 *bunch of morons.*

21     A  Yes.

22 BY MR. CAULFIELD:

23     Q  Helping around the house?

24     A  Yes.

25     Q  Do they have chores?

144

<u>CERTIFICATE</u>

I, Dena Farbman, a court-approved proofreader, do hereby

certify that the foregoing is a correct transcript from the

official electronic sound recording of the proceedings in the

above-entitled matter, to the best of my professional skills

and abilities.

Karen Raile, CDLT-105, Transcriptionist
Erin Perkins, CET-601, Proofreader



Dena
Farbman

Digitally signed
by Dena Farbman
Date: 2022.04.07
15:07:43 -04'00'

DENA FARBMAN, CET-629                    April 6, 2022
Proofreader/Quality Control Manager


**Original transcript signed on November 12, 2020**

1                           STATE OF MICHIGAN
2
3            IN THE CIRCUIT COURT FOR THE COUNTY OF ST. CLAIR
4
5                           FAMILY DIVISION
6
7
8 DANA ALBRECHT,
9
10          PLAINTIFF
11
12 VS                                    FILE NO: B 21-769 DC
13
14 KATHERINE ALBRECHT,
15
16          DEFENDANT
17 _____/
18
19                     MISCELLANEOUS HEARING
20
21            HEARD BY THE HONORABLE ELWOOD L. BROWN
22
23          THURSDAY, JULY 15, 2021 - PORT HURON, MICHIGAN
24
25 APPEARANCES:
26
27 FOR THE DEFENDANT:        MR. TIMOTHY WEGMEYER
28                           ATTORNEY AT LAW
29                           P.O. Box 596
30                           Marine City, Michigan  48039
31                           (586)634-4226
32
33 ALSO PRESENT:             MR. DANA ALBRECHT
34                           PLAINTIFF
35
36                           MS. KATHERINE ALBRECHT
37                           DEFENDANT
38
39
40
41 RECORDED BY:   MS. CHRISTINE A. REGAN, CER 4832
42               CERTIFIED ELECTRONIC RECORDER
43

                                    1

TABLE OF CONTENTS

WITNESSES:

       NONE

EXHIBITS:

       NONE

94                                          Thursday, July 15, 2021

95                                          Port Huron, Michigan

96          (At 11:04 a.m., proceeding began)

97          THE COURT:  Albrecht versus Albrecht.  Counsel, your

98     appearance, please.

99          MR. WEGMEYER:  For the record, your Honor, Tim Wegmeyer

100    appearing on behalf of—its Albrecht on the pleadings, her name

101    is--she actually goes by Minges.

102         THE COURT:  I'm just going by the pleadings.

103         MR. WEGMEYER:  But we're going to refer to her as Dr.

104    Albrecht today.

105         THE COURT:  When you address the Court it would be good if

106    you stood.  It would be good if you stood up when you address the

107    Court.

108         MR. WEGMEYER:  I'm sorry.

109         THE COURT:  All right.  So—you can have a seat now, Mr.

110    Wegmeyer.

111         Are you Dana Albrecht?

112         MR. ALBRECHT: Yes, your Honor.

113         THE COURT:  All right, it's your motion, go ahead.

114         MR. ALBRECHT:  So, I'd just like the Court to enforce

115    existing orders with the New Hampshire Family Court.  Forgive me,

116    I'm pro se if I speak a little slowly and I'm a little nervous.

117    This has been an extensive long going battle between myself and

118    Dr. Albrecht over here.  And I'm really just looking to have

119    parenting with my kids and I'm just looking to have a relationship

120    with my kids.  And, while we are working this out in New

121    Hampshire, I'm very concerned that Dr. Albrecht essentially moved

122    out here without notice to me.  I found out about it months later

123    when I found out my daughter was in an emergency room here.  She

124    purchased the house here on October 15th.  On November 6th she

125    testified under oath to the Court in California—excuse me, to the

126    Court in New Hampshire that she lived in California—

127         THE COURT:  Mr. Albrecht, none of that concerns me.

128         MR. ALBRECHT:  Okay.  What would you like to know, sir, and

129    I'll do my best to address it.

130         THE COURT: It's your Motion, all I'm doing is having you

131    focus on what's relevant here.

