# CLERK'S FILE COPY

1        IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3   KATHERINE ALBRECHT,                )
                    Plaintiff,         )
4                                      )   No. 03 C 6472
            v.                         )   Chicago, Illinois
5                                      )
    METROPOLITAN PIER AND EXPOSITION   )   September 15, 2003
6   AUTHORITY, et al.,                 )   10:15 a.m.
                    Defendants.        )
7
            TRANSCRIPT OF PROCEEDINGS - HEARING
8
        BEFORE THE HONORABLE MORTON DENLOW
9
    APPEARANCES:
10
    For the Plaintiff:   MR. HARVEY M. GROSSMAN
11                       MR. ADAM D. SCHWARTZ
                         MS. CONNIE Y. CHUNG
12                       ROGER BALDWIN FOUNDATION OF ACLU, INC.
                         180 North Michigan Avenue, Suite 2300
13                       Chicago, Illinois 60601-7401
                         (312) 201-9740
14
    For the Defendant:   MS. BETTINA GETZ
15                       MR. DANIEL G. HILDEBRAND
                         MR. DAVID W. FULLER
16                       MAYER, BROWN, ROWE & MAW, LLP
                         190 South LaSalle Street
17                       Chicago, Illinois 60603
                         (312) 782-0600
18

19

20

21
            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
22              TRANSCRIPT PREPARED BY COMPUTER

23                  MICHAEL P. SNYDER
                     Official Reporter
24          United States District Court
        219 South Dearborn Street, Room 1902
25              Chicago, Illinois 60604
                Telephone (312) 435-5563

## CLERK'S FILE COPY

C
L
E
R
K
'
S
F
I
L
E
C
O
P
Y



1           THE CLERK:  03 C 6472, Albrecht versus Metropolitan
2   Pier.
3           THE COURT:  Go ahead and identify yourselves, and
4   spell your last names for the record.
5           MR. SCHWARTZ:  Good morning, Your Honor.  Adam
6   Schwartz, S-c-h-w-a-r-t-z, on behalf of the plaintiff.
7           MR. GROSSMAN:  Harvey Grossman, G-r-o-s-s-m-a-n, on
8   behalf of the plaintiff.
9           MS. CHUNG:  Connie Chung, C-h-u-n-g, on behalf of the
10  plaintiff.
11          MR. SCHWARTZ:  Your Honor, this is the plaintiff's
12  motion for --
13          THE COURT:  Let me hear who the defendants are.
14          MR. HILDEBRAND:  Daniel Hildebrand,
15  H-i-l-d-e-b-r-a-n-d, for the defendant Metropolitan Pier &
16  Exposition Authority.
17          MS. GETZ:  Bettina Getz, also for the defendant.
18          MR. FULLER:  David Fuller, F-u-l-l-e-r, for the
19  defendant.
20          THE COURT:  Okay.  This is plaintiff's motion for a
21  temporary restraining order, is that correct?
22          MR. SCHWARTZ:  Yes, Your Honor.
23          THE COURT:  Let me just explain to you a procedural
24  issue that I want you to address, and that is, I am going to
25  encourage you to think about the possibility of giving me a

 1   limited consent.  If you want a decision that's going to have
 2   any meaning, without a limited consent, all I could do is make
 3   a report and recommendation to Judge Nordberg, and then you are
 4   going to be right back before Judge Nordberg who sent it back
 5   to me.  So I am going to have my courtroom deputy give you
 6   forms of limited consent, I'll give you forms of full consent
 7   too, but I'm not as concerned about that.  I'll give you forms
 8   of limited consent.

 9        I want you to think about it, and then I want you to
10   tell me collectively whether you are going to give me a limited
11   consent are not.  I don't want to know -- if one of you
12   doesn't, chooses not to give me a limited consent, that's your
13   choice, and I respect it.  But I don't want you to tell me who
14   it was that refused to consent because I don't want anybody to
15   feel that, as a result of one party's refusing to consent, that
16   I may feel differently about it.

17        Just from a practical standpoint, I mean, if we are
18   going to go through the trouble of arguing the motion and
19   obtaining a decision, and if all I do is a report and
20   recommendation, which would probably be a verbal report and
21   recommendation, then you are going to, you know, whoever loses
22   is going to go right back to Judge Nordberg and say, "Okay,
23   here's the report and recommendation, Judge, you still have to
24   deal with it."  I can't enter an order on the TRO.

25        Any questions about the procedural question that I'm

1  putting to you?  Okay.

2          So I'll give you five minutes to talk, and if you

3  agree either to the limited consent or the full consent, on the

4  limited consent form, just fill in the title of the motion for

5  which you are consenting for me to decide, and then that would

6  be I would be deciding that particular motion for purposes of

7  the case.  If you want to do a full consent, then I'll hang

8  onto the entire case, but that's not as important to me right

9  now as making sure that, if we are going to go through all this

10  effort, that it be for some useful reason and not just to spin

11  wheels and then send you right back to Judge Nordberg.

12          I'll get off the bench for a few minutes and let you

13  talk about it.

14          MS. GETZ:  Your Honor, one question.  The defendants

15  had sent over their papers this morning.  I just wanted to make

16  sure you got them.

17          THE COURT:  Yes, I did.

18          MS. GETZ:  Okay.  Thanks.

19      (Recess.)

20          THE COURT:  Let's call the case again, and let's

21  decide how we are going to proceed here.

22          THE CLERK:  03 C 6472, Albrecht versus Metropolitan

23  Pier.

24          THE COURT:  Okay.  Mr. Schwartz, what is it that you

25  intend to proceed on, just the papers that were filed and oral

1   argument?  Is there anything else?  Do you intend to call any

2   witnesses?

3          MR. SCHWARTZ:  Yes, Your Honor.  Ms. Albrecht, the

4   plaintiff in this lawsuit, is present in this courtroom and is

5   prepared to testify.

6          THE COURT:  Okay.  With an evidentiary hearing then?

7          MR. HILDEBRAND:  Your Honor, we object to an

8   evidentiary hearing.  We had no notice that plaintiffs intended

9   to put on witnesses.  Our understanding Friday was that this

10  would be done on the papers this morning.  We certainly could

11  have brought witnesses, but we think, as reflected in our

12  papers, that this whole proceeding is a trumped up emergency

13  and premature.  This is another way of sandbagging us.  Let's

14  stand on the papers and have an argument and see where the

15  result falls tomorrow.

16         MR. GROSSMAN:  Your Honor, may I address that

17  briefly?

18         THE COURT:  Sure.

19         MR. GROSSMAN:  I intend to be the person who puts

20  Miss Albrecht's testimony on.  We really have her here today as

21  a service to the Court.  We think that she can describe in some

22  degree of specificity what it is that she wants to do, how it

23  is that she intends to do it.  We put some emergency papers

24  together here.

25         We are only seeking limited relief on the TRO, that

 1   is, for Miss Albrecht and members of her group to go forward

 2   tomorrow.  We never had any understanding, I'm not questioning

 3   what opposing counsel's, quote, understanding is, but we never

 4   agreed to any process today.

 5          We certainly don't intend to take any unfair

 6   advantage of them.  Quite honestly, they have the majority of

 7   the evidence in this case.  It's their, it's their building,

 8   they know how it's run, they have people who have filed

 9   affidavits, they have made representations, numerous

10   representations in their papers that they filed this morning,

11   and all we really seek to do is establish through Miss

12   Albrecht's testimony who she is, what the importance of her

13   speech is, what her intentions are in terms of engaging in

14   communication.  It's very, very brief.  I don't believe it's

15   controversial, but I think it will inform the Court.

16          THE COURT:  Okay.  I mean, I am at a little bit of a

17   disadvantage because I was not here last week, and when I

18   arrived I had all these papers.  And I have dealt with a

19   similar case at one point, that Ayres versus City of Chicago,

20   case, I handled a preliminary injunction.

21          My general feeling is that we are better off, you

22   know, just deciding the case once on the merits and not

23   spending a lot of time -- I mean, you know, just sort of going

24   right to the merits and just deciding it on the merits.  I

25   don't know if the merits change significantly.

1            And I would make the following suggestion for
2   defendants to think about, that we continue the hearing to 1
3   o'clock, permit the defendants to either depose or informally
4   interview the plaintiff about what it is that she is going to
5   testify to, give you the opportunity if you want to bring a
6   person down, or you can stand on your papers about McCormick
7   Place, and let's just decide this up or down, you know, one way
8   or the other, if you feel comfortable with that, if you feel
9   comfortable with that.

10          MS. GETZ:  Your Honor, we do have a problem with
11  that, and this is why.  We didn't get served with this stuff
12  until late or middle of the afternoon on Friday.  This is
13  something that's been a rush through the weekend to get
14  something on file.  Our clients are due to start three new
15  trade shows tomorrow at Navy Pier to get --

16          THE COURT:  McCormick Place.

17          MS. GETZ:  I'm sorry, McCormick Place.

18          And to find someone at this point, get them prepared
19  and ready to testify, it puts us at an extreme disadvantage.  I
20  don't think what's going to come out through the plaintiff's
21  testimony is going to be anything that's earthshattering.  We
22  could probably just take a few minutes and talk with her and
23  reconvene before Your Honor.

24          THE COURT:  Okay.

25          MR. GROSSMAN:  Your Honor, might I also respond

1  briefly?

2  We intended to proceed -- we have no problem at all

3  trying this once so that, instead of going to a preliminary

4  injunction phase to have some sort of process by which the

5  Court determines the ultimate merits.  We would not like that

6  to happen today simply because we have had also no discovery at

7  all.  There are lots of factual representations here.

8  THE COURT:  Yes.  I don't know.  Will the case

9  survive beyond today?

10  MR. GROSSMAN:  Well, I think it will, Your Honor,

11  because we have challenged the rules on their face.  So I think

12  there is an as-applied challenge that we want you to hear

13  today, but a facial challenge that we want you to ultimately

14  determine.

15  MR. HILDEBRAND:  We would agree, Your Honor.  We

16  certainly don't want a preliminary injunction ruling based on

17  the limited evidence in the record today.

18  THE COURT:  That's fine.

19  MR. HILDEBRAND:  We did our best over the weekend to

20  provide you with a full presentation, but --

21  THE COURT:  That's fine.  My suggestion would be

22  then, let's just treat it as a TRO.  Let's forget the

23  preliminary injunction phase and go right to a hearing on the

24  ultimate merits whenever you are ready on that so that there

25  not be any intermediate step.  The only intermediate step will

1   be this TRO, which basically will govern what happens over the

2   next three days, which is the period of time that you are most

3   concerned about as far as this particular event is concerned.

4   Is that fair?

5               MR. HILDEBRAND:   That's agreeable to us.

6               MR. GROSSMAN:   It is also to us.

7               MR. HILDEBRAND:   If I understand, we'll just be

8   skipping, there will be no further preliminary relief, then it

9   will be a question of a permanent challenge to the policies.

10              THE COURT:   The TRO is going to be in effect for ten

11  days anyway.

12              MR. HILDEBRAND:   Right.

13              THE COURT:   So whatever happens on the TRO will

14  govern what happens with respect to this event.

15              MR. HILDEBRAND:   Okay.

16              THE COURT:   And that will be without prejudice to

17  then deciding it on the merits whenever you are ready.

18              MR. HILDEBRAND:   Full record.

19              MR. GROSSMAN:   We do agree with that with regard to

20  Miss Albrecht.   And I don't want the Court to think that we

21  have any agenda other than the one that we are explicitly

22  expressing here today.

23              The American Civil Liberties Union has a little

24  problem independent of our, us as counsel representing a single

25  plaintiff in this case.   I don't know if somebody else is going

 1  to be affected by this in the next 15 or 20 days and come in

 2  and see us and have a problem.  So I would try to reconcile

 3  that with our representation of Miss Albrecht and what we are

 4  trying to do here in this case, and I can make those

 5  representations binding on Miss Albrecht in this case, but I

 6  want the Court to understand.

 7        THE COURT:  Right, if somebody else tomorrow comes in

 8  and asks you to --

 9        MR. GROSSMAN:  Wants to do something else next week,

10  we will go to them and try to figure out what to do here.

11        MR. HILDEBRAND:  Just so long as the representation

12  is there aren't more waiting in the wings that you're aware of

13  at this point.

14        MR. GROSSMAN:  No, we are representing Miss Albrecht.

15        MR. HILDEBRAND:  Okay.

16        THE COURT:  Have you made any effort to meet and talk

17  about this to see whether you can work out something as it

18  relates to this particular show without prejudice on either

19  side as far as, you know, the merits go?

20        MR. HILDEBRAND:  We did make an effort to meet and

21  talk, Your Honor, but because of the particularly high density

22  of traffic down at McCormick Place tomorrow, with four shows in

23  the building, approximately 40,000 people, the general

24  manager's ultimate feeling was we have our policies for a

25  reason, and I guess for tomorrow, at least, we want to step up

1   and defend them as they are.

2           THE COURT:   Okay.

3           MS. GETZ:   And, Your Honor, this does come so very,

4   very late in the day when this was known to people months ago,

5   to sort of legislate on the fly and change the rules which

6   really could affect other protesters in the future.   We hate to

7   do that on a case-by-case basis and really shouldn't have to

8   given the timing of this case.

9           THE COURT:   Okay.

10          MR. GROSSMAN:   As a courtesy to the Court, I would

11  like to inform, and to the governmental body involved here,

12  represent to the Court that Miss Albrecht started her efforts

13  to perfect her speech at McCormick about 20 days ago, and that

14  she sought the assistance of pro bono counsel, that this matter

15  did come into our office about ten days ago, that by the time

16  we worked through our caseload, made contact, sent the demand

17  letter, that we find ourselves here today.   So we did not

18  consciously attempt to sandbag the defendants or the Court as

19  might be suggested to get an expedited ruling of some nature.

20  It is the nature of pro bono representation, unfortunately.

21          THE COURT:   Just for my own scheduling purposes,

22  because I had a couple other things going this morning,

23  including interviewing some people for law clerkships and stuff

24  and their coming in, I think it would work best for me if it

25  works for you to give me till about 1 o'clock so I can study,

1  you know, the briefs, at least refamiliarize myself with the

2  case law, make it a -- so I can ask the more specific questions

3  in terms of what the standards are and, therefore, have a more

4  intelligent discussion and oral argument; and then at that

5  point in time, in the meantime give you an opportunity, if you

6  want to interview the plaintiff, to either interview her or

7  depose her, and then leave it to Mr. Grossman as to whether he

8  wants to call her or wants to stand on the affidavit just for

9  the limited purposes of the TRO so that you are not taken at

10  all by surprise in terms of what the, you know, what she may

11  testify to.

12        MS. GETZ:  Well, there is no affidavit with the

13  complaint, Your Honor.

14        MR. GROSSMAN:  Yes, there are two declarations.

15        MS. GETZ:  Oh, okay.  I'm sorry.  What I am saying is

16  the complaint itself wasn't verified.

17        MR. GROSSMAN:  No.

18        MR. SCHWARTZ:  Correct.

19        THE COURT:  No.

20        MS. GETZ:  And we also have a verification at the end

21  of our response, Your Honor, and we would like that to be able

22  to stand in lieu of live testimony if there is no objection.

23        THE COURT:  That would be fine, given the --

24        MR. SCHWARTZ:  Your Honor, there is one additional

25  matter.  In addition to our written motion for a temporary

1   restraining order, we'd like to make at this time an oral

2   motion for a judicial inspection of McCormick Place, as I think

3   everyone will agree whether or not the speech that we are

4   proposing is protected within McCormick Place is a highly fact

5   intensive inquiry, and we believe that an inspection of the

6   facility would be useful in making that judgment.

