**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | | |
|---|---|---|
| **DANA ALBRECHT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil No. 1:23-cv-381-JL-TSM** |
| | ) | |
| **KATHLEEN STERNENBERG,** | ) | |
| solely in her official capacity as a | ) | |
| Guardian ad Litem appointed to serve | ) | |
| in the New Hampshire Circuit Court, | ) | |
| Family Division, and her successor(s) | ) | |
| in office, | ) | |
| | ) | |
| **BRUCE F. DALPRA,** | ) | |
| solely in his official capacity as a | ) | |
| former Marital Master in the New | ) | |
| Hampshire Circuit Court, Family | ) | |
| Division, and his successor(s) in | ) | |
| office, | ) | |
| | ) | |
| **JULIE A. INTROCASO,** | ) | |
| solely in her official capacity as a | ) | |
| former judge in the New Hampshire | ) | |
| Circuit Court, Family Division, and | ) | |
| her successor(s) in office, | ) | |
| | ) | |
| **MARK S. DERBY,** | ) | |
| solely in his official capacity as a | ) | |
| judge in the New Hampshire Circuit | ) | |
| Court, Family Division, | ) | |
| | ) | |
| **MARK S. DERBY,** | ) | |
| separately in his individual capacity, | ) | |
| | ) | |
| **KEVIN RAUSEO,** | ) | |
| solely in his official capacity as a | ) | |

- 1 -

judge in the New Hampshire Circuit                )
Court, Family Division, and his                   )
successor(s) in office,                           )
                                                  )
**JOHN CURRAN,**                                  )
solely in his official capacity as a              )
former judge in the New Hampshire                 )
Circuit Court, Family Division, and               )
his successor(s) in office,                       )
                                                  )
**DAVID D. KING,**                                )
solely in his official capacity as an             )
Administrative Judge of the New                   )
Hampshire Circuit Court, and his                  )
successor(s) in office,                           )
                                                  )
**ANNA BARBARA HANTZ MARCONI,**                   )
solely in her official capacity as a              )
former justice of the New Hampshire               )
Supreme Court, and her successor(s) in            )
office,                                           )
                                                  )
**GORDON MACDONALD,**                             )
solely in his official capacity as                )
chief justice of the New Hampshire                )
Supreme Court, and his successor(s) in            )
office,                                           )
                                                  )
**MARY ANN DEMPSEY,**                             )
solely in her official capacity as                )
former General Counsel, New Hampshire             )
Judicial Branch, and her successor(s)             )
in office,                                         )
                                                  )
**ERIN CREEGAN,**                                 )
solely in her official capacity as                )
former General Counsel, New Hampshire             )
Judicial Branch, and her successor(s)             )
in office,                                         )
                                                  )

**JESSICA KING,**                                      )
solely in her official capacity as                      )
General Counsel, New Hampshire                           )
Judicial Branch, and her successor(s)                    )
in office,                                              )
                                                       )
**NEW HAMPSHIRE JUDICIAL BRANCH,**     )
   **Defendants.**                                 )

---

**AMENDED COMPLAINT FOR CIVIL RIGHTS VIOLATIONS, DECLARATORY**

**JUDGMENT, AND INJUNCTIVE RELIEF**

---

**TABLE OF CONTENTS**

AMENDED COMPLAINT FOR CIVIL RIGHTS VIOLATIONS, DECLARATORY
JUDGMENT, AND INJUNCTIVE RELIEF..................................................................3
INTRODUCTION.............................................................................................8
PARTIES........................................................................................................8
JURISDICTION AND VENUE............................................................................10
FACTS PLEAD COMMON TO ALL COUNTS.......................................................11
    The Nine Conflict Cases.............................................................................12
    What GAL Kathleen Sternenberg Knew.......................................................13
    Master Bruce DalPra's Knowledge..............................................................15
    Judge Mark S. Derby's Knowledge..............................................................16
    The Hamblett & Kerrigan Nexus and Judge Kevin P. Rauseo's Knowledge.......18
    Administrative Judge David D. King's Knowledge and Active Concealment.....23
    Pattern of Non-Disclosure and Failure to Provide Remedy.............................25
    Albrecht v. Albrecht – The Underlying Family Law Case................................27
    Judge Introcaso's Abdication of Judicial Function.........................................30
    Master DalPra's Documented Misconduct – The November 6, 2020 Hearing.....32
    The Domestic Violence Orders and Their Extensions.....................................34
    Administrative Knowledge, Active Concealment, and the First Extension.......36
    The Institutional Response.........................................................................38
    Further Extension of the Domestic Violence Order........................................42
    The Appeal..............................................................................................45
    The Hearing Where Every Subpoena Was Quashed.......................................45
    The State Intervenes in a Private Domestic Violence Proceeding....................45
    Rauseo Narrows the Scope.........................................................................46
    Every Subpoena Quashed..........................................................................47
    Dana Albrecht Raises the Rauseo Conflict on the Record..............................48
    The Due Process Argument – Stated on the Record.......................................50
    Rauseo Dismisses the Conflict....................................................................50
    The Result...............................................................................................50
    The AG Structural Conflict.........................................................................51
    Marconi's Knowledge of the Albrecht Case – Five Concurrences....................52
    The Crime...............................................................................................55
    Post-Crime Orders....................................................................................56
    The False Certification..............................................................................57
    MacDonald's Knowledge...........................................................................57
    Administrative Leave and Conviction..........................................................58
    The Consequence Gap...............................................................................60
    Appellate Issues and Document Destruction................................................62
    Judge Derby and the December 2025 Church Service.....................................63

The Ongoing Harm.................................................................64
MATTERS OF LAW PLEAD COMMON TO ALL COUNTS.............................66
    I. Standard of Review and Fundamental Rights........................................66
    II. The Constitutional Standard for Judicial Impartiality...........................66
    III. Federal Jurisdiction Over Claims Against State Judicial Officers – Younger
    Abstention, Comity, and the Inadequate State Forum Exception...................71
    IV. Inapplicability of the Rooker-Feldman Doctrine....................................73
    V. Exceptions to Judicial Immunity – The Functional Analysis....................76
    VI. The Due Process Framework – Procedural and Substantive.....................81
    VII. Cumulative Error and Structural Due Process...................................84
    VIII. Ex Parte Young – Ongoing Violation and the Eleventh Amendment........87
    IX. State Action and Joint Conduct..................................................89
    X. Inapplicability of Collateral Estoppel and Res Judicata..........................90
    XI. Statute of Limitations – Discovery Rule and Concealment Tolling............90
    XII. Declaratory Relief Survives When Injunctive Relief Is Barred................92
    XIII. Collateral Attacks on Court Appointments – The Brown v. Newberger
    Distinction...........................................................................94
    XIV. Quasi-Judicial Immunity for Guardians ad Litem...............................95
    A. Preservation: *Cok v. Cosentino* Was Wrongly Decided.............................95
    B. Alternative Argument Under Existing Law: Concealment Is Not a Protected
    Function.............................................................................100
    XV. Qualified Immunity Standard....................................................101
REASONABLE INFERENCES FROM FACTS AND LAW.............................102
    A. The Trial Court Concealment Pattern.............................................104
    B. Sternenberg – Private Actor and Joint Conduct..................................108
    C. The H&K / Rauseo Disqualification................................................111
    D. The Appellate Concealment Pattern...............................................113
    E. Attorney General Structural Conflict..............................................115
    F. Neither Judicial Immunity Nor Qualified Immunity Protects Defendants...117
    G. Ongoing Violations and Harm.....................................................121
    H. Statute of Limitations – Concealment Timeline Applied.........................124
    I. Chain of Causation.................................................................126
CAUSES OF ACTION...................................................................130
    COUNT ONE.........................................................................130
    COUNT TWO.........................................................................131
    COUNT THREE.......................................................................131
    COUNT FOUR........................................................................131
    COUNT FIVE.........................................................................132
    COUNT SIX..........................................................................132
    COUNT SEVEN.......................................................................132
    COUNT EIGHT.......................................................................133

COUNT NINE....................................................................................................133
COUNT TEN.....................................................................................................134
COUNT ELEVEN.............................................................................................134
COUNT TWELVE.............................................................................................134
COUNT THIRTEEN.........................................................................................135
COUNT FOURTEEN.......................................................................................135
COUNT FIFTEEN............................................................................................135
COUNT SIXTEEN...........................................................................................136
COUNT SEVENTEEN.....................................................................................136
COUNT EIGHTEEN........................................................................................136
COUNT NINETEEN........................................................................................137
COUNT TWENTY...........................................................................................137
COUNT TWENTY ONE...................................................................................137
COUNT TWENTY TWO...................................................................................138
COUNT TWENTY THREE...............................................................................138
COUNT TWENTY FOUR.................................................................................139
COUNT TWENTY FIVE...................................................................................139
COUNT TWENTY SIX.....................................................................................140
COUNT TWENTY SEVEN...............................................................................140
COUNT TWENTY EIGHT...............................................................................141
COUNT TWENTY NINE..................................................................................141
COUNT THIRTY..............................................................................................141
COUNT THIRTY ONE......................................................................................142
COUNT THIRTY TWO.....................................................................................142
COUNT THIRTY THREE..................................................................................142
COUNT THIRTY FOUR....................................................................................143
COUNT THIRTY FIVE......................................................................................143
COUNT THIRTY SIX........................................................................................143
COUNT THIRTY SEVEN..................................................................................144
COUNT THIRTY EIGHT...................................................................................144
COUNT THIRTY NINE.....................................................................................145
COUNT FORTY................................................................................................145
COUNT FORTY ONE........................................................................................146
COUNT FORTY TWO.......................................................................................147
COUNT FORTY THREE....................................................................................149
COUNT FORTY FOUR......................................................................................150
COUNT FORTY FIVE – STRUCTURAL DUE PROCESS (CUMULATIVE
ERROR)............................................................................................................151
CONCLUSION....................................................................................................154
PRAYERS FOR RELIEF....................................................................................155
I. Prospective Declaratory Relief....................................................................155

II. Prospective Injunctive Relief (Ex parte Young)....................................156

III. Expungement and Correction.........................................................158

IV. Damages.........................................................................................159

V. Other Relief....................................................................................159

JURY DEMAND.........................................................................................159

CERTIFICATE OF SERVICE....................................................................160

LIST OF EXHIBITS..................................................................................161

**INTRODUCTION**

1.      This is a civil rights action brought pursuant to 42 U.S.C. § 1983 seeking declaratory and injunctive relief for ongoing violations of Plaintiff's procedural and substantive due process rights under the Fourteenth Amendment. Defendants' failure to disclose various conflicts of interest and other relevant materials to Plaintiff, their active concealment of judicial misconduct, and their continued enforcement of orders procured through fraud and corruption have deprived Plaintiff of his constitutional right to an impartial tribunal.

**PARTIES**

2.      Plaintiff Dana Albrecht is a citizen of the United States and a resident of Nashua, New Hampshire.

3.      Defendant Kathleen Sternenberg was the court-appointed *Guardian ad Litem* in Plaintiff's family law case, *ITMO Dana Albrecht & Katherine Albrecht*, No. 659-2016-DM-00288, New Hampshire Circuit Court, 9th Circuit, Family Division. She is sued solely in her official capacity and her successor(s) in office.

4.      Defendant Bruce F. DalPra was a New Hampshire Marital Master who issued recommendations in Plaintiff's family law case. He is sued solely in his official capacity as a former Marital Master and his successor(s) in office.

- 8 -

5.      Defendant Julie A. Introcaso was a New Hampshire Judge who issued orders in Plaintiff's family law case. She is sued solely in her official capacity as a former judge and her successor(s) in office.

6.      Defendant Mark S. Derby is a New Hampshire Judge who issued orders in Plaintiff's family law case and in the related domestic violence matter, *Albrecht v. Albrecht*, No. 659-2019-DV-00341. He is sued in his official capacity.

7.      Defendant Mark S. Derby is also sued separately in his individual capacity.

8.      Defendant Kevin P. Rauseo is a New Hampshire Judge who issued orders in the domestic violence matter. He is sued solely in his official capacity and his successor(s) in office.

9.      Defendant John Curran is a former New Hampshire Judge who issued orders extending the domestic violence Final Protective Order against Plaintiff. He is sued solely in his official capacity and his successor(s) in office.

10.     Defendant David D. King is the former Administrative Judge of the New Hampshire Circuit Court. He is sued solely in his official capacity and his successor(s) in office.

11.     Defendant Anna Barbara Hantz Marconi was a Justice of the New Hampshire Supreme Court who participated in orders in Plaintiff's appeal, *K.A. v. D.A.*, No. 2023-0181. She retired from the bench on February 12, 2026. She is sued solely in her official capacity as a former justice and her successor(s) in office.

12.    Defendant Gordon MacDonald is the Chief Justice of the New Hampshire Supreme Court. He is sued solely in his official capacity and his successor(s) in office.

13.    Defendant Mary Ann Dempsey served as General Counsel of the New Hampshire Judicial Branch. She is sued solely in her official capacity and her successor(s) in office.

14.    Defendant Erin Creegan succeeded Dempsey as General Counsel of the New Hampshire Judicial Branch. She is sued solely in her official capacity and her successor(s) in office.

15.    Defendant Jessica King currently serves as General Counsel of the New Hampshire Judicial Branch. She is sued solely in her official capacity and her successor(s) in office.

16.    Defendant New Hampshire Judicial Branch is an organization consisting of the various state courts located in the State of New Hampshire.

**JURISDICTION AND VENUE**

17.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 1983. The Court has jurisdiction over the request for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

18.    Venue is proper in the District of New Hampshire pursuant to 28 U.S.C. § 1391.

**FACTS PLEAD COMMON TO ALL COUNTS**

19.    Judge Julie A. Introcaso was a judge of the New Hampshire Circuit Court, Family Division, 9th Circuit (Nashua), from approximately 2012 until her resignation by letter dated February 22, 2021. (Exhibit 34).

20.    Kathleen A. Sternenberg, Esq. is an attorney licensed in New Hampshire who served as a *Guardian ad Litem* ("GAL") in family law cases (Exhibit 3). Judge Introcaso and Attorney Sternenberg maintained a close personal friendship beginning no later than 2012. (Exhibit 1, Page 2, Lines 24–Page 3, Line 6 – on-the-record confirmation; Exhibit 6 – written confirmation to Administrative Judge King; Exhibit 9 – Introcaso's own recusal order describing Sternenberg as a "long-standing friend").

21.    On the record in *Sobell v. Sobell* on May 1, 2014, Judge Introcaso described the relationship: "Attorney Sternenberg and I are very good friends. Very good friends... Very good friends like godparent of my child. We are very close." (Exhibit 1, Page 2, Lines 24–Page 3, Line 6). Judge Introcaso also stated: "She is on my conflict list." (Exhibit 1, Page 3, Line 15).

22.    Attorney Sternenberg was listed on Judge Introcaso's formal judicial conflict list, which was maintained with the court administration. (Exhibit 1, Page 3, Line 15 – "She is on my conflict list"; Exhibit 6 – "one of four people on my 'conflicts'

- 11 -

list," written to Administrative Judge King; Exhibit 9 – recusal order acknowledging the conflict as "non-waivable").

23.    The Introcaso-Sternenberg friendship extended beyond professional interactions. Attorney Sternenberg took vacations together with Judge Introcaso on more than one occasion, including trips to see plays at Niagara-on-the-Lake in New York. Attorney Sternenberg also discussed financial issues with Judge Introcaso. (Exhibit 1, Page 3, Lines 5–6 – on-the-record confirmation of closeness: "very good friends like godparent of my child. We are very close"; Exhibit 6 – "financial complications" disclosed to Administrative Judge King).

24.    Despite this conflict, between September 2013 and December 2018, Judge Introcaso appointed or approved the appointment of Attorney Sternenberg as *Guardian ad Litem* in at least nine separate family law cases. (Exhibit 3 – the Albrecht appointment order, documenting the mechanism: Master DalPra recommended, Judge Introcaso approved, same day, same form; see also Exhibit 33 – deposition exhibits contain all nine orders of appointment; the Albrecht appointment is Deposition Exhibit 17).

**The Nine Conflict Cases**

25.    The following nine cases involved appointments of Attorney Sternenberg as GAL by Judge Introcaso while the undisclosed conflict existed:

| Date | Case Name | Docket No. | H&K Involvement |
|------|-----------|------------|-----------------|
| 9/5/2013 | *Merrifield v. Cox* | 657-2011-DM-00565 | – |
| 1/30/2014 | *Sobell v. Sobell* | 659-2013-DM-00348 | – |
| 5/12/2015 | *Crawford v. Crawford* | 226-2008-DM-00525 | – |
| 8/20/2015 | *Covart v. Covart* | 659-2015-DM-00463 | – |
| 10/13/2016 | *Albrecht v. Albrecht* | 659-2016-DM-00288 | – |
| 2/22/2017 | *Yiatras v. Yiatras* | 659-2016-DM-00322 | – |
| 10/24/2018 | *Campbell v. Partello* | 659-2018-DM-00702 | – |
| 11/29/2018 | *Loudermilk v. Montgomery* | 659-2015-DM-00185 | Andrew Piela, Esq. (H&K) |
| 12/13/2018 | *Ausiaikova v. Meckel* | 659-2018-DM-00414 | Kevin P. Rauseo, Esq. (H&K) |

26.    The Albrecht family law matter has spawned related UCCJEA (Uniform Child Custody Jurisdiction and Enforcement Act) dockets in other states: **(a)** California Superior Court, Pasadena Courthouse, County of Los Angeles, No. 21PDFL00970; and **(b)** Michigan 31st Circuit Court, St. Clair County, No. 21-000769-UN. (Exhibit 37).

**What GAL Kathleen Sternenberg Knew**

27.    GAL Sternenberg knew of the conflict and acknowledged it on the record. In *Sobell v. Sobell* on May 1, 2014, Judge Introcaso asked Sternenberg directly: "K., are we very good friends?" Sternenberg responded: "Yeah, I think so." (Exhibit 1, Page 3, Lines 2–4).

28.    In that same hearing, Judge Introcaso stated on the record: "I don't appoint her to cases because I don't want anyone to think that I'm choosing a friend." (Exhibit 1, Page 3, Lines 19–20). Despite this representation, Judge Introcaso

appointed or approved Sternenberg's appointment in eight subsequent cases without disclosure. (Exhibit 3 – the Albrecht appointment, one of the eight undisclosed cases; Exhibit 6 – Judge Introcaso repeated the "party-requested" falsehood in writing to Administrative Judge King four years later; see also Exhibit 33 – deposition exhibits contain all nine orders of appointment).

29.    *Sobell v. Sobell* was likely the only one of the nine conflict cases in which the parties received any disclosure of the Introcaso-Sternenberg relationship. In the remaining cases, neither Judge Introcaso nor GAL Sternenberg appeared to disclose the conflict to the parties or their counsel. (Exhibit 3 – the Albrecht appointment form bears Sternenberg's signature with no disclosure notation).

30.    As an officer of the court appointed to represent the best interests of children, GAL Sternenberg had an independent obligation to disclose any conflicts of interest that could impair her independence. (Exhibit 1, Page 3, Lines 2–4 – Sternenberg confirmed on the record she knew of the friendship; Exhibits 3, 33 – she accepted the Albrecht appointment without disclosing, and the deposition exhibits document all nine appointments; Exhibit 4, Page 348 – she testified at the August 2017 hearing without disclosing, after twenty-four years' experience and "hundreds" of GAL appointments). The cases extending quasi-judicial immunity to GALs protect functions performed *for the court* – investigating, recommending, testifying. They do not protect a GAL's concealment of her personal relationship

with the appointing judge *from the court and the parties*. Concealment is not a GAL function; it is a breach of the fiduciary duty that justifies the appointment.

**Master Bruce DalPra's Knowledge**

31.     Master Bruce F. DalPra was a Marital Master assigned to the 9th Circuit Court, Family Division (Nashua), who regularly made recommendations on GAL appointments and other family law matters.

32.     Master DalPra knew of the Introcaso-Sternenberg conflict since at least 2014. When asked under oath whether there was any discussion between Master DalPra and Judge Introcaso about the conflict, Judge Introcaso testified: "Bruce has known that for seven years." (Exhibit 33, Page 61, Line 21). As the deposition occurred in February 2021, this testimony establishes that Master DalPra's knowledge dated to at least 2014.

33.     Judge Introcaso further testified regarding Master DalPra's practice when he encountered the conflict: "when he knows it's Kay Sternenberg or Jane-Holly Weintraub, he will go, 'Oh,' and he will take it to someone else. He knows my conflicts." (Exhibit 33, Page 48, Lines 12–14).

34.     Despite this knowledge, Master DalPra made recommendations that GAL Sternenberg be appointed in multiple cases that were then approved by Judge Introcaso, including the *Campbell v. Partello* matter. (Exhibit 3 – the Albrecht

- 15 -

appointment form documents the mechanism: DalPra recommended Sternenberg directly to Introcaso).

35.     Master DalPra did not disclose the conflict to litigants in any of the nine cases in which he was appointed, nor did he ensure that his recommendations for Sternenberg appointments were routed to a judge other than Judge Introcaso. (Exhibit 3 – the Albrecht appointment form shows DalPra recommended directly to Introcaso, same day, same form, no routing to a non-conflicted judge). Some of the nine cases were directly presided over by Judge Introcaso – including *Loudermilk v. Montgomery* – yet DalPra made no disclosure in any of them.

**Judge Mark S. Derby's Knowledge**

36.     Judge Mark S. Derby was commissioned as a judge of the New Hampshire Circuit Court on September 20, 2018 and began work in late October 2018. His office was located next door to Judge Introcaso's in the Nashua courthouse. (Exhibit 32, Page 111, Lines 6–9). He described Judge Introcaso as "kind of a mentor and a colleague." (Exhibit 32, Page 81, Lines 19–20).

37.     In December 2018 through January 2019, Judge Derby signed multiple orders in the *Campbell v. Partello* case while GAL Sternenberg was appointed and the conflict remained undisclosed. (Exhibit 32).

38.    On March 15, 2019, Judge Introcaso recused herself *sua sponte* from *Campbell v. Partello*, publicly disclosing the Sternenberg friendship for the first time. (Exhibits 9, 33).

39.    Judge Derby testified that he read Judge Introcaso's recusal order before issuing his April 2019 orders: "Yes, I know I read it before I issued the April orders." (Exhibit 32, Page 30, Lines 20–21).

40.    On April 26, 2019, Judge Derby issued an "Order on No. 48 Motion to Remove GAL," purporting to conduct a "de novo review" of all of Judge Introcaso's prior orders. Judge Derby upheld every substantive order and denied the motion to remove GAL Sternenberg. (Exhibit 11).

41.    In an official internal investigation conducted by NHJB General Counsel Mary Ann Dempsey in January 2020, Judge Derby's purpose in conducting this "de novo review" was documented. According to the Dempsey Investigation Report, Judge Derby **"tried to help Judge Introcaso out by reviewing all of her motions de novo and determining that he would have reached the same result**." (Exhibit 24, Dempsey Investigation Report, Page 5). Judge Derby confirmed this characterization under oath: he acknowledged that he conducted the review to assist his colleague. (Exhibit 32, Page 81, Lines 19–20; Page 111, Lines 6–9).

42.    Judge Derby's stated motivation – to "help out" a colleague facing ethics charges – reveals that his "de novo review" was not an independent exercise of judicial judgment but an administrative act of institutional self-protection. (Exhibit

32 – Derby testified that the review had no formal basis and that he was not sitting as an appellate court). A judge who reviews orders not to determine their correctness but to shield a colleague from accountability is performing an administrative function, not a judicial one.

43.    Judge Derby acknowledged that the Introcaso-Sternenberg relationship constituted a conflict: "Actually, I do. I'm sorry, I'm used to hedging my words, and I think – yes, it was a conflict. She admitted it was a conflict. I agree." (Exhibit 32, Page 107, Lines 11–13).

**The Hamblett & Kerrigan Nexus and Judge Kevin P. Rauseo's Knowledge**

44.    Prior to his judicial nomination, Kevin Rauseo was a partner and president of Hamblett & Kerrigan, P.A. ("H&K"), a Nashua-based law firm. He served as president of the firm for seven years before his nomination in August 2021.

45.    H&K attorneys represented parties in at least two of the nine Introcaso-Sternenberg conflict cases: (a) *Loudermilk v. Montgomery* (659-2015-DM-00185): Andrew Piela, Esq. of H&K represented Laura Montgomery; and (b) *Ausiaikova v. Meckel* (659-2018-DM-00414): Kevin P. Rauseo, Esq. personally represented Brian Meckel.

46.    In *Ausiaikova v. Meckel*, Attorney Rauseo directly corresponded with GAL Sternenberg in January 2019. On January 28, 2019, Rauseo stated the GAL was

"no longer impartial" and suggested she decline the appointment. (Exhibit 8, Paragraph 10 – Rauseo's statement as quoted in the GAL's Motion for Instruction).

47.    On February 4, 2019, GAL Sternenberg filed a Motion for Instruction in *Ausiaikova v. Meckel*. Paragraph 10 of that motion states: "Attorney Rauseo replied… that the Guardian ad Litem is 'no longer impartial'… and suggested that the GAL decline the appointment." (Exhibit 8, Paragraph 10). This motion was filed with the court, served on all parties, and ruled upon by both Master DalPra (recommendation) and Judge Introcaso (order on Page 3).

48.    On March 15, 2019, Judge Introcaso publicly disclosed her conflict with GAL Sternenberg in her recusal order in *Campbell v. Partello*. (Exhibit 9). This disclosure was a matter of public record in the Nashua Circuit Court.

