1

STATE OF NEW HAMPSHIRE

9TH CIRCUIT COURT - FAMILY DIVISION - NASHUA

IN THE MATTER OF:                    )
                                     ) Family Division Case No.
STEPHEN LOUDERMILK,                  ) 659-2015-DM-00185
                                     )
              Petitioner,            ) Nashua, New Hampshire
                                     ) June 3, 2019
         and                         ) 1:12 p.m.
                                     )
LAURA MONTGOMERY,                    )
                                     )
              Respondent.            )
_____     )

HEARING ON PRE-TRIAL CONFERENCE
BEFORE THE HONORABLE JULIE INTROCASO
JUDGE OF THE CIRCUIT COURT - FAMILY DIVISION

APPEARANCES:

For the Petitioner:          Timothy Coughlin, Esq.
                             125 Main Street
                             Suite 20
                             New Market, NH 03857

For the Respondent:          Andrew Piela, Esq.
                             20 Trafalgar Square
                             Suite 505
                             Nashua, NH 03302

Also Present:                Kathleen Sternenberg, Esq.
                             Guardian Ad Litem

Audio Operator:              Electronically Recorded
                             **Not Monitored**

TRANSCRIPTION COMPANY:       eScribers, LLC
                             7227 N. 16th Street, Suite 207
                             Phoenix, AZ 85020
                             (800) 257-0885
                             www.escribers.net

Proceedings recorded by electronic sound recording; transcript
produced by court-approved transcription service.

2

I N D E X

| WITNESS(ES) | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

FOR THE PETITIONER:

NONE


| WITNESS(ES) | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

FOR THE RESPONDENT:

NONE


| MISCELLANEOUS | PAGE |
|---|---|
| Court's Ruling | 65 |


| EXHIBITS | | ID | EVD |
|---|---|---|---|
| Respondent's A | Photo | 55 | |

3

(Proceedings commence at 1:12 p.m.)

THE COURT:  Now we are.  This is 659-2015-DM-185, the matter of Stephen Loudermilk and Laura Montgomery.  We're here today for a pre-trial conference.

I see that the parties did attend neutral case evaluation, thank you very much, with Judge Foley, our complex case docket professional, and unfortunately, with his assistance, the case was not able to settle as promised.  We will go forward.

I believe there was a subsequent motion to continue for some reason or another, but we are currently scheduled for a final hearing July 23rd, which is still a bit off, but I thought given the nature of the case and the number of issues, that we should do a pre-trial sooner rather than later.  So if we could just go through that.  Let me pull up my files reviewed this weekend, and here we have Loudermilk.  Okay.

Okay.  I should also say, counsel is here today represented by -- I'm sorry, parties are here represented by Attorney Coughlin for the Petitioner, Attorney Piela for the Respondent.  Again, we do have a court-appointed guardian ad litem, Kathleen Sternenberg.  I note there's one motion in here with regard to Attorney Sternenberg's fees, so at the very least we should probably address that.

And although I went through this at the structuring conference, I'm going to ask again if you would be so kind,



4

Attorney Coughlin, to review for me what issues remain in dispute, and with a little emphasis on what's the -- what do you think the major issue in this case is going to be, if you could explain that for the Court.

MR. COUGHLIN:  Sure.

THE COURT:  And the ones that we're really going to need to be concerned about.  Let me note, this is a modification case, by the way.

MR. COUGHLIN:  So I have one question before I start, Your Honor.  Has the guardian checked in with the Court today?  Did you --

THE COURT:  Apparently she did and said she was running about 20 minutes late.

MR. COUGHLIN:  Oh, good, okay.  So we can expect her --

THE COURT:  Yeah.  I'm --

MR. COUGHLIN:  (Indiscernible).

MR. PIELA:  -- it through the stuff with counsel, and if there's any discovery issues, if there's any scheduling issues.  Like I said, she has a motion pending which we should probably address but she's not here yet to talk about it, so I was going to go ahead and do the largely procedural business without waiting, if that's all right.  I've got some follow-up hearings this afternoon.

MR. COUGHLIN:  For a couple of reasons I asked that.



Number one, there was some events of this weekend that I won't get into without her, but it had to do with the police and a visit to Massachusetts, and she may want to weigh in on that. The other thing is, she was going to give us her report, I believe, today at this hearing.

THE COURT:  Okay.  Okay.

MR. COUGHLIN:  Obviously, we're here with regard to Emma (phonetic), the parties' 7th grader?

THE PETITIONER:  8th grader.

MR. COUGHLIN:  8th grader.

THE PETITIONER:  Going on 9th.

MR. COUGHLIN:  And my client is requesting that she live primarily with my clients in Fitzwilliam, New Hampshire. She's currently living with her mom in Nashua.

My client would suggest that the reasoning behind that request for modification is outlined in the petition we filed early on.  The guardian has done a pretty thorough investigation, I believe.  She has concerns, I can tell you that, that she's probably going to address today, I would think, I'm not certain, but -- and she was working diligently on a report.

You know, she told us as of Friday she was working on a couple different reports, she had three, I think, and that she wanted to get hers done and to us, but we haven't yet received it.  At least when I left an hour ago I hadn't gotten

anything.  So that's really, you know, the gist --

THE COURT:  Is your client seeking both a change in decision making -- is there currently joint decision making, he's asking for sole decision making?

MR. COUGHLIN:  Recently he made that decision, yes.

THE COURT:  Okay.  And obviously, a change of the allocation of parenting time.

MR. COUGHLIN:  Right.

THE COURT:  Are there any significant proceedings elsewhere?  Like you just mentioned an incident with the police, there's no third parties involved in this case, there's no pending --

MR. COUGHLIN:  No other legal matters --

THE COURT:  -- juvenile matters --

MR. COUGHLIN:  No.

THE COURT:  -- or matters involving the Division or anything of that nature?  Okay.

MR. COUGHLIN:  No.  This involved a visit to Massachusetts that the guardian was objectionable to that happened anyway, kind of unfortunate.  But I'm not certain exactly what happened so I won't give my testimony -- I won't give testimony on behalf of my client, Your Honor, but you certainly --

THE COURT:  Okay.

MR. COUGHLIN:  -- can ask him if you'd like.  So the



other issues are the ones that fall out of a change in primary residential responsibility, child support being the major one.

THE COURT:  Okay.

MR. COUGHLIN:  That's about it.

THE COURT:  All right.

MR. COUGHLIN:  I think that's the gist of this case.

THE COURT:  Okay.  And again, I think we have this scheduled for a full-day hearing, correct?

MR. COUGHLIN:  Right.

THE COURT:  (Indiscernible).

MR. PIELA:  Judge, I may have Attorney Coughlin at a bit of a disadvantage.  The guardian did email her report Saturday.

THE COURT:  To you?

MR. PIELA:  To me, and it was copied to Attorney Coughlin.

THE COURT:  Oh, okay.

MR. PIELA:  But --

MR. COUGHLIN:  I can just take a look, I don't --

MR. PIELA:  I was -- she asked that it be presented in hard copy today.  I just have a question with -- are we proceeding on a modification pursuant to 1C, which is the harm, harm to the child and the -- I just want to make -- if the guardian's report seems to analyze it solely under 1C of the modification statute, I just want to make sure I have --

8

THE COURT:  I wish I could remember the case, it's been within the last year and a half.  Was it your case, Attorney Piela?

MR. PIELA:  I've had many, Your Honor.  If you could be a little more specific, perhaps I could --

THE COURT:  There was a case where the Supreme Court basically said that the court can't fumble and bumble around to see which section of the statute --

MR. PIELA:  Oh, the Kelly (phonetic) case, yes.

THE COURT:  There you go.

MR. PIELA:  Well, I --

THE COURT:  Problem Kelly (phonetic)?

MR. PIELA:  Problem Kelly --

THE COURT:  (Indiscernible) Problem Kelly and someone else (indiscernible) --

MR. PIELA:  That was actually an interesting discussion.  It was -- both parties hated the parenting plan but both parties couldn't agree how they wanted to change it.  So the question as I tried to argue is the section, agreement to modify, does that just simply mean you agree to modify, or do you have to both agree --

THE COURT:  That the court can modify.

MR. PIELA:  Right, and --

THE COURT:  Yep.  But in that wasn't there a discussion that said, in pleading a modification, it's the



(973) 406-2250 | operations@escribers.net | www.escribers.net

9

burden of the moving party, who has the burden of proof, to define for the court what the subsection under which they're proceeding is?

MR. PIELA:  I believe so, Your Honor, and that's why I wanted to make sure I was understanding Mr. Coughlin's petition to say we're going under -- solely under 1C, which is the harm, if the current parenting plan continues and the benefits of modification outweigh the --

THE COURT:  Likelihood of harm to the child.

MR. PIELA:  -- harm, yeah, that one.

THE COURT:  C.

MR. PIELA:  1C.

THE COURT:  C is present environment will cause more harm than a change would.  C is emotional --

MR. PIELA:  Yeah, physical, psychological.

THE COURT:  Yep.

