## STATE OF NEW HAMPSHIRE

9th Circuit-Family Division-Nashua

Dana Albrecht and Katherine Albrecht

659-2016-DM-00288

2019 JUN 21 P 3:52

### Petitioner's Motion for Reconsideration

Now comes Dana Albrecht, Petitioner, by and through his attorney, requests that this honorable court reconsider its order dated May 30, 2019, and states:

1. This *Motion for Reconsideration* is being filed because Petitioner believes that this honorable court has misapprehended some of the evidence submitted during trial on May 9, 2019, as well as certain points of law and fact.

2. The trier of fact considers not only the facts, but the reasonable inferences from those facts. Consequently, Petitioner believes this honorable court has not correctly applied the law, and has held Petitioner to a higher standard of proof than "more likely than not."

3. It is not frivolous to question whether the court has made a mistake, or misapprehended the facts or reasonable inferences from these facts.

4. It is also required by our rules that a motion for reconsideration be filed in order to preserve issues for appellate review.

### Telephone Contact

5. In its order, this court states that "Petitioner ... has failed to prove his allegations that Respondent has refused to allow the children to telephone, text, or write."

6. However, RSA 461-A:6, I(f) requires that the court shall consider "The support of each parent for the child's contact with the other parent as shown by allowing and promoting such contact." RSA 461-A:6, I(f) requires that the court shall consider "the ability and disposition of each parent to foster a positive relationship and frequent and continuing physical, written, and telephonic contact with the other parent."

7. Pursuant to the transcript of the hearing of May 9, 2019 (henceforth *transcript*), Petitioner reminded this court of "Katherine's own sworn pleading in which she told them the privacy implications, quote, unquote, of them using phones [owned] by their father." (*see transcript at 11*).

345

8. In Respondent's own sworn pleading (document #244), Respondent admitted (see paragraphs 11 & 12) that:

> *When S███ and G███ returned from Christmas [December 2017] with new phones from their father, Ms. Albrecht said they were welcome to use them. However, since they had previously told her they did not want their father monitoring their communications, she felt it important to tell them the privacy implications of using phones that are owned by him. She explained that all phones (except pre-paid phones) allow the account holder to view usage logs, which include the time, date, phone number, and duration of all phone calls and SMS messages sent or received, although they cannot listen to the calls or read the texts themselves.*

> *The girls were unhappy to learn that their father, as the account holder, could determine who they called and texted on their new phones. Neither girl had realized that when they accepted the phones. They felt tricked that their father had not discussed it with them, and were concerned that he would use the phones to monitor them and then abuse the information. Both girls emphatically stated they no longer wanted the phones. Ms. Albrecht reminded them that their father had given them phones to regularly speak to him, not call their friends, and said they had to keep them and use them to speak to him. The girls grudgingly agreed.*

9. The undisputed evidence is that Respondent caused "both girls to emphatically state they no longer wanted the phones" provided by Petitioner. The court's claim in paragraph 1 of its order that "the allegations are simply speculation or suspicion" is inaccurate.

10. The reasonable inference from the fact that Dr. Albrecht told their children about the "privacy implications of using phones that are owned by [their father]" was that Dr. Albrecht caused the children to be convinced of Dr. Albrecht's own paranoid delusions, and also caused the children to be frightened and distrustful of their father.

11. To act accordingly is alienation. The most common cause of parental alienation is <u>one parent wishing to exclude the other parent from the life of their child</u>, though family members or friends, as well as professionals involved with the family (including psychologists, lawyers and judges)[1].

12. Parental alienation is the process, and the result, of psychological manipulation of a child into showing unwarranted fear, disrespect or hostility towards a parent and/or other family members. It is a distinctive form of psychological abuse and family violence, towards both the child and the rejected family member, that occurs almost exclusively in association with family separation or divorce, particularly where legal action is involved.[2]

13. Parental alienation often leads to the long-term, or even lifelong, estrangement of a child from one parent and other family members, and, as a significant adverse childhood experience and

---

[1] See https://en.wikipedia.org/wiki/Parental_alienation (internal citations omitted.)

[2] *Id.*

form of childhood trauma, results in significantly increased lifetime risks of both mental and physical illness.[3]

14. The court also states in paragraph 7 of its order that Petitioner "has not proven that Respondent does not allow the children to turn on their phones or willfully interferes with any calls."

15. Petitioner observes that it is not necessary for Respondent to have done so, as she long ago caused caused "both girls to emphatically state they no longer wanted the phones" provided by Petitioner.

