1

STATE OF NEW HAMPSHIRE

9TH CIRCUIT COURT - FAMILY DIVISION - NASHUA

IN THE MATTER OF:     )
            ) Family Division Case No.
STEPHEN LOUDERMILK,    ) 659-2015-DM-00185
            )
      Petitioner, ) Nashua, New Hampshire
            ) July 23, 2019
    and     ) 9:26 a.m.
            )
LAURA MONTGOMERY,    )
            )
      Respondent. )
_____ )

HEARING ON MOTION TO MODIFY
BEFORE THE HONORABLE JULIE A. INTROCASO
JUDGE OF THE CIRCUIT COURT - FAMILY DIVISION

APPEARANCES:

| | |
|---|---|
| Pro Se Petitioner: | Stephen Loudermilk |
| | 82 Main Stream Road |
| | Fairfield, ME 04937 |
| | |
| For the Respondent: | Andrew Piela, Esq. |
| | 20 Trafalgar Square |
| | Suite 505 |
| | Nashua, NH 03302 |
| | |
| Also Present: | Kathleen Sternenberg |
| | Guardian Ad Litem |
| | |
| Audio Operator: | Electronically Recorded |
| | **Not Monitored** |
| | |
| TRANSCRIPTION COMPANY: | eScribers, LLC |
| | 7227 N. 16th Street, Suite 207 |
| | Phoenix, AZ 85020 |
| | (800) 257-0885 |
| | www.escribers.net |

Proceedings recorded by electronic sound recording; transcript produced by court-approved transcription service.



2

I N D E X

| WITNESS(ES) | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE PETITIONER: | | | | |
| Kathleen Sternenberg | 11 | 33 | 64,76 | 74 |
| Chris Morrell | 84 | 98 | 114 | |
| Steven Loudermilk | 124 | 152 | 169,182 | 177,183 |
| Jessica Loudermilk | 185 | 198 | | |

| WITNESS(ES) | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE RESPONDENT: | | | | |
| Laura Montgomery | 205 | 237 | 266 | 267 |

| MISCELLANEOUS | PAGE |
|---|---|
| Petitioner Rests | 201 |
| Respondent Rests | 268 |

| EXHIBITS | | ID | EVD |
|---|---|---|---|
| Petitioner's 1 | Mother's Med Records | 71 | 133 |
| Respondent's A | Mother's Med Records | 22 | |
| Respondent's B | Dr. Sheridan Letter | 42 | |
| Petitioner's 2 | Medical Paperwork | 170 | |
| Petitioner's 6 | Text Messages | 133 | |

3

(Proceedings commence at 9:26 a.m.)

THE COURT:  Let me say, for the record -- well, I'm not going to say anything if I can't see what I'm reading. Sorry.

This is 659-2015-DM-185, in the matter of Steven Loudermilk and Laura Montgomery.  We are joined this morning by the Court-appointed Guardian Ad Litem, Kathleen Sternenberg, Attorney Tim Coughlin is here for our Petitioner, Mr. Loudermilk; Respondent is represented by Attorney Andrew Piela.

This is a modification case that has been pending for some time.  The parties are here today for a final hearing on that petition.  Let me, first, just start by asking, I assume everyone has gotten everything they intend to file to the clerk?

MR. COUGHLIN:  Yes, Your Honor.

THE COURT:  Okay.

Anything that anyone would like to address with the Court before we get started?

MR. COUGHLIN:  Your Honor, just housekeeping.  I assume prior court orders and the guardian ad litem's report are already in evidence, or I don't have to introduce them separately.

THE COURT:  No.

MR. COUGHLIN:  Okay.



4

THE COURT: No. Unless there is some objection, I would normally consider the guardian ad litem's report to be an unmarked exhibit but a referral for the Court's file. So I don't normally put that in as an exhibit.

MR. COUGHLIN: And prior court pleadings and the orders are also already --

THE COURT: Yes. And anything I take judicial notice of, I don't -- I don't necessarily need to have you readmit. If you are going to refer, however, to prior court orders, to the best of your ability, I would appreciate it if you can let me know either the date -- you know, a lot of folks are testifying and have the question like, well, remember, you know, last August when the Court issued an order about you doing X, Y, or Z, if you could, be specific with me and tell me either if you have the index number or what the number of that order is so that I can quickly find it, or give me a date so I can find it through my system.

Just so I'm aware of what you're referring to when you're questioning the witness. Okay?

MS. STERNENBERG: Your Honor?

THE COURT: Yes?

MS. STERNENBERG: I wrote a letter to counsel for Laura Montgomery on July 3rd requesting the complete Access evaluation records and did not receive them.

THE COURT: Okay.



MS. STERNENBERG: And I wrote to Laura Montgomery's psychologist asking, again, for a copy of the records of treatment with her.

THE COURT: Okay.

MS. STERNENBERG: I did not receive them either, so I did not file a supplemental report, because I did not receive the things that I was looking to get from both Laura and from Laura Sheridan. So I just wanted to put that on the record that I was -- I was unable to provide you with further information about --

THE COURT: Anything that's happened --

MS. STERNENBERG: -- Laura's treatment.

THE COURT: -- since -- since the time of the ex parte.

Attorney Piela, let me just take a quick look. I think part of the ex-parte order "Respondent shall be allowed to call Dr. Laura Sheridan as a witness, in this case, should she have updated information to provide to the Court at the time of trial or any interim hearing. Petitioner expresses assent to amending the respondent's witness list."

This was my order of June 7th. "The GAL shall make reasonable attempts to keep updated as to Ms. Montgomery's plans for future assessment, treatment recommendations, along with her compliance." Do you know or can you tell us whether or not there has been any future treatment orders? Do you



intend to call Dr. Sheridan?

MR. PIELA:  Regretfully, Your Honor, I can't. The -- what happened, and I'll ask my client to correct me if I'm wrong, she had, I believe, two visits with Dr. Sheridan post June 3, 2017.  Dr. Sheridan --

THE COURT:  '19.  '19.

MR. PIELA:  '19.

THE COURT:  This year.

MR. PIELA:  Strike that.

The GAL is correct in that she did send a letter to Dr. Sheridan advising her of what was happening in the case, asking for a treatment update by a letter dated July 5, but Dr. Sheridan discharged my client from future treatment.

THE COURT:  Okay.

MR. PIELA:  And the basis -- and we have that discharge letter, which will come in as an exhibit, but I will represent to you that the basis for the discharge was that Dr. Sheridan apparently felt that this case involved court involvement which she was not willing to participate in.  So, at that point, she said I will no longer see you as a patient. I'll be on -- you know, the standard discharge language.

My client, I will represent to you, has made repeated attempts to contact Dr. Sheridan through Southern New Hampshire Medical Center to get the records.  They are still outstanding.  The last we know of, and, again, I'll ask Laura



to correct me if I'm wrong, is the records were being reviewed internally, it would be released, at some point, in the future, so we don't know about that.

As far as the Southern New Hampshire Access notes, my client did obtain -- sign a release to the hospital, obtained the discharge summaries.  I think the issue with the GAL was the lab, the actual lab notes, the discharge summary has a -- has a lab summary of what the lab -- that we can talk about when we're that as -- as the case drags -- as the case goes along, but that's the story with Dr. Sheridan.

I wish I could bring her, but she has stated very clearly, she has no intention of appearing in court voluntarily.  So that's kind of where we are, Judge.

THE COURT:  The two documents you did refer to, however, the discharge letter and the --

MR. PIELA:  Access notes.

THE COURT:  -- Access notes and the summaries that you provided those to both parties?

MR. PIELA:  Yes, they were provided.

THE COURT:  Okay.  All right.

Well, unfortunately, I'm -- it saddens me to say that is not an unfamiliar situation.

MR. PIELA:  I'm equally as stressed, Your Honor, but I can only do what I can do.

Judge, can -- I know it's Mr. Coughlin's case, but



8

if we can sequester the witnesses?

THE COURT:  Sure.  Absolutely.

Attorney Sternenberg, I don't know if that -- that's incredibly dissatisfying to me, but I don't know what -- you got any proposals of what you can do about it?  I don't have any suggestions really.  I mean, it's -- like I said --

MS. STERNENBERG:  I went -- I went to the mailbox yesterday at 5:00.  I had a box.  Southern New Hampshire Medical Center or the Laura Sheridan's office sent me some records.

THE COURT:  Oh.

MS. STERNENBERG:  They are gynecological records for Ms. Montgomery, about 500 pages of them, and they sent me a bill for $236.

MR. PIELA:  You've got --

MS. STERNENBERG:  There are no records from Dr. Sheridan in those records, and that, my letter requesting the record, is for Dr. Sheridan's treatment records.  I'm very frustrated.

THE COURT:  Okay.

MR. PIELA:  So you have OB-GYN record's --

THE COURT:  It's not --

MR. PIELA:  -- but nothing else?

THE COURT:  You've got to fight with Southern New Hampshire Medical Center on your hands.



9

MS. STERNENBERG:  I don't understand, because if she saw Dr. Sheridan during that period of time, why they're not in there is odd.  They should be in there.

MR. PIELA:  And just for the record, Your Honor, we gave the guardian blank releases to get them, so --

THE COURT:  Well --

MS. STERNENBERG:  And --

THE COURT:  -- it sounds like it.

MS. STERNENBERG:  -- additional details were eventually revealed that the patient may be occasionally taking extra of her Adderall is in the Access' records, and that's why I asked for the labs.

THE COURT:  Yeah.

MS. STERNENBERG:  And the labs had to be a part of these records --

THE COURT:  Right.

MS. STERNENBERG:  -- so it's frustrating.

THE COURT:  Attorney Coughlin, are you ready to start?

MR. COUGHLIN:  I am, Your Honor.  Just by way of scheduling, my -- it was going to be my practice to have the guardian testify first.

THE COURT:  Sure.

MR. COUGHLIN:  Just to cut to the chase, if you will.



10

THE COURT:  Sure.

MR. COUGHLIN:  There are a couple of witnesses here. My client's wife, Jess.

THE COURT:  Okay.

MR. COUGHLIN:  And Mr. Morrell --

THE COURT:  Okay.

MR. COUGHLIN:  -- who is with Ms. Montgomery.  Now, I don't -- I called Mr. Morrell's lawyer yesterday, James Skurch (phonetic), if I've said that correctly --

THE COURT:  Shirk (phonetic throughout).

MR. COUGHLIN:  -- who practices -- Shirk?

THE COURT:  Shirk.

MR. COUGHLIN:  Shirk, who practices with Ms. Chantalaris (phonetic), who I know better, and I told him he could come at 11, but he's -- he's, you know, kind enough to show up early.  I don't care if, really, we sequester them or not, but if it's important to Attorney --

THE COURT:  Okay.

MR. COUGHLIN:  -- Piela, we can do that.

THE COURT:  All right.

I would ask the witnesses, if you're here and you've been asked to come here today to provide testimony, I hope you've got a good cellphone or something or you enjoy watching the rain fall and meditating.  I'm going to have to ask you to step out and sit outside in the lobby.  We'll give you a call

11

when it's time for you to testify.

MR. COUGHLIN:  So is that -- with that said, I would ask Attorney Sternenberg to either take the stand or do it from there.  I don't know what your practice is.

THE COURT:  Yeah.

THE CLERK:  Watch the two steps and please remain standing until you're sworn.

THE COURT:  Attorney Sternenberg is an officer of the Court, she doesn't need to be sworn at this time.  You can have a seat.

I'll tell you what I tell everybody, which is just because I'm not looking at you, it doesn't mean I'm not listening.  It means that I want to make sure my fingers are on the home keys like I was taught in high school when I'm not typing.  Something that makes absolutely no sense.  Okay?  So sorry, I'm going to be -- I'm looking in the opposite direction of the witness, but it's not because I'm not paying attention.

But, again, this was a petition to modify brought forward by Mr. Loudermilk, so, Attorney Coughlin, go ahead.

MR. COUGHLIN:  Thank you, Your Honor.

KATHLEEN STERNENBERG, WITNESS FOR THE PETITIONER

DIRECT EXAMINATION

BY MR. COUGHLIN:

Q   I don't suppose we need to go over your qualifications



12

and your experience.  So Her Honor is familiar with that, I would imagine.

MR. PIELA:  (Indiscernible) she's the guardian ad litem and an attorney licensed to practice in New Hampshire.

MR. COUGHLIN:  Okay.

BY MR. COUGHLIN:

Q  We were here on June 7th, Attorney Sternenberg, and we were about to begin this process when we were interrupted, if you will, by some recent developments.  So for the first time, I'm going to ask you to remind us and educate us as to how you were appointed, who you spoke to with regard to this case, and a summarization of what you learned as a result of your investigation.

A  I was appointed by this Court on November 29, 2018.  I was told to file a report by June 1, 2019, in preparation for this final hearing.  I was asked by the Court to investigate and make recommendations on residential responsibilities, parenting time, and any other issues agreed by the parties.

I, as I usually do, sent out paperwork, received the paperwork from both parents, set up initial interviews, interviewed both parents.  As a part of my interview, I learned that Mr. Loudermilk has a significant other, Jessica Loudermilk; I arranged to meet with her, and that Ms. Montgomery has a significant other, Christopher Morrell, and I arranged to meet with him.

I sent out reference letters to a number of people, including Laura's mother and father, Laura's neighbors, Laura's sister, Laura's cousin's husband, Laura's cousin, Laura's neighbor, and Mr. Loudermilk's mother and father and friends.  I met with Emma Loudermilk both at her mom's house and her father's house.  I met with Emma separately, because of her age, at a restaurant so that I could have her out of either home.

I went to the school and spoke with Emma's special ed director, her counselor, and the school's case manager, and a teacher.  I also returned to the school, at some point, just to meet with Emma briefly.  I spoke with the PCPs office, Emma's PCP's office.  I obtained her records and reviewed them, and then I got back in touch with the doctor because Emma has high cholesterol, which is of concern, which hadn't been tested in some time.

She's slightly overweight and the doctor had been advising that she participate in a program that the clinic has on weight management, and Emma also has adenoids that are very large, and it causes her to have problems sleeping and breathing at times, and that had, for years, been a discussion about having them removed.  So I had some concerns about just her medical records and not moving forward with some of the medical things.

I contacted Steven Loudermilk's treating psychiatrist.



I got a letter from him. I contacted Laura's treating psychiatrist and psychologist, who I learned weren't seeing her at the time, but they gave me a statement and their records. I reviewed them.

Q That's Dr. Sheridan?

A Dr. Sheridan is one of them. She provided a statement. And Dr. DeCesare is the psychiatrist who suggested that Laura take Adderall. Then he stopped seeing her, and her PCP took over administering the Adderall.

I received a lot of emails and text messages and reviewed them. I corresponded with the parties and counsel. I received and reviewed some police reports, and I think that's what I did.

Q Okay. And can you tell us what you found and lead us toward a recommendation?

A What I found was that Emma is well-loved by both parents. That Emma has had a different relationship with Mom and a different one with Dad, because Dad has been in the military for 20 years and has, as a consequence, been stationed in various places far away from Emma. Emma has lived with her mother most of her life.

Emma's relationship with Dad has been strained and, at times, nonexistent, but right now, Emma has reached a point where she understands that both parents love her, and she reaches out to both parents. Emma's relationship with her mom

15

right now is pretty strained.

Emma, if she could talk to the Court, would say that Mom and her significant other, Chris Morrell, have fought all her life, like at least since she was eight, and that the fights wake her up at night, that she protects her little brother from the fights by putting her hands over his ears, that the fighting is to the point where it causes her anxiety and not to be able to sleep and not -- she goes into school and goes for refuge to the counseling office. She has an incredible team at Fairgrounds Middle School who love her, who care for her, who think she's a wonderful kid and support her.

Emma has a problem reading and writing and processing, and she has a lot of people at the school who support her.

Q Emma will be entering ninth grade?

A Yeah. Emma is 14 going to be 15 in September and is going to be going to ninth grade. Emma is an incredible kid. She's an incredible kid. She's very upbeat. She's very happy. She's very involved in singing and dancing and theater. She's very social. She's funny. But Emma would tell you, if she were speaking today, that she's very upset and wants to be out of this constant fight.

Q So would Emma be going to a new school in the fall either way?

A She's going to go anyway. She's either going to go to Nashua High School, which is a very large school, or she would

16

go to the Monadnock School, which is a smaller school.

Q   That's in Swanzey?

A   Yes.

Q   So I may have interrupted you but, if you could, continue with your findings.

A   Throughout my discussions with special ed directors and caseworkers and teachers and counselors and physicians' records and people, I've been told of issues with Mom, and they are that Mom sometimes acts a little odd.  That she sometimes is paranoid.  The special ed teacher told me that, at some point, or one of the directors told me that, at some point, the boilerplate language that's used for an IEP was objectionable to Laura, that she pulled certain words out of it and said she wouldn't sign an IEP because of those words.

And they had to call the State Department of Education because that form is one that is used throughout the state.  These are the types of things that cause a lot of concern about Laura's mental health.  Laura worked, and she's very brilliant, and she worked in a -- in the biotech industry and stopped working in 2017 and hasn't worked since.  She hasn't been able to get a job.  She has, since at least the gynecological records that I looked at last night since 2012, complained of anxiety and depression throughout her records.

She's taking Lorazepam for anxiety.  She's --

MR. PIELA:  Judge, I was never provided with these



17

records, so I'm going to object.

THE WITNESS:  Well, I got them last night.

MR. PIELA:  Well, there was no update to the report. These records were never provided to me, so to the extent that we're talking about records that were never given to counsel, I will object to the discussion.  And this was also never part of her report.

THE COURT:  Sustained.

BY MR. COUGHLIN:

Q   Did you bring the records with you?

A   No, I didn't.

Q   Oh, okay.  I was going to suggest --

A   I can tell you that --

Q   -- that you bring them.

A   -- Laura would tell me that she's been depressed and anxious.  I can tell you that Laura told me that she has ADHD and that she takes Adderall for that.  Of concern to me was the -- the relationship strain that I saw, I witnessed.

The relationship strain between Chris Morrell and Laura Montgomery, which I saw, but, also, which Mr. Morrell very clearly stated to me was happening, and the problems that Laura and Steven have had in sharing basic information with each other in relate -- in relating to each other and in respecting each other as parents, and that has caused Emma to feel very harmed by the fact that she's been prevented from

18

having a relationship, in her mind, with her father. And that's what she's mad about.

She's mad about the fact that Mom has prevented her for years, in her mind, from having a relationship with her father.

Q   And at what -- just for the record, if one were to look through the file historically, in this case, one would see that Mr. Loudermilk has made these problems known to the Court and sought remedies for problems he was having with visitation and logistics and seeing Emma, correct?

MR. PIELA:  Objection.  Leading.

MR. COUGHLIN:  Well --

THE COURT:  Well, I'll allow it.  Overruled.

THE WITNESS:  Yes.  Oh, during the time that I've been involved in this case, I have stepped in at times because of the ridiculous nature of the back and forth.  I mean, I can't tell you how many times that Mr. Loudermilk has said, hey, this weekend would work better for me.  Can I pick her up on Friday?  Only to be told, no; she has to sleep, so you have to come over Saturday morning.  Or no, not this weekend, because she wants to sleep in, or she's too tired or -- they're just really -- there's an awful lot of pushing him off, and I think that's been going on.

It's a lot easier to do -- now that he's in the area, it's harder to do, but, you know, when she -- when he's

several hours away in Maine or in Ohio, it's really easy to do.  I want to make sure that the Court understands that I think that Emma is a wonderful child who has been raised by two parents who love her to death, and I don't think that either parent loves her any less than the other.

But I do think, at this time in her life, that she needs to be in a place where she's not having to be the protector for her little brother, having to run between Chris and Mom, having to hear the screaming and the hitting and the yelling and the throwing of objects and the throwing yourself on the floor.  All of those things are things that I was -- that were reported to me were happening, and not just by the child.

BY MR. COUGHLIN:

    Q   And have you, yourself, received any communications from Laura that have caused you concern?

    A   Yes.

    Q   And what are they?

    A   Well, Laura sent out an email saying that -- and it didn't make much sense, to tell you the truth, and we actually talked about that in June.  Somehow thinking that there were pictures that had been modified and had phalluses in them or had something in them, and saying things like, this is particularly disturbing because of a rape and just really not making sense.

20

And when asked about it by Steven Loudermilk, who also got the same communication, the answer was not -- didn't make much sense either.  Those correspondences happened at times throughout my investigation, but that one really bothered me.  And that, I guess, bothered the daycare to the point where, you know, they were alarmed as well.

And the police have been involved.  The most recent police involvement was the day that Emma had a final game, playoff game, and her mom didn't show up for the game and ended up saying she was lost and couldn't find the field and calling the police and saying she didn't know where her daughter was and not making sense.  And the police who were there reported that she was not making sense.  That's what alarmed me to the point where I asked the Court to intervene in June.

Q   And did you see police reports from the past where Ms. Montgomery was alleging, or at least explaining to the police, that she thought her home was being bugged or her computer was being hacked?

A   Yes.

Q   And that was three or four years ago.

A   And that -- that paranoia that I talked about, if that's the -- that's what I call it, runs throughout several years.

Q   Okay.



A    And has been to a point where both her parents and Chris have been concerned about that.

Q    Right.  Her mother actually accompanied her to the hospital at one point?

A    In June.  Yeah.  Saying and reporting that her behaviors were alarming --

Q    Right.

A    -- that day or that weekend.

Q    Right.  I think it said they were better today than yesterday or something --

A    Right.

Q    -- like -- to that effect.  So -- and maybe I'm a little confused about the medical records in this case.  I know that you were provided with authorizations because Attorney Piela just reminded the Court of that, and I know that you reached out yourself for some records.  Did Laura actually provide you with her medical records from --

A    The only records --

Q    -- more recently?

A    The only records that I was provided by Attorney Piela was the Access' records in -- June 19th, I was provided a copy of the Access' records, which are the time that Laura went to Southern Medical on June 3rd.

Q    And you have that in front of you?

A    I do.



22

MR. COUGHLIN:  We'd want to mark that as an exhibit, Your Honor, just so the Court can read along.  I think we're at -- I have a copy right here if you want --

THE COURT:  Well, mark it as -- do you want to mark it as like the Court's --

MR. COUGHLIN:  I have an extra copy as well, Judge. If I could approach, I can give you --

THE COURT:  Fine.  Do you want to take it to the court officer?

And we can mark that as the Court's Exhibit --

THE CLERK:  1?

THE COURT:  -- 1.

(Respondent's Exhibit A marked for identification)

MR. PIELA:  That's your Exhibit 1?

THE COURT:  I'm going to mark it as the Court's Exhibit.  It was obtained by the guardian.

MR. PIELA:  Okay.

THE COURT:  Is that correct?

THE WITNESS:  It was --

MR. COUGHLIN:  It was.

THE WITNESS:  -- given to me by Attorney Piela.

THE COURT:  Okay.  We'll put it in as Respondent's A.

BY MR. COUGHLIN:

Q  So are you suggesting that this report is -- is



incomplete as --

A   It is.

Q   Okay.  And how do you -- how do you come to that conclusion?

A   Because on page two of two it says, "Additional details were eventually revealed that the patient maybe occasionally taking extra of her Adderall and, also, abusing some diet pills at home."  And then when I looked further, "A chronic use of diet pills, obtained a prescription for Adderall, states she occasionally overuses the prescribed amounts.

"A combination of prescribed amphetamines and over-the-counter diet pills can mimic the effects of mania.  She has a psychologist with whom she maintains periodic contact," and then "chronic use of diet pills dating back to teen years," and then somewhere in here it says that there were labs taken.

Q   Right.  Page six of seven.

A   Six of seven.

Q   I see it in the middle of the page, it says "labs."

A   Right.  And so when I got to that page, I thought it was important to see the -- the lab results.  Amphetamines --

Q   Amphetamines.

A   -- D-A-U.  So I wanted to see that.  So I asked Attorney Piela to get me those labs, and he told me he

24

obtained these records directly from Laura, and he didn't have them either.

Q  Okay.

A  And on June -- July 3rd, I wrote him specifically and asked him to have his client get those for me.

Q  And is there any reason why she wouldn't be given access to those records?

A  No.

Q  So it's your --

THE COURT:  Can I -- can I stop you for just a second?

MR. COUGHLIN:  Of course.

THE COURT:  Let me just understand what happened, if I can.

So, Attorney Sternenberg, you contacted Dr. Sheridan --

THE WITNESS:  I did.

THE COURT:  -- and asked if she had those labs?

THE WITNESS:  No.  I called Dr. -- I contacted Dr. Sheridan on July 3rd because I hadn't received her --

THE COURT:  Records.

THE WITNESS:  -- records of treatment.

THE COURT:  Okay.  But what about the --

THE WITNESS:  These are labs that came to me -- these are records that came to me as a result of Laura



25

Montgomery going to the hospital after our hearing --

THE COURT:  Okay.  Yeah.

THE WITNESS:  -- and the hospital did -- drew some blood, and I don't have the records.

THE COURT:  Okay.  I'm sorry.  Because when you said "which she had access to those," I thought you meant Dr. Sheridan.

THE WITNESS:  Laura.

THE COURT:  You were talking about Laura.

THE WITNESS:  Laura.

THE COURT:  Okay.  And you also reported that on page six of seven of this report there is a -- there is a statement, or I assume it says "amphetamines," and then it said -- you said D-A-U?

THE WITNESS:  It says "D-A-U.

THE COURT:  Is there any indication as to what that's --

THE WITNESS:  It just says "Labs: D-A-U amphetamines."

THE COURT:  But there is no kind of key as to what D-A-U is indicative of?  Okay.

I apologize.

MR. COUGHLIN:  I used to know what D-A-U was.  It's not coming to me.

THE WITNESS:  I can't say that I do.



26

BY MR. COUGHLIN:

Q    Regardless.  What --

A    If I had my phone --

Q    What led you --

A    -- I'd be looking it up.

Q    What leads you to believe that they drew blood?  Is that -- is there something --

A    Well, they don't -- they don't usually say that there's a lab if they didn't --

Q    Okay.

A    -- draw blood.

Q    So you -- it's your opinion that these records are available to Ms. Montgomery, and she just hasn't decided to release them?

A    They are.

Q    And you had a conversation with her about that?

A    I had a conversation with counsel about that.

Q    And you had a conversation with her earlier today about -- about the records; did you not?

A    Right.

Q    Yeah.  So based on your investigation and your homework and your meeting with the parties and your experience, in this case, have you formulated a recommendation as to what's best for your client now?

A    I have.



27

Q   What is that?

A   I believe that Emma should stay with her father and see her mother on Sundays in the afternoon, and that Laura should obtain an evaluation which was ordered by this Court and should follow all recommendations therefrom.

Q   Okay.  So I assume you would support Emma being enrolled in the Monadnock Regional School System?

A   I would.

Q   Do you know if she's had any contact with that yet?

A   I think she's seen the outside of it.  I don't think she's been there yet.  It's a smaller school.  It's a significantly smaller school, but my feeling from having been at Fairgrounds Middle School is that going from Fairgrounds to the Nashua South High School would be a huge leap for Emma, and that she probably would do better in a smaller environment where they know her.

Q   Would you recommend that she begin the process of acclimating to the school area, maybe meeting some potential classmates?

A   I think so.  I think that's important for her to do. She's a social kid.  She's going to want to have friends, but I don't have a problem, because I know having been around her that she's very apt to make those friends.  Her dad told me that she went to softball camp and came home with a bunch of new friends, so I think that that's something she can do.

28

Q   This is just last week?

A   Just last week.

Q   Do you have any other recommendations for Emma?

A   I recommend that the parents employ Our Family Wizard, which is a new tool of mine to --

MR. PIELA:  I don't think (indiscernible).

THE WITNESS:  Well, that I'm using more and more.  I mean, I actually have cases now where they're employing Our Family Wizard, and it's helping --

BY MR. COUGHLIN:

Q   You're not -- you're not actually --

A   I don't own it.  I don't own it.

MR. PIELA:  No.

THE WITNESS:  I'm not the wizard.

THE COURT:  She wouldn't be here if you did.

THE WITNESS:  I wish I did.

MR. PIELA:  Charging a much higher rate.

THE WITNESS:  But they have -- not only communication goes through that, but they also have a really wonderful calendar.  All -- you can upload all kinds of information.  When you get a note from a doctor or from a COT counselor or from the school, you can upload it.  It's a really good tool for parents who don't have a really good communication between them, and I really think that it's the way of the future for these high-conflict cases.

29

So I encourage them to use that. It costs about $100 a year for a subscription, and it's definitely worth it. I'm concerned about Emma's health. She has had high blood pressure. She has had very high cholesterol. I think she needs to make sure that somebody is watching those things and involved, and I'm concerned about her mental health, and I -- she definitely needs counseling.

She needs somebody that is hers and she can go to and just spill, which I think she'll do. In the Fairgrounds Middle School, there was a program that was recommended where they had three social workers who worked with kids who need counseling, and it wasn't employed. So I really would like her to have that --

Q   Did you -- did you find that her medical needs were somewhat neglected, or what did you --

A   I have real concerns about her -- her -- what I read in the medical record. And, basically, she's at an age now that maybe she won't have her adenoids out, but, you know, she had tonsilitis a number of times. She saw an ENT in 2015, June of 2015. He suggested surgery for tonsils and adenoids, and her mother is quoted in the record as saying, "We just never got around to this."

She had enlarged tonsils with exudate in August of 2017. She really needs to get those out of there, and it may be that she's beyond that stage. I know that, at some point,



30

having your tonsils out is painful in your teens, but I -- you know, to me, if she's not sleeping and if its causing problems breathing, she probably should have them out, and if an ENT on a referral says have them out, it causes me a little bit of concern.

Q  Did you become aware that my client knew very little about some of these medical issues?

A  I did.

Q  Just the one logistical measure.  With regard to Sunday visits with Mom, is there an issue at all about transportation, or is that something that's been worked out already?  Did you make a recommendation on that level?

A  I think I did.  Hold on.  And my recommendations predated the ex parte, but "GAL recommends the mother drive to see Emma on Wednesdays, and the father facilitate transportation on Sundays."

So I said Wednesday afternoon from after school to 6:00 and every Sunday from 12 to 6.  So my recommendation was that she go over and see Emma in Emma's community on Wednesdays, and that -- that -- and have dinner or whatever, and that Steve bring Emma to her on Sundays from 12 to 6.

Q  Okay.  And what about decision-making?  Did you -- did you give a recommendation on how that should be handled?

A  I don't think I was asked to do that.

Q  Okay.



31

A   Let me see if I -- I did not.

Q   Okay.  But it would appear that the orders in effect right now have my client with sole decision-making, at least temporarily.  Isn't that a result of the hearing on June 7th --

A   Yes.

Q   -- I think, or June 3rd.

A   Yeah.  June 3rd.  Yeah.

Q   One more question I forgot to ask you, and that is, can you go back to the Access' records that you received?  On page six of seven, there's a date and time.  It says "June 14, 7:56 a.m.," correct?  Down at the very bottom of the page.

A   Yes.

Q   Do you know what that date signifies?

A   Oh, June 4th?

Q   Mine says June 14, 2019.  Could it be the day it was produced?

A   Can I see that?  Oh, no.  That's the date -- yeah.  That's the date it's produced.

Q   Well, do you know when she went -- she went in for this --

A   On the -- it's the 4th.

Q   -- testing?

A   They discharged her on the 4th --

Q   Okay.



32

A    -- at 12:05.

Q    All right.   So 10 days later, they just printed these records?

A    Right.

Q    Okay.   And I forgot to mention where it says "Present diagnosis" on page six.

A    Yes.

Q    It says "Diagnosis with specifics," and what does it say after that?

A    "Anxiety, not otherwise specified, and amphetamine abuse, moderate."

Q    Okay.   So some medical professional concluded that there was amphetamine abuse, and it's your opinion, at least, or if not your knowledge, that there had to be some type of test associated with that to see if there was amphetamines in the bloodstream?

A    The records actually indicate that there was -- there were labs, so there were -- there were records.

Q    All right.   I just wanted to confirm that.

