STATE OF NEW HAMPSHIRE

9TH CIRCUIT COURT - FAMILY DIVISION - NASHUA

IN THE MATTER OF:                      )
                                       ) Family Division Case No.
CHRISTOPHER MORRELL,                   ) 659-2019-DM-00383
                                       )
                    Petitioner,        ) Nashua, New Hampshire
                                       ) August 30, 2019
             and                       ) 11:53 a.m.
                                       )
LAURA MONTGOMERY,                      )
                                       )
                    Respondent.        )
_____        )

                    HEARING ON EX PARTE MOTION
            BEFORE THE HONORABLE JULIE A. INTROCASO
            JUDGE OF THE CIRCUIT COURT - FAMILY DIVISION

APPEARANCES:

For the Petitioner:          Jane M. Schirch, Esq.
                             SHANELARIS & SCHIRCH, PLLC
                             35 East Pearl Street
                             Nashua, NH 03060

Pro Se Respondent:           Laura Montgomery
                             (Address Unknown)

Audio Operator:              Electronically Recorded
                             **Not Monitored**

TRANSCRIPTION COMPANY:       eScribers, LLC
                             7227 N. 16th Street, Suite 207
                             Phoenix, AZ 85020
                             (800) 257-0885
                             www.escribers.net

Proceedings recorded by electronic sound recording; transcript produced by court-approved transcription service.



2

I N D E X

| WITNESS(ES) | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

FOR THE PETITIONER:

NONE

| WITNESS(ES) | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

FOR THE RESPONDENT:

NONE

| MISCELLANEOUS | | PAGE |
|---|---|---|
| Court's Ruling | | 21 |

| EXHIBITS | | ID | EVD |
|---|---|---|---|
| Respondent's A | Letter from psychologist, under seal | 13 | 13 |

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

(Proceedings commence at 11:53 a.m.)

THE COURT:  (Audio begins mid-sentence) gone 9 to 9:30, 10 to 10:30, 11 to 11:30.  It's been one of those mornings, so everybody runs five minutes over.  And when you're the fifth case, you're 25 minutes behind.  I really apologize for that.

MS. SCHIRCH:  It's okay.

THE COURT:  Okay.  And --

MS. SCHIRCH:  I have a proposed order, Your Honor.

THE COURT:  Sure.  If you would approach the clerk.

MS. SCHIRCH:  Sure.

THE COURT:  There is something in this file.  (Indiscernible).

THE CLERK:  Yes.

THE COURT:  Could I have you look at those?  Those are loose in this file.  Can you help me with that?

THE CLERK:  (Indiscernible) reference and return of service is --

THE COURT:  So does that mean -- to check, does that mean we don't -- I think we do have a return of service.  If we don't, we should certainly attempt to get one or serve her now while she's here.

Did you ever receive paperwork, Ms. Montgomery, serving you with the notice and the order in this case?

MS. MONTGOMERY:  I received the ex parte via -- I



4

think first from --

THE COURT:  When you came to court?

MS. MONTGOMERY:  Yeah.

THE COURT:  We just don't -- we just don't have an official return of service document.  I'm not sure why.

Lynn (phonetic), do you know -- can you pull up, maybe, an acceptance of service?

And Ms. Montgomery, I'm going to -- I'll allow the clerk, while I'm -- while we're going through the hearing real quickly, to just get you a copy of everything that you should get.  I'm not sure if you've received all the information and notifications regarding this case that you should have.

MS. MONTGOMERY:  I think --

THE COURT:  We normally put a packet together to have you pick up at the clerk's office or ask that you come pick it up, if you'd like.

MS. SCHIRCH:  Your Honor, my client says she was served by a sheriff.  He --

THE COURT:  By the sheriffs, okay.  Well, maybe we need to check on that.

MS. SCHIRCH:  The return of service just may not have been filed with the court.

THE COURT:  Okay.  But he --

MS. SCHIRCH:  He doesn't have it with him.

THE COURT:  You don't have the one that's signed by



5

the deputy sheriff?

MS. MONTGOMERY: Your Honor, I think there were -- now that she says that, there might have been two because I think the first one, he had gotten -- there might have been two sheriffs that had come.

THE COURT: Okay.

