1

STATE OF NEW HAMPSHIRE

9TH CIRCUIT COURT - FAMILY DIVISION - NASHUA

IN THE MATTER OF:              ) Family Division Case No.
                              ) 659-2016-DM-00288
DANA ALBRECHT,                 )
                              )
          Petitioner,          )
                              ) Nashua, New Hampshire
          and                  ) November 6, 2020
                              ) 11:37 a.m.
KATHERINE ALBRECHT,            )
                              )
          Respondent.          )
_____ )

HEARING ON MOTIONS
BEFORE THE HONORABLE BRUCE DALPRA
MARITAL MASTER OF THE CIRCUIT COURT - FAMILY DIVISION

**REVISED – UNABRIDGED FINAL WITH TIMESTAMPS**

APPEARANCES (All present by video or telephone):

For the Petitioner:          Joseph Caulfield, Esq.
                             CAULFIELD LAW AND MEDIATION
                             OFFICE
                             126 Perham Corner Rd
                             Lyndeborough, NH 03082

For the Respondent:          Michael J. Fontaine, Esq.
                             WELTS, WHITE & FONTAINE, P.C.
                             P.O. Box 507
                             Nashua, NH 03061

Also Present:                Kathleen Sternenberg
                             GAL

Audio Operator:              Electronically Recorded
                             **Not Monitored**

TRANSCRIPTION COMPANY:       eScribers, LLC
                             7227 N. 16th Street, Suite 207
                             Phoenix, AZ 85020
                             (800) 257-0885
                             www.escribers.net
Proceedings recorded by electronic sound recording; transcript
produced by court-approved transcription service.



2

I N D E X

| WITNESS(ES) | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

FOR THE PETITIONER:

| Dana Albrecht | 4 | 40 | 66 | |
| Dana Albrecht (rebuttal) | 126 | | | |

| WITNESS(ES) | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

FOR THE RESPONDENT:

| Katherine Albrecht | 78 | 126 | | |

| MISCELLANEOUS | PAGE |
|---|---|
| Petitioner Rests | 74 |
| Respondent's Opening Statement | 74 |
| Respondent Rests | 137 |
| Matter Taken Under Advisement | 130 |

| EXHIBITS | ID | EVD |
|---|---|---|
| NONE | | |

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

3

(Proceedings commence at 11:37 a.m.)

THE COURT: Good morning, Atty. Caulfield?

MR. CAULFIELD: Yes.

THE COURT: Atty. Fontaine?

MR. FONTAINE: Good morning, Judge.

THE COURT: My name is DalPra. You folks are connected to the courtroom, and we're here on four pleadings. And they both are pretty much -- the first two pleadings filed by Mr. Albrecht regarding a modification of the parenting plan, and the second two pleadings filed by Mrs. Albrecht with pretty much the same requests, modification of the parenting plan.

I'll tell you at the outset that the several hundred pages of exhibits have not been reviewed to date. And for the record, all the exhibits will be marked for identification, and I will make a determination following the hearing as to which documents should be submitted as full exhibits and which aren't. So we won't have any argument on those at this point.

Mr. Caulfield, these are your motions; you may proceed.

MR. CAULFIELD: Yes, Your Honor. I -- I just want to point out that that doesn't clear up the docket as they set forth in Petitioner's --

THE COURT: I don't care whether it clears the docket up or not, counsel. The order that went out said that



4

these four motions are what we're hearing today, and that's what I'm hearing today.

MR. CAULFIELD: Yes, Your Honor. And -- and -- and also, there's a couple of motions that both parties have signed that are sort of in the nature of in limine motions.

THE COURT: Proceed.

MR. CAULFIELD: Yes, Your Honor. Call Dana Albrecht to the stand, please.

THE PETITIONER: I'm here.

MR. CAULFIELD: Okay. Dana, could you raise your right hand, and swear that what you testify to today will be the truth, the whole truth, and nothing but the truth?

THE PETITIONER: Yes.

DANA ALBRECHT, PETITIONER, SWORN

DIRECT EXAMINATION

BY MR. CAULFIELD:

Q Okay. Would you please state your name for the record, sir?

A Dana Albrecht.

Q Where do you reside, sir?

A Nashua, New Hampshire.

Q And are you the defendant (sic) in this divorce and petition to modify?

THE COURT: He's the --

A I am the Petitioner in the --



5

THE COURT:  -- Petitioner.

A  -- divorce.

BY MR. CAULFIELD:

Q  Yes.  And you are also the moving party, the Petitioner, to modify, correct?

A  Yes.

Q  Now, you have -- you have a filed a sworn offer of proof in this case, have you not?

A  Yes.

Q  And if you were to testify, would that be your testimony, sir?

A  Yes.

Q  Okay.  And that -- and that described, basically, why you feel the Court should order this family into counseling?

A  Absolutely.

Q  Okay.  Now, in addition to your sworn offer of proof --

MR. CAULFIELD:  And Your Honor, I -- I guess I need to know if you accept that sworn offer of proof.  If not, I would have my client testify to it.

THE COURT:  I'll need testimony, counsel.

MR. CAULFIELD:  Okay.

BY MR. CAULFIELD:

Q  Dana, direct -- directing -- I'm going to question you on the substance of your sworn offer of proof.



6

A   All right.

Q   So -- so let's start with, how old are you, sir?

A   I'm 49.

Q   Okay.  And what do you do for a living?

A   I'm unemployed.

Q   Okay.  What's your education, sir?

A   I have a master's from Harvard in applied mathematics.

Q   Okay.  And were you married to Dr. Katherine Albrecht?

A   I was.

Q   Okay.  And you're divorced?

A   Correct.

Q   Okay.  And do you have any children?

A   Yes.

Q   Okay.  Could you tell us, please, about your children together?

A   My oldest child is Peter.  He is 23.  He lives with me here in Nashua, New Hampshire, and has for the past couple -- almost couple years, since Christmas of 2018.  My next son is Caleb.  He is currently 20.  I understand that he is with his mother in Southern California due to dorms being closed at college because of COVID.  My next daughter is Sophie.  She is currently age 16, residing with her mom in Sierra Madre, California.  And my youngest daughter is Grace.  She is currently 13, residing with her mother in Sierra Madre, California.  Sophie attends Maranatha High School.  Grace

7

attends Flintrith -- Flintridge Sacred Heart Academy.

Q  Now, let me -- I'm sorry, were you saying something else?

A  No, go ahead.

Q  Oh, okay.  Now, do you have any substance abuse history?

A  No.

Q  Okay.  Have you ever been convicted of a crime?

A  No.

Q  Okay.  Have you ever had a complaint that DCYF determined to be founded?

A  No.

Q  Okay.  There is -- there is a DV restraining order against you, correct?

A  Correct.

Q  Okay.  Very briefly, would you tell us how that occurred?

A  Yes.  I was at the -- putting a pleading to the court. It's still outstanding from over a year ago now.  When that wasn't ruled on, I went to Collinsville Bible Church on Sunday, November 3rd, 2019 in an attempt to see or have some contact with my children, Caleb, Sophie, and Grace, who were attending at that time.  There was no prior prohibition in place for me to go there.  And quite frankly, I am confused why I have a DV because I'm not aware of two events that would



8

cause one to have me (sic).  So I was there for just one day, and I was just trying to see my kids.

Rob Cooper told me I could come back on a different day --

MR. FONTAINE:  Your Honor, Your Honor.  Your Honor, I'm going to object.  This -- there -- there was a extensive trial on this matter.  There was findings and rulings by the Court, which are actually at our -- are part of our exhibits.  This -- this shouldn't be an opportunity for him to retestify and recharacterize his testimony at the previous hearing.  The judge already made findings on that.  I object to this.

MR. CAULFIELD:  Your Honor, one -- once -- the statute talks about someone being a fit parent.  I want to show that Mr. Albrecht is a fit parent.  The only blemish on his record is the second DV that Ms. -- that Dr. Albrecht has brought.  I think he's entitled to explain what happened.

THE COURT:  It sounds like he's trying to relitigate the -- the hearing.  I'm going to be bound solely by the findings of the court in the -- the prior court in that -- in that matter, at this point.  I'll note that the only quote/unquote blemish on his record, as you put it, counsel, is that there was a domestic violence entered against him.  Other --

MR. CAULFIELD:  Thank you, Your Honor.

THE COURT:  Other than that, you may proceed.



9

MR. CAULFIELD: Thank you, Your Honor.

BY MR. CAULFIELD:

Q Now, I want to -- I want to go over, Mr. Albrecht, what your contacts with these children have been over the last several years, to the end of how little your contact has been with these children. Would you briefly explain that to Master DalPra?

A So the date of separation was April 8th, 2016. During the first portion, while they were still in California, I believe it was 38 days total I saw them. They moved out -- they moved to Pasadena September 1st, 2017, I believe. And since Christmas 2018, which is one year and ten months, I have not been able to see them at all. And I don't even know what phone number or email address I should even use to reach out to them.

Q Have you made any attempts to see these children?

A Absolutely.

Q Could you -- could -- could you -- could you go over the attempts that you've made to see these children? And if you -- and if there are any exhibits that you filed in this case that -- that refer to your testimony and supports your testimony, could you please reference them?

A Yes. So first, I'd like to reference what I refer to as exhibit group B, which are Exhibits Number 7 through 28.

Q Okay. One moment, please. I need to slide over to my



10

PC to bring that up.  So this is -- this is your -- this was your first exhibit list?

A  Yes.

Q  And what group is it -- would you tell me what group it is again, please?

A  Group B, starting with Exhibit 7.

MR. CAULFIELD:  Your Honor, do you -- are you -- are you going to be looking at these now or just making notes, or should I wait for you?  Or what should we do?

THE COURT:  I have them with me.

MR. CAULFIELD:  Okay.

BY MR. CAULFIELD:

Q  So what -- so continue, Mr. Albrecht.

A  Okay.  So January 15th, Exhibit 7, you requested, I believe twice, for the kids to come out here for their spring vacation.  We provided even forms for unaccompanied minors for Grace's travel.  We never received those back, and the kids did not make it on the plane.  That's starting with their spring vacations.

When we get to summer -- hang on.  One moment here.  So that's starting with Exhibit 8.  I'm very frustrated because the kids were here at camp, at The Wilds of New England --

MR. FONTAINE:  Your Honor -- Your Honor, this is Mike Fontaine.  I object to this.  This -- this was litigated



(973) 406-2250 | operations@escribers.net | www.escribers.net

11

at length before you at a motion hearing regarding the December -- Christmas -- the December 2018 Christmas fiasco. And the -- the -- this information is going back in time. This is -- you -- you made orders and you made findings in your orders at -- after that motion hearing pertaining to the December incident that took into account all these same arguments.  He's rearguing this case and attempting to reargue these points all over again, and they've been litigated before you.  It's wasting your time and our time having to listen to this all over again.

THE COURT:  I'll allow it as --

THE WITNESS:  We never discussed the summer of 2019.

THE COURT:  I'll allow it as background, counsel.

Please continue.

MR. CAULFIELD:  Thank you, Your Honor.  Thank you, Your Honor.

A   In the summer of 2019, my children were in New England at The Wilds of New England associated with Collinsville Bible Church.  I didn't know that.  So Exhibit 8, Atty. Fontaine wrote a letter that didn't include that information.  And because I was unaware and we notified them I wanted parenting time, we, meaning Peter my older son and I, flew out to Southern California in an attempt to exercise our summer parenting time from July 31st, 2019 through August 14th, 2019. That's two out of the four weeks that the Court awarded me.



12

After we got there, we were very shocked to learn that Katherine had put them on a plane before I even left and sent them to the east coast.

She told the Sierra Madre police -- one moment -- that their father does not know. That would be Exhibit 40. So even before I got there, she told the Sierra Madre Police that I didn't know they were in camp. And that's why I went, in an attempt to see my children per the Court's parenting plan.

Should we move onto --

BY MR. CAULFIELD:

Q   I would -- I would -- I -- I -- I would move on, yes, rapidly; as rapidly as you can, but still prove the case. Yes.

A   Okay. So -- so when we got back -- so again, this exhibit group B, it's the chain of correspondence between attorneys. I missed the email that's Exhibit 9 or 10 at the time. They were alleged to be sent by my daughters. Those were sent while they were here at Collinsville Bible Church, so I actually didn't see those before I left.

Q   If may -- if may -- if I can maybe, Mr. Albrecht, you reference --

A   Yes.

Q   -- the -- the attempts that you sought to exercise the parenting rights that Master DalPra gave you, the -- the attempts --



13

A    Okay.

Q    -- in other words, that -- that may well be an exhibit.  And then what your result was, and then I think you could just reference the exhibit and Judge -- and Master DalPra can -- if he wants to, can look at the letter and learn more.  I -- I think that's --

A    Okay.

Q    -- probably sufficient and it would help you move --

A    I --

Q    -- and it would move the business, Mr. Albrecht.

A    Okay.  I tried and failed.  We flew all the way across the country.

Moving on, November -- so moving on.  When I learned that they were out here, we -- or when Katherine brought Caleb, Sophie, and Grace out here, we requested that the Court provide parenting time.  That motion was never ruled on, so that's still pending.  So I wasn't -- and that's when I tried to go to the church Sunday to see them.  So as we know, that didn't work out.

So next up, Exhibit 14, November 7th, we had a request for me to go out to California for a weekend that the Court has awarded I can see them in a reasonable amount of time, ten days' notice, so we did that.  I -- that was 11/7.  The following day, Katherine responded by filing her DV, so that didn't work out.  Or -- I believe that also references me



14

wanting to see them during Christmas, December 27th through 31st, which the Court awarded me.  That didn't work out.

Q  You say "that didn't work out".  What -- what do you mean?

A  Quite frankly, it's my understanding that Katherine was not amenable to that happening, and I actually didn't just get off a plane that time.  I wasted my time the last time I did that.

Q  Okay.

A  And there was also a lot of court pleadings going on at that time.  We -- on December 13th, 2019, we proposed --

Q  Is there -- is there -- is there an exhibit regarding that, Mr. Albrecht?

A  Yes, Exhibit 17.

Q  Thank you.  And it'd be helpful if you reference the exhibits for Master DalPra.

A  Okay.  So Exhibit 17, December 13th, 2019, we tried to get Craig Childress onboard as a reunification counselor.  If there's a relationship problem with my children, I'd like to see a counselor about that.  I'd like to be able to have them see a counselor about that and figure out what the issue is.  So Exhibit 17, trying to get Craig Childress, whom Katherine rejected, so that didn't work out.  Moving on to --

Q  So by -- excuse -- excuse -- excuse me, Mr. Albrecht.  "That didn't work out" --



15

A  Yeah.

Q  -- "that didn't work out", "that didn't work out". You mean that you didn't have parenting?

A  I didn't have parenting and Katherine didn't cooperate.

Q  Thank you.

A  Exhibit 18, we sent a letter quoting that the Court order asking for me to be able to place calls to both Sophie and Grace on phone numbers.  The Court wanted us to work out phones, Skype, and FaceTime with them December 20th, 2019, so close to a year ago.  And Katherine was uncooperative with that and was unwilling to set up any phones, Skype, or FaceTime with Sophie.  So I wasn't even -- was unable to discuss the Christmas holiday period with them.

Exhibit 18, we also offered to travel to Southern California for the weekend of January 11th and 12th, 2020, for parenting time.  And Katherine basically refused to have that happen.

And also notes we gave them, I do believe (indiscernible) any reunified -- reunification counselor, but Katherine was not amenable to that.

Moving on to Exhibit 19, we requested parenting time for the children's spring and school vacations 2020 as awarded by the Court.  I was hoping that my entire extended family -- my Aunt Karen, my cousin Liz, Linda, Karen's granddaughter,

Commented [DF1]: 11:58:08



16

Valerie -- all the people on my side of the family that Sophie and Grace have historically been able to see would be delighted to see them.  I was also hopeful that they would want to spend time with their brother Peter who lives with me.  And Katherine again refused reunification counseling and did not want to follow the Court's parenting plan for those spring vacations.

And the only response we got from Atty. Fontaine was if I wish to communicate with them, it would have to be postal mail only.  And he asked that I send letters and cards, which I did.

Q  Excuse me, Mr. Albrecht; is -- is there some exhibit that supports that testimony?

A  Yes.

Q  Would you tell us --

A  Yes, Exhibit 23 is the card I sent to Grace and Exhibit 24 -- excuse me, the card and letter I sent to Grace, and Exhibit 24 is the card and letter I sent to Grace (sic).

Q  What happened next, Mr. Albrecht?

A  July -- we also asked for the four weeks of court-awarded parent -- parenting time July 8th, 2020 through August 1st, and also August 8th through August 22nd.  We proposed those dates specifically, noting that we were, of course, amicable to alternate dates if those would work better for Katherine.  And we asked Katherine to bring Sophie and Grace



17

to Sierra Madre Police Department, Sierra Madre, California, for a parenting stage, and Katherine did not agree.

Q  Is that memoral -- memorialized in --

A  So I didn't fly out.

Q  Is that memoral -- memorialized in an exhibit?

A  The request is Exhibit 21, and the response from Atty. Fontaine is Exhibit 22.

Q  That's (indiscernible).

| Commented [DF2]: 12:00:55 |

A  So there was some concern whether they actually got that because Exhibit 25 --

Q  Got -- got -- excuse -- excuse me, Mr. Albrecht.  Got what?

A  That the children even got the cards because Exhibit 25, they're signed for her agent, and it's not until almost three weeks later that we get a response from Nadine (phonetic) -- that's Exhibit 26 -- that Katherine said that the girls' weren't received.  So I'm not sure it took them three weeks after they arrived to the girls to get those, but that's neither here nor there.

We next asked on Dec -- on September 18th, 2020, because Katherine rejected our first proposed counselor, Dr. Craig Childress.  We proposed four more; that's Exhibit 27.

Q  So what -- excuse me for one moment.

A  And --

Q  Excuse me one moment.  So you -- you proposed a Dr.

18

Craig Childress.  Now, is -- is -- how did you find him?

A  I simply went on the internet looking for who I thought was the best qualified person in the immediate geographic area.  So -- which is in --

Q  Okay.

