*In the Matter Of:*

RE HONORABLE JULIE A. INTROCASO

HONORABLE JULIE A. INTROCASO

February 08, 2021



**Certified**
**Videographers & Court Reporters**
**VIDEOCONFERENCING**

**603-666-4100**
**Toll Free: 1-888-212-2072**

814 Elm Street * Suite 400 * Manchester, NH  03101
Fax: 603-666-4145 * Email: info@avicorereporting.com
Website: www.avicorereporting.com

THE STATE OF NEW HAMPSHIRE

JUDICIAL CONDUCT COMMITTEE


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

            \*

IN RE:       \* Case Nos.:

         \* JC-19-050-C

HONORABLE JULIE A. INTROCASO \* JC-20-010-C

         \*

         \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


  DEPOSITION OF HONORABLE JULIE A. INTROCASO

  Deposition taken by agreement of counsel via

  Zoom on Monday, February 8, 2021, commencing at

  1:35 P.M.


Court Reporter:

Tina L. Hayes, RPR, NH LCR #80

(RSA 310-A:161-181)


---

**Page 2**

A P P E A R A N C E S

Representing the Judicial Conduct Committee:

  WAYSTACK FRIZZELL
  251 Main Street
  Colebrook, NH  03576
  By:  Philip R. Waystack, Esquire
  (603)237-8322
  phil@waystackfrizzell.com

Representing Honorable Julie A. Introcaso:

  McLANE MIDDLETON, P.A.
  900 Elm Street
  Manchester, NH  03101
  By:  Michael A. Delaney, Esquire
  (603)628-1248
  michael.delaney@mclane.com

  McLANE MIDDLETON, P.A.
  900 Elm Street
  Manchester, NH  03101
  By:  Amanda Quinlan, Esquire
  (603)628-1348
  amanda.quinlan@mclane.com

    S T I P U L A T I O N S

It is agreed that the deposition shall be taken in the first instance in stenotype and when transcribed may be used for all purposes for which depositions are competent under New Hampshire practice.

Notice, filing, caption and all other formalities are waived.  All objections except as to form are reserved and may be taken in court at time of trial.

It is further agreed that if the deposition is not signed within 30 days, the signature of the deponent is waived.

---

**Page 3**

      I N D E X

WITNESS:

 Honorable Julie A. Introcaso

EXAMINATION:          Page

 By Mr. Waystack       6, 210

 By Mr. Delaney        192

ERRATA SHEET          217

CERTIFICATE OF REPORTER      218

EXHIBITS FOR IDENTIFICATION:

Number              Page

Exhibit 1 03/30/18 - 04/27/18 Email String, Introcaso/King 6

Exhibit 2 10/25/18 Notice of Decision, Campbell/Partello 6

Exhibit 3 11/29/18 Order on Appointment of Guardian ad Litem, Loudermilk/Montgomery 6

Exhibit 4 12/12/18 Order on Appointment of Guardian ad Litem, Ausiaikova/Meckel 6

Exhibit 5 2/21/19 Notice of Decision, Campbell/Partello 6

Exhibit 6 3/12/19 Notice of Decision, Campbell/Partello 6

Exhibit 7 3/12/19 Notice of Decision, Campbell/Partello 6

Exhibit 8 3/12/19 Notice of Decision Campbell/Partello 6

---

**Page 4**

EXHIBITS FOR IDENTIFICATION:   (Cont.)

Number              Page

Exhibit 9 3/15/19 Notice of Decision and Sua Sponte Recusal Order, Campbell/Partello 6

Exhibit 10 4/29/19 Notice of Decision, Campbell/Partello 6

Exhibit 11 1/6/20 Email String, Bisson/Introcaso 6

Exhibit 12 3/12/19 Last page of Apple Pay Order with Margin Order 6

Exhibit 13 9/5/13 Order on Appointment of Guardian ad Litem, Merrifield/Cox 6

Exhibit 14 1/30/14 Order on Appointment of Guardian ad Litem, Sobell 6

Exhibit 15 5/12/15 Order on Appointment of Guardian ad Litem, Crawford 6

Exhibit 16 8/20/15 Order on Appointment of Guardian ad Litem, Covart 6

Exhibit 17 10/13/16 Order on Appointment of Guardian ad Litem, Albrecht 6

Exhibit 18 2/22/17 Order on Appointment of Guardian ad Litem, Yiatras 6

Exhibit 19 11/29/18 Email, Introcaso/Coughlin/Piela 6

Exhibit 20 1/9/20 Email from Judge Introcaso to Judges and Court Staff 6

Exhibit 21 1/9/20 Judge Introcaso's Draft Answer to JCC 6

**5**

EXHIBITS FOR IDENTIFICATION:  (Cont.)

Number                                              Page

Exhibit 22  December 2019 Calendar                     6

Exhibit 23  January 2020 Calendar                      6

   (The original exhibits were retained by Mr. Waystack.)

**6**

P R O C E E D I N G S

(Judge Introcaso Exhibit Nos. 1 through 23 were premarked by Mr. Waystack for identification.)

HONORABLE JULIE A. INTROCASO, having been first duly sworn by the reporter, under RSA 310-A:181, Limited Notarial Function, was deposed and testified as follows:

EXAMINATION

BY MR. WAYSTACK:

Q.   Okay.  Good afternoon, Judge Introcaso.

A.   Good afternoon.

Q.   As you know, my name is Philip Waystack. And in this matter, I am representing the Judicial Conduct Committee.

I don't know all of your general details; so let me get a few of them.  Do I understand you began serving on the bench in the year 2012?

A.   That's correct.

Q.   And whenabouts was that, Judge Introcaso?

A.   September.  I think my first day actually on the bench was around September 18.

Q.   And when you began your judicial career,

**7**

did you go right to the 9th Circuit?  Was that your first posting, so to speak?

A.   Yes.

Q.   And what was it that you were initially assigned to do at the 9th Circuit?

A.   I was assigned to the family division in both Manchester and Nashua, both in the 9th Circuit.

Q.   Okay.

A.   And I was working between the two for a period of time.

Q.   Was there -- I know that other judges, from time to time -- and this may be more a superior court matter.  But judges, from time to time, would do a process when they began -- of shadowing another judge.  Did you have such a process?

A.   I did.

Q.   And whom did you shadow?

A.   I know I spent a day with Judge Garner.  I know I spent a day with -- I apologize -- the judge who was in Carroll County.  He sat in Carroll County up in Laconia and he's since retired.

Q.   Is that Judge Patten maybe?

A.   No.  It was not Judge Patten.  I know

**8**

Judge Patten.  I apologize.

Q.   That's okay.  You don't have to apologize.

A.   Shadowed him.

Q.   Judge Pam Albee, is that the one?  No?

A.   No, no.  Not Pam Albee.  It's a gentleman.

Q.   It's a gentleman?

A.   He sat in Laconia.  I apologize, mostly to him.  I don't recall his name.  But he's retired within the last year or two.

Q.   Yeah.

A.   I believe I spent an afternoon or so perhaps with attorney -- sorry -- Judge Spath.  And I think that's about it.  I really didn't do much shadowing.

Q.   Okay.

A.   I had a discussion with Judge Kelly at the time, which was within those days that I was, you know, shadowing, so to speak.

Q.   Okay.  So for a few days with a few judges, but not any kind of formal shadowing program?

A.   No.

Q.   Okay.  So let's talk about you for a bit.

So before you went on the bench, I knew you as -- were you the clerk of the Rockingham County Superior Court?

A.  Deputy clerk of Rockingham County.

Q.  And for what period of time were you employed as deputy clerk?

A.  February 14, 2000, till January 3, 2011.

Q.  During that tenure, was the Odyssey Case Management System what the superior court used to do case management?

A.  It was developed during the time I was in the superior court.

Q.  Okay.  And so is it fair to say, by the time you left Rockingham as deputy clerk of courts, you were somewhat familiar with the Odyssey System?

A.  I was very familiar with the system.

Q.  And, in fact, back in those days, you would be the one setting the hearings for the judges; correct?

A.  Yes.

Q.  Okay.

A.  Generally.  Generally.

Q.  Generally.

A.  I can't say that as an absolute.  The staff did some of the scheduling.  But it was part of my responsibility, working with the judges, to schedule their calendar for matters that they had discretion over scheduling, yes.

Q.  Okay.  Who was the clerk of court when you were the deputy there?

A.  Mr. Raymond Taylor.

Q.  Oh, Ray Taylor.  Of course.  So Raymond has now retired too; right?

A.  He has indeed.

Q.  Yeah.  Prior to the time you went on to serve as deputy clerk in Rockingham, so I guess that would be prior to February of 2000, is it so that you were in private practice?

A.  I was in private practice for about seven years.

Q.  Okay.  So 1993 to 2000 approximately?

A.  If I could correct that?

Q.  Sure.

A.  Yes, I was in private practice, but I worked for a small firm for the first three years.

Q.  Yeah.

A.  I just want to make it clear I was in two different entities during that seven-year period of time.

Q.  No problem.  So what was the -- the first part of the seven years, was that when you were with the firm?

A.  Yes.

Q.  And what was the firm's name?

A.  Christy, Tessier & Innes in Manchester.

Q.  Oh, really?  Yeah.

And for those three years, just generally, what type of work did you do there?

A.  It was almost all court-appointed work.  I did some court-appointed juvenile work.  I did some guardian ad litem work.  While I was with them, I handled their marital matters.

Q.  Yeah.

A.  I did do a civil jury trial while I was there.  But, you know, pretty much the -- the new associate type of things, but I did have a number of cases appointed to me by the court because I had experience working in the court.

Q.  Can I kind of summarize that first three-year part of your legal practice as saying it was primarily a circuit court practice?

A.  I would say, at the time, it was probably 50-50 maybe, district and superior.

Q.  Okay.  All right.

A.  Because, again, I did do marital cases.  And at that time, family and marital cases were still being handled by the superior court.

Q.  Good point.  So you did both?

A.  Right.

Q.  You were in a firm that had a trial practice, and it was both in -- at that time, it was called a district court.  But we're calling it the circuit court now.  The trial practice of that firm was both in the circuit court and in the superior court; is that right?

A.  That's correct.

Q.  Did you do much or any transactional work?

A.  No.

Q.  Okay.  So for that period of time with the firm, you then left and went out on your own?  Is that the sense I get?

A.  Yes.  Between 1996 and 2000, my husband

and I had a firm for about four years.

Q. Your husband is a lawyer also?

A. Yes.

Q. I didn't know that.

A. Well, he's retired.

Q. Oh. Okay.

And where was your firm located?

A. Upstairs from the firm I worked for at 37 Salmon Street, Manchester.

Q. Nice.

And what type of work did you do for that three- or four-year period?

A. Again, pretty much the same type of stuff. Both my husband and I had been public defenders. He actually had a criminal defense contract at that time; so that was a good share of his income. But he also took a number of cases at the request of the court for, again, juvenile matters, involuntary emergency admissions, things of that nature.

Q. IEAs, huh?

A. Yes.

Q. When you say -- and I am just curious. I am not going to -- I am going to touch this lightly.

When you say your husband had a contract, was that what's called a conflicts contract with the Public Defender?

A. I have never heard of it called that. But we call it a criminal defense contract. It's a nice step out for public defenders to transition into private practice.

Q. Got it. Got it.

Okay. Now, the last piece you said intrigues me. So before 1993, when you went to the Christy, Tessier & Innes firm, you were a public defender; is that right?

A. I was a public defender from October of 1988 until 1993. I think it was in the fall sometime.

Q. And did you practice primarily out of the Manchester office, Judge?

A. Yes, exclusively out of the Manchester office.

Q. Okay. And while a public defender, you did district -- or circuit court and superior court work and probably some appellate work, did you?

A. Yes.

Q. Okay. Have I left anything out in terms of your professional career in the little explanation we just went through?

A. Between June 3, 2011, and September of 2012, I served as disciplinary counsel at the Attorney Discipline Office.

Q. Okay. Great.

Okay. So I want to go back. I am going to try and follow more or less of a timeline here. And I am going to begin by asking you questions concerning the conflict of interest charge. As you know, there are two charges that are in front of you. So, if you would, please turn to Exhibit 1.

MR. WAYSTACK: Mr. Delaney, do you want to hand that to the judge, Exhibit 1?

MR. DELANEY: Phil, are you okay if I bring both piles over to my desk?

MR. WAYSTACK: Sure. Absolutely. Absolutely.

Q. (By Mr. Waystack) So take a second and look at that document. It's, essentially, several emails, Judge Introcaso.

A. Oh, yes.

MR. DELANEY: Can I go off the record for a one second?

MR. WAYSTACK: Sure.

(Off the record.)

Q. (By Mr. Waystack) So if you would turn to the third page of Exhibit -- actually, the second page of Exhibit 1, Judge Introcaso?

A. Yes.

Q. Sort of like Japanese caricatures, you have got to begin from the last page.

A. That's correct.

Q. So my knowledge of Asian stuff doesn't go very deep, but I have learned that the oldest email is the first one. So I think I am labeling this a March 30, '18 email. Do you see what I am talking about, your email dated March 30, '18, at 1:55 P.M.?

A. I do.

Q. Okay. And take a second and review it. Take a second and review it. We have a bunch of documents we're going to go through here. I certainly don't begrudge you time to review them so you can be responsive to the questions.

A. That's fine. I think I am familiar with

17

it.

Q. Okay. So let me paraphrase if I can for a sec. It sounds to me what was going on in late March of '18 is that you were being evaluated under the judicial performance evaluations that occur for each judge every three years; is that correct?

A. Yes. It had -- it had just started for me in 2018.

Q. Okay. So this is your first judicial review -- performance review; is that right?

A. No. There was also one in 2015.

Q. Oh. Okay.

A. I am just saying there's some preliminary work that gets done before the actual evaluation process where the surveys are made available to the public.

Q. Right. Okay.

A. So this was sort of preliminary work.

Q. Right. And I got that by reading this. So I am going to ask you a few questions about it.

So it sounds like what happened is Judge King or somebody from Judge King's staff sent you a list of the, quote, "random selected lawyers" who

18

were receiving interviews directly from the judicial branch; is that right?

A. That's right. They are receiving surveys.

Q. Right. And so -- and I am assuming the reason it was sent to you and probably to other judges is, if there was anybody on that list who you were concerned about for whatever reason, you could get back to the court about it. Is that so?

A. That's what I have learned. Yes.

Q. Okay. So your March 30, 2018, email to Judge King, it sounds like, is in response to receiving that packet of information from the judge or the judge's office about who your surveys would be sent to?

A. That's right.

Q. Okay. And as you say in the email, you looked through -- looked it through. And apparently there was a self-evaluation piece; is that right?

A. There is a self-evaluation piece to the overall evaluation, yes.

Q. You mentioned that you will -- you will get that out. And then in your first paragraph you are asking specifically, it sounds like, for

19

feedback from certain people who apparently you worked with right away. And the one that jumped out at me right away is interpreters; right?

A. Right.

Q. And various other people who you worked more frequently with; is that right?

A. That's right.

Q. Let me just ask this before we get into detail about this. I am curious about this myself. So you were a trial lawyer for many years. You were a public defender. You did family and district and superior court work with the firm. You did some on your own. Did you ever fill out a performance evaluation yourself before you became a judge?

A. I don't recall specifically having done that.

Q. Okay. But would you agree with me, because you were a litigant, you probably got questionnaires from time to time?

MR. DELANEY: Objection to the form.

You may answer the question.

A. Again, I don't recall when this process began, and I really have no recollection of filling

20

out an evaluation for anyone who the court normally evaluates.

Q. (By Mr. Waystack) I have begun trying cases for many years, and I get them pretty regularly. To be honest, I don't fill out every single one every single time.

Okay. So you have no recollection of ever filling one out as a lawyer; correct?

A. No. Again, that would be, like, pre-2000. I don't have any recollection of that.

Q. How about when you were deputy clerk in Rockingham? Did you -- I assume, as was the case with you, part of the people who get the survey is court staff. Did you ever get a survey, as part of -- as deputy clerk of Rockingham County Superior Court, for judges in that court?

A. Yes.

Q. Do you have a recollection of ever filling one out as a deputy clerk of court for a judge who practiced in that court?

A. No.

Q. Okay.

A. Again, not -- not that I recall.

21

Q. So is it my sense, then, that -- back to this Exhibit 1. In March of 2018, is this -- no. This is your second experience with a performance evaluation, because I think you said you had one in 2015; is that right?

A. Second -- just to be clear -- judicial performance evaluation. I have been evaluated in other capacities, yes.

Q. Now, this is the one that -- in the Bar News, we see that. It mentions which judges are being reviewed for their judicial performance review?

A. Right.

Q. Okay. Then the second paragraph in your March 30, '18, email to Judge King specifically raised the issue of your relationship with Kathleen Sternenberg, didn't it?

A. Yes.

Q. Okay. And why is it that you discussed that with Judge King back in March of '18, Judge Introcaso?

A. Well, when I first got the list, I wasn't aware of the fact that the chief justice's office

22

was willing to take feedback from judges as to who might or might not be on that list.

Q. All right.

A. I had learned from a number of other judges that, when they see people on the list that they think are inherently unbiased for particular reasons, they call and have those people removed from the list. This was the first year that I knew that I could have some input as to who was on the list. So I wrote to Judge King to tell him I would like him to specifically solicit some information that I would like some feedback on.

Q. Sure.

A. I wrote to him to also tell him, "Here's the people who I think can't possibly be objective." There were, I believe, two lawyers at the time who were parties to a disciplinary complaint against me.

Q. Yeah. I saw that.

A. And, in balance, I also thought it wasn't that someone who had been a friend of mine be on the list and said, "You should probably take her off, too, just to be fair." I don't think it's fair to say, "Take off, you know, the bad opinions because

23

they are unbiased and leave on what might be an unbiased positive opinion." I was just trying to collect both sides and get the most fair list I could get.

Q. Sure. Okay. So I am looking at the page 2 of Exhibit 1. The paragraph 2 we're talking about. You go on and say, "Kathleen Sternenberg is one of the four people on my conflicts list."

Did you see that?

A. Yes.

Q. Okay. Who were the other three, Judge?

A. My former husband.

Q. And his name is?

A. Anthony Introcaso.

Q. Yeah.

A. Okay. And let me just say I never wrote his name down on a conflicts list. He was one with whom I knew obviously I have a conflict --

Q. Sure.

A. -- and would suspect others would as well. The other three named individuals would be Jane-Holly Weintraub.

Q. Jane-Holly Weintraub. Last name is

24

spelled W-E-I-N-T-R-O-P [sic]?

A. A-U-B, W-E-I-N-T-R-A-U-B.

Q. Weintraub. Okay.

A. Jane-Holly, hyphenated, Weintraub.

Q. Yeah.

A. Stephen Cherry.

Q. Yeah.

A. And Charles F. A. O'Leary.

Q. Okay. And I am assuming those were friends of yours? You had some personal relationship or some business with them?

A. That's correct.

Q. You didn't mention the other names, but you clearly mentioned Kathleen Sternenberg; correct?

A. That's correct. I just mentioned the one name on the list.

Q. And I think I saw in one of your responses somewhere that you make the point, which makes sense to me, that most of the people on the conflicts list you never see. The only one you happened to bump into once in a while was Kathleen Sternenberg. Is that about accurate?

MR. DELANEY: Objection to the form.

25

You may answer the question.

A. I have seen her, since taking the bench, more than the others, yes.

Q. (By Mr. Waystack) As to the others, not Kathleen Sternenberg, do you ever recall a time when you were scheduled to hear a matter involving them and recused yourself?

A. There have been other files presented to me, I recall specifically, regarding Jane-Holly Weintraub and I simply handed it to another judge and said, "I am not going to be able to hear this." There was no official proceeding with respect to conflict. Before they ever even knew the matter was on my docket, I saw to it that it was given to another judge or master.

Q. Can you date that circumstance for me at all, Judge?

A. I can't. I can't.

Q. Is it more than five years ago?

A. I can't say.

Q. Was Holly Weintraub -- I forget the middle name. Was she the only one other than Kathleen Sternenberg on whom you have recused yourself

26

concerning some litigated matter?

A. Yes.

Q. Okay. I am going to go on back to Exhibit 1 again. Again, in paragraph 2, it goes on a little further saying, "I have, however, after disclosure, appointed her as a GAL only when the parties have specifically requested her services."

Do you see that?

A. Yes.

Q. As you sit here today, in retrospect now, aren't there a few other cases in which you have appointed Kathleen Sternenberg as a guardian where the parties did not request her services?

A. Yes.

Q. We'll get into that in a little bit more. Let me keep going. Flip the page to the third page of Exhibit 1, please, Judge.

A. Sure.

Q. It's the first paragraph. It's a partial paragraph. There was something you said. We're going to read it. It says, "I do not appoint her otherwise because of the financial complications."

Did I read that correctly?

27

A. Yes.

Q. That puzzles me. What are the financial complications you were referring to?

A. Just the -- you know, the fact that she's involved in the case. She's -- I mean, she's doing it to make money. She's employed. I -- I have tried to avoid the impression that I have appointed her for anything other than her skills.

Q. Right. So "financial complications" in Exhibit 1, your email to Judge King, refers to, by appointing her, you understand that there's going to be revenue she's going to be getting from the litigants?

A. Correct.

Q. Okay. And you make the point here -- and I don't disagree with it -- sometimes our closest friends can be our harshest critics. So it sounds like you are raising to Judge King that Kathleen Sternenberg is on your conflicts list, one; two, that you have appointed her in some limited circumstances; and, three, it's up to him whether he wants to keep her on or not. But you are mindful that just the fact he leaves her on doesn't mean you

28

are going to get a good evaluation. Fair enough?

A. Oh, yeah, I mean, 60 or 70 people who are being surveyed.

Q. Okay. Judge King did not respond immediately to you, did he?

A. No.

Q. And so let's go to the first page of Exhibit 1. It looks to me like -- and I don't -- you tell me, because I am not very technologically savvy here. Did you forward the earlier email to him, or is it just -- the email that begins Friday, April 27, 2018, is that a new email to him?

A. If I could have just a minute?

Q. Sure. Take your time.

A. Oh, I -- I can't say for sure. I don't see any indication that I necessarily forwarded it. But given the way computers work, I would say it looks like I picked up my old email, added to it, and sent it directly to him again.

Q. Got it. Okay.

A. I don't see anything -- well, see, forward -- so perhaps I did. I may have picked up that earlier letter, 2018, and then forwarded it

29

again, you know, from my sent file, forwarded it again on April 27, to bring the issue up because I hadn't heard from him.

Q. Got it. Flip the page. Go to page 2.

A. Okay.

Q. I am looking now at the second message from you, Judge Introcaso, Friday, April 27. On the second page, the second two paragraphs, that refers to other lawyers who for whatever reason -- one involved in another complaint and one who you referred to the county attorney's office for prosecution. Those three lawyers -- it looks like you are calling those lawyers to Judge King's attention vis-a-vis whether or not you wanted to leave them on the list; is that right?

A. Again, yes. I thought that he should know that those were people I felt at this point could not be biased in terms of their evaluation.

Q. Right. Okay. And then so finally, on April 27, the same day -- the second time you sent the email to Judge King, he responded to you; correct?

A. Yes.

30

Q. And he references -- again, this is on the first page of Exhibit 1. He references the situation. He mentions Paul Moore. Did you know what he was talking about there?

MR. DELANEY: Objection to the form.

You may answer the question.

A. Generally, yes.

Q. (By Mr. Waystack) He goes on, explains something about stuffing the ballot box and whatnot?

A. Yes. I had a general understanding of Judge Moore's circumstances and the allegations, et cetera.

Q. Sure. Sure. Okay.

Okay. So that was March and April of '18.

Let's turn to Exhibit 2 now, if we could. And 2 now begins to get into the Partello matter. Would you take a moment and look at Exhibit 2, Judge?

A. Sure. (Witness peruses document.) I am all set.

Q. Okay. All right. So, again, I am going to try and save some time here. And if Attorney Delaney doesn't like it, he will object, I am sure.

31

So Exhibit No. 2 -- let me paraphrase -- is a notice of decision, an interim order, and an appointment of guardian ad litem form in the matter of Campbell and Partello. Is that a fair statement?

A. Yes.

Q. Okay. So let's begin at the first page. The first page is a notice of decision; correct?

A. Correct.

Q. On the top left-hand portion, underneath the words "Notice of Decision," do you see the words "File Copy"?

A. Yes. Yes.

Q. Now, as a former deputy clerk of Rockingham Court, what significance does the words "File Copy" on a court pleading have to you, Judge?

A. That's the copy that would be retained by the court to show the activity in the case.

Q. Would that be part of the court's file, so to speak?

A. Yes. That would be the copy that's retained for the court so the court has a copy.

Q. Right.

A. And then, obviously, the other parties to

32

whom it was distributed appear at the bottom.

Q. So thank you for saying that.

So let's look at the bottom of page 1 of Exhibit 2. So at the bottom there is a large "C" and a colon, and then there are three names: Jeffrey Manganaro, Robin Partello, and Kathleen Sternenberg; correct?

A. That's right.

Q. And now, procedural, you are helpful to me because you are not only a judge, you were a clerk. So, as I understand it, each of these three people who are copied on this, they would get a separate copy of this notice of decision only -- where the words "File Copy" appears on page 1 of Exhibit 2, each of their names and addresses would appear; am I correct?

A. Maybe you could break that down for me.

Q. Sure. Poor question.

Okay. So we just discussed that page 1 of Exhibit 2 is the court's copy because of the words "File Copy" in the top left?

A. Correct. Yes.

Q. There are three people, two lawyers and

a -- apparently, and a litigant whose names are at the bottom of the file copy; correct?

A. Correct.

Q. My understanding is that each of these litigants would have received a notice of this decision, but it doesn't look exactly like page 1 of Exhibit 2. Because where the words "File Copy" appears on page 1 of Exhibit 2, the individual names of these people would appear along with their office address. Does that make sense? Is that correct?

A. Yes.

Q. Perfect. Okay.

A. There would be four copies of this document: file copy and three additional ones addressed to the parties.

Q. Sure.

Okay. And so, if we go to the middle of the case, it shows the caption of the case, the docket number, and then it simply says "Enclosed please find" relative to "Interim Order, Order on the Appointment of Guardian ad Litem." That's sort of the hint-hint for the call-in center of what this notice of decision is all about. Is that what you understand?

MR. DELANEY: Objection to form.

You may answer the question.

A. It's notification to counsel or the parties as to what's enclosed.

Q. (By Mr. Waystack) Okay.

A. It's more of a -- that portion that you read, "Interim Order, Order on Appointment" --

Q. Yeah.

A. -- in my opinion, served more as a sort of a cover letter to notify them what the decisions are that may be included or may be described in the notice of decision.

Q. Sure. Let me go back to your days as Rockingham County Deputy Clerk. Did you issue notices of decisions at Rockingham, Judge?

A. All the time.

Q. And, if you remember, what was your personal -- as deputy clerk, what was your personal experience in terms of what would be written on the notices of decision?

A. There are certain things that are fields populated by data that have been in the system since the case was opened. There are fields that are optional where the clerk can choose to enter certain information, if necessary.

Q. Sure.

A. So, for example, this notice of decision has no discretionary information included in it.

Q. Right.

A. If, however, a judge were to make a side note or there were multiple motions, for example, let's say, a motion to continue, a clerk would have the ability with the Odyssey System to type in, for example, you know, "Amended order on appointment" or "Order on appointment of guardian ad litem." They could add some narrative language.

Q. Sure.

A. Like maybe the name of the guardian or limit the guardian's authority. And if the judge had written that, rather than asking a party or counsel to read the judge's writing, many of the times, from those documents, the clerks would type it into the space that's provided on that notice of decision.

Q. And what I am really interested in is your personal practice when you were deputy clerk. What did you fill in in the notice of decision?

A. Again, I would only have done the narrative portion.

Q. Yeah.

A. And it runs the gamut between writing absolutely nothing to perhaps typing up to a paragraph of language, if that's what the judge put, you know, at the bottom of a motion, for example.

Q. Okay. So below the text area, it says "DalPra, MM/Introcaso, J." Did I read that right?

A. That's right.

Q. And what does that signify?

A. That signifies that a marital master made a recommendation and the judicial officer approved that. It doesn't mean approved, but it gives you the name of who approved those orders by -- or following the master's recommendation.

Q. Sure.

Is it true, Judge Introcaso, that, when this notice of decision goes out with the orders, here the interim order and your appointed guardian -- as the judge involved, you don't get a

37

copy of that, do you?

A. No.

Q. You can access a file and look at it. But unlike the litigants in this case, a copy does not go to you?

A. No.

Q. Drop down to the bottom on the left -- to the left of where it says "Sherry Bisson, Clerk of Court," there's a date there. Do you see the date?

A. Yes.

Q. And what is it?

A. October 25, 2018.

Q. Again, as someone who has got wide experience, you can help out here. What's the purpose of that date on a notice of decision, judge?

A. The date of the clerk's notice of decision of whatever judicial action was taken in the case serves as a starting point for a number of different timelines under the court rules. Whether that's a motion to reconsider or an appeal, all those actions postdecision are guided in terms of their time requirements by that date on the notice of decision.

Q. So if, for instance -- and we'll just --

38

we're going to move on after this.

But -- so if the judge's order was made, let's say, October 19, but the notice of decision didn't get sent until the 25th, that would be the notice of decision. That would be the day by which the 10-day period for reconsiderations or the 30-day period for appeals begins, not the date that the judge signed the narrative; correct?

A. Correct.

Q. Okay. All right. Last piece. On the first page underneath the date, there is a parentheses and a three-digit number within the parentheses, "579."

A. Yes.

Q. And tell me what that refers to, please.

A. That's an Odyssey user code. The case management system assigns each authorized user a code whereby you can review who took what activity in the case management system.

Q. As you sit here today, do you know who 579 is?

A. I -- I believe -- to the best of my knowledge, I believe it's Julianne Lodes.

39

Q. Okay. All right. So let's turn to the second page. And I just -- this is the interim order. It's a two-page document. And it begins "The matter came before the court with regard to the petitioner's motion for ex parte orders."

Did I read that correctly?

A. Yes.

Q. And my understanding of this, it wasn't you who heard the ex parte orders. It was Marital Master Bruce DalPra; is that right?

A. Correct. He conducted the hearing and was the fact finder.

Q. So then, if we turn to the third page of Exhibit 2, this is the area where it's signed. And what appears is it was signed on October 24, 2018, by Master Bruce F. DalPra. Am I right?

A. Correct.

Q. And below that, it says "I hereby certify that I have read the recommendation and agree that, to the extent that the marital master has made factual findings, he has applied the correct standard to the facts determined by the marital master."

40

It looks like that's a preprinted piece. Would you agree that it is, Judge Introcaso?

MR. DELANEY: Objection to the form just because you skipped a word, Phil.

You may answer the question.

MR. WAYSTACK: What did I miss?

MR. DELANEY: You missed "legal" before "standard," I believe.

MR. WAYSTACK: "He has applied the correct legal standard."

Q. (By Mr. Waystack) Whatever it says on page 3 of Exhibit 2, Judge Introcaso, is that part of the form itself? Do you know?

A. This -- this is not a form.

Q. Okay.

A. This is what we would refer to as a narrative order. It's word-processed specifically by Master DalPra.

Q. So it looks like, on the same day Master DalPra signed this, that is, October 24, 2018, you signed it. I am assuming that's your signature above "Judge"?

A. It is.

41

Q. Okay. So a couple of questions about this. Did you read that one-and-a-half or one-and-a-third page interim order before you signed it?

A. Not as closely as I should have.

Q. But the question -- I didn't ask that question. I asked if you read it all. Did you read it at all?

A. Yes. I would not have signed it unless I knew it was an interim order. And, you know, I glance at it, and I get a sense of what it is, and I cosign. Did I read every word? Candidly, not likely.

Q. So look at the second page of Exhibit 2 at the bottom. It's an area where Master DalPra says "Recommended." Now I want to look at Recommendation 4. Can we do that?

A. Sure.

Q. Recommendation 4 says "Kathleen Sternenberg is appointed guardian ad litem to represent the interests of the minor child." Then it says "See accompanying GAL order."

Did I read that accurately?

42

A. Yes.

Q. So my question to you now is, when you reviewed the interim order, although you may not have read it as carefully as you might, did you see that the judge was appointing Kathleen Sternenberg, who was on your conflict list, to serve as guardian?

A. No, not -- not that I have any recollection of.

Q. You don't think you read that?

A. I -- I have no recollection of seeing her name right there, you know?

Q. So let me ask you to assume that you did read it. And this is -- we're going to begin down this trail.

Is the fact that Kathleen Sternenberg is on your conflicts or recusal list, is that sufficient for you to either refuse to sign this or to let people know that there's a relationship between the two of you?

A. I apologize, Counsel, but I think there's a couple of different issues in there. Could you try to break it down for me?

Q. Okay. You signed an interim order that

43

appointed Kathleen Sternenberg as guardian in this case?

A. Yes.

Q. As we have previously discussed and as you notified Judge King a few months before this, Kathleen Sternenberg is on your conflicts list; correct?

A. Correct.

Q. Did you feel as though you had any obligation to notify anybody about the conflict between you and Kathleen Sternenberg before you signed this interim order?

A. Not this order, no.

Q. Okay. Let's turn to the fourth page of Exhibit 2. It says "Order on Appointment of Guardian ad Litem."

A. Yes.

Q. Now, this document, this is a court form. Am I right?

A. Yes. This is a -- this is a generated form.

Q. Okay. So do you recall, when you signed this order on appointment of GAL -- which we'll get

44

to in a minute; it's a few pager -- did you happen to read that Kathleen Sternenberg was appointed as guardian?

A. Again, I don't believe I did. I don't believe that I read the first page where her name was on the form.

Q. Okay. So let's assume for a moment, Judge, that you did read that Kathleen Sternenberg was there, was appointed as guardian. Did that raise any obligation, in your mind, to notify anybody that Attorney Sternenberg was on your conflicts list?

A. Normally, it would, yes.

Q. But it didn't in this case, apparently?

A. No. Because, as I said, I don't believe I saw her name. And, candidly, Master DalPra has been aware of my conflict with Kay Sternenberg for several years. So he will frequently direct his things to other people when Kay's involved. So it struck me as odd. But in all likelihood, I signed the third -- or last page knowing it was a GAL appointment. And if Master DalPra is recommending that person, I generally don't question his ability

45

to do that.

Q. As you sit here today, do you think Ms. Partello had some right to be notified that the person who a judge has appointed to be her guardian was on your conflicts list?

A. Again, at this point in the case, no.

Q. Okay. Turn to the next page, please. Look at paragraph 4, Judge, which is halfway down the page. It says here "The court sets the maximum fee in this case of $3,500." Now, that's for the guardian's fee; is that right?

A. Yes.

Q. I mean, it's been many years since I have done marital work, but I always thought it was 1,000 or 1,500. $3,500 struck me as being a relatively significant amount for the guardian's fee. I guess that's the cap, so to speak.

A. Initially.

MR. DELANEY: Objection to the form. You may answer the question.

THE WITNESS: Okay.

A. That would be the initial cap that would be set by Master DalPra, yes.

46

Q. (By Mr. Waystack) Did you think that that was pretty significant, $3,500?

A. Again, I honestly don't believe that I read through this entire form. I -- I -- there are a number of court forms that, as a matter of course, I do not read the details of things, like the money issues.

Q. Whether you read it or not, I am asking you now. Do you think that $3,500 in the initial appointment is a relatively high figure for a guardian to receive?

A. It is unusually high, yes.

Q. Thank you.

Okay. Now, if you turn to the final page -- second-to-the-last page of this exhibit, this is the signature page; correct?

A. Yes.

Q. And as with the interim order, Master DalPra signs. And then you, as judge, also sign?

A. That's right.

Q. And the part that I read to you before that I thought was a form, apparently wrongly, it's

47

got that same language, hasn't it? Let me just read it once. "So ordered: I hereby certify that I have read the recommendations and agree that, to the extent the marital master/judicial referee/hearing officer has made factual findings, he/she has applied the correct legal standard to the facts determined by the marital master/judicial referee/ hearing officer."

Did I read that correctly?

A. Yes.

Q. So that part on this document in Exhibit 2 is part of a form; correct?

A. Yeah. It's -- it's in every form that either a master or referee can sign.

Q. And as you sit here today, you didn't -- you did not read the entire document? You didn't read the entire interim order? You didn't read the entire order appointing the GAL? Is that your testimony?

A. I did not read them word for word, no.

Q. Is it also your testimony that you were not aware that Kathleen Sternenberg, a person on your conflicts list, was being appointed GAL and

48

that she was receiving a high initial cap of $3,500?

A. I had no idea.

Q. In retrospect, if you had read that, would you have taken any other steps?

A. I likely would have given the file back to whomever presented it to me and said, "Why don't you have any other judge sign this?" as has been done in the case in other places, I notice, but -- and, like I said, it's unusual because Master DalPra oftentimes will come in for cosignatures. We live right next door in the courthouse. But when he knows it's Kay Sternenberg or Jane-Holly Weintraub, he will go, "Oh," and he will take it to someone else. He knows my conflicts.

Q. All right. So this document we're talking about was in late October of 2018?

A. Correct.

Q. Would you please turn to Exhibit 3. Take a moment and just look that over, if you would.

MR. WAYSTACK: Michael, did you want to make an objection about this? We discussed this beforehand.

MR. DELANEY: Thank you, Attorney

Waystack. My understanding is that Exhibit 3 relates to a different case than the Partello case involving an order on the appointment of guardian ad litem related to Guardian ad Litem Kay Sternenberg.

I also understand that Judge King has referred this matter to the Judicial Conduct Committee, and I am not aware of the case yet having been docketed as a complaint or scheduled for any form of inquiry or investigation.

Judge Introcaso has obligations of confidentiality related to that referral by Judge King. I want to ensure that she does not take any steps today that could be deemed inconsistent with her obligations under the judicial conduct rules.

I am not entirely sure if committee counsel of the JCC has a right to inquire about this before a majority of the JCC takes a vote to determine whether it should be docketed as a complaint.

With that being said, I will register an objection to the line of inquiry. I will allow Judge Introcaso to answer questions regarding prior cases, subject to that objection. And I would ask for a continuing objection, for the purposes of this deposition, for all inquiries related to prior cases other than the Partello case.

MR. WAYSTACK: Okay. Let me just respond briefly. There will be about six or seven other of these appointments I will be talking about. I agree, Attorney Delaney, you can have a continuing objection for the reasons stated. I am not going to eat up a lot of the time with a response to your objection other than to say this matter has been brought before the Judicial Conduct Committee. I don't have any view of there being new charges, but it relates to some of the statements in this case, in the Partello case.

Q. (By Mr. Waystack) So having said all that, did you have a chance to look at Exhibit 3, Judge Introcaso?

A. Yes.

Q. Let me ask you. This -- if you look at the -- let's go to the end of this. The third page -- it's a four-page exhibit, Exhibit 3.

Just for timeline here, so it looks like you signed this on November 29, 2018.

A. That's right.

Q. Do you see that? Okay.

So let me ask you this, now that I have given you the time frame: Do you have any recollection about this case at all, Loudermilk and Laura Montgomery?

A. I do.

Q. You do? Okay.

And this was a case that involved -- it needed a guardian ad litem because there was a parenting issue here; correct?

A. Correct.

Q. And this was not a case where Master DalPra had recommended this. This is a case, it looks like, you signed on your own.

A. Yes.

Q. Fair enough? Okay.

And in this case, again, page 1 of Exhibit 3, paragraph 2, who's being appointed?

A. Kathleen Sternenberg.

Q. Okay. And do you remember at the time if Mr. Loudermilk and Ms. Montgomery were represented by counsel?

A. They were both represented.

Q. Okay. And was this as a result of an actual hearing in a courtroom, Judge?

A. There was a hearing in a courtroom, that I recall. Whether this order was delivered to the parties in the courtroom or whether it was mailed out subsequently to that hearing, I couldn't tell you. But it was subsequent to a hearing.

Q. Okay. And I am going to go back to what you said in your email to Judge King. To your knowledge, did the parties -- or, rather, did counsel for the parties tell you they wanted Kathleen Sternenberg appointed as GAL?

A. They did. They had come to an agreement that she would be the guardian in the case.

Q. Do you have any different recollection of that, Judge Introcaso?

MR. DELANEY: Objection to the form.

## 53

You may answer.

MR. WAYSTACK: I will withdraw the question. I will withdraw the question.

Q. (By Mr. Waystack) Are you reasonably sure what you just said to me, Judge Introcaso, that is, that it was the parties who decided that they wanted Kathleen Sternenberg?

A. I am reasonably sure that these two attorneys had spoken with one another and agreed to have her appointed to the case. And we had a discussion -- whether or not it was on the record, I recall it very clearly -- with Attorney Piela and Attorney Coughlin and us talking about, "Oh, you have got Attorney Sternenberg here today. Well, then we have some things to talk about."

And when we -- I disclosed my conflict, they were both, "Fine. Fine. No. We're okay with that."

I don't have an immediate recollection of any language. I am just trying to reflect the tenor of the meeting with counsel. That was in the courtroom.

Q. Okay. From time to time, it appears to

## 54

me, in the course of my investigation, that you would -- as a judge, you would have direct email contact with the attorneys in the case; is that right?

A. Only if it's cc'd to the other side. But, yes, I allowed contact with counsel via email.

Q. So in certain cases, counsel could contact you directly by email rather than go through the court system?

A. Yes, under certain circumstances.

Q. Okay. Do you have a recollection of any such email contact in this case?

A. I remember the courtroom hearing. I don't specifically recall if I communicated with counsel prior to or subsequent to that hearing via email. But both Attorney Coughlin and Attorney Piela would have been permitted to do that if they needed to.

MR. WAYSTACK: Okay. Michael, would you please hand the witness Exhibit 19 now.

THE WITNESS: Excuse me. I am just going to throw away a piece of waste here.

MR. WAYSTACK: Go ahead.

THE WITNESS: Thanks.

## 55

Q. (By Mr. Waystack) I am going to give you a moment to read that, Judge, Exhibit 19.

A. Okay. Thank you. I was going to say this actually says "Exhibit 19."

(Witness peruses document.) Okay.

Q. Okay. So this appears to be an email sent from you on the same date you signed the orders appointing Kathleen Sternenberg as the guardian ad litem in the Loudermilk case.

A. Yes.

Q. And it's sent from you to Attorney Timothy Coughlin and Attorney Andrew Piela?

A. Right.

Q. And it's copied to Kathleen Sternenberg. Did I say that right?

A. Yes.

Q. In the first paragraph, it seems to suggest that it was you, Judge, who called several guardians ad litem. And you make the comment "most of whom don't pick up the phone." And then you spoke with Attorney Sternenberg, and you talked briefly about the facts in the case. That's what your email says, isn't it?

## 56

A. Yes. And I recall this. I now recall this. The attorneys could not agree on a guardian. We had a hearing. And, you know, I said, "If you guys can't agree on someone, then the court will appoint somebody."

Q. Right. And the someone you appointed was Kathleen Sternenberg?

A. Was Kay, right.

Q. Again, you make some reference to the fact that you worked with her for a while in Manchester before going to court, but -- before working for the court. But then you go back and you say -- you sort of explain it in the second-to-the-last paragraph. "I don't believe I would have any problem looking at her recommendation."

And what I am concerned about is the last paragraph that says, "If you have any concerns about the appointment, let me know in the next 27 minutes, if possible. Otherwise, I will head out, certain you will hear from her and move forward in the near future." In other words, "Get back to me in 27 minutes or Kathleen Sternenberg is appointed in this case." Isn't that what this says, Judge?

57

A.   No.  I don't agree with that.

Q.   Why not?

A.   At the end, I also say, "PS:  Absent an objection, a hard copy of the order will go out in tomorrow's mail along with a notice of decision."

I was trying to -- I believe the "27 minutes" has to do with the fact it was 3:34 and they wouldn't be able to get back to me that day and that I would hear from her if she was willing to take it.  I would hear from them.  I am just trying to put together, "Basically, can we all get on the page who the guardian is going to be?"  And, you know, I -- frankly, "Let me know in the next 27 minutes," unfortunately, was intended lightly.  It was not intended as pressure.

Q.   Well, let's just look at the facts.  So we just talked about Exhibit 3.  And Exhibit 3 is the actual appointment that you signed on the 29th.  That's the day you sent the email.

A.   Correct.

Q.   So it looks to me, by the end of the business day, that is, November 29, '18, you went ahead and appointed Kathleen Sternenberg.  And you

58

gave -- and I realize it's 3:34 you sent the email.  I know that the court closes at 4:00.  My read is, "You have got 27 minutes to object.  And if you don't, I am going to" -- "I am going to appoint her."

Now, maybe they sent a written objection later, but isn't that the way this happened, Judge Introcaso?

MR. DELANEY:  Objection to the form.  The question has been asked and answered.

You may answer the question.

A.   No.  I don't -- I don't think that that's how it went.  I mean, we had had an earlier hearing where we talked about guardians.  They had given me the authority to select a guardian.  I don't recall if I specifically mentioned Kay or not.  But I think this email, to me, reads like I am trying to document what happened in terms of the guardian.

Like I said, I just -- I distinctly remember Attorney Coughlin, Attorney Piela, and I talking about the issue of the guardian and my initial recollection being they were comfortable with me picking a guardian, regardless.

59

Q.   Okay.  To be clear, this was not an email to you.  This is an email you sent Judge Introcaso, isn't it?

A.   Yes, because the hearing was left on a note of, "We can't agree on someone.  Judge, we will give you the authority to pick who you think would be appropriate in this case."  And under the time constraints, the appropriate person was a person who I could get in touch with.  There aren't that many guardians available.  And she was -- she was available.  I thought she would do good in the case, do a nice job.  I told them that I had something of a conflict and, if they wanted to let me know, they would object.

Q.   Do you think it's your job as a judge to call guardians for appointment in cases?

A.   Yes, I do.

Q.   Did you do that regularly?

A.   Yes.  I was also regularly called as a guardian by judges to do specific cases.

Q.   And so your recollection is that the attorneys in this case asked you to find the guardian?  That's your testimony under oath?

60

A.   In essence, it's a default position.  If the two parties can't come up with lists that they can agree on one side or the other -- or one person or the other, by default, then, we kind of let the judge find somebody or have the judge try to find someone.

It's my practice to normally let people submit three names, each of them submit three names.  If they have got someone in common, great.  If they don't and we're finishing up a structuring conference, they sort of leave it in my hands.  And, frankly, 75 percent of that time I leave it to the staff, who often appoint guardians to do it.

Q.   Regardless of the process, Exhibit 19 seems to suggest that what you told Judge King, that you only appoint the guardian when both parties agree, that is not accurate in terms of what Exhibit 19 says, is it?

A.   No.  Not technically, no.

Q.   Okay.  Let's go to Exhibit 4, please.

Now, what is Exhibit 4.  Is it another order on the appointment of a guardian ad litem?

A.   It is.

61

Q. Okay. And in this case, it's the case of -- I will not be able to pronounce this correctly -- Kseniya Ausiaikova. Is that what this is?

A. It sounds like it. The defendant's name is Brian Meckel.

Q. Probably easier using that name, huh?

So if you turn to the third page of Exhibit 4, we're following a dateline here now. We just dealt with Loudermilk, which was November. This is December of '18; correct?

A. Correct.

Q. And this -- as with the first one, this was a recommendation of Bruce DalPra that you cosigned?

A. That's right.

Q. Was there any discussion at all with you and Judge and -- Master DalPra or you and the parties or the counsel that Kathleen Sternenberg was on your conflicts list?

A. Bruce has known that for seven years.

Q. What about the parties? What about the lawyers?

62

A. Oh, the parties? I apologize.

Q. No. I asked including Bruce.

A. I don't know the parties, and I don't know how they would know me or Attorney Sternenberg.

Q. Okay. So is it fair to say that you did not disclose that Kathleen Sternenberg was on your conflicts list to either the parties or their attorneys?

A. I didn't.

Q. Let's turn to Exhibit 5. We're transitioning now from late '18. The last order was December of '18. Hold on one second. I will wait. I will wait.

To save a little time, is this a notice of decision and an order on a motion for instruction in the Partello case?

A. Yes.

Q. Okay. The first page of Exhibit 5, the notice of decision, what is the date of the notice of decision?

A. February 21, 2019.

Q. And it looks like the three-digit number -- it isn't 579 like the first one. It's a

63

different number, "948." Do you see that?

A. Yes.

Q. Do you know who 948 is?

A. I don't, but I could guess.

Q. Okay. In the top left-hand portion after "Notice of Decision" -- is this a copy that went to the parties or is this the court's file copy?

A. With respect to the notice of decision, this looks like a copy of the court's file copy.

Q. File copy? Okay.

And the narrative in it says "Motion for instruction; A and B are granted. Respondent shall fully cooperate with the GAL. Failure to do so may result in sanctions and may be taken into consideration regarding the issuance of the final parenting plan."

Did you read that accurately?

A. Yes.

Q. And that was signed by Marital Master Bruce DalPra and also signed by you, Judge Introcaso; correct?

A. That's right.

Q. Okay. Did you read -- did you read and --

64

this decision carefully and -- decision?

The second page of Exhibit 5 appears to be the front page of a motion for instruction by Attorney Sternenberg. The third page of Exhibit 5 appears to be Kathleen Sternenberg's signature page. And then on the signature page, it looks like handwriting. And I am going to assume that's Master DalPra's so-called margin order. Is that what you see, Judge Introcaso?

A. I see that, yes.

Q. And below that is a stamp. It appears as though you signed this on February 15, 2018. Am I right?

A. That's right.

Q. So did you read this carefully before you countersigned it?

A. This one I think I read fairly carefully, yes. I mean, I don't have a specific recollection of reading it. But because Master DalPra had included some sort of narrative language beyond granted or denied, I suppose it piqued my interest more as to the details.

Q. So if you turn to the second page of

**65**

Exhibit 5, at the bottom of the page, this is a motion filed by Kathleen Sternenberg and -- where it begins with "Wherefore," in other words, her prayers in the motion. Do you see those?

A. Yeah.

Q. So she's asking the court to order Partello to cooperate for a home visit within seven days of the court's order. She's asking Partello to pay a second retainer of $350 within seven days and grant such other and further relief; correct?

A. Correct.

Q. I don't want to waste time bringing proceeding -- things I don't need in, but I will ask you this: Are you aware that Robin Partello, who was the respondent in this matter, objected to this motion?

A. I don't know that. Or I don't know -- sitting here, I don't know that. I would have to look at the file. But --

Q. I will deal with that issue later.

Okay. So let me ask you this: So this is Kathleen Sternenberg. It's her motion.

A. Right.

**66**

Q. She's filing a motion as a guardian ad litem within a couple of months after she was appointed in the case. And, A, she's asking to have a visit within seven days and already asking for more money. Is that clear to you that that's what's being asked here?

A. Yes.

Q. Okay. And my sense is -- and I don't know this. But my sense is that Marital Master Bruce DalPra actually had a courtroom hearing on this issue. Do you know that?

A. I have no idea.

Q. Okay. But, in any event, you were no part of the hearing if he held one; correct?

A. Correct.

Q. And I think I should have probably spend a moment on this. There is a reason that you, as a judge who has been appointed by the Governor and approved by the Executive Council, signs marital masters' orders. Am I right?

A. Yes.

Q. And would you, in a -- in a couple of sentences, explain why that is necessary, Judge.

**67**

A. In essence, marital masters are not constitutional officers. And the fundamental difference is the authority that's given to judges, as opposed to masters, primarily to incarcerate people. Within the family division, that authority doesn't exist for marital masters.

So they can propose sanctions, but they don't actually have the ability to incarcerate someone. So if they request, say, a show cause hearing, they make the determination that something hasn't been complied with or paid, and then it would be scheduled in front of a judge to make a determination as to what's an appropriate sanction.

Q. You said it in a short way. Marital masters don't have the power to punish for contempt vis-a-vis incarceration, do they?

A. Yes -- thank you -- more artfully stated.

Q. So here's my concern now: The order itself that Judge -- excuse me -- that Master DalPra suggested, I mean, reading it, seems pretty grim. It seems, "You better cooperate or it's going to result in sanctions, including the issuance of the final parenting plan." The final parenting plan is

**68**

where the court decides what a parent's custodial rights to their children are, isn't it?

MR. DELANEY: Objection to the form.

You may answer the question.

A. Yes. A parenting plan spells out parental rights and responsibilities.

Q. (By Mr. Waystack) Let me ask you this question: Do you think, as a parent, when a parent is told, "You better cooperate with this guardian or it's going to affect your ability to parent your child," that that's a kind of a strong reaction in a case that's just beginning?

MR. DELANEY: Objection to the form.

You may answer the question.

A. It's fairly routine language.

Q. (By Mr. Waystack) Fairly routine language? That someone may receive a sanction, including issuance of the parenting plan, that's fairly routine?

A. A person's apparent failure to comply with previous court orders impacts the court's decision-making in the parenting plan. Because if you don't trust someone's ability to comply with the orders,

69

you are not going to have a lot of trust in their ability to comply with the parenting plan.

So it inherently has an impact as to whether or not that person is going to continue to be in compliance with the court or to continue to basically fight court orders and that it's not unusual to let parents know that at the outset. "Those are the orders. Follow them or it could have consequences with respect to your rights to parent your child." I don't find it unusual language.

Q. Would you agree with me that warning someone of sanctions, including their right to parent their children, is a substantive order?

A. No.

Q. You don't think so?

A. I don't think it resolves any conflict in the case.

Q. Well, that's not my question. My question is is it a substantive order? That's my question.

A. Not as I define substantive, it's not. It's more of a directive from the court and not a substantive decision.

Q. What seems clear, when we look at

70

Exhibit 5, is, again, relatively early on in the case Attorney Sternenberg had just been appointed at the very end of October. A couple of months later, there seems to be some disconnect between the respondent and her concerning a house visit and she's also looking for more fees.

So here's my question: Did it dawn on you at that point, before you signed this order on February 15, 2019, that you needed to disclose to Robin Partello that Kathleen Sternenberg, the very person who filed the motion, the GAL, was on your conflicts list?

A. I did not.

Q. Did you think about it?

A. I don't recall if I thought about it or not, but I comfortably signed the order.

Q. Should you have thought about it, Judge Introcaso, and should you have notified Ms. Partello of the conflict before signing the order?

A. I probably should have been more thoughtful about a number of these things.

Q. I am asking you specifically about Exhibit 5, Judge.

71

A. Should I have done that in this situation? I will tell you, honestly, I am not clear if I had a requirement to do that. So using the term "should," it would have been better had I done that in some fashion. But in the posture of the case and the nature of the order, like I said, I was comfortable essentially approving an order for Master DalPra telling her she needed to comply. I didn't -- the issue of my conflict with Attorney Sternenberg was really not part of the calculus at that point.

Q. On the second page of Exhibit 5, if you turn to it, what is clear is that this is a motion filed not by the attorney for the petitioner or the respondent's attorney. This is a specific motion filed by the GAL. Am I right?

A. Yes.

Q. When you read that motion, I presume you read the order before you signed off on it? You read the three pages here -- excuse me -- the two pages?

A. Yes.

Q. When you saw that it was Kathleen Sternenberg, a member -- a person on your conflicts

72

list that filed a motion, did that raise concerns for you?

A. It -- again, it probably raised a concern. I mean, I see her name and her signature. I know who she is. But, again, the nature of the order that I was approving resolved any uncertainty I had about the propriety of my signing it.

Q. Okay.

MR. DELANEY: So, Phil, we have been going almost an hour and a half. When you hit a good breaking point, I would like to take a short break.

MR. WAYSTACK: Sure. Let's do that right now.

(A break was taken.)

Q. (By Mr. Waystack) Let's turn to Exhibit 6, if we can. Turn to Exhibit 6.

So let me represent to you, to save some time, this is a notice of decision and a two-page motion by the guardian to exceed the fee cap with a so-called margin order on the third page signed by you, Judge Introcaso. Does that appear to be accurate, what I just said?

73

A.  Yes.

Q.  Okay.  So we were recently talking about the motion for instruction order.  And, as you recall, that was signed by you on February 15, 2018.  So here we are less than a month later, and the guardian is now filing a motion to exceed the fee cap.  Do you see that?

A.  Yes.

Q.  Now, if I turn to the third page of Exhibit 6, there's no signature by Marital Master DalPra here, is there?

A.  No.  This was my order.

Q.  Okay.  So this is your order on your own, no recommendation by the marital master?

A.  No.

Q.  My understanding is there was no hearing on this motion.  Am I right?

A.  Correct.

Q.  So you didn't hear the parties argue.  You just made a decision on March 12 on this order on your own?

A.  That's right.  It would have been in the signing pile, if you will.

74

Q.  On the third page of Exhibit 6, it shows that the date Attorney Sternenberg signed this was the last day of February, February 28, 2019.  Do you see that?

A.  Yes.

Q.  My sense is, if I remember from the court index, that it wasn't indexed until March 1, 2019.  So here's a question:  Do you know if Robin Partello objected to that motion?

MR. DELANEY:  So, Phil, I am just going to object to the form based on the representation about the index, no objection to the question.

MR. WAYSTACK:  Okay.

MR. DELANEY:  I am not saying you are wrong.  I just -- it's not in the record.

MR. WAYSTACK:  No problem.

A.  Based on the language in my order, I believe there was an objection at No. 36.

Q.  (By Mr. Waystack) Okay.  And the language in your margin order on page 3 of Exhibit 6 says "over the respondent's objection at No. 36"; correct?

A.  Right.

75

Q.  And you signed it?

A.  Yes.

Q.  And can we agree, Judge Introcaso, that the "objection No. 36" meaning is Index 36 of the Odyssey Case Summary [sic]?

A.  It should be.

Q.  Yeah, it should be, and I think it is.

A.  Okay.

Q.  Now, having said that, turn to the second page of Exhibit 6, if you would.

A.  Okay.

Q.  At the bottom right of that, did somebody write in some letters -- some numbers there?

A.  Right.

Q.  And what number is that?

A.  You are looking at "34"?

Q.  Correct.

A.  Okay.

Q.  So I will double-check, but I am going to assume, then, that the motion is Index 34.  The objection was Index 36.  Does that sound right to you?

A.  Yes.

76

Q.  Okay.  So, now, this is the second motion by the guardian within a very short time and really early in the case where the guardian is taking a motion here financially to which the respondent objected.  So my question to you is did you think, under that circumstance, that it was -- that you should have notified the respondent, Robin Partello, that Kathleen Sternenberg was on your conflicts list?

MR. DELANEY:  Objection to the form.  You may answer the question.

A.  Yes.

Q.  (By Mr. Waystack) But you didn't do that, did you?

A.  I did not do that, as I signed the order.

Q.  Do you recall why you didn't do that?

A.  Prior to signing the order, I should say.

Q.  Do you recall why you didn't do that?

A.  Do I recall why?  In reading the motion, at the time I granted it -- again, I looked at the prayers for relief.  I think, first, I noticed that it was a file that was pretty early on in terms of the path of litigation and already there were a

considerable number of pleadings. So I will say the first thing I noticed was this getting thicker, as I might say.

And then I looked at this, and it was a motion to exceed the fee cap; again, not an unusual motion. It asked that the guardian be allowed to exceed the fee cap. And I can't read the second part of it, but I believe she was asking for money from both parties. Let me double-check. I apologize.

She used the initial retainer, informed both parties of her intent to file it. I -- to me, I read it and I thought, again, it was the guardian's sort of objective request to both parties to replenish the retainer.

Q. Well, let me take issue with the word "objective." If the respondent's objecting to it, it doesn't sound like she thinks it's very objective, does it?

A. No. No, obviously. She's objecting to paying more money. I was focused on what was the relief that Attorney Sternenberg was seeking and was it unfair to either one of the parties to grant the motion?

Q. Well, the question is whether it's unfair to Ms. Partello to grant the motion without notifying her that Kathleen Sternenberg is on your conflicts list. Isn't that the real issue here?

A. Well, that's a problem, correct.

Q. And you thought about it, but you did nothing about it? Do I have that right?

MR. DELANEY: Objection. Asked and answered.

You may answer the question.

A. I thought about it, and I granted the motion at the time.

Q. (By Mr. Waystack) So let's go to the first page of Exhibit 6. So at the first page of Exhibit 6, the notice of decision, we have talked generally about this. It looks like this is the court's file copy; correct?

A. Yes.

Q. Okay. That's what it says, "File Copy."

If you go to the bottom of the page, there's something different in the bottom of the page, isn't there, something different about the

notice of decision?

A. Yes.

MR. WAYSTACK: Okay. Let me take a second before we go any further. Michael, just so you know this, this has got your Bates stamp on the bottom right, "JAI." And these documents that I am using come out of Volume 1 of the color file that the attorney general provided both you and I and it looks like you subsequently Bates-stamped the bottom right.

Q. (By Mr. Waystack) Judge, back to the question. That's just information for your lawyer.

So what I see is handwriting that says "1/9/2020." Do you see that?

A. Yes.

Q. And then it says, underneath that, "Originals have been submitted @" -- at sign -- "JCC."

Did I read that right?

A. Yes.

Q. And then it looks like there are initials "JDL" at the bottom of that, what I just read; correct?

A. Correct.

Q. Now, you are not JDL, are you?

A. No.

Q. You are JAI?

A. That's right.

Q. So I expect you probably have been paying pretty close attention to this case. And you know that Ms. Lodes, Julianne Lodes -- first of all, I took her examination under oath. Secondly, she was deposed by your counsel recently. I am sure that you are aware of her testimony that, on January 9, 2020, which I will represent to you was a Thursday, that she went to your chambers and assisted you with making some markings on exhibits. Are you aware of that?

A. Yes.

Q. Okay. And so why don't you tell me -- on January 9, 2020, when Ms. Lodes made these notations, tell me what you recall the discussion was between the two of you and what you asked her to do.

A. I had spoken with her that morning. I was responding to the complaint in the Partello case.

**81**

When I started that -- I guess it was an answer, I went looking particularly for an order that was referenced in Ms. Partello's complaint but was not attached to her complaint. So I was looking to finish a partial answer, which I could not until I saw an order that was referenced.

On the morning of the 9th, when I went to look for that order that had not been attached to the complaint, I found a number -- well, specifically two documents in the file that someone had applied Wite-Out to those documents, and that was of concern to me.

Q. What was the document that you were looking for that was referenced in Ms. Partello's complaint?

A. I now know what I was looking for was that three-page handwritten order.

Q. I am going to refer to it as the Sua Sponte recusal order. Is that what you were talking about?

A. Sure. I think it's No. 35.

Q. That's dated March 15, 2019; correct?

A. Correct.

**82**

Q. And we'll talk about that in a few minutes.

So you had the file in your chambers on January 9, 2020; correct?

A. Yes.

Q. The testimony previously had been that you asked Ms. Lodes to bring it to your chambers on January 2, 2020. Do you agree with that statement?

A. Yes.

Q. Withdraw the question. Incorrect.

A. Okay.

Q. The testimony has been that you asked -- I was correct. Let me try again.

MR. WAYSTACK: Sorry, Tina. Old man.

Q. (By Mr. Waystack) The issue was that you had asked Ms. Lodes to bring what turned out to be Volume 1 of the Partello file to your chambers on January 2, 2020. Do you agree with that statement?

A. I would like to make it more clear.

Q. Well, why don't you answer my question. Then you can explain all you want.

A. Thank you.

No, no, I did ask her to bring it to my

**83**

chambers. She brought it to me on the 2nd. I didn't ask her on the 2nd. I had asked her prior to that.

Q. Okay.

A. Just to be clear. I am just trying to --

Q. That's good. Precision is important.

So now -- back up. I also saw a representation that you say that you did not open the file, that is, Volume 1 of the Partello file, from January 2, 2020, until January 9, 2020; is that accurate?

A. Yes.

Q. So the file sat in your chambers, and it wasn't until Thursday the 20th that you opened it and began to look at it?

A. Thursday the 9th.

Q. Thursday the 9th. What did I say?

A. "The 20th."

Q. Thursday, January 9, 2020, is when you first opened the file. Am I correct?

A. That's right.

Q. Okay. I have a recollection of being in your chambers on one occasion, Judge Introcaso. And

**84**

which -- where did you put the file? Which table or desk? Where was the file from January 2, 2020, to January 9, 2020?

A. My right-hand side of my desk where my office equipment would be: my pen, my pencil, my stapler.

Q. Yeah.

A. There's a space next to me where I keep files to be worked on. It was in the right-hand side of my desk.

Q. Okay. So back to Exhibit 6 now. So do you recall what time of day it was that --

A. May I correct my answer? I am touching here (indicating) saying "the right-hand side." It's the left-hand side of my desk. I apologize.

Q. Are you left-hand dominant?

A. I am right-hand dominant. But, honestly, I haven't known my right from my left since I was a child. It's one of those things that -- honestly, it's an oddity that I have. But it's the left-hand side of my desk.

Q. Okay.

A. You don't want me to give you directions

85

while we're driving.

Q. I won't. I won't ask.

Okay. So did you ask Julie Lodes to come up to your chambers on Thursday, January 9, 2020?

A. No.

Q. How was it that she came up to your chambers?

A. She was working in Courtroom 5, which is the courtroom immediately across the hallway from my chambers. And we routinely just speak without phones or anything. We can just vocally hear one another back and forth. So I did ask her to come into my office at some point.

Q. Okay. You had some hearings on Thursday, January 9, 2020.

A. Not that I recall. None were scheduled.

Q. But Julianne Lodes was your so-called courtroom clerk. So if you were hearing a matter in court, Ms. Lodes was likely in the courtroom with you. Is that a fair statement?

A. Yes. She generally worked in Courtroom 5.

Q. But, as you sit here today, you don't recall having any hearings on Thursday, January 9,

86

2020?

A. I don't recall having any hearings in that room that day.

Q. Okay. Now, last week Attorney Delaney did a relatively extensive review of the Odyssey Case System in order to learn some information. I am assuming that you were aware of that, Judge Introcaso?

A. Are you referring -- I was present at that time.

Q. That's what I thought. And I would assume --

A. I was communicating with him. Is that the Odyssey? Yeah, we communicated about that.

Q. I would assume, just because of the complexity of the Odyssey System, that you were sort of giving Attorney Delaney instructions on what to look for and what to ask for. Is that a fair statement?

A. Well, yes. I explained how the system worked to him.

Q. All right. So in that -- when we did that little review, did you see anything on the Odyssey

87

System that suggested that you had hearings on Thursday, January 9, 2020?

A. I don't recall it from that circumstance, no.

Q. So back to the issue of how Julie Lodes got into your chambers. So you think she was in the courtroom and just came by? Is that it?

A. Yeah. She will come up and she will bring files up in the morning for judges to sign. She has a cart that she can work off of.

Q. Yeah.

A. She, essentially, has a clerk's office workstation and a workstation completely set up in Courtroom 5. So even though I may not be sitting in 5, which is my, let's say, assigned courtroom, Judge Derby, Master DalPra, a visiting judge, anyone else could be in that courtroom and Julie would generally be the one who was also their courtroom clerk.

So on the morning of the 9th, she was stationed in the courtroom that morning. I don't know --

Q. Do you recall -- go ahead.

A. No. I was just saying I don't know what

88

she was specifically doing at that time.

Q. Okay.

THE WITNESS: Excuse me. Attorney Dell, could I --

MR. DELANEY: Just off the record for a second.

(Off the record.)

Q. (By Mr. Waystack) Okay. So tell me. What's your best recollection as to what time of day it was on Thursday, January 9, 2020, when Julie Lodes came into your chambers, and you began talking about the file, and she made the marks on Exhibit 6 that I just asked you about?

A. Oh, that -- that took a period of time. You are talking from somewhere between the 9:00 o'clock hour till probably 10:00-ish. And the whole matter didn't wrap up till around 11:00 dealing with this file.

Q. So she might have been with you as long as two hours on January 9, 2020?

A. On and off, right.

Q. Okay. So tell me what you said to her that caused her to make those notations.

A. I told her that I needed to show the committee what the state of the file was as I was writing my response. And the only way I could see that I could appropriately present them with what the actual file looked like was to give them the original file so that they could see these documents that were of concern to me.

And during that period of time where the originals would be in the possession of the JCC, I wanted there to be photocopies of all the documents in the file for reference and just for a complete record to be present in the courthouse as well while these originals were, essentially, on loan to the JCC.

Q. So you asked her to photostat this motion to exceed fee cap notice of decision and two-page motion and margin order and then to write on it and to stamp "Copy"; is that right?

A. In essence, yes. I asked her to -- we went through a number of documents that I thought made complete for the committee, the motions that had the Wite-Out applied to them, because those were two of the orders that I already acknowledged that I had made in my preliminary answer.

So I asked her, I know specifically, to mark those documents that had Wite-Out applied as originals, because those were the original motions, my original order, et cetera; but to make a photocopy of those documents that we were marking "Originals," mark them "Copy," put them in the file with the notation that the reason these aren't originals, just FYI, is because the originals are at the JCC.

Q. Okay. So -- and that may not be the case, but we'll get there.

So here's what I am a little curious about: If you turn to the third page of Exhibit 6, I see your margin order clearly, "over the respondent's objection" -- "Motion granted over the respondent's objection at 36." You see it clearly, too, don't you?

A. Yes.

Q. But the problem is that it was on Thursday, January 9, 2020, that you discovered that two orders had been whited out. Am I right?

A. Yes.

Q. And one of the orders whited out was, sure enough, this motion to exceed the fee cap, wasn't it?

A. Yes.

Q. So here's my sense. You tell me if you think I am right or wrong. It looks to me like what happened -- and I have been trying to scratch my head about what those -- I think they are fingerprints on page 3 that obstructed part of the request that you mentioned earlier. My sense is that what happened is, since you had the Partello complaint and you were responding to it, that this document, that is, page 3 of Exhibit 6, came from the Partello file. Do you agree with that statement?

A. No.

Q. Okay.

A. I had to make --

Q. Let's look at Exhibit --

MR. DELANEY: Hold on. Phil, she didn't finish her answer.

Q. (By Mr. Waystack) Oh, I am sorry. Go ahead.

A. That's fine. That's fine.

Q. I don't want to cut you off, Judge.

MR. DELANEY: I just need to clarify. Did you ask about the Partello file being -- what Partello file? There's two Partello files.

MR. WAYSTACK: Okay. Thank you. We'll clear it up.

MR. DELANEY: Let's get this clear.

THE WITNESS: Thank you.

Q. (By Mr. Waystack) We will do that. And the way we'll do that is by turning to Exhibit 7 first. Let's turn to Exhibit 7.

MR. DELANEY: Let me ask you this: Are you withdrawing your question, or do you want to allow her to finish answering?

MR. WAYSTACK: If she hasn't finished answering, go ahead and finish your answer. I will come back to it after 7.

Q. (By Mr. Waystack) If you want to finish answering, Judge Introcaso, go ahead.

A. I would like to finish answering.

With respect to this page, okay, yes, there's blotches all over it. There -- you will

93

notice there are also side punches on this document. I knew that this -- or, I should say, I know that this came from Robin Partello's complaint --

Q. Okay.

A. -- because that's the only place that this written order was reflected. It was no longer in the file.

Q. Right.

A. So in order -- when I was talking to Ms. Lodes, it was like, "This is the order I made." And I was looking at a copy that Ms. Partello had produced probably from her own notice of decision and attached to her complaint.

Q. All right. Thank you for saying that. So keep Exhibit 6 in front of you for a sec. So to be totally accurate about it, Exhibit 6 --

A. Yeah.

Q. -- Exhibit 6 is not a copy of the original court's file. The first two pages, that is, the notice of decision, this file copy -- I don't know what the second page is, but the third page clearly is not from the court's file. It's from Robin

94

Partello's judicial conduct complaint, isn't it?

A. Yes.

Q. So, really, to stamp "Copy" on Exhibit 6 is not accurate, is it, Judge?

MR. DELANEY: Objection to the form. You may answer the question.

A. It's a copy. It's not a copy of how the original file looks, but I couldn't see whether or not that was in the file based on my review of the file.

Q. (By Mr. Waystack) Let's turn to Exhibit 7.

MR. DELANEY: Phil, while you are transitioning, just for the record, you made a statement that Exhibit 6 has Bates numbers from the McLane firm which was a color copy of the Partello case file. For the purposes of the record, I believe you are providing the deponent with only black-and-white copies of what you stated was a color copy of the file, and I want that to be noted for the record.

MR. WAYSTACK: Fair enough. Fair enough.

Q. (By Mr. Waystack) Okay. Exhibit 7. So, again, to try and save some time, Exhibit 7 is a

95

notice of decision and two-page motion of GAL Kathleen Sternenberg to exceed the fee cap, similar to Exhibit 6; correct?

A. Yes.

Q. There are some differences, however, on these two documents, aren't there?

A. Yes.

Q. Okay. So let me just try and focus on that. On the first page of Exhibit 7, the notice of decision, up in the top hand right, I see the following -- it looks like handwriting. Very neatly, there is, it looks like, an "A" within parentheses as if this was being added an as exhibit, for instance, to a response. Then underneath the "A," I think that's a diagonal line striking that.

A. Right.

Q. And it looks to me like there's a signature. I am going to say it's "Julie." Is that your signature, Judge?

A. That's right, first name only.

Q. Okay. And then underneath that, it looks like it's "Julie" again and it says "1/10/20" and

96

the word "Stricken" --

A. Yes.

Q. -- and then two lines underneath it. Is that your --

A. Yes.

Q. -- handwriting?

A. Yes.

Q. And did you make those entries on Exhibit 7?

A. Yes.

Q. Okay. And when I look at the bottom of Exhibit 7, again, the notice of decision -- and it may be worthwhile to have Attorney Delaney give you back Exhibit 6 and put them side by side.

A. I have it right here.

Q. Okay. So what else has changed is on Exhibit 6 in the bottom right was a stamp "Copy"; correct?

A. Yes.

Q. Here on Exhibit 7, there's no "Copy," and it says "Original." The stamp says "Original," doesn't it?

A. Yes.

97

Q. But there's no Julie Lodes handwriting here, is there?

A. Well, no.

Q. Okay. So my question to you is, Judge Introcaso, are you the one who put the "Original" stamp on the first page of Exhibit 7?

A. I don't believe so.

Q. You are not sure, are you?

A. I don't have those stamps. I don't have an Original stamp or a Copy stamp, which leads me to think it was not me.

Q. You had Julie Lodes bring into your chambers on January 9 both an Original stamp and a Copy stamp, didn't you?

A. Oh, yes.

Q. If you turn to the second page of Exhibit 7, that "Original" stamp is on that page also, isn't it?

A. Yes.

Q. And if you turn to the third page of Exhibit 7, the "Original" stamp is on that page also, isn't it?

A. Yes.

98

Q. But the difference is, on page 3 your margin note is totally obscured, isn't it?

A. Right. That was the original when I found it. It would look like a motion with no order on it. And it's hard to see because it's a photocopy. But, right, where my granted motion had been written, there was Wite-Out applied on it. That was, in fact, the original document in the file.

Q. Can you explain to me why Exhibit 6 has a date and handwriting by Julie Lodes but Exhibit 7 does not?

A. Oh, because I -- I thought the -- any member of the public, any lawyer involved in the case would come in and wonder why there are copies there. So that's just an explanation to say we recognize this is a copy. We recognize there's -- there's a couple other documents where she acknowledged that these were copies. Okay? We didn't have to -- I didn't feel the need to notate anywhere that the originals were originals because I wrote to the JCC -- I was writing to the JCC telling them, "I am sending you the originals." So I am not sure what the notation

99

would have been; so there was no notation made. I thought a notation was important on the copies.

Q. As it turned out, you did not send the originals of the exceed-the-cap order to the Judicial Conduct Committee, did you?

A. No.

Q. And to your knowledge -- you may not know this. But the attorney general has those two original motions, the Apple Pay motion of 3/12/19 and the exceed-the-cap motion in their possession right now. So let me ask you this. I am going to ask you directly, Judge Introcaso. Did you white out the margin order on page 3 of Exhibit 7 to obstruct -- to obscure it by using Wite-Out tape?

A. No.

Q. Okay. On January 9, 2020, when Ms. Lodes was in your chambers helping you make copies and stamping documents and whatnot, did you ask her if she whited out the two March 12, 19, orders I just referred to, the exceed-the-cap order and the Apple Pay order?

A. In essence, I did. I said to her, "I hope you did not do this to protect me." That's the

100

complete statement.

Q. So you -- so, in essence, you accused her, but you are suggesting it was softer language; is that right?

MR. DELANEY: Objection to form. Misstates the testimony.

You may answer the question.

A. I asked her -- I should say I made a statement that, "I hope you did not do this to protect me," or, "I hope you didn't do this to protect me."

Q. And how did she respond to you?

A. Just with a, "No. I know I didn't do that," which is what I was expecting to be her answer.

Q. There was no hesitation in her response, was there?

A. No, not that I recall.

Q. As a matter of fact, up until that time, the two of you had a rather close relationship, hadn't you?

A. We have a very close relationship.

Q. Was it clear to you that she felt offended

101

when you asked her that?

A. No.

Q. Okay. What did you mean, "I hope you didn't do this," with the terms, "to protect me"? What was that a reference to?

A. That was a reference to the fact that I have a very good staff. And they are my second set of eyes, and they help me out an awful lot. And particularly with respect to Ms. Lodes, she's that person I rely on to bring files back to me if I have, you know, flipped the plaintiff and the defendant. She does a lot of that kind of stuff for me. And I think she cares about me a lot, and she knew that I had this complaint that had come on the tails of a larger complaint about a year ago. And I -- I asked her that just almost in a maternal way. You know, "Boy, I hope you didn't do that to protect me." It would not have been a smart thing for her to do. I don't think she really would have done it, but I know that she cares about me enough that she wouldn't want me to be concerned or suffering or panicking over this. So I guess it was a combination of all those sort of complex factors in

102

our relationship. But I would not accuse Ms. Lodes of doing anything inappropriate.

Q. So I am having a little confusion about understanding how she might have protected you by whiting it out. Was your implication "I hope you didn't do this to protect me" that you whited this out so I wasn't in trouble with the Partello complaint? Was that why she was protecting you? Is that what you thought?

A. I guess. I mean, I guess that's what I was implying, yes.

Q. Had you discussed -- go ahead.

A. You are not --

MR. DELANEY: She hasn't finished her answer, Phil.

A. That's what I was meaning to say, is, you know, it was really -- it was a comment where I said -- you know, I showed it to her and I said, "I hope you didn't do this to protect me." It was not intended as a serious accusation by any means. She said, "No, I" -- "No, I didn't do that." Sort of like, "Of course I wouldn't do that." And, you know, we went on to work together for another two

103

and a half hours to try to figure out who did.

Q. (By Mr. Waystack) Well --

A. So if your question is was I asking because I thought that she was trying to protect me from the complaint? Honestly, I don't think she -- she would have or was trying to do that. It was more of a -- it was an introductory comment to the discussion. I don't know how to explain it other than that. It -- it wasn't intended of having the weight of the words to it. In the same way we joke about a lot of other things, I was not joking. Let me put it that way. But it was casual. It was not accusatory.

Q. So let's go back to what I am really interested in knowing, which is this: As of January 9, 2020, you really hadn't discussed your judicial conduct complaint by Robin Partello with Ms. Lodes in any detail at all, had you?

A. Not true. She and I had been talking about it for probably a month, a month and a half.

Q. Okay. So that's -- okay. All right. On that issue, I need some dates here. Let me back up a bit. So do I understand that you went out on

104

leave sometime in October of '19?

A. Yes.

Q. The sense I have is it's around October 5 or 6. Can you help me with that date?

A. Well, yeah. I believe the 5th and the 6th were the weekend. But I did not go -- the first day out of work was the 7th, I believe, a Monday; but you would have to check the calendar. But I believe Monday I was officially, you know, on leave, as of Monday, October 7.

Q. And when did you return?

A. On December the 16th. Again, it was a Monday, I believe. So I can't be precise, but I believe that was the date I returned.

Q. Okay. And then there was a couple of short weeks with Christmas and New Year's in late December; correct?

A. Yes.

Q. And I am just curious if you can recall. I don't want to waste a lot of time on this. Each of those weeks were two days off. Am I right?

A. I, honestly, don't recall.

Q. Okay.

105

A. And, candidly, just because it's a holiday doesn't mean the court doesn't have to work in some respects, but I just don't recall.

Q. Okay. So your testimony is that you had had plenty of discussions with Ms. Lodes by January 9, 2020, about the substance of Robin Partello's judicial conduct complaint against you?

A. Yes, to the extent we discussed what she was alleging and to the extent Ms. Lodes gave me information about the fact that she proceeded to monitor, as the courtroom case monitor, the case after I had withdrawn in March. So she knew a little bit more about what was going on in the case than I did. So I told her about the complaint. She talked with me about the case, but...

Q. Back to January 9, 2020. After you asked Ms. Lodes if she had done the Wite-Out or done it to protect you, you then actually showed her the document, didn't you?

MR. DELANEY: Objection to form.

You may answer the question.

MR. WAYSTACK: Well, let me withdraw the question. I will start again.

106

MR. DELANEY: I am just trying to be precise about documents, Phil.

MR. WAYSTACK: I understand. That's okay.

Q. (By Mr. Waystack) Judge, on January -- Thursday, January 9, 2020, when you were discussing a judicial conduct complaint of Robin Partello with Ms. Lodes, did you show her the actual whited-out order -- either for the exceed-the-cap-fee order or the Apple Pay order?

A. Yes.

Q. And do you remember what she said to you when she showed it to you -- when you showed it to her?

A. I remember a number of things and -- but I can't remember the first, per se.

Q. Tell me what you remember.

A. I remember her saying, "Are you sure Ms. Partello wouldn't do something like this?"

Q. Okay.

A. And we talked about that for a bit by looking through the file and such.

Q. What else?

A. She said something to me about, "You ought

107

to go back and listen to the last hearing that Ms. Partello had, because she said all this same stuff about you."

And I said -- I remember sort of being dismissive of the need to listen to the hearing. And she also said to me, "You know, you love Wite-Out. It looks like you probably did this."

Q. What else did she say?

A. We -- you know, I don't remember. Generally, we talked about how this could have happened. We came up with a number of different ways why or how this could have happened.

Q. Well, let me ask you this: Do you recall her specifically saying to you, when you showed her the Wite-Out, "Well, Judge, that really doesn't matter because that exact text is in the notice of decision?" Do you remember her telling you that?

A. Not on that day, no.

Q. Okay. Do you remember her saying, "Well, Judge, it really doesn't matter because all you have to do is hold the Wite-Out up to the light and you can read the order right through it"?

A. I remember her and I discussing that,

108

saying, you know, "You are not" -- "It's ineffective, because you can see the order right underneath it."

Q. In other words, she thought you were concerned that the order was obscured simply because the litigants couldn't see it without reference to anything else? Isn't that the way she felt?

A. I don't know. I don't know what she felt. I do recall talking about the fact that it was -- it was, basically, transparent. You could see my order underneath by looking at the other side.

Q. Let's turn to Exhibit 8, if we can. Exhibit 8 is a notice of decision and two-page motion from Kathleen Sternenberg for instructions, but it's referred to as the "Apple Pay" order. Does that ring a bell with you, the Apple Pay order?

A. Yes, it does.

Q. Am I correct? Is that what this document is?

A. Yes. This is, I believe, Attorney Sternenberg's request that the court order Ms. Partello to pay in a form other than Apple Pay, in essence.

109

Q.   So let's look at the document for a moment.  The first page of Exhibit 8 is the notice of decision.

A.   Correct.

Q.   And as with the previous exhibit, Exhibit 7, the handwriting on the top right-hand portion of the exhibit, based on your previous answers, is your handwriting.  And this would have been Exhibit B to the response to the JCC; is that right?

A.   Yes.  My initial Exhibit B was intended for that purpose.

Q.   And later you drew a line diagonally through the "B" and you wrote the word "Stricken"; correct?

A.   That's right.

Q.   And then below the telephone number is the date of 1/10/20, which is actually that Friday.  Am I right?

A.   Right.

Q.   So the previous exhibit we talked about, it also has a date of 1/10/20, which would have been Friday.

110

A.   That's right.

Q.   That's the day you actually filed your response to the Judicial Conduct Committee, is it?

A.   That's, right, the day I put it in the mail, so to speak.

Q.   Okay.  And the word "Copy" also appears on the first page of Exhibit 8, doesn't it?  The stamp "Copy"?

A.   Yes, it does.

Q.   Yeah.  Okay.
On the bottom of the first page of Exhibit 8, no handwriting from Julianne Lodes; correct?

A.   No.  No.

Q.   Did you stamp the word "Copy" on that document, Judge Introcaso?

A.   I don't know.

Q.   Okay.  The bottom right-hand portion of page 1 of Exhibit 8, there is a stamp -- it looks like a stamp of the word "Original."  Do you see it?

A.   That's right.

Q.   And did you stamp "Original" on page 1 of Exhibit 8, Judge Introcaso?

111

A.   Again, I don't recall.  I just don't recall who did that.

Q.   Page 1 also -- page 1 of Exhibit 8 also reflects that this is the file copy; correct?

A.   Yes.

Q.   And if we turn the second and third page of Exhibit 8, they all have the "Original" stamp on the bottom of the page, don't they?

A.   Right.

Q.   But you can't see any margin order on page 3, can you?

A.   No.  There's a lot of black spotting.

Q.   Yeah.  And you know that there was a margin order on the third page of this -- of the original of this exhibit at one point, don't you?

A.   That's right.  I made an order with some narrative language.

Q.   Let me jump ahead a sec here.  I will come back to that later.
Okay.  So did you show Ms. Lodes the Apple Pay order that had been whited out on the third page on January 9, 2020?

A.   Again, I have no specific recollection,

112

but I am sure I did.  I wouldn't doubt that.

Q.   Why is it that Ms. Lodes didn't write her initials on Exhibit 8, the Apple Pay order?

A.   Again, because this was going -- this -- what we -- what I believe I am looking at are photocopies of the original documents that would be in the file.  So I made a point of asking her to stamp them Original or I stamped them Original.  Again, I am not clear on the stamping.  But I wanted these to be notated as originals that would be then sent to the JCC.
The JCC was going to have an accompanying letter that explained that I was sending them originals.  I didn't feel as though we needed any notation on the originals because we had the corresponding letter to the JCC explaining what we were providing for them.  It was only the documents that were going to be returned to the court file as photocopies, not originals, which is what you would expect to see in the court file, that I thought notations were important.

Q.   Well, let me ask you this:  What I am a little confused by is you are talking about you

113

stamped it "Original" so the court would understand. Why is the word "Copy" above the exhibit sticker, then? I mean, it can't be both a copy and an original, can it?

MR. DELANEY: Objection to the form relative to testimony about who stamped.

You may answer the question.

A. No, it can't be.

Q. (By Mr. Waystack) So it's kind of confusing on its face whether it's an original or a copy, isn't it?

A. Well, in photocopy form I think it is. I don't think it would be as confusing if I could see the original document.

But I would agree with your initial statement. It can't be both a copy and an original unless I was sending a copy of something that had already been stamped "Original" and didn't -- and didn't appropriately notice that. Because I -- I had two things that I was doing. I was sending things to the JCC. That was my initial plan. And I was responding to a complaint, which is -- which is a lot of what's going on in those upper right-hand

114

corners, is, you know, it was B for one purpose. And then I was using it again for the purpose of answering my complaint; so I would strike the B.

So that's the only possible explanation that I could have, is that the original was now a photocopy and I was sending a -- I was sending a copy as part of my response.

Q. You would agree with me now that Exhibit 8 is not the original Apple Pay order, is it?

A. No. It's a photocopy.

Q. And so the words -- the stamp "Original" on this is -- it's inaccurate, isn't it?

A. Well, right. It's a photocopy of something that had been designated as an original.

Q. The original of that order is now in the hands of the attorney general, to my knowledge.

All right. What time did Julie Lodes leave your chambers on Thursday, January 9, 2020, to the best of your recollection?

A. I could probably be more clear, but I am going to say my recollection is sometime around the 11:00 o'clock hour; after about two hours, it seemed.

115

Q. Did you later have a discussion with a member of the court staff, Nancy Dabilis, on Thursday, January 9, 2020?

A. I did.

Q. Did you ask her to come to your chambers?

A. I don't know if I did that specifically or I made a request through someone else. But I did want to speak with her, and she came to my chambers to speak with me.

Q. Tell me what you recall of your conversation with Nancy Dabilis on Thursday, January 9, 2020, in your chambers.

A. Nancy appeared to know what was going on already.

Q. Why do you say that?

A. Because she just did. She seemed to know what was going on. It was already two hours into the day. Julie had been up and down looking for sign-out sheets and stuff; so there was -- there was already some, if you will, sort of dust getting kicked up about, "We're having problems up in the file trying to find things for Judge Introcaso," okay, because I know she went down to look for the

116

sign-out sheets and such.

But Nancy came up and asked me, you know, "So what's the problem with this file?" sort of thing.

And I recall telling her kind of the quick version. "You know, I am trying to respond to a complaint. I have this file. Look at these two orders. They have been whited out." And I said, again, "Is there any possibility someone downstairs would have done this?"

And I remember her specifically saying, "No. My girls wouldn't have done that," used that term, "My girls wouldn't have done that." And I then went through to show her one of sort of the theories that Julie and I had come up with. And she said, "No. I still don't think that that would have happened," or, "could have happened," but that she would "check and let me know" kind of thing.

And I said, "Because, you know, somebody has got to look into this." I mean, I could be more...

Q. Have you finished your answer?

A. I finished my answer.

117

Q. Did you accuse Nancy Dabilis of whiting out the Apple Pay order and the exceed-the-cap order?

A. I have no recollection of accusing Nancy. As I said earlier, I wanted to talk to Nancy about whether or not anyone on the staff may have done this. There is very high turnover, and there was a number of new people who I thought may not be properly trained on how to do this.

Q. I am going change my selection of words, Judge. Did you ask Nancy Dabilis if she whited out the Apple Pay order and the exceed-the-cap order?

A. I may have asked her. I may have asked her, but I have no recollection of asking her, in particular.

Q. I mean, it sounds to me like, on Thursday, January 9, 2020, you are asking several of the court staff in an effort to find out who did this. Is that what you were doing?

MR. DELANEY: Objection to the form. You may answer the question.

A. I was inquiring of a number of people over the course of the morning what they knew about the

118

file. With respect to Julie specifically and Nancy specifically, I remember very clearly what I said to Julie and I have told you that.

With respect to Nancy, because this was a marital file and she was head of the marital department, I was basically trying to get from her, you know, "What do you know about this file? Who has been touching it? Could someone have read orders that occurred following my orders that would have caused someone to go back and apply Wite-Out to my orders?"

And we discussed that, and she said, "No. You know, none of my girls would do that."

And, again, I was simply trying to point out to her that, you know, there are people who aren't fully trained and could have misinterpreted some of what happened in the file that resulted in the application of the Wite-Out.

Q. Wait a minute. Hold on. How does training have to do with extensive use of Wite-Out to obscure the two documents that are at the heart of a judicial conduct complaint? I don't understand that.

119

A. Is this the rule --

Q. I mean, how would -- go ahead.

A. I just want to be -- I just want to be candid with you. Is this the rule I agreed to where I can't ask my counsel a question?

Q. You need to -- you can ask your counsel any question you want, but you need to answer my question first. If we're going to take a break and you are going to talk to counsel, you need to answer my question first.

MR. DELANEY: Let me ask Tina to restate the question, because it appears to have caused some confusion. Go ahead, Tina, please.

(Question read.)

A. I am not suggesting anyone has been trained to white out orders or put Wite-Out over judge's orders. What I meant to suggest is that there were new people -- a number of new people throughout the year who were handling marital cases. There was an order written after my orders which, in essence, stated that my orders were being reviewed de novo.

When I realized that that was in the

120

file -- I don't know who was the court clerk who handled that matter in processing that particular order. I was concerned that an inexperienced court clerk, who was processing orders, perceived that order, which was by Judge Derby, on a de novo basis as replacing the orders I had made in March and was concerned that, by doing so, they might just take my orders out since Judge Derby had essentially indicated my orders no longer matter and entered his orders with a new notice of decision.

And, candidly, when there's people there for two, three, four weeks sometimes at a time, I am not confident, given my experience with the court, that that wasn't a reasonable but terribly misguided way of handling the substitution of my order. And that was a concern of mine, which caused me to ask Nancy about the extent of the training of the staff.

MR. DELANEY: Before we go on, my client had asked for an opportunity to speak to me. You have got the answer to the question that was pending per your request. Give us a minute. I would just like to consult with my client.

121

MR. WAYSTACK: Okay.

(Off the record.)

Q. (By Mr. Waystack) Can you remember -- and I may have asked you this. If I have, I apologize. Do you remember what time you spoke with Nancy Dabilis?

A. Um --

Q. Excuse me. On January 9, 2020.

A. Sure. It was sometime around the lunch hour.

Q. Okay.

A. Again, late -- late in that 9:00-to-11:00-ish time frame.

Q. Yeah.

A. I do -- I say it was the lunch hour because I know it was Nancy's lunch hour. She walked in with a bowl of soup in her hand.

Q. Do you have a recollection to sending an email on that day, January 9, 2020, to a bunch of court staff and a number of judges and masters?

A. Yes.

Q. Okay. Would you please turn to Exhibit 20. Exhibit 20. Take a moment and read

122

that, Judge.

A. I am familiar with this.

Q. Okay. So this is an email sent from you to the following people, and these are court staff members: Nancy Dabilis, Kimberly Silva, Aline Chasseur, Emily Redwood, Kimberly Nunez, and Julianne Lodes. That's the court staff. And also to Marital Master Bruce DalPra; Judge Mark Derby; Judge Patricia Quigley; Kimberly Bonenfant, who is the deputy clerk; and Sherry Bisson, who is the clerk.

A. Correct.

Q. Did I say all of those people to whom this was published correctly?

A. Yes.

Q. And according to the document, according to Exhibit 20, Judge, it looks like the time you sent this was 10:12 A.M. Do you see that?

A. Yes.

Q. Okay. So my question now is: Did you speak to Nancy Dabilis before or after you sent this email?

A. After.

123

Q. After. Okay.

Does seeing this email refresh your memory about why Nancy Dabilis may have come to see you?

A. Well, I think she came up to talk to me generally, but she had received -- I don't remember if she had received the email or not.

Q. Okay.

A. I just don't know if she had opened it by the time she came up. I mean, I knew that --

Q. Let's put Nancy Dabilis aside.

A. Okay.

Q. Did any of the other people that you sent this email to on January 9 at 10:12 contact you?

A. Two people.

Q. Who?

A. Emily Redwood.

Q. Yeah. And what did she tell you?

A. Emily said she's familiar with the file, that she has not seen the file in quite some time, and that she was familiar with Ms. Partello.

Q. What else did she tell you?

A. That's the sum and substance of it. Basically, "I don't" -- "I don't know what I could

124

do to help you. I know the file exists because I know Ms. Partello."

Q. Okay. Who was the other person who spoke to you?

A. Judge Derby called me in response to my email.

Q. Tell me about that conversation, please.

A. Judge Derby called me. I believe he was sitting -- well, he was sitting in another court. I believe it was Merrimack, but I can't be certain.

Q. And what did he say?

A. I started by telling -- you know, he said, "Yeah, I know the case. What is it that you need to know?" I had already mentioned to him that I had a conduct complaint with respect to Ms. Partello. He then asked, just what Julie Lodes did, which is, "Did you check the sheets to see if Ms. Partello took the file?"

Q. Right.

A. And we had a very kind of light banter back and forth, and then he said, "Did you see that I wrote an order after your motions?"

Because I explained to him -- I said,

125

"There's been Wite-Out placed over two of my motions" -- "orders."

And he said something to the effect of, "Oh, that's not" -- you know, "I think that's all set because Ms. Partello came in front of me; was trying to get rid of the guardian; made an issue of, you know, your having signed some things in the case. So I reheard everything, and I issued an order." And he said, "So I think you should be okay," sort of thing.

And I said, "Well, I appreciate you calling me and letting me know."

It didn't, at the time, help me a whole lot in answering the question other than formulating, again, the theory I told you earlier. He couldn't remember who worked with him. I think I did ask him that. You know, "Who sat with you that day in terms of a courtroom clerk?"

But no one else responded. Neither of the clerks, Nancy, no one else responded.

Q. Did -- so Judge Derby's conversation with you, it sounds like, from what your response is that, as a result of his order -- and we'll get to

126

that in a minute. That's the April 26, 2019, order that he uses the words "de novo"?

A. Yes.

Q. He thinks that, by issuing that order, that made the fact that your Apple Pay order and exceed-the-cap order were whited out okay? Is that your testimony?

A. No. I don't know what Judge Derby was thinking. I was just saying I think he was trying to be reassuring to me that, because there isn't -- because those orders are no longer able to be read, if you will, in the file, that he reheard the whole thing anyway.

He said it was very clear that Ms. Partello at his hearing -- he made it appear as though she was all worked up about this conflict. And I think what he was saying is he thinks he straightened out the conflict she should have by giving her a new hearing on those same motions, as he called it, de novo, which is just an unusual phrase to use in the family division. We don't use that frequently.

But, no, I don't think -- well, that's the

127

best I can say. I think he was trying to be, you know, collegial and reassuring and said, you know, "Hey, if you read my order, I think it will make it clear that she's not got no argument to make. I reheard the case on the motions on the merits and ruled the same way you would have."

Q. Okay. I just want to understand what you are saying. So in Judge Derby's view based on his conversation with you, the fact that he had, quote, using your words, "reheard the motions and issued an order" meant that the whiting out of the Apple Pay order and the exceed-the-cap order were of no more significance. Is that it?

MR. DELANEY: Objection to the form. Misstates the testimony.

You may answer the question.

A. I don't know what he meant.

Q. (By Mr. Waystack) Well, I just listened to the way you explained it, Judge, and that's what it sounded like to me. But I will move on.

Let's turn to Exhibit 9, if we can. Exhibit 9, take a moment and flip through that. It's a four-page document, Judge Introcaso.

128

A. Yes.

Q. Have you flipped through it?

A. I think I am all set.

Q. I am going to make a representation you can agree with or disagree with. So it looks to me like Exhibit 9 is a notice of decision on -- that includes a three-page handwritten order from you. I am calling it a Sua Sponte recusal order. Does that seem a reasonable explanation of what this is?

A. That's fine. It's a ruling on a motion to continue. And that's right, a Sua Sponte recusal or disqualification.

Q. I don't disagree that it involves a continuance, but that's really of no moment to me.

So this order is issued. You signed this on March 15, 2019; correct?

A. That's right.

Q. That was only three days after you issued the two March 12 orders, the Apple Pay order and the exceed-the-cap order, over the objection of the respondent; correct?

A. Correct.

Q. I think we have already established this.

129

You hadn't contacted the respondent to let her know that Attorney Sternenberg was on your conflicts list. Something happened to cause you to Sua Sponte recuse yourself from this case in the time between March 12 and March 15, 2019, and I am wondering if you can explain to me what that was.

A. Briefly, it's what I would call wise mind. It was going from a feeling of discomfort on the 12th to a feeling of greater certainty when I read the motion to continue that I probably should not be involved in this case any further. The pretrial and the trial had already been scheduled in front of me. I knew that I certainly couldn't do that.

It was clear by now that these parties were obviously quite antagonistic towards one another. I did not want to add another issue to this case. And I felt very strongly, after having issued the March 12 orders, that I absolutely at that point had to bring them in, have a status conference, disclose my conflict, and deal with whatever was pending in the case.

Q. But you didn't do that. You thought about doing that. But before the status conference was

130

held, the lawyer for the petitioner filed a motion to continue. You granted the motion to continue and then just recused yourself from the case; correct?

A. Yes.

Q. Okay. If you would turn to the fourth page of Exhibit 9?

A. Yeah.

Q. So this is the order part now. And you have got one, two, three orders. Order 1: "Judge Julie Introcaso shall have no further involvement in this matter," that's what I call the Sua Sponte recusal. Nobody asked you to do that. You did that on your own, didn't you, Judge?

A. Yes.

Q. Number 2: "The clerk shall expeditiously work with the parties to reassign this matter, resolve the pending motions, and schedule this matter for any further hearing."

Did I read that correctly?

A. Yes.

Q. And then 3, that "No status conference will occur on March 19." So you canceled the status order that you had asked to have scheduled; correct?

131

A. That's right.

Q. Nowhere here does it say that you vacated the two March 12, 2019, orders, does it?

A. No.

Q. In fact, you didn't vacate those orders, did you?

A. No.

Q. Okay. So if you look -- and I -- we have been struggling with some technology here, but that's life. I want to point you -- give me one second now. Go to the third page of Exhibit 9, Judge, if you would.

A. Okay. All right. Yeah.

Q. And I think your lawyer knows this too. If you look at the -- like, the second full paragraph on that page --

A. "The GAL has been"?

Q. No, no. "The court does not believe."

A. Oh, okay.

Q. Next one down. Okay?

A. Correct.

Q. So "The court does not believe this conflict, under the circumstances as stated above,

132

is one which can be waived."

Now, I have got a copy. I haven't got the original. But I think that we saw the original. I think the word "which" was whited out. Can you tell that? Do you know that, Judge?

A. It looks like it was whited out and written over only because the line is missing.

Q. Right. And it is true that you have had some experience with Wite-Out, isn't it?

A. Absolutely.

Q. You frequently used Wite-Out -- and let me be clear about what I am going to say -- in the process of drafting court orders. And I am not suggesting there's anything wrong with that. I just want to know. That was your practice, to use Wite-Out when drafting orders. Am I right?

A. Absolutely. There's one on every desk in the courthouse.

Q. Okay. And so you actually whited out part of page 2 of your March 15 recusal order, didn't you?

A. Again, I am making that conclusion based on the copy in front of me where the line is missing

133

under the word "which." But also, I will just say, "which" and "that" are a common grammatical confusion for me. And I probably wrote "that" and realized it should be "which."

Q. There was nothing that prevented you from vacating the March 12, '19, orders in this March 15 order, was there, Judge Introcaso?

A. No.

Q. Let's turn to Exhibit 10, if we can, two-page exhibit. Exhibit 10 is, first page, notice of decision of Judge Derby's order on the removal of the GAL. Is that what that is?

A. Correct.

Q. Second page is Judge Derby's handwritten narrative order; correct?

A. That's correct.

Q. And this is -- this exhibit, Exhibit 10, this is what you just referred to when Judge Derby called you and told you he took care of that by writing this order. Am I right?

A. I don't -- again, I want to say that -- he did not say he took care of it. He thought that this would resolve some of the concerns about

134

whether or not there was -- there was some impropriety about me hearing the motions.

But, yes, this is -- he alerted me to the existence of this on our phone conversation that morning. He said, "You should read my April order." I don't think he knew the date. But "You should read my handwritten order shortly after yours. I took those motions up again and issued rulings on them."

Q. When you had this conversation, did he make any mention to you, because these are the documents that follow in the case -- or the file, court file after the March 12 and March 15 orders, did he make any mention to you that he observed Wite-Out on either the Apple Pay orders or the exceed-the-cap orders when he issued this April 26, 2019, order?

MR. DELANEY: Objection to the form. You may answer the question.

A. I don't believe that was in the conversation, no.

Q. (By Mr. Waystack) Wouldn't you think, if he had seen the Wite-Out in those orders on

135

March 26, when he -- when he reviewed yours -- and he says -- in Exhibit 9, he says he reviewed all the orders, didn't he?

A. He did.

Q. Yeah. And so if those orders that he reviewed and basically said that he would have issued the same orders, if they had had Wite-Out, don't you think he would have said something about that to you?

A. I don't know. I don't know if he looked at the motions or the notice of decision or the case summary. I don't know what he was looking at. He could have been looking at the case summary on his laptop in the courtroom. I really don't know.

Q. Well, he will be a witness. We'll have plenty of time to talk to him about that.

So, as you sit here right now, Judge Introcaso, do you realize that by issuing those two March 12, '19, orders, the Apple Pay order and the exceed-the-cap order, over the objection of Ms. Partello when the person who was seeking the relief, the guardian, is on your conflicts list was a problem? Do you realize that now?

136

A. Yes.

Q. Let me ask you this, Judge Introcaso: Did you ask Judge Derby to review your two March 12, '19, orders?

A. Never.

Q. Did you ever discuss them with him around the time you made them?

A. Never. He and I talked in January. Those orders were in March the year prior.

Q. So I guess that's what I am asking you. In March or April of 2019, did you have any conversations with Judge Derby about your two March 12, '19, orders or your March 15, '19, order?

A. Never, not -- don't recall that at all.

Q. Well, let me ask you this. As a result of your March 15 recusal order --

A. Yeah.

Q. -- Exhibit 9 --

A. Yeah.

Q. -- the case went to Judge Derby then; right?

A. It had been with him for some things prior. It had been with Master DalPra as well. It

137

hadn't really settled into being assigned, if you will, to anyone, which doesn't often happen until you pick a pretrial or trial date. And the staff picked the pretrial and trial date for me, which was a -- which was a problem.

But it -- I -- we're not like superior court. We don't assign judges to cases. There's too much moving around. Judges go from court to court on odd schedules. You know, it sort of lands with someone after you get deep enough into it. But up until the time of my March order, I think you will see there's three or four different judges who have been involved. But Derby was one of them, yes. Derby was one of them.

Q. Okay. So what we know, Judge Introcaso, is after March 15, 2019, you were no longer going to handle that case; right?

A. Didn't touch it.

Q. Okay. And that means for any purpose?

A. Any purpose.

Q. For appointing a guardian or granting a guardian's motion over the objection of any party? For anything, you were done with the case; correct?

138

A. That's my clear recollection.

Q. Right. And, I mean, I am not going to take the time to do it now because we're running long. But my guess is that, if we looked at the court summary, it was Judge Derby who handled that case. It fell to him. Once you recused yourself, he was the one who primarily handled it through most of 2019. Do you know that?

A. Looking at the case summary that was in discovery, I believe that to be the case.

Q. Okay.

A. Also knowing that Master DalPra was no longer sitting, it would have been either myself or Judge Derby. So by default, it must have stayed with Judge Derby.

Q. That's what I was just going to say. By then, DalPra is pretty much gone from the 9th Circuit, isn't he?

A. That's right.

Q. So, I mean, my curiosity is so if I am Judge Derby, you recused yourself with this handwritten order. I am the only one who's going to have this case because DalPra's gone. I mean, it

139

would strike me as I would be inclined to reach out to you and say, "Tell me a little bit about this case, Judge Introcaso. Why is it that you recused yourself, or what are the issues?" Are you -- is your testimony that he did not do that, Judge Introcaso?

A. He did not do that. It would be great if we had time for those discussions, but we simply don't.

Q. Okay. Let's go to Exhibit 11.

A. And if I might add --

MR. DELANEY: No.

THE WITNESS: No question. Okay.

Q. (By Mr. Waystack) Your lawyer is doing his job, Judge. Let him do it.

A. I am trying my best. I might not be the world's best client, but I am trying.

Q. Okay. So let's go back to that first week in January 2020. Let's go back to Monday, January 6. Okay?

A. Yeah.

Q. We previously established that you came back to the court on December 16, 2019; correct?

140

A. Right.

Q. And, again, I don't want to waste anybody's time here because it's getting late. But there were some fractured weeks right after that; correct?

A. Right, the holiday weeks.

Q. Let me ask you if you remember this: When was the first time after you came back on December 16 that you actually sat on a case? Do you remember that?

A. It may have been, like, the 16th or the 17th. I think I was given about a day to just go through email and such. But, no, I don't remember the specific day. But I do think I was given something of a breather maybe for a day, day and a half just, again, to -- you know, I had two months' of emails to look at and things of that nature.

Q. Okay. So let's move the calendar to Monday, January 6.

A. Okay.

Q. Monday, January 6. So what Exhibit 11 is -- I will say it, and Michael -- Attorney Delaney can object if he wants. It looks like it's an email

141

from you to Sherry Bisson sent -- and I am going to go to the bottom one -- sent at 8:49 A.M. Do you see that?

A. Yes.

Q. Okay. And what you are referencing to Ms. -- Sherry Bisson is the clerk of the 9th Circuit Court. Am I right?

A. Yes.

Q. She's responsible for the scheduling of marital cases, family law. She's responsible for scheduling district court cases and probate court cases; correct?

A. On a managerial level, yes.

Q. Nancy Dabilis is one of her deputies, so to speak, who takes care of family division; right?

A. Right. She's the supervisor of the family division.

Q. There are corresponding supervisors for both probate and district, aren't there?

A. Yes.

Q. And Sherry is on top of all of them, isn't she?

A. Yes. She is the clerk.

142

Q. So in your email, you say, "I spoke to Judge Ashley on Friday afternoon." That would be the 4th -- the 3rd -- the 2nd, January 2nd. "She said she would try to find some writing time this month if I needed it." And then you go on to mention that (as read) "It looks like I am not scheduled for anything for the 10th," meaning January 10; is that right? Do I have that right?

A. Yes.

Q. Okay. And January 10 would have been that Friday, Friday, January 10, 2020; correct?

A. Right.

Q. Okay. And you mentioned in the email to Ms. Bisson, Sherry, that part of the reason you needed some writing time is to get caught up on some cases and also on a JCC complaint?

A. Yes.

Q. That's what you say in this; right?

A. Yes.

Q. Sherry then responds to you about 10:41 saying, "I spoke with Judge Ashley this morning, and for some reason we didn't schedule you for this Thursday and Friday." So you have not one, but two

143

days to write. That's what her message says; right?

A. Okay. Yeah.

Q. And so that would have meant that Thursday, January 9, and Friday, January 10 -- that you had no court assignments because the case that apparently you had been assigned to settled, and you could use both days for writing days. Is that what that says?

MR. DELANEY: Objection to the form.

You may answer the question.

A. Actually, it had been put in as vacation time mistakenly by the court clerks. I was not, in fact, on vacation on the 9th or the 10th.

Q. (By Mr. Waystack) Okay. So --

A. They had entered it as a vacation day and scheduled nothing for me.

Q. I see. Okay.

In any event, you understood that, at least as of Monday, January 6, you had that Thursday, January 9, 2020, and that Friday, January 10, for writing days; correct?

A. That's correct.

Q. Right. And one of the writing assignments

144

you had was to complete your response to the Partello JCC complaint; correct?

A. Yes.

Q. And some of the previous testimony and documents we have discussed have to do with your efforts with Julie Lodes to create documents and exhibits to your response to the JCC; correct?

A. Yeah, to make some photocopies and such.

Q. Okay. So do you have a recollection of Sherry Bisson coming to your chambers on Monday, January 6, 2020?

A. Not at all.

Q. Not at all? You don't remember having a discussion with her about the JCC complaint on Monday, January 6, 2020?

A. No.

Q. No?

A. No. Corresponding via email perhaps, but not coming to my office.

Q. Okay. Let's look at January -- excuse me -- Exhibit 12, please.

MR. WAYSTACK: Exhibit 12, Michael.

THE WITNESS: I think that's you, Michael.

145

MR. WAYSTACK: Thank you.

THE WITNESS: Thanks.

MR. WAYSTACK: I don't mean to be pushy. I am just trying be efficient.

MR. DELANEY: Keep us moving, Phil. Keep us moving.

MR. WAYSTACK: I am trying to. I am trying to. I want you guys out of here before midnight.

Q. (By Mr. Waystack) Judge Introcaso, Exhibit 12 --

A. Yes.

Q. -- this is the margin note on the Apple Pay order that was missing because of the Wite-Out. Am I correct?

A. Yes.

Q. Okay. You recognize that handwriting as yours?

A. Absolutely.

Q. That's your signature, the flowing J?

A. Yes.

Q. Okay. Do you have a recollection of talking with Judge James Leary at any time the week

146

beginning Monday, January 6, 2020, and ending Friday, January 10, 2020?

A. I don't recall speaking to Judge Leary that week, no.

Q. Did you speak with him the following week?

A. Yes.

Q. That would be the week beginning January 13, 2020?

A. Yes.

Q. Tell me what you recall about that conversation.

A. That conversation would have been, I believe, on Wednesday, which would have been the 15th. I was due to head out on vacation on the 16th and the 17th, was where the confusion with the 9th and the 10th came in. I had vacation scheduled for that Thursday and Friday of that week. I went in to speak with Judge Leary on that Wednesday, I believe. It could have been late in the day Tuesday, but I believe it was Wednesday.

But the purpose of my going to speak with him was, again, just a stop in. "Hey, Jim. How are you doing? You know I am leaving on vacation."

147

He asked about how was my work going in terms of both catching up on old orders, getting new orders out? I commented to him that, "I am all caught up. I am ready to go." I said, "I got my JCC order out the door last Friday."

And he responded some way, and I made a comment to the effect of, you know, although it was a bear because I took two hours of my morning trying to figure out how this white out occurred in the file. And he immediately said, "I can't talk to you about this." Very distinct.

Q. Did you push it?

A. I didn't push it. I have a tremendous amount of respect for him. He and I have spoke over seven years about ethical issues due to our mutual background. And it was pretty clear to me, when he said, "I can't talk to you about it," I wouldn't -- I would never think to follow up and say, "Jeez, why can't you talk to me about it?" I just said, "Okay," and walked out.

Q. Did it dawn on you at that point that the white out is a real problem for you? Did that dawn on you then, as a result of that conversation with

148

Judge Leary?

A. I can't say it was specifically the fact that the stuff was whited out. He was sort of working in his office as I was -- as I was talking. You know, I think he was multitasking. And when I mentioned the whiting out, that's when he kind of said, "Stop." And I couldn't tell if it's because he had heard something about it. I just didn't know. I didn't know why he said, "Stop." Usually he's excluded from my cases when he sits on the JCC. I don't know when it sank in to him, but it was clear he was not going to talk to me about this case anymore.

Q. Okay. And my question to you was: Did it dawn on you at that point that that was a problem for you, the whiting out of those documents, as a result of Judge Leary's statement to you?

A. I knew the white out was a problem. I didn't think it was a problem for me.

Q. Who did you think it was a problem for?

A. I think it was a problem, in general, which is why I brought it to everybody's attention. I was concerned that there was a file in this

149

condition, which is not how it should be handled.

Q. Okay. Let me run through a few --

A. I am just trying to be really clear with you that I don't recall, in the course of the conversation, that there -- it was sort of concurrence in my mentioning the fact that the file had these issues and his failure to speak to me. I just remember, when I went to speak with him and we started to talk about whether or not I had completed my Partello response, he quickly shut me down. I just don't remember the timing of the subject matter when that occurred.

Q. Well, let me ask you this now.

MR. DELANEY: Phil, I don't want to stop your questioning. So at a convenient time -- we have now gone over three hours with only a five-minute break; so I would just like to break soon.

MR. WAYSTACK: Sure. Give me just a couple more questions. Then we'll do that, Mike.

MR. DELANEY: Absolutely. Whatever is a good time for you.

150

MR. WAYSTACK: Let me just make this observation. I realize this is important to Judge Introcaso. I know she's got a lot to say; so I am trying not to interrupt the answers, Michael, some of which are long. But I know this is important; so we'll just -- we'll take a break in a minute.

Q. (By Mr. Waystack) So here's my question to you based on your recent response, Judge Introcaso. You knew that Judge Leary was on the Judicial Conduct Committee, didn't you?

A. Yes.

Q. It sounds like you had some discussions with him before about that; is that right?

A. About?

Q. That he was on the Judicial Conduct Committee.

A. Oh, yes. We talked about it routinely.

Q. Okay. And when the Partello complaint -- Robin Partello filed her complaint in September of '19, didn't she?

A. Yes. Again, I get that from the document.

Q. Yeah. Well, let me represent to you she

151

filed in September of '19.

A. I agree.

Q. So by the time we're talking now, which is the second week in January 2020, as a member of the committee, he's fully aware that there's a judicial conduct complaint against you, isn't he?

MR. DELANEY: Objection to the form. You may answer the question if you know.

A. I don't know.

Q. (By Mr. Waystack) What you do know is that he could not talk to you about the white out of those documents, because he told you that; correct?

A. He told me he would not -- he didn't want me talking about my response to the committee.

Q. Okay. Did you ask him anything else in connection with the Judicial Conduct Committee at that point that you can remember?

A. Not that afternoon, no.

Q. Okay. Can you recall ever having any further discussion with him about the Judicial Conduct Committee or any of its operation?

A. That would take hours. We have had -- we have had many, many discussions. As I said, I was

152

on the Professional Conduct Committee. I was the Attorney Discipline Officer. We have discussed -- I have discussed issues with him. He has come to me about conduct of attorneys. We have had a lot of talks about it.

The one thing I am certain of and was told the day I went into Nashua is "He's on the JCC. He won't be sitting on any of your cases," that he would be recused and he would recuse himself. So the nice thing was for me is I had a mentor who I could go to with ethical issues.

So we talked quite a bit. And -- and some things he didn't talk with me about, and maybe it's because I knew the person. But most of the time, when it was my issues and his issues, we talked very freely. So we knew how things were operating with respect to the committees and such.

MR. WAYSTACK: Michael, how long do you want for a break?

MR. DELANEY: Ten minutes.

MR. WAYSTACK: I have got about seven or eight other exhibits. I am hoping we can get through them relatively quickly. I am not

153

trying to make this an endurance contest. But I respect the Judge's right to say -- you know, have an elongated answer. So we'll take a 10-minute break, and I will try and wrap this up as soon as I can.

THE WITNESS: I will work on brevity.

MR. WAYSTACK: You don't have to, Judge. This is important. I know it.

(A break was taken.)

MR. WAYSTACK: So we talked about Exhibit 12. Mike, would you hand the Judge Exhibits 13 through 18.

MR. DELANEY: Now you are moving, Phil.

MR. WAYSTACK: Well, I am going to run through these quick.

Q. (By Mr. Waystack) Okay. So, Judge, Attorney Delaney just handed you five or six exhibits, 13 through 18. Do you have them?

A. I do.

Q. Okay.

A. Whoops. Excuse me. There we go. There's one more there. Yes, I have them all.

Q. To save a little time, let me represent to

154

you these are all orders appointing GALs. I am going to ask you just a few questions about each. Okay? So take a look at Exhibit 13, please.

A. Yeah.

Q. Would you agree with me that it's an order on appointment of guardian ad litem?

A. Yes.

Q. Okay. Would you turn to the third page of this exhibit?

A. Yeah.

Q. It looks like you appointed Kathleen Sternenberg as a guardian in this case, that is, the Merrifield case, on September 5, 2013. Do you agree with that?

A. That appears to be the case.

Q. And that's a direct appointment. There was no recommendation by a marital master here. Do you agree with that statement?

A. There was no recommendation by a marital master, yes.

Q. Okay. As you sit here today, and I know this is a long time ago, do you remember anything about this case?

155

A. No. But looking at it, it appears as though both counsel and the parties submitted this as an agreement.

Q. Okay. And you don't remember that? You are telling me that because of the way the document looks?

A. Yes. This is not a document typed by the court. This is clearly something submitted by counsel.

Q. Let's go to Exhibit 14. Exhibit 14 is another order on appointment of guardian ad litem, isn't it?

A. Yes, it is.

Q. Okay. If you turn to the third page of Exhibit 14, do you recognize your signature?

A. Yes.

Q. And you signed this on January 30, 2014. Am I correct?

A. You can't do that anymore, with the math. Sorry. You asked about the date. Yes, January 30, 2014.

Q. Thank you.

No marital master recommendation here?

156

A. No.

Q. Go to the first page of Exhibit 14.

A. That's right.

Q. Paragraph 2, Kathleen Sternenberg.

A. Correct.

Q. Do you recognize that handwriting?

A. That's Julie Lodes.

Q. Julie Lodes's handwriting?

A. Yes --

Q. Okay.

A. -- as I explained earlier.

Q. I am sorry?

A. As I explained to you earlier, the clerks would often assign the guardian ad litem.

Q. Okay. Do you remember anything about this case, the Sobell case?

A. No.

Q. Do you remember whether --

A. Sorry.

Q. Do you remember whether Thomas Sobell and Patricia Sobell asked you to appoint Kathleen Sternenberg?

A. Oh, no. No, I have no direct recollection

157

of that at all.

Q. Turn to Exhibit 14 -- excuse me -- 15, please. This is an order on appointment of guardian ad litem also, Judge?

A. Yes.

Q. If you turn to the third page of Exhibit 15 --

A. Yeah.

Q. -- is that your signature signing this initially on May 12, '15, later amending it on June 22, 2015?

A. Yes.

Q. And there's no recommendation by a marital master here. Am I correct?

A. That's right.

Q. Do you remember anything about this case?

A. I don't. And I remember -- I remember the name Berniece Crawford, but I don't remember anything factually about the case. I recall that as a name on a case file.

Q. Let me tell you what you may remember. Take a look at Berniece Crawford and her address. She's your neighbor, isn't she?

158

A. Oh, my goodness. I just moved there about 12 months ago.

Q. So I am not giving away your secrets here, but you know where you live. It looks like E-304 is in a different location than where you live.

A. Yeah. I live in G-306 and moved in in 2020. It's a huge complex.

Q. Okay. So you don't -- other than the fact that she has an address near you, you don't know Berniece Crawford?

A. No, I don't.

Q. Okay. Do you remember whether the parties asked you to appoint Attorney Sternenberg?

A. I don't. But, again, I can -- it appears as though Julie Lodes did.

Q. Okay. If you look at paragraph 2 on the first page of Exhibit 15, that isn't Julie Lodes's handwriting, though, is it?

A. It doesn't look like it. But at the bottom, because it says "Amended, given in hand and sent to Attorney Sternenberg on," there's the "JL" at the end, which I think is Julie's -- I don't -- I will say I don't recognize that to be Julie's

159

writing, though. I am not sure I know whose writing that is. It's not mine.

Q. Okay.

A. But, again, I don't know who selected her as the guardian.

Q. Let's go to Exhibit 16. Now, Exhibit 16 has a -- it's more information, a multipage exhibit that begins with the order on appointment of guardian ad litem. Do you have it?

A. Yeah.

Q. Kathleen Sternenberg is the guardian appointed in paragraph 2; correct?

A. Yeah.

Q. Page 3 of Exhibit 16, your signature, Judge?

A. Yes.

Q. On August 20, 2015?

A. Yes.

Q. Do you remember if the parties agreed to Kathleen Sternenberg as the guardian ad litem?

A. I don't remember that. But my practice would be that I would not have -- if I am the one who typed this form to put all the preliminary

160

things in, I would have -- it's my handwriting. I certainly would have discussed it with them at some point because they don't have counsel. It doesn't look like they have counsel.

Q. Okay. If you turn --

A. But no specifics.

Q. -- to the second page of Exhibit 16? I am sorry.

A. Nothing specific.

Q. Turn to the second page of Exhibit 16.

A. Yeah.

Q. About halfway down, there is some handwriting that says "respondent's risk taking." Do you see that?

A. Yes.

Q. "Re: Possible use of pornography at work," do you see that?

A. Yes.

Q. A bit of an unusual circumstance, huh?

A. I will say yes.

Q. Okay. Maybe not. I don't know. I mean, to me, it seems.

Anyhow, given that that is one of the

161

issues, do you think it's likely the parties agreed on the appointment of Kathleen Sternenberg?

A. I don't see why they wouldn't.

Q. No? Okay. But you have no independent recollection?

A. No.

Q. Let's look at Exhibit 17, please.

MR. DELANEY: Phil, before you go on -- and I really appreciate that you are trying to move -- you have just referenced this as an order on an appointment of a guardian ad litem. And, you know, I have about five different pleadings here, none of which the Judge has been asked to review. So if you are moving onto the exhibit, I just want to make sure she has an opportunity to review it and she hasn't.

MR. WAYSTACK: She can flip through it if she wants. I had not planned to ask her any questions about the rest of that stuff.

MR. DELANEY: And I just want to make sure there's nothing relative to your questions about her memory that is actually impacted by the documents you are showing her.

162

MR. WAYSTACK: Let her take as much time as she wants to flip through Exhibit 16.

MR. DELANEY: This one is just a lot longer. Thank you.

A. The only thing I would like to do is correct a statement I may have just made saying it doesn't look like the parties had counsel. Now that I have gone through it, I looked at the structuring conference order, and it does indicate that Attorney Kempton Giggey and Andrew Gallagher were there for the scheduling conference. It looks like it's been handwritten filled out by counsel. And one of the two of them must have written some of those things. The other things are my writing.

But that would -- if I look at the dates upon which they were signed -- yeah, they are both August 20. So I would assume we had a scheduling conference hearing, and this order of appointment came out of that hearing. And I don't know if they had brought in the structuring conference order and the appointment order or we just discussed it at the hearing and I completed it. But there -- I just wanted to note there was, in fact, counsel involved

163

in this case. I said earlier it didn't look like there was.

Q. (By Mr. Waystack) Okay. So let me ask you, then, now that you have got me looking through it. Let's go back to Exhibit 16. Turn to the -- six pages in, Judge; Exhibit 16, 6 pages in.

A. "Motion to Exceed"?

Q. Right, "Motion to Exceed Guardian ad Litem Fee Cap." Do you see that?

A. Yeah.

Q. And that's a form?

A. Yes.

Q. Once again, Kathleen Sternenberg was on your conflicts list, is filing a motion to exceed cap. And below that, on 12/29/15, you approve that, don't you?

A. Yes.

Q. Would it surprise you if I told you, from what I can see on most every case I have looked at, Attorney Sternenberg moves usually multiple times to exceed the fee cap in cases? Would that surprise you?

A. I have no idea. I don't know anything

164

about her business.

Q. That's fine.

A. The numbers themselves do not strike me as particularly unordinary.

Q. It wasn't the numbers I asked you about. I asked about when someone -- a guardian on multiple times moves to exceed the fee caps. Does that strike you as ordinary?

MR. DELANEY: Objection. Asked and answered.

You may answer the question.

A. No.

Q. (By Mr. Waystack) Okay. Let's go to Exhibit 17. This is a shorter exhibit again. This is an order on appointment of GAL. And the name of the case is Albrecht. Do you see that?

A. Yes.

Q. Now, this one -- if you look at the third page, Judge, third page, Exhibit 17, this one was recommended by Master Bruce DalPra, wasn't it?

A. Yes.

Q. Okay. And if you go back to page 1 of Exhibit 17, on paragraph 2, can you tell whose

165

handwriting that is for Kathleen Sternenberg?

A.   This is a combination.  Again, I am almost certain.  This is a combination between Master DalPra's writing and -- for example, you will see "Dana Albrecht."  That to me looks like Master DalPra's handwriting of that name.  Below it appears to be the handwriting of Aline Chasseur, who is his courtroom clerk.

Q.   Paragraph 2 of the appointment, it looks like there's a name initially put in there and then it's crossed out.  Do you see that?

A.   Yeah.

Q.   Do you know whose name that was that was initially put in there to be the guardian?

A.   I have no idea.  I never conducted a hearing or prepared any forms in this case.

Q.   Okay.

A.   Oddly, I am familiar with it.  This is something of a notorious case.  But all I know is the name Albrecht and Albrecht.

Q.   Is this a case where, because you respected Master DalPra and he usually made good judgments, you just looked at it quick and signed

166

it?

A.   Absolutely.  Again, I -- yes.

Q.   Okay.

A.   Appointment of a GAL form, I cosigned it.

Q.   Let's look at Exhibit 18.  This is orders on appointment of guardian ad litem for Yiatras, if I pronounced that correctly.

A.   Uh-huh.

Q.   Do you see that?

A.   Yeah.

Q.   And if you look at paragraph 2 on the first page of Exhibit 18, it looks like the name initially put on was Courtney Curran Ware (ph).  Did I read that right?

A.   It's Vore, V-O-R-E.

Q.   Courtney Curran Vore.  Was Courtney Curran Vore a GAL in the 9th Circuit?

A.   She was.

Q.   And so it looks like whoever initially filled this out wanted Courtney Curran Vore.  And the address is Welts, White & and Fontaine.  That's a law firm in Nashua; correct?

A.   Yes.

167

Q.   Okay.  But that name is stricken out and above it is "Kathleen A. Sternenberg, Esq."  Can you see that?

A.   Yes.

Q.   Is that your handwriting, Judge?

A.   That is.

Q.   So do you remember the circumstances by which Courtney Curran Vore was stricken out as guardian and you inserted Kathleen Sternenberg?

A.   I don't.  I know she no longer handles guardian cases, and that may have been an issue.  I see this was proposed by the respondent and would have been -- would have been put together likely at a hearing.  So the respondent may have proposed her only to find out in our discussion she no longer was accepting guardian cases.

Q.   Did you suggest Kathleen Sternenberg to Ms. Yiatras?

A.   I don't know if that was something tossed up by one of the other attorneys or by myself.

Q.   Do you think this was as a result of a hearing?

A.   I would think it would be a result of a

168

hearing because I would not have scratched out "Courtney Curran Vore" if that's who the parties wanted.

Q.   Okay.

A.   You know, she could have told them herself.  I just suspect there was a conversation that was related to this.  I have no independent recollection of that.  Again, I am just kind of looking at it forensically, if you will.

Q.   Page 3 of Exhibit 18, you signed this on February 22, 2017; correct?

A.   Yes.

Q.   And no recommendation by a marital master?  You did this on your own?

A.   Right.  Like I said, I likely -- I likely conducted the hearing.

Q.   Okay.  Exhibit 21.

A.   I don't have that one yet.

Q.   You are going to have it in one second.

MR. WAYSTACK:  21, 22, and 23, Mike, and I think we're sort of at the end of the exhibits.  I may have a few more questions.

MR. DELANEY:  Phil, can I hand her all of

169

those exhibits at the same time?

MR. WAYSTACK: Sure.

MR. DELANEY: 21, 22, and 23.

Q. (By Mr. Waystack) So flip through 21 for a second.

A. Okay. Oh, there we go. Yeah.

Q. So it's my understanding this is a draft of the beginning of your response to the Partello complaint to the Judicial Conduct Committee. Would you agree with that statement?

A. That's right. It's a draft.

Q. Yeah. And for what it's worth, I was told that it was on the, quote, "S-drive." I am not sure what that means. But anyhow, turn to page 3 of Exhibit 21, would you -- 3 and 4, Judge.

A. Yeah.

Q. So the first things that you see in the first line, it looks like a "C" and then a "Y" with a -- those look like stenographer's notes to me. Did you learn stenography, Judge Introcaso?

A. I wish I had. But no. I have no idea what these two pages are.

Q. And it doesn't strike you as being

170

stenographic notes or shorthand?

A. No.

Q. I should say shorthand for anybody who remembers that. Only us old guys do.

A. Honestly, this -- this came to me in some form, and I have no idea what those are, what those two pages are about.

Q. Ultimately, you filed a more formal answer with the committee that was complete and attached a number of exhibits. Am I right?

A. Yes.

Q. Okay. Do you remember drafting this and saving it on the S-drive in your court computer, Judge Introcaso?

A. I remember very clearly drafting it.

Q. Yeah.

A. How and -- how and when it was saved, I am not certain of.

Q. But you are the one who typed this; correct?

A. Yes.

Q. So the likelihood is you are the one who saved it. Am I correct?

171

A. That was a problem in this case because I could not find the document.

Q. Okay. But just answer my question.

A. Okay.

Q. My question was you are likely the one who saved it if you are the one who typed it. Am I correct?

A. Yes.

Q. Thank you.
Exhibit 22 and 23 is simply the calendar for December of '19 and January of '20. Do you see that?

A. Yeah.

Q. I don't want to take time. I was going to use this when we went through what happened the week of the 6th and the 13th, but your answers were responsive. I didn't have to take that much time.

A. Okay.

Q. I think that gets me through the exhibits. Give me a minute here.
So, actually, we can use one of those exhibits. Use Exhibit 23 for a sec.

A. Okay.

172

MR. WAYSTACK: And I am almost done; so thank you all for your perseverance and energy.

Q. (By Mr. Waystack) So if you look at Exhibit 23, Judge, the week that begins Monday, January 6, we have talked about; right?

A. Yes.

Q. Do you understand we talked a lot about the 9th; Thursday, the 9th? Remember?

A. Oh, yes.

Q. Then the following week we talked about again. And I think what I understood you to say is the fact that you were given writing days on the 9th and the 10th. I understood it was a case that got canceled. You were thinking that it was days you had reserved for vacation; correct?

A. That's right.

Q. And I think what you said to me was that the actual vacation days you reserved were not the 9th and the 10th but rather the 16th and 17th of January?

A. That's right. I had put in for leave on the 16th and the 17th.

Q. Yeah.

173

A. And the clerk or clerks, whoever, put it in on the 9th and the 10th accidentally. And when I went to the 15th and 16th and I saw they were all booked, I brought that to the attention of the clerks, that I think they got the wrong Thursday and Friday there. But it ended up leaving the 9th and the 10th open.

Q. Okay. Did you end up going on vacation or taking vacation days on January 16 and January 17, 2020?

A. I did.

Q. And how about the following week beginning January 20?

A. I was not back until the 21st. The 20th was Martin Luther King Civil Rights Day.

Q. Okay. So you came back to work on January 21?

A. That's right.

Q. And then at some point after that, you went on leave again, administrative leave, at the decision of the New Hampshire Judicial Branch; is that right?

A. That afternoon, the 21st.

174

Q. The 21st? Okay.

Okay. Do you have a recollection of ever telling Julie Lodes the names of the people on your conflicts list?

A. I have no specific recollection of telling her those names.

Q. I am going to ask you that same question for Sherry Bisson. Did you ever tell her the names of the people on your conflicts list?

A. I provided a list of the people with whom I had a conflict to, I believe, Sherry. If it wasn't Sherry, it may have been Kim Bonenfant, the deputy clerk, when I first started work in Nashua.

Q. And was that a handwritten list, Judge? Was it a typed list?

A. It was a typed list.

Q. Okay. Do you have a copy of that, by chance?

A. I have asked to have access to my computer. It may be there. But I have not been given access to my computer to find it.

Q. You don't have an independent copy of that?

175

A. Again, if I did, it would be stored on my computer.

Q. And my question to you is, in addition to being stored on your computer, do you have a hard copy of the document yourself?

A. No.

Q. Okay. And you seem to think you gave it either to Kim Bonenfant or Sherry Bisson; is that right?

A. That's correct, as well as the clerks in Manchester.

Q. And when did you do that?

A. Within the first day or two when I came on to serve in their courthouses. It's a traditional first step. "Please let us know all your conflicts."

Q. Did you ever send that list of conflicts to Judge King or anybody in his office?

A. No. I was not asked to do so.

Q. Do you think it's the obligation of the clerk staff to tell you who's on your conflict list?

A. No.

Q. It's your responsibility, isn't it?

176

A. It's my responsibility to provide the list, yes.

Q. It's your responsibility to recuse yourself on conflicts, isn't it?

A. Yes.

Q. It's not the clerk staff's responsibility?

A. Absent a waiver, yes, it's my responsibility.

Q. Pretty hard for people to waive a conflict if they are not notified of it, isn't it, Judge Introcaso?

A. Yes.

Q. And the people on your conflicts list are the people you responded to me earlier when we began this deposition with Exhibit 1; correct?

A. The only people on my conflicts list?

Q. Right.

A. Are the people that I mentioned earlier?

Q. You mentioned four people this morning.

A. Yeah. I have never added anybody onto that list or taken anybody off of that list.

MR. DELANEY: Phil, I am just going to object to the form relative to your reference

177

to Exhibit 1.

MR. WAYSTACK: That's fine. No problem. Okay.

Q. (By Mr. Waystack) So I usually ask this at the beginning, Judge, but I am going to ask you now. What documents did you read in the last 30 days to prepare for this deposition?

A. I was given an entire copy -- or what I believe was the entire copy of the JCC file, which included Ms. Partello's complaint, my answer, and the notice of charges along with other correspondence. I was given an entire copy of the Partello court file, Volume 1. And I have seen some documents from Odyssey.

Q. Okay. With the exception of Attorney Michael Delaney, who have you spoken with in the last 30 days to prepare for this deposition?

MR. DELANEY: I will just add Attorney Quinlan to that list.

Q. (By Mr. Waystack) Attorney Quinlan too. Sorry.

A. No one.

Q. Okay. Did you read the transcripts of any

178

of the depositions Attorney Delaney took of the court staff, Judge?

A. No. Those haven't been provided to me.

Q. Okay. Other than Julie Lodes and Nancy Dabilis, during the January 2020 time frame, was there anybody else that you met with in your chambers?

MR. DELANEY: Objection to the form. Overbroad.

You may answer the question.

A. I couldn't begin to tell you all the people I had probably seen that week. Any number of staff members, regardless of whether they are in the family division, the criminal division, probate come into my office regularly.

Q (By Mr. Waystack) Okay. I get that.

A. But no one I met with with respect to this case, no.

Q. You anticipated my next question.

A. People come and go all the time.

Q. Whatever people may have visited you in January of 2020, not including Julie Lodes or Nancy Bisson [sic], do you have any recollection of anyone

179

speaking about your response to the Partello JCC complaint?

MR. DELANEY: Objection to the form. Phil, just rephrase because you are mixing up a first name and a last name of a different person.

MR. WAYSTACK: Thank you. I will rephrase.

Q. (By Mr. Waystack) Other than speaking with clerk staff member Julianne Lodes and Nancy Dabilis during January of 2020, is there anyone else who you can recall speaking to in your chambers about your response to the Partello JCC complaint?

A. Yes.

Q. And who would that be?

A. I know I spoke to Sherry, Sherry Bisson. I know I spoke to Mickey Fontanez, my court officer, you know, during that week time.

Q. What day did you speak with Sherry Bisson?

A. I may -- well, I may have spoken with Aline Chasseur as well.

Q. Okay. What day did you speak with Sherry Bisson?

180

A. January 7.

Q. The 7th?

A. In my chambers on the 7th.

Q. Tuesday?

A. Tuesday, that's right.

Q. And tell me about that conversation.

A. That morning I had a scheduled full docket, but it ended not being a full docket. I ended up having quite a bit of available time that morning. I was in my office, basically, setting myself up for the day. It was fairly early in the morning. I knew I had some time.

As I organized my work, Sherry came into my office and she had two files in her hand. And I assumed she wanted signatures on something, but it was sort of a, you know, "Can I help you?"

And she indicated, you know, she was just waiting to talk to some other judge. As I said, there may have been another judge in Courtroom 5 using my courtroom since I wasn't there -- or wasn't sitting there on the 7th. Judge Quigley's there. Master -- or Judge Derby would have been there. So there was a lot of people in the hall. And to me,

181

it seemed as though she was waiting to show some files to someone. I asked her, "Do you need me to help you?" Like, "Do you need my signature?"

She made it clear that, no, she didn't. And I believe she's the one who then asked me, "Are you are getting" -- you know, "Are you getting your writing done? You know, have you been able to get your writing going?"

And I said, "Well, I am setting aside the 9th and 10th," sort of as we learned yesterday. And we just kind of started talking about what I had to do before I went on vacation. And I mentioned to her that, you know, I had one order that was three months old that I was hoping to do on the 10th and that I had my JCC complaint, which I was hoping to complete on the 9th. And she asked me about both of those, and we talked for a bit about the JCC complaint.

Q. Okay. Do you remember showing her your margin order in the Apple Pay order in Volume 1 of the Partello file?

A. No.

Q. Part of her job is to make sure that the

182

judges who work in the 9th Circuit prepare their orders within -- I think it's -- is it 60 days, Judge?

A. Thirty.

Q. Thirty days?

A. Every 30 days we're asked to say if we have any pending orders that are more than 30 days past the last event.

Q. And it's Sherry Bisson who is the one who asks each of the judges; right?

A. It's Kim Bonenfant.

Q. Has Sherry ever asked you that question?

A. Occasionally, but it's not normally her duty.

Q. She's actually sent you an email to say that in the past, hasn't she?

A. She has, but I get a monthly one the 1st or 2nd of the month from Kim Bonenfant. But Sherry has occasionally asked.

Q. Is there anything else you recall about that conversation?

A. We did speak about the order -- I am sorry -- the complaint. And the distinguishing

183

comment that I recalled to her was that, you know, she asked me about how the complaint was going. I told her that I was not particularly concerned about the complaint because I had written quite a bit of it already and responded to a number of the allegations and that I really just needed to get around to seeing this other order that I didn't know what it was so that I could finish it up on Thursday.

And she -- you know, in just talking, she sort of reflected back to me that she got it wasn't that big of a deal. It's not anything I was panicking over. I mean, it was a conflict issue. It's a serious issue, but I felt like I was going to be able to get it done and written on the 9th.

And I said to her that I thought it was -- it was a really interesting complaint because there were some really unique allegations made in the complaint. And I said -- because I remembered, off the top of my head, and I shared this with Judge King earlier -- that she had made an allegation along the lines of Judge Introcaso must have a conflict because Dr. Johnson got appointed to this

184

case to evaluate the child and Judge Introcaso's last name is Johnson; so there must be a conflict there, which to me struck me as a bit farfetched and odd.

And I think Sherry was kind of amused by it, frankly. And I said, "Oh, wait. It gets better than that," sort of thing. And I picked up the complaint, because I couldn't -- I couldn't remember other than the "Johnson." I mean, that's very personal. And I read her a number of the other allegations that were made in the complaint that I said, "I mean, I don't think I am going to have a problem dealing with these. Okay? One has to do with Judge Derby and" -- "who he works in the legislature with." You know, and, I mean, I think she just found it unusual, somewhat amusing, as I did.

And then she says, "Oh, so you are not going to have any problem."

And I said, "Well, I am going to have a problem because, you know, I signed a couple of these orders that I probably shouldn't have signed." And that was kind of the nature of the discussion

185

all before the 9th.

Q. Anything else you can remember about the conversation?

A. I don't. I recall talking about the complaint with her.

Q. Okay.

A. And, like I said, and it was mostly contained to, if I recall now, the last page of Ms. Partello's allegations, which go into a lot of things that -- you know, kind of she's killing time. I am having a casual work discussion with her about it.

Q. Okay. So just to clarify -- thank you. So you talked about the complaint with Sherry Bisson on January 7, 2020. When you talk about the complaint, you are talking about Robin Partello's judicial conduct complaint against you, Judge; correct?

A. That's correct.

Q. Okay. And from what you -- your response, it sounds like you had a fairly extensive discussion about the nature of the complaint. Would you agree with that statement?

186

A. It was detailed, but I don't think it was more than a three- or four-minute exchange.

Q. Okay. And specifically what you recall is that Ms. Partello made comments about a Dr. Johnson maybe being related to you because your maiden name was Johnson?

A. Right, which we both got something of a chuckle out of, candidly.

Q. Of course, that's not the case?

A. That's right. I don't know Dr. Johnson. Well, I'm not related.

Q. That's why you thought it was funny; right?

A. I thought that it was a bit of a stretch, candidly, yes.

Q. Did you think the part about her being irritated about the March 12, '19, Apple Pay and exceed-the-cap order was a stretch?

A. No. I think she had reason to complain that that was a conflict of interest. And, like I said, I -- I acknowledge that I had written those orders.

Q. Okay. So you had a conversation with

187

Sherry Bisson on the week of January 6th. I asked you about the 6th. The conversation wasn't on the 6th. It was on the 7th, Tuesday, according to you.

A. That's my recollection. It was in the morning of the 7th.

Q. And you had the file in front of you during the conversation?

A. It was on the left side of my desk. I didn't have it during the conversation.

Q. Let me ask you this specifically, Judge Introcaso: Do you ever recall saying to Sherry Bisson or to anyone else, for that matter, that you were almost irritated, that how is it that this Partello woman knows this information specifically about Kathleen Sternenberg? Do you remember saying that to anybody?

A. Oh, yeah.

Q. And who did you say that to?

A. I initially mentioned it to Julie Lodes, which is why I suggested earlier she wanted to go get a tape. Because apparently Ms. Partello was speaking on tape and making a lot of these same allegations at a hearing before Judge Derby, I

188

believe.

Q. Right.

A. I think I mentioned to Judge Leary, you know, that she had made some kind of unusual allegations with respect to the ethics code.

Q. Did you say it to Sherry Bisson?

A. Oh, yeah.

Q. Okay.

A. Like I said, I read her some of the allegations.

Q. All right. So let's -- you also said that you were confused -- there was an order you were looking for. Do you remember that?

A. Yes.

Q. Okay. And the order you were looking for is the three-page Sua Sponte recusal order; right?

A. Right.

Q. Wasn't it?

A. Right.

Q. That was the order you were looking for?

A. Right.

Q. And the way I understand it, and you correct me if I am wrong, you had forgotten in

189

January of 2020 that you had written that order back on March 15 of '19, hadn't you?

A.   Yes.

Q.   Okay.  And do you remember who it was who showed you the order or told you about the order?

A.   Ms. Partello told me about the order in the writing of her complaint.  Like I said, she referenced it in her complaint.

Q.   I understand.  Okay.  Hold on.  Hold on. I want to go back to -- you are moving on.  We were talking about having discussions with the court staff, Julie Lodes, Sherry Bisson, Judge Leary, in the week of January that begins the 6th.  I am specifically referring now to Exhibit 9 in this deposition, which is a three-page handwritten order.

A.   Yeah.

Q.   Did any one of those three people I just mentioned, Sherry Bisson, Julie Lodes, or Judge Leary, call your attention to the Exhibit 9, which is the March 15, '19, handwritten recusal order?

A.   No.

Q.   How was it that you learned about that? Did you find that on your own?

190

A.   When I opened the file on Thursday, the 9th, my first step -- although let me go back.  I checked my computer first thing that morning to see if I had any orders that I had written about Partello.  Okay?  Because she alleged that I wrote some order.

So as I am logging on that morning, the very first thing I did -- and my computer is all alphabetical.  I have every order.  I searched for "Partello," found no order in this case, which struck me as even more odd.  I turned.  I got my file.  And I went looking for the order, flipping through the file because the case summary just says "Order."  It didn't tell me what it was about.

So I saw in the case summary there was an order there.  I am not even sure if it said my name. But I started looking through the file to find that three-page handwritten order first thing on the 9th. That's the only thing I had not addressed.  That's the time in which I noted the Wite-Out being applied to the file.

Q.   And that's when you found the handwritten order, which is Exhibit 9; is that right?  Is that

191

your testimony?

A.   The three-page handwritten order, yes. And I found it.

Q.   Go ahead.

A.   I found it, and that was the first time I had read it since I had written it in March.

Q.   And when you read that order on January 9, 2020, you realized where Robin Partello got much of the information for her complaint, didn't you?

A.   Yes.

MR. WAYSTACK:  I have no further questions.

THE WITNESS:  Thank you.

MR. WAYSTACK:  I am sure you are all happy.  Sorry to keep you so long.

THE WITNESS:  No.  That's fine.  When Judge Morrill says we have got to get the dinner menus, that moves him right along.

MR. WAYSTACK:  Tina, thank you very much. Michael and Amanda, thank you.

Judge Introcaso, thank you for making yourself available.

MR. DELANEY:  Phil, you are making a

192

presumption that I don't have any questions, which is a good presumption, but it's not case.

MR. WAYSTACK:  Sorry.

EXAMINATION

BY MR. DELANEY:

Q.   First, just very quickly, Judge Introcaso, when you were asked about your conversations with Julianne Lodes about the Partello complaint, you mentioned you had been speaking to her for a month or a month and a half.  Do you recall that statement?

A.   Yes.

Q.   So you spoke to her, as you stated, on January 9; is that right?

A.   Yes.

Q.   And you have also stated that you came back to the courthouse on December 16?

A.   Yes.

Q.   Did you have any conversations with Julie Lodes about the Partello complaint when you were not in the courthouse before you returned?

A.   I have no recollection of that, no.

Q.   So recognizing that you came back to the

courthouse on the 16th and you were working with Julie Lodes from the 16th of December to January 9, can you be more precise about the period of time when you were speaking to her about the Partello complaint?

A. Yeah. It was probably closer to three weeks over the holiday season.

Q. Attorney Waystack asked you a pointed question about whether you had used Wite-Out to obscure the orders using Wite-Out tape. Do you recall that question?

A. Yes.

Q. And I take it you took issue with his use of the word "obscure" because, as a judge, you know that may have criminal significance; is that right?

A. That would be fair to say.

Q. Do you have any other memory presently about how Wite-Out became applied to the March 12 orders?

A. I do.

Q. Can you tell me what you remember about reviewing the March 12 orders -- strike that.

Can you tell me what you remember about

reviewing the motion to exceed fee cap and the Apple Pay order on March 12?

A. Both of those motions came to me in the -- in what I call the general signing pile. On the third floor of the courthouse, we have two different cubbies. The civil and criminal folks sign in one cubby. The family division generally signs things in the other cubby.

On the 12th, I had time available to me and went to sign at the signing cubby. And those two motions were in a file in the pile of signing. And I remember specifically the Apple Pay order. I have never -- I never had anyone request to pay anything by Apple Pay in the court; so it sort of stuck out for me. So I do have a recollection of reading the Apple Pay order and a recollection of reading the motion to exceed fees. They were right by each other. There were signature -- little stickies to tell you where to sign.

And, as I explained earlier, I thought both of those motions were motions -- given the fact that they didn't seem to particularly favor one side or the other with respect to the motion to exceed.

With respect to the Apple Pay order, I thought I could very easily, without there being any issue of conflict, make a simple statement: "Court fees and GAL fees need to be paid by, you know, sort of legal acceptable tender."

So I made both of those orders and made some other orders, but I put them on top of the file pile before I carried them downstairs.

Q. Let me stop you there. Did you initially execute those orders while at the signing table?

A. Yes.

Q. And is that the signing table on the third floor of the courthouse?

A. Yes.

Q. You began to describe returning those files to the clerk's office.

A. Right.

Q. What do you remember about that?

A. Once I got done with all the signing that I could do, piled the files up, put the Partello file on top because I needed to speak with staff about that file, I took it downstairs. I gave it -- I put the files I didn't have any particular issues

with in our regular signed, ready-to-be-issued pile.

I took the Partello file to Julie Lodes and told her that I had made two orders in this case and that I would like them processed as quickly as possible. I wanted them to go out today. And she stopped what she was doing, and she processed those orders.

After having left them with Julie, I went over to talk with Nancy Dabilis.

Q. Why did you go talk to Nancy Dabilis?

A. Because I realized I needed to disclose my conflict, deal with the issues with respect to the two motions that I had just ordered -- or made orders on, and to determine whether or not the parties wanted to go forward, I think it was, in March or April, very shortly after those motions, and things of that nature.

Q. Do you have a specific recollection of speaking to Clerk Dabilis on the 12th?

A. Yes.

Q. Tell me what you remember.

A. I went to Nancy, who I had been instructed was to do my scheduling. And she and I started

197

working together to find an available spot on my docket, to find the hour which I requested. I requested an hour for this status conference because I knew I had multiple issues to discuss: the disclosure, whether or not they wanted me disqualified, whether or not they wanted the orders of the 12th vacated, et cetera. So Nancy and I worked together to find an hour of time as soon as possible.

Q. And just -- do you remember what hour of the day you were able to locate?

A. Oh. I gave them a 3:00-to-4:00-o'clock spot.

Q. And what was the significance of the 3:00-to-4:00-o'clock spot?

A. I don't schedule between 3:00 and 4:00.

Q. So that would have been a time of day when you would regularly have openings on your calendar?

A. Yeah. I would be writing, finishing up orders, or doing signing at the end of the day.

Q. And, again, what was your intent in scheduling at that time?

A. By the time I handed the orders to Julie,

198

I had already made a decision that I have a conflict in this case and that I have to take steps to remedy that somehow. Whether it's disclose and ask if they would like to waive, whether it's disclose and have them ask me to recuse myself, I didn't know how that discussion would end in the courtroom.

But there were also two substantive motions, motions for contempt, that were pending that would need to be dealt with, and there were the two orders that I had issued on the 12th that I intended to revisit when they came back in on the 19th. And I had disclosed to them that "I wrote these orders. And now that you know that I have a conflict, if you have any objection to these orders, I am happy to reconsider them."

Q. So it was your intention, when you spoke to Nancy Dabilis, to schedule a status conference on the 19th to revisit the orders you had just issued after you disclosed the conflict to the parties at the status conference?

A. In essence, yes.

MR. WAYSTACK: Objection to the form. You may answer.

199

A. Sum and substance.

THE WITNESS: Can you not hear me?

MR. WAYSTACK: Yeah. No. I am -- objection to the form of the question, Judge.

THE WITNESS: Oh. I apologize.

Q. (By Mr. Delaney) After you spoke to Nancy Dabilis regarding scheduling of the status conference, do you recall anything else that happened on March 12 related to the Partello case file?

A. Yes.

Q. What do you remember?

A. As I was standing at Nancy's desk and we had come up with a time slot within that reconsideration period -- it had to be within, you know, 10 days of the 12th -- Julie Lodes walked by from her desk with a hand of envelopes that had the notices of decision in them and made a comment to me along the lines of, "Well, if you are having a hearing, why are we sending out the orders?"

And I simply looked at her and I said, "Because I made those orders. Send them out. You have got to send the orders out."

200

So that's what she did. And later I believe she also issued the notice of hearing, but I am not really clear on that. But I knew that the -- I knew the hearing date had been selected. I believe Julie overheard that the hearing date had been selected, because she asked me that question, which I specifically remember, "If we're going to have a hearing, why are we issuing these orders?"

Q. Did you have any other physical contact with the Partello case file on March 12 as these conversations were occurring?

A. While Nancy, again, was doing part of the scheduling part of it, Julie had put the notice of decisions and the motions back into the file. And when Nancy and I kind of confirmed I had this hour open and we were going to do a notice of hearing and get that sent out today as well, I began to apply Wite-Out over my orders that I made on the 12th, knowing that on the 19th I was going to have to change those orders, if only to add "following a hearing where the parties hereby, you know, waive this judge's participation in this matter." I was going to have to do something on the 19th to either

201

reaffirm after a waiver or vacate after a waiver. Something was going to have to be done on the 19th.

So as I was standing there waiting for things to be processed, I put Wite-Out on those orders.

Q. So if you were going to revisit the orders on the 19th, why did you have to apply Wite-Out to them on the 12th?

MR. WAYSTACK: Objection to the form.

You may answer.

A. I didn't have to. I didn't have to. It was a -- it was -- I don't know if it was anticipatory, knowing that I was going to have to issue some new order. I don't -- it wasn't particularly well thought out on my part. I knew that I would have physical possession of that file until the 19th. Once all the processing was going to get done, it was going to go back into my little hands until that hearing took place on the 19th.

I did not anticipate that a motion to continue would come in. And when the motion to continue did come in, I, again, knew at that point I have to get out of the case, wrote the order, and I

202

never went back to vacate or write something more clear over where I had anticipated writing an order post the 19th hearing.

Q. Attorney Waystack asked you about whether you vacated the March 12 orders in your March 15 Sua Sponte order; is that right?

A. Right.

Q. Why didn't you just vacate the orders?

A. I just didn't, and I thought the orders could stand until we had that hearing on the 19th. It didn't -- like I said, it didn't occur to me, during the lunch hour when I was handwriting this order, that those orders of the 12th should be immediately addressed. I just didn't -- I realized I should have either gone back and vacated them once I wrote the substance of my disclosure and disqualification. I should have dealt with the motions on the 12th.

The notices of decision were fine, but the motions needed to have something put on them like, you know, "The Court's recused, to be scheduled in front of another judge," or I could have vacated the orders. But, frankly, at that point, I was in the

203

10-day period of reconsideration, which I knew I was going to disclose on the 15th. They would have plenty of time if they wanted to object to them.

I guess I didn't see at the time, in my own thinking, that I needed to vacate them, per se. I knew they would need to get addressed, and I simply forgot on the 15th to address them in my order. And I didn't, on the 15th, go back and go, "Oh, jeez. Now that I am not going to touch this case, I have got to deal with putting something in on the 12th." You know, "Consistent with my narrative order, Court hereby vacates these." I could have done that. I think there was probably about 10 or 15 options I could have taken but, unfortunately, under the circumstances, did not get that done.

Q. So I want to take you back to January 9 of 2020 when you were talking to Julianne Lodes about what had happened to this file. On January 9 of 2020, did you remember this interaction with the case file on March 12 that you just described to me?

A. I have no recollection whatsoever.

Q. You spoke to Mary Ann Dempsey and

204

Judge King and Judge Ashley on January 21 of 2020 about the Partello case file and the whiteouts; is that right?

A. Yes.

Q. Did you have any memory, when you spoke to them, about the interactions you had with this file on March 12 that you have just described?

A. No.

Q. The Judicial Conduct Committee -- let me -- just answer my question. The Judicial Conduct Committee in March and April of 2020 asked you to discuss alterations to these orders; is that right?

A. Yes.

Q. And when you first responded to the Judicial Conduct Committee a couple of months after January of 2020, did you remember your involvement with this case file on March 12, as you just testified?

MR. WAYSTACK: Objection to the form.

You may answer.

A. I may have been thinking about what happened when this stuff got processed, but I didn't have any real specific recollections, no.

205

Q. (By Mr. Delaney) So how is it that you have come to remember what you did to the file on March 12 when you didn't remember it earlier?

A. Sometime, I guess, early in the summer -- and, mind you, this has been playing over in my head for 13 months -- I recall very distinctly Julie Lodes saying, "So do you want me to send these out, or are we going to have a hearing?" I remembered that statement being made. If I could say, same way when I called Judge King the day after the interview, I remembered having the Johnson discussion. I didn't remember anything else about it, but I remembered those phrases.

So I -- I remembered that, and it started to sort of bring me into the place of where that comment was made. You know, I could now envision myself downstairs on the first floor and like -- I started asking myself, "Why would Julie not want to send that out?" I mean, I just -- it kind of started, frankly, coming together for me.

And then I remembered -- I still hadn't seen the file. But I was like, "I scheduled" -- "I did. I scheduled a hearing right then and there for

206

that," and sort of, "Why was that?"

And, candidly, I don't know how memory works. But the more I thought about it, the clearer it became. And, you know, we had a period of probably four or five months where nothing at all happened in this case.

Q. Do you remember when you received the statement of formal charges?

A. Late October.

Q. Was that the first time that anyone had formally accused you of potentially whiting out the file in March of 2019?

A. Yes. I believe so.

Q. And tell me -- tell me what happened after you read the statement of formal charges.

A. I was certain I didn't do anything in January. And then I read the formal charges, and it was sort of, like, sometime, anytime between this date and that date, and it wasn't real specific. But it -- it made me wonder, like, "What are they" -- "What are they thinking about?" You know, like -- and I was trying to think about "Why in the world would I have done something like that prior?"

207

It just didn't make any sense to me, but it did make me start to think more and more about March.

And I remember -- like I said, I remember Julie's statement, "If we're scheduling this hearing...." I started to remember hovering over Nancy, sharing a computer screen, telling her, like, "Don't put it there. No. Don't put it" -- "Oh, squeeze it in there." I started to remember what happened that afternoon.

I remember someone on the staff asking a question about like, "Well, can you send out the notice of decision?" and things like that. And it just kind of all came together for me.

And I remember, when Julie said something about, "If you are not going to make a decision, why" -- or, "If we're going to have a hearing, why are you making a decision?" And right around the time she asked me that is when I started to apply the Wite-Out.

As I stood in front of Nancy's desk, there's a little -- there's a little "T," if you will, where the cubbies meet. I hate to say it. Workstations, I think that's the more professional

208

term. And that's often where there would be files stacked up for me to sign, you know, just a quick signature on a bail bond or something. But I used that little square as I am sort of talking to Nancy, and I believe I took Kim Silva's Wite-Out and started to take the order out with the idea that, you know, because we're going to have to address these on the 19th.

Q. So let me stop you there. What's your best explanation for why you remember this now but you didn't remember it in January of 2020?

A. Well, it's the one and only case I have had all year; so I have given it a lot of thought. I spent several months emotionally and mentally racking my brain about why people were accusing me of doing this in January when I was absolutely certain that that was not the case. And it wasn't, frankly, until about the summer when things started to kind of slow down and, frankly, I started to relax a little bit, and I think my memory got a little bit better. And the more I started to kind of learn about the case just in talking with my attorney -- as I said, it's like a prompting or --

209

you know?

I don't understand how memory works. But with each piece of the puzzle, it more and more kind of started to fit together. And when I read the notice of charges and started to really think about March, it probably took 48 to 72 hours for me to really kind of crystalize a lot more of what happened that day, like riding down in the elevator and in the elevator thinking to myself, "I have got to get out of this case. This is craziness."

So I don't know. It was -- I was actively trying not to think about this very disappointing period in my life for many months. But when it came time to read legal things and such, it brought me back to that. And I -- my memory just sort of crystalized. To me, it's not unusual. It's like seeing these cases from five years ago. I remember the name. I couldn't tell you anything about the case. But if you told me a couple more things, I might start putting it together.

MR. DELANEY: With the understanding that Judge Introcaso will be available to testify at the hearing, I have no further questions.

210

MR. WAYSTACK: Of course, I am going to have a few now. And I apologize to everybody.

FURTHER EXAMINATION

BY MR. WAYSTACK:

Q. Judge Introcaso, I want to understand you clearly. Are you now admitting that you whited out the March 12, '19, Apple Pay order?

A. Yes. I put Wite-Out over the -- over the portion of the motion that I had written, "Granted. You must pay by check," et cetera.

Q. Are you now admitting that you whited out the March 12, 2019, exceed-the-cap order?

A. Yes. I put Wite-Out over my handwritten part of the order.

Q. You were responding to Attorney Delaney's questions and talking about a discussion with Julie Lodes in the summer. The summer of what year?

A. I apologize. I don't recall saying I talked to Julie Lodes in the summer.

Q. The record will reflect that you did. Which year were you talking about?

A. The only summer since I have been working there -- I haven't spoken to her -- is this summer

211

of 2020. I apologize, Counsel. If you could be more -- I honestly don't recall saying I spoke with her in the summer about something.

Q. Okay. You are saying that you whited out both of those orders while standing at Nancy Dabilis's desk?

A. Yes.

Q. Is that what you are saying?

A. Yes.

Q. Okay.

A. Right -- well, right between Nancy and Kim Silva, who is right next to her.

Q. And did Nancy Dabilis witness you whiting out those orders?

A. I believe she did.

Q. Okay. And who else would have witnessed you whiting out those orders?

A. I don't know if -- perhaps Kim Silva, because, like I said, she was right next door. She's on the other side of a 3-foot wall there. And I don't think Julie Lodes did, but I know that she believed -- she knew that I had. I shouldn't say she believed that. She knew that I had, because she

212

asked me that question.

Q. Julie Lodes did?

A. She asked me that question. Like, I remember her distinctly with the envelopes in her hand saying, "Well, then why am I sending out these decisions if you are just going to have a hearing?"

Q. When did she say that to you, Judge?

A. As she walked around the corner, she was heading to put them in the mail; because I told her, "I want them to go out today."

Q. I am asking you, Judge, what date that she said that to you.

A. Oh. That was March 12, when she was processing the motions.

Q. Yeah. And you know that those orders went out, don't you?

A. Yes.

Q. So what you have admitted to doing is altering a court order after it was issued. Do you understand that?

A. I disagree with that.

Q. Well, you have just admitted it under oath, Judge, that you have obstructed two court

213

orders after you know they were mailed out.

MR. DELANEY: Objection to the form.

You may answer the question.

A. Again, I disagree with that.

Q. (By Mr. Waystack) Judge Introcaso, I just asked you -- and you responded -- did you know that those orders, the Apple Pay order and the exceed-the-cap order with your handwritten margin order, went out on March 12?

A. Yes.

Q. And your answer was, "Yes."

A. Yes.

Q. So knowing that those orders had been issued to the parties with your handwritten margin notes on each order, you then obstructed those by whiting out the handwritten order, didn't you?

MR. DELANEY: Same objection to the form.

You may answer the question.

A. I disagree. I -- I put Wite-Out over what I had signed on the motion. The notice of decision was not touched. The computer system where all that information was entered was not touched. It was not my intention to vacate it. It was simply my

214

intention to get myself going on a hearing I was going to do in three or four days, court days mind you. And I was going to have to write a different order. I couldn't -- I couldn't let that order stand without the disclosure, which I was fully prepared to do and had a hearing scheduled for it.

Q. (By Mr. Waystack) But you did? You did let those obstructions go out without addressing it, didn't you?

MR. DELANEY: Same objection.

You may answer the question.

Q. (By Mr. Waystack) Didn't you, Judge?

A. No obstructions went out to anybody.

Q. You whited out part of a court order with your handwritten order after you knew the orders went out, didn't you?

A. I put --

Q. Answer my question, please.

A. Yes. I put Wite-Out on the handwritten portions of my order after I had asked Julie to "Please just send the orders out."

Q. Okay. So the answer to my question is you whited out a portion of a handwritten court order

215

after it had been sent out to the parties; isn't that the truth?

A. Yes.

Q. And you are just remembering that recently now, is that it?

A. Within, I would say, the past three months maybe.

Q. So the mystery of who whited out the March 12 Apple Pay order and exceed-the-cap order is over. And it was you, Judge Introcaso, who actually applied the Wite-Out to your handwritten margin orders in each of those orders; correct?

A. I applied the Wite-Out on those orders, yes.

Q. Who else did you tell that to, Judge Introcaso, other than your attorney?

A. No one.

MR. WAYSTACK: I have no further questions.

THE WITNESS: Can we consult for just one moment?

MR. WAYSTACK: Sure.

MR. DELANEY: So we'll take a short break.

216

THE WITNESS: Literally, 30 seconds.

(Off the record.)

MR. DELANEY: I am just going to put an objection on the record to the extent that your last question may have implicated medical privilege.

THE WITNESS: I just wanted to be --

MR. WAYSTACK: Wait, wait, wait. Hold there, Judge.

Michael, I didn't -- you objected to the extent what?

MR. DELANEY: That your last question implicated medical privilege.

MR. WAYSTACK: Medical privilege? Okay.

THE WITNESS: You asked if I understood --

MR. WAYSTACK: Look, your lawyer just made the objection. There's no pending question, Judge. Hold on.

Michael, anything else you want to say?

MR. DELANEY: No.

MR. WAYSTACK: I think we're done.

(The deposition concluded at 6:20 P.M.)

217

E R R A T A   P A G E

I, HONORABLE JULIE A. INTROCASO, the witness herein, have read the transcript of my testimony and the same is true and correct, to the best of my knowledge, with the exception of the following changes noted below, if any:

Page/Line                    Change/Reason

_____    _____
_____    _____
_____    _____
_____    _____
_____    _____
_____    _____
_____    _____
_____    _____
_____    _____
_____    _____
_____    _____
_____    _____
_____    _____
                    _____

HONORABLE JULIE A. INTROCASO

Sworn to and subscribed before me, this \_\_\_\_\_ day of _____, 2021.

_____
Notary Public
My commission expires:

218

C E R T I F I C A T E

I, Tina L. Hayes, a Licensed Shorthand Reporter and Notary Public of the State of New Hampshire, do hereby certify that the foregoing is a true and accurate transcript of my stenographic notes of the deposition of HONORABLE JULIE A. INTROCASO, who was duly sworn, taken on the date hereinbefore set forth.

I further certify that I am neither attorney nor counsel for, nor related to or employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING REPORTER.

_____
Tina L. Hayes, RPR, LCR

**$**

**$3,500** 45:10,15 46:2,9 48:1

**$350** 65:9

**1**

**1** 6:2 15:13,15 16:7 21:2 23:6 26:4,17 27:10 28:8 30:2 32:3,14,19 33:6,8 51:23 74:7 79:7 82:17 83:9 110:19,22 111:3 130:9 164:22 176:15 177:1,13 181:20

**1,000** 45:14

**1,500** 45:15

**1/10/20** 95:23 109:18,22

**1/9/2020** 79:14

**10** 133:9,10,17 142:8,10, 11 143:4,21 146:2 199:16 203:14

**10-day** 38:6 203:1

**10-minute** 153:4

**10:00-ish** 88:16

**10:12** 122:18 123:13

**10:41** 142:20

**10th** 142:7 143:13 146:16 172:13,19 173:2,7 181:10,14

**11** 139:10 140:21

**11:00** 88:17 114:22

**12** 73:20 99:19 128:19 129:5,18 131:3 133:6 134:13 135:19 136:3,13 144:21,22 145:11 153:11 157:10 158:2 186:17 193:18,22 194:2 199:9 200:10 202:5 203:21 204:7,17 205:3 210:7,12 212:13 213:9 215:9

**12/29/15** 163:15

**12th** 129:9 194:9 196:19 197:7 198:10 199:16 200:18 201:8 202:13,18 203:11

**13** 146:8 153:12,18 154:3 205:6

**13th** 171:16

**14** 9:7 155:10,15 156:2 157:2

**15** 64:12 70:9 73:4 81:22 128:16 129:5 132:20 133:6 134:13 136:13,16 137:16 157:2,7,10 158:17 189:2,20 202:5 203:14

**15th** 146:14 173:3 203:2, 7,8

**16** 139:23 140:9 159:6,14 160:7,10 162:2 163:5,6 173:9 192:17

**16th** 104:12 140:11 146:14 172:19,22 173:3 193:1,2

**17** 161:7 164:14,19,23 173:9

**17th** 140:12 146:15 172:19,22

**18** 6:22 16:15,16 17:4 21:15,20 30:14 57:22 61:11 62:11,12 153:12, 18 166:5,12 168:10

**19** 38:3 54:19 55:2,4 60:14,18 99:19 104:1 130:22 133:6 135:19 136:4,13 150:21 151:1 171:11 186:17 189:2,20 210:7

**1988** 14:14

**1993** 10:18 14:10,14

**1996** 12:23

**19th** 198:12,18 200:19,23 201:2,7,17,19 202:3,10 208:8

**1:55** 16:16

**1st** 182:17

**2**

**2** 23:6 26:4 29:4 30:15, 16,17 31:1 32:4,14,20 33:7,8 39:14 40:12 41:14 43:15 47:11 52:1 82:8,18 83:10 84:2 130:15 132:20 156:4 158:16 159:12 164:23 165:9 166:11

**20** 121:23 122:17 159:17 162:17 171:11 173:13

**2000** 9:7 10:14,18 12:23

**2011** 9:7 15:4

**2012** 6:18 15:5

**2013** 154:13

**2014** 155:17,21

**2015** 17:11 21:5 157:11 159:17

**2017** 168:11

**2018** 17:8 18:10 21:2 28:12,23 37:12 39:15 40:20 48:16 51:5 64:12 73:4

**2019** 62:21 70:9 74:3,7 81:22 126:1 128:16 129:5 131:3 134:17 136:11 137:16 138:8 139:23 206:12 210:12

**2020** 80:12,18 82:4,8,18 83:10,19 84:2,3 85:4,15 86:1 87:2 88:10,20 90:21 99:16 103:16 105:6,16 106:5 111:22 114:18 115:3,12 117:17 121:8, 19 139:19 142:11 143:20 144:11,15 146:1,2,8 151:4 158:7 173:10 178:5,22 179:11 185:15 189:1 191:8 203:18,20 204:1,11,16 208:11 211:1

**20th** 83:14,18 173:14

**21** 62:21 168:17,20 169:3,4,15 173:17 204:1

**21st** 173:14,23 174:1

**22** 157:11 168:11,20 169:3 171:10

**23** 6:2 168:20 169:3 171:10,22 172:4

**24** 39:15 40:20

**25** 37:12

**25th** 38:4

**26** 126:1 134:16 135:1

**27** 28:12 29:2,7,20 56:18, 22 57:7,14 58:3

**28** 74:3

**29** 51:5 57:22

**29th** 57:18

**2nd** 83:1,2 142:3 182:18

**3**

**3** 9:7 15:4 40:12 48:18 49:1 50:21 51:3 52:1 57:17 74:20 91:9,13 98:1 99:13 111:11 130:21 159:14 168:10 169:14,15

**3-foot** 211:20

**3/12/19** 99:9

**30** 16:15,16 18:10 21:15 155:17,20 177:6,17 182:6,7 216:1

**30-day** 38:6

**310-A:181** 6:7

**34** 75:16,20

**35** 81:21

**36** 74:18,21 75:4,21 90:17

**37** 13:9

**3:00** 197:16

**3:00-** 197:14

**3:00-to-4:00-o'clock** 197:12

**3:34** 57:7 58:1

**3rd** 142:3

**4**

**4** 41:17,19 45:8 60:20,21 61:9 169:15

**48** 209:6

**4:00** 58:2 197:16

**4th** 142:3

**5**

**5** 62:10,18 64:2,4 65:1 70:1,23 71:11 85:8,21 87:14,15 104:3 154:13 180:19

**50-50** 12:4

**579** 38:13,20 62:23

**5th** 104:5

**6**

**6** 72:16,17 73:10 74:1,20 75:10 78:15,16 84:11 88:12 90:14 91:13 93:15, 17,19 94:3,14 95:3 96:14,17 98:9 104:4

139:20 140:19,21 143:19 144:11,15 146:1 163:6 172:5

**60** 28:2 182:2

**6:20** 216:22

**6th** 104:5 171:16 187:1,2, 3 189:13

**7**

**7** 92:11,12,18 94:11,22, 23 95:9 96:9,12,20 97:6, 17,21 98:10 99:13 104:10 109:6 180:1 185:15

**70** 28:2

**72** 209:6

**75** 60:12

**7th** 104:7 180:2,3,21 187:3,5

**8**

**8** 108:12,13 109:2 110:7, 12,19,23 111:3,7 112:3 114:8

**8:49** 141:2

**9**

**9** 80:11,18 82:4 83:10,19 84:3 85:4,15,23 87:2 88:10,20 90:21 97:13 99:16 103:16 105:6,16 106:5 111:22 114:18 115:3,12 117:17 121:8, 19 123:13 127:21,22 128:6 130:6 131:11 135:2 136:18 143:4,20 189:14,19 190:23 191:7 192:14 193:2 203:17,19

**948** 63:1,3

**9:00** 88:16

**9:00-to-11:00-ish** 121:13

**9th** 7:1,5,7 81:7 83:16,17 87:19 138:18 141:6 143:13 146:15 166:17 172:8,12,19 173:2,6 181:10,16 182:1 183:15 185:1 190:2,18

**A**

**A-U-B** 24:2

**A.M.** 122:18 141:2

**ability** 35:11 44:23 67:8 68:10,23 69:2

**Absent** 57:3 176:7

**absolute** 10:1

**absolutely** 15:18,19 36:7 129:18 132:10,17 145:19 149:22 166:2 208:16

**acceptable** 195:5

**accepting** 167:16

**access** 37:3 174:19,21

**accidentally** 173:2

**accompanying** 41:22 112:12

**accurate** 24:22 60:17 72:23 83:11 93:16 94:4

**accurately** 41:23 63:17

**accusation** 102:20

**accusatory** 103:13

**accuse** 102:1 117:1

**accused** 100:2 206:11

**accusing** 117:4 208:15

**acknowledge** 186:21

**acknowledged** 89:23 98:18

**action** 37:17

**actions** 37:20

**actively** 209:11

**activity** 31:17 38:18

**actual** 17:14 52:8 57:18 89:5 106:7 172:18

**ad** 11:15 31:3 33:21 35:13 41:20 43:16 49:4 51:15 55:8,19 60:22 66:1 154:6 155:11 156:14 157:4 159:9,20 161:11 163:8 166:6

**add** 35:14 129:16 139:11 177:18 200:20

**added** 28:18 95:13 176:20

**addition** 175:3

**additional** 33:14

**address** 33:10 157:22 158:9 166:21 203:7 208:7

**addressed** 33:15 190:19 202:14 203:6

**addresses** 32:15

**addressing** 214:8

**administrative** 173:20

**admissions** 13:19

**admitted** 212:18,22

**admitting** 210:6,11

**affect** 68:10

**afternoon** 6:11,12 8:11 142:2 151:18 173:23 207:9

**agree** 19:17 39:19 40:2 47:3 50:11 56:2,4 57:1 59:5 60:3,17 69:11 75:3 82:8,18 91:14 113:15 114:8 128:5 151:2 154:5, 13,18 169:10 185:22

**agreed** 53:9 119:4 159:19 161:1

**agreement** 52:19 155:3

**ahead** 54:22 57:23 87:22 91:23 92:17,20 102:12 111:18 119:2,13 191:4

**Albee** 8:4,5

**Albrecht** 164:16 165:5,20

**alerted** 134:3

**Aline** 122:5 165:7 179:21

**allegation** 183:21

**allegations** 30:11 183:6, 18 184:11 185:9 187:23 188:5,10

**alleged** 190:5

**alleging** 105:9

**allowed** 54:6 77:6

**alphabetical** 190:9

**alterations** 204:12

**altering** 212:19

**Amanda** 191:20

**Amended** 35:12 158:20

**amending** 157:10

**amount** 45:16 147:14

**amused** 184:5

**amusing** 184:16

**Andrew** 55:12 162:10

**Ann** 203:23

**answering** 92:15,17,20, 21 114:3 125:14

**answers** 109:8 150:5 171:16

**antagonistic** 129:15

**Anthony** 23:14

**anticipate** 201:20

**anticipated** 178:19 202:2

**anticipatory** 201:13

**anybody's** 140:3

**anymore** 148:13 155:19

**anytime** 206:18

**apologize** 7:19 8:1,2,7 42:20 62:1 77:10 84:15 121:4 199:5 210:2,18 211:1

**apparent** 68:20

**apparently** 18:17 19:1 33:1 44:14 46:23 143:6 187:21

**appeal** 37:20

**appeals** 38:7

**appeared** 115:13

**appears** 32:14 33:8 39:15 53:23 55:6 64:2,5, 11 110:6 119:12 154:15 155:1 158:14 165:6

**appellate** 14:22

**Apple** 99:9,20 106:9 108:15,16,22 111:20 112:3 114:9 117:2,12 126:5 127:11 128:19 134:15 135:19 145:13 181:20 186:17 194:1,12, 14,16 195:1 210:7 213:7 215:9

**application** 118:18

**applied** 39:21 40:9 47:6 81:11 89:22 90:3 98:7 190:20 193:18 215:11,13

**apply** 118:10 200:17 201:7 207:18

**appoint** 26:21 56:5 58:4 60:13,16 156:21 158:13

**appointed** 11:21 26:6,12 27:7,20 36:22 41:20 43:1

44:2,9 45:4 47:23 52:1, 18 53:10 56:6,22 57:23 66:3,18 70:2 154:11 159:12 183:23

**appointing** 27:11 42:5 47:18 55:8 137:21 154:1

**appointment** 31:3 33:21 34:8 35:12,13 43:15,23 44:22 46:10 49:3 56:18 57:18 59:16 60:22 154:6, 16 155:11 157:3 159:8 161:2,11 162:18,21 164:15 165:9 166:4,6

**appointments** 50:10

**appropriately** 89:4 113:19

**approve** 163:15

**approved** 36:15,16,17 66:19

**approving** 71:7 72:6

**approximately** 10:18

**April** 28:12 29:2,7,20 30:14 126:1 134:5,16 136:11 196:16 204:11

**area** 36:10 39:14 41:15

**argue** 73:19

**argument** 127:4

**artfully** 67:17

**Ashley** 142:2,21 204:1

**Asian** 16:12

**asks** 182:10

**assign** 137:7 156:14

**assigned** 7:5,6 87:15 137:1 143:6

**assignments** 143:5,23

**assigns** 38:17

**assisted** 80:13

**associate** 11:20

**assume** 20:12 42:12 44:7 64:7 75:20 86:12,15 162:17

**assumed** 180:15

**assuming** 18:4 24:9 40:21 86:7

**attached** 81:4,8 93:13 170:9

**attention** 29:14 80:7 148:22 173:4 189:19

**attorney** 8:12 15:6 30:22 44:11 48:23 50:11 53:12, 13,14 54:16 55:11,12,21 58:20 62:4 64:4 70:2 71:9,13,14 74:2 77:22 79:8 86:4,17 88:3 96:13 99:8 108:20 114:16 129:2 140:22 152:2 153:17 158:13,21 162:9 163:20 177:15,18,20 178:1 193:8 202:4 208:23 210:15 215:16

**attorney's** 29:11

**attorneys** 53:9 54:3 56:2 59:22 62:8 152:4 167:20

**August** 159:17 162:17

**Ausiaikova** 61:3

**authority** 35:17 58:15 59:6 67:3,5

**authorized** 38:17

**avoid** 27:7

**aware** 21:23 44:17 47:22 49:8 65:14 80:11,14 86:7 151:5

**awful** 101:8

— **B** —

**back** 9:17 15:8 18:8 21:1, 20 26:3 34:14 48:5 52:14 56:12,21 57:8 79:11 83:7 84:11 85:12 87:5 92:18 96:14 101:10 103:14,22 105:16 107:1 111:19 118:10 124:21 139:18, 19,23 140:8 163:5 164:22 173:14,16 183:11 189:1,10 190:2 192:17, 23 198:11 200:14 201:18 202:1,15 203:8,17 209:15

**background** 147:16

**bad** 22:23

**bail** 208:3

**balance** 22:19

**ballot** 30:9

**banter** 124:20

**Bar** 21:9

**based** 74:11,17 94:9 109:7 127:8 132:22 150:9

**basically** 57:11 69:6 108:10 118:6 123:23 135:6 180:10

**basis** 120:5

**Bates** 79:5 94:14

**Bates-stamped** 79:10

**bear** 147:8

**began** 6:18,23 7:14 19:23 83:15 88:11 176:14 195:15 200:17

**begin** 15:10 16:10 31:6 42:13 178:11

**beginning** 68:12 146:1,7 169:8 173:12 177:5

**begins** 28:11 30:16 38:7 39:3 65:3 159:8 172:4 189:13

**begrudge** 16:21

**begun** 20:3

**believed** 211:22,23

**bell** 108:16

**bench** 6:18,22 9:1 25:2

**Berniece** 157:18,22 158:10

**biased** 29:18

**big** 183:12

**Bisson** 37:8 122:10 141:1,6 142:14 144:10 174:8 175:8 178:23 179:16,19,23 182:9 185:14 187:1,12 188:6 189:12,18

**bit** 8:23 26:15 103:23 105:13 106:20 139:2 152:12 160:19 180:9 181:17 183:4 184:3 186:14 208:20,21

**black** 111:12

**black-and-white** 94:18

**blotches** 92:23

**bond** 208:3

**Bonenfant** 122:9 174:12 175:8 182:11,18

**booked** 173:4

**bottom** 32:1,3,4 33:2 36:9 37:7 41:15 65:1 75:12 78:21,22 79:6,10, 22 96:11,17 110:11,18 111:8 141:2 158:20

**bowl** 121:17

**box** 30:9

**Boy** 101:17

**brain** 208:15

**branch** 18:2 173:21

**break** 32:17 42:22 72:12, 15 119:8 149:17,18 150:7 152:19 153:4,9 215:23

**breaking** 72:11

**breather** 140:15

**brevity** 153:6

**Brian** 61:6

**briefly** 50:9 55:22 129:7

**bring** 15:17 29:2 82:7,16, 23 87:8 97:12 101:10 129:19 205:15

**bringing** 65:12

**brought** 50:15 83:1 148:22 162:20 173:4 209:14

**Bruce** 39:10,16 61:14,21 62:2 63:20 66:9 122:8 164:20

**bump** 24:20

**bunch** 16:19 121:19

**business** 24:11 57:22 164:1

— **C** —

**calculus** 71:10

**calendar** 10:4 104:8 140:18 171:10 197:18

**call** 14:5 22:7 59:16 129:7 130:11 189:19 194:4

**call-in** 33:22

**called** 12:13 14:2,4 55:18 59:19 124:5,8 126:20 133:19 205:10

**calling** 12:13 29:13 125:12 128:8

**Campbell** 31:4

**canceled** 130:22 172:14

**candid** 119:4

**candidly** 41:12 44:16

105:1 120:11 186:8,15 206:2

**cap** 45:17,22 48:1 72:20 73:7 77:5,7 89:16 91:2 95:2 163:9,15,21 194:1

**capacities** 21:8

**caps** 164:7

**caption** 33:18

**care** 133:19,22 141:15

**career** 6:23 15:2

**carefully** 42:4 64:1,15,17

**cares** 101:13,20

**caricatures** 16:9

**carried** 195:8

**Carroll** 7:20

**cart** 87:10

**case** 9:8,10 20:12 27:5 31:17 33:18 35:1 37:4,17 38:16,19 43:2 44:14 45:6,10 48:8 49:2,3,8 50:7,18,19 51:10,14,18, 19,23 52:20 53:10 54:3, 12 55:9,22 56:23 59:7, 11,22 61:1 62:16 66:3 68:12 69:17 70:2 71:5 75:5 76:3 80:7,23 86:5 90:11 94:16 98:14 105:11,13,15 124:13 125:8 127:5 129:4,11,17, 21 130:3 134:12 135:11, 13 136:20 137:17,23 138:6,9,10,23 139:3 140:9 143:5 148:12 154:12,13,15,23 156:16 157:16,19,20 163:1,19 164:16 165:16,19,21 171:1 172:13 178:18 184:1 186:9 190:10,13, 15 192:2 196:3 198:2 199:9 200:10 201:23 203:10,21 204:2,17 206:6 208:12,17,22 209:10,19

**cases** 11:21 12:6,7 13:17 20:4 26:11 50:3,6 54:7 59:16,20 119:19 137:7 141:10,11,12 142:16 148:10 152:8 163:21 167:11,16 209:17

**casual** 103:12 185:11

**catching** 147:2

**caught** 142:15 147:4

**caused** 88:23 118:10 119:12 120:16

**cc'd** 54:5

**center** 33:22

**certainty** 129:9

**certify** 39:18 47:2

**cetera** 30:12 90:5 197:7 210:10

**chambers** 80:13 82:3,7, 17 83:1,13,23 85:4,7,10 87:6 88:11 97:13 99:17 114:18 115:5,8,12 144:10 178:7 179:12 180:3

**chance** 50:21 174:18

**change** 117:10 200:20

**changed** 96:16

**charge** 15:11

**charges** 15:12 50:17 177:11 206:8,15,17 209:5

**Charles** 24:8

**Chasseur** 122:6 165:7 179:21

**check** 104:8 116:18 124:17 210:10

**checked** 190:3

**Cherry** 24:6

**chief** 21:23

**child** 41:21 68:11 69:10 84:19 184:1

**children** 68:2 69:13

**choose** 35:2

**Christmas** 104:16

**Christy** 11:9 14:11

**chuckle** 186:8

**circuit** 7:1,5,7 12:2,14,15 14:21 138:18 141:6 166:17 182:1

**circumstance** 25:16 76:6 87:3 160:19

**circumstances** 27:21 30:11 54:10 131:23 167:7 203:15

**civil** 11:18 173:15 194:6

**clarify** 92:3 185:13

**clear** 11:1 21:6 59:1 66:5 69:23 71:2,12 82:19 83:5 92:7,8 100:23 112:9 114:20 126:14 127:4 129:14 132:12 138:1 147:16 148:12 149:3 181:4 200:3 202:2

**clearer** 206:3

**clerk** 9:2,4,6,14 10:6,13 20:11,15,19 31:13 32:10 34:15,19 35:2,10 36:1 37:8 85:18 87:18 120:1,4 122:10,11 125:18 130:15 141:6,23 165:8 173:1 174:13 175:21 176:6 179:10 196:19

**clerk's** 37:16 87:12 195:16

**clerks** 35:20 125:20 143:12 156:13 173:1,5 175:10

**client** 120:18,23 139:17

**close** 80:7 100:20,22

**closely** 41:5

**closer** 193:6

**closes** 58:2

**closest** 27:16

**code** 38:16,18 188:5

**collect** 23:3

**collegial** 127:2

**colon** 32:5

**color** 79:7 94:15,19

**combination** 101:23 165:2,3

**comfortable** 58:22 71:6

**comfortably** 70:16

**comment** 55:19 102:17 103:7 147:7 183:1 199:18 205:16

**commented** 147:3

**comments** 186:4

**committee** 6:15 49:8,18 50:16 89:2,21 99:5 110:3 150:11,17 151:5,14,16, 21 152:1 169:9 170:9 204:9,11,15

**committees** 152:17

**common** 60:9 133:2

**communicated** 54:14 86:14

**communicating** 86:13

**complain** 186:19

**complaint** 22:17 29:10 49:9,22 80:23 81:3,4,9, 15 91:12 93:3,13 94:1 101:14,15 102:8 103:5, 17 105:7,14 106:6 113:22 114:3 116:7 118:22 124:15 142:16 144:2,14 150:19,20 151:6 169:9 177:10 179:2,13 181:15,18 182:23 183:2,4,17,19 184:8,11 185:5,14,16,17, 22 189:7,8 191:9 192:8, 20 193:5

**complete** 89:11,21 100:1 144:1 170:9 181:16

**completed** 149:9 162:22

**completely** 87:13

**complex** 101:23 158:7

**complexity** 86:16

**compliance** 69:5

**complications** 26:22 27:3,9

**complied** 67:11

**comply** 68:20,23 69:2 71:8

**computer** 170:13 174:20, 21 175:2,4 190:3,8 207:6 213:21

**computers** 28:17

**concern** 67:18 72:3 81:12 89:7 120:16

**concerned** 18:7 56:16 101:21 108:5 120:3,7 148:23 183:3

**concerns** 56:17 72:1 133:23

**concluded** 216:22

**conclusion** 132:22

**concurrence** 149:6

**condition** 149:1

**conduct** 6:15 49:7,17 50:16 94:1 99:5 103:17 105:7 106:6 110:3 118:22 124:15 150:11,16 151:6,16,21 152:1,4 169:9 185:17 204:9,10, 15

**conducted** 39:11 165:15 168:16

**conference** 60:11 129:20,23 130:21 162:9, 11,18,20 197:3 198:17, 20 199:8

**confident** 120:13

**confidentiality** 49:13

**confirmed** 200:15

**conflict** 15:11 23:18 25:13 42:6 43:10 44:17 53:16 59:13 69:16 70:19 71:9 126:16,18 129:20 131:23 174:11 175:21 176:9 183:13,23 184:2 186:20 195:3 196:12 198:1,14,19

**conflicts** 14:2 23:8,17 24:19 27:19 42:16 43:6 44:12 45:5 47:23 48:14 61:20 62:7 70:12 71:23 76:8 78:5 129:2 135:22 163:14 174:4,9 175:16, 17 176:4,13,16

**confused** 112:23 188:12

**confusing** 113:10,13

**confusion** 102:3 119:13 133:3 146:15

**connection** 151:16

**consequences** 69:9

**considerable** 77:1

**consideration** 63:15

**Consistent** 203:11

**constitutional** 67:2

**constraints** 59:8

**consult** 120:22 215:20

**contact** 54:3,6,7,12 123:13 200:9

**contacted** 129:1

**contained** 185:8

**contempt** 67:15 198:8

**contest** 153:1

**continuance** 128:14

**continue** 35:10 69:4,5 128:11 129:10 130:2 201:21,22

**continuing** 50:4,12

**contract** 13:15 14:1,2,5

**convenient** 149:15

**conversation** 115:11 124:7 125:21 127:9 134:4,10,21 146:11,12 147:23 149:5 168:6 180:6 182:21 185:3 186:23 187:2,7,9

**conversations** 136:12 192:7,19 200:11

**cooperate** 63:13 65:7 67:21 68:9

**copied** 32:12 55:14

**copies** 33:13 94:18 98:14,18 99:2,17

**copy** 31:11,15,16,20,21 32:13,14,20,21 33:2,7,14 37:1,4 57:4 63:6,7,9,10

**conducted** 39:11 165:15 168:16

78:18,20 89:18 90:7 93:11,19,21 94:3,7,15,19 96:17,20 97:10,14 98:16 110:6,8,15 111:4 113:2, 3,11,16,17 114:7 132:2, 23 174:17,22 175:5 177:8,9,12

**corner** 212:8

**corners** 114:1

**correct** 6:19 9:19 10:19 12:17 16:11 17:6 20:8 24:12,14,15 27:14 29:22 31:7,8 32:7,16,22 33:2,3, 10 38:8,9 39:11,17,21 40:9 43:7,8 46:16 47:6, 12 48:17 51:16,17 57:20 61:11,12 63:21 65:10,11 66:14,15 73:18 74:22 75:17 78:6,18 79:23 80:1 81:22,23 82:4,13 83:20 84:13 95:3 96:18 104:17 108:18 109:4,15 110:13 111:4 122:12 128:16,21, 22 130:3,23 131:21 133:13,15,16 137:23 139:23 140:5 141:12 142:11 143:21,22 144:2, 7 145:15 151:12 155:18 156:5 157:14 159:12 162:6 166:22 168:11 170:20,23 171:7 172:15 175:10 176:15 185:18,19 188:23 215:12

**correctly** 26:23 39:6 47:9 61:3 122:14 130:19 166:7

**correspondence** 177:12

**cosign** 41:12

**cosignatures** 48:10

**cosigned** 61:15 166:4

**Coughlin** 53:13 54:16 55:12 58:20

**Council** 66:19

**counsel** 15:5 34:4 35:19 42:20 49:19 52:5,17 53:21 54:6,7,14 61:19 80:10 119:5,6,9 155:2,9 160:3,4 162:7,12,23 211:1

**countersigned** 64:16

**county** 7:20 9:2,4 20:15 29:11 34:15

**couple** 41:1 42:21 66:2, 22 70:3 98:17 104:15 149:20 184:21 204:15 209:19

**court** 7:13 9:3,9,12 10:6 11:21,22 12:2,8,13,14, 15,16 13:18 14:21 18:8 19:12 20:1,14,16,19,20 31:14,15,17,21 37:9,19 39:4 43:18 45:9 46:5 54:9 56:4,11,12 58:2 65:6 68:1,21 69:5,6,21 74:6 85:19 105:2 108:21 112:18,20 113:1 115:2 117:17 120:1,3,13 121:20 122:4,7 124:9 131:18,22 132:13 134:13 137:7,8,9 138:5 139:23 141:7,11 143:5,12 155:8 170:13 177:13 178:2 179:17 189:11 194:14

195:3 203:12 212:19,23 214:2,14,23

**court's** 31:18 32:20 63:7, 9 65:8 68:21 78:18 93:20,23 202:21

**court-appointed** 11:13, 14

**courthouse** 48:11 89:12 132:18 192:17,21 193:1 194:5 195:13

**courthouses** 175:14

**Courtney** 166:13,16,20 167:8 168:2

**courtroom** 52:8,9,11 53:22 54:13 66:10 85:8, 9,18,19,21 87:7,14,15, 17,18,20 105:11 125:18 135:14 165:8 180:19,20 198:6

**courts** 9:14

**cover** 34:11

**Crawford** 157:18,22 158:10

**craziness** 209:10

**create** 144:6

**criminal** 13:15 14:5 178:14 193:15 194:6

**critics** 27:17

**crossed** 165:11

**crystalize** 209:7

**crystalized** 209:16

**cubbies** 194:6 207:22

**cubby** 194:7,8,10

**curiosity** 138:20

**curious** 13:22 19:9 90:13 104:19

**Curran** 166:13,16,20 167:8 168:2

**custodial** 68:1

**cut** 92:2

---

**D**

**Dabilis** 115:2,11 117:1, 11 121:6 122:5,21 123:3, 10 141:14 178:5 179:10 196:9,10,19 198:17 199:7 211:13

**Dabilis's** 211:6

**Dalpra** 36:11 39:10,16 40:18,20 41:15 44:16,22 45:23 46:19 48:9 51:19 61:14,18 63:20 64:19 66:10 67:19 71:7 73:11 87:16 122:8 136:23 138:12,17 164:20 165:22

**Dalpra's** 64:8 138:23 165:4,6

**Dana** 165:5

**data** 34:23

**date** 25:16 37:9,15,16,22 38:7,11 55:7 62:19 74:2 98:10 104:4,14 109:18, 22 134:6 137:3,4 155:20 200:4,5 206:19 212:11

**dated** 16:16 81:22

**dateline** 61:9

**dates** 103:22 162:15

**dawn** 70:7 147:21,22 148:15

**day** 6:21 7:18,19 29:20 38:5 40:19 57:8,19,22 74:3 84:12 86:3 88:9 104:6 107:18 110:2,4 115:18 121:19 125:18 140:12,14,15 143:15 146:19 152:7 173:15 175:13 179:19,22 180:11 197:11,17,20 205:10 209:8

**days** 8:17,19 9:17 34:14 65:8,9 66:4 104:21 128:18 143:1,7,21 172:12,14,18 173:9 177:6,17 182:2,5,6,7 199:16 214:2

**de** 119:22 120:5 126:2,20

**deal** 65:20 129:20 183:12 196:12 203:10

**dealing** 88:18 184:13

**dealt** 61:10 198:9 202:17

**December** 61:11 62:12 104:12,17 139:23 140:9 171:11 192:17 193:2

**decided** 53:6

**decides** 68:1

**decision** 31:2,7,10 32:13 33:6,23 34:13,21 35:5,22 36:2,21 37:15,16,22 38:3,5 57:5 62:15,19,20 63:6,8 64:1 69:22 72:19 73:20 78:16 79:1 89:16 93:12,21 95:1,10 96:12 107:17 108:13 109:3 120:10 128:6 133:11 135:11 173:21 198:1 199:18 202:19 207:12,15,17 213:20

**decision-** 68:21

**decisions** 34:11,16 200:14 212:6

**deemed** 49:15

**deep** 16:13 137:10

**default** 60:1,4 138:14

**defendant** 101:12

**defendant's** 61:5

**defender** 14:3,12,13,20 19:11

**defenders** 13:14 14:6

**defense** 13:15 14:5

**define** 69:20

**Delaney** 15:14,16 16:1 19:20 24:23 30:5,23 34:2 40:3,7 45:19 48:23 50:11 52:23 58:9 68:3,13 72:9 74:10,14 76:10 78:9 86:4,17 88:5 91:20 92:3, 8,13 94:5,12 96:13 100:5 102:14 105:20 106:1 113:5 117:20 119:11 120:18 127:14 134:18 139:12 140:22 143:9 145:5 149:14,22 151:7 152:20 153:13,17 161:8,

20 162:3 164:9 168:23 169:3 176:22 177:16,18 178:1,8 179:3 191:23 192:5 199:6 205:1 209:21 213:2,17 214:10 215:23 216:3,12,20

**Delaney's** 210:15

**delivered** 52:10

**Dell** 88:3

**Dempsey** 203:23

**denied** 64:21

**department** 118:6

**deponent** 94:18

**deposed** 6:8 80:10

**deposition** 50:5 176:15 177:7,17 189:15 216:22

**depositions** 178:1

**deputies** 141:14

**deputy** 9:4,6,14 10:7,13 20:11,15,19 31:13 34:15, 19 36:1 122:10 174:13

**Derby** 87:16 120:5,8 122:8 124:5,8 126:8 133:18 136:3,12,20 137:13,14 138:5,14,15, 21 180:22 184:14 187:23

**Derby's** 125:21 127:8 133:11,14

**describe** 195:15

**designated** 114:14

**desk** 15:17 84:2,4,10,15, 21 132:17 187:8 199:13, 17 207:20 211:6

**detail** 19:9 103:18

**detailed** 186:1

**details** 6:16 46:6 64:22

**determination** 67:10,13

**determine** 49:21 196:14

**determined** 39:22 47:7

**developed** 9:11

**diagonal** 95:15

**diagonally** 109:13

**difference** 67:3 98:1

**differences** 95:5

**dinner** 191:18

**direct** 44:18 54:2 154:16 156:23

**directions** 84:23

**directive** 69:21

**directly** 18:1 28:19 54:8 99:12

**disagree** 27:16 128:5,13 212:21 213:4,19

**disappointing** 209:12

**disciplinary** 15:5 22:17

**Discipline** 15:6 152:2

**disclose** 62:6 70:9 129:20 196:11 198:3,4 203:2

**disclosed** 53:16 198:12, 19

**disclosure** 26:6 197:5

202:16 214:5

**discomfort** 129:8

**disconnect** 70:4

**discovered** 90:21

**discovery** 138:10

**discretion** 10:5

**discretionary** 35:6

**discuss** 136:6 197:4 204:12

**discussed** 21:19 32:19 43:4 48:21 102:12 103:16 105:8 118:12 144:5 152:2,3 160:2 162:21

**discussing** 106:5 107:23

**discussion** 8:16 53:11 61:17 80:19 103:8 115:1 144:14 151:20 167:15 184:23 185:11,21 198:6 205:12 210:16

**discussions** 105:5 139:8 150:13 151:23 189:11

**dismissive** 107:5

**disqualification** 128:12 202:17

**disqualified** 197:6

**distinct** 147:11

**distinctly** 58:19 205:6 212:4

**distinguishing** 182:23

**distributed** 32:1

**district** 12:4,13 14:21 19:11 141:11,19

**division** 7:6 67:5 126:21 141:15,17 178:14 194:7

**docket** 25:14 33:19 180:8 197:2

**docketed** 49:9,21

**document** 15:21 30:19 33:14 39:3 43:18 47:11, 16 48:15 55:5 58:18 81:13 91:13 93:1 98:8 105:19 108:18 109:1 110:16 113:14 122:16 127:23 150:22 155:5,7 171:2 175:5

**documents** 16:20 35:20 79:6 81:10,11 89:6,10,20 90:3,6 95:6 98:17 99:18 106:2 112:6,17 118:21 134:12 144:5,6 148:16 151:12 161:23 177:6,14

**dominant** 84:16,17

**door** 48:11 147:5 211:19

**double-check** 75:19 77:9

**doubt** 112:1

**downstairs** 116:9 195:8, 22 205:17

**draft** 169:7,11

**drafting** 132:13,16 170:12,15

**drew** 109:13

**driving** 85:1

**Drop** 37:7

**due** 146:14 147:15

**duly** 6:6

**dust** 115:20

**duty** 182:14

**E**

**E-304** 158:4

**earlier** 28:10,23 58:13 91:10 117:5 125:15 156:11,13 163:1 176:14, 18 183:21 187:20 194:20 205:3

**early** 70:1 76:3,22 180:11 205:4

**easier** 61:7

**easily** 195:2

**eat** 50:13

**effect** 125:3 147:7

**efficient** 145:4

**effort** 117:18

**efforts** 144:6

**elevator** 209:8,9

**elongated** 153:3

**email** 16:13,15,16 18:10, 16 21:15 27:10 28:10,11, 12,18 29:21 52:15 54:2, 6,8,12,15 55:6,23 57:19 58:1,17 59:1,2 121:19 122:3,22 123:2,6,13 124:6 140:13,23 142:1, 13 144:18 182:15

**emails** 15:22 140:17

**emergency** 13:19

**Emily** 122:6 123:16,18

**emotionally** 208:14

**employed** 9:6 27:6

**enclosed** 33:19 34:5

**end** 51:2 57:3,21 70:3 158:22 168:21 173:8 197:20 198:6

**ended** 173:6 180:8,9

**ending** 146:1

**endurance** 153:1

**energy** 172:2

**ensure** 49:14

**enter** 35:2

**entered** 120:9 143:15 213:22

**entire** 46:4 47:16,17,18 177:8,9,12

**entities** 11:2

**entries** 96:8

**envelopes** 199:17 212:4

**envision** 205:16

**equipment** 84:5

**Esq** 167:2

**essence** 60:1 67:1 89:19 99:22 100:2 108:23 119:21 198:21

**essentially** 15:21 71:7 87:12 89:13 120:8

**established** 128:23 139:22

**ethical** 147:15 152:11

**ethics** 188:5

**evaluate** 184:1

**evaluated** 17:4 21:7

**evaluates** 20:2

**evaluation** 17:14 18:20 19:14 20:1 21:4,7 28:1 29:18

**evaluations** 17:5

**event** 66:13 143:18 182:8

**everybody's** 148:22

**exact** 107:16

**examination** 6:9 80:9 192:4 210:3

**exceed** 72:20 73:6 77:5,7 89:16 91:2 95:2 163:7,8, 14,21 164:7 194:1,17,23

**exceed-the-cap** 99:4,10, 20 117:2,12 126:6 127:12 128:20 134:16 135:20 186:18 210:12 213:8 215:9

**exceed-the-cap-fee** 106:8

**exception** 177:15

**exchange** 186:2

**excluded** 148:10

**exclusively** 14:18

**excuse** 54:20 67:19 71:19 88:3 121:8 144:20 153:21 157:2

**execute** 195:10

**Executive** 66:19

**exhibit** 6:2 15:13,15 16:6, 7 21:2 23:6 26:4,17 27:10 28:8 30:2,15,17 31:1 32:4,14,20 33:7,8 39:14 40:12 41:14 43:15 46:15 47:11 48:18 49:1 50:21 51:3 52:1 54:19 55:2,4 57:17 60:14,18, 20,21 61:9 62:10,18 64:2,4 65:1 70:1,23 71:11 72:16,17 73:10 74:1,20 75:10 78:15,16 84:11 88:12 90:14 91:13, 19 92:11,12 93:15,17,19 94:3,11,14,22,23 95:3,9, 14 96:9,12,14,17,20 97:6,17,21 98:9,10 99:13 108:12,13 109:2,5,6,7,9, 11,21 110:7,12,19,23 111:3,7,15 112:3 113:2 114:8 121:23 122:17 127:21,22 128:6 130:6 131:11 133:9,10,17 135:2 136:18 139:10 140:21 144:21,22 145:11 153:11 154:3,9 155:10, 15 156:2 157:2,7 158:17 159:6,7,14 160:7,10 161:7,15 162:2 163:5,6 164:14,19,23 166:5,12 168:10,17 169:15 171:10,22 172:4 176:15 177:1 189:14,19 190:23

**exhibits** 80:14 144:7 152:22 153:12,18 168:21

169:1 170:10 171:19,22

**exist** 67:6

**existence** 134:4

**exists** 124:1

**expect** 80:6 112:20

**expecting** 100:14

**expeditiously** 130:15

**experience** 11:22 21:3 34:20 37:14 120:13 132:9

**explain** 56:13 66:23 82:21 98:9 103:8 129:6

**explained** 86:20 112:13 124:23 127:19 156:11,13 194:20

**explaining** 112:16

**explains** 30:8

**explanation** 15:3 98:15 114:4 128:9 208:10

**extensive** 86:5 118:20 185:21

**extent** 39:20 47:4 105:8,9 120:17 216:4,11

**eyes** 101:8

**F**

**face** 113:10

**fact** 9:17 21:23 27:4,23 39:12 42:15 56:9 57:7 98:8 100:19 101:6 105:10 108:9 126:5 127:9 131:5 143:13 148:2 149:6 158:8 162:23 172:12 194:21

**factors** 101:23

**facts** 39:22 47:6 55:22 57:16

**factual** 39:21 47:5

**factually** 157:19

**failure** 63:13 68:20 149:7

**fair** 9:13 22:22 23:3 28:1 31:4 51:22 62:5 85:20 86:18 94:21 193:16

**fairly** 64:17 68:15,16,18 180:11 185:21

**fall** 14:14

**familiar** 9:15,16 16:23 122:2 123:18,20 165:18

**family** 7:6 12:7 19:11 67:5 126:21 141:10,15, 16 178:14 194:7

**farfetched** 184:3

**fashion** 71:5

**favor** 194:22

**February** 9:7 10:14 62:21 64:12 70:9 73:4 74:3 168:11

**fee** 45:10,11,16 72:20 73:6 77:5,7 89:16 91:2 95:2 163:9,21 164:7 194:1

**feedback** 19:1 22:1,12

**feel** 43:9 98:19 112:14

**feeling** 129:8,9

**fees** 70:6 194:17 195:3,4

**fell** 138:6

**felt** 29:17 100:23 108:7,8 129:17 183:14

**fields** 34:22 35:1

**fight** 69:6

**figure** 46:10 103:1 147:9

**file** 29:1 31:11,15,18 32:14,21 33:2,7,14 37:3 48:5 63:7,9,10 65:19 76:22 77:12 78:18,20 79:8 81:10 82:3,17 83:9, 13,20 84:1,2 88:12,18 89:2,5,6,11 90:7 91:14 92:4,5 93:7,20,21,23 94:8,9,10,16,19 98:8 106:21 111:4 112:7,18, 20 115:22 116:3,7 118:1, 5,7,17 120:1 123:18,19 124:1,18 126:12 134:12, 13 147:10 148:23 149:6 157:20 177:9,13 181:21 187:6 190:1,12,13,17,21 194:11 195:7,21,22 196:2 199:10 200:10,14 201:16 203:19,21 204:2, 6,17 205:2,22 206:12

**filed** 65:2 70:11 71:13,15 72:1 110:2 130:1 150:20 151:1 170:8

**files** 25:8 84:9 87:9 92:5 101:10 180:14 181:2 195:16,20,23 208:1

**filing** 66:1 73:6 163:14

**fill** 19:13 20:5 36:2

**filled** 162:12 166:20

**filling** 19:23 20:8,18

**final** 46:14 63:15 67:23

**finally** 29:19

**financial** 26:22 27:2,9

**financially** 76:4

**find** 33:20 59:22 60:5 69:10 115:22 117:18 142:4 167:15 171:2 174:21 189:23 190:17 197:1,2,8

**finder** 39:12

**findings** 39:21 47:5

**fine** 16:23 53:17 92:1 128:10 164:2 177:2 191:16 202:19

**fingerprints** 91:9

**finish** 81:5 91:21 92:15, 17,19,21 183:8

**finished** 92:16 102:14 116:22,23

**finishing** 60:10 197:19

**firm** 10:22 11:6 12:11,14, 21 13:1,7,8 14:11 19:12 94:15 166:22

**firm's** 11:8

**fit** 209:4

**five-minute** 149:17

**flip** 26:16 29:4 127:22 161:17 162:2 169:4

**flipped** 101:11 128:2

**flipping** 190:12

**floor** 194:5 195:13 205:17

**flowing** 145:20

**focus** 95:8

**focused** 77:21

**folks** 194:6

**follow** 15:9 69:8 134:12 147:18

**Fontaine** 166:21

**Fontanez** 179:17

**forensically** 168:9

**forget** 25:21

**forgot** 203:7

**forgotten** 188:23

**form** 19:20 24:23 30:5 31:3 34:2 40:3,13,14 43:18,21 44:6 45:19 46:4,23 47:12,13 49:10 52:23 58:9 68:3,13 74:11 76:10 94:5 100:5 105:20 108:22 113:5,12 117:20 127:14 134:18 143:9 151:7 159:23 163:11 166:4 170:6 176:23 178:8 179:3 198:22 199:4 201:9 204:19 213:2,17

**formal** 8:20 170:8 206:8, 15,17

**formally** 206:11

**forms** 46:5 165:16

**formulating** 125:15

**forward** 28:10,22 56:20 196:15

**forwarded** 28:16,23 29:1

**found** 81:9 98:3 184:16 190:10,22 191:3,5

**four-minute** 186:2

**four-page** 51:3 127:23

**four-year** 13:12

**fourth** 43:14 130:5

**fractured** 140:4

**frame** 51:9 121:13 178:5

**frankly** 57:13 60:12 184:6 202:23 205:20 208:18,19

**freely** 152:16

**frequently** 19:6 44:18 126:22 132:11

**Friday** 28:11 29:7 109:18,23 142:2,11,23 143:4,20 146:2,17 147:5 173:6

**friend** 22:20

**friends** 24:10 27:17

**front** 15:12 64:3 67:12 93:15 125:5 129:12 132:23 187:6 202:22 207:20

**full** 131:15 180:7,8

**fully** 63:13 118:16 151:5 214:5

**Function** 6:7

**fundamental** 67:2

**funny** 186:12

**future** 56:21

**FYI** 90:9

**G**

**G-306** 158:6

**GAL** 26:6 41:22 43:23 44:21 47:18,23 52:18 63:13 70:11 71:15 95:1 131:17 133:12 164:15 166:4,17 195:4

**Gallagher** 162:10

**GALS** 154:1

**gamut** 36:6

**Garner** 7:18

**gave** 58:1 105:9 175:7 195:22 197:12

**general** 6:16 30:10 79:8 99:8 114:16 148:21 194:4

**generally** 9:22,23 11:11 30:7 44:23 78:17 85:21 87:17 107:10 123:5 194:7

**generated** 43:20

**gentleman** 8:5,6

**Giggey** 162:10

**girls** 116:12,13 118:13

**give** 55:1 59:6 84:23 89:5 96:13 120:21 131:10 149:19 171:20

**giving** 86:17 126:19 158:3

**glance** 41:11

**good** 6:11,12 12:9 13:16 28:1 59:11 72:10 83:6 101:7 149:23 165:22 192:2

**goodness** 158:1

**Governor** 66:18

**grammatical** 133:2

**grant** 65:10 77:23 78:3

**granted** 63:12 64:21 76:20 78:12 90:16 98:6 130:2 210:9

**granting** 137:21

**great** 15:7 60:9 139:7

**greater** 129:9

**grim** 67:20

**guardian** 11:15 26:12 31:3 33:21 35:13,16 36:23 41:20 42:6 43:1,16 44:3,9 45:4 46:11 49:4 51:15 52:20 55:8 56:2 57:12 58:15,18,21,23 59:20,23 60:16,22 66:1 68:9 72:20 73:6 76:2,3 77:6 125:6 135:22 137:21 154:6,12 155:11 156:14 157:3 159:5,9,11, 20 161:11 163:8 164:6 165:14 166:6 167:9,11, 16

**guardian's** 35:17 45:11, 16 77:14 137:22

**guardians** 55:19 58:14 59:10,16 60:13

**guess** 10:13 45:16 63:4 81:1 101:22 102:10 136:10 138:4 203:4 205:4

**guided** 37:21

**guys** 56:4 145:8 170:4

**H**

**half** 72:10 103:1,20 140:16 192:10

**halfway** 45:8 160:12

**hall** 180:23

**hallway** 85:9

**Hampshire** 173:21

**hand** 15:15 54:19 95:10 121:17 153:11 158:20 168:23 180:14 199:17 212:5

**handed** 25:10 153:17 197:23

**handle** 137:17

**handled** 11:16 12:8 120:2 138:5,7 149:1

**handles** 167:10

**handling** 119:19 120:15

**hands** 60:11 114:16 201:19

**handwriting** 64:7 79:13 95:11 96:6 97:1 98:10 109:6,8 110:12 145:17 156:6,8 158:18 160:1,13 165:1,6,7 167:5 202:12

**handwritten** 81:17 128:7 133:14 134:7 138:22 162:12 174:14 189:15,20 190:18,22 191:2 210:13 213:8,14,16 214:15,19, 23 215:11

**happen** 44:1 137:2

**happened** 17:21 24:20 58:7,18 91:7,11 107:11, 12 116:17 118:17 129:3 171:15 199:9 203:19 204:22 206:6,14 207:9 209:8

**happy** 191:15 198:15

**hard** 57:4 98:5 175:4 176:9

**harshest** 27:17

**hate** 207:22

**he/she** 47:5

**head** 56:19 91:8 118:5 146:14 183:20 205:5

**heading** 212:9

**hear** 25:6,11 56:20 57:9, 10 73:19 85:11 199:2

**heard** 14:4 29:3 39:9 148:8

**hearing** 39:11 47:8 52:8, 9,12,13 54:13,15 56:3 58:13 59:4 66:10,14

67:10 73:16 85:18 107:1, 5 126:15,19 130:18 134:2 162:18,19,22 165:16 167:14,22 168:1, 16 187:23 199:20 200:2, 4,5,8,16,21 201:19 202:3,10 205:8,23 207:5, 16 209:23 212:6 214:1,6

**hearings** 9:18 85:14,23 86:2 87:1

**heart** 118:21

**held** 66:14 130:1

**helpful** 32:9

**helping** 99:17

**hesitation** 100:16

**Hey** 127:3 146:22

**high** 46:10,12 48:1 117:7

**hint-hint** 33:22

**hit** 72:10

**hold** 62:12 91:20 107:21 118:19 189:9 216:8,18

**holiday** 105:1 140:6 193:7

**Holly** 25:21

**home** 65:7

**honest** 20:5

**honestly** 46:3 71:2 84:17,19 103:5 104:22 170:5 211:2

**HONORABLE** 6:5

**hope** 99:22 100:9,10 101:3,17 102:5,19

**hoping** 152:22 181:14,15

**hour** 72:10 88:16 114:22 121:10,15,16 197:2,3,8, 10 200:15 202:12

**hours** 88:20 103:1 114:22 115:17 147:8 149:16 151:22 209:6

**house** 70:5

**hovering** 207:5

**huge** 158:7

**husband** 12:23 13:2,14 14:1 23:12

**hyphenated** 24:4

**I**

**idea** 48:2 66:12 163:23 165:15 169:21 170:6 208:6

**identification** 6:4

**IEAS** 13:20

**immediately** 28:5 85:9 147:10 202:14

**impact** 69:3

**impacted** 161:22

**impacts** 68:21

**implicated** 216:5,13

**implication** 102:5

**implying** 102:11

**important** 83:6 99:2 112:21 150:2,6 153:8

**impression** 27:7

**impropriety** 134:2

**inaccurate** 114:12

**inappropriate** 102:2

**incarcerate** 67:4,8

**incarceration** 67:16

**inclined** 139:1

**included** 34:12 35:6 64:20 177:10

**includes** 128:7

**including** 62:2 67:22 68:17 69:12 178:22

**income** 13:16

**inconsistent** 49:16

**Incorrect** 82:10

**independent** 161:4 168:7 174:22

**index** 74:7,12 75:4,20,21

**indexed** 74:7

**indicating** 84:14

**indication** 28:16

**individual** 33:8

**individuals** 23:21

**ineffective** 108:2

**inexperienced** 120:3

**information** 18:12 22:11 35:3,6 79:12 86:6 105:10 159:7 187:14 191:9 213:22

**informed** 77:11

**inherently** 22:6 69:3

**initial** 45:22 46:9 48:1 58:22 77:11 109:11 113:15,21

**initially** 7:4 45:18 157:10 165:10,14 166:13,19 187:19 195:9

**initials** 79:21 112:3

**Innes** 11:9 14:11

**input** 22:9

**inquire** 49:19

**inquiries** 50:5

**inquiring** 117:22

**inquiry** 49:10 50:1

**inserted** 167:9

**instance** 37:23 95:14

**instructed** 196:22

**instruction** 62:15 63:12 64:3 73:3

**instructions** 86:17 108:14

**intended** 57:14,15 102:20 103:9 109:11 198:11

**intent** 77:12 197:21

**intention** 198:16 213:23 214:1

**interaction** 203:20

**interactions** 204:6

**interest** 15:11 64:21 186:20

**interested** 35:23 103:15

**interesting** 183:17

**interests** 41:21

**interim** 31:2 33:20 34:8 36:22 39:2 41:3,10 42:3, 23 43:12 46:18 47:17

**interpreters** 19:3

**interrupt** 150:4

**interview** 205:11

**interviews** 18:1

**intrigues** 14:10

**Introcaso** 6:2,5,11,20 15:22 16:7 21:21 23:14 29:7 36:20 40:2,12 49:12 50:2,22 52:22 53:5 58:8 59:2 63:21 64:9 70:18 72:22 75:3 83:23 86:8 92:20 97:5 99:12 110:16, 23 115:22 127:23 130:10 133:7 135:18 136:2 137:15 139:3,6 145:10 150:3,9 169:20 170:14 176:11 183:22 187:11 191:21 192:6 209:22 210:5 213:5 215:10,16

**Introcaso's** 184:1

**introductory** 103:7

**investigation** 49:11 54:1

**involuntary** 13:18

**involved** 27:5 29:10 36:23 44:19 51:14 98:13 129:11 137:13 162:23

**involvement** 130:10 204:16

**involves** 128:13

**involving** 25:6 49:3

**irritated** 186:17 187:13

**issuance** 63:15 67:22 68:18

**issue** 21:16 29:2 34:15 51:16 58:21 65:20 66:11 71:9 77:16 78:5 82:15 87:5 103:22 125:6 129:16 167:11 183:13,14 193:13 195:2 201:14

**issued** 125:8 127:10 128:15,18 129:18 134:8, 16 135:7 198:10,18 200:2 212:19 213:14

**issues** 42:21 46:7 139:4 147:15 149:7 152:3,11, 15 161:1 195:23 196:12 197:4

**issuing** 126:4 135:18 200:8

**J**

**JAI** 79:6 80:4

**James** 145:23

**Jane-holly** 23:22,23 24:4 25:9 48:12

**January** 9:7 80:11,18 82:4,8,18 83:10,19 84:2, 3 85:4,15,23 87:2 88:10, 20 90:21 97:13 99:16 103:16 105:6,16 106:4,5 111:22 114:18 115:3,12

117:17 121:8,19 123:13 136:8 139:19,20 140:19, 21 142:3,8,10,11 143:4, 19,20,21 144:11,15,20 146:1,2,8 151:4 155:17, 20 171:11 172:5,20 173:9,13,17 178:5,22 179:11 180:1 185:15 187:1 189:1,13 191:7 192:14 193:2 203:17,19 204:1,16 206:17 208:11, 16

**Japanese** 16:9

**JCC** 49:19,20 79:18 89:9, 14 90:10 98:21,22 109:9 112:11,12,16 113:21 142:16 144:2,7,14 147:5 148:10 152:7 177:9 179:1,13 181:15,17

**JDL** 79:22 80:2

**jeez** 147:18 203:9

**Jeffrey** 32:6

**Jim** 146:22

**JL** 158:21

**job** 59:12,15 139:15 181:23

**Johnson** 183:23 184:2,9 186:4,6,10 205:11

**joke** 103:10

**joking** 103:11

**judge** 6:2,11,20 7:15,18, 19,22,23 8:1,4,12,16 14:17 15:15,22 16:7 17:6,21,22 18:11,12 19:14 20:19 21:15,20 22:10 23:11 25:10,15,17 26:17 27:10,18 28:4 29:7,13,21 30:11,18 31:15 32:10 34:16 35:8, 17 36:8,20,23 37:15 38:8 40:2,12,22 42:5 43:5 44:8 45:4,8 46:19 48:7 49:6,12,14 50:2,21 52:8, 15,22 53:5 54:2 55:2,18 56:23 58:7 59:2,5,15 60:5,15 61:18 63:20 64:9 66:18,23 67:12,19 70:17, 23 72:22 75:3 79:11 83:23 86:7 87:15,16 92:2,20 94:4 95:20 97:4 99:12 106:4 107:15,20 110:16,23 115:22 117:11 120:5,8 122:1,8,9,17 124:5,8 125:21 126:8 127:8,19,23 130:9,13 131:12 132:5 133:7,11, 14,18 135:17 136:2,3,12, 20 137:15 138:5,14,15, 21 139:3,5,15 142:2,21 145:10,23 146:3,18 148:1,17 150:3,9,10 153:7,11,16 157:4 159:15 161:13 163:6 164:19 167:5 169:15,20 170:14 172:4 174:14 175:18 176:10 177:5 178:2 180:18,19,21,22 182:3 183:20,22 184:1, 14 185:17 187:10,23 188:3 189:12,18 191:17, 21 192:6 193:14 199:4 202:22 204:1 205:10 209:22 210:5 212:7,11, 23 213:5 214:12 215:10,

16 216:9,18

**judge's** 18:13 35:19 38:2 119:17 153:2 200:22

**judges** 7:11,13 8:20 9:19 10:3 18:6 20:16 21:10 22:1,5 59:20 67:3 87:9 121:20 137:7,8,12 182:1, 10

**judgments** 165:23

**judicial** 6:14,23 17:5,9 18:1 21:6,11 36:15 37:17 49:7,17 50:16 94:1 99:5 103:17 105:7 106:6 110:3 118:22 150:10,16 151:5,16,20 169:9 173:21 185:17 204:9,10, 15

**Julianne** 38:23 80:8 85:17 110:12 122:7 179:10 192:8 203:18

**Julie** 6:5 85:3 87:5,17 88:10 95:19,23 97:1,12 98:10 114:17 115:18 116:15 118:1,3 124:16 130:10 144:6 156:7,8 158:15,17 174:3 178:4, 22 187:19 189:12,18 192:19 193:2 196:2,8 197:23 199:16 200:5,13 205:6,18 207:14 210:16, 19 211:21 212:2 214:20

**Julie's** 158:22,23 207:4

**jump** 111:18

**jumped** 19:2

**June** 15:4 157:11

**jury** 11:18

**justice's** 21:23

**juvenile** 11:14 13:18

**K**

**Kathleen** 21:16 23:7 24:14,21 25:5,22 26:12 27:18 32:6 41:19 42:5,15 43:1,6,11 44:2,8 47:22 52:2,18 53:7 55:8,14 56:7,22 57:23 61:19 62:6 64:5 65:2,22 70:10 71:22 76:8 78:4 95:2 108:14 154:11 156:4,21 159:11, 20 161:2 163:13 165:1 167:2,9,17 187:15

**Kay** 44:17 48:12 49:5 56:8 58:16

**Kay's** 44:19

**Kelly** 8:16

**Kempton** 162:10

**kicked** 115:21

**killing** 185:10

**Kim** 174:12 175:8 182:11,18 208:5 211:11, 18

**Kimberly** 122:5,6,9

**kind** 8:20 11:23 60:4 68:11 101:12 113:9 116:5,18 124:20 148:6 168:8 181:11 184:5,23 185:10 188:4 200:15 205:19 207:13 208:19,21

209:3,7

**King** 17:22 18:11 21:15, 20 22:10 27:10,18 28:4 29:21 43:5 49:6,14 52:15 60:15 173:15 175:18 183:21 204:1 205:10

**King's** 17:22 29:13

**knew** 9:1 22:8 23:18 25:13 41:10 93:2 101:14 105:12 117:23 123:9 129:13 134:6 148:18 150:10 152:14,16 180:12 197:4 200:3,4 201:15,22 203:1,6 211:22,23 214:15

**knowing** 44:21 103:15 138:12 200:19 201:13 213:13

**knowledge** 16:12 38:23 52:16 99:7 114:16

**Kseniya** 61:3

---

**L**

**labeling** 16:14

**Laconia** 7:21 8:7

**lands** 137:9

**language** 35:14 36:8 47:1 53:20 64:20 68:15, 16 69:10 74:17,19 100:3 111:17

**laptop** 135:14

**large** 32:4

**larger** 101:15

**late** 17:3 48:16 62:11 104:16 121:12 140:3 146:19 206:9

**Laura** 51:11

**law** 141:10 166:22

**lawyer** 13:2 19:10 20:8 79:12 98:13 130:1 131:14 139:14 216:16

**lawyers** 17:23 22:16 29:9,12,13 32:23 61:23

**leads** 97:10

**learn** 86:6 169:20 208:22

**learned** 16:13 18:9 22:4 181:10 189:22

**Leary** 145:23 146:3,18 148:1 150:10 188:3 189:12,19

**Leary's** 148:17

**leave** 23:1 29:15 60:11, 12 104:1,9 114:18 172:21 173:20

**leaves** 27:23

**leaving** 146:23 173:6

**left** 9:14 12:21 15:1 32:21 37:7,8 59:4 84:18 187:8 196:8

**left-hand** 31:9 63:5 84:15,16,20

**legal** 12:1 40:7,10 47:6 195:4 209:14

**legislature** 184:15

**letter** 28:23 34:11 112:13,16

**letters** 75:13

**letting** 125:12

**level** 141:13

**life** 131:10 209:13

**light** 107:21 124:20

**lightly** 13:23 57:14

**likelihood** 44:20 170:22

**limit** 35:17

**limited** 6:7 27:20

**lines** 96:3 183:22 199:19

**list** 17:23 18:6 21:22 22:2,5,8,10,21 23:3,8,17 24:16,19 27:19 29:15 42:6,16 43:6 44:12 45:5 47:23 61:20 62:7 70:12 72:1 76:9 78:5 129:3 135:22 163:14 174:4,9, 10,14,15,16 175:17,21 176:2,13,16,21 177:19

**listen** 107:1,5

**listened** 127:18

**lists** 60:2

**litem** 11:15 31:3 33:21 35:13 41:20 43:16 49:4 51:15 55:9,19 60:22 66:2 154:6 155:11 156:14 157:4 159:9,20 161:11 163:8 166:6

**Literally** 216:1

**litigant** 19:18 33:1

**litigants** 27:13 33:5 37:4 108:6

**litigated** 26:1

**litigation** 76:23

**live** 48:10 158:4,5,6

**loan** 89:13

**locate** 197:11

**located** 13:7

**location** 158:5

**Lodes** 38:23 80:8,18 82:7,16 85:3,17,19 87:5 88:11 93:10 97:1,12 98:10 99:16 101:9 102:1 103:18 105:5,9,17 106:7 110:12 111:20 112:2 114:17 122:7 124:16 144:6 156:7 158:15 174:3 178:4,22 179:10 187:19 189:12,18 192:8, 20 193:2 196:2 199:16 203:18 205:7 210:17,19 211:21 212:2

**Lodes's** 156:8 158:17

**logging** 190:7

**long** 88:19 138:4 150:5 152:18 154:22 191:15

**longer** 93:6 120:9 126:11 137:16 138:13 162:4 167:10,15

**looked** 18:17 76:20 77:4 89:5 135:10 138:4 162:8 163:19 165:23 199:21

**lot** 50:13 69:1 101:8,12, 13 103:11 104:20 111:12

113:23 125:14 150:3 152:4 162:3 172:7 180:23 185:9 187:22 208:13 209:7

**Loudermilk** 51:10 52:4 55:9 61:10

**love** 107:6

**lunch** 121:9,15,16 202:12

**Luther** 173:15

---

**M**

**made** 17:15 36:14 38:2 39:20 47:5 73:20 80:18 88:12 89:21 90:1 93:10 94:13 99:1 100:8 111:16 112:7 115:7 120:6 125:6 126:5,15 136:7 147:6 162:6 165:22 181:4 183:18,21 184:11 186:4 188:4 195:6 196:3,13 198:1 199:18,22 200:18 205:9,16 206:20 216:16

**maiden** 186:5

**mail** 57:5 110:5 212:9

**mailed** 52:11 213:1

**majority** 49:20

**make** 11:1 24:18 27:6,15 33:10 35:8 48:21 55:19 56:9 67:10,12 82:19 88:23 90:5 91:18 96:8 99:17 127:3,4 128:4 134:11,14 144:8 150:1 153:1 161:15,20 181:23 195:3 207:1,15

**makes** 24:18

**making** 68:22 80:14 132:22 187:22 191:21,23 207:17

**man** 82:14

**management** 9:9,10 38:17,19

**managerial** 141:13

**Manchester** 7:7 11:9 13:9 14:17,18 56:10 175:11

**Manganaro** 32:6

**March** 16:15,16 17:4 18:10 21:2,15,20 30:14 73:20 74:7 81:22 99:19 105:12 120:6 128:16,19 129:5,18 130:22 131:3 132:20 133:6 134:13 135:1,19 136:3,9,11,13, 16 137:11,16 186:17 189:2,20 191:6 193:18, 22 194:2 196:16 199:9 200:10 202:5 203:21 204:7,11,17 205:3 206:12 207:2 209:6 210:7,12 212:13 213:9 215:9

**margin** 64:8 72:21 74:20 89:17 90:15 98:2 99:13 111:10,14 145:13 181:20 213:8,14 215:11

**marital** 11:16 12:6,7 36:14 39:9,20,22 45:14 47:4,7 63:19 66:9,19 67:1,6,14 73:10,14 118:5 119:19 122:8 141:10

154:17,19 155:23 157:13 168:13

**mark** 90:3,7 122:8

**marking** 90:6

**markings** 80:14

**marks** 88:12

**Martin** 173:15

**Mary** 203:23

**master** 25:15 36:14 39:10,16,20,23 40:18,19 41:15 44:16,22 45:23 46:19 47:14 48:9 51:18 61:18 63:19 64:7,19 66:9 67:19 71:7 73:10,14 87:16 122:8 136:23 138:12 154:17,20 155:23 157:14 164:20 165:3,5, 22 168:13 180:22

**master's** 36:18

**master/judicial** 47:4,7

**masters** 67:1,4,6,15 121:20

**masters'** 66:20

**maternal** 101:16

**math** 155:19

**matter** 6:14 7:13 25:6,13 26:1 30:16 31:3 39:4 46:5 49:7 50:15 65:15 85:18 88:17 100:19 107:16,20 120:2,9 130:11,16,18 149:11 187:12 200:22

**matters** 10:4 11:16 13:18

**maximum** 45:9

**Mclane** 94:15

**meaning** 75:4 102:16 142:7

**means** 102:20 137:19 169:14

**meant** 119:17 127:11,17 143:3

**Meckel** 61:6

**medical** 216:5,13,14

**meet** 207:22

**meeting** 53:21

**member** 71:23 98:13 115:2 151:4 179:10

**members** 122:5 178:13

**memory** 123:2 161:22 193:17 204:5 206:2 208:20 209:2,15

**mentally** 208:14

**mention** 24:13 134:11,14 142:6

**mentioned** 18:21 24:14, 15 58:16 91:10 124:14 142:13 148:6 176:18,19 181:12 187:19 188:3 189:18 192:9

**mentioning** 149:6

**mentions** 21:10 30:3

**mentor** 152:10

**menus** 191:18

**merits** 127:5

**Merrifield** 154:13

**Merrimack** 124:10

**message** 29:6 143:1

**met** 178:6,17

**Michael** 48:20 54:18 79:4 140:22 144:22,23 150:5 152:18 177:16 191:20 216:10,19

**Mickey** 179:17

**middle** 25:21 33:17

**midnight** 145:9

**Mike** 149:21 153:11 168:20

**mind** 44:10 129:7 205:5 214:2

**mindful** 27:22

**mine** 22:20 120:16 159:2

**minor** 41:21

**minute** 28:13 44:1 118:19 120:22 126:1 150:7 171:20

**minutes** 56:18,22 57:7, 14 58:3 82:2 152:20

**misguided** 120:14

**misinterpreted** 118:16

**missed** 40:7

**missing** 132:7,23 145:14

**Misstates** 100:6 127:15

**mistakenly** 143:12

**mixing** 179:4

**MM/INTROCASO** 36:11

**moment** 30:17 44:7 48:19 55:2 66:17 109:2 121:23 127:22 128:14 215:21

**Monday** 104:7,9,10,13 139:19 140:19,21 143:19 144:10,15 146:1 172:4

**money** 27:6 46:6 66:5 77:8,21

**monitor** 105:11

**Montgomery** 51:11 52:4

**month** 73:5 103:20 142:5 182:18 192:9,10

**monthly** 182:17

**months** 43:5 66:2 70:3 158:2 181:14 204:15 205:6 206:5 208:14 209:13 215:6

**months'** 140:16

**Moore** 30:3

**Moore's** 30:11

**morning** 80:22 81:7 87:9, 19,20 117:23 134:5 142:21 147:8 176:19 180:7,10,12 187:5 190:3, 7

**Morrill** 191:17

**motion** 35:10 36:9 37:20 39:5 62:15 63:11 64:3 65:2,4,16,22 66:1 70:11 71:12,14,17 72:1,20 73:3,6,17 74:9 75:20 76:1,4,19 77:5,6 78:1,3,

13 89:15,17 90:16 91:2 95:1 98:4,6 99:9,10 108:14 128:10 129:10 130:1,2 137:22 163:7,8, 14 194:1,17,23 201:20, 21 210:9 213:20

**motions** 35:9 89:21 90:4 99:9 124:22 125:2 126:19 127:5,10 130:17 134:2,8 135:11 194:3,11, 21 196:13,16 198:8 200:14 202:18,20 212:14

**move** 38:1 56:20 127:20 140:18 161:10

**moved** 158:1,6

**moves** 163:20 164:7 191:18

**moving** 137:8 145:5,6 153:13 161:14 189:10

**multipage** 159:7

**multiple** 35:9 163:20 164:6 197:4

**multitasking** 148:5

**mutual** 147:15

**mystery** 215:8

———————————

**N**

**named** 23:21

**names** 24:13 32:5,15 33:1,8 60:8 174:3,6,8

**Nancy** 115:2,11,13 116:2 117:1,4,5,11 118:1,4 120:17 121:5 122:5,21 123:3,10 125:20 141:14 178:4,22 179:10 196:9, 10,22 197:7 198:17 199:6 200:12,15 207:6 208:4 211:5,11,13

**Nancy's** 121:16 199:13 207:20

**narrative** 35:14 36:4 38:8 40:17 63:11 64:20 111:17 133:15 203:12

**Nashua** 7:7 152:7 166:22 174:13

**nature** 13:19 71:6 72:5 140:17 184:23 185:22 196:17

**neatly** 95:12

**necessarily** 28:16

**needed** 51:15 54:17 70:9 71:8 89:1 112:14 142:5, 15 183:6 195:21 196:11 202:20 203:5

**neighbor** 157:23

**News** 21:10

**nice** 13:10 14:5 59:12 152:10

**Nos** 6:2

**Notarial** 6:7

**notate** 98:20

**notated** 112:10

**notation** 90:8 98:23 99:1, 2 112:15

**notations** 80:19 88:23 112:21

**note** 35:9 59:5 98:2 145:13 162:23

**noted** 94:20 190:20

**notes** 169:19 170:1 213:15

**notice** 31:2,7,10 32:13 33:5,23 34:13 35:5,21 36:2,21 37:15,16,22 38:3,5 48:8 57:5 62:14, 19 63:6,8 72:19 78:16 79:1 89:16 93:1,12,21 95:1,9 96:12 107:16 108:13 109:2 113:19 120:10 128:6 133:10 135:11 177:11 200:2,13, 16 207:12 209:5 213:20

**noticed** 76:21 77:2

**notices** 34:16,21 199:18 202:19

**notification** 34:4

**notified** 43:5 45:3 70:18 76:7 176:10

**notify** 34:11 43:10 44:10

**notifying** 78:4

**notorious** 165:19

**November** 51:5 57:22 61:10

**novo** 119:22 120:5 126:2, 20

**number** 11:20 13:17 22:4 33:19 37:18 38:12 46:5 62:23 63:1 70:21 75:5 77:1 81:9 89:20 106:14 107:11 109:17 117:8,22 119:18 121:20 130:15 170:10 178:12 183:5 184:10

**numbers** 75:13 94:14 164:3,5

**Nunez** 122:6

———————————

**O**

**O'LEARY** 24:8

**oath** 59:23 80:9 212:23

**object** 30:23 58:3 59:14 74:11 140:23 176:23 203:3

**objected** 65:15 74:9 76:5 216:10

**objecting** 77:17,20

**objection** 19:20 24:23 30:5 34:2 40:3 45:19 48:21 50:1,3,4,12,14 52:23 57:4 58:6,9 68:3, 13 74:12,18,21 75:4,21 76:10 78:9 90:16,17 94:5 100:5 105:20 113:5 117:20 127:14 128:20 134:18 135:20 137:22 143:9 151:7 164:9 178:8 179:3 198:14,22 199:4 201:9 204:19 213:2,17 214:10 216:4,17

**objective** 22:15 77:14,17, 19

**obligation** 43:10 44:10 175:20

**obligations** 49:12,16

**obscure** 99:14 118:21 193:10,14

**obscured** 98:2 108:5

**observation** 150:2

**observed** 134:14

**obstruct** 99:14

**obstructed** 91:9 212:23 213:15

**obstructions** 214:8,13

**occasion** 83:23

**occasionally** 182:13,19

**occur** 17:5 130:22 202:11

**occurred** 118:9 147:9 149:12

**occurring** 200:11

**October** 14:13 37:12 38:3 39:15 40:20 48:16 70:3 104:1,3,10 206:9

**odd** 44:20 137:9 184:4 190:11

**oddity** 84:20

**Oddly** 165:18

**Odyssey** 9:8,15 35:11 38:16 75:5 86:5,14,16,23 177:14

**offended** 100:23

**office** 14:17,19 15:6 18:13 21:23 29:11 33:9 84:5 85:13 87:12 144:19 148:4 175:18 178:15 180:10,14 195:16

**officer** 36:15 47:5,8 152:2 179:17

**officers** 67:2

**official** 25:12

**officially** 104:9

**oftentimes** 48:10

**oldest** 16:13

**one-and-a-half** 41:2

**one-and-a-third** 41:3

**open** 83:8 173:7 200:16

**opened** 35:1 83:14,20 123:8 190:1

**openings** 197:18

**operating** 152:16

**operation** 151:21

**opinion** 23:2 34:10

**opinions** 22:23

**opportunity** 120:19 161:16

**opposed** 67:4

**optional** 35:2

**options** 203:14

**order** 31:2 33:20 34:8 35:12,13 36:22 38:2 39:3 40:17 41:3,10,22 42:3,23 43:12,13,15,23 46:18 47:17,18 49:3 52:10 57:4 60:22 62:11,15 64:8 65:6,8 67:18 69:13,19 70:8,16,19 71:6,7,18

72:5,21 73:3,12,13,20 74:17,20 76:15,17 81:2, 6,8,17,19 86:6 89:17 90:5,15 93:6,9,10 98:4 99:4,13,20,21 106:8,9 107:22 108:2,5,10,15,16, 21 111:10,14,16,21 112:3 114:9,15 117:2,3, 12 119:20 120:3,5,15 124:22 125:9,23 126:1,4, 5,6 127:3,11,12 128:7,8, 15,19,20 130:8,9,23 132:20 133:7,11,15,20 134:5,7,17 135:19,20 136:13,16 137:11 138:22 145:14 147:5 154:5 155:11 157:3 159:8 161:11 162:9,18,20,21 164:15 181:13,20 182:22 183:7 186:18 188:12,15, 16,20 189:1,5,6,15,20 190:6,9,10,12,14,16,18, 23 191:2,7 194:2,12,16 195:1 201:14,23 202:2,6, 13 203:8,12 208:6 210:7, 12,14 212:19 213:7,8,9, 15,16 214:4,14,15,20,23 215:9

**ordered** 47:2 196:13

**orders** 36:17,21 39:5,9 55:7 66:20 68:21,23 69:6,8 89:23 90:22 91:1 99:19 116:8 118:9,11 119:16,17,20,21 120:4,6, 8,9,10 125:2 126:11 128:19 129:18 130:9 131:3,5 132:13,16 133:6 134:13,15,16,23 135:3,5, 7,19 136:4,9,13 147:2,3 154:1 166:5 182:2,7 184:22 186:22 190:4 193:10,19,22 195:6,7,10 196:3,7,14 197:6,20,23 198:10,13,14,18 199:20, 22,23 200:8,18,20 201:5, 6 202:5,8,9,13,23 204:12 211:5,14,17 212:15 213:1,7,13 214:15,21 215:12,13

**ordinary** 164:8

**organized** 180:13

**original** 89:6 90:4,5 93:19 94:8 96:21 97:5, 10,13,17,21 98:3,8 99:9 110:20,22 111:7,15 112:6,8 113:1,4,10,14, 16,18 114:5,9,11,14,15 132:3

**originals** 79:17 89:9,13 90:4,7,9 98:20,21,23 99:4 112:10,14,15,19

**outset** 69:7

**Overbroad** 178:9

**overheard** 200:5

———————————

**P**

**P.M.** 16:16 216:22

**packet** 18:12

**pager** 44:1

**pages** 71:19,20 93:20 163:6 169:22 170:7

**paid** 67:11 195:4

**Pam** 8:4,5

**panicking** 101:22 183:13

**paragraph** 18:22 21:14 23:6 26:4,19,20 36:8 45:8 52:1 55:17 56:13,17 131:16 156:4 158:16 159:12 164:23 165:9 166:11

**paragraphs** 29:8

**paraphrase** 17:2 31:1

**parent** 68:8,10 69:9,13

**parent's** 68:1

**parental** 68:5

**parentheses** 38:12,13 95:13

**parenting** 51:16 63:16 67:23 68:5,18,22 69:2

**parents** 69:7

**part** 10:2 11:5 12:1 20:13,14 31:18 40:12 46:22 47:11,12 66:13 71:10 77:8 91:9 114:7 130:8 132:19 142:14 181:23 186:16 200:12,13 201:15 210:14 214:14

**parte** 39:5,9

**Partello** 30:16 31:4 32:6 45:3 49:2 50:6,19 62:16 65:7,8,14 70:10,18 74:8 76:7 78:3 80:23 82:17 83:9 91:11,14 92:4,5 93:11 94:16 102:7 103:17 106:6,18 107:2 108:22 123:20 124:2,15, 17 125:5 126:15 135:21 144:2 149:10 150:19,20 169:8 177:13 179:1,13 181:21 186:4 187:14,21 189:6 190:5,10 191:8 192:8,20 193:4 195:20 196:2 199:9 200:10 204:2

**Partello's** 81:3,14 93:3 94:1 105:7 177:10 185:9, 16

**partial** 26:19 81:5

**participation** 200:22

**parties** 22:17 26:7,13 31:23 33:15 34:5 52:11, 16,17 53:6 60:2,16 61:19,22 62:1,3,7 63:7 73:19 77:9,12,14,23 129:14 130:16 155:2 158:12 159:19 161:1 162:7 168:2 196:15 198:19 200:21 213:14 215:1

**party** 35:18 137:22

**past** 182:8,16 215:6

**path** 76:23

**Patricia** 122:9 156:21

**Patten** 7:22,23 8:1

**Paul** 30:3

**pay** 65:9 99:9,21 106:9 108:15,16,22 111:21 112:3 114:9 117:2,12 126:5 127:11 128:19 134:15 135:19 145:14 181:20 186:17 194:2,12,

13,14,16 195:1 210:7,10 213:7 215:9

**paying** 77:21 80:6

**pen** 84:5

**pencil** 84:5

**pending** 120:21 129:21 130:17 182:7 198:8 216:17

**people** 19:1,5 20:13 22:5, 7,15 23:8 24:19 28:2 29:17 32:11,23 33:9 42:18 44:19 60:7 67:5 117:8,22 118:15 119:18 120:11 122:4,13 123:12, 14 174:3,9,10 176:9,13, 14,16,18,19 178:12,20, 21 180:23 189:17 208:15

**perceived** 120:4

**percent** 60:12

**Perfect** 33:12

**performance** 17:5,10 19:13 21:3,7,11

**period** 7:10 9:5 11:2 12:20 13:12 38:6,7 88:14 89:8 193:3 199:15 203:1 206:4 209:13

**permitted** 54:17

**perseverance** 172:2

**person** 44:23 45:4 47:22 59:8 60:3 69:4 70:11 71:23 101:10 124:3 135:21 152:14 179:6

**person's** 68:20

**personal** 24:10 34:19 36:1 184:10

**peruses** 30:19 55:5

**petitioner** 71:13 130:1

**petitioner's** 39:5

**ph** 166:13

**Phil** 15:16 40:4 72:9 74:10 91:20 94:12 102:15 106:2 145:5 149:14 153:13 161:8 168:23 176:22 179:4 191:23

**Philip** 6:13

**phone** 55:20 134:4

**phones** 85:11

**photocopies** 89:10 112:6,19 144:8

**photocopy** 90:6 98:5 113:12 114:6,10,13

**photostat** 89:15

**phrase** 126:21

**phrases** 205:13

**physical** 200:9 201:16

**pick** 55:20 59:6 137:3

**picked** 28:18,22 137:4 184:7

**picking** 58:23

**piece** 14:9 18:18,19 38:10 40:1 54:21 209:3

**Piela** 53:12 54:16 55:12 58:20

**pile** 73:23 194:4,11 195:8 196:1

**piled** 195:20

**piles** 15:17

**piqued** 64:21

**place** 93:5 201:19 205:15

**places** 48:8

**plaintiff** 101:11

**plan** 63:16 67:23 68:5,18, 22 69:2 113:21

**planned** 161:18

**playing** 205:5

**pleading** 31:15

**pleadings** 77:1 161:13

**plenty** 105:5 135:16 203:3

**point** 12:9 24:18 27:15 29:17 37:18 45:6 70:8 71:10 72:11 85:13 111:15 112:7 118:14 129:19 131:10 147:21 148:15 151:17 160:3 173:19 201:22 202:23

**pointed** 193:8

**Poor** 32:18

**populated** 34:23

**pornography** 160:16

**portion** 31:9 34:7 36:4 63:5 109:7 110:18 210:9 214:23

**portions** 214:20

**position** 60:1

**positive** 23:2

**possession** 89:9 99:10 201:16

**possibility** 116:9

**possibly** 22:15

**post** 202:3

**postdecision** 37:21

**posting** 7:2

**posture** 71:5

**potentially** 206:11

**power** 67:15

**practice** 10:15,16,21 12:1,2,12,14 14:7,16 36:1 60:7 132:15 159:21

**practiced** 20:20

**prayers** 65:3 76:21

**pre-2000** 20:9

**precise** 104:13 106:2 193:3

**Precision** 83:6

**preliminary** 17:13,18 90:1 159:23

**premarked** 6:3

**prepare** 177:7,17 182:1

**prepared** 165:16 214:6

**preprinted** 40:1

**present** 86:9 89:4,12

**presented** 25:8 48:6

**presently** 193:17

**pressure** 57:15

**presume** 71:17

**presumption** 192:1,2

**pretrial** 129:11 137:3,4

**pretty** 11:19 13:13 20:4 46:2 67:20 76:22 80:7 138:17 147:16 176:9

**prevented** 133:5

**previous** 68:21 109:5,7, 21 144:4

**previously** 43:4 82:6 139:22

**primarily** 12:2 14:16 67:4 138:7

**prior** 10:12,14 50:3,6 54:15 76:17 83:2 136:9, 23 206:23

**private** 10:15,16,21 14:7

**privilege** 216:6,13,14

**probate** 141:11,19 178:14

**problem** 11:4 56:14 74:16 78:6 90:20 116:3 135:23 137:5 147:22 148:15,18,19,20,21 171:1 177:2 184:13,19, 21

**problems** 115:21

**procedural** 32:9

**proceeded** 105:10

**proceeding** 25:12 65:13

**process** 7:14,15 17:15 19:22 60:14 132:13

**processed** 196:4,6 201:4 204:22

**processing** 120:2,4 201:17 212:14

**produced** 93:12

**professional** 15:2 152:1 207:23

**program** 8:21

**prompting** 208:23

**pronounce** 61:2

**pronounced** 166:7

**properly** 117:9

**propose** 67:7

**proposed** 167:12,14

**propriety** 72:7

**prosecution** 29:12

**protect** 99:23 100:10,11 101:4,17 102:6,19 103:4 105:18

**protected** 102:4

**protecting** 102:8

**provide** 176:1

**provided** 35:21 79:8 174:10 178:3

**providing** 94:17 112:17

**PS** 57:3

**public** 13:14 14:2,6,11, 13,20 17:16 19:11 98:13

**published** 122:14

**punches** 93:1

**punish** 67:15

**purpose** 37:15 109:12 114:1,2 137:19,20 146:21

**purposes** 50:5 94:16

**push** 147:12,13

**pushy** 145:3

**put** 36:8 57:11 84:1 90:7 96:14 97:5 103:12 110:4 119:16 123:10 143:11 159:23 165:10,14 166:13 167:13 172:21 173:1 195:7,20,23 200:13 201:4 202:20 207:7 210:8,13 212:9 213:19 214:17,19 216:3

**putting** 203:10 209:20

**puzzle** 209:3

**puzzles** 27:2

**Q**

**question** 19:21 25:1 30:6 32:18 34:3 40:5 41:6,7 42:2 44:23 45:20 53:3 58:10,11 68:4,8,14 69:18,19 70:7 74:8,12 76:5,11 78:2,11 79:12 82:10,20 92:14 94:6 97:4 100:7 103:3 105:21,23 113:7 117:21 119:5,7,8, 10,12,14 120:20 122:20 125:14 127:16 134:19 139:13 143:10 148:14 150:8 151:8 164:11 171:3,5 174:7 175:3 178:10,19 182:12 193:9, 11 199:4 200:6 204:10 207:11 212:1,3 213:3,18 214:11,18,22 216:5,12, 17

**questioning** 149:15

**questionnaires** 19:19

**questions** 15:10 16:22 17:20 41:1 50:2 149:20 154:2 161:19,21 168:22 191:12 192:1 209:23 210:16 215:19

**quick** 116:5 153:15 165:23 208:2

**quickly** 149:10 152:23 192:6 196:4

**Quigley** 122:9

**Quigley's** 180:21

**Quinlan** 177:19,20

**quote** 17:23 127:9 169:13

**R**

**racking** 208:15

**raise** 44:10 72:1

**raised** 21:16 72:3

**raising** 27:18

**random** 17:23

**Ray** 10:9

**Raymond** 10:8,9

**reach** 139:1

**reaction** 68:11

**read** 26:21,23 34:8 35:19 36:11 39:6,19 41:2,7,12, 23 42:4,9,13 44:2,5,8 46:4,6,8,22 47:1,3,9,16, 17,20 48:3 55:2 58:2 63:17,23 64:15,17 71:17, 18,19 77:7,13 79:19,22 107:22 118:8 119:14 121:23 126:11 127:3 129:9 130:19 134:5,7 142:6 166:14 177:6,23 184:10 188:9 191:6,7 206:15,17 209:4,14

**reading** 17:19 64:19 67:20 76:19 194:16,17

**reads** 58:17

**ready** 147:4

**ready-to-be-issued** 196:1

**reaffirm** 201:1

**real** 78:5 147:22 204:23 206:19

**realize** 58:1 135:18,23 150:2

**realized** 119:23 133:4 191:8 196:11 202:14

**reason** 18:5,7 29:9 66:17 90:8 142:14,22 186:19

**reasonable** 120:14 128:9

**reasons** 22:7 50:12

**reassign** 130:16

**reassuring** 126:10 127:2

**recall** 8:8 19:15,22 20:23 25:5,9 43:22 52:10 53:12 54:14 56:1 58:15 70:15 73:4 76:16,18,19 80:19 84:12 85:16,23 86:2 87:3,22 100:18 104:19, 22 105:3 107:13 108:9 111:1,2 115:10 116:5 136:14 146:3,10 149:4 151:19 157:19 179:12 182:20 185:4,8 186:3 187:11 192:10 193:11 199:8 205:6 210:18 211:2

**recalled** 183:1

**receive** 46:11 68:17

**received** 33:5 123:5,6 206:7

**receiving** 18:1,3,12 48:1

**recent** 150:9

**recently** 73:2 80:10 215:4

**recognize** 98:16 145:17 155:15 156:6 158:23

**recognizing** 192:23

**recollection** 19:23 20:7, 10,18 42:8,10 51:10 52:21 53:19 54:11 58:22 59:21 64:18 83:22 88:9 111:23 114:19,21 117:4, 14 121:18 138:1 144:9 145:22 156:23 161:5

168:8 174:2,5 178:23 187:4 192:22 194:15,16 196:18 203:22

**recollections** 204:23

**recommendation** 36:15, 18 39:19 41:17,19 56:15 61:14 73:14 154:17,19 155:23 157:13 168:13

**recommendations** 47:3

**recommended** 41:16 51:19 164:20

**recommending** 44:22

**reconsider** 37:20 198:15

**reconsideration** 199:15 203:1

**reconsiderations** 38:6

**record** 16:1,4 53:11 74:15 88:5,7 89:12 94:13,17,20 121:2 210:20 216:2,4

**recusal** 42:16 81:19 128:8,11 130:12 132:20 136:16 188:16 189:20

**recuse** 129:4 152:9 176:3 198:5

**recused** 25:7,23 130:3 138:6,21 139:3 152:9 202:21

**Redwood** 122:6 123:16

**refer** 40:16 81:18

**referee** 47:7,14

**referee/hearing** 47:4

**reference** 56:9 89:11 101:5,6 108:6 176:23

**referenced** 81:3,6,14 161:10 189:8

**references** 30:1,2

**referencing** 141:5

**referral** 49:13

**referred** 29:11 49:7 99:20 108:15 133:18

**referring** 27:3 86:9 189:14

**refers** 27:10 29:8 38:15

**reflect** 53:20 210:20

**reflected** 93:6 183:11

**reflects** 111:4

**refresh** 123:2

**refuse** 42:17

**regard** 39:4

**register** 49:23

**regular** 196:1

**regularly** 20:5 59:18,19 178:15 197:18

**reheard** 125:8 126:12 127:5,10

**related** 49:4,13 50:6 168:7 186:5,11 199:9

**relates** 49:2 50:17

**relationship** 21:16 24:11 42:18 100:20,22 102:1

**relative** 33:20 113:6 161:21 176:23

**relax** 208:20

**relief** 65:10 76:21 77:22 135:22

**rely** 101:10

**remedy** 198:2

**remember** 34:18 52:3 54:13 58:20 74:6 106:11, 14,15,16,17 107:4,9,17, 19,23 116:11 118:2 121:3,5 123:5 125:16 140:7,10,13 144:13 149:8,11 151:17 154:22 155:4 156:15,18,20 157:16,17,18,21 158:12 159:19,21 167:7 170:12, 15 172:8 181:19 184:8 185:2 187:15 188:13 189:4 193:21,23 194:12 195:18 196:21 197:10 199:12 200:7 203:20 204:16 205:2,3,12 206:7 207:3,5,8,10,14 208:10, 11 209:17 212:4

**remembered** 183:19 205:8,11,13,14,21

**remembering** 215:4

**remembers** 170:4

**removal** 133:11

**removed** 22:7

**rephrase** 179:4,8

**replacing** 120:6

**replenish** 77:15

**reporter** 6:6

**represent** 41:21 72:18 80:12 150:23 153:23

**representation** 74:11 83:8 128:4

**represented** 52:4,6

**representing** 6:14

**request** 13:17 26:13 67:9 77:14 91:10 108:21 115:7 120:21 194:13

**requested** 26:7 197:2,3

**requirement** 71:3

**requirements** 37:22

**reserved** 172:15,18

**resolve** 130:17 133:23

**resolved** 72:6

**resolves** 69:16

**respect** 25:12 63:8 69:9 92:22 101:9 118:1,4 124:15 147:14 152:17 153:2 178:17 188:5 194:23 195:1 196:12

**respected** 165:22

**respects** 105:3

**respond** 28:4 50:8 100:12 116:6

**responded** 29:21 125:19, 20 147:6 176:14 183:5 204:14 213:6

**respondent** 63:12 65:15 70:5 76:4,7 128:21 129:1 167:12,14

**respondent's** 71:14 74:21 77:17 90:16,17

160:13

**responding** 80:23 91:12 113:22 210:15

**responds** 142:20

**response** 18:11 50:14 89:3 95:14 100:16 109:9 110:3 114:7 124:5 125:22 144:1,7 149:10 150:9 151:14 169:8 179:1,13 185:20

**responses** 24:17

**responsibilities** 68:6

**responsibility** 10:3 175:23 176:1,3,6,8

**responsible** 141:9,10

**responsive** 16:22 171:17

**rest** 161:19

**restate** 119:11

**result** 52:7 63:14 67:22 125:23 136:15 147:23 148:17 167:21,23

**resulted** 118:17

**retained** 31:16,21

**retainer** 65:9 77:11,15

**retired** 7:21 8:8 10:10 13:5

**retrospect** 26:10 48:3

**return** 104:11

**returned** 104:14 112:18 192:21

**returning** 195:15

**revenue** 27:12

**review** 16:18,19,21 17:10 21:12 38:18 86:5,23 94:9 136:3 161:14,16

**reviewed** 21:11 42:3 119:21 135:1,2,6

**reviewing** 193:22 194:1

**revisit** 198:11,18 201:6

**rid** 125:6

**riding** 209:8

**right-hand** 84:4,9,14,17 109:6 110:18 113:23

**rights** 68:2,6 69:9 173:15

**ring** 108:16

**risk** 160:13

**Robin** 32:6 65:14 70:10 74:8 76:7 93:3,23 103:17 105:6 106:6 150:20 185:16 191:8

**Rockingham** 9:2,4,14 10:13 20:12,15 31:14 34:15,16

**room** 86:3

**routine** 68:15,16,19

**routinely** 85:10 150:18

**RSA** 6:7

**rule** 119:1,4

**ruled** 127:6

**rules** 37:19 49:17

**ruling** 128:10

**rulings** 134:8

**run** 149:2 153:14

**running** 138:3

**runs** 36:6

**S**

**S-DRIVE** 169:13 170:13

**Salmon** 13:9

**sanction** 67:13 68:17

**sanctions** 63:14 67:7,22 69:12

**sank** 148:11

**sat** 7:20 8:7 83:13 125:17 140:9

**save** 30:22 62:14 72:18 94:23 153:23

**saved** 170:17,23 171:6

**saving** 170:13

**savvy** 28:10

**schedule** 10:4 130:17 142:22 197:16 198:17

**scheduled** 25:6 49:10 67:12 85:16 129:12 130:23 142:7 143:16 146:16 180:7 202:21 205:22,23 214:6

**schedules** 137:9

**scheduling** 10:2,5 141:9, 11 162:11,17 196:23 197:22 199:7 200:13 207:4

**scratch** 91:7

**scratched** 168:1

**screen** 207:6

**searched** 190:9

**season** 193:7

**sec** 17:3 93:16 111:18 171:22

**second-to-the-last** 46:15 56:13

**seconds** 216:1

**secrets** 158:3

**seeking** 77:22 135:21

**select** 58:15

**selected** 17:23 159:4 200:4,6

**selection** 117:10

**self-evaluation** 18:18,19

**send** 99:3 175:17 199:22, 23 205:7,19 207:11 214:21

**sending** 98:22 112:13 113:17,20 114:6 121:18 199:20 212:5

**sense** 12:22 21:1 24:18 33:10 41:11 66:8,9 74:6 91:5,10 104:3 207:1

**sentences** 66:23

**separate** 32:12

**September** 6:21,22 15:4 150:20 151:1 154:13

**serve** 10:13 42:6 175:14

**served** 15:5 34:10

**serves** 37:18

**services** 26:7,13

**serving** 6:18

**set** 30:20 45:23 87:13 101:7 125:5 128:3

**sets** 45:9

**setting** 9:18 180:10 181:9

**settled** 137:1 143:6

**seven-year** 11:2

**shadow** 7:17

**Shadowed** 8:3

**shadowing** 7:14 8:14,18, 20

**share** 13:16

**shared** 183:20

**sharing** 207:6

**sheets** 115:19 116:1 124:17

**Sherry** 37:8 122:10 141:1,6,21 142:14,20 144:10 174:8,11,12 175:8 179:16,19,22 180:13 182:9,12,18 184:5 185:14 187:1,11 188:6 189:12,18

**short** 67:14 72:11 76:2 104:16 215:23

**shorter** 164:14

**shorthand** 170:1,3

**shortly** 134:7 196:16

**show** 31:17 67:9 89:1 106:7 111:20 116:14 181:1

**showed** 102:18 105:18 106:12 107:14 189:5

**showing** 161:23 181:19

**shows** 33:18 74:1

**shut** 149:10

**sic** 24:1 75:5 178:23

**side** 35:8 54:5 60:3 84:4, 10,14,15,21 93:1 96:14 108:11 187:8 194:22 211:20

**sides** 23:3

**sign** 42:17 46:20 47:14 48:7 79:17 87:9 194:6, 10,19 208:2

**sign-out** 115:19 116:1

**signature** 40:21 46:16 64:5,6 72:4 73:10 95:19, 20 145:20 155:15 157:9 159:14 181:3 194:18 208:3

**signatures** 180:15

**signed** 38:8 39:14,15 40:20,21 41:3,9 42:23 43:12,22 44:20 51:5,20 55:7 57:18 63:19,20 64:12 70:8,16 71:18 72:21 73:4 74:2 75:1 76:15 125:7 128:15 155:17 162:16 165:23

168:10 184:21,22 196:1 213:20

**significance** 31:14 127:13 193:15 197:14

**significant** 45:16 46:2

**signifies** 36:14

**signify** 36:13

**signing** 70:19 72:7 73:23 76:17 157:9 194:4,10,11 195:10,12,19 197:20

**signs** 46:19 66:19 194:7

**Silva** 122:5 211:12,18

**Silva's** 208:5

**similar** 95:2

**simple** 195:3

**simply** 25:10 33:19 108:5 118:14 139:8 171:10 199:21 203:7 213:23

**single** 20:6

**sit** 26:10 38:20 45:2 47:15 85:22 135:17 154:21

**sits** 148:10

**sitting** 65:18 87:14 124:9 138:13 152:8 180:21

**situation** 30:3 71:1

**skills** 27:8

**skipped** 40:4

**slot** 199:14

**slow** 208:19

**small** 10:22

**smart** 101:18

**so-called** 64:8 72:21 85:17

**Sobell** 156:16,20,21

**softer** 100:3

**solicit** 22:11

**someone's** 68:23

**sort** 16:9 17:18 33:21 34:10 56:12 60:11 64:20 77:14 86:16 101:23 102:21 107:4 115:20 116:3,14 125:10 137:9 148:3 149:5 168:21 180:16 181:10 183:11 184:7 194:14 195:4 205:15 206:1,18 208:4 209:15

**sound** 75:21 77:18

**sounded** 127:20

**sounds** 17:3,21 18:11,23 27:17 61:5 117:16 125:22 150:13 185:21

**soup** 121:17

**space** 35:21 84:8

**Spath** 8:12

**speak** 7:2 8:18 31:19 45:17 85:10 110:5 115:8, 9 120:19 122:21 141:15 146:5,18,21 149:7,8 179:19,22 182:22 195:21

**speaking** 146:3 179:1,9, 12 187:22 192:9 193:4 196:19

**specific** 59:20 64:18 71:14 111:23 140:14 160:9 174:5 196:18 204:23 206:19

**specifically** 18:23 19:15 21:15 22:11 25:9 26:7 40:17 54:14 58:16 70:22 81:10 88:1 90:2 107:14 115:6 116:11 118:1,2 148:2 186:3 187:10,14 189:14 194:12 200:7

**specifics** 160:6

**spelled** 24:1

**spells** 68:5

**spend** 66:16

**spent** 7:18,19 8:11 208:14

**spoke** 55:21 121:5 124:3 142:1,21 147:14 179:16, 17 192:13 198:16 199:6 203:23 204:5 211:2

**spoken** 53:9 80:22 177:16 179:20 210:23

**Sponte** 81:19 128:8,11 129:3 130:11 188:16 202:6

**spot** 197:1,13,15

**spotting** 111:12

**square** 208:4

**squeeze** 207:8

**stacked** 208:2

**staff** 10:2 17:22 20:14 60:13 101:7 115:2 117:6, 18 120:17 121:20 122:4, 7 137:3 175:21 178:2,13 179:10 189:12 195:21 207:10

**staff's** 176:6

**stamp** 64:11 79:5 89:18 94:3 96:17,21 97:6,10, 13,14,17,21 110:7,15,19, 20,22 111:7 112:8 114:11

**stamped** 112:8 113:1,6, 18

**stamping** 99:18 112:9

**stamps** 97:9

**stand** 202:10 214:5

**standard** 39:22 40:8,10 47:6

**standing** 199:13 201:3 211:5

**stapler** 84:6

**start** 105:23 207:2 209:20

**started** 17:7 81:1 124:12 149:9 174:13 181:11 190:17 196:23 205:14, 18,20 207:5,8,18 208:6, 18,19,21 209:4,5

**starting** 37:18

**state** 89:2

**stated** 50:12 67:17 94:19 119:21 131:23 192:13,16

**statement** 31:4 82:8,18 85:20 86:19 91:15 94:14 100:1,9 113:16 148:17

154:18 162:6 169:10 185:23 192:11 195:3 205:9 206:8,15 207:4

**statements** 50:18

**stationed** 87:20

**status** 129:19,23 130:21, 22 197:3 198:17,20 199:7

**stayed** 138:14

**stenographer's** 169:19

**stenographic** 170:1

**stenography** 169:20

**step** 14:6 175:15 190:2

**Stephen** 24:6

**steps** 48:4 49:15 198:2

**Sternenberg** 21:17 23:7 24:14,21 25:5,23 26:12 27:19 32:7 41:20 42:5,15 43:1,6,11 44:2,8,11,17 47:22 48:12 49:5 52:2,18 53:7,14 55:8,14,21 56:7, 22 57:23 61:19 62:4,6 64:4 65:2,22 70:2,10 71:9,23 74:2 76:8 77:22 78:4 95:2 108:14 129:2 154:12 156:4,22 158:13, 21 159:11,20 161:2 163:13,20 165:1 167:2,9, 17 187:15

**Sternenberg's** 64:5 108:21

**sticker** 113:2

**stickies** 194:19

**stood** 207:20

**stop** 146:22 148:7,9 149:14 195:9 208:9

**stopped** 196:6

**stored** 175:1,4

**straightened** 126:18

**Street** 13:9

**stretch** 186:14,18

**stricken** 96:1 109:14 167:1,8

**strike** 114:3 139:1 164:3, 8 169:23 193:22

**striking** 95:16

**strong** 68:11

**strongly** 129:17

**struck** 44:20 45:15 184:3 190:11

**structuring** 60:10 162:8, 20

**struggling** 131:9

**stuck** 194:15

**stuff** 13:13 16:12 101:12 107:3 115:19 148:3 161:19 204:22

**stuffing** 30:9

**Sua** 81:18 128:8,11 129:3 130:11 188:16 202:5

**subject** 50:3 149:11

**submit** 60:8

**submitted** 79:17 155:2,8

**subsequent** 52:13 54:15

**subsequently** 52:12 79:9

**substance** 105:6 123:22 199:1 202:16

**substantive** 69:13,19,20, 22 198:7

**substitution** 120:15

**suffering** 101:21

**sufficient** 42:17

**suggest** 55:18 60:15 119:17 167:17

**suggested** 67:20 87:1 187:20

**suggesting** 100:3 119:15 132:14

**sum** 123:22 199:1

**summarize** 11:23

**summary** 75:5 135:12,13 138:5,9 190:13,15

**summer** 205:4 208:18 210:17,19,22,23 211:3

**superior** 7:12 9:2,9,12 12:4,8,15 14:21 19:12 20:15 137:6

**supervisor** 141:16

**supervisors** 141:18

**suppose** 64:21

**surprise** 163:18,21

**survey** 20:13,14

**surveyed** 28:3

**surveys** 17:15 18:3,13

**suspect** 23:20 168:6

**sworn** 6:6

**system** 9:9,15,16 34:23 35:11 38:17,19 54:9 86:6,16,20 87:1 213:21

— — —

**T**

**table** 84:1 195:10,12

**tails** 101:15

**takes** 49:20 141:15

**taking** 25:2 76:3 160:13 173:9

**talk** 8:23 53:15 82:1 117:5 119:9 123:4 135:16 147:10,17,19 148:12 149:9 151:11 152:13 180:18 185:15 196:9,10

**talked** 55:21 57:17 58:14 78:16 105:15 106:20 107:10 109:21 136:8 150:18 152:12,15 153:10 172:5,7,10 181:17 185:14 210:19

**talking** 16:15 23:6 30:4 48:15 50:10 53:13 58:21 73:2 81:19 88:11,15 93:9 103:19 108:9 112:23 145:23 148:4 151:3,14 181:11 183:10 185:4,16 189:11 203:18 208:4,22 210:16,21

**talks** 152:5

**tape** 99:14 187:21,22 193:10

**Taylor** 10:8,9

**technically** 60:19

**technologically** 28:9

**technology** 131:9

**telephone** 109:17

**telling** 71:8 98:22 107:17 116:5 124:12 155:5 174:3,5 207:6

**Ten** 152:20

**tender** 195:5

**tenor** 53:20

**tenure** 9:8

**term** 71:3 116:13 208:1

**terms** 15:1 29:18 34:20 37:21 58:18 60:17 76:22 101:4 125:18 147:2

**terribly** 120:14

**Tessier** 11:9 14:11

**testified** 6:8 204:18

**testify** 209:22

**testimony** 47:19,21 59:23 80:11 82:6,12 100:6 105:4 113:6 126:7 127:15 139:5 144:4 191:1

**text** 36:10 107:16

**theories** 116:15

**theory** 125:15

**thicker** 77:2

**thing** 77:2 101:18 116:4, 18 125:10 126:13 152:6, 10 162:5 184:7 190:3,8, 18,19

**things** 11:20 13:19 34:22 44:19 46:6 53:15 65:13 70:21 84:19 103:11 106:14 113:20,21 115:22 125:7 136:22 140:17 152:13,16 160:1 162:13, 14 169:17 185:10 194:7 196:17 201:4 207:12 208:18 209:14,19

**thinking** 126:9 172:14 203:5 204:21 206:21 209:9

**thinks** 77:18 126:4,17

**Thirty** 182:4,5

**Thomas** 156:20

**thought** 22:19 29:16 45:14 46:23 59:11 70:15, 17 77:13 78:7,12 86:11 89:20 98:12 99:2 102:9 103:4 108:4 112:20 117:8 129:22 133:22 183:16 186:12,14 194:20 195:1 201:15 202:9 206:3 208:13

**thoughtful** 70:21

**three-** 13:12 186:2

**three-digit** 38:12 62:22

**three-page** 81:17 128:7 188:16 189:15 190:18 191:2

**three-year** 12:1

**throw** 54:21

**Thursday** 80:12 83:14, 16,17,19 85:4,14,23 87:2 88:10 90:21 106:5 114:18 115:3,11 117:16 142:23 143:4,20 146:17 172:8 173:5 183:9 190:1

**till** 9:7 88:16,17

**time** 7:10,12,13 8:17 9:5, 11,14 10:12 11:3 12:3,7, 12,20 13:16 16:21 19:19 20:6 22:16 25:5 28:14 29:20 30:22 34:17 37:21 50:13 51:9 52:3 53:23 59:7 60:12 62:14 65:12 72:19 76:2,20 78:13 84:12 86:10 88:1,9,14 89:8 94:23 100:19 104:20 114:17 120:12 121:5,13 122:17 123:9, 19 125:13 129:4 135:16 136:7 137:11 138:3 139:8 140:3,8 142:4,15 143:12 145:23 149:15,23 151:3 152:14 153:23 154:22 162:1 169:1 171:14,17 178:5,20 179:18 180:9,12 185:10 190:20 191:5 193:3 194:9 197:8,17,22,23 199:14 203:3,4 206:10 207:18 209:14

**timeline** 15:9 51:4

**timelines** 37:19

**times** 35:20 163:20 164:7

**timing** 149:11

**Timothy** 55:11

**Tina** 82:14 119:11,13 191:19

**to-4:00-o'clock** 197:15

**today** 26:10 38:20 45:2 47:15 49:15 53:14 85:22 154:21 196:5 200:17 212:10

**told** 59:12 60:15 68:9 89:1 105:14 118:3 125:15 133:19 151:12,13 152:6 163:18 168:5 169:12 183:3 189:5,6 196:3 209:19 212:9

**tomorrow's** 57:5

**top** 31:9 32:21 63:5 95:10 109:6 141:21 183:20 195:7,21

**tossed** 167:19

**totally** 93:16 98:2

**touch** 13:23 59:9 137:18 203:9

**touched** 213:21,22

**touching** 84:13 118:8

**traditional** 175:14

**trail** 42:14

**trained** 117:9 118:16 119:16

**training** 118:20 120:17

**transactional** 12:18

**transcripts** 177:23

**transition** 14:6

**transitioning** 62:11 94:13

**transparent** 108:10

**tremendous** 147:13

**trial** 11:18 12:11,14 19:10 129:12 137:3,4

**trouble** 102:7

**true** 36:20 103:19 132:8

**trust** 68:23 69:1

**truth** 215:2

**Tuesday** 146:19 180:4,5 187:3

**turn** 15:13 16:5 30:15 39:1,13 43:14 45:7 46:14 48:18 61:8 62:10 64:23 71:12 72:16,17 73:9 75:9 90:14 92:12 94:11 97:16, 20 108:12 111:6 121:22 127:21 130:5 133:9 154:8 155:14 157:2,6 160:5,10 163:5 169:14

**turned** 82:16 99:3 190:11

**turning** 92:11

**turnover** 117:7

**two-page** 39:3 72:19 89:16 95:1 108:13 133:10

**type** 11:12,20 13:11,13 35:11,20

**typed** 155:7 159:23 170:19 171:6 174:15,16

**typing** 36:7

**U**

**Uh-huh** 166:8

**Ultimately** 170:8

**unbiased** 22:6 23:1,2

**uncertainty** 72:6

**underneath** 31:9 38:11 79:16 95:15,22 96:3 108:3,11

**understand** 6:17 27:11 32:11 34:1 49:6 103:23 106:3 113:1 118:22 127:7 172:7 188:22 189:9 209:2 210:5 212:20

**understanding** 30:10 33:4 39:8 49:1 73:16 102:4 169:7 209:21

**understood** 143:18 172:11,13 216:15

**unfair** 77:23 78:2

**unique** 183:18

**unlike** 37:4

**unordinary** 164:4

**unusual** 48:9 69:7,10 77:5 126:20 160:19 184:16 188:4 209:16

**unusually** 46:12

**upper** 113:23

**Upstairs** 13:8

**user** 38:16,17

**V**

**V-O-R-E** 166:15

**vacate** 131:5 201:1 202:1,8 203:5 213:23

**vacated** 131:2 197:7 202:5,15,22

**vacates** 203:12

**vacating** 133:6

**vacation** 143:11,13,15 146:14,16,23 172:15,18 173:8,9 181:12

**version** 116:6

**view** 50:17 127:8

**vis-a-vis** 29:14 67:16

**visit** 65:7 66:4 70:5

**visited** 178:21

**visiting** 87:16

**vocally** 85:11

**Volume** 79:7 82:17 83:9 177:13 181:20

**Vore** 166:15,16,17,20 167:8 168:2

**vote** 49:20

**W**

**W-E-I-N-T-R-A-U-B** 24:2

**W-E-I-N-T-R-O-P** 24:1

**wait** 62:12,13 118:19 184:6 216:8

**waiting** 180:18 181:1 201:3

**waive** 176:9 198:4 200:21

**waived** 132:1

**waiver** 176:7 201:1

**walked** 121:17 147:20 199:16 212:8

**wall** 211:20

**wanted** 29:14 52:17 53:6 59:13 89:10 112:9 117:5 162:23 166:20 168:3 180:15 187:20 196:5,15 197:5,6 203:3 216:7

**Ware** 166:13

**warning** 69:11

**waste** 54:21 65:12 104:20 140:2

**ways** 107:12

**Waystack** 6:3,10,13 15:14,18,20 16:3,5 20:3 25:4 30:8 34:6 40:6,9,11 46:1 48:20 49:1 50:8,20 53:2,4 54:18,22 55:1 68:7,16 72:13,16 74:13, 16,19 76:13 78:14 79:3, 11 82:14,15 88:8 91:22 92:6,10,16,19 94:11,21, 22 103:2 105:22 106:3,4 113:9 121:1,3 127:18 134:22 139:14 143:14 144:22 145:1,3,7,10 149:19 150:1,8 151:10

152:18,21 153:7,10,14, 16 161:17 162:1 163:3 164:13 168:20 169:2,4 172:1,3 177:2,4,20 178:16 179:7,9 191:11, 14,19 192:3 193:8 198:22 199:3 201:9 202:4 204:19 210:1,4 213:5 214:7,12 215:18, 22 216:8,14,16,21

**Wednesday** 146:13,18, 20

**week** 86:4 139:18 145:23 146:4,5,7,17 151:4 171:15 172:4,10 173:12 178:12 179:18 187:1 189:13

**weekend** 104:6

**weeks** 104:16,21 120:12 140:4,6 193:7

**weight** 103:10

**Weintraub** 23:22,23 24:3, 4 25:10,21 48:12

**Welts** 166:21

**whatnot** 30:9 99:18

**whatsoever** 203:22

**whenabouts** 6:20

**Wherefore** 65:3

**white** 99:12 119:16 147:9,22 148:18 151:11 166:21

**whited** 90:22 91:1 99:19 102:6 111:21 116:8 117:11 126:6 132:4,6,19 148:3 210:6,11 211:4 214:14,23 215:8

**whited-out** 106:7

**whiteouts** 204:2

**whiting** 102:5 117:1 127:11 148:6,16 206:11 211:13,17 213:16

**whomever** 48:6

**Whoops** 153:21

**wide** 37:13

**wise** 129:7

**Wite-out** 81:11 89:22 90:3 98:7 99:14 105:17 107:7,15,21 118:10,18, 20 119:16 125:1 132:9, 11,16 134:15,23 135:7 145:14 190:20 193:9,10, 18 200:18 201:4,7 207:19 208:5 210:8,13 213:19 214:19 215:11,13

**withdraw** 53:2,3 82:10 105:22

**withdrawing** 92:14

**withdrawn** 105:12

**witnessed** 211:16

**woman** 187:14

**wondering** 129:5

**word** 40:4 41:12 47:20 77:16 96:1 109:14 110:6, 15,20 113:2 132:4 133:1 193:14

**word-processed** 40:17

**words** 31:10,14 32:14,20 33:7 56:21 65:3 103:10 108:4 114:11 117:10 126:2 127:10

**work** 11:12,13,14,15 12:18 13:11 14:22 17:14, 18 19:12 28:17 45:14 87:10 102:23 104:7 105:2 130:16 147:1 153:6 160:17 173:16 174:13 180:13 182:1 185:11

**worked** 10:22 13:8 19:2,5 56:10 84:9 85:21 86:21 125:16 126:16 197:8

**working** 7:9 10:3 11:22 56:11 85:8 148:4 193:1 197:1 210:22

**works** 184:14 206:3 209:2

**workstation** 87:13

**Workstations** 207:23

**world** 206:23

**world's** 139:17

**worth** 169:12

**worthwhile** 96:13

**wrap** 88:17 153:4

**write** 75:13 89:17 112:2 143:1 202:1 214:3

**writing** 35:19 36:6 89:3 98:22 133:20 142:4,15 143:7,21,23 159:1 162:14 165:4 172:12 181:7,8 189:7 197:19 202:2

**written** 34:20 35:18 58:6 93:6 98:7 119:20 132:7 162:13 183:4,15 186:21 189:1 190:4 191:6 210:9

**wrong** 74:15 91:6 132:14 173:5 188:23

**wrongly** 46:23

**wrote** 22:10,14 23:16 98:21 109:14 124:22 133:3 190:5 198:12 201:23 202:16

**Y**

**year** 6:18 8:9 22:8 101:15 119:19 136:9 208:13 210:17,21

**Year's** 104:16

**years** 10:17,22 11:5,11 13:1 17:6 19:10 20:4 25:19 44:18 45:13 61:21 147:15 209:17

**yesterday** 181:10

**Yiatras** 166:6 167:18

EXHIBIT    1
Judge I.
2/8/2021

**From:**        Hon. David D. King
**Sent:**        Friday, April 27, 2018 12:47 PM
**To:**          Hon. Julie Introcaso
**Subject:**     RE: 2018 Evaluation

Hi Julie: I apologize for somehow missing this the first time around. Yes, we are all a little sensitive about judicial evaluations these days.   The names that were sent to you by Kathy Yee are all pulled randomly from parties/counsel who have actually appeared in front of you at least twice in the last two years.   That must mean, for example, that Attorney Sternenberg had an  appearance in at least 2 of your cases to make the list.   We also send the letter to the prosecutors and public defender offices, DCYF local offices, probation etc. for every court. I assume you also understand that anyone can go online and complete a survey, whether they receive a letter from us or not—put another way, even if we were to not send the evaluation letter to someone you have concerns about, they may well complete an evaluation anyway.  For reasons that have recently come to light, we are looking closely at our procedures and will likely not allow/request judges to suggest additions/deletions from the list.  As you know, one of the things that Paul Moore attempted to do was "stuff the ballot box" with people he knew would submit favorable responses.  We have been criticized for even offering that opportunity.

Every judge, probably more in the family division, is apt to have one or more persons who will try and railroad the judge through the evaluation process. We can generally spot those evaluations easily through the comments and discount those responses.   While I appreciate you raising these issues, I don't see anything out of the ordinary.   Finally, I will say what I have said publically a few times lately,  that NH is a very small state, Ed and I are pretty visible and accessible, and it is rare that we are surprised when we see the results of a judges' evaluation. If there is a problem with a judge, we generally don't have to wait the 3 years to read about it. We have not had negative feedback about you and don't have a concern that you will have an unfavorable evaluation.

Call me if you have further questions or issues.  Have a great weekend.

David

**From:** Hon. Julie Introcaso
**Sent:** Friday, April 27, 2018 11:52 AM
**To:** Hon. David D. King
**Subject:** FW: 2018 Evaluation

Good Morning Judge King,

        I apologize for taking your time up over this matter, but I hope you can understand my sensitivity around this topic given recent events and announcements regarding the evaluation process. The first time through, I didn't say or do much, but I suppose it was something of a mystery at the time.
        As you can see in my earlier email below, I felt compelled to tell you that "a friend" of mine appear on the list of attorneys. A friend  who, I have no doubt, would be honest in her evaluation - - nonetheless, I did what I believed I should and pointed that fact out.

        Assuming an illegitimate evaluation, either positive or negative, would likely be minimized in the process of averaging, I recognized I was being unfair to myself for only reporting those names who I had reason to believe

1

might be seen as unfairly skewing their opinion on the positive side. I also think I should note the three names who appear on the list who may well pose a problem on the negative side, due to a current conflict of interest. I know you will do whatever, if anything, is necessary or appropriate.

Kalie Lydon, Esq. and Ed Richards, Esq. — law partners in Nashua who currently have filed a Judicial Conduct Complaint against me (on behalf of a client they represented in the underlying litigation) as well as a Supreme Court appeal based on my "unfair and biased treatment" of their client. I understand that a judge's ethical issues is a most valuable subject for review, but at this time they appear to have a vested interest in promoting a narrative that suggests I'm unethical and unfair in a case that remains pending.

Attorney Meredith Gregory-Gallant — I recently referred a case involving Attorney Gallant to the Hillsborough County attorney's office as I believe she may have knowingly committed or allowed her staff member to commit a crime on her behalf. Needless to say, I suggest she may not be capable of assessing my actions fairly under her current circumstances.


Again, I appreciate your time, particularly allowing me the opportunity to be heard on this issue. I truly value this process, and hope I'm not making it more difficult than it need be.

All the best,
Julie Introcaso


---

**From:** Hon. Julie Introcaso
**Sent:** Friday, March 30, 2018 1:55 PM
**To:** Hon. David D. King
**Cc:** LCammett@courts.state.nh.us
**Subject:** 2018 Evaluation

Good afternoon,

Thanks for sending along the materials related to my judicial review. I did look at the sample survey last evening. I will complete the self-evaluation as quickly as possible; I'm in a more severe time crunch than usual right now. However, so as not to hold up your end of this effort, I want to make two comments:

1. I would appreciate feedback from Interpreters, Court Security Officers, Victim Advocates and the local prosecutors. Recently, I have been doing some limited work in the District Division (with the kind support of my colleagues who have allowed me to branch out beyond the marital docket at times). I'm reluctant to suggest names, you could always as a clerk; but Alexandra Baer is our lead interpreter from the Language Bank. John Dube, is our OIC for the CSOs, and he could surely tell you who might be able to give you the most meaningful review of my work from the CSO perspective, and our local DV advocates are at Bridges, 33 E. Pearl Street, Nashua. (I don't know their names and it's my policy to simply acknowledge them as "an advocate".) The Nashua prosecutor is Attorney Don Topham, for Hudson it would be Attorney Tessier, both of whom should be in our system or in the Bar Directory.

   I understand "Court Staff" is a category listed on the survey, but most of these folks don't easily fit into those areas, but they are really critical to how smoothly this rather busy operation runs.

2. I need to mention that one of the lawyers on the list you prepared, Kathleen Sternenberg, is one of four people on my "conflicts" list. That is, we have been friends and colleagues for many years. I have not heard any cases where she is counsel for a litigant. I have, however, after disclosures, appointed her as a GAL, only when the parties have specifically requested her services. On one occasion, I believe, I suggested her as a

2

possible GAL to counsel, recognizing her particular strengths and experience in dealing with children with disabilities - again with appropriate disclosures. I do not appoint her otherwise because of the financial complications. I suspect she is on your list because she has handled a number of cases before me as GAL only.

Obviously, I don't know if she will choose to fill out a survey or not. (Honestly, Kay is the epitome of the old adage "Sometimes our closest friends can be our harshest critics" – God bless, her. She's a tough nut.) I just thought I should give you my input on that point and inform you of the limited nature in which she appears in my cases. Do with it what you will.

I hope this email addresses your correspondence. Should you require a more formal response, just let me know.

Have a lovely Easter weekend.

JI

3

EXHIBIT 2

Judge I.
2/8/2021

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### NH CIRCUIT COURT

9th Circuit - Family Division - Nashua
30 Spring Street, Suite 102
Nashua NH  03060

Telephone: 1-855-212-1234
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

## NOTICE OF DECISION

**FILE COPY**

Case Name:    **In the Matter of David Campbell and Robin Partello**
Case Number:    **659-2018-DM-00702**

Enclosed please find a copy of the Court's Order dated October 24, 2018 relative to:

**Interim Order**
**Order on Appointment of Guardian ad litem**

**DalPra, MM / Introcaso, J.**

October 25, 2018

Sherry L. Bisson
Clerk of Court

(579)

C:  Jeffrey Leo Manganaro, ESQ; Robin Partello; Kathleen A. Sternenberg

JAI000296

NH IR 2207 DE (07/01/2011)

# THE STATE OF NEW HAMPSHIRE

## JUDICIAL BRANCH

Ninth Circuit-Family Division-Nashua

Docket No. 659-2018-DM-00702

In the Matter of: David Campbell and Robin Partello

### INTERIM ORDER

This matter came before the court with regard to Petitioner's motion for ex parte orders. He had counsel. Respondent was self-represented. The parties are parents of a four year old son. The evidence disclosed that the child apparently told a paternal aunt that his rectum hurt. Upon examination, the aunt began to interrogate the child. The child made some disclosures that someone had inserted a pen in his butt. The aunt informed Petitioner, who was away for the weekend, when he returned home. He also began questioning the child, naming names for the child to consider. Petitioner informed Respondent who took the child for a medical examination. The child was referred for further examination. The child made a similar disclosure, naming Petitioner as the alleged perpetrator. He then almost immediately recanted; shortly after, he named his father again. The physical examination did not reveal any evidence of abuse.

The medical provider reported the disclosure to DCYF. Derry police also became involved. The child submitted to a CAC interview and made no disclosures. Throughout all the interviews the child was subjected to (aunt; father; medical personnel; and the CAC interview) the child made references to a swamp creature; am friend and his father who may have allegedly inserted an object "in his butt".

The court finds no credible evidence at this time that anyone has abused the child. The court finds that Petitioner's sister and Petitioner's interrogation of the child was certainly not in the child's best interests. Respondent has not allowed any contact between the Petitioner and child for a few weeks. The Petitioner also has not seen the child for nearly a month. The evidence does not support continued non-contact. The evidence does suggest that the child should participate in counseling. The court shall also require the assistance of a guardian ad litem to represent the child's interests.

RECOMMENDED:

1. The parties are awarded joint decision-making responsibility for the minor child.

2. Petitioner shall have parenting time each Wednesday from 4:00 pm to 7:30 pm; alternate weekends from Friday at 4:00 pm to Sunday at 7:00 pm. Petitioner shall provide all transportation. Respondent shall have parenting time at all other times not otherwise reserved for the Petitioner.

3. The parties shall agree upon an equitable holiday parenting schedule.

4. Kathleen Sternenberg is appointed Guardian ad Litem to represent the interests of the minor child. See accompanying GAL Order.

JAI000297

5. The child shall immediately be enrolled in counseling with James Foster, unless the parties agree upon another counselor.

6. Neither Petitioner, Respondent or any other family member or friend shall question the child with regard to the incidents described in the Petitioner's motion. That is the area for the counselor and GAL to explore-if deemed in the child's best interests.

7. The Clerk shall schedule a further temporary hearing and scheduling conference in 60 days as the docket permits.



Date     10/24/18

Bruce F. DalPra, Master

I hereby certify that I have read the recommendation and agree that, to the extent that the marital master has made factual findings, he has applied the correct legal standard to the facts determined by the marital master.

**So ordered:**

Date     10/24/18

Judge

JAI000298

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
http://www.courts.state.nh.us

Court Name: __Ninth Circuit-Nashua__

Case Name: __David Campbell and Robin Partello__

Case Number: __659-2018-DM-00702__
(If known)

## ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM*
### (Divorce/Parenting)

__David Campbell__
Petitioner's Name                    D.O.B.

__Robin Partello__
Respondent's Name                    D.O.B.

__10 East Dunstable Road__
Street Address

__97 East Broadway Apt. 7__
Street Address

__Nashua, NH 03060__
City, State, Zip

__Derry, NH__
City, State, Zip

Telephone                    E-Mail Address

Telephone                    E-Mail Address

The following order shall be entered:

1. The attached Standing Order Relative to Guardian *ad Litem* Appointment (hereinafter referred to as the "Standing Order") is made a part of this order.

2. Name: __Kathleen Sternenberg__ _____ Telephone: __601-1048__

   Address: __PO Box 2288  Concord, NH 03302__

   is appointed Guardian *ad Litem* of the child(ren):

   B███ C███ _____ D.O.B. ███/2014

   _____ D.O.B. _____

   _____ D.O.B. _____

   **\* If you are not currently a board certified GAL you must notify the Court immediately and this order will be vacated. If at any time during appointment your certification lapses, you must notify the Court immediately and file a motion to withdraw.**

3. The Guardian *ad Litem* shall investigate the following issues and make recommendations to the court thereon:

   ☐ Decision-making responsibilities

   X Residential responsibilities

   X Parenting time

   Special needs of the child(ren) (specify):
   X Counseling for family/individual counseling for ☐ Petitioner ☐ Respondent ☐ child(ren)
   ☐ Psychological evaluations of ☐ Petitioner ☐ Respondent ☐ child(ren)

   X Parenting skills of ☐ Petitioner ☐ Respondent ☐ both parties

   ☐ Appropriateness of the home environment of ☐ Petitioner ☐ Respondent ☐ both parties

Case Name: Error! Reference source not found.
Case Number: Error! Reference source not found.
**ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM* (Divorce/Parenting)**

- ☐ Substance abuse: ☐ alcohol ☐ drugs ☐ both ☐ other _____
- ☐ Violence, physical abuse, emotional abuse
- ☐ Sexual abuse of
- ☐ Supervision of parenting time
- ☐ Rights of grandparents to visit
- ☐ Influence of companions of either party on child(ren)
- ☐ Maturity of child(ren) stating a preference
- ☐ Travel arrangements
- ☐ Time, place and manner of exchange for parenting time
- **X** Assessment of bond between child and each parent and/or between siblings
- **X** Other issues which the GAL deems relevant based upon the investigation
- **X** Other (specify):
  What is the basis for the child's disclosures; monitor the child's progress in counseling.

4. The Court sets the maximum fee in this case at $ $3,500.00. The fee may only be exceeded with prior approval of the Court and notice to all parties. Payment of the costs and fees of the Guardian *ad Litem* shall be made as follows:
   A. **Percentage of payment:**
      X      The Petitioner shall pay 65% of the Guardian *ad Litem* fees.

      X      The Respondent shall pay 35% of the Guardian *ad Litem* fees.

   B. **Payment Orders:**
      ☐      Unless otherwise agreed with the Guardian *ad Litem*, the Guardian *ad Litem's* hourly rate shall be no more than $ _____. All parties must cooperate with the Guardian *ad Litem's* reasonable requests for payment.

      X      Unless otherwise agreed with the Guardian *ad Litem*, a retainer of $2,500.00 shall be paid to the Guardian *ad Litem* by no later than 11/29/2018 in the proportion set forth in the paragraph above. In the event any party's payment is not made in accordance with this Order, the other party or the GAL may request a hearing. The party not in compliance with this Order may be required to appear at the hearing, prepared to show cause why s/he should not be held in contempt of court. Unless otherwise ordered, the Guardian *ad Litem* is not required to commence an investigation until the retainer is paid in full.

      ☐      Other Payment Orders:
      _____
      _____

5. Other provisions:
   Clerk shall be scheduling a further temporary hearing.
   _____

6. Guardian *ad Litem* Stipulations to be filed by: 12/19/2018

7. Preliminary Report to be filed by: 02/28/2019

JAI000300

Case Name: Error! Reference source not found.
Case Number: Error! Reference source not found.
**ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM* (Divorce/Parenting)**

8.    Final Report to be filed by: TBD

**Recommended:**

10/24/2018
Date

*Bruce F. DalPra*
Signature of Marital Master

Bruce F. DalPra
Printed Name of Marital Master

**So Ordered:**
I hereby certify that I have read the recommendation(s) and agree that, to the extent the marital master/judicial referee/hearing officer has made factual findings, she/he has applied the correct legal standard to the facts determined by the marital master/judicial referee/hearing officer.

10/24/18
Date

Signature of Judge

INTROCASO
Printed Name of Judge

| **STANDING ORDER RELATIVE TO GUARDIAN *AD LITEM* APPOINTMENT** |
|---|

This order applies to all Guardian *ad Litem* appointments unless its terms are altered by an order entered in a specific case. Any changes in the order or the stipulations must be in writing and filed with the court.

1.    GUARDIAN *AD LITEM* STIPULATION:

In every case in which a Guardian *ad Litem* is appointed, the parties and the Guardian shall file a stipulation as to the following issues:

a. Expenses for which the Guardian *ad Litem* will be reimbursed;

b. Guardian *ad Litem* hourly billing rate and the maximum fee established by the court in this case;

c. Frequency of billing, terms of payment, and payment of retainer;

d. The names of the individuals requested to be interviewed by the Guardian *ad Litem*, including names, addresses, telephone numbers and relationship to party or child, listed in order of importance. The Guardian *ad Litem* shall have the discretion to decide which individuals to interview;

e. Manner in which the Guardian *ad Litem* will communicate with each party's references (e.g., office conference, telephone call, letter);

f. Action(s) the Guardian *ad Litem* will take if unable to contact a reference;

g. Whether the Guardian *ad Litem* will visit each party's home;

h. Whether conversations between the Guardian *ad Litem* and the children will be confidential;

i. Other orders necessary to protect confidentiality; and

j. Dates by which parties will execute authorizations for reports. Specify records to be requested.

If this stipulation is not filed by the date set forth in the Order on Appointment of Guardian *ad Litem*, the court shall schedule an immediate enforcement hearing at the request of the Guardian *ad Litem* or either party.

2.    GUARDIAN *AD LITEM* FEES:

NHJB-2070-F (09/30/2014)                    Page 3 of 4                    JAI000301

Case Name: Error! Reference source not found.
Case Number: Error! Reference source not found.

ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM* (Divorce/Parenting)

a. The Guardian ad Litem shall be compensated at the rate of $_____ per hour. The maximum fee set by the court (including costs) shall not exceed $_____ for this case, and shall include attendance at hearings.

b. Parties, counsel and the GAL shall be aware of the GAL fees and costs and shall take reasonable action to contain those fees and costs. Maximum limits will be strictly enforced.

c. The maximum fee shall not be exceeded without prior approval of the court after hearing with the parties and the Guardian *ad Litem* present. Any request to exceed the maximum shall be filed with the court in writing and shall set forth in detail the reasons for the request and the amount by which the maximum is to be exceeded.

d. When the parties are paying the cost of the GAL, the $_____ per hour rate and the maximum fee set by the court may be waived upon written agreement of the parties and counsel which shall be filed with the court and subject to court approval. The agreement shall set forth the hourly rate and the maximum fee agreed to by the parties.

e. If counseling, therapy or evaluations are recommended by the GAL, no expenses for those may be incurred without the prior approval of the court after hearing. Notwithstanding the above, the court may enter orders upon motion of either party, or *sua sponte*, to authorize specific additional services with appropriate limits on payment.

3. COMMENCEMENT, SUSPENSION AND RESUMPTION OF WORK:

The Guardian *ad Litem* shall commence an investigation on receipt of the Order of Appointment and, unless otherwise ordered, on receipt of payment of the retainer in full, and shall diligently investigate the case, and prepare a report. If the parties agree to suspend the investigation and preparation of a report for any reason, they shall immediately seek the assent of the Guardian *ad Litem* to such suspension and file with the Court a written agreement to suspend the Guardian *ad Litem*'s work. This agreement shall be signed by all parties, including the Guardian *ad Litem* who shall suspend work on the case on receipt of notice that the Court has approved the agreement.

A party desiring that the Guardian *ad Litem* resume work on the case shall immediately file an appropriate motion and shall send a copy of the motion to the Guardian *ad Litem* who shall resume work in that case only on receipt of the court's notice that the motion has been granted.

4. PLEADINGS AND STIPULATIONS:

Each party shall certify on every pleading that s/he has mailed or delivered a copy of the pleading to the Guardian *ad Litem*.

The parties may agree on any issue concerning the child(ren) or incapacitated adult, and shall certify that s/he has mailed or delivered a copy of the written agreement to the Guardian *ad Litem*. The Guardian *ad Litem* may sign the agreement or file an objection, if appropriate, within ten days from the date of mailing or delivery.

JAI000302

EXHIBIT 3

Judge I.
2/8/2021

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
http://www.courts.state.nh.us

Court Name:     9th Circuit - Family Division - Nashua

Case Name:     In the Matter of Stephen Loudermilk and Laura Montgomery

Case Number:     659-2015-DM-00185
(if known)

## ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM*
### (Divorce/Parenting)

Petitioner name: Stephen Loudermilk                    D.O.B. ███/1975

Address: 82 Martin Stream Rd  Fairfield, ME  04937

Telephone: _____    E-Mail Address: _____

Respondent name: Laura A Montgomery                    D.O.B. ███/1979

Address: 6 Lockness Dr  Nashua, NH  03062

Telephone: _____    E-Mail Address: _____

The following order shall be entered:

1.  The attached Standing Order Relative to Guardian *ad Litem* Appointment (hereinafter referred to as the "Standing Order") is made a part of this order.

2.  Name: Kathleen A. Sternenberg, Esq.                    Telephone: 603-641-1048

    Address: P.O. Box 2288, Concord, NH 03302

    is appointed Guardian *ad Litem* of the child(ren):

    Name:                                        Date of Birth:

    E███ R██ L████████                                ██/2005

**\* If you are not currently a board certified GAL you must notify the Court immediately and this order will be vacated. If at any time during appointment your certification lapses, you must notify the Court immediately and file a motion to withdraw.**

3.  The Guardian *ad Litem* shall investigate the following issues and make recommendations to the court thereon:

    ☐   Decision-making responsibilities

    ☒   Residential responsibilities

    ☒   Parenting time

    ☐   Special needs of the child(ren) (specify):

    _____

    _____

    ☐   Counseling for family/individual counseling for ☐ Petitioner ☐ Respondent ☐ child(ren)

    ☐   Psychological evaluations of ☐ Petitioner ☐ Respondent ☐ child(ren)

NHJB-2070-F (05/31/2018)

Case Name: In the Matter of Stephen Loudermilk and Laura Montgomery

Case Number: 659-2015-DM-00185

ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM* (Divorce/Parenting)

☐ Parenting skills of ☐ Petitioner ☐ Respondent ☐ both parties

☐ Appropriateness of the home environment of ☐ Petitioner ☐ Respondent ☐ both parties

☐ Substance abuse: ☐ alcohol ☐ drugs ☐ both ☐ other _____

☐ Violence, physical abuse, emotional abuse

☐ Sexual abuse of _____

☐ Supervision of parenting time

☐ Rights of grandparents to visit

☐ Influence of companions of either party on child(ren)

☐ Maturity of child(ren) stating a preference

☐ Travel arrangements

☐ Time, place and manner of exchange for parenting time

☐ Assessment of bond between child and each parent and/or between siblings

☐ Other issues which the GAL deems relevant based upon the investigation

☒ Other (specify):
Any other issues agreed to by the parties _____

4. The Court sets the maximum fee in this case at $3,000. The fee may only be exceeded with prior approval of the Court and notice to all parties. Payment of the costs and fees of the Guardian *ad Litem* shall be made as follows:

   A. **Percentage of payment:**

      ☒ The Petitioner shall pay 100 % of the Guardian *ad Litem* fees.

      ☐ The Respondent shall pay _____ % of the Guardian *ad Litem* fees.

   B. **Payment Orders:**

      ☒ Unless otherwise agreed with the Guardian *ad Litem*, the Guardian *ad Litem's* hourly rate shall be no more than $ 125.00 . All parties must cooperate with the Guardian *ad Litem's* reasonable requests for payment.

      ☐ Unless otherwise agreed with the Guardian *ad Litem*, a retainer of $ TBD shall be paid to the Guardian *ad Litem* by no later than 12/15/18 in the proportion set forth in the paragraph above. In the event any party's payment is not made in accordance with this Order, the other party or the GAL may request a hearing. The party not in compliance with this Order may be required to appear at the hearing, prepared to show cause why s/he should not be held in contempt of court. Unless otherwise ordered, the Guardian *ad Litem* is not required to commence an investigation until the retainer is paid in full.

      ☒ Other Payment Orders:
      The Responsible party and the GAL shall communicate to resolve payment issues if they arise. _____

NHJB-2070-F (05/31/2018)

Case Name: In the Matter of Stephen Loudermilk and Laura Montgomery

Case Number: 659-2015-DM-00185

ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM* (Divorce/Parenting)

5.   Other provisions:

**The parties are scheduled to attend NCE on February 6, 2019, and the input of the GAL is essential to the parties preparation in advance of NCE.  This matter should be handled promptly by the GAL, and the parties should make the requests of the Guardian with respect to completing questionnaires, meetings, interviews, etc. a priority.**

6.   Guardian *ad Litem* Stipulations to be filed by: December 31, 2018

7.   Preliminary Report to be filed by: February 1, 2019

8.   Final Report, if necessary, to be filed by: February 20, 2019

**So Ordered.**

November 29, 2018

Date

Judge Julie A. Introcaso

---

## STANDING ORDER RELATIVE TO GUARDIAN *AD LITEM* APPOINTMENT

This order applies to all Guardian *ad Litem* appointments unless its terms are altered by an order entered in a specific case.  Any changes in the order or the stipulations must be in writing and filed with the court.

1.   GUARDIAN *AD LITEM* STIPULATION:

In every case in which a Guardian *ad Litem* is appointed, the parties and the Guardian shall file a stipulation as to the following issues:

a.   Expenses for which the Guardian *ad Litem* will be reimbursed;

b.   Guardian *ad Litem* hourly billing rate and the maximum fee established by the court in this case;

c.   Frequency of billing, terms of payment, and payment of retainer;

d.   The names of the individuals requested to be interviewed by the Guardian *ad Litem*, including names, addresses, telephone numbers and relationship to party or child, listed in order of importance.  The Guardian *ad Litem* shall have the discretion to decide which individuals to interview;

e.   Manner in which the Guardian *ad Litem* will communicate with each party's references (e.g., office conference, telephone call, letter);

f.   Action(s) the Guardian *ad Litem* will take if unable to contact a reference;

g.   Whether the Guardian *ad Litem* will visit each party's home;

NHJB-2070-F (05/31/2018)

Case Name: **In the Matter of Stephen Loudermilk and Laura Montgomery**

Case Number: **659-2015-DM-00185**

**ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM* (Divorce/Parenting)**

h.  Whether conversations between the Guardian *ad Litem* and the children will be confidential;

i.  Other orders necessary to protect confidentiality; and

j.  Dates by which parties will execute authorizations for reports.  Specify records to be requested.

If this stipulation is not filed by the date set forth in the Order on Appointment of Guardian *ad Litem*, the court shall schedule an immediate enforcement hearing at the request of the Guardian *ad Litem* or either party.

2.  **GUARDIAN *AD LITEM* FEES:**
a.  The Guardian *ad Litem* shall be compensated at the rate of $_____ per hour.  The maximum fee set by the court (including costs) shall not exceed $_____ for this case, and shall include attendance at hearings.

b.  Parties, counsel and the GAL shall be aware of the GAL fees and costs and shall take reasonable action to contain those fees and costs.  Maximum limits will be strictly enforced.

c.  The maximum fee shall not be exceeded without prior approval of the court after hearing with the parties and the Guardian *ad Litem* present.  Any request to exceed the maximum shall be filed with the court in writing and shall set forth in detail the reasons for the request and the amount by which the maximum is to be exceeded.

d.  When the parties are paying the cost of the GAL, the $_____ per hour rate and the maximum fee set by the court may be waived upon written agreement of the parties and counsel which shall be filed with the court and subject to court approval.  The agreement shall set forth the hourly rate and the maximum fee agreed to by the parties.

e.  If counseling, therapy or evaluations are recommended by the GAL, no expenses for those may be incurred without the prior approval of the court after hearing.  Notwithstanding the above, the court may enter orders upon motion of either party, or *sua sponte*, to authorize specific additional services with appropriate limits on payment.

3.  **COMMENCEMENT, SUSPENSION AND RESUMPTION OF WORK:**
The Guardian *ad Litem* shall commence an investigation on receipt of the Order of Appointment and, unless otherwise ordered, on receipt of payment of the retainer in full, and shall diligently investigate the case, and prepare a report.  If the parties agree to suspend the investigation and preparation of a report for any reason, they shall immediately seek the assent of the Guardian *ad Litem* to such suspension and file with the Court a written agreement to suspend the Guardian *ad Litem* 's work.  This agreement shall be signed by all parties, including the Guardian *ad Litem* who shall suspend work on the case on receipt of notice that the Court has approved the agreement.

A party desiring that the Guardian *ad Litem* resume work on the case shall immediately file an appropriate motion and shall send a copy of the motion to the Guardian *ad Litem* who shall resume work in that case only on receipt of the court's notice that the motion has been granted.

4.  **PLEADINGS AND STIPULATIONS:**
Each party shall certify on every pleading that s/he has mailed or delivered a copy of the pleading to the Guardian *ad Litem*.

The parties may agree on any issue concerning the child(ren) or incapacitated adult, and shall certify that s/he has mailed or delivered a copy of the written agreement to the Guardian *ad Litem*.  The Guardian *ad Litem* may sign the agreement or file an objection, if appropriate, within ten days from the date of mailing or delivery.



EXHIBIT 4
Judge I.
2/8/2021

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
http://www.courts.state.nh.us

| | |
|---|---|
| Court Name: | 9th Circuit - Family Division - Nashua |
| Case Name: | In the Matter of Kseniya Ausiaikova and Brian Meckel |
| Case Number: | 659-2018-DM-00414 |
| (if known) | |

## ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM*
### (Divorce/Parenting)

| Kseniya Ausiaikova | ▉/1983 | Brian Meckel | ▉/1977 |
|---|---|---|---|
| Petitioner's Name | D.O.B. | Respondent's Name | D.O.B. |
| 5 Hastings Lane | | 12 Lisa Drive | |
| Street Address | | Street Address | |
| Nashua NH 03064 | | Nashua NH 03062 | |
| City, State, Zip | | City, State, Zip | |
| 617-640-4895 | kakova83@gmail.com | 603-966-7784 | brian.meckel@gmail.com |
| Telephone | E-Mail Address | Telephone | E-Mail Address |

The following order shall be entered:

1. The attached Standing Order Relative to Guardian *ad Litem* Appointment (hereinafter referred to as the "Standing Order") is made a part of this order.

2. Name: *Kathleen Sternenberg*    Telephone: *601-1048*
   Address: *PO Box 2288   Concord, NH   03302*

   is appointed Guardian *ad Litem* of the child(ren):

| | D.O.B. | ▉/2014 |
|---|---|---|
| O▉ M▉ | D.O.B. | ▉/2016 |
| W▉ M▉ | D.O.B. | |

**\* If you are not currently a board certified GAL you must notify the Court immediately and this order will be vacated. If at any time during appointment your certification lapses, you must notify the Court immediately and file a motion to withdraw.**

3. The Guardian *ad Litem* shall investigate the following issues and make recommendations to the court thereon:

   ☐ Decision-making responsibilities

   ☒ Residential responsibilities

   ☒ Parenting time

   ☐ Special needs of the child(ren) (specify):

   _____

   _____

   ☒ Counseling for family/individual counseling for ☐ Petitioner ☐ Respondent ☒ child(ren)

   ☐ Psychological evaluations of ☐ Petitioner ☐ Respondent ☐ child(ren)

Case Name: _____ ( le Matter of Kseniya Ausiaikova and ( n Meckel _____

Case Number: _____ 659-2018-DM-00414 _____

**ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM***

☒ Parenting skills of ☐ Petitioner ☐ Respondent ☒ both parties

☒ Appropriateness of the home environment of ☐ Petitioner ☐ Respondent ☒ both parties

☒ Substance abuse: ☒ alcohol ☐ drugs ☐ both ☐ other _____

☐ Violence, physical abuse, emotional abuse

☐ Sexual abuse of

☐ Supervision of parenting time

☐ Rights of grandparents to visit

☐ Influence of companions of either party on child(ren)

☐ Maturity of child(ren) stating a preference

☒ Travel arrangements

☒ Time, place and manner of exchange for parenting time

☒ Assessment of bond between child and each parent and/or between siblings

☒ Other issues which the GAL deems relevant based upon the investigation

☒ Other (specify):

Petitioner's relocation to Massachusetts with the children.

4. Payment of the costs and fees of the Guardian *ad Litem* shall be made as follows, in the first instance:

A. **Percentage of payment:**

☒ The Petitioner shall pay __50__ % of the Guardian *ad Litem* fees.

☒ The Respondent shall pay __50__ % of the Guardian *ad Litem* fees.

B. **Payment Orders:**

☐ Unless otherwise agreed with the Guardian *ad Litem*, the Guardian *ad Litem's* hourly rate shall be no more than $ _____. All parties must cooperate with the Guardian *ad Litem* reasonable requests for payment:

☑ Unless otherwise agreed with the Guardian *ad Litem*, a retainer of $ 1,200 - shall be paid to the Guardian *ad Litem* by no later than 1/6/2019 in the proportion set forth in the paragraph above. In the event any party's payment is not made in accordance with this Order, the other party or the GAL may request a hearing. The party not in compliance with this Order may be required to appear at the hearing, prepared to show cause why s/he should not be held in contempt of court. Unless otherwise ordered, the Guardian *ad Litem* is not required to commence an investigation until the retainer is paid in full.

☑ Other Payment Orders:
Fee shall not exceed $3000 - without prior court approval.

5. Other provisions:
NCE: 3/7/19 8:30AM; PTC 3/29/19 9:00AM

6. Guardian *ad Litem* Stipulations to be filed by: 1/15/19

Case Name: _____ .1e Matter of Kseniya Ausiaikova and ( n Meckel _____

Case Number: _____ 659-2018-DM-00414 _____

**ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM***

7.   Preliminary Report to be filed by: 3/1/19 _____

8.   Final Report to be filed by: *TBD* _____

**Recommended:**

_____12/6/18_____                          _Bruce F. Dalpra_____

Date                                                      Signature of Marital Master

                                                      BRUCE F. DALPRA
                                                      _____
                                                      Printed Name of Marital Master

**So Ordered:**

I hereby certify that I have read the recommendation(s) and agree that, to the extent the marital
master/judicial referee/hearing officer has made factual findings, she/he has applied the correct legal
standard to the facts determined by the marital master/judicial referee/hearing officer.

____12/12/18____                                _____

Date                                                      Signature of Judge

                                                      Julie A. Introcaso
                                                      _____
                                                      Printed Name of Judge

---

| **STANDING ORDER RELATIVE TO GUARDIAN *AD LITEM* APPOINTMENT** |

This order applies to all Guardian *ad Litem* appointments unless its terms are altered by an order entered in
a specific case. Any changes in the order or the stipulations must be in writing and filed with the court.

1.   **GUARDIAN *AD LITEM* STIPULATION:**

In every case in which a Guardian *ad Litem* is appointed, the parties and the Guardian shall file a stipulation
as to the following issues:

a. Expenses for which the Guardian *ad Litem* will be reimbursed;

b. Guardian *ad Litem* hourly billing rate and maximum fee;

c. Frequency of billing, terms of payment, and payment of retainer;

d. The names of the individuals requested to be interviewed by the Guardian *ad Litem*, including names,
   addresses, telephone numbers and relationship to party or child, listed in order of importance. The
   Guardian *ad Litem* shall have the discretion to decide which individuals to interview;

e. Manner in which the Guardian *ad Litem* will communicate with each party's references (e.g., office
   conference, telephone call, letter);

f. Action(s) the Guardian *ad Litem* will take if unable to contact a reference;

g. Whether the Guardian *ad Litem* will visit each party's home;

h. Whether conversations between the Guardian *ad Litem* and the children will be confidential;

i. Other orders necessary to protect confidentiality; and

j. Dates by which parties will execute authorizations for reports. Specify records to be requested.

If this stipulation is not filed by the date set forth in the Order on Appointment of Guardian *ad Litem*, the court
shall schedule an immediate enforcement hearing at the request of the Guardian *ad Litem* or either party.

| Case Name: | ...ne Matter of Kseniya Ausiaikova and ...n Meckel |
|---|---|
| Case Number: | 659-2018-DM-00414 |

**ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM***

2. GUARDIAN *AD LITEM* FEES:

a. The Guardian *ad Litem* shall be compensated at the rate of $60.00 per hour. The maximum fee (including costs) shall not exceed $1,000.00 for any case, and shall include attendance at hearings.

b. Parties, counsel and the GAL shall be aware of the GAL fees and costs and shall take reasonable action to contain those fees and costs. Maximum limits will be strictly enforced.

c. The maximum fee shall not be exceeded without prior approval of the court after hearing with the parties and the Guardian *ad Litem* present. Any request to exceed the maximum shall be filed with the court in writing and shall set forth in detail the reasons for the request and the amount by which the maximum is to be exceeded.

d. When the parties are paying the cost of the GAL, the $60.00 per hour rate and the $1,000.00 maximum fee may be waived upon written agreement of the parties and counsel which shall be filed with the court and subject to court approval. The agreement shall set forth the hourly rate and the maximum fee agreed to by the parties.

e. If counseling, therapy or evaluations are recommended by the GAL, no expenses for those may be incurred without the prior approval of the court after hearing. Notwithstanding the above, the court may enter orders upon motion of either party, or *sua sponte*, to authorize specific additional services with appropriate limits on payment.

3. COMMENCEMENT, SUSPENSION AND RESUMPTION OF WORK:

The Guardian *ad Litem* shall commence an investigation on receipt of the Order of Appointment and shall diligently investigate the case, and prepare a report. If the parties agree to suspend the investigation and preparation of a report for any reason, they shall immediately seek the assent of the Guardian *ad Litem* to such suspension and file with the Court a written agreement to suspend the Guardian *ad Litem*'s work. This agreement shall be signed by all parties, including the Guardian *ad Litem* who shall suspend work on the case on receipt of notice that the Court has approved the agreement.

A party desiring that the Guardian *ad Litem* resume work on the case shall immediately file an appropriate motion and shall send a copy of the motion to the Guardian *ad Litem* who shall resume work in that case only on receipt of the court's notice that the motion has been granted.

4. PLEADINGS AND STIPULATIONS:

Each party shall certify on every pleading that s/he has mailed or delivered a copy of the pleading to the Guardian *ad Litem*.

The parties may agree on any issue concerning the child(ren) or incapacitated adult, and shall certify that s/he has mailed or delivered a copy of the written agreement to the Guardian *ad Litem*. The Guardian *ad Litem* may sign the agreement or file an objection, if appropriate, within ten days from the date of mailing or delivery.



EXHIBIT 5
Judge I.
2/8/2021
tabbies

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### NH CIRCUIT COURT

9th Circuit - Family Division - Nashua
30 Spring Street, Suite 102
Nashua NH  03060

Telephone: 1-855-212-1234
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

## NOTICE OF DECISION

**FILE COPY**

Case Name:    **In the Matter of David Campbell and Robin Partello**
Case Number:  **659-2018-DM-00702**

Please be advised that on February 15, 2019 the Court made the following Order relative to:

> **Motion for Instruction; A and B are granted. Respondent shall
> fully cooperate with the GAL. Failure to do so may result in
> sanctions and may be taken into consideration regarding the
> issuance of a final Parenting Plan.**
>
> **(MM. DalPra/J. Introcaso)**

February 21, 2019

Sherry L. Bisson
Clerk of Court

(948)

C:  Robin Partello; Kathleen A. Sternenberg; Tracey G. Cote, ESQ

JAI000204

NH.IB-2208-DF (07/01/2011)

**THE STATE OF NEW HAMPSHIRE**
**JUDICIAL BRANCH**
**CIRCUIT COURT**

**9ᵗʰ CIRCUIT - FAMILY DIVISION - NASHUA**

**CASE NO: 659-2018-DM-00702**

**IN THE MATTER OF DAVID B. CAMPBELL AND ROBIN A. PARTELLO**

**MOTION FOR INSTRUCTION**

**NOW COMES** Kathleen A. Sternenberg, Guardian ad Litem, in the above-referenced case, and she respectfully requests that this Court instruct her as to how to proceed with her court appointed investigation and in support thereof states as follows:

1. On October 25, 2018, Kathleen A. Sternenberg, was appointed to act as Guardian ad Litem for B████ ("█████") C██████, DOB ██/9/2014.

2. In a temporary hearing order, the Court ordered the GAL to file her report by March 29, 2019. The GAL requires assistance from this Court as she has been unable to continue with her investigation.

3. The Guardian ad Litem has repeatedly tried to arrange for a home visit with Robin Partello and ████. The GAL sent emails on 1/9/2019, 1/18/2019, 1/21/2019, 1/24/2019, 1/25/2019 and 1/27/2019, 1/28/2019 and 1/30/2019. Ms. Partello indicated that she was free the week of January 28, 29, 30, 31. The GAL proposed a visit on Wednesday, January 30, 2019 at 11:30 am, but she did not hear back to confirm this date and time and no visit was made.

4. The Guardian ad Litem also requested that the parties replenish their retainer as the original retainer was expended. David Campbell has provided a second retainer of $650, but Robin Partello has not paid the $350 retainer she owes.

5. The GAL requires Ms. Partello's cooperation in order to complete her investigation.

**WHEREFORE**, the Guardian ad Litem respectfully requests that this Court:

A. Order Robin Partello to cooperate with the GAL to schedule a home visit with ████ and herself at her residence within 7 days of this Court's order; and

B. Order Robin Partello to pay the GAL the second retainer amount of $350 within 7 days of this Court's order; and

C. Grant such other relief as may be fair and just.

-1-

JAI000205

Respectfully submitted,

Dated: February 5, 2019

*Kathleen A. Sternenberg*

Kathleen A. Sternenberg, Esq., NHB#8840
Law Office of Kathleen A. Sternenberg
P.O. Box 2288
Concord, NH 03302-2288
(603)641-1048 phone
(603)215-7570 fax
kas@sternenberglaw.com

<u>Certificate of Service</u>

I, Kathleen A. Sternenberg, hereby certify that I have, this day, mailed a copy of this motion to Jeffrey Manganaro, Esq./Tracey Goyette Cote, Esq., counsel for David B. Campbell and to Robin A. Partello, pro se.

*Kathleen A. Sternenberg*

Kathleen A. Sternenberg

**MASTER RECOMMENDS:**

2/15/19
Date

Bruce F. DalPra, Master

A+B are granted. Respondent shall fully cooperate with the GAL. Failure to do so may result in sanctions and may be taken into consideration regarding the issuance of a final Parenting Plan.

So Ordered:
I hereby certify that I have read the recommendation(s) and agree that to the extent the marital master/judicial referee/hearing officer has made factual findings, she/he has applied the correct legal standard to the facts determined by the marital master/judicial referee/hearing officer.

2/15/18
Date

Signature of Judge

Julie A. Introcaso

-2-

JAI000206



EXHIBIT 6
Judge I.
2/8/2021
tabbies

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### NH CIRCUIT COURT

9th Circuit - Family Division - Nashua
30 Spring Street, Suite 102
Nashua NH 03060

Telephone: 1-855-212-1234
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

## NOTICE OF DECISION

**FILE COPY**

Case Name:   **In the Matter of David Campbell and Robin Partello**
Case Number:   **659-2018-DM-00702**

Enclosed please find a copy of the Court's Order dated March 12, 2019 relative to:

> **Motion to Exceed Fee Cap**
> **"Motion granted over the Respondent's objection at #36".**

> Introcaso, J.

March 12, 2019 ·

Sherry L. Bisson
Clerk of Court

(579)

C:  Robin Partello; Kathleen A. Sternenberg; Tracey G. Cote, ESQ

*1-9-2020*
*originals have been submitted @ JCC*

**COPY**

JDL   JAI000194

THE STATE OF NEW HAMPSHIRE
JUDICIAL BRANCH
CIRCUIT COURT

9th CIRCUIT - FAMILY DIVISION - NASHUA

CASE NO: 659-2018-DM-00702

IN THE MATTER OF DAVID B. CAMPBELL AND ROBIN A. PARTELLO

MOTION TO EXCEED FEE CAP

**NOW COMES** Kathleen A. Sternenberg, Guardian ad Litem, in the above-referenced case, and she respectfully requests that this Court issue allow the Guardian ad Litem to exceed the fee cap by an additional $1,000 and in support thereof states as follows:

1.  On October 25, 2018, Kathleen A. Sternenberg, was appointed to act as Guardian ad Litem for B████ ("████") C████, DOB ██/2014.

2.  This matter has involved allegations of inappropriate contact with the child and a police investigation and DCYF investigation.

3.  The GAL has filed multiple pleadings, prepared for and attended hearings, and has received and replied to ongoing daily email exchanges, phone calls, arranged and attended in person meetings, home visits at both homes, had multiple contacts with the child's school, pediatricians, therapist; and has received police, DCYF and medical records and met with police and had contacts with DCYF.

4.  The GAL has used the initial retainer and supplemental retainer[1] as of her billing this week.

5.  The GAL anticipates that within a month, she will need to write and file a comprehensive report and to testify at the upcoming contested hearing.

6.  The GAL has informed both parties of her intent to file this motion.

7.  David Campbell has assented to this motion.

8.  Robin Partello objects to this motion.

**WHEREFORE,** the Guardian ad Litem respectfully requests that this Court:

A.  Allow the GAL's motion to exceed the fee cap in the amount of $1,000 and order

---

[1]The GAL has not received Robin Partello's portion of the supplemental retainer as of this writing.

-1-

34

JAI000195

the parties to ~~p~~ AL ~~additio~~ percentage of the retainer within fourteen days o~~f th~~ ~~or~~der; and

B.     Grant such other relief as may be fair and just.

Respectfully submitted,

Dated: February 28, 2019

*Kathleen A. Sternenberg*



Kathleen A. Sternenberg, Esq., NHB#8840
Law Office of Kathleen A. Sternenberg
P.O. Box 2288
Concord, NH 03302-2288
(603)641-1048 phone
(603)215-7570 fax
kas@sternenberglaw.com

<u>Certificate of Service</u>

I, Kathleen A. Sternenberg, hereby certify that I have, this day, mailed a copy of this motion to Jeffrey Manganaro, Esq./Tracey Goyette Cote, Esq., counsel for David B. Campbell and to Robin A. Partello, pro se.

*Kathleen A. Sternenberg*

Kathleen A. Sternenberg

Motion                    Granted / ~~Denied~~

3-12-19

Date

Judge Julie A. Introcaso

over the
Respondent's
objection at
# 36

-2-

JAI000196



# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### NH CIRCUIT COURT

STRICKEN

9th Circuit - Family Division - Nashua
30 Spring Street, Suite 102
Nashua NH 03060

Telephone: 1-855-212-1234
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

**NOTICE OF DECISION**

**FILE COPY**

## COPY

EXHIBIT 7
Judge I.
2/8/2021

Case Name:     **In the Matter of David Campbell and Robin Partello**
Case Number:   **659-2018-DM-00702**

Enclosed please find a copy of the Court's Order dated March 12, 2019 relative to:

**Motion to Exceed Fee Cap**
**"Motion granted over the Respondent's objection at #36".**

**Introcaso, J.**

March 12, 2019

Sherry L. Bisson
Clerk of Court

(579)

C:  Robin Partello; Kathleen A. Sternenberg; Tracey G. Cote, ESQ

ORIGINAL

NHJB-2207-DF (07/01/2011)

JAI000188

THE STATE OF NEW HAMPSHIRE
JUDICIAL BRANCH
CIRCUIT COURT

9th CIRCUIT - FAMILY DIVISION - NASHUA

CASE NO: 659-2018-DM-00702

IN THE MATTER OF DAVID B. CAMPBELL AND ROBIN A. PARTELLO

MOTION TO EXCEED FEE CAP

**NOW COMES** Kathleen A. Sternenberg, Guardian ad Litem, in the above-referenced case, and she respectfully requests that this Court issue allow the Guardian ad Litem to exceed the fee cap by an additional $1,000 and in support thereof states as follows:

1.    On October 25, 2018, Kathleen A. Sternenberg, was appointed to act as Guardian ad Litem for B███ ("████") C█████, DOB ███2014.

2.    This matter has involved allegations of inappropriate contact with the child and a police investigation and DCYF investigation.

3.    The GAL has filed multiple pleadings, prepared for and attended hearings, and has received and replied to ongoing daily email exchanges, phone calls, arranged and attended in person meetings, home visits at both homes, had multiple contacts with the child's school, pediatricians, therapist; and has received police, DCYF and medical records and met with police and had contacts with DCYF.

4.    The GAL has used the initial retainer and supplemental retainer[1] as of her billing this week.

5.    The GAL anticipates that within a month, she will need to write and file a comprehensive report and to testify at the upcoming contested hearing.

6.    The GAL has informed both parties of her intent to file this motion.

7.    David Campbell has assented to this motion.

8.    Robin Partello objects to this motion.

**WHEREFORE**, the Guardian ad Litem respectfully requests that this Court:

A.    Allow the GAL's motion to exceed the fee cap in the amount of $1,000 and order

---

[1]The GAL has not received Robin Partello's portion of the supplemental retainer as of this writing.

-1-

ORIGINAL

JAI000189

the parties to pay the GAL the additional percentage of the retainer within fourteen days of this order; and

B.      Grant such other relief as may be fair and just.

Respectfully submitted,

Dated: February 28, 2019

Kathleen A. Sternenberg, Esq., NHB#8840
Law Office of Kathleen A. Sternenberg
P.O. Box 2288
Concord, NH 03302-2288
(603)641-1048 phone
(603)215-7570 fax
kas@sternenberglaw.com

Certificate of Service

I, Kathleen A. Sternenberg, hereby certify that I have, this day, mailed a copy of this motion to Jeffrey Manganaro, Esq./Tracey Goyette Cote, Esq., counsel for David B. Campbell and to Robin A. Partello, pro se.

Kathleen A. Sternenberg



-2-

JAI000190

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### NH CIRCUIT COURT

9th Circuit - Family Division - Nashua
30 Spring Street, Suite 102
Nashua NH 03060

*Telephone: 1-855-212-1234*
*TTY/TDD Relay: (800) 735-2964*
*http://www.courts.state.nh.us*

STRICKEN

1/10/20

## NOTICE OF DECISION

**FILE COPY**

COPY

EXHIBIT 8
Judge I.
2/8/2021

Case Name:    **In the Matter of David Campbell and Robin Partello**
Case Number:  **659-2018-DM-00702**

Enclosed please find a copy of the Court's Order dated March 12, 2019 relative to:

**Further Motion for Instruction Regarding GAL Supplemental
Retainer Payment by Robin Partello
"Legal fees/GAL fees to be paid in Cash, by Money Order or
Bank Check, ONLY".**

**So Ordered**

**Introcaso, J.**

March 12, 2019

Sherry L. Bisson
Clerk of Court

(579)
C:  Robin Partello; Kathleen A. Sternenberg; Tracey G. Cote, ESQ

ORIGINAL

NHJB-2207-DF (07/01/2011)

JAI000181

**THE STATE OF NEW HAMPSHIRE
JUDICIAL BRANCH
CIRCUIT COURT**

**9th CIRCUIT - FAMILY DIVISION - NASHUA**

NH CIRCUIT COURT
9TH CIRCUIT NASHUA

2019 MAR -1  A 11: 12

**CASE NO: 659-2018-DM-00702**

**IN THE MATTER OF DAVID B. CAMPBELL AND ROBIN A. PARTELLO**

**FURTHER MOTION FOR INSTRUCTION REGARDING
GAL SUPPLEMENTAL RETAINER PAYMENT BY ROBIN PARTELLO**

**NOW COMES** Kathleen A. Sternenberg, Guardian ad Litem, in the above-referenced case, and she respectfully requests that this Court issue a further order to instruct Robin Partello to pay the GAL via check, money order or cash payment immediately and in support thereof states as follows:

1.  On October 25, 2018, Kathleen A. Sternenberg, was appointed to act as Guardian ad Litem for B███ ("███") C███, DOB ██/██/2014.

2.  Although this court ordered that Robin Partello pay the Guardian ad Litem within seven days of its recent order, the Guardian ad Litem has not received the $350 second retainer amount in a form acceptable to the GAL.

3.  Robin Partello has apparently sent electronic funds to Apple Pay and insists that the GAL accept these funds.

4.  The GAL does not accept Apple Pay and does not have Apple Pay connected to her client trust account.

5.  The GAL has repeatedly informed Robin Partello that she does not accept electronic payments for retainers.

6.  The GAL has informed Robin Partello that she needs to either send a check or money order or arrange a time to meet the GAL to give her cash.

7.  Robin Partello has refused to do so.

**WHEREFORE,** the Guardian ad Litem respectfully requests that this Court:

A.  Order Robin Partello to pay the GAL retainer in the amount of $350 by cash, by check or by money order and to either mail the check or money order to the GAL's business address or to arrange to meet the GAL at the NH Bar Association offices with a cash payment; and

B.  Grant such other relief as may be fair and just.

-1-



Respectfully submitted,

Dated: February 28, 2019

*Kathleen A. Sternenberg*

Kathleen A. Sternenberg, Esq., NHB#8840
Law Office of Kathleen A. Sternenberg
P.O. Box 2288
Concord, NH 03302-2288
(603)641-1048 phone
(603)215-7570 fax
kas@sternenberglaw.com

## Certificate of Service

I, Kathleen A. Sternenberg, hereby certify that I have, this day, mailed a copy of this motion to Jeffrey Manganaro, Esq./Tracey Goyette Cote, Esq., counsel for David B. Campbell and to Robin A. Partello, pro se.

*Kathleen A. Sternenberg*

Kathleen A. Sternenberg



-2-

JAI000183



# COPY

## THE STATE OF NEW HAMPSHIRE
### JUDICIAL BRANCH
NH CIRCUIT COURT

9th Circuit - Family Division - Nashua
30 Spring Street, Suite 102
Nashua NH 03060

Telephone: 1-855-212-1234
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

## NOTICE OF DECISION

**FILE COPY**



EXHIBIT 9
Judge I.
2/8/2021

Case Name:     **In the Matter of David Campbell and Robin Partello**
Case Number:   **659-2018-DM-00702**

Enclosed please find a copy of the Court's Order dated March 15, 2019 relative to:

**Petitioner's Expedited Motion to Continue March 19, 2019 Status Conference and Motion to Clarify Subject of Hearing - Granted**

**Introcaso, J.**

March 15, 2019

(659304)

Sherry L. Bisson
Clerk of Court

C:  David Campbell; Robin Partello; Kathleen A. Sternenberg; Tracey G. Cote, ESQ

NHJB-2207-DF (07/01/2011)

JAI000157



DAVID CAMPBELL
        AND
ROBIN PARTELLO

                        659-2018-DM-702

On 3-15-19, the Petitioner filed a motion to continue a Status Conf. scheduled by this judge. The motion (#38) is GRANTED.

In filing the motion, the Petitioner inquired as to the purpose of the hearing. The undersigned judge scheduled the hearing to disclose her conflict with the Court-appointed GAL in the case.

Although this judge has made no substantive rulings in this matter, it has approved substantantitative orders issued by the marital master that had previously handled this litigation.

The marital master has been reassigned to another court location, so numerous substantive motions were presented to this judge for review.

In doing so, this judge

JAI000158

pg 2.      has determined that she is unable to address these motions, particularly as some relate directly to the payment and performance of the GAL.

The GAL has been a long-standing friend of this judge; she has vacationed with her, discussed personal matters in depth (including financial issues) and the GAL is the godparent to one of this judge's children.

The Court does not believe this conflict, under the circumstances as stated above, is one which can be waived.

The Court hoped to put this matter on the record and set this matter for trial before another judge; however, even that may be seen as inappropriate given the conflict over the GAL specifically.

The wisest course for this judge, and in an attempt to

JAI000159

pg 3. provide the parties with the most unbiased and fair hearing, is to simply withdraw as the presiding justice in this matter with regret as to the delay this may cause to the parties.

ORDER:

1. Judge Julie Introcaso shall have no further involvement in this matter.

2. The Clerk shall expeditiously work with the parties to reassign this matter, resolve the pending motions, and schedule this matter for any further hearing.

3. No status conference will occur on March 19, 2019.

So Ordered.

3/15/19

Julie A. Introcaso

JAI000160

 

EXHIBIT 10

Judge I.
2/8/2021

tabbies

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### NH CIRCUIT COURT

9th Circuit - Family Division - Nashua
30 Spring Street, Suite 102
Nashua NH  03060

Telephone: 1-855-212-1234
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

## NOTICE OF DECISION

**FILE COPY**

Case Name:   **In the Matter of David Campbell and Robin Partello**
Case Number:   **659-2018-DM-00702**

Enclosed please find a copy of the Court's Order dated April 26, 2019 relative to:

**Order on Motion to remove GAL**

**Derby, M.**

April 29, 2019

Sherry L. Bisson
Clerk of Court

(659304)

C:  Jeffrey Leo Manganaro, ESQ; Robin Partello; Kathleen A. Sternenberg

NHJB-2207-DF (07/01/2011)

JAI000113

# The State of New Hampshire

Hillsborough County                    Ninth Circuit Court ~ Family Division ~ Ⓝ Nashua ~ ~~Merrimack~~

In the matter of: David Campbell            and    Robin Portello

Docket No. 65 9 - 2018 - DM - 702

## ORDER on #41, Motion to Remove GAL

Prior to ruling on the motion to remove GAL, the undersigned officer reviewed the October 24, 2018 Order Appointing GAL, the February 15, 2019 Order approving the Master's recommendation on the GAL's motion for instruction, the February 15, 2019 Order approving the Master's recommendation on the Motion to Strike, and the two March 12, 2019 orders re the GAL's fee cap and GAL payment method, as well as the relevant motions and objections. Reviewing all of those matters de novo, the undersigned officer would have issued the same orders, though the respondent may pay the GAL by personal check (in addition to the other methods), though the respondent does not use personal checks.

Substantively, the motion to dismiss/remove GAL is denied. The respondent's allegations do not form a sufficient basis to terminate the GAL and start over, which would cost significant funds and waste judicial resources. The GAL's sole mission is to investigate and advocate for Brady, and this may cause friction with the parents. That is a normal part of the process. Motion denied.

Date: 4-26 , 2019

Mark S. Derby, Judge
Ninth Circuit Court

JAI000114
47

Introcaso 508

## Sherry Bisson

| | |
|---|---|
| **From:** | Hon. Julie Introcaso |
| **Sent:** | Monday, January 06, 2020 11:50 AM |
| **To:** | Sherry Bisson |
| **Subject:** | RE: Writing Day |

**EXHIBIT** 11

tabbies

Judge I.
2/8/2021

I appreciate that. That'll be a big help.

J

**From:** Sherry Bisson
**Sent:** Monday, January 06, 2020 10:41 AM
**To:** Hon. Julie Introcaso
**Subject:** RE: Writing Day

I spoke with Judge Ashley this morning and for some reason we didn't schedule a docket for you this Thursday or Friday, you will have both days to write.

**From:** Hon. Julie Introcaso
**Sent:** Monday, January 06, 2020 8:49 AM
**To:** Sherry Bisson
**Subject:** Writing Day

I spoke to Judge Ashley on Friday afternoon. She said she would try to find me some writing time this month if I needed it. I am almost caught up on the OLD stuff, but I also have some recent matters and a JCC complaint to address before the 15th.
Since I don't seem to have anything scheduled for the 10th (?) could you enter that as my writing day for this month?

JI

EXHIBIT 12
Judge I.
2/8/2021

Respectfully submitted,

Dated: February 28, 2019

*Kathleen A. Sternenberg*

Kathleen A. Sternenberg, Esq., NHB#8840
Law Office of Kathleen A. Sternenberg
P.O. Box 2288
Concord, NH 03302-2288
(603)641-1048 phone
(603)215-7570 fax
kas@sternenberglaw.com

( )

Certificate of Service

I, Kathleen A. Sternenberg, hereby certify that I have, this day, mailed a copy of this motion to Jeffrey Manganaro, Esq./Tracey Goyette Cote, Esq., counsel for David B. Campbell and to Robin A. Partello, pro se.

*Kathleen A. Sternenberg*

Kathleen A. Sternenberg

3/12/19 -
Legal fees / GAL fees
to be paid in Cash,
by money order or
bank check, ONLY.
So Ordered.

Julie A. Introcaso

-2-



EXHIBIT 13
Judge I.
2/8/2021

THE STATE OF NEW HAMPSHIRE SEP -3 A 10:18
9TH CIRCUIT – FAMILY DIVISION – NASHUA

HILLSBOROUGH, SS.                                                    AUGUST, 2013

IN THE MATTER OF
REGAN MERRIFIELD AND AARON COX

Docket No. 657-2011-DM-00565

**ORDER ON APPOINTMENT OF GUARDIAN AD LITEM**
(RSA 458:17-A, as amended, effective May 12, 1992)

The Master recommends the following order be entered:

    1.    The Standing Order Relative to Guardian ad Litem Appointment
(hereinafter referred to as the "Standing Order") attached hereto is made a part hereof.

    2.    Name:    **Attorney Kathleen A. Sternenberg**
                           **Law Office of Kathleen A. Sternenberg**
                           **27 Webster Street**
                           **Manchester NH 03104-2547**
                           **(603) 641-1048**

Is appointed Guardian ad Litem of the children:

D&#9608;&#9608; C&#9608;&#9608; &#9608;/&#9608;/&#9608;



    3.    The Guardian ad Litem shall investigate the following issues and make
recommendations to the court thereon:

| | |
|---|---|
| X | **Joint decision making responsibilities** |
| X | **Residential parenting responsibility/parenting time** |
| | Special needs of the child(ren) |
| | (SPECIFY): |
| | Counseling for family/mother/father/child(ren) as recommended by the Guardian ad litem |
| ——— | Psychological evaluations of mother/father/child(ren) as recommended by the Guardian ad Litem |
| | Parenting skills of mother/father/both |
| | Appropriateness of home environment of mother/father/both |
| | Substance abuse: alcohol/drugs/both/other |
| | Violence, physical abuse, emotional abuse |

Page 1 of 3

Sexual abuse of
Supervision of parent-child contact
Rights of grandparents to visit
Influence of companions of either party on child(ren)
Maturity of child(ren) stating a preference
Travel arrangements
Time, place and manner of exchange for visits

_____   Assessment of bond between child(ren) and each parent and/or
between siblings

X        Other (SPECIFY):<u>Educational attendance of child/legal residence</u>

4.      Payment of the costs and fees of the Guardian ad Litem shall be made as follows, in the first instance:

X                **Petitioner** shall pay the entire GAL expense
·        Petitioner shall pay        %
         Respondent shall pay        %
         Payment of Petitioner's/Respondent's share shall be made from the Court Fund
         The Court orders Petitioner/Respondent/both to contact the Office of Cost Containment (OCC) within ten (10) days so that it may determine whether, and if so upon what terms reimbursement of GAL expenses is to be made to the Fund. The responsible party or parties shall comply with the terms for any reimbursement as established by OCC, subject to review by the terms for reimbursement. As long as an Order for Reimbursement is outstanding, the party responsible shall keep the Court and OCC informed at all times of their current mailing address. The address/telephone number of OCC is:

OCC/GAL
State House Annex Room 400
25 Capital Street
Concord NH 03301
(603) 271-7098

The maximum hourly billing rate is set forth in the Standing Order.

5.      Other Provisions:<u>GAL indicates rate $100 per hour with $1500 retainer</u>

6.      Guardian ad Litem Stipulations to be filed within 30 days of appointment.

7.      Preliminary Report to be filed by:

Page 2 of 3

8.    Final Report to be filed by:    **January 15, 2014**

Petitioner/Attorney for Petitioner    Respondent/Attorney for Respondent

Aaron Cox

So ordered:

I hereby certify that I have read the recommendation(s) and agree that, to the extent the marital master/judicial referee/hearing officer has made factual findings, she/he has applied the correct legal standard to the facts determined by the marital master/judicial referee/hearing officer.

9/5/13
Date

Julie A. Introcaso
Printed Name of Judge

Signature of Judge

EXHIBIT  14
Judge I.
2/8/2021
tabbies

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
http://www.courts.state.nh.us

Court Name:  Nashua Family Division

Case Name:  HMO Thomas Sobell and Patricia Sobell

Case Number:  659 -2013 - DM - 00348
(if known)

## ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM*
### (Divorce/Parenting)

Thomas Sobell
Petitioner's Name                         D.O.B.

Patricia Sobell
Respondent's Name                       D.O.B.

66 Bartemus Tr
Street Address

66 Bartemus Tr.
Street Address

Nashua , NH 03063
City, State, Zip

Nashua , NH 03063
City, State, Zip

605 7189532
Telephone                   E-Mail Address

Telephone                   E-Mail Address

The following order shall be entered:
1.  The attached Standing Order Relative to Guardian *ad Litem* Appointment (hereinafter referred to as the "Standing Order") is made a part of this order.
2.  Name: Kathleen Sterneberg _____ Telephone: 603-641-1048
    Address: 27 Webster Street, Manchester, N.H. 03104 - 2547
    is appointed Guardian *ad Litem* of the child(ren):

    E███ S███████                      D.O.B. ████ /2006
    _____           D.O.B. _____
    _____           D.O.B. _____

**\* If you are not currently a board certified GAL you must notify the Court immediately and this order will be vacated. If at any time during appointment your certification lapses, you must notify the Court immediately and file a motion to withdraw.**

3.  The Guardian *ad Litem* shall investigate the following issues and make recommendations to the court thereon:
    ☑  Decision-making responsibilities
    ☑  Residential responsibilities
    ☑  Parenting time
    ☑  Special needs of the child(ren) (specify):
       ADHD eating disorder anxiety, hypervigilance of mother + grandparent regarding feeding + sleeping arrangements
    ☐  Counseling for family/individual counseling for ☐ Petitioner ☐ Respondent ☐ child(ren) of Ethan
    ☐  Psychological evaluations of ☐ Petitioner ☑ Respondent ☐ child(ren)

NHJB-2070-FS (11/01/2011)                    Page 1 of 4                          35

Case Name: _____

Case Number: _____

**ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM* (Divorce/Parenting)**

☐ Parenting skills of ☐ Petitioner ☐ Respondent ☑ both parties

☐ Appropriateness of the home environment of ☐ Petitioner ☐ Respondent ☑ both parties

☐ Substance abuse: ☐ alcohol ☐ drugs ☐ both ☐ other_____

☐ Violence, physical abuse, emotional abuse

☐ Sexual abuse of

☐ Supervision of parenting time

☐ Rights of grandparents to visit

☐ Influence of companions of either party on child(ren)

☐ Maturity of child(ren) stating a preference

☐ Travel arrangements

☐ Time, place and manner of exchange for parenting time

☑ Assessment of bond between child and each parent and/or between siblings

☑ Other issues which the GAL deems relevant based upon the investigation

☐ Other (specify):
    _____

4. Payment of the costs and fees of the Guardian *ad Litem* shall be made as follows:

   **A. Percentage of payment:**

   ☑ The Petitioner shall pay **100** % of the Guardian *ad Litem* fees.

   ☐ The Respondent shall pay_____ % of the Guardian *ad Litem* fees.

   **B. Payment Orders:**

   ☐ Unless otherwise agreed with the Guardian *ad Litem*, the Guardian *ad Litem's* hourly rate shall be no more than $_____. All parties must cooperate with the Guardian *ad Litem's* reasonable requests for payment.

   ☐ Unless otherwise agreed with the Guardian *ad Litem*, a retainer of $_____ shall be paid to the Guardian *ad Litem* by no later than_in the proportion set forth in the paragraph above. In the event any party's payment is not made in accordance with this Order, the other party or the GAL may request a hearing. The party not in compliance with this Order may be required to appear at the hearing, prepared to show cause why s/he should not be held in contempt of court. Unless otherwise ordered, the Guardian *ad Litem* is not required to commence an investigation until the retainer is paid in full.

   ☐ Other Payment Orders:
      _____
      _____

5. Other provisions:
   _____
   _____

6. Guardian *ad Litem* Stipulations to be filed by:_____

Case Name: _____

Case Number: _____

**ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM* (Divorce/Parenting)**

7.   Preliminary Report to be filed by: _____

8.   Final Report to be filed by: _____

**Recommended:**

_____
Date

_____
Signature of Marital Master

_____
Printed Name of Marital Master

**So Ordered:**

I hereby certify that I have read the recommendation(s) and agree that, to the extent the marital master/judicial referee/hearing officer has made factual findings, she/he has applied the correct legal standard to the facts determined by the marital master/judicial referee/hearing officer.

_____1/30/14_____
Date

_____
Signature of Judge

**JULIE A. INTROCASO**

_____
Printed Name of Judge

---

## STANDING ORDER RELATIVE TO GUARDIAN *AD LITEM* APPOINTMENT

This order applies to all Guardian *ad Litem* appointments unless its terms are altered by an order entered in a specific case. Any changes in the order or the stipulations must be in writing and filed with the court.

1.   **GUARDIAN *AD LITEM* STIPULATION:**

In every case in which a Guardian *ad Litem* is appointed, the parties and the Guardian shall file a stipulation as to the following issues:

a.   Expenses for which the Guardian *ad Litem* will be reimbursed;

b.   Guardian *ad Litem* hourly billing rate and maximum fee;

c.   Frequency of billing, terms of payment, and payment of retainer;

d.   The names of the individuals requested to be interviewed by the Guardian *ad Litem*, including names, addresses, telephone numbers and relationship to party or child, listed in order of importance. The Guardian *ad Litem* shall have the discretion to decide which individuals to interview;

e.   Manner in which the Guardian *ad Litem* will communicate with each party's references (e.g., office conference, telephone call, letter);

f.   Action(s) the Guardian *ad Litem* will take if unable to contact a reference;

g.   Whether the Guardian *ad Litem* will visit each party's home;

h.   Whether conversations between the Guardian *ad Litem* and the children will be confidential;

i.   Other orders necessary to protect confidentiality; and

j.   Dates by which parties will execute authorizations for reports. Specify records to be requested.

If this stipulation is not filed by the date set forth in the Order on Appointment of Guardian *ad Litem*, the court shall schedule an immediate enforcement hearing at the request of the Guardian *ad Litem* or either party.

Case Name: _____

Case Number: _____

**ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM* (Divorce/Parenting)**

2.  **GUARDIAN *AD LITEM* FEES:**

    a. The Guardian *ad Litem* shall be compensated at the rate of $60.00 per hour. The maximum fee (including costs) shall not exceed $1,000.00 for any case, and shall include attendance at hearings.

    b. Parties, counsel and the GAL shall be aware of the GAL fees and costs and shall take reasonable action to contain those fees and costs. Maximum limits will be strictly enforced.

    c. The maximum fee shall not be exceeded without <u>prior</u> approval of the court after hearing with the parties and the Guardian *ad Litem* present. Any request to exceed the maximum shall be filed with the court in writing and shall set forth in detail the reasons for the request and the amount by which the maximum is to be exceeded.

    d. When the parties are paying the cost of the GAL, the $60.00 per hour rate and the $1,000.00 maximum fee may be waived upon written agreement of the parties and counsel which shall be filed with the court and subject to court approval. The agreement shall set forth the hourly rate and the maximum fee agreed to by the parties.

    e. If counseling, therapy or evaluations are recommended by the GAL, no expenses for those may be incurred without the prior approval of the court after hearing. Notwithstanding the above, the court may enter orders upon motion of either party, or *sua sponte*, to authorize specific additional services with appropriate limits on payment.

3.  **COMMENCEMENT, SUSPENSION AND RESUMPTION OF WORK:**

    The Guardian *ad Litem* shall commence an investigation on receipt of the Order of Appointment and shall diligently investigate the case, and prepare a report. If the parties agree to suspend the investigation and preparation of a report for any reason, they shall immediately seek the assent of the Guardian *ad Litem* to such suspension and file with the Court a written agreement to suspend the Guardian *ad Litem* 's work. This agreement shall be signed by all parties, including the Guardian *ad Litem* who shall suspend work on the case on receipt of notice that the Court has approved the agreement.

    A party desiring that the Guardian *ad Litem* resume work on the case shall immediately file an appropriate motion and shall send a copy of the motion to the Guardian *ad Litem* who shall resume work in that case only on receipt of the court's notice that the motion has been granted.

4.  **PLEADINGS AND STIPULATIONS:**

    Each party shall certify on every pleading that s/he has mailed or delivered a copy of the pleading to the Guardian *ad Litem*.

    The parties may agree on any issue concerning the child(ren) or incapacitated adult, and shall certify that s/he has mailed or delivered a copy of the written agreement to the Guardian *ad Litem*. The Guardian *ad Litem* may sign the agreement or file an objection, if appropriate, within ten days from the date of mailing or delivery.

EXHIBIT 15
Judge I.
2/8/2021

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
http://www.courts.state.nh.us

Court Name: __9th Circuit-Family Division Nashua__

Case Name: __In the Matter of John Crawford and Berniece Crawford__

Case Number: __226-2008-DM-525__
(if known)

## ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM*
### (Divorce/Parenting)

__John Crawford__ ▮1962
Petitioner's Name        D.O.B.

__Berniece Crawford__ ▮/56
Respondent's Name        D.O.B.

__20 Withces Spring Rd__
Street Address

__15 Iron Horse Drive E-304__
Street Address

__Hollis, NH 03049__
City, State, Zip

__Bedford, NH 03110__
City, State, Zip

__978-758-3789__
Telephone        E-Mail Address

Telephone        E-Mail Address

The following order shall be entered:

1. The attached Standing Order Relative to Guardian *ad Litem* Appointment (hereinafter referred to as the "Standing Order") is made a part of this order.

2. Name. __KaTHLEEN STernenberg__        Telephone: __641.1048__
   Address: __27 WEBSTER STREET - MANCHESTER, N.H. 03104254__

   is appointed Guardian *ad Litem* of the child(ren):

   J▮ C▮        D.O.B. ▮/99

   _____        D.O.B. _____

   _____        D.O.B. _____

   **\* If you are not currently a board certified GAL you must notify the Court immediately and this order will be vacated. If at any time during appointment your certification lapses, you must notify the Court immediately and file a motion to withdraw.**

3. The Guardian *ad Litem* shall investigate the following issues and make recommendations to the court thereon:

   ☐ Decision-making responsibilities

   ☐ Residential responsibilities

   ☐ Parenting time

   ☐ Special needs of the child(ren) (specify):

   _____

   ☐ Counseling for family/individual counseling for ☐ Petitioner ☐ Respondent ☐ child(ren)

   ☐ Psychological evaluations of ☐ Petitioner ☐ Respondent ☐ child(ren)

   *AMENDED GIVEN IN HAND AND SENT TO ATT. STERNENBERG ON 6-22-15 JL.*

NHJB-2070-F (09/30/2014)        Page 1 of 4

Case Name: Error! Reference source t found.

Case Number: Error! Reference source not found.

**ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM* (Divorce/Parenting)**

☐ Parenting skills of ☐ Petitioner ☐ Respondent ☐ both parties

☐ Appropriateness of the home environment of ☐ Petitioner ☐ Respondent ☐ both parties

☐ Substance abuse: ☐ alcohol ☐ drugs ☐ both ☐ other _____

☐ Violence, physical abuse, emotional abuse

☐ Sexual abuse of

☐ Supervision of parenting time

☐ Rights of grandparents to visit

☐ Influence of companions of either party on child(ren)

☒ Maturity of child(ren) stating a preference

☐ Travel arrangements

☐ Time, place and manner of exchange for parenting time

☐ Assessment of bond between child and each parent and/or between siblings

☐ Other issues which the GAL deems relevant based upon the investigation

☐ Other (specify):

_____

_____

4. The Court sets the maximum fee in this case at $_____. The fee may only be exceeded with prior approval of the Court and notice to all parties. Payment of the costs and fees of the Guardian *ad Litem* shall be made as follows:

   **A. Percentage of payment:**

    ☑ The Petitioner shall pay _50_ % of the Guardian *ad Litem* fees.

    ☑ The Respondent shall pay _50_ % of the Guardian *ad Litem* fees.

   **B. Payment Orders:**

    ☑ Unless otherwise agreed with the Guardian *ad Litem*, the Guardian *ad Litem's* hourly rate shall be no more than $ _75_ . All parties must cooperate with the Guardian *ad Litem's* reasonable requests for payment.

    ☑ Unless otherwise agreed with the Guardian *ad Litem*, a retainer of $ _500_ shall be paid to the Guardian *ad Litem* by no later than _21 day_ the proportion set forth in the paragraph above. In the event any party's payment is not made in accordance with this Order, the other party or the GAL may request a hearing. The party not in compliance with this Order may be required to appear at the hearing, prepared to show cause why s/he should not be held in contempt of court. Unless otherwise ordered, the Guardian *ad Litem* is not required to commence an investigation until the retainer is paid in full.

    ☐ Other Payment Orders:

_____

_____

5. Other provisions: _____

_____

6. Guardian *ad Litem* Stipulations to be filed by: _____ 7/15/15 _____

Case Name: Error! Reference source nt found.

Case Number: Error! Reference sourᴄᵉ not found.

**ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM* (Divorce/Parenting)**

7.   Preliminary Report to be filed by: _____

8.   Final Report to be filed by: _____ 8/7/15 _____

.Recommended:

_____          _____
Date                                        Signature of Marital Master

                                            _____
                                            Printed Name of Marital Master

**So Ordered:**
I hereby certify that I have read the recommendation(s) and agree that, to the extent the marital master/judicial referee/hearing officer has made factual findings, she/he has applied the correct legal standard to the facts determined by the marital master/judicial referee/hearing officer.

_____5/12/15_____
Date

*amended* 6/22/15

_____
Signature of Judge

_____ Julie A. Introcaso
Printed Name of Judge

---

**STANDING ORDER RELATIVE TO GUARDIAN *AD LITEM* APPOINTMENT**

   This order applies to all Guardian *ad Litem* appointments unless its terms are altered by an order entered in a specific case. Any changes in the order or the stipulations must be in writing and filed with the court.

1.   GUARDIAN *AD LITEM* STIPULATION:

   In every case in which a Guardian *ad Litem* is appointed, the parties and the Guardian shall file a stipulation as to the following issues:

   a.  Expenses for which the Guardian *ad Litem* will be reimbursed;

   b.  Guardian *ad Litem* hourly billing rate and the maximum fee established by the court in this case;

   c.  Frequency of billing, terms of payment, and payment of retainer;

   d.  The names of the individuals requested to be interviewed by the Guardian *ad Litem*, including names, addresses, telephone numbers and relationship to party or child, listed in order of importance. The Guardian *ad Litem* shall have the discretion to decide which individuals to interview;

   e.  Manner in which the Guardian *ad Litem* will communicate with each party's references (e.g., office conference, telephone call, letter);

   f.  Action(s) the Guardian *ad Litem* will take if unable to contact a reference;

   g.  Whether the Guardian *ad Litem* will visit each party's home;

   h.  Whether conversations between the Guardian *ad Litem* and the children will be confidential;

   i.  Other orders necessary to protect confidentiality; and

   j.  Dates by which parties will execute authorizations for reports. Specify records to be requested.

   If this stipulation is not filed by the date set forth in the Order on Appointment of Guardian *ad Litem*. the court shall schedule an immediate enforcement hearing at the request of the Guardian *ad Litem* or either party.

Case Name: Error! Reference source not found.

Case Number: Error! Reference source not found.

**ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM* (Divorce/Parenting)**

2. GUARDIAN *AD LITEM* FEES:

a. The Guardian ad Litem shall be compensated at the rate of $_____ per hour. The maximum fee set by the court (including costs) shall not exceed $_____ for this case, and shall include attendance at hearings.

b. Parties, counsel and the GAL shall be aware of the GAL fees and costs and shall take reasonable action to contain those fees and costs. Maximum limits will be strictly enforced.

c. The maximum fee shall not be exceeded without prior approval of the court after hearing with the parties and the Guardian *ad Litem* present. Any request to exceed the maximum shall be filed with the court in writing and shall set forth in detail the reasons for the request and the amount by which the maximum is to be exceeded.

d. When the parties are paying the cost of the GAL, the $_____ per hour rate and the maximum fee set by the court may be waived upon written agreement of the parties and counsel which shall be filed with the court and subject to court approval. The agreement shall set forth the hourly rate and the maximum fee agreed to by the parties.

e. If counseling, therapy or evaluations are recommended by the GAL, no expenses for those may be incurred without the prior approval of the court after hearing. Notwithstanding the above, the court may enter orders upon motion of either party, or *sua sponte*, to authorize specific additional services with appropriate limits on payment.

3. COMMENCEMENT, SUSPENSION AND RESUMPTION OF WORK:

The Guardian *ad Litem* shall commence an investigation on receipt of the Order of Appointment and, unless otherwise ordered, on receipt of payment of the retainer in full, and shall diligently investigate the case, and prepare a report. If the parties agree to suspend the investigation and preparation of a report for any reason, they shall immediately seek the assent of the Guardian *ad Litem* to such suspension and file with the Court a written agreement to suspend the Guardian *ad Litem* 's work. This agreement shall be signed by all parties, including the Guardian *ad Litem* who shall suspend work on the case on receipt of notice that the Court has approved the agreement.

A party desiring that the Guardian *ad Litem* resume work on the case shall immediately file an appropriate motion and shall send a copy of the motion to the Guardian *ad Litem* who shall resume work in that case only on receipt of the court's notice that the motion has been granted.

4. PLEADINGS AND STIPULATIONS:

Each party shall certify on every pleading that s/he has mailed or delivered a copy of the pleading to the Guardian *ad Litem*.

The parties may agree on any issue concerning the child(ren) or incapacitated adult, and shall certify that s/he has mailed or delivered a copy of the written agreement to the Guardian *ad Litem*. The Guardian *ad Litem* may sign the agreement or file an objection, if appropriate, within ten days from the date of mailing or delivery.

EXHIBIT 16

Judge I.
2/8/2021

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
http://www.courts.state.nh.us

Court Name:    9th Circuit-Family Division Nashua

Case Name:    In the Matter of Nicole Covart and Frank Covart

Case Number:    659-2015-DM-00463
(if known)

## ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM*
### (Divorce/Parenting)

| Frank Covart | ███████ /1983 | Nicole Covart | ███/1983 |
|---|---|---|---|
| Petitioner's Name | D.O.B. | Respondent's Name | D.O.B. |

15 Jefferson Road
Street Address

19 Melissa Drive
Street Address

Bedford NH 03110
City, State, Zip

Nashua, NH 03062
City, State, Zip

| Telephone | E-Mail Address | Telephone | E-Mail Address |
|---|---|---|---|

The following order shall be entered:
1. The attached Standing Order Relative to Guardian *ad Litem* Appointment (hereinafter referred to as the "Standing Order") is made a part of this order.

2. Name: Kathleen A. Sternenberg, Esq.    Telephone: 603 641-1048

   Address: 27 Webster Street, Manchester, NH 03104

   is appointed Guardian *ad Litem* of the child(ren):

   A████ J██ C████    D.O.B. ███████, 2012

   H███ F█ D███ C████    D.O.B. ███████, 2015

   D.O.B. _____

\* If you are not currently a board certified GAL you must notify the Court immediately and this order will be vacated. If at any time during appointment your certification lapses, you must notify the Court immediately and file a motion to withdraw.

3. The Guardian *ad Litem* shall investigate the following issues and make recommendations to the court thereon:

   ☐ Decision-making responsibilities

   ☒ Residential responsibilities

   ☒ Parenting time

   ☐ Special needs of the child(ren) (specify): Harrison is an Infant

   ─────────────────────────

   ☒ Counseling for family/individual counseling for ☒ Petitioner ☒ Respondent ☐ child(ren)

   ☐ Psychological evaluations of ☐ Petitioner ☐ Respondent ☐ child(ren)

NHJB-2070-F (09/30/2014)    Page 1 of 4

Case Name: <u>In the Matter of Nicole Covart and Frank Covart</u>
Case Number: <u>659-2015-DM-00463</u>
<u>ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM* (Divorce/Parenting)</u>

- ☐ Parenting skills of ☐ Petitioner ☐ Respondent ☐ both parties
- ☐ Appropriateness of the home environment of ☐ Petitioner ☐ Respondent ☐ both parties
- ☒ Substance abuse: ☐ alcohol ☐ drugs ☐ both ☐ other <u>issue regarding</u> <u>respondent's access/</u> <u>use of pornography</u>
- ☐ Violence, physical abuse, emotional abuse
- ☐ Sexual abuse of
- ☒ Supervision of parenting time
- ☐ Rights of grandparents to visit
- ☐ Influence of companions of either party on child(ren)
- ☐ Maturity of child(ren) stating a preference
- ☐ Travel arrangements
- ☐ Time, place and manner of exchange for parenting time
- ☐ Assessment of bond between child and each parent and/or between siblings
- ☐ Other issues which the GAL deems relevant based upon the investigation
- ☒ Other (specify): <u>Respondent's risk-taking, (re: possible use</u> <u>of pornography at work)</u>

4. The Court sets the maximum fee in this case at $<u>1500.00</u>. The fee may only be exceeded with prior approval of the Court and notice to all parties. Payment of the costs and fees of the Guardian *ad Litem* shall be made as follows:

   A. **Percentage of payment:**
      - ☐ The Petitioner shall pay _____ % of the Guardian *ad Litem* fees.
      - ☑ The Respondent shall pay <u>100</u> % of the Guardian *ad Litem* fees. (Retainer)

   B. **Payment Orders:**
      - ☒ Unless otherwise agreed with the Guardian *ad Litem*, the Guardian *ad Litem's* hourly rate shall be no more than $ <u>100.00</u>. All parties must cooperate with the Guardian *ad Litem's* reasonable requests for payment.
      - ☐ Unless otherwise agreed with the Guardian *ad Litem*, a retainer of $ <u>1500</u> shall be paid to the Guardian *ad Litem* by no later than <u>8/28</u> in the proportion set forth in the paragraph above. In the event any party's payment is not made in accordance with this Order, the other party or the GAL may request a hearing. The party not in compliance with this Order may be required to appear at the hearing, prepared to show cause why s/he should not be held in contempt of court. Unless otherwise ordered, the Guardian *ad Litem* is not required to commence an investigation until the retainer is paid in full.
      - ☐ Other Payment Orders:
        _____
        _____

5. Other provisions: _____
   _____
   _____

6. Guardian *ad Litem* Stipulations to be filed by: _____

NHJB-2070-F (09/30/2014)                    Page 2 of 4

Case Name: In the Matter of Nicole ~~~vart and Frank Covart

Case Number: 659-2015-DM-00463

ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM* (Divorce/Parenting)

7.    Preliminary Report to be filed by: _____ 11/1 _____

8.    Final Report to be filed by: _____ 2/1 _____

**Recommended:**

_____
Date

_____
Signature of Marital Master

_____
Printed Name of Marital Master

**So Ordered:**

I hereby certify that I have read the recommendation(s) and agree that, to the extent the marital master/judicial referee/hearing officer has made factual findings, she/he has applied the correct legal standard to the facts determined by the marital master/judicial referee/hearing officer.

August 20, 2015
Date

_____
Signature of Judge

Julie A. Introcaso
Printed Name of Judge

---

## STANDING ORDER RELATIVE TO GUARDIAN *AD LITEM* APPOINTMENT

This order applies to all Guardian *ad Litem* appointments unless its terms are altered by an order entered in a specific case. Any changes in the order or the stipulations must be in writing and filed with the court.

1. **GUARDIAN *AD LITEM* STIPULATION:**

In every case in which a Guardian *ad Litem* is appointed, the parties and the Guardian shall file a stipulation as to the following issues:

a. Expenses for which the Guardian *ad Litem* will be reimbursed;

b. Guardian *ad Litem* hourly billing rate and the maximum fee established by the court in this case;

c. Frequency of billing, terms of payment, and payment of retainer;

d. The names of the individuals requested to be interviewed by the Guardian *ad Litem*, including names, addresses, telephone numbers and relationship to party or child, listed in order of importance. The Guardian *ad Litem* shall have the discretion to decide which individuals to interview;

e. Manner in which the Guardian *ad Litem* will communicate with each party's references (e.g., office conference, telephone call, letter);

f. Action(s) the Guardian *ad Litem* will take if unable to contact a reference;

g. Whether the Guardian *ad Litem* will visit each party's home;

h. Whether conversations between the Guardian *ad Litem* and the children will be confidential;

i. Other orders necessary to protect confidentiality; and

j. Dates by which parties will execute authorizations for reports. Specify records to be requested.

If this stipulation is not filed by the date set forth in the Order on Appointment of Guardian *ad Litem*, the court shall schedule an immediate enforcement hearing at the request of the Guardian *ad Litem* or either party.

NHJB-2070-F (09/30/2014)                    Page 3 of 4

Case Name: <u>In the Matter of Nicole Covart and Frank Covart</u>

Case Number: <u>659-2015-DM-00463</u>

<u>ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM* (Divorce/Parenting)</u>

2.  <u>GUARDIAN *AD LITEM* FEES:</u>

    a. The Guardian ad Litem shall be compensated at the rate of $_____ per hour. The maximum fee set by the court (including costs) shall not exceed $_____ for this case, and shall include attendance at hearings.

    b. Parties, counsel and the GAL shall be aware of the GAL fees and costs and shall take reasonable action to contain those fees and costs. Maximum limits will be strictly enforced.

    c. The maximum fee shall not be exceeded without <u>prior</u> approval of the court after hearing with the parties and the Guardian *ad Litem* present. Any request to exceed the maximum shall be filed with the court in writing and shall set forth in detail the reasons for the request and the amount by which the maximum is to be exceeded.

    d. When the parties are paying the cost of the GAL, the $_____ per hour rate and the maximum fee set by the court may be waived upon written agreement of the parties and counsel which shall be filed with the court and subject to court approval. The agreement shall set forth the hourly rate and the maximum fee agreed to by the parties.

    e. If counseling, therapy or evaluations are recommended by the GAL, no expenses for those may be incurred without the prior approval of the court after hearing. Notwithstanding the above, the court may enter orders upon motion of either party, or *sua sponte*, to authorize specific additional services with appropriate limits on payment.

3.  <u>COMMENCEMENT, SUSPENSION AND RESUMPTION OF WORK:</u>

    The Guardian *ad Litem* shall commence an investigation on receipt of the Order of Appointment and, unless otherwise ordered, on receipt of payment of the retainer in full, and shall diligently investigate the case, and prepare a report. If the parties agree to suspend the investigation and preparation of a report for any reason, they shall immediately seek the assent of the Guardian *ad Litem* to such suspension and file with the Court a written agreement to suspend the Guardian *ad Litem*'s work. This agreement shall be signed by all parties, including the Guardian *ad Litem* who shall suspend work on the case on receipt of notice that the Court has approved the agreement.

    A party desiring that the Guardian *ad Litem* resume work on the case shall immediately file an appropriate motion and shall send a copy of the motion to the Guardian *ad Litem* who shall resume work in that case only on receipt of the court's notice that the motion has been granted.

4.  <u>PLEADINGS AND STIPULATIONS:</u>

    Each party shall certify on every pleading that s/he has mailed or delivered a copy of the pleading to the Guardian *ad Litem*.

    The parties may agree on any issue concerning the child(ren) or incapacitated adult, and shall certify that s/he has mailed or delivered a copy of the written agreement to the Guardian *ad Litem*. The Guardian *ad Litem* may sign the agreement or file an objection, if appropriate, within ten days from the date of mailing or delivery.

THE STATE OF NEW HAMPSHIRE
JUDICIAL BRANCH
CIRCUIT COURT

9th CIRCUIT - FAMILY DIVISION - NASHUA

CASE NO: 659-2015-DM-0046

IN THE MATTER OF NICOLE COVART AND FRANK COVART

ASSENTED TO MOTION TO EXTEND DATE FOR FILING OF GAL FINAL REPORT

   NOW COMES Kathleen A. Sternenberg, Guardian ad Litem, in the above-referenced case, and she respectfully requests that this Court extend the time to file the Guardian ad Litem Report and in support thereof states as follows:

1.    On August 20, 2015, Kathleen A. Sternenberg was appointed to act as Guardian ad Litem for A███ J██ C███t, DOB ███/2012 and H███ F██ D███ C███, DOB ███2015 in this matter.

2.    On January 14, 2016 at the Pre-Trial Conference, the court ordered the GAL to file her final report on February 1st, 2016.

3.    Counsel for the parties agreed that the GAL will file a final report on February 15, 2016 if needed after continued mediation.

   WHEREFORE, the Guardian ad Litem respectfully requests that this Court:

A.    Grant this Assented Motion to Extend Date for Filing of GAL Final Report; and

B.    Grant such other relief as may be fair and just.

                                        Respectfully submitted,

Dated: January 14, 2016                 _Kathleen A. Sternenberg_
                                        Kathleen A. Sternenberg, Esq., NHB#88█()
                                        Law Office of Kathleen A. Sternenberg
                                        27 Webster Street
                                        Manchester, NH 03104-2547
                                        (603)641-1048

Motion        Granted / Denied
              1/20/16
Date
Judge Julie A. Introcaso

LAW OFFICES OF KATHLEEN·A·STERNENBERG - 27 WEBSTER STREET - MANCHESTER, NH  03104-2547

Certificate of Service

I, Kathleen A. Sternenberg, hereby certify that I have, this day, mailed a copy of this Motion to Kempton P. Giggey, Esq., and Andrew M. Gallagher, counsel for the parties.

Kathleen A. Sternenberg

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
http://www.courts.state.nh.us

Court Name: **9th Circuit - District Division - Nashua**

Case Name: **In the Matter of Nicole Covart and Frank Covart**

Case Number: **659-2015-DM-00463**
(If known)

## MOTION TO EXCEED GUARDIAN *AD LITEM* FEE CAP – Divorce/Parenting

1. This Motion to Exceed Fee Cap pertains to a Motion to Exceed *Guardian ad Litem* fee cap of
   $ _____ **1,500.00** in the above divorce/parenting case:

2. RSA 461-A:16, IV requires that the maximum fee established by the court may only be exceeded with the prior approval of the presiding judge and when all parties to the case have been notified. Please state the reasons you are seeking to exceed the maximum fee established by the court. (Attach additional pages if necessary):

   **The GAL will need to perform additional investigation, prepare for/and attend Pre-Trial Conference, speak with pediatrician, obtain medical records, file her final report, and attend final hearing.**

3. ☑ I have not exceeded the fee cap before the filing of this Motion.

4. ☑ I have attached the original Order of Appointment.

5. ☐ I have attached the original petition(s).

6. I am requesting approval to exceed the fee cap by an additional amount of $ _____ **1,500.00** in anticipation of future bills. (Attach copy of most recent bill)

7. The total of my bills in this case $ **1,430.00** _____ (Attach copies of itemized invoices)

I represent that the foregoing is a true and reasonable bill for the services I rendered and for the costs incurred. I certify that I have not and will not receive any other compensation for the services or costs specified on the attached itemization.

I certify that on this date I provided this document(s) to the parties who have filed an appearance for this case or who are otherwise interested parties by: ☐ Hand-delivery OR ☑ US Mail OR ☐ Email (E-mail only by prior agreement of the parties based on Circuit Court Administrative Order).

Date **12/10/2015**

Telephone **(603) 641-1048**

Provider Signature *Kathleen A. Blunenberg*

Address **27 Webster St., Manchester, NH 03229-2215**

---

### IMPORTANT REQUIREMENTS
### for filing statement with court

A Motion to Exceed Attorney or Guardian *ad Litem* Fee Caps must be submitted to the court prior to exceeding the fee cap.

The motion must include the following
1. A copy of the order of appointment or order authorizing services, if applicable.
2. Itemization of all charges, including the date, amount of time and rate.
3. Itemization of all expenses, including a description of each expense and the cost of each expense.
4. A copy of the order or notice of decision, if any, granting a motion to exceed the fee cap related to the case.

NHJB-2913-F (09/30/2014)

Motion Granted / ~~Denied~~

Date **12/29/15**

Judge Julie A. Introcaso

37

Law Office of Kathleen Sternenberg
27 Webster Street
Manchester, NH  03104-2547

Invoice submitted to:
Nicole Covart
19 Melissa Drive
Nashua NH 03062

December 01, 2015

Invoice # 18873

Professional Services

|  |  | Hrs/Rate | Amount |
|---|---|---|---|
| 11/2/2015 | Prepare and finalize GAL report and send to court | 0.25<br>100.00/hr | 25.00 |
| 11/11/2015 | Receive and review GAL questionnaire from Elizabeth Covart, Frank's sister and Tim Wilde, Frank's brother- in- law | 0.50<br>100.00/hr | 50.00 |
|  | For professional services rendered | 0.75 | $75.00 |
|  | Previous balance |  | ($145.00) |
|  | Credit balance |  | ($70.00) |

cc: Frank Covart
    15 Jefferson Road
    Bedford, NH 03110

Law Office of Kathleen Sternenberg
27 Webster Street
Manchester, NH  03104-2547

Invoice submitted to:
Nicole Covart
19 Melissa Drive
Nashua NH 03062

November 03, 2015

Invoice # 18860

Professional Services

| | Hrs/Rate | Amount |
|---|---|---|
| 10/27/2015 Receive and review/print GAL questionnaire from Jodi Longden | 0.25 100.00/hr | 25.00 |
| 10/28/2015 Receive and review GAL questionnaires from Jean/Alena Gregoire | 0.50 100.00/hr | 50.00 |
| 11/1/2015 Review file; draft Preliminary Report | 3.00 100.00/hr | 300.00 |
| For professional services rendered | 3.75 | $375.00 |
| Previous balance | | ($520.00) |
| Credit balance | | ($145.00) |

cc: Frank Covart
    15 Jefferson Road
    Bedford, NH 03110

Law Office of Kathleen Sternenberg
27 Webster Street
Manchester, NH  03104-2547


Invoice submitted to:
Nicole Covart
19 Melissa Drive
Nashua NH 03062


October 26, 2015


Invoice # 18840


Professional Services

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 8/24/2015 | Receive and review Order on Appointmnent of GAL | 0.25 100.00/hr | 25.00 |
| 9/3/2015 | Receive and review email Andrew Gallagher regarding payment; reply | 0.25 100.00/hr | 25.00 |
| 9/17/2015 | Receive and review Frank Covart's questionnaire and documents (releases) | 0.50 100.00/hr | 50.00 |
| 9/24/2015 | Receive and review  Stipulation; receive/review/print GAL questionnaire, Nicole Covart | 0.30 100.00/hr | 30.00 |
| 10/5/2015 | Initial consult/interview Nicole Covart and Initial contact/interview Frank Covart | 3.00 100.00/hr | 300.00 |
| 10/15/2015 | Receive and review GAL questionnaire from Kristina Dean | 0.25 100.00/hr | 25.00 |
| 10/16/2015 | Receive and review GAL questionnaire from Lauren Hall | 0.25 100.00/hr | 25.00 |
| 10/19/2015 | Meeting with Penny at daycare; meet Addison and Harrison; home visit with Nicole and children | 2.50 100.00/hr | 250.00 |
| 10/20/2015 | Receive and review notes from Nicole | 0.25 100.00/hr | 25.00 |
| 10/21/2015 | Receive and review GAL questionnaire from Beth Philcrantz | 0.25 100.00/hr | 25.00 |

Nicole Covart

Page    2

|  | | Hrs/Rate | Amount |
|---|---|---|---|
| 10/21/2015 | Home visit with Frank Covart | 1.50<br>100.00/hr | 150.00 |
| 10/22/2015 | Research sexual addiction effect on children | 0.50<br>100.00/hr | 50.00 |
|  | For professional services rendered | 9.80 | $980.00 |
| 8/27/2015 | Payment - retainer from Frank Covart - thank you. |  | ($1,500.00) |
|  | Total payments and adjustments |  | ($1,500.00) |
|  | Credit balance |  | ($520.00) |

cc: Frank Covart
   15 Jefferson Road
   Bedford, NH 03110

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
## NH CIRCUIT COURT

HILLSBOROUGH COUNTY                                9TH CIRCUIT – FAMILY DIVISION -NASHUA

### In the Matter of:
### Nicole Covart  Petitioner and Frank Covart, Respondent
### Case No:  659-2015-DM-00463

### INTERIM ORDER

On August 20, 2015, the Court held a temporary hearing on the above-captioned Petition for Divorce at the request of the parties.  Both parties appeared with counsel.

The parties are the parents of two minor children, H▮▮▮▮, age 6 mos., and A▮▮▮▮, age 3. The Respondent has not seen the children since late June.

**Beginning August 22, 2105, the Respondent shall have parenting time with the children on Saturdays and Sundays from 9 a.m. to 4 p.m. on the condition that a paternal grandparents are present at all times during the Respondent's parenting time, including transportation. The children will be picked up and dropped off at the marital residence.**

The Petitioner shall provide necessary items for the baby's care to the Respondent, if needed.

**So Ordered.**

August 20, 2015
Date

Judge Julie A. Introcaso

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
http://www.courts.state.nh.us

Court Name:   9th Circuit – Family Division at Nashua

Case Name:   In The Matter Of Nicole Covert and Frank Covert

Case Number:   659-2015-DM-00463

## SCHEDULING CONFERENCE ORDER

1.   Conference relating to:
☒ Petition for Divorce/Legal Separation/Civil Union Dissolution

☐ Parenting Petition                    ☐ Modification of:

☐ Establish Paternity/Support              ☐ Parenting Plan

☐ UIFSA                              ☐ Support/Alimony

☐ Other: _____

2.   Present were:
☒ Petitioner                    ☒ Petitioner's Attorney: Kempton Giggey

☒ Respondent                   ☒ Respondent's Attorney: Andrew Gallagher

☐ Guardian *ad Litem*            ☐ Other: _____

3.   Issues:
☒ Parenting Rights and Responsibilities:       ☒ Property Distribution:
    ☐ Decision-Making                              ☒ Real Estate
    ☐ Residential                                  ☒ Personal
☐ Grounds                                        ☒ Pensions
☒ Child Support                                  ☐ Business Interest
☐ Alimony                                        ☒ Distribution of Debts
☒ Tax Exemptions                                 ☒ ~~Health Insurance~~
☒ Other: _____

4.   Discovery completed? ☐ Yes ☒ No, to be completed by ___90 Day___ unless specifically modified by court order.

Family Division Only: Has the Petitioner complied with Rule 1.25-A?   ☒ Yes ☐ No

Family Division Only: Has the Respondent complied with Rule 1.25-A?   ☒ Yes ☐ No

Interrogatories to be sent by _45 Days_     Depositions to be completed by _60_

Exchange of documents by _45 Day_          Disclosure of experts on/by _PTC_

Exchange appraisals by _45 Days_           Exchange pensions, etc. by _45 Day_

Other: _____

5a.   Has the Petitioner attended CIP?       ☐ Yes   ☒ No   ☐ N/A
5b.   Has the Respondent attended CIP?       ☒ Yes   ☐ No   ☐ N/A



Case Name: _____

Case Number: _____

<u>SCHEDULING CONFERENCE ORDER</u>

6. Have the Parties Attempted Mediation or other ADR?    ☐ Yes    ☒ No

   If no, why not? _Would like mediation 30 to 45 days_

7. Mediation ordered? ☒ Yes, see attached Order on Appointment of Mediator    ☐ No

8. Guardian *ad Litem* to be Appointed? _Reg: J Durkin._    ☐ Yes    ☐ No
   (If yes, see attached Order on Appointment of Guardian *ad Litem*.)

   GAL report to be filed by _TBO_

9. Miscellaneous: _____

10. Next Conference/Date and Time:
    ☒ Pretrial: _1-14-16  @  9:30_

    ☐ Motion: _____
    ☒ Final Hearing: _2-22-16  @  9:00_
    ☐ Other: _____

11. Amount of Time Requested: _1/2 to 1 Day_

12. Likelihood of Settlement: _Unknown but hopeful_

13. Monitor Requested? ☐ Yes    ☐ No

14: Other:

_____

_____

_____

_____

_____

_____

_____

**So Ordered:**

<u>August 20, 2015</u>
Date

Signature - Hon. Julie A. Introcaso

<u>NOTE</u>

This is a court order. The court intends to enforce the discovery deadlines and provisions described in this order. A party must request enforcement of this order by motion in a timely manner. If you settle the case before the next hearing date, or if the amount of time requested has been reduced due to partial agreements, please notify the court as soon as possible.

EXHIBIT 17
Judge I.
2/8/2021

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
http://www.courts.state.nh.us

Court Name: 9th Circuit-Family Division Nashua

Case Name: _Dana Albrecht and Katherine Albrecht_

Case Number: _659-2016-DM-00258_
(if known)

## ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM*
### (Divorce/Parenting)

Petitioner's Name: _Dana Albrecht 8/1/71_    D.O.B.

Respondent's Name: _Katherine Albrecht 8/17/66_    D.O.B.

Street Address: _38 E NASHUA ROAD_

Street Address: _214 Worcester Rd._

City, State, Zip: _WINDHAM, NH 03087-1139_

City, State, Zip: _Hollis, NH 03049_

Telephone: _(603) 809-1097_    E-Mail Address

Telephone: _(626) 484-4042_    E-Mail Address

The following order shall be entered:

1. The attached Standing Order Relative to Guardian *ad Litem* Appointment (hereinafter referred to as the "Standing Order") is made a part of this order.

2. Name: _Kathleen Sternenberg_ Telephone: _644-1048_
   Address: _27 Webster St. Manchester, NH_

is appointed Guardian *ad Litem* of the child(ren):

| | | D.O.B. |
|---|---|---|
| C█████ *Albrecht* | D.O.B. █████/2000 |
| G████ *Albrecht* | D.O.B. █████/2006 |
| S█████ *Albrecht* | D.O.B. █████/2004 |

**\* If you are not currently a board certified GAL you must notify the Court immediately and this order will be vacated. If at any time during appointment your certification lapses, you must notify the Court immediately and file a motion to withdraw.**

3. The Guardian *ad Litem* shall investigate the following issues and make recommendations to the court thereon:

   ☑ Decision-making responsibilities

   ☑ Residential responsibilities

   ☐ Parenting time

   ☐ Special needs of the child(ren) (specify):

   _____

   _____

   ☑ Counseling for family/individual counseling for ☐ Petitioner ☐ Respondent ☑ child(ren)

   ☐ Psychological evaluations of ☐ Petitioner ☐ Respondent ☐ child(ren)

NHJB-2070-F (09/30/2014)                Page 1 of 4

Case Name: _____

Case Number: _____

**ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM* (Divorce/Parenting)**

☑ Parenting skills of ☐ Petitioner ☐ Respondent ☑ both parties

☑ Appropriateness of the home environment of ☐ Petitioner ☐ Respondent ☑ both parties

☐ Substance abuse: ☐ alcohol ☐ drugs ☐ both ☐ other _____

☑ Violence, physical abuse, emotional abuse

☐ Sexual abuse of

☐ Supervision of parenting time

☐ Rights of grandparents to visit

☐ Influence of companions of either party on child(ren)

☑ Maturity of child(ren) stating a preference

☐ Travel arrangements

☐ Time, place and manner of exchange for parenting time

☑ Assessment of bond between child and each parent and/or between siblings

☑ Other issues which the GAL deems relevant based upon the investigation

☐ Other (specify):

_____

_____

4. The Court sets the maximum fee in this case at $4,000. The fee may only be exceeded with prior approval of the Court and notice to all parties. Payment of the costs and fees of the Guardian *ad Litem* shall be made as follows:

    A. **Percentage of payment:**

      ☑ The Petitioner shall pay __50__ % of the Guardian *ad Litem* fees.

      ☑ The Respondent shall pay __60__ % of the Guardian *ad Litem* fees.

    B. **Payment Orders:**

      ☐ Unless otherwise agreed with the Guardian *ad Litem*, the Guardian *ad Litem's* hourly rate shall be no more than $ _____. All parties must cooperate with the Guardian *ad Litem's* reasonable requests for payment.

      ☑ Unless otherwise agreed with the Guardian *ad Litem*, a retainer of $3,000 shall be paid to the Guardian *ad Litem* by no later than 11/2/16 in the proportion set forth in the paragraph above. In the event any party's payment is not made in accordance with this Order, the other party or the GAL may request a hearing. The party not in compliance with this Order may be required to appear at the hearing, prepared to show cause why s/he should not be held in contempt of court. Unless otherwise ordered, the Guardian *ad Litem* is not required to commence an investigation until the retainer is paid in full.

      ☐ Other Payment Orders:

_____

_____

5. Other provisions:

_____

_____

6. Guardian *ad Litem* Stipulations to be filed by: __11/9/16__

NHJB-2070-F (09/30/2014)          Page 2 of 4

Case Name: _____

Case Number: _____

ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM* (Divorce/Parenting)

7.    Preliminary Report to be filed by: _1/20/17_

8.    Final Report to be filed by: _TBD_

**Recommended:**

_10/13/16_

Date

_Bruce F. Dalpra_

Signature of Marital Master

**BRUCE F. DALPRA**

Printed Name of Marital Master

MARITAL MASTER

**So Ordered:**

I hereby certify that I have read the recommendation(s) and agree that, to the extent the marital master/judicial referee/hearing officer has made factual findings, she/he has applied the correct legal standard to the facts determined by the marital master/judicial referee/hearing officer.

_10/13/16_

Date

Signature of Judge

**JULIE A. INTROCASO**

Printed Name of Judge

---

## STANDING ORDER RELATIVE TO GUARDIAN *AD LITEM* APPOINTMENT

This order applies to all Guardian *ad Litem* appointments unless its terms are altered by an order entered in a specific case. Any changes in the order or the stipulations must be in writing and filed with the court.

1.    GUARDIAN *AD LITEM* STIPULATION:

In every case in which a Guardian *ad Litem* is appointed, the parties and the Guardian shall file a stipulation as to the following issues:

a.    Expenses for which the Guardian *ad Litem* will be reimbursed;

b.    Guardian *ad Litem* hourly billing rate and the maximum fee established by the court in this case;

c.    Frequency of billing, terms of payment, and payment of retainer;

d.    The names of the individuals requested to be interviewed by the Guardian *ad Litem*, including names, addresses, telephone numbers and relationship to party or child, listed in order of importance. The Guardian *ad Litem* shall have the discretion to decide which individuals to interview;

e.    Manner in which the Guardian *ad Litem* will communicate with each party's references (e.g., office conference, telephone call, letter);

f.    Action(s) the Guardian *ad Litem* will take if unable to contact a reference;

g.    Whether the Guardian *ad Litem* will visit each party's home;

h.    Whether conversations between the Guardian *ad Litem* and the children will be confidential;

i.    Other orders necessary to protect confidentiality; and

j.    Dates by which parties will execute authorizations for reports. Specify records to be requested.

If this stipulation is not filed by the date set forth in the Order on Appointment of Guardian *ad Litem*, the court shall schedule an immediate enforcement hearing at the request of the Guardian *ad Litem* or either party.

Case Name: _____

Case Number: _____

**ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM* (Divorce/Parenting)**

## 2. GUARDIAN *AD LITEM* FEES:

a. The Guardian ad Litem shall be compensated at the rate of $_____ per hour. The maximum fee set by the court (including costs) shall not exceed $_____ for this case, and shall include attendance at hearings.

b. Parties, counsel and the GAL shall be aware of the GAL fees and costs and shall take reasonable action to contain those fees and costs. Maximum limits will be strictly enforced.

c. The maximum fee shall not be exceeded without prior approval of the court after hearing with the parties and the Guardian *ad Litem* present. Any request to exceed the maximum shall be filed with the court in writing and shall set forth in detail the reasons for the request and the amount by which the maximum is to be exceeded.

d. When the parties are paying the cost of the GAL, the $_____ per hour rate and the maximum fee set by the court may be waived upon written agreement of the parties and counsel which shall be filed with the court and subject to court approval. The agreement shall set forth the hourly rate and the maximum fee agreed to by the parties.

e. If counseling, therapy or evaluations are recommended by the GAL, no expenses for those may be incurred without the prior approval of the court after hearing. Notwithstanding the above, the court may enter orders upon motion of either party, or *sua sponte*, to authorize specific additional services with appropriate limits on payment.

## 3. COMMENCEMENT, SUSPENSION AND RESUMPTION OF WORK:

The Guardian *ad Litem* shall commence an investigation on receipt of the Order of Appointment and, unless otherwise ordered, on receipt of payment of the retainer in full, and shall diligently investigate the case, and prepare a report. If the parties agree to suspend the investigation and preparation of a report for any reason, they shall immediately seek the assent of the Guardian *ad Litem* to such suspension and file with the Court a written agreement to suspend the Guardian *ad Litem*'s work. This agreement shall be signed by all parties, including the Guardian *ad Litem* who shall suspend work on the case on receipt of notice that the Court has approved the agreement.

A party desiring that the Guardian *ad Litem* resume work on the case shall immediately file an appropriate motion and shall send a copy of the motion to the Guardian *ad Litem* who shall resume work in that case only on receipt of the court's notice that the motion has been granted.

## 4. PLEADINGS AND STIPULATIONS:

Each party shall certify on every pleading that s/he has mailed or delivered a copy of the pleading to the Guardian *ad Litem*.

The parties may agree on any issue concerning the child(ren) or incapacitated adult, and shall certify that s/he has mailed or delivered a copy of the written agreement to the Guardian *ad Litem*. The Guardian *ad Litem* may sign the agreement or file an objection, if appropriate, within ten days from the date of mailing or delivery.

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
http://www.courts.state.nh.us



**EXHIBIT** 18
Judge I.
2/8/2021

| | |
|---|---|
| Court Name: | 9th Circuit – Family Division – Nashua |
| Case Name: | In the Matter of Cheryl Yiatras and Mark Yiatras |
| Case Number: (if known) | 659-2016-DM-00322 |

~~[RESPONDENT'S PROPOSED]~~
## ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM*
### (Divorce/Parenting)

| | | | |
|---|---|---|---|
| Cheryl Yiatras | ▮/1976 | Mark Yiatras | ▮/1970 |
| Petitioner's Name | D.O.B. | Respondent's Name | D.O.B. |
| 28 Roy Drive | | 43 Central St. Apt #B | |
| Street Address | | Street Address | |
| Hudson, NH 03051 | | Hudson, NH 03051 | |
| City, State, Zip | | City, State, Zip | |

| | | | |
|---|---|---|---|
| Telephone | E-Mail Address | Telephone | E-Mail Address |

The following order shall be entered:

1. The attached Standing Order Relative to Guardian *ad Litem* Appointment (hereinafter referred to as the "Standing Order") is made a part of this order. *Kathleen A. Sternenberg, Esq.*

2. Name: ~~Courtney Curran Vore~~    Telephone: ~~(603) 883-0797~~

    Address: ~~Wells, White & Fontaine, P.C. 29 Factory Street, Nashua, NH 03061~~

    is appointed Guardian *ad Litem* of the child(ren):

| | | |
|---|---|---|
| N▮ A▮ Y▮ | D.O.B. | ▮/2001 |
| C▮ J▮ Y▮ | D.O.B. | ▮/2004 |
| C▮ L▮ Y▮ | D.O.B. | ▮/2006 |

**\* If you are not currently a board certified GAL you must notify the Court immediately and this order will be vacated. If at any time during appointment your certification lapses, you must notify the Court immediately and file a motion to withdraw.**

3. The Guardian *ad Litem* shall investigate the following issues and make recommendations to the court thereon:

☐  Decision-making responsibilities

☒  Residential responsibilities

☒  Parenting time

☐  Special needs of the child(ren) (specify):

_____

_____

☐  Counseling for family/individual counseling for ☐ Petitioner ☐ Respondent ☐ child(ren)

☐  Psychological evaluations of ☐ Petitioner ☐ Respondent ☐ child(ren)

Case Name: _____ In the Matter of Cheryl Yiatras and Mark Yiatras _____

Case Number: _____ 659-2016-DM-00322 _____

**ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM***

☐ Parenting skills of ☐ Petitioner ☐ Respondent ☐ both parties

☐ Appropriateness of the home environment of ☐ Petitioner ☐ Respondent ☐ both parties

☐ Substance abuse: ☐ alcohol ☐ drugs ☐ both ☐ other _____

☐ Violence, physical abuse, emotional abuse

☐ Sexual abuse of

☐ Supervision of parenting time

☐ Rights of grandparents to visit

☐ Influence of companions of either party on child(ren)

☐ Maturity of child(ren) stating a preference

☒ Travel arrangements

☐ Time, place and manner of exchange for parenting time

☐ Assessment of bond between child and each parent and/or between siblings

☒ Other issues which the GAL deems relevant based upon the investigation

☐ Other (specify):

_____

4. Payment of the costs and fees of the Guardian *ad Litem* shall be made as follows, in the first instance:

**A. Percentage of payment:**

☒ The Petitioner shall pay __50__ % of the Guardian *ad Litem* fees. *[signature]* 2/22/17

☒ The Respondent shall pay __50__ % of the Guardian *ad Litem* fees.

**B. Payment Orders:**

☒ Unless otherwise agreed with the Guardian *ad Litem*, the Guardian *ad Litem's* hourly rate shall be no more than $ __100__ . All parties must cooperate with the Guardian *ad Litem* reasonable requests for payment.

☒ Unless otherwise agreed with the Guardian *ad Litem*, a retainer of $ __1,500__ shall be paid to the Guardian *ad Litem* by no later than __3/10/17__ in the proportion set forth in the paragraph above. In the event any party's payment is not made in accordance with this Order, the other party or the GAL may request a hearing. The party not in compliance with this Order may be required to appear at the hearing, prepared to show cause why s/he should not be held in contempt of court. Unless otherwise ordered, the Guardian *ad Litem* is not required to commence an investigation until the retainer is paid in full.

☐ Other Payment Orders:

_____

5. Other provisions:

_____

**Case Name:** _____ In the Matter of Cheryl Yiatras and N___ ___ Yiatras

**Case Number:** _____ 659-2016-DM-00322

**ORDER ON APPOINTMENT OF GUARDIAN** *AD LITEM*

7. Preliminary Report to be filed by: _____ N/A

8. Final Report to be filed by: _____ May 1, 2017

**Recommended:**

_____                    _____
Date                                         Signature of Marital Master


                                             _____
                                             Printed Name of Marital Master

**So Ordered:**

I hereby certify that I have read the recommendation(s) and agree that, to the extent the marital master/judicial referee/hearing officer has made factual findings, she/he has applied the correct legal standard to the facts determined by the marital master/judicial referee/hearing officer.

_____2/22/17_____                            _____
Date                                         Signature of Judge

                                             Julie A. Introcaso
                                             _____
                                             Printed Name of Judge

---

| **STANDING ORDER RELATIVE TO GUARDIAN *AD LITEM* APPOINTMENT** |

This order applies to all Guardian *ad Litem* appointments unless its terms are altered by an order entered in a specific case. Any changes in the order or the stipulations must be in writing and filed with the court.

1. **GUARDIAN *AD LITEM* STIPULATION:**

   In every case in which a Guardian *ad Litem* is appointed, the parties and the Guardian shall file a stipulation as to the following issues:

   a. Expenses for which the Guardian *ad Litem* will be reimbursed;

   b. Guardian *ad Litem* hourly billing rate and maximum fee;

   c. Frequency of billing, terms of payment, and payment of retainer;

   d. The names of the individuals requested to be interviewed by the Guardian *ad Litem*, including names, addresses, telephone numbers and relationship to party or child, listed in order of importance. The Guardian *ad Litem* shall have the discretion to decide which individuals to interview;

   e. Manner in which the Guardian *ad Litem* will communicate with each party's references (e.g., office conference, telephone call, letter);

   f. Action(s) the Guardian *ad Litem* will take if unable to contact a reference;

   g. Whether the Guardian *ad Litem* will visit each party's home;

   h. Whether conversations between the Guardian *ad Litem* and the children will be confidential;

   i. Other orders necessary to protect confidentiality; and

   j. Dates by which parties will execute authorizations for reports. Specify records to be requested.

   If this stipulation is not filed by the date set forth in the Order on Appointment of Guardian *ad Litem*, the court shall schedule an immediate enforcement hearing at the request of the Guardian *ad Litem* or either party.

| Case Name: | In the Matter of Cheryl Yiatras and M. Yiatras |
|---|---|
| Case Number: | 659-2016-DM-00322 |

**ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM***

2. GUARDIAN *AD LITEM* FEES:

a. The Guardian *ad Litem* shall be compensated at the rate of $60.00 per hour. The maximum fee (including costs) shall not exceed $1,000.00 for any case, and shall include attendance at hearings.

b. Parties, counsel and the GAL shall be aware of the GAL fees and costs and shall take reasonable action to contain those fees and costs. Maximum limits will be strictly enforced.

c. The maximum fee shall not be exceeded without prior approval of the court after hearing with the parties and the Guardian *ad Litem* present. Any request to exceed the maximum shall be filed with the court in writing and shall set forth in detail the reasons for the request and the amount by which the maximum is to be exceeded.

d. When the parties are paying the cost of the GAL, the $60.00 per hour rate and the $1,000.00 maximum fee may be waived upon written agreement of the parties and counsel which shall be filed with the court and subject to court approval. The agreement shall set forth the hourly rate and the maximum fee agreed to by the parties.

e. If counseling, therapy or evaluations are recommended by the GAL, no expenses for those may be incurred without the prior approval of the court after hearing. Notwithstanding the above, the court may enter orders upon motion of either party, or *sua sponte*, to authorize specific additional services with appropriate limits on payment.

3. COMMENCEMENT, SUSPENSION AND RESUMPTION OF WORK:

The Guardian *ad Litem* shall commence an investigation on receipt of the Order of Appointment and shall diligently investigate the case, and prepare a report. If the parties agree to suspend the investigation and preparation of a report for any reason, they shall immediately seek the assent of the Guardian *ad Litem* to such suspension and file with the Court a written agreement to suspend the Guardian *ad Litem* 's work. This agreement shall be signed by all parties, including the Guardian *ad Litem* who shall suspend work on the case on receipt of notice that the Court has approved the agreement.

A party desiring that the Guardian *ad Litem* resume work on the case shall immediately file an appropriate motion and shall send a copy of the motion to the Guardian *ad Litem* who shall resume work in that case only on receipt of the court's notice that the motion has been granted.

4. PLEADINGS AND STIPULATIONS:

Each party shall certify on every pleading that s/he has mailed or delivered a copy of the pleading to the Guardian *ad Litem*.

The parties may agree on any issue concerning the child(ren) or incapacitated adult, and shall certify that s/he has mailed or delivered a copy of the written agreement to the Guardian *ad Litem*. The Guardian *ad Litem* may sign the agreement or file an objection, if appropriate, within ten days from the date of mailing or delivery.

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### http://www.courts.state.nh.us

Court Name: _____ 9th Circuit – Family Division – Nashua _____

Case Name: _____ In the Matter of Cheryl Yiatras and Mark Yiatras _____

Case Number: _____ 659-2016-DM-00322 _____
(if known)

### *Petitioner's Proposed*
### ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM*
### (Divorce/Parenting)

| Cheryl Yiatras | ▇/1976 | Mark Yiatras | ▇/1970 |
|---|---|---|---|
| Petitioner's Name | D.O.B. | Respondent's Name | D.O.B. |
| 28 Roy Drive | | 43 Central St. Apt #B | |
| Street Address | | Street Address | |
| Hudson, NH 03051 | | Hudson, NH 03051 | |
| City, State, Zip | | City, State, Zip | |

| Telephone | E-Mail Address | Telephone | E-Mail Address |
|---|---|---|---|

The following order shall be entered:

1. The attached Standing Order Relative to Guardian *ad Litem* Appointment (hereinafter referred to as the "Standing Order") is made a part of this order.

2. Name: __George R. LaRocque, Jr.__    Telephone: __(603) 579-5401__
   Address: __46 Central Street, Hudson, NH 03051__

   is appointed Guardian *ad Litem* of the child(ren):

| N▇ A▇ Y▇ | D.O.B. | ▇/2001 |
|---|---|---|
| C▇ J▇ Y▇ | D.O.B. | ▇2004 |
| C▇ L▇ Y▇ | D.O.B. | ▇/2006 |

**\* If you are not currently a board certified GAL you must notify the Court immediately and this order will be vacated. If at any time during appointment your certification lapses, you must notify the Court immediately and file a motion to withdraw.**

3. The Guardian *ad Litem* shall investigate the following issues and make recommendations to the court thereon:

   ☐ Decision-making responsibilities

   ☒ Residential responsibilities

   ☒ Parenting time

   ☐ Special needs of the child(ren) (specify): _____

   _____

   ☐ Counseling for family/individual counseling for ☐ Petitioner ☐ Respondent ☐ child(ren)

   ☐ Psychological evaluations of ☐ Petitioner ☐ Respondent ☐ child(ren)        47

Case Name: _____ In the Matter of Cheryl Yiatras and Mark Yiatras _____

Case Number: _____ 659-2016-DM-00322 _____

**ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM***

☐ Parenting skills of ☐ Petitioner ☐ Respondent ☐ both parties

☐ Appropriateness of the home environment of ☐ Petitioner ☐ Respondent ☐ both parties

☐ Substance abuse: ☐ alcohol ☐ drugs ☐ both ☐ other _____

☐ Violence, physical abuse, emotional abuse

☐ Sexual abuse of

☐ Supervision of parenting time

☐ Rights of grandparents to visit

☐ Influence of companions of either party on child(ren)

☐ Maturity of child(ren) stating a preference

☒ Travel arrangements

☐ Time, place and manner of exchange for parenting time

☐ Assessment of bond between child and each parent and/or between siblings

☒ Other issues which the GAL deems relevant based upon the investigation

☐ Other (specify): _____

_____

_____

4. Payment of the costs and fees of the Guardian *ad Litem* shall be made as follows, in the first instance:

   **A. Percentage of payment:**

   ☒  The Petitioner shall pay ___60___ % of the Guardian *ad Litem* fees.

   ☒  The Respondent shall pay ___50___ % of the Guardian *ad Litem* fees.

   **B. Payment Orders:**

   ☒  Unless otherwise agreed with the Guardian *ad Litem*, the Guardian *ad Litem's* hourly rate shall be no more than $ ___100___ . All parties must cooperate with the Guardian *ad Litem* reasonable requests for payment.

   ☒  Unless otherwise agreed with the Guardian *ad Litem*, a retainer of $ ___1,500___ shall be paid to the Guardian *ad Litem* by no later than ___2/24/17___ in the proportion set forth in the paragraph above. In the event any party's payment is not made in accordance with this Order, the other party or the GAL may request a hearing. The party not in compliance with this Order may be required to appear at the hearing, prepared to show cause why s/he should not be held in contempt of court. Unless otherwise ordered, the Guardian *ad Litem* is not required to commence an investigation until the retainer is paid in full.

   ☐  Other Payment Orders:

   _____

   _____

5.    Other provisions:

_____

Case Name: _____ In the Matter of Cheryl Yiatras and ...ark Yiatras
Case Number: _____ 659-2016-DM-00322
ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM*

7.  Preliminary Report to be filed by: _____ N/A

8.  Final Report to be filed by: _____ May 1, 2017

**Recommended:**

_____          _____
Date                                Signature of Marital Master

                                    _____
                                    Printed Name of Marital Master

**So Ordered:**
I hereby certify that I have read the recommendation(s) and agree that, to the extent the marital master/judicial referee/hearing officer has made factual findings, she/he has applied the correct legal standard to the facts determined by the marital master/judicial referee/hearing officer.

_____          _____
Date                                Signature of Judge

                                    _____
                                    Printed Name of Judge

---

**STANDING ORDER RELATIVE TO GUARDIAN *AD LITEM* APPOINTMENT**

This order applies to all Guardian *ad Litem* appointments unless its terms are altered by an order entered in a specific case. Any changes in the order or the stipulations must be in writing and filed with the court.

1.  GUARDIAN *AD LITEM* STIPULATION:

In every case in which a Guardian *ad Litem* is appointed, the parties and the Guardian shall file a stipulation as to the following issues:

a. Expenses for which the Guardian *ad Litem* will be reimbursed;

b. Guardian *ad Litem* hourly billing rate and maximum fee;

c. Frequency of billing, terms of payment, and payment of retainer;

d. The names of the individuals requested to be interviewed by the Guardian *ad Litem*, including names, addresses, telephone numbers and relationship to party or child, listed in order of importance. The Guardian *ad Litem* shall have the discretion to decide which individuals to interview;

e. Manner in which the Guardian *ad Litem* will communicate with each party's references (e.g., office conference, telephone call, letter);

f. Action(s) the Guardian *ad Litem* will take if unable to contact a reference;

g. Whether the Guardian *ad Litem* will visit each party's home;

h. Whether conversations between the Guardian *ad Litem* and the children will be confidential;

i. Other orders necessary to protect confidentiality; and

j. Dates by which parties will execute authorizations for reports. Specify records to be requested.

If this stipulation is not filed by the date set forth in the Order on Appointment of Guardian *ad Litem*, the court shall schedule an immediate enforcement hearing at the request of the Guardian *ad Litem* or either party.

Case Name: _____ In the Matter of Cheryl Yiatras and ark Yiatras

Case Number: _____ 659-2016-DM-00322

## ORDER ON APPOINTMENT OF GUARDIAN *AD LITEM*

2.  **GUARDIAN *AD LITEM* FEES:**

    a. The Guardian *ad Litem* shall be compensated at the rate of $60.00 per hour. The maximum fee (including costs) shall not exceed $1,000.00 for any case, and shall include attendance at hearings.

    b. Parties, counsel and the GAL shall be aware of the GAL fees and costs and shall take reasonable action to contain those fees and costs. Maximum limits will be strictly enforced.

    c. The maximum fee shall not be exceeded without prior approval of the court after hearing with the parties and the Guardian *ad Litem* present. Any request to exceed the maximum shall be filed with the court in writing and shall set forth in detail the reasons for the request and the amount by which the maximum is to be exceeded.

    d. When the parties are paying the cost of the GAL, the $60.00 per hour rate and the $1,000.00 maximum fee may be waived upon written agreement of the parties and counsel which shall be filed with the court and subject to court approval. The agreement shall set forth the hourly rate and the maximum fee agreed to by the parties.

    e. If counseling, therapy or evaluations are recommended by the GAL, no expenses for those may be incurred without the prior approval of the court after hearing. Notwithstanding the above, the court may enter orders upon motion of either party, or *sua sponte*, to authorize specific additional services with appropriate limits on payment.

3.  **COMMENCEMENT, SUSPENSION AND RESUMPTION OF WORK:**

    The Guardian *ad Litem* shall commence an investigation on receipt of the Order of Appointment and shall diligently investigate the case, and prepare a report. If the parties agree to suspend the investigation and preparation of a report for any reason, they shall immediately seek the assent of the Guardian *ad Litem* to such suspension and file with the Court a written agreement to suspend the Guardian *ad Litem* 's work. This agreement shall be signed by all parties, including the Guardian *ad Litem* who shall suspend work on the case on receipt of notice that the Court has approved the agreement.

    A party desiring that the Guardian *ad Litem* resume work on the case shall immediately file an appropriate motion and shall send a copy of the motion to the Guardian *ad Litem* who shall resume work in that case only on receipt of the court's notice that the motion has been granted.

4.  **PLEADINGS AND STIPULATIONS:**

    Each party shall certify on every pleading that s/he has mailed or delivered a copy of the pleading to the Guardian *ad Litem*.

    The parties may agree on any issue concerning the child(ren) or incapacitated adult, and shall certify that s/he has mailed or delivered a copy of the written agreement to the Guardian *ad Litem*. The Guardian *ad Litem* may sign the agreement or file an objection, if appropriate, within ten days from the date of mailing or delivery.

**EXHIBIT** 19

Judge I.

2/8/2021

tabbies'

**From:** Hon. Julie Introcaso <JIntrocaso@courts.state.nh.us>
**Sent:** Thursday, November 29, 2018 3:34 PM
**To:** Timothy C. Coughlin <TCoughlin@nhtrialattorneys.com>; Andrew J. Piela <ajp@hamker.com>
**Cc:** Kathleen Sternenberg <kas@Sternenberglaw.com>
**Subject:** GAL Appointment

Counsel,

After calling several GALs (most of whom don't pick up the phone, Attorney Sternenberg and I spoke briefly about the case basics, particularly the need to work expeditiously on the matter given the holidays and the short time between appointment and NCE.
I need to state that having practiced law in Manchester for about 12 years prior to working for the Court beginning in 2000, Attorney Sternenberg and I became good friends and cooperative colleagues in the marital bar. She has an excellent reputation as a GAL in Manchester and rarely comes to Nashua. As I sit in Nashua each day, I don't see her often, although I still consider her a friend.

One of the reasons for that is my deep respect for her work ethic and professionalism. I think she will do a great job, she will do it with diligence, and I hope to assure you that I have before, and likely will again, disagree and argue with her about a variety of matters.

I don't believe I would have any problem looking at her recommendation objectively and, perhaps deciding a case differently from any recommendation she might make, should this case go to trial.

If you have any concerns about the appointment, let me know in the next 27 minutes if possible. Otherwise, I will head out, certain that you will hear from her and move forward in the near future.

Judge I.

PS – Absent an objection, a hard copy of the order attached will go out in tomorrow's mail along with a Notice of Decision

CONFIDENTIAL                                    Introcaso 437

## Sherry Bisson

| | |
|---|---|
| **From:** | Hon. Julie Introcaso |
| **Sent:** | Thursday, January 09, 2020 10:12 AM |
| **To:** | Nancy Dabilis; Kimberly Silva; Aline Chasseur; Emily Redwood; Kimberly Nunez; Julianne Lodes |
| **Cc:** | Master Bruce F. Dalpra; Hon. Mark S. Derby; Hon. Patricia Quigley; Kimberly Bonenfant; Sherry Bisson |
| **Subject:** | David Campbell and David Partello - Divorce Case |
| **Importance:** | High |

Good Morning folks,

I know some you may recognize this case, it is unresolved and consists of two jackets of pleadings. I also learned that Ms. Partello has come to the counter at times for various reasons.

If you have had any contact with this file, could you please contact me TODAY at ext. 0930. I have a few questions about the file.

Thanks.

DEPOSITION EXHIBIT

INTROCASO
22

**EXHIBIT** 20
Judge I.
2/8/2021

1                                    NHJB 280

EXHIBIT 21

Judge I.
2/8/2021

New Hampshire Judicial Conduct Committee
c/o Robert T. Mittelholzer, Esq.
Executive Secretary
132 Chapel Street
Portsmouth, NH 03801

January 9, 2020

RE: JC-19-050-C

To the Honorable Committee:

As an introductory matter, I would first like to state that I don't consider myself as ever having "presided over" this case as Ms. Partello suggests on her Cover Sheet. I am not a Supervisory Justice and do not have any authority to assign cases. Few cases are ever actually "assigned" to any particular judge, and when they are – the judge is informed of such. I have also never conducted a hearing involving the opposing parties in this case. She has acted as counsel on a number of cases in which I was involved; less than 10, and in most of those matters I signed agreements without any hearing. I believe my last involvement with a case where she appeared as counsel was in 2013.

I recently had an opportunity to review the file and the record in this case upon my return from medical leave on December 16th, 2019, and I appreciate the time this Committee has given me to do so.

In reviewing what I have been given, it is obvious I issued **two rulings** on a motion from the general "signing pile" in the Clerk's office, dated March 12, 2019. I will discuss those in detail below.

Notices of Decision were issued by the Clerk's office that day. (Clerk ID: 579)[1] Clerk ID: 597 is the number assigned to clerk Julianne Lodes, the same clerk who brought me this file to physically review on or after January 2, 2019. I looked through each page of the file on January 9, 2020, my first opportunity to address this matter.

In reviewing the specific orders at #34 (Motion to Exceed Fees – *See* Exh. A) and #35 (Motion for Instruction *See* Exh. B)), I noticed that the orders that I had handwritten have been whited out – gone. You can read my orders underneath the white out, and there is a Notice of Decision on both of my orders. Those underlined original orders, along with the Notices of Decision, which repeat the language of my orders, have been forwarded to this Committee and, on a temporary basis, the Clerk has placed the duplicates in the file until such time as the Committee has reviewed the originals. This tampering with original court documents only came to my attention January 9, 2020. Why anything of this nature occurred is unknown to me as it has no effect – given the presence of the Notices of Decision; it only

---

[1] Every clerk who processes orders or Notices of Hearing through our Odyssey Case Management System is assigned an ID so that the clerk can track which member of the staff processed and documents that goes into the system or is printed for distribution for the parties and counsel.

makes it appear as though I may have done so in an attempt to avoid responsibility for these orders. I did no such thing. THIS IS EXTREMELY TROUBLING.

I went on leave as of October 7, 2019, returning to the Court once with my sister on Saturday, October 12, 2019. I did not enter the Clerk's office, but only retrieved some personal belongings from my office knowing I would be on extended leave until December 16, 2019. I never again entered the courthouse until my return.

I received Ms. Partello's complaint *via* Judge King whose office received the complaint and knew of my leave. He forwarded it to me at home November 19, 2019. (*See* Exh. C) I had no indication that such a complaint was forthcoming.

On January 9, 2020, I issued an email to anyone who may have been involved in processing orders or conducting hearings in this case in an attempt to determine who may have whited out my orders. (*See* Exh. A) I did not mention the issue I was to ask about so as not to deter someone from replying to my email. The staff has also reviewed the rather imperfect sign-out sheets to see who may have taken the file into their possession after the March 12, 2019, orders issued.

Ms. Partello received copies of my orders on March 12, 2019, which clearly show the orders I issued, both in my hand on the original document and on the Notices of Decision.

On March 15, 2019, I was again presented with a Motion to Continue a Status Conference Hearing. IT WAS AT THAT TIME THAT I ISSUED A HANDWRITTEN ORDER RECUSING MYSEL FROM THE CASE. A Notice of this Decision was also issued to the parties and counsel with respect to this handwritten order. (Clerk ID:659304)

Within that order I indicated that "

The Notices of Decision were issued on The signing pile most often includes administrative or procedural matters that require any judge's review and signature.  Some are motions without objections, some are agreements, some are requests for waivers of court fees, many of them are orders issued by the Master or referees, etc.

With respect to this case, I see that I approved the appointment of the GAL in this case, a recommendation  made wholly by Master Bruce DalPra without consultation with me, a recommendation to deny a Motion to Reconsider and a recommendation to deny a Motion to Strike (February 21, 2019 – three orders).

I do not know the facts of this case, I have held no hearings in this case, and again, the issues I became  aware of as a result of those motions were limited in scope to the point I never hesitated to co-sign without a review of the entire file.

IN DIRECT ANSWER TO THE ALLEGATIONS:

1. – 6.   I have no knowledge of the facts of this case.

7.        As stated above, Master DalPra appointed a GAL in this matter.  He chose the GAL without any consultation with me, and it would be unusual for him to do so. He is more experienced than I,  and has a past history which allows him to select  a Guardian ad litem whom he believes would be appropriate for any particular case.  I co-signed the fourth page of the Order on Appointment of Guardian ad litem, recognizing the content of page four, and likely without every looking to see who he had appointed.  My "judicial signing" is nearly always prepared by the staff after their review, of the in my capacity as a judge certifying that I believe …..

8.        Again, my Order with respect to this allegation was an approval of the recommendation of Master DalPra of whom I am confident has the expertise to make such orders and to do so only when they are appropriate and necessary. I have no idea if his order was the result of an agreement to select a GAL, a contested matter, etc.

9.        I did, indeed, go on to co-sign a few of Master DalPra's orders as a matter of routine signing. However, I  deny  I ever ordered (or granted) a motion to exceed.  I likely co-signed a recommendation of the Master who was handling the case; I trust his judgment in those matters.

With respect to the March 12, 2019, order on pleading #34, the Court received this motion in  the routine signing pile and the volume of the case itself indicated it was likely a contested matter. A GAL had been appointed and the parties were already arguing over her fees and there was an allegation by the GAL of non-payment of part of the retainer (and #35 was available for my review, making it clear

that this was most certainly a highly-contested case going forward). Based upon my past experience, and understanding that a modest retainer of $1000. was likely insufficient, I granted the motion knowing that the payment of GAL fees and the reapportionment of those fees could be reviewed and revised by the trial judge at any time.   I agree that my ruling on #34 could appear to be an attempt on my part to enrich Attorney Sternenberg, but it was an impartial assessment, affecting each party equally.  >  I NEED TO READ THE ORDER I WROTE.

With respect to the March 12, 2019, order on Pleading #35, (handwritten by the undersigned judge), I ordered, in response to a motion from Attorney Sternenberg regarding payment of her retainer, that payment of the GAL fees must be made in the form of cash, bank check or money order.  I noticed the motion was from Attorney Sternenberg, but I honestly found no reason to withhold issuing the order that I did as it was not about Attorney Sternenberg, Ms. Partello, or any other individual. No one stood to be enriched or advantaged by my ruling. It was intended as a general statement of this Court consistent with every other order I issue with regard to payments.

Frankly, I don't use or understand Applepay. I have never heard of a party or an attorney satisfying a legal obligation with Applepay, but that was not my motivation either. I found Ms. Partello's position, as set forth in Attorney Sternenberg's motion, to be untenable. I could not conceive of ordering any party to accept payment in a form they cannot negotiate or don't know how to negotiate. I have no idea if Attorney Sternenberg uses Apple products, if Applepay costs money or fees to the sender or recipient, etc. I just made a simple order to pay in a generally acceptable form of currency.

10.    The allegations with respect to a March 15, 2019, order will require a supplemental answer on my part. This order is not included in the complaint (despite the language in para. 10 stating "See Order attached.") which I received; however, I do not doubt that when the issue of the appropriate amount of fees Attorney Sternenberg could charge in the case became an issue, I almost certainly would have written something in the file to indicate I should no longer make any rulings in this case. I never appoint Attorney Sternenberg to my cases without a full disclosure, on the record. I don't know what hearing is being referred to, and I don't generally request that the clerk schedule hearings in cases other than my own. I will attempt to clarify this point upon my return, anticipated to be December 16, 2019.

11. Not only would I have had no opportunity to "disclose" the fact that I have had a personal relationship with Attorney Sternenberg, but the first time I appear to have touched the file was in cosigning an order of February 21, 2019. The case was opened sometime in the fall of 2018. To state I waited six months to disclose is patently false as I had no involvement in the case prior to February 2019 when I co-signed Master DalPra's order that stated"...Failure to do so may result in sanctions...." Those are not my words and that was not my decision, substantive or otherwise.

12.    Denied.

13. Denied. I have no such authority. Master DalPra was reassigned to sit in Derry District Court for most of 2019. Judge Derby picked up most of the cases he was handling in Nashua. No judge or clerk ever consulted with me about the "assignment" of this case.

14. I have no knowledge of this fact.

15. I made a one-time, rather paltry, donation to Gov. Shaheen's first senatorial campaign while attending a house party given for her support. I don't know if that was in 2002 or 2004, but it was many years before I became a judge or judicial candidate. I do not recuse myself from Shaheen and Gordon cases as I do not consider that donation as having created a conflict of interest.

16. I have no knowledge as to the factrs of this case.

17. I have no knowledge of the facts of this case.

18. Argumentative; I can't confirm or deny the facts asserted.

19. I am familiar with Dr. Doug Johnson's work and I have employed him for specific purposes in my own family law cases. Needless to say, the fact that his last name is Johnson is a ridiculous stretch of the imagination; I have no knowledge of any close relation with Dr. Johnson. Yes, my maiden name is Johnson. Kay Sternenberg's husband's last name is also Johnson. I have no knowledge of any familial relationship with him, either. He's an architect. I have no reason to believe Attorney Sternenberg's husband, David Johnson, knows Dr. Douglas Johnson either. Johnson is a common surname (citations omitted.)

As stated, I have been on leave since October 7, 2019. I thank Judge David King for sending this along so that I could meet the committee's deadline. Upon my return to work on December 16, 2019, I will get a hold of the file any try to provide a more enlighteneing answer to the allegations made aboiut "scheduling a status hearing" and what that entailed.

For now, I submit that I have committed no violations of the Judicial Code of Conduct despite Ms. Partello's beliefs.

RESPECTFULLY, I ask this Committee to accept this partial Answer for the purposes of Supreme Court Rule 40(7). Also, I ask for an extension to December 30 to investigate the remaining matter cited in allegation #10.

**EXHIBIT** 22
Judge I.
2/8/2021

## December 2019 Calendar

Courtesy of **WinCalendar**

This Excel calendar is blank & designed for easy use as a planner.

| | | | December 2019 | | | |
|---|---|---|---|---|---|---|
| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | Notes: | | | |

More Calendars:    January    February    2020

**EXHIBIT** 23
Judge I.
2/8/2021

# January 2020 Calendar

This Excel calendar is blank & designed for easy use as a planner.

Courtesy of **WinCalendar.com**

| | | | January 2020 | | | |
|---|---|---|---|---|---|---|
| **Sunday** | **Monday** | **Tuesday** | **Wednesday** | **Thursday** | **Friday** | **Saturday** |
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | Notes |

More Calendars:        February        March        2021