CONFIDENTIAL

EXHIBIT
P

# RESPONSE TO JUDICIAL CONDUCT COMPLAINT
**By Chief Justice Gordon J. MacDonald**

*The Committee requires you to provide a complete explanation of the decision to remove Ms. Martin from the position of Director of AOC, including, but not limited to responding to the following:*

1. **Describe, in detail, the history and nature of your relationship with Attorney Martin.**

**ANSWER:** I first met Attorney Martin when I became Attorney General in April 2017. At the time, she was an assistant attorney general in the transportation and construction bureau. After working with Attorney Martin and witnessing her level of knowledge and skill, I recommended that she be promoted to senior assistant attorney general and, in that position, she assumed responsibility for counseling and oversight of all executive branch procurement. *See,* RSA 21 - M:11, III. (Appointments to most professional positions within the office are based on the attorney general's recommendation but are subject to approval by the Governor and Council. *See,* RSA 21 - M:3).

Again, based on her skill and work performance, I recommended that Attorney Martin be promoted to associate attorney general and chief of staff. In that position, she focused on human resources, recruitment and retention for the entire department, while continuing in her role as the statewide procurement attorney. At the time, there were approximately 70 attorneys and 125 total employees in the department. She worked very hard and, to my knowledge, was well - respected and

well - liked by her colleagues and handled human resources issues skillfully and without any issues.

Attorney Martin left the Attorney General's office when she was confirmed by the Executive Council to be the Chair of the Public Utilities Commission in approximately September 2019.

When I began my current role, Christopher Keating was the AOC Director. Shortly thereafter, in 2021, he became a circuit court judge.

With respect to appointing a new AOC Director, I viewed that decision as one for the entire Supreme Court to make. As we began the process, it is my memory that all the justices – myself included – strongly wished that a current employee would consider becoming Director. My memory is that when approached about that prospect, that employee declined.

With the concurrence of the justices, the Judicial Branch engaged the National Center for State Courts (NCSC) to assist with a national search for a new AOC Director. The principal NCSC consultant eventually identified a very strong candidate who was then serving as the deputy state court administrator in a larger state. That candidate advanced to the very late stage of the selection process. However, at that late stage, the candidate informed us that family considerations would preclude relocating to New Hampshire.

At that point, with the concurrence of the justices, and with my strong support, we again asked the same employee to consider becoming AOC Director. Again, that employee declined.

Thereafter, it is my memory that senior AOC staff surveyed state government leaders for potential candidates. That effort brought forward the name of Attorney Martin. She was still serving as PUC chair. Attorney Martin interviewed with the members of the administrative council and with the justices. With the concurrence of the justices, she was offered the position as AOC Director, and began that role in November 2021.

During the time that the justices were considering Attorney Martin for AOC Director, I first became aware of rumors that I had an adulterous relationship with Attorney Martin. Specifically, my memory is that Justice Hantz Marconi told other justices that her spouse had heard at a Governor and Council meeting that Attorney Martin was my "girlfriend," or something to that effect. I immediately disclosed this to the then - Judicial Branch general counsel, and told her that it was false. I also discussed it with each of the justices individually, telling them it was false.

**I am aware that this false rumor has persisted. This rumor was and remains false and has caused great damage to me. I emphatically state**

**that my relationship with Attorney Martin has been, is, and will remain purely professional.**

Director Keating and I had met on an approximately weekly basis and he met with the entire Supreme Court on an approximately monthly basis. My memory is that this practice continued with Attorney Martin when she became AOC Director.

2. **Describe, in detail, your understanding of Attorney Martin's job performance as Director of AOC.**

**ANSWER:** We all have our strengths and weaknesses. A fair assessment of Attorney Martin's performance as Director of the AOC must account for both.

*a.* ***<u>Grants</u>***

When I began my tenure as the Chief Justice, the Judicial Branch had no meaningful ability to apply for or manage grants on a branch - wide basis. As a result, the branch was, in effect, leaving millions of dollars on the table and missing important opportunities to advance its mission. In the COVID era, the opportunities were particularly abundant, including under the American Rescue Plan Act of 2021 (ARPA).

Leveraging her knowledge of the field and her contacts, Attorney Martin successfully recruited and retained a highly qualified individual from the attorney general's office to lead a new office of strategic funding initiatives, which was

focused on obtaining and managing grants. That office has since brought millions of dollars into the branch.

***b. Safety and Security***

Likewise, when I began my tenure, the state of security – particularly in the circuit court – was unacceptable. (Security in the Circuit and Supreme Courts is a Judicial Branch responsibility; county sheriffs partner with the Judicial Branch as to security in the Superior Courts). As leaders, we have few higher duties than to do all we can to provide for the safety and security of court users, our staff and our judges. Unfortunately, this issue had long been ignored. I felt an intense urgency to make meaningful improvements and I shared this feeling with the other justices. My sense of responsibility and urgency only increased after the New Hampshire Hospital (NHH) shooting in 2023 as there is a circuit courtroom in NHH.

Attorney Martin led a multi-faceted effort to improve security. Drawing on her executive branch contacts, Attorney Martin worked with the Police Standards and Training Council leadership to develop a first-ever training program for court security officers (CSOs). She also assisted with legislation to authorize this training. She worked on a successful effort, as part of the budget process, to secure the necessary funding to standardize weapons and protective gear for CSOs. In the wake of the NHH incident, she worked with the Governor's Office

to secure ARPA funding to provide immediate physical security improvements in courthouses, as well as to conduct a comprehensive site-by-site physical security assessment at approximately 40 courthouse locations. She also successfully recruited a highly respected law enforcement professional to become the AOC Assistant Director for Safety and Security, which required legislative authorization.

Because of Attorney Martin's efforts, our CSOs are better trained and equipped and our courthouses are physically safer.

c. ***Access to Justice***

The Supreme Court established its Access to Justice Commission in approximately 2012. It is intended to focus on issues related to the inability of many to access lawyers to address their legal needs. In 2022, Justice Bassett became the Commission's co-chair. With the justices' support, Attorney Martin created the office of access and community engagement within the AOC to provide, for the first time, dedicated staff support for the Commission's work. With the strong support of the justices, Attorney Martin worked with the Governor's Office to secure ARPA funds for six access to justice - related pilot projects designed to explore different strategies to improve court access for self-represented litigants and others.

After this funding had been secured, Justice Bassett attended a national access to justice conference. I recall that that he reported back to the court how pleased he was to be able to report to the conference on these ARPA-funded projects and how uniquely positioned New Hampshire was relative to other states because of this funding.

*d.* ***Regional Meetings***

Justice Bassett suggested that there should be a regional meeting of all Supreme Court justices. I asked Attorney Martin if anything could be done to advance Justice Bassett's suggestion. She ultimately secured grant funding from NCSC for a conference, undertook the logistics, and coordinated with her state court administrative colleagues from around New England. As a result, New Hampshire was able to host a highly successful regional conference of justices and state court administrative leaders in the fall of 2023. Justice Bassett presided over the educational components of the conference. Attendces were grateful and highly complimentary of the New Hampshire Judicial Branch's efforts.

In an email dated March 31, 2025, Judicial Branch General Counsel Erin Creegan set forth a more complete list of Attorney Martin's accomplishments:

> In less than four years, [Attorney Martin] led an initiative in the Judicial Branch to improve court and community response to people experiencing mental illness, including obtaining grant funding and creating a mental health team; coordinated a statewide mental health

> summit in New Hampshire; helped create a new the [sic] Office of Access and Community Engagement; served as the first chair of the newly created Judicial Branch committee on domestic violence; improved access for victims by improving the website and forms; applied for and received grant funds to support increased data and analysis related to domestic violence cases; obtained $3 million in grant funding for Judicial Branch security after the shooting as [sic] at New Hampshire Hospital; worked on legislation to create a dedicated training program for our court security officers and oversaw implementation; started the first ever grant office in the Judicial Branch, which led to a dramatic increase in grant funding; and was instrumental in obtaining Opioid Abatement Funds to support the [Judicial Branch] community housing program.

*(GJM RESP 0297-0298).*[1]

While Attorney Martin did many aspects of her job well, the court became increasingly aware that Attorney Martin's management skills and style may have been leading to operational issues at the AOC. An assessment of Attorney Martin's performance must also take into account the circumstances she confronted. Among them:

a. As described in detail below, the AOC was structurally flawed, leading to siloization and institutional dysfunction.

b. Also, as described below, there was a power differential between judicial officers and the non-judicial AOC Director.

c. The AOC Director's job description was very broad and hence not realistic for one person to manage.

[1] See attached Appendix.

d. Because of funding constraints, there was no redundancy and virtually no support for the position or other senior positions within the AOC.

e. By its nature, the AOC Director was required to implement policies or programs that may not have had universal support among judges or AOC staff.

Notwithstanding the above considerations, over time, the court became increasingly aware that Attorney Martin's management skills and style may have been leading to operational issues at the AOC, thus compounding the institutional dysfunction. Of particular concern was the departure of some long-standing staff (although, to be fair, Attorney Martin did recruit and retain some highly qualified individuals into important positions). These concerns became acute in mid-2024. On May 1, 2024, the court had received a complaint from a then-AOC employee making several allegations about Attorney Martin. The court retained Attorney Debra Weiss Ford to provide counsel with respect to the employee's complaint. Attorney Weiss Ford, in turn, identified Aleta Law to serve as a neutral, external factfinder for the purpose of investigating the employee's complaint. On July 9, 2024, the court received a final report. The investigation determined that there were insufficient facts to sustain the employee's allegations. However, the report

discussed differing perspectives within the AOC about Attorney Martin's management style.

Attorney Martin became aware of the report's discussions of her management style. Her concerns were set forth in an email to Attorney Weiss Ford and me, dated July 22, 2024. On the same day, I forwarded that email to the other justices and attached the following documents: NHJB job description of AOC Director; Dianne Martin list of accomplishments; Supreme-Court-AO-2023-06-amended; and, fw: investigation concluded. *(GJM RESP 0299-0319).*

The court decided to continue to retain Attorney Weiss Ford for purposes of obtaining advice about steps to be taken to address concerns raised in the report with respect Attorney Martin's management. My memory is that I called Attorney Weiss Ford to ask for her assistance. Attorney Weiss Ford did provide a recommendation regarding a consultant to assist with addressing issues at the AOC. *(GJM RESP 0331-0336).* The steps the court took are reflected in a document entitled "Timeline – MBC's notes from Calls with Deb Ford." *(GJM RESP 0320-0330).* Those notes, made by Justice Countway, reflect the following:

a. On July 11, 2024: During a call with Attorney Weiss Ford, the court "discussed developing an action plan to address the culture at the AOC including retaining a facilitator and revising and paring

down the Director's job description along with empowering managers, perhaps having a chief operating officer."

b. On July 23, 2024, Attorney Weiss Ford reported that Attorney Martin was "wildly upset, crying, incoherent" about the investigation report.

c. Late summer and fall 2024, the court was "basically hands-off during the period of FMLA."

d. On December 4, 2024, the court discussed with Attorney Weiss Ford "finding a consultant for the AOC," "FMLA issues" and some "planned messaging" that the employee investigation had "revealed personnel and communications issues and that we would have an outside consultant work with the AOC team to improve and that participation would be required."

e. On January 23, 2025, Justices Donovan and Countway had a call with Attorney Weiss Ford during which they discussed:

> ... new information regarding HR being siloed and bills not being paid on time; discussed concerns for a FMLA type claim alleging retaliation and how intermittent FMLA works; She discussed concerns of taking action in proximity to FMLA and recommended a 6 – 12 month no action timeframe [i.e. before taking action against an employee who has been on FMLA]; discussed concerns about [redacted] we discussed a severance agreement; discussed that if DM brought a claim she

> would have to prove it; discussed having a business reason for change; discussed a pathway [to the OBA job] and that GJM had discussed it with her twice but "DM [did] not bite". Discussed strategy of bringing her in and expressing our concerns as a first step and to see what she says in a "listening session". We discussed concerns about her "screaming" at Deb Ford in the past. Discussed goal of insulating us from liability and the suggestion that we offer paid leave if she "blows up". Noted that she had floundered in MBC trying to work with her and her asking PED to conduct Matt Seaton's evaluation. DF advised that it was OK for us to ask her "are you back to work full time."
>
> It was "during this timeframe" that Justices Donovan and Countway had meetings with Chief Justice Mark Howard and Circuit Count Administrative Judge Ellen Christo "who described the problems at [the] AOC and expressed being at a breaking point."

f. On February 25, 2025, Justices Donovan and Countway had another call with Attorney Weiss Ford. The note prepared following this call states:

> PED and MBC had a phone call with Deb Ford [MBC notes on a prepared word document with preprinted questions]. Notes highlight we discussed having a judicial officer as head of the AOC; discussed restructuring the entire court. Discussed IT lockdown. Discussed the strategy of terminate first then offer the other job with severance pay and a release. Notes say to expect a blow up. We discussed the concern anything short of termination first would likely result in "FMLA immediately".

*Id.* at 0321.

In addition to the telephone communications with Attorney Weiss Ford documented by Justice Countway, there were email communications with Attorney Weiss Ford. Of note were two email communications immediately prior to February 28, 2025. On February 25, 2025, Justice Countway sent the following email to Attorney Weiss Ford:

> Hi Deb,
>
> Thank you for speaking with us again today about our concerns regarding the AOC director. We shared these concerns with the rest of the Court at conference this morning and have made the difficult decision to terminate the Director. Our concerns involve the management style, mass departures of long-term career employees (I count 14), mishandling of bill payments, and a culture of fear and retaliation. As you know, these concerns were noted in the investigator's report last July. We have conducted exit interviews and the theme is the same: micromanagement, siloing employees, prohibiting employees from talking to, meeting with, and even emailing one another, and creating a climate of fear.
>
> This also comes at a time when the Court is working toward achieving greater efficiency in the overall structure of the AOC and administration of the trial courts. We have concluded that our goals for the position, and Diane's management style do not align.
>
> Thank you for supporting us through this difficult transition.

*(GJM RESP 0337-0338).*

On February 26, 2025, Justice Countway sent the following email to Attorney Weiss Ford:

> Hi Deb,
>
> Just to follow up with our plans regarding the AOC Director .... Our goal is to have the most positive transition possible while being clear and direct.
>
> While we do not feel that Diane has the management skill to lead the AOC, we think she could be a good match for another open position – heading the Office of Bar Admissions.
>
> Is it reasonable to let her know in this order: (1) we need to part ways with her as AOC Director; (2) we can structure the transition as a resignation, if she prefers, instead of a termination, if she would like to pursue the OBA position.
>
> If it is too much to expect her to decide on the spot, is it reasonable (from an employment law perspective) to conclude the meeting with this being a termination with an opportunity to restructure the transition (to allow her to resign instead) within the following week? Are there implications to her state retirement benefits to distinguish between termination and resignation?

*(GJM RESP 0339-0340).*

Attorney Weiss Ford followed up to this email, and another from Justice Donovan with answers embedded in the text. *(GJM RESP 0341-0343).*

3. **Who conducted Attorney Martin's job performance reviews? Please provide the Committee with a copy of all of Attorney Martin's job performance reviews.**

**ANSWER:** I have no memory of who, if anyone, including myself, conducted a performance review of Attorney Martin as AOC Director. My Counsel requested any job performance review for Attorney Martin from Judicial Branch General Counsel. To date, none have been provided but, if, and

when, such records are provided they will be provided to the Committee.

- **Were you aware of complaints by judicial officers and AOC staff about Attorney Martin's job performance?**

**ANSWER:** Yes.

- **Were you aware that Attorney Martin had not promptly filled the Director of Domestic Violence position?**

**ANSWER**: I have no memory of an issue relating to the hiring of the Domestic Violence Program Manager, a position within the Circuit Court. My counsel has requested information on this issue from Judicial Branch General Counsel and will supply information on this issue, if, and when, provided by Judicial Branch General Counsel.

- **Were you aware that Attorney Martin had not paid bills owed by the Judicial Branch in a timely manner?**

**ANSWER:** I do not understand that Attorney Martin, herself, "paid bills owed by the Judicial Branch" as this question implies. I understand the AOC has procurement, accounting and payroll protocols and processes with respect to accounts payable. Whether a bill is paid or unpaid is not something that I would generally have knowledge of. My memory is that based on prior conversations with Chief Justice Mark Howard and Judge Ellen Christo, Justices Donovan and Countway reported that there was a concern with the mishandling of bill payments. We have requested information relating to this question from Judicial

Branch General Counsel and will supply the information on this issue, if and, when provided by Judicial Branch General Counsel.

- **Were you aware that numerous staff left the AOC as a result of Attorney Martin's performance as AOC director?**

  a. **With respect to each of these questions:**
     i. **What information did you learn?**
     ii. **When did you become aware of the issue?**
     iii. **Who brought the issue to your attention?**
     iv. **What did you do in response to the issue?**

**ANSWER:** Yes, I was aware that a number of staff left the AOC. At some point in mid-2024, after the Court received the herein discussed report of investigation, Justices Donovan and Countway conducted exit interviews. They shared the results with the Justices. My memory is that those interviews revealed concerns with Attorney Martin's management style. In response, the justices continued to engage with Attorney Weiss Ford.

Other than these exit interviews, I do not have specific recollection of individual employees and their particular concerns.

4. **Was Attorney Martin an "at will" employee of the Judicial Branch? Could Attorney Martin have been terminated based on poor job performance without notice? If not, why not?**

**ANSWER:** I respectfully suggest that this question calls for a legal conclusion. Attorney Martin's employment status is determined by the Judicial Personnel Rules, including Rule 56. We have requested information from the

Judicial Branch General Counsel relating to this question and will provide the information, if, and, when, provided by Judicial Branch General Counsel.

5. **Did Attorney Martin have an employment contract with the Judicial Branch? Provide a copy of that contract if one exists.**

**ANSWER:** Attorney Martin did not have an employment contract with the Judicial Branch as the Director of the AOC.

6. **On February 28, 2025, was Attorney Martin terminated or laid off, or was she in some other employment status?**
   a. **When was that decision made?**
   b. **Who made it?**
   c. **What was the basis for the decision?**

**ANSWER:** At all times during my discussions with the justices regarding Attorney Martin and all aspects of her job, my intention was to conform with all applicable laws and rules. Hence, we consulted Attorney Weiss Ford who was well - versed in the field of employment law. I understood that on February 28, 2025, Attorney Martin was being relieved of her duties as AOC Director to be replaced with a trial judge in furtherance of our restructuring plans. I later came to understand that this constituted a layoff under Personnel Rule 56.

7. **What communication did you have with Attorney Martin after her removal as Director of AOC between February 28, 2025, and March 3, 2025, when you spoke with Justice Donovan and/or Justice Countway? Please describe in detail each of those communications.**

**a. When did they occur?**
**b. By what means?**
**c. What did you communicate to Attorney Martin?**
**d. What did Attorney Martin communicate to you?**

**ANSWER:** I had no communication, in any form, with Attorney Martin during the period after Justices Donovan and Countway met with her on February 28, 2025, until I received an email, addressed to then Judicial Branch General Counsel Erin Creegan (Attorney Creegan) and me, on March 3, 2025, at 8:45 am, captioned "Transition items". *(GJM RESP 0374-0410 [0385-0388]).* Following consultation with Attorney Creegan, I replied to Attorney Martin's email at 5:04 pm on March 3, 2025. *(GJM RESP 0385).* As discussed below, I replied to that email late that afternoon, which was my first communication with Attorney Martin.

At 9:07 am, I was in the office and received a call from Attorney Creegan. The call lasted approximately 20 minutes.

My memory of the call is as follows. Attorney Creegan asked whether I, as Chief Justice, had approved of the actions taken with respect to Attorney Martin on February 28, 2025. I said yes, but I was still unaware of the details about what had actually happened. She asked if the court had legal counsel involved. I said yes, explaining that we had been working with Attorney Weiss Ford. She then told me some of what happened during a meeting with AOC employees on February 28th. Attorney Creegan reported that in addition to telling the

employees that Attorney Martin was being replaced with Judge Keating, Justice Donovan also said that [redacted] not only being placed on leave and but was also "under investigation."

At some point, Attorney Creegan also told me that, over the weekend, Attorney Martin had reached out to her. [redacted]

Attorney Creegan expressed concerns about the legal risks the Judicial Branch faced as a consequence of what had happened. I specifically remember her saying words to the effect of: "No one knows the personnel rules better than Dianne."

We also discussed the potential reputational harm to both Attorneys Martin and [redacted] because of the way the actions had been taken and what was said during the AOC employee meeting.

When I later met with Attorney Creegan, I remember asking how I could help. Attorney Creegan suggested I send Attorney Martin an email. I asked her to help me draft something that would be appropriate.

I had returned to my office and drafted an email to Attorney Martin. I asked Attorney Creegan to review and to edit, which she did. *(GJM RESP 0389-0390).*

At 5:04 pm, I sent a slightly revised version of Attorney Creegan's draft email to Attorney Martin. *Id.* at 0385. My email was in response to the email from Attorney Martin to me and Attorney Creegan from earlier in the day, mentioned above, captioned "Transition issues".

8. **Attorney Martin reported to DOJ investigators that you praised her work and informed Attorney Martin that her removal as Director of AOC was not based on her job performance.**
    a. **Is this characterization of the communication accurate?**
    b. **If not, explain how it is inaccurate.**
    c. **If it is accurate, how is this consistent with complaints about Attorney Martin's job performance which were brought to your attention?**

**ANSWER:** At the suggestion of, and with the assistance of counsel, Attorney Creegan, I prepared and sent an email to Attorney Martin on March 3, 2025, at 5:04 pm. The text of the email speaks for itself. The statements regarding Attorney Martin's contributions with respect to safety and security, mental health, and domestic violence are accurate. I understood the purpose of the email to be an attempt to initiate a dialogue to mitigate the risks identified by Attorney Creegan as a result of the events of February 28, 2025.

9. **Did you have other communication with Attorney Martin between March 3, 2025, and April 4, 2025? Please describe in detail each of those communications.**
    a. **When did they occur?**
    b. **By what means?**
    c. **What did you communicate to Attorney Martin?**

**d. What did Attorney Martin communicate to you?**

**ANSWER:** Attorney Martin replied to my March 3rd email on March 4, 2025, at 6:15 pm. *(GJM RESP 0397-0399)*. Attorney Martin described the February 28, 2025 meeting with Justices Donovan and Countway and stated:

> With no prior notice, I was informed the Court was working with the National Center for State Courts to reorganize and my nonjudicial position as Director of the Administrative Office of the Courts (AOC) was being eliminated, I was being laid off and a judicial officer would be named to head the office. I was then offered a demotion to the position of counsel to the Office of Bar Admissions, a position in the AOC that reports to my current position and is at a lower labor grade. I was told this reorganization was going to be announced and that I needed to immediately respond so they could announce that I was accepting the other position at the same time.

*Id*. at 0398.

Attorney Martin further stated:

> [redacted] I was stunned and struggled [redacted] said … I explained the director position is a regular permanent position. It is not a term position, nor is it an at will position. No notice was given in the job offer or the job description that accepting a state position would put me at risk of loss of much needed state health insurance for my family, credit for my many years of longevity as a public servant, participation in the retirement plan, and the many other benefits earned over the years of state employment, by removal without notice. Even layoff has a process and notice is provided.

*Id*.

Later in the email, Attorney Martin stated:

> Given what happened to me last week and how I have been treated here, I know you will understand why I am incredibly hesitant to

> work at the Judicial Branch anymore. [redacted] For those reasons, the ability to continue my state health insurance without interruption is paramount. After much discussion with my family, unless severance and family health benefits can be provided for an extended period of time, I propose the following.

*Id.* at 0399. She then set forth a ten-point proposal.

Attorney Martin's ten-point proposal was, as follows:

i. Layoff effective March 21 and I remain on paid leave through the 21st without a reduction in my leave balance or accruals. The rules provide 21 days' notice for layoff. Payout computation as defined by the personnel rules for layoff.

ii. I will accept the OBA General Counsel position offered with a start date on March 28 at my current rate of pay (labor grade and step), with written confirmation of Justice Countway's representation that the position can be done fully remotely. Please confirm that there is no plan to eliminate this position through the next biennium.

iii. A written waiver of any probationary period for the new position.

iv. My benefits and longevity will not have any gap.

v. The message described in your email will be sent out to the branch and it will also be clarified for the group that was gather on Friday that this change resulted from the Court's work with the NCSC and reorganization is non - prejudicial and non-disciplinary.

vi. You will provide a positive recommendation along the same lines as your email, in recognition of my significant work and contributions to the branch, noting the layoff due to administrative reorganization. This will allow me to mitigate the impacts of what happened in the future.

vii. I will report to you (this position has functioned nearly entirely separately from the AOC Director during my tenure. The only think [sic] I have done is approve leave and time.).

viii. If Denise and Bibiana are willing and it is possible, make the positions equivalent and transfer the two between the assistant positions (Director's and OBA GC Assistant).

ix. I will continue to work with the CRTC students as I previously have.

x. I have a planned vacation at the end of June and may need to be permitted to take unpaid leave part of the time if necessary, depending on how much level I have accrued by then.

*Id.*

My memory is that I consulted with Attorney Creegan about a reply to Attorney Martin. On March 5, 2025, I sent an email to Attorney Martin which, in part, stated: "I would like to get this resolved asap, and we have started working through the items. I will likely need a few days to get through them all." *(GJM RESP 0393).*

I had no communication with Attorney Martin, in any form, until March 25, 2025, at 4:03 pm. At that time, I sent her an email regarding the Annual Bar Admissions Conference conducted by the National Conference of Bar Examiners. Attorney Martin replied on March 27, 2025, at 9:46 am, stating that she was unable to attend. *(GJM RESP 0468-0469).*

On April 4, 2025, at 8:11 am, Attorney Martin sent me an email about beginning her post as general counsel of the Office of Bar Admissions, to which I responded on April 4, 2025, at 9:10 am. *(GJM RESP 0470-0471).*

**10. Is there anything in writing notifying Attorney Martin of the reason she was removed as Director of the AOC? If so, please provide the Committee with a copy of any writing.**

**ANSWER:** There is no such writing.

**11. Why was Attorney Martin laid off on April 1, 2025 and rehired as General Counsel to the Office of Bar Admissions on April 4, 2025, instead of being transferred directly to that position?**

**ANSWER:** Upon advice of counsel, Attorney Creegan, the Supreme Court approved of this arrangement in order to mitigate risks to the Judicial Branch and conform with the requirements of Judicial Branch Personnel Rule 56.

**12. Did Attorney Martin threaten to sue the Judicial Branch or any judicial officer or non - judicial officer because of her removal as Director of the AOC?**

**ANSWER:** I have no knowledge of a direct threat by Attorney Martin to sue the Judicial Branch, a judge or a non-judicial employee over any issue. However, with respect to the events of February 28, 2025, on March 4, 2025, Attorney Creegan advised me that Attorney Martin's March 4, 2025 email presented a "potential landing zone for a negotiated resolution that will really mitigate risk to the Branch and also maybe mitigate any damages to Dianne." *(GJM RESP 0397)*. Additionally, when I reviewed DOJ's interview with

Attorney Martin, she noted "after consulting with private counsel, on March 12, 2025, she began communicating and negotiating with Creegan regarding the termination/layoff from the Director of Administration position and still open offer for the General Counsel to the Office of the Bar Admissions position." *(GJM RESP 0513-0514).*

**13. Was Attorney Martin's termination from the AOC part of a larger settlement? If so, please provide the Committee with a copy of that settlement.**

**ANSWER:** Over the ensuing weeks after the March 4th and 5th emails with Attorney Martin, Attorney Creegan communicated with Attorney Martin about her "proposal" and provided counsel to the other Justices, Judge Keating and me.

On March 12, 2025, Attorney Creegan reported to Judge Keating and me about a telephone conversation she had with Attorney Martin. *(GJM RESP 0425-0427)*. The email reflects an ongoing discussion about the terms of Attorney Martin's March 4th proposal. In the email, Attorney Creegan reported that, "[Attorney Martin] expressed concern that she had learned that even though she had been told it was a layoff, that may not have been right. I asked what was most important to her and she said keeping insurance [redacted] and that she would like the payout. [Judge] Chris [Keating] I believe is looking into this." *Id.* at 0427.

In the meantime, Attorney Creegan continued discussions with Attorney Martin. On March 21, 2025, Attorney Creegan sent an email to Judge Keating and me reporting on a meeting that had taken place at Attorney Martin's home. *(GJM RESP 0455-0457).* Attorney Creegan reported on a "productive meeting" but noted that there were still unresolved issues. *Id.* at 0457. Attorney Creegan also noted that Attorney Martin "said that the Chief had been working with her on reclassifying all GCs to 58." *Id.* Attorney Creegan raised the issue of waiver of claims and what would happen "if we couldn't come to terms." *Id.* There was an agreement to speak again on Monday, March 24, 2025. *Id.*

Resolving issues with Attorney Martin had been the subject of ongoing consideration by the justices, in consultation with Attorney Creegan, as well as Judge Keating. In addition to meetings, there were email inquiries about the proposed terms. My memory is that one such meeting took place during the court's scheduled conference on March 20, 2025, during which there was discussion of the actual amount of the proposed payment owed to Attorney Martin under Rule 56.

On March 21, 2025, at 3:51 pm, Justice Bassett sent an email to Attorney Creegan as follows:

> Can you please forward the document or documents that show the calculation of how we get to the $80k payment contemplated for Dianne? Or just send me a quick explanation? Just trying to wrap my head around that high number.

> What is the timeline for the negotiations with Dianne? I got the impression that deadlines are fast approaching. Is she aware that we want a global release of all possible claims.
>
> Is the ball in her court or ours at this point?"

*(GJM RESP 0462).*

Attorney Creegan replied to Justice Bassett as follows:

> It actually turned out to be 50k when [Judicial Branch accounting and payroll manager] Becky Plourde checked it. I don't have a spreadsheet but the inputs include up to 50 days annual leave full [sic] paid out and 50% of sick time up to 60 days. Between these two you land at about 3 months of salary, which for Dianne is about 40k. <u>This is from our personnel rules</u>. Would you like me to ask Suzanne [Gelinas] or Becky [Plourde] for a calculation sheet?
>
> I spoke to her today and raised that. She is taking it back. I hope to talk to her Monday. If we don't have a resolution then it might kickout the potential start date, which is currently proposed as March 28."

*Id.* (emphasis added); *cf.* Judicial Branch Personnel Rule 56(g).

Justice Bassett then replied:

> Thank you.
>
> I don't want to create a lot of work for them (but they must already have it done) – <u>but I think that it is important for members of the court to have those numbers spelled out before we agree to any payout</u>.

*Id.* at 0461. (emphasis added).

Attorney Creegan forwarded Justice Bassett's 4:07 pm email to me, stating "Justice Bassett seems to think the payout is something the court weighs in on?" *Id.* at 0459. I understood Attorney Creegan to mean that the issue of actually making a payout was required in order to comply with Judicial Branch Personnel Rule 56(g) and this issue was not otherwise within the discretion of the court. I replied to Attorney Creegan, "We will have to take this up with them on Monday." *Id.*

Attorney Creegan then further replied to Justice Bassett: "I don't think we can decline the payout under the personnel rules." *Id.* at 0461 (emphasis added).

Justice Bassett replied:

> understood.
>
> I just want to be comfortable with the math – and the various elements that are required by our rules. I would not want to pay more than required without a very good reason.

*Id.* (emphases added).

On March 24, 2025, the justices met with Judge Keating and Attorney Creegan. My memory is that Judge Keating discussed issues needed to finalize the Dianne Martin matter. Among them was the reclassification of the three Judicial Branch general counsel positions.

Judge Keating later prepared a memorandum to Fiscal Manager Raymond, Human Resources Manager Gelinas, and Accounting and Payroll Manager

Plourde, memorializing the discussion. Judge Keating's memorandum states in full:

> On March 24, 2025, the Justices of the New Hampshire Supreme Court waived the application of certain provisions of Personnel Rule 12 and unanimously approved the reclassification of the position of General Counsel to Labor Grade 58.
>
> The Justices explained that this reclassification has been under consideration for some time as a means of ensuring that the Judicial Branch can continue to recruit and retain qualified attorneys in these critical positions.
>
> The reclassification was intended by the Justices to affect the following three job titles:
>
> - Judicial Branch General Counsel
>     - Labor Grade 55 to Labor Grade 58
> - Office of Bar Admissions General Counsel
>     - Labor Grade 56 to Labor Grade 58
> - Attorney Discipline Office General Counsel
>     - Labor Grade 56 to Labor Grade 58
>
> The reclassification shall take effect on Friday, April 4, 2025. Thank you in advance for your help with implementation of this measure with respect to the employees occupying these positions. Please let me know how I might be of assistance in this effort.

*(GJM RESP 0463-0464).*

There is no formal written settlement agreement.

**14. What exactly are the specific personnel rules that apply to Attorney Martin's "layoff," rehiring, and the calculation of her benefits?**

**ANSWER:** I, along with the other justices, were advised by counsel

that the amount of the payout to Attorney Martin followed the requirements of Judicial Branch Personnel Rule 56.

**15. Provide specific calculations with supporting documentation to justify the approximately $50,000 payout to Attorney Martin.**

  a. **Who was responsible for tracking the amount of sick leave Ms. Martin used?**
  b. **Who was responsible for tracking the amount of annual leave Ms. Martin used?**
  c. **Did anyone in the Judicial Branch need to approve Attorney Martin's use of sick or annual leave?**

**ANSWER:** Please see the documents provided by the New Hampshire Judicial Branch General Counsel – Attorney Martin's personnel file, Production One and Production Two – to Attorney Phillip Waystack.

**16. Attorney Martin told investigators from the Department of Justice that she took a leave of absence around August 2024 and returned in December 2024 or January 2025.**

  a. **When did Attorney Martin take a leave of absence?**
  b. **When did she return to work?**
  c. **Was Attorney Martin's leave under Family and Medical Leave Act (FMLA) pursuant to Personnel Rule 39 or unpaid leave pursuant to Personnel Rule 40 or was it some other form of leave?**
  d. **Personnel Rule 39 requires that when an employee takes a leave of absence under FMLA, "An employee shall apply all accumulated leave, where applicable, to cover this period of absence. Unpaid leave may be used only if all other leave has been exhausted."**
  e. **Rule 40 governs leave without pay. Rule 40(c) likewise provides: "An employee who requests a leave of absence**

**without pay shall be required to use all applicable accumulated leave, including monthly accruals earned while on leave with pay, before being granted the leave of absence without pay."**

**f. Was Attorney Martin required to exhaust all accumulated leave pursuant to either of these rules while she was on leave?**

**g. If Attorney Martin was not required to exhaust annual and sick time before taking leave, why not?**

**h. Are the numbers reported by the DOJ investigation that Attorney Martin had 330 hours of annual leave and 194.75 hours sick time accurate? If so, provide documents establishing these numbers. If not, what are the accurate figures?**

**i. If Attorney Martin was required to exhaust annual and sick time, how did she have 330 hours of annual leave and 194.75 hours of sick time, as reported by the DOJ investigation, at the time she was "laid off" on April 1, 2025?**

**ANSWER:** I refer the committee to Attorney Martin's personnel file and NHJB Production One – #4 (Payroll Hours Lookup for Dianne Martin) and Production Two – #17 (Easier to review leave usage in Excel format) and #18 (Terminal Pay Excel Worksheet) (both of which have been provided to Attorney Waystack) for the details on her FMLA leave. My general memory is that her FMLA began in July 2024 and continued through November 2024. My memory is also that her FMLA leave was intermittent and that she was not continually absent from her duties.

The amount of the payment to Attorney Martin was the subject of scrutiny by the justices at the time. I strongly agreed that the amount of the payment needed

to conform with all applicable laws and rules.

**17. Is it true that several weeks into Attorney Martin's new position as General Counsel to the Office of Bar Admissions, you submitted a request for a pay increase for Attorney Martin, citing her skills and experience, as well as her "working relationships in the Judicial Branch"?**

**a. If so, what prompted you to take this action?**

**b. Upon what information was such a recommendation based?**

**ANSWER:** This is not accurate as the *Request to Approve Higher Entry Level Step for New Employee* form was signed by Judge Keating. As I was working on revisions to the draft response to the New Hampshire Public Radio (NHPR) questions posed by Todd Bookman, I became very concerned with one of Mr. Bookman's questions. Specifically, he asked the following:

> On April 14, Chief Justice MacDonald advocated for a step upgrade for Martin as General Counsel raising her salary to Grade 58, Level 9, according to a record reviewed by NHPR. Sherry Hieber was also awarded a pay raise, according to other payroll records. Given the financial constraints on the Branch, why did MacDonald propose this pay raise.

*(GJM RESP 0503).*

On Sunday, October 19, 2025, I circulated another draft of proposed responses to Judge Keating and Attorney Pyles. *Id.* at 0505. In my cover email, I quoted the above question from Mr. Bookman and stated:

> I have no record of a communication on April 14 on this issue. I have no memory of what it could be referring to, and I have no idea why I would be "advocating" for something that had

> already been decided. Therefore, I am extremely concerned about the accuracy and authenticity of the document to which he refers. The operative document on this issue would appear to be your [Judge Keating's] memo dated March 27 memorializing the steps taken by the justices on March 24 regarding reclassification of all of the GC positions. Unless there is an issue, I think we should provide that memorandum.

*Id.*

As a result of the Judicial Branch production of Attorney Martin's personnel file in this matter, I now understand that there is a document dated April 14, 2025, titled: *Request to Approve Higher Entry Level Step for New Employee.* I first saw the document on May 28, 2026. I had no knowledge that this document existed, and I did not review or approve the language contained in that document. Further, I do not know how Mr. Bookman apparently reviewed a document that is otherwise contained in Attorney Martin's personnel file. *(GJM RESP 0523-0524).* Finally, it is important to note that Attorney Martin did not receive a "pay raise." As AOC Director, she was at Labor Grade 60, Step 9. As OBA general counsel, she is at Labor Grade 58, Step 9.

**18. Who determined that Ms. Hieber and Attorney Martin would overlap positions as General Counsel to the Office of Bar Admissions during a transition period expected to last a "few months"?**

- **a. It has been reported that the overlap lasted for five months. Is this accurate?**
- **b. What duties and responsibilities did the General Counsel of Office of Bar Admissions have that required overlap of five months?**
- **c. Who determined that a five - month overlap was necessary**

**to learn those duties and responsibilities?**

**d. How was that decision made?**

**e. In so doing, did the Judicial Branch violate its own personnel policies, which appear to cap "overlapping appointments" at a maximum of two weeks? See Personnel Rule 26.**

**ANSWER:** The Supreme Court has plenary authority over the regulation of the practice of law. Pursuant to that authority, among the Court's most important public protection functions is the licensing of new attorneys. There are two principal elements to attorney licensing: a determination that an applicant is minimally competent and a determination that an applicant has the requisite character and fitness. Notably, there are multiple paths to establish minimal competence, among them: passing the bar examination, administered twice annually in February and July, successfully completing the Daniel Webster Scholar Honors Program at the University of New Hampshire Franklin Pierce School of Law, and admission by transferred Uniform Bar Examination score. Each one of these pathways has specific and detailed requirements.

By rule, the Supreme Court has established two Committees to oversee and implement these functions: the Board of Bar Examiners and the Committee on Character and Fitness. See, Sup. Ct. R. 42. Both the Board and Committee are supported by the Office of Bar Admissions (OBA). *See, id.* Bar admissions functions, including the operation of the OBA are entirely self - supporting based on fees assessed to applicants. No general funds are involved. Since its

establishment in 2011, the OBA has been comprised of just two staff: a general counsel and an administrative assistant. Over the years, Committee and OBA leadership had practiced prudent fiscal stewardship. A relatively healthy financial reserve had been built.

As a practicing attorney, I had chaired the Board of Bar Examiners and, as Attorney General, I had served on the Committee on Character and Fitness. As noted in my narrative, I remain active in the field of bar admissions nationally.

Attorney Sherry Hieber had served as the OBA General Counsel since the OBA was established. She was an exceptional public servant, and a respected leader in her field. I had long been concerned about the lack of redundancy in the OBA. There was simply no way to replicate Attorney Hieber's knowledge and skills. I knew first-hand the complexities of conducting a bar examination, as well as the many other aspects of bar admissions functions. It is a high stakes examination and the failure to execute properly harms applicants and undermines public trust and confidence.

In the fall of 2024, Attorney Hieber told me that she intended to retire and that her retirement date would coincide with the conclusion of her one-year term as the President of the Conference of Bar Admissions Administrators in the summer of 2025.

When I told the justices of Attorney Hieber's retirement, I recommended a

long transition period for a new general counsel, ideally covering both the February and July bar exams. My recommendation was based on the complexities of the function and the fact that Attorney Hieber had been a one-person (with an assistant) operation since 2011. The justices concurred with my recommendation for a long transition period for a new general counsel.

On November 5, 2024, there was an email exchange between Attorneys Martin and Hieber about a transition in the OBA. *(GJM RESP 0344-0346).* The concept of a lengthy transition was expressly discussed, as well as the mechanics and funding for facilitating such a transition. *Id.* The overlapping appointments did not violate Judicial Branch policies, including personnel rule 26.

**19. Several news reports have referred to a complaint made by a state employee which has not been previously made public and at least one other; a whistleblower who has alleged that Attorney Martin's layoff and immediate rehiring was done at Attorney Martin's request and with your assistance. The so - called "whistleblower" reportedly stated that Attorney Martin's layoff and immediate rehiring was the "Chief's idea."**

**a. Who is this "whistleblower"?**

**ANSWER:** As a preliminary matter, I respectfully note that the Committee has not defined "whistleblower." I assume that the definitions, descriptions and procedures set forth in RSA chapter 275-E, the Whistleblowers Protection Act, would otherwise apply. I have no knowledge of a "complaint" having been filed under that act, or an investigation undertaken by the

Department of Labor. See, e.g., RSA 275-E:8. At no time was I, or to my knowledge, any other justice made aware of any concerns regarding the resolution of the Attorney Martin issue. My intent was, at all times, with the advice of counsel, to comply with the law and, specifically, Judicial Personnel Rule 56. Based on the records now available to me, it appears that handwritten notes taken by Matthew Mavrogeorge, Deputy Director of the Department of Administrative Services Division of Personnel contain the words "putting Diane into another position is Chief's idea." *(GJM RESP 0527)*. Mr. Mavrogeorge's notes were of a telephone call he had with Suzanne Gelinas, then the human resources manager for the Judicial Branch. *Id.* at 0526 – 0527.

**b. Was it your idea to "lay off" Attorney Martin and rehire her as General Counsel to the Board of Bar Examiners?**

**ANSWER:** The decisions regarding Attorney Martin's employment as the Director of the AOC and General Counsel at the Office of Bar Admissions were made collectively by the then - sitting three justices and me on advice of counsel – first Attorney Weiss Ford and second Attorney Creegan.

**c. If it was not your idea, was this accomplished at Attorney Martin's request?**

**ANSWER:** See, Answer 19b.

**d. Precisely what assistance did you provide and what were your**

**reasons for doing so?**

**ANSWER:** Respectfully, I do not understand the scope of this question. In these answers and my accompanying narrative, I have tried to describe the events leading up to February 26, 2025, and the steps taken thereafter, and my role in them.

*The investigation indicates on the morning of March 3, 2025, you confronted Justice Donovan and Justice Countway in each of their offices in anger, yelling and swearing. ·The investigation revealed facts that this was not the first time you, in your role as Chief Justice, confronted another judge in anger, raising your voice, and using profanity.*

**20. How would you describe your interaction with Justice Donovan on March 3, 2025?**

- **a. Describe your demeanor.**
- **b. Did you slam the door?**
- **c. Did you raise your voice toward him?**
- **d. Did you use profanity toward him?**
- **e. Why were you so upset?**

**ANSWER:** Following the justices' lengthy consultation with Attorney Weiss Ford, I was aware that Justices Donovan and Countway were to meet with Attorney Martin on the morning of Friday, February 28, 2025. My memory is that while I was supportive of the decision to replace Attorney Martin with Judge Keating, I had expressed concerns about the actual mechanics of doing so. The other justices did not agree. On the evening of February 27, 2025, I reiterated my concerns to Justices Donovan and Countway in a text.

My text to the justices stated as follows:

> Patrick and Melissa, I recognize and accept that I am badly outnumbered. Nonetheless, I feel compelled to share two thoughts that I hope you might consider as you approach tomorrow.
>
> [First], I think the most accurate description of the situation is that [Attorney Martin's] skill sets do not match what is required for the role. That, however, does not diminish her extraordinary dedication, hard work and accomplishments. I cannot tell you how many times she rose to the occasion to help on a mission critical task when others fell short [or] no one was around. She certainly has not acted with anything remotely approaching malice or bad faith. Therefore, she should be afforded every degree of dignity and respect at this difficult moment. I take real issue with showing her the door. It will be highly and unnecessarily embarrassing as well as disruptive, particularly for those close to her.
>
> Second, I regret that my plea about timing was not honored. The Court is facing, simultaneously, an unprecedented number of extraordinary challenges: a difficult budget season, the [Justice Hantz Marconi] situation and associated litigation, [Justice Bassett's] impending departure, and a crushing workload. Externally, this news will be received in this context and will likely engender less, not more, faith in us. For me, personally, my job uniquely requires bearing all of this. The stress for me – already high – will only be compounded by the inevitable dysfunction flowing from the fact that she handled so much personally. In a situation which we can control, I think it is a mistake not [to] try to facilitate some reasonable, professional transition. We at least need a transition memo outlining where various projects stand, deadlines and next steps. Without something like that, we will be flying blind and potentially into some liability.
>
> Thank you for considering these points. There is no need to reply. I wish you the best tomorrow.
>
> Gordon

*(GJM RESP 0347-0361).*

Attorney Martin is a member of the Bar, a former agency head, and a former member of the Attorney General's Office. My memory is that I viewed this text as a final attempt to convey that I did not believe, even in the face of the news that we were transitioning to Judge Keating, that she would conduct herself in anything but a professional manner. Such an action would have obvious reputational consequences and I did not believe that, in fairness, anything about her service warranted such an approach.

On the morning of Friday, February 28, 2025, I attended a lengthy meeting at the U. S. District Court regarding federal - state cooperation on treatment courts. Later in the day, back in my office, I prepared for and chaired a virtual CLEAR executive committee meeting that began at 4 pm. During that CLEAR meeting, Justice Donovan stopped by my office, but I was unable to speak with him. My memory is that by the time the CLEAR meeting concluded (likely after 5:00 pm), Justice Donovan had left.

Justice Countway prepared notes of the February 28, 2025 meeting with Attorney Martin. On March 7, 2025, Justice Donovan sent an email to Justice Countway with bullet points that may not be captured in Justice Countway's notes and on March 12, 2025, I received a memo of combined notes from the meeting with Attorney martin *(GJM RESP 0362-0373).* I do not remember when

I first saw Justice Countway's notes, but it was likely after March 3, 2025.

On February 28, 2025, at 7:29 pm, I received an email from the Judicial Branch fiscal manager, Donna Raymond, informing me that the branch was scheduled to present its capital budget request to the House Public Works Committee on Tuesday, March 4, 2025.

In comparison to the Judicial Branch operating budget, the capital budget request is relatively modest and is largely focused on information technology - related needs. As opposed to the operating budget, in prior years, I had not personally participated in capital budget legislative hearings. The AOC Director had done so. Nonetheless, I regard an interaction with a legislative committee on a budget-related issue to be an important event, requiring planning and a polished presentation.

My memory is that I had no prior knowledge of this hearing. I had no knowledge of what had been done to prepare.

I had planned to spend the weekend of March 1-2, 2025, preparing for Supreme Court oral arguments also scheduled for March 4, 2025. Additionally, I had an important family - related obligation.

Instead, much of my time over that weekend was consumed by addressing the urgent need to prepare for the capital budget legislative hearing. I had numerous email exchanges and telephone conversations with Fiscal Manager

Raymond and others. I could not meet my family obligation.

This incident validated my concerns expressed to Justices Donovan and Countway about the need for transition planning with Director Martin.

By the morning of Monday, March 3, 2025, despite intensive efforts over the weekend by many Judicial Branch staff, we were still not adequately prepared for the House hearing the next day. Addressing this issue remained an utmost priority.

On that date, I had a pre-scheduled meeting with Judge Ned Gordon at 9:30 am to take place in the Supreme Court conference room.

I had no communication, in any form, with Attorney Martin during the period after Justices Donovan and Countway met with her on February 28, 2025, until I received the email discussed above addressed to Attorney Creegan and me, on March 3, 2025, at 8:45 am, captioned "Transition items". As previously discussed, I replied to that email late that afternoon, which was my first communication with Attorney Martin.

Again, as noted above, at 9:07 am, I was in the office and received a call from Attorney Creegan. The call lasted approximately 20 minutes. My memory of the call is as follows. Attorney Creegan asked whether I, as Chief Justice, had approved of the actions taken with respect to Attorney Martin on February 28, 2025. I said yes, but I was still unaware of the details about what had actually

happened. She asked if the court had legal counsel involved. I said yes, explaining that we had been working with Attorney Weiss Ford. She then told me some of what happened during a meeting with AOC employees on February 28th. Attorney Creegan reported that in addition to telling the employees that Attorney Martin was being replaced with Judge Keating, Justice Donovan also said [redacted]

At some point, Attorney Creegan also told me that, over the weekend, Attorney Martin had reached out to her. [redacted]

Attorney Creegan expressed concerns about the legal risks the Judicial Branch faced as a consequence of what had happened. I specifically remember her saying words to the effect of: "No one knows the personnel rules better than Dianne."

We also discussed the potential reputational harm to both Attorneys Martin and [redacted] because of the manner in which the actions had been taken and what was said during the AOC meeting.

Because I had Judge Gordon waiting for me, I asked whether I could come

to the AOC office later that morning to meet with her and Judge Keating to discuss next steps.

After the call concluded and before going to the conference room, I looked at my email. I saw that at 9:17 am, the court had issued an order appointing Judge Keating as the interim Director of the AOC. *(GJM RESP 0414).* Prior to that point, I had not seen the order, nor did I know that it was to be issued at that time. As a result of discovery in this matter, I have since learned that Justices Donovan and Countway exchanged emails with Clerk Timothy Gudas about such an order on February 28, 2025. *(GJM RESP 0411-0414).* I should have been included in that email exchange, and I wish I had been.

My memory is that I walked to Clerk Gudas's office, asked him about the order, noting I had not seen it, and he responded that he had been instructed by Justice Donovan to issue the order.

At that point, a court order had issued without my constitutionally required approval, I had just been informed by Attorney Creegan that the actions that had been taken may have created risk for the branch, I had been deprived of the opportunity to ask Attorney Creegan to review the order to mitigate any of those risks, because my request for some reasonable transition period had not been heeded, I had spent much of the weekend working on the then-still unresolved and urgent issue of House testimony the next day, and I had to miss an important

family obligation. I was extremely concerned, frustrated and, yes, angry.

I did walk down to Justice Donovan's office. I only remember that it was very brief as I still had to meet with Judge Gordon, that I said something to the effect of "just stop" or "don't do anything more" referring to the Attorneys Martin and [redacted] matters. I also remember invoking the constitution, intending to convey that the order should not have gone out without an opportunity for me to review it, and that he had no authority to instruct the clerk otherwise. I remember that I did raise my voice, I do not remember slamming the door or swearing, but I do not dispute I could have done so.

**21. How would you describe your interaction with Justice Countway on March 3, 2025?**

- a. **Describe your demeanor.**
- b. **Did you slam the door?**
- c. **Did you raise your voice toward her?**
- d. **Did you use profanity toward her?**
- e. **Why were you so upset?**

**ANSWER:** I do not remember any interaction with Justice Countway on that morning. On April 2, 2026, Justice Countway sent my counsel, Jane E. Young, an email that stated the following:

Hi Jane:

1. I never reported ANYTHING regarding my interactions with Gordon on March 3rd
2. There was no "heated exchange" between us

3. What did happen is Gordon told me to "stand down" as he was walking by my office. I am 100% sure this is all he said to me.
4. At the time I shared with PED and likely JPB that he said that. I recently shared with BKG the extent of that exchange. I absolutely have told no one else (other than routine end - of - day sharing with my spouse.)
5. Telling me to stand down was no big deal
6. He has never used profanity or raised his voice at me nor have I witnessed that with others

I know this is a small piece of the whole complaint but I want Gordon to know that I am not the source of any of that and he has my full confidence, support and empathy as he navigates this mess. Please let me know how I can set the record straight

Melissa Countway

*(GJM RESP 0415-0417).*

Justice Countway informed Attorney Young that the information in her email could be shared with the Judicial Conduct Committee. *Id.* at 0416.

I subsequently apologized to my colleagues. As unfortunate as that moment was, I was determined – and I believe my colleagues were – that we were going to move past this and not let it interfere with the important jobs we had to do. I believe that we did. Among other indicia, as noted above, 2025 was the court's most productive year since 2015.

**22. Have you ever raised your voice and/or used profanity in anger toward any judicial officer or employee of the Judicial Branch who is not a judge? If you answer yes, please describe each incident in detail.**

**a. When did it happen?**

**b. Where did it happen?**

**c. Who was present?**

**d. What was the issue that caused you to be angry?**

**e. How did the other person react?**

**ANSWER:** I have no memory of such incident or incidents. If the Committee has specific information, about any incident or incidents, I will certainly respond.

*As the facts set forth [in the Complaint] indicate, the position of Director of AOC was not eliminated on February 28, 2025, when Ms. Martin was relieved of her duties. Moreover, the Court did not order a study of the restructuring of the court until April 11, 2025, the NCSC did not issue a report recommending that the AOC be restructured until the summer of 2025, and the position of Director of the AOC was not actually eliminated until October 14, 2025.*

23. **Did Justices Donovan, Countway, and Gould participate in drafting and/or approve this Press Release? If so, was anyone else involved? Describe the role of each person who participated in drafting the press release?**

**ANSWER:** On October 30, 2025, the justices learned through Communications Director Harris that the Union Leader was working on a story that touched on the personnel decisions relating to Attorney Martin. Justices Donovan, Countway, Gould and I decided that a response was warranted. My memory is that Periklis Kiroutas, a consultant retained by the Judicial Branch to assist with communications, prepared an initial draft of a joint statement from the four justices. The draft was finalized during a call with Justices Donovan, Countway,

Gould, Judge Keating, Mr. Kiroutas and Attorney Richard Lehmann, who had been retained by the Supreme Court to assist with the Attorney General's inquiry into this matter. All those participants reviewed and approved the final version. The statement was then provided to the Union Leader and was posted on the Judicial Branch's website. *(GJM 0508-0509).*

**24. When was it first decided to eliminate the position of Director of AOC?**

**Answer:** In November 2003, the New Hampshire Office of Legislative Budget Assistant (LBA) had submitted to the General Court Joint Fiscal Committee a Performance Audit Report that addressed, in part, "Judicial Branch Administration." *(GJM RESP 0055-0201).*

> The LBA described Judicial Branch administrative functions as follows: The AOC was the only administrative office in the Judicial Branch prior to Supreme Court Administrative Order 90 - 02, which created the Administrative Council and established administrative judge position for the Supreme, Probate and District Courts. Supreme Court Rule 54, which superseded Administrative Order 90 - 02 in 1992 gives trial court administrative judges broad responsibility concerning the management of judicial and non - judicial personnel as well as budgeting and case flow management. The office of the administrative judges assumed certain responsibilities from the AOC, and some of the AOC's court services representatives, who had previously served as generalists in trial court functions and undertook special projects within the trial courts, were transferred to those offices. As a result, responsibilities such as developing and maintaining weighted caseload systems and coordinating education and training are shared between the trial court administrative judge's offices and the AOC.
>
> *(GJM RESP 0126).*

Consequently, the LBA recommended that action be taken to formally establish the AOC and to clearly define its responsibilities. As the LBA noted, absent such clear definition, "the trial court administrative offices have increasingly assumed responsibility for some aspects of certain administrative functions from the AOC, such as personnel management, judicial and non-judicial education, grant administration, and private sector transcriptionist certification. This creates inefficiency and ambiguity regarding administrative responsibility." *Id.* at 0128. ("'Unless both the administrators and those served by the administrators have a clear understanding of the respective roles of each, the likelihood of misunderstanding and a consequent impairment of effective working relationships is increased.'") (quoting The Report of the New Hampshire Supreme Court Long-Range Planning Task Force); and *id.* ("clearly established lines of administrative authority should exist, and the duties and responsibilities of court administrators should be specified") (citing American Bar Association's (ABA) Standards Relating to Court Organization). *Id.*

The LBA recommended: "We recommend the Legislature consider formally establishing the AOC and defining its responsibilities in statute." *Id.* In response to this recommendation, the Judicial Branch stated: "The Judicial Branch agrees in part. The Supreme Court established the Administrative Office of the Courts. It recognizes the value of more clearly defining the responsibilities

and authority of the Administrative Office of the Courts. The Supreme Court will promulgate a rule that more clearly defines the responsibility and authority of the Administrative Office of the Courts." *Id.*

As of 2021, when I became Chief Justice, the Supreme Court had not promulgated such a rule. In 2005, the Supreme Court had issued an order detailing some AOC responsibilities: accounting, auditing, human resources, technology, fiscal management, court security, purchasing, facilities, and statistics. But the Supreme Court had not established clear lines of authority and delineation of responsibilities.

When I became aware of the LBA Audit, I regarded the failure to follow through on an express statement to the legislature as very serious, both in terms of institutional integrity and inter-branch comity. It was imperative that this omission be addressed.

Further, I regarded the LBA Audit's observations and conclusions to be very well founded. The structure of the Judicial Branch resulted in a high degree of inefficiencies. Its siloed "fiefdoms" were not conducive to change and hence meaningful growth.

Another 2003 LBA Audit recommendation was to "implement a strategic planning process resulting in comprehensive, long- and short-term plans." *Id.* at 0129. This LBA Audit recommendation had also been overlooked by the

Judicial Branch for more than twenty years. My memory is that in late 2023, the Judicial Branch applied for a received a technical assistance grant from the State Justice Institute (SJI) to undertake strategic planning. The Judicial Branch thereafter retained NCSC to assist with the strategic planning process. In early 2024, NCSC began preliminary work. On April 15, 2024, I met with the NCSC's senior consultant on the project. My memory is that the consultant told me that he knew of no other state court system structured like New Hampshire's. Specifically, unlike other states, the New Hampshire AOC and, hence, the AOC Director, did not have oversight or responsibility for trial court operations or staff.

My memory is that, after this conversation in 2024, I relayed this observation to the other justices. It was not only consistent with the LBA Audit, but it also strongly confirmed my own experience and belief. Again, as stated above, the Judicial Branch was organizationally flawed as it was siloed and inefficient. Further, the role of the AOC was not well-defined. There was another structural flaw. There is an inherent disparity and "power differential" between judges and non-judicial staff. I observed it repeatedly. Thus, I came to believe that a realigned AOC should be led by a trial judge. A trial judge would have the experience necessary to lead trial court operations and staff and would not be subject to the inherent disparity associated with non-judicial staff.

In 2025, the Judicial Branch again engaged the NCSC to conduct an assessment of its operations. *(GJM RESP 0205-0290)*. Although the Court's order issued on April 11, 2025, I had, in fact, been in discussions with NCSC about the possibility of undertaking such a reorganization study for months. I informed the other justices of these discussions.

The NCSC's report, New Hampshire Judicial Branch Assessment (NCSC Efficiency Study), was released on September 3, 2025. The NCSC Efficiency Study referred to the 2003 LBA Audit and noted that the AOC's authority "never been codified into rule or statute." *Id.* at 0246. The NCSC observed that, "[w]hile there is cooperation between the three courts and the AOC, the administration of the courts is functionally siloed. Additionally, the trial courts operate as two separate entities, each complete with their own administrative office, judges, and court staff." *Id.* at 0214.

The NCSC Efficiency Study further elaborated on the structure: "The administrative structure of the NHJB is somewhat unique in that there is an administrative office of the courts, an administrative office in the Superior Court, and an administrative office in the Circuit Court. This structure makes it more difficult to establish uniform procedures and training for staff." *Id.* at 0247.

Consequently, the NCSC recommended that the Judicial Branch, "[e]stablish authority for the Administrative Office of the Courts through court

rule, statute or administrative order that delineates a clear role and responsibility for the AOC." *Id.* at 0246 (Recommendation 1).

The NCSC also recommended that the Judicial Branch, [c]onsolidate select functions of the Administrative Office of the Circuit and Superior Courts into the AOC." *Id.* at 0247 (Recommendation 2).

Following receipt of the NCSC Efficiency Study, the Supreme Court acted quickly to implement Recommendations 1 and 2. On October 10, 2025, the Supreme Court promulgated an entirely new version of Supreme Court Rule 54. *(GJM RESP 0291-0296)*. As revised, Rule 54:

a. Established the administrative office of the courts, Sup. Ct. R. 54(3);

b. Established the position of state court administrator, Sup. Ct. R. 54(2);

c. Established clear lines of responsibility and authority for the state court administrator and the AOC, Sup. Ct. R. 54(2) & (3);

d. Required that the state court administrator shall be a judge of either the superior or circuit courts, Sup. Ct. R. 54(2);

e. Established clear lines of responsibility and authority for the chief justice of the superior court, Sup. Ct. R. 54(5); and

f. Established the position of chief judge of the circuit court and established clear lines of authority for that position, Sup. Ct. R. 54(6).

*Id.* at 0294-0296.

Until these amendments, Supreme Court Rule 54 had provided for an administrative council. *See*, Sup. Ct. R. 54(3) (2024). It was comprised of the Chief Justice of the Supreme Court, the chief justice of the superior court, the administrative judge and the deputy administrative judge of the circuit court and the AOC Director. *Id.* The administrative council was established to facilitate communication among the courts and the AOC, and was required to apprise the Supreme Court of matters being considered "to enhance the effective and efficient administration of the Judicial Branch." *See, id.* Sup. Ct. R. 54(3) (2024).

In its current form, Supreme Court Rule 54 establishes a council of chief judges, comprised of the chief justice of the supreme court, the chief justice of the superior court, the chief judge of the circuit court and the state court administrator. *See*, Sup. Ct. R. 54(8). *(GJM RESP 0296)*. The council of chief judges "shall be a forum for the exchange of ideas and information for the improvement of the justice system . . ." and "shall make recommendations for the effective administration of the Judicial Branch to the supreme court." *Id.*

**25. Who made that decision?**
**ANSWER:** See Answer 24.

**26. How was the decision made?**
**ANSWER:** See Answer 24.

**27. Why was the decision made to eliminate the position?**

**ANSWER:** See Answer 24.

**28. If the position of Director of the AOC was eliminated on February 28, 2025, why was Judge Keating appointed interim Director of the AOC?**

**ANSWER:** See Answer 24.

**29. Why did Attorney Martin not continue to fulfill her job as Director of AOC until October 14, 2025, when the position of State Court Administrator was created?**

**ANSWER:** See Answer 24.

**30. Why did Attorney Martin not fill the position of State Court Administrator?**

**ANSWER:** As noted in Answer 24, a trial judge would have the experience necessary to lead trial court operations and staff and would not be subject to the inherent disparity associated with non - judicial staff.

**31. Why does Supreme Court Rule 54 require the position of State Court Administrator to be held by a judge?**

**ANSWER:** See Answer 24.

**32. Which members of the Court participated in the personnel decisions regarding Attorney Martin?**

**ANSWER:** As described in detail above and in my narrative, the justices acted collectively and in consultation with Attorney Weiss Ford and then Attorney Creegan about steps to be taken regarding Attorney Martin.

**33. How did the members participate?**

**ANSWER:** As a general matter, we met as a group in the Souter Conference Room at the Supreme Court.

**34. When did those communications occur?**

**ANSWER:** The communications occurred on an ongoing basis.

To the extent additional documents requested from the New Hampshire Judicial Branch General Counsel are produced, I respectfully reserve the right to supplement the above responses.

In addition, the documents produced to date from the New Hampshire Judicial Branch General Counsel to my counsel and Attorney Waystack – Attorney Martin's personnel file, Production One and Production Two – as well as the documents from the Attorney General's Investigation into the Employment of Attorney Martin at the New Hampshire Judicial Branch produced to my counsel by Attorney Waystack are incorporated herein by reference.

# RESPONSE TO JUDICIAL CONDUCT COMPLAINT
## Appendix


1. Chief Justice Gordon J. MacDonald's Narrative .......... 0002
2. State of New Hampshire Judicial Branch Administration Performance Audit Report – November 2003 .......... 0054
3. April 11, 2025 – Order Establishing Review Committee .......... 0202
4. National Center for State Courts (NCSC) Report 2025 .......... 0205
5. Appointment of Judge Christopher Keating as State Court Administrator as Part of Efficiency Measures (Press Release & Order) .......... 0291
6. Draft Email Annoucement by Attorney Erin Creegan Re: Dianne Martin on Her New Position as General Counsel of the Office of Bar Admissions .......... 0297
7. Emails between Supreme Court Justices and Attorney Debra Weiss Ford Re: Confidential Investigation .......... 0299
8. Justice Melissa Countway Timeline, Notes and Questions – Attorney Debra Weiss Ford .......... 0320
9. Email from Attorney Debra Weiss Ford Re: Consulting Proposal .......... 0331
10. February 25, 2025 Email from Justice Melissa Countway to Attorney Debra Weiss Ford Re: AOC Director .......... 0337
11. February 26, 2025 Email from Justice Melissa Countway to Attorney Debra Weiss Ford Re: Follow-up Question .......... 0339
12. February 26, 2025 Email from Attorney Debra Weiss Ford to Justice Melissa Countway and Justice Patrick Donovan Re: Responses to Follow-up Question .......... 0341
13. Emails between Attorney Dianne Martin and Attorney Sherry Heiber Re: Attorney Heiber Retirement .......... 0344
14. February 27, 2025 Text from Chief Justice Gordon J. MacDonald to Justice Patrick Donovan and Justice Melissa Countway .......... 0347
15. Justice Melissa Countway and Justice Patrick Donovan Notes Re: Meeting with Attorney Dianne Martin .......... 0362
16. Emails between Attorney Dianne Martin, Attorney Erin Creegan and Chief Justice Gordon J. MacDonald Re: Transition Items .......... 0374
17. Emails between Justice Patrick Donovan, Justice Melissa Countway and Clerk Timothy Gudas Re: Order Appointing Judge Christopher Keating as Interim Director of the AOC .......... 0411

CONFIDENTIAL

18. Emails between Justice Melissa Countway and Attorney Jane Young Re: Setting the Record Straight ........ 0415

19. Emails between Suzanne Gelinas and Judge Christopher Keating Re: Layoff – Rehire Impact on Benefits ........ 0418

20. Emails Re: Todd Bookman Inquiry Regarding Attorney Dianne Martin ........ 0422

21. Email from Attorney Erin Creegan to Chief Justice Gordon J. MacDonald and Judge Christopher Keating Re: Transition Conversation Notes ........ 0425

22. Emails between Judge Christopher Keating and Suzanne Gelinas Re: Medical and Dental Benefits for a Layoff – Rehired Employee ........ 0428

23. Email between Judge Christopher Keating and Attorney Erin Creegan Re: No Updates ........ 0430

24. Memo from Judge Christopher Keating Re: [redacted] ........ 0432

25. Emails between Judge Christopher Keating, Suzanne Gelinas, Laurie Livingston, and Deputy Director of Personnel Matthew Mavrogeorge Re: Confidential Benefits Scenario ........ 0437

26. Email between Judge Christopher Keating and Suzanne Gelinas Re: Findings Regarding Former Director's Layoff – Rehire Scenario ........ 0448

27. Emails between Judge Christopher Keating and Suzanne Gelinas Re: Draft Letter to Attorney Dianne Martin ........ 0450

28. Email from Attorney Erin Creegan to Judge Christopher Keating and Chief Justice Gordon J. MacDonald Re: Meeting with Attorney Dianne Martin ........ 0455

29. Emails between Justice James Bassett, Attorney Erin Creegan, and Chief Justice Gordon J. MacDonald Re: Calculation of Attorney Dianne Martin Payout ........ 0458

30. Judge Christopher Keating Memorandum Re: Reclassification of General Counsel Role ........ 0463

31. Emails between Suzanne Gelinas and Deputy Director Matthew Mavrogeorge Re: Open Leadership Role at DHHS ........ 0465

32. Emails between Chief Justice Gordon J. MacDonald and Attorney Dianne Martin Re: Annual Bar Admissions Conference and Signing On ........ 0468

33. Emails between Communications Manager Av Harris, Chief Justice Gordon J. MacDonald, Judge Christopher Keating and Attorney Erin Creegan Re: Draft Announcement ........ 0472

34. Email to Judicial Employees Re: Budget Update and Restructuring ........ 0476

35. Emails between Chief Justice Gordon J. MacDonald, Justice James Bassett, Justice Patrick Donovan, Justice Melissa Countway, Attorney Erin Creegan and Communications Manager Av Harris Re: OBA Message ........ 0478

36. Emails between Chief Justice Gordon J. MacDonald, Justice Patrick Donovan, Justice Melissa Countway, Judge Christopher Keating, Lorrie Rudis, Attorney Christopher Pyles and Communications Manager Av Harris Re: Questions from Mr. Bookman and Draft Response ........ 0496

37. Emails between Chief Justice Gordon J. MacDonald, Judge Christopher Keating and Attorney Christopher Pyles Re: Mr. Bookman Question Regarding Step Upgrade for Attorney Dianne Martin ........ 0504

38. Emails between Communication Manager Av Harris, Chief Justice Gordon J. MacDonald, Judge Christopher Keating, Laura Beeson and Todd Bookman Re: Response to Mr. Bookman's Questions ........ 0506

39. October 31, 2025 Statement of Supreme Court Justices Gordon J. MacDonald, Patrick Donovan, Melissa Countway and Bryan Gould. ........ 0508

40. Attorney General's Report Re: Interview with Dianne Martin ........ 0510

41. Request to Approve Higher Level Entry Step for New Employee Re: Dianne Martin Approved by Judge Christopher Keating, Offer of Employment and Agreement to the Terms of the Employment ........ 0517

42. March 18, 2025 Notes by Deputy Director Matthew Mavrogeorge ........ 0525

CONFIDENTIAL

# 1. Chief Justice Gordon J. MacDonald Narrative

# CHIEF JUSTICE GORDON J. MACDONALD NARRATIVE

## A. My Background and the Role of Chief Justice

1. I have served as Chief Justice of the New Hampshire Supreme Court since March 5, 2021. Prior to that, I served as Attorney General for the State of New Hampshire beginning in April 2017. Preceding that, I was in private practice, most recently as a partner at Nixon Peabody LLP, based in Manchester.
2. The Chief Justice is a constitutional officer. N. H. Const. part II, art. 73-a, states as follows: "The chief justice of the supreme court shall be the administrative head of all the courts. He shall, with the concurrence of a majority of the supreme court justices, make rules governing the administration of all courts in the state and the practice and procedure to be followed in all such courts. The rules so promulgated shall have the force and effect of law."
3. I conceive the office as having four basic functions, as follows:
    a. First, to be one of a five-member appellate court. The Court has a long tradition of striving to reach consensus on its decisions. In recent history, the court receives about 750 filings per year, although that number has been increasing. We have also been striving to increase our productivity, as measured by case dispositions. By that measure, 2025 was the most productive year since 2015.
    b. Second, to discharge administrative duties. Over the years, the Judicial Branch has established various committees to assist with the administration of the courts and the regulation of the practice of law. Among those committees are:
        i. Access to Justice Commission
        ii. Advisory Committee on Rules

iii. Professional Conduct Committee

iv. Board of Bar Examiners

v. Committee on Character and Fitness

vi. Committee on Professional Development

Given the breadth of these functions, administrative oversight is necessarily a shared responsibility among the justices and we strive to act as a committee on major administrative issues. The Supreme Court collectively exercises oversight of personnel decisions for leadership positions, both within the Supreme Court and in the entire Judicial Branch. Oversight of the Administrative Office of the Courts (AOC), personnel decisions, and relations with the trial courts was, and remains, the subject of continual and ongoing discussions among the justices. Among the many administrative duties I fulfill, perhaps the most important is to serve as liaison to the other branches. In that capacity, my single most important administrative function is, without question, to lead the Judicial Branch's efforts with respect to its biennial operating budget. Over a period of about ten months, beginning in the fall of even-numbered years, it is an intensive, time-consuming effort. I feel enormous responsibility to deliver a positive outcome for the more than 800 Judicial Branch employees and their families. There were numerous challenges with the budget in 2025.

c. Third, to be a public face for the Judicial Branch. I strive to attend as many functions as possible, particularly Bar- and Bar Foundation-related activities, events involving civics, civics education (particularly with students), and events involving mental health and well-being.

d. Fourth, to work nationally in advancing issues of importance to the legal profession. I have been an active member of the Conference of Chief Justices (CCJ). CCJ is comprised of all the state and territorial Chief Justices. I currently serve as the CCJ first vice president and am slated to become its president-elect in July 2026. I will, therefore, be in line to become CCJ president in 2027. I serve on the Board of Directors of both CCJ and the National Center for State Courts (NCSC). The NCSC, based in Williamsburg, Virginia, provides support to state and territorial court systems. Beginning in 2023, I chaired the Committee on Legal Education and Admissions Reform (CLEAR), a joint committee of CCJ and the Conference of State Court Administrators (COSCA). Leading CLEAR was an intensive but important effort. It involved extensive travel for listening sessions and stakeholder meetings around the country. CLEAR issued its report in July 2025. [1] The effort was the subject of significant national attention for which I was recently recognized by the American Bar Association as a "Legal Rebel." [2] In addition, I chair the CCJ Professionalism and Competence of the Bar Committee. For the last two years, I have also served as the CCJ Liaison to the National Conference of Bar Examiners (NCBE).

4. The chief justice position has no dedicated administrative support. I share a judicial assistant with the other justices. For our judicial duties, the justices have law clerks. Historically, the associate justices have had two law clerks, and the chief has had three. Because of the budget pressures and the many potential cuts we faced in 2025, I felt it was very important for me to "share the pain." When one of my law clerks left in 2025,

[1] https://www.ncsc.org/our-centers-projects/clear
[2] https://www.abajournal.com/legalrebels/article/clearing-a-path#google_vignette

the position remained unfilled and will remain so. Consequently, I now have two law clerks.

5. In sum, my duties as the Chief Justice are extensive and the responsibilities are significant. It is a high-pressure, high-volume job. To keep up, I work constantly. I tend to reserve the weekends, when there are fewer disruptions, for my judicial work, such as preparing for oral arguments as well as drafting and finalizing opinions and orders.

6. Throughout my legal career, I have always sought to adhere to the highest standards of professionalism and ethics. As a relatively new lawyer, I practiced in the field of attorney malpractice. Later, at Nixon Peabody LLP, I was the professional responsibility partner, assisting with risk management and counseling lawyers on ethics. As a private practitioner, I devoted significant time to addressing the access-to-justice gap. I served as the chair of the Leadership Council of the Campaign for Legal Services and was a volunteer attorney for the New Hampshire Bar Association's Domestic Violence Emergency (DOVE) program. By appointment of the Supreme Court, I served for many years as a member of the Board of Bar Examiners, including approximately six years as its chair. I became nationally involved in the field of bar admissions, serving as a member of the NCBE board of trustees. I also served the court as the chair of its Commission on the New Hampshire Bar in the 21st Century. In 2014, I received the Distinguished Service to the Public Award from the New Hampshire Bar Association and in 2017, I received the John E. Tobin, Jr., Justice Award from the Campaign for Legal Services. I am the author of a widely consulted treatise on civil practice in New Hampshire state courts, *Wiebusch on New Hampshire Civil Practice and Procedure*.

**B. The Structure of the Judicial Branch**

7. New Hampshire has a unified court system. The Judicial Branch is comprised of two trial courts, the circuit court and the superior court. The circuit court is a high-volume court comprised of three divisions: district, family and probate. It has a specialized, statute-driven subject matter jurisdiction. There are now 49 authorized judges and 34 courthouses.

8. The superior court is a court of general jurisdiction. All jury trials take place in superior court. There are now 23 authorized judges and 11 courthouses. As described above, there is one appellate court, the Supreme Court with five justices.

9. The AOC was first established by Supreme Court order in 1983. The AOC had been led by a director.

*i. __The 2003 LBA Audit__*

10. In November.2003, the New Hampshire Office of Legislative Budget Assistant (LBA) had submitted to the General Court Joint Fiscal Committee a Performance Audit Report that addressed, in part, "Judicial Branch Administration." *(GJM RESP 0055-0201).*

11. The LBA described Judicial Branch administrative functions as follows:

> The AOC was the only administrative office in the Judicial Branch prior to Supreme Court Administrative Order 90-02 in 1990, which created the Administrative Council and established administrative judge positions for the Supreme, Probate and District Courts. Supreme Court Rule 54, which superseded Administrative Order 90-02 in 1992, gives trial court administrative judges broad responsibilities concerning the management of judicial and non-judicial personnel as well as budgeting and case flow management. The office of the administrative judges assumed certain responsibilities from the AOC, and some of the AOC's court services representatives, who had previously served as generalists in trial court functions and undertook special projects within the trial courts, were transferred to those offices. As a result, responsibilities such as developing and maintaining weighted

> caseload systems and coordinating education and training are shared between the trial court administrative judge's offices and the AOC.

*(GJM RESP 0126).*

12. Consequently, the LBA recommended that action be taken to formally establish the AOC and to clearly define its responsibilities. As the LBA noted, absent such clear definition, "the trial court administrative offices have increasingly assumed responsibility for some aspects of certain administrative functions from the AOC, such as personnel management, judicial and non-judicial education, grant administration, and private sector transcriptionist certification. This creates inefficiency and ambiguity regarding administrative responsibility." *Id.* at 0128. ("'Unless both the administrators and those served by the administrators have a clear understanding of the respective roles of each, the likelihood of misunderstanding and a consequent impairment of effective working relationships is increased.'") (quoting *The Report of the New Hampshire Supreme Court Long-Range Planning Task Force*); and *id.* ("clearly established lines of administrative authority should exist, and the duties and responsibilities of court administrators should be specified") (citing American Bar Association's (ABA) *Standards Relating to Court Organization*). *Id.*

13. The LBA recommended: "We recommend the Legislature consider formally establishing the AOC and defining its responsibilities in statute." *Id.*

14. In response to this recommendation, the Judicial Branch stated: "The Judicial Branch agrees in part. The Supreme Court established the Administrative Office of the Courts. It recognizes the value of more clearly defining the responsibilities and authority of the Administrative Office of the Courts. The Supreme Court will promulgate a rule that

more clearly defines the responsibility and authority of the Administrative Office of the Courts." *Id.* (emphasis added).

15. As of 2021, when I became Chief Justice, the Supreme Court had not promulgated such a rule. In 2005, the Supreme Court had issued an order detailing some AOC responsibilities: accounting, auditing, human resources, technology, fiscal management, court security, purchasing, facilities, and statistics. But the Supreme Court had not established clear lines of authority and delineation of responsibilities.

16. When I became aware of the LBA Audit, I regarded the failure to follow through on an express statement to the legislature as very serious, both in terms of institutional integrity and inter-branch comity. It was imperative that this omission be addressed.

17. Further, I regarded the LBA Audit's observations and conclusions to be very well founded. The structure of the Judicial Branch resulted in a high degree of inefficiencies. Its siloed "fiefdoms" were not conducive to change and hence meaningful growth.

***ii. 2024 NCSC Strategic Planning***

18. Another 2003 LBA Audit recommendation was to "implement a strategic planning process resulting in comprehensive, long- and short-term plans." *Id.* at 0129. This LBA Audit recommendation had also been overlooked by the Judicial Branch for more than twenty years. My memory is that in late 2023, the Judicial Branch applied for a received a technical assistance grant from the State Justice Institute (SJI) to undertake strategic planning. The Judicial Branch thereafter retained NCSC to assist with the strategic planning process. In early 2024, NCSC began preliminary work. On April 15, 2024, I met with the NCSC's senior consultant on the project. My memory is that the consultant told me that he knew of no other state court system structured like New Hampshire's.

Specifically, unlike other states, the New Hampshire AOC and, hence, the AOC Director, did not have oversight or responsibility for trial court operations or staff.

19. My memory is that, after this conversation in 2024, I relayed this observation to the other justices. It was not only consistent with the LBA Audit, but it also strongly confirmed my own experience and belief. Again, as stated above, the Judicial Branch was organizationally flawed as it was siloed and inefficient. Further, the role of the AOC was not well-defined. There was another structural flaw. There is an inherent disparity and "power differential" between judges and non-judicial staff. I observed it repeatedly. Thus, I came to believe that a realigned AOC should be led by a trial judge. A trial judge would have the knowledge and experience necessary to lead trial court operations and staff and would not be subject to the inherent disparity associated with non-judicial staff.

***iii.*** ***<u>The 2025 NCSC Efficiency Study</u>***

20. In 2025, the Judicial Branch again engaged the NCSC to conduct an assessment of its operations. (GJM RESP 0205-0290). Although the Court's order issued on April 11, 2025, I had, in fact, been in discussions with NCSC about the possibility of undertaking such a reorganization study for months. I informed the other justices of these discussions.

21. The NCSC's report, *New Hampshire Judicial Branch Assessment* (NCSC Efficiency Study), was released on September 3, 2025. The NCSC Efficiency Study referred to the 2003 LBA Audit, and noted that the AOC's authority "never been codified into rule or statute." *Id.* at 0246. The NCSC observed that, "[w]hile there is cooperation between the three courts and the AOC, the administration of the courts is functionally siloed.

Additionally, the trial courts operate as two separate entities, each complete with their own administrative office, judges, and court staff." *Id.* at 0214.

22. The NCSC Efficiency Study further elaborated on the structure: "The administrative structure of the NHJB is somewhat unique in that there is an administrative office of the courts, an administrative office in the Superior Court, and an administrative office in the Circuit Court. This structure makes it more difficult to establish uniform procedures and training for staff." *Id.* at 0247.

23. Consequently, the NCSC recommended that the Judicial Branch, "[e]stablish authority for the Administrative Office of the Courts (AOC) through court rule, statute or administrative order that delineates a clear role and responsibility for the AOC." *Id.* at 0246 (Recommendation 1).

24. The NCSC also recommended that the Judicial Branch, "[c]onsolidate select functions of the Administrative Office of the Circuit and Superior Courts into the AOC." *Id.* at 0247 (Recommendation 2).

25. Following receipt of the NCSC Efficiency Study, the Supreme Court acted quickly to implement Recommendations 1 and 2. On October 10, 2025, the Supreme Court promulgated an entirely new version of Supreme Court Rule 54. *(GJM RESP 0291-0296)*. As revised, Rule 54:

    a. Established the administrative office of the courts, Sup. Ct. R. 54(3);

    b. Established the position of state court administrator, Sup. Ct. R. 54(2);

    c. Established clear lines of responsibility and authority for the state court administrator and the AOC, Sup. Ct. R. 54(2) & (3);

d. Required that the state court administrator shall be a judge of either the superior or circuit courts, Sup. Ct. R. 54(2);

e. Established clear lines of responsibility and authority for the chief justice of the superior court, Sup. Ct. R. 54(5); and

f. Established the position of chief judge of the circuit court and established clear lines of authority for that position, Sup. Ct. R. 54(6).

*Id.* at 0294-0296.

26. Until these amendments, Supreme Court Rule 54 had provided for an administrative council. *See,* Sup. Ct. R. 54(3) (2024). It was comprised of the chief justice of the supreme court, the chief justice of the superior court, the administrative judge and the deputy administrative judge of the circuit court and the AOC Director. *Id.* The administrative council was established to facilitate communication among the courts and the AOC, and was required to apprise the Supreme Court of matters being considered "to enhance the effective and efficient administration of the Judicial Branch." *See, id.* Sup. Ct. R. 54(3) (2024).

27. In its current form, Supreme Court Rule 54 establishes a council of chief judges, comprised of the chief justice of the supreme court, the chief justice of the superior court, the chief judge of the circuit court and the state court administrator. *See*, Sup. Ct. R. 54(8). *(GJM RESP 0296).* The council of chief judges "shall be a forum for the exchange of ideas and information for the improvement of the justice system . . ." and "shall make recommendations for the effective administration of the Judicial Branch to the supreme court." *Id.*

28. The AOC consists of approximately 70 staff and 150 court-security officers, many of whom are part-time.

**C. Attorney Dianne Martin**

29. I first met Attorney Dianne Martin when I became Attorney General in April 2017. At the time, she was an assistant attorney general in the transportation and construction bureau. After working with Attorney Martin and witnessing her level of knowledge and skill, I recommended that she be promoted to senior assistant attorney general and, in that position, she assumed responsibility for counseling and oversight of all executive branch procurement. *See,* RSA 21-M:11, III. (Appointments to most professional positions within the office are based on the attorney general's recommendation, but are subject to approval by the Governor and Council. *See,* RSA 21-M:3).

30. Again, based on her skill and work performance, I recommended that Attorney Martin be promoted to associate attorney general and chief of staff. In that position she focused on human resources, recruitment and retention for the entire department, while continuing in her role as the statewide procurement attorney. At the time, there were approximately 70 attorneys and 125 total employees in the department. She worked very hard and, to my knowledge, was well-respected and well-liked by her colleagues and handled human resources issues skillfully and without any issues.

31. Attorney Martin left the Attorney General's office when she was confirmed by the Executive Council to be the Chair of the Public Utilities Commission in approximately September 2019.

32. When I began my current role, Christopher Keating was the AOC Director. Shortly thereafter, in 2021, he became a circuit court judge.

33. With respect to appointing a new AOC Director, I viewed that decision as one for the entire Supreme Court to make. As we began the process, it is my memory that all of the justices – myself included – strongly wished that a current employee consider becoming Director. My memory is that when approached about that prospect, that employee declined.

34. With the concurrence of the justices, the Judicial Branch engaged the NCSC to assist with a national search for a new AOC Director. The principal NCSC consultant eventually identified a very strong candidate who was then serving as the deputy state court administrator in a larger state. That candidate advanced to the very late stage of the selection process. However, at that late stage, the candidate informed us that family considerations would preclude relocating to New Hampshire.

35. At that point, with the concurrence of the justices, and with my strong support, we again asked the same employee to consider becoming AOC Director. Again, that employee declined.

36. Thereafter, it is my memory that senior AOC staff surveyed state government leaders for potential candidates. That effort brought forward the name of Attorney Martin. She was still serving as PUC Chair. Attorney Martin interviewed with the members of the administrative council and with the justices. With the concurrence of the justices, she was offered the position as AOC Director, and began that role in November 2021.

37. During the time that the justices were considering Attorney Martin for AOC Director, I first became aware of rumors that I had an adulterous relationship with Attorney Martin. Specifically, my memory is that Justice Hantz Marconi told other justices that her spouse had heard at a Governor and Council meeting that Attorney

Martin was my "girlfriend," or something to that effect. I immediately disclosed this to the then-Judicial Branch general counsel, and told her that the rumor was false. I also discussed it with each of the justices individually, telling them it was false.

38. I am aware that this false rumor has persisted. This rumor was and remains false and has caused great damage to me. I emphatically state that my relationship with Attorney Martin has been, is, and will remain purely professional.

39. Director Keating and I had previously met on an approximately weekly basis and he met with the entire Supreme Court on an approximately monthly basis. My memory is that this practice continued with Attorney Martin when she became AOC Director.

40. In addition, it is common for an individual justice to reach out to the AOC Director or other AOC staff directly on any issue of concern. Given the breadth of duties, oversight of the administrative functions of the Judicial Branch was, and remains, a necessarily shared responsibility. At all times, the Supreme Court was, and continues to be, engaged in an ongoing, collective discussion about the Judicial Branch, all the courts and the administrative functions, to include major personnel decisions.

41. We all have our strengths and weaknesses. A fair assessment of Attorney Martin's performance must account for both.

*i. __Grants__*

42. When I began my tenure as the Chief Justice, the Judicial Branch had no meaningful ability to apply for or manage grants on a branch-wide basis. As a result, the branch was,

in effect, leaving millions of dollars on the table and missing important opportunities to advance its mission. In the COVID era, the opportunities were particularly abundant, including under the American Rescue Plan Act of 2021 (ARPA).

43. Leveraging her knowledge of the field and her contacts, Attorney Martin successfully recruited and retained a highly qualified individual from the attorney general's office to lead a new office of strategic funding initiatives, which was focused on obtaining and managing grants. That office has since brought millions of dollars into the branch.

*ii. __Safety and Security__*

44. When I began my tenure as the Chief Justice, the state of security – particularly in the circuit court – was unacceptable. (Security in the Circuit and Supreme Courts is a Judicial Branch responsibility; county sheriffs partner with the Judicial Branch as to security in the Superior Courts). As leaders, we have few higher duties than to do all we can to provide for the safety and security of court users, our staff and our judges. Unfortunately, this issue had long been ignored. I felt an intense urgency to make meaningful improvements and I shared this feeling with the other justices. My sense of responsibility and urgency only increased after the New Hampshire Hospital (NHH) shooting in 2023 as there is a circuit courtroom in NHH.

45. Attorney Martin led a multi-faceted effort to improve security. Drawing on her executive branch contacts, Attorney Martin worked with the Police Standards and Training Council leadership to develop a first-ever training program for court security officers (CSOs). She also assisted with legislation to authorize this training. She worked on a successful effort, as part of the budget process, to secure the necessary funding to standardize weapons and protective gear for CSOs. In the wake of the NHH incident, she worked

with the Governor's Office to secure ARPA funding to provide immediate physical security improvements in courthouses, as well as to conduct a comprehensive site-by-site physical security assessment at approximately 40 courthouse locations. She also successfully recruited a highly respected law enforcement professional to become the AOC Assistant Director for Safety and Security, which required legislative authorization.

46. Because of Attorney Martin's efforts, our CSOs are better trained and equipped and our courthouses are physically safer.

*iii.* ***Access to Justice***

47. The Supreme Court established its Access to Justice Commission in approximately 2012. It was and is intended to focus on issues related to the inability of many to access lawyers to address their legal needs. In 2022, Justice Bassett became the Commission's co-chair. With the justices' support, Attorney Martin created the office of access and community engagement within the AOC to provide, for the first time, dedicated staff support for the Commission's work. With the strong support of the justices, Attorney Martin worked with the Governor's Office to secure ARPA funds for six access to justice-related pilot projects designed to explore different strategies to improve court access for self-represented litigants and others.

48. After this funding had been secured, Justice Bassett attended a national access to justice conference. I recall that that he reported back to the court how pleased he was to be able to report to the conference on these ARPA-funded projects and how uniquely positioned New Hampshire was relative to other states because of this funding.

*iv. __Regional Meetings__*

49. Justice Bassett suggested that there should be a regional meeting of all Supreme Court justices. I asked Attorney Martin if anything could be done to advance Justice Bassett's suggestion. She ultimately secured grant funding from NCSC for a conference, undertook the logistics, and coordinated with her state court administrative colleagues from around New England. As a result, New Hampshire was able to host a highly successful regional conference of justices and state court administrative leaders in the fall of 2023. Justice Bassett presided over the educational components of the conference. Attendees were grateful and highly complimentary of the New Hampshire Judicial Branch's efforts.

50. In an email dated March 31, 2025, Judicial Branch General Counsel Erin Creegan set forth a more complete list of Attorney Martin's accomplishments:

> In less than four years, [Attorney Martin] led an initiative in the Judicial Branch to improve court and community response to people experiencing mental illness, including obtaining grant funding and creating a mental health team; coordinated a statewide mental health summit in New Hampshire; helped create a new the [sic] Office of Access and Community Engagement; served as the first chair of the newly created Judicial Branch committee on domestic violence; improved access for victims by improving the website and forms; applied for and received grant funds to support increased data and analysis related to domestic violence cases; obtained $3 million in grant funding for Judicial Branch security after the shooting as [sic] at New Hampshire Hospital; worked on legislation to create a dedicated training program for our court security officers and oversaw implementation; started the first ever grant office in the Judicial Branch, which led to a dramatic increase in grant funding; and was instrumental in obtaining Opioid Abatement Funds to support the [Judicial Branch] community housing program.

*(GJM RESP 0297-0298).*

51. An assessment of Attorney Martin's performance must also take into account the circumstances she confronted. Among them:

a. As described in detail above, the AOC was structurally flawed, leading to siloization and institutional dysfunction.

b. Also, as described above, there was a power differential between judicial officers and the non-judicial Director.

c. The AOC Director's job description was very broad and hence not realistic for one person to manage.

d. Because of funding constraints, there was no redundancy and virtually no support for the position or other senior positions within the AOC.

e. By its nature, the AOC Director was required to implement policies or programs that may not have had universal support among judges or AOC staff.

Notwithstanding the above considerations, over time, the court became increasingly aware that Attorney Martin's management skills and style may have been leading to operational issues at the AOC, thus compounding the institutional dysfunction. Of particular concern was the departure of some long-standing staff (although, to be fair, Attorney Martin did recruit and retain some highly qualified individuals into important positions). These concerns became acute in mid-2024. On May 1, 2024, the court had received a complaint from a then-AOC employee making several allegations about Attorney Martin. The court retained Attorney Debra Weiss Ford to provide counsel with respect to the employee's complaint. Attorney Weiss Ford, in turn, identified Aleta Law to serve as a neutral, external factfinder for the purpose of investigating the employee's complaint. On July 9, 2024, the court received a final report. The investigation determined that there were insufficient facts to sustain the employee's allegations. However, the report discussed differing perspectives within the AOC about Attorney Martin's management style.

Attorney Martin became aware of the report's discussions of her management style. Her concerns were set forth in an email to Attorney Weiss Ford and me, dated July 22, 2024. On the same day, I forwarded that email to the other justices and attached the following documents: NHJB job description of AOC Director; Dianne Martin list of accomplishments; Supreme-Court-AO-2023-06-amended; and, fw: investigation concluded. *(GJM RESP 0299-0319).*

52. The court decided to continue to retain Attorney Weiss Ford for purposes of obtaining advice about steps to be taken to address concerns raised in the report with respect Attorney Martin's management. My memory is that I called Attorney Weiss Ford to ask for her assistance. Attorney Weiss Ford did provide a recommendation regarding a consultant to assist with addressing issues at the AOC. *(GJM RESP 0331-0336).* The steps the court took are reflected in a document entitled "Timeline – MBC's notes from Calls with Deb Ford." *(GJM RESP 0320-0330).* Those notes, made by Justice Countway, reflect the following:

a. On July 11, 2024: During a call with Attorney Weiss Ford, the court "discussed developing an action plan to address the culture at the AOC including retaining a facilitator and revising and paring down the director's job description along with empowering managers, perhaps having a chief operating officer."

b. On July 23, 2024, Attorney Weiss Ford reported that Attorney Martin was "wildly upset, crying, incoherent" about the investigation report.

c. Late summer and fall 2024, the court was "basically hands-off during the period of FMLA."

d. On December 4, 2024, the court discussed with Attorney Weiss Ford "finding a consultant for the AOC," "FMLA issues" and some "planned messaging" that the employee investigation had "revealed personnel and communications issues and that we would have an outside consultant work with the AOC team to improve and that participation would be required."

e. On January 23, 2025, Justices Donovan and Countway had a call with Attorney Weiss Ford during which they discussed:

> … new information regarding HR being siloed and bills not being paid on time; discussed concerns for a FMLA type claim alleging retaliation and how intermittent FMLA works; She discussed concerns of taking action in proximity to FMLA and recommended a 6 – 12 month no action timeframe [i.e. before taking action against an employee who has been on FMLA]; discussed concerns about [redacted], we discussed a severance agreement, discussed that if DM brought a claim she would have to prove it; discussed having a business reason for change; discussed a pathway [to the OBA job] and that GJM had discussed it with her twice but "DM [did] not bite". Discussed strategy of bringing her in and expressing our concerns as a first step and to see what she says in a "listening session". We discussed concerns about her "screaming" at Deb Ford in the past. Discussed goal of insulating us from liability and the suggestion that we offer paid leave if she "blows up". Noted that she had floundered in MBC trying to work with her and her asking PED to conduct Matt Seaton's evaluation. DF advised that it was OK for us to ask her "are you back to work full time."

It was "during this timeframe" that Justices Donovan and Countway had meetings with Chief Justice Mark Howard and Circuit Count Administrative Judge Ellen Christo "who described the problems at [the] AOC and expressed being at a breaking point."

f. On February 25, 2025, Justices Donovan and Countway had another call with Attorney Weiss Ford. The note prepared following this call states:

> PED and MBC had a phone call with Deb Ford [MBC notes on a prepared word document with preprinted questions]. Notes highlight we discussed having a judicial officer as head of the AOC; discussed restructuring the entire court. Discussed IT lockdown. Discussed the strategy of terminate first then offer the other job with severance pay and a release. Notes say to expect a blow up. We discussed the concern anything short of termination first would likely result in "FMLA immediately".

*Id.* at 0321.

53. In addition to the telephone communications with Attorney Weiss Ford documented by Justice Countway, there were email communications with Attorney Weiss Ford. Of note

were two email communications immediately prior to February 28, 2025. On February 25, 2025, Justice Countway sent the following email to Attorney Weiss Ford:

> Hi Deb,
> Thank you for speaking with us again today about our concerns regarding the AOC director. We shared these concerns with the rest of the Court at conference this morning and have made the difficult decision to terminate the Director. Our concerns involve the management style, mass departures of long-term career employees (I count 14), mishandling of bill payments, and a culture of fear and retaliation. As you know, these concerns were noted in the investigator's report last July. We have conducted exit interviews and the theme is the same: micromanagement, siloing employees, prohibiting employees from talking to, meeting with, and even emailing one another, and creating a climate of fear.
>
> This also comes at a time when the Court is working toward achieving greater efficiency in the overall structure of the AOC and administration of the trial courts. We have concluded that our goals for the position, and Diane's management style do not align.
>
> Thank you for supporting us through this difficult transition.

*(GJM RESP 0337-0338).*

54. On February 26, 2025, Justice Countway sent the following email to Attorney Weiss Ford:

> Hi Deb,
>
> Just to follow up with our plans regarding the AOC Director . . . Our goal is to have the most positive transition possible while being clear and direct.
>
> While we do not feel that Diane has the management skill to lead the AOC, we think she could be a good match for another open position – heading the Office of Bar Admissions.
>
> Is it reasonable to let her know in this order: (1) we need to part ways with her as AOC Director; (2) we can structure the transition as a resignation, if she prefers, instead of a termination, if she would like to pursue the OBA position.

> If it is too much to expect her to decide on the spot, is it reasonable (from an employment law perspective) to conclude the meeting with this being a termination with an opportunity to restructure the transition (to allow her to resign instead) within the following week? Are there implications to her state retirement benefits to distinguish between termination and resignation?

*(GJM RESP 0339-0340)*

Attorney Weiss Ford followed up to this email, and another from Justice Donovan with answers embedded in the text. *(GJM RESP 0341-0343).*

**Office of Bar Admissions**

55. The Supreme Court has plenary authority over the regulation of the practice of law. Pursuant to that authority, among the Court's most important public protection functions is the licensing of new attorneys. There are two principal elements to attorney licensing: a determination that an applicant is minimally competent and a determination that an applicant has the requisite character and fitness. Notably, there are multiple paths to establish minimal competence, among them: passing the bar examination, administered twice annually in February and July, successfully completing the Daniel Webster Scholar Honors Program at the University of New Hampshire Franklin Pierce School of Law, and admission by transferred Uniform Bar Examination score. Each one of these pathways has specific and detailed requirements.

56. By rule, the Supreme Court has established two Committees to oversee and implement these functions: the Board of Bar Examiners and the Committee on Character and Fitness. *See,* Sup. Ct. R. 42. Both the Board and Committee are supported by the Office of Bar Admissions (OBA). *See, id.* Bar admissions functions, including the operation of the OBA are entirely self-supporting based on fees assessed to applicants. No general funds are involved. Since its establishment in 2011, the OBA has been comprised of just

two staff: a general counsel and an administrative assistant. Over the years, Committee and OBA leadership had practiced prudent fiscal stewardship. A relatively healthy financial reserve had been built.

57. As a practicing attorney, I chaired the Board of Bar Examiners and, as Attorney General, I served on the Committee on Character and Fitness. As noted above, I remain active in the field of bar admissions nationally.

58. Attorney Sherry Hieber had served as the OBA General Counsel since the OBA was established. She was an exceptional public servant, and a respected leader in her field. I had long been concerned about the lack of redundancy in the OBA. There was simply no way to replicate Attorney Hieber's knowledge and skills. I knew first-hand the complexities of conducting a bar examination, as well as the many other aspects of bar admissions functions.

59. In the fall of 2024, Attorney Hieber told me that she intended to retire and that her retirement date would coincide with the conclusion of her one-year term as the President of the Conference of Bar Admissions Administrators in the summer of 2025.

60. When I told the justices of Attorney Hieber's retirement, I recommended a long transition period for a new general counsel, ideally covering both the February and July bar exams. My recommendation was based on the complexities of the function and the fact that Attorney Hieber had been a one-person (with an assistant) operation since 2011. The other justices concurred with my recommendation for a long transition period for a new general counsel.

61. On November 5, 2024, there was an email exchange between Attorneys Martin and Hieber about a transition in the OBA. *(GJM RESP 0344-0346)*. The concept of a lengthy

transition was expressly discussed, as well as the mechanics and funding for facilitating such a transition. *See, id.*

**D. Events of February 27-March 2, 2025**

62. Following the justices' lengthy consultation with Attorney Debra Weiss Ford, I was aware that Justices Donovan and Countway were to meet with Attorney Martin on the morning of Friday, February 28, 2025. My memory is that while I was supportive of the decision to replace Attorney Martin with Judge Keating, I had expressed concerns about the actual mechanics of doing so. The other justices did not agree. On the evening of February 27, 2025, I reiterated my concerns to Justices Donovan and Countway in a text.

63. My text to the justices stated as follows:

> Patrick and Melissa, I recognize and accept that I am badly outnumbered. Nonetheless, I feel compelled to share two thoughts that I hope you might consider as you approach tomorrow.
>
> [First], I think the most accurate description of the situation is that [Attorney Martin's] skill sets do not match what is required for the role. That, however, does not diminish her extraordinary dedication, hard work and accomplishments. I cannot tell you how many times she rose to the occasion to help on a mission critical task when others fell short [or] no one was around. She certainly has not acted with anything remotely approaching malice or bad faith. Therefore, she should be afforded every degree of dignity and respect at this difficult moment. I take real issue with showing her the door. It will be highly and unnecessarily embarrassing as well as disruptive, particularly for those close to her.
>
> Second, I regret that my plea about timing was not honored. The Court is facing, simultaneously, an unprecedented number of extraordinary challenges: a difficult budget season, the [Justice Hantz Marconi] situation and associated litigation, [Justice Bassett's] impending departure, and a crushing workload. Externally, this news will be received in this context and will likely engender less, not more, faith in us. For me, personally, my job uniquely requires bearing all of this. The stress for me – already high – will only be compounded by the inevitable dysfunction flowing from the fact that she handled so much personally. In a

> situation which we can control, I think it is a mistake not [to] try to facilitate some reasonable, professional transition. We at least need a transition memo outlining where various projects stand, deadlines and next steps. Without something like that, we will be flying blind and potentially into some liability.
>
> Thank you for considering these points. There is no need to reply. I wish you the best tomorrow.
>
> Gordon

*(GJM RESP 0347-0361).*

64. Attorney Martin is a member of the Bar, a former agency head, and a former member of the Attorney General's Office. My memory is that I viewed this text as a final attempt to convey that I did not believe, even in the face of the news that we were transitioning to Judge Keating, that she would conduct herself in anything but a professional manner. Such an action would have obvious reputational consequences and I did not believe that, in fairness, anything about her service warranted such an approach.

65. On the morning of Friday, February 28, 2025, I attended a lengthy meeting at the U.S. District Court regarding federal-state cooperation on treatment courts. Later in the day, back in my office, I prepared for and chaired a virtual CLEAR executive committee meeting that began at 4 pm. During that CLEAR meeting, Justice Donovan stopped by my office, but I was unable to speak with him. My memory is that by the time the CLEAR meeting concluded (likely after 5:00 pm), Justice Donovan had left.

66. Justice Countway prepared notes of the February 28, 2025 meeting with Attorney Martin. On March 7, 2025, Justice Donovan sent an email to Justice Countway with bullet points that may not be captured in Justice Countway's notes and on March 12, 2025, I received a memo of combined notes from the meeting with Attorney Martin. *(GJM RESP 0362-*

*0373).* I do not remember when I first saw Justice Countway's notes, but it was likely after March 3, 2025.

67. On February 28, 2025, at 7:29 pm, I received an email from the Judicial Branch fiscal manager, Donna Raymond, informing me that the branch was scheduled to present its capital budget request to the House Public Works Committee on Tuesday, March 4, 2025.

68. In comparison to the Judicial Branch operating budget, the capital budget request is relatively modest and is largely focused on information technology-related needs. As opposed to the operating budget, in prior years, I had not personally participated in capital budget legislative hearings. The AOC Director had done so. Nonetheless, I regard an interaction with a legislative committee on a budget-related issue to be an important event, requiring planning and a polished presentation.

69. My memory is that I had no prior knowledge of this hearing. I had no knowledge of what had been done to prepare.

70. I had planned to spend the weekend of March 1-2, 2025, preparing for Supreme Court oral arguments also scheduled for March 4, 2025. Additionally, I had an important family-related obligation.

71. Instead, much of my time over that weekend was consumed by addressing the urgent need to prepare for the capital budget legislative hearing. I had numerous email exchanges and telephone conversations with Fiscal Manager Raymond and others. I could not meet my family obligation.

72. This incident validated my concerns expressed to Justices Donovan and Countway about the need for transition planning with Attorney Martin.

### E. March 3, 2025

73. By the morning of Monday, March 3, 2025, despite intensive efforts over the weekend by many Judicial Branch staff, we were still not adequately prepared for the House hearing the next day. Addressing this issue remained an utmost priority.

74. On that date, I had a pre-scheduled meeting with Judge Ned Gordon at 9:30 am to take place in the Supreme Court conference room.

75. I had no communication, in any form, with Attorney Martin during the period after Justices Donovan and Countway met with her on February 28, 2025, until I received an email, addressed to Judicial Branch General Counsel Erin Creegan (Attorney Creegan) and me, on March 3, 2025, at 8:45 am, captioned "Transition items". *(GJM RESP 0374-0410 [0385-0388]).* As discussed below, I replied to that email late that afternoon, which was my first communication with Attorney Martin.

76. At 9:07 am, I was in the office and received a call from Attorney Creegan. The call lasted approximately 20 minutes.

77. My memory of the call is as follows. Attorney Creegan asked whether I, as Chief Justice, had approved of the actions taken with respect to Attorney Martin on February 28, 2025. I said yes, but I was still unaware of the details about what had actually happened. She asked if the court had legal counsel involved. I said yes, explaining that we had been working with Attorney Weiss Ford. She then told me some of what happened during a meeting with AOC employees on February 28th. Attorney Creegan reported that in addition to telling the employees that Attorney Martin was being replaced with Judge Keating, Justice Donovan also said that [redacted] was not only being placed on leave and but was also "under investigation."

78. At some point, Attorney Creegan also told me that, over the weekend, Attorney Martin had reached out to her. [redacted]

79. Attorney Creegan expressed concerns about the legal risks the Judicial Branch faced as a consequence of what had happened. I specifically remember her saying words to the effect of: "No one knows the personnel rules better than Dianne."

80. We also discussed the potential reputational harm to both Attorneys Martin and [redacted] because of the manner in which the actions had been taken and what was said during the AOC employee meeting.

81. Because I had Judge Gordon waiting for me, I asked whether I could come to the AOC office later that morning to meet with her and Judge Keating to discuss next steps.

82. After the call concluded and before going to the conference room, I looked at my email. I saw that at 9:17 am, the court had issued an order appointing Judge Keating as the interim Director of the AOC. *(GJM RESP 0414)*. Prior to that point, I had not seen the order, nor did I know that it was to be issued at that time. As a result of discovery in this matter, I have since learned that Justices Donovan and Countway exchanged emails with Clerk Timothy Gudas about such an order on February 28, 2025. *(GJM RESP 0411-0414)*. I should have been included in that email exchange, and I wish I had been.

83. My memory is that I walked to Clerk Gudas's office, asked him about the order, noting I had not seen it, and he responded that he had been instructed by Justice Donovan to issue the order.

84. At that point, a court order had issued without my constitutionally required approval, I had just been informed by Attorney Creegan that the actions that had been taken may have created risk for the branch, I had been deprived of the opportunity to ask Attorney Creegan to review the order to mitigate any of those risks, because my request for some reasonable transition period had not been heeded, I had spent much of the weekend working on the then-still unresolved and urgent issue of House testimony the next day, and I had to miss an important family obligation. I was extremely concerned, frustrated and, yes, angry.

85. I walked down to Justice Donovan's office. I only remember that it was very brief as I still had to meet with Judge Gordon, that I said something to the effect of "just stop" or "don't do anything more" referring to the Attorneys Martin an[redacted]matters. I also remember invoking the constitution, intending to convey that the order should not have gone out without an opportunity for me to review it, and that he had no authority to instruct the clerk otherwise. I remember that I did raise my voice, I do not remember slamming the door or swearing, but I do not dispute I could have done so.

86. I do not remember any interaction with Justice Countway on that morning. On April 2, 2026 Justice Countway sent my counsel, Jane E. Young, an email that stated the following:

> Hi Jane:
>
> 1. I never reported ANYTHING regarding my interactions with Gordon on March 3rd
> 2. There was no "heated exchange" between us
> 3. What did happen is Gordon told me to "stand down" as he was walking by my office. I am 100% sure this is all he said to me.
> 4. At the time I shared with PED and likely JPB that he said that. I recently shared with BKG the extent of that exchange. I absolutely have told no one else (other than routine end-of-day sharing with my spouse.)

5. Telling me to stand down was no big deal
6. He has never used profanity or raised his voice at me nor have I witnessed that with others

I know this is a small piece of the whole complaint but I want Gordon to know that I am not the source of any of that and he has my full confidence, support and empathy as he navigates this mess. Please let me know how I can set the record straight

Melissa Countway

*(GJM RESP 0415-0417)*

Justice Countway informed Attorney Young that the information in her email could be shared with the Judicial Conduct Committee. *Id.* at 0416. I subsequently apologized to my colleagues. As unfortunate as that moment was, I was determined – and I believe my colleagues were – that we were going to move past this and not let it interfere with the important jobs we had to do. I believe that we did. Among other indicia, as noted above, 2025 was the court's most productive year since 2015.

*i.* ***March 3, 2025, Meeting at AOC and Legal Advice Regarding Next Steps***

87. Following my meeting with Judge Gordon, I went to the AOC offices to address both the Attorneys Martin and [redacted] matters as well as the House testimony.

88. I remember meeting with both Judge Keating and Attorney Creegan. I remember asking Judge Keating about his assessment of what had happened on February 28th. He said, "the right decision, but disastrously executed," or words to that effect. Judge Keating's words have remained with me as they aptly and succinctly described the situation we then confronted.

89. My memory is that we had a further discussion about the potential legal risks that we faced and that Attorney Creegan elaborated on her concerns about compliance with the Judicial Branch personnel rules as well as concerns about claims for reputational harm as

to both attorneys involved. From the morning of March 3, 2025, I and the other justices received legal advice exclusively from Attorney Creegan regarding issues involving Attorney Martin. Attorney Weiss Ford had no further involvement.

90. Judicial Branch Personnel Rule 56 provides, in relevant part:

> (a) A layoff is a termination of employment that occurs when the Supreme Court deems it necessary to abolish a position due to a shortage of funds or work, due to a material change in the duties or organization of a work unit, a change in state laws, or a change in federal requirements. A layoff shall be considered not prejudicial and non-disciplinary.
>
> (b) Layoff and reinstatement procedures shall be developed by the administrative council, approved by the Supreme Court as necessary, and published as administrative orders at least 21 calendar days before the date the layoff becomes effective.
>
> (g) *Pay computation*. An employee who is laid off shall receive the following, which shall be paid within thirty (30) days after the effective date of the layoff:
>
> (1) Compensation for all unused accrued annual leave remaining to his/her credit up to a maximum of fifty (50) days.
>
> (2) Compensation for 50% of accumulated sick leave to his/her credit, not to exceed sixty (60) days.
>
> (3) Compensation for terminal pay for qualifying administrative/exempt employees.
>
> *See*, Personnel Rule 56. (emphases added) and *(GJM RESP 0420-0421)*.

91. I remember asking how I could help. Attorney Creegan suggested I send Attorney Martin an email. I asked her to help me draft something that would be appropriate.

92. Meanwhile, at 12:39 pm, Attorney Creegan and I received an email from Judicial Branch Communications Manager, Av Harris, forwarding an inquiry from Todd Bookman of New Hampshire Public Radio (NHPR). *(GJM RESP 0422-0424)*. In that inquiry, Mr. Bookman states, in relevant part, as follows:

> NHPR is hoping to confirm that Dianne Martin is no longer the director of the AOC. Could you clarify if she was terminated or resigned and what day is/was her official last day?
>
> Who is now serving as director of the AOC?
>
> Additionally, can you confirm that [redacted] has been placed on administrative leave? (Could you also confirm her exactly [sic] title within the AOC is?)
>
> And finally: if the branch as a statement or comment to share on why these changers are taking place, <u>including whether there is an investigation into either or both of these employees, please share what you can.</u>

*Id.* at 0424. (emphasis added).

93. This NHPR inquiry amplified concerns about the potential for reputational harm to both these employees. After discussion with Attorney Creegan, the Judicial Branch provided Mr. Bookman with the administrative order appointing Judge Keating earlier in the day, along with a statement that the Judicial Branch cannot comment on personnel matters. *Id.* at 0423-0424.

94. I returned to my office and drafted an email to Attorney Martin. I asked Attorney Creegan to review and to edit, which she did. *(GJM RESP 0389-0390)*. At 5:04 pm, I sent a slightly revised version of Attorney Creegan's draft email to Attorney Martin. *(GJM RESP 0385)*. My email was in response to an email from Attorney Martin to me and Attorney Creegan from earlier in the day, mentioned above, captioned "Transition issues".

**F. Attorney Martin's March 4, 2025, Email and Her "Proposal" for Resolution**

95. Attorney Martin replied on March 4, 2025, at 6:15 pm. *(GJM RESP 0397-0399)*. Attorney Martin described the February 28, 2025 meeting with Justices Donovan and Countway and stated:

> With no prior notice, I was informed the Court was working with the National Center for State Courts to reorganize and my nonjudicial position as Director of the Administrative Office of the Courts (AOC) was being eliminated, I was being laid off and a judicial officer would be named to head the office. I was then offered a demotion to the position of counsel to the Office of Bar Admissions, a position in the AOC that reports to my current position and is at a lower labor grade. I was told this reorganization was going to be announced and that I needed to immediately respond so they could announce that I was accepting the other position at the same time.

*Id.* at 0398.

96. Attorney Martin further stated:

> [redacted] I was stunned and struggled to even comprehend what was being said ... I explained the director position is a regular permanent position. It is not a term position, nor is it an at will position. No notice was given in the job offer or the job description that accepting a state position would put me at risk of loss of much needed state health insurance for my family, credit for my many years of longevity as a public servant, participation in the retirement plan, and the many other benefits earned over the years of state employment, by removal without notice. Even layoff has a process and notice is provided.

*Id.*

97. Later in the email, Attorney Martin stated:

> Given what happened to me last week and how I have been treated here, I know you will understand why I am incredibly hesitant to work at the Judicial Branch anymore. [redacted] For those reasons, the ability to continue my state health insurance without interruption is paramount. After much discussion with my family, unless severance and family health benefits can be provided for an extended period of time, I propose the following.

*Id.* at 0399. She then set forth a ten-point proposal.

**G. Attorney Martin's Ten-Point "Proposal"**

98. Attorney Martin's ten-point proposal was, as follows:

i. Layoff effective March 21 and I remain on paid leave through the 21st without a reduction in my leave balance or accruals. The rules provide 21 days' notice for layoff. Payout computation as defined by the personnel rules for layoff.

ii. I will accept the OBA General Counsel position offered with a start date on March 28 at my current rate of pay (labor grade and step), with written confirmation of Justice Countway's representation that the position can be done fully remotely. Please confirm that there is no plan to eliminate this position through the next biennium.

iii. A written waiver of any probationary period for the new position.

iv. My benefits and longevity will not have any gap.

v. The message described in your email will be sent out to the branch and it will also be clarified for the group that was gather on Friday that this change resulted from the Court's work with the NCSC and reorganization is non-prejudicial and non-disciplinary.

vi. You will provide a positive recommendation along the same lines as your email, in recognition of my significant work and contributions to the branch, noting the layoff due to administrative reorganization. This will allow me to mitigate the impacts of what happened in the future.

vii. I will report to you (this position has functioned nearly entirely separately from the AOC Director during my tenure. The only think [sic] I have done is approve leave and time.).

viii. If Denise and Bibiana are willing and it is possible, make the positions equivalent and transfer the two between the assistant positions (Director's and OBA GC Assistant).

ix. I will continue to work with the CRTC students as I previously have.

x. I have a planned vacation at the end of June and may need to be permitted to take unpaid leave part of the time if necessary, depending on how much level I have accrued by then.

*Id.* at 0399.

**H. Attorney Creegan's Advice Regarding Attorney Martin's Proposal**

99. On March 4, 2025, at 7:13 pm, I forwarded Attorney Martin's email to Attorney Creegan.

*Id.* at 0397. Attorney Creegan responded at 7:32 pm. *Id.*

100. Attorney Creegan responded, in part, as follows: "This is not great in terms of her experience of what happened, I had not heard most of this. But as a positive, it does seem like there may be a landing zone for a negotiated resolution that will really mitigate risk to the Branch and also maybe mitigate any damages to Dianne. Most of this looks like things we would be happy to do." *Id.* (emphasis added).

101. Attorney Martin's proposal plainly tracked the provisions of Judicial Branch Personnel Rule 56. An objective reader might reasonably conclude that she had consulted with counsel. (During her November 20, 2025 interview at the Department of Justice, Attorney Martin indicated that after consulting with private counsel, on March 12, 2025, she began communicating and negotiating with Attorney Creegan regarding her termination/lay-off from the Director of Administration position and offer for the General Counsel at the OBA position). *(GJM RESP 0513-0514)*. My memory is that Attorney Creegan and I discussed that possibility and, later, we discussed it with the other justices.

102. Whether she had counsel or not, the clear implication of Attorney Martin's email is that the Judicial Branch had not conformed with the dictates of Rule 56. Specifically, that Attorney Martin was entitled to 21 days' notice, that the action had to be non-prejudicial and non-disciplinary, and that the Judicial Branch was required to pay the amounts prescribed in the rule. That framed my understanding of the situation that we confronted after February 28. It was also the basis of the ongoing advice I, along with the other justices, received from Attorney Creegan.

103. I do not believe that, in rendering advice to the court prior to February 28, Attorney Weiss Ford discussed, referred to, or considered Rule 56. I did not consider the implications of Rule 56 prior to the events of February 28.

### I. Ensuing Communications and Negotiations with Attorney Martin

104. My memory is that I consulted with Attorney Creegan about a reply to Attorney Martin. On March 5, 2025, I sent an email to Attorney Martin which, in part, stated: "I would like to get this resolved asap, and we have started working through the items. I will likely need a few days to get through them all." *(GJM RESP 0393).*

105. Over the ensuing weeks, Attorney Creegan communicated with Attorney Martin about her "proposal" and provided counsel to the other justices, Judge Keating and me.

106. On March 12, 2025, Attorney Creegan reported to Judge Keating and me about a telephone conversation she had with Attorney Martin. *(GJM RESP 0425-0427).* The email reflects an ongoing discussion about the terms of Attorney Martin's March 4th proposal. In the email, Attorney Creegan reported that, "[Attorney Martin] also expressed concern that she had learned that even though she had been told it was a layoff, that may not have been right. I asked what was most important to her and she said keeping insurance [redacted] and that she would like the payout. [Judge] Chris [Keating] I believe is looking into this." *Id.* at 0427.

### J. Judge Keating Seeks Guidance About Terms in Attorney Martin's Proposal

107. I later learned that, the next morning, March 13, 2025, at 6:04 am, Judge Keating sent an email to Judicial Branch Human Resources Manager Suzanne Gelinas, stating as follows:

> I wonder if you could look into what the effect would be to an NHJB employee's medical and dental benefits if the employee goes into layoff status as of March 21 and then is rehired into a different NHJB position with a start date of March 28.
>
> Let's talk this morning about next steps, please. …
>
> This remains a highly confidential inquiry, I very much appreciate your discretion.

*(GJM RESP 0428- 0429).*

108. At 8:27 am the same day, Ms. Gelinas responded to Judge Keating: "…I will get started on this inquiry. This remains confidential and I will be sure to ask broad questions accordingly." *Id.*

109. On Sunday March 16, 2025, Judge Keating emailed Attorney Creegan with the subject line "no updates." Judge Keating wrote:

> Writing to explain that we are waiting for information from DAS about the feasibility and consequences of the proposed layoff/rehire scenario for D.M.
>
> Suzanne was on a mission to acquire a solid grasp of the mechanics and details of the salary and benefits so that she could put it all down on paper to be able to present to us before the end of the day on Friday, but she fell sick and was out on Friday.
>
> I'm hoping we can make progress on Monday; this is a critical priority; I will ask Suzanne if she can clear the deck of anything else not as time sensitive.
>
> Thank you for your patience; I'll be in first thing Monday, maybe we could find a moment to go over where things stand.

*(GJM RESP 0430-0431).* Attorney Creegan responded and said she would be available. *Id.* at 0431.

### *xi. __Human Resources Manager Suzanne Gelinas__*

110. My current understanding is that Ms. Gelinas had been hired as Judicial Branch Human Resources Manager at some point in December 2024. I understand that AOC Assistant Director Rakhmatova made the decision to hire Ms. Gelinas. Judge Keating later told me that Ms. Gelinas' employment references had not been checked prior to her hiring.

111. I met Ms. Gelinas briefly on one or two occasions, and had no substantive interactions with her during her tenure with the Judicial Branch.

[redacted]

113. Based on information later provided to me by Judge Keating, Ms. Gelinas apparently harbored animosity toward me. Judge Keating's April 20, 2025 Memo notes that during a March 28th meeting with Ms. Gelinas she stated that "Chief Justice MacDonald has to go." *(GJM RESP 0432-0436 [0436]).*

114. I have no knowledge of the basis for Ms. Gelinas' animosity toward me. As stated, other than briefly meeting her once or twice, I had no substantive interactions with her.

*ii. Contact with the Department of Administrative Services*

115. The New Hampshire Department of Administrative Services (DAS) is an executive branch agency. *See,* RSA chapter 21-I. Its Division of Personnel (DOP) provides centralized human resources support for government agencies. *See,* RSA 21-I:42. Although, as discussed above, the Judicial Branch has its own personnel rules and, for the most part, manages its own personnel-related decisions, it does rely on the executive branch for some functions including, I believe, processing payroll.

116. In the immediate wake of Judge Keating's March 13, 2025, request to her, Ms. Gelinas exchanged multiple, mostly non-substantive, emails with DAS. *(GJM RESP 0437-0447).*

117. On March 18, 2025, Judge Keating emailed Ms. Gelinas: "I'll be keen to learn your findings from your discussions about the feasibility of the pending proposal with respect to the former director's layoff/rehire scenario." *(GJM RESP 0449).* Judge Keating then informed Attorney Creegan that Ms. Gelinas was to meet with Department of Personnel

Deputy Director Matthew Mavrogeorge later that date. At one point that day, Ms. Gelinas suggested that there might be a meeting with Mr. Mavrogeorge and DOP Director Lorrie Rudis, to which Judge Keating expressed an interest in attending. *(GJM RESP 0445).*

118. On March 19, 2025, Ms. Gelinas sent Judge Keating a draft letter to be sent to Attorney Martin. *(GJM RESP 0450-0452)*. The draft cites to Judicial Branch Personnel Rule 56(b), and recites the payments required under Rule 56(g). *Id.* at 0452.

119. In response to the draft letter, Judge Keating said, in part, "[w]ith respect to your conversation with Matt Mavrogeorge, please let me know if you learned anything valuable or important about the mechanics of this layoff-rehire process that we should be attending to. There are a lot of details to sort this out and I'm not an expert in State Government Human Resources. I don't want to miss something because of my inexperience." *Id.* at 0453. (emphasis added).

**K. Further Negotiations with Attorney Martin and Supreme Court Review and Approval of Terms**

120. In the meantime, Attorney Creegan continued discussions with Attorney Martin. On March 21, 2025, she sent an email to Judge Keating and me reporting on a meeting that had taken place at Attorney Martin's home. *(GJM RESP 0455-0457)*. Attorney Creegan reported on a "productive meeting" but noted that there were still unresolved issues. *Id.* at 0457. Attorney Creegan also noted that Attorney Martin "said that the Chief had been working with her on reclassifying all GCs to 58." *Id.* Attorney Creegan raised the issue of waiver of claims and what would happen "if we couldn't come to terms." *Id.* There was an agreement to speak again, on Monday, March 24, 2025. *Id.*

121. Resolving issues with Attorney Martin had been the subject of ongoing consideration by the justices, in consultation with Attorney Creegan, as well as Judge Keating. In addition to meetings, there were email inquiries about the proposed terms. *(GJM RESP 0458-0462).* My memory is that one such meeting took place during the court's scheduled conference on March 20, 2025, during which there was discussion of the actual amount of the proposed payment owed to Attorney Martin under Rule 56.

122. On March 21, 2025, at 3:51 pm, Justice Bassett sent an email to Attorney Creegan as follows:

> Can you please forward the document or documents that show the calculation of how we get to the $80k payout contemplated for Dianne? Or just send me a quick explanation? Just trying to wrap my head around that high number.
>
> What is the timeline for the negotiations with Dianne? I got the impression that deadlines are fast approaching. Is she aware that we want a global release of all possible claims?
>
> Is the ball in her court – or ours – at this point?

*Id.* at 0462.

123. Attorney Creegan replied to Justice Bassett as follows:

> It actually turned out to be 50k when [Judicial Branch accounting and payroll manager] Becky Plourde checked it. I don't have a spreadsheet but the inputs include up to 50 days annual leave full [sic] paid out and 50% of sick time up to 60 days. Between those two you land at about 3 months of salary, which for Dianne is about 40k. <u>This is from our personnel rules</u>. Would you like me to ask Suzanne [Gelinas] or Becky [Plourde] for a calculation sheet?
>
> I spoke to her today and raised that. She is taking it hack. I hope to talk to her Monday. If we don't have a resolution then it might kickout the potential start date, which is currently proposed as March 28.

*Id.* (emphasis added); *cf.* Judicial Branch Personnel Rule 56(g).

124. Justice Bassett then replied:

> Thank you

> I don't want to create a lot of work for them (but they must already have it done) – but I think that it is important for members of the court to have those numbers spelled out before we agree to any payout.

*Id.* at 0461. (emphasis added).

125. Attorney Creegan forwarded Justice Bassett's 4:07 pm email to me, stating "Justice Bassett seems to think the payout is something the court weighs in on?" *Id.* at 0459. I understood Attorney Creegan to mean that the issue of actually making a payout was required in order to comply with Judicial Branch Personnel Rule 56(g) and this issue was not otherwise within the discretion of the court. I replied to Attorney Creegan, "We will have to take this up with them on Monday." *Id.*

126. Attorney Creegan then further replied to Justice Bassett: "I don't think we can decline the payout under the personnel rules." *Id.* at 0461 (emphasis added).

127. Justice Bassett replied:

> understood.
>
> I just want to be comfortable with the math – and the various elements that are required by our rules. I would not want to pay more than required without a very good reason.

*Id.* (emphasis added).

128. On March 24, 2025, the justices again met with Judge Keating and Attorney Creegan. My memory is that Judge Keating discussed issues needed to finalize the Dianne Martin matter. Among them was the reclassification of the three Judicial Branch general counsel positions.

129. Judge Keating later prepared a memorandum to Fiscal Manager Raymond, Human Resources Manager Gelinas, and Accounting and Payroll Manager Plourde, memorializing the discussion. Judge Keating's memorandum states in full:

> On March 24, 2025, the Justices of the New Hampshire Supreme Court waived the application of certain provisions of Personnel Rule 12 and unanimously approved the reclassification of the position of General Counsel to Labor Grade 58.
>
> The Justices explained that this reclassification has been under consideration for some time as a means of ensuring that the Judicial Branch can continue to recruit and retain qualified attorneys in these critical positions.
>
> The reclassification was intended by the Justices to affect the following three job titles:
>
> - Judicial Branch General Counsel
>     - Labor Grade 55 to Labor Grade 58
> - Office of Bar Admissions General Counsel
>     - Labor Grade 56 to Labor Grade 58
> - Attorney Discipline Office General Counsel
>     - Labor Grade 56 to Labor Grade 58
>
> The reclassification shall take effect on Friday, April 4, 2025.
>
> Thank you in advance for your help with implementation of this measure with respect to the employees occupying these positions. Please let me know how I might be of assistance in this effort.

*(GJM RESP 0463-0464).*

**L. Ms. Gelinas's Further Contact with DAS**

130. Based on documents later provided to me by Judge Keating, I understand that, on March 26, 2025, Ms. Gelinas sent Mr. Mavrogeorge an email asking for information on an "open HR Leadership role for DHHS [Department of Health and Human Services]." *(GJM RESP 0465-0467).* Ms. Gelinas stated: "Dianne Martin and [redacted] are returning to the AOC and I can no longer work in this very unethical organization. I am very worried about retaliation upon their return." *Id.* at 0467. In reply, Mr. Mavrogeorge asked: "When are they scheduled to return to AOC? Does this mean that they are not moving forward with the layoff and NHBA [sic] position plan?" *Id.*

131. Ms. Gelinas then responded:

> It is a layered plan for Dianne. Layoff – Payout of Benefits – Then rehired as General Counsel for the Office of Bar Admissions into a role already occupied and won't be open until August 2025 when the current incumbent is set to retire. Dianne will be working from home. Salary adjusted from LG 60 to LG 58, Step 9. Reporting directly to the Chief Justice. But the current position reports to the Director of the AOC. Completely tailored to her wants.
>
> [redacted]
>
> The NHJB will see fall out from these moves. There is ZERO accountability for unethical behavior; instead, people get rewarded.
>
> My morale [sic] compass will not work in such an environment. I cannot make change to an organization who will not support Ethics and a Code of Conduct.

*Id.* at 0466 (emphasis added).

132. Judge Keating later told me that, at no time, did Ms. Gelinas express any concerns whatsoever to him with respect to the proposed Attorney Martin resolution, either based on her conversations with DAS or otherwise. Had any concerns been expressed, I am certain that Judge Keating (and/or Attorney Creegan) would have brought them forward. I am equally certain that both I and the other justices would have carefully considered them. At all times since March 3, 2025, acting on the advice of Attorney Creegan, my intent was to comply with the law, including the Judicial Branch Personnel Rules.

**M. Conclusion of the Negotiations**

133. My understanding is that there were several drafts of letters from Judge Keating to Attorney Martin regarding finalizing the arrangement. The Supreme Court approved the substance of those letters, although I have no memory of reviewing the multiple drafts.

134. Attorney Martin began her role at OBA on April 4, 2025. On March 25, 2025, I emailed her suggesting that she consider attending the Annual Bar Admissions Conference conducted by the National Conference of Bar Examiners which was to be held in early

May 2025, Attorney Martin responded to that email on March 27, 2025 at 9:46 am noting she would be unable to attend the conference. *(GJM RESP 0468-0469).* That was the first communication, in any form, that I had with Attorney Martin since March 5, 2025. We subsequently had an email exchange about what I felt should be her immediate priorities. *Id.* at 0470-0471.

135. As a matter of AOC records, the AOC Director position remained vacant. The general funds that were appropriated to the Judicial Branch to provide for the salary and benefits for the Director position were never spent. Judge Keating's salary and benefits are a function of the office he holds as a circuit judge.

136. In 2024, the legislature had created a judicial training coordinator position with the Judicial Branch. *See,* 2024 N. H. Laws, Ch. 317, sec. 11, codified at RSA 490-K:1. However, no funds were appropriated for this position. In early 2026, Judge Keating recommended to the Supreme Court that the position of AOC Director be converted to the judicial training coordinator. The Supreme Court approved. Consequently, the position of AOC Director has been abolished and the funds that otherwise appropriated for it are now devoted to the training coordinator position, thus advancing a legislative priority.

**N. Announcement to Judicial Branch**

*137.* Point 5 of Attorney Martin's proposal was: "The message described in your email will be sent out to the branch and it will also be clarified for the group that was gather on Friday that this change resulted from the Court's work with the NCSC and reorganization is non-prejudicial and non-disciplinary." *(GJM RESP 0399).* On March 31, 2025,

Attorney Creegan sent to Judge Keating and me an initial draft of such a message. *(GJM RESP 0298).*

138. The message went through many iterations. At one point, I asked Judicial Branch communications officer Av Harris to draft a message with the following points:

- Tough budget season
- Hiring freeze, with exceptions for critical positions to be evaluated on a case-by-case basis by [Administrative Council]
- Engaging in a study with NCSC to restructure NHJB (trial courts and AOC) and find maximum efficiencies while maintaining current staffing levels
- As part of that restructuring, the position of Director of Administrative Office of the Courts has been eliminated as an administrative position, and going forward it will be a judicial position
- Former AOC Director Dianne Martin has transitioned to a new role of General Counsel for the Office of Bar Admissions
- Dianne brings many positive attributes to the role
- The current occupant of that role, Sherry Hieber, will be retiring later this summer
- Thank you Sherry for all of your contributions

*(GJM RESP 0472-0475).*

139. I do not remember the details, but it was determined to bifurcate the message; that is, to send a message about the budget process and the NCSC study and another message about Attorneys Martin and Hieber.

140. I sent an email to all judges and non-judicial employees regarding the budget process and the NCSC study on April 9, 2025. *(GJM RESP 0476-0477).*

141. My memory is that, at some point in April 2025, Attorney Creegan took a vacation out of the country.

142. By May 7, 2025, a branch-wide message about the Attorney Martin and her transition to the OBA had not been distributed. On that date, Attorney Martin contacted Attorney Creegan via Teams about this issue. *(GJM RESP 0478-0495)*. In that communication, Attorney Martin stated:

> When you have a free minute, let's touch base on the communications to the branch/folks gathered on 2/28 to correct the record? Before you left, the plan was to have the branch one go out on 4/10. I wasn't receiving branch wide emails early on, so I may have missed it, but Sherry hasn't seen it either. Sherry has brought up a few times when I am going to follow up with the chief on it. She is very uncomfortable with folks not knowing (she was particularly concerned that folks she is interacting with and has worked closely with don't know) and it has made it hard to do the work we need to do. I told her you had been handling and were away and I wanted to give you a chance to catch your breath. Not sure you even know it hasn't happened! For my part, the communication in whatever form to correct the record to those gathered on the 28th is the priority. I heard as recently as last week that a high-level colleague in the state heard the gossip resulting from the way the announcement was handled. The clarification remains important. I think the larger recognition is nice and I appreciate the chief doing that but am much less worried about the timing on that.

*Id.* at 0485 (emphasis added).

143. I circulated a revised draft of the statement to the justices. *(GJM RESP 0486-0487).* Separately, I circulated the same revised draft to Judge Keating and Attorney Creegan. *(GJM RESP 0488-0489).*

144. The justices all approved the draft. *See,* Email from Justice Bassett to Chief Justice MacDonald, May 8, 2025. *(GJM RESP 0490)*; Email from Justice Countway to Chief Justice MacDonald, May 8, 2025. *Id.*; Email from Justice Donovan to Chief Justice MacDonald, May 8, 2025. *Id.* at 0491. Attorney Creegan also approved, remarking "Fine with me. Hopefully Dianne can get to a good place." *See,* Email from Attorney Creegan to Chief Justice MacDonald, May 8, 2025. *(GJM RESP 0492).* Judge Keating likewise noted that "[the] revised draft looks good to me." *See,* Email from Judge Keating to Chief Justice MacDonald, May 8, 2025. *Id.* The message was distributed to all judges and non-judicial employees on May 9, 2025. *(GJM RESP 0494-0495).*

### O. NHPR Inquiry

145. On October 6, 2025, DAS Commissioner Charles Arlinghaus called me. During that call, he informed me that DAS had received a Right-to-Know request regarding records relating to Dianne Martin. My memory is that he used the word "skullduggery." Commissioner Arlinghaus told me that he had personally spoken to Todd Bookman and that it was apparent to the Commissioner that Mr. Bookman knew such records existed. The Commissioner told me that DAS would be producing the documents in a day or two. My memory is that I thanked the Commissioner for the call and ended it.

146. My memory is that following Commissioner Arlinghaus's call, I told Communications Manager Av Harris about it. I asked whether he had heard of any other inquiries relating to Attorney Martin. He said no. My memory is that I also informed the justices about Commissioner Arlinghaus's call.

147. On October 15, 2025, Communications Manager Harris forwarded an email from Mr. Bookman to Judge Keating and me. *(GJM RESP 0501-0503)*. The email from Mr. Bookman contained a series of questions relating to Dianne Martin, Judge Keating and me.

148. The questions from Mr. Bookman posed a significant challenge. The questions largely related to Attorney Martin's status as a Judicial Branch employee. Compliance with the law requires that personnel-related matters remain confidential. Moreover, at that point in time, the Judicial Branch was without a general counsel as on August 13, 2025, Attorney Creegan had been appointed Interim United States Attorney for the District of New Hampshire and new Judicial Branch General Counsel, Attorney Jessica King, did

not start until October 31, 2025. Mr. Bookman's deadline for response was Monday, October 20, 2025, at 12:00 pm. *Id.* at 0502.

*xii. __Draft Narrative Response__*

149. Notwithstanding these obstacles, I believed it was important to respond accurately to the extent permitted by law. Among other things, Mr. Bookman's questions raised important issues regarding the integrity of Judicial Branch operations as well as the use of public funds.

150. I informed the other justices of Mr. Bookman's questions and I drafted a proposed narrative response. On October 16, 2025, I circulated a draft to Justices Donovan and Countway, as well as to Judge Keating, Lorrie Rudis and Attorney Christopher Pyles. *(GJM RESP 0499-0501)*. Ms. Rudis, who had been the DAS DOP Director, was (and, remains) the human resources manager for the Judicial Branch. Attorney Pyles had counseled the Judicial Branch on employment-related matters and, my understanding is that Judge Keating asked him to assist in responding to Mr. Bookman's questions.

151. Justice Countway responded to the draft statement as follows:

> This accurately summarizes what transpired. I have one comment:
>
> In the last paragraph, should we specifically mention that knowing we wanted to restructure the AOC and achieve more efficiency, we engaged the National Center to guide the process (noting their comprehensive evaluation and review) culminating in the efficiency report with its recommendations?

*(GJM RESP 0497)*.

152. I agreed with Justice Countway's suggestion. *Id.*

153. Justice Donovan replied: "I agree with Melissa's edit. I approve." *Id.*

154. On Sunday, October 19, 2025, a New England regional conference of state Supreme Court justices and state court administrators was to begin in New Haven, Connecticut. This was the third such meeting since the first one organized by Attorney Martin at Justice Bassett's behest as described earlier. Although I was scheduled to attend, I decided to forego it in order to address Mr. Bookman's questions, as well as other business.

155. I made some further revisions to the draft response. In the course of that work, I became very concerned with one of Mr. Bookman's questions. Specifically, he asked the following:

> On April 14, Chief Justice MacDonald advocated for a step upgrade for Martin as General Counsel raising her salary to Grade 58, Level 9, according to a record reviewed by NHPR. Sherry Hieber was also awarded a pay raise, according to other payroll records. Given the financial constraints on the Branch, why did MacDonald propose this pay raise.

*(GJM RESP 0503).*

156. On Sunday, October 19, 2025, I circulated another draft to Judge Keating and Attorney Pyles. *(GJM RESP 0505).* In my cover email, I quoted the above question from Mr. Bookman and stated:

> I have no record of a communication on April 14 on this issue, I have no memory of what it could be referring to, and I have no idea why I would be "advocating" for something that had already been decided. Therefore, I am extremely concerned about the accuracy and authenticity of the record to which he refers. The operative document on this issue would appear to be your [Judge Keating's] memo dated March 27 memorializing the steps taken by the justices on March 24 regarding reclassification of all of the GC positions. Unless there is an issue, I think we should provide that memorandum.

*Id.*

157. As a result of the Judicial Branch production of Attorney Martin's personnel file in this matter, I now understand that there is a document dated April 14, 2025, titled: *Request to*

*Approve Higher Entry Level Step for New Employee.* I first saw the document on May 28, 2026. I had no knowledge that this document existed, and I did not review or approve the language contained in that document. Further, I do not know how Mr. Bookman apparently reviewed a document that is otherwise contained in Attorney Martin's personnel file. *(GJM RESP 0523-0524).* Finally, it is important to note that Attorney Martin did not receive a "pay raise." As AOC Director, she was at Labor Grade 60, Step 9. As OBA general counsel, she is at Labor Grade 58, Step 9.

158. I later learned from Judge Keating that he had shared the draft response with Attorney Martin. My memory is that Judge Keating told me that Attorney Martin approved of it.

*ii. __The Decision Not to Respond__*

159. At some point, Judge Keating sent the draft response to Communications Manager Harris. Without my knowledge, Mr. Harris read the draft response to Laura Kiernan Beeson. At one point, Ms. Beeson served as the Judicial Branch Communications Manager. More recently, she served in that role on an interim basis, and then as a consultant to the Judicial Branch.

160. On October 20, 2025, Ms. Beeson called me. She told me that Mr. Harris had read her the draft statement. My memory is that she said, in essence, that this was a confidential personnel matter and that the judiciary would never comment on such a thing. My memory is that I told her I disagreed, but I invited her to share her views with the other justices.

161. Later that morning, there was a conference call with Justices Donovan, Countway, Gould and Judge Keating, who were all in New Haven at the regional conference, Communications Manager Harris and Ms. Beeson. I was in my office in Concord. On

that call, Ms. Beeson expressed her strong opposition to providing any substantive response to Mr. Bookman. My memory is that she said words to the effect that, "the judiciary would never respond to such a thing," "the judiciary must rise above matters like this," "we do not know what he [meaning, Mr. Bookman] has" and "I never went on background with reporters." I expressed my disagreement. However, the other justices agreed with Ms. Beeson and the consensus was to respond to Mr. Bookman with a brief statement. Although I continued to strongly disagree, I acquiesced. Toward the end of the call, I clearly remember stating words to the effect, "This is going to be a hit piece against me." After the call concluded, Judge Keating called me to ask if I was ok. I said something to the effect of "not really." He said that the other justices want you to know they all support you.

162. Later that morning, Communications Manager Harris sent Mr. Bookman an email with the following response: "The New Hampshire Supreme Court oversees all personnel decisions within the Judicial Branch and does not comment on any matters involving personnel." *(GJM RESP 0507).*

**P. The October 30, 2025 Statement**

163. On October 30, 2025, the justices learned through Communications Manager Harris that the *Union Leader* was working on a story that touched on the personnel decisions relating to Attorney Martin. Justices Donovan, Countway, Gould and I decided that a response was warranted.

164. My memory is that Periklis Kiroutas, a consultant retained by the Judicial Branch to assist with communication prepared an initial draft of a joint statement from the four justices. The draft was finalized during a call with Justices Donovan, Countway, Gould,

Judge Keating, Mr. Kiroutas and Attorney Richard Lehmann, who had been retained by the Supreme Court to assist with the Attorney General's inquiry into this matter. All those participants reviewed and approved the final version.

165. The statement was then provided to the *Union Leader* and was posted on the Judicial Branch's website. *(GJM RESP 0508-0509).*

# 2. State of New Hampshire Judicial Branch Administration Performance Audit Report – November 2023

CONFIDENTIAL

# STATE OF NEW HAMPSHIRE
# JUDICIAL BRANCH ADMINISTRATION

## PERFORMANCE AUDIT REPORT
## NOVEMBER 2003

*To The Fiscal Committee Of The General Court:*

We have conducted an audit of Judicial Branch administration to address the recommendation made to you by the Legislative Performance Audit and Oversight Committee. We conducted our audit in accordance with the standards applicable to performance audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States. Those standards require that we plan and perform the audit to provide a reasonable basis for our findings and conclusions. Accordingly, we have performed such procedures as we considered necessary in the circumstances.

The purpose of the audit was to evaluate certain administrative operations of New Hampshire's Judicial Branch and make recommendations to improve efficiency and effectiveness. The audit period encompassed the six-year period from State Fiscal Year (SFY) 1997 through SFY 2002.

This report is the result of our evaluation of the information noted above and is intended solely for the information of the Judicial Branch and the Fiscal Committee of the General Court. This restriction is not intended to limit the distribution of this report, which upon acceptance by the Fiscal Committee is a matter of public record.

*Office Of Legislative Budget Assistant*
Office Of Legislative Budget Assistant

November 2003

THIS PAGE INTENTIONALLY LEFT BLANK

CONFIDENTIAL

STATE OF NEW HAMPSHIRE
JUDICIAL BRANCH ADMINISTRATION

TABLE OF CONTENTS

PAGE

TRANSMITTAL LETTER .......... i

SUMMARY .......... 1

RECOMMENDATION SUMMARY .......... 9

1. INTRODUCTORY SECTION .......... 15

1.1 Overview .......... 15
1.2 Scope, Objectives, And Methodology .......... 15
1.3 Background .......... 16
1.4 Supreme Court .......... 19
1.5 Superior Court .......... 25
1.6 District And Municipal Courts .......... 28
1.7 Probate Courts .......... 32
1.8 Family Division Pilot Project .......... 35
1.9 Significant Achievements .......... 39
1.9.1 Supreme Court .......... 39
1.9.2 Superior Court .......... 40
1.9.3 District Courts .......... 41
1.9.4 Probate Courts .......... 42
1.9.5 Administrative Office Of The Courts .......... 43

2. INFORMATION TECHNOLOGY .......... 45

Observation No. 1: Improve Information Technology Planning .......... 46
Observation No. 2: Immediately Develop A Branch-Wide Strategic Plan And Analyze Court Work Flow Concurrent With Implementing The New Case Management System .......... 47
Observation No. 3: Develop A Formalized Systems Development Methodology .......... 49
Observation No. 4: Develop Information Technology Policies And Procedures .......... 50
Observation No. 5: Information Technology Disaster Recovery Plan Needed .......... 51
Observation No. 6: Evaluate Network Design And Operations .......... 52
Observation No. 7: Employ Procedures Ensuring Dates In The SUSTAIN Case Management System Are Accurate .......... 54
Observation No. 8: Ensure The Supreme Court Has An Effective Electronic Case Management System To Properly Manage Its Caseload .......... 57
Observation No. 9: Ensure The New Case Management System Is Capable Of Tracking Statutory Compliance For Certain Probate Court And Family Division Cases .......... 59
Observation No. 10: Review Internet Access .......... 61



GJM RESP 0058

3. ADMINISTRATIVE FUNCTIONS ....63

Observation No. 11: Establish The AOC And Define Its Responsibilities In Statute ....65
Observation No. 12: Develop And Implement A Strategic Planning Process ....65
Observation No. 13: Develop A Continuity And Contingency Plan ....67
Observation No. 14: Repeal Statutes Authorizing Payments For Commuting To Work ....69
Observation No. 15: Examine Revolving And Operating Fund Issues ....72
Observation No. 16: Request Administrative Services Resume Independent Review Of Judicial Branch Expenditures ....74
Observation No. 17: Re-Evaluate The Duties Of The New Hampshire Court Accreditation Commission And Implement Comprehensive Standards For Court Facilities ....75
Observation No. 18: Legislature Should Consider Discontinuing Budget Reduction Practice ....77

4. WEIGHTED CASELOAD ....79

Observation No. 19: A Judicial Weighted Caseload System Needed In All Trial Courts ....81
Observation No. 20: Monitor And Update Case Weights Used In Weighted Caseload Systems ....82
Observation No. 21: Develop Procedures Ensuring Updates To The Clerical Weighted Caseload Studies Are Consistent With Best Practices ....84
Observation No. 22: Continue Updating Judicial Weighted Caseload Systems Using Time Studies In Accordance With Best Practices ....87
Observation No. 23: Count Criminal Charges Against A Single Defendant Involving A Single Incident As One Case ....88
Observation No. 24: Clearly Define Brought Forward Cases And Ensure Only Relevant Cases Are Included In The Court's Caseload ....90
Observation No. 25: Establish A Monitoring Case Weight For Probate Court Guardianship Cases ....91
Observation No. 26: Centralize And Improve Statistical Resources ....92

5. CASE PROCESSING ....95

5.1 Case Processing Guidelines ....95
Observation No. 27: Revise Probate Court Guardianship Caseflow Management Guidelines ....96
Observation No. 28: Adopt Supreme Court Performance Standards Consistent With ABA Standards ....97
Observation No. 29: Require Completed Transcripts Within 30 Days Of Supreme Court Scheduling Order ....99
Observation No. 30: Adopt District Court Case Processing Time Standards Consistent With ABA Standards ....100
Observation No. 31: Formally Adopt District Court Case Processing Standards For Civil Writ, Small Claims, And Landlord And Tenant Cases ....102

Observation No. 32: Adopt Superior Court Case Processing Time Standards Consistent With ABA Standards ....103
Observation No. 33: Adopt Family Division Case Processing Time Standards Consistent With ABA Standards ....106
Observation No. 34: Establish Probate Court Case Management Timelines For Adoption, Trust, Involuntary Admission, And Equity Cases ....107
Observation No. 35: Adopt And Monitor Trial Court Case Processing Standards....109

5.2 Delay Prevention And Reduction....110
Observation No. 36: Employ Delay Reduction Procedures In The Supreme Court Consistent With ABA Standards ....112
Observation No. 37: Employ Delay Reduction Procedures In The Trial Courts Consistent With ABA Standards ....115
5.3 Management Issues ....117
Observation No. 38: Establish Branch-Wide Definitions Of Data Elements And Ensure They Are Consistently Applied ....117
Observation No. 39: Provide Sentences In Writing To Defendants At Time Of Sentencing....119
Observation No. 40: Amend RSA 594:20-a To Eliminate Saturday Arraignments....119

6. COURT REPORTING....121

Observation No. 41: Reduce The Number Of Court Reporters Employed And Increase The Use Of Court Monitors And Digital Audio Recording Technology....121
Observation No. 42: Improve Management Of Court Reporters And Court Monitors....125
Observation No. 43: Require Court Reporters To Submit Bi-Weekly Payroll Time Reports....127
Observation No. 44: Ensure The AOC Communicates Information Regarding Ownership Of Stenographic Notes And Develop A Policy Regarding Proper Storage Of Stenographic Notes....128
Observation No. 45: Improve Performance Evaluations Of Court Reporters, Court Monitors, And Transcriptionists....129
Observation No. 46: Centralize Coordination Of Transcription Services....130
Observation No. 47: Discontinue Operation Of The Superior Court Transcript Center And Use Private Transcript Firms For Producing Transcripts From Audio Recordings....132
Observation No. 48: The AOC Should Certify Transcriptionists And Ensure Confidentiality Of Recordings And Transcripts....134

7. OTHER ISSUES AND CONCERNS....135

8. CONCLUSION....137

CONFIDENTIAL

APPENDICES

Judicial Branch Response To Audit....A
Operational Review Of The New Hampshire Supreme Court....B
Survey Of Judges And Marital Masters....C
Survey Of Clerks And Registers....D
Survey Of Court Assistants And Deputies....E
Survey Of Court Reporters And Monitors....F

**LIST OF FIGURES**

Figure 1: Distribution Of Cases Filed By Court Level....2
Figure 2: Average Expenditures By Court Level....3
Figure 3: Supreme Court Cost Per Case....4
Figure 4: Trial Court Cost Per Case....4
Figure 5: Judicial Branch Structure And Jurisdiction....17
Figure 6: Judicial Branch Trial Court Locations....18
Figure 7: Supreme Court Organization....20
Figure 8: Administrative Office Of The Courts Organization....23
Figure 9: Superior Court Organization....27
Figure 10: District Courts Organization....31
Figure 11: Probate Courts Organization....35
Figure 12: Family Division Pilot Project Organization....39
Figure 13: Comparison Of Supreme Court To ABA Standards....97
Figure 14: Comparison Of District Courts To ABA Standards....101
Figure 15: Comparison Of Superior Court To ABA Standards....104
Figure 16: Comparison Of Family Division To ABA Standards....107
Figure 17: Percent Of Supreme Court Cases Meeting ABA Standards....112

LIST OF TABLES

Table 1: Judicial Branch Operating Expenditures....19
Table 2: Supreme Court Expenditures....21
Table 3: Supreme Court Filings And Dispositions....22
Table 4: AOC Expenditures....25
Table 5: Superior Court Filings And Dispositions....26
Table 6: Superior Court Expenditures....28
Table 7: District Courts Filings And Dispositions....29
Table 8: District Courts Expenditures....30
Table 9: Probate Courts Filings And Dispositions....33
Table 10: Probate Courts Expenditures....34
Table 11: Family Division Pilot Project Expenditures....37
Table 12: Family Division Pilot Project Filings And Dispositions....38
Table 13: Constructing The Judicial Case Weight For A Sample Felony Case....80
Table 14: ABA Standards For Trial Court Case Processing....95
Table 15: Average Percentage Of Trial Court Cases Meeting ABA Standards....115
Table 16: SFY 2002 Superior Court Transcript Center Operations....133

## ABBREVIATIONS

| | |
|---|---|
| 3JX | Three Justices Expedited |
| ABA | American Bar Association |
| AOC | Administrative Office Of The Courts |
| DAS | Department Of Administrative Services |
| DCM | Differentiated Case Management |
| DCYF | Division For Children, Youth, and Families |
| FTE | Full-Time Equivalent |
| GAO | U.S. General Accounting Office |
| IRS | Internal Revenue Service |
| IT | Information Technology |
| LAN | Local Area Network |
| LBA | Office Of Legislative Budget Assistant |
| LPAOC | Legislative Performance Audit And Oversight Committee |
| NCIC | National Crime Information Center |
| NCSC | National Center For State Courts |
| RFP | Request For Proposal |
| RSA | Revised Statutes Annotated |
| SFY | State Fiscal Year |
| SITP | Strategic Information Technology Plan |
| SPOTS | State Police Online Telecommunications System |
| WAN | Wide Area Network |

THIS PAGE LEFT INTENTIONALLY BLANK

STATE OF NEW HAMPSHIRE
JUDICIAL BRANCH ADMINISTRATION

SUMMARY

**Purpose And Scope Of Audit**

This audit was performed at the request of the Fiscal Committee of the General Court consistent with the recommendation of the joint Legislative Performance Audit and Oversight Committee. It was conducted in accordance with generally accepted government auditing standards. The purpose was to evaluate certain administrative operations of New Hampshire's Judicial Branch and make recommendations to improve efficiency and effectiveness. We examined five issue areas: 1) information technology planning; 2) administrative functions; 3) weighted caseload systems; 4) case processing; and 5) court reporting.

**Background**

New Hampshire's Judicial Branch consists of the Supreme Court, Superior Court, District Courts, Probate Courts, and the Family Division Pilot Project. The Chief Justice of the Supreme Court is the administrative head of the Judicial Branch and is responsible for supervising the operations of the court system.

The Supreme Court, as the sole appellate court in the State, is the court of last resort. It hears appeals from all court levels and State administrative agencies. It has discretionary power to select which appeals it will accept. The Administrative Office of the Courts (AOC) is the administrative arm of the Supreme Court and provides general support services to all levels of court.

There are 11 Superior Court locations in the State, two in Hillsborough County and one in each of the other nine counties. The Chief Justice of the Superior Court, with the help of staff at the Superior Court Administrative Center located in Concord, is responsible for supervising and administering the Superior Court. The Superior Court is the only court of general jurisdiction in the State, handling all matters not covered by other courts. It handles felony cases, civil lawsuits, equity matters, domestic relations cases, and appeals of some misdemeanor convictions from the District Court. Superior Court justices can address any case type in the Superior Court, while marital masters are limited to handling only family law cases.

There are 36 District Court locations in the State administered by the administrative judge with the help of the Office of the Administrative Judge located in Concord. The District Courts have exclusive jurisdiction in civil cases where damages do not exceed $1,500 and do not involve title to real estate. The District Courts also enforce local regulations and have concurrent jurisdiction with the Superior Court in domestic violence cases, civil cases involving damage claims up to $25,000, all landlord and tenant disputes, violation and misdemeanor criminal cases, child abuse and neglect cases, and juvenile cases. Statute also allows the Supreme Court to expand concurrent jurisdiction in civil cases where damages do not exceed $50,000. The District Courts also issue domestic violence petitions, search and arrest warrants, and hold criminal arraignments and probable cause hearings in felony cases.

There are ten Probate Court locations, one in each of the State's ten counties. The administrative judge administers the Probate Court system with the help of the Office of the Administrative

Judge in Brentwood. The Probate Courts have exclusive jurisdiction in adoption, termination of parental rights, guardianships, certain trusts, wills, estates, involuntary commitments, and name change cases. Probate Courts have concurrent jurisdiction with the Superior Court in certain trust matters, durable powers of attorney, and marriage waivers for minors.

The Family Division Pilot Project operates in eight locations in Grafton and Rockingham Counties. It consolidates a host of family issues into one forum. The division has taken over new domestic relations, child protection, juvenile delinquency, domestic violence, adoption, termination of parental rights, and guardianship of minors cases previously handled by the other trial courts in Grafton and Rockingham Counties.

During the six-year audit period, approximately 1.3 million cases were filed in the Judicial Branch. Figure 1 shows the distribution of cases filed in the courts during the six-year audit period. During the audit period 5,036 cases were filed in the Supreme Court, 164,033 cases in the Superior Court, 1,044,049 cases in the District Courts, 56,586 cases in the Probate Courts, and 45,593 cases in the Family Division Pilot Project.

**Figure 1**

**Distribution Of Cases Filed By Court Level**
**SFY 1997 - 2002**




Source: LBA analysis of Judicial Branch data.

**The Judicial Branch expended a total of $305 million on operations from State Fiscal Year (SFY) 1997 through 2002. Personnel costs accounted for approximately three-quarters of the Judicial Branch's expenditures. Figure 2 graphically presents the allocation of the $305 million expended by court level.**

CONFIDENTIAL



Figure 2




Source: LBA analysis of Judicial Branch data.

When court costs are examined in relation to caseloads, there are vast differences among the courts. Supreme Court cases cost the most to process, averaging $3,893 per case during the audit period (Figure 3). For the trial courts, the District Courts had the lowest cost per case averaging $97 while the Superior Court had the highest cost averaging $750 per case during the audit period (Figure 4). These per case costs vary widely due to the different nature of the different courts. For example, Supreme Court cases involve five judges and extensive legal research. Trials in Superior Court are generally longer than in the other trial courts, with some of those longer trials involving the expense of a jury.

The Supreme Court's cost per case increased 71 percent from $3,099 per case in SFY 1997 to $5,295 in SFY 2002. Among the trial courts, the Superior Court's cost per case dropped by six percent between SFY 1997 and SFY 2002. The Family Division Pilot Project's cost per case increased 90 percent from $211 in SFY 1997 to $401 in SFY 2002. The cost per case for the District and Probate Courts increased 36 percent and 13 percent respectively during the audit period.

As of March 2003, the Judicial Branch had 620.2 authorized full-time equivalent (FTE) non-judicial positions with a vacancy rate of eight percent or 46.3 FTEs. The Branch also had 70 full-time and 66 part-time judicial positions. The Family Division Pilot Project and the AOC have the largest vacancy rates at over ten percent each.

CONFIDENTIAL



**Figure 3**




Source: LBA analysis of Supreme Court data.

**Figure 4**




Source: LBA analysis of Judicial Branch data.

## Results In Brief

Our audit presents 48 observations with recommendations. Ten observations address information technology issues, eight observations address administrative issues related to the AOC and trial court administrative offices, eight observations concern weighted caseload systems in the trial courts, 14 observations concern case processing, and eight observations address court reporting issues. Nine recommendations require Legislative action.

In commenting on this report, the Judicial Branch agreed in whole or in part with 43 observations and recommendations. The Branch agreed in whole or in part with four additional observations, but felt they were beyond the scope of the audit. The Branch did not take a position on one observation. The Branch's overall response to the report is found in Appendix A, while detailed responses to individual observations and recommendations follow each observation.

### Improve Information Technology Planning

We found the Judicial Branch does not have a strategic plan, an up-to-date and comprehensive information technology (IT) plan, an information technology disaster recovery plan, or a continuity and contingency plan. Additionally, the Branch has not established a systems development methodology to guide IT projects.

> *Branch Response: Recommendations will be made for an updated Information Technology (IT) plan and systems development methodology. A formal IT disaster recovery plan will be included in the Branch disaster recovery plan. Regarding a strategic plan, contacts have been made outside the Branch for a follow up project to the 1990 Long Range Planning Task Force.*

### Develop And Review Policies And Procedures

We found the Judicial Branch does not have policies and procedures governing use, access, and security of its computer systems, nor does it have policies and procedures governing access to and proper uses of the Internet. Additionally, we found deficiencies in the Branch's management of its network design and operation.

We also found the Judicial Branch does not have adequate policies regarding use of its revolving and operating accounts. Judicial Branch expenditures do not receive independent review because the Department of Administrative Services discontinued its review of Judicial Branch expenditures many years ago. Additionally, we question the continued appropriateness of statutes allowing Supreme and Superior Court justices, and court reporters to receive payments for commuting between home and work. We also question the policy allowing marital masters to receive such payments.

> *Branch Response: As resources permit, and as not otherwise already described in existing Judicial Branch personnel rules, the AOC will recommend policies for acceptable IT practices, including Internet use. Centralized network design and operation are required in the new case management system.*

*The Judicial Branch will review the revolving fund and operating account policies and will consider having the state treasurer make more payments. The Branch supports resumption of independent review of its expenditures by Administrative Services. State law entitles Supreme Court justices, Superior Court judges and court reporters to reimbursement for travel expenses. Marital masters are no longer reimbursed.*

Ensure The New Case Management System Includes All Necessary Functions

We found SUSTAIN, the Judicial Branch's trial court case management system, does not capture some information necessary for monitoring caseloads. Our file review revealed some filing and disposition dates in SUSTAIN were either incorrect or could not be verified. Additionally, the Supreme Court did not have a completed case management system during the audit period.

*Branch Response: The new trial court case management system will verify reasonableness of dates entered and collect information to monitor time standard compliance. Some anomalies in current data reflect efforts to best use an obsolete case management system. During the audit period, the Supreme Court used word-processing for case management.*

Clearly Define Roles Of The AOC

We found the AOC's administrative authority and responsibilities have not been formally established, while each trial court administrative office has broad and clearly defined administrative authority.

*Branch Response: The Supreme Court, which created the AOC in 1984, will promulgate a rule more clearly defining the AOC's authority and responsibilities.*

Revise Weighted Caseload Systems

We found the Judicial Branch does not have policies and procedures for using, developing, or updating its weighted caseload systems. As a result, the weighted caseload systems are outdated and updates to the clerical weighted caseload systems were not conducted using best practices.

*Branch Response: District and Probate Court weighted caseload formulae were revised, but mandatory budget reductions prevented implementation. At least two full-time employees would be needed to monitor and update a weighted caseload system in the trial courts. With existing staff shortages, personnel cannot be reassigned to those duties instead of processing cases.*

Establish Definitions For Data Elements

We found definitions of data elements used in the trial courts are not consistent and sometimes not uniformly reported. Additionally, the Judicial Branch's method of counting criminal cases differs from the method used in the majority of states. We also found the Judicial Branch lacks statistical support staff to ensure docketing information is accurate; to produce management

reports for trial court judges and staff; and to develop, revise, and monitor the weighted caseload systems.

*Branch Response: The Judicial Branch will define core data elements. Court managers in New Hampshire believe the current method of counting each charge against a defendant as an individual case facilitates record keeping of pleadings, deadlines and disposition of each charge. The Judicial Branch supports hiring a statistician, as the auditors recommend, but no funds have been available.*

Ensure Case Processing Guidelines Are Consistent With National Standards

We found some steps in the Probate Court's guardianship caseflow management guideline do not meet statutory requirements and the Supreme, Superior, and District Courts and the Family Division Pilot Project use less rigorous case processing time guidelines than national standards. Additionally, the District and Probate Courts have not established case processing standards for certain cases in their jurisdictions. Finally, we found the case processing guidelines used in the trial courts are not monitored for compliance.

*Branch Response: Case processing guidelines have been adopted at all court levels but not for all types of cases. The Judicial Branch will review all time standards. National standards, which few states have adopted, will be consulted, but any time standards considered must reflect the realities facing not only the court system in New Hampshire but its many constituents.*

Employ Delay Reduction And Prevention Programs

We found the Supreme, Superior, and District Courts and the Family Division Pilot Project do not meet American Bar Association case processing time guidelines for some cases, and the Probate Courts do not have the ability to measure compliance with caseflow management guidelines.

*Branch Response. With numerous clerical vacancies in the trial courts, delay reduction is not a reality. Delays are increasing. The system cannot be expected to endure a shrinking workforce and to reduce delay at the same time. In the past three years, additional staff resources were committed to the Supreme Court and, as a result, the case backlog was significantly reduced.*

Reduce The Number Of Court Reporter And Transcriptionist Positions

We found the Judicial Branch should reduce the number of court reporters it employs and hire additional court monitors to increase its record-taking capabilities in the trial courts. We also found the Superior Court Transcript Center is operating at a loss and should be closed. Additionally, we found the Branch should improve its management of record-taking personnel and transcription services.

*<u>Branch Response</u>: The Superior Court Transcription Center was closed in July 2003 and three transcriptionist positions were abolished. The Judicial Branch has in place a plan to eliminate court reporter positions, as reporters resign or retire, and replace them with court monitors, using digital audio recording equipment. In light of the audit recommendation, the Judicial Branch will reassess the timetable for reducing court reporter positions.*

<u>Improve Oversight Of The Record-Taking Function</u>

We found the Judicial Branch should improve its policies, procedures, and rules concerning court reporters, court monitors, and private sector transcriptionists.

*<u>Branch Response</u>: The AOC plans to take several steps to improve management of the record-taking process including electronic payroll records of reporters' time; adoption of a policy regarding possession and storage of stenographic notes; performance evaluations of reporters; and centralization of transcription services at the AOC.*

STATE OF NEW HAMPSHIRE
JUDICIAL BRANCH ADMINISTRATION

RECOMMENDATION SUMMARY

| Observation Number | Page | Legislative Action Required | Recommendation | Branch Response |
|---|---|---|---|---|
| 1 | 46 | No | Develop information technology (IT) plans supporting organizational strategic plans and update plans at least every two years. | Concur |
| 2 | 47 | No | Begin strategic planning, IT planning, and business process re-engineering immediately. | Concur In Part |
| 3 | 49 | No | Adopt a formal systems development methodology to guide IT projects. | Concur In Part |
| 4 | 50 | No | Develop and implement comprehensive IT policies and procedures. | Concur |
| 5 | 51 | No | Develop, implement, and test a comprehensive IT disaster recovery plan. | Concur |
| 6 | 52 | No | Map the Branch's current network, assess the trial court's network structure, monitor the network for unauthorized users and attempted access, and appoint a security officer. | Concur In Part |
| 7 | 54 | No | Establish a Branch-wide policy to date-stamp all case filings including complaints from police departments, ensure the new case management system has the ability to test data entered for reasonableness, and periodically audit docketing information to ensure its accuracy and reliability for management purposes. | Concur In Part |
| 8 | 57 | No | Ensure all relevant dates are captured and entered into the Supreme Court's new case management system and periodically audit docketing information to ensure it is accurate, reliable, and serves management purposes. | Concur |
| 9 | 59 | No | Ensure the new case management system has the ability to capture intermediate case events for the Probate Courts and the Family Division Pilot Project to monitor compliance with case management and statutory timelines. | Concur |


GJM RESP 0072
CONFIDENTIAL

| Observation Number | Page | Legislative Action Required | Recommendation | Branch Response |
|---|---|---|---|---|
| 10 | 61 | No | Determine whether Internet access is necessary for employees to carry out their assigned duties and provide access to those needing it. | Concur |
| 11 | 65 | Yes | Establish the Administrative Office of the Courts and define its responsibilities in statute. | Concur In Part |
| 12 | 65 | No | Implement a strategic planning process resulting in comprehensive long- and short-term plans. | Concur |
| 13 | 67 | No | Complete and implement a continuity and contingency plan. | Concur In Part |
| 14 | 69 | Yes | Repeal RSAs 490:18, 491:6-a, and 519:29. Review all travel reimbursement policies and court rules for reasonableness and based on that review, reimburse personnel appropriately. | Outside Scope |
| 15 | 72 | No | Establish, implement, and monitor effective internal controls over all revolving and operating fund checking accounts. | Outside Scope |
| 16 | 74 | No | Request the Department of Administrative Services, Bureau of Accounts resume pre-auditing expenditures. | Concur |
| 17 | 75 | Yes | Complete and implement comprehensive standards for court facilities and determine whether the New Hampshire Court Accreditation Commission provides value to the Branch as currently established by statute. | Outside Scope |
| 18 | 77 | Yes | Discontinue the Legislative practice of requiring the Judicial Branch to independently identify reductions to its General Fund appropriation and work with Judicial Branch management to identify priorities and areas for potential appropriation reductions through the State's biennial budget process. | Outside Scope |
| 19 | 81 | Yes | There should be a judicial weighted caseload system in all trial courts. | Concur In Part |



GJM RESP 0073

CONFIDENTIAL

| Observation Number | Page | Legislative Action Required | Recommendation | Branch Response |
|---|---|---|---|---|
| 20 | 82 | No | Update the case weights used in weighted caseload systems and determine what personnel resources are needed to continuously monitor and update the various weighted caseload systems used by the courts. Also, adopt a policy defining the process and methodology for updating the weighted caseload systems. | Concur In Part |
| 21 | 84 | No | Establish procedures for conducting clerical weighted caseload systems consistent with best practices, establish a steering committee representative of all trial court staff to coordinate and oversee the clerical weighted caseload system, and determine whether dedicated personnel are needed to continuously monitor and update the weighted caseload systems. | Concur In Part |
| 22 | 87 | No | Continue conducting updates to each trial court *judicial* weighted caseload system using time studies consistent with best practice and migrate towards conducting time studies for updating the *clerical* weighted caseload systems. | Concur |
| 23 | 88 | No | Count all charges against one defendant involved in a single incident as one case. | Concur In Part |
| 24 | 90 | No | Define brought forward cases only as those requiring judicial attention and establish a separate case weight for brought forward cases. | Concur |
| 25 | 91 | No | Establish a monitoring case weight for the Probate Courts to reflect the amount of time spent monitoring guardianship cases each year. | Concur |
| 26 | 92 | No | Establish a full-time statistician position at the AOC responsible for compilation, analysis, and dissemination of data Branch-wide and implement Branch-wide policies promoting uniform statistical reporting. | Concur |
| 27 | 96 | Yes | Revise Probate Court guidelines for guardianships to be in compliance with timeframes established in RSAs 464-A:5, III and 464-A:11-a. | Concur In Part |





CONFIDENTIAL

| Observation Number | Page | Legislative Action Required | Recommendation | Branch Response |
|---|---|---|---|---|
| 28 | 97 | No | Adopt performance standards for the Supreme Court consistent with the American Bar Association's (ABA) standards. | Concur In Part |
| 29 | 99 | No | Change Supreme Court Rule 15 to require transcripts be produced within 30 days of screening and include this time standard in the Supreme Court's *Court Performance Standards*. | Concur In Part |
| 30 | 100 | Yes | Adopt performance standards consistent with the ABA's standards for all District Court case types. The Legislature should consider amending RSA 169-B:14, II and RSA 169-B:16, V to reflect these standards. | Concur In Part |
| 31 | 102 | No | Establish case processing standards for civil writs, small claims, and landlord and tenant cases consistent with case processing standards established by the ABA. | Concur In Part |
| 32 | 103 | No | Adopt performance standards consistent with the ABA for all Superior Court case types. | Concur In Part |
| 33 | 106 | Yes | Adopt performance standards consistent with the ABA for all Family Division Pilot Project case types. The Legislature should consider amending RSA 169-B:14, II and RSA 169-B:16, V to reflect these standards. | Concur In Part |
| 34 | 107 | No | Establish case processing timelines for adoption, trust, involuntary admission, and equity cases. | Concur |
| 35 | 109 | No | Each level of trial court should monitor compliance with case processing standards. | Concur |
| 36 | 112 | No | The Supreme Court should establish a delay reduction program and establish and strictly enforce a formal continuance policy. | Concur |
| 37 | 115 | No | The trial courts should establish a delay reduction program including elements of differentiated case management, monitoring case processing guidelines, and establishing firm trial dates and continuance policies. | Concur In Part |



CONFIDENTIAL

| Observation Number | Page | Legislative Action Required | Recommendation | Branch Response |
|---|---|---|---|---|
| 38 | 117 | No | Establish Branch-wide definitions of data elements and case processing events in court rules and ensure they are consistently applied. | Concur In Part |
| 39 | 119 | No | Ensure all defendants receive a written copy of their sentence at sentencing and examine the feasibility of generating the judge's sentence from the bench using the new case management system. | Concur |
| 40 | 119 | Yes | Amend RSA 594:20-a to eliminate requiring District Courts to hold arraignments on Saturdays. | No Position |
| 41 | 121 | No | Eliminate nearly all court reporter positions and determine the number of additional court monitors necessary Branch-wide. | Concur In Part |
| 42 | 125 | No | Centralize management and coordination of record-taking services at the AOC, develop policies and procedures for both court reporters and court monitors, and discontinue the practice of allowing court reporters to leave the courthouse early with the permission of a supervisory judge. | Concur In Part |
| 43 | 127 | No | Require court reporters to submit bi-weekly payroll reports documenting all time worked and approved time away from work. | Concur |
| 44 | 128 | No | Ensure all court reporters receive a copy of Superior Court Administrative Rule 3-8 regarding the court's ownership of stenographic notes, tapes, and disks; develop and implement a policy regarding proper custody, storage, and inventorying of stenographic notes. | Concur |
| 45 | 129 | No | Performance evaluations of court reporters, court monitors, and transcriptionists should consider the quality, accuracy, or timeliness of their respective work products. | Concur |
| 46 | 130 | No | Centralize the coordination of transcription services at the AOC and establish Branch-wide policies and procedures relative to transcription. | Concur |





CONFIDENTIAL

| Observation Number | Page | Legislative Action Required | Recommendation | Branch Response |
|---|---|---|---|---|
| 47 | 132 | No | Discontinue operating the Superior Court Transcript Center and reassign Transcript Center staff to court monitoring duties. | Concur |
| 48 | 134 | No | Implement a system-wide transcriptionist certification program and address standards related to confidential recordings and transcripts. | Concur |





CONFIDENTIAL

STATE OF NEW HAMPSHIRE
JUDICIAL BRANCH ADMINISTRATION

## INTRODUCTORY SECTION

### 1.1 Overview

In November 1998, the Fiscal Committee approved a recommendation made by the joint Legislative Performance Audit and Oversight Committee (LPAOC) to conduct a performance audit of the Judicial Branch administrative structure. Due to other audit engagements, work did not begin until November 1999.

We held an entrance conference with the Chief Justice of the Supreme Court and the director of the Administrative Office of the Courts (AOC) in November 1999 and initial planning lasted until April 2000 when work was suspended pending resolution of impeachment proceedings against members of the Supreme Court.

In September 2001 we met with the director of the AOC to discuss resuming the audit. Following discussions between the Legislative and Judicial Branches regarding separation of powers issues and the scope of the audit, a scope statement was approved by the LPAOC in January 2002 and audit work resumed at that time.

### 1.2 Scope, Objectives, And Methodology

This performance audit was conducted in accordance with generally accepted government auditing standards applicable to performance audits and accordingly included such procedures as we considered necessary in the circumstances.

*Scope And Objectives*

This performance audit focuses on the following question: ***Do current AOC and court procedures promote efficient and effective management of Judicial Branch resources?*** The results are intended to provide the Legislature with information needed to adequately carry out its constitutional obligation to oversee expenditures, while recognizing the importance of the separation of powers principle. We did not, therefore, review areas within the exclusive jurisdiction of the Judicial Branch, including the methodology and thought processes used in deciding and adjudicating cases.

Personnel costs (including benefits) consumed roughly 75 percent of the approximately $56 million expended for the administration of the Judicial Branch (the Branch) in State Fiscal Year (SFY) 2002. In assessing AOC and court procedures related to resource management it was necessary to examine the mechanisms used by the Branch in determining needed levels of judicial and clerical staffing, the Branch's use of automation, as well as its administrative and case processing practices. For our evaluation of the efficiency and effectiveness of AOC and court procedures we examined five inter-related issues within Branch operations. These are:

1) The current state-of-the-art in court automation, along with national trends and how closely the Judicial Branch's technology planning resembles national standards.

2) Administrative functions performed by the AOC and by the administrative offices of the trial courts.
3) The adequacy of the weighted caseload system in determining judicial and clerical staffing.
4) Case processing practices to determine whether such practices are consistent with applicable standards.
5) The availability of court reporting at all court levels and a comparison of costs and efficiencies of the various methods of reporting.

*Methodology*

We reviewed pertinent State laws, administrative and Court rules, Branch policies and procedures, State court decisions, annual reports, management reports, reports on other states' judicial functions, contracts, and news articles. We interviewed current staff at the AOC and courts, as well as knowledgeable individuals external to the Branch, such as the Judicial Council, the Public Defender's Office, the New Hampshire Bar Association, the New Hampshire Trial Lawyers Association, and the New Hampshire Department of Justice. We sought information from the American Bar Association (ABA), the National Center for State Courts (NCSC), and court systems in other states. We also surveyed most trial court employees, and conducted data analysis of case and financial information.

## 1.3 Background

New Hampshire's Constitution establishes the Supreme, Superior, and Probate Courts, while the District Courts and the Family Division Pilot Project are statutorily established. With Chapter 383, Laws of 1983, all State courts within New Hampshire were consolidated under the unified State system. Figure 5 shows the structure and jurisdiction of each of these courts.

The Supreme Court has broad power over all trial courts to prevent and correct errors and abuses and according to RSA 490:4, "shall do and perform all the duties reasonably requisite and necessary to be done by a court of final jurisdiction of questions of law and general superintendence of inferior courts." The Supreme Court is the court of last resort in the State. It hears appeals from all court levels and State administrative agencies and is also responsible for supervising the entire court system. The Superior, District, and Probate Courts, and the Family Division Pilot Project are the trial courts, each responsible for hearing and determining the facts of cases and applying the law to those facts.

The Constitution of New Hampshire authorizes the nomination of judges by the Governor and appointment by a majority of the Executive Council and also designates the Supreme Court Chief Justice as the administrative head of the Judicial Branch. Pursuant to Part 2, Article 73-a of New Hampshire's Constitution, all rules promulgated by the Chief Justice with the concurrence of the majority of the Supreme Court justices governing the administration of the courts have the force and effect of law. RSA 490-A:2 states the Supreme Court Chief Justice is responsible for supervising the efficient operation of all courts in New Hampshire, with the exception of the Superior Court where the advice and consent of the Superior Court's Chief Justice is needed. The District and Probate Courts are each managed by an administrative judge while the Family

CONFIDENTIAL



Division Pilot Project is co-managed by two Supreme Court-designated trial judges, one from each of the two program counties.

Figure 5

Judicial Branch Structure And Jurisdiction




Source: Judicial Branch information as of March 2003.

An Administrative Council recommends policies to the Supreme Court for adoption and coordinates operations of the various court levels. Membership of the Council consists of a Supreme Court justice; the administrative judges of the Superior, District, and Probate Courts; and the director of the AOC.

The AOC provides specialized and centralized support services such as accounting, auditing, personnel administration, and technology management to all levels of court. The director of the AOC serves at the pleasure of the Supreme Court Chief Justice and a majority of the Supreme Court.

**Figure 6**

**Judicial Branch Trial Court Locations**
**(As Of March 2003)**




Note: During the audit period Somersworth District Court was consolidated with Dover District Court.
Source: LBA analysis of Judicial Branch data.

During SFY 2002, the Judicial Branch operated 65 trial court sites around the State (Figure 6), and the Supreme Court. It expended $55.8 million on operations, of which $4.4 million was offset by restricted revenues including $2 million in transfers from the Highway Fund. In addition, the Branch collected $14.4 million in unrestricted court fines and fees revenue [Note: The Department of Safety collected an additional $8.8 million that was budgeted as unrestricted 'court fines and fees']. Table 1 presents expenditures incurred by court level during the six-year audit period SFY 1997 through SFY 2002. During this time period expenditures increased by 20 percent. We note during the same period total State expenditures exclusive of Educational Adequacy payments and certain Medicaid program costs (Disproportionate Share and Proshare) increased by 29 percent.

Table 1

**Judicial Branch Operating Expenditures**
**For SFY 1997 - 2002**

| | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | Total |
|---|---|---|---|---|---|---|---|
| Supreme | $ 2,760,909 | $ 2,758,443 | $ 3,072,708 | $ 3,067,876 | $ 3,603,129 | $ 4,220,366 | $ 19,483,431 |
| AOC | 3,782,200 | 3,762,071 | 3,446,459 | 3,337,835 | 3,228,851 | 3,349,938 | 20,907,354 |
| Superior | 19,838,137 | 19,610,201 | 19,690,892 | 21,079,559 | 20,779,170 | 21,879,731 | 122,877,690 |
| District | 14,486,009 | 15,837,450 | 16,293,059 | 17,745,467 | 17,858,618 | 18,528,423 | 100,749,026 |
| Probate | 3,912,998 | 4,184,596 | 4,409,133 | 4,646,651 | 4,750,759 | 4,895,520 | 26,799,657 |
| Family Division | 1,633,218 | 2,142,510 | 2,434,638 | 2,667,626 | 2,768,021 | 2,892,372 | 14,538,385 |
| **TOTAL** | $ 46,413,471 | $ 48,295,271 | $ 49,346,889 | $ 52,545,014 | $ 52,988,548 | $ 55,766,350 | $ 305,355,543 |

Source: LBA analysis for Judicial Branch data.

As of March 2003, the Judicial Branch had 620.2 authorized FTE non-judicial positions of which 46.3 FTEs (seven percent) were vacant. The Branch also had 70 full-time and 66 part-time judicial positions.

The remainder of this section discusses the responsibilities, jurisdiction, organization, management, and expenditures of each court level.

## 1.4 Supreme Court

The Supreme Court is New Hampshire's highest court. It decides appeals in civil, criminal, and juvenile cases as well as decisions made by State administrative agencies. It issues advisory opinions at the request of the Legislature or Governor and Council, has jurisdiction over admission to the New Hampshire Bar, and administers the State's Law Library.

To assist in managing the Judicial Branch, the Chief Justice, with concurrence of the majority of the Supreme Court, appoints one judge each from the Superior, District, and Probate Courts as an administrative judge pursuant to Supreme Court Rule 54. Administrative judges have general supervisory responsibility for administration, operation, and improvement of their respective courts, and serve on the Administrative Council. The Administrative Council meets monthly to facilitate communication among the courts and the AOC, as well as provide an opportunity to exchange views, measure progress, resolve conflicts, receive recommendations from the policy formulation committees, and make recommendations to the Supreme Court.

Figure 7 shows the organization of the Supreme Court comprised of the Chief Justice, four associate justices, and 40 support staff. These positions include the clerk, information officer, general counsel, reporter of decisions, law clerks, and other support staff. The Supreme Court also administers the Law Library, which had four staff. As of March 2003, three positions were vacant within the Supreme Court's organization.

**Figure 7**




Note: Numbers in parentheses represents number of full-time equivalent authorized positions.
Source: LBA analysis of Judicial Branch personnel data.

**Table 2 shows the Supreme Court spent approximately $19.5 million during the audit period on operating expenditures of which $15.8 million (81 percent) was for personnel. The Supreme Court experienced growth of 53 percent in operating expenditures from SFY 1997 to SFY 2002. Much of that increase resulted from non-judicial salaries which increased from $951,534 in SFY 1997 to $1,664,191 in SFY 2002, or by 75 percent.**

Table 2

| Supreme Court Expenditures For SFY 1997 - 2002 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | Total |
|---|---|---|---|---|---|---|---|
| **Personnel** | | | | | | | |
| Non-Judicial Salaries | $ 951,534 | $ 967,457 | $ 1,077,874 | $ 1,102,370 | $ 1,268,363 | $ 1,664,191 | $ 7,031,789 |
| Justices | 482,503 | 488,653 | 506,760 | 565,974 | 535,305 | 548,232 | 3,127,427 |
| Retired Justices & Widows | 419,340 | 389,561 | 379,184 | 405,253 | 498,315 | 548,579 | 2,640,232 |
| Library Personnel | 81,678 | 114,533 | 117,123 | 100,910 | 94,883 | 137,432 | 646,559 |
| Benefits | 296,882 | 311,451 | 322,081 | 366,505 | 448,586 | 589,231 | 2,334,736 |
| **Subtotal Personnel** | $ 2,231,937 | $ 2,271,655 | $ 2,403,022 | $ 2,541,012 | $ 2,845,452 | $ 3,487,665 | $ 15,780,743 |
| Library | $ 157,554 | $ 179,698 | $ 213,761 | $ 207,427 | $ 216,536 | $ 233,812 | $ 1,208,788 |
| Current Expenses | 88,433 | 83,515 | 66,628 | 78,727 | 171,084 | 146,638 | 635,025 |
| Continuing Education | 106,397 | 92,497 | 99,586 | 56,656 | 56,627 | 98,576 | 510,339 |
| Judicial & Professional Conduct | 10,000 | 10,420 | 11,635 | 72,582 | 76,465 | 120,022 | 301,124 |
| Computerization | 35,630 | 16,147 | 162,413 | 10,632 | 59,067 | 3,965 | 287,854 |
| Other | 41,000 | 39,191 | 39,544 | 33,964 | 53,151 | 52,160 | 259,010 |
| Travel | 25,008 | 26,138 | 27,100 | 18,404 | 16,168 | 15,559 | 128,377 |
| Maintenance | 30,463 | 8,817 | 24,710 | 32,354 | 8,213 | 5,156 | 109,713 |
| Grant Expenditures | 61 | 2,183 | 1,050 | 0 | 74,692 | 28,593 | 106,579 |
| Rents & Leases | 14,592 | 16,276 | 15,232 | 13,164 | 10,788 | 9,862 | 79,914 |
| Equipment | 19,834 | 11,906 | 8,027 | 2,458 | 14,886 | 6,028 | 63,139 |
| Organizational Dues | 0 | 0 | 0 | 0 | 0 | 7,365 | 7,365 |
| Facilities Escrow Account – Court Improvements | 0 | 0 | 0 | 496 | 0 | 4,965 | 5,461 |
| **Total Operating Expense** | $ 2,760,909 | $ 2,758,443 | $ 3,072,708 | $ 3,067,876 | $ 3,603,129 | $ 4,220,366 | $ 19,483,431 |
| **Capital Expenditures** | | | | | | | |
| Supreme Court Admin. | $ 0 | $ 1,337,647 | $ 162,134 | $ 219 | $ 0 | $ 0 | $ 1,500,000 |
| Information Technology Project | 0 | 0 | 0 | 0 | 0 | 233,728 | 233,728 |
| **Total Capital Expenditures** | $ 0 | $ 1,337,647 | $ 162,134 | $ 219 | $ 0 | $ 233,728 | $ 1,733,728 |
| TOTAL EXPENDITURES | $ 2,760,909 | $ 4,096,090 | $ 3,234,842 | $ 3,068,095 | $ 3,603,129 | $ 4,454,094 | $ 21,217,159 |

Source: LBA analysis of Judicial Branch financial data.

As a technique to manage its caseload, the Court does not hear all cases filed. A litigant has the right to an appeal in New Hampshire but there is no guarantee there will be full appellate consideration (i.e., briefing, oral argument, and formal written opinion). The Court uses its discretion to choose which cases will receive full appellate consideration. A clearance rate is a statistic showing the relationship between the number of cases accepted and the number of accepted cases disposed. A clearance rate of 100 percent or more shows the Court disposed more cases than it accepted during the SFY. Clearance rate data presented in Table 3 shows SFY 2002 was the most productive year for the Court. According to Court filing and disposition data shown in Table 3, there were 797 cases filed during SFY 2002. Of these 797 cases, 289 were accepted for review. Also during SFY 2002, 478 cases were disposed, some of which were filed in previous years, for a clearance rate of 165 percent.

Table 3

**Supreme Court Filings And Dispositions For SFY 1997 - 2002**

| | 1997 | | | | 1998 | | | |
|---|---|---|---|---|---|---|---|---|
| | Filed | Accepted | Disposed[1] | Clearance Rate[2] | Filed | Accepted | Disposed[1] | Clearance Rate[2] |
| Administrative | 175 | 88 | 74 | 84% | 117 | 63 | 80 | 127% |
| Civil | 374 | 105 | 86 | 82 | 413 | 118 | 96 | 81 |
| Domestic | 79 | 18 | 24 | 133 | 89 | 19 | 13 | 68 |
| Insurance | 23 | 10 | 14 | 140 | 23 | 10 | 9 | 90 |
| Criminal | 240 | 118 | 95 | 81 | 216 | 104 | 114 | 110 |
| Other[3] | 0 | 0 | 1 | 0 | 5 | 3 | 0 | 0 |
| TOTAL | 891 | 339 | 294 | 87% | 863 | 317 | 312 | 98% |
| | 1999 | | | | 2000 | | | |
| | Filed | Accepted | Disposed[1] | Clearance Rate[2] | Filed | Accepted | Disposed[1] | Clearance Rate[2] |
| Administrative | 114 | 64 | 66 | 103% | 130 | 62 | 49 | 79% |
| Civil | 351 | 96 | 87 | 91 | 373 | 83 | 84 | 101 |
| Domestic | 114 | 26 | 16 | 62 | 117 | 31 | 25 | 81 |
| Insurance | 27 | 17 | 13 | 77 | 17 | 7 | 12 | 171 |
| Criminal | 198 | 92 | 82 | 89 | 207 | 105 | 70 | 67 |
| Other[3] | 9 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| TOTAL | 813 | 295 | 264 | 90% | 845 | 288 | 240 | 83% |
| | 2001 | | | | 2002 | | | |
| | Filed | Accepted | Disposed[1] | Clearance Rate[2] | Filed | Accepted | Disposed[1] | Clearance Rate[2] |
| Administrative | 108 | 52 | 54 | 104% | 65 | 36 | 48 | 133% |
| Civil | 389 | 94 | 225 | 239 | 401 | 112 | 273 | 244 |
| Domestic | 117 | 26 | 68 | 262 | 99 | 29 | 52 | 179 |
| Insurance | 13 | 8 | 7 | 88 | 12 | 6 | 10 | 167 |
| Criminal | 199 | 110 | 92 | 84 | 220 | 106 | 95 | 90 |
| Other[3] | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 827 | 290 | 447 | 154% | 797 | 289 | 478 | 165% |

[1]Disposed refers only to cases accepted by the Court rather than all filings.
[2]Clearance rate is the ratio between cases disposed and cases accepted.
[3]Other refers to cases that had no case type information in the database.
Source: LBA analysis of Supreme Court data.

The Supreme Court introduced the Three Justices Expedited docket, or 3JX, in December 2000 in an effort to better manage its caseload. This alternative to the traditional hearing before the full Court was created to shorten the waiting time between the filing of an appeal and the disposition of the case. Cases may be assigned to the 3JX docket at the request of the parties or, if after an initial screening, the justices believe a full written opinion in the case may not be needed. Three justices hear abbreviated oral arguments in these cases and if they reach a unanimous decision, issue an order stating reasons for their decision. If there is a disagreement among the three justices, the case is reheard at a later date by the full Court.

CONFIDENTIAL



*Administrative Office Of The Courts*

The AOC was created in 1984 by the Supreme Court to improve the administration of justice and the efficient operation of all State courts pursuant to RSA 490-A, which established a unified court system. The AOC is responsible for centralized Judicial Branch functions such as: accounting and auditing, administration of the uniform personnel system for non-judicial employees, computerization, fiscal management, security coordination for all levels of court, and other duties requiring specialized knowledge or expertise. The AOC also handles facilities management to the extent of the Branch's responsibilities. The AOC is headed by a director, who serves at the pleasure of the Chief Justice and a majority of the Supreme Court.

**Figure 8**

**Administrative Office Of The Courts Organization**
**(As of March 2003)**




Notes: Numbers in parentheses represent number of full-time equivalent authorized positions.
[1]This position heads security for the entire Branch half-time and is a regional administrator for the District Court half-time.
[2]1.6 FTE is for court monitors who float between the District, Supreme, and Probate Courts at the direction of the operations manager.
Source: LBA analysis of Judicial Branch personnel data.

The AOC had 49.4 authorized FTE positions as of March 2003, including five vacant FTE positions. As shown in Figure 8, the AOC is divided into three sections: administrative services, operations, and security.

The administrative services section had 33.6 authorized FTE positions and is supervised by the manager of administrative services. It is further divided into four units: accounting, information



GJM RESP 0086

technology, audit, and facilities. The accounting unit handles the court system's accounting, payroll, and leave accounting. Audit conducts internal audits of the individual courts, while information technology handles all technology-related matters. The facilities unit includes the building and grounds workers for the Supreme Court and AOC buildings as well as those responsible for court construction.

Security for the Judicial Branch is managed by a court services representative who also serves as a regional administrator for the District Court. The court security officers provide security at the Supreme Court and coordinate Branch-wide security from the AOC. Security is handled differently in various courts. Security is provided by court employees in the Supreme Court, all District Courts, Family Division Pilot Project sites except Haverhill and Brentwood, and the Merrimack and Strafford Probate Courts.

Operations is divided into two units: personnel and support services. The personnel unit manages the Branch's human resource needs such as recruitment, benefits, salary administration, and personnel rules. The support services unit provides reception and secretarial services for the AOC.

*Facilities*

With the exception of the AOC and Supreme Court buildings located on Noble Drive in Concord, the State's Department of Administrative Services (DAS) is responsible for providing and maintaining suitable court facilities throughout the State. By July 1 of each year, the Supreme Court must submit a report to the Commissioner of Administrative Services setting forth the space and facility operating requirements for each court location. The Bureau of Court Facilities within DAS manages 14 State-owned court facilities. On-site maintenance personnel perform custodial services at these facilities. In addition to the State-owned court facilities, there are 34 leased court facilities. Depending on lease agreement provisions, either DAS personnel or the landlord performs custodial services for these facilities. The DAS pays utilities unless specifically included in lease agreements. Funding for facilities is accomplished through transfers for facilities from the Judicial Branch budget to the DAS.

RSA 490:5-a established the New Hampshire Court Accreditation Commission. The commission is composed of nine members: one member appointed by the Governor, one House member appointed by the House Speaker, one Senate member appointed by the Senate President, and six members appointed by the Supreme Court. Composition of the Supreme Court's appointees includes a justice or designee of the Supreme Court, a justice of the Superior Court, a Probate Court judge and a District Court judge, a lay person, and an attorney with experience in the trial of cases at all court levels. According to statute, the commission's responsibilities include prescribing minimum standards for all courts with respect to size, adequacy of facilities, decor and design, and other attributes; and regularly visiting and inspecting every Superior, District, and Probate Court. The commission periodically reports its findings, conclusions, and recommendations for improvements to the Supreme Court, as well as, reviews the adequacy of court facilities and reports its findings and recommendations to the Supreme Court for consideration in June of each year.

*Expenditures*

**As shown in Table 4, the AOC expended a total of $21 million during the six-year audit period. Personnel costs averaged 64 percent of total operating costs. Annual expenditures incurred for AOC operations decreased 11 percent from SFY 1997 to SFY 2002.**

Table 4

**AOC Expenditures**
**For SFY 1997 - 2002**

| | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | Total |
|---|---|---|---|---|---|---|---|
| **Personnel** | | | | | | | |
| Non-Judicial Salaries | $ 1,534,749 | $ 1,646,496 | $ 1,709,590 | $ 1,802,240 | $ 1,768,132 | $ 2,129,265 | $ 10,590,472 |
| Benefits | 406,355 | 429,127 | 432,068 | 462,694 | 512,149 | 581,199 | 2,823,592 |
| **Subtotal Personnel** | $ 1,941,104 | $ 2,075,623 | $ 2,141,658 | $ 2,264,934 | $ 2,280,281 | $ 2,710,464 | $ 13,414,064 |
| Grants Expenditures | $ 504,005 | $ 248,465 | $ 474,280 | $ 345,867 | $ 297,026 | $ 156,198 | $ 2,025,841 |
| Computerization | 186,397 | 348,982 | 185,600 | 187,883 | 114,675 | 58,714 | 1,082,251 |
| Court Modernization (Bond payments) | 522,127 | 500,654 | 0 | 0 | 0 | 0 | 1,022,781 |
| Workers Compensation | 246,163 | 191,032 | 114,957 | 126,809 | 185,993 | 119,179 | 984,133 |
| Current Expenses | 118,536 | 127,761 | 126,667 | 150,112 | 142,051 | 140,355 | 805,482 |
| Maintenance | 33,985 | 92,529 | 79,626 | 64,167 | 66,410 | 46,716 | 383,433 |
| Organizational Dues | 54,850 | 54,850 | 54,850 | 59,885 | 44,914 | 66,835 | 336,184 |
| Equipment | 74,122 | 11,100 | 167,067 | 62,919 | 18,117 | 1,094 | 334,419 |
| Other | 63,876 | 60,000 | 48,420 | 39,229 | 30,355 | 0 | 241,880 |
| Travel | 19,879 | 18,780 | 28,669 | 16,610 | 16,183 | 21,740 | 121,861 |
| Facilities Escrow Account - Court Improvements | 0 | 22,548 | 0 | 0 | 28,551 | 3,480 | 54,579 |
| Continuing Education | 8,657 | 8,925 | 7,534 | 5,957 | 3,079 | 14,406 | 48,558 |
| Library | 8,000 | 0 | 15,785 | 10,117 | 0 | 8,987 | 42,889 |
| Rents & Leases | 499 | 822 | 1,346 | 1,346 | 1,216 | 1,770 | 6,999 |
| Sheriff Reimbursements (Security) | 0 | 0 | 0 | $ 2,000 | 0 | 0 | $ 2,000 |
| **Total Operating Expense** | $ 3,782,200 | $ 3,762,071 | $ 3,446,459 | $ 3,337,835 | $ 3,228,851 | $ 3,349,938 | $ 20,907,354 |
| **Capital Expenditures** | | | | | | | |
| Admin. Office Building | $ 33,142 | $ 23,949 | $ 4,866 | $ 0 | $ 0 | $ 0 | $ 61,957 |
| Information Technology Project | 0 | 0 | 0 | 0 | 0 | 152,525 | 152,525 |
| **Total Capital Expenditures** | $ 33,142 | $ 23,949 | $ 4,866 | $ 0 | $ 0 | $ 152,525 | $ 214,482 |
| **TOTAL EXPENDITURES** | $ 3,815,342 | $ 3,786,020 | $ 3,451,325 | $ 3,337,835 | $ 3,228,851 | $3,502,463 | $ 21,121,836 |

Source: LBA analysis of Judicial Branch financial data.

## 1.5 Superior Court

**The Superior Court is the only court of general jurisdiction in the State, handling all matters not covered by other courts. It is the only court in which jury trials are held. The Superior Court has jurisdiction over felony trials, civil lawsuits, equity (civil proceedings generally not involving money), and marital matters. In addition, the Superior Court hears de novo appeals of certain misdemeanor convictions from the District Courts and certain juvenile matters. There is no**

limitation on the amount of damages a Superior Court may award. Marital masters handle the majority of family law cases in Superior Court.

As shown in Table 5, the Superior Court had 30,231 filings and 28,186 dispositions during SFY 2002. Criminal cases accounted for 44 percent of the filings; while marital, civil, and equity cases accounted for 30 percent, 15 percent, and 11 percent, respectively. Juvenile cases accounted for less than one percent of the entire caseload.

Table 5

**Superior Court Filings And Dispositions For SFY 1997 - 2002**

| | 1997 | | | 1998 | | | 1999 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Filed | Disposed | Clearance Rate | Filed | Disposed | Clearance Rate | Filed | Disposed | Clearance Rate |
| Civil | 4,830 | 5,319 | 110% | 4,477 | 5,096 | 114% | 4,510 | 4,680 | 104% |
| Marital | 8,420 | 9,898 | 118 | 8,453 | 9,521 | 113 | 8,544 | 9,271 | 109 |
| Equity | 2,933 | 2,981 | 102 | 3,064 | 3,185 | 104 | 3,483 | 3,646 | 105 |
| Juvenile | 69 | 69 | 100 | 68 | 54 | 79 | 64 | 71 | 111 |
| Criminal | 9,509 | 9,287 | 98 | 9,329 | 9,887 | 106 | 10,161 | 9,832 | 97 |
| TOTAL | 25,761 | 27,554 | 107% | 25,391 | 27,743 | 109% | 26,762 | 27,500 | 103% |
| | **2000** | | | 2001 | | | **2002** | | |
| | Filed | Disposed | Clearance Rate | Filed | Disposed | Clearance Rate | Filed | Disposed | Clearance Rate |
| Civil | 4,255 | 4,294 | 101% | 4,278 | 4,214 | 99% | 4,630 | 4,309 | 93% |
| Marital | 9,222 | 9,286 | 101 | 8,776 | 8,934 | 102 | 8,945 | 8,528 | 95 |
| Equity | 3,408 | 3,374 | 99 | 3,672 | 3,535 | 96 | 3,399 | 3,296 | 97 |
| Juvenile | 89 | 64 | 72 | 48 | 53 | 110 | 102 | 76 | 75 |
| Criminal | 10,442 | 9,805 | 94 | 11,698 | 11,176 | 96 | 13,155 | 11,977 | 91 |
| TOTAL | 27,416 | 26,823 | 98% | 28,472 | 27,912 | 98% | 30,231 | 28,186 | 93% |

Source: LBA analysis of Superior Court data.

### *Organization And Management*

The Superior Court had 29 full-time justices and ten marital master positions, two of which were vacant and 207.5 authorized FTE non-judicial positions. The Superior Court is supervised by a Chief Justice. As of March 2003, 15.3 FTE non-judicial positions were vacant for a vacancy rate of 7.4 percent. Figure 9 shows there are eleven Superior Court locations in New Hampshire, one in each county except Hillsborough County, which has two locations. The Superior Court has an administrative center located in Concord with six authorized FTE non-judicial positions.

Figure 9

**Superior Court Organization**
**(As Of March 2003)**




Note: Numbers in parentheses represent number of full-time equivalent authorized positions. J indicates the number of judicial positions, which include judges and marital masters; NJ indicates the number of non-judicial positions.
Source: LBA analysis of Judicial Branch personnel data.

*Expenditures*

Table 6 shows Superior Court operating expenditures incurred between SFY 1997 and SFY 2002 totaled approximately $123 million. Annual expenditures increased approximately ten percent from SFY 1997 to SFY 2002. Personnel costs average approximately 70 percent of the Superior Court's budget, while Sheriff's reimbursement and jury fees average six and four percent, respectively.

Table 6

**Superior Court Expenditures For SFY 1997 - 2002**

| | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | Total |
|---|---|---|---|---|---|---|---|
| **Personnel** | | | | | | | |
| Non-Judicial Salaries | $ 6,621,840 | $ 6,828,529 | $ 6,829,896 | $ 7,224,929 | $ 7,228,260 | $ 7,639,015 | $ 42,372,469 |
| Justices/Marital Masters | 3,408,993 | 3,373,735 | 3,456,518 | 3,590,794 | 3,403,231 | 3,685,241 | 20,918,512 |
| Retired Justices & Widows | 945,052 | 944,276 | 1,032,930 | 1,100,568 | 1,118,726 | 1,149,123 | 6,290,675 |
| Benefits | 2,417,730 | 2,451,951 | 2,432,854 | 2,752,734 | 3,095,114 | 3,371,920 | 16,522,303 |
| **Subtotal Personnel** | $ 13,393,615 | $ 13,598,491 | $ 13,752,198 | $ 14,669,025 | $ 14,845,331 | $ 15,845,299 | $ 86,103,959 |
| Payments to DAS for Court Facilities Fees | $ 2,380,135 | $ 2,499,730 | $ 2,657,017 | $ 2,683,355 | $ 2,486,067 | $ 2,546,023 | $ 15,252,327 |
| Sheriff Reimbursement (Security) | 1,284,316 | 1,093,046 | 1,103,239 | 1,248,362 | 1,157,467 | 1,276,233 | 7,162,663 |
| Jury Fees | 1,014,970 | 930,224 | 850,046 | 852,694 | 828,169 | 727,959 | 5,204,062 |
| Current Expenses | 535,264 | 569,566 | 573,897 | 522,697 | 529,521 | 555,767 | 3,286,712 |
| Travel | 239,655 | 220,207 | 225,891 | 215,107 | 182,689 | 236,312 | 1,319,861 |
| Maintenance | 127,396 | 146,181 | 144,682 | 169,948 | 158,836 | 112,021 | 859,064 |
| Library | 114,950 | 127,889 | 135,167 | 143,021 | 140,654 | 148,750 | 810,431 |
| Computerization | 13,618 | 60,495 | 26,753 | 218,160 | 118,883 | 214,905 | 652,814 |
| Equipment | 126,694 | 83,289 | 86,075 | 38,279 | 113,731 | 58,203 | 506,271 |
| Facilities Escrow Account -- Court Improvements | 300,320 | 39,672 | 33,363 | 67,823 | 21,407 | 15,115 | 477,700 |
| Grant Expenditures | 126,409 | 160,736 | 25,255 | 95,213 | 15,149 | 0 | 422,762 |
| Other | 123,786 | 26,279 | 24,512 | 69,525 | 107,826 | 54,287 | 406,215 |
| Rents & Leases | 47,428 | 40,517 | 36,628 | 36,168 | 32,470 | 53,220 | 246,431 |
| Continuing Education | 9,581 | 13,879 | 16,169 | 28,663 | 17,625 | 11,693 | 97,610 |
| Organizational Dues | 0 | 0 | 0 | 21,519 | 23,345 | 23,944 | 68,808 |
| **Total Operating Expense** | $ 19,838,137 | $ 19,610,201 | $ 19,690,892 | $ 21,079,559 | $ 20,779,170 | $ 21,879,731 | $ 122,877,690 |
| **Capital Expenditures** | | | | | | | |
| Information Technology Project | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 60,640 | $ 60,640 |
| **Total Capital Expenditures** | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 60,640 | $ 60,640 |
| **TOTAL EXPENDITURES** | $ 19,838,137 | $ 19,610,201 | $ 19,690,892 | $ 21,079,559 | $ 20,779,170 | $ 21,940,371 | $ 122,938,330 |

Source: LBA analysis of Judicial Branch financial data.

## 1.6 District And Municipal Courts

Beginning in 1964, regional District Courts were consolidated from Municipal Courts, with the last Municipal Court closing in the spring of 2000. The District Courts have exclusive jurisdiction in civil cases where damages are less than $1,500 and do not involve title to real estate. The District Courts enforce local regulations and have concurrent jurisdiction with the Superior Court in domestic violence cases, and civil cases involving damage claims from $1,500 to $25,000. The District Courts have exclusive original jurisdiction over all landlord and tenant disputes, violation and misdemeanor criminal cases, child abuse and neglect cases, and juvenile cases. Statute also allows the Supreme Court to expand concurrent jurisdiction in civil cases where damages do not exceed $50,000.

In addition, search warrants and arrest warrants are issued by the District Courts. District Courts also hold criminal arraignments and probable cause hearings in felony cases, but do not hear these trials. Jury trials in criminal misdemeanor cases were held in Rockingham and Merrimack Counties until April 1, 2001 when they were suspended indefinitely.

Table 7 shows a total of 177,159 cases were filed with District Courts during SFY 2002, while 170,076 cases were disposed. This resulted in a clearance rate of 96 percent in SFY 2002. Criminal cases accounted for 75 percent of all cases filed in the District Courts during SFY 2002, while civil and juvenile cases accounted for four percent each.

Table 7

District Courts Filings And Dispositions
For SFY 1997 - 2002

| | 1997 | | | 1998 | | | 1999 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Filed | Disposed | Clearance Rate | Filed | Disposed | Clearance Rate | Filed | Disposed | Clearance Rate |
| Criminal | 140,339 | 142,737 | 102% | 116,559 | 116,441 | 100% | 122,388 | 122,708 | 100% |
| Civil | 6,698 | 6,160 | 92 | 5,904 | 5,698 | 97 | 6,394 | 6,082 | 95 |
| Domestic Violence | 5,588 | 5,559 | 100 | 5,211 | 5,130 | 98 | 4,796 | 4,679 | 98 |
| Invol. Emerg. Admin. | 1,227 | 1,197 | 98 | 1,174 | 1,122 | 96 | 1,146 | 1,079 | 94 |
| Jury Trial | 2,906 | 2,651 | 91 | 2,681 | 2,654 | 99 | 2,900 | 2,992 | 103 |
| Juvenile | 6,980 | 7,144 | 102 | 7,120 | 6,928 | 97 | 6,688 | 6,464 | 97 |
| Landlord & Tenant | 6,526 | 6,335 | 97 | 6,308 | 6,152 | 98 | 6,851 | 6,296 | 92 |
| Small Claims | 19,085 | 17,455 | 92 | 17,651 | 17,075 | 97 | 16,969 | 16,508 | 97 |
| TOTAL | 189,349 | 189,238 | 100% | 162,608 | 161,200 | 99% | 168,132 | 166,808 | 99% |
| | 2000 | | | 2001 | | | 2002 | | |
| | Filed | Disposed | Clearance Rate | Filed | Disposed | Clearance Rate | Filed | Disposed | Clearance Rate |
| Criminal | 128,390 | 126,411 | 99% | 127,802 | 128,329 | 100% | 133,359 | 128,685 | 97% |
| Civil | 5,360 | 5,322 | 99 | 5,970 | 5,668 | 95 | 6,890 | 6,127 | 89 |
| Domestic Violence | 4,897 | 4,750 | 97 | 4,919 | 4,816 | 98 | 4,819 | 4,698 | 98 |
| Invol. Emerg. Admin. | 1,238 | 1,197 | 97 | 1,352 | 1,328 | 98 | 1,276 | 1,272 | 100 |
| Jury Trial | 3,536 | 3,216 | 91 | 2,961 | 3,703 | 125 | 21 | 154 | 733 |
| Juvenile | 6,579 | 5,910 | 90 | 6,565 | 6,342 | 97 | 6,731 | 6,401 | 95 |
| Landlord & Tenant | 7,150 | 7,005 | 98 | 7,122 | 6,939 | 97 | 6,920 | 6,708 | 97 |
| Small Claims | 16,687 | 15,794 | 95 | 16,273 | 15,319 | 94 | 17,143 | 16,031 | 94 |
| TOTAL | 173,837 | 169,605 | 98% | 172,964 | 172,444 | 100% | 177,159 | 170,076 | 96% |

Source: LBA analysis of District Courts data.

*Expenditures*

**As shown in Table 8, the District Courts expended a total of approximately $101 million for its operations between SFY 1997 and SFY 2002. Annual District Court expenditures increased approximately 28 percent from $14.5 million in SFY 1997 to $18.5 million in SFY 2002. Personnel costs averaged approximately 73 percent of the District Court's operating expenditures during the audit period.**

Table 8

**District Courts Expenditures**
**For SFY 1997 - 2002**

| | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | Total |
|---|---|---|---|---|---|---|---|
| **Personnel** | | | | | | | |
| Non-Judicial Salaries | $ 5,618,136 | $ 6,024,169 | $ 6,027,100 | $ 6,636,345 | $ 6,712,634 | $ 6,541,226 | $ 37,559,610 |
| Justices | 2,989,836 | 3,049,996 | 3,238,265 | 3,502,528 | 3,484,869 | 3,545,896 | 19,811,390 |
| Retired Justices & Widows | 246,528 | 309,625 | 371,726 | 395,283 | 465,723 | 446,832 | 2,235,717 |
| Benefits | 2,036,020 | 2,043,390 | 2,078,545 | 2,437,490 | 2,773,026 | 2,904,920 | 14,273,391 |
| Subtotal Personnel | $ 10,890,520 | $ 11,427,180 | $ 11,715,636 | $ 12,971,646 | $ 13,436,252 | $ 13,438,874 | $ 73,880,108 |
| Payments to DAS for Court Facilities Fees | $ 2,010,182 | $ 2,510,362 | $ 2,634,485 | $ 2,674,463 | $ 2,472,918 | $ 2,705,962 | $ 15,008,372 |
| Current Expenses | 637,806 | 669,905 | 713,935 | 726,697 | 722,621 | 745,891 | 4,216,855 |
| Grant Expenditures | 197,123 | 350,699 | 215,175 | 313,626 | 211,292 | 736,040 | 2,023,955 |
| Maintenance | 254,589 | 221,477 | 225,964 | 230,346 | 199,325 | 189,084 | 1,320,785 |
| Facilities Escrow Account – Court Improvements | 56,999 | 156,540 | 248,361 | 112,588 | 34,907 | 127,238 | 736,633 |
| Travel | 91,937 | 113,146 | 128,625 | 116,912 | 125,551 | 91,858 | 668,029 |
| Computerization | 8,331 | 55,035 | 28,230 | 198,092 | 159,154 | 205,281 | 654,123 |
| Equipment | 103,092 | 79,000 | 97,253 | 68,723 | 129,120 | 38,429 | 515,617 |
| Jury Fees | 85,434 | 89,565 | 100,408 | 105,519 | 102,279 | 5,514 | 488,719 |
| Library | 78,151 | 80,633 | 85,259 | 74,984 | 80,663 | 81,193 | 480,883 |
| Other | 34,157 | 35,642 | 41,760 | 84,211 | 135,913 | 104,670 | 436,353 |
| Rents & Leases | 20,456 | 30,074 | 35,800 | 35,693 | 30,879 | 33,967 | 186,869 |
| Continuing Education | 6,546 | 6,294 | 6,558 | 15,597 | 5,501 | 11,057 | 51,553 |
| Sheriff Reimbursement (Security) | 10,686 | 11,898 | 15,610 | 5,910 | 1,297 | 71 | 45,472 |
| Organizational Dues | 0 | 0 | 0 | 10,460 | 10,946 | 13,294 | 34,700 |
| **Total Operating Expense** | $ 14,486,009 | $ 15,837,450 | $ 16,293,059 | $ 17,745,467 | $ 17,858,618 | $ 18,528,423 | $100,749,026 |
| **Capital Expenditures** | | | | | | | |
| Information Technology Project | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 23,536 | $ 23,536 |
| **Total Capital Expenditures** | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 23,536 | $ 23,536 |
| TOTAL EXPENDITURES | $ 14,486,009 | $ 15,837,450 | $ 16,293,059 | $ 17,745,467 | $ 17,858,618 | $ 18,551,959 | $100,772,562 |

Source: LBA analysis of Judicial Branch financial data.

CONFIDENTIAL



**Figure 10**

**District Courts Organization**
**(As Of March 2003)**




Notes: Numbers in parentheses represent authorized positions. FJ indicates number of full-time judicial positions; PJ indicates the number of part-time judicial positions; and NJ indicates number of full-time equivalent non-judicial positions.
During the audit period the Somersworth District Court was consolidated with the Dover District Court.
¹Includes six floating court system clerks.
²This regional administrator is also in charge of Branch-wide security and is therefore counted here as a half position.
³Excludes administrative judge who serves part-time in this court.
Source: LBA analysis of Judicial Branch personnel data.

*Organization And Management*

Figure 10 shows the District Courts are managed by an administrative judge and had 220.8 authorized FTE non-judicial positions including 15.6 positions from various federally-funded court projects related to domestic violence, drug court, and child maltreatment. Of the 220.8 authorized FTE non-judicial positions, 17 were vacant as of March 2003. Judicial officers include judges, and special and associate justices. As of March 2003, there were 19 full-time judges, excluding the administrative judge, and 59 part-time judge positions, two of which were vacant. The District Courts have an Office of Administrative Judge, which coordinates District Court judicial schedules; develops continuing education programs; monitors judicial and clerical performance; and hires, fires, and supervises personnel. The District Court's Office of Administrative Judge had nine positions not including the administrative judge.

The administrative judge of the District Court is responsible for supervising judges and staff of the District Court system, including 6.6 FTE grant-funded positions. Three regional administrators supervise the clerks of court. One regional administrator supervises 20 courts and coordinates security for the AOC. Another regional administrator supervises 12 courts, and the third regional administrator supervises four courts and manages the District Court's special projects, which has nine FTE grant-funded positions. As of March 2003, there were 36 District Court locations throughout the State.

## 1.7 Probate Courts

Probate Courts have exclusive jurisdiction in adoption, termination of parental rights, guardianships, certain trusts, wills, estates, involuntary commitments, and name change cases. Probate Courts have concurrent jurisdiction with the Superior Court in certain trust matters, durable powers of attorney, and marriage waivers for minors.

Judicial officers in the Probate Courts include five full-time and five part-time judges sitting in the ten counties. Special masters may also be appointed to hear contested probate cases to the extent funds are available.

As shown in Table 9, a total of 9,976 cases were filed in the Probate Courts during SFY 2002. The Probate Courts disposed of 9,533 cases in SFY 2002, a clearance rate of 96 percent. SFY 2002 had the lowest clearance rate for any year during the audit period. SFYs 1997 through 2000 had clearance rates of 100 percent or more. The largest category of cases was estates and trusts, which accounted for 55 percent of all cases filed in SFY 2002.

Case 1:23-cv-00381-JL-TSM Document 64-2 Filed 09/29/26 Page 154 of 583

CONFIDENTIAL



Table 9

**Probate Courts Filings And Dispositions For SFY 1997 - 2002**

| | 1997 | | | 1998 | | | 1999 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Filed | Disposed | Clearance Rate | Filed | Disposed | Clearance Rate | Filed | Disposed | Clearance Rate |
| Adoption | 407 | 463 | 114% | 453 | 446 | 99% | 444 | 455 | 103% |
| Equity | 83 | 90 | 108 | 109 | 101 | 93 | 108 | 121 | 112 |
| Estate & Trust | 5,691 | 5,836 | 103 | 5,406 | 5,811 | 108 | 5,401 | 5,907 | 109 |
| Guardianship | 1,194 | 951 | 80 | 1,291 | 1,133 | 88 | 1,374 | 1,120 | 82 |
| Involuntary Admission | 358 | 353 | 99 | 335 | 338 | 101 | 325 | 322 | 99 |
| Name Change | 988 | 965 | 98 | 1,083 | 1,118 | 103 | 1,081 | 1,079 | 100 |
| Relinquishment of Parental Rights | 53 | 58 | 109 | 65 | 72 | 111 | 48 | 50 | 104 |
| Termination of Parental Rights | 93 | 102 | 110 | 139 | 129 | 93 | 199 | 165 | 83 |
| Other[1] | 153 | 160 | 105 | 146 | 160 | 110 | 239 | 234 | 98 |
| TOTAL | 9,020 | 8,978 | 100% | 9,027 | 9,308 | 103% | 9,219 | 9,453 | 103% |

| | 2000 | | | 2001 | | | 2002 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Filed | Disposed | Clearance Rate | Filed | Disposed | Clearance Rate | Filed | Disposed | Clearance Rate |
| Adoption | 496 | 467 | 94% | 519 | 518 | 100% | 492 | 492 | 100% |
| Equity | 137 | 126 | 92 | 106 | 106 | 100 | 161 | 121 | 75 |
| Estate & Trust | 5,404 | 5,732 | 106 | 5,559 | 5,627 | 101 | 5,517 | 5,576 | 101 |
| Guardianship | 1,453 | 1,176 | 81 | 1,426 | 1,184 | 83 | 1,622 | 1,269 | 78 |
| Involuntary Admission | 376 | 368 | 98 | 342 | 321 | 94 | 374 | 383 | 102 |
| Name Change | 1,180 | 1,205 | 102 | 1,236 | 1,188 | 96 | 1,257 | 1,201 | 96 |
| Relinquishment of Parental Rights | 79 | 74 | 94 | 85 | 49 | 58 | 82 | 78 | 95 |
| Termination of Parental Rights | 218 | 192 | 88 | 207 | 236 | 114 | 252 | 175 | 69 |
| Other[1] | 291 | 295 | 101 | 230 | 232 | 101 | 219 | 238 | 109 |
| TOTAL | 9,634 | 9,635 | 100% | 9,710 | 9,461 | 97% | 9,976 | 9,533 | 96% |

[1]Includes the following case types: conservatorship, marriage waiver, power of attorney, nursing home-no administration, death certificate, successor custodian, child custody, uniform gift to minor, no case type, and preauthorization for surrogacy

Source: LBA analysis of Probate Courts data.

## *Expenditures*

Probate Court operating expenditures totaled $27 million between SFY 1997 and SFY 2002. Annual Probate Court expenditures increased 25 percent from SFY 1997 to SFY 2002 (Table 10).

Table 10

**Probate Courts Expenditures**
**For SFY 1997 - 2002**

| | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | Total |
|---|---|---|---|---|---|---|---|
| **Personnel** | | | | | | | |
| Non-Judicial Salaries | $ 1,584,982 | $ 1,744,302 | $ 1,816,491 | $ 1,915,563 | $ 1,931,906 | $ 1,950,347 | $ 10,943,591 |
| Justices | 516,290 | 526,170 | 541,939 | 619,390 | 599,313 | 583,911 | 3,387,013 |
| Retired Justices & Widows | 56,131 | 56,131 | 58,937 | 71,724 | 82,659 | 85,003 | 410,585 |
| Benefits | 596,935 | 614,824 | 629,771 | 753,109 | 823,768 | 887,071 | 4,305,478 |
| **Subtotal Personnel** | $ 2,754,338 | $ 2,941,427 | $ 3,047,138 | $ 3,359,786 | $ 3,437,646 | $ 3,506,332 | $ 19,046,667 |
| Payments to DAS for Court Facilities Fees | $ 765,759 | $ 805,239 | $ 850,708 | $ 863,567 | $ 790,867 | $ 897,343 | $ 4,973,483 |
| Current Expenses | 222,962 | 239,555 | 242,689 | 229,693 | 241,085 | 234,836 | 1,410,820 |
| Maintenance | 74,202 | 66,542 | 67,138 | 61,924 | 55,936 | 43,484 | 369,226 |
| Computerization | 4,412 | 20,990 | 88,806 | 3,114 | 63,517 | 83,306 | 264,145 |
| Sheriff Reimbursement (Security) | 27,362 | 25,281 | 25,637 | 38,933 | 43,190 | 49,398 | 209,801 |
| Travel | 18,815 | 31,595 | 34,881 | 34,347 | 26,966 | 29,486 | 176,090 |
| Equipment | 20,891 | 25,263 | 27,499 | 20,460 | 45,153 | 16,032 | 155,298 |
| Library | 8,266 | 11,303 | 11,198 | 10,460 | 13,265 | 15,185 | 69,677 |
| Rents & Leases | 3,653 | 6,981 | 8,195 | 6,567 | 7,330 | 10,439 | 43,165 |
| Facilities Escrow Account – Court Improvements | 10,517 | 4,720 | 1,167 | 4,888 | 8,045 | 0 | 29,337 |
| Continuing Education | 1,821 | 2,414 | 696 | 10,862 | 6,093 | 1,977 | 23,863 |
| Other | 0 | 0 | 0 | 0 | 8,996 | 4,522 | 13,518 |
| Organizational Dues | 0 | 0 | 0 | 2,050 | 2,670 | 2,680 | 7,400 |
| Grant Expenditures | 0 | 3,266 | 3,381 | 0 | 0 | 500 | 7,167 |
| **Total Operating Expense** | $ 3,912,998 | $ 4,184,596 | $ 4,409,133 | $ 4,646,651 | $ 4,750,759 | $ 4,895,520 | $ 26,799,657 |
| **Capital Expenditures** | | | | | | | |
| Information Technology Project | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 8,356 | $ 8,356 |
| **Total Capital Expenditures** | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 8,356 | $ 8,356 |
| **TOTAL EXPENDITURES** | $ 3,912,998 | $ 4,184,596 | $ 4,409,133 | $ 4,646,651 | $ 4,750,759 | $ 4,903,876 | $ 26,808,013 |

Source: LBA analysis of Judicial Branch financial data.

## *Organization And Management*

The Probate Courts are headed by an administrative judge and consists of a court located in each of the ten counties (Figure 11). The Office of Administrative Judge is located at the Rockingham Courthouse in Brentwood. The Probate Courts had 64.5 authorized FTE non-judicial positions, four of which report to the Probate Court administrative judge. These positions include an executive secretary, one staff attorney, the Probate Court administrative coordinator, and one court assistant. The Office of Administrative Judge handles probate-specific educational conferences for judges and staff, develops uniform policies and procedures, and handles recusals. As of March 2003, six of the 64.5 authorized FTE non-judicial positions were vacant for a vacancy rate of 9.3 percent.

Figure 11




Notes: FJ indicates the number of full-time judicial positions, PJ indicates the number of part-time judicial positions, NJ indicates the number of non-judicial authorized full-time equivalent positions.
[1]The administrative judge serves as the judge in this court.
Source: LBA analysis of Judicial Branch personnel data.

## 1.8 Family Division Pilot Project

According to Chapter 152:1, Laws of 1995, the Family Division Pilot Project is intended to "promote the public interest and to better serve citizens" seeking judicial resolutions of "divorce, child custody and visitation, child support, legal separation, paternity, domestic violence, juvenile delinquency, child abuse and neglect, children in need of services, guardianship of minors, termination of parental rights, and adoption." The stated goals of the pilot project are:

- geographically accessible court locations,
- respectfully treat all citizens,
- promptly and fairly resolve family issues,
- assign one judge or marital master to hear all family matters of a single family,
- decrease the adversarial nature of proceedings through the use of alternative dispute resolution, and
- select and train judges and marital masters to address family-related cases.

The Family Division Pilot Project consolidates a host of family issues into one forum. Traditionally, family-related cases have been handled by three levels of court in New Hampshire. The pilot project has taken over new cases previously handled by the Superior Court (primarily domestic relations cases), District Courts (primarily child protection, juvenile delinquency, and domestic violence cases), and Probate Courts (adoption, guardianship of minors, and termination

of parental rights cases) in Grafton and Rockingham Counties. These cases are handled in four courthouses in each county, as specified by Chapter 152:4, Laws of 1995. In Rockingham County the four Family Division Pilot Project sites are currently located in Brentwood, Derry, Portsmouth, and Salem; in Grafton County they are located in Haverhill, Lebanon, Littleton, and Plymouth.

There are two supervisory judges, one each for Rockingham and Grafton Counties, reporting to the Judicial Branch's Administrative Council. The supervisory judges and the Family Division Pilot Project administrator develop rules, policies, training, and forms.

Marital master positions were created for the Superior Court to hear marital cases throughout New Hampshire and have been incorporated into the Family Division Pilot Project. Marital masters are attorneys who have applied for and been appointed by the Superior Court for the position. Marital masters do not have the same powers as a judge; they do not have the power to impose sanctions for contempt of their orders and a judge must approve their decisions. Marital masters were intended to hear juvenile and marital cases in order to preserve the one judge for one family concept. An early appeal regarding marital masters was made to New Hampshire's Supreme Court, which found marital masters did not have the authority to hear juvenile delinquency cases. This ruling hampers the goal of having one hearing officer handle all family-related cases for one family.

The Family Division Pilot Project started on July 1, 1996. For the first three years, the Family Division Pilot Project drew upon resources from other levels of court for its operations. Operating expenditures increased 77 percent from SFY 1997 to SFY 2002 (Table 11).

Table 11

**Family Division Pilot Project Expenditures**
**For SFY 1997 - 2002**

| | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | Total |
|---|---|---|---|---|---|---|---|
| **Personnel** | | | | | | | |
| Non-Judicial Salaries | $ 579,990 | $ 684,441 | $ 927,919 | $ 948,114 | $ 979,221 | $ 981,113 | $ 5,100,798 |
| Justices/Marital Masters | 254,995 | 476,837 | 479,848 | 575,646 | 601,040 | 664,937 | 3,053,303 |
| Benefits | 226,058 | 257,010 | 272,650 | 381,079 | 429,982 | 507,741 | 2,074,520 |
| **Subtotal Personnel** | $ 1,061,043 | $ 1,418,288 | $ 1,680,417 | $ 1,904,839 | $ 2,010,243 | $ 2,153,791 | $ 10,228,621 |
| Payments to DAS for Court Facilities Fees | $ 384,857 | $ 514,965 | $ 592,559 | $ 558,522 | $ 520,018 | $ 515,979 | $ 3,086,900 |
| Current Expenses | 106,209 | 110,671 | 100,103 | 92,992 | 96,712 | 96,578 | 603,265 |
| Travel | 27,710 | 35,821 | 31,581 | 38,652 | 41,074 | 39,234 | 214,072 |
| Sheriff Reimbursement (Security) | 10,436 | 16,559 | 0 | 17,437 | 30,258 | 29,925 | 104,615 |
| Equipment | 25,676 | 18,916 | 1,868 | 13,169 | 11,570 | 0 | 71,199 |
| Computerization | 0 | 1,447 | 377 | 0 | 15,831 | 35,319 | 52,974 |
| Continuing Education | 475 | 17,111 | 4,452 | 10,179 | 18,459 | 1,808 | 52,484 |
| Maintenance | 2,313 | 1,607 | 630 | 16,451 | 14,721 | 11,707 | 47,429 |
| Facilities Escrow Account – Court Improvements | 11,188 | 3,437 | 18,712 | 572 | 0 | 0 | 33,909 |
| Other | 1,991 | 1,410 | 1,838 | 10,765 | 5,390 | 1,841 | 23,235 |
| Rents & Leases | 1,320 | 2,278 | 2,101 | 2,888 | 2,542 | 3,202 | 14,331 |
| Organizational Dues | 0 | 0 | 0 | 1,160 | 1,203 | 1,523 | 3,886 |
| Library | 0 | 0 | 0 | 0 | 0 | 1,465 | 1,465 |
| **Total Operating Expense** | $ 1,633,218 | $ 2,142,510 | $ 2,434,638 | $ 2,667,626 | $ 2,768,021 | $ 2,892,372 | $ 14,538,385 |
| **Capital Expenditures** | | | | | | | |
| Information Technology Project | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 3,847 | $ 3,847 |
| **Total Capital Expenditures** | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 3,847 | $ 3,847 |
| **TOTAL EXPENDITURES** | $ 1,633,218 | $ 2,142,510 | $ 2,434,638 | $ 2,667,626 | $ 2,768,021 | $ 2,896,219 | $ 14,542,232 |

Source: LBA analysis of Judicial Branch financial data.

**As shown in Table 12, there were 7,216 filings in the Family Division Pilot Project during SFY 2002 and 6,742 were disposed of resulting in a 93 percent clearance rate.**

Table 12

**Family Division Pilot Project Filings And Dispositions For SFY 1997 - 2002**

| | 1997 | | | 1998 | | | 1999 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Filed | Disposed | Clearance Rate | Filed | Disposed | Clearance Rate | Filed | Disposed | Clearance Rate |
| Adoption | 139 | 87 | 63% | 168 | 146 | 89% | 173 | 166 | 96% |
| Domestic Violence | 2,041 | 1,846 | 90 | 1,987 | 1,903 | 96 | 1,960 | 1,959 | 100 |
| Guardianship | 121 | 48 | 40 | 210 | 64 | 31 | 199 | 111 | 56 |
| Juvenile | 2,790 | 2,302 | 83 | 2,646 | 2,425 | 92 | 2,473 | 2,367 | 96 |
| Marital | 2,608 | 1,541 | 59 | 2,760 | 2,492 | 90 | 2,753 | 2,892 | 105 |
| Termination of Parental Rights | 49 | 7 | 14 | 59 | 49 | 83 | 74 | 42 | 57 |
| TOTAL | 7,748 | 5,831 | 75% | 7,830 | 7,079 | 90% | 7,632 | 7,537 | 99% |
| | 2000 | | | 2001 | | | 2002 | | |
| | Filed | Disposed | Clearance Rate | Filed | Disposed | Clearance Rate | Filed | Disposed | Clearance Rate |
| Adoption | 248 | 199 | 80% | 194 | 200 | 103% | 230 | 191 | 83% |
| Domestic Violence | 1,972 | 1,921 | 97 | 1,896 | 1,839 | 97 | 1,857 | 1,813 | 98 |
| Guardianship | 275 | 136 | 50 | 272 | 171 | 63 | 281 | 174 | 62 |
| Juvenile | 2,271 | 2,009 | 89 | 2,466 | 2,065 | 84 | 2,125 | 1,911 | 90 |
| Marital | 2,756 | 2,705 | 98 | 2,654 | 2,532 | 95 | 2,637 | 2,602 | 99 |
| Termination of Parental Rights | 91 | 52 | 57 | 72 | 93 | 129 | 86 | 51 | 59 |
| TOTAL | 7,613 | 7,022 | 92% | 7,554 | 6,900 | 91% | 7,216 | 6,742 | 93% |

Source: LBA analysis of Judicial Branch data.

### *Organization And Management*

The Family Division Pilot Project is administered by the Family Division Pilot Project administrator and had 38 authorized FTE non-judicial positions. Four of the 38 FTE non-judicial positions were vacant as of March 2003 for a vacancy rate of 10.5 percent. The Family Division Pilot Project has three full-time judicial positions, but also relies on utilizing judges from the District and Probate Courts. Figure 12 shows the organization of the Family Division Pilot Project as of March 2003.

Figure 12

Family Division Pilot Project Organization
(As Of March 2003)




Note: Numbers in parentheses represent full-time equivalent authorized positions. J indicates the number of judicial positions, including marital masters. Supervisory judges are District Court judges and are not shown. NJ indicates the number of non-judicial positions.
Source: LBA analysis of Judicial Branch personnel data.

## 1.9 Significant Achievements

It is important to recognize performance auditing by its nature is a critical process, designed to identify problems or weaknesses in past and existing practices and procedures. Noteworthy management accomplishments within the scope of the audit are included here. Such information provides a more fair presentation of the situation by providing appropriate balance to the report. Significant achievements are considered practices, programs, or procedures that perform above and beyond normal expectations. Changes made to enhance efficiency or effectiveness could be considered a significant achievement.

### 1.9.1 Supreme Court

*Backlog Reduction*

In December 2000, the Supreme Court instituted a summary procedure, known as the 3JX docket, for handling appealed cases the Supreme Court believes present issues of settled law and do not need a published opinion. This procedure has enabled the Supreme Court to hear more cases, to give cases different types of treatment based on their complexity, and to get a decision to the parties earlier than would have occurred if all cases were handled in the regular appellate process. Cases selected for the 3JX docket, which features shorter oral arguments before a three-judge panel, receive an unpublished written order with reasons for the Court's disposition. The decision of the Court must be unanimous. The 3JX docket has helped the Supreme Court reduce the backlog of cases awaiting oral argument.

*Significant Achievements*

In 2001 the Supreme Court worked to eliminate the backlog of cases awaiting decision after oral argument. The Supreme Court asked its entire staff to focus their efforts on clearing the backlog. The Supreme Court also rearranged its oral argument schedule; now it holds oral arguments for three consecutive months, followed by a month with no scheduled oral arguments other than 3JX arguments (except August when no oral arguments are scheduled). This reportedly permits the justices and staff to concentrate on drafting and issuing decisions in the argued cases, and to clear most cases within four-month time blocks.

*Internal Reorganization*

In fall 2000, the Supreme Court began to review its internal structure. To assist in this review, the Supreme Court contracted with the National Center for State Courts (NCSC) to conduct a review of its operations, primarily related to case processing procedures. The NCSC made several recommendations, some of which were implemented. See Appendix B for a complete copy of the NCSC report.

In October 2001, the Supreme Court reorganized its administrative staff. With this reorganization, the clerk of court assumed primary responsibility for administrative operations and case processing. A separate position, reporter of decisions, was created, and is now responsible for reviewing and editing opinions and preparing the *New Hampshire Reports*. The Office of Staff Attorney, which assists in processing substantive issues, now reports directly to the justices. The Supreme Court also created an Office of General Counsel to advise the Supreme Court and Branch on legal matters.

The reorganization reportedly permits the Supreme Court to have more involvement in administrative and managerial activities, provides for greater accountability by ensuring the justices and staff are aware of their job performance requirements, and better utilizes staff resources.

### 1.9.2 Superior Court

*Individual Calendaring - Pilot Locations*

Two court locations experimented with individual calendaring - the assignment of a case to one justice following that case from entry to disposition. The system was reportedly designed and implemented using many strategies learned in case flow management training programs and is individually tailored for the two locations. It required coordination with other agencies working closely with the court, e.g., county and private attorneys. There are clearly advantages and disadvantages to this system and both locations reportedly experienced some of the positive and negative aspects.

*Domestic Relations Rules*

Domestic relations cases have received particular attention over the past few years within the Superior Court and Family Division Pilot Project. The Superior Court developed new rules governing processing for these cases. The rules are intended to make the process easier for the

layperson to understand. Forms and procedures pertaining to domestic relations cases were also revised.

*Improved Service To Jurors*

A committee of clerks and judges was formed to revise and update the juror handbook - a critical piece of information jurors receive on their first day of jury service. The handbook provides jurors practical and useful information on what to expect during their term as a juror.

*Alternative Dispute Resolution In The New Hampshire Courts*

In March 1997, the Superior Court and the Family Division Pilot Project created a program to help parties resolve their marital cases. The program uses volunteer attorneys, trained by the court, to act as neutral evaluators. These evaluators help the parties better understand their respective positions and facilitate a dialogue to find ways to resolve these cases.

Mediation (as distinguished from neutral evaluation) of marital cases has been available on a voluntary basis. To provide a broader range of options, a volunteer committee comprised of Legislators, marital masters, judges, mediators, attorneys, domestic violence advocates, and court staff has worked to create a mediation program for family cases.

### 1.9.3 District Courts

*Juvenile Drug Court*

In recent years the District Courts have applied for and received grant funding for planning and implementing juvenile drug courts. In 1999, the U.S. Department of Justice, Office of Drug Court Programs, awarded a planning grant for juvenile drug courts.

A pilot juvenile drug court site commenced in the Plymouth District Court in September 2001. The funding was obtained through the State's Department of Health and Human Services, Division of Alcohol and Drug Abuse Prevention and Recovery. Funds to initiate this program provided for treatment as well as hiring a program coordinator.

*Reclaiming Futures Initiative*

The District Courts sought and received a planning grant from the Robert Wood Johnson Foundation to design and build community-based solutions to substance abuse and delinquency. This project, as envisioned, will create a partnership between the juvenile justice system, substance abuse treatment systems, schools, youth, family, and community members to develop a strategy addressing juvenile drug abuse and delinquency.

*The Greenbook Project*

The Greenbook Project is a federally-funded initiative designed to bring together systems to better address the needs of families when domestic violence and child abuse and neglect co-

occur. The project is a joint effort among Grafton County District Courts and Family Division Pilot Project, the Division of Children, Youth and Families, the New Hampshire Coalition Against Domestic and Sexual Violence and the four domestic and sexual violence crisis centers serving Grafton County.

The court system's goals include increasing the ability of courts to identify cases where domestic violence and child abuse and neglect co-occur, and increasing information sharing among civil, criminal, and juvenile courts. Other goals include increasing batterer accountability and increasing interagency collaboration. The Greenbook Project grant was awarded in December 2000.

*Electronic Bench Warrants*

In 1993, the District Courts embarked upon a process to record and disseminate bench warrants electronically. A bench warrant is an arrest warrant issued due to the failure of an individual to appear in court, pay a fine, or otherwise comply with a court order. Prior to the institution of electronic bench warrants, all such warrants were on paper and disseminated only to the arresting department. Following the upgrade of the State Police network in 1998 the District Courts embarked on deploying the availability of electronic bench warrants for all of the State's District Courts. Under the current system, all law enforcement officials of the State have immediate access to the warrants 24-hours a day. This reportedly has created a more efficient mechanism for detaining individuals failing to abide by court orders.

### 1.9.4 Probate Courts

*Estate Administration*

Starting in 2001 the Probate Courts have worked to simplify the process for administering the approximately 3,000 estates filed every year Statewide. The first step in this process was new legislation allowing a waiver of full administration for cases that met certain criteria. For those cases, an inventory and appraisal of estate assets, a fiduciary bond, and an accounting of the estate assets are not required, but are instead replaced by the completion of a single form.

*Forms On Website*

In mid-1997, the Probate Courts posted a web page dedicated to Probate Court information on the Judicial Branch's website. The page contains the most commonly used forms in estate administration as well as all Probate Court administrative orders and procedure bulletins. Interest in the site was the reported impetus for adding other probate forms for all case types, resulting in most probate forms now being available through the Internet.

### 1.9.5 Administrative Office Of The Courts

*Supreme Court Information On The Internet*

The Judicial Branch's website on the Internet contains all Supreme Court Opinions released since November 1995, various forms and orders from the different court levels, contact information, and directions to the courts. It also contains new Supreme Court opinions, case acceptance lists, oral argument calendars, and orders. A search engine allows the public to search the site for needed information.

In addition, the AOC created the New Hampshire Judicial Branch list service to automatically notify members of changes to the website. This service is available to the public and can be accessed through the Branch's website.

*Intranet*

The AOC created an internal web server, available to the courts but not the public, which it uses to post material for staff and judicial use. This material includes all the pages the Branch has on its official website, Judicial Branch salary information, Judicial Branch personnel rules, and e-mail master lists. This intranet also provides Judicial Branch employees with confidential access to their leave balances.

*Digital Audio Recording*

The Judicial Branch has begun installing digital audio recording hardware and software throughout the Branch following an analysis of digital audio recording software available from major vendors. A 90-day evaluation period showed this solution to be viable for New Hampshire courts. Digital audio sound recording will enhance sound recording quality; allow immediate access to any part of recorded testimony; enable precise and automatic time referencing of audio recording; allow audio playback on a personal computer CD-ROM player; allow storage of a full day of court proceedings on a single CD-ROM; and allow judges, monitors, and attorneys to easily create electronic notes linked to the audio recording during proceedings.

*Domestic Violence Registry*

In the past, trial courts faxed domestic violence protective orders to the Department of Safety where officials maintained a registry. The registry was used to implement federal firearms restrictions and to provide law enforcement agencies with information about outstanding domestic violence protective orders. The AOC implemented procedures for courts to report those who had protective orders issued to a central point at the AOC. Protective orders could then be directly entered into the federal National Crime Information Center (NCIC) and state registries. Errors, delays, and misunderstandings are reduced by moving the data entry function out of the Department of Safety and into the AOC because the latter is closer to the point of origin of the subject orders.

Furthermore, the AOC electronically stores images of orders and makes those images available to local law enforcement entities twenty-four hours a day, seven days a week. Using codes and touch-tone telephone signals, law enforcement agencies can select an order and cause the AOC server to send a copy of the order to the agency by fax transmission. This feature provides local law enforcement officials with access to an image of the actual order rather than access merely to a database that contains summaries of orders.

## INFORMATION TECHNOLOGY

The Judicial Branch's information technology (IT) resources are managed and supported by an IT group located at the Administrative Office of the Courts (AOC). The group has an IT manager and is staffed with three systems analysts/programmers, six programmers, four local area network (LAN) specialists, and a technical trainer.

During the six-year audit period, the Branch spent approximately $6.9 million on IT hardware, software, and services, excluding personnel costs. The Branch replaced nearly all its personal computers with at least Pentium® III class processors during the SFY 2002-2003 biennium to prepare for the implementation of new case management systems.

Our research indicated the current "state of the art" technology in a court system includes:

1) *Computers on the judge's bench integrated with the case management system* - enables judges to issue orders immediately and eliminates the need for clerical staff to manually enter information into the electronic case record from a paper form.
2) *Electronic filing* – allows parties to file court documents electronically, thereby reducing the amount of data entry and document filing the clerk's office staff must do.
3) *E-mail* – enables the clerk's office staff to distribute case-related information to attorneys and other parties to the case rather than generating paper documents and sending them via regular mail.
4) *Digital audio recording* – allows the court to store recordings of court proceedings electronically on computer networks for future distribution to transcriptionists, parties to the case, or the media.
5) *Document imaging* – saves storage space and enables the electronic distribution of case-related documents.
6) *Teleconferencing/videoconferencing* – allows the court to conduct certain proceedings when one or more parties to a case are located in different physical locations.
7) *Evidence presentation systems* – enables evidence, such as written documents, photographs, or video to be projected on video monitors located on the courtroom wall or in the jury box for viewing.

The Branch has experimented with all of these technologies, and plans to expand its use of digital audio recording technology in the future. However, specific and formal plans to expand use of the other technologies and incorporate them into case management and administrative systems had not been developed at the time of our audit.

Information technology literature indicates thorough planning and workflow reviews are the key to ensuring technology improves the efficiency and effectiveness of an organization. The remainder of this chapter presents our observations on the state of the Branch's IT. We found the Branch needs to improve IT planning and development.

**Observation No. 1**

***Improve Information Technology Planning***

Information technology planning for the Judicial Branch can be improved by tying the IT plan to an organizational strategic plan, sufficiently addressing areas considered necessary for an adequate IT plan, and revising plans more frequently. Planning reduces risk and is characteristic of a successful organization and effective IT deployment. Information technology planning helps to establish goals towards which the Branch should be working.

*Information Technology Plans Should Support Organization-Wide Strategic Plan*

The most successful IT plans are developed subsequent to a strategic plan for the organization. Information technology supports the organization and therefore should be closely aligned with the organization's strategic plan. As discussed in Observation No. 12, the Judicial Branch bas no current strategic plan. As a result, technology may not be properly utilized in support of the organization's goals.

*More Comprehensive Information Technology Plans Needed*

We examined the State's Strategic Information Technology Plan (SITP) Documentation Standard published by the Executive Branch's Division of Information Technology Management. The standard requires Executive Branch agencies to address several areas including agency organization; mission, vision, goals, and objectives; IT architecture; standards and policies; analysis of current environment; IT resource assessment (including human capital); future IT architecture; IT initiatives; budget; and compatibility with the Statewide strategic IT plan. While we acknowledge the Judicial Branch is not obligated to follow this standard, the standard illustrates best practices in IT planning. Our review of the Judicial Branch's IT plans indicated many of these concepts were either not addressed or addressed in very general terms.

*More Frequent Plans Needed*

The Judicial Branch last prepared an IT plan in January 2001. Prior to the 2001 plan, the Branch issued an IT plan in 1998. The Judicial Branch also considers memorandums written by Branch employees attending court technology conferences as updates to the plan. Plans should be updated every one or two years.

Without a strategic plan and a comprehensive, up-to-date technology plan, the Judicial Branch may not be able to adequately assess and communicate future technology needs, which increases the risks that technology initiatives may not fully support the future direction of the Branch.

Recommendation:

**We recommend the Branch develop IT plans to support organization strategic plans, include essential elements in its plan as outlined in the State's SITP guidance, and update its plan at least every two years.**

*Auditee Response:*

*The Judicial Branch agrees. With input from the Court Technology Committee, the AOC expects to recommend to the Supreme Court a revised and updated Judicial Branch Information Technology Plan.*

*On completion of a Judicial Branch Strategic Plan, the AOC expects to lead a more extensive IT planning process.*

**Observation No. 2**

***Immediately Develop A Branch-Wide Strategic Plan And Analyze Court Work Flow Concurrent With Implementing The New Case Management System***

On March 26, 2003 the Judicial Branch released a Request For Proposals (RFP) for a Statewide browser-based case management system for use by the trial courts. The new case management system will replace the existing SUSTAIN case management system implemented in 1990. The system is intended to support information management needs of the Judicial Branch and policy makers, as well as make information exchange with other government entities possible. However, the long-term effectiveness of the new case management system may be jeopardized without a linkage to functional strategic and IT plans, and without process re-engineering and standardization of procedures among court levels and locations in advance of implementation.

Information technology literature recommends business process re-engineering before developing or implementing new computer systems. It is more expensive to make revisions to a system once it has been implemented than it is to fully identify system specifications and appropriate design before implementation. Business process re-engineering may have added importance to the Judicial Branch, where we observed similar functions are executed differently by court location and court level. Before investing in new or replacement IT systems, business processes should be documented, and where appropriate, rethought, restructured, and standardized. The U.S. General Accounting Office (GAO) recommends agencies carefully analyze processes or procedures to be modernized to ensure business needs dictate an organization's technology requirements. According to the National Center for State Courts (NCSC), a court must resolve work-process issues before implementing an automated system; otherwise, the system will magnify poor procedures. The NCSC specifically recommended in 1999 that the New Hampshire Judicial Branch study business processes and develop and document standard operating procedures applicable to all trial courts before purchasing a new trial court case management system. However, the Judicial Branch has not comprehensively examined court workflow prior to soliciting proposals for a new trial court case management system. Without examining the business processes in use, abandoning unnecessary work, and streamlining the remaining work, there is a risk inefficient and ineffective processes will become institutionalized in the new system.

Observation No. 12 notes the Judicial Branch needs to develop a strategic plan. A strategic plan identifies long-term goals and priorities, provides focus, involves many internal employees in determining the court's long-term direction, and is instrumental in making organizational

improvements. Through strategic planning the Judicial Branch could set organizational goals, as well as identify how it plans to meet those goals. Subordinate plans, such as IT plans, should be written to support the goals identified in the strategic plan. The Judicial Branch last produced an IT plan in 2001, but it was not linked to a strategic plan, nor does it contain essential elements identified in IT planning literature. Without a strategic plan and a proper IT plan, the Judicial Branch's goals may not be fully identified or prioritized, increasing the risk the new trial court case management system will not support the Judicial Branch's organizational goals.

Recommendation:

**We recommend the Judicial Branch begin strategic planning, IT planning, and business process re-engineering immediately; concurrent with the beginning stages of the implementation of the new trial court case management system project so the system will automate efficient and effective court processes and its final functionality can be aligned with fully-developed and articulated goals developed by the Branch.**

*Auditee Response:*

*The Judicial Branch agrees in part. The value of strategic planning is addressed in Observation No. 12.*

*The Judicial Branch expects to continue with its present information technology planning process until a Branch-wide strategic plan is developed.*

*Judicial Branch officials acknowledge the value of business process reengineering. One consultant projected the cost of conducting a business process reengineering effort in each of the three levels of established trial court at $100,000. Budget reductions in recent years and related chronic staff shortages throughout the court system have made it impossible to allocate that sum of money to business process reengineering.*

*The Judicial Branch sought and obtained a grant to hire a consultant to facilitate a business process reengineering initiative in the trial courts. This project will depend heavily on Judicial Branch personnel. When the budget for FY 2004-2005 is finalized and we can project staffing levels in different areas of the Judicial Branch, we expect to meet with the consultant to determine how to proceed with business process reengineering in New Hampshire trial courts.*

*The Judicial Branch has minimized risks identified by the auditors in three respects:*

- *We intend to purchase a new case management system that follows the functional standards developed by the Consortium for National Case Management Automation Functional Standards. These standards will position the Judicial Branch within the mainstream of court automation, avoiding inefficient and idiosyncratic case processing practices.*

- *We intend to purchase a commercial off-the-shelf product that has been successfully used in other state court systems. Such a general purpose product will allow the NH Judicial*

*Branch to continue its automation efforts within the mainstream of national court automation.*

- *We intend to purchase a case management system that is readily adaptable to the changing needs of New Hampshire trial courts. As efficiencies are discovered in the business process reengineering project, the new case management system will be adapted to take advantage of those efficiencies.*

**Observation No. 3**

***Develop A Formalized Systems Development Methodology***

The Judicial Branch has not formally established a systems development methodology. A systems development methodology is a framework for guiding development of IT projects that result in the delivery of properly functioning, documented, and completed systems; and provides for on-going maintenance of these systems. The overall goal is to improve the quality and efficiency of software applications. The methodology provides a control structure for IT projects, whether developing a new system or enhancing an existing system.

The Judicial Branch is currently involved in two major IT projects. One project involves a no bid fixed-price contract worth $400,000 signed in November 2001 to develop case management system software for the Supreme Court. Phase I of the project was delivered January 2002 as contracted. As of June 2003, phase II of the system remained in the testing phase despite a contracted completion date of May 2002. The second project is the procurement of case management system software for the trial courts that will replace the SUSTAIN case management system implemented in 1990. On March 26, 2003 the Judicial Branch released an RFP for a statewide browser-based case management system for use by the trial courts. The new case management system is intended to support the management information needs of the Judicial Branch and policy makers, as well as make information exchange with other government entities possible. As of June 2003, the AOC was reviewing bids and preparing to contract with a vendor for a new trial court case management system with an estimated cost of $2 million. Without a formal systems development methodology, IT projects may not be properly focused, may fail to meet deadlines, and may not fulfill user requirements.

During the useful life of the SUSTAIN case management system end-users continually requested special computer procedures and reports that were not part of existing software systems. These requests were handled informally since no formal systems development methodology existed to service these requests. Without a formalized systems development methodology, informal user requests could be misunderstood, lost, or improperly prioritized. In addition, incomplete, improper, and/or untimely software development and implementation could occur.

The IT manager stated no systems development methodology is used because Judicial Branch projects tend to be small and the IT staff is experienced. Policies, procedures, and responsibilities outlined in a formal systems development methodology can help ensure consistent and thorough control is maintained over the IT function; prevent questions and misunderstandings on scope and limits of authority; and provide for appropriate involvement of senior management, IT management, and user management.

Recommendation:

**We recommend the IT group within the AOC adopt a formal systems development methodology to guide its IT projects. We also recommend that appropriate memoranda, directives, reports, and signoffs be utilized to provide evidence of adherence to the policies and procedures outlined in the methodology.**

*Auditee Response:*

*The Judicial Branch agrees in part. A simple and streamlined systems development methodology would be helpful and the senior systems analyst/programmer will prepare plans appropriate to different types of Judicial Branch systems development projects. While larger projects may benefit from more formal and elaborate methodologies, many small and routine projects can be accomplished with a more streamlined plan.*

*Because there are no commercial off-the-shelf appellate court case management systems on the market, the AOC contracted with IBM to (1) develop functional specifications for this project and (2) serve as project manager and prime contractor, utilizing a subcontractor which was tasked with adapting an existing case management system to the needs of the New Hampshire Supreme Court. Phase one of this project was delivered on time in January 2002. Delivery of Phase two, consisting of enhancements and refinements of the core application, has been delayed because the subcontractor underestimated the scope of this project. The AOC has allowed significant delays in this project, confident that IBM and the subcontractor will deliver a very useful appellate court case management system and that the delays are justified by the anticipated value of this product.*

**Observation No. 4**

***Develop Information Technology Policies And Procedures***

Policies and procedures are directives from management that identify and communicate preferred practices. The Judicial Branch has no formal policies or procedures governing its IT resources or operations. The Branch's IT manager reported policies sometimes are distributed to staff in letters but did not provide them to the audit team despite requests. Common IT policies and procedures found in organizations include the following general categories:

- acceptable use of computer resources;
- operations and systems responsibility;
- safeguards over data, including data backup and disaster recovery, and media disposal;
- e-mail use and expectation of privacy;
- virus protection and mitigation;
- intellectual property rights;
- security awareness, including remote access;
- incident response and reporting;
- internet use;
- access control and authorization, including password length and complexity;
- network management;
- change management;
- training; and
- use of unauthorized software.

There is not sufficient management concern regarding the development and implementation of policies and procedures. Without comprehensive IT policies and procedures, the Branch cannot effectively communicate required practices to Branch employees, which may expose it to unnecessary operational risks. In addition, the lack of policies and procedures may make it difficult to take disciplinary action against individuals engaging in risky IT practices.

**Recommendation:**

We recommend the Branch develop and implement comprehensive IT policies and procedures, distribute them to affected personnel, and monitor compliance as appropriate.

*Auditee Response:*

*The Judicial Branch agrees. Judicial Branch officials recognize the value of formal policies that describe preferred information technology practices.*

*As staff resources permit, the AOC expects to assemble and recommend policies that describe recommended information technology practices in areas not already covered by existing policies such as the New Hampshire Judicial Branch Personnel Rules. The development, monitoring, and updating of policies, methodologies, and plans recommended in this Observation and in Information Technology Observations Numbered 2, 3, and 5 will likely occupy one full-time equivalent technical planner/administrator.*

**Observation No. 5**

***Information Technology Disaster Recovery Plan Needed***

The IT group within the AOC has no disaster recovery plan for the Judicial Branch's IT resources. As a result, there is no assurance the organization could respond quickly and efficiently to a variety of potential emergencies or significant disruptions to computer operations. All organizations should have formal, customized strategies for recovery from significant interruptions to IT services.

Local clerks of court are responsible for the nightly backup of data and storing the backup tapes off-site. However, there is no policy regarding where tapes should be stored. According to the IT manager, he would only need the backup tapes and could procure replacement hardware in the event of disaster. In our view, a much more robust plan is necessary. Issues addressed in a typical disaster recovery plan are:

- the type of disasters covered by the plan;
- staff responsibilities;
- description of how systems will operate immediately after a disaster (e.g., manually/alternative computer site);
- list of where information such as backup files, programs, etc., are stored;
- checklists of requirements and supplies for each system where recovery is intended;
- a summary of personnel and third parties who should be contacted when a disaster occurs;

- a summary of what actions are required to re-establish processing capabilities, including the necessary insurance and legal arrangements to fund re-establishment costs, required equipment, software and data file retrieval, vendor support, and minimum staffing levels necessary for operations; and
- a list of critical applications and resources and their priority for re-establishment.

Once such a plan has been developed and distributed to the necessary management and staff and training has taken place, the plan should be regularly reviewed and updated. In order for the plan to remain current and effective, the plan should be updated when changes occur in the information systems processing environment (including software, hardware, personnel, and administration).

The IT manager stated there is no disaster recovery plan because developing one would take time and money.

Recommendation:

We recommend the IT group within the AOC develop and implement a comprehensive IT disaster recovery plan. It should be closely coordinated with the Branch-wide business continuity and contingency plan we recommend in Observation No. 13. We also recommend the Judicial Branch test the disaster recovery plan and revise it periodically.

*Auditee Response:*

*The Judicial Branch agrees. The AOC expects to prepare and recommend an Information Technology Disaster Recovery Plan in connection with the development of the Judicial Branch Disaster Recovery Plan.*

**Observation No. 6**

***Evaluate Network Design And Operations***

The Judicial Branch uses the State Police computer network as a wide area network (WAN) connecting each local courthouse to the AOC. The WAN provides connectivity for e-mail service and access to the Branch's intranet. Each court location uses a LAN to provide employees access to the local server containing the SUSTAIN case management system and other data files.

Each LAN in the 66 court locations around the State is managed by the local clerk of court. Each clerk of court is responsible for establishing user accounts for SUSTAIN, determining access rights for groups and individuals, and revoking user access credentials to applications from employees who separate from State service. The IT group located at the AOC sets up user accounts for access to the WAN. We noted the following issues related to the Judicial Branch's current network design and operations:

- The IT manager could not tell us whether user accounts in the local courthouses are discontinued upon employee termination. Best practices indicate user accounts should be established and revoked by the IT group within the AOC. The personnel office should

initiate the process upon change in employment status. The court clerk should then approve new users and forward his/her approval to the IT group who actually creates the account. The personnel office should forward terminations directly and immediately to the IT group.

- Potential intrusions and unauthorized access attempts are not monitored. The IT manager stated there was no need to monitor intrusion or access attempts because the network is managed by the State Police. Considering the importance and sensitivity of court data, intrusion detection and unauthorized access attempts should be monitored and acted upon.

- There is no current network map showing the network boundaries and methods of access. A network map is a tool from which an assessment of network security can begin. Information technology groups should have a current network map readily available.

The Judicial Branch is currently embarking on the purchase of a new case management system. It is an ideal time to assess whether the current network design is desirable and efficient. A centralized network could be beneficial because it would allow standards, such as password length and complexity, to be enforced across the organization and it would alleviate the burden for the local clerks of court for management tasks unrelated to their primary responsibilities.

**Recommendation:**

**We recommend the AOC ensure the IT group assess whether the current decentralized organization and management of the trial court's computer systems will meet the needs of the new case management system and the trial court's IT needs. We also recommend the IT group map its current network topology, including all access points and identifying access method, and monitor the network for unauthorized users and attempted access. Further, the AOC should consider appointing an individual from within the IT group as a security officer.**

*Auditee Response:*

*The Judicial Branch agrees in part. The AOC's request for proposals (issued March 26, 2003) for a new case management system specifies that the case management system will operate in a centralized system. The present network was designed in the late 1980s, conforms to standards of that era, and is now obsolete. Funding constraints have prevented the Judicial Branch from moving to a more modern and centralized architecture.*

*The present network topology is relatively simple; a map is unnecessary. The information technology team is presently designing a new LAN for the Supreme Court and the AOC; we expect to draw a diagram of the new structure. Likewise, we expect to draw a diagram of our network system when the information technology team and the vendor of the new case management system have finished preliminary design work.*

***The AOC Senior Systems Analyst/Programmer expects to appoint an information technology security officer who will monitor unauthorized access attempts.***

***The Observation suggests a higher level of vulnerability to unauthorized intrusion than actually exists in the Judicial Branch network architecture. The Judicial Branch network is appropriately secured from the outside world by firewalls and other security measures.***

***As the Judicial Branch moves towards a centralized computer architecture, the AOC information technology staff expects to consider a degree of centralization appropriate to the decisions, and actions, related to access to Judicial Branch information systems.***

**Observation No. 7**

***Employ Procedures Ensuring Dates In The SUSTAIN Case Management System Are Accurate***

Our file review to determine the accuracy of dates in SUSTAIN revealed some filing and disposition dates were inaccurate and some filing dates could not be verified. Additionally, we found instances where the year on the docket number did not match the year the case was filed. It is imperative for SUSTAIN to capture accurate dates in order for the Judicial Branch to effectively manage its caseload.

To verify docketing data in SUSTAIN were accurate, we generated a random sample of 720 trial court case files to review. During our file review, we found some filing dates and disposition dates in the case management system were inaccurate. Of 720 filing dates checked, 75 cases (ten percent) were inaccurate when compared to the actual case files and another 74 cases (ten percent) could not be verified. However, upon further examination we found 96 percent of the filing dates and 95 percent of the disposition dates in SUSTAIN were within one week of the date recorded in the case file. The majority of the cases that could not be verified (88 percent) were from the District Courts and many were complaints filed by local police departments.

Court clerks reported police departments deliver complaints to the court and are not always timely with their submission. Some police departments, especially those that are not in the same town as the court, hold the complaints until they have enough to warrant a trip to the court. Clerks reported many courts do not date-stamp these complaints when they receive them. Although personnel at various court locations reported they have started to date-stamp complaints, we found this practice to be inconsistent among the court locations. The date court staff enter the complaint into SUSTAIN is considered the filing date. According to the clerks, complaints are usually entered into SUSTAIN the day they arrive at the court or the following day.

Of the 720 disposition dates checked during the file review, 89 cases (12 percent) did not match the date in the case file and an additional 11 dates (two percent) could not be verified. Logically, the disposition date should not pre-date the filing date because it would mean the case was disposed before it was filed in the court. In databases we received in September 2002, which contained 1,310,118 cases, we found 633 instances in the Superior Court where the disposition date pre-dates the filing date, as well as 7,557 instances in the District Court, 70 instances in the Probate Court, and 105 instances in the Family Division Pilot Project. Additionally, we found

instances where the disposition occurs in the future. According to our analysis, 18 cases in the Superior Court were disposed between 2003 and 2010, nine Probate Court cases were disposed between 2005 and 2011, five Family Division Pilot Project cases were disposed between 2003 and 2019, and 160 District Court cases were disposed between 2003 and 2019.

Docketing information is organized so the docket number includes the year the case was filed. During our analysis, we found 209 instances in the District Court, 607 instances in the Superior Court, 299 instances in the Probate Court, and 100 instances in the Family Division Pilot Project where the docket number year did not match the year the case was filed. Many of these instances occurred during the first few months after the start of a new calendar year. Data entry mistakes can be made when the filing date or the docket numbers are entered into SUSTAIN, especially in the first few months after the start of a new calendar year. Our analysis of the data revealed that in 102 instances in the Superior Court, 104 instances in the District Court, 111 instances in the Probate Court, and 31 instances in the Family Division Pilot Project, the mistakes were within the first three months of a new calendar year. According to personnel at the AOC, the year in the filing date should always match the year in the docket number.

The American Bar Association (ABA) states courts should have a system to furnish prompt and reliable information concerning the status of cases and case processing. According to the NCSC, the court's information and management reports must be accurate and allow the court to assess its performance compared to its standards and goals. Court managers should periodically audit the accuracy of data entry and supervisors should review audit findings with the staff.

Inaccurate data limits the court's ability to properly monitor caseflow management guidelines or produce management reports that could assist them in managing their caseload.

Recommendation:

**We recommend the Judicial Branch establish a Branch-wide policy to date-stamp all case filings including complaints from police departments. The Judicial Branch should also ensure this policy is consistently followed.**

**We also recommend the Judicial Branch ensure the new case management system has the ability to test data entered for reasonableness when compared to data in other fields specific to that case. The system should then be able to generate error messages to warn staff if a date appears illogical compared to other dates pertinent to the case. Error messages should appear when the filing date entered does not match the year in the system's internal calendar. Additionally, error messages should appear if the disposition date seems unreasonable compared to the filing date.**

**Finally, we recommend the Judicial Branch conduct periodic audits of docketing information to ensure it is accurate and reliable for management purposes.**

*Auditee Response:*

*The Judicial Branch agrees in part. Superior Courts and Probate Courts date-stamp all pleadings filed. District Court officials are reviewing the feasibility of requiring that all pleadings be date-stamped.*

*As called for in the request for proposals issued March 26, 2003, the new case management system will verify the reasonableness of dates entered and notify users of illogical dates.*

*Judicial Branch officials recognize the value of periodic audits of data reliability. Unfortunately, one of three internal auditor positions is presently vacant. The remaining auditors direct substantially all of their time to financial issues. Without funds necessary to fill the vacant court auditor position, it is unrealistic to expect the depleted audit group to expand their activities. If the Legislature appropriates funds for the statistician referred to in Observation No. 26, that person could assist auditors in monitoring data reliability by planning and producing reports of apparent data entry errors. The appropriation to the Judicial Branch has been insufficient to employ enough court data entry personnel to timely process pleadings, notices, and court orders. It would be unwise to allocate scarce clerical staff time to the review of data reliability reports; this task would only interfere with efforts to timely process current documents. The resultant delays would cause only pain and inconvenience to litigants.*

*The Observation purports to document errors in SUSTAIN docketing data. Often "illogical" dates are entered in an effort to adapt SUSTAIN to particular needs. For example, Probate Court personnel purposely enter old wills, as a group, in a single year in order to maintain a convenient alphabetic reference to those documents. In addition, some case files that did exist when SUSTAIN was introduced to the Probate Courts have been subsequently entered into SUSTAIN, without entering case history information from the date of case filing to the present. Many other Probate Court case types follow the same pattern. That is, old cases are brought forward and entered into SUSTAIN years after the original case filing. It would appear that the actual case filing date and the case filing date recorded in SUSTAIN did not agree. However, trained court personnel understand how we have used our obsolete case management system and recognize that although these dates may be illogical, there was a method behind the entry of those dates.*

*The Observation purports to document errors made by District Court clerical staff in the entry of docketing information into SUSTAIN. Many of these errors are easily explained. For example, the auditors report of 7,557 District Court disposition dates that pre-date the filing dates include many domestic violence orders and search warrant orders that were acted on by a judge outside of the usual hours of court operation. When the orders are actually entered into SUSTAIN one or two days later, it may appear that the court record includes docketing errors. That is not the case; instead, court staff in fact enter some cases after judicial activity has occurred.*

*AOC staff considered modifying SUSTAIN in order to address some of the anomalies noted in this Observation and decided not to invest resources in this area for three reasons:*

1. *We "capped" further development of SUSTAIN, in anticipation of a new docketing system;*

2. ***Severe shortages of trial court staff make it impossible to invest clerical staff in activities that contribute nothing to the dispositon of cases; and***

3. ***We lacked sufficient AOC staff time to support trial court staff in implementing and monitoring changes in data entry.***

***In light of the Judicial Branch dependence on an obsolete, DOS-based case management system, and in light of chronic staff shortages, and in light of the fact that most of the anomalies noted by the auditors are explainable, the performance of the trial courts in entering data into SUSTAIN is excellent.***

**Observation No. 8**

***Ensure The Supreme Court Has An Effective Electronic Case Management System To Properly Manage Its Caseload***

During the audit period, 5,036 appeals were filed at the Supreme Court. During this period the Supreme Court did not have an electronic case management system that could readily produce useful reports for management purposes. The Supreme Court tracked case information in Excel spreadsheets and Word documents. The Excel spreadsheets contained fields for the docket number, case name, filing date, court action, court appealed from, and closing date, as well as intermediate steps in the appellate process such as dates related to screening, ordering and filing the transcript, filing briefs, oral arguments, and decision. The tracking spreadsheets were reportedly created and maintained to track the file as it traveled through the Court. They were not used for tracking case processing time from filing to disposition and were not used for gathering statistical information. Supreme Court personnel reported some case information and formulas in the spreadsheets may be incomplete and inaccurate because staff entered data into the spreadsheets as time allowed. Our review of the data contained in these spreadsheets demonstrated some dates for intermediate steps in the appellate process were incomplete and other pertinent case information was also incomplete. In addition to the spreadsheets, the Court maintained docket cards in a Word document for each case filed. However these docket cards could not be used to compile statistical data. Court staff manually counted case information to compile statistical data.

The Supreme Court purchased a case management system during calendar year 2001. Phase I was delivered January 2002 as contracted. As of June 2003, phase II was still in the testing phase and was not capable of compiling docket statistics despite a contracted completion date of May 2002.

The ABA states courts should have a system to furnish prompt and reliable information concerning the status of cases and case processing. According to the NCSC, a court's information and management reports must be accurate and allow the court to assess its performance compared to its standards and goals. Insufficient data limits the court's ability to properly monitor caseflow management guidelines or produce management reports that could

assist them in managing their caseload. Additionally, court managers should periodically audit the accuracy of data entry and supervisors should review audit findings with the staff.

## Recommendation:

We recommend the Supreme Court ensure all relevant dates are captured and entered into the new case management system. We also recommend the Supreme Court conduct periodic audits of docketing information to ensure it is accurate, reliable, and serves management purposes.

### *Auditee Response:*

*The Judicial Branch agrees with the recommendation that all relevant dates be captured and entered into the Supreme Court's new case management system. In fact, the system does accomplish this result. Regarding periodic audits of Supreme Court docket information, the docket is reviewed monthly. While not an audit in the traditional sense, the monthly docket review does help ensure the accuracy and reliability of the docket data. Over the years, the Supreme Court's docket data has proved to be accurate and reliable. Nevertheless, if the audit division of the AOC had sufficient staff to perform periodic audits of docket data, the Supreme Court would welcome such audits as a further effort to ensure accuracy and reliability of docket data*

*The Observation is correct in stating that courts should have a system to furnish information concerning case status and processing. During the audit period, the Supreme Court had an information system. Individual case information has been kept on docket cards which through 2001 were on a word processing document and since then has been part of the first phase of the court's new case management system. From the docket information, various reports were compiled and distributed. These include screening reports, which told the justices what screening was outstanding; transcript tracking reports, which reported on the status of all outstanding transcripts; the fully briefed list, which provided a list of all the cases fully briefed and awaiting scheduling for oral argument; status lists kept of cases awaiting opinion both on a full court and individual justice basis and shown by age since submission of the case to the court, and finally, the list of cases pending reconsideration and rehearing. In addition, as mentioned above, the docket was monitored monthly in conjunction with the preparation of the oral argument calendar.*

*All of the above-mentioned reports are based on complete and accurate data entered in the court's docketing system. The management reports generated from that data have given the court staff and justices reliable and timely information on case status and processing. Moreover, since Volume 139 of the New Hampshire Reports, beginning on September 21, 1994, the Supreme Court has provided the public with aggregate statistics on the number of case filings and disposition and the manner of those dispositions. See e.g., 139 NH at xv. Also, for cases filed since January 1, 2002, the court has published the case status information on a quarterly basis as required by RSA 490:8-a, enacted by the 2001 Legislature.*

*Finally, this Observation mentions the delayed implementation of the Supreme Court's automated case management system. The first phase of the system was delivered on time. The enhancements of the second phase are what have been delayed. A subcontractor grossly underestimated the complexity and cost of enhancements to the core elements of the case management system. The decision of the Judicial Branch to delay delivery of enhancements is justified by the likelihood a very useful product will soon be delivered.*

**Observation No. 9**

***Ensure The New Case Management System Is Capable Of Tracking Statutory Compliance For Certain Probate Court And Family Division Cases***

The SUSTAIN case management system used by the courts does not fully support the information and reporting needs of the Probate Courts and the Family Division Pilot Project. Because of these shortcomings, the courts are unable to extract reliable and accurate information to monitor compliance with time standards established in statutes or caseflow management guidelines.

*Probate Courts*

The Probate Courts currently do not have the ability to track and monitor compliance with caseflow management guidelines. These guidelines provide timeframes for events occurring between filing and disposition. SUSTAIN is able to track events such as case filing dates, as well as dates for guardianship, fiduciary, or other appointments. However, it does not have the ability to adequately track intermediate hearings (known as scheduled events), which are entered into the scheduled event screen. The primary function of the screen is to produce hearing notices. Scheduled event information can be monitored on a case-by-case basis by reviewing case history or reviewing the file and checking to see if a hearing has been scheduled. It can also be accessed for a group of cases by using the browse function or calendar functions allowing the user to view scheduled hearings by date, time, court, or judge.

According to Judicial Branch personnel, information in the scheduled event screens cannot be used to monitor compliance with caseflow management guidelines. This is reportedly because SUSTAIN lacks the ability to differentiate whether the scheduled event has occurred or if it was continued to another date. SUSTAIN also reportedly does not have the ability to distinguish between multiple events, such as guardian and temporary guardian appointments, and corresponding hearings. For instance, if a guardian is appointed and the case requires a temporary guardian, the separate sets of hearings cannot be differentiated.

According to the Probate Court coordinator, registers use a case status report to ensure cases are not overlooked. The case status report identifies cases that have no future scheduled event or time standard, a date calculated by SUSTAIN to identify when annual reports, accounts, and other annual filings are due.

*Family Division Pilot Project*

The Family Division Pilot Project reportedly follows timelines established in statute for juvenile cases. However, it does not have the ability to monitor its juvenile caseload for compliance with timelines established in RSA 169-B and 169-D.

SUSTAIN is able to track case events such as case filing and disposition, as well as the date of the charge. It does not have the ability to adequately track dates for scheduled events such as arraignments, adjudicatory hearings, and dispositional hearings. These hearings are also entered into a "scheduled event screen" to generate notices.

The Family Division Pilot Project does not have the ability to check its entire caseload for compliance with statutory timeframes. According to the Family Division Pilot Project administrator, the pilot project has the ability to monitor compliance on a case-by-case basis by checking time standards entered when the case is filed. Time standards are triggered when motions or documents are filed and generate a date for when the next event should occur or document should be filed. The Family Division Pilot Project has the ability to monitor cases not meeting time standards through exception reporting, however it reportedly no longer runs exception reports due to lack of staffing. The Family Division Pilot Project also checks cases for non-compliance with statutory timeframes by examining how many cases have filed continuances or waivers of time standards for speedy trial and adjudicatory hearings.

According to the NCSC's *Caseflow Management*, successful caseflow management requires courts continually measure their actual performance against their goals. According to the ABA's *Standards Relating to Trial Courts*, timely disposition standards are important management tools for evaluating court performance, as well as ultimate and measurable objectives for court system planning. Additionally, the ABA states courts should have a system to furnish prompt and reliable information concerning the status of cases and case processing as part of a delay reduction program. Using this information, the court should continually monitor and report caseflow results.

Without a method to adequately track case events, Family Division Pilot Project management cannot monitor the court's juvenile caseload for compliance with statutory requirements. Without a method to adequately track case events, Probate Court management cannot determine compliance with case processing timelines nor can it monitor the court's caseload for compliance with statutory requirements. As a result, the Probate Courts and the Family Division Pilot Project risk failing to meet statutory requirements for these cases. Additionally, without monitoring compliance with goals, the Probate Courts and the Family Division Pilot Project cannot institute corrective measures to ensure compliance with statutory requirements.

Recommendations:

**We recommend the Probate Court ensure the new case management system currently being acquired by the Judicial Branch has the ability to capture intermediate case events to allow it to monitor compliance with its case management timelines. Likewise, we also recommend the Family Division Pilot Project ensure the new case management system has**

**the ability to capture intermediate case events to allow it to monitor compliance with RSAs 169-B and 169-D.**

*Auditee Response:*

***The Judicial Branch agrees. On March 26, 2003, the Judicial Branch issued a request for proposals for a trial court case management system. Included with the request was Appendix A, which detailed the functional and non-functional requirements of the system. Section 4.3 of that appendix lists case monitoring requirements. Those requirements will allow the Probate Court to track intermediate hearings and to distinguish between different types of events and the Family Division Pilot Project to monitor its juvenile caseload for compliance with statutory timelines. Specifically, requirement 4.3.60 establishes that the system must have the ability to create and assign time standards at event and case levels. The response to the request for proposals of the company with which the Judicial Branch is negotiating a final contract for the case management system states that its system will meet this requirement.***

**Observation No. 10**

*Review Internet Access*

**The Judicial Branch should review how the Internet is accessed from its trial court locations and the security of its Internet connections and equipment.**

The Branch provides Internet access only to personnel physically located at the Supreme Court and AOC buildings on Noble Drive in Concord. Employees located in the AOC and Supreme Court receive Internet access via the New Hampshire Statewide Unified Network. The connection is a T1 line.

The Branch provides no Internet access to court employees located outside the Supreme Court and AOC. However, ten of 57 judges and marital masters and four of 39 clerks and registers responding to the survey question stated they use their own personal accounts to access the Internet from the court for court purposes. One clerk we spoke to dials into his personal Internet service provider from court and sees access to the Internet as a necessity because he believes his court should keep up with recent events and court practices in other states. The clerk also reported being asked by the judges to look up information on the Internet. As noted in Observation No. 4, the Branch has no Internet use policy despite use by court personnel.

Reportedly, the Supreme Court has not decided whether employees should be given Internet access or how it should be provided. According to the IT manager the Branch has no plans to offer additional employees Internet access because the State Police Online Telecommunications System used by the trial court locations as its WAN is owned and managed by the State Police and federal security requirements reportedly prohibit Internet access over the State Police network.

Recommendation:

**We recommend the Judicial Branch formally determine whether the Internet is necessary for its employees to carry out their assigned duties. The Branch should decide which**

**employees need Internet access to fulfill their assigned duties, and if necessary, how to deploy secure Internet access to those employees. If the Branch decides its employees do not need Internet access, it should develop policies to prohibit the use of personal Internet accounts from the courts.**

*Auditee Response:*

*The Judicial Branch agrees. Internet resources are increasingly valuable to judges and court staff. The AOC expects to ask the Court Technology Committee to recommend criteria for determining which judges and employees should have access to the Internet.*

*The Legislature has not provided sufficient funds to support trial court Internet access and the related requisite firewalls. The Judicial Branch has relied on the SPOTS Network to provide e-mail functionality to all Judicial Branch employees. Once we have identified those judges and employees who should have Internet access, the Judicial Branch expects to determine the cost of providing and supporting secure Internet access at appropriate court sites. The Judicial Branch expects to make a request for a general fund appropriation to implement this recommendation.*

*The AOC internal auditor expects to propose procedures by which auditors may determine whether judges and employees are using unauthorized modems or inappropriately accessing the Internet.*

STATE OF NEW HAMPSHIRE
JUDICIAL BRANCH ADMINISTRATION

## ADMINISTRATIVE FUNCTIONS

The Administrative Office of the Courts (AOC) performs centralized functions that are essential to all courts and functions that depend on specialized knowledge or expertise. The AOC provides accounting, auditing, personnel management, information technology management, and fiscal management.

The AOC was the only administrative office in the Judicial Branch prior to Supreme Court Administrative Order 90-02 in 1990, which created the Administrative Council and established administrative judge positions for the Supreme, Probate, and District Courts. Supreme Court Rule 54, which superseded Administrative Order 90-02 in 1992, gives trial court administrative judges broad responsibilities concerning the management of judicial and non-judicial personnel, as well as budgeting and caseflow management. The offices of the administrative judges assumed certain responsibilities from the AOC, and some of the AOC's court services representatives, who had previously served as generalists in trial court functions and undertook special projects within the trial courts, were transferred to those offices. As a result, responsibilities such as developing and maintaining weighted caseload systems and coordinating education and training are shared between the trial court administrative judge's offices and the AOC.

The Administrative Council, which consists of the administrative judges, a Supreme Court associate justice, and the director of the AOC, serves as a forum for trial court management to communicate with each other and with the Supreme Court. The Administrative Council also acts as an advisor to the Supreme Court, relying on the theory that issues of concern will "bubble up" to the Supreme Court through the Council. According to one administrative judge, administrative responsibilities frequently shift among the Administrative Council, the administrative judges, and the Supreme Court.

### *Superior Court Administration*

The Chief Justice of the Superior Court currently serves as the Superior Court's administrative judge. The Chief Justice's staff includes an executive assistant, two secretaries, a receptionist, a court coordinator, and the secretary to the Sentence Review Division, who also participates in projects for the Chief Justice. Two floating court monitors are also assigned to the office, but work at the various court locations. The Office of the Chief Justice (also known as the Superior Court Center) performs other administrative functions in addition to those specified in Supreme Court Rule 54, which include coordinating judicial education for the Superior Court, scheduling floating court monitors and court reporters, and certifying court reporters and transcriptionists.

### *District Court Administration*

The District Court administrative judge's office staff includes an office administrator, a secretary, a transcript coordinator, and six floating clerks that fill in at court locations. In addition to carrying out the duties of the administrative judge specified in Supreme Court Rule 54, the District Court administrative judge's office: 1) develops continuing education programs for District Court judges and staff; 2) develops weighted caseload systems for the District Court; 3)

coordinates transcription for District and Probate Courts, and the Family Division Pilot Project; 4) manages grants; and 5) performs other administrative functions specific to the District Courts.

District Court regional administrators supervise all activities of District Court clerks. One District Court regional administrator supervises special projects for the District Courts and oversees four court locations. Another regional administrator supervises 20 court locations and also serves as the Branch's security manager. The third regional administrator oversees 12 court locations. District Court regional administrators also assist the administrative judge with administrative duties such as case processing studies, management reviews, and human resources management.

*Probate Court Administration*

The Probate Court administrative judge's office staff includes an executive secretary, staff attorney, and the Probate Court administrative coordinator. A floating court assistant position in the office has been left vacant. The office also utilizes the deputy clerk of the Rockingham Probate Court. In addition to carrying out the administrative judge's duties stipulated by Supreme Court Rule 54, the office also monitors national probate court trends, coordinates Probate Court-specific education for judges and staff, develops procedures and rules manuals for the Probate Court, and performs other administrative functions specific to the Probate Court.

The Probate Court administrative coordinator works at the AOC. The administrative coordinator previously served as a court services representative on activities related to all trial courts, but was transferred to the Probate Courts with the advent of the administrative judge's office. The administrative judge believed the administrative coordinator could be part of AOC decision-making by remaining at the AOC. The administrative coordinator organizes Probate Court activities, conducts special projects for the Probate Court administrative judge, and handles Probate Court personnel issues.

*Family Division Pilot Project Administration*

The Family Division Pilot Project has two supervisory judges and an administrator accountable to the AOC director. The administrator is the top administrative official of the Family Division Pilot Project. In addition, a Family Division Pilot Project coordinator is assigned to each county in which the Family Division Pilot Project operates to oversee efficient and timely case processing, monitor customer service, and provide technical assistance. The Family Division Pilot Project does not maintain its own administrative office; its administrator is located at the AOC.

The remainder of this chapter presents our observations related to administrative functions.

**Observation No. 11**

***Establish The AOC And Define Its Responsibilities In Statute***

No statute or court rule establishes the AOC or defines its responsibilities. As a result, the trial court administrative offices have increasingly assumed responsibility for some aspects of certain administrative functions from the AOC, such as personnel management, judicial and non-judicial education, grant administration, and private sector transcriptionist certification. This creates inefficiency and ambiguity regarding administrative responsibility.

The Supreme Court's long-range planning task force, which was established by Supreme Court Order in 1989, noted clear authority is necessary for the AOC to be effective. According to *The Report of the New Hampshire Supreme Court Long-Range Planning Task Force*:

> The specific duties and responsibilities of the AOC and any other administrative function within the Judicial Branch must be clearly articulated and effectively communicated to all persons who are affected by or have contact with the administrative and support services group. Unless both the administrators and those served by the administrators have a clear understanding of the respective roles of each, the likelihood of misunderstanding and a consequent impairment of effective working relationships is increased.

According to the American Bar Association's (ABA) *Standards Relating to Court Organization*, clearly established lines of administrative authority should exist, and the duties and responsibilities of court administrators should be specified. New Hampshire is presently the only New England state where the court's administrative office is not established in statute. Further, responsibilities of the court administrator or court administrative office are also specified in statute in Rhode Island, Connecticut, Maine, and Massachusetts. In Vermont, the court administrator's responsibilities are established by court order.

Recommendation:

**We recommend the Legislature consider formally establishing the AOC and defining its responsibilities in statute.**

*Auditee Response:*

*The Judicial Branch agrees in part. The Supreme Court established the Administrative Office of the Courts. It recognizes the value of more clearly defining the responsibilities and authority of the Administrative Office of the Courts. The Supreme Court will promulgate a rule that more clearly defines the responsibility and authority of the Administrative Office of the Courts.*

**Observation No. 12**

***Develop And Implement A Strategic Planning Process***

The Judicial Branch is not currently using an up-to-date strategic plan to assist with its operations or to prioritize its efforts. The last strategic plan was issued in 1990 when the Supreme Court commissioned a long-range planning task force to recommend

a vision for the Branch. Since 1990, no formal Branch-wide planning has been conducted. Two studies conducted by the National Center for State Courts (NCSC), one in March 1999 related to information technology planning and the other in March 2002 concerning the Supreme Court's operations, commented on the need for strategic planning.

Strategic plans must be continually reviewed and updated to reflect the current internal and external environment to remain effective. A monograph produced by the Colorado Center for Public Policy Studies, with support of the State Justice Institute, cites the following benefits of court strategic planning: 1) improves performance and accountability; 2) provides a rationale for making budget, operational, and other management decisions; 3) helps to identify and support the need for additional resources; 4) initiates internal and external dialogue; 5) identifies long-term priorities; 6) provides focus; 7) establishes a common understanding of issues among judges and other court officials and enables them to work towards common goals; 8) enhances relationships with external parties, community groups, and the public; 9) educates external parties about the court system; and 10) involves many internal people in determining the court's long-term direction and in making organizational improvements.

Without a strategic planning process, Branch operations may not be as efficient and effective as possible. In the absence of clearly articulated goals, and a process to unify and balance goals and resources, it is unclear how the Branch has prioritized its efforts.

Recommendation:

**We recommend the Branch implement a strategic planning process resulting in comprehensive, long- and short-term plans. In addition, the Branch should take steps to continually update the plans on a regular basis.**

*Auditee Response*

*The Judicial Branch agrees. Judicial Branch officials recognize the value of the strategic planning process. In fact, in 1990, the Supreme Court adopted a comprehensive Judicial Branch strategic plan and since then judges and court officials have worked diligently to implement the provisions of that plan.*

*Judicial Branch officials have discussed with various individuals outside the Judicial Branch the prospect of leading a Judicial Branch planning process. None has been able to commit the time necessary to ensure the success of a project of this magnitude, on a voluntary basis.*

*Judicial Branch officials are discussing funding, staffing, and leadership issues related to a Judicial Branch planning process with representatives of a private foundation. Those discussions will continue.*

*A comprehensive and useful Judicial Branch strategic plan will depend on the commitment of Legislative and Executive Branch leaders to participate in the planning process and cooperate in the execution of a plan, especially if the plan involves statutory changes and additional funding.*

*While not involving comprehensive planning, there have been efforts during the audit period at long range planning in specific areas. An example of this is the "Red Jacket" conference on the appellate system organized by the New Hampshire Bar Association in 1999, which was followed by a Legislative study commission on Appellate System Reform. See Laws of 2001, Chapter 159. Other examples include the Pro Se Task Force and a public access committee which has studied issues regarding access to Judicial Branch information in the electronic age; the District Court Juvenile Justice Task Force of 1996, involving Legislators, members of the public, Executive Branch agencies, and judges and employees of the District Courts; the Court Improvement Project conducted by the District and Probate Courts to plan and improve practices in child abuse, neglect, and termination of parental rights cases; participation in the "9-11 Summit: Courts in the Aftermath of September 11," including the planning and training related to anti-terrorism; and a 1997 "Red Jacket" planning conference on "Family Court: Criteria for Evaluation."*

**Observation No. 13**

***Develop A Continuity And Contingency Plan***

The Judicial Branch lacks a continuity and contingency plan that would enable it to quickly recover from the effects of damage caused by unexpected and undesirable events. Judicial Branch management initiated but has not completed a continuity and contingency planning process during 2003. However, the Branch operated without a continuity and contingency plan during the audit period.

The development of a continuity and contingency plan identifies essential court functions and establishes backup operation procedures. In general, the primary objectives of a continuity and contingency plan are to:

- provide the Judicial Branch with a tested process which, when executed, will permit an efficient, timely resumption of interrupted operations;
- ensure the continuity of the Judicial Branch's functions;
- minimize the inconvenience and potential disruption to citizens who must access the courts; and
- minimize the negative impact to the Judicial Branch's public image.

The most important task an organization can undertake to mitigate damage from unforeseen circumstances is to plan ahead. Continuity and contingency planning is especially important for courts because court operations are essential to an orderly society. In addition, because statutes and court rules establish time limits for many court actions, it is particularly important to eliminate delay caused by disasters or other interruptions in normal operations. According to the National Association for Court Management's *Disaster Recovery Planning for Courts: A Guide to Business Continuity Planning*, a court with a continuity and contingency plan is more likely to serve its community through a crisis, and will recover its information systems and resume its critical services faster than a court caught unprepared.

Recommendation:

**The Judicial Branch should complete and implement its continuity and contingency plan as soon as possible. Staff should be trained to implement those aspects of the plan for which they are responsible, the plan should be tested and rehearsed, and procedures should be established to ensure the plan is updated annually. Judicial Branch management should determine if one continuity and contingency plan will cover issues specific to court locations, or if each court location will produce a supporting plan that addresses location-specific issues.**

*Auditee Response:*

*The Judicial Branch agrees in part. The Judicial Branch has in place emergency and contingency plans related to circumstances such as Hostage Taking, Natural Disasters, Bomb Threats, Power/Utility Failures, and Fire and Medical Emergencies. Those procedures are set out in the New Hampshire Judicial Branch Court Security Officer Manual which has been distributed to all Judicial Branch court facilities. In addition, a Desk Side Quick-Reference Guide to emergencies has been distributed to all judges and employees. Finally, every court site has a written court evacuation plan.*

*An associate justice of the Supreme Court attended a conference on "Bio-Terrorism, Biological Attack and the Courts" on January 17-29, 2002 hosted by the Einstein Institute for Science, Health and the Courts and the Lawrence Livermore National Laboratory. That conference led to development of enhanced safety precautions at the Supreme Court and the AOC and was the impetus for the training that began in June 2002, as discussed below.*

*Beginning in June 2002, the Judicial Branch, in coordination with the New Hampshire Emergency Management Office provided Terrorism Response Training to all court employees at eight court sites. The training included definitions of types of terrorism, safety precautions, and management control of terrorist incidents.*

*An associate justice of the Supreme Court and the AOC security manager attended the national conference "9-11 Summit: Courts in the Aftermath of September 11" on September 25-27, 2002, to examine best practices in court planning and response to terrorist acts. Based in part on information learned at that conference, the AOC is presently leading a committee of representatives of each level of court in the development of a Judicial Branch Business Continuity Plan that will be more comprehensive and less specific than the contingency plans already developed. HB 217 relative to emergency powers of the Supreme Court, was introduced in the 2003 Legislative session, sponsored by Representative O'Neil at the request of County Attorney James Reams, and retained in the House Judiciary Committee. If this bill becomes law, it will be helpful to this effort.*

*Chapter 257 of the Laws of 2002 creates the Governor's Advisory Council on Emergency Preparedness and Security. That statute excludes Judicial Branch officials from participation; the Judicial Branch expects to request that the Judicial Branch of state government be permitted to participate in the Governor's Advisory Council.*

**Observation No. 14**

***Repeal Statutes Authorizing Payments For Commuting To Work***

Supreme Court and Superior Court justices, marital masters, and court reporters receive payments for expenses incurred while traveling to and from work, primarily in the form of private vehicle mileage. From our analysis of Judicial Branch payroll information for SFY 2002, it appears one Superior Court justice's payments were inappropriately processed as non-taxable, and six marital masters received payments for travel to and from work who are specifically prohibited by court rule from receiving such payments. In addition, we question the sensibility of laws allowing Judicial Branch employees to receive payment for travel between their home and primary place of business.

Supreme Court justices are entitled to actual personal expenses and reimbursements pursuant to RSA 490:18 and Superior Court Justices are entitled to the same pursuant to RSA 491:6-a. Supreme Court justices have been reimbursed for travel expenses since 1901; Superior Court justices since 1913. Court reporters are allowed actual expense reimbursement pursuant to RSA 519:29 as well as Superior Court Administrative Rule 3-10. Since 1911, RSA 519:29 has authorized court reporters to receive reimbursement for travel expenses. According to Superior Court Administrative Rule 12-15, marital masters not on circuit are not entitled to reimbursement for mileage not associated with an overnight stay on court business, although marital masters who must travel to various courthouses (i.e., those who are "on circuit") are entitled to mileage reimbursement.

According to federal Internal Revenue Service (IRS) regulation 26 CFR 1.62-2, pay for travel from an employee's home to the employee's primary place of business (i.e., regular work location) must be included in the employee's gross income and reported on IRS Form W-2, and is subject to withholding and payment of employment taxes. Pay for travel to locations other than an employee's primary place of business can be excluded from the employee's gross income and is exempt from IRS Form W-2 reporting, withholding, and employment taxes. The State may be liable for financial penalties if the Judicial Branch does not comply with IRS regulations.

<u>*Superior Court Travel Pay*</u>

Supreme Court Administrative Order 93-2 informs Superior Court justices entitled to reimbursement for expenses pursuant to RSA 491:6-a that mileage payments for travel to a principal place of business must be included in gross income for tax purposes, and mileage reimbursement for travel away from that principal location need not be included in gross income. The order directs Superior Court justices to annually certify their principal place of business within the meaning of the IRS code to the manager of operations at the AOC, although criteria for determining a principal place of business are not included. Similarly, Supreme Court Administrative Order 93-3 informs court reporters entitled to reimbursement for expenses of the tax status of travel payments. Although no administrative order pertains to marital master's mileage reimbursements, a memorandum dated March 11, 2003 from the Chief Justice of the Superior Court reminds Superior Court justices, court reporters, and marital masters of the taxability of mileage reimbursements and requires them to annually certify their principal place of business.

Our analysis of Judicial Branch payroll information for SFY 2002 showed: 1) 29 Superior Court justices received a total of $127,850 in travel payments; $89,404 was reported as taxable payments for commuting mileage and $38,446 was reported as non-taxable reimbursements; 2) 19 court reporters received a total of $47,822 in travel payments; $36,181 was taxable payments for commuting mileage and $11,641 was non-taxable reimbursements; and 3) ten marital masters received $33,704 in travel payments; $13,584 was taxable payments for commuting mileage and $20,120 was non-taxable reimbursements. It is important to note we do not question non-taxable mileage reimbursements made for work-related activities, such as meetings.

Although most Superior Court justices, marital masters, and court reporters appeared to receive travel pay in accordance with IRS regulation 26 CFR 1.62-2, one Superior Court justice was not taxed on $1,722 of mileage payments during SFY 2002, although the justice was scheduled to hear cases exclusively at his declared principal place of business. In addition, while Superior Court Administrative Rule 12-15 prohibits marital masters not on circuit from receiving reimbursement for mileage not associated with an overnight stay on court business, six marital masters not on circuit received $13,584 in taxable payments for travel between their home and primary place of business during SFY 2002, in apparent violation of Superior Court Administrative Rule 12-15.

*Supreme Court Travel Pay*

Some Supreme Court justices received mileage payments for travel between their residence and Concord, none of which was taxed. According to a June 1, 1992 memorandum from the Supreme Court to the Office of Legislative Budget Assistant, Audit Division, the principal place of business for most Supreme Court justices is their residence. Supreme Court justices do not annually certify their primary place of business.

*Travel Reimbursement Statutes*

Statutes allowing Supreme Court justices, Superior Court justices, and court reporters reimbursement for travel between home and work date back to the early 1900s, and may be the result of the modes of transportation at the time and the historical practice of rotating Superior Court justices and court reporters among part-time county court locations. However, during 2002, only two Superior Court justices, three marital masters, and one court reporter were on circuit and did not have a primary place of business. Also, the practice of reimbursing certain judges and staff for commuting to work may be improper given the lack of any evidence showing benefit to the State for doing so, as well as the State's current fiscal climate. During SFY 2002, taxable commuting payments made pursuant to RSAs 490:18, 491:6-a, and 519:29 totaled $139,169, not including the portion of travel reimbursements paid to Supreme Court justices that were for commuting from their home to the Supreme Court building in Concord.

**Recommendation:**

**We recommend the Legislature consider repealing RSAs 490:18, 491:6-a, and 519:29. We also recommend the Judicial Branch: 1) ensure marital masters are reimbursed for travel expenses in accordance with Administrative Rule 12-15; 2) review its policies regarding**

**mileage payments for Superior Court justices and court reporters, and include criteria for determining principal place of business; 3) ensure Superior Court justices and all other eligible personnel are reimbursed for travel expenses appropriately, and periodically audit travel reimbursements to ensure compliance with IRS regulations; and 4) review its policy concerning Supreme Court justices' reimbursement for travel expenses and require Supreme Court justices to annually certify their primary place of business.**

*Auditee Response:*

*Of the five areas encompassed within the scope of the audit, only one is even possibly relevant for this Observation. That is the second scope area, which states as follows:*

> *An examination of administrative functions performed by the AOC and by the administrative offices of the trial courts.*

*The subject of mileage payments to judges, marital masters, and court reporters was never contemplated as within the scope of the audit in the descriptions of this audit scope area written by both the LBA audit division and the court as part of the negotiation process, which led to this audit. Therefore, this subject is beyond the scope of the audit.*

*In making mileage payments, the Judicial Branch complies with RSA 490:18, RSA 491:6-a, and RSA 519:29. It also complies with IRS regulations. The tax consequences of mileage payments vary depending on the circumstances of the recipient of the payments. It is the responsibility of each recipient of mileage payments to comply with federal income tax law.*

*The audit Observation does make reference to the taxability of mileage payments to one Superior Court judge and to the payment of commuting mileage to six marital masters. While beyond the scope of this audit, these would be appropriate subjects of a financial audit, and, therefore, the Judicial Branch shall respond to these issues.*

*As mentioned in the Observation, Superior Court justices annually certify to the manager of operations at the AOC their principal place of business within the meaning of the Internal Revenue Code. In the case of the Superior Court judge whose commuting mileage was reported as non-taxable when it should have been reported as taxable, the judge was reassigned to a new location shortly after the judge's annual certification. Through oversight, the judge did not report the change to the manager of operations at the AOC; therefore, from the time of the reassignment, the judge's mileage was reported as non-taxable. A corrected W-2 form is being filed with the IRS and the judge is being notified. In addition, the Chief Justice of the Superior Court has issued a memorandum to all judges notifying them that should their permanent assignment be changed during the course of the year, they are to file a modified form with the AOC. Upon the change of a judge's permanent assignment, the Chief Justice will issue to the judge whose assignment is changed the form which the judge must submit to the AOC.*

*Regarding the six marital masters who received commuting mileage even though not on circuit, the Judicial Branch admits that this was contrary to Superior Court Administrative Rule 12-15. These payments were an administrative oversight and have been discontinued.*

**Observation No. 15**

***Examine Revolving And Operating Fund Issues***

A Supreme Court administrative action established various revolving funds at each court location in 1984 "…for the sole purpose of paying postage, witness fees, and miscellaneous expenses under $100 and creating a change fund." The amount in each fund was reviewed by the courts in December 2002 and is set at a total of $64,835 for all courts. Each court maintains an operating checking account for the deposit of all receipts. As of June 30, 2002, $3,001,024 resided in these accounts. These accounts are used not only for revolving fund activity, but also as the primary depository accounts for various receipts (e.g., bail, transcripts, fines, and restitution).

During our review of the revolving funds we noted the following issues:

<u>*Supreme Court Revolving Fund*</u>

1) The Supreme Court has a revolving fund account maintained at $7,950. Our review found this account is not used for the purposes identified in the court's policy. Reportedly the account is for emergencies in the event a check is needed quickly so there would be no need to wait for a check from State Treasury. Our review of the check register revealed the account is used mostly to pay travel expenses. From our inquiries, checks from the State Treasury can usually be obtained the next business day. No criteria have been established for having a check issued from this account, whereas reimbursement from the Treasury requires preparing an expense voucher.

2) Funds from this account were used to establish another revolving fund account that supports the Greenbook Project, a domestic violence program, with no formal authorization. The Judicial Branch has no policies or procedures for establishing new accounts.

3) The account is not reconciled monthly and has gone unreconciled for as long as six months. The employee performing the reconciliation of the account is not aware of when reimbursements are requested for the account, thereby providing a risk deposits for the account could get lost and/or cashed inappropriately without being detected.

The Branch exposes itself to increased risk of loss or theft when maintaining separate checking accounts used to process payments outside its normal controls. Also, added clerical duties are needed to administer separate checking accounts (e.g., issuing checks, requesting reimbursements, reconciling accounts, and maintaining the check register). Using revolving funds for purposes other than those identified in policy may also put employees in compromising situations when allowable uses of the accounts are not clearly identified and communicated. Accordingly, the Branch should ensure effective internal controls are in place over the account or alternatively consider whether the account continues to be necessary if checks can be obtained from the State Treasury through the normal payment process within one business day.

*Trial Court Revolving Funds*

1) According to policy, revolving funds in the 65 trial courts range from $150 to $4,100. However, the actual amount held in the trial courts' operating checking accounts is significantly higher because the accounts are also used to deposit receipts related to bail, transcripts, restitution, escrow funds, fines due to towns, and civil judgments. There is activity in the accounts that may best be accounted for centrally by the AOC rather than by 65 separate locations. Centralized accounting may reduce risk of loss and be a more efficient mechanism of accounting for these transactions. For example, RSA 597:3 states that bail "shall be held for the use of the state until the clerk of the superior court where the bail is deposited shall certify that no liability exists." These funds may be more appropriately remitted to the State Treasurer and accounted for by the AOC in the State's accounting system.

2) Our review of account activity indicated the courts occasionally overdraw the original revolving fund balance for court purchases. As a result, money may not be available when it must be returned. The practice of overdrawing the revolving fund balance for court purchases has been acceptable to Branch management as long as the court's requests for reimbursements are at least monthly. However, Branch policy provides that the courts' expense reports should be submitted weekly to the AOC for reimbursement.

Recommendation:

**We recommend the Branch establish, implement, and monitor effective internal controls over all revolving fund accounts. Policies should be specific as to allowable uses of the funds and should be communicated to all employees with responsibilities in this area.**

***Supreme Court Revolving Fund***

**We recommend the Supreme Court consider closing its revolving fund account as checks can generally be received from the State Treasury within one business day. If the Court determines the fund continues to be necessary, we recommend it:**

- **review the authorized amount in the fund to determine whether $7,950 continues to be appropriate;**
- **adhere to its established policy for revolving fund uses or develop and implement a policy outlining other allowable uses; and**
- **establish, implement and monitor effective internal controls.**

***Trial Court Revolving Funds***

**We recommend the Branch examine its current practice of having the custody of and accounting for millions of dollars decentralized in physical locations across the State. While it is recognized that courts need operating accounts, it is likely that some of the activity would be better controlled centrally.**

*Auditee Response:*

***This Observation is outside the scope of the audit. Although the second area in the audit scope ("an examination of administrative functions performed by the AOC and by the administrative offices of the trial courts.") appears to encompass these issues, the purpose of this audit area was to determine whether the AOC and the administrative offices of the trial courts perform duplicate or overlapping functions. The gist of this scope area was to find and eliminate wasteful duplication of effort and to increase efficiency in the Judicial Branch.***

***Nonetheless, the Judicial Branch will review past use of the Supreme Court Revolving Fund and determine how much money should be held in that account. The Judicial Branch will also consider adopting policies that would limit payments from the Supreme Court Revolving Fund and cause some payments to be made through the State Treasury.***

***In regards to trial court revolving funds, each court has authority to maintain a revolving fund <u>and</u> an operating account. The authority for the operating account is contained in the New Hampshire Judicial Branch Financial Policy Manual at page 33. The revolving fund is maintained <u>in</u> the operating account, as opposed to a separate account, at each court location, for the sake of efficiency. This is consistent with RSA 597:3 which provides that "all money deposited for bail shall be held for the <u>use of the state</u> until the clerk of the superior court where the bail is posted shall certify that no liability exists against the bail." (emphasis added)***

***Occasionally, when a clerk or register fails to timely submit a Request for Reimbursement, a trial court revolving fund may carry a negative balance. The float from the court's transfer of revenue to the State Treasury prevents an overdraft. A negative balance in the revolving fund has never prevented the timely return of bail. The Judicial Branch expects to review the locations of depository accounts and accounting practices related to those accounts.***

***Centralization of bail funds at the AOC would not improve the administration of justice. Often the rightful owner demands return of bail funds in person and on the day the underlying case is resolved. Involvement of the AOC and the State Treasurer would delay return of funds. The Judicial Branch expects to reassess internal controls and to consider whether some activity should be controlled centrally.***

**Observation No. 16**

***Request Administrative Services Resume Independent Review Of Judicial Branch Expenditures***

Judicial Branch expenditures do not receive formal independent review or pre-audit prior to payments being made. The Judicial Branch's chief accountant reviews and approves general expenditure transactions. RSA 21-I:18 (j) exempts the Judicial Branch from the pre-audit function performed by the Executive Branch.

The Department of Administrative Services (DAS), Bureau of Accounts performs a pre-audit function on all payment vouchers for both the Executive and Legislative Branches prior to payments being made. Although RSA 21-I:18 (c) exempts the Legislature from pre-audit by the Bureau of Accounts, it has elected to utilize an independent review of its expenditures.

The Judicial Branch participated in the Bureau of Accounts' pre-audit service until 1993, when insufficient staff within the bureau prevented it from continuing to process all expenditures for all three branches of State government. Both the former and current fiscal managers for the Judicial Branch agreed utilizing the Bureau of Accounts pre-audit function would be a good idea. The independent pre-audit function would provide:

- expenditures are charged to appropriate budget codes;
- funds are available within program administrative units (PAU);
- proper amounts are paid;
- expenditures are committed in accordance with established policies/guidelines; and
- the Judicial Branch properly authorized the expenditures.

**Recommendation:**

**We recommend the Judicial Branch request the DAS, Bureau of Accounts resume pre-audit of its expenditures. The Judicial Branch should provide the Bureau of Accounts with its policies and procedures to allow the auditors performing this function to effectively monitor the transactions for compliance. The Judicial Branch should also request the Bureau of Accounts provide periodic reporting of the number of errors discovered and the nature of such errors.**

*Auditee Response:*

*The Judicial Branch agrees with the auditor's report that the Judicial Branch participated in the Bureau of Accounts' pre-audit service until the Bureau discontinued the service, on account of insufficient staff.*

*The Judicial Branch expects to ask the Bureau of Accounts to resume pre-auditing of Judicial Branch expenditures, on a trial basis. This task will increase the Administrative Office of the Courts' accounting department workload.*

*After a reasonable trial period, the Judicial Branch expects to conduct a cost benefit analysis of the pre-audit activity performed by the Bureau of Accounts.*

**Observation No. 17**

***Re-Evaluate The Duties Of The New Hampshire Court Accreditation Commission And Implement Comprehensive Standards For Court Facilities***

RSA 490:5-a establishes the New Hampshire Court Accreditation Commission (Commission). RSA 490:5-c outlines the duties of the Commission, which include prescribing minimum standards for court facilities, regularly visiting and inspecting every trial court, and reporting its findings and recommendations to the Supreme Court annually. In addition, RSA 490:5-d requires the Commission to rate each court's level of accreditation.

The Commission approved "General Guidelines and Minimum Design Standards for New Hampshire Court Facilities" in 1991, a five-page document that still serves as the Judicial

Branch's facility standards. However, the Commission does not regularly visit the trial courts to inspect facilities, nor does it rate the accreditation of each court or report its findings and recommendations to the Supreme Court annually. Instead, the court services representative who coordinates facilities for the AOC regularly visits the trial courts and prepares an annual "Facilities Needs Plan" that communicates the Branch's priorities for facility improvements. The "Facilities Needs Plan" is submitted to the Commission for its approval. The court services representative reported the current procedure for identifying facility needs is adequate.

The AOC began developing comprehensive court facility standards during the audit period, though the standards have not been finalized or approved. The draft standards are based on the NCSC's *The Courthouse: A Planning and Design Guide for Court Facilities*, and include provisions for ensuring the federal Americans with Disabilities Act requirements and special information technology considerations are incorporated into facilities. The draft standards are intended to be used to evaluate both existing and proposed facilities, as well as during the design of new facilities.

According to the ABA's *Standards Relating to Court Organization*, the administrative office of the courts should develop and promulgate facility standards.

**Recommendation:**

**We recommend the AOC complete and implement comprehensive standards for court facilities. In addition, the Judicial Branch should determine whether the New Hampshire Court Accreditation Commission provides value to the Branch as it is currently established by statute. If so, the Branch should ensure the Commission fulfills its statutory duties. If not, the Branch should request statutory change to remove the Commission or amend its duties.**

*Auditee Response:*

*This audit Observation is beyond the scope of the audit. The Court Accreditation Commission is created by RSA 490:5-a et seq. It contains representatives of all three branches of government. The Supreme Court is the supervisory authority of the commission pursuant to RSA 490:5-c. Nowhere in the governing statute is the AOC mentioned or is administrative responsibility given to the AOC or the administrative offices of the trial courts.*

*Were this Observation within the scope of the audit, the Judicial Branch would agree with the recommendation. The AOC will attempt to complete the work that has begun on developing new comprehensive court facility standards. The person at the AOC who works on court facilities issues spends a portion of his time as the court's statistician, which Observation 26 recommends be a full-time position, among other duties. Thus, the continuation of the developments of court facility standards will be done on a time available basis. In addition, the Supreme Court, in conjunction with the Court Accreditation Commission, will examine the duties of the Commission and determine if any statutory changes should be requested in the Commission's enabling legislation which is over thirty-years-old and has not been amended in almost fifteen years.*

Observation No. 18

***Legislature Should Consider Discontinuing Budget Reduction Practice***

**Budget footnotes since SFY 1991 have required Judicial Branch management to independently determine which functional units will absorb budget reductions imposed on the Judicial Branch. This practice lessens Legislative control over line-item appropriations and compromises transparency in the budget process and accountability in budget execution.**

The Legislature has required the Judicial Branch to reduce General Fund appropriations approved in Section 1 of the biennial State budget since SFY 1991. Reductions include $2,000,000 for SFYs 1997, 1998, and 1999, $4,563,000 for SFY 2000, $4,480,000 for SFY 2001, and $4,418,101 for SFY 2002. Language in budget footnotes requires the Chief Justice to notify the Department of Administrative Services regarding specific amounts to be reduced in specified line-item appropriations in functional units. This practice requires Judicial Branch management to determine which line-item appropriations to reduce without Legislative input or oversight. The AOC director sends a memorandum to the DAS identifying the line-items to be reduced. Although the complete State budget is published by department and by line-item and readily available to the public, it is impossible for the public to determine funding levels of the Judicial Branch functional units by examining the budget without also having access to the adjusting memorandum from the AOC, limiting the transparency of the budget.

Transparency and accountability as a budget is developed, approved, and executed helps enforce fiscal discipline, facilitates allocation of government resources to the areas of greatest current public priority, and encourages efficiency. The line-item budget enforces control over spending, using limits set by the Legislature, and mandates how resources are to be expended. The practice of allowing Judicial Branch management discretion in choosing which line-item appropriations to cut reduces Legislative oversight over the Judicial Branch, weakens Legislative control over expenditures, and compromises transparency and accountability in the budget process.

Recommendation:

**We recommend the Legislature discontinue its practice of requiring the Judicial Branch to independently identify reductions to its general fund appropriation and work with Judicial Branch management to identify priorities and areas for potential appropriation reductions through the State's biennial budget process.**

*Auditee Response:*

*The subject of this Observation is outside the scope of the audit. The five audit areas are (1) technology, (2) the administrative functions of the AOC and the administrative offices of the trial courts, (3) weighted caseload system, (4) case processing practices, and (5) court reporting issues. The Legislature's budgeting process is outside these five audit areas.*

*As a long-standing part of the budget process, the Supreme Court has implemented budget reductions mandated by the Legislature.*

THIS PAGE INTENTIONALLY LEFT BLANK

STATE OF NEW HAMPSHIRE
JUDICIAL BRANCH ADMINISTRATION

## WEIGHTED CASELOAD

During the audit period, 1.3 million cases were filed in the trial courts. However, focusing on raw case counts offers little guidance for allocating judicial and clerical resources because it does not account for differences in the amount of work associated with each case type. Using raw case counts, for example, 100 shoplifting cases would be equivalent to 100 capital murder cases. According to the National Center for State Court's (NCSC) *Assessing the Need for Judges and Court Support Staff*, a weighted caseload system is the best direct measure of the demand for judges and court support staff. It provides an objective and standardized assessment of resource needs based on workload rather than caseload and recognizes cases vary in complexity. Therefore, different types of cases require different judicial and clerical attention. Additionally, in an environment of financial constraint and fiscal accountability, there must be an objective and independent process for determining the need for court personnel. This process must be understood and accepted by both the Court and the Legislature.

A weighted caseload study is comprised of two parts: establishing the case weights and determining the amount of staff time available per year to process cases.

### *Determining The Case Weights*

A case weight represents the average amount of time to complete all tasks involved in processing a case. Table 13 illustrates the process of constructing a case weight. The first steps in conducting a weighted caseload study are determining the number of case processing events required to process each case type and determining the frequency with which each case event occurs. The average amount of time, in minutes, to accomplish the case events should then be collected through a time study. Once average time needed for each case event is established, it should be multiplied by the event frequency to obtain the case event weight. The case weight for each case type is then established by summing the individual case event weights.

It is important to note that case weights reflect the average amount of time required by judges and court staff to process each case type. Some cases will require more processing time than their assigned case weight, while others will require less. However, over the long run the case weights should approximate the amount of time judges and court staff spend on each case type. In this section, we refer to the accuracy of the case weights used in the weighted caseload systems. While we recognize case weights cannot be completely accurate because they are based on averages, they should, in the aggregate, approximate the time it takes to process cases.

**Table 13**

| Constructing The Judicial Case Weight For A Sample Felony Case | | | |
|---|---|---|---|
| **Case Event** | **Average Time (in minutes)** | **Event Frequency** | **Case Event Weight** |
| Initial appearance | 5 | 1.05 | 5.25 |
| Preliminary hearing | 17 | .63 | 10.71 |
| Arraignment | 7 | .64 | 4.48 |
| Scheduling hearing | 15 | .03 | .45 |
| Pretrial hearing | 15 | 1.83 | 27.45 |
| Default judgment/Plea | 15 | .85 | 12.75 |
| Court trial | 47 | .01 | .47 |
| Jury trial | 480 | .05 | 24.00 |
| Verdicts/Post judgment | 15 | .18 | 2.70 |
| Disposition/Sentencing hearing | 18 | .73 | 13.14 |
| Bench warrant | 5 | .39 | 1.95 |
| Appeal | 5 | .33 | 1.65 |
| **TOTAL** | **644 Minutes** | **Case Weight** | **105.00 Minutes** |

Source: LBA analysis of the NCSC's *Assessing the Need for Judges and Court Support Staff (1996).*

***Determining The Amount Of Staff Time Available To Process Cases***

**The second step in conducting a weighted caseload study is to determine the amount of time per year court staff are available to process cases. This is done by first establishing the number of *days per year* court staff are available, excluding weekends, holidays, vacation and sick leave, and time spent on staff education. The next step is to determine the number of *hours per day* staff are available to process cases, excluding time for administrative duties and helping litigants. To determine the number of hours available per year, multiply the number of *hours available per day* by the number of *days available per year*. To determine full-time equivalent (FTE) court staff needed to process a court's caseload, the number of weighted case filings in minutes is divided by the number of minutes per year staff are available to process cases.**

**The Judicial Branch uses a *judicial* weighted caseload system in the District and Probate Courts and the Family Division Pilot Project. It uses a *clerical* weighted caseload system in all trial courts. We were unable to determine the accuracy of the case weights used in the weighted caseload systems because they were outdated. Therefore, we could not determine adequate staffing levels for the Judicial Branch.**

**Our review of the Judicial Branch's weighted caseload systems revealed the Branch needs to develop management policies to govern the use, development, and updating of the weighted caseload system. Additionally, we found the Branch should uniformly report statistical information and needs statistical support staff to monitor the weighted caseload systems.**

**Observation No. 19**

***A Judicial Weighted Caseload System Needed In All Trial Courts***

There is no Branch-wide policy requiring a weighted caseload system in all trial courts. The Superior Court did not have a completed judicial weighted caseload system during the audit period. The District and Probate Courts have used a judicial weighted caseload system since 1987 and the Family Division Pilot Project has had a system in place since the late 1990s. A proposal for a Superior Court judicial weighted caseload study was prepared in 1998. However, the Superior Court still has yet to adopt it according to court personnel, because Superior Court cases are complex, difficult to consistently classify into categories, and there is no way to quantify the pace at which different justices work.

The NCSC states the best measure of the demand for judicial and clerical resources is the number of weighted case filings, tempered by qualitative factors. Because unweighted cases are indirectly tied to workload, they offer minimal guidance for determining the need for judicial and clerical staff. Weighting cases provides an unambiguous process for shifting from caseload to workload and provides an objective and standardized method for allocating resources.

Recommendation:

**The Judicial Branch should adopt a policy requiring a weighted caseload system in all trial courts to ensure the fair and objective allocation of judicial resources. The Legislature should consider supporting the use of a weighted caseload system for all trial courts.**

*Auditee Response:*

*The Judicial Branch agrees in part. The Judicial Branch has had in effect since 1987 weighted caseload policies for judges and staff in the District Courts and in the Probate Courts. Those policies were instituted to objectively determine 1) the need for judge time in trial courts, and 2) compensation of part-time judges.*

*Weighted caseload systems have been important components in management of the trial courts. Since February 2001, we have been developing a process to objectively measure judicial workload in New Hampshire's only full-time trial court.*

*The Judicial Branch would consider adopting formal policies requiring use of weighted caseload systems in all trial courts to objectively measure the needs for judicial time and clerical support staff if the resources to do so without adverse impact to the work of the courts were provided. The Judicial Branch projects the need for two additional full-time employees to successfully implement this proposed policy.*

*The Judicial Branch should not adopt a formal policy to assess judicial and clerical workload in the Family Division Pilot Project until the Legislature determines the future of that Project. During the early part of the Pilot Project, new procedures and practices were developed and amended. It would have been impossible to measure workloads in that rapidly changing environment. In the later years of the Project, the Legislature has declined to expand the Project statewide.*

***The Judicial Branch notes that our sister New England states of similar size, Vermont and Maine, do not have a weighted caseload system.***

**Observation No. 20**

***Monitor And Update Case Weights Used In Weighted Caseload Systems***

The case weights for the District and Probate Courts, and the Family Division Pilot Project weighted caseload systems have not received periodic review or update. District Court *judicial* case weights have been in use since the weighted caseload system was adopted in 1987 and have not been updated since. The AOC reviewed the case weights in the early 1990s, however the resulting weights were not adopted. The District Court *clerical* weighted caseload system has been in place since the mid-to-late 1980s and case weights have not been revised since its adoption. The weights in use do not account for changes to court procedures.

Case weights for the Probate Court *judicial* weighted caseload system were adopted in 1987 and last updated in the mid-1990s. Probate Court personnel stated despite the update, the case weights are still inaccurate and do not reflect current judicial procedures or expanded jurisdictions. Additionally, changes in law have made certain processes lengthier. Case weights for the Probate Court *clerical* weighted caseload system were updated in 2000. However, Probate Court personnel reported the system still does not accurately reflect court operations.

The Family Division Pilot Project does not have its own judicial or clerical weighted caseload systems. Instead, the case weights were transferred from corresponding case weights from the District and Probate Courts. The system dates back to the late 1990s and has not been revised to reflect new procedures and processes of the Family Division Pilot Project.

The Superior Court does not yet have a *judicial* weighted caseload system, as addressed by Observation No. 19. However, a Superior Court *clerical* weighted caseload system was developed in 1996 and has not been updated since.

According to RSAs 491-A:3 and 491-A:4, the "supreme court shall establish and revise as needed a weighted case value, relating the judicial time required for each type of case included in the court's jurisdiction, which when multiplied by the caseload of each court will produce the number of weighted case units for that court." The number of weighted case units shall be used for the purposes of calculating the annual salaries of part-time District and Probate Court judges.

The NCSC states periodic monitoring and updating of case weights are essential to reflect changes in case processing time resulting from new legislation, changes in court jurisdictions, or increased efficiency. This will help to ensure the weights continue to accurately represent workload. Additionally, weighted caseload systems are most criticized when case weights are not updated periodically. Ideally, case weights should be updated every four years unless major statutory or other changes directly impacting a case type's weight occurs sooner. In this case, the affected case weights should be changed within one year.

The NCSC recommends the best approach for periodically monitoring case weights is by reviewing a selected sample of case events from a small number of courts. These events should

have a significant impact on the overall case weight, such as those that have a high frequency of occurrence or require the greatest amount of judicial or clerical time to perform. The sample should be comprehensive and include a sufficient number of events to ensure events occurring in every type of case are reviewed. Courts should also periodically monitor the impact of major changes in administrative practices or legislation.

Failing to periodically review and update case weights could result in inadequate judicial and clerical staffing calculations, as well as impact salary calculations for part-time District and Probate Court judges. Additionally, without an accurate indication of workload, judicial and clerical resources may not be fairly and objectively allocated.

Judicial Branch personnel reported the Branch has not adopted a formal method for maintaining and updating the weighted caseload system, resulting in no process for keeping the case weights current.

Recommendation:

**The Judicial Branch should update the case weights used in its weighted caseload systems. The Judicial Branch should determine what personnel resources are needed to continuously monitor and update the various weighted caseload systems used by the courts.**

**The Judicial Branch should also adopt a policy defining the process and methodology for updating the weighted caseload systems including establishing policies for when and how case weights should be updated. The Judicial Branch should also establish procedures to periodically monitor a sample of case events to determine if case weights are sufficiently accurate.**

The judicial and clerical weighted caseload systems should be updated every four years or within one year when changes in jurisdiction or statutes affecting case processing time occur.

*Auditee Response:*

*The Judicial Branch agrees in part. The Judicial Branch revised the District Court and Probate Court case weights and weighted caseload formulae in 1994. We requested funds with which to implement these revisions in the biennial budgets of FY 1996-1997, FY 1998-1999, FY 2000-2001, and FY 2002-2003. Mandatory budget reductions have prevented implementation of revised case weights and formulae.*

*Analyses of case weights show the work of judges and staff is increasing for many case types. Implementation of revised case weights or new weighted caseload formulae will require assignment of more judge time to the existing caseload. Without additional funds, an increase in judge time for the existing cases will leave the District and Probate Courts with fewer days of judge time.*

***During the audit the Judicial Branch has been working on revisions and updates to the judicial work assessment weights and formulae in the three established trial courts and clerical work assessment weights and formula in the Superior Court. Without individuals dedicated solely to this project, other responsibilities have been neglected and progress has been slow.***

***The Branch projects the need for two full-time employees to successfully monitor and update the weighted caseload systems. The Judicial Branch requested $100,000 in FY 2000 with which to hire an outside consultant to conduct weighted caseload studies in the trial courts. Although those funds were appropriated in Section 1 of the Budget Act, that line was eliminated as part of the Judicial Branch implementation of the $4,563,000 mandatory budget reduction in that year.***

***We should not adopt a policy defining the process and methodology for updating the weighted caseload systems including establishing policies for when and how case weights should be updated. There are multiple trial court workload methodologies available and all are evolving. Adoption of a specific and detailed policy would either deprive courts of developments in weighted caseload system methodologies or necessitate frequent policy revisions.***

**Observation No. 21**

***Develop Procedures Ensuring Updates To The Clerical Weighted Caseload Studies Are Consistent***
*With Best Practices*

The trial courts all use clerical weighted caseload systems. However, the Judicial Branch has adopted neither a consistent approach to develop the weighted caseload systems nor a methodology to update them consistent with best practice as established by the NCSC. Additionally, the Judicial Branch has no dedicated staff to monitor or update the weighted caseload systems. Court personnel report being unsure who is responsible for updating the weighted caseload systems and it becomes the responsibility of whoever is available at the time.

The Judicial Branch's case weights were not developed in accordance with best practices. The District, Probate, and Superior Courts developed case weights for the clerical weighted caseload systems by taking actual hours worked for each case type, less leave time, and dividing it by the number of cases filed for each case type. Court staff estimated the percent of time spent processing each type of case during the previous year and these percentages were used to determine the amount of time spent processing each case type. The Superior Court developed separate case weights for large and small courts.

Instead of using best practices for determining time staff are available, the District and Superior Courts use their own, differing methodologies. The staffing formula for the District Courts is based on each employee processing 1,700 unweighted cases per year. The District Courts then determined the amount of time it takes for staff to process 500 of each case type. To determine the number of court staff needed for each department, 500 cases were divided by the number of weighted cases filed for each case type, then multiplied by the proportional case type.

The Superior Court weighted caseload system established separate staffing formulas for deputy clerk positions, administrative support, and clerk's office staff. Based on case filings, the formula proposed a deputy clerk position for every 1,500 unweighted cases filed, as well as one

administrative support staff for every 1,000 unweighted cases filed in a small court and one for every 1,400 cases filed in a large court. The Superior Court first determined the recommended clerk's office staff level for each court by calculating average time spent for each case type. The court took the number of weighted cases per court and divided it by the number of recommended staff to determine an average of one position for every 244 weighted cases. According to the Superior Court's weighted caseload report, *Staffing Model for the Superior Courts,* the committee did not review case processing procedures in the courts. As a result, the case weights do not reflect recommended or ideal case processing times in the courts. Reportedly, the case weights developed, and the staffing model that resulted were not accurate and there was little confidence in the numbers from the time it was developed.

The Probate Court's system for determining available staff time follows closely with best practices. The system established the number of hours a FTE employee is available to work per year, less time allowances for supervision and administrative duties, annual and sick leave, and court monitoring.

As of May 2003, the Judicial Branch was in the process of updating the District and Superior Courts clerical weighted caseload systems. The Superior Court conducted Delphi surveys (See Observation No. 22) of court staff to determine case processing times, as well as time spent on administrative duties and helping citizens. Steering committees established to review each case type are reportedly in the process of validating the results. The District Courts suspended work on updating the clerical weighted caseload system until Fall 2003, reportedly due to time constraints. The District Courts have not yet developed methodology for the study.

Without a consistent method for conducting clerical weighted caseload systems in all levels of court, there is no way to compare resource allocation among the court levels and staff resources may not be allocated fairly and objectively throughout the system, resulting in a perception of disparity among the courts. Additionally, without a formal process for conducting updates to weighted caseload studies, the Judicial Branch is spending time developing a new methodology each time an update is needed.

Recommendation:

**We recommend the Judicial Branch establish procedures for conducting updates to the clerical weighted caseload systems consistent with the NCSC's *Assessing the Need for Judges and Court Support Staff.***

**We also recommend the Judicial Branch establish a steering committee representative of all trial court staff to coordinate and oversee the clerical weighted caseload system. The steering committee should select courts to participate in the weighted caseload time studies, as well as develop formal policies and procedures to govern the clerical weighted caseload system methodology and ensure all updates are conducted regularly using established methodology. The policies and procedures should include a consistent method for collecting case processing time data, as well as for data analysis. The Branch's policy should also include a schedule for periodically monitoring the case weights and updating systems as needed.**

*Weighted Caseload*

**The Judicial Branch should determine whether dedicated personnel are needed to continuously monitor and update the clerical and judicial weighted caseload systems used by the courts and consider whether additional funding for staff is needed.**

Auditee Response:

*The Judicial Branch agrees in part. The first recommendation flowing from this Observation is that "the Judicial Branch establish procedures for conducting clerical weighted caseload systems consistent with the NCSC's* Assessing the Need for Judges and Court Support Staff." *The Judicial Branch notes that many of its clerical weights predate that 1996 publication. More importantly, that publication states, as part of its purposes, the goal "to develop a range of alternative approaches for determining the need for judges and court support staff." That goal is consistent with our response to Observation No. 20 to the effect that multiple trial court workload methodologies exist so we should not establish specific procedures which would adopt one methodology over another. We should remain flexible so that we can use procedures appropriate to the work involved to develop weighted caseload data. That being said, the Judicial Branch agrees that clerical weighted caseload studies should be consistent with best practices; however, since there is more than one best practice, the Branch should be able to match the method of study to the work involved. Also the method of doing a weighted caseload study is affected by the resources available to conduct the study.*

*The second recommendation flowing from this Observation is that "the Judicial Branch establish a steering committee representative of all trial court staff to coordinate and oversee the clerical weighted caseload system." We will consider establishing such a committee, but without the resources to properly conduct and update weighted caseload studies, the trial courts will probably be unable to carry out some or all of the recommendations of such a committee.*

*The subject of resources is the third recommendation flowing from this Observation. As stated in the response to Observation Nos. 19 and 20, the Judicial Branch projects the need for two full-time employees to successfully monitor and update the weighted caseload systems. It would be less expensive to hire personnel dedicated to this task than to hire outside consultants. Moreover, having personnel dedicated to this task would better ensure the constant monitoring and updating of weighted caseloads than would one-time consultants. The issue regarding resources for weighted caseload studies is at what point does the Judicial Branch decide that those resources are a priority. Currently, when there are more than sixty clerical vacancies in the Branch, personnel dedicated to conducting weighted caseload studies have been considered an unaffordable luxury.*

*The Judicial Branch has attempted to do its best with the resources it has been able to devote to weighted caseload analysis. In fact, the administrative judge of the District Courts estimates that the clerical weights in that court are accurate within a margin of error of ten percent. The problem is not the accuracy of the weights but rather the fact that funding by the Legislature has not historically allowed the Judicial Branch to fill the positions which the clerical weights demonstrate are necessary, even when they were current.*

**Observation No. 22**

***Continue Updating Judicial Weighted Caseload Systems Using Time Studies In Accordance With Best Practices***

The case weights used by the District and Probate Courts judicial weighted caseload systems during the audit period were developed using Delphi surveys. The Delphi technique relies on judges' estimates of time necessary to process certain case types without directly measuring the actual time. Once average times are calculated for each of the case types, the results are shared with the participants, who are asked to adjust their original estimates in light of their colleagues' information. According to the NCSC, the Delphi technique is subjective in nature and may not be a completely reliable indication of case processing time because it is natural to remember the unusually long or complex cases. Instead, time studies are recommended because they are considered more accurate. According to the NCSC, the method used to determine the appropriate level of judicial and clerical resources must be credible to judges, court staff, and the legislature.

The Probate Courts developed its judicial weighted caseload system in 1987 and updated the case weights in 1993 using Delphi surveys. It validated Delphi results by conducting a time study in only one Probate Court.

The District Courts also developed its judicial weighted caseload system in 1987 using a Delphi survey, but did not use a time study to validate the results. The District Courts attempted to update the judicial weighted caseload system in 1994 by asking judges to complete a Delphi survey. The District Courts did not conduct a time study and did not adopt the updated case weights because they reportedly did not appear accurate.

As of May 2003, the Judicial Branch was in the process of updating the District and Probate Courts *judicial* and Superior Court *clerical* weighted caseload systems. The Judicial Branch will reportedly conduct four-week time studies to collect case processing time for the District and Probate Courts judicial weighted caseload systems. The Superior Court clerical weighted caseload study gathered time data through a Delphi survey and steering committees are reportedly in the process of reviewing and validating survey results.

According to the NCSC, even when consensus is reached on the time required to process case types, Delphi estimates may be significantly different from actual case processing time. As a result, case weights developed using the Delphi technique may lead to inaccurate assessments of judicial and clerical staffing needs.

Recommendation:

**We recommend the Judicial Branch continue conducting updates to each trial court *judicial* weighted caseload system using time studies consistent with best practice. We also recommend the Judicial Branch migrate towards conducting time studies for updating the *clerical* weighted caseload systems.**

We recommend the Judicial Branch determine the personnel resources needed to continuously monitor and update the clerical and judicial weighted caseload systems used

**by the courts. The Judicial Branch should consider seeking funding for staff dedicated to performing this function.**

Auditee Response:

*The Judicial Branch agrees. Time studies are the most labor intensive and, therefore, the most expensive method of conducting and updating weighted caseload studies. As noted in the Observation, the Judicial Branch has used time studies in the past to validate data developed by other methods. Moreover, it conducted time studies last year with respect to establishing a weighted caseload system for Superior Court judges and this year with respect to updating the weights for the system used by District Court and Probate Court judges. Thus, the Branch uses time studies and will continue to use them in its weighted caseload systems consistent with the availability of resources.*

*As in Observation No. 21, this Observation recommends determining the resources necessary to maintain weighted caseload systems. The Observation goes further to recommend that the Judicial Branch consider seeking funding for staff dedicated to this function. As stated in the response to Observation Nos. 19 and 20, the Judicial Branch projects the need for two full-time employees to successfully monitor and update the weighted caseload systems. Previously, in FY 2000, the Judicial Branch did have in its budget $100,000 to hire an outside consultant to conduct weighted caseload studies in the trial courts. Those funds were eliminated as part of the implementation of the $4,563,000 reduction mandated by the Legislature that year. As stated in the response to Observation No. 21, the issue regarding resources for weighted caseload studies is at what point does the Judicial Branch decide that those resources are a priority. Currently, when there are more than sixty clerical vacancies in the Branch, personnel dedicated to conducting weighted caseload studies have been considered an unaffordable luxury. The Judicial Branch will consider seeking funding in its next budget request for staff dedicated to weighted caseload systems.*

**Observation No. 23**

***Count Criminal Charges Against A Single Defendant Involving A Single Incident As One Case***

Our review of the District and Superior Court docketing information obtained from the SUSTAIN case management system shows the Superior and District Courts count each criminal charge against an individual stemming from a single incident as separate cases with separate docket numbers. An analysis of the *State Court Caseload Statistics* prepared by the NCSC for 2000 reveals that of the 41 states reporting a uniform method of counting criminal cases in *general jurisdiction* courts, only New Hampshire and three other states count each criminal charge stemming from a single incident as separate cases. The remaining 37 states count all charges stemming from a single incident or include multiple incidents against a defendant as one case. Of 25 states reporting uniform criminal case counting methods in *limited jurisdiction* courts, eight states count all charges stemming from a single incident as separate cases while the remaining 17 states count all charges stemming from a single incident or include multiple incidents against a defendant as one case.

The Judicial Branch counts each charge individually because each charge may take a different path and may have a different sentence attached. Some charges will be dropped or disposed of through plea bargain, therefore, not every charge will go to court for a decision. The AOC director reported counting each case individually has an administrative advantage because it makes it easier for clerks to match each sentence with a charge. Although court personnel create separate folders for each charge, we observed motions, correspondence, and dates of hearings are documented only in the lead folder.

Our analysis of criminal caseload data for the District and Superior Courts from SFYs 2000 through 2002 revealed counting criminal defendants rather than charges would result in 35,204 fewer criminal cases in SFY 2000, or a decrease of 24.8 percent. The caseload would decrease by 37,489 cases, or 26.4 percent, in SFY 2001 and 38,166 cases, or 25.8 percent, in SFY 2002. When Superior Court docketing information from SFYs 2000 through 2002 were compared by court, Rockingham Superior Court had the most criminal charges, however Hillsborough Superior Court – North had the most defendants. Additionally, when charges are counted, Carroll Superior Court ranked ninth for filings, however when defendants were counted, its ranking moved to tenth. Since the number of case filings is factored into resource allocation decisions, Hillsborough Superior Court – North and Carroll Superior Court may not be receiving adequate resources to process its caseload. Similar patterns existed for the District Courts.

In memoranda to court management from 1996, 1997, and 1999, one Superior Court clerk stated the current practice of counting criminal cases does not accurately measure the relative level of criminal case activity in each court. When a defendant enters a plea or goes to trial on 12 felony counts it is really one case because the pleas will usually be accepted at a single hearing or the cases will be tried at a single trial in front of one judge. Additionally, the clerk states there is usually little additional time or effort required to handle additional cases against the same defendant because the work is done in the lead case. For the purpose of allocating resources to the various court locations, the clerk suggested counting criminal defendants rather than criminal charges to get a clearer picture of workload.

The *Trial Court Performance Standards and Measurement System Implementation Manual* issued by the Bureau of Justice Assistance and the *State Court Model Statistical Dictionary* published by the NCSC advocate counting each criminal defendant and all the charges involved in a single incident as a single case for reporting purposes.

Counting all charges against a defendant stemming from a single incident as separate cases risks overstating the court's caseload.

Recommendation:

We recommend the Judicial Branch count all charges against one defendant involved in a single incident as one case.

*Auditee Response:*

***The Judicial Branch agrees in part. The Judicial Branch acknowledges that there is more than one valid way of counting criminal cases, by charge, by defendant, by incident, or a combination thereof. We have decided to count each individual charge for the case management reasons cited in the observation. We do not keep these records for purposes of supporting inappropriate budget requests or to artificially inflate the count. They are kept in this manner because it is easier to deal with the different pleadings, deadlines, and other issues each charge presents.***

***The practice of counting cases in this manner is a long-standing one. Others who deal with the courts count cases in a similar manner, such as police departments and prosecutors. Thus, for the Judicial Branch to change its method of counting criminal cases may affect other justice system users. It would also make our future data incompatible with our historic data.***

***This long-standing practice of keeping each charge separate also allows court administrators to easily comply with the recent New Hampshire Supreme Court decision in State v. Ramos, 149 N.H. 118 (2003). In that case, the court changed its traditionally permissive approach to joining multiple charges against a defendant for a single trial. Thus, in the future more multiple charge cases will likely be severed for separate trials.***

***Moreover, while a plea or a trial on 12 consolidated counts is only one court proceeding, it is more than one case. In the context of a plea, the judge must deal with each individual charge, making certain the defendant understands each one and the consequence of the plea to each one. In a trial, the prosecution must present evidence on each charge and the defendant has the opportunity to do the same.***

***In a weighted caseload system, the weighted caseload studies should be based on the manner in which cases are counted. The case weights will be lower on a per case basis if each charge is counted as a separate case. If the count is by defendant, then the weight per case would have to be greater to account for those cases which involve multiple counts.***

***We expect to consider the issue of how to count criminal charges as we install a new trial court case management system. It may be possible to count both ways, organizing case numbers by defendant or incident, with sub-numbers for each charge. Such a system would give the benefits of both a defendant count and a charge count. Whatever decision is made regarding counting, the weighted caseload numbers must be based on only one method to ensure their integrity.***

**Observation No. 24**

***Clearly Define Brought Forward Cases And Ensure Only Relevant Cases Are Included In The Court's Caseload***

As discussed in Observation No. 38, the trial courts define and track brought forward cases, or re-entries, inconsistently. A brought forward case is a case that has previously been closed but is re-opened for further action. The Superior Court tracks and reports brought forward cases as part of the court's caseload, while the Family Division Pilot Project and the District Courts do not. Conversations with court personnel revealed some courts consider telephone inquiries, requests for record checks, or requests for copies of court orders as brought

forward cases. In a memo from March 2003, one administrative judge encourages the Judicial Branch to establish a common definition of re-entry, excluding all minor actions, and apply it consistently across all court levels. Our survey of court clerks revealed some clerks consider certain requests as brought forward while others do not. For instance, out of 33 court clerks responding to our survey question, 11 clerks consider a case brought forward if litigants request a certified copy of court orders and five clerks consider a case brought forward if exhibits are returned in a case.

Since brought forward cases are used in the weighted caseload system to determine clerical staffing needs in the Superior Court, counting actions such as telephone inquiries and requests for copies as brought forward cases can affect staffing calculations.

According to its staffing formula, the Superior Court has established and applies a case weight for marital brought forward cases. Additionally, Superior Court personnel stated the marital department has many brought forward cases and are a large part of the judges' caseloads. Court personnel stated they enter brought forward cases into SUSTAIN; however, our surveys showed the definition of a brought forward case is inconsistent. Finally, court personnel stated all cases entered into SUSTAIN are counted as part of the court's caseload and are included in the weighted caseload system.

Recommendation:

We recommend the Judicial Branch define brought forward only as cases requiring judicial attention. Actions not requiring judicial attention such as requests for copies, returning exhibits, and telephone inquiries, should be included in time spent on administrative duties.

We recommend the Judicial Branch establish a separate case weight for brought forward cases.

*Auditee Response:*

*The Judicial Branch agrees. The committee that the Administrative Council expects to appoint, and referenced in the response to Observation No. 38, will be asked to recommend a definition of brought forward cases.*

**Observation No. 25**

***Establish A Monitoring Case Weight For Probate Court Guardianship Cases***

Probate Court clerical case weights for guardianships over adults and children are applied annually to open cases, while case weights for other Probate Court cases are applied only to new case filings. Guardianship of an adult can last until the person is deceased and guardianship of a minor can last until the person is 18 and in some cases, until 21. Open guardianship cases require annual maintenance by court personnel, including processing annual reports and accounts, and scheduling them for hearings, as well as answering questions about the case. The original case weight is applied to the guardianship case each year. However, the amount of work each case

requires generally decreases in years subsequent to when the case was filed. The case weight is applied to open guardianship cases to accommodate for the on-going nature of guardianships.

Because guardianship cases can be monitored for several years before they are closed, staffing needs in the Probate Courts may be inflated because cases open for monitoring are given the same value as those recently filed.

Recommendation:

**The Probate Courts should consider establishing a monitoring case weight to reflect the amount of time spent monitoring guardianship cases each year. This case weight should be applied for each subsequent year the guardianship is open for monitoring.**

*Auditee Response:*

*The Judicial Branch agrees. In conjunction with the installation of a new case management system, the Probate Courts will consider establishing a "monitoring" case weight for the time spent monitoring guardianship cases. The new system will allow the use of a case status for monitoring guardianship cases. See Observation No. 9 and response thereto.*

*Historically, when the Probate Courts developed the clerical weighted caseload system, it recognized that there was, as stated in the Observation, an ongoing workload associated with both a new and a continuing guardianship case as long as the case remained open. In addition to the annual reports, guardianship monitoring reports, related scheduling and general questions that occur while an adult guardianship is open, the Probate Courts are required by statute to send out an annual notice to the ward. That process alone requires verifying the validity of the time standard that triggers the action, pulling the case, verifying that the case is still active and that the case information is up-to-date, issuing the notice to the appropriate parties, and then responding to any inquiries generated by the notice. In minor guardianships, the courts frequently deal with motions to terminate the guardianship which require scheduling and handling pretrial hearings and other hearings. Therefore, in dealing with a clerical weighted caseload for guardianship cases, the Probate Courts set out to determine the average time spent annually per guardianship case, no matter whether a new or existing case. While court staff perform different functions each year in "monitoring" a guardianship from what they did in setting up the case, the average time per case was established through studies at 2.5 hours per year.*

**Observation No. 26**

***Centralize And Improve Statistical Resources***

A court services representative at the AOC currently serves as the Judicial Branch's facilities coordinator and statistician. The court services representative regularly produces some statistical reports for the trial courts, including quarterly trend analysis reports for the District Court administrative judge and regional administrators that identify staffing needs at the various locations, as well as ad hoc statistical analyses for trial court judges and staff, the Supreme Court, and other organizations such as the NCSC. In addition, both the

court services representative and the AOC internal auditor conduct statistical analyses pertaining to weighted caseload systems.

During 2002, the Superior Court's Office of the Chief Justice began maintaining statistics specific to the Superior Court backlog. Superior Court clerks prepare monthly counts of mail to be processed and sent, hearings to be scheduled, and case files to be closed for each court department (i.e., criminal, civil, equity, and domestic relations) and report them to the Office of the Chief Justice. The statistics allow the Chief Justice to make clerical workload comparisons among the Superior Court locations, as well as fulfill Legislative requests for information. The Offices of the District and Probate Court Administrative Judges do not maintain backlog statistics specific to their courts.

Clerks, registers, judges, and marital masters reported they receive reports assisting them in managing their caseload from multiple sources. Thirteen of 38 clerks and registers and 11 of 51 judges and marital masters responding to our survey question receive management reports from the AOC, while nine of 38 clerks and registers and 14 of 51 judges and marital masters receive management reports from their administrative judge's office. Fifteen of 38 clerks and registers create their own reports used to help manage their caseload. Thirteen of 38 clerks and registers and 20 of 51 judges and marital masters reported they receive no reports that assist them in managing their caseload.

According to the NCSC's *Caseflow Management: The Heart of Court Management in the New Millennium*, management reports including data on individual cases and court-wide caseload and performance are essential to day-to-day caseflow management because they allow judges and clerks to evaluate actual performance against expectations and direct resources to areas of concern. In addition, the American Bar Association's *Standards Relating to Court Organization* states the administrative office of the courts should be responsible for statistical compilation and analysis for the court system as a whole, and system-wide policies should promote uniformity in statistics. The AOC director and the District Court administrative judge both stated the AOC needs a full-time statistician to collect and disseminate statistical information Branch-wide.

Recommendation:

**We recommend the Judicial Branch consider establishing a full-time statistician position at the AOC responsible for compilation, analysis, and dissemination of data Branch-wide. The statistician, in consultation with court management, should determine what reports will be most useful to judges, marital masters, clerks, and registers in all levels of court for caseflow management purposes and establish a system to regularly and promptly disseminate management reports to appropriate personnel. The duties of the statistician could also include auditing docket information pursuant to Observations No. 7 and No. 8, as well as monitoring and updating clerical and judicial weighted caseload systems discussed in Observations No. 21 and No. 22. In addition, we recommend the AOC implement Branch-wide policies promoting uniform statistical reporting.**

*Weighted Caseload*—

*Auditee Response:*

***The Judicial Branch agrees. The Judicial Branch recognizes the value of management reports and statistical reports that could be produced by an AOC employee dedicated solely to that task. The Judicial Branch requested funds in the FY 04-05 budget to hire a full-time statistician. In order to implement a $6,000,000 reduction in the Judicial Branch budget request, the Judicial Branch has found it necessary to reduce the workforce in the Supreme, Superior, and Probate Courts and will be unable to fill other useful positions for which funds were requested. The Judicial Branch does not have sufficient resources to fill the court statistician position during this biennium.***

***The Judicial Branch expects to renew its request for funding to hire a full-time statistician in its next budget request.***

***The New Hampshire Judicial Branch annually processes over 200,000 cases filed among 66 courts that are organized into four levels of established court and one pilot project. The development, refinement, and timely distribution of helpful statistical reports to appropriate judges and managers will keep a single court statistician very busy.***

***The auditing of court data would be the responsibility of the internal auditors. Presently, one of the four Judicial Branch internal auditor positions is vacant.***

***The monitoring and periodic updating of six judicial and clerical weighted caseload systems should be the responsibility of two skilled employees dedicated to that enterprise. Although the statistician will support this process, he or she will be unable to allocate significant time to this monitoring and updating clerical and judicial weighted caseload systems.***

STATE OF NEW HAMPSHIRE
JUDICIAL BRANCH ADMINISTRATION

## CASE PROCESSING

The American Bar Association (ABA), in its *Standards Relating to Trial Courts* and *Standards Relating to Appellate Courts*, promulgated timely case processing standards for trial courts and supreme courts respectively. According to the ABA, timely disposition standards are important management tools that provide a court with a basis for evaluating its performance, as well as ultimate and measurable objectives to direct planning. Additionally, the ABA states the absence of clear goals for directing supervisory efforts is one factor contributing to delay.

According to the ABA, any elapsed time other than reasonably required for pleadings, discovery, and court events is unacceptable and should be eliminated. To promote efficient and timely case disposition, the court should control the pace of litigation. Delay devalues judgment, creates anxiety in litigants, and signals a failure of justice, as well as subjects the court system to open criticism and loss of confidence in its fairness and utility. Accumulated delay creates backlogs that waste court resources. Additionally, the ABA states delay in the appellate process results in the injustice inherent in protracted litigation.

### 5.1 Case Processing Guidelines

Table 14 shows the ABA's trial court case processing standards for criminal, civil, domestic relations, and juvenile cases.

**Table 14**

| ABA Standards For Trial Court Case Processing | |
|---|---|
| **CRIMINAL** | |
| Felony | 90% in 120 days of arrest |
| | 98% in 180 days of arrest |
| | 100% in 12 months of arrest |
| Misdemeanor | 90% in 30 days of arrest or citation |
| | 100% in 90 days of arrest or citation |
| **CIVIL** | |
| General Civil | 90% in 12 months of filing |
| | 98% in 18 months of filing |
| | 100% in 24 months of filing |
| Summary Proceedings | 100% in 30 days of filing |
| **DOMESTIC RELATIONS** | |
| General Domestic Relations | 90% in 3 months of filing |
| | 98% in 6 months of filing |
| | 100% in 12 months of filing |
| **JUVENILE** | |
| Detention/Shelter Hearing | 24 hours of arrest |
| Adjudicatory/Transfer Hearing: | |
| *In a detention facility* | 15 days of arraignment |
| *Not in a detention facility* | 30 days of arraignment |
| Disposition Hearing | 15 days of adjudicatory hearing |

Source: LBA analysis of the ABA's "*Standards Relating to Trial Courts*" (1992)

According to the ABA, these standards are goals courts can and should reach and maintain, while striking a balance between allowing adequate time for litigants to exercise their procedural rights, while limiting delay. Additionally, the standards put into operation the general principle of delay reduction that recommends elapsed time is proportional to procedural activity.

In this section, we recommend the Branch revise caseflow management guidelines and monitor those guidelines for compliance.

**Observation No. 27**

***Revise Probate Court Guardianship Caseflow Management Guidelines***

The Probate Courts' timeframes for guardianship proceedings are not consistent with statute. According to RSA 464-A:5, III, orders of notice "shall be sent by first class mail or served by delivery to the office of any court appointed attorney or of the attorney retained by the proposed ward within 24 hours of the appointment by the court or of the notification to the court of the name and address of the attorney." The Probate Courts' caseflow management guidelines for guardianship of the person, estate, or both, states the court must set the time and place for the hearing and issue the orders of notice within five calendar days after the filing date. The Probate Courts' case management guidelines do not specify when the orders of notice should be sent in relation to the appointment of the attorney and could exceed statutory requirements by up to four days if the attorney is appointed immediately after the petition is filed.

Additionally, RSA 464-A:11-a states, "the probate court shall act upon the petition within 30 days of its filing," while Probate Court guidelines state a hearing must be held within 30 calendar days of when the orders of notice were issued. Since the timeline for issuing the orders of notice are exceeded by up to four days, this requirement is also exceeded by the same number of days.

Recommendation:

**We recommend the Probate Court revise its guidelines for guardianships to be in compliance with timeframes established in RSAs 464-A:5, III and 464-A:11-a. If the Probate Court determines this requirement is impractical, it should seek to have the statute amended.**

*Auditee Response:*

*The Judicial Branch agrees in part. The Probate Guidelines state timeframes from the date of filing, taking into consideration statutory requirements. The Guidelines allow one to five calendar days after the filing date to review the petition, appoint the attorney, and issue orders of notice. The statute states that the orders of notice must be sent within 24 hours of the (attorney's) appointment by the court. The Probate Courts are meeting that requirement. We will modify the Guidelines to specify the time frame for the various steps making certain that we clarify that the orders of notice must be issued within 24 hours of appointment.*

*Extensions of guardianship are the exception, not the rule. They are rarely filed in any Probate Court. We will ask the Legislature to amend RSA 464-A:11-a so that it reads "...the probate court shall act upon the petition within 30 days of orders of notice being issued."*

**Observation No. 28**

***Adopt Supreme Court Performance Standards Consistent With ABA Standards***

The Supreme Court's performance standards allow significantly more time to elapse between case filing and disposition than standards promulgated by the ABA. Figure 13 shows a comparison of the Supreme Court's time standards with standards promulgated in the ABA's *Standards Relating to Appellate Courts.*

Overall, a state's supreme court should resolve 50 percent of its cases within 290 days, 90 percent of its cases within 365 days, and the remaining ten percent should be resolved as expeditiously as possible. However, the Supreme Court's performance standards allow 530 days to process an appeal from the date of the scheduling order to disposition. This exceeds ABA standards by 165 days.

**Figure 13**

**Comparison Of Supreme Court To ABA Standards**




[1]For comparability to ABA standards the number of days excludes the 90-day screening period used by the Supreme Court. The ABA measures transcript production from the filing of the notice of appeal. The Supreme Court measures it from the date of scheduling order, which is usually issued 90 days after the filing of the notice of appeal.

[2]Supreme Court standards also allow one 15-day extension, which is not reflected in the number of days shown.

Source: LBA analysis of ABA's *Standards Relating to Appellate Courts (1994)* and the New Hampshire Supreme Court's *Court Performance Standards.*

As shown in Figure 13, when the standards are examined by case event, most of the time difference between New Hampshire's standards and the ABA's is consumed by the oral argument phase and publishing the court's opinion. According to the ABA standard, a case should be scheduled for oral arguments within 55 days of receiving the appellee's brief. The Supreme Court's standard allows 180 days to hold oral arguments, exceeding the ABA standard by 125 days. The ABA standard also permits 55 days between oral arguments and publishing the court's opinion. The Supreme Court's standard for publishing the Court's opinion allows the court 180 days, again exceeding the ABA standard by 125 days.

Figure 13 also shows the appellant's brief should be filed within 50 days from the filing of the transcript, however the Supreme Court's standard allows the appellant 60 days to file the brief. This exceeds the ABA standard by ten days. Observation No. 29 addresses the discrepancy between ABA standards and the Supreme Court's standards regarding transcript production.

Delay in the appeals process results in the injustice inherent in protracted litigation. In allowing appeals to exceed nationally recommended time standards, Supreme Court litigants may not receive timely resolution of their cases. During a review of randomly selected Supreme Court case files, we found an instance where a litigant claimed the Supreme Court violated his federal rights to due process by taking 3.5 years to decide his appeal.

Recommendation:

**We recommend the Supreme Court adopt performance standards consistent with the ABA's *Standards Relating to Appellate Courts.***

*Auditee Response:*

*The Judicial Branch agrees in part. Time standards for the New Hampshire Supreme Court were first adopted in June 2001, a time when the court was experiencing backlog for oral argument and opinion writing. The standards were designed to address the New Hampshire reality of the time which stemmed from rising case volume through 1997 (rising from 504 to 915 case filings annually during the decade from 1988 to 1997) and opinion output on the low side in 1998, 1999, and 2000 (103, 158, and 124 opinions, respectively). By June 2001, when the standards were adopted, the situation was changing as a result of the adoption of a faster docket for cases of less precedential value, known as the 3JX docket, and a prodigious volume of opinions (322 opinions in 2001, including 223 full opinions and 99 3JX.). Still, the standards reflected the 2001 reality.*

*The ABA standards are written for an appellate court with mandatory jurisdiction, i.e. one which must accept and substantively decide all cases. New Hampshire is virtually unique in having a first level appellate court with discretionary jurisdiction. The ABA standards do not have a time segment for deciding whether to accept a case for appellate review. The New Hampshire time standard for that segment is 90 days.*

*Furthermore, as reported in the annual performance evaluation report for 2002, the New Hampshire Supreme Court's averages for all cases disposed of in 2002 are much closer to the*

*ABA standards than to its own. For the cases disposed in 2002, oral argument averaged 90 days after the appellant's brief, and opinions 76 days after argument. These figures are 90 and 104 days, respectively, lower than the New Hampshire standards, and only 35 and 21 days, respectively, above the ABA standards.*

*Finally, given the success of the New Hampshire Supreme Court in cutting down its backlog, it may be time to reevaluate the New Hampshire standards to reflect the 2003 reality. A caveat is in order on that issue. The New Hampshire Supreme Court announced in 2003 that it would change its system whereby the court will accept most cases for appellate review. The effect of this plan, which has been put on hold due to budget constraints, may make it wise to wait before revising the New Hampshire standards.*

*In any event, any adjustment to existing standards will reflect the situation in New Hampshire. National standards will be consulted but will not be followed just because they exist. Any time standard has to reflect the realities facing not only the court system in New Hampshire but also its many constituents, which for the New Hampshire Supreme Court include private attorneys, public attorneys, litigants, and pro se litigants.*

**Observation No. 29**

***Require Completed Transcripts Within 30 Days Of Supreme Court Scheduling Order***

New Hampshire Supreme Court Rule 15, allows court reporters and transcriptionists twice as long to complete a transcript as standards promulgated in the ABA's *Standards Relating to Appellate Courts.*

The ABA has established a time standard of 30 days from the filing of the notice of appeal for the production of a transcript. The New Hampshire Supreme Court has discretionary power to determine which cases it will accept for full appellate review. Once a case is accepted, the Court issues the scheduling order for the transcript. For comparative purposes, we calculated the time for transcript production from the date the scheduling order was issued. Supreme Court Rule 15 (4) states transcripts should be prepared "as early as possible within 60 days after the [court] reporter receives the scheduling order." Additionally, Supreme Court Rule 15 (4) allows court reporters to request an extension "not exceeding 15 days." Therefore, transcripts may not be completed until at least 30 days, and in some cases, 45 days beyond what the ABA standards recommend. We also note the Supreme Court's performance standards do not include a standard for transcript production.

According to the ABA, transcript preparation is fundamental to the appellate process and virtually no action can be taken until it is prepared. Additionally, the ABA has cited transcript production as the single greatest factor in the delay of appellate cases. According to the *Standards Relating to Appellate Courts,* if transcript production is kept as simple as possible, the 30-day standard for preparation of the transcript should be more than adequate for most courts and should be considered an outside limit. Without timely transcript production, appeals may be subjected to lengthy delays.

Recommendation:

**We recommend the Supreme Court change Supreme Court Rule 15 to require transcripts be produced within 30 days of the scheduling order. This time standard should be included in the Supreme Court's *Court Performance Standards*.**

*Auditee Response:*

*The Judicial Branch agrees in part. As stated above, the triggering event in New Hampshire for transcript preparation is the scheduling order from the Supreme Court. The transcript is due at the Supreme Court 60 days from that scheduling order. Thus, the difference between New Hampshire and the ABA standard is whether the transcript should be filed within 30 or 60 days of the event that triggers its preparation. Reasonable people can differ on this question, but given the limited resources available in New Hampshire's trial courts for transcript preparation, 60 days is a reasonable choice.*

*Moreover, transcript preparation has not generally been a source of delay in appeals in New Hampshire. It has been in isolated cases, but as a whole delays in the appellate process in New Hampshire, when they have occurred, have not been caused by delay in receiving transcripts.*

*The court notes that in the proposed rules for a new appellate procedure, whereby most appeals would be non-discretionary, the time for production of the transcript is 45 days "after the reporter is notified by the lower court clerk to proceed with the transcription."*

*Finally, the Observation notes that the Supreme Court's performance standards do not include a standard for transcript production. The performance standards measure Supreme Court performance and include standards only for that performance. Transcript preparation is not part of the Supreme Court's performance and, therefore, is not part of its performance standards.*

**Observation No. 30**

***Adopt District Court Case Processing Time Standards Consistent With ABA Standards***

The District Courts' recommended case processing guidelines allow significantly more time to elapse between the filing date and date of disposition for misdemeanors and adjudicatory and dispositional hearings in juvenile cases than standards promulgated by the ABA. Figure 14 shows a comparison of District Courts time standards compared to ABA standards.

The District Courts have established a standard from arraignment to disposition, as well as a standard from the issuance of the complaint to arraignment. The District Courts' standard states 90 percent of all misdemeanors should be adjudicated within 90 days of arraignment and 100 percent should be adjudicated within 120 days of arraignment, while arraignments should occur no later than 30 days from the issuance of the complaint. Conversations with District Court clerks revealed police departments are not always timely in submitting complaints to the court. *Excluding the time elapsed from the issuance of the complaint to arraignment,* District Court standards for misdemeanor cases exceed ABA standards for the 90th percentile by 60 days and exceeds the 100th percentile by 30 days.

According to the guidelines followed by the District Courts and established in RSA 169-B:14, II, an adjudicatory hearing for juvenile delinquents shall be held within 21 days of arraignment if a juvenile is detained. Therefore, the District Court guidelines and RSA 169-B:14, II exceed ABA standards by six days.

Figure 14




Source: LBA analysis of ABA's *Standards Relating to Trial Courts (1992)* and New Hampshire District Court time standards.

According to the guidelines followed by the District Courts and established in RSA 169-B:16, V, a dispositional hearing should be scheduled within 21 days of the adjudicatory hearing if the minor is detained and within 30 days if the minor has been released. Therefore, the District Court guidelines and RSA 169-B:16, V exceed ABA standards by six days when a juvenile is in a detention facility and 15 days when a juvenile has been released.

**Recommendation:**

**We recommend the District Courts adopt performance standards consistent with the ABA's *Standards Relating to Trial Courts* for all case types.**

**We recommend the Legislature consider amending RSA 169-B:14, II and RSA 169-B:16, V to reflect standards promulgated by the ABA.**

*Auditee Response:*

***The Judicial Branch agrees in part. The District Courts are undertaking a review of all time standards; however, any adjustment to existing standards or adoption of any new standards will reflect the situation in New Hampshire. National standards will be consulted but will not be followed just because they exist. Any time standard has to reflect the realities facing not only the court system in New Hampshire but also its many constituents, which for the District Courts***

*include police departments, government agencies, private attorneys, public attorneys, litigants, and pro se litigants.*

*Data taken from the National Center for State Court's publication* Case Processing Time Standards in State Courts, 2002-03 *shows that only ten states have adopted case processing time standards in misdemeanor cases that comply with the ABA standards. For New Hampshire those standards may be an aspiration for the future; for now, as mentioned above, our standards will reflect our realities.*

*Specific comments regarding the Observation as it pertains to misdemeanor and juvenile cases in the District Courts follow.*

> ***Misdemeanor Cases:*** *In New Hampshire, the District Courts have no control over the date complaints are filed or the dates arraignments are scheduled. Local police departments routinely issue summonses in lieu of complaints on the date of arrest pursuant to RSA:594:14. Complaints are prepared and filed weeks, and sometimes longer, after arrest. The court conducts regularly scheduled arraignment sessions; however, local police departments "schedule" the arraignments on the summons or complaint form, generally taking into consideration availability of officers, etc. The first time the District Courts can exercise control over scheduling is from the date of arraignment under our state's statutory scheme for filing of criminal complaints. Consequently, the establishment of time standards from date of arrest could not be effective absent the statutory requirement that all complaints be filed within a specified period from arrest and arraignments scheduled accordingly.*
>
> ***Juvenile Cases:*** *The time standards established by the Legislature have been the subject of legislative review in the recent past. In establishing the 21/30 day rule in RSA 169-B:14, II and RSA 169-B:16, V, the Legislature received testimony from the law enforcement community, DCYF, guardians ad litem, prosecuting and defense attorneys, as well as the courts, that the current 21/30 day time frame was the minimum time necessary to allow adequate case preparation. The Legislature did, through RSA:169-B:14, II limit the reasons for continuances and the length of time that may be granted. It is noteworthy, as well, that in New Hampshire, pursuant to Supreme Court decisions (*In re Russell C., *120 N.H. 260 (1980) and* In re Eric C., *124 N.H. 222 (1983)), the 21/30 day requirements have been deemed mandatory by the Supreme Court, requiring dismissal of charges if not complied with.*

**Observation No. 31**

***Formally Adopt District Court Case Processing Standards For Civil Writ, Small Claims, And Landlord And Tenant Cases***

In the District Courts, civil cases are comprised of small claims, and those brought forth by civil writ as well as juvenile and domestic violence cases. During the audit period, 37,216 civil writs, 103,808 small claims, and 40,887 landlord and tenant cases were filed in the District Courts. However, the District Courts have not formally adopted case processing standards for these cases.

The District Courts follow timelines established by statute for landlord and tenant and small claims cases. In addition to the timeframes established in statute, the District Courts have

developed court rules outlining procedures regarding these cases. The procedures outlined in court rules for landlord and tenant cases establish timeframes for certain events in the processing of these cases such as discovery and trial. However, they do not establish a timeframe for disposing cases after filing. District Court rules and statutes governing small claims cases are very general and do not establish timeframes within which events must occur, nor do they establish a timeframe for disposing cases after filing. No timeframe guidelines exist for civil writ cases. The ABA has established a maximum case processing standard of 30 days for all summary civil cases such as landlord and tenant and small claims.

Without formal performance standards for civil writs, small claims, and landlord and tenant cases, the District Courts have no means of measuring case processing performance for these cases. As a result, District Court litigants may not receive timely disposition of their cases.

Recommendation:

**We recommend the District Courts establish case processing standards for civil writs, small claims, and landlord and tenant cases. Performance standards established for these cases should be consistent with case processing standards established by the ABA, as discussed in Observation No. 30. Additionally, these timelines should be adopted as formal case processing standards, as discussed in Observation No. 35.**

*Auditee Response:*

*The Judicial Branch agrees in part. The District Courts are undertaking a review of all case processing standards, including considering the adoption of standards for civil writs, small claims, and landlord and tenant cases; however, any adjustment to existing standards or adoption of any new standards will reflect the situation in New Hampshire, including legislatively adopted requirements. National standards will be consulted but will not be followed just because they exist. Any time standard has to reflect the realities facing not only the court system in New Hampshire but also its many constituents, which for the District Courts include police departments, government agencies, private attorneys, public attorneys, litigants, and pro se litigants.*

*Regarding whether these timelines should be adopted as formal case processing standards, see the response to Observation No. 35.*

**Observation No. 32**

***Adopt Superior Court Case Processing Time Standards Consistent With ABA Standards***

Superior Court case processing guidelines adopted in 1997 allow significantly more time to elapse between the filing date and date of disposition for criminal and domestic relations cases than standards promulgated by the ABA. Case processing guidelines for civil and equity cases are consistent with ABA standards. Figure 15 shows a comparison of Superior Court time standards compared to ABA standards.

The Superior Court established standards for felony cases from grand jury indictment to arraignment and from arraignment to disposition. However, it has not established a time standard from arrest to indictment. According to the Superior Court's time standards, incarcerated and non-incarcerated defendants should be arraigned within 15 days and 20 days of grand jury indictment, respectively. The Superior Court standards state 90 percent of all criminal felony cases should be adjudicated within nine months, or 270 days, after arraignment. ***Excluding the time elapsed from arrest to grand jury indictment***, the Superior Court's standards allow a minimum of 285 days to process a felony case from indictment to disposition. This exceeds the ABA standards by at least 165 days.

**Figure 15**




Note: Superior Court felony standard does not include time elapsed from arrest to grand jury indictment.
Source: LBA analysis of ABA's *Standards Relating to Trial Courts (1992)* and New Hampshire Superior Court time

The Superior Court's standards state 90 percent of all misdemeanors should be adjudicated within 120 days of entry and 100 percent should be adjudicated within 180 days. Therefore, Superior Court standards for misdemeanor cases exceed ABA standards for both the 90th and 100th percentile by 90 days.

The Superior Court's standards state 100 percent of all domestic relations matters should be concluded within 18 months, or 547 days, of the date of case filing, exceeding ABA standards by 182 days.

**Recommendation:**

**We recommend the Superior Court adopt performance standards consistent with the ABA's *Standards Relating to Trial Courts* for all case types.**

*Auditee Response:*

***The Judicial Branch agrees in part. The Superior Court will consider undertaking a review of all time standards; however, any adjustment to existing standards or adoption of any new standards will reflect the situation in New Hampshire. National standards will be consulted but will not be followed just because they exist. Any time standard has to reflect the realities facing not only the court system in New Hampshire but also its many constituents, which for the Superior Court include police departments, government agencies, private attorneys, public attorneys, litigants, pro se litigants, and jurors.***

***Data taken from the National Center for State Court's publication*** **Case Processing Time Standards in State Courts, 2002-03** ***show that few states have adopted standards that meet the ABA standards. The following numbers of states have adopted standards that meet ABA standards, in the areas noted.***

| *Case Type* | *States with ABA-Consistent Standards* |
|---|---|
| *Civil* | *5* |
| *Misdemeanor* | *10* |
| *Domestic Relations* | *11* |
| *Felony* | *18* |

***For New Hampshire, those standards may be an aspiration for the future; for now, as mentioned above, our standards will reflect our realities.***

***Those realities in New Hampshire include declining clearance rates, i.e. case dispositions divided by case filings. As the Table 5 on page 26 of this report shows, the Superior Court had its lowest clearance rate of the audit period in SFY 2002. In fact in the Superior Court, the clearance rate exceeded 100% in the first three years of the audit period but was below it in the last three, dropping to only 93% in SFY 2002. Surely, fiscal constraints have contributed to the decline in clearance rates. Where resources have been increased, as they were at the Supreme Court in late 2000, the effect on clearance rates has been dramatic. See Table 3 at page 22.***

***Specific comments regarding the Observation as it pertains to felony, misdemeanor, and domestic relations cases in the Superior Court follow:***

***Felony Cases:*** *The Observation notes that the Superior Court does not have a time standard from arrest to indictment. That is because in New Hampshire that time span is not within the control of the Judicial Branch. It should also be noted that in felony cases there is an ultimate time standard. That standard is the rules relating to speedy trials established by the United States Supreme Court to enforce the Sixth Amendment to the United States Constitution.*

***Misdemeanor Cases:*** *The ABA standards on misdemeanor cases are applicable to the original trial of those cases, which often takes place in a court of limited jurisdiction as it does in New Hampshire. The Superior Court jurisdiction in misdemeanor cases is for a de novo appeal. Most such cases are appealed for the purpose of a jury trial. The ABA misdemeanor standards are not applicable to the misdemeanor jurisdiction of the New Hampshire Superior Court.*

***Domestic Relations Cases:*** *Domestic relations cases are the most labor intensive cases in the court system from a clerical point of view. As a result, the clerical vacancies that the Judicial Branch has been enduring for more than two years have had their greatest impact on these cases. As a result of recent budget issues, the number of clerical vacancies has reached a high point. As of September 10, 2003, there are more than 26 vacant positions in the Superior Court, or 12.73% of its non-judicial workforce. Meeting the ABA standards in domestic relations cases is nothing more than an aspiration for the Superior Court.*

**Observation No. 33**

***Adopt Family Division Case Processing Time Standards Consistent With ABA Standards***

Family Division Pilot Project case processing time standards allow significantly more time to elapse between scheduling hearings for adjudicatory and dispositional hearings in juvenile cases than standards promulgated by the ABA. Figure 16 shows a comparison of Family Division Pilot Project juvenile time standards compared to ABA standards.

According to the guidelines followed by the Family Division Pilot Project and established in RSA 169-B:14, II, an adjudicatory hearing for juvenile delinquents shall be held within 21 days of arraignment if a juvenile is detained. Therefore, the Family Division Pilot Project guidelines and RSA 169-B:14, II exceed ABA standards by six days.

According to the guidelines followed by the Family Division Pilot Project and established in RSA 169-B:16, V, a dispositional hearing should be scheduled within 21 days of the adjudicatory hearing if the minor is detained and within 30 days if the minor has been released. Therefore, Family Division Pilot Project guidelines and RSA 169-B:16, V exceed ABA standards by six days when a juvenile is in a detention facility and 15 days when a juvenile has been released.

Since the Family Division Pilot Project allows adjudicatory and dispositional hearings in juvenile cases to exceed nationally recommended standards, juveniles may spend more time in a detention facility than is necessary.

Figure 16




Source: LBA analysis of ABA's *Standards Relating to Trial Courts (1992)* and RSAs 169-B:14, II and 169-B:16, V.

<u>Recommendation:</u>

We recommend the Family Division Pilot Project adopt performance standards consistent with the ABA's *Standards Relating to Trial Courts* for all case types.

We recommend the Legislature consider amending RSA 169-B:14, II and RSA 169-B:16, V to reflect standards promulgated by the ABA.

*<u>Auditee Response:</u>*

*The Judicial Branch agrees in part. This Observation is identical to Observation No. 30 so far as that Observation pertains to juvenile cases. The response in that Observation so far as it pertains to juvenile cases is equally applicable to Observation No. 33.*

**Observation No. 34**

***Establish Probate Court Case Management Timelines For Adoption, Trust, Involuntary Admission, And Equity Cases***

During the audit period, the Probate Courts handled 2,811 adoption cases, 944 trusts, 2,110 involuntary admissions, and 704 equity cases. However, the Probate Courts have not established case management timelines for events in these case types. The Probate Courts followed statutory timelines for adoption, trust, and involuntary admission cases. Case management timelines were not developed for these case types because the Probate Courts reportedly lack the means to track and monitor their compliance with the current case management system. The Probate Courts intended to wait until a new case management system or other method of tracking was in place before establishing timelines for these case types. Case

management timelines were established for events in guardianship, estate, and termination of parental rights cases in 1999 to help clarify statutory requirements and ensure all courts apply the statutes uniformly. The Probate Courts also did not have the ability to track compliance with these case types.

Without case management timelines for adoption, trust, involuntary admission, and equity cases, the Probate Courts have no means of measuring case processing performance for these cases. As a result, Probate Court litigants may not receive timely disposition of their cases. Additionally, since timelines serve to clarify statutes and ensure they are consistently applied, statutory requirements for adoption, trust, and involuntary admission cases may be inconsistently applied.

Recommendation:

**We recommend the Probate Courts establish case processing timelines for adoption, trust, involuntary admission, and equity cases. Additionally, these timelines should be adopted as formal case processing standards, as discussed in Observation No. 35.**

*Auditee Response:*

*The Judicial Branch agrees. The Probate Courts are committed to establishing timelines for all primary case types in its jurisdiction, including the case types mentioned in this Observation; however, the adoption of any new standards will reflect the situation in New Hampshire. Any time standard has to reflect the realities facing not only the court system in New Hampshire but also its many constituents, which for the Probate Courts include pro se litigants, government agencies, private attorneys, public attorneys, and litigants.*

*The first timelines developed in the Probate Courts were for guardianship, estate, and termination of parental rights cases. Guardianship and estate cases comprise more than half of the docket of the Probate Courts. Termination of parental rights cases were the subject of certain federal requirements so timelines were set for them. Timelines for adoption, trust, involuntary admission, and equity cases were not given the same priority for several reasons. First, timelines for these cases were seen as being less needed because the Probate Courts had greater confidence that the procedures used in these cases were more uniform statewide than with respect to guardianship, estate, and termination of parental rights cases. Second, for involuntary admission cases court created timelines were less necessary since the timelines in those cases are largely driven by statute. Finally, the category of cases covered by this Observation amounts to only 11% of the caseload of the Probate Courts.*

*Regarding whether these timelines should be adopted as formal case processing standards, see the response to Observation No. 35.*

**Observation No. 35**

***Adopt And Monitor Trial Court Case Processing Standards***

The Superior, District, and Probate Courts, and the Family Division Pilot Project have established and adopted timelines to guide case processing for various case types within their jurisdictions. However these timelines reportedly serve just as guidelines and are not standards monitored for compliance. Results from our survey of court clerks and registers indicate 17 of the 44 respondents to the question do not track the time it takes to process the court's caseload from filing to disposition. In addition, 13 of the 38 respondents to another question do not produce reports to assist them in caseload management.

According to the National Center for State Courts' (NCSC) *Caseflow Management: The Heart of Court Management in the New Millennium*, adopting case processing standards reflects a commitment that timely disposition of cases is an important goal. Additionally, courts with successful caseflow management programs have a clear understanding of what they are trying to accomplish because their goals are reflected in case processing time standards they have adopted. According to the ABA's *Standards Relating to Trial Courts*, standards of timely disposition are important management tools providing a mechanism to evaluate a court's performance. Time standards provide a yardstick for measuring management effectiveness and serve as a benchmark for determining whether the pace of court proceedings is acceptable. Additionally, the ABA states one factor contributing to delay is the absence of clear goals toward which a court can direct its supervisory efforts. In a 1999 study conducted by the NCSC, researchers concluded a court's degree of commitment to case processing time goals shapes the impact these goals have on attorneys and judges and ultimately, on the pace of litigation.

Absent clear case processing goals, processing times may not be reviewed and monitored. As a result, litigants may not receive timely disposition of their cases. The absence of clear goals also diminishes management's ability to compare case processing time from court to court and among court departments to ensure resources are distributed fairly and equitably. Additionally, without enforced standards and a method for checking compliance with those standards, there is no accountability for timely disposition of cases.

Recommendation:

**The Superior, District, and Probate Courts and the Family Division Pilot Project should monitor compliance with adopted standards.**

*Auditee Response:*

***The Judicial Branch agrees. As shown in prior responses, the Judicial Branch has been moving toward the adoption of case processing guidelines in all levels of court and is committed to their adoption in areas where standards do not exist today. Furthermore, the Judicial Branch agrees that compliance with the guidelines should be monitored. A good example of this monitoring is the performance evaluation report for 2002 where the Supreme Court compared its performance for all the cases disposed of in 2002 with its time standards.***

*To monitor compliance with standards, a necessary tool is proper management reporting The trial courts in the Judicial Branch are still operating a case management system run on DOS and originally installed in the 1980s. It is simply incapable of the type of management reporting needed to either monitor or enforce compliance with standards. The Legislature appropriated capital funds in the 2001 session, and has extended that appropriation in the 2003 session, sufficient for the Branch to purchase the hardware necessary to run a modern case management system and the software comprising the system. The hardware is now in place, and a contract for the purchase of the software is expected shortly. Thus, the Judicial Branch anticipates that during the current biennium it will have a case management system capable of monitoring compliance with standards.*

*Proper monitoring of standards, however, is extremely labor intensive. Once the management reports identify cases outside the parameters of the standards, it takes people to review the files and take the action necessary to bring offending cases into compliance. With more than sixty clerical vacancies in the Judicial Branch, a number that now exceeds ten percent of it clerical workforce, the manpower to properly monitor standards is just not there.*

*In sum, the Judicial Branch is committed to adopting case processing standards and to monitoring compliance.*

## 5.2 Delay Prevention And Reduction

Courts can prevent delay and ensure timely case processing by establishing a delay prevention and reduction program. According to the ABA and the NCSC, elements of a delay prevention and reduction program include continuous court supervision and control over the movement of cases, promulgating and monitoring case processing time standards, commencing trials on the original scheduled date, and a firm, consistent policy for minimizing continuances.

Early intervention and continuous monitoring are key components of timely disposition. Once a case is filed, courts should assume responsibility for moving it through the judicial process. The ABA, in its *Trial Court Performance Standards*, recommends courts initiate procedures for early differentiation of cases according to their urgency, complexity, subject matter, and common parties through the use of Differentiated Case Management (DCM). DCM eliminates the first-in-first-out model of case processing and replaces it with a caseflow management program based on complexity and readiness of the case to proceed to the next step. DCM attempts to maximize resources by quickly disposing of cases that can be easily resolved, freeing up resources for complicated cases. One element of DCM is establishing multiple tracks and criteria for assigning individual cases to these tracks. Courts should also institute early case screening to identify and eliminate case events that do not contribute to case resolution while incorporating events that promote early case disposition. Results from our survey of court clerks and registers revealed seven out of 46 court clerks and registers responding to the survey question do not screen cases for complexity or other issues. Additionally, seven out of 45 court clerks and registers report their court has not established specialized tracks for processing cases.

To achieve management results, courts must adhere to and monitor case processing goals. Case processing goals help identify cases that exceed appropriate standards for case disposition as

well as help courts monitor delay by providing a method to evaluate progress. Court personnel report the case processing guidelines used by the trial courts serve only as guidelines and are not standards to which the courts must adhere. Our survey of court clerks and registers revealed 17 of 44 respondents to the question do not monitor the time it takes to process a case from filing to disposition. Additionally, 13 of 38 clerks and registers responding to the survey question report they do not receive or generate reports to assist them in managing their court's caseload.

Judges should retain exclusive authority to grant continuances and the court system should establish a strict, written continuance policy that is consistently applied. According to the ABA, a court that is too liberal in granting continuances encourages attorneys to be unprepared and encourages more requests for continuances. Firm enforcement of deadlines breaks this cycle and encourages attorneys to prepare for appearances, resulting in fewer delays in the judicial process. The court should track all requests for continuances and issue disciplinary action for excessive requests. The State Justice Institute advocates a continuance rate of 15 percent or less. Our survey of court clerks and registers revealed 21 out of 45 respondents to our question reported their court does not have a formal written continuance policy. Ten of 31 clerks and registers reported the clerk or register also grants continuances. Two District Court clerks also reported court assistants grant continuances. According to our survey of court clerks and registers, ten of 38 respondents to the question reported their court has a continuance rate of more than 15 percent for pre-trial hearings and 18 of 43 respondents to the question reported a continuance rate of more than 15 percent for trials.

According to the NCSC, about 95 percent of all criminal cases are disposed by plea or other non-trial means. Therefore, management of criminal cases should focus on ways to provide for meaningful plea discussions at the earliest stage of the proceedings as possible. Establishing a plea cut-off date ensures the docket for the day does not collapse due to last minute plea negotiations, leading to better utilization of court resources. The NCSC advocates the court schedule a conference between the prosecutor and defense attorney where the prosecutor's best plea offer is presented. Any plea entered after the designated plea cut-off date should be to the original charge. This helps prevent defendants from waiting for the most favorable deal and reduces the number of cases that go to trial. Additionally, eliminating last-minute plea negotiations allows the court to better schedule cases and ensures better use of judicial time. In our survey of court clerks and registers 25 of 37 respondents to the question reported their court does not have a written plea cut-off policy. Through the surveys and our field visits, five court clerks expressed last minute plea negotiations are a problem for their court. Three expressed many pleas are entered on the day of court and some defendants do not start to discuss a plea until the jury has been selected and they know trial is imminent. One clerk expressed that judge time could be better utilized if there is a plea cut-off date.

Firm trial dates are as important as enforcing a firm continuance policy. Therefore, the court should adopt firm policies regarding scheduling trials and trials should start on the first date scheduled. According to the ABA, uncertainty regarding trial dates lends itself to last minute continuances and settlements, leading to underutilization of court resources.

The remainder of this section presents our observations regarding the Branch's compliance with ABA case processing standards.

**Observation No. 36**

***Employ Delay Reduction Procedures In The Supreme Court Consistent With ABA Standards***

Since the Supreme Court did not have an automated case management system, we could not readily calculate the time between intermediate steps in the appellate process or determine the Supreme Court's compliance with established standards for these steps. We were able to calculate the time from filing to disposition and determine compliance with these standards. The Supreme Court could not provide automated case information for calendar year 2002; however, we manually collected the data in December 2002 using docket cards printed from the case management system. SFY 2002 data is not included in the analysis because at the time we gathered the data, 61 percent of cases accepted for review had not yet been disposed.

According to the ABA's *Standards Relating to Appellate Courts,* an appellate court should dispose of 90 percent of its cases within one year of filing the notice of appeal and the remaining ten percent should be disposed as quickly as possible. As shown in Figure 17, from SFY 1997 through 2001, the Supreme Court met the ABA standards in 18 percent, 15 percent, 21 percent, seven percent, and 21 percent of the cases respectively for a five-year average of 16 percent. In other words, only 21 percent of the cases filed in SFY 2001 were disposed of within 365 days.

**Figure 17**

**Percent Of Supreme Court Cases Meeting ABA Standards**
**SFY 1997 - 2001**




Note: Number of cases represents cases accepted for review and disposed during that SFY.
Source: LBA analysis of Supreme Court data.

**The Supreme Court reportedly experienced a backlog during our audit period. During this time the court had a long fully-briefed list, so some cases were not being scheduled for oral argument until other cases on the list had been scheduled, regardless of how long the case had been waiting**

on the list. To alleviate the backlog, the Court instituted the Three Justice Expedited (3JX) Docket in December 2000. Court personnel reported, as of July 2003, the Court has no backlog, therefore cases are being scheduled for oral argument immediately after they are fully briefed. However, Court personnel stated if the Court becomes backlogged again, scheduling cases for oral argument could become an issue.

Supreme Court Rule 21(7) reportedly addresses continuance requests. However, Rule 21(7) does not address continuances directly, rather it addresses non-dispositive motions and orders in general. The court manually tracks continuances because neither the old tracking system nor the new case management system has the ability to track continuances.

Recommendation:

**We recommend the Supreme Court establish a delay reduction program consistent with elements proposed by the ABA. To prevent cases from waiting unnecessarily for oral arguments, the Supreme Court should schedule cases for oral argument based on the date the briefing is completed. As discussed in Observation No. 8, the Supreme Court should ensure the new case management system can readily track information necessary to monitor compliance with case processing standards. Finally, the Supreme Court should establish and strictly enforce a formal continuance policy.**

*Auditee Response:*

*The New Hampshire Supreme Court agrees with these recommendations and submits that they are being accomplished by the court on an on-going basis.*

*This Observation makes the following four recommendations: (1) that the Supreme Court establish a delay reduction program; (2) that cases be scheduled for oral argument based on the date briefing is completed; (3)that the Supreme Court ensure its new case management system has the ability to track information necessary to monitor compliance with case processing standards, and (4) that the court establish and enforce a formal continuance policy. Each will be discussed in turn.*

*The Supreme Court has established a delay reduction program. In the fall of 2000, more than 180 argued cases were awaiting opinions, and approximately 150 fully-briefed cases were awaiting argument. The court set about on a delay reduction program on several fronts. First, it hired additional staff both on the professional and clerical levels. This move was long overdue since the increase in the Supreme Court's staff during the decade from 1988 through 1997, when case filings increased from 504 to 915, did not come close to keeping apace with that volume increase. Second, it established a program for early case differentiation, known as the 3JX docket, whereby cases of less precedential value were heard sooner, in shorter arguments, before three judges. Early case differentiation is one of the points mentioned in this Observation. Third, it began sitting for oral argument for three consecutive months, not having argument in the fourth month to concentrate on finishing all opinions in cases argued in all but the last month of the prior three. This pattern is repeated for each four month segment of the year. As such, the court has set a recurring goal for itself. Goal setting is another of the points mentioned in this*

*Observation. The result of these delay reduction efforts has been the elimination of the backlog faced in 2000. The court is now scheduling cases for oral argument on a current basis. At the end of each four-month cycle of three months of argument and one without argument, the court has been very close to completing opinions in all cases argued more than two months earlier. This successful delay reduction effort would not have been possible without the increase in court staff.*

*The second recommendation is that cases be scheduled for argument based on the date briefing is completed. Both a system of scheduling cases based on the date of completion of briefing and one based on the date the case was filed are logical. The New Hampshire Supreme Court has opted for the latter system because it gives preference to the oldest cases on the docket. In fact, this Observation itself concentrates on statistics of case disposition based on time between case filing and case disposition. Scheduling cases for oral argument based on case filing dates, as does the New Hampshire Supreme Court, will result in the lowest possible filing to disposition time period. It should also be noted that there are exceptions to the date of filing rule. Certain classes of cases, such as cases involving the status of a child, landlord and tenant cases, lawyer discipline case, and domestic violence cases are scheduled on a priority basis. In addition, the court in its discretion can expedite the processing of time sensitive cases – another method of case differentiation.*

*The third recommendation is that the court ensure its new case management system has the ability to track information necessary to monitor compliance with case processing standards. The new system will allow this tracking. Even using manual systems for the past many years, the court has, as mentioned in the response to Observation No. 8, engaged in an extensive monitoring and control system based on accurate data. Court staff has produced many reports for staff and the justices. These include screening reports, which told the justices what screening was outstanding; transcript tracking reports, which reported on the status of all outstanding transcripts; the fully briefed list, which provided a list of all the cases fully briefed and awaiting scheduling for oral argument; status lists kept of cases awaiting opinion both on a full court and individual justice basis and shown by age since submission of the case to the court; and finally, the list of cases pending reconsideration and rehearing. Furthermore, as reported in the annual performance evaluation report for 2001 and 2002, the New Hampshire Supreme Court monitors its compliance with the time standards it has set. In addition, the court's docket is monitored monthly in conjunction with the preparation of the oral argument calendar. Continuous court supervision and control of its docket has always existed at the New Hampshire Supreme Court, even at the height of the court's backlog.*

*Finally, this Observation recommends the establishment and enforcement of a formal continuance policy. Continuances have not been a serious source of delay at the New Hampshire Supreme Court. One justice is in charge of continuance requests, thereby achieving consistency and oversight of continuances.*

**Observation No. 37**

***Employ Delay Reduction Procedures In The Trial Courts Consistent With ABA Standards***

**The Superior and District Courts and the Family Division Pilot Project do not meet some case processing standards established by the ABA (Table 15). No national standards exist for processing probate cases. However, the Probate Courts have established caseflow management guidelines for processing steps in termination of parental rights, guardianship, and estate cases, but SUSTAIN does not have the ability to measure compliance with the time frames.**

Table 15

| Average Percentage Of Trial Court Cases Meeting ABA Standards For SFY 1997 - 2002 | | | | |
|---|---|---|---|---|
| **CRIMINAL** | | | | |
| | **ABA Standard** | **Superior Court[1,2]** | **District Courts[2]** | **Family Division** |
| Felony | 90% in 120 days of arrest | 19% | N/A | N/A |
| | 98% in 180 days of arrest | 39% | N/A | N/A |
| | 100% in 12 months of arrest | 80% | N/A | N/A |
| Misdemeanor | 90% in 30 days of arrest or citation | 28% | 38% | N/A |
| | 100% in 90 days of arrest or citation | 42% | 76% | N/A |
| **CIVIL** | | | | |
| | **ABA Standard** | **Superior Court** | **District Courts** | **Family Division** |
| General Civil | 90% in 12 months of filing | 72% | 93% | N/A |
| | 98% in 18 months of filing | 87% | 94% | N/A |
| | 100% in 24 months of filing | 93% | 94% | N/A |
| **EQUITY** | | | | |
| | **ABA Standard** | **Superior Court** | **District Courts** | **Family Division** |
| Equity[3] | 90% in 12 months of filing | 84% | N/A | N/A |
| | 98% in 18 months of filing | 90% | N/A | N/A |
| | 100% in 24 months of filing | 93% | N/A | N/A |
| **DOMESTIC RELATIONS** | | | | |
| | **ABA Standard** | **Superior Court** | **District Courts** | **Family Division** |
| General Domestic Relations | 90% in 3 months of filing | 42% | N/A | 43% |
| | 98% in 6 months of filing | 63% | N/A | 65% |
| | 100% in 12 months of filing | 82% | N/A | 86% |
| **JUVENILE** | | | | |
| | **ABA Standard[4]** | **Superior Court** | **District Courts** | **Family Division[5]** |
| Arraignment to Disposition | 45 days of arraignment | N/A | 66% | N/A |

[1]Felony data were calculated from the date the case was filed in the court.
[2]Misdemeanor data were calculated from the date the case was filed in court.
[3]ABA general civil standards are applied to the Superior Court's equity cases because equity is a specialized civil case.
[4]Days are the sum of the maximum number of days for arraignment to adjudicatory hearing and adjudicatory hearing to dispositional hearing.
[5]Family Division Pilot Project data could not be calculated because data was not available.
Source: LBA analysis of Judicial Branch caseload data.

**The Superior Court does not meet any of the ABA's felony case processing standards. The ABA calculates the days from filing to disposition in a felony case beginning with the date of arrest.**

The date of arrest was not available in the database obtained from the Judicial Branch, therefore data were calculated from the date the case was filed in the Superior Court.

Misdemeanor arraignments for Superior Court cases occur in the District Courts prior to being sent to Superior Court. Additionally, our conversations with District Court clerks revealed police departments are not always timely in submitting complaints to the court. Therefore, we calculated the number of days for adjudication beginning the day the case is filed in the court.

As discussed in Observations No. 30 and 33, RSA 169-B:14, II requires an adjudicatory hearing within 21 days of arraignment if a juvenile is detained and within 30 days if the juvenile is released. Additionally, RSA 169-B:16, V requires a dispositional hearing within 21 days of the adjudicatory hearing if the minor is detained and within 30 days if the minor is released. As discussed in Observation No. 9, we were unable to check the Family Division Pilot Project's juvenile caseload against ABA standards because SUSTAIN does not have the ability to track necessary data. For our analysis of District Court juvenile cases, we assumed every juvenile was released, using a conservative estimate of 45 days, the maximum number of days under ABA standards. We then calculated the number of days for adjudication beginning the day of arraignment. Table 15 shows the average percentage of criminal, civil, equity, domestic relations, and juvenile cases meeting ABA standards.

**Recommendation:**

**We recommend the trial courts establish delay reduction programs containing elements advocated by the ABA. The delay reduction programs should include elements of DCM, monitoring case processing guidelines, and establishing firm trial dates and continuance policies.**

*Auditee Response:*

*The Judicial Branch agrees in part. The issue of adopting ABA standards with respect to the trial courts has been previously discussed in the responses to Observation Nos. 30 through 34. Reference should be made to those responses.*

*Currently, delay reduction is not occurring in New Hampshire's trial courts. Since the adoption of the budget for fiscal year 2002 in June 2001, vacancies in the clerical workforce in the trial courts have climbed. For fiscal year 2002, the Judicial Branch averaged approximately 40 vacancies, or about 7% of its workforce, in order to live within its appropriation. For fiscal year 2003, just ended, that number increased to approximately 50 vacancies, or more than 8% of the non-judicial workforce. As of September 10, 2003, even with a recent cancellation of the layoff of 28 employees, there exist 70 non-judicial vacancies in the Judicial Branch workforce. This amounts to almost 12% of that workforce.*

*In light of these numbers, delay reduction is not a reality in New Hampshire's trial courts. Delays are increasing. A good indication of that fact can be seen in the Judicial Branch's Annual Report for 2002. For each level of trial court, the number of cases filed exceeded the number of cases disposed in fiscal year 2002. That fact means that backlogs are increasing.*

*The fact that filings are exceeding dispositions in the trial court is confirmed in this report. Every level of trial court had its worst clearance rate, i.e. case dispositions divided by case filings, in the last year of the audit period, SFY 2002. Moreover, all of those clearance rates were 96% or below, whereas in the first three years of the audit period (SFYs 1997 through 1999), the Superior and Probate Courts were 100% or above each year and the District Courts were at either 99% or 100%. See Tables 5, 7, and 9, at pages 26, 29, and 33.*

*Money is not the answer to every problem in the court system; however, the system cannot continue to endure a shrinking workforce and be expected to reduce delay at the same time. An exception to the shrinking workforce was seen in the New Hampshire Supreme Court in 2000-2001. As part of a delay reduction program, its workforce was increased, as is detailed in the response to Observation No. 36. It is not a coincidence that the Supreme Court was the only court in New Hampshire to dispose of more cases than were filed in fiscal year 2002. The increase in the clearance rate at the Supreme Court has been dramatic. See Table 3 at page 22. The Supreme Court, though, has not been spared the recent workforce declines. Currently, one clerical and three professional positions at the Supreme Court are vacant.*

*New Hampshire's trial courts have been used to delay reduction. In the mid-1990s, the Superior Court led the nation in the percentage of cases disposed of to cases filed. It is sad and frustrating to see the opposite trend take hold in the trial courts. Without even nearly adequate human resources, however, delay reduction is not possible in the very labor-intensive environment of the trial courts.*

## 5.3 Management Issues

We found the Judicial Branch should develop Branch-wide definitions of data elements. We recommend the courts give defendants their sentences in writing. Finally, we recommend the Legislature consider eliminating Saturday arraignments.

**Observation No. 38**

***Establish Branch-Wide Definitions Of Data Elements And Ensure They Are Consistently Applied***

The trial courts use different definitions of when a case is disposed, as well as what constitutes a brought forward case, or re-entry. A brought forward case is a case that has previously been closed but is re-opened for further action. The Superior Court created a statistical definitions and entry procedures manual in 1999. However the guidelines were inconsistently followed and are reportedly subject to each clerk's interpretation.

For example, responses to our survey of court clerks and registers revealed different definitions for when a criminal case is disposed through a trial. Thirty-two respondents reported four different definitions. Sixteen clerks reported using the date of the judge's order as the disposition date, ten clerks reported using the date of sentencing, eight clerks reported using the end of the appeal period, and one clerk reported using the date of the clerk's notice as the disposition date. However, three clerks reported more than one definition for disposition.

Similarly, 36 respondents gave four different definitions of disposition for criminal cases where a plea of guilty is entered. Two clerks reported more than one definition of disposition. Also, 37 respondents reported five definitions for disposition in settled civil cases. In this case, three clerks reported more than one definition of disposition.

Definitions of disposition for other case types such as domestic violence, juvenile, and violations were similarly inconsistent among survey respondents.

The trial courts also define and track brought forward cases inconsistently. The Superior Court tracks and reports brought forward cases as part of the court's caseload, while the Family Division Pilot Project and the District Courts do not. In a memo from March 2003, the District Court administrative judge encourages the Judicial Branch to establish a common definition of re-entry and apply it consistently across all levels of court.

According to the NCSC, uniform definitions of case events allow management to gather comparable data from all courts. Court rules or statutes should specify a clear set of definitions and management should conduct periodic audits to ensure data elements are reliable and uniformly defined. The Judicial Branch uses caseload information for the weighted caseload system; therefore, data used to establish case weights and determine allocation of resources should be reliable, valid, and comparable.

Without a standardized definition of disposition, the Judicial Branch cannot ensure all courts are measuring their case processing timelines based on the same endpoint. Our file review of a random sample of 720 cases from the trial courts showed that 89 disposition dates (12 percent) were inaccurate. Different definitions of disposition among the courts could have contributed to this. Additionally, the absence of a consistent definition of disposition diminishes management's ability to evaluate court performance.

When brought forward cases are inconsistently defined, statistics may not be kept uniformly among the trial courts and courts risk overstating or understating their caseloads. Without consistent data, Judicial Branch management are unable to compare workload and adequately determine the need for judicial and clerical resources among courts.

Recommendation:

**We recommend the Judicial Branch establish Branch-wide definitions of data elements and case processing events in court rules and ensure they are consistently applied.**

*Auditee Response:*

*The Judicial Branch agrees in part. The Administrative Council expects to appoint a committee charged with identifying core court events and recommending definitions of those events for use by all court personnel. This task will proceed slowly because the committee will consist of, and depend on, personnel whose time is already fully committed to serving the immediate needs of litigants.*

*The capacity of the Judicial Branch to ensure that the definitions of events are consistently used at 66 court sites will depend largely on the willingness of the Legislature to appropriate funds necessary (1) to fill a vacant court auditor position and (2) to hire a full-time court statistician.*

*Court rules are intended to bring order, consistency, and predictability to practices and procedures followed by litigants. Data element definitions will not be promulgated in court rules.*

**Observation No. 39**

***Provide Sentences In Writing To Defendants At Time Of Sentencing***

Sentences are not always given to defendants at sentencing in written form. Instead, the sentence is typically read to the defendant in court. An administrative judge speculated copies are not given to defendants because the clerk's offices do not have the staff resources to provide it, but also agreed defendants should receive written sentences.

Defendants not immediately receiving their sentences in written form may have difficulty complying because they may misunderstand or may not recall the provisions. One clerk stated defendants default because they are unaware of when a fine is due, resulting in an arrest warrant for the defendant.

**Recommendation:**

**We recommend the Judicial Branch ensure all defendants receive a written copy of their sentence at sentencing. We further recommend the Judicial Branch examine the feasibility of generating the sentence from the bench using the new case management system thereby enabling the sentence to be given to the defendant at sentencing. Until then, the Branch's multi-page complaint form should be redesigned to add a page to allow the defendant to receive a copy of the sentence.**

*Auditee Response:*

*The Judicial Branch agrees that providing written sentences to defendants at the time of sentencing is a good idea. There are, however, practical obstacles to accomplishing that goal. The Administrative Council will consider whether this idea can be made a reality at a reasonable cost.*

**Observation No. 40**

***Amend RSA 594:20-a To Eliminate Saturday Arraignments***

RSA 594:20-a requires arrested persons appear before the District Court within 24 hours, excluding Sundays and holidays. Their initial appearance, or arraignment, is to ensure due process by reading the formal charges to the defendant. As a result, the District Courts currently hold Saturday arraignments as necessary in 36 District Court locations across the State. According to the District Courts administrative judge, Saturday arraignments are unnecessary and could be eliminated without violating a defendant's rights under the United States Constitution.

Thirty of 35 judges and 32 of 33 clerks responding to our survey question indicated they would like to see the practice changed by either excluding Saturdays *or* utilizing video arraignment to centralize Saturday arraignments and utilize District Court judges on a rotating schedule. Upon further inquiry judges and clerks overwhelmingly recommended revising RSA 594:20-a to exempt Saturdays in addition to Sundays and holidays.

According to the District Courts administrative judge there are no Constitutional issues involved with revising the statute. In addition, he stated counties would primarily benefit because they would save the cost of transporting prisoners to court on Saturday. The State would have minimal savings because the District Courts try to use salaried employees to attend Saturday arraignments, but some of the larger courts bring in security officers who are paid on a per diem basis.

Recommendation:

We recommend the Legislature consider revising RSA 594:20-a to eliminate the requirement of the District Courts to hold arraignments on Saturdays.

*Auditee Response:*

*The Judicial Branch takes no position. The Judicial Branch complies with RSA 594:20-a as it currently exists and, if it is amended, the Branch will comply with it as amended.*

CONFIDENTIAL

## STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH ADMINISTRATION

## COURT REPORTING

The Judicial Branch relies on court reporters, court monitors, and untrained court personnel to record court proceedings. Court reporters take stenographic notes during court proceedings and are paid a per-page fee to produce transcripts from their notes. Court monitors operate either analog (tape) or digital (computer-based) audio recording machines and take log notes during proceedings. Audio recordings of court proceedings are transcribed by either private sector transcriptionists or by Branch-employed court monitors trained as transcriptionists. As of March 31, 2003, the Branch employed 17 full-time court reporters, 26 full-time court monitors (including three transcriptionists), and one part-time court monitor. All court reporters and most court monitors are assigned to the Superior Court.

In this chapter we recommend the Judicial Branch make changes to the level and management of its current record-taking resources. In addition, we found areas where policies, procedures, and rules concerning court reporters and court monitors can be improved, including performance evaluations, ownership and storage of stenographic notes, confidentiality of transcripts, and timekeeping.

**Observation No. 41**

***Reduce The Number Of Court Reporters Employed And Increase The Use Of Court Monitors And Digital Audio Recording Technology***

Although court reporters provide certain benefits specific to their method of taking the record, the cost to retain all 17 court reporters presently employed by the Judicial Branch is not justified when the relative cost of employing court monitors, the need for additional court monitors in the other trial courts, and the benefits of digital audio recording technology are considered.

The Judicial Branch is replacing its analog audio recording machines, which are presently used in 123 courtrooms, hearing rooms, and chambers, with digital audio recording technology. The Branch is also phasing out its use of court reporters by replacing them with court monitors as the court reporters leave State service, reportedly due to the high cost to employ court reporters relative to court monitors, and because the Branch would like to discontinue the practice of allowing court employees to serve as independent contractors by selling transcripts.

The Judicial Branch conducted a 90-day pilot evaluation of digital audio recording technology at Strafford Superior Court during 2001. AOC technology personnel evaluated three digital recording products for functionality and price before choosing one product to use in the pilot project. Personnel testing the digital audio recording technology at Strafford Superior Court and the AOC technology staff concluded the technology met all expectations. According to the Judicial Branch, the benefits of digital audio recording technology include: 1) superior sound quality relative to analog audio recordings, 2) immediate access to any part of the recorded testimony, 3) precise and automatic time referencing of audio, 4) storage of a full day of court proceedings on a single CD ROM, 5) electronic note taking capability, 6) ability to review log notes and audio from earlier proceedings while continuing to record, and 7) improved transcription quality and timeliness.

The Federal Judicial Center's *Digital Audio Recording Technology: A Report on a Pilot Project in Twelve Federal Courts* supports the AOC's conclusions relative to digital audio recording technology. According to the report, digital audio recording technology provides opportunities for integration with other digital systems such as case documents, as well as the ability to transmit the record electronically to other court offices and transcriptionists. While some courts involved in the federal pilot project experienced difficulties in implementing the new technology, all twelve courts recommended approving digital recording as a method for taking the official record. In September 1999, the federal Judicial Conference approved digital audio recording technology as a method of taking the official record of federal court proceedings.

At the state level, the California Legislative Analyst's Office concluded in 2003 that audio recording is a reliable and cost-effective alternative to court reporting. Its conclusion was based on a survey of other states' practices and experiences as well as the results of the California Judicial Council's evaluation of a pilot project that tested audio and video recording at 75 sites. However, it noted the availability of monitoring staff is important to the successful implementation of the technology.

Judicial Branch personnel, including court reporters and court monitors, identified various benefits and drawbacks with both court reporters and recording technology staffed by court monitors. According to survey responses and interviews, benefits of court reporters include: 1) accuracy of the transcripts they produce, 2) familiarity with the proceedings they transcribe, 3) ability to ask those present in the courtroom to restate inaudible portions of testimony, 4) availability of same-day transcripts, and 5) real-time reporting technology provides near-instant text of court dialogue on computer monitors for hearing impaired individuals. Drawbacks of utilizing court reporters noted by court personnel include: 1) the high compensation cost, including pay for travel to and from work and to produce transcripts at work; 2) required breaks during court proceedings; and 3) no procedure to check the accuracy of the work products.

Reported benefits of utilizing court monitors to record court proceedings include: 1) accuracy of the record, 2) testimony can proceed while exhibits are marked, 3) proceedings can be reviewed on audio recordings without ordering a transcript, 4) accuracy of transcripts can be challenged with the audio recording, 5) ability to ask those present in the courtroom to restate inaudible portions of testimony, and 6) the lower cost to employ court monitors relative to court reporters. In addition, court monitors provide clerical assistance in the clerk's office during breaks in courtroom proceedings. Drawbacks of court monitors noted by court personnel include: 1) greater difficulty to order transcripts relative to court reporters, 2) no same-day transcripts, and 3) instances of inaudibles noted in transcripts produced from recordings.

Our analysis of the cost to the Judicial Branch to employ and equip court monitors and court reporters during SFY 2002 shows the cost of taking a courtroom record utilizing a court reporter is approximately *double* that of utilizing a court monitor. Our analysis of Judicial Branch payroll information showed the average annual cost to employ a court reporter during SFY 2002 was $77,328, or $297 per day, including regular and longevity pay, benefits, and taxable mileage payments for travel between home and work. Court reporters themselves pay for most of the equipment they use to perform their duties. We estimate the annual cost to the Judicial Branch to employ a court monitor using computer-based digital recording equipment during SFY 2002 was

$39,113, or $150 per day. The estimated annual cost to employ a court monitor using analog recording equipment was $38,224, or $147 per day. These estimates include regular and longevity pay, overtime pay, and benefits, as well as equipment purchase and maintenance costs. According to the AOC director, the Branch's digital audio recording equipment vendor will provide training to a limitless number of court personnel with the installation of one new digital audio recording unit, and the Branch's cost to train one employee on analog recording equipment is $125.

Either a court reporter or court monitor takes a record of all proceedings in the Superior Court. However, District and Probate Courts, and Family Division Pilot Project proceedings are usually held in monitor-less courtrooms, where untrained court personnel turn on an audio recording machine when the judge enters the courtroom but do not take log notes or monitor the recorder. During monitor-less proceedings, the clerk is responsible for ensuring the recording machine is operating properly and has sufficient tape. The District and Probate Courts share one full-time floating court monitor and one part-time floating court monitor, and the Family Division Pilot Project locations share three full-time floating court monitors, who offer limited court monitoring resources to those courts.

According to District and Probate Courts management, the practice of relying on untrained court personnel to occasionally monitor recording equipment significantly compromises the quality of audio recordings. District Court regional administrators reported instances when a recording machine's tape has run out during a proceeding or the machine was not turned on at all. In addition, court monitors take log notes that aid the transcriptionist, as well as court staff when preparing tapes for transcription. As noted in Observation No. 42, better coordination of court reporters and court monitors would allow for better coverage of proceedings by trained record-taking personnel in all courts.

By eliminating most court reporter positions, the Judicial Branch could hire additional court monitors who would enable it to continue to staff each Superior Court proceeding with a trained court monitor and add additional court monitor coverage of proceedings in the other trial courts. Additional court monitors could utilize the mix of analog and digital audio recording units presently available in trial court courtrooms and hearing rooms, while the Judicial Branch expands its use of digital audio recording technology in all levels of trial court as resources permit.

Recommendation:

**We recommend the Judicial Branch eliminate most court reporter positions except a small number of court reporters with real-time capability to aid hearing-impaired parties who rely on that technology, and add additional court monitor positions. The Branch should consider using per diem court reporters for certain proceedings where a court reporter with real-time capability may be necessary, such as those with hearing-impaired parties, attorneys, or witnesses. We also recommend the Judicial Branch determine how many additional court monitors are needed Branch-wide, while considering such factors as the number of courtrooms at each court location, the proximity of court locations, and the**

**likelihood of appeal of all types of cases. We further recommend the Judicial Branch continue to deploy digital audio recording technology as resources permit.**

*Auditee Response:*

*The Judicial Branch agrees in part. Presently 17 court reporters and 19 court monitors take records in the Superior Court for 28 sitting justices, 9 full-time marital masters, and one-half time marital master. Pursuant to Superior Court policy, no justices or marital masters preside in a courtroom without either a court reporter or a monitor, in order to preserve the record of the proceeding for an appeal or for later reference and also to protect the justice or marital master against false accusations by a party displeased with the court's decision. A competent, complete record of all Superior Court courtroom proceedings is essential. The Branch also believes that a record should be available, as needed, in the District Courts, Probate Courts, and Family Division Pilot Project sites.*

*Consistent with the auditors' recommendation, the Judicial Branch has in place a long-standing plan to eliminate court reporter positions and replace them with court monitor positions as court reporters resign or retire from office. In connection with that process, the Judicial Branch expects to appoint a committee charged with 1) evaluating the success of court monitors; 2) recommending additional training in court procedures, professionalism, and tasks related to monitoring the record; and 3) recommending a court monitor compensation plan consistent with the skills required of court monitors, the responsibilities imposed on court monitors, and the importance of the record for which they are responsible. When this analysis is complete, the Judicial Branch expects to reassess the need for stenographers in the New Hampshire Judicial Branch, with an eye, among other things, toward increasing the number of monitors available to District Courts, Probate Courts, and Family Division Pilot Project sites. We will encourage the District Courts to utilize their funds to increase the availability of record takers in the District Courts.*

*Some of the issues regarding court reporter compensation were addressed with the decision to discontinue paying full-time court stenographers for transcripts and judges' orders typed after August 1, 2003.*

*The Judicial Branch expects to continue to upgrade audio recording equipment to take advantage of digital audio recording technology, as resources permit.*

*The Observation incorrectly reports that Probate Court proceedings are usually held in "monitor-less" courtrooms where untrained court personnel simply turn on an audio recording machine but do not take log notes or otherwise monitor the record. Eight of the ten Probate Courts use either a court monitor or court staff member to monitor the record and take log notes in 100% of their recorded cases. In the remaining two Probate Courts, one register reports use of a monitor or staff person in at least 90% of their cases; the last court reports use of a monitor or staff person in at least 75% of recorded cases. Court staff who monitor audio recordings are court assistants who have been trained in the use of audio recording equipment and in the practice of taking log notes.*

**Observation No. 42**

***Improve Management Of Court Reporters And Court Monitors***

Court reporters and court monitors are managed in a decentralized manner resulting in ineffective deployment of the Judicial Branch's record taking resources Branch-wide. The Superior Court retains authority to assign nearly all of the Judicial Branch's court monitors to its court locations for both record taking and clerical work, while the other trial courts frequently use untrained clerical staff and court security officers to operate and monitor recording equipment during proceedings. No procedure exists for reassigning Superior Court court reporters and court monitors to other trial courts when they become available and trained recording personnel are needed elsewhere.

Either a court reporter or court monitor takes a record of all proceedings in the Superior Court. As of March 31, 2003, the Superior Court had 17 full-time court reporters and 22 full-time court monitors. According to their job description, court reporters are under the general supervision of a judge, yet it is not clear who has responsibility for supervising them in practice. A memorandum dated November 20, 2002 from the Superior Court Chief Justice instructs court reporters to assume the responsibilities of court monitors when freed from duties with an assigned judge so court monitors can perform clerical tasks in the clerk's office. However, court reporters are also allowed to leave the courthouse before the end of the day with the permission of a supervisory judge for the purpose of preparing transcripts, for which they are paid a per page fee in addition to their regular salary. This practice may create morale problems among other court employees who are not afforded the same privilege.

Four of the Superior Court's court monitors are "floaters" who often travel to fill in for court reporters or court monitors absent from work, while another three serve exclusively at Hillsborough Superior Court – South and function mainly as transcriptionists. Court monitors preparing transcripts do not receive a per page fee in addition to their regular salary. The remaining court monitors generally work at their home court, though they may be required to travel to other Superior Court locations as well. Hiring procedures and supervision for court monitors in the Superior Court differ depending on whether the employee floats or works primarily at one court.

The manager of operations at the AOC coordinates the assignments of one full-time floating court monitor and one part-time floating court monitor. These court monitors are considered by District and Probate Court management to be shared staff of those two court levels. However, according to the manager of operations, they may be assigned to any level of court, and are primarily assigned to record Supreme Court and Probate Court proceedings. On days when no District or Probate Court requests a court monitor from the AOC, the full-time floater is directed by the Probate Court administrative coordinator to perform clerical tasks at a Probate Court. District Court management stated the monitors are used primarily by the Probate Courts, and are often unavailable to operate recording machines in the District Courts.

The Family Division Pilot Project has three full-time floating court monitors; two are shared by the four Rockingham County locations, one is shared by the four Grafton County locations. The judges and clerks of the Family Division Pilot Project coordinate their daily courthouse assignments.

Recording machines are sometimes monitored by court security officers or clerical staff, which takes them away from their regular work. According to District and Probate Courts, and Family Division Pilot Project management, the lack of trained personnel available to monitor recording equipment has resulted in recordings that are incomplete or contain inaudibles, making transcription difficult or impossible. Some cases have reportedly been appealed to the Supreme Court with an incomplete record.

According to the American Bar Association's (ABA) *Standards Relating to Trial Courts*, all aspects of record making should be governed by system-wide policies administered by the administrative office of the courts. Policies should apply to both court reporters and court monitors, and cover such matters as appropriate record making procedures for different situations.

The ABA states the trial court administrator should be responsible for the management and supervision of court reporters and court monitors, including their assignments and the establishment of pooling procedures for assigning work and priorities in making the record. However, it may be more appropriate for the AOC to assume these responsibilities in New Hampshire, given the lack of record-taking personnel available to the District and Probate Courts and the Family Division Pilot Project. In addition, the relatively small geographic size of the State and the proximity of trial court locations make pooling these trial court staff an efficient alternative.

**Recommendation:**

**We recommend the Judicial Branch centralize the management and coordination of record-taking services at the AOC and develop policies and procedures that apply to both court reporters and court monitors working in the trial courts. Priorities should be established for the assignment of court reporters and court monitors to trial court locations for the purpose of taking the record. In addition, the Judicial Branch should discontinue its practice of allowing court reporters to leave the courthouse early with the permission of a supervisory judge.**

**We note that if the Judicial Branch implements our recommendation to Observation No. 41 by eliminating most court reporter positions in the Superior Court, replacing those eliminated positions with new court monitor positions, and expanding court monitor staffing in the District and Probate Courts and the Family Division Pilot Project, it may be more appropriate for the trial court administrative offices to manage and coordinate the assignments of record-taking personnel.**

*Auditee Response:*

*The Judicial Branch agrees in part. In light of the planned reassessment of the need for stenographers, it is appropriate for trial court administrative offices to manage and coordinate the assignments of record-taking personnel.*

*Effective and efficient management and coordination of those who take the record in New Hampshire's trial courts requires accurate and up-to-date information concerning trials and hearings scheduled at 65 trial courts and one appellate court. Hearings and trials are frequently cancelled without warning mainly because of settlements or pleas; on the other side of the equation, reporters and monitors are often unexpectedly unavailable. It is unrealistic to expect that information can reliably be collected, stored, and updated by the AOC and then used to more efficiently deploy 40 full-time record takers and one part-time record taker among 66 courts sites. Those tasks are best left to administrators at each level of court because they have other responsibilities related to, and are much closer to, the court operations that depend on the presence of a record taker. Responsibility for management of the record making process in New Hampshire courts lies with trial court administrators, consistent with the ABA Standard cited by the auditors.*

*All New Hampshire trial courts are courts of record. A complete and accurate record is essential to all courtroom proceedings in every trial court. The Judicial Branch would need a significant additional appropriation if it were to provide staff dedicated to taking the record in every trial court. The District Courts, the Probate Courts, and the Family Division Pilot Project sites will continue to make use of court monitors when they are available. However, due to budget constraints, it is likely they will continue to depend on court assistants trained in the operation of audio recording equipment and in the taking of log notes to take the record in those courts. The Judicial Branch expects to request funds for adequate staffing and modern equipment to improve the quality of the records of trial court procedures.*

*The responsibility of the AOC is to support New Hampshire courts in areas that require special expertise or that lend themselves to centralization. While the responsibilities discussed in this Observation require skill, they do not require special expertise and they do not lend themselves to centralization. In fact, on account of the issues outlined in the second paragraph above, these responsibilities lend themselves to de-centralized management. For these same reasons, the AOC does not have responsibility for trial court operations in any other part of the New Hampshire Judicial Branch. It would be exceptional, and inappropriate, to create conflicting and confusing lines of authority by making the AOC responsible for this part of trial court operations.*

**Observation No. 43**

***Require Court Reporters To Submit Bi-Weekly Payroll Time Reports***

According to the Judicial Branch's *Court Financial Policy Manual*, all employees must submit bi-weekly payroll time reports documenting time worked and leave taken during pay periods. Payroll time reports must be approved by a clerk or register and submitted to the AOC. However, court reporters do not submit bi-weekly payroll time reports. Instead, court reporters' payroll hours default to 75 hours per pay period.

Court reporters are classified as administrative employees and therefore accrue annual, sick, and administrative leave time pursuant to accrual rates specified in Judicial Branch Personnel Rule 45. Court reporters' requests for leave time are directed to the Superior Court Chief Justice for approval. As noted in Observation No. 42, court reporters are also allowed to leave the courthouse before the end of the day with the permission of a supervisory judge for the purpose of preparing transcripts, for which they are paid a per page fee in addition to their regular salary.

Without bi-weekly payroll time reports completed by court reporters, the Judicial Branch cannot ensure court reporters completed leave slips or received the permission of a supervisory judge for all leave time taken during a bi-weekly pay period.

Recommendation:

We recommend the Judicial Branch require court reporters to submit bi-weekly payroll time reports that document all time worked and approved time away from work in compliance with established Judicial Branch policy.

*Auditee Response:*

*The Judicial Branch agrees. The AOC information technology staff expects to adapt payroll system software to facilitate electronic recording of court reporters' (1) time worked and (2) actual leave approved and taken.*

**Observation No. 44**

***Ensure The AOC Communicates Information Regarding Ownership Of Stenographic Notes And Develop A Policy Regarding Proper Storage Of Stenographic Notes***

Pursuant to RSA 519:29, the supplies court reporters (stenographers) use in court business, such as paper and computer disks for taking stenographic notes, are paid for and provided by the courts. Accordingly, Superior Court Administrative Rule 3-8 states: "Any and all stenographers' notes ... shall be the sole property of the Superior Court." However, survey responses by court reporters indicate confusion regarding ownership of the notes they produce and the mediums on which they record their notes. Of the 14 court reporters responding to our survey, four indicated they own the notes, tapes, and disks they produce while taking a record of court proceedings, while another four indicated both the court reporter and the court share ownership. In addition, four Superior Court clerks believed court reporters own the notes, tapes, and disks they produce while taking a record of court proceedings.

Ownership of stenographic notes becomes an issue when court reporters leave State service. Court reporters indicated notes and disks produced by court reporters that have left State service are sometimes retained by those individuals. Without court access to the stenographic notes from a proceeding, a transcript of the proceeding cannot be prepared by another court reporter.

According to the ABA's *Standards Relating to Trial Courts*, the court should have ownership and control over court reporters' records of court proceedings. In addition, system-wide policies administered by the administrative office of the courts should govern ownership and storage of stenographic notes.

Recommendation:

We recommend the AOC ensure all court reporters receive a copy of Superior Court Administrative Rule 3-8 regarding the court's ownership of stenographic notes, tapes, and

disks. We also recommend the AOC develop and implement a policy regarding custody, storage, and inventorying of stenographic notes, tapes, and disks.

*Auditee Response:*

*The Judicial Branch agrees. With input from the Administrative Council, the Supreme Court expects to promulgate a policy concerning possession and storage of stenographic notes, tapes, and disks. That policy, and information concerning Superior Court Administrative Rule 3-8, will be distributed to reporters and monitors by the appropriate supervisory authorities.*

**Observation No. 45**

***Improve Performance Evaluations Of Court Reporters, Court Monitors, And Transcriptionists***

Court reporters, court monitors, and Superior Court Transcript Center transcriptionists receive performance evaluations annually. The evaluation form and criteria used are the same for evaluating all other non-judicial personnel. However, their work is uniquely specialized and technical relative to the work of other non-judicial employees and quality is critical to the accuracy of the court record.

According to their job description, court reporters are evaluated based on the speed and accuracy of their work, which includes taking stenographic notes during court proceedings and preparing accurate and timely transcripts from those notes. However, no formal process exists for evaluating court reporters' unique work products. A customized evaluation form could be used to evaluate court reporters' performance allowing the evaluator to comment on quality of work, timeliness of transcripts, and adherence to transcript formatting requirements specified in Supreme Court Rule 15(7).

The court monitor job description does not mention specific performance evaluation procedures, and there is no process for evaluating court monitors' specialized work, which includes monitoring and controlling courtroom recording equipment and preparing extensive log notes. Court monitors could be evaluated based on criteria established in their work manual, *Procedures for Sound Recording Practices in New Hampshire Courts*, which contains information relating to court monitors' responsibilities as well as specific procedures to be followed that are part of maintaining an accurate record. Superior Court Transcript Center transcriptionists, who hold the court monitor job title and sometimes perform the duties of a court monitor, are not evaluated based on the quality of the transcripts they produce. The Office of the Chief Justice of the Superior Court plans to evaluate transcripts produced by the transcriptionists based on its own *Standards For Transcriptionist Certification and Transcript Format in the New Hampshire Superior Court* beginning in 2003.

Employee performance evaluations can be used in compensation and promotion decisions, as well as to identify training needs. Without addressing the quality, accuracy, or timeliness of their respective work products, performance evaluations of court reporters, court monitors, and transcriptionists do not consider the full scope of their job responsibilities, and the Judicial Branch has no assurance the record of court proceedings is accurate.

Recommendation:

**We recommend performance evaluations of court reporters, court monitors, and transcriptionists consider the quality, accuracy, and timeliness of their respective work products.**

*Auditee Response:*

***The Judicial Branch agrees. The AOC Manager of Operations expects to work with appropriate Judicial Branch personnel to recommend performance evaluation forms that address the special job requirements of court reporters and monitors.***

***By order dated July 16, 2003, the Supreme Court eliminated the Superior Court Transcription Center at Hillsborough Superior Court – Southern District and abolished the transcriptionist positions.***

**Observation No. 46**

***Centralize Coordination Of Transcription Services***

The Judicial Branch currently utilizes court reporters, court-employed transcriptionists, and approved private sector transcriptionists to produce transcripts of court proceedings. Court policies and procedures for ordering transcripts and monitoring compliance with appropriate time standards for completion of transcripts differ depending on trial court level, court location, and method of transcription. Lack of uniformity in policy and procedure can result in differences in treatment of those responsible for preparing transcripts, and makes it impossible to comprehensively monitor and evaluate transcript producers.

The Superior Court uses court reporters, Superior Court Transcript Center transcriptionists, and approved private sector transcriptionists to transcribe Superior Court proceedings. Court reporters prepare transcripts of proceedings they recorded using a stenotype machine. Supreme Court Rule 15, Superior Court Rule 80, and Superior Court Administrative Rules 3-1 through 3-7 communicate court reporters' responsibilities regarding transcription. The Superior Court Center maintains monthly reports that indicate the number of pages each court reporter has remaining to be transcribed, though it does not monitor the timeliness of all transcripts court reporters produce for management purposes.

The Superior Court Transcript Center primarily produces transcripts of proceedings recorded on analog audiotape[1] at its home court, Hillsborough Superior Court – South, and it also produces transcripts of proceedings held at other trial courts as resources allow. The Transcript Center monitors the timeliness of the transcripts it produces. When other Superior Court locations receive a request for a transcript of a proceeding recorded on tape and the Transcript Center cannot process the request, court staff sends the request and a copy of the recording to an approved private sector transcriptionist. Each Superior Court is responsible for monitoring the timeliness of transcript requests it sends to private sector transcriptionists.

[1] The Superior Court Transcript Center cannot transcribe proceedings recorded using digital recording equipment. Digital recordings must be transcribed by one of four approved private sector transcriptionists capable of transcribing digital recordings.

According to a procedural memo from the District Court administrative judge, when a transcript is requested at a District Court or the Family Division Pilot Project, court staff must send a completed "District and Family Court Transcript Order Form" and the original tape containing the proceeding to the transcript coordinator at the office of the District Court administrative judge. The transcript coordinator makes a copy of the tape and completes a different transcript order form, then sends the form and copy of the tape to one of the approved private sector transcriptionists selected on a rotational basis. If the tape is of poor quality or if the proceeding to be transcribed is unusually long, the transcript coordinator sends original tapes to the private sector transcriptionist, leaving the District Courts and the Family Division Pilot Project without a record of certain proceedings for a period of time. There is also no guarantee original or copied tapes will be returned, since private sector transcriptionists reportedly do not always return copied tapes after transcription is complete. The transcript coordinator took the initiative to begin informally tracking the timeliness of transcript completion in a handwritten ledger during 2002; however, timeliness is measured from the date the request is received by the transcript coordinator, and not the date the request was submitted to the court. The ledger indicates the transcript coordinator processed 1,836 transcript requests during the audit period, mostly from District Courts and the Family Division Pilot Project.

According to procedural memorandums from the District Court administrative judge and Probate Court administrative coordinator, when a transcript is requested at a Probate Court, court staff has the option to send a completed "District and Family Court Transcript Order Form" and the original tape to the District Court transcript coordinator. Four of the Probate Courts reported sending transcript requests to the District Court transcript coordinator, while six Probate Courts reported sending original tapes directly to approved private sector transcriptionists, which leaves the Probate Court without a record of certain proceedings for a period of time and no guarantee the tapes will be returned. Each Probate Court is responsible for monitoring the timeliness of transcript requests it sends to private sector transcriptionists.

According to the ABA's *Standards Relating to Appellate Courts*, preparation of transcripts is fundamental to the appellate process and virtually no action can be taken until it is prepared. The ABA cites transcript production as the single greatest factor in the delay of appellate cases. Timely preparation of transcripts can be ensured by accountability and efficient procedures. The ABA's *Standards Relating to Trial Courts* states all aspects of record making, including transcription, should be governed by system-wide policies administered by the administrative office of the courts. Additionally, the administrative office of the courts should continuously supervise the transcript production process to ensure compliance with established policies. The Judicial Branch could transfer the District Court's transcript coordinator position to the AOC and establish Branch-wide policies and procedures relative to transcript preparation for the transcript coordinator to enforce. Policy could stipulate the transcript coordinator will be informed of the ordering and completion of all transcripts produced on behalf of the Judicial Branch to allow for comprehensive monitoring and evaluation of transcript producers.

Recommendation:

We recommend the Judicial Branch centralize the coordination of transcription services at the AOC and establish Branch-wide policies and procedures relative to transcription. The

**AOC should continuously supervise transcript production for all trial court levels to ensure compliance with established policies.**

Auditee Response:

***The Judicial Branch agrees. The Judicial Branch expects to establish uniform policies and procedures relative to transcription. (See Observation No. 48) The Judicial Branch expects to centralize the coordination of transcription services at the Administrative Office of the Courts to ensure uniform compliance with established policies and procedures.***

**Observation No. 47**

***Discontinue Operation Of The Superior Court Transcript Center And Use Private Transcript Firms For Producing Transcripts From Audio Recordings***

The Superior Court Transcript Center at Hillsborough Superior Court – South located in Nashua did not produce sufficient revenue from transcript production sales to cover its operating expenses during SFY 2002. The Transcript Center provides transcription services mostly for its home court, while approved private sector transcriptionists perform the majority of the Judicial Branch's audio transcription at the expense of the party requesting the transcript. The Judicial Branch could achieve significant savings by discontinuing operation of the Transcript Center and reassigning its staff.

The Transcript Center began in 1994 as part of a grant-funded pilot project that evaluated transcript production from videotape and audiotape recordings. The two transcriptionists[2] hired as part of the pilot project were kept on staff after the pilot project was completed in 1997, and a third position was added during 1996. The three transcriptionists produce transcripts from analog recordings of court proceedings. The Transcript Center largely handles transcript requests submitted to that court, and it also handles requests placed at other Superior Court locations and the other trial courts as resources allow. Transcriptionists at the Superior Court Transcript Center are paid a salary plus benefits and do not receive a per page fee for the transcripts they produce. Transcript fees generated from the Transcript Center go to the General Fund. The transcriptionists also work as court monitors and provide clerical assistance in the clerk's office when necessary.

To determine the cost-effectiveness of Transcript Center operations, we estimated the Transcript Center's operating cost during SFY 2002 and compared it to the estimated income it generated from the sale of transcripts requested during SFY 2002 (Table 16). We estimated an operating cost of $110,303 for the Transcript Center during SFY 2002, including salary and benefits for the three transcriptionists. We did not include expenses for equipment and supplies. Our estimate included annual compensation for the two lowest paid transcriptionists, plus two-thirds the annual compensation for the highest paid transcriptionist, to account for Transcription Center staff time spent performing other court duties. One transcriptionist spends an average of one hour per day in the courtroom, and one transcriptionist spends an average of one day per week performing clerical tasks in the clerk's office.

---

[2] Transcriptionists hold the "court monitor" job title.

The Transcript Center tracks transcript information in a hand-written ledger kept in the clerk's office. According to that ledger, the Transcript Center received 118 transcript requests during SFY 2002 that were processed by its staff. Of the 118 requests, 109 entries included an estimate of the number of pages to be transcribed, which totaled 14,055 pages. Most transcript requests are for an original transcript, which the court retains, plus one copy for the customer, and page estimates prepared by the court tend to be high. Superior Court Administrative Rule 3-7 sets the price for an original transcript plus one copy at $3.00 per page. Therefore, we estimate the Transcript Center sold 14,055 pages of transcript at $3.00 per page for a total of $42,165.

**Table 16**

| SFY 2002 Superior Court Transcript Center Operations | |
|---|---|
| Estimated annual operating cost: | **$110,303** |
| Estimated number of pages of transcript requested[1]: | **14,055** |
| Estimated annual income from fees for transcripts requested: | **$ 42,165** |
| Estimated annual operating loss: | **($ 68,138)** |
| Estimated production cost for one page of transcript ($110,303.27/14,055 pages): | **$ 7.85** |
| Price to the public for one page of transcript plus one copy: | **$ 3.00** |
| Estimated loss per page of transcript sold: | **$ 4.85** |

[1]Does not include page estimates from nine transcripts produced during SFY 2002.
Source: LBA analysis of Transcript Center ledger and Judicial Branch payroll information.

Table 16 shows the Transcript Center sold an original transcript plus one copy to the public for $3.00 per page that cost the Transcript Center an estimated $7.85 per page to produce, for a loss of $4.85 per page and a total annual operating loss of $68,138. If the Judicial Branch discontinued operating the Transcript Center, audio recordings of proceedings could be forwarded to approved private sector transcriptionists who are paid according to the Judicial Branch's established transcription rates with amounts collected from the requesting party by clerk's office staff. The Judicial Branch could then utilize its Transcript Center staff as court monitors, since they are also trained as court monitors and hold the job title of court monitor.

**Recommendation:**

**We recommend the Judicial Branch discontinue operating its Superior Court Transcript Center and reassign Transcript Center staff to court monitoring duties.**

*Auditee Response:*

*The Judicial Branch agrees. In response to this preliminary observation daft, by order dated July 16, 2003, the Supreme Court eliminated the Superior Court Transcription Center at Hillsborough Superior Court – Southern District and abolished the transcriptionist positions.*

**Observation No. 48**

***The AOC Should Certify Transcriptionists And Ensure Confidentiality Of Recordings And Transcripts***

The Judicial Branch utilizes five transcriptionists from the private sector to produce transcripts of proceedings recorded on analog audiotapes and digital media. The AOC originally approved the five private sector transcriptionists to produce transcripts for the trial courts. A committee of Superior Court personnel developed *Standards For Transcriptionist Certification and Transcript Format in the New Hampshire Superior Court* during 2002. The Office of the Chief Justice of the Superior Court plans to annually re-certify the five approved private sector transcriptionists and the three court-employed transcriptionists at the Superior Court Transcript Center based on those standards beginning in 2003. The Office of the Chief Justice of the Superior Court also plans to accept applications for certification from other private sector transcriptionists.

The standards for transcriptionist certification developed by the Superior Court do not include safeguards that address private sector transcriptionist access to recordings of proceedings that are confidential by statute, rule, or order. Safeguards are important not only because the private sector transcriptionists are asked to produce transcripts of confidential proceedings, but also because original and copied tapes sent to the private sector transcriptionists routinely contain recordings of proceedings other than those which are to be transcribed that may be confidential.

The District and Probate Courts and the Family Division Pilot Project were not involved in developing the Superior Court's transcriptionist certification and transcript format standards, nor do those standards apply to the other trial courts. However, the District and Probate Courts and the Family Division Pilot Project rely exclusively on the same five private sector transcriptionists for transcription services.

Development and implementation of separate standards by any of the other trial courts would result in duplicating administrative policy and procedure, and could cause different treatment of transcriptionists from one court to another. Accordingly, the ABA's *Standards Relating to Trial Courts* states all aspects of record making, including transcription, should be governed by system-wide policies administered by the administrative office of the courts.

**Recommendation:**

**We recommend the AOC implement a system-wide transcriptionist certification program. The AOC should evaluate the Superior Courts' transcript format and transcriptionist certification standards and consult personnel from the other trial courts before implementing the program. Standards related to confidential recordings and transcripts should also be addressed.**

*Auditee Response:*

*The Judicial Branch agrees. The Judicial Branch expects to review existing transcriptionist certification standards and consider whether to 1) apply those standards to all trial courts, and 2) add confidentiality policies to the standards.*

STATE OF NEW HAMPSHIRE
JUDICIAL BRANCH ADMINISTRATION

## OTHER ISSUES AND CONCERNS

In this section, we present issues and concerns we encountered during our audit not developed into formal observations, yet we consider noteworthy. The Judicial Branch and the Legislature may consider these issues and concerns deserving of further study or action.

*Evaluate The Necessity To Acknowledge Misdemeanors*

During the audit period RSA 592-A:7 required a criminal complaint for violation, misdemeanor or felony to be signed under oath. The complaint form used by the court system requires the complaining officer to swear to the facts of the case typically in front of a Justice of the Peace before the case is filed with the court. During the 2003 Legislative session RSA 592-A:7 was amended to eliminate the need for an officer to swear under oath before filing a violation-level offense with the court. Requiring the complaint to go to a Justice of the Peace before it is submitted to the court is superfluous and hinders electronic submission. The Legislature and the Judicial Branch should consider whether misdemeanor and felony complaints need to be sworn before a Justice of the Peace.

*Branch Response: RSA 592-A:7 requires that misdemeanors be signed under oath and the Judicial Branch will honor that statute unless and until the Legislature amends it.*

*Job Classification And Compensation Study Purchased But Not Released Or Utilized*

The Judicial Branch contracted with a consultant in June 1999 to conduct a study of job classifications and compensation for non-judicial employees. However, the Judicial Branch has not implemented any of the consultant's recommendations.

The Judicial Branch stated in its Request for Proposals for the study that it needed to revise its entire personnel classification and pay system because many employees had reached the maximum of their assigned salary grade, the current classification system had career-path limitations and did not provide adequate career-path movement, and State and federal law made it imperative the Branch be able to identify the essential job functions of any position, which it could not do with its existing job descriptions.

According to the approved project proposal, consulting work would include developing Americans with Disabilities Act/Equal Employment Opportunity-compliant job descriptions for each job class, new salary range/grade structures and pay scales, and fiscal impact estimates of alternative salary policies and structures. The consultant agreed to provide assistance with implementing its proposed job classification and compensation plan for one year following project completion. The consultant's final report was scheduled for completion during March 2000. Our review of Judicial Branch expenditures showed the Branch paid the consultant $69,990 for services between 1999 and 2001.

Despite repeated requests during audit fieldwork to the Branch for a copy of the final report of the job classification and compensation study and assurances a copy would be provided, the

**Branch did not provide us with a copy until September 2003. According to the director of the Administrative Office of the Courts (AOC), the final report has not been released because the Branch does not have the money it needs to implement all the changes the final report suggested. Due to the lateness of receiving this report, we could not determine if the AOC received the consulting services it paid for, nor could we assess whether all or some recommendations contained in the final report, such as suggested changes to job descriptions that would ensure compliance with federal laws, could be implemented without additional funding. In addition, the Judicial Branch's inaction elicits concerns it did not adequately plan for the implementation of the consultant's potential recommendations, and therefore the expenditure of $69,990 on consulting services may have been premature in the absence of a plan to fund any potential recommendations.**

**We suggest the Judicial Branch make publicly available the final report of the job classification and compensation study, implement any worthwhile recommendations contained in the final report not requiring additional funding, and develop a plan to implement other worthwhile recommendations the Branch believes would require additional appropriation.**

***Branch Response:*** *The Judicial Branch contracted with a consultant for a review of the Judicial Branch classification and compensation schedule because Judicial Branch personnel rules require that a complete review of the classification plan be conducted at least once every five years. It would have cost the Judicial Branch approximately $450,000 to implement the consultant's recommendations. Since completion of the study, the Judicial Branch has not received funding sufficient to implement the consultant's compensation and classification recommendations. Furthermore, since completion of the report, the Judicial Branch has consistently held many non-judicial positions vacant in order to keep expenditures within appropriations.*

*Because it has been unable to implement the consultant's recommendations, the Supreme Court has not adopted the report. The report has not been made public because many of its recommendations would only aggravate a serious morale problem among diligent employees who struggle to provide excellent constituent service even as many non-judicial positions are held vacant in the Judicial Branch.*

## CONCLUSION

In many ways the Judicial Branch is similar to the Executive Branch organizations we have audited. While the Judicial Branch is a co-equal branch of State government that carries out sacred Constitutional functions instrumental to the proper functioning of State government and New Hampshire society in general, its health and proper functioning depend on effective and efficient management.

We found New Hampshire's unified court system could benefit from increased centralized administration. The Superior, Probate, and District Courts function independently in many areas. Under the authority and supervision of the Supreme Court each administrative judge has broad powers to issue administrative directives affecting court operations and procedures within that level of trial court. The AOC is not charged with setting consistent policies and uniform procedures to coordinate, standardize, and improve activities common to all trial courts. The Legislature and the Supreme Court should empower the AOC to coordinate administrative and operational activities throughout the court system, which will allow judges and staff to spend more time processing cases and less time dedicated to administrative tasks pertaining only to one level of court.

While assessing the adequacy of the Judicial Branch's financial resources and staffing levels were not a part of this audit, it is difficult to ignore comments made throughout the audit by Judicial Branch management and staff that the Branch lacks the resources necessary to function efficiently and effectively. At every turn we heard "lack of staff" as the reason for not being able to do something. We believe the best way for both lawmakers and the Branch's management to assess the adequacy of the Judicial Branch's human resources is through weighted caseload systems.

Unfortunately, the Branch's present weighted caseload systems are out of date and may be inaccurate. In the Superior Court, a weighted caseload system for judges was started but is not yet completed. As a result, neither the Branch nor the Legislature can identify the Branch's appropriate staffing level with any reasonable approximation. Branch management claim it cannot develop and maintain accurate judicial and non-judicial case weights for each trial court without additional staff to assume that responsibility. We believe the Judicial Branch needs to find a way to do the work necessary to make its case for additional staff, and the best way to make such a case is by developing methodology for a weighted caseload system that both they and the Legislature agree will produce accurate and reliable results. Once a weighted caseload system is completed, it should be independently audited and continually monitored to ensure it accurately reflects court procedures. If, according to the weighted caseload system, the Branch can show it needs additional staff to process cases in a reasonable amount of time, the Legislature should seriously consider funding such a request.

We believe there should be more transparency and accountability in the Judicial Branch budget than current Legislative budgeting practices provide. The Legislature's practice of requiring Judicial Branch management to determine imposed budget reductions outside the budget process reduces Legislative and public oversight. In addition, laypeople are not able to identify how money is allocated within the Judicial Branch without obtaining separate documents created after

the budget is approved that outline where the Branch made cuts to its budget. We recommend the Legislature work with Judicial Branch management to identify appropriate funding for each Judicial Branch line item within the State's biennial budget process.

We believe the Judicial Branch could benefit from hiring a consultant knowledgeable in court processes to review its case management and processing practices to eliminate redundant or unnecessary procedures. Such a study should be conducted concurrent with the Branch's implementation of a new case management system for the trial courts to maximize efficiency and return on its investment.

We recognize that efficiency is not the central organizational goal to the Judicial Branch that it is to other organizations. Due process and fairness are typically among the criteria used to evaluate a judicial system. However, due process and fairness are not mutually exclusive of efficiency; on the contrary, improved efficiency can help the Judicial Branch improve responsiveness to the needs of New Hampshire citizens. Management practices, such as planning, monitoring, and reporting, as well as commitment to performance standards, can be improved throughout the Judicial Branch. By implementing the recommendations contained in this report, we believe the Judicial Branch can become a more efficient and effective organization.

# 3. April 11, 2025 – Order Establishing Review Committee

STATE OF NEW HAMPSHIRE

SUPREME COURT OF NEW HAMPSHIRE

# O R D E R

Following consultation with the supreme court, the chief justice hereby orders a comprehensive review of the administrative structure of the judicial branch and the trial courts. N.H. Const. part II, article 73-a. In recognition of the strength and experience of the existing judicial branch workforce, the objectives of this review are as follows:

1. To identify opportunities to maximize the efficient use of resources to better serve the people of New Hampshire.
2. To identify opportunities to streamline and coordinate administrative functions across the judicial branch.
3. To identify any statutory or rule changes necessary to implement these reforms.

The review shall be conducted by a committee comprised of the chief justice, Superior Court Chief Justice Mark E. Howard, Circuit Court Administrative Judge Ellen V. Christo, Circuit Court Judge Christopher M. Keating as the Interim Director of the Administrative Office of the Courts, Superior Court Administrator Jennifer Haggar, and 2nd New Hampshire Circuit Court Clerk Pamela G. Kozlowski (Lebanon and Haverhill). The committee is authorized to draw on resources currently available to the judicial branch to engage the services of the National Center for State Courts to assist

with this review. The Interim Director of the Administrative Office of the Courts shall provide staff and other resources necessary to perform this review.

The review committee shall solicit and consider comments from court users, attorneys, judicial branch employees, and judicial officers. The review committee shall consider the trial court and administrative structures of other state court systems.

The review committee shall present a report to the supreme court no later than July 1, 2025.

Issued: April 11, 2025

ATTEST: Timothy A. Gudas

Timothy A. Gudas, Clerk of Court
Supreme Court of New Hampshire

# 4. National Center for State Courts (NCSC) Report 2025



# New Hampshire Judicial Branch Assessment

2025

**Prepared By:**

National Center for State Courts
Court Consulting Services

# Acknowledgements

**The National Center for State Courts (NCSC) project team acknowledges the New Hampshire Judicial Branch (NHJB) justices, judges and staff at the Supreme Court, Superior Court, Circuit Court and Administrative Office of the Courts for their assistance in project coordination, providing responses to our requests for information and willingness to participate in interviews and focus groups during this project. The support and participation by New Hampshire Judicial Branch have been a critical component of this study. Specifically, the NCSC project team expresses its gratitude to Chief Justice Gordon J. MacDonald, The Honorable Christopher M. Keating, Interim Director of the AOC, The Honorable Mark Howard, Chief Justice of the Superior Court. The Honorable Ellen V. Christo, Administrative Judge of the Circuit Court, Jennifer Haggar, Superior Court Administrator, and Pamela Kozlowski, Circuit Court Clerk.**

NCSC Project Team:

Cathy Zacharias
Deputy Director
Center for Judicial Ethics

Mandy Allen
Senior Court Management Consultant

Hengel Reina
Court Management Consultant

Emma Maier
Project Associate

National Center for State Courts
Court Consulting Services
Laurie K. Givens, Vice President

300 Newport Avenue
Williamsburg, VA 23185-4147
www.ncsc.org

# National Center for State Courts

NCSC is an independent non-profit corporation with the mission to improve the administration of justice through leadership and service to state courts and justice systems around the world. NCSC draws on more than 50 years of experience supporting US-based and global courts with strategy development, organizational assessments, and improving the administration of justice. NCSC serves as the secretariat to the Conference of Chief Justices and the Conference of State Court Administrators ("CCJ/COSCA") and works in close partnership with CCJ/COSCA to develop national policy and best practices, supporting state and local courts with judicial modernization and innovation, and identifying and sharing promising practices to address challenges to successful court systems.

## WE DRIVE INNOVATION AND PROGRESS IN COURTS AND JUSTICE SYSTEMS

NCSC's Court Consulting Services group is dedicated to rethinking and retooling existing processes and practices, modernizing court operations, and improving justice at the state and local levels. NCSC provides direct court consulting services to courts to improve court management performance across a broad spectrum of topical areas, including, but not limited to, strategic planning, leadership and governance, caseload, financial, and technological management, facilities, court security, jury management, behavioral health, juvenile justice, language access, disability accommodations, and access to justice. NCSC's work includes providing knowledge, technical assistance, executive coaching, and consulting services to courts and other interested parties, as well as conducting research and evaluations in all areas of court operations. NCSC provides a trusted outside perspective to solicit feedback from diverse stakeholders and to share insight from experiences and successes of other state courts.

CONFIDENTIAL

# Table of Contents

**Acknowledgements** .......... ii

**National Center for State Courts** .......... iii

**Table of Contents** .......... iv

**Executive Summary** .......... 1

**About the Project** .......... 4

**About the New Hampshire Judicial Branch** .......... 5
- The New Hampshire Supreme Court .......... 5
- New Hampshire Superior Court .......... 7
- New Hampshire Circuit Court .......... 8
- Administrative Office of the Courts .......... 10

**Methodology** .......... 12
- Project Scope .......... 12
- Project Launch Meeting .......... 12
- Data Request and Analysis .......... 12
- Qualitative Data Collection .......... 12
- Report Preparation, Revision, and Finalization .......... 13

**Suggestions from the Courts** .......... 15
- Employee Feedback .......... 15

**What We Heard** .......... 18
- Interviews & Focus Groups .......... 18
- Public Survey .......... 24
- State Court Comparisons .......... 35

**Discussion & Recommendations** .......... 37
- Structural .......... 37
- Governance .......... 39
- Administration .......... 42
- Judicial Process and Policy Changes .......... 48
- Automation .......... 52
- Electronic Case Files .......... 56

**Next Steps** .......... 60

**Appendix A: NHJB 2025 Software Standards** .......... 61

**Appendix B: NCSC Court IT Governance Model** .......... 64

**Appendix C: PHASE Model** .......... 72

**Appendix D: Focus Group Summaries** .......... 77

# Executive Summary

In anticipation of a possible budget reduction in the next legislative cycle the New Hampshire Judicial Branch (NHJB) engaged the National Center for State Courts (NCSC) to conduct an analysis of the NHJB and make recommendations identifying:

- Opportunities to maximize the efficient use of resources to better serve the people of New Hampshire.
- Opportunities to streamline and coordinate administrative functions across the judicial branch.
- Statutory or rule changes necessary to implement these reforms.

This report encompasses the observations and findings of the NCSC for consideration by the NHJB project steering committee. The NHJB has operated with both lean budgets and staff for many years. The current negative budgetary outlook presents a significant challenge for the already leanly staffed NHJB as the court system cannot pursue further reductions in force without critically affecting core functions and services to the public. The NCSC approached this project and its research as an opportunity to assist the NHJB in identifying new ways to conduct its business without sacrificing the NHJB's commitment to providing the people of New Hampshire with high levels of services, justice, and an independent third branch of government.

The 27 recommendations made in this report span the areas of organizational structure, governance, and administration; process and policy change; automation; and electronic case files for the administration of the courts that could help maximize resources and streamline processes while still meeting the branch's mission. These recommendations are summarized in the following table New Hampshire Judicial Branch Governance Recommendations and vary in terms of complexity, impact to current structures, and time scale and resources needed to successfully execute. Note, to implement several of these recommendations, the NHJB would need to adopt or modify court rules or work with the legislature to adopt or amend statutes. To initiate implementation of those recommendations the NHJB would need to:

- Establish the authority of the AOC by Supeme Court rule.
- Work with the legislature on the impact of the felonies first statute.
- Develop a rule on the assignment of judges.
- Develop a rule on filing electronic transcripts in the Supreme Court.
- Review the small claims Rule 4.2 for simplification of service of process.

As the NHJB evaluates its organizational structures, policies, and processes, the project team hopes that this report serves as a starting place for decision makers and stakeholders as they plan for the future of the NHJB.

New Hampshire Judicial Branch Governance Recommendations

## Structural

R1 Establish authority for the AOC through statue, court rules, or administrative order that delineates a clear role and lines of responsibility for the AOC.

R2 Consolidate select functions of the Administrative Offices of the Circuit and Superior Courts into the AOC.

R3 Establish a committee to evaluate further unification of the trial courts.

## Governance

R4 Develop and implement a strategic plan to implement structural changes to the NHJB.

R5 Establish a judicial council composed of judges and justices to provide guidance on policies and procedures.

R6 **Reconstitute the Interbranch Criminal and Juvenile Justice Council established under N.H. Rev. Stat. § 651-E:1 "to provide leadership, communication, and coordination among those involved in or affected by the criminal and juvenile justice systems," and begin meeting again to fulfill its statutory obligation to submit a biennial report to the speaker of the house of representatives, the senate president, the house clerk, the senate clerk, the governor, and the state library with findings and recommendations for proposed legislation.**

## Administration

R7 Explore new and evaluate existing centralized functions for the judicial system.
Specific areas to explore include:

i. Evaluate the use of the Efiling Centers and determine whether the elimination of the Efiling Centers and reverting staff resources back to local courts or consolidating the staff into one Efiling Center would provide better support to the courts.

ii. Establishment of clear and streamlined procurement guidelines and contracts for the ordering of court supplies and equipment.

iii. Development of an online option for court users to pay fines, fees, and costs.

iv. Development of a centralized self-help center for court users with a network of Court Navigators to assist on site.

v. Development of uniform policy and procedures for court staff and provision of centralized staff training resources.

vi. Encourage regional coordination of docket, staffing, and judge on-call scheduling.

R8 Explore implementation of a standardized employee performance evaluation process for court employees.

R9 LEAN – PHASE Using principles of existing LEAN program and change and implementation management such as PHASE, to evaluate current practices and to manage any needed changes based on said evaluation.

## Judicial Process and Policy Changes

R10 Evaluate the impact on efficiency that the legislative change to the repeal of the 'Felonies First' process has on the courts and report the findings to the New Hampshire legislature.

R11 Investigate the current processes by which police file criminal cases directly with circuit courts and determine if statewide standards of practices are needed.

R12 Explore adoption of early case resolution processes for criminal cases.

## Judicial Process and Policy Changes

R13 Evaluate current fines, fees, and cost structures and processes and develop clear guidelines for fee waivers.

R14 Evaluate current processes for tracking account receivables and debt collection.

R15 Evaluate current practices on the use of judicial referees throughout the courts, provide clear guidance on when referees may be used and explore possible changes to statutes and rules regarding the need for judges to co-sign referee's court orders.

R16 Explore lengthening the assignment of judges to court locations to multiyear terms.

R17 Consider adoption of a rule for the Supreme Court that unless a paper copy is requested, electronic transcripts are sufficient to file to the record and disseminate.

R18 Review Supreme Court Rule 4.2, Small Claims, For Simplification of Service of Process.

## Automation

R19 Prioritize securing adequate funding to fully staff and support the IT department to better meet the needs of the Branch and individual courts.

R20 Restructure the deployment of IT technicians, embedding them regionally throughout the state to provide timely and reliable assistance to local courts.

R21 Develop an IT governance structure to guide projects and coordinate automation policies.

R22 Evaluate automated services to self-represented litigants (SRLs), including policies and resources related to accessing court documents, Efiling, TurboCourt, and informational kiosks at courts to ensure they are configured to best meet the needs of these court users.

R23 Evaluate broadband connectivity at local courts to ensure staff can reliably access and update judicial branch systems.

R24 Investigate whether the NHJB email system can be certified as CJIS compliant to facilitate the emailing of records and move away from faxing documents for domestic violence orders.

## Electronic Case Files

R25 Implement electronic case records for all circuit court case types.

R26 Evaluate and prioritize case types for an expansion of Efiling to all circuit court case types.

R27 Evaluate the current Odyssey case management system (CMS) and Efiling system for possible enhancements.

CONFIDENTIAL

# About the Project

On April 11, 2025, Chief Justice Gordon J. MacDonald of the New Hampshire Supreme Court issued an order for a comprehensive review of the administrative structure of the judicial branch and the trial courts. The order establishes a committee to identify:

- Opportunities to maximize the efficient use of resources to better serve the people of New Hampshire.
- Opportunities to streamline and coordinate administrative functions across the judicial branch.
- Statutory or rule changes necessary to implement these reforms.

The order authorized the New Hampshire Judicial Branch (NHJB) to engage the National Center for State Courts (NCSC) to conduct an analysis of the NHJB and make recommendations for the committee's review. The NHJB is anticipating a budget reduction in the next legislative budget cycle. The recommendations in this report identify opportunities to maximize administrative efficiency throughout the courts while providing a high degree of service to the people of New Hampshire.

NCSC acknowledges the NHJB judges and court staff's dedication to providing the best service possible to the people of New Hampshire despite the long-term budgetary challenges they have been facing. For many budgetary cycles, the NHJB has operated with both lean budgets and staff. Despite these limitations the dedicated men and women that work in the New Hampshire courts as judges and court staff have prided themselves with providing excellent service to their communities. Considering this history, the current budgetary landscape of the state creates a significant challenge for the NHJB. Already leanly staffed, the court system cannot pursue any further reductions in force without critically affecting core functions and services to the public.

Instead, the NHJB must look at new ways to conduct the business of the courts without sacrificing its role as an independent third branch of government.

This report provides recommendations for the administration of the courts that could help maximize resources and streamline processes while still meeting the branch's mission. The intent of this report is not meant to imply that the New Hampshire courts are not providing justice to the people of New Hampshire but rather the recommendations made in this report are a recognition that there may be different ways to provide court services, especially in light of the constricting state budget environment.

# About the New Hampshire Judicial Branch

NHJB consists of the Supreme Court, the Superior Court, the Circuit Court, and the Administrative Office of the Courts (AOC). The Supreme Court and the Superior Court were created by the New Hampshire constitution and the Circuit Court was created by statute in 2011. The AOC was created by order of the Supreme Court in 1983 to support the administration of the NHJB.

**New Hampshire Judicial Branch Mission**

To preserve the rule of law and protect the rights and liberties guaranteed by the United States and New Hampshire constitutions, the Courts will provide accessible, prompt, and efficient forums for the fair and independent administration of justice, with respect for the Dignity of all we serve.

New Hampshire established a unified court system in 1971. The Chief Justice of the Supreme Court has administrative authority over and is responsible for the efficient operation of all the courts in New Hampshire. While there is collaboration between the three courts and the AOC, the administration of the courts is functionally siloed. Additionally, the trial courts operate as two separate entities, each complete with their own administrative office, judges, and court staff.

## The New Hampshire Supreme Court

The New Hampshire Supreme Court is the court of last resort and the state's only appellate court. The Supreme Court has both mandatory and discretionary jurisdiction for appeals. The Court's mandatory jurisdiction includes appeals from a final decision on the merits issued by a Circuit Court with nine exceptions or appeals filed by the State pursuant to N.H. R.S.A. § 606:10. The Court has discretionary jurisdiction over cases that fall within the definition of nine exceptions or is an interlocutory appeal of a lower court's ruling, and for petitions requesting review pursuant to the Court's original jurisdiction.

*Figure 1. Map of New Hampshire Court Districts*



The Supreme Court has five justices; a Chief Justice and four Associate Justices.[1] The justices may serve on the Court until the age of 70. The Court currently has 26.6 employees, which includes staff for the Judicial Conduct Committee and a project manager assigned part-time to the Court. There are currently three vacant staff positions with the Supreme Court.

In 2024, the Supreme Court heard 729 appeals. 60% of the appeals were from the Circuit Court, 33% from the Superior Court, 6% from administrative agencies, and 1% were original jurisdiction to the court. The majority, 36%, of the appeals were civil, followed by criminal appeals, 20%. The

[1] N.H. R.S.A.. § 490:1

remainder of the appeals fall into probate, administrative, family, juvenile and other case types. Of the cases filed, the Court accepted 434, the Court held oral arguments in 95 cases, issued opinions in 71 cases, and disposed of 752 cases in 2024.

The Supreme Court uses C-Track from Thomson Reuters for its automation needs.

While the NHJB does not have a formal decision-making governing body, the Supreme Court has established various committees to assist with the administration of the courts as seen in Table 1. below.

**Table 1. NHJB Established Committees and Commissions[2]**

| | |
|---|---|
| Access to Justice Commission | The commission, established by Supreme Court order, works to improve public access to the courts. The commission supports the court navigator program. |
| Administrative Council | The council, established by supreme court rule, is comprised of the chief justice of the supreme court or his or her designee, the chief justice of the superior court, the administrative judge and deputy administrative judge of the circuit court, and the director of the administrative office of the courts. The council was established to facilitate communications among the various courts and the administrative office of the courts and shall apprise the Supreme Court of matters being considered by the council to enhance the effective and efficient administration of the judicial branch.[3] |
| Advisory Committee on Rules | The committee, established by Supreme Court Rule 51, reviews all court rules and gathers input from the public, judiciary, and legal professionals. It holds hearings, invites public comments, and submits proposed rule changes to the New Hampshire Supreme Court. |
| Attorney Discipline System | The Attorney Discipline System is composed of the Attorney Discipline Office, the Complaint Screening Committee, the Hearings Committee, and the Professional Conduct Committee. Together these committees consider and fairly evaluate grievances against attorneys. |
| Board of Bar Examiners | Established by the Supreme Court the Board oversees the Office of Bar Admissions and all aspects of the admission process. |
| Committee on Character and Fitness | Established by Supreme Court Rule 42, this nine-member Committee investigates the character and fitness of applicants to the bar, conducting hearings and making recommendations to the Supreme Court on applicants' moral character and fitness to practice law. |
| Committee on Diversity and Inclusion | The committee, established by the Supreme Court in 2022, was created to build trust and confidence in the court system and to make sure that the court system is fair and unbiased. |
| Committee on Domestic Violence | The committee was established to catalog and monitor the implementation of recommendations from the Domestic Violence Task Force to improve judicial responses to domestic violence. |
| Judicial Conduct Committee | Created by the Supreme Court as an independent office complete with its own offices, independent budget, and executive director, the Judicial |

[2] Committees, New Hampshire Judicial Branch, 2025, accessed https://www.courts.nh.gov/resources/committees
[3] Supreme Court Rule 54

CONFIDENTIAL

Table 1. NHJB Established Committees and Commissions[2]

| | |
|---|---|
| | Conduct Committee considers and investigates alleged judicial misconduct as defined by Supreme Court Rule 40(2). |
| New Hampshire Court Accreditation Commission | The commission, established by N.H. R.S.A. 490:5-a, evaluates the quality and adequacy of court facilities against established standards and assists in planning new courthouses. |
| Standing Committee on Professional Development | The committee, established by Supreme Court order, develops educational programs for court staff. |

## New Hampshire Superior Court

**There are 11 Superior Court locations in New Hampshire. Each county has one Superior Court, except for Hillsborough County which has two. The Superior Court has one Chief Justice of the Superior Courts and one Superior Court Administrator. New Hampshire has a total of 23 Superior Court justices, including the chief justice; three active status senior justices; and five referees. Currently the Superior Court has 135 non-judicial staff allotted with 10 vacancies and one pending retirement at the time of this report.**

Established by the New Hampshire constitution, the Superior Court is the state's only general jurisdiction court.[4] It has statewide jurisdiction of the following case types:

- Felonies (major crimes such as drugs, burglary, theft, and aggravated felonious sexual assault).
- Misdemeanor appeals from the Circuit Court - District Division.
- Treatment Courts including Adult Drug Courts, Mental Health Courts, Veterans Court, and Young Adult Treatment Court
- Negligence, contracts, real property rights and other civil matters with a minimum claim of $1,500 in damages in which either party requests a trial by jury. The Superior Court has exclusive jurisdiction over cases in which the damage claims exceed $25,000.
- Petitions for injunctive relief, appeals from municipal zoning and planning board decisions, and disputes over title to real estate.
- Business and Commercial[5]

In 2024, the Superior Court had 17,879 new cases filed, a slight decrease from the 19,379 cases filed in 2023 and 18,907 cases filed in 2022 and slightly more than the 16, 719 cases filed in 2021. The change in case filings can be attributed in part to the statutory change to the felonies first statute. Because of the new statutory process, the Superior Court did not see new felony filings until March 2024. New criminal cases account for a large percentage of the Superior Court caseload: 11,411 (2024), 13,558 (2023), 13,200 (2022), and 11,109 (2021).

The Superior Court uses Tyler Odyssey, Tyler File and Serve, TurboCourt, and CaseLines for its automation needs.

The Administrative Office of the Superior Courts provides the following support:

[4] NH Const., Pt. 2, Art. 72-a.
[5] N.H. R.S.A.§ 491:7

CONFIDENTIAL

**Table 2. Administrative Office of the Superior Courts Support Services**[6]

| | |
|---|---|
| Bail Commissioners | The Superior Court provides oversight, qualifications, and training for all bail commissioners. |
| The Electronic Filing Center (EFC) | A statewide department that handles civil Superior Court Efiled cases in the first instance and manages filings until they are scheduled for hearing with the court or disposed. |
| The Jury Center | The center is responsible for managing the jury management system, maintaining the master jury list, summoning jurors, and reviewing jurors' requests for excusals for the Superior Court. |
| The Warrant Office | Processes warrants for Superior and Circuit Courts through the federal LEEP system and coordinates applications for search warrants and arrest warrants with local police departments and prosecuting agencies and assists judges who are assigned "warrant days." |

## New Hampshire Circuit Court

The Circuit Court was formed in 2011 by consolidating the District, the Probate, and the Family Courts into one court and establishing the previously separate courts as individual divisions within the Circuit Court.[7] There are ten circuits with 34 court locations throughout the state, ten probate divisions, 31 district divisions, and 31 family divisions. The Circuit Court has an Administrative and Deputy Administrative Judge and a Senior Administrator and two administrators.

There are a total of 454 employees authorized to work for the Circuit Court. This includes 49 full-time circuit judges, four active status senior judges, 15 judicial referees, three part-time/per diem judges, and 383 non-judicial staff. There are currently 55 vacant nonjudicial positions.

The Circuit Court has statewide jurisdiction to hear the following case types in its divisions as shown in Table 3.



*Image 1 Littleton Circuit Court*

**Table 3. Circuit Court Case Jurisdiction by Division**[8]

| District | Family | Probate |
|---|---|---|
| Misdemeanor and violation level offenses (including motor vehicle matters) | Divorce/parenting disputes | All matters related to wills, trusts, and estates |
| Small claims | Child support | Guardianships of adults |
| Involuntary emergency admissions | Domestic violence petitions | Involuntary non-emergency admissions |
| Landlord-tenant cases | Guardianships of minors | Select adoptions |

[6] Superior Court, New Hampshire Judicial Branch, 2025, accessed https://www.courts.nh.gov/our-courts/superior-court
[7] N.H. R.S.A.§ 490-F
[8] Circuit Court, New Hampshire Judicial Branch, 2025, accessed https://www.courts.nh.gov/our-courts/circuit-court

**Table 3. Circuit Court Case Jurisdiction by Division**[8]

| | | |
|---|---|---|
| Stalking cases | Termination of parental rights | Name changes |
| Other civil cases | Abuse/neglect cases, children in need of services, juvenile delinquency | |
| Initiation of Felony Offenses | Select adoptions | |

In 2024, the Circuit Court had 112,285 new cases filed, which is an increase from the 97,777 new cases filed in 2023. The increase in filings, can be attributed to, in large part, to the change in the "Felonies First" statute in which felonies must be initiated in the Circuit Court and to a dramatic increase in new small claims cases. This number does not include reopened cases which are substantial in number.

The Circuit Court has an administrative office that provides support to the Circuit Court staff and judges that is managed by the Circuit Court administrator – the Circuit Court is managed by the Administrative Judge and the Deputy Administrative Judge with support from the Senior Administrator and the Administrators. The Administrative Office of the Circuit Courts manages the following programs:

**Table 4. Administrative Office of the Circuit Courts Support Services**[9]

| | |
|---|---|
| The Central Processing Center | **Provides central, statewide service to entities and individuals seeking public case information about parties, often for housing or employee reference checks. It processes about 823,589 record requests per year, including about 1,600 per month from public entities. It also handles about 1,000 Circuit Court audio requests per year.** |
| The Court Improvement Project (CIP) | **A federally funded program focused on improving child protection practices in local courts. The grant focuses on efficiency and effectiveness gains in areas like legal representation, hearing quality, family engagement, and collaborations between child welfare agencies and courts. The Administrative Office of the Circuit Courts helps to administer this program and track metrics for reporting.** |
| The Domestic Violence Program | **Oversees compliance with FBI and other federal requirements related to criminal and protection order data, enters and vacates all protection orders in the statewide and national systems and is managed by a coordinator that does training, takes complaints, and is the project manager for Violence Against Women Act (VAWA) grants from the U.S. Department of Justice.** |
| The Electronic Filing Center (EFC) | **A statewide department that handles Circuit Court small claims, civil, and minor guardianship Efiled cases in the first instance. It manages filings until they are scheduled for a hearing with the court or disposed and offers courts an expert resource for questions about processing the cases. The center processes more than 20,000 filings per year.** |
| The Estate Electronic Filing Center (EEFC) | **A statewide department that handles Circuit Court trust and estate and name changes Efiled cases in the first instance. In many cases, it manages a process from opening to disposition. It offers courts an expert resource for questions about processing the cases. It also answers most phone questions related to estates. It handles more than 10,000 cases per year.** |

[9] Id.

Table 4. Administrative Office of the Circuit Courts Support Services[9]

| | |
|---|---|
| The Information Center | A centralized communication center for all calls to both Circuit and Superior Courts. With 35.53 FTE employees authorized (30.53 FTE currently filled), a Manager and Assistant Manager, it is the largest management group in the NHJB. The Information Center provides case summaries, documents (when appropriate), and forms via mail or email to litigants. The Information Center has hundreds of template responses for commonly asked questions. It refers 25-30% of calls to the courts. Most of these are for payment or rescheduling. In 2023, the Information Center answered 414,456 calls. |
| The Office of Mediation and Arbitration (ADR Office) | A statutorily created Office within the NHJB managed by an ADR Coordinator. There are fifteen statewide programs in the Circuit Court, Superior Court, and Supreme Court. The coordinator advises judges and staff statewide about ADR best practices, trains internal and external stakeholders in ADR processes, designs, and implements new programs, proposes new or improvements to current legislation/court rules and forms, serves on the A2J committee, manages contracts for ADR services, oversees mediators including discipline and payments, and manages the ADR Fund. |

## Administrative Office of the Courts

The AOC provides operational support to the NHJB. The AOC was initially created in 1983. In 2005, the Supreme Court issued an order detailing its responsibilities: accounting, auditing, human resources, technology, fiscal management, court security, purchasing, facilities, and statistics. The order was in response to a 2003 Audit Report from the New Hampshire Office of Legislative Budget Assistant (2003 LBA). The 2003 LBA audit identified that there was not a statute or court rule that established an AOC.

Headed by a director, the AOC operates with a current staff of 70 and 139 full or part-time court security officers. There are four vacant staff positions and an additional 37 security officer positions that are vacant. The AOC provides the following limited services to the NHJB.

Table 5. Administrative Office of the Courts Services[10]

| | |
|---|---|
| Communications | The Communications Office handles all internal and external court communications, all media related issues, distribution of public information, production of Judicial Branch events and maintenance of the NHJB website. |
| Court Security | The Court Security Department provides court security service to the Circuit Courts. The department recruits, hires, trains, assigns, and supervises Court Security Officers (CSOs) in 28 state-wide Circuit Court locations and the NH Supreme Court. |
| Fiscal, Accounting, and Accounting Support Departments | Responsible for all financial operations of the Judicial Branch.<br><br>Fiscal is responsible for the preparation, implementation, and management of the NHJB biennial budget, as well as financial reporting of grants and other activities, and analysis of financial data in addition to oversight of the Accounting and Accounting Support departments.<br><br>Accounting is responsible for processing payroll, accounts payable/receivable and revenues, as well as purchasing and fixed assets tracking. |

[10] Administrative Office of the Courts, New Hampshire Judicial Branch, 2025, accessed https://www.courts.nh.gov/our-courts/supreme-court/about/administrative-office-courts

Table 5. Administrative Office of the Courts Services[10]

| | |
|---|---|
| | Accounting Support is responsible for Payment Card Industry (PCI) compliance, and providing technical support to the Superior and Circuit courts for their Odyssey case management system, as well as reconciliations of bank accounts to revenues recorded in Odyssey and the Supreme Court's case management system C-Track |
| General Counsel | The Office of General Counsel answers questions or requests related to ADA accommodations for an upcoming court hearing, public access requests; contracts including RFPs; and court matters where the Judicial Branch is a party. |
| Government Relations Coordinator | The Government Affairs Coordinator assists the NHJB in tracking, analyzing, and responding to legislative proposals and requests for information, including preparing fiscal impact statements requested by the Office of the Legislative Budget Assistant. |
| Human Resources | The Human Resources Department provides information and support to all Judicial Branch employees by providing assistance with recruitment, selection and hiring of new employees, pay and benefits, training and onboarding, and supports labor relations. |
| Information Technology | The IT Department provides the NHJB's technology needs and provides support to ensure that the NHJB has access to reliable, cost effective, and secure IT services. The department includes a support desk, network support, security, and project development. IT is responsible for the administration and maintenance of many software programs. The complete list of software that IT supports is detailed in Appendix A. IT also supports the courtrooms that are equipped with workstations that have the FTR suite of applications to record courtroom audio of hearings.<br><br>The support desk processes approximately 1,703 tickets per month, with a yearly average of 20,436 (average). The support desk assists court users with software related questions on Odyssey, Microsoft 365, Windows, and other software. In addition to software support, the support desk also assists with:<br>• Account support which includes account creation, termination, permissions, password resets.<br>• Network<br>• Hardware (purchase, replace, repair)<br>• Printers<br>• [illegible] |
| Operations and Audit Department | The operations and audit departments provide operational and audit support to the NHJB. |
| Operations Manager | The Operations Manager is responsible for business operations, services, and projects that include strategic planning, enterprise risk management and the development and implementation of a strong system of internal controls. |
| The Internal Audit Team | Performs court audits, as well as audits of the departments that make up the Administrative Office of the Courts. |

The AOC does not have a formal process to prioritize IT projects nor does the NHJB have a committee that advises the AOC and the branch on court automation issues and needs or set priorities for competing technology projects. The 2003 LBA recommended the NHJB improve technology planning and develop and review policies governing use, access, and security of its IT infrastructure.

# Methodology

## Project Scope

This project was initiated by the NHJB calling for a comprehensive review of the structure and operations of the Court and tasking the NCSC specifically to identify:

- Opportunities to maximize the efficient use of resources to better serve the people of New Hampshire.
- Opportunities to streamline and coordinate administrative functions across the judicial branch.
- Statutory or rule changes necessary to implement proposed reforms.

## Project Launch Meeting

Following the initial contract agreement, NCSC developed a project plan to meet the objectives of the Judicial Branch. A project launch meeting was held on April 16, 2025, between the Courts' steering committee and the NCSC project team. The topics discussed included the expectations for the final report given the compressed project timeline for the project. Next steps and tasks were identified and specifics regarding requests for court information and data, comparison data from other states, and preliminary logistics for scheduling interviews and focus groups.

## Data Request and Analysis

A formal request was sent to the Court mid-April requesting information regarding the Court's organizational structure, technology used, staffing information, general policies employed by the Court, and other general data to assist the project team in conducting a comprehensive review. The Court provided the materials requested through a shared link. More than 136 files were shared pertaining to the Administrative Office of the Court (AOC), Circuit Courts, Superior Courts, Supreme Court, and included key items regarding constitutional, statutory and Supreme Court rules to outline the authority of the NHJB. This information was reviewed by the NCSC in preparation for interviews and focus groups.

## Qualitative Data Collection

### Employee Feedback

The NHJB solicited ideas from Branch employees on possible areas for efficiencies. The call for ideas garnered significant responses both in number and depth of contributions. Responses were collected, organized, and preliminary themes catalogued. The NHJB steering committee provided the responses to NCSC as part of the data request. NCSC reviewed these responses as part of their preparation for focus groups and interviews, noting potential areas of discussion and specific topics to inquire specifically about with participants.

### Focus Groups, Interviews, & Surveys

The NCSC project team conducted a series of virtual interviews and focus groups starting in late April through the end of May 2025. NCSC conducted 25 focus groups comprised of staff, supervisors, managers and judges from the various courts, and AOC staff. An additional focus group was conducted with attorneys practicing law within the state of New Hampshire. Finally, each member of the steering committee was interviewed individually.

Interview questions for the focus groups were developed by NCSC and reviewed by the steering committee. The questions were used as a method to solicit feedback from the focus group participants. These facilitated discussions focused on the participants' experiences, pain points encountered, and areas where improvements in process or changes in policy should be explored. The focus groups helped NCSC understand, from the perspective of staff, justice system partners, and court leadership, the challenges facing the NHJB and opportunities for uncaptured efficiencies that would facilitate robust use of current resources.

At the conclusion of the qualitative data collection period NCSC anonymized and summarized its notes drawing forth major themes and perspectives. A preliminary analysis was then developed for dissemination to the steering committee.

**State Court Comparisons**

NCSC researched the court systems for states identified as appropriate comparisons through data maintained by the Court Statistics Project and information from publicly available sources. The NHJB steering committee and NCSC identified the following benchmark states: Colorado, Connecticut, Delaware, Hawaii, Idaho, Indiana, Maine, Massachusetts, Minnesota, Montana, North Dakota, Oregon, Rhode Island, South Dakota, Utah, Vermont, and West Virginia. Benchmark states were selected according to region (New England States), states with similar populations, court structures, and administrative offices that perform centralized functions for the courts. This analysis is included in the Observations & Feedback: State Court Comparisons section of this report.

**Public Survey**

It was important to the NHJB that there be an opportunity for the public to provide input about ways to increase efficiency. NCSC developed a Qualtrics survey and a QR code was provided to the NHJB for dissemination to the public. The survey was shared with the New Hampshire State Bar, local media outlets, and posted to the Court's website.

## Report Preparation, Revision, and Finalization

Based on a review of the information provided by the AOC, information gathered on the AOC authority and structures in other state courts, and focus group and interviews that were conducted, a draft report was prepared. The report was provided to the NHJB steering committee for review and comment. The purpose of this review process is to ensure the substance and format of the report met their needs and was factually accurate. The Steering Committee then provided suggestions and comments to the project team to incorporate into the final report.

Based on the feedback received to the draft report, the project team made corrections to any factual inaccuracies that were inadvertently included in the report or added content to clarify the report. The project team prepared a final report and submitted it to the NHJB. The project team

also provided a virtual presentation on the report that included the findings and recommendations.

# Suggestions from the Courts

## Employee Feedback

The NHJB solicited feedback from NHJB employees on changes the courts could adopt to operate more efficiently. The input of front-line employees was sought for an on-the-ground perspective of areas where there were unrealized gains and identifying impactful changes that would otherwise be overlooked. These responses were provided to the project team as part of the data request for further analysis and incorporation into the report.



*Image 2 New Hampshire Call Center*

The feedback from employees was broad and deep in scope, identifying the pain points encountered in encountered during their work and possible solutions. Many of the themes and recommendations identified below were also shared in interviews and focus groups.

**Improving Efficiency and Accountability:**

Those who responded to the call for ideas for efficiencies identified several areas where streamlining of processes, encouraging better use of available tools and improving court business process manuals. The suggestions for streamlining processes included external communications, procurement, and invoice handling. To address the mailing of court documents, it was suggested that email communications be allowed to streamline select notification processes and save on postage. Procurement for services, employee training opportunities, routine office purchases, and interpreter invoicing were also noted as having become overly complicated and in need of simplification. In particular, simplification of the payment process for interpreters was suggested. Respondents also shared that the NHJB should consider encouraging and facilitating the use of available AI technologies such as Microsoft CoPilot to assist employees with simplifying administrative tasks. More generally, there were several recommendations centering on working with IT to identify tools and software upgrades that could improve the workflow of staff and demonstrate the benefits and train staff on these tools.

Staff expressed that procedures and practices can vary from court to court and even from judge to judge, forcing court staff to remember multiple ways of doing their work and having to navigate differences in processes when interacting with other courts. Respondents expressed a desire to increase consistency for those procedures and processes. Clearer and uniform procedures, updated court business process manuals, and consistent process across court locations could reduce the administrative load on staff. Related to increased consistency of process is the theme of tying performance more closely to NHJB's mission. This theme suggests the NHJB overhaul the employee evaluation process to bring performance metrics in line with the branch's priorities. In part, there is a call for standardization of expectations according to position but also a clearer understanding of how one's work supports the NHJB's priorities.

**Enhancing Training and Skills Development:**

Respondents strongly advocated that the NHJB improve and expand employee training and focus on skill development offerings on work specific skills. Suggestions included providing regular and effective Word and Excel training for court staff, and specialized training for specific roles, such as navigating court systems, and *ex-parte* communication. It was also suggested that the NHJB consider encouraging multilingual staff to pursue court interpreter certification and to encourage employees to consider interpreting for the courts once accredited by compensating them accordingly.

In line with improving training, several respondents suggested the development of onboarding checklists to streamline the integration of new hires. The benefits were framed as multifold, for new employees a clear schedule for onboarding that prepares them for their new role and for supervisors a clear process to track and prompt the administrative processes that need to take place for new hires.

**Optimizing Resources and Reducing Costs:**

There were many suggestions for how the NHJB could reduce costs and make more efficient use of its current resources. One called for a review of positions to reallocate resources from outdated positions to better support efforts to attract and retain employees in needed positions. Several respondents suggested that the NHJB should encourage remote work. They also suggested reviewing the possibility of consolidating court locations or reducing the days/hours lower trafficked courts are open to the public. There was a recommendation that the courts make better use of current court spaces, especially for shared work environments to help facilitate remote work.



*Image 3 Merrimack Superior Court*

Other suggestions for reducing costs included encouraging the sharing of resources between courts such as unused office supplies and facilitating cross-training staff to be able to work in different court locations. Several respondents noted that the NHJB should reevaluate its postage and supply expenses and allow more electronic communications to reduce costs. The issue of interpreters and the current contract was also brought up and it was suggested that the NHJB look to hire interpreters locally, for languages that it can, to save on milage.

**Improving Internal Communication and Employee Engagement:**

Staff reported that they are overworked, and morale is low. To help remedy this some respondents suggested establishing regular communications from leadership with updates on strategic branch goals and increased employee recognition efforts. To further improve employee morale and enhance team cohesion a respondent suggested the courts look at encouraging social activities and team building such as employee appreciation events or intramural leagues.

Policy Changes and Structural Adjustments:

Additional suggestions mentioned by employees for consideration to help the courts run more efficiently, focused on policy changes and other structural changes to the NHJB. For example, returning all felony cases to Superior Court and changing proof of service requirements for small claims. Other respondents focused on the court's website and channels for external communications suggesting the NHJB consolidate its external communications and work to ensure courts' websites are fully searchable to better serve the public. Other suggestions focused on ways the courts could boost revenue by evaluating filing fees, costs, and fines and standardizing when and how fee waivers can be issued.

Structurally, respondents pointed to a need to implement clear governance policies particularly for IT to identify the NHJB technology needs, provide better service to the courts, and effectively manage and advocate for IT resources.

# What We Heard

***The following information represents the views and perceptions of the participants, as shared during the focus groups and interview process. None of the comments, assertions, or conclusions have been verified, nor should they be viewed as those of the NCSC consultants.***

## Interviews & Focus Groups

The project team conducted virtual interviews and focus groups with various Circuit Court, Superior Court, AOC and Supreme Court staff between late April and May 2025. The goal of these remote meetings was to gather information from staff and judicial officers of the Circuit Courts, Superior Courts, Supreme Court and the AOC. The interviews and focus groups were scheduled for 45 minutes, though some lasted longer due to robust discussion. The project team asked similar questions of all participants to capture and better understand the various viewpoints of staff and judicial officers throughout the NHJB. Examples of the questions asked included:

- Are there divisions, either in the courts or at the AOC, which are responsible for similar duties or areas of duplication? If so, which ones?
- Is there work that is currently being done that could stop without impacting quality of services?
- What are your suggestions to make the NHJB more efficient?

The following summary of the findings from the interviews highlights the key themes and significant points made by participants.

### Perspectives on Operational and Fiscal Efficiencies

#### Staffing & Resource Management

Clerks & Court Operations Specialists: Nearly all staff and supervisors said that they are facing challenges due to inadequate staffing because of constrained budgets. As staff left for promotions, other positions within the NHJB or outside of it, or retired, work was redistributed among those who remained as courts were often unable to fill positions due to budget. The project team learned that while this is primarily felt in front line positions, the NHJB has been forced to adopt a lean budget posture for many years to the point where supervisory and higher positions have also been affected. Many interviewees shared examples of the compounding stress and issues understaffing and the inability to replace staff had on their operations. Clerks and other court staff spoke of increased workloads and less time to problem solve or stay current on training due to high turnover and understaffing.

Clerk & Court Operations Supervisors: Reiterating the same themes as those of front-line staff and clerks, several participants shared how staffing challenges throughout their court affected staff morale and retention, further adding to an already demanding work environment. Supervisors also spoke of lack of resources when onboarding new employees or conducting training. Often, supervisors assist front-line staff daily due to understaffing, taking them away from their core duties and responsibilities. In addition, training and onboarding of new staff largely falls to supervisors who often juggle their role responsibilities and work alongside their frontline staff as needed in addition to training. Supervisors spoke about the need for more regional or centralized training resources to help train new employees and remove the training duty from court staff and

shift it to the AOC. They also noted comparatively low salaries, and demanding work hindered the court's ability to attract applicants. Participants offered a variety of possible remedies to alleviate the issue including increased pay, flexible/hybrid work schedules, paths to advancement within the courts, reducing the public hours, and more job-specific skills training.

Judges & Attendant Staff: Recently, the New Hampshire Legislature increased the number of authorized judge positions based on the Branch's Weighted Case Load Study. However, there are other issues that hinder the branch from capitalizing on its of judges. Though there was an increase in the number of judges, the attendant staff that were originally appropriated to support the new judges were not immediately hired and the FTEs have been eliminated in the most recent budget reduction. Participants noted Superior Court judges had fuller staffing compliments such as court monitors and law clerks, while Circuit Court judges did not, leading to a staffing inequity between the Superior Courts and the higher volume Circuit Courts. The project team also heard that the extensive use of referees, which has increased administrative process and paperwork due to judges needing to co-sign referee's court orders, needs to be revisited.

### Document Management and Efiling Issues

Concerns Regarding Odyssey (CMS): In interviews and focus groups the project team heard that the systems the court uses for its daily and core functions could be improved both for court employees and court users. Odyssey, the NHJB's CMS, was noted for being cumbersome and not user friendly, lacking useful functions that would save employes time, increasingly difficult to service, and several versions behind the latest update. Various participants shared that Odyssey is also not fully integrated with other electronic court systems. For example, Efiling and TurboCourt can take in filings and generate forms, respectively but neither fully integrate into the Odyssey CMS for a seamless electronic case management system.

Efiling & Efiling Center: Clerks and court staff also expressed concern with Efiling. Many shared variations on a concern that expanding Efling to more case types in the Circuit Court would result in a drastic increase in filings staff would have to process. Those specializing in family courts also expressed concern that the courts would not be able to maintain confidentiality of information if Efiling were expanded to the family law cases.

Another theme that arose from interviews and focus groups was that the procedure for case initiation by the Efiling Center is creating more work and issues than efficiency gains. Several clerks and case managers shared they would prefer for the entire process of case processing to return to individual courts. Currently, the Efiling center handles the initiation of civil cases and subsequent document processing until a hearing is scheduled. At that point, the case file is transferred to the court and handled by local staff until case closure. Local court staff expressed that this current process creates inefficiencies as they are not aware of a case until it is set for an initial hearing and must suddenly familiarize themselves with the case file. It was also shared that litigants do not understand that Efiling is centrally processed, which creates inefficiencies because the litigants telephone the local court



*Image 4 Keene Circuit Court*

for case status prior to the court knowing about the case initiation. Some participants offered the solution of dissolving the centralized Efiling Center and having local courts take the responsibilities of the Efiling Center.

Paper Filings & Forms: Another theme that emerged was the inconsistency in the use of paper case files versus electronic case files and forms. Superior Court operates electronically while Circuit Court counterparts rely more on paper with many operating in a hybrid state. From interviews and focus groups it became clear that many courts have duplicative document management and processes that create additional work for their staff. Some Circuit Court participants indicated that they feel more comfortable with paper files, but if a transition were handled properly, they would acquiesce to a change to electronic files. Additionally, participants noted administrative changes to reduce the need to copy/file/mail multiple documents and allow the use of electronic signatures instead of just wet signatures could significantly improve current document management issues.

### Streamlined Processes

Centralized Policies: The project team heard two competing narratives throughout interviews and focus groups. Some wanted the NHJB to adopt more standard policies for consistency throughout the state court system. Others could not see standardized policies working, often stating that courts' needs and local ways of doing things were so different that standardized policies couldn't possibly work. However, overall, most participants leaned towards standardizing select policies for uniformity across the state.

Reduced Administrative/Bureaucratic Steps: Participants expressed an overwhelming need for reducing administrative and bureaucratic steps, noting that current practices not only varied throughout the state but were often tediously overwrought leading to delays and frustrations. Clerks and staff shared frustrations with trying to get equipment fixed or replaced. Supervisors and court administrators shared examples of needing four signatures or securing multiple approvals from various decision makers for routine matters. These extra steps add to their workload and create unnecessary delays for things like ordering office supplies or securing permission for staff to attend professional development opportunities.

Improved Public Access to Minimize Workload: Focus group participants also expressed that improved public access to records could improve their workload. Currently, it is difficult for the public and pro se litigants to access certain court documents due to restrictions on Efiling or lack of knowledge of how to access needed records. This leads to increased calls and visits to the court as clerks and court staff attempt to answer questions and aid these court users in securing their documents. Clerks and court staff suggested the development of online portals for non-confidential documents to help improve the public's access to court documents. Easily accessible video tutorials and instructions to help educate the public on court processes and how to access available resources were also forwarded as a potential change that would help staff reclaim time to attend to their core duties.

### Cost-Saving Measures

Evaluation of Language Bank contracts and fee schedules: A significant theme to emerge from conversations with court staff and administrators was dissatisfaction with the current Language Bank contract that provides interpreters for courts. Concerns raised included a cumbersome

reimbursement process, late and incorrect invoicing, high rates for service, and high 'windshield' times. Participants identified the Language Bank contract as a key expense where evaluation would likely yield savings and efficiencies for the branch.

Efforts to reduce custody transport orders and expand virtual arraignments: A secondary theme that arose from the project team's conversations with court staff and administrators was the observation that the NHJB could save costs by evaluating custody transport orders and working with justice system partners to coordinate them more strategically. Several participants gave examples of the coordination of staff and expense transports incurred and suggested the NHJB consider expanding the use of virtual arraignments to alleviate the strain on staff.

Evaluation of referee use: Administrators noted in our conversations that while the state has more active full judges to address the current caseload,-the NHJB must still rely on judicial referees for various dockets. Participants also noted the use of judicial referees in many instances could cause a delay in justice as findings of fact and conclusions of law must be cosigned by an active judge. The judicial referees have experience as a judge and co-sign should not be required, although this would require a statutory change. Judges should not be required to automatically review proceedings held by a judge referee for the above reason, but also, the time spent reviewing judge referee orders would be best spent working on their own caseload. It was suggested that the NHJB reevaluate the policies and practices surrounding referees to streamline or reduce the cosigning process.

Ease of purchasing: Supervisors and administrators both stressed that the process for purchasing routine office supplies and securing approvals for other routine expenditures by a court are excessively bureaucratic. Several examples were shared where the process of buying office paper or trying to secure a new desktop printer to replace a broken one was complicated by needing to gain approvals from a centralized or non-local entity that could often take days if not weeks. Supervisors and administrators also shared that securing approval for the expenditure of staff training funds was cumbersome making it harder to provide those opportunities for professionalization.



*Image 5 Rockingham Superior Court*

Some participants made suggestions to streamline and ease the process of purchasing. Administrators advocated for the return of staff training/professionalization budgets to court administrators, removing the need for individual approvals from other entities for each request. Supervisors advanced that the NHJB solicit a statewide contract for office supplies that would enable courts to order from an online portal for office supplies up to a certain amount. For supplies above a specified threshold approval from court managers or administrators would be necessary before fulfillment and invoicing.

Technology Integration

Improved IT Management

Staffing shortages in IT fields: A common theme throughout interviews and focus groups was the understanding that many of the technology complaints, delays in routine maintenance, lack of available technicians to address problems onsite, and out-of-date equipment were due in large part to the shortage of IT staff in the NHJB. Universally the sentiment echoed throughout discussions that the NHJB's IT department needed more staff to begin to address other IT related issues in the NHJB. The lack of adequate staffing seems to have led to long wait times for phone assistance and the reluctance of centralized IT staff to visit local courts to assist or address issues in person. The project team heard several instances of court staff supervisors having to pick up equipment or drive malfunctioning equipment to central IT locations. Focus group participants shared that this was done out of necessity as IT staff were not available to drive to the local court. A fully staffed IT department was seen by focus group participants as necessary for the NHJB to adequately address its IT needs.

Need for better governance and evaluation of existing technologies: A secondary theme to arise from the focus groups and interviews is the need for a governance structure for IT needs and an evaluation framework to assess technologies against it. Focus group participants shared that practices and technologies differed from region and even from court to court. The current IT policies, equipment, and practices seem to be more an accumulation of site specific and regional needs, making it difficult to standardize procedures. A governance structure could help courts identify and implement best practices while purposefully making decisions in the present with an eye towards system wide needs in the future. Such a governance structure could also be useful for evaluating existing technologies to ensure they meet the needs of the branch and are user friendly.

Throughout the focus groups participants shared various platform and system pain points: interfaces that were not user friendly, lack of integration between key systems, malfunctioning software, out of date versions of systems with limited features, etc. A governance structure could provide the soft infrastructure to develop standards, review technologies, and solicit input from technology users as to what is working, what is not, and where are opportunities for improvement. Currently, there is no such mechanism by which technologies used by the NHJB are considered and evaluated against the current and future needs of the NHJB. For employees this has led to systems of technologies that are not integrated, out of date, and time-consuming and frustrating to use. Improvements to technology and a process to ensure timely review of technologies could help the NHJB in the long run capture efficiencies.

Training Improvements

Enhanced training for staff in document management systems and technology tools: Court staff and clerks voiced the need for enhanced training on specific systems and tools they use in their work. Participants shared that they often lacked the resources to pursue detailed or advanced training on their own aside from the training received during their initial onboarding and subsequent programming during training days. However, the ongoing training provided to them does not always relay information or the advanced skills staff seek to deploy on the job. Particiants identified that there is a lack of availability of experts within the branch that have the skills sought and are knowledgeable of front-line staff's work. It was recommended that perhaps such trainers

could be centralized in the AOC but stressed that they would also need to be familiar with and stay current on the work and issues faced by local court staff to be effective and provide relevant training.

Cross Training: Another theme throughout discussions was the value and need for more cross training within courts. One interviewee credited the success of this court in continuing to meet their workload needs with the fact that cross-training is deeply embedded in its organizational culture. Several focus group attendees also voiced a need for more cross training in their courts as they often had to pitch in and help other sections of their office periodically. However, just as many staff and most supervisors shared they believed their work or the work of their staff to be so specialized as to render the ability to cross-train between dockets, courts, or circuit and district courts for the same position moot. The current level of receptiveness for cross-training of clerk and court operation specialist positions seems mixed, and there is likely to be resistance unless the benefits are clearly articulated and rapidly realized.

**Public Access and Communication Challenges**

Enhancing Public Access

Developing online portals for easier access to non-confidential documents: Throughout our focus groups clerks and court staff shared that online portals providing easier access for public access to non-confidential documents would help ease their workload. Currently, court users often contact the court for questions and access to court documents. For non-confidential documents allowing the public more direct access would allow front line staff to recoup some of their time. Online portals would also enable the public to access documents at their convenience, not only during local court hours.

Communication Efficiency

Miscommunication between departments affecting case management: Participants shared that under current process there were several pain points that affected their case management. Chief among them was miscommunication or lack of adequate channels of communication between centralized departments and local courts. For example, there are fractured lines of communication between the Efiling Center and court clerks making it difficult for the two to reach out to each other in a timely manner when needing to quickly address an issue. This causes delay and often mounting frustrations for staff and court users who are not aware of the compartmentalized process governing circuit court civil case filings.

Need for tailored communication strategies for the public: A theme of improved public communication strategies emerged from the project team's conversation with the NHJB staff and leadership. Court staff noted that the current court resources and informational aids/campaigns were not sufficient to meet the needs of court users. They also expressed frustration that because of poor public communications they often bore the brunt of questions and demands, adding to their workload. The project team also noted that several participants shared that attorneys also often directly contacted court staff asking for information or seeking assistance with a court action. Supervisors shared frustration that despite repeated reminders that attorneys are not to directly contact court staff the issue remains and that court staff comply with requests in the spirit of being 'helpful' and 'customer service oriented.' Adoption of improved or new communication channels/strategies to relay routine information to court users was voiced as a possible remedy to help increase staff efficiency.

**Considerations for Future Governance and Project Management**

Technology Governance Committee to oversee IT and improve resource allocation: Interestingly, while most interview and focus group participants were not in overt favor of centralization of key services or further unification of the NHJB, many were in favor of centralized technology governance to oversee IT and improve resource allocations. With various systems and platforms in use staff and supervisors feel the impact daily when the technologies they rely on malfunction, no longer meet their needs, or fall short of expectations. Participants were clear that they wanted technologies that worked, were adaptable, and most importantly met their needs without demanding their constant attention to regulate. Some form of governance structure was seen to meet these needs, improve the current state of, and advocate for future IT resources and practices.

## Public Survey

To gather additional feedback from stakeholders, NCSC developed a Qualtrics survey and provided an anonymous link and QR code to the NHJB. The brief survey asked participants to identify their role in the New Hampshire Judicial Branch. Participants then were invited to answer a series of non-mandatory questions to encourage feedback about their experience with the courts. Survey questions were designed to gauge overall satisfaction, identify specific areas for improvement, and obtain suggestions for improving efficiency.

### Survey Results

The survey results are reported as June 12, 2025.

Survey respondents were asked to identify their role within the NHJB which included court staff, attorney/attorney staff, party to a case, public, and other. There were 104 responses to the question with attorneys being the highest percentage of respondents, followed by court staff and the public. *See Figure 2.* The other respondents included a journalist, a legislator, a guardian ad litem (GAL), former employee, retired attorney, and other members of the public.

*Figure 2 What is your role in the New Hampshire Judicial Branch?*



NCSC identified several key themes in the analysis of the survey results. One emerging theme is customer service as a strength of the NHJB. Respondents emphasized the courteous and responsive court staff as something the NHJB does well. The Information Center was also highlighted for their helpful staff, in addition to quality judges. A second theme is the need for the NHJB to prioritize automation and technology improvements. Survey respondents stressed the need to improve E-Filing and expand it to all courts. In addition, the NHJB case access portal, CaseLines, and TurboCourt were repeatedly pointed out as areas for improvement. Finally, respondents recommended improvements to support for self-represented litigants, which is tied to improvements to TurboCourt and automation.

The survey responses are included on this and the following pages.

Q2 How would you rate your overall experience with New Hampshire Judicial Branch?

The majority of respondents rated their experiences as mostly satisfied or very satisfied as seen in *Figure 3*.

*Figure 3 Q2 How would you rate your overall experience with the New Hampshire Judicial Branch?*




Below *Figure 4* shows the experiences broken down by respondent type. The public, attorneys, and court have the highest satisfaction.

*Figure 4 How would you rate your overall experience with the New Hampshire Judicial Branch?*




There were 13 responses with the option for respondents to explain why they were very satisfied or dissatisfied. Those responses included the following comments.

Lack of Transparency and Accountability:

- Courts perceived as serving their own interests rather than the public.
- Cases take too long.

Due Process, Bias, and Ethics:

- Concern that the judicial system is biased against fathers in custody cases.
- Concern about perceived lack of due process and unethical behavior in family courts.

Barriers to Legal Representation:

- Difficulty finding affordable or willing legal representation.
- Navigating the system without support is complex.

Staff helpful and responsive:

- Court staff is helpful and responsive.

CONFIDENTIAL

Q3 What court services did you use? (Choose all that apply)

*Figure 5* below shows the services that most often used by the respondent. Overall, most services are accessed at the courthouse followed by the website.

*Figure 5 What court services did you use?*




*Figure 6* shows the services broken down by respondent type by service.

*Figure 6 What court services did you use?*



CONFIDENTIAL

*Figure 7* shows experiences broken down by service by respondent type.

*Figure 7 What court services did you use?*




Q5 Were the court forms helpful?

*Figure 8* shows that majority of respondents strongly or somewhat agree believe that the court forms are helpful.

*Figure 8 Were the court's form helpful?*



Q6 Did you find what you were looking for on the website?

*Figure 9* shows that majority of respondents strongly or somewhat agree that they found what they needed from the website.

*Figure 9 Did you find what you were looking for on the website?*




Q7 Are there any court processes or functions that are in need of improvement?

*Figure 10* shows an overwhelming percentage of respondents who believe that there are areas with the NHJB that need improvement.

*Figure 10 Are there any court processes or functions that are in need of improvement?*




Q8 If you answered yes, what specific areas do you believe need improvement in the New Hampshire Judicial Branch? (Choose all that apply)

*Figure 11* shows the areas that respondents believe need to be improved with speed of processing cases and the transparency of court procedures, the highest responses.

CONFIDENTIAL

*Figure 11 What specific areas do you believe need improvement in the New Hampshire Judicial Branch*




*Figure 12* shows the areas for improvement broken down by respondent type by recommendation.

*Figure 12 What specific areas do you believe need improvement in the New Hampshire Judicial Branch*



*Figure 13* shows the areas for improvement broken down by recommendation by respondent type.

*Figure 13 What specific areas do you believe need improvement in the New Hampshire Judicial Branch*




Respondents were able to provide additional areas that they believed need improvement. Those areas included:

### Court Technology and Accessibility

- Frustration with e-filing, TurboCourt, CaseLines, and online portals.
- Requests for more automation and user-friendly interfaces, especially for non-lawyers.

### Infrastructure and Logistics

- Practical issues like lack of power outlets in courtrooms.
- Delays in case scheduling and document processing.

### Legal Representation and Pro Se Challenges

- Difficulty accessing affordable legal help.
- Perceived bias against self-represented litigants.

### Family Court Reform

- Concerns about fairness, parental rights, and misuse of emergency protections and reforming family courts.

### Judicial Accountability

- Desire for more transparency and better communication from courts.
- Requests for prompt decisions.

Court Staff Competence

- Complaints about staff being untrained or unhelpful.
- Issues with filing errors and delays.

Q9 What suggestions do you have for improving the efficiency of the New Hampshire Judicial Branch? (Choose all that apply)

*Figure 14* shows the areas that respondents believe could be improved to increase the efficiency of the NHJB. Implementing more digital services had the highest percentage of responses followed by increasing remote proceedings and reducing the time it takes to get a case set.

*Figure 14 What suggestions do you have for improving the efficiency of the New Hampshire Judicial Branch?*



*Figure 15* shows the areas for efficiency broken down by respondent type by recommendation.

*Figure 15 What suggestions do you have for improving the efficiency of the New Hampshire Judicial Branch?*




*Figure 16* below shows the areas for efficiency broken down by recommendation by respondent type.

*Figure 16 What suggestions do you have for improving the efficiency of the New Hampshire Judicial Branch?*



The survey gave respondents an opportunity to provide other suggestions. The suggestions fell into the following categories.

### Court Structure and Management

- Too many supervisory and middle management roles.
- Calls to streamline departments and reduce unnecessary positions.
- Suggestions to combine small departments and automate processes.

### Access to Justice

- Difficulty in obtaining legal representation.
- Better support for self-represented (pro se) litigants, including:
  - Educational resources (videos, guides).
  - A dedicated site for pro se litigants.

### Technology and Efficiency

- Frustration with the electronic filing system and CaseLines and better training
- Requests for smoother, more user-friendly e-filing and case access portals.
- Suggestions to digitize audio recordings and improve courtroom technology (e.g., flat screens, better audio).

### Staffing and Resources

- Need for more judges and support staff.

## State Court Comparisons

NCSC reviewed the services that other AOCs provide to their trial courts. Compared to AOCs in the other states researched, the NHJB AOC provides fewer services to local courts. In New Hampshire, much of the work traditionally done by an AOC is split among the AOC, the Superior Court AOC, and Circuit Court AOC. This split in responsibility leads to duplication of effort by administrative staff in the Superior Court and Circuit Court in areas such as business process and training.

In addition to responsibilities, NCSC reviewed the source of authority for the establishment and responsibilities of the AOCs. The legal citations for the legal authority for AOCs in the benchmarked states are shown in Table 6.

**Table 6. Legal Authority for AOCs in Benchmark States**

| State | SCA | AOC Duties |
|---|---|---|
| Colorado | C.R.S.A. Const. Art. 6, § | CO Rev Stat § 13-3-101 (2024) |
| Connecticut | C.G.S.A. § 51-5a | |
| Delaware | 10 Del. C. § 128 | |
| Hawaii | Hawaii Constitution, Article VI, Section 6 | HRS § 601-3 |
| Idaho | I.C.§ 1-611 | I.C. § 1-612 |
| Indiana | Indiana Code § 33-24-6-1 | IN Code § 33-24-6-3 (2024) |
| Maine | 4 M.R.S.A. § 15 | 4 M.R.S.A. § 17 |

| | | |
|---|---|---|
| Massachusetts | | Mass. Gen. Laws Ch. 211B, § 9 |
| Minnesota | M.S.A. § 480.13 | M.S.A. § 480.15 |
| Montana | Montana Code Annotated § 3-1-701 | Montana Code Annotated § 3-1-702 |
| North Dakota | ND Constitution, Article VI, § 3 | AR 1, N.D.R.Sup. Ct. Admin. R., |
| Oregon | ORS 8.110 | ORS 8.120 |
| Rhode Island | R.I. Gen. Laws § 8-15-4 | |
| South Dakota | S.D. Const., Art. V, § 11 | |
| Utah | UT R JUD ADMIN Rule 3-301 | U.C.A. 1953 § 78A-2-107 |
| Vermont | 4 V.S.A. § 21 | |
| West Virginia | W. Va. Code, § 51-1-17 | |

# Discussion & Recommendations

NCSC has identified opportunities for the NHJB to capture as of yet unrealized efficiencies and maximize the use of current resources based upon the information obtained through the focus groups, interviews, and employee suggestions and expertise of NCSC. The recommendations shared in this report fall into six categories: structural, governance, administration, judicial process and policy changes, automation, and electronic case files. The recommendations range from process changes that could be implemented quickly to major restructuring that will take time to plan and implement. All recommendations are offered with the goal of increasing efficiency throughout the NHJB.

## Structural

The NHJB should consider making structural changes to become a more agile court system able to meet the current and future judicial needs of the NHJB. While court systems can be slow to adapt to change, their experience during the COVID pandemic showed the courts how quickly they can adapt and pivot.

R1: Establish authority for the Administrative Office of the Courts (AOC) through court rule, statute or administrative order that delineates a clear role and lines of responsibility for the AOC.

As indicated earlier in this report, the AOC was established by an order of the Supreme Court, however, that authority has never been codified into rule or statute. To establish clear lines of authority and responsibilities of the AOC, the Supreme Court should consider the adoption of a Supreme Court Rule or propose a statute that clearly defines existing and new responsibilities of the AOC.[11]

**2003 LBA**

We found the AOC's administrative authority and responsibilities have not been formally established, while each trial court administrative office has broad and clearly defined administrative authority.

Having clear authority and responsibilities will help the NHJB eliminate any duplication of administrative work throughout the branch. A Supreme Court rule or statute will lay the groundwork for any changes to reengineer the court system.

[11] This report includes a table with the legal authority that creates the administrative offices of courts and their responsibilities for each of the states researched for this report as a resource for the NHJB.

R2: Consolidate select functions of the Administrative Offices of the Circuit and Superior Courts into the AOC

An administrative office of the court can play an important role in a court system. According to ***A Case for Court Governance Principles,*** a strong central administrative office is designed to help prepare the state budget, take local politics out of hiring, to help standardize court processes, and to help professionalize staff.[12]

The New Hampshire court operations and administration are separate entities and are functionally siloed. NCSC heard from the focus groups and interviews that there is duplication of responsibilities between circuit and superior courts, and between courts and the Administrative Office of the Courts (AOC).

The administrative structure of the NHJB is somewhat unique in that there is an administrative office of courts, an administrative office in the Superior Court, and an administrative office in the Circuit Court. This structure makes it more difficult to establish uniform procedures and training for staff. Under this arrangement, the NH AOC provides fewer services than is typically found in an AOC. While currently the AOC provides fiscal, budget, HR, and IT support, it does not have what is commonly referred to as a "court services" division that would provide support to the trial courts by establishing the business processes and procedures for case processing or have a training section that would provide ongoing education for judicial officers and non-judicial staff. This work is currently being done in both administrative offices of the trial courts. Efficiencies could be gained if those resources were combined and incorporated into the AOC.

If NHJB wants to consolidate functions within the AOC, the Supreme Court should consider appointing a committee of judges, clerks, and AOC staff to evaluate the positions and responsibilities that should be consolidated and those positions that should remain in the trial courts. While there was some concern expressed about the AOC having the needed expertise on business processes and training, this can be alleviated by transferring positions such as the court administrators, central managers, and court services representatives to the AOC. The clerks of court should remain at the trial court level to provide supervision and administrative support to the court.

The AOC should analyze its current reporting structure to determine the best structure to move those responsibilities to the AOC. The AOC should consider the establishment of court services divisions as well as others to effectively do the work by process, such as civil case processing, criminal case processing, probate case processing, family and juvenile case processing, instead of by court structure. The trial courts use the same case management system which would allow staff to focus on business process and develop best practices.

R3: Establish a committee to evaluate further unification of the trial courts

The NHJB is facing a budget shortfall as a result decreasing state revenue. Revenues are not expected to improve in the immediate future due to the revenue structure of the state. To help address the budget issues, the NHJB has already implemented a hiring freeze which has resulted in a large number of vacancies across the branch. With their current resources, the NHJB is only

[12] A Case for Court Governance Principles, Christine M. Durham, and Daniel J. Becker, 2012, accessed https://bja.ojp.gov/sites/g/files/xyckuh186/files/Publications/HarvardExecSession_CourtGovernance.pdf

able fill a limited number of the vacancies created by staff when they leave. Without new state revenue, those vacant positions will remain unfilled. Based upon NCSC's observations, the staffing levels are at a critical mass and courts are already experiencing backlogs and delays in judgments, orders, and warrants being entered into the case management system and sent out to the attorneys and parties. Morale is being impacted by the hiring freeze and workload pressures.

Staff cannot be easily shared between the Superior Court and the Circuit Court because of the supervision structure that currently exists, though staff could be trained in the processes of the other court. Currently there is not a practical way to share staff or work.

To address the workload, the NHJB would benefit with having more flexibility with the assignment of staff, not just between court locations within the Superior Court or the Circuit Court, but also between the trial courts. Ultimately, full integration or unification of trial courts would be a pathway to have court employees that could be more easily deployed to where there is a need to cover vacations, medical leave, employee turnover, or increased workload.

The NHJB has experience with unification as seen with their successful effort in 2011 to create the Circuit Court. The NHJB could engage in a similar process to evaluate the feasibility of creating a unified trial court. The Superior Court and Circuit Court could be consolidated into a Superior Court that would have four divisions, a superior division, a district division, a family division, and a probate division. As part of the evaluation process, an analysis should be conducted to determine the potential for the consolidation of court locations while still providing services to the attorneys, litigants, and public.

## Governance

Court governance has been defined as the framework by which courts operate, manage day-to-day operations, and develop long term strategies. Effective court governance provides consistency and predictability of operations, increases transparency and accountability, and provides meaningful input into the decision-making process.[13] Due to the fragmented nature of the NHJB, there is not a unified strategic vision for the NHJB. It has been said that "hard times can inspire new ways of thinking about old problems."[14], the NHJB has an opportunity make changes and reimage its court system for the future.

In ***A Case for Court Governance Principles***, the following 11 principles were offered to assist courts in analyzing their court structures implementing a governance structure. The principles are broken down by internal governance of the court system and external to other branches of government.[15] If the NHJB adopts a more formalized governance structure, utilizing these principles can help ensure success.

### Internal Governance Principles

1. *A well-defined governance structure for policy decision-making and administration for the entire court system.*

   The authority for policy decision-making should be explicit and well defined.

[13] National Association for Court Management (NACM), https://nacmnet.org/competency/court-governance/
[14] A Case for Court Governance Principles, Christine M. Durham, and Daniel J. Becker, 2012, accessed https://bja.ojp.gov/sites/g/files/xyckuh186/files/Publications/HarvardExecSession_CourtGovernance.pdf
[15] Id.

2. *Meaningful input from all court levels into the decision-making process.*

   Inclusive decision-making that values contributions from all parts of the system enhances decision making.

3. *Selection of judicial leadership based on competency, not seniority or rotation.*

   Judicial leadership should be selected for identified skills, not just seniority or rotation.

4. *Commitment to transparency and accountability.*

   Courts must be knowledgeable about their performance and be open and accountable for their use of public resources.

5. *A focus on policy level issues; delegation with clarity to administrative staff; and a commitment to evaluation.*

   Policymakers should avoid micromanagement of the day-to-day operations, delegate that responsibility to administrative staff with clear authority to implement policies and commit to evidence-based evaluation of policies and new initiatives.

6. *Open communication on decisions and how they are reached.*

   Decisions and their rationale should be communicated clearly to judges and staff.

7. *Clear, well-understood and well-respected roles and responsibilities among the governing entity, presiding judges, court administrators, boards of judges, and court committees.*

   Defined and respected roles for judges, administrators, and committees to avoid confusion and conflict.

8. *A system that speaks with a single voice.*

   The court system should present a consistent unified message to external stakeholders.

External Governance Principles

9. *Authority to allocate resources and spend appropriated funds independent of the legislative and executive branches.*

   Courts should control how they spend appropriated funds to maintain policy independence.

10. *Positive institutional relationships that foster trust among other branches and constituencies.*

    Build trust and credibility with legislative and executive branches through transparency and professionalism by building personal and professional relationships with the members of the other branches.

11. *The judicial branch should govern and administer operations that are core to the process of adjudication.*

    Courts should govern essential functions like record-keeping and staffing.

R4: Develop and adopt a strategic plan to implement structural changes to the branch

**The NHJB had engaged NCSC to facilitate a strategic planning process. However, the effort was suspended prior to the development of a strategic plan. Should the NHJB decide to undertake the**

structural changes recommended throughout this report, the development and adoption of a strategic plan would be a vital first step. Change, however beneficial or necessary, is difficult, resource intensive, and often meets with resistance by those it affects. This is especially true of organizational change where securing buy-in from internal and external stakeholders and a thoughtful roll-out of the change(s) are just as important as the planning and logistics of the change itself. The NCSC recommends the development and adoption of a strategic plan before implementation of structural changes to an organization. Doing so gives leadership and decision-makers an opportunity to think deeply about the environmental context they see the NHJB facing over the next 3 to 5 years and set a direction for their organization to best meet key goals. A strategic plan can then be used multiple ways to support considered changes by first providing a framework by which to assess considered changes against and then serving as clear and common ground by which to build support among internal and external stakeholders. Most importantly, a strategic plan can help ensure that any adopted structural changes are in line with the medium- and long-term goals of the NHJB. Making it more likely that changes once complete will continue to be in line with the vision of the NHJB and able to facilitate organizational goals.

R5: Establish a judicial council composed of judges to provide guidance on policies and procedures.

A vast majority of states have a judicial council or other judicial body that provides guidance on policy and procedures such as The Judicial Council of California or the Utah Judicial Council. A judicial council established by court rule or statute and their responsibilities can be as broad or narrow as deemed appropriate.

A judicial council could be useful to provide guidance and policies as the NHJB makes reforms to the court system. NCSC recommends the creation of a governing judicial body.

R6: Reconstitute the Interbranch Criminal and Juvenile Justice Council established under RSA § 651-E:1

Court systems around the United States have found that regular collaboration with justice partners is essential in the administration of justice. The exchange of ideas, concerns and issues among justice partners allows for all perspectives to be heard and examined, which is necessary to fully understand needs, requirements, and possible impediments to the administration of justice. Collaboration may also enhance the development of policies and procedures to complement processes.

In 2008, the New Hampshire legislature established the Interbranch Criminal and Juvenile Justice Council (Council) to provide leadership, communication and coordination among agencies affected by the criminal and juvenile justice systems. The duties of the Council include policy study and development, promotion of effective allocation and use of resources, to foster communication and to inform and engage the public regarding matters involving the criminal and juvenile justice system.

Like many formal foundations, the COVID-19 pandemic, changed the course of business for most courts across the United States. The Council and its regularity of meeting and function lessened after the pandemic.

NCSC recommends that the Court make efforts to reconstitute the Council, to recommend regular meetings to reengage the justice partners, and to submit biennial reports as required by statute.

## Administration

One key area that NCSC reviewed and received a lot of instructive feedback during the focus groups was the administration of the courts and what functions make the most sense to be centralized. NCSC recommends that the NHJB consider the following for the administration of the courts.

R7: Explore new and evaluate existing centralized functions for the judicial system.

Centralization of functions can be appropriate for some work and those areas need to be reevaluated over time to determine if the goals are still being met. The specific areas for the NHJB to explore include:

i. Evaluate the use of the Efiling Centers and whether the elimination of the Efiling Centers and reverting staff resources back to local courts or consolidating the staff into one Efiling Center would provide better support to the courts.

The NHJB has established four electronic filing centers (Centers),Supreme Court Efiling Center, Superior Court Efiling Center, Circuit Court Efiling Center (EFC), and the Estate Efiling Center (EEFC), with the idea that the Centers would be able to take responsibility for accepting electronic filings, thereby freeing local court staff of that duty. Table 7 shows the number of staff and the case types that each of the Efiling centers process. The Superior Court local staff retain acceptance process for all criminal cases. All other case types are processed in paper.

**Table 7. NHJB Efiling Centers**

| Efiling Center | Number of Employees | Duties |
|---|---|---|
| Supreme Court Efiling Center | 1[16] | All Supreme Court filing |
| Superior Court Efiling Center | 6 | Superior Court civil filing |
| Efiling Center (EFC) | 13 | Circuit Court civil, small claims, and minor guardianship filings |
| Estate Efiling Center (EEFC) | 12 | Probate Division Efiled estate and probate cases and name changes |

The Centers are responsible for the accepting the filings for new cases as well as subsequent filings on existing cases. In theory, it assists with standardization of procedures used by the Court so that electronically filed documents are handled the same way in terms of acceptance and any rejection of filings so that the courts and the court users experience the same process each time a document is filed and reviewed.

During focus groups, NCSC learned that the local court staff had mixed feelings about the Center. For example, the staff was appreciative of the effort to assist them with the electronic filing tasks, however, there have been some experiences whereby a staff member has needed to get something accepted during a court session so that the judge had the information available during a hearing, and the staff member does not have the ability to do that; he/she must ask a supervisor or contact the Center for assistance during a busy docket. There was a desire for the

[16] Other staff assists on cases assigned.

local courts to have control over all aspects of case processing and that the local court is better positioned to accept the filings and answer questions.

Every focus group indicated that the local courts are understaffed to the degree that it is affecting morale and more errors are being seen. Allocating the 19 staff back to the local courts would alleviate some of the staffing issues. The local courts would need to accept Efiling at their location, but those duties could be assigned to local staff.

ii. Evaluate the current procurement policy to establish clear and streamlined procurement guidelines for purchasing court supplies and equipment.

**NCSC heard from the focus groups and interviews how complicated the procurement process was to get simple items such as office supplies. The process requires multiple layers of approvals, and staff indicated that most of their time is spent doing cost comparison. NCSC recommends that the NHJB streamline the procurement process. During the project, NCSC was notified that the AOC issued an *Interim Procurement and Contracting Policy and Procedure* effective May 14, 2025, that may address the concerns raised by staff. The interim policy appears to make it easier for designated staff to purchase supplies for the court. NCSC recommends that the NHJB should evaluate whether the policy successfully addresses the issues raised by staff and whether the policy should be fully adopted. In addition, NCSC recommends that Circuit Court and Superior Court be allocated a set budget for offices supplies that can be purchased from the approved vendors that do not need further approvals.**

**To further assist the local court, the AOC should determine if the statewide vendor has a customer portal where approved staff, such as the clerk of court, can purchase office supplies up to a specified dollar amount. If their vendor does not have a customer portal to order supplies, the AOC should work with the state purchasing department to encourage the development of such a portal.**

iii. Development of an online option for court users to pay fines, fees, and costs.

**The process for payment of court fines, fees, and costs was a concern expressed across almost all focus groups. While other New Hampshire government services offer online payment options, such as the Division of Motor Vehicles online ticket payment system, the NHJB does not provide that service. The courts currently collect credit card payment by credit card machine at the local courthouse, which is time consuming and inefficient. Some court locations reported that their credit card machines were not always reliable, creating operational issues for the court when the payment could not be made. Because the party attempted to pay, staff would have to recall the warrant and wait and hope the party would pay when the credit card was available. Staff emphasized the need for a centralized payment process and online payment system, as it is currently the responsibility of the local courts to process payments.**

**Staff explained that currently the Information Center transfers many phone calls per day to the local court for the sole purpose of making a payment as neither the Information Center nor the Efiling Center staff can process payments. One court estimated that about half of all the calls Superior Court staff receive each day are payment related. Once the call is received, court staff must take the call at their desk, obtain and verify the caller's information, and then use the credit card machine to complete the transaction. Often this process requires walking back and forth from their desk to the location of the credit card machine. After the transaction is complete, staff must update Odyssey with the payment, creating an additional step to the process. Not only do**

credit card payment calls disrupt court staff's work, but they also add additional time for the Information Center staff. Furthermore, court users experience waiting periods with this process.

To reduce the time spent by staff related to payment processing, the NHJB should consider the development and implementation of a centralized online payment system that integrates into Odyssey. A working group should be established to investigate possible options for an online platform, create a plan, and oversee the rollout of the system. Having an online payment system would allow for the Court to receive timely payment and to free up time to work on case aspects of the case process. An online process can help with accuracy of case financials in Odyssey.

iv. Development of a centralized self-help center for court users with a network of Court Navigators to assist on site.

The Information Center (IC) employs thirty-four (34) people, serves both Circuit and Superior Courts, and is managed by the Circuit Court. The purpose of the IC is to receive calls for assistance for requests for documents, general information, or assistance with Efiling at a central location rather than directing calls to the local courts.

Focus group participants indicated that many of the calls that were initiated at the IC are eventually directed back to the court for attention, and the manager of the IC reported that 25-30% of all calls are routed back to the local courts. Most of the rerouted calls are due to the caller wishing to make a payment or to reschedule a hearing. The IC is not able to take payments or see documents in Odessey, so those calls must be transferred to the local court to handle. In addition, if the caller requests to transfer to a specific court, the IC must transfer the call. Attorneys, in particular, frequently request to be transferred to a court. Rerouting calls caused some concerns among court staff. The requirement to phone the IC rather than the local courts caused some concern among justice partners. Because of the number of calls that are transferred to the local courts and the limited amount of assistance it can provide, the IC does not relieve as much work from the local courts as they would like.

The Circuit Court currently has a navigator program, employing two (2) staff members to assist self-represented litigants across the state of New Hampshire. There are few, if any, staffed "self-help" centers, but there are public kiosks that may be used to file documents electronically, review and print records, and complete court forms. The court's front counter staff maintains the kiosks; when the user has a problem or needs to pick up and pay for prints, they go to the clerk's front counter for assistance. Staff reported that at times they are pulled away from the front counter for long periods of time.

Court Navigators assist self-represented litigants by providing procedural information, assisting with forms completion and other assistance as required. The navigators are available locally when they travel to local courts and are also available by telephone and video when needed. They have split the state; one navigator is responsible for the northern half of the state and the other is responsible for the southern half of the state.

NCSC recommends that the Court either eliminate the IC, or reduce the number of staff, deploying those employees to court locations across the state as court navigators for both Circuit and Superior Courts. The staff and the attorneys interviewed indicated that having a navigator at each court location, or at least several navigators per region, would benefit the public and the local staff who are spending an inordinate amount of time with self-represented litigants. Repurposing the IC staff would allow the local staff to work on case-related work.

To be most effective, kiosks should have screen-sharing software and the telephone number of a navigator, or the IC should be posted. As the public experiences problems needing customer support, the customer, and the navigator/IC either in person, or by screen-sharing software, can look at the kiosk screen together and resolve the issues. This would alleviate some of the stress placed on the front-counter staff.

Standardized forms for each case type, complete with user instructions, should be developed, posted on the Court's website, and used by navigators for assisting self-represented litigants.

v. Development of uniform policy and procedures for court staff and provision of centralized staff training resources.

The project team recommends the NHJB support efforts to develop uniform policy and procedures for court staff. Through conversations with court staff, it became evident that while there are variations in local court processes and practices, they are not so apart as to warrant such court-by-court variations in how legal matters are processed. Of course, such an effort would need to deeply involve front line staff and those whose day-to-day work would be governed by the policies and procedures. The benefits would be standardization of how cases are processed and clear expectations for staff, attorneys, litigants, and other court users of what they can expect when they have matters before a court. Uniform policy and procedures would help to reduce confusion among court users and allow the NHJB to realize efficiencies though centralized staff training resources.

Currently, when staff onboards, it falls to the already stretched-thin supervisors and current senior employees to provide much of the hands-on training, orienting new employees to court processes. Uniform policy and procedures would make it easier for staff training to centralize certain resources, freeing current staff and supervisors from onboarding duties and focusing on their core tasks. Centralization of training resources could also benefit from allowing key NHJB members to specialize in training or key topics, becoming collectors and depositories of organizational knowledge and best practices and focusing on disseminating what they know throughout the NHJB. The NHJB could leverage these specialized positions to improve not only onboarding but continuing education and training offerings for staff. Better trained staff can fully transition into their roles more quickly, are more skilled and thus more confident in their day-to-day tasks, and apply learned skills, tips, and best practices to provide higher levels of service to the community and more efficiently accomplish their tasks.

vi. Evaluate regional coordination of docket, staffing, and judge on-call scheduling.

Courts, while independent from the other branches of government and other justice partners, rely on cooperation and coordination to achieve the goals of the court and court business. Conversations with court staff and other justice partners indicated the need for increased regional coordination that could benefit individual courts. NCSC recommends the NHJB evaluate regional coordination opportunities to ensure dockets, staffing, and judge on-call scheduling are set so that they leverage resources and facilitate more efficient functioning of court.

In regions where attorneys routinely must appear in multiple courts or travel moderate distances or a circuit to sustain a practice, the coordination of dockets can benefit multiple stakeholders. Attorneys can more easily coordinate their caseloads and in court hearings if there are set and/or non-overlapping dockets. For example, if criminal first appearances for two courts where attorneys take cases are set for separate days and probate and civil hearings are set for morning

and afternoon dockets respectively it will be easier for most attorneys to make their in-court appearances. The same coordination of dockets can also have the added benefits of reducing delays or need for continuances due to counsel's docket scheduling conflicts.

Likewise, courts share staffing resources within regions with judges participating in staff on-call duty schedules and court officers flexing their assignments to ensure courts have adequate security on heavy docket days or if heightened need for security at a particular court. While there is some coordination between courts now, court staff points to greater gains with deeper and more sustained coordination between court leadership and administrators. Similarly, greater use across the state of on-call duty schedules for judges to ensure due, fair, and timely process would benefit communities and reduce costs to the state and courts. The New Hampshire Judiciary-has inconsistent use of on-call duty schedules to sign motions or set bail for during non-standard business hours, weekends, and holidays. Instead, the state and courts rely on bail commissioners to meet this need, costing the courts additional monies when standard and best practice is for judges to attend to those legal matters as part of their position.

R8: Explore implementation of a standardized employee performance evaluation process for court employees.)

Performance evaluation is a tool to improve organizational culture and employee involvement[17]. NCSC learned that the NHJB does not currently have a formal process for employee performance evaluation. During focus groups and interviews, participants recommended that the NHJB develop formal performance management controls. Staff also suggested that employee performance be tied to organizational goals to improve efficiency and alignment with the strategic vision of the NHJB as whole.

NCSC recommends that the NHJB consider implementing a uniform process for employee performance review. A work group spearheaded by HR could evaluate best-practices and possible formats and platforms to utilize for evaluations. Recent research suggests that a combined review approach of narrative and numerical feedback measures is the most effective. Furthermore, the NHJB will need to develop a clear consensus on performance standards and maintain transparency throughout the process. Performance goals and standards can also be informed by strategic goals for the organization.

To implement performance reviews after performance goals and standards are set, HR should provide mandatory training for the NHJB, with separate training for staff and leadership and supervisors. A communication plan for all staff should be developed to maintain transparency and clearly communicate expectations. One expectation should be for supervisors to meet with staff to discuss their performance evaluation. A copy of the performance review containing written feedback should be provided to staff. In addition, regular one-on-one supervisory check-ins can be utilized as an informal method to continuously assess performance and other issues. It should be noted that while a performance-based pay model may not be feasible for the NHJB at this time, this evaluation process and compensation structure could be explored in the future.

[17] Research: Performance Reviews That Actually Motivate Employees, Joonyoung Kim and Emily Zitek, Harvard Business Review, 2024, accessed https://hbr.org/2024/11/research-performance-reviews-that-actually-motivate-employees

R9: LEAN – PHASE. Using principles of existing LEAN program and change and implement management such as PHASE, to evaluate current practices and to manage any needed changes based on said evaluation.)

Lean

During focus groups and interviews, NCSC learned that the state of New Hampshire uses the Lean method when evaluating processes for improvement. While it is not clear how frequently this method is used, the Court could use the process to evaluate various functions and processes within the NHJB.

The Toyota Production System developed the Lean method of process improvement to streamline processes. To accomplish this, Toyota had to determine the value of the product, examine which parts of production added value, employ effective techniques of organization and ensure that processes had a smooth flow. Focus group attendees highlighted some areas of court process that could be examined using the Lean methodology.

To streamline some functions and processes of the court, the New Hampshire Judicial Branch should centralize some functions such as the Electronic Filing Center, the Central Processing Center and the Information Center. These centers were developed to help the local courts by directing those functions away from them, to free the local staff and to allow them to concentrate on other functions. However, during the focus groups, NCSC learned that while the local staff appreciate these efforts, they may create a delay in services at the local level, for staff, judges and the public. These centers should be evaluated using the Lean method.

PHASE

PHASE is a form of implementation science which was developed for the purpose of assisting organizations and individuals undergoing a significant change in process. The science provides a roadmap users may use to strategically implement change in the most meaningful and impactful way, while allowing those affected by the change to experience change in a less intimidating environment.

PHASE is a five-step approach to assist organizations in implementing new projects or processes. The five steps are seen in the figure to the right. More information on each step of PHASE is included as Appendix C.

As an example of how these processes can be used by the NHJB, earlier in this report NCSC recommends that the Court develop an online option for court users to pay fines, fees and costs. To implement this recommendation, the Court would first need to evaluate, using the Lean method, the entire process of receiving payments from court users and then develop an effective procedure for that purpose. This would be followed by using the PHASE method to implement the change. Making changes in this manner would ensure that changes are not made solely for the sake of change, but because the change is warranted, well thought out, and includes the perspectives of all who may be impacted by the change.

**The 5 Steps of PHASE**

- **P** PURPOSE *establishes clear reasons for change, aligning stakeholders and outcomes.*
- **H** HOW *focuses on readiness assessment, ensuring an adaptable environment and cultural alignment.*
- **A** ACTION PLAN *provides a structured roadmap, optimizing resources and accountability.*
- **S** SUPPORT *empowers court professionals through training and coaching, fostering engagement and positive culture.*
- **E** EXAMINE *entails ongoing evaluation, using data to refine implementation strategies and celebrate progress.*

## Judicial Process and Policy Changes

The NHJB has an opportunity to evaluate current practices and policy changes to determine the impact that judicial policies have on efficiency. While not all policy changes are under the control of the NHJB, where appropriate, the NHJB should use evidence-based practices to evaluate the impact and share the data with decision-makers.

R10. Evaluate the impact on efficiency that the repeal of the 'Felonies First' legislation has had on the courts and report the findings to the New Hampshire legislature.

**The NCSC heard across the board about the impact that the repeal of the "Felonies First" has had on both the Superior Court and the Circuit Court. The repeal of "Felonies First" pushed the initial filing of a felony case back to the Circuit Court and reimplemented the bind over process that was in place before the legislative change. Court staff and judges all expressed that the current process is less efficient and has created more work. This could be partially explained because of the difference in electronic case files. The Superior Court has electronic case files and uses Efiling for criminal cases while the Circuit Court does not. This difference has created a complex process to assemble the case record at the Circuit Court, transfer to the Superior Court, and initiate the new case in Superior Court. There seems to be a loss of knowledge from the prosecutor and defender side on resolution of the cases that has impacted the process.**

**As this was a legislative change, NCSC recommends that the NHJB conduct a detailed evaluation of the impact that the repeal has had, such as looking at the number of cases filed in both trial courts, the time to disposition, and other case processing milestones and present those findings to the legislature.[18] While the legislature has the authority to create or modify criminal procedures, having the impact of the legislation can provide information that can be used for future legislative decisions.**

R11: Investigate the current processes by which police file criminal cases directly with circuit courts and determine if statewide standards of practices are needed.

**New Hampshire police and non-attorney police prosecutors file criminal charges against individuals directly with the Circuit Courts. In focus groups participants noted that there are variations across the state with how these filings were handled. It also seemed from the focus group discussions that this was not practice in all circuits with some court staff expressing unfamiliarity with these types of filings. The filing of charges of typically an executive branch function exercised exclusively by a prosecutor. The project team recommends the NHJB consider further examination of statewide practices by which criminal cases can be filed by local police and non-attorney police prosecutors directly with the circuit courts to determine if uniform statewide standards of practices should be drafted and implemented.**

R12: Explore adoption of early case resolution processes for criminal cases.

Early Case Resolution (ECR) programs, designed to identify appropriate felony cases and resolve them early in the criminal justice process, are not new to the New Hampshire courts. They were

[18] NHJB could use the NCSC's CourTools to assist in the evaluation. https://www.ncsc.org/resources-courts/data/measure-your-courts-performance-courtools

successfully adopted by the courts long before the Felonies First legislation was passed. For example, Strafford County has a long history of ECR efforts. Recently, the Court has engaged in an initiative to expand pre-trial diversion programs to address mental health. ECR was implemented more broadly when the Felonies First legislation moved felony case initiation from Circuit Court to Superior Court. In their 2017 report the Judicial Council recommended the implementation of ECR to alleviate the increased caseload of the Superior Courts and improve felony case flow.[19] In addition, the Criminal Defense Task Force of the Supreme Court made recommendations that underlined the utilization of ECR programs to address caseloads. The Court can build on experience to modify and expand ECR programming to help with criminal case processing after the repeal of the Felonies First legislation.

Staff and judges reported concerns about delays in case processing since the repeal of Felonies First. Felony cases typically take two to three months at the Circuit Court before the case is bound over to the Superior Court. Once filed in Superior Court, there is a ninety-day window for the indictment to be filed in addition to arraignment and thirty to sixty days for the hearing. Participants suggested local courts can address delays in the administration through the adoption of formal ECR programs.

For example, Rockingham County Superior Court was highlighted for their collaboration with the County Attorney's Office to resolve more cases before indictment (since 2015) The Rockingham County Attorney's Office, notes that, "The cases in our ECR program have resolved on average – 67 days after the defendant's arrest." Through our research, we learned that more counties are adopting some form of ECR, Hillsborough County-North has a dedicated team of prosecutors and public defenders, but further expansion is needed.[20]

NCSC recommends that the NHJB implement formal ECR programs throughout the state. The courts will need to partner with local stakeholders, most importantly the County Attorney's Office and the New Hampshire Public Defender. The NHJB will also need to re-engage efforts to train stakeholders including all county attorney offices on the process. Successful implementation of ECR will allow the courts to resolve a number of cases earlier in process, freeing up judicial resources for those felonies that will go to trial.

R13: Evaluate current fines, fees, and cost structures and processes and develop clear guidelines for fee waivers.

During focus groups and interviews, NCSC learned that the court's cost and fee schedules have not been reviewed or revised in several years. Staff believed that the court costs should be increased to be more in line with the current cost of living[21]. Consistent with CCJ/COSCA principles, the court costs charged by the court should be reviewed every 3-5 years. The principles also indicate that fees and surcharges should be established for the purpose of administration of justice. The NHJB should report their findings to the legislature for their consideration. NCSC

[19] NH Judicial Council Report on Felonies First, Access https://www.judicialcouncil.nh.gov/sites/g/files/ehbemt511/files/inline-documents/sonh/felonies-first-01-01-17.pdf

[20] Hillsborough county-North Workshop Summary, New Hampshire Judicial Branch Administrative Office of the Courts, 2024, Access https://www.courts.nh.gov/sites/g/files/ehbemt471/files/documents/2024-03/hills-north-sim-report-final.pdf

[21] After the report recommendation were completed, NCSC was notified that the NHJB through the current budget process is making recommendations to increase filing fees.

recommends that these schedules be reviewed and evaluated in the near term to ensure that the fines, fees and costs of the NHJB are in-line with other states and reasonable.

Additionally, NCSC learned that while there is statutory authority for fee waivers, there are no written standards for the fee waiver process. Those seeking fee waivers must file a motion, sometimes accompanied by an affidavit or statement of assets and expenses. Staff expressed concern that there is no consistency across the state in how fee waivers are approved. NCSC recommends that the Supreme Court develop guidelines to help ensure that consistent standards are used for approving the fee waivers. Waivers of court fines must be approved by the judge; however, payment plans may be approved by the judge or the clerk. While judges have bench cards on the factors to consider before granting the waiver of fines, they are not widely known or used which contributes to inconsistency.

R14: Evaluate current processes for tracking account receivables and debt collection.

NCSC heard from court staff that a lot of time is spent trying to collect past due court costs and fines. There was not a clear understanding of the total amount of past due court costs owed to the NHJB. The courts should make better use of the management reports that calculate the amounts receivable help get a better understanding of the amount that is past due.

The NHJB should establish a working group to evaluate the feasibility of issuing a request for proposals to contract for debt collection. If the NHJB is able to utilize Odyssey to transfer the accounts receivable to a vendor to collect, this would relieve the trial court staff from having to track down parties and send out collection letters.

R15: Evaluate current practices on the use of judicial referees throughout the courts, provide clear guidance on when judicial referees may be used and explore possible changes to statutes and rules regarding the need for judges to co-sign referee's court orders.

Pursuant to RSA § 493-A:1-a (2024), a full-time justice of the supreme, superior, district or probate court who is mandatorily retired due to reaching the age of 70, may serve as a judicial referee on the court from which he or she retired. The referee may take testimony, receive and review evidence and make recommendations for findings of fact and conclusions of law. A sitting justice must approve the recommendations and conclusions to become the final order of the court.

The Court assigns Judicial Referees to hear matters where there is recusal and press of business exists. The use of referees became very important because, according to the 2022 workload study conducted by NCSC, the state needed additional judges. Based upon the need for additional judges identified in the workload study of 2022, the NHJB was successful in getting the New Hampshire Legislature to approve several new judgeships although the legislature did not approve additional staff needed to support the new judgeships. However, the use of referees has not changed, adding to the number of judicial officers that the staff must support.

During focus groups, NCSC learned that the Court maintains a significant budget to support the appointment of referees to hear certain cases, and that there are times when the findings and conclusions approval process slows case progress.

Many states develop a "Senior Judge Program," to continue using the skills of a judge who has retired before or after reaching the age of mandatory retirement. Using Colorado as an example, § 24-51-115, C.R.S., provides authority for retired judges to participate in a program whereby the judge, for a period of twelve (12) years following retirement, may work for ten (10), twenty (20), thirty (30), sixty (60) or ninety (90) days per year, as a senior judge, under contract with the State of Colorado Judicial Department.

In Utah, the Code of Judicial Administration defines the senior judge program, setting forth qualifications, terms and limitations on service and performance standards. In Missouri, the Supreme Court may appoint retired judges to serve as judges within the Circuit Courts of the state. In all three states, the senior judge presides over cases as a judge of the court and does not require approval of another judge. Each of these states have strict guidelines on the qualification to serve in this capacity and participation in periodic reviews of the senior judge's work.

If the Court does not wish to develop a senior judge program which would allow retired judges to preside over cases without the need to have their orders signed by sitting judge, NCSC recommends that the Court support a legislative change to New Hampshire statutes and rules to provide authority for the referee to issue final orders in certain circumstances, and for others, provide a review process that requires a party to seek review of the referee's order rather than an automatic review process. For example, in Colorado, the court uses magistrates in their courts of limited and general jurisdiction, hearing cases in criminal, civil, family, juvenile and probate case types. Magistrates are not considered to be judges because they are appointed by the local chief judge rather than participating in the full appointment and retention process of judges.

R16: Explore lengthening the assignment of judges to court locations to multiyear terms.

To aid the ability of court staff to plan court dockets, NCSC recommends the NHJB explore moving away from the current practice of assigning judges to one-year terms to towards multiyear assignments in one location. During the focus groups, staff said that the one-year assignments of judges hampered the ability of courts to adequately plan for their dockets and allocation of staff resources. Often, assignments for the next year's judges are not received by a court until October, leaving staff little time and under stress to rework and coordinate schedules, dockets, and courtroom assignments. This yearly 'churn' creates excessive work and uncertainty for an already stretched thin court staff. The move to multi-year assignments could help the NHJB capture efficiencies by lowering the turnover and associated paperwork and logistics coordination of off and on-loading judges to their yearly court assignment. Multi-year assignments would provide judges, attorneys, and staff with more certainty and stability for scheduling while still maintaining the rotation of judges through various courts.

R17: Consider adoption of a rule for the Supreme Court that electronic transcripts are sufficient to file to the record and disseminate.

Under the current Supreme Court rule[22], the electronic version of the transcript serves as the official transcript under Supreme Court Rule 15 (4). However, the rule also states that the transcriber should produce a paper copy of the transcript. Staff explained that the requirement

[22]Rule 15 Transcripts. New Hampshire Judicial Branch, Access https://www.courts.nh.gov/rules-supreme-court-state-new-hampshire/rule-15-transcripts

for a paper copy of the transcript can lead to delays in issuing orders. Staff must wait to receive the paper copy to issue the Order, which can take an additional week or more after receiving the electronic copy. There is additional expense and potential waste associated with the requirement to file the paper copy. The electronic copy of the transcript is more efficient to use. If a paper copy is needed, the clerk's office could print the transcript upon request. This will eliminate the need to store the transcripts and speed up the process.

Staff also reported that there is no consistency in the format of electronically filed documents. Some documents are converted to PDF and are text searchable and other documents are scanned. Those documents must go through an OCR process to be text searchable. NCSC recommends that the Supreme Court consider the adoption of a rule that specifies the format of electronically filed documents.

R18: Review Supreme Court Rule 4.2, Small Claims, For Simplification of Service of Process.

Under Rule 4.2, the procedure for service of process requires a lot of work by the court staff. NCSC recommends that a work group review the rules and process and make recommendations for any changes to the Supreme Court.

An example of how another state has addressed this issue is to allow for service by certified mail and specifies that refusal of service of the certified mail, constitutes proper service to proceed.

## Automation

Automation has become vital to the efficient operations of the courts. The NHJB uses an electronic case management system, electronic filing, electronic filing for self-represented litigants, digital sound recording for capturing the record, electronic evidence system plus all the standard systems to manage the judicial network and user hardware and software.

Artificial intelligence (AI) is the latest technological development that courts are grappling with. The true impact that AI could have on court efficiency is not yet known, but courts around the country are experimenting with AI through the development of chatbots or using AI to help with back-end case processing. Before beginning to experiment with AI, it is important for the court system to adopt an AI use policy. Additional information on AI can be found on NCSC's webpage on AI. The NCSC is currently working with several states to develop their AI policies.

R19. Prioritize securing adequate funding to fully staff and support the IT department to better meet the needs of the NHJB and individual courts.

Courts are reliant on technology and automation for the operation of their courts and the NHJB is no exception. It is important to maintain current versions of software and to refresh hardware on a regular schedule as out-of-date software can be vulnerable to security breaches. Staff reported issues with equipment breaking down and not having the ability to get it replaced. The NHJB should continue to request adequate funding in its technology budget to ensure that the technological needs of the court are met.

R20. Restructure the deployment of IT technicians, embedding them regionally throughout the state to provide timely and reliable assistance to local courts.

At present, the AOC maintains the IT department for the NHJB. The IT department has evolved over time, adding courts as they were created. The IT department is responsible for cyber security, CMS integrations, software development, applications, and IT technical support as well as other duties.

The IT department at the AOC supports all courts from the AOC location. IT technicians make trips to the local courts as necessary to respond to local requests for help, however, there was concern about the time it takes to get issues resolved and that there are not enough staff to have dedicated technicians travel to all court locations, and many issues are resolved virtually or by using local court staff. Because the IT department is short-staffed, there is a risk of delayed technical support.

As courts are more dependent on technology than ever for daily activities, NCSC recommends that IT at the AOC maintains a staffing level sufficient to serve all courts within the state. Further, NCSC recommends that regionalization of IT technical services be considered. A regionalization structure may consist of a managing IT technician located at the AOC, and 5-7 IT support technicians housed at strategic court locations throughout the state. Regional technicians could be made available locally as needed for their region.

In addition to adding availability, regionalization allows each IT technician to develop and maintain a working relationship with leadership and staff at each court location, while still reporting back to the AOC, which can be critical for continuity of services. As a stop-gap measure to ensure that the courts are getting the technical support they need, IT could establish a schedule for onsite support for each court location so that the courts know when the technicians will be onsite.

R21. Develop an IT governance structure to guide projects and coordinate automation policies.

IT Governance is, "a formal structure and process for managing business operations and supporting technology tools. It is a method of making decisions, allocating resources, and resolving problems within and across organizational boundaries, arriving at solutions that are optimal for the system, rather than for its discrete parts. From multiple interests, it produces a single, consolidated agenda to guide the efforts of individuals and organizations." [23]

Similar to the general governance principles previously defined, the ***NCSC Court IT Governance Model*** outlines a structured approach to managing technology in courts, emphasizing the importance of leadership, collaboration, and clarity in decision-making.[24]

[23] THE NCSC COURT IT GOVERNANCE MODEL, Lawrence P. Webster, 2006. Access https://cdm16501.contentdm.oclc.org/digital/collection/ctadmin/id/426
[24] Id.

Key governance principles:

1. *Court Leaders Must Provide Vision and Strategic Direction*

   Court leaders must define the technology vision by looking at where we are, where do we want to go, and how do we get there. The vision must be practical, realistic, and continuously reassessed.

2. *Court Leaders Must Understand Technology at a Conceptual Level*

   Court leaders need a foundational understanding of IT to manage it effectively because they cannot manage what they do not understand.

3. *Court Leaders Must Lead Technology Initiatives*

   Leadership on technology initiatives must come from court leaders, not technologists, as they are responsible for the outcome. Technology leadership should be integrated into court governance structures.

4. *Policy Decisions Must Be Made by Policy Leaders*

   Technologists and business experts inform and educate the policy leaders on the issues and options, but policy leaders must decide.

5. *Business Experts Must Drive Technological Innovation*

   Technology solutions should improve court operations and solve real business problems. Business experts should be used to define business needs.

6. *Court Leaders Must Rely on Their Technology Experts*

   Because of the speed of technology innovation, court leaders need their technologists to provide updated information on technology issues and options. The CIO should manage operations and advise leadership.

*Figure 17 NCSC Court IT Governance Model*




The report also outlines a three-tiered governance model that has a court policy group, a business tier, and a technical tier.

One way to formalize the IT governance is through the adoption of a Charter that defines roles, responsibilities, and decision-making rules to help manage technology jointly.[25]

Some state court systems, such as Arizona and Missouri, have formalized IT governance through a statutory committee. The Missouri Court Automation (MCA) committee is a comprised of internal and external stakeholders as identified in the statute. The MCA guides all aspects of court automation including, setting priorities on development projects, ensuring the courts have right technology, maintenance of the judicial network, cybersecurity policies, and the court automation fund.

Arizona established the *Court Automation Coordinating Committee* (CACC) which is a standing advisory committee of the Commission on Technology (COT). The CACC coordinates planning, enhancements, and implementation of automation in trial courts.

Georgia's judicial council has a Standing Committee on Technology that provides guidance and oversight on technology-related issues and initiatives and is composed of judges, clerks, administrators, attorneys, legislators, the attorney general, and a representative from the governor's office.

NCSC heard from the NHJB that there are a lot of competing interests for court automation projects but there is not a process in place to evaluate, prioritize, and establish automation policies. Establishing a formal IT governance structure will provide the needed guidance for policies and priorities.

The Supreme Court should consider the establishment of a Supreme Court Committee to govern court automation. The committee should have a diverse membership that would include judges, administrators, clerks, and external stakeholders such as members of the New Hampshire bar. The AOC should be responsible for staffing the committee.

R22: Evaluate automated services to self-represented litigants (SRLs), including policies and resources related to accessing court documents, Efiling, TurboCourt, and informational kiosks at courts to ensure they are configured to best meet the needs of these court users.

The NHJB uses TurboCourt as their Efiling program for self-represented litigants (SRLs) and non-attorney filers and has kiosks available at the courthouses. Staff reported that they spend a lot of time assisting SRLs with the kiosks and the information center spends a lot of time assisting with TurboCourt. The Office of Access and Community Engagement should work with the Access to Justice Commission and IT to evaluate the current technology platforms that are being used for SRLs to determine if those platforms are meeting their needs. As NHJB uses some of the Tyler suite of products, they should evaluate Tyler's Guide and File to increase integration into the case management system.

NCSC has published resources to assist courts with providing access to SRLs on its website including a 2023 report on Court Based Self-Help Centers which outlines best practices to consider for the development of self-help center.

[25] Id.

R22. Evaluate broadband connectivity at local courts to ensure staff can reliably access and update judicial branch systems.

**Having good reliable internet at the courthouses is vital to court operations for both staff and visitors to the courthouse. Staff reported that at times their case management system is very slow. In addition, it was reported that the guest Wi-Fi can have problems. Older courthouses can be harder to wire and to install Wi-Fi. The NHJB should evaluate the broadband coverage for its court locations to determine if it is possible to get better and more reliable connectivity.**

R23. Investigate whether the NHJB email system can be certified as CJIS complaint to facilitate the emailing of records and move away from faxing documents for domestic violence orders.

**Staff must currently fax domestic violence orders to the domestic violence registry. This takes a lot of time for staff to print out the documents, fax, and then wait for confirmation. The NHJB should investigate and work with their state police to determine whether they can develop a process to have electronic mail communication certified as CJIS compliant. The** latest CJIS policy **is available on the Federal Bureau of Investigation's website.**

## Electronic Case Files

**Electronic case management and electronic document management are booming industries for a good reason; keeping records electronically assists users in organization of information, provides an ability to access data from multiple locations, and removes the need to pay for or arrange for storage of paper records. However, with all of the positive return on that investment, it is important to develop and maintain excellent data governance and data integrity.**

**Having electronic case files in court eliminates the need for court staff to track down paper case files and pull them for scheduled hearings. Electronic case files can prevent lost files, and it gives the judges and court staff the ability to access the file at any time.**

R24. Implement electronic case files for all circuit court case types.

**At present, the Superior Court is fully electronic in that it has electronic case files and uses Efiling and scan/upload processes to commence a case and to add documents to a case. The Circuit Court is partially electronic with electronic case files for small claims, civil, and certain probate and family division cases. All other case types are not electronic. There are cases that are initially filed within the Circuit Court that eventually land in the Superior Court, either by removal, or in the case of felonies, at bind over. When a Circuit Court case is removed to the Superior Court, a staff member must scan the documents and send an email, transmitting the documents to the Superior Court, who must then create an electronic file. Staff reported that it takes time to separate the PDF documents they receive into the individual pleadings to upload to Odyssey. Both courts use Odyssey as their case management system and Odyssey File & Serve as their electronic filing system. Self-represented litigants use TurboCourt as the Efiling resource.**

**During focus groups, NCSC inquired of attendees about their experiences with electronic records of the courts. Other than the slowness of the system, which is discussed in other areas of this report, court users generally appreciated electronic files. Having 24/7 access to the courts' files is advantageous to many court users. However, many of the Circuit Court participants had an**

adverse reaction to the concept of having electronic files.[26] They cited several concerns about the time required to make each filing electronic, and the perceived inability to keep certain aspects of files, or complete files, inaccessible to the public.

Most electronic case filing systems and document management systems include an ability to set a document as a "non-public document," and in fact, New Hampshire e-file instructions to the case parties provide a procedure for filing such documents. NCSC did not have access to the Odyssey File & Serve Manual for employees but suspect that the court staff could set security level of documents being accepted from e-file and for documents that court staff are scanning and uploading to the file. In addition, most electronic case filing systems offer the ability to set an entire case file or case type to "non-public."

Processing paper documents by Court Operations Specialists (COS) takes time. The COS must read the document, determine the case in which to apply the document, conduct data entry on the document (receipt of the document, setting any reviews/ticklers based on the document filed, change of address, etc.), match the paper document to the paper file, and either place the paper file back onto the shelf, or route to the judge or other staff for a review. In electronic case filing, all of the above actions must take place, except matching the paper document to a file and placing the file on the shelf or directing it to a judge or other staff member. Instead of these functions, the staff member would need to scan the document and upload it to the file and then either move to process the next document or place the document into the judge's electronic queue. In other words, the difference in case processing is nearly identical, but end users can see the document more quickly than if processed in the "paper world." It is important for courts to establish rules on naming conventions for files and to use specific informative docket codes for pleadings. The use of generic codes such as other, motion, or filing should be avoided. Having specific file names makes it easier for judges and court staff to locate and find the right document, especially during a court hearing. The use of specific codes could lay the foundation for a more robust dashboard for judges to use during hearings to find the right document. It is important that technology does not hinder the judges' ability to run their docket in the courthouse.

Maintaining a paper file is more costly, in terms of finance, space and time, than maintaining an electronic file. For this reason, in addition to the rationale discussed above, the NCSC recommends that the Circuit Court develop a plan to convert to electronic case files as soon as possible. This recommendation focuses on the creation of the electronic case file while recommendation 25 addresses expansion of Efiling. The creation of an electronic case file does not require that the Circuit Court allow attorneys and parties to electronically file pleading into the case, but allowing attorneys, at a minimum to use the eFiling system would certainly benefit the court so that court operation specialists (COS) do not have to scan and upload all the pleadings to the electronic case file. While this recommendation also does not address older case files, these files may be converted to electronic form as staff has the time to scan and upload the files.

[26] There was a minority of staff that recommended adoption of Efiling in all case types.

R25. Evaluate and prioritize case types for an expansion of Efiling to all circuit court case types.

**The Circuit Courts generally hear misdemeanors, small claims, civil, probate and family cases. Most of these cases involve self-represented litigants who are not as knowledgeable of the rules of practices and procedure. Efiling is allowed in small claims, civil and probate cases, but not in other case types. Planning for allowance of electronic filing in other case types was completed, but was never fully realized by the Circuit Court as the idea for electronic filing in all case types was discarded or placed on indefinite hold.**

**A recent survey of attorneys and the public revealed that there is an interest in having electronic filing available in all courts and case types.**

**In conjunction with recommendations 21 and 24, the NCSC recommends that electronic filing be expanded to all case types for the Circuit Court. To assist in this effort, a working group should be established to identify priority of case types for the expansion, focusing on those cases that have a high percentage of attorneys on the cases. If the Circuit Court is hesitant to allow electronic filing because of pro se litigants, it is possible to make Efiling mandatory for attorneys and leave Efiling optional for pro se litigants. It would mean that the COS would be required to scan and upload the filings of the pro se litigants, but if the files are electronic, that would be required anyway.**

R26. Evaluate the current Odyssey case management system (CMS) and Efiling system for possible enhancements.

**During focus groups, NCSC learned that there may be a need to evaluate the Odyssey Case Management System and Efiling system for possible enhancements to ensure that the systems are cohesive, contain all functionality that is required and desired by the Court, and is easy to use and navigate. The system should also fully enhance the Court's ability to extract data for management purposes.**

**Many users indicated that both systems are slow, and they experience "time out" errors frequently. It is unknown if this issue has been reported to the vendor, but it would be advisable to determine whether this is a function of the software applications, or a function of the broadband internet services available to the Court.**

**It was also reported that courts are using an older version of Odyssey. The AOC implemented Odyssey 2023 on May 30, 2025, and has received the Odyssey 2025 update and is currently testing that version. It is important to keep current on the version of the case management system to fix bugs in the system and to provide the most up-to-date modifications to the system.**

**The Supreme Court is currently using C-Track as their case management and Efiling platform. It is unknown whether it is possible to certify the trial court's record as an electronic record from Odyssey to C-Track. Efficiencies may be realized if certified records from the trial courts are in electronic format rather than in paper format.**

**The focus group participants described a process whereby staff is required to fax copies of protection orders and warrants to local law enforcement, for entry into the national database. It is preferred that the case management system be capable of reporting data to other agencies through a transfer process that does not require a staff member to print a document and fax it to** another agency.

The recent survey of attorneys, the public, and focus groups indicated that there may be issues with the CaseLines application. The issues reported were training, operation of the system and potential glitches in display of documentary evidence.

Finally, the NHJB should review the Efiling application, Odyssey File and Serve, together with TurboCourt to determine whether this is a good pairing of systems. NCSC heard from participants that pro se filers often experience difficulties with TurboCourt and the transfer of data. If the use of TurboCourt is for the sole purpose of offering guide and serve options, NCSC recommends that the NHJB inquire of Odyssey about whether that is an option of their current package and if not, the cost to add it.

Any review of the systems should include stakeholder input and analysis of the business needs of the courts to ensure that the technology platforms are meeting their needs.

# Next Steps

As the NHJB evaluates its organizational structures, policies, and processes this report can serve as a starting point for further discussion and initial direction. Considering the budgetary landscape of the state and the NHJB's outlook of future reductions by the legislature to its budget, a reimaging of how the courts facilitate justice for the people of New Hampshire is necessary.

Should the NHJB decide to pursue the recommendations forwarded in this report the NCSC project team recommends careful consideration as to which recommendations and in what order the Branch decides to execute. The recommendations vary in terms of complexity, impact to current structures, and time scale and resources needed to successfully execute. To implement several of these recommendations, the NHJB would need to adopt or modify court rules or work with the legislature to adopt or amend statutes. To initiate implementation of those recommendations the NHJB would need to:

1. Establish the authority of the AOC by Supeme Court rule.
2. Work with the legislature on the impact of the felonies first statute.
3. Develop a rule on the assignment of judges.
4. Develop a rule on filing electronic transcripts in the Supreme Court.
5. Review the small claims Rule 4.2 for simplification of service of process.

The NHJB is not alone facing a constricting budget outlook as other state court systems and public institutions are navigating similar waters. This moment serves as an opportunity, however forced, for the NHJB to rethink its practices, identify core goals, and plan for the future.

CONFIDENTIAL

# Appendix A: NHJB 2025 Software Standards

**NHJB SOFTWARE STANDARDS**

Created: October 24, 2012, Updated: April 23rd, 2025

The purpose of this standard is to ensure NHJB employees are using commercial software that is industry software licensing compliant, approved by AOC IT for security and network compliance purposes, is supported by AOC IT staff and for reporting Open Source Software use to the legislature.

| SOFTWARE PRODUCT NAME | SOFTWARE PRODUCT DESCRIPTION | OPEN SOURCE/ PROPRIETARY |
|---|---|---|
| MOBILE DEVICE OPERATING SYSTEM REQUIREMENTS | | |
| iOS x | Apple iPhone Operating System where x is the software version number | P |
| Microsoft Mobile x.x.x | Microsoft based Operating System where x.x.x is the software version | O |
| Android | Google Android ("Droid") based Operating System | O |
| PRIMARY PERSONAL COMPUTER SOFTWARE | | |
| MS-Windows | Standard desktop and laptop Operating System | P |
| MS-Edge | Allows an interface for accessing the Internet | P |
| MS Office | Word, Excel, PowerPoint (presentations), Outlook (email) | P |
| MS Visio | Draws graphical depictions of flowcharts, structure charts, hierarchy charts. | P |
| MS-Project | Develops Project Plans and Schedules | P |
| MS-Teams | Collaboration Tool | P |
| Adobe Pro/Acrobat/Reader | Write protects files in .pdf format and read capability of .pdf | P |
| PDF Annotator | Annotates PDF files | P |
| Dragon Naturally Speaking | Software which translate speech into Word text | P |
| GoToWebinar | Shared calendaring system for scheduling webinars | P |
| .PTX Reader | File "viewer" to read special files such as transcripts | P |
| Identicard | Software for creating employee identification badges | P |
| Microsoft 365 | Microsoft Collaboration site for project file sharing, communication, and online file editing | P |
| Microsoft Silverlight | Screen Display Enhancement Add-On | P |
| MS-One Note | Used for digital note taking | P |
| MS-Outlook | Client used for accessing email | P |
| Windows Media Player | Launches FTR Audio formatted files | P |
| COURT STAFF SOFTWARE APPLICATIONS | | |
| Odyssey | Court case management system | P |
| Odyssey Party Access Portal | Used to provide the parties in a case access to specific case files | P |
| Odyssey Public Access | Used to provide case summary and public documents for select case type via kiosks in court lobbies | P |
| TurboCourt | e-Filing for Self-represented litigants | P |
| File & Serve | e-Filing for Attorneys; e-Filing integration into Odyssey | P |
| File & Serve Review Application | Clerk review | P |
| Judge Edition | Used by Judges to view/manage e-filed cases | P |
| Check Assist Software | Accounting software supporting check writing | P |
| NH First | State enterprise financial system: payroll, personnel, budgeting, accounting | P |

CONFIDENTIAL

| | | |
|---|---|---|
| Timesheet System | Internally developed timesheet management system | C |
| Payroll System | Legacy internal accounting/financial and personnel/payroll system | C |
| Judicial Scheduling | Legacy internal judge scheduling system | C |
| OGE ethics and PURbase NH | Law Library software for ..... | P |
| Westmate | Communications software allows automatic access to Westlaw to customize PC | P |
| LexisNexis | RSA and other legal reference software | P |
| Thompson-Reuters C-Track | Supreme Court Case Management System | P |
| Software 995 | Creates .pdf file types from other types | O |
| Horizon | Library Book Tracking Database | P |
| ForTheRecord(FTR)-Lognotes | Records the audio of court proceedings in a digitalized file | P |
| Sony DVE version 3.3.01 | Hand-held recorder software to copy files from hand-held to PC's | P |
| Open Fox System | Web Browser Software for Entry of Bench Warrants/ Protective Orders | P |
| WinSCP | File Transfer Protocol Software for secure file transmission (used in NH First) | P |
| RightFax | Receives, stores and views Protective Order images for Registries staff | P |
| RMS | Viewer for imaged files | P |
| Capture Perfect | Document Scanning Software used in AOC Accounting | P |
| Cisco Web Ex | Collaboration and Meeting tool used for official court hearings | P |
| Courthouse JMS | Jury Management System - Tyler Tech Software | P |
| Case Center | Digital Evidence Management System | P |
| Telax | Information Center Contact Management System | P |
| IT STAFF USE ONLY | | |
| Actian Zen PSQL | Legacy database management system for Administrative Systems | P |
| MS-SQL | Judicial Branch standard database management system | P |
| Cisco Secure Endpoint | Anti-virus software that provides virus/malware protection on Workstations/Servers | P |
| CrowdStike | Provides endpoint security, threat intelligence, and cyberattack response services | P |
| Mozilla Firefox | For Jury Management only | P |
| My-SQL | Database software | P |
| BJS Administrator | Batch job scheduling software | P |
| DDF Builder | B-trieve Data Manager-changes data, designs B-Trieve file structures V6.15 | P |
| Apache TomCat | Executes Java Servlets & renders web pages from Web servers (ie MS-IIS) | O |
| Remote Desktop | Allows IT technicians to diagnose/fix problems on remote computers | P |
| Microsoft Team Foundation Server | Application Life Cycle management + used by staff to record UAT | P |
| Microsoft Test Manager | Managing Testing | P |
| Microsoft Visual Studio | Integrated Development Environment and Automated Testing | P |
| Microsoft Bus. Intell. Dev. Studio | Data Warehouse ETL Tool | P |
| Microsoft Team Explorer | Data Warehouse Office Integration and Project Management | P |
| Adobe Photoshop | Raster Image Manipulation tool (web graphics) | P |
| Merant DataDirect Connect | ODBC Driver | P |
| Apex SQL and Data Diff | SQL database comparison utilities | P |
| Redgate SQL Doc | SQL database documentation software | P |
| Autopsy | PC forensics software | O |

CONFIDENTIAL

| | | |
|---|---|---|
| ForcePoint | Content filtering tool used to secure web browsing | P |
| Snort | Network debugging tool | O |
| SolarWinds Orion | Network monitoring and alerting tool | P |
| Footprints | Help Desk Ticket (Request) Tracking | P |
| Veeam | Backup software used for infrastructure backups | P |
| Wireshark | Network only | O |
| Putty | Networking only | O |
| Divar/GE Nave/WaveReader | Security camera | P |
| VMWare | Virtualization software | P |
| DreamWeaver | Web Design Software | P |
| Distribute | Used to send files from central AOC servers to remote court servers | P |
| Remote Assistance | Used by IT & Accounting to access a remote computer for debugging purposes | P |
| Redgate SQL Prompt | SQL database intellisense | P |
| System Center Configuration Manager | Collects and manages and maintains software inventory and updates | P |
| Microsoft SQL Server Management Studio (IT use) - Allows access to MS SQL databases | | P |
| WMHelp XMLPad | XML editor: Imports HTML, create/remove tags, color syntax highlight, etc. | P |
| Fiddler | Debugging proxy which logs all HTTP(s) traffic from applications to Internet | P |
| JQuery | JavaScript Library | O |
| NotePad ++ | Open Source utility for light editing and text/source code manipulation | O |
| TruVision | Used by IT and Security - DVR Software to export and monitor DVR | P |
| VMware vRealize Log Insight | Real-time log management search and archiving | P |
| FirstLight Hosted VOIP | Hosted PBX provided by FirstLight | P |
| 7Zip | Used by IT - Utility to compress files | O |
| DevOps | Managing Testing | P |
| NON-STANDARD SOFTWARE (still in limited use but no longer purchased or new copies installed) | | |
| ASPI | Internet Service Provider | P |
| SPSS | Statistical Analysis Report Writing Software | P |
| GoToRescue | PC access for remote troubleshooting | P |

**All software is kept up to date to the best of our abilities given resources and funding.**

[illegible]

CONFIDENTIAL

# Appendix B: NCSC Court IT Governance Model

## TECHNOLOGY

### THE NCSC COURT IT GOVERNANCE MODEL*

**Lawrence P. Webster**
Principal Court Management Consultant, Court Consulting Services, National Center for State Courts

*Almost all courts are relying more and more on technology to help them do their work. Court leaders of the future, to establish vision and strategic direction for technology, will be adopting an IT governance strategy for their courts. IT governance is a formal structure and process for managing business operations and supporting technology tools.*

This article was prepared to substantiate trends and to document best practices in information technology (IT) governance in the court environment. Almost all courts rely on technology to help them do their work. Some technologies can be installed out of the box and require little or no configuration, adjustments to work processes, documentation, or training of users. Tools that are more complex may require a great deal of specialized expertise to implement and operate. The magnitude of budget and staff commitments to case and document management systems, as well as their effects on business operations in the courts and related organizations, makes IT a significant management issue for the judicial branch. For more than 30 years, court leaders have struggled to apply technology tools to the work of the courts, often with great success, but seldom without high levels of tension, frustration, and exasperation.

Court leaders are responsible for the success of technology initiatives, but few have the training or experience to guide these efforts. Court leaders who succeed have found ways to assemble teams of individuals at all levels of the organization who possess the appropriate knowledge, skills, and abilities to get the job done. How those teams are organized and operate is an important key to success.



#### Court Context

This article is intended to provide principles of IT governance that are applicable in all kinds of court environments. Some courts rely on an executive-branch IT department or similar organizations for automation support; other courts operate and maintain their own systems; others rely on the private sector for some or all of their technology services; others participate in centralized or federated systems administered at the state level; and some are part of integrated justice environments where they are but one of many stakeholders. These principles have proven to be effective in all of these situations.

IT governance seldom is completely internal to the court; often, it crosses organizational boundaries and includes non-court stakeholders that provide or receive court information. In most environments, IT governance must balance the competing interests of many organizations.

Many court leaders are well grounded in IT management principles, where few were in that position just a decade ago. More and more, courts are relying on technology solutions developed in the private sector (which creates new and different governance issues), though many still develop and maintain their own systems. Many court leaders still do not focus well on IT issues and struggle to manage technology projects.

#### IT Governance

IT governance is a formal structure and process for managing business operations and supporting technology tools. It is a method of making decisions, allocating resources, and resolving problems within and across organizational boundaries, arriving at solutions that are optimal for the system as a whole, rather than for its discrete parts. From multiple interests, it produces a single, consolidated agenda to guide the efforts of individuals and organizations.

#### The Three-tiered Governance Model

The National Center for State Courts recommends a three-tiered approach for the governance of business operations and technology. At the top level is the court policy group that is responsible for the administration of the judicial branch. This role typically is played by the supreme court, judicial council, board of judges, or other similar body. This group is responsible for setting priorities and for limiting the number of worthy projects that are pursued to match available resources. It also is responsible for overall budgets, financial management, strategic planning, and project oversight.




The second tier is the business layer, composed of experts in business operations from throughout the court system, including selected administrators, clerks, operational managers, and supervisors. The business group defines and analyzes business problems, adjusts business practices, implements policy directives, and manages projects. It labors closely with the technologists to design changes to case management and other applications, managing priorities within the structure defined by the policy group. It is responsible for signing off on all technology products as they are delivered. It develops plans, budgets, issue papers, and other materials to assist the policy leaders in making important decisions. It ensures that technology efforts are focused on solving business problems.

The third tier of the governance model is the technical level, consisting of key technical experts in the court system. Even if all of the technical expertise resides in a single organizational unit of a court, a formal group still should be established and should be the vehicle for providing assignments and managing progress. Often, there are multiple IT organizations supporting technology at various levels of the court system, and this arrangement provides an opportunity for them to work together and coordinate their efforts. The technical group develops architecture; manages the infrastructure; creates, procures, and implements technology solutions; and resolves day-to-day operational problems.

The court CIO[1] is the key contact between the court and technology worlds. This individual should be conversant in both languages to communicate effectively. The CIO is responsible for educating court leaders on IT and for helping technical staff understand the business environment in which they work. The CIO, who should report directly to the court administrator, manages technology staff and related resources, system development and acquisition, technical operations and production activities, and user support, including problem management. The CIO assesses staff capabilities and obtains outside expertise, when needed.

Very large or complex court or justice systems may have additional tiers in their governance structures; these three are the minimum required to manage IT effectively.




Most court IT issues have policy, business, and technical implications. Managing the overlapping aspects of business and technology issues requires that a member of the policy group participate with the business group, that a member of the business group participate with the policy and technical groups, and that a member of the technical group be a part of the business group. This will help ensure adequate communication and advocacy for important issues. It is assumed that the CIO participates in meetings of the policy group whenever technology issues are discussed.

### The Charter

An essential element of effective governance is a charter. A charter is a document that defines the structure, mission, role, responsibility, and rules of operation of the various individuals and groups with governance responsibility. It reflects agreements between policy leaders about how decisions will be made, how resources will be allocated, and how problems will be solved. All participating organizational units must share sacrifice, work, and benefits fairly. The charter defines how this will be done. A written charter represents a strong commitment by the participating organizations, groups, and individuals to work together to manage technology jointly.

Who participates in policy-setting meetings, and how are votes allocated? Will a decision require consensus, or will a majority vote be sufficient? When business and technical experts cannot agree on an optimal approach, how will a decision be made? These are the kinds of questions that should be answered in advance in the charter; rules of operation cannot be invented during a crisis.

#### Principles of Court IT Governance

Certain principles facilitate effective court IT governance, in addition to the principles of structure and process outlined above. Some of these key principles are:

##### *Court Leaders Must Provide Vision and Strategic Direction*

Working with court staff and other stakeholders, court leaders must establish vision and strategic direction for technology in the courts. Three questions outline technology vision: where are we, where do we want to be, and how do we get there? The answers to these questions must be practical, concrete, and realistic.
Creating, articulating, and communicating vision throughout the organization is a responsibility of court leadership.

Distorted vision in technology leadership (unrealistic expectations, erroneous beliefs about the capabilities and limitations of technology, inadequate comprehension of the complexity of judicial and justice-system business processes, quixotic budgeting and time scheduling) is a sure prescription for failure, despite the caliber of staff and the quality of technology tools.

Building vision and strategic direction is not an event, but an ongoing process. Just keeping up with changing technology is sufficient to demand continuous reeducation of court leaders. Shifting political, economic, and organizational winds also force periodic reassessment of the court's vision. In such a dynamic environment, flexibility is essential to success.

##### ***Court Leaders Must Understand Technology Issues at the Conceptual Level***

Court leaders must understand technology issues; they cannot manage what they do not understand. The National Association for Court Management has published the Information Technology Management Core Competency Curriculum Guidelines, which outline the essential knowledge, skills, and abilities (KSAs) needed to lead court IT initiatives.[2] The Institute for Court Management provides a program to assist court leaders in acquiring the KSAs outlined in the core competencies.[3]

##### *Court Leaders Must Lead Technology Initiatives*

Court leaders must lead technology initiatives, not technologists. While they may not grasp all of the detail, they are responsible for the outcome. Technologists, like business experts, play a supporting role. Technology leadership must be institutionalized and integrated into established court leadership structures and processes; it is not a separate activity conducted by a separate organization.

##### *Policy Decisions Must Be Made by Policy Leaders*

Policy decisions must be made by policy leaders. Business experts and technologists must define the issues and alternatives and must help educate the policy leaders.

##### *Business Experts Must Drive Technological Innovation*

Business experts play a key role in improving court operations. Technology solutions must be created to address the business problems of the court. Business experts drive this process.

##### *Court Leaders Must Rely on Their Technology Experts*

Technologists are best equipped to understand the rapidly changing world of technology. Court leaders must insist on thorough explanation of technology issues and options that relate to policy decisions. Responsibility for technology operations should be delegated to the CIO.

#### Why Things Go Wrong

Most governance problems occur when issues are addressed at the wrong level of the structure. For example, when policy leaders become ensnared in discussions of printer problems and other trivial operational issues, they may disengage and cease to participate in meetings. When no one is at the table to make policy decisions, business experts cannot set a direction, and while there still may be a lot activity and talk, there will be much less accomplishment. When technologists cannot get answers to business questions,



Technical jargon often goes mainstream.

they must guess about how to develop technology solutions, and they often make the wrong choices. If policy leaders make technology decisions without the input of technologists, solutions may be incompatible with existing architecture. Effective governance requires policy leaders to address policy questions, business experts to address operational issues, and technologists to take the lead on technology decisions.

### Benefits of Effective Governance

The implementation of a sound system of governance will help court organizations work together to achieve common goals, instead of working as discrete, competing units. It will produce a single set of priorities that will allow resources to be focused more effectively on solving the highest priority problems as quickly as possible. It will provide a forum for resolving related policy, business, and technical issues in a thorough, systematic way. Better expectation management will result in a lower level of frustration. Conflicts will be resolved before they damage working relationships. Technology staff will receive clear, unambiguous direction. Solutions will be business driven, rather than technology driven.

## ENDNOTES

* Review and assistance with this article was provided by Thomas Clarke, Terrie Bousquin, James E. McMillan, John T. Matthias, Scott Fairholm, Jim M. Harris, and Thomas C. Carlson.

1. Chief information officer, the head technologist in the organization.
2. National Association for Court Management, *Information Technology Management Core Competency Curriculum Guideline*, available at http://www.nacmnet.org/CCCG/cccg_4_corecompetency_ITmgmt.html.
3. *Managing Technology Projects and Technology Resources: Fundamentals for the Court Executive Team*. See http://www.ncsconline.org/D_ICM/icmindex.html.

CONFIDENTIAL

# Appendix C: PHASE Model

## PHASE → PURPOSE | How | Action Plan | Support | Examine

A Roadmap to Implementation

### The Importance of PURPOSE

**Clarity around the reasons for a change in policy or practice is foundational for successful implementation.** This clarity helps to illustrate how current practices may need to be adjusted and to identify anticipated outcomes of the change. Documenting a clear purpose also helps to establish a shared understanding and mobilize support with court professionals, community members, and partners.

### Elements of PURPOSE

A clear purpose statement should include the following components:

1. **What issue is the policy or practice change addressing?**
   Sometimes changes are required by external forces, and other times we decide changes are necessary to address a problem or move closer to best practices. Describing in the purpose statement the issue the change aims to resolve promotes a shared understanding of the need for the change and helps to identify specific factors, practices, and processes that need to be modified to address the issue.
2. **What are the anticipated outcomes of the policy or practice change?** Visualize how the current process and performance will be different because of the change, and ask others to describe the changes they expect to see from their perspective and interests including these anticipated outcomes in the purpose statement provides a clear window to the future and can help motivate others and generate support

### Connecting the Dots

**The components of the PHASE framework are interrelated and interdependent. While each component can be focused on in isolation decisions and efforts in one area affect and inform the others Purpose describes where you want to be when the change has been fully implemented.**

- **How:** Purpose helps you to identify the partners who need to be involved and clearly message the goals to partners.
- **Action Plan:** A clear purpose helps to keep the tasks in the action plan focused
- **Support:** Tying new skills and expectations to a shared purpose and anticipated outcomes is beneficial during training and coaching.
- **Examine:** A clear purpose sets the stage for identifying meaningful performance measures.

### Considerations for Courts

- Develop an elevator pitch that includes the purpose of the change and the anticipated outcomes. The elevator pitch should be concise and use plain language so it can be widely understood
- Providing opportunities for those impacted by the change to contribute to developing the purpose statement can enhance their sense of commitment and responsibility toward implementation.
- Those responsible for communicating the purpose of the change effort must believe in it. Engage in open discussion with those responsible for messaging the change to others so they can ask questions and share concerns. Incorporate their feedback when possible to demonstrate responsiveness.

NCSC

CONFIDENTIAL

# PHASE Purpose | HOW | Action Plan | Support | Examine

A Roadmap to Implementation

## The Importance of HOW

When implementing a new practice, procedure, or policy in the court system, professionals should consider the impacted individuals, available resources, and effective strategies – otherwise known as determining readiness for change. Assessing for readiness involves evaluating the willingness of individuals and partners to change, understanding the court's capacity, and aligning the change with the organizational culture. Creating a conducive environment increases the likelihood of successful and sustained adoption.

## Elements of HOW

When preparing to implement and sustain a new practice, procedure, or policy, courts should consider the following questions:

1. **Who needs to be involved?** At the outset of the implementation process, identify key stakeholders – individuals, groups, and organizations affected by the new policy or change. Involve them early on to foster ownership and include their perspectives in readiness discussions.
2. **Are we ready to make these changes?** Assessing readiness is crucial before making changes. This involves evaluating the court's and individuals' willingness and capacity to adopt new practices, policies, or procedures. Consider court-level factors such as staffing, resources, and technological infrastructure, and also individual-level factors like staff knowledge and skills. Courts can use structured assessments or checklists to identify strengths to leverage and potential barriers to successful implementation.
3. **What implementation strategies should we use?** Choose effective implementation strategies or plans designed to introduce and integrate new practices, policies, or procedures effectively. These strategies are meant to facilitate the successful adoption and implementation of changes and ensure they are sustained over time. Options include forming strategic partnerships, establishing learning collaboratives, pilot testing, and continuous quality improvement.

## Connecting the Dots

The components of the PHASE framework are interrelated and interdependent. While each component can be focused on in isolation, decisions and efforts in one area affect and inform the others. **How describes the strategy for making the change, considering existing culture, priorities, and capacities.**

- **Purpose:** A shared purpose with the individuals and groups who need to be included in the change effort promotes buy-in and shared responsibilities.
- **Action Plan:** Understanding a court's readiness for change facilitates including tasks on the action plan that leverage existing capacities and protect against potential risks.
- **Support:** Identifying the need to increase knowledge and motivation to change through the readiness assessment informs training and coaching needs.
- **Examine:** Readiness assessments can be repeated to evaluate changes in motivation and capacity over time.

## Considerations for Courts

- Evaluate the ability of court professionals and community partners to influence or support the change. This is particularly important for those directly impacted by the change.
- Embrace the opportunities for improvement revealed by assessing the court's readiness to change. Use this information strategically to target implementation strategies, enhance readiness, and mitigate risks. Achieving a perfect score may be unrealistic due to external threats, but addressing challenges during implementation strengthens the court's capacity for future changes.
- When determining the court's readiness for change, consider the impact of new court practices on existing initiatives, resource availability, and marginalized populations.

For more information or for assistance applying these principles to implement a new policy, practice, or program in your court, contact Teri Deal.

© 2025 National Center for State Courts

CONFIDENTIAL

# PHASE Purpose | How | ACTION PLAN | Support | Examine

A Roadmap to Implementation

## The Importance of an ACTION PLAN

A clear action plan is crucial for courts implementing new policies, practices, or programs as it facilitates clear communication, aligns efforts, optimizes resource allocation, mitigates risks, and fosters accountability. **It serves as a guiding document that helps the court system navigate the complexities of change and increases the likelihood of successful implementation.**

## Elements of an ACTION PLAN

An action plan should have the following elements:

1. **Agreed upon tasks, timelines, and responsibilities.** Utilize the action plan to outline clear steps, tasks, and milestones for a structured implementation process. Assign ownership of tasks to individuals or teams to enhance accountability, commitment, and responsibility in achieving objectives and timelines.
2. **Agreed upon communication plan.** Set clear expectations for communication frequency and methods to track progress on the action plan. Balance frequent updates to maintain momentum and engagement with sufficient time for progress. Transparent and regular communication builds trust, manages expectations, and garners support and buy-in throughout implementation.
3. **Agreed upon performance measures to monitor implementation.** Use the action plan to establish a basis for monitoring the progress of the implementation efforts by defining key performance measures. Regularly tracking performance measures and sharing progress with those involved helps to identify issues and inform modifications to the plan.

## Connecting the Dots

The components of the PHASE framework are interrelated and interdependent. While each component can be focused on in isolation, decisions and efforts in one area affect and inform the others. **The action plan documents the specific tasks required to implement the change, the expected timeline, and the individuals responsible.**

- **Purpose:** Continually refer to the purpose while developing the action plan to guard against mission creep.
- **How:** Use the readiness assessment to assign tasks and responsibilities and leverage identified opportunities and strengths.
- **Support:** Include specific opportunities for feedback and reflection in the action plan to identify training and coaching needs.
- **Examine:** Routinely monitoring progress on the action plan provides valuable information for examining implementation.

## Considerations for Courts

- Use the action plan to ensure equitable sharing of responsibilities among team members with diverse roles and backgrounds. Clearly define roles and tasks based on expertise, capacity, and availability. Encourage open discussions among team members about their preferred contributions, allowing for potential rotation or reassignment of responsibilities.
- When implementing new policies, practices, or programs in courts, address risks proactively. Include tasks in the action plan to develop contingency plans, monitor risks, and prepare alternative approaches. Encourage regular communication to address barriers and challenges as they arise.
- Recognize and celebrate quick wins and successes during the change process. This boosts motivation, especially for low-effort achievements that may otherwise be overlooked, and keeps the team focused on the action plan.

NCSC

GJM RESP 0279

CONFIDENTIAL

# PHASE Purpose | How | Action Plan | **SUPPORT** | Examine

A Roadmap to Implementation

## The Importance of SUPPORT

Court professionals and partners play vital roles and are directly impacted by changes in court operations. **Strategic support through training, coaching, and feedback loops fosters successful adoption, engagement, motivation, and a positive court culture conducive to continuous improvement.**

## Elements of SUPPORT

Effective support plans include the following elements:

1. **Targeted training schedule.** Supporting change efforts include comprehensive training and skill development for court professionals and partners. This ensures they understand the reason for the change and can perform their roles effectively, leading to enhanced confidence, job satisfaction, and performance.
2. **Individualized coaching.** Quality training is crucial, but insufficient for knowledge transfer to practice. Ongoing coaching with feedback and Q&A opportunities ensures fidelity to the change and successful institutionalization.
3. **Intentional feedback loops.** Supporting court professionals and partners involves establishing feedback channels for continuous improvement. Seeking input on experiences, challenges, and suggestions during implementation fosters a culture of learning and innovation within the court system.

## Connecting the Dots

The components of the PHASE framework are interrelated and interdependent. While each component can be focused on in isolation, decisions and efforts in one area affect and inform the others. **Support focuses on providing training and coaching and cultivating an environment open to change.**

- **Purpose:** Because training and coaching can feel time-consuming, referring to the purpose of the change during training helps maintain motivation and focus on the long-term goal.
- **How:** Allow the readiness assessment to inform the types of training needed. For example, if there is a lot of resistance, consider training focused on shifting values.
- **Action Plan:** Include the training schedule and expectations for coaching in the action plan to document progress on efforts to support court professionals.
- **Examine:** Data may reflect the need for more training or coaching. If the expected outcomes are not achieved, lack of knowledge transfer into practice may be the problem.

## Considerations for Courts

- Invest in a comprehensive training strategy for real change. Avoid relying solely on one-time sessions; include universal in-person training, discipline-specific specialized training, and individualized coaching. This approach solidifies practice changes and integrates them into day-to-day operations effectively.
- Recruit champions at all levels, including front-line staff like clerks and attorneys, to support training and coaching. This approach ensures a peer perspective and strengthens the change initiative.
- Promote open communication and feedback by integrating ongoing feedback loops, continuous quality improvement practices, or reflective supervision into the overall court culture to support court professionals in the long term

CONFIDENTIAL

# PHASE Purpose | How | Action Plan | Support | EXAMINE

A Roadmap to Implementation

## The Importance of EXAMINE

Evaluating whether a program, policy, or practice achieves its intended outcomes requires waiting until it is fully implemented, however, **examining how implementation is going can provide valuable insights throughout the implementation process.** Examination occurs multiple times with various data types and sources and starts early in the implementation process. Through intentional data collection and information sharing, implementation teams can identify opportunities to celebrate progress or refine their approach.

## Elements of EXAMINE

Plans to examine implementation should include the following components:

1. **Decide early on what data are necessary to collect.** Consider what types of information will help objectively measure progress on implementation. This may include tracking task completion, measuring anticipated changes in beliefs or attitudes, counting events like meetings or hearings, or gathering feedback from those impacted by the change. Resist the temptation to measure everything - only commit to measuring information that will be useful.
2. **Identify where useful information can be found.** For each piece of important data, determine where it is currently kept or, if it is not collected, at what point it could be. Recognize that not all information is kept in a case management system; be open to qualitative data from interviews and focus groups. Create a table that describes the information to be collected, its source, who is responsible for collecting it, and at which points it should be collected and analyzed.
3. **Share information on fidelity early and often.** Acclimate the team to using data to describe how programs, policies, or practices are being implemented from the very beginning. Make time for the team to discuss quantitative and qualitative data and identify what is going well with implementation, what barriers exist, and to inform decisions about the process or plan.

## Connecting the Dots

**The components of the PHASE framework are interrelated and interdependent. While each component can be focused on in isolation, decisions and efforts in one area affect and inform the others. Examination focuses on using data to support implementation monitoring and improvements**

- **Purpose:** Continuous monitoring of implementation helps determine if the program, policy, or practice is achieving its purpose
- **How:** Measuring how aspects of readiness change over time helps identify areas needing additional support or reinforcement to ensure implementation goes as planned
- **Action Plan:** An action plan with specific and measurable objectives helps to objectively examine implementation progress
- **Support:** Monitoring implementation helps to pinpoint areas that would benefit from further training and coaching

## Considerations for Courts

- Do not let perfect be the enemy of the good. It may be tempting to put off data collection until there is an ideal process or high-quality data, but data completeness and quality only improve when the data are used.
- Keep a timeline of changes made to the implementation plan either due to unplanned events or based on knowledge gained from monitoring implementation. This timeline may help to describe patterns in the data later.
- Include a data expert on the implementation team. Their valuable understanding of where to find the information and the limitations of the data helps ensure the data collection plan is reasonable and feasible.

# Appendix D: Focus Group Summaries

**Perspectives on Operational and Fiscal Efficiencies**

Staffing & Resource Management

- Participants felt that the Judicial Branch's focus should be on keeping the courts staffed, as several courts are understaffed. Participants also indicated that there is an uneven distribution of staff and resources amongst the courts.
- The strain on morale due to inadequate staffing and resources was a recurring theme.
- Recruitment and retention continue to be a concern. Despite the pay increases a couple of years ago, the entry level pay is still low. Many court staff must work a second job.
- Staff are often performing higher level work and/or additional duties outside of their roles, and positions are not appropriately classified or compensated.
- Participants were concerned that the Branch has underestimated the staffing assessments.
- Security within courtrooms is continuously being improved, yet challenges in recruitment and retention continue. Many security staff are retired law enforcement, adding complexity to the staffing dynamics.
- With staff taking on additional duties despite reduced resources, they are more likely to make errors, and some tasks may take even longer.
- Staffing shortages have required some court staff to put non-urgent tasks, such as the mail sorting and destruction of files, on the backburner.
- Participants identified issues with warrants not being entered in a timely manner, which raised concerns about stakeholder relationships and the administration of justice.
- Suggestions were made to create "floater" positions or "team share groups" to allow for staff to assist other similar courts with overflow work and administrative work. Although circuit and superior courts both use Odyssey, they do not have the same processes and procedures, so participants did not feel that staff should assist in a different class of court.
- The Branch could consider opportunities for staff to assist other courts in co-located areas.
- A suggestion was made for the small counties to close a couple of weeks a month and have those judges cover other courts with busier dockets.
- Another suggestion was for superior court could assist circuit court with case types that are currently only filed in circuit court, such as stalking petitions.
- Staff spend significant time assisting users at the kiosks. Additional Court Navigators (or contracted nonprofit agencies) would speed up the process and accuracy of pro se filings. One common recommendation was that the Branch should expand the Court Navigators program.
- Several participants suggested that the Efiling Center give some of their staff or responsibilities back to the courts to improve case processing time.
- Clerks find it helpful that they can assist remotely in the queue for another court, but they desperately need in-person staff.
- Senior judges are helpful, but magistrates are underutilized and should be re-evaluated.
- Referees should be utilized more in any work that does not require co-signing.

- A suggestion was made for the Branch to employ a full-time referee that travels throughout the state to assist courts that lack coverage from the only part-time child support referee.
- Law clerks could have a rotation schedule to support the circuit court judges.

Document Management and Efiling Issues

- Several court staff mentioned encountering errors or time-outs in File and Serve. Some staff said that File and Serve crashes or fails entirely, which stops much of their work.
- Odyssey and File and Serve are not fully integrated, which causes some delays in processing. For example, documents are not scanned as a pdf file. Documents must be scanned from the desktop scanner into Odyssey, and then separately converted into a pdf file. To create an order, the pdf must then be uploaded into File and Serve.
- The clerk staff cannot add a document to more than one case at a time in Odyssey.
- Supreme Court uses C-Track, which is a separate case management system from other courts. Most staff agree that they like using C-Track.
- Supreme Court staff should have permission to open orders in Odyssey, and trial courts should at least be able to view C-Track.
- Information Center staff should be given access to view (not edit) cases in Odyssey.
- The Efiling system does not allow the Supreme Court to notify the lower courts, so they have to send notice on paper. The Supreme Court needs the ability to electronically serve the file court.
- Many agreed that TurboCourt does not decrease the time court staff spend assisting self-represented litigants with filing.
- The "completed" message in TurboCourt does not actually indicate submission to the court, which confuses self-represented litigants, slows down the process, and creates more errors.
- TurboCourt is not an efficient replacement for paper filing for pro se litigants. Participants noted that many court users have trouble navigating the Efiling system.
- Participants suggested that the Efiling Center (EFC) be evaluated, as it creates additional work and waiting time for local courts. Local courts would prefer to control their own electronic filings.
- Superior Court civil departments feel their case processing is slowed down because they can't accept their own pleadings. Judges also noted dealing with delays in complex civil cases.
- Participants shared experiences with the Efiling Center (EFC) causing delays due to filings bouncing back or getting rejected, which does not help with efficiency.
- There is no standard for how documents are filed electronically with the Supreme Court. Often, documents are not searchable or even readable, which is inefficient for staff. Staff also have limited access to an Adobe license to convert a document to OCR.
- J-One is a program available to police departments/law enforcement to electronically file with the courts, but currently participation is voluntary and sporadic.
- Some participants expressed concern that electronic files for family law cases would be difficult due to the volume of case documents. However, participants felt that expanding Efiling in criminal cases would be helpful.
- Judges observed that paper files create a lot of expense and burden on staff.

- For the Supreme Court, paper certified records can be cumbersome. Staff must sign out the paper record, and only one person is allowed to sign it out at a time.
- Data restrictions on Efiling that limit litigants to a certain number of megabytes would minimize potential overburdening of the system.
- Probate Court is mostly electronic, but they still process civil commitments on paper, which is time-consuming for staff.
- The lack of electronic files creates a burden for attorneys. Family lawyers expend resources paying couriers around the state. Circuit court prosecutors have a hard time getting court orders in the court mail.
- The Supreme Court should consider a project to digitize historic files.

Streamlined Processes

- Most participants expressed concern about the repeal of the Felonies First program creating cumbersome processes and adding challenges and time to their work.
- Superior and Circuit Court don't have the same file management systems. The bindover process takes significant time because Superior Court staff receive the entire case file in one pdf form via email from the Circuit Court, which then must be broken into separate documents. There is a lack of Adobe licenses at all courts, so some courts must print the pdf first to start the process.
- Superior Court must manually enter bindover cases because only the name and charges carry over in Odyssey. The SCN number also does not transfer over.
- The bindover process requires the Circuit Court to get a case file to Superior Court within ten days, so when Circuit Court is short-staffed, other work falls on the backburner.
- Some Superior Courts now only sporadically receive the Gerstein affidavits along with the indictment. Judges find this information helpful to do their jobs efficiently.
- Participants noted the increase in bail hearings with the repeal of Felonies First. For example, a defendant could have four to six bail hearings in the first couple of months of the case while they are still incarcerated. A recommendation is that after the arraignment, bail should be heard in Superior Court instead of another review at Circuit Court (only a few days later) when there has been no real change in circumstances. This could be an administrative rule change
- The bindover cases take longer to process as cases spend two to three months in Circuit Court before being sent to Superior Court with ninety days to indict in addition to an arraignment and additional waiting period for the hearing.
- Judges suggested examining the practice of doing ECR (early case resolution) on certain appropriate felony cases before the indictment at Superior Court level.
- Judges mentioned that cases with competency issues are an area of redundancy. For example, one defendant could have competency-related proceedings in 6 different courts at the same time, which is inefficient, and burdens the Office of the Forensic Examiner (OFE).
- Participants consistently voiced the need for a centralized payment process or online payment system as currently only the local courts can process payments.

- About half the calls that Superior Court staff receive are payment related. There are multiple steps involved for staff to process payment, and they frequently stop other work to take payments throughout the day.
- Participants said the court process would be more efficient if there were more "date certain" for trials. A suggestion came from one local court that started the year with brief statuses of all cases to figure out the next steps and trial dates, which did a lot to move cases forward for the year.
- Some participants said their courts are behind on destruction of files and running out of space. A suggestion was made to have a third-party handle file destruction.
- The Judicial Branch should use NH FIRST to streamline the process for future job postings.
- A new internal document management system could help to manage workflows for paper processing for court documents that are not in the case management system.
- Participants observed that there is inconsistency of process and procedure across the courthouses. For example, there is a disparity in the way judges handle filings and submissions.
- The courts can improve consistency in the application of the rules such as in expert disclosures.
- Participants recommended that the courts should streamline Standing Orders.
- Participants raised an issue regarding a lack of set policy or procedure around the use of email for certified documents.
- Time sheet process requires entry in the homegrown system, uploading payroll into NH First, and then checking/adjusting. However, migration is supposed to happen by next year.
- The way that the hourly wage is calculated for Court Security Officers is complicated and time-consuming for staff.

Cost-Saving Measures

- Participants recommended that the Judicial Branch consider enforcing more filing fees and/or raise filing fees to generate more income. On the other hand, participants suggested that the Branch evaluate resources expended on the enforcement of court fines/fees.
- Court fees have been the same for a long time and have not increased.
- With fees constantly waived, participants have noticed that there is less incentive for litigants to participate in the court process and prepare for hearings.
- When the sheriff's fee is waived, the court still must reimburse the sheriff's office.
- Some staff expressed concern that the courts are waving too many fees and not requiring any type of proof of income for the fee waiver, which is an issue particularly in the Family Division. The Court Administrator has the initial authority to waive fees.
- There is no standard for how restitution is paid out and no statewide debt collection system for past due fines/fees.
- Staff should have the option to schedule shorter hearings and utilize them when appropriate.
- The control over supplies/purchasing at the AOC-level has led to a slow process with many steps for approval.
- There is no standard for how restitution is paid out and no statewide debt collection system for past due fines/fees.

- Several judges mentioned that less frequent Speedy Trial Reports would be adequate and save court staff a significant amount of time preparing the reports.
- Language Bank contract can create additional work for staff because there are often issues with billing and mileage. Participants repeatedly recommended that the Branch evaluate the Language Bank contract, as it is a large expenditure for the courts.
- Some circuit and superior courts are co-located in the same building. Many courts rent their offices from the county.
- Participants suggested that the Branch consider consolidating/combining courthouses and utilizing more remote services. However, participants also noted that the operations savings examined, but it wasn't very much to help the overall budget. Closing a court may provide minimal savings because that docket still must go somewhere.
- **Another participant recommendation is to reduce custody transport orders. All Superior Court transports are handled by the Sheriff's office and reimbursed by the AOC. For example, in Hillsborough North, 48% of inmates transported do not attend the hearing due to waiving hearings, status hearings, etc. Virtual arraignments have cut down on some transports.**
- **The Information Center helps efficiency because it reduces the volume of calls for court staff.**
- **The Supreme Court receives paper and electronic copies of transcripts. Staff felt that the paper copies are not necessary and delay the process of issuing the order. If a paper copy is needed, the clerks can print it.**
- A suggestion was made to evaluate the need for the Office of Mediation and Arbitration.

**Technology Integration**

Improved IT Management

- Judges had mixed reviews of CaseLines Digital Evidence Center. Some of the issues are due to internet speed.
- Several participants stated that Odyssey moves too slowly to use in court, so they have to work on paper and enter it in later.
- Participants expressed concern that the current CMS and internet speeds/hardware make it difficult to imagine switching to all electronic files.
- Judicial officers observed that TurboCourt is slow and cumbersome on the bench.
- There is a lack of Adobe Acrobat Pro licenses at all courts which staff need to do their jobs efficiently.
- Webex technical difficulties were noted as problematic, particularly for users unfamiliar with the technology.
- Participants expressed frustration with outdated technology and broken equipment. For example, one court only has one working printer.
- There are challenges with getting IT-related issues resolved or being notified of IT-related issues.
- A schedule of times when IT is coming in-person to different courts would help with issues.
- The IT Support Desk does not have enough staff to have dedicated technicians to travel to the court locations to assist court staff.

- A suggestion was made that IT needs around ten additional staff members in order to be able to focus on the technical debt and process improvements that are needed by the branch.
- Staff need more IT-related training. However, IT staff are beyond capacity and can't always provide that training.
- The IT Support Desk staff handles some Odyssey updates due to past lack of training, but those responsibilities could be delegated court staff dedicated to Odyssey changes so that the Support Desk can focus on IT-related work and priorities.
- Re-establishing the Technology Steering Committee or something similar would help to prioritize projects.

Training Improvements

- Participants mentioned that the training manuals are outdated and may not be helpful to new staff because they are not in simple terms.
- Online trainings for staff, such as the E-Court training, are not recorded, and require waiting periods and different levels of permission from the AOC.
- Participants agreed that they would benefit from dedicated trainers to train new court staff. Alternatively, if staff at the trainee's home court are too busy, the trainee could train on the basics with other less busy courts.
- The currently required training for all Branch staff is inadequate for court staff because it's not case specific.
- Lack of proper training can lead to issues with retention. A barrier to proper training is the lack of uniform process and policy across the courts.
- Everyone is opposed to cross-training because it wouldn't work in the current environment with existing differences in process and procedure between courts.
- Employee relations and workplace culture are suffering, partly due to lack of training.
- AOC does not have a research department. Staff are interested in more training and tools in data analysis to make data-informed decisions and utilize the Branch's data.
- Participants acknowledge the need for more support and training of the administrative authority at the local courts.
- While some staff find the regularly scheduled professional development helpful, many staff are concerned that they should be focusing on their important daily job functions during that time.
- The burden of multiple layers of review and required signatures for processes has increased, potentially limiting professional development opportunities.

**Public Access and Communication Challenges**

Enhancing Public Access

- Court staff at all courts frequently get requests for court documents and feel that time can be wasted on these requests.
- Participants suggested that the Branch should expand public access to nonconfidential court documents.

- Currently the public can come to the courthouse and download unsealed documents at the self-service kiosk.
- The Communications Department spends about 60% of their time responding to requests from the media.
- There is no formal policy about sharing case information with the public.
- If a public access portal is created/expanded to allow access to non-confidential documents, a policy needs to be developed.

Communication Efficiency

- Participants highlighted the importance of coordinating administrative functions and suggested meeting more frequently to help manage employees and processes.
- Court staff feel that they have a lack of communication with the AOC, while the AOC feels that they are removed from the happenings at the courts.
- Court staff are not always informed by the AOC regarding important updates such as new forms.
- Clerk staff from different courts should also meet and/or have more communication.
- Deputy Clerks should be included in more regular meetings, communications, and decision-making along with Clerks.
- Allow the staff subject matter experts and department heads to publish directly to the Judicial Branch website will save time and improve efficiency.
- Participants suggested having more open communication between judges and attorneys. The Branch can coordinate opportunities for attorneys to have brown bag lunches with judges or communications with the clerks about how to streamline attorney practices.
- There is a desire for regular meetings between stakeholders such as judges, public defenders, prosecutors, law enforcement, and mental health professionals to address and resolve issues collaboratively. These meetings are not happening regularly as needed.
- Information and navigation on the website should be more accessible for self-represented litigants, particularly for the Supreme Court where staff often end up helping self-represented litigants over the phone since the information on the website may not be in plain language.

Considerations for Future Governance and Project Management

Centralized Governance

- Participants felt that overall staff are not consulted before new processes and procedures are decided. For example, Court Operations Specialists should be involved in governance related to their job functions.
- While centralizing some functions such as the Dictation Center and payment processing creates efficiency, many participants would prefer for the control over budgeting and purchasing to be controlled by the local courts.
- Procurement policies and procedures need to be streamlined.
- Participants advocated for a distributed decision-making model that allows local clerks to be able to run their own courts.

- Clerks may not feel empowered to make their own scheduling decisions. Judges and clerks should feel empowered to set their own calendars.
- Some participants stated that the AOC structure and resources should be examined for potential reallocation.
- All AOC departments need more strategic alignment.
- Addendums on end-user license agreements for purchases take a lot of time and effort with little return.
- A suggestion was made to document more processes and procedures to help with organization and efficiency.
- Staff feel there needs to be more strategic planning and process for initiating projects.
- Policy should be centralized as much as possible, but there are silos and no clear authority.
- The Branch needs a more streamlined approval process for moving forward with projects.
- A Project Management Office (PMO) or team/committee as well as Lean Certification for department heads could assist with project management.
- Participants suggested creating a Technology Governance Committee for IT projects.
- Develop a strategic plan for the branch, formal risk management and compliance.
- Develop performance management controls tying employee reviews to strategic priorities.
- Lean principles have been utilized to streamline workflows and identify choke points within processes. The adoption of lean processes has helped improve efficiency.
- A PMO, Lean Certification for department heads, etc. could assist with project management.

Other

- Participants recommended that the Court eliminate Motions to Vacate Warrants/Defaults which take up significant processing time.
- A suggestion was made to create a rule around dismissal of protective orders due to no-service issues. Without knowledge of the defendant's location, these cases continue for months on end and use up a lot of court time and resources (and sheriff resources).
- In Guardianship/Neglect cases, judges currently have to sign to approve attorney and GAL fees. Participants recommended that they should go directly to the Judicial Counsel from the clerk's office, and should only come to the judge if they wish to exceed a cap. This is what is done in criminal cases.
- The Supreme Court should re-examine policy about only handwriting drafts and reconsider tools to (securely) edit drafts electronically to improve efficiency.



# 5. Appointment of Judge Christopher Keating as State Court Administrator as Part of Efficiency Measures (Press Release & Order)

CONFIDENTIAL


# Press Release

For Immediate Release
**Date:** October 14, 2025

## Contact

Av Harris, Communications Manager
(603) 415-6770 | aharris@courts.state.nh.us

# Supreme Court Appoints Judge Christopher Kea Created Role of State Court Administrator as Par Measures

## Administrative Restructuring Recommended by the National Cent

**Concord, NH** -- As part of several efficiency measures recommended by the National Cente Hampshire Supreme Court has appointed Circuit Court Judge Christopher Keating to a 5-year t Court Administrator.

The appointment of Judge Keating as State Court Administrator is one of several administrative re from a recent Supreme Court order creating and clearly defining the role and authority of Previously, court operations were overseen independently by the Circuit Court and the Superior C intended to ensure the New Hampshire Judicial Branch is in the best position possible to collectiv and opportunities facing the courts in the coming years.

Judge Keating was appointed to the Circuit Court by former Governor Christopher Sununu and

CONFIDENTIAL

THE STATE OF NEW HAMPSHIRE

SUPREME COURT OF NEW HAMPSHIRE

# ORDER

Pursuant to Part II, Article 73-a of the New Hampshire Constitution and Supreme Court Rule 51(6)(c), the Supreme Court of New Hampshire adopts the following amendment to court rules.

**I. Supreme Court Rule 54**

*(This amendment repeals the current version of Rule 54 and replaces it with new text.)*

1. Amend Supreme Court Rule 54 as set forth in Appendix A.

**Effective Date**

The amendment shall take effect on October 14, 2025.

Date: October 10, 2025

ATTEST: Timothy A. Gudas
Timothy A. Gudas, Clerk
Supreme Court of New Hampshire

**APPENDIX A**

Repeal the current version of Supreme Court Rule 54 and replace it with the following new text:

**Rule 54. Administration of the Courts**

(1) Pursuant to N.H. Const. art. 73-a, the chief justice, with the concurrence of a majority of the supreme court justices, makes this rule governing the administration of the courts.

(2) There is hereby established the position of state court administrator. The state court administrator shall, in collaboration with the chief justice of the supreme court, the chief justice of the superior court and the chief judge of the circuit court, have responsibility for the administration, operation and improvement of all administrative functions of the judicial branch. The state court administrator shall be appointed by the chief justice of the supreme court with the concurrence of a majority of the supreme court justices for a term stated in the order of appointment. The state court administrator shall be a judge of the superior or circuit court and shall serve at the pleasure of the appointing authority and at the direction of the chief justice of the supreme court. The state court administrator shall ensure compliance with the policies, rules, orders and guidelines established by the supreme court for the administration, operation and improvement of the judicial branch and shall ensure compliance with state and federal laws. The state court administrator shall regularly communicate with the chief judges and shall collaboratively address concerns relating to the administration or operation of the superior court and the circuit court. The administrative functions of the judicial branch shall include:

a. All employment-related functions, including the retention and discharge of all non-judicial personnel except as otherwise provided in this rule, and managing the relationships with public employee unions.
b. Preparation of judicial branch budget requests.
c. Supervision of the judicial branch's information and central processing centers.
d. All judicial branch finance, accounting and grants administration.
e. All judicial branch procurement and contracting.
f. All judicial branch information technology and implementation of information technology-related projects.
g. All judicial branch data and statistical reporting.
h. Supervision of all judicial branch communications personnel.
i. All judicial branch project management, research and planning, risk management and compliance.

j. All judicial branch training.
k. All judicial branch domestic violence program management.
l. All superior court and circuit court case processing procedures.
m. Supervision of bail commissioners, centralized jury administration and warrant processing.
n. All judicial branch security-related services, including supervision of circuit court security and coordination with county sheriffs with respect to superior court security.
o. Judicial branch facilities management, in coordination with the bureau of court facilities.
p. All judicial branch alternative dispute resolution services.
q. Administrative support for the judicial branch internal audit function.
r. Administrative support for all judicial branch treatment courts.
s. Administrative support for the John W. King Law Library, the Attorney Discipline Office, the Office of Bar Admissions and the Committee on Judicial Conduct; and
t. Such other functions as may be assigned by the chief justice of the supreme court.

(3) There is hereby established the administrative office of the courts to discharge the administrative functions of the courts under the direction of the state court administrator. The state court administrator shall be the administrative authority for the administrative office of the courts.

(4) The chief justice of the supreme court shall be the administrative authority for the clerk, reporter of decisions, supervisory law clerks, law clerks and staff attorneys of the supreme court.

(5) The chief justice of the superior court shall be the administrative authority for the judges, supervisory law clerks and law clerks of the superior court and the administrative assistant to the chief justice. The chief justice of the superior court shall appoint a presiding judge for each superior court location and shall assign judges to court locations and, unless appointment authority is vested in a different person or body, to judicial branch committees. The chief justice of the superior court shall counsel, assist and supervise superior court judges in the performance of their adjudicatory responsibilities. The chief justice of the superior court shall represent the superior court in its relations with other courts of the state, other branches of government of the state, the bar, and the public.

(6) There is hereby established the position of chief judge of the circuit court. The chief judge of the circuit court shall be appointed by the chief justice of the supreme court with the concurrence of a majority of the supreme court justices for a term stated in the order of appointment. The chief judge of the circuit court shall be the administrative authority for the judges of the circuit court and the staff attorneys. The chief judge of the circuit court shall

appoint presiding judges and shall assign judges to court locations and, unless appointment authority is vested in a different person or body, to judicial branch committees. The chief judge of the circuit court shall counsel, assist and supervise circuit court judges in the performance of their adjudicatory responsibilities. The chief judge of the circuit court shall represent the circuit court in its relations with other courts of the state, other branches of government of the state, the bar, and the public. The chief judge of the circuit court shall perform all duties assigned by statute to the administrative judge of the circuit court.

(7) The appointment of clerks in the supreme court, superior court and circuit court as well as bail commissioners shall be pursuant to the constitution or statute.

(8) There is hereby established the council of chief judges. The council shall consist of the chief justice of the supreme court, the chief justice of the superior court, the chief judge of the circuit court and the state court administrator. The council shall meet regularly to ensure the judicial branch provides accessible, prompt and efficient forums for the fair and independent administration of justice and with respect for the dignity of all persons served by the courts. The council shall be a forum for the exchange of ideas and information for the improvement of the justice system. The council shall make recommendations for the effective administration of the judicial branch to the supreme court. The council shall perform all duties assigned by statute to the judicial branch administrative council.

# 6. Draft Email Announcement by Attorney Erin Creegan Re: Dianne Martin on Her New Position as General Counsel of the Office of Bar Admissions

CONFIDENTIAL

Adding Av now that he's back in.

**From:** Erin Creegan <ECreegan@courts.state.nh.us>
**Sent:** Monday, March 31, 2025 4:49 PM
**To:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>; Hon. Christopher Keating <CKeating@courts.state.nh.us>
**Subject:** Draft announcement

No pride of authorship, please feel free to suggest improvements.

Announcement

Please join me in congratulating Dianne Martin on her new position as General Counsel of the Office of Bar Admissions. As part of her distinguished career in state government, Dianne most recently served as Director of the Administrative Office of the Courts. As the constitutional administrative head of the Branch, I know better than anyone the exceptional service Dianne gave to the Judicial Branch, and her accomplishments were many. In less than four years, Dianne led an initiative in the Judicial Branch to improve the court and community response to people experiencing mental illness, including obtaining grant funding and creating a mental health team; coordinated a statewide mental health summit in New Hampshire; helped create a new the Office of Access and Community Engagement; served as the first chair of the newly created Judicial Branch committee on domestic violence; improved access for victims by improving the website and forms; applied for and received grant funds to support increased data and analysis related to domestic violence cases; obtained $3 million in grant funding for Judicial Branch security after the shooting as New Hampshire Hospital; worked on legislation to create a dedicated training program for our court security officers and oversaw implementation; started the first ever grant office in the Judicial Branch, which led to a dramatic increase in grant funding; and was instrumental in obtaining Opioid Abatement Funds to support the community housing program. The people of New Hampshire will benefit from her contributions for years to come, particularly in the areas of mental health, access to justice, domestic violence, safety and security, and modernization of administrative processes, among others.

The Branch will continue to improve from all Dianne has to offer in her new role of General Counsel of the Office of Bar Admissions. The challenges in the field of bar admissions are great, and there is enormous opportunity to better serve the public through reform. Dianne is a natural fit in the field of bar admissions: a community of smart people, full of integrity and deeply committed to making our profession better. This subject is a particular passion of mine, and I am so pleased to have a person of Dianne's intelligence, competence, and diligence in this position. I have no doubt she will make a positive change in the lives of many.

It will come as no surprise to many of you, in this challenging budget environment, that the Judicial Branch must evaluate ways we can both deliver services for litigants, as well as value for the taxpayer. In the coming weeks and months, we will be looking at ways the court system can be more efficient, utilizing the resources that we currently have. This includes leveraging the abilities of the amazing staff of the Branch, sometimes in new and different ways. I appreciate Dianne's support for these changes as we evaluate ways we can improve the Branch, and her willingness to serve in a place where she is most needed.

While welcoming Dianne into this role is wonderful news for the Branch, it means we must also soon say goodbye to the very talented person who has served in the role for 14 years: Sherry Hieber. A former private attorney with experience in civil litigation and alternative dispute resolution, Sherry's leadership and expertise in bar admissions was recently on display as Conference of Bar Admissions Administrators chairwoman for 2024-25, and in bringing bar admissions through the disruptions of the pandemic. We thank Sherry for her service, and wish her a well-deserved retirement.

CONFIDENTIAL

# 7. Emails between Supreme Court Justices and Attorney Debra Weiss Ford Re: Confidential Investigation

CONFIDENTIAL

**Chief Justice Gordon MacDonald**

| | |
|---|---|
| **From:** | Chief Justice Gordon MacDonald |
| **Sent:** | Monday, July 22, 2024 15:42 |
| **To:** | Justice James P. Bassett; Justice Anna Barbara Hantz Marconi; Justice Patrick E. Donovan; Justice Melissa Countway |
| **Cc:** | Ford, Debra Weiss (Portsmouth) |
| **Subject:** | Confidential investigation |
| **Attachments:** | NHJB Job Description AOC Director (updated departments 2023) .pdf; Dianne Martin List of Accomplishments .pdf; Supreme-Court-AO-2023-06-amended (1).pdf; FW: Investigation concluded |

**CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION**

**We will meet at 10:30 am tomorrow in the Souter Room. Call-in information is below for anyone who cannot be physically present.**

**Below you will find a communication from Dianne, along with two attachments. I have also attached a copy of the Judicial Branch Anti-Discrimination and Harassement Policy, along with sample notification language that has been used in the past and to which Dianne refers.**

**Thank you.**

**Dial 603-[redacted]**

**At the prompt, please enter the Participant Code of [redacted]#**

**The Moderator (Chief Justice MacDonald) will enter the Moderator Code of [redacted]#**

**The call will begin when the Moderator has dialed in.**

**From:** Dianne Martin <Dmartin@courts.state.nh.us>
**Sent:** Monday, July 22, 2024 06:44
**To:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>; Ford, Debra Weiss (Portsmouth) <Debra.Ford@jacksonlewis.com>
**Subject:** Release of Summary Investigation Report

Good morning, Chief and Deb,

As you know, Deb has provided me the summary of the report of the investigation of the complaints made by [redacted]. While I am not surprised by the outcome, I am pleased that the evidence proved [redacted] true and did not support the allegations and that there are no findings. Deb has informed me that it is the court's intent to share the written summary of the report with the complainant. I am providing this to share my concerns for you and the court regarding that plan, as requested. I hope that you will share these concerns with the members of the court. I understand we will separately discuss the management options going forward so an informed decision can be made.

CONFIDENTIAL

The Judicial Branch has not historically released a written report like this to the complainant. Our written policy and existing public policy, in addition to that history, do not support doing so. As the report itself notes, it is a confidential document.

The reputational harm that has already occurred due to these unfounded claims is significant. Simply informing the complainant and others that were interviewed, either verbally or in writing, that the claims are unfounded would help address that harm and I would not be opposed to that. However, this summary, includes significantly more information than that, including "preliminary considerations" that do not directly relate to [redacted] complaints. While I understand these are not findings and are merely reflections of an employee's perceptions, without more background and information, as written, they could be understood to be conclusions. Providing a written document with just the perceptions of one or more employees, without more, would only serve to exacerbate that reputational harm.

I was also not provided notice of these "considerations" or an opportunity to defend during the investigation. I and others interviewed were not asked about any of these "preliminary considerations" during the investigation. Had I been, I would have shared that I supervise many employees and if asked, I believe the vast majority of my managers would say that my management style is to allow competent employees broad latitude to manage their areas and to come to me for guidance when necessary. I would have provided additional witnesses for the investigator to speak with that would contradict these perceptions and I would have suggested that there are a handful of individuals who are not pleased with the change in leadership and the active management that has occurred in the past few years and see the appropriate exercise of oversight as micromanagement. The role of Director has the unhappy responsibility for implementing policy and organizational changes directed by the court and making changes to address errors and inefficiencies. And, there have been many. The AOC has also been the most audited part of the branch int the past few years, and those audits have revealed numerous past practices, that preexisted my arrival, that must be corrected. That kind of change does not always make people happy and that impacts their perceptions. I would have also said that my role and existing rules and policies require the Director to perform certain duties. If I did not do my job, I would be accountable to the court for that. I would also have provided emails and other writings from current and prior employees providing positive feedback about my management style. Lastly, consideration of other reasons for the unhappiness of some employees would make sense. The number of disciplinary actions that have had to be taken in my time here are very limited; to include [redacted] (this list does not include court security officers). The role of Director is not an easy one and needs the support of the Court to be able to do the work.

I have worked for the state in one capacity or another for nearly 20 years and my personnel file is clean. I have never been counseled or disciplined for these or any other issues. In light of that, it is not clear to me why the court would act differently in this case than it has in the past and provide a written document that includes what could be understood or represented to be a conclusion regarding these preliminary considerations to an individual who has already made several unsupported claims about me, particularly when it is not our practice or policy to do so. This will only serve to exacerbate the reputational harm to me and could also interfere with my ability to get a position in the future if these perceptions are provided to third parties without more and/or further publicized. For these reasons, I ask that the written summary be kept confidential. If the Court chooses to proceed with releasing it, I ask that it be revised to remove these general perceptions and any information not directly related to [redacted] complaints, including the second paragraph of "preliminary considerations." Given I was not previously given the opportunity to do so, I also request for the opportunity to, at a minimum, supplement the underlying record with written materials regarding these preliminary considerations.

Dianne

CONFIDENTIAL

Dianne Martin, Esq., Director

New Hampshire Judicial Branch

One Granite Place, Suite N400

Concord, New Hampshire 03301

CONFIDENTIAL

# New Hampshire Judicial Branch Job Description

| | |
|---|---|
| **Classification Title** | Director, Administrative Office of the Courts |
| **FLSA Status** | Exempt |
| **Labor Grade** | 60 |
| **Reports To** | Chief Justice of the Supreme Court |
| **Work Location** | Administrative Office of the Courts |

## GENERAL SUMMARY

This is a highly responsible, confidential position managing the state-wide operations of the Administrative Office of the Courts (AOC).The employee in this position will oversee Administrative Office of the Courts' departments and employees, including: internal audit, communications, facilities, fiscal, legal, human resources, information technology, court security, operations, accounting and payroll, access and community engagement, strategic funding initiatives, mental health and wellness, justice data and statistics, court technology and operations program manager, and any other AOC departments, offices, and employees. The Director ensures efficient and effective operations of the state court system and works to uphold public trust and confidence in the New Hampshire Judicial Branch. The employee in this position will serve as a member of the Administrative Council pursuant to Supreme Court Rule 54, and will support the New Hampshire Supreme Court and the Chief Justice of the New Hampshire Supreme Court in discharging their respective constitutional responsibilities to provide for the administration of justice

## ESSENTIAL DUTIES & RESPONSIBILITIES

*The intent of this job description is to provide a representative summary of the major duties and responsibilities performed by incumbents of this job. Employees may be requested to perform tasks other than those specifically presented in this description.*

- Manage and direct all operations of the AOC to ensure support for statewide Judicial Branch locations including internal audit, communications, facilities, fiscal, legal, human resources, information technology, court security, risk management, and related functions.
- Direct development, implementation, and compliance of administrative policies, procedures, and work standards.
- Conduct strategic planning and program evaluation to ensure the goals and objectives of the Judicial Branch are achieved.
- Recruit, develop and supervise diverse, professional staff of AOC Managers.
- Interact daily with the AOC management team to set and communicate goals to multiple stakeholders.
- Lead statewide programs and projects that provide support to the Supreme Court, Superior Court, and Circuit Court to meet the diverse, current, and future needs of the state courts system and constituents.

- Establish performance and operational metrics to support achievement of operational goals and justify investments and resource utilization.
- Coordinate and support Judicial Branch leaders in the achievement of court system initiatives and objectives.
- Interact frequently with judges from all court levels, court employees, legislative and executive branch leaders, public agencies, law enforcement and members of the public to support the administration of justice by the Judicial Branch.
- Review and respond to legislative changes and developments.
- Use modern management trends in court administration to respond to change in technology, State and Federal Law, risk profile and evolution of threats to the operations of the Judicial Branch.
- Exercise the Judicial Branch's sole delegated authority to review and approve contracts.
- Assist with preparation of an annual Judicial Branch budget of approximately $100 million, comprised of general, federal, and other funds.
- Administer Judicial Branch's appropriations and revenue accounts.
- Review and approve internal audits.
- Provide continuous oversight of the organization, operation and business functions of the Judicial Branch and make recommendations for improvement.
- Resolve complaints and provide decisions for grievances and employment disputes.
- Serve on the Judicial Branch Administrative Council, which coordinates governance activities of the Supreme, Superior and Circuit Courts and the AOC.
- Serve on various boards and committees as required by statute, court order or assignment.
- Provide strong internal controls to administrative operations to maintain the dignity and integrity of the Judicial Branch at all times.
- Performs related work as required.
- If a member of the NH Bar, provides legal counsel as requested by the Chief Justice of the Supreme Court and performs the duties of General Counsel in their absence.

REQUIRED QUALIFICATIONS

**Education and Experience**

- Graduate degree from an accredited college or university in Business Administration, Public Administration, Law or a related field.
- Nine (9) years of related work experience, including working with elected and other government officials in a management capacity.
- Any equivalent combination of training, education, and experience that provides the required knowledge, skills, and abilities.

**PREFERRED QUALIFICATIONS**

- Experience leading organization operations, including policy and procedure development, procurement, contracting, and other operational functions, preferably in the public sector.
- Experience in a leadership role managing many employees with diverse responsibilities.
- Experience successfully developing and presenting a budget for a large public agency or organization.
- Experience working with members of the Legislature and Executive Branch.
- Working knowledge of public policy analysis and evaluation; techniques in managing multiple and diverse statewide program(s); and working with diverse communities, and justice system partners;
- Knowledge of State of New Hampshire's Statutes, rules and administrative orders, policies and procedures, applicable Federal rules and requirements.
- Admitted to the New Hampshire Bar.

**OTHER JOB REQUIREMENTS**

- Successful completion of a background check, including criminal records check and motor vehicle records check.
- Strong organizational skills and detail oriented.

**COMPETENCIES FOR SUCCESSFUL PERFORMANCE OF JOB DUTIES**

**Capability of becoming knowledgeable in:**

- Legal terminology and court procedures.
- State of New Hampshire's Statutes, rules and administrative orders, policies and procedures, applicable Federal rules and requirements.
- Financial policies, operations and activities of Judicial Branch.
- Judicial Branch financial computer programs and applications.
- Judicial Branch's operational goals.
- Record retention guidelines.
- Employment law principles and benefits administration.
- Legal requirements that apply to employers operating within a unionized work environment featuring a number of collective bargaining agreements.
- Risk management processes and principles.
- Modern judicial administration, theories, practices and principles.

**Skilled in:**

- Providing staff supervision and management.

- Managing operational budget of substantial size and complexity.
- Service delivery, improvements, and efficiency.
- Data gathering and compilation.
- Preparing and maintaining excel spreadsheets.
- Planning and analysis.
- Prioritization and organization.
- Decision-making.
- Project management.
- Procurement and contract management.

**Ability to:**

- Meet schedules and deadlines of the work.
- Perform a variety of duties, often changing from one task to another of a different nature.
- Express ideas clearly and concisely, both verbally and in writing.
- Establish and maintain effective and cooperative working relationships with associates and representatives of other federal and state departments, courts and the general public.
- Follow oral and written instructions.
- Interact with respect to the Judicial Branch, other stakeholders and entities.
- Manage people, projects and systems.
- Justify investments of time, money and human resources.
- Assist adaptation to changes in personnel, policy and planning.
- Serve as steward of taxpayer funds.

**WORKING CONDITIONS/PHYSICAL DEMANDS**

*The physical demands described here are representative of those that must be met by an employee to successfully perform the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.*

| Work Conditions | Seldom or Never | Sometimes or Occasionally | Frequently or Often |
|---|---|---|---|
| Office or similar indoor environment | | | X |
| Individuals who are angry or exhibiting signs of stress | | X | |
| Other: | | | |
| **Physical Demands** | **Seldom or Never** | **Sometimes or Occasionally** | **Frequently or Often** |

CONFIDENTIAL

| | | | |
|---|---|---|---|
| Lift (10 LBS) | | | X |
| Carry (10 LBS) | | | X |
| Push (10 LBS) | | X | |
| Pull (10 LBS) | | X | |
| Bending | X | | |
| Kneeling | X | | |
| Sitting | | | X |
| Walking | | X | |
| Standing | | X | |
| Other: | | | |

CONFIDENTIAL

**Dianne Martin Annual Report of accomplishments for the time period 11.19.22 through 11.19.23**

While serving as Director also:

Served as General Counsel for 4.5 months

Covered Communications Department for press contacts

Served as Government Affairs Coordinator while the position was vacant

Created and led Interbranch Mental Health (MH) Team with CJ

Planned and arranged Branch wide MH training

Created and conducted Branch wide MH survey with input from MH Team

Planned and served as master of ceremonies for Statewide MH Summit

Arranged, negotiated and drafted contract for first SIM pilot and participate in SIM Planning team

Planned and arranged Branch wide Anti-Discrimination training

Planned, with the DV Committee, Branch wide DV training and coordinated the training with the Coalition and J. Chabot

Chaired the Internal DV Committee and complete nearly all task force recommendations in a little over a year.
Conducted DV Protocol feedback process with the DV Committee

Member of the D&I Steering Committee – co-chair of the data collection subcommittee

Co-chair of the Committee on Cooperation with the Courts – led the November, 2023 meeting on wellness, presented our MH initiative and had other presenters including Sarah Blodgett, Anne Zinkin, and Brian Moushegian

Served as a member of the Concord High Advisory Board for the CRTC – mentored three students interested in the law three hours a week – planned mock oral arguments for the students.

Planned a visit for female high school students to the supreme court to increase interest in the law.

Created the Office of Strategic Initiatives and expanded the resources there – created the Strategic Funding Initiatives Manager position - that office now handles all grant proposals, reporting and invoicing. This relieved the strain created by all of the new work from our newly added grants (get amount of grant total)

Suggested the creation of the Professional Development Standing Committee and serve on the Committee.

Recommended and supported creation of the Office of Access and Community Engagement, with the Access and Community Engagement Coordinator

Recommended creating the Justice Data and Statistics Manager position, hiring now – will be part of the Office of Justice Data and Statistics

CONFIDENTIAL

Launched NH First Project Team to fully implement NHFirst at the Judicial Branch.

Oversaw the Audit function directly for one year – later reorganized the Audit function to create the Audit Manager position in the Office of Internal Audit

Reorganized the Fiscal and HR Departments to create a new, separate Accounting and Payroll Department to oversee the entire payroll function. Created the Accounting and Payroll Manager position to oversee that department.

Instituted an AOC-wide Policy, Procedure, and Process Update Project – to overhaul and update AOC policies and procedures.

Created the Assistant Director position to oversee procurement, contracting, purchasing. Adding a part-time purchasing position. This position is also managing personnel and administrative actions.

Worked on and supported legislation to create a training program for court security at Police Standards and Training.

Worked on integration of ADO and OBA into the Branch formally.

Participated in Collective Bargaining for both the Teamsters and SEA and achieved four-year agreements with both.

Worked with the Chief and Fiscal Manager to develop a branch budget and support it at the legislature.

Updated the Dedicated Fund reports and testified in support.

Created a Recruitment Project Team – hired NCSC to participate in the team – drafted the related contract.

Created a Strategic Plan Project Team – drafted the related contract – worked with the team to develop plan, timeline and communications plan

Member of the Byrne SCIP Advisory Board – as a member advocated for and secured funding for our Statewide Treatment Court Coordinator.

Planned the COSCA Regional Meeting in NH with the CJ and Justice Bassett.

CCJ/COSCA Civil Justice Co-chair - working on diversion initiatives for high volume cases.

Led a number of successful requests for funding, including ARPA (A2J -$6,3927,712) (IEA supplemental request $2,059,499 on top of the original amount of $3,922,994) BJA Mental Health Collaboration Grant ($515,571), SJI Technical Assistance Grant ($42,793) among others.

CONFIDENTIAL

# THE STATE OF NEW HAMPSHIRE

# SUPREME COURT OF NEW HAMPSHIRE

# AMENDED ADMINISTRATIVE ORDER 2023-06

Pursuant to its authority under part II, article 73-a of the New Hampshire Constitution and RSA 490:4, the New Hampshire Supreme Court adopts, effective immediately, the New Hampshire Judicial Branch Anti-Discrimination and Harassment Policy, which is attached as Appendix A. This Administrative Order repeals Administrative Order 2007-06, which was issued on April 30, 2007. As amended, this Administrative Order also corrects the email address listed in section E of the New Hampshire Judicial Branch Anti-Discrimination and Harassment Policy, which was attached as Appendix A to Administrative Order 2023-06 as originally issued on June 9, 2023.

Date: June 13, 2023

ATTEST: Timothy A. Gudas

Timothy A. Gudas, Clerk
Supreme Court of New Hampshire

**APPENDIX A**

# NEW HAMPSHIRE JUDICIAL BRANCH ANTI-DISCRIMINATION AND HARASSMENT POLICY

## A. PURPOSE

This document establishes the policy of the New Hampshire Judicial Branch ("Judicial Branch") regarding all forms of discrimination and harassment, including but not limited to sexual harassment, in, or related to, the workplace. All employees have the obligation to understand the policy and to abide by it. This policy applies to Judicial Officers and all other Judicial Branch employees, regardless of position, location and facility.

## B. POLICY

The Judicial Branch is committed to maintaining a work environment in which all individuals are treated with dignity, respect, and courtesy and in accordance with state and federal laws. The Judicial Branch fully supports the right of all persons who work in the Judicial Branch to an atmosphere that promotes equal employment opportunity and prohibits discriminatory practices, including harassment based upon one's legally protected status. Therefore, members of the Judicial Branch shall not engage in verbal, non-verbal, visual, or physical conduct that denigrates or shows hostility or aversion toward an individual because of the individual's actual or perceived age, sex, race, color, marital status, physical or mental disability, religious beliefs, national origin, sexual orientation, gender identity or gender expression, or any other class protected by federal or state law. For more information about each of these protected classes, please refer to the U.S. Equal Employment Opportunity Commission and RSA 354-A.

All complaints of conduct prohibited by this policy will be promptly and thoroughly investigated in as confidential a manner as possible, consistent with a complete investigation, as detailed below.

The Judicial Branch will not tolerate retaliation against a complainant or anyone who participates in an investigation, as detailed more fully below. This policy extends to the use of Judicial Branch property, including, but not limited to, its telephones, copy machines, fax machines, computers and computer applications such as Microsoft Teams, email and internet access, and social media. In addition, the policy governs the behavior of employees during activities that are related to work and may take place outside of the

workplace, including but not limited to, remote work[1], meetings, seminars, conferences, travel, or work-related social events.

## C. DEFINITIONS AND EXAMPLES OF DISCRIMINATION AND HARASSMENT

Discrimination and harassment can consist of a single incident or a pattern of behavior. Conduct prohibited by this policy is unwelcome and inappropriate words or actions that implicate an employee's actual or perceived age, sex, race, color, marital status, physical or mental disability, religious beliefs, national origin, sexual orientation, gender identity or gender expression, or any other class protected by federal or state law. It includes, but is not limited to:

1. Behavior that unreasonably interferes with an individual's work performance that creates an intimidating or offensive work environment, or that otherwise adversely affects an individual's employment opportunities.

2. Hostile physical contact, intimidating acts, threats of such actions or violence, or any other threatening or hostile actions.

3. Derogatory remarks, epithets, slurs, negative stereotyping, offensive jokes, bullying, teasing, the display or circulation of offensive printed, visual or electronic materials or similar misconduct.

4. Sexual harassment including but not limited to:
   a. Unwanted sexual flirtations, advances, or propositions;
   b. Verbal abuse of a sexual nature;
   c. Unwanted innuendo of a sexual nature;
   d. Uninvited physical contact such as touching, kissing, hugging, patting, pinching, or brushing up against;
   e. Comments of a sexual nature about an individual's body or sexual terms used to describe an individual;
   f. Display of sexually suggestive objects, pictures, posters, or cartoons;
   g. Jokes, language, emails, or remarks of a sexual nature;
   h. Obscene gestures or suggestive or insulting sounds;
   i. Sexually-oriented verbal comments, whistling, teasing;
   j. Indecent exposure;

[1] Remote work is a work arrangement where an employee is authorized to perform some or all work at an Alternate Worksite instead of the employee's Primary Worksite. Remote work is also known as telework or offsite work, and is distinctively different from field work.

k. The demand for sexual favors accompanied by an implied or overt threat concerning an individual's employment status or promises of preferential treatment; and
l. Ridicule or embarrassment of a person because of the individual's sex, gender, gender identity, and gender expression.

## D. JUDICIAL OFFICER AND EMPLOYEE RESPONSIBILITY

All judicial officers and employees will receive training in this policy initially upon employment with the Judicial Branch, and employees will be required to execute documentation confirming receipt and acknowledgement of this policy and procedure. All judicial officers and employees will be required to participate in training on this policy and procedure every two years, at minimum, and at any time the policy is updated. Human Resources will be responsible for coordinating, scheduling training, and maintaining attendance records.

All employees are responsible for ensuring that the workplace is free from discrimination, harassment, and any other conduct that is prohibited by this policy. Regardless of intent, employees shall avoid any behavior or conduct that could reasonably be interpreted or perceived as prohibited under this policy.

## E. REPORTS OF POLICY VIOLATIONS

The Judicial Branch encourages all employees to report behavior that could reasonably be interpreted or perceived as prohibited under this policy to any Mandated Reporter, even if the employee is not directly affected by the misconduct. Mandated Reporters, identified below, are *required* to immediately report to the Director of the Administrative Office of the Courts any misconduct witnessed or which has been provided by an employee.

Employees can report alleged misconduct either verbally or in writing. Employees are encouraged to make reports of alleged violations of this policy in writing, so long as it does not delay the reporting, as doing so will assist in the investigative process. Written reports should be sent to DHReports@courts.state.nh.us, which will be responded to by the Director and/or Human Resources Manager.

Reports of alleged misconduct will be accepted, investigated, and resolved irrespective of whether they are verbal or in writing. Reports should include, but not be limited to: name of individual allegedly engaging in conduct prohibited by this policy ("respondent"); name of individual allegedly subjected to conduct prohibited by this policy ("recipient of alleged misconduct"); dates

and times of misconduct; description of the misconduct alleged; and witnesses, if any.

The following are "Mandated Reporters":

- Judicial Officers
- Director of the Administrative Office of the Courts, Deputy and Assistant Directors
- Human Resources Manager, Associates and Generalists
- Attorneys in the Office of General Counsel
- Department Heads and Assistant Department Heads in the Administrative Office of the Courts
- Court Administrators
- Managers, Assistant Managers, and Supervisors
- Clerks
- Deputy Clerks

## F. MANDATED REPORTER RESPONSIBILITIES

When a member of the Judicial Branch reports conduct alleged to be in violation of this policy to a Mandated Reporter, the Mandated Reporter shall immediately provide that complaint to the Director. If the complaint impacts safety and/or security, the Mandated Reporter shall take the additional step of immediately speaking with the Director about the complaint. The Mandated Reporter's responsibility includes reporting conduct that the reporting employee asks not to be reported to anyone else, conduct that the reporting employee characterizes as confidential, and conduct where the circumstances surrounding it are unclear and cannot immediately be substantiated.

## G. ADMINISTRATIVE PROCESS UPON RECEIPT OF COMPLAINT

Upon receipt of a complaint from a Mandated Reporter, the following steps should be taken:

1. The Director shall promptly consult with General Counsel and the Human Resources Manager. The Director, General Counsel, and Human Resources Manager shall review the complaint and make a recommendation as to whether to initiate a formal investigation under the policy, or take other appropriate action. The Director shall communicate the recommendation to the Supreme Court. If a formal investigation is initiated, the Director shall assign the complaint to an investigator.

2. At the outset of the investigation, the Supreme Court may require interim measures against an individual being investigated be taken by the Administrative Authority prior to the completion of the investigation,

consistent with the New Hampshire Judicial Branch Personnel Rules ("Personnel Rules"). All such measures should protect the rights of all parties involved to the greatest extent possible and be consistent with the goal of ensuring that the workplace is free from discrimination.

3. The investigator shall make whatever inquiry with respect to the allegation as is reasonably necessary to conduct a full and fair investigation. The steps to be taken during the investigation will vary depending upon the nature of the allegations.

4. Every employee must cooperate fully with an investigation. Every effort will be made to limit the investigation to relevant persons and documents and to preserve the confidentiality of all persons involved. The investigator shall inform all people interviewed of the importance of confidentiality. The investigator shall remind all people interviewed that the Anti-Discrimination Policy forbids retaliation. Retaliatory conduct is subject to disciplinary action under the Personnel Rules.

5. The investigator shall deliver a confidential preliminary written report to the Director. The investigator's report shall contain all relevant information, including but not limited to:

- Scope of investigation;
- Summary of complaint;
- Potential violations;
- Summary of action taken by the investigator, including a list of people interviewed;
- Review of respondent's personnel file;
- Summary of interviews and any relevant information learned in the course of the investigation;
- Proposed factual findings and conclusions;
- Recommendations for remedial action to be taken, if any.

6. The Director, General Counsel, and the Human Resources Manager shall review the preliminary report to determine whether any further action is required. Upon completion of a final confidential written report, the Director shall send it to the members of the Supreme Court.

7. The Supreme Court shall review the investigative report and may require further investigation or other action. If no further action is necessary, the Supreme Court shall determine whether the Policy has been violated, and, if so, the appropriate remedial action to be taken by the Administrative Authority, if any. Such action may include disciplinary action as defined in the Personnel Rules or other action appropriate to the violation. It may also involve reports to any

appropriate agency or committee, such as the Judicial Conduct Committee and/or the Professional Conduct Committee, consistent with Committee rules and guidelines.

8. Once the Supreme Court's decision is final, the Director shall forward it to the Human Resources Manager, General Counsel, and the applicable Administrative Authority. If no violation of the policy is found, the applicable Administrative Authority shall determine whether any personnel action is required.

9. The investigator's report and any other report or writings that are generated in the course of the investigation are confidential and will not be shared with the complainant, the respondent, the recipient of the alleged misconduct, or those who have been interviewed as part of the investigation. Under appropriate circumstances, however, the Judicial Branch may share any written document with the Judicial Conduct Committee and/or the Professional Conduct Committee, consistent with Committee rules and guidelines, or other appropriate authority.

10. After consultation with the General Counsel and the Director, the Human Resources Manager shall advise necessary and appropriate NHJB Judicial Officers and employees of the outcome of the investigation. After consultation with General Counsel, the Director shall make any reports to any appropriate agency or committee, such as the Judicial Conduct Committee and/or the Professional Conduct Committee, consistent with Committee rules and guidelines.

11. The Human Resources Manager shall work with the Administrative Authority to implement the remedial action, if any. Any written documentation concerning a finding that the employee violated the Anti-Discrimination and Harassment Policy will be placed in the employee's personnel file.

12. If the Human Resources Manager, General Counsel, the Director, or any member of the Supreme Court is personally involved in any complaint, whether as the respondent or a witness, s/he shall be disqualified from participation in the complaint and decision-making process. The Chief Justice of the Supreme Court may appoint a substitute if s/he deems it necessary.

13. If the complaint is against a Judicial Officer, in addition to proceeding with an internal investigation, the matter may also be referred to the Judicial Conduct Committee. The Judicial Branch will act consistently with any obligation to report potential violations of the

Code of Judicial Conduct and will cooperate fully with the Judicial Conduct Committee.

14. If the respondent has appeal rights under the Personnel Rules, is dissatisfied with a final decision rendered under this policy and that decision involves an "adverse action" as defined by the Personnel Rules, the employee may file an appeal with the New Hampshire Judicial Branch Appeals Board in accordance with the Personnel Rules.

## H. RETALIATION

Retaliation is defined as adverse action(s) against individuals because they have reported instances of discrimination, harassment or allegations of such conduct, or participated in or have been witnesses in any procedure to address a complaint of discrimination or harassment. No hardship, loss of benefit, or adverse employment action may be imposed on an employee for making a good-faith complaint under this policy. If an employee believes that retaliation has occurred, then the employee is encouraged to report it immediately through the means described above in the section entitled "Reports of Policy Violations."

Complaints of retaliation will be viewed as separate and distinct from the original complaint and may form the basis for a new complaint. Retaliation may result in disciplinary action even though the original complaint investigated was not substantiated.

Anyone who is found to have retaliated against an employee for reporting conduct covered by this policy, or for cooperating or otherwise participating in a harassment investigation, regardless of the job positions of the person involved, will be subject to discipline, up to and including termination. If the respondent is not a Judicial Branch employee, then the Judicial Branch will take whatever corrective action is reasonable and appropriate under the circumstances.

CONFIDENTIAL

**Chief Justice Gordon MacDonald**

| | |
|---|---|
| **From:** | Erin Creegan |
| **Sent:** | Thursday, July 18, 2024 14:17 |
| **To:** | Chief Justice Gordon MacDonald |
| **Subject:** | FW: Investigation concluded |

**From:** Dianne Martin <Dmartin@courts.state.nh.us>
**Sent:** Friday, February 23, 2024 5:37 AM
**To:** Erin Creegan <ECreegan@courts.state.nh.us>
**Subject:** Fw: Investigation concluded

Sorry for the delay! Here is the sample language you were looking for.

Dianne Martin, Esq., Director

New Hampshire Judicial Branch

One Granite Place, Suite N400

Concord, New Hampshire 03301

---

**From:** Victoria Prestejohn <VPrestejohn@courts.state.nh.us>
**Sent:** Wednesday, February 7, 2024 3:04 PM
**To:** Dianne Martin <Dmartin@courts.state.nh.us>
**Subject:** Investigation concluded

Hi Dianne,
This is along the lines of something I would send to a complainant once an investigation has been completed:

*I wanted to reach out and let you know that the investigation into the comments made by CSO [redacted] which you reported has been completed. Given this is a personnel investigation, I'm unable to share any specifics pertaining to the outcome. However, please be assured that the investigation was thorough and followed NHJB processes and procedures.*

*If you have any other questions, please let me know.*

Victoria Prestejohn, PHR, SHRM-CP
*(she/her/hers)*
Human Resources Manager
Administrative Office of the Courts
1 Granite Place, Suite N400
Concord, NH 03301

O: 603-415-0688
F: 603-513-5454

CONFIDENTIAL

*STATEMENT OF CONFIDENTIALITY*
*The information contained in this electronic message and any attachment to this message may contain confidential or privileged information and is intended for the exclusive use of the addressee(s). Please reply immediately if you are not the intended recipient and destroy all copies of this electronic message and any attachments. Thank you.*

CONFIDENTIAL

# 8. Justice Melissa Countway Timeline, Notes and Questions – Attorney Debra Weiss Ford

CONFIDENTIAL

**Timeline—MBC's notes from Calls with Deb Ford**

**7/1/2024** Deb Ford reported regarding the confidential investigation regarding [redacted] The Court hired Deb Ford to help navigate as he made many complaints, alleged that he was a whistleblower and alleged that he had been discriminated against; she coordinated an outside investigator to review [redacted] claims. Although the report concluded that there was insufficient evidence to support his claims, it did note concerns about leadership at the AOC.

**7/11/24** the Court discussed with Deb Ford the strategy to disseminate the executive summary of the report to [redacted] and Dianne. We discussed developing an action plan to address the culture at the AOC including retaining a facilitator and revising and paring down the director's job description along with empowering managers; perhaps having a chief operating officer. My notes indicate that we would work on this "later"

**7/23/24** Notes from conversation with Deb Ford that D.M. was "wildly upset, crying, incoherent" regarding the investigation report. Deb described the call as long and unproductive.

**7/30/24** Dianne presented a game plan See Exhibit; I infer this was part of her FMLA part time work plan

**Late Summer and Fall 2024** We were basically hands-off during the period of FMLA

**12/4/24** Call with Deb Ford regarding finding a consultant for the AOC; my notes indicate we discussed Dianne and her "insulating from people and issues" We discussed FMLA status

We discussed beginning a first phase in January and our planned messaging was that the [redacted] investigation revealed personnel and communications issues and that we would have an outside consultant work with the AOC team to improve and that participation would be required.

**1/23/25** PED and MBC had a phone call with Deb Ford regarding Dianne and retaining a consultant for coaching; we discussed the concern that DM would not accept; discussed new information regarding HR being siloed and bills not being paid on time; discussed concerns for a FMLA type claim alleging retaliation and how intermittent FMLA works; She discussed concerns of taking action in proximity to FMLA and recommended a 6 – 12 month no action timeframe [i.e. before taking action against an employee who has been on FMLA]; discussed concerns about [redacted] we discussed a severance agreement; discussed that if DM brought a claim she would have to prove it; discussed having a business reason for change; discussed a pathway [to the OBA job] and that GJM had discussed it with her twice but "DM [did] not bite". Discussed strategy of bringing her in and expressing our concerns as a first step and to see what she says in a "listening session". We discussed concerns about her "screaming" at Deb Ford in the past. Discussed goal of insulating us from liability and the suggestion that we offer paid leave if she "blows up". Noted that she had floundered in MBC trying to work with her and her asking PED to conduct Matt Seaton's evaluation. DF advised that it was OK for us to ask her "are you back to work full time."

**In this timeframe PED and MBC had meetings with Mark Howard and Ellen Christo who described the problems at AOC and expressed being at a breaking point.**

**2/25/25** PED and MBC had a phone call with Deb Ford [MBC notes on a prepared word document with preprinted questions]. Notes highlight we discussed having a judicial officer as head of the AOC; discussed restructuring the entire court. Discussed an IT lockdown. Discussed the strategy of terminate first then offer the other job with severance pay and a release. Notes say to expect a blow up. We discussed the concern that anything short of termination first would likely result in "FMLA immediately"

CONFIDENTIAL From Confidential Investigation 7/9/24

believe as a student [redacted] was more used to being self-directed. However, it would have been fair for Dianne to expect for him to function in his role as I do in mine: receiving projects, checking in on what direction to take, obtaining New Hampshire-specific advice because he is not deeply knowledgeable about the structures and personalities (as I was not, when I started)." Erin observed that [redacted] "does not appear to want to be managed."

[redacted] also said that she noticed some instances where "a couple of things were hard to get [across] to [redacted]." For example, [redacted] stated that she had to remind [redacted] of his role when working with contractors for the AOC.

*Dianne's Role and Leadership at the AOC*

Dianne has been the Director of the AOC since November of 2021. Dianne has 15 direct reports and oversees "about 200 people."[5]

Witnesses provided differing perspectives regarding Dianne's management style. For example, [redacted],[6] explained that Dianne has a "very hands on approach" and "wants to be informed on everything." [redacted] stated that she copies Dianne on any "major decisions to [be] finalized" and Dianne "wants to be briefed or consulted so she can approve it." [redacted] similarly stated that Dianne allows working independently, but she would like to be aware of the projects that the employee is planning or is involved in.

[redacted] explained that, under the current leadership structure in the AOC, decision making "[is] all Dianne, [redacted], and previously [redacted], the former Deputy Director of the AOC. [redacted] said that, outside of these three, employees must "check in to make sure they are doing things the way the Director and Chief want." [redacted] observed that, when Dianne began to lead the AOC, "there seems to be less trust in people that were Judicial Branch employees ... prior to Dianne and the Chief joining." [redacted] noted a feeling of "skepticism" toward long-term employees in their "loyalty and ability." [redacted] said there "seems to be more trust in new hires" or employees that "used to work with Dianne or the Chief at the DOJ." [redacted] described Dianne's leadership style as "very top down" and stated that "hierarchy is very important" to Dianne. [redacted] stated that "if [she] had to quickly summarize [Dianne's leadership]," she would use the word "micro-manager but hates to use that description due to the negative connotation."

When asked about decision making in the AOC, [redacted] stated that while "there are opportunities to represent your opinion, [opinions] are not necessarily solicited" by Dianne. [redacted] stated that she "do[es] not feel that peoples' expertise in certain areas are given adequate weight" and "that some of the collaborative discussion may be seen as an impediment to progress." [redacted] stated that the AOC used to have "managers' meetings that occurred on a weekly basis," but managers "no longer have those" since Dianne began to lead the team. [redacted] "feel[s] there is a lot more siloed work

[5] Erin explained that Dianne has "almost forty" direct reports and "way too large" of a workload, which is something the AOC is "trying to address."

[6] [redacted] stated that her role's responsibilities include liaising for the Access to Justice commission, being a member of the DEI Steering Committee, and managing E-Court initiatives, which includes improving and enabling software to make online/digital services available to citizens of New Hampshire.

occurring." [redacted] stated that she feels "hampered in her ability to collaborate with others." [redacted] also recalled instances where she has "distinctly been told 'don't talk to this person' or 'don't talk to this person about this project.'" [redacted] explained there "was less collaboration and more of a directive stance" by Dianne for initiatives.

[redacted] stated that there is "a tremendous amount of favoritism" from Dianne toward employees she previously worked with or recently hired. [redacted] stated that if an employee worked at the AOC prior to Dianne's arrival, they are "on the lower treatment end." [redacted] described his own working relationship with Dianne as "tenuous," stating that he "definitely cannot have a different opinion." [redacted] stated that the "vast majority of the time, [Dianne] does not listen to or seek [his] technology recommendations" and "dismisses [his] concerns." [redacted] stated that, despite his role as [redacted] he has "not been consulted on anything tech related since Dianne arrived." [redacted] stated that Dianne has "absolutely" instructed him to not collaborate with others. [redacted] described a situation he experienced where "[Dianne] was extremely upset and told [redacted]] that [redacted] was not to share information … without going to [Dianne] first and getting [Dianne's] permission to share it with others." [redacted] further expressed his belief that under Dianne's leadership, the AOC culture is very "hostile," and "everyone is afraid of retaliation" or being "written up" for "disagreement with leadership."

[redacted] stated his belief that Dianne "purposely pits" IT, HR, administration, and "everyone against each other so she can maintain full control of everything that is happening while hiding illegal activity, gross mismanagement of processes, and the hostile work environment she's created." [redacted] also stated his belief that Dianne did not like [redacted]'s "collaboration" with members of these other teams.

*Dianne and [redacted] Relationship*

[redacted] said that when he began at the AOC, his relationship with Dianne was "amazing" and that "all the doors were open as far as getting the data from everywhere."

Dianne stated that toward the beginning of [redacted]s employment, they were "going a lot of places together." Dianne stated that in mid-March she brought [redacted] to the Governor's Commission on Domestic Violence. Dianne noted that "one of the primary goals" of [redacted] position was to acquire DV data and "share that data to the extent it is shareable with stakeholders." Dianne also stated that she set up a meeting for [redacted] to meet with the D&I data subcommittee advisory board members, where Dianne is a co-chair. Dianne stated that she set up meetings with the Attorney General and [redacted] so they could "meet and hear how [redacted], Dianne, and the Attorney General] could collaborate."[7] Dianne said that she organized a meeting for [redacted] with the National Center for State Courts ("NCSC") because they have an "excellent data person" and Dianne wanted to set [redacted] up with them as a mentor.

[redacted]xplained that, when [redacted] first joined the AOC, it seemed like he "received more favorable treatment than others." [redacted] explained that [redacted] "received expensive computer equipment and software" that the average employee did not have and perhaps could have been

[7] [redacted] similarly stated he was brought before the DEI committee, domestic violence committee, state legislators, and the Governor's Commission as the "data expert," noting that he was "doing some really cool work."

CONFIDENTIAL

D.F. 7/11/24

- Ex Sum = to [redacted]
  & Diane
  in & out groups older vs. newer

Statements of King & Howard
- accurate? not going any further
  inflate issue
  - exaggeration / lie
  As addendum to the Report

Disseminate – by D.F. email on Monday –
- Reporting to ___!

NOT Term. = Retaliation
Supervisor – monitor
42% EEOC – retaliation

Manage = Oversee
Location... Tim? – Data Mgt.
[redacted]... understanding...
Send to Diane – Call w/Deb – re supervisor

Culture... – later – Action Plan
- Job Description –
  Revise & Pare Down.
  - Empower Managers
- Facilitator
C.O.D.
Mgr Meeting –

Grants
Projects
ARPA

CONFIDENTIAL

7/23/24 per DebF P/M

wildly upset, crying incoherent
long + unproductive call

Mon - email to GJM + D.F.

fear + logistics

Sch. policy - Notice

CONFIDENTIAL DJM 7/30/24

| AD Sean Haggerty | GC Erin Greenan | DD Jackie Waters (Ret.) | AD [illegible] Rakhimova |
|---|---|---|---|
| Security | JCC | Grants (Tanya Pitman) | YDC (Jen Foley) |
| Buildings and Grounds (Josh) | ADO (Brian M.) | Access and Community Engagement (Irena Goddard) | Accounting and Payroll (Becky Plourde) |
| IT jointly with Jackie | OBA (Sherry H.) | Court Project and Operations (Julie Lamson) | Facilities (Dan Labrie) |
| Communications (Av Harris) | | Fiscal (Donna Raymond) | HR (TR as the lead, jointly with Sean and Jackie) |

Dianne will meet with each member of this team at least once a week to answer questions and address issues and will also be available to address issues that come up. During the available hours, she will focus on the budget process and development as requested by the Chief, and oversee classification plan changes, and execution of contracts. Policy and procedure updates will continue to be drafted and review will be shared by the members of this team on a rotating basis.

CONFIDENTIAL

12/4/24 -

Call to D.F. re Consultant for ADC.

DM

Insulating from people + issues

FMLA?

New HR - 12/13

Phase I - OK to go -
- Begin January

MBC - P.O.C.

Mgs - [redacted] Invest.
personnel & communication issues
outside consultant
to work w/Team +
improve

Required to participate -

Communicate to rest of Team
@ Admin Council &
@ Super/Circuit Leaders

CONFIDENTIAL

T.C. PED+
Deb Ford re DM 1/23/25

Consultant - Coaching -
·concern re she accept

New info
e.g. new HR - being siloed -
Bills not paid on time
Count software

FMLA type claim - Retaliation
intermittent FMLA
* For sure?
DB's Note:

Proximity to FMLA - 6 m. - 12 m. timeframe

[redacted]

Severance A'ment

Would have to prove ...
-she will try to pin on others

Business Reason

Pathway - GJM - 2 conversations -
DM not bite

CONFIDENTIAL

Bring in - Express Concerns
Deb: see what she says
e.g. HR person
- Severance PKG.
- Alt. Job -
· Consultant to facilitate
get ammo.

consistent w/ investigator
Get her point of view
[Screaming @ D.F.]

· Insulate from liability

Paid leave if Blows up

Not do ... work w/ MBC
floundering

asking PED to evaluate Matt Seaton

Off FR: Are you back to work full time?

- Meet here -

603-781-8051
Deb Ford

CONFIDENTIAL

**Questions For Deb Ford**

2/25/25
PED+MBC TC w/DF

DM

- Term
  - Late paid bills
  - Pattern of Departures (at least 14 in near past)
  - Pattern of Management Concerns
  - Pattern of Culture of Fear and Retaliation
- Transition to Soft Landing
  - Short Paid Leave to consider options ✓ vs 2 wk notice
  - Authority to offer severance
  - Continue to work on the budget
- Explosive — I.T. Lock-down — Judicial officer - head AOC
  - Location
  - Keys
  - Computer
- Status as State E'ee — Restructuring Entire Court
- Logistics and Timing
  * Term. 1st
  * Offer other Job - / Severance Pay + Release

TR

- Paid Leave ✓
- Investigation by SH regarding truthfulness to auditor ✓
  Scripted 2 e'ees

Plan to DF - email

expect blow-up - e.g. 98% pos investigate

• Clean - Soft landing - excel - not accept Move on
FMLA immediately -
• Investigate
• Susan re Deputy
• Exit Interviews
• Bills

• 2nd Mtg - 4-5 days later - computer
delegate

# 9. Email from Attorney Debra Weiss Ford Re: Consulting Proposal

CONFIDENTIAL

**Chief Justice Gordon MacDonald**

**From:** Ford, Debra Weiss (Portsmouth) <Debra.Ford@jacksonlewis.com>
**Sent:** Tuesday, November 12, 2024 10:56
**To:** Chief Justice Gordon MacDonald
**Subject:** Fw: Proposal
**Attachments:** TRC Proposal DWeissFord NHSC 11-12-24.docx

EXTERNAL EMAIL WARNING! This email originated outside of the New Hampshire Judicial Branch network. Do not click on links or open attachments unless you recognize the sender and are expecting the email. Mouse over links to confirm the target before you click. Do not enter your username and password on sites that you have reached through an email link. Forward suspicious and unexpected messages to 'suspicious@courts.state.nh.us'.

Chief,
Attached is the proposal from the consulting group I talked to last week. Please let me know if you want to schedule a call later this week or next week to discuss. Thanks.

Debra Weiss Ford (She/Her)
Attorney at Law

**Jackson Lewis P.C.**
100 International Drive
Suite 363
Portsmouth, NH 03801
Direct: (603) 559-2727 | Main: (603) 559-2700 | Mobile: (603) 781-8251
Debra.Ford@jacksonlewis.com | www.jacksonlewis.com

**From:** Loraine Della Porta <lmdellaporta@themediationgroup.org>
**Sent:** Tuesday, November 12, 2024 10:48
**To:** Ford, Debra Weiss (Portsmouth) <Debra.Ford@jacksonlewis.com>
**Cc:** Loraine Della Porta <TheResCollab@gmail.com>
**Subject:** Proposal

Good morning, Debra-

My apologies for the delay in getting this to you. Last week was a tough week.

I hope I've captured what you had in mind. I am happy to discuss/refine further.

All best,
Loraine

PS - I've cc'd my Resolution Collaborative email address, which is what I'll be using going forward.

**Loraine M. Della Porta, JD (she/her)**

CONFIDENTIAL

Senior Consultant
The Mediation Group
235 Cypress Street, Suite 300
Brookline, MA 02445
Tel: (617) 277-9232 | Fax: (617) 277-1699
Rhode Island Office: (401) 437-6621
lmdellaporta@themediationgroup.org

CONFIDENTIALITY NOTICE: The contents of this message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information and may be legally protected from disclosure.

CONFIDENTIAL

THE RESOLUTION COLLABORATIVE

November 12, 2024

Ms. Debra Weiss Ford
Attorney at Law
Jackson Lewis P.C.
100 International Drive – Suite 363
Portsmouth, NH 03801
(Delivered via Email)

**CONFIDENTIAL**

Re: Proposal to Provide Consulting Services

Dear Debra,

It was a pleasure to speak with you last week. As we discussed, I have put together a proposal to provide conflict resolution/ consulting services to the NH Supreme Court. It is my understanding that your goal in undertaking this work is two-fold. First, to facilitate a timely response to concerns recently raised relative to the work climate and second, to obtain recommendations for improving the climate and working relationships going forward.

By way of background, I am an organizational development consultant and professional mediator with many years of experience in assessing organizations and helping to facilitate positive change. I assist people at all levels of an organization in examining structures, policies, practices, communication patterns, and other key factors to determine what is working well and what might be contributing to a less-than-optimal work environment.

My first step in working with clients is to carefully assess and diagnose underlying drivers of inefficiency, lost opportunity, and conflict and to identify obstacles to collaborative working relationships. In my experience, many interventions fail because organizations do not take the time to identify and address the underlying root causes of organizational inefficiencies and conflicts. As a result, each conflict that is resolved is replaced by another, and issues thought to be resolved simply resurface at a later time. I propose to undertake a 2-Phase approach as described below:

**Phase 1. Assessment**

It is my practice to begin each engagement with a brief assessment. The assessment is not about determining who is right or wrong – or assigning blame. The primary purpose of an assessment is to identify and strengthen existing approaches, that are working well, and to collect data that will allow me to recommend appropriate interventions to address areas where improvement could benefit everyone.

By providing those individuals directly involved in current work conflicts an opportunity to speak with an experienced, independent, neutral, workplace interventionist, we can gain unique insights into what is contributing to (or detracting from) optimal working relationships and/or work performance.

Services to include: CONFIDENTIAL

- Conducting 2-3 confidential one-on-one interviews with those directly involved in current/historic work conflicts. At the outset of each interview, I will confirm the participant's understanding of the purpose of the interview and the methodology that will be used. Each interviewee will be assured that their participation in the interview is strictly voluntary and that every precaution will be taken to protect confidentiality. I will explain that individual names or other identifying information will not be used without their permission, and therefore, they should feel free to speak frankly about their concerns, opinions, and perspectives.
- During the interviews, individuals will be asked about key elements of their work environment, which will include at a minimum: communication, teamwork, conflict, and leadership/management effectiveness.

**Phase 2. Diagnosis and Recommendations for Appropriate Interventions**

- Following the interviews, I will analyze the information collected and provide you with a brief verbal assessment report, which will include a summary (without attribution) of my findings, as well as recommendations for interventions designed to overcome current challenges and manage conflict respectfully and constructively. The report will be made to you as the sponsor of this engagement and to anyone else you deem appropriate.

Based on the findings, I may recommend one or more of the following services as appropriate:

- One-on-one mediation sessions to attempt to resolve ongoing conflicts between individuals
- Facilitated group session(s) to develop agreements about future working relationships and to set expectations about workplace "norms" or guiding principles
- Individual conflict coaching
- Training/capacity building (e.g. Conflict Resolution, Effective Communication, etc.)

<u>LOGISTICS AND COSTS</u>

It is anticipated that all services will be provided on-site at the Court unless you specify otherwise. If requested, I can also arrange for off-site meeting space for interviews and/or subsequent mediation/intervention sessions. This proposal assumes that I will take responsibility for scheduling and coordinating logistics for interviews and subsequent mediation/intervention sessions.

For government/education/non-profit entities, I charge a discounted hourly rate of $450.00 per hour for my services. As a professional courtesy, I will further discount my hourly rate to $425.00 per hour. For this engagement, I will also waive any travel costs. Based on similar work performed for other institutions, we offer the following time estimates:

| **SERVICE** | **ESTIMATED HOURS** |
|---|---|
| **Phase 1** | |
| Initial Assessment | |
| - Meetings/Prep | 1-2 hours |
| Logistical Coordination/Interviews (2-3 court staff) | .5 hours |
| - Interviews with 2-3 court staff | 2-3 hours |

| **SERVICE** | **ESTIMATED HOURS** |
|---|---|
| **Phase 2** | |
| Diagnosis and Recommendations for Appropriate Interventions | |
| - Analysis and drafting of the assessment report and recommendations | 1-2 hours |

**:DDITICNAL SERVICES & ESTIMATED HOURS** CONFIDENTIAL

| | |
|---|---|
| - Individual Mediation Sessions/Per Session (Optional) | 1-2 hours |
| - Prepare/Facilitate Group/Team Process (Optional) | 2-3 hours |
| - Conflict Coaching (Optional) | TBD |
| - Training/Workshops (Optional) | TBD |
| - Logistical Coordination/Interventions | 1-2 hours |

Based on the above scope, I estimate it will take between 4.5 and 7.5 hours to complete Phases 1 and 2 of this engagement. As stated above, I will waive any fees for initial consultation as well as travel costs. This estimate does not include optional additional services such as individual mediation or coaching sessions or facilitated group sessions, which would be billed at the same discounted $425.00 hourly rate. Note that once I conduct the initial interviews with the court staff, I will present a separate cost estimate for recommended interventions in Phase 2. Also, I will not perform any work outside of this initial proposed scope without obtaining express. written consent from you as the sponsor.

I am excited by the prospect of working with you and believe that I can deliver the high-quality results you desire. I offer this proposal and the corresponding budget estimate as a starting point for our conversations. Recognizing the limitation of the written word, I would be happy to speak with you again to further refine the project scope and budget.

Cordially,

*Loraine*

Loraine M. Della Porta, J.D.
President/Senior Mediator
The Resolution Collaborative, LLC
200 Midway Road, P.O. Box 8411
Cranston, RI 02920
(401) 437-6621
therescollab@gmail.com

# 10. February 25, 2025 Email from Justice Melissa Countway to Attorney Weiss Ford Re: AOC Director

CONFIDENTIAL

**Justice Melissa Countway**

| | |
|---|---|
| **From:** | Justice Melissa Countway |
| **Sent:** | Tuesday, February 25, 2025 3:20 PM |
| **To:** | Ford, Debra Weiss (Portsmouth) |
| **Cc:** | Justice Patrick E. Donovan |
| **Subject:** | AOC Director |

Hi Deb,

Thank you for speaking with us again today about our concerns regarding the AOC director. We shared these concerns with the rest of the Court at conference this morning and have made the difficult decision to terminate the Director. Our concerns involve the management style, mass departures of long-term career employees (I count 14), mishandling of bill payments, and a culture of fear and retaliation. As you know, these concerns were noted in the investigator's report last July. We have conducted exit interviews and the theme is the same: micromanagement, siloing employees, prohibiting employees from talking to, meeting with, and even emailing one another, and creating a climate of fear.

This also comes at a time when the Court is working toward achieving greater efficiency in the overall structure of the AOC and administration of the trial courts. We have concluded that our goals for the position, and Diane's management style do not align.

Thank you for supporting us through this difficult transition.

Melissa Countway
Associate Justice
New Hampshire Supreme Court

# 11. February 26, 2025 Email from Justice Melissa Countway to Attorney Debra Weiss Ford Re: Follow-up Question

CONFIDENTIAL

**Justice Melissa Countway**

| | |
|---|---|
| **From:** | Justice Melissa Countway |
| **Sent:** | Wednesday, February 26, 2025 8:51 AM |
| **To:** | Ford, Debra Weiss (Portsmouth) |
| **Cc:** | Justice Patrick E. Donovan |
| **Subject:** | Follow Up Question |

Hi Deb,

Just to follow up with our plans regarding the AOC Director... Our goal is to have the most positive transition possible while being clear and direct.

While we do not feel that Diane has the management skill to lead the AOC, we think she could be a good match for another open position – heading the Office of Bar Admissions.

Is it reasonable to let her know in this order: (1) we need to part ways with her as AOC Director; (2) we can structure the transition as a resignation, if she prefers, instead of a termination, if she would like to pursue the OBA position.

If it is too much to expect her to decide on the spot, is it reasonable (from an employment law perspective) to conclude the meeting with this being a termination with an opportunity to restructure the transition (to allow her to resign instead) within the following week? Are there implications to her state retirement benefits to distinguish between termination and resignation?

Melissa Countway
Associate Justice
New Hampshire Supreme Court

# 12. February 26, 2025 Email from Attorney Debra Weiss Ford to Justice Melissa Countway and Justice Patrick Donovan Re: Response to Follow-up Question

CONFIDENTIAL

**Justice Melissa Countway**

**From:** Ford, Debra Weiss (Portsmouth) <Debra.Ford@jacksonlewis.com>
**Sent:** Wednesday, February 26, 2025 9:40 AM
**To:** Justice Patrick E. Donovan; Justice Melissa Countway
**Subject:** RE: Follow Up Question

EXTERNAL EMAIL WARNING! This email originated outside of the New Hampshire Judicial Branch network. Do not click on links or open attachments unless you recognize the sender and are expecting the email. [illegible] before you click. [illegible] that you have received through an email link. Forward [illegible] and [illegible]

Morning,
Please see my responses to both of your emails below in red

**Debra Weiss Ford** (She/Her)
**Attorney at Law**

**Jackson Lewis P.C.**
100 International Drive
Suite 363
Portsmouth, NH 03801
Direct: (603) 559-2727 | Main: (603) 559-2700 | Mobile: (603) 781-8251
Debra.Ford@jacksonlewis.com | www.jacksonlewis.com

**From:** Justice Patrick E. Donovan <PDonovan@courts.state.nh.us>
**Sent:** Wednesday, February 26, 2025 8:57 AM
**To:** Justice Melissa Countway <MCountway@courts.state.nh.us>; Ford, Debra Weiss (Portsmouth) <Debra.Ford@jacksonlewis.com>
**Subject:** RE: Follow Up Question

Also, should we put her termination package or offer in writing?
You do not need to do that in NH and I generally don't unless you have a practice of doing so.
PED

Patrick E. Donovan
Associate Justice
N.H. Supreme Court
One Charles Dow Drive
Concord, NH 03301
pdonovan@courts.state.nh.us

**From:** Justice Melissa Countway <MCountway@courts.state.nh.us>
**Sent:** Wednesday, February 26, 2025 8:51 AM
**To:** Ford, Debra Weiss (Portsmouth) <Debra.Ford@jacksonlewis.com>

CONFIDENTIAL

**Cc: Justice Patrick E. Donovan <PDonovan@courts.state.nh.us>**
**Subject: Follow Up Question**

**Hi Deb,**

**Just to follow up with our plans regarding the AOC Director... Our goal is to have the most positive transition possible while being clear and direct.**

**While we do not feel that Diane has the management skill to lead the AOC, we think she could be a good match for another open position – heading the Office of Bar Admissions.**

**Is it reasonable to let her know in this order: (1) we need to part ways with her as AOC Director; (2) we can structure the transition as a resignation, if she prefers, instead of a termination, if she would like to pursue the OBA position.** Yes

**If it is too much to expect her to decide on the spot, is it reasonable (from an employment law perspective) to conclude the meeting with this being a termination with an opportunity to restructure the transition (to allow her to resign instead) within the following week?** Yes

**Are there implications to her state retirement benefits to distinguish between termination and resignation?** That is a good question, and I am not familiar with the state system. Are you able to ask Erin or Suzanne without revealing it is about Dianne? Do you have confidence they will keep your inquiry confidential?

**Melissa Countway**
**Associate Justice**
**New Hampshire Supreme Court**

CONFIDENTIAL

# 13. Emails between Attorney Dianne Martin and Attorney Sherry Heiber Re: Attorney Heiber Retirement

CONFIDENTIAL

**Sherry Hieber**

| | |
|---|---|
| **From:** | Sherry Hieber |
| **Sent:** | Tuesday, November 5, 2024 1:13 PM |
| **To:** | Dianne Martin |
| **Subject:** | RE: Congratulations and next steps |
| **Attachments:** | Legal Asst. Job Description 2024.docx |

Hello Dianne,

I hope everything is going well. Thank you for your kind words about my retirement. It is a bit daunting to contemplate such a big change in one's life, but it feels like the right decision. I appreciate your sensitivity to the fact that the news of my departure is not yet public. Given that I let the Chief and Mary know my plan to work through the end of August 2025, which coincides with the end of my term as CBAA Chair, it seemed too early to make the news public. However, I wanted to give the court plenty of time to think about succession. I hope to be able to share the news first with the Board of Bar Examiners and the Character and Fitness Committee when the time is right.

I thought it might be helpful to share with you some of the discussion that we have had about these two transitions: Lyne's job and mine. Lyne's last day in the office will be December 13. I do not know whether she has finalized everything through HR, but I know she is communicating with them. Mary spoke with the Chief, and Mary and I also had a chance to speak with Takhmina about replacing Lyne. Takhmina, Mary and I discussed some ways that the job might evolve in the future, particularly if we are able to decrease administrative tasks through an online application system or other IT solutions. However, the job description that we updated was not meant to change the duties of this position now. After our discussion with Takhmina, we changed the description to better reflect the current role, and added language that a college degree was preferred. However, the job level remains the same. Attached is a copy of the redlined version that I shared with Takhmina after our discussion.

Because Lyne is leaving so soon, it is important to post the job and find a replacement who can begin when she leaves. In mid-December, we are processing applications for the February bar exam – a task that involves a lot of data entry that falls primarily on Lyne. In January, the applications come in for the DWS applicants and we continue to prepare for the exam and for the February Character and Fitness Committee meeting. And, of course, we have a constant stream of motion and UBE transfer applications. So, it is a busy time, and the OBA will need a support person to function in a reasonable manner.

With respect to the new general counsel, I am pleased that everyone recognizes that some overlap is necessary. I originally hoped that someone would work with me during the July exam cycle, and I now understand that the Chief would like someone to start early enough to experience both the February and July exams.

In response to your questions about the impact on the budget, I am concerned whether the OBA budget alone can support a parallel position for 7 months. The OBA created a surplus during the 10 years that we were an independent entity. The surplus allows us to absorb costs during time periods when we have a lull in applications/revenue. At the end of September 2024, our surplus was $240.000.00. I expect the surplus to drop until the end of November, when we start to receive February exam applications. 7 months of salary and benefits for my position is about $110,000.00. If the plan is to fund the parallel position through surplus, I believe there may be some additional factors on the horizon that could impact the OBA budget in the future and require surplus funds. For example, there is a new bar exam in the works which is more expensive, and the extent of the financial impact on the OBA budget is uncertain.

This is just an overview of the issues, but I am happy to meet with you and Mary to move forward with a transition plan.

CONFIDENTIAL

Thank you for your support,

Sherry

Sherry Hieber
General Counsel
N.H. Office of Bar Admissions
One Granite Place, Suite N400
Concord, N.H. 03301
shieber@courts.state.nh.us

**From:** Dianne Martin <Dmartin@courts.state.nh.us>
**Sent:** Tuesday, November 5, 2024 7:12 AM
**To:** Sherry Hieber <SHieber@courts.state.nh.us>
**Subject:** Congratulations and next steps

Good morning, Sherry,

I spoke with the chief on Friday and he asked me to connect with you on your retirement 'congratulations!! - I also know this is confidential now so I won't share further and we can talk about how you want to message) and posting a GC position to work with you during the next two bar exams so they can learn from your many years of experience and the court can avoid having things fall apart when you retire (although it is undisputed you are irreplaceable).

We would need to create a parallel position to yours. Perhaps Interim or some other title so it is clear you retain the position. We will also need to determine cost and make sure your budget can support both. Could you please take a look at your surplus and let me know if it could support two GCs (salary and benefits) for 7 months? I'd be happy to get on a call or teams to work through any issues.

On the assistant position, Takhmina mentioned you were hoping to create a higher-level position that will take on more independent responsibility. Our highest administrative position is the executive assistant. That is a LG35. My assistant is in this category - they are typically very experienced assistants who sometimes are paralegals or have other expertise. The next option might be a senior paralegal - LG29. Let me know if either of those sounds right. Again, happy to discuss.
Thanks,
Dianne

Dianne Martin, Esq., Director

New Hampshire Judicial Branch

One Granite Place, Suite N400

# 14. February 27, 2025 Text from Chief Justice Gordon J. MacDonald to Justice Patrick Donovan and Justice Melissa Countway

CONFIDENTIAL

9:17 5G

2 People

Text Message · RCS
Feb 27, 2025 at 7:42 PM

Gordon MacDonald

Patrick and Melissa, I recognize and accept that I am badly out-numbered. None-theless, I feel com-pelled to share two thoughts that I hope you might consider as you approach to-morrow.

Forst, I think the most

CONFIDENTIAL

9:17 5G

2 People

Forst, I think the most accurate description of the situation is that DM's skill sets do not match what is required for the role. That, however, does not diminish her extraordinary dedication, hard work and accomplishments. I cannot tell you how many times she rose to the occasion to help on a mission critical task when

+ Text Message • RCS

CONFIDENTIAL

9:17

2 People

help c ... tion critical task when others fell short on no one was around. She certainly has not acted with anything remotely approaching malice or bad faith. Therefore, she should be afforded every degree of dignity and respect at this difficult moment. I take real issue with showing her the door. It will be highly and unnecessarily embar-

CONFIDENTIAL

8:17 5G

2 People

neces[illegible]bar-
rassing as well as
disruptive, particular-
ly for those close to
her.

Second, I regret that
my plea about timing
was not honored.
The Court is facing,
simultaneously, an
unprecedented num-
ber of extraordinary
challenges: a diffi-
cult budget season,
the ABHM situation
and associated litiga-

CONFIDENTIAL

9:17 5G

2 People

ber of ... linary
challenges: a diffi-
cult budget season,
the ABHM situation
and associated litiga-
tion, JB's impending
departure, and a
crushing workload.
Externally, this news
will be received in
this context and will
likely engender less,
not more, faith in us.
For me, personally,
my job uniquely re-
quires bearing all of
this. The stress for

CONFIDENTIAL

9:17 5G

2 People

not m... in us. For me, personally, my job uniquely requires bearing all of this. The stress for me -- already high -- will only be compounded by the inevitable dysfunction flowing from the fact that she handled so much personally. In a situation which we can control, I think it is a mistake not try to facilitate some reasonable, professional

CONFIDENTIAL

9:17 5G

2 People

can control, I think it is a mistake not try to facilitate some reasonable, professional transition. We at least need a transition memo outlining where various projects stand, deadlines and next steps. Without something like that, we will be flying blind and potentially into some liabilty.

CONFIDENTIAL

9:17 5G

2 People

Thank you for considering these points. There is no need to reply. I wish you the best tomorrow.

Gordon

Feb 28, 2025 at 7:41PM

Gordon MacDonald

I need to see all communications about the Dianne communication asap. I do not know what the

CONFIDENTIAL

9:18 5G

2 People

Gordon MacDonald

I need to see all communications about the Dianne communication asap. I do not know what the staff have been told. I need to work with them this weekend to address the several urgent problems this has already spawned.

We met with AOC staff and told them that Dianne is no

CONFIDENTIAL

9:18

2 People

has al... ...awned.

We met with AOC staff and told them that Diane is no longer the director and that Chris Keating is stepping in on an interim basis

Feb 28, 2025 at 11:39 PM

Patrick Donavan

We also gave Erin a summary as to the basis of our decision

CONFIDENTIAL

9:18 5G

2 People

Mar 1, 2025 at 7:52 AM

Gordon MacDonald

Have you locked her out of her account so that she could not re-trieve the capital budget drafts upon our request?

Mar 1, 2025 at 10:17 AM

Patrick Donovan

Yes we disabled her access

Mar 1, 2025 at 5:20 PM

Text Message • RCS

CONFIDENTIAL

9:18 5G

2 People

Mar 1, 2025 at 5:20PM

Gordon MacDonald

Do you have a copy of a presentation given earlier this week by Matt and Julie on ecourt? If so, I need an electronic version asap.

Patrick Donovan

No but I will ask

Mar 3, 2025 at 12:16PM

Gordon MacDonald

+

CONFIDENTIAL

9:18 5G

2 People

Mar 3, 2025 at 12:16 PM

Gordon MacDonald

Was Dianne placed on paid leave?

Patrick Donavan

That's up to you

We didn't take her off payroll

At Deb Fords recom- mendation we com- municated that this was a termination but [illegible]

CONFIDENTIAL

8:18 5G

2 People

At Deb Fords recommendation we communicated that this was a termination but that we can restructure it differently if she wished to accept the other position. Placing her on leave exposes us to a further FMLA leave.

# 15. Justice Melissa Countway and Justice Patrick Donovan Notes Re: Meeting with Attorney Dianne Martin

CONFIDENTIAL

2/28/25

Meeting w/ Elaine -

PED

Restructure of AOC
NCSC Study + consolidate
mgt -> judicial officers
- Eliminate Position -
Consider Sherry there -
Need new transition
Budget
Nat'l Program -
Improve to Retain -
- Rehiring of [illegible] as Director of AOC -

- feels not getting support -
- wants to be heard -
denies abuse - retaliatory
disciplined - [redacted]

culture pre-existed

Not improved past King -

People ganged-up

Great / amazing People - she wants to succeed
small toxic group -

CONFIDENTIAL

- Not call Terminat
  call transiti -
- Message -

· Challenges [illegible] -

defends duties she does -

· Knows [redacted] not like [redacted]
· Re-exiting -

Eventually will be Judge -

Works 6:30 - 6:45
Concerns re HR: unstable
cries all the time

· recent traumatic -
must manage the emotion

[redacted]
no one ever heard say anything inappropriate -
never said or heard -

[redacted] - working 100 hrs year
no recognition.
Work remotely 1-week - Take 1 week vacation - Break

CONFIDENTIAL

On that day - [redacted] reported to [redacted]
that [redacted] & Diane
[redacted] yelled @ her -
[redacted] met
[redacted] called [redacted] - & said [redacted] yelling -
[redacted] told Diane -

[redacted] cries a lot - very emotional -

Not know enough to understand
- work load -

Speak w/others for perspective

[redacted] - very angry re Chief
transfer to the Director -

HR Personnell Files not updated
Things not updated for long time

Had to do unpopular things
Exposed to a lot of Risk - HR
unhappy w/changes -

Will discuss w/Husband -
would be horrifying experience -

CONFIDENTIAL

Credit for Hires

Ran [redacted] attendance -
Remote - appeared 2x

A lot of Problems

[redacted] great job

Surprised re [redacted] - look into

[redacted] - left 1x - better perspective

[redacted] great job -

99% Fabulous - Worked very hard
Would consider severance?
Never inappropriate abusive unkind
never disciplined retaliated

-Some not like what had to do -
-Culture judges more powerful -
8 / Projects - Die b/c people not want to do - Get Done + Do it - w/kindness

CONFIDENTIAL

Group not transparent not data
Chief wants Data
S-court - level of hatred is huge -

Right for Public - some not agree what asked -
Resources -

Dyling

Legislature - Tues re Cap. Budget -
2012 Reports
$\frac{3}{4}$ 1:00
Promises not delivering on -
Give the $ Back

Mon

Wed - Cttee. Coop Courts -
Chief Budget
[redacted] Update -
$ IEA judges + Staff -

Right for Entity -
Be Brave - People unhappy -

CONFIDENTIAL

**Justice Patrick E. Donovan**

| | |
|---|---|
| **From:** | Justice Patrick E. Donovan |
| **Sent:** | Friday, March 7, 2025 1:49 PM |
| **To:** | Justice Melissa Countway |
| **Subject:** | Diane Martin |

A few bullet points that may not be captured in your notes.
After we discussed the possible restricting of the OAC, you indicated that we were flexible wanted her to consider a transition to enable her to attain whatever retirement benefits she needed to vest and that we wanted a smooth transition that protected her reputation and the branch at the same time.
Diane stated that she gets no support from the Chief, although she has repeatedly asked for any support by way of repeated emails
I recall her telling us that [redacted] was "investigating" [redacted] production and days in the building. She failed to tell us that she put [redacted] out to work remotely in response to some disagreement.
I thought the [redacted] thing involved [redacted] yelling at someone else in HR and [redacted] admonished [redacted] for doing so (maybe that is when [redacted] yelled at [redacted] She had no knowledge of [redacted] verbally accosting [redacted] after the meeting with the auditor.
Denied that employees have approached her about [redacted] behavior. Denied telling employees to just get over it.
She started naming names of people who don't like her and asked why we have not spoken to other employees who support her, was told that we haven't spoken to ANY current employees, just employees who have left and told us they did not want to leave but felt like they had to.
Represented that she worked with the [redacted] on a regular basis which contradicted information received directly from [redacted]

That is all I have at the moment.

Patrick E. Donovan
Associate Justice
N.H. Supreme Court
One Charles Dow Drive
Concord, NH 03301
pdonovan@courts.state.nh.us

CONFIDENTIAL

# MEMO

**To:** GJM

**From:** PED and MBC

**CC:** JPB

**Date:** 03/12/2025

**Re:** Notes from Meeting with Dianne Martin 02/28/2025

**COMMENTS:** Attached please find combined notes from PED and MBC from meeting with Dianne Martin on 2/28/25.

CONFIDENTIAL

Notes from Meeting with Diane Martin 2/28/25

--see MBC contemporaneous handwritten notes; this document was prepared by MBC and PED based on our notes and recollection of the discussion.

PED began with the plan that we are contemplating a restructuring the AOC; working with NCSC to study and consolidate and put management with a judicial officer

As such your position may be eliminated or replaced with a COO-type of position
We would like you to consider Sherry Hieber's position, which we need to fill now and would like to have a new person transition into

In that position you can continue help with budget and national programs; working with GJM

It is important to us to retain you

But we are relieving you of duties as director of AOC

MBC added clarification and emphasized wanting to have a positive transition; however we have had concerns about DM's management style and heard from a number of exit interviews of same pattern

MBC explained that we are concerned with the culture at AOC
We emphasized that we wanted a positive transition and are offering her another job

After we discussed the possible restricting of the OAC, MBC indicated that we were flexible wanted her to consider a transition to enable her to attain whatever retirement benefits she needed to vest and that we wanted a smooth transition that protected her reputation and the branch at the same time.

DM said she feel she is not getting the support she needs; Diane stated that she gets no support from the Chief, although she has repeatedly asked for any support by way of repeated emails

She wants to be heard; she denies any abuse or retaliatory conduct; she said she did discipline [redacted] and [redacted]

While saying she never disciplined anyone, she acknowledged disciplining [redacted] and [redacted] but if we looked at the files we would understand why

She said the culture pre-existed her

PED notes that no improvement post Judge King's departure as admin judge and no improvement since the investigation of [redacted] claims. Diane responded that she had been out from July to January

CONFIDENTIAL

DM said people ganged up on her but that there are also great amazing people that she wants to succeed;

But there is a small toxic group there

Conversation shifts to us saying we don't need to call this a termination; can classify it as a transition and DM can be part of the messaging

DM challenges the fairness and defends her duties

She states she knows that [redacted] does not like her and neither does [redacted]

She attributes to pre-existing conditions and understands the position will eventually be a judge

She works 645 am to 630 pm

She has concerns re the new HR Director. She spent a lot of time explaining that [redacted] is very emotional that she has suffered serious trauma and as a result cries very easily
Said she "must manage through emotions"

She denied any issues with [redacted] She said "no one ever heard her say anything inappropriate" [redacted] never said anything wrong and no one has heard that.

She had no knowledge of [redacted] verbally accosting [redacted] after the meeting with the auditor.
Denied that employees have approached her about [redacted] behavior. Denied telling employees to just get over it.

Said that [redacted] reported something about [redacted]
Then said that people had made reports to her and so she told [redacted] to work remotely for one week and take a one week vacation b/c she needed a break; she works 100 hours per week and just needed a break to take care of things

She said that [redacted] reported that [redacted] yelled at [redacted]

[redacted] called [redacted] and said [redacted] was yelling and [redacted] told [redacted]

Repeated that [redacted] cries a lot and is very emotional

We don't know enough to understand

CONFIDENTIAL

Her work load

We should speak with others for perspective

[redacted] is very angry re the Chief and that was transferred to the director

The HR personnel files are not updated; things have not been updated for a long time and things are a mess

She has had to do a lot of unpopular things; branch is exposed to a lot of risk in HR; people are unhappy with changes

She stated that she has not been supported or recognized for her work. MBC stated that we appreciated all of her many accomplishments as the Director and that we understood that it is a difficult job.

She complained that she does not have a manager. MBC points out that as director she should not need a manager; she complained that she did not have support; she felt she should have had a manager; MBC points out that we want someone in that role that can support us

She stated that she could only be terminated for cause. PED stated we have cause

She said she had no idea there were issues; MBC stated the independent investigation this summer identified problems in the culture

She said that [redacted] was monitoring [redacted] emote work and discovered that she has only worked in person on two days. [we were later told that [redacted] was told to work remotely after some disagreement with Diane and that is how Diane reprimands people]

Regarding the other job offer; that would be "horrifying experience" she will speak with her husband
MBC says can work through issues of office location

She wants credit for her new hires

There are a lot of problems at the AOC per Diane

She started naming names of people who don't like her and asked why we have not spoken to other employees who support her, was told that we haven't spoken to ANY current employees, just employees who have left and told us they did not want to leave but felt like they had to.

Represented that she worked with the [redacted] on a regular basis which contradicted information received directly from [redacted] [told us in prior meeting the Justice

CONFIDENTIAL

HM asked her to manage and supervise [redacted] because Justice HM was having trouble managing her]

But good people: [redacted] she is surprised we have heard anything concerning re [redacted] left once and has better perspective; [redacted] does a great job

99% fabulous and worked very hard

PED asks would she consider a severance or settlement; she seems open to the concept [redacted]

She says she was never inappropriate, abusive, unkind; never disciplined anyone ; never retaliated

Some people do not like what she had to do

The culture is that judges are more powerful

She got lots of money for projects; she would die b/c people not wanting to do things; she gets things done and does it with kindness. MBC stated that we recognize that Diane brought a lot of grant and ARPA money into the branch. PED agreed and stated that the Court had put a great deal of thought and time into making this difficult decision.

She discussed that the group was not transparent and there was no data and the chief wants data
Regarding e-court the level of hatred is huge

Right for the Public but some do not agree with what is asked
Expressed she wished she had not taken this job

Lack of resources and the AOC is dying but she does what is right for the entity; she is brave but people are unhappy.

CONFIDENTIAL

# 16. Emails between Attorney Dianne Martin, Attorney Erin Creegan and Chief Justice Gordon J. MacDonald Re: Transition Items

CONFIDENTIAL

Outlook

## RE: Transition items

From Erin Creegan <ECreegan@courts.state.nh.us>
Date Tue 3/4/2025 7:31 PM
To Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>

This is not great in terms of her experience of what happened, I had not heard most of this. But as a positive, it does seem like there may be a landing zone for a negotiated resolution that will really mitigate risk to the Branch and also maybe mitigate any damages to Dianne. Most of this looks like things that we would be happy to do.

Questions:
-The toughest I think is maintaining the same salary. Maybe you have a different view. DOJ told me (in response to a q from Justice Donovan) the AG often does 1-2 months salary to settle a low merit suit. For Dianne, the difference between her current salary and my salary is 25k a year. That would be 2 months of current salary. Maybe instead of a commitment to hold the salary and grade, a year of current salary and grade (which would allow her to find another job if she wants) but then we have to take the salary to its normal level (budgeting issues!). Alternately, make up the difference of one year's salary in a negotiated settlement, which she gets up front.
-Do we want a release of any kind? DOJ would want that, but tough subject to broach.
-Going to have to figure out how that week impacts longevity and gap with HR. Might require unpaid leave or something strange. Maybe Becky Plourde and HRSU can figure this out.

What do you think?

**From:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Sent:** Tuesday, March 4, 2025 7:13 PM
**To:** Erin Creegan <ECreegan@courts.state.nh.us>
**Subject:** Fw: Transition items

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

**From:** Dianne Martin <[redacted].com>
**Sent:** Tuesday, March 4, 2025 6:15:00 PM
**To:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Subject:** Re: Transition items

| |
|---|
| **EXTERNAL EMAIL WARNING!** This email originated outside of the New Hampshire Judicial Branch network. Do not click on links or open attachments unless you recognize the sender and are expecting the email. Mouse over links to confirm the target before you click. Do not enter your username and password on sites that you have reached through an email link. Forward suspicious and unexpected messages to 'suspicious@courts.state.nh.us'. |

Thank you for this email, Gordon, and the plan to correct the record. I really appreciate you recognizing my hard work, accomplishments, and the sacrifices that have been made over the years, particularly by my family. I was

incredibly distraught after what happened Friday. CONFIDENTIAL

I am not sure how much you have heard about the way this was handled, so I will describe it in more detail. Last Tuesday, I received a request to meet with Justices Donovan and Countway on Friday at 10am. Assuming that this would be a normal meeting, I prepared to update the Justices on ongoing matters.

The meeting was anything but normal. With no prior notice, I was informed the Court was working with the National Center for State Courts to reorganize and my nonjudicial position as Director of the Administrative Office of the Courts (AOC) was being eliminated. I was being laid off and a judicial officer would be named to head the office. I was then offered a demotion to the position of counsel to the Office of Bar Admissions, a position in the AOC that reports to my current position and is at a lower labor grade. I was told the reorganization was going to be announced and that I needed to immediately respond so they could announce that I was accepting the other position at the same time.

[redacted] I was stunned and struggled to even comprehend what was being said. I was provided no advance notice of the purpose of this meeting and given no information in advance. I could not make a decision like that on the spot, without information, and alone. My heart was pounding, and my hands were shaking. I did my best with no notice or preparation to advocate for myself and my family. I explained the director position is a regular permanent position. It is not a term position, nor is it an at will position. No notice was given in the job offer or the job description that accepting this state position would put me at risk of loss of much needed state health insurance for my family, credit for my many years of longevity as a public servant, participation in the retirement plan, and the many other benefits earned over the years of state employment, by removal without notice. Even layoff has a process and notice is provided.

I will not get into the remainder of the meeting, but it felt like a personal attack without a full understanding of my role, the work I have been asked to do over the past few years, the hostility I have faced, or the rules, policies, and procedures in the branch.

The full import of this meeting and its impacts on the lives of me and my family hit me, and I began to cry. I said I needed a few days to consider the offer and talk with my family and consider the alternatives and their impact on my family and reputation. The Justices agreed. Justice Donovan indicated that if I was not interested in the offered position, he would look into a severance arrangement in the interim. I was then told that I needed to turn over my laptop and building access immediately and I was escorted from the building in a manner usually reserved for a terminated employee. I did not get to say goodbye to the people I have worked with for years. It was devastating, embarrassing, and very confusing. I was not and still have not been given access to my personal things. [redacted] prejudicial and non-disciplinary, so I should not have been treated this way.

I understand all of my colleagues were called together later that afternoon, with other members of the Administrative Council present, and informed I had been removed from my position. I do not believe they were told of the reorganization and layoff, as I was, or the non-prejudicial, non-disciplinary nature of that removal. Unfortunately, the inept way this was handled and announced could have reasonably caused my colleagues to believe that I was terminated for some egregious conduct that required immediate removal. After all, I was in the office earlier that morning doing my job and talking with everyone. It has been reported to me that the "word on the street" is that I was terminated. It is not clear why this was handled this way, with this approach and timing, but the potential harm to me and my reputation is clear. I have represented nearly every agency in the state and this branch, and I have never seen anything like this before.

I have since received many messages from the people I have worked with, sending messages of concern and thanking me for what I have done for them. One said, "I was sad to hear you will no longer be with the Judicial Branch. Thank you for your guidance and help as I have grown in several roles at the Judicial Branch in the past several years. I appreciated the time you took to listen and help me with various ideas and projects...You have been a remarkable person to work for, with an amazing ability to remember detail and a gift for working with people of all sorts of personalities. Wishing you the best. Another wrote, "Hi Dianne, I just want to say that working with you has been an absolute privilege. I've learned so much from you, and truly appreciate the experience. I wish you nothing but success and happiness moving forward."

As you are aware, during my tenure, systemic changes and other directives from you and the Court have been implemented. Many, like the transfer of the treatment courts, and the plan to create data dashboards and a document access portal, while legal, ethical, and appropriate, have not been popular with some members of the branch. As the person tasked with implementation in many cases, I have been subjected to hostility and even false claims. You have cautioned me to "watch your back," particularly with regard to the Circuit Court administration. Despite that, I have tried to implement the Court's agenda in a professional, kind, and ethical manner. When I raised a concern about being targeted, I was told the Court has my back and I relied on that in doing my job. Based on some of the statements during my meeting on Friday and the handling of this matter, it is clear they did not.

CONFIDENTIAL

I have worked tirelessly to perform the numerous and varied responsibilities of the Director role, routinely working 60-70 hours or more per week. I regularly arrive at 6:45 am and depart at 5:30 or 6pm, just to go home to work more. In nearly seventeen years working for the State, I have never received a negative performance evaluation or any kind of discipline. As you confirmed in your email, it has been my understanding that you have been pleased with my performance. I have only just returned [redacted] continue to use FMLA leave on an intermittent basis. [redacted] I have continued to devote the time and effort necessary to perform my duties to the best of my ability.

Ultimately, I recognize that it is the Court's prerogative to reorganize the branch and implement that through layoffs. Had I been asked, I would have assisted with implementation of this reorganization and ensured it was handled appropriately, even if my position was affected. In fact, I have demonstrated my ability to do that in the past at the PUC when we reorganized and created the Department of Energy. I handled it as a professional. I have had access to the highest level of sensitive information for years and have demonstrated my trustworthiness working with you for a very long time.

Given what happened last week and how I have been treated here, I know you will understand why I am incredibly hesitant to work at the Judicial Branch anymore. [redacted] the ability to continue my state health insurance without interruption is paramount. After much discussion with my family, unless severance and family health benefits can be provided for an extended period of time, I propose the following:

- Layoff effective March 21 and I remain on paid leave through the 21st without a reduction in my leave balances or accruals. The rules provide 21 days' notice for layoff. Payout computation as defined by the personnel rules for layoff.
- I will accept the OBA General Counsel position offered with a start date on March 28 at my current rate of pay (labor grade and step), with written confirmation of Justice Countway's representation that the position can be done fully remotely. Please confirm there is no plan to eliminate this position through the next biennium.
- A written waiver of any probationary period for the new position.
- My benefits and longevity will not have any gap.
- The message described in your email will be sent out to the branch and it will also be clarified for the group that was gathered on Friday that this change resulted from the Court's work with the NCSC and reorganization and is non-prejudicial and non-disciplinary .
- You will provide a positive recommendation along the same lines as your email, in recognition of my significant work and contributions to the branch, noting the layoff due to administrative reorganization. This will allow me to mitigate the impacts of what happened in the future.
- I will report to you (this position has functioned nearly entirely separately from the AOC Director during my tenure. The only think I have done is approve leave and time.)
- If Denise and Bibiana are willing and it is possible, make the positions equivalent and transfer the two between the assistant positions (Director's and OBA GC Assistant).
- I will continue to work with the CRTC students as I previously have.
- I have a planned vacation at the end of June and may need to be permitted to take unpaid leave part of the time if necessary, depending on how much leave I accrue by then.

The handling of this situation does not reflect well on the Branch and has had a significant impact on me that I have not fully described here. This proposal won't make it right, but it will allow me and my family to reduce the negative consequences and move forward.

I truly hope the work that I have done and the incredible people I have hired have laid the foundation for a better future for those at the Judicial Branch. May this never happen again.

Dianne

---

**From:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Date:** Monday, March 3, 2025 at 5:04 PM
**To:** Dianne Martin <[redacted].com>
**Subject:** RE: Transition items

Dianne,

CONFIDENTIAL

**I am learning some of what happened last week.**

**As the constitutional administrative head of the Branch, I know better than anyone that you gave exceptional service to the Judicial Branch, and your accomplishments are many. The people of New Hampshire will benefit from your contributions for years to come, particularly in the areas of safety and security, mental health, access to justice and domestic violence, among others. I am very grateful to you and to your family for all of the sacrifices you made to advance our mission. This is a proud chapter is your long public service career.**

**I had hoped, and continue to hope, that we could continue to benefit from all you have to offer as the general counsel of the office of bar admissions. The challenges in the field of bar admissions are great, and there is enormous opportunity to better serve the public through reform. That said, while the position promises the reward of professional challenges, it is manageable in terms of workload and demands. It is certainly far more manageable in terms of hours and stress. I have been involved in the field of bar admissions since 2014; the people involved are smart, full of integrity and deeply committed to making our profession better. I think you would be an excellent fit. As you know, this subject is a particular passion of mine. Having a person of your intelligence, competence, and diligence in this position could make a positive change in the lives of many.**

**I very much hope you will consider accepting this position. I have an image in my mind of announcing that you have graciously agreed to continue serving the Branch and recounting your many accomplishments to the full court system, and working together to see big things happen in a job that I hope will also work for you, while you serve others.**

**Gordon**

**From:** Dianne Martin <[redacted].com>
**Sent:** Monday, March 3, 2025 08:45
**To:** Erin Creegan <ECreegan@courts.state.nh.us>
**Cc:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Subject:** Transition Items

| |
|---|
| **EXTERNAL EMAIL WARNING!** This email originated outside of the New Hampshire Judicial Branch network. Do not click on links or open attachments unless you recognize the sender and are expecting the email. Mouse over links to confirm the target before you click. Do not enter your username and password on sites that you have reached through an email link. Forward suspicious and unexpected messages to 'suspicious@courts.state.nh.us'. |

Good morning, Erin,

There are a few things I want to make sure are on your radar. This Thursday from 9:30 am - 11am, the students from the Concord High Regional Technical (CRTC) program are coming. You may remember this from last year. Each year I work with students who want to be lawyers or work with the law in their careers and they come over for several visits on Thursdays. I am hoping someone can take this on so these students will still have their planned externship. Bibiana has the school's contact information and has been in touch with the program.

I generally start by giving them the overview of the branch in the first week (I used the Chief's powerpoint that he did for the Jaffrey Library presentation - he will know which one that is). The second through fourth weeks, I work with Kate Geraci, Jen Uhouse, and Tim Gudas to arrange visits at the three Concord courts so the students can observe court in process and talk with the judges. I also check with Alex to see if there is an opportunity to visit a treatment court. When I need a gap filler for a week, I arrange to have several of the AOC employees speak with them about their careers so the students can hear more about the options. One of the students is the child of immigrants who moved hear three years ago. She is keenly interested in working in the FBI, so I told her about you and said perhaps you could speak with her about your experience.

I have also had the students meet with the chief or another justice for one day in the past so they can hear about their careers. The rest of the time I spend working with the students to prepare for a mock oral argument at the supreme court, which is done on the last day. I arrange for a panel of judges (historically, it has been me, and Tim, and one other person, so Tim would be a good person to connect with on this - he provided me the case materials and I have used that case every year.) Each student takes one of the roles in the case and argues that position and the judges ask questions. I invite the parents and teachers from the school. It is really awesome to watch. Bibiana has all of the contact information for the school. I am hopeful someone can still take this on as it would be awful to let these kids and the program down now. It is set to start this week. Please let me know if you need any more information or if I can help in any way. I

At the chief's request, I was supposed to meet with Brian Moushegian this morning at 7am to walk him around the Fiscal Department space to see if he felt it could work for the ADO. It dawned on me early this morning so I texted him and let him know I could not be there. I spoke with him last week and explained the space is not ideal but might be workable if workstation style offices can be added (actual construction would be cost prohibitive - we have priced out several scenarios at OGP and it is very significant). The issue is it does not have sufficient offices and an access door would likely need to be added so ADO employees could enter through the kitchen rather than walking through the open space in the court area. Perhaps that is not necessary, it depends on how much separation and barriers to hearing the court's work you decide are necessary. It would require building a few offices that are the full wall work stations with doors. We did this at the PUC for attorneys and it worked pretty well. It would also require relocating any folks in there - when I have been down there, only one Fiscal Department employee has been in there (Cindy King) and the two OBA employees are in. Donna's office is in there, but Sean reported she had only been in twice in the prior thirty days, so it may not be an issue if she is permitted to work fully remotely. The logistics will be challenging but if Brian thinks it is workable, the Chief wanted to consider it in an effort to further support the budget reductions and be more efficient.

The capital budget presentation is on Tuesday. I had spoken with Jackie early last week as I was preparing. She is the who had historically done the presentation and managed the capital budget and I was working on preparing for this on Friday. Jackie recommended starting with the report to the legislature on the capital budget I had done in 2023 because she said it was very good, and updating the numbers. I am hoping someone can track that down for whoever will handle. The plan was to have that completed on Friday and then she and Irena were going to review.

The Committee on Cooperation with the Courts meeting is Wednesday at 4pm. The Chief is presenting on the budget first and Irena and her team are then presenting on the OACE projects. Any powerpoints need to be submitted the day before.

On Thursday, I planned to meet with Alex and Tanya to go over the Byrne SCIP presentation and request in light of more information about the funding available. I spoke with DOJ last week and they were going to send me additional information. This is likely something they can update and the chief can review. He has been fully in the loop on decision-making for this.

The Supreme Court approved the recommendation of the group to investigate the reported complaint[redacted]This is the one that [redacted]recently weighed in on and everyone agreed should be investigated. I had planned to assign you as the investigator with [redacted]as your partner, so she could learn the process for a government investigation from you. This or whatever approach you all decide is best will need to be implemented. For a future one, I planned to do the same for [redacted]y

CONFIDENTIAL

thought was the branch and team can benefit greatly from downloading your knowledge and experience in this area before you head off to greener pastures.

Dianne

CONFIDENTIAL

Outlook

**FW: Transition items**

**From** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Date** Tue 3/11/2025 10:07 AM
**To** Erin Creegan <ECreegan@courts.state.nh.us>

CONFIDENTIAL

**From:** Chief Justice Gordon MacDonald
**Sent:** Wednesday, March 5, 2025 14:52
**To:** Dianne Martin <[redacted].com>
**Subject:** RE: Transition items

**Dianne,**

**Thank you very much for your email.**

**I would like to get this resolved asap, and we have started working through the items. I will likely need a few days to get through them all.**

**Thank you, again.**

**Gordon**

**From:** Dianne Martin <[redacted].com>
**Sent:** Tuesday, March 4, 2025 18:15
**To:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Subject:** Re: Transition items

**EXTERNAL EMAIL WARNING!** This email originated outside of the New Hampshire Judicial Branch network. Do not click on links or open attachments unless you recognize the sender and are expecting the email. Mouse over links to confirm the target before you click. Do not enter your username and password on sites that you have reached through an email link. Forward suspicious and unexpected messages to 'suspicious@courts.state.nh.us'.

Thank you for this email, Gordon, and the plan to correct the record. I really appreciate you recognizing my hard work, accomplishments, and the sacrifices that have been made over the years, particularly by my family. I was incredibly distraught after what happened Friday.

I am not sure how much you have heard about the way this was handled, so I will describe it in more detail. Last Tuesday, I received a request to meet with Justices Donovan and Countway on Friday at 10am. Assuming that this would be a normal meeting, I prepared to update the Justices on ongoing matters.

The meeting was anything but normal. With no prior notice, I was informed the Court was working with the National Center for State Courts to reorganize and my nonjudicial position as Director of the Administrative Office of the Courts (AOC) was being eliminated. I was being laid off and a judicial officer would be named to head the office. I was then offered a demotion to the position of counsel to the Office of Bar Admissions, a position in the AOC that reports to my current position and is at a lower labor grade. I was told the reorganization was going to be announced and that I needed to immediately respond so they could announce that I was accepting the other position at the same time.

[redacted] I was stunned and struggled to even comprehend what was being said. I was provided no advance notice of the purpose of this meeting and given no information in advance. I could not make a decision like that on the spot, without information, and alone. My heart was pounding, and my hands were shaking. I did my best with no notice or preparation to advocate for myself and my family. I explained the director position is a regular permanent position. It is not a term position, nor is it an at will position. No notice was given in the job offer or the job description that accepting this state position would put me at risk of loss

CONFIDENTIAL

of much needed state health insurance for my family, credit for my many years of longevity as a public servant, participation in the retirement plan, and the many other benefits earned over the years of state employment, by removal without notice. Even layoff has a process and notice is provided.

I will not get into the remainder of the meeting, but it felt like a personal attack without a full understanding of my role, the work I have been asked to do over the past few years, the hostility I have faced, or the rules, policies, and procedures in the branch.

The full import of this meeting and its impacts on the lives of me and my family hit me, and I began to cry. I said I needed a few days to consider the offer and talk with my family and consider the alternatives and their impact on my family and reputation. The Justices agreed. Justice Donovan indicated that if I was not interested in the offered position, he would look into a severance arrangement in the interim. I was then told that I needed to turn over my laptop and building access immediately and I was escorted from the building in a manner usually reserved for a terminated employee. I did not get to say goodbye to the people I have worked with for years. It was devastating, embarrassing, and very confusing. I was not and still have not been given access to my personal things.[redacted]. Layoff is non-prejudicial and non-disciplinary, so I should not have been treated this way.

I understand all of my colleagues were called together later that afternoon, with other members of the Administrative Council present, and informed I had been removed from my position. I do not believe they were told of the reorganization and layoff, as I was, or the non-prejudicial, non-disciplinary nature of that removal. Unfortunately, the inept way this was handled and announced could have reasonably caused my colleagues to believe that I was terminated for some egregious conduct that required immediate removal. After all, I was in the office earlier that morning doing my job and talking with everyone. It has been reported to me that the "word on the street" is that I was terminated. It is not clear why this was handled this way, with this approach and timing, but the potential harm to me and my reputation is clear. I have represented nearly every agency in the state and this branch, and I have never seen anything like this before.

I have since received many messages from the people I have worked with, sending messages of concern and thanking me for what I have done for them. One said, "I was sad to hear you will no longer be with the Judicial Branch. Thank you for your guidance and help as I have grown in several roles at the Judicial Branch in the past several years. I appreciated the time you took to listen and help me with various ideas and projects...You have been a remarkable person to work for, with an amazing ability to remember detail and a gift for working with people of all sorts of personalities. Wishing you the best. Another wrote, "Hi Dianne, I just want to say that working with you has been an absolute privilege. I've learned so much from you, and truly appreciate the experience. I wish you nothing but success and happiness moving forward."

As you are aware, during my tenure, systemic changes and other directives from you and the Court have been implemented. Many, like the transfer of the treatment courts, and the plan to create data dashboards and a document access portal, while legal, ethical, and appropriate, have not been popular with some members of the branch. As the person tasked with implementation in many cases, I have been subjected to hostility and even false claims. You have cautioned me to "watch your back," particularly with regard to the Circuit Court administration. Despite that, I have tried to implement the Court's agenda in a professional, kind, and ethical manner. When I raised a concern about being targeted, I was told the Court has my back and I relied on that in doing my job. Based on some of the statements during my meeting on Friday and the handling of this matter, it is clear they did not.

I have worked tirelessly to perform the numerous and varied responsibilities of the Director role, routinely working 60-70 hours or more per week. I regularly arrive at 6:45 am and depart at 5:30 or 6pm, just to go home to work more. In nearly seventeen years working for the State,

CONFIDENTIAL

I have never received a negative performance evaluation or any kind of discipline. As you confirmed in your email, it has been my understanding that you have been pleased with my performance. I have only just returned [redacted] and continue to use FMLA leave on an intermittent basis. [redacted] I have continued to devote the time and effort necessary to perform my duties to the best of my ability.

Ultimately, I recognize that it is the Court's prerogative to reorganize the branch and implement that through layoffs. Had I been asked, I would have assisted with implementation of this reorganization and ensured it was handled appropriately, even if my position was affected. In fact, I have demonstrated my ability to do that in the past at the PUC when we reorganized and created the Department of Energy. I handled it as a professional. I have had access to the highest level of sensitive information for years and have demonstrated my trustworthiness working with you for a very long time.

Given what happened last week and how I have been treated here, I know you will understand why I am incredibly hesitant to work at the Judicial Branch anymore. [redacted] For those reasons, the ability to continue my state health insurance without interruption is paramount. After much discussion with my family, unless severance and family health benefits can be provided for an extended period of time, I propose the following:

- Layoff effective March 21 and I remain on paid leave through the 21st without a reduction in my leave balances or accruals. The rules provide 21 days' notice for layoff. Payout computation as defined by the personnel rules for layoff.
- I will accept the OBA General Counsel position offered with a start date on March 28 at my current rate of pay (labor grade and step), with written confirmation of Justice Countway's representation that the position can be done fully remotely. Please confirm there is no plan to eliminate this position through the next biennium.
- A written waiver of any probationary period for the new position.
- My benefits and longevity will not have any gap.
- The message described in your email will be sent out to the branch and it will also be clarified for the group that was gathered on Friday that this change resulted from the Court's work with the NCSC and reorganization and is non-prejudicial and non-disciplinary .
- You will provide a positive recommendation along the same lines as your email, in recognition of my significant work and contributions to the branch, noting the layoff due to administrative reorganization. This will allow me to mitigate the impacts of what happened in the future.
- I will report to you (this position has functioned nearly entirely separately from the AOC Director during my tenure. The only think I have done is approve leave and time.)
- If Denise and Bibiana are willing and it is possible, make the positions equivalent and transfer the two between the assistant positions (Director's and OBA GC Assistant).
- I will continue to work with the CRTC students as I previously have.
- I have a planned vacation at the end of June and may need to be permitted to take unpaid leave part of the time if necessary, depending on how much leave I accrue by then.

The handling of this situation does not reflect well on the Branch and has had a significant impact on me that I have not fully described here. This proposal won't make it right, but it will allow me and my family to reduce the negative consequences and move forward.

CONFIDENTIAL

I truly hope the work that I have done and the incredible people I have hired have laid the foundation for a better future for those at the Judicial Branch. May this never happen again.

Dianne

**From:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Date:** Monday, March 3, 2025 at 5:04 PM
**To:** Dianne Martin <[redacted].com>
**Subject:** RE: Transition items

**Dianne,**

**I am learning some of what happened last week.**

**As the constitutional administrative head of the Branch, I know better than anyone that you gave exceptional service to the Judicial Branch, and your accomplishments are many. The people of New Hampshire will benefit from your contributions for years to come, particularly in the areas of safety and security, mental health, access to justice and domestic violence, among others. I am very grateful to you and to your family for all of the sacrifices you made to advance our mission. This is a proud chapter is your long public service career.**

**I had hoped, and continue to hope, that we could continue to benefit from all you have to offer as the general counsel of the office of bar admissions. The challenges in the field of bar admissions are great, and there is enormous opportunity to better serve the public through reform. That said, while the position promises the reward of professional challenges, it is manageable in terms of workload and demands. It is certainly far more manageable in terms of hours and stress. I have been involved in the field of bar admissions since 2014; the people involved are smart, full of integrity and deeply committed to making our profession better. I think you would be an excellent fit. As you know, this subject is a particular passion of mine. Having a person of your intelligence, competence, and diligence in this position could make a positive change in the lives of many.**

**I very much hope you will consider accepting this position. I have an image in my mind of announcing that you have graciously agreed to continue serving the Branch and recounting your many accomplishments to the full court system, and working together to see big things happen in a job that I hope will also work for you, while you serve others.**

**Gordon**

**From:** Dianne Martin <[redacted].com>
**Sent:** Monday, March 3, 2025 08:45
**To:** Erin Creegan <ECreegan@courts.state.nh.us>
**Cc:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Subject:** Transition items

CONFIDENTIAL

EXTERNAL EMAIL WARNING! This email originated outside of the New Hampshire Judicial Branch network. Do not click on links or open attachments unless you recognize the sender and are expecting the email. Mouse over links to confirm the target before you click. Do not enter your username and password on sites that you have reached through an email link. Forward suspicious and unexpected messages to 'suspicious@courts.state.nh.us'.

Good morning, Erin,

There are a few things I want to make sure are on your radar. This Thursday from 9:30 am - 11am, the students from the Concord High Regional Technical (CRTC) program are coming. You may remember this from last year. Each year I work with students who want to be lawyers or work with the law in their careers and they come over for several visits on Thursdays. I am hoping someone can take this on so these students will still have their planned externship. Bibiana has the school's contact information and has been in touch with the program.

I generally start by giving them the overview of the branch in the first week (I used the Chief's powerpoint that he did for the Jaffrey Library presentation - he will know which one that is). The second through fourth weeks, I work with Kate Geraci, Jen Uhouse, and Tim Gudas to arrange visits at the three Concord courts so the students can observe court in process and talk with the judges. I also check with Alex to see if there is an opportunity to visit a treatment court. When I need a gap filler for a week, I arrange to have several of the AOC employees speak with them about their careers so the students can hear more about the options. One of the students is the child of immigrants who moved hear three years ago. She is keenly interested in working in the FBI, so I told her about you and said perhaps you could speak with her about your experience.

I have also had the students meet with the chief or another justice for one day in the past so they can hear about their careers. The rest of the time I spend working with the students to prepare for a mock oral argument at the supreme court, which is done on the last day. I arrange for a panel of judges (historically, it has been me, and Tim, and one other person, so Tim would be a good person to connect with on this - he provided me the case materials and I have used that case every year.) Each student takes one of the roles in the case and argues that position and the judges ask questions. I invite the parents and teachers from the school. It is really awesome to watch. Bibiana has all of the contact information for the school. I am hopeful someone can still take this on as it would be awful to let these kids and the program down now. It is set to start this week. Please let me know if you need any more information or if I can help in any way. I

At the chief's request, I was supposed to meet with Brian Moushegian this morning at 7am to walk him around the Fiscal Department space to see if he felt it could work for the ADO. It dawned on me early this morning so I texted him and let him know I could not be there. I spoke with him last week and

explained the space is not ideal but might be workable if workstation style offices can be added (actual construction would be cost prohibitive - we have priced out several scenarios at OGP and it is very significant). The issue is it does not have sufficient offices and an access door would likely need to be added so ADO employees could enter through the kitchen rather than walking through the open space in the court area. Perhaps that is not necessary, it depends on how much separation and barriers to hearing the court's work you decide are necessary. It would require building a few offices that are the full wall work stations with doors. We did this at the PUC for attorneys and it worked pretty well. It would also require relocating any folks in there - when I have been down there, only one Fiscal Department employee has been in there (Cindy King) and the two OBA employees are in. Donna's office is in there, but Sean reported she had only been in twice in the prior thirty days, so it may not be an issue if she is permitted to work fully remotely. The logistics will be challenging but if Brian thinks it is workable, the Chief wanted to consider it in an effort to further support the budget reductions and be more efficient.

The capital budget presentation is on Tuesday. I had spoken with Jackie early last week as I was preparing. She is the who had historically done the presentation and managed the capital budget and I was working on preparing for this on Friday. Jackie recommended starting with the report to the legislature on the capital budget I had done in 2023 because she said it was very good, and updating the numbers. I am hoping someone can track that down for whoever will handle. The plan was to have that completed on Friday and then she and Irena were going to review.

The Committee on Cooperation with the Courts meeting is Wednesday at 4pm. The Chief is presenting on the budget first and Irena and her team are then presenting on the OACE projects. Any powerpoints need to be submitted the day before.

On Thursday, I planned to meet with Alex and Tanya to go over the Byrne SCIP presentation and request in light of more information about the funding available. I spoke with DOJ last week and they were going to send me additional information. This is likely something they can update and the chief can review. He has been fully in the loop on decision-making for this.

The Supreme Court approved the recommendation of the group to investigate the reported complaint [redacted]. This is the one that [redacted] cently weighed in on and everyone agreed should be investigated. I had planned to assign you as the investigator with [redacted] your partner, so she could learn the process for a government investigation from you. This or whatever approach you all decide is best will need to be implemented. For a future one, I planned to do the same for [redacted] My thought was the branch and team can benefit greatly from downloading your knowledge and experience in this area before you head off to greener pastures.

Dianne

CONFIDENTIAL

**Chief Justice Gordon MacDonald**

**From:** Erin Creegan
**Sent:** Monday, March 3, 2025 15:52
**To:** Chief Justice Gordon MacDonald
**Subject:** RE: Draft

**Dianne,**

**I am learning some of what happened last week.**

**As the constitutional administrative head of the Branch, I know better than anyone that you gave exceptional service to the Judicial Branch, and your accomplishments are many. The people of New Hampshire will benefit from your contributions for years to come, particularly in the areas of safety and security, mental health, domestic violence, I am very grateful to you and to your family for all of the sacrifices you made to advance our mission. This is a proud chapter is your long public service career.**

**I had hoped, and continue to hope, that we could continue to benefit from all you have to offer as the general counsel of the office of bar admissions. The challenges in the field of bar admissions are great, and there is enormous opportunity to better serve the public through reform. That said, while the position promises the reward of professional challenges, it is manageable in terms of workload and demands. It is certainly far more manageable in terms of hours and stress. I have been involved in the field of bar admissions since 2014; the people involved are smart, full of integrity and deeply committed to making our profession better. I think you would be an excellent fit. As you probably know, this subject is a particular passion of mine. Having a person of your intelligence, competence, and diligence in this position could make a positive change in the lives of many.**

**I really, really hope you will consider accepting this position. I have an image in my mind of announcing that you have so graciously agreed to continue serving the Branch and recounting your many accomplishments to the full court system, and working together to see big things happen in a job that I hope will also work for you, while you serve others. Please let me know if there is any way I can convince you to take this position.**

**Gordon**

**From:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Sent:** Monday, March 3, 2025 3:31 PM
**To:** Erin Creegan <ECreegan@courts.state.nh.us>
**Subject:** RE: Draft

**Would you mind editing with what you think would help? I would really appreciate it.**

**From:** Erin Creegan <ECreegan@courts.state.nh.us>
**Sent:** Monday, March 3, 2025 15:27
**To:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Subject:** RE: Draft

I think the content is good. I wouldn't want to change your voice to mine, but I would say to be as emphatic as feels authentic to you on past value in the Director position and how much you would like her to take the new position. Maybe it would be good to say how much you would like to communicate to the branch all her valued service in the Director role when making an announcement that she will stay with the Branch in a new role.

**From:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Sent:** Monday, March 3, 2025 2:31 PM

To: Erin Creegan <ECreegan@courts.state.nh.us> CONFIDENTIAL
Subject: Draft

For review and comment. Thank you.

DRAFT

Dianne,

I am learning some of what happened last Friday.

You gave exceptional service to the Judicial Branch, and your accomplishments are many. The people of New Hampshire will benefit from your contributions for years to come, particularly in the areas of safety and security, mental health, domestic violence, I am very grateful to you and to your family for all of the sacrifices you made to advance our mission.

I had hoped, and continue to hope, that we could continue to benefit from all you have to offer as the general counsel of the office of bar admissions. The challenges in the field of bar admissions are great, and there is enormous opportunity to better serve the public through reform. That said, while the position promises the reward of professional challenges, it is manageable in terms of workload and demands. It is certainly far more manageable in terms of hours and stress. I have been involved in the field of bar admissions since 2014; the people involved are smart, full of integrity and deeply committed to making our profession better. I think you would be an excellent fit.

Again, I hope you will give serious thought to this opportunity.

Gordon

Gordon J. MacDonald
Chief Justice
New Hampshire Supreme Court
One Charles Doe Drive
Concord, New Hampshire 03301
(603) 415-6742
GMacDonald@courts.state.nh.us

CONFIDENTIAL

**Chief Justice Gordon MacDonald**

**From:** Chief Justice Gordon MacDonald
**Sent:** Tuesday, March 11, 2025 10:07
**To:** Erin Creegan
**Subject:** FW: Transition items

**From:** Chief Justice Gordon MacDonald
**Sent:** Wednesday, March 5, 2025 14:52
**To:** Dianne Martin <[redacted].com>
**Subject:** RE: Transition items

**Dianne,**

**Thank you very much for your email.**

**I would like to get this resolved asap, and we have started working through the items. I will likely need a few days to get through them all.**

**Thank you, again.**

**Gordon**

**From:** Dianne Martin <[redacted].com>
**Sent:** Tuesday, March 4, 2025 18:15
**To:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Subject:** Re: Transition items

**EXTERNAL EMAIL WARNING!** This email originated outside of the New Hampshire Judicial Branch network. Do not click on links or open attachments unless you recognize the sender and are expecting the email. Mouse over links to confirm the target before you click. Do not enter your username and password on sites that you have reached through an email link. Forward suspicious and unexpected messages to 'suspicious@courts.state.nh.us'.

Thank you for this email, Gordon, and the plan to correct the record. I really appreciate you recognizing my hard work, accomplishments, and the sacrifices that have been made over the years, particularly by my family. I was incredibly distraught after what happened Friday.

I am not sure how much you have heard about the way this was handled, so I will describe it in more detail. Last Tuesday, I received a request to meet with Justices Donovan and Countway on Friday at 10am. Assuming that this would be a normal meeting, I prepared to update the Justices on ongoing matters.

The meeting was anything but normal. With no prior notice, I was informed the Court was working with the National Center for State Courts to reorganize and my nonjudicial position as Director of the Administrative Office of the Courts (AOC) was being eliminated. I was being laid off and a judicial officer would be named to head the office. I was then offered a demotion to the position of counsel to the Office of Bar Admissions, a position in the AOC that reports to my current position and is at a lower labor grade. I was told the reorganization was going to be announced and that I needed to immediately respond so they could announce that I was accepting the other position at the same time.

[redacted] I was stunned and struggled to even comprehend what was being said. I was provided no advance notice of the purpose of this meeting and given no information in advance. I could not make a decision like that on the spot, without information, and alone. My heart was pounding, and my hands were shaking. I did my best with no notice

CONFIDENTIAL

Given what happened last week and how I have been treated here, I know you will understand why I am incredibly hesitant to work at the Judicial Branch anymore. [redacted] For those reasons, the ability to continue my state health insurance without interruption is paramount. After much discussion with my family, unless severance and family health benefits can be provided for an extended period of time, I propose the following:

- Layoff effective March 21 and I remain on paid leave through the 21st without a reduction in my leave balances or accruals. The rules provide 21 days' notice for layoff. Payout computation as defined by the personnel rules for layoff.
- I will accept the OBA General Counsel position offered with a start date on March 28 at my current rate of pay (labor grade and step), with written confirmation of Justice Countway's representation that the position can be done fully remotely. Please confirm there is no plan to eliminate this position through the next biennium.
- A written waiver of any probationary period for the new position.
- My benefits and longevity will not have any gap.
- The message described in your email will be sent out to the branch and it will also be clarified for the group that was gathered on Friday that this change resulted from the Court's work with the NCSC and reorganization and is non-prejudicial and non-disciplinary.
- You will provide a positive recommendation along the same lines as your email, in recognition of my significant work and contributions to the branch, noting the layoff due to administrative reorganization. This will allow me to mitigate the impacts of what happened in the future.
- I will report to you (this position has functioned nearly entirely separately from the AOC Director during my tenure. The only think I have done is approve leave and time.)
- If Denise and Bibiana are willing and it is possible, make the positions equivalent and transfer the two between the assistant positions (Director's and OBA GC Assistant).
- I will continue to work with the CRTC students as I previously have.
- I have a planned vacation at the end of June and may need to be permitted to take unpaid leave part of the time if necessary, depending on how much leave I accrue by then.

The handling of this situation does not reflect well on the Branch and has had a significant impact on me that I have not fully described here. This proposal won't make it right, but it will allow me and my family to reduce the negative consequences and move forward.

I truly hope the work that I have done and the incredible people I have hired have laid the foundation for a better future for those at the Judicial Branch. May this never happen again.

Dianne

---

**From:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Date:** Monday, March 3, 2025 at 5:04 PM
**To:** Dianne Martin [redacted].com>
**Subject:** RE: Transition items

**Dianne,**

**I am learning some of what happened last week.**

**As the constitutional administrative head of the Branch, I know better than anyone that you gave exceptional service to the Judicial Branch, and your accomplishments are many. The people of New Hampshire will benefit from your contributions for years to come, particularly in the areas of safety and security, mental health, access to justice and domestic violence, among others. I am very grateful to you and to your family for all of the sacrifices you made to advance our mission. This is a proud chapter is your long public service career.**

**I had hoped, and continue to hope, that we could continue to benefit from all you have to offer as the general counsel of the office of bar admissions. The challenges in the field of bar admissions are great, and there is enormous opportunity to better serve the public through reform. That said, while the position promises the reward of professional challenges, it is manageable in terms of workload and demands. It is certainly far more**

CONFIDENTIAL

**Chief Justice Gordon MacDonald**

| | |
|---|---|
| **From:** | Chief Justice Gordon MacDonald |
| **Sent:** | Wednesday, March 5, 2025 14:52 |
| **To:** | Dianne Martin |
| **Subject:** | RE: Transition Items |

**Dianne,**

**Thank you very much for your email.**

**I would like to get this resolved asap, and we have started working through the items. I will likely need a few days to get through them all.**

**Thank you, again.**

**Gordon**

**From:** Dianne Martin <[redacted].com>
**Sent:** Tuesday, March 4, 2025 18:15
**To:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Subject:** Re: Transition Items

EXTERNAL EMAIL WARNING! This email originated outside of the New Hampshire Judicial Branch network. Do not click on links or open attachments unless you recognize the sender and are expecting the email. Mouse over links to confirm the target before you click. Do not enter your username and password on sites that you have reached through an email link. Forward suspicious and unexpected messages to 'suspicious@courts.state.nh.us'.

Thank you for this email, Gordon, and the plan to correct the record. I really appreciate you recognizing my hard work, accomplishments, and the sacrifices that have been made over the years, particularly by my family. I was incredibly distraught after what happened Friday.

I am not sure how much you have heard about the way this was handled, so I will describe it in more detail. Last Tuesday, I received a request to meet with Justices Donovan and Countway on Friday at 10am. Assuming that this would be a normal meeting, I prepared to update the Justices on ongoing matters.

The meeting was anything but normal. With no prior notice, I was informed the Court was working with the National Center for State Courts to reorganize and my nonjudicial position as Director of the Administrative Office of the Courts (AOC) was being eliminated. I was being laid off and a judicial officer would be named to head the office. I was then offered a demotion to the position of counsel to the Office of Bar Admissions, a position in the AOC that reports to my current position and is at a lower labor grade. I was told the reorganization was going to be announced and that I needed to immediately respond so they could announce that I was accepting the other position at the same time.

[redacted] was stunned and struggled to even comprehend what was being said. I was provided no advance notice of the purpose of this meeting and given no information in advance. I could not make a decision like that on the spot, without information, and alone. My heart was pounding, and my hands were shaking. I did my best with no notice or preparation to advocate for myself and my family. I explained the director position is a regular permanent position. It is not a term position, nor is it an at will position. No notice was given in the job offer or the job description that accepting this state position would put me at risk of loss of much needed state health insurance for my family, credit for my many years of longevity as a public servant, participation in the retirement plan, and the many other benefits earned over the years of state employment, by removal without notice. Even layoff has a process and notice is provided.

CONFIDENTIAL

- Layoff effective March 21 and I remain on paid leave through the 21st without a reduction in my leave balances or accruals. The rules provide 21 days' notice for layoff. Payout computation as defined by the personnel rules for layoff.
- I will accept the OBA General Counsel position offered with a start date on March 28 at my current rate of pay (labor grade and step), with written confirmation of Justice Countway's representation that the position can be done fully remotely. Please confirm there is no plan to eliminate this position through the next biennium.
- A written waiver of any probationary period for the new position.
- My benefits and longevity will not have any gap.
- The message described in your email will be sent out to the branch and it will also be clarified for the group that was gathered on Friday that this change resulted from the Court's work with the NCSC and reorganization and is non-prejudicial and non-disciplinary.
- You will provide a positive recommendation along the same lines as your email, in recognition of my significant work and contributions to the branch, noting the layoff due to administrative reorganization. This will allow me to mitigate the impacts of what happened in the future.
- I will report to you (this position has functioned nearly entirely separately from the AOC Director during my tenure. The only think I have done is approve leave and time.)
- If Denise and Bibiana are willing and it is possible, make the positions equivalent and transfer the two between the assistant positions (Director's and OBA GC Assistant).
- I will continue to work with the CRTC students as I previously have.
- I have a planned vacation at the end of June and may need to be permitted to take unpaid leave part of the time if necessary, depending on how much leave I accrue by then.

The handling of this situation does not reflect well on the Branch and has had a significant impact on me that I have not fully described here. This proposal won't make it right, but it will allow me and my family to reduce the negative consequences and move forward.

I truly hope the work that I have done and the incredible people I have hired have laid the foundation for a better future for those at the Judicial Branch. May this never happen again.

Dianne

**From:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Date:** Monday, March 3, 2025 at 5:04 PM
**To:** Dianne Martin <[redacted].com>
**Subject:** RE: Transition items

**Dianne,**

**I am learning some of what happened last week.**

**As the constitutional administrative head of the Branch, I know better than anyone that you gave exceptional service to the Judicial Branch, and your accomplishments are many. The people of New Hampshire will benefit from your contributions for years to come, particularly in the areas of safety and security, mental health, access to justice and domestic violence, among others. I am very grateful to you and to your family for all of the sacrifices you made to advance our mission. This is a proud chapter is your long public service career.**

**I had hoped, and continue to hope, that we could continue to benefit from all you have to offer as the general counsel of the office of bar admissions. The challenges in the field of bar admissions are great, and there is enormous opportunity to better serve the public through reform. That said, while the position promises the reward of professional challenges, it is manageable in terms of workload and demands. It is certainly far more manageable in terms of hours and stress. I have been involved in the field of bar admissions since 2014; the people involved are smart, full of integrity and deeply committed to making our profession better. I think you would be an excellent fit. As you know, this subject is a particular passion of mine. Having a person of your intelligence, competence, and diligence in this position could make a positive change in the lives of many.**

CONFIDENTIAL

**I very much hope you will consider accepting this position. I have an image in my mind of announcing that you have graciously agreed to continue serving the Branch and recounting your many accomplishments to the full court system, and working together to see big things happen in a job that I hope will also work for you, while you serve others.**

Gordon

**From:** Dianne Martin <[redacted].com>
**Sent:** Monday, March 3, 2025 08:45
**To:** Erin Creegan <ECreegan@courts.state.nh.us>
**Cc:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Subject:** Transition items

**EXTERNAL EMAIL WARNING!** This email originated outside of the New Hampshire Judicial Branch network. Do not click on links or open attachments unless you recognize the sender and are expecting the email. Mouse over links to confirm the target before you click. Do not enter your username and password on sites that you have reached through an email link. Forward suspicious and unexpected messages to 'suspicious@courts.state.nh.us'.

Good morning, Erin,

There are a few things I want to make sure are on your radar. This Thursday from 9:30 am - 11am, the students from the Concord High Regional Technical (CRTC) program are coming. You may remember this from last year. Each year I work with students who want to be lawyers or work with the law in their careers and they come over for several visits on Thursdays. I am hoping someone can take this on so these students will still have their planned externship. Bibiana has the school's contact information and has been in touch with the program.

I generally start by giving them the overview of the branch in the first week (I used the Chief's powerpoint that he did for the Jaffrey Library presentation - he will know which one that is). The second through fourth weeks, I work with Kate Geraci, Jen Uhouse, and Tim Gudas to arrange visits at the three Concord courts so the students can observe court in process and talk with the judges. I also check with Alex to see if there is an opportunity to visit a treatment court. When I need a gap filler for a week, I arrange to have several of the AOC employees speak with them about their careers so the students can hear more about the options. One of the students is the child of immigrants who moved hear three years ago. She is keenly interested in working in the FBI, so I told her about you and said perhaps you could speak with her about your experience.

I have also had the students meet with the chief or another justice for one day in the past so they can hear about their careers. The rest of the time I spend working with the students to prepare for a mock oral argument at the supreme court, which is done on the last day. I arrange for a panel of judges (historically, it has been me, and Tim, and one other person, so Tim would be a good person to connect with on this - he provided me the case materials and I have used that case every year.) Each student takes one of the roles in the case and argues that position and the judges ask questions. I invite the parents and teachers from the school. It is really awesome to watch. Bibiana has all of the contact information for the school. I am hopeful someone can still take this on as it would be awful to let these kids and the program down now. It is set to start this week. Please let me know if you need any more information or if I can help in any way. I

CONFIDENTIAL

At the chief's request, I was supposed to meet with Brian Moushegian this morning at 7am to walk him around the Fiscal Department space to see if he felt it could work for the ADO. It dawned on me early this morning so I texted him and let him know I could not be there. I spoke with him last week and explained the space is not ideal but might be workable if workstation style offices can be added (actual construction would be cost prohibitive - we have priced out several scenarios at OGP and it is very significant). The issue is it does not have sufficient offices and an access door would likely need to be added so ADO employees could enter through the kitchen rather than walking through the open space in the court area. Perhaps that is not necessary, it depends on how much separation and barriers to hearing the court's work you decide are necessary. It would require building a few offices that are the full wall work stations with doors. We did this at the PUC for attorneys and it worked pretty well. It would also require relocating any folks in there - when I have been down there, only one Fiscal Department employee has been in there (Cindy King) and the two OBA employees are in. Donna's office is in there, but Sean reported she had only been in twice in the prior thirty days, so it may not be an issue if she is permitted to work fully remotely. The logistics will be challenging but if Brian thinks it is workable, the Chief wanted to consider it in an effort to further support the budget reductions and be more efficient.

The capital budget presentation is on Tuesday. I had spoken with Jackie early last week as I was preparing. She is the who had historically done the presentation and managed the capital budget and I was working on preparing for this on Friday. Jackie recommended starting with the report to the legislature on the capital budget I had done in 2023 because she said it was very good, and updating the numbers. I am hoping someone can track that down for whoever will handle. The plan was to have that completed on Friday and then she and Irena were going to review.

The Committee on Cooperation with the Courts meeting is Wednesday at 4pm. The Chief is presenting on the budget first and Irena and her team are then presenting on the OACE projects. Any powerpoints need to be submitted the day before.

On Thursday, I planned to meet with Alex and Tanya to go over the Byrne SCIP presentation and request in light of more information about the funding available. I spoke with DOJ last week and they were going to send me additional information. This is likely something they can update and the chief can review. He has been fully in the loop on decision-making for this.

The Supreme Court approved the recommendation of the group to investigate the reported complaint [redacted]. This is the one that [redacted] recently weighed in on and everyone agreed should be investigated. I had planned to assign you as the investigator wit[redacted]s your partner, so she could learn the process for a government investigation from you. This or whatever approach you all decide is best will need to be implemented. For a future one, I planned to do the same for [redacted] My thought was the branch and team can benefit greatly from downloading your knowledge and experience in this area before you head off to greener pastures.

Dianne

CONFIDENTIAL

**Chief Justice Gordon MacDonald**

| | |
|---|---|
| **From:** | Erin Creegan |
| **Sent:** | Tuesday, March 4, 2025 19:32 |
| **To:** | Chief Justice Gordon MacDonald |
| **Subject:** | RE: Transition items |

This is not great in terms of her experience of what happened, I had not heard most of this. But as a positive, it does seem like there may be a landing zone for a negotiated resolution that will really mitigate risk to the Branch and also maybe mitigate any damages to Dianne. Most of this looks like things that we would be happy to do.

Questions:
-The toughest I think is maintaining the same salary. Maybe you have a different view. DOJ told me (in response to a q from Justice Donovan) the AG often does 1-2 months salary to settle a low merit suit. For Dianne, the difference between her current salary and my salary is 25k a year. That would be 2 months of current salary. Maybe instead of a commitment to hold the salary and grade, a year of current salary and grade (which would allow her to find another job if she wants) but then we have to take the salary to its normal level (budgeting issues!). Alternately, make up the difference of one year's salary in a negotiated settlement, which she gets up front.
-Do we want a release of any kind? DOJ would want that, but tough subject to broach.
-Going to have to figure out how that week impacts longevity and gap with HR. Might require unpaid leave or something strange. Maybe Becky Plourde and HRSU can figure this out.

What do you think?

**From:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Sent:** Tuesday, March 4, 2025 7:13 PM
**To:** Erin Creegan <ECreegan@courts.state.nh.us>
**Subject:** Fw: Transition items

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

**From:** Dianne Martin <[redacted].com>
**Sent:** Tuesday, March 4, 2025 6:15:00 PM
**To:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Subject:** Re: Transition items

**EXTERNAL EMAIL WARNING!** This email originated outside of the New Hampshire Judicial Branch network. Do not click on links or open attachments unless you recognize the sender and are expecting the email. Mouse over links to confirm the target before you click. Do not enter your username and password on sites that you have reached through an email link. Forward suspicious and unexpected messages to 'suspicious@courts.state.nh.us'.

Thank you for this email, Gordon, and the plan to correct the record. I really appreciate you recognizing my hard work, accomplishments, and the sacrifices that have been made over the years, particularly by my family. I was incredibly distraught after what happened Friday.

CONFIDENTIAL

I am not sure how much you have heard about the way this was handled, so I will describe it in more detail. Last Tuesday, I received a request to meet with Justices Donovan and Countway on Friday at 10am. Assuming that this would be a normal meeting, I prepared to update the Justices on ongoing matters.

The meeting was anything but normal. With no prior notice, I was informed the Court was working with the National Center for State Courts to reorganize and my nonjudicial position as Director of the Administrative Office of the Courts (AOC) was being eliminated. I was being laid off and a judicial officer would be named to head the office. I was then offered a demotion to the position of counsel to the Office of Bar Admissions, a position in the AOC that reports to my current position and is at a lower labor grade. I was told the reorganization was going to be announced and that I needed to immediately respond so they could announce that I was accepting the other position at the same time.

[redacted] I was stunned and struggled to even comprehend what was being said. I was provided [redacted] this meeting and given no information in advance. I could not make a decision like that on the spot, without information, and alone. My heart was pounding, and my hands were shaking. I did my best with no notice or preparation to advocate for myself and my family. I explained the director position is a regular permanent position. It is not a term position, nor is it an at will position. No notice was given in the job offer or the job description that accepting this state position would put me at risk of loss of much needed state health insurance for my family, credit for my many years of longevity as a public servant, participation in the retirement plan, and the many other benefits earned over the years of state employment, by removal without notice. Even layoff has a process and notice is provided.

I will not get into the remainder of the meeting, but it felt like a personal attack without a full understanding of my role, the work I have been asked to do over the past few years, the hostility I have faced, or the rules, policies, and procedures in the branch.

The full import of this meeting and its impacts on the lives of me and my family hit me, and I began to cry. I said I needed a few days to consider the offer and talk with my family and consider the alternatives and their impact on my family and reputation. The Justices agreed. Justice Donovan indicated that if I was not interested in the offered position, he would look into a severance arrangement in the interim. I was then told that I needed to turn over my laptop and building access immediately and I was escorted from the building in a manner usually reserved for a terminated employee. I did not get to say goodbye to the people I have worked with for years. It was devastating, embarrassing, and very confusing. I was not and still have not been given access to my personal things. [redacted] Layoff is non-prejudicial and [redacted]

I understand all of my colleagues were called together later that afternoon, with other members of the Administrative Council present, and informed I had been removed from my position. I do not believe they were told of the reorganization and layoff, as I was, or the non-prejudicial, non-disciplinary nature of that removal. Unfortunately, the inept way this was handled and announced could have reasonably caused my colleagues to believe that I was terminated for some egregious conduct that required immediate removal. After all, I was in the office earlier that morning doing my job and talking with everyone. It has been reported to me that the "word on the street" is that I was terminated. It is not clear why this was handled this way, with this approach and timing, but the potential harm to me and my reputation is clear. I have represented nearly every agency in the state and this branch, and I have never seen anything like this before.

I have since received many messages from the people I have worked with, sending messages of concern and thanking me for what I have done for them. One said, "I was sad to hear you will no longer be with the Judicial Branch. Thank you for your guidance and help as I have grown in several roles at the Judicial Branch in the past several years. I appreciated the time you took to listen and help me with various ideas and projects...You have been a remarkable person to work for, with an amazing ability to remember detail and a gift for working with people of all sorts of personalities. Wishing you the best. Another wrote, "Hi Dianne, I just want to say that working with you has been an absolute privilege. I've learned so much from you, and truly appreciate the experience. I wish you nothing but success and happiness moving forward."

As you are aware, during my tenure, systemic changes and other directives from you and the Court have been implemented. Many, like the transfer of the treatment courts, and the plan to create data dashboards and a document access portal, while legal, ethical, and appropriate, have not been popular with some members of the branch. As the person tasked with implementation in many cases, I have been subjected to hostility and even false claims. You have cautioned me to "watch your back," particularly with regard to the Circuit Court administration. Despite that, I have tried to implement the Court's agenda in a professional, kind, and ethical manner. When I raised a concern about being targeted, I was told the Court has my back and I relied on that in doing my job. Based on some of the statements during my meeting on Friday and the handling of this matter, it is clear they did not.

CONFIDENTIAL

I have worked tirelessly to perform the numerous and varied responsibilities of the Director role, routinely working 60-70 hours or more per week. I regularly arrive at 6:45 am and depart at 5:30 or 6pm, just to go home to work more. In nearly seventeen years working for the State, I have never received a negative performance evaluation or any kind of discipline. As you confirmed in your email, it has been my understanding that you have been pleased with my performance. I have only just returned [redacted] and continue to use FMLA leave on an intermittent basis. [redacted] I have continued to devote the time and effort necessary to perform my duties to the best of my ability.

Ultimately, I recognize that it is the Court's prerogative to reorganize the branch and implement that through layoffs. Had I been asked, I would have assisted with implementation of this reorganization and ensured it was handled appropriately, even if my position was affected. In fact, I have demonstrated my ability to do that in the past at the PUC when we reorganized and created the Department of Energy. I handled it as a professional. I have had access to the highest level of sensitive information for years and have demonstrated my trustworthiness working with you for a very long time.

Given what happened last week and how I have been treated here, I know you will understand why I am incredibly hesitant to work at the Judicial Branch anymore. [redacted] For those reasons, the ability to continue my state health insurance without interruption is paramount. After much discussion with my family, unless severance and family health benefits can be provided for an extended period of time, I propose the following:

- Layoff effective March 21 and I remain on paid leave through the 21st without a reduction in my leave balances or accruals. The rules provide 21 days' notice for layoff. Payout computation as defined by the personnel rules for layoff.
- I will accept the OBA General Counsel position offered with a start date on March 28 at my current rate of pay (labor grade and step), with written confirmation of Justice Countway's representation that the position can be done fully remotely. Please confirm there is no plan to eliminate this position through the next biennium.
- A written waiver of any probationary period for the new position.
- My benefits and longevity will not have any gap.
- The message described in your email will be sent out to the branch and it will also be clarified for the group that was gathered on Friday that this change resulted from the Court's work with the NCSC and reorganization and is non-prejudicial and non-disciplinary.
- You will provide a positive recommendation along the same lines as your email, in recognition of my significant work and contributions to the branch, noting the layoff due to administrative reorganization. This will allow me to mitigate the impacts of what happened in the future.
- I will report to you (this position has functioned nearly entirely separately from the AOC Director during my tenure. The only think I have done is approve leave and time.)
- If Denise and Bibiane are willing and it is possible, make the positions equivalent and transfer the two between the assistant positions (Director's and OBA GC Assistant).
- I will continue to work with the CRTC students as I previously have.
- I have a planned vacation at the end of June and may need to be permitted to take unpaid leave part of the time if necessary, depending on how much leave I accrue by then.

The handling of this situation does not reflect well on the Branch and has had a significant impact on me that I have not fully described here. This proposal won't make it right, but it will allow me and my family to reduce the negative consequences and move forward.

I truly hope the work that I have done and the incredible people I have hired have laid the foundation for a better future for those at the Judicial Branch. May this never happen again.

Dianne

**From:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Date:** Monday, March 3, 2025 at 5:04 PM
**To:** Dianne Martin <[redacted].com>
**Subject:** RE: Transition items

CONFIDENTIAL

Dianne,

I am learning some of what happened last week.

As the constitutional administrative head of the Branch, I know better than anyone that you gave exceptional service to the Judicial Branch, and your accomplishments are many. The people of New Hampshire will benefit from your contributions for years to come, particularly in the areas of safety and security, mental health, access to justice and domestic violence, among others. I am very grateful to you and to your family for all of the sacrifices you made to advance our mission. This is a proud chapter is your long public service career.

I had hoped, and continue to hope, that we could continue to benefit from all you have to offer as the general counsel of the office of bar admissions. The challenges in the field of bar admissions are great, and there is enormous opportunity to better serve the public through reform. That said, while the position promises the reward of professional challenges, it is manageable in terms of workload and demands. It is certainly far more manageable in terms of hours and stress. I have been involved in the field of bar admissions since 2014; the people involved are smart, full of integrity and deeply committed to making our profession better. I think you would be an excellent fit. As you know, this subject is a particular passion of mine. Having a person of your intelligence, competence, and diligence in this position could make a positive change in the lives of many.

I very much hope you will consider accepting this position. I have an image in my mind of announcing that you have graciously agreed to continue serving the Branch and recounting your many accomplishments to the full court system, and working together to see big things happen in a job that I hope will also work for you, while you serve others.

Gordon

**From:** Dianne Martin <[redacted]com>
**Sent:** Monday, March 3, 2025 08:45
**To:** Erin Creegan <ECreegan@courts.state.nh.us>
**Cc:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Subject:** Transition items

**EXTERNAL EMAIL WARNING!** This email originated outside of the New Hampshire Judicial Branch network. Do not click on links or open attachments unless you recognize the sender and are expecting the email. Mouse over links to confirm the target before you click. Do not enter your username and password on sites that you have reached through an email link. Forward suspicious and unexpected messages to 'suspicious@courts.state.nh.us'.

Good morning, Erin,

There are a few things I want to make sure are on your radar. This Thursday from 9:30 am - 11am, the students from the Concord High Regional Technical (CRTC) program are coming. You may remember this from last year. Each year I work with students who want to be lawyers or work with the law in their careers and they come over for several visits on Thursdays. I am hoping someone can take this on so these students will still have their planned externship. Bibiana has the school's contact information and has been in touch with the program.

I generally start by giving them the overview of the branch in the first week (I used the Chief's powerpoint that he did for the Jaffrey Library presentation - he will know which one that is). The second through fourth weeks, I work with Kate Geraci, Jen Uhouse, and Tim Gudas to arrange visits at the three Concord courts so the students can observe court in process and talk with the judges. I also check with Alex to see if there is an opportunity to visit a treatment court. When I need a gap filler for a week, I arrange to have several of the AOC employees speak with them about their careers so the students can hear more

about the options. One of the students is the child of immigrants who moved hear three years ago. She is keenly interested in working in the FBI, so I told her about you and said perhaps you could speak with her about your experience.

I have also had the students meet with the chief or another justice for one day in the past so they can hear about their careers. The rest of the time I spend working with the students to prepare for a mock oral argument at the supreme court, which is done on the last day. I arrange for a panel of judges (historically, it has been me, and Tim, and one other person, so Tim would be a good person to connect with on this - he provided me the case materials and I have used that case every year.) Each student takes one of the roles in the case and argues that position and the judges ask questions. I invite the parents and teachers from the school. It is really awesome to watch. Bibiena has all of the contact information for the school. I am hopeful someone can still take this on as it would be awful to let these kids and the program down now. It is set to start this week. Please let me know if you need any more information or if I can help in any way. I

At the chief's request, I was supposed to meet with Brian Moushegian this morning at 7am to walk him around the Fiscal Department space to see if he felt it could work for the ADO. It dawned on me early this morning so I texted him and let him know I could not be there. I spoke with him last week and explained the space is not ideal but might be workable if workstation style offices can be added (actual construction would be cost prohibitive - we have priced out several scenarios at OGP and it is very significant). The issue is it does not have sufficient offices and an access door would likely need to be added so ADO employees could enter through the kitchen rather then walking through the open space in the court area. Perhaps that is not necessary, it depends on how much separation and barriers to hearing the court's work you decide are necessary. It would require building a few offices that are the full wall work stations with doors. We did this at the PUC for attorneys and it worked pretty well. It would also require relocating any folks in there - when I have been down there, only one Fiscal Department employee has been in there (Cindy King) and the two OBA employees are in. Donna's office is in there, but Sean reported she had only been in twice in the prior thirty days, so it may not be an issue if she is permitted to work fully remotely. The logistics will be challenging but if Brien thinks it is workable, the Chief wanted to consider it in an effort to further support the budget reductions and be more efficient.

The capital budget presentation is on Tuesday. I had spoken with Jackie early last week as I was preparing. She is the who had historically done the presentation and managed the capital budget and I was working on preparing for this on Friday. Jackie recommended starting with the report to the legislature on the capital budget I had done in 2023 because she said it was very good, and updating the numbers. I am hoping someone can track that down for whoever will handle. The plan was to have that completed on Friday and then she and Irena were going to review.

The Committee on Cooperation with the Courts meeting is Wednesday at 4pm. The Chief is presenting on the budget first and Irena and her team are then presenting on the OACE projects. Any powerpoints need to be submitted the day before.

On Thursday, I planned to meet with Alex and Tanya to go over the Byrne SCIP presentation and request in light of more information about the funding available. I spoke with DOJ last week and they were going to send me additional information. This is likely something they can update and the chief can review. He has been fully in the loop on decision-making for this.

CONFIDENTIAL

The Supreme Court approved the recommendation of the group to investigate the reported complaint [redacted] This is the one that [redacted] recently weighed in on and everyone agreed should be investigated. I had planned to assign you as the investigator with [redacted] as your partner, so she could learn the process for a government investigation from you. This or whatever approach you all decide is best will need to be implemented. For a future one, I planned to do the same for [redacted] My thought was the branch and team can benefit greatly from downloading your knowledge and experience in this area before you head off to greener pastures.

Dianne

CONFIDENTIAL

**Chief Justice Gordon MacDonald**

| | |
|---|---|
| **From:** | Chief Justice Gordon MacDonald |
| **Sent:** | Tuesday, March 4, 2025 19:13 |
| **To:** | Erin Creegan |
| **Subject:** | Fw: Transition items |

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

---

**From:** Dianne Martin <[redacted].com>
**Sent:** Tuesday, March 4, 2025 6:15:00 PM
**To:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Subject:** Re: Transition items

**EXTERNAL EMAIL WARNING!** This email originated outside of the New Hampshire Judicial Branch network. Do not click on links or open attachments unless you recognize the sender and are expecting the email. Mouse over links to confirm the target before you click. Do not enter your username and password on sites that you have reached through an email link. Forward suspicious and unexpected messages to 'suspicious@courts.state.nh.us'.

Thank you for this email, Gordon, and the plan to correct the record. I really appreciate you recognizing my hard work, accomplishments, and the sacrifices that have been made over the years, particularly by my family. I was incredibly distraught after what happened Friday.

I am not sure how much you have heard about the way this was handled, so I will describe it in more detail. Last Tuesday, I received a request to meet with Justices Donovan and Countway on Friday at 10am. Assuming that this would be a normal meeting, I prepared to update the Justices on ongoing matters.

The meeting was anything but normal. With no prior notice, I was informed the Court was working with the National Center for State Courts to reorganize and my nonjudicial position as Director of the Administrative Office of the Courts (AOC) was being eliminated. I was being laid off and a judicial officer would be named to head the office. I was then offered a demotion to the position of counsel to the Office of Bar Admissions, a position in the AOC that reports to my current position and is at a lower labor grade. I was told the reorganization was going to be announced and that I needed to immediately respond so they could announce that I was accepting the other position at the same time.

[redacted] I was stunned and struggled to even comprehend what was being said. I was provided no advance notice of the purpose of this meeting and given no information in advance. I could not make a decision like that on the spot, without information, and alone. My heart was pounding, and my hands were shaking. I did my best with no notice or preparation to advocate for myself and my family. I explained the director position is a regular permanent position. It is not a term position, nor is it an at will position. No notice was given in the job offer or the job description that accepting this state position would put me at risk of loss of much needed state health insurance for my family, credit for my many years of longevity as a public servant, participation in the retirement plan, and the many other benefits earned over the years of state employment, by removal without notice. Even layoff has a process and notice is provided.

I will not get into the remainder of the meeting, but it felt like a personal attack without a full understanding of my role, the work I have been asked to do over the past few years, the hostility I have faced, or the rules, policies, and procedures in the branch.

The full import of this meeting and its impacts on the lives of me and my family hit me, and I began to cry. I said I needed a few days to consider the offer and talk with my family and consider the alternatives and their impact on my family and

CONFIDENTIAL

reputation. The Justices agreed. Justice Donovan indicated that if I was not interested in the offered position, he would look into a severance arrangement in the interim. I was then told that I needed to turn over my laptop and building access immediately and I was escorted from the building in a manner usually reserved for a terminated employee. I did not get to say goodbye to the people I have worked with for years. It was devastating, embarrassing, and very confusing. I was not and still have not been given access to my personal things. [redacted] Layoff is non-prejudicial and non-disciplinary, so I should not have been treated this way.

I understand all of my colleagues were called together later that afternoon, with other members of the Administrative Council present, and informed I had been removed from my position. I do not believe they were told of the reorganization and layoff, as I was, or the non-prejudicial, non-disciplinary nature of that removal. Unfortunately, the inept way this was handled and announced could have reasonably caused my colleagues to believe that I was terminated for some egregious conduct that required immediate removal. After all, I was in the office earlier that morning doing my job and talking with everyone. It has been reported to me that the "word on the street" is that I was terminated. It is not clear why this was handled this way, with this approach and timing, but the potential harm to me and my reputation is clear. I have represented nearly every agency in the state and this branch, and I have never seen anything like this before.

I have since received many messages from the people I have worked with, sending messages of concern and thanking me for what I have done for them. One said, "I was sad to hear you will no longer be with the Judicial Branch. Thank you for your guidance and help as I have grown in several roles at the Judicial Branch in the past several years. I appreciated the time you took to listen and help me with various ideas and projects...You have been a remarkable person to work for, with an amazing ability to remember detail and a gift for working with people of all sorts of personalities. Wishing you the best. Another wrote, "Hi Dianne, I just want to say that working with you has been an absolute privilege. I've learned so much from you, and truly appreciate the experience. I wish you nothing but success and happiness moving forward."

As you are aware, during my tenure, systemic changes and other directives from you and the Court have been implemented. Many, like the transfer of the treatment courts, and the plan to create data dashboards and a document access portal, while legal, ethical, and appropriate, have not been popular with some members of the branch. As the person tasked with implementation in many cases, I have been subjected to hostility and even false claims. You have cautioned me to "watch your back," particularly with regard to the Circuit Court administration. Despite that, I have tried to implement the Court's agenda in a professional, kind, and ethical manner. When I raised a concern about being targeted, I was told the Court has my back and I relied on that in doing my job. Based on some of the statements during my meeting on Friday and the handling of this matter, it is clear they did not.

I have worked tirelessly to perform the numerous and varied responsibilities of the Director role, routinely working 60-70 hours or more per week. I regularly arrive at 6:45 am and depart at 5:30 or 6pm, just to go home to work more. In nearly seventeen years working for the State, I have never received a negative performance evaluation or any kind of discipline. As you confirmed in your email, it has been my understanding that you have been pleased with my performance. I have only just returned [redacted] continue to use FMLA leave on an intermittent basis. [redacted] have continued to devote the time and effort necessary to perform my duties to the best of my ability.

Ultimately, I recognize that it is the Court's prerogative to reorganize the branch and implement that through layoffs. Had I been asked, I would have assisted with implementation of this reorganization and ensured it was handled appropriately, even if my position was affected. In fact, I have demonstrated my ability to do that in the past at the PUC when we reorganized and created the Department of Energy. I handled it as a professional. I have had access to the highest level of sensitive information for years and have demonstrated my trustworthiness working with you for a very long time.

Given what happened last week and how I have been treated here, I know you will understand why I am incredibly hesitant to work at the Judicial Branch anymore. [redacted] For those reasons, the ability to continue my state health insurance without interruption is paramount. After much discussion with my family, unless severance and family health benefits can be provided for an extended period of time, I propose the following:

- Layoff effective March 21 and I remain on paid leave through the 21st without a reduction in my leave balances or accruals. The rules provide 21 days' notice for layoff. Payout computation as defined by the personnel rules for layoff.
- I will accept the OBA General Counsel position offered with a start date on March 28 at my current rate of pay (labor grade and step), with written confirmation of Justice Countway's

representation that the position can be done fully remotely. Please confirm there is no plan to eliminate this position through the next biennium.

- A written waiver of any probationary period for the new position.
- My benefits and longevity will not have any gap.
- The message described in your email will be sent out to the branch and it will also be clarified for the group that was gathered on Friday that this change resulted from the Court's work with the NCSC and reorganization and is non-prejudicial and non-disciplinary.
- You will provide a positive recommendation along the same lines as your email, in recognition of my significant work and contributions to the branch, noting the layoff due to administrative reorganization. This will allow me to mitigate the impacts of what happened in the future.
- I will report to you (this position has functioned nearly entirely separately from the AOC Director during my tenure. The only think I have done is approve leave and time.)
- If Denise and Bibiana are willing and it is possible, make the positions equivalent and transfer the two between the assistant positions (Director's and OBA GC Assistant).
- I will continue to work with the CRTC students as I previously have.
- I have a planned vacation at the end of June and may need to be permitted to take unpaid leave part of the time if necessary, depending on how much leave I accrue by then.

The handling of this situation does not reflect well on the Branch and has had a significant impact on me that I have not fully described here. This proposal won't make it right, but it will allow me and my family to reduce the negative consequences and move forward.

I truly hope the work that I have done and the incredible people I have hired have laid the foundation for a better future for those at the Judicial Branch. May this never happen again.

Dianne

---

**From:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Date:** Monday, March 3, 2025 at 5:04 PM
**To:** Dianne Martin <[redacted].com>
**Subject:** RE: Transition items

**Dianne,**

**I am learning some of what happened last week.**

**As the constitutional administrative head of the Branch, I know better than anyone that you gave exceptional service to the Judicial Branch, and your accomplishments are many. The people of New Hampshire will benefit from your contributions for years to come, particularly in the areas of safety and security, mental health, access to justice and domestic violence, among others. I am very grateful to you and to your family for all of the sacrifices you made to advance our mission. This is a proud chapter is your long public service career.**

**I had hoped, and continue to hope, that we could continue to benefit from all you have to offer as the general counsel of the office of bar admissions. The challenges in the field of bar admissions are great, and there is enormous opportunity to better serve the public through reform. That said, while the position promises the reward of professional challenges, it is manageable in terms of workload and demands. It is certainly far more manageable in terms of hours and stress. I have been involved in the field of bar admissions since 2014; the people involved are smart, full of integrity and deeply committed to making our profession better. I think you would be an excellent fit. As you know, this subject is a particular passion of mine. Having a person of your intelligence, competence, and diligence in this position could make a positive change in the lives of many.**

**I very much hope you will consider accepting this position. I have an image in my mind of announcing that you have graciously agreed to continue serving the Branch and recounting your many accomplishments to the full court system, and working together to see big things happen in a job that I hope will also work for you, while you serve others.**

CONFIDENTIAL

**Gordon**

**From:** Dianne Martin <[redacted].com>
**Sent:** Monday, March 3, 2025 08:45
**To:** Erin Creegan <ECreegan@courts.state.nh.us>
**Cc:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Subject:** Transition Items

**EXTERNAL EMAIL WARNING!** This email originated outside of the New Hampshire Judicial Branch network. Do not click on links or open attachments unless you recognize the sender and are expecting the email. Mouse over links to confirm the target before you click. Do not enter your username and password on sites that you have reached through an email link. Forward suspicious and unexpected messages to 'suspicious@courts.state.nh.us'.

Good morning, Erin,

There are a few things I want to make sure are on your radar. This Thursday from 9:30 am - 11am, the students from the Concord High Regional Technical (CRTC) program are coming. You may remember this from last year. Each year I work with students who want to be lawyers or work with the law in their careers and they come over for several visits on Thursdays. I am hoping someone can take this on so these students will still have their planned externship. Bibiana has the school's contact information and has been in touch with the program.

I generally start by giving them the overview of the branch in the first week (I used the Chief's powerpoint that he did for the Jaffrey Library presentation - he will know which one that is). The second through fourth weeks, I work with Kate Geraci, Jen Uhouse, and Tim Gudas to arrange visits at the three Concord courts so the students can observe court in process and talk with the judges. I also check with Alex to see if there is an opportunity to visit a treatment court. When I need a gap filler for a week, I arrange to have several of the AOC employees speak with them about their careers so the students can hear more about the options. One of the students is the child of immigrants who moved hear three years ago. She is keenly interested in working in the FBI, so I told her about you and said perhaps you could speak with her about your experience.

I have also had the students meet with the chief or another justice for one day in the past so they can hear about their careers. The rest of the time I spend working with the students to prepare for a mock oral argument at the supreme court, which is done on the last day. I arrange for a panel of judges (historically, it has been me, and Tim, and one other person, so Tim would be a good person to connect with on this - he provided me the case materials and I have used that case every year.) Each student takes one of the roles in the case and argues that position and the judges ask questions. I invite the parents and teachers from the school. It is really awesome to watch. Bibiana has all of the contact information for the school. I am hopeful someone can still take this on as it would be awful to let these kids and the program down now. It is set to start this week. Please let me know if you need any more information or if I can help in any way. I

At the chief's request, I was supposed to meet with Brian Moushegian this morning at 7am to walk him around the Fiscal Department space to see if he felt it could work for the ADO. It dawned on me early this morning so I texted him and let him know I could not be there. I spoke with him last week and explained the space is not ideal but might be workable if workstation style offices can be added (actual construction would be cost prohibitive - we have priced out several scenarios at OGP and it is very

significant). The issue is it does not have sufficient offices and an access door would likely need to be added so ADO employees could enter through the kitchen rather than walking through the open space in the court area. Perhaps that is not necessary, it depends on how much separation and barriers to hearing the court's work you decide are necessary. It would require building a few offices that are the full wall work stations with doors. We did this at the PUC for attorneys and it worked pretty well. It would also require relocating any folks in there - when I have been down there, only one Fiscal Department employee has been in there (Cindy King) and the two OBA employees are in. Donna's office is in there, but Sean reported she had only been in twice in the prior thirty days, so it may not be an issue if she is permitted to work fully remotely. The logistics will be challenging but if Brian thinks it is workable, the Chief wanted to consider it in an effort to further support the budget reductions and be more efficient.

The capital budget presentation is on Tuesday. I had spoken with Jackie early last week as I was preparing. She is the who had historically done the presentation and managed the capital budget and I was working on preparing for this on Friday. Jackie recommended starting with the report to the legislature on the capital budget I had done in 2023 because she said it was very good, and updating the numbers. I am hoping someone can track that down for whoever will handle. The plan was to have that completed on Friday and then she and Irena were going to review.

The Committee on Cooperation with the Courts meeting is Wednesday at 4pm. The Chief is presenting on the budget first and Irena and her team are then presenting on the OACE projects. Any powerpoints need to be submitted the day before.

On Thursday, I planned to meet with Alex and Tanya to go over the Byrne SCIP presentation and request in light of more information about the funding available. I spoke with DOJ last week and they were going to send me additional information. This is likely something they can update and the chief can review. He has been fully in the loop on decision-making for this.

The Supreme Court approved the recommendation of the group to investigate the reported complaint [redacted] This is the one that [redacted] recently weighed in on and everyone agreed should be investigated. I had planned to assign you as the investigator with [redacted] your partner, so she could learn the process for a government investigation from you. This or whatever approach you all decide is best will need to be implemented. For a future one, I planned to do the same for [redacted] My thought was the branch and team can benefit greatly from downloading your knowledge and experience in this area before you head off to greener pastures.

Dianne

CONFIDENTIAL

**Chief Justice Gordon MacDonald**

| | |
|---|---|
| **From:** | Erin Creegan |
| **Sent:** | Monday, March 3, 2025 15:27 |
| **To:** | Chief Justice Gordon MacDonald |
| **Subject:** | RE: Draft |

I think the content is good. I wouldn't want to change your voice to mine, but I would say to be as emphatic as feels authentic to you on past value in the Director position and how much you would like her to take the new position. Maybe it would be good to say how much you would like to communicate to the branch all her valued service in the Director role when making an announcement that she will stay with the Branch in a new role.

**From:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Sent:** Monday, March 3, 2025 2:31 PM
**To:** Erin Creegan <ECreegan@courts.state.nh.us>
**Subject:** Draft

For review and comment. Thank you.

DRAFT

Dianne,

I am learning some of what happened last Friday.

You gave exceptional service to the Judicial Branch, and your accomplishments are many. The people of New Hampshire will benefit from your contributions for years to come, particularly in the areas of safety and security, mental health, domestic violence, I am very grateful to you and to your family for all of the sacrifices you made to advance our mission.

I had hoped, and continue to hope, that we could continue to benefit from all you have to offer as the general counsel of the office of bar admissions. The challenges in the field of bar admissions are great, and there is enormous opportunity to better serve the public through reform. That said, while the position promises the reward of professional challenges, it is manageable in terms of workload and demands. It is certainly far more manageable in terms of hours and stress. I have been involved in the field of bar admissions since 2014; the people involved are smart, full of integrity and deeply committed to making our profession better. I think you would be an excellent fit.

Again, I hope you will give serious thought to this opportunity.

Gordon

Gordon J. MacDonald
Chief Justice
New Hampshire Supreme Court
One Charles Doe Drive
Concord, New Hampshire 03301
(603) 415-6742
GMacDonald@courts.state.nh.us

CONFIDENTIAL

**Chief Justice Gordon MacDonald**

| | |
|---|---|
| **From:** | Erin Creegan |
| **Sent:** | Monday, March 3, 2025 15:52 |
| **To:** | Chief Justice Gordon MacDonald |
| **Subject:** | RE: Draft |

**Dianne,**

**I am learning some of what happened last week.**

**As the constitutional administrative head of the Branch, I know better than anyone that you gave exceptional service to the Judicial Branch, and your accomplishments are many. The people of New Hampshire will benefit from your contributions for years to come, particularly in the areas of safety and security, mental health, domestic violence, I am very grateful to you and to your family for all of the sacrifices you made to advance our mission. This is a proud chapter is your long public service career.**

**I had hoped, and continue to hope, that we could continue to benefit from all you have to offer as the general counsel of the office of bar admissions. The challenges in the field of bar admissions are great, and there is enormous opportunity to better serve the public through reform. That said, while the position promises the reward of professional challenges, it is manageable in terms of workload and demands. It is certainly far more manageable in terms of hours and stress. I have been involved in the field of bar admissions since 2014; the people involved are smart, full of integrity and deeply committed to making our profession better. I think you would be an excellent fit. As you probably know, this subject is a particular passion of mine. Having a person of your intelligence, competence, and diligence in this position could make a positive change in the lives of many.**

**I really, really hope you will consider accepting this position. I have an image in my mind of announcing that you have so graciously agreed to continue serving the Branch and recounting your many accomplishments to the full court system, and working together to see big things happen in a job that I hope will also work for you, while you serve others. Please let me know if there is any way I can convince you to take this position.**

Gordon

**From:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Sent:** Monday, March 3, 2025 3:31 PM
**To:** Erin Creegan <ECreegan@courts.state.nh.us>
**Subject:** RE: Draft

**Would you mind editing with what you think would help? I would really appreciate it.**

**From:** Erin Creegan <ECreegan@courts.state.nh.us>
**Sent:** Monday, March 3, 2025 15:27
**To:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Subject:** RE: Draft

I think the content is good. I wouldn't want to change your voice to mine, but I would say to be as emphatic as feels authentic to you on past value in the Director position and how much you would like her to take the new position. Maybe it would be good to say how much you would like to communicate to the branch all her valued service in the Director role when making an announcement that she will stay with the Branch in a new role.

**From:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Sent:** Monday, March 3, 2025 2:31 PM

CONFIDENTIAL

**To:** Erin Creegan <ECreegan@courts.state.nh.us>
**Subject:** Draft

**For review and comment. Thank you.**

**DRAFT**

**Dianne,**

**I am learning some of what happened last Friday.**

**You gave exceptional service to the Judicial Branch, and your accomplishments are many. The people of New Hampshire will benefit from your contributions for years to come, particularly in the areas of safety and security, mental health, domestic violence, I am very grateful to you and to your family for all of the sacrifices you made to advance our mission.**

**I had hoped, and continue to hope, that we could continue to benefit from all you have to offer as the general counsel of the office of bar admissions. The challenges in the field of bar admissions are great, and there is enormous opportunity to better serve the public through reform. That said, while the position promises the reward of professional challenges, it is manageable in terms of workload and demands. It is certainly far more manageable in terms of hours and stress. I have been involved in the field of bar admissions since 2014; the people involved are smart, full of integrity and deeply committed to making our profession better. I think you would be an excellent fit.**

**Again, I hope you will give serious thought to this opportunity.**

**Gordon**

Gordon J. MacDonald
Chief Justice
New Hampshire Supreme Court
One Charles Doe Drive
Concord, New Hampshire 03301
(603) 415-6742
GMacDonald@courts.state.nh.us

# 17. Emails between Justice Patrick Donovan, Justice Melissa Countway and Clerk Timothy Gudas Re: Order Appointing Judge Christopher Keating as Interim Director of the AOC

CONFIDENTIAL

**Justice Patrick E. Donovan**

**From:** Justice Melissa Countway
**Sent:** Friday, February 28, 2025 4:35 PM
**To:** Timothy Gudas; Justice Patrick E. Donovan
**Subject:** Re: AOC Director

Yes thank you

Get Outlook for iOS

---

**From:** Timothy Gudas <TGudas@courts.state.nh.us>
**Sent:** Friday, February 28, 2025 3:49:24 PM
**To:** Justice Patrick E. Donovan <PDonovan@courts.state.nh.us>
**Cc:** Justice Melissa Countway <MCountway@courts.state.nh.us>
**Subject:** RE: AOC Director

Is issuance first thing Monday morning OK?

**From:** Justice Patrick E. Donovan <PDonovan@courts.state.nh.us>
**Sent:** Friday, February 28, 2025 3:46 PM
**To:** Timothy Gudas <TGudas@courts.state.nh.us>
**Cc:** Justice Melissa Countway <MCountway@courts.state.nh.us>
**Subject:** RE: AOC Director

Looks good to me. PED

**From:** Timothy Gudas <TGudas@courts.state.nh.us>
**Sent:** Friday, February 28, 2025 3:37 PM
**To:** Justice Patrick E. Donovan <PDonovan@courts.state.nh.us>
**Cc:** Justice Melissa Countway <MCountway@courts.state.nh.us>
**Subject:** RE: AOC Director

Do you think the order should say anything else/different?

Tim

**From:** Justice Patrick E. Donovan <PDonovan@courts.state.nh.us>
**Sent:** Friday, February 28, 2025 3:15 PM
**To:** Timothy Gudas <TGudas@courts.state.nh.us>
**Subject:** RE: AOC Director

OK, that works for me. PED

**From:** Timothy Gudas <TGudas@courts.state.nh.us>
**Sent:** Friday, February 28, 2025 3:15 PM
**To:** Justice Patrick E. Donovan <PDonovan@courts.state.nh.us>; Justice Melissa Countway <MCountway@courts.state.nh.us>
**Subject:** RE: AOC Director

CONFIDENTIAL

I think that the order appointing Judge Keating will suffice for Dianne's situation.

**From:** Justice Patrick E. Donovan <PDonovan@courts.state.nh.us>
**Sent:** Friday, February 28, 2025 2:51 PM
**To:** Timothy Gudas <TGudas@courts.state.nh.us>; Justice Melissa Countway <MCountway@courts.state.nh.us>
**Subject:** AOC Director

Tim: Diane Martin was relieved of her duties as Director of the AOC this morning. We need to issue an administrative order appointing Judge Chris Keating as the Interim Director of the AOC as of Monday. Do we need to issue an order regarding Diane Martin too?

Patrick E. Donovan
Associate Justice
N.H. Supreme Court
One Charles Dow Drive
Concord, NH 03301
pdonovan@courts.state.nh.us

CONFIDENTIAL

THE STATE OF NEW HAMPSHIRE

SUPREME COURT OF NEW HAMPSHIRE

ADMINISTRATIVE ORDER 2025-02

Pursuant to its constitutional and statutory authority and powers of general superintendence over the New Hampshire court system, the Supreme Court hereby appoints Circuit Court Judge Christopher M. Keating to serve as interim Director of the Administrative Office of the Courts (AOC), commencing March 3, 2025, and succeeding the former AOC Director, Dianne Martin.

Issued: March 3, 2025

ATTEST: Timothy A. Gudas

Timothy A. Gudas, Clerk of Court
Supreme Court of New Hampshire

# 18. Emails between Justice Melissa Countway and Attorney Jane Young Re: Setting the Record Straight

CONFIDENTIAL

**From:** Justice Melissa Countway
**To:** Jane Young
**Cc:** Mark Morrissette
**Subject:** Re: Setting the Record Straight
**Date:** Thursday, April 2, 2026 6:40:21 PM

You don't often get email from mcountway@courts.state.nh.us Learn why this is important

Yes absolutely

MBC

Get Outlook for iOS

---

**From:** Jane Young
**Sent:** Thursday, April 2, 2026 6:29:41 PM
**To:** Justice Melissa Countway
**Cc:** Mark Morrissette
**Subject:** RE: Setting the Record Straight

**EXTERNAL EMAIL WARNING!** This email originated outside of the New Hampshire Judicial Branch network. Do not click on links or open attachments unless you recognize the sender and are expecting the email. Mouse over links to confirm the target before you click. Do not enter your username and password on sites that you have reached through an email link. Forward suspicious and unexpected messages to 'suspicious@courts.state.nh.us'.

Justice Countway,

Thank you very much for this clarification.

Do I have your permission to provide this information to the JCC?

Jane

Jane E. Young
McDowell & Morrissette, PA
282 River Road
Manchester, NH 03104
(603) 623-9300

*Privileged and Confidentiality Notice*

*The information in this electronic mail is intended for the addressed recipient(s) only. This e-mail may contain privileged and confidential material from the law firm of McDowell & Morrissette, P.A. If you are not the intended recipient, please be advised that any disclosure, copying, distribution or use of the contents of this e-mail is prohibited. If you have received this e-mail in error, please notify the sender immediately by replying to this e-mail or by telephone at 603-623-9300 Ext. 237. Receipt by anyone other than the intended recipient(s) is not a waiver of any privilege. Thank you.*

**From:** Justice Melissa Countway
**Sent:** Thursday, April 2, 2026 6:24 PM
**To:** Jane Young
**Subject:** Setting the Record Straight

You don't often get email from mcountway@courts.state.nh.us. Learn why this is important

Hi Jane:

CONFIDENTIAL

1. I never reported ANYTHING regarding my interactions with Gordon on March 3rd
2. There was no "heated exchange" between us
3. What did happen is Gordon told me to "stand down" as he was walking by my office. I am 100% sure this is all he said to me.
4. At the time I shared with PED and likely JPB that he said that. I recently shared with BKG the extent of that exchange. I absolutely have told no one else (other than routine end-of-day sharing with my spouse.)
5. Telling me to stand down was no big deal
6. He has never used profanity or raised his voice at me nor have I witnessed that with others

I know this is a small piece of the whole complaint but I want Gordon to know that I am not the source of any of that and he has my full confidence, support and empathy as he navigates this mess. Please let me know how I can set the record straight
Melissa Countway
Get Outlook for iOS

# 19. Emails between Suzanne Gelinas and Judge Christopher Keating Re: Layoff – Rehire Impact on Benefits

CONFIDENTIAL

Outlook

**Layoff Impacts**

**From** Suzanne Gelinas </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C2FD341B08164013B29DAA257318ABF0-17D7E2A0-C7>

**Date** Wed 3/12/2025 12:40 PM

**To** Hon. Christopher Keating <CKeating@courts.state.nh.us>

1 attachment (109 KB)

Layoff Impacts.docx;

Judge Keating-

Here is a summary of what I took from the PR and the State of NH Benefits site; as well as the NHRS site.

Many thanks.

Suzanne

***Suzanne M. Gelinas***
Manager, Human Resources
New Hampshire Judicial Branch
One Granite Place
Concord, New Hampshire 03302
Office: (603) 415-0308

CONFIDENTIAL
**THE STATE OF NEW HAMPSHIRE**
**ADMINISTRATIVE OFFICE OF THE COURTS**

HON. CHRISTOPHER KEATING
INTERIM DIRECTOR

ONE GRANITE PLACE, SUITE N400
CONCORD, NH 03301
(603) 415-0665
ckeating@courts.state.nh.us

**Layoff – Rehire Impact on Benefits**

**PR 25: Probationary Period**

- Any promoted or demoted employee or an employee recalled or transferred to a materially different position shall serve a three-month probationary period in the new position.

**PR 56: Layoffs**

- (e) Employees with permanent status who are laid off shall have the right upon recall to be appointed to a position in the class they held at the time they were laid off except that:
  (1) such right shall not exceed one year from the effective date of layoff.
  (2) such right may be waived by the employee.

- (f) *Recall.* If a recall occurs, employees will be called back to work in the inverse order of layoff. A court or office which has laid off employees will not be allowed to permanently fill positions within those job classes vacated due to the layoff until all employees with recall rights have been re-employed or have waived their rights.

- (g) *Pay computation.* An employee who is laid off shall receive the following, which shall be paid within thirty (30) days after the effective date of the layoff:
  (1) Compensation for all unused accrued annual leave remaining to his/her credit up to a maximum of fifty (50) days.
  (2) Compensation for 50% of accumulated sick leave to his/her credit, not to exceed sixty (60) days.
  (3) Compensation for terminal pay for qualifying administrative/exempt employees.

  (A) The State shall be financially responsible only for that portion of termination pay that applies to the years in which the employee received a paycheck signed by the Treasurer, State of New Hampshire.

**Definitions:**

- *Rehire:* Employment of a former NH Judicial Branch employee. A rehired employee is subject to a probationary period.
- *Reinstate:* Restore a former employee into the same classification, labor grade, and step the employee was assigned at the date of separation and who was in good standing. A reinstated employee is not subject to a probationary period. To be considered a reinstatement, the employee must be reinstated within 3 years after separation.

**MEDICAL/PRESCRIPTION DRUG & DENTAL BENEFITS – State of New Hampshire**

Medical (including Prescription Drug) and Dental coverage is available on the 1st day of the month following the completion of one full month of full-time regular employment.

CONFIDENTIAL

**Medical/Prescription Drug & Dental**: For the scenario we discussed, benefits would become effective May 1, 2025.

Life Insurance: Available Day 1.

Flexible Spending: Available Day 1

**NHRS**:

**If a member terminates employment, must the member's accumulated contributions be withdrawn immediately?**
No. A terminated member who is vested may leave accumulated contributions with NHRS indefinitely, and interest earnings will be credited at the same rate as active members.

CONFIDENTIAL

# 20. Emails Re: Todd Bookman Inquiry Regarding Attorney Martin

CONFIDENTIAL

**Chief Justice Gordon MacDonald**

| | |
|---|---|
| **From:** | Erin Creegan |
| **Sent:** | Monday, March 3, 2025 13:20 |
| **To:** | Av Harris; Chief Justice Gordon MacDonald |
| **Subject:** | RE: AOC question |

I just spoke to Chief and he says give him the order and no comment on personnel matters otherwise.

**From:** Av Harris <AHarris@courts.state.nh.us>
**Sent:** Monday, March 3, 2025 12:58 PM
**To:** Erin Creegan <ECreegan@courts.state.nh.us>; Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Subject:** RE: AOC question

We can, however the Administrative order has been issued which is a public document, and we updated the information on the website to reflect the administrative order. So I think we can either confirm what is in the administrative order and share that with the reporter, or we could send him the administrative order and just say no comment on personnel matters.

Av Harris
Communications Manager/Public Information Officer
New Hampshire Judicial Branch
aharris@courts.state.nh.us
603-415-6770

**From:** Erin Creegan <ECreegan@courts.state.nh.us>
**Sent:** Monday, March 3, 2025 12:50 PM
**To:** Av Harris <AHarris@courts.state.nh.us>; Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Subject:** RE: AOC question

Can we simply say we don't have a comment on personnel matters?

**From:** Av Harris <AHarris@courts.state.nh.us>
**Sent:** Monday, March 3, 2025 12:39 PM
**To:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>; Erin Creegan <ECreegan@courts.state.nh.us>
**Subject:** FW: AOC question
**Importance:** High

See below from Todd Bookman of NHPR. I think we should confirm what is in the administrative order and not speak in any detail about personnel matters. Let me know your thoughts on the below.

My recommended response:

Hi Todd,

See attached Supreme Court Administrative Order issued today, Monday March 3, 2025. I can confirm that Dianne Martin is no longer Director of the Administrative Office of the Courts and that Circuit Court Judge Christopher Keating has been appointed to serve as Interim Director of the AOC until a permanent replacement is found. Dianne concluded her service to the Judicial Branch on Friday February 28.

CONFIDENTIAL

We have no comment on any of your other questions.

Thank you,
Av

Av Harris
Communications Manager/Public Information Officer
New Hampshire Judicial Branch
aharris@courts.state.nh.us
603-415-6770

**From:** Todd Bookman <tbookman@nhpr.org>
**Sent:** Monday, March 3, 2025 11:43 AM
**To:** Av Harris <AHarris@courts.state.nh.us>
**Subject:** AOC question

**EXTERNAL EMAIL WARNING!** This email originated outside of the New Hampshire Judicial Branch network. Do not click on links or open attachments unless you recognize the sender and are expecting the email. Mouse over links to confirm the target before you click. Do not enter your username and password on sites that you have reached through an email link. Forward suspicious and unexpected messages to 'suspicious@courts.state.nh.us'.

Hi Av,
Hope you are doing well.

NHPR is hoping you can confirm that Dianne Martin is no longer the director of the AOC. Could you clarify if she was terminated or resigned, and what day is/was her official last day?

Who is now serving as the director of the AOC?

Additionally, can you confirm that [redacted] has been placed on administrative leave? (Could you also confirm what her exactly title within the AOC is?)

And finally: if the branch has a statement or comment to share on why these changes are taking place, including whether there is an investigation into either or both of these employees, please share what you can.

Sincerely,
Todd

REPORTER
NEW HAMPSHIRE PUBLIC RADIO
2 Pillsbury Street, 6th Floor, Concord NH 03301
tbookman@nhpr.org

CONFIDENTIAL

# 21. Email from Attorney Creegan to Chief Justice Gordon J. MacDonald and Judge Christopher Keating Re: Transition Conversation Notes

CONFIDENTIAL

Outlook

**Transition conversation notes**

**From** Erin Creegan <ECreegan@courts.state.nh.us>
**Date** Wed 3/12/2025 4:53 PM
**To** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Cc** Hon. Christopher Keating <CKeating@courts.state.nh.us>

CONFIDENTIAL

Connected with Dianne by phone. Went through some of the things I had questions about, easiest to hardest.

I started with fully remote just asking if she was comfortable coming in person if required for a big meeting. I thought that would be an easy start but even there she was a little upset. She said she did not want to be around people who did not wish her well.
I asked about what she wanted to see in a message to the Branch and she said nothing specific requested, just to have her reputation restored.
I asked about how to handle the question of reporting to the director and she did not want an order but rather a delegation. She did not want the full NHSC involved.
I said there was some difficulty with [redacted] and [redacted] aving different pay and she related that because [redacted] as [redacted] ast secretary, she was nervous about keeping her. She said she didn't have anything against [redacted] he was just worried. I asked about moving [redacted] and she was also quick to say she did not want [redacted] treated unfairly because of her. This is a tough one, I'm not sure of the solution.

Moving up to more difficult I asked about how to handle the payout and any gaps in service. She said she understood we did something similar for [redacted] She thought it just had to be same month. She would be willing to do a smaller gap in days if necessary. She also expressed concern that she had learned that even though she had been told it was a layoff, that may not have been right. I asked what was most important to her and she said keeping insurance [redacted] and that she would like the payout. Chris I believe is looking into this.
Finishing with the most difficult I said keeping the same salary might be difficult. She expressed surprise and said moving her down would not be right. I said I understood it was not a very large move, about 161 to 145. She said she thought she was more at like 165, and that she had been working on a reclass of Sherry's position to 58. I said I would take this back and look into that and maybe something like a lump sum up front, or maybe some other idea. She didn't really respond to that so I did not push it.

[redacted]

Erin

# 22. Emails between Judge Christopher Keating and Suzanne Gelinas Re: Medical and Dental Benefits for a Layoff – Rehired Employee

CONFIDENTIAL

Outlook

**RE: Health and dental question**

From Hon. Christopher Keating <CKeating@courts.state.nh.us>
Date Thu 3/13/2025 3:25 PM
To Suzanne Gelinas <SGelinas@courts.state.nh.us>

I'm at 1752 for the rest of the day

**From:** Suzanne Gelinas <SGelinas@courts.state.nh.us>
**Sent:** Thursday, March 13, 2025 8:27 AM
**To:** Hon. Christopher Keating <CKeating@courts.state.nh.us>
**Subject:** RE: Health and dental question

Judge Keating-

As soon as I finish with my reports to the SEA, I will get started on this inquiry.

This remains confidential and I will be sure to ask broad questions accordingly.

I will contact you shortly.

Suzanne

***Suzanne M. Gelinas***
Manager, Human Resources
New Hampshire Judicial Branch
One Granite Place
Concord, New Hampshire 03302
Office: (603) 415-0308

**From:** Hon. Christopher Keating <CKeating@courts.state.nh.us>
**Sent:** Thursday, March 13, 2025 6:04 AM
**To:** Suzanne Gelinas <SGelinas@courts.state.nh.us>
**Subject:** Health and dental question

Good morning Suzanne,

I wonder if you could look into what the effect would be to an NHJB employee's medical and dental benefits if the employee goes into layoff status as of March 21 and then is rehired into a different NHJB position with a start date of March 28.

Let's talk this morning about next steps, please. I will be sitting in Laconia this morning and this afternoon, but I have some time first thing if you will please call me at extension 1752.

This remains a highly confidential inquiry. I very much appreciate your discretion.

-cmk

CONFIDENTIAL

# 23. Email between Judge Christopher Keating and Attorney Erin Creegan Re: No Updates

CONFIDENTIAL

Outlook

**RE: no updates**

**From** Erin Creegan <ECreegan@courts.state.nh.us>
**Date** Sun 3/16/2025 9:21 AM
**To** Hon. Christopher Keating <CKeating@courts.state.nh.us>

Thanks. I have an 8:30am meeting and somewhat urgent call [redacted] early tomorrow morning, but am otherwise available.
Erin

**From:** Hon. Christopher Keating <CKeating@courts.state.nh.us>
**Sent:** Sunday, March 16, 2025 8:20 AM
**To:** Erin Creegan <ECreegan@courts.state.nh.us>
**Subject:** no updates

Erin,

Writing to explain that we are waiting for information from DAS about the feasibility and consequences of the proposed layoff/rehire scenario for D.M.

Suzanne was on a mission to acquire a solid grasp of the mechanics and details of the salary and benefits so that she could put it all down on paper to be able to present to us before the end of the day on Friday, but she fell sick and was out on Friday.

I'm hoping we can make progress on Monday; this is a critical priority; I will ask Suzanne if she can clear the deck of anything else not as time sensitive.

Thank you for your patience; I'll be in first thing Monday, maybe we could find a moment to go over where things stand.

-cmk

**Hon. Christopher M. Keating**
*Interim Director*
Administrative Office of the Courts
New Hampshire Judicial Branch

CONFIDENTIAL

# 24. Memo from Judge Christopher Keating Re: [redacted]

GJM
RESP
PP. 0433-
0436
Redacted/
Withheld

# 25. Emails between Judge Christopher Keating, Suzanne Gelinas, Laurie Livingston and Deputy Director of Personnel Matthew Mavrogeorge Re: Confidential Benefits Scenario

CONFIDENTIAL

Outlook

**FW: CONFIDENTIAL Benefits Scenario**

**From** Suzanne Gelinas </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C2FD341B08164013B29DAA257318ABF0-17D7E2A0-C7>
**Date** Mon 3/17/2025 10:39 AM
**To** Hon. Christopher Keating <CKeating@courts.state.nh.us>

Judge Keating-

DAS suggests I speak with Matthew Mavrogeorge on the layoff/benefits question.

Ok to proceed with contacting him?

Mavrogeorge, Matthew
Deputy Director of Personnel
271-2824
Matthew.G.Mavrogeorge@das.nh.gov

***Suzanne M. Gelinas***
Manager, Human Resources
New Hampshire Judicial Branch
One Granite Place
Concord, New Hampshire 03302
Office: (603) 415-0308

**From:** Livingston, Laurie <Laurie.L.Livingston@das.nh.gov>
**Sent:** Friday, March 14, 2025 10:38 AM
**To:** Suzanne Gelinas <SGelinas@courts.state.nh.us>
**Subject:** RE: CONFIDENTIAL Benefits Scenario

**EXTERNAL EMAIL WARNING!** This email originated outside of the New Hampshire Judicial Branch network. Do not click on links or open attachments unless you recognize the sender and are expecting the email. Mouse over links to confirm the target before you click. Do not enter your username and password on sites that you have reached through an email link. Forward suspicious and unexpected messages to 'suspicious@courts.state.nh.us'.

Hi Suzanne,

I spoke with the Deputy Director about this and she suggested that since it's regarding a possible layoff scenario that you reach out to Matt Mavrogeorge who is the Deputy Director of the Division of Personnel. If after speaking with him, he guides you our direction we're happy to answer any questions, but it would be better to start with him first.

Thank you,

*Laurie Livingston*
Employee Health Benefits Administrator
Risk and Benefits Division
25 Capitol Street, Room 412
Concord, NH 03301
(603)271-3130/Fax (603)271-1427

CONFIDENTIAL

**From:** Suzanne Gelinas <SGelinas@courts.state.nh.us>
**Sent:** Thursday, March 13, 2025 4:05 PM
**To:** Livingston, Laurie <Laurie.L.Livingston@das.nh.gov>
**Subject:** CONFIDENTIAL Benefits Scenario

Hi Laurie

Thanks for your patience while I discussed this with Judge Keating (Interim Director for the AOC).

Could you please have your Deputy Administrator contact me directly? My direct line at the AOC is [redacted].
I will be packing up for the night [redacted] but will be available via cell phone for this evening [redacted]

Totally understandable if she is unavailable this evening and we need to move this matter to the morning.

We ask that this matter be maintained at the highest level of confidentiality.

Much appreciated!

Suzanne

***Suzanne M. Gelinas***
Manager, Human Resources
New Hampshire Judicial Branch
One Granite Place
Concord, New Hampshire 03302
Office: (603) 415-0308

CONFIDENTIAL

Outlook

**RE: CONFIDENTIAL Benefits Scenario**

From Hon. Christopher Keating <CKeating@courts.state.nh.us>
Date Mon 3/17/2025 10:40 AM
To Suzanne Gelinas <SGelinas@courts.state.nh.us>

Yes, please do.

**From:** Suzanne Gelinas <SGelinas@courts.state.nh.us>
**Sent:** Monday, March 17, 2025 10:39 AM
**To:** Hon. Christopher Keating <CKeating@courts.state.nh.us>
**Subject:** FW: CONFIDENTIAL Benefits Scenario

Judge Keating-

DAS suggests I speak with Matthew Mavrogeorge on the layoff/benefits question.

Ok to proceed with contacting him?

Mavrogeorge, Matthew
Deputy Director of Personnel
271-2824
Matthew.G.Mavrogeorge@das.nh.gov

***Suzanne M. Gelinas***
Manager, Human Resources
New Hampshire Judicial Branch
One Granite Place
Concord, New Hampshire 03302
Office: (603) 415-0308

**From:** Livingston, Laurie <Laurie.L.Livingston@das.nh.gov>
**Sent:** Friday, March 14, 2025 10:38 AM
**To:** Suzanne Gelinas <SGelinas@courts.state.nh.us>
**Subject:** RE: CONFIDENTIAL Benefits Scenario

**EXTERNAL EMAIL WARNING!** This email originated outside of the New Hampshire Judicial Branch network. Do not click on links or open attachments unless you recognize the sender and are expecting the email. Mouse over links to confirm the target before you click. Do not enter your username and password on sites that you have reached through an email link. Forward suspicious and unexpected messages to 'suspicious@courts.state.nh.us'.

Hi Suzanne,

I spoke with the Deputy Director about this and she suggested that since it's regarding a possible layoff scenario that you reach out to Matt Mavrogeorge who is the Deputy Director of the Division of Personnel. If after speaking with him, he guides you our direction we're happy to answer any questions, but it would be better to start with him first.

Thank you,

CONFIDENTIAL

*Laurie Livingston*
Employee Health Benefits Administrator
Risk and Benefits Division
25 Capitol Street, Room 412
Concord, NH 03301
(603)271-3130/Fax (603)271-1427

**From:** Suzanne Gelinas <SGelinas@courts.state.nh.us>
**Sent:** Thursday, March 13, 2025 4:05 PM
**To:** Livingston, Laurie <Laurie.L.Livingston@das.nh.gov>
**Subject:** CONFIDENTIAL Benefits Scenario

Hi Laurie

Thanks for your patience while I discussed this with Judge Keating (Interim Director for the AOC).

Could you please have your Deputy Administrator contact me directly? My direct line at the AOC is [redacted].
I will be packing up for the night [redacted] but will be available via cell phone for this evening [redacted].

Totally understandable if she is unavailable this evening and we need to move this matter to the morning.

We ask that this matter be maintained at the highest level of confidentiality.

Much appreciated!

Suzanne

***Suzanne M. Gelinas***
Manager, Human Resources
New Hampshire Judicial Branch
One Granite Place
Concord, New Hampshire 03302
Office: (603) 415-0308

CONFIDENTIAL

Outlook

**RE: Confidential Matter**

**From** Suzanne Gelinas </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C2FD341B08164013B29DAA257318ABF0-17D7E2A0-C7>
**Date** Mon 3/17/2025 4:19 PM
**To** Mavrogeorge, Matthew <Matthew.G.Mavrogeorge@das.nh.gov>
**Cc** Hon. Christopher Keating <CKeating@courts.state.nh.us>

Hi Matt

I just left you a VM message – not sure what is going on with my office phone line – someone else told me they could not get through either.

If you can use my cell phone number, I am sitting in my office [redacted].

Many thanks!

Suzanne

***Suzanne M. Gelinas***
Manager, Human Resources
New Hampshire Judicial Branch
One Granite Place
Concord, New Hampshire 03302
Office: (603) 415-0308

**From:** Mavrogeorge, Matthew <Matthew.G.Mavrogeorge@das.nh.gov>
**Sent:** Monday, March 17, 2025 3:44 PM
**To:** Suzanne Gelinas <SGelinas@courts.state.nh.us>
**Cc:** Hon. Christopher Keating <CKeating@courts.state.nh.us>
**Subject:** Re: Confidential Matter

**EXTERNAL EMAIL WARNING!** This email originated outside of the New Hampshire Judicial Branch network. Do not click on links or open attachments unless you recognize the sender and are expecting the email. Mouse over links to confirm the target before you click. Do not enter your username and password on sites that you have reached through an email link. Forward suspicious and unexpected messages to 'suspicious@courts.state.nh.us'.

Hi Suzanne, I just tried calling you, but it didn't go through. Can you try calling me at [redacted]? Thanks. - Matt

**From:** Mavrogeorge, Matthew <Matthew.G.Mavrogeorge@das.nh.gov>
**Sent:** Monday, March 17, 2025 12:58:34 PM
**To:** Suzanne Gelinas <SGelinas@courts.state.nh.us>
**Cc:** Hon. Christopher Keating <CKeating@courts.state.nh.us>
**Subject:** RE: Confidential Matter

Hi Suzanne,

CONFIDENTIAL

Thanks for reaching out. I'm about to head into a meeting until 3:30. I can call you when the meeting finishes.

Thanks,

Matt

*Matt Mavrogeorge*
Deputy Director of Personnel
Division of Personnel
Department of Administrative Services
Matthew.G.Mavrogeorge@das.nh.gov
(603) 271-2824

One Workforce
Organizational navigation for NH state employees

CONFIDENTIALITY NOTICE: This email message and any attachments may contain confidential and proprietary information. If you are not the intended recipient, please be informed that you have received this message in error. Please notify the sender immediately via the contact information listed above and delete the message and all attachments from your files. Thank you for your cooperation.

**From:** Suzanne Gelinas <SGelinas@courts.state.nh.us>
**Sent:** Monday, March 17, 2025 11:10 AM
**To:** Mavrogeorge, Matthew <Matthew.G.Mavrogeorge@das.nh.gov>
**Cc:** Hon. Christopher Keating <CKeating@courts.state.nh.us>
**Subject:** Confidential Matter

Good morning Matthew-

My name is Suzanne Gelinas, and I am the new Manager, Human Resources for the NH Judicial Branch.

I am working with Judge Keating, our Interim Director for the AOC on a highly confidential matter and I looking for your assistance on a couple of questions. Your team suggested that I reach out to you directly.

My direct line at the AOC is [redacted] and my cell phone for this evening [redacted].

We ask that this matter be maintained at the highest level of confidentiality.

Much appreciated!

Suzanne

***Suzanne M. Gelinas***
Manager, Human Resources
New Hampshire Judicial Branch
One Granite Place

Concord, New Hampshire 03302
Office: (603) 415-0308

CONFIDENTIAL

CONFIDENTIAL

Outlook

**FW: Confidential Matter**

From Hon. Christopher Keating <CKeating@courts.state.nh.us>
Date Tue 3/18/2025 9:01 AM
To Suzanne Gelinas <SGelinas@courts.state.nh.us>

A meeting tomorrow with Director Rudis and Matt Mavrogeorge is not a bad idea. If you decide to set up a meeting for tomorrow, I would happy to join. Please let me know what you decide.

**From:** Mavrogeorge, Matthew <Matthew.G.Mavrogeorge@das.nh.gov>
**Sent:** Tuesday, March 18, 2025 8:50 AM
**To:** Suzanne Gelinas <SGelinas@courts.state.nh.us>
**Cc:** Hon. Christopher Keating <CKeating@courts.state.nh.us>
**Subject:** RE: Confidential Matter

**EXTERNAL EMAIL WARNING!** This email originated outside of the New Hampshire Judicial Branch network. Do not click on links or open attachments unless you recognize the sender and are expecting the email. Mouse over links to confirm the target before you click. Do not enter your username and password on sites that you have reached through an email link. Forward suspicious and unexpected messages to 'suspicious@courts.state.nh.us'.

Just tried calling both your numbers again and the same issue is happening. Do you want to set up a time to come to my office tomorrow to meet with me and Director Rudis?

**From:** Mavrogeorge, Matthew <Matthew.G.Mavrogeorge@das.nh.gov>
**Sent:** Tuesday, March 18, 2025 8:20 AM
**To:** Suzanne Gelinas <SGelinas@courts.state.nh.us>
**Cc:** Hon. Christopher Keating <CKeating@courts.state.nh.us>
**Subject:** RE: Confidential Matter

Hi Suzanne, I tried calling your cell, but it went straight to voicemail. I'll be around today if you'd like to call me at 603-271-2824. Thanks. – Matt

**From:** Suzanne Gelinas <SGelinas@courts.state.nh.us>
**Sent:** Monday, March 17, 2025 4:19 PM
**To:** Mavrogeorge, Matthew <Matthew.G.Mavrogeorge@das.nh.gov>
**Cc:** Hon. Christopher Keating <CKeating@courts.state.nh.us>
**Subject:** RE: Confidential Matter

Hi Matt

I just left you a VM message – not sure what is going on with my office phone line – someone else told me they could not get through either.

If you can use my cell phone number, I am sitting in my office [redacted]

Many thanks!

Suzanne

CONFIDENTIAL

***Suzanne M. Gelinas***
Manager, Human Resources
New Hampshire Judicial Branch
One Granite Place
Concord, New Hampshire 03302
Office: (603) 415-0308

**From:** Mavrogeorge, Matthew <Matthew.G.Mavrogeorge@das.nh.gov>
**Sent:** Monday, March 17, 2025 3:44 PM
**To:** Suzanne Gelinas <SGelinas@courts.state.nh.us>
**Cc:** Hon. Christopher Keating <CKeating@courts.state.nh.us>
**Subject:** Re: Confidential Matter

**EXTERNAL EMAIL WARNING!** This email originated outside of the New Hampshire Judicial Branch network. Do not click on links or open attachments unless you recognize the sender and are expecting the email. Mouse over links to confirm the target before you click. Do not enter your username and password on sites that you have reached through an email link. Forward suspicious and unexpected messages to 'suspicious@courts.state.nh.us'.

Hi Suzanne, I just tried calling you, but it didn't go through. Can you try calling me at 603-271-2824? Thanks. - Matt

---

**From:** Mavrogeorge, Matthew <Matthew.G.Mavrogeorge@das.nh.gov>
**Sent:** Monday, March 17, 2025 12:58:34 PM
**To:** Suzanne Gelinas <SGelinas@courts.state.nh.us>
**Cc:** Hon. Christopher Keating <CKeating@courts.state.nh.us>
**Subject:** RE: Confidential Matter

Hi Suzanne,

Thanks for reaching out. I'm about to head into a meeting until 3:30. I can call you when the meeting finishes.

Thanks,

Matt

*Matt Mavrogeorge*
Deputy Director of Personnel
Division of Personnel
Department of Administrative Services
Matthew.G.Mavrogeorge@das.nh.gov
(603) 271-2824

One Workforce
*Organizational navigation for NH state employees*

CONFIDENTIALITY NOTICE: This email message and any attachments may contain confidential and proprietary information. If you are not the intended recipient, please be informed that you have received this message in error. Please notify the sender immediately via the contact information listed above

and delete the message and all attachments from your files. Thank you for your cooperation.

CONFIDENTIAL

**From:** Suzanne Gelinas <SGelinas@courts.state.nh.us>
**Sent:** Monday, March 17, 2025 11:10 AM
**To:** Mavrogeorge, Matthew <Matthew.G.Mavrogeorge@das.nh.gov>
**Cc:** Hon. Christopher Keating <CKeating@courts.state.nh.us>
**Subject:** Confidential Matter

Good morning Matthew-

My name is Suzanne Gelinas, and I am the new Manager, Human Resources for the NH Judicial Branch.

I am working with Judge Keating, our Interim Director for the AOC on a highly confidential matter and I looking for your assistance on a couple of questions. Your team suggested that I reach out to you directly.

My direct line at the AOC is (603) 513-0308 and my cell phone for this evening [redacted]

We ask that this matter be maintained at the highest level of confidentiality.

Much appreciated!

Suzanne

***Suzanne M. Gelinas***
Manager, Human Resources
New Hampshire Judicial Branch
One Granite Place
Concord, New Hampshire 03302
Office: (603) 415-0308

# 26. Email between Judge Christopher Keating and Suzanne Gelinas Re: Findings Regarding Former Director's Layoff – Rehire Scenario

CONFIDENTIAL

Outlook

**RE: former director**

**From** Suzanne Gelinas </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C2FD341B08164013B29DAA257318ABF0-17D7E2A0-C7>
**Date** Tue 3/18/2025 8:37 AM
**To** Hon. Christopher Keating <CKeating@courts.state.nh.us>

Good morning Judge Keating-

I will try calling Matt again this AM. Hoping to get this one accomplished today!

I will be in touch with you soon.

Suzanne

***Suzanne M. Gelinas***
Manager, Human Resources
New Hampshire Judicial Branch
One Granite Place
Concord, New Hampshire 03302
Office: (603) 415-0308

**From:** Hon. Christopher Keating <CKeating@courts.state.nh.us>
**Sent:** Tuesday, March 18, 2025 8:15 AM
**To:** Suzanne Gelinas <SGelinas@courts.state.nh.us>
**Subject:** former director

Suzanne,

I'll be keen to learn your findings from your discussions about the feasibility of the pending proposal with respect to the former director's layoff/rehire scenario.

I will be sitting in the Laconia Circuit Court hearing cases all day but please don't hesitate to call me at my extension, (1752), if you need anything, or, feel free to consult with Erin.

Many, many thanks.

-cmk

**Hon. Christopher M. Keating**
*Interim Director*
Administrative Office of the Courts
New Hampshire Judicial Branch

# 27. Emails between Judge Christopher Keating and Suzanne Gelinas Re: Draft Letter to Attorney Dianne Martin

CONFIDENTIAL

Outlook

**Letter - Revised**

**From** Suzanne Gelinas </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C2FD341B08164013B29DAA257318ABF0-17D7E2A0-C7>

**Date** Wed 3/19/2025 4:24 PM

**To** Hon. Christopher Keating <CKeating@courts.state.nh.us>

1 attachment (109 KB)

DM_Letter Eff 3-24-2025 REHIRE.docx;

***Suzanne M. Gelinas***
Manager, Human Resources
New Hampshire Judicial Branch
One Granite Place
Concord, New Hampshire 03302
Office: (603) 415-0688

CONFIDENTIAL
**THE STATE OF NEW HAMPSHIRE**
**ADMINISTRATIVE OFFICE OF THE COURTS**

HON. CHRISTOPHER M. KEATING
INTERIM DIRECTOR

ONE GRANITE PLACE, SUITE N400
CONCORD, NH 03301
(603) 415-0665
ckeating@courts.state.nh.us

March XX, 2025

Dianne Martin
[redacted]

Dear Dianne:

This correspondence is regarding your position as Director for the Administration of the Courts for the New Hampshire Judicial Branch.

Effective Monday, March 3, 2025, you were placed on paid administrative leave and removed from the position of Director of the Administration of the Courts for the New Hampshire Judicial Branch. Per Personnel Rule 56, Section (b), *'Layoff and reinstatement procedures shall be developed by the administrative council, approved by the Supreme Court as necessary, and published as administered orders at least 21 calendar days before the date of layoff becomes effective'.*

Effective March 24, 2025, your employment status with the New Hampshire Judicial Branch will cease.
Your termination status is considered a layoff, and the pay computation shall be as follows:

- Unused accrued annual leave; up to a maximum of fifty (50) days:
- Compensation for 50% of accumulated sick leave not to exceed sixty (60) days.
- Compensation for terminal pay for qualifying administrative /exempt employees. Terminal pay applies to the years in which the employee received a paycheck signed by the Treasurer, State of New Hampshire.

As we discussed, you would receive an appointment to the position of General Counsel, Office of Bar Admissions. You can expect a formal offer letter for this role.

Your contingent rehire date is scheduled for Friday, March 28, 2025, and you will be reporting to the Chief Justice Gordon J. MacDonald. This is a regular, full-time administrative position and your normal working hours will be 37.5 per week.

The starting compensation will be Labor Grade 56, Step 09 which is equal to an annual salary of $146,796.00, payable bi-weekly at $5646.00. This position is considered an exempt position.

There will be no break in your current benefits coverage.

Should you have any questions, please contact Erin Creegan, General Counsel for the New Hampshire Judicial Branch (603) 415-0353 ecreegan@courts.state.nh.us .

Best Regards,

Gordon J. MacDonald
Chief Justice, New Hampshire Supreme Court

CONFIDENTIAL

Outlook

## RE: CONFIDENTIAL - Draft Letter

From Suzanne Gelinas </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C2FD341B08164013B29DAA257318ABF0-17D7E2A0-C7>

Date Wed 3/19/2025 2:44 PM

To Hon. Christopher Keating <CKeating@courts.state.nh.us>

1 attachment (109 KB)

DM_Letter Eff 3-24-2025 REHIRE.docx;

Good day Judge Keating

Please see attached draft for your review.

Many thanks.

Suzanne

***Suzanne M. Gelinas***
Manager, Human Resources
New Hampshire Judicial Branch
One Granite Place
Concord, New Hampshire 03302
Office: (603) 415-0688

**From:** Hon. Christopher Keating <CKeating@courts.state.nh.us>
**Sent:** Wednesday, March 19, 2025 12:53 PM
**To:** Suzanne Gelinas <SGelinas@courts.state.nh.us>
**Subject:** RE: CONFIDENTIAL - Draft Letter

Suzanne,

Thank you for this draft.

Will you please add language about the rehire and start date and benefit eligibility as Office of Bar Admissions General Counsel, Labor Grade 56, Step 9, equating to a bi-weekly salary of $5,646, (please confirm these numbers). In terms of start date, don't we require people to start on Fridays?

We should probably be specific about the consequences the break in service will have on health insurance.

With respect to your conversation with Matt Mavrogeorge, please let me know if you learned anything valuable or important about the mechanics of this layoff-rehire process that we should be attending to. There are a lot of details to sort out and I'm not an expert in State Government Human Resources. I don't want to miss something because of my inexperience.

We might need several drafts of this letter to make sure we get everything accurate. Thank you for your efforts and patience during this process.

Thank you again.

-cmk

CONFIDENTIAL

**From:** Suzanne Gelinas <SGelinas@courts.state.nh.us>
**Sent:** Wednesday, March 19, 2025 10:45 AM
**To:** Hon. Christopher Keating <CKeating@courts.state.nh.us>
**Subject:** CONFIDENTIAL - Draft Letter

Good morning Judge Keating

Please see attached draft letter we discussed yesterday morning.

Suzanne

***Suzanne M. Gelinas***
Manager, Human Resources
New Hampshire Judicial Branch
One Granite Place
Concord, New Hampshire 03302
Office: (603) 415-0688

# 28. Email from Attorney Erin Creegan to Judge Christopher Keating and Chief Justice Gordon J. MacDonald Re: Meeting with Attorney Dianne Martin

CONFIDENTIAL

Outlook

**Meeting with Dianne**

**From** Erin Creegan <ECreegan@courts.state.nh.us>
**Date** Fri 3/21/2025 1:52 PM
**To** Hon. Christopher Keating <CKeating@courts.state.nh.us>
**Cc** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>

CONFIDENTIAL

Had a productive meeting with Dianne at her house this morning. Toplines:

She appeared to be doing well, have gotten farther along in processing everything that happened.
She accepts that we can't move [redacted]
The 50k-ish payoff sounds right to her.

The 56,9 salary concerned her. She said that the Chief had been working with her on reclassing all GCs to 58. Judge Keating, I spoke to the Chief and it sounds like this was in the works. I told Dianne I would check whether (1) it was possible to reclassify the position to 58,9 and (2) whether it could be done by Friday the 28th, or was too ambitious. (Just a flag, I technically have a financial interest in accelerated reclassification for GCs, so please don't take anything I say as pushing you to this result.)
If it can be done but not by Friday, she would want it done before she starts on a date in April.
I asked if receiving the 58,9 salary, if it was possible, would resolve the question from her perspective. [redacted]

We talked a little about lump sum up front and while she didn't initially love the idea of doing a waiver of claims or a commitment to a term of service, I talked about how not attaching it to something would make it salary and would affect reclassing other people and she said she got that. [redacted]

Last we talked about what would happen if we couldn't come to terms. I said we might be able to do a little bridge at current salary if she could line up another job, but it wouldn't be 6 months to find something perfect, it would be relatively short. She asked what the title and duties would be a little if she did that. [redacted]

We are going to speak again on Monday. I told her she is still on paid leave Monday and depending on whether she felt she could make a decision then it might be possible to extend it.

Erin

# 29. Emails between Justice James Bassett, Attorney Erin Creegan and Chief Justice Gordon J. MacDonald Re: Calculation of Attorney Dianne Martin Payout

CONFIDENTIAL

**Chief Justice Gordon MacDonald**

**From:** Chief Justice Gordon MacDonald
**Sent:** Friday, March 21, 2025 16:36
**To:** Erin Creegan
**Subject:** [redacted]

**We will have to take this up with them Monday.**

**From:** Erin Creegan <ECreegan@courts.state.nh.us>
**Sent:** Friday, March 21, 2025 16:27
**To:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Subject:** FW: [redacted]

Justice Bassett seems to think the payout is something the court weighs in on?

**From:** Justice James P. Bassett <JBassett@courts.state.nh.us>
**Sent:** Friday, March 21, 2025 4:07 PM
**To:** Erin Creegan <ECreegan@courts.state.nh.us>
**Subject:** [redacted]

Thank you

I don't want to create a lot of work for them (but they must already have it done)— but I think that it is important for the members of the court to have those numbers spelled out before we agree to any payout.

Get Outlook for iOS

**From:** Erin Creegan <ECreegan@courts.state.nh.us>
**Sent:** Friday, March 21, 2025 3:58:11 PM
**To:** Justice James P. Bassett <JBassett@courts.state.nh.us>
**Subject:** RE: [redacted]

It actually turned out to be 50k when Becky Plourde checked it. I don't have a spreadsheet but the inputs include up to 50 days of annual leave full paid out and 50% of sick time up to 60 days. Between those two you land at about 3 months of salary, which for Dianne is about 40k. This is from our personnel rules. Would you like me to ask Suzanne or Becky for a calculation sheet?

I spoke to her today and raised that. She is taking it back. I hope to talk to her Monday. If we don't have a resolution then it might kickout the potential start date, which is currently proposed as March 28.

**From:** Justice James P. Bassett <JBassett@courts.state.nh.us>
**Sent:** Friday, March 21, 2025 3:51 PM
**To:** Erin Creegan <ECreegan@courts.state.nh.us>
**Subject:** Re: [redacted]

Can you please forward the document or documents that show the calculation of how we get to the $80k payout contemplated for Dianne? Or just send me a quick explanation?Just trying to wrap my head around that high number.

What is the timeline for the negotiations with Dianne? I got the impression that deadlines are fast approaching. Is she aware that we want a global release of all possible claims?

Is the ball in her court—our ours—at this point?

Get Outlook for iOS

CONFIDENTIAL

**Chief Justice Gordon MacDonald**

| | |
|---|---|
| **From:** | Chief Justice Gordon MacDonald |
| **Sent:** | Friday, March 21, 2025 17:10 |
| **To:** | Erin Creegan |
| **Subject:** | RE: [redacted] |

**OK. Thank you.**

**From:** Erin Creegan <ECreegan@courts.state.nh.us>
**Sent:** Friday, March 21, 2025 16:37
**To:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Subject:** FW: [redacted]

Maybe I can satisfy with a calculation sheet. (see below) I asked Becky for one.

**From:** Justice James P. Bassett <JBassett@courts.state.nh.us>
**Sent:** Friday, March 21, 2025 4:35 PM
**To:** Erin Creegan <ECreegan@courts.state.nh.us>
**Subject:** Re: [redacted]

understood
I just want to be comfortable with the math— and the various elements that are required by our rules.
I would not want to pay more than required without a very good reason.

Get Outlook for iOS

**From:** Erin Creegan <ECreegan@courts.state.nh.us>
**Sent:** Friday, March 21, 2025 4:30:22 PM
**To:** Justice James P. Bassett <JBassett@courts.state.nh.us>
**Subject:** RE: [redacted]

I don't think we can decline the payout under the personnel rules.

**From:** Justice James P. Bassett <JBassett@courts.state.nh.us>
**Sent:** Friday, March 21, 2025 4:07 PM
**To:** Erin Creegan <ECreegan@courts.state.nh.us>
**Subject:** Re: [redacted]

Thank you

I don't want to create a lot of work for them (but they must already have it done)— but I think that it is important for the members of the court to have those numbers spelled out before we agree to any payout.

Get Outlook for iOS

CONFIDENTIAL

**From:** Erin Creegan <ECreegan@courts.state.nh.us>
**Sent:** Friday, March 21, 2025 3:58:11 PM
**To:** Justice James P. Bassett <JBassett@courts.state.nh.us>
**Subject:** RE: [redacted]

It actually turned out to be 50k when Becky Plourde checked it. I don't have a spreadsheet but the inputs include up to 50 days of annual leave full paid out and 50% of sick time up to 60 days. Between those two you land at about 3 months of salary, which for Dianne is about 40k. This is from our personnel rules. Would you like me to ask Suzanne or Becky for a calculation sheet?

I spoke to her today and raised that. She is taking it back. I hope to talk to her Monday. If we don't have a resolution then it might kickout the potential start date, which is currently proposed as March 28.

**From:** Justice James P. Bassett <JBassett@courts.state.nh.us>
**Sent:** Friday, March 21, 2025 3:51 PM
**To:** Erin Creegan <ECreegan@courts.state.nh.us>
**Subject:** Re: [redacted]

Can you please forward the document or documents that show the calculation of how we get to the $80k payout contemplated for Dianne? Or just send me a quick explanation?Just trying to wrap my head around that high number.

What is the timeline for the negotiations with Dianne? I got the impression that deadlines are fast approaching. Is she aware that we want a global release of all possible claims?

Is the ball in her court—our ours—at this point?

Get Outlook for iOS

[redacted]

# 30. Judge Christopher Keating Memorandum Re: Reclassification of General Counsel Role

CONFIDENTIAL

**THE STATE OF NEW HAMPSHIRE**
**ADMINISTRATIVE OFFICE OF THE COURTS**

HON. CHRISTOPHER M. KEATING
INTERIM DIRECTOR

ONE GRANITE PLACE, SUITE N400
CONCORD, NH 03301
(603) 415-0665
ckeating@courts.state.nh.us

# MEMORANDUM

TO: Donna Raymond, Fiscal Manager; Suzanne Gelinas, Human Resources Manager; Becky Plourde, Accounting and Payroll Manager

FROM: Hon. Christopher Keating, Interim Director

DATE: March 27, 2025

RE: Reclassification of the General Counsel Role

On March 24, 2025, the Justices of the New Hampshire Supreme Court waived the application of certain provisions of Personnel Rule 12 and unanimously approved the reclassification of the position of General Counsel to Labor Grade 58.

The Justices explained that this reclassification has been under consideration for some time as a means of ensuring that the Judicial Branch can continue to recruit and retain qualified attorneys in these critical positions.

This reclassification was intended by the Justices to affect the following three job titles:

- Judicial Branch General Counsel — Labor Grade 55 to Labor Grade 58
- Office of Bar Admissions General Counsel — Labor Grade 56 to Labor Grade 58
- Attorney Discipline Office General Counsel — Labor Grade 56 to Labor Grade 58

The reclassification shall take effect on Friday, April 4, 2025.

Thank you in advance for your help with implementation of this measure with respect to the employees occupying these positions. Please let me know how I might be of assistance in this effort.

# 31. Emails between Suzanne Gelinas and Deputy Director Matthew Mavrogeorge Re: Open Leadership Role at DHHS

CONFIDENTIAL

Outlook

**RE: DHHS**

**From** Mavrogeorge, Matthew <Matthew.G.Mavrogeorge@das.nh.gov>
**Date** Wed 3/26/2025 1:38 PM
**To** Suzanne Gelinas <SGelinas@courts.state.nh.us>

> **EXTERNAL EMAIL WARNING!** This email originated outside of the New Hampshire Judicial Branch network. Do not click on links or open attachments unless you recognize the sender and are expecting the email. Mouse over links to confirm the target before you click. Do not enter your username and password on sites that you have reached through an email link. Forward suspicious and unexpected messages to 'suspicious@courts.state.nh.us'.

I understand. I'll let you know if I hear anything about that position being posted.

**From:** Suzanne Gelinas <SGelinas@courts.state.nh.us>
**Sent:** Wednesday, March 26, 2025 11:56 AM
**To:** Mavrogeorge, Matthew <Matthew.G.Mavrogeorge@das.nh.gov>
**Subject:** RE: DHHS

It is a layered plan for Dianne. Layoff – Payout of Benefits – Then rehired as General Counsel for the Office of Bar Admissions – into a role already occupied and won't be open until August 2025 when the current incumbent is set to retire.
Dianne will be working from home. Salary adjusted from LG 60 to 58 Step 9. Reporting directly to the Chief Justice. But the current position reports to the Director of the AOC. Completely tailored to her wants.

[redacted]

The NHJB will see fall out from these moves. There is ZERO accountability for unethical behavior; instead, people get rewarded.

My morale compass will not work in such an environment. I cannot make change to an organization who will not support Ethics and a Code of Conduct.

Sorry for my rant.

Suzanne

***Suzanne M. Gelinas***
Manager, Human Resources
New Hampshire Judicial Branch
One Granite Place
Concord, New Hampshire 03302
Office: (603) 415-0688

**From:** Mavrogeorge, Matthew <Matthew.G.Mavrogeorge@das.nh.gov>
**Sent:** Wednesday, March 26, 2025 11:30 AM
**To:** Suzanne Gelinas <SGelinas@courts.state.nh.us>
**Subject:** RE: DHHS

CONFIDENTIAL

**EXTERNAL EMAIL WARNING!** This email originated outside of the New Hampshire Judicial Branch network. Do not click on links or open attachments unless you recognize the sender and are expecting the email. Mouse over links to confirm the target before you click. Do not enter your username and password on sites that you have reached through an email link. Forward suspicious and unexpected messages to 'suspicious@courts.state.nh.us'.

Hi, I will check and see about the posting of that position. When are they scheduled to return to AOC? Does this mean they are not moving forward with the layoff and NHBA position plan?

**From:** Suzanne Gelinas <SGelinas@courts.state.nh.us>
**Sent:** Wednesday, March 26, 2025 11:05 AM
**To:** Mavrogeorge, Matthew <Matthew.G.Mavrogeorge@das.nh.gov>
**Subject:** DHHS

Good morning Matt-

I am interested in applying for the open HR Leadership role for DHHS. Could you provide me a heads up to when it will be posted.

Dianne Martin and [redacted]re returning to the AOC and I can no longer work in this very unethical organization. I am very worried about retaliation upon their return.

I appreciate it.

Suzanne

***Suzanne M. Gelinas***
Manager, Human Resources
New Hampshire Judicial Branch
One Granite Place
Concord, New Hampshire 03302
Office: (603) 415-0688

# 32. Emails between Chief Justice Gordon J. MacDonald and Attorney Dianne Martin Re: Annual Bar Admission Conference and Signing On

CONFIDENTIAL

**Chief Justice Gordon MacDonald**

**From:** Dianne Martin [redacted]
**Sent:** Thursday, March 27, 2025 09:46
**To:** Chief Justice Gordon MacDonald
**Subject:** Re: NCBE ABAC in Seattle

**EXTERNAL EMAIL WARNING!** *This email originated outside of the New Hampshire Judicial Branch network. Do not click on links or open attachments unless you recognize the sender and are expecting the email. Mouse over links to confirm the target before you click. Do not enter your username and password on sites that you have reached through an email link. Forward suspicious and unexpected messages to 'suspicious@courts.state.nh.us'*

Gordon,
I was planning to attend [redacted] I am looking into whether it will be held again at a later date this year and if so, I will reschedule and attend this conference.
Dianne

---

**From:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Date:** Tuesday, March 25, 2025 at 4:03 PM
**To:** Dianne Martin [redacted]
**Subject:** NCBE ABAC in Seattle

**Dianne,**

**I am very excited about your new role!**

**One thing I wanted to put on your radar screen immediately is the Annual Bar Admissions Conference (ABAC) which is conducted by the National Conference of Bar Examiners (NCBE). It will be held from May 1-4, 2025, in Seattle. As one of our designated representatives, the NCBE will pay for your registration, hotel and up to $750 in air fare. More information is attached.**

**If at all possible, I strongly encourage you to attend. In the world of bar admissions, ABAC is a big deal. The content is excellent and you will have the chance to meet hundreds of others involved in all aspects of bar admissions. I will be going, along with Sherry. Fred Coolbroth is also attending as he will be receiving an award from the NCBE.**

**If you can go, you should register with the NCBE, make hotel reservations (preferably, arriving Thursday and departing Sunday) at the Westin and book your air travel.**

**Gordon**

Gordon J. MacDonald
Chief Justice
New Hampshire Supreme Court
One Charles Doe Drive
Concord, New Hampshire 03301
(603) 415-6742
GMacDonald@courts.state.nh.us

CONFIDENTIAL

**Chief Justice Gordon MacDonald**

| | |
|---|---|
| **From:** | Dianne Martin [redacted] |
| **Sent:** | Friday, April 4, 2025 09:17 |
| **To:** | Chief Justice Gordon MacDonald |
| **Subject:** | Re: Signing on |

EXTERNAL EMAIL WARNING! This email originated outside of the New Hampshire Judicial Branch network. Do not click on links or open attachments unless you recognize the sender and are expecting the email. Mouse over links to confirm the target before you click. Do not enter your username and password on sites that you have reached through an email link. Forward suspicious and unexpected messages to 'suspicious@courts.state.nh.us'.

Thank you for the direction. That is very helpful. I will do all of those things and circle back with any questions.
Dianne

On Fri, Apr 4, 2025 at 9:09 AM Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us> wrote:

Good morning!

Please feel free to reach out to Sherry. I think she has a pile of stuff for you. Also, at some point, you should reach out to Mary Tenn and Ryan Guptil. I spoke with both of them, and they are excited to be working with you in this role. Also, at some point, you should reach out to Courtney Brooks who directs the Daniel Webster Scholars Program at the law school.

From my perspective, the big immediate priorities are the July exam, assisting the BBE with its decision on whether to adopt the NextGen exam, if it does and the Court agrees, the numerous implementation issues associated with it, and the issues surrounding reciprocity for those jurisdictions that have already adopted NextGen.

I completely understand about the conference. There will be numerous opportunities to engage with the NCBE. I think you will find it is a warm and welcoming community. The northeast regional group is also really great.

Please let me know if you need anything from me.

Thank you very much for taking this on.

Gordon

CONFIDENTIAL

**From:** Dianne Martin [redacted]
**Sent:** Friday, April 4, 2025 08:11
**To:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Subject:** Signing on

**EXTERNAL EMAIL WARNING!** This email originated outside of the New Hampshire Judicial Branch network. Do not click on links or open attachments unless you recognize the sender and are expecting the email. Mouse over links to confirm the target before you click. Do not enter your username and password on sites that you have reached through an email link. Forward suspicious and unexpected messages to 'suspicious@courts.state.nh.us'.

Good morning, Chief,

I am signing on in the GC role this morning. Yesterday, Erin said she did not think they have everything ready for me yet (laptop, etc.), so we discussed that I would sign on and start learning about bar admissions. I cleaned out my old office, so I will also get that unpacked and set up here today. You can reach me by cell or on this email until they have my new email and computer one set up.

Please let me know when it is ok to reach out to Sherry, and I will do that as well to set up a time to meet with her and find out what she recommends I study/do to get up to speed and what opportunities to shadow her are coming up. Unfortunately, I cannot change my plans [redacted] so I will not be able to attend the conference. I am happy to attend any other conference or learning experience that would be helpful. Just let me know and I will get them on my calendar now.

If there is anything you would like me to focus on, learn, or review over the next few days, please let me know.

Thanks,
Dianne

# 33. Emails between Communications Manager Av Harris, Chief Justice Gordon J. MacDonald, Judge Christopher Keating and Attorney Erin Creegan Re: Draft Announcement

CONFIDENTIAL

**Chief Justice Gordon MacDonald**

| | |
|---|---|
| **From:** | Erin Creegan |
| **Sent:** | Thursday, April 3, 2025 06:58 |
| **To:** | Av Harris; Chief Justice Gordon MacDonald; Hon. Christopher Keating |
| **Subject:** | Re: Draft announcement |

Got it, thank you!

Get Outlook for iOS

**From:** Av Harris <AHarris@courts.state.nh.us>
**Sent:** Thursday, April 3, 2025 6:41:08 AM
**To:** Erin Creegan <ECreegan@courts.state.nh.us>; Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>; Hon. Christopher Keating <CKeating@courts.state.nh.us>
**Subject:** Re: Draft announcement

I sent it to Dianne last night. I was going to call her this morning and check in.

Av Harris
Communications Manager/Public Information Officer
New Hampshire Judicial Branch
603-415-6770
aharris@courts.state.nh.us

**From:** Erin Creegan <ECreegan@courts.state.nh.us>
**Sent:** Thursday, April 3, 2025 6:35:29 AM
**To:** Av Harris <AHarris@courts.state.nh.us>; Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>; Hon. Christopher Keating <CKeating@courts.state.nh.us>
**Subject:** Re: Draft announcement

There may be some line edits but overall it looks good to me. Can we send to Dianne this morning?

Get Outlook for iOS

**From:** Av Harris <AHarris@courts.state.nh.us>
**Sent:** Wednesday, April 2, 2025 8:35:08 PM
**To:** Erin Creegan <ECreegan@courts.state.nh.us>; Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>; Hon. Christopher Keating <CKeating@courts.state.nh.us>
**Subject:** RE: Draft announcement

Pursuant to our discussions earlier today, here is a new draft for this message. I will share with Dianne as well. It is long, but it hits all of the elements we spoke about.

Let me know thoughts.

Thanks,
Av

CONFIDENTIAL

Key messages:

- **Tough budget season**
- **Hiring Freeze, with exceptions for mission critical positions to be evaluated on a case by case basis by the Admin Council**
- **Engaging a study with NCSC to restructure NHJB (trial courts and AOC) and find maximum efficiencies while maintaining current staffing levels**
- **As part of that restructuring, the position of Director of the Administrative Office of the Courts has been eliminated as an administrative position, and going forward will be a judicial position.**
- **Former AOC Director Dianne Martin has transitioned to a new role of General Counsel for the Office of Bar Admissions**
- **Dianne brings many positive attributes to the role.**
- **The current occupant of that role, Sherry Heiber, will be retiring later this summer.**
- **Thank you Sherry for all of your contributions.**

**Subject:** Budget and staffing Update

Dear Colleagues;

I wanted to take this opportunity to provide you with some important updates regarding the state budget process and some staffing changes within the NH Judicial Branch.

As you may have heard end seen in news coverage, 2025 has proven to be a challenging budget year for the State of New Hampshire. The House Finance Committee Division I has recommended significant reductions to the Judicial Branch General Fund allocation for the Fiscal Year 2026-27 biennium. We are still a long way from the end of the process, and I and our leadership team in the trial courts and the AOC are doing everything we can to minimize any cuts as we work with the other branches of government to finalize the state budget for the next two years. I am committed to maintaining current staffing levels.

As a result of our challenged fiscal environment, however, we have made several important decisions. Effective immediately, the Judicial Branch will freeze all hiring, with exceptions for mission critical positions to be evaluated on a case by case basis by the Administrative Council of Judges.

In addition, the Judicial Branch will be engaging with the National Center for State Courts on a study intended to propose restructuring and reallocation of resources in the trial courts and the AOC to maximize efficiencies while maintaining current staffing levels. We will provide ample opportunities for every employee of the Judicial Branch to participate in this study and provide feedback and ideas that both cut costs and streamline our operations.

As part of the restructuring already underway, the position of Director of the Administrative Office of the Courts has been eliminated, and this will be a judicial position going forward. Due to this reorganization, former AOC Director Dianne Martin will be taking on a new role within the branch, as General Counsel for the Office of Bar Admissions. In her new position, Dianne will be succeeding Attorney Sherry Heiber, who will begin her well deserved retirement later this summer.

Dianne has given exceptional service to the Judicial Branch in her more then three years of leading the Administrative Office of the Courts. Among her many accomplishments in that role, Dianne:

- Modernized many administrative processes
- Led the Judicial Branch initiative to improve the court and community response to people experiencing mental illness, including obtaining grant funding and creating a mental health team; coordineting the first-ever statewide mental health summit in New Hampshire
- Helped create the new Office of Access and Community Engagement

- Served as the first chair of the newly created Judicial Branch internal committee on domestic violence; improved access for victims by improving the website and forms; applied for and received grant funds to support increased data and analysis related to domestic violence cases
- Obtained $3 million in grant funding for Judicial Branch security after the shooting at New Hampshire Hospital; worked on legislation to create a dedicated training program for our court security officers and oversaw implementation; started the first ever grant office in the Judicial Branch, which led to a dramatic increase in grant funding;
- Was instrumental in obtaining Opioid Abatement Funds to support the Community Housing Program.

The people of New Hampshire will benefit from Dianne's contributions for years to come.

Dianne's expertise and commitment to improving public service make her the ideal new leader for the Office of Bar Admissions role of General Counsel of. The challenges in the field of bar admissions are great, and there is enormous opportunity to better serve the public through reform, such as finding creative innovations that promote opportunities for law school graduates to pursue careers in public service or to represent those currently underserved by the profession.

Dianne is deeply devoted to these goals, and the Branch and the practice of law in New Hampshire will continue to improve from all she has to offer in the field of bar admissions. She is an excellent fit for a community of smart people, full of integrity and deeply committed to making our profession better. This subject is a particular passion of mine, and I am so pleased to have a person of Dianne's intelligence, competence, and diligence in this position. I have no doubt she will make a positive change in the lives of many. Congratulations Dianne and I look forward to continuing to partner with you as we work together to ensure the best qualified candidates become members of the bar and we work to open the field of law to all those who wish to enter it, regardless of their circumstances.

I also wish to express profound gratitude to Sherry Heiber for her 14 years of stellar leadership as General Counsel of the Office of Bar Admissions. Sherry is a former private attorney with experience in civil litigation and alternative dispute resolution. Her nationally known leadership and expertise in bar admissions was recently on display to her colleagues across the country while she served as chair of the Conference of Bar Admissions Administrators for 2024-25. Among her many accomplishments was the herculean task of bringing New Hampshire bar admissions through the vast disruptions of the COVID-19 pandemic. Thank you Sherry for your many years of service. We are sad to see you go, but we wish you the very best in retirement!

Thank you and Congratulations to both Sherry and Dianne as you begin your new professional chapters. We are committed to keeping the branch informed as we travel the long and winding road of the state budget process.

Thank you,
Chief Justice Gordon J. McDonald

Av Harris
Communications Manager/Public Information Officer
New Hampshire Judicial Branch
aharris@courts.state.nh.us
603-415-6770

**From:** Erin Creegan <ECreegan@courts.state.nh.us>
**Sent:** Tuesday, April 1, 2025 6:21 AM
**To:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>; Hon. Christopher Keating <CKeating@courts.state.nh.us>
**Cc:** Av Harris <AHarris@courts.state.nh.us>
**Subject:** Re: Draft announcement

# 34. Email to Judicial Employees Re: Budget Update and Restructuring

CONFIDENTIAL

**Chief Justice Gordon MacDonald**

| | |
|---|---|
| **From:** | Lisa Merrill |
| **Sent:** | Wednesday, April 9, 2025 08:31 |
| **To:** | Judicial Employee List - All |
| **Subject:** | Budget Update and Restructuring |

This email message is sent to all judges and non-judicial employees on behalf of Chief Justice MacDonald.

Dear Colleagues,

I want to provide you with some important updates regarding the state budget process, and our efforts to examine restructuring within the Judicial Branch.

As you may have heard and seen in news coverage, 2025 has proven to be a challenging budget year for the State of New Hampshire. The House Finance Committee Division I has recommended significant reductions to the Judicial Branch General Fund allocation for the Fiscal Year 2026-27 biennium. We are still a long way from the end of the budget process, and our leadership team is doing everything we can to advocate for the Branch's needs.

We have strongly advocated with the legislature to maintain our current staffing levels, and will continue to do so. However, given the current circumstances, this is something we unfortunately can no longer guarantee. Our challenged fiscal environment has forced us to make several difficult, important decisions. Effective immediately, the Judicial Branch will freeze all external hiring, with exceptions for mission-critical positions to be evaluated on a case-by-case basis. Internal hiring will also be considered on a case-by-case basis.

In addition, the Supreme Court will be shortly issuing an Administrative Order establishing an efficiency committee within the Judicial Branch. Through this work we are also engaging with the National Center for State Courts on a study to examine possible avenues to restructure and reallocate resources in the trial courts and the AOC to maximize efficiencies. A critical part of the committee's work will be to provide ample opportunities for every employee to participate in this study and provide feedback and ideas that both reduce costs and streamline our operations. In fact, if you would like to get started, we encourage you to do so by sending an email with efficiency ideas to: EfficiencyIdeas@courts.state.nh.us

I thank you in advance for your patience; please know that the entire leadership of the Branch is committed to keeping you informed about the steps we are taking to support the critical work done every day on behalf of the people of New Hampshire.

Thank you.

Gordon J. MacDonald
Chief Justice

# 35. Emails between Chief Justice Gordon J. MacDonald, Justice James Bassett, Justice Patrick Donovan, Justice Melissa Countway, Attorney Erin Creegan and Communications Manager Av Harris Re: OBA Message

CONFIDENTIAL

**Chief Justice Gordon MacDonald**

| | |
|---|---|
| **From:** | Chief Justice Gordon MacDonald |
| **Sent:** | Thursday, April 24, 2025 17:04 |
| **To:** | Justice James P. Bassett; Justice Patrick E. Donovan; Justice Melissa Countway |
| **Subject:** | Draft message re OBA |
| **Attachments:** | 4.4.25 DRAFT Dianne Sherry message.docx |

**Please see the attached draft message and let me know of any concerns or suggestions.**

**Thanks very much.**

Gordon J. MacDonald
Chief Justice
New Hampshire Supreme Court
One Charles Doe Drive
Concord, New Hampshire 03301
(603) 415-6742
GMacDonald@courts.state.nh.us

CONFIDENTIAL

**Subject**: Office of Bar Admissions

Dear Colleagues;

The Office of Bar Admissions (OBA) discharges a critical function for the Supreme Court. Working with the Committee on Character and Fitness and the Board of Bar Examiners, it upholds and enforces the Court's standards for admission to the New Hampshire Bar.

For the past fourteen years, Sherry Hieber has led the OBA as its General Counsel. Earlier this year, Sherry notified us that she plans to retire at some point this summer. Her service has been truly exceptional. She is a highly respected national leader in the field of bar admissions, and currently serves as Chair of the Conference of Bar Admissions Administrators. She has skillfully balanced our duty to protect the public while being fair to applicants. We are grateful for all she has done.

Replacing Sherry is no small task, but our recently announced plans to evaluate the Branch's administrative structure has presented an opportunity. While the ultimate form of the administrative function supporting the Judicial Branch is part of our ongoing study, the Supreme Court has concluded that it should be led by a judge. We communicated that to former AOC Director Dianne Martin and asked her to consider taking on leadership of the OBA. We are delighted that she agreed. Dianne has recently begun her new role and during the transition period over the next few months, she and Sherry will overlap in the position.

Dianne brings to this new role a record of many important accomplishments, including: leading efforts to promote safety and security in our facilities by securing over $3 million in grant funding for our ongoing assessment and training efforts; serving as the first chair of the Branch committee on domestic violence and securing grant funding to support increased data and analysis related to domestic violence cases; chairing the Branch's Initiative to improve the court and community response to people experiencing mental illness and securing grant funding to support these efforts; and, expanding the Branch's access-to-justice efforts by creating the Office of Access and Community Engagement and securing grant funding to support new access-related initiatives.

The people of New Hampshire will benefit from Dianne's contributions as Director for years to come. We are very grateful to Dianne and her family for all of the sacrifices made during her time as Director to advance the Branch's mission.

We will continue to benefit from Dianne's work ethic and commitment to public service in this new role. The field of bar admissions is confronting new challenges and opportunities, and Dianne's skills and experience will help us greatly as we take them on.

Thank you,
Chief Justice Gordon J. McDonald

CONFIDENTIAL

**Chief Justice Gordon MacDonald**

**From:** Chief Justice Gordon MacDonald
**Sent:** Friday, April 25, 2025 15:42
**To:** Erin Creegan
**Subject:** FW: Draft message re OBA

**From:** Justice James P. Bassett <JBassett@courts.state.nh.us>
**Sent:** Friday, April 25, 2025 15:23
**To:** Justice Melissa Countway <MCountway@courts.state.nh.us>; Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>; Justice Patrick E. Donovan <PDonovan@courts.state.nh.us>
**Subject:** RE: Draft message re OBA

I agree with MBC. I offer these additional observations:

If the 4th paragraph remains, I would be more comfortable if it began with "Dianne's accomplishments at the Branch include the following..."

I have a concern about the statement in the third paragraph that "the Supreme Court has concluded that [the AOC] should be led by a judge". Is this the first communication to the Branch about this important restructuring? I think that it might be—perhaps I am wrong. Not sure that this is the best vehicle for communicating that change.
Also, since the administrative structure study is ongoing and could impact our decision as to structure, might it be better to frame the issue as "it is quite possible that the Supreme Court will conclude that the Judicial Branch should be led by a judge"—or something like that? If we make that edit, then the following sentences would need to be tweaked.

Regarding the second to the last sentence of that paragraph, I suggest using "pleased' rather than "delighted".

James P. Bassett
Associate Justice
New Hampshire Supreme Court
One Charles Doe Drive
Concord, NH 03301
(603) 271-2646

JBassett@courts.state.nh.us

CONFIDENTIAL

**From:** Justice Melissa Countway <MCountway@courts.state.nh.us>
**Sent:** Friday, April 25, 2025 8:39 AM
**To:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>; Justice James P. Bassett <JBassett@courts.state.nh.us>; Justice Patrick E. Donovan <PDonovan@courts.state.nh.us>
**Subject:** RE: Draft message re OBA

Re-reading this this morning, the tone seems a little too flowery. Maybe we should cut the 4th and 5th paragraphs and the first sentence of the last paragraph to tone it down a bit.

Melissa Countway
Associate Justice
New Hampshire Supreme Court

**From:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Sent:** Thursday, April 24, 2025 5:04 PM
**To:** Justice James P. Bassett <JBassett@courts.state.nh.us>; Justice Patrick E. Donovan <PDonovan@courts.state.nh.us>; Justice Melissa Countway <MCountway@courts.state.nh.us>
**Subject:** Draft message re OBA

**Please see the attached draft message and let me know of any concerns or suggestions.**

**Thanks very much.**

Gordon J. MacDonald
Chief Justice
New Hampshire Supreme Court
One Charles Doe Drive
Concord, New Hampshire 03301
(603) 415-6742
GMacDonald@courts.state.nh.us

CONFIDENTIAL

**Chief Justice Gordon MacDonald**

**From:** Av Harris
**Sent:** Wednesday, May 7, 2025 17:20
**To:** Chief Justice Gordon MacDonald; Hon. Christopher Keating
**Subject:** RE: Messaging question from Dianne

Sounds good

Av Harris
Communications Manager/Public Information Officer
New Hampshire Judicial Branch
aharris@courts.state.nh.us
603-415-6770

**From:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Sent:** Wednesday, May 7, 2025 5:16 PM
**To:** Av Harris <AHarris@courts.state.nh.us>; Hon. Christopher Keating <CKeating@courts.state.nh.us>
**Subject:** Re: Messaging question from Dianne

Thanks. Perhaps the 3 of us can discuss tomorrow.

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

**From:** Av Harris <AHarris@courts.state.nh.us>
**Sent:** Wednesday, May 7, 2025 5:12:03 PM
**To:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>; Hon. Christopher Keating <CKeating@courts.state.nh.us>
**Subject:** FW: Messaging question from Dianne

FYI I wanted to keep you both in the loop. Erin forwarded me a message she received over Teams today from Dianne, and asked that I respond since it is a question related to messaging. You can see the tone and content of Dianne's message below, as well as my proposed response. I know this is a sensitive one, but I do think her message warrants a response. Given our last conversation about this, however, I am not sure what we are allowed to say. I do think it is important to affirmatively state the purpose of the branch wide communication which is to clarify her new role and not to correct any record. I am happy to be the one to deliver the message. Erin suggests I give Dianne a call about this instead of email.

Happy to take any direction.

Thanks,
Av

Av Harris
Communications Manager/Public Information Officer
New Hampshire Judicial Branch
aharris@courts.state.nh.us
603-415-6770

CONFIDENTIAL

**From:** Av Harris
**Sent:** Wednesday, May 7, 2025 5:00 PM
**To:** Erin Creegan <ECreegan@courts.state.nh.us>
**Subject:** RE: Messaging question from Dianne

Here is how I propose responding:

Hi Dianne,

I hope you are well. Erin forwarded me the below message from you. I wanted to provide you with an update.

In announcing your new role to the branch, it is important to the Chief to do the following:

1. Recognize Sherry's accomplishments in the field of Bar Admissions and wish her well in her retirement

2. Announce that you will be taking over the role and overlapping your positions for a transition period until August when Sherry retires

3. Explain clearly to all Judicial Branch employees that the Supreme Court has determined that the AOC Director role should be held by a judge, and in light of that the Supreme Court asked you to consider this role, and they are delighted you have agreed, because of your many accomplishments and capabilities, and in general the leadership qualities you bring to the role.

The exact wording and timing of this announcement is still being worked out, but these both have been impacted by the budget related announcements and the ongoing major effort related to the efficiency study.

Overall, the goal of communicating this message is to state fact and appreciation for both yours and Sherry's many contributions to the Branch, and not to correct any record. The announcement of February 28 stated to AOC personnel was that you were no longer Director of the AOC. That was a fact then and remains so, and requires no corrective action. There is virtually nothing anyone can do to impact rumors or impressions Branch personnel or others have related to it. What we do have under our control is the ability to inform the branch of your new role, Sherry's transition and pay tribute to all you both have accomplished.

I know this is a challenging transition. We are determined to get this right, and we appreciate your ongoing patience. It is best for everyone to move forward and we will put out an announcement as soon as we can. Let me know if you have any more thoughts or questions.

Thank you,
Av

Av Harris
Communications Manager/Public Information Officer
New Hampshire Judicial Branch
aharris@courts.state.nh.us
603-415-6770

**From:** Erin Creegan <ECreegan@courts.state.nh.us>
**Sent:** Wednesday, May 7, 2025 12:30 PM
**To:** Av Harris <AHarris@courts.state.nh.us>
**Subject:** Messaging question from Dianne

CONFIDENTIAL

From her:

When you have a free minute, let's touch base on the communications to the branch/folks gathered on 2/28 to correct the record? Before you left, the plan was to have the branch one go out on 4/10. I wasn't receiving branch wide emails early on, so I may have missed it, but Sherry hasn't seen it either. Sherry has brought up a few times when I am going to follow-up with the chief on it. She is very uncomfortable with folks not knowing (she was particularly concerned that folks she is interacting with and has worked closely with don't know) and it has made it hard to do the work we need to do. I told her you had been handling and were away and I wanted to give you a chance to catch your breath. Not sure you even know it hasn't happened! For my part, the communication in whatever form to correct the record to those gathered on the 28th is the priority. I heard as recently as last week that a high-level colleague in the state heard the gossip resulting from the way the announcement was handled. The clarification remains important. I think the larger recognition is nice and I appreciate the chief doing that but am much less worried about timing on that.

CONFIDENTIAL

**Chief Justice Gordon MacDonald**

| | |
|---|---|
| **From:** | Chief Justice Gordon MacDonald |
| **Sent:** | Thursday, May 8, 2025 14:50 |
| **To:** | Justice James P. Bassett; Justice Patrick E. Donovan; Justice Melissa Countway |
| **Subject:** | DRAFT OBA message |
| **Attachments:** | DRAFT OBA message.docx |

**Here is a revised message regarding the transition at the Office of Bar Admissions. I have incorporated most of the feedback. Please let me know your thoughts.**

**Thank you.**

**Gordon**

Gordon J. MacDonald
Chief Justice
New Hampshire Supreme Court
One Charles Doe Drive
Concord, New Hampshire 03301
(603) 415-6742
GMacDonald@courts.state.nh.us

CONFIDENTIAL

**Subject**: Office of Bar Admissions

Dear Colleagues;

The Office of Bar Admissions (OBA) discharges a critical function for the Supreme Court. Working with the Committee on Character and Fitness and the Board of Bar Examiners, it upholds and enforces the Court's standards for admission to the New Hampshire Bar.

For the past fourteen years, Sherry Hieber has led the OBA as its General Counsel. Earlier this year, Sherry notified us that she plans to retire at some point this summer. Her service has been truly exceptional. She is a highly respected national leader in the field of bar admissions, and currently serves as Chair of the Conference of Bar Admissions Administrators. She has skillfully balanced our duty to protect the public while being fair to applicants. We are grateful for all she has done.

Replacing Sherry is no small task, but our recently announced plans to evaluate the Branch's administrative structure presented an opportunity. While the ultimate form of the administrative function supporting the Judicial Branch is part of our ongoing study, the Supreme Court asked Dianne Martin to consider taking on leadership of the OBA. We are delighted that she agreed. Dianne has recently begun her new role and during the transition period over the next few months, she and Sherry will overlap in the position.

Dianne's accomplishments at the Branch during her tenure as AOC Director include: leading efforts to promote safety and security in our facilities by securing over $3 million in grant funding for our ongoing assessment and training efforts; serving as the first chair of the Branch committee on domestic violence and securing grant funding to support increased data and analysis related to domestic violence cases; chairing the Branch's initiative to improve the court and community response to people experiencing mental illness and securing grant funding to support these efforts; and, expanding the Branch's access-to-justice efforts by creating the Office of Access and Community Engagement and securing grant funding to support new access-related initiatives.

The field of bar admissions is confronting new challenges and opportunities, and Dianne's skills and experience will help us greatly as we take them on.

Gordon J. MacDonald

CONFIDENTIAL

**Chief Justice Gordon MacDonald**

| | |
|---|---|
| **From:** | Chief Justice Gordon MacDonald |
| **Sent:** | Thursday, May 8, 2025 14:30 |
| **To:** | Hon. Christopher Keating; Erin Creegan; Av Harris |
| **Subject:** | DRAFT OBA message |
| **Attachments:** | DRAFT OBA message.docx |

**Responding to feedback I received from Justices, here is a revised draft of this announcement. Please let me know of any comments or concerns.**

**Thank you.**

**Gordon**

CONFIDENTIAL

**Subject**: Office of Bar Admissions

Dear Colleagues;

The Office of Bar Admissions (OBA) discharges a critical function for the Supreme Court. Working with the Committee on Character and Fitness and the Board of Bar Examiners, it upholds and enforces the Court's standards for admission to the New Hampshire Bar.

For the past fourteen years, Sherry Hieber has led the OBA as its General Counsel. Earlier this year, Sherry notified us that she plans to retire at some point this summer. Her service has been truly exceptional. She is a highly respected national leader in the field of bar admissions, and currently serves as Chair of the Conference of Bar Admissions Administrators. She has skillfully balanced our duty to protect the public while being fair to applicants. We are grateful for all she has done.

Replacing Sherry is no small task, but our recently announced plans to evaluate the Branch's administrative structure presented an opportunity. While the ultimate form of the administrative function supporting the Judicial Branch is part of our ongoing study, the Supreme Court asked Dianne Martin to consider taking on leadership of the OBA. We are delighted that she agreed. Dianne has recently begun her new role and during the transition period over the next few months, she and Sherry will overlap in the position.

Dianne's accomplishments at the Branch during her tenure as AOC Director include: leading efforts to promote safety and security in our facilities by securing over $3 million in grant funding for our ongoing assessment and training efforts; serving as the first chair of the Branch committee on domestic violence and securing grant funding to support increased data and analysis related to domestic violence cases; chairing the Branch's initiative to improve the court and community response to people experiencing mental illness and securing grant funding to support these efforts; and, expanding the Branch's access-to-justice efforts by creating the Office of Access and Community Engagement and securing grant funding to support new access-related initiatives.

The field of bar admissions is confronting new challenges and opportunities, and Dianne's skills and experience will help us greatly as we take them on.

Gordon J. MacDonald

CONFIDENTIAL

**Chief Justice Gordon MacDonald**

| | |
|---|---|
| **From:** | Justice Melissa Countway |
| **Sent:** | Thursday, May 8, 2025 14:56 |
| **To:** | Justice James P. Bassett; Chief Justice Gordon MacDonald; Justice Patrick E. Donovan |
| **Subject:** | RE: DRAFT OBA message |

I agree

Melissa Countway
Associate Justice
New Hampshire Supreme Court

**From:** Justice James P. Bassett <JBassett@courts.state.nh.us>
**Sent:** Thursday, May 8, 2025 2:55 PM
**To:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>; Justice Patrick E. Donovan <PDonovan@courts.state.nh.us>; Justice Melissa Countway <MCountway@courts.state.nh.us>
**Subject:** Re: DRAFT OBA message

Looks good to me.

Get Outlook for iOS

**From:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Sent:** Thursday, May 8, 2025 2:49:40 PM
**To:** Justice James P. Bassett <JBassett@courts.state.nh.us>; Justice Patrick E. Donovan <PDonovan@courts.state.nh.us>; Justice Melissa Countway <MCountway@courts.state.nh.us>
**Subject:** DRAFT OBA message

**Here is a revised message regarding the transition at the Office of Bar Admissions. I have incorporated most of the feedback. Please let me know your thoughts.**

**Thank you.**

**Gordon**

Gordon J. MacDonald
Chief Justice
New Hampshire Supreme Court
One Charles Doe Drive
Concord, New Hampshire 03301
(603) 415-6742
GMacDonald@courts.state.nh.us

CONFIDENTIAL

**Chief Justice Gordon MacDonald**

| | |
|---|---|
| **From:** | Justice Patrick E. Donovan |
| **Sent:** | Thursday, May 8, 2025 14:59 |
| **To:** | Chief Justice Gordon MacDonald; Justice James P. Bassett; Justice Melissa Countway |
| **Subject:** | RE: DRAFT OBA message |

All good by me. PED

**From:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Sent:** Thursday, May 8, 2025 2:50 PM
**To:** Justice James P. Bassett <JBassett@courts.state.nh.us>; Justice Patrick E. Donovan <PDonovan@courts.state.nh.us>; Justice Melissa Countway <MCountway@courts.state.nh.us>
**Subject:** DRAFT OBA message

**Here is a revised message regarding the transition at the Office of Bar Admissions. I have incorporated most of the feedback. Please let me know your thoughts.**

**Thank you.**

**Gordon**

Gordon J. MacDonald
Chief Justice
New Hampshire Supreme Court
One Charles Doe Drive
Concord, New Hampshire 03301
(603) 415-6742
GMacDonald@courts.state.nh.us

CONFIDENTIAL

**Chief Justice Gordon MacDonald**

| | |
|---|---|
| **From:** | Erin Creegan |
| **Sent:** | Thursday, May 8, 2025 14:38 |
| **To:** | Hon. Christopher Keating; Chief Justice Gordon MacDonald; Av Harris |
| **Subject:** | RE: DRAFT OBA message |

Fine with me. Hopefully Dianne can get to a good place.

**From:** Hon. Christopher Keating <CKeating@courts.state.nh.us>
**Sent:** Thursday, May 8, 2025 2:37 PM
**To:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>; Erin Creegan <ECreegan@courts.state.nh.us>; Av Harris <AHarris@courts.state.nh.us>
**Subject:** RE: DRAFT OBA message

The revised draft looks good to me.

**From:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Sent:** Thursday, May 08, 2025 2:30 PM
**To:** Hon. Christopher Keating <CKeating@courts.state.nh.us>; Erin Creegan <ECreegan@courts.state.nh.us>; Av Harris <AHarris@courts.state.nh.us>
**Subject:** DRAFT OBA message

**Responding to feedback I received from Justices, here is a revised draft of this announcement. Please let me know of any comments or concerns.**

**Thank you.**

**Gordon**

CONFIDENTIAL

**Chief Justice Gordon MacDonald**

| | |
|---|---|
| **From:** | Av Harris |
| **Sent:** | Thursday, May 8, 2025 14:37 |
| **To:** | Chief Justice Gordon MacDonald; Hon. Christopher Keating; Erin Creegan |
| **Subject:** | RE: DRAFT OBA message |

I like it. It accomplishes what Dianne is looking for in terms of framing her transition. It is factual, and very positive.

Av Harris
Communications Manager/Public Information Officer
New Hampshire Judicial Branch
aharris@courts.state.nh.us
603-415-6770

**From:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Sent:** Thursday, May 8, 2025 2:30 PM
**To:** Hon. Christopher Keating <CKeating@courts.state.nh.us>; Erin Creegan <ECreegan@courts.state.nh.us>; Av Harris <AHarris@courts.state.nh.us>
**Subject:** DRAFT OBA message

**Responding to feedback I received from Justices, here is a revised draft of this announcement. Please let me know of any comments or concerns.**

**Thank you.**

**Gordon**

CONFIDENTIAL

**Chief Justice Gordon MacDonald**

| | |
|---|---|
| **From:** | Lisa Merrill |
| **Sent:** | Friday, May 9, 2025 14:11 |
| **To:** | Judicial Employee List - All |
| **Subject:** | Update Regarding the Office of Bar Admissions |

This email message is sent to all judges and non-judicial employees.

Dear colleagues,

Please click here for an update from Chief Justice MacDonald regarding the Office of Bar Admissions.

Thank you,

Lisa Merrill

Executive Assistant to the
Justices of the NH Supreme Court
One Charles Doe Drive
Concord, NH 03301
603-415-6744 Direct Line

CONFIDENTIAL

Search

- AOC
- ACCOUNTING
- INTERNAL AUDIT
- HUMAN RESOURCES
- INFORMATION TECHNOLOGY
- SECURITY
- TOOLS

# Update Regarding the Office of Bar Admissions

Dear Colleagues;

The Office of Bar Admissions (OBA) discharges a critical function for the Supreme Court. Working with the Committee on Character and Fitness and the Board of Bar Examiners, it upholds and enforces the Court's standards for admission to the New Hampshire Bar.

For the past fourteen years, Sherry Hieber has led the OBA as its General Counsel. Earlier this year, Sherry notified us that she plans to retire at some point this summer. Her service has been truly exceptional. She is a highly respected national leader in the field of bar admissions, and currently serves as Chair of the Conference of Bar Admissions Administrators. She has skillfully balanced our duty to protect the public while being fair to applicants. We are grateful for all she has done.

Replacing Sherry is no small task, but our recently announced plans to evaluate the Branch's administrative structure presented an opportunity. While the ultimate form of the administrative function supporting the Judicial Branch is part of our ongoing study, the Supreme Court asked Dianne Martin to consider taking on leadership of the OBA. We are delighted that she agreed. Dianne has recently begun her new role and during the transition period over the next few months, she and Sherry will overlap in the position.

Dianne's accomplishments at the Branch during her tenure as AOC Director include: leading efforts to promote safety and security in our facilities by securing over $3 million in grant funding for our ongoing assessment and training efforts; serving as the first chair of the Branch committee on domestic violence and securing grant funding to support increased data and analysis related to domestic violence cases; chairing the Branch's initiative to improve the court and community response to people experiencing mental illness and securing grant funding to support those efforts; and, expanding the Branch's access-to-justice efforts by creating the Office of Access and Community Engagement and securing grant funding to support new access-related initiatives.

The field of bar admissions is confronting new challenges and opportunities, and Dianne's skills and experience will help us greatly as we take them on.

Gordon J. MacDonald, Chief Justice

36. Emails between Chief Justice Gordon J. MacDonald, Justice Patrick Donovan, Justice Melissa Countway, Judge Christopher Keating, Lorrie Rudis, Attorney Christopher Pyles and Communications Manager Av Harris Re: Questions from Mr. Bookman and Draft Response

CONFIDENTIAL

**Chief Justice Gordon MacDonald**

| | |
|---|---|
| **From:** | Justice Patrick E. Donovan |
| **Sent:** | Friday, October 17, 2025 10:17 |
| **To:** | Chief Justice Gordon MacDonald; Justice Melissa Countway |
| **Cc:** | Hon. Christopher Keating; Lorrie Rudis; cpyles@sulloway.com |
| **Subject:** | RE: DRAFT |

I agree with Melissa's edit. I approve. PED

**From:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Sent:** Thursday, October 16, 2025 4:11 PM
**To:** Justice Melissa Countway <MCountway@courts.state.nh.us>; Justice Patrick E. Donovan <PDonovan@courts.state.nh.us>
**Cc:** Hon. Christopher Keating <CKeating@courts.state.nh.us>; Lorrie Rudis <LRudis@courts.state.nh.us>; cpyles@sulloway.com
**Subject:** RE: DRAFT

**Yes. Excellent suggestion. Thank you.**

**From:** Justice Melissa Countway <MCountway@courts.state.nh.us>
**Sent:** Thursday, October 16, 2025 16:10
**To:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>; Justice Patrick E. Donovan <PDonovan@courts.state.nh.us>
**Cc:** Hon. Christopher Keating <CKeating@courts.state.nh.us>; Lorrie Rudis <LRudis@courts.state.nh.us>; cpyles@sulloway.com
**Subject:** RE: DRAFT

This accurately summarizes what transpired. I have one comment:

In the last paragraph, should we specifically mention that knowing we wanted to restructure the AOC and achieve more efficiency, we engaged with the National Center to guide the process (noting their comprehensive evaluation and review) culminating in the efficiency report with its recommendations?

Melissa Countway
Associate Justice
New Hampshire Supreme Court

**From:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Sent:** Thursday, October 16, 2025 3:58 PM
**To:** Justice Patrick E. Donovan <PDonovan@courts.state.nh.us>; Justice Melissa Countway <MCountway@courts.state.nh.us>
**Cc:** Hon. Christopher Keating <CKeating@courts.state.nh.us>; Lorrie Rudis <LRudis@courts.state.nh.us>; cpyles@sulloway.com
**Subject:** DRAFT

**For review and comment. Thanks very much.**

**Gordon**

CONFIDENTIAL

Gordon J. MacDonald
Chief Justice
New Hampshire Supreme Court
One Charles Doe Drive
Concord, New Hampshire 03301
(603) 415-6742
GMacDonald@courts.state.nh.us

CONFIDENTIAL

**Chief Justice Gordon MacDonald**

| | |
|---|---|
| **From:** | Chief Justice Gordon MacDonald |
| **Sent:** | Thursday, October 16, 2025 15:58 |
| **To:** | Justice Patrick E. Donovan; Justice Melissa Countway |
| **Cc:** | Hon. Christopher Keating; Lorrie Rudis; cpyles@sulloway.com |
| **Subject:** | DRAFT |
| **Attachments:** | N R.docx |

For review and comment. Thanks very much.

Gordon

Gordon J. MacDonald
Chief Justice
New Hampshire Supreme Court
One Charles Doe Drive
Concord, New Hampshire 03301
(603) 415-6742
GMacDonald@courts.state.nh.us

CONFIDENTIAL

DRAFT

Under the state constitution, the chief justice with the concurrence of the other justices, directs the administrative functions of the judicial branch. N.H. Const. part II, art. 73-a. The administrative office of the courts (AOC) was established by supreme court rule. The supreme court has ultimate responsibility for the AOC. Until recent amendments to the rule, the AOC was led by a director appointed by the supreme court. The judicial branch has its own personnel rules, which govern non-judicial employees.

By January 2025, the supreme court had decided that a restructuring of the AOC was warranted. As part of that restructuring, the supreme court had concluded the AOC should be led by a sitting trial judge. On February 28, 2025, the supreme court notified AOC Director Dianne Martin of its decision and that the decision would be effective immediately. Director Martin then began a period of administrative leave. On March 3, 2025, the supreme court issued an order appointing a trial judge, Circuit Court Judge Christopher Keating, as the Interim AOC Director, effective immediately.

Because the supreme court had decided to change the qualifications for the AOC Director position had changed, this decision constituted a layoff under the judicial branch's personnel rules. No other employees were affected. When an employee is laid off, the personnel rules mandate certain benefits. Jud. P. R. 56(g).

The supreme court has the sole authority for determining whether an applicant is qualified to be admitted to the New Hampshire Bar. See, e.g. RSA 311:2 ("Any citizen of the age of 18 years, of good moral character and suitable qualifications, on application to the supreme court shall be admitted to practice as an attorney."). Supreme Court Rule 37 sets forth requirements for both competence and character and fitness. Historically, admissions issues were handled directly by the supreme court. For example, with respect to character and fitness issues, the court appointed a single justice to review an application and to make a recommendation. See, e.g., In re Application of Appell, 116 N.H. 400 (1976) (adopting single justice's recommendation to deny application but to allow reapplication in two years). Over the years, the supreme court created two boards, the board of bar examiners and the committee on character and fitness, to make recommendations to the supreme court on, respectively, competence and character and fitness determinations.

Fifteen years ago, the supreme court created by rule the office of bar admissions (OBA). Sup. Ct. R. 37. The office is a unit of the judicial branch, but is self-funded and no general funds are used to support its operations. The office is led by a general counsel. Shortly after adoption of the rule, the supreme court appointed Sherry Hieber as general counsel. For the ensuing fourteen years, Sherry with the assistance of one administrative assistant, served in that role. She worked with both boards in guiding them with respect to the multiple pathways to establish competence under Rule 37 including conducting twice annual bar examinations, character and fitness requirements, and compliance issues.

Last year, General Counsel Hieber informed the supreme court that she intended to retire at some point during the summer of 2025. Because of the complexities of the bar admissions processes and the fact that General Counsel Hieber had been performing this general counsel function on her own for fourteen years, the supreme court decided that a long transition period for an incoming general counsel would be prudent.

Based on her skills and experience, the supreme court had determined that AOC Director Martin would be an excellent candidate to assume the role as OBA general counsel. On February 28, 2025, she was asked to consider taking on that role. There were follow up written communications from Interim Director Keating. Those communications were prepared with the assistance of legal counsel and were approved by the supreme court. Separately, the supreme court had decided to increase the salaries of all general counsel in the judicial branch – the judicial branch general counsel, the Attorney Discipline Office general counsel and the OBA

general counsel. This was intended to achieve parity across similar functions as well as to respond to market conditions.

Upon accepting the general counsel position, Attorney Martin was paid from non-general funds available to the OBA. Because Interim Director Keating was a sitting Circuit Court Judge, the judicial branch did not spend general fund dollars which had been appropriated and would have otherwise been spent on the AOC Director's salary and benefits.

Last week, following extensive review and study, the supreme court approved amendments to Supreme Court Rule 54, which culminated its process of restructuring the administrative functions of the judicial branch. Under the new Rule, the leader of the AOC is now known as the State Court Administrator (SCA) and the SCA must be a sitting judge of either the Superior or Circuit Courts. Last week, the supreme court appointed Judge Keating to a five-year term as the State Court Administrator.

CONFIDENTIAL

Outlook

## FW: Questions: Martin/MacDonald/Keating

From Hon. Christopher Keating <CKeating@courts.state.nh.us>
Date Wed 10/15/2025 4:52 PM
To Bibiana Rummler <BRummler@courts.state.nh.us>

**From:** Av Harris <AHarris@courts.state.nh.us>
**Sent:** Wednesday, October 15, 2025 2:35 PM
**To:** Hon. Christopher Keating <CKeating@courts.state.nh.us>; Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Subject:** FW: Questions: Martin/MacDonald/Keating

FYI This just arrived. Now we know what Todd has been asking people about. Happy to discuss response strategy.

Av Harris
Communications Manager/Public Information Officer
New Hampshire Judicial Branch
aharris@courts.state.nh.us
603-415-6770

**From:** Todd Bookman <tbookman@nhpr.org>
**Sent:** Wednesday, October 15, 2025 2:08 PM
**To:** Av Harris <AHarris@courts.state.nh.us>
**Subject:** Questions: Martin/MacDonald/Keating

**EXTERNAL EMAIL WARNING!** This email originated outside of the New Hampshire Judicial Branch network. Do not click on links or open attachments unless you recognize the sender and are expecting the email. Mouse over links to confirm the target before you click. Do not enter your username and password on sites that you have reached through an email link. Forward suspicious and unexpected messages to 'suspicious@courts.state.nh.us'.

Hi Av,

Below, you'll see a series of questions related to Dianne Martin, Chief Justice MacDonald, and Judge Chris Keating. NHPR is open to interviews on these topics, should that be an option. If not, we request a response to these questions no later than Monday Oct. 20 at 12pm. Should you need any clarification, I'm reachable anytime at 914-912-9528.

NHPR has obtained several state records pertaining to Dianne Martin's job status. In a March 27 letter, Martin is offered the General Counsel position with an April 4 start date. In a subsequent letter dated April 1, Martin is laid off from her position as AOC director as part of a reorganization. Given that Martin was already offered a new position, why was the lay off completed, as opposed to simply transitioning her into her new role as general counsel?

CONFIDENTIAL

As a result of Martin's break in employment, which lasted just two days (Apr 2-3), she was able to collect her unused leave, sick time and termination pay, totalling $49,856, according to the records we have seen. At a time when the Judicial Branch was facing budgetary constraints and was soon to implement a hiring freeze, why did the branch decide to structure her transition to the general counsel position in this way?

Can you provide any other examples of Judicial Branch employees being allowed to cash out their accrued benefits while transitioning into other positions within the branch? Is this practice standard, or permitted under current Judicial Branch personnel rules?

Were any other Judicial Branch employees laid off in March or April of this year, as a result of the reorganization cited in the letter addressed to Martin?

The letters to Martin offering her new employment and laying her off are signed by Chris Keating. Did Keating authorize these personnel moves himself, or was he instructed to structure these moves by Chief Justice MacDonald? Did MacDonald review or edit the letters before they were disseminated?

Martin's departure from the director position was announced in an administrative order dated March 3. However, she was not laid off until April 1. Could you clarify what role Martin held during that interim period?

On April 14, Chief Justice MacDonald advocated for a step upgrade for Martin as General Counsel, raising her salary to Grade 58, Level 9, according to a record reviewed by NHPR. Sherry Hieber was also awarded a pay raise, according to other payroll records. Given the financial constraints on the Branch, why did MacDonald propose this pay raise?

When Chief Justice MacDonald announced that Martin would assume the role of General Counsel at the Office of Bar Admissions, he said that Martin and Hieber would overlap "over the next few months" during a transition period. According to salary records, Hieber remained in her position until September 4, an overlap of roughly five months. Why did the branch believe it to be fiscally prudent or necessary to have two general counsels assigned to the Office of Bar Admissions for that extended period?

According to Martin's offer letter to serve as general counsel, Chief Justice MacDonald is her direct supervisor. Does that relationship present any conflicts of interest when Martin appears before MacDonald for legal proceedings, such as on Sept. 30, 2025, when Martin represented the Office of Bar Admissions during oral arguments in case ADM-2025-0008? Did the Chief Justice consider recusing himself from that matter?

Did the Judicial Branch follow its protocols and notify Martin 21 days in advance of her layoff? If not, why not?

According to Supreme Court Rule #42, a general counsel for the Office of Bar Admissions can only be appointed after "consultation" with the chairs of the Board of Bar Examiners and the Committee on Character and Fitness. Did the Supreme Court follow those procedures and consult with the chairs before appointing Martin? Can you provide details on how and when that consultation took place?

REPORTER
NEW HAMPSHIRE PUBLIC RADIO
2 Pillsbury Street, 6th Floor, Concord NH 03301
tbookman@nhpr.org

# 37. Emails between Chief Justice Gordon J. MacDonald, Judge Christopher Keating and Attorney Christopher Pyles Re: Mr. Bookman Question Regarding Step Upgrade for Attorney Dianne Martin

CONFIDENTIAL

**Chief Justice Gordon MacDonald**

| | |
|---|---|
| **From:** | Chief Justice Gordon MacDonald |
| **Sent:** | Sunday, October 19, 2025 15:34 |
| **To:** | Hon. Christopher Keating |
| **Cc:** | cpyles@sulloway.com |
| **Subject:** | RE: DRAFT |

Thanks.

**From:** Hon. Christopher Keating <CKeating@courts.state.nh.us>
**Sent:** Sunday, October 19, 2025 15:28
**To:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Cc:** cpyles@sulloway.com
**Subject:** RE: DRAFT

The additional edits make sense.

Paragraph 4 third sentence needs the word "for" added: "Supreme Court Rule 42 sets forth requirements **for** competence and Rules 42 and 42B for character and fitness.

I've attached the March 27 memo for Attorney Pyles' situational awareness.

-cmk

**From:** Chief Justice Gordon MacDonald <GMacDonald@courts.state.nh.us>
**Sent:** Sunday, October 19, 2025 3:05 PM
**To:** Hon. Christopher Keating <CKeating@courts.state.nh.us>
**Cc:** cpyles@sulloway.com
**Subject:** DRAFT

I have made some further edits, attached.

**Mr. Bookman asks the following:**

On April 14, Chief Justice MacDonald advocated for a step upgrade for Martin as General Counsel, raising her salary to Grade 58, Level 9, according to a record reviewed by NHPR. Sherry Hieber was also awarded a pay raise, according to other payroll records. Given the financial constraints on the Branch, why did MacDonald propose this pay raise?

**I have no record of a communication on April 14 on this issue. I have no memory of what it could be referring to, and I have no idea why I would be "advocating" for something that had already been decided. Therefore, I am extremely concerned about the accuracy and authenticity of the record to which he refers. The operative document on this issue would appear to be your memo dated March 27 memorializing the steps taken by the justices on March 24 regarding reclassification of all the GC positions. Unless there is an issue, I think we should provide that memorandum.**

# 38. Emails between Communication Manager Av Harris, Chief Justice Gordon J. MacDonald, Judge Christopher Keating, Laura Beeson and Todd Bookman Re: Response to Mr. Bookman's Questions

CONFIDENTIAL

**Chief Justice Gordon MacDonald**

| | |
|---|---|
| **From:** | Av Harris |
| **Sent:** | Monday, October 20, 2025 10:49 |
| **To:** | lkbeeson[redacted]Hon. Christopher Keating; Chief Justice Gordon MacDonald |
| **Subject:** | FW: Questions: Martin/MacDonald/Keating |

FYI – this has been sent to Todd Bookman.

Av Harris
Communications Manager/Public Information Officer
New Hampshire Judicial Branch
aharris@courts.state.nh.us
603-415-6770

**From:** Av Harris
**Sent:** Monday, October 20, 2025 10:48 AM
**To:** Todd Bookman <tbookman@nhpr.org>
**Subject:** RE: Questions: Martin/MacDonald/Keating

Hi Todd,

Apologies for the delay in getting back to you. Here is a statement in response to your inquiry. You can attribute to me:

The New Hampshire Supreme Court oversees all personnel decisions within the Judicial Branch and does not comment on any matters involving personnel.

Let me know if you have any more questions.

Thanks,
Av

Av Harris
Communications Manager/Public Information Officer
New Hampshire Judicial Branch
aharris@courts.state.nh.us
603-415-6770

**From:** Todd Bookman <tbookman@nhpr.org>
**Sent:** Wednesday, October 15, 2025 2:08 PM
**To:** Av Harris <AHarris@courts.state.nh.us>
**Subject:** Questions: Martin/MacDonald/Keating

**EXTERNAL EMAIL WARNING!** This email originated outside of the New Hampshire Judicial Branch network. Do not click on links or open attachments unless you recognize the sender and are expecting the email. Mouse over links to confirm the target before you click. Do not enter your username and password on sites that you have reached through an email link. Forward suspicious and unexpected messages to 'suspicious@courts.state.nh.us'.

CONFIDENTIAL

# 39. October 31, 2025 Statement of Supreme Court Justices Gordon J. MacDonald, Patrick Donovan, Melissa Countway and Bryan Gould

New Hampshire
Judicial Branch

OPEN MENU

# Press Release

For Immediate Release
**Date:** October 31, 2025

## Contact

Av Harris, Communications Manager
(603) 415-6770 | aharris@courts.state.nh.us

# Statement of Supreme Court Justices MacDonal Countway and Gould

The court has become aware of public interest in a matter involving a judicial branch employee. Hampshire law, the court cannot disclose confidential personnel information. However, the court at this time.

Every personnel decision regarding Ms. Martin was made collectively by the Supreme Court. Sin been undertaking a comprehensive review of its administrative operations and costs as part of an align staffing with current needs, and lower overall costs for taxpayers. As part of this reorganiz eliminate the position previously held by Ms. Martin. Under the personnel rules, elimination of a p employee, and the employee is entitled to three weeks' notice. In accordance with standard pers Department of Administrative Services, she received the accrued leave and benefits to which she

Ms. Martin is presently employed as General Counsel to the Office of Bar Admissions. That office admission and application fees, and its operations do not draw upon state general fund appropria decided to offer Ms. Martin the opportunity to transition into this critical position previously occupie

# 40. Attorney General's Report Re: Interview with Dianne Martin

CONFIDENTIAL

**DEPARTMENT OF JUSTICE**
**OFFICE OF THE ATTORNEY GENERAL**
**REPORT OF INVESTIGATION**

| Matter # | Case Name | Investigator | Report Date |
|---|---|---|---|
| 2025180174 | Review of Dianne Martin's Employment in Judicial Branch | Daniel J. Mederos | November 20, 2025 |

**<u>11/14/25- Interview with Dianne Martin at the New Hampshire Department of Justice</u>**

On November 13, 2025, I was assigned to assist with an interview scheduled for November 14, 2025 with:

Dianne Martin ("Martin")
General Counsel
New Hampshire Supreme Court Office of Bar Admissions

The interview was in reference to a preliminary review being conducted by the Department of Justice. This review involved the facts and circumstances referenced in Todd Bookman's recent report on NHPR (New Hampshire Public Radio online) regarding Martin's employment within the New Hampshire Judicial Branch to determine if any appropriate next steps were warranted. This interview was scheduled and agreed upon through Martin's private counsel:

Emma Sisti
Shaheen & Gordon Attorneys at Law
107 Storrs Street, Concord, NH 03301

On November 14, 2025 at approximately 4:30 pm, Deputy Attorney General James Boffetti, Associate Attorney General Christopher Bond and I met with Martin and Attorney Sisti at the New Hampshire Department of Justice at 1 Granite Place South, Concord, NH. Martin had signed in as visitors with reception prior to being escorted upstairs with Attorney Sisti to a fourth-floor conference room where the interview was conducted. After introductions, Martin was advised the purpose of the interview relates to an initial review regarding her employment within the Judicial Branch and that no formal criminal investigation has been opened regarding this matter. Martin was asked and respectfully declined to have our contact audio recorded. Martin confirmed the following in reference to her employment within the Judicial Branch:

She confirmed she was asked to join the Judicial Branch as the Director of Administration by Chief Justice Gordon MacDonald in November 2021. She expressed she had high hopes of taking on this new position to assist with changes within the Judicial Branch. During her position as Director of Administration, her sole point of contact and supervisor was Chief Justice MacDonald, who she reported directly to. By 2023 she felt stressed in her position due to the changes within the court and human resource related issues among other things. This was while working upwards of 70 hours per week. Under these conditions in 2024, [redacted] and by August 2024 she began a stint of approved leave being fully out of work. Although she was

| Page 1 of 5 | SIGNED | DATE |
|---|---|---|
| | [signature] | November 21, 2025 |

| Matter # | Case Name | Investigator | Report Date |
|---|---|---|---|
| 2025180174 | Review of Dianne Martin's Employment in Judicial Branch | Daniel J. Mederos | November 20, 2025 |

fully on leave, admittedly she was terrible at saying "no" and assisted while out with some work to include the budget and other projects she was invested in. She was aware other Judicial Branch employees were tasked to "pickup work" due to her leave.

In December 2024 into January 2025, she returned to work from her leave with approval to work up to 40 hours per week with flexible work scheduling. After this return to work, she described that her overall workplace dynamic "felt different". She believed Chief Justice MacDonald was annoyed as the workplace was chaotic, describing the justices as not agreeing with or communicating with each other and not being on the same page regarding the administration of the court. She pointed out that this was during the time period Justice Anna Barbara Hantz Marconi was on leave from the court. Martin advised there were always problems and justices would approach her about issues with staff. [redacted]. She expressed that the combination of these issues made it a difficult work environment for her. She cited the diversity, equity and inclusion initiative project of the court and its grant funding as one of the contentious topics at the Judicial Branch. She said she had limited interactions with justices about these projects but described an interaction with Chief Justice MacDonald on/or about February 25, 2025 regarding her understanding and the completion of billing for work associated with the diversity, equity and inclusion project. Martin described later receiving a text message from the Chief Justice on her work cell phone directing her to shut down the project and that she was uncomfortable relaying this to the project members.

Soon after, she was invited to a meeting with Justices Patrick Donovan and Melissa Countway scheduled for February 28, 2025 at 10:00 am at the Supreme Court in Concord. This meeting was scheduled by the justices' support staff. Martin was unaware of what the meeting was about. She prepared for this meeting with topics of discussion as if it was the type of meeting she would typically have with Chief Justice MacDonald. She believed this meeting with these justices would be addressing and helping with the Chief Justice's workload.

Martin met with Justices Donovan and Countway on Friday February 28, 2025. At this meeting, Martin advised the justices she had prepared an agenda for the meeting. Justice Donovan stated words to the effect that they were "here to let you know your position is being eliminated effective immediately" and "You are going to be replaced by a judge" referencing a reorganization at the Judicial Branch. She advised there was no previous communication about this reorganization, and she was completely shocked by this notification. She was offered the

CONFIDENTIAL

**DEPARTMENT OF JUSTICE**
**OFFICE OF THE ATTORNEY GENERAL**
**REPORT OF INVESTIGATION**

| Matter # | Case Name | Investigator | Report Date |
|---|---|---|---|
| 2025180174 | Review of Dianne Martin's Employment in Judicial Branch | Daniel J. Mederos | November 20, 2025 |

position of General Counsel to the Office of Bar Admissions at the Judicial Branch, at this meeting, which she refused.

She was aware the General Counsel to the Office of Bar Admissions position was a position the court had been attempting to fill as the individual in that position was due to retire in August 2025. The plan was to hire for the position prior to the February and July bar exams so the new General Counsel would have overlapped time with the current General Counsel to become familiar with the position. She stated the General Counsel position was structured under her supervision as the Director of Administration. She declined the offer of this position as it paid less than her current position and she felt that it was a demotion.

During this meeting, Martin did point out that there was a process in the Judicial Branch policies regarding layoffs. After discussion about this process, Justice Donovon commented to Martin words to the effect of "other people had to do parts of your job". Justice Countway advised that their meeting was not a negotiation, and that the court had made a decision, advising Martin her position was "at will". This meeting concluded with Justice Donovon requesting and collecting from Martin her work computer, work cellphone, work identification and access cards with no further instruction as she was escorted out of the building by Justice Countway. She left this meeting under the impression the termination of her employment was effective that day. She was not provided with any written documentation or notification of this termination/layoff at this time. The next day, she made arrangements through Erin Creegan ("Creegan"), the Judicial Branch General Counsel at the time, to retrieve personal items from her office at the Administrate Office of the Courts. She later discovered Justice Donovon sent a message to all court staff that Martin was removed from her position immediately and Judge Christopher Keating would be taking over as Administrator of the Court.

The following Monday March 3, 2025, she reached out and corresponded from her personal email with Chief Justice MacDonald and Creegan regarding her position elimination. During this correspondence the Chief Justice praised Martin and expressed his hope she would take the General Counsel to the Office of the Bar Admissions position. She was under the impression Chief MacDonald was aware of the planned termination/layoff and provided his reasoning for the termination/ layoff as being nothing to do with her performance and was just a reorganization of the position.

After consulting with private counsel, on March 12, 2025 she began communicating and negotiating with Creegan regarding the termination/layoff from the Director of Administration position and still open offer for the General Counsel to the Office of the Bar Admissions

| Page 3 of 5 | SIGNED | DATE<br>November 21, 2025 |
|---|---|---|

CONFIDENTIAL

**DEPARTMENT OF JUSTICE**
**OFFICE OF THE ATTORNEY GENERAL**
**REPORT OF INVESTIGATION**

| Matter # | Case Name | Investigator | Report Date |
|---|---|---|---|
| 2025180174 | Review of Dianne Martin's Employment in Judicial Branch | Daniel J. Mederos | November 20, 2025 |

position. Creegan expressed to Martin that Creegan was unaware of and knew nothing of the decision to terminate/layoff Martin. She believed Creegan was tasked with negotiating the risk associated with the process or lack thereof associated with Martin's termination/layoff. This is when Martin discovered she remained on paid administrative leave while the Judicial Branch formally processed her layoff effective April 1, 2025 which was documented in a letter dated April 1, 2025 sent to Martin from Judge Keating.

While negotiating with Creegan three potential options were presented and discussed to include: being offered the General Counsel to the Office of Bar Admissions position at a higher labor grade pay scale, talk about a monetary sum under a release to cover time spent searching for new employment, or potentially working alongside Judge Keating in some capacity. She eventually agreed to the verbal offer for the General Counsel to the Officer of Bar Admissions position at the higher pay rate. Martin was formally offered this position in writing from Judge Keating in a letter dated March 27, 2025. Martin executed and signed the offer letter agreeing to the terms of employment on April 3, 2025. Per the terms of the offer, her rehire date in this new position was scheduled for April 4, 2025. She denied ever being asked to sign any type of release in reference to taking this new position.

Martin stated that during this negotiation with Creegan, Martin denied threatening a lawsuit associated with her termination/ layoff and the retroactive accruals paid out to her in the amount of approximately $49,000.00. She confirmed these calculated accrual amounts compiled by the Judicial Branch were presented to her by Creegan prior to the payout and Martin asserted they appeared accurate. Martin advised all her prior leave was properly documented, submitted, and approved by the Chief Justice pursuant to Judicial Branch procedures.

She confirmed she still holds her position as General Counsel to the Office of Bar Admissions, which is a remote position that now reports directly to the Chief Justice. In October 2025, Judge Keating reached out to her regarding a press inquiry relating to Martin's employment advising [redacted] had painted an unflattering picture regarding the termination/layoff and rehiring of Martin. She encouraged the court to be forthcoming that the layoff was due to a restructuring by the court. She provided her work email and cell number to Judge Keating for any inquiries directed to her. She was aware the court decided against providing a statement in response to the press inquiry and Martin was never contacted directly by the press regarding this inquiry or prior to Todd Bookman's published report on NHPR regarding her employment within the New Hampshire Judicial Branch. Martin stated she was unaware the Supreme Court Justices were going to issue the statement released on October 30, 2025 related to her layoff and current employment.

| Page 4 of 5 | SIGNED | DATE |
|---|---|---|
| | [signature] | November 21, 2025 |

CONFIDENTIAL

**DEPARTMENT OF JUSTICE**
**OFFICE OF THE ATTORNEY GENERAL**
**REPORT OF INVESTIGATION**

| Matter # | Case Name | Investigator | Report Date |
|---|---|---|---|
| 2025180174 | Review of Dianne Martin's Employment in Judicial Branch | Daniel J. Mederos | November 20, 2025 |

The interview with Martin concluded at approximately 7:15 pm.

End of report

| Page 5 of 5 | SIGNED | DATE November 21, 2025 |
|---|---|---|

# 41. Request to Approve Higher Level Entry Step for New Employee Re: Dianne Martin Approved by Judge Christopher Keating, Offer of Employment and Agreement to the Terms of the Employment

CONFIDENTIAL

Outlook

## Higher Step - D Martim

**From** Suzanne Gelinas </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C2FD341B08164013B29DAA257318ABF0-17D7E2A0-C7>

**Date** Mon 4/21/2025 3:40 PM

**To** DAS: HRSU <hrsu@das.nh.gov>

**Cc** Human Resources <HumanResources@courts.state.nh.us>

3 attachments (366 KB)

EA Dianne Martin 4-4-2025 Signed CMK.pdf; Dianne Martin Higher Step.pdf; DM signed Offer Letter.pdf;

FYI

***Suzanne M. Gelinas***
Manager, Human Resources
New Hampshire Judicial Branch
One Granite Place
Concord, New Hampshire 03302
Office: (603) 415-0688

CONFIDENTIAL

**Request to Approve Higher Entry Level Step for New Employee**

Clerk/Manager Name: Chief Justice Gordon MacDonald

Clerk/Manager of: New Hampshire Judicial Branch
Court or management group name

Seeks to offer new employee:

Dianne Martin — Name

General Counsel — Position Title

position in the Office of Bar Admissions
Court or management group name

starting at LG 58,
Step 1. ☐ 2. ☐ 3. ☐ 4. ☐ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☒

Requesting new employee start at higher step due to (select one):

**Unusual Conditions:**

☐ ~~There is a documented shortage in the labor market or~~

☑ ~~There is marked difficulty in recruitment or retention~~

And/Or

**Unusual Qualifications:**

☑ The proposed new hire has substantial prior job experience at an equivalent or higher level of responsibility than that of the new position.

The above reason(s) is/are supported by the following facts:

Dianne possesses the advanced skills and experience for the role of General Counsel of the Office of Bar Admissions. Dianne's dedicated 17 years of service to the State of New Hampshire, along with working relationships in the Judicial Branch, well quantifies a LG58 Step 9. ~~Additionally, Dianne will continue her work with the Concord Regional Technical Center, which is an additional responsibility of this role.~~

Approval Recommended by:

Date

Signature of Administrator

4/14/2025

Date

Signature of Senior Administrator

Christopher M. Keating

GJM RESP 0519

NHJB Prod One 00048

CONFIDENTIAL

**Approved by:**

Date _______________ Signature of Administrative Judge _______________

**The Director of the Administrative Office of the Courts:**

☑ certifies that funds needed for the enhanced step are available.
☑ approves the above request (only for step 4 and above)

Date 4/14/25 Signature of Director

Christopher M. Keating

CONFIDENTIAL

**THE STATE OF NEW HAMPSHIRE**
**ADMINISTRATIVE OFFICE OF THE COURTS**

HON. CHRISTOPHER M. KEATING
INTERIM DIRECTOR

ONE GRANITE PLACE, SUITE N400
CONCORD, NH 03301
(603) 415-0665
ckeating@courts.state.nh.us

March 27, 2025

Dianne H. Martin
[redacted]

Dear Attorney Martin,

The Supreme Court authorized me to extend to you the offer of appointment to the position of General Counsel for the Office of Bar Admissions, a component entity of the New Hampshire Judicial Branch.

If you accept the offer, your contingent rehire date is scheduled for Friday, April 4, 2025. This is a regular, full-time administrative position and your normal working hours will be 37.5 per week.

With this appointment your pay will change to a Labor Grade 56, Step 09 which is equal to an hourly rate of $79.03, payable bi-weekly and equating to an annual amount of $154,109.80. This position is considered an exempt position. Additionally, there will be no break in your current benefits coverage.

Pursuant to New Hampshire Judicial Branch Personnel Rule 9, supervisory responsibility for your position, (and all personnel actions relative to your position), have been delegated to Chief Justice Gordon MacDonald. Application of Personnel Rule 25 with respect to the imposition of a Probationary Period has been waived; your employment will not be subject to a Probationary Period.

For purposes of the Judicial Branch Remote Work Policy, your position is designated as fully remote. You will, of course, be expected to attend meetings, events and conferences consonant with your responsibilities.

Your ability to continue to work with Concord Regional Technical Center students will be honored and supported.

Please feel free to contact the Human Resources Department at humanresources@courts.state.nh.us should you have any questions about wages, benefits, personnel rules, or any other matter concerning your employment. You are also welcome to contact me at (603) 415-0665 or ckeating@courts.state.nh.us

Wishing you success in this important position.

Sincerely,

Hon. Christopher M. Keating
Interim Director

CONFIDENTIAL



Kindly indicate your understanding and acceptance by signing below and returning it no later than, April 2, 2025. Signed copies can be sent via email to humanresources@courts.state.nh.us, or via fax 603-513-5454, and originals can be mailed to:

Human Resources Department
Administrative Office of the Courts
One Granite Place, Suite N400
Concord, NH 03301

I agree to the terms of the employment set forth above.

Dianne Martin 4.3.25

Signature – Dianne H. Martin Date

CONFIDENTIAL

**Approved by:**

Date

Signature of Administrative Judge

**The Director of the Administrative Office of the Courts:**
☑ certifies that funds needed for the enhanced step are available.
☑ approves the above request (only for step 4 and above)

4/14/25
Date

Signature of Director

Christopher M. Keating

Rev. June 14, 2021

CONFIDENTIAL

**Request to Approve Higher Entry Level Step for New Employee**

Clerk/Manager Name: Chief Justice Gordon MacDonald

Clerk/Manager of: New Hampshire Judicial Branch
Court or management group name

Seeks to offer new employee:

Dianne Martin — General Counsel
Name — Position Title

position in the Office of Bar Admissions
Court or management group name

starting at LG 58
Step 1. ☐ 2. ☐ 3. ☐ 4. ☐ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☒

**Requesting new employee start at higher step due to (select one):**
**Unusual Conditions:**
☐ ~~There is a documented shortage in the labor market or~~
☑ ~~There is marked difficulty in recruitment or retention~~

And/Or

**Unusual Qualifications:**
☑ The proposed new hire has substantial prior job experience at an equivalent or higher level of responsibility than that of the new position.

The above reason(s) is/are supported by the following facts:

Dianne possesses the advanced skills and experience for the role of General Counsel of the Office of Bar Admissions. Dianne's dedicated 17 years of service to the State of New Hampshire, along with working relationships in the Judicial Branch, well quantifies a LG58 Step 9. ~~Additionally, Dianne will continue her work with the Concord Regional Technical Center which is an additional responsibility of this role.~~

Approval Recommended by:

Date ______

Signature of Administrator

Date 4/14/2025

Signature of Senior Administrator
Christopher M. Keating

GJM RESP 0524

NHJB DM 00019

# 42. March 18, 2025 Notes by Deputy Director Matthew Mavrogeorge

CONFIDENTIAL

3/18/2025

Suzanne Celins.

[redacted]

+ Liam Marsh
Appeal [illegible] pending
Arrest.
[illegible] Judge [illegible]
[illegible] [illegible]
[illegible] wants to [illegible]
[illegible] & then [illegible]
[illegible] idle [illegible] NH Bar Assoc

[illegible] would [illegible]
Argued

from [illegible] -60, step 9 — to [illegible] 56, step 4

• Judge Kearney went to [illegible] asked her to help him figure that out.

E/m [illegible] Gen. Counsel [illegible] does Judge Kearney

CONFIDENTIAL

- Justice Donovan said [illegible] [illegible] & Jaime [illegible] [illegible] no longer works for [illegible] [illegible]

- Suzanne told Judge Leahy that she doesn't understand why the Chief wants to classify this as a layoff

- Dianne & Gen. Counsel (Sp[illegible] of Gen. Counsel) went to Suzanne & said [illegible] is referencing 21 day layoff & [illegible] rule
  - [illegible] believes Judge [illegible] [illegible] [illegible] in her position is triggering a layoff & they have 21 days to [illegible] it

- Chief told Judge Leahy to have Suzanne put Dianne on paid leave pending charges. [redacted]

- putting Dianne into another position is Chief's idea.

CONFIDENTIAL

[illegible] told Jerome that [illegible]
[illegible] because her daughter is
sick. [illegible] accept the [illegible]
because she wants the payoff [illegible]
tp