**Avicore Reporting - 15 Constitution Drive, Suite 1A, Bedford, NH 03110**

STATE OF NEW HAMPSHIRE

* * * * * * * * * * * * * * * * *
*
REVIEW OF DIANNE MARTIN'S *
EMPLOYMENT IN JUDICIAL BRANCH *
*
* * * * * * * * * * * * * * * * *

**INTERVIEW OF [redacted] - 11/7/25**
**TRANSCRIBED FROM AUDIO**

Prepared for:

Eleanor Cloutier, Legal Assistant
Criminal Justice Bureau
N.H. Department of Justice
1 Granite Place South
Concord, NH 03301

INVESTIGATOR RICHARD TRACY: It's November 7th, 2025. It's 1:10 p.m. We're at the office of the Attorney General. We're in Room 108B, as in Boston. This is Investigator Richard Tracy (hereinafter referred to as "INTERVIEWER"). With me is Deputy Attorney General James Boffetti (hereinafter referred to as "INTERVIEWER") and General Counsel Chris Bond (hereinafter referred to as "INTERVIEWER"). And also with us is [redacted]. And [redacted], could you please state your name and spell your last name for the record, please?

[redacted] and last name is [redacted].

INTERVIEWER: Okay. You understand the conversation is being recorded?

[redacted] Yes.

INTERVIEWER: Are you okay with that?

[redacted] Yes.

INTERVIEWER: Thank you. And what's a good address for you?

[redacted], [redacted].

INTERVIEWER: Okay. And I have your phone

number but if you could just state it for this interview, please.

[redacted].

INTERVIEWER: All right. Thank you. [redacted], could you start by telling us the times that -- dates when you first started at the Judicial Branch and when you left and how did you come to leave?

[redacted] I started there in June 28th of 2024 and I left in September 8th -- no, that's my new job. I left there the week before that, August -- late August.

INTERVIEWER: Late August of this year?

[redacted] Of 2025.

INTERVIEWER: Okay. And how did you come to leave? You know, was it a resignation, was it termination? How did you become --

[redacted] It was a voluntary resignation.

INTERVIEWER: Okay. Did they ask you to resign?

[redacted] No.

INTERVIEWER: So you left on your own?

[redacted] Yes.

INTERVIEWER: And what was your job?

[redacted] So I started as HR Associate in June of 2024 and I was promoted to HR Coordinator December 2024.

INTERVIEWER: And when was that again, when you got HR Coordinator?

[redacted] December 19th or so.

INTERVIEWER: Of 2024?

[redacted] 2024.

INTERVIEWER: Okay. And when you started back in June of 2024, who else was in the HR Department?

[redacted] Jair Santos and Tracey Sinclair. I don't know if Lori Galetta (ph) was considered to be in the HR Department. It was very up in the air.

INTERVIEWER: Okay. But she kind of worked in that area?

[redacted] Yes.

INTERVIEWER: Lori Galetto?

[redacted] Galetta.

INTERVIEWER: Galetta? Okay. And do they

-- do they maintain employment with New Hampshire Judicial Branch today, these three folks, Sinclair, Geletta and Santos?

[redacted] Only Tracey Sinclair and Jair Santos.

INTERVIEWER: And what is their position now? Are they still in the HR Department?

[redacted] Yes, they are. Yes. Jair, he was pay -- HR and Payroll Associate.

INTERVIEWER: Yeah.

[redacted] And Tracey is -- handles leave with management.

INTERVIEWER: But Lori's no longer employed?

[redacted] Not with the Branch.

INTERVIEWER: Okay. And Suzanne Gelinas, does that name sound familiar to you?

[redacted] Yes.

INTERVIEWER: Okay. And did you come to know her?

[redacted] Yes.

INTERVIEWER: And how did you come to know her?

[redacted] She was hired as HR Manager

December 19th, 2024.

INTERVIEWER: And did she -- do you know whose place she took? Did she take somebody's place?

[redacted] Yeah, she took the place of -- what was her name -- of the HR Manager that was there and had left around March 2024. I forgot her name.

INTERVIEWER: So that job then, that manager's job was vacant from March --

[redacted] Yes.

INTERVIEWER: -- of '24 to December of '24?

[redacted] Yes.

INTERVIEWER: Okay. And how long does Suzanne work at Judicial Branch or for the Judicial Branch, do you know?

[redacted] Around -- let's see -- maybe around three months.

INTERVIEWER: Three months. [redacted]

INTERVIEWER: [redacted]

[redacted]

INTERVIEWER: [redacted]

[redacted]

INTERVIEWER: [redacted]

[redacted]

INTERVIEWER: [redacted]

[redacted]

INTERVIEWER: [redacted]

[redacted]

INTERVIEWER: [redacted]

[redacted]

INTERVIEWER: [redacted]

INTERVIEWER: [redacted]

INTERVIEWER: [redacted]

INTERVIEWER: [redacted]

INTERVIEWER: [redacted]

INTERVIEWER: [redacted]

[redacted]

INTERVIEWER: [redacted]

[redacted]

INTERVIEWER: [redacted]

[redacted]

INTERVIEWER: Okay.

INTERVIEWER: Who did -- so obviously when Suzanne becomes the HR Manager, she would be your supervisor?

[redacted] Yes.

INTERVIEWER: And who would Suzanne -- who would be Suzanne's supervisor?

[redacted] Judge Keating.

INTERVIEWER: Before Judge -- but so I've come to understand that Judge Keating wasn't there when Suzanne got hired, he comes in to the Judicial Branch afterwards?

[redacted] Uh-hmm.

INTERVIEWER: Is that correct?

[redacted] Oh yeah, that's right, that is correct.

INTERVIEWER: So prior to Judge Keating, who would have Suzanne been responsible to?

[redacted] She would have -- it was an interesting structure. We -- because we were all technically reporting to Dianne Martin, but really the day to day person we had to -- that was our direct manager was Takhmina.

INTERVIEWER: Okay.

INTERVIEWER: [redacted]

[redacted] I don't recall.

INTERVIEWER: Okay. And Takhmina worked under Dianne. She was like a deputy?

[redacted] Yes.

INTERVIEWER: Okay.

INTERVIEWER: In the time that you're there, do you know if Dianne Martin is ever on FMLA?

[redacted] Yes, I was actually just going to mention that. Even though she was technically my -- my reports-to person, I saw her twice for no longer than ten-minute periods in 2024.

INTERVIEWER: All of 2024.

[redacted] It could have been maybe three times but I barely saw Dianne.

