**Avicore Reporting - 15 Constitution Drive, Suite 1A, Bedford, NH 03110**

STATE OF NEW HAMPSHIRE

* * * * * * * * * * * * * * * * *

REVIEW OF DIANNE MARTIN'S EMPLOYMENT IN JUDICIAL BRANCH

* * * * * * * * * * * * * * * * *

**INTERVIEW OF [redacted] - 11/3/25**
**TRANSCRIBED FROM AUDIO**

Prepared for:

Eleanor Cloutier, Legal Assistant
Criminal Justice Bureau
N.H. Department of Justice
1 Granite Place South
Concord, NH 03301

INVESTIGATOR RICHARD TRACY: This is Investigator Richard Tracy (hereinafter referred to as "INTERVIEWER"), New Hampshire Attorney General's Office. It's November 3rd. It's 3:32 p.m. We're in a conference room at the Attorney General's Office in a Teams meeting. And with me is Deputy Attorney General James Boffetti (hereinafter referred to as "INTERVIEWER") and General Counsel Chris Bond (hereinafter referred to as "INTERVIEWER"). And on the meeting from the State of [redacted] is [redacted]. [redacted], could you state your name and spell your last name, please, for the record?

[redacted] Yes. Yeah. My -- it's [redacted], and it's [redacted], my middle name is [redacted], [redacted], and [redacted].

INTERVIEWER: Okay. [redacted] before we went on record, you agreed to have this conversation recorded. Is that still okay?

[redacted] Yes, that is one hundred percent acceptable.

INTERVIEWER: Okay. Before we actually get into why we're here today, would you mind providing

us with your new address, please?

[redacted] Certainly. [redacted]

INTERVIEWER: Okay. And your phone number again, please?

[redacted] Area code [redacted]

INTERVIEWER: The other day when we first spoke, you mentioned that you plan on changing that phone number. Is that correct?

[redacted] That's correct. I'll be going to a [redacted] area code but I wasn't going to change it until -- actually until we spoke.

INTERVIEWER: Okay. And if you don't mind, when you do change it, if you could please shoot me a text or give me a call with the new number?

[redacted] Absolutely.

INTERVIEWER: Okay.

[redacted] I will certainly do that, sir.

INTERVIEWER: All right.

INTERVIEWER: So hey, [redacted], can you tell us when you started working for the Judicial Branch?

[redacted]

[redacted] That's correct. I started the position I believe it was [redacted].

INTERVIEWER: Okay. And when did you finish?

[redacted] It was [redacted]. I want to say it was [redacted]. It's the middle of [redacted] but I don't have any documentation with me.

INTERVIEWER: Okay, that's fine.

[redacted] But it was -- yeah.

INTERVIEWER: Of this year, [redacted]?

[redacted] Oh, I'm sorry, yes.

INTERVIEWER: Yes.

[redacted]. My apologies.

INTERVIEWER: No, no, no, no, that's fine. Okay. And who -- who hired you? Was this a process you went through with interviews with Judges or was it just with the director? Who hired you?

[redacted] Sure. So I was initially phone screened by Takhmina.

INTERVIEWER: Yeah.

[redacted] Her last name I cannot pronounce. I apologize.

INTERVIEWER: That's okay, we know who she is.

[redacted] Yes. And after my initial phone screen, I had an onsite interview and that was -- there was Takhmina, there was -- oh my goodness -- Becky Plourde, there was someone -- her name escapes me by now. There was like four or five people that I initially met within a conference room onsite at the Judicial Branch. I'd have to go back and look at their names. I have everything again in a file at home, I should say in my -- in -- this is -- it's hard because I'm adjusting but I do have a safe that is with me that has all my personal papers in it and I do have all the initial interview process. And then after I got through the onsite interview, I had a Teams or Webex with Dianne Martin. My understanding is that she was at her home office and she was working part time. She couldn't be on the onsite but then I interviewed with her lastly. And then I received an offer within two weeks of that.

INTERVIEWER: Okay. Who was your direct supervisor?

[redacted] It was -- in the letter, it was written as Dianne Martin but when I started, I was told to report everything to Takhmina. So she would be my day to day supervisor.

INTERVIEWER: Okay.

[redacted] If there was anything of great importance, meaning if there was a legal issue, an employee relations issue, that required, you know, additional sitings, then I would contact Dianne and -- Takhmina wanted me to go through her with everything. So but I did -- I could speak to Dianne if I needed to.

INTERVIEWER: Okay. And when you started, it looks like in effect already was this MOU between the Judicial Branch and the Department of Administrative Services for them to provide support for Human Resources. Is that correct?

[redacted] That's correct. I wasn't -- I wasn't told during the interview process that there was the Department of Personnel involved. What I was told was there had been a lag in the HR

manager's position. There had been some support through other resources to try to keep the day to day going but Takhmina was the primary Human Resource contact. She was dealing with employee relations issues, legal issues, recruiting efforts, but I didn't know about the Personnel until my first week onboard and Takhmina, when we were going through the training process, she explained to me that the Department of Personnel was assisting with offer letters, processing of any -- any monetary payroll pieces, including increases, and that I needed to -- I needed to work out in writing job aids for every process. So I needed to spend some time with them. And by the second week, she told me that I needed to [redacted] to -- and that was going to be my schedule. And I had -- I said to her, you never told me I was supposed to work offsite, and she goes, oh no, I told you. And I said, no, that wasn't something we discussed but of course I needed to do that. So I started spending [redacted] and the remainder of my week would be in office at the Judicial Branch.

INTERVIEWER: Okay. And --

[redacted] I --

INTERVIEWER: Go ahead.

[redacted] My apologies. I know you're referencing the MOU.

INTERVIEWER: Yeah.

[redacted] I did not see an official copy of the MOU until January. It was probably late January that I -- it was actually someone else through, I believe it might have been Becky Plourde who said, by the way, [redacted], we have an agreement with the Department of Personnel. And I said, agreement? She goes, yeah, there's an MOU. And I said, oh, who has a copy of that? She goes, you're going to have to ask Dianne. So that's when I asked Dianne to send me a copy of it and she did. So I officially knew at that point that this was an agreement in writing.

INTERVIEWER: Okay. And was there one person in particular at the Department of Personnel that you dealt with?

[redacted] There were three individuals that I was working with. Oh my goodness.

There were -- there were two like administrator type clerks. There was one woman who was working on offer letters and processing paperwork and I spent a lot of time with her. I can see where they sit but in terms of like -- one of them was Tanya (ph). She -- she did offer letters and she did a lot of the process within the HRS system. And then the other person, she had two cubicles down and if I could remember her name. It'll come to me. But then the woman who oversaw the office, she was in a private office off to the left. And I only spoke to her like literally -- like she was running from meeting to meeting and she was saying hello or she would come over and ask how things were going. But I never really sat with her. I was spending most of my time with Tanya.

INTERVIEWER: Okay. So would that woman in the private officer, would that have been a woman named Lorrie Rudis?

[redacted] No. Lorrie -- Lorrie was the head. She was the --

INTERVIEWER: Oh, okay, all right.

[redacted] It was -- it was like an assistant --

INTERVIEWER: Joanne Lydick?

INTERVIEWER: Joanne Lydick.

[redacted] Thank you. It was Joanne Lydick. Thank you very much. Yes, it was Joanne Lydick. And again, all my time over there, I never knew there was a piece of paper that existed until I was told about it by my colleague and I asked Dianne Martin for it. But those were my three primary contacts. The other woman, she worked part time and we did a little bit of training but I spent most of my time with Tanya.

INTERVIEWER: Okay, great. So March 18th, 2025, according to this handwritten note, you had a conversation with a guy named Matt Mavrogeorge. He's an attorney -- he's an attorney at the Division of Personnel.

[redacted] Yes.

INTERVIEWER: Can you tell us how it was that you ended up going in to talk to Matt?