132         MR. ALBRECHT:  Okay.  So, I think what's relevant—

133         THE COURT:  Excuse me just a minute.  You want to take your

134    hat off. Mr.—he's got to take his hat off, this is a courtroom.

135    Go ahead.

136         MR. ALBRECHT:  I think what's relevant, your Honor, is we've

137    gone years without having court orders followed.  And now that Dr.

138    Albrecht is here in Michigan I'd like to see those orders followed

139    when she's in Michigan.  And, I'd like the assistance of the Court

140    to basically say that the Orders out of 9th Circuit will be follow

141    and they're registered here and that you have a copy—this Court

142    has a copy in their case there's anything the New Hampshire Court

143    needs assistance with from Michigan.

144         THE COURT:  All right, you can have a seat.  Mr. Wegmeyer,

145    your response.

146         MR. WEGMEYER:  Thank you, your Honor.  Your Honor, the only

147    thing at issue today is whether this Court is going to take

148    jurisdiction of this matter under the Uniform Child Custody Act.

149    Under the requirements for that is that there's an Order that's

150    enforceable in this State.  And, I've attached as my exhibit B,

151    first of all, my exhibit A, and I don't know how much—I apologize

152    for the volume of information because I haven't been looking at it

153    —Mr. Albrecht served me with over a thousand pages of document,

154    discovery requests, et cetera.  It's an ongoing thing that I have

155    a copy of the 9th Circuit index—pleadings index, if your Honor

156    would like to see it, it's unbelievable.  There's four-hundred and

157    five entries; three hundred and ninety three pleadings filed, it's

158    just—and I'm afraid if this Court takes jurisdiction this is just

159    going to keep going and going.

160         But, back to the point, the last Order out of the New

161    Hampshire Court is attached as Exhibit B to my response.  And it

162    indicates that any parenting time—there's going to be a temporary

163    parenting time in May, which took place, very short, with the

164    youngest daughter it was five or six hours and the oldest

165    daughter, who is seventeen, was five minutes.  That's the first

166    parenting time since Christmas of 2019—

167         MS. ALBRECHT:  '18.

168         MR. WEGMEYER:  '18.  It was very bad circumstances and the

169    children refused to see their father after that.  So, five

170    minutes, with the oldest child, and a few hours only on my

171    client's assistance that you go and try to do it.  She did it and

172    it was very tough.  She's written another letter to the Court

173    which I would provide to you.  Under the last—the temporary Order

174    out of New Hampshire, it says there's going to be some short--a

175    two and a half hour duration, that took place, that was bad.

176    Pending further order all such periods shall occur in New

177    Hampshire and I believe they were in a public place because the

178    girls don't want to be alone with him in private.  Any further

179    such period shall be contingent upon the children's preferences

180    and their comfort levels.  So, there's no mandatory parenting

181    time, it's up to the children whether or not they want to schedule

182    time with him they are free to do that.    Petitioner's extended

183    parenting time in the Summer of 2021 is temporarily suspended.

184        That Order is going to be reviewed on August 6th.  And I

185    spoke with New Hampshire counsel—I apologize, your Honor, I have

186    new teeth and I'm having a tough time—

187        THE COURT:  I understand what you're saying.

188        MR. WEGMEYER:  Anyway, August 6th the Court is going to

189    review that and see how the parenting time went and determine then

190    whether there's going to be any parenting time or if it's going to

191    be suspended for another period of time; whether it's going to be

192    terminated, et cetera.  And, it's my position we shouldn't, right

193    at this point, there was a never—which is a requirement under the

194    Act, that's enforceable in this Court.  Well, there's never been a

195    Court Order that provides for parenting time in the State of

196    Michigan.  There's no support—

197        THE COURT:  Under the UCCJEA, you don't have to have one in

198    Michigan.  What Mr. Albrecht's asking for is for me to enforce

199    another State's order.

200        MR. WEGMEYER:  I understand.

201        THE COURT:  So, it doesn't have to be my order that I'm

202    enforcing.

203        MR. WEGMEYER:  No, I understand.  But I'm saying that there's

204    no—even if we took the New Hampshire Court Order—

205        THE COURT:  I understand what you're saying.  But I just

206   wanted it to be clear from what you just said that there's no

207   order in Michigan and he's asking for an Order in Michigan.