7           It is a practice that is engaged in by other courts

8   in this district.  Judge Moran went to the United Center in the

9   context of the challenge to speech restrictions at the

10  Democratic convention in 1996.  Also in a lawsuit called Mercy

11  Hospital, Judge Grady went to a hospital.

12          The basic paradigm is that paradigm is that the Court

13  may look at the location to allow the Court to better

14  understand the evidence before the Court, and that it can be

15  done by consent of the parties or in the absence of consent if

16  it is absolutely necessary to do so.

17          THE COURT:  Okay.  My schedule just will not permit

18  it today.  I have no problem if the parties agree to engaging

19  in that process as we deal with the case on the merits, but

20  it's just not, it's not practical for me to just drop

21  everything and run out to McCormick Place and try to understand

22  that, given my schedule.

23          I mean, and that's -- part of the problem is the

24  timing of the lawsuit itself.  I mean, had the lawsuit been

25  filed two weeks ago or even a week ago, I mean, we could have

1 │ talked about it.  But here it is, it was filed late Friday, and
2 │ it's Monday, and you want something to happen tomorrow.  I
3 │ can't both be reading the cases and driving to McCormick Place
4 │ and accommodating all that.

5 │         I would not be -- I mean, I would be open to that in
6 │ dealing with the case ultimately on the merits if the parties
7 │ feel it's appropriate, but I'm not going to do it today.

8 │         Anything else you want to raise, Mr. Schwartz?

9 │         MR. SCHWARTZ:  No, Your Honor.

10 │        THE COURT:  Okay.  So does it work for everybody to
11 │ resume at 1 o'clock?

12 │        MR. HILDEBRAND:  That's very good, Your Honor.

13 │        THE COURT:  The one case, you know, that jumped out
14 │ to me was this Chicago Acorn versus Metropolitan Pier.  Is that
15 │ the leading case on your side?

16 │        MR. HILDEBRAND:  We believe so, Your Honor, yes.

17 │        THE COURT:  What would you say the leading case is on
18 │ your side?

19 │        MR. SCHWARTZ:  We could also say Acorn, as well as
20 │ International Society of Krishna Consciousness versus Lee, and
21 │ also Los Angeles versus Jews for Jesus.

22 │        THE COURT:  Okay.  I am going to try to at least read
23 │ those cases.

24 │        MR. HILDEBRAND:  Let us call the Hawkins decision out
25 │ of Denver to your attention as well as the Carpenters decision

```
 1   out of the First Circuit.  They are cited in the first portion
 2   of our brief.
 3             THE COURT:  Hawkins, Carpenters, okay.  Very good.
 4             MR. SCHWARTZ:  Your Honor, we would also add
 5   Weinberg, a recent decision of the Seventh Circuit.
 6             THE COURT:  Was that cited in your --
 7             MR. SCHWARTZ:  It's in our brief.  I'm sorry.  It's
 8   not in our brief.
 9             THE COURT:  Okay.  Why don't you give me a cite if
10   you expect me to --
11             MR. SCHWARTZ:  I will.
12             MR. HILDEBRAND:  Me too.
13             MR. SCHWARTZ:  I apologize.
14             THE COURT:  I do try to stay current on the Seventh
15   Circuit, but --
16             MR. SCHWARTZ:  I apologize, I don't have that cite
17   with me.  Will it be okay if my assistant calls your chambers
18   and --
19             MR. HILDEBRAND:  I know what you are talking about.
20             MR. SCHWARTZ:  This is the peddling of a book about
21   the Blackhawks near the United Center.
22             THE COURT:  Okay.  There's probably about some 15,000
23   people interested in it.
24             MR. HILDEBRAND:  I would say that Weinberg is
25   irrelevant because there is no dispute --
```

1           THE COURT:   We'll argue it later.  I just want to be

2    sure I have read the cases that you are going to be most

3    heavily relying on.

4           Okay, and, Mr. Grossman, if you will make your client

5    available in some way for defendants to interview or depose or

6    whatever you want to do between now and then, we'll resume at 1

7    o'clock.

8           MR. GROSSMAN:   Thank you, Your Honor.

9           THE COURT:   Thank you.

10          MR. HILDEBRAND:   Thank you, Your Honor.

11          MS. GETZ:   Thanks.

12       (Recess from 10:45 a.m. until 1:00 p.m..)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
2                             EASTERN DIVISION

3    KATHERINE ALBRECHT,                    )
                         Plaintiff,         )
4                                           )    No. 03 C 6472
                   v.                       )    Chicago, Illinois
5                                           )
     METROPOLITAN PIER AND EXPOSITION       )    September 15, 2003
6    AUTHORITY, et al.,                     )    1:00 p.m.
                         Defendants.        )
7
                       TRANSCRIPT OF PROCEEDINGS - HEARING
8
                   BEFORE THE HONORABLE MORTON DENLOW
9
     APPEARANCES:
10
     For the Plaintiff:   MR. HARVEY M. GROSSMAN
11                        MR. ADAM D. SCHWARTZ
                          MS. CONNIE Y. CHUNG
12                        ROGER BALDWIN FOUNDATION OF ACLU, INC.
                          180 North Michigan Avenue, Suite 2300
13                        Chicago, Illinois 60601-7401
                          (312) 201-9740
14
     For the Defendant:   MS. BETTINA GETZ
15                        MR. DANIEL G. HILDEBRAND
                          MR. DAVID W. FULLER
16                        MAYER, BROWN, ROWE & MAW, LLP
                          190 South LaSalle Street
17                        Chicago, Illinois 60603
                          (312) 782-0600
18

19

20

21
               PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
22                   TRANSCRIPT PREPARED BY COMPUTER

23                          MICHAEL P. SNYDER
                            Official Reporter
24                     United States District Court
                   219 South Dearborn Street, Room 1902
25                      Chicago, Illinois 60604
                        Telephone (312) 435-5563

Albrecht -

1    (Proceedings in open court.)

2            THE COURT:  Okay.  Are we ready to proceed?  Have

3    the defendants had an opportunity to interview the plaintiff?

4            MR. HILDEBRAND:  We have, Your Honor.

5            THE COURT:  Okay.  Mr. Grossman, do you want to call

6    a witness?

7            MR. GROSSMAN:  Yes, sir.  Your Honor, at this time

8    plaintiffs would like to call the plaintiff Katherine Albrecht.

9            THE COURT:  Please step forward.

10           The courtroom deputy will swear you.

11           THE CLERK:  Please raise your right hand.

12               KATHERINE ALBRECHT, PLAINTIFF, SWORN

13           THE CLERK:  Please take a seat.

14           THE COURT:  Miss Albrecht, try to bring the

15   microphone close to you and speak into it, and just be relaxed.

16           Mr. Grossman, you may proceed.

17           MR. GROSSMAN:  Your Honor, I have several exhibits

18   that I'd like the plaintiff to review during her testimony.

19   They are all contained, I am going to use the defendants'

20   exhibits and photographs to avoid any kind of issues.  So they

21   are attached to the affidavit of Thomas Mobley that was filed

22   by the defendants today.  Do you have a copy, sir?

23           THE COURT:  Yes.  Okay.

24           Any objection?

25           MS. GETZ:  No objection, Your Honor.

Albrecht - direct by Grossman

1           THE COURT: Very good.

2           Also, there is a microphone back there. Be sure your
3    green light is on.

4           MR. HILDEBRAND: The green light is on, Your Honor.

5           THE COURT: Very good.

6                       DIRECT EXAMINATION

7    BY MR. GROSSMAN:

8    Q. Will you please state your name and spell your last name
9    for the record.

10   A. My name is Katherine Albrecht. My last name is
11   A-l-b-r-e-c-h-t.

12   Q. Miss Albrecht, are you the plaintiff in this lawsuit?

13   A. Yes, I am.

14   Q. I'd like you to briefly describe to the Court what your
15   educational background is.

16   A. I have an undergraduate degree in international marketing,
17   I have a master's degree in education from Harvard University,
18   and I am currently working on my dissertation in a doctoral
19   program at Harvard University where I am focusing on consumer
20   education and specializing in privacy research.

21   Q. And you identify in the papers that you have filed in this
22   case that you have a relationship with an organization named
23   CASPIAN, C-a-s-p-i-a-n. Could you describe that organization
24   to the Judge, please.

25   A. Yes. I'm the founder and director of CASPIAN. CASPIAN

Albrecht - direct by Grossman

1   stands for Consumers Against Supermarket Privacy Invasion in
2   Numbering.  We are I guess a loose-knit group of consumers
3   around the country who have agreed that we oppose retail
4   surveillance and technologies that contribute to retail
5   surveillance and invasion of privacy of customers.
6   Q.   And what is your relationship historically and presently
7   with that organization?
8   A.   I founded that organization in 1999 by the creation of a
9   web site, and I am currently its director.
10  Q.   If I understand correctly, you have come to Chicago because
11  of the existence of a technology known as RFID, is that
12  correct?
13  A.   That is correct.
14  Q.   Could you explain what RFID is?
15  A.   Yes.  RFID stands for radio frequency identification.  It's
16  a technology that uses tiny computer chips, and I've brought an
17  exhibit for the Court to see those.  They are the size of a
18  spec of dust or a spec of glitter, and they communicate with
19  reader devices at a distance of up to about 20 feet away with a
20  unique identification number.

21        The goal behind this technology is to replace the bar
22  code.  Ultimately, once the goal of proponents of developers of
23  the technology, meaning that consumer products as they were
24  manufactured, would be equipped with one of these tiny devices
25  hooked up to an antenna making that product able to be tracked

Albrecht - direct by Grossman

1   and identified from a distance of up to 20 feet away, meaning
2   that if these chips were in something, for example, like
3   Huggies, Baby Wipes, which is one place they've been
4   demonstrated or trialed, someone could aim a reader device at
5   the Baby Wipes and be able to get this tiny chip to beam back
6   its number at a distance, and then the reader device would be
7   able to cross reference that in a database and look that item
8   up.

9          Our concern is that if and when these replace bar
10  codes, particularly in labels in people's clothing and other
11  items that are personal items of individuals, not only would
12  this database contain information about what the item is, but
13  it could also potentially contain information about who had
14  purchased it, what credit card was used to make that purchase,
15  when and where the purchase was made, meaning that ultimately
16  this technology could lead to the tracking of individuals.
17  Q.   And CASPIAN is opposed to the use of this technology?
18  A.   Yes, we are.

19          MR. HILDEBRAND:   Your Honor, if I may, I'd like to
20  interpose an objection.   We don't believe the content of
21  plaintiff's speech is at issue in this matter.   We let the
22  prior question pass for purposes of context, but I see no
23  purposes in exploring at any length the content --

24          THE COURT:   Right.   I am just accepting it for some
25  background, but I'm not really concerned about, for purposes of

Albrecht - direct by Grossman

1   this hearing, you know, the whole program and what -- you know,
2   just a little background is fine, and I'm accepting it for that
3   purpose.

4             I'm not aware that there is a content attack on the
5   ordinance or the regulation, is there?

6             MR. GROSSMAN:   Your Honor, we have raised viewpoint
7   discrimination, and to center the Court's attention, at page 7
8   of the brief that was filed this morning by the defendants, in
9   the first full paragraph midway down the page, the authority,
10  the defendant authority, as I understand, it asserts that in
11  fact, quote, "The Authority's professional judgment is that
12  McCormick Place's customers prefer to conduct business in an
13  environment where they are not confronted by persons who
14  disagree with their agenda."

15            I think it's quite clear that viewpoint
16  discrimination is implicated here.   The authority believes that
17  in pursuing their commercial interests and those of the --

18            THE COURT:   Well, but I'm not aware, in terms of the
19  regulation, that there are certain types of content that's
20  allowed and certain type that is prohibited.

21            MR. GROSSMAN:   Well, Your Honor, I think that as we
22  proceed, maybe we can develop that more fully.   But we do not
23  intend to dwell at great length on the opposition.

24            MR. HILDEBRAND:   Your Honor, for the record, we
25  obviously disagree with any suggestion that the rules out at

Albrecht - direct by Grossman

1  McCormick Place are content based, and we also disagree that

2  the statement just quoted implicates in any way content

3  discrimination rules under a First Amendment analysis.

4          THE COURT:  Very good.  Thank you.

5          You may proceed, Mr. Grossman.

6  BY MR. GROSSMAN:

7  Q.  In the past, what vehicles have you chosen to express

8  CASPIAN's opposition to the implementation or deployment of

9  RFID technology?

10  A.  We have done numerous interviews with print and broadcast

11  media, we've issued press releases on a variety of different

12  issues on the subject, we have called for boycotts against

13  companies that have done particularly egregious privacy

14  invasion with this technology and, like, I guess primarily

15  speaking with the public and educating the public both through

16  the web site and through appearances with the press.

17  Q.  And have you sought to educate members of society other

18  than the general public itself?

19  A.  Yes, I have, and I've spoken in a number of public venues,

20  and I've also published an article in the Denver University Law

21  Review in which a substantial portion of that article was

22  dedicated to describing and uncovering this technology.

23  Q.  Now, you have also spoken at various symposia, meetings,

24  and conferences on this subject, is that correct?

25  A.  That is correct.

Albrecht - direct by Grossman

1  Q.  And could you review for the Court very briefly some of

2  those conferences or meetings?

3  A.  Yes.  Last month I testified at legislative hearings in the

4  state of California out in Sacramento on this issue, RFID.  I

5  was a speaker at the Computer Freedom and Privacy Conference in

6  New York City in I believe April of this year.  I spoke at a

7  national event at McCormick Place about two months ago on this

8  issue also, and next month I will be appearing before, on a

9  panel to discuss RFID technology before the European

10 Commission.

11 Q.  Now, has CASPIAN ever engaged in grass-roots advocacy

12 involving leafleting?

13 A.  Yes, we have.

14 Q.  And what approach has your organization and you yourself

15 taken in using leafleting at a communicative device?

16 A.  Well, in the past two events that I'm thinking of where we

17 did use leafleting, we made ourselves available in public

18 locations in front of retail spaces and were approached by

19 members of the public who asked to speak with us, at which

20 point we handed them a leaflet.

21 Q.  And were you or other members of CASPIAN subject to any

22 objections by law enforcement authorities or persons who were

23 administering the forums in which you distributed leaflets?

24 A.  Absolutely not.  In fact, we worked closely with them to

25 make sure that we were behaving appropriately in that venue.

Albrecht - direct by Grossman

1  Q.  Now, would it be fair to say that CASPIAN has developed a

2  communications strategy regarding the use of RFID technology?

3  A.  I think that would be accurate.

4  Q.  And could you describe briefly what the objectives of that

5  strategy are?

6          MR. HILDEBRAND:  Objection, Your Honor.  Again, I

7  think we are spending too much time going into too much detail

8  about CASPIAN's strategy and the content of their message.

9  None of this has anything to do with the First Amendment

10 standards for the rules at McCormick Place.

11         THE COURT:  Well, there is a question as to whether

12 or not they are going to be able to communicate their message

13 in some effective way.  I view that as -- you have offered them

14 a place where they can engage in this activity, and I need to

15 know what kind of message they are trying to get out to see

16 whether the place you put them is an effective way to

17 communicate it.

18         So I will accept the testimony.  You may proceed.

19 Objection overruled.

20 BY MR. GROSSMAN:

21 Q.  Could you describe briefly for the Court what your

22 objective is in terms of communicating information about RFID

23 technology?

24 A.  We have two objectives.  One is to educate the public about

25 this technology, which has been developed since 1999 with very

Albrecht - direct by Grossman

1  little public awareness.  So we hope to raise that public
2  awareness given that now there is quite a bit of business
3  awareness at least about what the technology is and what it can
4  do.  That's the first piece of our communications strategy.

5       The second piece is to communicate with the business
6  leaders who have been invited to adopt this technology by its
7  developers and proponents to the fact that there is
8  considerable consumer opposition to it and that it does, in our
9  opinion, pose considerable threats to consumer privacy and
10  potential civil liberties as well.
11  Q.  Have you adopted any particular devices or methods of
12  communication in order to implement this objective?
13  A.  Well, in our proposed event at McCormick Place, our goal is
14  to communicate with business leaders who have been invited to
15  attend this event to let them know of our opposition to the
16  technology, to explain and have an opportunity to speak with
17  them directly if they are interested in why it is that we
18  oppose this technology.