49.    In *Loudermilk v. Montgomery*, Andrew Piela of H&K was physically present in Judge Introcaso's courtroom on June 3, 2019 and July 23, 2019 – after the March 15, 2019 disclosure – in hearings involving GAL Sternenberg. (Exhibits 14, 16).

50.    In those post-disclosure hearings, H&K's client Laura Montgomery appeared before Judge Introcaso in a case where GAL Sternenberg served as Guardian. This was not the first post-recusal instance of preferential treatment: on June 3, 2019, Judge Introcaso praised Sternenberg's "agreeable nature" and relaxed court rules to grant her unnoticed oral emergency motion. (Exhibit 14, Page 25, Lines 19–24; Page 55). On July 23, 2019 – 130 days after Judge Introcaso's public

- 19 -

recusal from a Sternenberg case – Judge Introcaso excused Sternenberg from the oath required of every other witness, stating: "Attorney Sternenberg is an officer of the Court, she doesn't need to be sworn at this time." (Exhibit 16, Page 11, Lines 6–10). Judge Introcaso then publicly thanked Sternenberg: "Thank you, again, for all your work in this case… Nice report. I appreciate that." (Exhibit 16, Page 122, Lines 5–7). Every other witness that day was sworn. Only the judge's undisclosed friend was exempt.

51.    On April 23, 2019 – more than one month after Judge Introcaso's public disclosure of her conflict with GAL Sternenberg – Judge Introcaso signed an order granting GAL Sternenberg's Motion to Exceed Fee Cap in *Loudermilk v. Montgomery*. (Exhibit 10). The total fee amount reached $6,638.25, paid solely by Petitioner Loudermilk; his motion to reallocate fees was denied. (Exhibit 22). The pattern was not limited to *Loudermilk*: on June 3, 2019, Judge Introcaso approved another Sternenberg fee motion in the same case with H&K's Piela present. (Exhibit 14). In *Ausiaikova v. Meckel*, where Rauseo personally represented a party, Judge Introcaso also approved Sternenberg's fee motion. (Exhibit 13). H&K's client Montgomery was the party whose case generated the *Loudermilk* fees. As firm president, Attorney Rauseo was in a position to know that his firm's client's case was producing court-approved fee increases for a GAL appointed by a conflicted judge.

52.    Through these cases, H&K – with Rauseo as its president – had direct exposure to the Introcaso-Sternenberg arrangement: a judge appointing her

- 20 -

undisclosed personal friend as GAL, approving that friend's requests to exceed fee caps, excusing that friend from the oath, and continuing to preside over Sternenberg cases months after publicly admitting the conflict required recusal. (Exhibit 8 – Rauseo personally challenged Sternenberg's impartiality; Exhibit 10 – post-recusal fee cap approval in *Loudermilk*; Exhibit 13 – fee approval in *Ausiaikova* where Rauseo personally served; Exhibit 14 – Piela present at June 2019 hearing where Introcaso relaxed rules for Sternenberg; Exhibit 16 – Piela present at July 2019 hearing where Introcaso excused Sternenberg from the oath; Exhibit 22 – Piela on certificate of service in January 2020 *Loudermilk* proceeding; Exhibit 33, Dep. Ex. 19 – Judge Introcaso emailed Piela directly about the Sternenberg friendship on November 29, 2018; Exhibit 35 – JCC prosecutor contacted Piela specifically about the conflict on December 30, 2020, and followed up by email on January 6, 2021; Exhibit 43 – Plaintiff raised the H&K nexus on the judicial record at the November 15, 2023 hearing). The institutional environment in which H&K attorneys operated was one of systematic rubber-stamping: files placed in a "signing pile," orders approved "as a matter of routine." (Exhibit 32 – Derby's testimony describing the signing-pile infrastructure).

53.    As firm president, Attorney Rauseo was in a position to know about the Introcaso-Sternenberg conflict through: (a) his own personal representation of a party in a case with GAL Sternenberg (Exhibit 13 – *Ausiaikova v. Meckel*); (b) his direct correspondence with GAL Sternenberg, in which he stated she was "no longer

impartial" (Exhibit 8); (c) his colleague Attorney Piela's involvement in a case where Piela witnessed Judge Introcaso presiding over hearings with GAL Sternenberg after the March 2019 disclosure (Exhibits 14, 16, 22 – three separate *Loudermilk* proceedings spanning June 2019 through January 2020); (d) the public record of Judge Introcaso's recusal (Exhibit 9); and (e) his firm's direct exposure to the fee arrangement between Judge Introcaso and her undisclosed friend (Exhibits 10, 22). H&K's knowledge was documented through two independent channels beyond the courtroom: Judge Introcaso emailed Piela directly about Sternenberg on November 29, 2018 (Exhibit 33, Dep. Ex. 19), and the JCC prosecutor contacted Piela specifically about the conflict on December 30, 2020 (Exhibit 35).

54.    Attorney Piela's reaction to what he witnessed was documented on the record. On June 3, 2019, in *Loudermilk v. Montgomery*, Judge Introcaso praised GAL Sternenberg for her "agreeable nature" and explicitly "relaxed" court rules to grant Sternenberg's unnoticed oral emergency motion. (Exhibit 14, Page 25, Lines 19–24; Page 55). Attorney Piela objected: "This is a complete, I would say, violation of my client's due process rights." (Exhibit 14, Page 35, Lines 1–2). He stated on the record: "So I'm livid. I am absolutely livid for my client." (Exhibit 14, Page 39, Lines 20–23). This was a partner at Rauseo's firm – an attorney who had just watched a conflicted judge bend the rules for her undisclosed friend, eighty days after that judge's public recusal from another Sternenberg case – stating on the record that the conduct violated due process.

55.    In August 2021, Attorney Rauseo was nominated to fill the judicial vacancy created by Judge Introcaso's resignation.

**Administrative Judge David D. King's Knowledge and Active Concealment**

56.    Administrative Judge David D. King served as Administrative Judge for the New Hampshire Circuit Court during the relevant time period and received communications from Judge Introcaso regarding the conflict.

57.    On March 30, 2018, Judge Introcaso sent an email to Administrative Judge David D. King explicitly disclosing that Attorney Sternenberg was on her judicial conflict list. (Exhibit 6).

58.    In her March 30, 2018 email, Judge Introcaso wrote to Judge King: "Kathleen Sternenberg is one of the four people on my conflicts list." (Exhibit 6).

59.    In the same email, Judge Introcaso represented to Judge King: "I have, however, after disclosure, appointed her as a GAL only when the parties have specifically requested her services." (Exhibit 6). This was false. Judge Introcaso had stated the same falsehood on the record four years earlier: "I don't appoint her to cases because I don't want anyone to think that I'm choosing a friend." (Exhibit 1, Page 3, Lines 19–20). The appointment orders themselves refute the claim – they show DalPra recommended and Introcaso approved, with no party request. (Exhibit 3).

60.     On April 27, 2018, Administrative Judge King responded to Judge Introcaso, acknowledging that Attorney Sternenberg had appeared in at least two of Judge Introcaso's cases: "The names that were sent to you by Kathy Yee are all pulled randomly from parties/counsel who have actually appeared in front of you at least twice in the last two years. That must mean, for example, that Attorney Sternenberg had an appearance in at least 2 of your cases to make the list." (Exhibit 6).

61.     Despite this explicit disclosure that Attorney Sternenberg was on Judge Introcaso's conflict list and had appeared in multiple cases before Judge Introcaso, Administrative Judge King took no action to investigate or remedy the conflict.

62.     Judge Introcaso later admitted under oath that she appointed Attorney Sternenberg as GAL in cases where the parties had NOT specifically requested her services, contradicting her March 30, 2018 representation to Judge King. (Exhibit 33, Page 26, Lines 10–14). The Albrecht appointment order confirms this: the form shows DalPra recommended and Introcaso approved, with no notation of a party request. (Exhibit 3).

63.     At the time of Judge King's April 27, 2018 response, Judge Introcaso had already appointed Attorney Sternenberg as GAL in six of the nine conflict cases (Merrifield, Sobell, Crawford, Covart, Albrecht, and Yiatras). Three additional conflict cases (Campbell, Loudermilk/Montgomery, and Ausiaikova) followed in late 2018.

64.    On February 3, 2020, Administrative Judge King sent a letter to the Judicial Conduct Committee enclosing the complete Dempsey Investigation Report. (Exhibit 24). At that time, Judge King knew: **(a)** that Judge Derby had admitted his "de novo review" was designed to "help Judge Introcaso out"; **(b)** that Judge Introcaso had admitted she "is not sure that she even fully reviewed the documents to know that GAL Sternenberg was involved" before signing orders; **(c)** that court files had been altered with white-out during Judge Introcaso's preparation for her JCC response; and **(d)** that General Counsel Dempsey had concluded: **"I do not find Judge Introcaso credible." (**Exhibit 24, Page 7**).**

65.    Despite receiving this report documenting pervasive judicial misconduct, Administrative Judge King took no action to notify affected litigants – including Dana Albrecht – that their cases had been tainted by the now-documented conflict, rubber-stamping, and concealment.

**Pattern of Non-Disclosure and Failure to Provide Remedy**

66.    Of the nine cases identified above, only one litigant (in *Sobell v. Sobell*) received any disclosure of the Introcaso-Sternenberg conflict prior to Judge Introcaso's *sua sponte* recusal in March 2019. (Exhibit 1 – the *Sobell* hearing transcript is the only known documented instance of disclosure to litigants).

67.    Multiple judicial officers knew of the conflict and failed to disclose it to affected litigants: **(a)** Judge Introcaso knew and failed to proactively disclose in eight

of nine cases (Exhibit 6 – she confirmed in writing to Administrative Judge King that Sternenberg was on her conflict list, then repeated the "party-requested" falsehood); (b) GAL Sternenberg knew (as she confirmed on the record in Sobell, Exhibit 1, Page 3, Line 4) and failed to independently disclose in any of the nine cases; (c) Master DalPra knew since 2014 and failed to disclose (Exhibit 3 – the Albrecht appointment form places all three – Introcaso, Sternenberg, and DalPra – on a single document, with no disclosure notation); (d) Judge Derby learned of the conflict by March 15, 2019, acknowledged it was "a conflict," and failed to disclose it to Plaintiff.

68.    When the conflict was finally disclosed through Judge Introcaso's recusal, Judge Derby conducted a "de novo review" in which he upheld all conflicted orders and denied the motion to remove the conflicted GAL. (Exhibit 11). His stated purpose was to "help Judge Introcaso out" – not to independently adjudicate the merits. (Exhibit 32 – Derby testified the review was self-initiated, had no formal basis, and that he was not sitting as an appellate court).

69.    Even after publicly recusing herself from the *Campbell* case on March 15, 2019, Judge Introcaso continued to preside over Sternenberg cases. Thirty-nine days after the recusal, she signed a post-recusal order in *Loudermilk v. Montgomery* granting Sternenberg's fee cap motion. (Exhibit 10). On June 3, 2019, in the same case, Judge Introcaso praised Sternenberg on the record for her "agreeable nature" and explicitly "relaxed" court rules to grant Sternenberg's oral emergency motion over the vehement objection of counsel. (Exhibit 14).

70.     The contamination extended beyond the nine conflict cases. On August 30, 2019 – 168 days after her recusal – Judge Introcaso presided over a hearing in *Morrell v. Montgomery*, No. 659-2019-DM-00383, a separate case involving the same respondent. (Exhibit 17). During that hearing, Judge Introcaso drew explicitly on GAL Sternenberg's report from the *Loudermilk* conflict case to make findings in the *Morrell* case: "Court is aware from related proceedings that Ms. Montgomery is using prescription medication Adderall." (Exhibit 17, Page 21, Lines 9–14). Testimony from tainted proceedings before a conflicted GAL migrated across dockets, producing court-ordered forensic evaluations and custody restrictions for a pro se respondent who had no knowledge of the underlying conflict. Judge Introcaso also referenced her own tainted prior orders as authority: "my prior orders have made findings." (Exhibit 17, Page 28).

**Albrecht v. Albrecht – The Underlying Family Law Case**

71.     On April 8, 2016, Dana Albrecht's family law matter commenced when Katherine Albrecht obtained a civil domestic violence order of protection from Judge Paul S. Moore, docket number 659-2016-DV-00120. (Exhibit 2). This initial order was later dismissed. Judge Moore was subsequently disbarred on July 5, 2018. (Exhibit 7).

72.     *Albrecht v. Albrecht* (659-2016-DM-00288) was one of the nine conflict cases. GAL Sternenberg was appointed on October 13, 2016, upon recommendation

by Master DalPra and approval by Judge Introcaso. (Exhibit 3). Judge Introcaso later admitted under oath that she "looked at it quick and signed it" – specifically regarding this appointment. (Exhibit 33).

73.    On August 9, 2017, a hearing was held at which GAL Sternenberg provided extensive testimony. (Exhibit 4). Neither Master DalPra nor GAL Sternenberg disclosed the Introcaso-Sternenberg conflict. During that hearing, GAL Sternenberg recommended that three of Dana Albrecht's children (C.A., S.A., and G.A.) be relocated from New Hampshire to California. Before the examination began, Master DalPra signaled deference to the conflicted GAL: "I've read the report. I don't want to hear it in conversation form at this point." (Exhibit 4, Page 348, Lines 14–16). GAL Sternenberg was called as Katherine Albrecht's witness – not as a neutral court officer. (Exhibit 4, Page 348, Line 10).

74.    GAL Sternenberg testified: "I couldn't be any stronger in my recommendation that this happen right away." (Exhibit 4, Page 353, Lines 14–17). On cross-examination, she admitted the relocation might not achieve its stated purpose. Asked how moving the children to California would stop two contentious people from contending, she answered: "I don't know that it will." (Exhibit 4, Page 377, Lines 21–23). Asked whether her recommendation would change if the allegations supporting it proved to be mistaken or fabricated, she answered: "It won't change my recommendations to this Court." (Exhibit 4, Page 386, Lines 9–12). The GAL's conclusion was fixed regardless of the evidence.

75.    On September 1, 2017 – twenty-three days after the hearing – Master DalPra recommended that Katherine Albrecht's desire to relocate with the children to California was for a legitimate purpose and that the relocation was reasonable under the circumstances. (Exhibit 5). The order provided for immediate relocation: "She shall be entitled to relocate with the children to CA as soon as she is able to arrange for same." (Exhibit 5, Page 5, Section B). Dana Albrecht's parenting time was reduced to limited school vacations and two non-consecutive two-week summer periods. He was made solely responsible for all transportation costs. (Exhibit 5, Page 6, Section D). The order prohibited any stay pending appeal: "There shall no stay of any provision herein should either party file any post-hearing motions for reconsideration or clarification or take an appeal to the NH Supreme Court." (Exhibit 5, Page 8, Section I). This order – which permanently separated Dana Albrecht from three of his children – was based in part on testimony from the conflicted GAL, approved without any stay that would have permitted appellate review before the relocation occurred. The magnitude of this deprivation is measured from the status quo ante: Dana Albrecht had joint custody of his children prior to the conflict-tainted proceedings. (Exhibit 2 – establishing the joint custody baseline).

76.    On May 9, 2019, a hearing was held in Dana Albrecht's case concerning, inter alia, allegations that Katherine Albrecht was in contempt of the Parenting Plan. Master DalPra presided over this hearing. Neither Master DalPra nor GAL

Sternenberg disclosed the Introcaso-Sternenberg conflict at this hearing. (See Exhibit 12).

77.     On May 30, 2019 – **seventy-six (76) days** after Judge Introcaso's March 15, 2019 recusal disclosure in *Campbell v. Partello* (Exhibit 9) – Judge Introcaso signed an Order in *Albrecht v. Albrecht* based on Master DalPra's recommendation. (Exhibit 12). This order contained findings that would later be used against Dana Albrecht.

78.     On June 28, 2019, Master DalPra issued a recommendation to deny Dana Albrecht's motion for reconsideration of the May 30, 2019 order. He did not disclose the Introcaso-Sternenberg conflict prior to issuing this recommendation. On June 30, 2019, Judge Derby approved Master DalPra's recommendation. (Exhibit 15; Exhibit 32 – Derby's testimony describes the "signing pile" infrastructure through which such recommendations were approved as a matter of routine). Judge Derby later acknowledged this in writing: "on or about June 30, 2019 the undersigned judicial officer approved the recommendation of marital Master Bruce Dalpra to deny the defendant's motion for reconsideration of a substantive May 30, 2019 order (co-signed by a different judicial officer)." (Exhibit 23, Page 2). The "different judicial officer" was Judge Introcaso.

**Judge Introcaso's Abdication of Judicial Function**

79.    On February 15, 2022, Julie Introcaso – after her resignation – sent an email **directly** to Dana Albrecht discussing his case. In that email, Introcaso stated: **"I have no recollection of you personally, any facts of your case, or having co-signed many orders"** and described her role as providing "certification and approval" without substantive review. (Exhibit 38).

80.    The Dempsey Investigation Report confirms that Judge Introcaso's lack of substantive review was systematic. In an interview with General Counsel Dempsey, Judge Introcaso stated that "the Campbell file was put in her signing pile" and that **"she is not sure that she even fully reviewed the documents to know that GAL Sternenberg was involved."** (Exhibit 24, Page 4–5).

81.    Under the New Hampshire marital master system, "it is a judge, not a master, which determines the case." *Witte v. Justices of New Hampshire Superior Court*, 831 F.2d 362, 364 (1st Cir. 1987). Judge Introcaso's admissions – that she had "no recollection" of Dana Albrecht and provided only "certification and approval" (Exhibit 38), that she "looked at it quick and signed it" when approving the Albrecht GAL appointment (Exhibit 33), that the file "was put in her signing pile" and she signed orders "as a matter of routine" (Exhibit 33; Exhibit 24, Page 4–5), and that she was "not sure" she even knew GAL Sternenberg was involved (Exhibit 24, Page 4–5) – establish that she abdicated the judicial function that *Witte* requires. Ministerial rubber-stamping is not a "judicial act" entitled to immunity.

**Master DalPra's Documented Misconduct – The November 6, 2020 Hearing**

82.    On November 6, 2020, Master DalPra presided over a hearing on motions in the underlying parenting case, *Albrecht v. Albrecht* (659-2016-DM-00288). GAL Kathleen Sternenberg was present. The hearing was conducted by video/telephone due to COVID-19 restrictions, and the audio was electronically recorded but "not monitored." (Exhibit 29, Page 1).

83.    During the hearing, Master DalPra made statements captured on the recording and attributed to "THE COURT" in the official transcript. While Dana Albrecht was testifying about matters directly affecting his relationship with his children, Master DalPra stated: "Who gives a fuck?" (Exhibit 29, Page 33, Line 23).

84.    Later in the hearing, while testimony concerned the welfare of Dana Albrecht's children, Master DalPra referred to them as: "Of course not; they're a bunch of morons." (Exhibit 29, Page 80, Lines 19–20).

85.    While Dana Albrecht searched through documents during testimony, Master DalPra stated: "And while you're looking through that, I'm gonna go pee." (Exhibit 29, Page 65, Lines 7–8).

86.    Master DalPra engaged in extended off-topic conversations about the Boston Red Sox during live testimony, discussing coaches, players, trades, and team ownership. (Exhibit 29, Pages 72–73).

87.     During testimony about matters involving domestic violence, mental health, and parenting disputes, Master DalPra repeatedly laughed. (Exhibit 29, Page 61, Line 20; Page 65, Lines 3, 24; Page 66, Line 3; Page 67, Line 7; Page 68, Lines 5, 7, 19; Page 69, Line 25; Page 70, Line 20).

88.     When Dana Albrecht testified that he was concerned his son C.A. might be mentally ill, based on troubling text messages, Master DalPra laughed. He then commented to a courtroom assistant: "Hopeless. Heartless." (Exhibit 29, Page 67, Lines 6–7, Line 13). A father expressing fear for his child's mental health, in a custody proceeding, was met with laughter and mockery from the presiding judicial officer.

89.     During the hearing, Master DalPra gave a whispered instruction to mute Dana Albrecht while he was testifying on cross-examination: "Put him on mute." (Exhibit 29, Page 62, Line 23). A judicial officer covertly directing that a litigant be silenced during his own testimony is not a procedural ruling. It was not announced on the record or to the parties.

90.     Master DalPra also acknowledged, on the recording, that the virtual hearing format enabled conduct that would have been impossible in a physical courtroom: "Can you imagine if this was in person?" (Exhibit 29, Page 65, Lines 7–9). This statement establishes that Master DalPra was aware his conduct was improper and that he was deliberately exploiting the remote format.

91.    Throughout the hearing, Master DalPra conducted whispered sidebar conversations with a courtroom assistant while testimony was being given. These conversations, captured on the recording, included the statements identified above as well as running commentary evaluating witness credibility – "She did say that"; "Yes, you did" – and critiquing attorney tactics: "Do you have to say that?" (Exhibit 29, Pages 126–134). The New Hampshire Judicial Conduct Committee would later formally find that Master DalPra committed misconduct at this hearing.

**The Domestic Violence Orders and Their Extensions**

92.    On December 20, 2019, Judge Derby presided over a domestic violence hearing in *Albrecht v. Albrecht* (659-2019-DV-00341). During that hearing, Dana Albrecht was cross-examined about findings in the May 2019 parenting order. When asked about the order's finding regarding a "verbal agreement," Mr. Albrecht responded: "I don't. May I see the order, please?" (Exhibit 21, Page 71, Lines 2–6). When shown the order and asked again, he requested: "May I see that one more time?" (Exhibit 21, Page 71, Line 16).

93.    At the time of this December 2019 hearing before Judge Derby, Dana Albrecht had no knowledge that: (a) GAL Sternenberg had been on Judge Introcaso's conflict list; (b) the underlying parenting proceedings had been tainted by an undisclosed judicial conflict; (c) Judge Introcaso had publicly recused herself from another Sternenberg case nine months earlier; or (d) Judge Introcaso had continued

to sign orders in his case despite that disclosure. The concealment was active: GAL Sternenberg had testified extensively at the August 2017 hearing as though no conflict existed, without disclosing her personal friendship with the appointing judge. (Exhibit 4).

94.    On January 27, 2020, Judge Derby issued an Order on Post-Trial Motions in the DV case. (Exhibit 23). The order states:

> "This order is rooted in the findings of stalking and the present credible threat that the defendant poses to the plaintiff's safety, and particularly in the defendant's answers, deflections and evasive non-answers to the questioning on Pages 71-79 of the December 20, 2019 transcript." (Exhibit 23, Page 1).

The "stalking" characterization entered the record through the second domestic violence proceeding (659-2019-DV-00341), which originated with **allegations of church attendance at Collinsville Bible Church** – not physical violence, with no arrest and no criminal charges. (Exhibit 23).

95.    The testimony on Pages 71–79 of the December 20, 2019 transcript (Exhibit 21) includes Mr. Albrecht's requests to review the May 30, 2019 order – an order signed by Judge Introcaso 76 days after her public recusal, and an order that Judge Derby himself had affirmed on June 30, 2019 as part of his effort to "help Judge Introcaso out."

96.    Mr. Albrecht's requests to review the May 30, 2019 order were not "evasiveness" – they were reasonable confusion regarding an order that *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988), requires to be vacated. A

litigant cannot be punished for failing to recall the details of an order that the Constitution demands be set aside.

**Administrative Knowledge, Active Concealment, and the First Extension**

97.    On November 13, 2020 – one week after the hearing and 38 days before the DV order was first extended – Administrative Judge David D. King sent an email to Master DalPra regarding the November 6, 2020 Albrecht hearing. (Exhibit 30). The email was prompted by the transcription company eScribers, whose transcriptionist "brought to her supervisor's attention comments that 'the judge' made during the proceedings."

98.    In his email, Judge King wrote: "I am sorry to have to be writing this email but I'm sure you will understand that I have an obligation under the Code to deal with these situations." He acknowledged that Master DalPra's comments "do not demonstrate the patience or dignity expected of judicial officers under Rule 2.8." (Exhibit 30).

99.    Judge King's email included notes from eScribers identifying specific timestamps of Master DalPra's misconduct: "'Who gives a fuck?' - **12:28:16" and "'Of course not, they're a bunch of morons.' - 1:45:59"** (Exhibit 30, eScribers notes).

100.    Despite knowing on November 13, 2020 that the November 6, 2020 hearing was marked by documented judicial misconduct, Judge King took no action to notify the parties, flag the tainted record, or prevent reliance on that hearing's

testimony. On December 21, 2020 – **38 days later** – Judge Curran extended the DV Final Protective Order against Dana Albrecht based on the "well-documented" evidence that included testimony from that very hearing.

101. Judge King's failure to notify affected litigants was not mere nondisclosure – it was *active concealment*. He knew the November 6, 2020 hearing was tainted. He knew the Albrecht family law case was part of the Introcaso-Sternenberg conflict pattern. He received the full Dempsey Investigation Report documenting Judge Introcaso's rubber-stamping and Judge Derby's effort to "help out." He did nothing to protect the Albrecht family from ongoing harm.

102. On December 18, 2020, Katherine Albrecht filed a "Verified Motion for Extension of Domestic Violence Final Order of Protection" in the DV case (659-2019-DV-00341). The motion's sole substantive basis was a reference to the tainted record: "Mr. Albrecht has demonstrated a pattern of harassing and stalking behavior and actions that is well-documented with this Court both in pleadings and evidence and testimony presented to this Court in this domestic violence matter and in the divorce matter, In the Matter of Dana Albrecht and Katherine Albrecht, Docket No. 659-2016-DM-00288."

103. The "divorce matter" referenced – Docket No. 659-2016-DM-00288 – was one of the nine Introcaso-Sternenberg conflict cases. The "well-documented" testimony included the November 6, 2020 hearing before Master DalPra. The "stalking" characterization that the extension motion invoked originated in the

second domestic violence proceeding (659-2019-DV-00341), which began with allegations of church attendance at Collinsville Bible Church – not physical violence – with no arrest and no criminal charges. (Exhibit 23).