MR. PIELA:  I just want to make sure that that's --

THE COURT:  And to be honest, that's why I'm looking for the current petition, but it may be a bit down because I know this case has been being litigated now for some time. Hold on, here we go.  Looks like I have the petition.

And I think at the very least, at the time of the pre-trial, I'm going to ask that -- yep, this is the August 2018 petition to bring forward and modify.  I'll take a quick look at it to see if any numbers jump out at me.



10

MR. PIELA:  The GAL report analyzed it solely under 1C.  I just want to make sure that we're all on the same page.

THE COURT:  Attorney Coughlin, you did not, in fact, at least cite -- cite, citation, literally, a particular provision of 461-A:11.  Again, could probably get you a better reference than throwing around some names, but again, the Court can't make the decision that you are -- for example, I'll note by a quick review of number 25 of the Court's file, Attorney Coughlin, for example, cites alienation.  That would be subsection (b).  Fights with Emma, I would put that probably under (c), psychological harm or damage.  Health and education, extreme distrustfulness, again, these all look subsection C-like, creating some sort of emotional and psychological harm to the child.

MR. COUGHLIN:  It's probably why I didn't cite a particular subsection.

THE COURT:  Well, so technically you talked about, like I said, 11(b) and(c).  Can we proceed under 11(b) and (c)?  I mean, you know, the language is a little different, the facts are a little different, the standards, I think (b) has clear and convincing in it.

MR. PIELA:  I'd have to look at the --

MR. COUGHLIN:  Yeah, I don't have it --

MR. PIELA:  I just want to make sure that going into trial on the 23rd, I just want --

11

THE COURT:  I understand.  I understand, and I do too.  I, you know, I need to be cognizant of what I'm listening for in terms of relevant testimony and such.  But I think it might be beneficial if I just read, specifically (b), again, is the Court finds, okay?

The burden of proof is simply preponderance of the evidence.  Burden of this action is on the moving party.  (B) states if the court finds repeated, intentional, and unwarranted interference by a parent with the residential responsibilities of the other parent, court may order a change in the parental rights and responsibilities without the necessity of showing harm to the child if the court determines such a change would be in accordance with the best interests.  Again, that's a repeated, intentional, and unwarranted interference.

I don't know if the facts of what you're terming "alienation", but you do use the term "block the Petitioner", you know, et cetera.  I don't know if that would be considered interference.

It looks like Attorney Sternenberg is poking her head in, unless I'm -- unless that's somebody other than her.  If you want to let her know we've started the hearing, if she's out there, if you would recognize her, but I saw someone with kind of glasses and -- well, the backlighting makes it hard.

12

Yes, that is indeed her.  Okay.  So --

MR. COUGHLIN:  I was just thumbing through her report --

THE COURT:  Okay.

MR. COUGHLIN:  -- she recommends a change in residential responsibility.

THE COURT:  Okay.

MR. COUGHLIN:  I don't see --

THE COURT:  Let me just say Attorney Sternenberg has arrived, thank you.

MR. COUGHLIN:  There she is.

THE COURT:  Thank you for calling to let us know you'd be late.

MS. STERNENBERG:  Oh, you're welcome.

THE COURT:  We're just going through the issues. Attorney Piela reported to the Court that you were able to get to him his final -- your final report?

MS. STERNENBERG:  I did.

THE COURT:  By email.  Unfortunately, Attorney Coughlin --

MR. COUGHLIN:  Took the weekend off.

THE COURT:  -- was enjoying his weekend and I don't think he had known that it arrived by email, so he's looking through it quickly.

MS. STERNENBERG:  Oh, I apologize.



(973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT:  I'm reviewing --

MR. COUGHLIN:  No, my fault, I just --

THE COURT:  I'm reviewing the statute 461-A:11 because there isn't a particular subsection of 461-A:11 alleged in the petition, but there seems to be some factual allegation about alienation.  I don't know, again, alienation, as folks refer to it, could be seen as emotional, psychological -- actually, if you wouldn't mind giving it to the clerk, thank you.

MS. STERNENBERG:  I did mail it on Saturday, but.

THE COURT:  That's fine, thank you.  But if that would be considered emotional, psychological damage, alienation.  Interference, I'll just say generally what the Court interprets that as is literally, like, I didn't see my child in six months because they never show up for the exchange.  My child's been, you know, prohibited from contacting me.

Repeat -- the way I interpret repeated, intentional, and unwarranted interference is not necessarily alienation.  Alienation is an emotional harm.  So I guess I leave it up to you, but I do need you to at least define for me what it is you're proceeding under.

MR. COUGHLIN:  Well, again, I'd have to read the statute before --

THE COURT:  Do you want to --



14

MR. COUGHLIN:  -- I can give you an answer.

MR. PIELA:  How about seven days from today, if -- maybe if Attorney Coughlin --

THE COURT:  Can you specify that?

MR. PIELA:  -- if Attorney Coughlin can file something --

MR. COUGHLIN:  I think the child also stated a preference, I know that.

THE COURT:  They should both have a copy that they can print, I think, but.

MS. STERNENBERG:  It's in the mail as well.

THE COURT:  You want to print it on paper so it's easier to look at right now?

THE CLERK:  (Indiscernible) copies.

MR. PIELA:  I already have a copy, I belted it out beforehand.

THE CLERK:  Need a copy?

MR. COUGHLIN:  Of?

THE CLERK:  Do you want me to make you a copy so I --

MR. COUGHLIN:  Your (indiscernible) report?

THE COURT:  (Indiscernible) so you have a paper copy to look at --

MR. COUGHLIN:  Yeah, that would be great.

THE COURT:  -- rather than your phone?



15

MS. STERNENBERG:  I have one right here.

THE CLERK:  You have one?

THE COURT:  Oh.  She's got an extra one, thanks.

MR. PIELA:  Yeah.  As to child's preference, Your Honor, I think that would be a mature minor and I'm not sure that's been alleged in the petition.  Thank you.

MR. COUGHLIN:  I have it in my computer --

MR. PIELA:  So I -- I'm assuming we're going under 1C, but if perhaps Attorney Coughlin, within the next week, could file something with the Court specifying which section or sections he's going to proceed under, just so we can, again, make sure that we're all on the same -- rowing in the same direction.

THE COURT:  Is that unreasonable?

MR. COUGHLIN:  I'd be glad to do that, Your Honor.

THE COURT:  Thank you.

MR. COUGHLIN:  I know I also, at least, alleged the stated preference of the child.  I don't know if that's (a), (b), (c).

MR. PIELA:  I think the stated preference, Your Honor, is a separate section for a mature minor.  I think the statute, as it defines best interests, allows the Court to consider the preference of the child, but I think if you want to do a mature minor, you have to find that Emma is mature, and that -- I'm not sure the evidence is there for that.  I

16

mean, she has an opinion; whether it constitutes a mature minor opinion is something entirely different.

THE COURT:  For me to determine.

MR. PIELA:  For you to determine.

THE COURT:  And I guess we'll have -- in terms of the evidence, I mean, I'll have to do that --

MR. PIELA:  All right.

THE COURT:  -- based on the evidence at this point.

MR. PIELA:  All right.  Well, just, I'll wait for Attorney Coughlin's submission, and then we'll -- give us the guidepost.  Do we have the full day on the 23rd, Your Honor?

THE COURT:  Yes.

MR. PIELA:  Okay.

THE COURT:  I can't tell you specifically what time we're going to start, the clerk would know that.  Is it 10:00?  If it's 10:00 we take a half hour lunch and go to 4.

MR. PIELA:  Okay.

THE COURT:  If it's 9:00, I usually take an hour lunch and go to 4.

MR. PIELA:  Okay.

THE COURT:  So it's either --

THE CLERK:  10 a.m.  10 a.m.

THE COURT:  10?  Okay.  Yes, some days I have other -- I have to set aside some emergency hearings, so.

MR. PIELA:  So we'll have the guardian ad litem



17

first, and Mr. Coughlin's client.  I'm probably going to have two witnesses, my client and one other.

THE COURT:  Attorney Piela?

MR. PIELA:  Huh?

THE COURT:  I'm filling out the form.

MR. PIELA:  Oh, sorry.

THE COURT:  I may ask you questions.  Okay?  I'm writing an order that he disclosed no later than 4:00 next Monday, specifically those sections under which he's proceeding with respect to modification.  You just got to list them, you know?

MR. COUGHLIN:  I'll be glad to.

(Pause)

THE COURT:  Just put that in the structuring conference order as an other order simply stating the Petitioner shall have until June 10, 2019, at 4:00 p.m. to declare affirmatively in writing into the Court the provisions of 461-A:11 he intends to prove supporting his petition. Okay?

All right.  So obviously, child support goes along with that, perhaps tax exemptions.  Okay.  How about any special circumstances to be discussed under child support?  Or are there going to be -- there's no, like, nothing unusual there --

MR. COUGHLIN:  No.



18

THE COURT:    -- if there needs to be a change.

MR. COUGHLIN:    Nothing.

THE COURT:    Factors, just find sole decision-making responsibility?

MR. COUGHLIN:    I don't know, did the guardian chime in on that?    No?

THE COURT:    That's you, Attorney Coughlin.