## The Sierra Madre Police Incident on August 28, 2018

16. On September 1, 2017, this court permitted Respondent to relocate with their minor children to Pasadena, CA. Respondent represented that she and their children would reside with Respondent's mother, Ms. Elaine Hodgkinson, at Ms. Hodgkinson's residence at 2610 Deodar Circle, Pasadena, CA.

17. In March 2018, Respondent and their children began spending time in a second home at 730 W Alegria Ave, Sierra Madre, CA. *See Transcript at 95-96.*

18. On August 28, 2019, at approximately 0500 hours, Sgt. Amos (#130) and Officer Deem (#10831) of the Sierra Madre Police Department were dispatched to Respondent's home at 730 W Alegria Ave, Sierra Madre, CA as a consequence of Respondent reporting a burglary in progress. Officer Kenneth Berry (#117) was then dispatched at 6:11 am to assist Sgt. Bailey (#10906), Sgt. Amos, and Ofc. Deem. The relevant police report (#180537) was admitted into evidence as Petitioner's "Exhibit 2."

19. On August 28, 2019 Petitioner was unaware that Respondent and their children had moved. Respondent did not disclose to Petitioner that she and their children had moved to Sierra Madre, CA until January 2, 2019, nine months later. *See Transcript at 46.*

20. Respondent reported to the Sierra Madre Police that on Tuesday, August 29, 2019, at approximately 5:30 a.m. she heard the sounds of something aggressively impacting the east facing door of the residence. Respondent reported that she went to check on the disturbance and also reported that somebody was outside attempting to force their way in.

21. Respondent said <u>she also heard the sound of a drill</u> being operated and <u>feared somebody was going to use the drill on the door locks in an attempt to gain entry</u>.

22. As a result, Respondent ran into C█████'s bedroom and woke him up. Respondent said that C█████ screamed in fear when he realized somebody was attempting to gain access inside. C█████ also turned on a light in the kitchen. According to Respondent, these actions caused the suspect(s) to stop their activities and flee the location.

3    *Id.*

23. Respondent said she believed the suspect(s) were somehow affiliated with Petitioner. She said this was the reason she had so many monitoring devices placed in and around the house. She also stated there have been several other crime reports made with the Sierra Madre Police Department.

24. Respondent, however, was unable to show the police anything around the property that was either freshly disturbed or was missing.

25. Officer Kenneth Berry (#117) reported[4] that:



> *I arrived and I met with Sgt. Baily who requested that I get statements from the three children. I spoke to C___ A_____ who told me that at about 5:30 a.m., he was awakened by his mother Katherine Albrecht because she told him she head someone at the front door. C___ said he and his mother went outside and walked around the house, but they did not notice anything unusual. C___ stayed home while his mother and two sisters, S___ A_____ and G___ A_____, drove to the police department. C___ said he did not see any cars parked behind his mother's car in the driveway, any cars parked in the street, or any persons on the property.*
>
> *I spoke to S___ A_____, who told me at about 5:30 a.m., she was asleep in the same room as her sister, G___. S___ heard her mother "freaking out" and someone scream. Respondent told S___ to lock the front door while Respondent and C___ went to check outside. S___ said after she locked the front door, she <u>saw on the camera monitor,</u> which was on the counter next to the front door, lights come on from a car parked behind mom's car in the driveway, reverse out of the driveway, and drive westbound. She said she saw a second car that was parked in front of the house drive eastbound. S___ said she could not describe either car and she could not describe anyone who was inside either car.*

26. The police further noted that Respondent's extensive surveillance system was non-operational and could not record. Respondent told the police that the reason she had so many monitoring devices placed in and around the house was because Petitioner, who lives in New Hampshire, had "essentially been stalking her." Respondent told the police that none her video monitoring devices record because Petitioner had the expertise to disable them and had "bugged" her house.

27. Consequently, S___ reported to the Sierra Madre police that S___ "saw" events occur on a non-operation camera monitor.

28. The reasonable inference from these facts is that Dr. Albrecht has caused their daughter S___ to be convinced of Dr. Albrecht's own paranoid delusions.

29. Officer Kenneth Berry (#117) also reported[5] that:

---

4      See the police report in evidence.
5      *Id.*

*I then spoke to G████ A██████, who told me at about 5:30 a.m., she was asleep in her bedroom and she was awakened by her mother "freaking out" and her brother's scream. She stood at the front door with her sister, S████, while her mother and brother went outside. She thought she saw a car back out of the driveway while she was looking at looking at the camera monitor. She could not describe the car and she did not describe anyone inside the car.*

30. Consequently, G███ reported to the Sierra Madre police that G███ "thought she saw" events occur on a non-operation camera monitor.