Do you have any other recommendations for these parties?

A    I think that it's really important that Emma have a consistent, predictable relationship with her mother, and that she, if necessary, goes to counseling to work on that relationship.   She has counseled in the past to work on her



33

relationship with her dad, and I didn't put that in my report, but as things go along, if Mrs. Montgomery gets the help she needs, that would be the next step.

MR. COUGHLIN:  I think that's all I have, Your Honor.

THE COURT:  Thank you.

Attorney Piela?

MR. PIELA:  Yes.

CROSS-EXAMINATION

BY MR. PIELA:

Q  If I could just ask the guardian ad litem, I'm going to be referring to your report on a number of my questions; so, if you could, just make it available to yourself, and I'll also be referring to Respondent's A, so, if you could, make that available.

MR. PIELA:  Does the Court have a copy of the GAL' report?  Or would you --

THE COURT:  I have a copy right here.

BY MR. PIELA:

Q  Attorney --

THE COURT:  Are you talking about the initial one, June 1?

MR. PIELA:  The June 1.  That's the only report I have.

THE COURT:  Okay.

34

BY MR. PIELA:

Q   Attorney Sternenberg, can you --

THE COURT:  Excuse me.

MR. PIELA:  Uh-huh.

THE COURT:  Speaking of which, you did not -- you did not, or I could not find a supplemental report.  You just came in and gave an oral report based on what I read in the orders?  Okay.

THE WITNESS:  Yes.

THE COURT:  All right.  Thank you.

BY MR. PIELA:

Q   Ms. Sternenberg, would it be fair to say that one of your concerns, in this case, involves my client's mental health?

A   Yes.

Q   Okay.  And just for the record, you are not a licensed psychiatrist; is that correct?

A   I am not.

Q   You are not a licensed psychologist; is that correct?

A   I am not.

Q   You are -- you've mentioned some concerns about my client's use or potential misuse of Adderall, correct?

A   Yes.

Q   And just for the record, you are not a licensed pharmacist?



35

A   I am not.

Q   And you also raised some concerns about Emma's medical care, vis-à-vis her triglycerides and her adenoids?

A   I did.

Q   You are not a licensed medical provider in --

A   I am not.

Q   -- New Hampshire?  Okay.

You do realize that my client was seen at Southern New Hampshire Medical Center on or about June 3rd --

A   I do realize --

Q   -- this --

A   -- that.

Q   Yeah.  And this was an Access consultation or an Access meeting?

A   That's what I've been told.

Q   Okay.  Do you know what an Access meeting is?

A   You can tell me, but it's --

Q   Well, yeah, but you're the witness.  You tell --

A   -- it's the -- excuse me?

Q   You're the witness.  You tell me.  Just if you know what Access is.  I'm -- can you tell me what it is?

A   Each medical center has an emergency room team, and they're connected with the local mental health agency.

Q   Okay.  As part of an Access interview, do you know if the Access team would admit a patient either voluntarily or



36

involuntarily if their mental health so required it?

A   They would IEA if they had the reason to do so.

Q   And IAE means involuntary admission -- emergent admission?

A   Involuntary emergency admission.

Q   Okay.

A   Which is a process -- a legal process.

Q   Okay.  And my client was not involuntarily admitted on June --

A   She was not.

Q   Okay.  You have to let me finish the question first.

And do you know that any Access report -- and I am looking at page two of seven, Initial clinical evaluation, bottom of the page, how do they see her consciousness, general cognition?

A   Within normal limits, alert.  Is that what you're talking about?

Q   Yep.

A   Within normal limits, concentration within normal limits, intact memory.

Q   And was she oriented times three or times four?

A   It doesn't say that.  Where are you directing me?

Q   Bottom of page two.

A   It just says, "orientation; person, place, time, and event."

Q  Okay.  Times four.

A  Well, times four is a mental health --

Q  I'm sorry.  I was -- I was using shorthand.

A  Yeah.

Q  Turn -- turn the page, please.  What's the thought processes?

A  Normal.

Q  Thought content?

A  Normal.  Her insight was limited, and her impulse control was tenuous.

Q  Okay.  Any --

A  And her reliability was minimal.

Q  Okay.  But she was not admitted, correct?

A  I said no.

Q  I'm ask -- I understand that.  I want to make sure I got it clear.  Any -- any concern with suicidal ideology on page four?

A  No.

Q  Any concern of psychotic or homicidal behavior?

A  No.  I -- homicidal ideation, no.

Q  Any concern with delusional thought patterns?

A  Can you help me out?

Q  Well, I'm asking you.  If you've read this report, do they make any indication that -- did any doctor find that my client on June 3 into the morning of June 4, 2019, was

38

suffering from delusional thought patterns?

A   I don't know where you are --

Q   Look at page three.

A   Page three.

Q   Middle of the page, "thought content, comments."

A   No evidence of a thought disorder noted in exam.

Q   Okay.  You had a concern that a lab test or lab results was not produced.  Can you look at the first page, page one of two, where is says "Diagnostic data"?

A   "CBC chemistries and alcohol level are normal.  The patient is medically stable."

Q   Okay.  And if you look at page five of seven, there is a history of substance abuse.  Does my point indicate any other substance aside from amphetamines or caffeine?

A   "Diet pills and occasional overuse of prescribed Adderall" on page six of seven.

Q   Okay.  Any other hallucinogens, cocaines (sic), methamphetamines, any other --

A   No.

Q   -- hallucinogenic drugs?

A   Nope.

Q   In fact, the presence of any hallucinogenic drugs is -- there's no mention of that in this report, is there?

A   There is not.

Q   Okay.  And, ultimately, Southern New Hampshire Medical

39

Center discharged my client home on June 4th, early morning, 2019, correct?

A   Yes.

Q   And they recommended that she follow up with Dr. Sheridan, correct?

A   Yes.

Q   And the only mental health diagnosis that they've made appears on page six of seven where it says, "Anxiety, NLS, and amphetamine abuse moderate," correct?

A   Yes.  Yes.  And it also is on page two of two.

Q   Okay.  So we have someone who is anxious and someone who may be taking too much amphetamine-related pills, and these are not illegal amphetamines so far as -- as far as you know?  These aren't -- this isn't cocaine.  This isn't methamphetamine.  This isn't crack.

A   It's Adderall.

Q   It's Adderall.  I know.  I just want to make sure you -- because you're -- I want to make sure there's no insinuation that my client is using illegal drugs.

A   I don't think I ever insinuated that.

Q   Well, very well.  Would you agree with me that a custody fight is stressful?

A   Yes.

Q   Would you agree with me that a custody fight can make a parent anxious?



40

A   Yes.

Q   Make them angry, irritable?

A   But the manic behavior that her mother described that's in the --

Q   I'm asking you a question.

A   I'm answering.

Q   No, you're not.  I'm asking you a simple yes or no.

Would you agree with me that a custody dispute can make a person irritable; yes or no?

A   Yes.

Q   Okay.  And standing alone, never mind what anybody else says, standing alone, anxiety, stress, or irritability is not a sufficient basis to modify a custody plan in your opinion.  Would you agree with me --

MR. COUGHLIN:  I will object to the form of the question, Your Honor.

MR. PIELA:  I'll withdraw it.

THE COURT:  Thank you.

MR. COUGHLIN:  And I would also suggest that the witness be able to, you know, finish her answers.  I mean, she's a lawyer.  She's a guardian, we don't -- we don't really need to protect from hearsay.  She was about to, you know, comment upon what she learned from Laura's mother, and I think that's completely admissible.

MR. PIELA:  Your Honor, this is my cross-



41

examination.  I would like to ask a question, and I would like the witness to answer it.  If there's a need to explain or follow-up, I would ask the Court to allow that to be done during redirect.

THE COURT:  That's fine.  You can direct -- you can rehabilitate her to the extent you need to.

MR. PIELA:  Okay.

BY MR. PIELA:

Q  Do you know if my client is still treating with Dr. Sheridan?

A  No.  You told me that she wasn't when we met.  When you reviewed my file, and you gave me a letter saying that the day or two after I asked for her records, she no longer was treating her.

MR. PIELA:  If I could approach the witness, Your Honor?

THE COURT:  Sure.

BY MR. PIELA:

Q  Do you recognize this letter?

A  I do.

MR. PIELA:  I apologize for the Court copy.

THE WITNESS:  I do.

BY MR. PIELA:

Q  And that is the letter that was provided by Dr. Sheridan to my client on July 5?



42

A   Well, you gave it to me on -- whenever it was that we met.

MR. PIELA:  May I have it as Respondent's B, as in bravo, please?

THE COURT:  Sure.

(Court's Exhibit B marked for identification)

MR. PIELA:  I have an extra copy for the Court, if you would like, Your Honor.

BY MR. PIELA:

Q   I'd like you to focus on what we've marked as Exhibit B.  So anything in that letter that indicates Laura Montgomery was noncompliant with her treatment?

A   No.

Q   Is there anything in that letter that indicates that it was Laura Montgomery's choice to terminate treatment with Dr. Sheridan?

A   No.

Q   Okay.  You have access to or have been given access to my client's medical records, correct, and my -- and her mental health records?

A   No.

Q   You have obtained mental health records for my client?

A   From Dr. Dicesare, but Dr. Sheridan has not provided her records.

Q   Okay.  I'd like you to look at page 13 of your report,



43

the top of the -- the top of the report, and I'll read what you wrote to make sure that I got this right.

"The GAL has reviewed Laura's treatment records from 2005 -- 2015 to 2019, and there is no indication that Laura has told her providers of her struggles."  Did I read you -- did I read that correctly?

A  You did.

Q  Are you insinuating that my client has not been truthful with her medical providers?

A  I don't know because I don't have Dr. Sheridan's treatment records, but I have a letter, a general letter from Dr. Sheridan, and I have Dr. Dicesare's records.  And neither of them talks about the struggles she's had in fighting, yelling, screaming, throwing herself on the floor, throwing things --

Q  Has any --

A  -- that has gone one.

Q  Has any medical provider provided you any report, or have you seen any medical report that indicates that my client is not being truthful with her providers?

A  Well, hold on.  I'm going to pull out the records that I have.  I think I answered the question, but I'll see if --

Q  I just want to know if any --

A  -- I can do it again.

Q  -- medical provider, in a report that you have seen,



44

has indicated that Laura Montgomery has not been truthful in her statements to her providers?

MR. COUGHLIN:  Can I just ask where in the guardian's report you're referring to?

MR. PIELA:  Page 13.

MR. COUGHLIN:  Thirteen.  I'm sorry.

MR. PIELA:  The top two lines.

MR. COUGHLIN:  Sorry?

MR. PIELA:  The top two lines.

THE WITNESS:  I don't have anything in a report from her doctors or that say that she's not being truthful, if that's --

BY MR. PIELA:

Q   Okay.

A   -- what you're asking me.

Q   Thank you.

June 3, 2019 --

A   They say her insight is fair.

Q   Thank you.

A   I don't know if that means that --

Q   Thank you.

A   -- they're commenting on whether she is telling them the truth or not.

Q   Well, I think my --

THE COURT:  I don't know that they could make that



45

determination.

MR. PIELA:  I'm just trying to get a source of that quote from her report, but I think the guardian has answered the question.

BY MR. PIELA:

Q  June 3, 2019, you indicate that you filed or made an oral ex-parte motion, in this case, correct?

A  I think Mr. Coughlin made the motion.

Q  Oh.  You brought -- I'll let the Court' record speak for itself, but the -- the issues that you were concerned about was a photograph of Keegan (phonetic throughout), which you indicate Laura reported that there may have been a genital on it.  Laura being lost or upset trying to find a softball game.

A  It was a little more than that.

Q  I think the Court will take its own recollection of what it was.

And there was also, I believe, an issue about Laura being -- about Emma being exhausted and Laura making a comment about whether Emma was pregnant or sexually active.

A  Yeah.

Q  Do you remember that?

A  Yes, I do.

Q  Okay.  Do you have any evidence to tell you that Emma was aware that her mom was lost getting to a softball game



46

that day?

THE COURT:  Could you repeat that?

BY MR. PIELA:

Q  Do you know if Emma was aware about her mom getting lost going to her softball game?

A  I was told that Emma was in contact with her mother on text.

Q  Okay.

A  And so, I don't have those texts.

Q  Okay.

A  But I was told that, so I would assume that Emma was told by her mother why she wasn't at the last playoff game of the season.

Q  Okay.  Do you know if Emma was ever made aware of Laura's concern about the photograph of Keegan?

A  It wasn't just one photograph.  It was a photograph --

Q  And answer the question.

A  It wasn't --

Q  Do you know if Emma was made aware of Laura's concerns regarding the photograph of Keegan; yes or no?

A  Yes, because Emma knew that there was some problem with her Instagram account according to her mother.  So, yes, she knew about those.

Q  She knew that -- she knew that Laura --

A  Her mother --



47

Q  -- believed --

A  -- was saying that --

Q  -- that the --

A  -- something was inappropriate on her Instagram.

Q  The question is:  Did Emma know or do you have any information to show that Emma was aware that Laura thought there was a penis on a photograph of Keegan?

A  No, because we didn't know what Laura thought, because Laura's --

Q  Answer the question --

A  -- communication --

Q  -- please.

A  I said no.

Q  Yes or no?  Thank you.

A  But I'd like to be able to explain that.

Q  I --

MR. COUGHLIN:  Your Honor, I think she has that right.

MR. PIELA:  I just asked a yes-or-no question.  Again, if it's rehabilitation, she can be rehabilitated.  That was your order, Your Honor.

THE COURT:  Go ahead.

BY MR. PIELA:

Q  And, in fact, Laura took Emma and Keegan to visit her grandparents following that exchange of emails, correct?



48

A   Can you give me a time on that?

Q   June -- the Memorial Day weekend.  May 29, we have a softball game.  June -- that Saturday, you write the report. That Saturday and Sunday, Emma and Keegan and Laura went to visit grandparents in Plymouth, Mass.

A   Okay.

Q   All right.  I'd like you look at page 12 of your report, footnote 11.

"Laura called the Nashua police, and the police called Steven and asked if Laura was having mental health with substance abuse issues," correct?

A   Yes.

Q   You also write under page 12, paragraph 3(a), "The recent incidents wherein Laura became disoriented and unable to function, see police report attached."

A   Yes, I did.

Q   All right.  Now let's look at the police report that you attached.

A   Yes.

Q   This is attached to her guardian ad litem' report. Where in the police report does it say that my client was disoriented and unable to function?

A   "She had difficulty explaining her situation and concerns.  She became" --

Q   Where --



49

A -- "exasperated and required police assistance. She kept requesting a ping on her daughter's cellphone. She was having difficulty putting thoughts together."

Q Where does it say she was disoriented and unable to function?

THE COURT: She just read that.

MR. PIELA: Okay.

BY MR. PIELA:

Q Where does it say that the police were concerned that my client was on drugs?

A It doesn't say that here.

Q Where does it say that my -- the police were concerned that my client had mental health issues?

A She was having difficulties putting thoughts together.

Q Where does it say that --

A And she was -- excuse me?

Q I asked you a question. Where does it say that my client was having mental health issues? It's a -- did the police --

A I answered you.

Q Did the police use that language?

A I used that language.

Q I see. Do you realize -- well, let me put it this way. What are the last two words of the narrative report of that police report? Just the last two words.

50

A    All okay.

Q    Okay.  The police didn't arrest Laura?

A    No.

Q    Correct?

A    This was just a --

Q    I'm just --

A    There were two --

Q    Let me ask the question.  Did the police arrest Laura?

A    No.

Q    Did the police take Laura into protective custody?

A    No.

Q    Do you realize that when the police contacted Laura, Keegan was in the car with her?

A    Yes.

Q    And the police let her go with Keegan?

A    Yes.

Q    Would it be a stretch to -- would you agree with me that if the police believed Laura was a danger to Keegan, they wouldn't have let her go?  Would you agree with --

A    Is it a stretch?

Q    Would you agree with me that the police believed that Laura presented a danger to Keegan, they wouldn't have let her --

A    I hope so.

Q    -- go?  I hope so too.



51

Page 13 of your report.  You express concerns about Laura's -- about Emma's triglyceride levels.

A   I do.

Q   Okay.  Would you agree with me that a pediatrician is a mandatory reporter of child abuse and neglect?

A   Yes, I would agree with you.

Q   Okay.  And I didn't think it was funny, so -- would you agree with me that if a pediatrician believed that Emma was being neglected and harmed by Laura, they would have reported the matter to DCYF or some other authority, correct?

A   I hope, but that doesn't always happen.

Q   I hope so too.  Are you aware of any pediatrician making any medical report, or any report, to any government agency that raised a question about Laura's medical care of Emma?

A   The difference between a beyond a reasonable doubt standard for a abuse and neglect --

MR. PIELA:  Judge, I'm going to ask --

THE COURT:  Hold on.  Hold on a second.

MR. PIELA:  Judge, I'm going to ask you to strike that last answer.  It's a yes or no.

BY MR. PIELA:

Q   Do you -- are you aware of any report being made?

THE COURT:  A report --

THE WITNESS:  No.



THE COURT:  All right.

MR. PIELA:  Thank you.

BY MR. PIELA:

Q   The same thing with the adenoids.  Are you aware of any ENT provider reporting Laura to DCYF about concerns --

A   I am not aware.

Q   -- like in -- let --

A   And I would not be aware, because those are confidential records that I wouldn't --

Q   Just --

A   -- have.

Q   Just yes or no.

A   I am not aware.

Q   Thank you.  Thank you.

Now, since June 3, 2019, Steven Loudermilk has had sole decision-making authority concerning Emma, correct?

A   Yes.

Q   You have not been provided with any medical records post June 3, 2019, which states that Emma has been harmed in any way by Laura's failure to address her triglyceride level, post June 3, 2019?

A   No.

Q   You have not been provided with any medical record that suggests that Emma has been harmed by Laura's failure to address the adenoid post June 3, 2019; is that correct?

53

A   No.

Q   Okay.   Your report lists conversations that you've had with Emma's guidance counselors at school, correct?

A   It talks about the contacts I've had, yeah.

Q   Yeah.   Let's look at your report on page eight, and I'm looking at the collateral contact, Laura LaBrie (phonetic throughout).   She is the guidance counselor at the Fairgrounds?

A   She is.

Q   Okay.   And you write, "Emma has expressed passive suicidal ideation at times."   Did I read that correctly?

A   You did.

Q   And that is information that you allegedly received from Laura LaBrie?

A   Yes.

Q   And you also write that "Emma needs a place to vent when she's upset," and you quote Ms. LaBrie as reporting Emma saying, "I can't function in my life.   I can't take it anymore."   Did I read those quotes correctly?

A   You did.

Q   Okay.   Now just like a pediatrician, a school guidance counselor is a mandatory reporter to DCYF --

A   Yes.

Q   -- correct?   And you would agree with me that if a school guidance counselor believed that the child was being



54

abused and neglected at home, she/he would make a report to DCYF, correct?

A   Sometimes.

Q   Okay.  Well, I hope so.

You would agree with me that if a child came to a guidance counselor and reported that she was feeling suicidal, that would -- that could trigger a whole series of reactions --

A   It could.

Q   -- from the school?  You're not aware of Laura LaBrie contacting DCYF, are you?

A   I am not.

Q   You're not aware of any teacher or guidance counselor at Fairgrounds Middle School contacting DCYF?

A   I am not.

Q   Okay.  Now you testified that you believe that Emma should have a counselor for her own mental health?

A   I do.

Q   And, again, Mr. Loudermilk has had sole decision-making from June 3, 2015 -- 2019, strike that.

Correct?

A   Yes.

Q   And, in fact, in June 12, 2019, an email from Mr. Loudermilk, Mr. Loudermilk writes -- I can let you see it if you want.  -- "Hope all is well.  Emma got her lab work



55

done today.  Also made appointment with local psychologist for her to meet.  I explained to her that it will be a person outside of everything that she can talk to.  The appointment is next Wednesday at 5 p.m."

I'll let you take a look at the email.  Did I read that correctly?

A   Yeah.

Q   Now, --

A   Yes, you did.

Q   -- you do not have in your file any of this lab work that Mr. Loudermilk references, correct?

A   I do not.

Q   You do not have in your file any report from this psychologist or mental health provider that Mr. Loudermilk references in his June 12 report?

A   I don't have a report.  I have a note, because I talked to him.

Q   Oh, you did?

A   I did.

Q   Did you ever supplement your GAL' report to say what that provider stated?

A   Nope.

Q   Okay.

A   When you see a -- when a child sees a provider the first time --



56

Q  I --

A  -- they don't have an awful lot to say.

Q  Oh, okay.  They don't have an awful lot to say.

A  Because they don't know the child well.

Q  Okay.  If that --

A  I did get a call from a provider who met with Emma.

Q  And there is no report or testimony from you that says this mental health provider believes that Emma has been psychologically or mentally harmed by Laura Montgomery?

A  No.

Q  You don't?

A  I don't.

Q  Okay.  Now --

A  But I'm going to look at my records to see if I can find a --

Q  Well, please do.

THE COURT:  And this -- and this is post June?

MR. PIELA:  Post June 3, 2019.

BY MR. PIELA:

Q  Would you agree with me that Emma has lived the vast majority of her life in Nashua, New Hampshire?

A  I would.

Q  Okay.  And I think you testified that she had a very supportive structure set up at the Fairgrounds Middle School --



A   She does.

Q   -- correct?

A   Or did.

Q   Would you agree with me -- or let me -- strike that.

Are you aware that in June of 2019, that a transition meeting was done with Fairgrounds Middle School and Nashua South regarding the transfer of Emma's IEP?

A   I am aware of that.

Q   Okay.  No such meeting, to your knowledge, has occurred between Fairgrounds Middle School and any of the schools in Fitzwilliam?

A   No.  It wouldn't happen until after an order.

Q   Well --

A   The Court -- the school would not just assume that they would have such a meeting.

Q   I don't want -- I don't want you to assume anything. I just --

A   I'm not assuming.

Q   I just want you --

A   The school district has to have an order --

MR. PIELA:  Move to strike.

THE WITNESS:   -- saying where she's going to go to school.

THE COURT:  Wait a minute.  Let me -- let me hear what she's saying.

58

MR. PIELA:  I just wanted to ask her if she was aware of any meeting occurring, and that's a yes or no.

THE COURT:  No.  Okay.

MR. PIELA:  Okay.

THE COURT:  Yeah.

MR. PIELA:  Thank you.

THE COURT:  All right.

MR. PIELA:  All right.

BY MR. PIELA:

Q   Emma has a lot of friends in Nashua?

A   She has some friends in Nashua.

Q   Okay.  Now, Emma participates in school sports in Nashua?

A   She has participated in softball in middle school.

Q   She, to your knowledge, hasn't met any friends in Fitzwilliam, has she?

A   I don't know.

Q   She has not attended any schools in Fitzwilliam, has she?

A   Not yet, no.

Q   Well, not yet.  She hasn't participated in any school activity -- any recreational teams in Fitzwilliam like travel softball or drama or a course in Fitzwilliam?

A   Nope.

Q   Okay.  Were you aware that Emma reported to her father

59

that she would like to attend Nashua South?

A  No.

Q  Okay.  If Emma reported that she would like to attend Nashua South, would you support that decision?

A  That decision?  No.

Q  Or that -- all right.

Does Emma have a close relationship with Christopher Morrell?

A  He -- she does, or she did.

Q  Okay.

A  Yeah.

Q  She's known Chris since age five.

A  She has.

Q  She even has a little nickname for him, doesn't she?

A  Yes.  I reported that.

Q  Chraddy, C-H-R-A-D-D-Y.  Would you agree with me that under your proposed parenting plan, she wouldn't be living with Chris Morrell?

A  I would agree with you.

Q  And, in fact, there is no guarantee that she would even be allowed to continue to see Chris Morrell?

A  I don't believe that to be true.

Q  Okay.  You report in your GAL' report on page seven that Emma has a close relationship with Chris's mother.

A  She does.



60

Q   They're next-door neighbors or nearby neighbors?

A   She has a little friend in the neighborhood.

Q   Okay.

A   If that's what you're talking about.

Q   Well, I'm talking about Chris's mother.  Is she the little friend?

A   I said yes to Chris's mother.

Q   Okay.  Okay.  That relationship won't continue if Emma is primarily in Fitzwilliam; would you agree with me?

A   There is absolutely no basis for that.

Q   And, of course, we have Keegan.  What's Emma's relationship like with Keegan?

A   Excuse me?

Q   What's Emma's relationship like with Keegan?

A   She's got a close relationship with Keegan.

Q   Okay.  Lived with him all his life.

A   She has.

Q   Loves him dearly.

A   She does.

Q   And your --

THE COURT:  Can I -- can I just interject for a second?  Keegan is Chris's child?

MR. PIELA:  Keegan is Christopher and Laura's child; he is four years old.

BY MR. PIELA:



61

Q   Your proposed parenting plan would separate these two siblings, wouldn't it?

A   Yes.

Q   Okay.  Now you've testified extensively about these acts of domestic violence that you claim Emma has been witness to, correct, between Laura and Christopher?

A   Yes.

Q   Has Laura ever filed a domestic violence petition against Christopher?

A   Not to my knowledge.

Q   Has Christopher ever filed a domestic violence petition against Laura?

A   Not to my knowledge.

Q   Do you claim that Christopher has hit Laura?

A   Do I claim that Christopher has hit Laura?

Q   Yes.

A   I claim that the reports to me of yelling, screaming, hitting, and throwing things.

Q   Where in your GAL' report does it mention that people are throwing objects at each other?

A   Even if my GAL' report doesn't say that people are throwing objects at each other, it's been reported to me.

Q   I understand that.  I want to know where --

A   I'm going to find it.

Q   Okay.



62

A   You have to give me a minute.

Q   Well, please take your time.

A   Okay.  On page one, under summary it says "screaming, hitting, throwing things, making accusations, threats, and fighting on a regular basis."

Q   Who has told you that Laura has struck Christopher?

THE COURT:  I think she just read that.

BY MR. PIELA:

Q   Who has told you that Christopher struck Laura?

A   Emma has told me of the arguments that happened in the home.  Christopher Morrell has told me of the arguments and the fighting and the hitting and screaming and the yelling.

Q   Okay.  Let's look at Christopher Morrell's summary, page seven and eight.

Where does it say in your summary of Christopher Morrell that there's been physical altercations?

A   It may not say that.

Q   Okay.  Thank you.

MR. COUGHLIN:  Your Honor?  My client is letting me know, he needs a break, a restroom break.

THE COURT:  Okay.  Okay.

MR. PIELA:  I'm almost done.

MR. LOUDERMILK:  I can wait then.

THE COURT:  Wait.  Can you stay --

MR. LOUDERMILK:  I can wait then.  I can wait, Your



63

Honor, if he's almost done.

THE COURT:  Okay.

MR. COUGHLIN:  Okay.

THE COURT:  At least on the topic that you're on.

MR. PIELA:  Well, I'm done with the topic I'm on. I've got maybe 10 more minutes of cross-examination for the --

THE COURT:  All right.  Let's take a break then.

MR. PIELA:  All right.

THE CLERK:  All rise, please.

THE COURT:  It's quarter of 11.  I'll see you back here at about five minutes of.

MR. PIELA:  Okay.  Thanks.

THE COURT:  It's actually 10:44.

(Recess at 10:44 a.m., recommencing at 10:59 a.m.)

MR. PIELA:  -- concluded my cross-examination of the guardian.

THE COURT:  Oh.  Okay, then.

Attorney Coughlin, any redirect?

MR. COUGHLIN:  Just a touch.

THE COURT:  Hold on.

Attorney Shirk is here.  We were talking about here -- her, but I don't remember why.

MR. PIELA:  She represents Christopher Morrell.

THE COURT:  Thank you.

MR. PIELA:  Who is probably going to be the next



64

witness.

THE COURT:  Okay.  All right.

We were pronouncing your name, and for some reason, I just completely lost the connection of why we were talking about you.  I didn't know if you were going to be a witness or not, but thank you for being here.

Okay.  Attorney Coughlin, again, any redirect?

MR. COUGHLIN:  Yes, Your Honor.

THE COURT:  Okay.

REDIRECT EXAMINATION

BY MR. COUGHLIN:

Q   Attorney Sternenberg, you were asked under cross-examination to what extent your client knew about her mother's erratic behavior, either at the ballgame or trying to get to the ballgame, or -- and a few instances otherwise.  Is it important, relative to your investigation, that Emma know about these instances of erratic behavior?

A   Well, I'd hope that she doesn't, but I think she's a 14-year-old and she does.

Q   Okay.  But --

A   But if it -- if she didn't know, it still happened.

Q   Okay.  For instance, there was some testimony, and I don't know if I fully understand it, but involving a penis on a cellphone relative to a -- what was the nature of the app that was used?



65

A   So Instagram.

Q   Instagram.

A   Which kids use, and she has a account.  I received a copy of an email that was sent to Steven Loudermilk with two pictures attached that Laura suggested were -- had been changed around.  I couldn't figure out what in them had been changed around, but apparently one of the pictures was of her young son, Keegan, who had a picture taken at daycare, and apparently Laura saw that there was a penis in that picture.

And then there was another picture of Emma with a birthday cake for Keegan and Christopher Morrell in the picture, and apparently she found that the arm that was around one of the people in the pictures had been changed to look like a penis.  I didn't see it, but that's --

Q   So when you say --

A   -- that's my understanding.

Q   When you say you didn't see it, you saw the pictures?

A   I saw the pictures, yes.

Q   But you didn't see whatever it was that -- that Laura Montgomery saw?

A   Right.

Q   And that was sent by Laura to Steven?

A   Yes.

Q   Were you -- you were copied on it?

A   I was copied on it.



66

Q   I see.  But are you concerned with whether or not Emma knew about these pictures?

A   No.  I think it's the fact that Laura and her -- her communication with those pictures was disturbing.  It's the -- it's the disturbing action.  It's not whether or not my 14-year-old client knew about the action.

Q   Okay.  But by the same token, does it matter to you that no doctor has ever suggested that there has been abuse and neglect, or there's been no abuse and neglect action initiated by any medical provider in the past?

A   No, because it's my understanding -- well, I -- it's my knowledge after 30 years of practice that oftentimes they aren't made; whether it be a school or a doctor or a psychiatrist.  They -- you know, they use their discretion at making those reports.  Those reports don't generally go a long way, and unless it's something that they feel that they can't monitor, they don't usually do that.  They don't usually make those --

MR. PIELA:  Judge, I'm going to move to strike that testimony.  It's supposition as to what might have happened; what could have happened.

THE COURT:  Well, in all fairness, Attorney Piela, I'm going to allow the question, because you were asking questions like, well, wouldn't you expect that if a school counselor had heard that there was suicidal ideation, she

67

would report it?  You asked a number of questions like that which -- which were basically asking for Attorney Sternenberg's collective experience.

I mean, she is not here as solely a fact witness. She is trained to give opinions about what she thinks is best for children based on her cumulative experience.  Go ahead.

BY MR. COUGHLIN:

Q  In fact, you're not suggesting that, based on what you have uncovered and what you have investigated, that any abuse or neglect proceedings should have been brought in the past, are you?

A  No.

MR. PIELA:  Now I'm going to object, Your Honor. That's -- now we're asking for a legal opinion as to what meets the standard of abuse and neglect.

THE COURT:  No.  Listen -- listen to his question.

BY MR. COUGHLIN:

Q  Through your investigation, right, and let me ask this question beforehand:  Are you a mandatory reporter?

A  I definitely am.

Q  Okay.  And you have probably mandatorily reported in the past?

A  I have.

Q  Throughout your investigation of this case and what you've uncovered, you haven't found that the level of care



68

that Laura provided to Emma rose to a level where an abuse and neglect action should have been initiated?

A   Not -- I haven't initiated -- initiated one, but the level of reported discord in the home, to me, in my experience, starts to get close to a report, because psychological abuse, while it may not be founded, is happening in that home.

Q   And why did you not report this particular incident?

A   Because I felt that this was already being in front of the Court, and that it could be taken care of this way, and in my experience, abuse and neglect at the beyond-a-reasonable-doubt level is not often the way that I proceed in parenting cases.