MS. MONTGOMERY: I'll double-check, but --

THE COURT: Well, yeah, no, I -- all right. I mean you're here. That's what's most important is that you had notice to be here today for the hearing and that you've seen the order. It's just it is part of us keeping our files appropriately. We should have something from the sheriff saying that they served you.

It's not something that would come from you. It's something that they sign, saying, I went to Laura Montgomery's house; I gave her the paperwork for this case. So hopefully, you have it. It's what they sent back to Mr. Morrell that I'm looking for. And if he doesn't have a copy, we could contact the sheriff and see if they have another copy they could provide to us, just -- or make some notation, at least, that we're --

MS. SCHIRCH: I'll look into that, Your Honor.

THE COURT: -- we have a record of service. Okay.

All right. So this is a hearing on an ex parte motion that was filed by the Petitioner, Christopher Morrell.

6

There is an underlying parenting petition in this case.  The parties are the unmarried parents of Keegan (phonetic) Morrell.  Date of birth is 3/14/15.  Back on June 4th, this Court issued an order awarding Mr. Morrell temporary sole decision-making and residential responsibility for Keegan based on allegations made in his motion for ex parte emergency relief.

The first thing I'd like to ask -- and I know the answer but need to ask on the record -- Attorney Schirch, who is here representing the Petitioner, Counsel, do you feel as though your client is still in need of the emergency orders that were issued back on June 4th?

MS. SCHIRCH:  Yes, Your Honor.  And if you take a look at the proposed order that we've submitted today, I guess one of the things the Court needs to know is that the parties are continuing to reside in the same residence right now.

THE COURT:  Okay.

MS. SCHIRCH:  My client doesn't see that as a long-term situation.  But as you know, there's a companion case to this with regards to Ms. Montgomery's older daughter, Emma.

THE COURT:  Um-hum.

MS. SCHIRCH:  And they have been kind of waiting for the order on that case.  And --

THE COURT:  So am I.

MS. SCHIRCH:  And so we're kind of in limbo here,



honestly.  And my client's representation is yes, he does need the orders in place to remain in place.  And certainly, I can tell you that since the Court issued the temporary order, the ex parte order, my client has done his best to ensure that Keegan is not left alone for any more than 45 minutes to an hour with his mother.  My client has taken the steps necessary to ensure that either he is present with Ms. Montgomery and Keegan or that Keegan is -- or that Ms. Montgomery is with her parents when she is with Keegan.  And so he does believe that the current order should remain in place.

THE COURT:  Let me ask.  Any issues of concern since June 4th?  I mean, I understand he's been vigilant in supervising her.  But has he seen or observed any behavior that is of concern on the part of Ms. Montgomery in the nature of what was presented at the time of the filing of his emergency motion?

MS. SCHIRCH:  Well, I mean, Your Honor, there's kind of this ongoing behavior that my client was really hopeful that Ms. Montgomery would obtain some mental health services.  That has not been the case.  She hasn't, to his knowledge, received any mental health services.

So to the -- I guess my client would testify that there have been kind of these continuing episodes of extreme anger, of outbursts, of name-calling.  There have not been any contact with the police since -- Memorial Day weekend was the



8

last contact with the -- that the police were involved.  But he does have continuing and ongoing concerns with regards to Ms. Montgomery's mental health and her ability to adequately care for Keegan if she doesn't have supervision.

Of particular concern is, quite frankly, Your Honor -- I know that you've heard this -- the kind of paranoia and delusions that Ms. Montgomery has experienced in the past, specifically with respect to -- there was a -- I think you recall from the other case, there was a photo of Keegan that was taken at his --

THE COURT:  Um-hum.

MS. SCHIRCH:  -- preschool.  And Ms. Montgomery saw a penis in this photo.  As a result, she kept Keegan out of school for close to two weeks.  Yeah, two and a half weeks.  And so my client feels very strongly that he has sole decision-making so that kind of thing can't happen.  That has not happened since the ex parte has been in place.  But certainly, if it did, with the ex parte orders in place, my client could certainly take Keegan and bring him to school.  And Ms. Montgomery couldn't go -- then go to school and remove him from school and take him out of school.

There has been an ongoing kind -- what my client would characterize as paranoia that -- and unfortunately, this has been somewhat voiced to Keegan that it's my client has taken Emma away from him, away from Keegan -- and that's just



9

not the case -- and kind of portraying my client as kind of the bad guy.  And the person that has caused all of this turmoil in their family and kind of no recognition that Ms. Montgomery has some ownership and it's her behaviors that have caused the family to be where they are today.