A  -- Claremont --

Q  And so --

A  -- you know, (indiscernible) California.

Q  Okay.  And Dr. Albrecht rejected him?

A  Correct.

Q  Now, did -- now, you propose some other people?

A  Yes.  So again, we're on Exhibit 27 where we proposed Carey Edwards, attorney (phonetic), Renee A. Cohen, Ph.D., Lynn Steinberg, Ph.D., and Alan Yellin, Ph.D.

Q  And -- and --

A  I --

Q  And excuse me for a moment.  And are their curricular vitaes and their fees set forth in the exhibit?

A  Yes, I was just --

Q  Not the exhibit --

A  -- about to get there, that their CVs are set forth in Exhibits 1 through 5, one CV for each reunification counselor. And Exhibit 6 is their fees.

Q  And what was Dr. Albrecht's response to these additional five reunification therapists you proposed?

Commented [DF3]: 12:02:25

19

A  She did ask for fees, which she provided.  After that, we attempt --

Q  You mean -- you mean, their -- you mean -- excuse me; you mean their fees, correct?

A  Their fees, yeah.

Q  Okay.  Gotcha.

A  But after that, repeated requests, I believe, through counsel, did not get any response back from her on those.

Q  I see.

A  So that would be -- I would refer the judge to my Exhibit 28, which is the email chain of us attempting to get a response.

Q  Regarding these five additional reunification therapists?

A  Four additional after the first one --

Q  Oh, I'm sorry.

A  -- was rejected.

Q  I'm sorry, yes.

A  Yeah, so five total with the (indiscernible).  So we've got no cooperation on getting reunification therapy for the kids.  Does that answer your question?

Q  I -- I think so.  So now -- so -- so now we'll pose another one.  One of the issues brought -- brought up in this case is the children's teeth.  And from --

A  Yes.

Commented [DF4]: 12:04:14

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

20

Q -- the pleadings -- from the pleadings, I'm sure the Court will notice that Dr. Albrecht is -- is blaming you for the children's teeth and, I believe, wants to take away joint medical deciding ability from you, if I remember correctly. And you're blaming her for the teeth and saying she's not cooperating; is that a fair statement?

A That's a fair statement.

Q Okay. Could you please tell Doc -- could you please tell Master DalPra your position as to the children's dental needs and what has been happening with them?

A One moment, let me find the relative (sic) exhibits. So I would characterize my position is I've agreed to all medical and dental care that Katherine has proposed with a single exception. So we had an -- I'm going to cover teeth and vaccinations at once, if you don't mind?

Q I don't mind.

A Okay. So Exhibit 89 represents an agreement that we had to obtain a vaccination schedule in writing from Dr. Greenberg. Exhibit 87 is Katherine's proposing Dr. Greenberg. So she proposed Dr. Greenberg; I accepted; we had an agreement. And after that agreement was violated by Katherine, I did not consent to start over with Dr. Hanif. Quite frankly, given the amount of trouble that caused, at this stage, I -- I would reconsider. But anyway, the different tracks that Katherine --



(973) 406-2250 | operations@escribers.net | www.escribers.net

21

Q  Excuse -- excuse -- excuse me, Mr. Albrecht.  What do you mean the --

A  Yes.

Q  -- agreement was violated by Dr. Albrecht?

A  So we agreed that Dr. Greenberg was going to provide us with a schedule for vaccinations.  Now, I don't care where the kids actually get them, but after spending two or three hours on the phone with Dr. Greenberg together going over that, I'd at least like to get the vaccination schedules in writing.  At that point, we can go to Walgreens and get it for free; I don't care where we go.  But there were real medical issues that she had to address, and the schedule was not the usual one.  And she never even got either kids for a single appointment.  You know, what's an appointment cost, a couple hundred bucks?  For a single appointment so we could get that schedule so we could receive the total visit.

Q  Mr. Albrecht, you mentioned -- so -- so you said there were real medical issues regarding getting the kids vaccinated.  Would you explain that to Master DalPra this morning?

A  Yes, there is a family history of allergic reactions. That is the only time I have ever been admitted to a hospital was ICU 20 years ago when I had a reaction to vaccines.  What that means is I'm not opposed to them.  I just want the doctor who's doing this to be well aware of that and to give them



(973) 406-2250 | operations@escribers.net | www.escribers.net

22

separately, not all at once, on a schedule that takes that into account.

Q  So you -- so you feel that this is -- I --

A  I feel that we worked that all out, and then it got canned.

Q  Okay, all right.  All right.

A  And it got canned over failure to want to spend a couple hundred bucks on one more appointment.

Q  All right.  Please continue.

A  So my greater concern for the children is their dental.  She's resisted, canceled, and changed appointments since the beginning of this case.  So if I may refer to Exhibit 92.  This is way back in the first DV where I set up an appointment with Dr. Cheifetz for Grace, needing an exam and X-ray.  I paid for that in full in advance on my credit card.  And when she took Grace there, she refused to have a cleaning done.  If I wasn't under a DV, I would have taken Grace myself because I normally, throughout the marriage, was the one who took these kids to the dentist.

Q  This -- by this -- when you mean "under a DV", you're talking about the temporary orders of the first DV which was with the -- the DV was eventually dismissed, correct?

A  Right.  So the first one --

Q  Okay.

A  -- had me required to go to the church; the second one



23

prohibited me from going to church.

Q  Okay.  So that -- so those are the -- so when you say "under the DV", you mean the temporary orders on the first DV?

A  Temporary, yes.

Q  Okay.

A  Yeah, so back in 2016, we -- we had this going on already when Katherine -- when we start to schedule dental appointments, and basically Katherine's not getting them there.  The response --

Q  You --

A  -- we got from --

Q  Excuse me.

A  -- Atty. Font --

Q  Excuse me.

A  Yes.

Q  Excuse me just one second.  I'm sorry to interrupt you, but I want to -- just want to ask you a question.

A  Sure.

Q  So before -- before you were removed from the household ex parte way back when, who used to --

A  Yeah.

Q  -- handle the -- who used to handle the kids' dental needs?

A  Me.

Q  Okay.  Continue, please.



24

A  So after that, Exhibit 93, Katherine believed that these -- says these are not essential appointments.  They also got cancelled for Sophie and Caleb, so that's why they didn't get there.  So starting out with cancellations of appointments I make.  So yeah, she cancelled the appointments for Sophie and Caleb with their dentist, Dr. Machell, on July 26th.

Exhibit 94, we put Katherine essentially on notice; that's your letter to her that you were expecting regular dental care for the kids every six months.  Again, I never hindered any dental or orthodontics appointment she set up.  That Katherine (sic) has gone over a year in braces, about 15 months without any cleanings and exams.

Q  Who -- who is -- who is not -- start over again.

A  Sophie.  Sophie --

Q  Okay.

A  -- went over a year in braces without any cleaning or exam at all, and she wound up needing two crowns.  Grace has gone 15 months without any appointments whatsoever, and that resulted in Grace having 11 cavities.  It required full general anesthesia.  It cost $2,550.  That's my Exhibit 32.  And Katherine didn't even -- hasn't even submitted that bill to insurance.

So there's one other exhibit here.

Q  Now, in --

A  Oh, and she -- yes.



25

Q  I -- I was -- don't mean to interrupt you, but some of the pleadings in this case allege that you've been spiting the dental appointments by sending threatening letters to -- to the providers or something.  Could you address that, Mr. Albrecht?

A  Yes, one moment.  Let me find the appropriate exhibit here.  So if we can go to Exhibit 84.  This is a letter I sent to Hastings Ranch Dental Group in Pasadena.  And to summarize it, it's just to let them know that I'm dad and to provide them with the parenting plan, and all I ask they do is to update their records with my name and contact information.  And I thanked them for the care they've provided my daughters.  I think they were surprised to learn that the kids had a dad, but the letter's polite.  It's Exhibit 84.

The one other letter I sent Hastings Ranch is Exhibit 85 in which I'm making an effort to get them all of Grace's dental records from her prior providers.  I just thought that her current dentist should have all of the old records, that it's in her best interest.

And I'm very disappointed -- I will direct your attention to 87 -- that this is characterized as harassing them and that these letters were legal threats.  I don't think --

Q  So did you -- did you --

A  -- they're legal threats.



26

Q -- did you mean them to be threats?

A Not at all. I meant them to let the kid -- the dentist know that the kids had a dad, what the parenting plan is, that I have no objection to their treatment, and oh, by the way, here's their prior providers so you can even get all the old records so you can treat them better.

Q And exact -- and exactly which is said to the -- to the dentist is memorialized in those exhibits?

A Yes.

Q Okay. Now, is there anything else concerning -- before I move onto something else, Mr. Albrecht, is there anything else concerning the children's dental and medical issues that you think are important for Master DalPra to know?

A Yes, I would refer the judge to Exhibit 96, which is an --

Q What is that?

A -- email chain. It's an email chain. It -- it starts where I email Katherine. She's always unwilling to respond directly. I always continue to try. It goes to you; it goes to her counsel. But the bottom line is we're just trying to make sure we've got a list of all the dentists. And it went for over a year, and my (indiscernible) you never responded, even February this year, we asked again, and we've (sic) never responded. So the point is, is when we just ask some reasonable questions about who the children have even seen, we

Commented [DF5]: 12:15:44



27

get silence.

The last -- I think if I can just say one more thing on this issue, I think the issue -- and I refer the judge to Exhibit 62, which is her admissions, is we've got a pattern where we're (sic) misrepresenting to schools and the kids' providers that I don't have custody, and -- or any kind of legal decision at all, that I'm just not in the picture. And when the providers find out, they kind of scratch their heads, but I -- I don't have any issue with them treating the kids.

Anything else surface?

Q  Well, since you brought up the school, why don't we segue into the school because that -- that's another issue that's been raised by both parties' pleadings. You mention -- you -- you were saying, regarding the dentist, that Dr. Albrecht doesn't let these -- the provider know that you even exist. Have you experienced that same issue concerning the schools?

A  Yes. So it's --

Q  And tell us -- can you tell us about that, please?

A  Yes. So -- so Katherine, without any input from me, submitted an application to (sic) Grace to Flintridge Sacred Heart Academy. If I may refer to that henceforth as just FHHA (sic) or Flintridge, we'd all be happier. So that school application here is Exhibit 29. And if I may direct your attention to page 4 of that exhibit, that's the information



28

she provided for me.  She said I'm not the custodial parent, that I don't have legal custody, that I'm not responsible for any school-related decisions, I'm not responsible for any communications, and she doesn't even provide any contact information for the -- the school to be able to contact me.  The issue's, you know, again, so that leaves the school in a state of confusion.

I would also direct the Court to Exhibit 62 with respect for admissions in which she basically acknowledges that she did this.  So again, that's Exhibit 62, admissions 42 through 53.

Going specifically to 53, again, admission 53 on Exhibit 62, the issue here:  we're in the age of COVID and everything is being done remotely.  We're also in an age where it's customary for parents just to be able to log on to see there is assignments, to get their grades.  This is standard.  I'm able to do it for Sophie.  I've been able to do it for Sophie and Grace since day one.  Flintridge Sacred Heart customarily provides online access for this.  They've never not done it.  I mean, aside from a termination of parental rights, they've never not done it.  I think they are confused, and they're in a very hard place now because I have to email them manually.  They have to go into the system, they have to print it out, and then they have to send back the request because they've got to -- they need to provide me with what --



29

the school records, and we're putting them in the middle.

So I guess --

Q   Excuse me.

A   -- it's Katherine's position that I'm not -- that she wants me to be different from all the other parents and not have access to this and to have to email the school, have the school go into it, print it out, send it to me, and it's just causing everybody a lot of headaches.

Q   All right.  And -- and concerning that issue with Flint (sic), did Master DalPra grant Respondent's verified expedited motion concerning that issue, prevent -- preventing you from access to Flint (sic)?

A   It was granted as a temporary order, which is why I had to email them and have them print it all out for me.

Q   And so it was -- it was -- it was --

A   But it's per the order.

Q   It was granted by Master DalPra; it says granted on a temporary basis?

A   Yes.  So I'm hoping we can vacate that so the school doesn't have to do it for me.

Q   Okay, okay.  Now, is there anything else concerning the school issue that you wish to testify about?

A   No.

Q   Okay.  Now, you did file a written offer of proof, and Master DalPra said that he -- he wishes oral testimony.  So in



30

that written oral -- offer of proof, I think you told the Court what you feel you're missing in the children's lives and what the children are missing not having a dad; is that correct?

A  Yeah.  So if I can just --

Q  Could you -- could -- could -- could --

A  Yeah, sorry.

Q  Yeah.  So -- so -- so could you please tell us that, what you -- why you feel the children should have a dad, why you feel you should be in the children's lives and what you've missed by the fact that you haven't seen your children, what is it, about two years now?

A  Yes, two years --

Q  Okay.

A  -- close to two years in fall; it's close to four years for any kind of normal relationship.

Q  Okay.  So how --

A  Before the divorce, and I'm going to talk about Caleb, Sophie, and Grace because Peter lives with me.  He's not the issue.  Caleb, Sophie, and Grace had me, I'm a dad.  I drove them every week to their piano lessons.  I was a former pianist myself.  I helped them practice.  I played music with them.  I played the duet parts with them.  They played music for me.  The last time we got to do that together was at my dad's house in San Jose and that's the ghetto I grew up in.



31

And that's close to two years ago.  And I respect Katherine, she's got lots of talent, but that's not something she can do. She doesn't play an instrument.

I mean, I was the dad.  I drove up to New Hampshire Hills.  Got the house club in Milford, New Hampshire here, as the Court is unfamiliar, and I went swimming with them.  All four of the kids were on the swim team during our marriage, and I'm the one who took them and did all the swimming with them.  And I understand that Sophie is on the swim team now at Maranatha High School where she's going, and I've never been able to be there for that.  I used to be there for all her competitions, but I've never been -- before the divorce, I went to all her swim meets.  But -- and saw her compete and I've never been able to see Sophie compete since the divorce.

All remarks either -- them or myself.  Peter, again, he lives with me.  We do distance open water swimming at Walden Pond practically every week regularly.  Caleb has even been here for that.  It's been a while since he doesn't live with us.  And I've never been able to take Sophie and Grace. They were -- I used to do that with them and before the divorce.

I regularly took them camping, and I took them on outdoor hikes.  And in particular, we used to go together as a family with my dad, that's their paternal grandfather.  We went to our family property in Northern California every



(973) 406-2250 | operations@escribers.net | www.escribers.net

32

summer with the kids on vacation.  And there is an exhibit relative to that.  I'd like to direct the judge to Exhibit 76.  And --

Q  What is that, sir?

A  That's her -- Katherine's first request for admissions, and it's very long.  It's relative to the vacation.  I'm directing to just answers 35 through 41.  And that's just to establish that we're all on the same page, that summer of 2015, I took the kids on their normal vacation for two, two-and-a-half weeks, whatever the dates are, while Katherine stayed home in New Hampshire.  So again, that's something I was always able to do.  And we've only been able to do that once since the divorce.  That was two weeks in the summer of 2018.  And those two weeks were the longest period of time I've had with my daughters for over four years now.  Other than those two weeks, I've never seen them more than five days, and even that's just a couple times.

But, you know, moving on.  Before the divorce, I read out loud to them in bed every night.  I'm guessing four years now, they've outgrown that.  I haven't.  If they're still inclined, I still would, but you know, that was the life we had.  I read to them in bed every night.

Before the divorce, I made all the family meals for holidays, and Thanksgiving, Christmas.  And the last time we had that together was our Christmas dinner at my dad's house



33

for Christmas 2018.  If we --

Q  Do you have any photographs of that?

A  Yes.  One moment, please.  I would direct the Judge to -- Exhibit would be -- there's two sets of photographs. Exhibit 47 is the first batch taken from 12/23 through 12/27. And Exhibit 48 is just an email from Dr. Albrecht's is in the middle chronologically, just to be chronological.  And then the next set of photographs is Exhibit 49, which were taken on the 31st, where I'm opening the last presents they gave me, and we're altogether at the airport.  And Grace is hanging out watching TV at my dad's house.  And that's the last I've ever been able to see them.

And again, that's when Peter also came back with me and moved to New Hampshire after that.  So he's been okay for those two years, but it's the other kids.  And there's pictures of the dinner there, if anybody cares, but the point is, is I'm always the one that made it.

I heard from Caleb that last year, they did get to go out and eat at a super nice place, so I think that's what -- I'm glad they got to go out to eat at a super nice place.  At the same time, that's not the traditional homecooked meal that I always make --

THE COURT:  *[Whispered] Who gives a fuck?*

A  -- that they were used to.  So it's just sad for me.  Again, just a basic, they probably miss the traditional



34

one too.

Other stuff I think of, I helped them with their schoolwork. And what I mean by that is the actual concrete details. Caring in the individual math problems, actually looking at what they've written, you know, for English, help them edit to the degree that's ethical and it's still their own work. And I haven't been able to do that since the divorce. And even finding out what Grace's daily schoolwork is now -- is problematic because why -- it's within my rights, I guess, to email whatever teachers every day and ask, that's obnoxious to them, they don't want to deal with that. They're used to having the parents just log onto the system and look. But when I have emailed their teachers, they've responded. I mean, I just don't want to do it regularly and put an undue burden on them. So it's hard losing the kids. Or I guess, losing all but one. So again, I have Peter here close to two years now.

I'm just thinking of other stuff I've missed. The only pictures I have of Caleb, Sophie, and Grace are from when they've been with me. I don't get any pictures from when they're with Katherine. Grace was 10 when she lost -- when she lost her dad. She's 13, almost 14 now. So just a few pictures I have during the very minimal parenting time, almost nothing the last two years.

BY MR. CAULFIELD:



(973) 406-2250 | operations@escribers.net | www.escribers.net

35

Q  Excuse me.

A  I guess, Sophie --

Q  Excuse me.

A  Yes.

Q  Excuse me, Mr. Albrecht.  You're telling us that Dr. Albrecht has never sent you a single picture of the kids in two years?

A  Correct.