INTERVIEWER: And just for a few minutes, 10 to 15 minutes at a time?

[redacted] One once, yeah, she just asked me what my career goals were and that's it, and then --

INTERVIEWER: Okay.

[redacted] -- the other time --

INTERVIEWER: When they hired you, was she part of the interview process?

[redacted] Yes.

INTERVIEWER: Okay. Which means that she just wasn't -- and the office was here, right? It was --

[redacted] Yeah, I was here every day. (Laughs.)

[redacted] At one point, I was the

only one.

INTERVIEWER: (Laughs.) Only one in HR?

[redacted] And the -- yeah, because everyone else was remote or absent.

INTERVIEWER: So when you say you saw her, you mean physically saw her, right, a couple time -- two or three times, maybe 10, 15 minutes --

[redacted] Yeah.

INTERVIEWER: -- at a time?

INTERVIEWER: And that's for 2024?

[redacted] Yes.

INTERVIEWER: So you start in June of 2024. So from June till the end of December, you see her two, maybe three times?

[redacted] Yes.

INTERVIEWER: But did you have interactions with her and through other means, e-mails, Teams meetings, other kinds of things in 2024?

[redacted] Definitely not Teams. Maybe there were a few e-mail exchanges. I don't recall if there would have been e-mail communication. I was mostly reporting to Takhmina.

INTERVIEWER: Okay. Did you -- did you know

where Dianne was when she wasn't at the office?

[redacted] Where?

INTERVIEWER: Yeah.

[redacted] No.

INTERVIEWER: Do you know -- you said -- Dick mentioned about FMLA. Do you know -- did you know if she was on FMLA during that time in 2024?

[redacted] I don't know that I'm allowed to --

INTERVIEWER: To say?

[redacted] -- say --

INTERVIEWER: Okay, all right.

[redacted] -- any medical information.

INTERVIEWER: I don't want any medical information. So I don't want you to tell me anything -- all right, let's not -- talk about it in terms of FMLA. Was she on leave? I don't want to know anything about any medical issues [redacted], any reasons why she may have taken or maybe not taken FMLA, but she was -- was she on leave, you know, using sick leave or annual leave during the time, or was she working? What was your understanding of what was she --

INTERVIEWER: Could she have been working remote versus not being in the office?

INTERVIEWER: Right.

[redacted] Oh, okay. My understanding is that she was doing some work remotely but I don't know, because there's full leave and then there's intermittent leave.

INTERVIEWER: Yeah.

[redacted] I don't know -- I know that some of that time she was working like maybe ten hours a week or something like that. But I don't know if there was a period of time during that time that was full leave.

INTERVIEWER: Who in the Judicial Branch would track leave?

[redacted] Tracey Sinclair.

INTERVIEWER: And how -- how would that happen? Is there a system? Is there a computer that would have you log on to record your time and your leave? How does that -- can you just tell us -- explain how that would work. If Dianne -- you know, Dianne would have to record her -- was she recording her time in the system?

[redacted] No. She would have recorded timesheets because we did -- we were asked to fill out timesheets.

INTERVIEWER: Like regular paper, handwritten, or?

[redacted] It was a --

INTERVIEWER: Word --

[redacted] -- program called Timekeeper or --

INTERVIEWER: So it's a computer -- but you complete the timesheet, you go into this program and you complete your time?

[redacted] Uh-hmm. And then --

INTERVIEWER: Yeah.

[redacted] -- submit it to Payroll --

INTERVIEWER: Okay.

[redacted] -- in house. And then if anything needs adjusted, you would work with Payroll to adjust your time based on actual hours worked. Because a timesheet is prefilled for salaried employees. So if anything changes, you go through Payroll to change it. But, yeah, so there was -- ASAP is our -- is the system of record.

INTERVIEWER: Okay.

[redacted] And then there's another system that Tracey Sinclair uses --

INTERVIEWER: Uh-hmm.

[redacted] She's the only one that has access to that system.

INTERVIEWER: Okay. And do you know if Dianne was putting her time into ASAP?

[redacted] I have no idea.

INTERVIEWER: Okay.

[redacted] I never even think -- thought to look at her timesheet.

INTERVIEWER: Okay. But you and HR, you and Suzanne and whoever, that wasn't your responsibility to track people's leave. That was Tracey Sinclair?

[redacted] Yes. And that would have been tracked on the ASAP.

INTERVIEWER: Okay. ASAP and another system you said?

[redacted] And another system that --

INTERVIEWER: Only Tracey had access to?

[redacted] -- I never -- I tried getting as a backup but it never -- they were --

INTERVIEWER: But Tracey was the only one, single point of failure, just her --

[redacted] Yes.

INTERVIEWER: -- no one else? Okay.

INTERVIEWER: And when you put in time, let's say it was you, you put in time, would that have to be approved by your supervisor?

[redacted] Yes, every timecard gets approved.

INTERVIEWER: Approved. Like every week or --

[redacted] Prior to payroll processing --

INTERVIEWER: Okay. And that would be --

[redacted] -- every other week.

INTERVIEWER: -- approved every other week. Approved in your case by Suzanne?

[redacted] So in my case, yes.

INTERVIEWER: Suzanne. Yeah. Do you know -- assuming that Dianne would have done time into ASAP, do you know who would have approved her time?

[redacted] Who Dianne reports to? I don't know who she would -- who her manager would be.

INTERVIEWER: Okay. That's fine.

INTERVIEWER: What was your understanding of the structure over at Judicial Branch? I think you mentioned earlier who the top person was. Who was that?

[redacted] [redacted] The top person?

INTERVIEWER: Yeah, for the Judicial Branch.

[redacted] [redacted] The Administrative Offices of the Courts would have been Dianne.

INTERVIEWER: Okay. But what about the Chief Justice? Is he above Dianne or is he equal to Dianne, or?

[redacted] [redacted] He's above everybody.

INTERVIEWER: Okay.

[redacted] [redacted] So he runs -- you know, he would be the head of the Supreme Court but he also has the power to make any decisions regarding the Judicial Branch.

INTERVIEWER: Okay.

[redacted] [redacted] That was my understanding. Actually there is -- it's in the employee handbook that you can even like -- he can decide if you get fired or not or, you know -- so --

INTERVIEWER: Okay.

[redacted] That's one of the reasons I didn't say anything.

INTERVIEWER: Say anything about what?

[redacted] About weird things happening.

INTERVIEWER: Okay.

INTERVIEWER: So you didn't complain to anybody? Is that what you're saying? Like you observed things that you considered to be weird or different?