[redacted] Yes, I can. So back in February, there was an incident that happened during a meeting with [redacted], my employee who was there as well my HR coordinator, myself and then we had like

an internal auditor, and he was going around to each department and basically testing processes, making certain that we had documentation in place, and just making certain that things were being done according to processes. And during this meeting, [redacted] actually lied to him and I -- I left that meeting because every time I tried to speak up, [redacted] was talking over me. I was trying to be open and to let this gentleman know that, you know what, we did not have our stuff together and that there was a lot of broken pieces. But [redacted] did not allow me -- [redacted] actually, you know, flat out lied to this gentleman. And I reported it and what happened was I got together with the auditor privately and we -- we met in an office without any doors -- any windows on the doors because [redacted] was following me around. [redacted] did not want me talking to anyone. [redacted] controlled every movement. I mean, literally followed me into the bathroom. So I met with this auditor and I said, [redacted] lied. He encouraged me to file a report and I did so. And during that process, this auditor was speaking directly with Justice Donovan. It was -- actually I believe it was Valentine's Day February

14th where Justice Donovan told the auditor, have [redacted] write a full statement of everything that's been going on in this office. I reported -- I reported behavior and also the hostile work environment that I felt that I was working in. And all that was sent over to the auditor and the auditor sent it to Justice Donovan. So what happened was the Justices -- there was a few Justices that came in. They placed Dianne Martin on a leave. [redacted] was already out on vacation. [redacted] was contacted, put on leave. And what had happened was the investigation was done by the gentleman, the head of security, Sean. I was sat down by Judge Keating who came in as the acting director and I was told that there was no validity to my submission and that Dianne was returning and [redacted] was returning and I was to be a good [redacted]. And within a week, Judge Keating came back to me and said, [redacted], I need for you to write a letter to officially, you know, bringing Dianne back. And I wrote the letter basically saying that her timeframe was a paid leave of absence, you know, and that she would be returning. And then I gave it to Judge Keating. He goes, no, that's not what I

wanted, I spoke with the Chief Justice and what we're going to do is we're going to lay Dianne off and then we're going to return her, and you need to figure out how to do this without her losing her benefits, without allowing her to lose any pay. And what happened was all the avenues, all the documentation that I was reading gave me clear direction. So what happened was Judge Keating and I basically decided that it was best for me to call, you know, the head of Personnel and to get some guidance. And during this discussion, I said to Matthew that I do not feel comfortable with what I'm doing and that this is not a layoff and by the time these -- my draft letters and my conversation with Matthew, it was decided by the Chief Justice and Judge Keating that we would also pay out Dianne some monies according to the Personnel rules, which was like a payout of her time being with the Judicial Branch and for like every year of service, they get X amount of dollars, you know, according to their pay scale. And I had said to Matthew, I feel as though this is -- this is wrong and that there's a better solution. And I told Matthew that I was very uncomfortable and he said,

you know, would you be willing to transfer to another department. I said I will do anything, I'm not comfortable. This has just been horrible, I've been treated horrible, I've been placed in a very uncomfortable situation. Matt and I had several conversations and before you know it, I'm not hearing from Matt anymore and that there must have been six different drafts of that letter. Everything was electronically saved. Any time I made a change to that letter, I saved it as a different version. When the final came out, it was -- you have to remember, as these drafts are being done, they're being printed, I'm handing them over to Judge Keating. Judge Keating is taking a 24-hour timeframe to get back to me. He's giving me these letters back with red lines, blue lines, things crossed out, things scribbled in. And the final version was basically he looked at me and said, you need to do what I'm telling you to do, this is coming from the Chief, make it happen. And then once it was done, I was told to send it to Dianne to her personal e-mail, which I did professionally. And then after that, I never heard a thing. There was -- there was -- what

happened was there was like a lag of like a week and a half between I sent the letter and then Judge Keating came in to see me and said, Dianne is not happy with the level and the amount of salary that was offered to her in her return back to work -- in her rehire, I should say, because the letter was written as a rehire. And we had to adjust the salary once again. We adjusted the grade level. And you got to remember, this is Dianne dictating what her rehire was going to be. So that's how things came about with Matthew.

INTERVIEWER: Okay. That's a lot there. So let's unpack that a little bit.

[redacted] I'm sorry.

INTERVIEWER: No, no, no, no.

INTERVIEWER: No, that's great.

INTERVIEWER: That was really helpful.

INTERVIEWER: No, no, it's wonderful, and I appreciate it. I wanted you to tell the whole story because it's important to put it in context. And I can only imagine how stressful this has been and I apologize for what you've been through.

[redacted] You have to understand,

gentlemen, you have no idea how bad I wanted this conversation to happen today.

INTERVIEWER: Yeah.

[redacted] I am -- I have been in HR for 30 years. I have always done my job fair square and legal.

INTERVIEWER: Yeah.

[redacted] I have an excellent reputation.

INTERVIEWER: Yeah.

[redacted] And I'm sorry, and I'm trying to keep it together and you've got to remember too, I'm very tired.

INTERVIEWER: Yeah.

INTERVIEWER: Exhausted.

[redacted] Okay.

INTERVIEWER: Yeah.

[redacted] Oh, I'm sorry --

INTERVIEWER: [redacted], take a breath, right? Do you need to get a tissue or anything?

[redacted] Yeah, I'm good.

INTERVIEWER: Okay.

INTERVIEWER: Okay. If you need water or something, just -- if you want to take a break, just let us know.

INTERVIEWER: Yeah, just let us know any time.

[redacted] Yeah.

INTERVIEWER: Not a problem.

INTERVIEWER: [redacted], what's the name of the auditor? Do you know by chance?

[redacted] (No audible reply.)

INTERVIEWER: Would you have saved his contact information? Because you e-mailed him a report, right? Did you send the auditor a report?

[redacted] Yes. So what happened was on Friday the 14th, when -- when he -- when he e-mailed me back, and I can't remember if it was e-mail or if it was an IM message, but he got back to me and said, [redacted], Justice Donovan wants you to put everything together, and I stayed till like 7 o'clock that night. And if I could remember this gentleman's name -- and you got to remember too, I do things by the book. I don't take anything home. I don't print anything that is work related. So I would need like

a little bit to think of this gentleman's name.

INTERVIEWER: Okay, that's fine.

[redacted] But he -- he was working -- he actually was working for Dianne. It was a position that reported directly into her but I -- I need a little bit of time --

INTERVIEWER: That's fine. Was he an employee of the Judicial Branch?

[redacted] Yes, he was.

INTERVIEWER: Okay. And do you have a copy of that report that you wrote for Justice Donovan?

[redacted] (No audible reply.)

INTERVIEWER: No. Okay.

[redacted] No, I don't.

INTERVIEWER: All right.

[redacted] It was a letter that I wrote at -- when I was -- after the Judicial Branch. It was written in the hours between 5 p.m. and 7 p.m. on Friday the 14th.

INTERVIEWER: Okay.

[redacted] It was a -- it was a Word document. It was I think a page and a half long and that there must have been, oh boy, maybe eight

attachments to that e-mail. It was extremely lengthy. It was a signed statement from myself.

INTERVIEWER: Okay.

[redacted] And I scanned it with my signature and put it in that e-mail along with all the attachments.

INTERVIEWER: Okay.

[redacted] So it's electronically there somewhere, gentlemen.

INTERVIEWER: Okay. No, that's fine. Why -- I'm curious as to how does Justice Donovan get involved and why is he asking for you to write this report and send it to him? Do you know?

[redacted] This is a very interesting situation. I don't think he was supposed to be involved. And the reason being is the day that the Justices came to the Judicial Branch and they called an emergency meeting -- and I had no idea this was going on. This was all very confidential. They called everyone into the training room and Justice Donovan was the chief speaker. He looked at everyone and said -- and this was the day that they told Dianne she was on leave but Justice Donovan said to

everyone, I want everyone to know Dianne Martin is no longer with the Judicial Branch. And everyone was just kind of like, oh my goodness, and I sat there and I am shaking. And they said that [redacted] was no longer there and that there's a lot that's been going on, if anyone feels as though they need to speak to himself or one of the other Justices, they would be available. They said they wanted to change the image of the Judicial Branch. They did not want it to be an intimidating, harassing environment and that they were going to make every effort to make certain that it was a better work environment and that they apologized for what was going on. And then at the end of this message, they said, who was [redacted]? I raised my hand and Justice Donovan said, we need to speak with you privately. I was -- I was -- I went into -- I believe it might have been Justice Howard's office. I can't remember whose office it was. It was in the corner. It had a big table in it. And this is at the Judicial Branch. Justice Donovan was there. Also to the attorney for the Judicial Branch there, Erin was there. She was sitting onto my left. I had Howard. There was one other Justice. I can't

remember her name. And then across the table from me was -- oh, she's one of the -- one of the key administrators. I would -- what I have to do is look at the names, like go on --

INTERVIEWER: Okay.

[redacted] -- you know what I mean?

INTERVIEWER: So --

[redacted] But they all -- the first thing -- the first thing out of Justice Donovan's mouth along with the other Justices was, [redacted], we are so sorry that this has occurred, we're so sorry what has happened, we want to make this better, we want you to stay, we hope you're not going to leave. And Erin spoke up and said, she's a solid HR person, she knows what she's doing and they promised me that it would get better and that in the coming days there would be an interim director. I didn't know who that was going to be but the word -- there was rumors, of course, afterwards that Judge Keating was coming back and that Judge Keating was a solid individual.

INTERVIEWER: Okay. So --

[redacted] So that's basically -- I just kind of --

INTERVIEWER: Okay.

[redacted] -- you know --

INTERVIEWER: So at that separate meeting that you had, you said it was Justice Donovan. Was Justice --

[redacted] So what --

INTERVIEWER: Was Justice Countway there?