208        MR. WEGMEYER:  No.  I'm saying—I was saying there was no

209   Court Order out of New Hampshire that provides for any parenting

210   time in the State of Michigan.

211        THE COURT:  That's not what you said.

212        MR. WEGMEYER:  Well, I apologize.

213        THE COURT:  It might have been what you meant but it's not

214   what you said.

215        MR. WEGMEYER:  That's what I meant.

216        THE COURT:  All right.

217        MR. WEGMEYER:  There's nothing in New Hampshire that requires

218   any parenting time—it says it's going to take place in New

219   Hampshire.  Mr. Albrecht filed simultaneously the same action in

220   California as he did here with no legal basis.  There's no Nexis

221   to California whatsoever for either party.  This is just a

222   continuation of abusing the judicial system, your Honor.  His

223   Attorney filed in New Hampshire is nine banker boxes.  We're just

224   into this a week and we've got a thousand pages.  Your Honor, if

225   you take jurisdiction in this matter now, and you might end up, I

226   admit that if the Court in New Hampshire says parenting time is

227   going to happen—right now there is no parenting time to enforce.

228   And, Mr. Albrecht is the one paying all be it, very little, 50.00

229   a month, a man with a Harvard Education.  He's the one that, if

230   there's any enforcement for child support, it would take place in

231   New Hampshire.  But he is up to date on his 50.00 a month.

232   There's nothing that this Court needs to enforce.

233        And, I do have attached as Exhibit B(3) is the Notice of

234   Hearing for August 6th in New Hampshire.

235        I would direct your attention, your Honor, I know it's on the

236   merits, if this Court were to assume jurisdiction--but the letters

237   from the children are attached as exhibits, the Court should be

238   aware of their position.  They are fourteen and seventeen.  I know

239   them very casually and I've never actually spoke to them about

240   this file but Dr. Albrecht recently started, when she moved to

241   Michigan, started attending the Church that I belong too and I'm

242   one of the Church Council members et cetera.  I haven't had a

243   whole lot of contact with the kids but the Youth Pastor has

244   indicated they are just wonderful intelligent—

245        THE COURT:  Mr. Wegmeyer, that's really not relevant here to

246   these proceedings.

247        MR. WEGMEYER:  I understand.

248        THE COURT:  And even their feelings, at this point and time,

249   are not relevant to this issue because it would be relevant to the

250   Court in New Hampshire as it would affect the Judge's decision

251   there on what he ordered.

252        MR. WEGMEYER:  Understood, your Honor.

253        THE COURT:  But I can't change that order.

254        MR. WEGMEYER:  I understand, your Honor.

255        THE COURT:  So, if he ordered, for example, that there be

256   parenting time, the desire of the kids, I can't change that just

257   because they don't want to do it.

258        MR. WEGMEYER:  I understand.

259        THE COURT:  He would have to change--he or she would have to

260   change that in New Hampshire.

261        MR. WEGMEER:  Right.

8

262          THE COURT:  So, anything else?

263          MR. WEGMEYER:  Nothing, your Honor.

264          THE COURT:  All right.  Mr. Albrecht, you want to respond.

265          MR. ALBRECHT:  A quick procedural thing.  I understand Mr.

266     Wegmeyer's put in exhibits.  I have some exhibits in response to

267     that.

268          THE COURT:  No, you should have filed them if you wanted me

269     to see them.  I'm not going to look at them now.

270          MR. ALBRECHT: I don't need you to look at them now, I'd just

271     like to have them filed.  I only got them from him and I had to

272     fly out and I—

273          THE COURT:  Mr. Albrecht, I'm not going to take them.  I'm

274     not the keeper of the records.

275          MR. ALBRECHT:  Okay.  May I file them with the Court

276     downstairs?

277          THE COURT:  For what purpose?

278          MR. ALBRECHT:  They're responsive to Mr. Wegmeyer's exhibits,

279     which I only received—he promised them to me—

280          THE COURT:  No.  I'm not going to allow you to just to file

281     blank exhibits.  You could have attached them to your motion right

282     from the beginning.