19       One of our concerns is, having looked at the agenda
20  for the three-day EPC symposium that's coming up at McCormick
21  Place, this is the event sponsored by the developers of the
22  technology in question, that less than 2 percent of that
23  meeting is devoted to addressing any kind of consumer privacy
24  or public issues relating to the deployment of the technology,
25  and in that case it's only in track 3 of three different tracks

Albrecht - direct by Grossman

1   that attendees can attend.  I believe it's called Don't Forget
2   the Public.  So we have a sense there that if only one of three
3   tracks is addressing it, less than 2 percent of the total time
4   available, that perhaps that issue needs additional education,
5   and we'd like to be available and make ourselves available to
6   those business leaders to obtain that information.
7   Q.  Now, in the complaint that we have filed on your behalf and
8   in the evidentiary materials in support of that complaint, we
9   have identified several different vehicles that you intend to
10  use.  One is t-shirts.  Would you describe to the Court the
11  t-shirt that you intend to use and why and how you are going to
12  use the t-shirts.
13  A.  Yeah, essentially a t-shirt, either white or colored with
14  the words "STOP RFID" across the front to communicate to
15  anybody who is a passerby that we are in opposition to the
16  technology and let them know that we are people that they can
17  speak with if they'd like to learn about opposition.
18  Q.  And you have identified three different groups of people, I
19  believe, who would wear t-shirts.  The first group would be
20  people outside of the building, is that correct?
21  A.  Yes.
22  Q.  And the second group is people who would be inside the
23  building, and where would they be located?
24  A.  Well, the event is taking place in exhibition hall B-1 on
25  the third floor of the hall, the grand concourse in McCormick

Albrecht - direct by Grossman

1   Place.  That's quite a wide pedestrian hallway there.  People
2   mill and can converse in that location.

3           We would like to be in that concourse somewhere, you
4   know, within say 50 feet of that entrance so that, as people
5   see us with our t-shirts on, if they'd like to speak with us,
6   we'd be available to them for that purpose.

7   Q.  I'd like you to turn your attention to what has been marked
8   as Exhibit 4 in the documents submitted by the defendants
9   titled "Affidavit of Thomas Mobley."  Could you turn to that
10  exhibit, please.  I believe it's a color photograph.

11          You just described the grand concourse area outside
12  the meeting room.  Is that contained in Exhibit 4?
13  A.  Yes, it is, and in fact on the left you see the B-1 with
14  the four entrances to that exhibit hall.

15  Q.  Now, as we understand the position as it's been refined by
16  the defendants, they have indicated at page 8 and footnote 2 of
17  their memoranda that they wish to, I'll read it, "The authority
18  wishes to make clear that it has no policy banning persons from
19  wearing expressive t-shirts, buttons, and the like, or from
20  engaging in conversations with other visitors at McCormick
21  Place.  To the extent plaintiff heard otherwise, she
22  misunderstood or was misinformed.

23          "However, for most private events in McCormick Place,
24  it is the show managers that control access.  They are free to
25  impose limits on attendance as they see fit, including dress

Albrecht - direct by Grossman

1  codes, but not, of course, illegal limits that would constitute
2  discrimination or similar violation of the law."
3         So we are talking about apparently now the defendants
4  allowing you to enter this concourse area with your t-shirts
5  on, and they would allow you to engage in conversations with
6  other visitors.  Do you understand that?
7  A.   That's my understanding today.  That was not my
8  understanding initially when we contacted McCormick Place.
9  Q.   Now, given those circumstances, as you look at Exhibit 4,
10 where would you intend to be with up to nine other persons, I
11 believe is the request that we have made in the complaint,
12 where would you intend to be with others within this area
13 identified in Exhibit 4?
14 A.   Well, if you look on the left, you can see it's somewhat
15 cut off, but there is a B-1 and then the words north, north,
16 north, north.  Those four north signs constitute the entryway
17 to exhibit hall B-1, and having been there on Saturday, I can
18 say that's over 100 feet wide.  We would like to be somewhere
19 outside of that, clearly not blocking traffic, but where we
20 would also be visible to people entering that exhibit hall.
21 Q.   And would you also consider placing yourself across from
22 the area of B-1?
23 A.   Well, as seen from this image here, down the middle of the
24 concourse there is places for people to congregate and
25 converse.  Provided that we weren't blocking traffic, I think

Albrecht - direct by Grossman

1   that would be appropriate as well.

2   Q.  Now, you indicated to the Court that you attended a meeting

3   at McCormick Place last June, I believe, is that correct?

4   A.  That's correct.  That's the event at which I spoke on this

5   issue, yes.

6   Q.  And at that time were there other events going on at

7   McCormick Place?

8   A.  Yes, there were.

9   Q.  Do you know the nature of those events?

10  A.  Let's see.  There was the Chicago, I want to call it Retail

11  Conference.  I think that's the shorthand for it.  It was quite

12  a large event with many attendees.

13  Q.  Did you have an opportunity to be within the grand

14  concourse in the area around meeting room B-1 that's depicted

15  on Exhibit No. 4?

16  A.  Yes, I did.

17  Q.  And on those occasions, was that concourse more crowded

18  than it is in this picture?

19  A.  No, it was not.

20  Q.  Now, there was a third area that you were also going to

21  wear t-shirts in, is that correct?

22  A.  That's correct.

23  Q.  And that was to be within the room itself, within B-1, is

24  that correct?

25  A.  Correct.

Albrecht - direct by Grossman

1      THE COURT:  Wait.  The first area was in the
2  concourse?
3      MR. GROSSMAN:  The first area was outside the
4  building.
5      THE COURT:  Oh, outside the building, okay.
6  BY THE WITNESS:
7  A.  I don't know that we have discussed outside the building.
8  BY MR. GROSSMAN:
9  Q.  I intend to return to outside the building.
10      Now, the third area that you wish to wear t-shirts
11  was actually in the meeting room B-1, is that correct?
12  A.  Yes, the EPC symposium has a policy where any individual
13  apparently can purchase a $75 pass that gives them access to
14  the exhibit hall during the day or for a single day.
15  Q.  And you intend to buy that?
16  A.  Yes.
17      MR. GROSSMAN:  Your Honor, just for clarification, to
18  the extent that our papers sought an order from this Court
19  regulating the plaintiff or her group's access or expression
20  within the meeting room B-1, we are going to not pursue that
21  based on the representations made in the footnote.  So the only
22  areas that we will be concerned about will be the areas outside
23  of the building and this concourse area.
24      THE COURT:  Okay.  Well, let me just clarify.  If the
25  person who is selling the $75 ticket decides that, once Miss

MICHAEL P. SNYDER, Official Reporter

Albrecht - direct by Grossman

1  Albrecht enters wearing what they may consider to be an
2  offensive t-shirt, decides to remove her from inside B-1, you
3  are not asking me to deal with that issue?

4        MR. GROSSMAN:  That's correct.

5        THE COURT:  Okay.

6        MR. GROSSMAN:  We did not have clarification on that
7  prior to filing these papers.

8        THE COURT:  So is it my understanding then that it's
9  your position that coming into the grand concourse, anybody can
10 come in off the street into the grand concourse?

11       MR. GROSSMAN:  Yes, Your Honor.  We understand that
12 to be the defendants' position.

13       THE COURT:  Okay, and that the $75 ticket is
14 necessary to enter the meeting room B-1?

15       MR. GROSSMAN:  That's correct, Judge.

16       THE COURT:  Go ahead.

17 BY MR. GROSSMAN:
18 Q.  Now, based on your experience in leafleting as well as
19 having attended the conference at McCormick Place last June, do
20 you believe that you will be able to, assuming that you are
21 wearing a t-shirt and engaging in conversation with other
22 visitors including other people who are attending the meeting
23 room B-1, do you believe that you will be able to distribute
24 leaflets at that same time and place in a manner that will not
25 block ingress or egress to the building or create any kind of a

Albrecht - direct by Grossman

1   safety issue?

2   A.   Yes, I do believe we can safely do that.

3   Q.   Did you have occasion to have discussions with other

4   persons in the concourse last June?

5   A.   Actually, I did.

6   Q.   Do you carry business cards with you?

7   A.   I do.

8   Q.   Do you ever distribute those business cards?

9   A.   I do.

10  Q.   Did you have occasion to distribute business cards incident

11  to conversations in June?

12  A.   I don't know if I did so in the grand concourse, but I

13  certainly did within McCormick Place on a number of occasions.

14  Q.   I'd like to address your attention now to what has been

15  marked as Exhibit 9 in the submission by the defendants titled

16  "Affidavit of Thomas Mobley."

17          Do you understand that in the first illustration

18  contained in Exhibit 9, the top half of the page, that the

19  yellow area near the pylons is designated as the free speech

20  area?

21  A.   Yes.

22  Q.   Did you have occasion, or are you familiar with that area?

23  A.   I am.

24  Q.   And can you describe to the Court why you are familiar with

25  that area?

Albrecht - direct by Grossman

1   A.   I'm familiar with that area both having visited it recently
2   to refresh my memory on Saturday and also having spent
3   essentially two, I believe two and a half days at a conference
4   in June at McCormick Place which took place in this variety of
5   different buildings, so I am familiar with that location.
6   Q.   And where do you believe, based on your experience, will be
7   the exterior ingress and egress for persons attending the
8   convention meeting that you are concerned with?
9   A.   Based on my own personal experience of having come there in
10  a taxi, the taxi, and it's not really clear from this diagram,
11  perhaps on the other exhibit shows it more clearly, but around
12  that pylon is a circular driveway.  Taxis actually bypass the
13  pylons altogether, drive into the circular area, and drop off
14  pedestrian traffic right there at the entrance to the building.
15         Other pedestrian entrances which I actually used at
16  that time include a pedestrian walkway, which actually crosses
17  the street from above by passing the pylons altogether, and I
18  also entered the building from the Hyatt Hotel, which any guest
19  doing so would do so from the inside.
20  Q.   Would it be correct, looking at Exhibit 9, that the area
21  that's marked Gate 4 and is the blue front of that building,
22  the dark blue front of the building is approximately where the
23  gate is that you believe people will enter?
24  A.   That's the entrance that pedestrian traffic coming out of
25  taxis or private cars would go in through.

Albrecht - direct by Grossman

1   Q.  I'd like you to turn to Exhibit 11 now.

2              Can you identify the entryway that is of particular

3   interest to you?

4   A.  Yes, it's sort of to the right center.  It's actually that

5   glass wide entryway.  To the right of it there is a sort of

6   yellow billboard sign.  So it's sort of in the distance there.

7   Q.  And can you identify the structure running along the

8   left-hand side of this photograph?

9   A.  That is one of the pylons.

10  Q.  So this designations area for free speech that you have

11  made reference to in Exhibit 9, the yellow area, is

12  approximately where this pylon on the left-hand side of this

13  photograph, Exhibit 11, is located, is that correct?

14  A.  That's correct.

15  Q.  And have you walked that distance between the front entry

16  Gate 4 and the distance of the pylon?

17  A.  Yes, I have.

18             MR. HILDEBRAND:  Your Honor, excuse me.  I'd like to

19  object to this line of questioning.  We had understood that

20  testimony this morning -- this afternoon, I should say -- would

21  be limited to subject matters raised in the complaint, and it

22  appears that opposing counsel is now using his witness to

23  introduce our free speech area.  We think that's inappropriate.

24  It was also undisclosed, so it's outside the scope of what we

25  expected to deal with.

MICHAEL P. SNYDER, Official Reporter

Albrecht - direct by Grossman

1        THE COURT:  Yes.  I think I am going to sustain the

2  objection.  I think we can just argue that from the exhibits

3  themselves.

4        MR. GROSSMAN:  Your Honor, just to clarify the

5  record, I object to the characterization.  What we have told

6  the defendants is we were going to cover the matters in the

7  complaint, and if there is any problem with that -- this is our

8  only witness to do that with, and so they have verified

9  virtually their entire background section, every single

10  statement that's in their memoranda through a simple statement

11  of verification.

12        THE COURT:  Okay.  Well, I am, you know, I'm still a

13  little unclear as to where the free speech area is when I look

14  at Exhibit 11.

15        MR. GROSSMAN:  Okay.  I am trying to clarify that.

16        THE COURT:  And I think we can do that really without

17  the witness.  I mean, in other words, defense counsel can point

18  it out in here, and if later there is some disagreement, your

19  witness wants to come on for that, that's fine.  But I think

20  there shouldn't be a dispute as to where it is and how far it

21  is and those kinds of things.  I was more concerned about

22  what's the message that she's trying to communicate, what she

23  feels to be an effective message, and then I'll deal with what

24  McCormick Place has done based on what's out here.

25        MR. GROSSMAN:  Okay.

Albrecht - direct by Grossman

1   BY MR. GROSSMAN:

2   Q.   Would you turn your attention to Exhibit 15.

3        Can you identify the area between the pylons?

4   A.   That would be the first amendment area designated by

5   McCormick Place.

6   Q.   And do you object to having to speak there and give out

7   your leaflets in that area?

8   A.   Yes, I do.

9   Q.   Could you tell the Court why.

10  A.   Yes, because, as we pointed out, very few pedestrians are

11  going to pass down that section of sidewalk given the majority

12  of people entering the building will either be doing so from

13  the other side entirely from the interior of McCormick Place,

14  they will be doing so from a circular driveway which actually

15  passes right in front of that black door in the distance there,

16  or they will be doing so through the hotel, which is actually

17  visible over there to the left which would also be an internal

18  entrance.

19       Our concern is that if we are in that location, the

20  business people who have actually expressed an interest in

21  speaking with us would have to actually walk all the way

22  outside of the building and basically what amounts to half a

23  block away in order to even find us, if they even knew we were

24  there.

25  Q.   Do cars stop along the pylons?

Albrecht - direct by Grossman

1  A.  Not to my knowledge, no.

2  MR. HILDEBRAND:  Your Honor, I move to strike, lack

3  of foundation.  This witness has visited McCormick Place once

4  or twice, and I don't believe she's competent to enter this

5  type of testimony.

6  THE COURT:  Objection sustained for the simple reason

7  that, you know, the defendants, given the short time frame,

8  have not been in a position.  I don't want to make certain

9  factual findings about that.  Unless the parties will stipulate

10  to certain facts, I don't want to rely on the plaintiff's

11  testimony, because it would be unfair to the defendants who

12  don't have a witness here to come and address that.

13  Like I say, the thing I'm concerned about is what's

14  the type of message that she was trying to get across, how was

15  she trying to get it across, and why she feels what McCormick

16  Place is providing to her is either effective or not effective.

17  And that's simply for the purposes of the TRO today.

18  Later on we can address a lot of other things, but I want to

19  deal with this issue.

20  MR. GROSSMAN:  Your Honor, may I review what is

21  physically located, based on her observations, in that area?

22  THE COURT:  Well, I'll let you argue.  I mean, in

23  other words, you can use these pictures and argue.  You don't

24  need her to testify to it.  If there's some confusion, we'll

25  try to work it out with McCormick Place counsel to see if we

MICHAEL P. SNYDER, Official Reporter

Albrecht - direct by Grossman

1   can agree what's there and what's not there.

2          MR. GROSSMAN: Okay, Your Honor.

3   BY MR. GROSSMAN:

4   Q.  What kind of information do you intend to include in a

5   leaflet that you will distribute tomorrow?

6   A.  We would like to essentially inform business leaders that

7   there is, there are consumer privacy concerns around this

8   technology and that there is consumer opposition to the

9   technology.  One of the things we are concerned the business

10  leaders have not been told is the fact that, according to the

11  auto-ID center -- that's the organization sponsoring this

12  event -- according to their own internal documents, 78 percent

13  of the public, when they learn about this technology, are

14  opposed to it on privacy grounds.