104.   On December 21, 2020, Judge John A. Curran granted the extension. The order indicates the extension was granted "based upon the Plaintiff's representations," with no hearing held. (Exhibit 31). Judge Curran extended the Final Protective Order to December 2021.

105.   Judge Curran's order thus extended a restraining order against Dana Albrecht based on "well-documented" evidence that included: (a) testimony from proceedings tainted by the undisclosed Introcaso-Sternenberg conflict; and (b) a hearing at which the presiding judicial officer called the children "a bunch of morons" and responded to a father's testimony about his family with "who gives a fuck."

**The Institutional Response**

106.   On August 26, 2022, Judge King was deposed in *State of New Hampshire v. Master Bruce DalPra*, Docket JC-21-072-C, before the Judicial Conduct Committee. (Exhibit 40). Judge King testified that when deciding how to respond to the November 6, 2020 hearing misconduct, he had Rule 2.15 (reporting judicial misconduct) "in mind, guiding [his] actions in this specific case." (Exhibit 40, Page 24, Lines 15–19).

107.    When asked whether he told the Judicial Conduct Committee what he "had found regarding the transcript in the Albrecht case," Judge King answered: "Yes." However, he then clarified: "When I say 'Judicial Conduct Committee,' I had a conversation with Robert Mittelholzer after I spoke with Master DalPra about this incident. So I didn't have any communication with the committee itself. I didn't send them anything." (Exhibit 40, Page 26, Lines 12–27, Line 3).

108.    When asked whether he provided his November 13, 2020 email to the Judicial Conduct Committee, Judge King answered: "No." (Exhibit 40, Page 26, Lines 17–19).

109.    On October 22, 2020, New Hampshire Supreme Court Justice Gary Hicks wrote to (then) New Hampshire Attorney General Gordon MacDonald about Judge Introcaso's misconduct, initiating the formal investigation. (Exhibit 26). Justice Hicks had firsthand experience with judicial fraud in family courts: two years earlier, he had concurred in the disbarment of Judge Paul S. Moore, who had presided over the initial DV proceeding in Dana Albrecht's case. (Exhibit 7).

110.    On October 26, 2020, NHJB General Counsel Mary Ann Dempsey wrote an email to JCC Counsel Philip Waystack about Judge Mark Derby's involvement in cases with GAL Sternenberg. (Exhibit 28). The email disclosed that Judge Derby had proactively contacted Dempsey after reviewing the Statement of Formal Charges against Judge Introcaso. (Exhibit 28, Page 1). Derby told Dempsey that "he could not say with 100% certainty that he did not white out the March 12, 2019 Orders."

(Exhibit 28, Page 1). Dempsey rejected this, stating that her factual investigation concluded he did not. (Exhibit 28, Page 2). The email further revealed that Dempsey had spoken with Derby by phone in January 2020 – an interview not documented in the original Dempsey Investigation Report. (Exhibit 28, Page 1). Derby thus knew of the active investigation into the Introcaso-Sternenberg conflict in January 2020 – before he issued the January 27, 2020 Order on Post-Trial Motions denying reconsideration of the domestic violence Final Protective Order against Dana Albrecht. (Exhibit 23). The Final Protective Order itself had been issued on December 30, 2019, following the December 20, 2019 hearing; Exhibit 23 is the subsequent order denying reconsideration.

111. On March 23, 2021, the New Hampshire Supreme Court issued its Final Order on Judge Introcaso's judicial misconduct. (Exhibit 35).

112. Judge Introcaso resigned from the bench by letter dated February 22, 2021, one day before she was to face judicial ethics allegations before the Judicial Conduct Committee. (Exhibit 34).

113. On February 11, 2021, Judge Introcaso was charged with two felony counts of falsifying physical evidence (RSA 641:6) and three misdemeanor counts: two counts of tampering with public records or information (RSA 641:7) and one count of unsworn falsification (RSA 641:3). On November 15, 2021, Introcaso entered an Alford plea. The felony charges were resolved; Introcaso was convicted of three misdemeanors.

114.    The New Hampshire Supreme Court ordered Judge Introcaso to pay $75,000 for the cost of the investigation into her conduct. (Exhibit 35).

115.    On May 28, 2021, NHJB General Counsel Mary Ann Dempsey denied Dana Albrecht's request for copies of the deposition transcripts from the Introcaso investigation that discussed his case. (Exhibit 36). As of that date, Mr. Albrecht did not have these transcripts. He could not have introduced evidence he did not possess in any proceeding prior to that date.

116.    On February 25, 2022, Julie Introcaso was disbarred. (Exhibit 39).

117.    Kevin Rauseo was confirmed as a Circuit Court judge and currently serves on the bench.

118.    On November 10, 2022, the New Hampshire Supreme Court issued its Final Order determining that Master Bruce DalPra had committed judicial misconduct. (Exhibit 41). While the order itself does not name the specific case, the investigation invoices attached to Exhibit 41 identify the underlying matter as "*In the Matter of Dana Albrecht and Katherine Albrecht.*" (Exhibit 41, Page 9). This order formally confirmed that the November 6, 2020 hearing was marked by proven judicial misconduct.

119.    Dana Albrecht first learned of the Introcaso-Sternenberg conflict on October 23, 2020, when the *New Hampshire Union Leader* published a story about Judge Introcaso's misconduct. (Exhibit 27). Prior to that date, Mr. Albrecht was

completely unaware that his family law proceedings had been tainted by the undisclosed judicial conflict.

**Further Extension of the Domestic Violence Order**

120.    On February 3, 2023, Katherine Minges (formerly Katherine Albrecht) filed a "Request for Extension of Domestic Violence or Stalking Final Protective Order" in the DV case **(659-2019-DV-00341)**, seeking extension of the Final Protective Order against Dana Albrecht. ([Exhibit 42](#)). The request was notarized in St. Clair County, Michigan – Katherine no longer resided in New Hampshire. She had relocated from California to Michigan ([Exhibit 25](#)) after the relocation initially authorized by the tainted parenting proceedings.

121.    As with prior extension requests, the February 2023 request contained no specific allegation of any discrete act of domestic violence. Its sole substantive basis was a reference to the tainted record: "Mr. Albrecht has demonstrated a pattern of harassing and stalking-like behavior and actions that is well-documented with this Court not only in this matter, but also in numerous pleadings filed and in the testimony of Ms. Minges and her witnesses at multiple hearings ITMO Dana Albrecht and Katherine Albrecht, Docket No. 659-2016-DM-00288." ([Exhibit 42](#), Page 2). The only conduct cited was "filing of pleadings clearly intended to harass Ms. Minges" – legal filings characterized as domestic violence. As with prior extensions, the "stalking" characterization traced to proceedings that originated with allegations of

- 42 -

electronic monitoring, church attendance, and similar conduct – not physical violence, with no arrest and no criminal charges. (Exhibits 2, 23).

122.    The "divorce matter" referenced in the request – Docket No. 659-2016-DM-00288 – was one of the nine Introcaso-Sternenberg conflict cases, and the same case in which: (a) GAL Sternenberg served with an undisclosed conflict; (b) Master DalPra made recommendations while knowing of that conflict; (c) Judge Introcaso signed orders 76 days after her public recusal; and (d) Master DalPra presided over the November 6, 2020 hearing later found to constitute judicial misconduct.

123.    On February 24, 2023, Judge Kevin P. Rauseo signed an "Order on Further Extension of Domestic Violence or Stalking Final Protective Order." (Exhibit 42). The order indicates it was granted "based upon the Plaintiff's representations, that good cause exists to extend the order." (Exhibit 42, Page 1). No evidentiary hearing was held. Judge Rauseo acted as the presiding judicial officer and signed the order without any independent review of the underlying record – a record he had reason to know was tainted by the very conflicts documented above.

124.    At the time Judge Rauseo signed this extension, he had knowledge of the conflicts underlying the "well-documented" record through multiple independent channels: (a) his own personal representation of Brian Meckel in *Ausiaikova v. Meckel*, one of the nine conflict cases; (b) his January 2019 statement that GAL Sternenberg was "no longer impartial" (Exhibit 8); (c) his firm Hamblett & Kerrigan's representation of Laura Montgomery before Judge Introcaso, with

Sternenberg as GAL, in *Loudermilk v. Montgomery* ([Exhibit 16](#)); **(d)** his firm's direct exposure to Introcaso's approval of GAL fee increases in that case; and **(e)** the public record of Judge Introcaso's resignation, criminal charges, and disbarment, and of Master DalPra's misconduct findings – all of which had occurred before Judge Rauseo signed the extension.

125.  Judge Rauseo thus extended a restraining order against Dana Albrecht based on "well-documented" evidence from proceedings in which: **(a)** Judge Rauseo himself had participated as an attorney in a related conflict case; **(b)** the GAL had been called "no longer impartial" by Rauseo himself; **(c)** the presiding judge had been disbarred; **(d)** the presiding master had been found guilty of misconduct in Plaintiff's specific case; and **(e)** Rauseo's former firm had directly witnessed the GAL fee scheme in the Montgomery litigation.

126.  Dana Albrecht was now subject to a domestic violence restraining order that had originated from Judge Derby's January 2020 order, been extended by Judge Curran in December 2020, and was further extended by Judge Rauseo in February 2023. Each link in this chain relied on the same "well-documented" record from proceedings tainted by the undisclosed Introcaso-Sternenberg conflict and the documented DalPra misconduct. The February 2023 extension ran through February 24, 2024; a subsequent extension extended the order to February 24, 2028. None of these extensions contained any specific allegation of a discrete act of domestic violence.

**The Appeal**

127.    Dana Albrecht appealed the trial court's rulings to the New Hampshire Supreme Court. The appeal was docketed as *K.A. v. D.A.*, No. 2023-0181.

**The Hearing Where Every Subpoena Was Quashed**

128.    On November 15, 2023, Judge Rauseo held a hearing on motions in the DV case. (Exhibit 43). Dana Albrecht had received notice of this hearing at approximately 3:30 p.m. the evening before – less than 24 hours' notice. The hearing had been delayed approximately seven and a half months past the statutory deadline under RSA 173-B:5, VI for holding a hearing on extension of a protective order. (Exhibit 43, Page 19).

**The State Intervenes in a Private Domestic Violence Proceeding**

129.    Deputy Attorney General Catherine Denny appeared at the hearing representing Administrative Judge David D. King and New Hampshire Judicial Branch General Counsel Erin Creegan. (Exhibit 43, Page 1). The State of New Hampshire, through the Attorney General's Office, deployed resources to intervene in a private domestic violence proceeding between two individuals – to quash subpoenas and block discovery.

130.    Neither Administrative Judge King nor Attorney Creegan appeared in person at the hearing. Deputy AG Denny announced: regarding King, "He will not be

appearing," and regarding Creegan, "She will not be present either." (Exhibit 43, Page 4). Both witnesses whose testimony Dana Albrecht sought to compel were shielded from the proceedings through state counsel.

131.   Dana Albrecht objected to the Attorney General's standing to appear in a private civil domestic violence case. The objection was overruled. (Exhibit 43).

**Rauseo Narrows the Scope**

132.   Judge Rauseo announced that the hearing would be limited to "whether the current conditions are such that there is still concern for the safety and well-being of the Plaintiff." (Exhibit 43, Page 9). By restricting the inquiry to "current conditions," Judge Rauseo excluded all evidence of the judicial conflicts, the misconduct, and the tainted record that formed the basis of the very order under review.

133.   This scope restriction contradicted the applicable standard. Under New Hampshire law, a court reviewing a protective order extension must consider the "circumstances giving rise to the original protective order." (Exhibit 43, Page 30, citing the Supreme Court's extension standard). The undisclosed Introcaso-Sternenberg conflict, the DalPra misconduct, and the tainted record were the circumstances giving rise to the original order. Judge Rauseo's scope ruling precluded Dana Albrecht from presenting any evidence about them.

**Every Subpoena Quashed**

134.   Dana Albrecht had subpoenaed nine witnesses and served one subpoena duces tecum. Judge Rauseo quashed every one. (Exhibit 43, Pages 13–45). Not a single witness was permitted to testify. Not a single document was produced.

135.   Judge Rauseo quashed the subpoena for Administrative Judge David D. King. Deputy AG Denny opposed King's appearance. King was the administrative judge who had received the March 2018 email from Judge Introcaso disclosing the Sternenberg conflict (Exhibit 6), received the full Dempsey Investigation Report (Exhibit 24), received the eScribers report of DalPra's misconduct (Exhibit 30), and testified under oath that his November 13, 2020 email was never provided to the Judicial Conduct Committee (Exhibit 40). His testimony was directly relevant to the concealment of the tainted record underlying the DV order.

136.   Judge Rauseo quashed the subpoena for Erin Creegan, General Counsel of the New Hampshire Judicial Branch. Deputy AG Denny shielded Creegan from appearing. Creegan would later appear in a different role: as counsel for Chief Justice Gordon MacDonald during his August 2, 2024 interview in the Marconi criminal investigation. (Exhibit 46, Page 2). The same person shielded from testifying about judicial branch concealment at the trial level later represented the Chief Justice at the appellate level.

137.   Judge Rauseo quashed the subpoena for GAL Kathleen Sternenberg – the court-appointed guardian whose undisclosed friendship with the appointing judge was the origin of the entire conflict.

138.   Judge Rauseo quashed the subpoena duces tecum directed to Philip Waystack, counsel to the Judicial Conduct Committee, seeking the full, unredacted deposition of Administrative Judge King. During argument on this subpoena, Waystack stated on the record: "The rest of the deposition, it was totally redacted, that deposition is not in the public domain at all." (Exhibit 43, Page 33). Waystack confirmed that the full King deposition – in which the supervising administrative judge was questioned about his response to judicial misconduct in Dana Albrecht's specific case – had been reduced to a small excerpt (Exhibit 40), and the remainder was unavailable. Waystack also confirmed that he had prosecuted both Judge Introcaso and Master DalPra before the Judicial Conduct Committee. (Exhibit 43, Page 32).

139.   Judge Rauseo also quashed subpoenas for: Andrew Piela, Esq. (the Hamblett & Kerrigan attorney who represented Laura Montgomery before Judge Introcaso with Sternenberg as GAL); Wendy Borrun; Vivian Girard; David Smith; and Julie Introcaso (prospective). Every witness who could have testified about the conflicts, the concealment, or the tainted record was excluded from the proceeding.

**Dana Albrecht Raises the Rauseo Conflict on the Record**

140.    During the hearing, Dana Albrecht raised Judge Rauseo's own disqualifying conflict. Mr. Albrecht stated on the record that Rauseo's former firm, Hamblett & Kerrigan, had represented Laura Montgomery in *Loudermilk v. Montgomery* – one of the nine Introcaso-Sternenberg conflict cases – before Judge Introcaso, with Sternenberg as GAL. (Exhibit 43, Pages 33–34).

141.    Mr. Albrecht listed the nine conflict cases by name and docket number on the record, creating the most complete single enumeration of the Introcaso-Sternenberg conflict pattern in the entire case file. (Exhibit 43, Pages 33–34).

142.    Mr. Albrecht further stated on the record that in the Montgomery case, GAL Sternenberg's clients had been "milked dry" through the fee arrangement with Judge Introcaso – an arrangement that Rauseo's firm witnessed firsthand through its representation of Montgomery. (Exhibit 43, Page 40; errata applied: original transcript reads "no strife," corrected to "milked dry" based on audio review). Mr. Albrecht also stated that the "cash" generated by GAL fee increases in these cases was the mechanism by which the Introcaso-Sternenberg arrangement operated. (Exhibit 43, Page 40; errata applied: original transcript reads "task," corrected to "cash").

143.    Mr. Albrecht told the court: "I am compelled to appear, Your Honor." (Exhibit 43, Page 42; errata applied: original transcript reads "I failed to appear," corrected to "I am compelled to appear" based on audio review). The original transcription error reversed the meaning of Mr. Albrecht's statement –

transforming his assertion that he was forced to be there into a concession of non-compliance.

**The Due Process Argument – Stated on the Record**

144.   Dana Albrecht articulated his due process argument on the record. Regarding the withheld King deposition, Mr. Albrecht stated: "How can I have any semblance of due process if I don't see the whole thing?" (Exhibit 43, Pages 17–18; errata applied). He was asking the presiding judge to compel production of a deposition in which the supervising administrative judge had been questioned about concealing misconduct in Mr. Albrecht's own case – and the presiding judge refused.

**Rauseo Dismisses the Conflict**

145.   When Dana Albrecht raised the Hamblett & Kerrigan conflict – that Rauseo's former firm had represented a party before Judge Introcaso with Sternenberg as GAL, had witnessed the fee arrangement, and that Rauseo as firm president was in a position to know – Judge Rauseo dismissed the conflict objection as "not relevant" and proceeded to adjudicate the matter. (Exhibit 43, Pages 40–41). Judge Rauseo did not recuse himself. He did not address the substance of the conflict. He ruled on the objection and moved on.

**The Result**

146.   The hearing on the following day, November 16, 2023, was limited to thirty minutes. (Exhibit 43).

147.   As a result of Judge Rauseo's rulings at the November 15, 2023 hearing, Dana Albrecht entered the November 16 hearing stripped of all evidence. Every witness who could have testified about the judicial conflicts, the misconduct, and the concealment had been excluded. The King deposition – which Judge King's own former law partner, JCC Counsel Philip Waystack, confirmed was "totally redacted" and "not in the public domain at all" – remained unavailable. The scope had been narrowed to "current conditions," precluding any challenge to the tainted record underlying the protective order. Mr. Albrecht was required to defend against an order rooted in proceedings he was forbidden to examine.

148.   Five appellate issues arising from Judge Rauseo's rulings at the November 15, 2023 hearing were subsequently accepted by the New Hampshire Supreme Court for review in *K.A. v. D.A.*, No. 2023-0181. (Exhibit 45). Every one of those issues traced directly to the evidence suppression and scope restrictions imposed at this hearing.

**The AG Structural Conflict**

149.   The Attorney General's Office, through Deputy AG Catherine Denny, appeared at the November 15, 2023 hearing to quash subpoenas protecting Administrative Judge King and General Counsel Creegan from testifying about the

concealment of judicial misconduct. The same Attorney General's Office – through the same prosecutors, Senior Assistant Attorney General Geoffrey Fincham and Assistant Attorney General Dan Jimenez – later investigated and prosecuted Justice Marconi in the criminal matter arising from her June 6, 2024 conduct. (Exhibits 46, 47). The same office that shielded trial-level officials from accountability subsequently investigated an appellate-level justice, with investigators who had participated in both proceedings.

150. The November 15, 2023 hearing is the hinge between the trial court arc and the appellate arc of this case. At the trial level, every avenue of proof was closed: subpoenas quashed, scope narrowed, conflict dismissed. At the appellate level, the case landed before a panel that included a justice who would commit a crime 204 days later and certify herself "not disqualified" 236 days later. The same concealment pattern – officials acting to protect other officials from disclosure – connects both arcs.

**Marconi's Knowledge of the Albrecht Case – Five Concurrences**

151. On September 16, 2019, the New Hampshire Supreme Court unanimously declined Dana Albrecht's appeal in *Albrecht v. Albrecht*, Case No. 2019-0436. Justice Anna Barbara Hantz Marconi participated and concurred. (Exhibit 18). Under Supreme Court Rule 7(1)(B), "[n]o appeal, however, is declined except by unanimous vote of the court with at least three justices participating." Marconi

- 52 -

affirmatively voted to foreclose Albrecht's appellate remedy. The distribution list for the order included all four conflicted actors from the trial court level: Judge Derby, Judge Introcaso, Master DalPra, and GAL Sternenberg. This was Marconi's first relevant documented participation in the Albrecht case.

152.    On October 25, 2019, the same panel – including Marconi – denied Albrecht's motion for reconsideration. (Exhibit 19). The court stated it had concluded that "no points of law or fact were overlooked or misapprehended." Marconi cast her second unanimous vote against Albrecht in 39 days. The most critical fact – the Introcaso-Sternenberg conflict – was concealed from the court, from the parties, and from Albrecht.

153.    Dana Albrecht did not learn of the Introcaso-Sternenberg conflict until October 23, 2020, when the *New Hampshire Union Leader* published a story about Judge Introcaso's misconduct. (Exhibit 27). This was almost exactly one year after the Supreme Court affirmed the denial of his appeal. The concealment outlasted his appellate window by twelve months.

154.    On March 23, 2021, the New Hampshire Supreme Court issued its Final Order on Judge Introcaso's judicial misconduct. (Exhibit 35). The Judicial Conduct Committee had found six Code of Judicial Conduct violations, including a violation of Rule 2.16(A) – candor with disciplinary agencies. Introcaso waived all hearing rights. The investigation cost $74,935.69. "Bassett, Hantz Marconi, and Donovan,

JJ., concurred." ([Exhibit 35](), Page 2). This was Marconi's first concurrence in a misconduct proceeding arising from the Introcaso-Sternenberg conflict.

155.    On February 25, 2022, the New Hampshire Supreme Court disbarred Julie Introcaso following her criminal convictions: three misdemeanors – two counts of Tampering With Public Records ([RSA 641:7]()) and one count of Unsworn Falsification ([RSA 641:3]()) – entered via Alford plea. ([Exhibit 39]()). The court classified the convictions as a "serious crime" under Supreme Court Rule 37(9)(b). "Bassett, Hantz Marconi, and Donovan, JJ., concurred." ([Exhibit 39]()). This was the same panel as the March 2021 misconduct order and Marconi's second concurrence in an Introcaso misconduct proceeding.

156.    On November 10, 2022, the New Hampshire Supreme Court issued its Final Order determining that Master Bruce DalPra had committed judicial misconduct. ([Exhibit 41]()). The Judicial Conduct Committee found four Code violations by clear and convincing evidence, including violations of Rule 2.11 (disqualification) and Rule 2.16(A) (candor with disciplinary agencies). DalPra admitted the violations and waived his right to a de novo hearing. The investigation invoice specifically named the underlying misconduct case as "*In the Matter of Dana Albrecht and Katherine Albrecht.*" ([Exhibit 41](), Page 9). The full five-justice panel concurred: "MacDonald, C.J., and Hicks, Bassett, Hantz Marconi, and Donovan, JJ., concurred." ([Exhibit 41](), Page 2). This was Marconi's third concurrence in a misconduct proceeding directly connected to the Albrecht case.

157.  Chief Justice MacDonald also concurred in the November 10, 2022 DalPra order. MacDonald had previously served as New Hampshire Attorney General from 2017 to 2021. In that capacity, he received Justice Gary Hicks's October 22, 2020 criminal referral regarding Judge Introcaso's conduct. (Exhibit 26). MacDonald thus had knowledge of the Introcaso misconduct from his service as AG and again from his participation on the Supreme Court panel disposing of DalPra's misconduct – in a case specifically naming Dana Albrecht.

158.  By November 2022, Marconi had concurred in at least five separate orders involving the Albrecht case or the misconduct arising from it: the September 2019 appeal declination (Exhibit 18), the October 2019 reconsideration denial (Exhibit 19), the March 2021 Introcaso misconduct order (Exhibit 35), the February 2022 Introcaso disbarment (Exhibit 39), and the November 2022 DalPra misconduct order (Exhibit 41). Through these proceedings, Marconi was repeatedly proximate to the Albrecht case and its underlying misconduct – she participated in the original appeal, two Introcaso disciplinary proceedings, and the DalPra misconduct order that specifically named Dana Albrecht. Marconi's exposure to judicial fraud in family courts predated these proceedings: she had concurred in the disbarment of Judge Paul S. Moore (Exhibit 7), the judge who presided over the initial DV proceeding in Dana Albrecht's case.

**The Crime**

159. On June 6, 2024, Justice Anna Barbara Hantz Marconi met with Governor Christopher Sununu and solicited him to secure a governmental privilege and/or advantage regarding the Attorney General's investigation into her husband, Geno Marconi. The conviction record confirms: "Date of Offense: June 06, 2024." (Exhibit 47, Page 1).

160. Despite having engaged in criminal conduct directed at the Attorney General's Office on June 6, 2024, Justice Marconi continued to preside over the Albrecht appeal – a case in which the Attorney General's Office had appeared at the trial court level to quash subpoenas and shield witnesses at the November 15, 2023 hearing. (Exhibits 43, 44, 45).

**Post-Crime Orders**

161. On June 12, 2024 – six days after her criminal solicitation of the Governor – Justice Marconi issued a single-justice order in *K.A. v. D.A.*, No. 2023-0181, directing that "the clerk's office shall not docket the above-referenced miscellaneous trial court documents." (Exhibit 44). The order was issued under Rule 21(7), which permits a single justice to act without panel review. The order contained no disqualification certification.

162. Dana Albrecht had filed the trial court documents on June 7, 2024 – one day after Marconi's criminal conduct. Marconi blocked them from the docket five days later.

**The False Certification**

163.   On July 8, 2024 – thirty-two days after Marconi's criminal solicitation – the New Hampshire Supreme Court issued a panel order in *K.A. v. D.A.*, No. 2023-0181. The order contained the following certification: "Justice Hantz Marconi has reviewed this matter and has determined that she is not disqualified." (Exhibit 45, Page 2).

164.   Dana Albrecht had preserved the disqualification issue. He had filed a motion for "clarification re; Justice Marconi." The July 8 order denied that motion in two sentences. (Exhibit 45, Page 2). Albrecht's challenge was on the record.

165.   At the time Marconi certified that she was "not disqualified," she knew that she had engaged in criminal conduct targeting the Attorney General's Office thirty-two days earlier, that the Attorney General's Office had appeared at the trial court level in the Albrecht case, and that she was under active investigation by that same office. The eventual conviction confirmed that the conduct underlying the investigation was criminal.