MR. COUGHLIN:    I don't know what I put in my petition.

THE COURT:    I'm sorry?

MR. COUGHLIN:    I don't remember what I alleged in the petition.

THE COURT:    Well, there's mental -- you've alleged some mental health issues, there's something along those lines, it looks like --

MR. COUGHLIN:    Those would be the --

THE COURT:    -- upon my review of the file. There's --

MR. COUGHLIN:    I think the same factors would apply to sole decision making.

MR. PIELA:    He did -- Mr. Coughlin did indicate that he would be asking for sole decision making in his proposed final parenting plan, so.

THE COURT:    Okay.    Not applicable, not applicable, NA.    I'm going to scoot through this as quickly as I can to --

okay.  Here's a biggie.  Like I said, we're about 60 days out.  Any unresolved discovery issues?

MR. PIELA:  I would just ask, I did some interrogatories to Mr. Coughlin early on in the case.  I'd just ask if there are any updates, that we can do it 20 days before trial.

MR. COUGHLIN:  Sounds good to me.

THE COURT:  Thank you.  Attorney Sternenberg, before you appeared today there was some discussion of some incident that occurred this weekend.  I don't know much about it, I just understand generally the police were involved in a family dispute that involved the child.  Do you intend to file anything to supplement that?  Would you like to?

MS. STERNENBERG:  I've given you the police report in my report that I filed --

THE COURT:  Oh, okay.  Sorry --

MS. STERNENBERG:  -- last week.

THE COURT:  -- just got it -- oh, last week.

MR. COUGHLIN:  Thursday.

THE COURT:  Oh, okay, I'm sorry, I thought it was just this --

MR. COUGHLIN:  My weekends start on Thursday.

THE COURT:  Your weekend --

MR. PIELA:  It's good to be the king.

THE COURT:  It's good to be the king.  Okay.



20

MR. PIELA:  Five points if you can tell me the movie that's from.

THE COURT:  I've now become, you know, Downton Abbey, weekends?  What are weekends?  Okay.

So updates to interrogatories presented to the opposing party no later than July 1st.  It's 23 days before trial, okay.  The rest, this other stuff, thank goodness we don't have to deal with:  real estate, pensions, business interests.  No experts will be testifying I assume?

MR. COUGHLIN:  Right.

THE COURT:  No treating therapist or diagnostician, anything of that nature.  Attorney Piela, now you want to tell me about your witnesses?

MR. PIELA:  I have envisioned two.

THE COURT:  Okay.

MR. PIELA:  I envision my client and one other.  I envision the guardian ad litem.

THE COURT:  Okay.

MR. PIELA:  That's why I was saying six hours, we're going to have to move at flying speed to get it all in.

THE COURT:  Okay.

MR. PIELA:  If for some reason we run out of time, I think this case is important enough that we don't want to try to jam it all in.  Would the Court entertain bringing us back for a couple hours the following week if we need to finish up?

21

I'm just throwing that out there because I don't know what Mr. Coughlin is going to call as witness.  I imagine it would be his client --

THE COURT:  Yeah, Attorney Coughlin, I obviously haven't had a chance to read your pre-trial packets because I just got them, but what do you anticipate for witnesses other than Mr. Loudermilk?

MR. COUGHLIN:  So I listed his wife, I know that.

THE COURT:  Okay.

MR. COUGHLIN:  Jessica (phonetic).  Chris Morel (phonetic), who is Laura Montgomery's significant other.

THE COURT:  Okay.

MR. COUGHLIN:  Ms. Montgomery, and the guardian.

THE COURT:  Okay.

MR. COUGHLIN:  So that would be --

THE COURT:  Total of looks -- sounds about --

MR. COUGHLIN:  I would predict I call three out of those five at most.

THE COURT:  Okay.

MR. COUGHLIN:  But I just -- I did list five.

THE COURT:  Okay.  All right.  Thank you.

Attorney Piela, let me take a look at my calendar. Let me see, I wonder if it's far enough out that you folks can also take a look and see if -- I'm happy to set aside half a day somewhere if I have it around that time, and candidly, I

22

think I'm scheduling around that time.  So let me see.  You folks are on for the 23rd, that's a Tuesday.  Are we right about that?

THE CLERK:  Yes.

THE COURT:  Ah, Mrs. Lodes, do me a favor, this might be easier.  I'm thinking this could be a lot easier.  Any objection to starting at 8:30 that day?

MR. COUGHLIN:  I was just going to recommend it.

MR. PIELA:  None here, Your Honor.

THE COURT:  Want to kill that DV session at 8:30?

THE CLERK:  (Indiscernible).

MR. COUGHLIN:  My calendar says --

THE COURT:  But not by me, so no consequences here.  If the clerks get upset you'll have to deal with them.  No, what I was going to suggest honestly, to keep the space, is if you look over on Thursday, you know I can put up -- up that to 4.  Take the two from Tuesday, move it to Thursday morning at 4.

THE CLERK:  How about if I do July 23rd from 8:30 to 9, and then we start from 9 until 4.

THE COURT:  You're saying this for your own personal (indiscernible).

THE CLERK:  I'm saying it because I would like to, on Wednesday, still be here.

THE COURT:  That's fine.  All right.  We'll start at

23

9.  Try our best to start at 9.

MR. PIELA:  Okay.

THE COURT:  I'll say to you folks, as you probably both know, be here at 8:30.  It's an all-day case, be here, be ready.  If at 8:45 I don't have a petitioner or a respondent, I'm done.  It's not unusual for those cases to go away, which is why we kind of overbook them, which is why I was suggesting we could overbook Thursday because usually I lose one or two of them with failure to serve or somebody doesn't go forward on a DV, but.  All right.  Let's move the 23rd at least until 9.

MR. PIELA:  Okay.

THE COURT:  Okay?  But I'll tell you, Attorney Piela, rather than explicitly setting time aside -- here she goes -- as it stands right now I have --

THE CLERK:  So it's going to be from 9 to 4.

THE COURT:  Yeah.

THE CLERK:  Okay.

THE COURT:  9 to 4.  August 8th.  August 8th, which is about two weeks later, is my next writing day.  And if we're really in the middle of something that goes beyond 4, then I have to -- I would give you more time on my writing day, or you know, I got two or three trials between then, so if some time frees up I will make whatever time available for you that I can.

24

MR. COUGHLIN:  And that -- I'm sorry, Your Honor, that was August 8th?

THE COURT:  August 8th.

MR. COUGHLIN:  Okay.

THE COURT:  You know, like, if it needs to continue, that's a date that won't -- that nothing will be scheduled for me.  So you know, even if we have to come at 2:00 for a couple hours, I'd rather -- you know, like I said, I'd rather move swiftly, take a half hour lunch and try to get it in in a day.  But if we need to put something off we can do that.

MR. PIELA:  I just didn't want to get -- at 3:00 I have two witnesses and try to --

THE COURT:  I understand.  I understand, that's -- you know, I don't like dividing up hearings either.  If I had a convenient time I could just say, okay, you know what, let's set aside that hour or two right now, but oddly, I guess I don't really have that time, unfortunately.  The court is losing Judge Leary (phonetic), so you know, a lot of time that we've had to shift people into his docket until we get a more permanent replacement for him (indiscernible), so.

MR. PIELA:  Judge Murphy once said you're trying to divide loaves and fishes without the aid of a miracle.

THE COURT:  That's right.  I think that's the State employee's motto.

THE CLERK:  (Indiscernible).



25

THE COURT: No. It's a petition to modify. They registered it, and then the petition changed (indiscernible). Okay. Let me get back to my scheduling.

So currently scheduled for July 23, 2019, at 9. We will give you a notice for the new time, and then August 8. Like I said, I'm willing to do that, but you know, if the horse has died, just --

MR. PIELA: Stop beating it.

THE COURT: Please. Settlement status, unfortunately we've done that and it looks like we aren't going to make any progress there. Now we get to one pending motion that I have, and that is a motion by Attorney Sternenberg to address her fees. It was filed May 20th, I have no objections.

MR. PIELA: No position, Your Honor, on that.

MR. COUGHLIN: I don't think I objected either.

THE COURT: Thank you.

MR. COUGHLIN: Right?

THE COURT: And Attorney Sternenberg, let me tell you, I have addressed that issue. Attorney Piela and Attorney Coughlin agreed upon your appointment. Based on your agreeable nature in this case particularly, I went ahead and got you involved, and it sounds like they're both fairly pleased that you've done a pretty thorough job, so thank you.

Today is -- I'm having a hard time. This is the



26

first time I've had to write it.

MS. STERNENBERG:  3rd.

MR. PIELA:  June 3.

THE COURT:  Any other issues from you, Attorney Sternenberg, that need to be addressed?  You came all this way.

MS. STERNENBERG:  The fact that you didn't receive my report and didn't have a chance to review it --

THE COURT:  Yeah.

MS. STERNENBERG:  -- if you have time I would like you to review it before you let us leave.

THE COURT:  Okay.  That being, can you just kind of make an offer of proof for me?

MS. STERNENBERG:  I believe there's harm -- actual harm being done to Emma right now, and I am very concerned about Mother's mental state.