31. The reasonable inference from these facts is that Dr. Albrecht has caused their daughter G███ to be convinced of Dr. Albrecht's own paranoid delusions.

32. The Sierra Madre Police further documented that Officer Baily discovered "inconsistencies" in the children's statements.

33. Dr. Albrecht "heard" the "sound of a drill, … fearing that somebody was going to use the drill on the door locks in an attempt to gain entry," woke up screaming, and caused their children to report that she was "freaking out." Dr. Albrecht then drove to the police station with S███ and G███, all while blaming Petitioner for this incident.

34. Respondent testified that the Sierra Madre Police Report accurately characterized these events. *See transcript at 161-164.*

35. The reasonable inference from these facts is that Respondent has caused the children to be frightened and distrustful of their father. To act accordingly is alienation.

### Paragraphs 10 and 13 of the court's order.

36. Petitioner acknowledges that "the parties' two youngest children have a problematic relationship with Petitioner at times."

37. However, the court claims (paragraph 10) that "Petitioner's actions and conduct is the major contributor to these circumstances," and (paragraph 13) "any estrangement that exists between Petitioner and his two youngest daughters is largely the result of his actions." Petitioner continues to deny this.

38. The court did not explain how Petitioner's actions contributed to the Sierra Madre Police Incident, or how Petitioner's actions caused their children to "to emphatically state they no longer wanted the phones" provided by Petitioner.

39. Petitioner also testified at trial on May 9, 2019 that more recently he had not been able to contact his daughters S███ or G███ at all since Christmas in 2018. *See Transcript at 8.* This is not disputed. By a reasonable inference, consequently Petitioner's actions since Christmas 2018 could not in any way have contributed to his problematic relationship with their daughters.

40. The court should have explained how Respondent's actions have contributed to these circumstances.

## Education Decisions

41. The court granted Dr. Albrecht the final authority to make educational decisions for the parties' children in the event the parties do not agree. This has amounted to de-facto sole-decision making authority exercised by Dr. Albrecht, without any participation by Petitioner.

42. Petitioner has previously advised this court that it should refer to In the Matter of Kurowski & Kurowski, 161 NH 578 (2011) for guidance, most recently testifying that "I'd like the Judge to read sort of about the Cowapowski (phonetic) case in the pleadings." *See transcript at 55.*

43. Paragraph 5 of the court's order notes that:

> *In the narrative regarding the Parenting Plan (doc. 176) the court was reluctant to issue and order for sole decision-making due to the potential that the party with such authority would abuse it. The conduct of the parties and these proceedings since the issuance of that order has reinforced that finding.*

44. The party to whom the court gave more decision making authority is Dr. Albrecht. The court has found this decision making authority has been abused. By a logical necessity, the court has found that Dr. Albrecht has abused her decision making authority.

45. Respondent also testified that decisions concerning counseling for the children do not need to be made jointly in California. *See transcript at 166.* She has refused to cooperate with Petitioner concerning joint decision making for counseling for their children.

46. The only remedy the court has ordered is to require that "Respondent shall ensure Petitioner is listed as an emergency contact on all the children's school and health records."

47. This ineffective remedy in no way curtails Dr. Albrecht's abuse of her de-facto sole-decision making authority.

## Counseling

48. On September 1, 2017, Petitioner requested that this court "order the parties and their children to attend Family Systems Therapy; or as the parties otherwise agree." *See Petitioner's Verified Motion for Reconsideration (document #180), Prayer (H).*

49. In its order dated October 2, 2017, this court denied Petitioner's request.

50. On May 9, 2019, Respondent testified that their daughter S███ now refuses to see a counselor. *See transcript at 154.*

51. In its most recent order, this court has re-iterated that it will not "order the parties and their children to attend Family Systems Therapy; or as the parties otherwise agree," by stating that "there is no order the court can issue that will ease the tension and utter disdain these parties have for one another."

52. Petitioner has previously raised the issue that high-conflict divorce is highly correlated with one or both parents having a "cluster B" personality disorder, such as borderline or narcissistic personality disorder. He wishes to do so again here.

53. Mr. Albrecht's treating therapist, Dr. Hildreth Grossman, has not diagnosed Mr. Albrecht with any personality disorder.