MR. COUGHLIN:  I just -- this is in part of her report.

MR. PIELA:  Uh-huh.

BY MR. COUGHLIN:

Q   I just want to show you, I cherrypicked, if you will, a document from your guardian's report, and ask you if you recognize that?

A   Yes, I do.

Q   Okay.

A   I reviewed -- I obtained and reviewed --

THE COURT:  What page are you on?

Excuse me.



69

THE WITNESS:  I'm sorry.  Do you have this?

MR. COUGHLIN:  Of the report?

THE COURT:  Yeah.

MR. COUGHLIN:  Is that part of the report?  It's part of your file, I know.

THE WITNESS:  It's my file.  It's not my report.

THE COURT:  Okay.  All right.

If you could, just be clear about what she's testifying from.

THE WITNESS:  It's a Foundation Medical Partners medical record, and it's from 10/26/2015.

THE COURT:  Okay.

BY MR. COUGHLIN:

Q  Okay.  So this will be four years old this fall, right?

A  Yes.

Q  And there's -- this medical record establishes what?  There was an incoming --

A  It's a call.

Q  -- triage call?

A  Right.  It's a call from Mom, Laura --

Q  Right.

A  -- saying that --

Q  To who?

A  It's a call -- it's a triage call, so it's a call to a



nurse saying that -- Amanda Anderson, R.N., Mom states that her ex-husband, Emma's father, is back in the area. They are trying to figure out the next visitation schedules. Mom states they recently had a nanny that abruptly left. States, one day, Mom came home from work and all her belongings were packed and she left, and there are claims that her ex, Mom's ex, sexually harassed the nanny.

Q   So who would Mom's ex be there in this? Was that Mr. Morrell or Mr. Loudermilk?

A   I asked Steven Loudermilk about sexual harassment of Laura Montgomery's nanny, and he denied it. I guess it's Chris.

Q   He's living up in -- way up in Maine at the time, right?

A   Right.

Q   Okay. What else do you glean from that report?

A   Mom had a question if a DCYF report has been filed. She states she's worried that someone would do this out of retaliation. Let Mom know, I have no files, reports, claims in either Emma or Keegan's chart in regards to DCYF or anything else unusual. Mom relieved. Mom wants to -- the number to DCYF -- DHHS as she wants to call and ask if someone has filed a report against her. Mom states, I realize how crazy this sounds and how paranoid it makes me seem. Mom states, my concern is that someone is setting me up.

71

Q   So those are Mom's words saying that she understands how paranoid she is?

A   Yes.

MR. COUGHLIN:  Your Honor, I would just as soon mark that as what I call Bench or Court C we're on, I think?

THE COURT:  Yes.  Is this the guardian -- this is a document from the guardian?

MR. COUGHLIN:  This one is --

THE WITNESS:  It's from the guardian's file.

THE COURT:  Yeah.  That's Court's 1.

(Court's Exhibit 1 marked for identification)

MR. COUGHLIN:  Court's 3?

THE COURT:  1.

MR. COUGHLIN:  1.

THE COURT:  I have A and B from the respondent.

MR. COUGHLIN:  Oh.

THE COURT:  You're going to be 1, but the Court -- and my orders, I note -- I note the Court's exhibits --

MR. COUGHLIN:  Thank you, Your Honor.

THE COURT:  -- in Roman numerals.  But just on the record, it will be Court's 1.

BY MR. COUGHLIN:

Q   You need not make the determination that a DCYF proceeding has existed or occurred at any point in time in order for you to recommend a custody modification, correct?

72

A   No.

Q   Do you have any concerns about the fact that my client hasn't initiated any contact between Monadnock Regional School and Emma's former middle school?

A   I always try -- I don't have concerns.  I always try not to involve the child in that way until a decision is made, because I figure while you can talk about it's a smaller school and they have softball and whatever, to involve the child in looking at the school, I discourage.

Q   It would appear from the questioning that there was some criticism relative to my client not having done that yet, but he actually was engaged in following your advice by doing so?

A   I think so.

MR. PIELA:  Object to the token leading, Your Honor.

MR. COUGHLIN:  I was clarifying her answer.  I don't --

THE COURT:  That's fine.  Sustained.

MR. COUGHLIN:  I don't think this witness can be led very -- very easily.

BY MR. COUGHLIN:

Q   Are you aware that there have been visits, at least since June 3rd, between the dads, if you will, and the kids, the two kids?

A   I'm very aware.



Q   Okay.  And who -- who initiated that contact?

A   Steve and Chris talked and came to an agreement about how that would work.  Although Laura has been extremely agitated about it and, in fact, reached out to me at one point and said that they couldn't do that without her being involved.  Laura has had a hard time understanding the Court's orders around this, but it's my understanding from Steven that he knows how much Emma loves Keegan, and he knows how much Emma loves Chris, and he encourages that contact.

Q   In fact, my understanding is that they had a plan to do a certain activity, which Laura threatened to appear at, and they had to change their plans and do something else?

A   Yes.

Q   Do you remember what that was?

A   No.

Q   Okay.

A   I got -- I got an email, or -- from Laura, an urgent, you know, communication from Laura about it.

Q   Saying what?

A   And then I found out the next week that it was about her being very worked up about them not being able to get together without her involved.

Q   What was the urgent email; do you remember?

A   She said that she needed to talk to me because she needed to clarify that she could be there, and she couldn't.



74

I mean, the order is pretty clear.

Q    Okay.  So I imagine you promote those visits occurring in the future?

A    I promote those visits and have talked to both Chris and Steve about getting together, because I think it's important to both of the kids.

MR. COUGHLIN:  That's all I have, Your Honor.

THE COURT:  Okay.

Attorney Piela, recross?

RECROSS-EXAMINATION

BY MR. PIELA:

Q    You cite -- or you were questioned about the 2015 triage call?

A    Yes.

Q    And just so the record is clear, that was Laura's words saying, I realize how paranoid or delusional this sounds?

A    Yes.

Q    But there was no finding in that triage note that said that Laura was suffering from delusional thought patterns, no doctor made a finding of that?

A    No.  It was just a report from a nurse, who took a call, of her conversation.

Q    And the June 3, 2019, would you agree with me, that as of right now that is the most recent mental health evaluation



75

of Laura that we have?

A   It's too bad, but, yes, because she really does need a full evaluation.

Q   Well, I understand that's your opinion, and we all -- we've gone through ad nauseum what the two and three Access' note says, correct?  We've -- we've discussed that it did not find delusional thought patterns.

A   Yes.  Mr. Piela, I -- going and seeing -- going to the emergency room and seeing somebody there is certainly the first step, but they even said that she should continue and go see her therapist.

Q   Which she did.

A   But I don't have any notes of that, so I have --

Q   That's not my -- is that my client's --

A   -- no evidence --

Q   Is that my client's fault?

A   Well, she could have gotten them.

Q   Do you know if she's been asking for them?

A   I don't know.

Q   I'll make a --

A   She told me this morning that she --

Q   I'll make a --

A   -- she had.

Q   I'll make a representation that she's been asking for them for months.



(973) 406-2250 | operations@escribers.net | www.escribers.net

76

THE COURT:  Well, if she's going to testify, you can ask her about --

MR. PIELA:  Okay.

THE COURT:  -- what she's done since June 3rd.

MR. PIELA:  All right.

BY MR. PIELA:

Q  And as of right now, there's no mental health diagnosis of Laura that indicates that she's delusional or has a paranoid -- paranoid, delusional.  Is there any diagnosis along that line?

A  No.

Q  Okay.

MR. PIELA:  That's all I have.

FURTHER REDIRECT EXAMINATION

BY MR. COUGHLIN:

Q  So let's talk, briefly, about what's happened since June 3rd.  Have you witnessed or discovered any behavior on the part of Ms. Montgomery that's caused you concern about her mental health?

A  Well, she went to the doctor.  She walked into the ER with her mother, and the records from the Access' report say that her mother was there, and her mother --

MR. PIELA:  Judge, I think the question was after June 3rd.

THE WITNESS:  -- just -- and her -- this is June --



77

BY MR. COUGHLIN:

Q   Well, then I meant to say since the last hearing.

A   On June 3rd, she went to the doctor --

Q   The same day?

A   -- and her mother reported rapid and pressured speech, running back and forth, eyes darting back and forth, and behavior that she, her mother, identifies as paranoid.  And --

MR. PIELA:  Judge, I'm going to object.  It's -- now we're getting into totem-pole hearsay.

MR. COUGHLIN:  We're just reading a medical report, Your Honor, that's already been admitted.

MR. PIELA:  And we -- the -- the findings speak for themselves, Your Honor.

THE COURT:  Okay.  Overruled.

Go ahead.  Read from the report.  I'm trying to get -- June 3rd is before we came to court on June 17th.

MR. PIELA:  No, no.  We came to Court June 3rd --

THE WITNESS:  Twice.

THE COURT:  I'm trying to -- I'm trying to put myself into the --

MR. PIELA:  All right.  June -- June 3rd, we --

THE COURT:  -- into the chronology correctly.

MR. PIELA:  June 3rd, we had a pretrial conference.  June 3rd, ex parte --

THE COURT:  Okay.

78

MR. PIELA: -- is filed.

THE COURT: Okay.

MR. PIELA: June 3rd evening --

THE COURT: So this is -- this happens the evening after the court hearing?

MR. PIELA: Correct.

THE COURT: Thank you.

Okay. Go ahead.

THE WITNESS: Her mother is present and states that she wanted client evaluated due to what she described as manic behavior this past weekend with rapid and pressured speech, running back and forth, eyes darting back and forth, and behavior that she identifies as paranoid without being able to describe what she was doing that could be construed as paranoid. Client reports a history of anxiety and depression and that she has become more anxious and depressed associated with custody relationship.

So -- and then there is her presentation dot, dot, dot, which is odd, but that's what it says in the records. So I don't know whether there's more to the record that wasn't recorded.

BY MR. COUGHLIN:

Q Okay. And what -- okay. Go ahead.

A My concern about Laura and Laura parenting Emma is that she has -- there was a court order, we came to court; we

had a court order, the Court said, is there someone who could supervise visits? Laura said yes. My mom. Steven Loudermilk agreed, and then there was a big kerfuffle about her mother supervising visits. And there was, I want Keegan there, and I want to change things up, and I want to drive her.

It was supervised visits, and Laura has a competent attorney, and I was concerned, because I was involved in a lot of the emails back and forth and text messages and calls after June 3rd trying to get Laura to understand what the Court's order meant. She didn't, to the point where she was still saying she wanted to take Keegan and Emma to Plymouth, Massachusetts, this weekend.

Q   Uh-huh.

A   Past weekend. There are court orders. They're pretty plain. I am concerned that she doesn't really either appreciate the order or understand that she has to comply with the order.

Q   And did you receive electronic communications from her since June 3rd --

A   I have.

Q   -- that caused you concern?

A   I have.

Q   And what -- what were those?

A   Including that, you know, urgent, I need to be involved in the Chris contact with Steve and the Keegan and

Emma contact. I'm very plain when I answer stuff like that, and just say the Court' order says, but even to the extent of the Court was generous and said, every night, you have a call with your daughter. But the Court didn't say and you can text her all day long throughout the day, and yet that happened.

And then Steve recently sent me a picture of Emma's phone with a message from a calendar that Mom had changed the calendar to eliminate Emma's birthday from the family calendar, and that showed up on Emma's phone. That stuff is really harmful and bad. Not to appreciate that, you know, worries me. Those are things that worry me.

And I'm worried that Laura doesn't understand that she should have, even if Dr. Sheridan said I can't be involved in court because she was worried about being called as a witness, Laura needs to be treated, and I don't think she understands that or has an appreciation of that. And it's not just for stress of the divorce. It's her behaviors need to be treated.

Q   Is it your -- are you reading that June 3rd report as her mother bringing her in, or she --

A   That's what it says.

Q   Just remind the Court of that, again, that it says that.

A   It says, "Her mother is present and states she wanted client evaluated due to what she described as," --

Q   Okay.



A   -- and I've read it before.

Q   And it doesn't appear that Laura is actually going as the Court recommended she do so?

A   No.   The first page -- the first paragraph says, "She presents to the ED stating what she describes as a court-ordered evaluation during a custody hearing earlier today." She doesn't bring any documentation from the Court with her, stating only she was told to obtain a full psychiatric evaluation.

Q   Okay.

A   She denies suicidal ideation and homicidal ideation during triage and indicates she was -- that she -- that the assessment was not based on concerns about safety, which it was based on concerns about safety.

Q   Okay.

MR. PIELA:   That's your --

BY MR. COUGHLIN:

Q   My last question is:   Since her involvement with that medical professional, has she engaged with any other mental health or medical professional to your knowledge?

A   I have no knowledge of that.

MR. COUGHLIN:   That's all I have, Your Honor.

THE COURT:   Attorney Piela, anything else?

MR. PIELA:   I think we've covered it all, Your Honor.



82

THE COURT:  I noticed on the Access' assessment, and now based on the narrative that you just read, it says here, "Date:  June 3, 9:04 p.m.  Time evaluated:  10:45 p.m."

And I had testimony earlier saying she was released on the morning of the 4th.

THE WITNESS:  Right.

MR. COUGHLIN:  Yes.

THE WITNESS:  It says that.

MR. COUGHLIN:  12:05 a.m., Your Honor.

THE COURT:  Okay.  All right.  So she didn't spend any considerable time there?  She was there for a total of about three hours.  Okay.

All right.  All right.  Thank you.

MR. PIELA:  Can the guardian be excused?

THE COURT:  I'm happy to let her go if you don't think you're going to need her for any other reason.

MR. PIELA:  I think she said what she needs to say.

THE COURT:  All set, Attorney Coughlin?

MR. COUGHLIN:  Really, I think it's up to the guardian whether she thinks it's important to hear any further testimony today or not, and she may have things to say.

THE COURT:  Don't you hate that question?

MS. STERNENBERG:  I do hate the question.

MR. COUGHLIN:  It's my job to --

MS. STERNENBERG:  I think if you're going to call



Chris, I think I might like to listen to Chris's testimony.

MR. COUGHLIN:  Okay.  That's my next witness.

MS. STERNENBERG:  If you don't -- with permission.

THE COURT:  You're welcome to stay.

MR. COUGHLIN:  Shall I go retrieve Chris?

THE COURT:  Sure.

MS. SHIRK:  I'll grab him.

MR. COUGHLIN:  Okay.  Thanks.

THE COURT:  This is so the record can only hear what counsel says and not what the judge says.

MR. PIELA:  I thought it was for the comfort of the Court.

THE COURT:  That is the comfort of the Court.  No, if this bothers anybody, please let me know.

MR. PIELA:  Oh, God no.  I wish I had one.

MR. COUGHLIN:  I didn't even know it was there.

THE COURT:  But please understand.  I'd love to put a wool blanket over each and every one of you, so you can enjoy the day like I am.  It's just extraordinarily -- it's starting to feel humid too.  I told you that it's -- I'm not sure (indiscernible).  You know, it's kind of Rockingham Superior, just a living creature unfortunately.

MR. PIELA:  I'll see you that and raise you the old Carroll County Superior Court.

MR. COUGHLIN:  Shall I swear him in, Your Honor, or

84

would you like --

THE COURT:  Oh, you can go ahead if you'd like.

MR. COUGHLIN:  Mr. Morrell, before you sit down, will you raise your right hand?

Okay.  Go ahead and have a seat if you're more comfortable.

CHRISTOPHER M. MORRELL, WITNESS FOR THE PETITIONER, SWORN

DIRECT EXAMINATION

BY MR. COUGHLIN:

Q  Could you give us your full name, spell your last name, and give us your residential address?

A  Christopher Michael Morrell, M-O-R-R-E-L-L.  6 Loch Ness Drive, Nashua, New Hampshire 03062.

Q  How long have you lived there, Mr. Morrell?

A  Thirteen, fourteen years.  Thirteen, I think.

Q  So do you own the home there?

A  Yes.  Well, the bank owns some of it.  I pay the bank --

Q  Okay.

A  -- a couple more years.  Yes.

Q  Do I detect an accent?  I do detect an accent.  Where is --

A  Possibly.  I'm born in Massachusetts.  I reside here.

Q  I detect a British accent or a Irish.

A  Irish.  Yes.  I work for the government of Ireland in



85

the U.S. Operations.  I work for --

Q  So --

A  -- an Irish company.  So I spend a lot of time --

Q  Your employer is the Republic of Ireland, but you live over here?

A  National Standards Authority of Ireland, yes.  But I work and reside -- my office -- the U.S. Headquarters is here in Nashua.

Q  Okay.

A  So I spend a lot of time there.

Q  So you live at that address with whom?

A  Laura, Keegan, our son, and up until recently, Emma.

Q  Okay.  And how long have the, I don't know what you call them, Loudermilks or Montgomerys, I guess.  How long have they lived there?

A  We call them the Loch Ness monsters.

Q  How long have they been living with you?

A  I think we're just going on 10 years now or just shy of 10 years.

Q  And when were you guys married?

A  We are not married.

Q  You're not married.

A  No.

Q  Okay.

A  We've been engaged for several years just prior to



86

Keegan, so four or five, five years.

Q   So recently, I believe you appeared in front of her Honor and filed your own custodial action with regard to your son?

A   Yes.

Q   And was that a month ago or so?

A   June 4th.

Q   June 4th.  And we were here in court the day before that; were you aware of that?

A   Yes, I was.

Q   Okay.  And why did you file that particular action?

A   Numerous reasons.  There was a lot going on in the weeks, months building up to that.  Some of the different behavioral patterns.  There was some activities around the photographs and some other activities that were making me a little bit more uncomfortable than usual.  There were --

Q   Okay.  So let me -- let me just slow you down if I could.  Give an example of an activity that you found to cause concern if you would.

A   There were increased photograph -- I don't know if I would say manipulation or not, but there were photograph comments from going back to March from a birthday.  There were some other discussions --

Q   Is these -- these are from whom?

A   Laura had seen -- Laura saw different things in



photographs than I saw or I had shared concerns of.  Keegan had -- well, the one -- then more frequently, there was one from Keegan's school that Keegan had been kept out of school for a couple of weeks while we clarified some of -- tried to clarify some of the activities with the photograph in question for -- with his school.  So he had stayed home.  It was also going into summertime.  I did not share the same concern when I saw the photo.  When I first saw the photograph presented to me enlarged, I saw an anomaly.  When I saw the photograph that was taken, it was not a concern of mine.

Q   Whose decision was it to keep Keegan out of school?

A   Laura's.

Q   Okay.  And you -- I guess, you were --

A   I supported it enough that Laura was home and he was home and -- because it was beginning of summer, and they were doing it.  I did push for the school aspect of it, but they were also enjoying their time.  Once it started to pushing to two-and-a-half to three weeks, it got a little bit too much for me.  Or it got a little bit -- it was going to be hard to get him back into a schedule --

Q   I see.

A   -- if you will.  Through the course of the Memorial Day week, there was a 9-1-1 call, and then I learned there was another 9-1-1 call.  On Memorial Day, there was a 9-1-1 call, and another one a couple of days later I had learned of while

88

Keegan was in the car, so that would have been two -- two 9-1-1 calls or police scenes that he would have witnessed, so I had concerns.

Q    Did the police -- did the police come to your home?

A    The police came to the home on Memorial Day in that afternoon, to which we were in the backyard lighting sparklers, and they came to the home at that point in time. We were not aware until they came to the door.

Q    Have the police been to your home in the past?

A    No.

Q    Have the police been called in the past?

A    No.

Q    What other behavior, I assume from Laura, was causing you concern during this -- in the last month or so?  I guess, leading up to the June -- I'm sorry.  In May, I would assume, early June, late May, what was going on that was causing you concern?

A    It was just some of the -- the -- I don't -- it was those.  It was -- it was the -- the pictures, the different scenes.  There was still some anomalies with some IT activities and some -- some --

Q    Okay.  I don't know what that means.  Anomalies with IT activities.  You're going to have to slow it down for me, because --

A    Calendar changes, phone activities.



89

Q    Okay.  Tell me about a calendar change.

A    Laura's had a history of hacking in computer and phone -- iPhone-type things that change on a regular basis, so I was -- I was growing concerned of the more frequency of those.

Q    Was she the hackee or the hacker?

A    Hack -- she was the hackee, hacked.  She was the one hacked or she was the one that had -- she was the one that has the issues on the phone, or the phone or the computer issues; hacked or not hacked.

Q    Was she -- was she claiming --

A    That there are issues with her telephone and her systems that I don't -- I cannot explain.

Q    I'm just asking you.  Were you concerned about her allegations of being hacked by someone else, or were you -- are you saying that she was hacking someone else's computers?

A    I was concerned that she was hacked by somebody else or there was anomalies with how her phone was acting and things were going, and things that she would be seeing on her phone in regards to pictures or other accounts --

Q    Okay.

A    -- and things to that effect.  She is -- no, she is not hacking.

Q    What's been your experience with regard to the relationship between Emma and Laura; let's say, for the last

couple of years if you will?

A    Laura loves her children very much.  I would say that there is -- the last couple of years, there's -- or the last year or so, there has been the past 18 months, probably more so.  There has been a change in the relationship.  It's hit or miss some days, and it changes on a daily basis.  So it changes on an hourly basis.  They could be very much very happy watching a television program or a movie or going out to lunch or going shopping, getting their nails done, and it could change very dramatically when sitting at home or trying to do something together, they can end up going head-to-head and in an argument of nature.

Q    Has it gotten physical at all?

A    No.  I wouldn't say physical.  I've seen them come close to squaring off, if you will, getting in each other's face, but not physical.  I've seen them get close a few different times where when I was there, I would have said, okay.  They've either stepped away, or said, okay; that is enough.  Time to -- time to stop.

Q    And does this acrimony exist between Laura and Keegan?

A    Keegan is going through a rough time, so Laura doesn't get in Keegan's face by any means.  Keegan is going through a rough time right now trying to figure out what's going on, so Keegan is having site meltdowns where when --

Q    I'm sorry, can you repeat the last one, I missed.



91

Keegan is having them --

A   Keegan is having a rough time right now trying to figure out where his sister is --

Q   Okay.

A   -- and what's going on and what has happened.  He has never been away from her for more than two weeks at a time, and it's -- you know, in a year's period.  So I'd say, Keegan, and Laura and I are both very concerned with that, is having occasional meltdowns where if he doesn't want to do something, he gets a little bit upset and he will get a little bit aggressive and be a four-year-old and have a temper if you will.

Q   Okay.

A   But they're not getting in each other's face.  He's being a four-year-old and being stubborn and not doing what he's want.  So we've got him signed up for Karate, and we have a few other things as an outlet for him as we're trying to maneuver through what we're doing now or what we're going through.

Q   So I'm -- I'm gaining the understanding, you're still living together, the three of you?

A   Yes, we are.

Q   Okay.  At the same residence --

A   Yes, we are.

Q   -- you've always had?



A   Yeah.

Q   Okay.   I would represent to you that the guardian has testified that she learned from you that there was a history of -- and I'll just read it to you.   You and Laura engaging in screaming, hitting, throwing things, making accusations and threats, and fighting on a regular basis.   Exposure to verbal and physical assaults is harmful to Emma, and ultimately, she wrote, is grounds for this Court to modify its parenting arrangement.

Did you agree with the guardian that there was -- these events taking place between the two of you at some point in time?

A   There has been arguments, yes.   Ongoing arguments for sure.

Q   Well, she talks about more than that, Chris.   She talks about screaming, hitting, throwing things, and threatening and fighting --

A   Yeah.

Q   -- on a regular basis?

A   In -- New Year's Eve 2016, I -- texting through my phone where I had an infidelity, and at that moment in -- at that time, and there was some emotional activities, and there was.   The -- there was -- Laura had broke some photographs of ours and thrown some flowers away and some things that I had given her previously.   Yes, there was a short period of time

93

where the emotions ran very high.

Q She thought you were -- she thought you were being unfaithful to her? Am I getting that correct?

A Correct.

Q Okay.

A Yes.

Q And she had made those allegations and it turned into a fight?

A Yep.

Q Were there other instances?

A There were other instances around that same circumstances and around that same period of time.

Q Okay. You seem to say it was a blip in the relationship between the two of you. The -- out of the ordinary or was it chronic as she seems to suggest?

A That aspect of the higher escalation of it, from what you alluded to there. The ongoing arguments and concerns of whether it be insecurities or jealousies or ongoing -- just ongoing arguments have been ongoing. But any escalation of anything other than verbal was in that short period of time or that small window of time of the -- the (indiscernible).

Q Do you have any understanding about a potential substance-abuse issue regarding Laura? Do you have any concerns about her use of prescription or other drugs?

A I'm aware that she has a prescription for Adderall,



94

but that is a prescribed -- the best of my -- it is prescribed from a doctor.

Q   Do you have any knowledge of any potential abuse of the prescription amounts?

A   I am aware that it's prescribed.

Q   Okay.

A   That's -- so --

Q   You haven't -- you haven't seen her engaged in behavior that gave you concern that she might be taking too much of a particular prescription?

A   There is -- there is up-and-down behaviors.  I would not be able to -- I am not a psychiatrist or a --

Q   Fair enough.

A   -- doctor or anything like that.  I could not point to what that is.  There are mood swings.  There is happier and sadder times and different times.

Q   I get it.

A   I would not -- I would not be comfortable pointing at what that would be or the reason behind that.

Q   I appreciate that.  You and my client, Steve, have been acting as a team, if you will, in organizing some visits between the kids, correct?

A   Yes.  I'd like to say Steve and I have been acting as a team for the better part of 10 years --

Q   Good.



95

A -- since I've been involved in Emma's life and raising her. But definitely more recently in getting the kids together, yes.

Q Right. And how often have you been doing that?

A We've been trying to do it once a week as of late. Yeah.

Q And has Laura been supportive of that?

A To the best of her ability and emotional time. The first time was a little bit rough.

Q Why would she -- do you have any understanding as to why she would have issues with the two of you and the kids having fun together?

A From an emotional person who has been raising the kids and taken with them? I -- if I put my heart on the line, I would say, probably because we are seeing her two children that she can't see together. I would say that's probably ripping her heart out. I know it is mine.

Q Has she made you aware of those feelings --

A Yeah.

Q -- or is that your own conclusion?

A No. She's made me aware of them.

Q Okay.

A But I also understand that it's an order, so --

Q So if -- if her Honor were to issue some orders keeping, if you will, the custodial arrangement in effect,

would you want these visits to continue with the kids and you and Steve?

A   Oh, absolutely.  I think it's necessary that the kids -- the kids need to see each other and be involved in each other's lives.

Q   And do you think Laura ought to be included in those visits or not?

A   I would hope so.

Q   Okay.

A   I would hope that's --

Q   Even maybe --

A   I would hope that --

Q   Maybe in the future --

A   -- their mother would be involved.

Q   -- you're saying?

A   Yeah.  I would hope that Laura could be involved in the children's lives.

Q   Maybe not immediately, but at some --

A   That's not for me to decide.

Q   No, I mean, would you prefer that these visits take place, at least for the time being, with just the four of you, or would you prefer that Laura be interactive in the -- in that happening?

A   The visits are successful.  I don't know the outcome of what's going on here or what's been said here or what's



going on in this full hear, it just has been a very stressful time, so this was a very abrupt change on July 3rd.  So I would -- I think it's very hard for Keegan.  I don't know Emma's feelings on the other side, so I think if there was an opportunity if things are not going to change for them to be together and then there was no disruption and they're allowed to all be together, I think that would a great opportunity.

I think they would -- the flexibility on that, provided it wasn't an emotional -- more emotionally disturbing to the kids as well.  So the freedom of that or the ability to have that choice would be nice.

Q  Are you and Laura involved in any therapeutic measures to improve your relationship?

A  We are in discussions of that.  We have sought that before.  We have a list of people to talk to, to -- to be -- and to interview and to meet with.  To be honest with you, we are kind of in a holding pattern.  This is quite a change of events from what we would have had been planning in April and May for the summer, so we're in a holding pattern.  We're trying to figure out what's going to happen from here; trying to balance out what's going on with our four-year-old son at home.

Again, my ex-parte filing had many reasons behind it, but I also wanted to, you know, provide the support that keeping -- you know, having Laura in the house.  I was hoping



98

to provide that support while I have the full custody and the decision-making.  Laura staying in the house, I was hoping to provide that support, keep Keegan involved in her life, albeit with some rules around it if you will.  I was hoping that, you know, from insurance from the household that she would be able to see him daily, support that, and it wouldn't be such a change in his lifestyle as well.

He's just -- his sister has been abruptly removed from him.  I do not want his mother abruptly removed from him.  And I also wanted to provide an environment where if there was next steps and other activities that could help give her support that is needed that it would be there.

Q  All right.  Well, I want to thank you for your testimony.  I know it's not easy to come in and talk about these matters.

THE COURT:  Attorney Piela?

MR. PIELA:  Yes.

CROSS-EXAMINATION

BY MR. PIELA:

Q  Mr. Morrell, can I call you Christopher or Mr. Morrell or Chris?

A  Chris.  Whichever you like.

Q  I'd like to kind of begin from a point where you raised earlier this -- something about hacking of phones. Laura's iPhone or computer system being hacked or a question



99

was raised about them being hacked.  Do you remember that --

A  Yes.

Q  -- testimony?  Okay.  And I think your testimony also indicated, then, that there was some strange images or communications on Laura's devices --

A  Yes.

Q  -- that cannot be explained?  Okay.

Did you see those strange communications or images on her computer at that time?

A  If we're talking about the one that I was referring to about my son and the one regarding the -- a birthday party, they were shown to me.

Q  Okay.  But I'm going about the event earlier.  You folks had a nanny, correct?

A  I'm sorry.

Q  Did you and Laura have a nanny?

A  Oh, you're going back years.  So, yes.  Okay.

Q  Yeah.  Okay.

A  Yep.

Q  And, at some point, that nanny was terminated from your employment or left your employment?

A  We had two -- three nannies, yes, at -- yep.

Q  And, at some point, after a nanny left your employment, did Laura raise a concern about her electronic devices being hacked?



100

A    I guess at about that timeline, there was a whole bunch of different ones at that -- yes.

Q    Approximately, what timeline are we talking about?

A    Oh, god.

Q    Are we talking 2015?  2016?

A    I believe there was a police report filed.

Q    Okay.

A    I never saw the police report, so I'm going -- I don't know the exact year.  That one, I wasn't prepared for, so you would --

Q    Okay.

A    -- know better than I.  But there was an ongoing -- Laura has had ongoing phone histories, IT histories.

Q    And did Laura show you what raised her concerns about hacking or images back then?

A    I don't recall.

Q    Okay.

A    Like I said, she's had much of a history of them.

Q    Okay.

A    So now what I was referring to earlier were her constant calendar changes, constant updates, things that changed that are unexplainable that a time will change and something will come in.  We've had such a series of -- since 2015, and maybe even prior to that, of different phone activities.  I don't even link up to the house internet system

to make sure that I don't get involved or put into it.

Q   Okay.

A   So I dismiss most of what is said.  When I see a photograph --

Q   Okay.  But --

A   -- that's alarming to me.  I do not.

Q   -- I guess -- but the question I'm raising is that, at some point in time, there were anomalies with electronic devices that raised Laura's concern about a possible --

A   Absolutely.  There was a very large one at one point in time.

Q   Okay.

A   Yes.  And --

Q   And you --

A   -- the police -- there was a police report.  I just did not see it.

Q   Okay.  You didn't see the report, but did you see -- but you saw the calendar changes and the unexplained updates, I believe you testified to.  Did Laura it and say, hey, look; the calendar has changed, or the --

A   These I still see, yes --

Q   Okay.

A   -- currently.

Q   And you don't have any idea what's causing them?

A   No, I do not.



102

Q   Okay.   You're not --

A   I wish I would.   If I could, I would have fixed them. We tried to call Apple.   We tried to do specialists.   We've gotten new phones.   We've blown our phones.   We've done new systems.   We've tried everything, and, again, it's just so frequently, there is nothing --

Q   Okay.   So --

A   I believe they are true.   To what extent, I don't know.