And unfortunately, her lack of ability to rectify that by getting some mental health treatment, my client would -- wants the Court to know that's all he wants.  He wants Ms. Montgomery to get the mental health treatment that he believes she needs.  But she seems unwilling and unable to do that, at this time.

THE COURT:  Okay.  Ms. Montgomery, did you want to respond to Attorney Schirch's comments?

MS. MONTGOMERY:  Yes, absolutely.

THE COURT:  Could you stand, please, and just --

MS. MONTGOMERY:  Yes.

THE COURT:  -- raise your right hand?

LAURA MONTGOMERY, RESPONDENT, SWORN

THE COURT:  Go ahead.

MS. MONTGOMERY:  You know, in terms of -- can I -- should I stay standing?

THE COURT:  You can sit.

MS. MONTGOMERY:  Okay.

THE COURT:  In fact, you want to know something? Because I'm looking at my -- I'm kind of half typing, half



10

listening, half looking.  Would you mind moving closer?  Because that way, you actually hit my field of vision, and I can multitask and watch you and listen and type all at the same time.  Thanks.

MS. MONTGOMERY:  So there -- there are a few things I wanted to respond to.  One, in terms of mental health, because that keeps coming up, I was seeing a psychologist, as you know.  And that -- she had dropped me.  I have been in contact since then with the Women's Counseling center of Nashua.  And I'm on a waiting list to go see somebody there.  In terms of --

THE COURT:  I'm sorry.  Hold on.  I want to -- I want to get the name of -- and the name again?

MS. MONTGOMERY:  Women's Counseling center of Nashua.

THE COURT:  Okay.  So you've just basically, at this point, opened a line of communication with them?

MS. MONTGOMERY:  Yes.

THE COURT:  Okay.  Where is that located?

MS. MONTGOMERY:  I think it's -- it's Spit Brook Road, but I think it -- at 116 --

THE COURT:  Oh, okay.

MS. MONTGOMERY:  -- is my doctor, so I think it's, like, 2- or 3-something.

THE COURT:  Okay.

11

MS. MONTGOMERY:  But basically, they were full for quite -- so I'm on a waiting list.  And when this case is over, I'm going to give them a call back and see if I can get in a little bit sooner.

But in terms of the day-to-day care with Keegan, I still do a -- a chunk of the day-to-day care.  I have been left alone for more than 45 minutes with Keegan, unsupervised.  There have been instances where, you know, Mr. Morrell has said that -- or -- or I have been notified that there's somebody that's been watching Keegan and I when we are together.  And I have not heard any -- any of that from Mr. Morrell, because I specifically asked.

So I disagree with a lot of things that have been said about me.  And I have my mental health records with the adjustment disorder that was received and my medical health history and everything else to back that up.  In terms of the day-to-day care for my children --

THE COURT:  Who provided you or who issued a diagnosis of an adjustment disorder?

MS. MONTGOMERY:  My psychologist, Dr. --

THE COURT:  Okay.

MS. MONTGOMERY:  -- Laura Sheridan, or my old psychologist.

THE COURT:  And is that the person who "dropped you"?



12

MS. MONTGOMERY:  Um-hum.

THE COURT:  Can you remind me -- and I know this came up in a previous hearing.  I apologize.  But can you remind me, what was that -- what was that -- the reason behind the termination of that relationship?

MS. MONTGOMERY:  She was getting a lot of calls, emails, or whichever, so from a few different people and was worried that she would have to testify in court.

THE COURT:  Okay.

MS. MONTGOMERY:  And that's not her specialty.  And --

THE COURT:  Okay.  Do you have any document with you from the psychiatrist that provides any sort of a diagnosis?

MS. MONTGOMERY:  I have it from the psychologist.

THE COURT:  Okay.  I'm going to accept this under seal at this point.

MS. SCHIRCH:  Can I have a copy?

THE COURT:  Not right now.  I'm not even sure I'm going to take a copy.  Let me just see what it says.

Okay.  Do you have any concerns about this document being given to opposing counsel?