Q  Okay, thank you.

A  So, you know, one minor spot in that, so when Grace had her eighth-grade graduation from Gooden, I just clarified to the Court that Grace was -- last year, was in Gooden School, which only goes through eighth grade.  This year she's at Flintridge, which is ninth through twelfth.  So this spring, Peter and I, her brother, are in our living room. We're sitting on the TV, we did get to see her graduation because it was broadcast live on Zoom.  So Peter and I are sitting on the couch together watching it.  Again, a little rough because while we can see it, there was no mechanism to communicate anything back to Grace.  And that's nobody's -- that's not the school's fault, a million parents, you know, going back in to that.

Forgive me, I probably misspoke about a million parents because it's actually a very, very small school.  But still.  So just, you know, that once I got to see how much



36

Grace has grown, you know, how she's matured, how she's becoming a young lady, but I haven't been there for that. She doesn't have a dad for that.

The one thing I did notice at her graduation is she seems very quiet and withdrawn. So what I point out is, again, this is a very small school and during that ceremony, the teachers were able to devote, you know, maybe five, ten minutes per student, just talked about the students. And what they were like, and what they appreciated about each student, and just a really nice human. And the thing that struck me is that Grace's teachers really couldn't find much to say about her, other than she worked very hard and was a very thoughtful young lady. So again, she struck me as very withdrawn. The teachers didn't talk about her outside interests, dreams, hobbies, much even about her friends, and they were talking about these sorts of things for all the other students. And this was sort of a very bland about Grace; a good student, thoughtful, pleasure to have in class, so these very nice things, but so generic.

Q  Are there any other -- you of course, Mr. Albrecht, set this out in the -- your offer of proof. Is there a -- since we're limited -- we're limited, is there anything else very relevant that you want to talk about on this issue?

A  I just thought -- I understand that they participate in band and orchestra, that they do plays. I never got to see



37

Grace play Gertrude in Hamlet.  I never got to see her perform in Romeo and Juliet the year before that.  When you see a brief mention of her report card, you know, it's hard to remember stuff.  When you see it live, you remember the rest of your life.  I've never been there for that.

Even miss going with the kids to church.  I know there's issues with the church now, but that's something we always did as a family.  And the last time I got to go to church with them was Christmas 2018 in California.  I get to go every Sunday, even every Monday I would be there to our new church, but --

Q  Let me –

A  -- even to pray.

Q  -- let me -- these things, of course, are very important, but again, we only --

A  Yeah.

Q  -- have a limited amount of time.

A  Okay.

Q  So let me -- so let me bring you to some other issues.  So you --

A  Sure.

Q  -- you're asking the -- I want to discuss specifically what you're asking the Court to do.  And of course, in your answer -- because you've read the pleadings, you understand that Dr. Albrecht's position appears to be "I can't get the



38

kids to do it"?

A  Right.

Q  So you're going to address specifically what you want the Court to do, and how you think it's going to play out.

A  Well, so specifically, this is a fractured family.  I think we even have issues between Peter and the younger siblings in which -- but the bottom line is these kids need counseling.  These kids need reunification counseling with their dad.  To the degree there's an issue with the relationship between me and them and Sophie and Grace, we need a professional who has dealt with these kind of things before.  It's all over the CVs in the exhibits we've already referenced.  And so we're really just looking for the Court to get some cooperation or even compel Katherine that -- to cooperate with therapy for myself and the kids together with a qualified reunification therapist.

Does that answer your question?

Q  Well, sort of.  What are you -- so how do you -- what do you do when you're going to, as I'm sure shortly hear, "I can't get the kids to do it"?  What's your position?

Hello?  Oh, okay.

A  Yes.  Yeah.

Q  I thought I lost you, okay.

A  Well, so we've gotten -- Katherine has been able to get the kids to her own therapist.  So her therapist was



39

Cherylynne Berger that she treated with. And Katherine also -- oh, I forget her name, the other one she treated with. Katherine also got the kids to go there. So if Katherine gets the kids to go to her treating therapist, I can't imagine why she couldn't get the kids to go to a therapist that we -- the Court selects or that is involved in reunification.

Q  Do you anticipate that these children are compliant, that if Katherine were to say, "I'd like you to do it," that they would do it?

A  Yes.

Q  Okay.

A  If she wants -- I think if Katherine wants the kids to go to this therapy and I think if Katherine wants this relationship to be repaired, I would anticipate that these therapists would be doing a bang-up job of that, so we'd be miles ahead of where we are now.

Q  All right. Mr. Albrecht, I don't really think that I have anything more, unless you feel like I've forgotten something. So I'm inclined to let Atty. Fontaine inquire. Would that be a fair thing for me to do, Mr. Albrecht?

A  Yes.

MR. CAULFIELD:  Turn it over to Atty. Fontaine.

THE COURT:  Cross-examine.

MR. CAULFIELD:  Your witness.

MR. FONTAINE:  Thank you. Okay, Judge. Am I okay



40

to go forward?

THE COURT:  Yes.

MR. FONTAINE:  Okay, thank you.

CROSS-EXAMINATION

BY MR. FONTAINE:

Q  Mr. Albrecht, you testified -- you made a statement, "To the degree there is an issue between me and the children."

A  Yes.

Q  Do you recognize there's an issue?

A  Yes.

Q  You admit there's an issue?

A  I think -- what?

Q  Do you admit that there is an issue in your relationship with your two girls?

A  Yes.

Q  As you recall, at a 2019 extensive hearing, hearing testimony at length about how your pair of girls felt about the Christmas break 2018 visit with you?

A  I recall hearing testimony.  I can't characterize it as to the length.

Q  Do you recall that it was testified that the girls, as well as Caleb, your now over 18-year-old son, were very, very troubled with your behavior at the December visit?

A  Excuse me, whose testimony are we referring to?

Q  The testimony of Katherine in describing the



41

children's reaction to the visit of 2018.

    A   Yes.

    Q   And you understood from that testimony, did you not, that the children were very bothered by the fact that you had not allowed them to return on the day that was specifically agreed to?

    A   I understand that Katherine said that's what they said.

    Q   Okay.  So you have not acknowledged that your children were troubled by that, are you?

    A   I acknowledge they were troubled, but under any normal circumstances, spending a weekend where they wouldn't want to be, they may be annoyed, but they would quickly get over it. That's what normal kids do if they spend a weekend where they don't want to be, they're annoyed and then they quickly get over it.

    Q   How has your relationship -- because you've talked about Katherine and her alleged control over the girls.  How has your relationship been with Caleb since that December visit in 2018?

    A   My -- excuse me, my relationship with Caleb in 2018 or now?

    Q   How has your relationship been with Caleb since the visit of 2018?

    A   I believe it's deteriorated.  If I may refer to some



42

texts?

Q  No, you may not, sir.  You can answer the question I ask of you, which --

A  Okay.

Q  -- you've already done.  You -- you, in fact, were told by Caleb that he was very upset with your behavior during that December 2018 visit, didn't he?  Did he --

A  No.

Q  He's never told you that?

A  If he has, I don't recall.  The last thing I recall him referring to on visits was at the church on November 3rd. I don't recall Caleb and I discussing Christmas after Christmas happened.

Q  Do you recall -- let's move on.  Do you recall the incident with regards to The Wilds of New England summer camp?

A  So one moment here, because there's been a lot of stuff at The Wilds.  So we've got --

MR. CAULFIELD:  So excuse --

A  -- tickets -- 77 proof -- on the --

MR. CAULFIELD:  Excuse me.

THE WITNESS:  Yes.

MR. CAULFIELD:  Excuse me.  This is Atty. Caulfield. Perhaps Atty. Fontaine could tell which visit he's talking about?

THE WITNESS:  Yes, because there's been so many.



43

BY MR. FONTAINE:

Q   In the -- in the -- in the late July going into August of 2019, the children attended the Wilds of New England summer camp; isn't that correct?

A   That's my understanding.  I'm not sure why Katherine denied that on her admission, so.

Q   Your understanding was that you, in fact, attempted to contact your children during that visit when they were at the Wilds of New England summer camp during that late July through August?

A   Indirectly, yeah.  I attempted to contact the camp.

Q   You also filed a DCYF complaint, or a department -- I don't have it in front of me right now, but Department of Children and Family Services complaint in late July of 2018, didn't you?  2019.

A   If you're referring to L.A. DCSF, then yes.  And for everybody's clarification, it's DCSF in California and DCYF in New Hampshire.

Q   And you filed the complaint in California while you were in California, correct?

A   Yes.

Q   And was that the same time that you claim that you went out to visit with your children?

A   Yes.

Q   And isn't that the same time that Katherine's mother



44

passed away?

A  Yes.  I was not aware of that at the time though.

Q  So while you were out there for the purpose of visiting with your children, instead you sidetracked and went to the Department of Children and Family Services in L.A. and filed a complaint with them?

A  Well, the first thing I did when they weren't there is I went to ask them simply what they thought I should do.  I did not file a complaint at all, I just said I'm here to see my kids, they're not here, what do you recommend.  They said, we recommend that you go talk to Sierra Madre police.  So Sierra Madre -- and then come back and talk to us.

Sierra Madre police went out there and, again, that was the first I learned that Katherine took them to the other side of the country.  After I learned that, I forget what night it was, L.A. DCSF did call me.  They wanted -- and I went and met with them and they wanted more information on what was going on.  One other thing --

Q  And this -- what --

A  Let me just finish.  In terms of contacting them, I also in --

Q  I didn't ask anything about the police.  I didn't ask anything about the police, sir.  I'll ask that --

A  Okay.

Q  -- in a separate question.



45

A    Okay.

Q    And also briefly.

A    Okay.  So I did let them know I'd had concerns about their dental, and when they asked what I wanted them to do I said I just wanted them to make sure that they were -- were okay.

Q    And you're -- and you're fully aware that they were, in fact, contacted by the Division when they were at a summer camp, are you not?

A    I believe I -- that sounds right.  But I -- I only had gotten the records last week so it was unclear to me, you know, what they did in terms of trying to contact the kids.  I didn't have the records.

Q    Now, so let's be clear.  So you were aware that they, in fact, contacted the children.  And in fact, you filed this complaint while you were out there supposedly for purposes of visiting with them.  I --

MR. CAULFIELD:  Objection to the "supposedly".

THE COURT:  He may answer.

BY MR. FONTAINE:

Q    Sir, you have to cooperate with --

A    I went out there to visit.  When they went missing, I don't know what they did.  It sounds very reasonable that they would attempt to contact the children, but I don't know that. I don't have access to the records until you produced them



46

last week.

Q  Now, you acknowledge, sir, that prior to your visiting them, in California you presented a request to exercise visitation and you were informed that the children did not want to visit with you, correct?

A  I was informed that Katherine said they didn't.  My position is that if they didn't, then when I went out there if they told me at that time they didn't, then we'd take that bridge if we come with it and maybe there we would want to be.  Peter and I went out to see the kids.  If we're there and they don't want to visit, that's one thing.  But my position is we're going to go out there and make sure that they realize that we're there and we want to see them.  And if at that point --

Q  You didn't --

A  -- they don't, they don't, but we could do that exchange at Sierra Madre PD.

Q  And sir, you're --

A  Yes.

Q  -- you're aware that from the May hearing, the May motion hearing where there was extensive testimony as to what the girls' feelings were about visiting or having contact with you, and that they didn't want it, you insisted on going out and visiting them anyway, didn't you?

A  I believe the testimony at that hearing was they



47

didn't want to get on the plane to come to Sierra.  And if they don't want to get on the plane to come to Sierra then I'll get on the plane to go there.

Q  So you're testifying under oath that you were not aware that your children, based upon what occurred at the December 2018 Christmas break visit with you, that your children, your girls specifically did not want to have any contact or any visit with you?  Are you saying you weren't aware of that?

A  I'm aware there's issues, but if they don't want to have contact then we can discuss that when they're aware, and they're fully aware that I'm available, near them physically, and they can make their choice at that time.  Kids change their minds.  If they know I was there they might have changed their mind.

Q  And so you thought it was wise --

A  Particularly with Peter with me, yes.

Q  I'm asking a question, sir.  You figure as why after your children -- after you understood from the May hearing that they wanted no contact with you, they wanted no visit with you, and after being informed in a letter by my office after you requested a visit in July, you stuck -- you thought it was wise to go out and visit with them anyway?

A  Absolutely, because at that time I had Peter with me, who they might want to see.  Even if they don't want to see


(973) 406-2250 | operations@escribers.net | www.escribers.net

48

me, maybe they want to see their older brother.  And my dad was coming down, and even if they don't want to see me, maybe they want to see their grandfather.  And we have extended family in California, and even if they don't want to see me maybe they want to see their extended family.

Q  So instead of that happening, you go and file a DCYF complaint that results in them receiving a call while they're away at summer camp.  Did you --

A  Again, if I had known they were at summer camp, none of this would ever have happened.  Yeah.  Because I -- my kids are missing, I was very surprised.  Very surprised that they were at summer camp when I showed up.

Q  Can you cite me to the section of any order that requires Katherine to inform you of where her children are at all times when they're in her care?

A  I would anticipate that she would inform me where they are when it's my parenting time that we requested.

Q  Do you understand why Katherine might have concerns about you informing -- to telling you of where she is at with the children?

A  I see the paranoia, medical reports.  I see all the police reports in evidence where she falsely accuses me of --

Q  I didn't ask you that, sir -- I -- sir --

A  -- breaking in.

Q  I didn't ask you that.  Sir, you --



49

A   So yes.  So those would be concerns, yes.

Q   You --

A   Yeah.

Q   Sir, do you understand from your actions, from what you are doing in going and insisting on seeing them when they have expressed to you that they don't want to see you, that they don't want to spend time with you, do you see why to have a concern about informing you of where they are at?

A   Sophie and Grace have never expressed that to me directly.  We're going just from what their mother said.

Q   Did you ever --

A   To the degree they have -- go on.

Q   Have you ever issued an apology to them for the December Christmas visit incident?

A   Yes.  There were the letters and cards I sent referenced in prior testimony to --

Q   Show me --

A   -- the exhibit numbers again?

Q   Show me in those -- show me in those cards -- it's Exhibit Number 22, it looks like.  Show me in those cards where it says you apologize for your behavior in not allowing the girls and your son to return?  Where does it say it?

A   First of all, my son was 18 and he was entitled to do what he wants, so I object to the form of the question.

Q   Then answer it as to the girls.  Where does it say in



50

that -- that card you -- that you submitted as an exhibit, where does it say anything about you apologizing for your behavior, which you understood from Katherine's testimony was the cause of them not wanting to see you?

A  I don't believe Katherine, that that's the primary cause because it says -- sir --

Q  No.  Sir, I'm asking you --

A  Okay, let me find the exhibit.  Hang on.  Hang on.  If you give me one moment.  Okay.  "I'm so sorry things are so strange between us."

Q  That's your way of apologizing for failing to return them on an agreed-upon time?

A  Absolutely, when that's the advice of my professional therapist on how best to patch things up.

Q  Okay.  Where in the second card that's attached from July 7th of 2020, is there any apology to them in the prior --

A  "I'm so sorry things are so strange between us."

Q  That's the extent of your apology?

A  Absolutely.  I mean, my prior behavior, there they were.  I have not done anything -- I have treated these kids well.  So as my -- again, on the advice of my therapist, what's in their best interest, my therapist was quite clear that any -- normal kids under any normal circumstance who were upset at being a single weekend where they wanted to be someplace else would normally quickly get over that, and it



(973) 406-2250 | operations@escribers.net | www.escribers.net

51

would not be an issue.  And --

Q  So it's --

A  -- she's shocked that they haven't.

Q  So in --

A  That's what we get from Katherine.  I haven't heard -- I've heard very little -- I've heard nothing directly from my children.

Q  So in the --

A  Only from Katherine.  So you're kind of asking me to testify to what I heard from Katherine --

Q  Sir, I'm not asking you -- I'm not asking a question at this point.  Can you let me --

A  Okay.

Q  -- ask the questions, please?

A  Sure.

Q  So in no document that you've ever given to your children:  Caleb, your adult son, or the girls, have you ever admitted that your failure --

THE COURT:  *[Whisper] (Indiscernible) want something (indiscernible).*

BY MR. FONTAINE:

Q  -- to return them on an agreed-upon time in December of 2018 was a mistake on your part --

A  I think that --

Q  -- and then that you apologized.  There's no --

**Commented [DF6]:** *12:55:23*

52

A   I think that --

Q   -- way (indiscernible) back to Katherine.

Commented [DF7]: 12:55:33

A   -- that that was handled verbally, and I've had no way to verbally --

THE COURT:   *[Whispered]* (*Indiscernible*).

Commented [DF8]: 12:55:38

A   -- contact Sophie and Grace.

BY MR. FONTAINE:

Q   Okay.  Now let's move up to the incident where you filed the complaint with the DCYF.

A   Sure.

Q   You're aware that the -- the girls were involved in that investigation?

A   Yes.  I'm surprised Caleb wasn't, though.

Q   You're aware that the girls were involved you said, right?

A   Yes.  Yes.

Q   And did you ever -- and you've read the report that's now been filed, correct?

A   I have gone over it briefly.

Q   And you see that --

A   I -- I --

Q   -- there's no findings -- there was no finding of neglect by them, right?

A   Actually, it's indeterminate.

Q   Sir, did they conclude that the file was being

53

closed -- that their file was being closed?

A  They concluded that it was insufficient evidence and that the complaint was not unfounded.

Q  And did you ever apologize to your children, your girls specifically, relative to involving them in that DCYF investigation, including when they were at summer camp?

A  So first of all, until I had the records, I don't know to what degree they were involved.  The -- to the degree I know they've been involved in an investigation it's been here in New Hampshire, Exhibit 63.  I've -- not for a while.  You gave me this last week, even though it's dated November 1, 2019.  You know, if I had it earlier, you know, maybe we could have done something.