[redacted] Uh-hmm.

INTERVIEWER: But you didn't report them to anybody? Is that what you're saying?

[redacted] No, I only -- I do have a text, you know, with my coworker, Jay, because we had trust, just basically being like this is strange.

INTERVIEWER: Yeah.

[redacted] And I'm worried.

INTERVIEWER: And who's Jay?

[redacted] Jair.

INTERVIEWER: Oh, Jair.

[redacted] My coworker, yeah.

INTERVIEWER: Uh-hmm.

INTERVIEWER: And what is an example of something that's strange or weird?

[redacted] A lot.

(Laughs.)

[redacted] Almost everything.

(Laughs.)

[redacted] An example.

INTERVIEWER: What's the strangest thing you experienced over there?

[redacted] The strangest --

INTERVIEWER: Or one of the strangest things.

[redacted] Oh, that I think the strangest thing was how many people did HR-related work without HR's knowledge or approval.

INTERVIEWER: And who were some of these people that were doing HR's work that should have been done by HR?

[redacted] Well, Dianne should not be reclassifying positions, for example. That's the HR manager. One time I found out that our job was posted on an external jobsite and that was my job to

do that I wasn't aware of. And that was someone in operations, IT, enabling system access to someone that we weren't even aware was coming back to work.

INTERVIEWER: Yeah, that's weird. Do you ever recall being summonsed or called into a meeting with a bunch of -- with your coworkers and Justice Donovan being present?

[redacted] Yes.

INTERVIEWER: And do you know roughly when that happened or do you even know the date by chance?

[redacted] Yes, I do. That was February 28th.

INTERVIEWER: And tell us about what your recollection is as to what happened on February 28th.

[redacted] We had received an e-mail late morning that we were going to have a meeting at 1 p.m. with the Justices involved and that was another strange thing, because I am Human Resources and the one that's there every day. So then employees came to me worried because they were worried they might be getting laid off or what's happening. And I had no clue that what this meeting was about, what the message was going to be.

INTERVIEWER: Do you know who sent the e-mail or who it came from?

[redacted] No. I think it was a bunch of people. I don't know who it came from.

INTERVIEWER: Okay, all right. And do you remember in essence what the e-mail said?

[redacted] It just said that we have an announcement or big announcement, to please meet in this room.

INTERVIEWER: Okay.

INTERVIEWER: What room is that?

[redacted] That was the training room.

INTERVIEWER: Yeah. And --

INTERVIEWER: In the afternoon? Do you know what time of day it was?

[redacted] I think it was 1 p.m. The meeting was at 1 p.m. And I called I think maybe [redacted]. I was trying to get information about what it was about so I could calm people down.

INTERVIEWER: Did [redacted] know what it was about?

[redacted] No, she didn't, because, yeah, we thought it was maybe [redacted] had -- you

know, was gone or something.

INTERVIEWER: [redacted] was gone?

[redacted] We thought maybe that was it.

INTERVIEWER: Why would you have thought that?

[redacted] Because [redacted] had spoken out about some encounters with [redacted] and we thought maybe those encounters were justified to mean either leaving or --

INTERVIEWER: Okay. And how do you know that, about what [redacted] did? Did she talk to you about complaints she made against [redacted]?

[redacted] Yes.

INTERVIEWER: Okay. And do you know what those complaints were?

[redacted] Yeah. She complained that we had a meeting with the risk management professional and that [redacted] had asked us not to speak freely and that she had lied during that meeting.

INTERVIEWER: Okay. Who's risk management: Who was it? Do you know their name?

[redacted]: Gary -- yeah, Gary.

INTERVIEWER: Do you know Gary's last name?

[redacted] Gary -- I could think of it.

INTERVIEWER: Was he a -- is Gary a Judicial Branch employee?

[redacted] Yes, internal risk.

INTERVIEWER: But he's part of risk management?

[redacted] He was hired maybe right around August.

INTERVIEWER: Of last year?

[redacted] Of last year.

INTERVIEWER: Or this year? Last year?

[redacted] Last year.

INTERVIEWER: Okay.

[redacted] And he sat right behind me for a bit through the ups and downs. He was the other guy that was there regularly.

INTERVIEWER: Okay.

INTERVIEWER: So that meeting that you had that [redacted] had with that risk manager, you were a part of that too?

[redacted] Yes.

INTERVIEWER: And [redacted] had asked you not to talk in the meeting or not to say certain things?

[redacted] just asked us not to say certain things.

INTERVIEWER: Okay. So back up to that February 28th meeting, you get the e-mail, meet in the training room at 1 o'clock. Roughly, how many of your coworkers are at that meeting?

[redacted] It was a full room. If I were to guess, maybe at least 30 to 40 people.

INTERVIEWER: And other than your coworkers, so who comes in and runs that meeting? You know, who takes charge of that meeting?

[redacted] Well, they all walked in the order of importance.

(Laughs.)

INTERVIEWER: Meaning the most important in the front or in the back?

[redacted] Most important in the front with Justice Donovan and Conway, then it was Judge Howard, Judge Christo.

INTERVIEWER: Okay. So was it -- could it

have been Justice Countway?

[redacted] Countway, yes.

INTERVIEWER: And then it was Judge Howard and Judge Christo?

[redacted] Yes.

INTERVIEWER: And anyone else?

[redacted] Maybe Sean Haggarty, who's the Assistant Director.

INTERVIEWER: Okay. Was Erin Creegan there (inaudible) counsel?

[redacted] I don't recall.

INTERVIEWER: Okay. So Justice Donovan, Justice Countway, Judge Howard, Judge Christo and Sean Haggarty, those are the people you remember in the procession?

[redacted] Uh-hmm.

INTERVIEWER: I'm assuming Sean Haggarty was at the end of the line?

[redacted] (Laughs.) Don't tell him I said that.

INTERVIEWER: (Laughs.) Okay. So they come in and who starts talking first, do you remember?

[redacted] No, I don't remember.

INTERVIEWER: Okay. Do you remember -- well, do you remember who did most of the talking at the meeting?

[redacted] Do I remember who did most of the talking? Well, I know who spoke.

INTERVIEWER: Yeah.

[redacted] It was Justice Donovan, Justice Countway.

INTERVIEWER: Okay.

[redacted] And Judge Christo.

INTERVIEWER: Okay. Judge Howard didn't talk?

[redacted] He might have shared a few -- a word or two.

INTERVIEWER: Okay. So I know, you know, you can't remember the whole conversation. But what did they -- what was the message they wanted to tell you all?