[redacted] Justice Donovan -- Howard was there.

INTERVIEWER: Okay. And you said there was --

[redacted] Um --

INTERVIEWER: [redacted] -- [redacted], you said there was a female Justice there?

[redacted] Yes, there was.

INTERVIEWER: Do you remember --

[redacted] If I can look it up, I could recall the name from looking -- you know, seeing the face.

INTERVIEWER: Okay.

[redacted] And then there was one of the other key --

INTERVIEWER: So, [redacted], could it have

been Justice Countway, Melissa Countway?

[redacted] Yes.

INTERVIEWER: Okay.

[redacted] Yes. It was Justice Countway. Yes, she was sitting on the other side.

INTERVIEWER: So it was -- it was Justice Donovan, Justice Countway, Judge Howard and Erin Creegan?

[redacted] Yes, and there was one other person in the room --

INTERVIEWER: Okay.

[redacted] -- and it was -- she was one of the -- she's a Judge but she was in a key administrator role.

INTERVIEWER: So could it have been just Judge Christo?

[redacted] Yes, it was Judge Christo. Thank you. Yes, yes, yes, yes, because -- and her and I connected very, very well, very professional. She was -- she's an outstanding -- outstanding person. So what happened was Justice Donovan during this private meeting said to me that there was going to be an internal investigation and after that

meeting I was to go and see Sean, he was going to take my statement. And I said to him, Justice Donovan, I've already written my statement. He goes, I know nothing about that. And I took that and I said, [redacted], keep your mouth shut, because he -- I believe at this point when he told me that he didn't know anything about it, that that was my key to keep my mouth shut. He literally said, [redacted], I know nothing about that.

INTERVIEWER: Okay.

[redacted] And I just sat back and I said, okay, I'll go see Sean right after this meeting.

INTERVIEWER: Okay. So at any time during all this was happening, did you meet with the Chief Justice?

[redacted] Never.

INTERVIEWER: Okay. And did you meet with --

[redacted] Never.

INTERVIEWER: -- any of the other Justices, Justice Bassett?

[redacted] Never, no.

INTERVIEWER: Okay. And I think at this point probably Justice Hantz Marconi was out on leave?

[redacted] That's correct. She was out on leave. Yes, I never got to physically meet her. I mean, I looked at the payroll. She was on payroll. I worked with Becky Plourde on that but never met her.

INTERVIEWER: Okay. So all right, let's just go back. At some point, you had this meeting with Justice Donovan. You had the all hands meeting with the staff and he said that -- oh, [redacted]?

[redacted] Yes, I'm here.

INTERVIEWER: Oh, we lost your picture, that's all.

[redacted] Oh, sorry.

INTERVIEWER: That's okay. No problem.

[redacted] Okay. I thought maybe it didn't --

INTERVIEWER: Yeah, you're back.

[redacted] -- frozen.

INTERVIEWER: Yeah, you're frozen -- your picture is frozen but we can hear your voice.

[redacted] Okay. I'm going to try to --

INTERVIEWER: That's all right. Don't worry about it. I mean, as long as we can talk to each other.

[redacted] I'm gonna -- okay, because I am in a room, there's no windows. I'm in a manufacturing plant with -- and the walls are concrete. So that might be a problem.

INTERVIEWER: Okay.

[redacted] If I need to move outside, I can move outside.

INTERVIEWER: Okay. Right now it's fine.

INTERVIEWER: But the audio is good and that's what matters I think.

INTERVIEWER: Yeah.

[redacted] Okay.

INTERVIEWER: So when you had that meeting with everybody and Justice Donovan said that Dianne was no longer with the Judicial Branch. All right. So --

[redacted] Yeah.

INTERVIEWER: But talk to me a little bit

about before that, was Dianne -- was Dianne in the office? Was she -- had she been on leave? What happened just before he announced that she was no longer working for the Judicial Branch? What had she been doing? She'd been working?

[redacted] She -- I believe that she had been working. I have to remember now because she was back to the office full time. When I first started, she was still on a part-time schedule and I knew nothing about this. But at the time, she was back to work, I got into work probably around 8:15 that morning. I actually had a meeting scheduled with her. We were kind of talking about some issues and we just had kind of a meeting agenda. Her secretary or her administrative assistant said to me -- she came over to me. She goes, [redacted], do you know anything about Dianne going over to the Supreme Court this morning? And I said, no, I had a scheduled meeting with her, is she out? And she goes, I have no idea, I haven't heard from her today but someone says that they told -- she told them that she was heading over for an emergency meeting at 9 a.m. at the Supreme Court. And I said, oh, well, you

know, let me try to reach out to her and make sure everything is okay. But I got busy and then her administrative assistant came back and said, I'm getting worried, I haven't heard from her, and I said, you know, if you want to try to reach out to her, maybe you should try to reach out to her. And then all of a sudden there was an e-mail that came out that said, everyone please meet up in the training room. And you know, people were coming over to me going, do you know what's going on? I said, I have no idea but, you know, it looks like we need to go to this meeting.

INTERVIEWER: Okay.

[redacted] And as far as I know, she showed up for work that morning and got called over to the --

INTERVIEWER: To the Supreme Court.

[redacted] -- Supreme Court. That's what I heard. I don't know that for certain.

INTERVIEWER: Do you know what day this was?

[redacted] May I look at my calendar?

INTERVIEWER: Of course.

INTERVIEWER: Oh yeah, yeah sure.

[redacted] Of course. So I'm just going to show you. This is a -- it's a blank calendar. It has --

INTERVIEWER: Okay, that's fine.

[redacted] It was actually purchased, you know, right before I started my new job, but I just want to look at February, and I'm going into March. Gentlemen, I cannot pinpoint -- I mean, I know the day that I filed my statement --

INTERVIEWER: Yeah.

[redacted] -- and I -- but I don't know what day that was.

INTERVIEWER: That's fine.

[redacted] I'm going to say March 3rd.

INTERVIEWER: Okay.

[redacted] But I don't know for certain, but?

INTERVIEWER: Okay. But you know that it was February 14th that you -- that you wrote that -- it was a Friday, Valentine's Day, you wrote that statement to the auditor that went to Justice Donovan. It was after that.

[redacted] That is correct.

INTERVIEWER: It was a week -- couple of weeks after that that this happened where Dianne was essentially fired. Right?

[redacted] The words that were used that she was no longer with the Judicial Branch. The word "fire" was never used.

INTERVIEWER: Okay.

[redacted] She's no longer with the Judicial Branch.

INTERVIEWER: Okay. And [redacted] -- after the -- Diane goes to that meeting at the Supreme Court, does she come back to the office, do you know?

[redacted] No, no. There was no -- there was absolutely no sign of her. I know what vehicle she drives and I know where she parked. I never saw anything. And then if my colleagues came to see me and said that she was here, so but I can tell you that when the Justices came over, they -- they were -- they weren't in Dianne's office. They were actually on the other side of the building over by Howard's office and by Judge Christo's office. So I don't think they ever stepped foot in Dianne's office. So no sighting whatsoever.

INTERVIEWER: Does Dianne ever get an opportunity to clean her office out, to take her personal belongings?

[redacted] No. Her -- her administrative assistant actually was the one to collect her belongings with Judge Keating. I never -- I was never asked, I never volunteered. I do remember when Judge Keating came in and he called me in just to have a discussion, he had boxes on the floor. Her treadmill was still in there because she had a treadmill set up right at her desk. I'm not kidding you, treadmill, desk, monitors. And the treadmill had been moved over to the side, there were boxes with stuff in them.

INTERVIEWER: Okay. Do you know how Diane got her belongings?

[redacted] I do not know that. There were people coming to see me offering to drop them off at her house. I said that is not for me to decide. You need to go and see Judge Keating. So I do not how she got her personal belongings and I don't know how that treadmill got back to her house.

INTERVIEWER: Okay. So let me ask you this.

Going back a little bit, before this all happened --

[redacted] Yes.

INTERVIEWER: -- were you aware that Dianne was ever on FMLA?

[redacted] So I was -- Becky Plourde. Becky Plourde told me that Dianne -- and I'm sorry -- Becky Plourde is the payroll manager.

INTERVIEWER: Yeah.

[redacted] She told me that Dianne was out on leave for a bit of time and that when I came on board, she was working part time. I personally went in and looked up the FMLA because I was like, wait a minute, there's absolutely no documentation. You know, how did this happen? Like there has to be some sort of paper trail, because once someone is placed on FMLA, typically there's paperwork that -- there needs to be a letter that goes to the house, you know, accepting the FMLA, follow-up with, you know, physician statement. And there was no paperwork trail. There was something in her medical -- and remember, the Judicial Branch went to electronic personnel files. So in Dianne's medical file there was just the certification of

healthcare provider. There was no other paperwork, just the certification stating from the doctor that she had been placed out on leave.