283          MR. ALBRECT:  I attached—

284          THE COURT:  I'm telling you, I'm not going to take them—

285          MR. ALBRECHT:  Okay.

286          THE COURT:  --so that's it.

287          MR. ALBRECHT:  Okay.

288          THE COURT:   What did you have to say in response?

289          MR. ALBRECHT:  Give me just a moment to recall his points,

9

290     sir.  Primarily there are other aspects of the Order enforceable

291     here, such as access to records, access to school stuff and all

292     that so this isn't just about parenting.

293          THE COURT:  That's it.

294          MR. ALBRECHT:  If you have questions for me, sir, I'd be

295     happy to answer them.

296          THE COURT:  You can have a seat.  First of all, I want to

297     indicate that your Motion, Mr. Albrecht, not only asks me to

298     enforce the Order but asks me to require the Respondent to bring

299     the minor children to law enforcement for purpose of exchanges, to

300     —frankly, I think that's unconscionable to involve children with

301     the police.  And, there is no way, even if I had the ability to

302     enforce this—even if the Court in New Hampshire had said, and had

303     not issued their temporary order, I wouldn't have granted that to

304     begin with.  And I think it's unconscionable that'd you even ask

305     that your children be taken to the police station and have them

306     involved.  I think that would be detrimental to the children,

307     period, to have to be gone—taken to a police station.  And the law

308     is clear, now in as much as Ms.—it says Albrecht on the heading

309     here, is a resident of the State of Michigan, any Orders in the

310     State of New Hampshire is enforceable here.

311          The current Order, however, suspends parenting time.  It did

312     not suspend the party's joint legal custody as far as having

313     access to records and things of that nature.  So, to the extent

314     that Mr. Albrecht is asking that I enforce parenting time, I'm not

315     going to do it because you don't have any, number one, at least

316     temporarily.  And, number two, if any parenting—the only Order

317     that I've been provided for indicates that the parenting time take

318  place in New Hampshire. So, it's not like you can just come to

319  Michigan and see the kids. So, as far as records go, at least

320  until you can show me that you've—for example, on the kids'

321  schooling, that you have been unable to access them yourself,

322  because it's not the respondent's responsibility to give them to

323  you. That part of the provision of the Order simply allows you

324  access to them from whoever has them. So—and I don't have

325  jurisdiction over the school in this case and neither does the

326  Court in New Hampshire. I don't have jurisdiction over medical

327  records, only hospitals or whoever is the provider has that. They

328  are not a party to this case. I can simply indicate and agree

329  that you have joint—what's referred to as joint legal custody and

330  have the ability to obtain that information. And, to that extent,

331  I would sign an Order that says that because that's what the

332  current Order in New Hampshire says, but that's all I'll do. I

333  will not direct the school, I will not direct the medical facility

334  to give them to you. If you have problems with them you're going

335  to have to deal with them directly.

336      MR. ALBRECHT: May I respond.

337      THE COURT: No, this is not a response, I'm issuing a ruling

338  here. So, your Motion here to the extent that you're asking me to

339  enforce a parenting time Order is denied because there is no

340  parenting time Order that I can enforce.

341      To the extent that you're asking to have access in Michigan

342  to the information that you're seeking, I'm not going to issue

343  that either because you already have an Order from New Hampshire

344  that says the same thing. And, to the—and as I indicated, I have

345  no jurisdiction over those agencies, they are not a party to this

11

346     case.

347         So,  your Motion here, to this extent, I would simply

348     indicate that to the extent that I have an enforceable issue from

349     the State of New Hampshire—a Court in the State of New Hampshire,

350     I will enforce it in Michigan.  But, so far I haven't been

351     presented with an enforceable issue.  So, your Motion today is

352     denied.

353         That's it.

354         MR. WEGMEYER:  Thank you, your Honor.

355         (At 11:21 a.m., proceeding concluded)

356

357                    REPORTER'S CERTIFICATE

358 STATE OF MICHIGAN          )

359                            )

360 COUNTY OF ST. CLAIR        )

361

362     I hereby certify that this transcript, consisting of 13 pages, is

363 a complete, true and accurate transcript of the proceedings heard in

364 this Court on Thursday, July 15, 2021 before the Honorable Elwood L.

365 Brown.

366

367 _____         _____

368 Dated                   MS. CHRISTINE A. REGAN, CER 4832

369                         201 MCMORRAN BLVD., ROOM 2200

370                         PORT HURON, MICHIGAN  48060

371                         (810) 985-2010