15         We feel that it is in the interest of those business

16  leaders to be aware of the fact that they are not being fully

17  informed about consumer opinion and consumer concerns over the

18  technology that they are being asked to adopt as a result of

19  this symposium or at the symposium.

20  Q.  And why put information like that into the form of a

21  leaflet?  What is the use of that in terms of communication?

22  A.  Well, I think the idea is that many people may not have

23  time to stand and converse with us one on one at length to

24  learn that information.  They may be interested in having it in

25  order to review it at a later point.  Handing it to them in a

Albrecht - direct by Grossman

1  written form gives them something they can remember and look

2  over.  Even those individuals who do have time to speak with us

3  may want to be able to contact us later.  That leaflet would

4  have both a phone number and a web site address where they

5  could learn, go to and learn more about our organization and

6  our_views.

7  Q.  Now, you also intend to -- and you intend to distribute

8  leaflets outside the McCormick building, is that correct?

9  A.  That is correct.

10 Q.  And to also distribute leaflets inside the McCormick

11 building in the grand concourse area?

12 A.  Right.

13 Q.  You also intend to use signs outside, is that correct?

14 A.  Yes.

15 Q.  And can you describe what those signs are about?

16 A.  A sign might say, you know, "Think wise before adapting."

17 It might say, "Please hear our views."  It might say,

18 "Consumers in overwhelming majority oppose RFID technology,"

19 simply letting them know that we are a source of information on

20 that if they would like to approach us.

21 Q.  And what about face-to-face communication?  What role does

22 that play in getting your message out.

23 A.  I think it actually plays quite a large role in that we are

24 pretty much their only source of information.  Primarily when

25 we've done events like this in the past, we have designated one

Albrecht - direct by Grossman

1  or two people as spokespeople.  Other people have just handed
2  out leaflets or been able to do that when asked.  So
3  face-to-face communication, clearly I'd like to be able to
4  speak to the business leaders and answer any questions they
5  might have about the technology and our views.
6          MR. GROSSMAN:  Could you just give me one moment,
7  Your Honor?
8          THE COURT:  Sure.
9      (Pause.)
10         MR. GROSSMAN:  Your Honor, I would like to briefly
11 return to Exhibit 4 just to clarify the area in the grand
12 concourse that she wishes, that Miss Albrecht wishes to utilize
13 for speech purposes.  I will not be unduly long.
14 BY MR. GROSSMAN:
15 Q.  Are there commercial activities or facilities along this
16 area?
17 A.  I believe there is a food court, and there is a lounge.
18 I'm not sure where it is exactly in relation to this, but
19 certainly in the grand concourse, there are at least six
20 restaurants in the food court, and there is a Kinko copy or I'm
21 not sure if it is Kinko's, but there's a copy facility and a
22 number of other businesses in there.
23         MR. HILDEBRAND:  Your Honor, I am going object again
24 to foundation.
25         THE COURT:  I am going to sustain the objection.

Albrecht - cross by Hildebrand

1   Mr. Grossman, to the extent you want to establish that kind of

2   information, you can just establish it.  In other words,

3   without this witness.  And if there is some disagreement, I'll

4   look to counsel from McCormick Place to say there either is or

5   is not a food court there, or either is or is not --

6             MR. GROSSMAN:  That's fine, Your Honor.

7             THE COURT:  -- a copy machine.  This is not -- that

8   was not the purpose for my letting her testify.

9             MR. GROSSMAN:  Okay.  We understand that.

10            That's all we have.

11            THE COURT:  Thank you.

12            Any cross-examination?

13            MR. HILDEBRAND:  Briefly, Your Honor.

14            THE COURT:  All right.  Mr. Hildebrand.

15            What my concern is from a First Amendment standpoint

16  is what's the type of message that the plaintiff is trying to

17  get out, and does she have a way of getting it out absent

18  what's going on here, or have you provided a mechanism for her

19  to get it out, or are you even required to provide a mechanism?

20  Those are the issues I'm focused on with this witness for this

21  hearing.

22            MR. HILDEBRAND:  Right.

23            THE COURT:  You may proceed, Mr. Hildebrand.

24                      CROSS-EXAMINATION

25  BY MR. HILDEBRAND:

Albrecht - cross by Hildebrand

1   Q.   A few follow-up questions about your organization CASPIAN.

2   Is that a legal entity?

3   A.   No.   It's an affiliation of consumers.

4   Q.   So it hasn't been organized or chartered in any fashion?

5   A.   No.

6   Q.   It doesn't pay taxes?

7   A.   No.

8   Q.   Okay.   Now, have you sought access to the symposium

9   involving this technology going on at McCormick Place tomorrow?

10  A.   We were told it would cost over a thousand dollars to

11  attend this event, and we don't have the budget to allow all of

12  the people of interest who would be interested in communicating

13  to pay a thousand dollars a head to enter the event.

14  Q.   Excuse me.   I didn't hear the end of your answer.

15  A.   To pay a thousand dollars or over a thousand dollars apiece

16  to enter the event.

17  Q.   Do you have a budget to send one person?

18           THE WITNESS:   Is that a relevant question?  As to our

19  budget on this?

20           THE COURT:   Well, I'm a little unclear.   Was the

21  question directed to what it would cost to be a presenter?   Is

22  that the idea?

23           MR. HILDEBRAND:   No, it was simply to attend the EPC

24  symposium and speak to whoever she wants to.

25           THE COURT:   I thought that was $75.   Am I missing

Albrecht - cross by Hildebrand

1  something?

2           THE WITNESS:  Yes.  There's two ways to access the

3  event.  For over a thousand dollars per person, one gets full

4  access to the event for the full three days that it takes

5  place.  They can go into the speeches, the talks, in the

6  theaters.  For $75 they are actually barred entry to those

7  theaters where most of the attendance will be for most of the

8  day, and they only gain access to the exhibit halls where, or

9  the exhibits where vendors are demonstrating their wares.

10          THE COURT:  Thank you.

11  BY MR. HILDEBRAND:

12  Q.  Okay.  So if I understand your answer, you testified that

13  your group could not afford the roughly thousand dollars per

14  person fee to take a number of people into the full-blown

15  three-day symposium and talk to whoever you wanted to?

16  A.  I think it would be more appropriate to say we did not

17  think it was in our interest to pay a thousand dollars per

18  person in order to go and sit in the audience to hear other

19  people give speeches on this topic.

20  Q.  Did you try to get yourself invited to the symposium?

21  A.  I did not.

22  Q.  Did you ask if they would be willing to waive the fee so

23  they could have an opportunity to talk to consumers and hear

24  their point of view on this important new technology?

25          MR. GROSSMAN:  Your Honor, we are going to object

Albrecht - cross by Hildebrand

1   simply because the defendants themselves through their own

2   papers have made the meeting room, that is, where the private

3   speech is taking place, irrelevant to this controversy.

4        The question before this Court is in the public

5   spaces in which public, in which persons are allowed free

6   access without regard to whether they are paying a thousand

7   dollars or not paying a thousand dollars, may, in addition to

8   wearing a t-shirt and engaging in conversations with other

9   persons, may, in fact, this particular plaintiff and the

10  persons with whom she associates, distribute a leaflet, because

11  that's the only issue that's left inside.

12        And as to outside, not limited to persons who are

13  paying a thousand dollars to attend the symposium, may she

14  stand close to the door or must she be hundreds of feet away at

15  the pylons?

16        Those are the questions that are left before this

17  Court.

18        THE COURT:  Mr. Hildebrand?

19        MR. HILDEBRAND:  Your Honor, I think the questions go

20  to and illustrate a spillover problem in this case, and they go

21  to the reasonableness of the Authority's policies.  You know,

22  the Authority is in the business of putting on conventions.

23  And the way this whole system works is that people pay money to

24  attend the things, and if it is very easy for anyone who kind

25  of wants to make themselves heard and get involved but doesn't

Albrecht - cross by Hildebrand

1  want to pay the fee, to stand outside and mingle and get

2  involved, that is, we think that is a threat to our operational

3  purpose, and that's part of what I am trying to elicit here.

4       THE COURT:  I don't believe that the First Amendment

5  has an alternative requirement that if you can afford the

6  thousand dollars, then that becomes your mechanism for

7  communicating.

8       MR. HILDEBRAND:  Well, I would certainly agree with

9  that, Your Honor, but I guess the questions go to pointing out

10  that she hasn't explored other means of communicating with

11  these people, which might be possibly be free and move this

12  whole dispute.  We don't know whether, if she had asked to be

13  invited, whether she'd be there talking to them tomorrow

14  without a need for a TRO and us working all weekend.  So that

15  was, I guess, the thrust of my question.

16       THE COURT:  Obviously, alternative means of

17  communication is a factor that the courts have considered --

18       MR. HILDEBRAND:  Right.

19       THE COURT:  -- in the cases, so I will let you

20  explore that to see whether -- but paying for it doesn't cut it

21  as far as the case law goes.  But there were alternative means

22  that she can get the same message across, I would listen to

23  that.

24       MR. GROSSMAN:  We would just for the record clarify

25  our position.  Alternative channels of communication are

Albrecht - cross by Hildebrand

1  unquestionably relevant, but they are government-provided

2  alternative channels of communication, not privately-provided

3  alternative channels of communication under the case law.

4          THE COURT:  Very good.

5          MR. HILDEBRAND:  Actually, Your Honor, we would

6  dispute that the time, place, manner analysis is relevant to

7  the nonpublic forum at all.  The test is whether the

8  restriction is reasonable, but we'll get to that a little

9  later.

10         THE COURT:  We'll get into the legal argument as to

11  whether it's a public forum or nonpublic forum, but go ahead

12  and cover the factual issue.

13  BY MR. HILDEBRAND:

14  Q.  This is by way of clarifying prior testimony.

15         Did you say you did intend to purchase the $75 passes

16  or did not?  I don't remember your answer.

17  A.  I personally do intend to purchase a $75 pass to the

18  exhibit.

19  Q.  And how many of your compatriots will be doing the same?

20  A.  My estimate is about ten people would like to do that.

21  Q.  Okay.

22  A.  I'm sorry.  Five people.  Ten people would like to be in

23  the building, and we discussed five people.

24         MR. GROSSMAN:  Your Honor, might we have a standing

25  objection to this line of questioning?

Albrecht - cross by Hildebrand

1        THE COURT:  Yes, you may.

2   BY MR. HILDEBRAND:

3   Q.  What other efforts have you made to contact the persons

4   putting on the EPC symposium and make your views known to them?

5   A.  We have sent repeated letters to the auto-ID center on

6   behalf of consumers that have gone unanswered.  We have sent

7   repeated letters both to the board of overseers of the auto-ID

8   center and to its director.  We have sent letters to

9   vice-president of Gillette, and Dick Cantwell, who also is the

10  chair of the board of overseers of the auto-ID center, who is

11  actually going to be giving the speech which we will be outside

12  of at, to coincide with his speech given at 10 o'clock tomorrow

13  morning.  Those letters have gone unanswered.  Despite repeated

14  attempts to communicate with those individuals, they have

15  simply refused to respond to us despite saying that they would,

16  and we have waited, and we've waited.  We sent certified

17  letters and attempted in many ways to communicate with them.

18  Q.  Okay, and I don't recall if you answered my prior question.

19  Did you ask to be invited yourself or any member of your group?

20  A.  Even at this event --

21  Q.  Let me finish my question, please.

22        Did you ask to be invited, you or any member of your

23  group, to the EPC symposium so you could speak and express your

24  views?

25  A.  We did not.  Given that we had not received responses to

1 | our previous communications with them, we simply assumed that

2 | if they won't answer their letter, they probably won't let us

3 | into their event for free.

4 | Q.  Okay.

5 | MR. HILDEBRAND:  Your Honor, if I may have a moment

6 | to confer with co-counsel?

7 | THE COURT:  Yes, you may.

8 | (Pause.)

9 | MR. HILDEBRAND:  Nothing further, Your Honor.

10 | Thank you, Miss Albrecht.

11 | THE COURT:  Mr. Grossman, any redirect?

12 | MR. GROSSMAN:  No, Your Honor.

13 | THE COURT:  Okay.  You may step down.  Thank you very

14 | much.

15 | (Witness excused.)

16 | THE COURT:  Okay.  It may just be easier to argue the

17 | case from right where you are seated so you can spread out your

18 | papers.  So if you are comfortable there -- do you intend to

19 | call a witness?

20 | MR. HILDEBRAND:  I don't intend to call a witness,

21 | Your Honor, but I do feel a bit far afield out here.  I think I

22 | would be more comfortable a little closer to Your Honor, and I

23 | am happy to stand beside co-counsel.

24 | THE COURT:  That's fine.

25 | So let me tell you what I'd like to do.  Let's see if

1  we can define the various issues that come into play here,
2  okay?

3          I think the first issue, the first issue is what type
4  of forum are we dealing with?  Is that a reasonable first
5  issue?  Okay.

6          And there are three different types of forum
7  potentially, a traditional public forum, a designated public
8  forum, and a nonpublic forum.  Do I have those right?  Okay.

9          My inclination is that this is a nonpublic forum.
10  That's my inclination.  So who wants to address on the
11  plaintiff's side why I am wrong on that?  Or you can agree with
12  me.

13          Based on the case law as I see it, at least in this
14  circuit, if Navy Pier is a nonpublic forum, it would be hard
15  for me to imagine how McCormick Place, which I view as less
16  accessible to the public than Navy Pier, becomes something
17  other than a nonpublic forum.  But, Mr. Schwartz, do you want
18  to address that?

19          MR. SCHWARTZ:  Yes, Your Honor.  There are --

20          THE COURT:  And if you want to come up here, you are
21  free to come up here.  If you want to sit there, whatever you
22  are comfortable with.

23          MR. SCHWARTZ:  I'll just stay right here.

24          There are several sets of facts that plaintiff
25  believes support the proposition that both of the venues that

1  we are talking about here are traditional public forums, and

2  what I mean by that, number one, is the public grassy part to

3  the rest of Gate 4 and, number two, the grand concourse.

4          The overriding function of McCormick Place is

5  expressive activity.  Millions of people come to McCormick

6  Place every day of the year for purposes of engaging in

7  association and expression on every conceivable issue affecting

8  our society.  It's trade organizations, it's professional

9  organizations, it's businesses, it's religious organizations,

10  it's governmental organizations.  Last month there were

11  thousands if not tens of thousands of Muslim Americans gathered

12  at McCormick Place to talk about every issue affecting them,

13  including the civil liberties implications of life after

14  September 11.

15          It's a location where government officials come to

16  participate in these kinds of venues, it's a location to which

17  the holders of these conventions summon the media.

18          It is fitting for a venue like this, where people are

19  engaging in the conversations about the important economic and

20  political issues of our times, that there be alternative voices

21  heard in this venue -- that there be alternative voices in this

22  venue.

23          Specifically as to the outside park --

24          THE COURT:  Well, let me just say, the fact that

25  there is an outside park tied into McCormick Place, I'm not

1  sure that that makes McCormick Place a traditional public

2  forum.  I mean, if you want to separate the outside park area,

3  but it's my understanding that one of the areas where they can

4  do what they, you know, the public expression is in the outside

5  park area.  Am I wrong?

6          MR. SCHWARTZ:  Let me just clarify, Your Honor.

7          The approach in such opinions as Acorn is, where

8  appropriate, to break up a large multipurpose forum such as

9  Navy Pier or in this case McCormick Place into constituent

10  pieces, and what the plaintiff means to argue is that the park

11  to the west is a traditional public forum and separately to

12  argue that the grand concourse within McCormick Place is a

13  traditional public forum.

14          THE COURT:  Wouldn't the grand concourse be somewhat

15  analogous to an airport?