166.   At no point did Justice Marconi disclose to the parties in the Albrecht appeal that she was under criminal investigation by the Attorney General's Office while adjudicating matters in which that same office had appeared as counsel at the trial court level. (Exhibits 44, 45).

**MacDonald's Knowledge**

167.    On August 2, 2024, Chief Justice Gordon MacDonald was interviewed by DOJ investigators Geoffrey Fincham and Dan Jimenez in the Marconi criminal investigation. (Exhibit 46). Erin Creegan, General Counsel of the New Hampshire Judicial Branch, appeared as MacDonald's counsel. (Exhibit 46, Page 2).

168.    Creegan – who appeared as MacDonald's counsel at the August 2, 2024 interview – was the same person whom Deputy AG Denny had shielded from testifying at the November 15, 2023 hearing before Judge Rauseo. (Exhibit 43). At the trial level, Creegan was protected from having to answer questions about judicial branch concealment. At the appellate level, she appeared as counsel for the Chief Justice in the criminal investigation of another justice on the same court. The same individual served as both a shielded witness and an advocate, depending on the proceeding.

169.    MacDonald confirmed during the interview that Marconi had told him about grand jury subpoenas "at some point during the month of May" 2024. (Exhibit 46, Page 16). This was before Marconi's June 6, 2024 criminal conduct, before the June 12 single-justice order (Exhibit 44), and before the July 8 false certification (Exhibit 45). MacDonald concurred in the July 8 order – an order containing Marconi's certification that she was "not disqualified" – with this knowledge.

**Administrative Leave and Conviction**

170.    On July 25, 2024, Justice Marconi was placed on administrative leave – more than seven weeks after her June 6, 2024 criminal conduct. Between June 6 and July 25, she issued or participated in two orders in the Albrecht appeal. (Exhibits 44, 45).

171.    On October 7, 2025, Justice Marconi was convicted of Criminal Solicitation (Misuse of Position) under RSA 629:2, I and RSA 21-G:23, II. (Exhibit 47). The charging document stated that Marconi committed the offense by "soliciting then-Governor Sununu to secure a governmental privilege and/or advantage for her to which she was not otherwise entitled regarding an investigation into Geno Marconi." (Exhibit 47, Page 5). The offense was classified as a Class B Misdemeanor – the lowest criminal classification – despite having originated as a grand jury investigation.

172.    Marconi entered a no contest plea and was found guilty. (Exhibit 47, Page 2). The information was filed on October 6, 2025, and the conviction entered the following day – a same-day resolution. Her total financial consequence was $1,488: a $1,200 fine plus a $288 statutory penalty assessment. (Exhibit 47, Pages 3–4). No incarceration, probation, or community service was imposed.

173.    The criminal investigation and prosecution of Justice Marconi was conducted by Senior Assistant Attorney General Geoffrey Fincham and Assistant Attorney General Dan Jimenez (with Senior Assistant Attorney General James Boffetti). (Exhibit 47). These were the same prosecutors who had conducted the

August 2, 2024 interview of Chief Justice MacDonald regarding the Marconi matter.

([Exhibit 46](Exhibit 46)).

**The Consequence Gap**

174.    Dana Albrecht's appeal of the domestic violence order was adjudicated by a panel that included a justice who had: (a) engaged in criminal conduct directed at the Attorney General's Office six days before issuing an order in the case; (b) certified that she was "not disqualified" thirty-two days after committing a crime; (c) been under criminal investigation by the same office that had appeared at the trial court level; and (d) been subsequently convicted.

175.    The total consequence for Justice Marconi's criminal conduct was a $1,488 fine. Dana Albrecht remains subject to a domestic violence restraining order – traceable to proceedings tainted by the conflicts and misconduct documented in this complaint – that restricts his liberty until 2028. His three children were relocated from New Hampshire to California, then to Michigan, and his contact with them has been severed for years.

176.    The concrete consequences of the tainted proceedings were documented in the record that was summarily denied. On June 21, 2019, through licensed counsel, Dana Albrecht filed a thirteen-page sworn motion for reconsideration of the May 30, 2019 post-recusal order. ([Exhibit 15](Exhibit 15)). The motion documented that Dana Albrecht had received a total of thirty-eight days of parenting time with his

daughters in over eighteen months since the relocation. (Exhibit 15, Page 7, ¶56). He had not been able to contact his daughters at all since Christmas 2018. (Exhibit 15, Page 7, ¶57). The motion further alleged that Katherine Albrecht had been "locking their children, alone, inside her residence… with zip ties while traveling to… Pasadena, CA to care for her mother." (Exhibit 15, Page 9, ¶71). Master DalPra disposed of this thirteen-page sworn motion – filed through licensed counsel, documenting safety concerns about minor children – with a single handwritten word: "Denied." (Exhibit 15, Page 13). Judge Derby approved two days later. (Exhibit 15, Page 13). The order DalPra and Derby preserved was the May 30, 2019 order – signed by Judge Introcaso seventy-six days after her public recusal. (Exhibit 12). The separation documented in the motion traced to the conflicted GAL's testimony recommending immediate relocation (Exhibit 4), adopted by DalPra's recommendation and the relocation order (Exhibit 5), and was independently corroborated by sworn testimony at subsequent proceedings: "Haven't seen my kids in 10 months," with "no contact" for one year (Exhibit 21); "Since Christmas 2018… I have not been able to see them at all. And I don't even know what phone number or email address I should even use to reach out to them." (Exhibit 29, Page 9, Lines 12–15). The separation ultimately extended to two and a half years, a fact confirmed by opposing counsel's own admission at the November 6, 2020 hearing that Dana Albrecht had not seen his children since Christmas 2018. (Exhibit 37).

177.    Six days after the New Hampshire Supreme Court unanimously declined Dana Albrecht's appeal (Exhibit 18) and denied reconsideration (Exhibit 19, October 25, 2019), Dana Albrecht called the Sierra Madre Police Department from New Hampshire to request a welfare check on his children. (Exhibit 20). His children had not been to school for three days and he was unable to contact them or the mother's attorney. (Exhibit 20). The school confirmed the children's absence. When officers made contact, Katherine Albrecht told police that her ex-husband "is only calling to disturb them" and that "she has full custody of the children." (Exhibit 20). The "full custody" she invoked was the product of the tainted relocation order – the order that originated in the conflicted GAL's testimony recommending immediate removal (Exhibit 4) and was formalized in DalPra's recommendation and the relocation order itself (Exhibit 5). A father calling police from three thousand miles away because he cannot confirm his children are attending school – while the mother characterizes his concern as harassment – is the lived consequence of the conflicted proceedings documented in this complaint.

178.    Dana Albrecht did not obtain the MacDonald interview transcript (Exhibit 46) until January 2025. The evidence that the Chief Justice knew of grand jury subpoenas in May 2024 – before both post-crime orders – was unavailable to Plaintiff when those orders were issued and for months afterward.

**Appellate Issues and Document Destruction**

179.    The July 8, 2024 order accepted five appellate issues for briefing in *K.A. v. D.A.*, No. 2023-0181. ([Exhibit 45](#), Pages 1–2). Each of the five issues traced directly to Judge Rauseo's rulings at the November 15, 2023 hearing: **(1)** denial of King's deposition; **(2)** disallowance of witness subpoenas; **(3)** striking of the Piela/H&K subpoena; **(4)** exclusion of the police report; and **(5)** total denial of discovery and witnesses.

180.    The Supreme Court accepted these issues for review – and placed them before a panel that included a justice who had committed a crime and a Chief Justice who knew about the grand jury investigation.

181.    The same July 8 order threatened destruction of documents: "After August 7, 2024, the documents will be discarded." ([Exhibit 45](#), Pages 2–3). Plaintiff was given thirty days to retrieve several hundred pages of trial court filings before the court would destroy them.

**Judge Derby and the December 2025 Church Service**

182.    Judge Derby's Final Protective Order against Dana Albrecht ([Exhibit 23](#)) included a provision prohibiting Mr. Albrecht from coming within 2,000 feet of Collinsville Bible Church in Dracut, Massachusetts, **at all times.** This restriction was imposed to protect Katherine Albrecht, **who resides in Michigan.**

183.    On December 6, 2025, New Hampshire State Representative Mark Pearson invited Dana Albrecht to attend an Advent Lessons and Carols service at

Trinity Church, 80 Route 125, Kingston, New Hampshire, at 4:00 p.m. on December 7, 2025. (Exhibit 48). Mr. Albrecht's attendance was invited by a sitting state legislator.

184. Mr. Albrecht accepted the invitation. He had no knowledge that Judge Derby would be in attendance.

185. Judge Derby appeared at the service. Mr. Albrecht was seated in the same row as Judge Derby.

186. The same judge who had restricted Mr. Albrecht's access to a Massachusetts church – at all times, to protect a person who resides in Michigan – was present at a New Hampshire church where Mr. Albrecht had been lawfully invited by a sitting state legislator.

**The Ongoing Harm**

187. As of the date of this filing, the domestic violence restraining order against Dana Albrecht remains in effect until 2028. The order traces to proceedings tainted by the undisclosed Introcaso-Sternenberg conflict, recommendations made by a GAL functioning as co-counsel for the mother, findings from a hearing at which the presiding judicial officer committed proven misconduct, extensions signed without hearings by judges relying on a record they knew or should have known was tainted, and appellate review conducted by a panel that included a convicted justice.

188.   As of the date of this filing, Dana Albrecht still does not have the full, unredacted deposition of Administrative Judge David D. King. The deposition – in which the supervising administrative judge was questioned under oath about his response to judicial misconduct in Dana Albrecht's case – remains "totally redacted" and "not in the public domain at all," as JCC Counsel Waystack confirmed on the record at the November 15, 2023 hearing. (Exhibit 43, Page 33). Every effort to obtain this deposition has been blocked: requests to the Judicial Branch General Counsel's office were denied, Rauseo quashed the subpoena duces tecum (Exhibit 43), and the Attorney General's Office intervened to shield the deponent.

189.   If Katherine Albrecht seeks to extend the domestic violence order beyond 2028, the extension request will be filed in the same New Hampshire court system in which: the underlying record was produced by conflicted and compromised judicial officers; the supervising administrative judge's deposition has been withheld; the Attorney General's Office has intervened to block accountability; and no judicial officer involved has been recused. Absent the relief sought in this complaint, the same tainted system will adjudicate the same tainted order.

190.   Dana Albrecht remains subject to a domestic violence restraining order that traces directly to the concealment of the Introcaso-Sternenberg conflict and the subsequent failures, at every level of the New Hampshire judiciary, to disclose, investigate, or remedy the tainted proceedings that produced it. The ongoing

enforcement of that order constitutes a continuing violation of Plaintiff's constitutional rights.

## MATTERS OF LAW PLEAD COMMON TO ALL COUNTS

### I. Standard of Review and Fundamental Rights

191.   A document filed *pro se* is to be liberally construed, and all such pleadings shall be so construed as to do substantial justice. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

192.   The liberty interest of parents in the care, custody, and control of their children is among the oldest fundamental liberty interests recognized by the United States Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000). The Due Process Clause of the Fourteenth Amendment protects this fundamental right. *Id.* at 66.

### II. The Constitutional Standard for Judicial Impartiality

193.   There is a presumption of honesty and integrity in those serving as adjudicators. But this presumption is rebuttable. A challenger must demonstrate that, "under a realistic appraisal of psychological tendencies and human weakness," the arrangement "poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). The objective standards implementing

the Due Process Clause do not require proof of actual bias. *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 883 (2009) (adopting the *Withrow* standard). The question is whether, as an objective matter, the average judge in the position of the challenged adjudicator is "likely" to be neutral, or whether there is an unconstitutional "potential for bias." *Id.* at 881 (quoting *Mayberry v. Pennsylvania*, 400 U.S. 455, 466 (1971)). Due process "may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties." *In re Murchison*, 349 U.S. 133, 136 (1955). The *Rippo* Court applied this objective standard in collateral proceedings challenging the impartiality of the tribunal – not on direct appeal from the proceedings themselves. *Rippo v. Baker*, 580 U.S. 285, 287 (2017). The constitutional right to an impartial adjudicator is not limited to a particular procedural vehicle; it may be vindicated wherever due process claims are cognizable.

194.    The Due Process Clause forbids any tribunal in which the judge has "a direct, personal, substantial, pecuniary interest" in the outcome. *Tumey v. Ohio*, 273 U.S. 510, 523 (1927). A direct bribe is not required: "Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law." *Id.* at 532. This possible temptation exists even where the judge does not personally pocket funds, if the judge holds an executive responsibility for the

financial welfare of the entity or individual benefiting from the decision. *Ward v. Village of Monroeville*, 409 U.S. 57, 60 (1972). Where a judge discusses financial matters with a court-appointed officer and subsequently approves that officer's requests to exceed fee caps and generate revenue from litigants, the structural temptation to favor that officer violates *Ward* and *Tumey*.

195.    To perform its high function in the best way, "justice must satisfy the appearance of justice." *In re Murchison*, 349 U.S. 133, 136 (1955). The appearance of partiality alone is sufficient to warrant relief. "Scienter is not an element of a violation" of the duty of disqualification; a judge's lack of knowledge of a disqualifying circumstance "may bear on the question of remedy, but it does not eliminate the risk" that his impartiality might reasonably be questioned by other persons. *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 859–60 (1988). Moreover, vacatur is required if even one member of a multi-member tribunal had a disqualifying interest. *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825–26 (1986) (majority holding vacatur required where disqualified justice cast the deciding vote); *Id.* at 831 (Blackmun, J., concurring) (a disqualified member's "mere participation in the shared enterprise of appellate decision-making – whether or not he ultimately wrote, or even joined, the … opinion – posed an unacceptable danger of subtly distorting the decisionmaking process").

196.    The consequence of a disqualified adjudicator's participation is vacatur – not a balancing test, not harmless-error review, but the presumptive unwinding of

the proceedings. In *Liljeberg*, the Supreme Court vacated a judgment where the district judge had a disqualifying financial interest he did not subjectively know about at the time of decision, holding that the question is "whether a reasonable person, knowing all the circumstances, would expect that the judge would have actual knowledge" of the disqualifying facts. 486 U.S. at 860–61. *Aetna* reinforces the point for multi-member tribunals: even one disqualified member requires vacatur of the entire proceeding. 475 U.S. at 825. In assessing whether vacatur is appropriate, the Court considers "the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process." *Liljeberg*, 486 U.S. at 864. Together, *Liljeberg* and *Aetna* establish that disqualification is a structural defect – the remedy follows from the violation, not from a showing that the outcome would have been different.

197. The United State Supreme Court has identified specific categories where the probability of actual bias is constitutionally intolerable: (a) where the adjudicator has a pecuniary interest in the outcome, *Tumey*, 273 U.S. at 523; (b) where the adjudicator has been the target of personal abuse or criticism from the party before him, *Mayberry v. Pennsylvania*, 400 U.S. 455 (1971); and (c) where the size and timing of campaign contributions create an unconstitutional probability that the judge would be biased against the non-contributing party, *Caperton*, 556 U.S. at 884. But these categories are not exhaustive. The Supreme Court has

separately recognized that bias stemming from an extrajudicial source – a relationship, interest, or information acquired outside the proceedings – is categorically more suspect than impressions formed during the judicial process. Opinions formed on the basis of facts introduced or events occurring in the course of proceedings "do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994). No such heightened showing is required when the source of bias is extrajudicial. *Id.* at 554–56. And *Withrow* expressly left room for identification of new structural conditions that generate intolerable bias risk based on "special facts and circumstances." 421 U.S. at 47. An undisclosed close personal relationship between a judge and a court-appointed officer – concealed from the parties and perpetuated across multiple cases and multiple years – is the paradigm extrajudicial source of bias, and it presents precisely the kind of "special facts and circumstances" that *Withrow* contemplated.

198. Loyalty to a client is impaired when a lawyer cannot consider, recommend, or carry out an appropriate course of action because of the lawyer's other responsibilities or interests. *Fiandaca v. Cunningham*, 827 F.2d 825, 829 (1st Cir. 1987). A Guardian ad Litem, as an officer of the court appointed to represent the best interests of children, owes duties of loyalty and disclosure no less exacting than those of an attorney. Where a GAL maintains an undisclosed personal and financial

- 70 -

relationship with the appointing judge, the fiduciary obligation to the children and the disclosure obligation to the court are both breached.

199.    The right to a trial de novo or appellate review does not cure a biased initial proceeding. A state's trial court procedure may not be deemed constitutionally acceptable simply because the State eventually offers a defendant an impartial adjudication. The petitioner is entitled to a neutral and detached judge in the first instance. *Ward*, 409 U.S. at 62. This principle extends to all proceedings affecting fundamental rights: the right to an impartial tribunal attaches at the initial proceeding, not merely on review. Where appellate review is itself compromised – by the same concealment that tainted the trial – the safeguard that justifies tolerance of potential error at the trial level is absent.

## III. Federal Jurisdiction Over Claims Against State Judicial Officers – Younger Abstention, Comity, and the Inadequate State Forum Exception

200.    While federal courts generally abstain from interfering with state proceedings under *Younger v. Harris*, 401 U.S. 37 (1971), this deference presupposes the existence of a competent state forum. Abstention is not required when the state tribunal itself is "incompetent by reason of bias to adjudicate the issues pending before it." *Gibson v. Berryhill*, 411 U.S. 564, 577 (1973).

201.    A state forum is constitutionally inadequate when the structural safeguards designed to correct errors are themselves compromised. Only if

"extraordinary circumstances" render the state court incapable of fairly and fully adjudicating the federal issues before it can there be any relaxation of the deference to be accorded to the state criminal process. *Kugler v. Helfant*, 421 U.S. 117, 124 (1975). The Court in *Kugler* assessed whether the state system was "irretrievably impaired" – and found it was not, because procedural safeguards including mandatory judicial disqualification rules remained available. *Id.* at 126. The safety valves of a state judicial system include trial-level adjudication, de novo review, administrative oversight, and appellate review. Where each of these levels is compromised – the trial judge by an undisclosed conflict, the reviewing judge by a purpose of assistance rather than adjudication, the administrative oversight mechanism by concealment rather than correction, and the appellate panel by a member who falsely certifies impartiality – the system as a whole is irretrievably impaired, and the procedural safeguards that saved *Kugler* from federal intervention do not exist here.

202.    Where the administrative, trial, and appellate levels are all implicated in the constitutional injury, *Gibson* controls: a plaintiff is not required to exhaust futile state remedies before seeking federal relief.

203.    Defendants may cite *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 534 (2021), for the proposition that principles of equity, comity, and federalism may counsel against suits involving state judges. That case involved a facial challenge to a

statutory scheme; it did not involve allegations that specific judicial officers engaged in documented fraud, concealment, and cover-up.

204.   The same equitable principles that counsel restraint in ordinary circumstances demand intervention here. A litigant deprived of an impartial tribunal has no adequate remedy at law. Comity is not owed to a state judicial system that has been corrupted at every level – trial, administrative, and appellate – where the state courts did not merely fail but actively participated in the constitutional violation. Federal courts exist precisely to vindicate federal constitutional rights when state systems fail; 42 U.S.C. § 1983 was enacted because state courts cannot always be trusted to protect federal rights. Equity does not protect fraud. When the trial judge rubber-stamps orders without review, the reviewing judge assists a colleague instead of adjudicating, the administrative judge conceals documented misconduct, and an appellate justice lies on a court form, the entire foundation for judicial comity has collapsed.

## IV. Inapplicability of the Rooker-Feldman Doctrine

205.   The *Rooker-Feldman* doctrine does not deprive this Court of subject matter jurisdiction. Four requirements must be met for *Rooker-Feldman* to bar suit: "(1) the federal plaintiff lost in state court; (2) the plaintiff complains of injuries caused by the state-court judgments; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and

reject the state judgments." *Allen v. DeBello*, 861 F.3d 433, 438 (3d Cir. 2017). "The doctrine has narrow applicability" and "does not bar suits that challenge actions or injuries underlying state court decisions – especially those that predate entry of a state court decision – rather than the decisions themselves." *Id.*

206. The distinction between challenging a state court *judgment* and challenging the *process* by which that judgment was reached is dispositive. Where a federal plaintiff challenges the constitutional adequacy of the proceedings themselves – proceedings corrupted by undisclosed conflicts, documented misconduct, evidence suppression, and a false judicial certification – the injuries are independent federal injuries, not disguised appeals from state court outcomes. "[W]hen the source of the injury is the defendant's actions (and not the state court judgments), the federal suit is independent, even if it asks the federal court to deny a legal conclusion reached by the state court." *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 167 (3d Cir. 2010). If the doctrine barred such claims, "there would be no federal remedy for a violation of federal rights whenever the violator so far succeeded in corrupting the state judicial process as to obtain a favorable judgment." *Id.* at 171 (quoting *Nesses v. Shepard*, 68 F.3d 1003, 1005 (7th Cir. 1995)).

207. *Rooker-Feldman* does not apply for three independent reasons:

(a) *Post-Filing Orders Exception (Dispositive)*. Where a federal plaintiff challenges orders issued *after* the commencement of the federal action,

*Rooker-Feldman* does not bar those challenges. The doctrine is "confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).

(b) *Fraud/Corruption Exception.* A federal court "may entertain a collateral attack on a state court judgment which is alleged to have been procured through fraud, deception, accident, or mistake." *In re Sun Valley Foods Co.*, 801 F.2d 186, 189 (6th Cir. 1986) (quoting *Resolute Ins. Co. v. State of North Carolina*, 397 F.2d 586, 589 (4th Cir. 1968)). Challenging the corruption of a process is not challenging the substantive determinations that emerged from it.

(c) *Independent Constitutional Injury.* Where the injuries alleged arise from an administrative cover-up and concealment of misconduct – injuries independent of any substantive ruling – the injuries are not caused by the state court judgments.

208.   The concealment throughline confirms this distinction. A litigant who does not know that the presiding judge has an undisclosed conflict with the court-appointed officer, that the marital master has committed misconduct, that the administrative judge has concealed that misconduct, and that an appellate justice

- 75 -

has falsely certified her impartiality while under criminal investigation – that litigant cannot have raised these issues in the state proceedings from which defendants would have this Court abstain. *Rooker-Feldman* does not bar claims that the plaintiff was prevented from raising by the very misconduct he now challenges.

## V. Exceptions to Judicial Immunity – The Functional Analysis

209. The foundational American doctrine of absolute judicial immunity holds that "judges of courts of superior or general jurisdiction are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly." *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 351 (1872). The remedy for judicial misconduct lies in impeachment, removal, or criminal prosecution – not civil suit. *Id.* at 350, 354. However, *Bradley* drew a critical distinction that limits the doctrine's reach: acts taken merely "in excess of" jurisdiction remain protected, while acts taken "in the clear absence of all jurisdiction" over the subject matter are not. *Id.* at 351–52. Judicial immunity does not protect judges so much as it protects the judicial acts they undertake as part of their public service; it is "defined by the functions it protects and serves, not by the person to whom it attaches." *Forrester v. White*, 484 U.S. 219, 227 (1988) (emphasis in original); *accord Gibson v. Goldston*, 85 F.4th 218, 223 (4th Cir. 2023).

210.   The United State Supreme Court has articulated a two-part test for judicial immunity: **(1)** whether the judge acted in the "clear absence of all jurisdiction," and **(2)** whether the act was a "judicial act." "The factors determining whether an act by a judge is a 'judicial' one relate to the nature of the act itself, i.e., whether it is a function normally performed by a judge, and to the expectations of the parties, i.e., whether they dealt with the judge in his judicial capacity." *Stump v. Sparkman*, 435 U.S. 349, 362 (1978). Procedural errors – even grave ones – do not defeat immunity so long as the act was judicial in nature and the court had jurisdiction. *Id.* at 359. But acts that are administrative, legislative, or executive in character fall outside the scope of judicial immunity regardless of the officer's title. *Forrester*, 484 U.S. at 227. The Constitution distributes governance tasks among three branches; "the one who issues the order is not the one to enforce it. Issuing an order is a judicial function; carrying that order out is an executive one." *Gibson*, 85 F.4th at 224.

211.   Under this functional analysis, certain categories of conduct by judicial officers are administrative or executive in nature and fall outside the scope of judicial immunity. Coordinating with a colleague facing ethics charges – where the stated purpose is to assist the colleague rather than to adjudicate the merits – is administrative, not judicial. Concealing reports of judicial misconduct from affected litigants is records management, not adjudication. Certifying and approving orders

without substantive review is ministerial, not judicial. Attending a social or religious event is categorically not a judicial act regardless of who else is present.

212. The Supreme Court has recognized that absolute immunity extends beyond Article III judges to officials performing adjudicatory functions sufficiently similar to the judicial process. *Butz v. Economou*, 438 U.S. 478, 512 (1978). The *Butz* Court reasoned that "the safeguards built into the judicial process tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct," and identified six characteristics of that process bearing on whether absolute, rather than qualified, immunity applies: **(a)** the need to assure that the individual can perform his functions without harassment or intimidation; **(b)** the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; **(c)** insulation from political influence; **(d)** the importance of precedent in resolving controversies; **(e)** the adversary nature of the process; and **(f)** the correctability of error on appeal. *Id.* at 512. Where these structural characteristics are present, the case for absolute immunity is strongest. Where they are absent, only qualified immunity applies.