THE COURT:  Okay.

MS. STERNENBERG:  And I don't think that it's in her best interests to wait until July -- yeah, July to -- June 23rd or August 8th to make -- I think this case needs to be -- something needs to be done.  I could refer this to DCYF, but I -- if you have the time to review the report, maybe we could just have a discussion before we leave.

THE COURT:  Well, you certainly have the authority to make a motion for emergency relief, and I would hear that.

My concern is I got a 1:30 hearing, so I'm going to have a hard time reading your report before that.

MS. STERNENBERG:  Okay.  Well, let me talk to both counsel --

THE COURT:  Well, that's what I was going to say. What I'd like to do is perhaps take up my 1:30 hearing, and then maybe see you folks after that.  Could you talk for a half hour or 20 minutes, see if there's any kind of agreement you could reach?

MR. PIELA:  We could, Your Honor, but this -- first of all, the guardian ad litem is not a party to this case. There's a new guardian ad litem statute that outlines what her position is.

Second of all, she comes -- she rolls in here 20 minutes late, and then drops a request for an emergency motion to modify custody.  I have --

THE COURT:  She can probably -- she can call DCYF.

MR. PIELA:  Yeah, let her call DCYF --

THE COURT:  -- or call the Division.  They'll be here at 4:00 if they have a concern.  I don't mind proceeding that way, I just don't think that that's the most efficient way to do it.

MR. PIELA:  But I think I have at least a due process right of being noticed and being able to respond to whatever it is she's going to allege.  And just to say, read

28

my report then enter emergency relief, there was never a request in her report for emergency relief, and to show up here now and say, I want an emergency change of custody right now without telling us why, to me -- at least give me a chance to respond.

THE COURT:  Well, with all due respect, Attorney Piela, you read her report on Saturday.

MR. PIELA:  I did.

THE COURT:  I mean, I haven't looked at the first page of it, so you're in a much better position than I am.

MR. COUGHLIN:  Or me.

THE COURT:  Or Attorney Coughlin.  That's what I'm saying, maybe the three of you could sit down and talk about what it is she's reported, what her concerns for harm are.  I think the best alternative is going to be if there's something you could put in place on a temporary basis, until you can further investigate the allegations, whatever it is, you know, it would be great if you could put in place some temporary emergency agreement to address whatever it is that I don't know about, but it's apparently documented in her report.

You know, I personally prefer not to get the Division involved.  It ends up either extending this case by another 9 to 12 months or, you know, frankly, then they're going to send all kinds of reports to me as well.  So you know, I don't know, I would ask for the courtesy of counsel to

discuss the issue, because --

MR. PIELA:  I just don't like being blindsided at, you know, 1:30 on a Monday afternoon.

THE COURT:  I know, but -- but you're the most in the know other than the guardian.  You know, Attorney Coughlin and I are kind of blindsided and I don't think that's anybody's fault.  It's, you know, we now live in an electronic age, you know.  I didn't have the report, Attorney Coughlin doesn't have any obligation to receive something electronically either, by the way.  So she's coming to the Court, before me now, saying there's actual harm to the child.

MR. COUGHLIN:  So if I could just be heard.

THE COURT:  Sure.

MR. COUGHLIN:  I guess I would say two things, Your Honor.  Number one, if the Court needs to entertain a motion for emergency relief, then so moved.

And secondly, I kind of saw this coming today, and I canceled a 3:30 in my office, kind of important meeting, because I thought what I was hearing, I didn't see the report, but I saw a lot of other action this weekend.  I thought that was just one in a series of emails.

I knew something was probably going to be brought up by the guardian.  I think Attorney Piela would feel the same way.  I mean, I said it before she got here, intuitively --

THE COURT:  I know, I heard you say, is the guardian

30

coming because you have some concerns about what's been happening.

MR. COUGHLIN:  Right.  So I think she thinks the child could be in harm's way, and I think we got to hear her out on that level.

THE COURT:  Okay.

MR. COUGHLIN:  And I got the rest --

THE COURT:  With all due respect to counsel, can I ask you to talk --

MR. COUGHLIN:  Yeah.

THE COURT:  -- so I can go check in on the status --

MR. COUGHLIN:  I have a lot of time.

THE COURT:  -- of my next case?

MR. COUGHLIN:  In fact, I'm going to read the report.

THE COURT:  Why don't you step back, let me take a look at the paperwork, let me take a look at Attorney Sternenberg's report as quickly as I can, and see what the status of my next hearing is.  It's -- it is, either fortunately or unfortunately, another structuring conference, temporary hearing with counsel.  So they may walk in and tell me things are great, or they may walk in and tell me that they need more than their half hour and I'll tell them I'm dealing with an emergency.  So let me see what's going on with that, okay?

31

THE CLERK:  You didn't do an order on this.

THE COURT:  No, I haven't finished my order because we're not quite done yet.

THE CLERK:  (Indiscernible) gave you a copy.

THE COURT:  No, no, he said -- we were going to print a paper copy for him.

MS. STERNENBERG:  I gave it to him.

THE CLERK:  (Indiscernible) got it.

THE COURT:  Oh, oh.

MR. COUGHLIN:  Yeah.  I'll just read it.

THE CLERK:  Do you want another copy?

MR. COUGHLIN:  If you can do it, I would love it.

MR. PIELA:  So we'll stand by, Your Honor, for second call?

THE COURT:  Yeah.  Why don't you take your place in the conference room.  Kick the other folks out.

(Recess at 1:47 p.m., recommencing at 2:25 p.m.)

THE COURT:  We are back on the record in 659-2015-DM-185, the matter of Stephen Loudermilk and Laura Montgomery, both of whom are here with counsel, along with the guardian ad litem, Attorney Sternenberg, here on behalf of the parties' child Emma.  In the context of the pre-trial conference, the parties have all been recently provided, at different times, with a copy of the guardian ad litem's report.



Guardian -- well, before the guardian arrived, Petitioner's counsel expressed some concerns about an incident that has recently occurred between Emma and her mother. I guess there was more than just the two of them present. Well, most specifically with her mother, I should say, and raised some concerns about, I guess I could say her ability to parent safely at this point.

I did have a chance to read the guardian ad litem report, not as close as I want to, but as quickly as I could, taking in everything that's in it, and it is a very thorough report. I'm going to ask Attorney Sternenberg, how best can the Court meet the child's needs at this point?

MS. STERNENBERG: I would ask that the Court have Emma go home with her father and instruct her father that he has the responsibility to get her to school, back and forth from school from today through the 18th, when she graduates. But I do not believe that it's in her best interests to be in the Mother's home right now.

And I would ask that the Court take notice that what I believe to be some decompensation and some mental health issues are occurring that need to be addressed by her mother. At least until we come back before you, I would like to protect Emma and have her be safe with her father. If you'd like me to make an offer of proof about the last week I can do so.

THE COURT:  Just for the record, let me say it is -- there is a police report attached to the guardian ad litem's report.  It is regarding an incident that occurred on May 29th, but why don't you go ahead and summarized what you learned.  And in obtaining the police report, if you spoke to any other individuals, could you tell us about that?

MS. STERNENBERG:  The report was made, it's my understanding, Emma had her last softball game of the year.  She was going away to Pembroke to play, she's a pitcher, and Steve and Jessica were on their way to the game and got some frantic calls from Mom asking for where they were going and if they were going and what the address was.  Steve was driving, Jess was taking the phone calls.

Apparently they got to the field, the game was played, and Mom never arrived at the field.  And then after the game, Emma got on the bus with her team and went back to the school, but Steve was worried that he hadn't found -- he didn't know where her mother was.

So he got a call from the police at some point saying they were looking to find out where Emma was, and Emma was on the bus going back to school.  Mom apparently was in the parking lot of Fairgrounds Middle School and was a little disheveled and having difficulty putting thoughts together, and asking the police to ping her daughter's cell phone to find her.  And the police called Steve, and that's how we

found out that there was police involvement, and asked Steve where Emma was, and he confirmed that she was on the bus somewhere en route between Pembroke and Nashua.

And he was concerned about Laura. She had her 4-year-old in the car with her. It's just -- this is only one event, one discrete event, but there have been many. And the last week there were some communications from Laura saying -- alleging that --

THE COURT: Laura to who?

MS. STERNENBERG: Laura communicated with me and with Steve that she was getting -- her phones were getting hacked and pictures were being changed, and she had found some pictures that she alleges from the child, the 4-year-old child's daycare, she alleges that one of the teachers took that shows the child with a penis. When I look at the pictures, and I invite you to look at the pictures, I don't see one.

But she also alleges that there was a picture that was taken at Keegan's (phonetic) 4th birthday and sent to her, and somebody had changed something on it. When I look at it I don't see that, but there's some paranoia about a lot of things that just really need to be addressed, Your Honor.

THE COURT: Let me ask Attorney Piela if there's anything you'd like to say in response.

MR. PIELA: First of all, I absolutely object to



35

the -- this procedure. This is a complete, I would say, violation of my client's due process rights. We have no notice that the guardian ad litem is going to come to court today. Yes, she indicated that she had concerns and she said she was going to bring the concerns to your attention, but this goes far beyond bringing concerns to your attention.