54. The court did not order any form of court-ordered counseling or mental health evaluation for either of the parties or their children. Based upon the facts about and the reasonable inferences thereof, the court should have done so.

## Frequent and continuing contact between each child and both parents

55. RSA 461-A:6, I(l) requires that this court consider whether its parenting plan and subsequent orders have supported "frequent and continuing contact between each child and both parents" pursuant to the policy of the state regarding the determination of parental rights and responsibilities described in RSA 461-A:2.

56. Since the court issued its *Final Parenting Plan*, Petitioner has had a total of 38 days of parenting time with S███ and G██ from September 1, 2017, to the present time, a period of over one and a half years. *See document #322, paragraphs 39-42.*

57. Petitioner testified at trial on May 9, 2019 that more recently he had not been able to contact his daughters S███ or G██ at all since Christmas in 2018. *See Transcript at 8.*

58. Respondent has caused their daughters S███ and G██ to have separate school vacations by enrolling them, against Petitioner's wishes, in two different private schools. Neither private school's vacation schedule comports with the public school vacation schedule where their children reside. *See Transcript at 55.*

59. The court's present Parenting Plan does not "frequent and continuing contact between each child and both parents." The court has not amended its Parenting Plan. Based upon the facts above and the reasonable inferences thereof, the court should amend its Parenting Plan to support "frequent and continuing contact between each child and both parents."

## Heinrich and Curotto, 160 NH 650 (2010)

60. Petitioner has been unemployed for the duration of these proceedings, and remains so.

61. Respondent is currently on SSDI.

62. This court has found the parties cannot effectively communicate.

63. In Heinrich and Curotto, 160 NH 650 (2010), our Supreme Court noted that the Derry Family Division trial court:

> worried that the Florida parenting plan "would require *significant air travel*, which involves a cost factor that the parties may or may not be able to realistically afford, as well as requiring the parties to *effectively communicate*, which they have been unable to do so to date."

when it upheld the trial court's decision to deny a mother's request to relocate their family's minor children to Florida.

64. Consequently, the court's current *Parenting Plan* is not consistent with Heinrich in light of how well the parties can "effectively communicate" and whether they can "realistically afford significant air travel."

## Tomasko v. Dubuc, 145 NH 169, 172 (2000)

65. In paragraph 10 of its order denying P*etitioner's Motion to Amend the Parenting Plan (document #297)*, this court did not properly examine the factors set forth in Tomasko v. Dubuc, 145 NH 169, 172 (2000), which include:

(1) each parent's reasons for seeking or opposing the move; (2) the quality of the relationships between the child and the custodial and noncustodial parents; (3) the impact of the move on the quantity and quality of the child's future contact with the noncustodial parent; (4) the degree to which the custodial parent's and child's life may be enhanced economically, emotionally, and educationally by the move; (5) the feasibility of preserving the relationship between the noncustodial parent and child through suitable visitation arrangements; (6) any negative impact from continued or exacerbated hostility between the custodial and noncustodial parents; and (7) the effect that the move may have on any extended family relations.

## The Family's Medical Needs and RSA 461-A:6, I(b)

66. In determining the best interests of the child, RSA 461-A:6, I(b) requires that the court consider "the ability of each parent to assure that the child receives adequate food, clothing, shelter, medical care, and a safe environment."

67. Respondent did not allow any dental treatment at all for their daughter G▇ for over fifteen months, causing G▇ to have eleven dental caries ("cavities") and require costly sedation dentistry.

68. Respondent Dr. Albrecht has been diagnosed with stage IV breast cancer with brain metastases.

69. Respondent testified that her mother, Ms. Elaine Hodgkinson, has stage IV ampullary cancer, which is related to pancreatic cancer, and that Respondent spends "a considerable amount [of time] taking care of my mom." *See transcript at 95-96.* Respondent did not disclose this information to Petitioner prior to trial. Respondent also did not elaborate on her mother's prognosis, but as this is a terminal condition, it does not appear to be positive.