Q   Okay.   Now you were questioned about a -- the guardian ad litem's conclusion that there was constant arguing between you and Laura, and that arguing involved physical conflict. Okay.   Do you recall that line of questioning?

A   Yes.

Q   Okay.   And you mentioned in 2106 there was a brief spat where Laura broke some pictures or some vases with flowers because she believed that you were unfaithful to her?

A   In 2016 on New Year's Eve, I received a text that she read that indicated the unfaithfulness, and I was very clear that I was.

Q   Okay.

A   It wasn't what it was made out to be, so it was early 2017.

Q   Okay.

A   Yes.



(973) 406-2250 | operations@escribers.net | www.escribers.net

103

Q   The breaking of objects only occurred, to your knowledge, in that 2016 time period?  It didn't continue through until today?

A   It appeared very frequently in that -- well, not very frequently.  It appeared in that short amount of time more frequently.  It has -- it has appeared than more than one -- occasionally, I will bring home flowers or something like that, and they'll -- they would be thrown out sooner --

Q   Okay.

A   -- than their time.

Q   They'd be thrown in the trash?

A   Thrown in the trash or the vase would be broken or a picture would be -- but it wouldn't --

Q   Okay.  In your relationship with Laura since 2011, have you filed any type of domestic violence action --

A   No.

Q   -- against Laura?  Has Laura filed any domestic violence action against you?

A   Not that I'm aware of.

Q   Okay.  Have you ever physically struck Laura?

A   No.

Q   Has Laura ever physically assaulted you?

A   No, not -- I mean, there's flailing.  There's some -- no.  Not that.  I'm not -- no.

Q   Okay.  Now you own 6 Loch Ness Drive with the bank?



104

A    Yes.

Q    Laura is not on the deed?

A    No.

Q    Laura is not -- you and Laura don't have a lease together?

A    No.  I bought the house two or three years before she moved in.

Q    And you've never attempted up until today to evict her from the premises?

A    I don't believe I attempted to evict her today.

Q    Okay.

A    But --

Q    Well, let's hope that continues.

Do you have any plans going forward to evict Laura?

A    We've had discussions.  Again, my ex parte to keep Laura in the house was, there's a lot of good reasons behind the ex parte, and there was a lot of concerns, but keeping her in the house was to also try to maintain the balance of our four-year-old not knowing the outcome of what happened with our shared --

Q    But for right now --

A    -- Emma, and I wanted to give her the comfort to be able to do what needs to be done or to provide -- she's not employed.

Q    Okay.



105

A   She's also under my medical insurance.  I hope there might be a future for our relationship; I don't know if there will be.

Q   Okay

A   But I'm not putting her on the street.

Q   Okay.

A   No.

Q   I understand that.

This is going to be like a strange question.  You testified that Laura and Emma have gotten into verbal fights, where both have gotten pretty heated with each other?

A   Yes.

Q   Emma's a teenager?

A   Yes.

Q   Have you any experience with raising teenage girls or being around teenagers?

A   No.

Q   Okay.  So you don't know if this is just normal teenage drama between mother and daughter?

A   I can't say I do.

Q   Okay.  Now Laura lost her job sometime in 2017, correct?

A   Yes.

Q   And since that time, since 2017, she's been -- she wants to stay-at-home parent with Emma and Keegan, correct?

A    Yes.

Q    And in between 2017 and June 4, 2019, have you ever felt compelled to file any type of custody action against Laura the way she was raising or treating Keegan?  Let me put it this way, you haven't filed -- you did not file a custody action in that time?

A    No.  We had discussions throughout the timeframe that if we were going to split up, and, again, that goes back to early 2017 when those things came up, well, we had discussions if we were going to split up, then we had verbal agreements that we would have a 50-50 custody and try to make it amicable if that's what we were going to do.  At one point in time, we looked at a condo a mile down the road and it just fell through and we were piecing the relationship back together.

Q    But in between 2017 from the time Laura lost the job to June of 2017, you have not felt an emergent need to file some sort of custody action against Laura?  That some -- that the situation had deteriorated to a point that emergency action would be needed by a court?

A    By June 4th?

Q    Correct.

A    No.

Q    Okay.  Now after June 4, this Court granted you sole decision-making and sole residential responsibility for Keegan, correct?

107

A    Uh-huh.

Q    And that situation has continued up until today, correct?

A    It's still going, yes.

Q    Okay.  Laura still lives at 6 Loch Ness Drive?

A    Uh-huh.

Q    Okay.  You have to answer yes or no.

A    Yes.

Q    And you work full-time?

A    Yes.

Q    Between June 4, 2019, and today, would you agree with me there have been occasions where Laura has spent the entire day alone home with Keegan?

A    The majority -- there's been a few times.  They have been very limited times.

Q    Okay.

A    And there have been stressed out times that I've had, and we've kept in constant contact.  And I have -- the neighbor works from home, I've notified her, and, yes, there's been occasions where I've had to go to work that Keegan would not go to school.

Q    Okay.  Now these neighbors, do they actually physically come into the house and sit with Laura, or are they just in the neighborhood and just to be -- have their ears open?



108

A    They're the next-door neighbor keeping an eye on the driveway and the house.  They're not going physically into it.  So I notified them, and then I stay in contact with Laura.

Q    And between June 4, 2019, and today, have any of these neighbors raised an issue with you to say, hey, I think something really bad is happening.  You've got to come home.  You've got to do something.  Laura is acting inappropriately with Keegan.  Has that ever occurred?

A    Nope.

Q    Okay.

A    But I stay in constant contact with her, again, and I know when he's sleeping, and I come home as soon as I can.  There are meetings that I have to attend to, and, again, with the dramatic situation that Keegan is going through and his meltdowns, it is difficult to get him out of the house on some occasions.  We have gotten much better at it.

Q    And you would agree with me, sir, that if you felt that Keegan was unsafe in Laura's presence, that Laura presented a threat to Keegan's safety, you would not allow Keegan to be alone with her?

A    And I think, yes, I would agree with you.  And I also think there are many times that I did not leave them alone based on actions or attitudes or behaviors in the morning or in the afternoon where I came home from there.  Yes.

Q    Now, I understand that there was a hearing scheduled



109

for July 8th regarding your ex-parte order, correct?

A   Okay.  Yes.

Q   Did you or your attorney file a motion to continue that hearing?

A   Yes.

Q   And you -- would you agree with me that you filed the continuance because there was nothing dramatic or emergent that you needed to bring to this Court's attention?

A   No.  I filed the continuance solely based on the fact that there was this activity going on, and I wanted Laura to not have the strain of both going on at the same time.  I wanted her to clarify and get past what was going on with Emma and this hearing and these activities, and then we would proceed with ours.  It was so she didn't have any further stress of what was going on.

Q   In between June 4, 2019, and today, you have not filed any further emergency pleadings with this Court vis-à-vis Laura's behavior around Keegan?

A   No.  There's been a couple of times we've had to have verbal discussions on it where we're, you know, we're picking up Keegan jointly, and a couple of other times where she would just say, I'm going to get Keegan, and I'd say nope.  We're going to pick up Keegan together or doing things in the earlier stages, and we've sat down and we've discussed that a little bit more clearer of what the ex parte means and the

110

custody, and we have to have agreement, and so we --

Q  And were you successful in reaching an accord with Laura on those occasions?

A  Yes.

Q  Yes?

A  Yes.

Q  Okay.  Thank you, Mr. Morrell.

MR. COUGHLIN:  I don't know if the guardian has any questions, Your Honor, or I can -- I don't know --

THE COURT:  I'm going to throw the fourth -- well, I'll ask the guardian.

Any questions, Attorney Sternenberg?

MS. STERNENBERG:  No.

THE COURT:  Okay.

I have a quick question.  I've just got to go back to find it.

At the very beginning of your testimony, Attorney Coughlin was talking about, you know, what are -- what are some of those?  You said over the past three -- about two to three months leading up to the incidents in June that we have heard about with respect to Emma, he asked if you had had any -- if you had seen or observed anything kind of concerning or unusual, and you said yes there was a couple of things.

And, I'm sorry, that's why -- you said something about her behavioral patterns, activity around photographs,

111

other things that were making me uncomfortable.  One of the things you talked about were a few 9-1-1 calls made by Laura when the PB came to your home?

THE WITNESS:  Yes.

THE COURT:  Did you talk to the police?

THE WITNESS:  One was on Memorial Day -- no, I didn't.  Yes, briefly.

THE COURT:  Okay.

THE WITNESS:  One was on Memorial Day; it was in the afternoon.  We had returned, and this was also a typical of behavioral pattern.  A fun morning, something happened in the afternoon, got a little strange, and then the evenings seemed to be kind of fun.  We were lighting off the sparklers in the backyard after a barbeque.  Keegan had woken up from a nap, and we were out back doing that, and the doorbell rang.  The back patio, so we went through the garage, I opened the door, and lo and behold, there was a Nashua officer there, and both the kids were a bit shocked as I was.

And so, somebody called 9-1-1, and I looked at them and I looked at Emma, and I knew Keegan didn't call it, but the officer immediately said, well, maybe it was the -- did your son call 9-1-1.  I looked at him like, they've been out back with me, and then Laura sat there and said -- did that.  So someone had dialed 9-1-1 and hung up, and it turned out that it was Laura.

112

THE COURT:  Okay.

THE WITNESS:  The police officer then -- I said, I would like to keep the kids out back, he said, well, we'll go inside, and he and Laura went inside and talked.  I kept the kids out back, because they were, obviously, a little -- a little nervous and a little concerned of what was going on, and it kind of ruined the sparkler activities, and about 15 minutes later, we were playing ball and doing whatever, and about 15 minutes later, I thought it odd that I hadn't seen them, so I went back out to say -- to see the officer, and the officer had left.

THE COURT:  Okay.

THE WITNESS:  So then the night kind of -- I tried to balance out the kids, and I called the police station the next day and there was not a file or a report filed.

THE COURT:  So you don't have any idea of why the police were called?  You know that Laura called them, hung up, but don't know why she did that.

THE WITNESS:  Correct.  I have two different -- two different stories.  No, I don't have any.  I don't -- I don't have any direct -- to be honest with you, I have no direct answer.

THE COURT:  Did you ask Laura what -- why did you do that?

THE WITNESS:  I asked Laura.  She said -- she said



113

she had already told me, and she saw something on Emma's phone. I asked Emma, and Emma said that Laura was uncomfortable with something. I don't know if it was around the sparklers or something that I was doing, and the only thing I was doing was lighting sparklers, so I don't know why they were really called.

THE COURT: Okay.

THE WITNESS: I do not have a solid answer.

THE COURT: Okay.

THE WITNESS: So I need to go with what Laura said of seeing something on Emma's phone, so I don't know. The next one, I understood, was while Keegan was in the car and something -- or a couple of two days later, and this softball game. We were trying to get to a softball game that I could not get to because I was at work. My understanding, there was one called and that there was a report filed on that.

THE COURT: Okay. Is this -- is this the event where Laura was trying to find her way to the game?

THE WITNESS: That's my understanding.

THE COURT: Okay.

THE WITNESS: The -- I was not privy to that knowledge, other than hearing it from the children.

THE COURT: Okay.

THE WITNESS: And finding more about it.

THE COURT: All right. I'm all set.



114

MR. COUGHLIN:  I just have a couple more questions.

THE WITNESS:  I thought you were done.  No, just kidding.  Go ahead.

MR. PIELA:  I get one final bite at the apple though.

REDIRECT EXAMINATION

BY MR. COUGHLIN:

Q  Has Laura ever suggested -- suggested to you that Steve is behind this hacking activity relative to her computers or her electronics?

A  There were -- there were suggestions.  There were comments that there was a possibility that he was there, but there was also possibilities that I had something to do with it.  There was also possibilities that my family had stuff to do with it.  So there was a time when everybody had potentially some -- some accusations of it, hence the reason I don't connect to the home internet; therefore, I can't be.

So there were times that, yes, Steve; yes, me; yes, potentially my mother, potentially my uncle.  Yes, there was anybody who could have something to do with something that showed up as an anomaly, potentially had -- and when I say anomaly, potentially it came up with a different time or a different thing, whether it was trying to close out a Facebook account or trying to do something different.

Q  And has there been any --



115

A   Laura has had issues, again, for as long as I can remember with phones, or at least for five years with phones and computers and different accounts and different things.

Q   Okay.

A   I believe some of it to be true.  I believe -- I've heard her -- I've heard her on the phone, and I've heard her with IT support.  I've taken her to the Apple store.  We've bought new phones.  We've wiped out OS systems.

Q   Is there any --

A   And, at this point in time, I don't hear it anymore because it's just so frequent and there is nothing I can do about it.

Q   Okay.  So is there any -- has any light been shed on who might be the hacker, or --

A   No.

Q   Okay.  So the -- we have -- we have no idea whether there has been hacking or not and who is responsible, correct?

A   There is definitely something wrong with her systems. Who is responsible for it or who is --

Q   Okay.

A   -- responsible for it then, I do not know.

Q   Did you ever advise my client that indeed Laura had hit you in the past?

A   I don't know.  I don't know.  Like I said, I don't know.



116

Q  You don't remember.

A  I don't even recall that.  I don't recall that exactly.  In the times of those emotions, there would have been -- you know, I don't -- sorry.  There was a direct -- the first incident of that there was a direct smack, absolutely.  No question.  I believe Emma even witnessed it.  It was the shock of --

Q  My next question was, did Steve tell you that Emma told her (sic) that she saw Laura hit you?

A  The immediate after reading the text, there was a smack, yes.

Q  Okay.  Why is it that Laura, in your opinion, hasn't become employed?

MR. PIELA:  Objection.  No foundation.

BY MR. COUGHLIN:

Q  Well, are you aware that Laura has been engaged in a job search, or --

A  Uh-huh.

Q  Okay.

A  Yeah.

Q  And --

A  Laura has been on and off.  The first year of her changing jobs, we had agreed to take the summer off and -- and to do it, because, you know, financially, we were secure.  We had agreed to take the summer off and spend it with Keegan



117

before he went -- we were in between the nannies, and he was going to kinder care and other activities, so we had agreed to take that summer off.

So whenever that was, early 2000 -- I don't even know the year. I think it was 2017, the same year, take that summer off. It was going to be Emma's last real summer, you know, of not doing something. I think she was only doing camp. Take the summer off and spend it with the kids. In September, they were going back to -- Keegan was going back to full-time kinder care-type school system, daycare, and Emma was going into school, so take the summer off and enjoy it, and then go back to --

Q  So this wouldn't --

A  -- (indiscernible).

Q  -- this wouldn't have been last summer. It would have been the summer before that.

A  2017, I think.

Q  Yeah.

A  I'm horrible with dates.

Q  Three -- two years ago.

A  I'm horrible -- I'm horrible with dates, so bear with me a minute on that one, but I think so, yes.

Q  Two years ago now.

A  Sure.

Q  Okay.



118

A    Maybe three.  Two, yeah.  Okay.

Q    Well, do you have any knowledge as to why she's not employed today?

A    She was looking to get out of the field that she was in and looking to do some other things.  So she was looking -- so she was very heavy into the medical-device world and specializes in a specific activities in the medical-device world in women's urology and bioactivities, and I think she had some bad experiences when she was leaving the other activities that were not of her doing and wanted to change, wanted to get into a different activity, and tried that -- tried to find out for her six months or a year if she could get into a different business, and that did not seem to work out.

And I know she's been looking heavily for the last year or so, and I don't know if it's because all of the jobs that she's looking for are all in Boston or on the other side of Boston and they're a heavy commute and they're difficult, or if -- I don't know the real reasons behind why they're not -- or if she's out of -- or initially too much has changed at this point in time.

Q    Fair enough.

A    I know she looks.  She doesn't not look.  I know she spends a lot of time looking.

Q    So just a couple more questions.  I wrote down that --



119

while you were testifying, that you -- you notify your neighbors when you're leaving the home?

A  If I'm not leaving with Keegan, yes.

Q  If you what?

A  If I'm not leaving the house with Keegan or if Keegan is staying there, I notify our -- we have a very close next-door neighbor that works from home, and I let them know, and they're close and they can -- Laura is close to them, and I just let them know that if there are any anomalies that's, you know, Keegan's home, let me know.  And they're neutral on both sides.

Q  Okay.  So when you say you're leaving, where are you going?

A  Work.

Q  Oh, so wouldn't -- wouldn't that be every day?

A  Yes.  Some days, I bring Keegan to school.  Some days, Laura brings --

Q  Okay.

A  -- Keegan to school.  His school is at the bottom of the hill.  So sometimes there may be a half an hour difference between our departure time.

Q  And you also testified that if your son wasn't going to school, you would change your plans and remain home with him.

A  As much as I could.  In these first instances in the



120

first two weeks of June, I was home for the two weeks, a majority of the two weeks with the exception of when he took a nap. I came here for an hour. I went down to his school to examine the pictures and have something to do, and I came here for an hour and filed.

Q So my question is: Why would you not allow those two to be alone?

A What? I'm sorry.

Q Why would you be uncomfortable with those two being alone at home?

A That's a tough answer because it's not all the time. It -- I -- it's the changing of the behavioral patterns. I can tell when there is a balance and when there's not. The reasons behind it, I do not know. It's the -- it's the same with myself. I -- so I want to make sure that Keegan is okay and everything is okay. I want to make sure that the screaming and the yelling is not there.

Q Okay. Thank you, again.

MR. PIELA: I have nothing further for Mr. Morrell. Thank you very much for your testimony.

THE COURT: Okay.

Again, Attorney Sternenberg? Pass? Okay.

Mr. Morrell, thank you very much. I appreciate your testimony. Again, I -- (indiscernible) Attorney Coughlin's sentiment. I know these are not easy hearings to testify in,

121

so I appreciate your candor.

THE WITNESS:  Thank you.

THE COURT:  It looks like lunchtime to me, folks.

MR. PIELA:  We've just got to read on when the witching hour is for the Court?

THE COURT:  4:00.

MR. PIELA:  The coach turns into a pumpkin?

THE COURT:  You'll -- well, the lights will be shut out and you will hear doors slam.  And if you can get yourself out, good luck to you, you know.

MR. PIELA:  Tim, I only have my client, but I don't know.  Do you think we'll be able to get done by 4:00, or --

MR. COUGHLIN:  That will be my goal, no question.

THE COURT:  You want to take a -- if you want to take a short lunch, if you're prepared to do like a quick half hour or just go over to the bakery and grab a, you know, roll or the -- you know, the little bagel shop behind the church there?  You can get a bagel and a soda or half a bagel and a soda in 20 minutes.

MR. COUGHLIN:  That's probably what I --

MR. PIELA:  Let's do a half hour, because --

THE COURT:  Okay.  Right.

MR. PIELA:  -- everybody -- if everybody is okay with that.

THE COURT:  Yeah.  Well, like, I don't want to push

122

everybody to 4.

Attorney Sternenberg, are you --

MS. STERNENBERG:  I'm going to leave.

THE COURT:  You're going to head north?  Okay. Thank you, again, for all your work in this case.

MS. STERNENBERG:  You're welcome.

THE COURT:  Nice report.  I appreciate that.

All right.  So let's come back around -- 20 of is fine.  Okay?

MR. COUGHLIN:  Can we leave our materials here?

THE COURT:  Absolutely.  We'll be locked up.

MR. COUGHLIN:  Okay.  Very good.

THE COURT:  Okay.

MR. COUGHLIN:  Thank you, Judge.

THE COURT:  All right.  Thank you.

THE CLERK:  All rise.

(Recess at 12:08 p.m., recommencing at 12:44 p.m.)

THE COURT:  I'm -- you know, I'm soaking in the Nantucket Breeze, so I'm -- you know, I'm -- it's the name of my little fan, Nantucket Breeze.

MR. COUGHLIN:  Nantucket Breeze?

THE COURT:  Yeah.

(Court and Clerk confer)

THE COURT:  I don't know, but if -- yeah. Gentlemen, if you're warm, please.  I know, you know, again,

123

state building.

MR. PIELA:  I don't hesitate to do that.  You've probably notice already.

MR. COUGHLIN:  Take off your coat?

THE COURT:  You're welcome to.  You know, I know -- I am blessed, right?  Look at these windows, blessed with this courtroom.

MR. COUGHLIN:  Yeah.

MR. PIELA:  Uh-huh.

THE COURT:  But June, July, and August, it's like the little terrariums you used to get in Sugar Pops.  You know, they'd give you a little soil, and all you had to do was put it someplace hot and it would grow.  I feel like, you know, the -- I almost feel like the water is going to start coming off the ceiling some afternoons and --

MR. COUGHLIN:  Well, it did -- it did a couple of years ago.

THE COURT:  Well -- oh.  Oh, yeah.

MR. COUGHLIN:  Yeah.  That's when -- that's when --

THE COURT:  You don't know the half of it.

MR. COUGHLIN:  That's when -- that's when you got --

THE COURT:  Don't remind me.  My -- I was the flood.  My office was the flood.  It was an unfortunate event, but --

MR. PIELA:  I didn't know that.

THE COURT:  Yeah.  It just gets kind of -- it will



get warmer as the afternoon goes on, so --

MR. COUGHLIN:  Well, if -- I will take you up on that offer --

THE COURT:  Be comfortable.

MR. COUGHLIN:  -- if it gets to that point, Judge.

THE COURT:  Be comfortable.

You all set?

THE CLERK:  Yes, Your Honor.

THE COURT:  Okay.

Attorney Coughlin, go ahead.

MR. COUGHLIN:  Before you sit down, Steve, could you raise your right hand.

STEVEN B. LOUDERMILK, PETITIONER, SWORN

MR. COUGHLIN:  Thanks.

DIRECT EXAMINATION

BY MR. COUGHLIN:

Q  Could you state your full name and your address?

A  My full name is Steven Buchanan Loudermilk.  Address is 123 Fulham Hill Road, Fitzwilliam, New Hampshire 03447.

Q  And how long ago did you move to Fitzwilliam?

A  It was October of 2018.

Q  So it would be a year in October?

A  Yes.

Q  And what -- what precipitated your move?

A  The concern for Emma's health and wellbeing and to be



125

closer to her to help her out whereas needed.

Q   Where were you living prior?

A   I was living in -- just outside Waterville, Maine. It's about three-and-a-half hours.

Q   Three-and-a-half hours from here?

A   Three-and-a-half hours from Nashua, yes.

Q   Okay.  So you owned a home there, and you sold it and moved to Fitzwilliam?

A   I did, yes.

Q   Without getting into the history of your marriage, I just want to start with, perhaps, your relationship with me. How long have we been teamed up here in this endeavor?

A   I believe I contacted you in late of 2014 or the beginning of 2015 to assist me into getting some help with visitation with my daughter.

Q   And we filed some pleadings with the Court here, and we went to mediation a couple of times, which we're not going to really talk about, but the file speaks for itself as far as what you were trying to accomplish then and what Laura's position was, correct?

A   Yes.

Q   Okay.  Well, what -- what was the nature of the difficulties between you then?

A   I was -- at that time, I was having difficulties with the communication with Emma and getting with -- to spend time

126

with Emma.  I was having a difficulty between communications with her mother and myself trying to set up visitation.  I was having issues with communications with Emma.  I would attempt to call her, and she would not want to speak with me, or when she was speaking with me, she was being angry towards me and disrespectful.

So, at that point in time, I felt that I needed to reach out to you again, and that was for the second time that we went through mediation.

Q   When did you move to Maine?

A   That would have been in October of 2014.

Q   Okay.  So prior to that, you had sort of an on-and-off relationship with Emma, I would suggest?

A   For visitation, yes, but it was an ongoing -- we talked almost every night, even when I was stationed outside or even if I was deployed somewhere, I tried to talk to her every night.

Q   Okay.  Did your relationship improve over the four years that you lived in Maine?

A   It did.  Towards the end, it did.  The first year-and-a-half was tough.

Q   Okay.  Did you have difficulty conducting visits at times, and --

A   Yes.

Q   What were the problems?  Some of them were logistical,



127

no?

A  Yeah.  Meeting halfway or setting up dates for visitation, there was always an issue of, oh, well, I have to check my calendar, I'll put it in reference to Laura, always saying, oh, I have to check my calendar.  And then I would have to repeatedly text or, at that point in time, we were communicating through text because I could not contact her through email, because that was around the same time when she was saying that I was hacking into all her electronics.

So texting, and I would constantly be texting to try to get visitation with Emma, and I was even following the parenting plan.  It was just difficult at that point in time. If -- I knew if I fought with her and was very assertive, it was just going to make me -- make it even more difficult for me to see Emma.

Q  So there was one particular custodial transition where you called me during the weekend, I believe.  Do you remember that?

A  Yes, I do.

Q  When was that?

A  That was last March.

Q  And what was happening then that you reached out?

A  So I had a weekend visitation with Emma, and Emma brought one of her friends up from -- that she went to school with.  And through visits before that, Emma expressed her



128

interest in hunting and archery and just getting involved in the outdoor sports, and she stated on that visit that she would like to go to a hunter safety course.

I said, well, then I will speak with your mother when we meet up and we do the exchange. At that point in time, we traditionally met at Biddeford, which was halfway, so it was -- but, at that time, I messaged -- I text her and I said, let's meet in Kittery, which is actually closer to her, because I had to stop down there. I think I had to stop down for -- I don't recall. It was for one of those stores or something down there. I had to stop --

Q  Kittery Trading Post probably?

A  I think it was the Kittery Trading Post. And --

MR. PIELA:  Shameless plug.

THE WITNESS:  And the -- during the transition, her and Chris pulled in this way. I was pulled in this way.

BY MR. COUGHLIN:

Q  Her being Laura?

A  Yes. I'm sorry.

Q  Yeah.

A  Laura and Chris were pulled in, and I was pulled in this way, and it was in a parking lot of a restaurant. We did the exchange, and Emma's friend got in the car and Emma was outside the car, and I mentioned to Laura that -- I'm like, Emma has expressed her interest in doing a hunter safety

129

course.  And she showed her unhappiness with that, and I said, I'm just trying to just tell you what she's interested in doing with me.

And she said, well, you don't have to be a dick.  And, at that point in time, my wife, Jessica, is a very meek-and-mild person, she doesn't ever speak up, she finally got sick of me being stepped on all the time.

MR. PIELA:  Objection, Your Honor.  Characterization.

THE COURT:  I'm sorry.

MR. PIELA:  He's characterizing the emotions of another witness.  He's saying that Jessica got sick of this and did that.

THE COURT:  Okay.  Yeah, that's fine.

She can testify to that when she testifies, but --

MR. COUGHLIN:  Thank you, Your Honor.

THE COURT:  -- you can -- you can -- all right.  Go ahead.

THE WITNESS:  And so Jessica said, well, you know, you just need to stop.  You just need to stop.  You don't need to call names.  You just need to stop.  Well, Laura got very irritated, and with the kids there, I didn't want to make any -- any -- a scene out of it.  So I looked over and I said, Chris, can you get Laura in the car?  And he's like, yeah.  And I said, Emma, get in the car, and in her mother's car, and

she got in.  I gave her a kiss.

And Chris was like, Laura, get in the car and, at that point in time, she like flipped out and started screaming at him.  I did tell Jess, I'm like, Jess, just get in the -- get in the truck, please.  Jess got in -- Jessica got in the truck and we just went our separate ways.

BY MR. COUGHLIN:

Q   Uh-huh.

A   On my transit back up home, I think it was probably about a half hour later, I started getting text messages from Emma stating that she wanted me to pick her up, that her mom was screaming and yelling and saying bad stuff about me, and she got sick of her mom saying bad stuff about me, so she spoke up and started yelling at her mom, and she said later in text messages -- well, actually, it was -- so, at that point in time, I turned around and I started discussing the options with Jess of what we should do.

I reached out to you at that point in time as my legal counsel, and I started heading back down to get Emma, because I knew that there was probably -- it was -- there was probably some arguments going on between Laura and Chris at the time, because previous to that exchange, we've been -- we've been given information that there has been a large amount of fighting between Chris and Laura.  After discussing it some more, Jess and I both agreed that if I showed up in Nashua to

get Emma that she is probably going to call the police, and I did not want to make that type of a scene in front of Emma.

So I discussed -- so I talked back and forth -- well, Jess was doing a lot of the texting, and -- because I was driving at the time, and then we switched off, and then I started texting her, and she -- I stated, you know, if I go down there, your mom is probably going to call the cops on me. And I said, just call me when you get home.

Q  Okay.  So let me just show you from --

MR. COUGHLIN:  What I've offered, Your Honor, as Exhibit 6.

BY MR. COUGHLIN:

Q  And I ask you if you recognize this exchange between the two of you?  Or I ask you to explain what -- what you see here.  It's just one page.

A  Yeah.  That's the -- so that was the text conversation between us.  Yes.

Q  This is while she's in the car going home?

A  Yes.

Q  Can you just go over this one page of the conversation?

A  Hold on a second.

MR. PIELA:  Judge, I think the text messages speak for themselves.  I don't object to the introduction of Exhibit 6.



MR. COUGHLIN:  Good.

I'd like him to read it.

THE COURT:  Okay.  Go ahead.

THE WITNESS:  From Emma it said, "I need you to come pick me up."  In response, this was through Jessica's phone, my wife's phone.  She says, "Can you call me?"  Emma said, "In the car almost home.  When I get home, I will."  And she said -- she said, "She doesn't want me anymore, and she is talking bad about you."  And then it was a -- the response was, "Okay.  Tell her I'm turning around to come get you," and Emma said, "K. K."  "We are turning around and heading that way.  We'll be there in about two-and-a-half hours."

BY MR. COUGHLIN:

Q  Okay.  So we just saved that one sheet, Exhibit 6, which has been admitted, but you decided soon thereafter not to turn around or to --

THE COURT:  Attorney Coughlin, hold on.  Before you -- before you go forward.

Did you submit --

MR. COUGHLIN:  Yeah.

THE COURT:  -- your proposed exhibits to my clerk?

MR. COUGHLIN:  Yes.

THE COURT:  Okay.  Hold on.

Can you find Petitioner's 6?

THE CLERK:  Yes.



133

THE COURT:  And mark that accordingly because I think it's actually --

THE CLERK:  So that would be 1?

THE COURT:  Petitioner's 1.  Okay.

(Petitioner's Exhibit 1 received)

THE COURT:  Well, you know, it's --

MR. COUGHLIN:  That's fine.

THE COURT:  People bring us these files with exhibits, and sometimes some of them don't ever get used, so I keep them in order per admission.  Sort of 6 for ID kind of thing.

MR. COUGHLIN:  So can I proceed?

THE COURT:  Yeah.  Go ahead.  I just wanted to make sure the clerk got the count.

BY MR. COUGHLIN:

Q  So you reversed your reversal?

A  Correct.

Q  And you headed back up to Maine?

A  Correct.

Q  Okay.  And that kind of -- that issue kind of went away?

A  No.  Well, we -- I communicated with Emma through the phone.  She was crying hysterically.  She was upset.  Trying to get information out of her, and I couldn't really understand everything she was stating because she was so --

134

she was crying so much, and, you know, I started calming her down.

And then I could hear her mom come into her bedroom and start screaming at her, and then Emma would start screaming at her, and I said -- and I would tell Emma like I do all the time, I'm like, don't disrespect your mother. Don't yell at her. I said, it's not going to -- it's not going to end well. It's -- you're just going to cause more and more arguments.

Q   So how soon thereafter did you file this petition to modify custody?

A   I believe it was in July we filed the motion.

Q   Okay. So this happened in March?

A   Correct.

Q   And did you go through some other experiences between March and July that caused you to believe it was in her best interest to file this modification proceeding?

A   Yes.

Q   And what -- what were those things that you were concerned about? Or I know the petition speaks for itself --

A   Actually, I think the -- did we -- I think we filed the petition in August or --

Q   Okay.

A   -- something like that, because we went on a vacation down to Tennessee in July, and this is when -- on that -- in

135

our RV, we were driving to go see my father in Tennessee, and then we went to Nashville for vacation.  And in the RV, Emma just started spurting out a bunch of stuff about situations that was happening in her home between her and her mother, her mother and Chris.