MS. MONTGOMERY:  My only -- I -- I -- I don't.  My only concern is that, you know, daily, I get the -- I get the I need mental help and I'm -- you know, I have wires crossed and everything.  So I don't want to get into -- if this -- if

13

everyone -- and we all are seemingly aware that this is not going to be a long-term, that living situation, then I don't know why Mr. Morrell needs my -- my medical history.

THE COURT:  Okay.

MS. MONTGOMERY:  He's certainly welcome to ask, and he does when he feels he needs to.  And I answer the questions.

THE COURT:  Give me just a second, please.  You can sit if you'd like.

This is Respondent's A.

(Respondent's Exhibit A marked and received)

(Pause)

THE COURT:  I want you to make one copy and give that to Attorney Schirch.

Let me just note, Attorney Schirch, what I just wrote.  I said, "A copy of which was provided" --

You can give a copy to counsel and then a copy to me and back to her.

See Respondent's A, a copy of which was provided to opposing counsel with the caveat that it is not to be reproduced for any individual, including your client.  It should be kept under seal in your file but may be reviewed by the Petitioner.  Okay?

MS. SCHIRCH:  Okay.

THE COURT:  So he can see it, but no copies out to



14

him.

MS. SCHIRCH:  Okay.

THE COURT:  If people hadn't posted them on Facebook in the past, I would be less concerned.  But I have to respect her HIPAA rights.  And --

MS. SCHIRCH:  Yeah, absolutely.

THE COURT:  -- you can have it for the purpose of knowing what it shares.

Let me say for the record, this is basically a record.  It is what is described as a outline of the nature and limits of services offered to Ms. Montgomery.  It does confirm what she just testified to, which is a diagnosis of adjustment disorder with mixed emotions and then just goes down and lists some individuals who she may seek to speak with with respect to forensic evaluation, et cetera.

So it does, at least for the Court, substantiate the fact that there is a mental health diagnosis in place.  She's not currently treating with Ms. Sheridan, but she has referrals to other services.

MS. SCHIRCH:  Your Honor, I guess just to respond to a couple of things that Ms. -- a couple of the statements that Ms. Montgomery made, with respect to the allegation that my client has left Keegan alone with Ms. Montgomery for more than 45 minutes, that is accurate, Your Honor.  My client would testify that in a couple of instances, he has left Keegan with

Ms. Montgomery -- this was earlier on in the process -- with the oversight of a neighbor, and so -- and my client was in constant contact with him as well.

With regards to, certainly, the allegation that Ms. Montgomery is involved in Keegan's life, that's absolutely true. And my client wouldn't dispute that and obviously wants Ms. Montgomery to remain involved -- actively involved in Keegan's life. Keegan loves his mother very much, and -- but he just wants to make sure that Keegan is safe and that it's a healthy environment when he is with his mother when my client can't be there to kind of oversee things or some other responsible adult.

I don't know, Your Honor, if you want me to go through kind of the facts that gave rise to the ex parte. I know that much of this came up in the other case, in the case with Ms. Montgomery and Mr. Loudermilk. And certainly, one of the things that came up in the course of that litigation that has raised concerns for my client is that apparently, there was a GAL report, which my client has not seen.

And within his understanding through discussions with both Ms. Montgomery and the guardian ad litem is that the guardian ad litem was very concerned that there may be some misuse of Ms. Montgomery's prescription to Adderall. And my client is also concerned about that. He would testify that he's never specifically seen Ms. Montgomery take more pills,

16

but it's not something that he is actively -- he doesn't watch her like that.

And so but certainly, if the guardian ad litem has received information from Ms. Montgomery's medical records and through whatever other sources the guardian had available to her when she did her investigation that raised this concern, that my client is also concerned about that.

THE COURT:  Yeah.  Ms. Montgomery, who, at this point, is overseeing your prescription medications?  Is it just your primary care provider?

MS. MONTGOMERY:  My primary care -- my primary care physician.  And I --

THE COURT:  Okay.

MS. MONTGOMERY:  -- do have my medical records, and there are some inaccuracies in my medical records as well.  So that's, obviously, a -- a bigger mountain to tackle, but I can --

THE COURT:  Okay.

MS. MONTGOMERY:  -- share those as well.

THE COURT:  Okay.

MS. MONTGOMERY:  And that would also be inclusive of billing and things like that, just to --

(Pause)

THE COURT:  Okay.  I think I'm all set.  Let me just ask.  Both parties have talked somewhat generally about this

may not be a long-term situation. Is that that the two of you are basically living together to co-parent, and there's not a relationship here; there may be somebody moving? Are there any imminent plans for that to change?