Q  Well, you've had it for -- now for a week.  Did you do anything after that?  Did you send them anything --

A  I have no --

Q  -- like a card -- hold on, let me finish, sir.  I'm asking a question.  Did you ever write them a note or a letter or send them a card saying, I'm so sorry that you got involved in this investigation?  Were you --

A  I'd love to call them up and even send them -- I -- I'd love an email.  Give me an email, I'll write them an email.  Postal mail is slow, and the last time I sent a postal mail it took them three weeks to get it.

Q  Have you ever apologized for the incident that



54

occurred at the Collinsville Bible Church that resulted in you having a one-year final domestic violence restraining order issued against you?

A  I had no way to contact Sophie and Grace.  With regard to Caleb, he apologized to me for not contacting me while I was there.

Q  So -- so your answer is you didn't -- you didn't send any apologies.  You never wrote a card, you never wrote -- I mean, you never attempted it even.  You never did anything, did you, with regard to apologizing for your behavior?

A  I was sitting in a church pew quietly by myself.  I don't feel a need to chur -- to say -- to apologize for sitting in a church pew quietly by myself hoping to see my daughters.

Q  Okay.  In fact, do you recall -- and this is at our Exhibit Number 10 -- do you see the transcript --

A  On yours?

Q  Yes.

A  Yours?

Q  Yes.  Do you see this -- the domestic violence transcript?

A  I don't see an exhibit.  One moment, please, I don't see an Exhibit 10 from you.  I only see Exhibits 1 through 9.

Q  Well, let me ask you the question then.  Do you remember testifying, and I asked you at that hearing, did you



55

ever --

A   Where we were -- which?

Q   Domestic violence hearing, sir.

A   Yes.

Q   Do you remember me asking you, had you ever apologized to or contacted the children regarding the incident on November 3, 2019, and your response was, "No.  I don't think I need to."  Do you remember saying that?

A   Yes.

Q   And you still think you don't need to, don't you?

A   When they spent ten years being there with their father, sitting with their father in a pew, one would anticipate that their father sitting quietly in a pew like they have been used to for ten years of their life would not upset them.

Q   That's your -- that's your belief, correct?

A   That's my belief, unless Katherine or the church pastor has done something to cause them to be upset by my presence.  Just seeing Dad sitting in a church pew.

Q   Do you --

A   People sit in church pews quietly.

Q   You mentioned something --

A   Yeah.

Q   You mentioned something about contacting -- pictures.  You said you wanted -- you haven't been sent any pictures.



56

Have you ever requested of Katherine directly or my office directly for pictures of the children, harmless, are sent --

A  Yes.  I don't -- it's not in an exhibit but I requested recordings of their performances in the VBS.  I'd have to check my email for other requests.  And quite frankly, I don't think I should have to request it through your office, I think I should be able to request it from Katherine directly.

Q  Okay.  But beyond your requesting video recordings of them, you've never asked for, as you testified, that you never received photographs or pictures.  You've never asked --

A  Well, it's -- most of my requests go ignored, so after I request them a couple of times, if I don't get anything you kind of give up.  Otherwise the emails between you guys pile up even more than they are right now.

Q  Let's talk about the medical issues for a second, medical --

A  Sure.

Q  -- treatment issues.  There was a previous issue regarding you not providing insurance coverage as the Court ordered you; you recall that?

A  If we could review the order in question --

Q  I have asked a question of you.  Do you recall there being an issue with you not providing the insurance that the Court ordered?  That's a simple question.  Do you know the



57

answer?

A  I did not understand the Court's order.  If we could review that now.

Q  No, I'm not going to review that now.  I'm asking you a question.  Do you remember that inci -- that it being an issue before the Court?

A  Yes.

Q  Okay.  And the Court subsequently ordered that Katherine could provide the insurance, correct?

A  I can't testify as to the order unless we get it up in front of us.  I'm happy to do that if we want to take a couple minutes.  It's the final decree --

Q  No.  I don't --

A  Yeah.  So if we could --

Q  I don't have that much time left.  Hold on.  Hold on. Your attorney can cross-examine you and he can question you and he can bring that forth.  I'm asking the questions.

A  Okay.

Q  Now, Katherine -- have you -- have you ever provided insurance coverage for your children?

A  Yes.

Q  Subsequent to the divorce order --

A  Yeah.

Q  -- final divorce order?

A  Yes.



58

Q  Okay.  What insurance did you provide?

A  Christian Care Medi-Share is the insurance they've had since 2011.  I kept that active even though there was no court order to do so.

Q  You -- your --

A  It was out of benefit and love for them.

Q  You're aware that Katherine provided -- obtained other insurance coverage for the minors?

A  Yes.

Q  And in fact, Katherine hasn't asked you to pay any of the unreimbursed expenses to date, has she?

A  She has.

Q  And what was your response to that, sir?

A  That I wanted them to go to insurance first, and that we would like to see why insurance hasn't paid them.

Q  Do you recall if the --

A  And I would love -- I would love to get the insurance documents from your office so we can move forward on that.

Q  In fact, you've been asking for access to her personal insurance information, right?

A  Katherine's?  No.

Q  You haven't been asking for -- for insurance informa -- for insurance information -- I mean --

A  Only for the children.

Q  Okay.  But it's insurance that she's providing,



59

correct?

A    I don't care whose parent's paying for it.  If it's the children's insurance both parents should have access to the records.

Q    Let's go back to this -- to the doctor.  You -- at one point there was a discussion about the children seeing Dr. Greenberg, correct?

A    Yes.  Katherine and I had -- that was one of the few times I was able to talk to her.  We had a conference call with Dr. Greenberg.

Q    In early June of 2019, you were informed by letter through our office that, in fact, Katherine had discovered that Dr. Greenberg was not one of the preferred providers, and that she would have to meet a 5,000-dollar deductible before any expense -- any charges of Dr. Greenberg would be paid for. Do you recall receiving that letter?

A    Yes.

Q    And she suggested instead that a Dr. Hanif, who was covered as a preferred provider, be seen by the children.  Do you recall that as well?

A    Yes.

Q    And you recall her agreeing that Dr. Hanif could provide the vaccinations at the same schedule that you and her had previously agreed to, correct?

A    I disagree with that because we don't have a copy of



60

the schedule.

Q  Okay.  But from her letter --

A  We would need to see Dr. Greenberg again.

Q  Her letter said that she would agree to that, correct?

A  I don't have it in front of me.  One moment.  Would you refer to me which exhibit that is?

Q  Exhibit Number 6, the letter of June 6th.

A  Okay.  What page?  17 pages in here.

Q  First -- it's the first --

A  Okay.

Q  -- the decision -- there's a letter dated June 6th in that exhibit.  Do you see the second sentence of that letter?

A  Regarding the deductible?

Q  Yes.

A  Yes.

Q  Okay.  So -- so she informed you that she couldn't afford to pay that.  She informed you that she wanted to use doctors that were covered under her insurance.  She gave you a specific name.  And in fact, you didn't agree to that doctor being used by them, did you?

A  Not until we got the vaccination schedule, no, because we'd already worked it out.  She's violating an agreement; I want the existing agreement, or we come to a conclusion on what we're doing instead.  I would have been happy to negotiate and discuss with her a different doctor.  But if



61

she's going to violate the agreement we came to, then we need to have a conversation about it.

Q  Where does it say in any of your emails or your responses that you were willing to consider using Dr. Hanif or any other provider other than Dr. Greenberg?  Where does it say that?

A  There's been lots of emails -- hang on -- in this exhibit.  I would say -- I said if cost is a concern, I'd anticipate that Medi-Cal would provide free care through an in-network provider.  I don't know why we have an insurance with a 5,000-dollar deductible when insu -- free insurance with no deductible is available.

We asked for California Blue Cross Blue Shield insurance cards, and didn't -- and they can verify what's covered and what's not with Dr. Greenberg.  Let's see, I said --

Q  Based on your (indiscernible) --

Commented [DF9]: 1:09:05

A  -- I'm still agreeable to have my -- let me quote that -- your answer of where I said it.

THE COURT:  [Laughter].

Commented [DF10]: 1:09:12

A  I said, I'm still agreeable to having Sophie seen by Dr. Greenberg for a general physical ASAP, for Sophie and Grace to each get their first MMR shot -- it's already agreed to by Katherine -- Dr. Greenberg, by himself -- as soon as possible, and for Dr. Greenberg to provide as close to



62

Dr. Greenberg's proposed future vaccination schedule in writing.  That's a single appointment.  I said, we can take it with that.  We can take it from there.

BY MR. FONTAINE:

Q  Did you mean to say that --

A  If time is the primary concern --

Q  Wait --

A  If -- I'm just letting you know -- you asked a question, sir, and I'm answering it.  Will you allow me to answer where I said I was able to negotiate this?  I'm just reading my email in the exhibit to you.

I appreciate that if cost is the primary concern, as soon as I repeat the insurance information to you, I'll do my best to look into alternatives to Dr. Greenberg and promote alternative providers.

THE COURT:  *[Whispered] I'll be back in about an hour.*

*[Whispered conversation]*

A  And I also wanted to know what Sophie and Grace thought.  I asked for a phone number so I could see -- I mean, they -- we had issues with them not wanting to see people.  I wanted to talk to them and get their take on it.

THE COURT:  *[Whispered] Put him on mute.*

BY MR. FONTAINE:

Q  Sir, on -- in that same exhibit packet, July 2nd

Commented [DF11]: 1:10:15

63

letter --

A  Yes.

Q  -- first paragraph --

UNIDENTIFIED SPEAKER:  *[Whispered] Again, we need (indiscernible).*

BY MR. FONTAINE:

Q  -- last sentence reads, "after my client discovered this information, she researched and found another pediatrician, Dr. Hanif, that was in the network provider with Blue Shield --

THE COURT:  *[Whispered] Not this -- not this one, but the previous.*

BY MR. FONTAINE:

Q  -- and who had excellent reviews online.  She was also willing to see the girls quickly on July 1st to administer the vaccinations on the schedule agreed to by Dr. Greenberg --

THE COURT:  *[Whispered] Tom (phonetic) looks like this (indiscernible).*

A  I don't see that.

BY MR. FONTAINE:

Q  -- remember that?

A  No.

THE COURT:  *[Whispered] All excited.*

BY MR. FONTAINE:

Q  You see that in the letter?

**Commented [DF12]:** 1:10:35

**Commented [DF13]:** 1:10:57

64

A   I don't see anywhere on the -- on Dr. Greenberg -- which page?

UNIDENTIFIED SPEAKER:   *[Whispered] (Indiscernible) voice.  He's got another voice.  He's got another voice.*

THE COURT:   *[Whispered] Sweet.  Pretty.*

A   Direct me to a page.

BY MR. FONTAINE:

Q   Sir, this is my Exhibit Number 6, there are several letters --

A   Yeah, what page?  Which page of the 17 pages?

Q   They don't have page --

A   It's 17 pages, sir.  Please tell me which page in Exhibit 6 and I will go there.

Q   The page -- the pages are not numbered, sir.

A   They are in the PDF I have.  If you -- we can sit here and --

Q   No.  I apologize --

A   Give me a page and I'll go there.

THE COURT:   *[Whispered] I don't seem to have the rest of this.*

BY MR. FONTAINE:

Q   I apologize, I don't have the same PDF.  I don't know why, but mine don't have page numbers.  But there is a letter dated July 2nd from my office to your attorney.  That's the letter I'm referring to.

**Commented [DF14]:** 1:11:04

65

A   Dated July 2nd.  Excuse me while I look through these 17 pages for this letter.

THE COURT:  *[Laughter]*

A   You said -- what was the date again?

BY MR. FONTAINE:

Q   July 2nd, 2019.

THE COURT:  *[Whispered] And while you're looking through that, I'm gonna go pee.*

*Can you imagine if this was in person?*

UNIDENTIFIED SPEAKER:  *Oh, my God.  I don't know if I (indiscernible).*

Commented [DF15]: 1:12:33

A   So I don't know.  Yes, it does say the vaccinations on schedule agreed to.  I don't know how we could do that if we don't have a copy of the schedule, but I would be amenable, if we have a copy of the schedule, to anyone administering the vaccines.

BY MR. FONTAINE:

Q   Okay.  So let me ask you this.  After this, there was an appointment scheduled for Dr. -- but you --

A   Yeah, with --

Q   You canceled it, didn't you?

A   There was a prior appointment scheduled with Dr. Greenberg that was canceled.

THE COURT:  *[Laughs].*

A   So yes, if she's canceling the appointment that we

66

agreed to, I will cancel the appointment that we did not agree to.

THE COURT:  *[Laughs].*

BY MR. FONTAINE:

Q  So you canceled the appointment with Dr. Hanif, correct?

A  Yes.  It's the only appointment in the entire history of this case I have ever canceled.

Q  And --

A  I can't say the same for Katherine.

UNIDENTIFIED SPEAKER:  *[Whispered] Stupid.*

MR. FONTAINE:  I have no further questions, Your Honor, for this witness.

THE COURT:  Any redirect, Mr. Caulfield?

MR. CAULFIELD:  Yes, Your Honor.  One moment, please.

REDIRECT EXAMINATION

BY MR. CAULFIELD:

Q  Atty. Fontaine asked you about your relationship with Caleb deteriorating since Christmas 2018, and you said that that's not correct, and you were trying to refer to some exhibit?

A  The --

THE COURT:  *[Whispered] No, (indiscernible).*    Commented [DF16]: 1:14:13

A  -- apology for Caleb?  Or the relationship since then?

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

67

Q  Well, my notes say that Atty. Fontaine asked you about the relationship with Caleb deteriorating since Christmas 2018, and I see that I have an asterisk --

Commented [DF17]: 1:14:23

A  Yes.  Yes.  That was the weekend -- so I have shown these texts to get some advice from my therapist because I'm concerned he's mentally ill.

THE COURT:  *[Laughs]*

A  So October 5th, from a different number I'm not familiar, he asked me, how long does it take to hack into a black phone, do you know?  I need to know how often I need to replace it.  I have no idea why he thinks he needs to replace his phones.  He says he's got to throw his phone out soon.

THE COURT:  *Hopeless.  Heartless.*

UNIDENTIFIED SPEAKER:  *No, he did.*

THE COURT:  *He was concerned; he said he was hopeless.  (Indiscernible).*

Commented [DF18]: 1:15:17

A  I can read this in-depth, his own words, but they're quite incoherent.  So long, rambling emails.

BY MR. CAULFIELD:

Q  That was after this incident?  Mr. Albrecht, that was after the incident that Atty. Fontaine asked you about?

A  This is most recently, if we go to the incident at church, that's more relevant because he's much saner at that point where he just apologizes for not getting in touch with me.



68

THE COURT:  (*Indiscernible*).

Commented [DF19]: 1:15:48

BY MR. CAULFIELD:

Q  So after the incident in which you have these -- which the DV is outstanding, he apologized to you?

THE COURT:  *[Laughs]*

A  Correct.  No.

THE COURT:  *[Laughs]*

BY MR. CAULFIELD:

Q  But -- but -- but during your cross-examination, you were challenged with, did you do this this way, did you do that way; what did you say in your apology letter; why didn't you say this in your apology letter.

THE COURT:  (*Indiscernible*) *so what?*

Commented [DF20]: 1:16:17

UNIDENTIFIED SPEAKER:  *(Indiscernible).*

BY MR. CAULFIELD:

Q  If for some reason you found out that over your lifetime as a parent, you didn't make the right choice every single blessed time, would you accept that?

THE COURT:  *[Laughs]*

A  Yes.

BY MR. CAULFIELD:

Q  Right.  And -- and if somebody -- and if you did the best you could in writing a letter and consulted with your own therapist as how you should write the letter --

THE COURT:  *[Whispered] The apology (indiscernible)*

Commented [DF21]: 1:16:45

69

*to have a (indiscernible) relationship.  He doesn't think his son's (indiscernible).*

BY MR. CAULFIELD:

Q  -- if someone else thinks that it should be written differently, is that really neither here nor there, Mr. Albrecht?

A  Only in the sense that a professional therapist, professional opinion, I would think, would be better than somebody who's not similarly trained.

Q  Okay.  Now, if Master DalPra orders this fractured family to go to -- for some sort of reunification therapy --

THE COURT:  *He lives on the East Coast.  They live on the West Coast.  They're going to go there (indiscernible).*

UNIDENTIFIED SPEAKER:  *[Laughs].*

BY MR. CAULFIELD:

Q  -- would you do what the therapist tells you to do?

A  Absolutely, in a heartbeat.  I would love that.

Q  Would -- would you send the letter the way the therapist says you should do it?

A  Absolutely, in a heartbeat, sir.

Q  Okay.  Now, there was some discussion about some examination about Judge -- Judge DalPra -- Master DalPra's order regarding insurance, and you were saying that you -- you didn't understand it --

THE COURT:  *[Laughs]*

70

BY MR. CAULFIELD:

Q  -- and you -- you started to try to reference it and then we moved on.  Is there something about that order you wanted to discuss?

A  Yes, if you could just briefly give me one moment to bring it up.

Q  And while you're getting it up, assuming you can multi-process, sir, if it turns out that somewhere along the line in your lifetime as a parent you had made some mistake, you didn't say the right thing in a letter, you held the kids two more days during parenting, would it make any sense that you should be punished and the children should be punished by never seeing their dad again?

A  Yeah.

Q  Okay.  That would -- that would really be mentally ill to think that way, wouldn't it?

A  Yes.

Q  Yes.  Okay.

A  Okay.  So I found the order.

THE COURT:  *[Laughs]*.

A  So I think the issue here is the uniform support order that Judge Introcaso signed in paragraph 16 says, see decree providing coverage under Blue Shield of California.  So the order from the judge is to look at the decree for providing Blue Shield coverage.  But when I look at the divorce decree



71

for providing coverage under Blue Shield, I can't find it anywhere in there.

So it's unclear how I -- I -- I accept that by the time we get to the order where judge -- I accepted Judge Introcaso found me in contempt of that. But again, to this point, I'm not sure why, because he told me to look at the decree and I can't find it in the decree.

MR. CAULFIELD: Okay. I have -- I have no further questions.

THE COURT: Any recross, Mr. Fontaine?

MR. FONTAINE: No, I'm all set, Your Honor. Thank you.