[redacted] I was trying to recall exactly what they said. They essentially said effective today, Dianne is no longer the Director and the Interim Director is Judge Keating and [redacted] is still under investigation and it's a personnel matter

that we can't share.

INTERVIEWER: Okay.

[redacted] And they said -- and then that's when Judge Christo, or somebody -- I think it was Judge Howard said, is there a [redacted] in the room, and [redacted] raised her hand and stood up. And Judge Christo said, you now have the authority you deserve.

INTERVIEWER: So you said you think it was Judge Howard who asked for [redacted]?

[redacted] It could have been but I don't recall for certain.

INTERVIEWER: You don't know. You don't know. That's what I thought you said. I don't want to put words in your mouth. Who do you think -- who you said -- who do you think said, is [redacted] in the room?

[redacted] I think it was either Judge Howard or maybe Justice Donovan.

INTERVIEWER: Okay, that's fine. And they said, so is [redacted] in the room, right? [redacted] probably like, oh my god.

(Laughs.)

[redacted] was, oh man.

INTERVIEWER: Yeah.

INTERVIEWER: But you remember it was Christo who said something like --

[redacted] Uh-hmm.

INTERVIEWER: -- you now have the authority you deserve?

[redacted] Yes.

INTERVIEWER: Do you have any idea what she meant by that?

[redacted] Well because total authority was [redacted] before.

INTERVIEWER: Okay. What are you thinking when you -- when this is happening? Like in real time, you're sitting there and you hear Justice Donovan saying, you know, effective today, Dianne is no longer the Director and the Interim Director is Judge Keating and [redacted] is still out on leave, it's a personnel matter. What are you -- what's going through your mind?

[redacted] I am very excited and I think somebody said they almost clapped but they didn't, and I'm just thinking about all the great

things we can now contribute.

INTERVIEWER: And is that because [redacted] was sort of a -- she was sort of exercising a lot of control over HR?

[redacted] Yes.

INTERVIEWER: Did any of the Judges say anything at all about personnel other than it was a personnel matter? Did they make any reference to what that was?

[redacted] No reference at all.

INTERVIEWER: Okay. And when they -- was [redacted] already under investigation when they said that -- did you all know that she was under investigation?

[redacted] I did because I was interviewed for that.

INTERVIEWER: Okay. So --

[redacted] And --

INTERVIEWER: But maybe not everybody knew that [redacted] --

[redacted] Right, yes.

INTERVIEWER: But you would probably know more because of your position?

[redacted] Right.

INTERVIEWER: How -- for how long had [redacted] been out on -- out on leave for investigation, do you know?

[redacted] I don't know exactly.

INTERVIEWER: Okay.

[redacted] It was -- [redacted] was supposed to -- I don't know, it's been a while. A couple of weeks.

INTERVIEWER: Okay. So that meeting --

[redacted] Three maybe.

INTERVIEWER: -- so they announced this, right? Did they take questions from anybody?

[redacted] Yeah, but I don't think any -- there was one question -- oh yeah, there was just one question about how if we still need to get approvals on expenditures as little as a dollar or something like that.

INTERVIEWER: Approvals from who?

[redacted] I guess before -- and I've never -- well I did ask for approvals on HR-related stuff. I don't know the procurement process. I don't know who was --

INTERVIEWER: Okay.

[redacted] Probably Dianne or [redacted].

INTERVIEWER: Who would give you your approvals when you needed it to buy something?

[redacted] Dianne or [redacted].

INTERVIEWER: Okay, all right.

[redacted] And --

INTERVIEWER: So they were asking who's going to do that now --

INTERVIEWER: Yeah.

INTERVIEWER: -- that they're gone basically?

[redacted] So now that they're -- yeah, pretty much.

INTERVIEWER: Yeah.

[redacted] And for what amounts. So people were wondering if we -- if they could purchase like notepads for the office without getting -- you know, waiting for approvals. So that's when they said, yes, you can go ahead and make purchases under $500 without having to go through --

INTERVIEWER: But prior to that, what was

the threshold to get permission? What was like the lowest amount you had to --

[redacted] I don't know. But I think it was like anything.

INTERVIEWER: Anything?

[redacted] Yeah.

INTERVIEWER: Okay. How long do you think that meeting lasted?

[redacted] Maybe 15 minutes.

INTERVIEWER: Okay. And then what happened after the meeting?

[redacted] I wanted to make sure that my coworkers were aware. [redacted] left with the proceeding line.

INTERVIEWER: Because they called her out -- they called -- did they say, can you come with us?

[redacted] Yes.

INTERVIEWER: Okay.

[redacted] And they all met privately and I called Jair who was working remotely to let him know.

INTERVIEWER: And do you know -- did [redacted] have a meeting with them? Do you know that?

[redacted]: Yes.

INTERVIEWER: How do you know that?

[redacted]: [redacted] told me [redacted] just came -- afterwards I talked to [redacted], [redacted] said [redacted] just came back from that meeting.

INTERVIEWER: And what did [redacted] tell you about the meeting? Did [redacted] share with you what the meeting was about?

[redacted]: I think [redacted] just talked about now we can move forward. I don't really remember exactly what [redacted] said.

INTERVIEWER: Okay.

INTERVIEWER: How do you spell Jair's first name?

[redacted]: J-A-I-R.

INTERVIEWER: Were either Takhmina or Dianne at that meeting?

[redacted]: No. And that's when we were like, ooh.

(Laughs.)

INTERVIEWER: So neither one of them were there?

[redacted]: No, they were not.

INTERVIEWER: Okay. And you don't remember if Erin Creegan was at that meeting?

[redacted] I think so.

INTERVIEWER: Okay.

[redacted] But in the -- I think, yeah, she might have sat near me.

INTERVIEWER: Okay.

[redacted] Yeah. I don't think she was up in front.

INTERVIEWER: Yeah, she wasn't in the parade?

[redacted] I don't remember.

INTERVIEWER: Okay. That's fine.

INTERVIEWER: You said [redacted] was under investigation and you were interviewed. Who interviewed you?

[redacted] Sean.

INTERVIEWER: Haggerty?

[redacted] Yeah.

INTERVIEWER: Yeah.

[redacted] I gave him a statement, a written statement, too. But everything I had was under my e-mail -- my work e-mail.

INTERVIEWER: Right. So you don't have any --

[redacted] And during -- I do have a few texts but I don't share, you know, sensitive information via text. So it's usually like well -- like to my husband, big announcement today.