INTERVIEWER: Okay, that makes sense. So when Justice Donovan said that Dianne was no longer with the Judicial Branch, did you know --

[redacted] [redacted] Yeah.

INTERVIEWER: -- did you know why that happened to her?

[redacted] [redacted] The only -- my thought process was that my -- my statement that I submitted had something to do with that. That was my personal thought. And then when I was told by Justice Donovan that Sean Haggerty was opening up -- was going to be in charge of the investigation, then I knew. So I didn't meet with Sean until it was -- I want to say [redacted] [redacted] [redacted] [redacted], somewhere between February 25th, February 27th, it was -- there was a lag in the time that I met with him, because after Justice Donovan said, go see him, I went to go see him and he looks at me and he goes, I'm not ready for you yet. And I was like, okay, I was told to come see you. He goes, no, I'll let you know when I need to see you. And it

was probably a solid week that -- it could have been closer to two weeks that he -- he finally did call me in to take my statement.

INTERVIEWER: Okay. So and when he took your statement, he had the written statement. All right? Is that right?

[redacted] I do not -- I don't know that.

INTERVIEWER: Okay, all right.

[redacted] I don't know that. He -- he had a folder that he was -- let me just kind of --

INTERVIEWER: Yeah.

[redacted] -- demonstrate. He was like this.

INTERVIEWER: Okay.

[redacted] And then he had a piece of paper. So I had no idea whether or not he had my statement. I didn't ask if he had my statement.

INTERVIEWER: Okay.

INTERVIEWER: And who's this? This is Haggerty?

[redacted] Sean Haggerty.

INTERVIEWER: Sean Haggerty. How long did

you spend with him?

[redacted] It was probably less than 35 minutes.

INTERVIEWER: Okay. So you don't know what -- if there was some conduct that Dianne committed that caused her to be dismissed from her job?

[redacted] So my primary statement was focused on [redacted].

INTERVIEWER: Okay.

[redacted] Okay? So when I met with Sean for the investigation, he was asking me questions directly related to her behavior and the alleged lie that she made to the auditor. To be quite honest with you, there was really no discussion on Dianne because my -- my submission was really about [redacted] and about the -- you know, the harassing environment that I was working in. I was being followed. Every e-mail I wrote, I could not send it until [redacted] looked at it. And then she gave me authorization to send it. So very, very, very controlling environment. So really --

INTERVIEWER: Okay.

[redacted] -- we didn't -- Sean and I

did not discuss Dianne.

INTERVIEWER: Okay.

[redacted] So I had no idea, you know, what that was about and, to be honest with you, at that point in time, it was nothing I was being asked about.

INTERVIEWER: Okay. And were you aware of any other employees who had complaints against Dianne for, you know, for harassing conduct or for --

[redacted] Yeah. Yeah. So there was -- there was a few people that came in to see me. There was [redacted] (ph), he actually was part of the security team. He came in to see me at some point and I don't -- again, all this is in that office, electronic. I kept notes on everything. So [redacted] came in to see me one day and said, you know, [redacted], I made a mistake one day and I told one of my security officers -- excuse my language -- to fuck off, and I got reprimanded for that. And I said, you should have got reprimanded for that. And he goes -- he said, Dianne said that she put a letter in my file and that if I screwed up in the next five years that I would be terminated. He goes, I want to know

what's in my personnel file. And by law, any employee can ask for a copy of their personnel file or, you know, ask to see the information. And I said, could you give me a day to look into this, and I looked at the file and I got back to him and I said, do you want to see your file? He goes yeah. So I sat with him and he goes, where's that document? And I said, I have no idea what you're talking about [redacted], there's nothing in your file about that incident.

INTERVIEWER: Okay.

[redacted] And he goes, why would she do that to me? Why would she do that? I said, I have no idea, [redacted], but I can tell you there's nothing in your file. Then there was another employee, he was in [redacted], he -- he took care of systems. [redacted] (ph), he was in [redacted] and he actually came to see me one day and said that he had an interaction with Dianne that was extremely negative, that he -- that she basically had yelled at him about something and she was just horrid. And I said, you know, is this something recent? And he goes, no, this happened a few years ago but let me

talk -- let me talk to you about the environment. So and then I also had a private conversation with the [redacted]. His name was [redacted], I believe. He told me about some situations that have happened over the past two and a half years, that was the time that I was there, you know, and saying that it had been a very, very hostile environment, that she had made some decisions about hiring some people that were outside of what was approved by the budget. And [redacted] had also told me about some things that, you know, basically saying yes, she hired some people outside of the approved head count. So people basically funneled in to see me and kind of said, this happened and that happened and this happened. You know, people were mad. People were upset. People were intimidated. People were scared. It was a -- as people described, it was hostile, and all I could refer to was my own situation, because that's all I had experience in.

INTERVIEWER: Yeah.

[redacted] All of the other people were coming in and just offloading on me.

INTERVIEWER: Yeah.

[redacted]: [redacted] --

INTERVIEWER: Uh-hmm.

[redacted] -- [redacted]. And I said, [redacted], this happened way before I started. I mean, he was like, [redacted], I'm just trying to give you some history, I'm just trying to tell you what's going on here.

INTERVIEWER: Okay. So did Dianne ever do anything to you directly to make you feel harassed or intimidated? Were you fearful of her?

[redacted] Yes. So Dianne and I were on our way to a meeting with the Union in Derry and we had a conversation, and I'm trying to remember what it was. I don't know if I included it in my statement but there was a conversation that happened in that vehicle and we had another meeting and I referred back to that conversation and she looked at me, and she goes, what are you talking about,

[redacted], that never happened. And I looked at her and I said, Dianne, we were in your Maserati, driving to Derry for this Union meeting. We were talking about this, what -- I don't -- she goes, [redacted], no, what are you talking about? And it was in a bunch -- there was a bunch of people in the room. I felt like a jerk. I'm like, what is happening? But I -- I mean, I'm -- I'm gonna be open and honest here. [redacted]. [redacted]. My mother was living with me (crying) and I would come home and I would say, mom, you're not gonna believe like what happened today. Dianne made you feel very small but I can tell you the thing that really shook me was that conversation that happened in her vehicle and when I referred back to it, she said, [redacted], you're lying, you have no idea what you're talking about, that conversation never happened. So I did have that one interaction.

INTERVIEWER: Okay.

INTERVIEWER: What was that conversation about?

INTERVIEWER: Yeah, that's what I was going

to ask.

[redacted] Gentlemen, I -- I need to -- you got to remember, I came into this meeting today with nothing. Everything I've kept in my interactions with the New Hampshire Judicial Branch was documented at the Judicial Branch on company computers. Nothing came home with me. Nothing was on my personal stuff.

INTERVIEWER: Yeah.

[redacted] I have -- and you got to remember, I've been through hell (crying).

INTERVIEWER: Yeah.

INTERVIEWER: Uh-hmm.

INTERVIEWER: Yeah, no, we get it. It's perfectly understandable. I'm sorry.

[redacted] Yeah, no, it's okay. I just -- I feel bad because --

INTERVIEWER: No, don't feel --

INTERVIEWER: No, no, no, no.

INTERVIEWER: -- bad. No, don't feel bad at all. You have nothing to feel bad about.

INTERVIEWER: [redacted], by chance, do you recall what it was that [redacted] lied about to the

auditor?

[redacted] So there was a -- there was a question on the checklist that said, are you in compliance with federal and state postings. And I knew that we weren't. And she looked at the auditor and said, yes, I personally went around and updated all of our locations, all 37 of them myself. And I knew for a fact that was a lie. And that's what started it, gentlemen.

INTERVIEWER: Okay. So, all right. So now this meeting with Justice Donovan, the whole staff where he said she's no longer working here, you then have that follow-up meeting with the Judges, we talked about, Countway and Donovan and Howard and --

INTERVIEWER: Christo.

[redacted] Christo.

INTERVIEWER: -- Christo and Erin Creegan. And then so Dianne, is Dianne gone? Do you ever see her again? Does she come back to the Judicial Branch?

[redacted] No.

INTERVIEWER: Okay.

[redacted] Never comes back. Her

badge was actually deactivated.

INTERVIEWER: How do you know that?

[redacted] I called down to security and said, have you been alerted that Dianne -- that we need to deactivate Dianne's badge and I was told it was already done. And that was from Jason.

INTERVIEWER: Jason Jordan?

[redacted] Jason Jordan. Thank you. Yeah.

INTERVIEWER: Okay. Do you know what her status was? Was she put on paid leave from that day on?

[redacted] She was and what happened was Becky Plourde, the payroll manager, came to me after this, after I got finished with the Justices and said, how should I -- how should I categorize Dianne in the system. I went back to see -- I went to go see Donovan and I said, Justice Donovan, how should we classify Dianne, should we continue to, you know, put her on the payroll, and he said yes for now, keep her on the payroll.