16          MR. SCHWARTZ:  In some ways, yes; in some ways, no.

17  An airport is, has two functions going under ISKCON versus Lee.

18  One is a transportation hub, and the other is as a mall.

19          McCormick Place has an additional function, which,

20  again, is the gathering of millions and millions of people to

21  engage in expressive and associational activity, a function

22  that is not taking place largely within airports, perhaps some

23  exceptions for --

24          THE COURT:  However, I view the -- and these are all

25  preliminary views simply for purposes of a TRO hearing.  They

1   are not to be findings of fact in any way.  I am just trying to
2   deal with what I can glean from the papers and from the case
3   law.

4        It seems to me that in order to go into these various
5   rooms at McCormick Place, when you are bringing in thousands of
6   people, I mean, you have to have a hall to get them in.  In
7   other words, in contrast to a park where you are inviting
8   people to be outside in the park and, you know, Grant Park, and
9   the case I had was a t-shirt case involving Grant Park, I found
10  that to be a traditional public forum.

11       I have a tough time where people cannot -- I'm not
12  aware that you can just walk into McCormick Place 24/7 and just
13  walk around the grand concourse.  Maybe you can, maybe I'm
14  missing that, but it's not my perception that that's a place
15  where people hang out generally or where you could expect other
16  people to come see you delivering public speeches.  So I am
17  having a tough time finding that to be a traditional public
18  forum at this point.

19       MR. HILDEBRAND:  Your Honor, if I could interpose a
20  quick point of clarification on the record?

21            THE COURT:  Yes.

22            MR. HILDEBRAND:  This came up earlier in the context
23  of Miss Albrecht's testimony, and actually if I could take a
24  moment to introduce the general counsel of the Metropolitan
25  Pier and Exposition Authority, Renee Benjamin, who is here with

1   us at the table.

2          THE COURT:  Good morning, Ms. Benjamin.

3          MR. HILDEBRAND:  She, of course, is much more

4   familiar with the facility than I am and reminded me that, at

5   times, the staircase that leads up into the upper level of the

6   grand concourse does in fact require you to show an ID badge,

7   essentially indicating that you have been admitted to whatever

8   is going on up there in the hallway.  So the ingress and egress

9   checkpoints differ depending on the function that's in the

10  space.  That wasn't clear from our papers, frankly, because it

11  just wasn't clear to me as an operational matter when I was

12  doing the drafting.

13         We believe that Miss Albrecht will have access to

14  walk as a pedestrian in the grand concourse tomorrow, but to be

15  honest, without the general manager sitting here, I can't say

16  that for certain one way or the other.

17         THE COURT:  I mean, and even that, the Colorado case,

18  the Hawkins case that was cited to me, as I read that case, I

19  mean, that also seemed to be a McCormick Place type setting

20  where, you know, you had to have a way for people to get in to

21  experience the theater and the other things that were going on

22  in that area, and I believe there they also found that it was

23  a -- what do they call it -- a nonpublic forum.  Did I read

24  that case right?

25         MR. SCHWARTZ:  Speaking to the issue of whether this

1   is a traditional public forum, there are several factors that

2   we think we want to emphasize.

3        The first is that we, our experience in the last

4   week, everyone at the plaintiff's table has gone to McCormick

5   Place over different visits, and we could walk in the front

6   door without anyone stopping us.  You can walk into the grand

7   concourse, you can walk into the restaurant, you can sit down

8   at a sofa and have a coffee, you can admire the art, you can

9   admire the fountains, you can walk up to people and speak to

10  them.

11       So it is a largely unrestricted environment.  I don't

12  know if the front gates are always open, but that would not

13  make it unanalogous to a traditional public forum, which is a

14  grassy park where there is a ban on people being there at night

15  for the purpose of safety and security.

16       We believe that Denver Galleria, where, yes, they did

17  find -- that is the Colorado case you referenced, but the

18  Denver Galleria did find that it was a nonpublic forum, but

19  that venue was different in several respects.  The function of

20  that forum was to act basically as a lobby for artistic

21  performances.  But, again, the purpose of McCormick Place is

22  much broader.  It's not just artistic performances; it's people

23  gathered to talk about every important issue, whether it's

24  politics or economics, facing our society.  So it's a much

25  broader forum.

1          THE COURT:   See, but this is the kind of issue that I
2     think would need a more comprehensive factual record in which
3     to make, because while you may argue that it is for the
4     discussion of public policy, I mean, defendants may, at least
5     in their papers, say it is really for commercial purposes.

6          So at least for purposes of this TRO hearing, I am
7     going to find that you have not, you have not demonstrated a
8     likelihood of success of establishing that it's a traditional
9     public forum and that -- and it certainly has not been a
10    designated public forum that I'm aware of, so I am going to
11    treat it as a nonpublic forum at least for purposes of the TRO
12    hearing.  And, once again, you certainly can make your case out
13    with a fuller record, but these are the cases I am looking at
14    now, and these are the areas that I am concerned with.

15         Okay.  So let's move on.  What's the next issue for
16    analysis once I have established what type of public setting it
17    is?  Mr. Schwartz, what's the next thing we have to talk about?

18         MR. SCHWARTZ:   If we assume that these are nonpublic
19    forums, we analyze it for reasonableness under Perry and other
20    decisions.  We know from Perry and from Lee and from the Acorn
21    decision that this is highly fact intensive, that the Court
22    would look at the special attributes of the facility and that
23    every facility is potentially unique for the purposes of this
24    analysis.

25         Among the facts -- and I'll separately treat on the

 1  reasonableness of the policy in the grand concourse and the

 2  outdoors area.  Everything we have stated earlier about the

 3  basic factual nature of McCormick Place we think is important

 4  here as well.  The question is whether the speech restriction

 5  in this case, a flat ban on all expressive activity anywhere

 6  inside McCormick Place, is reasonable and likewise whether the

 7  ban on expressive activity outside of McCormick Place with the

 8  narrow exception of this designated location by the five pylons

 9  is reasonable, and the plaintiff believes that it is not.

10          Within the grand concourse, the proposed activity is

11  fully compatible with all of the government's purposes and

12  goals in running this multipurpose forum, and, again, it's a

13  convention center, it's a place for people to go back and forth

14  between rooms, it's a place for people to gather, admiring the

15  art, admiring the fountains, to talk with each other.  It's a

16  mall where people can buy t-shirts, get a back rub, go to the

17  business center, buy some fudge, any number of dozens of

18  businesses inside this location.

19          There is a critical statement on page 8 of the

20  defendants' written submission in footnote 2 where the

21  defendant states that, and Mr. Grossman read this before, but

22  I'll read it again:

23          "The Authority wishes to make clear that it has no

24  policy banning persons from wearing expressive t-shirts,

25  buttons, and the like or from engaging in conversation with

1 | other visitors at McCormick Place."

2 | So what this looks like is someone, for example, from
3 | Ms. Albrecht's organization standing there wearing a t-shirt,
4 | and someone walks up to them and says, "I'm interested in why
5 | you want to stop our RFID; please tell me," and they have a
6 | conversation about it within this grand concourse or outside in
7 | this park.  But the defendants want to stop Ms. Albrecht in
8 | that situation from handing out a leaflet, which doesn't make
9 | any sense, it's just inherently unreasonable.  There is nothing
10 | that would happen when someone wears a t-shirt or engages in a
11 | conversation with passersby that isn't happening when -- and
12 | vice versa when someone hands out a leaflet.  In fact, the
13 | handing out of a leaflet might be less intrusive to any
14 | governmental interests than this conversation inasmuch as the
15 | information can be transmitted far more rapidly.

16 | In terms of the out-of-door location --

17 | THE COURT:  Let's stay with the indoor.  Let's just
18 | stop at the indoor.

19 | And, Mr. Hildebrand, do you want to address with me
20 | why it is reasonable to bar any of this activity indoors.

21 | MR. HILDEBRAND:  Yes, Your Honor.  In the first
22 | place, I'd like to dispute the analytic rubric that this
23 | aggregates the forum, because I don't think that's the way it
24 | works.  I think you take McCormick Place as a whole, and you
25 | look at whether, as a whole, the Authority provides a

1  reasonable opportunity for people to express their views.

2            But stepping with the dialogue back into the grand
3  concourse --

4            THE COURT:  Well, let me tell you what my concern is.
5            MR. HILDEBRAND:  Okay.

6            THE COURT:  Let me tell you what my concern is in
7  terms of reasonableness, just generally speaking.

8            I don't conceptually have a problem with McCormick
9  Place setting aside an area that they think is one that they
10 can control for safety reasons, for traffic control, things of
11 that sort.

12           My concern is, having said that, whether they are
13 providing or whether they are required to provide an area which
14 is accessible for permitting the message to be gotten across.
15 So that, you know, even in a public forum, you can set aside an
16 area, but if you take everybody and put them out in left field
17 where nobody is going to see them, is that reasonable?

18           And my question is without an indoor location, is it
19 reasonable that the message can be gotten across and why isn't
20 it that you cannot provide a space that you can control indoors
21 to permit the plaintiff to have a chance for First Amendment
22 activity or do you feel -- help me analyze that question.

23           MR. HILDEBRAND:  I understand your question, Your
24 Honor, and I think I can give you some comfort that the correct
25 answer is that the government may prohibit all leafleting

1  inside the concourse of McCormick Place.

2        A couple reasons why.  First of all, the rule is that

3  the accommodation to speech need only be reasonable in light of

4  the intended uses and purpose of the forum.  There are several

5  cases, Your Honor, including the Grossbaum decision in this

6  circuit, which make it clear that in the lobbies of

7  government-owned buildings, it is permissible for the

8  government to enact a flat ban on expressive activities.  A lot

9  of speech happens in this courthouse, Your Honor, in the

10  courtrooms here on issues of public importance, and yet,

11  nevertheless, you know, the circuit executive here is entirely

12  within his rights, or GSA or whoever it is, to have a flat ban

13  on leafleting or any other kind of gatherings or assemblies in

14  the lobby of this courthouse.

15        The same would be true, Your Honor, if the government

16  were the proprietor of an office building.  Let's imagine for a

17  moment that the government has a large office building, it's

18  partly vacant, and it leases a lot of space in that building to

19  tenants.  It's acting, in essence, as the proprietor of an

20  office building, and there is no reason under First Amendment

21  case law why the government cannot simply hire John Buck

22  Company to post a couple security guards like all the other

23  office buildings in this city do and run the office building

24  like an office building.  That's what it is.

25        The answer is, Your Honor, we have to look to the

1  intended purpose of the forum and, in that context, ask

2  yourself whether the restriction is reasonable.

3        The fact of the matter is, Your Honor --

4        THE COURT:  Let's look at McCormick Place.  What do

5  you say is the intended purpose, and tell me why this

6  restriction is reasonable.

7        MR. HILDEBRAND:  McCormick Place is set up to attract

8  and host private business gatherings.  Many of the events at

9  McCormick Place can consider as an alternative to McCormick

10  Place private facilities such as large privately-owned hotel

11  conference centers which are not open to leafleting or any

12  other forms of expressive activity in their corridors and

13  outside their meeting rooms.  And really it has to do

14  substantially with customer expectations.  You know, frankly,

15  when you walk into McCormick Place, it looks kind of like an

16  office building, it looks like a hotel conference center.

17  Indeed, the Hyatt is right down the hall next door, and the

18  expectation and environment created there is inconsistent with

19  public expression.  Now, it's not inconsistent with

20  conversation in the hallways.  But that's my answer.

21        THE COURT:  Let me tell you the language of the

22  Seventh Circuit case that piques my curiosity here.  Looking at

23  Chicago Acorn at 150 F.3d 695 at page, at page -- I don't see

24  the page numbers here.  It's a Westlaw printout here.

25        Headnote 16.  I mean, the language yet while holding

1   that the airport was not a traditional public forum, the Court

2   also held that the Krishnas were entitled to hand out leaflets

3   in the public areas of the airport, citing International

4   Society for Krishna Consciousness versus Lee.

5          MR. HILDEBRAND:   I'm with you, Your Honor.

6          THE COURT:   Okay.   And that's, that's sort of the

7   analogous situation that I am trying to think through here.

8   Why isn't this analogous to that?   I mean, I would agree with

9   you that -- or you should agree with me that an airport is not,

10  you know -- I mean, I found for you on the first issue, at

11  least initially, it's not a nonpublic forum and that you could

12  make the same argument that airports are competing for

13  business, and it's not a place necessarily for free expression;

14  it's, you know, for conducting business or whatever.   But here

15  the Court is saying, even in that kind of setting, you'd have

16  to permit some place for leaflets to be distributed.

17         MR. HILDEBRAND:   Well, Your Honor, two answers.

18         First of all, I don't think airports compete for

19  business in the same way that a conference center does.   In

20  other words, there is no private alternative, and people don't

21  choose their flight routes based on the likelihood that they

22  are going to encounter a leafleter.   To this day, Your Honor --

23  it's been years since I have known and been familiar with the

24  ISKCON versus Lee decision -- I have yet to see ever a

25  leafleter at a major airport.   I think that's because there is

1   a tiny number of zones typically, I think in the Miami Dade

2   County case, another airport case, there were a half a dozen or

3   so sprinkled throughout a very large airport.  They are out of

4   sight and off to the side.

5         THE COURT:  Well, all I am saying is, and my question

6   is, I mean, why isn't there a zone in the main concourse, in

7   the main concourse in an area -- and I have no problem with,

8   you know, McCormick Place trying to create what the area is for

9   safety and other reasons and be sure that it's not blocking

10  anybody, but why isn't that required under the Chicago Acorn

11  case or the Krishna case?

12        MR. HILDEBRAND:  Two answers, Your Honor.

13        First of all, we do have a zone.  It's very large and

14  visible from many parts of the facility, and it's outside, and

15  that distinguishes us from an airport.  We are a more

16  single-purpose facility than an airport.

17        And, secondly, Your Honor, I think the answer to that

18  question is better answered on a full record and not for

19  purposes of the TRO.  You know, we don't have our witnesses

20  here able to explain and make their record about the business

21  purpose.

22        THE COURT:  I understand.

23        MR. HILDEBRAND:  But we do believe there is a

24  business purpose, and we also think our customers have a choice

25  about where they go.

1            THE COURT:  Well, but one of the things about being

2  government is, you know, that's part of being government.  You

3  may have to do some things that a private business doesn't have

4  to do, even if you are competing with them, even if you are

5  competing with them.  And in headnote 17 it says, "But as Navy

6  Pier is publicly owned, it seems to us to come within the rule

7  of the ISKCON case, and leafleting must be allowed, just as the

8  First Circuit held in reliance on ISKCON with reference to the

9  Boston subway in Jews for Jesus versus Massachusetts Bay

10  Transportation Authority.  There is no relevant difference

11  between the sidewalks on Navy Pier and the public areas of the

12  indoor shopping malls, both types of pathways or pedestrian

13  walkways leading mainly to shops.  The fact that one type has a

14  roof over it and the other does not cannot make as large a

15  difference as the district judge thought."

16            MR. HILDEBRAND:  Your Honor, our answer is, number

17  one, the stark difference between Navy Pier and McCormick Place

18  in terms of the variety and density of activities at Navy Pier

19  in contrast to the very kind of austere, business-focused

20  environment of McCormick Place.  That's our first answer.

21            Our second answer is to take a look at the Hawkins

22  case out of Denver and also the Fish Pier case, the Carpenters

23  case out of Boston.  We really think we are most on point with

24  Hawkins, Your Honor, and it goes to the same sentiment that led

25  the Court to think that when people get out of a concert, it's

1   really not appropriate and consistent with the purpose of that
2   forum for them to be confronted with leafleters.  That's not
3   what the space is about, that's not what it was constructed
4   for.

5          The same holds true at McCormick Place.  McCormick
6   Place is set up for people who want to get together and talk to
7   one another about their own private business, but it is not set
8   up for public debate.  It's not set up so people who disagree
9   with you can kind of have a shot at you when you are spending
10  all this money to put on a private show.  So we think
11  Hawkins --

12         THE COURT:  But there's all sorts of uses of
13  McCormick Place.  I mean, it's used for political purposes,
14  it's used for private purposes.  You know, anybody who is
15  willing to pay the dime can rent the space in McCormick Place
16  and come in and use it, I would think.