213. The *Butz* functional test is a double-edged sword. While it establishes the principle of quasi-judicial immunity, it also provides the analytical framework for *denying* absolute immunity where the requisite independence is lacking. In *Cleavinger v. Saxner*, 474 U.S. 193 (1985), the Supreme Court applied the *Butz* factors and held that prison discipline committee members were entitled only to

qualified immunity – not absolute immunity. The Court found that the committee members "were not professional hearing officers, as are administrative law judges," but "prison officials, albeit no longer of the rank and file, temporarily diverted from their usual duties," *Id.* at 203–04; they were "employees of the Bureau of Prisons" and "the direct subordinates of the warden who reviews their decision," *Id.* at 204; they worked "with the fellow employee who lodges the charge against the inmate upon whom they sit in judgment" and were "under obvious pressure to resolve a disciplinary dispute in favor of the institution," *Id.*; and the proceedings lacked the safeguards that characterize formal adjudication – "no right to compel the attendance of witnesses or to cross-examine," "no right to discovery," "no cognizable burden of proof," and "[n]o verbatim transcript," *Id.* at 206.

214.    The *Cleavinger* analysis establishes a principle with direct application to court-appointed officers: absolute immunity requires genuine functional independence from the appointing or supervising authority. Where the quasi-judicial actor is subordinate to the authority whose decisions she effectively implements, where the actor has an institutional or personal interest in the outcome, and where the proceedings lack the safeguards that characterize formal adjudication, only qualified immunity applies. The *Cleavinger* Court's analysis turned heavily on the committee members' lack of independence from the appointing authority – the very characteristic *Butz* identified as factor (c), insulation from political influence. 474 U.S. at 202–04. An undisclosed close personal relationship

- 79 -

between a court-appointed officer and the appointing judge is the antithesis of the insulation from improper influence that absolute immunity presupposes. Where the officer's independence is compromised at its source – by a concealed relationship with the very person who controls the appointment – the structural conditions justifying absolute immunity are absent.

215.   The policy justification for absolute immunity is that institutional mechanisms – criminal prosecution, judicial discipline, removal from office – will correct misconduct more effectively than private litigation. *Imbler v. Pachtman,* *424 U.S. 409, 427–28 (1976)*. This justification, as the Court acknowledged, "does leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty," but the "broader public interest" is served by immunity so long as alternative institutional mechanisms remain available. *Id.* at 427. This justification has limits. Where institutional mechanisms have already run their course – where a judicial officer has been criminally convicted, disciplined, forced to resign, and disbarred, and where a marital master has been found to have committed misconduct in the plaintiff's specific case – yet the litigant harmed by the misconduct still has no remedy because the immunity doctrine bars civil redress, the policy justification is exhausted. The system self-corrected as to the officers; it did not self-correct as to the litigant. When every institutional safeguard that the immunity doctrine relies upon has been activated and completed, yet the litigant remains subject to orders produced by the

very misconduct those mechanisms condemned, the balance that *Imbler* struck no longer holds.

## VI. The Due Process Framework — Procedural and Substantive

216.  In analyzing whether governmental action violates procedural due process, courts apply the three-part balancing test articulated in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976): identification of the specific dictates of due process "generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

217.  The *Mathews* balancing test applies with full force to proceedings affecting the parent-child relationship. *Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982). The private interest – a parent's fundamental liberty interest in the care, custody, and management of his children – is "commanding." *Id.* at 758–59. The risk of erroneous deprivation through constitutionally defective procedures is substantial. *Id.* at 762–63. And the state's interest, as *parens patriae*, is not in an inaccurate or biased determination but in an accurate one – the state shares the

parent's interest in a correct outcome. *Id.* at 766–67. Critically, *Santosky* held that each procedural safeguard in a parental-rights proceeding must independently satisfy due process. A constitutionally defective element of the proceeding – such as a biased adjudicator, a compromised court-appointed officer, or concealment of material conflicts – cannot be excused by reference to the adequacy of other procedural protections. The Court rejected the argument that the system should be evaluated as a "package": "we would rewrite our precedents were we to excuse a constitutionally defective standard of proof based on an amorphous assessment of the 'cumulative effect' of state procedures." *Id.* at 758 n.9. This principle applies with equal force to the impartiality requirement: a proceeding before a biased tribunal is not cured by the existence of appellate review, and a tainted GAL report is not cured by the availability of cross-examination.

218.    Where the private interest is a parent's fundamental liberty interest in the care, custody, and control of his children – an interest of the highest constitutional order under *Troxel* – and where the risk of erroneous deprivation was maximized because the entire adjudicative process was corrupted by undisclosed conflicts and documented misconduct, and where the Government has no valid interest in protecting the reputation of officials who engaged in fraud or preserving the finality of orders procured through concealment, the *Mathews* balance weighs decisively in favor of the plaintiff. Under *Bracy v. Gramley*, 520 U.S. 899 (1997), a plaintiff is entitled to discovery to prove that a judge was compensatorily biased –

that is, that the judge ruled harshly in certain cases to camouflage misconduct in others. The Court held that "if it could be proved, such compensatory, camouflaging bias on Maloney's part in petitioner's own case would violate the Due Process Clause." *Id.* at 905. No man is permitted to try cases where he has an interest in the outcome. *In re Murchison*, 349 U.S. at 136.

219. Substantive due process protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense. *County of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998). The standard for substantive due process is conduct that "shocks the conscience." *Id.* at 846. This standard is met where government officials exercise power "without any reasonable justification in the service of a legitimate governmental objective." *Id.* at 846. The threshold is demanding: not every procedural irregularity rises to the level of a substantive due process violation. But where government officials engage in a deliberate, sustained pattern of concealment – hiding disqualifying conflicts across multiple cases and multiple years, concealing reports of judicial misconduct from affected litigants, suppressing evidence of the tainted record, and certifying impartiality while under criminal investigation – the cumulative conduct transcends procedural error and enters the realm of conscience-shocking behavior. Individual acts of nondisclosure, standing alone, may sound only in procedural due process. But when those acts aggregate into a coordinated pattern of deliberate concealment that results in the permanent deprivation of a fundamental liberty interest – the

separation of a parent from his children – the pattern shocks the conscience even if no single act does. The substantive due process claim rests on the totality of the defendants' conduct, not on any isolated omission.

220. The distinction between procedural and substantive due process claims is not merely academic; it affects the analysis and the remedies. A procedural due process claim asks whether the plaintiff received adequate process before being deprived of a protected interest; the remedy is typically to provide the process that was withheld. A substantive due process claim asks whether the government's conduct was so arbitrary or conscience-shocking that no amount of process could justify it; the remedy may include declaratory relief, injunctive relief, and – where a defendant is sued in his individual capacity – damages. *Lewis*, 523 U.S. at 845–46. Both theories are plead because the facts support both: the plaintiff was denied adequate procedures (procedural due process), *and* the cumulative pattern of concealment was so extreme as to shock the conscience (substantive due process).

## VII. Cumulative Error and Structural Due Process

221. Defendants might ask this Court to evaluate each individual act of alleged misconduct in isolation, characterizing each as an exercise of discretion, an administrative judgment, or a procedural ruling. But the constitutional inquiry does not end with the individual acts. The Supreme Court has recognized that a plaintiff's due process claim may rest on the cumulative effect of multiple errors, even where no

single error was independently unconstitutional. *Chambers v. Mississippi*, 410 U.S. 284, 290 n.3 (1973) (characterizing the petitioner's claim as resting on "the cumulative effect of [those] rulings in frustrating his efforts to develop an exculpatory defense"). In *Chambers*, the Court held that "the exclusion of this critical evidence, coupled with the State's refusal to permit Chambers to cross-examine McDonald, denied him a trial in accord with traditional and fundamental standards of due process." *Id.* at 302. The constitutional violation emerged from the interaction of errors, not from any one alone.

222.    The cumulative failure contemplated by *Chambers* becomes structural error when it affects "the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). Structural errors are "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." *Id.* at 309. The Court's enumerated list of structural errors explicitly includes a proceeding held before a biased judge – "a judge who was not impartial." *Id.* (citing *Tumey v. Ohio*, 273 U.S. 510 (1927)). If a proceeding before *one* biased judge is structural error requiring no showing of prejudice, then a proceeding in which the trial judge, the reviewing judge, the marital master, the administrative overseer, the successor judge, and the appellate panel were all compromised – by concealment, by misconduct, by criminal conduct, or by knowledge of the foregoing – is structural

error of the most extreme kind. Prejudice is not merely presumed; it is self-evident. There is no untainted baseline against which to measure what would have happened.

223.   The structural character of the error is reinforced where defendants occupied overlapping roles across the same proceedings. In *Williams v. Pennsylvania*, 136 S. Ct. 1899 (2016), the Supreme Court held that "under the Due Process Clause there is an impermissible risk of actual bias when a judge earlier had significant, personal involvement as a prosecutor in a critical decision regarding the defendant's case." *Id.* at 1905. The question is not whether actual bias existed but whether there is an unconstitutional "potential for bias." *Id.* (citing *Caperton*, 556 U.S. at 881). The Court further held that "the involvement of multiple actors and the passage of time do not relieve the former prosecutor of the duty to withdraw in order to ensure the neutrality of the judicial process in determining the consequences that his or her own earlier, critical decision may have set in motion." *Id.* at 1907. And the Court held that an unconstitutional failure to recuse constitutes structural error – a defect "not amenable" to harmless-error review – because "each member's involvement plays a part in shaping the court's ultimate disposition." *Id.* at 1909 (quoting *Aetna*, 475 U.S. at 831 (Blackmun, J., concurring in judgment)). Where a single prior role creates an impermissible risk of bias, the systemic intertwining of concealment and adjudication across multiple levels of a state judiciary – with the same individuals appearing in supervisory, adjudicative, prosecutorial, and advisory roles – amplifies that risk beyond any reasonable threshold. *See also Aetna*, 475 U.S.

- 86 -

at 825 (vacatur required when even one member of a multi-member tribunal was disqualified).

224.    The structural failure of the state system is not merely a factual predicate for federal jurisdiction – it creates an obligation to provide a remedy. The principle underlying the Supremacy Clause is that the existence of the jurisdiction creates an implication of duty to exercise it. *Mondou v. New York, N.H. & H.R. Co., 223 U.S. 1, 58 (1912)*, quoted in *Howlett v. Rose, 496 U.S. 356, 370 (1990)*. *Howlett* held that state courts may not refuse to hear § 1983 claims when they have jurisdiction over analogous state claims, because federal law is the law of the land and its vindication cannot be declined. Where the state judicial system has failed structurally – trial, administrative, and appellate – the federal forum is not merely available; it is the only forum capable of providing the certain remedy that the New Hampshire Constitution itself guarantees. N.H. Const. pt. I, art. 14 (every subject of this state is entitled to a certain remedy, freely, completely, and without any denial). The cumulative and structural character of the failure, established under *Chambers* and *Fulminante*, reinforces the inadequate-state-forum finding and confirms that abstention is not required under *Gibson v. Berryhill, 411 U.S. 564, 577 (1973)*.

**VIII. Ex Parte Young – Ongoing Violation and the Eleventh Amendment**

225.    To the extent Plaintiff seeks prospective declaratory and injunctive relief against state officials in their official capacities, such claims are not barred by

the Eleventh Amendment under *Ex parte Young, 209 U.S. 123 (1908)*. In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar, a court need only conduct a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Maryland Inc. v. Public Serv. Comm'n of Maryland, 535 U.S. 635, 645 (2002)* (quoting *Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 296 (1997)* (O'Connor, J., concurring in part and concurring in judgment)). Where the ongoing enforcement of orders derived from tainted proceedings, the continued withholding of key depositions, and the structural compromise of the tribunal all persist as of the date of filing, *Ex parte Young* is satisfied.

226.    The severity of the ongoing deprivation reinforces the need for federal intervention. A nominally civil protective order may carry consequences that are prohibitory and stigmatizing in ways that rival or exceed criminal sanctions. *See Kashem v. Barr, 941 F.3d 358, 370 (9th Cir. 2019)*; *see also Sessions v. Dimaya, 584 U.S. 148 (2018)* (Gorsuch, J., concurring in part and concurring in the judgment) (observing that today's civil penalties are routinely graver than those associated with misdemeanor crimes). Where such severe, ongoing restrictions on liberty and parental rights rest on constitutionally defective proceedings, the case for prospective federal relief is at its strongest.

## IX. State Action and Joint Conduct

227.    A private party acts under color of state law for purposes of 42 U.S.C. § 1983 when she is a "willful participant in joint activity with the State or its agents." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970) (quoting *United States v. Price*, 383 U.S. 787, 794 (1966)). The Supreme Court has held that a private party who corruptly conspires with a judge acts under color of state law, even though the judge himself is immune from damages. *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980). "Immunity does not change the character of the judge's action or that of his co-conspirators." *Id.* at 28. A court-appointed officer who maintains an undisclosed personal and financial relationship with the appointing judge, and who participates in a sustained course of mutual concealment across multiple cases and multiple years, is not a passive recipient of court appointments – she is a knowing, willing participant in conduct that deprives litigants of their constitutional right to an impartial tribunal. Under *Dennis*, such joint conduct with a state actor constitutes action under color of state law subject to § 1983 liability.

228.    This analysis bridges the immunity argument set forth in Section V: even if a GAL enjoys quasi-judicial immunity for certain functions, a private party who acts in concert with a state actor to conceal disqualifying conflicts is subject to § 1983 under *Dennis*. The joint-action theory does not depend on the characterization

of the GAL's functions; it depends on the existence of a coordinated scheme of concealment with a judicial officer.

## X. Inapplicability of Collateral Estoppel and Res Judicata

229.    Plaintiff's claims are not barred by collateral estoppel (issue preclusion) or *res judicata* (claim preclusion). Collateral estoppel requires, among other elements, that the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding. *Garod v. Steiner Law Office, PLLC*, 161 A.3d 104, 107 (N.H. 2017). Where the constitutional defects alleged – specifically, undisclosed judicial conflicts, judicial misconduct, and administrative concealment – were actively concealed from the plaintiff during the state court proceedings, the plaintiff did not have a full and fair opportunity to litigate those defects. A party cannot be estopped from raising a claim they were prevented from litigating due to fraud or concealment.

230.    Furthermore, preclusion doctrines require privity between the parties. Where the defendants in the federal action are the judicial officers and the judicial branch itself – not parties to the underlying litigation but rather the allegedly biased tribunal – collateral estoppel and *res judicata* do not apply. Preclusion doctrines do not bar claims against the tribunal itself for corruption of the adjudicative process.

## XI. Statute of Limitations – Discovery Rule and Concealment Tolling

231.    Claims under 42 U.S.C. § 1983 borrow the forum state's statute of limitations for personal injury actions. *Wilson v. Garcia*, 471 U.S. 261, 276 (1985). In New Hampshire, that period is three years. RSA 508:4, I. Although the limitations period is borrowed from state law, "the accrual date of a § 1983 cause of action is a question of federal law that is not resolved by reference to state law." *Wallace v. Kato*, 549 U.S. 384, 388 (2007). The First Circuit has held that a § 1983 cause of action accrues "when plaintiff knows or has reason to know of the injury which is the basis of the action." *Marrapese v. Rhode Island*, 749 F.2d 934, 936 n.4 (1st Cir. 1984). Where the injury results from concealed misconduct, the plaintiff cannot be charged with knowledge of facts that were actively hidden from him. Federal courts applying state limitations periods to § 1983 claims must also apply the state's coordinate tolling rules; courts "should not unravel state limitations rules unless their full application would defeat the goals of the federal statute at issue." *Hardin v. Straub*, 490 U.S. 536, 539 (1989). New Hampshire law independently provides that "fraudulent concealment of a cause of action from the one in whom it resides by the one against whom it lies constitutes an implied exception to the statute of limitations, postponing the commencement of the running of the statute until discovery or reasonable opportunity of discovery." *Lakeman v. LaFrance*, 102 N.H. 300, 303 (1959). Defendants cannot invoke the statute of limitations as a defense to claims arising from a scheme of concealment that they themselves perpetuated.

**XII. Declaratory Relief Survives When Injunctive Relief Is Barred**

232.    Prior to **1996**, the Supreme Court held that judicial immunity does not bar prospective injunctive or declaratory relief under § 1983. *Pulliam v. Allen*, 466 U.S. 522 (1984). The Court of Appeals in *Pulliam* determined that judicial immunity did not extend to injunctive and declaratory relief, *Id.* at 527, and the Supreme Court affirmed – holding that both forms of prospective relief were available against judicial officers. In 1996, Congress amended 42 U.S.C. § 1983 to provide that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. Pub. L. No. 104-317, § 309(c), 110 Stat. 3853 (1996). The amendment bars *injunctive* relief against judicial officers absent a predicate declaratory decree – but it does not bar *declaratory* relief itself. Congress's selective restriction to injunctive relief – leaving *Pulliam*'s declaratory-relief holding untouched – confirms that declaratory relief remains available against judicial officers acting in their judicial capacity.

233.    This distinction is reinforced by the Supreme Court's recognition that Congress designed the Declaratory Judgment Act to serve precisely this function. "The express purpose of the Federal Declaratory Judgment Act was to provide a milder alternative to the injunction remedy," and it was "designed to be available to test the constitutionality of state criminal statutes in circumstances where an

injunction would not be appropriate." *Steffel v. Thompson*, 415 U.S. 452, 466–67 (1974). "Congress plainly intended declaratory relief to act as an alternative to the strong medicine of the injunction." *Id.* at 466; *accord Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 381 (2008) (quoting *Steffel*). To the extent Plaintiff seeks a declaration that conduct by judicial officers or court-appointed officers violated Plaintiff's due process rights – rather than money damages – quasi-judicial immunity does not apply.

234.    A declaration that past conduct was illegal, standing alone and without more, is an impermissible advisory opinion. *Green v. Mansour*, 474 U.S. 64, 73 (1985) (declaratory judgment unavailable where there is no claimed continuing violation and no threat of future violation). The First Circuit has confirmed this principle: "issuance of a declaratory judgment deeming past conduct illegal is also not permissible as it would be merely advisory." *ACLU of Mass. v. U.S. Conference of Catholic Bishops*, 705 F.3d 44, 53 (1st Cir. 2013). And a declaratory judgment "is meant to define the legal rights and obligations of the parties in anticipation of some future conduct, not simply to proclaim liability for a past act." *Justice Network Inc. v. Craighead Cnty.*, 931 F.3d 753, 764 (8th Cir. 2019). These principles are not in dispute. But they are inapplicable where the challenged conduct is not a completed historical event but an ongoing deprivation. Where a court order derived from constitutionally defective proceedings remains in force today, restricts a litigant's liberty today, and will be subject to future extension proceedings, a declaration that

the enforcement of that order violates due process defines future rights and obligations – it does not merely proclaim past liability. The relief sought is not a retrospective judgment on what happened; it is a prospective determination of whether the State may continue to enforce orders that trace to proceedings the Constitution requires to be set aside.

## XIII. Collateral Attacks on Court Appointments – The Brown v. Newberger Distinction

235.   Courts have held that retrospective attacks on technical defects in court appointments are disfavored, reasoning that the "essential fact" is that the officer was operating at the request of the court, and that permitting collateral challenges to the technical validity of appointments would produce "uncertainty, delay, and frustration" in an already difficult litigation field. *Brown v. Newberger*, 291 F.3d 89, 94 (1st Cir. 2002). However, this principle presupposes that the court's request was itself untainted by concealed conflicts. Where the appointment was the product of an undisclosed disqualifying relationship between the appointing judge and the appointed officer – a relationship actively concealed from the court's own administrative apparatus, from opposing counsel, and from the children the officer was appointed to serve – the "essential fact" of the court's request is itself constitutionally defective. The bar on collateral attacks on appointments addresses ministerial irregularities in the appointment process – a missing form, a procedural

misstep. It does not extend to challenges based on the active concealment of the very conflict that renders the appointment constitutionally impermissible. A challenge to concealment is not a "collateral attack on a technical defect"; it is a challenge to the integrity of the process that produced the appointment.

## XIV. Quasi-Judicial Immunity for Guardians ad Litem

### A. Preservation: *Cok v. Cosentino* Was Wrongly Decided

236.    Plaintiff acknowledges this argument is foreclosed in this Circuit by *Cok v. Cosentino*, 876 F.2d 1 (1st Cir. 1989), which held that a Guardian ad Litem functioned as an agent of the court and shared the appointing judge's absolute immunity. Plaintiff preserves the argument that *Cok* was wrongly decided for en banc or Supreme Court review. The grounds are stated below.

237.    *Cok*'s error is not in its result for the facts before it, but in its failure to perform the functional analysis that *Butz v. Economou*, 438 U.S. 478 (1978), and *Cleavinger v. Saxner*, 474 U.S. 193 (1985), require. *Butz* established that absolute immunity outside the Article III context depends on whether the officer performs functions sufficiently similar to the judicial process – and identified six structural characteristics (independence from political influence, adversarial proceedings, the presence of procedural safeguards, correctability on appeal, the importance of precedent, and insulation from harassment) that bear on whether absolute or qualified immunity applies. *Id.* at 512. *Cleavinger* applied those factors and held that

prison discipline committee members – who made adjudicative-style decisions – were entitled only to qualified immunity because they lacked genuine functional independence from the appointing authority. 474 U.S. at 202–06. *Cok* undertook neither the *Butz* factor analysis nor the *Cleavinger* independence inquiry. It moved from "court-appointed" to "quasi-judicial" without examining what a Guardian ad Litem actually does.

238.   A Guardian ad Litem performs three categories of functions. None is judicial.

(a) *Investigation.* A GAL gathers information through home visits, interviews, and document review. This is an executive function – the same function performed by social workers, probation officers, and court-appointed evaluators. The Supreme Court drew the line between judicial and executive functions in *Forrester v. White*, 484 U.S. 219 (1988): issuing an order is judicial; carrying it out is executive. The Fourth Circuit sharpened the distinction in *Gibson v. Goldston*, 85 F.4th 218, 224–25 (4th Cir. 2023): investigating facts is executing, not adjudicating. A GAL who visits a home and interviews a child is performing an investigative function. The immunity appropriate to that function is qualified immunity.

(b) *Recommendation.* A GAL prepares a report and makes a recommendation to the court. That recommendation is advisory and non-binding. The New Hampshire Supreme Court has held that a GAL's recommendations "do not,

and should not, carry any greater presumptive weight than the other evidence in the case. The guardian ad litem is appointed to represent the best interests of the child, not to make a conclusive or presumptive determination; that is the province of the court." *Richelson v. Richelson*, 130 N.H. 137, 536 A.2d 176, 180 (1987). This principle is not confined to New Hampshire: the Rhode Island Supreme Court adopted *Richelson*'s standard, holding that a trial justice is not required to act on a GAL's recommendation and that the GAL's role is to represent the child's interests, not to make the determination that belongs to the court. *Souza v. Souza*, 221 A.3d 371, 375 (R.I. 2019) (quoting *D'Onofrio v. D'Onofrio*, 738 A.2d 1081, 1084 (R.I. 1999), itself quoting *Richelson*). If the recommendation is not binding – if it carries no more weight than any other evidence – then making it is not a judicial act. Even New Hampshire marital masters, who possess substantially more authority than a GAL and whose recommendations are processed through a formal approval mechanism, have no inherent power, but rather derive all their power from the appointing judge or from the agreement of the parties, and it is a judge, not a master, which determines the case. *Witte v. Justices of New Hampshire Superior Court*, 831 F.2d 362, 363–64 (1st Cir. 1987). If a master does not perform a judicial function under *Witte*, then a GAL – who has less authority than a master and whose recommendations carry no presumptive weight under *Richelson* – *a fortiori* does not.

- 97 -

(c) *Testimony.* A GAL testifies in court as a witness. Witnesses receive immunity for the testimonial act itself under *Briscoe v. LaHue*, 460 U.S. 325, 335 (1983). That is a narrow, function-specific protection for what is said on the stand. It is not the blanket absolute immunity that attaches to every act connected with a court appointment – which is what *Cok* provides.

239.    The correct immunity framework maps protection to function: qualified immunity for investigation, no absolute immunity for a non-binding advisory recommendation, and witness immunity for testimony. This framework is consistent with how courts analyze immunity for every other category of court-adjacent actor. *Cok* is the outlier – it skipped the functional analysis and extended the appointing judge's absolute immunity to an officer whose functions are investigative, advisory, and testimonial, not adjudicative.

240.    Applying the stare decisis factors articulated in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228, 2264–65 (2022):

(a) *Nature of the error.* *Cok* collapsed the distinction between judicial and executive functions that the Supreme Court drew in *Forrester* and that subsequent circuits have sharpened in *Gibson*. It extended absolute immunity to investigative, advisory, and testimonial functions – none of which is adjudicative under the framework the Supreme Court has established.

(b) *Quality of the reasoning.* *Cok* relied on out-of-circuit authority involving different types of court-appointed actors – *Meyers v. Morris*, 810 F.2d 1437

(8th Cir. 1987) (guardian investigating specific allegations); *Ashbrook v. Hoffman*, 617 F.2d 474 (7th Cir. 1980) (commissioner executing court orders). It did not engage with the First Circuit's own holding in *Witte*, decided two years earlier, that marital masters do not independently determine cases. It did not consider *Richelson*, decided the same year, establishing that GAL recommendations are non-binding. And it did not undertake the *Butz*/*Cleavinger* independence inquiry – the analysis the Supreme Court requires before extending absolute immunity to non-Article III actors.

(c) *Workability.* The function-specific framework Plaintiff proposes – qualified immunity for investigation, witness immunity for testimony – is no less workable than *Cok*'s blanket rule and is consistent with the functional analysis courts already apply to every other category of government actor. *Cok*'s rule is the anomaly: it is the only context in which courts extend absolute immunity without first analyzing whether the officer's functions are actually judicial.

(d) *Effect on other areas of law.* Absolute immunity for GALs is in tension with the fiduciary duties GALs owe to the children they represent and the disclosure obligations they owe to the court. If a GAL is absolutely immune for all conduct connected to the appointment, there is no federal remedy for breach of the duties that justify the appointment. The doctrine immunizes the very obligations it was designed to protect.