This is a motion to modify custody on an emergent basis to strip Emma from my client's care and award it to Stephen, who for the past several years has only had the child on weekends. He lives in Fitzwilliam, and now we're going to have Emma being driven from Fitzwilliam, New Hampshire, to and from Nashua.

Now, as far as this whole issue of the Pembroke, yes, my client was confused as to where the game was going to be. Yes, she didn't know where the high school was. She probably called a few too many times and got worried. She got worried.

Was Emma harmed in any way, shape, or form? No. Did Emma even know that my client was trying to track her down? Probably not if she was on the bus. As far as what this police allegedly told Stephen, what's in the police report is in the police report.

Now, as far as these photographs, I only saw these photographs on Saturday. They -- what I was shown was blurry. My client claims that she saw something in the photograph that



was disturbing --

THE COURT:  These photographs were not provided to the Court, can I just say for the record.

MR. PIELA:  My client has copies.  You want to see -- would you like to see --

THE COURT:  No, I'm just saying there -- Attorney Sternenberg attached a number of documents to her report, some studies that she's reviewed.  There was a report card, I'm just -- I just want to make it clear for the record, you know, she suggests some therapeutic alternatives, whatever, she attached a police report.  The pictures she's referring to are not in the report.  I'm just stating it for the record I have not seen -- go ahead.

MR. PIELA:  Very well.  The thrust of the matter is, if you -- to succeed in any kind of an emergency motion, which I question whether the guardian even has the ability to do, but to succeed in any type of emergency motion you have to show a clear and immediate risk of irreparable harm to the child.  There is no showing on that.

What -- how this all initiated was a dispute between Stephen and Laura as to where -- whether Emma could come visit Stephen in Fitzwilliam this past weekend or go to Plymouth to see Emma's grandparents.  And my client had plans to go see the grandparents, and took her there.  There was no violation of any court order, there was no allegation that Emma was

going to be harmed by this visit. By all accounts they had a great time on the beach and getting the grandfather's boat ready to go on the water.

Here's my concern, Your Honor. Yes, the guardian -- the GAL report is very negative to my client. I had a chance to read it over once, my client literally got it about an hour ago. She hasn't had a full chance to digest it.

We certainly haven't had a chance to strategize and come to this Court with evidence as to an appropriate response to this. And now I'm getting told at a pre-trial conference that was never noticed for some sort of emergency motion that the guardian ad litem wants to pull custody of Emma away from my client. No notice, no prior motion, no nothing. If you're going to do something like that, even the court rules requires that you give advanced notice to the other side.

THE COURT: (Indiscernible) Rule 2.9 says, subject to the provisions of 458, 16, and 461-A:9, an emergency order may be granted without written or oral notice to the other party or attorney --

MR. PIELA: Subject to Rule 461-A:11-9 (sic), which says that both parties are represented --

THE COURT: A:9.

MR. PIELA: A:9, and I'm paraphrasing because I don't have the statute in front of me, as I understand that, if parties are represented, advanced notice is generally

required and no emergency will be -- motion will be granted without at least some showing of prior notice. I got no notice of this.

MS. STERNENBERG: Your Honor, on Friday I had a coliloquy (sic) via email with Attorney Piela, and I told him that I would take it up with the Court because I was concerned about Emma and where she was going to be over the weekend. And his client did not agree.

His client was taking Emma out of school Tuesday, and then said that she was going to be out of school Friday and Monday, and I did not agree with that. So Attorney Piela did know from me on Friday that I was going to take this up with the Court.

MR. PIELA: And Attorney Sternenberg is not --

MS. STERNENBERG: He was on notice.

MR. PIELA: -- is not telling you that she told me that she was going to file a motion to strip my client of custody. There's a huge difference, one, to voice concerns; second, to file an unnoticed motion.

That is why I am upset with this, because I am feeling like myself and my client have been blindsided, and this is what this is. It's a blindsiding by the other side. And as far as taking Emma out to school today, Emma is in school at the middle school in Nashua.

MS. STERNENBERG: Only because I insisted upon it,



39

and Dad did not agree that Emma should be taken out of school --

MR. PIELA:  And before --

MS. STERNENBERG:  -- without notice.

MR. PIELA:  -- before you advise -- interrupt me again, Attorney Sternenberg.  Let me finish.  I myself said that Emma should be in school, but what were the --

THE COURT:  Hold on a second.  Why would Emma be taken out of school?  What's the purpose --

MR. PIELA:  Because Mom wanted to take the child on a vacation and miss a school day.  Okay, if that's bad judgment on her part, fine.  But it's not showing that this child is going to be imminently in danger of irreparable harm.

That's the standard that has to be met, and it's not fair to my client to show up here today and be handed this oral motion for emergency custody at the 11th hour.  I don't care how Attorney Sternenberg tries to massage the facts, the fact is that she never noticed me properly or at all that she was going do this.

So I'm livid.  I am absolutely livid for my client because if this is the case and the guardian ad litem can walk into any court any time and say, I have concerns, boom, I want an emergency motion, the kid disappears.

THE COURT:  Well, I'm reading through the rules that you pointed out about what guardians can and can't do.  You're

40

telling me she can't file the motion.

MR. PIELA:  From what I understand --

THE COURT:  I'm not sure how she's to alert the Court to an emergency situation if she can't file a motion --

MR. PIELA:  I'm --

THE COURT:  -- other than comment as an officer of the court, notify me --

MR. PIELA:  Then --

THE COURT:  -- and the parties.

MR. PIELA:  -- I would cite the Court to the recent decision that Judge Alfano, I believe, got reversed on, but he was citing the recent amendment to the GAL statute where the GAL was to participate as a party, and Judge Alfano indicated that no, the GAL could not do that.  But even if we put aside whether she could procedurally go forward and bring a motion, has she done it properly under 461-A:11 -- A:9, no, she has not.

THE COURT:  461-A:9.

MR. PIELA:  Which is the emergency --

THE COURT:  You keep saying 11-9.  I'm just correcting you for the record.

MR. PIELA:  My tongue is -- is --

THE COURT:  That's fine.  Go ahead.

MR. PIELA:  -- wrapped around my molars.

THE COURT:  Go ahead.



41

MR. PIELA: She hasn't done it properly, and more important, she hasn't even met the basic standard of an emergency motion. That is immediate, irreparable danger. The child is not in immediate, irreparable danger, she's in school. She's not in immediate, irreparable danger because she went to Plymouth to see her grandparents. She is not in immediate, irreparable danger because Mom was going to take her out of school one day early to go see her grandparents. The kid's in 8th grade, she doesn't have final exams. She's not in immediate, irreparable danger --

THE COURT: Do you know that?

MR. PIELA: Huh?

THE COURT: Do you know that?

MR. PIELA: Does Emma have final exams in 8th grade?

THE RESPONDENT: She had a -- one of the things that she had to do was a choral (phonetic) thing.

MR. PIELA: Okay, she has a choral --

THE COURT: Yeah, I'm just saying, you know, don't represent those things unless you know them to be the case. Go ahead.

MR. PIELA: I'm sorry, Your Honor, I'm going back by what most 8th graders have and they don't have finals. But to the extent -- missing a day of school does not show immediate, irreparable harm to the child.

If the guardian -- the guardian's report's replete



42

with her concerns, this was all known to her February, March, where some of these issues happened. If she felt that strongly she should have filed something then, not wait until today, not wait without any type of notice to walk in and do something. And she certainly has to show that something right now is giving Emma immediate risk of irreparable harm; she has failed to do that. I would ask the motion be denied.

THE COURT: Attorney Coughlin, what would you like to say in response? The guardian's request, to which I'll note for the record Attorney Coughlin has already said so moved. By that, first of all, could you clarify whether or not you're making a motion to the Court, and what you're seeking for relief?

MR. COUGHLIN: Yes, Your Honor, I am asking that the Court grant an immediate, oral motion relative to the guardian's recommendation that primary residential responsibility, until we have a hearing in this case in July, lie with Stephen and Jessica Loudermilk. And in support of that, I would promote what you haven't heard yet. I would suggest if my client were to take the stand, Your Honor, he would tell you that this has been a long time coming, but the events of the last ten days or so have been particularly alarming.

With regard to the procedure implemented today, I think the Court is aware that if anybody's been in the dark



43

with regard to this case, it's me, and yet I told you when I walked into this courtroom that I expected the guardian to be seeking some relief. Not having read the report, I can tell you, and having that perception is important because Attorney Piela did read the report, as I understand it, and I've only read bits and pieces, but in my humble opinion it represents a situation where this child could face some serious danger or emotional harm in the environment that she has been witnessing for the last couple of weeks.

That environment is replete with violence and other emotional abuse between her mother and her mother's SO, apparently named Chris. Upon information and belief, Your Honor, he's taking action today relative to that minor child.

MR. PIELA: Can I have an offer of proof as --

THE COURT: If you could just clarify, are you referring to her -- when you say SO, significant other Chris with whom she resides and with whom she has a, I believe, a 4-year-old child?

MR. COUGHLIN: Yes --

MR. PIELA: Correct.