70. Respondent also testified that her sister, Ms. Laura Minges, "is disabled," and "had a series of health problems." *See transcript at 95-96.*

71. Respondent has been locking their children, alone, inside her residence at 730 W Alegria Ave in Sierra Madre, CA with zip ties while traveling to 2610 Deodar Circle in Pasadena, CA to care for her mother. *See transcript at 144-146.*

72. It is unclear, under these circumstances, who is caring for the parties' children.

## Petitioner is unemployed

73. Petitioner has not worked outside the parties' home or family business since 2004 and is presently unemployed. Petitioner submitted to this court, as evidence, a report by his treating therapist, Dr. Hildreth Grossman. In her report dated May 6, 2019 , Dr. Grossman stated:

> *I have seen Mr. Albrecht in psychotherapy since April 11, 2016. He came to therapy under severe stress caused by marital conflicts. At the time, his wife had taken out a restraining order after having the police come and remove him from their home. That began a series of court battles and police filings by Mrs. Albrecht in which Mr. Albrecht had to continually defend himself. The outcome of these accusations has been to exonerate Mr. Albrecht. Clearly the effect of having to continually defend himself against unwarranted accusations has exacerbated the stress, anxiety and depression Mr. Albrecht has struggled with through this process.*

74. Dr. Grossman also stated:

> *Mr. Albrecht's stress and strain emotionally and financially have made it difficult if not impossible to seek adequate employment. He has relied on the generosity of his father to support him through his tribulations. The oldest Albrecht son, P███ has chosen to spend time with his father working on university courses toward his bachelor's degree. Mr. Albrecht is enjoying spending time with P███ and working to restore their relationship. He has made it a point to avoid putting his son in the middle of the enduring difficulties between himself and Mrs. Albrecht. P███ was witness to some of the falsehoods Mrs. Albrecht rendered during a visit between the children and their father in California. Mr. Albrecht has avoided asking P███ to testify in court to eliminate the potential wrath by his mother for being disloyal.*
>
> *Mr. Albrecht is a forthright person who works very hard in therapy and is always willing to look at himself as well as his situation in order to understand what has been happening to him. He has a deep and sincere need to know and tell the truth.*

75. As to Petitioner's prognosis, Dr. Grossman remarked:

> *Mr. Albrecht has a strong motivation to get his life in order. I experience him as very hard working in therapy. I believe that <u>when access to his children is stable</u> and follows the judgment in his divorce decree, and when he finds employment in a field of his expertise and interest, an enormous amount of anxiety and depression will lift. He is also willing to do more work looking at his acceptance of a harmful spousal relationship and work on how to look for and feel entitled to healthier and more rewarding connections.*

## The children's health insurance and the USO

76. Petitioner, who has been unemployed for the duration of these proceedings, nevertheless faithfully paid $350/month in child support to Respondent from September 9, 2016 through February 14, 2018 under the courts temporary USO (document #42).

77. Petitioner also faithfully paid $50/month in child support to Respondent from February 14, 2018 to the present time under the court's final USO (document #247).

78. Petitioner has also faithfully paid for Medi-share to cover <u>all four</u> of the parties children from the commencement of this action on April 15, 2016 to the present time. The current cost is $434 per month. *See transcript at 90.*

79. On December 22, 2018, Petitioner obtained Medi-Cal coverage under the Affordable Care Act (ACA) for S███ and G███ through "Covered California," the "Official Site of California's Health Insurance Marketplace." Petitioner also continued to maintain the Medi-Share coverage for all four of the parties children (P███, C███, S███, and G███) that Petitioner has paid for for the duration of these proceedings and that has been the primary coverage for all four children since 2011.

80. With no finding concerning Petitioner's ability to pay, the court in paragraph 6 of its order has now found Petitioner in contempt, and required him to pay $700 in attorneys' fees, as well as to reimburse Respondent "for the cost of health insurance for the children from when Respondent purchased same through May 31, 2019," an <u>undetermined amount</u>, even though the parties' minor daughters S███ and G███ were <u>already covered</u> through <u>both</u> Medi-Cal and Medi-Share.

81. Paragraph 16A of the USO (document #247) stated that "Obligor is ordered to provide private health insurance for the child(ren) effective <u>Continuing – See Decree re providing coverage under Blue Shield of California</u>"

82. However, Petitioner could not find any place in the Decree (document #248) the court described "providing coverage under Blue Shield of California."

83. Consequently, it appears that Petitioner did not understand this court's order, believing in good faith that this court had made a scrivener's error on the USO (document #247) in paragraph 16A.

84. Consequently, this court should now explain why it failed to describe "providing coverage under Blue Shield of California" in its Decree (document #248) when its USO (document #247) referenced this.

85. If the court did not make a scrivener's error, then Petitioner now asserts the court's USO order was "vague and indefinite" and was incomprehensible to Petitioner.