Q  Okay.  What's a couple of examples of those?

A  The fighting, the screaming, the yelling, the throwing of flowers, vases.  She told us that she observed her mother slap Chris.  She spoke of two instances that her mother spanked her on the hand during an argument.  Then she -- then she brought back about the whole thing with that March changeover, and about -- about how her mother was yelling at Chris saying that she was -- that he was staring at Jess's tits.

It came -- well, Emma didn't say tits.  She said the T word, which means boobs, which I found very concerning that -- you know, that it was even said in front of Emma.  But -- and Chris has been nothing but 100 percent respectful to Jess and myself since the day that I met him.  He's always been respectful, so I just found it very hard to that -- to believe that that happened.

But, you know, Emma started talking about how she would take Keegan when he was younger and grab him and run into her bedroom and cover his ears when they were fighting.  She stated about them fighting at all hours of the night and

136

would keep her get.  She would get to school and she would be exhausted, and like the guardian stated, that she would seek sanctuary with either some of the school counselors or with the nurse.  This -- there's so many.  There's --

Q  So she would protect Keegan from the fighting in the home?

A  Yes.

Q  Did she talk to you about her medical care?

A  No.  I spoke to her -- well, my wife and I are very healthy eaters, so we're -- we believe in, you know, what you put in is what you get out.  And, you know, we kind of bring that on to Emma about, you know, watching what you eat, sugar intake and stuff like that.  So --

Q  With regard to medical --

A  We would --

A  -- concerns, did she tell you that she actually made her own decisions in that regard?

A  No, but it --

MR. PIELA:  Objection.  Leading.

THE WITNESS:  If --

MR. COUGHLIN:  Oh, I can rephrase the question.

THE COURT:  Hold --

Okay.  Go ahead.

BY MR. COUGHLIN:

Q  With regard to professional medical help that Emma has



received throughout her life, did she give you an insight into how those decisions were made?

A    It was -- not verbally, no.  It wasn't until that I got all of Emma's medical records, when I started reading into the notes, that I found that Emma was sometimes dictating whether or not she was going to go to appointments.

Q    Okay.  Did you learn from Emma her mother's attitude about you --

A    Yes.

Q    -- before you filed the petition?

A    Yes.

Q    What did you learn?

A    That she talks bad about me.  That she states that I cheated on her with Jess.  Jess is the reason that our -- that our marriage broke up.  That I don't care for her.  That --

Q    That you don't --

A    -- when -- when --

Q    That you don't care for your daughter?

A    For Emma.  And that I don't -- and I'm not there for her.  That I don't have her best interests at heart.  That -- it's just more and more statements like that.

Q    Did you have concerns with regard to Laura's mental health after discussing things with Emma?

A    I started having true concerns about Emma's -- or belay my last, concerns about Laura's mental health was when

138

the hacking stuff started coming up.

Q   When was that?

A   That was -- I believe it was in 2015 when I started seeing text messages about hacking and -- but then --

THE COURT:  Wait.  I'm sorry.

Without what?

THE WITNESS:  About hacking.

THE COURT:  Oh, okay.  Emails about hacking.

THE WITNESS:  About me hacking -- about me hacking into her --

THE COURT:  All right.

THE WITNESS:  -- phone and her --

BY MR. COUGHLIN:

Q   These are emails from --

A   -- her wi-fi.

Q   -- Laura accusing you of hacking her?

A   Text messages, yes.

Q   Okay.  Are you skilled at hacking into computers at all?

A   No.  I am definitely not.  I'm not the most computer literate person, but I know enough to make documents, and that's about it.

Q   What did she -- Emma tell you about the fighting between Laura and herself?

A   She -- she was saying that through -- I mean, I just



(973) 406-2250 | operations@escribers.net | www.escribers.net

had a -- myself and Jess just had a conversation with her three nights ago, and she stated that her and her mother's relationship is absolutely horrible. She goes, I love my mom, but I do not like her. She -- she stated many times about her mom will get into her face and scream at her and say, I'm the parent. I can scream. You can't. You're the child. And Emma has the thought of, why should I respect my mother if she does not respect me?

And I've told Emma multiple times that you will respect your mother, she is your mother. I said, I understand your concern and how you feel that this is not fair, but you do not need to disrespect your mother.

Q  So since June, when Emma was brought into your care, for the most part, --

A  Yes.

Q  -- has Laura engaged in behavior that's been upsetting to Emma or to you?

A  Yes.

Q  What -- can you describe that?

A  The constant emails or text messages or just not following the court order. I mean, of course, I have to tell Emma, you know -- you know, this is -- I didn't go into the nuts and bolts of the court order. I didn't let her read anything. I just said, you know, since -- since June 3rd, when I picked her up and we explained just a brief of what was

140

happening, and I told her, your mom is going to contact you every night at 7:00 through phone as per the court order or she can text you from 7 to 7:15.

I said, but if she communicates with you anything other than that, just -- just please let us know. And she was, and Laura was communicating outside those -- the court order.

Q What about the nature of the communications?

A They weren't like -- it wasn't like malicious or being mean or anything, but there was -- you know, there's times -- like at softball camp, Emma got really mad at her because Laura stated to her, I guess Emma was out of breath, they had to walk 15 minutes from their softball field up to the dorms they were staying at, and she was huffing and puffing up the hill, and her mom mentioned, like, why are you huffing and puffing? What, have you been drinking or something?

Well, that's a sensitive subject with Emma because her mom accused her of drinking alcohol when she was in seventh grade, either on her way or coming back from a dance, and Emma stated, you know, that ruined the dance and everything and she goes, that's a very sensitive subject with me. So it made me very mad. And, you know, she -- she just -- she constantly says that my mom treats me like I'm five. I wish she would treat me like I'm 13.

Q Okay. Does she share with Emma -- does Emma relate to



141

you her mom sharing with her matters involving this proceeding or her brother or --

A   I'm sorry.  Can you say it --

Q   Does -- does -- did Emma relate to you that -- that her mother shares with her more of what's transpiring here, and that she misses her brother and things of that sort?  Or her brother misses --

A   She said she misses her brother.

Q   -- her, I guess?

A   Yes.  She said -- so in the beginning, you know, she stated that she did not want to be the person who chooses where she resides.  She stated --

Q   Yes.

A   -- that she wanted that left to the adults.  She did not want to make that decision.  And she said, specifically, the only reason that I do not want to live at your house, Dad, is because I cannot protect Keegan.  And I explained to her multiple times that, I said, Emma, this is not your job to protect Keegan.  I said, it's honorable that you do.  I said, but that is your mother and Chris's job to protect Keegan.  I said, I know you love your brother, and I know you love your mom, and I know you love Chris, I said, but that is not your job to protect Keegan.

So she understands that, but it's really the only thing that she states that keeps her from saying, I just want

142

to live with dad.

MR. PIELA:  Objection.  He's trying to explain what is going on through Emma's mind.

THE WITNESS:  That's what the statement was.

MR. PIELA:  And that's why I'm objecting.

THE COURT:  Well, I'll accept it's --

MR. PIELA:  Move to strike.

THE COURT:  -- a bad term.  My notes specifically state she stated to her father that she would like the adults to decide.  The only reason she didn't want to live with her father was that she felt that she would be unable to protect Keegan.  Father told her it was not her job.  So that's all I'm taking from testimony.

MR. PIELA:  Very well, Your Honor.

THE COURT:  It'll be also stricken.

BY MR. COUGHLIN:

Q   Did her mother share with Emma her potentially leaving this area at some point?

A   During a visit or one of her --

THE COURT:  I apologize.  Again, maybe I was just thinking through what I was -- just said.  Are you asking, did Laura Montgomery, at some time, speak with Emma about leaving the area, and did she report that to him?

MR. COUGHLIN:  Yes.

THE COURT:  Okay.



143

THE WITNESS:  So at one of the supervised visits of, which Jessica is the person that's at the supervised visits, she stated that she was -- to Emma and Jessica that she was looking and applying for jobs in Colorado, so --

BY MR. COUGHLIN:

Q  How did that affect Emma?

A  I guess -- you know, Emma's eyes -- Jess told me that Emma's eyes just got really big.

MR. PIELA:  Objection.  Hearsay.

MR. COUGHLIN:  Okay.  I can ask Jess.

THE WITNESS:  You'll have to ask Jessica when you --

MR. COUGHLIN:  I will.

THE WITNESS:  -- call her.

MR. COUGHLIN:  Very briefly.

THE WITNESS:  Yeah.  She'll tell you the same thing. I was just going to say --

MR. PIELA:  Objection.  Move to strike.

BY MR. COUGHLIN:

Q  What other adult matters do you remember being discussed between Laura and Emma?

A  Oh, she's told Emma that Chris cheated on her.  That I've cheated on her.  That her grandfather has cheated on her grandmother, but it was okay, because he made it up to her. And like -- this is stuff that Emma is telling me.  You know, it's -- she's talked about -- you know, about --



(973) 406-2250 | operations@escribers.net | www.escribers.net

144

MR. PIELA:  Excuse me.  What do you have in your hand, sir?

THE WITNESS:  I have notes.

MR. PIELA:  Your Honor, I'm asking those be removed.

THE COURT:  Is -- are you reading from your notes?

THE WITNESS:  I have ADHD, and I --

MR. COUGHLIN:  No, he's not reading anything.

THE WITNESS:  I'm not reading them.  They're just bullets.

THE COURT:  Okay.

MR. PIELA:  Your Honor, I'm going to ask that --

THE COURT:  Just -- just set them over up on the side of the --

MR. PIELA:  -- (indiscernible).

THE COURT:  -- counter there if you would.

THE WITNESS:  Yeah.  You can have them if you would like a copy of them.

THE COURT:  Okay.  You can -- you're welcome to use notes during the course of the proceeding, but you have to listen to the questions and try to remember from your present recollection what the answer is.  If you don't know what the answer is, say I don't recall, but it may be in my notes, and we'll deal with it at that point, but don't -- don't look to your notes to find the answer, if you could, okay?

THE WITNESS:  Can I go in a little bit more to my



145

medical --

THE COURT:  I can't necessarily make an exception for that.

THE WITNESS:  Okay.  All right.

THE COURT:  There is a way --

THE WITNESS:  Thank you.

THE COURT:  -- in which we enter evidence for people who cannot recall.

THE WITNESS:  Okay.  Thank you.

THE COURT:  And both of these lawyers are skilled and know how to do that, so we'll take it from there.

BY MR. COUGHLIN:

Q  So let me -- let me finish up with you.

A  Okay.

Q  There has been supervised visits since early June, in this case, right?

A  Yes.

Q  And Laura's mother served as the supervisor initially?

A  As the second one, yes.  The fist one did not happen.

Q  Okay.

A  I guess there was logistical issues with her mom able to come up for that first visit, so the first visit did not happen.

Q  Okay.

A  But the second visit, Laura's mother, Paulette, came

146

up to supervise the visit, yes.

Q   Okay.  How did that go to your knowledge?

A   Good.  As far as I know.  There was -- you know, I don't -- when Emma comes back from her visits, I don't dig into her and stuff.  All I just ask her, how was your time with your mother?  Did you enjoy your time?  And then I just ask like some basic activity questions and that's it.

Q   Has Laura's mother supervised since?

A   No.

Q   Why is that?

A   It was -- Laura sent -- sent an email to me and stated that it was difficult financially and -- for her -- her -- if I remember correctly, her mom doesn't drive right now, but -- so it would incorporate her father having to drive, and this is -- I'm -- I'm not 100 percent sure on that.  I don't -- but it was she pretty much just stated that her mother wasn't able to do the supervised visits.

Q   Who has been supervising since?

A   Jessica.

Q   All right.  How many of those has she done?

A   Four, maybe.  Four or five.  I can't give you the exact number.  But in reference to, like, some of the supervised visits, she --

THE COURT:  Sir, there is no question pending.

THE WITNESS:  Okay.  Thank you.  Sorry, Your Honor.



147

THE COURT:  It's okay.

BY MR. COUGHLIN:

Q   Have there been concerns related to you with regard to the visits supervised by Jess?

A   Yes.

Q   What are those?  And I guess I'd ask you, just talk about Emma's experience, not what Jess told you.

A   Emma stated to me that her mom has just made some inappropriate, like, jokes, and she stated that, well, I'm sure Mom is trying to be funny and all, but they were just like inappropriate.  And a time they went for a hike next to our house, there was some hiking trails, but I guess they were passing a dirt road or something and she stated, well, that's where -- that's where Dad and Jessica would make out, and I guess that was said a couple of times.  And --

Q   They were hiking near your home?

A   Yeah.

Q   Okay.

A   Yes.  And there was a -- I guess, there was some initials carved in on a tree, and she mentioned, oh, that's where Chris -- Chris and Jess carved their initials in a tree.

MR. PIELA:  Chris and Jess?

THE WITNESS:  Yes.  Her boyfriend, Chris.

BY MR. COUGHLIN:

Q   Chris and Jeff -- Jess?



148

A   Jess, yes.

Q   Okay.   To your knowledge, there is no relationship between those two, right?

A   No.

Q   Okay.

A   Just in a professional and just the stepparents.   They have that -- you know, like I said that -- well, not a question.

Q   Did Emma -- did Emma comment to you upon how her mother looked or acted?

A   The last visit, she stated that Mom was really on edge and it seemed like she was just trying to pick fights with me.  And I said, well, that's -- I said, I'm sure that's not the case, Emma.  And she goes, no.  I think she was just trying to start fights with me.  And I reiterated, again, to her, I said, and I have from the beginning, since June 3rd, I have told Emma that this is hard on your mom doing this, and so I said, be a little bit lenient with your mom.  I said, don't be so critical of your mom because this is hard on her.  She's away from you.

So -- and she -- the -- it was the visit before last, so she stated that Mom was like -- when they got there, was just like off the wall.  Like it was just -- she was her -- I don't know exactly the -- I can't say the exact word that she used, but she was stating that she was highly energetic.  And

149

she goes, that's the time that I get along with my mom the best is when she's like that.

Q   Jess was there as well.  She'll --

A   Correct.

Q   -- testify to that.

MR. PIELA:  Objection.  Leading.

MR. COUGHLIN:  I didn't ask a question, so it can't be leading.

MR. PIELA:  Move to strike.  I mean, he can't -- he can't say, she'll testify to that too.  Let her testify.  But, I mean --

MR. COUGHLIN:  I can certainly say that.  There's nothing -- there's no objection there.

THE COURT:  Okay.

MR. PIELA:  Yeah, it is.

THE COURT:  Comments of counsel aren't evidence, and furthermore, I'll be honest, I didn't hear it.

MR. PIELA:  All right.

THE COURT:  So it's --

MR. COUGHLIN:  Do I need to speak up, Your Honor?

THE COURT:  No.  It was -- it was sort of a trailing off.

MR. COUGHLIN:  I was.  I was just --

THE COURT:  I stopped taking notes, and I was looking -- I was looking at something the clerk had handed me



150

briefly, because I -- I apologize.  But if I could say, I can't deal with this in the middle of a trial.

THE CLERK:  No, I know.

THE COURT:  So will you just tell her --

THE CLERK:  And I just --

THE COURT:  -- tomorrow morning.

THE CLERK:  Yeah.

MR. COUGHLIN:  I'm going to limit these exhibits here, but --

THE COURT:  I'm only -- I'm only so amazing.

MR. PIELA:  My kingdom friends (indiscernible).

THE COURT:  I'm sorry.  Just, as you know, if there's things that come in and out of this courthouse on an emergency basis that, unfortunately, sometimes --

MR. PIELA:  Remind me --

MR. COUGHLIN:  So --

MR. PIELA:  Remind me when we're off the record, I'll tell a Judge Vincent Dunn' story.

THE COURT:  Okay.

Attorney Coughlin, go ahead.

BY MR. COUGHLIN:

Q   There was some mention earlier that you haven't really engaged Emma in associating herself with Monadnock Regional High School, where I happen to have gone to school, I don't know if anybody has known that yet, but --



151

MR. PIELA:  We do now.

BY MR. COUGHLIN:

Q  -- you clearly have not engaged in doing that?

A  I have not brought her to the school.  Well --

Q  Has she --

A  I have brought her -- myself and Jess and brought her by the school to see the school.

Q  In Swanzey?

A  Yeah.  And that was last summer.  We were over in Keene, and we swung on by, and we're like, oh, this is the high school for this general area.

Q  Okay.

A  And I have reached out to that school and spoke to the IEP counselor or the case manager and the guidance counselor there at Monadnock Regional High School.

Q  Okay.  Did they give you advice on how you should proceed?

A  The -- you know --

MR. PIELA:  Objection.  Hearsay.

THE COURT:  That --

BY MR. COUGHLIN:

Q  Or how are you going to proceed after meeting with them discussing things?

A  I have to -- I wasn't going to do anything.  I'm not going to --



152

Q  Right.

A  -- go ahead and start wheels in motion for something that I don't know is definite.  It's -- that would be kind of --

Q  So you're going to continue doing what you've been doing?  You didn't learn from them any problems associated with her going to school there?

A  No.  She -- they meet the needs of what her -- her IEP needs are.

Q  Okay.

MR. COUGHLIN:  That's all I have, Your Honor.

THE COURT:  Okay.  Great.

CROSS-EXAMINATION

BY MR. PIELA:

Q  Mr. Loudermilk, you divorced Laura in 2007, correct?

A  Correct.

Q  That was a divorce in New Jersey?

A  Yes.

Q  And that was a -- was that a negotiated settlement or was it a result of a trial?

A  Can you articulate which --

Q  Did you and Laura reach an agreement as to how you would parent Emma in 2007, or did the judge impose that upon you in 2007?

A  I believe there was an agreement.  I can't tell you



153

100 percent.

Q   Okay.   Would you agree with me, Mr. Loudermilk, that between 2007 and 2015, you did not file any petition or pleading or any document in New Jersey, Massachusetts, or New Hampshire looking to change the 2007 divorce decree?

A   Correct.

Q   Now you testified on direct examination that you became concerned about Laura's paranoia in 2015.   Do you recall that testimony?

A   Yep.

Q   And your concerns about this paranoia were based upon Laura's revelation that there was possible computer hacking or iPhone hacking or some sort of electronic interference.   Is that a fair statement?

A   Yes.

Q   Okay.   Now you filed a petition with this Court in 2015 to register the divorce decree from New Jersey, correct?

A   Can you say that again?   Because you -- when you talk that way, I have --

Q   Okay.

A   -- partial hearing loss, so --

Q   Sorry.   I'll stay in front of you.

A   Okay.   Thank you.

Q   In 2015, you filed a petition in this court to register the New -- the New Jersey divorce decree, correct?

(973) 406-2250 | operations@escribers.net | www.escribers.net

154

A    Correct.  Yes.

Q    And then to modify the New Jersey divorce decree --

A    Correct.

Q    -- correct?  You did not ask in that petition, to your recollection, that this Court award you primary custody of Emma.  Is that correct, sir?

A    Correct.

Q    Okay.  You and Laura eventually executed an agreed upon parenting plan in 2015, correct?

A    Correct.

Q    All right.  And in that 2015 parenting plan, which I will represent is in the Court' file, your -- your residential responsibility with Emma on a routine basis was one weekend per month, correct?

A    Correct.

Q    Okay.  And when you signed that parenting plan in 2015, you had the advice and representation of counsel --

A    Correct.

Q    -- correct?

A    Yes.

Q    You would not have signed that parenting plan if you did not think the plan was in Emma's best interest, correct?

A    Correct.

Q    Okay.  You would not have signed that parenting plan, which, essentially, gave primary residential responsibility to



155

my client if you thought, at that time, Laura posed a threat

to Emma, correct?

A    Absolutely correct.

Q    Okay.  Now 2015 to 2018, March of 2018 was the

incident involving the hunter safety course.

A    Correct.

Q    And Laura's objection or argument concerning that,

correct?

A    Correct.

Q    You then went to Tennessee or someplace in

Appalachia --

A    Tennessee.

Q    -- Tennessee, and then your testimony was, on that

trip Emma told you other concerning issues that were going on

between her and her mom and Laura and Christopher, correct?

A    Correct.

Q    But you didn't file any petition for modification

until August of 2018, correct?

A    Correct.

Q    You didn't ask in your petition for modification,

which you filed in August of 2018, for any ex-parte or

emergency orders; is that correct?

A    Yes.

Q    Okay.  You did not ask in your petition for

modification, which was filed in August of 2018, for any



156

temporary orders, and by that, I mean asking the Court, Judge, before you make a final decision, issue a temporary order granting me custody of Emma, correct?

A  Correct.

Q  Okay.  Now in your petition for modification, now I'm going to generalize --

A  Okay.

Q  -- but would it be fair to say one of your concerns about Emma is the medical treatment she is receiving while in Laura's care?

A  Correct.

Q  Okay.  And I believe that the two issues that were raised by the guardian are triglycerides and adenoids, correct?

A  Yeah, and I believe she said blood pressure also.

Q  Blood pressure.  Okay.

A  Yep.

Q  Now the 2015 parenting plan grants you shared decision-making, correct?

A  Yep.

Q  The 2015 parenting plan also grants you the right to -- of unrestricted access to Emma's medical records --

A  Correct.

Q  -- correct?  Okay.  Now you carry the health insurance for Emma --



157

A   Correct.

Q   -- correct?

A   Yes.

Q   So what -- do you know what an EOB is?

A   An explanation of benefits.

Q   An explanation of benefits.

A   Yes, I do.

Q   Okay.  So when Emma goes to a doctor or a specialist or whomever --

A   I do know what it is.

Q   -- you get the EOB?

A   I don't.

Q   You do not get the EOB?

A   No.  She gets the -- Laura gets the EOB --

Q   Laura gets the EOB.

A   -- because that's where Emma resides.

Q   Can you -- do you know if you can request a copy of that EOB?

A   Absolutely.

Q   You can?

A   Yeah.

Q   Have you between 2015 and 2018?

A   There was no reason to, because Laura gave me the explanation of benefits that were given -- that came to the house as --

158

Q   Well --

A   -- far as all of the ones that I know.  But I can --

Q   Okay.

A   -- access it also electronically.

Q   You can access it electronically.

A   Yep.

Q   There was nothing preventing you between 2015, and I know you're a bit of a Luddite when it comes to computers --

A   I don't know what that word is.

Q   All right.  Well, I'm going to wax.  A Luddite is a person who is a technophobe.

A   I don't know what a technophobe is either.

Q   It is --

THE COURT:  You're not great with computers.  You --

BY MR. PIELA:

Q   Basically, it's someone who hates technology; the word "sabotage" comes from the word sabo, which means shoe, and it refers --

A   Okay.  I understand your --

Q   -- to the French loom workers that would throw their shoes into mechanical looms.

A   Got it.

Q   Okay.  There was nothing preventing you from going online to see where Emma's medical treatment was occurring, correct?



159

A   Yes, and I did.

Q   Okay.  But there was nothing preventing you between 2015 and 2018 from requesting any/all of Emma's medical records, correct?

A   Correct.

Q   You never did?

A   Correct.

Q   There was nothing preventing you from calling Emma's doctors between 2015 and 2018 and asking for a treatment status?

A   Nope.

Q   Okay.  You never did?

A   Correct.

Q   No.  That's -- let's talk about Emma's schooling.  One of your concerns that you raised in your petition filed in August of 2018 was that you were not given sufficient information regarding Emma's school events, correct?

A   Correct.

Q   You do know that Emma resided in Nashua since 2011, correct?  And the parenting plan allowed you unfettered access to Emma's school records, correct?

A   Sure.

Q   Between -- and you could certainly ask Emma, hey, what school do you go to?

A   Uh-huh.



160

Q   Correct?  You have to answer yes verbally.

A   Yes.

Q   Okay.  And you knew in 2015 that Emma was attending Fairgrounds Elementary School?

A   Yes, sir.

Q   And you knew that she was attending middle school in Fairgrounds Middle School, correct?

A   You just said that twice, didn't you?

Q   Fairgrounds is an elementary school, Fairgrounds as in middle school?

A   No.  It was -- it was New Searles was the elementary. Fairgrounds.

Q   I stand corrected.  Did you ever, between 2015 and June of 2018, ask for a copy of Emma's school records?

A   Nope.  I didn't feel a need to.

Q   Did you ever ask either New Searles Elementary School or Fairgrounds to be added to an email list for Emma's IEP meetings?

A   Yes.

Q   Okay.  Were you?

A   Yes, later.

Q   Okay.  Do you -- are you telling me that Laura refused to or somehow interfered with your ability to interface with the school regarding Emma's IEP?

A   The lack of knowledge given could be considered



161

interference, I guess, yeah.

Q   Well -- but even if you were not getting satisfactory data from Laura, you yourself had the ability to do it yourself?

A   But -- so if -- I wouldn't look up a basketball schedule if I didn't know she was in basketball.  So I wouldn't know to look up IEP stuff if I didn't know she was in the IEP program.

Q   Well, there was nothing preventing you from calling the school, asking for the guidance counselor assigned to Emma and say, hey, I'm Emma's dad.  I'm out of state, but I would like to know what's going on with my daughter.  Is there anything I should be aware of?  Nothing prevented you from doing that?

A   Nope.

Q   And nothing -- and similar, you could have called the schools and asked for Emma's teacher, correct?

A   Correct.

Q   And you could have asked to have a conference with that teacher by phone, correct?

A   Correct.

Q   And you could have said, hi.  My name is Steven Loudermilk.  I'm Emma's dad.  You know, I'm deployed outside -- out of state, but I would like to know what's going on with my daughter, correct?  You could have done that.



162

A   Oh, absolutely.

Q   Right.  Did you?

A   No.

Q   Okay.  Now you filed this petition August of 2018. You raise a number of pretty serious concerns concerning Emma and her relationship with Laura, the fighting.  You raise a number of serious concerns about my client's relationship with Christopher.

A   Uh-huh.

Q   Okay.  You have to answer yes or no.

A   Yes.  I'm sorry.

Q   Okay.  Between August of 2018 and June of 2019, we're talking about 10 months now, did you ever file an emergency motion to change custody?

A   No.

Q   Did you ever file a motion to -- a temporary order saying, temporarily give me custody of Emma?

A   No.

MR. COUGHLIN:  Are you talking prior to June 3rd?

MR. PIELA:  Prior to June 3rd.

///

BY MR. PIELA:

Q   You were in constant contact with the guardian ad litem once she began her investigation in this case?

A   Yes.



163

Q   And you made her aware of your concerns with Emma?

A   Yes.

Q   And you had a free-flowing dialogue with the guardian regarding her concerns?

A   Correct.

Q   And despite that, prior to June 3rd, no emergency motion was ever filed by you, correct?

A   Correct.

Q   Okay.  Let's go to June 3, 2019.  You were in court that day?

A   Correct.

Q   You probably understood there was a pretrial conference, correct?  There was a conference --

A   Yep.  Yes.

Q   -- prior to that hearing, did you sign or prepare any motion seeking emergency orders for custody of Emma?

A   I don't believe so.

Q   Did you sign any affidavit that would be used to support a motion for emergency custody orders regarding Emma?

A   No.  I discussed with my counsel and --

Q   I don't want -- we don't want to talk about what you talked with him about.  I was asking if you did these actions.

A   Yes.  No.  Then no.

Q   Okay.  Was it your intention, I'm not talking about what you talked with Attorney Coughlin, I just want to know



164

what's going on in your mind, on June 3rd, prior to us walking into this courtroom, was it your intention at that time to seek an emergency order of custody for Emma?

A   Yes.

Q   It was your intention?  But you prepared no documents to do that?  Who was the first person to raise the issue of an ex-parte motion?  Was it your lawyer or the guardian?

A   I couldn't tell you.  I don't recall.

Q   Did you tell the guardian ad litem that you instruct -- would it -- are -- were instructing her on June 3, 2019, to file an ex-parte or an emergency motion?

A   I don't instruct the guardian on anything.

Q   I know that, but did you -- did you say, hey, Kay?

A   I don't talk to her like that.  No.

Q   You have to give me theatrical license.

A   No.

Q   Did you type or call Attorney Sternenberg and say, I'd like you to file an ex-parte motion on June 3rd?  Did you --

A   I don't recall, sir.

Q   Okay.  All right.

A   I can't say a definite yes or no, so --

Q   Okay.  June 3rd comes and goes.

A   Yes.

Q   You've been granted temporary, sole decision-making for Emma.



165

A   Yes.

Q   And temporary residential responsibility for Emma, correct?

A   Yes.

Q   Do you understand temporary, sole decision-making you now can control or set up medical appointments for Emma at your sole command?

A   Yes, sir.

Q   Okay.  That would include mental health examinations, correct?

A   Correct.

Q   That would include physical examinations?

A   Correct.

Q   Now your attorney has given us a packet of proposed exhibits.  Would you agree with me that after June 3, 2019, you have no doctor report that states that Laura's attention or lack of attention to Emma's triglycerides have caused Emma physical harm?  Is there a doctor's report that says that?

A   I think I do have a document from her primary care of discussions between -- but I don't know if it was after -- I don't --

Q   Well, we want to -- we want to focus on June 3rd, because June 3rd --

A   No, I know.  I understand that.  I'm trying to dictate what -- or trying to determine whether it was before or after.

166

I think it was after because that's when I went and got her triglycerides checked.

Q   Okay.

A   Yeah.  And --

Q   Now -- but the question is:  Has any doctor issued a report that says to you, and I'll paraphrase, but I want you to kind of get the gist of what I'm asking you, that because Laura failed to follow up with Emma's triglycerides in 2015, 2016, 2017 --

A   No.  There hasn't been anything like that.

Q   -- that she -- that Emma is now permanently harmed? There is nothing that says that, correct?

A   (No audible response heard)

Q   Okay.  And the same thing with Emma's adenoid issue.

A   Correct.

Q   You do not have a doctor that says that Laura's failure to have those adenoids, tonsils, I don't know what they are, something that hangs in your throat, removed has caused Emma permanent harm, correct?

A   Correct.

Q   In fact, sir, wouldn't you agree with me that after June 3rd, we don't have a medical report that's even critical of Laura's medical care of Emma?  We don't have a report saying Emma is the -- suffering from long-term medical neglect?

167

A   No.

Q   Correct?

A   No, sir.

Q   Okay.  And we don't have any report, and I probably -- I probably asked this multiple times, and you can kick me if I'm wrong --

A   What was that?

Q   You can kick me or you can tell me if I've asked this multiple times, but we don't have a medical report that says these triglyceride levels and the adenoids are causing Emma any kind of damage.  It's not healthy to have high triglycerides, but it's not -- she's not going to drop dead tomorrow because of it?

A   You're not a doctor, right?

Q   No, I'm not.

A   Nor am I.

Q   Nor are -- nor are you.

Now let's talk about Emma's mental health.  Okay.

A   Uh-huh.  Let's.

Q   Again, June 3, 2019, your -- you have the helm to quote a Naval term?

A   Yeah.  I'm a --

Q   You --

A   I was a chief in the Coast Guard, so --

Q   Yeah.  I got it.



168

A  -- I'm not a helmsman.

Q  So you -- you brought Emma to see a mental health provider?

A  Yes.

Q  Okay.  You don't have a report from that provider that says --

THE COURT:  This is on June 3rd?

MR. PIELA:  June 3rd to today.

THE WITNESS:  No.  No.

THE COURT:  Oh, since that time.

MR. PIELA:  Right.  Remember --

THE COURT:  Okay.  All right.

MR. PIELA:  -- June 3rd.  Now he has sole control.

THE COURT:  Okay.

BY MR. PIELA:

Q  Do you have a report in those packets of proposed exhibits that says Emma is suffering from psychological injury or mental health injury because of what she has witnessed or observed or been exposed to while living with Laura?

A  No, sir.

Q  Okay.

MR. PIELA:  If I could just have one moment.

Thank you for your testimony, sir.

THE WITNESS:  Thank you.

THE COURT:  Attorney Coughlin?



169

REDIRECT EXAMINATION

BY MR. COUGHLIN:

Q   Let me show you, Steve, what we've previously marked as Exhibit 5.  This is a rather huge document, but I'm going to ask you to just tell me what that is.  What that consists of, all of those pages.