MS. SCHIRCH: My understanding is -- my client would testify that there's no imminent plans. I mean, part -- but that there's an acknowledgement by both parties that the relationship is over. Ms. Montgomery has been spending two or three nights a week away from the home. The parties don't have much interaction. And quite frankly, what they do is probably not healthy to the interaction in front of their son. Think they would both be better off, and certainly, Keegan would probably be better off if they were living separately.

However, Ms. Montgomery doesn't have a job. She has no source of income. She doesn't have any place to go. And so my client's not going to force her to leave the home when she's got no place to go. And quite frankly, Your Honor, they're kind of waiting to see what happens with Emma. They were a family before Emma was -- primary residential responsibility was transferred to Emma's dad.

And so I think there's some sort of -- I guess what -- I don't know. I mean, I -- from my client's perspective, I think he believes that at some point in the not-too-distant future, they will be living separately. But there's no specific plans for that right now.

18

If that's not accurate, please let me know.

THE PETITIONER:  That was accurate as I can be.

THE COURT:  I understand.  These are situations that's very hard to be accurate about.  It sounds like you guys are in a real ebb and flow.  And to the extent that a lack of a court order has anything to do with that, you have my sincere apologies.  I --

MS. SCHIRCH:  I know.

THE COURT:  Seven days a week is not getting my job done.

MS. SCHIRCH:  It's too much.

THE COURT:  But I communicated with counsel about that.

Ms. Montgomery, what kind of health insurance coverage do you have?

MS. MONTGOMERY:  So right now, I have Anthem Blue Cross Blue Shield.  And that is through Chris's work.

THE COURT:  Great.

MS. MONTGOMERY:  And again, you know, yes, the relationship is over.  No, I don't have a job.  That would be step number one.  And it is accurate that he carries the health insurance and pays for the mortgage and living expenses.  So -- and I do agree that getting out of the house instead of fighting in front of the children is a better idea.

THE COURT:  Thank you.

19

MS. MONTGOMERY:  You're welcome.

THE COURT:  I hope we can all agree on that.

MS. SCHIRCH:  Your Honor, I guess just for purposes of the record, I've raised some concerns that in June of 2019, this letter was given to Ms. Montgomery -- and I'm referring to Respondent's 1 -- by her -- by Laura Sheridan.  And there was a referral to three individual doctors there.  And to my knowledge, certainly, Ms. Montgomery hasn't gone forward and sought the assistance of any of those physicians.

And again, I -- that sort of raises the issue that Ms. Montgomery hasn't really -- doesn't really appreciate where she's at with these concerns and hasn't taken the steps that she needs to take in order to get the mental health treatment that, certainly, my client believes is necessary for her to be the best mom that she can be.

THE COURT:  Thank you.

Two pages of yellow, please.  I need to -- I need to clear things up for just a second, please.  (Indiscernible).

(Pause)

THE COURT:  Okay.  The Court has indicated that there were, in fact, ex parte orders put in place on June 4th of this year.  Today, Petitioner informed the Court the parties are still residing together, but the Petitioner is actively supervising the child and limiting the time the Respondent is alone with Keegan.  There is ongoing behavior of

20

the Respondent that is concerning: anger, outbursts, name-calling, et cetera. So the Petitioner hopes that the Respondent will initiate some mental health services.

The delusional incidents, which appear not to be occurring at this time, but the ex parte orders remain important so that a decision with a negative impact on the child does not take place. The paranoia has continued.

I mean, I agree with Attorney Schirch in that I think sole decision-making, at this point, should remain with the father, again, for those purposes. I don't want any decisions being made that will adversely impact the child. And I think, again, given the custodial orders and the sufficiency of time, it's important to maintain the orders that are in place.

The Respondent has reached out to Women's Counseling center of Nashua. At this time, she's on a waiting list. She's here today with a diagnosis of adjustment disorder with mixed emotions. See Respondent's Exhibit A, a copy of which was provided to opposing counsel, which I explained earlier. I'm not letting her make any copies of that for anybody, other than she gets to keep that in her file so that she has a right to know what, if anything, you've done to address these issues.