THE COURT: Very well. At this point we're going to take about a 15-minute recess. I am going to keep my line open here; you can stay on the line, or you can call back in 15 minutes. Okay?

MR. CAULFIELD: Thank you, Your Honor.

MR. FONTAINE: Thank you.

THE COURT: Very well.

We're going to take, like, about a three-minute break because I have to --

UNIDENTIFIED SPEAKER: You're absolutely right; it sounds like Gilbert Godfrey.

(Recess at 1:20 p.m., recommencing at 1:33 p.m.)

MR. CAULFIELD: (Audio begins mid-sentence) yes, Your



72

Honor.

THE COURT:  Are your clients back?  Ms. Albrecht?

Katherine Albrecht, are you back on the line?

Dana Albrecht, are you back on the line?

THE PETITIONER: I'm here, Your Honor.

THE COURT:  Very well; we'll wait a few more minutes.

MR. CAULFIELD:  (Indiscernible) now, Judge.

Commented [DF23]: 1:33:59

THE COURT:  *[Whispered] She's probably having a hot dog.  [Laughter]*

So Alex Corey is back.

UNIDENTIFIED SPEAKER:  Yup.

THE COURT:  I wonder if they're going to do anything with the other guy with a thing like the guy from New Hampshire.  Fold (phonetic)?

UNIDENTIFIED SPEAKER:  Oh, it's not -- what's his name?  The guy that was the manager this year who was the bench coach, he's not coming back.

THE COURT:  No.

UNIDENTIFIED SPEAKER:  Did they -- the first base coach and third base coach, was those new coaches?

THE COURT:  They're back.

UNIDENTIFIED SPEAKER:  Were they the ones that worked on this (indiscernible) previously?

THE COURT:  Yeah, they were.  I think they're both

73

back.  Febles and the other guy, I think they're both back.

UNIDENTIFIED SPEAKER:  I'll be curious to see what they do to improve the team, if they even try.

THE COURT:  I don't know.  I don't -- I don't mind John Henry as an owner, but I don't like Werner at all.

UNIDENTIFIED SPEAKER:  Oh, yeah.

THE COURT:  He's too --

UNIDENTIFIED SPEAKER:  What do you think of this new GM they have?

THE COURT:  It's hard -- it's hard to say over the first --

UNIDENTIFIED SPEAKER:  Yeah, because of the --

THE COURT:  -- first year with what went on.

UNIDENTIFIED SPEAKER:  -- the way the end of the season was.

THE COURT:  I mean, they -- they basically told him to trade Betts (phonetic), and I don't think Betts was going to stay anyway.  Didn't sound like he wanted to be in the -- the Boston.

UNIDENTIFIED SPEAKER:  Ken Nuke (phonetic) can pitch.

[Laughter]

THE COURT:  All right.

I must have these exhibits somewhere.  Forgot to check them.



(973) 406-2250 | operations@escribers.net | www.escribers.net

74

(Off the record)

THE RESPONDENT:  I'm here.

THE COURT:  You are.

THE RESPONDENT:  I'm here.

MR. FONTAINE:  Oh, good.

THE COURT:  Okay, so we're all --

THE RESPONDENT:  Sorry about that.

THE COURT:  We're all back, and we're on the record. Mr. Caulfield, do you have any other witnesses?

MR. CAULFIELD:  No, Your Honor.

                    PETITIONER RESTS

THE COURT:  Mr. Fontaine?

MR. FONTAINE:  Thank you.  Thank you, Your Honor. If I could just make a brief opening before I have my client testify, Judge --

THE COURT:  Okay.

MR. FONTAINE:  -- to -- to -- to summarize a few points.

THE COURT:  Go ahead.

                  RESPONDENT'S OPENING STATEMENT

MR. FONTAINE:  Thank you.  As you can see, we've submitted relatively few exhibits.  And we're trying to directly -- to provide exhibits that directly relate to the motions before this Court and to not burden the Court with having to review many others.



75

In previous hearings, we've covered a lot of testimony that has been brought up in these pleadings. In the previous hearing, we've extensively covered the incident that occurred on this December 2018 holiday visit, the attendant -- the incident that happened regarding the children's attendance at The Wilds of New Hampshire (sic) Summer Camp in 2019, and -- and Mr. Albrecht's actions regarding that same incident.

And we've also, in a separate hearing with Judge Derby, covered, at length, the incident that occurred at the Collinsville Bible Church, which resulted in him issuing a detailed decision with findings and rulings. That was appealed and subsequently affirmed on appeal. Those are final orders of the Court.

More specifically, Judge, your order of May 30th, 2019 found in pertinent part that there was a reliable evidence that the parties had reached a verbal agreement -- also, through counsel -- regarding the December vacation period. Evidence existed supporting the Respondent's assertion that the Petitioner did not comply with that verbal agreement, quote.

The Court also finds -- found in the same order, quote, there is reliable evidence to show that the parties' two youngest children have a problematic relationship with Petitioner at times, and that the Petitioner's actions and conduct is the major contributing factor to those



76

circumstances -- major contributor to those facts and circumstances.

The Court also found, in denying the previously filed motion for contempt by -- by Mr. Albrecht, that the girls do not wish to fly to New Hampshire for parenting time with Petitioner and there's insufficient reliable evidence to show that the Respondent has willfully disregarded the parenting plan or has acted, in any way, to discourage parenting time.

Further, the Court's denying the -- the -- another -- on the motion for contempt says that there's reliable evidence disclosed that the Respondent has encouraged Sophie to travel to New Hampshire.

Therefore, my question to you, Judge, is whether we need to cover any of the information again pertaining to the December incident, The Wilds of New Hampshire (sic) incident, or the November incident that resulted in the restraining order. Obviously, I'll be glad to do that if you feel that it's necessary, but I think extensive testimony and findings have already occurred in that regard.

THE COURT: I believe they have, and I don't think you have to rehash or replow old ground.

MR. FONTAINE: Okay, great. What is new and has not been previously addressed in the pleadings and the -- and the evidence is the abuse and neglect petition that was filed --



77

the abuse and neglect complaint that was filed by Mr. Albrecht and the Department's findings.  The allegations of Mr. Albrecht's neglect relative to their medical and dental care was brought up in his motion, and the -- the Department of -- the -- the Division in California has specifically addressed that in their findings in their investigation.  And therefore, I think it's important, Judge, that you review those -- those -- that -- that report that we have submitted as an exhibit in regards to that specific allegation on their part.

In fact, what is interesting in that report, as you can see, is that Mr. Albrecht claims what Ms. Albrecht was -- sorry, that Mr. Albrecht what Ms. Albrecht had claimed, and most importantly, what the two girls in private meetings with the caseworker about their father, his previous actions, and their -- their desire to not visit with or have contact with him.

You know, you -- you had specifically not allowed us to have the guardian reappointed at this point, but I think what is stated in the report helps you get a feeling of exactly how these girls feel about their father, about their willingness to visit with him.  You previously -- and if I could, just page 1 contains -- in that report, contains Mr. Albrecht's interview; page 3, the mother's interview; page 6, Sophie's interview; page 7, Grace's interview; page 10, the documents and records that she gave to the Department relative



78

to the money she spent on dental, orthodontic, and medical care; and page 5, is -- is his reference to an order that we knew -- that he knew full well was no longer in existence, and I think that's important.

The judge, in his domestic violence finding, Judge Derby, made a comment about how he had misused previously issued orders, and I think it's important to see that he has done so again in this -- in this report to the Division in California.

MR. CAULFIELD: Excuse me, this is Atty. Caulfield. I'm confused as to what's happening here. Atty. Fontaine said that he wanted to make an opening. He's now making a closing argument. And I also want to point out that nothing of what he says is evidence.

The exhibits may be accepted by the Court, but none of this is evidence; correct, Your Honor?

THE COURT: Mr. Caulfield, I'm aware of how to run a trial. None of it's evidence.

MR. CAULFIELD: All right, Judge. Thank you.

THE COURT: Call your first witness, Mr. Fontaine.

MR. FONTAINE: Thank you. Thank you, Your Honor.

Katherine, could you please raise your right hand.

KATHERINE ALBRECHT, RESPONDENT, SWORN

DIRECT EXAMINATION

BY MR. CAULFIELD:



79

Q  For the record, state your full name.

A  My name is Katherine Michelle Mingus, and was previously Albrecht.

Q  Okay.  And where do you reside?

A  I reside at 730 West Alegria Avenue in Sierra Madre, California.

Q  And who lives with you at that location?

A  My son Caleb, my daughters Sophie and Grace, and most recently, my sister Laura.

Q  Okay.  And your sister Laura, does -- is -- does she need assistance?

A  She is -- she has cerebral palsy.  She's in a wheelchair.  She has attendant care 24 hours, and my mother was her primary caregiver until she passed away last year. And now I'm --

Q  Okay.

A  I'm not the primary caregiver.  She has an attendant, but I'm supporting her and helping her out.

Q  Have you had an opportunity to discuss with the girls whether they want to see their father?

A  Yes.

Q  And has that been recent?

A  Yes.

Q  And have they changed their prior position that you testified to at the motion hearing a little over a year ago?

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

80

A   No.

Q   Have they indicated any desire to have any contact with him?

A   No.

Q   Have you continued, on occasion, to encourage them to reach out to him?

A   Yes.

Q   And what has their response been?

A   Their response has consistently been no.

Q   Do you believe that they're mature minors?

A   Yes.

Q   How do they do in school?

A   They have very good grades.

Q   Have they had any problems with their conduct in school or outside of school?

A   Never, never.

Q   Do they make wise, mature decisions in their daily lives relative to, for example, schoolwork?

        THE COURT:   *[Whispered] Of course not; they're a bunch of morons.*

A   Yes.

BY MR. CAULFIELD:

Q   Helping around the house?

A   Yes.

Q   Do they have chores?



81

A   Yes.

Q   Do they do them?

A   Yes.

Q   How about decisions about personal hygiene?

A   They're great.

Q   How about their choice of friends?

A   Their friends are great.

Q   How about choice of appropriate clothing?

A   Yes, fine.

        THE COURT:  *[Sigh]*

BY MR. CAULFIELD:

Q   Do they attend church services?

A   Weekly.

        THE COURT:  *[Laughter]*

BY MR. CAULFIELD:

Q   Is there anything that would cause you to question them being mature minors?

A   No.

Q   Do you think they're capable of making mature, independent decisions?

A   Yes.

Q   Do you believe their decisions on not wanting to have contact or visits with their father is a decision that they've thought carefully about and that they've made after the consideration of all relevant factors?



(973) 406-2250 | operations@escribers.net | www.escribers.net

82

A   Yes.

Q   Do you think that it's free of any influence?

A   Yes.

Q   Did you, in any way, attempted to influence their decision in that regard?

A   I have encouraged them to go to their visits, but if that's what you mean, yes.  I've tried to get them to do it.

Q   Have you encouraged them to not have any relationship with him?

A   Never.

Q   Have you asked them -- do you know that they've requested that -- that the children engage in reunification counseling?

A   Yes.

Q   Have you asked them as to whether they would be willing to engage in reunification counseling with their father?

A   Yes.

Q   What was their response?

A   They said they don't want to do it.

Q   Okay.  And --

A   Sophie said -- actually, Sophie said she absolutely wouldn't do it and she couldn't be made to do it.

Q   Okay.  And have you encouraged them to consider engaging in it?



(973) 406-2250 | operations@escribers.net | www.escribers.net

83

A  Yes.

Q  Has Dana, as far as you know and from speaking with your girls, ever apologized to the girls regarding the December Christmas break issue?

A  No.

Q  Has Dana ever apologized to the turmoil he caused regarding The Wilds of New England incident during the summer of 2019?

A  No.

Q  Has Dana ever apologized to the children regarding the complaint that he filed with the Division in -- in Los Angeles?

A  No.

Q  Has he ever apologized to them regarding the November incident at the Collinsville Bible Church which resulted in final domestic restraining orders?

A  No.

Q  Do you think that that is important to the girls?

A  Yes.

Q  Now, you understand that Dana has submitted some proposed reunification counselors?

A  Yes.

Q  If the girls were to consider reunification counseling, do you believe that those counselors would be the good -- a good choice?



(973) 406-2250 | operations@escribers.net | www.escribers.net

84

A  No.

Q  Have you researched them?

A  Yes.

Q  And do you believe that they are unbiased?

A  I believe that they are biased.

Q  Okay.  And why do you say that?

A  Well, their backgrounds primarily talk about parental alienation as the thing that needs to be addressed in therapy. And Mr. Albrecht's contention is that that's what the issue is, so it doesn't really get to the heart of what's going on between him and the girls.  And I don't -- I don't believe that that's an unbiased approach.  I think an unbiased approach would talk to them and figure out what they're upset about.

Q  And do you believe that in -- based on your conversations with them, that you have, in any way, intentionally alienated the children from Dana?

A  No.

Q  Do you think that, based upon your -- their statements to you about reunification counseling, that it would be in their best interest for a court to order it, despite their indicating that they don't want to be part of it?

A  No, I don't think that would be in their best interest to have it ordered and forced on them.

Q  Do you think it would be emotionally harmful to them?



85

A   I do.

Q   Let's talk about Dana's claims for a minute.  You heard him discuss the medical and dental care issues?

A   Yes.

Q   Start with the medical.  First of all, have you been required to obtain your own health insurance for the children?

A   He obtained indigent insurance after failing to provide them with the insurance in the parenting plan and we had to go to court.  And he then came up with the indigent insurance, which in California is very problematic.  So I obtained insurance for them that I believe, as a parent, is more appropriate for their medical care and wellbeing.

Q   And how much does that cost?  Okay.

A   Which I pay for currently.

Q   Okay, and how much does that cost?

A   I pay 400 -- I pay $488 a month for -- for both children for that insurance.

Q   Okay.  And how much do you receive from Dana in child support?

A   $50 a month for both children.

Q   Okay.  And that -- why was the -- why was he only ordered to pay $50 a month?

A   Well, initially, it was because he stated that he was unable to work because of the stress of this divorce.  And it's unclear to me, since that time, why he's still not



86

working.

Q  Now, under this insurance, are there certain providers that are considered preferred providers that you do not have to apply towards your deductible?

A  Correct, there's just a $40 copay for most of them. There's a big list and then that -- and a catalogue they put out every year.

Q  And you recall the testimony regarding Dr. Greenberg?

A  Yes.

Q  Now, do you acknowledge that you actually had the children see Dr. Greenberg for a visit?

A  Just Grace.  Grace got her for a visit prior to a medical procedure that required anesthesia as it required a physical.  I looked in the phone book and called several providers.  She was the one who could see her on short notice because I had only been informed that day that I needed to have the physical.  So we had it on short notice with a doctor I didn't know who was Dr. Greenburg.  So she was seen by her for an exam.

Q  This kind of dovetails with the second subject we're going to talk about, dental, correct?

A  Yes.

Q  Okay.  So did she, in fact, see Dr. Greenberg for that physical?

A  She did.



87

Q   Okay.  Now, did you find out at a later point in time that Dr. Greenberg was not a preferred provider under the new insurance that you had purchased?

A   Yes, I later found that out, so I paid cash for that first visit.

Q   Okay.  And once you had insurance, did you want them to be -- did you want them to see providers that were actually covered -- as -- were preferred providers under your plan?

A   Yeah.  Just to clarify, when I made the appointment with Dr. Greenberg, I currently had the Blue Shield insurance for the girls, but I was unable to find a provider that could see them on that short notice, so that's why I went with Dr. Greenberg.  And to be honest, I was grateful she could see me at all, and I didn't really bother to look into her insurance credentials for a one-time visit for a physical, which was reasonably priced.

Q   Now, at some point in time, did you have some discussions with Dana about the fact that you wanted -- and again, I'm talking conversations, whether it be directly with -- with him or through our office -- that you wanted to use a different doctor that was, in fact, a preferred provider?

A   Yes.

Q   And the letter of June 6th, 2019 from my office to Atty. Caulfield that's in our Exhibit 6, was that the first letter informing them of that?



88

A  I believe so.

Q  At any time at -- oh, by the way, before that time, you had actually had a discussion with Dana regarding his request that there be a specific schedule of vaccinations, correct?

A  Well, what happened was, we saw -- I -- I took the girls to Dr. Greenberg, and then the issue of vaccinations came up from their school.  And both parents wanted the girls to be vaccinated.  I made an appointment and set up a conference call between Dr. Greenberg and Dana and myself to discuss medical issues associated with their vaccinations. And he participated in that conference call.  I was there physically in her office; he was on a speakerphone.  And during that visit, we discussed our concerns about vaccinating the girls and she -- we hung up.  And then she proceeded to write out a schedule after we had hung up of what that would take and then informed that the cost would be many thousands of dollars.  So --

Q  Okay.  And that --

A  So that's what happened at that visit.  And then I contacted your office --

Q  Hold on.

A  -- and said --

Q  Wait, before you go on to that --

A  Okay.



89

Q  -- let me ask a question about that.  So explain why it would be so expensive to see Dr. Greenberg for these vaccinations as was discussed?

A  So what I learned at that visit was that she was not in our network, and I knew that our -- that Blue Shield would pay a portion of the visits for doctors who were not in our network.  What I wasn't aware of is that her prices were exorbitant, that the schedule required 13 visits for vaccinations that could have been completed in three, that -- and that was because we wanted to monitor their response to the vaccines.  And Dana and I had agreed on that.  But because there were 13 required visits and she was not going to accept any insurance payments, they would not make any payments.

And she also was going to charge me the full cost of the actual vaccine drugs themselves, which was very high.  And that was when I discovered that we were talking about literally many thousands of dollars that would not be covered by my insurance until we hit a deductible of $5,000, at which point they would then still only pay us a percentage of her fee, not the full fee.

Q  Okay.  And did that result in you sending that June 6th letter?

A  Yes.

Q  Okay.  And at any time after that June 6th letter, did Dana agree that you could see Dr. Hanif, who you had asked



90

that he -- him to -- the girls to be able to see and follow the schedule that had been agreed to regarding vaccinations?

A  Yeah, I believe that -- my recollection is that we offered two options:  for him to either pay Dr. Greenberg's fees himself or for him to allow me to choose a different provider who would follow the same vaccination schedule we had agreed on, but under my insurance.