INTERVIEWER: But you didn't tell him what the announcement was about?

[redacted] No, or I didn't tell him afterwards or anything --

INTERVIEWER: Okay. Yeah.

[redacted] -- you know, in writing.

INTERVIEWER: Your statement that you gave to Sean about [redacted] for his investigation, was it -- what did it say? I mean, was it largely supportive of [redacted] complaint or did it diverge from her version?

[redacted] I don't know.

INTERVIEWER: Okay.

[redacted] He told me not to tell anyone about it. So I didn't even tell Suzanne that I was meeting with him or anything.

INTERVIEWER: Okay. Do you know what the

result of that investigation with [redacted] was?

[redacted] Suzanne told me that they didn't find anything, that [redacted] was fine to return.

INTERVIEWER: Okay. Did that surprise you or were you not surprised?

[redacted] I was extremely surprised and scared.

INTERVIEWER: And scared. Why scared?

[redacted] Because I really thought -- I didn't want to even get involved in any of this.

INTERVIEWER: Yeah.

[redacted] And Suzanne said, don't worry, you don't have to do anything, you know, I'll speak out and if I have to leave my job I will. So I didn't even want to, you know, sit down and do all of this and speak against -- you know, or not against but like just talk about what happened in that meeting with Sean. But I don't even know who assured me that it was -- that it was safe to do it. And I did it reluctantly and then when I heard [redacted] was coming back, I was afraid that [redacted] would find out what I said.

INTERVIEWER: Okay. When you come back, did

you work directly for [redacted] again or no?

[redacted]: No. Suzanne said Judge Keating removed [redacted] authority to manage anybody.

INTERVIEWER: Okay. So you have this meeting on the 28th and then [redacted] meets with this group of people. Do you see Dianne again? Does she come back into the office, Dianne Martin, after that?

[redacted]: No. I -- we all thought that was it.

INTERVIEWER: Okay.

INTERVIEWER: Yeah. So was it your understanding that she had been terminated from employment entirely at the time of the meeting?

[redacted]: They didn't explicitly say. They just said that -- they just said she's no longer the director. So if some -- in HR, if somebody tells me that, I assume she either quit or was terminated.

INTERVIEWER: Right, yeah.

INTERVIEWER: Yeah. Yeah. So you didn't take it to mean -- they weren't -- with [redacted], they were making it clear [redacted] was under investigation and with Dianne, they just said she was no longer the director?

[redacted] Effective today.

INTERVIEWER: Which you understood as a euphemism for some reason she no longer works for the Branch?

[redacted] Yeah, that's what we all understood.

INTERVIEWER: So after that day, the 28th of February, did you ever see Dianne again in the AOC?

[redacted] I saw her once here in the --

INTERVIEWER: Lobby?

[redacted] -- lobby.

INTERVIEWER: Just she happened to be here and you ran into her?

[redacted] Yeah. She said she was coming for a meeting and it was wonderful to run into me.

INTERVIEWER: (Laughs.)

[redacted] It's like, oh yeah, good to see you too.

INTERVIEWER: (Laughs.) And do you know approximately when that was, like how much -- how much --

[redacted] I think though I had already resigned actually. So that must have been --

INTERVIEWER: August.

[redacted] -- August.

INTERVIEWER: Yeah.

INTERVIEWER: Okay.

[redacted] Yeah, August.

INTERVIEWER: But you saw [redacted] again. [redacted] came back?

[redacted] Yes.

INTERVIEWER: And how long did [redacted] stay?

[redacted] Maybe a week.

INTERVIEWER: Okay. And then what happened to [redacted]?

[redacted] A week and a half. [redacted] resigned.

INTERVIEWER: Okay, all right. And then how -- how long did Suzanne stay? Suzanne left at some point? Right? She left her job. Do you know when that -- approximately when that was?

[redacted] Sometime in March.

INTERVIEWER: Okay. [redacted] know why she -- [redacted]

[redacted] Yeah, yeah. That was another shocking thing because --

INTERVIEWER: Yeah.

[redacted] -- she just called me and said, I'm no longer your manager, you're going to have to report to Judge Keating now.

INTERVIEWER: Okay. And did she leave quickly on like -- like the same day that she was there?

[redacted] I was actually working remotely when this all happened. So I just got a call from her and never saw her again.

INTERVIEWER: You never saw her again?

[redacted] Uh-hmm.

INTERVIEWER: Okay. What did you think of her abilities as an HR professional, Suzanne's?

[redacted] I think she has high abilities, also some weaknesses. I think she was just, you know, in a tough emotional position [redacted]

INTERVIEWER: [redacted]

[redacted]

INTERVIEWER: Okay.

[redacted] So, you know, I think she could be a really effective leader if all -- if she was in a [redacted]

INTERVIEWER: Uh-hmm. Okay. Who replaced Suzanne as the HR manager?

[redacted] Lorrie Rudis.

INTERVIEWER: And how -- how soon after Suzanne [redacted] did Lorrie Rudis come over?

[redacted] That was in like July.

INTERVIEWER: Okay. So you went a number of months, like from March or April, until July with no HR manager?

[redacted] Correct.

INTERVIEWER: And Keating was doing it essentially?

[redacted] He tried. He works really hard. He tried but it just -- he couldn't be on the day to day.

INTERVIEWER: Right.

[redacted] So his solution was to send us over to DAS --

INTERVIEWER: Okay.

[redacted] -- and report to the leaders there.

INTERVIEWER: Okay. And that's -- is that --

[redacted] The HR (inaudible) leaders.

INTERVIEWER: That's what you were doing?

[redacted] So yes, we then reported to them --

INTERVIEWER: Okay.

[redacted] -- and only -- you know, Judge Keating was only involved for, you know, timecards or something like that.

INTERVIEWER: Okay. Okay.

INTERVIEWER: Do you have an understanding about what happened with Dianne Martin? So she was no longer the director as of that meeting on the 28th but what -- what happened after that and when did you learn that -- about her fate?

[redacted] I learned about that she was actually not out of the Branch --

INTERVIEWER: Yeah.

[redacted] -- I want to say sometime

around late March.

INTERVIEWER: So several weeks went by?

[redacted] Yeah.

INTERVIEWER: So several weeks you just assumed she's gone --

[redacted] Yeah.

INTERVIEWER: -- that time passed and then at some point you learn oh she's still with the Branch.