INTERVIEWER: Okay. Now you're -- are you going over to the Supreme Court to meet with Justice

Donovan?

[redacted] (Inaudible).

INTERVIEWER: He's coming over to AOC?

[redacted] This was all the same -- this was the same day --

INTERVIEWER: Same day.

[redacted] -- that they did the --

INTERVIEWER: Okay.

[redacted] Yes, it was the same day because they -- they were -- they had some personal meetings that I wasn't involved with and I ran back down and I said, how should we classify this, and I was, you know, basically -- Justice Donovan said, keep her on the payroll. And then Justice Howard pulled me aside and he -- he goes, [redacted], you know, there's a lot of priorities that I need to get you going on, there's some people that are not going to agree with me. And he says to me, you need to get rid of that fucking MOU. And I said, the MOU? Because at this point --

INTERVIEWER: Yeah.

[redacted] -- I know about the MOU. And I said, is that the MOU with the Personnel

Branch, and he goes yeah, get rid of it, [redacted]. He goes, it's none of their fucking business what we do over here at the Judicial Branch, and you know what, that should have never been done, they're into our business, they have access to our information and get rid of it. And I said, okay, I'll make that a priority when Judge Keating comes in. He goes, I don't care what you have to do, get rid of it.

INTERVIEWER: Okay.

[redacted] So --

INTERVIEWER: Yeah.

[redacted] Yeah.

INTERVIEWER: Okay. So Dianne is put out on paid leave. All right.

[redacted] And [redacted], both of them.

INTERVIEWER: And [redacted]. All right. So now go forward, like about a month or so, and then you were talking about this whole plan to lay her off and rehire her.

[redacted] Correct, sir.

INTERVIEWER: Who told you about that, that she was going to be laid off? Was that Keating?

[redacted] That is Judge Keating.

INTERVIEWER: Okay. And tell me again how he explained that, like why she was being laid off.

[redacted] So I was told that she needed access -- this is coming from Judge Keating. She needed access to some money and, you know, I needed to find a way how to make this happen and she wasn't -- we could not allow her to lose her benefits [redacted]. So that's when I was trying to look through the Personnel rules. I was trying to look at -- try to find some information that we had some consistent practices. And when I couldn't find anything, Judge Keating came back to me and said, can you just make a phone call and make it as discreet as possible. That is a quote. "Make it as discreet as possible. I don't want them knowing what we're doing but you need to figure this out".

INTERVIEWER: When you say "them", who does he mean by "them"?

[redacted] He means the Department of Personnel and --

INTERVIEWER: All right. So they were

trying to -- so do you know what he means when he said that Dianne needed access to money?

[redacted] Yeah. What he was referring to was when someone leaves the Judicial Branch, after a certain number of years, they earn part of their salary for like a -- it's like an exit bonus.

INTERVIEWER: Okay.

[redacted] So he said if we were to lay her off, [redacted] --

INTERVIEWER: Right.

[redacted] -- will she have access to that money. And I said, it's not in the Personnel rules, how do you want me to verify this. He's like, you need to -- you need to try to get ahold of somebody but do it as discreet as possible, don't let them know what we're doing.

INTERVIEWER: Okay.

[redacted] So that prompted my phone call to Matthew.

INTERVIEWER: Yeah.

[redacted] And basically I book. I said, something's going on here and it is -- I don't

think that it's -- I believe that it's not legal. I believe that the taxpayers of New Hampshire are basically almost defrauded in a way and I said, I'm not comfortable, and that's when I explained to him what was going on. And he said, do you mind if I take notes. I said no.

INTERVIEWER: Yeah, yeah.

[redacted] I said, you know, my biggest issue right now is protection and he said, [redacted], you know, this is serious. And I said, I know how serious it is, that's why I'm having this discussion with you. I'm supposed to be figuring this out to find a way but I'm telling you right now I need to tell you what's going on.

INTERVIEWER: Yeah. But -- but did Keating -- did Keating tell you why she needed access to money? Like was there something going -- I know that she needed health insurance benefits to continue [redacted]. But why did she need access to money?

[redacted] There was no detail around that other than she needed that money.

INTERVIEWER: Okay. All right.

[redacted] That's all -- that's all that was said to me, she needs -- she needs access to that money.

INTERVIEWER: And did Keating -- was Keating saying, well if we lay her off -- was he saying if we lay her off and rehire her, was that always the plan to lay her off and then rehire her? Did he talk about that at that time?

[redacted] No.

INTERVIEWER: No. Just her lay off?

[redacted] No. So -- yeah. So if you were to go back and pull all six or seven versions of these letters --

INTERVIEWER: Yeah.

[redacted] -- you're going to find a theme that there's a change. There's a change of how we're going to do this.

INTERVIEWER: Uh-hmm.

[redacted] And when the Chief came back that sixth or seventh time to Judge Keating, because remember, Judge Keating is saying this is saying from the Chief, [redacted] filing this piece of paper across the desk to me.

INTERVIEWER: Yeah.

[redacted] And it's all written -- it's got red on it, it's got blue on it, it's crossed out. And basically when I'm being told to revise this letter again, that might have been version four, that it was going to be a layoff and a rehire and that, [redacted], you need to figure out how to make this happen and that she can get these monies.

INTERVIEWER: Yeah.

[redacted] And the final -- the final version was the accelerated salary because she wasn't happy with -- I think it was 150,000 we finally -- it finally came to like 156,000 or something of that nature. So if you were to go back and pull all those versions of the letter --

INTERVIEWER: Yeah.

[redacted] -- you're going to see all those changes.

INTERVIEWER: Okay. Was it clear from Keating that this was -- this was what the Chief Justice wanted?

[redacted] Yes.

INTERVIEWER: And could you --

[redacted] The words --

INTERVIEWER: Yeah, go ahead. The words were what?

[redacted] So the words were, "This is not my idea, this is coming from the Chief".

INTERVIEWER: Okay. And by the Chief, you understood that to mean Gordon MacDonald?

[redacted] That is correct.

INTERVIEWER: Okay.

[redacted] We never used -- we never used Chief Justice MacDonald. We always used Chief Justice or Chief.

INTERVIEWER: Yeah. Okay. And were these drafts that were going back and forth, you said there was handwriting on it, there was stuff. Could you -- could you tell whose handwriting it was that was making the edits to the --

[redacted] It was Judge Keating's writing.

INTERVIEWER: Okay.

INTERVIEWER: Okay.

[redacted] There was at one point in time on one of the documents up in the corner, there

was some chicken scratchings --

INTERVIEWER: Yeah.

[redacted] -- and when I saw it, I said, that's not Judge Keating's handwriting but I could not say whose it was.

INTERVIEWER: Okay. But did Keating ever say to you that the Chief had looked at these, the Chief had been making edits to the letters?

[redacted] He said that he was discussing these with the Chief.

INTERVIEWER: Okay. Okay.

INTERVIEWER: You said that he said, this was not my idea, it's the Chief's idea, was he -- did he give --

[redacted] Yes.

INTERVIEWER: -- you the impression that he didn't think this was a good idea, that Keating didn't think it was a good idea to do it this way or is that not part of it?

[redacted] The only thing I can tell you is body language and the tone of the voice.

INTERVIEWER: Yeah.

[redacted] And you got to remember,

I'm a 30 year HR professional.

INTERVIEWER: Yeah.

[redacted] I've done hundreds of investigations. You could tell by Judge Keating's body language that he's just saying, [redacted], just do this, just do this, this is the Chief, man, just do it.

INTERVIEWER: Yeah.

INTERVIEWER: Okay. Okay.

INTERVIEWER: Hey [redacted], so back when Justice Donovan brings everybody together and, you know, I know that he never said that, hey Dianne Martin is fired, that never comes up. But he does say, she no longer works at the Judicial Branch. Now --

[redacted] Yes.

INTERVIEWER: -- we go, you know, a month, month and a half later and she's coming back now.

[redacted] That's right.

INTERVIEWER: Have you ever heard why the change of she's no longer going to be employed at Judicial Branch but now we're going to do this other thing where we're going to lay her off and bring her

back? Why -- what happens?

[redacted] Okay. So -- so if you don't mind, I'm picking back up my calendar, gentlemen.

INTERVIEWER: Yeah.