17         MR. HILDEBRAND:  That's exactly right, Your Honor,
18  but I guess in a sense that's our point.  It's all private
19  speech that happens.  We are agnostic as far as what goes on
20  once somebody signs a license agreement, consistent with safety
21  and obviously running a secure facility.

22         THE COURT:  So your answer is as long as you provide
23  them some place to leaflet or hold their placards or
24  communicate, it doesn't have to be in the main concourse?
25         MR. HILDEBRAND:  It doesn't have to be in any

1   particular place, Your Honor.

2          And if I could, you know, part of the reasonableness

3   inquiry is looking at what we do provide.

4          THE COURT:  Okay.

5          MR. HILDEBRAND:  And I want to talk about that.

6          THE COURT:  Why don't we move on to that, because I

7   think the two points are somewhat interlinked.  Let me ask

8   Mr. Schwartz to first address, given what McCormick Place

9   provides, why is that inadequate?  Why is that in some ways

10  unreasonable?  Is that a fair next step in the analysis?

11         MR. SCHWARTZ:  I'd like to answer that.  There are

12  several points that plaintiff would like to just put on the

13  table to respond to this, the colloquy between the Court and

14  the defendant.

15         The first is that there is nothing unusual about

16  there being expressive activity in lobbies of governmental

17  buildings.  For instance, there are have been press conferences

18  on numerous occasions within the lobby of this federal

19  courthouse.

20         Second of all, it is important to emphasize the

21  distinctions between this case and the other two cases that the

22  defendants have just referenced, the Hawkins case and the Fish

23  Pier case.  Fish Pier is especially unrelated.  Fish Pier

24  involves -- this is the case out of Boston involving the

25  carpenters' union.

MICHAEL P. SNYDER, Official Reporter

1           Fish Pier is a largely commercial enterprise where
2   fishing fleets are loading and unloading their wares.  There
3   are a small number of nonfish-related activities going on, but
4   there is no sidewalks, there are trucks running back and forth,
5   and there is a gate with a security card at the front end
6   restricting public access.  So there is no way that the
7   McCormick Place facility resembles the Fish Pier in the
8   carpenters case from the Second Circuit.

9           As to Hawkins, there are numerous additional
10  restrictions.  The lobby in question was a far narrower space,
11  in many places 30 feet wide, whereas here we are talking about
12  a much wider area.  As well, there were only three stores.  In
13  McCormick Place there are dozens of stores.  And, again, the
14  designated activity at the Galleria was the arts and
15  performances, whereas here we are talking about every political
16  and economic issue affecting our society.

17          Additionally, the speech that was proposed in the
18  Hawkins decision was a much more potentially intrusive speech.
19  There they wanted to bring 25 people into the Galleria to
20  engage in picketing, whereas here we want to bring 10 people
21  into the McCormick Place to engage in leafleting.  So we think
22  that Hawkins is simply inapposite to this case.

23          A few factors about the so-called designated speech
24  area that we want to emphasize.

25          Again, the area is hundreds of feet away from the

1   front gate.  It's an area where people who are coming to these
2   conferences would not even be aware that activity is going on
3   there.  It can be seen at -- it's very unclear what's going on
4   down there, and the vast majority of people entering the
5   facility go nowhere near there, and for people who are driving
6   by, the pylons themselves become a barrier to seeing what is
7   happening there.

8           Additionally, there are issues of inclement weather.
9   If it's raining, if it's snowing, if it's cold, it's not an
10  appropriate place for people to engage in expressive activity,
11  and even if the weather is good, it's impossible to distribute
12  a leaflet or engage in one-on-one conversation with people at
13  the various functions at McCormick Place from that so-called
14  designated speech area.

15          Another, a small issue to clear up is that, in terms
16  of the competition that McCormick Place is having with private
17  hotels, private hotels have sidewalks outside the front door
18  where people have a perfect right right now to engage in
19  expressive activity.  So the notion that somehow McCormick
20  Place is at a competitive disadvantage, if it has leafleters
21  near the front door, compared to downtown hotels, is just
22  simply incorrect.

23          Finally, as to the intended purposes of McCormick
24  Place, this, of course, is an element of the analysis under
25  whether due restriction is reasonable.  The intended purpose of

 1  McCormick Place is expressive and associational activity about
 2  political and economic questions, which is exactly what the
 3  plaintiff in this lawsuit wants to participate in.

 4          Finally, under the Navy Pier decision, Chicago Acorn
 5  versus the same defendant, at this moment leafleting is
 6  permitted within the mall on the interior of Navy Pier and also
 7  locations outside on the sidewalk on Navy Pier, and there is no
 8  reason in the world why the same accommodation could not be
 9  made at McCormick Place.

10          As well at O'Hare Airport, right now there is a right
11  to leaflet, and, you know, leafleting takes place in airports
12  across the country, as we can all attest from our business
13  travel.

14          MR. HILDEBRAND:  I must have missed them, Your Honor.
15          THE COURT:  I haven't gotten too many either, but
16  they are probably out there.

17          MR. GROSSMAN:  We fought for that right.

18          MR. HILDEBRAND:  Let's turn to the free speech zone
19  that we provide, Your Honor, and I am going to focus
20  particularly on the western zone, although I just want to note
21  for the record and let's not forget that there are in fact two
22  zones.  So we have put one large exterior zone at each end.

23          THE COURT:  McCormick Place is a pretty big place.
24          MR. HILDEBRAND:  It is a big place.  It is a big
25  place.  But I don't want, I don't want to lose sight of that.

1          Let's focus though on the characteristics of the

2     western zone since that is a --

3          THE COURT:  Give me -- you want to lead me to one of

4     your exhibits so --

5          MR. HILDEBRAND:  I was about to do so, Your Honor.

6          THE COURT:  Good.

7          MR. HILDEBRAND:  Let's take a look first at Exhibit

8     3, please.

9          THE COURT:  And this is Exhibit 3 to the affidavit.

10          MR. HILDEBRAND:  To the Mobley affidavit, that's

11     correct.

12          THE COURT:  All right.

13          MR. HILDEBRAND:  You will notice in the middle, Your

14     Honor, a large green swatch that has building in white letters.

15          THE COURT:  Yes.

16          MR. HILDEBRAND:  Now, if you move up to the upper

17     left-hand corner of that, in smaller type face, it says,

18     "McCormick Square" in a white box, and there is a blue

19     perimeter around that.  Do you see where I am looking?

20          THE COURT:  Yes.  The light blue perimeter around

21     McCormick Square?

22          MR. HILDEBRAND:  Yes.  Now, the light blue perimeter,

23     Your Honor, is in essence the turnaround circle that taxis and

24     buses and so on use when they drop persons off at the main

25     entrance to McCormick Place.  The main entrance is at a place.

1   This is a very small type, I definitely need my glasses for

2   this one, where it says, "Gate 4" in the green corner there,

3   abutting McCormick Square, in little white letters, it says,

4   "Gate 4."

5            THE COURT:  That's the main entrance to the south

6   building?

7            MR. HILDEBRAND:  That is the main entrance, and if

8   you look at the first exhibit to McCormick Place -- I'm sorry,

9   to the Mobley affidavit, Your Honor, this gold cover of the

10  promotional brochure, Exhibit 1.

11           THE COURT:  Yes.

12           MR. HILDEBRAND:  That structure there, this facade is

13  what we are talking about when we say Gate 4.  And it's the

14  main entrance to the facility.

15           THE COURT:  Okay.  Now, is it fair, is it fair to

16  suggest that most people arriving are going to either come

17  through that Gate 4 or walk over from the Hyatt?

18           MR. HILDEBRAND:  Yes.  According to my general

19  manager, the vast majority of the persons who arrive at

20  McCormick Place do so through McCormick Square in some fashion.

21           THE COURT:  Okay.

22           MR. HILDEBRAND:  And if I, I am sorry, if I could

23  call your attention to immediately to the left of McCormick

24  Square, the main parking garage called Parking Garage A, it's

25  kind of a peach-colored zone.

1          THE COURT:  Yes.

2          MR. HILDEBRAND:  That's the main parking garage.  So

3   to get from that parking garage to Gate 4, Your Honor, you walk

4   right through McCormick Square, and I'd like to refer you to

5   some of the other pictures attached to the Mobley affidavit to

6   help us get --

7          THE COURT:  What I want you to do is help me

8   understand how somebody that's in one of your prescribed areas

9   communicates with these people that are arriving or departing.

10         MR. GROSSMAN:  Your Honor, could we just for -- I

11  don't want to -- you know, we are at a marked disadvantage

12  here.  We understand the logistics, but the experience that we

13  have had is that people use the two elevated walkways that you

14  see from the garage into the building.  They don't go across

15  the street, and so we don't know what to do with this

16  testimony.  We take exception to it.

17         MR. HILDEBRAND:  Mr. Grossman will want an

18  opportunity, Your Honor, when his turn comes, but I guess I'd

19  like to finish what I have to say, and then he can point out

20  what's wrong with it, if anything.

21         THE COURT:  That's a good way to proceed,

22  Mr. Hildebrand, so go ahead.

23         MR. HILDEBRAND:  Thank you, Your Honor.

24         So in any event, if we take a look at Exhibit 10,

25  Your Honor, this is, from the vantage point of a person

MICHAEL P. SNYDER, Official Reporter

1  standing immediately outside the doors to Gate 4, you can see a

2  taxi right in front there, Your Honor, this is the taxi

3  drop-off point.  And as you look across McCormick Square, you

4  see a bunch of tall vertical pylons, okay?  That entire area

5  out there in and around the pylons is the free speech zone, all

6  right?

7           THE COURT:  The grassy area?

8           MR. HILDEBRAND:  It's just beyond the grassy area.

9  You can't see it in this picture, Your Honor, but the grass

10 ends, and before you get to the pylons, there is about 30 feet

11 or so of purplish flagstones.  They abut either side of the

12 pylons.  They run right up to the sidewalk on Martin Luther

13 King Drive.  So it's a rather large area suitable for, frankly,

14 very large groups of demonstrators.  You could accommodate 200

15 people out there no problem.

16          THE COURT:  But that's not the kind of message that

17 they are trying to communicate.  I mean, they are not looking

18 to bring thousands of people.  They are trying to pass out

19 leaflets or carry placards that people will see.  So tell me

20 how, what the likelihood is of anybody walking over there to

21 obtain a -- how far would they have to walk?

22          MR. HILDEBRAND:  Well, let's continue, Your Honor.

23          Anyone who parks in the parking garage and walks

24 across McCormick Square, and I guess I just want to finish

25 orienting you to the pictures because I think you will get a --

MICHAEL P. SNYDER, Official Reporter

1   I am trying to answer your questions as quickly as I can.   I

2   think, when we get better oriented, you'll see what I am

3   talking about.

4          If you look at Exhibit 14, Your Honor, that is the

5   entrance to both the parking garage and the conference center

6   which sits to the west of McCormick Square.  So, in other

7   words, there's some conference rooms across McCormick Square

8   from the main entrance, so what we are talking about here.

9   Exhibit 14 shows the entrance to the parking garage and the

10  conference center.  So when you park at the parking garage, if

11  you walk out these doors, you will see there's a walkway and

12  some planters, okay?  And just to the right, there is a tall

13  vertical, that's one of the pylons.  That is a -- this is the

14  protest area right here by the pylons.  So anyone walking along

15  the major axis, along the major axis from the parking garage to

16  Gate 4, the grand concourse, the main pedestrian access, must

17  pass right by the leafleting zone.  This is, Your Honor, the

18  primary parking garage down there in this part of McCormick

19  Place.  Mr. Grossman is correct.  There are circuitous interior

20  routes through bridges which run over towards -- in other

21  words, you don't have to talk through this area to get to the

22  Hyatt, but on the ordinary day, the common convenient way to

23  get from the parking garage to the main entrance of McCormick

24  Place is to walk right through the leafleting zone and the

25  protest zone, okay.  And a couple other pictures illustrate

1  this as well.

2       You see Exhibit 11 and you compare it to Exhibit 14,

3  those are essentially facing in opposite directions from the

4  same point.  In one direction across Martin Luther King Drive

5  is the entrance to the parking garage, and the other entrance

6  down past the walkway there is the entrance to McCormick Place.

7       So this is a major pedestrian access at McCormick

8  Place, Your Honor, and it passes right through the leafleting

9  zone.

10      I'd like to respond to another suggestion, though,

11 Your Honor, which is your expressed concern for the particular

12 mode of expression plaintiff prefers.

13      The authorities can't have a zone for everybody, and

14 it needn't be the best zone for everybody's intended

15 communicative desire.  It need only be a reasonable zone.  We

16 provided a zone that is, it abuts traffic, which is important

17 to some people, it provides a great photo op of the

18 recognizable facade of McCormick Place for press conferences,

19 which is important for some demonstrators.  It's very large, it

20 can accommodate large groups, which is important to some

21 demonstrators.  And it also provides access to all, you know,

22 to pedestrians who walk from the parking garage across the main

23 walkway into the grand concourse.

24      So we strongly feel, Your Honor, that it blends a

25 wide variety of, blends and accommodates a wide variety of

MICHAEL P. SNYDER, Official Reporter

1   expressive activities and is eminently reasonable.  We haven't
2   put people off in a little box somewhere where they are going
3   to be limited to one type of contact with activities at
4   McCormick Place.  We have, rather, provided a very large area
5   that accommodates, in our view, appropriately widely and
6   differing types of First Amendment uses that people might want
7   to engage in at McCormick Place.

8            THE COURT:  Excuse me one second.

9            Jeff, do you have the Ayres decision there?

10           THE CLERK:  (Tendering.)

11           THE COURT:  Go ahead.

12           MR. HILDEBRAND:  Sure.

13           If we could take, another photo which conveys a
14   better sense of the extent of our zone is Exhibit 6.  You can't
15   quite see the pavement that these pylons sit on, but this
16   entire area on all, in and around and all across these pylons
17   is open for free speech activities, and, you know, the fact
18   that everyone sees this when they come to McCormick Place by
19   vehicles, the fact that heavy traffic on Martin Luther King
20   drive sees this --

21           THE COURT:  What happens when it's raining?

22           MR. HILDEBRAND:  Well, when it's raining, when it's
23   raining, people get wet.  You are in the same situation as you
24   would be protesting outside a downtown hotel, Your Honor.  So,
25   again, we think it's reasonable.

1          Looking again at Exhibit 3, you can see by the size
2   of McCormick Square on this plat, the zone is very long.   The
3   northern end is near the Hyatt Hotel, the southern end is right
4   by the pedestrian thoroughfare from the parking garage to Gate
5   4.

6          So, as I said, under the case law, this zone need not
7   be the most reasonable or the only reasonable accommodation; it
8   must simply be reasonable in light of the intended uses of the
9   forum.   We think Hawkins, coupled with the extent and
10  flexibility of our zone, more than satisfies the reasonableness
11  tests of nonpublic forum cases.

12          THE COURT:  Mr. Schwartz?

13          MR. SCHWARTZ:  Your Honor, the plaintiff would like
14  to begin by directing your attention to Exhibit 3 of the same
15  package of documents, I think to just walk through the
16  different ways that people could get into McCormick Place and
17  show the lack of contact that those people would have with the
18  people who are demonstrating.

19          I am starting at the northernmost -- if you start at
20  the northernmost parking lot, if you come down from the C in
21  campus map two inches, you see the phrase "Soldier Field
22  Parking Lot."  Do you see that?

23          THE COURT:  Yes.

24          MR. SCHWARTZ:  If someone parks there, they are not
25  going to come anywhere near McCormick Square.  If you go south

1  from there, you get to underground parking garage C.  If
2  someone parks there, they are not going to come anywhere near
3  McCormick Square.