(e) *Reliance interests.* GALs performing their functions in good faith would be fully protected under the correct framework. Qualified immunity shields good-faith investigation. Witness immunity shields testimony. The only protection removed is blanket absolute immunity for functions that are not judicial – and no legitimate reliance interest attaches to immunity for a function the officer does not perform.

241. **This argument is stated for purposes of preservation.** Plaintiff does not ask this Court to overrule *Cok* – only to note that the issue was raised so that it may be considered on further review. The doctrinal basis for reconsideration has strengthened since 1989: *Gibson v. Goldston* (2023) has sharpened the functional analysis *Cok* never performed; *Souza v. Souza* (2019) has confirmed, thirty-two years after *Richelson*, that a GAL's recommendation is advisory and non-presumptive; and the *Butz*/*Cleavinger* independence inquiry – which *Cok* had no occasion to consider because its facts presented no conflict between the GAL and the appointing judge – remains the Supreme Court's required framework for determining whether absolute immunity extends to non-judicial actors.

## B. Alternative Argument Under Existing Law: Concealment Is Not a Protected Function

242. Even if *Cok* controls and a Guardian ad Litem is treated as a quasi-judicial actor, quasi-judicial immunity does not protect conduct that subverts the

judicial process. *Cok* itself limits the doctrine to "activities integrally related to the judicial process." *Cok, 876 F.2d at 3*, citing *Briscoe v. LaHue, 460 U.S. 325, 335 (1983)*. Concealing a disqualifying personal relationship with the appointing judge – from the court, from the parties, and from the children the GAL was appointed to serve – is not a function integrally related to the judicial process. It is a breach of the fiduciary duty that justifies the appointment. An officer of the court who conceals a conflict of interest from the court is not performing an adjudicative function – she is undermining the process at its foundation.

243. *Cok* is also factually distinguishable. The *Cok* court found "no allegations of theft or personal profiteering" and characterized the claims as "dissatisfaction with the manner in which the [GAL] performed appointed duties." *Cok, 876 F.2d at 4*. Where, by contrast, a complaint alleges that a GAL derived financial benefit from an undisclosed personal relationship with the judge who approved the GAL's fees – and where the challenge is not to performance but to the concealment of a conflict that tainted the entire appointment – *Cok*'s reasoning does not reach the claim. The question is not whether this Court should overrule *Cok*, but whether *Cok* governs facts it never considered.

## XV. Qualified Immunity Standard

244. The defense of qualified immunity protects officials from liability for civil damages insofar as their conduct does not violate clearly established statutory

or constitutional rights. The standard is "objective legal reasonableness," assessed in light of the legal rules that were "clearly established" at the time the action was taken. *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19 (1982). In concrete application, this means that the relevant question is "the objective (albeit fact-specific) question whether a reasonable officer could have believed [the challenged action] to be lawful, in light of clearly established law and the information the [officials] possessed." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). The right to an impartial tribunal, free from undisclosed conflicts of interest, was clearly established no later than 2009 by *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009). All defendant-specific qualified immunity analysis is set forth in the Reasonable Inferences section.

## REASONABLE INFERENCES FROM FACTS AND LAW

245.    The facts set forth in ¶¶19–190 and the legal principles established in ¶¶191–244, taken together, compel the following inferences. The cumulative effect of the individual acts alleged in this complaint is a proceeding in which every self-correction mechanism of the New Hampshire judicial system failed – not once, but at every level. The trial court was compromised: Judge Julie Introcaso appointed her undisclosed personal friend, Kathleen Sternenberg, as Guardian ad Litem in at least nine cases (¶¶24–25), while Marital Master Bruce DalPra knew of the conflict "for seven years" (Exhibit 33, Page 61) and recommended Sternenberg's appointment in Plaintiff's case without disclosure (Exhibit 3). A reviewing judge, Mark Derby,

admitted his purpose was to "help out" the conflicted judge rather than to adjudicate the merits (Exhibit 24; Exhibit 32 – Derby's own confirmation under oath; ¶41). The administrative level was compromised: Administrative Judge David King received three separate written disclosures of judicial misconduct (Exhibits 6, 24, 30) and responded to each by concealing the information from affected litigants (¶¶57–58, 64, 97). A successor trial judge, Kevin Rauseo, connected to the conflict through his former firm, Hamblett & Kerrigan, then suppressed all evidence of the tainted record, quashed every subpoena, and dismissed the conflict objection as "not relevant" (Exhibit 43, Pages 40–41; ¶¶134, 145). The appellate level was compromised: Justice Anna Barbara Hantz Marconi committed criminal solicitation on June 6, 2024, and then falsely certified her impartiality thirty-two days later (Exhibits 45, 47; ¶¶159, 163), while Chief Justice Gordon MacDonald concurred in that certification knowing of grand jury subpoenas directed at the same justice (Exhibit 46, Page 16; ¶169). And the institutional safeguard was compromised: the Attorney General's Office blocked Plaintiff's access to evidence at the trial court level (¶¶129–130) while simultaneously investigating judicial misconduct at the appellate level (¶173), with the same General Counsel, Erin Creegan, shielded from deposition at one level (Exhibit 43; ¶136) and serving as counsel for the Chief Justice at another (Exhibit 46, Page 2; ¶168). At each level, the system could have self-corrected. At each level, it compounded the violation instead.

**A. The Trial Court Concealment Pattern**

246.    Defendant Introcaso knew of her disqualifying conflict with Defendant Sternenberg – she disclosed it herself, on the record, in May 2014 (Exhibit 1, Page 2, Lines 24–25: "Counsel should know that Attorney Sternenberg and I are very good friends. Very good friends.") and in writing to Defendant King in March 2018 (Exhibit 6). Yet she continued to approve Sternenberg's appointment across at least nine cases (Exhibit 43, Pages 33–34), continued to approve fee cap increases for Sternenberg (Exhibits 10, 13), and continued to sign orders in Plaintiff's case seventy-six days after her own "non-waivable" recusal (Exhibit 12; Exhibit 9). The reasonable inference is that Introcaso knew the conflict was disqualifying, declared it non-waivable when forced to, and disregarded that declaration whenever it suited her. As the appointing judge whose concealment launched the scheme, Introcaso's conduct exemplifies the inadequate-state-forum conditions described in ¶201: the trial court itself was incompetent by reason of bias to adjudicate the issues.

247.    Defendant DalPra knew of the Introcaso-Sternenberg conflict "for seven years" (Exhibit 33, Page 61). He recommended Sternenberg's appointment as GAL in Plaintiff's case (Exhibit 3) without disclosing this knowledge to Plaintiff. He presided over hearings where Sternenberg testified as the court-appointed advocate for the children while functioning as co-counsel for the mother – called as respondent's witness, not as a neutral court officer (Exhibit 4, Page 348, Line 10).

DalPra's own conduct at the November 6, 2020 hearing – whispering "Who gives a fuck?" about a father's testimony regarding his children (Exhibit 29, Page 33, Line 23), calling the minor children "a bunch of morons" (Exhibit 29, Page 80, Lines 19–20), and laughing when a father expressed concern his son was mentally ill (Exhibit 29, Page 67, Lines 6–7) – confirms predetermination, not adjudication. The reasonable inference is that DalPra's silence about the conflict was not an oversight – it was the condition on which the arrangement depended.

248. Defendant King received direct written notice of the Introcaso-Sternenberg conflict in March 2018 (Exhibit 6). He accepted Introcaso's false representation that Sternenberg's appointments were "party-requested" (Exhibit 6) – a claim she had first stated on the record four years earlier: "I don't appoint her to cases because I don't want anyone to think that I'm choosing a friend" (Exhibit 1, Page 3, Lines 19–20) – and a claim refuted by the appointment orders themselves, which show DalPra recommended and Introcaso approved (Exhibit 3). King never reassigned Introcaso's conflict docket; the consequence was visible 168 days after her recusal, when Introcaso admitted on the record that managing seven days a week of caseload was "not getting my job done" (Exhibit 17). He transmitted the Dempsey investigation report (Exhibit 24) without notifying the affected litigants. He received a further report of DalPra's misconduct in November 2020 (Exhibit 30) and responded with a private email rather than a referral to the Judicial Conduct Committee (Exhibit 40, Page 26, Lines 17–19: "Did you provide this email to the

Judicial Conduct Committee?" "No."). When questioned under oath about these failures, he characterized the misconduct as conduct he had "never seen before in my 30+ years as a judge" (Exhibit 40, Page 26, Lines 7–11), yet classified it as discretionary rather than mandatory under Rule 2.15 – after consulting the offender himself to decide how to report (Exhibit 40, Page 25, Lines 2–5). His deposition was subsequently redacted and withheld from Plaintiff (Exhibit 40). The reasonable inference is that King's role was not supervisory failure but **supervisory concealment** – he managed the information flow to prevent, not facilitate, accountability. His conduct falls within the category of non-judicial administrative acts described in ¶211: concealing reports of judicial misconduct from affected litigants is records management, not adjudication.

249.    Defendant Derby knew of the Introcaso-Sternenberg conflict at the time of his "de novo review" in *Campbell v. Partello* – a review he acknowledged was conducted to "help Judge Introcaso out" (Exhibit 11; Exhibit 24). He knew, or should have known, that the record underlying his June 30, 2019 order (Exhibit 15) and his January 27, 2020 Final Protective Order (Exhibit 23) was produced by a conflicted judge and a conflicted GAL. He did not disclose any of this to Plaintiff at the December 20, 2019 hearing (Exhibit 21). When confronted during the Dempsey investigation, he could "not say with 100% certainty that he did not white out the March 12, 2019 Orders" (Exhibit 28, Page 1). Derby's conduct exemplifies compensatory bias as described in ¶218: a judge who ratified a tainted record without

independent review camouflaged the structural defects of the proceedings rather than correcting them. Under *Bracy v. Gramley*, 520 U.S. 899 (1997), a court may infer that a judge ruled favorably in some cases to deflect attention from corruption in others. Derby's pattern – reviewing orders to "help out," rubber-stamping a one-word denial of a thirteen-page sworn motion documenting thirty-eight days of parenting time in eighteen months (Exhibit 15), and proactively contacting the investigator after public disclosure (Exhibit 28) – is consistent with compensatory bias. The reasonable inference is that Derby treated disclosure as someone else's problem while ratifying the tainted record as his own.

250.    The pattern across these four defendants is consistent: each knew of the Introcaso-Sternenberg conflict; each had an independent obligation to disclose it; none did. Plaintiff did not learn of the conflict until October 23, 2020, when a newspaper reported on Introcaso's misconduct (Exhibit 27) – more than four years after Sternenberg was appointed GAL in his case, and more than two years after King received written notice of the conflict (Exhibit 6, March 30, 2018). Under *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 883 (2009), due process requires recusal where the "probability of bias" is too high. The concealment of the conflict prevented Plaintiff from ever raising a *Caperton* challenge. This concealment is the throughline that transforms state court errors into federal injuries: a litigant who does not know of the conflicts tainting the proceedings cannot have raised those issues in the state

proceedings, and *Rooker-Feldman* does not bar claims that the plaintiff was prevented from raising by the very misconduct he now challenges **(¶208).**

**B. Sternenberg – Private Actor and Joint Conduct**

251. Defendant Sternenberg is a private attorney who maintained a contractual relationship with the parties in the cases in which she served as Guardian ad Litem. She is not an employee of the State of New Hampshire or any agency of the State. She has retained private defense counsel in this action at her own expense. Her defense is not funded by the State. By contrast, every other defendant in this action is a current or former employee of the State or its agencies, represented by state counsel and defended at state expense. This distinction is not incidental – it reflects the fundamental difference between a judicial officer exercising the power of the state and a private professional engaged by contract. The analysis of Sternenberg's immunity under the functional approach and the preservation of the argument that *Cok* was wrongly decided are set forth in ¶¶209–215 and ¶¶236–243.

252. Sternenberg and Judge Introcaso engaged in joint action to deprive Plaintiff and other litigants of the right to an impartial tribunal:

(a) Sternenberg and Introcaso maintained a close personal friendship beginning no later than 2012. On the record, Introcaso described Sternenberg as "very good friends" and "like godparent of my child" (Exhibit 1, Page 3,

Lines 5–6). Sternenberg confirmed: "Yeah, I think so" (Exhibit 1, Page 3, Line 4).

(b) Despite this conflict, Introcaso appointed or approved Sternenberg's appointment as GAL in at least nine separate family law cases between September 2013 and December 2018 (¶¶24–25). In eight of those nine cases, neither Introcaso nor Sternenberg disclosed the conflict to the parties or their counsel (¶29).

(c) The mutual concealment was knowing. Sternenberg knew she was on Introcaso's formal judicial conflict list (¶22; Exhibit 1, Page 3, Line 15). Introcaso represented on the record in the one case where partial disclosure occurred that "I don't appoint her to cases because I don't want anyone to think that I'm choosing a friend" (Exhibit 1, Page 3, Lines 18–20) – then appointed Sternenberg in eight subsequent cases without disclosure (¶28).

(d) The arrangement was mutually beneficial. Introcaso discussed "financial issues" with Sternenberg (Exhibit 1) and subsequently approved Sternenberg's requests to exceed fee caps (Exhibits 10, 13), generating revenue for Sternenberg from litigants whose cases were assigned by the conflicted judge. Sternenberg took vacations together with Introcaso, including trips to Niagara-on-the-Lake (¶23). This was not arm's-length professional interaction; it was a personal and financial relationship concealed from every party who appeared before the court.

(e) Even after Introcaso publicly disclosed the conflict by recusing from one case on March 15, 2019 (Exhibit 9), both continued to operate in concert. Seventy-six days after the recusal disclosure, Introcaso signed an order in *Albrecht v. Albrecht* based on a recommendation involving Sternenberg (Exhibit 12; ¶77). In *Loudermilk v. Montgomery*, Introcaso excused Sternenberg from the oath required of every other witness, publicly thanked her ("Nice report. I appreciate that." – Exhibit 16, Page 122, Lines 5–7), and approved her fee cap increase – all after the conflict was a matter of public record (Exhibits 10, 14, 16).

253.   This is the fact pattern *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980) contemplated: a private party and a state actor engaged in a sustained course of joint conduct – mutual concealment of a disqualifying conflict, mutual financial benefit, and coordinated action to maintain the arrangement across multiple cases and multiple years – that deprived litigants, including Plaintiff, of the constitutional right to an impartial tribunal. Sternenberg was not a passive recipient of court appointments; she was a knowing, willing participant in the very corruption that taints the proceedings. Under *Dennis*, she acted under color of state law and is subject to § 1983 liability. Even if *Cok v. Cosentino*, 876 F.2d 1 (1st Cir. 1989), controls, the joint-action theory does not depend on the characterization of the GAL's functions – it depends on the existence of a coordinated scheme of concealment with a judicial officer (¶228).

**C. The H&K / Rauseo Disqualification**

254.   Defendant Rauseo's disqualifying conflict runs through his former firm's client work. Hamblett & Kerrigan, P.A., through attorney Andrew Piela, represented Laura Montgomery in *Loudermilk v. Montgomery* – a case before Judge Introcaso with Sternenberg as GAL (Exhibit 16). In that case, Introcaso approved fee cap increases for Sternenberg, exempted Sternenberg from the oath, praised her work from the bench, and directed a fee structure that generated revenue from litigants (Exhibits 10, 14, 16). Piela's involvement in the *Loudermilk* case extended through January 2020 (Exhibit 22 – Piela on certificate of service). Rauseo personally served in *Ausiaikova v. Meckel*, another of the nine conflict cases, where Introcaso also approved Sternenberg's fee motion (Exhibit 13). Rauseo was president of H&K during this period (Exhibit 43, Pages 40–41). H&K's knowledge of the conflict was documented through two additional independent channels: Judge Introcaso emailed Piela directly about Sternenberg on November 29, 2018 (Exhibit 33, Dep. Ex. 19), and the JCC prosecutor contacted Piela specifically about the conflict on December 30, 2020, with a follow-up email on January 6, 2021 (Exhibit 35). The reasonable inference is that Rauseo, through his firm's direct participation in the Introcaso-Sternenberg fee arrangement and multiple independent channels of notice, knew or should have known of the very conflict he later dismissed as "not relevant."

- 111 -

255.    When Plaintiff raised the H&K conflict on the record at the November 15, 2023 hearing, identifying the specific cases and specific connections, Rauseo dismissed it without analysis (Exhibit 43, Pages 33–34, 40–41). He then quashed every subpoena Plaintiff had issued – including subpoenas directed at Sternenberg, King, Creegan, Waystack, Introcaso, Piela, and others who could have testified about the conflict and its concealment (Exhibit 43). He restricted the hearing to thirty minutes and denied all discovery. The reasonable inference is that Rauseo's total suppression of evidence at the November 15, 2023 hearing was not the exercise of judicial discretion – it was the elimination of every avenue through which his own conflict could be exposed.

256.    Rauseo had previously characterized Sternenberg as "no longer impartial" in a February 2019 filing (Exhibit 8). Yet in February 2023, he extended the domestic violence order against Plaintiff based on a record produced by that same GAL (Exhibit 42). The "Recommended" section of the standard form was blank; no marital master reviewed the case; Rauseo signed a judicial certification directly over a blank recommendation (Exhibit 42). Rauseo cannot claim he relied on the record in good faith when he is on record calling the author of that record biased. His prior knowledge poisons every order that incorporates that record by reference. The reasonable inference is that Rauseo recognized Sternenberg's partiality when it served his former firm's client, and disregarded it when disclosure would have threatened his own position.

- 112 -

**D. The Appellate Concealment Pattern**

257.    The concealment pattern that began at the trial court level replicated at the appellate level through Defendant Marconi and Defendant MacDonald. Marconi participated in at least five orders or panels involving Dana Albrecht's case or the underlying misconduct between September 2019 and November 2022 (Exhibits 18, 19, 35, 39, 41). Through these proceedings – which included two Introcaso disciplinary panels, an Introcaso disbarment, and a DalPra misconduct order that specifically named Dana Albrecht's case – Marconi was repeatedly proximate to the Albrecht matter and its underlying pattern of concealment. Her comprehensive knowledge of the background misconduct is established by these documented proceedings, which span more than three years.

258.    On June 6, 2024, Marconi engaged in criminal conduct directed at the Attorney General's Office – soliciting then-Governor Sununu to secure a governmental privilege to which she was not entitled regarding a criminal investigation (Exhibit 47, Page 5). Six days later, she issued an order in Plaintiff's appeal without any disqualification certification (Exhibit 44). Twenty-six days after that – thirty-two days after her crime – she certified that she was "not disqualified" (Exhibit 45, Page 2). The reasonable inference is that this certification was false when made. Her subjective knowledge of her own conduct is the disqualifying factor, not the eventual conviction. She knew what she had done. She certified anyway. The

conviction (Exhibit 47) confirmed what Marconi already knew. Under *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825 (1986), a single disqualified member of a multi-member tribunal requires vacatur regardless of whether that member's vote was decisive. Plaintiff preserved the disqualification issue by motion, which was denied (Exhibit 45, Page 2: "D.A.'s motion for 'clarification re; Justice Marconi' is denied.").

259.   Defendant MacDonald's conduct confirms the structural character of the appellate error described in ¶223. MacDonald learned of grand jury subpoenas related to the Marconi investigation in May 2024 – before Marconi's crime on June 6 and before both post-crime orders (Exhibit 46, Page 16: "at some point during the month of May she told me there are grand jury subpoenas being issued."). He nevertheless concurred in the July 8, 2024 panel order that contained Marconi's false certification (Exhibit 45). The reasonable inference is that MacDonald knew the certification was unreliable – he knew the Attorney General's Office was investigating the very justice who was certifying her own impartiality – and concurred anyway. Under *Williams v. Pennsylvania*, 579 U.S. 1, 8–9 (2016), a single prior role creates an impermissible risk of bias, and the passage of time does not relieve the duty to withdraw. *Id.*, 136 S. Ct. at 1907. MacDonald's overlapping roles are pervasive: he served as Attorney General when the Introcaso misconduct was referred for criminal investigation (Exhibit 26; ¶157), then sat as Chief Justice on the panel disposing of the DalPra misconduct in a proceeding that specifically named

Dana Albrecht (Exhibit 41; ¶156), then concurred in the order containing Marconi's false certification (Exhibit 45; ¶169). A single prior role suffices under *Williams*. MacDonald had three.

**E. Attorney General Structural Conflict**

260.    The Attorney General's Office of the State of New Hampshire occupied fundamentally conflicting positions across the proceedings affecting Plaintiff. At the trial court level, Deputy Attorney General Catherine Denny appeared at the November 15, 2023 hearing to quash subpoenas directed at Administrative Judge King and General Counsel Creegan – blocking Plaintiff's access to witnesses who could testify about the concealment of judicial misconduct (Exhibit 43). At the appellate level, the same office – through Senior Assistant Attorney General Geoffrey Fincham and Assistant Attorney General Dan Jimenez – investigated and prosecuted Justice Marconi for criminal conduct arising from the same pattern of judicial corruption (Exhibits 46, 47). The same prosecutors who appeared at the trial level subsequently conducted the criminal investigation of the appellate justice whose misconduct those subpoenas could have revealed. Defendant Creegan is the connecting node: the Attorney General's Office intervened specifically to shield Creegan from deposition at the November 15, 2023 hearing (Exhibit 43; ¶136), and Creegan later appeared as counsel for Chief Justice MacDonald during his August 2, 2024 interview with the same DOJ investigators who prosecuted Marconi (Exhibit

46, Page 2: "Erin Creegan, General Counsel for the Judicial Branch, appearing on behalf of the Chief Justice"). The same individual was shielded from testifying about judicial branch concealment at the trial level and then served as counsel for the Chief Justice at the appellate level.

261.    This structural conflict deprived Plaintiff of any confidence that the appellate process was untainted. The Attorney General's Office cannot simultaneously shield witnesses from testifying about concealment of judicial misconduct at the trial level and serve as the independent investigator and prosecutor of judicial misconduct at the appellate level. These roles are irreconcilable. A single office cannot be both the guardian of institutional secrecy and the vindicator of judicial integrity. The conflict is structural, not personal – it would exist regardless of which individual attorneys staffed each role. It is precisely the kind of systemic failure that justifies federal intervention under *Gibson v. Berryhill*, 411 U.S. 564, 577 (1973), and the inadequate-state-forum exception set forth at ¶¶200–202. The structural conflict is compounded by the financial and institutional interests at stake: the Attorney General's Office, by intervening to shield King and Creegan from deposition, was protecting sitting Judicial Branch officials from having to testify about their response to documented misconduct, while simultaneously prosecuting a sitting Supreme Court justice whose misconduct was connected to the same pattern. These competing institutional loyalties are

precisely the conditions under which state proceedings cease to provide an adequate forum for the vindication of federal constitutional rights.

## F. Neither Judicial Immunity Nor Qualified Immunity Protects Defendants

262.   Defendant Derby is not entitled to judicial immunity for his conduct in this matter. Under the functional analysis set forth in ¶¶209–211, judicial immunity protects acts performed in a judicial capacity – not administrative assistance to a colleague under investigation. Derby's "de novo review" was conducted to "help Judge Introcaso out" (Exhibit 24), not to independently adjudicate the merits. He testified that the review had no formal basis and that he was not sitting as an appellate court (Exhibit 32). Derby was interviewed by the General Counsel investigating the conflict in January 2020 – six days before he issued the Order on Post-Trial Motions against Plaintiff (Exhibit 23; Exhibit 28). He could "not say with 100% certainty" that he had not tampered with court orders (Exhibit 28, Page 1). Reviewing orders to shield a colleague from accountability, while knowing the underlying record was tainted and while the investigator was actively questioning his own conduct, is administrative self-protection – not adjudication. It falls outside the scope of judicial immunity under *Forrester v. White*, 484 U.S. 219, 229 (1988), and the functional independence inquiry of *Butz v. Economou*, 438 U.S. 478, 512 (1978), and *Cleavinger v. Saxner*, 474 U.S. 193, 202 (1985). To the extent Derby raises qualified immunity for his individual-capacity conduct (Count 44), the right to

an impartial tribunal was clearly established no later than *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009), and no reasonable official in Derby's position – knowing what he knew – could have believed his conduct was constitutionally permissible.

263.   Defendant Rauseo is not entitled to judicial immunity for his conduct at the November 15, 2023 hearing or his extensions of the domestic violence order. Judicial immunity protects the exercise of judicial discretion; it does not protect a judge who presides over a matter from which he should be disqualified and who uses procedural authority to suppress evidence of his own conflict. Rauseo knew that his former firm, Hamblett & Kerrigan, had represented a party before Judge Introcaso with Sternenberg as GAL (Exhibit 16); that his former partner Andrew Piela had witnessed the Introcaso-Sternenberg dynamic firsthand and objected to it as "a complete … violation of my client's due process rights" (Exhibit 14, Page 35); and that he had himself called Sternenberg "no longer impartial" (Exhibit 8). When Plaintiff raised the H&K conflict on the record, Rauseo dismissed it as "not relevant" without analysis, quashed every subpoena, restricted the hearing scope, and limited the continuation to thirty minutes (Exhibit 43, Pages 40–41). The totality of Rauseo's rulings – each of which individually might appear to be an exercise of judicial discretion – operated collectively to eliminate every avenue through which his own disqualifying conflict could be exposed. That pattern transforms what might otherwise be protected discretionary acts into acts of self-interested concealment

that fall outside the scope of judicial immunity under the functional analysis set forth in ¶¶209–211. Rauseo's extension of the domestic violence order on February 24, 2023 (Exhibit 42) was likewise compromised by his personal knowledge of the tainted record: he extended the order without a hearing, without a finding of a discrete act of domestic violence, based on a record produced by a GAL he had personally called biased.