MR. COUGHLIN: -- and I think he's the father.

THE COURT: You have -- yes. You have reason to believe that he is taking some sort of legal action against Ms. Montgomery with respect to their child?

MR. COUGHLIN: That's what I've heard.



44

MR. PIELA:  Can you -- can I ask Attorney Coughlin to please give me more detail on that?

THE COURT:  Or at least the source of the information?

MR. COUGHLIN:  Sure.

MS. STERNENBERG:  I spoke to Chris Morel this morning.

MR. COUGHLIN:  Okay, that's my source.  Go ahead.

THE COURT:  Thank you.

MR. PIELA:  Then can I have a representation from the guardian as to what Mr. Morel is purportedly doing?

MS. STERNENBERG:  I don't know -- I don't know what he's doing.  I know that he was very concerned about the events, including Mrs. Montgomery going to the daycare with a picture that she has, Your Honor, if you'd like to look at it, that she says represents the young 4-year-old with a penis in his hand.  I don't see that, but KinderCare was quite concerned about it.

There are some things, Your Honor, that have happened over the last 12 days that have caused me to become increasingly concerned about the welfare of Emma and of the 4-year-old.  Not -- when I ask questions, and I just met with Laura and her counsel, she tells me things like, I called the police because Steve was on the bus.

Well, he wasn't on the bus.  And then she said, but

he was following the bus, but he wasn't following the bus. But Jess sounded frantic. Emma wasn't on the bus, she couldn't pick up an address. She talked to Emma, Emma was on the bus. There were all these things that happened in very short time that indicate to me, Your Honor, that there's a mentally instable situation.

And I am very concerned because, over the last week, I've shared with counsel the emails that I've received that have pictures in them and that have kind of nonsensical discussions going on, and I've asked some questions that weren't answered directly. And then I was told that Emma was tired so she picked her up in the middle of a school day on Tuesday, and Emma was tired so she wasn't going to school on Friday and Monday. And I said, no, Emma should go to school.

Emma is a kid who absolutely loves being in school and wants to be in school and is proud of being in school. I will tell you, Your Honor, it is not in Emma's best interests not to be in school. Was it in Emma's best interests to stay with her father over the weekend on Saturday and Sunday and to gain some sleep? Yes, but that did not happen. She got home late at night on Monday -- on Sunday night after being in Plymouth, Massachusetts.

Emma is not --

THE COURT: Hold on. Can I just get the facts straight? So Mother did pick the child up from school on

46

Friday --

MS. STERNENBERG:  On Tuesday --

THE COURT:  On Tuesday?

MS. STERNENBERG:  -- she picked her up.  On Friday morning she alerted us that she was going to take her out Friday and Monday, and I insisted she go to school.

THE COURT:  Okay.  Thank you.

MS. STERNENBERG:  And Attorney Piela allowed that he would make sure that that happened --

THE COURT:  Okay.

MS. STERNENBERG:  -- and it did happen.  And then on Monday she was returned to school, but not -- you know, she got home very late at night, so of course she's probably still tired.

THE COURT:  Okay.

MR. PIELA:  Your Honor, I would move to strike most of these --

THE COURT:  So she was picked up Friday by her mom --

MS. STERNENBERG:  Yes.

THE COURT:  -- and taken away for a weekend in Plymouth --

MS. STERNENBERG:  Yes.

THE COURT:  -- but returned late is your understanding.



47

MS. STERNENBERG:  Yes.

THE COURT:  Okay.

MS. STERNENBERG:  It's my understanding she's at school today.  But Your Honor, it has more to do with the --

THE COURT:  I understand.

MS. STERNENBERG:  --  strangeness of things that keep happening over the last week that make me very concerned, and I don't want to find out that something worse has happened.

MR. PIELA:  Your Honor, move to strike.

MS. STERNENBERG:  Laura's told me -- Laura told me.

MR. PIELA:  Move to strike.

THE COURT:  Attorney Piela, it's argument --

MR. PIELA:  It is argument, but --

THE COURT:  -- I don't take argument for anything other than argument.  Go ahead.

MS. STERNENBERG:  Laura told me just now that during the week she called the police because she got these altered emails, pictures on her phone, and that she had them come out and she showed them the pictures, and that the police said they did see penises but nothing was done.  And when Mr. Loudermilk went to try to get the release, the report from the court -- the police, they did not make a report.  So it's just those crazy things that are happening that make me very concerned about the Mother's stability.

THE COURT:  Okay.



48

MR. PIELA:  Your Honor, if --

MR. COUGHLIN:  Technically it's my turn, but --

MR. PIELA:  I'm sorry, I had to -- had to respond to --

MR. COUGHLIN:  I started -- I was going to have you take notice, Your Honor, of this particular guardian ad litem, who's been at this for as long as I have, 30 years I bet, who's issued thousands of reports, who knows the gravity of what she's recommending, and can weigh the harms here as to, you know who's going to suffer here more potentially, Emma or Laura, her mother.  One other story my client would relate to you --

THE COURT:  Let me just say for the record, my concern about whether or not Laura suffers is not a concern.

MR. COUGHLIN:  Okay.  But you know, what I heard opposing counsel say is you're stripping custody from my client.  Nobody's trying to strip anybody from anybody, we're simply trying to keep this child out of harm's way.

My client would tell you one other story which may be of note.  While he was at the softball game at Pembroke, New Hampshire, he gains the understanding that she's in Pembroke, Massachusetts.  Take that for what it's worth.

He also got an email this weekend from her alleging that he went on to the field and asked her when she was due, suggesting that the minor child was pregnant to my client.



That's the only way he could take it.  In fact, the word "pregnancy" was --

THE PETITIONER:  Yes, was --

MR. COUGHLIN:  -- part of what --

THE COURT:  This was something that happened not on the 29th, but on June 1st?

MR. COUGHLIN:  No, this was last Thursday night, right?

THE PETITIONER:  It was in an email talking about Emma being pregnant, and I was quite honestly, Your Honor, just confused.  I asked my wife, she didn't understand.

And it was only brought to my attention today of why the pregnancy comment was even brought up, but it was by Laura stating that I went on the field and asked my daughter when she was due.  At that point in time I was a first base coach because I've been actively participating in her softball, and she may have misunderstood what I said.  But the only questions I ever ask Emma during a softball game is when is she up to bat, so I --

MR. COUGHLIN:  He may have --

THE PETITIONER:  -- maybe --

MR. COUGHLIN:  He may have asked, when are you due up.

THE PETITIONER:  Or whichever -- so but for --

MR. COUGHLIN:  But then he gets the whole pregnancy



50

series of emails.

THE PETITIONER:  -- for me to ask my 13-year-old daughter if she's pregnant is completely outlandish and --

THE COURT:  And again, that comment came from a later correspondence from Ms. Montgomery?

THE PETITIONER:  I don't know exactly the game that it happened at, Your Honor.  You would have to ask her.

MR. COUGHLIN:  Okay.  My client and/or his wife would testify today that today, they received a number of texts from Laura asking if I was coming to this hearing, asking Jessica whether her husband was coming to this hearing, and she did her best to say, yeah, we have a hearing today, and I suppose she responded that everyone's coming.  What?

THE RESPONDENT:  I did not --

THE PETITIONER:  There was no response.

MR. COUGHLIN:  You didn't respond.

THE PETITIONER:  No responses.

MR. COUGHLIN:  Okay.  We're not suggesting that -- at least I'm not suggesting that immediate, irreparable harm occurred in this case by the child missing school or the child going to Plymouth.  She's clearly not following the recommendations she's getting from the guardian.  She's on her own (indiscernible) detour, I would suggest to the Court.

And it's clear that her mind is not working in a functional capacity.  So the guardian -- what I haven't heard



51

the guardian say today, which is the last thing I want to tell you, is the guardian feels that she needs to seek some immediate mental health.  And if that can be done quickly and she can get on the right regimen of whatever medicines she might need or counseling that she might benefit from, that's certainly going to be a good thing for this family.

And the irreparable harm is the things you heard about from the guardian:  the involvement of the police, the violence between Laura and this 4-year-old's father.  These things cannot occur any longer, especially as school ends. It's an important time for a young child.  I think that's all I have for the Court.

THE COURT:  Okay.  Thank you.

MR. PIELA:  May I have the opportunity to comment briefly?

THE COURT:  Go ahead.  I have one -- I'd like to make one request of all counsel, and candidly, of the parties. Any text communications that you've discussed or made mention of, including, Attorney Sternenberg, I was not -- I don't believe I was, although I've been looking through days of email because I'm back from a recent vacation, I don't believe you emailed me your report.

MS. STERNENBERG:  I did not, Your Honor.

THE COURT:  Okay.

MS. STERNENBERG:  I -- I don't --



52

THE COURT:  Okay, that's fine.

MS. STERNENBERG:  -- typically do that.

THE COURT:  That's fine.  That's fine.  I didn't ask you to, I'm glad you shared it with both of the parties.  I'm just saying, if you would share that email as to when it was sent, I'm interested in any communication between yourself and Attorney Piela if it was done through -- was it done through email communication?  Okay, great.  And then again, communications that Mr. Loudermilk or his wife received in texts on the 29th of May, and any text communication Ms. Montgomery may have had with Mr. Loudermilk or his wife on the day of May 29th would be helpful.