86. Blue Shield of California is a private California not-for-profit mutual benefit corporation.

87. Medi-Cal and Blue Shield of California are both controlled by California and Federal Law, not New Hampshire law.

88. Based upon the facts above, the reasonable inference is that requiring Petitioner, who is unemployed, to have purchased a new, and higher-cost health plan for their children directly from a private California not-for-profit mutual benefit corporation, rather than under the Affordable Care Act (ACA) from "Covered California," the "Official Site of California's Health Insurance Marketplace," was an unsustainable exercise of discretion.


## RSA 461-A:6, I(m)

89. RSA 461-A:6, I(m) requires, when determining the "best interests of the child," that the court shall consider "any other additional factors the court deems relevant."

90. Concerning a "Judicial Enforcement of Parenting Plan," RSA 461-A:4-a requires that "Any motion for contempt or enforcement of an order regarding an approved parenting plan under this chapter, if filed by a parent, shall be reviewed by the court within 30 days."

91. On March 30, 2018, Petitioner filed *Petitioner's Motion for Contempt re Telephone Contact and Written/Electronic Communication with Children* (document #241).

92. On August 21, 2018, Petitioner filed *Petitioner's Motion to Schedule Outstanding Parenting Motions* (document #274).

93. On May 9, 2019, this court heard *Petitioner's Motion for Contempt re Telephone Contact and Written/Electronic Communication with Children* (document #241).

94. Petitioner believes the court should state whether it considered any "additional factor" that is "relevant" to the best interests of the child pursuant to RSA 461-A:6, I(m).

## Paragraphs 15 and 16 of the court's order

95. Petitioner also wishes to remind the court that he filed a no-fault petition for Legal Separation on April 15, 2016 (document #1) in response to Respondent's DV action filed against him a week earlier on April 8, 2016. Respondent then filed her cross-petition alleging fault grounds on April 27, 2017 (document #7).

96. Respondent has also filed numerous "potty pleadings" with this court, and has continued to do so as recently as January 25, 2019. The court may refer to paragraph 7 of document #290, filed by Respondent.

97. The court has made no finding why Respondent's motion for attorney's fees was denied without prejudice, but Petitioner's motion was apparently denied "with prejudice."

98. Petitioner notes that many of his motions have been made simply to defend himself against Respondent's numerous "potty pleadings."

99. Petitioner notes that his other motions, which the court now describes as "border[ing] on vexatious and frivolous," have been limited in scope to parenting and financial issues.

100.      The court should advise whether it finds paragraph 7 of document #290 filed by Respondent either "vexatious" or "frivolous."

WHEREFORE, the Petitioner prays this Honorable Court for relief as follows:

A) Reconsider its order dated May 30, 2019; and,

B) Find that Respondent caused both S████ and G████ "to emphatically state they no longer wanted the phones" provided by Petitioner; and,

C) Grant Petitioner's Motions for Contempt (documents #241 and #294) regarding phone calls; and,

D) Adopt Petitioner's proposed Parenting Plan (document #298); or,

E) Develop a new parenting plan that "supports frequent and continuing contact between each child and both parents," comports with RSA 461-A:4, VI, and is in the best interests of the children; and,

F) Order the parties and their children to attend Family Systems Therapy; or as the parties otherwise agree,

G) Deny Respondent's Motion for Contempt (document #291) concerning the USO; and,

H) Vacate paragraphs 15 and 16 of its order; and,

I)  Deny Respondent's Motion for Attorneys' Fees (document #324) with prejudice; and,

J)  Set forth the reasons for its decision in a written order; and,

K)  For such other relief as this Court deems just and reasonable.

Respectfully submitted,

June 21, 2019

_____
Dana Albrecht
by his attorney

_____
Joseph Caulfield, Esq.
NH Bar #262
Caulfield Law & Mediation Office
126 Perham Corner Rd.
Lyndeborough, NH  03082
603-505-8749

MASTER RECOMMENDS: Denied.

6/25/19
Date        Bruce F. DalPra, Master

Approved & so ordered.

JUN 3 0 2019
MARK S. DERBY

State of New Hampshire
Hillsborough, SS

Now comes Dana Albrecht and swears that the foregoing is true to the best of his knowledge and belief.

June 21, 2019

Joseph Caulfield
NH Justice of the Peace
Comm. expires Dec. 3, 2019

_____

Certification

I sent this date a copy of this Motion to Atty. Fontaine.

_____

Joseph Caulfield, Esq.