A   These are reports from Emma's primary care manager at Foundation Medical Partners on 268 Main Street, Nashua, New Hampshire.

Q   Okay.  And we listed those as an exhibit, the medical records of Emma, 2014 to 2019, right?

A   Correct.

Q   So they begin way back in 2014 and then end more recently?

A   Correct.

MR. COUGHLIN:  Your Honor, to the extent you have any -- I wasn't going to necessarily admit all of this to the Court, but since you've heard some evidence about triglycerides --

THE COURT:  No.  I'd be interested in seeing it, unless there's an objection.

MR. COUGHLIN:  I'd like this --

MR. PIELA:  No.  No objection to Number 5 coming in.

THE COURT:  Okay.  Great.

Could we please mark Number 5 as Petitioner's 2?



170

THE CLERK: Did you get Number 1? Because we didn't get Number 1, they were just texts from Emma.

MR. COUGHLIN: Yeah.

MR. PIELA: Texts from Emma, which is -- Number 6 is in.

THE CLERK: Right.

MR. PIELA: Medical records from Emma, '14 to '19, is in.

THE COURT: Did you find it in his packet --

THE CLERK: But he says it's Number 6, so I'm --

MR. COUGHLIN: Yeah. I can pull it out of there.

THE CLERK: Okay. Can you do that (indiscernible).

(Petitioner's Exhibit 2 marked for identification)

THE COURT: Great. Thank you.

BY MR. COUGHLIN:

Q   In fact, Steve, the notion of seeking an emergency order, if you will, or an ex-parte order, to have Emma reside primarily with you wasn't your idea whatsoever, was it?

A   I don't -- discussing with you was --

MR. PIELA: Do you really want your client to get into attorney-client stuff? I mean, I'm --

MR. COUGHLIN: Sure.

THE COURT: He can ask.

MR. PIELA: All right.

THE WITNESS: I was discussing with you about it.



171

It was about trying to get Emma out of that household as soon as possible.

BY MR. COUGHLIN:

Q  Okay.  And what -- what led you to believe that there was a potentially extreme situation that you -- that called for, perhaps, an immediate custodial change?  It wasn't you waking up one morning --

A  Me and --

Q  -- and just thinking that --

A  No.

Q  -- right?  What was the basis of it?

A  No.  Receiving emails about genitalia and pictures and receiving phone calls from Nashua P.D. asking me where my daughter was when -- stating that they were right there with Laura and she stated she didn't know where her daughter was when Emma was, in fact, at her softball game.  That was the one that the guardian discussed earlier that was her last game, whichever.  So it was her last softball game when the police called.  Just other communications with Emma and about the fighting and the fighting is still going on, and --

Q  Well, the guardian came into the hearing on June 3rd with some major concerns, did she not?

A  Yes.

Q  And you had had conversations with her, perhaps, only a day or two prior, right?

172

A   Correct.

Q   I mean, as you sit here today, do you even know what an ex-parte order is?

A   I think I have a layman's knowledge of it, yes.

Q   Okay.  But that wasn't your idea?

A   No.

Q   You and I never even discussed doing it until the guardian provided us with information that we felt required that action, correct?

A   I believe so, yes.

Q   In fact, I came into this court that morning without a lot of the knowledge that led us to eventually orally move for an order requiring Emma to be in your care primarily, right?

A   Yes.

Q   I learned a lot of it while I was here that morning. Do you remember that?

A   Yeah.

THE COURT:  Let me just state, there is -- for the -- for the record, the purpose of the record, there is a -- there is a record of the hearing that took place.

MR. COUGHLIN:  Right.

THE COURT:  And my recollection is quite clear that the statements of counsel, the statements of the parties, the statement of the guardian will show that there was -- there was new information and knowledge being shared in the moment

173

during that hearing --

MR. COUGHLIN:  Uh-huh.

THE COURT:  -- that was not made privy to all parties, and the guardian came in and had talked, I believe, very briefly at the beginning saying she had learned some things either late on a Friday or over a weekend.  She had sent emails to person who may or may not have been in their office to receive them, etcetera.  So there was -- it was -- it was sort of a, kind of a late breaking-news situation that was -- that was kind of happening in real time during the course of that hearing.  It was -- you know, that -- it was just a timing situation, but I think the record captured very clearly kind of how that -- how that took place.

MR. COUGHLIN:  Okay.

BY MR. COUGHLIN:

Q  I just wanted the record to reflect that this was not your brainchild.  You didn't come up with the idea that we'd seek ex-parte relief?

A  No.

Q  Okay.  You were asked a couple of questions about Emma's medical records in the past and why you didn't retrieve them in the past, correct?

A  Correct.

Q  Did you have any knowledge that Emma's medical health may have been being ignored until the guardian reported to you



174

on that level?

A    Not ignored, no.

Q    What?

A    Not ignored, no.

Q    Did she report to you that she felt like --

A    No.  I didn't have any knowledge of it --

Q    Okay.

A    -- being ignored, no.

Q    So you've learned of those things only since her investigation started?

A    I knew of some of Emma's triglycerides and her adenoids a little bit previous to that, but not to the extent of what it was until the investigation --

Q    Okay.

A    -- and talking with the guardian, and then getting the copies of the medical files myself.

Q    Have you learned from the guardian that Emma wasn't getting enough medical health --

A    Yes.

Q    -- care?

A    Correct.

Q    Okay.  So if she's not getting medical health care, there wouldn't be a lot of records for you to be perusing, right?

A    Correct.  The online version of the health care that



175

we have does not show every doctor's appointment of what they are.  It does not describe what they are, Your Honor.  It just describes a date and a time of when a claim was filed.  Some do.  Some go into -- and they give -- I think it's a diagnostic code, and then it states of what it was for, and that's really it.

Q   And this is Tricare, the governmental program?

A   Tricare, yes.  Yes.

THE COURT:  So can I just be clear?  So you're learning through things like explanation of benefits, claims that have been made for what types of services.  You're not getting notes of those actual visits?

THE WITNESS:  Correct, Your Honor.

THE COURT:  Okay.  So you're looking at a database that's just informing you of activity and claims, not substance of medical issues discussed, diagnoses, follow-up recommendations?

THE WITNESS:  Some -- some diagnosis, but not all of the way through, Your Honor.

THE COURT:  So not -- it's not the type of --

THE WITNESS:  No, it's not.

THE COURT:   -- narrative that we were talking about earlier this morning?

THE WITNESS:  No, Your Honor.

THE COURT:  Okay.



176

THE WITNESS:  It's not what you would get from a doctor's office.  It's --

THE COURT:  Okay.

THE WITNESS:  I think it's -- really, it's dependent on what the medical --

THE COURT:  It's more the insurance --

THE WITNESS:  -- office decides to put --

THE COURT:  It's more the insurance database as opposed to the Partner's Healthcare medical database?

THE WITNESS:  Correct, Your Honor.

THE COURT:  Okay.

THE WITNESS:  Yes.

BY MR. COUGHLIN:

Q   And did your petition that we filed about a year ago, I guess, in August of last year, did it express concerns about her medical care?

A   Yes.

Q   And it expressed concerns about her mental health?

A   Yes.

Q   And it expressed all of the concerns that the guardian has looked into regarding --

A   Yes.

Q   -- domestic issues at home and all that stuff?

A   Yes.

Q   So I would assume, and you would agree with me, that



177

there was no reason for you to seek any type of an emergency order until you learned of these concerns that the guardian had?

A  Correct.

Q  And you didn't object to her suggestion that things change?

A  No.

MR. COUGHLIN:  That's all I have, Your Honor.

THE COURT:  Attorney Piela?

MR. PIELA:  Sure.

RECROSS-EXAMINATION

BY MR. PIELA:

Q  Well, you may have a layman's knowledge only of the law, although I'm assuming you're probably getting more educated as this case progresses.

A  Layman knowledge.

Q  You wouldn't want your daughter to be in a situation where she could possibly be harmed physically, mentally, emotionally.  Is that a fair statement?

A  Correct.

Q  And while you may not know the terminology of what kind of motion to file; ex-parte motion, petition, application, whatever, you would certainly know enough to say, hey, I want this changed.  Get -- do something to stop this situation, correct?



178

A   Correct.

Q   And between August of 2018 to, you know, June 3, 2019, you never went to your attorney and said, hey, Tim, file something to get Emma out of this situation?

A   I did.

Q   Is that a fair statement?

A   No, I did.

Q   You never did.

A   I did.  I did.

Q   Prior -- no, this is explicit.  Chop out the June 3rd issue.

A   No.  I'm telling you, I did.  I answered, I did.

Q   You did?

A   Yes.

Q   When?

A   I don't know the exact date.

Q   Did it ever happen?

A   No.

Q   Okay.  How about between October 2015, when you signed the parenting plan, and August of 2018, when you eventually filed your petition, in between those two windows, did you ever go to your attorney and say, hey, Tim, we've got a real problem here.  Emma has, you know, had this fight in March of 2018, or Emma is telling me all of these things that are going on with her mom and her mom's boyfriend.  We've got to move

179

now.  We've got to get her out of there now.  Did you ever say that to your lawyer?

A  No.

Q  No, you never did.  And you would have if you thought the situation warranted it, wouldn't you of?

A  May I addend to that?  May I make --

Q  No.  Just -- let me -- let me -- why don't you answer the question, first, then Mr. Coughlin can -- if you thought Emma was in immediate risk of harm, you would have done that?  You would have moved heaven and Earth --

A  Yeah.

Q  -- as a father --

A  And I have.

Q  -- to help your daughter?

A  And I have.

Q  You have been deployed and you've been living in Maine for a number of years, correct?

A  Yes.

Q  And part of that, you've been in Ohio, I think?

A  Yes.

Q  And New Jersey, Cape May?

A  Correct.

Q  And --

A  Cape Cod.

Q  I think you also were in Cape Cod?  What's --

180

A   Correct.

Q   Yep.  You even were on a cutter of the -- was it the Mako?

A   Nope.

Q   Am I close?

A   Nope.

Q   The Bluefin?

A   Nope.

Q   All right.

A   My military history is --

Q   No, I -- I just --

MR. COUGHLIN:  Your Honor, this is rather fascinating, but I think we --

MR. PIELA:  No, no, no.  I'm getting --

MR. COUGHLIN:  I'm going to object.

MR. PIELA:  I'm getting there.  I'm getting there.

MR. COUGHLIN:  I think we're beyond the scope of cross-examination.

BY MR. PIELA:

Q   Let me ask you this --

THE COURT:  Sustained.

BY MR. PIELA:

Q   Let me ask you this --

MR. COUGHLIN:  Well, the objection was sustained, so don't ask the same question you were about to ask, please.

181

MR. PIELA:  Well, I'm going to ask something different.  You've got to wait.

BY MR. PIELA:

Q  You weren't, obviously, involved in Emma's day-to-day activities, and you couldn't be.  You were three, four, five hours away.  Weren't you ever curious to know if -- how Emma's physical was?

MR. COUGHLIN:  Your Honor, I have the same objection.

MR. PIELA:  Well, here's the thing.  He's --

THE COURT:  Attorney Piela, let me just say, I've probably just heard at least five or ten minutes of, you never asked about reports; you never asked about school; you never asked about -- you know --

MR. PIELA:  You got the drift.

THE COURT:  -- it's a different -- it's a little bit different twist or perspective or wording, but I think the point was made.

MR. PIELA:  As long as you got the point, Your Honor.

Thank you for your --

THE COURT:  I'm all set.

MR. PIELA:  -- testimony, Mr. Loudermilk.

THE COURT:  All right.  Thank you.

MR. COUGHLIN:  And one more question.



182

FURTHER REDIRECT EXAMINATION

BY MR. COUGHLIN:

Q   Since the matter was brought up of the communications between you and me, Steve, it is true that you wanted to move faster in this case and to take quicker and more heavy action, right?

A   Correct.

Q   And I, in fact, counseled you against that, didn't I?

A   Correct.

Q   Why?  Did I tell you why?

A   I can't state exactly why, because I don't want to miss -- I don't want to put words in your mouth, so --

Q   That's okay.  I -- maybe you would agree with me recollecting what I said.  And that is, we need to let the guardian do her job.

A   Yeah.  Yeah.

Q   Right?

A   Correct.

Q   Do you remember me saying that?

A   Yep.

Q   That ex-parte proceedings are not necessarily good for anyone involved.

A   Correct.

Q   Do you remember me saying that?

A   Yes.



183

Q And that we needed to make sure that the allegations we were making were true before we asked the Court to just conclude that they are. Remember that?

A Yep. Yes.

MR. COUGHLIN: That's all I have.

THE WITNESS: Can I make one more statement to you?

MR. COUGHLIN: Sure.

THE COURT: No.

MR. PIELA: No, no question pending.

THE COURT: No.

MR. PIELA: But I've got --

MR. COUGHLIN: Okay.

MR. PIELA: I'd like one --

MR. COUGHLIN: Okay.

MR. PIELA: -- one last nibble.

MR. COUGHLIN: All right.

FURTHER RECROSS EXAMINATION

BY MR. PIELA:

Q Remember in October of 2018, there was an (indiscernible) conference with this Court when there was a -- a suggestion was raised that a guardian ad litem be appointed back in the fall of 2018?

A Yes.

Q And do you recall Judge Introcaso made a number of phone calls and eventually secured Attorney Sternenberg?



184

A   Yes.

Q   And that was November of 2018?

A   Correct.  Sure.

Q   Okay.

A   You -- you obviously know it, but I'm not remembering exactly.

Q   And you just testified to your lawyer that a guardian ad litem was an essential and important element --

A   Absolutely.

Q   -- in this case?  And you filed a motion to suspend her appointment, didn't you?

A   I filed it because I didn't have the money to do it because I was paying for it myself.

Q   Okay.  You filed a motion to suspend the -- to suspend the --

A   No, I didn't suspend the investigation.

Q   Thank you.  That's all I have.

MR. COUGHLIN:  That's all I have.

THE COURT:  All right.

Thank you, Mr. Loudermilk.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  You may step down.

Attorney Coughlin, any further witnesses?

MR. COUGHLIN:  I just have one.  Mr. Loudermilk's wife, Jess.



185

THE COURT:  Okay.

MR. COUGHLIN:  And I expect, you know, 10 minutes on direct.

THE COURT:  Okay.

MR. COUGHLIN:  Should I go get her?

THE COURT:  Please do.

Thank you very much for your patience.

MS. LOUDERMILK:  You're welcome.

MR. COUGHLIN:  The Wi-Fi service in here --

So, Jess, before you sit down, can you raise your right hand.

JESSICA L. LOUDERMILK, WITNESS FOR THE PETITIONER, SWORN

DIRECT EXAMINATION

BY MR. COUGHLIN:

Q  Could you state your full name and residential address?

A  Jessica Lynn Loudermilk.  123 Fulham Hill Avenue in Fitzwilliam.

Q  Steve testified that you guys moved there almost a year ago; is that true?

A  Yes.

Q  When did you move there?

A  October.

Q  From way up in Maine?

A  Uh-huh.



Q   And you're enjoying your time there?

A   I am.

Q   I'm going to be very specific with you because her Honor has heard quite a bit of evidence already.

A   Okay.

Q   And I want to focus on your involvement as supervisor for the visits that occur between Emma and her mother.

A   Okay.

Q   And I want to ask you, first, how many have there been?

A   I was involved in five.

Q   Okay.   There was one supervised by her mother, right?

A   Yes.

Q   You were not present at that one?

A   Correct.

Q   And then there was one, I guess, I understand that didn't happen?

A   Correct.

Q   So there should have been seven, but there were actually six, and you were involved in five?

A   Correct.

Q   Okay.   And can you describe each visit quickly?   I mean, start with number one.

A   Okay.   The first one, I mean, it was a bit awkward. You know, because of being married to one and, you know, but I

187

think the mood was kept pretty light.  I just try to keep things light, and we were up in Keene and I didn't want to plan the visits, because I didn't want to dictate what mother does with her daughter, so I tried to stay out of it, but since she's not familiar with the area, I, you know, gave some input and we went for a hike and it went pretty well.

Her mood was good, and there were comments here and there that I thought were a little -- you know, she would talk about, like, sort of about the case a little bit that she missed her a lot and her brother missed her, and I just, you know, just tried to just steer it away from that, so -- because I know it makes Emma feel kind of bad.

Q  So how long were these visits?

A  I want to say -- I can't remember if that one was nine or ten, but they're about eight or nine hours typically, if I recall correctly.

Q  Eight or nine hours?

A  Uh-huh.  Correct.

Q  So you're obviously not working.

A  Right.

Q  But you're retired military as well?

A  I am.

Q  How did you serve?

A  I served in the Coast Guard for five years as an aviation mechanic and then was retired on disability due to a

188

heart condition and fibromyalgia.

Q   Okay.  So the first visit was in the Monadnock Region that I know and love?

A   Yes.

Q   And then the second one was where?

A   And then the second one was at Laura's residence and we went shopping.  I think we spent most of the time out and about doing some things.

Q   And is this visit just the same duration?

A   Yes.

Q   So these are all-day visits?

A   Correct.

Q   Okay.  And anything remarkable happen during that visit?

A   Not during that one really.  I mean, there was, I don't know, like I said, comments made about her missing her brother and trying to get her house in order and stuff, so I was just trying to steer away from that.

Q   Laura is saying that her brother misses her?

A   Correct.

Q   And that she's trying to get the house in order?

A   Her house in order.

Q   For -- in order for what?

A   Basically, getting her children back under the same roof.



189

Q  Oh, okay.  So you --

A  So I would just try to steer that way from that.

Q  You thought was a little too heavy?

A  Uh-huh.

Q  So I don't want to talk about visits if they don't matter, but, at some point in time, did Laura's behavior become concerning to you?

A  There was a -- the next visit we had, she had asked Emma to choose who she was going to spend her birthday with -- Laura was going to spend her birthday with either her brother or Emma, and I thought that was inappropriate, because Emma seemed like she was kind of putting -- being put in the middle and kept saying she just wanted her mom to decide.  So I stepped in and just said it was -- it was not Emma's -- you know, Emma shouldn't be the one deciding.

But it was the visit after that when I went to her house with Emma.  She was --

Q  In Nashua?

A  In Nashua.

Q  But you and Emma traveled down together to visit --

A  We did.

Q  -- with Mom?

A  Uh-huh.

Q  And it was another all-day visit?

A  Another all-day visit.



190

Q   Okay.

A   I believe it was on the 13th of July.

Q   Okay.

A   Laura was very, very hyper, and very -- just a very elevated mood and just -- just different than the way she was on most of the visits.  Even Emma kind of looked at me with her eyes big like, oh.  You know, Mom seems really excited and just very hyper, but we ended up watching --

Q   Do you remember what she was saying or doing that led you to believe that?

A   I mean, she was in a great mood, but it wasn't a normal mood.  She, you know, was excited about makeup she got and wanted Emma to help her, and nothing inappropriate in a sense that she wasn't saying anything inappropriate, but her behavior was not typical.  And if she wanted to drive us somewhere, I would have said no, because it didn't seem the same as she was --

Q   What was your impression of --

A   -- before.

Q   Why would you have said no driving?

A   She was very manic and very hyper and it didn't -- it looked like it was -- it was not -- it wasn't normal behavior.

Q   Did you have a fear that it was induced?

A   I did.  I had a fear that it was --

        MR. PIELA:  Objection, Your Honor.  Now we're



191

talking about opinion beyond the scope of -- or the capability

of rendering -- she said she was hyper.  Why she was hyper;

whether it was induced by medication or whatever.

THE COURT:  That's fine.  You can -- you can ask her

what she observed and such.

BY MR. COUGHLIN:

Q  Did you feel that she was impaired?

A  I did.  I did.

Q  Okay.  But you had no idea that there was any usage of

drugs or anything --

A  No.

Q  -- like that?

THE COURT:  That's as far as you can go.

MR. COUGHLIN:  Okay.

THE COURT:  Okay.  She appeared to her to be

impaired, that's been rendered to be a common-knowledge

observation --

MR. COUGHLIN:  Okay.

THE COURT:  -- people can make.

THE WITNESS:  Okay.

///

BY MR. COUGHLIN:

Q  Did -- well, what -- what happened on the rest of that

visit, I guess, I should ask?

A  We watched a lot of movies, and Emma pretty much

192

didn't want people talking and stuff because she wanted to listen to what was going on, and then we -- we left.  So it was more we had takeout and watched movies.  Nothing inappropriate really happened from that point, but then we left.

Q  Did Laura's mood change?

A  She, at a certain point, because very -- it's like she just kind of crashed, I guess, in a sense and looked very disheveled.  And I just noticed she just was not like, again, acting the same way that she was during the other visits.  It's almost like she just kind of -- her energy went and took, you know, a really rapid crash, I guess you could say.

Q  And was that soon before you left, or --

A  A few hours before we left.

Q  Did she go be by herself or go to sleep or anything?

A  No.

Q  Okay.

A  She went to the bathroom, but nothing like that.

Q  So the visit continued?

A  Uh-huh.

Q  All right.  What about -- is the last -- the most recent visit --

A  The last visit --

Q  -- remarkable at all?

A  -- seemed very tense for some reason.  She and Emma



just seemed to be really just kind of -- I can almost -- it just seemed like Laura was like wanting to fight with Emma. It was really strange, and Emma was getting very upset. And, actually, I had to step in, at one point, and just end the conversation between the two of them because it was escalating. Emma was in a really good mood, and then once her mother made a statement about saying that she was testing her, she got very, very upset and you could tell the rest of the visit was so tense. I was uncomfortable.

Q Okay. So describe that to me a little bit. You used the word --

A Emma was --

Q -- testing.

A -- doing like a cooking class for us and making cake and wanted to lick the batter. Like she's usually allowed to, I believe, at both of our houses, and Emma was just having fun and licking her finger and looking at her mom, and her mom said, stop testing me. And Emma said, I'm not. And she's like, yeah. You are. And Emma immediately just got very upset, picked up what she was doing -- I mean, she walked out of the room because she was that upset.

And when she came back, her mom just kept trying to like talk about it and tell her how she was behaving. And Emma was like, no, I'm not, and their voices started to raise, and I said, I think we just need to stop this conversation

194

now, because I could tell the tension between the two of them was escalating. And I just -- if it -- if it didn't stop, at that point, I probably would have ended the visit, because the whole visit, off and on, was just very, very tense, so --

Q  And did that -- does it end okay?

A  It did.  It did.  Both of their moods started to get better and they played in the pool, so that -- which was good, but there was a lot of tension during that the whole day.

Q  Okay.  And let me ask you this question, finally, generally.

A  Okay.

Q  You've had a lot of conversations with Emma about her relationship with her mom and her relationship with her dad, and --

A  Yes.

Q  -- and a decision being made as to where she's going to reside, right?

A  Yes.

Q  What do you feel is best for Emma, and why?

A  I personally believe staying at our residence is best for her, because she describes her relationship with her mom as very bad.  And, you know, I try to talk to her about working on it with her, but she says that she doesn't think her mom will because she doesn't seem to understand that it needs to be worked on, which is very difficult, but she -- the

195

one statement that stood out to me the most was I love my mom, but I don't like her.

And in order to facilitate healing between the two of them and that relationship, I feel like we need to help her work towards that goal in a protected environment so that they can get back to where they were before. But it's -- she just keeps saying to me, it's really bad. Even my friends -- this is what Emma said -- didn't really believe me until they saw it firsthand, and they said it's really bad.

THE COURT: Sustained.

THE WITNESS: And that kind of sums it up.

BY MR. COUGHLIN:

Q   Okay. So we can't talk about --

A   Okay.

Q   -- what people say --

A   Oh, okay.

Q   -- who are not around --

A   Sorry.

THE COURT: Sorry. I knew it was coming.

THE WITNESS: Sorry, Your Honor.

THE COURT: I looked at Attorney Piela --

THE WITNESS: Okay.

THE COURT: -- and he gave me one of those it's coming looks, so --

MR. PIELA: Yeah. Am I telegraphing that much?



(973) 406-2250 | operations@escribers.net | www.escribers.net

THE WITNESS:  All right.  Sorry.

THE COURT:  It's okay.  It's all right.  Just talk about what --

THE WITNESS:  Okay.

THE COURT:   -- what you've seen or observed.

THE WITNESS:  Okay.  And she -- she does unload a lot about how she feels and the fighting and how her mom, she says, screams at her a lot for reasons she doesn't even understand, and that they just -- they fight for days sometimes, to the point that Emma says she's falling asleep in class.  She's cried in class because she's so exhausted, and she usually feels like she's the one that has to stop the fight for it to move forward.

BY MR. COUGHLIN:

Q   Does she -- has she described to you her feelings about the home environment with Chris and --

A   She said that they've -- the parents, Chris and Laura, fight a lot, and a lot of times, Chris wants Emma to be on his side to help with the fighting, and she said, that's not my place to do so, but she said that the fighting has been bad for quite some time.  She said they've fought since before she was eight years old, and it's just -- now it's just getting worse and worse and worse.

And she believes that she needs to protect her brother and bring him out of the room when this is happening, and



that's part of the reason why she's not happy that she's not there, because she said, I want to be able to protect my brother.

Q  How have you transitioned into having Emma in your home as often as she has been?  How are you feeling about it, faring with it?

A  I think it's going great.  Back when we were in Ohio, we would have her for six to -- or four to six weeks at a time, so it wasn't uncommon to be with her a while, and she's doing her chores without being asked.  And, you know, there's some things that we have to work on that she's, you know, not used to doing, but I think it's going really well, so --

Q  Is it your -- is it -- are you forecasting that you will be around and at home during the rest of her four high school years?

A  Yes.

Q  And living in Fitzwilliam?

A  Yes.

Q  You're not going back to work?

A  No.

MR. COUGHLIN:  I think that's all I have, Your Honor.

THE COURT:  Okay.

Attorney Piela?

MR. PIELA:  Sure.



198

CROSS-EXAMINATION

BY MR. PIELA:

Q   First of all, thank you for being supervisor.  It's having contact between my client and Emma is very important, and I'm glad that you agreed to assume that mantle.

You testified about a number of visits that you supervised.

A   Yes.

Q   You have to speak up a little bit.

A   Yes.  Sorry.

Q   And they were five in total?

A   Yes.

Q   And now you had some concerns about some of the behaviors that you saw --

A   Yes.

Q   -- correct?  But you never terminated a visit early --

A   No.

Q   -- correct?  Did you ever say to anybody, whether Christopher -- I'm sorry, Steven, or his lawyer, we've got to stop these visits?

A   I said that if things got any worse, it's almost like Laura knew to tow the line, that I would have been stopping these visits, and at the last two, I said I can't -- I don't think I can do this anymore, because it's physically and emotionally --

199

Q    -- exhausting?

A    -- exhausting.

Q    Okay.

A    Uh-huh.

Q    Now Emma is -- you've known Emma for a number of years?

A    Yes.

Q    Would you agree with me that Emma has -- when she -- when she would tell you about things happening with Christopher and Laura that predated the 2018 filing of the petition to modify, did she tell you in 2017 things were bad?

A    She would off and on throughout the years tell me they fought a lot.

Q    Okay.

A    But I didn't understand the scope of it until she was older, because she couldn't dictate things as well as she can now, or articulate.  Sorry.  So, yes, before 2018.

Q    Okay.  And you would agree with me that aside from a 2015 petition and this petition, there has been no other filings in any court to change custody?

A    To change custody?

Q    Correct.

A    No.

Q    Okay.  Thank you very much, Jessica.

A    You're welcome.



200

MR. COUGHLIN:  I don't have any other questions, Your Honor.

THE COURT:  Can I just be -- can I just be clear, because it -- you were talking about living in Ohio.

THE WITNESS:  Yes, Your Honor.

THE COURT:  How long have you and Steven been together?

THE WITNESS:  Since 2007.  Married 2009.

THE COURT:  Okay.

MR. COUGHLIN:  That's what I -- we glossed over that, Your Honor.

THE COURT:  No, that's fine.  I just wanted to know. So, I mean, you've been with her since --

MR. COUGHLIN:  Well, your --

THE COURT:  -- with Emma since she was --

THE WITNESS:  Yes, Your Honor.  I think a little bit before two.

THE COURT:  Okay.

THE WITNESS:  Yes.

THE COURT:  Okay.  Great.  Thank you.

MR. COUGHLIN:  All right.  So I think you can step down.

THE WITNESS:  Okay.

THE COURT:  You can step down.

THE WITNESS:  Thank you.



THE COURT:  That's what I meant to say.

THE WITNESS:  Thank you.

MR. COUGHLIN:  So that concludes our portion of the evidence, Your Honor.

THE COURT:  Okay.  So the petitioner rests.

PETITIONER RESTS

THE COURT:  Attorney Piela, we now have -- well --

MR. COUGHLIN:  Does she need to remain sequestered, or --

MR. PIELA:  I'm not going to call her, so if she --

THE COURT:  Okay.

MR. PIELA:  I have no objection for her to leave.

THE COURT:  If you would like to stay, you can.

THE WITNESS:  Thank you.

MR. PIELA:  I just have my client, Your Honor.

THE COURT:  Okay.  Ready --

MR. PIELA:  Before I do that, I --

THE COURT:  Ready to go, or do you want a little five-, 10-minute stretch?

MR. COUGHLIN:  Yeah.  I think my client would enjoy that.

MR. PIELA:  Okay.  Five or ten minutes, but if we could do a hard restart at -- in --

THE COURT:  2:20.

MR. PIELA:  2:20?  We'll be here.



202

THE COURT: Okay. 2:20. I promise. The clock says 2:12. In fact, I'd almost leave it running --

MR. COUGHLIN: All right.

THE COURT: -- unless Margie wants to turn it off.

MR. PIELA: Thank you, Judge.

THE COURT: All right. Thank you.

You know, just like take a little time with your witness, then we'll get started at 2:20.

MR. PIELA: Okay.

(Recess at 2:12 p.m., recommencing at 2:23 p.m.)

THE COURT: We are back on the record. It's my understanding, Petitioner has rested.

Attorney Piela, are you going to present any witnesses?

MR. PIELA: Yes. I'd like to call my client, but before that, I'd move to dismiss at this point. I believe that we're proceeding under 461(a)(11)(C). There must be clear and convincing evidence of harm and a showing that the change would be in the child's best interest. I don't believe we have the clear and convincing standard met, so for those reasons, I would ask the Court to dismiss the petition at this time.

MR. COUGHLIN: I would just respond by saying, I think the evidence establishes otherwise, clearly, based on the guardian's findings and the testimony you've heard today.



THE COURT: Just one second.

The statute reads, it's not just a matter of clear and convincing evidence. I mean, that has to be the evidence, but if the Court finds clear and convincing evidence that the child's present environment is detrimental to the child's physical, mental, or emotional health, and, candidly, the Court thinks that there has been presented sufficient evidence upon which it could potentially draw, particularly, with respect to Emma's mental and emotional health.

I think there has been concerns about her exposure to domestic violence that have led her to take on, obviously, some anxiety, and, obviously, some concerns about the protection of a younger child, both of which I believe are things that aren't in a child's best interest. It's not in a child's best interest to feel as though they have to play the role of the adult. I am also concerned about what I'm hearing in terms of an adolescent girl and her ability to communicate openly with her mother slowly deteriorating.

I'm hearing evidence about her being up all night, things of that nature. It doesn't specifically talk about the child's academic performance, and I certainly haven't heard anything that says her academic performance in and of itself has suffered, but she does have an IEP. She has had a team of people, apparently, working with her at Fairgrounds to deal with what she shares with them to be a certain level of mental

204

and emotional disruption, such that she steps out of her daily routine to seek assistance from professionals.

I think that's -- that's clear and convincing evidence of a child who is suffering in some way. Whether it meets the standard, again, perhaps I need to -- perhaps I need to hear from your client, but I think even looking at that in the light most favorable to the petitioner, I think he's made a prima facie case where the Court could find that there is sufficient evidence by a clear and convincing standard to make a modification if it proves to be in the child's best interest as opposed to creating additional harm and changing her environment.