I am going to change this. I wrote "she", but I don't want it to be confusing as to whom I'm speaking about.



Ms. Montgomery does not believe she is in need of services. However, the letter Ms. Sheridan provided appears to suggest otherwise. In terms of Keegan's day-to-day care, she has done much of that and claims that she has been alone with Keegan without difficulties. But the Court remains concerned about Ms. Montgomery's apparent lack of insight into her own issues, some of which have affected her children, others that have affected her ability to co-parent.

Court is aware from related proceedings that Ms. Montgomery is using prescription medication Adderall under the supervision of her primary care physician, but the behaviors described by Petitioner here and in the related case suggest that the primary care provider is either unaware or unable to better address her behavioral issues.

COURT'S RULING

THE COURT: This Court believes a comprehensive forensic evaluation, including an assessment of her use of Adderall and other amphetamines or stimulants or other nonprescription medications should be completed. Therefore, I am ordering the following.

That is, Court finds that the emergency orders issued are beneficial to the child and have served to protect him from any harm. Combined with the unknown status of Ms. Montgomery's mental health, the Court will keep the ex parte emergency orders issued in June 4th, 2019 in place.



22

Ms. Montgomery shall seek the completion of a forensic examination, including an assessment for substance use-abuse disorders.  A copy of this Court's order shall be given to her provider.  She may utilize the providers suggested in Exhibit A -- that is the three folks listed here -- or any other qualified provider that your insurance covers.  The parties shall be scheduled for first appearance.  Okay?

MS. MONTGOMERY:  Your Honor --

THE COURT:  Ms. Montgomery, I agree and I agreed when I first read it with what Attorney Schirch just said.  There is nothing in here that says you do not need treatment.  In fact, what this says is it suggests that you may want to talk to some of these other doctors, okay?

MS. MONTGOMERY:  If you may -- or if I may, I -- I have.  I have called them.

THE COURT:  Okay.

MS. MONTGOMERY:  I -- I already have.

THE COURT:  Okay.  And have you done a forensic examination?

MS. MONTGOMERY:  No, they didn't want to do one.

THE COURT:  I'm sorry?

MS. MONTGOMERY:  They didn't want to do one.  A few -- well, and then in bringing on new patients, a few of them were booked up.  But the -- when the forensic evaluation,

23

they didn't want to do them.

THE COURT: Okay. So what you need to do is get in touch with Anthem and find a doctor who will do them. Why, for example, wouldn't Dr. Phillips (phonetic) do an evaluation?

MS. MONTGOMERY: According to my attorney for the case with Emma, he was afraid I would not pass it. And my response to that was, well, why wouldn't I take it, then, just to make sure? Why wouldn't you want to know that information?

THE COURT: Okay.

MS. MONTGOMERY: So I volunteered to take it, and it still didn't --

THE COURT: Well, I need -- in this case, okay, you're unrepresented in this case. It's not that -- I'm not suggesting at all you can't talk to your counsel or get legal counsel whenever you choose. That's fine. But I'm ordering you to have one of these evaluations. And I know of -- because of my position here, of at least two of these individuals who I think are more than qualified to do the evaluation. I don't know why they wouldn't do it for you. But that's why I also said, please provide a copy of the Court order to them so that they know that it's a court-ordered evaluation, okay?

I don't, apparently -- I don't know a Dr. Robbins (phonetic), 893. I'm thinking that might be --

24

MS. MONTGOMERY:  I didn't have a court-ordered eval -- I didn't have a copy for a court-ordered evaluation.

THE COURT:  No, I'm going to give you one.

MS. MONTGOMERY:  Today?

THE COURT:  I just ordered you to get one.

MS. MONTGOMERY:  Okay.

THE COURT:  I'm saying I'm going to give you this order so that you can show it to the doctors.  I would suggest to you, so that you can comply with the Court's orders, that you give them a copy of this.  Say, look, the judge has concerns, and I need to have this forensic evaluation done, along with an assessment for substance abuse or substance use disorder.

Any one of those doctors on the list, other than Dr. Robbins whom I don't know and have not heard of or worked with in any capacity, I'm aware can certainly do for you a forensic psychological examination, okay?  They may refer you out to a second provider or someone who they're affiliated with to do, like, what we call a MLADC, which is a master's LADC evaluation, so someone can talk to you specifically about your use of substances:  Adderall, over-the-counter prescriptions.  We talked about diet pills, amphetamines.