Q  And you, in fact -- you, in fact -- well, let me ask you this.  Could you afford -- could you have afforded to pay that $5,000 deductible for all of these visits, et cetera?

A  No.

Q  Was the -- did Dana ever respond saying that your proposal that you see Dr. Hanif and that they -- and that you follow the schedule that had already been agreed to for vaccinations, did he ever respond saying he was agreeable to it?

A  No.

Q  Did he ever respond saying he wasn't agreeable to it?

A  He responded saying he wasn't agreeable; then we followed up and said unless you have a better proposal or, I believe, will pay for Dr. Greenberg, that Katherine needs to proceed with these vaccinations, so we've made an appointment. And at that point, I think a couple weeks went by where we heard literally nothing.  He didn't respond to that in any way.



(973) 406-2250 | operations@escribers.net | www.escribers.net

91

Q  Okay.  And when you ended up scheduling the appointment, did you -- with Dr. Hanif, did you actually get to go to it?

A  No, I scheduled the appointment, and we informed Dana of that.  We then heard nothing back.  Two weeks went by, during which I had to prepare the girls for their vaccinations, which they were very nervous about.  And on the day of the vaccines, they woke up bright and early a little stressed, but ready to do it.  And then I checked my email on that morning -- I believe our appointment was around noon -- and there was an email from -- from Dana to me saying, "I have cancelled your appointment today with Dr. Hanif."  And I -- "You will not be able to vaccinate those girls today.  I cancelled the appointment."

Q  Did you continue to want Dr. Hanif to be able to see the girls after that cancellation?

A  Yes.  I actually called his office to find out what had happened or to see if the appointment had been cancelled; they informed me that it had, indeed, been cancelled.  And I then pretty much said to him --

Q  Did they --

A  -- (indiscernible) the girls --

Q  -- inform you -- did they inform you who cancelled it?

Hello?

A  It was from Dana.  Can you hear me?  Am I here?  Yeah.

Commented [DF24]: 2:00:39



(973) 406-2250 | operations@escribers.net | www.escribers.net

92

Hello?

Q  Did they inform -- yes, can you hear me?

A  Yeah, they informed me that they had received legal documents from Dana.  And then I spoke to Dr. Hanif directly, and he said that he was unwilling to see the girls.  And I said what if I got a court to order that they could -- they could be seen?  And he said he would still be unwilling to see them because he did not want the risk of a lawsuit from Dana.  And so he told me that he would not see the girls under any circumstances at that point.

Q  Was that one of the reasons that you filed your motion to modify the parenting plan?

A  Yes.

Q  Have you been able, up to this point in time, to get the girls vaccinated?

A  No, because my options were to violate a court order to vaccinate them, and I thought this hearing would be held a long time ago.  So I've been just waiting for this hearing so the judge could decide how we're going to proceed on the vaccinations.

Q  Do you feel that Dana's actions with regards to the girls --

THE COURT:   (Indiscernible).

BY MR. FONTAINE:

Q  -- receiving medical treatment was done with the

Commented [DF25]: 2:01:58



93

intent of trying to impede your ability to obtain appropriate treatment?

A  I do.

Q  Has that frustrated you in your desire to get the girls appropriate treatment?

A  Yes, it has.

Q  Has it resulted in any issues with you with regards to them not being vaccinated?

A  Well, they're not vaccinated currently, and their schools are asking about it.  I'm also just -- they don't have a primary care physician because I thought Dr. Hanif would be a great choice.  He was willing to be their primary physician, and they currently don't have a primary physician.  So if something happens with their health, my only option is that I take them to a walk-in clinic or to an emergency room because I don't have a doctor for them.

Q  Now, had you -- have you had to do that on occasion when they've had --

A  Yes, I have.  Yeah.

Q  And explain.

A  Christmas of, I believe, last year, Grace had a cold, and we were concerned and just wanted to rule out anything serious, so we took her to a walk-in clinic, and the doctor physically examined, said she'd be fine, it was just a cold, and sent us home.



(973) 406-2250 | operations@escribers.net | www.escribers.net

94

Since that time, there have been -- like last week, Grace sprained her finger, and normally, I would have simply -- it was on a Thursday, and normally, on Friday I would have simply taken her to her family physician and had it looked at, but because I don't have a family physician, I did not want to take her to a walk-in clinic because I don't know what's up with her, and there's COVID around, and other issues. So I literally went online and subscribed to a physician referral system that just answers generic questions, and I got the -- the answer that she should buy an over-the-counter splint, leave it on for a day or two, and it should be fine, and it is. And she's fine.

I guess the issue, though, about not having a primary care physician is even though all is well with that, I didn't have an opportunity to see an actual (audio interference). And so now I'm -- it's (audio interference). Do you go all the way to the emergency room? Or do you just wait things out? And I'd really like to be able to just have a doctor I can take the girls to.

Q And when you go to the emergency room, does it cost you more, personally, to have them treated, or to a walk-in clinic to have them treated than if, say, you'd gone to a primary care physician?

A I haven't had occasion to take anyone to the emergency room. We've only been into walk-in care that one time. The



(973) 406-2250 | operations@escribers.net | www.escribers.net

95

girls are in good health, and we don't have a lot of medical needs, but what (audio interference) is two-to-three-hour wait in the waiting room of the walk-in clinic here in Los Angeles, during which we could be exposed to COVID in the waiting room; I don't know.

But as far as the cost goes, typically, the insurance will cover that, but not at the same rate as if I had gone to a doctor covered in the network.

Q   Based upon the problems that you've had in having joint decision-making --

A   I'm sorry, one more time?

Q   Based on the problems that you have had in joint decisions regarding medical treatment, are you asking this Court to provide you with either sole decision-making or decision-making along the lines that you currently have relative to education?

A   Yes, so that I can at least get them the care they need even if Dana tries to impede it.  Yes.

Q   Okay.  And if -- currently, the order for -- the order relative to education decision-making is that you need to inform Dana of it, of the decisions, but that you are ultimately able to make the decision in the event that the two of you can (sic) agree, correct?

A   It does state that, in the event of a disagreement, I can make the decision, correct.



96

Q   Okay.   Now, you've asked the Court in this -- in your motion to award you sole decision-making regarding both education and medical without that kind of a -- alternative, correct?

A   Correct.

Q   Why has that option that's allowed in the education arena caused you issues?

A   Because Dana has used his joint decision-making regarding education to essentially cause a lot of problems for the girls at their schools.   He has used information that he has gotten from the schools through that in order to contact the schools and, I mean -- I guess I'll say it -- just what feels to them like harassment.   He has created emergency meetings for me to come in and talk to them.   He's forwarded them private emails that Sophie has written to him.   He has essentially made their lives at all of their schools very, very difficult.   Our kids are noted by the schools as being problem students.   There are attorneys involved, at great expense to the schools.   And it's really been a problematic issue.

Q   We'll talk about the education and the education choice for your daughter in a little bit, but I want to get on to the -- on to the dental.   But before I do that, one last question.   So your preference is to have complete decision-making relative to medical, education, et cetera, correct?



(973) 406-2250 | operations@escribers.net | www.escribers.net

97

A   That is correct.

Q   But you -- but as an alternative, if -- if the Court is not so inclined, you would like the -- the ability to make the final decision in the event you can't agree, correct?

A   Yes.

Q   So let's talk about dental.  For den -- you heard Dana's testimony about your treatment of the girls relative to dental treatment?

A   Yes.

Q   Okay.  Why don't you give us some background as to what's occurred relative to their treatment, including the issue you have with Grace?

A   So starting back in 2016, or even prior, with Grace, Grace has severe dental phobia.  So she's unable to have a teeth cleaning.  She's kind of successfully had a few of those, but she's been unable to have any fillings filled, except by one doctor that Dana and I found in either Nashua or Amherst, who's Dr. Andrew Cheifetz.  She was seen by Dr. Cheifetz up until 2016, and he was able to fill her cavities. He was able to do all the treatments with her.

And then in 2016, we had an appointment with -- I made an appointment with Dr. Cheifetz for her regular six-month exam, and Dana contacted their office, and that was the first time he contacted an office and said he had legal authority and that things had to be done his way, not my way.  And he



98

essentially caused their office, because he spoke to their office manager, to determine that -- that there would be a threat of their being sued and they fired Grace as a patient. So I was unable to get Grace the dental care that she had previously been able to get.

From there, Dr. -- excuse me, Dana wanted me to go to Dr. Machell, the family doctor. I could not afford his rates at that time. He was extremely expensive. He's a great dentist, but he's very, very costly. So I found a dentist that was covered under our New Hampshire insurance. We had New Hampshire Children and Family Insurance that I had obtained at that time due to low income. And they were seen at Sterling Smiles in Nashua. From that point -- but they were unable to treat Grace because of her phobia.

So then we moved to California, and we -- I had them seen at Hastings Ranch Dental, but during the period when we moved to California, I did not have dental insurance for the girls. I had had dental insurance under the California Family and Children Insur -- or excuse me, New Hampshire Family and Children Insurance, but when we moved here in September of 2017, I no longer had that insurance.

Q   Okay. And did that create -- did that create any -- did you have any financial issues with regards to paying for dental privately?

A   Yeah, I had financial issues with pretty much



99

everything on coming out here to California.  As the Court is aware, I get around $1,600 a month in disability because I have stage IV breast cancer.  I have no other income --

(Phone ringing)

THE WITNESS:  One second.  And so -- I'm sorry, but -- I'm sorry about that.

A  So I did not have insurance coming out here.  I had a court order saying that Dana needed to pay for the insurance, but we didn't have it and we were experiencing some financial difficulty, which is pretty -- pretty (audio interference).  Yeah, I -- I think I answered your question.  I'm sorry, I got distracted by the phone, but I turned it off.

BY MR. FONTAINE:

Q  Yeah, and -- that's okay.  That's okay.  And so with regards to the dental coverage for -- for Grace, does that cost -- typically cost more than would be for a child that doesn't have that fear?

A  Yeah.  It does because, okay, she can't just have a cavity filled for two or three (audio interference) filled in all the cavities.  It's literally thousands of dollars because she requires full anesthesia at this point because we've been unable to find a doctor that can do it any other way.

Q  Okay.  And so did you -- you acknowledge that you put off some of that care because you couldn't afford it?

A  Correct.



100

Q  And have you shut your phone off, by the way?

A  Yes.

Q  Okay, thank you.  So with regards to the dental care -- we'll stick with Grace for right now.  With regards to dental care for Grace, did you, at some point, obtain care for her?

A  Yes, in June, I think, the 18th, I took her to Hastings Ranch to go for a full set of X-rays and cleaning.

Q  Who paid for that?

A  I did.  Actually, my -- my mother helped me.

UNIDENTIFIED SPEAKER:  We paid -- but yeah, I -- Dana didn't.  I -- we did.

BY MR. FONTAINE:

Q  Okay.  And did they -- and what did they find?

A  They found six cavities for Grace.

Q  Okay.  At some point in time, were they able to fix those cavities?

A  They tried to do some procedures with her, but it wound up the same way it always does.  She's hysterical, and they give up.  And they then said this child needs medical anesthesia to have her cavities filled under anesthesia.  And they gave me the name of La Habra Family Dentistry, or I believe, La Habra Modern Dentistry in La Habra, which is about an hour away from here.  And they referred me to their office and said I should make an appointment and have her go in and



101

get the full anesthesia and have the six cavities treated then.

Q   And did you do that?

A   We did.  So I made the appointment with La Habra Family Dentistry, and I then contacted your office, who then contacted Dana, and we explained the situation that she had six cavities, needed to go La Habra Modern Family -- needed to have dental anesthesia.  And I said that I had let -- on the advice of my dentist, they had referred to me to the La Habra Modern Family Dentistry location.  I provided a link to their website and information about them, and I told Dana that I needed his permission to proceed.  And he said he -- that I already had an appointment on a certain date, and that I needed his approval to keep the appointment or he could review the information if he did not like that doctor and present an alternative doctor that I could take them to.  So that was sent out after I discovered the six cavities and got the referral.

Q   And did Dana, in fact, agree that you could get the treatment?

A   He did not agree to the treatment.  And I reluctantly had to cancel the appointment with La Habra Family Dentistry.

Q   Okay.  And has Grace, at any point, received the treatment that she needed?

A   Yes.  So that was in June, and then all that fall, I



102

tried to get Dana's permission, and I made two separate appointments with La Habra Family Dentistry, both of which I was unable to keep because of Dana's not giving permission. I then took the kids back for their six-month checkup in January of 20- -- what would it have been -- 2018. Switching track of years, but that was in June. So yeah, of 2018 -- 2019. So I took them back in January of 2019.

At that point, the doctor at Hastings Ranch Dental, where I was taking them every six months, gave Grace another set of X-rays and said this child now doesn't have six cavities like in June. She has 11 cavities. Why have you not fixed her cavities? We gave you a referral; why did you not fix them? And I answered to her that I, under a -- a New Hampshire family order, have to get my -- the -- her father's permission to proceed, and he has not provided permission.

She then said this is urgent enough that you should probably do it even without permission. And I said that would be a violation of the court order. And she then wrote a -- a fairly straight-up letter at my request because I said can you write a letter stating this so I can send it to the court and get the court's permission to get her treated, if Dana won't agree? She wrote a letter in January of 2019 stating that Grace had had 6 cavities in June, now had 11 cavities, and that it was absolutely urgent that she receive the care.

So I got that letter -- I requested the letter; I got



103

the letter to send to the court.  And we tried again to contact Dana and to suggest a different dentist, which is one in Pasadena.  He agreed to that.

Oh, let me back up.  So after I got the letter from her, I went -- I took Grace, physically, to La Habra Family Medical Dentistry and had an appointment with her with the doctor to consult, even without Dana's permission.  I took her at least for the consultation.  And then we came back, and we thought let's propose a different dentist; maybe he'll agree with a different anesthesiologist and dentist, so we proposed that.  And I did that combined with the fact that there were now 11 cavities, he agreed to that.  And then we proceeded and had the procedure done.

As he says, it was $2,500.  I did submit it to insurance; they paid a portion of it.  They paid something like the first 15 minutes of anesthesia, not the whole thing, and I wound up having to pay the majority of that out of pocket.  I've asked him to reimburse me, and he hasn't.

Q  Has Dana -- has -- and how did you get money for -- to be able to afford that?

A  I had to ask my mom, kind of on bended knee at that point.

Q  Has Dana --

(Phone ringing)

THE WITNESS:  Oh, I guess I didn't turn my phone



104

off; sorry.  I'm so sorry; I thought I had it off.  Okay, go ahead.

BY MR. FONTAINE:

Q  So do you believe that Dana's actions with regards to the -- the dental treatment of the -- first of all, the insurance that would have covered some of the dental treatment and then, subsequently, the dental treatment itself has inhibited your ability to get prompt dental treatment?

A  Yes, it caused Grace to go from 6 cavities to 11 at -- at great trauma and distress to both me and Grace -- and my dentist.

Q  Let's talk about Sophie for a second.  Did she also require any -- any dental work?

A  So I had purchased braces for Sophie on the recommendation of our dentist.  I took her to an orthodontist and purchased braces for her, which were close to $6,000.  I did this back in New Hampshire.  And my mother helped me to pay for a portion of that expense.

I -- we saw that --

Q  Did Dana -- did Dana contribute to that expense at all?

A  Not one penny, no.  And now Grace needs braces too, and I'm sure he's not going to pay for that either.  I've got to figure that out.  But anyway, so I got Sophie braces and took her to her regular appointments for tightening and



105

adjustments all throughout our stay in New Hampshire.

When we moved to California, obviously, I couldn't take her to the orthodontist we'd been seeing, so I took her to two separate orthodontists here in California and said can you take over Grace's -- or excuse me, Sophie's braces. And both orthodontists gave me exorbitantly high prices of thousands of dollars which, at that point, I did not have and was unable to pay for it. So I asked that -- the orthodontist that I saw, I said what would -- what's the worst-case scenario if I just wait until I get some money? Because if the Court will recall, I was awarded proceeds from the sale of the house, but Dana had put in an appeal causing all of those proceeds to be on hold. So we were absolutely broke during that period of time, which was a long period of time, until finally that was decided and those funds were released. So that was during that time when I had just no money and I could not afford thousands of dollars for orthodontic care for Sophie at that point in California.

What -- what -- like I said, I asked the orthodontist what's the worst that would happen if we just left it alone? And they said, well, they won't get better, but they won't get worse. And you can do that until you can afford it. And I kept thinking any month now I would be able to afford it.

Q  After you received your money from the -- from the property settlement after the appeal was denied, did you end



106

up proceeding with having some work done for Sophie?

A  Yes, which I paid for out of pocket.  So I took Sophie to an orthodontist once I had that money, and we had her braces adjusted and then removed and a retainer made, again, all at my expense in cash.

Q  Did Dana contribute anything for that expense?

A  Nothing.

Q  So in regards to the -- this -- the request in your motion for decision-making relative to medical and -- medical decisions, do you feel that his -- the -- the -- the -- the difficulty that you've had relative to Dana's cooperation with dental care is part of that request as well?

A  Yes.

Q  I'm going to refer you to our Exhibit Number 5 regarding the landlord.  At some point in time, did your landlord contact you regarding a packet of information that Dana had -- had sent to them?

A  He sent me an email, yes.

Q  Okay.  And was it your landlord -- first of all, who are you landlords?

A  My -- the home I live in is owned by a -- a -- a Chinese couple whose last name is Lin (phonetic).  And the person who manages the property is their son, George Tsai.

Q  Who contacted you?

A  George Tsai contacted me, the son.


(973) 406-2250 | operations@escribers.net | www.escribers.net

107

Q  Did he indicate to you that -- that the package he received had caused him concern?

A  Yes.

Q  And explain that conversation.

A  So he told me that he had received an unsolicited package by postal mail that he did not know how, but -- but appeared to be from my ex-husband, Dana Albrecht; that's the return name on it.  He said it contained sensitive information about my children, including their birth certificates, and it made him extremely uncomfortable.  He felt it was inappropriate.  And he said it was unsolicited.  He didn't know how Mr. Albrecht got his name or address, but I guess through property records, and that he wanted me to know that in no way did this affect his high estimation of me or my family, my children.