[redacted] And Accounting -- and I'm the HR person and Accounting's asking me when they should terminate her in the system. And I'm like, I have no clue but we -- HR is always looking for backup documentation. So there was no backup documentation to terminate her in the system, or at least I hadn't seen it. So I said, I don't know, I haven't seen any, you know, termination letter. So I don't know if you should or not. You should go ask Judge Keating.

INTERVIEWER: Dianne was still in the system, she was getting paid from the time that she was -- that you had that meeting on the 28th until this time in March, right? She was still in the

system getting paid?

[redacted] I know that she was still active on ASAP, the system of record.

INTERVIEWER: How do you know that?

[redacted] Because Payroll asked me if they should terminate her in the system and I'm like, oh, you haven't done that yet. And I said, I haven't seen any termination letter. So I don't know if you should -- like I have no clue if you should or not.

INTERVIEWER: Okay.

[redacted] But, yeah, you asked about -- yeah, so late March is kind of when I found out she's -- I don't know if it was maybe I saw the termination letter or whatever it was, the letter saying you're no longer with us. And then I was brought in to a room with Judge Keating about -- I don't know, it's so scary. So Suzanne just went -- she stopped showing up. And I think this was the first week of April. That whole week she was out and we hadn't heard from her. I even have texts with my -- with Jair, like where she is, people are asking about her. Now people are coming to me. And that week when I texted Jay that I was concerned that

people were wondering where she is is when I first saw the offer letter and the dates on it. And I got really scared because if the HR manager's not there and I'm the -- technically after my promotion I was supposed to be like second in command, I'm supposed to get trained up to be kind of like the assistant manager, like backup manager, that I was scared when I saw that, that they were gonna make me sign that.

INTERVIEWER: So why was that scary to you?

[redacted] Because the information on it, I didn't -- in my opinion, it wasn't -- I don't know. There was something -- it wasn't correct.

INTERVIEWER: Okay. Do you remember what it was that wasn't correct?

[redacted] The -- the -- because we found out that she was no longer the director in February 28th I thought -- and Jair even -- I texted him and he said, yeah, it's strange that they're saying April 1st.

INTERVIEWER: Uh-hmm. Saying April 1st what?

[redacted] That April 1st was when she no longer was the director.

INTERVIEWER: Okay.

[redacted] Because they said that in February.

INTERVIEWER: Oh, okay.

INTERVIEWER: Oh, so February 28th they say she's no longer the director but then you see an offer letter that says that her term as director doesn't end until then?

[redacted] Oh maybe it was the termination letter. So both letters, I saw them very close together --

INTERVIEWER: Okay.

[redacted] -- like the same week.

INTERVIEWER: So there's two letters?

[redacted] Yes.

INTERVIEWER: And one you think is a termination letter?

[redacted] Yes.

INTERVIEWER: And what's the other letter?

[redacted] The offer letter.

INTERVIEWER: Offer letter. So Dianne Martin got two letters. One is ending one job and it's an offer for a second job?

[redacted] Uh-hmm.

INTERVIEWER: Do you remember what the second job was?

[redacted] General Counsel of the Bar.

INTERVIEWER: Bar. Okay.

[redacted] And it also said reports to -- so they -- so I don't remember if -- yeah, no. So it was strange that the letter said reports to the Chief when the person that was in that role, Sherry, reports to the director of the AOC. So I thought that was strange.

INTERVIEWER: Uh-hmm.

[redacted] And then at the same time, I see reclassification for those positions, and I'm like, so I was so scared that my mom was in town and I decided to just say that I'm sick and I got lucky or someone's watching over me, because that Monday morning, that following week, where I thought they were -- like I was wondering, are they going to have to make me sign this or what -- my dentist called and I had -- was gonna get [redacted] on Thursday that week. My -- I said I was sick that Monday because I didn't -- I wanted to be absent so I didn't have to do anything unethical. And the

dentist called that Monday morning and said, we can't make your appointment on Thursday, can you come in today.

(Laughs.)

[redacted] So it was like I would rather get my teeth pulled and be out all week than deal with this sketchy business.

(Laughs.)

INTERVIEWER: Probably the happiest patient they ever had.

[redacted] Yes, I was. Can I get a note for the week?

INTERVIEWER: Maybe next week too. Yeah. So was it a termination letter or a layoff letter, do you know?

[redacted] The thing is, in Human Resources, termination can be either.

INTERVIEWER: Okay.

[redacted] You're just terminating the employment. But yeah, the letter said that it was restructuring.

INTERVIEWER: A restructuring. And up until that letter, had you heard anything about any sort of

restructuring of Dianne's job?

[redacted]: No.

INTERVIEWER: Okay. So and this rehire letter -- there were two letters, right? There was hiring her as general counsel for the Board of Bar Overseers. Was -- was she going to leave one job and then go immediately into the second job? Is that how it was going to work?

[redacted]: Well, I knew that -- I mean, the offer letter said April 2nd.

INTERVIEWER: Okay.

[redacted]: And I was mostly worried about what I'm responsible for, which is putting together all the paperwork and into the personnel file --

INTERVIEWER: Uh-hmm.

[redacted]: -- on time. And we still didn't have a signed offer letter.

INTERVIEWER: Okay. Yeah.

[redacted]: So I felt like I was just trying to figure out how to get this letter signed and it was already -- I don't know how long it went without it.

INTERVIEWER: And you said there was some sort of an upgrade? Is that what you called it? A reclassification of what position?

[redacted] General counsel positions.

INTERVIEWER: Up to reclassify it to a different paygrade?

[redacted] Uh-hmm.

INTERVIEWER: And had you seen that -- you saw that as well?

[redacted] Uh-hmm.

INTERVIEWER: Okay. So they were -- she was ending her -- officially her position as the director. She was being offered this new job as general counsel. And at that time, that job was being upgraded to a higher rate of pay?

[redacted] Uh-hmm.

INTERVIEWER: I mean, that's happening like all at one time?

[redacted] Yes.

INTERVIEWER: Okay. So are you aware there was a lag time between when she officially ended her job as director and when she started as the general counsel?

[redacted] Am I aware of the --

INTERVIEWER: Lag time. So in other words, she didn't go right into one position to the next. There was a time where she was basically essentially out of state service. That job ended say on the 1st of April. She didn't start her new job until the 4th of April.

[redacted] It depends, because you would have to probably look into the systems --

INTERVIEWER: Okay.

[redacted] -- and because I don't know if she was working from home.

INTERVIEWER: Okay.

INTERVIEWER: No, but what he's asking, [redacted], is if you were aware -- do you know that one job ended before the other job started? Like did you know that the director's job ended before the general counsel job started for Dianne or did one end and the same day she started? Like she ended director, she became general counsel the same day. Do you have any understanding of that or knowledge of that?