[redacted] So basically Judge Keating comes to see me, I believe it might have been a Thursday. Let me just go back here. Because this is before the letters start getting written. I want to say it was around the mid March timeframe, maybe March 17th, around that timeframe, he came in to see me, it was late in the afternoon, 4, 4:30. He closed my office door. Becky Plourde worked from home. So I shared an office with her. He closed the door, sat down and said, I have something to tell you, the investigation found no validity in Dianne or [redacted] behaviors, therefore, they're both coming back. And end of conversation. And I said, well when are they going to return, and he goes, so they are both effective to come back. It was Monday -- I want to say it was like the 31st but we -- I had to tell Becky to take them off of like a leave status, a paid leave status and, you know, she said to me,

what's going on. And I said, I really don't want to talk about it. She knew that I was upset and she said, oh, [redacted], I'm -- you know, if you need to talk, let me know. And, you know, Becky had a good relationship with Judge Keating. So there's a lot of conversation happened between that office and her. But I can -- I can tell you that [redacted] came back to the office for one week. She -- I told Judge Keating I was not comfortable reporting to her. I was not comfortable interacting with her. And he goes, [redacted] I've made it so that you don't have to interact with her, she is to come through me for everything. And they took away security piece after security piece after access piece. This woman was stripped of everything, gentlemen. She came into the office for one week and then she put in for -- she came in with a doctor's note and said that her doctor was taking her out of work. And I had FMLA documentation sent to her. And within that week that she was out on medical leave, she submitted her resignation and it was -- I think it was going to be effective the -- I want to say like April 1st or something of that nature but -- no, I'm sorry. It

was going to be April 14th that it was going to be effective and then two days later [redacted]. But, I mean, I can definitely tell you that she only spent a week at work. She went out on medical leave and then she gave her resignation during her medical leave. Dianne never came back to the office. I was told by Judge Keating that she was working from home strictly and that she would not come back to the office and that she would only have to report to the office if there was a meeting that she needed to attend.

INTERVIEWER: Did he explain why that was the case with Dianne?

[redacted] He did not explain it nor did I ask.

INTERVIEWER: Okay. So I think you said in the beginning of this you thought you left the Judicial Branch around the 13th or so. You weren't sure of the exact date of April.

[redacted] So Judge Keating came to see me on -- it was on Wednesday the 16th.

INTERVIEWER: Okay. 16th of April?

[redacted] Yeah. Yeah.

INTERVIEWER: Okay.

[redacted] 16th of April, came in to see me with a letter. Actually I was asked to -- it was by the administrative assistant to report to his office at like 2:30 or something, 2 or 2:30, I had been working all day. I went in, I thought I was meeting with him on, you know, just the state of the business. He hands me a letter and he goes, don't read it now but you're being released, you know, hand me your keys. And I handed him my keys and he goes, we'll get your personal stuff. I said, no, I want to get my personal stuff. And he goes, I don't want you to cause any problems. I looked straight at him and I said, what problems am I going to cause? And I said, I don't have much at my desk, I have my personal pictures, I have some food. He goes, as long as you're not going to cause any problems, you can go back. And just the attitude, like I was some predator, like some, you know -- you know, he hadn't spoken to me in three days and then Becky Plourde came in around 11 o'clock on the 16th. She had -- she was actually on vacation. She came into my office with her dog and she goes, why does Judge

Keating need to see me. And I said, well he hasn't spoken to me in three days, he's probably going to terminate me. And she went into his office and I heard her screaming, crying, arguing. Because you could hear right through the walls. And I said, that's it, today's my last day. And then when I went in there, I had my -- I had this with me. This is my notepad that I carried for 20 years. It's a leatherbound notepad. And I went in there and sat down and when he said that I was done, I said -- and in my head I'm going, yeah, I could read the room like a book.

INTERVIEWER: Did he tell you why -- did he tell you why he was letting you go?

[redacted] He said that my behavior was not professional and that I was a disgrace. And I said, can I read the letter? He goes, you can read it later, I'm just telling you right now. And I said -- I said, do I have any rebuttal, and he goes, absolutely not. He goes, you know, the unprofessional behavior. And I just looked at him and I said, what? I said, do you want to discuss unprofessional behavior? He goes, no, I don't want

to discuss anything with you. He goes, I'll let -- her name was -- oh, I don't remember her name. But she -- she -- Judge Keating said, as long as you don't cause any problems, I'll let you go in and get your stuff. And I had a Carhartt bag that I brought in every day, it had my lunch in it, had food and stuff and snacks. And I took my Carhartt bag and I just started putting my stuff in it and she goes, I'm so sorry, [redacted], I'm so sorry. And I looked straight at her and I said, you don't need to say a word, I said, I will get my stuff and get out of here. And she's helping me. And I went to the -- I went to the stairwell and Judge Keating is standing there with his hands in his pocket with a smirk on his face and I looked straight over at him and I just nodded my head and I went into the elevator and I went down and I left.

INTERVIEWER: Do you know what behavior Keating was referring to that was not professional?

[redacted] He didn't specify anything. I can tell you that the Thursday before I had a meeting with Heather Kulp.

INTERVIEWER: Oh yeah.

[redacted] She had called me -- she had a meeting -- we had a meeting on recruiting and I was explaining to her my frustration that I had asked for help, I had gotten no help, I don't understand how they can run this HR Department on two people. You know, and I just basically vomited, like I vomited. I said, you know, with Dianne coming back and, you know, this is just crazy, this is absolutely insane, and I am letting loose, guys. I am -- I am upset, I am crying. And Heather goes, [redacted], it's probably good that you just get all this out because -- and I looked at her straight and I said, I have no one to talk to, I have no one to talk to. I feel like I have been, you know, basically put in the position of being a scapegoat and I basically said that I fear for my job, that I am losing sleep, that I drag myself in here to work 10, 12 hours a day just to be kicked in the teeth. Guys, I unloaded. I'll be absolutely a hundred percent honest with you. And I have a feeling she went back to Judge Keating and said, [redacted] is not happy.

INTERVIEWER: Yeah.

[redacted] And I think that's what he

was referring to.

INTERVIEWER: Did the letter that he gave you --

[redacted] Because I --

INTERVIEWER: Did the letter that he gave you have any further explanation other than what he told you at that meeting?

[redacted] No. It said that my behavior was unbecoming, unprofessional and that it won't be tolerated. And I have a copy of the letter. It's in my safe. I'll be honest with you guys, I didn't read that letter for a week.

INTERVIEWER: Uh-hmm. Yeah. Do you know if Judge Keating knew that you went over to see Matt Mavrogeorge on March 18th? Like that was almost a month before.

[redacted] I never -- I never told him that I -- I never told Judge Keating that I told Matt about the layoff and the rehire.

INTERVIEWER: Okay.

[redacted] I told him that I spoke to Matt about how to get around and how to maneuver this but I never disclosed to Judge Keating that I

disclosed to him that I felt as though that this was wrong.

INTERVIEWER: But somebody else could have, right? If you met with Matt Mavrogeorge, you know, he may have told his superior, Lorrie Rudis.

[redacted] He told me he was going to tell -- yeah, he told me he was going to tell -- he goes --

INTERVIEWER: Right.

[redacted] -- he said to me, [redacted], I can't keep this a secret. I said, no, I don't expect you to --

INTERVIEWER: Right.

[redacted] -- you need to report it.

INTERVIEWER: But is it --

[redacted] And I never heard from him again.

INTERVIEWER: Isn't it possible that he, Matt Mavrogeorge told Lorrie Rudis, Lorrie Rudis may have told Judge Keating or -- because Lorrie Rudis now has your job. You know that? She was hired to be the HR Director.

[redacted] No, I don't know that. I

never asked any questions.

INTERVIEWER: Yeah.

[redacted] Because my -- you know, I'm a professional. I don't pick up the phone and go, well what's going on.

INTERVIEWER: Yeah.

[redacted] When I left there, I severed ties. The only person that I was in contact with was -- hold on. She was -- she was Becky Plourde's assistant to Payroll. So she was texting me, she said, [redacted], you left your plants here, you left your fan here. And I had some -- I had some professional stuff that I left with Juliana Durand and she said, how do you want me to get this stuff. I said, well if you want to meet up, I'll grab it. And I never met up with her. So she was the only person I was in contact with. And then I can tell you that Lee Robinson reached out to me, the IT person.

INTERVIEWER: Yeah.

[redacted] He got my telephone number from the system. I never gave him my cell phone number. And I said, how did you get my number? He

goes, oh, I looked it up in the system.

INTERVIEWER: Yeah.

[redacted] And I said, oh okay. He goes, how are you doing? I said, I'm devastated, I'm completely blown away. He goes, [redacted], you are just an outstanding person, you didn't deserve this. And so I had Lee reach out to me, I had that assistant payroll person reach out to me, Juliana Townes. [redacted] is her maiden name. She reached out to me but I wouldn't return her message. And then there was -- oh, one of the other people that was working for Dianne -- my god, I forgot his name -- but he reached out to me and asked me how I was doing. And I said that I was hanging in there and I said, stay strong, keep your head down, you know, keep working hard. But the only person I had extended conversations with was the -- Becky's assistant there, and she was just trying to meet up with me to get my stuff back. And I never met up with her and I never got my stuff back.

INTERVIEWER: Yeah. Okay.