4        Continuing clockwise around, if they go to parking
5  lot B, they are not going to come anywhere near McCormick
6  Square.

7        If they take a taxicab to one of the locations other
8  than near McCormick Square, they are not going to be anywhere
9  near McCormick Square.  There are, for example, taxi drop-off
10 and pickup points in the basement area of the grand concourse.
11 If you start at McCormick Square and go a half inch to an inch
12 out of there, there is a Gate 3, a Gate 2, a Gate 1.  If
13 someone is dropped off by car or cab or bus in those locations,
14 they are not going to be anywhere near McCormick Square.

15       If somebody does park in parking garage A, if they
16 park in parking garage A, they can bypass the pylons by going
17 in one of two bridges across Martin Luther King Drive that
18 would keep them away from the pylons.

19       If they come by Metra, they are not going to be
20 anywhere near the pylons.  If they spend the night in the Hyatt
21 parking garage, they are not going to be anywhere near the
22 pylons.

23       If they choose to take a bus or cab or are dropped
24 off in a car at Gate 4, they are going to arrive at that gate
25 in a location at least 200 feet away from the pylons.

1          Finally, if they come northbound on Martin Luther
2    King Drive and turn right onto the driveway, they won't see
3    demonstrators at all who will be between different pylons.
4    Those pylons are I believe 30 feet wide, and somebody between
5    two different pylons would not be visible from a south-facing
6    location.

7          And if somebody is driving south on Martin Luther
8    King Drive, it would only be short segments of space or short
9    segments of time, seconds that somebody looking out their
10   window might be aware that there was someone standing between
11   the different pylons.

12         I'd like to turn the Court's attention to Exhibit 10.
13   This the view of a person standing at Gate 4 facing west
14   towards the pylons.  If you note the middle pylon, towards the
15   bottom of that pylon, just to the left of the pylon is a person
16   wearing a red baseball hat.  From the perspective of somebody
17   standing in McCormick Place, it would be impossible to read
18   anything written on a t-shirt, on a hat, on a button, and
19   unless the sign was enormous, larger than any I've ever seen in
20   a political demonstration, it's impossible to see what's
21   written on the sign.  Unless these people were chanting in
22   numbers of hundreds of people, it would be impossible for
23   anyone standing at this door to hear what was going on there.

24         So the message received by people entering Gate 4 by
25   way of bus, taxi, or being dropped from a car would be somebody

1  is upset about something, and I have no idea what it is.  This
2  is an utter failure of expressive activity.

3       Accordingly, it is critical for the people who want
4  to engage in expressive activity at McCormick Place to be
5  inside, somewhere in the flow of persons attending these
6  conventions in reasonable proximity without getting in the way,
7  and the location suggested by Ms. Albrecht earlier is fully
8  consistent with that.

9       Incidentally, by our estimation, the distance from
10  the Gate 4 to the pylons is at least 200 feet.  It would be
11  interesting to me and I'm sure to the Court to know by the
12  measure of the defendants how great that distance is from the
13  gate to the pylons.

14       I'd like to direct the Court's attention to a quote
15  from the Acorn decision on page 703.  Judge Posner is analyzing
16  the fifth, though controlling opinion of Justice O'Connor in
17  the ISKCON decision, International Society of Krishna
18  Consciousness.  And Judge Posner says, "What is particularly
19  interesting about Justice O'Connor's swing vote in ISKCON is
20  that it blurs the line between public and nonpublic forums,
21  suggesting a sliding scale approach in which the benefits and
22  costs of free speech are balanced in particular settings."

23       Here, when we weigh the costs and benefits of free
24  speech, there has been no showing at all of any cost to the
25  defendants for a person to be engage in leafleting in a group

MICHAEL P. SNYDER, Official Reporter

1  of 10 within the forum that we are talking about within the

2  McCormick Place.

3         THE COURT:  But I think that's in some way the issue,

4  I mean, for which the record at this stage is very incomplete.

5  I think the real question becomes what would be the financial

6  impact or other impact on McCormick Place and its ability to

7  market its facilities if those vendors or people who are going

8  to use it were aware that if there were protesters, that those

9  protesters would be, you know, right in the center of the grand

10 hallway.

11        I mean, one of the things that concerns me now, you

12 know, as I deal with this question, is when you have an entity

13 that has contracted for McCormick Place to use to it put on its

14 program, at the time it entered into this contract, it

15 understood what it was getting itself into, what the access

16 was, what the access wasn't, what the hotel facilities were,

17 and took all that into account.  And one of the things

18 potentially, and once again the record is not, you know, hasn't

19 been made on this, is do they consider that important, is that

20 something that's important to them when they come to McCormick

21 Place, that they know it's a secure facility, if there is going

22 to be any problems or protests, here's where they are going to

23 be, we can deal with that, something that, you know, to that

24 extent.

25        That's an interest -- it's a little bit different

MICHAEL P. SNYDER, Official Reporter

1  than the defendant here and in a sense an unrepresented party,
2  it's an unrepresented party, who will be the one that's
3  impacted or not impacted by what happens here today.  I mean,
4  they are the ones whose message you are seeking to communicate
5  with.

6          I mean, if they were aware, if they were aware of
7  what the situation is, they could deal with it or decide not to
8  come here, and to some extent the fact that you are filing your
9  lawsuit, you know, on Friday for something starting on Tuesday,
10  it raises a lot of questions about the fairness of creating a
11  new set of rules that come into play.  I mean, I have some
12  questions in my own mind as to the reasonableness of the access
13  that's being provided at McCormick Place, but, you know, the
14  law may not require anything more.

15          MR. GROSSMAN:  Can I ask a question just to guide us?
16          THE COURT:  Yes.

17          MR. GROSSMAN:  Because we are obviously into this for
18  the long run and trying to figure out a solution for everybody.

19          One is that without regard to what the discrete
20  expectation is, the question is what is a reasonable
21  expectation for contractors to have when they rent that space?
22  You know, we as a city host virtually thousands of expressive
23  activities to private organizations all the time, but we don't
24  promise to insulate them from dissent in public places, and
25  once they get into the business of providing rental space for

1   expression, I don't believe that they can insulate, under the
2   law, those entities from dissent in public places.  We have
3   been fairly clear not to do that.

4   THE COURT:  Well, but that's in a sense what the
5   Judge Posner decision -- is it Posner -- in the Acorn case
6   talks about, Mr. Grossman, and, you know, he's big into the
7   economic analysis, as we all know.  Let me see, at page 702
8   beginning at 703, because the MPEA owns the buildings on Navy
9   Pier and depends for the upkeep of the Pier on the revenues
10  that those buildings generate, it has a legitimate and
11  substantial interest in preventing activities that could kill
12  those revenues.  It has a greater interest than the City of
13  Chicago itself has in the prosperity of the shops along State
14  Street.

15  I mean it's that kind of, it's that kind of
16  expression that talks about the interest of McCormick Place and
17  what it does.

18  MR. GROSSMAN:  I think that's true, but I think that
19  the nature of the commercial activity per se did what -- or I
20  should say the different kind of commercial activities is
21  what's critical.  When we run an airport, we look at the
22  commercial activity of airlines.  There is not lots of dissent
23  against airline policy that we see taking place at O'Hare.

24  There is a menagerie of commercial activity at Navy
25  Pier that really doesn't come under any particular rubric, but

1   the rubric here is private space for expressive activity with

2   adjoining public spaces, both, we would say, parklike setting

3   and this grand concourse, is very much like a city

4   thoroughfare.  It goes through to the lake, it connects parks.

5           THE COURT:  Right, but by the same token, it's not as

6   if they are precluding expressive activity.

7           MR. GROSSMAN:  But isn't that really the point, not

8   the -- it's, it certainly is the focus of the defendants that

9   they are providing that, but doesn't that really make our case?

10  Because if we can be there with t-shirts, and if we can talk to

11  people, and if, in the milieu of business cards being

12  exchanged, our client can give her business card, what possible

13  reasonableness, what possible reasonable justification can they

14  have in somebody not being able to memorialize that dialogue

15  and conversation by way of a informational leaflet?  I mean,

16  leafleting is different.  That's the essence of these cases.

17  We just got through litigating this on the federal plaza as

18  well here.

19          If you look at leafleting as low intrusive activity,

20  the reason that Posner and different judges around the country,

21  the reason that O'Connor gets into the dialogue is because it

22  is so low level in its intrusiveness, and really it is so

23  fundamental, it is so integral, it is such an historically

24  significant grass-roots one-on-one, low-level, inexpensive form

25  of communication that people who can't pay the thousand bucks

MICHAEL P. SNYDER, Official Reporter

1    to get inside get to get their message across on the outside,

2    and they get to do it in a --

3            THE COURT:  But we are not dealing with the federal

4    plaza here.

5            MR. GROSSMAN:  No, we are not, but we are dealing

6    with the same forum that Judge Posner dealt with or we would

7    say to, contrary to the defendants' views, we would say that

8    because of the nature of the activity, that is, renting space

9    for expressive activity, with adjoining public space, that that

10   is more unreasonable not to allow leafleting while you are

11   allowing conversation and public admission inside the McCormick

12   Place than it is the pier, and the pier has leafleting inside

13   right now.  So if we have leafleting inside at O'Hare, if we

14   have leafleting inside at the pier, how can it not be that it's

15   unreasonable to have it in this huge thoroughfare?

16           I mean, if you look at the front page of this

17   document that they have, their Exhibit 2, in the upper

18   left-hand corner, you are getting just a glimpse of how huge

19   this concourse is.  It's, it's just massive.  And if they do

20   not have an interest that is offended by our client being there

21   talking in that concourse, wearing a t-shirt that says, "No

22   RFID," how can it possibly be reasonable to limit one further

23   mode of communication that the courts have all historically

24   recognized as being low intrusive?  The message is no

25   different, so it cannot be that whatever it is that the vendors

1  think about having antagonistic messages outside is somehow

2  made more antagonistic because somebody actually has it in

3  writing.  I mean, I'm not exactly sure who is the most forceful

4  advocate.  I don't know if Miss Albrecht's words or her speech,

5  her written words or her oral speech are more powerful, but it

6  can't possibly be that it's any more antagonistic to those

7  interests to have it in a leaflet.

8           THE COURT:  let me hear from Mr. Hildebrand.

9           MR. HILDEBRAND:  Your Honor, I disagree, and I think

10  the first point is there is no real support in the record for

11  any of this, and an eleventh hour TRO is not an appropriate

12  time to in essence make this up as we go along.  That's the

13  first point.

14           Secondly, I think there are some important

15  differences between leafleting and casual conversation.  One of

16  them was pointed out in our brief, Your Honor, where the

17  general manager expressed to me a real concern about -- this is

18  specific to tomorrow's intended protest, Your Honor -- about

19  the spillover effects of it getting out there in the travel and

20  convention industry that a protest got in at McCormick Place.

21           Leafleting, Your Honor, if it is not, you know, the

22  guy in the gorilla suit passing out a Subway leaflet on the

23  corner, if it is leafleting to express a message, Your Honor,

24  that is understood to be political, somewhat confrontational,

25  which is not to say that Miss Albrecht would be disruptive, but

1    it is a different kind of dialogue than simply engaging your

2    fellow person in conversation.

3          THE COURT:  See, my concern is to what extent, you

4    know, you read the Acorn case as saying that the restrictions,

5    you know, if the Metropolitan Pier and Exposition Authority has

6    legitimate business reasons for imposing certain limits,

7    whether on a First Amendment basis it doesn't make any

8    difference whether you are wearing a t-shirt or passing out a

9    leaflet.  But if it does make a difference in the mind of the

10   people who are renting McCormick Place, that's a different

11   issue.  That's a financial issue which may provide a basis for

12   the restriction, even though we could argue on First Amendment

13   it doesn't make any difference.

14         MR. GROSSMAN:  That would translate into the

15   exception that ate the rule.  There would be no leafleting

16   anywhere because leafleting is site specific, and it is by

17   definition antagonistic to the interests that are present

18   physically at that place.  You know, we, you know, the nature

19   of secondary boycotts and the ability to restrict them is

20   evidence of the site that's gone awry.  But in the pure First

21   Amendment context, in the nonlabor context, every single

22   leafleting activity will be site specific.  I am sure that all

23   of the -- nobody is at -- nobody is at Navy Pier because Navy

24   Pier is unrelated to the message of the place.  There has to be

25   a reason that you are there.

1          THE COURT:  Are there regulations at Navy Pier now

2     that govern leafleting?

3          MR. GROSSMAN:  To our knowledge, we have been told,

4     we have not been able to get them, the defendants are the same

5     authority.

6          THE COURT:  I know.

7          What's the story at Navy Pier?

8          MR. HILDEBRAND:  Navy Pier, Your Honor, has six very

9     small leafleting zones.  This was the outcome of the Acorn

10    litigation, so it was in a sense judicially imposed.  But there

11    are, there are, I believe it is six leafleting zones, and the

12    rules out there are that one person, one person only may apply

13    for a permit to leaflet, and they have been carefully located

14    by the general manager and with court approval to result in the

15    least, shall we say, intrusive impact on the facility.

16         Your Honor, I will point out that there is no

17    leafleting zone in the meeting rooms portion of Navy Pier.  So,

18    in other words, if you are up there in the -- you know, I don't

19    know if you have been out there, but there is some areas called

20    Festival Hall A and B where they will have things like the

21    Antique Poster Show.  There is no leafleting area up there,

22    that's the part of Navy Pier that is most like McCormick Place,

23    and there is also no, obviously there is no enormous open zone

24    for free speech activities at Navy Pier comparable to what the

25    authority has provided at McCormick Place.

1        THE COURT:  Okay.  What else in the analysis do we
2   have to consider in terms of criteria?

3        MR. HILDEBRAND:  Well, Your Honor, I think you hit on
4   an important point a few moments ago in focusing on the
5   spillover effect on the expectations of third parties.  There
6   is no support in the record for Mr. Grossman's assertion that
7   the intended purpose of McCormick Place is to foster expressive
8   activity.  The intended purpose of McCormick Place is
9   established by the Illinois legislature, and the only evidence
10  in the record is that McCormick Place is set up to host large
11  conventions.  And in the opinion of its managers, the people
12  who attend these conventions essentially view their licensed
13  spaces at McCormick Place as an extension of their private
14  business.  In other words, Your Honor, they have no more
15  expectation of being leafleted when they leave Hall B and enter
16  the grand concourse than they would when they get out of the
17  elevators at the bottom of the AT&T Center and walk to
18  Starbucks.  It's that kind of environment, Your Honor.  It's
19  what's called a business-to-business environment, and those are
20  customers' expectations.

21        THE COURT:  Okay, but my concern is making sure that
22  First Amendment expressive activity can be effectively
23  communicated to people, and, you know, if you don't want to do
24  it in the grand concourse, you have to make some way, make some
25  way available I think under the case law to have communicated,

1    and I am not sure what you have done is adequate at this point.

2         MR. HILDEBRAND:   Your Honor, we'd like to explore

3    that with the opportunity to develop a full record, but we get

4    back to the point that this is a TRO.  Tomorrow there are going

5    to be four huge shows in McCormick Place.  Our security people

6    aren't expecting this.  They had no notice.  The people

7    attending the show aren't expecting this.  No one expects to

8    see leafleters out in the grand concourse because they have

9    never been there before.

10        So if, you know, if we want to pursue this analysis

11   in the litigation, we feel confident that, with the proper

12   testimonial foundation and developing an evidentiary record, it

13   would have been possible if we had done this two or six weeks

14   ago.  You know, we could get to the right outcome and the same

15   outcome, but we do think, Your Honor, it's sharply unfair to

16   impose this on us at the last minute when we have a huge

17   protest zone outside, and, again, the testimony is that people

18   who park in the parking garage and walk in will walk right by

19   it, and everybody who comes through McCormick Place can see the

20   signs these people are carrying, and if they are curious, they

21   can walk over, say hello and start chatting.