264.    Defendant King is not entitled to judicial immunity for his conduct in this matter. Although King held the title of Administrative Judge, the conduct at issue – receiving reports of misconduct (Exhibits 6, 24, 30), deciding whether to notify affected litigants, managing the flow of information about judicial conflicts, and directing the institutional response to documented corruption – was administrative and executive in nature, not adjudicative. King was not resolving disputes between parties; he was managing the court system's response to its own officers' misconduct. These are precisely the executive functions that *Gibson v. Berryhill*, 411 U.S. 564, 577 (1973), recognized fall outside the protection of judicial immunity, and that the functional analysis in ¶¶209–211 addresses. Because judicial immunity does not attach to King's administrative conduct, only qualified immunity applies – and King fails that standard as well. A judicial administrator who receives direct written notice that a judge has appointed her undisclosed personal friend as GAL in multiple cases (Exhibit 6), who receives an investigation report documenting that the same judge rubber-stamped orders and another judge sought to "help out"

rather than adjudicate (Exhibit 24), and who receives a further report of judicial misconduct in a specific litigant's hearing (Exhibit 30) – and who responds to each of these by concealing the information from affected parties, consulting the offender before deciding how to report (Exhibit 40, Page 25, Lines 2–5), and maintaining a "low key" approach to misconduct (Exhibit 40, Page 27, Lines 11–15) – acts without any arguable basis for believing such concealment is constitutionally permissible. King's deposition – in which he was questioned under oath about these administrative decisions – was subsequently redacted and withheld from Plaintiff (Exhibit 40). The reasonable inference is that the deposition contains testimony that would further undermine any claim to good-faith administrative discretion. King cannot simultaneously claim that his concealment decisions were reasonable and shield from Plaintiff the sworn testimony in which those decisions were examined.

265.   Defendant MacDonald is not shielded by judicial immunity for his concurrence in the July 8, 2024 panel order (Exhibit 45). MacDonald confirmed during his August 2, 2024 interview that Justice Marconi had told him about grand jury subpoenas "at some point during the month of May" 2024 (Exhibit 46, Page 16). This was before Marconi's criminal conduct on June 6, 2024, before the June 12 single-justice order (Exhibit 44), and before the July 8 panel order containing Marconi's false certification (Exhibit 45). A Chief Justice who concurs in an order containing a self-certification of impartiality by a justice he knows to be under criminal investigation is not exercising independent judicial discretion – he is

ratifying a known procedural defect. Under *Williams v. Pennsylvania*, 579 U.S. 1, 8–9 (2016), a single prior role creates an impermissible risk of bias, and the passage of time does not relieve the duty to withdraw. MacDonald's overlapping roles are pervasive: he served as Attorney General when the Introcaso misconduct was referred for criminal investigation (Exhibit 26; ¶157), then sat as Chief Justice on the panel disposing of the DalPra misconduct in a proceeding that specifically named Dana Albrecht (Exhibit 41; ¶156), then concurred in the order containing Marconi's false certification (Exhibit 45; ¶169). A single prior role suffices under *Williams*. MacDonald had three. Moreover, Plaintiff's claims against MacDonald seek prospective injunctive relief under *Ex parte Young*, 209 U.S. 123 (1908), for which judicial immunity does not apply.

**G. Ongoing Violations and Harm**

266.    The domestic violence restraining order against Dana Albrecht remains in effect until 2028 (Exhibit 23). The order traces to findings made by a GAL who functioned as co-counsel for the mother (Exhibit 4) under appointment from a judge with an undisclosed disqualifying conflict (Exhibit 3), ratified by a master who knew of the conflict for seven years (Exhibit 33), extended by judges relying on a record they knew or should have known was tainted (Exhibits 15, 31, 42), and reviewed at the appellate level by a panel that included a convicted justice (Exhibit 47). The magnitude of the deprivation is measured from the status quo ante: Dana Albrecht

had joint custody of his children prior to the conflict-tainted proceedings (Exhibit 2). The order is not merely historical – it restricts Plaintiff's liberty today. As the legal principles set forth in ¶226 establish, a nominally civil protective order may carry consequences that are prohibitory and stigmatizing in ways that rival or exceed criminal sanctions. The order against Plaintiff restricts his physical movement, prohibiting him from coming within 2,000 feet of a Massachusetts church "at all times" (Exhibit 23); limits his parental rights; brands him with the stigma of a domestic violence finding; and operates without any temporal limitation short of 2028. His three children were relocated across the country based on the conflicted GAL's recommendation (Exhibit 5). Where such severe, ongoing restrictions rest on constitutionally defective proceedings, the case for prospective federal relief under *Ex parte Young* is at its strongest (¶¶225–226).

267.    Plaintiff still does not have the full, unredacted deposition of Defendant King (Exhibit 40). The existing excerpt – six pages of testimony, redacted by agreement of counsel in a proceeding to which Plaintiff was not a party – has been described as "totally redacted" and "not in the public domain at all" (Exhibit 43, Page 33). Every effort to obtain the full deposition has been blocked: requests to the Judicial Branch General Counsel's office were denied, Rauseo quashed the subpoena (Exhibit 43), and the Attorney General's Office intervened to shield the deponent (Exhibit 43). The concealment of this deposition is ongoing. The current General Counsel of the Judicial Branch, Defendant Jessica King, has the present authority

and obligation to produce the deposition (¶15). Under *Ex parte Young*, 209 U.S. 123 (1908), prospective injunctive relief lies against state officials for ongoing violations of federal law. The continued withholding of King's deposition is not a past injury – it is a present deprivation.

268.   If Katherine Albrecht seeks to extend the domestic violence order beyond 2028, the extension request will be adjudicated by the same court system in which: the underlying record was produced by conflicted and compromised judicial officers; the supervising administrative judge's deposition has been withheld; the Attorney General's Office has intervened to block accountability; and no judicial officer involved has been recused. Absent the relief sought in this complaint, the same tainted system will adjudicate the same tainted order. The need for prospective structural relief – an untainted tribunal for any future proceedings affecting Plaintiff – is not speculative; it is a certainty given the order's 2028 expiration and the realistic possibility of a further extension request.

269.   Defendant Derby's voluntary attendance at a religious service on December 7, 2025 (Exhibit 48) – where he was seated in the same row as Plaintiff – is categorically not a judicial act. Church attendance cannot be characterized as adjudication, regardless of who else is present. Derby was acting in his personal capacity, not his judicial capacity. This conduct falls entirely outside the scope of judicial immunity under the functional analysis in ¶¶209–211. Derby's presence at this service, in close physical proximity to Plaintiff – while Plaintiff remains subject

to restrictions imposed by Derby's own order, including a prohibition from coming within 2,000 feet of a Massachusetts church "at all times" to protect a person who resides in Michigan (Exhibit 23) – demonstrates either: **(a)** deliberate intimidation designed to chill Plaintiff's exercise of his First Amendment rights to religious worship and freedom of association; or **(b)** Derby's own recognition that the restrictions he imposed are pretextual and unnecessary for anyone's safety. If Derby believed his own findings that Plaintiff poses a "credible threat," he would not have voluntarily placed himself in the same church pew. Either conclusion supports federal intervention. Plaintiff's attendance was at the invitation of State Representative and Canon Mark A. Pearson (Exhibit 48), not self-initiated.

**H. Statute of Limitations – Concealment Timeline Applied**

270.    Each category of constitutional injury was concealed by the defendants responsible for it, and each was discovered at a different time:

(a) The Introcaso-Sternenberg conflict was not disclosed to Plaintiff at any point during the underlying proceedings. Defendant King knew of the conflict no later than March 30, 2018 (Exhibit 6) and received the full Dempsey Investigation Report documenting the rubber-stamping and "helping out" (Exhibit 24) but never notified affected litigants. Plaintiff first learned of the conflict on October 23, 2020 (Exhibit 27). The three-year limitations period for claims arising from the conflict itself began no earlier than that date.

(b) The DalPra misconduct was known to Defendant King no later than November 13, 2020 (Exhibit 30), but the eScribers report and King's responsive email were not disclosed to Plaintiff. The concealment of the DalPra "hot mic" recording – and King's decision to address it internally rather than notify affected litigants – constitutes independent concealment supporting tolling.

(c) The Marconi criminal conduct (June 6, 2024) and false certification (July 8, 2024, Exhibit 45) occurred after the filing of this federal action and could not have been known to Plaintiff beforehand. Claims arising from the Marconi and MacDonald conduct accrued no earlier than the dates of those orders.

(d) Chief Justice MacDonald's knowledge of grand jury subpoenas in May 2024 – before both post-crime Marconi orders – was not available to Plaintiff until January 2025, when the MacDonald interview transcript (Exhibit 46) was obtained. The three-year limitations period for claims arising from MacDonald's concurrence with knowledge of the investigation began no earlier than January 2025.

(e) The full King deposition remains withheld as of the date of this filing. The limitations period for claims dependent on evidence that remains actively concealed has not yet begun to run.

271. Defendants cannot invoke the statute of limitations as a defense to claims arising from a scheme of concealment that they themselves perpetuated.

Under the discovery rule and concealment tolling principles set forth in ¶231, Plaintiff's claims are timely. Each new revelation – the Union Leader report (October 2020, Exhibit 27), the November 2023 hearing disclosures (Exhibit 43), the Marconi conviction (Exhibit 47), the MacDonald interview (Exhibit 46, January 2025) – exposed a new dimension of the constitutional injury and restarted the limitations period for the newly discovered conduct. The four-element framework for equitable estoppel set forth in *Kierstead v. State Farm Fire & Casualty Co.*, 160 N.H. 87, 7 A.3d at 1277 (2010), maps directly onto these facts: defendants concealed material facts (the conflict, the investigation reports, the King deposition) with knowledge of those facts; Plaintiff was ignorant of the truth; the concealment was intentional, not negligent; and Plaintiff was induced to rely on the integrity of the proceedings to his injury. Moreover, Plaintiff's diligence in pursuing the concealed information – subpoenaing nine witnesses (Exhibit 43), seeking the King deposition, demanding disclosure of the conflict in open court – demonstrates the absence of any laches defense. It was the defendants, not Plaintiff, who delayed the reckoning.

## I. Chain of Causation

272.   The harms suffered by Plaintiff flow directly from the concealment of the Introcaso-Sternenberg conflict and the subsequent failures to disclose, investigate, or remedy the tainted proceedings:

(a) But for the concealment of the conflict, Plaintiff would have moved to disqualify GAL Sternenberg before she testified at the August 2017 hearing. The conflict was known (Exhibit 1 – on-the-record confirmation in 2014) and the concealment was effectuated at the moment of appointment (Exhibit 3 – no disclosure on the appointment form).

(b) But for Sternenberg's conflicted testimony (Exhibit 4 – called as respondent's witness, not as a neutral court officer, recommending immediate relocation), the relocation recommendation would not have been made on terms favorable to Katherine Albrecht. The consequence is documented: a father calling police from three thousand miles away because his children have not been in school for three days (Exhibit 20).

(c) But for the relocation recommendation, Plaintiff's three children would not have been permanently removed to California. The relocation order provided for immediate removal with no stay pending appeal (Exhibit 5). The children were relocated to California (Exhibit 20 – welfare check documenting school absence and "full custody" invocation), then to Michigan without notice (Exhibit 25; Exhibit 37 – opposing counsel confirmed a two-and-a-half-year gap in contact since Christmas 2018). The deprivation began from a baseline of joint custody (Exhibit 2).

(d) But for the tainted record created by the conflicted GAL and the complicit Master, the subsequent orders would not have been issued. The tainted record

was preserved by denying reconsideration with a single handwritten word (Exhibit 15), weaponized in the DV proceeding when Plaintiff was cross-examined on findings from conflict-tainted orders (Exhibit 21), and documented in its fullest expression at the November 6, 2020 hearing where the presiding Master called the children "a bunch of morons" and responded to a father's testimony about his family with "who gives a fuck" (Exhibit 29). The mechanism by which the tainted record was created – a "signing pile" infrastructure in which orders were approved "as a matter of routine" – is documented in Derby's own testimony (Exhibit 32).

(e) But for Judge Introcaso's continued signing of orders seventy-six days after her recusal, the May 30, 2019 order (Exhibit 12) would not exist in its current form.

(f) But for Judge Derby's ratification of that order – conducted to "help out" his colleague rather than to adjudicate the merits (Exhibit 32 – Derby's own confirmation under oath) – the findings would have been subject to independent review. Derby ratified the tainted record in Plaintiff's own case by approving DalPra's one-word denial of a thirteen-page sworn motion (Exhibit 15), and then weaponized it through the "evasive" characterization in his January 2020 DV order (Exhibit 23).

(g) But for Judge King's concealment of both the conflict and the DalPra misconduct, Plaintiff could have challenged the tainted record before it was used to extend the domestic violence order.

(h) But for Judge Rauseo's extension of the DV order based on a record he knew to be tainted by a GAL he had personally called "no longer impartial" (Exhibit 8), the restraining order would have expired. Rauseo extended the order without a hearing, without a finding of a discrete act of domestic violence, and by signing a judicial certification directly over a blank recommendation (Exhibit 42).

(i) But for Judge Rauseo's total suppression of evidence at the November 15, 2023 hearing – in a case involving parties connected to his former firm – the conflicts would have been aired in open court. Every subpoena was quashed, every witness excluded, all discovery denied, and the hearing scope restricted to "current conditions" only (Exhibit 43).

(j) But for Justice Marconi's false certification that she was "not disqualified," Plaintiff's appeal would have been adjudicated by an untainted panel.

(k) But for Chief Justice MacDonald's concurrence in that false certification – with prior knowledge of the grand jury investigation – the panel order would not carry the imprimatur of the full court.

273.   Each link in this chain represents a point at which disclosure would have broken the cycle. At each point, the responsible defendant chose concealment. Under

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), the risk of erroneous deprivation was not merely elevated – it was guaranteed by a system in which every safeguard designed to catch error was itself compromised by the officers responsible for applying it. The structural character of this failure, as established under *Chambers v. Mississippi*, 410 U.S. 284, 290 n.3 (1973), and *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991), confirms that the constitutional violation is not any single act but the cumulative destruction of the framework within which Plaintiff's case was adjudicated. There is no untainted baseline against which to measure what would have happened, because the taint pervaded every level of the adjudicative chain.

## CAUSES OF ACTION

### COUNT ONE

*Counts 1, 2, 7, 8, 11, 12, and 40 are restated from the original Complaint filed August 4, 2023, solely for purposes of preservation.*

274.    Plaintiff repeats and re-alleges ¶¶1–273 stated above.

275.    Defendant Sternenberg had a duty to disclose her relationship with Defendant Introcaso to Plaintiff at the time of her appointment as *Guardian ad Litem* (GAL), but failed to do so.

276.    By failing to do so, Defendant Sternenberg violated Plaintiff's procedural due process rights under the Fourteenth Amendment.

## COUNT TWO

277.   Plaintiff repeats and re-alleges ¶¶1−276 stated above.

278.   Defendant Sternenberg had a duty to disclose her relationship with Defendant Introcaso to Plaintiff at the time of her appointment as *Guardian ad Litem* (GAL), but failed to do so.

279.   By failing to do so, Defendant Sternenberg violated Plaintiff's substantive due process rights under the Fourteenth Amendment.

## COUNT THREE

280.   Plaintiff repeats and re-alleges ¶¶1−279 stated above.

281.   Defendant DalPra had a duty to disclose the relationship between Defendant Sternenberg and Defendant Introcaso at the time of Sternenberg's appointment as *Guardian ad Litem* (GAL), but failed to do so.

282.   By failing to do so, Defendant DalPra violated Plaintiff's procedural due process rights under the Fourteenth Amendment.

## COUNT FOUR

283.   Plaintiff repeats and re-alleges ¶¶1−282 stated above.

284.   Defendant DalPra had a duty to disclose the relationship between Defendant Sternenberg and Defendant Introcaso at the time of Sternenberg's appointment as *Guardian ad Litem* (GAL), but failed to do so.

- 131 -

285.   By failing to do so, Defendant DalPra violated Plaintiff's substantive due process rights under the Fourteenth Amendment.

## COUNT FIVE

286.   Plaintiff repeats and re-alleges ¶¶1−285 stated above.

287.   Defendant Introcaso had a duty to disclose her relationship with Defendant Sternenberg to Plaintiff at the time of Sternenberg's appointment as *Guardian ad Litem* (GAL), but failed to do so.

288.   By failing to do so, Defendant Introcaso violated Plaintiff's procedural due process rights under the Fourteenth Amendment.

## COUNT SIX

289.   Plaintiff repeats and re-alleges ¶¶1−288 stated above.

290.   Defendant Introcaso had a duty to disclose her relationship with Defendant Sternenberg to Plaintiff at the time of Sternenberg's appointment as *Guardian ad Litem* (GAL), but failed to do so.

291.   By failing to do so, Defendant Introcaso violated Plaintiff's substantive due process rights under the Fourteenth Amendment.

## COUNT SEVEN

292.   Plaintiff repeats and re-alleges ¶¶1−291 stated above.

293. Defendant Sternenberg had a duty to disclose her relationship with Defendant Introcaso to Plaintiff at the time of the August 9, 2017 hearing, but failed to do so.

294. By failing to do so, Defendant Sternenberg violated Plaintiff's procedural due process rights under the Fourteenth Amendment.

## COUNT EIGHT

295. Plaintiff repeats and re-alleges ¶¶1−294 stated above.

296. Defendant Sternenberg had a duty to disclose her relationship with Defendant Introcaso to Plaintiff at the time of the August 9, 2017 hearing, but failed to do so.

297. By failing to do so, Defendant Sternenberg violated Plaintiff's substantive due process rights under the Fourteenth Amendment.

## COUNT NINE

298. Plaintiff repeats and re-alleges ¶¶1−297 stated above.

299. Defendant DalPra had a duty to disclose the relationship between Defendant Sternenberg and Defendant Introcaso at the time of the August 9, 2017 hearing, but failed to do so.

300. By failing to do so, Defendant DalPra violated Plaintiff's procedural due process rights under the Fourteenth Amendment.

## COUNT TEN

301.    Plaintiff repeats and re-alleges ¶¶1−300 stated above.

302.    Defendant DalPra had a duty to disclose the relationship between Defendant Sternenberg and Defendant Introcaso at the time of the August 9, 2017 hearing, but failed to do so.

303.    By failing to do so, Defendant DalPra violated Plaintiff's substantive due process rights under the Fourteenth Amendment.

## COUNT ELEVEN

304.    Plaintiff repeats and re-alleges ¶¶1−303 stated above.

305.    Defendant Sternenberg had a duty to disclose her relationship with Defendant Introcaso to Plaintiff before the May 9, 2019 hearing, but failed to do so.

306.    By failing to do so, Defendant Sternenberg violated Plaintiff's procedural due process rights under the Fourteenth Amendment.

## COUNT TWELVE

307.    Plaintiff repeats and re-alleges ¶¶1−306 stated above.

308.    Defendant Sternenberg had a duty to disclose her relationship with Defendant Introcaso to Plaintiff before the May 9, 2019 hearing, but failed to do so.

309.    By failing to do so, Defendant Sternenberg violated Plaintiff's substantive due process rights under the Fourteenth Amendment.

## COUNT THIRTEEN

310.  Plaintiff repeats and re-alleges ¶¶1−309 stated above.

311.  Defendant DalPra had a duty to disclose the relationship between Defendant Sternenberg and Defendant Introcaso during the May 9, 2019 hearing, but failed to do so.

312.  By failing to do so, Defendant DalPra violated Plaintiff's procedural due process rights under the Fourteenth Amendment.

## COUNT FOURTEEN

313.  Plaintiff repeats and re-alleges ¶¶1−312 stated above.

314.  Defendant DalPra had a duty to disclose the relationship between Defendant Sternenberg and Defendant Introcaso during the May 9, 2019 hearing, but failed to do so.

315.  By failing to do so, Defendant DalPra violated Plaintiff's substantive due process rights under the Fourteenth Amendment.

## COUNT FIFTEEN

316.  Plaintiff repeats and re-alleges ¶¶1−315 stated above.

317.  Defendant DalPra had a duty to disclose the relationship between Defendant Sternenberg and Defendant Introcaso prior to issuing his May 30, 2019 recommendation, but failed to do so.

318.    By failing to do so, Defendant DalPra violated Plaintiff's procedural

due process rights under the Fourteenth Amendment.

## COUNT SIXTEEN

319.    Plaintiff repeats and re-alleges ¶¶1−318 stated above.

320.    Defendant DalPra had a duty to disclose the relationship between

Defendant Sternenberg and Defendant Introcaso prior to issuing his May 30, 2019

recommendation, but failed to do so.

321.    By failing to do so, Defendant DalPra violated Plaintiff's substantive

due process rights under the Fourteenth Amendment.

## COUNT SEVENTEEN

322.    Plaintiff repeats and re-alleges ¶¶1−321 stated above.

323.    Defendant Introcaso had a duty to disclose her relationship with

Defendant Sternenberg prior to issuing her May 30, 2019 order, but failed to do so.

324.    By failing to do so, Defendant Introcaso violated Plaintiff's procedural

due process rights under the Fourteenth Amendment.

## COUNT EIGHTEEN

325.    Plaintiff repeats and re-alleges ¶¶1−324 stated above.

326.  Defendant Introcaso had a duty to disclose her relationship with Defendant Sternenberg prior to issuing her May 30, 2019 order, but failed to do so.

327.  By failing to do so, Defendant Introcaso violated Plaintiff's substantive due process rights under the Fourteenth Amendment.

## COUNT NINETEEN

328.  Plaintiff repeats and re-alleges ¶¶1−327 stated above.

329.  Defendant DalPra had a duty to disclose the relationship between Defendant Sternenberg and Defendant Introcaso prior to issuing his June 28, 2019 recommendation, but failed to do so.

330.  By failing to do so, Defendant DalPra violated Plaintiff's procedural due process rights under the Fourteenth Amendment.

## COUNT TWENTY

331.  Plaintiff repeats and re-alleges ¶¶1−330 stated above.

332.  Defendant DalPra had a duty to disclose the relationship between Defendant Sternenberg and Defendant Introcaso prior to issuing his June 28, 2019 recommendation, but failed to do so.

333.  By failing to do so, Defendant DalPra violated Plaintiff's substantive due process rights under the Fourteenth Amendment.

## COUNT TWENTY ONE

334.   Plaintiff repeats and re-alleges ¶¶1–333 stated above.

335.   Defendant Derby had a duty to disclose the relationship between Defendant Sternenberg and Defendant Introcaso prior to issuing his June 30, 2019 order, but failed to do so.

336.   By failing to do so, Defendant Derby violated Plaintiff's procedural due process rights under the Fourteenth Amendment.

## COUNT TWENTY TWO

337.   Plaintiff repeats and re-alleges ¶¶1–336 stated above.

338.   Defendant Derby had a duty to disclose the relationship between Defendant Sternenberg and Defendant Introcaso prior to issuing his June 30, 2019 order, but failed to do so.

339.   By failing to do so, Defendant Derby violated Plaintiff's substantive due process rights under the Fourteenth Amendment.

## COUNT TWENTY THREE

340.   Plaintiff repeats and re-alleges ¶¶1–339 stated above.

341.   Under the UCCJEA, NH Rev Stat § 458-A:35 (2021) provides a right of appeal of an order on the enforcement of a parenting plan.

342.   Under the UCCJEA, NH Rev Stat § 458-A:39 (2021) provides that in applying and construing the UCCJEA, "consideration must be given to the need to

promote uniformity of the law with respect to its subject matter among states that enact it."

343.    "Under federal due process, the question of whether an appeal provided in the State system is one of right or of discretion is a federal question." *State v. Cooper*, 127 N.H. 119, 129 (1985), citing *Evitts v. Lucey*, 469 U.S. 387 (1985).

344.    By denying certiorari for review of Defendant Introcaso's May 30, 2019 Order and Defendant Derby's June 30, 2019 Order, the New Hampshire Judicial Branch violated Plaintiff's procedural due process rights.

### COUNT TWENTY FOUR

345.    Plaintiff repeats and re-alleges ¶¶1–344 stated above.

346.    By denying certiorari for review of Defendant Introcaso's May 30, 2019 Order and Defendant Derby's June 30, 2019 Order, the New Hampshire Judicial Branch violated Plaintiff's substantive due process rights.

### COUNT TWENTY FIVE

347.    Plaintiff repeats and re-alleges ¶¶1–346 stated above.

348.    Defendant Derby had a duty to tell Plaintiff what Defendant Derby knew about Defendant Introcaso and Defendant Sternenberg at the December 20, 2019 hearing.

349.   Defendant Derby did not inform Plaintiff about the conflict between Defendant Introcaso and Defendant Sternenberg at the December 20, 2019 hearing.

350.   Consequently, Defendant Derby violated Plaintiff's procedural due process rights.

## COUNT TWENTY SIX

351.   Plaintiff repeats and re-alleges ¶¶1–350 stated above.

352.   Defendant Derby did not inform Plaintiff about the conflict between Defendant Introcaso and Defendant Sternenberg at the December 20, 2019 hearing.

353.   Consequently, Defendant Derby violated Plaintiff's substantive due process rights.

## COUNT TWENTY SEVEN

354.   Plaintiff repeats and re-alleges ¶¶1–353 stated above.

355.   On October 23, 2020, Plaintiff learned for the very first time about the conflict between Defendant Sternenberg and Defendant Introcaso.

356.   Defendant King had been aware of the conflict between Defendant Sternenberg and Defendant Introcaso since at least March 30, 2018.

357.   Defendant King's failure to disclose this information to Plaintiff prior to Plaintiff learning about it by reading a newspaper article was a violation of Plaintiff's procedural due process rights.