Attorney Sternenberg, you mentioned some incidents that happened earlier in the week with regard to some photographs.  Again, if those are texts I would like them text.  I'm about to give you the email to which you can submit all of those, cc-ing all three of you.  That is Attorney Sternenberg's email, Attorney Coughlin's email, Attorney Piela's email, I would like them all sent to jlodes, J-L-O-D-E-S, at courts.state.nh.us, and please cc all three of the attorneys involved in this case.  And Ms. Lodes will produce them in paper form for myself --

MR. PIELA:  J-L-O-D-U-S?

THE COURT:  No, D-E-S.

MR. PIELA:  D-E-S at courts.state.nh.us.



53

THE COURT:  Right.  Same address as mine, she's just J-L-O-D-E-S.

MS. STERNENBERG:  Your Honor, the pictures that I received I will certainly send on, but I couldn't --

THE COURT:  But you want to wait for the prosecution --

MS. STERNENBERG:  I couldn't make pictures -- or copies of those pictures, but I know that Laura has the originals with her.  So it might be a better idea, if you're interested in seeing the pictures --

THE COURT:  Is there discussion of it?

MS. STERNENBERG:  Yes.

THE COURT:  Okay.  Then I don't need to see the pictures.

MS. STERNENBERG:  Okay.  All right.

THE COURT:  Unless someone feels as though the pictures are relevant, and Attorney Coughlin -- Attorney Piela in particular, do you have some assertion or would you like the Court to see those pictures to see that your client's representation is something other than what was expressed by -- apparently the daycare was kind of concerned about her representation as to --

MR. PIELA:  I have no --

THE COURT:  -- pictures.

MR. PIELA:  I didn't --



54

THE COURT: You don't have the pictures?

MR. PIELA: I have the pictures here.

THE COURT: Okay.

MR. PIELA: Do you want to see the pictures in detail?

THE COURT: If you want to submit them to me as an explanation as to your client's concern, sure.

MR. PIELA: I think that would be appropriate.

THE COURT: Okay. I'm saying please email them to Mrs. Lodes. Oh, you have the actual --

MR. PIELA: I have the actual physical photograph --

THE COURT: -- physical photographs, okay.

MR. PIELA: Yeah.

THE COURT: Do you want to just -- are these the photographs we're talking about, folks?

MS. STERNENBERG: Yeah, there's another -- there's another one that's on her phone, Your Honor.

THE PETITIONER: I've never seen those -- I've never seen those pictures, Your Honor.

THE COURT: Okay. Do you have another photograph that's on a phone?

MR. PIELA: I have -- yes. There's a photograph on a phone.

THE COURT: Okay. Could we see that? First of all, I'm going to ask you, would you mind kindly just showing those

55

to the guardian ad litem.  Let me just ask also, you know --

MR. COUGHLIN:  You've already seen them.  Can I see them?

THE COURT:  Yeah, I was going to ask you to just walk them around to make sure that they are the same things that the attorneys have been talking about.  But is this -- okay.  I mean, clearly this isn't Emma.

MR. PIELA:  No, that's Keegan.

THE COURT:  Oh, this is Keegan, the 4-year-old.

MR. PIELA:  The 4-year-old.

THE COURT:  Okay.  Thank you.  I have two photographs of Keegan on paper.  May I retain these?  Respondent's A.

(Respondent's Exhibit A marked for identification)

MR. PIELA:  But Judge, this is kind of the problem that we're having.  Essentially we're trying this case --

THE COURT:  Yeah, it's an emergency hearing, Attorney Piela.  This is what you get.  You know, believe it or not, when you walk in with an ex parte and you sit and you wait for the judge's order, the judge has the authority to say, if both parties are here, come on up, we're having a hearing right now.  You're not entitled to the same amount of discovery, et cetera, et cetera.

When a child is at risk of imminent harm or injury, the rules are quite relaxed.  It talks about things like you

56

can attach exhibits, you can send in attachments.  There's all kinds of things that the Court can do to relax the normal procedures and the rules to address an emergency situation.

You know, frankly, the fact that I let you, by necessity, step out for a half hour and think a little bit about it is more notice than most people have.  And again, I would remind you that, you know, you had this on Friday.  You had this well before any --

MR. PIELA:  I --

THE COURT:  You know, I didn't have it, Attorney Coughlin didn't have it.

MR. PIELA:  I had it on Saturday, and then I was --

THE COURT:  Saturday, and I'm just saying, you know --

MR. PIELA:  -- trying to read it off my phone.

THE COURT:  -- we had no notice of it.  But you know, sometimes emergency situations require us to, you know, be on the tip of our toes, and I'm trying to do the best I can here in affording you the opportunity to respond to the allegations.  I mean, again, is there anything else you want to say other than showing me the picture?

MR. PIELA:  Did she see the picture?

THE COURT:  We're still looking for the picture.

MR. PIELA:  Oh, okay.

THE COURT:  And now, this picture was shown to a



57

police officer.

MR. PIELA:  I believe this picture was, and the pictures of --

MS. STERNENBERG:  The pictures of Keegan were shown to a police officer.

THE COURT:  Okay.  And then I have another picture --

MR. PIELA:  Whose phone was that?

THE RESPONDENT:  That's mine.  That's an emergency thing.

THE COURT:  All right.  This is going to be the wrong question for me to ask but I have to ask it.  Where in this picture is there supposed to be a penis?

MR. PIELA:  There is none.

THE COURT:  Okay.

MR. PIELA:  It's a --

THE COURT:  All right.  I'm just looking.  Let me just represent, I have a picture that shows four people.

MR. PIELA:  Yes.

THE COURT:  Attorney Piela, when you handed me the phone it was expanded and blown up to the very right side where there was a hand and an arm.  So that's all I could see.

MS. STERNENBERG:  That's --

THE COURT:  So it's kind of this squishy, fleshy-looking thing and I'm going, like, what is that.



58

That's a hand --

MR. PIELA:  My client would tell you that --

THE COURT:  -- and a hand.

MR. PIELA:  -- that part of the picture, her concern was that it was altered.

THE RESPONDENT:  That it was altered.

MR. PIELA:  She believes that there's a blurring area where it was altered, I don't know what it depicts, but it looks like a movement artifact on the phone.

THE COURT:  Okay.  Is there -- okay.  There's a number of these pictures.  I don't know which of these pictures you'd like to give to me, but whichever she thinks is the best representation of what --

MR. PIELA:  I'll have her email them to me and I will forward them to you.

THE COURT:  Could you do that?  Could you email them to her and then email them to Mrs. Lodes?

MR. PIELA:  Yes, I will, and with copies to everybody.

MR. COUGHLIN:  So if I could, Your Honor, I haven't said much.  I'm looking at communication from Laura Montgomery dated May 28th --

THE COURT:  Is this part of what you're going to now send to Mrs. Lodes, please?

MR. COUGHLIN:  Yes.



59

THE COURT:  Okay, thank you.

MR. COUGHLIN:  Okay.  And I -- I would like to quote it to the Court, I'd like to put it on the record today, if I could.  This is Laura Montgomery talking to -- I'm uncertain who, you?

THE COURT:  And let me just note, the phone dinged twice and I can't ignore the fact they're coming from the child to the Mother.  Are you responding to your daughter right now?

THE RESPONDENT:  Yes.

MR. COUGHLIN:  All right.  This will take one minute, Your Honor.  This is Laura Montgomery's words.

"I have been seeing altered photos and others have been seeing oddities as well.  Definitely audio has gotten worse, especially if you are a child under the age of five and you are mixing media and parental controls," in parens, "and parental thoughts/beliefs about restrictions," end parens, "with that of a teen.  Here are some clearly altered photos that are of concern, especially given the involvement of child genitalia when it appeared, and people not knowing certain information about past," in parens, "i.e., adoption, abortion, et cetera," end parens.  "These only recently appeared and are out of place, just seem wrong, especially

60

when having to cover up the face of a rape victim

when both the mother/father and resulting child are

involved."

THE COURT:  And is that her communication?

MR. PIELA:  Yep.

THE COURT:  Is that one of the things you're going to send to me, Attorney Piela?

MR. PIELA:  That was one of the communications that was sent to me and to Attorney Coughlin --

THE COURT:  Okay.

MR. PIELA:  -- and apparently also to the guardian ad litem.

THE COURT:  Okay.  Give me just a minute, please.  I have a -- I now have a 3:00 that I'm going to issue an order.

(Pause)

THE COURT:  Please be patient.  I apologize for the delay.

(Pause)

THE COURT:  Attorney Piela, does your client work with any individual therapist at this point?

MR. PIELA:  Laura, do you work with any individual therapist at this point?  No, she does not.

(Pause)

THE COURT:  Are you getting tons of email from counsel?

61

THE CLERK:  No.

MR. PIELA:  My phone is dead, so I --

MR. COUGHLIN:  We didn't know there was a time frame.

THE COURT:  As we roll into the 3:00 hour, you know, I try not to keep them that arbitrary, but.