I did also, like I said, I'm mindful of the fact that what Mr. Loudermilk is asking is going to also bring into -- bring into play the second part of that, which is modifying the order may outweigh the harm to be changed, and you've touched on that in terms of, you know, the continuity and in the Nashua School District, the sibling separation, and things like that.

But I think there is certainly sufficient evidence that Emma has for the past several years been having such significant difficulties with her mother that she's reached out for help to the point she feels like, I won't quote from my notes, but, you know, I don't like my mother. I don't love my -- I love my mother, but I don't like her. I wish this

205

could all end.  I wish I could just get out of here.  Things like that, to me, add up to a detrimental environment for positive parenting.

So I'm going to allow you to put on your case.  At this time, the motion to dismiss is denied.

MR. PIELA:  Very good.

Laura Montgomery, please.

Laura, please remain standing when you get to the chair.  Please raise your right hand.

LAURA MONTGOMERY, RESPONDENT, SWORN

MR. PIELA:  With the Court's permission, you may be seated.

THE COURT:  Oh, please.

DIRECT EXAMINATION

BY MR. PIELA:

Q  And please keep your voice up so the microphone can hear you.

Please tell me your name.

A  Laura Montgomery.

Q  Where do you live today?

A  6 Loch Ness Drive, Nashua, New Hampshire.

Q  Who lives with you at that address?

A  Currently, Christopher Morrell and Keegan Michael Morrell.

Q  And do you work or are you unemployed right now?



A   I am unemployed.

Q   Since June 3, 2019, has Christopher left you alone with Keegan for any part of the day?

A   Yes, he has.

Q   How often would he leave you alone with Keegan?

A   Most weeks, in the morning before school to get him to school.  And occasionally, on a span of time throughout the course of a day.

Q   Okay.  Does any person come to your house while you're alone with Keegan to observe you or watch how you parent Keegan?

A   From which date?

Q   From June 3, 2019, to present.

A   The first two days after the ex parte was filed, his mother came.  When I went to go pick Keegan up, she was with me and she stayed until Chris came home from work, and after that, no.

Q   Okay.  So that was just for the first two days after --

A   That is correct.

Q   -- June 4, I believe, 2018; am I correct?

A   That is correct.

Q   2019.  Okay.  How long have you lived at 6 Loch Ness Drive?

A   Approximately, 10 years.



(973) 406-2250 | operations@escribers.net | www.escribers.net

207

Q   Okay.   When did you divorce Steven Loudermilk?

A   October 25, 2007.

Q   Under the 2007 divorce decree, who was granted primary custody of Emma?

A   Myself.

Q   Was that a negotiated decree or is that something that was the result of a trial?

A   It never resulted in trial.  It was negotiated between --

Q   Between 2007 to 2011, which is when I think you moved in with Christopher at Loch Ness Drive, where did you live?

A   Plymouth, Massachusetts, and Weymouth, Massachusetts.

Q   Between 2007 and 2015, can you describe in general terms what Steven's parenting -- routine parenting time was with Emma?

A   The routine time was typically over the summers because -- due to his work scheduled.  Obviously, when he was in Falmouth, it was easier to meet the parenting time as it was written, then he got stationed in Ohio and that was -- like that's about one month out of the summer.

Q   Okay.  Did Steven file for a modification of the parenting plan in 2015?

A   Yes, he did.

Q   And did you and Steven reach an agreement as to how the parenting plan would be modified in 2015?



208

A    Yes, we did.

Q    Between 2015 and June of 2019, what was Steven's routine parenting time with Emma?

A    One weekend a month, five Monday holidays, and we would -- I can't recall exactly, but we were going to try to integrate holidays in.  Prior to that, holidays were spent with Emma -- with myself.

Q    In what grade was Emma when she first started attending schools in Nashua?

A    She was in the first grade for the public system, and she did half a year of, like, kindergarten and kinder care.

Q    So from first grade to eighth grade, she was in the Nashua public school system?

A    That is correct.

Q    Has she graduated from eighth grade?

A    She has.

Q    Did she fail any classes in her eighth grade?

A    No.  She's incredibly smart.

Q    Okay.  What kind of grades was she getting in --

A    A's.

Q    -- eighth grade?

A    A's?  Does Emma have friends in Nashua?

A    Yes, she does.

Q    Okay.  Does Emma participate in any activities in Nashua?



A   Yes, she does.

Q   What does she do?

A   Drama, select choir, choir, softball, DECA.

Q   Okay.  Some mention was made about an IEP.  When did Emma first have an IEP assigned to her?

A   End of first grade.

Q   What was the reason for that IEP in first grade?

A   Spelling mainly in first grade, and, you know, even before she went into the first grade, I was concerned that she didn't have a full year of kindergarten and had asked if she could be held back a year.

Q   Okay.  So since first grade, Emma has had an IEP.  Has she always had an IEP since first grade?

A   Yes.  But I think it was called a four something at that point.

Q   Some sort of --

A   I think the --

Q   Some sort of plan?

A   Like a slight difference.  Yes.

Q   Was -- what was the IEP primarily intended to address with Emma?  Was it academics, spelling?

A   Spelling and reading.

Q   Was there, to your knowledge, any time that the IEP was modified to address any emotional or behavioral issues with Emma?



(973) 406-2250 | operations@escribers.net | www.escribers.net

210

A   No.

Q   There is mention in the guardian ad litem' report that Emma was recommended or a discussion was had regarding an Impact Program at Fairgrounds Middle School.  Do you know what I'm talking about?

A   Yes.  I remember reading that in the report.

Q   When did that discussion occur?

A   That discussion occurred end of 2018 or the beginning of 2019 when Mr. Loudermilk was in for an IEP meeting and I had met with Ms. Keyworth.  Emma gets attached to people she likes to talk to, and Ms. Keyworth was one of the impact counselors and Emma really enjoyed talking with her, but she couldn't get in there on a weekly basis.

So I went in to introduce myself and say hello, you know, and with all of this going on, I just wanted to see if she needed -- if Ms. Keyworth felt that she needed to go on a weekly or a regular basis.

Q   To your recollection, did Ms. Keyworth recommend that Emma participate in the Impact Program?

A   No, she didn't.

Q   If Ms. Keyworth had suggested to you that Emma participate in the Impact Program, would you have objected at that time?

A   No, I would not have.

Q   Okay.  Between October of 2015 and August of 2018,



let's get that window of time in our mind, did Mr. Loudermilk

ever attend any IEP meetings, to your knowledge, at Emma's

schools?

A  Yes, he did.

Q  How many?

A  Three, maybe.

Q  Three out of those entire three years?

A  Yes.

Q  Okay.

A  To the best of my recollection.

Q  Did you, at any time, tell the Nashua school system

not to invite Mr. Loudermilk to any of these IEP meetings?

A  No, I did not.

Q  Did you, at any time, tell the Nashua school system

not to include Mr. Loudermilk on emails or --

A  I asked -- I asked them not to put us on the same

email.

Q  Not to put it on the same email?

A  That is correct.

Q  Okay.  Between 2015 and June of 2019, what is the

longest period of time that Emma has spent with

Mr. Loudermilk?

A  A few weeks.

Q  Did Emma ever voice to you between 2015 and 2018,

August, that she did not want to see her father?



212

A   Yes.   In the beginning of 2015.

Q   What was her reasoning for that?

A   She just -- she goes through periods where she doesn't want to see him, and then goes through periods where she does.

Q   Okay.   Right now, Emma is living in what town?

A   That is correct.

Q   What town is she living in?

A   Fitzwilliam.

Q   Has Emma ever attended any school in Fitzwilliam?

A   No.

Q   Has Emma ever participated in any town activities in Fitzwilliam like recreational softball or soccer or youth theater?

A   Not to my knowledge, no.

Q   Okay.   To your knowledge, does Emma have any friends in Fitzwilliam?

A   At this point in time, there is very few kids on -- in the area that are her age.   I know that they have been -- you know, Jess is -- and Emma have been going out and trying to meet new kids.

Q   Okay.

A   That's the best way to put it.

Q   In 2019, was there a transition meeting for Emma's IEP to be transitioned from Fairgrounds to Nashua, I think, South?

A   Yes.



213

Q   Describe what that meeting entailed.

A   Usually at the beginning and ending of every year, you do a kickoff and a transition.  So this one was a transition to cut over to high school in terms of what specific learning disabilities would be the bigger, hitting item, and it was, again, the spelling.

Q   Uh-huh.  So as of right now, is there anything further that needs to happen to transition Emma's IEPs from Fairground Middle School to Nashua High School that you are aware of?

A   Not that I'm aware of.

Q   Okay.  You were here when the guardian ad litem testified this morning?

A   Yes, I was.

Q   And a statement was raised or an issue was raised about you not wanting to sign a document --

A   That is correct.

Q   Okay.  Can you tell me what document you didn't want to sign regarding the IEP context and why you didn't want to sign it?

A   It was the draft IEP, and it was a free-text field matching Emma's milestone or goals and who was responsible for implementing and carrying out those milestones -- or milestones and goals, and they didn't have the goals matching up with the milestones.

Q   Was it a problem with the boilerplate or was it a



214

problem with the substance of the IEP form?

A   The boilerplate was the table, and it was a free-text field.  So the problem was with the -- yeah.  I guess, the --

Q   The data that was entered in the free-text field?

A   Yes.

Q   Did you eventually sign this document?

A   Yes, I did.

Q   Okay.  Between October of 2015 and June of 2018, can you tell me how often Steven Loudermilk would attend Emma's softball games?

A   '15 and '18 were the --

Q   Yeah.

A   -- years?  No.

Q   Did he --

A   I can't --

Q   Did he ever -- did he attend frequently?

A   Occasionally in 2018.

Q   Okay.

A   She only started playing softball last -- seventh grade.

Q   Okay.  How about other school events, like dances or concerts?  Would he -- would he always attend, or would he frequently attend, or would it be infrequent?

A   He would mostly attend.  Him and Jess would mostly attend her plays and concerts and things of that nature.

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

215

Q   Okay.   Emma has had issues with triglycerides.   You've heard testimony to that effect?

A   Yes, I have.

Q   Okay.   Have you ever refused to have a test done for Emma, a blood test?

A   No, I have not.

Q   Have you ever wanted it to be delayed?

A   No, I have not.

Q   Okay.   Has any doctor ever told you that Emma is going to sustain long-term or permanent damage because of her high triglycerides?

A   No.

Q   How about her adenoids?   When did you find out that Emma had a problem with adenoids?

A   Emma had always had a problem with being sick when she was younger, and when they had to put her on Prednisone because her adenoids was so swollen, I took issue with the Prednisone.   It's really not good for a growing body.   So that was about the second or third illness she had that year, and I had asked to go to an ENT to have it checked out.

Q   Okay.   Has any -- did any surgeon recommend to you that the adenoids or tonsils be removed?

A   Yes.

Q   And have they been removed?

A   No, they have not.



216

Q   Why have they not been removed?

A   Mr. Loudermilk did not agree with that approach.

Q   Would you have -- if it was up to you, would you have removed the adenoids and tonsils?

A   Absolutely.

Q   Okay.  At any time, between October 2015 to June of -- to August of 2018, have you ever withheld information concerning Emma's medical care to Steven Loudermilk?

A   No.

Q   Have you ever instructed any doctor or pediatrician not to copy Mr. Loudermilk or not to disclose information to Mr. Loudermilk regarding Emma's medical care?

A   I have never even been asked that or --

Q   Okay.

A   -- brought it up.

Q   All right.  Since 2007, who has been the primary parent of Emma?  Who has been with her most of the time?

A   Myself.

Q   Okay.  Just give me your opinion -- or give me a description of your relationship currently with Emma.  She's 13 -- a 13-year-old girl.

A   She's 13, yes.

Q   Okay.

A   She's a teenage girl.  Right now currently, it's very strained.  I would agree with that.  It is very strained.

217

There's -- open communication doesn't exist.  There is limited topics I have to talk about --

Q  And is that --

A  -- with her.

Q  -- because of -- why?  Is that because of the ex-parte order, or is that because of something else?

A  The ex-parte order and what I've been told I can and can't talk to her about.

Q  But prior to the ex-parte order being issued, let's talk --

THE COURT:  I apologize.  She said something before; you followed up with a question before I could interject.

You said something doesn't exist?

THE WITNESS:  Open -- right now?

THE COURT:  Oh.  Open communication --

THE WITNESS:  In this -- in the current --

THE COURT:  -- doesn't exist.

BY MR. PIELA:

Q  Now let's talk about --

THE COURT:  Okay.

BY MR. PIELA:

Q  -- right before the ex-parte was issued.  What was your relationship like the end of May, June 2019?

A  She's a teenage kid and doesn't want to listen to her mom.  It's -- I've always felt that I've had a great



218

relationship with her. I will say that as she's gotten older and more ready to spread her wings, it's gotten a little bit more strained.

Q Okay. You guys have gotten into disputes?

A Yes.

Q Is it because Emma -- what is the focus of these -- what causes these disputes; is it just Emma not wanting to do things, or --

A Cleaning her room, use of media, her lack of social media because I won't allow it. Clothing choices, I'd prefer her to be covered. Things like that.

Q You've heard testimony that you and Chris have had some disagreements from time to time?

A Yes.

Q Tell me how often you and Chris have disagreements? By disagreements, I mean, verbal differences of opinion?

A It -- you know, again, that's a very fluctuating parameter, but it could be anywhere from one time a week to three or four times a week.

Q Okay. And in these verbal disagreements, are they in front of Emma?

A I try my best not to, but sometimes they do happen with the kids around.

Q Let's talk about the issue about the March 2018. Do you recall that testimony from Mr. Loudermilk about a hunter

219

safety course he wanted to take Emma on?

A    Yes.    When we were exchanging.    Yeah.

Q    Tell me what you recall of that day?

A    We went to pick Emma and her friend up at Red Lobster. They had had lunch there, so we -- that's where we were going to pick them up.    We went to go get her bags from his car and put them in our car like we normally do.    He had said something about going -- a hunter safety course, and then going hunting, and, you know, I was okay with the hunter's safety course.    I was not okay with the actually -- the act of going out and hunting.

At that point, he had told me it didn't matter.    He was going to do it anyway.    At that point, I started to get heated, and I said, well, if I had known that, I would have gotten her adenoids taken out if I had known we weren't doing joint decisions anymore.    And after that, it got a little bit loud, and Chris had come over and told me to get in the car.

Q    Talk about the ride home.    Was Emma upset on the ride?

A    She was very upset.

Q    Why was she upset?

A    Because I disrespected her father.

Q    In her view, you disrespected her father?

A    Yes.    And I wouldn't let her go hunting.

Q    You wouldn't let her go hunting.    Did you ever tell her that I don't want you anymore, leave?    Go away.



(973) 406-2250 | operations@escribers.net | www.escribers.net

220

A   I said if you -- if you think that much -- or she had said some mean and hurtful things, and I had said, if you think that of me, then you can go live with your father.

Q   Did she ever follow you up on that request to say, okay, Mom; pack my bags.  I'm out of here?

A   No.

Q   Is it typical that sometimes Emma gets dramatic in her expressions and statements?

A   Yes.  Yeah.  She's very -- yes.

Q   She's a teenager.

A   She's a teenage girl, and she's also very theatrical as well.  She's very creative, so --

Q   Okay.  Let's talk about Keegan.

Let's -- can you describe Emma's relationship with Keegan as of right before the ex-parte?  What were they -- how was her relationship?

A   They had a good -- they have a good relationship.  You know, they're 10 years apart, so she gets annoyed when he goes into her room and takes her stuff, but it's okay to -- she enjoys doing his nails, and he enjoys having her do her nails, and they go outside and play, and they ride -- you know --

Q   She does his nails, or he does --

A   Uh-huh.

Q   He get his nail painted?

A   Yeah, sometimes.  Sometimes.



221

Q   All right.   More power to him.   How has Keegan been since Emma left on June 3rd?

A   It was okay at first, because we were telling him that Emma was at camp.   You know, I -- he's -- he's realizing now that that's probably not the scenario, and it's getting -- you know, he misses her.

Q   Now you heard some testimony about a joint visit between Keegan, Emma, Christopher, and Steven.

A   Yes.

Q   Did that raise concerns with you, or -- tell me about how you learned of that and how you responded to that.

A   Mr. Loudermilk -- well, I had no idea that the -- that Mr. Loudermilk and Chris could do those arrangements, but he had opened up the floor and had said, you know, I'm at liberty to make arrangements for Emma and Keegan to see each other with Chris; ask Chris about it, and he did not -- he didn't either agree or disagree.   The first visit came, and I had to ask -- I had sent an email to the GAL about, you know, what were the parameters around these sibling visits, and was I able to attend?

And she had -- I think the email had said, this does not need to be restrictive was her response back.   So I was going to go to that visit.   They're, you know, my kids.   I want to see them together.   I want to -- you know --

Q   Okay.   In your mind, did you understand the GAL saying

222

to you that you were not prevented from being part of this joint visit?

A   I don't believe that's how the email -- I don't think the email said I'm not prevented.  It just said it doesn't have to be restrictive.  So in my mind, then, I was going with the positive and saying yes, I can go there.

Q   Did you eventually go to the visit, or did you -- were you --

A   I tried to.  I call -- and I had called Mr. Loudermilk and Chris and said I was on my way.  I got a bunch of backlash; you know, the whole phones hanging up, people hanging up and screaming, and --

Q   Were you screaming or was it someone else screaming?

A   Probably both ways.  After that, I turned around and went home, and they did not -- and I don't know if they actually went fully through with that visit.  On the next visit, I had just asked if I could get a location so I knew where my kids were.

Q   Okay.  You don't have any trouble understanding the terms of what this Court has ordered you?

A   Yeah.  No, I don't have any trouble understanding that I have -- yeah.

Q   Yeah.  You have reservations about what -- about why the Court did it, but if --

A   Yeah.



223

Q -- the Court makes an order, will you follow it?

A Yes.

Q There was some commentary about you removing Emma's birthday from a calendar. Tell me about that.

A Yeah. I can only imagine how heartbreaking that is. It's heartbreaking to hear. I have about 20 calendars on my phone, and I'm trying to figure out what is the actual calendar that doesn't either bump things out a day before or after, an hour before or after. I had thought I had finally found the calendar that was getting -- screwing up dates, because dates and times or whatever, and it just happened that Emma's birthday was on that color of calendar.

Q Was it your intention to delete Emma's birthday entirely from your --

A No, it was not my intention to delete my daughter's birthday.

Q Were you intending to send a message to Emma to say that your birthday is no longer important to me?

A No. I absolutely was not.

Q Okay. Let's talk about Emma and Chris.

What's Emma's relationship with Christopher like?

A They have a very buddy-buddy relationship.

Q Talk to me about that. But what's their -- what do you mean "buddy-buddy"?

A You know, just hanging out watching movies. You know,



224

doing the things that I always usually say no to.

Q   Okay.  Does Emma have a pet name for Chris?

A   Yes.  It's Craddy.

Q   Craddy.  Which stands for?

A   Chris and daddy.

Q   Chris and daddy.  Has Chris ever participated in any of Emma's school events, like daddy-daughter dances or --

A   Yes.

Q   Okay.  And right now, Chris has no, to your knowledge, any legal rights to see Emma?

A   To my knowledge, no, other than the agreements that they do for sibling time.

Q   Okay.  Let's talk a little bit about June 3, 2019.

You went to Southern New Hampshire Medical Center?

A   That is correct.

Q   Did you voluntarily go?

A   Yes, I did.

Q   Okay.  Were you admitted?

A   No, I was not.

Q   Do you know what the discharge diagnosis was?

A   Anxiety.

Q   Is that something that you've struggled with over the past?

A   It's something that I struggle with when custody comes up.

225

Q   Have you seen a provider named Dr. Dicesare?

A   Yes, I have.

Q   Has he prescribed you any medication?

A   He previously did.

Q   Has that been taken over by your primary care provider?

A   Yes.

Q   Has your primary care provider changed or altered your medication dosages?

A   No, she has not.

Q   Have you consistently taken your medication dosages in accordance with what the prescription label says?

A   I sometimes go over.

Q   And is that something that you --

THE COURT:  So -- I apologize.

MR. PIELA:  Sometimes go over.

THE COURT:  Okay.

BY MR. PIELA:

Q   And is that something that you do because of what?

A   The need to be constantly making sure I get everything done to get my kids back or to function.

Q   Okay.  Aside from Adderall, are you prescribed any other prescription medications?

A   No, I am not.

Q   (Indiscernible) any insinuation to the contrary, do



226

you use any illegal drugs?

A   No, I do not.

Q   Did you have a medical provider named Dr. Sheridan?

A   Yes, I did.

Q   After June 3rd, did you see Dr. Sheridan?

A   Yes, I did.

Q   How many visits did you see Dr. Sheridan?

A   Two to -- two.

Q   Okay.  Did you have a plan -- a visit coming up with Dr. Sheridan?

A   Yes.

Q   When is that visit?

A   Tomorrow.

Q   Who canceled that visit for -- is that visit still going forward?

A   No, it is not.

Q   Who canceled that visit?

A   She discharged me as a patient.

Q   Why did she discharge you?

A   She did not feel comfortable speaking in court.

Q   Did she ever tell you you were being discharged for noncompliance?

A   No.

Q   Did she ever tell you you were being discharged for being lack -- for lack of candor --



A    No.

Q    -- to her?  Did she ever tell you that there's a breakdown by -- of a therapeutic relationship between you and her?

A    She did, at one point, say she was concerned that the Court's involvement would make it not pure, because I've always just gone myself when I felt like I was under a lot of stress.

Q    Was it your choice to end your relationship with Dr. Sheridan?

A    No.

Q    Would you like to try to find a new provider if it --

A    Yes.

Q    Okay.  Let's talk a little bit about the events that gave rise to June 3, 2019.

Let's talk, first, about an incident involving a softball game.

A    Uh-huh.

Q    Do you know the incident that I'm talking about?

A    Yes, I do.

Q    What do you recall happening that day?

A    That day, I went to meet the bus, because I did not know where the field was, and I had sent out emails to coaches, school, athletic directors.  Prior to that, I had even sent an email to the -- the school chairman because of

228

the fact that I wasn't getting any responses from Ms. Little or -- and I'm blanking on the name, but either one of the -- either the district athletic director or the school athletic director, in terms of where the fields are and why am I pulling up P.O. boxes versus an actual field address so I can locate where my child's game is.

Q  Pulling it up on a GPS device?

A  Yes, or an app like Google Maps or Apple Maps.

So I had driven there early to go behind the bus so that I could follow the bus --

Q  Driven -- driving there being Fairgrounds.

A  Fairgrounds Middle School.

Q  Okay.

A  That is correct.

Q  So your plan was to follow the bus to Penacook?

A  That is correct.

Q  Why couldn't you follow the bus to Penacook?

A  Keegan had to go potty, so I had to get out and go -- bring him to the potty just as soon as the bus was pulling out, so I missed following the bus.

Q  So you can't -- so why did you call the police?

A  That had come after various phone calls back and forth between Steven and Jess.  Jess was also having issues with the website in terms of getting the address.  I was told that Steven was on the bus with Emma, and then when I called Jess

at that -- around that time when I couldn't get a hold of Mr. Loudermilk, Jess had said, you know, he -- no, he's following the bus.

So it was either he was on the bus or following the bus, and then, at one point, I had gotten a phone call saying, you know, Emma needs you.  You need to go back to the school. During this time, I was trying to punch in the address that Jess had sent me via text, and both my navigation system in the car and on my cellular phone, neither one of them were pulling up any addresses.  I had gotten a text from Mr. Loudermilk with his location -- with a PIN in Concord, and I didn't know what that was about.

So I just pulled over and --

Q  Frustrating situation?

A  Uh-huh.

Q  Did the police eventually try to sort things out for you?

A  Yes.  They said that -- you know, that she was on the bus and she was heading back.

Q  The police let you go?

A  Yes.

Q  You weren't taken into custody?

A  No.

Q  Did the police ever ask you if you were on drugs?

A  No.



230

Q  Did the police ever ask you if you were -- had mental health problems?

A  No.

Q  Okay.  All this time, Keegan is in the car with you?

A  Yes.  He was asleep in the car seat in the back.

Q  You heard Christopher testify earlier about problems with your home electronics.

A  Uh-huh.

Q  When did those problems first start manifesting?

A  For me?

Q  Yes.

A  Definitely before 2015, 2014 for as long as I -- yeah. I would --

Q  Did you -- did you share these concerns with Christopher?

A  Yes, I did.

Q  Did you attempt to solve these problems with technical support?

A  Yes, I did.

Q  Were these -- were these problems still ongoing?

A  Yes, they are.

Q  Okay.  And does that cause you concern?

A  Yes, it does.

Q  Is that a reason why there is a -- do you put any restrictions on Emma's use of the home computer system or home

231

internet system or anything like that?

A  She's not allowed to have social media.  She did get her first social media app, Instagram, a few months ago.

Q  Was your restriction on Emma's using social media because of these internet problems, or just because you didn't think she was old enough to be on social media?

A  Because of the bullying that goes on on social media, and talking to Ms. Keyworth and other counselors at the school, they agree that that, you know, is a good thing to do is limit the social media.  And because of the issues that I had been having, and I didn't want them filtering over into her world.

Q  You heard Christopher testify about a police officer that came in Memorial Day of 2019?

A  Yes.

Q  How -- who summoned the police to the house on Memorial Day 2019?

A  So at -- I did.  I had called.  At that point, I had seen the -- that was when -- the picture with Keegan --

Q  Uh-huh.

A  -- I was sent home a hardcopy picture from his daycare that appeared to have child genitalia on it, and if you look the picture, anatomically, it's -- his body would had to have been switching ways that isn't possible, but, okay.  And then when my daughter was using sparklers, her phone was up and she

232

was making a video, and that -- and the -- an audio came through saying call 9-1-1 on Instagram, and I had asked her, I said, Emma, do you have -- are you making a -- posting a video to Instagram, or are you on Instagram?  And she said no.  I'm just making a video.

Q  Okay.  The police show up?

A  The police show up.

Q  Did they talk to you?

A  Yes, they did.

Q  What did they do afterwards?

A  They talked about what was going on.  They had asked to see the picture.  I showed the picture, and then they had said everything as okay.  He -- Keegan high-fived him.  He was excited to -- you know, he's a little boy.

Q  Little boys love police officers.

A  Yes, they do.

Q  Okay.  Laura, tell me how this filing of this custody action in August of 2018 has affected you emotionally?

A  I am stressed out beyond --

Q  Stressed out in what way?

A  Well, in terms of I've been, in my mind, an excellent mother.  I try to be the best person I can be, and then to come in one day and have both your kids taken from you within a time span of 24 hours is very stressful.

Q  Has it caused you anxiety?



233

A   Oh, yeah.

Q   Has it caused you -- how does that anxiety manifest itself?

A   Sleepless nights; up all night trying to find, you know, what evidence I need to prove that I'm a good mother, to prove that I'm not this insane person that I'm being made out to look like.

Q   Have you tried to comply with the Court's suggestion of a mental health examination?

A   Yes, I did.  I called all three providers listed and recommended, and the -- one didn't want to do an evaluation, the other two weren't taking new clients.

Q   These were providers recommended by whom?

A   Dr. Sheridan.

Q   Okay.  And, again, was it your decision to end your treatment with Dr. Sheridan?

A   No, it was not.

Q   Now, I know we don't have Dr. Sheridan's notes, and we only have you, but in those two visits you had with Dr. Sheridan, did she ever recommend to you to go back to see Dr. Dicesare for a medication adjustment?

A   No, she did not.

Q   Did she ever recommend to you that you should consider inpatient psychiatric care?

A   No.  But I did ask for numbers to call just to be



234

pro -- to -- that's what I just felt like I had to do after that June 3rd.

Q   But my question to you is:  Dr. Sheridan didn't say to you words to this effect, Laura, you need to go to -- you need to be hospitalized?

A   No, she did not.

Q   In your communications with Dr. Sheridan, has she ever given you any other diagnosis, to your knowledge, aside from anxiety issues?

A   I think the diagnosis is adjustment --

Q   Anxiety adjustment --

A   Yeah.

Q   -- disorder.  Has Dr. Sheridan, since June 3rd and those two visits you've had with said, I think it's a different diagnosis?

A   No.

Q   Laura, what would you -- do you have any present plans to move out of Christopher's house?

A   My plans right now are to find a job, first, so I have the means to support.

Q   So at some point, you will be looking to transition out of Christopher's house.  Would you likely be staying in the Nashua area?  There was testimony about you getting a job in Colorado.

A   Yes.  So, again, I'm probably not the most funny



235

person there is, but my sister had become very sick.  Her husband is in the military; she was very ill; she has three kids, and I made a very bad joke of, well, if I can't take care of my own kids, maybe I can take care of my sister's kids.

Q   Do you have any present intention here today to go to Colorado?

A   No, I do not.

Q   And there was some concerns that Jessica made about jokes or comments that you've made to Emma of why she's huffing and puffing or testing when she's licking a spoon?

A   Oh.  So one of the jokes about her, she had posted an Instagram of -- a video on Instagram of the girls in the softball camp practicing for their -- they had a talent show. And they were, you know, doing silly teenage-girl things, and I was like, oh, what; are you drinking?  Ha-ha.  You know, trying to make light of the fact that I did, at a seventh-grade dance, ask her if she was drinking, because the bottle she was drinking out of smelled like alcohol.

Q   Okay.

A   The other one was --

Q   But were these attempts at humor?

A   Yeah.  Yeah.

Q   And you -- your humor fell flat?

A   Yeah, it did.  Very -- very -- yeah.



Q  You -- was your intention to be hurtful to Emma?

A  No, not at all.

Q  Your intention to be disrespectful to Emma?

A  No, not at all.

Q  Just that you're a bad joke teller?

A  I'm just really not funny.

Q  Okay.

A  She would say the same.

Q  Would you like Emma back?

A  Yes.

Q  Why?

A  Why wouldn't I?  She's my daughter.  I love her, and I've always -- I've always been with her.  She's always been in my life.

Q  Thank you, Laura.

MR. COUGHLIN:  Well, Your Honor, I could use about 90 seconds of relief outside the courtroom.

THE COURT:  You can go right ahead.

MR. COUGHLIN:  Do you want to take a two-minute break?

THE COURT:  I'm going to sit right here.

MR. COUGHLIN:  Okay.

MR. PIELA:  Do you want me to start without you, or do you --

MR. COUGHLIN:  Anybody want to join me?



237

THE COURT:  No.

MR. PIELA:  Well, not since I was three.

Now that Tim is gone, we can start talking about him.

THE COURT:  Fine.  We're going to turn off the record.

Do you want to turn off the record?

(Recess at 3:06 p.m., recommencing at 3:09 p.m.)

THE COURT:  Okay.  Attorney Coughlin, cross-examination.

MR. COUGHLIN:  Thanks, Your Honor.

CROSS-EXAMINATION

BY MR. COUGHLIN:

Q  Ms. Montgomery, is it all right if I call you Laura?

A  That is wonderful.  Thank you.

Q  Laura, why are you not -- why are you not employed?

A  I do not know.  Because I haven't been able to find a job, or give a job offer.

Q  Have you been steadfastly looking for work, and if so, for how long?

A  I have been looking for work for about two years, sometimes more steadfastly than others.  I can tell you that a lot of my time is dedicated to my kids.

Q  Okay.  Have you received any job offers?

A  I had received one at one point, but other than that,

238

no.

Q   And why didn't you take that one?

A   Because it was in Canton, Massachusetts.

Q   Canton, Massachusetts?

A   Yeah.

Q   Is that --

A   It's a very -- it's a hard commute.

Q   From Nashua?

A   On 128, yes.  I've done it.  It's -- it's not fun.

Q   So have you been -- do you have a geographical circle around your home as to where you might work?

A   Yes.  I'm looking in about a 25-mile radius or about an hour, and less than an hour with traffic of a commute in the Nashua area just because that's where I am now.

Q   I assume you'd like to get a job that pays you well?

A   I'd like to be able to support myself and my children.

Q   And you've been employed at that level in the past?