MS. MONTGOMERY:  Um-hum.  Yeah.

THE COURT:  Somebody needs to address that issue, and I need to have an evaluation back, because --

25

MS. MONTGOMERY:  Okay.

THE COURT:  -- if that is -- if that is an underlying problem that's creating some of the anger, outbursts, paranoia, delusions, we need to address that because they're not going to go away.  If it's being caused by a substance abuse disorder that you're not addressing, it needs to get addressed.  And the only way it's going to get addressed is if you get a doctor in there to give you an evaluation as to what type of services you need to address it.  Okay?

And the only -- I'm going to tell you what's going to happen is counsel for your children are going to continue to want to see that you're doing something to address these issues.  And if what you're telling me is correct, that I am reaching out and I'm being put on a waiting list, that's fine.  I don't disbelieve you in one bit.  But get a letter from them, saying we spoke to her on this and that date; we are currently unable to take new patients, but she's on our waiting list.  You want to keep being able to provide us --

MS. MONTGOMERY:  Okay.

THE COURT:  -- with the status, okay?  You might call Dr. Phillips' office, who says he's prepared to do an evaluation; it's a two-day process; he's scheduled you for the 13th and 14th of October or whatever, okay?  You need to have documentation.  You can't just come in to the Court and say,

26

none of these people will do it, because I'm not going to be able to just take your word for that.  I'm going to need something, just like this letter from Dr. Sheridan, explaining that they can't do it, they won't do it, or they're not qualified, or I'm going to expect you to go to somebody else until you find someone.

MS. MONTGOMERY:  Would you take phone records? Because when they -- when you do the initial call, they don't intake you right away as a -- as a new patient.  So, like, if you call the doctor's office and ask if they do the services and they typically call you and ask, you know, why -- why you need them done, so would you --

THE COURT:  Well, let me just say I don't know.  I mean, I can't answer for the behavior of every doctor's office out there.  But I think if you call and explain to them, I'm looking for someone to do a court-ordered forensic psychological exam, and they say, oh, we can't do that or we won't do it, and say, is -- just ask, is there any way you could provide me with a letter, either with a referral, just like this, just saying, Ms. Montgomery got in touch with us; we can't meet her needs, but here's who we referred her to.

MS. MONTGOMERY:  Okay.

THE COURT:  You should be able to get that from them.

MS. MONTGOMERY:  Okay.



THE COURT:  Or you should be able to say, please, this is court-ordered, so could I at least get some record from you that I've contacted you.  I would think they would be happy to type up a two- or three-sentence letter, say, on August 30th, we received a call from a Laura Montgomery requesting a forensic psychological examination along with a substance abuse disorder exam.  And unfortunately, we're not able to take new patients at this time.  Okay?

MS. MONTGOMERY:  Can I ask one more question?

THE COURT:  Why I think it's important for you to have the Court order and provide it to them, because they'll get that you're accountable to the Court.  And we're a court, and we stamp paper for people so when they go back to work, their work asks them to prove that they were really in court. I mean, I think most people will help you out in that regard. I hope that they do.

MS. MONTGOMERY:  Okay.

THE COURT:  I know I would like to think, at least, like I said, I know two of these doctors who appeared in front of me before.  They understand the importance of establishing for the Court that you're trying to comply with the orders, that you're making the effort you can.  They know they're backed up.  They know they may need to have you wait.  So they'll type a little letter to the Court, saying, Your Honor, I'm happy to work with her.  It may not be until the second

28

week in November because I'm booked.  And that's okay, okay?

But I need something from them that proves to me that you are making the attempt to get the evaluation.  And then, eventually, you're going to have to get it.  So if the first three people on the list -- and it's a great place to start -- don't work, you get in touch with Anthem.  And you tell Anthem, here's what I need.

MS. MONTGOMERY:  Okay.

THE COURT:  Okay?

MS. MONTGOMERY:  In terms of the concerning behaviors and the inabilities to parent my children, I -- I just -- I -- I'm hoping to get a little bit more clarity in what particular -- or -- or some kind of actual factual information in terms of that, because I -- I -- I just -- with both of these cases, I'm having a hard time understanding what the -- where I dropped the ball.