And then I spoke to him on the phone after receiving this email, and I learned from him that the -- that this packet of information was sent to that family -- or to my landlord a month before my lease was up for renewal and that his parents, his Chinese conservative parents, had said that on the day he got this packet from Mr. Albrecht, that they were not going to renew my lease.  So I would have had like 30 days to not have a home.

George, who's very kind, actually spoke to his parents on my behalf and said please don't hold the bad actions of Mr.



108

Albrecht against this woman and her children.  And he was able to persuade his parents to relent and allow me to renew my lease and remain in my home.

Q  And -- and what did you consider that packet to be from Mr. Albrecht?

A  I think it was an attempt to -- given the timing, especially, to having exactly that outcome:  for me to lose my lease and lose my home.  For me and the children to lose our home.  I think it was just designed to -- to create hardship for me.

Q  Now, let's talk a little bit about Exhibit Number 4.  This is a couple documents relative to The Wilds -- addressed to The Wilds of New England.

A  Yes.

Q  And these are from Dana, correct?

A  Yes.

Q  And did you have any conversation with this gentleman, Rand Hummel?

A  I did.  During -- it's kind of a blur because it's right when my mom died, but I had sent my kids to the summer camp.  They always attend.  So -- because for a couple reasons.  That was the week that their friends were going to be there, and they historically always go when their friends are there.  And also, I wanted them to get a little break because at that time, my mother was in hospice, and -- I'm



109

sorry.  At that time, my mother was very sick, and I was administering morphine to her.

Q  Okay.

A  Should I go on?

Q  Take your time.  So what -- what -- how did this -- how did the -- these -- their visit at The Wilds of New England result in these letters?

A  Okay.  So Mr. Albrecht flew out here with Peter to California and went to the Sierra Madre Police, who I guess informed him or maybe it was DCFS, the child abuse report he filed an hour later.  But one of them, he said my children are missing, help, help.  And I guess they contacted The Wilds directly, and my kids, at DCFS, the day after my mom died, I had to go in and meet with them.  So I put on a dress and makeup and high heels, and I went in and smiled and met the lady and brought my daughters, and she -- oh, excuse me, I didn't bring my -- just communicated with my daughters.  She put us on FaceTime with Rand Hummel and the staff at The Wilds, and -- who then went out and got my girls in from where they were participating in a -- in a fun camp activity.  They came in.  I was in this woman's office in the DCFS government building, and I had FaceTime.

And the staff at The Wilds had the girls, you know, FaceTime on the phone, and the girls saw me and said, "Hi, mom.  We're having such a great time.  Hi, how are you?"  And



110

then they looked at the background of where I was standing and said, "Wait a minute, where are you?"  And at that moment, the DCFS worker, Veronica, comes to the phone and said, "Hi, girls.  I am a child abuse investigator caseworker, basically."  And the girls went from totally happy to completely stressed out.

And at that point, she said, "Are you safe?"

And they said, "Of course we're safe."

And then we ended that call.  And I guess it was at that point that -- I -- I don't remember exactly how he got informed that they were at The Wilds, but I then talked to Rand Hummel and learned that he was trying to, like, talk to them at The Wilds, go see them at The Wilds.  And there was like a whole -- Mr. Hummel told me that he was extraordinarily aggressive and rude to him on the phone.  And the whole Wilds was upset about the way Mr. Albrecht was treating them and, I guess, letters followed.

Q  So the letters that we've attached to Exhibit 4 are letters that The Wilds received from Dana, correct?

A  That is correct.

Q  You said that was the --

A  I believe that they were -- I'm sorry.

Q  Go ahead.

A  Mr. Hummel told me that he would not -- that he was not -- because of the girls' request, he was not allowing



111

them -- allowing Mr. Albrecht to speak to them.  And then we had an emergency motion in court, and Mr. Hummel said that he was going to await the outcome of that motion before requiring the girls to talk to their dad.  And he told that to Dana, and I guess that made Dana very angry.  And then this was his form of retaliation within these letters, requesting all of these government documents, or whatever documents, from The Wilds.

Q  So now let's switch gears for a second and go to this -- the -- the -- Grace's choice of school.

A  Yeah.

Q  Can you give us some background how that all occurred?  First of all, where was she going --

A  So in --

Q  -- before she went to the school in question?

A  So in California, where we live, there is a very selective process for getting into private high schools.  Grace had -- Grace and Sophie both had attended the Gooden School for middle school, and then it was time for high school applications, which is a big thing in 8th grade.  They have (audio interference), they have tutoring about it, (audio interference).  So Grace (audio interference).  And Grace applied to a number of different schools around -- around December of January for a decision about admission that would come in, in March, to attend a private high school in the fall.



(973) 406-2250 | operations@escribers.net | www.escribers.net

112

These are extraordinarily exclusive and competitive schools, and some of them only take a very small percentage of students who apply. So they have to have great grades, really good test scores on the admissions test, and the applications have to be perfect. So Grace, in January --

Q  Okay. Hold on, before you go there. Hold on.

A  -- (audio interference) about that.

Q  Hold on, before you go there. So the Gooden School that they were attending previous to this, who paid for that?

A  I did. My mother --

Q  Okay.

A  -- my mother and I did. Yeah. Actually, my mother did, but --

Q  Okay.

A  -- Dana didn't.

Q  Okay. Okay. Dana didn't contribute anything for it; is that correct?

A  Not a penny.

Q  Okay. Now, was it your intention that if they got into any of the schools -- first of all, did they choose these schools to apply to?

A  Yes, I -- they -- well, Sophie had already been through it. She was already in high school. And then Grace, on the basis of her own research and the visits from the schools and to the schools, decided which ones she wanted to



113

apply to.

Q  Okay.  And did you assist her with that?

A  I did.  I used to tutor in this area, so I know the schools really well, and I drove her to the visits at the schools and helped her with the research.

Q  Okay.  And did she get into -- what -- what schools did she end up getting into?

A  She was admitted to (Indiscernible) High School to Mayfield Junior School, to Flintridge Sacred Heart Academy, and I believe those are the three that she applied to, or at least the three she was most interested in; those are the ones she applied to.

Q  And did --

A  Oh, and also the high school where her sister attends, so she applied to four schools.

Q  Okay.  And did she -- did she make a decision on where she wanted to attend?

A  Yes, her choice was Flintridge Sacred Heart Academy.

Q  Okay.  And in that regard, who is going to pay for that school?

A  I -- I -- me.

Q  Okay.

A  I -- I was going to, and I do.

Q  Okay.  And have you applied for financial assistance to be able to go there?

Commented [DF26]: 2:31:28

114

A  Yes.

Q  Okay.

A  And I receive --

Q  And --

A  -- some, but it's expensive.  I pay a lot of money to them, yes.

Q  At some point in time -- first of all, did you inform Dana, early on in that process, that Grace was applying to these schools?

A  I did not.

Q  And why did you not inform him?

A  So Grace was so nervous about these applications, and she begged me to make sure that her dad didn't keep her from getting admitted to her schools.  And so I thought long and hard about it, I talked to other people about it, I prayed about it, and I was so concerned that he would contact the schools and do what he's done before to Maranatha, where Sophie attends, what he's done at -- what he did at The Wilds, what he did to my landlord, what he's done to the doctors, what he's done to the dentists, what he's done to pretty much anybody in family he has contact with, and I -- I mean, I -- I can't say I knew, but I pretty much knew that Dana, if he knew the schools she was applying to, would contact them in the guise of being a caring parent and cause them also to reject our family from participating and would reject Grace's



115

applications, and she would get into none of these exclusive high schools.

Q   When -- at -- at some point in time, we received a letter from Dana inquiring as to whether she had chosen a school, correct?

A   Yes.

Q   And at that point, she had actually not made her final choice, correct?

A   Correct.

Q   And did you inform him of the school that she was in?

A   Once she had -- yeah, once she selected Flintridge Sacred Heart Academy and had basically been admitted, then I informed him of that.

Q   You've expressed some -- now -- now -- now, she's actually started there, correct?

A   Yes, yep.

Q   And do they have in-person attendance?

A   No, it's all COVID.  It's the Zoom, long-distance learning on the computer.

Q   And how is -- does she like the school?

A   She -- she is a people person; she's an extravert, so she really hates Zoom.  And it's difficult for her to be schooled from home and not be experiencing all the art classes and P.E. and those things.  So she -- I -- I'll be honest, she's not enjoying school this year.  Her sister, on the other



116

hand, who's an introvert loves long-distance learning, so Sophie's happy. But Grace is not enjoying this.

Q Okay. But beyond that, is -- but beyond that, is there -- is -- is -- does she have any complaints about her school beyond the fact that it's --

A It's all -- it's all intermingled. I think -- I think she's -- I think she's just struggling with the Zoom thing, and I don't -- I don't really know if it's the school or Zoom.

Q Okay. Have you been working with her to try to get past that?

A Yeah, we've -- she has a lot of homework, and I've been trying to help her with that. And I've also talked to the school nurse and communicated with some of her teachers at the school about ways that maybe it could be made a little bit easier on -- on the kids to be doing distance-learning.

Q So it's not just part of the experiencing issues?

A No, I think everybody's having a hard time.

Q Now, there was a question on the applications that they requested a copy of that you provided them.

A Yes.

Q You referenced legal custody. Was -- was -- that Dana didn't have legal custody. Do you recall that?

A Right, yes.

Q Why did you say that?

A Well, because I didn't really know the California term



117

of "legal custody".  I know that in the State of New Hampshire, we have primary parenting, and I have been awarded primary parenting.  I did not -- I was not really familiar with the California language.  I -- it's since been explained to me that there is custodial -- what is it?  I can't -- now I can't remember.  There's legal custody and then there's physical custody.  Anyway, I have one kind of custody, but not the other kind of custody, and I wasn't aware that there were two different custodies here.  So I said that I had legal custody, even though it's shared with Dana, I've now learned.

Q  And you are -- you were involved in a domestic violence incident back on November 3rd --

A  Yes.

Q  -- of 2019.  Do you recall that?

A  Yes.

Q  Okay.  Did that incident cause your girls emotional trauma?

A  Yes.

Q  Did it contribute, do you believe, in their poor relationship with their father?

A  Well, it was already poor.  I think -- I think it definitely made it worse.

Q  Since that time, has anything changed for the better relative to their relationship with their father?

A  No.



118

Q  Have the girls, otherwise, been doing well without having contact with their father?

A  Yes, and in fact, as noted, I believe, by their counselor, their -- it was either the counselor or the DCFS report, they're actually doing much better than when they had threats of having to deal with visits with him.  So in my observation, they're happier, they're sunnier, you know, they're not crying at night like they used to before visits.  They're -- they're -- they just seem healthier.  I mean, it's really sad, but -- yeah, they -- they seem to be doing better.  I mean, it's sad for me, but they seem to be doing a whole lot better.

Q  In the -- in the DCY -- in the Division report, Dana made a point of saying that the finding was inconclusive.

A  Yes.

Q  Do you remember that moment?

A  Yes, yes.

Q  Did you have a discussion with the caseworker on this matter at the end of the case?

MR. CAULFIELD:  Objection.

A  I did because --

MR. CAULFIELD:  This is Caulfield; objection.

THE COURT:  State --

A  Well --

THE COURT:  Excuse me.

119

MR. FONTAINE:  Hold on.  Hold on.

THE COURT:  Excuse me.

A  -- wanting that what I did, not what I was told.

MR. FONTAINE:  Hold -- hold on.

THE COURT:  Excuse me.

MR. FONTAINE:  Hold on, wait.  Don't answer the question.

THE COURT:  State the basis of your objection.

MR. CAULFIELD:  That it's -- that -- that it's unpermissible (sic), unreliable hearsay.

THE COURT:  Overruled.  Continue.

BY MR. FONTAINE:

Q  Did you have a discussion with -- and what was the name of the caseworker?

A  Veronica Coss -- C-O-S-S.

Q  Is she the same lady that you -- that -- that called the girls with you present, when they were at The --

A  Yes.

Q  Okay.

A  Yes.

Q  And has she been the caseworker throughout this investigation?

A  Yes.

Q  And -- and has she been the caseworker that interviewed the girls?



120

A   Yes.

Q   And at -- at -- at the conclusion of this, did she indicate whether she felt that your failure to -- that -- that --

MR. FONTAINE:  Strike that.

BY MR. FONTAINE:

Q   Did she indicate whether she felt that your obtaining of medical treatment or your obtaining of dental treatment or lack thereof had been neglectful?

A   No.

Q   Did she indicate that there was any remedial action that you needed to take relative to the --

A   No.

Q   -- way that you parented your children?

A   No.

Q   Did she indicate that she had planned on taking any further action in the future relative to this investigation?

A   She gave a warning in my house, sitting --

Q   Okay.

A   -- on my sofa, during our investigation.  And the warning was that if the girls continued to have to see their father, that I should be on notice that DCFS could literally take my children away from me if I could not protect them from Dana.  And that's what she told me in person.  And I said it's not up to me.  I'm doing everything I can to protect them, and



121

she gave me that warning.

Q  Has anything occurred since they closed their investigation?

A  No.

Q  In -- in regards to your motion to modify, you're asking that the Court remove Dana's rights to have parenting time with his girls, correct?

A  Yes, in part because of that warning.

Q  Well, let's -- but let's just talk about it.  So you've asked the Court, in your motion, to -- or currently, he has the ability -- he has rights, under the current parenting plan, to exercise parenting time with his girls at different times throughout the year, correct?

A  Yes.

Q  You've asked that that be removed, correct?

A  Yes.

Q  And you've heard Dana's testimony about all of the attempts that he's made to exercise those parenting rights after the girls had stated to him that they didn't want to visit with him, correct?

A  Yes, yes.

Q  And do you -- can you describe what the girls' reactions are when he has requested that time and you've informed them of that?

A  Yeah.  The girls have said no, and I think they're



122

very upset that, rather than listening to that, apologizing to them, or trying to do constructive things, that he disrupted their time at The Wilds, filed bogus reports against me that involved them in an investigation, showed up at their church causing a huge scene at the church with police in front of all their friends, refused to leave, stood outside in the parking lot.  I mean, it's just thing, after thing, after thing.  Contacted their schools, contacted -- it's just -- I think the girls are truly believing that his desire to -- I think at this point, they believe it's -- it's harmed them, but it's certainly to harm me.  I think that they believe that that has gotten to such an extreme that they are not safe.  And they've been very, very consistent in stating that they will not -- that they don't want to see him.  And these efforts that he's making have made things a lot worse.

Q  Is -- when you bring this to their attention that he has requested these additional times to visit with them after they've expressly indicated that they don't want to visit with him, what is their emotional state when you're -- they're informed of that?

A  Well, Sophie, who's now 16, just gets very angry.  And Grace, who's 13, just says I don't want to talk about this, and you're just -- it's just going to upset me even more, and I don't want to talk about it.  You know every time you talk about this, I get upset.  And then I try to talk about it to



123

encourage them, and I -- Grace seems just very emotionally distraught. And Sophie has gone from being emotionally distraught a couple years ago to just seeming extraordinarily angry. And that anger sometimes come out at me too. But yeah.

And it's -- it's anger at him; it's anger at the process; it's anger at why won't anybody listen to them.

Q If the -- if the -- if the Court were not to remove the current orders allowing him to exercise this time, and he were to continue to assert his rights to exercise those times, do you think emotional harm would result to the girls?

A I think it already has, and -- and certainly, it would be more.

Q And is that why you're asking for that to be removed?

A Yes. If -- if they want to repair their relationship, I don't think it should be us mandating that they have to do it. It just -- they'll then refuse, and then they want to -- then they feel the need to argue with me, against the Court, against their father, and it just brings them through a whole ton of emotional turmoil. They've made it very clear that no matter what anyone does, they're not going to have these visits, and to have them continue to come up every couple months is extraordinarily stressful for them, for me, for the family, and it's -- it's -- it's leading to a bad outcome for them.



124

Q  You already indicated that you thought it would not be emotionally good for them to be forced to do reunification counseling.  But if the judge decides that he is going to order it, do you have a preference on how the choice of that counselor would occur?

A  Well, first of all, the counselors that he recommended, some of them are like $375, I think -- just exorbitant -- an hour, or 45 minutes; I can't remember, but they -- they were extraordinarily expensive.  He has not reimbursed any of the over $9,000 of medical expenses I've spent on the kids since moving to California.  He has not reimbursed any of it, so I have no reason to believe that he would contribute, in any way, to paying for the counseling. Since I would be the one taking them to the counseling, that burden would fall on me, and I can't afford to pay, nor should I have to pay, $400 an hour to people to counsel them.  So I would want that, obviously, it be an unbiased counselor and one covered by our insurance, the children's insurance, and one that was reasonably priced.

Q  Would you like to be part of that decision on -- on who their reunification counselor would be if the Court were to order that?

A  Yes, I would.

Q  Okay.  But you still object -- you would object to the Court doing that, though, correct?



125

A  Well, I think "forcing" is the operative word here.  I think forcing the girls to do anything at this point, when they're 13, almost 14, and 16 and have already had -- everything that has happened has already happened.  I think forcing them to do anything at this point is probably going to be counterproductive to their relationship with their father and their emotional health.

Q  Okay.

MR. FONTAINE:  Give me one second, Judge?

THE COURT:  Sure.

MR. FONTAINE:  Just at this point, Your Honor, I would ask that all -- all of our exhibits be accepted as full exhibits.  I understand you'll be making that decision later, but I just wanted to make a formal request for that.

Thank you.  I have no further questions at this time.

THE COURT:  Okay.  Mr. Caulfield, before you begin your cross-examination, I want to inform both counsel and the parties that the conversation that the Respondent had with Ms. Coss from the Los Angeles Department of -- excuse me -- Children and Family Services, specifically the warning, the Court is going to disregard.  I'm not saying that it -- that she didn't --

MR. CAULFIELD:  Thank you, Your Honor.