[redacted] On -- I mean, in the system, we have to transfer -- well, we have to -- if

the person is leaving the organization, you have to terminate their employment and then rehire the person.

INTERVIEWER: Uh-hmm.

[redacted] That is like an actual process for our system, their system of record. So there must be -- in the system, there must be a date of when that -- where she was terminated --

INTERVIEWER: Yeah.

[redacted] -- in the system.

INTERVIEWER: But you aren't aware of any of that for Dianne? You don't know the timing of when one job started and when the next job began? You don't know that?

[redacted] The only thing I rely on is the termination letter that says effective date --

INTERVIEWER: Okay.

[redacted] -- and offer letter says effective date.

INTERVIEWER: And you don't remember what those dates were in those two letters?

[redacted] The -- well, the -- I saw the NHPR article and I know the offer letter is there

and it said April 2nd.

INTERVIEWER: Okay, all right. Okay.

[redacted] But that's just based on that.

INTERVIEWER: Okay. So you saw the NHPR article, right?

[redacted] Uh-hmm.

INTERVIEWER: And so you know that there was a -- it was actually classified as a layoff and that she was -- that the Branch determined she was eligible for paying out her accrued leave and some of her term payment, right? So unused sick leave, unused vacation leave and the term payment. It was like $49,000.

[redacted] Mmmm.

INTERVIEWER: Were you involved in any of that, calculating that, or did anyone talk to you about the fact that she was going to get -- she was going to cash out her unused leave and get this big check?

[redacted] No. I was not involved in -- the Payroll Team usually handles payout calculations for all employees.

INTERVIEWER: So you wouldn't be involved on anyone who was leaving State's -- if someone else got laid off and they were getting a payout, you wouldn't be involved in that typically?

[redacted] No, that would be Payroll and usually Becky.

INTERVIEWER: All right. So but you would -- maybe you would send something to Becky saying that the employee was terminated on this date, they ended their employment in the Branch on this date, and then she would do what she needed to do for payroll?

[redacted] Normally or in this scenario?

INTERVIEWER: Yeah, normal. Normal. If an employee left, would you send a notice to the -- to Payroll? Like they just left, they finished their employment, you send Payroll a notice saying "employee X left on this date", and then Payroll would figure out what they would do for pay or for -- if there was unused sick time, that kind of stuff?

[redacted] Ideally, yes, you -- HR should know when people are leaving but it was so

dysfunctional that I was not aware of when people were leaving. Like I -- and I complained about this for a year. Usually it was handled between the manager. So for example, if someone in the court puts in a resignation letter, they send it to the HR inbox. Ideally, they should send it to the HR inbox so that we can then take that letter and put it in the personnel file.

INTERVIEWER: Uh-hmm.

[redacted] And communicate with Payroll to let them know that this person is leaving. However, that -- my complaint was that the HR inbox was not getting the termination letters and I was unaware of when people were resigning.

INTERVIEWER: Okay, all right. So --

INTERVIEWER: And that wasn't just Dianne. That was for all employee --

[redacted] Everyone.

INTERVIEWER: Okay, all right. So I'm going to go -- might go back in a little bit because before we started we went down this other route. But you said that you got called into a meeting with Judge Keating at some point around this time. Can you talk

to us about that?

[redacted] Yeah. They were wondering -- they were -- because Suzanne -- that was the week that Suzanne was gone.

INTERVIEWER: She's gone, right? Yeah. So --

[redacted] So they asked me --

INTERVIEWER: Who's "they"?

[redacted] Judge Keating and Erin.

INTERVIEWER: Erin Creegan. Okay.

[redacted] I got scared because I'm like, oh my gosh, I'm in a room with a lawyer and a judge and I don't know -- I don't have a law background.

INTERVIEWER: Okay.

[redacted] Anyways, they were just wondering how HR processes worked.

INTERVIEWER: Generally?

[redacted] When -- generally, how do you -- you know, what are the steps to rehiring an employee?

INTERVIEWER: Rehiring an employee. Okay.

[redacted] Or hiring -- the hiring

process, something like that. They were wondering about HR processes.

INTERVIEWER: And did they ask about anyone in particular, the rehiring or hiring of any particular employee?

[redacted] I think so, because I have -- I have a text from that time, because I did get your voicemail about looking up what I had.

INTERVIEWER: So I had asked her to look to see if she had any messages or documents related to this event.

INTERVIEWER: Okay.

[redacted] And I said, was pulled by Judge Keating about how to bring Dianne back and others are asking about Suzanne.

INTERVIEWER: The first part was what?

[redacted] I'm a little -- I'm concerned.

INTERVIEWER: Who are you sending that to? Jair?

[redacted] Jair.

INTERVIEWER: And what did you say?

INTERVIEWER: I'm sorry.

[redacted] So they must have mentioned her.

INTERVIEWER: It says, "Good morning Jay, how are you today?" And then he says, "I am doing good. How are you?" And then [redacted] responds, "I'm okay, not too stressed but a little concerned about Suzanne and people meeting her here. Was pulled by Judge Keating about how to bring Dianne back and others are asking about Suzanne. Oh boy."

INTERVIEWER: Okay. So they -- that meeting was specifically to ask about --

INTERVIEWER: What's the date?

INTERVIEWER: April 2nd.

[redacted] Uh-hmm.

INTERVIEWER: That meeting was specifically to ask about how to bring Dianne back. And what did they want to know? Like what were they --

[redacted] They wanted to know the processes and I -- the conclusion, it was very short. The conclusion was that they had to talk to Becky Plourde because she's the one that processes terminations.

INTERVIEWER: Okay.

[redacted] And if she's not terminated in the system, we can't rehire someone who's not terminated in the system.

INTERVIEWER: Okay. Oh, I see, because you -- at that point, you didn't know if Dianne was terminated yet?

[redacted] Exactly.

INTERVIEWER: She was still in the system.

[redacted] I didn't know if she was or not. I was so out of the loop.

INTERVIEWER: Okay. So that's what they wanted to know, how to bring Dianne back and what the process was for doing that. And it was a short meeting?

[redacted] Yeah, it was like five minutes --

INTERVIEWER: And it's just Keating and Creegan?

[redacted] Uh-hmm.

INTERVIEWER: Okay. Was that the only time that you met with Keating or Creegan to talk about Dianne?

[redacted] Uh-hmm.

INTERVIEWER: Okay.

INTERVIEWER: You're shaking your head up and down?