[redacted] My decision, by the way.

INTERVIEWER: Yeah. So when you met with

Matt Mavrogeorge in March, March 18th, you told him then that you knew that they were trying to rehire Dianne into this role at the Board of Bar Overseers? Right?

[redacted] Yes.

INTERVIEWER: How did you --

[redacted] That's correct.

INTERVIEWER: How did you find out about that? Who told you about that? Was that Chris Keating as well?

[redacted] That's Judge Keating.

INTERVIEWER: Okay. And that was the deal where she'd be laid off and then rehired a couple of days and he told you that was -- that was the Chief's plan, Chief Justice's plan?

[redacted] That's correct. That was correct.

INTERVIEWER: And they also -- you also like told Matt about the pay step that she was -- you know, they were contemplating what pay step they could give her, like the step nine, right?

[redacted] That's correct.

INTERVIEWER: Okay. So that was -- that was

in March. It looks like all of that happened in early April before you were let go, right? She was --

[redacted] That's correct.

INTERVIEWER: -- laid off. There was a letter. Looks like a letter from Keating which was -- to Dianne, which said she was being laid off. And then there was a rehire.

[redacted] Correct.

INTERVIEWER: Were you involved in --

[redacted] That's correct.

INTERVIEWER: Were you involved in any of that, writing those letters or working with Keating on the --

[redacted] Yes.

INTERVIEWER: Okay.

[redacted] Yeah. There were six or seven versions of those letters that were done by me.

INTERVIEWER: Okay.

[redacted] Every time that I gave the new version --

INTERVIEWER: Yeah.

[redacted] -- of the letter to Judge

Keating, he came back with a marked up version and said --

INTERVIEWER: Okay. Okay. All right. Yeah.

[redacted] And then I would resave the document with version two, version three, version four, version five.

INTERVIEWER: Yeah.

[redacted] So there's a consistent -- you can notice the changes that if you print all those letters.

INTERVIEWER: Okay.

INTERVIEWER: But you don't have those letters now?

[redacted] No. Oh no, sir. Inspector Tracy, there is one thing that I -- that you do not do is you do not take any company documents with you.

INTERVIEWER: Right.

INTERVIEWER: Yes, right.

INTERVIEWER: So it looks like that you may have said to Matt that the idea of this layoff was -- Dianne was insisting on it, I guess, because she

wanted the payoff, right?

[redacted] That was -- yes.

INTERVIEWER: Yeah. Okay. Do you -- did you have anything to do with calculating the amount of the payoff?

[redacted] So I did a rough estimate because Becky Plourde had sent me the template -- this was for another employee. This has nothing to do with Dianne. So I already had the template. I went into the template and I put in the number of years and it came out with a dollar figure. I went ahead and --

INTERVIEWER: Okay.

[redacted] -- sent that as a -- I did a cut and paste and I sent it -- I e-mailed it over to Judge Keating and said, this is a rough estimate but it hasn't been verified by payroll.

INTERVIEWER: And do you remember what your rough estimate was?

[redacted] About 52,000.

INTERVIEWER: Okay. And was that -- but was that just for her service in the Judicial Branch or was she -- was she claiming service when she worked

for the Executive Branch as well?

[redacted] Okay. There is a Personnel rule that indicates that I believe it's State years of service, I'm trying to remember, but I believe it might have been 17 years of service, if I recall correctly. But I don't know what that included because I never -- I never looked at her work history, I never went into her file and said, oh she did a number of years here. All I did was go into the system and say, okay, this is the date I should be using, plug that into the spreadsheet and there was a formula in there -- because you put the salary, you put the years and it calculates what that payout would be.

INTERVIEWER: Okay. So for her payout, it was 54,000 I think and 836 dollars. Most of it is annual leave, it was $27,386 in annual leave. And then there's sick leave, $16,162. And then there's this termination pay, which I think is the longevity pay, which is only $6,000.

[redacted] Yes.

INTERVIEWER: And so how were you able to verify that the annual leave and the sick leave was

as much as it was? How did you do that?

[redacted] So -- so you go into the accrual system and basically it gave you what the amount was that she had for like PTO, and then the sick, and then the termination pay was -- that's that calculation in that spreadsheet.

INTERVIEWER: Okay. So you -- so you know -- you know that before Dianne went to the Judicial Branch, she was in the Executive Branch, she worked here at DOJ, and then she worked at the Public Utilities Commission.

[redacted] I knew that she worked for the DOJ. I knew she worked for the Energy, and that was all just rumor. Like people came in and said, did you know that she worked here.

INTERVIEWER: Yeah.

[redacted] And what I did was one night at home, I Googled her.

INTERVIEWER: Yeah. Okay.

[redacted] And I just read up on where she worked.

INTERVIEWER: Right. But when you were counting her years of service, you were counting all

those years, right, that she worked for State service?

[redacted] I went into the system and it told me years of service and that's when I did the estimated calculation. That, I will tell you that needed to go into Payroll, and Payroll was to verify what those figures are.

INTERVIEWER: Right.

[redacted] Because all I can do is a rough estimate. Payroll is the -- those are the people that actually do all the final payout calc. What I was trying to give Judge Keating was the estimate. He's like, I need an estimate of how much this is going to be. I said, I don't know until I verify with Becky. He goes, don't talk to Becky yet, just give me -- just give me a number, [redacted]. So that's when I took the draft of the termination Excel spreadsheet and I put the stuff in it and said, okay, here's a number. And I believe it was around $52,000.

INTERVIEWER: So would it surprise you to know that when Dianne left the Public Utilities Commission that she cashed out her time already?

[redacted] I wouldn't know that.

INTERVIEWER: So she got a -- she got a check in December of 2021 for $10,619 and then she got another $49,000. So now we're almost at $60,000 of payout. So --

[redacted] Gentlemen, if I knew that, I would have reported it. (Crying.)

INTERVIEWER: Yeah, okay. Because who -- did somebody give you the number of years that she had for service? How did you --

[redacted] I went into the system.

INTERVIEWER: Okay.

[redacted] I went into -- I went into the HRAS, pulled the years of service, because that's how you calculate the termination pay.

INTERVIEWER: Yeah.

[redacted] Then I went into the accrual system and I pulled the vacation, PTO, and I pulled the sick time, and I reported back on a spreadsheet, took a snapshot of it, sent it to Judge Keating. And I said, you probably need to verify this with Payroll because all I can do is give you an estimate. I don't do that calculation. HR does not

do the final calc.

INTERVIEWER: Right. Why -- so why wouldn't somebody had talked to the Division of Personnel because they would have been able to pull her payroll from when she left the Executive Branch to see if she got paid out?

[redacted] I'll be honest with you, I was never -- I was never told that to verify whether or not she had any other payouts or anything of that nature.

INTERVIEWER: Okay.

[redacted] I was never ever told that.

INTERVIEWER: Okay, all right. I get it. And was there -- I mean, if she was on leave, right, you talked about her -- she was working part time, she was on leave. Was there a system to track her leave? Were you able to go in and say, yeah, you know, she's working part time, she's taking leave?

[redacted] Yeah.

INTERVIEWER: Because it seems to me she worked at the Judicial Branch from -- looks like from about January of 2022 is when she started to April --

to April of 2025. So that's three years, right? And so, to accumulate $27,000 of annual leave, I'm assuming she's taken vacations during that time while she's working at the Judicial Branch, and another $16,000 --

[redacted] I'm assuming.

INTERVIEWER: -- of paid sick leave when she was on sick leave, taking FMLA, I mean, where did those -- where do those figures come from?

[redacted] Okay. So it was -- it was -- again, this is Becky Plourde. So when someone goes out on medical leave, I had to update the Payroll Department and say, Bill Smith went out effective April 14th, 2025, and then once I got the note to say that Bill Smith is released to come back to work on May 5th, 2025, I would let Payroll know. Then the Payroll Group, whatever they did, they did. All HR -- all I was responsible for, what I was told, was I needed to get those dates of when people were out, give them to Payroll and Payroll puts them into the system. HR does not do that.

INTERVIEWER: Okay.

[redacted] It was all done at the

Becky Plourde level.

INTERVIEWER: Right.

[redacted] So when -- when -- I never saw that stuff. I --

INTERVIEWER: Yeah. So is it done basically on the honor system? Like if Dianne was taking some sick time, would she just report it to somebody and eventually put it in the system?

[redacted] No.

INTERVIEWER: How would you know that she was out on sick time?

[redacted] So the only people that knew that she was out on sick time, I believe was like [redacted], Sean, because Sean and [redacted] were the assistant directors and they were -- they were running the Branch while she was out. And of course, I'm assuming that Chief Justice MacDonald knew because she reported directly to him. Now, when I was hired, she was still on a part-time basis but I didn't know enough at that point to go, oh wait a minute here. There was just so much coming at me and I was working alone with an HR coordinator. That's all I had.