22        THE COURT:   Here's what I'd like to do.  Is there --

23   I mean, you have got the general counsel here.  Do you have any

24   ability to negotiate with the plaintiffs or are your hands

25   tied?

MICHAEL P. SNYDER, Official Reporter

1          MS. GETZ:  She doesn't have her clients.

2          MR. HILDEBRAND:  The real person we need to talk to

3     is the general manager and the CEO, and they are not here.

4          THE COURT:  I mean, I will be prepared to rule later

5     this afternoon.  I am going to encourage you, if you have the

6     ability to do so, to talk about trying to create an area closer

7     to where people come in and go out so that leaflets can be

8     distributed.  I mean, I have some concern that where they are

9     right now or where you are putting them enables them to get

10    their message across.

11         By the same token, I want the plaintiffs to realize

12    that I have some grave concern about the lateness of you

13    bringing the case and what the potential balance of hardships

14    are in this situation, in other words, the hardship on you to

15    be able to leaflet this particular forum versus what the

16    potential consequences are on McCormick Place and its ability

17    to continue to attract conventions.  I'm not unmindful of the

18    First Amendment importance, but by the same token the economic

19    realities of McCormick Place and its importance to Chicago, and

20    I am looking to find some kind of effective balance that

21    McCormick Place can live with and that First Amendment

22    advocates can live with.  And I know, you know, ultimately we

23    worked out something with Taste of Chicago to provide a place

24    for people in the main areas of Taste where they could do that,

25    and I guess you've worked the same thing out at Navy Pier.  And

 1   while you may think you have worked something out or provided
 2   something at McCormick Place, I want you to think very hard
 3   about whether it's consistent with the Acorn decision and the
 4   leafleting implications that Judge Posner talks about to see
 5   whether there may be some room even on an experimental basis
 6   for you for these next three days to come to some
 7   accommodation.

 8           Is there anything to talk about between you?
 9           MR. GROSSMAN:  We'd be happy to continue that
10   dialogue.

11           THE COURT:  Yes.  I want to.

12           MR. HILDEBRAND:  Mindful of what you are saying, Your
13   Honor, we should certainly, we will consider it, although,
14   without conferring with the client, I don't know what the
15   answer will be.  But I hear what you are saying.

16           THE COURT:  I mean, let me make it clear.  The
17   defendant certainly has the right to designate an area for
18   safety, traffic, and other reasons that's reasonable, but that
19   area has to also permit the message to get across in some
20   meaningful way, and, you know, based on this record, I don't
21   know whether you met it or not.  I'm not telling either side
22   what I am going to rule.  I am trying to express to you my
23   concerns on both sides in the hope that you will at least try
24   something out for three days, but if you can't, I'll give you a
25   ruling.  And you tell me when you want to come back for the

1 | ruling.

2 |      MR. GROSSMAN:  We are ready.  We have our clients

3 | here.

4 |      MR. HILDEBRAND:  Well --

5 |      MS. GETZ:  What is good for you, Your Honor?

6 |      THE COURT:  I'm here for the duration.  I've got

7 | discovery motions that are going to take me God knows how long.

8 |      MR. HILDEBRAND:  Your Honor, if we could have just a

9 | few moments out in the hall, if I could return in two or three

10 | minutes to give you a clear answer?

11 |      THE COURT:  That's fine.

12 |      MR. HILDEBRAND:  One way or the other.

13 |      THE COURT:  Why don't we take a short recess.

14 |      MR. HILDEBRAND:  Thank you.

15 |      THE COURT:  Was there anything else anybody wants to

16 | argue to me on this?  Okay.  Thank you.

17 |    (Recess.)

18 |      MR. HILDEBRAND:  Your Honor, we aren't able to come

19 | to an answer in the short time frame, so what we would suggest

20 | is as follows:  We will go back, make a few phone calls, try to

21 | have a discussion if we can, and in the meantime, just say we

22 | will reappear for ruling at 4 o'clock.  If we are able to work

23 | something out before then, so be it.

24 |      THE COURT:  That's fine.  I'll be here.

25 |      MR. HILDEBRAND:  Okay.

1              THE COURT:  Thank you.

2              MR. HILDEBRAND:  Thank you, Your Honor.

3        (Recess.)

4              THE COURT:  Have you had any luck in your

5    discussions?

6              MR. HILDEBRAND:  We have not, Your Honor.  We were

7    unable to reach the required decisionmakers, and so we are

8    prepared to take your ruling.

9              However, we want to assure you we are mindful of some

10   of the things you expressed today.  We don't feel it's

11   appropriate for us to take this in an imposed fashion in a TRO.

12   We will go back and talk and think about what you've said.

13             THE COURT:  The first thing I'd like to do is I'd

14   like to decide what's no longer at issue.  What is no longer at

15   issue here?  Let's talk about what is the understanding of what

16   plaintiff will be allowed to do without any court ruling.

17             MR. SCHWARTZ:  Your Honor, if I may start?

18             One issue that's off the table is expressive activity

19   within Hall B-1.  Now that we have learned that it is

20   controlled by the group that had rented that venue, we don't

21   want to ask this Court to order the defendants to order the

22   tenent to allow the expressive activity therein.

23             MR. HILDEBRAND:  We'd agree with that, with the

24   caveat that we have a contractual relationship with them, and

25   we are not sure that any such relief would be appropriate in

1  any event, but apparently that's off the table.

2          THE COURT:  All right.  Now, what will she be allowed

3  to do, the group be allowed to do in the main hallway?

4          MR. HILDEBRAND:  Well, Your Honor --

5          THE COURT:  Absent a court ruling.

6          MR. HILDEBRAND:  Absent a court ruling, Ms. Albrecht

7  and her like-minded citizens will enjoy whatever public access

8  to McCormick Place exists tomorrow, and I believe the only time

9  the bottom -- I was talking to the general counsel about this.

10  Our understanding, again without confirming with the general

11  manager, our understanding is the grand concourse is in fact

12  typically open to the public, and you can simply walk up the

13  steps and over to Lakeside Center, except when both the north

14  and south buildings are under a single show.  Some of the very

15  larger shows do span both facilities.

16          THE COURT:  So we don't have that situation tomorrow?

17          MR. HILDEBRAND:  I do not believe we have that

18  situation tomorrow because we know for a fact that there is

19  different shows in the north building and the south building.

20          So we do believe that the concourse will be open to

21  pedestrian access as it usually is, and provided they are

22  nondisruptive and follow the rules, so to speak, plaintiffs

23  will be able to move about, wear t-shirts, talk to people, that

24  sort of thing.

25          THE COURT:  And what will they be prohibited from

1 doing, absent a court ruling?

2          MR. HILDEBRAND:  Leafleting, Your Honor.  They would

3 be prohibited from trying to unfurl a banner, obviously.

4          THE COURT:  Within the grand concourse?

5          MR. HILDEBRAND:  Within the grand concourse, correct.

6          MR. GROSSMAN:  Which we do not seek to do.

7          MR. HILDEBRAND:  Right.

8          THE COURT:  Okay.

9          MR. HILDEBRAND:  I am trying to remember what else

10 they indicated an interest in doing in there.

11          MR. GROSSMAN:  That's the extent of the activity.

12          MR. HILDEBRAND:  I think obviously kind of shouting

13 or singing or chanting or something like that, I think they

14 would be asked to leave as disruptive, but I don't believe they

15 have indicated an interest in doing that.  Linking arms and --

16 you know, but none of this is going on.

17          THE COURT:  Sitting down in front of the doors

18 blocking the traffic?

19          MR. HILDEBRAND:  Yes, they can even wear tie-died

20 shirts, Your Honor, but they can't link arms.

21          MR. SCHWARTZ:  Your Honor, in addition to leafleting

22 both inside the grand concourse and in the park area outside of

23 the grand concourse, the plaintiff in the park area would like

24 to hold signs that say "Stop RFID."

25          THE COURT:  I'm not aware that that's being -- I

MICHAEL P. SNYDER, Official Reporter

1  think that's what those areas are for.

2       MR. HILDEBRAND:  If by the park area you simply mean

3  the pylons --

4       MR. SCHWARTZ:  Let me clarify.  We want to or the

5  plaintiff would like to hold up a sign and do the leafleting

6  within 25 feet of the front door in the park area.

7       MR. HILDEBRAND:  They will be prevented from doing

8  that, Your Honor.  The landscaped space is currently not open

9  for protest activities, and so they would not be allowed to do

10  that.

11       MR. GROSSMAN:  Your Honor, for clarification, the

12  place 25 feet from Gate 4, excuse me, the area that is 25 feet

13  from Gate 4 that we would anticipate using if this Court would

14  empower us to do so is the area directly south of that gate and

15  not in the street area.  There is a substantial sidewalk

16  directly south of the, of Gate 4.

17       MR. HILDEBRAND:  I am somewhat confused now because

18  when counsel mentioned the park area, I guess I thought he was

19  talking about the grass across the turnabout.  So --

20       THE COURT:  Okay.

21       MR. HILDEBRAND:  Maybe we should try and --

22       THE COURT:  I am ready to rule.

23       MR. HILDEBRAND:  Excuse me, Your Honor.

24       THE COURT:  I think I am ready to rule.  I think I

25  have an understanding.

1      First of all, this is a very interesting case, as are

2   all First Amendment cases, and based on the record that's been

3   presented before me, I am going to deny the motion for a

4   temporary restraining order for the following reasons:

5      First, with respect to the type of area, I do find,

6   for at least these purposes, that the plaintiff has not

7   established that it's a traditional public forum.  I don't

8   think there has been a sufficient record to establish that.

9      And under these circumstances, I believe the

10  defendant has made a reasonable accommodation to the plaintiff

11  to be able to express her and the group's opposition to the

12  activities by being allowed to go to the grand concourse where

13  these people are going to be entering the meeting rooms, to be

14  able to wear a t-shirt which expresses their opposition, to be

15  able to approach these people, and to discuss these matters

16  with them.

17      While leafleting generally falls within the

18  expressive activity, I am concerned at this point in time about

19  dealing with how to prevent potential disruption and whether or

20  not there can be an area found in the main concourse for those

21  kind of activities which I think would require further engaging

22  of people, and it may be on the merits that I will find that

23  there is a violation and possibly on the merits I will enter

24  some kind of permanent injunction.

25      As I indicated in my questioning, I think in

MICHAEL P. SNYDER, Official Reporter

1  balancing the threat of irreparable harm, I don't find that the
2  plaintiff is going to suffer irreparable harm at this time
3  because she still will have access to the people she wants to
4  contact.  She appears to be and the group appears to be
5  sophisticated and knowledgeable about being able to contact the
6  people, the types of people who are going to be attending this
7  conference in other ways, so that she will still have access to
8  them.

9          I believe that there is, in the balancing of
10 hardships, I am concerned about the potential hardship on
11 McCormick Place and the potential adverse consequences if
12 general leafleting and demonstrations were allowed to occur in
13 the grand concourse.  I'd rather see that worked out in some
14 kind of controlled setting, and I think the plaintiffs had an
15 obligation to come forward earlier so that these issues could
16 have been addressed in a way that would have enabled everybody
17 to try to think this through rather than do it in a hurried
18 fashion.  Tomorrow appears to be an extremely busy day at
19 McCormick Place with a whole variety of conferences and
20 conventions taking place, I think the papers indicate something
21 on the magnitude of 40,000 people, and to introduce leafleting
22 and other things without giving everybody adequate time to
23 prepare for and deal with the issue I think places an undue
24 burden on the representatives of McCormick Place and the other
25 conventions and bodies participating there, including the one

1  to which you wish to communicate to.

2       In terms of the overall public interest here, while
3  the First Amendment has a great and extremely high value and
4  one of the highest, I think the plaintiffs are not being
5  prevented from communicating their message.

6       For all those reasons, I am going to deny the motion
7  for a temporary restraining order without prejudice to seeking
8  ultimate relief.

9       I think I am going to encourage the defendants to
10 think carefully about trying to find an area within the grand
11 concourse, if it's consistent, I mean, if it's at all
12 consistent with what they believe their mission to be, to
13 provide an area for protest or other demonstrations in a way
14 that the Seventh Circuit has talked about at Navy Pier.  And I
15 would just say this is a very close question in terms of
16 business and financial implications of running McCormick Place
17 as against the types of activities that are out there, some of
18 which are business and some of which may have more broader
19 public interest ramifications.

20      So for all those reasons, the Court is going to deny
21 the motion for a temporary restraining order, finding that the
22 defendant, at least for purposes of tomorrow and through
23 Wednesday, has provided a reasonable access to the plaintiff to
24 get her message across, both through the stated public areas
25 which have been marked off for the demonstrations and also by

1  providing the plaintiff with access in the grand concourse

2  wearing t-shirts and being able to approach people who may be

3  entering the conference, to talk to them if she chooses to do

4  so.

5          That's the Court's ruling.  Thank you.

6          MR. GROSSMAN:  Judge, could we seek clarification on

7  one point?

8          My client is a little bit confused about the use of a

9  business card in conversations that she's had.  Is that

10  permitted activity under the --

11          THE COURT:  It would be my view that if engaging in

12  conversation, as a result of the conversation, somebody

13  requests it or she offers it and somebody expresses an interest

14  in receiving it, that there would be no prohibition in doing

15  that so that people could follow up with them.  I'm not trying

16  to prevent future communications.

17          But I don't think she should be, you know, throwing

18  business cards at people.  I think the purpose is to permit her

19  to interact with people.  If they wish to discuss it with her,

20  she can discuss.  If they wish further information, she can

21  supply them with her business card.  But as opposed to

22  leafleting, as opposed to leafleting.

23          Anything further?

24          MR. GROSSMAN:  Nothing.

25          MR. HILDEBRAND:  No, Your Honor.

```
 1              THE COURT:  Anything further from the defendants?

 2              MR. HILDEBRAND:  Not at all.  Thank you for your

 3    time.

 4              THE COURT:  Why don't we just talk about future

 5    scheduling of the case so that we can do this in a more

 6    controlled environment.

 7              How much time to answer the complaint?

 8              MR. HILDEBRAND:  Two weeks, Your Honor?

 9              THE COURT:  Okay.  And how much discovery, or is it

10    too early to tell?

11              MR. GROSSMAN:  It's early for us, Your Honor.

12    Perhaps we could have a date?  We could meet before then.

13              THE COURT:  For a status?  That's fine.  Why don't

14    you make your initial disclosures on both side, whatever

15    initial disclosures you have, within five weeks, initial

16    disclosures in five weeks, and why don't we have a status and

17    work out a discovery schedule later that week.

18              THE CLERK:  October 23rd at 10 o'clock.

19              THE COURT:  Okay.  That will be for status, and we'll

20    deal with it at that time.  And that way I'll also get some

21    feedback on the events that transpire, or perhaps in the

22    meantime you will have worked something out and be able to have

23    people talk about the issues and try to work out something that

24    both sides can live with.  Not only -- it will be over with for

25    you and this particular conference, but they can at least deal
```

1   with issues in the future, and McCormick Place I believe is
2   going to be there, if we don't have another fire, for a long
3   period of time.  So the issues you have raised are important
4   ones, and it just requires I think a little more time to really
5   work all of this out.

6           So thank you.

7           MR. GROSSMAN:   Thank you.

8           MR. HILDEBRAND:   Thank you, Your Honor.

9                   C E R T I F I C A T E

10          I, Michael P. Snyder, do hereby certify that the
11  forgoing is a complete, true, and accurate transcript of the
12  proceedings had in the above-entitled case before the Honorable
13  ELAINE E. BUCKLO, one of the judges of said Court, at Chicago,
14  Illinois, on September 15, 2003.

15

16

17                  Official Court Reporter
18                  United States District Court
19                  Northern District of Illinois
20                  Eastern Division

21

22

23

24

25

MICHAEL P. SNYDER, Official Reporter