## COUNT TWENTY EIGHT

358.    Plaintiff repeats and re-alleges ¶¶1–357 stated above.

359.    Defendant King's failure to disclose information to Plaintiff about the conflict between Defendant Sternenberg and Defendant Introcaso prior to Plaintiff learning about it by reading a newspaper article was a violation of Plaintiff's substantive due process rights.

## COUNT TWENTY NINE

360.    Plaintiff repeats and re-alleges ¶¶1–359 stated above.

361.    As Mary Ann Dempsey's October 26, 2020 correspondence makes clear, Defendant Derby informed Mary Ann Dempsey that Defendant Derby was not completely positive Defendant Derby did not white out court orders.

362.    By not informing Plaintiff of this information prior to Plaintiff appearing before Defendant Derby at trial, the New Hampshire Judicial Branch violated Plaintiff's procedural due process rights.

## COUNT THIRTY

363.    Plaintiff repeats and re-alleges ¶¶1–362 stated above.

364.    By not informing Plaintiff that Defendant Derby was not completely positive Defendant Derby did not white out court orders prior to Plaintiff appearing

before Defendant Derby at trial, the New Hampshire Judicial Branch violated Plaintiff's substantive due process rights.

## COUNT THIRTY ONE

365.   Plaintiff repeats and re-alleges ¶¶1−364 stated above.

366.   At the November 6, 2020 hearing, Master DalPra stated "who gives a fuck." (Exhibit 29, Page 33, Line 23).

367.   Defendant DalPra's conduct at the November 6, 2020 hearing violated Plaintiff's procedural due process rights.

## COUNT THIRTY TWO

368.   Plaintiff repeats and re-alleges ¶¶1−367 stated above.

369.   Defendant DalPra's conduct at the November 6, 2020 hearing also violated Plaintiff's substantive due process rights.

## COUNT THIRTY THREE

370.   Plaintiff repeats and re-alleges ¶¶1−369 stated above.

371.   On November 13, 2020, Defendant King sent an email to Defendant DalPra regarding misconduct at the November 6, 2020 hearing.

372.   Defendant King did not notify Plaintiff of the contents of Defendant King's email.

373.  By not notifying Plaintiff about the content or nature of Defendant King's November 13, 2020 email, Defendant King violated Plaintiff's procedural due process rights.

## COUNT THIRTY FOUR

374.  Plaintiff repeats and re-alleges ¶¶1−373 stated above.

375.  By not notifying Plaintiff about the content or nature of Defendant King's November 13, 2020 email, Defendant King violated Plaintiff's substantive due process rights.

## COUNT THIRTY FIVE

376.  Plaintiff repeats and re-alleges ¶¶1−375 stated above.

377.  On May 28, 2021, Plaintiff requested that the New Hampshire Judicial Branch (NHJB) produce depositions directly related to, and discussing, Plaintiff's case.

378.  The NHJB refused to produce the depositions.

379.  By refusing to produce the depositions, the NHJB violated Plaintiff's procedural due process rights.

## COUNT THIRTY SIX

380.  Plaintiff repeats and re-alleges ¶¶1−379 stated above.

381.   The NHJB refused to produce depositions directly related to, and discussing, Plaintiff's case.

382.   By refusing to produce the depositions, the NHJB violated Plaintiff's substantive due process rights.

## COUNT THIRTY SEVEN

383.   Plaintiff repeats and re-alleges ¶¶1–382 stated above.

384.   In Defendant King's August 26, 2022 deposition, Defendant King stated he told the New Hampshire Judicial Conduct Committee what he "had found regarding the transcript in the Albrecht case."

385.   However, Defendant King did not tell Plaintiff what he "had found regarding the transcript in the Albrecht case."

386.   Because Defendant King did not notify Plaintiff what he told the New Hampshire Judicial Conduct Committee regarding the transcript in the Albrecht case, Defendant King violated Plaintiff's procedural due process rights.

## COUNT THIRTY EIGHT

*[Intentionally Omitted]*

387.   This Count is intentionally omitted. In the original Complaint filed on August 4, 2023, the numbering of causes of action erroneously skipped from Count

Thirty Seven to Count Thirty Nine. To maintain consistency with the original filing and facilitate the Court's review, Plaintiff preserves this numbering gap.

## COUNT THIRTY NINE

388.   Plaintiff repeats and re-alleges ¶¶1–387 stated above.

389.   Because Defendant King did not also notify Plaintiff what he told the New Hampshire Judicial Conduct Committee regarding the transcript in the Albrecht case, Defendant King violated Plaintiff's substantive due process rights.

## COUNT FORTY

390.   Plaintiff repeats and re-alleges ¶¶1–389 stated above.

391.   Between April 15, 2017 and July 9, 2017, the Boston Museum of Fine Arts held the largest, most important display of Botticelli's works in the United States.

392.   The exhibit consisted primarily of religious art.



393.   Defendant Sternenberg testified at the August 9, 2017 hearing that "Botticelli is naked paintings" and she "was told by Katherine that G.A. had some real problems sleeping the next day because of what she seen, you know." (Exhibit 4, Page 361, Lines 6–18).

394.   Defendant Sternenberg displayed extreme religious prejudice, in violation of the Free Exercise Clause, the Establishment Clause, and further violated Plaintiff's procedural and substantive due process rights.

## COUNT FORTY ONE

395.   Plaintiff repeats and re-alleges ¶¶1–394 stated above.

396.   Prior to his appointment to the bench, Defendant Rauseo was a partner and president of Hamblett & Kerrigan, P.A. (Exhibit 43, Pages 40–41). Through attorney Andrew Piela, Hamblett & Kerrigan represented Laura Montgomery in *Loudermilk v. Montgomery* before Judge Introcaso, with Sternenberg serving as Guardian ad Litem (Exhibit 16). In those proceedings, Introcaso approved fee cap increases for Sternenberg, exempted Sternenberg from the oath, and directed a fee structure from which Sternenberg derived revenue (Exhibits 10, 14, 16). These were among the cases on Introcaso's recusal list arising from the Introcaso-Sternenberg conflict.

397.   Defendant Rauseo was assigned to preside over the domestic violence proceedings in *Albrecht v. Albrecht*, No. 659-2019-DV-00341, a case in which

Sternenberg had served as Guardian ad Litem and in which the underlying record was produced by Judge Introcaso – the same judge before whom Rauseo's former firm had appeared in matters involving Sternenberg.

398.    At the November 15, 2023 hearing, Plaintiff raised Defendant Rauseo's conflict on the record, identifying Rauseo's H&K connections and the specific cases establishing those connections. (Exhibit 43, Pages 33–34, 40–41). Defendant Rauseo dismissed the conflict as "not relevant" without analysis and proceeded to quash every subpoena Plaintiff had issued – including subpoenas directed at witnesses who could have testified about the conflict and its concealment. (Exhibit 43).

399.    Defendant Rauseo had a duty to disqualify himself from proceedings in which parties and issues were connected to his former firm's client work, or at minimum to address Plaintiff's conflict objection with the analysis due process requires. By dismissing the conflict without analysis and then suppressing every avenue through which that conflict could be examined, Defendant Rauseo violated Plaintiff's rights to procedural and substantive due process under the Fourteenth Amendment, actionable under 42 U.S.C. § 1983.

## COUNT FORTY TWO

400.    Plaintiff repeats and re-alleges ¶¶1–399 stated above.

401.    Defendant Mary Ann Dempsey served as General Counsel, New Hampshire Judicial Branch, during the investigation of the Introcaso-Sternenberg

conflict and the DalPra misconduct. In that capacity, she authored the investigation report (Exhibit 24), denied Plaintiff's May 28, 2021 request for copies of the Introcaso and Derby deposition transcripts directly related to Plaintiff's case (Exhibit 36), and subsequently served as defense counsel for Defendant King at King's August 26, 2022 deposition (Exhibit 40). Dempsey thus occupied four conflicting roles in the same matter: investigator, prosecution participant, gatekeeper of evidence, and defense counsel for a witness.

402.   Defendant Erin Creegan succeeded Dempsey as General Counsel, New Hampshire Judicial Branch. At the November 15, 2023 hearing, the Attorney General's Office appeared specifically to shield Creegan from deposition (Exhibit 43, "for Attorney Creegan"). Creegan subsequently appeared as Chief Justice MacDonald's personal counsel at the August 2, 2024 interview regarding the Marconi investigation (Exhibit 46). Creegan had the authority to produce the unredacted King deposition to Plaintiff and did not do so.

403.   Defendant Jessica King currently serves as General Counsel, New Hampshire Judicial Branch. As of the date of this filing, the full, unredacted deposition of Defendant David D. King remains withheld from Plaintiff. Defendant Jessica King, as the current holder of the office, has the present authority and obligation to produce the deposition.

404.   The successive holders of the office of General Counsel, New Hampshire Judicial Branch, have collectively maintained the suppression of Defendant King's

deposition across three officeholders and more than three years. Each had independent authority to produce the deposition to Plaintiff. None did. The deposition – in which the supervising administrative judge was questioned under oath about his response to judicial misconduct in Plaintiff's case – has been confirmed on the record as "totally redacted" and "not in the public domain at all." (Exhibit 43, Page 33).

405.  This ongoing withholding has been accomplished within a structural conflict: the same Attorney General's Office that intervened to shield the General Counsel from deposition at the trial court level (Exhibit 43) later investigated and prosecuted Justice Marconi (Exhibits 46, 47), using the same prosecutors (Senior Assistant Attorney General Fincham and Assistant Attorney General Jimenez). The office that blocked Plaintiff's access to evidence about trial court concealment simultaneously managed the investigation of appellate court concealment.

406.  By withholding from Plaintiff the unredacted deposition of Defendant King – a deposition that discusses Plaintiff's own case, taken in an investigation of misconduct that directly affected Plaintiff's proceedings – the successive holders of the office of General Counsel, New Hampshire Judicial Branch, have violated Plaintiff's rights to procedural and substantive due process under the Fourteenth Amendment, actionable under 42 U.S.C. § 1983. This violation is ongoing.

**COUNT FORTY THREE**

407.   Plaintiff repeats and re-alleges ¶¶1–406 stated above.

408.   In May 2024, Defendant MacDonald learned that grand jury subpoenas had been issued in the criminal investigation of Justice Marconi. (Exhibit 46, Page 16). This was before Marconi's June 6, 2024 criminal conduct and before both post-crime orders in Plaintiff's appeal.

409.   On July 8, 2024, Defendant MacDonald concurred in a panel order in *K.A. v. D.A.*, No. 2023-0181, that contained Justice Marconi's certification that she was "not disqualified." (Exhibit 45). Defendant MacDonald concurred in this order with knowledge that the Attorney General's Office was actively investigating the justice who had certified her own impartiality.

410.   Defendant MacDonald had a duty to ensure that Plaintiff's appeal was adjudicated by an impartial tribunal. By concurring in an order containing a certification he knew or should have known was unreliable – given his prior knowledge of the grand jury investigation – Defendant MacDonald violated Plaintiff's rights to procedural and substantive due process under the Fourteenth Amendment, actionable under 42 U.S.C. § 1983.

### COUNT FORTY FOUR

411.   Plaintiff repeats and re-alleges ¶¶1–410 stated above.

412.   On December 7, 2025, Plaintiff attended a religious service at Trinity Church, Kingston, New Hampshire, at the express invitation of New Hampshire

State Representative Mark Pearson. (Exhibit 48). Plaintiff had no prior knowledge that Defendant Derby would be in attendance.

413.    Defendant Derby appeared at the same religious service and was seated in the same row as Plaintiff. At the time of this encounter, Plaintiff remained subject to Defendant Derby's January 27, 2020 Final Protective Order (Exhibit 23), which included a provision prohibiting Plaintiff from coming within 2,000 feet of a different church – Collinsville Bible Church in Dracut, Massachusetts – "at all times," to protect Katherine Albrecht, who resides in Michigan.

414.    Defendant Derby's voluntary attendance at a religious service, in close physical proximity to a person who remains under restrictions imposed by Derby's own order, constitutes conduct outside the scope of judicial immunity. Church attendance is not a judicial act.

415.    Defendant Derby's conduct violated Plaintiff's rights under the First Amendment (freedom of religion and freedom of association) and the Fourteenth Amendment (due process), actionable under 42 U.S.C. § 1983. This count is brought against Defendant Derby in his individual capacity.

**COUNT FORTY FIVE – STRUCTURAL DUE PROCESS (CUMULATIVE ERROR)**

416.    Plaintiff repeats and re-alleges ¶¶1−415 stated above.

417.    The individual acts of concealment, conflict, and suppression alleged in Counts 1 through 44 – taken together – constitute a structural due process violation

under the Fourteenth Amendment that no single count captures in isolation. Under *Chambers v. Mississippi*, 410 U.S. 284, 290 n.3 (1973), constitutional error may arise from the cumulative effect of individual acts where the combined impact denies a fundamentally fair proceeding, even if no single act independently compels relief. Under *Arizona v. Fulminante*, 499 U.S. 279, 309–310 (1991), a biased adjudicator is structural error – the kind of defect that pervades the entire proceeding, defies harmless-error analysis, and requires automatic reversal. Under *Williams v. Pennsylvania*, 579 U.S. 1, 8–9 (2016), a single prior involvement in a matter creates an impermissible risk of bias that the passage of time does not cure. The legal principles establishing the cumulative error and structural due process framework are set forth in ¶¶221–224. The application of that framework to the facts of this case is demonstrated in ¶245. The constitutional injury alleged in this count is not any single defendant's misconduct but the destruction of the framework within which Plaintiff's case was adjudicated.

418.   Every self-correction mechanism of the New Hampshire judicial system failed – not once, but at every level. The trial court was compromised by the undisclosed conflict between Defendants Introcaso and Sternenberg and the knowing silence of Defendant DalPra. The administrative level was compromised by Defendant King's concealment of three separate written disclosures of judicial misconduct. The successor trial courts were compromised by Defendant Derby's ratification of the tainted record and Defendant Rauseo's suppression of all evidence

of the conflict. The appellate level was compromised by Defendant Marconi's false certification of impartiality and Defendant MacDonald's concurrence with knowledge of the grand jury investigation. The institutional safeguard was compromised by the structural conflict within the Attorney General's Office and the successive withholding of Defendant King's deposition by Defendants Dempsey, Creegan, and Jessica King. Defendant Curran extended orders derived from the tainted record. No single defendant's conduct can be evaluated in isolation because each act of concealment depended on and reinforced the others: Introcaso's concealment enabled Sternenberg's continued appointments; DalPra's silence preserved the arrangement; King's administrative concealment prevented affected litigants from learning of the conflict; Derby's ratification embedded the tainted findings into enforceable orders; Rauseo's suppression eliminated the last avenue for exposure; and Marconi's and MacDonald's conduct at the appellate level ensured that even the appeal was adjudicated by a compromised tribunal. The cumulative effect was a proceeding in which no level of the judicial system remained capable of self-correction.

419. By operating a judicial system in which the trial court, the administrative apparatus, the successor trial courts, the appellate court, and the institutional oversight office were each independently compromised by conflicts of interest, concealment, or suppression – and in which those compromises were mutually reinforcing – Defendants Sternenberg, DalPra, Introcaso, Derby, Rauseo,

Curran, King, Marconi, MacDonald, Dempsey, Creegan, and Jessica King collectively deprived Plaintiff of the constitutional right to a fundamentally fair proceeding before an impartial tribunal, in violation of the Due Process Clause of the Fourteenth Amendment, actionable under 42 U.S.C. § 1983. This structural violation is ongoing: the domestic violence order remains in effect (Exhibit 23), the King deposition remains withheld (Exhibit 40), and future proceedings affecting Plaintiff will be adjudicated by the same compromised system absent the relief sought in this complaint.

## CONCLUSION

420.    The facts set forth in this complaint establish a pattern of concealment that spans the entire New Hampshire judiciary – from the trial court judge who hid a disqualifying conflict, to the marital master who knew for seven years and said nothing, to the administrative judge who managed the information flow to prevent accountability, to the successor judges who ratified a tainted record, suppressed evidence, and dismissed conflicts without analysis, to the Supreme Court justice who certified her own impartiality thirty-two days after committing a crime, to the Chief Justice who concurred with knowledge of the grand jury investigation. At every level, the officers responsible for safeguarding Plaintiff's constitutional rights chose concealment over disclosure. Every safeguard that existed to catch the error was itself compromised by the officers responsible for applying it. The cumulative effect

of these failures is not merely the sum of individual wrongs – it is the complete destruction of the structural conditions necessary for due process to function.

421.   The domestic violence restraining order that traces to these proceedings remains in effect today. The full, unredacted deposition of the supervising administrative judge remains withheld today. The harm is not historical – it is ongoing. Federal intervention is necessary because the state judicial system that produced this harm is the same system that would adjudicate its correction, staffed by the same officers who participated in its concealment.

### PRAYERS FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Honorable Court grant the following relief:

### I. Prospective Declaratory Relief

A) Declare that the continued enforcement of findings of fact and orders derived from proceedings tainted by the Introcaso-Sternenberg conflict violates the Due Process Clause of the Fourteenth Amendment;

B) Declare that the practice of extending Domestic Violence Final Protective Orders based solely on "representations" referencing a "well-documented" record from proceedings tainted by undisclosed judicial conflicts and documented judicial misconduct, without an independent evidentiary hearing

or finding of a discrete act of violence, violates the Due Process Clause of the Fourteenth Amendment;

C) Declare that Justice Marconi's certification that she was "not disqualified" – made thirty-two days after she engaged in criminal conduct directed at the Attorney General's Office (Exhibit 47) – violated Plaintiff's constitutional right to an impartial tribunal under the Due Process Clause of the Fourteenth Amendment;

D) Declare that Chief Justice MacDonald's concurrence in the July 8, 2024 panel order containing Justice Marconi's false certification (Exhibit 45), with prior knowledge that grand jury subpoenas had been issued in the Marconi investigation (Exhibit 46), violated Plaintiff's constitutional right to an impartial tribunal under the Due Process Clause of the Fourteenth Amendment;

E) Declare that the cumulative effect of the individual acts of concealment, conflict, and due process deprivation alleged in Counts 1 through 45 – spanning trial, administrative, and appellate levels of the New Hampshire judiciary – constitutes a structural violation of Plaintiff's right to due process under the Fourteenth Amendment (Count 45);

## II. Prospective Injunctive Relief (Ex parte Young)

F) Enjoin Defendants Rauseo, Derby, King, Jessica King, and the New Hampshire Judicial Branch, and their successors in office, from enforcing or relying upon the "findings of fact" contained in the May 30, 2019 Order (Exhibit 12), the January 27, 2020 Order (Exhibit 23), and any subsequent orders that incorporate or reference those findings, until such time as Plaintiff has received a hearing before an impartial tribunal untainted by the Introcaso-Sternenberg conflict;

G) Enjoin Defendant Rauseo and his successors in office from further extending the Domestic Violence Final Protective Order in *Albrecht v. Albrecht*, No. 659-2019-DV-00341, based on references to the "well-documented history" from proceedings in Docket No. 659-2016-DM-00288, until the record has been purged of findings derived from proceedings tainted by the Introcaso-Sternenberg conflict and Master DalPra's documented misconduct;

H) Order Defendant Jessica King, in her capacity as General Counsel of the New Hampshire Judicial Branch, and her successors in office, to produce to Plaintiff the complete, unredacted deposition of Defendant David D. King (Exhibit 40), which has been withheld from Plaintiff through successive General Counsel officeholders since at least the November 15, 2023 hearing at which its existence was confirmed on the record (Exhibit 43);

I) Enjoin Defendant Derby, in his individual capacity, from knowingly attending any place of worship at which Plaintiff has a prior documented invitation,

pending resolution of this action – a restriction no broader than, and reciprocal to, the restriction Defendant Derby imposed on Plaintiff prohibiting him from coming within 2,000 feet of a Massachusetts church "at all times" to protect a person who resides in Michigan (Exhibit 23);

J) Enjoin Defendants and their successors in office from conducting any future proceedings affecting Plaintiff's parental rights or the Domestic Violence Final Protective Order in *Albrecht v. Albrecht*, No. 659-2019-DV-00341, except before a judicial officer with no prior involvement in, or institutional connection to, the matters alleged in this complaint (Count 45);

## III. Expungement and Correction

K) Order the expungement or vacatur of the June 12, 2024 single-justice order (Exhibit 44) and the July 8, 2024 panel order (Exhibit 45) issued with the participation of Defendant Hantz Marconi, whose false certification that she was "not disqualified" renders those orders constitutionally infirm under *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813 (1986);

L) Order the New Hampshire Judicial Branch to administratively correct the docket in *ITMO Dana Albrecht & Katherine Albrecht*, No. 659-2016-DM-00288, to reflect that the proceedings were conducted by a judge (Introcaso) with an undisclosed conflict of interest who later admitted she provided only "certification and approval" without substantive review, and that the Marital

Master **(DalPra)** has been formally found to have committed judicial misconduct in those proceedings;

## IV. Damages

M) Award Plaintiff nominal damages against Defendant Derby in his individual capacity for violations of Plaintiff's rights under the First Amendment and the Due Process Clause of the Fourteenth Amendment (Count 44);

## V. Other Relief

N) Award Plaintiff costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988;

O) Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all disputed issues of fact so triable.

Respectfully submitted,

_____

**DANA ALBRECHT**
*Pro Se*
131 Daniel Webster Hwy #235
Nashua, NH 03060
(603) 809-1097
dana.albrecht@hushmail.com

April 1, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on this date that the foregoing Amended Complaint will be served electronically through the CM/ECF system to all counsel of record.

_____

**DANA ALBRECHT**
*Pro Se*
131 Daniel Webster Hwy #235
Nashua, NH 03060
(603) 809-1097
dana.albrecht@hushmail.com

April 1, 2026

## LIST OF EXHIBITS

1. 5/1/2014 Excerpt from Sobell v. Sobell, No. 659-2013-DM-00348.

2. 4/8/2016 Domestic Violence Petition.

3. 10/13/2016 Order of appointment of GAL Sternenberg (DalPra/Introcaso).

4. 8/9/2017 GAL Sternenberg testimony.

5. 9/1/2017 Final Parenting Plan.

6. 3/30/2018 Email chain – Judge Introcaso to Administrative Judge King.

7. 7/5/2018 Paul S. Moore disbarment.

8. 2/25/2019 Introcaso Order in Ausiaikova v. Meckel (includes GAL Motion for Instruction, ¶10 – Rauseo statement).

9. 3/15/2019 Julie Introcaso recusal Order in Campbell v. Partello.

10. 4/23/2019 Introcaso Order in Loudermilk v. Montgomery.

11. 4/26/2019 Judge Derby Order in Campbell v. Partello re: Kathleen Sternenberg ("de novo review").

12. 5/30/2019 Order (DalPra/Introcaso) – 76 days post-recusal; cover page references 5/9/2019 hearing.

13. 5/31/2019 Derby Order in Ausiaikova v. Meckel.

14. 6/3/2019 Loudermilk v. Montgomery, No. 659-2015-DM-00185.

15. 6/30/2019 Order (DalPra recommendation 6/28/2019; Derby approval 6/30/2019), Doc. 345.

16. 7/23/2019 Loudermilk v. Montgomery, No. 659-2015-DM-00185.

17. 8/30/2019 Morrell v. Montgomery, No. 659-2019-DM-00383.

18. 9/16/2019 NH Supreme Court Order, No. 2019-0436.

19. 10/25/2019 NH Supreme Court Order, No. 2019-0436.

20. 10/31/2019 Sierra Madre Police Department document.

21. 12/20/2019 Excerpt from DV Hearing (Mark Derby), Pages 71–79.

22. 1/2/2020 Order in Loudermilk v. Montgomery.

23. 1/27/2020 Derby Order on Post-Trial Motions (cites Pages 71–79 as "evasive").

24. 2/3/2020 Email from Administrative Judge King (includes Dempsey Investigation Report).

25. 10/15/2020 Deed to home, East China, Michigan.

26. 10/22/2020 Correspondence – Gary Hicks to Gordon MacDonald.

27. 10/23/2020 Newspaper Article – New Hampshire Union Leader.

28. 10/26/2020 Correspondence – Mary Ann Dempsey.

29. 11/6/2020 Excerpt from Hearing (Bruce DalPra) – "hot mic" transcript.

30. 11/13/2020 Email from Administrative Judge King to Bruce DalPra.

31. 12/21/2020 Curran Order (DV extension – "based upon Plaintiff's representations").

32. 1/18/2021 Deposition of Mark S. Derby.

33. 2/8/2021 Deposition of Julie Introcaso ("Bruce has known that for seven years").

34. 2/22/2021 Resignation Letter – Julie Introcaso.

35. 3/23/2021 Julie Introcaso – NH Supreme Court Order and Invoices.

36. 5/28/2021 Email from Mary Ann Dempsey.

37. 7/15/2021 UCCJEA Hearing transcript.

38. 2/15/2022 Email from Julie Introcaso ("no recollection" / rubber-stamp admission).

39. 2/25/2022 Julie Introcaso disbarment.

40. 8/26/2022 Deposition of Administrative Judge King (partial/redacted).

41. 11/10/2022 Bruce DalPra – NH Supreme Court Order and Invoices.

42. 2/24/2023 Rauseo Order (DV extension – "based upon Plaintiff's representations").

43. 11/15/2023 Hearing transcript.

44. 6/12/2024 Marconi single-justice Order – 6 days post-offense.

45. 7/8/2024 Full panel Order (Marconi certifies "not disqualified").

46. 8/2/2024 Gordon MacDonald interview.

47. 10/7/2025 Conviction – Anna Barbara Hantz Marconi (offense date: 6/6/2024).

48. 12/6/2025 Mark Pearson Invitation.