MR. PIELA:  I'll -- my plan was, Your Honor, was to print out the emails that I received in the last couple of days, scan them in hard copy, and then email them to everybody.

THE COURT:  That would be a very wise thing to do if you want to.  I just wanted a chance to see them today, but you're all officers of the court and I trust that you've been candid about what you've represented.  So based on that, I'm -- I wouldn't normally see them, but I would like to have them as a supplement to your testimony on the record or your representations on the record today.

MR. PIELA:  I actually believe the 8th graders don't have final exams, Your Honor.

THE COURT:  I'll let that one go.  It's probably irrelevant, but.

(Pause)

MR. PIELA:  Judge, may I ask one question while you're writing?

THE COURT:  No.



62

MR. PIELA:  Please?

THE COURT:  But right after.

(Pause)

THE COURT:  Okay.  Now the last thing is this. Would your client like a five-day hearing on my order next Friday?  My order being that the Petitioner shall have sole legal and temporary sole decision making, residential responsibility.

MR. PIELA:  We would like the five -- to ask for a five-day hearing, Judge.

THE COURT:  Okay.  We have to add a session on Friday at 10:30.  This Friday.  You have judicial education all day, I know, but I'm going to have to forego that because I can't do hearings on Saturday and Sunday (indiscernible).  I bumped into Attorney Ballenger (phonetic) on Sunday, oh, I hope you're enjoying your Sunday.  I said, yeah.

MS. STERNENBERG:  Can we do Monday instead?

THE COURT:  I can't do Monday.

MR. COUGHLIN:  (Indiscernible).

THE COURT:  Attorney Sternenberg, if for any reason you could appear by phone?

MS. STERNENBERG:  Oh, I could do that.

THE COURT:  Is that possible?

MS. STERNENBERG:  It's better, yeah.

THE COURT:  This Friday at 10:30.  I have a judicial



63

education day that day but I've already had to schedule two emergency hearings, so there goes that. But no complaints that I'm not competent, that's all I ask, so. Foregoing my education for trying to get things squared away here.

MR. COUGHLIN: I'm under notice of a deposition that day as a deponent for the first time in life. I witnessed an accident.

THE COURT: Are you serious? What time would you be available Friday?

MR. COUGHLIN: It's down for 9.

MR. PIELA: Do it after lunch?

MR. COUGHLIN: It would have to be after 1.

MR. PIELA: That would work for me.

THE CLERK: (Indiscernible) at some point you have to appear.

THE COURT: I do. At some point I have to at least go for a pastry or they take my -- we judges also have to do continuing legal education, it's just not the same as attorneys. Again, I could do the afternoon but it would have to be late in the afternoon. Attorney Coughlin, what is your --

MR. COUGHLIN: Yeah, the later the better for me.

MR. PIELA: Ditto.

THE COURT: Yeah, does anybody really want to be here 3:30 on the a Friday? Or 3:00 on a Friday?



64

MR. COUGHLIN:  (Indiscernible).

THE COURT:  Put it on at 3.  Attorney Piela?

MR. PIELA:  Yes, ma'am.  June 7th, 3:00.

THE COURT:  6/7 at 3.  Wear my cloak of invisibility, they won't know when I get there or when I leave.

MR. PIELA:  How long is offers of proof or live testimony?

THE COURT:  Offers of proof only, please.  And let me first say, Attorney Piela, I offered to answer a question once I was done with my order, but I'm going to have to state on the record some other things.  Go ahead.

MR. PIELA:  Procedurally you want emails, obviously, that were exchanged between the group.  Individual emails between myself and my client would be privileged and I wouldn't disclose those.

THE COURT:  They are not privileged unless you discuss them in the course of today's hearing.

MR. PIELA:  Correct.  But if I gave specific advice to my client that I did not discuss --

THE COURT:  No, I would not expect any privileged communication.

MR. PIELA:  Understood.

THE COURT:  But if you made a representation to me like, Your Honor, my client -- what my client wrote was X, Y,

and Z, you've waived that privilege and I'd want to see those emails.

(Court and clerk confer)

COURT'S RULING

THE COURT: What is -- there's one thing that's not in this order, and that is obviously, I'd like to see something from Ms. Montgomery. 12 Amherst Street, emergency crisis evaluations. She can walk in there, have a crisis evaluation. I would want to see some sort of a report from somebody on Friday addressing some of the concerns that have been raised here today.

With respect to my ex parte motion, it's been doctored up, it looks a little different than what you're used to seeing because this form is a form, and there's nothing about family court that fits on a form. But in any case, I indicated an oral motion for ex parte relief has been submitted to the Court. The Court reviewed the motion, comma, see record.

Based on that request, the Petitioner, that is Mr. Loudermilk, shall have temporary, and I underlined that, sole decision making and residential responsibility for the minor child. Under "other", I simply wrote -- and "other" is intended for an order, but I made a very brief factual finding that the Respondent's behaviors as represented by legal counsel on the record today demonstrates delusional and

66

paranoid thinking.  She appears to be mentally deteriorating, and suffers from known mental health and behavioral disorders.

The Court finds the child to be at risk of imminent -- I'm sorry, the child to be at risk, sorry, that's why I like to read these over -- at immediate risk of irreparable harm or injury if no order issues at this time. Father to pick the child up from school.

MS. STERNENBERG:  She's at home.

THE PETITIONER:  She's at home.

THE COURT:  She's at home?

THE PETITIONER:  She's home now, correct, Laura?

THE RESPONDENT:  Yeah, she's at home.

THE COURT:  Okay.

MS. STERNENBERG:  Are there -- is there going to be a problem if he picks up --

THE RESPONDENT:  If what?

MR. PIELA:  My client will follow the order.

THE COURT:  Thank you.

MS. STERNENBERG:  Are your parents there?

MR. PIELA:  My client will follow the order and will turn the child over to Mr. Loudermilk.

THE COURT:  Obviously, you know, if you have any issues you can seek a civil stand-by.  But again, I appreciate that, thank you, Attorney Piela.

Mother may contact the child by phone at 7 p.m.



That's each and every day; however, calls may be monitored by Mr. Loudermilk.  Representations by offer of proof of counsel substitute under the statute for is otherwise required as an affidavit or verified petition.

I am -- I'm familiar, Attorney Piela, with your citation of the rules; however, in reading the rules I think the purposes of intent and intent behind things like, there must be a verified affidavit or petition is so that people, most often unrepresented individuals unfamiliar with their obligations to the court, come in and make unsubstantiated claims, and the Court cannot issue ex parte relief without it being verified or attested to.  However, I have three people in front of me, all of whom who are officers of the court, all of whom have responsibilities under Rule 3.3.  Based on what they said, I have concerns about Ms. Montgomery.

Again, I would expect by Friday she would have some evidence or information for the Court to demonstrate that she is fine and mentally stable and not experiencing any sort of odd or unusual thinking, that she is not in any way delusional or paranoid or the types of things that I've been hearing and I suspect will be substantiated by what counsel provides me over the next several days.  We will have a hearing in five business days to address whether or not the order should be changed or should remain in place until the end of the school year.

Attorney Sternenberg, you need not file a motion to appear telephonically. If you choose to appear telephonically, you need to contact the clerk to find out how to do that.

MS. STERNENBERG: Thank you.

THE COURT: Okay? Otherwise I'll see you Friday at 3:00.

Ms. Montgomery, please understand, I as a family court judge never issue orders intended to be punitive. Even in contempt motions, I just want people to follow the order. I'm not out to punish you, I'm not out to take your daughter away. I'm out to make sure, as they say on an airplane, that your air mask is on before you assist others, okay?

Parents have to have themselves together before you can provide well for your child. I'm in essence giving you a week of time to hopefully talk with -- and again, we have Greater Nashua Mental Health Services, we have an emergency intake at 12 Amherst Street, you can walk in any time of the day and say, you know, the Court just ordered my daughter stay with her dad for a week because they have concerns about my well-being. You know, tell them what happened, tell them what your concerns are.

If you need some kind of assistance to be a better parent, please exercise your opportunities to do that. If they say you're absolutely fine and dandy, you're going to

69

probably be talking on and off with Attorney Piela, he can communicate with your physician and bring me a report on Friday that tells me something other than what I've heard here today, okay?

MR. PIELA: Very well.

THE COURT: Thank you very much. I will have a structuring conference order out to you later. Again, I don't intend to substantiate anything on this ex parte emergency order, very much in the same way I don't want to issue them on a normal basis. After the hearing next Friday when I hear more and make offers of proof, I can make findings, okay?

MR. PIELA: Very good.

THE COURT: Thank you. Please just be nearby so that Mrs. Lodes can get you your hearing notice for next week, and if we want to -- we have some photocopies (indiscernible) if you need it, Attorney Sternenberg. Thank you, Counsel.

(Proceedings concluded at 3:27 p.m.)



70

CERTIFICATE

I, Karen Raile, a court-approved transcriptionist/proofreader, do hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, to the best of my professional skills and abilities.

KAREN RAILE, CDLT-105                    April 26, 2021
Transcriptionist/Proofreader

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net