A   Yes.

Q   What was your annual income over the last six or eight years when you were working?

A   When I had a job, it was about 100-, 115- a year.

Q   And what did you do?  You were involved with medical devices?

A   Regulatory Affairs.

Q   Regulatory Affairs?



239

A    That is correct.

Q    For manufacturers of --

A    For -- yes.  Medical devices, combination products.

Q    Okay.  Have you looked into making less money, making, you know, 60,000 a year or even 30,000 a year --

A    I have --

Q    -- just to help out?

A    Yep.  I have looked into everything as best I know where to look into.

Q    So your testimony is that throughout the course of Emma's childhood, you've been in tune with her medical needs and have been careful about making sure that she's medically provided for, correct?

A    Absolutely.

Q    Okay.  Are you aware that her triglyceride level has been high in the past?

A    Yes, I am aware.

Q    Were you given any suggestions about how to remedy that situation?

A    Diet and exercise.

Q    Okay.  Did they recommend anything else to you?

A    There was a camp that they had recommended at one point in time, and I had spoke to Mr. Loudermilk about.  At that time, Emma was having some body issues, so we felt that maybe a camp of that nature wasn't the best idea.

240

Q   Okay.  So let me just show you a portion of the medical records that are already in evidence in this case.  I just picked three different examples.  It looks like the first one is last December.  So it looks like December 20, 2018.

A   Okay.

Q   Can you just read what it says here about history of present illness?

A   She also had her lipid panel checked, and --

Q   No.

A   Oh.

Q   "Emma."

A   Oh, the highlighted.  Sorry.

Q   Well, first of all, who are you meeting with during this appointment?

A   This is Dr. Olson, her primary care --

Q   Okay.

A   -- physician.

Q   A Well-Child visit.

A   That would be my guess, this is a Well-Child -- yes.  This is her annual, which would be Dr. Olson.

Q   Okay.  What's the -- what's the -- generally, what are they suggesting to you here?  You've cut to the chase, so you can start with "she," right?

A   "She also had a lipid panel check, which -- and this showed a significantly elevated triglyceride level of three.



241

Teen/parent declined referral to Lipid Weight Management Clinic through CHaD in Manchester, but Mom does report today that there is a strong family history of hypertriglyceridemia. Yeah."

Q  Hypertriglyceridemia.  So is this what you were talking about, going to -- I thought you might have said the word "camp" or class?

A  Yeah.  No.  So it's a -- yeah.  Right here.  The --

Q  This is something else?

A  The management clinic.

Q  Right.  So --

A  The weight management clinic.

Q  So her --

A  It was like a truncated program for a period of like a week.

Q  Correct.  So her doctor recommended it, and you declined referral to the Lipid Weight Management Clinic in Manchester, right?

A  After I talked to her father and her doctor again.

Q  Okay.  So what were your concerns about going to a clinic after a doctor told you it would be best for your daughter?

A  The doctor did not say it would be best for my daughter.

Q  Well, she -- she referred you to the -- the clinic,



242

right?  It seems to me --

A  She gave us a recommendation, but we -- there is also -- you can also get a recommendation for things like prescribe the Y.  It doesn't mean that it's a required.

Q  Oh, no.  I know.

A  And when I talked to Mr. Loudermilk about it, at that time, Emma was having some body-images -- some body-image concerns, and my position was that it would be better to just gradually introduce her into exercise and things of that nature versus sending her to a clinic like this.

Q  Okay.

A  Can you -- do you know what tubes were used to draw that to get those levels or if it was truly a fasting lab?  Do you have that information by any chance?

Q  I have no idea what you're talking about, A; and, B, it's my job to ask the questions.

A  Okay.

Q  Okay?  Let me just show you this other medical record and have you read problem number two in this, and who are you meeting with here?

MR. PIELA:  Can we have a date for that, please?

MR. COUGHLIN:  Yeah.  I was just going to ask that.

THE WITNESS:  It looks like a print date of April 24, 2019.

BY MR. COUGHLIN:



243

Q   No.   That's -- I think they all say that.   But in the body of it, it gives some dates as to when you were there for that.

A   Vaccine order, December 20, 2018.

Q   Okay.   Yeah.   What is it?

A   Well-child, HPV administered.

Q   Uh-huh.   What does it say about problem number two? If you could, just read that out loud.

A   "Recommended rechecking this level for the" -- the -- her glycemic index, maybe.   "Mom states that she will consider this.   Doesn't want to make Emma feel stressed or worried about it; however, she was interested to hear that there are medications available to treat this condition."

Q   Did you --

A   But that does not sound like something I would ask.

Q   Well, I'm not asking you whether it sounds like something you said, but does the document say that?

A   The document does say that.

Q   Yeah.   Did you ever look at any medicine that she might take?

A   No, not -- and if that was when the HPV was administered, that was done at her Well-Child checkup, and her second one will be done at her next Well-Child checkup.

Q   Okay.

A   So this would have had to have been on the same day as



244

that first Well-Child.  And if it doesn't say it on that one right there, that's it.

Q   Okay.  It says, "Recommended rechecking this level. Mom states that she will consider this."  That sounds to me like you didn't have a --

A   But if this wasn't -- so I'm not sure what's going on here, but I -- on this, this was if -- the reason for this was the HPV, the first vaccination for HPV.  That was done on the 2018 annual Well-Child checkup.  There's two -- it's a series of two.  The next one gets done this year on her next Well-Child.

Q   Okay.

A   So these looks like they're different dates, and so now I'm wondering where this is coming from.  It has conflicting information.  It actually got another vaccine, and I don't know.

Q   All right.  Well, let's go back to your -- that's unclear.  This is dated 2017, December, right?

A   Uh-huh.

Q   So this is the year before.  Another well-check, right?

A   Yep.

Q   And the higlycerides (sic) are high then, too, right?

A   Her triglycerides?

Q   Yeah.  Isn't that what the doctor is saying there?



245

A    Yep.  Is this one -- I know that there is one of the tests that did have a -- that wasn't a fasting, and I can say that I do call one month and two weeks prior to her annual appointment to see if any lab work is needed.

Q    Okay.  And this one says -- and this is, again, the year before, "Because of her increase in triglyceride level, Emma is a candidate for the Pediatric Weight and Lipid Management Clinic in Manchester," right?  It says that here? Did I read it correctly?

A    Yeah.

Q    Okay.  Because I want you to read this sentence, "Call to Mom."  What's that say?

A    "Call to Mom and informed her of the above.  Mom states that she will speak to Dad and call back if she would like the referral.  Mom states, she understands that her health is important, but her mental health is also important, and Emma already has a poor body image and Mom doesn't want to make it worse."

Q    Do you remember saying that to the doctor?

A    Yes.

Q    Okay.  Now, I heard you say something that caused me pause, and that was when your lawyer was asking you about decision-making.  And I wrote down, and maybe this is inaccurate, but I wrote down that you said, "If I knew that, I would have taken out her adenoids."  Do you remember -- do you

246

remember testifying to that?

A    That was in regards to when Mr. Loudermilk said he didn't need my permission to take her hunting.

Q    Okay.  And I'm just trying to make the connection here.  So Mr. Loudermilk says to you, he's going to do this hunting thing with Emma whether you, you know --

A    Agree or disagree.

Q    -- are --

A    Yeah.

Q    -- whether you are onboard or not, right?

A    Uh-huh.

Q    Okay.  And you respond by saying, "If I knew" --

A    If I had known --

Q    -- "that you were going to take this position, I would have taken her adenoids out"?

A    No.  If I had known that we weren't doing joint decision-making per our parenting plan, I would have gone and taken her adenoids out without -- instead of not taking them out, because Mr. Loudermilk did not want to have them taken out.

Q    So you're testifying today that Mr. Loudermilk objected to the adenoids being remedied?

A    Yes.

Q    And you -- you promoted them being --

A    Yes.



247

Q  -- removed?

A  Yes.

Q  Oh, okay.  So on June -- on June 3rd, you enter Southern New Hampshire Medical Center with your mom, right?

A  Yes.

Q  And I think her Honor pointed out that -- earlier today that it's like 9:30, 10:00 at night?

A  It was late, yes.

Q  And why are you there so late?

A  Because I was in court all day and my parents had to come in from -- or come up from Plymouth.

Q  Oh.

A  And that's what time they got there.

Q  Was Chris home with the kids then?  I mean, with --

A  Chris stayed --

Q  -- your son?

A  Yes.  He stayed home with Keegan while my parents and I were at the hospital.

Q  But it looks like -- it looks to me like, when I read the records, that your mom was concerned about you --

A  Yes.

Q  -- and wanted you to go into the -- and go and get checked out?

A  Yep.

Q  Okay.  So you decided to do it then when she got



248

there?

A    Well, that's why they were coming up.

Q    To enable you to go to the clinic?

A    For support, or --

Q    Or the --

A    Yeah.  I guess, just support and --

Q    Okay.

A    -- to have somebody there with me, I would assume.

Q    Then did you have your blood tested that night?

A    I did.

Q    Why don't we have the evidence of your blood test?

A    Because I haven't received it in the mail yet.  I went in at the end of last week to have them send -- the hospital, to have them send it to me.

Q    But you realize, Attorney Sternenberg has been pretty adamant about her need to see that lab test, right?

A    As soon as I found out she needed to see that, I went and got it, but I also know that she has the ability to go get those results herself.

Q    So you went and got it yourself?

A    I went and put in the paperwork to have it mailed to my house.

Q    And how long ago was this?

A    End of last week.

Q    Okay.  And you -- couldn't you have gotten the medical



records, as I have, I'll submit, by visiting the hospital and asking for the records?

A  I --

MR. PIELA:  Objection.  Hypothetical.

BY MR. COUGHLIN:

Q  Did you ask for the records that day?

A  I did.  I did, and they --

THE COURT:  Thank you for rephrasing.

BY MR. COUGHLIN:

Q  Did you ask for the records that day?

A  I asked for the records, and they gave me a piece of paper for records release and have it mailed to my house.

Q  They wouldn't give them to you otherwise?

A  I don't know.  I didn't sit there and go back and forth.  I just said that I needed the lab results.

Q  So you just --

A  And that's what they told me to do, so I did it.

Q  You just filled out the form and left?

A  Yep.

Q  Did you ever go back?

A  For what reason?

Q  Well, as I understand it, Attorney Sternenberg testified earlier today that she thought it was very important that she see these records, and you're saying, a week ago, you filled out a form, and I just asked you, did you ever go back

to get the records that Ms. Sternenberg told you she really needs to see?

A   No, because they were going to be mailed to my house.

Q   Okay.  Fair enough.

But that blood test is now almost eight -- seven or eight weeks old.  June 3rd it was taken, right?

A   The results are still there though, correct?

Q   No.  I mean, the test was taken seven or eight weeks ago?

A   Yeah.  What is it, July 23rd?  June -- so 20 -- 20 days.

Q   More like 40 days, right?

A   Forty days.  Sorry.  40 days.

Q   Okay.  So let me try to understand this situation.

When you called the police relative to trying to figure out what was going on with the softball game --

A   Uh-huh.

Q   -- had you been to softball games in the past?

A   Yeah.

Q   That season?

A   Yes.

Q   And how did you figure out where to go?

A   I looked on the website for Nashua Athletics and got the address, and when it didn't pull up an address but a P.O. box, or whichever was listed there, sometimes nothing, I would

251

get a hold of the school and try to get a hold of the coach,
and then if --

Q   No.  I'm not talking about this particular day.  I'm
talking about --

A   No.  I'm talking about -- I know.  I understand.

Q   Oh, okay.

A   That the process is the same all the time.  And then
if I couldn't get any answers that way, I would just go and
wait to where I knew the bus was filling up with kids and
follow them to the -- to the field.

Q   You'd follow the bus?

A   Uh-huh.

MR. PIELA:  You have to answer yes or no.

THE WITNESS:  Yes.  Oh, sorry.  Yes.

BY MR. COUGHLIN:

Q   Okay.  And Mr. Loudermilk goes to these same events,
right?

A   Yes.

Q   And he appears to be able to negotiate where it is and
get there for the game, right?

A   Apparently so, yes.

Q   I mean, do you have -- do you have trouble getting
from Point A to Point B at times, other than softball games?
I don't know.

MR. PIELA:  Objection.  That's kind of a vague



252

question.

THE COURT:  I don't think it's all that vague, but you can maybe be more specific.  Have you ever.  I mean, that would specify.

MR. PIELA:  Well, you can -- you can have trouble getting somewhere because of a traffic and, you know, trouble anywhere because you don't know --

MR. COUGHLIN:  Okay.  But --

MR. PIELA:  directions?

THE WITNESS:  Yeah.

BY MR. COUGHLIN:

Q  -- what I'm hearing is that you need to follow the bus to go to these games that your -- at least occasionally, you followed the bus?

A  I need to have an address to look up to put into a GPS or a map system, so that I am able to follow the directions of the map system, whichever it is, and if I have the address. And the last game of the season was a different scenario where I had the address, I just didn't have any directions.

Q  Okay.  So can you put the address into your machine and have that woman tell you where to go?

A  Usually, that's how it works.  Right?

Q  It wasn't it working that day?

A  No.

Q  Okay.  Because my client gave me the address or, at



253

least, maybe I can show you. You can tell me who is talking here, but I have these two pages from that day, Wednesday, May 29th, right? What time is the game; do you remember?

A They usually start -- they get dismissed from school a little bit early. They start about 3:30-ish.

Q Okay. So this is 2:27 --

A Uh-huh.

Q -- right? And if I'm getting this right, these are from two different senders; one is light gray, one is gray, and over here is you. Is that -- is that accurate for me to assume that?

A So if this is on somebody else's phone, then, yeah. Yes, I would be over here.

Q Right. So this is someone giving you the address, 14 Allen Street, Penacook, right?

A Uh-huh.

Q And that same person says, "Merrimack Valley Middle School," right?

A Okay.

Q And these are sent at 2:27, right?

A Okay.

Q And then it looks like another individual, and I would submit to you these are both Jess and Steve, one being Jess and one being Steve, the next -- the next one of the two of them says, "Did the -- did the address come through?" And you

254

say no, right?

A    That's what it looks like.

Q    But -- so then they send it to you again, "14 Allen Street, Penacook, Merrimack Valley Middle School," right?

A    Yeah.    But I had -- that doesn't look -- I don't know. I'd have to --

Q    On --

A    This is what -- yeah.    I believe I got this right here.

Q    Okay.    This is from one of them as well, right?    And it says, "The game is actually at the park next to the school" --

A    Yeah.

Q    -- "on the left side."    And then they give you a --

A    Yep.

Q    -- map that you can look up online to get there, right?

A    Yeah.    Absolutely.

Q    Okay.    Near Concord, New Hampshire.

A    Yeah.

Q    Rolfe Park they tell you.

A    Yeah.

Q    And you respond by saying, "Are you going to the pretrial today?"

A    Is this a different day?



Q  Nope.  I think it's the same day, June 3, 2019.

A  I don't know how to respond to that.

Q  No, you're right.  That is a different day.  "Are you going to the pretrial today?"  Okay.  So I think what happened was that conversation ended about the game, and the next conversation was about the pretrial.  Okay.  Fair enough.

So you've gotten all of this information from the two of them, and you -- I know you were probably stressed and everything, but -- and you've got your son in the car, and you're -- are you driving to Penacook, New Hampshire, when you call the police?

A  I'm pulled over on the side of the road.

Q  Okay.  Smart.  Safety, right?  What are you asking the police to do?

A  I'm asking them if -- well, my first question was or my first statement was:  I don't know if this is the most appropriate number to call, but I'm having trouble finding my daughter's school and my maps or GPS system isn't working.  I can't look up directions, and I am supposed to be at my daughter's game and her stepmother says Emma -- with distress in her voice had stated, Emma really needs you.

Q  Okay.  And who told you that Steve was on the bus?

A  I can't -- I don't recall.  I do -- people I talked to that day were Jess, Steve, and Emma.  I couldn't get a hold of the coach.  I couldn't get a hold of the --



Q   Okay.

A   -- athletic directors.

Q   But you said somebody told you that he was on the bus?

A   Yeah.  So then it would have -- I think it was Jess that had said that.

Q   Jess told you he was on the bus?

A   To the best of my knowledge or recollection.

Q   He's never been on the bus before with his daughter, has he?

A   Not to my knowledge, no.

Q   Parents don't really do that, right?

A   No, they don't.

Q   And, lastly, this Instagram incident.  This is another time when you called the police, right?

A   Yep.

Q   And you -- this is May 27th at 8 -- well, let me show it to you, first, so you can tell me what it is, but is this you talking here on May 27th at 8:13 p.m.?

A   To let Mr. Loudermilk know that I called the police, yes.

Q   Okay.  So read what you wrote to Steve.

A   "Just a heads up.  I called the police for a wellness check because of what appears to have gone through on Emma's Instagram account in no way should have had, at least from what I hear."

Q   Okay.  So you're at home with --

A   I'm at -- I'm at home with two kids and the police are headed over, and I wanted to let Mr. Loudermilk know as fast as I could that I had called the police because I think it's important that he know.  And then after that, when I was -- after I was talking with the police, I believe Emma was -- or shortly thereafter, Emma was on the phone for about an hour with her father in the backyard.

Q   Okay.  So this is -- Steve asks you, you say --

A   This is me, that Steve was gone through --

Q   And you say, "And no way it should have" --

A   So it was audio that had -- so the audio should not have come through.

Q   So at least ask the question, and you can answer, and I'll let you explain.  You said, "There is no way it should have, at least from what I hear," right?  And Steve says the following, right; "What has gone through her account?"  Right?

A   Uh-huh.

Q   Is that Steve?

A   Yeah.

Q   And Steve says, "Wellness check on who?"

A   Yeah.

Q   Right?  And then Steve says, "Why are you pulling Emma out of school?"  So you went and pulled her out of school at noon or so?

258

A   The following day.

Q   The following day.  Okay.  This is the following day.

A   Yeah.

Q   Okay.  So you pull her out of school and you write, "She is tired, and softball canceled.  That's what I heard anyway."  Right?

A   (No audible response heard)

Q   All right.  So let me ask this about the police.

A   Was that a half day on -- at the -- oh, no.  That was a Tuesday.

Q   So you're at home with Emma and your son.  I forget his name.

        MR. PIELA:  Keegan.

        THE WITNESS:  Keegan.

BY MR. COUGHLIN:

Q   Keegan.

A   Uh-huh.

Q   And you -- you noticed something suspicious or alarming or concerning on Emma's -- on her -- what account do you call it, the app?

A   Her Instagram account said --

Q   Instagram account.

A   -- "Call 9-1-1."  So that seemed odd to me.

Q   What's that?

A   Her Instagram account or a voice in her phone said



259

that Instagram called 9-1-1, which is why I asked her if she was on Instagram.  And she said no, she was making a movie.

Q   She wasn't on Instagram?

A   According to her, she had said no, she was not.

Q   Okay.  So what did you see on Instagram that was alarming?

A   I didn't see.  I heard.

Q   What did you hear?

A   "Instagram, call 9-1-1."

Q   And so you called 9-1-1?

A   Yes, because I thought it was very bizarre that this would be coming through her phone, and in light of everything else that was going on at that point in time, it just -- I panicked.  It seemed like a whole lot of anomalies all -- all kind of culminating into one.

Q   So you thought it was like a warning from --

A   I didn't know what it was.

Q   -- them for someone to call 9-1-1?  I'm just trying to understand why you called the police.

A   I can't answer that.  I don't know.

Q   Okay.

A   It seemed like the right thing to do at the time.

Q   I get it.  So is it your present intent to stay in, where are we, Southern Hillsboro County; Nashua?  Would you move?  You said that you may or may not be staying at Loch

260

Ness, right?

A    My plan is to get a job so I can support myself and my kids in our own place.

Q    Right.   And are you wedded to the -- the 25-mile radius that you talked about earlier, even if your relationship with Chris is -- doesn't continue?

A    I'm looking for areas that I can commute and that are -- that I can afford a place, and seeing as how the kids are here, I'm -- yeah.

Q    Okay.   So you -- okay.   Let's not -- why am I mixing on the name?   Keegan is not school age yet, obviously; he's four?

A    He's four.

Q    And would you -- if the Court were to decide that Emma begins school with you in the fall, would you think it important to keep her in the -- the Nashua South School District, I guess, we're referring to it as?

A    I think it's important to keep my kids safe and together, and then everything else after that.

Q    Okay.   And let's say you got a job offer from Providence, Rhode Island, for 150,000 a year, would you consider moving to Providence?

A    I would consider it, but I wouldn't do anything until I talked to their fathers.

Q    To their fathers?



261

A    Uh-huh.

Q    Okay.

MR. COUGHLIN:  That's all I have, Your Honor.

MR. PIELA:  I have nothing further.

THE COURT:  Okay.

You're all set?

MR. COUGHLIN:  Yeah.

MR. PIELA:  Judge, you look surprised.

THE COURT:  Okay.  I have a -- no.  I have a couple of questions.

Ms. Montgomery, in looking -- I can't recall.  The guardian testified this morning, again, about some of the things in this Access' assessment that was done late hours June 3rd into the morning of June 4th.  And I'm not sure specifically, and I'm looking for it now, I apologize, I should have been looking, but I was trying to listen.

You were released, it said, with present diagnosis of anxiety, not otherwise specified.  And also, amphetamine abuse, moderate.  Are you still prescribed Adderall?

THE WITNESS:  Yes, I am.

THE COURT:  And how much Adderall do you take?

THE WITNESS:  30 milligram extended release, and then two 10s twice a day.

THE COURT:  And when are those -- when do you take your 10s?

262

THE WITNESS:  Usually 1:00.

THE COURT:  Yeah.

THE WITNESS:  And then I take either -- depending on the day, I'll either take the extended release about 7.

THE COURT:  You're talking the 30-milligram extended release?

THE WITNESS:  Uh-huh.

THE COURT:  You take it at 7 p.m. or a.m.?

THE WITNESS:  7 a.m.

THE COURT:  A.m.  Okay.  Yeah, morning.

THE WITNESS:  Uh-huh.

THE COURT:  Okay.  And then a 10 at 1:00, and then --

THE WITNESS:  Two 10s at 1, and then like two 10s at 9 or 10 a.m.

THE COURT:  Okay.  There is also a discussion in here reporting that you have been using diet pills on and off since your teenage years.

THE WITNESS:  Yes.

THE COURT:  When was the last time you took diet pills?

THE WITNESS:  Today.

THE COURT:  Okay.  So you take them regularly?

THE WITNESS:  Yeah.

THE COURT:  Can I -- can I ask what you take?

263

THE WITNESS:  Like Green Tea Fat Burner it's called. I take a -- something I found on Amazon, it's a -- I don't know the name of it.

THE COURT:  It states -- it states in the medical report, "Combination of prescribed amphetamines and over-the-counter diet pills," --

THE WITNESS:  Uh-huh.

THE COURT:  -- but indicates that some of them contain amphetamines.  Do you know what that is?

THE WITNESS:  No, I do not.

THE COURT:  You don't -- you don't --

THE WITNESS:  Isn't --

THE COURT:  You don't read the labels as to what --

THE WITNESS:  Are amphetamines a --

THE COURT:  -- you're taking?

THE WITNESS:  I do, but I don't take anything that says amphetamines on it, other than the prescription --

THE COURT:  Well, no.  But like --

THE WITNESS:  -- because that's --

THE COURT:  -- phenylpropanolamine?  Anything of that nature?  Do you read --

THE WITNESS:  Yes.  And --

THE COURT:  -- what's in that?

THE WITNESS:  Yes.  And --

THE COURT:  Okay.

264

THE WITNESS:  -- synthyrin (sic) or whatever it is.
Yes.

THE COURT:  Does that sound familiar to you,
phenylpropanolamine?

THE WITNESS:  Uh-huh.

THE COURT:  Garcinia cambogia, anything like that in
those diet pills?

THE WITNESS:  Not the garcinia, but, yes.

THE COURT:  Okay.  And how many of those do you take
a day?

THE WITNESS:  One or two.

THE COURT:  When do you take those?

THE WITNESS:  Morning and afternoon.

THE COURT:  And does your -- for -- does your
prescriber who is giving you about 70 milligrams of Adderall a
day know that you take two of those diet pills along with them
each day?

THE WITNESS:  Yes.

THE COURT:  Have you -- do they ask about any effect
you seem to feel with them?

THE WITNESS:  No, they have not.  Do you mean in
terms of negative effect, or --

THE COURT:  Yeah.

THE WITNESS:  No, they have not.

THE COURT:  Did you read this report?



265

THE WITNESS:  Yes, I did.

THE COURT:  That said that it -- it clearly states here, "Client reports having recently obtained a prescription of her Adderall, states she occasionally overuses the prescribed amount.  Client advised that the -- client is advised," meaning the doctor is speaking to you, "combination of prescription amphetamines and over-the-counter diet pills can mimic the effects of mania," and --

THE WITNESS:  Uh-huh.

THE COURT:  -- "strongly" -- it discourages you from maintaining this usage.  That didn't have any effect on your regular practice in terms of what you medicate yourself with?

THE WITNESS:  It did.  I threw -- I actually threw away a lot of diet pills, so --

THE COURT:  Your mother, apparently, told the doctors, when you went in, "Client's presentation this evening is calmer and better than she's been all weekend."

THE WITNESS:  Uh-huh.

THE COURT:  Had you stopped taking pills after you came to court that day?  Did you take any pills between the time you left the court, when I saw you on June 3rd, and when you reported to Southern New Hampshire Medical Center around 9 or 10 at night?

THE WITNESS:  I don't believe I did, no.

THE COURT:  Okay.



266

THE WITNESS:  I don't --

THE COURT:  When you were having your visits with Jessica, she made mention of the fact that one day you showed up and you were a little hyper, a little manic, but by the end of the day, you were kind of crashing.

THE WITNESS:  July 13th, I was excited that we were having a movie day with my daughter.  That's our -- that's what we do.  We were going to -- the movie was "Taken," and watching movies together.

THE COURT:  Did you take Adderall that day?

THE WITNESS:  Yes, I did.

THE COURT:  Did you take all of your Adderall?

THE WITNESS:  The dosage on the label?  Yes.

THE COURT:  Did you take more than what was prescribed?

THE WITNESS:  No.

THE COURT:  Did you take diet pills?

THE WITNESS:  Yes.

THE COURT:  Do you take diet pills every day?

THE WITNESS:  Yes.

THE COURT:  Anybody want to follow up?

MR. COUGHLIN:  I'm all set.

MR. PIELA:  I do.

REDIRECT EXAMINATION

BY MR. PIELA:



267

Q   Laura, these diet pills are over-the-counter?

A   Yes, they are.

Q   They are something you can get legally online?

A   Yes.

Q   You've obviously heard the judge's concern about these diet pills?

A   Yes.

Q   Let me ask you this:  Do you feel a need that you have to take these diet pills?  Let me put it this way:  If the diet pills are keeping -- are potentially keeping you from seeing your children, would you stop taking the pills?

A   Yes.

Q   If -- would you be willing to state, well, I think you already did under oath, that if there's a concern about diet pills, all of them go down the toilet?

A   The trash, not the toilet, but, yeah.

Q   Okay.  Yeah.  God knows what's in the sewer water.

Thank you.

THE COURT:  Just for the record, can you tell me your height and weight?

THE WITNESS:  I am 5'6", I weigh 130 pounds.

THE COURT:  130 pounds?

THE WITNESS:  Yeah.  I know, everyone questions that.  I do.  I weigh 130 pounds.

RECROSS-EXAMINATION



268

BY MR. COUGHLIN:

Q   Well, I guess, my only question would be, you don't appear to be someone who is battling a weight problem; is that true?

A   No, I don't think I'm battling a weight problem.

Q   So what is it about the -- why do you take the weight pills?

A   I'm exhausted.

Q   Diet pills.

A   I'm exhausted.

Q   So they kind of enhance your mood?

A   No.  They keep me moving all day so I don't fall flat on my face and can't get everything done I need to fit into a day.

MR. COUGHLIN:  That's all I have, Your Honor.

MR. PIELA:  I have nothing further, Your Honor.

THE COURT:  Okay.  Submitted?

MR. PIELA:  Submitted, Your Honor.

RESPONDENT RESTS

THE COURT:  Okay.

MR. COUGHLIN:  Yes, Your Honor.

THE COURT:  You can step down, ma'am.

MR. PIELA:  Before we go, can I ask just a question on the exhibits that are in?  We have Respondent's A, which is the Access' notes.  Respondent's --



THE COURT:  Hold on just a second, please.

Okay.  You can step down, ma'am.

But just to close things up with counsel, it -- let me -- if I could, I'm going to ask Mrs. Lotus to --

MR. PIELA:  Sure.

THE COURT:  -- just read into the record what she has in terms of her -- her exhibit list.

THE CLERK:  From the Petitioner, I have texts from Emma, March 2018.  Medical records of Emma Loudermilk, 2014 to 2019.  From the Respondent, I have Southern New Hampshire Center authorization to release protective health information, and, B, letter from family practice of South Nashua, Re: Laura Montgomery.  And then I have the Court's exhibit, Foundation Medical Partners.  That's what I have.

MR. COUGHLIN:  And the authorization is attached to the Access' notes.

THE CLERK:  This is what I've been --

MR. COUGHLIN:  Yeah.

THE CLERK:  -- (indiscernible).

THE COURT:  I have the Access' notes, which are A. You're asking are they --

MR. COUGHLIN:  Okay.  Yeah.  Yeah.

THE COURT:  -- are the releases attached?

MR. COUGHLIN:  Yeah.  The releases of the --

THE COURT:  Yes.

270

MR. COUGHLIN:  The releases of the --

THE COURT:  The releases are --

MR. COUGHLIN:  Okay.  Okay.  That's all --

THE COURT:  -- they're --

MR. COUGHLIN:  That's all I wanted to make certain.

THE COURT:  Okay.  Very -- the very top document on Respondent's A is, in fact, the -- the signatures didn't copy, but it's called "Authorization to Release Protected Health Information."  So I assume that the -- it's signed June 13th.  And it says, "Please mail it to my home address."  That must be something that your client wrote.  So who obtained these after she asked to have them sent?

MR. COUGHLIN:  My client.

THE COURT:  Oh, the -- so then I misunderstood the questioning.  I'm going to go back and try to correct the record.

MR. COUGHLIN:  My client requested the Access' notes.  The Access' notes were given to my client.

THE COURT:  Okay.  We're talking --

MR. COUGHLIN:  They were --

MR. COUGHLIN:  -- solely about the labs being missing that she didn't get.

MR. COUGHLIN:  Right.

THE COURT:  Okay.

MR. COUGHLIN:  She -- she got --



271

THE COURT:  All right.  I'm all set.

MR. COUGHLIN:  There was -- okay.

THE COURT:  I'm all set.

MR. COUGHLIN:  All right.

THE COURT:  That was my -- that was my misunderstanding.  I'm like, I -- that's right.  It was that one specific finding with respect to the blood test.

MR. COUGHLIN:  Correct, Your Honor.

THE COURT:  There is a -- yeah.  There's something in here that talks about the fact that there was a test done.

MR. COUGHLIN:  Page two of the emergency room note.  It's labs, CBC --

THE COURT:  Yeah.

MR. COUGHLIN:  -- blood.  And then it goes into more specific findings in the later pages.

THE COURT:  Okay.  I'm in a bit of a quandary.  Okay.  Everything is submitted.  You're all set.

MR. COUGHLIN:  Okay.

THE COURT:  You can turn it off.

Can I just talk to counsel for a couple of minutes?

MR. PIELA:  Sure.

MR. COUGHLIN:  In your -- in your office?

THE COURT:  Yes.

MR. COUGHLIN:  Okay.

(Proceedings concluded at 03:09 p.m.)

272

## CERTIFICATE

I, Jennifer C. Burke, a court-approved transcriptionist/proofreader, do hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, to the best of my professional skills and abilities.

TRANSCRIPTIONIST(S):   Jennifer C. Burke, CET-448

JENNIFER C. BURKE, CET-448                July 26, 2021
Transcriptionist/Proofreader