THE COURT:  Well, my prior orders have made findings with respect to an incident -- a couple of incidents, I believe, that occurred in May or June involving your daughter, where law enforcement found you to be behaving in a delusional fashion and confused and unable to communicate with them in a rational and logical way, which causes concern for me.  If someone said to me, I have a delusional person; would you like them to babysit your child, I'd probably say, no.

MS. MONTGOMERY:  Yeah, that's a pretty strong



statement, especially if it's --

THE COURT: It is a very strong statement.

MS. MONTGOMERY: -- in a medical record or a police record.

THE COURT: Okay. It is a very strong statement. Regrettably, I'm not a doctor. I can only testify based on what other people tell me. So I wasn't there. I don't observe. I hear evidence, and I make findings based on that, okay? I know, again, as Attorney Schirch pointed out, there was an issue with these photographs that most folks whom you talked to about it were concerned about your response, your behavior, your --

MS. MONTGOMERY: It was really only the fathers that were concerned --

THE COURT: Okay.

MS. MONTGOMERY: -- about those.

THE COURT: Those are other people who are concerned. And I'm just saying, I -- sitting here before me, you're -- you seem rational and oriented to time and place. And that's perfectly fine. But again, if you have a mental health issue, there are people who have panic attacks. They have anxiety disorders that can be triggered under certain circumstances when, suddenly, you don't think clearly or think straight. And if those -- if that occurs, that's not safe for your child. That's what I'm saying.

30

MS. MONTGOMERY:  I'm just --

THE COURT:  I need some confidence that those incidents aren't likely to occur.  I mean, they can happen to anybody, right?  I mean, everybody has their first incident. People who have mental health issues, most people have a first incident that triggers the thought that maybe I've got a mental health issue that needs to be dealt with.

I'm not saying that people can self-diagnose.  I'm just saying that if there's a pattern or if there's a sequence of events that lead me to think that at times you're unable to act calmly, rationally, effectively, it makes me wonder, if her child falls off a bike and breaks her leg, is she -- does she have the mental capacity to act appropriately under those circumstances if she's got an underlying mental health issue or an underlying substance abuse issue, okay?

I don't know the answers, Ms. Montgomery.  I need you to provide me with the answers.  I'm just here to make a determination based on what I hear, okay?

MS. MONTGOMERY:  I -- but I just don't know what proof would -- would be able to -- or that would assist you in making those conclusions.

THE COURT:  Well, that's why I'm ordering you to get a forensic psychological evaluation, having a psychiatrist tell me there's nothing wrong with her and she doesn't have a substance abuse issue or problem.  I mean, I don't know.  Then

31

I guess I don't have a lot of evidence to go on, okay? But I'm suggesting to you that the issues, just this sort of general sense of paranoia, concerns me. Angry outbursts, emotional dysregulation, those kind of things concern me when you have children in your care, when you don't know when somebody's going to, for lack of a better word -- I apologize, but snap.

I mean, the best parents, under the worst circumstances, can be bad parents. We all lose our composure at times. But what I want to make sure is that you don't have a predisposition because of a mental health issue or a substance abuse issue to have it occur more frequently than your average parent does, okay?

But what I've heard over the past couple of months raises enough concern that I think you need to establish that it's not a problem. And that's not simply to satisfy my curiosity. It's to reassure the other parent that their child's safe with you. That's the purpose of this process is to make sure both parents are trusting of your ability to handle parenting without these issues happening.

Nobody wants to leave their child with somebody who they can't be pretty certain that they're going to be calm, stable, not lose control. You've got to be the adult. Children are very subject to losing their temper or losing their control, and the parent has to be the one there to be



32

reassuring and to deescalate situations.  But if that's not something that you possess on a pretty steady day-to-day basis --

MS. MONTGOMERY:  That's what I do every day, so --

THE COURT:  -- we're going to have more issues, okay?

MS. SCHIRCH:  Thank you, Your Honor.

THE COURT:  All right.  Thank you.

(Proceedings concluded at 12:37 p.m.)

33

## CERTIFICATE

I, Cheryl Odom, a court-approved proofreader, do hereby

certify that the foregoing is a correct transcript from the

official electronic sound recording of the proceedings in the

above-entitled matter, to the best of my professional skills

and abilities.


CHERYL ODOM, CDLT-186                    August 27, 2021
Proofreader/Transcriptionist