THE COURT:  -- I'm not saying she didn't say that.



126

I'm just saying that I am disregarding that particular warning, okay?

You may cross --

MR. CAULFIELD:  Thank you, Your Honor.

THE COURT:  -- you may cross-examine.

MR. CAULFIELD:  Yes, Your Honor.

CROSS-EXAMINATION

BY MR. CAULFIELD:

Q   Dr. Albrecht, you testified on direct examination that Mr. Albrecht's position is that you've alienated the children, correct?

A   He filed words to that effect in many filings.

Q   Right, right.  Isn't it true that what he really has said in his filings is -- and I'm reading from page -- from paragraph 31 of the case we're trying right now, the amended petition to bring forward and modify, and I'll read it to you. He says, "It is clear that their children are either being alienated by Dr. Albrecht, estranged by Mr. Albrecht, or some combination thereof."  So he's not saying what you're saying he says, is he, Dr. Albrecht?

THE COURT:  *[Whispered] Not in the pleading, but in his testimony, he has.*

A   Not there.

BY MR. CAULFIELD:

Q   Sorry?



127

A  He's not saying that there.

Q  Well, he's not saying it in the -- in the petition that we're -- that we're trying today, right?

A  Correct.

THE COURT:  *[Wheeze or laughter] [Whispered]  Okay.*

BY MR. CAULFIELD:

Q  Okay.  Now, you mentioned that -- one second.  There we are.

THE COURT:  *[Whispered] He's actually born on (indiscernible).*

BY MR. CAULFIELD:

Q  You mentioned that all five of the reunification counselors that have been --

THE COURT:  *[Whispered] Do you have to say that?*

BY MR. CAULFIELD:

Q  -- proposed by Mr. Albrecht are biased?

THE COURT:  *[Whispered] I'm not throwing you out, but if you want to leave --*

*[Laughter]*

A  I believe that my attorney asked me if I thought that his list of counselors recommended was biased, and I answered that I did.

BY MR. CAULFIELD:

Q  I see.  And the -- these counselors are all certified by the court, right, to conduct investigations --

Commented [DF27]: 2:50:34

128

THE COURT: *[Whispered] (Indiscernible) clearly asked her that.*

BY MR. CAULFIELD:

Q  -- of the Los Angeles Superior Court; they're all 730 evaluators, correct?

A  If you say that, yeah, I'm sure it's accurate.

Q  Okay.  And when you said earlier in direct examination that they were biased, that's when you thought that Mr. Albrecht's position was that this is all your fault, right, that the children have been -- have been alienated by you, correct?

A  I believe that is his position.  I haven't changed that belief.

Q  Right.  So -- so -- so now that you -- now that you realize that the pleadings, the case we're trying today says the opposite, do you still feel that these five evaluators are biased against you?

A  That question doesn't make sense.  They don't know me.

Q  Well, why do you think they're biased then?

A  Well, I don't think they're biased against me, but when I go back and look at, I believe, Craig Childress and some of the other names on there, it appears that their specialty is parental alienation.  And that --

Q  And if I said -- I'm sorry.

A  Yeah.  In previous pleadings, in -- in numerous, many,



129

many previous pleadings, it has been Mr. Albrecht's position that the reason that the girls and his relationship is strained is because of actions that I have taken, which would be -- constitute parental alienation.  So a counselor who specializes in that would appear to be biased towards that position.

Q  And these -- these -- these five therapists, their -- their curriculum vitaes, and the links to their websites have been made exhibits in this case.  And are you representing that when -- when Master DalPra reviews these -- these curriculum vitaes, he will find that these evaluators' sole expertise is in alienation cases?

A  No.

Q  Okay.  Now, when you -- when you mentioned that Mr. Albrecht keeps sending legal documents to the school and legal documents to providers, is -- is -- is there -- has he sent any legal documents, other than Master DalPra's parenting plan?

A  I haven't seen the documents that have been sent or been privy to those conversations.  I only know what the providers have told me.

Q  Did the providers tell you that Mr. Albrecht sent any other legal document, other than Master DalPra's parenting plan?

A  I don't know what they sent.  They simply said that



130

they've received legal packets and are afraid of litigation.

Q  Right.  So you don't know is the answer, correct?

A  I do not know.

Q  Right.  Okay.  Now, let's talk briefly about your children's teeth.  So is it your position that your children's teeth are all Dana's fault?

A  No.

Q  Okay.  Is it your position that the children not being vaccinated is all Dana's fault?

A  Yes.

Q  I see, okay.

THE COURT:  *[Wheeze or laughter]*

BY MR. CAULFIELD:

Q  And how long -- so -- so you -- you said that you didn't get them vaccinated, yet, surely, you've done other things without consulting with Mr. Albrecht.  You haven't got them vaccinated because you're waiting for Master DalPra's order?

A  Yes.

Q  Is that somehow in the parenting plan that Master DalPra is to determine the children's vaccination schedules?

A  No.

Q  That's something that a mom and dad does, right?

A  Yes.

Q  Right.



131

THE COURT:  *[Whispered] He's not doing it.*

BY MR. CAULFIELD:

Q  Now, you mentioned that you haven't taken the children to get their teeth done because you can't afford it?

A  No, I have taken the children to many dental visits, including one just recently.

Q  So is that because of money?

A  No, it's since there's not insurance, I've taken them every six months to the dentist.

Q  Oh.  Oh, so you do have -- but so you do have money --

THE COURT:  *[Whispered] (Indiscernible) agree.*

BY MR. CAULFIELD:

Q  -- to take the children to the dentist, if you chose so?

A  I have dental insurance now.

Q  Right, okay.  So it's not a financial issue?  It's not that Dana is not paying anything, or it's all -- it's all you can do it any time you want to, correct?

A  Well, I take them on the recommended schedule, which is a cleaning every six months.  And that's --

Q  Right.

A  -- covered by insurance.

Q  Right.  So that's -- we don't blame Dana for that?

A  Blame him for what?

Q  For -- for the teeth?



132

A   I don't understand your question.

Q   Okay, that's all right.  I'll withdraw it.

How much do you pay to send the kids to private school?

A   Thousands.

Q   Thousands, okay.  Thousands.  Now, you testified under -- under direct that Dana contacted the providers and his children's schools in the guise of being a caring parent.  Do you remember saying that?

A   No, I did not say that.

Q   Oh, you didn't -- you never said "in the guise of being a caring parent"?

THE COURT:   *[Whispered]*  *(Indiscernible)*.

A   I did say that phrase.

BY MR. CAULFIELD:

Q   You did say it?

A   I said that phrase, but not in the way you're asking.

Q   Well, let's -- let's ask the question again.  Did you testify in direct examination that Dana contacted the providers and the schools, and I'm -- and I quote, "in the guise of being a caring parent"?  Did you testify to that?

THE COURT:   *[Whispered]*  *She did say that.*

A   I did not say that.

THE COURT:   *[Whispered]*  *Yes, you did.*

BY MR. CAULFIELD:

> Commented [DF28]: 2:56:42

133

Q  Okay.  Now --

A  What I -- can I say what I did say?

Q  No, your lawyer can put you back on the stand for that.

Now, if I understand, you -- you admitted on direct examination that you haven't followed the parenting plan in certain areas because the children didn't want you to, you talked to people, and you prayed on it, correct?

A  In exactly one instance, yes.

Q  Okay.  And so you didn't follow the parenting plan, correct?

A  Under that one instance, I did not.

Q  Right.  But if Dana doesn't follow the parenting plan, he should have his rights stripped away and he shouldn't see the children; is that your testimony?

A  I never said that.

Q  Okay.  So then -- so then if Dana doesn't follow --

THE COURT:  *[Whispered] Would you (indiscernible) and ask defense (indiscernible).  Thank you.*

BY MR. CAULFIELD:

Q  -- the parenting plan, say, on the Christmas when he kept the kids a couple of extra days, that's -- that's no more of a horrible crime than you not following the parenting plan, correct?

A  Those are very different circumstances, and what he

> **Commented [DF29]:** 2:58:12

134

did harmed the kids.

UNIDENTIFIED SPEAKER: *[Whispered] Thank you.*

BY MR. CAULFIELD:

Q  But what you do doesn't harm the kids?

A  In that one instance where I --

Q  I see.

A  -- waited until Grace was admitted to a school before telling Dana when she hadn't even accepted that admission, I don't think what I did was that bad and did not harm her.

Q  Okay.  But what Dana did was very bad, you think?

A  Yes, I do think that.

Q  Okay.  Now, you mentioned that the children are crying at night and you feel that they're better off without their dad?

A  No, I didn't say that.

Q  You didn't say that you thought that they were better off without their dad?

THE COURT: *[Whispered] I remember seeing that (indiscernible) afterwards.*

A  I didn't say that.

BY MR. CAULFIELD:

Q  Okay.  Now, do -- do -- do you -- do you agree that Dana has never been found unfit to be a parent?

A  I agree.

Q  Okay.  And do you agree that it's the policy of New

Commented [DF30]: 2:59:09

135

Hampshire to support frequent and continuing contact between children and --

MR. FONTAINE:  I object.  I object, Judge.  She's not a lawyer.

THE COURT:  I'm not sure --

MR. CAULFIELD:  I'm asking if she agrees.

THE COURT:  -- I'm not sure the witness knows what the policy of the State of New Hampshire is, Counsel.  So you can either --

MR. CAULFIELD:  I was -- I was --

THE COURT:  -- you can either rephrase the questions or I'll -- I'll sustain the objection.

BY MR. CAULFIELD:

Q  Dr. Albrecht, do you personally agree that children do well when they have contact with both parents?

A  Yes.

MR. CAULFIELD:  One second, please.

(Pause)

MR. CAULFIELD:  Give me one moment, please.

BY MR. CAULFIELD:

Q  Now, you mentioned about a big scene when Dana went to church to try to visit with the children, right?

A  In November, yes.

Q  Well, the -- the -- the one that's spun out in this DV, whatever the date is, correct?  We're talking about the

136

same incident?  Okay, all right, all right, all right.

And you said the police were called?

A   Yes.

Q   Who called the police?

A   The leadership of the church.

Q   Right.  He a friend of yours?

A   Our family's attended there for 12 years, so yes.

Q   So he's a friend of yours, right?

THE COURT:  *[Laughter]*

A   Well, it was the pastor.

BY MR. CAULFIELD:

Q   Now, you said that when the children contemplate seeing their father every few months, it's -- it's a huge issue in your household, right?

A   It has been in the past, yes.

Q   Every few months; is that right?

A   Okay, yeah.

Q   Okay.

MR. CAULFIELD:  I -- I have no further questions.

THE COURT:  Do you have any redirect, Atty. Fontaine?

MR. FONTAINE:  No, no, Judge.

THE COURT:  Very well.

MR. CAULFIELD:  I would like to put my -- I'd like to put my client back briefly on -- on -- on the stand for

137

rebuttal, Your Honor.

THE COURT:  One moment.  Mr. Fontaine, do you have any other -- other witnesses?

MR. FONTAINE:  I don't.

RESPONDENT RESTS

THE COURT:  Very well.  Yep, go ahead.

Mr. Albrecht, you're still under oath.

MR. CAULFIELD:  So if I could get --

THE WITNESS:  Yes.

MR. CAULFIELD:  Thank you.

DANA ALBRECHT, PETITIONER, PREVIOUSLY SWORN

DIRECT EXAMINATION (REBUTTAL)

BY MR. CAULFIELD:

Q  So Mr. Albrecht, you heard your ex, Dr. Albrecht, testify that you sent a letter to her landlord, and she -- she drew an inference from that that your intention -- and I -- and I'm not quoting her directly here as I did previously, but my notes tell me that she said that she thought that the -- that you were doing this to make her homeless or something?  Something close to that.  Do you remember that testimony?

A  Yes.

Q  Okay.  Well, could you tell us -- could you tell -- tell Master -- Master DalPra why you sent the letter to the landlord?

A  I was concerned for the safety of my children.



138

There's a police report.  It is one of the exhibits here, Exhibit 39, concerning break-ins, people going at the door with a drill.  I was also concerned that my children might not be able to exit this property.  We've got photos -- photos of them being restrained and the doors being secured from the inside with a zip tie, Exhibit 71.  So I was concerned it was a safety issue.  And quite frankly, I have no idea what her lease arrangement is.  If that caused problems with the lease, I do apologize.  I -- I've never seen her lease, don't know anything about that, but it was just concern for the safety of the children.  I just wanted them to have this police report and the two photos and to be aware of who my children were and they're staying at the property.

Q  And -- and -- and you said something, you said that you -- that the children were being zip-tied into the apartment, but there's -- but there's been testimony here -- here that she was -- that what Dr. Albrecht was doing was trying to prevent people from outside the apartment getting in.  Do you -- do you have any evidence that your children --

MR. CAULFIELD:  Your Honor -- hold on, hold on.

Your Honor, I object.  This was already litigated.  This was already before you.  You made orders.

THE COURT:  It was.  Objection sustained.

MR. CAULFIELD:  It was, Your Honor, except on cross-examine -- on direct examination, Atty. Fontaine specifically



(973) 406-2250 | operations@escribers.net | www.escribers.net

139

asked her about the letter to the landlord and implied -- and attributed to my client evil intents of why he did it.

THE COURT:  And he's test --

MR. CAULFIELD:  I think he's entitled to explain why he did it.

THE COURT:  But he's testified as to why he did it.

MR. CAULFIELD:  But -- but there was one other thing she said, Your Honor, that when she zip-tied the doors, it was to lock people out.  And I just want him to direct you to an exhibit that says the exact opposite from the children themselves, that it was to lock them in.

THE COURT:  I've seen the exhibit.

THE WITNESS:  Exhibit 72.

THE COURT:  I've -- I've dealt with that issue.

MR. FONTAINE:  It has nothing to do with --

THE COURT:  Excuse me, hello?  I've dealt with that issue at a prior hearing.  Objection is sustained with regard to this hearing.

MR. FONTAINE:  Thank you.

MR. CAULFIELD:  Your Honor, then would you please strike her testimony regarding this incident?  Because she told -- she testified about the landlord and the letter.

THE COURT:  The letter is -- I -- I -- as I mentioned earlier -- no, I'm not going to strike the testimony.  But as I mentioned earlier, if I determine that



140

the letter to the landlord is irrelevant, it's not going to be admitted as an exhibit.  I must have 400 pages of exhibits in front of me here.

MR. CAULFIELD:  I think that's true.  All right. Well, Your Honor, I -- I -- I -- as I've -- just for the record, Your Honor, I -- I think that I should maybe show that the children themselves say that they wouldn't -- she was not locking someone out in this incident; she was locking them in. But be that as it may, I'll move on.

THE COURT:  Very well.

MR. CAULFIELD:  Yes.

BY MR. CAULFIELD:

Q  So these -- Mr. Albrecht, you heard testimony about these reunification counselors and what's your position in this case as to whether they're biased.  What is your position in this case regarding why you want a reunification counselor?

MR. FONTAINE:  Well, Judge --

A  I just --

MR. FONTAINE:  I -- I object.  This -- this is not rebuttal testimony.  This is re -- this is him testifying.  He could have easily addressed this in -- in direct examination. This is his request.

THE COURT:  Well, perhaps I'm wrong, Atty. Caulfield -- excuse me for a moment.  Perhaps I'm wrong, Atty. Caulfield, but I'm assuming that he wants reunification



141

counseling to try to repair his relationship with his children and try to make a determination as to why their relationship has deteriorated.

MR. CAULFIELD:  Absolutely correct.

THE COURT:  And I believe --

MR. CAULFIELD:  What I was getting at --

THE COURT:  I believe he test -- I believe he testified to that on direct examination.

MR. CAULFIELD:  Correct.  And on -- and on Dr. Albrecht's direct examination, she testified that these reunification counselors were biased and were only experts in the area of alienation.  And now I have Dana back on the stand to try -- to testify that that's not at all true.

THE COURT:  Okay.  Well, with all due respect to both counsel and both witnesses, I'm not sure that any of them know what these counselors' areas of expertise are or whether they are slanted one way or another with respect to the alienation issue.  So the objection is sustained.

MR. CAULFIELD:  We have no -- okay.

BY MR. CAULFIELD:

Q  Now, Mr. Albrecht, I direct your attention to Exhibit 91.  How is that relevant to what -- what Dr. Albrecht just testified to?

A  So this is a letter we sent them that they never gave us an adequate response to.  But in short, I believe that



(973) 406-2250 | operations@escribers.net | www.escribers.net

142

she's the beneficiary of her mother's estate, so that's got ten rental properties worth $2.8 million.

MR. FONTAINE:  Your Honor, I object.  This is -- this is completely inappropriate --

THE COURT:  Sustained.

MR. FONTAINE:  -- for rebuttal.  This is not a financial case.

THE COURT:  Sustained.

MR. CAULFIELD:  I don't have any other questions, Your Honor.

THE COURT:  Very well.  Any redirect on -- recross, Mr. Fontaine?

MR. FONTAINE:  No, I don't, Your Honor.

THE COURT:  Very well.  I'm going to take the matters under advisement.  Don't expect a -- an order any time real soon because I do have to plow through those exhibits that were proffered, not necessarily admitted at this point. But the -- the record will reflect that all the exhibits would be marked as ID until I have an opportunity to determine the relevant ones and the ones that don't apply.

So with that said, I want to commend all four of you for a very comprehensive, civil hearing under difficult circumstances.  And I wish everyone to stay safe.  I'll take the matters under advisement.

This hearing is adjourned.  I'm going to terminate



143

the telephone call at this time.  Thank you.

MR. CAULFIELD:  Thank you, Your Honor.

THE PETITIONER:  Okay, thank you.

(Proceedings concluded at 3:10 p.m.)

144

<u>CERTIFICATE</u>

I, Dena Farbman, a court-approved proofreader, do hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, to the best of my professional skills and abilities.

Karen Raile, CDLT-105, Transcriptionist
Erin Perkins, CET-601, Proofreader

DENA FARBMAN, CET-629                    April 6, 2022
Proofreader/Quality Control Manager

**Original transcript signed on November 12, 2020**