[redacted] Yes.

INTERVIEWER: Okay. I just -- that doesn't see your head go up and down.

[redacted] Oh yeah, that's right.

INTERVIEWER: We see your head but --

[redacted] Yes, because after that, just got very nervous about what was happening.

INTERVIEWER: Okay. All right.

INTERVIEWER: [redacted], can I ask you. So you leave in October on your own --

INTERVIEWER: August.

[redacted] September --

INTERVIEWER: August --

[redacted] Oh August --

INTERVIEWER: Yeah.

[redacted] -- and I started my new job in September.

INTERVIEWER: Yeah. And why did you leave? Do you mind telling us?

[redacted] Many reasons.

INTERVIEWER: Okay.

[redacted] Yeah. That was my first experience working for a government. (Laughs.) So --

INTERVIEWER: It'll be your last.

[redacted] -- my conclusion was maybe government is not for me.

(Laughs.)

[redacted] Things take too long to -- I want to move forward and do things and move quickly. That was impossible. And I was hoping for an opportunity to advance and I had that with Suzanne. She was going to like take me under her wing and we were gonna do HR projects that would expand my growth as a professional. And when Lorrie came in, that -- it was apparent that my role was gonna be much more limited. Yeah, so.

INTERVIEWER: All right. Thank you.

INTERVIEWER: Okay. I don't think I have anything else.

INTERVIEWER: Yeah. Yeah, I can't think of anything else. Is there anything that we didn't ask you that you think we should know? You've read the

articles. You know what the controversy is about.

[redacted] Uh-hmm.

INTERVIEWER: So anything about all of that that you think would be something that would be important for us to know as we look at this?

[redacted] Why would -- what's convenient about that timeframe between April 1st terminated or whatever and April 2nd or whatever it was to be hired --

INTERVIEWER: Uh-hmm.

[redacted] -- in employment. When you terminate employment, you're -- you lose your benefits.

INTERVIEWER: Uh-hmm.

[redacted] But if -- but not until the end of the month.

INTERVIEWER: Right. Your health benefits?

[redacted] Right.

INTERVIEWER: Right. So you're saying if the termination and the rehire are in the same date, there will not be a gap in benefits. Is that your point?

[redacted] I think there was something

about that, that --

INTERVIEWER: So if she -- if an employee, any employee gets -- their employment with the State ends on the 28th of this month but they're rehired on the 1st of the next month, would there be a separation of benefits or would --

[redacted] Uh-hmm.

INTERVIEWER: So they would have to start all over again?

[redacted] I think so. I think they would have to -- I have a cheat sheet actually for that. I think they have to wait 30 days --

INTERVIEWER: Thirty days.

[redacted] -- until the 1st of the month.

INTERVIEWER: But if their employment ends on the 1st of the month and their new employment starts two or three days later in the same month, they don't lose any benefits?

[redacted] Uh-hmm.

INTERVIEWER: Yeah. You're shaking your head?

[redacted] Yes. The health insurance,

for example --

INTERVIEWER: Okay.

[redacted] -- would remain in place.

INTERVIEWER: Okay, all right. So that's something you were thinking about when you saw the timing on these letters. And, in fact, like because your understanding it sounds like had been she's not working for the Branch as of the meeting on February 28th but then later you see letters that have a different termination date than that, is that -- is that -- and you think that that was maybe structured to preserve the benefits for her rather than make her go through a new waiting period?

[redacted] Yes. And I don't know if it was my conclusion alone or if it was a conversation with Suzanne. I just remember someone saying something like, yeah, well. And I don't know if any of this is true or -- it's just hearsay that there -- you know, the reason for the delay of all of this is because she wanted to keep her insurance because her daughter's only insurance. And actually there was a loop hole in the Personnel rules and now there could be a payout. I feel like -- I think that

was a conversation in the room but I don't know -- you know, that's just in my head as like something I heard.

INTERVIEWER: Okay. So if I show you this, this is a document that says, "Request to approve higher entry level step for new employee".

[redacted] Uh-hmm.

INTERVIEWER: If you could take a look at that.

[redacted] Yeah.

INTERVIEWER: Is that -- remember we talked about that there was -- there were the three documents and one of them was an upgrade. Is that the one -- is that the document you're talking about?

[redacted] No. This is a standard document that hiring managers have to fill out whenever employee gets hired at a higher step than one --

INTERVIEWER: Okay.

[redacted] -- for the organization.

INTERVIEWER: There's another one. There's another document.

[redacted] That's similar looking to

this.

INTERVIEWER: Okay.

[redacted] That would be the re --

INTERVIEWER: So I don't have -- so this looks like it's the offer letter to the new position?

[redacted] Yeah.

INTERVIEWER: If you could just take a look at that. Does that look familiar to you?

[redacted] Yes.

INTERVIEWER: Okay. Is that the one that you remember seeing?

[redacted] Uh-hmm. Yes.

INTERVIEWER: Okay. And then what is this -- do you know what that document is?

[redacted] That's so weird they added the Concord Regional Technical Center students --

INTERVIEWER: Yeah.

[redacted] -- will be honored and supported. Like that's not -- doesn't go with offer letters.

INTERVIEWER: Uh-hmm. Yeah.

[redacted] That is part of a job description normally. Yeah, that's just -- this is

also a standard document. So this is what's needed to actually rehire someone is --

INTERVIEWER: Okay.

[redacted] -- this, the hire step and the offer. So those three have to be put together.

INTERVIEWER: Okay.

[redacted] But there was one more that is the reclass -- reclassification of the general counsel --

INTERVIEWER: Okay.

[redacted] -- positions. Because if you reclassify one job, you have to reclassify all of the other jobs with the same title.

INTERVIEWER: All right. Okay. I don't think there's anything else. I don't think I have anything else.

INTERVIEWER: If you do think of something later that you feel like we should have known, feel free to reach back out to Dick and -- would it be all right if we had other questions if we reached out again?

[redacted] Yeah, sure.

INTERVIEWER: Okay. Thank you.

INTERVIEWER: Okay. I have nothing else.

INTERVIEWER: All set.

INTERVIEWER: This is -- all set. This is really helpful. Thank you.

[redacted] Okay.

INVESTIGATOR RICHARD TRACY: Okay. We're going to go off record, it's 2:25.

(End)

CERTIFICATE

I, Lisa Caron, a court—approved transcriptionist, do hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceeding in the above—entitled matter to the best of my professional skill and ability .

Lisa Caron

Lisa Caron
Avicore Reporting