INTERVIEWER: No, I get it. But it seems like just in the Judicial Branch it was pretty loose, right, that people, you know, took time off, there was no reporting --

[redacted] Correct.

INTERVIEWER: -- but the problem is, that they were allowed to accumulate sick leave and annual leave and then cash it out.

[redacted] That's correct.

INTERVIEWER: It's, you know, $40,000 of unused leave that may all be bonus.

[redacted] I would have to -- I would hope that there were true records but I can tell you that, you know, there were days I walked around and I'm like, hey, where's so and so today, oh, they're on vacation. And then I would go upstairs and I'd be like, how the heck did that happen.

INTERVIEWER: Yeah.

[redacted] And then I would say -- then I would say to my colleague on the other side of the cubicle, hey Becky, does everyone report their time? Oh, they're supposed to, [redacted].

INTERVIEWER: Yeah.

[redacted] And then I would send a note to the manager and I'd be like, hey manager, isn't this supposed to be reported through the system? Well, it's supposed to be.

INTERVIEWER: Yeah. Okay. It wasn't. I mean, it's just a terrible system. So you -- in total, you were only there for, what, five months --

[redacted] Five months.

INTERVIEWER: Yeah. Okay.

[redacted] That's correct, sir.

INTERVIEWER: Yeah.

[redacted] Yeah. I was released a month before my sixth month probationary period.

INTERVIEWER: Yeah. Yeah. Great, huh?

[redacted] Yeah. Let me just tell you that if I needed a morning off or a doctor's appointment --

INTERVIEWER: Yeah.

[redacted] -- I was reprimanded one day that I came in an hour later than my scheduled time --

INTERVIEWER: Yeah.

[redacted] -- and I was written up

for it.

INTERVIEWER: By whom? Who did that?

[redacted] By [redacted].

INTERVIEWER: [redacted]. Yeah.

[redacted].

INTERVIEWER: Yeah.

[redacted] I have that e-mail, by the way. I sent it home to my personal e-mail. That's the only thing I kept.

INTERVIEWER: Okay.

[redacted] Because it was -- it was something to my personnel file.

INTERVIEWER: Yeah. Could we -- if I could just circle back. I realize you don't have the report that you gave to the auditor that went to Justice Donovan but --

[redacted] I don't, sir.

INTERVIEWER: -- you mentioned that there was reference to [redacted] telling the auditor that the employment postings were up to date, even though you knew that not to be the case. Do you remember anything else that was in there besides that? Were there other allegations that were in that?

[redacted] So that expanded to where she told the auditor that she personally, I quote, "personally went around to every location and updated them", which I knew was not true.

INTERVIEWER: Yeah.

[redacted] I believe that I did indicate in that letter, there was something about that conversation I had with Dianne in her vehicle that day and that she basically told me I was full of crap during a meeting. I believe that there might have been something else in that statement that I wrote. I know there was more, because I --

INTERVIEWER: Okay.

[redacted] -- I had been through quite a few things. I also indicated in that statement that I was being watched, I was being followed around by [redacted]. I believe that I did indicate that as well and I felt like I was working in a hostile work environment.

INTERVIEWER: Okay. But like you said, most of your complaints were directed to [redacted], not so much --

[redacted] That's correct, sir.

INTERVIEWER: Not so much to Dianne, yeah.

[redacted] That's correct.

INTERVIEWER: Yeah.

[redacted] Yeah.

INTERVIEWER: Okay.

INTERVIEWER: Hey [redacted], how do you know -- how do you know [redacted] was lying about the updates in that she didn't personally --

[redacted] Because I called around to a couple of the locations. Also too, I walked -- I walked to the areas where we had postings at One Granite Place. Nothing had been updated. And I -- I asked Juliana, I said, Juliana, do you know if she personally went around to the locations? And she said, no. And then I checked with Becky Plourde and I said, Becky, was there mileage recorded for [redacted] for going around to all the locations? And she goes, no, there wasn't any expense report for anything for that. And I said, okay. And that's when I knew that she had lied.

INTERVIEWER: So these 37 locations, they're not 37 locations here at One Granite Place. They're 37 locations throughout the State of New Hampshire?

INTERVIEWER: All the courthouses basically.

INTERVIEWER: Yeah, courthouses.

INTERVIEWER: Yeah.

[redacted] That is correct. All the courthouses, so Circuit, Probate --

INTERVIEWER: Yeah. Superior.

[redacted] Yes.

INTERVIEWER: Yeah.

[redacted] Superior. Thank you.

INTERVIEWER: Okay. Well, we've been going a long time and you're probably tired of answering our questions.

[redacted] Yeah. I mean, if you have more for me --

INTERVIEWER: Yeah.

[redacted] -- I told Inspector Tracy when he called me last week that I am willing to answer any questions you have. (Crying.)

INTERVIEWER: Thank you.

INTERVIEWER: We really appreciate that.

INTERVIEWER: We really do. And again, I am so sorry that you've been through all of this. If we do have questions though --

[redacted] Thank you.

INTERVIEWER: -- it sounds like you'll be okay if we had questions, Dick could call you and we could either go on this again or he could just ask you questions to clarify some things.

[redacted] Oh --

INTERVIEWER: Okay.

[redacted] -- there's absolutely no issues whatsoever. During the -- during the day I'm pretty busy here with my new job.

INTERVIEWER: Yeah, sure. Yeah.

[redacted] But when -- the best -- the best way to get ahold of me would be text message, because I --

INTERVIEWER: Okay.

[redacted] -- my text messages read out to me because [redacted]. So I kind of keep an eye on text messages.

INTERVIEWER: Yeah.

[redacted] But my personal e-mail, I don't check until I get home at night.

INTERVIEWER: Okay. So and don't forget

that if you get a new cell phone number, you update -- let Dick know. Yeah, that would be important to find you.

[redacted] There's no doubt that I will update --

INTERVIEWER: Okay.

[redacted] -- Inspector Tracy with my number as soon as I --

INTERVIEWER: I don't mind being the second person you update after you tell your mother.

INTERVIEWER: Yes.

[redacted] My mother.

INTERVIEWER: Right.

[redacted] My -- she is my everything.

INTERVIEWER: Yeah, yeah.

[redacted] Yes. And my e-mail will not change. It will be [redacted] (ph). I do plan on keeping that.

INTERVIEWER: All right. You have her e-mail?

INTERVIEWER: Yeah.

INTERVIEWER: Okay. [redacted], we can't thank

you enough. This has been enormously helpful. We really appreciate it.

[redacted] Absolutely.

INTERVIEWER: I hope your new job is excellent and everything you hope it to be. I hope this place in [redacted] is a nice place to live.

[redacted] It is. (Laughs.)

INTERVIEWER: And we wish you nothing but the best.

INTERVIEWER: What are you closest to --

[redacted] Thank you.

INTERVIEWER: -- [redacted]?

[redacted]. I'm 35 minutes from [redacted].

INTERVIEWER: Oh okay, nice.

INTERVIEWER: Oh, that's great.

INTERVIEWER: Nice town. Yeah, yeah.

[redacted] Yeah. Yeah. And I will tell you they are treating me like a queen.

INTERVIEWER: I bet. They should. Is there anything else that you want to tell us that we haven't asked you about?

[redacted] I mean, right now with the

emotions and everything, the only thing that I was very concerned about was the MOU, the re -- I'm sorry -- the layoff and rehire of Dianne --

INTERVIEWER: Yeah.

[redacted] -- the hostile work environment that I was working in.

INTERVIEWER: Yeah.

[redacted] That was my real primary concerns that I wanted to make certain that we spoke about today.

INTERVIEWER: Great. Great.

INTERVIEWER: And we did.

INTERVIEWER: And if you think of anything else though, you know how to get in touch with Dick.

[redacted] Yeah.

INTERVIEWER: So you can reach out. If after we hang up, you think, oh wait, there's something else, he'll be right there.

[redacted] Certainly.

INTERVIEWER: Of course.

[redacted] I certainly -- I certainly will. But, you know, if you need any documentation to back up what I have said --

INTERVIEWER: Yeah.

[redacted] -- it is in electronic form.

INTERVIEWER: Okay.

INTERVIEWER: Awesome.

INTERVIEWER: Great, okay. Thank you so much.

INTERVIEWER: Thank you.

INTERVIEWER: All right. Thanks.

[redacted] Thank you. Thank you.

INTERVIEWER: Yeah, bye-bye.

INTERVIEWER: Goodbye.

INVESTIGATOR RICHARD TRACY: All right. We're going to shut this off. It's 5:12 p.m.

(End)

CERTIFICATE

I, Lisa Caron, a court—approved transcriptionist, do hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceeding in the above—entitled matter to the best of my professional skill and ability .

Lisa Caron
Avicore Reporting